**Supplemental Complaint**

**Exhibit Index**

**"Other" Document Types Cited**

| Document Order | Document Name | Link (if applicable) |
|---|---|---|
| 1 | Transcript from October 1, 2020 Hearing in *Sweet v. Cardona* (related to ECF No. 141, the zoom chat transcript). | n/a |
| 2 | Order re: Preliminary Injunction, *Calvillo Manriquez v. DeVos*, Case No. 3:17-cv-07210 (ND. Cal., May 25, 2018, ECF No. 60). | n/a |
| 3 | **Premier Education group Litigation:** Complaint, *United States v. Premier Education Group* (2016 WL 2747195) | n/a |
| 4 | **Premier Education group Litigation**: ECF No. 222 | n/a |
| 5 | **Premier Education group Litigation**: ECF No. 224 | n/a |
| 6 | **Premier Education group Litigation**: ECF No. 229 | n/a |
| 7 | **Premier Education group Litigation**: Jeanette DeForge, Agreement with AG Forces Premier Education Group Out of Massachusetts; Salter College, Others, to Forgive $1.6M in Student Debt | https://www.masslive.com/news/2019/07/attorney-general-agreement-to-shut-down-5-colleges-statewide-cancel-students-debt.html |
| 8 | Borrower Defense to Repayment Application – OMB No. 1845-0163 | https://studentaid.gov/sites/default/files/BD-General-Application-Form.pdf |
| 9 | Borrower Defense to Repayment Application – OMB No. 1845-0146 | https://studentaid.gov/sites/default/files/borrower-defense-application.pdf |
| 10 | Career Education Corporation, FTC Complaint, Case No. 1.19-cv-05739, N.D. Ill., ECF No. 1. | https://www.ftc.gov/system/files/documents/cases/career_education_corporation_complaint_8-27-19.pdf |
| 11 | Career Education Corporation, FTC Settlement, Case No. | https://www.ftc.gov/system/files/documents/cases/de_11_- |

| Document Order | Document Name | Link (if applicable) |
|---|---|---|
| | 1.19-cv-05739, N.D. Ill., ECF No. 11. | _stipulated_order_for_permanent_injunction.pdf |
| 12 | Career Education Corporation, Assurance of Voluntary Compliance, Case No. D-1-GN-19-000017 | https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2019/Press/FINAL%20CEC%20AVC%20attached%20to%20Petition%20wCauseNo.pdf |
| 13 | Kevin Carey, "Corinthian College Is Closing. Its Students May Be Better Off as a Result" | https://www.nytimes.com/2014/07/03/upshot/corinthian-colleges-is-closing-its-students-may-be-better-off-as-a-result.html?_r=0 |
| 14 | Federal Student Aid, Fiscal Year 2020 Annual Report | https://www2.ed.gov/about/reports/annual/2020report/fsa-report.pdf?source=email |
| Not Attached. Use Live Link. | Borrower Defense to Repayment Loan Forgiveness Data | https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data |

**Supplemental Complaint**

**Exhibit Index**

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 1**

Pages 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| THERESA SWEET, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | **NO. C 19-03674 WHA** |
| ) | |
| ELISABETH DEVOS, in her ) | |
| official capacity as Secretary ) | |
| of the United States Department) | |
| of Education and the UNITED ) | |
| STATES DEPARTMENT OF EDUCATION,) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California
Thursday, October 1, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES**:  (via Zoom)

For Plaintiffs:

                    LEGAL SERVICES CENTER OF
                    HARVARD LAW SCHOOL
                    122 Boylston Street
                    Boston, MA  02310
              BY:  **MARGARET E. O'GRADY, ATTORNEY AT LAW**

For Defendants:

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Civil Division, Federal Programs Branch
                    919 East Main Street - Suite 1900
                    Richmond, Virginia  23219
              BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter



**APPEARANCES:**   **(CONT'D)**

SPEAKERS:

Rachel Greenbaum

Laura Dadich

Treiva Johnson

Jana Bergevin

Danielle Adorno

Rebekah Sanchez Norton

Victoria Linssen

Maureen Simmons

Tarah Gramza

Evelyn Segovia

Cassandra Nordman

Hugh McGinley

Ashley Hardin

Kishan Redding

<u>**Thursday - October 1, 2020**</u>                    <u>**8:00 a.m.**</u>

P R O C E E D I N G S

---oOo---

**THE CLERK:**  This court is now in session.  The

Honorable William Alsup presiding.

Calling civil matter 19-3674, Sweet, et al. versus DeVos,

et al.

Starting with Plaintiff, will Counsel please make your

appearances.

**MS. O'GRADY:**  Good morning, Your Honor, this is

Margaret O'Grady, Counsel for Plaintiffs from the Project On

Predatory Student Lending.

**THE COURT:**  Is anyone representing the Defendants?

**MR. MERRITT:**  Yes.  Good morning, Your Honor, this is

Charlie Merritt from the Department of Justice on behalf of the

Defendants.

**THE COURT:**  Thank you.  Welcome.  Any other Counsel

wish to appear?

(No response.)

**THE COURT:**  Okay.  Thank you all for appearing.  And I

want to welcome several hundred class members to this hearing.

Thank you for attending.

My name is William Alsup, A-L-S-U-P.  I'm the Judge.  And

this is a case -- this is a case brought on behalf of persons

who borrowed student loans and applied to the Department of

1   Education for relief from having to pay back those loans.

2       And there is quite -- I think there is 160,000 in this

3   class.  And the problem is that the Agency has been slow in

4   ruling on the applications.  And so this lawsuit was brought to

5   require the Agency to make a ruling, either yes or no.

6       Now, I want to be very clear.  The lawsuit is not designed

7   to require a ruling in favor of class members or against them

8   but simply to get a ruling, one way or another.

9       So then if a class member were to lose, they would have to

10  then, if they wanted to, pursue it further, go to the District

11  Court when -- they would have a statutory venue and litigate on

12  their own.

13      It would not be up to me to decide whether any of 160,000

14  applications should or should not have been granted.  But the

15  issue before us is the timing of the -- of just getting a

16  ruling, one way or the other.

17      So that's the background.  Now, why are we here today?

18  Well, the parties we thought had reached a settlement that

19  would allow the Department of Education to begin saying --

20  giving rulings on their -- on the 160,000 applications.

21      And under the law, I have to give class members an

22  opportunity to be heard.  So we set today's hearing to give you

23  that opportunity.

24      Now, the problem is, unlike most class actions where there

25  is either zero or one or two people who might want to be heard,

1  over 200 people wanted to be heard today.  It is impossible to

2  do that.

3       So we went through all the comments and picked out,

4  I believe, 15 individuals that we would like to hear from and

5  we think those 15 comments are representative of the hundreds

6  and hundreds of comments that came in.

7       So you will just have to bear with us.  If you were picked

8  to comment, great.  If you weren't, well, just go with your

9  written comments.  I'm sorry.

10       Anyway, that's why we are here today.  I need to give you

11  a heads-up that the lawyers have a different problem, which is

12  they -- the settlement may fall apart for other reasons; but

13  that is not the purpose of today's hearing.

14       The purpose of today's hearing is to get your input on the

15  proposed settlement which has been previously summarized to

16  you.

17       I won't make a decision today.  I want to take into

18  account what you say, but I don't want to make any decision

19  today.  I want to hear from the class members.

20       Now, before we hear from any of the class members -- I

21  don't want any speeches -- but do any of the lawyers have

22  any -- anything that you wish to add or subtract from the

23  preliminary remarks that I made?  First, Plaintiffs' Counsel.

24            MS. O'GRADY:  Thank you, Your Honor.  I would just say

25  that we are happy that the opportunity is being given to the

1  class members to speak today and look forward to hearing what

2  they have to say.  Thank you.

3          THE COURT:  Thank you for those comments.  And by the

4  Government?

5          MR. MERRITT:  Nothing more, Your Honor, other than we

6  are thanking everyone for choosing to submit comments and

7  appearing today.  And we look forward to hearing from everyone

8  as well.

9          THE COURT:  Thank you for that brief comment.

10      So at this time, I will ask the Clerk -- by the way, we

11  are in the courtroom.  I don't know if you can tell, but we are

12  actually in the courtroom because it's the only one set up for

13  this kind of telephone plus Zoom proceeding.  So I'm on the

14  bench wearing a robe just like it would be a regular hearing,

15  and my Clerk is here.  And she will now call out the name of

16  the first person.  And I think each person will get up to 90

17  seconds; is that correct?

18          THE CLERK:  That's correct, Your Honor.

19          THE COURT:  Okay.  So you have been previously

20  notified that you were selected.  And are there any other

21  ground rules, Angela?

22          THE CLERK:  No.  They have 90 seconds to speak; and I

23  have let them know when their 90 seconds are up, I would let

24  them know if they can wrap up promptly.  Then I will mute them

25  and we will move on to the next person.

1          **THE COURT:**  Very good.  I'm going to be listening

2    carefully.  So, please, Angela, go ahead.

3          **THE CLERK:**  All right.  Rachel Greenbaum, you are up

4    first.

5          **RACHEL GREENBAUM:**  Thank you.  Hi, Your Honor.  My

6    name is Rachel Greenbaum, and I graduated from Brooks Institute

7    of Photography in 2006.

8       I told my own personal student loan horror story at a

9    California State hearing last year that was the first of its

10   kind.

11         My story is as bad as most and worse than some.  Certainly

12   terrible enough to be picked as one of only five to speak on

13   that panel.  The other stories brought me to tears.  Telling my

14   own story broke me down too.

15         We have all collectively been waiting now for years to

16   find out if we get some relief in our lives that have been put

17   on hold.

18         Our futures that have been stolen; our hesitations to

19   marry or dare start families; our immediate family members that

20   have become estranged or just inconsolably angry due to

21   cosigning on monumentous predatory loans that have affected

22   their credit, their lives and relationships.

23         When I discovered there was a settlement to get our loan

24   dismissed, I felt hopeful for justice to finally be served.

25   And when I realized that all that came from it was mass

1   denials, I felt infuriated, deflated and hopeless, which has

2   certainly deepened throughout 2020.

3        My hope now is that the Honorable Judge Alsup will enforce

4   the settlement under the true spirit of the agreement; that our

5   applications should be given real and legitimate consideration.

6   And if then denied -- not just as a smothering blanket

7   denial -- we should be given all the reasons why so that we can

8   launch a factual appeal.

9        Thank you for your consideration and allowing me to speak

10  for all the struggling, hardworking students that were lied to

11  and robbed blind with our Secretary of Education stamp of

12  approval.

13          **THE COURT:**  Thank you.  What is your -- Rachel, but I

14  didn't get the last name.

15          **RACHEL GREENBAUM:**  Greenbaum.

16          **THE COURT:**  Where do you live?

17          **RACHEL GREENBAUM:**  Currently, I'm in Los Angeles

18  California.

19          **THE COURT:**  All right.  Thank you for that.

20          **RACHEL GREENBAUM:**  Thank you.

21          **THE COURT:**  How much money did you borrow?

22          **RACHEL GREENBAUM:**  I'm well over a hundred thousand

23  dollars in debt.

24          **THE COURT:**  Okay.  Thank you.  All right.  Next.

25          **THE CLERK:**  Thank you, Ms. Greenbaum.

1      Laura Dadich.

2      **LAURA DADICH:**  Good morning, Your Honor.  I went to

3  Katharine Gibbs School for my Associate's in Healthcare

4  Management for long-term care in 2006.  Upon admissions to

5  Gibbs, I was told my credits would transfer anywhere nationwide

6  to pursue my nursing degree.

7      Not long after, I relocated out of state for more

8  educational opportunities and found out from these schools that

9  I had applied to that, unbeknownst to me, my credits were not

10  accepted because they were from a regionally accredited school;

11  not a nationally accredited school.

12      I was then forced to re-take these classes and soon maxed

13  out of undergrad financial aid and was unable to complete my

14  degree, which I am just short by two semesters.

15      I applied for borrower's defense around September 2015,

16  and all of the sudden I get a denial letter just weeks before

17  today's hearing.  The reasons were incredibly vague and gave no

18  reason for the denial other than -- and I quote -- "other."

19      Years spent at Katharine Gibbs obtaining a 3.8 GPA have

20  got me a worthless degree, mounds of debt and loss faith in the

21  education system.  The financial strain has been extremely

22  challenging.

23      If my loans are discharged, I would be able to complete

24  all of these years my degree.  The employment opportunities

25  that I have missed because of this have cost me both

1  financially and emotionally.

2      I feel that the Department of Education has duped us and

3  issued mass denials just a few weeks ago knowing this.

4      I feel that we are being swept under the rug, and I feel

5  that Ms. DeVos and the Department of Education have been trying

6  to end this Borrower Defense program since she took her

7  position.

8      I feel that it is only fair that those of us who are

9  manipulated, tricked and lied to by these deceitful diploma

10  mills be given the chance to have our loans forgiven or

11  discharged so we can finally have the opportunity to finish our

12  education the legal and fair way and move forward with our

13  lives.  Thank you, Your Honor.

14          THE COURT:  Thank you.  How much money did you borrow?

15          LAURA DADICH:  Oh, federally about $75,000.

16          THE COURT:  And where do you live now?

17          LAURA DADICH:  Currently I'm in St. Paul, Minnesota.

18  Originally from Long Island, New York.

19          THE COURT:  Your last name again?

20          LAURA DADICH:  D-A-D-I-C-H, Dadich.

21          THE COURT:  Okay.  All right.  Thank you very much for

22  those comments.  Next.

23          THE CLERK:  Thank you, Ms. Dadich.  Next is Treiva

24  Johnson.

25          THE COURT:  Say the name more loudly.

1          **THE CLERK:**  Treiva Johnson.

2          **THE COURT:**  Okay.

3          **TREIVA JOHNSON:**  Hello.  Hi.  Good morning, everyone.

4     Thank you for this opportunity to speak today.  I have

5     received a denial pertaining to the loan reimbursement or the

6     forgiveness of the loan.  The reason that I am here today is

7     because I would like to speak for those who are still awaiting.

8          The promotion of higher education and it leading to a

9     better way of life or a way out of what is considered an

10    unfavorable lifestyle is not the case.

11         Meaning that -- I'm sorry -- many believe that the actions

12    taken by the powers that be and in the areas that matter the

13    most, such as our education, are actions that cripple the most

14    vulnerable, who are at risk and who are already living in

15    poverty and looking for a way out.

16         This is an unjust, and it starts as early as junior high

17    and rolling over into high school where students are taught by

18    the very individuals who are seeking loan forgiveness

19    themselves and teaching in red zone communities that obtaining

20    a higher education is the best way to go.

21         A large portion of these individuals are a part of an

22    at-risk community or their backgrounds stem from at-risk

23    communities.  But the -- more importantly, these individuals --

24    because they are struggling and they are poor -- these

25    universities are able to present to them financial aid and

1  loan.  Financial aid and loan may automatically help them

2  because they provide money.

3      At this time I just wanted to speak for those individuals

4  and hope that you take them into consideration.  Thank you.

5          **THE COURT:**  Thank you.  And how much did you borrow?

6          **TREIVA JOHNSON:**  Well, I was actually told I had to

7  borrow more money because I didn't have enough to cover.  So I

8  went to University of Phoenix online, and I think my debt

9  totaled about 86,000.

10          **THE COURT:**  Okay.  Where do you live now?

11          **TREIVA JOHNSON:**  I relocated from Denver, Colorado and

12  I moved to Houston, Texas.

13          **THE COURT:**  Okay.  And this is Treiva Johnson?

14      **TREIVA JOHNSON:**  Yes, sir.

15          **THE COURT:**  All right.  Thank you for your comments,

16  Ms. Johnson.

17          **TREIVA JOHNSON:**  You are very welcome.

18          **THE COURT:**  Next.

19          **THE CLERK:**  Thank you, Ms. Johnson.

20      Next is Jana Bergevin.

21      **JANA BERGEVIN:**  Hello.  Can you guys hear me?

22          **THE COURT:**  Yes, your name, please.

23      **JANA BERGEVIN:**  Jana Bergevin.

24          **THE COURT:**  Richmond?

25      **JANA BERGEVIN:**  Bergevin.

1          **THE COURT:**  Okay.

2          **JANA BERGEVIN:**  Hello, Your Honor.  I'm a defrauded

3     borrower from California.  I have been waiting for a decision

4     to be made on my borrower defense for over five years.  And I

5     am --

6          **THE COURT:**  Please go slower.  It is too fast and I

7     can't hear it.

8          **JANA BERGEVIN:**  Okay, sure.

9          And I'm against the settlement as it stands with the DOE.

10    I'm infuriated by the DOE's complete disregard for the student

11    borrowers.  The DOE has assured me it is not interested in

12    upholding its side of the settlement in good faith.  And this

13    is not the first time that it has done so in a California

14    court.

15         DeVos was held in contempt of court for the *Cavillo*

16    *Manriquez versus DeVos* case for violating the preliminary

17    injunction issued continuing to illegally collect on students.

18         Following DeVos being held in contempt, it was then

19    discovered that the impact was far greater than previously

20    reported.  She has still not returned all the money owed to

21    students.

22         Not only does the DOE not operate in good faith, it

23    continues -- it also seeks to undermine its own mission

24    statement.

25         I direct your attention to an investigation by the House

1   Education and Labor Committee revealing that Diane Jones had

2   worked to paper over the Dream Center's deceptions.  She

3   maliciously covered up the loss of accreditation of art

4   institutes owned by the Dream Center in multiple statements.

5   This debacle can be found in the Congressional record.

6        Finally, I will draw attention back to our current mass

7   denial reality, which is in direct violation of the law and

8   spirit of this very settlement.

9        Given the overwhelming evidence, DOE cannot be trusted to

10  uphold its fight of the settlement, I ask that the Judge remove

11  the decision from the DOE and place it in the hands of an

12  impartial and an independent body.

13       The shroud of civility has gone on too long.  The DOE has

14  had five years of time in which to act promptly and with due

15  process.  They have lost any shred of credibility and decency

16  that they ever had.

17       I thank you for your time.

18           **THE COURT:**  And thank you.  Where do you live now?

19           **JANA BERGEVIN:**  I currently live in Pleasanton,

20  California.

21           **THE COURT:**  And how much did you borrow?

22           **JANA BERGEVIN:**  I borrowed -- initially it was

23  115,000.  I have since paid it down to about 87,000.

24           **THE COURT:**  Okay.  Thank you.  Next.

25           **THE CLERK:**  Thanks, Ms. Bergevin.

1        Next is Danielle Adorno.  Ms. Adorno, you may need to dial

2   star 6 on your phone to unmute.

3        **DANIELLE ADORNO:**  Good morning, Your Honor.  My name

4   is Danielle Adorno.  I am a former student of the Art Institute

5   of New York who filed a borrower's defense repayment in 2015

6   and I was recently denied.  I and countless others have waited

7   for a decision for years.

8        I'm speaking today against the proposed settlement.  I do

9   not believe the Department of Education's decision to due

10  process and the results were reached in a fair manner.  The

11  outcome reached negatively impacts the lives of all the

12  students who were fraudulently misled by the respective

13  institutions.

14       The DOE were and still are aware of these fraudulent

15  practices and continue to allow these organizations to operate

16  in dire of financial deed at the expense of vulnerable

17  students.

18       The students who have been affected by this have been

19  burdened with federal and private loans for degrees that are

20  worthless and not recognized.  Some students are saddled with

21  tremendous debt and have no degree to show it.

22       I ask that these institutions be held accountable and that

23  the debt incurred be discharged for all current and former

24  students who have an (inaudible) of these so-called

25  institutions of learning.

1    Countless lives have been upended due to these debts and

2    (inaudible) restitution.  These institutions are actively

3    taking advantage of people who are making the effort to work

4    towards a better future and be accomplished productive members

5    of our society.

6    Rather than being protected by the regulations in place by

7    the Department of Education -- the entity that is charged with

8    ensuring our school systems remain effective and equitable --

9    these are left to the wolf that is predatory education who has

10   been flagrantly exposing people with impunity by sending them

11   an education that did not live up to the code name.

12   Thank you, and I appreciate your time.

13   **THE COURT:**  Thank you.  Where do you live now?

14   **DANIELLE ADORNO:**  I live in New York.

15   **THE COURT:**  And what was the amount that you borrowed?

16   **DANIELLE ADORNO:**  Federally I borrowed 21,000, and

17   privately I borrowed 5,000 for a 9-month program.

18   **THE COURT:**  Thank you.  Thank you.  We will go to the

19   next person, but I need to -- I need to ask everyone who is

20   speaking -- especially if you are on cell phone -- to speak

21   slowly kind of like the way I am because it is hard -- it is

22   sometimes hard to hear perfectly.

23   Some of you come through clearly, and some of you come

24   through a little muffled.  So if you are on a cell phone,

25   please -- even if you are reading it, speak slowly.  It will

1   also help the court reporter.   It will also help me.   I want to

2   get everything that you have to say.   Okay, Angela, next.

3              **THE CLERK:**   Next is Rebekah Sanchez Norton.

4              **REBEKAH SANCHEZ NORTON:**   Thank you, Your Honor, for

5   this opportunity to share the importance and potential impact

6   of the proposed settlement to me, my family and my fellow

7   defrauded borrowers.

8        As a working mother of four children, two of whom are

9   special needs, and a community-based mental health worker, I

10  was hopeful for justice and submitted my claim and was received

11  by the Department of Education On November 3rd of 2016.

12       When I received notification about the proposed

13  settlement, I was hopeful that the extended delay of a decision

14  on my claim was nearing an end and that our federal courts

15  would enforce a timely review of claims that like mine were in

16  status for years.

17       Enforcing the terms of what proposed was a fair and

18  appropriate resolution would acknowledge the significance of my

19  continued financial devastation and validate the callous and

20  seemingly mass volume of denials by the Department of Education

21  three months following the settlement agreement.

22       Among this group I am certainly not the only person who

23  submitted claims but because of loans are unable to provide for

24  their families due to fraudulent schools.

25       Not the only one in their 40s unable to contribute to

1   retirement funds and have been ineligible for employment

2   opportunities limited only due to my debt to income ratio with

3   momentous student loans making me considered incompatible for

4   County and State jobs due to the set ratio and providing an

5   appearance of irresponsible disregard of finances to

6   organizations; organizations that defrauded me and other

7   borrowers.

8        I am sure most others in the courtroom today have also

9   been denied loans for vehicles and are unable to invest in a

10  home themselves or a family like I am.

11       As one of the thousands of borrowers denied relief only

12  after April's agreement, I understand that the debilitating

13  financial devastation that my family and I have faced is not

14  what is under review today.

15       When my claim was denied in July after years of waiting

16  for review, adequate notice that was agreed on in the

17  settlement was not provided me.  I was dismissed with a vague,

18  confusing and incomplete explanation of decision.

19       Your Honor, I believe our country, its public servants and

20  general population fundamentally strive for justice, equality

21  and genuinely values honesty and integrity.  And I hope you can

22  help the borrowers obtain that justice.  Thank you, Your Honor.

23            **THE COURT:**  Okay.  You said that you received a denial

24  in July?

25            **REBEKAH SANCHEZ NORTON:**  Yes, sir.

```
 1              THE COURT:  How long was that -- how long a statement
 2     was it?
 3              REBEKAH SANCHEZ NORTON:  Oh, it was very brief and
 4     vague.  I didn't understand.  It was very confusing and without
 5     complete sentences.  There was no explanation of this denial
 6     after three and a half years and literally pounds, I mailed, of
 7     supporting information.
 8              THE COURT:  What -- do you have it right there with
 9     you?
10              REBEKAH SANCHEZ NORTON:  My documents?  Or the
11     application?
12              THE COURT:  The denial.
13              REBEKAH SANCHEZ NORTON:  The denial, I can -- it's on
14     the same phone in my e-mail box, Your Honor.
15              THE COURT:  Well, can you -- if you had it handy, I
16     would like you to read the denial out loud so I can hear what
17     it said.
18              REBEKAH SANCHEZ NORTON:  Yes, Your Honor.  Let me grab
19     that.  I apologize.
20                          (Pause in proceedings.)
21              THE COURT:  Let's do this:  While you look for it, we
22     will go to the next person and I will come back to you.
23              REBEKAH SANCHEZ NORTON:  I appreciate it, Your Honor.
24     Thank you.
25              THE COURT:  Okay.  Next.
```

1              **THE CLERK:**  Next is Victoria Linssen.  Ms. Linssen,

2      you may need to dial star 6 to unmute your phone.

3                           (Pause in proceedings.)

4              **MS. LINSSEN:**  Can you hear me?

5              **THE COURT:**  Yes, now we can.

6              **MS. LINSSEN:**  Okay.  So sorry.  It took me a few

7      seconds to unmute.

8          Good morning, Your Honor.  I applied for my Brooks

9      borrower's defense to -- application in October of 2016.  I'm

10     still waiting to be -- I'm still waiting for my application to

11     be reviewed.  I have received neither a denial or an approval,

12     and I just have a very short statement today.

13         What I'm witnessing amongst my fellow classmates is that

14     it feels to me like the borrower's defense to repayment

15     application that are now being reviewed are being blanket

16     denied whether or not a student has a legitimate claim.

17         And I would really like to be provided with transparency

18     on the exact criteria and data points that the applications are

19     being approved or denied for.

20         And that is it, short and sweet.  Thank you, Your Honor.

21             **THE COURT:**  And where do you live now?

22             **MS. LINSSEN:**  I live in Muncie, Indiana.  I lost my

23     job, my livelihood.  Lost my home.  My car.  Was out of work

24     for four years and forced to move seven states and 1,800 miles

25     away from my family to get work.

1              THE COURT:  How much did you borrow?

2         MS. LINSSEN:  I initially borrowed I think around -- I

3    want to say around 80 or 90,000.  And I have been paying

4    consistently on my private student loans for eight years.  And

5    that balance for my private student loans have -- I have paid

6    $30,000 on my private student loans, and the balance has gone

7    down by $2,000.

8         I owe $77,000 on my private student loans.  And my federal

9    student loans started at around $45,000.  And with interest,

10   they have ballooned to over 65,000.  So I'm over $125,000 in

11   debt and in student loans right now.

12             THE COURT:  What was the name of the institution or

13   the school?

14             MS. LINSSEN:  I went to The Brooks Institute of

15   Photography, which in its height was a private institution and

16   then was bought by Career Education Core.  They had a class

17   action lawsuit filed against The Brooks Institute and -- in

18   around 2003 to 2005.

19        When I attended, I asked some very hard questions to the

20   administrators about that lawsuit and I was -- I was told that

21   my concerns were valid items; that the previous lawsuit items

22   and issues had been cleaned up.  And, in fact, they had

23   actually not been cleaned up.

24        And I believe that when Brooks went downhill is when they

25   were purchased by Career Education Corporation, and that's when

1    the fraud against the students began.  Brooks was accepting

2    loans for students all the way up until the day they filed

3    bankruptcy, and they were expanding leases on properties in

4    Southern California also all the way up until the day they

5    filed bankruptcy.

6          **THE COURT:**  All right.  I wish I had more time to hear

7    it all, but I appreciate very much your coming in.

8          Now, let's go back to Ms. Rebekah Sanchez Norton, I

9    believe it was.

10         **REBEKAH SANCHEZ NORTON:**  Yes, Your Honor.  I have it

11   right here.  Thank you for that time.

12         Would you like me to read the Department of Education -- I

13   will just start.  I apologize.

14         It is dated July 10 of 2020.  It has my application number

15   and my name (reading):

16         Dear Rebekah Norton:  The U.S. Department of Education

17   (ED) has completed its review of your application under the

18   applicable borrower defense to repayment regulations for

19   discharge of your William D. Ford federal direct loans (direct

20   loans) made in connection with your or your child's enrollment

21   to Brooks Institute.

22         You, in quotation marks, as used here should be read to

23   include your child if you are a direct plus loan borrower who

24   requested a discharge for loans taken out to pay for a child's

25   enrollment at Brooks Institute.

1      ED has determined that your application is ineligible for

2  relief based on review of the facts of your claim and the

3  regulatory criteria for relief.  This decision means that your

4  direct loans will not be discharged.  ED explains the reasons

5  below.

6      Applicable law.  For direct loans first disbursed prior to

7  July 1st, 2017, a borrower may be eligible for a discharge

8  (forgiveness) or part or all of one or more direct loans if the

9  borrower's school engaged in acts or omissions that would give

10  rise to cause of action against the school under applicable

11  State law.

12      Would you like me to quote the law?  It then says:  See

13  with squigglies 455(H) of the Higher Education Act of 1965 as

14  amended 20 U.S.C., squigglies, 1087E(H) and 34CFR, more

15  squigglies, 685.26C and 685.222, the borrower defense

16  regulations.

17      ED recognizes a borrower's defense to repayment of a

18  direct loan only in the cause of action if the cause of action

19  directly relates to the direct loan or to the school's

20  provision of educational services for which the direct loan was

21  provided.

22      34CFR, two more squigglies, 685.206(c)(1) and 6851.222(a)

23  (5), U.S. Department of Education notice of interpretation, 60

24  Fed Reg. 37,769 (July 21, 1995).

25      Then in bold it says:  Why was my application determined

1    to be ineligible?

2        ED reviewed your borrower defense claims based on any

3    evidence submitted by you in support of your application.   Your

4    loan data from National Student Loan Data System (NSLDS) and

5    evidence provided by other borrowers.

6        Allegation 1, other.   You allege that Brooks Institute

7    engaged in misconduct related to other.

8        This allegation fails for the following reasons:   Failure

9    to state a legal claim.   Your claim for relief on this basis

10   therefore is denied.

11       Allegation 2, educational services.   You allege that

12   Brooks Institute engaged in misconduct related to educational

13   services.

14       This allegation fails for the following reasons:   Failure

15   to state a legal claim.   Your claim for relief on the basis,

16   therefore, is denied.

17       Allegation 3, transferring credits.   You allege that

18   Brooks Institute engaged in misconduct related to transferring

19   credits.

20       This allegation fails for the following reasons:   Failure

21   to state a legal claim.   Your claim for relief on this basis,

22   therefore, is denied.

23       Allegation 4, career services.   You allege that Brooks

24   Institute engaged in misconduct related to career services.

25       This allegation fails for the following reasons:

1   Insufficient evidence.  Your claim for relief on this basis,

2   therefore, is denied.

3         Allegation 5, program costs and nature of loans.  You

4   allege that Brooks Institute engaged in misconduct related to

5   program costs and nature of loans.

6         This allegation fails for the following reasons:

7   Insufficient evidence.  Your claim for relief on this basis,

8   therefore, is denied.

9         Allegation 6, employment prospects.  You allege that

10  Brooks Institute engaged in misconduct related to employment

11  prospects.

12        This allegation fails for the following reasons:

13  Insufficient evidence.  Your claim for relief on this basis,

14  therefore, is denied.

15        What evidence was considered in determining my

16  application's ineligibility?  We reviewed evidence provided by

17  you and other borrowers who attended your school.

18        Additionally, we considered evidence gathered by the --

19  from the following four sources:  New York Attorney General's

20  Office, Pennsylvania Attorney General's Office, evidence

21  obtained by the Department in conjunction with its regular

22  oversight activities, publicly available security filings made

23  by Career Education Corporation, now known as Perdoceo

24  Education Corporation; multi-state Attorney General assurance

25  of voluntary compliance effective January 2nd, 2019.

1        What do I -- what if I do not agree with this decision?

2   If you disagree with this decision, you may ask ED to

3   reconsider your application.

4        To submit a request for reconsideration, please send an

5   e-mail with the subject line "request for reconsideration,

6   reference 00Dt0GYIQ._500t0DPQQS:ref to borrowerdefense@ed.gov

7   or mail your request to U.S. Department of Education, P.O. Box

8   1854, Monticello, Kentucky, 42633.

9        In your request for reconsideration please provide the

10  following information:  Which allegations you believe that the

11  ED incorrectly decided; why you believe that ED incorrectly

12  decided your borrower defense to repayment application; and,

13  three, identify and provide any evidence that demonstrates why

14  ED should approve your borrower defense to repayment claim

15  under the applicable law set forth above.

16       ED will not accept any requests for reconsideration that

17  includes new allegations.  If you wish to assert allegations

18  that were not included in your application, please see the

19  following section.

20       Additionally, your loans will not be placed into

21  forbearance unless your request for reconsideration is accepted

22  and your case is reopened.

23       Failure to begin or resume repayment will result in

24  collection activity including administrative wage garnishment,

25  off-set of state and federal payments you may be owed and

 1   litigation.

 2       For more information about the reconsideration process,

 3   please contact our borrower defense hotline at 1-855-279-6207

 4   from 8:00 a.m. to 8:00 p.m. Eastern Time, ET, on Monday through

 5   Friday.

 6       Can I apply for borrower defense if I have additional

 7   claims?  If you wish to file a new application regarding acts

 8   or omissions by the school other than those described in the

 9   borrower defense application -- and then it has case number in

10   paren, but like the words case number, not actual numbers --

11   please submit an application at

12   studentaid.gov\borrower-defense.

13       In the new application you should explain in the relevant

14   sections the basis for any new borrower defense claims and

15   submit all supporting evidence.

16       What should I do now?  Besides cry.  Because your borrower

17   defense to repayment application was found to be ineligible,

18   you are responsible for repayment of your loans.

19       ED will notify your servicers of the decision on your

20   borrower defense to repayment application within the next 15

21   calendar days, and your servicer will contact you within the

22   next 30 to 60 calendar days to inform you of your loan balance.

23       Further, if any loan balance remains, the loans are

24   returned to their status prior to the submission of your

25   application.

1    If your loans were in forbearance as a result of your

2 borrower defense application, the servicer will remove these

3 loans from forbearance.  *See COVID-19 note below.

4    If your loans are in default and are currently in stopped

5 collections, your loans will be removed from stopped

6 collections.

7    Failure to begin or resume repayment could result in

8 collection activity such as administrative wage garnishment,

9 off-set of state and government payments that you may be owed

10 and litigation.  *See COVID-19 note below.

11    While normally interest would not be waived for

12 unsuccessful borrower defense applications, given the extended

13 period of time it took ED to complete the review of the

14 application, the Secretary is waiving any interest that accrued

15 on your direct loans from the date of the filing of your

16 borrower defense application to the date of this notification.

17    Your servicer will provide additional information in the

18 coming months regarding the specific amount of interest

19 adjusted.  *See COVID-19 below.

20    *COVID-19 note:  On March 27, 2020, the President signed

21 the CARES Act, which among other things provides broad relief

22 and response to coronavirus disease, 2019 (COVID-19) for

23 federal student loan borrowers whose loans are owned by ED.

24    For the period of March 2020 through September 30th, 2020,

25 the interest rate on the loans will be zero percent and no

 1   payments will be required.

 2        During the same period for defaulted borrowers all

 3   proactive collection activities, wage garnishments and treasury

 4   off-sets will be stopped.

 5        Your federal loan servicer will answer any questions you

 6   have about your specific situation.  In addition, federal

 7   student aid's COVID-19 information page for students borrowers

 8   and parents are located at studentaid.gov\coronavirus.  Please

 9   visit the page regularly for updates.

10        What if I have another pending borrower defense

11   application?  If you have an additional pending defense --

12   borrower defense to repayment application, this information

13   applies to you:  If your loans associated with an additional

14   borrower defense to repayment application that is still

15   pending, are in forbearance or another status that does not

16   require you to make payments, your loans will remain in

17   forbearance or that other status.

18        Similarly, if your loans associated with that borrower

19   defense application are in default and you are currently in

20   stopped collections, those loans will remain in stopped

21   collections.

22        If you are unsure if you have additional pending

23   applications or if you would like to check the status of your

24   loans associated with an additional application, contact our

25   borrower defense hotline at 855-279-6207 from 8:00 a.m. to

 1   8:00 p.m. ET on Monday through Friday.

 2        ED offers a variety of loan repayment options including

 3   the standard 10-year repayment plan as well as extended

 4   repayment, graduated repayment and income-driven repayment

 5   plans.

 6        For more information about student loan repayment options,

 7   visit studentaid.gov\plans.  If you have questions about the

 8   status of your loans or questions about repayment options,

 9   please contact your servicers.

10        If you do not know the name of your federal loan servicer,

11   you may go to studentaid.gov to find your servicer and get your

12   federal loan information.

13        Sincerely, U.S. Department of Education, Federal Student

14   Aid.

15        **THE COURT:**  All right.  Thank you.

16        **REBEKAH SANCHEZ NORTON:**  Thank you, Your Honor.

17        **THE COURT:**  I noticed in the discussion about what I

18   can do now -- or what you can do now, there was no mention that

19   everyone has the right to go to court.

20        **REBEKAH SANCHEZ NORTON:**  No, Your Honor.

21        **THE COURT:**  It doesn't mention that.  But you do have

22   that right.  And that's not what is involved in this lawsuit.

23        What is involved in this lawsuit is trying to get a

24   decision.  But once a decision is made -- those notices maybe

25   should have said:  By the way you have the right to sue us in

1  your District Court if you feel that the decision is not a

2  correct decision.

3      So I'm concerned over that lack of notice to that effect.

4  And all class members should be aware of that procedural

5  option.  Ms. Norton, where do you live?

6      **REBEKAH SANCHEZ NORTON:**  I'm a military brat who

7  landed in Ventura County, California.

8      **THE COURT:**  All right.  Well, you did a very good job

9  reading that.

10      **REBEKAH SANCHEZ NORTON:**  Thank you, Your Honor.  Sorry

11  there was a delay.

12      **THE COURT:**  What do you do for a living?

13      **REBEKAH SANCHEZ NORTON:**  Currently I serve the

14  Medi-Cal community in connecting them to services that are

15  appropriate mental health providers or pointing them to the

16  county for more intensive care.

17      **THE COURT:**  And how much did you borrow?

18      **REBEKAH SANCHEZ NORTON:**  Originally I borrowed, I want

19  to say, about 72,000.  But I was unable to transfer credits, so

20  I attended -- to be eligible for the job I have now, only

21  another private institution would accept a degree, after much

22  begging and pleading.  And so I now currently owe over 170,000.

23  And I only borrowed 20,000 on the additional private before

24  stopping.

25      **THE COURT:**  What was the name of the institution you

```
 1    went to?  Was it called Brooks?
 2            REBEKAH SANCHEZ NORTON:  I went to Brooks, yes,
 3    Your Honor.
 4            THE COURT:  All right.  All right.
 5            REBEKAH SANCHEZ NORTON:  Thank you for your time.
 6            THE COURT:  Thank you.  All right.  Let's go to the
 7    next person.
 8            THE CLERK:  All right.  Thank you, Ms. Norton.  Next
 9    is Maureen Simmons.
10            MAUREEN SIMMONS:  Good morning, Your Honor.  My name
11    is Maureen Simmons.
12        I filed borrower's defense for $10,000 in loans for Med
13    Help Training School who fraudulently received the loans on my
14    behalf.
15        When I received the e-mail notifying me of the settlement
16    agreement in this matter, I was thrilled at the prospect of
17    finally getting closure for an issue that has been in limbo for
18    years.
19        Unfortunately, several days later I received an e-mail
20    from the Department of Education dismissing my borrower defense
21    application.
22        The Department's vague e-mail claimed there were flaws in
23    my application; though, my application addressed every issue
24    they outlined in great detail.
25        I contacted the class attorneys, but soon learned the
```

1   Department was issuing blanket decisions for thousands of

2   applications just days after the settlement agreement.

3        Secretary DeVos continues to practice widespread abuse of

4   power that has harmed thousands of class members and her

5   actions circumvent the intentions of the settlement agreement.

6        Like so many others, my application was dismissed without

7   so much of a review of the materials I presented.  This smacks

8   in the face of fairness.  So I beg the Court to not allow this

9   settlement agreement to proceed.

10       Your Honor, I deserve better.  And the members of this

11  class deserve better.  Thank you.

12       **THE COURT:**  Thank you, Ms. Simmons.  Where do you

13  live?

14       **OTHER ATTORNEY:**  I currently live in Northern

15  California in Fairfield.

16       **THE COURT:**  All right.  Thank you.  Next.

17       **THE CLERK:**  Thank you, Ms. Simmons.  Next is Tarah

18  Gramza.  You may need to unmute your phone by dialing star 6.

19                    (Pause in the proceedings.)

20       **THE CLERK:**  It looks like you are unmuted, but we

21  still can't hear you.

22       **TARAH GRAMZA:**  Sorry.  Can you hear me now?

23       **THE CLERK:**  Yes, we can.

24       **TARAH GRAMZA:**  Sorry about that.  Good morning.  Thank

25  you, Your Honor, for letting me speak this morning.

1        I applied in September 2016 for borrower defense program

2    prior to there being a formalized application.

3        After my school, American Intercontinental University

4    online owned by Career Education Corporation or CEC, which we

5    have heard commonly this morning, had multiple sanctions for

6    misbehavior for lying about education, quality, quality of

7    teachers, pressure to enroll, cost of education and others --

8    all of which I personally experienced while attending -- I

9    submitted five separate, carefully written and thought-out

10   complaints with numbered allegations and links to citations and

11   even added additional evidence when CEC had its DOJ settlement

12   for the exact same allegations in 2019.

13       After the *Sweet versus DeVos* proposed settlement, my case

14   was denied in July 2020 with the decision "lack of evidence"

15   for one of the five complaints.

16       The other four complaints were completely ignored and no

17   other explanation was provided.

18       When I called the defense care center, they said to

19   reapply for a new application and file an appeal as well as

20   that they could not see the original complaint due to their

21   system issues of which I did complete.

22       I recently received another e-mail asking for a copy of my

23   original complaint -- yes, from 2016 -- by the Department of

24   Education because they could not see my complaint of which I

25   sent again.

```
 1        If the Department is going to use this settlement to mass

 2   deny cases and not even review them thoroughly and give them

 3   any formal look at, this settlement is completely pointless and

 4   doesn't resolve the lawsuit in a fair manner for us at all.

 5   Thank you.

 6             THE COURT:  Okay.  Tell me your name.  I didn't get

 7   it.

 8             TARAH GRAMZA:  Sure.  My first name is Tarah, and my

 9   last name is Gramza.

10             THE COURT:  Spell the last name.

11             TARAH GRAMZA:  Sure.  It is G-R-A-M-Z-A.

12             THE COURT:  What was the first T or P?

13             TARAH GRAMZA:  G, as in George.  And my first name is

14   Tarah with a T.

15             THE COURT:  Okay.  Where do you live?

16             TARAH GRAMZA:  I live in Arizona.

17             THE COURT:  And how much did you borrow?

18             TARAH GRAMZA:  About $85,000.  I'm now just under

19   $100,000 with the interest.

20             THE COURT:  Okay.  Thank you very much.  Next.

21             THE CLERK:  Thank you, Ms. Gramza.  Next is Evelyn

22   Segovia.

23             EVELYN SEGOVIA:  Hello.  My name is Evelyn Segovia.

24   Let me walk away.  I think I'm getting some feedback.

25             THE CLERK:  If you have another device logged in, you
```

1   should hang up there.

2        **EVELYN SEGOVIA:**   I'm -- so I started attending

3   University of Phoenix in 2007.   I graduated in 2011 and with

4   approximately $69,000 in debt.   And it has since ballooned to

5   around $82,000 in debt due to interest.

6        I received almost the same exact denial letter that one of

7   the previous speakers mentioned.   And they specifically stated

8   that they also reviewed information from the FTC in regards to

9   deciding my application just like they did in hers.

10       I find that especially interesting considering that in

11  2009 the Department of Education produced a report claiming the

12  untimely return of title funds for more than 10 percent of

13  sampled students.

14       The University of Phoenix has settled a false claims suit

15  for $78 and half a million in 2009.   In 2014 the U.S.

16  Department of Education's Office of the Inspector General

17  demanded records from University of Phoenix and the Apollo

18  Group going back to 2007, which was when I was attending,

19  related to marketing recruitment, enrollment, financial aid,

20  fraud prevention and student retention.

21       In October of 2015, the U.S. Department of Defense

22  suspended the school's ability to recruit on U.S. military

23  bases and receive federal funding for educating members of the

24  U.S. Military.

25       The Federal Trade Commission began investigating the

University in 2015 in regards to an advertising campaign that
ran in 2012 through 2014.  There was also a settlement in
relation to that.

So to cite in my denial letter that you considered
evidence that both other borrowers submitted along with
evidence that the FTC already had seems fraudulent because they
very clearly did not review their own records considering that
I attended at the same time that they also allege that my
school participated in predatory practices.  So with that,
I'm -- I just believe that they are also issuing blanket
denials.

If you, yourself, accuse a school of predatory lending
practices and fraudulent activity, then it -- you know, it is
reasonable to assume that the students who are alleging the
same misconduct would receive that same consideration.  That's
all I have to say.

**THE CLERK:**  Your time is up.

**THE COURT:**  Okay.  Next.

**THE CLERK:**  Are you ready to hear the next person?

**THE COURT:**  Yes, I am.  Next.

**THE CLERK:**  Next is Cassandra Nordman.

**CASSANDRA NORDMAN:**  Thank you, Angela.  And thank you,
Judge Alsup for your time.

My name is Cassandra Nordman.  I attended McNally Smith
College of Music in St.Paul, Minnesota.  I borrowed around

1   75,000.

2       My college targeted minorities and lower income

3   households; lied about their accreditation; convinced us to

4   take hundreds of thousands of dollars in loans; fraudulently

5   altered our graduation requirements; and led us into additional

6   semesters and additional loans; and washed their hands of us in

7   a bankruptcy filing that left absolutely nothing for former

8   students and no personal local recourse.

9       Now we sit with our futures wrecked by debt and

10  meaningless degrees.  The borrower's defense is the only chance

11  we supposedly have.

12      We are not millennials looking for an easy way out.  We

13  are hardworking individuals who trusted our federal government

14  to provide us with the ability to seek higher education.  We

15  are not lazy.  We are the young adults who are committed to

16  hundreds of thousands of dollars of debt as teenagers.  Many of

17  us without the support of family.

18      We are the people who grew up here, and you have to go to

19  college to defy the odds to get ourselves there.  Now, after we

20  have been maliciously taken advantage of, we have fought

21  through the only (inaudible) available to us, the borrowers

22  defense.

23      (Inaudible) education holding our future captive, in best

24  case scenarios or dismissed in mass for people speaking today.

25  I hear the fight and pain in other people speaking that I have

1    known constantly for the last five years.

2        The settlement alone include 160,000 Americans currently

3    being crippled by not only a pandemic but to the

4    administrations' desperate account to look away from the

5    devastating effect of predatory institutions.

6        There is no question that these types of establishments do

7    not align with our American values as evident in the admissions

8    of this process.

9        The Department of Education continues to do everything in

10   their power to keep from rectifying the wrongdoing of these

11   institutions.  Holding up this process and dismissing cases

12   without real consideration is actively causing harm.

13       I'm sure you can imagine the crossover in currently

14   unemployed people who were taken advantage of by these

15   for-profit institutions.  If anything, the settlement does not

16   begin to come close to doing anything to assure us.

17       I ask the Court to remove the decision of the borrower's

18   defense application from the Department of Education and place

19   the investigation in the hands of an independent organization.

20   Thank you for your time.

21           **THE COURT:**  All right.  Thank you.  Next.

22           **THE CLERK:**  Next is Hugh McGinley but I'm not seeing

23   him anymore.

24       So if you are here, Mr. McGinley, please raise your hand

25   and I will call you after the next person.

1          Ashley Hardin, you may need to dial star 6 to unmute your

2    phone.

3          **ASHLEY HARDIN:**  Good morning, Honorable Alsup.  Can

4    you hear me?

5          **THE COURT:**  Yes, I can.  Thank you.

6          **ASHLEY HARDIN:**  Fantastic.  My name is Ashley Hardin

7    and I graduated from Brooks Institute, a CEC owned school, in

8    2009.

9          And I have spent the last 11 years of my life thwarting

10   through and dealing with what feels very much like a

11   bamboozlement.

12         I feel I, along with my colleagues, have -- were taken

13   advantage of and preyed upon by not only our college but by the

14   federal government and their servicers.

15         I am not alone when I say that I have spent a great deal

16   of time and pain in recalling and preparing my application for

17   the review process only to be part of what feels like a blanket

18   denial in which I don't think my application or my colleagues

19   were properly reviewed nor judged.

20         At this time I have questions which is -- which are:  Did

21   lawyers review our applications?  Also, without further

22   information and direction from the Department of Education on

23   the denial reasonings or any further explanations regarding the

24   denial letters, how do you recommend we proceed to appeal?

25   Thank you for your time.

1              **THE COURT:**  I wish I could answer that.  I don't have

2     any answers of that problem.

3              **ASHLEY HARDIN:**  Okay.

4              **THE COURT:**  You should talk to the class action

5     lawyers here, Ms. O'Grady.  She is on the line and she

6     represents the class, and she could give you some advice about

7     that but --

8              **ASHLEY HARDIN:**  Perfect.  Thank you.

9              **THE COURT:**  But as the Judge, I -- I can't really get

10    into giving you advice on how to proceed but she can.

11             **ASHLEY HARDIN:**  Sure.  Okay.

12             **THE COURT:**  I could hear your comments.  Where do you

13    live?

14             **ASHLEY HARDIN:**  I currently reside in Seattle,

15    Washington.

16             **THE COURT:**  And how much did you say you borrowed?

17             **ASHLEY HARDIN:**  I borrowed over 150,000.  And I

18    currently over 133,000.

19             **THE COURT:**  All right.

20             **ASHLEY HARDIN:**  I was current from about 2013 up until

21    March of 2020.

22             **THE COURT:**  Did you also get a denial letter?

23             **ASHLEY HARDIN:**  I did.  I applied for borrower defense

24    November 2nd, 2016, and received my denial letter on July 10th,

25    2020.

1          **THE COURT:**  Okay.  I appreciate your -- tell me

2     this -- I couldn't understand one part -- do you --

3          **ASHLEY HARDIN:**  Sure.

4          **THE COURT:**  Do you support -- do you want me to

5     approve this final settlement or do you want me not to approve

6     it?

7          **ASHLEY HARDIN:**  I'm for the settlement.  I just don't

8     feel like the Department of Ed held up their end of the stick.

9          **THE COURT:**  Okay.  Let's go to the next --

10         **ASHLEY HARDIN:**  Thank you.

11         **THE CLERK:**  Thank you, Ms. Hardin.  It looks like

12    Mr. McGinley is back.  Mr. McGinley, you can -- sorry.  I think

13    I just muted you after you unmuted yourself.

14         **HUGH McGINLEY:**  No problem.  Thank you, Judge Alsup

15    for listening to us.  The time you have already given us is way

16    more than DOE and Betsy DeVos have given us.

17         I disagree with the proposed settlement agreement in this

18    case because I think it is unfair to students.  Under the

19    settlement motion Section A settlement class, this should

20    expand indefinitely.  Not everyone is aware that they can

21    submit a defense to repayment against their fraudulent school.

22    So it excludes those who did not.

23         This should also include those who have already received a

24    decision and those who submit DTIs after the executed

25    settlement.

1       Under Section B relief, the 18 to 21-month time limit

2   given to the DOE to address submitted DTIs is too long and

3   lenient.  The DOE has had plenty of time to address submissions

4   already; some like mine that have taken over four years to

5   address with still no response provided.  Instead, the DOE has

6   used that time to ignore students and to rewrite the rules more

7   favorably towards schools.

8       They are also showing they are not taking this lawsuit

9   seriously and just blanket denying almost every DTI submission

10  since April of this year.

11      The 90-day time period the DOE has been given to report

12  their decision to Plaintiffs is also too long.  This

13  information is easily shareable and should be provided once

14  every one to two weeks, if not on a daily basis.

15      In closing, I do not feel that Betsy DeVos and the DOE are

16  acting in good faith in regards to this lawsuit.  The blanket

17  denials the DOE are giving out are a joke, and they are just

18  laughing in both our faces and the courts.  They are just

19  giving out decisions to meet their requirement.

20      In my opinion all submitted DTIs should be approved and

21  the debt of these students should be forgiven, both federal and

22  private.  The DOE should also be both penalized and

23  investigated for their mishandling and blatant ignorance

24  towards all DTI submissions for many years now.

25      Finally, Betsy DeVos and the DOE should apologize to the

```
 1   Plaintiffs, the Court and to you, Judge Alsup, for treating

 2   this lawsuit as a joke.  Thank you.

 3           THE COURT:  What was your name again?

 4           HUGH McGINLEY:  My name is Hugh McGinley.  I currently

 5   live in Los Angeles, California.

 6           THE COURT:  All right.  And the amount of your loans?

 7           HUGH McGINLEY:  I borrowed 90,000 for this particular

 8   defense to repayment.  It's over $100,000 now.

 9           THE COURT:  Thank you.

10           HUGH McGINLEY:  You are welcome.  Thank you.

11           THE COURT:  I didn't understand.  You oppose the

12   settlement; is that correct?

13           HUGH McGINLEY:  Yes.  A lot of the terms in the

14   settlement I don't agree with.  It gives the DOE -- it is too

15   lenient to the Department of Education.

16           THE COURT:  And you would -- and did you get a denial

17   letter or not?

18           HUGH McGINLEY:  I did not, sir.  It has been over four

19   years.

20           THE COURT:  Okay.  You are still waiting.  All right.

21   Let's go to the next class member.

22           THE CLERK:  Thank you, Mr. McGinley.  Next is Kishan

23   Redding.

24           THE COURT:  We cannot hear you.  Please push the right

25   buttons.
```

1          **KISHAN REDDING:**  Good morning, Your Honor.

2          **THE COURT:**  We hear you now.

3          **KISHAN REDDING:**  Great.  Good morning.

4     I am saddened but also comforted by my fellow class

5  members' stories.  I truly felt alone until this morning.

6          While I am in support of the proposed settlement, I would

7  like to express my concerns regarding oversight and the process

8  of reviewing applications.

9          I feel that applications are not reviewed as thoroughly

10 and appropriately as they should be.  For example, after

11 waiting for four years, I received a response denying my

12 application with a total of less than 30 words.  I find wholly

13 suspect that my decision just so happened to be received around

14 the time this case was being settled.

15         If the Department of Education was taking years to respond

16 to applications, logically I feel there is reason for me to

17 question how they would manage and respond to class members'

18 applications within 18 months without rushing through the

19 process.

20         We all know that we have had some major changes in the

21 world, in this country.  And now there is another concern.  How

22 are these investigations going to be completed thoroughly when

23 a lot of schools are having alternate class arrangements?

24         How will they investigate fairly; converse with other

25 students and get information from enough sources related to the

1  schools when people are still in transition trying to figure

2  out how to make school work?  These are questions that class

3  members need to know.

4      Lastly, the Department claims they are provided with

5  information from other borrowers.  And I question the

6  demographics of these borrowers.

7      As a person of color, I am well aware of disparities and

8  clear differences between borrowers of different identities and

9  insist the demographics are taken into account.

10     People of color, low income individuals and aspiring

11 artists, amongst many others, are preyed upon as it may be

12 difficult to get into different schools for a variety of

13 reasons.

14     The predators -- and I stand by that word -- of these

15 schools have taken advantage of thousands of students, and

16 those students are entitled to a fair and thorough -- I repeat,

17 fair and thorough -- review of their cases.  Thank you very

18 much.

19          **THE COURT:**  All right.  Is it Redding, R-E-D-D-I-N-G?

20          **KISHAN REDDING:**  Yes, Your Honor.

21          **THE COURT:**  Where do you live, Mr. Redding?

22          **KISHAN REDDING:**  I'm in Los Angeles, California.

23          **THE COURT:**  What do you do for a living?

24          **KISHAN REDDING:**  I'm actually unemployed right now,

25 but I worked pre-pandemic as a teaching artist in the school

1   districts.

2           **THE COURT:**  All right.  Well, I could -- I could hear

3   you very clearly.  Are you on a landline or a cell phone?

4           **KISHAN REDDING:**  I'm on the computer actually.

5           **THE COURT:**  Really.  Amazing, very clear.  How much

6   did you borrow?

7           **KISHAN REDDING:**  About 80,000.

8           **THE COURT:**  Okay.  And did you say you did get one of

9   those denial letters or did not?

10          **KISHAN REDDING:**  Yes, I did receive a denial letter.

11          **THE COURT:**  Okay.  And do you support the settlement

12  as written or not?

13          **KISHAN REDDING:**  I support the settlement if there is

14  oversight and people who are not related to the DOE overseeing

15  the process.  I do not support the settlement if the DOE is

16  going to be able to do this alone.

17          **THE COURT:**  Okay.  All right.  Thank you.  Good luck,

18  Mr. Redding.  Next.

19          **THE CLERK:**  Those are all of the people that were

20  selected to speak that confirmed that they were able to speak.

21          **THE COURT:**  I didn't hear you.

22          **THE CLERK:**  Those are all of the people who were

23  selected to speak who showed up at the hearing.

24          **THE COURT:**  Oh, I see.  We have now heard everyone?

25          **THE CLERK:**  That's correct.

```
 1              THE COURT:  It is hard for me to hear you too, Angela.

 2   I don't know what, the acoustics are.  We are done with the

 3   list?

 4              THE CLERK:  We are done with the list.

 5              THE COURT:  I see.  Okay.

 6              JANA BERGEVIN:  Your Honor, may I request to be able

 7   to speak following up to something you have mentioned?  I don't

 8   know if I'm allowed that, but I thought I would ask.

 9              THE COURT:  I will let one more person speak, but I

10   can't let -- we have 511 people.  And I just can't hear

11   everyone, you know.  I have got other cases.  And we selected a

12   representative group, but we will let you speak.  One more.  Go

13   ahead.

14              JANA BERGEVIN:  Okay.  Thank you.  I had spoken before

15   but something, Your Honor, had said struck me very much, which

16   was that we could seek legal aid to combat these denials.

17       And I wanted to say that that is very far from the truth.

18   I have tried to sue, you know, on by borrower defense before to

19   push for this kind of decision making or just to get a

20   decision.

21       I contacted my local bar association.  I contacted Air Reg

22   (phonetic).  There are no lawyers that will represent a

23   borrower individually.  They don't exist.  So I just wanted to

24   reach out through this that experience.

25              THE COURT:  That's good to know.  Ms. O'Grady is on
```

1   the line.  You should talk to her separately, not in front of

2   everybody.  Maybe she can give you some advice on how to get a

3   lawyer to take an appeal to District Court in your case.

4         **JANA BERGEVIN:**  I would be lucky because I live in

5   California, but I don't see this happening for other members

6   that are in other states.  I just --

7         **MS. O'GRADY:**  Your Honor, this is Margaret O'Grady.

8   If you wouldn't mind, can I address this question briefly?

9         **THE COURT:**  Please, go ahead.

10         **MS. O'GRADY:**  I would just like to reiterate there are

11   170,000 borrowers that are members of this class.  I would love

12   to have the ability to represent every single one of them to

13   challenge the denials on the merits.  I think, for many

14   reasons, that is plainly impractical.

15      And that is why we are here today; to hear from this class

16   of borrowers on the class-wide issue on the Department of

17   Education refusing to decide these borrower defense

18   applications on the merits.

19      And so I think that, as you identified, there is a problem

20   with the notices because they don't -- for many reasons -- but

21   one reason is they don't even state the borrower can seek

22   redress in their district court.  And they don't provide enough

23   information for them to do so.

24      And, as Ms. Bergevin is noting, on an individual basis,

25   there is an impracticability here because there are, in this

1  case alone, 170,000 borrowers affected.

2  **THE COURT:**  Thank you.  That's good information for

3  everyone to have.

4  Well, I need to bring this to a close -- I mean the

5  hearing to a close.  I don't know what to do about whether to

6  approve the settlement or not.  I have to study this.

7  Okay.  We will now sign off and we will bring -- I'm

8  bringing the hearing to a close unless -- I will let the

9  lawyers -- do the lawyers have anything further to say?

10  **MS. O'GRADY:**  Your Honor, I would like to make two

11  more brief points if you will allow me.

12  **THE COURT:**  Say it again.

13  **MS. O'GRADY:**  I would like to make two more brief

14  points if you will allow me to.

15  **THE COURT:**  Sure.  Go ahead.

16  **MS. O'GRADY:**  Thank you.  The first is I just want to

17  express my gratitude and gratitude on behalf of the Plaintiffs'

18  counsel for everyone attending today and those class members

19  who spoke and everyone who asked to speak.

20  It is not often that we get together altogether and that

21  they get to communicate together.  They are their best

22  advocates, and we are honored to represent you.  So I wanted to

23  just give that message to all the class members.

24  I would also like to note that there has been a very

25  active chat during this hearing.  Of course, I have been paying

1    attention to the speakers and haven't been able to go through.

2         But individuals who are on the line and in the chat have

3    been posting full texts of their denial letters.  And other

4    borrowers are weighing in and saying:  I received the exact

5    same denial letter, the exact same text, or I got the same

6    letter.  Just the school name was different.  People are

7    discussing this openly in the chat.

8         And I'm hoping, perhaps, there is a way to make the chat

9    part of the record because I think it is a really, really,

10   important validation of what the speakers have talked about

11   today, really applying to many hundreds more people than we

12   were able to hear from especially with regard to the actual

13   text being posted and people writing in that they received the

14   same words, word-for-word.

15        So I don't know if there is a way for that to become part

16   of the record, but I would like to just make sure that we note

17   that and preserve that in some way.

18        **THE COURT:**  Angela, I don't know the answer to that.

19   That is a good question.  Angela, is there a way to keep a

20   permanent record of all the chat boxes that showed up on the

21   screen?  Quite a number of them.  I saw some of them myself.

22   Is there a way to do that?

23        **THE CLERK:**  Yes, there is, Your Honor.  I was planning

24   on downloading the chat and providing it to the Court after the

25   hearing.  And I will do so.

1          **THE COURT:**  All right.

2          **MS. O'GRADY:**  Wonderful.

3          **THE COURT:**  So, yes, Angela is going to go do that.

4     We will make it part of the record.  And, now, I didn't -- the

5     little things that I saw were just three or four sentence --

6     three or four words.  I didn't see any full pictures of the

7     denial letters on my screen.  But whatever we got here, I think

8     Angela is able to make a record of it.  So we will do that.

9     Thank you for that.

10         **MS. O'GRADY:**  Fantastic.  Thank you so much.  And

11    thank you so much, Angela, for organizing this today.  Again,

12    it was galvanizing to hear from all the borrowers; and I'm glad

13    they were able to connect in the harm the delay has caused each

14    and every one of them.

15         **THE COURT:**  Yes.  I have been a Judge 21 years now,

16    and I have done a lot of class action hearings.  And this is

17    the most interesting one of all because five -- over 500 people

18    tuned in -- way more than you would ever get in a normal class

19    action -- and we have done it so that people can show up from

20    all over the country.  It is quite amazing.

21         I have a question that I would like the lawyers to address

22    for me and each of you -- don't address it now, but I want you

23    to submit a statement within one week, each of you.

24         In listening to the comments, it occurred to me that it

25    would be useful for me to know which educational institutions,

 1   like University of Phoenix or Brooks, or whoever -- I don't

 2   know the details of this myself -- but which of those

 3   institutions have already been found by the Department of

 4   Education or the FTC or a State Attorney General or some other

 5   official to have been a fraudulent institution or engaged in

 6   fraudulent solicitation of students.

 7        You probably think that I know the answer to this off the

 8   top of my head, but actually I don't.  I don't know that.  It

 9   has never come up in this case before.  But it would be useful

10   to me to have a list of those.

11        Now, down the road it might also be useful as to which

12   class members attended which of those schools.  Now, I'm not

13   interested yet in the ones that haven't been adjudicated.  Let

14   me just ask you, Ms. O'Grady, are there institutions that the

15   FTC has already said are fraudulent?

16        MS. O'GRADY:  Yes, Your Honor.  I don't have that list

17   off the top of my head either but that is certainly true.

18        THE COURT:  What?

19        MS. O'GRADY:  There are institutions that the FTC has

20   deemed fraudulent; and there is a number of institutions that

21   specific findings have been made by agencies about misconduct,

22   yes.

23        THE COURT:  All right.  So it may be that down the

24   road those institutions that have already been adjudicated to

25   be frauds, we might want to ask the Department of Education to

1   explain why they are denying, if they are, applications that

2   are associated with the fraudulent institutions.

3         **MS. O'GRADY:**  Your Honor, we would be quite interested

4   in those explanations as well.  And I can confirm that there

5   have been denials issued for such institutions already by the

6   Department.

7         **THE COURT:**  Is that true, Mr. Merritt?  That somebody

8   has already adjudicated the institution to be a fraud and yet

9   you are not -- you are not granting the loan application

10  relief?

11        **MR. MERRITT:**  Your Honor, this is addressed a little

12  bit in one of the letters that the Defendant sent to the

13  Plaintiffs back in August.  It is a part of the record attached

14  to one of Plaintiffs' motions.  I also note that we have a

15  filing today potentially to address some of these issues as

16  well in response to the Plaintiffs' motion to enforce the

17  settlement agreement.

18      I would just note at this point that there are

19  institutions such as -- you mentioned federal and state

20  enforcement authorities -- have conducted investigations in

21  schools and determined they engaged in certain kind of

22  wrongdoings during certain periods of time.

23      It doesn't mean that, you know, individuals that were

24  subject to that wrongdoing would have a basis for borrower

25  defense.

1      It is not a matter of, you know, adjudicating a school

2    fraudulent across the board.  It would be based on certain

3    actions at certain period of times.  (Inaudible) school would

4    not necessarily prevent claims being denied from individuals

5    who attended the schools and were not affected by that

6    wrongdoing.

7          **THE COURT:**  I don't know.  Maybe.  But maybe there is

8    a presumption that it's saying that the University of Jonestown

9    was found by the Attorney General of New York to be fraudulent

10   in the year 2010.  That we could presume that it was still

11   fraudulent in the year 2011.  I don't know the answer to that

12   but I want to see the list.

13         **MS. O'GRADY:**  Your Honor, if I may, I think it would

14   be interesting to know the timeline and to discover what is a

15   floor and what is the ceiling.  But there are instances where

16   students have actually received restitution for fraudulent

17   schools directly from a New York Attorney General finding and

18   then were denied by the Department.

19         We have an affidavit attached to our filing by Yvette

20   Collon when we filed for the additional case management

21   conference.  And she is a person who received restitution but

22   then had her borrower defense denied.

23         So that is not an issue of timing or windows or anything

24   like that.  That is a direct contradiction to a previous

25   finding.  There are other examples.  That is just one for now.

1   They are in our papers, previous papers.

2       I will note too those denials are unexplained.  They say

3   they considered evidence from other adjudications and other

4   investigations.  They may list the evidence, but then they deny

5   them without explanation of why that evidence wasn't found to

6   be relevant in this case; and they also do not mention any of

7   the evidence that the individual provided.

8       **MR. MERRITT:**  Your Honor, I think a lot of that

9   points -- a lot of these claims, you know, at least pointed out

10  these cases brought based on the Department's delay in issuing

11  decisions.  And that is kind of the class issue that has been

12  certified.

13      Obviously we are not here today to resolve any of the

14  disputes or issues, but it does point out that, you know,

15  borrowers submit different kinds of applications and the legal

16  sufficiency of the Department's response to any given case

17  would be a case specific determination and is not appropriate

18  for determination in these proceedings and in this class action

19  based on the claims that were brought.

20      **THE COURT:**  All right.  I'm going to end the hearing,

21  but I want to end with one statement and that is:  If it turns

22  out that we undo the class settlement, we would have wasted a

23  lot of time that could have been used -- Ms. O'Grady, you could

24  have been taking depositions in the Department of Education of,

25  Ms. DeVos.

1       You could have been taking depositions of every one of

2  those people writing up the letters, the denial letters.  And

3  none of that has been done on account of this "settlement."

4       So I -- if we do deny it, we are going to get huckle-buck.

5  I don't know if you know that word but that means fast.  We are

6  going to get back into this case fast.  We are going to

7  litigate it like a real lawsuit with depositions; people under

8  oath.

9       I don't know the answer.  But I want to end by saying to

10  all of you who tuned in:  Thank you.  It is a tough problem.  I

11  don't have a good answer.  I wish I did.  But thank you.  I

12  appreciate all of your comments.

13       I'm going to step off the bench now.  And Angela is going

14  to end the -- terminate all of the phone call stuff.  Okay.

15  Bye-bye.

16       **THE CLERK:**  I would like to say to everyone listening

17  that I'm already getting e-mails asking about transcripts and

18  how to access recordings of the hearings.

19       Please, please, please, don't e-mail me.  As much as I

20  would love to respond to each and every one of you, I'm only

21  one person.

22       I will put information in the chat box right now about how

23  you can obtain a transcript of the hearing and access public

24  records in this case.

25       Again, please, please don't e-mail me.  It is not because

1    I don't want to hear from you.  It is just because I can't

2    physically respond to 700 e-mails.

3         You are welcome to log off, Counsel.  It was nice meeting

4    both of you.

5              **MS. O'GRADY:**  Thank you very much.

6              **MR. MERRITT:**  Thank you.

7                   (Proceedings adjourned at 9:22 a.m.)

8                        ---oOo---

9

10                   <u>**CERTIFICATE OF REPORTER**</u>

11        We certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:   Sunday, October 18, 2020

15

16

17

18   _____

19              Marla F. Knox, RPR, CRR
                U.S. Court Reporter

20

21

22

23

24

25

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 2**

1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    MARTIN CALVILLO MANRIQUEZ, et al.,        Case No.  17-cv-07210-SK

8                      Plaintiffs,

9          v.                                   **ORDER GRANTING IN PART AND
                                                DENYING IN PART PLAINTIFF'S
10   ELISABETH DEVOS, et al.,                   MOTION FOR PRELIMINARY
                                                INJUNCTION**
11                    Defendants.

12                                              Regarding Docket No. 35

13         Plaintiffs move the Court for a preliminary injunction returning to the *status quo ante* by

14   requiring the Department of Education to process certain non-discharged federal student loan debt

15   in accordance with the "Corinthian Job Placement Rate Rule."  Defendant Elisabeth Devos,

16   Secretary of the Department of Education (hereinafter "Secretary") opposes the motion.  Having

17   considered the parties papers, relevant legal authority, and having heard oral argument, the Court

18   **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

19                              **FACTUAL BACKGROUND**

20   **A.  Regulatory Background.**

21         The Department of Education (the "Department") is responsible for overseeing and

22   implementing Title IV of the Higher Education Act of 1965 ("Higher Education Act") 20 U.S.C. §

23   1001 *et seq.*, including the William D. Ford Direct Loan Program ("Direct Loan Program"), 20

24   U.S.C. § 1087a *et seq.,* which provides loans ("Direct Loans") to borrowers for use at

25   "participating institutions of higher education."  (Dkt. 35, at page 4.)  The Higher Education Act

26   allows borrowers to seek cancellation of their Direct Loans based on a school's misconduct and

27   directs that "the Secretary shall specify in regulations which acts or omissions of an institution of

28   higher education a borrower may assert as a defense to repayment of a loan made under this

1    part[.]"  20 U.S.C. § 1087e(h).

2         In 1995, the Secretary promulgated a regulation that permits a borrower to assert as a

3    defense to repayment, "any act or omission of the school attended by the student that would give

4    rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

5    The regulation, also known as the "borrower defense rule," relieves the borrower of the obligation

6    to repay all or part of the loan and associated costs and fees.  The regulation further provides:

> If the borrower's defense against repayment is successful, the Secretary notifies the
> borrower that the borrower is relieved of the obligation to repay all or part of the
> loan and associated costs and fees that the borrower would otherwise be obligated
> to pay.  The Secretary affords the borrower such further relief as the Secretary
> determines is appropriate under the circumstances.  Further relief may include, but
> is not limited to, the following:
>
> (i)     Reimbursing the borrower for amounts paid toward the loan voluntarily or
>         through enforced collection;
>
> (ii)    Determining that the borrower is not in default on the loan and is eligible to
>         receive assistance under title IV of the Act.
>
> (iii)   Updating reports to consumer reporting agencies to which the Secretary
>         previously made adverse credit reports with regard to the borrower's Direct
>         Loan.

16   34 C.F.R. § 685.206(c)(2).

17        The loans that are the subject of this litigation were issued pursuant to a Master Promissory

18   Note, which states that the borrower may assert a defense against collection of the loan, if "the

19   school did something wrong or failed to do something that it should have done," provided that

20   "the school's act or omission directly relates to [the] loan or the educational services that the loan

21   was intended to pay for, and if what the school did or did not do what would give rise to a legal

22   cause of action against the school under applicable state law."  (Dkt. 35-5, at ¶ 3, Ex. 1, at page 7.)

23        A memorandum from James Runcie, the Chief Operating Officer of the Federal Student

24   Aid office of the Department, dated June 4, 2015, states:  "Prior to 2015, the borrower defense

25   identified above was rarely asserted by any borrowers and no specific methods of collecting

26   information regarding borrower defense claims had been defined or found necessary."  (Dkt. 35-7,

27   Ex. 12, at page 1.)  According to the Department's Office of Inspector General's report dated

28   December 8, 2017, from July 1, 1995 through June 24, 2015, the Department received only five

2

1    borrower defense claims.  (Dkt. 35-6, Ex. 10, at page 6.)

2        **B.  Corinthian Colleges.**

3        Corinthian Colleges, Inc. ("Corinthian") was a for-profit college chain, operating under the

4    brands Everest, Heald, and WyoTech.  (Dkt. 35-5, Ex. 2, at page 1.)  At its peak in 2009 and 2010,

5    Corinthian operated over 100 campuses in 25 states, enrolled over 110,000 students and collected

6    over $1.7 billion in revenue, over 80% of which was in the form of student loans provided under

7    the Direct Loan Program.  (*Id.*, at page 2.)  The Corinthian schools included different campuses for

8    a wide variety of subjects.  For example, Corinthian schools included Heald Concord –

9    Accounting, Heald Fresno – IT Network Systems, Everest Los Angeles Wilshire – Dental

10   Assistant (Diploma), and WyoTech Long Beach – Plumbing Technology (Diploma). (Dkt. 35-6,

11   Exs. 6-7.)

12       In January 2014, the Department sought data supporting Corinthian's advertised job

13   placement rates.  (Dkt. 35-7, Ex. 11, at page 4.)  Corinthian refused to provide the data, and in

14   June 2014, the Secretary placed Corinthian on a heighted cash monitoring status.  (*Id.*)  In July

15   2014, the Secretary and Corinthian entered into an operating agreement, pursuant to which

16   Corinthian would cease operations "by teaching out at least a dozen of its campuses and by selling

17   as many of the rest of the schools as possible."  (*Id.*)  The Secretary also appointed a monitor to

18   oversee Corinthian's operations and its wind-down activities, "including federal student aid draws,

19   expenditures (including refunds required under the operating agreement), and [Corinthian's]

20   compliance with its obligations to the Department."  (*Id.*)

21       In March 2015, after Corinthian failed to file audited financial statements, the Secretary

22   requested a letter of credit from Corinthian.  (*Id.*, at page 5.)  In April 2015, the Secretary

23   determined that Corinthian made false statements about its placement rates and issued a fine

24   against Corinthian in the sum of $30 million for "substantial misrepresentation" under 34 C.F.R.§

25   668.71-75.  (Dkt. 35-5, Exs. 3-4; Dkt. 35-7, Ex. 11.)  Specifically, the Secretary found that

26   Corinthian published falsely inflated job placement rates for 947 programs at its Heald College

27   locations.  (Dkt. 35-5, Ex. 3.)

28       Corinthian closed its colleges in April 2015, and students who had borrowed federal

United States District Court
Northern District of California

United States District Court
Northern District of California

1    student loans to attend a Corinthian program asserted their rights to cancellation of their loans

2    under the borrower defense rule and terms of the Master Promissory Notes.  (Dkt. 35-5, Ex. 5, at

3    pages 2-3.)

4        **C.  The Secretary's Response to the Collapse of Corinthian.**

5        Faced with the collapse of Corinthian and over 100,000 borrowers with potential borrower

6    defenses, Under Secretary Ted Mitchell ("Under Secretary") of the Department appointed a

7    special master ("Special Master") to help the Department develop the processes and systems

8    needed to provide relief to borrowers who had relied upon false and misleading statements from

9    certain career colleges, including Corinthian.  (Dkt. 35-7, Ex. 11, at page 1.)  The goal of the

10   Special Master was to develop a system for providing debt relief that was "fair, transparent, and

11   efficient, with a minimal burden on borrowers."  (*Id*.)

12       In June 2015, the Secretary requested that the Office of Management and Budget grant

13   emergency approval of an attestation form, waiving the requirement for public notice in the

14   Federal Register.  (Dkt. 35-7, Ex. 12, at page 3.)  It appears that the Office of Management and

15   Budget granted approval, as the Secretary disseminated the attestation forms and set up a process

16   to review claims and to provide expedited relief for certain Corinthian borrowers.  (Dkt. 35-5, Ex.

17   5.)  The attestation forms advise borrowers of Corinthian's publication of misleading job

18   placement rates and the location of a website containing two lists of covered programs and dates

19   of enrollment covered by the attestation (the "Lists").  (Dkt. 35-6, Exs. 6, 7, 8, 9.)  The Lists

20   include names of schools and dates of enrollment from 2010 to 2014.  (Dkt. 35-6, Exs. 6, 7.)  For

21   example, borrowers listed in the examples above were eligible for relief under the Corinthian Rule

22   only if their first dates of enrollment were as follows: (1) Heald Concord – Accounting after

23   February 13, 2014; (2) Heald Fresno – IT Network Security after July 1, 2010; (3) Everest Los

24   Angeles Wilshire – Dental Assistant (Diploma), between July 1, 2010 and September 30, 2014;

25   and (4) WyoTech Long Beach – Plumbing Technology (Diploma) between July 1, 2010 and

26   September 30, 2014.  (*Id*.)  The attestation forms state that borrowers should submit the forms

27   only if their programs and dates of enrollment are included on the Lists.  (Dkt. 35-6, Exs. 8, 9.)

28       In the case of a borrower who attended a Heald program on the Lists, the attestation form

4

states as follows:

> I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206(c).
>
> ….
>
> I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

(Dkt. 35-6, Ex. 8.) The combined attestation form for the Everest and WyoTech programs is identical to the attestation form for the Heald program attestation form but substitutes the names of Everest and WyoTech for Heald. (Dkt. 35-6, Ex. 9.)

On March 26, 2016, the Special Master reported that he had reviewed 546 claims from borrowers and recommended to the Under Secretary that "full relief (including restitution of all amounts paid) be provided for [certain] loans." (Dkt. 35-7, Ex. 13, at page 5.) Such loans included programs at Heald, Everest, and WyoTech. (*Id.*)

### D. The Department's Actions in Relieving Debt before January 20, 2017.

The Department reached out to borrowers who were potentially eligible for discharge of their loans under the borrower defense rule by electronic mail and postal mail. (Dkt. 35-7, Ex. 15, at pages 5-6.) The outreach was to 280,000 Everest and WyoTech students and over 55,000 Heald students. (*Id*.) The Department received 72,877 claims between June 25, 2015 and January 20, 2017 and reviewed and discharged 26,964 claims. (Dkt. 35-6, Ex. 10, at page 6.)

In October 2016, in response to the claims resulting from the collapse of the Corinthian colleges, the Secretary announced the final regulations, which were scheduled to take effect on July 1, 2017.[1] The regulations established a new federal standard for borrower defenses and limitations periods for loans disbursed on or after July 1, 2017, but also included a separate provision for those loans disbursed prior to July 1, 2017. 81 Fed. Reg. 75926-76089 (November 1, 2016). According to the revised, proposed regulation, 34 C.F.R. § 685.206(c), the borrower

---

[1] U.S. Department of Education: http://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html (last visited May 25, 2018.)

United States District Court
Northern District of California

defense rule for loans made before July 1, 2017, provides a borrower defense for:

> any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:
>
> (i)    A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.
>
> (ii)   A claim to recover amounts previously collected by the Secretary on the Direct Loan in whole or in part.

81 Fed. Reg. 76080.

Plaintiffs claim that, before January 20, 2017, there was a "Corinthian Job Placement Rate Rule" (the "Corinthian Rule").[2] According to Plaintiffs, the Secretary based the Corinthian Rule on the following determinations:

(1)  California is the applicable state law for purposes of determining whether there is a cause of action against the specific Corinthian school under 34 C.F.R. § 685.206(c)(1);

(2)  Corinthian misrepresented its job placement rates at specified campuses, regarding certain programs, during enumerated periods of time;

(3)  Any Corinthian borrower who submits a simple attestation form provided by the Department or otherwise submits sufficient information to establish a membership in a certain group establishes a borrower defense; and

(4)  The Department will provide relief under California law by cancelling all outstanding amounts on related loans and returning any money collected by the Department. (Dkt. 35, at pages 12-13.) According to Plaintiffs, the Corinthian Rule covers 800 Heald programs between 2010-2015, for the benefit of at least 50,000 borrowers, and 800 Everest and WyoTech programs in over twenty states, with 85,000 borrowers who are eligible for cancellation under the borrower defense rule. (*Id.*, at page 14.)

Plaintiffs contend that the Corinthian Rule was "codified" in three documents:  (1) a memorandum prepared by the Department's Office of General Counsel, (2) a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and (3) an

---

[2] The Court understands that the Secretary challenges the very existence of the Corinthian Rule, but for purposes of this Order, the Court will refer to the Corinthian Rule as a shorthand for describing the process that was, for practical purposes, in place before January 20, 2017.

1   April 2015 document prepared by the Federal Student Aid's Administrative Actions & Appeals

2   Services Group. (Dkt. 35, at pages 13-14 (citing Dkt. 35-6, Ex. 10); Dkt. 58 (First Amended

3   Complaint), at ¶ 80.) In addition, Plaintiffs claim that the Department issued consistent public

4   statements about the existence of the Corinthian Rule. (Dkt. 35, at pages 13-14 (citing Dkt. 35-7,

5   Ex. 11).)

6           Plaintiffs do not provide the three source documents cited above for this motion because

7   they do not possess them. (Dkt. 58, at ¶ 80; Dkt. 48, at page 10, n. 13.) Instead, Plaintiffs cite to

8   secondary sources to bolster the existence of the Corinthian Rule and to show that the above-cited

9   documents exist. None of the secondary sources refer to the Corinthian Rule by any name, and

10  none of the secondary sources lists the entire set of standards that Plaintiffs claim constitute the

11  Corinthian Rule. (Dkt. 35-5, Ex. 5; Dkt. 35-7, Exs. 11 - 15.) For example, Plaintiffs cite to the

12  report of the Special Master for the existence of the legal memorandum. (Dkt. 35-7, Ex. 11, at

13  page 5.) That report states: "Because Heald was headquartered in and managed from California,

14  the Department looked to California law and determined that Heald's misrepresentation of

15  placement rates constituted prohibited unfair competition under California Unfair Competition

16  Law (UCL)." (Dkt. 35-7, Ex. 11, at page 5.) The Special Master further stated: "Accordingly,

17  students that relied on such misleading placement rates when they enrolled at Heald would have a

18  cause of action under state law." (*Id*.)

19          There is one area of agreement. Plaintiffs and the Secretary agree that, if borrowers signed

20  the attestation forms to show that they had attended the schools on the Lists and that they had

21  relied upon the false statements, the Department did not require them to prove on an individual

22  basis that they were defrauded. (Dkt. 35-5, Ex. 5, at pages 2-3; Dkt. 42, at pages 6-7.) Instead of

23  proving their claims individually, those borrowers could assert their right to relief as part of an

24  expedited system. (*Id*.)

25          However, the Secretary challenges the existence of the Corinthian Rule. The Secretary

26  states that there was no rule that guaranteed full relief to any borrower who completed the

27  attestation form. The Secretary claims that the Department "maintained its discretion to . . .

28  discharge 'all or part' of a loan subject to a successful borrower claim." (Dkt. 42, at page 1.) The

United States District Court
Northern District of California

7

Secretary argues that the Department never represented to borrowers that they would be entitled to full relief if they completed the attestation forms.

"Loan forgiveness" on the attestation forms does not specify the amount of forgiveness of the debt. (Dkt. 35-6, Exs. 8, 9; Dkt. 42, at page 7.) None of the documents that Plaintiffs cite state that borrowers are entitled to full relief even if they attended a program on the Lists and completed the attestation form. As a practical matter, though, it appears that, before January 20, 2017, the Department did provide full relief or total discharges for borrowers who completed the attestation forms. The Secretary does not challenge or refute that factual statement.

### E. The Department's Actions as of January 20, 2017.

Starting on January 20, 2017, the Secretary stopped processing claims under the Corinthian Rule. (Dkt. 35-6, Ex. 10, at pages 3, 13-14.)

#### 1. Delay of Previous Regulations.

In June 2017, the Secretary announced that she was undertaking further rulemaking on the issue of the borrower defense rule and delayed the regulations that were set to become effective July 1, 2017, discussed above. (Dkt. 35-7, Ex. 18.) One news article reported that the Secretary remarked: "Under the previous rules, all one had to do was raise his or her hands [sic] to be entitled to so-called free money." (Dkt. 35-8, Ex. 32.)

#### 2. The "Average Earnings Rule."

##### a. Preliminary Assessment Using "Gainful Employment" Metric.

The Secretary first reviewed a metric of "gainful employment" for Corinthian schools and determined that some students who attended Corinthian schools obtained some educational benefit. The metric of "gainful employment" assesses whether a program "has indeed prepared students to earn enough to repay their loans, or was sufficiently low cost, such that students are not unduly burdened with debt, and to safeguard the Federal investment in" Title IV. 79 Fed. Reg. 64891. A program passes the gainful employment requirement if students' median annual loan payments are less than or equal to 20% of discretionary income or 8% of their annual earnings. 34 C.F.R. § 668.403(c). The Secretary examined data already within the Department for Corinthian programs and learned that many Corinthian programs had passing scores under the gainful

8

Case 3:17-cv-07210-SK Document 130-6 Filed 09/23/19 Page 61 of 98

1    employment metric. (Dkt. 42-1, Ex. 2, at ¶¶ 12- 16.) For example, the Department analyzed the

2    data for 106 Corinthian programs from 2015 and found that 51 of them had passing scores under

3    the gainful employment metric. (Dkt. 42-2, ¶ 11.) This preliminary analysis suggested to the

4    Secretary that a "more rigorous analysis of earnings" was appropriate as a test to provide relief for

5    borrowers who asserted the borrower defense rule. (*Id.*, at ¶ 13.)

6                    **b.  December 15, 2017 Memorandum and December 20, 2017 Press Release.**

7            The Secretary claims that the Department quantified the lack of value actually received

8    from the educational program attended "by comparing the average earnings of students who

9    attended a given academic program with the average earnings of similar programs at schools the

10   Department determined adequately prepared students for gainful employment." (Dkt. 42, at page

11   2.) The Secretary issued a memorandum, dated December 15, 2017, authored by the Senior

12   Advisor to the Office of the Chief Financial Officer of the Department "in collaboration with FSA

13   [Federal Student Aid office] and the Department's Office of the General Counsel" (the "December

14   15, 2017 Memorandum"). (Dkt. 42-2, at ¶¶ 2, 6 and Ex. 1.) The December 15, 2017

15   Memorandum details the steps that the Department took in determining the new methodology for

16   relief. (*Id.*, at ¶ 6.) The Secretary also issued a press release on December 20, 2017 explaining the

17   new methodology for evaluating borrowers' claims (the "December 20, 2017 Press Release").

18   The Secretary stated: "This improved process will allow claims to be adjudicated quickly and

19   harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder

20   massive costs that may be unjustified." (Dkt. 42-1, Ex. 1, at page 1.)

21           Instead of developing a "new rule" as Plaintiffs claim, the Secretary maintains that the

22   Department came to the "common sense conclusion" that the relief for the successful borrower

23   defense claims should be based on a measure of the actual harm that borrowers suffered as a result

24   of Corinthian's misconduct. (Dkt. 42, at page 2.) Plaintiffs refer to the Secretary's new process as

25   the "Average Earnings Rule." (Dkt. 42-1, Ex. 1.)[3] The Secretary maintains that the weakness of

26

27           _____
                     [3]   For purposes of this Order, the Court will refer to the Secretary's methodology as
28   explained in the December 15, 2017 Memorandum and the December 20, 2017 Press Release as
     the "Average Earnings Rule."

United States District Court
Northern District of California

the previous administration's process for assessing claims of borrower defense is that that process assumed that all Corinthian students received nothing of value, when in many cases graduates received "substantial value from their education." (Dkt. 42-1, Ex. 2, at page 11.)

### c. Method for Determining Relief under Average Earning Rule.

The Average Earning Rule, instead of granting full relief to borrowers who submitted attestation forms for attending schools on the Lists, is a system which provides a percentage of relief based on a comparison of earnings from a specific Corinthian program and a comparable (non-Corinthian) school with a passing gainful employment score. (Dkt. 42-2, at ¶ 14, Ex. 1, at pages 3-4.) To compare the earnings from Corinthian schools and comparable schools with a passing gainful employment score, the Department identified 79 Corinthian programs and submitted information identifying the names of 61,717 former Corinthian students to the Social Security Administration ("Social Security Administration") to obtain the data regarding the earning capacities of those students. (Dkt. 42-2, Ex. 1, at page 3.) Specifically, the Department sent information with dates of birth and Social Security numbers of the applicants who submitted attestation forms for Corinthian programs to claim the borrower defense. (*Id*.) In return, the Social Security Administration provided the Department with aggregate data regarding the "mean and median incomes" for each group of students in the Corinthian programs, based on data from 2014. (*Id*.) The Social Security Administration then provided that data "in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual." (Dkt. 35-8, Ex. 27, at page 41.) The Department refers to the information that the Social Security Administration sends as "aggregate earnings information." (*Id*.) The Secretary claims that the Department exchanged this information under the terms of an agreement between the two agencies: *Amended Information Exchange Agreement between the Department of Education & the Social Security Administration for Aggregate Earnings Data* (the "Gainful Employment Agreement"). (Dkt. 35-8, Ex. 27.)

Using the data from the Social Security Administration, the Department compared the earnings under four different formulas, using the mean and median earnings for Corinthian students with the mean and median earnings of students at comparable programs with passing

Case 3:17-cv-03674-SK   Document 183-6   Filed 03/26/18   Page 73 of 587

gainful employment scores.  (Dkt. 42-2, Ex. 1, at pages 3-4.)  Although the process is more

complicated than this general description, the general, relevant parameters are that the Department

analyzed the difference between the earnings of Corinthian borrowers and the earnings of students

from schools with passing gainful employment scores.  If the earning from the passing school was

higher than the earning of the Corinthian students, this difference represented the educational

value or lack of educational value of the Corinthian program.  (*Id*.)

Based on the methodology above, those borrowers in a Corinthian group who earned less

than 50% of the earnings of comparable programs with passing gainful employment scores

received 100% relief from their loans.  (Dkt. 42-2, Ex. 1, at pages 4-5.)  Borrowers in a Corinthian

group who earned between 50% and 90% of the earnings of comparable programs with passing

gainful employment scores received relief in amounts inverse to their earnings.  (*Id*., at page 4.)

For example, if the average Corinthian borrower earned 60% of the average received in the

comparable program, the Corinthian borrower received 40% relief.  (*Id*., at page 4.)  All approved

borrowers receive a minimum of 10% in relief.  (*Id*., at page 5.)   The Secretary issued a table in

the December 20, 2017 Press Release that shows in graphic form the amount of relief:

| CCI Earnings as a Percentage of GE [Gainful Employment] Earnings | Amount of Relief |
| --- | --- |
| 1% to 49% | 100% |
| 50% to 59% | 50% |
| 60% to 69% | 40% |
| 70% to 79% | 30% |
| 80% to 89% | 20% |
| 90% and above | 10% |

(Dkt. 42-1, Ex. 1.)

The December 20, 2017 Press Release reported that the Department approved 12,900

pending claims for discharge and denied 8,600 claims.  (*Id*.)  Many of the denials were ones that

the previous administration had identified but for which the previous administration had not yet

United States District Court
Northern District of California

1    acted.  (*Id.*)  The Secretary advised borrowers that the Department would notify them on a rolling

2    basis as the Department finalized their discharges.  (*Id.*)

3            **d.  Current Status.**

4            As of April 1, 2018, borrowers filed over 147,000 claims under the borrower defense rule,

5    and 99,000 claims remained pending.  (Dkt. 42-3, at ¶ 4.)

6            **3.  Claimants' Discharges under the Average Earnings Rule.**

7            Plaintiffs submit several declarations from borrowers who attended Corinthian programs,

8    borrowed Direct Loans, and asserted a borrower defense to obtain relief from repayment.

9            **a.  Plaintiff Jennifer Craig.**

10           Named Plaintiff Jennifer Craig submitted a claim for relief from her student loan under the

11   borrower defense.  (Dkt. 35-1.)  She attended Everest College in California and relied upon

12   statistics that Corinthian's representatives showed her about the success of graduates in getting

13   jobs in medical insurance and billing.  (*Id.*, at ¶¶ 7-10.)  She enrolled in the Everest program in

14   April 2014 and borrowed $9,019 to pay for her education.  (*Id.*, at ¶¶ 10-11.)  Although she

15   completed her course of study, she did not receive a diploma because Corinthian closed in 2015

16   before she could get her diploma.  (*Id.*, at ¶¶ 14-17.)  Craig was not able to find work in the area of

17   study – medical insurance billing – and later learned that, in order to get a job, she needed at least

18   one year of experience that she had not obtained in her practical training at Corinthian.  (*Id.*, at ¶¶

19   18 - 19.)  Craig submitted an attestation form to the Department for relief from repayment of her

20   Direct Loan, and she received notice that the Department had discharged only 20% of her Direct

21   Loan.  (*Id.*, at ¶¶ 21, 23, Ex. 1.)  The letter from the Department does not provide a detailed

22   explanation for the determination of relief of only 20%, but it states:

23           The amount of loan relief that you will receive is based on the Department's
             assessment of the value of the education that you received.  The Department has
24           determined the value of your education by comparing the average aggregate
             earnings of students who attended yours program(s) of study to the average
25           aggregate earnings of students who graduated from similar programs at other
             schools that have adequately prepared students for gainful employment, under the
26           standard set forth by the Department's regulations at 34 C.F.R. Part 668, Subpart
             Q.
27
     (*Id.*, Ex. 1.)  There is no more information about the way in which the relief was calculated and no

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    information about a process of appealing or challenging the decision.  The letter states:

2    "If you have questions about this notice, please contact the Department of Education at

3    FSAOperations@ed.gov or at 1-855-279-6027." (*Id.*)  Craig and her husband have a very limited

4    income or no income, and their expenses for their family exceed their income.  (*Id.*, at ¶¶ 26 - 30.)

5    They appear to live, by any definition, in poverty.  The existence of loans with the obligation to

6    repay 80% of her Direct Loan causes Craig stress on a daily basis.  (*Id.*, at ¶¶ 31-32.)

7            **b.  Plaintiff Jamal Cornelius.**

8            Plaintiff Jamal Cornelius attended a Heald College program in information technology

9    because recruiters told him that he could obtain a high-paying job.  (Dkt. 35-2, at ¶ 6.)  He began

10   his program in July 2013 and borrowed a total of $25,555 in federal student loans and $2,000.26

11   in private loans.  (*Id.*, at ¶ 13.)  In 2015, Cornelius began making repayments of $273.64 per

12   month.  (*Id.*, at ¶ 14.)  Cornelius submitted his attestation form in the summer of 2016 and

13   resubmitted it in August 2016.  (*Id.*, at ¶¶ 16-18.)  Cornelius initially paid the loans but then

14   requested loan forbearance because he was not able to make the payments.  (*Id.*, at ¶¶ 22-23.)  He

15   learned that the only forbearance program he could seek would capitalize the interest on his loan.

16   (*Id.*, at ¶ 24.)  Cornelius is still waiting for a decision on his request for discharge and repayment

17   of his federal loans.  (*Id.*, at ¶ 25.)  Cornelius has not been able to obtain a job in information

18   technology and is working at Taco Bell in Hercules, California.  (*Id.*, at ¶¶ 11-12.)

19           **c.  Plaintiff Rthwan Dobashi.**

20           Plaintiff Rthwan Dobashi attended a WyoTech program in automotive technology in

21   Fremont, California, after seeing advertisements about high-paying jobs.  (Dkt. 35-3, at ¶ 5.)

22   Dobashi borrowed $22,184 in federal student loans and $3,183.73 in private loans.  (*Id.*, at ¶ 11.)

23   He made monthly repayments, even though he was not able to find a job in the area where he

24   trained.  (*Id.*, at ¶¶ 10, 12.)  Dobashi wants to return to school but cannot do so because of the

25   loans he has to repay.  (*Id.*, at ¶ 13.)  He submitted an attestation form for discharge of his loans

26   and also asked for forbearance of his loans in April 2016.  (*Id.*, at ¶¶ 16, 17.)  The Department

27   notified him that his loans were in forbearance but accruing interest at the rate of $76.27 per

28   month.  (*Id.*, at ¶ 18.)  He has not received a response from the Department, even though he

1    submitted his attestation form over two years ago.  (*Id*., at ¶¶ 16, 19-21.)

2              **d.  Plaintiff Alina Farajian.**

3         Plaintiff Alina Farajian attended Everest College to become a medical assistant.  (Dkt. 35-

4    4, ¶ 23.)  Everest's recruiters assured Farajian that she could attend even though she had a learning

5    disability and assured Farajian that Everest had a job placement program that could assist her in

6    getting a job.  (*Id*., at ¶¶ 9, 10, 12-13.)  Farajian also reviewed brochures that listed very high job

7    placement rates.  (*Id*., at ¶ 18.)  Farajian finally enrolled in the summer of 2013 and borrowed

8    $5,000 in federal Direct Loans.  (*Id*., at ¶ 24.)  Her mother borrowed $10,000 in PLUS loans.  (*Id*.,

9    at ¶ 24.)  Farajian  completed her program and received a diploma, but the only job she was able to

10   obtain in her field of study was a one-month, temporary job.  (*Id*., at ¶¶ 26-27.)  Farajian began

11   repaying her loans in 2015 but then submitted an attestation form and asked for forbearance of her

12   loans.  (*Id*., at ¶¶ 30, 32.)  Farajian's mother also submitted an attestation form, and her entire

13   PLUS loan was discharged.  (*Id*., at ¶ 33.)  On March 1, 2018, Farajian received a letter from the

14   Department indicating that only 30% of her loan would be discharged.  (*Id*., at ¶ 37.)  Farajian is

15   working as a driver for Lyft but makes only $250 per month over her expenses.  (*Id*., at ¶¶ 39-40.)

16   Farajian is suffering from stress as a result of the loans.  (*Id*., at ¶¶ 41.)

17                      **PLAINTIFFS' PROPOSED INJUNCTION**

18         Plaintiffs seek class-wide preliminary injunctive and declaratory relief to return to the

19   *status quo ante*.  The proposed class of Plaintiffs is defined as:

20         all individuals who borrowed a Direct Loan to finance the cost of enrollment in a
           program who are covered by the Department's Corinthian Job Placement Rule,
21         who have applied or will apply for a borrower defense, and who have not been
           granted the full relief provided for by the Rule.
22

23   (Dkt. 58, at ¶ 257.)  Plaintiffs identify the class of borrowers who attended programs in the Lists

24   for the time periods in the Lists.  (Dkt. 35-6, Exs. 6-7)  Plaintiffs seek an injunction ordering the

     Department:
25

26         to cease all efforts to collect outstanding federal student loan debt
           from Plaintiffs, to ensure the removal of negative credit reporting on
27         Plaintiffs' outstanding federal student loan debt, to restore federal
           student loan eligibility to Plaintiffs in the amount of their non-
28         discharged Corinthian federal student loan debt, to stop applying the
           "Average Earnings Rule" to members of the proposed class, and to

                                          14

process Plaintiffs' claims under the "Corinthian Job Placement Rate Rule[.]"

(Dkt. 35, at page 1.)

## ANALYSIS

A preliminary injunction requires that Plaintiffs establish: "(1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) [that] the balance of equities tips in [Plaintiffs'] favor; and (4) that an injunction is in the public's interest." *Doe v. Kelly,* 878 F.3d 710, 719 (9th Cir. 2017) (citations omitted). A "possibility" of irreparable harm is insufficient; rather it must be "likely" absent an injunction. *Am. Trucking Ass'n, Inc. v. City of L.A.,* 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a balance of hardships that tip sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Plaintiffs bear the burden to show that these factors are met. *DISH Network Corp. v. FCC,* 653 F.3d 771, 776-77 (9th Cir. 2011).

### A. Likelihood of Success on the Merits.

Plaintiffs attack the actions of the Secretary under the Administrative Procedures Act (the "APA"). The APA allows a court to set aside an "agency action" only under limited circumstances:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall --
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
>     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
>
>     (B) contrary to constitutional right, power, privilege, or immunity[.]

5 U.S.C. § 706. Section 704 of the APA states that agency action is "subject to judicial review" if the action is a "final agency action for which there is no other adequate remedy in a court." 5

15

United States District Court
Northern District of California

1    U.S.C. § 704.  Plaintiffs allege that the Average Earnings Rule is a "final agency action" that

2    violates §§ 706(2)(A) and (B).  Specifically, Plaintiffs allege that the Average Earnings Rule is

3    unlawful under the APA for three reasons:  (1) the Average Earnings Rule violates (A) because it

4    is "arbitrary and capricious," (2) the Average Earnings Rule is unlawful under (A) because it

5    violates the Privacy Act, and (3) the Average Earnings Rule violates (B) by violating Plaintiffs'

6    Constitutional rights to due process.

7            **1.  Is the Average Earnings Rule a Final Agency Action?**

8            The threshold question for any action under the APA is whether the challenged action is

9    the type of action – a "final agency action" – which the Court can review.  Plaintiffs argue that the

10   Department's abandonment of the Corinthian Rule and adoption of the Average Earning Rule

11   constitute a final agency action that is subject to judicial review.  (Dkt. 35, at pages 26-27).  A

12   "final agency action" is one that "mark[s] the consummation of the agency's decision-making

13   process" and "one by which rights or obligations have been determined or from which legal

14   consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1977) (citations omitted).  The

15   question of whether an action is final is "pragmatic and flexible" with the focus on "practical and

16   legal effects of agency action." *Or. Nat'l Desert Ass'n v. U.S. Forest Serv.,* 465 F.3d 977, 982

17   (9th Cir. 2006) (citation omitted).

18           The Secretary argues that the adoption of the Average Earnings Rule is not a "final agency

19   action" and thus not subject to review.  The Secretary's argument fails under *Bennett.*  First, the

20   adoption of the Average Earnings Rule marks the consummation of the Secretary's decision-

21   making – that the Secretary will review and analyze applications from borrowers under a specific

22   plan.  Second, legal consequences will follow based on these calculations for those borrowers.  *See*

23   *Salazar v. King,* 822 F.3d 61, 83-84 (2d Cir. 2016) ("The APA does not require that the

24   challenged agency action be the agency's final word on the matter for it to be 'final' for the

25   purposes of judicial review.").

26           As noted above, the Secretary documented the Average Earnings Rule in the December 15,

27   2017 Memorandum and in the December 20, 2017 Press Release.  (Dkt. 42-1, Ex. 1; Dkt. 42-2,

28   Ex. 1.)  These two documents show that the Secretary made a final decision about how to evaluate

16

United States District Court
Northern District of California

1  claims for borrowers who attended Corinthian schools on the Lists and show that the Secretary

2  adopted specific methodology for that evaluation.  Thus, the first part of the test is satisfied

3  because the Secretary consummated decision-making.  Second, there is no dispute that legal

4  consequences flow from the Department's adoption of the Average Earnings Rule, as the

5  Department has applied and is applying the Average Earnings Rule to determine the amount of

6  relief each borrower obtains.  (Dkt. 42-2, at ¶¶ 23-34.)  *See Salazar,* 822 F.3d at 82 (2d Cir. 2016)

7  ("The second requirement of the *Bennett* test is also met, because legal consequences flow from

8  the [Department's] decision not to suspend the collection of the loans of the putative class

9  members.").

10  Because the Average Earnings Rule is a "final agency action" subject to review, the Court

11  must then analyze the three arguments that Plaintiffs make to attack the Average Earnings Rule.

12  **2.  Does the Average Earnings Rule Violate the Privacy Act?**

13  Plaintiffs argue that the Average Earnings Rule is "otherwise not in accordance with law"

14  pursuant to 5 U.S.C. § 706 and specifically that the Average Earnings Rule violates the Privacy

15  Act.  The Privacy Act of 1974, 5 U.S.C. § 552a, "regulate[s] the collection, maintenance, use, and

16  dissemination of information by [governmental] agencies."  *Doe v. Chao,* 540 U.S. 614, 618

17  (2004).  The purpose is to avoid "substantial harm, embarrassment, inconvenience, or unfairness

18  to any individual on whom information is maintained."  5 U.S.C. § 552a(e)(10).

19  **a.  Does the Privacy Act Allow this Type of Injunctive Relief?**

20  Before even addressing the merits of the Privacy Act, the Secretary argues that Plaintiffs

21  cannot seek injunctive relief here because the Privacy Act provides a "comprehensive remedial

22  scheme" that limits injunctive relief to two narrow areas not sought here.  In *Doe v. Chao,* the

23  Court held that the Privacy Act authorizes injunctive relief only in the following circumstances:

24  (1) to order an agency to amend inaccurate, incomplete, irrelevant or untimely records, or (2) to

25  order an agency to allow an individual access to his or her records.  540 U.S. at 635.  *See also See*

26  *Cell Assoc., Inc. v. Nat'l Inst. of Health*, 579 F.2d 1155, 1160 (9th Cir. 1978) ("the detailed

27  remedial scheme adopted by Congress [in the Privacy Act] would make little sense" if a party

28  could seek general injunctive relief.)  Neither situation applies here, as Plaintiffs seek to enjoin the

United States District Court
Northern District of California

1    Department from using data compiled as a result of disclosing information to the Social Security

2    Administration and receiving information from the Social Security Administration to make

3    decisions about Plaintiffs' claims under the borrower defense rule.

4         Despite this restriction under the Privacy Act, the Supreme Court indicated in two later

5    cases that a party can seek injunctive relief *under the APA* – and not under the Privacy Act – to

6    attack a rule that violates the Privacy Act.  *FAA v. Cooper*, 566 U.S. 284, 303 n. 12 (2012); *Doe v.*

7    *Chao*, 540 U.S. at 619, n.1.  In *Doe v. Chao*, the plaintiff sued under the Privacy Act because the

8    Department of Labor used the plaintiff's Social Security number in "multicaptioned" notices sent

9    to people other than the plaintiff.  *Id*. at 617.  The Supreme Court noted in a footnote that the

10   Privacy Act contains no specific standards for equitable relief because the APA provides those

11   standards.  *Id*.  In *FAA v. Cooper*, the Supreme Court again addressed the issue of the APA's

12   relation to the Privacy Act and stated in a footnote:  "The [Privacy] Act deters violations of its

13   substantive provisions in other ways – for instance, by permitting recovery for economic injury;

14   by imposing criminal sanctions for some violations . . . and possibly by allowing for injunctive

15   relief under the Administrative Procedures Act (APA)[.]"  566 U.S. at 303, n. 12.  The Supreme

16   Court interpreted *Doe v. Chao* as "noting the absence of equitable relief in suits under §

17   552a(g)(1)(C) or (D) may be explained by the availability of such relief under the APA."  *Id.* at

18   619, n.1.

19        Thus, a plaintiff cannot seek injunctive relief *under the Privacy Act* if that injunctive relief

20   exceeds the scope of the remedies allowed under the Privacy Act, but a plaintiff may seek

21   injunctive relief *under the APA* if an agency has taken an action in violation of the Privacy Act.

22   The Court therefore finds that Plaintiffs can seek injunctive relief under the APA for a final

23   agency action that violates the Privacy Act.

24              **b.  Does the Privacy Act Allow Disclosure?**

25        The Privacy Act provides:  "No agency shall disclose any record which is contained in a

26   system of records . . . to another agency."  5 U.S.C. § 552a(b).  As noted above, the Department

27   sent to the Social Security Administration the following: names, dates of birth, and Social Security

28   numbers of the claimants who submitted attestation forms to obtain relief under the borrower

18

1    defense rule. (Dkt. 42-2, Ex. 1, at page 3.) The Social Security Administration then provided the

2    Department with the mean and median annual earnings of the students in aggregate form, without

3    any personal identifying information. (Dkt. 35-8, Ex. 27, at page 1.) Plaintiffs challenge this

4    exchange of information as a violation of the Privacy Act. There are two acts of disclosure: (1)

5    the Department's sending of names, Social Security numbers, and dates of birth of claimants to the

6    Social Security Administration, and (2) the Social Security Administration's sending of aggregate

7    statistical data about earnings to the Department.

8           There is no question that the Department and the Social Security Administration are both

9    agencies for purposes of the Privacy Act. There is no question that, with regard to the first act of

10   disclosure, the Department disclosed to the Social Security Administration a "record" contained in

11   its "systems of records." The Department disclosed to the Social Security Administration the

12   names of applicants with dates of birth and Social Security numbers. Section 552a(a)(4) defines a

13   "record" as "any item . . . of information about an individual that is maintained by an agency . . .

14   that contains . . . [an] identifying number . . . or other identifying particular assigned to the

15   individual." Section 552a(a)(5) defines a "system of records" as "a group of any records under the

16   control of any agency from which information is retrieved by the name of the individual or by

17   some identifying number, symbol, or other identifying particular assigned to the individual."

18   When the Department disclosed to the Social Security Administration information about the

19   applicants' Social Security numbers and dates of birth from the Department's files, that disclosure

20   violated the Privacy Act unless the Privacy Act exempts the disclosures.

21          The Privacy Act lists several specific exceptions to the prohibition of disclosure of

22   information, none of which apply here. 5 U.S.C. § 552a(b)(1) – (12). The exception the Secretary

23   asserts here is the alleged ability to share "aggregate statistical data." That term arises only in the

24   Privacy Act in a discussion of a process in which federal agencies may share data in "matching

25   programs." 5 U.S.C. § 552a(o). The Privacy Act defines "matching programs" as "any

26   computerized comparison of . . . two or more automated systems of records . . . for the purpose of,

27   . . . or continuing compliance with statutory and regulatory requirements by, applications for,

28   recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-

Case 3:17-cv-07210-SK   Document 183-6   Filed 05/26/18   Page 82 of 98

1    kind assistance or payments under Federal benefit programs, or recouping payments or delinquent

2    debts." 5 U.S.C. § 552a(a)(8)(A).  "Federal benefit programs" include "payments, grants, loans,

3    or loan guarantees to individuals."  5 U.S.C. § 552a(12).  On the face of the description, the

4    Department's sharing of information is a matching program under the Privacy Act.  The

5    Department shared information with the Social Security Administration for the purpose of

6    recouping payments or delinquent debts – collection of student loans.

7            Matching programs must satisfy several procedural requirements: (1) the agencies must

8    have entered into a written agreement specifying the purpose, legal authority and cost savings of

9    the matching program, 5 U.S.C. § 552a(o); (2) the executive department must inform applicants

10   for a federal benefit that matching programs may be used to verify their applications, 5 U.S.C. §

11   552a(o)(1)(D); (3) the agency must notify individuals that they have the right to contest the

12   agency's findings from the matching program before the agency take any adverse action, 5 U.S.C.

13   § 552a(p); and (4) the agency must report any new or revised matching program to the House

14   Committee on Government Operations, the Senate Committee on Governmental Affairs, and the

15   Office of Management and Budget.  5 U.S.C. § 552a(o)(2)(A); 5 U.S.C. § 552a(r).

16           Thus, if the sharing of data between the Social Security Administration and the

17   Department is a matching program as defined by the Privacy Act, the agencies must comply with

18   the requirements listed above.  It is undisputed that the Department and Social Security

19   Administration did not comply with the requirements above and thus violated the Privacy Act.

20           Probably because the Department did not adhere to the requirements of a matching

21   program, the Secretary argues that the sharing of information by the Department with the Social

22   Security Administration does *not* constitute a matching program, and the Gainful Employment

23   Agreement specifically disclaims that it is a matching program.  (Dkt. 35-8, Ex. 27, at page 1.)

24   Instead, the Secretary argues that agencies generally may share aggregate statistical data, which is

25   what the agencies did here.  Even if the Secretary is correct that the Department's sharing of

26   information with the Social Security Administration was not a matching program and even if the

27   Secretary is correct that agencies may share aggregate statistical data, the Privacy Act nonetheless

28   bars the disclosure.

United States District Court
Northern District of California

20

1    First, there is no simply no portion of the Privacy Act that states that agencies may share

2  aggregate statistical data.  The Secretary has a convoluted reading of the Privacy Act, which relies

3  upon an exception to an exception that creates the alleged ability to share data.  But the clear terms

4  of the Privacy Act lay out exceptions and do not include an exception for sharing of aggregate

5  statistical data.

6    But even assuming for the sake of argument that sharing of aggregate statistical data is

7  allowed, the Department did not share aggregate statistical data with the Social Security

8  Administration.  The Department sent names, dates of births, and Social Security numbers to the

9  Social Security Administration.  The Privacy Act defines a "statistical record" as information

10  "maintained for statistical research or reporting purposes only and not used in whole or in part in

11  making any determination about an identifiable individual."  5 U.S.C. § 552a(a)(6).  In addition,

12  the express terms of section 552a(a)(8)(B)(ii) forbid use of data to make decisions concerning the

13  "rights, benefits or privileges of specific individuals."  Here, the information the Department

14  disclosed to the Social Security Administration was used to make a determination about a specific

15  individual – how much of the borrower's loan that the Department would forgive.

16    And with respect to the Social Security Administration's sending of information to the

17  Department, which did not contain personal identifiers, the disclosure again violated the Privacy

18  Act because the disclosure was made to make a determination about an individual.

19    Thus, even if the Privacy Act allows agencies to share aggregate statistical data, the

20  Privacy Act prohibits the disclosures the Secretary made here to the Social Security

21  Administration because the Department then uses that information to make determinations about

22  the benefits of specific individuals.  For the same reason, the Privacy Act also prohibits the Social

23  Security Administration's disclosure of aggregate statistical data to the Department because again,

24  the Department used that information to determine benefits.

25    In conclusion, Plaintiffs have met their burden to show that they are likely to succeed on

26  the merits of their argument that the Privacy Act bars the Department's disclosure of information

27  about applicants to the Social Security Administration and the receipt and use of information from

28  the Social Security Administration.  First, the plain language of the statute bars the disclosure.

1   Second, even if the sharing of information between the Department and the Social Security

2   Administration falls under the exception of the matching program, the Department and the Social

3   Security Administration did not comply with the requirements of a matching program.  Finally,

4   even if there is an exception that allows agencies to share aggregate statistical data, the Privacy

5   Act expressly forbids the use of that aggregate statistical data to make determinations about

6   individuals, as here the Secretary did under the Average Earnings Rule.  The Secretary simply

7   fails to point to an exception to the Privacy Act that allows disclosure of the specific information

8   about the applicants to the Social Security Administration and that allows the disclosure of the

9   aggregate data from the Social Security Administration to the Department for the Department's

10  use in determining relief for borrowers.

11       **3.  Does the Average Earnings Rule Violate Plaintiff's Due Process Rights?**

12       Separate and independent from their arguments under the APA, Plaintiffs contend that the

13  Secretary violated their due process rights by failing to provide them with "adequate procedural

14  protections" in evaluating their claims for relief under the borrower defense rule.  (Dkt. 35, at page

15  35.) Plaintiffs allege that they have a "property interest" in the "outcome of their borrower defense

16  application[s]."  (*Id.*)  Plaintiffs have a slightly shifting definition of their property rights, as they

17  also contend that they have a right to the relief under the Corinthian Rule, which Plaintiffs claims

18  is full relief or total discharge:  "Plaintiffs simply request that the [Department of Education]

19  continue to review applications [for relief under the borrower defense rule] under its prior

20  (streamlined and easier to administer) rule[.]"  (Dkt. 48, at page 9.) The "prior . . . rule" is the

21  Corinthian Rule.

22       **a.  Do Plaintiffs Have a Property Right?**

23       In order to proceed with a due process claim, Plaintiffs must show that they have a

24  protected interest in property or liberty and that the Secretary denied them adequate procedural

25  protections in depriving them of that right.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-71 (1972).

26  A party does not have a property interest if the party has a "unilateral expectation" or an "abstract

27  desire or need for it."  *Foss v. Nat'l Marine Fisheries Serv.,* 161 F.3d 584, 588 (9th Cir. 1998).

28  Where a regulation creates the alleged entitlement, the question is whether the benefit is

United States District Court
Northern District of California

Case 3:17-cv-03670-GK Document 183-6 Filed 05/26/18 Page 35 of 58

United States District Court
Northern District of California

1    "mandatory in nature." *Foss*, 161 F.3d at 588. An individual asserting a loss of due process must

2    show that "an existing law, rule, or understanding makes the conferral of benefit mandatory." *U.S.*

3    *v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) (citation omitted).

4           Here, by definition, there can be no "right to an outcome" that is mandatory in nature.

5    Thus, by the way that Plaintiffs frame their purported property interest as a "right to an outcome,"

6    they cannot show that it is mandatory in nature. To the extent that Plaintiffs claim that they are

7    entitled to relief, they cannot show that they are entitled to full relief or total discharge. Plaintiffs

8    do not have a property interest in total discharge of their loans. Although they do have a property

9    interest in "some" relief once they establish their borrower defense, there is no property right to

10   the amount of relief because the Higher Education Act provides discretion to the Secretary to

11   determine the amount of relief. The Higher Education Act states that the "Secretary shall specify

12   in regulations which acts or omissions of an institution of higher education a borrower may assert

13   as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h). The

14   regulations do not require complete discharge but instead provide discretion to the Secretary. The

15   regulation states that a borrower may assert, as a defense to repayment of a student loan, "any act

16   or omission of the school attended by the student that would give rise to a cause of action against

17   the school under applicable state law." 34 C.F.R. § 685.206(c)(1). The regulation further

18   provides:

19          If the borrower's defense against repayment is successful, the Secretary notifies the
            borrower that the borrower is relieved of the obligation to repay *all or part of the*
20          *loan* and associated costs and fees that the borrower would otherwise be obligated
            to pay.
21
22   34 C.F.R. § 685.206(c)(1) (emphasis added). The Secretary is allowed - but not required - to

23   reimburse the borrower for amounts already paid, determine that the borrower is not in default,

24   and update reports to consumer reporting agencies to remove any negative reporting. 34 C.F.R. §

     685.206(c)(2).
25
26          Plaintiffs, once they establish their claims for relief under the borrower defense rule by

27   completing the attestation forms, have a mandatory right to *some* relief. Based on the language of

28   the regulations, they also have a mandatory right to be notified about the amount of the relief they

are receiving.  However, the regulations do not provide a mandatory right to a full discharge.
The Secretary has made clear in the Average Earnings Rule that borrowers who successfully
complete the attestation forms will be afforded relief in the form of 10% reduction at a minimum.
(Dkt. 42-2, Ex. 1, at page 5.)  Even if the Secretary gives a borrower the minimum amount of
relief under the Average Earnings Rule, that borrower still receives some relief from that partial
discharge.  Plaintiffs do not allege that the Secretary refused to provide at least *some* relief to
borrowers who successfully completed the attestation form.  Because borrowers do not have a
mandatory right or entitlement to a specific amount of relief, as long as they are provided *some*
relief, they do not have a right to procedural safeguards to regarding the relief amount, including
the decision to provide less than a full discharge.

Plaintiffs cite to a case in which the Court held that the plaintiffs, who sought discharge of
their loans under the Higher Education Act, had a "protected property interest" in their right to
discharge. *Higgins v. Spellings*, 663 F. Supp. 2d 788, 795 (W.D. Mo. 2009).  *Higgins* addressed a
different section of the Higher Education Act that provided no discretion to the Secretary in
discharging a student loan in full.  In *Higgins*, the Higher Education Act mandated that the
Secretary provide full relief to a borrower who is disabled.  The Higher Education Act provides
that, if a borrower dies or becomes permanently disabled or unable to work under certain
circumstances, "then the Secretary *shall* discharge the borrower's liability on the loan  by repaying
the amount owed on the loan." 20 U.S.C. 1087(a)(1) (emphasis added).  Where a borrower can
prove that she or he falls under those circumstances, a borrower has a property interest in the
complete discharge of the debt because the Secretary has no discretion to refuse to discharge the
debt in full.  *Higgins*, 663 F. Supp. 2d at 794.

The right in *Higgins*, based on the section of the Higher Education Act which required a
full discharge, is different from the right here, which is the mandatory right to some relief but not a
full discharge, under the separate section of the Higher Education Act and its regulations.

Therefore, because Plaintiffs have not met their burden to show that they have a "property
right" in the "outcome" of the adjudication of their claims for relief under the borrower defense
rule, Plaintiffs cannot show likelihood of success on the merits of their argument that the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Secretary's adoption and implementation of the Average Earnings Rule violates their due process

2  rights.

3  **b.  Did the Corinthian Rule Create a Property Interest?**

4  Plaintiffs then argue that the Corinthian Rule created their "right."  However, there is much

5  uncertainty about the contours of the Corinthian Rule.  As noted above, Plaintiffs allege that the

6  Corinthian Rule was based on documents that they do not have, and Plaintiffs infer the existence

7  of the Corinthian Rule from secondary sources that do not discuss the Corinthian Rule in detail.

8  As a practical matter, it appears that the Secretary did provide full relief or total discharge for

9  borrowers who completed attestation forms before 2017.  The documentation that even the

10  Secretary submits shows that the Secretary considered the implementation of the Average

11  Earnings Rule to be a change in policy from previous policy.  (Dkt. 41-1, at ¶¶ 9-10.)  In

12  reviewing the previous approvals of borrower's applications for relief, the Secretary found that

13  "previous approvals had been based on the assumption that CCI borrowers received a worthless

14  education and therefore that the discharge of the total amount of borrowers' loans and

15  reimbursement of all payments was appropriate for all CCI borrowers with valid claims."  (*Id.*, at ¶

16  9.)  The Secretary then evaluated that assumption as incorrect and created a new methodology to

17  determine the value that students gained.  (*Id.*, at ¶¶ 16-17.)  The Secretary essentially admits that

18  there was a previous policy, even if informal, for full discharge of debt of borrowers who

19  completed the attestation forms.

20  For purposes of this motion, though, the Court is troubled by the fact that there is no

21  document in the record that lists or describes the Department's previous policy.  The missing

22  element that matters most for this motion is whether the Secretary in the previous policy reserved

23  to the Secretary the ability to change the analysis at a later time.  The Secretary has the power

24  under the regulations to determine the amount appropriate for discharge, and it is possible that the

25  Secretary could devise a policy that relinquished the Secretary's right to determine whether

26  borrowers who completed the attestation forms could have partial or full relief.  It is also possible

27  that the Secretary could impose a policy that provides full relief but specifically reserves the

28  Secretary's power under the statute and regulations to override the relief for individual borrowers

United States District Court
Northern District of California

1    at any time.[4]  Without any clear indication that the Secretary specifically gave up discretion to

2    determine the amount appropriate for relief, the Court cannot find that the Corinthian Rule existed

3    in such a way that bound the Secretary.  An "agency process without binding effect" is not

4    reviewable under 5 U.S.C. § 551 even if it leads to "significant practical consequences."  *Indus.*

5    *Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1120 (D.C. Cir. 1988) (citation omitted).

6         Therefore, Plaintiffs do not meet their burden to show likelihood of success on the merits

7    of their argument that they have a "property right" based on the Corinthian Rule.  Because

8    Plaintiffs have not met that burden, the Court will not address their argument that the Secretary in

9    implementing the Average Earnings Rule violated their procedural rights.

10        **4.  Is the Average Earnings Rule Arbitrary and Capricious?**

11        Because the Court finds that Plaintiffs demonstrated a likelihood of the merits that the

12   Secretary violated the Privacy Act in her implementation of the Average Earnings Rule, it may

13   appear that the Court need not discuss the issue of whether the Secretary's adoption of the

14   Average Earning Rule is arbitrary and capricious.  However, as discussed below, the Court will

15   need to determine the remedy to the Privacy Act violation.  The Court finds that a discussion of

16   the arbitrary and capricious standard is helpful to understand the scope of the Secretary's

17   permissible remedial actions.

18        The scope of review under the "arbitrary and capricious" standard is "narrow and

19   deferential."  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).  The court in reviewing

20   an agency's action "is not empowered to substitute its judgment for that of the agency."  *Citizens*

21   *to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), overruled on other grounds by

22   *Califano v. Sanders*, 430 U.S. 99, 105 (1977).  The reviewing court should "uphold a decision of

23   less than ideal clarity if the agency's path may reasonably be discerned."  *Arrington,* 516 F.3d at

24

25   _____

26        [4] That the Department made no public statement of any kind indicating that borrowers
     would receive full discharge of loans or full refund of loans is telling.  For example, the attestation
     forms do not state what relief the borrowers will receive.  (Dkt. 35-6, Exs. 8-9.)  In addition, Arne

27   Duncan, the previous Secretary, stated: "[If] you've been defrauded by a school, we'll make sure
     that you get every penny of the relief you are entitled to through a streamlined process – as

28   streamlined as possible."  (Dkt. 35-5, Ex. 5, at page 2.)  There was no explanation about what that
     relief was.

1112 (internal citation and quotation omitted). A rule is arbitrary and capricious if the agency: (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) offers an explanation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Plaintiffs argue that the Secretary fails to meet the standard to show that the new policy, the Average Earnings Rule, is better than the old policy, the Corinthian Rule. When an agency changes policy, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]" *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (italics in original). As noted above, there is not sufficient evidence to determine that a Corinthian Rule existed as Plaintiffs describe it.

However, even assuming that the Secretary had previously adopted a Corinthian Rule, the Secretary met the burden necessary to change the policy. In reviewing the previous approvals of borrower's applications for relief, the Secretary found that "previous approvals had been based on the assumption that CCI borrowers received a worthless education and therefore that the discharge of the total amount of borrowers' loans and reimbursement of all payments was appropriate for all CCI borrowers with valid claims." (Dkt. 41-1, at ¶ 9.) The Secretary then evaluated that assumption and determined that the assumption was false and made a new methodology for determining the value gained. (*Id*., at ¶¶ 16-17.) The Secretary provided a justification for the Average Earnings Rule: the assumption that students who attended the Corinthian schools obtained no value is not factually accurate for all students and thus basing relief from loans on that assumption is a bad policy. (*Id*., ¶¶ 15-17 and Ex. 1.) The Secretary's concern is genuine, and the attempt to create a policy to determine whether students obtained value and if so, how much, is also a legitimate exercise of the Secretary's discretion under the Higher Education Act. As noted above, the regulations promulgated under the Higher Education Act provide that the Secretary can

United States District Court
Northern District of California

27

1    relieve "all or part" of the loan of a borrower who successfully asserts a borrower defense and

2    provides that the Secretary has discretion to provide relief "as the Secretary determines is

3    appropriate under the circumstances." 34 C.F.R. § 685.206(2). Here, there is no question that the

4    Secretary has the power to determine the amount of relief a borrower can obtain.

5         Nonetheless, Plaintiffs challenge the actions in implementing that discretion as arbitrary

6    and capricious. First, Plaintiffs challenge the Average Earnings Rule on a legal basis, since

7    Plaintiffs claim that the Department had previously issued a legal memorandum concluding that

8    California's Unfair Competition law is the applicable law for determining borrower's relief, and

9    specifically that borrowers who were defrauded were entitled to a full discharge of their debt. As

10   discussed above, Plaintiffs do not provide the legal memorandum, so the Court cannot determine

11   if that legal memorandum was the basis for the Secretary's decision for the Corinthian Rule. The

12   Court also cannot determine what the legal memorandum concluded or whether it was the basis

13   for the Secretary's decision for the Corinthian Rule. The specific regulation addressing the

14   amount or type of relief does not reference state law. *See* 34 C.F.R. § 685.206(c)(2).[5] Moreover,

15   even if the Secretary were bound to apply California law, either by the legal memorandum or

16   regulation, California's Unfair Competition law does not require full discharge in cases of fraud.

17   California's Unfair Competition law, Cal. Bus. & Prof. Code § 17200 *et seq*., provides either

18   equitable relief or restitution as a remedy. *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal.

19   4th 1134, 1144 (2003). Restitution is defined as "the excess of what the plaintiff gave the

20   defendant over the value of what the plaintiff received" in order to "restore the defrauded party to

21   the position he would have absent the fraud." *Pulaski & Middleman LLC v. Google, Inc*., 802

22   F.3d 979, 988 (9th Cir. 2015) (citations omitted). Here, the Average Earnings Rule, in attempting

23   to determine the value of what plaintiff received, is not arbitrarily inconsistent with a restitution

24   calculation under California's Unfair Competition law. Even if the percentage awarded under the

25   Average Earnings Rule is somewhat less than the Plaintiffs' calculation of restitution under

26

27         _____
           [5]In contrast, the specific regulation addressing the right to relief does reference state law.

28   34 C.F.R. § 685.206(c)(1). In addition, the Master Promissory Note references state law but does
     not specify that the state law governs the amount of discharge. (Dkt. 35-5, Ex. 1, at page 7.)

28

United States District Court
Northern District of California

United States District Court
Northern District of California

California's Unfair Competition law, this differential does not render the Secretary's determination arbitrary and capricious.  Even if the Court disagrees with the relief amount, the Court "is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.

Plaintiffs also argue that the Average Earnings Rule is arbitrary and capricious because: (1) the  Average Earnings Rule is "irrational" in the manner in which the Average Earnings Rule applies the gainful employment standard, (2) the Average Earnings Rule ignores previous findings and leads to inconsistent results for borrower who submitted claims before the Average Earnings Rule and after the Average Earnings Rule, (3) the Average Earnings Rule relies upon data from third parties that is not relevant or specific to the borrowers, and (4) the Average Earnings Rule fails to take into account whether the borrower is working in the field she or he studied in determining the amount of forgiveness.  (Dkt. 35, at pages 40-42.)  All of these attacks are attempts to second-guess the Secretary's decision-making and substitute the Court's judgment for the judgment of the Secretary.  The Secretary, in adopting the Average Earnings Rule, provided a rational reason for the Average Earnings Rule and a method – imperfect in many ways and illegal under the Privacy Act – to assess the value of what the borrower actually received as compared to the loans.  However, aside from the illegal disclosure of information to the Social Security Administration and use of that data from the Social Security Administration, the Secretary's attempts to devise a more narrowly tailored system for determining the amount of relief is not arbitrary and capricious.

Therefore, Plaintiffs do not meet their burden to show likelihood of success on the merits of their argument that the Secretary's adoption and implementation of the Average Earnings Rule is arbitrary and capricious.

**5.  Does the Average Earnings Rule Constitute Retroactive Rule Making?**

Plaintiffs argue also that, separate from the alleged violations of the APA, the Secretary's use of the Average Earnings Rule constitutes impermissible, retroactive rulemaking.  Plaintiffs argue that an agency cannot create a new rule and apply it retroactively.  *Cort v. Crabtree*, 113 F.3d 1081 (9th Cir. 1997).  The issue before the Court is whether the Secretary is applying the

United States District Court
Northern District of California

1   Average Earnings Rule retroactively.  It is undisputed that the Secretary is not clawing back any

2   funds or changing any decisions made and communicated before the Average Earnings Rule was

3   put in place with regard to borrowers who submitted their attestation forms before the Average

4   Earnings Rule was put in place.  Plaintiffs argue that the Average Earnings Rule is retroactive

5   because the Secretary is applying the Average Earnings Rule to all borrowers in the proposed class

6   of plaintiffs – whether they have submitted an attestation form or not.  Plaintiffs' argument turns

7   on whether they have a vested right in a full discharge of their loans and that the adoption of the

8   Average Earnings Rule took away that right.  *See*, *e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S.

9   244, 269-70 (1994) (a rule is "retrospective" if it "takes away or impairs vested rights acquired

10  under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability,

11  in respect to transactions or considerations already past") (citation omitted).  This analysis is

12  similar to the analysis of due process rights discussed above, as a vested right is similar to a

13  mandatory right.  Because Plaintiffs cannot show, with the evidence before the Court now, that all

14  borrowers in the proposed class were entitled to full relief as a matter of stated policy, Plaintiffs

15  cannot show that the Average Earnings Rule is retroactive in nature.

16      The main case Plaintiffs cite, *Cort*, is distinguishable because in *Cort*, the plaintiffs[6] had

17  already received letters notifying them that they were eligible for relief, but the governmental

18  agency (Bureau of Prisons) then changed its interpretation of a statute and determined that the

19  plaintiffs were no longer eligible.  *Cort,* 113 F.3d at 1082.  The plaintiffs had a right that the

20  Bureau of Prisons then took away.  Here, because Plaintiffs cannot show – based on the record

21  before the Court now –  that they had a vested right or a mandatory right to full relief, they cannot

22  show the Secretary engaged in retroactive rule making by taking away that right.  Therefore,

23  Plaintiffs do not meet their burden to show likelihood of success on the merits of their argument

24  that the Secretary's adoption and implementation of the Average Earnings Rule constitutes

25  retroactive rule-making.

26  / / /

27  _____

28      [6] The plaintiffs in *Cort* were three individuals who did not assert a class action.  *Cort,* 113
    F.3d at 1081-82.

**B. A Preliminary Injunction Is Necessary to Stop Irreparable Harm.**

Because the Court finds that Plaintiffs have shown a likelihood of success on the merits of the APA claim, the Court must determine whether they can show irreparable harm to justify a preliminary injunction. A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 21 (2008). A mere possibility of irreparable injury is insufficient. *Id.* "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act v. Brewer,* 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). Further, the irreparable nature of a plaintiff's injury is heightened when it involves the plaintiff's "young age and fragile socioeconomic position." *Ariz. Dream Act,* 757 F.3d at 1068. Plaintiffs claim irreparable injury because Plaintiffs are suffering extreme financial hardship, emotional distress, loss of opportunity, and invasion of Plaintiffs' privacy rights.[7] Because the Court finds that the Average Earnings Rule violates the Privacy Act, the Court will examine the harm largely in that context.

**1. Do Privacy Act Violations and Emotional Distress Constitute Irreparable Harm?**

Plaintiff Mercado states that, when she learned that her own Social Security information was used against her to forgive only 30% of her loan, she was "sad, distressed and betrayed." (Dkt. 48-1, ¶ 17.) She felt that the use of her own information against her in determining the amount of her loan forgiveness was a "slap in the face." (*Id.*)

As noted above, the Court finds that the Secretary's disclosure to the Social Security Administration and receipt and use of data from the Social Security Administration violates the Privacy Act because the results are used in determining borrowers' benefits – relief from loans. In this situation, borrowers can feel emotional distress, similar to Mercado's sentiments. Here, Plaintiffs Craig, Farajian, and Dobashi discuss in general terms the emotional stress that the repayment system is causing them. (Dkt. 35-1 at ¶¶ 17, 32; Dkt. 35-3 at ¶¶ 22-23; Dkt. 35-4 at ¶¶

---

[7] Plaintiffs contend that they are suffering irreparable harm of violation of their due process rights. Because the Court finds that Plaintiffs do not have a property interest in the outcome of their applications for borrower defenses, the Court will not analyze that harm.

United States District Court
Northern District of California

36, 41.)[8] Plaintiffs cannot recover for emotional distress under the Privacy Act, even if there is a final determination that the Secretary violated the Privacy Act, because the government had provided only limited avenues for relief in waiving sovereign immunity. *FAA v. Cooper*, 566 U.S. at 303-304 (no mental or emotional distress allowed under the Privacy Act). Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm. *See*, *e.g.,* *Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (if sovereign immunity bars damages, damages can be irreparable). *See also Krebs v. Rutgers*, 797 F. Supp. 1246, 1259 (D. N.J. 1992) (Privacy Act harms are irreparable). Thus, the emotional distress that Plaintiffs are suffering from the violation of the Privacy Act is irreparable, and an injunction is warranted.

## 2. Does Economic Harm Constitute Irreparable Harm?

Both parties discuss the economic harm from denial of full relief from debt. Because the Court finds that the Secretary has discretion to determine the amount of relief a borrower can receive – as long as the rule does not violate laws – the issue of economic harm is not necessarily relevant here. The Secretary's action in adopting the Average Earnings Rule is unlawful and therefore invalid under the APA, but the harm – loss of privacy – does not necessarily cause economic injury. The Secretary could devise a lawful rule to evaluate and determine relief for borrowers that does not provide full relief. Even if the Secretary were to devise a lawful rule for Plaintiffs, they might still suffer some economic harm.

However, the Court notes that, because the Court finds that the Average Earnings Rule is invalid, Plaintiffs whose claims are evaluated under the Average Earnings Rule might be forced to repay higher amounts than they would under a validly constructed rule. If that is the case, then economic harm is relevant. The Court finds that Plaintiffs have shown that they are suffering

---

[8] With their Reply, Plaintiffs also submit the declarations of two mental health professionals, both of whom discuss the psychological effects of student loans on individuals in general. (Dkt. 48-2; Dkt. 48-3.) Neither mental health professional examined the Plaintiffs but rather only reviewed their declarations. (Dkt. 48-2, 5; Dkt. 48-3, at ¶ 23.) Given that the Court has found that Plaintiffs have submitted evidence of emotional distress, there is no need for the Court to review the declarations of mental health professionals. Moreover, the Court is not inclined to accept these additional declarations on reply without giving the Secretary a chance to address them, because they contain more than factual allegations and provide expert opinions that are subject to attack.

United States District Court
Northern District of California

irreparable harm in the form of economic harm. Although economic harm generally does not

constitute irreparable injury, economic injury may be the basis for an injunction where a plaintiff

lives on a fixed income and where minimal increases in the cost of living creates a "potential [for]

financial disaster" and the possible deprivation of "life's necessities." *United Steelworkers of Am.,*

*AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987); *see also Golden v. Kelsey-Hayes Co.*, 73

F.3d 648, 657 (6th Cir. 1996) (economic harm satisfied factor of irreparable injury because

plaintiffs were "unable to absorb even relatively small increases in their expenses without extreme

hardship"). Here, Plaintiffs Craig and Farajian provide detailed information to show that they are

living in dire circumstances. (Dkt. 35-1; Dkt. 35-4.) In addition, Plaintiff Cornelius, who is

working at a Taco Bell in Hercules, California, faces payments of at least $273.64 per month.

(Dkt. 35-2, at ¶¶ 2, 14.) It is difficult for workers at fast food restaurants to make ends meet in the

San Francisco bay area, one of the most expensive areas in the country, even without a monthly

loan payment of $273.64 per month. These detailed declarations from Craig, Farajian, and

Cornelius, show that repayment of loans threatens these borrowers' ability to pay for basic life

expenses like food and rent.[9]

The Secretary argues that Plaintiffs have not shown that the repayment of loans is causing

the harm that they are suffering because they have other financial problems that caused the harm.

This argument seems meaningless given the dire financial circumstances that Plaintiffs describe.

Given their financial situations, any additional dollar they are required to repay takes away from

basic need for food and shelter. In economic terms, the marginal utility of each dollar is extremely

high to the Plaintiffs.

Under these circumstances, the Court finds that Plaintiffs have shown irreparable harm

because the economic harm they are suffering affects their ability to pay for life's most basic

necessities.

/ / /

---

[9] The briefs of *amici curiae* - the Debt Collective and Public Law Center - also provide
examples of individual borrowers who are suffering economic hardships. (Dkt. 43; Dkt. 45.)
These individual borrowers did not submit declarations under penalty of perjury, and therefore
Court will not consider that information.

33

United States District Court
Northern District of California

### 3.	Does Loss of Opportunity Constitute Irreparable Harm?

Plaintiffs also claim that they are suffering a loss of opportunity and that loss constitutes irreparable injury.  Again, the harm that Plaintiffs assert in this area is linked to the failure to obtain a full discharge and not linked to the violation of their privacy rights.  But for the same reasons as discussed with regard to the economic harm, the loss of opportunity for Plaintiffs who are forced to repay more for their loans under the invalid Average Earnings Rule, compared with the amount that they would repay under a valid rule, is relevant harm.  Lost opportunities can constitute irreparable injury.  *Brewer,* 757 F.3d at 1068 (holding that loss of professional opportunity constitutes irreparable harm); *see also Enyart v. Nat'l Conf. of Bar Examiners, Inc.,* 630 F.3d 1153, 1163 (9th Cir. 2011) (loss of opportunity to pursue one's chosen profession constitutes irreparable harm).  The Secretary argues that Plaintiffs fail to meet their burden of proof to assert this area of damage as irreparable injury.  However, Plaintiffs submitted, with their Reply, an additional declaration of Plaintiff Mercado in which she explains that she has not been able to obtain a mortgage for a home because of the existence of her loans.  (Dkt. 48-1, at ¶ 23.)  Although the Mercado Declaration was submitted in such a way that the Secretary did not have a chance to rebut it, the Court will accept the factual allegations of the Mercado Declaration.  The Mercado Declaration shows that Plaintiffs can suffer loss of opportunities similar to the type the Court in *Brewer* found to constitute irreparable injury.

Under these circumstances, the Court finds that Plaintiffs have shown irreparable harm because they cannot recover their lost opportunities.

### C.	Public Interest and Balance of Equities Weigh in Favor of Preliminary Injunction.

The Court finds that the balance of equities weighs in favor of a preliminary injunction and that the public interest weighs in favor of a preliminary injunction.  Although normally courts consider the third and fourth factors of the test for a preliminary injunction separately, where the federal government is a party, the last two factors of the balance of equities and public interest merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  There is a strong public interest in ensuring that agencies comply with the law in enacting rules and regulations, and here, preventing the use of data in violation of the Privacy Act is a compelling interest.  The

Secretary argues that forcing the Secretary to forgive all loans to Plaintiffs costs the government money that the government should not pay, given that some Plaintiffs received some benefit from their education through the Corinthian schools. The Secretary argues that the relief Plaintiffs seek will divert resources from other educational programs, and that there is a strong public interest in saving funds. Saving money does not justify a violation of the law – the Privacy Act. The Court here, as discussed more fully below, is not ordering the Secretary at this time to return to the Corinthian Rule. The Court recognizes that the Secretary has discretion to enact rules regarding the amount of relief as long as the rules are lawful and not arbitrary and capricious. Given that the injunction below is narrowly tailored to the violation of the Privacy Act and temporary in nature, the Court finds that the balance tips in favor of Plaintiffs for an injunction.

**D. The Appropriate Remedy.**

Plaintiffs seek an injunction ordering the Secretary to take cease two actions and to take three other affirmative actions. As described above, Plaintiffs seek an injunction in five main areas: (1) to stop "all efforts to collect outstanding federal student loan debt from Plaintiffs," (2) to remove negative credit reporting of "Plaintiffs' outstanding federal student loan debt", (3) "to restore federal student loan eligibility to Plaintiffs in the amount of their non-discharged Corinthian federal student loan debt," and (4) to stop using the "Average Earnings Rule," and (5) to apply the Corinthian Rule to Plaintiffs' claims.

**1. Is Removal of Negative Credit Reporting and Restoring Eligibility for Student Loans the Correct Relief?**

The Court will not order the Secretary to take the actions Plaintiffs seek with regard to the requests for removal of negative credit reporting and restoring eligibility for further student loans. Even if the Court were to assume that the Corinthian Rule existed, Plaintiffs' definition of the Corinthian Rule does not include this relief. (Dkt. 35, at pages 12-13.) There is no other evidence in the record to show that the Corinthian Rule included these provisions.

Furthermore, the regulation provides that the Secretary has discretion to provide that relief. Section 685.206(c)(2) states that "[f]urther relief may include, but is not limited to, the following . . . . Determining that the borrower is not in default on the loan and is eligible to receive assistance

35

under Title IV of the Act," and "Updating reports to consumer reporting agencies to which the

Secretary previously made adverse credit reports with regard to the borrower's Direct Loan."

Under the clear terms of the regulation, the Secretary can, but is not required, to provide this relief.

The Court cannot, in the absence of any evidence, force the Secretary to take action that the

Secretary is not required to do. The Court therefore **DENIES** Plaintiffs' request for preliminary

injunction to the extent that Plaintiffs seek an order requiring the Secretary to remove negative

reports from Plaintiffs' reports with credit reporting agencies and to restore Plaintiffs' eligibility

for further student loans.

### 2. Is Enjoining Use of Average Earnings Rule, Return to the Corinthian Rule and Immediate Cessation of Collection of Plaintiffs' Debts Appropriate?

Because Plaintiffs have met their burden to show likelihood of success on the merits of the

argument that Secretary violated the APA by implementing a rule, the Average Earnings Rule, that

violates the Privacy Act, that implementation of the Average Earning Rule is causing irreparable

harm, and that the balance of equities tips in favor of Plaintiffs on this serious issue, the Court

**ENJOINS** the Secretary from using the Average Earnings Rule as it currently exists. Normally,

when a court issues an injunction, the injunction orders a return to the *status quo*. In this case, it is

unclear what the *status quo* is, since there is no clear documentation outlining the parameters of

the Corinthian Rule.

At this time, the Court cannot compel the Secretary to return to the Corinthian Rule, since

the parameters of the Corinthian Rule are not clearly defined. *See Norton v. Southern Utah*

*Wilderness Alliance,* 542 U.S. 55, 64 (2004) (court can compel agency action "only where a

plaintiff asserts that an agency failed to take a discrete agency action that it required to take.")

The action that the plaintiff seeks to compel must be so clear that it is subject to the traditional test

of mandamus. *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2015). A *writ*

*of mandamus* is appropriate only when "(1) the plaintiff's claim is clear and certain, (2) the

defendant official's duty to act is ministerial, and so plainly prescribed as to be free from doubt,

and (3) no other adequate remedy is available." *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir.

1994) (internal quotations and citations omitted). Here, the Court cannot compel the Secretary to

take specific actions allegedly under the Corinthian Rule when there is no evidence to show that

the Corinthian Rule included those specific actions. The Court therefore **DENIES** Plaintiffs' request for preliminary injunction to the extent that Plaintiffs seek an order requiring the Secretary to implement the Corinthian Rule in assessing claims under the borrower defense rule, filed by borrowers who attended schools on the Lists.

Thus, the Court **GRANTS** Plaintiffs' motion for preliminary injunction to prevent the Secretary from using the Average Earnings Rule but **DENIES WITHOUT PREJUDICE** Plaintiffs' motion for preliminary injunction to return to the Corinthian Rule. With regard to the injunction for the Secretary to stop all efforts to collect Plaintiffs' loans, the Court temporarily **GRANTS** this request. The Secretary is **ORDERED** to cease all efforts to collect debts from Plaintiffs until the Court can determine the proper course of action.

The Secretary has the right to assess claims for relief from borrowers who attended Corinthian schools on the Lists who seek relief under the borrower defense rule as long as the Secretary does not violate the Privacy Act or other laws in doing so. At this time, though, because the Court is not sure how to define the *status quo* in the absence of key documentation, the Court requests additional briefing on this issue and will hear oral argument on this issue on June 4, 2018, the date currently scheduled for a case management conference. The hearing will be specially set for 2:30 p.m. Parties may submit supplemental briefing on this subject, to be exchanged simultaneously, on May 31, 2018. At the hearing on June 4, parties should be prepared to address the following questions:

(1) Does the Court have the authority to order the Secretary to produce the three documents that Plaintiffs allege constitute the Corinthian Rule: (1) a memorandum prepared by the Department's Office of General Counsel, (2) a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and (3) an April 2015 document prepared by the Federal Student Aid's Administrative Actions & Appeals Services Groups?

(2) What is the *status quo*? What is the date by which the Court measures the *status quo*? The Court directs the parties to a recent case on this subject: *Animal Legal Defense Fund v. U.S. Dept. of Agriculture*, 2017 WL 2352009, *3 (N.D. Cal. May 31, 2017).

(3) If the Court enjoins the Secretary from using the Average Earnings Rule and the Secretary does not return to the Corinthian Rule, what steps will the Secretary take to assess claims from Plaintiffs?

(4) Do Plaintiffs contend that the Secretary has a mandatory duty to provide forbearance pending a determination of the discharge amount? If so, what is the authority for that position? Does the Secretary dispute that she has a mandatory duty to provide forbearance pending a determination of the discharge amount? If so, what is the authority for that position?

(5) Should the Secretary treat in a different manner the borrowers who were not able to complete a program or receive a diploma or certification on the Lists because the school or program closed? If the students who were not able to complete their program did receive some value, would it be arbitrary to treat them the same (provide the same discharge amount) as those students who were able to complete their programs?

**IT IS SO ORDERED**.

Dated: May 25, 2018

SALLIE KIM
United States Magistrate Judge

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 3**

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

**Pagination**

\*    BL

Majority Opinion >

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA, ex rel. LAPORTE, et al., Relators, v. PREMIER EDUCATION GROUP, L.P. et al., Defendants.

Civil No. 11-3523 (RBK/AMD)

May 11, 2016, Filed

May 10, 2016, Decided

NOT FOR PUBLICATION

For UNITED STATES OF AMERICA, ex. rel., LAURA LAPORTE, ANGELA DAVENPORT, PAMELA HONE, ROBERT BIASELLI (LDHWB), Plaintiff: DAVID C. KISTLER, LEAD ATTORNEY, BLANK ROME, LLP, PRINCETON, NJ; DAVID I. SINDERBRAND, LEAD ATTORNEY, Law Office of David I. Sinderbrand, LLC, Northfield, NJ.

For PREMIER EDUCATION GROUP, L.P., doing business as HARRIS SCHOOL OF BUSINESS OF LINWOOD N.J., PREMIER EDUCATION GROUP, G.P., INC., Defendants: RICHARD M. HOWARD, LEAD ATTORNEY, MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP, MINEOLA, NY; KEVIN C. DONOVAN, WILSON ELSER MOSKOWITZ EDELMAN & DICKER, NEWARK, NJ; RYAN PATRICK O'CONNOR, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, FLORHAM PARK, NJ.

For BRANFORD HALL CAREER INSTITUTE, SALTER COLLEGE, THE SALTER SCHOOL, SEACOAST CAREER SCHOOLS, SUBURBAN TECHNICAL SCHOOL, SALTER SCHOOL OF NURSING & ALLIED HEALTH, JOHN DOES NOS. 1-50, FICTITIOUS NAMES, Defendants: RICHARD M. HOWARD, LEAD ATTORNEY, MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP, MINEOLA, NY.

For STATE OF NEW JERSEY, Interested Party: EDWARD JAMES MULLINS, III, LEAD ATTORNEY, Office of



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

the Attorney General, Division of Law, Newark, NJ.

ROBERT B. KUGLER, United States District Judge.

ROBERT B. KUGLER

**KUGLER**, United States District Judge:

This matter is a <u>qui tam</u> action, which Relators bring under the False Claims Act, arising out of alleged fraudulent claims made by Premier Education Group, and its affiliated schools, to the federal government. Presently before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) . (Doc. No. 52.) For the reasons expressed herein, Defendant's motion is granted-in-part and denied-in-part.

## I. FACTUAL BACKGROUND

Relators Laura LaPorte, Angela Davenport, Pamela Hone, Robert Biaselli, Kelli J. Amaya, Amanda Kenny, and Doris Moody ("Relators") brought this <u>qui tam</u> action on behalf of the United States of America against Defendants Premier Education Group, L.P. and Premier Education Group, G.P., Inc. d/b/a Branford Hall Career Institute, Harris School of Business, Salter College, The Salter School, Seacoast Career Schools, and Suburban Technical School (collectively, "PEG"), and John Does # 1-50, Fictitious Names (together with PEG, the "Defendants"), pursuant to the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 , et seq. ("FCA"). Relators originally brought this action on June 20, 2011 (Doc. No. 1), and they subsequently amended the complaint four times. Relators filed the Fourth Amended Complaint ("FAC") on February 27, 2014 (Doc. No. 46).

In their FAC, Relators explain that their lawsuit is based on the actions of PEG, which allegedly made or caused to be made false claims and statements in order to participate in the Federal student financial aid programs ("Federal Programs"), from 2006 onward. (FAC ¶ 2; id. ¶ 97.) They claim PEG violated federal regulations it was required to comply with in order to be eligible to receive Federal Program funding. Specifically, PEG violated provisions of the contractual **[*2]** agreements between PEG and the Department of Education ("DOE"), called Program Participation Agreements ("PPAs"), in which PEG agreed to abide by federal regulations and not engage in material misrepresentations as a condition of PEG's eligibility to receive said funding. As required by the PPAs, PEG certified, each time it drew down student aid monies, that the funds were being expended in accordance with the conditions of those PPAs. ( Id. ¶ 3.)

Congress established various student loan and grant programs under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 et seq. ("HEA"), including the Federal Pell Grant Program, the Federal Family Education Loan Program and the Federal Direct Loan Program. In 2008 Congress reauthorized the HEA, as amended, through its passage of the Higher Education Opportunity Act. (FAC ¶ 60.) In order to participate in the Title IV Federal Programs for financial aid, an institution such as PEG must (1) establish institutional and



⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

program eligibility, and then (2) ensure student eligibility prior to disbursing the Federal Program funds. ( Id. ¶ 61.) There are federal requirements for institutions that wish to participate in Title IV Federal Programs, including the requirement that a school be accredited and licensed to operate in each state in which it is doing business. ( Id. ¶ 64; 20 U.S.C. § 1001 ; 34 C.F.R. § 600.5(a)(4) , (6) .) Institutions that wish to participate also may not make substantial misrepresentations to prospective applicants about the nature of the institution's educational programs or the employability of its graduates. (FAC ¶ 65; 34 C.F.R. § 668.71 ; id.§ 668.74 ; id.§ 668.72 .) To qualify as eligible, a student must be enrolled or accepted for enrollment in an eligible program at an eligible institution, must have a high school diploma or recognized equivalent or satisfy some other means of obtaining eligibility (such as, during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"), and must be maintaining "Satisfactory Academic Progress" in his or her course of study according to the school's published standards, and in accordance with Federal guidelines. (FAC ¶ 62; 34 C.F.R. § 668.32 ; id.§ 668.34 .)

All post-secondary schools must enter into PPAs with the DOE in order to be eligible to receive Title IV Federal Program funds, or have their students receive Title IV funding. (FAC ¶ 67; 20 U.S.C. § 1094 ; 34 C.F.R. § 668.14 .) PPAs condition the initial and continued participation of an eligible institution in a Title IV Federal Program upon compliance with the regulations specified above. (FAC ¶ 67; 34 C.F.R. § 668.14(a)(1) .) PEG has, since at least 2006, annually signed and submitted PPAs to the DOE on behalf of all of its educational institutions throughout the United States. (FAC ¶ 88.) These PPAs signed by PEG contain the same certifications that PEG was in compliance with all the applicable regulations described supra. ( Id. ¶¶ 89-96.) Relators aver that PEG has "claimed and received substantial sums in Title IV funding from the [DOE] as a result of its fraudulent conduct." ( Id. ¶ 97.)

The first of the specific allegations is that PEG made false statements and concealed material information from state agencies **[*3]** and the DOE in order to ensure that it would maintain its state licenses and accreditation status for each of its campuses in order to continue to receive Federal Program funding. ( Id. ¶¶ 4, 6.) This included actions such as fabricating job placement statistics for graduates at its campuses, in order to remain licensed and accredited. ( Id. ¶ 6; id. ¶ 257-58; id. ¶ 308.) Second, Relators allege that PEG engaged in false advertising in an attempt to induce students to enroll at its campuses, in violation of Federal Program regulations and its PPAs. ( Id. ¶ 7.) This involved misrepresenting the accreditation status of certain programs, enrolling students into programs of study without disclosing that they would be effectively disqualified from employment in their chosen fields upon graduation, and misrepresenting the nature and success of PEG's career placement services. ( Id.; id. at 78-91.)₁ Third, Relators aver that PEG engaged in fraudulent conduct in order to secure financial aid for students who, but for PEG's conduct, would not have been eligible for assistance from the Federal Programs. ( Id. ¶ 8.) For example, PEG allegedly falsified records to make it appear that students had either graduated from a recognized high school or received a GED in order to permit unqualified students to enroll, and PEG improperly received and retained Federal Program assistance and monies for those ineligible students. ( Id.; id. at 41-55.). Fourth, PEG purportedly continued to falsify student records once they were enrolled and receiving Federal Program financial aid, in order to receive more Federal Program funding for which the students were in fact ineligible. ( Id. ¶ 9.) To achieve this, PEG falsely certified students' "Satisfactory Academic Progress" on the Federal Program financial aid recipient list by falsifying attendance records for students who were no longer in attendance and changing student grades from failing to



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

passing, and PEG falsified financial aid records in order to secure more Federal Program funding than students should have been eligible to receive. ( Id.; id. at 55-72.) Finally, Relators allege PEG's employee compensation system, as designed and implemented, did not comply with the Incentive Compensation Ban in Title IV of the HEA. ( Id. ¶ 10; id. at 72-75.)

The named relators are all reportedly original sources of the allegations in the FAC. ( Id. ¶ 17.) Relator Laura LaPorte (LaPorte) worked as the Registrar at the Harris School of Business ("HSB") in Linwood, New Jersey ("HSB-Linwood"), in 2006 and 2007, and she was responsible for administering admissions tests, tracking student attendance, and inputting student grades into the computer system. ( Id. ¶ 19.) She resigned her employment with PEG voluntarily. ( Id.) Relator Robert Biaselli ("Biaselli") worked as an instructor at HSB-Linwood in 2006 and 2007. ( Id. ¶ 22.) Relator Pamela Hone ("Hone") was an admissions representative at HSB-Linwood in 2006 and 2007. ( Id. ¶ 25.) Relator Angela Davenport ("Davenport") was the Director of Education for HSB during 2009. ( Id. ¶ 28.) In her role, Davenport worked directly with the registrar at the HSB campus [*4] in Cherry Hill, New Jersey ("HSB-Cherry Hill"), and was responsible for preparation of the HSB-Linwood personnel files. ( Id.) She resigned her employment with PEG voluntarily. ( Id. ¶ 29.) Relator Kelli J. Amaya ("Amaya") worked as the Externship Coordinator at HSB-Linwood from September, 2009, through June, 2010, and in July, 2010 she was promoted to Director of Education/Externship at HSB in Wilmington, Delaware ("HSB-Wilmington"). ( Id. ¶ 32.) She claims that, after she reported problems at the HSB-Wilmington campus, she was first demoted and then fired in January, 2011, as a result of "whistleblowing activities." ( Id.) Relator Amanda Kenny ("Kenny") was hired as a Financial Aid Administrator for HSB-Wilmington in 2009, and was promoted to Director of Financial Aid at HSB-Wilmington in January, 2011. ( Id. ¶ 35.) As Director of Financial Aid she was responsible for the submission of FAFSA forms to the DOE, for scheduling financial aid disbursements, for drawing down Federal Program funds for HSB-Wilmington students, for preparing and processing all internal and external paperwork and reports and correspondence to the DOE relating to student financial aid, for monitoring each student's eligibility for financial aid on an ongoing basis, for attending weekly manager meetings and financial aid conference calls with other PEG schools, and for weekly meetings with the Director of Admissions and other PEG managers to monitor the financial aid process on a student-by-student basis, as well as to manage re-enrollments. ( Id.) Relator Kenny voluntary resigned her position with PEG in October, 2011. ( Id.) Relator Doris Moody ("Moody") was the Registrar at HSB-Wilmington from October, 2010, until August, 2012, at which point she alleges she was constructively terminated due to her "whistleblowing activities." ( Id. ¶¶ 38-39.) As Registrar, her responsibilities included grade and attendance records input and generating reports of the same. ( Id. ¶ 38.)

In their FAC, Relators allege that Defendants violated the FCA by (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval (FAC Count I citing 31 U.S.C. § 3729(a)(1)(A) ); ₂ (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim (FAC Count II citing § 3729(a)(1)(B) );₃ (3) conspiring to commit a violation of subparagraph (A) , (B) , (D) , (E) , (F) , or (G) of § 3729(a)(1) (FAC Count III citing § 3729(a)(1)(C) );₄ and (4) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (FAC Count IV citing § 3729(a)(1)(G) ).₅ Additionally, Relators allege Defendants violated § 3730(h) by taking retaliatory action against



⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

relators Amaya and Moody in the terms and conditions of their employment because of lawful acts done by them in furtherance of this action under the FCA (FAC Counts V, VII). Finally, Relators also allege that Defendants violated the rights of relators Amaya and Moody **[\*5]** to be free from intentional infliction of emotional distress (FAC Counts VI, VIII).

As indicated above, the original Complaint was filed on June 20, 2011, under seal, the Third Amended Complaint was unsealed on July 2, 2013 (Doc. No. 18), and the FAC was filed on February 27, 2014. On March 26, 2014, Defendants filed the present motion to dismiss the FAC. The United States filed its Notice of Election to Decline Intervention on July 2, 2013, (Doc No. 17), and a Statement of Interest in Response to Defendants' Motion to Dismiss on May 21, 2014 (Doc. No. 60).

In their motion, Defendants argue that Relators' action must be dismissed for lack of jurisdiction under 31 U.S.C. § 3730(b)(5) and § 3730(e)(4) . (Defs.' Br. at 7-15.) Additionally, they argue the claims are barred by the applicable statute of limitations. ( Id. at 15-16). In the alternative, if the Court were to reach the merits of Relators' claims, Defendants move to dismiss Counts I-IV for failure to properly plead pursuant to Rule 8 and to plead fraud with particularity pursuant to Rule 9(b) , ( id. at 16-28), and/or to dismiss all Counts for failure to state a claim pursuant to Rule 12(b)(6) . ( Id. at 28-55.)

The Court initially ruled on Defendants' motion on October 27, 2014. (See Doc. Nos. 76-77.) The Court dismissed Counts I-IV for lack of jurisdiction on account of 21 U.S.C. § 3730(b)(5) , which prohibits persons from bringing an action based on facts that formed the basis of a prior action under the FCA. The Court reasoned that Relators' suit and Bumgarner et al. v. Premier Education Group et al., No. 10-787 (D.N.J. filed Feb. 17, 2010), concerned the same underlying facts and were therefore related cases. (See Op. 11-18, Doc. No. 76.) Siding with the D.C. Circuit's interpretation of § 3730(b)(5) and the "first-to-file" rule, this Court held that Bumgarner barred Relators' related suit under the first-to-file rule notwithstanding the fact that Bumgarner was dismissed prior to Relators' filing suit. ( Id. 19-22.) The Court also dismissed Counts V and VII, finding Relators had failed to state a prima facie retaliation claim under § 3730(h) , and declined supplemental jurisdiction over the state law claims in Counts VI and VIII in the absence of any remaining federal causes of action. ( Id. 19-26.) Relators appealed.

While their appeal was pending, the Supreme Court decided Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter, 135 S. Ct. 1970 , 191 L. Ed. 2d 899 (2015), which both parties agree affects the Court's holding on the "first-to-file" rule. Without deciding Relators' appeal, the Third Circuit remanded the case for this Court to reconsider in light of recent developments in the law. Having been extensively briefed by the parties, the issues are now ripe for the Court's review.

## II. LEGAL STANDARD

Defendants move to dismiss the FAC for lack of subject-matter jurisdiction under Rule 12(b)(1) , for failure to state a claim under Rule 12(b)(6) , and for failure to satisfy the heightened pleading standard of Rule 9(b) . "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." In re Corestates **[\*6]** Trust Fee Litig., 837 F. Supp. 104 , 105 (E.D. Pa. 1993).

 © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

Where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, plaintiffs bear the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction. See Gould Elecs. Inc. v. U.S., 220 F.3d 169 , 178 (3d Cir. 2000). A district court may treat a party's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) as either a facial or factual challenge to the court's jurisdiction. Id. at 176 . A facial challenge is one in which a defendant argues "that the allegations on the face of the complaint, taken as true, are insufficient to invoke the court's jurisdiction." Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293 , 300 & n.4 (3d Cir. 2002). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the Relator." Gould, 220 F.3d at 176 (citing PBGC v. White, 998 F.2d 1192 , 1196 (3d Cir. 1993)). On the other hand, the court may consider evidence outside the pleadings, in reviewing a factual attack. Id. A district court has "substantial authority" to "weigh the evidence and satisfy itself as to the existence of its power to hear the case." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884 , 891 (3d Cir. 1997). "No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." Id .

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203 , 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224 , 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662 , 678 , 129 S. Ct. 1937 , 173 L. Ed. 2d 868 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 , 570 , 127 S. Ct. 1955 , 167 L. Ed. 2d 929 (2007).

To make this determination, a court conducts a three-part analysis. Santiago v. Warminster Twp., 629 F.3d 121 , 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Id . (quoting Iqbal, 556 U.S. at 675 ). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 131 (quoting Iqbal, 556 U.S. at 680 ). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id . (quoting Iqbal, 556 U.S. at 680 ). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 . A complaint cannot survive where a court can infer only that a claim is merely possible rather than plausible. Id .

The more exacting standard in Federal Rule of Civil Procedure 9(b) applies to claims raised under the False Claims Act because the claims allege fraud. U.S. ex rel. Wilkins [*7] v. United Health Group, 659 F.3d 295 , 301 n.9 (3d Cir. 2011). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other circumstances of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) . Pursuant to Rule 9(b) , a plaintiff must plead the circumstances of the alleged fraud with particularity sufficient to put the defendant on notice of the "precise misconduct with which [it is] charged." Lum v. Bank of Am., 361 F.3d 217 , 223-24 (3d Cir. 2004). A plaintiff may satisfy that requirement in two ways. Id. at 224. First, a plaintiff can meet the requirement "by pleading the date, place or time of the fraud." Id. Second, the plaintiff may use an "alternative



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

means of injecting precision and some measure of substantiation into their allegations of fraud." Id. (citing Seville Indus. Mach. v. Southmost Mach., 742 F.2d 786 , 791 (3d Cir. 1984)). Rule 9(b)'s heightened pleading standard is meant "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville, 742 F.2d at 791 , abrogated in part on other grounds by Twombly, 550 U.S. at 557 . At a minimum, Rule 9(b) requires "that the plaintiff identify the speaker of allegedly fraudulent statements." Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338 , 345 (3d Cir. 1999).

## III. DISCUSSION

"The FCA empowers a person, or 'relator,' to sue on behalf of the United States those who defraud the government," in what is referred to as a qui tam suit. U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294 , 297 (3d Cir. 2016). If a relator's suit is successful, he or she shares in any ultimate recovery. Relators allege a violation of 31 U.S.C. § 3729(a)(1)(A) , which imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." A prima facie claim under the FCA requires the plaintiff to show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." U.S. ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295 , 311 (3d Cir. 2011). The elements of a claim under § 3729(a)(1)(B), which Relators also bring, are that "(1) the defendant made, or caused someone else to make, a false or fraudulent record or statement; (2) the defendant knew the statement to be false or fraudulent; and (3) the statement was material to a claim." U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr., 2014 U.S. Dist. LEXIS 44002 , [2014 BL 87182], 2014 WL 1293882 , at *9 (D.N.J. Mar. 31, 2014). Defendants seek dismissal of Relators' suit on multiple grounds, which the Court will address in turn.

### A. Jurisdiction

### 1. First-to-file Rule

As noted supra, the Court previously ruled that Bumgarner barred Relators' claims under § 3729 (Counts I-IV), a holding that hinged on the Court's interpretation of § 3730(b)(5) 's first-to-file bar. That bar provides that "[w]hen a person brings an action . . . no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." § 3730(b)(5) (emphasis added). This Court, siding with the D.C. Circuit, interpreted "pending" to include cases that had been brought but **[*8]** dismissed prior to the filing of the related suit. Thus, the Court held that the first-to-file rule barred Relators' claims even though Bumgarner had been dismissed prior to Relators filing suit. The parties now contend, and the Court agrees, that the Supreme Court's holding in Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter, 135 S. Ct. 1970 , 191 L. Ed. 2d 899 (2015), renders that holding incorrect. In Kellogg, the Supreme Court held that "a qui tam suit under the FCA ceases to be 'pending' once it is dismissed." 135 S. Ct. at 1979 . Here, Bumgarner was dismissed prior to the filing of Relators' initial complaint and therefore imposes no jurisdictional bar to Relators' claims. As such, the Court's previous holding that it lacked jurisdiction pursuant to § 3730(b)(5) is vacated. The Court now denies Defendants' 12(b)(1) motion on grounds that Bumgarner divests this Court of jurisdiction.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

## 2. Public Disclosure Bar

Defendant argues that Relators' claims are barred by 31 U.S.C. § 3730(e)(4) , the FCA's public disclosure bar. Between 1986 and 2010, the FCA's public disclosure bar precluded a relator from bringing a suit based on allegations of fraud that had already been publicly disclosed, subject to an exception if the relator was the "original source" of the information:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in (i) a criminal, civil, or administrative hearing, (ii) in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

§ 3730(e)(4)(A) (2006). This version of the statute defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based." § 3730(e)(4)(B) .

In 2010, Congress passed the Patient Protection and Affordable Care Act (ACA),[6] which, among other things, amended § 3730(e)(4) . See Pub. L. 111-148 , § 10104(j)(2), 124 Stat. 119 , 901-02 . As amended, § 3730(e)(4) states that,

> [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Governmental Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

§ 3730(e)(4)(A) (2010). The statute as amended defines "original source" as an individual who has voluntarily disclosed information to the Government or one "who has knowledge that is independent of and materially adds to" information already publicly disclosed. § 3730(e)(4)(B).

Thus, the amended version of § 3430(e)(4)(A) provides more limited bases for dismissal than does the pre-ACA version. The amended provision bars allegations raised in prior federal proceedings to which **[*9]** the government was a party, while the pre-amendment provision precludes allegations raised in either state or federal proceedings. Compare § 3730(e)(4)(A)(i) (2010) (requiring courts to dismiss claims the basis of which have been publicly disclosed "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party" (emphasis added)) with § 3730(e)(4)(A)(i) (2006) (divesting a court's jurisdiction over allegations publicly disclosed in "a criminal, civil, or administrative hearing"). The amended public disclosure bar is also no longer a jurisdictional limitation, see U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries,



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 110 of 587**

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

LLC, 812 F.3d 294 , 297 (3d Cir. 2007) ("We agree that the public disclosure bar is no longer jurisdictional. . . ."), while the pre-amendment disclosure bar is a jurisdictional threshold. See § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . ." (emphasis added)). Thus, the pre-amendment disclosure bar is analyzed under a 12(b)(1) standard while the post-amendment version is analyzed under a 12(b)(6) standard.

The parties disagree on which version of § 3730(e)(4) applies. Defendants argue that the pre-amendment provision applies, while Relators argue that the post-amendment version applies. The Third Circuit has clarified that courts are to apply the version of the § 3730(e)(4) that was the law "at the time the alleged conduct in the Complaint took place." U.S. ex rel. Judd v. Quest Diagnostics, 638 Fed. Appx. 162 , *2015 U.S. App. LEXIS 15084* , [2015 BL 275201], 2015 WL 4025447 , at *2 (3d Cir. 2015) (quoting U.S. ex rel. Judd v. Quest Diagnostics, Inc., No. 10-4914, 2014 U.S. Dist. LEXIS 73760 , [2014 BL 153131], 2014 WL 2435659 , at *6 (D.N.J. May 30, 2014); see also U.S. ex rel. Zizic v. Q2Admins., LLC, 728 F.3d 228 , 232 n.3 (3d Cir. 2013). Citing the Supreme Court's decision in Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939 , 945-46 , 117 S. Ct. 1871 , 138 L. Ed. 2d 135 (1997), the Third Circuit recognized the "presumption against retroactive legislation," particularly where, as here, "an amendment eliminates a defense to a qui tam suit." Judd, *2015 U.S. App. LEXIS 15084* , [2015 BL 275201], 2015 WL 4025447 , at *2. The Third Circuit also found "no indication . . . that Congress intended to make the amendments to the public disclosure bar retroactive." *2015 U.S. App. LEXIS 15084* , [WL] at *2 (citing Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280 , 283 n.1, 130 S. Ct. 1396 , 176 L. Ed. 2d 225 (2010)). In Graham, the Supreme Court declined to give an amendment retroactive effect where the amendment eliminated a defense to a qui tam suit. 559 U.S. at 283 ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a qui tam suit."). If Judd, Hughes Aircraft, and Graham did not make it sufficiently clear, multiple circuit courts have also held that courts are to apply the public disclosure bar in effect at the time the conduct took place. See, e.g., Cause of Action v. Chicago Transit Auth., 815 F.3d 267 , 2016 WL 767345 , at *5 n.6 (7th Cir. 2016) ("Our cases hold that the 2010 changes to § 3730(e)(4)(A) are not retroactive and therefore the applicable version of subsection (A) is the one that was 'in force when the events underlying the suit took place.'"); U.S. ex rel. Antoon v. Cleveland Clinic Found., 788 F.3d 605 , 614-15 (6th Cir. 2015) (applying the pre-2010 version of section 3730(e)(4) to events that took place in 2007 and 2008); [*10] U.S. ex rel. May v. Purdue Pharma L.P., 737 F.3d 908 , 915 (4th Cir. 2013) (declining to give retroactive effect to the post-amendment public disclosure bar because "the significant revisions to the statute 'change[] the substance of the existing cause of action'"(quoting Hughes Aircraft, 520 U.S. at 948 )).

Where, as here, the complaint includes a continuing course of fraud that occurred both before and after Congress amended the public disclosure bar, the court applies the pre-amendment version of § 3730(e)(4) to conduct occurring prior to the amendment's enactment and the post-amendment version to conduct occurring after the amendment took effect.[7] As such, the pre-amendment version of the public disclosure bar governs conduct occurring before March 23, 2010 and the post-amendment version governs conduct occurring after.

Despite the substantive differences between the two versions of the public disclosure bar, the fundamental analysis remains the same. "To determine whether a Relator is barred by the FCA's public disclosure provisions, we must first assess whether the relator's claim is based on publicly disclosed allegations or



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

transactions." U.S. ex rel. Atkinson v. PA. Shipbuilding Co., 473 F.3d 506 , 519 (3d Cir. 2007). This is a two-step analysis: first, the Court must "determine whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A) , and second, the court must "decide whether the relator's complaint is based upon those disclosures." Id . To be properly considered "based upon" the publicly disclosed allegations, "the complaint need only be 'supported by' or 'substantially similar to' the disclosed allegations and transactions." Id . (citing U.S. ex rel. Mistick v. Housing Auth. of the City of Pittsburgh, 186 F.3d 376 (3d Cir. 1999)).

Defendants argue that the allegations in the FAC are based upon allegations that appeared in four previous lawsuits and/or media coverage of those suits, namely (1) United States ex rel. Bumgarner v. Premier Education Group, No. 10-0787 (D.N.J. 2010), filed on February 17, 2010; (2) Gomez et al. v. Premier Education Group, L.P., No. L-4412-08 (N.J. Super Ct. 2008), filed on December 8, 2008; (3) Eagen et al. v. Premier Education Group, L.P., No. 2128-11 (N.J. Super. Ct. 2011), filed March 4, 2011; and (4) Harrigan et al. v. Premier Education Group, L.P., No. L-2924-07 (N.J. Super. Ct. 2007), filed on September 6, 2007. The Court will address each of the alleged public disclosures as they apply in the context of both the pre-and post-amendment versions of the ACA.

## (a) Bumgarner

The parties do not dispute that the Bumgarner complaint constitutes a "civil hearing" as included in both the amended and unamended version § 3730(e)(4)(A). See U.S. ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Prudential Ins. Co., 944 F.2d 1149 , 1155-56 (3d Cir. 1991) (rejecting a narrow reading of "hearing" and finding it includes "[i]nformation gleaned in litigation and on file in the clerk's office"). The parties dispute whether the complaint was a public disclosure. To be "publically available," the disclosure must be "information that would have been equally available to strangers to the fraud transaction had they chosen to look for it." Stinson, 944 F.3d at 1155-56 ; see also Paranich, 396 F.3d at 333-34 (holding that a complaint constitutes a **[*11]** public disclosure if it is both filed with the court and publicly available).

Defendants argue that because Bumgarner was filed a year and a half prior to Relators' suit, it is properly considered a "public disclosure." (Defs.' Br. 12.) At the time Relators filed the instant suit, however, the Bumgarner complaint was sealed and was not available to the general public. (See Doc. Nos. 6-10.) It seems uncontroversial to the Court that "a sealed qui tam complaint, of which a relator has no knowledge, is not a public disclosure for purposes of" § 3730(e)(4) ." U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp.2d 25 , 46-47 (D.D.C. 2007) (reasoning that a sealed complaint is a "poor candidate" for public disclosure because it does not serve the purposes of § 3730 , namely to encourage relators to come forward but to disallow parasitic lawsuits). Thus, the Bumgarner complaint is not a public disclosure because it was not "equally available" to the general public—or Relators—at the time they filed their original Complaint in 2011. See Stinson, 944 F.3d at 1155-56 .

Even when considering Bumgarner from the date at which the seal was partially lifted to certain authorized parties in October, 2012, the Court finds that it is not a public disclosure. Relators assert that the allegations in the Bumgarner complaint were not revealed to them, and Defendants have not alleged otherwise. Rather, they argue that "regardless of Relators' knowledge of the admitted unsealing," the partial unsealing renders the Bumgarner complaint a public disclosure because any stranger to the fraud could potentially have discovered



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

the allegations contained therein. (Defs.' Supp. Br. 3 (emphasis added).) The Court disagrees. The complaint was only partially unsealed and was unavailable to the public at large. See U.S. ex rel Rush v. Agape Senior Servs., Inc., No. 13-0666, 2014 U.S. Dist. LEXIS 174206 , [2014 BL 355366], 2014 WL 6910480 , at *9 (D.S.C. Aug. 18, 2014) ("[A] qui tam action whose existence is kept under seal, except for certain enumerated disclosures authorized by the court, is not a public disclosure within the meaning of the pre-amendment or post-amendment version of 31 U.S.C. § 3730(e)(4)(A) ."). The Court is satisfied that Bumgarner does not divest the Court over jurisdiction of Relators' claims.

## (b) Harrigan, Gomez, and Eagen Complaints and Related News Media

The Harrigan, Gomez, and Eagen state suits ("the State Suits") allege a fraudulent scheme at HSB, a PEG-affiliated school. The plaintiffs in those cases were students or former students of HSB's Professional Medical Assistants ("PMA") program. They alleged that HSB misrepresented that upon completion of the PMA program, students would be eligible to take the American Association of Medical Assistants certification exam—a credential that substantially increases earning potential—when in fact they were ineligible because HSB was unaccredited. (Harrigan Compl. ¶¶ 30-46; Gomez Compl. ¶¶ 23-26; Eagen Compl. ¶¶ 27-44.) The plaintiffs also allege that PEG d/b/a HSB altered students' grades, permitted students to re-enroll in classes multiples times after failing, and changed students' attendance records in order to continue receiving funds from New Jersey programs, Federal Pell Grants, **[*12]** and subsidized and unsubsidized Federal Stafford loans. (Harrigan Compl. ¶¶ 56-59; Gomez Compl. ¶¶ 69-74; Eagen Compl. ¶¶ 58-61.) The Press of Atlantic City and the Local Fox News, both online sources, also reported on the State Suits prior to Relators filing suit. ( See Howard Cert. Exs. L-O.) Those news reports focus almost entirely on the allegations concerning the lack of proper accreditation, id. Exs. L-N, save for one story reporting on students being taught a CPR course by teachers who were not qualified to do so, id. Ex. O.

As indicated supra, information revealed through civil litigation, including civil complaints, constitutes a public disclosure under § 3730(e)(4)(A) . Paranich, 396 F.3d at 333-34 . The Harrigan, Gomez, and Eagen complaints were filed in 2007, 2008, and 2011, respectively, well before the Relators filed the instant suit. They therefore constitute the type of disclosure enumerated in the pre-ACA version of § 3730(e)(4)(A). They do not qualify as public disclosures under the post-ACA version, however, because, as state suits, they do not constitute a "Federal, criminal, civil, or administrative hearing in which the Government or its agent is a party." § 3730(e)(4)(A)(i) (2010). Therefore, the pleadings in the State Suits qualify as public disclosures under the pre-ACA version of the statute only.

On the other hand, the news articles about the State Suits qualify as public disclosures under both versions of the statute. Each version specifically enumerates allegations publicly disclosed by the "news media." Plaintiffs do not dispute that the news articles covering the allegations in the State Suits constitute "news media." See Freedom Unlimited, Inc., 2016 U.S. Dist. LEXIS 43701 , [2016 BL 102237], 2016 WL 1255294 , at *16 ("Courts in this jurisdiction have held that information obtained through a publicly accessible website can qualify as 'news media' under the public disclosure bar.").

Therefore, the remaining inquiry is whether the allegations in the FAC are "based upon" these disclosures. Atkinson, 473 F.3d at 519 . This analysis requires the Court to address each of Relators claims separately.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

See U.S. ex rel. Merena v. SmithKline Beecham Corp, 205 F.3d 97 , 102 (3d Cir. 2000) ("[I]n applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone."); see also U.S. ex rel. Boise v. Cephalon, Inc., Doc. No. 08-287, *2014 U.S. Dist. LEXIS 143742* , [X1GOQKJBG000N], 2014 WL 5089717 , *7 (E.D. Pa. Oct. 9, 2014) (reviewing the ways in which a district court may examine each claim independently, such as "by looking at each count of the complaint" or at "each theory of recovery"). In this instance, it makes little sense to review Relators' claims by looking to the separate counts in the FAC. Indeed, nearly all of the FAC's factual allegations underlying the specific Counts are organized as a detailed 107-page preamble to the mere seven pages of specifically enumerated counts. (See generally FAC.) Instead, it makes more sense to compare the allegations made in the State Suits—and related news media— to the FAC's many theories of liability.

When comparing the complaints, it is clear that the allegations in the FAC far exceed those in the State Suits. The former contains allegations not even mentioned in the State Suits, including the following:**[*13]**

> • PEG knowingly admitted students who did not possess a valid high school diploma or GED, in violation of the schools' published admissions criteria. (See FAC ¶¶ 127, 132-155.)₈

> • PEG admitted known felons who were either ineligible for federal financial aid or could not obtain licensure in their chosen fields. (See FAC ¶¶ 146-156.)

> • PEG admitted individuals with learning disabilities, non-english speaking individuals, and illiterate individuals. (See id. ¶¶ 157-70.)

> • PEG completed FAFSA applications for prospective students who could not read or write English, or who were not capable of understanding the financial obligations they were undertaking. (See id. ¶¶ 171-75.)

> • PEG imposed rigid sales quotas on admissions representatives such that they would be fired if they failed to enroll at least five new students per week. PEG tied admissions' representatives' performance and salaries to their ability to meet PEG's sales quotas. (See id. ¶¶ 227-37.)

> • PEG misrepresented to students that the credits earned at PEG schools were transferable to other institutions. (See id. ¶¶ 278-286.)

> • PEG used prohibited incentive compensation to induce employees to participate in fraudulent enrollment and graduation schemes. (See id. ¶¶ 289-305.)

These allegations could not have been publicly disclosed by the State Suits or news media because the complaints in those cases—and the media coverage thereof—make no mention of these allegations. Therefore, the Court properly has jurisdiction over these allegations in the FAC.

The Court also finds that it has proper jurisdiction over the FAC's allegations regarding accreditation, despite Defendants' arguments otherwise. The State Suits consist almost entirely of allegations that HSB misrepresented to students in the PMA Program that they would be able to take the relevant certification exam when in reality they could not because HSB was not accredited by either the Commission on Accreditation of



Case 3:19-cv-03674-WHA    Document 193-6    Filed 03/18/21    Page 114 of 587
United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis
62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

Allied Health Education Professionals (CAAEP) or the Accrediting Bureau of Health Education Schools
(ABHES). (See generally, Harrigan, Gomez, and Eagen Compls.) The media coverage covers only these
allegations. The FAC, on the other hand, does not contain allegations concerning HSB's lack of CAAEP or
ABHES accreditation.[9] As such, the Court finds it properly has jurisdiction over these claims as well.

Multiple allegations in the FAC, however, resemble allegations in the State Suits. First, the FAC and the State
Suits contain similar allegations concerning the altering of students' grades, during similar time periods. The
complaints in the State Suits allege that HSB "changed grades of students to pass them in order to continue"
receiving government funds. (Harrigan Compl. ¶ 57; see also Gomez Compl. 70, Eagen Compl. ¶ 58.) The
FAC also alleges that PEG changed students grades "from failing to passing, in order to mislead accrediting
agencies and Federal Programs" so that it could preserve the students eligibility for government funds. (FAC ¶
179). However, the complaints in the State Suits contain no allegations regarding the specific **[\*14]** scheme or
the manner in which HSB altered students' grades, while the FAC goes into much detail about the alleged
scheme:

> PEG implemented a top down scheme to falsify student grades . . . . PEG routinely pressured its
> administrators and instructors to ensure that students received passing grades regardless of the
> students' actual performance . . . . Through its well-known pattern of blaming and harassing
> instructors when students failed courses, PEG preempted the submission of failing grades . . . .
> [Director of Education Kathy Bertolini] was required to challenge any instructor who submitted a
> failing grade for a student, and to dispute the failing grade . . . . Similarly, at PEG's BHCI-
> Southington Campus, Computer Information Technology instructor Jay Baker, who was employed
> by the school between 1999-2003 and 2004-2011, and his fellow instructors routinely were asked
> to change student grades from failing to passing . . . . PEG retaliates against instructors who fail to
> comply with its demand that they change grades from failing to passing . . . . For those instructors
> who refused to acquiesce in PEG's pressure to "pass" unqualified students in order to permit
> certification of their satisfactory academic progress, PEG administrators routinely changed those
> students grades from failing to passing without the instructor's consent, ordering Registrars to
> falsely certify students' [satisfactory academic progress].

(FAC ¶¶ 179-86; see also ¶¶ 179-89; 190-211.) None of these allegations, nor the specifics of this scheme,
were contained in the State Suits. The FAC is also not limited to conduct occurring at HSB.

Second, both the State Suits and the FAC make allegations concerning the falsification of students' attendance
records. The former alleges that "Defendants counted students for attendance by marking them present when
they were not present so as to continue to receive government funds." (Gomez Compl. ¶ 73; see also Harrigan
Compl. ¶ 59, Eagen Compl. ¶ 61.) The FAC makes a similar allegation, but expands on it substantially:

> Pursuant to 34 C.F.R. 668.22(b) , PEG was obligated to track its students' attendance, and thus
> their continued eligibility to receive Federal student aid. In this regard, PEG based a student's
> withdrawal date on that student's "last date of attendance" ("LDA") at an academically-related
> activity . . . . Under PEG's LDA tracking system, if a student had not been in a PEG building for
> fourteen (14) days, the student would have to be dropped/failed, and any unused Federal student



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

aid returned. PEG engaged in various fraudulent conduct to manipulate its LDA reports, including altering students' attendance records, in order to ensure that students not benefiting from instruction at PEG would maintain their enrollment and, accordingly, their eligibility for Federal Program financial aid, notwithstanding the fact that they were not attending class . . . . During the course of auding HSB-Wilmington student attendance records, Relator Amaya discovered that the attendance records of numerous students had been falsified to make it appear they were attending class when **[*15]** that was not actually the case . . . . During her tenure as Registrar at PEG's HSB-Linwood campus, Relator LaPorte was responsible for keeping the school's student attendance records on the CampusVue computer application. She regularly was instructed by Campus Director Steven Strong and Director of Education Craig Hennequant to alter student attendance records in order to avoid "failing" a student for lack of attendance in class. When Relator LaPorte voiced her concerns about this practice, Hennenquant responded: "Just do as I tell you."

(FAC ¶¶ 212-19.) This additional information concerning the scheme at HSB and PEG's other campuses was not included in the State Suits.

The question therefore becomes whether the additional information provided in the FAC prevents the otherwise similar allegations from being "based on" the complaints in the State Suits and the media coverage thereof. The Third Circuit has emphasized that the public disclosure bar is not limited to actions "solely based upon" public disclosures but rather, it includes actions "even partly based upon" such allegations. Zizic, 728 F.3d at 238 (citing U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548 , 553 (10th Cir. 1992)). To analyze whether an allegation is "based upon" a public disclosure, the Third Circuit uses "an algebraic representation of the nature and extent of disclosure required to raise the jurisdictional bar." Atkinson, 473 F.3d at 519 . The equation provides that "[i]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ & $Y$ represent its essential elements." Id. The public disclosure bar precludes a relator from bringing suit "[i]f either $Z$ (fraud) or both $X$ (misrepresented facts) and $Y$ (true facts) are disclosed by way of a listed source." Id.

Here, the Court finds that the allegations in the FAC concerning the changing of grades and attendance records are "based upon" the similar allegations in the State Suits. The State Suits allege that PEG d/b/a HSB routinely changed students' grades from failing to passing and altered attendance records to receive federal financial aid to which they were not entitled. Here, although Relators have revealed details and facts absent from the complaints in the School Suits, the underlying allegation of fraud—"$Z$"—was previously disclosed by the State Suits. As such, the Court finds the pre-ACA version of §3730(e)(4)(A) divests it of jurisdiction over Relators' allegations concerning the pre-2010 altering of grades and attendance records, unless Relators can demonstrate they are the original sources of that information. § 3730(e)(4)(A).

### 3. Original Source Exception

To be an "original source" under the pre-2010 version of the statute, "a relator's knowledge must be both direct and independent," meaning that the knowledge must "not depend on public disclosures" and be "obtained without any intervening agency, instrumentality or influence." Atkinson, 473 F.3d at 520 (internal quotation marks and citations omitted). Relators allege that they engaged in their own independent investigation of the conduct described in the FAC and are therefore original sources. (Pls.' Opp. Br. 20, Doc. No. 53.) As indicated



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

supra, however, Relators **[*16]** have argued that the post-amendment version of § 3730 applies and therefore have not engaged in a pre-amendment original source analysis. (See Opp. Br. 17-21.) As such, Relators have submitted no Record and instead rely on the allegations in the FAC and their brief to satisfy this Court of its jurisdiction over their claims.

On a 12(b)(1) factual attack on jurisdiction, however, the Court is not obligated to accept Relators' claims as true. Here, the Court is left without any Record on which to examine the Relators' alleged investigation into the alteration of students' grades and attendance records. Without any evidence that the Relators undertook an investigation into the alleged frauds occurring at PEG's campuses, the Court cannot find that their investigation renders them the original sources of the information. Indeed, Relators suggest that their investigation included public sources, see Pl.'s Br. 20, and "the extent of reliance on information already in the public domain should be a consideration during the original source inquiry, even if that information is not a public disclosure within the meaning of § 3730(e)(4)(A)." Atkinson, 473 F.3d at 522 . Here, the Court does not know on what, if any, public disclosures Relators' investigation relied. If it relies even in part on the public disclosures identified above, then Relators are not original sources of the information. If it does not, even then, Relators may still fail to qualify as original sources. As the Third Circuit explained in Zizic,

> reliance on public information that does not qualify as a public disclosure under § 3730(e)(4)(A) may also preclude original source status, depending on the extent of that reliance, and the nature of the information in the public domain, as well as the availability of information, and the amount of labor and deduction required to construct the claim.

Zizic, 728 F.3d at 240 (internal citations and quotations omitted). In sum, the Court has no information whatsoever about the alleged investigation, whether from the Record or from the FAC. The Court therefore finds that Relators have failed to meet their burden and demonstrate that the Court has jurisdiction over the allegations that PEG falsified students' grades and attendance records for the purpose of receiving federal funds. As such, the Court has jurisdiction over the allegations that PEG falsified students' grades and attendance records only to the extent that conduct occurred after March 23, 2010 because the post-ACA public disclosure bar does not mandate dismissal of allegations that were disclosed in state proceedings.

## B. Implied Certification Theory

The Third Circuit has recognized an "implied false certification theory," which "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." Wilkins, 659 F.3d at 305 . The rationale is that "the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." Id . (citing Mikes v. Straus, 274 F.3d 687 , 696 (2d **[*17]** Cir. 2001)); see also United States v. Science Applications Int'l Corp., 626 F. 3d 1257 , 1266 , 393 U.S. App. D.C. 223 (D.C. Cir. 2010) ("Courts infer implied certifications from silence where certification was a prerequisite to the government action sought."). "Thus, in contrast to reviewing the expressed representations made to the government, an analysis of an implied false certification claim focuses on 'the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment.'" Freedom Unlimited, Inc., 2016 U.S. Dist. LEXIS 43701 , [2016 BL 102237], 2016 WL 1255295 , at * 26 (citing Wilkins, 659 F.3d at 313 ).



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

The Third Circuit has also qualified the doctrine, stating that "the implied certification theory of liability should not be applied expansively." Id. at 307. In order to state a claim under this theory, a claimant must show more than a simple regulatory violation; a party must show that compliance with those regulations was required to receive federal funds. Id. "In other words, a plaintiff must set forth a plausible showing with sufficient particularity 'that if the Government had been aware of the defendant's violations of the . . . laws and regulations that are the bases of [the] plaintiff's FCA claims, it would not have paid the defendant's claims.'" Freedom Unlimited, 2016 U.S. Dist. LEXIS 43701 , [2016 BL 102237], 2016 WL 1255294 , at *26 (quoting Wilkins, 659 F.3d at 307 ). The Third Circuit intended this requirement to avoid turning the FCA "into a 'blunt instrument to enforce compliance with all . . . . regulations rather than 'only those regulations that are a precondition to payment.'" Id . (citing Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297 , 304 (3d Cir. 2008)). Defendants move to dismiss Relators' claims to the extent they are premised on the implied certification theory because (1) relators have not identified any regulatory violations, and (2) to the extent they do, those regulations are conditions of participation and not of payment.

**1. Lack of Regulatory Violation**

Defendants allege that Relators cannot state a claim under the implied false certification theory because they have not alleged conduct that actually violates any Title IV, HEA regulation.

**(a) Misleading Career Placement Performance**

Relators allege that PEG misled prospective students about its schools' career placement performance. Specifically, Relators allege that PEG's promoted materially misleading employment statistics that were based on disingenuous—and often falsified—employment data. (See generally FAC ¶¶ 259-77.) Defendants allege that Relators' have not pled any regulatory violation. (Defs.' Br. 32-33.) The Court disagrees. In their opposition brief and in their FAC, Relators cite to 34 C.F.R. § 668.74 , which prohibits "misrepresentations regarding the employability of an eligible institution's graduates." (See Pls.' Br. 39; FAC ¶¶ 66, 259.) Although the then-current version mentions only three specific prohibited misrepresentations, the statute specifically says the list is non-exhaustive. See§ 668.74 ("Misrepresentation by an institution regarding the employability of its graduates includes, but is not limited to . . . ."). The then-current version of § 668.71 , also cited by Relators, also prohibits substantial misrepresentations, **[*18]** which it defines as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." Taking Relators' allegations as true, as the Court is required to do at this stage, the Court finds that Relators have sufficiently alleged that Defendants' alleged practices in reporting job placements violated § 668.74 . The fact that the regulatory structure is such that Defendants have freedom in determining how to calculate their statistics does not defeat Plaintiffs' allegations that the calculations they used were materially misleading or in fact false.

**(b) High Pressure Tactics to Enroll Students**

Next, Defendants argue that Relators state no regulatory infraction with their allegations concerning Defendants' use of high-pressure tactics to enroll students. (Defs.' Br. 44.) The Court agrees. Relators allege that PEG imposed rigid sales quotas on admissions representatives, threatened termination if the quota was not met, and trained its admissions representatives to use excessive pressure to enroll students. However,



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Relators cite no regulation that Defendants have allegedly violated. Although the HEA prohibits the payment of "any commission, bonus, or other incentive payment," 20 U.S.C. § 1094(a) , the Act does not concern personnel decisions, such as the hiring and the firing of employees. See U.S. ex rel. Bott v. Silicon Valley Colls., 262 Fed. App'x 810 , 812 (9th Cir. 2008) ("The decision to fire an employee is not covered by the Act because termination is not a prohibited 'commission, bonus, or other incentive payment.'"); U.S. ex rel. Whatley v. Eastwick College, No. 13-1226, 2015 U.S. Dist. LEXIS 95862 , [2015 BL 235629], 2015 WL 4487747 , at *7 ("[T]he incentive compensation ban does not prohibit institutions from terminating employees based on their recruitment numbers."). As such, the Court finds Relators' allegations concerning "high-pressure tactics," FAC ¶¶ 227-48, fail to state a regulatory violation.

**(c) Incentive Compensation Ban**

Relators allege that PEG violated the Incentive Compensation Ban by (1) paying bonuses based on students' successful graduation, and (2) paying bonuses based on the number of students enrolled. The Ban prohibits an institution from providing,

> any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds, except that this limitation does not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive title IV, HEA program funds.

34 C.F.R. § 668.14(b)(22)(i) . Defendants take issue with Plaintiffs' allegations concerning PEG's "Admissions Representative Compensation Plan" ("the Plan"), which provides bonuses based on students successfully graduating as opposed to enrolling. (FAC ¶ 297.) Defendants contend that the Plan falls within a Safe Harbor of the Incentive Compensation Ban that exempts from prohibition "[c]ompensation that is based upon students successfully completing **[*19]** their educational programs, or one academic year of their educational programs, whichever is shorter." See 34 C.F.R. § 668.14(b)(22)(ii)(E) (in effect until June 30, 2011).

Relators disagree, arguing that providing bonus compensation based on graduation rates, when those graduation rates themselves have been altered to allow students to reenroll, violates the Ban.[10] (See FAC ¶ 291.) As written, however, the Plan does not appear to violate the Incentive Compensation Ban. It awards admissions representatives $40 and $60 bonuses, depending on their level of seniority, for each graduate, and is "structured and introduced formally to do our utmost to motivate and assist our students in the pursuit of success." ( Id. ¶ 297.) Thus, as written, bonuses are tied to students' success rather than admissions representatives' success in securing enrollments, and the provision of bonuses based on student success is expressly contemplated in the Ban's Safe Harbor.

Relators also do not sufficiently allege that the Plan, as implemented, violates the Incentive Compensation Ban under this theory. First, many of Relators allegations do not assert that Defendants actually compensated employees for successful graduates. (See FAC ¶¶ 292, 294-95.) They have alleged only that Defendants promised bonus compensation for successful graduates. The Incentive Compensation Ban prohibits providing not promising any commission, bonus, or other incentive payment. Even if promising bonuses was actionable, Relators do not allege that these employees were promised bonuses in exchange for changing grades and



⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

thereby reenrolling students. (See FAC ¶¶ 292, 94.) The Ban prohibits incentive payments <u>based directly or indirectly upon success in securing enrollments</u>. 34 C.F.R. § 668.14(b)(22)(i) . Regardless of whether PEG's conduct qualifies for a safe harbor, alleging that PEG promised bonus payments based on graduation rates is insufficient to state a violation of the Ban because it does not connect the bonuses to the alteration of grades and resulting continued enrollment. In other words, Relators have not sufficiently alleged that the admissions representatives were incentivized by the provision of graduation bonuses to alter grades so that they could reenroll students and see them forward to graduation.

Relators have alleged that Tammy Denesha received a $7,000.00 bonus for changing students' grades and attendance records. Although concerning if true, this allegation is not enough on its own to state a violation of the Incentive Compensation Ban because Relators have not connected this allegation to the "success in securing enrollments." § 668.14(b)(22)(i). Relators have not alleged that Tammy Denesha, as Director of Education of Branford Hall, was in any way responsible for recruiting or admitting students. See id. (prohibiting payments on the basis of enrollments to "any person or entity engaged in <u>any student recruiting or admission activities</u> or in making decisions regarding the awarding of title IV, HEA program funds." (emphasis added)). Without such an allegation, Relators have not stated that the Plan **[*20]** violates the Incentive Compensation Ban.

Relators also allege that PEG provided bonuses based on enrollments. Specifically, they allege that Marlena Berghammer and Susan Kershaw received a $2,000 admissions bonus for enrolling a high number of students, FAC ¶ 293, and that Relator Hone received a two-day vacation trip to Connecticut as a reward for her weekly enrollments, Id. 292.[11] These allegations, when combined with the more general allegations regarding PEG's provision of bonuses based on enrollments are sufficient to state a violation of the Incentive Compensation Ban under Rule 12(b)(6).

**(d) Admitting Unqualified Students**

Defendants move to dismiss Relators' allegations that PEG admitted students who did not pass a Wonderlic test because such allegations do not state a regulatory violation. The Court agrees. Relators have not identified what regulation was violated by admitting students who failed the Wonderlic test, nor how doing so would have resulted in any false claim. To the extent Relators attempt to state a claim based on these allegations, such claim is dismissed.

Defendants also move to dismiss Relators' claims that Defendants admitted unqualified students, namely convicted felons who were either ineligible to receive financial aid or to practice the careers for which they were receiving training, see FAC ¶¶ 146-56; and students who had learning disabilities or could not read or speak English, see FAC ¶¶ 157-70.[12] The Court agrees that Relators' allegations concerning the <u>admission</u> of felons fail to state a regulatory violation. (See FAC ¶¶ 146-70.) Relators point to no regulation prohibiting the admission of students with a felony conviction, and do not contest Defendants' motion for dismissal on this ground. Moreover, 34 C.F.R. § 668.40 states that a student is ineligible for title IV funds if he or she has been convicted for possession or sale of illegal drugs at a time when a student was enrolled and receiving Title IV funds. 34 C.F.R. § 668.40 . Relators do not allege a violation of this regulation.

Likewise, Relators' allegations concerning the admission of students with learning disabilities and limited



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 18**

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

English language skills fail to identify a cognizable regulatory violation. Relators cite 34 C.F.R. § 668.32 and § 668.34 , but neither of those regulations prohibits admitting students with learning disabilities or limited English language skills. In fact, Defendants are prohibited from denying admission to students on the basis of their disability. See 34 C.F.R. § 104.42 ("Qualified handicapped persons may not, on the basis of handicap, be denied admission or be subjected to discrimination in admission or recruitment by a recipient to which this subpart applies."). Moreover, § 668.34 does not regulate student admissions—it governs the tracking of a student's progress after the student is admitted and enrolled. See 34 C.F.R. § 668.34 . As such, these allegations, FAC ¶¶ 157-70, are dismissed.

### (e) Altering Students' Grades and Attendance Records

Relators allege that PEG falsified students' grades in order to keep students eligible for federal financial aid, in violation of 34 C.F.R. § 668.34 . (FAC ¶¶ 176-224**[*21]** .) The version of § 668.34 in effect until June 30, 2011 required students enrolled in academic programs of more than two years to maintain "satisfactory progress"—defined as a "C" average or equivalent—in order to maintain eligibility for Title IV funds. See 34 C.F.R. § 668.34(a) (effective until June 30, 2011). Defendants allege that Relators cannot maintain a cause of action under § 668.34 because the students in this case were not enrolled in academic programs that were two years or longer. (Defs.' Br. 38.) Although Relators do not dispute Defendants' factual representation, the Court cannot—at the motion to dismiss stage—dismiss Relators' claims on facts alleged by the Defendants. The Court is obligated to accept all facts alleged in the FAC as true. Defendants' may file a motion for summary judgment on Relators' allegations at any time they feel the record is sufficient.

Even then, however, 34 C.F.R. § 668.32 , which governs students' eligibility to receive federal financial aid, requires a student to "maintain[] satisfactory progress in his or her course of study according to the institution's published standards of satisfactory progress that satisfy the provisions of § 668.16(e) , and, if applicable, the provisions of § 668.34 ." § 668.32(f) . Even if Relators' conduct does not violate § 668.34 because the students are enrolled in longer-than-two-year programs, § 668.16(e) requires a school to apply reasonable standards to evaluate a students' progress. Here, Relators have alleged that PEG falsified students' grades and was therefore not applying the required reasonable standards. Defendants are free to argue that their maintenance of grades in fact was reasonable but that is to be resolved at the motion for summary judgment stage.

Relators also allege that PEG falsified students' attendance records, in violation of 34 C.F.R. § 668.22(b) , which Defendants argue is inapplicable on its face. Although Defendants are correct that this regulation governs the treatment of Title IV funds when a student withdraws, the Court finds that Relators have sufficiently pled a violation of the regulation. Subsection (b)(3) in effect during the relevant period required an institution "to take attendance if an outside entity (such as the institution's accrediting agency or a State agency) has a requirement, as determined by the entity, that the institution take attendance." § 668.22(b)(3)(i) (effective until July 1, 2011). In the event that an institution is required to take an attendance, § 668.22(b)(1) establishes that a student's withdrawal date is the "last date of academic attendance as determined by the institution from its attendance records." Here, Relators allege that PEG violated the attendance policy imposed by their accreditor by manipulating attendance records to maintain students' eligibility for federal funds. By doing so, Relators allege PEG improperly retained financial aid funds. Relators' allegations sufficiently state a violation of § 668.22(b) . They allege that PEG did not comply with the attendance policy set by its accreditors



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 121 of 587

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

and as a result, improperly retained funds to which it was not entitled. To **[*22]** the extent Defendants allege that the accrediting body did not actually impose attendance parameters on PEG, that, too, may be an issue best resolved at the motion for summary judgment stage.

## ii. Remaining Regulations Are Conditions of Payment

As mentioned <u>supra</u>, the crux of the implied certification theory is whether compliance with a regulation is a condition of payment versus a condition of participation. The Third Circuit distinguishes between the two based on the consequences of noncompliance, with conditions of payment resulting in nonpayment and conditions of participation resulting in administrative sanctions. <u>Wilkins</u>, 659 F.3d at 309 (citing <u>U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.</u>, 543 F.3d 1211 , 1219-20 (10th Cir. 2008)). "[A] plaintiff must set forth a plausible showing with sufficient particularity 'that if the Government had been aware of the defendant's violations of the . . . laws and regulations that are the bases of [the] plaintiff's FCA claims, it would not have paid the defendant's claims.'" <u>Freedom Unlimited</u>, 2016 U.S. Dist. LEXIS 43701 , [2016 BL 102237], 2016 WL 1255294 , at *26 (quoting <u>Wilkins</u>, 659 F.3d at 307 ). Defendant argues that Relators allege non-compliance with regulations that are conditions of participation, not of payment, while Relators and the Government as amicus curiae argue that the PPAs and Title IV regulations are conditions of payment. The Court agrees with Relators and the Government.

Defendants are correct that PPA stands for Program <u>Participation</u> Agreement, not Program <u>Payment</u> Agreement, but the difference is not as distinct in the Title IV, HEA context. In <u>United States ex rel. Hendow v. University of Phoenix</u>, 461 F.3d 1166 , 1176 (9th Cir. 2006), the Ninth Circuit described the difference between conditions of payment and those of participation in the context of the HEA as a "distinction without a difference, " adding that, "[i]n the context of Title IV and the Higher Education Act, if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all—and thus, an educational institution could flout the law at will." <u>Hendow</u>, 461 F.3d at 1176 .

In <u>Sobek v. Education Management, LLC</u>, No. 10-131, *2012 U.S. Dist. LEXIS 188243* , [2013 BL 142300], 2013 WL 2404082 (W.D. Pa. 2013), the court likened the student education funding context to the AKS regulations found to be conditions of payment in <u>Wilkins</u>. *2012 U.S. Dist. LEXIS 188243* , [2013 BL 142300], 2013 WL 2404082 , at *3. The <u>Sobek</u> court found that alleged violations of the Incentive Compensation Ban and misrepresentations of accreditation and job placements statistics were "material" enough to satisfy the condition of payment requirement at the pleading stage. 2013 U.S. Dist. LEXIS 76354 , [WL] at *2. The Court similarly finds here. Federal regulations and the PPA condition initial <u>and continued</u> participation in title IV programs, and by extension, the receipt of title IV HEA funding, on compliance with the PPA and the regulations therein. <u>See</u> 20 U.S.C. § 1094 ; 34 C.F.R. § 668.14 . The United States is expressly authorized to withhold funds from a non-compliant school. <u>See</u> 20 U.S.C. § 1094(c)(1)(G) (providing for the promulgation of rules concerning an "emergency action" to withhold funds from a non-compliant institution). The Court is also not convinced that Relators allege only "minor" misrepresentations that would not warrant withholding **[*23]** of funds under the then-current version of 34 C.F.R. § 668.75 . (<u>See</u> Defs.' Br. 44.) Relators have plead with sufficient particularity that the United States would have refused payment had it known of PEG's regulatory violations. Defendants are welcome to defeat liability at the motion for summary judgment stage, if it can be shown that the United States would not have refused payment. <u>See Sobek</u>, *2012 U.S. Dist. LEXIS 188243* , [



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

2013 BL 142300], 2013 WL 2404082 , at *3.

Defendants urge the Court to follow a ruling out of the U.S. Court of Appeals for the Seventh Circuit in <u>United States v. Sandford-Brown, Limited et al.</u>, 788 F.3d 696 (7th Cir. 2015). There, the Seventh Circuit held that "FCA liability is not triggered by an institution's failure to comply with Title IV Restrictions subsequent to its entry into a PPA, unless the relator proves that the institution's application to establish initial Title IV eligibility was fraudulent." 788 F.3d at 711 . However, in <u>Sandford-Brown</u>, the Seventh Circuit completely rejected the doctrine of implied false certification, id. at 711-712 , which the Third Circuit recognized in <u>Wilkins</u> and which has been consistently applied within this Circuit. As such, the Court declines to follow <u>Sandford-Brown</u>.13

## C. Reverse False Claims Under 31 U.S.C. §§ 3729 (a)(7) (1994) and 3729(a)(1)(G) (2009)

Relators also allege a reverse false claim. A reverse false claim essentially requires a plaintiff to show that a defendant failed to refund money or property that it was obligated to return to the government. The obligation to return such money to the government must be clear. <u>See U.S. ex rel. Quinn v. Omnicare, Inc.</u>, 382 F.3d 432 , 444 (3d Cir. 2004).

Prior to 2009, the reverse false claims provision of the FCA imposed liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . ." § 3729(a)(7) . On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended the FCA and designated § 3729(a)(7) as § 3729(a)(1)(G) and applied it to conduct that occurred after the amendment took effect.14 The amended version imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." § 3729(a)(1)(G).

Here, Relators appear to alternatively plead their § 3729(a)(1)(A)-(B) claims under the reverse false claims provision. They essentially allege that PEG received payment by implicitly falsely certifying that it was in compliance with its PPAs and the regulations cited therein. Consequently, payments it received were undue, prompting a duty to refund those payments.15 (<u>See</u> FAC ¶¶ 344-45.) In other words, the same funds that Defendants received through fraudulently certifying compliance with the PPAs is the same money that they allegedly did not refund to the Government. Defendants allege that Relators' reverse false claim cause of action must be dismissed because it is duplicative and **[*24]** redundant of Relators § 3729(a)(1)(A)-(B) claims. The Court agrees.

Courts within this circuit have consistently held that the reverse false claims provision is not a vehicle to simply recast an identical claim under a traditional false claim provisions. <u>See U.S. ex rel. Petratos v. Genentech, Inc.</u>, 141 F. Supp. 3d 311 , *2015 U.S. Dist. LEXIS 146525* , 2015 WL 6561240 , at *9 (D.N.J. Oct. 29, 2015); <u>Sobek</u>, *2012 U.S. Dist. LEXIS 188243* , [2013 BL 194709], 2013 WL 2404082 , at *29; <u>U.S. ex rel. Thomas v. Siemens AG</u>, 708 F. Supp. 2d 505 , 514 (E.D. Pa. 2010). Relators allege that two of these cases, <u>Thomas</u> and <u>Sobek</u>, analyzed the pre-FERA reverse false claims provision, and that the amended version does in fact permit a claim under § 3729(a)(1)(G) that is the inverse of conduct violating §§ 3729(a)(1)(A) and 3729(a)(1)(B). The Court, however, sees no such clarification in the text of the statute, and declines to rely on a Senate Report



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

alone.[16] Moreover, <u>Petratos</u>, too, declined to recognize such a reverse false claim under the amended version of the statute. The Court therefore finds that Relators have not stated a claim under § 3729(a)(7) or § 3729(a)(1)(G). Relators have not alleged a concealment or avoidance of an obligation that arose independent from the allegedly false certifications of compliance with the PPA and the regulations therein. To the extent, Relators allege that Defendants falsified or concealed the students' ineligibility, such fraud forms the basis of their § 3729 (a)(1)(A)-(B) claims, further demonstrating the duplicative nature of the claims. As such, Defendants' motion to dismiss Count IV of the Complaint is granted.

## D. Conspiracy Under 31 U.S.C. §§ 3729(a)(3) and 3729(a)(1)(C)

Relators allege a violation of § 3729(a)(1)(C).[17] Specifically, they allege Defendants "conspired, and may still be conspiring, with the various entities and/or persons described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2) ."[18] To state a conspiracy under the FCA, a plaintiff must show "(1) a conspiracy to get a false or fraudulent claim allowed or paid and (2) an act in furtherance of the conspiracy." <u>Atkinson</u>, 473 F.3d at 514 . Importantly, an agreement between two or more persons is the "essence" of a conspiracy under the FCA. <u>U.S. ex rel. Cestra v. Cephalon, Inc.</u>, No. 14-1842, 2015 U.S. Dist. LEXIS 71505 , [2015 BL 174720], 2015 WL 3498761 , at *12 (E.D. Pa. June 3, 2015). Defendants allege that Relators have failed to state a conspiracy claim because they have not sufficiently pled either element of a conspiracy claim and because the intracorporate conspiracy doctrine mandates dismissal.

Here, the Court finds that Relators have not identified an agreement to defraud the Government. The Complaint alleges only that Defendants conspired with "various entities and/or persons described herein (as well as other unnamed co-conspirators)," which is vague and insufficient to state a plausible entitlement to relief. It does not specify which specific entities or persons were party to the alleged conspiracy. In their Opposition Brief, Relators assert that the agreement was between Defendants PEG GP and PEG LP, but the Court reviews the sufficiency of Relators' allegations as they are alleged in the complaint, not in their brief. The Court sees no such allegation in the FAC. Rather, the FAC continually refers to PEG GP and PEG LP as if they were one entity, rather than two conspiring **[*25]** entities. (FAC ¶ 46 ("PEG LP and PEG GP are collectively referred to herein as "PEG" and each has been operated in all material respects as alter ego for the other.").) Indeed, Relators have pled that PEG GP assumed management control of PEG LP and is responsible for the actions alleged in the Complaint. ( <u>Id.</u> ¶ 44.) These facts do not allow the Court to infer an agreement between the two because Relators have effectively pled that PEG GP and PEG LP are the same entity for all intents and purposes. As such, Count III is dismissed.

## E. Heightened Pleading Standard

"Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspapers story'—that is, the 'who, what, when, where, and how' of the events at issue." <u>U.S. ex rel. Pilecki-Simko v. Chubb Inst.</u>, No. 06-3562, 2010 U.S. Dist. LEXIS 27187 , [2010 BL 62256], 2010 WL 1076228 , at *7 (D.N.J. Mar. 22, 2010) (quoting <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198 , 217 (3d Cir. 2002)). Relators may also "use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." <u>U.S. ex rel. Underwood v. Genentech, Inc.</u>, 720 F. Supp. 2d 671 , 676 (E.D. Pa. 2010) (quoting <u>Rolo v. City</u>



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Investing Co. Liquidating Trust, 155 F. 3d 644 , 658 (3d Cir. 1988)). Defendants move to dismiss a number of Relators' claims on grounds that Relators have not pleaded the PPA violations with the requisite particularity. ( See Defs.' Br. 17-28.) The Court has already dismissed a number of these allegations on 12(b)(6) grounds and therefore addresses only those that remain.

As an initial matter, the Court declines to limit Relators' allegations to only those campuses where the alleged conduct took place. (See Defs.' Br. 25.) Relators sufficiently allege throughout the FAC that PEG dominates the management of all its schools and that it is responsible for establishing the schools' goals and policies. ( See, e.g., FAC ¶ 103 ("The corporate team is responsible for setting overall corporate coals and strategies, and overseeing the daily operations at each of PEG's campuses."); id. ¶ 104 ("Across all the PEG Schools, PEG management employed a unified corporate strategy that was managed out of the corporate office in Connecticut, and that focused on increased admission and profits above all else."). Courts within this circuit have declined to limit relators' allegations where they have made a similar showing. In Sobek, the Court rejected Defendants' argument that a relator could not allege a company-wide fraud perpetrated by all of Defendants' universities over an eight-year period when he worked only at one of Defendant's universities and for a limited time. 2012 U.S. Dist. LEXIS 188243 , [2013 BL 142300], 2013 WL 2404082 , at *24. The court explained that as an associate director of admissions, it was plausible that the relator "acquired knowledge of EDMC system-wide corporate policies designed and utilized in service of the overarching, system-wide false certification financial aid scheme alleged, and spanning a longer period of time than his actual employment period of almost two and one-half years." 2012 U.S. Dist. LEXIS 188243 , [WL] at *25. The Sobek court relied on the reasoning of Judge McVerry in a related case:

> Plaintiffs allege that EDMC corporate **[*26]** headquarters signed and submitted the PPA's on behalf of all of its related educational institutions . . . . In addition, Plaintiffs aver that the compensation plan was developed by an EDMC-wide task force . . . . Because government funding represented such a significant source of EDMC's revenues, it is plausible that any conduct which would have imperiled those revenues, such as the alleged violations of the Incentive Compensation Ban, would have required approval from the highest levels of EDMC management. In sum, Plaintiffs have pled the involvement and knowledge of senior EDMC executives. Because Plaintiffs' theory is that there was one, EDMC-wide scheme controlled by top-level executives, it is not necessary to allege separate conduct by each of the affiliated schools named as Defendant s.

Id . (quoting United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433 , 453 (W.D. Pa. 2012)).

The Court finds the reasoning and Sobek and Education Management Corp. persuasive and declines to limit Relators' claims to only those schools where they allege specific instances of misconduct. Just as the plaintiffs did in Education Management Corp., Relators here allege that PEG's CEO or his designee signed all of PPAs executed by the schools. (FAC ¶ 94.) Relators also worked at various HSB locations for a time period spanning from 2006 to 2012, and held positions such as Director of Education of HSB (Relator Davenport), Registrar of HSB-Wilmington (Relator Moody), and Director of Financial Aid at HSB-Wilmington (Relator Kenny). Just as the court in Sobek reasoned, it is entirely plausible that Relators obtained knowledge of PEG's corporate-wide policies while working in these various positions at multiple HSB campuses for a cumulative six years. For these reasons, the Court declines to limit Relators allegations to only those campuses where they have



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

specifically alleged misconduct took place. The Court will evaluate Relators' allegations under Rule 9(b) as they pertain to a company-wide scheme.

## 1. Causing Financial Aid To Be Awarded to Ineligible Students

Relators allege that Defendants caused financial aid to be awarded to students to who had no high school diploma and were therefore ineligible to receive financial aid. Defendants allege that Relators allegations are insufficient because Relators do not specify why the individuals were ineligible for financial aid, identify students who actually submitted claims for Title IV funding, or sufficiently plead that Defendants acted with the requisite scienter. (Defs.' Br. 17-20.) Relators dispute each of Defendants' grounds for dismissal and argue that a relaxed Rule 9(b) standard is appropriate because the FAC alleges a broad scheme of corporate fraud and the facts lie "peculiarly within the defendant's knowledge or control." (See Pls.' Br. 28 (quoting In re Craftmatic Sec. Litig. v. Krastow, 890 F.2d 628 , 645 (3d Cir. 1989)).)

The Court need not determine whether a relaxed Rule 9(b) standard is more appropriate because Relators have failed to state a claim at all. Relators allege that students were ineligible to receive financial aid because **[*27]** they did not have a high school diploma or equivalent, and that Title IV funding is available to the student "only if he has a high school diploma or its recognized equivalent." (FAC ¶ 132 (citing 34 C.F.R. § 668.32(e)(1) .) Relators are incorrect— § 668.32(e) provides multiple ways that a student may qualify for Title IV funding apart from obtaining a high school diploma or its equivalent.[19] For instance, a student may be eligible if he or she was home-schooled and received credentials provided for under state law. § 668.32(e)(4). Here, Relators have alleged only that students had no high school diploma, but have failed to allege that the students were wholly ineligible from receiving aid because they did not qualify under any of the alternative means provided for in § 668.32(e). Without doing so, Relators have not alleged a regulatory violation. As such, Relators claims alleged in paragraphs 132-45 of the FAC are dismissed.

## 2. Material Misrepresentations to Induce Prospective Students to Enroll

Relators allege that Defendants misrepresented to students that it lost its institutional accreditation status in 2011. Relators allege that HSB-Voorhees lost its institutional accreditation in 2011 after an audit, but nevertheless continued to operate without institutional accreditation while falsely certifying otherwise. (FAC ¶ 257.) Relators allege that the school's Director Rosemary Parker instructed the Director of Admissions Nicole Gentles to lie to other within the school and students about the school's accreditation. ( Id.) They also allege that this was done at the direction of PEG's Regional Vice President Nick Hastain, and was done with the intention of retaining eligibility and, consequently, Title IV funding. In sum, Relators allegations sufficient to establish the "who, what, when, where, and why." Pilecki-Simko, 2010 U.S. Dist. LEXIS 27187 , [2010 BL 62256], 2010 WL 1076228 , at *7.

The Court also finds that Relators have satisfied Rule 9(b) with respect to allegations concerning career placement performance, FAC ¶¶ 259-77, and those concerning the transferability of course credits, id. 278-86. Relators identify the various tactics employed to carry out each violation, such as miscounting successful job placements, falsifying employment records, and instructing students that their credits would be transferrable to any other college or university or to any other school offering a similar career program. (See id. ¶¶ 266, 271, 291.) Relators identify specific individuals at various PEG schools responsible for committing such violations at



United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 US Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

each school, as well as the senior PEG representatives from whom they received instructions to do so. (See id. ¶¶ 266-75, 278-85.) The Court finds Relators' allegations satisfy the heightened standard of Rule 9(b) .

### 3. Incentive Compensation

Lastly, the Court finds that Relators have sufficiently pled that Defendants' schools falsely certified compliance with the Incentive Compensation Ban by paying bonuses based on enrollments. As indicated supra, Relators specifically allege that Defendants paid bonuses to two individuals based on their successful enrollments. (See FAC ¶¶ 293, **[*28]** 295.) Relators identify the amount of the bonuses, where and when the bonuses are provided, and the reasoning for such bonuses. As such, Relators have satisfied Rule 9(b) 's requirements.

### F. Statute of Limitations [20]

Defendants argue that the FCA's six-year statute of limitations bars Relators § 3729 claims.[21] (See Defs.' Br. 15.) Citing United States v. The Baylor University Medical Center, 469 F.3d 263 (2d Cir. 2006), Defendants contend that the statute of limitation runs from August 9, 2013, the date on which the Third Amended Complaint was unsealed. ( Id. at 15.) The Court disagrees. Baylor's specific holding that does not apply in the instant case. There, the Second Circuit held that the Government's complaint-in-intervention does not relate back to the original qui tam complaint filed under seal and therefore commences, for statute of limitations purposes, on the date on which it files its complaint-in-intervention.[22] Id. Baylor has no bearing on the commencement date of Relators' FCA claims. See U.S. ex rel. Grupp v. DHL Exp. (USA), Inc., 47 F. Supp. 3d 171 , 179 (W.D.N.Y. 2014) (distinguishing Baylor on the grounds that it addressed the commencement date of the Government's complaint-in-intervention, not the original qui tam complaint); Hayes v. Dept of Educ. of the City of New York, 20 F. Supp. 3d 438 , 444 (S.D.N.Y.) (finding Baylor inapposite on the issue of "when a relator herself tolls the statute of limitations for her own claims").

Defendants alternatively argue that the allegations in the FAC should relate back only to the filing of the Third Amended Complaint, which Relators filed on May 9, 2013, because it superseded the prior complaints rendering them of no legal effect. (Defs.' Br. 16.) Defendants' position is simply incorrect. Rule 15(c)(1)(B) provides that an amendment to a pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[23] Here, Relators commenced this action on June 20, 2011, with the filing of the sealed original complaint, within the statute of limitations. Therefore, so long as the allegations in the subsequent complaints relate back to the original complaint, Relators claims are not time-barred. See Fed. R. Civ. P. 15(c)(1)(B) . The Court finds that a number of Relators' allegations in the FAC relate back to the original complaint, including allegations that PEG falsified grades, falsified attendance records, and violated the incentive compensation ban. (See Compl. at 11-15, 19-20.) A number of allegations that remain, however, relate back only to the second amended complaint, which the Court notes is substantially similar to the FAC, and which Relators filed on November 27, 2012. Specifically, the second amended complaint put Defendants on notice of Relators allegations concerning PEG's misrepresentation regarding of schools' accreditation status, graduate career placement performance, and the transferability of course credits. (See Second Am. Compl. ¶¶ 223, 258-59, 260-76.) Thus, these allegations are actionable to the extent it occurred on or after November 27, 2006.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## G. Intentional [*29] Infliction of Emotional Distress

Relators Amaya and Moody each bring a claim of intentional infliction of emotion distress under Delaware law, where they reside and were employed with PEG, for PEG's retaliatory conduct. Relator Amaya alleges that, in retaliation for her "whistleblowing activities," PEG created a hostile work environment, including demoting her and then using her demotion to embarrass her at a campus staff meeting, and eventually terminating her. ( Id. ¶¶ 321-23.) Relator Moody alleges that PEG created a hostile work environment in retaliation for disclosing PEG's improprieties and constructively terminated her. ( Id. ¶¶ 327-28.)

Defendants move to dismiss Relators Amaya and Moody's claims on grounds that the Delaware Workers' Compensation Act precludes claims for intentional infliction of emotional distress. (Defs.' Br. 53-54.) The Delaware Workers' Compensation Act provides as follows:

> Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

Del. Code. Ann. Tit. 19, § 2304 (2016). "This statute precludes any tort claims for personal injury arising out of and in the course of employment, including for emotional distress." Parker v. Comcast Corp., No. 04-344, *2005 U.S. Dist. LEXIS 22612* , [2005 BL 39591], 2005 WL 2456221 , at *2 (D. Del. October 5, 2005). However, the Workers' Compensation Act does not preclude claims "that involve a true intent by the employer to injure the employee." Id . (quoting Rafferty v. Hartman Walsh Painting Co., 760 A. 2d 157 , 159 (Del. 2000). "To show such an intent and to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show a deliberate intent to bring about an injury." Id. (internal quotation marks and citations omitted).

In Parker, cited by Relators, and in EEOC v. Avecia, Inc., No. 03-320, *2003 U.S. Dist. LEXIS 19325* , *2003 WL 22432911* , (D. Del. Oct. 23, 2003), reconsideration denied in *2004 U.S. Dist. LEXIS 7995* , *2004 WL 1077915* (Apr. 28, 2004), cited by Defendants, the court held that the employers' actions were insufficient to show a deliberate intent to injure the plaintiffs because the actions taken "were not unusual in the employment environment." Parker, *2005 U.S. Dist. LEXIS 22612* , [2005 BL 39591], 2005 WL 2456221 , at *3; see also Avecia, *2004 U.S. Dist. LEXIS 7995* , *2004 WL 1077915* , at *2. In Parker, the plaintiff alleged that in retaliation "(1) her work was criticized; (2) she was told to resign or face an increased workload, being 'written up,' other discipline, and eventually being fired for cause; (3) a file was developed that documented poor work performance; and (4) she was terminated." *2005 U.S. Dist. LEXIS 22612* , [2005 BL 39591], 2005 WL 2456221 , at *3. In Avecia, the plaintiff alleged that her employer "scrutinized her vacation requests, work assignments, and progress more than any other employees," "required her to remain at her work station during work breaks," and prohibited her from displaying personal items around her work area. *2003 U.S. Dist. LEXIS 19325* , *2003 WL 22432911* , at *1. The Court found none of this conduct, when accepted as true, sufficiently alleged that the employers deliberately set out to harm the plaintiffs.

Here, [*30] Relator Moody alleges that "PEG began systematically to retaliate against Relator Moody for her whistleblowing activity, creating a hostile work environment." (FAC ¶ 328.) However, Relator Moody does not



⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

allege any <u>specific</u> actions PEG took against her, other than stating PEG created a hostile work environment and constructively terminated her.[24] Such bare allegations are insufficient to withstand a motion to dismiss and do not demonstrate a "deliberate intent" on the part of PEG to cause Relator Moody emotional distress. As such, Relator Moody's claim for intentional infliction of emotional distress is dismissed.

Relator Amaya makes similar allegations as Relator Moody, albeit her factual allegations are a bit more detailed. She similarly alleges that PEG created a hostile work environment in retaliation for her whistleblowing activity and demoted her from her position as Director of Education. The former allegation is conclusory with little to no factual support, and the latter is the type of conduct that typically occurs in the workplace. <u>Parker</u>, *2005 U.S. Dist. LEXIS 22612* , [2005 BL 39591], 2005 WL 2456221 , at *3; <u>see also Avecia</u>, *2003 U.S. Dist. LEXIS 19325* , *2004 WL 1077915* , at *2. Despite Relator Amaya's allegation that "PEG possessed a deliberate intent to bring about an injury to Relator Amaya," FAC ¶ 354, these allegations do not demonstrate a deliberate intent to inflict intentional harm on Relator Amaya.

She further alleges that PEG singled her out and "professionally embarrassed [her] during a campus staff meeting as having been demoted." ( <u>Id.</u> ¶ 328.) Even if the Court were to find that using Relator Amaya's demotion to embarrass her demonstrates "deliberate intent" on PEG's part, she still has not sufficiently pled that PEG exhibited "extreme and outrageous behavior" when they used her demotion to embarrass her. <u>Jordan v. Delaware</u>, 433 F. Supp. 2d 433 , 444 (D. Del. 2006). "Extreme and outrageous conduct has been defined as behavior, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 444 (internal quotation marks omitted) (quoting <u>Mattern v. Hudson</u>, 532 A.2d 85 (Del. Super. 1987)). As distasteful as such behavior is, the Court cannot find that embarrassing Relator Amaya on account of her demotion was "beyond all possible bounds of decency." As such, Relator Amaya's claim for intentional infliction of emotional distress is dismissed.

## IV. LEAVE TO AMEND

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." <u>Phillips</u>, 515 F.3d at 245 (citing <u>Alston v. Parker</u>, 363 F.3d 229 , 235 (3d Cir. 2004)). Indeed, even when "a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103 , 108 (3d Cir. 2002).

Here, the Court finds that allowing the Relators to amend their complaint would be futile. The Court dismissed Relators' claims not because the Complaint lacked sufficient detail to state a claim but because the facts **[*31]** alleged do not state a claim as a matter of law. Relators could remedy these deficiencies only by alleging new facts entirely. As such, the Court declines to grant Relators' leave to amend those claims that the Court has dismissed.

## V. CONCLUSION

For the reasons expressed herein, Defendants' motion to dismiss is granted-in-part and denied-in-part.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 129 of 587

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 US Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

Dated: 05/10/2016

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

---

fn

1

For purposes of clarity, each time the Court cites to a paragraph or range of paragraphs in one of the documents in the record it will use the "¶" symbol, and when it cites to a page or range of pages numbers it will use the notation "[document] at [page number]."

fn

2

To the extent the conduct occurred prior to May 20, 2009, Relators allege a violation of 31 U.S.C. § 3729(a)(1) , the equivalent provision prior the FCA's 2009 amendments. For purposes of this motion, any minor differences between the two provisions, are insignificant.

fn

3

To the extent the conduct occurred prior to May 20, 2009, Relators allege a violation of 31 U.S.C. § 3729(a)(2) , the equivalent provision prior the FCA's 2009 amendments. Any minor differences between the two provisions are insignificant for purposes of this motion.

fn

4

Relators also alleged violation of § 3729(a)(3) to the extent that the conduct complained of preceded the FCA's May 20, 2009 amendments. Any minor differences between the two provisions are insignificant for purposes of this motion.

fn

5

Here, too, Relators allege a violation of § 3729(a)(7) under the prior version, though as noted supra at note 3, is not relevant for purposes of the Court's analysis.

fn

6

The ACA became effective March 23, 2010.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

fn
7

District courts within the Third Circuit have consistently done so. See U.S. ex rel. Freedom Unlimited, Inc. et al. v. City of Pittsburgh et al., No. 12-1600, 2016 U.S. Dist. LEXIS 43701 , [2016 BL 102237], 2016 WL 1255294 , at *12 (D.N.J. Mar. 31, 2016) ("[A]llegations of pre-2010 conduct will be assessed under the pre-ACA FCA and allegations of post-2010 conduct will be assessed under the post-ACA FCA."); U.S. ex rel. Moore & Co., P.A. v. Magestic Blue Fisheries, LLC, 69 F. Supp. 3d 416 , 423 (D. Del. 2014), rev'd on other grounds, 812 F.3d 294 (3d Cir. 2015) ("The case at bar was filed after the PPACA amendment took effect and involves continuing conduct, both before and after the PPACA amendment . . . [T]he court applies the pre-PPACA FCA to pre-amendment conduct and the amended FCA to later conduct" (footnote omitted)); Judd, 2014 U.S. Dist. LEXIS 73760 , [2014 BL 153131], 2014 WL 2435659 , at *6 ("Here, however, the initial Complaint was filed after the ACA-amended provision took effect, while the pre-2010 conduct alleged in the Complaint occurred while the pre-ACA provision was still in place. Therefore, because the ACA-amended provision is not retroactive, the pre-ACA provision applies to all pre-2010 conduct alleged in the case.").

fn
8

Defendants argue that this allegation is also contained in the second amended complaint in Eagen and is therefore a public disclosure on which Relators' suit is based. However, this allegation was contained in Relators original complaint, filed on June 20, 2011, months before the filing of the second amended complaint in Eagen. The original complaint in Eagen did not contain this allegation.

fn
9

Relators' original Complaint contains allegations substantially similar to those in the State Suits. (See Doc. No. 1.) In that pleading, Relators put forth allegations concerning HSB's misrepresentations on its accreditation and the effects on those students wishing to apply for the medical assistant certification. (See id. ¶ 41.) However, these claims are no longer part of the case—they are not contained in the FAC, which is the operative Complaint for Defendants' motion to dismiss.

fn
10

Specifically, Relators allege that "PEG used the promise of bonuses to incentivize its personnel to first enroll as many students as possible (regardless of the prospective students' qualifications), and then to keep them enrolled (regardless of actual performance or attendance, often based on falsified grade and attendance records) for as long as possible in order to milk as much Federal Program funding as possible." (FAC ¶ 291.)

fn
11

**Bloomberg Law** ®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

Relators' also allege that PEG promised bonuses to Russell McKee, id. ¶ 295, but this allegation fails to state an actionable claim. Without allegations that Defendants actually paid McKee a bonus for enrollment, there has been no regulatory violation.

fn
12

Defendants do not move to dismiss on 12(b)(6) grounds Relators' allegations concerning the impropriety of admitting students without a high school diploma or equivalent degree. (See Mot. to Dismiss 35-37.)

fn
13

Even under the reasoning of Sandford-Brown, however, Relators' allegations could still survive. In the FAC, Relators allege that PEG signed and submitted annual PPAs to the Department of Education, (see FAC ¶ 88), and that their fraud was ongoing from 2006 to 2011. Under Sandford-Brown's reasoning, PEG violated the FCA by entering into the yearly PPAs when it knew that it was already in noncompliance with the regulations contained therein and that it had no intention of complying with them.

fn
14

Relators contend that § 3729(a)(1)(G) as amended applies to all of the conduct in the FAC because Relators filed suit after the amendment took effect. However, as it has with every other non-retroactive provision of the FCA, the Court finds it most appropriate to apply the law that was in place at the time the conduct took place.

fn
15

Specifically, Relators allege that,

> [w]hen PEG learned through its own investigation and the whistleblowing activity of Relators Amaya and Moody that its agents and employees had submitted or caused to be submitted knowingly false or fraudulent claims for Federal financial aid dollars, it was required to disclose those facts to the Government and to refund the amount of the overpayments to the Government.

FAC ¶ 144. However, Relators' traditional false claims causes of action allege that PEG was actively engaged in the fraud—that it was a fraud carried out from the top down. (See generally FAC.) Thus, by saying that PEG had a duty "when it learned" of the fraud, Relators are actually alleging that PEG had a duty "when it learned" of the fraud, Relators are actually alleging that PEG had a duty when it "carried out" the fraud. Based on the pleadings, PEG knew of the fraud at its inception.

fn
16

Relators cite to the Senate Report, which discusses the definition of "obligation" as meant in the intended version. The Report mentions that the definition will be helpful to Government contractors who receive



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

⊞ United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

money incrementally from the Government based on cost estimates but who are overpaid on account of an overestimation of the ultimate cost. See S. Rep. 111-10 , at 14 (2009), <u>available at</u>*2009 WL 787872* . That paragraph states that,

> any action or scheme created to intentionally defraud the Government by receiving overpayments, even if within the statutory or regulatory window for reconciliation, is not intended to be protected by this provision. Accordingly, any knowing any improper retention of an overpayment beyond or following final submission of payment as required by statute or regulation—including relevant statutory or regulatory periods designated to reconcile cost reports, but excluding administrative and judicial appeals—would be actionable under this provision.

<u>Id.</u>

fn
17

Relators allege violations of 31 U.S.C. § 3729(a)(3) to the extent wrongdoing occurred prior to May 20, 2009. (<u>See</u> FAC at Count III.)

fn
18

Relators also allege that Defendants conspired to violate the equivalent sections of the previous version of the FCA, namely §§ 3729(a)(1) -(2) . (<u>See</u> FAC ¶¶ 341.)

fn
19

This section of Title IV was amended multiple times over the relevant period. Each version, however, provides multiple ways a student may qualify for federal financial aid other than obtaining a high school diploma or its equivalent. <u>See</u>§ 668.32(e) (2006); <u>id .</u> (2008); <u>id .</u> (2009); <u>id .</u> (2010); <u>id .</u> (2011).

fn
20

The Court reviews Defendants' argument with respect to only those claims that have not been dismissed <u>infra</u>.

fn
21

Defendants also argue in their motion that Relators Amaya and Moody's retaliation claims are barred by the applicable statute of limitations. Those claims, however, are not at issue. The Court's previous Opinion and accompanying Order dismissed Relator Amaya and Moody's retaliation claims for failure to state a claim under Rule 12(b)(6) . That holding is not before this Court on remand.

fn
22

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>

**Bloomberg Law**®

United States ex rel. Laporte v. Premiere Educ. Grp., LP, No. 11-3523 (RBK/AMD), 2016 BL 149924, 2016 Us Dist Lexis 62066, 2016 WL 2747195 (D.N.J. May 10, 2016), Court Opinion

Subsequent to the decision in Baylor, the FCA was amended to allow the Government's complaint-in-intervention to relate back to the filing of the qui tam complaint "to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint." 31 U.S.C. § 3731(c) .

fn

23

The full text of Federal Rule of Civil Procedure 15(c)(1) provides as follows:

(1) When an Amendment Relates Back. An Amendment to a pleading relates back to the date of the original pleading when:

(A) The law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period of Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

fn

24

Relator Moody even asserts that prior to being constructively terminated, "PEG never informed Moody that she had any performance issues." Id. at 329.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 4**



**U.S. Department of Justice**

United States Attorney
District of New Jersey
*Civil Division*

---

CRAIG CARPENITO
UNITED STATES ATTORNEY

*David E. Dauenheimer*
*Assistant United States Attorney*
*Deputy Chief, Civil Division*

*970 Broad Street, Suite 700*          main: (973) 645-2700
*Newark, NJ 07102*                       direct:(973) 645-2925
*david.dauenheimer2@usdoj.gov*      fax:   (973) 297-2010

June 4, 2019

**<u>VIA ECF ONLY</u>**
Honorable Ann Marie Donio
United States Magistrate Judge
Mitchell H. Cohen Bldg. & U.S. Cthse.
4th and Cooper Streets
Camden, New Jersey 08101

      Re:    *U.S. ex rel. LaPorte et al. v. Premier Education Group, G.P., Inc., et al.*
                <u>Civil Action No.: 11-3523 (RBK – AMD)</u>

Dear Judge Donio:

      The United States has been apprised by counsel for Relators and for
defendants that they have reached agreement on the revised settlement agreement
language. The Department of Education ("DOE"), however, is still reviewing the
proposed language including the draft release language concerning administrative
consequences. Counsel for the DOE has informed the undersigned that it expects to
have its review and redline of the proposed language completed by June 5, 2019.
Additional time will be required to ensure agreement among the parties to any
changed required.

      The United States thus requests, with the parties concurrence, that the
Court adjourn the current June 7, 2019 deadline for Relators' motion to enforce the
settlement until June 21, 2019.

                              Respectfully submitted,

                              CRAIG CARPENITO
                              United States Attorney

           By:    <u>*s/ David E. Dauenheimer*</u>
                  DAVID E. DAUENHEIMER
                  Assistant United States Attorney

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 5**



**U.S. Department of Justice**

United States Attorney
District of New Jersey
*Civil Division*

---

CRAIG CARPENITO
UNITED STATES ATTORNEY

*David E. Dauenheimer*
*Assistant United States Attorney*
*Deputy Chief, Civil Division*

*970 Broad Street, Suite 700*
*Newark, NJ 07102*
*david.dauenheimer2@usdoj.gov*

*main: (973) 645-2700*
*direct:(973) 645-2925*
*fax: (973) 297-2010*

June 18, 2019

**VIA ECF ONLY**
Honorable Ann Marie Donio
United States Magistrate Judge
Mitchell H. Cohen Bldg. & U.S. Cthse.
4th and Cooper Streets
Camden, New Jersey 08101

Re:   *U.S. ex rel. LaPorte et al. v. Premier Education Group, G.P., Inc., et al.*
Civil Action No.: 11-3523 (RBK – AMD)

Dear Judge Donio:

I write to request a one-week adjournment of the current June 21, 2019 deadline for Relators' motion to enforce the settlement until June 28, 2019. During our last two-week adjournment the parties have been provided a new draft of the government's proposed settlement agreement incorporating changes required based, in part, on input from the Department of Education. Additional time will be required to ensure agreement among the parties to these changes.

The United States thus requests, with the parties concurrence, that the Court adjourn the deadline for Relators' motion to enforce until June 28, 2019.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

By:   *s/ David E. Dauenheimer*
DAVID E. DAUENHEIMER
Assistant United States Attorney

**Full Text**

PageID: 4634 U.S. Department of Justice United States Attorney District of New Jersey Civil Division

_____

_____ CRAIG CARPENITO
970 Broad Street, Suite 700 main: (973) 645-2700 UNITED STATES ATTORNEY Newark, NJ 07102 direct: (973) 645-2925 david.dauenheimer2@usdoj.gov fax: (973) 297-2010 David E. Dauenheimer Assistant United States Attorney Deputy Chief, Civil Division June 18, 2019 VIA ECF ONLY Honorable Ann Marie Donio United States Magistrate Judge Mitchell H. Cohen Bldg. & U.S. Cthse. 4th and Cooper Streets Camden, New Jersey 08101 Re: U.S. ex rel. LaPorte et al. v. Premier Education Group, G.P., Inc., et al. Civil Action No.: 11-3523 (RBK â☐☐ AMD) Dear Judge Donio: I write to request a one-week adjournment of the current June 21, 2019 deadline for Relators' motion to enforce the settlement until June 28, 2019. During our last two-week adjournment the parties have been provided a new draft of the government's proposed settlement agreement incorporating changes required based, in part, on input from the Department of Education. Additional time will be required to ensure agreement among the parties to these changes. The United States thus requests, with the parties concurrence, that the Court adjourn the deadline for Relators' motion to enforce until June 28, 2019. Respectfully submitted, CRAIG CARPENITO United States Attorney By: s/ David E. Dauenheimer DAVID E. DAUENHEIMER Assistant United States Attorney

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 6**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LAURA LAPORTE, ANGELA DAVENPORT, PAMELA HONE, ROBERT BIASELLI, KELLI J. AMAYA, AMANDA KENNY, and DORIS MOODY, | ) ) ) Civil Action No.: ) 1:11-CV-03523(RBK)(AMD) ) ) |
| *Plaintiffs,* v. | ) ) ) ) ) |
| PREMIER EDUCATION GROUP, L.P. and PREMIER EDUCATION GROUP, G.P., INC. d/b/a HARRIS SCHOOL OF BUSINESS, BRANFORD HALL CAREER INSTITUTE, SALTER COLLEGE, THE SALTER SCHOOL, SEACOAST CAREER SCHOOLS, SUBURBAN TECHNICAL SCHOOL; and JOHN DOES NOS. 1-50, FICTITIOUS NAMES, | ) ) ) ) ) **[Filed Electronically]** ) ) ) ) |
| *Defendants.* | ) ) |

## ORDER

WHEREAS, the Court issued decisions in this action, *inter alia, U.S. ex rel. LaPorte v. Premier Educ. Grp., L.P.,* 2014 WL 5449745 (D.N.J. Oct. 27, 2014) and *U.S. ex rel. LaPorte v. Premier Educ. Grp., L.P.,* 2016 WL 2747195 (D.N.J. May 11, 2016), granting Defendants' motion to dismiss individual claims of certain Relator Plaintiffs and granting in part and denying in part Defendants' Motion to Dismiss the *qui tam* False Claims Act claims set forth in a Fourth Amended Complaint;

WHEREAS, the surviving claims in the Fourth Amended Complaint (the "Complaint") concerning certain specified conduct by Defendants at the Harris School of Business, Branford

Hall Career Institute, Salter College, The Salter School, Seacoast Career Schools and Suburban Technical School campuses shall constitute the "Covered Conduct".;

IT IS HEREBY ORDERED that the Complaint filed in the United States District Court for the District of New Jersey captioned *U.S. ex rel. LaPorte et al. v. Premier Educ. Grp., L.P. et al.*, Case No. 11-cv-3523 (D.N.J.) and this action shall be dismissed against all Defendants with prejudice as to Relators, and with prejudice as to the United States as to the "Covered Conduct".

SO ORDERED.

HON. ROBERT B. KUGLER

Dated this _____ day of _____, 2019.

894969-2                                    2

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**


**Document 7**

Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 143 of 587

Set weather

masslive's Logo

Fact-forward journalism on demand. Subscribe now for instant access.



A sign announces the coming of Salter College at 645 Shawinigan Drive in Chicopee, before it opened in 2011. The school is now closed. (Republican file)

927
shares

By **Jeanette DeForge | jdeforge@repub.com**

A for-profit two-year career training school has agreed to waive $1.6 million in student debt and stop enrolling all Massachusetts students by the end of the year.

Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 144 of 587

The Premier Education Group, of Pennsylvania, entered into a settlement agreement with Attorney General Maura Healey after being accused of failing to provide students with information on job placement, loan repayment and graduation rates, as required by state law, according the attorney general's office.

Advertisement

The agreement was voluntary and as part of it the company does not admit wrongdoing, documents said.

The settlement specifically relates to students who attended one of the company's five schools — Branford Hall Career Institute in Springfield, Salter College in Chicopee and West Boylston, and Salter School in Fall River and Malden — between April 2016 and March 31, 2018, according to the attorney general's office.

The company agreed to discharge $1.6 million in debts that those students owe to Premier's schools and will seek to have student credit reports wiped clean from negative reporting regarding the debts, the agreement said.

"Salter College misled students and deprived them of the information they needed to make informed choices about their education," Healey said in a statement. "This settlement will provide students the relief they deserve and stop this predatory for-profit school from doing business in our state."

As part of the agreement, the company, which offered associate degrees, will no longer enroll Massachusetts students, including through its internet and

Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 145 of 587

other remote programs, and must wind down all Massachusetts operations by Dec. 31, the agreement said.

Many of the schools have already closed. Branford Hall announced in May 2018 it had stopped taking new student registrations. The company previously merged it with Chicopee's Salter College.



Brandford Hall School in Springfield to close

The agreement also calls for Premier Education Group to pay the state $100,000. The money is not considered a fine but is to pay for things such as monitoring, investigating and other actions conducted by the attorney general.

The AG's office previously secured a consent judgement against Salter College in 2014 that resolved allegations of similar deceptive enrollment tactics.

Those who have student loans or have any other questions about the settlement can contact the Attorney General's Student Loan Assistance Unit at 1-888-830-6277 or visit the attorney general's student loan assistance website for free help.

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

# Around the web





Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA    Document 193-6    Filed 03/18/21    Page 146 of 587



### New Hampshire Drivers With No DUIs Getting a Pay Day
Comparisons.or…

Comparisons.org |

Learn More                    Sponsored



### Why You Should Stop Drinking $10 Grocery Store

Naked Wines |

Learn More                    Sponsored



### The Best Emergency Backpack Kit
After an earthquake, hurricane or other natural disasters you may

Stealth Angel Survival |

Sponsored



### Most Wine Drinkers In The US Don't Know These 5 Simple Do's And Don'ts

Naked Wines |

Learn More                    Sponsored



### Most Expensive Celebrity Engagement Rings Of All Times!

Instant Feeds |

Sponsored



### This Knee Sleeve May Transform Your Knees Back

Research Into Health |

Sponsored



### Skip the Doctor and Upgrade to the World's Smartest

The Easy Blog by EasyBreathe.com |

Sponsored



### NFL Star Rob Gronkowski's Go To Shoes Off The Field

Wolf & Shepherd |

Sponsored





Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 147 of 587



## 40 Vinyl Records Worth a Fortune Today

Articles Vally |

Sponsored



## Jury Finds Roundup Responsible For Lymphoma | Bayer To Pay $10 Billion

National Injury Bureau |

Sign Up

Sponsored



## Best & Worst Refinance Mortgage Companies Of 2021

Comparisons.org |

Sponsored



## A List of The 18 Best Breeds That Don't Shed

Livestly |

Sponsored



## 1 Food You Should Never Feed You Cat

There is one specific thing in most cats' diets that could be causing

Dr Marty Nature's Feast |

Sponsored



## Suspects in kidnapping, slaying of Chicopee resident Francisco Roman indicted by federal grand jury

Masslive



## Springfield Police Officer John Toledo fired for social media policy violation

Masslive





Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com



### Randy Jackson: This 3 Minute Routine Transformed My Health

Unify Health Labs |

Sponsored



### These Cars Are So Loaded It's Hard to Believe They Cost Under Average

Luxury Cars | Search Ads |

Sponsored



### The Best SUVs For Seniors (The Price Might Surprise

Senior Cars | Search Ads |

Sponsored



### Play this game for 3 minutes and see why everyone is

Total Battle - Tactical Game Online |

Sponsored



### Get These 5 Star Rated Masks in 3-5 Days by UPS!

WellBefore |

Sponsored



### M&T takeover of People's United causes ripples in WMass banking industry

Masslive



### Garry Brown: Holyoke High School 1950, 1953 state champions honored

Masslive





Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 149 of 587

### U.S. Surgeon: This Simple Trick Empties Almost Immediately Your

Gundry MD |

Sponsored

### 17 Airports With The Most Dangerous Landings In the World

Forbes.com |

Sponsored



### This Only Looks Like A Regular Pocketknife - A

My Deejo |

Sponsored



### Windows Users Don't Forget To Do This Before Sunday

Remember To Do This Before Turning off Your Windows Computer

Bright Life |

Sponsored



### Research The Best Mattress 2020. Mattresses That Will

Mattresses | Yahoo! Search |

Sponsored



### Amherst police arrest homeless man accused of trying to abduct baby from home

Masslive



### Westcomm regional police, fire dispatch will move to Chicopee building that housed strip club, disgraced college

Masslive



Registration on or use of this site constitutes acceptance of our **User Agreement**, **Privacy Policy and Cookie Statement**, and **Your California Privacy Rights** (each updated 1/1/21).

Cookies Settings

© 2021 Advance Local Media LLC. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Agreement with AG forces Premier Education Group out of Massachusetts; Salter College, others, to forgive $1.6M in student debt - masslive.com

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 150 of 587

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷**Ad Choices**

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**


**Document 8**



# U.S. DEPARTMENT OF EDUCATION
## BORROWER DEFENSE
## TO REPAYMENT APPLICATION

OMB Number: 1845-0163
Form Approved
Expiration Date: 11/30/2023

## INSTRUCTIONS

Under the Borrower Defense to Repayment provision of law, certain conduct by a school you attended might make you eligible to receive a discharge of some or all of your federal student loans. The type of conduct that might make you eligible for student loan relief and the process by which the Department of Education will review your claim may differ based upon when you took out your loan. In general, loans taken out or consolidated prior to June 30, 2017 will be evaluated under one set of regulations, while those taken or consolidated between July 1, 2017 and June 30, 2020 will be evaluated under a second set of regulations, and those taken or consolidated after July 1, 2020 will be evaluated under a third set of regulations. For that reason, in completing this application you may be asked different questions about different loans or may receive a different determination regarding your eligibility for loans taken or consolidated at different points in time.

The most common types of conduct that might make a borrower eligible for loan relief through borrower defense to repayment discharge are misrepresentations of the truth made by the school or its representatives during their efforts to recruit you to enroll at the school or to continue your enrollment at the school. These misrepresentations typically take the form of untruthful representations of the school's selectivity in admitting students, its rankings as compared to other schools, the job placement and earnings outcomes of its prior graduates, or the likelihood that its credits will be accepted by another school or that it will accept credits from other schools.

There are other kinds of experiences that may leave a student dissatisfied with their educational choices; however, these experiences do not make a borrower eligible for federal student loan relief under the borrower defense to repayment provision.  Examples of such experiences that would likely not make a borrower eligible for relief include, but are not limited to:

- Dissatisfaction with the school's program or classes, the grades a student received, or the perceived teaching skills of otherwise qualified instructors;

- Disappointment with the school's housing or facilities, availability of on-campus housing, parking availability, the performance of a school's athletic teams, the availability of or access to student activities on campus, or campus eating facilities, food quality or meal plans;

- A student's inability to live in their dormitory of choice, enroll in the program of their choice *unless otherwise guaranteed admission to the program), or the departure of a distinguished faculty member under whom the student wished to study;

- Informal comments made by other students who are or in the past were enrolled at the school, but who are not spokespeople for the school and are not participating in school-sponsored student recruitment activities;

- General findings of a school's non-compliance with certain U.S. Department of Education's rules for administering Federal Aid;

- Violations of local, state, or federal laws unrelated to the making of a Federal student loan, such as those that govern truth in advertising or misrepresentation;

- Personal injury, loss of property, sexual harassment or other violations of law or civil rights; or

- Academic disputes and disciplinary matters.

It is also important to understand that to be eligible for full or partial federal student loan relief through borrower defense to repayment, you must also have suffered monetary harm. The act of taking a loan or holding student debt is not, by itself, considered to be monetary harm. Instead, the Department compares earnings of prior graduates of your program to graduates of other similar programs and makes a determination of monetary harm, if the earnings of graduates of your program are below the range of normal variation of earnings among graduates of other similar programs. The data used to calculate earnings for purposes of determining monetary harm are based on data provided by a Federal agency, such as the Internal Revenue Service or in some instances, the Social Security Administration.

If you believe you are eligible for borrower defense to repayment relief, please complete this application.

**When answering questions on this application, please be as detailed as possible. While you are not required to submit documentation with your application to be considered for discharge, we recommend that you do so.**

## SECTION 1: BORROWER INFORMATION

Please provide contact information for the borrower:

First Name                              Middle Name                              Last Name

Date of Birth *(mm/dd/yyyy)*    Social Security Number    Telephone Number

Email Address

Street Address                                          City            State        Zip Code

Are you a PARENT who took out a federal loan on behalf of the student?
☐ Yes    ☐ No

If yes, please enter the full name of the student *(Last, First, Middle)*:

If yes, please enter the student's Social Security Number:

## SECTION 2: SCHOOL INFORMATION

School Name:

Campus Name (if you attended a multi-campus system or school):

Campus Location *(City, State)*:

In what state(s) did you live during the enrollment period that is the subject of this claim, and when did you live in each state listed (month, year to month, year)?

Enrollment Dates at this school (month, year to month, year). (If you have multiple enrollments at the school, please list all that are the subject of this claim):

Are you still enrolled at this school? ☐ Yes ☐ No

Did you enroll at the school subsequent to the enrollment which is the subject of this claim? If so, when?

Are the enrollment dates listed above approximate or exact? ☐ Approximate ☐ Exact

Program Name or Major *(e.g. Engineering, Law, Nursing)*.

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters)*.

If you are seeking relief for multiple programs, please submit a separate application for each program.

Current Enrollment Status at school listed above:

☐ Graduated     ☐ Transferred Out     ☐ Withdrew     ☐ Attending

Note:  if you are enrolled at this school, indicate that you are "attending"  even if at the time you complete this application you are on a scheduled break, an approved leave of absence, or have decided to not attend classes during the current term, but plan to resume attendance in the near future.

## SECTION 3: OTHER REFUNDS, REMEDIES, LOAN REDUCTION OR TUITION RECOVERY REQUESTS OR ACTIONS:

Have you made any attempt, other than submitting this application, to recover tuition or fees that you paid to your school or to have your student loans forgiven (for example, submitting a closed school loan discharge application to the U.S. Department of Education or seeking relief as part of a class action lawsuit or other settlement)?

☐ Yes     ☐ No

If yes, please describe these other request(s), and attach any documentation about the requests, if available.

Have you received financial relief as a result of any of these attempts?   ☐ Yes     ☐ No

If so, how much relief did you receive?

Have you been denied financial relief for any of the attempts you have made or that were made by others on your behalf?

☐ Yes     ☐ No

If so, which ones and why?

Have you been, or are you currently in, arbitration with the school that is the subject of this application?

☐ Yes     ☐ No

If yes, what was the date that a written request for arbitration was filled, by either yourself or the school?

Documentation: Please attach any relevant documents related to the arbitration:

- Transcripts

- Enrollment agreements

- Promotional materials from your school

- Communications with school officials or employees

- Student Manual

- Course Catalog

- Legal documents

- Findings or determinations made by government entities

- Any other documentation that you believe is related to the arbitration.

## SECTION 4 - CONDUCT THAT RESULTS IN ELIGIBILITY FOR BORROWER DEFENSE TO REPAYMENT RELIEF

## ADMISSIONS SELECTIVITY

Did your school misrepresent or fail to tell you important information about their admissions practices or admissions selectivity?

Examples of such behavior include, but are not limited to misrepresenting: the average grade point average or entrance exam scores of current students; the percentage of applicants who were accepted by the school; the percentage of applicants who submitted standardized test scores or met other admissions criteria; or the ranking of the school or program relative to other schools or programs.  Please select all that apply:

☐ My school misrepresented the selectivity of the school, meaning the percentage of applicants who are admitted or denied admission to the school or their qualifications (such as test scores, GPAs, or prior experience).

☐ My school claimed to be an open-enrollment school, but failed to disclose that some programs are not open enrollment and instead have entrance requirements, such as minimum GPA, test scores, or volunteer experience in the field that limit admissions to the program.

☐ My school made a misrepresentation concerning its criteria for admission, meaning the basis upon which a school determines who it will admit.

☐ My school made a misrepresentation concerning the ranking of the school or a program offered by the school.

☐ Other, please identify:

Per item selected above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about its admission process? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per the item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes     ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts

- Enrollment agreements

- Promotional materials from your school

- Communications with school officials or employees

- Student Manual

- Course Catalog

- Legal documents

- Findings or determinations made by government entities

- Any other documentation you believe supports your application.

**REPRESENTATIONS TO THIRD PARTIES**

Did your school provide misleading or incorrect data about the school's admissions requirements, selectivity, or student outcomes to an accreditor or an organization that ranks or rates schools of higher education? Please select all that apply:

☐ My school misrepresented information about itself or enrolled students to a ranking organization, such as *U.S. News and World Report* or *Barron's Profile of American Colleges*.

☐ My school misrepresented information about itself or enrolled students to an accrediting agency.

☐ My school misrepresented information about itself or enrolled students to a state higher education authorizing agency such as the New York State Department of Education, Office of College and University Evaluation or the Illinois Board of Higher Education.

☐ My school misrepresented information about itself or enrolled students to a Federal agency, such as the U.S. Department of Veterans Affairs or the the U.S. Department of Education.

☐ Other, please identify:

When did you discover that the information that the school provided was inaccurate?

Please explain:

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes   ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts

- Enrollment agreements

- Promotional materials from your school

- Communications with school officials or employees, or third party to which the information was reported

- Student Manual

- Course Catalog

- Legal documents

- Findings or determinations made by government entities

- Copies of the information that was reported to a third party and that you saw

- Any other documentation you believe supports your application.

## URGENCY TO ENROLL

**Urgency to enroll is not itself a grounds for Borrower Defense to Repayment discharge, but can be considered as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation. Thus applicants completing this section must also make a separate allegation of school misconduct to be considered for Borrower Defense to Repayment discharge.**

Did your school tell you that you had to enroll right away (such as the same day you contacted or visited the school) or you would miss out on an enrollment spot or scholarship opportunity?

☐ Yes      ☐ No

If so, was that false information?

☐ Yes      ☐ No

If yes, please explain.

Who at the school told you that you had to enroll on the spot or on the same day as your visit or inquiry? If known, please provide their names and titles of these individuals.

How did the school communicate with you about its admission process? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities

## EDUCATIONAL SERVICES

Did the school misrepresent or fail to tell you important information about the availability of educational opportunities or support services provided by the school? Please select all that apply:

☐ My school misrepresented the availability of internships or externships.

☐ My school misrepresented the qualifications of its faculty.

☐ My school misrepresented the services that would be provided by its career services staff or department.

☐ My school misrepresented how my course of study would be taught (for example, ground-based versus online).

☐ My school misrepresented the prerequisites required for my course of study.

☐ My school misrepresented how often required courses would be available or when those courses would be scheduled (i.e. you were promised you could complete the program by enrolling on weekends, and then you learned that a required course was available only on weekdays during regular business hours when you are working)

☐ My school misrepresented the number of credits required to graduate.

☐ My school told me I would be able to graduate in a certain amount of time, but then did not offer enough sections of required classes so that I could complete the program on time.

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about its educational services? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## EMPLOYMENT PROSPECTS

Did your school misrepresent employment outcomes that would be available to you or the employment outcomes of prior graduates? Please select all that apply:

☐ My school did not fulfill its promise that I would find future employment.

☐ My school misrepresented its job placement rates.

☐ My school misrepresented the demand for graduates in my field.

☐ My school misrepresented its partnerships with employers.

☐ My school misrepresented my eligibility for a certification or a licensure in my field of study.

☐ My school exaggerated the earnings of prior graduates or my likely earnings after graduation.

☐ My school misrepresented that it was accredited when it was not.

☐ My school misrepresented that my program had the accreditation necessary to qualify graduates for licensure or certification when it did not.

☐ My school failed to tell me that my programs did not have the accreditation necessary to qualify graduates for certification or licensure.

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your employment prospects? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

Please provide information about the difficulties you have had getting a job in your field of study that lead you to believe that the school misrepresented the employment outcomes or earnings of past graduates or your likely employment outcomes or earnings.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

• Transcripts

• Enrollment agreements

• Promotional materials from your school

• Communications with school officials or employees

• Student Manual

• Course Catalog

• Legal documents

• Findings or determinations made by government entities
• Any other documentation you believe supports your application.

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you, or fail to tell you, important information about your program cost or the nature of your loan? Please select all that apply:

☐ My school told me I was receiving only grants and scholarships, but I found out later that some or all of those funds were loans.

☐ My school offered me a payment plan without telling me that the plan would convert to a loan without accurately disclosing the terms of the payment plan or resulting loan.

☐ My school misrepresented the repayment terms or total cost of loans it provided to me or that were provided to me by a lender recommended by the school.

☐ My school misrepresented the overall cost of my program.

☐ My school misrepresented what costs were or were not included in the published tuition and fees.

☐ My school misrepresented the cost of living in campus-owned or campus-operated housing.

☐ My school offered me a full scholarship when admitting me to the school, but then reduced the scholarship amount or failed to renew the scholarship even though I met the requirements of the scholarship, such as by maintaining a certain GPA, enrolling in a particular program, performing required community or volunteer service, or some other criteria that I satisfied.

☐ Other, please identify:

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?
☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## TRANSFERRING CREDITS

Did your school make a misrepresentation to you about the likelihood of credits earned at the school being accepted by other schools as transfer credits or about its likelihood to give you transfer credit for courses or work experiences completed elsewhere? Please select all that apply:

☐ My school told me that my credits were transferrable to a specific school, but they were not.

☐ My school told me credits earned at the school were generally transferrable to other schools, but they were not.

☐ My school told me it would accept credits earned elsewhere if I enrolled, but then, after I enrolled, it told me that it would not accept some or all of my transfer credits.

☐ My school told me they would accept my credits, but did not inform me until after I enrolled that those credits would not be counted toward my major.

☐ Other, please identify:

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you:

Who at the school provided you with the allegedly misleading information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain:

Documentation: Please attach any relevant documents that support these allegations including:

•  Transcripts

•  Enrollment agreements

•  Promotional materials from your school

•  Communications with school officials or employees

•  Student Manual

•  Course Catalog

•  Legal documents

•  Findings or determinations made by government entities

•  Any other documentation you believe supports your application.

## CAREER SERVICES

Did your school make a misrepresentation to you about the scope and availability of career services support it would provide? Please select all that apply:

☐ My school failed to provide the career services assistance it promised (including, but not limited to: resume writing help, mock interviews, and responding to job listings)

☐ My school promised that it would find me a job when I graduated but it did not.

☐ Other, please identify:

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with you:

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

How were you financially affected by the misrepresentation?

When did you discover that the information that the school provided was inaccurate?

Please explain:

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?
☐ Yes    ☐ No
Please explain:

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## JUDGMENT

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2017 and prior to July 1, 2020.*

Did you successfully file suit and obtain one or more nondefault, contested judgments against your school in a Federal or State court or from a Federal or State administrative tribunal or did you benefit from a government enforcement action or from a nondefault, contested judgment that arose from your participation in class action litigation?

☐ Yes     ☐ No

Have you received the full amount awarded in the judgment or judgments?

☐ Yes     ☐ No

If not, what is the outstanding balance of the judgment or judgments owed to you?


Please attach the judgment or judgments and all relevant documents relating to your judgment or judgments.

## BREACH OF CONTRACT

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2017 and prior to July 1, 2020.*

Did you ever enter into a contract with your school (e.g. enrollment agreement or other agreement)?

Yes          No

Did your school fail to perform any obligations under the contract? For example, your school may have breached a contract with you if they denied you the right to defend yourself against an accusation of a Title IX violation (sexual advancement/misconduct) based on your school's disciplinary policy.)

Yes          No

If so, please provide a copy of the contract.

State when the school failed to perform any obligation(s) of that contract.


Please explain:




Provide a detailed description why you believe the school breached the contract.

**OTHER**

Did your school make a misrepresentation to you, or fail to tell you, important information other than what you have already alleged in this application?

Yes        No

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with you:

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain:

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain:

Documentation: Please attach any relevant documents that support these allegations including:

• Transcripts

• Enrollment agreements

• Promotional materials from your school

• Communications with school officials or employees, or third party to which the information was reported

• Student Manual

• Course Catalog

• Legal documents

• Findings or determinations made by government entities

• Copies of the information that was reported to a third party and that you saw

• Any other documentation you believe supports your application.

## SECTION 5: FINANCIAL HARM

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2020.*

You are eligible to receive full or partial loan discharge as a result of an eligible borrower defense claim only if you have suffered financial harm as a result of your school's misrepresentation. We can only discharge federal student loans, and the amount of a discharge that you may be eligible to receive cannot be more than what you borrowed. For example, we cannot consider private student loans you may have borrowed. Financial harm does not include:

• Nonmonetary loss, such as personal injury, inconvenience, aggravation, emotional distress, pain and suffering, punitive damages, or opportunity costs.

• The act of taking out a federal student loan or merely having federal student loan debt.

• Your voluntary decision to pursue less than full-time work.

• Your decision to not work.

• Your decision to voluntarily change occupations or pursue a different line of work.

• Payments you made other than through the use of federal student loans.

What is the total monetary loss associated with your federal student loans that you have incurred due to your school's alleged misrepresentation?

Please note that you are not required to complete this field, and that the Department will not limit the amount you are owed to the amount you reported in this field.  The information you provide helps us review financial harm, but the Department also considers published earnings information from prior graduates to determine whether or not you were financially harmed, and how much harm you incurred. If you complete this field, you may, but are not required, to include the amount of your federal student loans (the Department has this information already).

Please explain how you determined that amount:

For which jobs did the program say it would prepare you, if any?

When and how did the school provide you with this information?

Have you actively pursued employment in the field for which your education was intended to prepare you?

Yes        No

If yes, list jobs in your field for which you applied, and the date on which you applied for each, as well as any reason you may have been given for not being selected for that or those jobs.  You may limit the list to jobs for which you have applied during the most recent year.

| Job Title | Date Applied | Reason for Not Being Selected for the Position |
|-----------|--------------|------------------------------------------------|
|           |              |                                                |
|           |              |                                                |
|           |              |                                                |

If yes, please include documents that demonstrate this pursuit. These may include:

- Job application confirmation emails
- Correspondence with potential employers
- Registration at job fairs
- Enrolling with a job recruiter
- Attendance at a resume workshop

Have you failed to meet other requirements or qualifications for employment in your field of study for reasons unrelated to your school's misrepresentation such as, but not limited to, your ability to pass a drug test, satisfy driving record requirements, or meet health qualifications?

Yes        No

If yes, please explain:


## SECTION 6: FORBEARANCE AND STOPPED COLLECTIONS

If you are not currently in default on any Federal student loan, you may request **forbearance** status on the Federal student loans that are the subject of this application while your application is under review. "Forbearance" means that you do not have to make loan payments, and your loans will not go into default, while your application for a borrower defense discharge is pending with the U.S. Department of Education. Your servicer will notify you when your loans have been placed into forbearance status.

If your Federal student loans are in default, you may request stopped collections status on the Federal student loans that are the subject of this application while your application is under review. "Stopped collections status" means that the Federal government or debt collection companies will not attempt to collect on the defaulted, including efforts to withhold money from your wages or Federal income tax refunds, while your borrower defense application is pending with the U.S. Department of Education.

If you have more questions about forbearance or stopped collections, visit StudentAid.gov/borrower-defense or contact your servicer. If you do not know who your servicer is, please visit StudentAid.gov/aid-summary or call 1-800-4-FED-AID.

Interest will continue to accumulate on all Federal student loans regardless of their status, including subsidized loans. If your application for borrower defense is denied or partially approved, the total amount you owe on those loans may be higher, and outstanding interest may capitalize (meaning that they will be added to your principal balance)  If you wish to make interest payments while your loans are in a forbearance or stopped collections status, please contact your servicer.

You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief. Instead, you may opt to continue making payments on your loans, especially if you are in a repayment program like loan rehabilitation to remove your loans from default. If you received loans for attendance at a school for which you are not filing a claim, you still must repay those loans.

You can learn more about repayment options at StudentAid.gov/manage-loans.

Are you in default on any Federal student loans?
If the answer is no, do you wish to request forbearance on the loan(s) for which you have filed a borrow defense application?

☐ Yes, to be placed in forbearance.        ☐ No.

If your answer is yes, do you wish to request stopped collections status?

☐ Yes        ☐ No.

If you do not select one of the options above and you are not in default on any Federal student loan, the U.S. Department of Education will automatically place the Federal student loan(s) into forbearance that is the subject of your borrower defense application pending the Department's review of the application.

If you do not select one of the options set forth above and you are in default, the Department will place into stopped collections status the Federal student loan(s) that is the subject of your borrower defense application pending the Department's review of the application.

The Department will also make these requests to commercial holders of Federal Family Education Loan (FFEL) program loans not held by the Department.

## SECTION 7. CERTIFICATION

By signing this attestation I certify that:

All of the information that I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education additional information that is reasonably available to me that will verify the accuracy of my completed attestation.

I also agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section 2 above.

I certify that I have not received a refund, tuition recovery, settlement, or other financial restitute to repay the loans that are the subject of this borrower defense to repayment claim.

I certify that I have accurately reported other efforts I have made to receive loan relief, including by filing suit against the school, participating in a class action suit, entering into arbitration, applying to a tuition recovery fund, or similar.

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am transferring my interest in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other financial losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097. I sign this application under penalty of perjury.

I understand that in the event that I receive a 100 percent discharge of my loan balance for which the defense to repayment application has been submitted, the school may, if not prohibited by other applicable law, refuse to verify or to provide an official transcript that verifies my completion of credits or a credential associated with the discharged loan.

I understand that, should the Department receive any documentation from the school, in response to the Department's request for records and evidence, the Department will provide me with those documents as well as any evidence otherwise in the possession of the Department.  If my application is based on a loan that I received on or after July 1, 2020, then I further understand that my application and supporting evidence will be sent to my school, and I will have a time-limited opportunity to review and respond to any evidence that my school submits in response to my application.

I agree to allow the school that is the subject to this defense to repayment application to provide the Department with items from my student educational record relevant to this defense to repayment application.

| Signature | Date |
|---|---|
|  |  |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or by mail to: U.S. Department of Education, PO Box 1854, Monticello, KY 42633. If you have questions while your application is pending you may contact the Department at: 1-855-279-6207.

## PRIVACY ACT NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., and 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

## PAPERWORK REDUCTION ACT NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0163. Public reporting burden for this collection of information is estimated to average .5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 9**



# U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE
## TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 06/30/2023

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**:  To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school.  Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name *(First, Middle, Last)* | *Date of Birth *(mm/dd/yyyy)* | *Social Security Number *(Last 4 Digits)* |
|---|---|---|
| *Telephone Number | *Email Address | |
| *Street Address | *City | *State | *Zipcode |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes    ☐ No

*If yes, please enter the full name of the student *(Last, First, Middle)*:

*If yes, please enter the student's Social Security Number *(last 4 digits)*:

## SECTION II: SCHOOL INFORMATION

*School

Campus *(including on-line campuses for distance education borrowers)*

*Location *(City, State)*

* Enrollment Dates at this school:
*From *(month/year)*:                    *To *(month/year)*:

☐  If you are still attending this school/campus, please indicate by checking the box.

☐  Check if the enrollment dates above are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

---

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal)*.

---

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters)*.

---

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

---

*Current Status at school listed above

☐   Graduated    ☐   Transferred Out    ☐   Withdrew    ☐   Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐ Yes    ☐ No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

---

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for example, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐ Yes    ☐ No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

---

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1.   How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2.   The name/title of people who you believe misled you *(if known)*

3.   What the school told you or failed to tell you.

4.   Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

\*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

\*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes   ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes   ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

☐ Yes  ☐ No

Is there some other reason you feel your school misled you?

☐ Yes  ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes  ☐ No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds**. Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

☐ Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

☐ No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed.  During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently *(as applicable)*.

## SECTION VI.  CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| *Signature | Date |
|---|---|
|  |  |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov  or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

## PRIVACY ACT NOTICE

Information required by subsection (e)(3) of the *Privacy Act of 1974*, as amended (*Privacy Act*) (5 U.S.C. 552a(e) (3))requires the following notice be provided to you:

The authorities for collecting the requested information from and about you are Section 455(h) of the *Higher Education Act of 196*5, as amended (*HEA*) (20 U.S.C. 1087e(h)) and 34 C.F.R. § 685.206(c) and the authorities for collecting and using your Social Security Number (SSN) are the same but also include 31 U.S.C. 7701(b). The primary purpose of the information collected is for the use and administration of the U.S. Department of Education's office of Federal Student Aid (ED/we) for borrower defense to loan repayment program. The information you provide ED on this form and your SSN are voluntary, but you may need to provide the requested information on this form, including your SSN and/or a Federal Student Aid ID (FSA ID) that provides ED your verified SSN and other individual information pertaining to a student's or parent's Student Financial Assistance Programs account(s), for ED to process or complete our review of your borrower defense to loan repayment application. You may submit a form without your SSN or an FSA ID by filling out a form and sending it to ED via email or physical mail because disclosure of the information requested on this form is voluntary. However, without providing all the requested information on this form, ED may not be able to conduct a full investigation and complete the review of your application.

We use the information that you provided on this form including your name, SSN, date of birth, address, email address, telephone number(s), and / or an FSA ID, to receive, review, evaluate, and process requests for relief under the borrower defense to loan repayment regulations, to render decisions on the merits of such requests for relief, and, where requests for borrower defense to loan repayment are successful, to determine the relief that is appropriate to borrowers under the circumstances as well as to initiate appropriate proceedings to require schools whose acts or omissions resulted in the successful defenses against repayment to pay ED the amounts of the loans that apply to the defenses. Without your consent, ED may disclose the information that you provided and as otherwise allowed by the *Privacy Act*, pursuant to the routine uses identified in the system of records notice (SORN) entitled "Customer Engagement Management System (CEMS)" (18-11-11) and published in the Federal Register as 83 FR 27587-27591 (June 13, 2018). These routine uses include, but are not limited to, a routine use that permits ED to disclose your information to foreign agencies, Federal agencies, State agencies, Tribal or local agencies, accreditors, schools, lenders, guaranty agencies, servicers, and private collection agencies when further information is relevant to ED's resolution of your complaint, request, or other inquiry, tracking your application or your inquiry, and, where a request for borrower defense to loan repayment is successful, to determine the relief that is appropriate under the circumstances as well as to initiate the appropriate proceeding to require the school whose acts or omissions resulted in the successful defense against loan repayment to pay ED the amount of the loan that apply to the defenses. We may use your information for reporting, analyzing the data to make recommendations in student financial assistance programs, and assisting in the informal resolution of disputes. Disclosure of relevant information also may be made to the responsible foreign, Federal, State, Tribal or local agencies charged with investigating or prosecuting a violation or potential violation of law in the event that information indicates, either on its face or in connection with other information, a violation or potential violation of any applicable statute, regulation, or order of a competent authority.

 In the event of litigation or alternative dispute resolution (ADR) involving ED or that we have an interest in and if that a party is either any component of ED, any ED employee in his or her official capacity, any ED employee in his or her individual capacity where representation for the employee has been requested or has been agreed to by ED or the Department of Justice (DOJ), or the United States where ED determines that the litigation is likely to affect ED or any of its components, we may disclose your information to DOJ, a court, adjudicative body, a person or an entity designated by ED or otherwise empowered to resolve or mediate disputes, or a counsel, party, representative, or witness if the disclosure is relevant and necessary to the litigation or ADR. ED also may disclose your information to DOJ to the extent necessary for obtaining DOJ's advice on any matter relevant to an audit, inspection, or other inquiry. We may send information to members of Congress if you ask them to help you with federal student aid or Student Financial Assistance Programs account(s) questions. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. As part of such a contract, we will require the contractor to maintain safeguards to protect the security and confidentiality of the records that are disclosed to the contractor. If a record is relevant and necessary to a borrower complaint regarding participants in any Federal Student Financial Assistance Programs under title IV of the *HEA*, ED may disclose a record only during the course of

processing, reviewing, investigating, fact-finding, or adjudicating the complaint to: any party to the complaint; the party's counsel or representative; a witness; or a designated fact-finder, mediator, or other person designated to resolve issues or decide the matter. ED also may disclose records to the DOJ or Office of Management and Budget (OMB) if ED concludes that disclosure is desirable or necessary in determining whether particular records are required to be disclosed under the *Freedom of Information Act* (*FOIA*) or the *Privacy Act*. ED may disclose your information to appropriate agencies, entities, and persons when ED suspects or has confirmed that there has been a breach of the system maintaining your information; which poses a risk of harm to individuals, ED (including its information systems, programs, and operation), the Federal agencies, or national security and the disclosure made to such agencies, entities, and persons is reasonably necessary to assist ED's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm. ED also may disclose your information to another Federal agency or Federal entity, when ED determines that your information is reasonably necessary to assist the recipient agency or entity in responding to a suspected or confirmed breach or preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal agencies, or national security, resulting from a suspected or confirmed breach.

## PAPERWORK REDUCTION ACT NOTICE

According to the *Paperwork Reduction Act of 1995*, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average .5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 10**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. _19-cv-5739_ |
| Plaintiff, | |
| v. | |
| CAREER EDUCATION CORPORATION, a corporation, | |
| AMERICAN INTERCONTINENTAL UNIVERSITY, INC., a corporation, | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| AIU ONLINE, LLC, a limited liability company, | |
| MARLIN ACQUISITION CORP., a corporation, | |
| COLORADO TECH., INC., a corporation, | |
| and | |
| COLORADO TECHNICAL UNIVERSITY, INC., a corporation, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its complaint alleges:

1

1.      Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, a permanent injunction, and other relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule (the "TSR" or "Rule"), as amended, 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.  This action arises under 15 U.S.C. § 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and 15 U.S.C. § 6105.

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), 1391(c)(1), 1391(c)(2) and 1395(a), and 15 U.S.C. § 53(b). Defendants reside in or transact business in this District.

## DEFENDANTS

4.      Defendant Career Education Corporation is a Delaware corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  Career Education Corporation transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Career Education Corporation has advertised, marketed, distributed, or sold

2

educational products and services to consumers throughout the United States. At all times material to this complaint, with respect to the acts and practices of American InterContinental University, Inc., AIU Online, LLC; Marlin Acquisition Corp., Colorado Technical University, Inc., and Colorado Tech, Inc., that are described below, Career Education Corporation dominated or controlled those acts and practices, knew or approved of those acts and practices, and/or benefitted from those acts and practices.

5.     Defendant American InterContinental University, Inc. ("AIU") is a Georgia corporation and wholly owned subsidiary of Career Education Corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At all times material to this Complaint, acting alone or in concert with others, AIU has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

6.     Defendant AIU Online, LLC ("AIU Online") is a Delaware corporation and wholly owned subsidiary of AIU with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At times material to this Complaint, acting alone or in concert with others, AIU Online has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

7.     Defendant Marlin Acquisition Corp. ("Marlin") is a Florida corporation and wholly owned subsidiary of Career Education Corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At all times material to this

3

Complaint, acting alone or in concert with others, Marlin, a Career Education Corporation holding company, has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

8.     Defendant Colorado Technical University, Inc. ("CTU") is a Colorado corporation and wholly owned subsidiary of Marlin with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  At all times material to this Complaint, acting alone or in concert with others, CTU has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

9.     Defendant Colorado Tech., Inc.  ("CT") is a Delaware corporation and wholly owned subsidiary of CTU with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  At all times material to this Complaint, acting alone or in concert with others, CT has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

**COMMON ENTERPRISE**

10.     At all times material to this Complaint, Defendants Career Education Corporation; American InterContinental University, Inc.; AIU Online, LLC; Marlin Acquisition Corp.; Colorado Technical University, Inc.; and Colorado Tech., Inc.  have operated as a common enterprise while engaging in the deceptive and abusive acts and practices alleged below.  CEC has conducted the business practices described below through an interrelated network of companies that have common ownership, business

4

functions, employees, and office locations.  Because these Defendants have operated as a common enterprise, they are jointly and severally liable for the acts and practices alleged below.  Hereinafter, this complaint refers to all Defendants collectively as CEC.

## COMMERCE

11.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act.

## DEFENDANTS' BUSINESS ACTIVITIES

12.    Since at least 2012, Defendants have used an illegal and deceptive telemarketing scheme to lure consumers to their post-secondary and vocational schools. Defendants, acting through lead generators, have deceived consumers into divulging their contact information under the guise of providing services unrelated to post-secondary education.  For instance, some of Defendants' lead generators have posed online as official U.S. military recruiters or as job-finding services and then called consumers whose contact information was solicited under false pretenses.  Further, on numerous calls, Defendants' lead generators have continued the deception by misrepresenting that the U.S. military or an independent education advisor recommends the CEC school being marketed.  Three such lead generators have been the subject of FTC law enforcement actions in connection with their lead generation activities on behalf of CEC.

5

13.     CEC has purchased consumer leads from such lead generators, and its in-house telemarketers have called those consumers to pitch its schools, regardless of whether they had placed their telephone numbers on the National Do Not Call Registry. Some such consumers have expressed no interest in college or CEC schools, while others have expressed interest in CEC schools under the false impression that the military, an independent education advisor, or an employer recommended or endorsed CEC schools.

14.     Such consumers then have received a sales pitch urging them to attend a CEC school from a CEC telemarketer who must meet a monthly enrollment quota or face termination. CEC telemarketers have used high-pressure sales tactics to persuade consumers to enroll.

### Overview of Defendants' Business

15.     Since 2012, CEC has operated the following post-secondary and vocational schools: Colorado Technical University, American InterContinental University, Briarcliff College, Brooks Institute, Brown College, Collins College, International Academy of Design & Technology, Harrington College of Design, Le Cordon Bleu College of Culinary Arts, Missouri College, Sanford-Brown College, and Sanford-Brown Institute. Currently, approximately 35,000 students are enrolled at CEC schools. Only CTU and AIU continue to enroll new students.

16.     CEC has had campuses in over twenty states, including Colorado, Georgia, Illinois, and Texas. In addition to the physical campuses, CEC has operated

6

schools that offer online tuition programs.  As of 2018, over 92% of students attend classes exclusively online.

17.     CEC schools have accepted federal and military financial aid.  The total tuition cost for a bachelor's degree has ranged from $54,360 to $60,450.

### CEC's Marketing and Admissions

18.     Career Education Corporation centrally controls numerous functions for its various schools, including compliance, marketing, admissions, and financial aid.  CEC negotiates, purchases, and oversees advertising and marketing for all of its schools. Virtually all in-house telemarketers for CEC schools operate from CEC headquarters using a centralized computer system, call scripts, and compliance guidelines created by CEC.

19.     CEC has advertised and marketed its schools using a variety of different media, including radio, television, internet, direct mail, social media, and print.  Some of its direct advertisements have focused on specific program offerings or have targeted certain demographics, such as military consumers or Spanish-speaking consumers.

20.     CEC has engaged in telemarketing to sell enrollments in its schools.  Its in-house telemarketers have made outbound calls to consumers identified through different channels, including consumers whose contact information CEC has purchased from lead generators.

**CEC Lead Generators Procure Consumer Information through Deception**

21.     CEC has hired lead generators to induce consumers to provide their contact and other information, which CEC then has used to telemarket its schools and sell enrollments to consumers.  CEC has used over 70 different lead generators, many of which have obtained the consumer leads that they have sold to CEC from yet other lead generators.

22.     Numerous lead generators acting on behalf of CEC have used deceptive websites and advertisements.  In fact, numerous such websites and advertisements have induced consumers to submit their contact and other personal information under the guise of providing consumers with completely unrelated services such as military recruitment, assistance with job searches and applications and government benefits.  These websites have not sought consent for CEC or its lead generators to call consumers, nor disclosed that the purpose of any call would be to market post-secondary or vocational education.

23.     Numerous lead generators acting on behalf of CEC have telemarketed CEC schools.

24.     The United States Department of Justice, based on a referral from the FTC, sued CEC lead generators Sun Key Publishing, LLC and Fanmail.com, LLC, and

their principals and related companies (collectively, "SKFM").[1]  The FTC sued CEC lead

generator Expand, Inc., its principal, and related companies (collectively, "Expand"),[2]

and the FTC sued CEC lead generator Edutrek, L.L.C., its principals, and related

companies ("Edutrek").[3]   Below are some examples of the deceptive and illegal tactics

used by CEC's lead generators in these cases.

  25. CEC has marketed its schools by calling consumer leads generated by

SKFM.  Since at least 2010, SKFM targeted consumers interested in military service by

operating numerous websites that posed as official recruiting websites, including

army.com, armyreserves.com, air-force.com, armyenlist.com, airforceenlist.com,

marinesenlist.com, nationalguardenlist.com, and navyenlist.com.  To drive traffic to their

websites, SKFM used internet search engine ads that made no mention of education and

contained phrases such as, "Join the U.S. Air Force" and "The Army Wants You!"

  26. SKFM's websites appeared to be official military recruitment sites.  The

following was an example of an SKFM webpage:

---

[1] *U.S. v. Sun Key*, Case 3:18-cv-01444-HNJ (N.D. Ala. Sept. 6, 2018).  The telemarketers
in this case were employed by Sun Key Publishing, LLC and its related companies.  For
ease of reference, the Complaint refers to them as "SKFM telemarketers."

[2] *FTC v. Expand, Inc.*, 6:16-cv-00714-CEM-TBS (M.D. Fla. Apr. 27, 2016).

[3] *U.S. v. Day Pacer LLC*, 1:19-cv-01984 (N.D. Ill. Mar. 22, 2019).



27.     In reality, SKFM did not have an official relationship with the military. The websites urged consumers to submit their information to "Contact a Recruiter" or "Get Information About Joining" and represented that their "personal information will not be shared with anyone else."  In fact, SKFM shared consumer information with CEC and other postsecondary schools.  SKFM websites did not disclose that their purpose was to collect consumer information to be sold as leads for schools including CEC.

10

28.     CEC also has marketed its schools by calling consumer leads generated by Expand.  Expand, from at least 2012 to 2016, targeted consumers looking for jobs and lured them into submitting personal information by misrepresenting that it could assist them in applying for jobs, claiming that it pre-screened consumers on behalf of specific prospective employers.  Its "job postings" made no mention of post-secondary education or specific schools.

29.     The following is an example of an Expand job post:



30.     In reality, many of the jobs Expand advertised were not current job opportunities, and Expand was not authorized by the prospective employers to collect

11

applications, screen applicants, or interview them, and did not pass along any consumer information to the advertised prospective employers.

31. CEC also has marketed its schools by calling leads generated by Edutrek. Edutrek has generated leads originated from websites that claim to help consumers apply for jobs, health insurance, unemployment benefits, Medicaid coverage, or other forms of public assistance (collectively, "job and benefits websites"). These websites have directed consumers to complete an online form by entering their personal information, including their phone numbers. The websites have not clearly informed consumers that their personal information may be sold or used to market training or education programs.

32.     The following is an example of one such job and benefits website:



33.     In reality, the job and benefits websites' primary purpose has been to collect consumer information for marketing purposes.  The websites have created the false appearance that they have obtained consumers' consent to receive telemarketing calls.  For example, Edutrek obtained leads from the website depicted above, which prominently displayed the headline "Jobs In Your Area" and claimed that "Thousands of

13

Government Jobs In Your Area Are Looking to Hire Immediately." Immediately below the submit button, the official seals of several federal government agencies appear, further reinforcing the impression that consumers could obtain information about "Thousands of Government Jobs" by entering their contact information. In fact, Edutrek was not helping consumers find jobs. Instead, Edutrek called consumers to market CEC schools.

34. During that time, CEC received, and had the power to review, the marketing materials that its lead generators used to lure consumers into providing personal information. CEC also had the ability to revise, reject, or opt out of the use of those marketing materials. After reviewing SKFM's websites, CEC directed SKFM to implement certain changes. For example, CEC had SKFM change specific disclosure language on their websites. Yet CEC did not require changes to misleading military related imagery and content on those same websites, including the representation on army.com to "Be More. Join or reenlist today" next to where consumers entered their personal information. CEC also reviewed and approved SKFM's telemarketing scripts, which directed its telemarketers to decrease the number of hang-ups by "[e]mphasiz[ing] the name of the branch and giv[ing] a brief pause during the phrase delivery, 'Hello, this is **NAVY**… Enlist calling for John.'" The CEC-approved scripts also instructed SKFM telemarketers to identify themselves in their voicemail greeting as working at "Military Verification Services." CEC continued its relationship with SKFM even though it

14

continued to pose as the military and deceive consumers interested in joining the military in order to obtain leads for CEC.

### CEC Lead Generators' Deception Continues During Telemarketing Calls

35.     During calls with consumers who submitted contact information online, Defendants' lead generators often continue to deceive consumers about their identities or the purpose of the call.  As part of their pitch, some of Defendants' lead generators also misleadingly introduce the topic of post-secondary education and make false claims about CEC schools to get consumers' consent to be contacted by CEC.  Below are some examples of CEC lead generators' deceptive telemarketing claims.

36.     SKFM telemarketers reinforced misrepresentations on their websites that they either were, or were affiliated with, the military.  They told consumers that they were calling "in regard to information requested on the military."  Training materials also directed sales representatives, in order to "decrease the number of HANG-UPS," to "[e]mphasize the name of the branch and give a brief pause during the phrase delivery. 'Hello, this is **NAVY**… Enlist calling for John.'"

37.     During the calls, SKFM telemarketers, posing as military representatives, verified the information that the consumer submitted, and advised that the "military supports earning a degree while serving in the military."  If the consumer expressed interest in receiving information on "military friendly colleges," SKFM telemarketers

15

recommended up to two post-secondary schools that agreed to pay for Defendants' education marketing leads, including CEC schools.

38.     If the consumer expressed interest in a CEC school after being told it was a military friendly college, SKFM sold the consumer's contact information to CEC as a marketing lead.  CEC then contacted the consumer directly.

39.     Expand telemarketers called consumers who submitted their information on its websites for an "interview."  During such "interviews," consumers were transferred to "independent" education advisors helping consumers find the "best" option to continue their education.  For instance, Expand's "independent" education advisors would tell consumers, "I just want to make sure you know I'm an independent education advisor and that I do not work for any schools or enroll students."

40.     In reality, the independent education advisors only recommended schools, including CEC schools, that hired Expand to generate leads.

41.     If the consumer expressed interest in a CEC school after an "independent" advisor recommendation, Expand sold the consumer's contact information to CEC as a marketing lead.  CEC then contacted the consumer directly.

42.     Edutrek telemarketers have made vocational and post-secondary education pitches during telemarketing calls over consumers' objections.  Its telemarketers have made outbound calls to consumers and have also received transfer calls from other lead generators.  Edutrek has provided call representatives with a script that instructs them to

16

continue marketing even if a consumer denies having requested information or having any interest in vocational and post-secondary education programs. Edutrek has also trained its representatives to extract further information from consumers who are not interested in post-secondary education, going as far as to award representatives prizes for completing their sales pitch over consumer objections.

43. If the consumer has expressed interest in a school, Edutrek has sold the consumer's contact information to CEC as a marketing lead. CEC then has contacted the consumer directly.

### CEC Lead Generators Call Numbers on the National Do Not Call Registry

44. In numerous instances, CEC lead generators have called numbers listed on the National Do Not Call Registry to pitch CEC schools or to facilitate contact between CEC and the consumer who has submitted the number.

45. CEC lead generators have called consumers who have not consented to be contacted by the lead generator or to be called about post-secondary education or CEC schools, but rather, have submitted their information to be contacted about joining the military, jobs, government benefits, or for other purposes.

46. CEC lead generator SKFM initiated hundreds of thousands of calls to numbers on the National Do Not Call Registry to market CEC schools without having obtained consumers' express written agreement to receive calls made on behalf of CEC.

17

47.     CEC lead generator Edutrek has initiated millions of outbound telemarketing calls to phone numbers on the National Do Not Call Registry to market CEC schools without having obtained consumers' express written agreement to receive calls made on behalf of CEC.

48.     CEC and Edutrek have a history of calling consumers without express written consent.  In 2016, both were sued for placing marketing calls to consumers who did not consent to receive such calls.  *Fitzhenry v. Career Educ. Corp.*, No. 14-CV-10172, 2016 WL 792312, at *1 (N.D. Ill. Mar. 1, 2016); *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4651395, at *1 (N.D. Ill. Sept. 7, 2016).

49.     In numerous instances, both SKFM and Edutrek have made telemarketing calls to consumers even though consumers did not have a pre-existing business relationship with CEC.

## CEC Had Authority to Control Its Lead Generators and Was On Notice of Their Practices

50.     CEC has authority over its lead generators.  Pursuant to CEC's standard lead purchase agreement, lead generators selling consumers' contact information to CEC must submit all materials that they use to generate leads to CEC, such as websites and advertisements, and allow CEC to edit, revise, reject, or opt out of the use of those materials.  The agreement also prohibits use of any telephone scripts without CEC's prior written approval.

18

51.     CEC does not review its lead generators' marketing materials, including telephone scripts and websites, before hiring them to generate leads on its behalf.  It has not changed this practice even after it has been on notice that its lead generators are engaging in illegal conduct to procure leads for CEC.

52.     CEC was aware that an affiliation with the military was being used by lead generators to induce consumers to consent to be contacted.  CEC reviewed a SKFM telemarketing script that directed SKFM telemarketers to feign affiliation with military, yet did not require changes to the script.  Consumers expressed to CEC telemarketers that they believed that the military recommended a CEC school.

53.     In numerous instances, CEC has continued to accept leads from lead generators despite determining that the lead generator used marketing materials, whether directly or through another lead generator, that did not comply with prohibitions in its lead purchase agreement against deception.  For example, CEC used lead generators that deceived consumers into providing their personal information.

54.     In numerous instances, consumers have expressed confusion to CEC telemarketers as to why they were being contacted by CEC about college.  In fact, CEC training materials anticipate that the consumers telemarketers call may not be interested in school at this time.  Despite this, CEC continued to use the same lead generators to market CEC schools.

19

55.     In addition to the FTC enforcement actions discussed above, there were several other actions against CEC lead generators, and an action against CEC itself, alleging deception in procuring consumer information or illegal calls to numbers on the National Do Not Call Registry.  For example, CEC lead generator QuinStreet entered into an assurance of voluntary compliance in 2012 with 30 state attorneys general stemming from its use of deceptive military-themed websites, including GIBill.com, that misrepresented that the military recommended schools, including CEC schools.  After QuinStreet entered into the assurance of voluntary compliance, CEC continued to use lead generators, such as SKFM, that engaged in similar practices.

56.     As discussed above, the FTC and DOJ have brought enforcement actions against three CEC lead generators.  Yet CEC has not changed its practices with respect to Edutrek and other lead generators that were not obtaining consent for calls to consumers from CEC.

### Illegal Telemarketing Practices by CEC's In-House Telemarketers

57.     CEC has placed over one million outbound calls to numbers on the National Do Not Call Registry derived from CEC's lead generators.

58.     CEC telemarketers have placed outbound telemarketing calls to consumers to sell enrollments.  CEC policy has permitted its telemarketers to call the same consumer up to six times per day and to continue calling until the consumer requests not to be

20

contacted anymore. In numerous instances, CEC has placed hundreds of outbound auto-dialed calls to a single number.

59.     CEC telemarketers have worked in a high-pressure call center environment and must meet a monthly quota of enrollments or face termination. If the school does not offer a program of study in which the consumer is interested, CEC telemarketers have encouraged the consumer to sign up for a program that the school offers. CEC telemarketers have used rebuttal scripts to address specific concerns consumers express, including that the consumer had misgivings about whether it was an appropriate time to attend college.

60.     An enrollment counts towards a CEC telemarketer's monthly enrollment quota only if the student remains enrolled past the drop/add period, during which they can cancel enrollment without penalty. CEC telemarketers have made numerous calls to consumers who have enrolled up through the drop/add period to dissuade them from cancelling, and would call them up to six times per day during the drop/add period to ensure that they did not cancel enrollment.

61.     Based on Defendants' long history of continuous conduct of the type described above; Defendants' continued use of the practices challenged above after learning of the Commission's investigation; Defendants' continued use of lead generators and telemarketing; and the ease with which Defendants can engage in similar conduct,

21

the Federal Trade Commission has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATION OF THE FTC ACT

62.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

63.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

64.     In numerous instances, in connection with advertising, marketing, promotion, offering for sale, or sale of post-secondary education programs, Defendants through lead generators acting on their behalf and for their benefit, have represented, expressly or by implication, that:

       a.      the lead generators are, represent, or are affiliated with the United States Military;

       b.      the United States Military recommends or endorses their post-secondary schools;

       c.      the information the lead generators have collected from consumers will be provided to the United States Military for recruitment purposes and will not be shared with anyone else;

d.      by submitting information, or by participating in a purported interview, consumers have applied or are applying for an open job position;

e.      representatives are acting on behalf of prospective employers hiring for open job positions; and

f.      independent education advisors recommend or endorse their post-secondary schools.

65.      The representations set forth in Paragraph 63 are false and misleading.

66.      Therefore, Defendants' representations as set forth in Paragraph 63 of this Complaint constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

67.      Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

68.      Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the FTC (the "National Do Not Call Registry"), of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the National Do Not Call Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

23

69.     Consumers who receive telemarketing calls to their registered numbers can complain of National Do Not Call Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

70.     The FTC allows sellers, telemarketers, and other permitted organizations to access the National Do Not Call Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

71.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  *Id*. § 310.2(dd).

72.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

73.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the National Do Not Call Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has not stated that

24

he or she does not wish to receive such calls.  16 C.F.R. §§ 310.2(q), 310.4(b)(1)(iii)(B).

Valid written consent to receive a live telemarketing call to a number on the National Do

Not Call Registry requires:  (i) a writing signed by the consumer, (ii) clearly evidencing

authorization to receive calls placed on behalf of a specific seller, and (iii) stating the

phone number to which such calls may be placed.  16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

74.    The TSR prohibits sellers and telemarketers from repeatedly or

continuously calling a number with the intent to annoy, harass, or abuse any person at the

called number.  16 C.F.R. § 310.4(b)(1)(i).

75.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c),

and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR

constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Defendants Violated the Do Not Call Provisions of the TSR**

76.    Defendants are "sellers" and "telemarketers" who, in connection with

"telemarketing," as those terms are defined in the TSR, sell post-secondary educational

services.

77.    Defendants are also sellers and telemarketers that initiate or cause others

to initiate outbound telephone calls to consumers in the United States to induce the

purchase of their post-secondary educational services.

25

78.     Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of post-secondary educational services by the use of one or more telephones and which involves more than one interstate telephone call.

79.     Defendants cause lead generators to call consumers to induce the purchase of post-secondary educational services.

80.     Defendants buy leads from lead generators where the lead generators represent that the leads have given their permission to be called about post-secondary educational services.  Defendants then call the leads to induce the purchase of their post-secondary educational services.

81.     Defendants made no efforts to prevent their live telemarketing calls from being placed to telephone numbers on the National Do Not Call Registry.

82.     Consequently, Defendants made hundreds of thousands of calls to telephone numbers on the National Do Not Call Registry.

83.     Consumers whose telephone numbers were on the National Do Not Call Registry and who received Defendants' live telemarketing calls did not have a pre-existing business relationship with Defendants nor had they given express written consent to receive telemarketing calls specifically from Defendants or their lead generators.

**COUNT II**

84.     In numerous instances, in connection with telemarketing, Defendants directly or through their lead generators, have initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

**COUNT III**

85.     In numerous instances, in connection with telemarketing, Defendants directly or through their lead generators, have misrepresented, expressly or by implication, that:

a.      the lead generators are, represent, or are affiliated with the United States Military;

b.      the United States Military recommends or endorses their post-secondary schools;

c.      the information the lead generators have collected from consumers will be provided to the United States Military for recruitment purposes and will not be shared with anyone else;

d.      by submitting information, or by participating in a purported interview, consumers have applied or are applying for an open job position;

e.      representatives are acting on behalf of prospective employers hiring for open job positions; and

        f.      independent education advisors recommend or endorse their post-secondary schools.

    86.    Defendants' practice as alleged in Paragraph 84 of this Complaint is a deceptive telemarketing practice that violates the TSR, 16 C.F.R. §§ 310.3(a)(2)(vii) & (a)(4).

## COUNT IV

    87.    In numerous instances in connection with telemarketing, Defendants have provided substantial assistance or support to one or more lead generators even though Defendants knew or consciously avoided knowing that one or more such lead generators were engaged in violations of § 310.4 of the TSR.  Defendants, therefore, have violated 16 C.F.R. § 310.3(b).

## COUNT V

    88.    In numerous instances, in connection with telemarketing, Defendants have initiated repeated and continuous outbound telemarketing calls to telephone numbers with the intent to annoy, abuse, or harass the person at the called number.  16 C.F.R. § 310.4(b)(1)(i).

## CONSUMER INJURY

    89.    Consumers in the United States have suffered and will suffer injury as a result of Defendants' violations of the FTC Act and the TSR.  Absent injunctive relief by

this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

90.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the FTC.

91.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $41,484 for each violation of the TSR, 16 C.F.R. § 1.98(d).  Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

92.    This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to remedy injury caused by Defendants' violations of the TSR and the FTC Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court, as authorized by Sections 5(a), 5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and pursuant to its own equitable powers:

A.     Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this complaint;

B.     Award Plaintiff monetary civil penalties from each Defendant for every violation of the TSR;

C.     Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendants;

D.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

E.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: August 27, 2019

LEAH FRAZIER
QUINN MARTIN
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Drop CC-10232
Washington, DC 20580
(202) 326-2187; (202) 326-2080
(202) 326-3768 (facsimile)
lfrazier@ftc.gov; qmartin@ftc.gov

ELIZABETH C. SCOTT, Local Counsel
Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois 60604
(312) 960-5609
(312) 960-5600 (facsimile)
escott@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

31

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 11**

LA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CAREER EDUCATION CORPORATION, a corporation,<br><br>AMERICAN INTERCONTINENTAL UNIVERSITY, INC., a corporation,<br><br>AIU ONLINE, LLC, a limited liability company,<br><br>MARLIN ACQUISITION CORP., a corporation,<br><br>COLORADO TECH., INC., a corporation, and<br><br>COLORADO TECHNICAL UNIVERSITY, INC., a corporation,<br><br>Defendants. | Case No. _19 cv 5739_<br><br><br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), filed its

Complaint ("Complaint") for a permanent injunction and other equitable relief, pursuant

to Sections 13(b), 19, and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"),

15 U.S.C. §§ 53(b), 57b, and 56(a)(1), and the Telemarketing and Consumer Fraud and

Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101 et seq. Defendants have

waived service of the summons and the Complaint. The Commission and Defendants

stipulate to the entry of this Stipulated Final Order for Permanent Injunction and

Monetary Judgment ("Order") to resolve all matters in dispute in this action between

them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendants violated Section 5 of the FTC Act, 15

U.S.C. § 45, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in marketing

their post-secondary schools.

3. Defendants neither admit nor deny any of the allegations in the Complaint, except

as specifically stated in this Order. Only for purposes of this action, Defendants admit the

facts necessary to establish jurisdiction.

4. Defendants waive any claim that they may have under the Equal Access to Justice

Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this

Order, and agree to bear their own costs and attorney fees.

5. Defendants and the Commission waive all rights to appeal or otherwise challenge

or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

2

A.    **"Clear(ly) and Conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.    A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.    An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.    In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.    The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

B. **"Covered Information"** means information from or about an individual consumer, including, but not limited to (a) first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a telephone number; (e) a Social Security number; (f) a driver's license or other government-issued identification number; (g) a financial institution account number; (h) credit or debit card information; (i) precise geolocation data of an individual or mobile device, including but not limited to GPS-based, WiFi-based, or cell-based location information; or (j) an authentication credential, such as a username and password.

C. **"Defendants"** means all of the Defendants, individually, collectively, or in any combination.

D. **"Established Business Relationship"** means a relationship between the Seller and a person based on: (a) the person's purchase, rental, or lease of the Seller's goods or services or a financial transaction between the person and Seller, within the 18 months

4

immediately preceding the date of the Telemarketing call; or (b) the person's inquiry or application regarding a product or service offered by the Seller, within the 3 months immediately preceding the date of a Telemarketing call.

E.      **"Lead Aggregator"** means any Lead Generator from which Defendants directly purchase Covered Information.

F.      **"Lead Generation"** means providing, in exchange for consideration, Covered Information to a Seller, Telemarketer, or other marketer, or assisting others in providing such information, including through Telemarketing, but excluding solely hosting or displaying advertising and marketing content created by Defendants.

G.      **"Lead Generator"** means any person who provides, in exchange for consideration, Covered Information to a Seller, Telemarketer, or other marketer, or who assists others in providing such information, including through Telemarketing but excluding persons solely hosting or displaying advertising and marketing content created by Defendants.

H.      **"Lead Path"** means information sufficient to identify each Lead Source with which a consumer interacted prior to the sale of that consumer's Covered Information to Defendants.

I.      **"Lead Source"** means any platform operated by a Lead Generator involving Lead Generation, including a website or call center.

J.      **"National Do Not Call Registry"** means the National Do Not Call Registry, which is the "do-not-call" registry maintained by the Commission pursuant to 16 C.F.R. § 310.4(b)(1)(iii)(B).

K.     **"Outbound Telephone Call"** means a telephone call initiated by a Telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

L.     **"Seller"** means any person who, in connection with a Telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration whether or not such person is under the jurisdiction of the Commission.

M.     **"Student"** means any natural person who is or was enrolled in a program of study at an institution of higher education operated by Defendants.

N.     **"Telemarketer"** means any person who, in connection with Telemarketing, initiates or receives telephone calls to or from a customer or donor, whether or not such person is under the jurisdiction of the Commission.

O.     **"Telemarketing"** means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.

### ORDER

### I.     PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or sale of any

6

educational product or service, are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

      A.     That Defendants or Lead Generators acting on their behalf are, represent, are affiliated with, or are endorsed by the United States Department of Defense or its Military Departments, or any other branch or agency of the United States federal government;

      B.     That the United States Department of Defense or its Military Departments or any other branch or agency of the United States government endorses or recommends a post-secondary school;

      C.     That Defendants or Lead Generators acting on their behalf are neutral and independent educational advisors that endorse or recommend a post-secondary school;

      D.     That consumers who submit Covered Information to Lead Generators, acting on Defendants' behalf, are applying for open job positions or government benefits;

      E.     That Lead Generators, acting on Defendants' behalf, represent prospective employers;

      F.     With respect to Defendants' products or services, any material benefits, including the likelihood of consumers finding employment, of those products or services; and

      G.     With respect to Defendants' products or services, the total costs, or any other material restrictions, limitations, or conditions, of those products or services.

## II.    INJUNCTION CONCERNING LEAD GENERATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents,

employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order, whether acting directly or indirectly, in

connection with the advertising, marketing, promoting, offering for sale, or sale of any

educational product or service, are permanently restrained and enjoined from:

A.    Failing to, as a condition of doing business with any Lead Aggregator: (a)

provide each such Lead Aggregator a copy of this Order within 7 days of entry of this

Order; and (b) either (i) obtain from each such Lead Aggregator a signed and dated

statement acknowledging receipt of this Order and expressly agreeing to comply with this

Order within 30 days of entry of this Order or (ii) cease purchasing Covered Information

from such Lead Aggregator until such time as the Lead Aggregator has provided a signed

and dated statement acknowledging receipt of this Order and expressly agreeing to

comply with this Order;

B.    Failing to, within 14 days of the appearance of a Lead Source in a Lead

Path, provide a copy of this Order by a trackable delivery method with return receipt to

every Lead Generator associated with such Lead Source;

C.    Using or purchasing Covered Information:

1.    Unless Defendants have established, implemented, and thereafter

maintained a system to monitor and review Lead Sources, which system shall include

procedures sufficient to:

8

a. Obtain the Lead Path associated with such Covered

Information, and information sufficient to permit Defendants to review: (i) copies of all

materials created or used by a Lead Generator displayed or contained within a Lead

Source in the Lead Path, including text, graphic, video, audio, and photographs; (ii) the

location of any Lead Source in the Lead Path; and (iii) the URL of any hyperlink

contained in a Lead Source in the Lead Path;

b. Review, directly or through a non-Lead Generator agent, all

materials used to obtain such Covered Information, prior to Defendants' use or purchase

of that Covered Information; and

c. Preclude payment of any amounts to the Lead Aggregator or

Lead Generator for such Covered Information and to inform the Lead Aggregator that

approval is denied if such material contains a misrepresentation prohibited by this Order

or otherwise does not comply with this Order;

2. If Defendants know or should know that any material associated

with the Lead Path of the Covered Information, including any material identified in

Subsection II.C.1.a, contains a misrepresentation prohibited by this Order or otherwise

does not comply with this Order.

D. Failing to promptly and completely investigate any complaints or other

information that Defendants receive about whether any Lead Generator is engaging in

acts or practices prohibited by this Order. If any Lead Generator is engaging in acts or

practices prohibited by this Order, Defendants shall inform the Lead Aggregator that

9

approval is denied and shall not pay any amounts to the Lead Aggregator or Lead Generator for such Covered Information.

## III.   PROHIBITION AGAINST ABUSIVE TELEMARKETING PRACTICES

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with Telemarketing are permanently restrained and enjoined from engaging in, or assisting and facilitating others in engaging in, any of the following practices:

A.     Initiating any Outbound Telephone Call to any person at a telephone number on the National Do Not Call Registry unless the Seller or Telemarketer proves that:

1.     The Seller has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of that Seller may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person. Such written agreement shall fully disclose the identity of the Seller and must be obtained prior to the Seller or Telemarketer placing a call to a telephone number on the National Do Not Call Registry; or

2.     The Seller has an Established Business Relationship with such person, and that person has not stated that he or she does not wish to receive Outbound Telephone Calls made by or on behalf of the Seller.

10

B.      Initiating any Outbound Telephone Call to a person when that person has previously stated that he or she does not wish to receive an Outbound Telephone Call:

1.      Made by or on behalf of the Seller whose goods or services are being offered; or

2.      Made on behalf of a charitable organization for which a charitable contribution is being solicited.

C.      Initiating any Outbound Telephone Call that delivers a prerecorded message, unless the Seller or Telemarketer can demonstrate that:

1.      Prior to making any such call to induce the purchase of any good or service, the Seller has obtained from the recipient of the call an express agreement, in writing, that:

a.      The Seller obtained only after a Clear and Conspicuous disclosure that the purpose of the agreement is to authorize the Seller to place prerecorded calls to such person;

b.      The Seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

c.      Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the specific Seller; and

d.      Includes such person's telephone number and signature; and

2.      In any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a non-profit charitable organization on whose behalf the call is made, the Seller or Telemarketer:

11

          a.     Allows the telephone to ring for at least fifteen (15) seconds

or four (4) rings before disconnecting an unanswered call; and

          b.     Within two (2) seconds after the completed greeting of the

person called, plays a prerecorded message that promptly and in a Clear and Conspicuous

manner discloses to the person receiving the call: (i) the identity of the Seller or the

charitable organization; (ii) that the purpose of the call is to sell goods or services or

solicit a charitable donation: and (iii) if the purpose of the call is to sell goods or services,

the nature of the goods or services, followed immediately by a disclosure of one or both

of the following:

          i.     In the case of a call that could be answered in person

by a consumer, that the person called can use an automated interactive voice and/or

keypress-activated opt-out mechanism to assert a Do Not Call Request at any time during

the message. The mechanism must:

          (a)     Automatically add the number called to the

Seller's Entity-Specific Do Not Call List;

          (b)     Once invoked, immediately disconnect the call;

and

          (c)     Be available for use at any time during the

message; and

          ii.     In the case of a call that could be answered by an

answering machine or voicemail service that the person called can use a toll free-number

12

to assert a Do Not Call Request. The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

> (a)     Automatically adds the number called to the Seller's Entity-Specific Do Not Call List;

> (b)     Immediately thereafter disconnects the call; and

> (c)     Is accessible at any time throughout the

duration of the Telemarketing campaign.

D.     Initiating any Outbound Telephone Call to a telephone number within a given area code unless the Seller, either directly or through another person, has paid the annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry;

E.     Initiating any Outbound Telephone Call in which the Telemarketer fails to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call:

> 1.     the identity of the Seller whose goods or services are being offered for sale or the charitable organization on behalf of which a request for a charitable contribution is being made;

> 2.     that the purpose of the call is to sell goods or services or solicit a charitable contribution; and

> 3.     if the purpose of the call is to sell goods or services, the nature of the goods or services.

13

F.      Initiating any Outbound Telephone Call in which the Seller or Telemarketer fails to transmit or cause to be transmitted to any Caller Identification Service in use by a recipient of a Telemarketing call either:

1.      the Telemarketer's telephone number and, when made available by the Telemarketer's carrier, the name of the Telemarketer making the call; or

2.      the name of the Seller or charitable organization on behalf of which a telemarketing call is placed, and that Seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours.

G.      Violating the Telemarketing Sales Rule, 16 C.F.R. Part 310, attached as Appendix A.

## IV.    MONETARY JUDGMENT FOR EQUITABLE MONETARY RELIEF

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of Thirty Million Dollars ($30,000,000) is entered in favor of the Commission against Defendants, jointly and severally, as equitable monetary relief, including for the purposes of restitution subject to Section V.

B.      Defendants are ordered to pay the Commission Thirty Million Dollars ($30,000,000), which, as Defendants stipulate, their designated agent holds in escrow for no purpose other than payment to the Commission.  Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## V.    ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.    Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.    The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.    The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.    Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers) may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

E.    All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to

15

consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VI. CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants are permanently restrained and enjoined from directly or indirectly:

A. failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress, to the extent permitted by and in compliance with the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. Part 99 ("FERPA"). If a representative of the Commission requests in writing any information related to redress, Defendants must provide such information to the extent permitted by and in compliance with FERPA, in the form prescribed by the Commission, within 14 days; and

B. disclosing, using, or benefiting from customer information, including the name, address, telephone number, and email address, obtained from Edutrek, LLC, Day Pacer, LLC, SoftRock, Inc., Sunkey Publishing, Inc.; Sun Key Publishing, LLC; Wheredata, LLC; or Fanmail.com, LLC prior to entry of this Order in connection with the advertising, marketing, promoting, offering for sale, or sale of any educational

16

product or service, unless (i) the customer information is associated with a Student, or (ii) Defendants also received the same consumer information from another source.

## VII. COOPERATION

IT IS FURTHER ORDERED that Defendants shall cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Defendants shall provide truthful and complete information, evidence, and testimony. Defendants shall, upon a reasonable request from a Commission representative with a minimum of 10 days notice, cause their officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings at such reasonable places and times as a Commission representative may designate, without the service of a subpoena.

## VIII. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.     Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, each Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for advertising, marketing, promoting, offering for sale, or sale of any educational product or service, and all agents and representatives who participate in the advertising, marketing, promoting, offering for sale, or sale of any educational product or service; and (3) any business entity resulting

from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

    C.    From each individual or entity to which a Defendant delivered a copy of this Order pursuant to this Section VII, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## IX.    COMPLIANCE REPORTING

    IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

    A.    One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury. Each Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant; (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

    B.    For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the

following: (a) any designated point of contact; or (b) the structure of any Defendant or

any entity that Defendant has any ownership interest in or controls directly or indirectly

that may affect compliance obligations arising under this Order, including: creation,

merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages

in any acts or practices subject to this Order.

      C.     Each Defendant must submit to the Commission notice of the filing of any

bankruptcy petition, insolvency proceeding, or similar proceeding by or against such

Defendant within 14 days of its filing.

      D.     Any submission to the Commission required by this Order to be sworn

under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746,

such as by concluding: "I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct. Executed on: _____" and

supplying the date, signatory's full name, title (if applicable), and signature.

      E.     Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to

DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate

Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission,

600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin:

FTC v. Career Education Corporation.

## X.    RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Defendants in connection with Telemarketing or the advertising, marketing, promoting, offering for sale, or sale of any educational product or service, must create and retain the following records:

A.    accounting records showing the revenues from all goods or services sold, including revenues attributable to consumers whose Covered Information was provided to Defendants by Lead Aggregators, and to the extent practicable, broken down by Lead Generator;

B.    personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.    records of all consumer complaints and refund requests concerning the subject matter of the Order, whether received directly or indirectly, such as through a third party, and any response;

D.    records identifying all Lead Generators that Defendants use since entry of this Order;

E.    records relating to all websites and marketing materials that have been reviewed to ensure compliance with Section II of this Order;

F.    all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

## XI.    COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order and any failure to transfer any assets as required by this Order:

A.    Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant.  Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use

21

of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49,

57b-1.

## XII.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

SO ORDERED this ___9___ day of ___October___, 2019.

_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:  FEDERAL TRADE COMMISSION**

_____

LEAH FRAZIER, ESQ.
QUINN MARTIN, ESQ.
Federal Trade Commission
600 Pennsylvania, Ave., NW
Washington, DC 20580
Telephone: (202) 326-2187 (Frazier)
Telephone: (202) 326-2080 (Martin)
Facsimile: (202) 326-3768
Email: lfrazier@ftc.gov, qmartin@ftc.gov

**FOR DEFENDANTS:**

Date: _July 26, 2019_

WILLARD K. TOM, ESQ.
DANIEL S. SAVRIN, ESQ.
DAVID I. MONTEIRO, ESQ.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001
Email: willard.tom@morganlewis.com, daniel.savrin@morganlewis.com,
david.monteiro@morganlewis.com
COUNSEL for Career Education Corp.; American InterContinental University, Inc.; AIU
Online, LLC; Marlin Acquisition Corp.; Colorado Tech., Inc.; and Colorado Technical
University, Inc.

23

**DEFENDANTS:**

JEFFREY D. AYERS, ESQ., as
Senior Vice President & General Counsel,
Career Education Corporation;
Vice President, American InterContintental University, Inc.;
Manager, AIU Online, LLC;
Vice President, Marlin Acquisition Corp.;
Vice President, Colorado Tech., Inc.; and
Vice President, Colorado Technical University, Inc.

Date: July 26, 2019

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 12**

NO.   D-1-GN-19-000017

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| | § | |
| STATE OF TEXAS | § | |
| | § | |
| | § | |
| and | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAREER EDUCATION CORPORATION, | § | |
| AMERICAN INTERCONTINENTAL | § | |
| UNIVERSITY, INC., and | § | |
| COLORADO TECHNICAL UNIVERSITY, | § | |
| INC. | § | |
|       Respondent. | § | 353RD JUDICIAL DISTRICT |

## ASSURANCE OF VOLUNTARY COMPLIANCE

This Assurance of Voluntary Compliance ("AVC") is entered into by the Attorneys General of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (referred to collectively as the "Attorneys General") and Career Education Corporation ("CEC"), American InterContinental University, Inc. ("AIU") and Colorado Technical University, Inc. ("CTU"), including, except as otherwise provided herein, all of their respective subsidiaries, affiliates, successors, and assigns (collectively, "CEC" and, together with the Attorneys General, the "Parties").

This AVC resolves certain claims of the Attorneys General relating to CEC's compliance with applicable state consumer protection laws, particularly with respect to recruitment and enrollment practices relating to CEC's institutions' post-secondary educational programs.

CEC enters into this AVC solely for the purpose of resolving the allegations and related claims of the Attorneys General.  Nothing contained herein shall constitute or may be construed as an admission by CEC of any liability or wrongdoing.

## PARTIES

1.    The parties to this AVC are as follows:

    (a)    The State of Texas through Attorney General Ken Paxton, is authorized to enforce its consumer protections laws, including Texas Deceptive Trade Practices – Consumer Protection Act.  See, Tex. Bus. & Com. Code Ann §§ 17.41-17.63.

    (b)    Career Education Corporation is a Delaware corporation with corporate headquarters at Schaumburg, Illinois.  American InterContinental University, Inc. is a Georgia Corporation with its corporate headquarters in Schaumburg, Illinois. Colorado Technical University, Inc. is a Colorado corporation with its corporate headquarters in Colorado Springs, Colorado.

## THE ALLEGATIONS OF THE ATTORNEYS GENERAL

2.    At times during the course of offering enrollment in educational programs, CEC placed significant pressure on its employees to enroll students and engaged in unfair and deceptive practices by making misleading statements to prospective students, failing to disclose material facts to prospective students, and otherwise engaging in Unreasonable Recruitment Methods in violation of state consumer protections laws as follows:

    (a)    CEC misled students about the total costs of enrollment at CEC institutions;

    (b)    CEC misled students about the transferability of credits into CEC from other institutions and out of CEC to other institutions;

(c)     CEC misrepresented their program offerings and the potential to obtain employment in the field desired by prospective students, including failing to adequately disclose the fact that certain programs lacked the necessary programmatic accreditation, which negatively affect a student's ability to obtain a license or employment; and

(d)     CEC engaged in unfair and deceptive practices in calculating job placement rates, thereby giving prospective students an inaccurate impression of CEC graduates' employment outcomes.  CEC's misrepresentations related to job placement rates include but are not limited to:

(i)     misrepresenting CEC graduates who worked only temporarily as having been "placed," based, for example, on less than two weeks of work or having continued in an internship for a week after graduation; and

(ii)    misrepresenting CEC graduates as having been "placed" in fields in which the students trained or in related fields, when in fact, CEC graduates employment was neither in the field in which the graduate was trained nor in a field related to their field of study.

As a result of the unfair and deceptive practices described above, some students enrolled in CEC who would not have otherwise enrolled, could not obtain professional licensure, and/or incurred debts that they could not repay nor discharge.

## CEC'S RESPONSE TO ALLEGATIONS

3.     CEC denies the allegations of the Attorneys General, including those set forth in paragraph 2, denies any wrongdoing or liability of any kind, and enters into this AVC solely for the purpose of resolving certain disputed claims of the Attorneys General relating to the

allegations including those set forth above in paragraph 2.

## DEFINITIONS

Whenever the terms listed below are used in this AVC, the following definitions shall apply:

4.    "**Administrator**" shall have the meaning set forth in paragraphs 34 through 37 below.

5.    "**Admissions Advisor**" means any natural person employed by CEC who has substantial responsibility for encouraging Prospective Students to apply or enroll in a Program of Study or recruiting Prospective Students, including but not limited to assisting Prospective Students with the application process and informing Prospective Students about Programs of Study at CEC's institutions, but shall exclude Financial Aid Advisors.

6.    "**Anticipated Total Direct Cost**" means the estimated cost of tuition, fees, books, supplies, and equipment to complete a Program of Study.

7.    "**Attorneys General**" means the Attorneys General of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

8.    "**CIP Code**" means the six-digit U.S. Department of Education Classification of Instructional Program ("CIP") code identified for a particular Program of Study.

9.    "**CIP to SOC Crosswalk**" means the crosswalk developed by the National Center for

Educational Statistics and the Bureau of Labor Statistics relating CIP Codes to Standard Occupational Classification ("SOC") codes and available at http://nces.ed.gov/ipeds/cipcode/resources.aspx or its successor site.

10.      "**Clearly and Conspicuously**" or "**Clear and Conspicuous**," when referring to a statement or disclosure, means that such statement or disclosure is made in such size, color, contrast, location, and duration that it is readily noticeable, readable, and understandable. A statement may not contradict or be inconsistent with any other information with which it is presented.  If a statement modifies, explains, or clarifies other information with which it is presented, it must be presented in proximity to the information it modifies, in a manner that is likely to be noticed, readable, and understandable, and it must not be obscured in any manner.

11.      "**Core Skills**" means skills that are necessary to receive a diploma or degree in a Student's field of study, such that failure to master these skills will result in no diploma or degree being awarded.  "Core Skills" are specific to the Program of Study and are not taught in general education courses or generally taught across all fields of study, and are not the same as basic skills, which are skills that are necessary for success in a Student's field of study, but which the Student should possess upon entry into a Program of Study.  Core Skills do not include generic skills such as "collaboration," "team work," and "communication," and for bachelor's degree programs, Core Skills do not include skills taught in 100-level courses unless the skill is refined and specifically identified in upper-level courses.

12.       "**Cost of Attendance**" means cost of attendance as defined in the Federal Higher Education Act of 1965, § 472, 20 U.S.C. § 1087ll, or as that statute may be amended.

13. "**Completer**," only for purposes of calculating a Job Placement Rate in accordance with this AVC, means a Student who is no longer enrolled in a Program of Study and who has either completed the time allowed or attempted the maximum allowable number of credits for the Program of Study but who did not accomplish the requirements for graduation, such as:

(a)   achieving the necessary grade point average;

(b)   attaining required competencies or speed skills; or,

(c)   satisfying non-academic requirements, including but not limited to paying outstanding financial obligations.

14. "**Do Not Call Registry**" means the national registry established by the Federal Communications Commission and the Federal Trade Commission and the state registry established by the Public Utility Commission of the State of Texas that prohibits the initiation of outbound telephone calls, with certain statutory exemptions, to registered consumers.

15. "**Effective Date**" means January 2, 2019.

16. "**Electronic Financial Impact Platform**" means an interactive, internet-based program that produces a personalized disclosure for a Prospective Student of the potential financial impact of pursuing a particular Program of Study and incurring a specific amount of debt. The platform shall permit Prospective Students to input and/or adjust fields to customize the resulting disclosure, including but not limited to the fields that pertain to sources of funding (*i.e.*, scholarships, grants, student contributions, federal loans, and private loans) and post-graduation expenses, and shall generate a customized disclosure for the Prospective Student that shows current estimates of (a) the Prospective Student's

Anticipated Total Direct Costs in pursuing the Program of Study, (b) the Prospective Student's Cost of Attendance, including each component thereof, (c) the Prospective Student's estimated total debt incurred by pursuing the Program of Study at the time of repayment and the corresponding monthly loan payments over a term of years based on the loan interest rate information, (d) the Prospective Student's estimated income if he/she successfully graduates from the Program of Study, if available from the U.S. Department of the Education, and (e) the Prospective Student's estimated post-graduation expenses, including personal financial obligations such as rent or mortgage payments, other debt, car payments, child care expenses, utilities, and the like.  The Electronic Financial Impact Platform shall also provide information about the Program of Study, including the following information: Program Completion Rates, Median Debt for Completers, and Program Cohort Default Rate.  For the avoidance of doubt, the Parties agree that the Program Cohort Default Rate and the Median Earnings for Completers are to be calculated by the U.S. Department of Education and that this AVC does not require CEC itself to calculate these figures for use in the Electronic Financial Impact Platform if unavailable from the U.S. Department of Education.

17. "**Enrollment Agreement**" shall mean the document executed by a Prospective Student that sets forth certain terms and conditions of the Prospective Student's enrollment in a Program of Study.

18. "**Executive Committee**" shall refer to the Attorneys General of the States of Connecticut, Illinois, Iowa, Kentucky, Maryland, Oregon, and Pennsylvania.

19. "**Financial Aid Advisor**" means any natural person employed by CEC who has substantial responsibility for assisting or advising Students and Prospective Students with respect to

financial aid matters.

20.    "**Former Employee**" means any person who was employed by CEC on or after the Effective Date and who is no longer employed by CEC.

21.    "**Good Cause**" means: (a) a material and substantial breach of the terms of this AVC by the Administrator, including the failure to comply with the terms and limitations of this AVC, (b) any act of dishonesty, misappropriation, embezzlement, intentional fraud, or similar conduct by the Administrator, (c) any intentional act of bias or prejudice in favor or against either party or Students by the Administrator, or (d) conduct by the Administrator that demonstrates unfitness to serve in any administrative capacity.  Good Cause shall not include disagreements with the decisions of the Administrator pursuant to this AVC, unless there is a clear pattern in the Administrator's decisions that demonstrates or shows that the Administrator has not been acting as an independent third party in rendering decisions.

22.    "**Graduate**," only for purposes of calculating a Job Placement Rate in accordance with this AVC, means a Student who has accomplished all of the requirements of graduation from a Program of Study, such as, for example, achieving the necessary grade point average, successfully passing all required courses and meeting all clinical, internship, and externship requirements, and satisfying all non-academic requirements.

23.    "**Job Placement Rate**" means the job placement rate calculated in accordance with this AVC and is a numeric rate calculated by dividing the total number of placed Graduate/Completers by the total number of Graduate/Completers who do not qualify for exclusion from the calculation as set out below.  CEC shall count a Graduate/Completer as placed or excluded for purposes of calculating a Job Placement Rate in accordance with this AVC only where CEC is able to successfully contact a Graduate/Completer or

employer to verify employment or exclusion and possesses at the time it is calculating the Job Placement Rate the documentation required below.

(a)     In calculating Job Placement Rates in accordance with this AVC, CEC shall assess whether the Student has been placed within six (6) months of the later of (i) the end of the month in which the Student becomes a Graduate/Completer or (ii) if a license or certification is required for the relevant occupation, the date on which the results of the first licensing or certification exam for which the Graduate/Completer was eligible to sit become available; *provided*, *however*, that such six (6) month period shall be extended for up to sixty (60) days to permit Students who accepted employment prior to the expiration of such six (6) month period to satisfy the minimum employment threshold set forth in paragraph 68(a)(v) and (a)(vi), in which case the Graduate/Completer shall be excluded from the current reporting cohort and included in the next reporting cohort.

(b)     In calculating a Job Placement Rate in accordance with this AVC, a Graduate/Completer may be excluded from the total number of Graduates/Completers (*i.e.*, the denominator) if CEC obtains written documentation that the Graduate/Completer:

(i)     has a medical condition or disability that results in the Graduate/Completer's inability to work or the Graduate/Completer is not available for employment because the Graduate/Completer has a parent, child, or spouse who has a medical condition that requires the care of the Graduate/Completer;

(ii)    is engaged in full time active military duty;

(iii)   is enrolled at least half-time in an additional program of post-secondary education;

(iv)   is deceased;

(v)   is not eligible for placement in the United States because of visa restrictions;

(vi)   is a spouse or dependent of military personnel who have moved due to military transfer orders;

(vii)   is incarcerated; or

(viii)   qualifies for any other job placement rate calculation exclusion that the U.S. Department of Education adopts subsequent to the Effective Date, unless the Attorneys General determine in their reasonable judgment within thirty (30) days of being notified by CEC of the adoption of such waiver that recognizing the waiver for purposes of calculating the Job Placement Rate would be contrary to the interests of Prospective Students; *provided, however*, that CEC shall have the right to apply to the District Court for the State of Iowa, Fifth Judicial District, for a ruling as to whether any such determination by the Attorneys General was reasonable under the circumstances.

(c)   Where CEC excludes a Graduate/Completer from the total number of Graduate/Completers for the purposes of calculating the Job Placement Rate, CEC shall not count that Graduate/Completer as "placed."

24.   "**Median Earnings for Completers**" means the earnings calculated according to the definitions and method provided by the U.S. Department of Education in 34 CFR 668.413(b)(8) and as that regulation may be amended or recodified.

25. "**Median Debt for Completers**" includes Title IV loans, institutional loans, private loans, credit, or unpaid balances extended by or on behalf of the CEC institution to Students, as provided in 34 CFR 668.404(d)(1).  Median Debt for Completers is the median debt for Students who completed the program during the most recent award year and is determined according to the definitions and method provided in 34 CFR 668.413(b)(4) and as that regulation may be amended or recodified.

26. "**Program Cohort Default Rate**" means the program cohort default rate determined according to 34 CFR 668.413(b) (13) and as that regulation may be amended or recodified.

27. "**Program Completion Rate**" means the program completion rate for full-time Students calculated according to the definitions and method provided by the U.S. Department of Education in 34 CFR 668.413 and as that regulation may be amended or recodified.

28. "**Program of Study**" shall mean a series of courses, seminar, or other educational program offered at a CEC institution in the United States, for which CEC charges tuition and/or fees, which is designed to lead toward a degree, certificate or diploma, and which (a) is eligible for Title IV funding, (b) involves more than 25 contact hours in a credit bearing course, or (c) is designed to make a Student eligible to sit for any state or national certification or licensing examination.  Notwithstanding anything in the foregoing sentence to the contrary, non-credit courses, courses paid for entirely by employers, or programs offered for personal enrichment, *i.e.*, hobby or training courses, that are not Title-IV eligible, courses that are not taken for the purpose of ultimately obtaining a degree, certificate, diploma, or review courses that are designed to assist with a Student's preparation for a state or national certification or licensing exam for which the Student is already eligible to sit, shall not be Programs of Study.

29.   "**Prospective Student**" means any natural person who is being recruited for a Program of Study and/or pursuing enrollment at a CEC institution in a Program of Study and is a resident of a state which is a party to this AVC at the time of such recruitment or pursuit.

30.   "**Student**" means any natural person who is or was enrolled at a CEC institution in a Program of Study and is or was a resident of a state which is a party to this AVC at the time of enrollment.

31.   "**Third-Party Lead Vendor**" means any third-party vendor (whether a person, corporation, partnership, or other type of entity) that is directly retained and authorized by CEC to provide Prospective Student inquiries to CEC, but excludes companies that host CEC's advertising or marketing content including but not limited to Facebook, Google, Twitter, and LinkedIn.

32.   "**Transferability of Credits Disclosure**" means a disclosure with respect to the transferability of credits earned at CEC institutions.  For regionally accredited institutions, each such disclosure shall state: "Course credits are not guaranteed to transfer to other schools."  For all other institutions each such disclosure shall state: "Course credits will likely not transfer to other schools.  Degrees will likely not be honored by other schools." CEC shall be permitted to make such reasonable changes to the Transferability of Credits Disclosure that are approved by the Administrator in consultation with the Attorneys General.

33.   "**Unreasonable Recruitment Methods**" means the intentional exploitation of a Prospective Student's fears, anxieties, or insecurities, or any method intentionally calculated to place unreasonable pressure on a Student to enroll in a CEC institution.

## TERMS OF AGREEMENT

## ADMINISTRATOR PROVISIONS

### Appointment of an Administrator

34.     Robert M. McKenna, Esq. of Orrick, Herrington & Sutcliffe LLP is appointed as the Administrator to oversee CEC's compliance with the provisions of this AVC, effective as of the Effective Date.   The Administrator may act directly or through staff, agents, employees, contractors, and representatives in overseeing CEC's compliance with the terms of this AVC.

35.     Contemporaneously with the execution of this AVC, the Parties shall execute a separate Work Plan that sets forth the Administrator's scope of work consistent with the Powers and Duties of the Administrator, set forth in paragraph 39.   In the event of any dispute arising over the Administrator's performance or the reasonableness of the Administrator's costs and fees, either CEC or the Attorneys General may request that the issue be submitted to the Iowa Attorney General, and, if necessary, the issue may be resolved by the District Court for the State of Iowa, Fifth Judicial District.

36.     The Administrator may be dismissed for any reason by agreement of the Parties.   In the event the Parties do not agree to the dismissal of the Administrator, either the Attorneys General or CEC may submit the question of the Administrator's dismissal to the District Court for the State of Iowa, Fifth Judicial District, and the Administrator shall only be dismissed if that court finds that there is Good Cause for dismissal.

37.     The Administrator shall be appointed for a term of three (3) years, to run from the Effective Date.  If the Administrator is dismissed or leaves the position for any reason before the end of the term, another Administrator shall be appointed by agreement of CEC and the

Attorneys General to serve the remainder of the term.

## Costs of the Administrator

38.    CEC shall provide for the reasonable and necessary fees, expenses, and costs of the Administrator as set forth in the Administrator's fee agreement, but in no event shall the Administrator's fees, expenses, and costs exceed $1,000,000 in the first year, $600,000 in the second year, and $400,000 in the third year.

## Powers and Duties of the Administrator

39.    The Administrator shall independently review CEC's compliance with the terms of this AVC in accordance with the Work Plan referenced in paragraph 35.  In furtherance of this purpose, and without limiting the power of the Administrator to review any relevant matter within the scope of this AVC, the Administrator shall be permitted to:

(a)    observe Admissions Advisor and Financial Aid Advisor training sessions;

(b)    review telephone calls and meetings between Admissions Advisors or Financial Aid Advisors, on the one hand, and Students or Prospective Students, on the other; the Administrator shall not be permitted to participate in such calls or attend such meetings, but it is expressly understood that the Administrator may review CEC's existing mystery shopping program and be permitted to request additional mystery shops and/or utilize independent mystery shops if the Administrator believes that such additional shops are reasonably necessary to review compliance with this AVC;

(c)    review transcripts, recordings, and/or reports, to the extent they exist, related to any telephone call or meeting with Prospective Students;

(d)    review materials used to train Admissions Advisors and Financial Aid Advisors;

(e)     review complaints made to CEC, its accreditors, the Attorneys General, the Better Business Bureau, or any state or federal governmental body, after the Effective Date of this AVC, which potentially concern or relate to any of CEC's recruitment, admissions, Student financial aid, or career services practices;

(f)     review CEC's advertisements, marketing materials, websites, catalogs, enrollment agreements, disclosures, and other public-facing media to verify compliance with this AVC;

(g)     review documents, data, and information related to CEC's calculation of any job placement rate;

(h)     review CEC's compliance practices with respect to the conduct of Third-Party Lead Vendors;

(i)     review documents in the possession of CEC or reasonably accessible to CEC related to the conduct of Third-Party Lead Vendors;

(j)     review communications with Students and Prospective Students in the possession of CEC or reasonably accessible to CEC related to Student recruitment, admissions, financial aid, or career services;

(k)     review CEC's compliance with its refund policy;

(l)     review CEC's compliance with data reporting requirements imposed by this AVC;

(m)     review CEC's complaint resolution practices;

(n)     review reports provided by CEC's third-party vendor related to CEC's monitoring of Third-Party Lead Vendors;

(o)     review CEC's institutional and programmatic accreditation status to verify compliance with this AVC;

(p)     review CEC's records to verify CEC's compliance with its obligation to forgo efforts to collect outstanding debt from certain Students pursuant to paragraphs 116 and 117 of this AVC;

(q)     have reasonable access to books, records, other documents, and staff sufficient to insure implementation of and compliance with this AVC; and

(r)     have reasonable access to employees and Former Employees of CEC as the Administrator deems necessary to insure implementation of and compliance with this AVC; reasonable access for purposes of this subparagraph includes disclosing the identity of any current employee or Former Employee if the identity is requested by the Administrator and can be determined by CEC; reasonable access to current employees shall include providing appropriate times and locations for staff interviews; and reasonable access to Former Employees shall include providing the most recent contact information available;

*provided, however*, that this AVC shall not effectuate a waiver of the attorney-client privilege or the attorney-work-product doctrine, and the Administrator shall not have the right to demand access to documents or information protected by the attorney-client privilege or the attorney-work-product doctrine.

40.     The Administrator shall make a good faith effort to leverage CEC's existing compliance mechanisms when reviewing CEC's compliance with this AVC.

41.     The Administrator shall make a good faith effort to perform his or her duties in a manner designed to cause minimal disruption to CEC's activities.  In this regard, CEC shall designate senior officials within the Office of the General Counsel (or any office subsequently organized to succeed to the duties of the foregoing office) to serve as the

primary points of contact for the Administrator in order to facilitate the Administrator's access to documents, materials, or staff necessary to review CEC's compliance with this AVC.  The Administrator shall communicate any request for documents, materials, or access to staff to the designated contacts, unless otherwise instructed.  For the avoidance of doubt, nothing in this paragraph shall be interpreted to prohibit the Administrator from speaking with a current or Former Employee of CEC.

42.     If at any time the Administrator believes that there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee or Former Employee deemed necessary by the Administrator to implement or review compliance with this AVC, the Administrator shall meet and confer with the designated CEC officials referenced in paragraph 41.  If the Administrator cannot resolve such limitation or denial, it shall be immediately reported to the Attorneys General.

43.     Nothing in this AVC shall limit the ability of the Administrator to communicate at any time with the Attorneys General regarding CEC's conduct or to provide documents or information to the Attorneys General as it relates to the Administrator's role of ensuring compliance with this AVC.

**<u>Oversight and Compliance</u>**

44.     The Administrator and the designated CEC officials referenced in paragraph 41 shall meet on a quarterly basis, or more frequently if the Administrator or CEC deem reasonably necessary, in order to discuss any facts, matters, issues, or concerns that may arise in the administration of this AVC or that may come to the attention of the Administrator or CEC. The purpose of these meetings is to permit CEC to confer with the Administrator and address issues and concerns as they arise.  In addition, the Administrator may in his

discretion and on reasonable advance notice invite the CEC officials referenced in paragraph 41 and the Attorneys General to meet and confer to the extent he deems it reasonably necessary for the administration of this AVC.

45.   The Administrator shall issue a report (hereinafter "Annual Report") to the Attorneys General and to CEC within nine (9) months after the Effective Date and every twelve (12) months thereafter for the duration of the Administrator's term.  The Administrator may make more frequent reports to the Attorneys General and to CEC as deemed reasonably necessary to ensure compliance with this AVC or upon request of the Attorneys General. The Annual Report and all written reports requested by the Attorneys General shall be provided to CEC prior to their presentation to the Attorneys General.  The Administrator and CEC shall meet and confer to discuss all written reports and Annual Reports prior to their presentation to the Attorneys General.  As part of this conferral process, the Administrator shall in good faith consider all reasonable modifications to the report proposed by CEC.

46.   The Annual Report shall include:

(a)    a description of the methodology and review procedures used;

(b)    an evaluation of whether CEC is in compliance with the provisions of this AVC, together with a description of the underlying basis for that evaluation; and

(c)    a description of any practice which the Administrator believes may constitute a deceptive or unfair practice (as those terms are commonly understood in the context of consumer protection laws).

47.   Notwithstanding any other provision in this AVC, the Administrator's reports (including the Annual Reports) shall identify only practices or patterns of CEC's noncompliance with

this AVC, if any, and are not intended to identify isolated incidents, unless the Administrator determines that such incidents are indicative of CEC's substantial non-compliance with the AVC.

48.     If, at the conclusion of the Administrator's three-year term, the Attorneys General determine in good faith and in consultation with the Administrator that justifiable cause exists, the Administrator's engagement shall be extended for an additional term of up to two (2) years, subject to the right of CEC to commence legal proceedings for the purpose of challenging the decision of the Attorneys General and to seek preliminary and permanent injunctive relief with respect thereto.  For purposes of this paragraph, "justifiable cause" means a failure by CEC to achieve and maintain substantial compliance with the substantive provisions of the AVC.

**Use of the Administrator's Reports**

49.     The Administrator's reports (including the Annual Reports) and testimony may be used by the Attorneys General or CEC in any action or proceeding brought by the Attorneys General or CEC relating (a) to this AVC or (b) to any CEC conduct described in the reports by the Administrator to the Attorneys General, and the reports shall be admissible into evidence in any such action or proceeding to the extent allowed by the rules of evidence of the respective tribunal in which such reports are sought to be introduced.  For the avoidance of doubt, the Parties do not intend for the Administrator's reports (including the Annual Reports) or testimony to be admissible in any action or proceeding other than an action or proceeding described in the preceding sentence.  No action or lack of action by the Attorneys General regarding information received from the Administrator regarding CEC's conduct shall be considered affirmation, acceptance, or ratification of that conduct

by the Attorneys General, and the Attorneys General reserve the right to act at any time regarding information provided to them by the Administrator.

**Confidentiality**

50. The Administrator shall keep confidential from any and all individuals, entities, regulators, government officials, or any other third party that is not a party to this AVC all communications with employees and information and documents obtained by or produced to the Administrator in the course of his duties.  The Administrator also agrees to ensure that any third-party whom the Administrator engages shall agree to the same restriction. Nothing in the preceding sentences shall limit the Administrator's ability to make any disclosure compelled by law.   In the event the Administrator receives a request for disclosure of any such communications, information, or documents, the Administrator shall notify CEC the sooner of no more than ten (10) business days following receipt of the request or five (5) business days prior to disclosure to afford CEC time to object to such disclosure.  Nothing herein shall relieve the Administrator of his obligation to comply with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

51. It is understood that any document, information, or report shared with the Attorneys General pursuant to this AVC (including reports created by the Administrator pursuant to paragraphs 45 and 112) may be subject to applicable state open records laws.  Nevertheless, the Attorneys General recognize that some or all of such documents, information, or reports may be confidential pursuant to those laws or other applicable state statutes or federal laws. In the event that the Attorneys General (or any of them) receive a request or otherwise intends to disclose a document, information, or report, and the Attorneys General (or any of them) determine that the requested document, information, or report is not confidential

pursuant to applicable law and is subject to disclosure, or if the Attorneys General (or any of them) are compelled to produce the material pursuant to a court or administrative order, the relevant Attorney(s) General shall provide notice to CEC ten (10) business days prior to disclosing the document, information, or report to any third party, or any lesser period required under state law.  Notwithstanding the above requirements, the Attorneys General may share any document, information, or report subject to this paragraph with any other local, state, or federal agency empowered to investigate or prosecute any laws, regulations, or rules.  Subject to the foregoing, unless required under applicable state law, the Attorneys General shall not release to the public any confidential document or information provided by CEC pursuant to this AVC.

**Miscellaneous Administrator Provisions**

52.    Non Retaliation Clause:  CEC shall not intimidate, harass, threaten, or penalize any employee or Former Employee for his or her cooperation with or assistance to the Administrator relating to the Administrator's Powers and Duties to ensure implementation of and compliance with this AVC.

53.    Compliance Hotline:  It is understood that CEC is operating a compliance hotline, which permits employees to lodge concerns with CEC anonymously.  CEC shall continue to maintain this hotline or a reasonable equivalent.  CEC shall provide the Administrator access to any complaints or reports made through this hotline (whether made anonymously or not).

## REQUIRED DISCLOSURES

**General Disclosures**

54.     CEC shall comply with 34 CFR 668.412(e) and any substantially similar successor regulation requiring the direct disclosure of the U.S. Department of Education gainful employment template information to Prospective Students.   The requirements of paragraphs 55-58 herein shall take effect only if the U.S. Department of Education repeals, amends, or delays 34 CFR 668.412(e) in a manner that substantially changes this direct disclosure requirement.  In addition, should paragraphs 55-58 take effect, CEC may cease compliance with providing a Single-Page Disclosure Sheet as required by paragraphs 55-58 in the event the U.S. Department of Education or Congress promulgates a substantially similar direct disclosure requirement.

55.     CEC shall Clearly and Conspicuously disclose to Prospective Students a "Single-Page Disclosure Sheet" that conforms as to form to the sample disclosure sheet attached as Exhibit B hereto and contains the following information:

   (a)     the Anticipated Total Direct Cost for the Program of Study at the prospective campus; *provided*, *however*, that this provision shall not be interpreted to restrict CEC's ability to change tuition, fees, or expenses;

   (b)     the Median Debt for Completers for the Program of Study for the most recent reporting period, if available;

   (c)     the Program Cohort Default Rate for the most recent reporting period if available;

   (d)     the Program Completion Rate for the most recent reporting period, if available;

   (e)     the Transferability of Credits Disclosure;

   (f)     the Median Earnings for Completers for the Program of Study for the most recent reporting period, if available; and

   (g)     the Job Placement Rate Disclosure for the Program of Study at the prospective

campus for the most recent reporting period, if available.

For the avoidance of doubt, the Parties agree that the Program Cohort Default Rate and the Median Earnings for Completers are to be calculated by the U.S. Department of Education and that this AVC does not require CEC itself to disclose figures that are unavailable from the Department.

56.   Specifically, CEC shall Clearly and Conspicuously disclose the Single-Page Disclosure Sheet for the Program of Study in which the Prospective Student is seeking to enroll in the following ways:  (1) by Clearly and Conspicuously disclosing the Single-Page Disclosure Sheet during the enrollment process, prior to the Prospective Student's execution of the Enrollment Agreement; and (2) CEC shall also email the Single-Page Disclosure Sheet as one of two attachments in an email to the Prospective Student prior to starting the first day of class.  The other attachment in this email would be a Clear and Conspicuous disclosure of the refund policy as outlined in Paragraph 101.

57.   Before an already-enrolled Student begins a new Program of Study, CEC shall Clearly and Conspicuously disclose to the Student the Single-Page Disclosure Sheet for that Program of Study.  Additionally, CEC shall also email the Single-Page Disclosure Sheet to the Student prior to starting the first day of class in the new Program of Study.

58.   CEC shall be permitted to make such reasonable changes to the Single-Page Disclosure Sheet and to the form and timing of the disclosure of the Single-Page Disclosure Sheet as are approved by the Administrator in consultation with the Attorneys General.

59.   CEC may calculate and disclose to Students and Prospective Students, in materials other than the gainful employment template or the Single-Page Disclosure Sheet, information with respect to the income earned by CEC's graduates in reporting period as to which the

Median Earnings for Completers is not available, provided that such information is not false, misleading, or deceptive.

60.     If a CEC institution elects to disclose that it has articulation agreements for the transferal of credits to other schools, then, in addition to the foregoing, the CEC institution shall also Clearly and Conspicuously:  (a) list any school(s) with articulation agreements with that CEC institution, (b) list the classes for which the receiving school allows credits to transfer, (c) disclose any conditions upon the acceptance of transferred credits, and (d) disclose that credits are accepted by the receiving school for elective credit only, if that is the case.

**Job Placement Rate Disclosures**

61.     For any Program of Study at a CEC institution that is required to calculate or provide a job placement rate by a national accreditor or any federal, state, or local law, rule, or judgment, CEC shall calculate a Job Placement Rate for such Program of Study in accordance with this AVC, and such rate shall be disclosed on the Single-Page Disclosure Sheet described in paragraph 55.  The parties agree that a regionally accredited institution shall not be subject to paragraphs 61 to 69 relating to placement rates unless it shall choose to voluntarily report a placement rate.  If a CEC institution voluntarily calculates a job placement rate for any Program of Study offered at a CEC campus, it must calculate the Job Placement Rate in accordance with this AVC for that Program of Study and also calculate a Job Placement Rate in accordance with this AVC for all Programs of Study that are offered at that same CEC campus, and such rates shall be disclosed on the Single-Page Disclosure Sheet described in paragraph 55.  For purposes of this paragraph, all online offerings of each one of CEC's institutions shall be considered a "campus." Notwithstanding the foregoing, CEC shall not be required to calculate Job Placement Rates

for any Program of Study that CEC is teaching out (*i.e.*, that is not accepting new Students).

62.    If CEC does not calculate a job placement rate for a Program of Study, and it is not required to calculate a Job Placement Rate by this AVC, then CEC shall disclose to Prospective Students on the Single Page Disclosure Sheet that: "[CEC institution] does not calculate a job placement rate for students who completed this program."

63.    CEC shall not make any claims or representations to Prospective Students about the likelihood of such Prospective Students obtaining employment after completing a Program of Study if it does not calculate and disclose a Job Placement Rate in accordance with this AVC.

64.    The Job Placement Rate calculated in accordance with this AVC shall be disclosed on the U.S. Department of Education's Gainful Employment Program Disclosure Template, which is the disclosure form issued by the Secretary of the U.S. Department of Education for Gainful Employment Programs, as well as at the time(s) and in the manner(s) provided herein.  Moreover, with respect to job placement rates that CEC calculates after the Effective Date, CEC shall not report and/or disclose any job placement rate other than the Job Placement Rate calculated in accordance with this AVC, except as may be required by a government entity or accreditor.  CEC must comply with any state regulations in addition to the requirements of this AVC.

65.    Notwithstanding anything to the contrary in this AVC, CEC shall not be required to disclose a Program Completion Rate, a Program Cohort Default Rate, a Median Debt for Completers, or a Job Placement Rate for any Program of Study at a location with fewer than ten (10) Students or Graduates/Completers, as applicable, in that program.

66.    Notwithstanding anything to the contrary in this AVC, CEC shall not be required to

calculate a Job Placement Rate for new Programs of Study that have not had any Completers or Graduates.  A Program of Study is not "new" for purposes of this paragraph if the same campus at which the Program of Study is offered previously offered a program of substantially similar subject matter, content, length, and ending credential.  For the avoidance of doubt, a Program of Study will be "new" for purposes of Job Placement Rate calculations if any governmental entity or any relevant accreditor considers the Program of Study substantially different from a prior Program of Study in terms of subject matter, content, length, or ending credential.

67.    If CEC relies on a third party for verifying and/or calculating Job Placement Rates, CEC shall enter into a contract with such third party pursuant to which the third party shall agree to adhere to the requirements of this AVC concerning calculation and/or verification of Job Placement Rates (to the extent applicable) and require the third party to provide any requested information regarding the calculation and/or verification of Job Placement Rates to the Administrator.  CEC shall monitor such third party's compliance with these requirements.

68.    CEC shall deem an individual as "placed" only if the Graduate or Completer meets the below conditions of "employed" or "self-employed."

    (a)    Employed.  The individual shall be deemed "employed" if each of the following six (6) requirements are met:

        (i)    The position is in the field of study or a related field of study.  The position shall be considered to be in the field of study or a related field of study if it meets one of the following criteria:

            (1)    the position is included on the list of job titles for the

Graduate's/Completer's Program of Study published by the institution and is included in the most recent CIP to SOC Crosswalk for the applicable CIP Code; *provided*, *however*, that it is understood that in an instance where a Graduate/Completer's actual job title is not listed on the CIP to SOC Crosswalk, CEC may include the job as a placement under this provision if the job title the Graduate/Completer obtained is listed as a "Lay Title" on the O*Net Code Connector for an SOC job title that is linked to the Graduate/Completer's Program CIP per the CIP to SOC Crosswalk, regardless of any job level within the Graduate/Completer's title (*e.g.*, Registered Nurse 1, Registered Nurse 2, etc.), and the job description by the employer for the job title the Graduate/Completer obtained predominantly matches the job description, tasks, and work activities for the SOC job title that is linked to the CIP for the Graduate/Completer's program; or

(2)     the position requires the Graduate/Completer to use, during a majority of the time while at work, the Core Skills listed in the institution's published program and course descriptions expected to have been taught in the Student's program; and (a) the written job description requires education beyond a high school diploma or provides that a postsecondary credential is preferred, (b) the position is one as a supervisor or manager, or (c) the Graduate/Completer or the employer certifies in writing that the education received by the

Graduate/Completer provided a benefit or advantage to the Graduate/Completer in obtaining the position.

(ii)     The position is a permanent position (*i.e.*, there is no planned end date) or a temporary position that the Graduate/Completer expects to maintain for a minimum of one hundred and eighty (180) days;

(iii)    The position is a paid position;

(iv)     The position requires at least twenty (20) work hours per week;

(v)      The Graduate/Completer has worked in the position for a minimum of thirty (30) days; and

(vi)     CEC has verified the employment after the Graduate/Completer has worked in the position for a minimum of thirty (30) days by:  (1) speaking to either the employer or an agent of the employer to confirm employment, (2) contacting the Graduate/Completer directly, (3) receiving an email from the Graduate/Completer, or (4) the Graduate/Completer's employer provides employment information about the Graduate/Completer by email or other written confirmation, or on-line.

(b)     Self-Employed.  The individual shall be deemed placed as "self-employed" if each of the following four (4) requirements is met:

(i)      The position is in the field of study or a related field of study.  The position shall be considered to be in the field of study or a related field of study if it meets one of the following criteria:

(1)     the position is included on the list of job titles for the Graduate's/Completer's Program of Study published by the

institution and is included in the most recent CIP to SOC Crosswalk for the applicable CIP Code; *provided*, *however*, that it is understood that in an instance where a Graduate/Completer's actual job title is not listed on the CIP to SOC Crosswalk, CEC may include the job as a placement under this provision if the job title the Graduate/Completer obtained is listed as a "Lay Title" on the O*Net Code Connector for an SOC job title that is linked to the Graduate/Completer's Program CIP per the CIP to SOC Crosswalk and the job description by the employer for the job title the Graduate/Completer obtained matches the job description, tasks, and work activities for the SOC job title that is linked to the CIP for the Graduate/Completer's program; or

(2)     the position requires the Graduate/Completer to use, during a majority of the time while at work, the Core Skills listed in the institution's published program and course descriptions expected to have been taught in the Student's program; and the Graduate/Completer certifies in writing that the education received by the Graduate/Completer provided a benefit or advantage to the Graduate/Completer in performing the tasks entailed in such self-employment;

(ii)     The Graduate/Completer has received some compensation in return for services provided in connection with the self-employment;

(iii)     In the case of grant-funded or similar employment, the position is

anticipated to employ the Graduate/Completer for a period of no less than three (3) months; and

(iv)    CEC has verified the self-employment and the Graduate/Completer has either (a) completed at least 135 hours of work (including, for example, time devoted to marketing or other unpaid preparatory or developmental work) in connection with the Graduate/Completer's self-employment or (b) received no less than $4,500.00 in compensation, over a period of no more than ninety (90) days, in return for services provided in connection with the self-employment, provided that CEC has obtained written verification directly from the Graduate/Completer that includes:  (1) an attestation that s/he is self-employed with a description of the nature of the self-employment and (2) the number of hours worked and/or amount of compensation earned.

(c)    Federal Work/Study positions at CEC or any affiliated school shall not be counted as "employment" or "self-employment."

(d)    Continuing Employment.

(i)    Graduates/Completers continuing employment in a position that was held prior to enrolling in the Program of Study shall not be deemed "placed" unless:

(1)    the requirements of subsections (a)(i) through (a)(vi) of this paragraph are met; and

(2)    completing the Program of Study enabled the Graduate/Completer to maintain the position, or the Graduate/Completer earned a

promotion or an increase in pay as a result of completing the Program of Study.

(ii)   If a Graduate/Completer continuing in a pre-enrollment position enrolled in the Program of Study pursuant to an "established employer educational assistance program," and the conditions of subsection (d)(i)(2) of this paragraph are not satisfied, then the Graduate/Completer shall be excluded from the Job Placement Rate calculation. (The term "established employer educational assistance program" shall mean a program evidenced in writing in which an employer pays 50% or more of the cost of tuition for its employee to attend a Program of Study to gain skills related to the employee's current position with the employer.)

(e)   CEC's first calculation of the Job Placement Rate in accordance with the provisions of this AVC will be for the cohort of Graduates and Completers from July 1 through June 30 of the year following that time period in which this paragraph becomes effective.

69.   CEC shall implement a protocol for performance checks of those employees responsible for verifying, calculating, and/or disclosing job placement rates. Such performance checks shall be designed to provide a reliable assessment of the accuracy of disclosed job placement rates and compliance by CEC's employees, agents, and/or contractors with the verification, calculation, and disclosure of job placement rates. The performance checks shall be carried out regularly by CEC's compliance department or an independent third party, if used. If the institution obtains placement data by contacting employers and Completer/Graduates, the information should be documented in writing, including, to the

extent practicable, the name of the employer, name of the Student, address and telephone number of Student and employer, title of employment, duties of employment, length of employment, hours worked, the name and title of the person(s) providing the information to CEC, the name and title of the person(s) at CEC who received and recorded the information, and the date the information was provided. CEC shall maintain a copy of the above information for a period no less than three (3) years.

**Electronic Financial Impact Platform Disclosures**

70.   As soon as reasonably practicable after a Prospective Student has enrolled in a program for the first time and received a financial aid award letter, CEC shall provide the Student with a link such that the Student generates a required personalized disclosure using the Electronic Financial Impact Platform; *provided*, *however*, that Prospective Students who are ineligible for federal student aid or who are not borrowing funds to finance their education shall be exempt from this requirement. For the avoidance of doubt, in the event that a Student chooses to revisit the Electronic Financial Impact Platform after enrolling in a Program of Study, CEC shall not have any additional obligations to that Student under this paragraph. If a Student's refund period expires without the Student having received a financial aid award letter and link to the Electronic Financial Impact Platform, CEC shall Clearly and Conspicuously disclose to that Student that he or she may withdraw from his or her Program of Study without financial responsibility for any tuition and fees associated with the Student's class attendance that term. For purposes of this paragraph, the term "refund period" is described by paragraph 101 unless that paragraph does not apply, in which case the refund period is any time frame within which the Student is eligible to withdraw without financial liability for tuition and fees associated with attending classes.

71.   Within one hundred eighty (180) days of the Effective Date, CEC shall, in consultation with the Administrator and the Attorneys General, implement its Electronic Financial Impact Platform.  The link required in paragraph 70 may include a disclaimer that states: "This link is provided to you for informational purposes only and is not intended to provide, suggest, or imply financial advice of any kind."

## MISREPRESENTATIONS, PROHIBITIONS, AND REQUIRED CONDUCT

72.   In connection with the recruitment of any Prospective Students, CEC is prohibited from:

(a)   making any false, deceptive, or misleading statements;

(b)   omitting any material fact;

(c)   engaging in unfair practices (as that term is commonly understood in the context of consumer protection laws);

(d)   using any Unreasonable Recruitment Methods to persuade a Student to enroll or remain enrolled at a CEC institution; and

(e)   making any representation inconsistent with required Disclosures of the U.S. Department of Education found in Title 34 of the Code of Federal Regulations Chapter 668 as such regulations may be amended or recodified.

73.   In connection with any communication with Students or Prospective Students, CEC shall not:

(a)   make a false, misleading, or deceptive statement about any governmental (federal, state, or other) approval related to a Program of Study;

(b)   represent that a "recommendation" is required for acceptance into a Program of Study or that an Admissions Advisor must recommend the Student for acceptance prior to admission unless such recommendation is an independent requirement for

admission and is expressly stated in the catalog; or

(c)    provide inaccurate statistics regarding any statistic required to be disclosed by this AVC or by the U.S. Department of Education in Title 34 of the Code of Federal Regulation Chapter 668.

74.    In connection with any communication with Students or Prospective Students, CEC shall not make any false, deceptive, or misleading statements or guarantees concerning Student outcomes by:

(a)    misrepresenting that Students will be assured program completion or graduation;

(b)    misrepresenting that Students will be assured a job or employment following graduation; or

(c)    misrepresenting how many of the Student's credits will transfer in or out of the institution, or representing to the Student that any credits obtained while attending the institution are transferable (unless CEC receives written assurance from another school or transfer of credits is assured through an articulation agreement or is required by state law).

Notwithstanding the prohibitions contained in subparagraphs (a) through (c), CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about how many of the Students' or Prospective Students' credits obtained while attending other schools will transfer to a CEC institution.

75.    In connection with any communication with Students or Prospective Students concerning financial aid, CEC shall not:

(a)    make any false, deceptive, or misleading statements concerning whether a Student will receive financial aid or any particular amount of financial aid;

(b)      purport to guarantee a Student particular military or veteran benefit without proper documentation on file; or

(c)      imply that financial aid or military funding will cover the entire costs of tuition, the costs of books or supplies, or the costs of attending a Program of Study, including living expenses, if such is not the case.

Notwithstanding the prohibitions contained in subparagraphs (a) through (c), CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about the amount of financial aid they may be expected to receive.

76.     CEC shall not make express or implied false, deceptive, or misleading claims to Prospective Students with regard to the likelihood of obtaining employment as a result of enrolling, including but not limited to misrepresenting:

(a)      the percentage, rate, or portion of Students who obtain employment following the completion of a Program of Study;

(b)      the annual starting salary for persons employed in a given field;

(c)      the annual starting salary of Graduates employed in a given field; and

(d)      the annual starting salary of Graduates.

77.     CEC shall not make any express or implied false, deceptive, or misleading claims that Program Completion Rates, job placement rates, or annual salaries that are generally applicable to CEC are equivalent to those for a specific Program of Study or that institution-wide rates for a Program of Study are equivalent to those for a specific campus.

78.     CEC shall not make express or implied false, deceptive, or misleading claims to Students or Prospective Students with regard to the ability to obtain a license or certification from a third party as a result of enrolling in a Program of Study, including but not limited to

misrepresenting:

(a)     whether the Program of Study will qualify a Student to sit for a licensure exam, if any;

(b)     the types of licensure exams Students are eligible to sit for;

(c)     the states where completion of the Program of Study will qualify a Student to take an exam or attain immediate authorization to work in the field of study;

(d)     the passage rates of graduates from that Program of Study;

(e)     the states where completion of the Program of Study will not qualify a Student to sit for a licensure exam or attain immediate authorization to work in the field of study; and

(f)     the states where a Student may be qualified to work within a profession if the Student must meet other requirements to be employed in such states.

79.     CEC shall not make express or implied false, deceptive, or misleading claims to Prospective Students with regard to the academic standing of its programs and faculty, including but not limited to misrepresenting:

(a)     the transferability, or lack thereof, of any credits, including but not limited to any credits for which the Student wishes to receive credit from a CEC institution and for all credits from a CEC institution for which the Student may wish to receive credit from another school, provided however, that CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about how many of the Students' or Prospective Students' credits obtained while attending other schools will transfer to a CEC institution;

(b)     the accreditation and the name of the accrediting organization(s);

(c)     the Student/faculty ratio;

(d)     the percentage of faculty holding advance degrees in the program;

(e)     the names and academic qualifications of all full-time faculty members;

(f)     the course credits and any requirements for satisfactorily completing a Program of Study, such as clinicals, internships, and externships; and

(g)     the Program Completion Rates for each of its offered Programs of Study.

80.   CEC shall not make express or implied false or misleading claims to Prospective Students regarding actual or potential financial obligations the Student will incur regarding a Program of Study, including but not limited to:

(a)     the Cost of Attendance;

(b)     the Anticipated Total Direct Cost the Student will incur to complete the Program of Study;

(c)     the Program Cohort Default Rate; and

(d)     the Median Debt of Completers of each Program of Study.

81.   CEC shall provide all Admissions Advisors and Student Financial Aid Advisors with the information reasonably necessary to inform Prospective Students about CEC and its Programs of Study, including but not limited to the Single-Page Disclosure Sheet, and if a representative of CEC truthfully advises a Student or Prospective Student that he or she does not have the information requested by the Student or Prospective Student at hand, then CEC shall subsequently, to the extent such information is reasonably ascertainable prior to the expiration of the applicable refund period established by paragraph 101 (or, if no such refund period applies, prior to the first day of the Student's semester, quarter, or payment term), provide such information.

82.   Except as set forth in paragraph 84, CEC shall not represent in advertising, marketing, or promotional materials or otherwise that graduates of a Program of Study would be qualified for a particular occupation if that Program of Study lacks an accreditation necessary to qualify graduates for such occupation.

83.   Except as set forth in paragraph 84, for Programs of Study that prepare Students for employment in fields that require Students to obtain state licensure or authorization for such employment, CEC shall not enroll Students in the Program of Study if graduation from the Program of Study would not qualify such Students for state licensure or authorization or to take the exams required for such licensure or authorization in the state in which:

   (a)   the CEC campus is located, if the Program of Study is offered at an on-ground campus;

   (b)   the Prospective Student resides, if the student resides in a different state from the on-ground campus; or

   (c)   the Prospective Student resides if the Program of Study is offered online.

84.   The prohibitions established by paragraphs 82 and 83 shall not apply if:

   (a)   the Program of Study is a new program that cannot obtain a programmatic accreditation that would be necessary to qualify Students for state licensure or authorization or to take exams required for such licensure or authorization in the relevant state until the program is operational, the institution is making a good faith effort to obtain the necessary programmatic accreditation in a timely manner, the institution Clearly and Conspicuously discloses to Prospective Students on all promotional materials for the Program of Study and in a Clear and Conspicuous

written disclosure prior to the Student signing an Enrollment Agreement that such programmatic accreditation would need to be obtained before the Student would qualify for state licensure or authorization or to take exams required for such licensure or authorization, and CEC teaches-out the program if the institution's application for accreditation for a program subject to this paragraph is denied, and it is not subject to further review;

(b)     the Prospective Student has notified CEC in writing that the Student intends to seek employment in a state where the program does lead to immediate state licensure or authorization or qualification to take the exams required for such licensure or authorization;

(c)     the Prospective Student has already completed some of the coursework necessary to complete the Program of Study and is seeking re-enrollment, and CEC advises the Prospective Student Clearly and Conspicuously in writing prior to re-enrollment that completion of the Program of Study is not expected to qualify the Student for state licensure or authorization or to take exams required for such licensure or authorization; or

(d)     the reason that graduation from the Program of Study would not qualify the Prospective Student for state licensure or authorization or to take the exams required for such licensure or authorization is that the Prospective Student has a criminal record that is disqualifying, and CEC has complied with the disclosure and acknowledgement requirements of paragraph 87.

85.    CEC shall take reasonable measures to arrange and facilitate sufficient placements for Students in internships, externships, practicums, or clinicals that are prerequisites for

graduation, licensure, or certification; *provided, however*, that nothing herein shall prevent a CEC institution from requiring its Students to seek to obtain an internship, externship, practicum, or clinical through their own efforts in the first instance.

86. CEC shall not knowingly enroll a Student in a Program of Study that does not possess the programmatic accreditation typically required by employers in the Student's state of residence for employment, except where a Student has indicated the intention to seek employment in a different state in which employers do not typically require programmatic accreditation for that Program of Study, or where the Program of Study does possess the programmatic accreditation typically required by employers in that state. "Typically" shall mean 75% or more of job opportunities in a particular occupation are open only to graduates of a school with certain accreditation(s) and/or an academic program with certain programmatic accreditation(s). CEC shall make reasonable efforts to assess employer requirements in states where they enroll Students.

87. If CEC knows that a criminal record may disqualify a Student from employment in the field or a related field for which the Program of Study is a prerequisite, then CEC shall (a) Clearly and Conspicuously disclose that a criminal record may disqualify the Student for the chosen field or related field of employment and (b) require the Student's acknowledgment of such disclosure in writing at or before the time of enrollment. If CEC knows that a criminal record will disqualify a Student from employment in the field or a related field for which the Program of Study is a prerequisite, then CEC shall (a) Clearly and Conspicuously disclose that a criminal record will be disqualifying and (b) require the Student's acknowledgment of such disclosure in writing at or before the time of enrollment.

88. Arbitrations between CEC and any Student shall not be protected or treated as confidential

proceedings, unless confidentiality is required by law or the Student requests confidentiality. CEC shall not ask or require any Student, participant, or witness to agree to keep the arbitration confidential, unless confidentiality is required by law. Nothing in this paragraph shall prevent CEC from asking the arbitrator to designate arbitration materials as a trade secret or proprietary information subject to nondisclosure. Except as may be prohibited by law or a Student request for confidentiality, and subject to appropriate assertions of the following:

(a)     the attorney-client privilege and/or the attorney-work-product doctrine; and

(b)     compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g;

the Administrator and the Attorneys General shall not be prohibited from reviewing or inspecting the parties, proceedings, and evidence pertaining to any arbitration involving a Student that commences after the Effective Date of this AVC. The Administrator and the Attorneys General shall not, to the extent permitted by law, disclose any of CEC's properly designated trade secrets or proprietary information that appear in arbitration materials.

89.    CEC shall not adopt any policy or engage in any practice that delays or prevents Students with complaints or grievances against CEC from contacting any accrediting body, state or federal regulator, or Attorney General regarding the complaint or grievance. Notwithstanding anything to the contrary in this paragraph, CEC shall be permitted to encourage Prospective Students and Students to file any complaint or grievance with CEC in the first instance, so long as CEC does not represent or imply that Students are required to file their complaints or grievances with CEC before contacting any accrediting body, state or federal regulator, or Attorney General regarding the complaint or grievance, unless

the accrediting body, state or federal regulator, or Attorney General so requires.

## CEC RECRUITING PRACTICES

90.    CEC shall not engage in any false, misleading, deceptive, abusive, or unfair acts or
practices (as those terms are commonly understood in the context of consumer protection
laws) when recruiting Prospective Students, including during the orientation program and
refund periods referenced in paragraphs 100 and 101.

91.    CEC shall not use Unreasonable Recruitment Methods when communicating with
Prospective Students during the admissions and enrollment process.  CEC shall train
Admissions Advisors and other employees to avoid use of Unreasonable Recruitment
Methods.  CEC shall audit its communications with Prospective Students, including those
of its Admissions Advisors, to ensure that Unreasonable Recruitment Methods are not
being used.  CEC shall make the results of such audits reasonably available to the
Administrator and the Attorneys General upon request.

92.    CEC shall record all telephone calls and online chats between Admissions Advisors or
Financial Aid Advisors, on the one hand, Students and Prospective Students, on the other,
subject to interruptions in the ordinary course of business; *provided*, *however,* that CEC
shall not be required to record telephone calls between Students and Admissions Advisors
when the purpose of the telephone call or online chat is not to discuss recruiting,
admissions, or financial aid related to admissions, but the Admissions Advisor is instead
serving an advisory role related to the Student's performance in the Program of Study.  This
provision shall not require CEC to record telephone calls or online chats placed or received
on personal devices, such as cell phones.  Admissions Advisors and Financial Aid Advisors
will be trained not to engage in communications with Students on personal devices.  During

the term of this AVC, CEC shall continue to retain its current third party vendor, or a vendor who employs comparative services, for call recording under this paragraph and for automated voice interaction analytics.  Any decision to switch from its current vendor to another vendor shall be done in consultation with and approval by the Administrator.  CEC shall make the call recordings required under this paragraph reasonably available to the Administrator and the Attorneys General upon request.

93. Notwithstanding anything to the contrary in this AVC, CEC shall not be required to record a telephone conversation if the Student or Prospective Student, after receiving the disclosure required by paragraph 95, objects to the conversation being recorded, nor shall CEC be prohibited from continuing a telephone conversation with a Student or Prospective Student on an unrecorded line once such an objection has been made; *provided*, *however*, that CEC shall be prohibited from encouraging Students or Prospective Students to object to recording the conversation.

94. Call recordings and online chats shall be maintained for a period not less than ninety (90) days after the date of the call.  The Administrator shall have full and complete access to all recordings via the voice analytics platform.

95. CEC shall inform a Prospective Student at the outset of any telephone call after the initial greeting that the call may be being recorded.  CEC shall be permitted to make this disclosure in pre-recorded form.

96. CEC shall not initiate unsolicited telephone calls to a Prospective Student's telephone number that appears on any current Do Not Call Registry.  CEC shall keep an accurate record of and comply with any request to not receive further telephone calls.  CEC shall not initiate any outbound telephone calls to a person who has previously stated to CEC that

he or she does not wish to receive telephone calls from CEC, or who has expressed a desire not to be contacted anymore by CEC, or who has requested that they be placed on CEC's internal do-not-call list, unless the person has made a renewed request for contact or has otherwise indicated a desire to again receive calls from CEC.

97.   CEC shall not continue a telephone call after a Prospective Student has expressed a desire to conclude the call or has clearly stated that he/she does not want to apply to or enroll at a CEC institution.

98.   CEC shall not prevent a Prospective Student from consulting with or obtaining advice from a parent, adult friend, or relative with respect to any issue relevant to enrollment.

99.   CEC shall invite Prospective Students under the age of eighteen (18) to bring an adult with them to any interview/meeting on campus prior to enrollment.

<u>**REQUIRED ORIENTATION AND REFUND PROVISIONS**</u>

100.   CEC shall require all incoming Students (other than graduate Students and Students who have already obtained twenty-four (24) or more credits at the post-secondary education level) to complete an online and/or in-person orientation program prior to the Student's first class at no cost to the Student.  This orientation program shall be approved by the Administrator in consultation with the Attorneys General.  This orientation program shall address such topics as study skills, organization, literacy, financial skills, and computer competency.  A Student may withdraw from enrollment in a Program of Study at any time during the orientation program without any cost, and any grants or financial aid received directly from a grantor or lender on behalf of the Student shall be returned to the grantor or lender.  In the alternative, and in lieu of the orientation described above, CEC may satisfy its obligation by requiring all incoming Students (other than graduate Students and

Students who have already obtained twenty-four (24) or more credits at the post-secondary education level) to complete a college readiness course components of which will address the topics referenced above and the content of which will be approved by the Administrator in consultation with the Attorneys General. If CEC elects to offer a college readiness course, CEC shall give Students enrolled in the course a Clear and Conspicuous disclosure of the refund provision contained in paragraph 101 within ten (10) days after the start of the course.

101. All Students who are newly enrolled in any fully online Program of Study at CEC institution (other than graduate Students and Students who have already obtained twenty-four (24) or more online credits at the post-secondary education level) shall be permitted to withdraw within the first twenty-one (21) days of the first day of the Student's semester, quarter, or (with respect to students enrolled in a non-term program) payment term at the CEC institution in which the Student enrolled. If a Student's credits are from a university that predominantly offers online programs, CEC can count the Student's credits towards the 24 online credit threshold. All Students who are newly enrolled in any on-ground Program of Study at a CEC institution (other than graduate Students) shall be permitted to withdraw within the first seven (7) days of the first day of the Student's first session, at the CEC institution in which the Student enrolled. CEC shall Clearly and Conspicuously disclose the availability of the refund periods described in this paragraph in the Enrollment Agreement or in a separate written disclosure prior to starting class. CEC shall not hold a qualifying Student who withdraws in accordance with this paragraph liable for any tuition and fees associated with attending classes and shall return to grantors or lenders any grants and financial aid received directly from a grantor or lender for or on behalf of the Student.

Under no circumstances shall the time of a Student's attendance in the orientation program required pursuant to paragraph 100 be included in the refund periods required pursuant to this paragraph.

102.   Except for qualifying Students who withdraw during the new Student orientation program required pursuant to paragraph 100 or the applicable refund period established by paragraph 101, when a Student withdraws from a Program of Study, CEC may retain or be entitled to payment for a percentage of any tuition and fees and other educational costs earned, based on the percentage of the enrollment period attended by the Student, subject to the CEC institution's internal refund policies and applicable law; *provided*, *however*, that where a student has not attended sixty (60) percent of the academic term as calculated in accordance with 34 CFR 668.22, CEC shall not retain or be entitled to payment for a percentage of any tuition and fees or other educational costs for a class that was scheduled to be taken during the relevant academic term but was not attended because the student withdrew from school prior to the commencement of the class.  Except as mandated by changes to federal or state laws or regulations, no CEC institution shall change its internal policy with respect to calculating the percentage of tuition and fees and other educational costs that a Student remains obligated to pay upon withdrawal in a manner that results in the policy becoming less favorable to Students unless CEC obtains the prior approval of the Administrator or, if the Administrator's term has expired, the Executive Committee. CEC shall comply with all state and federal record-keeping requirements for documenting Student attendance and determining dates of withdrawal.

103.   CEC shall comply with applicable state and federal law specifying the amounts owed by or to be refunded to Students to the extent their application would result in a greater refund

or lower cost for a Student than is otherwise required herein.

## THIRD-PARTY LEAD VENDOR REQUIREMENTS

104.    CEC shall require that all contracts with Third-Party Lead Vendors who provide it with

lead generation services include each of the following:

(a)    a provision requiring that the Third-Party Lead Vendor comply with:

(i)    CEC's lead aggregator guidelines in effect at the time of contracting or as

may be modified subsequently, subject to approval by the Administrator;

(ii)    all applicable state and federal consumer protection laws;

(iii)    if and when applicable to CEC, all provisions in the Code of Conduct

referenced in paragraph 105; and

(iv)    all provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227;

(b)    a prohibition on attracting Students or obtaining leads by misleading advertising

suggesting available employment opportunities rather than educational

opportunities;

(c)    a prohibition on representing that a Student or Prospective Student is guaranteed to

receive "free" financing from the federal or a state government; *provided*, *however*,

that CEC may permit its Third-Party Lead Vendors to represent that grants and

scholarships may be available and would not need to be repaid;

(d)    a prohibition on representing that loans are grants that do not carry with them an

obligation to be repaid;

(e)    a provision prohibiting Third-Party Lead Vendors from transferring a Prospective

Student inquiry to a CEC institution unless the Prospective Student has expressly

informed the Third-Party Lead Vendor that he or she is interested in educational

opportunities.  Prior to transferring a Prospective Student to a CEC institution, Third-Party Lead Vendors shall be required to ask the Prospective Student if they are interested in educational opportunities.  Should the Prospective Student say "no," or otherwise provide a clear negative response as to their interest in pursuing educational opportunities, the Prospective Student cannot be directed to a CEC institution.  Should the Prospective Student say "I'm not sure," or otherwise provide an equivocal response as to their interest in pursuing educational opportunities as opposed to job opportunities, the Third-Party Lead Vendor shall be permitted to describe the advantages an education may provide in creating additional job opportunities, but in so doing, the Third-Party Lead Vendor shall be prohibited from referencing any specific salary amounts.  The Third-Party Lead Vendor shall then again ask the Prospective Student if they are interested in educational opportunities.  Should the Prospective Student respond by providing a clear and affirmative indication that they are interested in educational opportunities, the Third-Party Lead Vendor shall be permitted to continue transferring the Prospective Student to a CEC institution; otherwise, the Prospective Student cannot be transferred to a CEC institution.  In all events, prior to transferring any Prospective Student to a representative of any CEC institution, Third-Party Lead Vendors shall be required to confirm the Prospective Student's interest in pursuing educational opportunities; and

(f)     a requirement that all Third-Party Lead Vendors begin calls made on behalf of CEC with the following statement immediately after the Prospective Student answers the phone, "This is [insert company], this call may be recorded for quality assurance

and training purposes," or words to that effect.  Should the Prospective Student that answers the phone transfer the call to another Prospective Student, the preceding statement must be repeated for this Prospective Student and any other Prospective Student that may be later connected to the call.  Additionally, the Third-Party Lead Vendor will clearly state that "this call may be recorded for quality assurance and training purposes" before transferring a call to CEC.

105.    In addition, CEC shall negotiate in good faith with the Attorneys General and other post-secondary educational institutions with the goal of codifying a Code of Conduct that may be amended from time to time, for the recruitment of Students through Third-Party Lead Vendors.  The Code of Conduct shall include provisions to help ensure that Third-Party Lead Vendors do not make misleading claims or use misleading solicitation strategies when generating leads for post-secondary educational institutions.  CEC shall be bound to abide by the provisions of the Code of Conduct that post-secondary educational institutions agree to follow and implement as long as those provisions do not conflict with any other requirement of this AVC.  CEC shall not be obligated to abide by the Code of Conduct provisions unless and until the Code of Conduct becomes effective as to industry participants representing (together with CEC) at least 50% of students enrolled in for-profit schools, with such percentage to be calculated using the most recent available data from The Integrated Postsecondary Education Data System regarding student enrollments at four-year and two-year post-secondary educational institutions that award degrees at the associate's degree level or above.  All parties shall use reasonable efforts to encourage the participation of Third-Party Lead Vendors in the Code of Conduct.

(a)      During the term of this AVC, CEC shall continue to retain its current third-party

vendor, or a vendor who employs comparative services, to monitor the conduct of CEC's Third-Party Lead Vendors and monitor that they are complying with the contractual terms set forth in paragraph 104, including but not limited to whether the Third-Party Lead Vendors are using any unfair, false, misleading, deceptive, or abusive acts or practices (as those terms are commonly understood in the context of consumer protection laws), and the use of any incentive, discount, or inducement of any kind to encourage Student inquiries or otherwise used to recruit Students. Any decision to switch from its current vendor to another vendor shall be done in consultation with and approval by the Administrator.

106.    If CEC learns that a Third-Party Lead Vendor or a sub-vendor, which for the purposes of this paragraph shall mean a third-party utilized by a Third-Party Lead Vendor to assist it in providing Prospective Student inquiries to CEC, that provides services to the Third-Party Lead Vendor has failed to materially comply with the contractual terms set forth in paragraphs 104(a)(ii) through 104(f), or has failed to materially comply with any of CEC's Lead Aggregator Guidelines that would give rise to a violation of paragraphs 104(a)(ii) through 104(a)(iv) ("a Violation"), CEC shall retain a record of such Violation (which record shall be available to the Administrator and the Attorneys General upon request) for a period of two (2) years and shall address such Violation by taking corrective action against the segment of the Third-Party Lead Vendor's business in which the Violation occurred (for example, if the Third-Party Lead Vendor commits a Violation related to a webpage, electronic solicitation, or other online advertisement, CEC shall not be required to take corrective action against that Third-Party Lead Vendor with respect to any call center, that the Third-Party Lead Vendor may be providing to CEC) or by demanding

corrective action against the sub-vendor as follows:

(a)     First Violation within any rolling 12-month period:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform the Third-Party Lead Vendor and pause the campaign, or if the Violation was committed by a sub-vendor, demand that the Third-Party Lead Vendor pause the sub-vendor's participation in the campaign, until the Violation is corrected;

(b)     Second Repeated Violation within any rolling 12-month period:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform the Third-Party Lead Vendor and pause the campaign, or if the Violation was committed by a sub-vendor, demand that the Third-Party Lead Vendor pause the sub-vendor's participation in the campaign, for thirty (30) days or until the Violation is corrected, whichever is longer; and

(c)     Third Repeated Violation within any rolling 12-month period:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform

the Third-Party Lead Vendor that the segment of the Third-Party Lead Vendor's business in which the Violations occurred shall be removed from CEC's vendor list for a period of at least one (1) year, or if the Violation was committed by a sub-vendor, that the Third-Party Lead Vendor must cease using the sub-vendor for CEC's account for a period of at least one (1) year;

*provided*, *however*, that nothing in this paragraph shall be deemed to limit or otherwise affect CEC's obligations under paragraph 107 of this AVC.

107. Termination Violations.

(a)     For purposes of this paragraph, a "Termination Violation" means any one of the following occurrences:

(i)     a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement references both a post-secondary educational opportunity and an employment opportunity, and the webpage, electronic solicitation, or online advertisement (1) uses a substantially smaller font size to present the educational opportunity as compared with the employment opportunity or (2) represents the educational opportunity as a "want ad" or employment application;

(ii)    a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement states that the Prospective Student (1) is eligible for a scholarship, grant, or financial aid as the result of having already won a drawing or raffle, (2) has been specially selected to receive a scholarship, grant, or financial aid, or (3) is entitled to receive compensation to fund his or her education in exchange for completing a form; or

       (iii)    a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement states that a Prospective Student will receive compensation to fund his or her post-secondary education that will not need to be repaid, unless the statement refers to grants that are expressly stated to be subject to eligibility.

    (b)    Notwithstanding anything in paragraph 106 to the contrary, in the event that a Third-Party Lead Vendor incurs three Termination Violations within a 180-day period, CEC shall, within thirty (30) days of discovering the third such Termination Violation, terminate any outstanding insertion orders to the segment of the Third-Party Lead Vendor's business in which the Termination Violations occurred and not issue any new insertion orders to that business segment for at least ninety (90) days if the Termination Violations were attributable to the Third-Party Lead Vendor, or if the Termination Violations were attributable to a sub-vendor, demand that the Third-Party Lead Vendor must cease using the sub-vendor for CEC's account a period of at least ninety (90) days; *provided*, *however*, that the requirements of this subparagraph shall not apply if the CEC and/or the Third-Party Lead Vendor document to the reasonable satisfaction of the Administrator that the three Termination Violations that would otherwise have triggered the requirements of this subparagraph represented, in the aggregate, no more than 1% of the total Prospective Student leads from the Third-Party Lead Vendor during the relevant period.

108.    Upon written notice from the Attorneys General or Administrator that a Third-Party Lead Vendor has failed to comply with the contractual terms set forth in paragraph 104 of this

AVC, or any provision of an applicable state consumer protection law, CEC shall conduct an investigation of the Third-Party Lead Vendor practice and report the results of that investigation to the Attorneys General and to the Administrator within thirty (30) days, unless the Attorneys General agree otherwise.

109.    CEC shall maintain policies and procedures and take appropriate action, including but not limited to exercising any rights available to it under a contract, to require Third-Party Lead Vendors to comply with this AVC.  Appropriate action shall be determined by the nature and circumstance of the alleged Violation, including but not limited to the pattern or severity of the alleged conduct.

110.    Subject to the prior approval of the U.S. Department of Education, CEC shall work in good faith to develop and implement a system of paying Third-Party Lead Vendors based on the actual quality of leads produced by the particular vendor.

111.    Nothing in this AVC limits the right of the Attorneys General to investigate or take any action against Third-Party Lead Vendors for any violation of applicable law, nor shall anything in this AVC be construed to limit the remedies available to the Attorneys General for any violation of applicable law by Third-Party Lead Vendors.

## ENFORCEMENT

112.    The terms of this paragraph apply only during the term of the Administrator.

(a)     If at any time it appears that CEC is engaged in a practice or pattern of non-compliance with this AVC, or commits an egregious act of non-compliance with this AVC, either on the basis of information obtained by the Administrator pursuant to the Work Plan or from information obtained through any other source, then the Administrator shall review the relevant facts, collect whatever additional facts the

Administrator deems necessary, and seek CEC's position as to the practice, pattern, or egregious act of alleged non-compliance and related instances of individual violations.  If the Administrator's review establishes either a pattern or practice of non-compliance or egregious act of non-compliance with this AVC, then the Administrator shall work in conjunction with CEC to devise a corrective action plan to remedy such practice or pattern of non-compliance, including a reasonable period for corrective action and implementation of such plan.  To the extent that the Administrator and CEC are unable to agree to a corrective action plan, the Attorneys General may take whatever action they deem necessary, including but not limited to bringing an action to enforce this AVC, filing a new original action, conducting further investigation, or attempting to negotiate a corrective action plan directly with CEC.  Should the Attorneys General choose to file a new original action, nothing referred to in this paragraph shall affect the release in paragraph 131.

(b)     At a reasonable time following the period for corrective action, the Administrator shall provide a report to the Executive Committee, setting forth:

(i)     a description of the practice or pattern of non-compliance and related instances of individual violations of this AVC (including the relevant facts);

(ii)    a description of the corrective action plan;

(iii)   findings by the Administrator as to whether the Administrator deems it reasonably likely that CEC is in substantial compliance with the terms of this AVC, including but not limited to whether CEC has ceased to engage in a practice or pattern of non-compliance; and

        (iv)     a description of CEC's views as to the foregoing matters.

(c)      The Attorneys General agree that they will meet and confer with CEC concerning the subject of the action before filing any action related to this AVC, so long as CEC makes necessary representatives available to meet and confer in a timely manner.  However, an Attorney General may take any action where the Attorney General concludes that, because of a specific practice, an imminent threat to the health, safety, or welfare of the citizens of the State exists, or the practice creates a public emergency requiring immediate action.

(d)      The Attorneys General agree that no action may be filed to enforce the terms of this AVC unless they have proceeded as set forth in this paragraph.  However, an Attorney General may take any action where the Attorney General concludes that, because of a specific practice, an imminent threat to the health, safety, or welfare of the citizens of the State exists, or the practice creates a public emergency requiring immediate action.

113.   The terms of this paragraph shall apply following the term of the Administrator.

(a)      For the purposes of resolving disputes with respect to compliance with this AVC, should any of the Attorneys General have a reasonable basis to believe that CEC has engaged in a practice that violates a provision of this AVC and decide to pursue the matter, then such Attorney General shall notify CEC in writing of the specific practice in question, identify with particularity the provision of this AVC that the practice appears to violate, and give CEC thirty (30) days to respond to the notification.  Within thirty (30) days of its receipt of such written notice, CEC shall provide a good-faith written response to the Attorney General notification,

containing either a statement explaining why CEC believes it is in compliance with this AVC, or a detailed explanation of how the alleged violation occurred and a statement explaining how CEC intends to remedy the alleged breach.

(b)     Should any of the Attorneys General have a reasonable basis to believe that CEC has engaged in a practice that violates a provision of this AVC and decide to pursue the matter, and following notice to CEC as provided in subparagraph (a), CEC shall provide the Attorneys General reasonable access to inspect and copy relevant, non-privileged records and documents in the possession, custody, or control of CEC that relate to CEC's compliance with the identified practice that the Attorneys General believe may violate this AVC.  If the Attorneys General make or request copies of any documents during the course of that inspection, the Attorneys General will provide a list of those documents to CEC.  This provision does not limit the rights of the Attorneys General to otherwise serve subpoenas or CIDs on CEC or to enforce them.

(c)     The Attorneys General may assert any claim that CEC has violated this AVC in a separate civil action to enforce compliance with this AVC, or may seek any other relief afforded by law to enforce compliance with this AVC, but only after providing CEC an opportunity to respond to the notification described in subparagraph (a); *provided*, *however*, that an Attorney General may take any action if the Attorney General concludes that a specific practice alleged to be in violation of this AVC requires immediate action due to an imminent threat to the health, safety, or welfare of the public, or the practice creates a public emergency requiring immediate action.

114.   The Attorneys General agree to make good faith efforts to coordinate any future efforts to enforce violations of this AVC to the extent they are reasonably able to do so.  To that end, each Attorney General agrees to provide notice to the Executive Committee at least ten (10) business days prior to the filing of any action to enforce this AVC against any of the parties released from liability pursuant to paragraph 131.  However, nothing in this paragraph shall be construed so as to limit the right of a state to enforce any law in any action by that state not related to enforcement of compliance with this AVC.  In addition, the notice requirement stated herein shall not apply to the extent that the relevant Attorney General concludes that further delay in acting constitutes a threat to public health, safety, or welfare, or that the action intended to be taken addresses a public emergency requiring immediate action.  For the avoidance of doubt, nothing in this paragraph shall relieve the Attorneys General of the requirements of paragraphs 112 and 113 of this AVC, which must be satisfied before any Attorney General may provide the notices required by this paragraph.

115.   Subject to the release set forth in paragraph 131, nothing in this AVC limits the right of the Attorneys General to conduct investigations or examinations or file suit for any violation of applicable law, not related to the enforcement of compliance with this AVC nor shall anything in this AVC be construed to limit the remedies available to the Attorneys General for any violation of applicable law that is not released by this AVC.  For the avoidance of doubt, nothing in this paragraph shall be construed to modify the procedures to be followed prior to the filing of an action to enforce the terms of this AVC, as set forth in paragraphs 112 through 114.

## INSTITUTIONAL RECEIVABLES

116.  For purposes of this paragraph and paragraph 117, a "Qualifying Former Student" means any former student whose last known address at the time of the Effective Date is in a state that is a party to this AVC and either (a) attended a CEC institution which was closed prior to the Effective Date or is currently scheduled to close before December 31, 2018; or (b) whose final day of attendance at AIU or CTU occurred on or before December 31, 2013. As partial consideration for the release set forth in paragraph 131, without any admission of wrongdoing, CEC agrees to forgo any and all efforts to collect any amounts that are owed to CEC by such Qualifying Former Students (hereinafter "Institutional Receivables") on the first day of the month following after the Effective Date which amounts totaled, as of December 1, 2018, approximately $493,687,220.00. The parties agree that issuance of 1099s is not required, and that 1099s will not be issued to Qualifying Former Students. For the avoidance of doubt, Institutional Receivables shall not include any amounts that are owed to non-CEC entities, such as, for example, federal student loans owed to the United States government. In the event that any Qualifying Former Student or a co-signer for a Qualifying Former Student attempts to make a payment to CEC after the first day of the month following thirty (30) days after the Effective Date that relates to Institutional Receivables, CEC shall use all reasonable efforts to refuse such payment and return the payment. CEC shall request that any and all trade line information related to amounts covered by this paragraph be deleted from Qualifying Former Students' credit reports, to the extent that such trade line information exists, at CEC's own expense. For the avoidance of doubt, it is not the Parties' intent to allow Qualifying Former Students to recover the amounts CEC is foregoing collection of pursuant to this paragraph in any other forum.

117.   On or before sixty (60) days after the Effective Date, CEC shall send a letter by U.S. mail to each Qualifying Former Student at his or her last known mailing address notifying such former students that CEC are forgoing collection on their Institutional Debt, including all interest and fees.  The notice shall state that due to a recent settlement with the Attorneys General the student's account balance owing to CEC is $0 and shall encourage the student to advise any and all co-signers that the student's account balance owing to CEC has been reduced to $0.  The notice shall also inform the student that CEC will send a copy of the notice to each of the credit reporting agencies (*i.e.*, TransUnion, Equifax, and Experian).  The notice shall further inform the student that if the student finds that the amounts owed to CEC by the student are still erroneously appearing on the student's credit report after one hundred and twenty (120) days and notifies CEC, then CEC, at its own expense, shall promptly and properly notify the appropriate credit reporting agency, whether directly or indirectly, of any change(s) to be made to the credit reporting resulting from the application of the terms of this AVC.  The notice shall provide CEC's contact information for making a request to correct a credit report and for any additional inquiries about the student's account.

## PAYMENT TO THE STATES

118.   CEC shall pay $5 million (the "Payment Amount") to the Attorneys General.  CEC and the Attorneys General agree that CEC shall make this payment according to instructions communicated to CEC by the Attorneys General of the State of Connecticut and the State of Iowa, including allocated distributions to the Attorneys General as determined by the Executive Committee and a payment of $500,000.00 to the National Association of Attorneys General Financial Services and Consumer Protection Fund and $250,000.00 to

the State Center.  The Texas Attorney General shall receive a payment of $50,000.00. Payment by CEC shall be made no later than thirty (30) days after the Effective Date of this AVC and after CEC's receipt of such payment instructions.  The Executive Committee shall, in its sole discretion, determine the amount to be allocated to each Attorney General from the Payment Amount.  Each Attorney General may, at his or her sole discretion, use such allocation for any purpose or expenditure permitted by law, including but not limited to attorneys' fees and other costs, and/or for any other consumer protection purpose. However, no portion of the Payment Amount or such allocation shall be characterized as the payment by CEC of a fine, civil penalty, or forfeiture.

## TIME TO IMPLEMENT AND DURATION

119. Except as otherwise provided in paragraphs 116 and 117 and Exhibit A hereto, CEC shall implement the terms of this AVC by no later than the Effective Date.

120. With respect to each of the paragraphs of this AVC listed in Exhibit A hereto, CEC shall implement the terms of the relevant paragraph of this AVC by no later than the date set forth in Exhibit A.

121. Except as otherwise provided in paragraphs 37 and 48, CEC shall be relieved of its obligations under this AVC on the sixth anniversary of the Effective Date; provided, however, that CEC's obligations under paragraphs 72 through 80, 82, 90, 91 (first sentence only), and 133 through 139 of this AVC shall remain in effect unless and until the AVC is terminated or modified by the Parties.

122. Beginning on the fourth anniversary of the Effective Date, CEC shall have the right to petition the Executive Committee to be relieved of its obligations under specific identified paragraphs of this AVC that CEC believes have become overly burdensome or

unnecessary.  CEC shall set forth in writing the reasons why it believes it should be relieved

from such obligations and any additional factors that it would like the Executive Committee

to consider.  Moreover, if the U.S. Department of Education adopts regulations that

establish a uniform approach for the calculation and disclosure of job placement rates that

is applicable to CEC institutions, then CEC may petition the Executive Committee to be

relieved of its obligations under paragraph 23 and paragraphs 61 through 69 on the date

when such regulations become effective.  The Executive Committee shall consider any

petitions made by CEC in good faith and, in each case, the Executive Committee shall be

obligated to meet and confer with CEC within sixty (60) days of the request being sent and

to make a recommendation about the petition to the Attorneys General within sixty (60)

days thereafter.

123.　In the event that CEC sells or otherwise transfers control of American InterContinental

University or Colorado Technical University, to a third-party acquirer (the "Acquiring

Company"), and the Acquiring Company becomes subject to the terms of this AVC as a

successor to CEC, the Acquiring Company shall assume CEC's rights to petition under this

paragraph with respect to the institutions sold or transferred by CEC.

## MISCELLANEOUS PROVISIONS

124.　All obligations undertaken by CEC under this AVC shall apply prospectively.  Nothing

herein, including the powers and duties of the Administrator to review CEC's compliance

with this AVC shall apply to any of the schools owned or operated by Career Education

Corporation fully taught out by December 31, 2018.

125.　Nothing in this AVC shall override or prevent CEC from complying with its obligations

under the August 19, 2013 Assurance of Voluntary Discontinuance with the New York

Attorney General, including its obligations regarding placement rate disclosures.

126.   During the term of this AVC, if the position of the Administrator is vacant, then, to the extent that this AVC or the Work Plan referenced in paragraph 35 requires the Administrator's approval or consent for CEC to take a particular action, then CEC shall be entitled to take that action if it notifies the Attorneys General of its intent to act and the Attorneys General fail to object with particularity within thirty (30) days.  If the Attorneys General object and particularize the bases for the objection within the thirty (30) day period, then the Parties shall promptly meet and confer, following which CEC shall be entitled to seek judicial review with regard to the objection if necessary.

127.   Either the Attorneys General or CEC may request to meet and confer with respect to any aspect of this AVC or its implementation by notifying the other party.  The notice shall state the subjects proposed to be discussed.  The recipient of the notice shall in good faith make itself and/or its representatives available to meet and confer at a mutually convenient time within thirty (30) days of the notice being sent.

128.   This AVC is for settlement purposes only.  No part of this AVC constitutes or shall be deemed to constitute an admission by CEC that they have ever engaged in any conduct proscribed by this AVC.

129.   This AVC is made without trial or adjudication of any issue of fact or law by a court at law or equity, or finding of liability or fact of any kind, and no party to this agreement shall make contrary representations.  This AVC is not intended by the parties to constitute evidence against CEC in, or provide any basis for, any action brought by any person or entity for any violation of the common law, any federal or state statute or regulation, or constitute evidence in, or provide any basis for, any defenses, claims or assertions by or on

behalf of current or former Students seeking student loan forgiveness or defense to repayment claims initiated at or by the U.S. Department of Education.  Further, this AVC is not intended by the parties to constitute evidence in favor of CEC in, or provide any basis for, any defense put forward by CEC against any alleged violation of the common law, or any federal or state statute or regulation, or to constitute evidence in or provide any basis for any defenses, claims or assertions by or on behalf of CEC seeking to disallow student loan forgiveness or defense to repayment claims initiated at or by the U.S. Department of Education.

130.   Notwithstanding the provisions of paragraphs 128, 129, or any other provision of this AVC, this AVC may be used as evidence in an action brought by the Attorneys General to enforce the terms of this AVC for the sole purpose of establishing those terms of the AVC that any such action seeks to enforce.  In addition, notwithstanding the provisions of paragraphs 128, 129, or any other provision of this AVC, this AVC may be used by CEC and may constitute evidence in favor of CEC in any proceeding (a) brought by or on behalf of Students whose institutional debt has been forgiven pursuant to the provisions of paragraphs 116 and 117 of this AVC for the sole purpose of establishing the amount of institutional debt forgiven, or (b) brought by the Attorneys General seeking relief or recovery for claims or other matters released pursuant to paragraph 131 of this AVC for the sole purpose of establishing the matters allegedly released, or (c) in any action brought by the Attorneys General to enforce the terms of this AVC for the sole purpose of establishing conditions precedent to the bringing of such action, pursuant to paragraphs 112 and 113.

131.   As of the Effective Date, the Attorney Generals hereby release CEC from any and all civil

claims, actions, causes of action, damages, losses, fines, costs, and penalties, pursuant to each Attorney General's State's consumer protection and trade practice statutes, that have been or could have been brought against CEC or any of their respective current or former subsidiaries, affiliates, divisions, agents, representatives, and each of their respective officers, directors, shareholders, members, insurers, attorneys or employees on or before the Effective Date related to (1) the allegations set forth in paragraph 2 and (2) CEC's institutional lending practices that are the subject of paragraphs 116 and 117. Notwithstanding any other term of this AVC, the following do not comprise released claims:  private rights of action; criminal claims; claims of environmental or tax liability; claims for property damage; claims alleging violations of State or federal securities laws; claims alleging violations of State or federal antitrust laws; claims brought by any other agency or subdivision of the State; claims alleging violations of State or federal privacy laws or State data breach laws; and claims alleging a breach of this AVC.

132. The Parties agree that this AVC does not constitute an approval by the Attorneys General of any of CEC's past or future practices, and CEC shall not make any representation to the contrary.

133. The requirements of this AVC are in addition to, and not in lieu of, any other requirements of state or federal law.  Nothing in this AVC shall be construed as relieving CEC of the obligation to comply with all local, state, and federal laws, regulations, or rules, nor shall any of the provisions of this AVC be deemed as permission for CEC to engage in any acts or practices prohibited by such laws, regulations, or rules.

134. Nothing contained in this AVC shall be construed to create or waive any individual private right of action.

135.   CEC shall not participate directly or indirectly in any activity to form or proceed as a separate entity or corporation for the purpose of engaging in acts prohibited in this AVC or for any other purpose which would otherwise circumvent any part of this AVC.

136.   If any clause, provision or section of this AVC shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this AVC and this AVC shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

137.   The section headings and subheadings contained in this AVC are included for convenience of reference only and shall be ignored in the construction or interpretation of this AVC.

138.   To the extent that any changes in CEC's business, advertisements, and/or advertising practices are made to achieve or facilitate conformance to the terms of this AVC, the fact that such changes were made shall not constitute any form of evidence or admission, explicit or implicit, by CEC of wrongdoing.

139.   In the event that any statute, rule, or regulation pertaining to the subject matter of this AVC is enacted, promulgated, modified, or interpreted by any federal or state government or agency, or a court of competent jurisdiction holds that such statute, rule, or regulation is in conflict with any provision of this AVC, and compliance with this AVC and the subject statute, rule, or regulation is impossible, CEC may comply with such statute, rule, or regulation and such action in the affected jurisdiction shall not constitute a violation of this AVC.  CEC shall provide written notices to the Attorneys General and the Administrator, if applicable, that it is impossible to comply with this AVC and the subject law and shall explain in detail the basis for claimed impossibility, with specific reference to any

applicable statutes, regulations, rules, and court opinions.  Such notice shall be provided

immediately upon CEC learning of the potential impossibility and at least thirty (30) days

in advance of any act or omission which is not in compliance with this AVC.  Nothing in

this paragraph shall limit the right of the Attorney General to disagree with CEC as to the

impossibility of compliance and to seek to enforce this AVC accordingly.

140.    All notices under this AVC shall be provided to the following via email and Overnight

Mail:

FOR CEC

Jeffrey D. Ayers
Senior Vice President, General Counsel and Secretary
Career Education Corporation
231 N. Martingale Rd.
 Schaumburg, Illinois 60173
jayers@careered.com

Jerry W. Kilgore
Cozen O'Connor
Three James Plaza
Suite 1420
Richmond, VA 23219
jkilgore@cozen.com

FOR THE STATE OF TEXAS

Office of the Texas Attorney General
Consumer Protection Division
Attention: D. Esther Chavez
P.O. Box 12548
Austin, Texas 78711-2548
Esther.Chavez@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

PAUL SINGER
Chief, Consumer Protection Division


D. ESTHER CHAVEZ
Senior Assistant Attorney General
State Bar No. 04162200
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 475-4628
Facsimile:    (512) 463-8301
Email:  Esther.Chavez@oag.texas.gov
Dated:  **JAN. 2,** _____, 2019.

For Career Education Corporation, American InterContinental University, Inc., and Colorado Technical University, Inc.

Jeffrey D. Ayers
Senior Vice President, General Counsel and Secretary
Career Education Corporation
231 N. Martingale Rd.
Schaumburg, Illinois 60173
jayers@careered.com

Counsel for Career Education Corporation, American InterContinental University, Inc., and Colorado Technical University, Inc.


Jerry W. Kilgore
COZEN O'CONNOR
Three James Plaza
Suite 1420
Richmond, VA 23219
Phone:  (804) 762-6916
jkilgore@cozen.com

EXHIBIT

tabbies

A

### Exhibit A – Implementation Schedule

| AVC Paragraph(s) | Subject Matter | Deadline for Compliance |
|---|---|---|
| ¶¶ 54-59 (and all other references) | Single-Page Disclosure Sheet[1] | 180 days from the Effective Date, subject to the qualifications contained in the relevant paragraphs regarding what information must be contained in the Single-Page Disclosure. |
| ¶¶ 70-71 | Electronic Financial Impact Platform | CEC shall have one hundred eighty (180) days from the Effective Date to complete development, have approved by the Administrator in consultation with the Attorneys General, and implement its Electronic Financial Impact Platform |

[1] All capitalized terms used in this Exhibit A shall have the meaning given to them in the AVC.

EXHIBIT

*B*

# PROGRAM NAME

## PROGRAM COST AND LENGTH

### TUITION AND FEES*: $XX,XXX    PROGRAM LENGTH: XX months

| Tuition: | Total Credits: | Cost Per Credit Hour: | Technology Fee: | Graduation Fee: |
|---|---|---|---|---|
| $XX,XXX | XXX | $XXX | $XXX/term | $XXX |

*The amounts shown above include costs for the entire program, assuming normal time to completion. In addition, a non-refundable $150 Graduation Fee will be charged to the student's account during the final term. Program length and cost may vary due to multiple factors including eligible transferred credits, program pacing and proficiency credit awarded for passing knowledge assessments.

## TRANSFER CREDITS

- Course credits are not guaranteed to transfer to other schools.
  Transferability of credits is at the sole discretion of the receiving institution.

- Not all credits are eligible to transfer.
  The Prior Learning Assessment Team can determine what credits students may be eligible to transfer into their current program. You can transfer in up to 75% of credits required for a degree. See the university's catalog regarding transfer credit policies.

## STUDENT SUCCESS & OUTCOMES

### THE TYPICAL GRADUATE LEAVES WITH A LOAN DEBT OF: $XX,XXX

The median debt of borrowers who completed this program. This debt includes federal, private, and institutional loans.

### SUCCESS OF STUDENTS WHO ENROLL

**XX%** of Title IV students complete the program within XX months



XX out of XX complete within XX months



XX out of XX do not complete within XX months

### THE TYPICAL GRADUATE EARNS $XX,XXX PER YEAR AFTER LEAVING THIS PROGRAM.

The median earnings of program graduates who received Federal aid.

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**

**Document 13**

Corinthian Colleges Is Closing. Its Students May Be Better Off as a Result. - The New York Times

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 317 of 587

ADVERTISEMENT

**UPSHOT**

**DEGREES OF EDUCATION**

# *Corinthian Colleges Is Closing. Its Students May Be Better Off as a Result.*

**By Kevin Carey**

July 2, 2014

Late last month, Corinthian Colleges, a publicly traded for-profit higher education company that enrolls 72,000 students at over 100 campuses nationwide, announced its imminent bankruptcy.

Facing declining enrollment and multiple investigations into its financial and educational practices from parties including the federal Consumer Financial Protection Bureau and a group of state attorneys general, Corinthian was also under pressure from Department of Education regulators demanding information about practices that, the department said, included "falsifying job placement data used in marketing claims to prospective students and allegations of altered grades and attendance." The

Corinthian Colleges Is Closing. Its Students May Be Better Off as a Result. - The New York Times

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 318 of 587

department announced that it was temporarily withholding some of the federal student aid money that makes up the vast majority of Corinthian's $1.6 billion in annual revenues. The company said the cash delay would render it effectively insolvent.



Tomi Um

Last week, Corinthian and the Education Department agreed to negotiate a settlement that will amount to an orderly dissolution of the company.

Some campuses will remain open long enough to finish teaching classes, and others are being readied for sale. In terms of the number of students and amount of money involved, it's one of the largest higher education collapses in American history.

Given Corinthian's track record, its students may very well be better off as a result.

The Obama administration has taken an aggressive stance toward for-profit colleges, proposing a set of regulations that would deny federal aid dollars

Corinthian Colleges Is Closing. Its Students May Be Better Off as a Result. - The New York Times

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 319 of 587

to for-profit programs whose graduates don't make enough money to pay back their student loans. The industry sued to block the regulations, which remain tied up in lengthy judicial and federal rule-making procedures. But that didn't prevent the administration from calculating which programs *would have* failed under the new regulations.

Not all for-profit colleges are the same. Some, such as Strayer University, which dates to the 19th century, have had no programs fall short of the proposed federal standards. Others, including the Apollo Group, parent company of the giant University of Phoenix, had a number of substandard programs. Twenty Apollo programs failed — 17 percent of the total — and another three fell in an intermediate warning "zone," meaning they fell below the federal standards but not by enough to qualify as failed.

# For—Profit Colleges, Failing the Test

Although the Obama administration's proposed regulations governing for—profit colleges are not yet in effect, it has published the results of the test it proposes to apply to their programs — and one company, Corinthian Colleges, has gone out of business as a result.

Corinthian, by contrast, had 162 failing programs, more than any other for-profit college. It also led all for-profits in "zone" programs, with 68. Fully 50 percent of Corinthian's programs missed the standard.

To end up in these categories, programs must have terrible results. At Corinthian-owned Everest College's Newport News, Va., campus, for example, more than 500 students completed the medical assistant certificate program during the 2007-08 and 2008-09 school years. After hitting the job market, they earned an average of $12,553 per year in 2011. Since 90 percent of full-time medical assistants are paid at least $21,080 per year, according to the Bureau of Labor Statistics, this suggests that many of these students couldn't get jobs in their field at all. The 10-month program costs "about $20,000," according to a telephone representative whom I spoke to this week only after an online representative refused to tell me the price, saying, "I don't have access to that information." It's not

Corinthian Colleges Is Closing. Its Students May Be Better Off as a Result. - The New York Times

Case 3:19-cv-03674-WHA   Document 193-6   Filed 03/18/21   Page 320 of 587

surprising that a third of all the program's borrowers defaulted on their loans.

The taxpayers will be on the hook for some defaulted loans. Others were backed by Corinthian itself, which has made expensive private loans to its own students despite knowing ahead of time that most of them would default. It did this because by law, no more than 90 percent of the company's revenues may come from federal financial aid. Every dollar that Corinthian lent directly to students allowed it to receive an additional nine dollars in federal aid, making the loans profitable even with default rates of 50 percent or more. At its peak, Corinthian received more than half a billion dollars per year from the federal Pell Grant program, more than the entire University of California system.

The collapse of Corinthian suggests that increased scrutiny and regulation of the for-profit higher education sector are working as intended, even before the rules themselves are finally enacted. For-profit colleges focused on providing adult learners with valuable job skills at an affordable price remain open. Those that fail to serve students well and act as responsible stewards of taxpayer dollars are beginning to close.

ADVERTISEMENT

© 2021 The New York Times Company

NYTCo    Contact Us    Accessibility    Work with us    Advertise    T Brand Studio    Your Ad Choices    Privacy Policy    Terms of Service

Terms of Sale    Site Map    Help    Subscriptions

**"Other" Document Types**

**Cited in Supplemental Complaint, March 19, 2021**


**Document 14**

# Federal
# **Student**
# **Aid**

*An* OFFICE *of the*
U.S. DEPARTMENT *of* EDUCATION



# ANNUAL  REPORT  FY 2020



**United States Department of Education**
Betsy DeVos
*Secretary*

**Federal Student Aid**
Mark A. Brown
*Chief Operating Officer*

**Finance Office**
Alison L. Doone
*Chief Financial Officer*

November 16, 2020

This report is in the public domain. Authorization to reproduce it, in whole, or in part, is granted. While permission to reprint this publication is not necessary, the citation should be:

U.S. Department of Education, Federal Student Aid, *FY 2020 Annual Report*, Washington, D.C., 20002.

This report is also available under Performance Reports on the Federal Student Aid website at **StudentAid.gov**.

To connect to Federal Student Aid through social media, please visit the Federal Student Aid website at **StudentAid.gov** or on Twitter at **@FAFSA**.

Federal Student Aid strives to improve and enhance the content quality, report layout, and public accessibility of the *Annual Report*. Suggestions on how this report can be made more informative and useful are welcome. The public and other stakeholders are encouraged to submit all questions and comments to **AFRComments@ed.gov**.

# Contents

## About This Report .................................................................. iii
### About This Report ............................................................. v
### Overview of the Federal Student Aid Annual Report ................... vii

## Letter from the Chief Operating Officer of Federal Student Aid ........................................................ ix
### Letter from the Chief Operating Officer of Federal Student Aid .... xi

## Management's Discussion and Analysis (Unaudited) ......... 1
### Overview of Management's Discussion and Analysis .................... 3
### Fiscal Year 2020 Organizational Highlights ................................. 4
Looking Forward at Federal Student Aid ................................................ 4
Federal Student Aid Fiscal Year 2020 by the Numbers .......................... 7
### Mission and Organizational Structure ........................................ 9
Mission, Vision, and Core Values .................................................... 10
FSA Organizational Structure ........................................................ 11
Significant Legislation that Directs the Federal Student Aid Mission ...................... 13
Federal Student Aid Stakeholders .................................................. 14
Federal Student Financial Aid Programs ........................................... 16
### Performance Management ......................................................... 21
Agency Priority Goals ................................................................. 28
Quality of Performance Data ......................................................... 31
### Analysis of Financial Statements .............................................. 32
Introduction .............................................................................. 32
Balance Sheet ........................................................................... 34
Financial Management Highlights ................................................... 49
### Analysis of Systems, Controls, and Legal Compliance ................. 50

## Annual Performance Report (Unaudited) ......................... 53
### Overview of the Annual Performance Report ............................. 55
### Introduction to the Annual Performance Report ......................... 56
Federal Student Aid Strategic Goals, Performance Metrics, and Results ................ 58

**Performance Results by Strategic Goal**.......................................**63**
Strategic Goal 1: Empower a High-Performing Organization...................................64
Strategic Goal 2: Provide World-Class Customer Experience to the Students,
Parents, and Borrowers We Serve ....................................................................72
Strategic Goal 3: Increase Partner Engagement and Oversight Effectiveness .........92
Strategic Goal 4: Strengthen Data Protection and Cybersecurity Safeguards........103
Strategic Goal 5: Enhance the Management and Transparency of the Portfolio.....111

**Fiscal Year 2020 Accomplishments of Federal Student Aid**........**137**
**Legislative and Regulatory Recommendations** ........................**142**
**Annual Bonus Awards**.................................................................**143**
**Report of the Federal Student Aid Ombudsman**.......................**144**

**Financial Section**.........................................................................**165**
**Overview of the Financial Section** ...............................................**167**
**Financial Statements** ...................................................................**168**
Consolidated Balance Sheet..........................................................................169
Consolidated Statements of Net Cost .............................................................170
Consolidated Statements of Changes in Net Position.......................................171
Combined Statements of Budgetary Resources ...............................................172

**Notes to the Financial Statements**..............................................**173**
**Required Supplementary Information (Unaudited)** ...................**210**
**Independent Auditors' Report** ....................................................**217**
Office of Inspector General Audit Transmittal...................................................217
Independent Auditors' Report ........................................................................219

**Other Information (Unaudited)**....................................................**233**
**Other Information** .........................................................................**235**
Summary of Financial Statement Audit and Management Assurances ................235
FSA Management Challenges .........................................................................235
Payment Integrity .........................................................................................236

**Appendices** ..................................................................................**237**
**Appendix A: Discontinued Strategic Goals and Performance
Metrics** .........................................................................................**239**
**Appendix B: Glossary of Acronyms and Terms**...........................**241**
**Appendix C: Availability of the Federal Student Aid Annual
Report** ...........................................................................................**247**



# About This Report

*This page is intentionally left blank*

# About This Report

Federal Student Aid (FSA), a principal office of the United States (U.S.) Department of Education (the Department), is required by legislation to produce an Annual Report, which details the organization's fiscal year financial and program performance. The *Federal Student Aid FY 2020 Annual Report (Annual Report)* is a comprehensive document that provides an analysis of FSA's financial and program performance results for Fiscal Year (FY) 2020 and exhibits the organization's effectiveness in accomplishing its mission. The *Annual Report* enables the President of the United States, the U.S. Congress (Congress), and the public to assess the organization's performance relative to its mission and determine whether FSA has demonstrated accountability for the resources entrusted to it.

This report presents information about FSA's performance as a Performance-Based Organization (PBO), its initiatives, accomplishments, and challenges, as required by the U.S. Office of Management and Budget (OMB) Circular A-11, *Preparation, Submission and Execution of the Budget, Part 6, Section 260,* and Circular A-136, *Financial Reporting Requirements.* The report also satisfies the requirements included in the following federal statutes:

- *Higher Education Act of 1965, as amended*

- *Federal Managers' Financial Integrity Act of 1982*

- *Chief Financial Officers Act of 1990*

- *Government Performance and Results Act of 1993*

- *Government Management Reform Act of 1994*

- *Federal Financial Management Improvement Act of 1996*

- *Reports Consolidation Act of 2000*

- *Improper Payments Information Act of 2002, amended*

- *Government Performance and Results Modernization Act of 2010*

- *Improper Payments Elimination and Recovery Act of 2010*

- *Improper Payments Elimination and Recovery Improvement Act of 2012*

The Department produces the ***U.S. Department of Education FY 2020 Agency Financial Report (AFR)***. That report provides a comprehensive view of the Department's stewardship over its resources and includes a summary of the information contained in the *Annual Report.*

The *Annual Report* is available at **StudentAid.gov/Annual Report**.

*This page is intentionally left blank*

# Overview of the Federal Student Aid Annual Report

The *Annual Report* is organized into the following five sections:



### Management's Discussion and Analysis
Management's Discussion and Analysis provides an overview of the *Annual Report.* It includes a discussion of the FSA mission, its organizational structure, and the fiscal year financial and performance highlights. The section concludes with a discussion of FSA's systems, controls, and compliance with laws and regulations.



### Annual Performance Report
The Annual Performance Report section presents the strategic goals included in the *Federal Student Aid Strategic Plan for Fiscal Years 2015–19 (FY 2015–19 Strategic Plan)* and the draft *Federal Student Aid Five-Year Strategic Plan for Fiscal Years 2020–24 (FY 2020–24 Strategic Plan)*. This section also includes a crosswalk between both strategic plans, and a discussion of the results of the performance metrics under each strategic goal. The section concludes with FSA's fiscal year accomplishments, its legislative and regulatory recommendations to the Department, the Annual Bonus Awards, and the Report of the Federal Student Aid Ombudsman.



### Financial Section
The Financial Section provides a detailed view of FSA's stewardship and accountability for its resources. The audited financial statements begin the section, followed by the accompanying Notes to the Financial Statements, Required Supplementary Information, and the Independent Auditors' Report.



### Other Information
Other Information includes a summary of the Financial Statement Audit, links to the Summary of Management Assurances, and FSA's Management Challenges included in the *AFR.*



### Appendices
The Appendices include Appendix A, which provides the discontinued strategic goals and performance metrics; Appendix B, which lists the acronyms cited throughout the report; and Appendix C, which provides information on the availability of the *Annual Report.*

*This page is intentionally left blank*

**Letter from the Chief Operating Officer of Federal Student Aid**



## Letter from the Chief Operating Officer of Federal Student Aid

*This page is intentionally left blank*

# Letter from the Chief Operating Officer of Federal Student Aid

**Dear Federal Student Aid Colleagues, Partners, and Customers:**

I am pleased to present the Fiscal Year (FY) 2020 Annual Report that highlights the outstanding work and accomplishments of the entire Federal Student Aid (FSA) organization. This report tells the story of our substantial work to improve the quality of service to customers, foster collaboration among stakeholders, improve operational efficiency and flexibility, and invest in our internal and expanded workforce capability.

This report reflects the spirit of our mission—*Keeping the Promise: Funding America's Future, One Student at a Time*—which is ingrained in the *Higher Education Act of 1965*, as amended. For 55 years, the ideals framing this law have guided the United States (U.S.) Department of Education in facilitating broad access to higher education and enabled FSA's evolution to execute that critical task.



**Mark A. Brown**
**Chief Operating Officer**

While broadening access to higher education remains integral to our mission, we are cognizant of, and concerned about, the size of the federal student loan portfolio, which now exceeds $1.5 trillion. Management of such a vast portfolio requires steady leadership, active stewardship, and transparency. Through internal portfolio analytics and feedback from our customers and other stakeholders, we recognize the need for improvement and are working to improve our programs, products, services, and operations.

During FY 2020, FSA provided more than $115 billion in federal grants, loans, and work-study funds to approximately 10.8 million students at more than 5,600 participating postsecondary schools. We fulfilled our mission even as we addressed the challenges of the global Coronavirus Disease 2019 (COVID-19) emergency.

In FY 2020, our challenges became opportunities, especially as more than 1,400 FSA employees in 11 offices across the United States deftly transitioned to a 100 percent virtual work posture. Organizational productivity remained high over the past year as employees went from packing in crowded conference rooms to gathering in virtual meetings. PowerPoint slides on big screens suddenly transitioned to screensharing and virtual whiteboards, and FSA shifted resources and assistance online to serve students, families, and partner institutions.

Working closely with our federal student loan partners, we made sure student loan servicers were compliant with the *Coronavirus Aid, Relief, and Economic Security Act* (CARES Act) student loan relief provisions that suspended loan payments and temporarily set the interest rate on all Department-held loans to zero percent. FSA notified employers to stop wage

garnishments, and when some employers continued to garnish wages, we worked with the U.S. Department of Treasury to get those wages refunded quickly, expediting more than 2 million Treasury Offset Program/Administrative Wage Garnishment refund payments. And, we developed resources, such as the **StudentAid.gov/coronavirus** webpage, that provided customers with vital information.

In FY 2020, FSA reached new heights in customer service, an improved user experience, proactive partner engagement, and streamlined organizational capabilities. This success was largely due to the innovative planning and work undertaken over the past decade by current and former FSA employees. We have long had in our sights the goals of transforming FSA's technology infrastructure and data processing environments, implementing a world-class user experience, strengthening our partnership with schools, and enhancing our oversight of vendors.

The Next Gen FSA initiative delivered intuitive, self-service tools for students, parents, and borrowers. The new **StudentAid.gov**—FSA's primary website for customers—consolidated the four most-visited websites into one and has steadily added information, tools, and resources that offer personalized guidance about federal student aid. These tools include the Annual Student Loan Acknowledgment, which is designed to help borrowers understand their debt balance—including their lifetime maximums—before borrowing more money. The tools will also help ensure borrowers understand common debt terms. Students who have received grants will also see how much they have received and how much eligibility they have left. In a little more than 5 months, more than 858,000 customers have completed the acknowledgment.

The Aid Summary dashboard gives customers personalized information about loans and grants they have received. For borrowers who have filed an Employment Certification Form to determine their eligibility for Public Service Loan Forgiveness, the Aid Summary dashboard provides them with a count of their qualifying payments. The Make a Payment pilot allows a subset of FSA customers—between five and seven million people—to make a payment on the **StudentAid.gov** website or through their mobile device. Part of the Next Gen FSA roadmap will eventually allow all federal student loan borrowers to do so.

Another tool on **StudentAid.gov**, Loan Simulator, walks students and parents through a guided, easy-to-use wizard that allows them to "test-drive" and compare personalized scenarios, using their own student debt data. This tool helps students set repayment goals and develop informed financial strategies.

Customers can now access all our contact centers through one phone number: 1-800-4-FED-AID. This number includes a new interactive voice response functionality to direct our customers to the appropriate place so they can get help fast. FSA's virtual assistant—Aidan[SM]—uses artificial intelligence to answer more than 3,000 variations of common questions about federal student aid. Available to a subset of FSA customers in the first year of its pilot rollout, Aidan responded to more than 1.3 million messages from nearly 546,000 customers.

Once FSA brings its online Business Process Operations (BPO) vendors, customers will benefit greatly from centralized contact center support. In FY 2020, FSA awarded Next Gen FSA contracts to five companies for services that include corresponding with customers and partners via phone, chat, social media, postal mail, and email, as well as supporting the back-office processing associated with those contacts. FSA will provide comprehensive contact center

training and oversight, ensuring that BPO vendors have up-to-date knowledge about federal student aid programs to give customers the right answer in every interaction.

FSA strives to be the most-trusted source of information about federal student aid. That includes building trust and collaboration among stakeholders and partners by promoting transparency, accountability, and proactive assistance. FSA closed 96 percent of outstanding *Freedom of Information Act* requests in FY 2020 and adjudicated approximately 150,000 borrower defense applications.

FSA recognizes that by providing proactive technical assistance to postsecondary institutions, schools can administer the federal student aid programs more effectively. In FY 2020, we fulfilled our oversight responsibilities by resolving more than 3,000 deficient audits and flagged financial statements, evaluating more than 2,000 school financial responsibility notifications, and processing 5,500 eligibility-related actions, including recertification applications. Additionally, FSA has reduced the number of outstanding Program Reviews. In FY 2020, we issued more than 240 Program Review Reports and Final Program Review Determinations to institutions and third-party servicers subjected to a program review.

Through the Project Success program, FSA collaborated with guaranty agencies to improve retention, graduation, and cohort default rates at more than 160 minority-serving institutions. At no cost to participating schools, the program provides tools, programs, and other resources for students to increase their financial literacy and help them achieve their higher education goals. Project Success has been extended through September 2022.

During FY 2020, FSA developed a draft *FY 2020–24 Strategic Plan*, our organization's road map for improving our programs, products, services, and operations. The draft plan fully reflects our work to support customers and partners in every possible way, aggressively advance the Next Gen journey, and meet new and existing requirements.

I invite you to look back on all that our organization achieved in FY 2020, and I encourage you to look ahead to the opportunities that await us for our nation's students and their families.

Sincerely,

Mark A. Brown
Chief Operating Officer
Federal Student Aid
United States Department of Education
November 16, 2020

*This page is intentionally left blank*



## Management's Discussion and Analysis (Unaudited)

*This page is intentionally left blank*

# Overview of Management's Discussion and Analysis

Management's Discussion and Analysis provides an overview of the *Annual Report*. It includes the following subsections:

- **Fiscal Year 2020 Organizational Highlights:** Fiscal Year 2020 Organizational Highlights presents Looking Forward at Federal Student Aid, which details the most important events and challenges that FSA faces and discusses the actions taken and progress made by FSA in addressing those challenges. This subsection also includes a presentation of FSA by the Numbers.

- **Mission and Organizational Structure:** Mission and Organizational Structure provides the history of FSA; its mission, vision, and core values; as well as its organizational structure. The section also includes a discussion of the federal student aid programs.

- **Performance Management:** Performance Management presents an overview of FSA's strategic and performance-planning framework, an overview of its draft *FY 2020–24 Strategic Plan*, the close-out details of its *FY 2015–19 Strategic Plan*, and a crosswalk between both strategic plans. This subsection concludes with a discussion of the annual priority goals and the quality of FSA's performance data.

- **Analysis of Financial Statements:** Analysis of Financial Statements provides an overview of FSA's financial data, an analysis of the financial data presented in the audited financial statements, and a discussion of FSA's financial management highlights.

- **Analysis of Systems, Controls, and Legal Compliance:** Analysis of Systems, Controls, and Legal Compliance provides FSA's management assessment in conjunction with the Department's assessment on FSA's internal controls related to the *Federal Manager's Financial Integrity Act of 1982* and its compliance with other laws and regulations related to the compliance of financial systems with federal requirements.

# Fiscal Year 2020 Organizational Highlights

## Looking Forward at Federal Student Aid

A major step forward for FSA in FY 2021 will be the publication of the *FY 2020–24 Strategic Plan*. The *FY 2020–24 Strategic Plan* will serve as the roadmap for FSA to meet existing and new requirements, operationalize the Next Generation Financial Services Environment (Next Gen FSA) initiative—the technical infrastructure designed to improve the customer and partner experience while streamlining FSA's existing operations—and support millions of customers in pursuit of their educational dreams. The goals and objectives within the plan will help FSA meet the deliverables it established to improve customer service and transform the loan servicing programs for students, parents, borrowers, institutions, and taxpayers.

FY 2020 has offered many lessons, and perhaps, the most important is that to effectively operate in the 21st century, FSA must be able to respond quickly to its customers' needs and adapt to major shifts in public policy. The Coronavirus Disease 2019 (COVID-19) global pandemic changed the landscape of higher education and heightened the need for FSA to be responsive to students, parents, borrowers, institutions, and other higher education stakeholders. In response to the pandemic, FSA increased its commitment to customer service, continued its Next Gen FSA journey to an improved digital environment, and worked to instill a stronger culture of accountability with student loan servicers.

To fulfill its commitment during the COVID-19 emergency, FSA collaborated with its student loan servicers and other vendors to quickly execute the student loan relief provisions found in the *Coronavirus Aid, Relief, and Economic Security Act* (CARES Act). These provisions suspended payments on Department-held loans and temporarily set the interest rates for loans held by the Department to 0 percent. Although the CARES Act flexibilities expired at the end of FY 2020, presidential action extended the benefits through December 31, 2020. To this end, FSA is committed to safeguarding the careful implementation of all present and future COVID-19 emergency relief efforts for students and families.

In conjunction with executing the *FY 2020–24 Strategic Plan* and managing the extended COVID-19 student loan provisions, FSA will continue to advance the momentum gained in FY 2020. The focus for FY 2021 and beyond is to further deliver on the promise of Next Gen FSA. As discussed, Next Gen FSA already is transforming the experience of learning about, applying for, receiving, and repaying federal student aid for millions of students, parents, and borrowers. In FY 2021, Next Gen FSA will improve the experience of customers and partners– including more than 5,600 postsecondary institutions–by:

- Expanding the availability of FSA's virtual assistant, Aidan[SM], which uses artificial intelligence and natural language processing to answer common questions from customers about federal student aid,

- Enhancing the **StudentAid.gov** website inclusive of updates with new and existing features (Aid Summary, Loan Simulator, and Make a Payment Pilot), which provide personalized information and tools that help customers make more informed decisions and manage their loans,

- Improving the Public Service Loan Forgiveness (PSLF) Help Tool to assist borrowers with updated information about qualifying employers,

- Modernizing infrastructure systems and every aspect of how federal student aid is delivered and monitored,

- Executing further enrichments to the myStudentAid mobile app which places financial aid information and services at the customers' fingertips,

- Implementing planning for the Next Generation Partner Participation and Oversight (Next Gen PPO) program to transform the way FSA interacts with the thousands of schools, financial institutions, and other partners by creating a single portal, FSA Partner Connect, through which institutions can access FSA systems and processes, streamlining processes for submitting and reviewing program participation and other eligibility materials, and improving FSA workflow tools to support faster decision-making, and

- Improving loan servicing throughout the student aid lifecycle by the appropriate solicitation and acquisition of contracts. Specifically, the contracts will perform the following:

  - Create a state-of-the-art, enterprise-wide core processing capability for new customers.

  - Provide a transitional core processing system to house the legacy portfolio of more than 35 million borrowers.

  - Identify multiple vendors to staff and operate call centers, and manage manual processing associated with customers transitioned to a new loan servicing platform.

As FSA works to modernize its organization through the acquisition of tools and services using contract vehicles, there are two areas on which it will not compromise. First, FSA will remain good stewards of taxpayer dollars and will not pay more than a fair price for services from any vendor. And second, because FSA will not provide customers with anything less than an exceptional experience and exceptional service, vendors' performance will be measured in an objective manner through service-level agreements. These agreements will hold vendors to high operational standards for their service to customers.

To assist in executing in all these areas, and in compliance with the *Further Consolidated Appropriations Act, 2020*, FSA also has developed a Next Gen FSA Strategic Plan. Although Next Gen FSA is embedded within the *FY 2020–24 Strategic Plan*, the Next Gen FSA Strategic Plan includes the subset of goals and objectives focused on the deliverables of this specific initiative. The Next Gen FSA Strategic Plan describes the FSA vision and introduces the Next Gen FSA Strategic Roadmap, which details how Next Gen FSA will work toward an interim servicing solution to continue to meet servicing needs at reasonable costs while also enabling Next Gen FSA capabilities.

But financial aid begins with FSA's flagship deliverable, and that is the Free Application for Federal Student Aid® (FAFSA®) form. For this reason, FSA will also continue to work toward improving not only access to the FAFSA form, but also the ease of completing the application.

By focusing on increasing customer knowledge about the form and the associated application periods, the Department will better assist students and families with understanding and accurately filling it out. In addition, in FY 2021, FSA will support FAFSA form simplification through technological enhancements such as the Data Retrieval Tool and through flexibilities provided to FSA through the *Fostering Undergraduate Talent by Unlocking Resources for Education Act* (FUTURE Act).

The timeline for implementation of the FUTURE Act is an iterative process and an important measure of FSA performance because the potential outcome of the associated changes will be beneficial to borrowers and stakeholders, visible in both the FAFSA form and other FSA services. FSA will continue to build out and develop the base infrastructure design to ensure effective and timely implementation. High-level designs have been completed and will assist in navigating implementation decisions throughout the fiscal year.

Lastly, in the first half of 2020, FSA conducted a variety of exploratory research activities using different methods of data collection and customer-based research. As work in this area moves forward, FSA plans to use enhanced customer analytics and information learned through improved exit counseling to suggest repayment strategies based on customers' individualized goals, allowing customers to seamlessly enroll in repayment plans, easily establish recurring automatic payments, and feel confident in next steps toward successful repayment or loan forgiveness. FSA will proactively monitor borrower behavior in response to new borrower tools and resources, as well as environmental factors that may impact student loan repayment rates, then use predictive analysis to help guide students into and through loan repayment to reduce the number of delinquent or defaulted borrowers.

## Federal Student Aid Fiscal Year 2020 by the Numbers

**Figure 1: Federal Student Aid Net Outlays[1]**
**Fiscal Years 2016–20**



**Figure 2: Federal Student Aid Administrative Budget[2]**
**Fiscal Years 2016–20**



**Figure 3: Federal Student Aid Student Loan Portfolio[3]**
**Fiscal Years 2016–20**



---

[1] The Budgetary account is also known as the Program account; the Non-budgetary credit reform account is also known as the Financing account. For more information on these two accounts, please refer to Note 5.

[2] Fiscal Year 2018 amount corrected from $1.5 to $1.7.

[3] The amounts in Figure 3 include both lender-held FFEL loans and School-held Perkins loans.

### Figure 4: Total FAFSA® Forms Processed and Total Students Receiving Aid
### Fiscal Years 2016–20



### Figure 5: Total Federal Student Aid Delivered
### Fiscal Years 2016–20



### Figure 6: Federal Student Aid Federal Employees[4]
### Fiscal Years 2016–20



---

[4] Number of employees listed is as of September 30 of each fiscal year.

# Mission and Organizational Structure

FSA, a principal office of the Department, seeks to ensure that all eligible individuals can benefit from federal financial assistance for education beyond high school. As the nation's largest provider of federal student financial aid, FSA is responsible for implementing and managing federal student financial assistance programs authorized under the *Higher Education Act of 1965,* as amended (HEA). Specifically, Title IV of the HEA (Title IV) authorizes the federal student assistance programs for which FSA is responsible. These programs provide grants, loans, and work-study funds to students attending colleges or career and technical schools.

To execute the Title IV programs, FSA is responsible for a range of functions across the student aid lifecycle, which include:

- Informing students and families about the availability of the federal student aid programs and the process of applying for and receiving aid from those programs,

- Processing millions of FAFSA forms,

- Accurately disbursing, reconciling, and accounting for billions of dollars of federal student aid funds delivered to students annually,

- Managing the outstanding federal student loan portfolio and securing repayment from federal student loan borrowers,

- Offering free assistance to students, parents, and borrowers throughout the entire financial aid process, and

- Providing oversight and monitoring of all program participants—schools, financial entities, and students—to ensure compliance with the laws, regulations, and policies governing the federal student aid programs.

This complex, multifaceted mission calls on a range of staff skills, and demands coordination by all levels of management. Designated as a PBO by Congress in 1998, FSA emphasizes tangible results and efficient performance, as well as continuous improvement of the processes and systems that support its mission.

## Mission, Vision, and Core Values

FSA's mission is student-focused. This mission drives the organization's vision to be a reliable provider of federal student aid and services and to be the most trusted source of postsecondary education information to students and their families. As part of its vision, FSA strives to assist students and families in making better decisions about their postsecondary education funding options. The core values reflect a culture of integrity, excellence, and collaboration—key components in building a high-performing organization.

### Table 1: FSA Mission, Vision, and Core Values

| MISSION | |
| --- | --- |
| **Mission** | *Keeping the Promise: Funding America's Future, One Student at a Time.* |
| **VISION** | |
| **Vision** | To be the most trusted and reliable source of student financial aid, information, and services in the nation. |
| **CORE VALUES** | |
| **Integrity** | Do the right thing above other interests and hold everyone accountable. |
| **Customer Service** | Know what our customers want and ensure we meet their expectations. |
| **Excellence** | Strive to be the very best in all we do by embracing a culture of continuous improvement. |
| **Respect** | Value individuals by acknowledging the diversity of their contributions, ideas, and beliefs. |
| **Stewardship** | Uphold the sacred trust of taxpayers as we work to support the goals of Congress and the Administration. |
| **Teamwork** | Work in collaboration with our colleagues and partners to produce the best possible results. |

As discussed in detail in the Performance Management section and Annual Performance Report, FSA has translated this vision into a set of clearly defined strategic goals and objectives, with related measurable performance metrics. The realization of these goals will enable the organization to accomplish its mission successfully.

## FSA Organizational Structure

In FY 2020, FSA operated under a functional organizational structure that aligned the organization with its strategic drivers, business objectives, and mission goals. A Chief Operating Officer (COO) is appointed by the Secretary of Education (Secretary) to lead FSA. In March 2019, the Secretary appointed Mark A. Brown as the FSA COO. Figure 7 illustrates the functional organizations within FSA.

**Figure 7: Federal Student Aid Organizational Chart
Fiscal Year 2020**



**Mission and Organizational Structure**

During FY 2020, FSA operated on an annual administrative budget of approximately $1.8 billion. As of September 30, 2020, FSA was staffed by 1,462 full-time employees and augmented by contractors who provide outsourced business operations. The workforce is primarily based in FSA's headquarters located in Washington, DC, with 10 regional offices located throughout the country as reflected in the following graphic (See Figure 8). The number of full-time employees at each location is shown in parentheses immediately following the location name.

**Figure 8: Federal Student Aid Regional Map**
**Fiscal Year 2020**



## Significant Legislation that Directs the Federal Student Aid Mission

Several legislative acts guide FSA's mission. The *Higher Education Amendments of 1998* established FSA as a PBO to administer the Title IV programs. The following table, while not all-inclusive, identifies additional significant enactments of legislation that have influenced FSA's mission.

**Table 2: Overview of Legislative Authority**

| Legislation | Purpose |
|---|---|
| *Higher Education Act of 1965, as amended* | Created the federal student financial assistance programs known as Title IV programs. |
| *Student Loan Reform Act of 1993* | Authorized a multi-year phased implementation of the William D. Ford Federal Direct Loan Program. |
| *Higher Education Reconciliation Act of 2005* | Allowed graduate and professional students to use the Parent Loan for Undergraduate Studies Loan Program. |
| *College Cost Reduction and Access Act of 2007* | Authorized the Teacher Education Assistance for College and Higher Education Grant Program, created the Public Service Loan Forgiveness Program, and established Income Based Repayment plans. |
| *Ensuring Continued Access to Student Loans Act of 2008* | Provided the Department with the authority to implement programs to ensure eligible students and parents were not denied access to federal student loans during the credit market disruptions of 2008. |
| *SAFRA Act of 2009* | Provided that, beginning July 1, 2010, no new loans would be originated under the Federal Family Education Loan Program. |
| *Bipartisan Student Loan Certainty Act of 2013* | Established that federal student loan interest rates will be tied to financial markets and that each loan will have a fixed interest rate for the life of the loan. |
| *Consolidated Appropriations Act, 2014* | Transferred all Health Education Assistance Loan Program loans as of July 1, 2014, from the U.S. Department of Health and Human Services to the Department. |

**Mission and Organizational Structure**

## Federal Student Aid Stakeholders

The community of stakeholders in the student aid delivery system includes students, parents, lenders, guaranty agencies, postsecondary institutions, contracted servicers, and collection agencies, as well as taxpayers and other federal entities such as Congress and OMB.

**Table 3: Role of FSA and Participants in the Federal Student Aid System**

| Participants | Participants' Role | FSA's Engagement with Participants |
|---|---|---|
| Students | • Receive aid to finance postsecondary education and repay loans following completion or exit from school. | • Explaining federal student aid opportunities and requirements,<br>• Providing products, services, and tools to help students pay for postsecondary education,<br>• Identifying students who are eligible for aid, and<br>• Protecting students and borrowers from unfair, deceptive, or fraudulent practices in the student aid marketplace. |
| Guaranty Agencies | • Insure Federal Family Education Loan Program loans and service their defaulted loan portfolios. | • Monitoring compliance,<br>• Assisting them in meeting regulatory requirements,<br>• Providing technical assistance, and<br>• Paying default claims. |
| Loan Holders | • Hold and service outstanding Federal Family Education Loan Program loans to students. | • Monitoring compliance,<br>• Assisting them in meeting requirements,<br>• Providing interest subsidies and Special Allowance Payments; and<br>• Educating them regarding policy. |
| FSA-Contracted Loan Servicers | • Service William D. Ford Federal Direct Loan Program portfolio and portions of Federal Family Education Loan Program portfolio,<br>• Provide systems and services to support FSA's core operations (e.g., applications, disbursements), and<br>• Recover payments from defaulted borrowers. | • Entering contractual agreements,<br>• Setting performance standards, and<br>• Overseeing operations. |
| Postsecondary Institutions | • Determine students' aid packages and disburse funds. | • Determining eligibility and disbursing aid,<br>• Monitoring compliance and regulatory requirements, and<br>• Providing technical assistance. |
| Congress | • Sets statutory requirements for student loan programs as well as a myriad of borrower benefits and budget appropriations. | • Providing data and information for decision making and<br>• Providing updates on operational performance. |
| The President, the Department, and others in the Executive Branch | • Set regulatory standards and establish policy for the distribution of aid and collection of loan payments. | • Providing data that informs policy decisions,<br>• Providing recommendations for implementation of new policies, and<br>• Sharing information regarding high risk compliance concerns. |

FSA's responsibilities include coordinating and monitoring the activity of the large number of federal, state, nonprofit, and private entities involved in delivering federal student aid within the statutory framework established by Congress and regulatory framework established by the Department.

## Federal Student Financial Aid Programs

Each year, FSA delivers more than $115 billion in financial aid to students through the Title IV programs of the HEA. These programs collectively represent the nation's largest source of federal financial aid for postsecondary education students. This aid covers expenses such as tuition and fees, room and board, books and supplies, and transportation. Federal financial aid is mainly distributed to students through:

- **Loans:** Student aid funds that are borrowed to help pay for eligible education programs and must be repaid with interest,

- **Grants:** Student aid funds that do not have to be repaid, unless other conditions apply, and

- **Work-Study:** Part-time employment program that allows students enrolled in college to earn money to help pay for school.

To obtain federal financial aid, prospective aid recipients must complete the FAFSA. In FY 2020, FSA processed more than 17.8 million FAFSA forms, resulting in the delivery of approximately $115.6 billion in Title IV aid to more than 10.8 million postsecondary students and their families. These students attended more than 5,600 active institutions of postsecondary education that participate in federal student aid programs and which are accredited by agencies recognized by the Secretary.

The following table presents a comparison of the amounts of Title IV aid disbursed to students by program in FY 2020 and FY 2019. A summary discussion of each Title IV program is presented in the paragraphs after the table.

**Table 4: Summary of Federal Aid Disbursed to Students by Program**[5]
**(Dollars in Millions)**

| Programs | 2020 Aid Disbursed to Students | 2019 Aid Disbursed to Students | Difference | Percentage Change |
|---|---|---|---|---|
| **Federal Loan Programs** | | | | |
| William D. Ford Federal Direct Loan Program | $86,129.4 | $90,156.0 | $(4,026.6) | (4.5)% |
| Federal Perkins Loan Program | 0.0 | 630.5 | (630.5) | (100.0) |
| Other Loan Programs | - | - | - | 0.0 |
| **Subtotal Loan Programs** | **$86,129.4** | **$90,786.5** | **$(4,657.1)** | **(5.1)%** |
| **Federal Grant Programs** | | | | |
| Federal Pell Grant Program | $27,466.5 | $28,974.7 | $(1,508.2) | (5.2)% |
| Federal Supplemental Educational Opportunity Grant Program | 820.5 | 853.5 | (33.0) | (3.9) |
| The Teacher Education Assistance for College and Higher Education Grant Program | 78.1 | 78.5 | (0.4) | (0.5) |
| Other Grant Programs | 0.5 | 0.4 | 0.1 | (25.0) |
| **Subtotal Grant Programs** | **$28,365.6** | **$29,907.1** | **$1,541.5** | **(5.2)%** |
| **Federal Work-Study Program** | | | | |
| Federal Work-Study Program | $1,079.3 | $1,078.5 | $0.8 | 0.1% |
| Rounding | 0.1 | 0.1 | 0.0 | 0.0 |
| **Grand Total** | **$115,574.4** | **$121,772.2** | **$(6,197.8)** | **(5.1)%** |

## Federal Loan Programs

In fulfilling its program responsibilities, FSA directly manages or oversees a loan portfolio of more than $1.5 trillion, representing approximately 212 million student loans to more than 45 million borrowers. These loans were made primarily through the first two federal student loan programs described below.

**The William D. Ford Federal Direct Loan (Direct Loan) Program** lends funds directly to students and parents through participating schools. Created in 1993, this program is funded primarily by borrowings from Treasury, as well as an appropriation for subsidy costs. Four different types of direct loans are available for borrowers:

---

[5] Aid disbursed to students as cited in the table above, and in the following sections concerning the Federal Loan Programs, the Federal Grant Programs, and the Federal Work-Study Program in the Management's Discussion and Analysis, excluding the Federal Perkins Loan Program amounts, are derived from amounts from FSA's and the Department's financial systems. All amounts are fiscal year amounts, except for the Federal Perkins Loan Program, which is reported as the prior award year amount (e.g., Award Year 2018–19 reported in FY 2020). The number of awards or recipients reported in the Management's Discussion and Analysis is derived from a variety of sources including FSA's Common Origination and Disbursement System and data used to support the President's Budget. Recipient counts are based on award year.

**Mission and Organizational Structure**

- **Direct Subsidized Loans:** Federal loans based on financial need made to undergraduate students for which the federal government generally does not charge interest while the borrower is in school, in grace, or in deferment status. If the interest is not paid during the grace period, the interest is added to the loan's principal balance.

- **Direct Unsubsidized Loans:** Federal loans made to undergraduate students and graduate students for which the borrower is fully responsible for paying the interest regardless of the loan status. Interest on unsubsidized loans accrues from the date of disbursement and continues throughout the life of the loan.

- **Direct Parent Loans for Undergraduate Students (PLUS) Loans:** Federal loans made to graduate or professional students and parents of dependent undergraduate students for which the borrower is fully responsible for paying the interest regardless of the loan status.

- **Direct Consolidation Loans:** Federal loans that allow the borrower to combine multiple existing federal student loans into one new loan. The borrower will only have to make one monthly payment on the consolidation loan, and the repayment term of the loan may be longer than the terms of the original loans, which may result in a lower monthly payment.

As of September 30, 2020, FSA's portfolio of Direct Loans included $1,100.5 billion in credit program receivables, net. In FY 2020, the Department made $86.1 billion[6] in net loans to 7.9 million recipients.

Under the **Federal Family Education Loan (FFEL) Program,** students and parents obtained federal loans through private lenders. Guaranty Agencies insure lenders against borrower default; the federal government, in turn, reinsures the guaranty agencies. Federal subsidies ensure private lenders earn a certain yield on the loans they hold.

The passage of the SAFRA Act, which was included in the *Health Care and Education Reconciliation Act of 2010* (HCERA) (Pub. L. 111-152), ended the origination of new FFEL Program loans as of July 1, 2010. Nevertheless, FSA, lenders, and guaranty agencies continue to service and collect outstanding FFEL Program loans. FSA, FFEL lenders, and guaranty agencies held a FFEL Program loan portfolio of approximately $108.8 billion as of September 30, 2020. Of this portfolio, $67.4 billion represented FSA's credit program receivables, net. In FY 2020, FSA made gross payments of approximately $757.9 million to lenders for interest and special allowance subsidies and $5.6 billion to guaranty agencies for reinsurance claims and fees paid for account maintenance, default aversion, and collection activities.

*The Ensuring Continued Access to Student Loans Act of 2008* (ECASLA) authorized the Department to implement a number of programs to ensure credit market disruptions did not deny eligible students and parents access to federal student loans for the 2008–09 and 2009–10 academic years. The authority for two ECASLA Programs, the Loan Purchase Commitment Program and the Loan Participation Interest Purchase Program, expired after

---

[6] Excludes consolidation loans of $30.4 billion.

September 30, 2010. The third ECASLA Program, the Asset-Backed Commercial Paper Conduit (ABCP Conduit) Program, ended in January 2014.

As of September 30, 2020, FSA-held FFEL credit program receivables net totaled $67.4 billion, comprising $21.1 billion acquired under the "traditional" (Non-ECASLA) guaranteed loan program, and $46.3 billion in loans acquired under the ECASLA authorization.

The **Federal Perkins Loan Program** is one of three campus-based student aid programs. These federal loans were made by schools to undergraduate and graduate students who demonstrate financial need. Historically, participating schools received a certain amount of funds each year from FSA for distribution under this program, which supplemented funds in a school's revolving fund, from which new disbursements were made. These funds enabled eligible institutions to offer low-interest loans to students based on financial need. Once the full amount of the school's funds had been awarded to students, no additional loans were to be made under this program for the year. In FY 2020, FSA reported Award Year 2018–19 disbursements of approximately $0 million of funds, comprising 0 awards to eligible students. The *Federal Perkins Loan Program Extension Act of 2015* eliminated the authorization for schools to make new Perkins loan disbursements as of September 30, 2017 and ended all Perkins loan disbursements by June 30, 2018.

The **Health Education Assistance Loan (HEAL) Program** was transferred to the Department from the U.S. Department of Health and Human Services in FY 2014 under the *Consolidated Appropriations Act, 2014* (Pub. L. 113-76). This program enabled graduate students in schools of medicine, osteopathy, dentistry, veterinary medicine, optometry, podiatry, public health, pharmacy, chiropractic, or programs in health administration and clinical psychology to obtain federally insured loans through participating lenders. Since September 30, 1998, no new loans have been originated through this program; however, borrowers are still obligated to repay any outstanding loans obtained through the program.

The Department assumed responsibility for the program and the authority to administer, service, collect, and enforce the loans. Credit program receivables, net of allowance for subsidy, were approximately $386.0 million for FY 2020.

## Federal Grant Programs

In fulfilling its responsibility for administering Title IV aid, FSA oversaw the disbursement of approximately $28.4 billion in grants to 6.7 million recipients. The following provides a summary for each grant program, including aid disbursed in FY 2020.

The **Federal Pell Grant (Pell Grant) Program** helps ensure financial access to postsecondary education by providing grant aid to low-income and middle-income undergraduate students. Considered the foundation of a student's financial aid package, Pell Grants vary according to the financial circumstances of students and their families. In FY 2020, the Department disbursed $27.5 billion in Pell Grants averaging approximately $4,080 to approximately 6.7 million students. The maximum Pell Grant award was $6,195 in the 2019–20 award year and increased to $6,345 in the 2020–21 award year.

The **Federal Supplemental Educational Opportunity Grant Program** is one of three campus-based programs through which the Department provides funds directly to eligible institutions. Funds provided through this program enable eligible institutions to offer grants to students

based on need. Federal grants distributed under this program are administered directly by the financial aid office at each participating school. Each participating school receives a certain amount of Federal Supplemental Educational Opportunity Grant funds each year from FSA. Once the full amount of the school's grant funds has been awarded to students, no additional awards can be made under this program for the year. This form of aid does not require repayment. In FY 2020, approximately $820.5 million were disbursed through approximately 1.8 million campus-based awards.

**The Teacher Education Assistance for College and Higher Education (TEACH) Grant Program** provides individual awards up to $4,000 per year to students agreeing to teach mathematics, science, or other specialized subjects in a high-poverty school for at least four years within eight years of their graduation. This grant program began in the 2008–09 school year, starting July 1, 2008. For any 2019–20 or 2020–21 TEACH Grant first disbursed on or after October 1, 2019, and before October 1, 2020, the maximum award is $3,764. For any 2020-21 TEACH Grant first disbursed on or after October 1, 2020, and before October 1, 2021, the maximum award is $3,772. If students fail to fulfill the service requirements specific to the program, their TEACH Grants convert to Direct Unsubsidized Loans, with interest accruing from the time of the award. In FY 2020, the Department disbursed more than 25,000 grants totaling $78.1 million under the TEACH Grant Program.

**The Iraq and Afghanistan Service Grant Program**, which became effective July 1, 2010, provides non-need-based grants to students whose parent or guardian was a member of the Armed Forces and died in Iraq or Afghanistan because of military service after September 11, 2001. These grants are awarded to students who are not eligible for a Pell Grant based on financial need, but meet the remaining Pell Grant eligibility requirements, and:

- Have a parent or guardian who was a member of the U.S. Armed Forces and died as a result of military service in Iraq or Afghanistan after the 9/11 events, and

- Were under 24 years old or enrolled in college at least part-time at the time of the parent or guardian's death.

For any 2020–21 Iraq and Afghanistan Service Grant first disbursed on or after October 1, 2019, and before October 1, 2020, the maximum award is approximately $5,971. For any 2020–21 Iraq and Afghanistan Service Grant first disbursed on or after October 1, 2020, and before October 1, 2021, the maximum award is approximately $5,983. The Department disbursed approximately $525,000 to support fewer than 100 awards in FY 2020.

### Federal Work-Study Program

The **Federal Work-Study Program** is one of three campus-based programs through which the Department provides funds directly to eligible institutions. Funds provided through this program enable eligible institutions to offer part-time employment to undergraduate, graduate, and professional students based on financial need, allowing them to earn money to help pay education expenses. The program is available to full-time or part-time students and encourages community service work. The work is often related to the student's course of study. In FY 2020, approximately $1.1 billion were disbursed through more than 731,000 campus-based awards.

# Performance Management

The Performance Management section of the *Annual Report* provides a general overview of the performance management processes at FSA. The foundation of performance management within FSA is the five-year strategic plan. The key strategic drivers relevant to the strategic planning process within FSA are listed below.

**Table 5: Key Strategic Drivers Relevant to FSA Strategic Planning**

| Key Strategic Driver | Relevance to FSA's Strategic Planning Process |
|---|---|
| *The Higher Education Act of 1965* legislation | Prescribes Title IV program and PBO requirements (i.e., improve service, reduce costs, improve, and integrate support systems, develop delivery and information systems, and enhance staff development and talent). |
| Student and borrower needs | Students and borrowers are key customers of FSA services and products. |
| Key trends and conditions for the financial aid environment | Indicates student aid environment within which FSA must operate. Listed below are key trends that may affect the financial aid environment. <ul><li>The size and performance of FSA's portfolio of loans has direct implications for taxpayers.</li><li>Students are making high impact financial decisions without the benefit of adequate financial knowledge.</li><li>Digital fluency and mobile ubiquity are driving new service expectations among customers.</li><li>Increased volume of student data has created new opportunities, obligations, and risks.</li></ul> |
| The Department's Five-Year Strategic Plan | Requires FSA's support of the Department's strategic goals related to postsecondary education. |
| Office of Inspector General's (OIG) Management Challenges | Requires the Department and FSA senior management's consideration for establishing priorities. OIG's Management Challenges for FY 2020 include: <ul><li>Improper Payments,</li><li>Information Technology Security,</li><li>Oversight and Monitoring, and</li><li>Data Quality and Reporting.</li></ul> |
| OIG and GAO audits | Requires FSA senior management's consideration for establishing priorities to address findings and recommendations. |
| Federal financial management laws and regulations | Prescribes financial management requirements. |
| Federal performance reporting legislation and requirements | Prescribes performance and reporting requirements. |
| Federal budget deficits | Requires FSA to look for opportunities to reduce operating costs through improved efficiency. |

**Performance Management**

The key strategic drivers inform the strategic planning process, aligning FSA with the PBO requirements outlined in the 1998 Amendments to the HEA while ensuring future consistency and accountability. In this way, the key strategic drivers influenced the development and implementation of FSA's strategic plan, as well as the development and tracking of performance measures. The Performance Management section illustrates the outcome of this effort by discussing the following:

- FSA's transition to a new *FY 2020–24 Strategic Plan*,
- FSA's performance management processes,
- FSA's FY 2020 strategic goals,
- FSA's alignment to the Department's *FY 2018–22 Strategic Plan*, and
- FSA's efforts to validate the quality of performance data reported.

The performance management framework outlined in this section provides the foundation for the presentation of both performance achievements and challenges experienced in FY 2020. The section also highlights the organizational emphasis to create a more robust culture of performance management through collaboration internally and with Department officials.

## FSA's Transition to the FY 2020–24 Strategic Plan

In FY 2019, FSA initiated the development of an organizational five-year performance plan that aligned with its vision to create a more student-focused, agile, and transparent organization. The plan, *FY 2020–24 Strategic Plan*, establishes ambitious goals and objectives to ensure that FSA will continue to improve upon its mission while increasing accountability in all areas of organizational performance. As FSA also continues its implementation of the Next Gen FSA initiative, staged to transform nearly every aspect of the federal student aid programs, the draft *FY 2020–24 Strategic Plan* creates measurable outcomes consistent with the effort.

From an organizational performance standpoint, FSA managed the organization towards the strategic goals, objectives, and performance metrics established in the draft *FY 2020–24 Strategic Plan* throughout FY 2020. To maintain consistency with the previous *FY 2015–19 Strategic Plan*, FSA transitioned eight performance metrics into the draft *FY 2020–24 Strategic Plan*. FSA aligned the transitioned metrics under the appropriate goals and objectives to strengthen the range of measurement in key performance areas. FSA also discontinued the utilization of five performance metrics from the *FY 2015–19 Strategic Plan* and will no longer use these performance metrics to measure organizational progress.

To increase accountability, FSA introduced 36 new performance metrics in the draft *FY 2020–24 Strategic Plan*. Therefore, there are a total of 44 performance metrics within the new plan in comparison to 13 performance metrics outlined in the previous one. The significant increase in performance metrics associated with the draft *FY 2020–24 Strategic Plan* is illustrative of FSA's concerted effort to evaluate its progress across its five strategic goals through clear and measurable strategic objectives to reinforce accountability and transparency in operations. By assigning detailed performance metrics to each goal and objective throughout the plan, FSA broadened its scope to analyze organizational progress. In this way, both now and in the future, FSA can establish performance targets that are aligned with measurable outcomes of organizational success.

To review the performance metrics transitioned and discontinued from the *FY 2015–19 Strategic Plan*, please refer to the Crosswalk between FY 2015–19 and FY 2020–24 Strategic Plans (Table 6). For a more detailed discussion of the goals, objectives and performance metrics associated with the *FY 2020–24 Strategic Plan*, please refer to the *Annual Performance Report* section of this document.

**Table 6: Crosswalk between FY 2015–19 and FY 2020–24 Strategic Plans**

| Performance Metrics FY 2015–19 Plan | Disposition in FY 2020–24 Plan |
|---|---|
| **A.1** Percent of First-Time FAFSA Filers Among High School Seniors | **2.1.B** Percentage of high school seniors submitting the FAFSA. |
| **A.2** Persistence Among First-Time Filing Aid Recipients | **5.1.E** Persistence among first-time filing aid recipients. |
| **A.3** Customer Visits to StudentAid.gov | **2.1.A** Number of visits (sessions) demonstrating adoption of the updated StudentAid.gov site. |
| **A.4** Social Media Channel Subscribership | **Discontinued in FY 2020** |
| **A.5** ACSI Aid Life Cycle Surveys | **2.2.G** American Customer Satisfaction Index (ACSI) Aid Lifecycle Survey score. |
| **B.1** Improper Payment Rate | **Discontinued in FY 2020** |
| **B.2** Percent of Borrowers > 90 Days Delinquent | **5.3.C** Percent of Borrowers > 90 Days Delinquent. |
| **C.1** Aid Delivery Costs Per Application | **Discontinued in FY 2020** |
| **C.2** Outstanding Direct Loan Portfolio in Current Repayment Status | **5.1.C** Outstanding Direct Loan Portfolio in Current Repayment Status. |
| **D.1** Ease of Doing Business with FSA | **3.2.D** Ease of doing business with FSA. |
| **D.2** Percentage of Contract Dollars Competed by FSA | **Discontinued in FY 2020** |
| **D.3** Collection Rate | **Discontinued in FY 2020** |
| **E.1** Employee Engagement Index | **1.1** Improve Federal Employee Viewpoint Survey score: Employee Engagement Index. FSA's scores will improve the first year and continue to increase 1–2% annually. |

## Performance Management Processes at Federal Student Aid

During FY 2020, FSA used a tiered performance management framework to establish goals and communicate, measure, and report performance:

- *FSA FY 2020–24 Strategic Plan*
- Weekly Performance Accountability Meetings
- *Annual Performance Report*
- Department's Quarterly and Annual Performance Reviews
- Agency Priority Goals (APGs)

### FSA's *FY 2020–24 Strategic Plan*

The *FY 2020–24 Strategic Plan* outlines goals, objectives, and performance metrics that provide a roadmap for how FSA will successfully operate, respond to change, and execute its mission moving forward. These strategic goals collectively provide the framework for continuous improvement at FSA, guiding the organization in managing its programs more effectively, and providing clear strategic direction to all of FSA's internal and external constituencies. To provide the framework to effectively achieve these outcomes the five-year strategic goals must be:

- Appropriate to the mission of the organization,
- Realistic and measurable,
- Achievable in the time frame established and challenging in their targets, and
- Understandable to the layperson with language that is unambiguous and terminology that is adequately defined.

As stated, each strategic goal encompasses objectives and identifies performance metrics to measure FSA's level of success in meeting the strategic goal. For each performance metric, FSA identifies a target level of performance for each fiscal year. FSA sets the target level of performance at a challenging, but realistic level that is achievable within the timeframe. Meeting or exceeding the target indicates that FSA succeeded in attaining the established performance metric, while falling short of the target indicates that FSA did not attain the performance metric. The following table summarizes the key components of the *FY 2020–24 Strategic Plan*.

### Table 7: Key Components of the FY 2020–24 Strategic Plan

| Key Component | Description |
|---|---|
| Strategic Goals | Statements of long-term purpose outlined in the *FY2020–24 Strategic Plan* that define how FSA will accomplish its mission. These goals are aligned to FSA's responsibilities as a PBO. |
| Objectives | Statements that describe the tactical activities FSA will perform to achieve the associated strategic goal. |
| Performance Metrics | Levels of performance over a certain timeframe used to gauge FSA's success in reaching its strategic goals. These metrics include targets and timeframes. |
| Targets | Indicators of the desired performance levels or specific desired results targeted for a given fiscal year. Targets, if available, are expressed in quantifiable terms and are compared to the actual result to determine level of performance. |

## FSA's *FY 2020–24 Strategic Plan* – At a Glance

The *FY 2020–24 Strategic Plan* outlines strategic goals and objectives that will be used to track and evaluate FSA's progress toward meeting its mission. The following table provides an abbreviated view of the *FY 2020–24 Strategic Plan*.

### Table 8: Strategic Goals and Strategic Objectives for Fiscal Years 2020–24

| Strategic Goal 1 | Strategic Objectives |
|---|---|
| Empower a High Performing Organization | **1.1**: Improve employee engagement and workplace inclusion to develop and retain talent, improve employee satisfaction, and engage in effective succession planning. |
| | **1.2:** Expand employee skills and capabilities to support Next Gen FSA. |
| **Strategic Goal 2** | **Strategic Objectives** |
| Provide World-Class Customer Experience to the Students, Parents, and Borrowers We Serve | **2.1**: Ensure that all students can easily access information on federal student aid, apply for federal student aid, and have information on repayment options. |
| | **2.2:** Provide seamless, easy, personalized digital interactions equal with top financial institutions in the delivery of financial aid products and services. |
| | **2.3:** Streamline contact center and back-office operations to improve our customers' integrated experience. |
| | **2.4:** Simplify the communication and processes associated with borrower repayment plans. |
| **Strategic Goal 3** | **Strategic Objectives** |
| Increase Partner Engagement and Oversight Effectiveness | **3.1:** Provide effective oversight of FSA's partners utilizing a comprehensive suite of monitoring tools. |
| | **3.2:** Strengthen partner engagement and provide effective outreach and assistance. |

| Strategic Goal 4 | Strategic Objectives |
|---|---|
| Strengthen Data Protection and Cybersecurity Safeguards. | **4.1:** Implement business partner and vendor systems that house, manage, and provide systems supporting FSA business processes, outreach and awareness focused on oversight, enforcement, infrastructure, systems, and data. |
| | **4.2:** Improve student privacy data and cybersecurity controls of Institutions of Higher Education (IHEs) through outreach and communication to mitigate future cyber-incidents and breaches. |
| | **4.3:** Build an effective cybersecurity culture through employee awareness, training and accountability focused on protecting systems and data. |

| Strategic Goal 5 | Strategic Objectives |
|---|---|
| Enhance the Management and Transparency of the Portfolio | **5.1:** Improve the management and transparency of FSA's student loan portfolio performance. |
| | **5.2:** Provide analytics and operational support for a customer-centric, data-driven, performance-based organization. |
| | **5.3:** Leverage portfolio analytics to drive improved outcomes for customers and taxpayers. |
| | **5.4:** Increase vendor performance through quality management activities centered on customer service and product delivery. |

## Weekly Performance Accountability Meetings

Throughout FY 2020, FSA measured and analyzed performance based upon performance metric results outlined in the draft *FY 2020–24 Strategic Plan*, as well as various internal metrics used for operational management. The analysis of performance is a transparent process within the organization, executed through weekly performance accountability meetings with the FSA leadership and management team.

Each week, the analysis of specified performance metrics is presented through various performance dashboards to the FSA leadership and management team by program managers responsible for outcomes. In the weekly meetings, progress of the designated performance metrics, both negative and positive, is discussed in an open forum. For any performance metrics not on track, the analysis must include identification of the root cause of the unexpected result and a recommendation of the appropriate corrective actions necessary to improve performance. Performance dashboards for the draft *FY 2020–24 Strategic Plan* and the performance metrics associated with the Department's Quarterly Performance Review were also developed in FY 2020 and utilized to discuss performance metric progress on a quarterly basis.

### Annual Performance Report

To report progress on meeting the strategic goals, FSA prepares and publishes an *Annual Performance Report,* which is included in the *Annual Report.* In addition to the *Annual Performance Report*, the *Annual Report* includes FSA management's discussion and analysis of financial and performance results, its audited financial statements and notes, and the report of the independent auditors.

### Department of Education Quarterly and Annual Performance Reviews

The Quarterly and Annual Performance Review meetings and data calls are part of the Department-wide performance management system. The meetings, associated data collection, and reporting protocols operate at the principal office level and are designed to integrate and

align all of the Department's performance management elements, including the *U.S. Department of Education Strategic Plan for Fiscal Years 2018–22,* APGs, the priorities of the President and other principal offices, and legal requirements. The Quarterly Performance Review framework primarily focuses on process improvements and capacity building, providing principal offices an opportunity to establish specific milestones. FSA tracks the status of its Quarterly Performance Review metrics and reports on its progress to the Department on a quarterly and annual basis.

The Department's goals, objectives, and performance measures have been integrated seamlessly into FSA's draft *FY 2020–24 Strategic Plan*. Fourteen performance measures are shared between the plans, and others are built into the objectives. The decision to have shared performance metrics between the plans was made during the development of the strategic plan to ensure there was both consistency and alignment between the Department and FSA. This decision will improve customer service, partner collaboration, and oversight throughout FSA's ongoing efforts. Currently, FSA directly supports the following Department strategic goals:

- **Goal 2:** Expand postsecondary educational opportunities; improve outcomes to foster economic opportunity; and promote an informed, thoughtful, and productive citizenry.

- **Goal 3:** Strengthen the quality, accessibility, and use of education data through better management, increased privacy protections, and transparency.

- **Goal 4:** Reform the effectiveness, efficiency, and accountability of the Department through its focuses on vendor management, risk mitigation, and cybersecurity.

## Agency Priority Goals

APGs are a performance accountability structure of the *Government Performance and Results Modernization Act of 2010* (Pub. L. 111-352) that provide agencies a mechanism to focus on leadership priorities, set outcomes, and measure results, bringing focus to mission areas where agencies need to drive significant progress and change. APG statements are outcome-oriented, ambitious, and measurable with specific targets set that reflect a near-term result or achievement agency leadership wants to accomplish within approximately 24 months.

In FY 2020, the Department identified five proposed APGs for FY 2020–21. These APGs were focused on an increase in educational choice, enhancing multiple pathways for student success in career and job ready skills, improving the customer service the Department provides, and improving student privacy protection and cybersecurity at institutions of higher education and provide regulatory relief and burden reduction to education stakeholders. Of the five APGs, two were closely tied to FSA's mission and were supported by FSA during FY 2020. They are:

- **Related to Goal 2.4 – APG:** The Next Generation Financial Services Environment (Next Gen FSA) will personalize and improve customers' experience when they engage with Federal Student Aid (FSA); and

- **Related to Goal 3.2 – APG:** Improve Student Privacy and Data Security at Institutions of Higher Education through Outreach and Compliance Efforts.

Each quarter, the Department analyzes the progress toward accomplishing the Departmental APGs, with the objective of successfully accomplishing the current APGs by September 30, 2021.

To achieve the success of the Goal 2.4 APG, FSA is responsible for improving the customers' experience throughout the entire student aid life cycle by continuing to modernize capabilities for the FAFSA application and the servicing and repayment of student loans. As noted in the APG, Next Gen FSA is the Department's transition to the digital future of FSA and aims to shift FSA to be a more customer-centric organization. It is the Department's expectation, articulated within the APG Achievement Statement, that FSA will build products and services that meet customers' expectations. The Department notes that this strategy is predominately used in private industry, and now several government agencies, including FSA, are following this customer-centric model. The FY 2020 approved Goal 2 APG statement is:

By September 30, 2021, FSA will transform its relationship with prospective and current customers through deployment of significant components of the Next Gen FSA that result in a personalized experience:

- The number of individuals submitting a Free Application for Federal Student Aid® (FAFSA®) through a mobile device will increase to 2.6 million.

- The overall customer satisfaction level throughout the student aid life cycle, as measured by the FSA Customer Satisfaction score[7], will increase.

Therefore, the APG is aligned with the progress of Next Gen FSA and is measured by the following customer-centric metrics in FY 2020:

- Number of customers submitting the FAFSA forms via a mobile platform—either through the myStudentAid mobile app or mobile-optimized **FAFSA.gov**.

- The overall customer satisfaction level throughout the student aid life cycle, as measured by the ASCI.

- Number of customers checking loan balances via the myStudentAid mobile app.

- Number of users adopting a virtual assistant that will answer questions about federal student aid.

- Number of visits (sessions) to the redesigned **StudentAid.gov** website.

For data validation purposes, mobile app and FAFSA data are collected from Apple's App Store, Google Play, and FSA's online platform analytics. For number of downloads of the app, FSA generates a monthly report directly from Apple's App Store and Google Play. The data are reported as a cumulative number for all three months within the quarter, and summarily for the entire fiscal year reporting.

For the Goal 3.2 APG, FSA works with the Department's Office of the Chief Information Officer (OCIO). The Goal 3.2 APG statement is:

By September 30, 2021, the Department will participate in 12 engagements with sector-related Non-Governmental Organizations (NGOs) to inform the development of five best practice programmatic improvements such as, by:

1) Issuing guidance to IHEs to provide a definition of information security breach and when and how to report a breach;

2) Establishing secure mechanisms for breach notification, including secure storage for such information; or

3) Creating a process through which IHEs can validate compliance notifications and reporting requests.

As previously stated, this is also a two-year APG covering FY 2020 and FY 2021. FSA and the Department will achieve this APG through collaborative efforts involving training, outreach, monitoring, and reporting to include:

---

[7] The Federal Student Aid Customer Satisfaction Score is an annual composite metric that measures the overall customer satisfaction level throughout the student aid life cycle FAFSA applicants (mobile and **FAFSA.gov**), Title IV aid recipients in school, and borrowers in repayment. The score is based on the American Customer Satisfaction Index surveys.

- Issuing best practice programmatic improvements documents to IHEs to provide a definition of information security breach and on when and how to report an information security breach.

- Establishing secure mechanisms for breach notification, including secure storage for such information.

- Creating a process through which IHEs can validate compliance notifications and reporting requests.

- Developing a collaborative IHE outreach strategy in compliance with the Gramm-Leach-Bliley Act (GLBA) and constructing an outreach timeline.

- Conducting ongoing outreach activities by FSA and the Privacy Technical Assistance Center within the Student Privacy Policy Office related to privacy and data security requirements.

- Tracking the timeliness of privacy and data security reports received by FSA as a result of FSA outreach activities.

For data validation purposes regarding the outreach metric, the activity records maintained by FSA and the Department's OCIO through the Department's Privacy Technical Assistance Center, are recorded on a SharePoint site. Based on actions by contractors, Department personnel, and FSA personnel, data accuracy is high, reliable, and consistent.

All APG metric results were also made available on **Performance.gov** each quarter for public view.

## Quality of Performance Data

Ensuring the integrity of the data required to determine performance results is a critical step in reporting performance. For this step, FSA developed and implemented a Validation and Verification Matrix. Specifically, FSA uses this matrix as a tool to validate the completeness and reliability of the underlying data gathered and used to calculate each performance metric for the reporting period, including the performance results reported in this *Annual Report*. For each performance metric, this matrix is used to document the following: measurement definition and owner; data source, availability, security procedures, and known limitations; whether data are subject to FSA's OMB Circular A-123 Internal Control Review process; and procedures for accessing the data, calculating the performance metric, and validating and verifying the data gathered.

In FY 2020, FSA updated its approach to create the matrix using an online information collection tool. The information collection tool automated the process of information gathering across the organization. In addition, the information received by the tool was also used to establish the process of performance reporting and generate content for this report.

For a discussion of data quality and limitations for each performance metric, please see the section Performance Results by Strategic Goal, contained in the *Annual Performance Report* section.

# Analysis of Financial Statements

## Introduction

The Analysis of Financial Statements section provides an overview of FSA's financial results for FY 2020. This section assists readers in understanding FSA's financial results, position, and condition as reflected in the financial statements and notes located in the Financial Section of this report. The financial analysis explains major changes in assets, liabilities, costs, and budgetary resources. It also includes comparisons of the current year to the four prior years and discusses the relevance of significant balances, amounts, and trends reflected in the financial statements and notes.

FSA is committed to providing sound management, financial systems, and controls to ensure students receive aid and repay loans according to applicable laws and regulations. FSA's financial statements are prepared in accordance with established federal accounting standards and reporting requirements. The financial statements are subject to an annual independent audit to determine whether FSA's financial statements present fairly FSA's financial position, net cost, changes in net position, and budgetary resources. In FY 2020, FSA achieved an unmodified audit opinion on its financial statements for the eighteenth consecutive year.

FSA presents its financial statements and notes in the format required by OMB Circular A-136, *Financial Reporting Requirements*. For FY 2020 and FY 2019, the Balance Sheet, Statement of Net Cost, and Statement of Changes in Net Position were prepared on a consolidated basis, whereas the Statement of Budgetary Resources was prepared on a combined basis. These financial statements, along with the Independent Auditors' Report on these statements, can be found in the Financial Section of this *Annual Report.*

FSA has oversight responsibilities for more than $1.5 trillion in federal student loans, of which it directly owns and manages approximately $1.4 trillion. The remaining balance represents non-defaulted FFEL Guaranteed loans held by lenders and Federal Perkins loans held by schools, as detailed in Note 5**.** As described in Note 1 and Note 5, FSA reports its portfolio of federal student loans on its Balance Sheet, on the line item Credit Program Receivables, Net. This is the gross amount of loans and interest receivable less an allowance for the present value of amounts not expected to be recovered (Allowance for Subsidy). Subsidy Expense is a factor included in the Allowance for Subsidy and represents an estimate in present value terms of the cost to the government of direct loans and loan guarantees. Subsidy Expense is recorded in the year a loan is disbursed and updated annually through a re-estimation process. It includes default costs (net of recoveries), contractual payments paid to third-party private collection agencies (PCAs), and net borrowing costs, less any origination or other fees collected. If the net cost to the government is greater than zero, then the subsidy expense is said to be positive. However, the subsidy expense may also be zero (break-even), or it may be negative if the estimated cost of providing loans to borrowers is less than the value of collections received as interest and fees. As of September 30, 2020, FSA reported $1.2 trillion in Credit Program Receivables, Net after deducting an Allowance for Subsidy of approximately $258.3 billion. Credit Program Receivables, Net was 0.3 percent less than the prior-year amount which resulted from a 8.9 percent decrease in FSA's underlying portfolio of credit program receivables that was offset by adjustments that decreased the FY 2020 Allowance for Subsidy by

approximately 38 percent from the FY 2019 amount. The reasons for the adjustment to the Allowance for Subsidy estimate are explained in Note 5.

The FY 2020 FSA Financial Highlights tables presented below provide a condensed summary of the significant balances in FSA's Balance Sheets and Statements of Net Cost over a five-year period, beginning with FY 2016. The tables also show the percentage change between the prior and current fiscal years as of September 30, 2019 and 2020, respectively. The figures and tables presented in this section include rounding adjustments to ensure that the component line items sum to the corresponding total. As a result, there may be small discrepancies between the amounts shown in a particular figure or table when compared to similar items discussed in the text or presented in other areas of the Annual Report.

### Table 9: Federal Student Aid Financial Highlights
### Condensed Balance Sheets
### Fiscal Years 2016–20
(Dollars in millions)

| Asset | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Percentage Change[8] |
|---|---|---|---|---|---|---|
| Fund Balance with Treasury | $60,358 | $74,032 | $73,405 | $62,567 | $70,266 | 12.3% |
| Credit Program Receivables, Net | 1,075,227 | 1,145,406 | 1,209,495 | 1,202,092 | 1,169,614 | (2.7) |
| Remaining Assets | 1,334 | 2,256 | 2,365 | 2,217 | 2,171 | (2.1) |
| **Total Assets** | **$1,136,919** | **$1,221,694** | **$1,285,265** | **$1,266,876** | **$1,242,051** | **(2.0)%** |
| | | | | | | |
| Debt | $1,126,345 | $1,178,473 | $1,258,481 | $1,287,494 | $1,249,807 | (2.9)% |
| Subsidy due to Treasury General Fund | 2,642 | 7,013 | 7,528 | 10,302 | 3,283 | (68.1) |
| Remaining Liabilities | 9,614 | 13,000 | 10,197 | 13,971 | 8,350 | (40.2) |
| **Total Liabilities** | **$1,138,601** | **$1,198,486** | **$1,276,206** | **$1,311,767** | **$1,261,440** | **(3.8)%** |
| | | | | | | |
| Unexpended Appropriations | $26,531 | $28,524 | $32,487 | $31,400 | $35,038 | 11.6% |
| Cumulative Results of Operations | (28,213) | (5,316) | (23,428) | (76,291) | (54,427) | 28.7) |
| **Net Position** | **$(1,682)** | **$23,208** | **$9,059** | **$(44,891)** | **$(19,389)** | **(56.8)** |
| **Total Liabilities & Net Position** | **$1,136,919** | **$1,221,694** | **$1,285,265** | **$1,266,876** | **$1,242,051** | **(2.0)%** |

### Table 10: Statements of Net Cost
### (Summarized)
### Fiscal Years 2016–20
(Dollars in millions)

| Asset | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Percentage Change[9] |
|---|---|---|---|---|---|---|
| Gross Cost | $93,032 | $73,771 | $71,232 | $144,865 | $171,245 | 18.2% |
| Less: Earned Revenue | (34,260) | (35,825) | (36,224) | (36,820) | (39,384) | 7.0 |
| **Net Cost of Operations** | **$58,772** | **$37,946** | **$35,008** | **$108,045** | **$131,861** | **22.0%** |

---

[8] The percentage change is calculated as the difference between FY 2019 and FY 2020, divided by the FY 2019 amount. In some instances, where the current-year amount has an opposite sign to the prior-year amount, the percentage change may be negative even though the annual change is positive (and vice versa). Similarly, if the current-year negative amount has a larger negative value than the prior-year negative amount, the difference will be negative, but the percentage change will be positive.
[9] Refer to Footnote 6.

## Balance Sheet

The Balance Sheet presents the recorded value of assets and liabilities retained or managed by FSA as of a specific point in time. The assets represent resources available for use by FSA to pay its liabilities or to satisfy its future service needs. The liabilities are amounts FSA owes, the probable and measurable future outflows of its resources arising from past transactions or events. The difference between the assets and the liabilities represents FSA's net position.

The consolidated Balance Sheet shows that FSA had total assets of $1,242.1 billion as of September 30, 2020, a decrease of $24.8 billion, or 2.0 percent under the September 30, 2019 total assets balance of $1,266.9 billion. The difference resulted primarily from a 12.3 percent increase in Fund Balance with Treasury ($7.7 billion), combined with a 2.0 percent decrease in net Credit Program Receivables ($32.5 billion). Together, FSA's Fund Balance with Treasury and its net Credit Program Receivables accounted for approximately 99.9 percent of Total Assets as of September 30, 2020, as illustrated in the Composition of Assets chart (Figure 9). The Comparison of Assets chart (Figure 10) presents changes in these two principal Balance Sheet line items over the past five fiscal years.

**Figure 9: Composition of Federal Student Aid Assets\***
**Fiscal Years 2016–20**



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| ▯ Credit Program Receivables, Net | 94.6% | 93.8% | 94.1% | 94.9% | 94.2% |
| ▮ Fund Balance with Treasury | 5.3% | 6.1% | 5.7% | 4.9% | 5.7% |
| ▪ Remaining Assets | 0.1% | 0.1% | 0.2% | 0.2% | 0.2% |

\*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Figure 10: Comparison of Federal Student Aid Assets\***
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| ▭ Credit Program Receivables, Net | $1,075.2 | $1,145.4 | $1,209.5 | $1,202.1 | $1,169.6 |
| ▬ Fund Balance with Treasury | $60.4 | $74.0 | $73.4 | $62.6 | $70.3 |
| ▬ Remaining Assets | $1.4 | $2.3 | $2.4 | $2.2 | $2.1 |
| ✕ Total Assets | $1,137.0 | $1,221.7 | $1,285.3 | $1,266.9 | $1,242.1 |

\*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Analysis of Financial Statements**

**Credit Program Receivables, Net.** FSA's Credit Program Receivables, Net balance of $1,169.6 billion balance as of September 30, 2020, represents FSA's most important asset category and accounted for almost 95 percent of Total Assets. This balance includes $1,330.2 billion in principal, interest, and fees, less an allowance for subsidy cost of approximately $160.6 billion that adjusted the loan portfolio to its estimated present value. FSA reports the total amount under the three major program categories Direct Loan, FFEL, and Other, as illustrated in Figure 11 below and discussed more fully in the following sections.

**Figure 11: Total Federal Student Aid Loan Portfolio***
**Net of Allowance for Subsidy**
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Direct Loans | $958.9 | $1,041.6 | $1,115.1 | $1,123.7 | $1,100.5 |
| FFEL | $114.9 | $102.4 | $92.9 | $76.8 | $67.4 |
| Other Programs | $1.4 | $1.4 | $1.5 | $1.6 | $1.7 |
| Total | $1,075.2 | $1,145.4 | $1,209.5 | $1,202.1 | $1,169.6 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

Figure 11 also shows that over the four-year period 2016–20, FSA's portfolio of FSA net credit program receivables increased by $94.4 billion or 8.8 percent. The Direct Loan program accounted for most of this change, increasing by $141.6 billion (14.8 percent), offset by the $47.5 billion (41.3 percent) reduction of the FFEL Portfolio over the same period. However, the overall upward trend reversed in FY 2020 when the $9.4 billion (12.2 percent) net reduction in FFEL net credit program receivables coincided with the $23.2 billion (2.1 percent) decrease in Direct Loan credit program receivables. The overall reduction in FSA's net credit program receivables portfolio was $32.5 billion or 2.7 percent.

The directional changes observed in the Direct Loan and FFEL portfolios are principally related to the impact of the SAFRA Act, which as of June 30, 2010, eliminated all new loan originations under the FFEL Program in favor of direct lending. Loan consolidation has also played a role. Consolidation is the process of combining one or more federal student loans into one loan. For more information about which federal loans may be eligible for consolidation and other requirements, please visit **StudentAid.gov/consolidation**. Another significant factor in FY 2020 was a decrease to the allowance for subsidy cost by $97.7 billion (almost 38 percent). The reasons for the adjustment to the subsidy cost estimate are explained in Note 5.

**Analysis of Financial Statements**

**Direct Loan Credit Program Receivables, Net**. Direct Loan Credit Program receivables continue to be the major component of FSA's credit program receivable portfolio in FY 2020. As of September 30, the $1,100.5 billion Direct Loan portfolio ending balance comprises 94.2 percent of FSA's total credit program receivables net, compared to the prior year ending balance of $1,123.7 that represented 94.9 percent. The FY 2020 Direct Loan ending balance total includes $1,316.9 billion in principal, interest, and fees, with an allowance for subsidy cost to the government of $216.4 billion. This amount contrasts to the prior year where the subsidy costs were projected at $124.5 billion on Direct Loan principal, interest, and fees of $1,248.2 billion. The factors that contributed to the variance in subsidy cost at a time when the underlying loan balances increased by 5.5 percent are addressed in Note 5.

The FY 2020 $68.7 billion increase in Direct Loan Receivables (before subsidy costs) was mainly driven by the growth in the outstanding amount owed by borrowers, principally resulting from new loan originations ($86.1 billion), consolidation disbursements ($30.4 billion), and the net increase in accrued interest and fees ($8.8 billion). This was offset by reductions to principal due to loan payments by borrowers ($53.1 billion), loan discharges ($7.7 billion), and other adjustments.

The growth in principal outstanding has accounted for virtually all growth of the Direct Loan portfolio over the past five years in dollar terms, as seen in Figure 12. Over the same period, Table 12 shows that accrued interest increased at a higher average annual rate than did principal outstanding (8.9 percent versus 20.3 percent), although, as illustrated by Table 11, accrued interest only increased from 5.3 percent to 8.4 percent of the net receivable amount, while principal outstanding increased from 94.1 percent to 111.3 percent of the net amount. See Note 5 for more details.

### Figure 12: Components of Direct Loan Receivables, Net*
### Fiscal Years 2016–20[10]
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Principal | $902.8 | $998.8 | $1,083.7 | $1,164.9 | $1,224.8 |
| Accrued Interest* | $50.8 | $59.6 | $72.0 | $83.3 | $92.1 |
| Allowance for Subsidy | $5.3 | $(16.8) | $(40.6) | $(124.5) | $(216.4) |
| Net Receivable | $958.9 | $1,041.6 | $1,115.1 | $1,123.7 | $1,100.5 |
| Total Recipients | 31.5 | 33.0 | 34.2 | 35.1 | 35.9 |

---

[10] Line items may include rounding adjustments to reconcile to the total amount being reported. Recipient numbers come from the Data Center or NSLDS. See Footnote 12

Figure 12 also includes the number of recipients corresponding to the outstanding loan portfolio at each fiscal year end. Recipients are students that benefit from the federal student loans. In most cases, a recipient is the borrower; but in the PLUS loans, the parent is the borrower, and the student is the recipient. The chart shows that Direct Loan recipients grew from 31.5 million to 35.9 million over the five-year period, reflecting, as reported in Table 12, an average annual increase of 3.3 percent, well below the rate of increase of principal and interest described earlier. As a result, the average debt (principal and interest) balance outstanding per Direct Loan recipient increased by 21.1 percent during this time, from $30,273 to $36,682; the higher debt burden per student is likely an indication of increasing postsecondary education costs.

**Table 11: Components of Direct Loan Credit Program Receivables, Net by Percentage***
**Fiscal Years 2016–20**

| Direct Loan Component | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Principal* | 94.1% | 95.9% | 97.2% | 103.7% | 111.3% |
| Accrued Interest | 5.3% | 5.7% | 6.5% | 7.4% | 8.4% |
| Allowance for Subsidy | 0.6% | (1.6)% | (3.7)% | (11.1)% | (19.7)% |
| Net Receivable | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Table 12: Increase in Principal, Interest and Subsidy Components of Direct Loan Credit**
**Program Receivables, Net and Recipient Counts***

| Direct Loan Component | FY 2016–17 | FY 2017–18 | FY 2018–19 | FY 2019–20 | FY 2016–20 Average Year-to-Year Change |
|---|---|---|---|---|---|
| Principal | 10.6% | 8.5% | 7.5% | 5.1% | 7.9% |
| Accrued Interest | 17.7% | 21.0% | 15.7% | 10.6% | 16.1% |
| Allowance for Subsidy | (415.1)% | (143.1)% | (206.7)% | 73.8% | (172.8)% |
| Net Receivable | 8.6% | 7.1% | 0.8% | (2.1)% | 3.6% |
| Total Recipients | 4.8% | 3.6% | 2.6% | 2.3% | 3.3% |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

While the Direct Loan portfolio has grown rapidly in recent years, it has also changed in character as an increasing proportion of students begin the repayment phase of their loans. Under Title IV, each loan may pass through several distinct statuses as the student progresses through the loan life cycle, from borrowing to repaying.

Repayment on most federal student loans is not required while the student recipient is "In School" unless they drop below half-time enrollment. However, PLUS loans enter repayment as soon as the loan is fully disbursed. Then, after the student graduates, leaves school, or drops below half-time enrollment, student borrowers are frequently entitled to a "Grace" period. During this period, repayment is not required to begin on the loan. Not all federal student loans have a grace period and for most loans, interest will accrue during the grace period. At the end of the grace period, the loan will enter "Repayment" status and regular monthly payments will be required according to an agreed upon payment schedule. If the borrower continues to make timely payments such that no more than 30 days elapse after the due date without payment, then the loan is classified as "Current." If more than 30 days elapse, then the loan will be reclassified as "Delinquent." Under Title IV, if more than 270 days pass without payment being

received to satisfy the oldest payment due, Direct Student Loans are technically considered "In Default".[11] The status continues to be tracked through the life of the loan until the loan is paid in full or otherwise closed out.

On March 20, 2020, the Secretary directed the FSA to provide the following relief on Department-held federal student loans: suspend loan payments; stop collections on defaulted loans; and set interest rates to 0 percent for a period of 60 days. This relief was provided retroactively to borrowers beginning on March 13, 2020. On March 27, 2020, Congress passed, and the President signed into law, the CARES Act, which extended the above described relief measures and provided additional relief measures through September 30, 2020. On August 8, 2020, the President directed the Secretary to continue to provide relief for Department-held loans until December 31, 2020. The Department has extended the relief provided to borrowers in the CARES Act through December 31, 2020. The relief provided to borrowers from March 13, 2020 through March 26, 2020, and from October 1, 2020 through December 31, 2020, was provided under the Secretary's authority in the *Higher Education Relief Opportunities for Students Act of 2003*.

Figure 13[12] divides FSA's portfolio of direct loans into two main categories, based on repayment status. For the purpose of this discussion,[13] loans are classified as "In Repayment" if, under the terms of the promissory note, the loan is current, delinquent, defaulted, in non-defaulted bankruptcy, or in a disability status. Alternatively, loans are classified as "Not in Repayment" if the borrower is "In School", "In Grace", or has been granted a deferment or a forbearance. The loan status "Deferment" includes loans for which payments have been postponed due to certain circumstances, such as returning to school, military service, or economic hardship. Similarly, "Forbearance" includes loans for which payments have been temporarily suspended or reduced because of certain types of financial hardships. Figure 13 reports the portfolio balance as the sum of principal and interest balances (i.e., the gross amount) owed by the borrower and excludes any subsidy cost or allowance that would adjust the outstanding balance to its net present value.

As can be seen in Figure 13, although both segments grew during the period FY2016–19, the "In Repayment" segment grew more rapidly to become the larger portfolio segment. During this period the "In Repayment" segment grew to represent 65.7 percent of the total principal and interest amount outstanding, increasing the need for FSA to facilitate the ability of Direct Loan borrowers to meet their repayment obligations timely.

The September 30, 2020 balance of loans in repayment of $146.6 billion (11.1 percent of the total direct loan portfolio) is significantly less than the $820.1 billion (65.7 percent) as of September 30, 2019. The dramatic decline in this segment reflects the impact of COVID-19 and

---

[11] FSA's policy is to not transfer such loans to the defaulted debt servicer until more than 360 days pass without payment being received, in order to ensure parity of Direct Loan borrower treatment with that of FFEL borrowers.

[12] FY 2015–18 data are based on data published by the FSA Data Center, **StudentAid.gov/portfolio**. FY 2019 data are taken directly from the NSLDS. Also, the FY 2018 data published in the FY 2018 Annual Report, taken directly from NSLDS, have been replaced with data subsequently published by the Data Center.

[13] The In Repayment/Not in Repayment classifications used for this discussion are slightly different from the definitions under 34 CFR §§ 685.207, 685.204, and 685.205 which specify that a borrower first enters repayment before receiving a deferment or forbearance. Under 34 CFR § 685.205(a), borrowers in forbearance may still make payments on their loans. In addition, under 34 CFR Part 668 Subpart N, borrowers in a deferment or forbearance are considered to be in repayment for purposes of calculating the cohort default rate for institutions.

the CARES Act which placed most borrowers into administrative forbearance through December 31, 2020.

**Figure 13: Direct Loan Portfolio by Repayment Status***
**Principal and Interest Only**
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| In Repayment* | $557.5 | $644.2 | $738.7 | $820.1 | $146.6 |
| Not in Repayment | $396.1 | $414.2 | $417.0 | $428.0 | $1,170.3 |
| Total Direct Loan Portfolio* | $953.6 | $1,058.4 | $1,155.7 | $1,248.1 | $1,316.9 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported. Also, prior data may be restated, as explained in Footnote 12.

In the following Figures 14A and 14B, the Direct Loan portfolio of "In Repayment" principal and interest has been subdivided into three categories, "Current", "Delinquent", and "Default/Bankruptcy/Other", as those terms are defined above.

**Figure 14A: Direct Loan Portfolio Segment in Repayment by Status***
**Principal and Interest Only**
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Current | $406.8 | $467.9 | $531.2 | $594.7 | $14.7 |
| Delinquent | $71.8 | $79.5 | $92.3 | $90.9 | $0 |
| Default/Bankruptcy/Other* | $79.0 | $96.8 | $115.2 | $134.5 | $131.9 |
| Totals | $557.6 | $644.2 | $738.7 | $820.1 | $146.6 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported. Also, prior data may be restated, as explained in Footnote 12.

**Analysis of Financial Statements**

### Figure 14B: Direct Loan Portfolio Segment in Repayment by Status*
### Principal and Interest Only
### Fiscal Years 2016–20
(Percentage of Total)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| ■ Current | 72.9% | 72.6% | 71.9% | 72.5% | 10.0% |
| ■ Delinquent | 12.9% | 12.3% | 12.5% | 11.1% | 0.0% |
| □ Default/Bankruptcy/Other* | 14.2% | 15.1% | 15.6% | 16.4% | 90.0% |
| ■ Totals | 100% | 100% | 100% | 100% | 100% |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported. Also, prior data may be restated, as explained in Footnote 12.

Regarding the "In Repayment" segment amounts as of September 30,2020, $0 in loan principal is in delinquent status (0 percent) as compared to $90.9 (11.1 percent) as of September 30, 2019. Also, regarding the "In Repayment" segment amounts as of September 30, 2020, $131.9 billion (90.0 percent) in loan principal was in default/bankruptcy/other status compared to $134.5 billion (16.4 percent) as of September 30, 2019. The dramatic changes in these segments from 2019 to 2020 were due to the impact of the CARES Act and Presidential Directives which suspended borrower payments through December 31, 2020.

For related performance information about the percentage of borrowers more than 90 days delinquent, please see Performance Metric 5.3.C located in the *Annual Performance Report* section.

The portfolio of Direct Loan principal and interest receivables "Not in Repayment" can also be further subdivided based on the reason why the debt is not currently subject to repayment. Figures 15A and 15B[14] subdivide this segment into two such categories, "In School, Grace Period, and Education Deferments" and "Forbearance/Noneducation Deferments", as defined earlier.

Figure15A shows that the amount of Direct Loan principal and interest categorized as "In School, Grace Period, and Education Deferments" has remained relatively consistent, $289.5 billion in FY 2016 to $282.8 billion at the end of the current year. This slight decrease reflects a decline in new Direct Loan disbursements over the period, and the aging of the Direct Loan portfolio of principal and interest receivable, as a greater proportion of debt moved from "In School, Grace Period, and Education Deferments" category to the "In Repayment" segment.

Figure 15B indicates that during the four-year period FY 2016–19, the "Forbearance and Noneducation Deferments" segment grew from $106.6 billion to $133.2 billion, increasing from 26.9 percent to 31.1 percent of the "Not in Repayment" segment. However, during the

---

[14] Please refer to footnotes 11 and 12.

FY 2016–19 period, as a percentage of the total portfolio of Direct Loan principal and interest receivables, the "In Deferment/Forbearance" portion has declined from 11.1 percent to 10.7 percent.

Figures 15A and 15B illustrate the dramatic impact of the CARES Act and Presidential Directives. "In School, Grace Period, and Education Deferments" amounts decreased from $294.8 billion as of September 30, 2019 to $282.8 billion as of September 30, 2020. However, the "Forbearance and Noneducation Deferments" amounts increased from $133.2 billion as of September 30, 2019 to $887.5 billion as of September 30, 2020.

**Figure 15A: Direct Loan Portfolio Segment not in Repayment by Status***
**Principal and Interest Only**
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|---|---|
| In School/Grace | $198.6 | $192.6 | $187.3 | $181.6 | $176.7 |
| In Deferment/ Forbearance | $188.7 | $203.5 | $226.9 | $235.4 | $251.3 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Figure 15B: Direct Loan Portfolio Segment not in Repayment by Status***
**Principal and Interest Only**
**Fiscal Years 2016–20**
(Percentage of Total)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| In School, Grace Period, and Education Deferments | 73.1% | 70.4% | 70.9% | 68.9% | 24.2% |
| Forbearance and Noneducation Deferments | 26.9% | 29.6% | 29.1% | 31.1% | 75.8% |
| Totals | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Analysis of Financial Statements**

**FSA FFEL Credit Program Receivables, Net.** FSA's portfolio of FFEL loans includes debt acquired under the Conduit, Loan Participation Purchase, and Loan Purchase Commitment Programs established through the FY 2008 ECASLA law and referred to collectively as the FFEL ECASLA Loan Programs. It also includes debt acquired under the "traditional" (Non-ECASLA) defaulted guaranteed loan programs, known collectively as the "FFEL Guaranteed" portfolio segment. Changes in these FFEL loan portfolio segments over the past five fiscal years are shown in Figure 16.

**Figure 16: Total Federal Student Aid FFEL Loan Portfolio\*\*\***
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| FFEL, Guaranteed* | $32.0 | $29.3 | $28.1 | $23.1 | $21.1 |
| FFEL, ECASLA** | $82.9 | $73.1 | $64.8 | $53.7 | $46.3 |
| Total FFEL | $114.9 | $102.4 | $92.9 | $76.8 | $67.4 |

*FFEL, Guaranteed (Non-ECASLA) Program
**FFEL, ECASLA Acquired Loan Program
***Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

Figure 16 illustrates that with $46.3 billion outstanding, the ECASLA FFEL portfolio segment remains the major component of the FFEL Guaranteed portfolio of net credit program receivables as of September 30, 2020 but declined by $36.6 billion (44.1 percent) during the five-year period shown. This decrease was mainly the result of collections of principal and the impact of borrowers consolidating their loans under the Direct Loan Program, to take advantage of more favorable repayment options available in that program.

The ECASLA FFEL portfolio declined from $53.7 billion as of September 30, 2019 to $46.3 billion as of September 30, 2020 ($7.4 billion). Outstanding principal declined $4.6 billion to $48.1 billion and the subsidy allowance increased by $4.1 billion to $11.0 billion. These amounts, which reduce the net receivable balance, were offset by an increase in the interest receivable of $1.3 billion to $9.2 billion. Despite this decrease, the proportion of ECASLA FFEL loans were approximately 70 percent of the total $67.4 billion of FFEL loans outstanding as of the current year-end.

**Analysis of Financial Statements**

Over the same five-year period, the smaller FFEL Guaranteed portfolio declined from $32.0 billion to $21.1 billion. The FFEL Guaranteed portfolio declined from $23.1 billion as of September 30, 2019 to $21.1 billion as of September 30, 2020 ($2.0 billion). Outstanding principal declined $0.8 billion to $36.7 billion and the subsidy allowance increased by $1.7 billion to $30.5 billion. These amounts, which reduce the net receivable balance, were offset by an increase in the interest receivable of $0.5 billion to $14.9 billion.

The overall impact of changes in the principal, accrued interest, and subsidy components of the FFEL portfolio are shown below in Figure 17.[15] The reduction in FFEL recipients during the period FY 2016–20 also demonstrates the impact of debt consolidations and refinancing on the outstanding portfolio balance.

**Figure 17: Components of Federal Student Aid FFEL Receivables, Net Fiscal Years 2016–20**

(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Principal | $109.8 | $101.6 | $95.1 | $90.2 | $84.8 |
| Accrued Interest | $18.2 | $19.3 | $21.1 | $22.3 | $24.1 |
| Allowance for Subsidy | $(13.1) | $(18.5) | $(23.3) | $(35.7) | $(41.5) |
| Total Receivable | $114.9 | $102.4 | $92.9 | $76.8 | $67.4 |
| Total Recipients | 7.5 | 7.0 | 6.6 | 6.1 | 5.8 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

**Other Credit Program Receivables, Net**. As shown in Figure 18 below, TEACH Grants, Perkins Loans, and HEAL Loans make up the third segment of Credit Programs Receivable, net that FSA reports on its balance sheet.

---

[15] Recipients in Millions for FY 2015–18 are based on data published by the FSA Data Center, at **StudentAid.gov/portfolio**. FY 2019 data are taken directly from NSLDS. Also, the FY 2018 data published in the *FY 2018 Annual Report*, taken directly from NSLDS, have been replaced with data subsequently published by the Data Center.

**Figure 18: Federal Student Aid Other Loan Portfolio
Fiscal Years 2016–20**
(Dollars in Millions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| ▣ TEACH Grant Program | $690.6 | $594.3 | $584.1 | $616.0 | $669.9 |
| ▣ Perkins Loan Program | $449.3 | $494.7 | $551.0 | $607.1 | $634.3 |
| ▢ HEAL | $335.8 | $353.1 | $359.9 | $394.6 | $386.0 |
| ▣ TOTAL | $1,475.7 | $1,442.1 | $1,495.0 | $1,617.7 | $1,690.2 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

This segment, known as Other Credit Program Receivables, Net, increased by 14.5 percent during the past five years, but still accounted for only 0.1 percent of FSA's total loan portfolio throughout that period. Other Credit Program Receivables, net ended FY 2020 with a balance of $1.7 billion, a $214.5 million increase compared to the prior year-end.

**Composition of FSA Liabilities.** FSA's liabilities represent probable and measurable future outflows of resources arising from past transactions or events. As of September 30, 2020, FSA had total liabilities of nearly $1.3 trillion, a decrease of $50.3 billion or 3.8 percent less than the September 30, 2019 total, in contrast to the 2.0 percent reduction in FSA's total assets.

**Debt.** FSA's debt is the primary component of its liabilities, accounting for 99.1 percent of the total. FSA's debt balance of approximately $1.3 trillion as of September 30, 2020 is 2.9 percent less than the prior-year amount. As shown in Figure 19, the Direct Loan Program was the principal debt component throughout the FY 2016–20 period and ended FY 2020 with a balance of nearly $1.2 trillion, 0.8 percent above the prior-year amount, representing 92.8 percent of total debt.

**Figure 19: Comparison of Federal Student Aid Debt**
**Fiscal Years 2016–20**
(Dollars in Billions)

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Direct Loan Program | $909.9 | $994.3 | $1,061.6 | $1,150.6 | $1,160.1 |
| FFEL Program | $131.3 | $116.3 | $107.3 | $94.7 | $89.0 |
| Other Programs (TEACH) | $0.7 | $0.6 | $0.6 | $0.7 | $0.7 |
| Total Debt | $1,126.3 | $1,178.5 | $1,258.5 | $1,287.5 | $1,249.8 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

FSA borrows funds from Treasury to support the disbursement of new loans, and for the payment of credit program outlays and related costs. FSA then makes repayments after considering its cash position and liability for future cash outflows, as mandated by the *Federal Credit Reform Act of 1990* (FRCA). The net impact of these activities on the outstanding debt portfolio are illustrated for the Direct Loan and FFEL Programs in Figures 20 and 21 respectively.

**Figure 20: Direct Loan Program Net Financing Activity**
**Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Borrowing | $147.0 | $160.5 | $155.3 | $137.6 | $116.9 |
| Repayments | $(62.6) | $(93.2) | $(66.2) | $(96.1) | $(148.9) |
| Net Change | $84.4 | $67.3 | $89.1 | $41.5 | $(32.0) |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

Direct Loan net financing activity (Figure 20) also accounted for most of the overall increase in FSA's outstanding debt level during the same five years. By comparison, in the absence of any borrowing for new loan disbursements (Figure 21), FFEL-related debt decreased consistently from FY 2016–20. These changes in net financing activity for Direct Loan and FFEL Programs reflect the impact of the SAFRA Act on disbursements, interest rate driven loan consolidations, and related changes in estimated subsidy costs.

**Analysis of Financial Statements**



**Figure 21: Federal Student Aid FFEL Loan Program Net Financing Activity
Fiscal Years 2016–20**
(Dollars in Billions)

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Borrowing | $0.2 | $- | $0.2 | $- | $11.0 |
| Repayments | $(8.6) | $(15.1) | $(9.3) | $(12.6) | $(16.7) |
| Net Change | $(8.4) | $(15.1) | $(9.0) | $(12.6) | $(5.7) |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

## Statement of Net Cost

The Statement of Net Cost is the federal financial statement that presents the net cost of operations for FSA programs. FSA's net cost is the gross cost incurred during its operations less any exchange (i.e., earned) revenues earned from its activities. Gross cost is composed of the cost of credit programs, grant programs, and operating costs. Exchange revenues are primarily interest earned on credit program loans.

**Figure 22: Composition of Federal Student Aid Net Cost
Fiscal Years 2016–20**
(Dollars in Billions)



| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|
| Gross Costs | $93.0 | $73.7 | $71.2 | $144.9 | $171.2 |
| Earned Revenue | $(34.2) | $(35.8) | $(36.2) | $(36.8) | $(39.4) |
| Net Costs | $58.8 | $37.9 | $35.0 | $108.1 | $131.8 |

*Note: Line items may include rounding adjustments to reconcile to the total amount being reported.

As shown in Figure 22, FSA's earned revenues (mainly interest and fee accruals net of subsidy amortization) increased from $34.2 billion in FY 2016 to $39.4 billion in FY 2020, an overall increase of 15.2 percent or about 3.8 percent annually on average. By comparison, FSA's gross costs fluctuated much more widely over the same period, from $93.0 billion in FY 2016 to $171.2 billion in FY 2020, mainly as the result of subsidy-related transactions. As a result, net costs fluctuated also, most notably increasing 22.0 percent from $108.1 billion reported in FY 2019 to $131.8 billion in FY 2020. FSA's total costs exceeded its earned revenues in both years, but the margin was greater in FY 2020 by $23.7 billion, of which $39.4 billion was attributable to the Direct Loan Program, largely offset by the $10.6 billion decrease in FFEL net costs.

For the Direct Loan Program, the $39.4 billion increase in net costs was primarily the result of an increase in subsidy transfer modifications ($39.6 billion). Similarly, the $10.6 billion decrease in FFEL Program net costs was mostly the result of a $10.3 billion increase in gross costs.

Both the FFEL and Direct Loans Programs are mandatory programs whose costs are largely driven by Federal borrowing costs, prevailing interest rates, in-school interest benefits for borrowers, the costs related to borrower defaults, and loan volume demand. The programs are funded by mandatory and indefinite budget authority and therefore do not receive annual appropriations. For more details regarding the inherent difficulty of estimating the impact of these complex factors, please refer to Note 5.

## Statement of Changes in Net Position

The Statement of Changes in Net Position presents those amounts that caused the net position section of the Balance Sheet to change from the beginning to the end of the reporting period and is affected by changes in its two components, cumulative results of operations and unexpended appropriations.

FSA's net position as of September 30, 2020, was negative $19.4 billion, an increase of $25.5 billion compared to the previous September 30 net position. The difference reflects an increase in the cumulative results of operations by the amount of $21.9 billion, from $(76.3) billion, to $(54.4) billion, of which $(8.0) billion of the increase related to the Direct Loan Program and $(14.0) billion was attributable to the FFEL Program. In addition, unexpended appropriations increased by $3.6 billion, of which $2.9 billion were attributable to the combined Perkins Loan and Grants Programs, with the $0.9 billion increase in Direct Loan Program unexpended appropriations accounting for most of the remaining difference.

## Statement of Budgetary Resources

The Statement of Budgetary Resources compares the budgetary resources provided with the status or execution of those resources. It also details the composition of the resources and shows the amount of net outlays. Appropriations are available to cover the subsidy cost of each loan program and administrative expenses. Subsidy expense represents the difference between the net present value of expected future cash flows and the face value of each loan portfolio. Appropriation authority is available as needed on a permanent basis to finance costs resulting from loans guaranteed in the years before FY 1992. The Pell Grant Program receives appropriations to cover actual grant disbursements.

This statement shows that as of September 30, 2020, FSA had $388.9 billion in combined budgetary resources, of which $24.4 billion remained unobligated and not apportioned. This compared to $306.1 billion in budgetary resources twelve months earlier of which $20.1 billion were unobligated and not apportioned. Overall budgetary resources increased by only $82.8 billion or 27.0 percent, primarily as the net result of increases in budgetary resources for the Direct Loan Program ($60.2 billion) and the increase attributable to the FFEL Program ($22.8 billion).

FSA's Net Outlays after Distributed Offsetting Receipts as of September 30, 2020, were $104.4 billion, an increase of $7.1 billion or 7.3 percent compared to the prior September 30 amount of $97.3 billion. The Direct Loan Program accounted for a $7.9 billion increase, with a FFEL increase of $1.9 billion and a $2.8 billion decrease attributable to the combined Perkins Loan and Grants Programs. FFEL Program activity was mainly due to an increase in net outlays ($6.6 billion), together with an increase in distributed offsetting receipts ($4.8 billion). Additional information is provided in Note 12.

## Financial Management Highlights

### Financial Impact of the Coronavirus Disease 2019 (COVID-19)

In response to the COVID-19 pandemic, Congress enacted the CARES Act on March 27, 2020. As part of the CARES Act, FSA received $40 million to support efforts related to loan forbearance, default collection wage garnishment assistance for student loan borrowers, servicing system modifications, systems support of COVID-19 telework, and hiring of temporary employees. In FY 2020, FSA obligated $13.9 million, committed approximately $3.0 million, and the remaining balance will carry over into FY 2021.

The CARES Act provided emergency relief measures in the Direct Loan program that included suspending loan payments, halting collections on defaulted loans, and setting interest rates to 0 percent through September 30, 2020. In response, FSA stopped all federal wage garnishments and collection actions for borrowers with federally held loans in default, and FSA paid approximately 2.3 million refunds of Treasury Offset Program (TOP) and Administrative Wage Garnishments (AWG) totaling $2.5 billion. On August 8, 2020, the President directed the Secretary to continue these measures until December 31, 2020.

### Limitations of Financial Statements

The principal financial statements are prepared to report the financial position, financial condition, and results of operations, pursuant to the requirements of 31 U.S.C. § 3515(b). The statements are prepared from records of Federal entities in accordance with Federal generally accepted accounting principles (GAAP) and the formats prescribed by OMB. Reports used to monitor and control budgetary resources are prepared from the same records. Users of the statements are advised that the statements are for a component of the U.S. Government.

# Analysis of Systems, Controls, and Legal Compliance

FSA adheres to the Government Accountability Office (GAO) published guidance on internal control and recognizes that internal control is an integral part of managing an organization. Internal control includes the plans, methods, and procedures used to meet the organization's missions, goals, and objectives. In carrying out these components of internal control, FSA supports an environment for performance-based management. Internal control also serves as the first line of defense in safeguarding assets and preventing and detecting errors and fraud. Internal control helps government program managers achieve desired results through effective stewardship of public resources.

Internal controls should provide reasonable assurance that the objectives of the agency are being achieved in the following categories:

- Effective and efficient operations,
- Reliability of reporting for internal and external use, and
- Compliance with applicable laws and regulations.[16]

FSA is responsible for establishing and maintaining effective internal control over reporting and financial management systems that meet the objectives of the *Federal Managers' Financial Integrity Act of 1982* (FMFIA) and annually assessing the effectiveness and efficiency of its internal controls over operations and compliance with applicable laws and regulations in accordance with OMB Circular A-123, Management's Responsibility for Enterprise Risk Management and Internal Control (OMB Circular A-123). On June 6, 2018, OMB updated OMB Circular A-123, Appendix A, Management of Reporting and Data Integrity Risk, to further align to the revised OMB Circular A-123 updated in 2016. FSA continues to coordinate with the Department and internally to execute these requirements.

Based on the results of this year's assessment, FSA reported to the Department's management that its internal control over operations, including internal controls intended to prevent, detect and recover improper payments, and compliance with applicable laws and regulations, as of September 30, 2020, was operating effectively, with one exception noted in the Legal Compliance section of the Department's AFR: *Debt Collection Improvement Act of 1996*. More details about this issue and the efforts being taken to remediate the non-compliance can be found in the Department's *AFR*.

In addition, FSA, working with the Department, conducted its current year assessment of the effectiveness of internal control in accordance with the requirements of Appendix A of OMB Circular A-123, updated on June 6, 2018. OMB Circular A-123, Appendix A provides requirements to agencies for conducting management's assessment of internal control over reporting. The Department's evaluation for FY 2020 did not identify any material weaknesses in controls as of September 30, 2020. The scope of FSA's assessment focuses on new processes and processes with high-risk profiles that are tested every year. Processes with lower-risk

---

[16] Government Accountability Office Standards for Internal Control in the Federal Government, GAO-14-704G, September 10, 2014, p.5.

profiles are reviewed and tested on a 3-year cycle. In FY 2020, FSA continued to rely on audits of external service providers conducted by independent public accountants in accordance with the Statement on Standards for Attestation Engagements Number 18, Reporting on Controls at a Service Organization.

FSA's participation in the Department's implementation of the requirements of OMB Circular A-123, including Appendix A, enables it to continue to build upon its internal control framework. This framework will be used in continuing efforts to monitor and improve internal control. Refer to the Analysis of Systems, Controls and Legal Compliance section of the Department's *AFR* for additional information related to management's assurances and disclosures.

Refer to the Analysis of Systems, Controls and Legal Compliance section of the Department's *AFR* for information related to the Department's compliance with the FMFIA.

FSA's financial management systems strategy is formulated and managed as part of the Department's strategy. For details on FSA's financial management systems strategy, refer to the Financial Management Systems Strategy narrative found in the Management's Discussion and Analysis section of the Department's *AFR*.

*This page is intentionally left blank*



# Annual Performance Report (Unaudited)

*This page is intentionally left blank*

# Overview of the Annual Performance Report

The *Annual Performance Report* section of the *Annual Report* provides detailed performance information on FSA's progress in achieving the goals and objectives described in the *FY 2015–19 Strategic Plan and the draft FY 2020-24 Strategic Plan*. This section also includes reports on other areas of performance that are required by the Higher Education Amendments of 1998. The subsections of the *Annual Performance Report* are listed and briefly discussed below:

- **Introduction to the Annual Performance Report:** The Introduction to the Annual Performance Report provides an overview of the Annual Performance Report and includes a high-level summary of the *FY 2020–24 Strategic Plan*.

- **Performance Results by Strategic Goal:** This subsection details the results of each overall strategic goal by performance metric. Each performance metric includes a table that presents five years of data results, where available, its current target and results. The performance metric section also includes a discussion of the metric's target context, analysis of progress, and data quality limitations.

- **Fiscal Year 2020 Accomplishments of Federal Student Aid:** This subsection describes additional accomplishments that were not measured by the performance metrics included in the strategic plan but were the result of initiatives that FSA undertook to support the implementation of the strategic plan or legislative changes.

- **Legislative and Regulatory Recommendations:** This subsection details legislative and regulatory recommendations that FSA provided to the Department in support of the Department's regulatory activities.

- **Annual Bonus Awards:** This subsection discusses executive compensation at FSA in compliance with the legislative requirements under the PBO legislation that created FSA.

- **Report of the Federal Student Aid Ombudsman:** The report discusses the FSA Ombudsman's activities in accomplishing its statutory mission of addressing complaints about Title IV financial aid programs.

# Introduction to the Annual Performance Report

In FY 2019, FSA embarked on the journey to guide the organization towards more effectively achieving its vision "To be the most trusted and reliable source of student financial aid, information, and services in the nation." This effort culminated into an organizational five-year performance plan that better aligned with the vision and established the framework to create a more student-focused, agile, and transparent organization. For the development of the *FY 2020–24 Strategic Plan*, FSA worked throughout the fiscal year to also coordinate the closing of FSA's *FY 2015–19 Strategic Plan* on September 30, 2019. In compliance with the PBO legislation, FSA has offered a public comment period for external stakeholders, such as students, institutions of higher education, Congress, lenders, and other key parties. The public comment period for the draft plan ends on October 23, 2020. FSA will review and incorporate comments as appropriate and plans to publish the *FY 2020–24 Strategic Plan* by December of Calendar Year 2020.

In conjunction with this effort and to ensure a consistent transition with the previous *FY 2015–19 Strategic Plan*, FSA is utilizing eight existing performance metrics within the draft *FY 2020–24 Strategic Plan*. FSA also aligned these metrics with goals and objectives in a specific manner to reinforce the performance expectations in key areas. Due to these changes, FSA also discontinued the utilization of five performance metrics from the *FY 2015–19 Strategic Plan*. FSA will no longer use these performance metrics to measure organizational progress (refer to the Table 13: Crosswalk between *FY 2015-19* and *FY 2020-24 Strategic Plans*, for the discontinued performance metrics). Therefore, in FY 2020, FSA's performance is measured against the strategic goals, objectives and performance metrics established in the *FY 2020–24 Strategic Plan*.

In the FY 2020 Annual Performance Report, FSA provides the results associated with both the 36 new performance metrics introduced in the draft *FY 2020–24 Strategic Plan*, as well as the 8 existing metrics discussed earlier. The performance framework established within the draft *FY 2020–24 Strategic Plan* encompasses all areas of business and offers a renewed focus on data-driven decisions that will enable positive outcomes for customers, other stakeholders, and taxpayers. By making advances in performance accountability, FSA is working to be a more transparent organization.

FSA is required, by the PBO-enabling legislation, to report annually its level of performance and the associated results. This section, the Annual Performance Report, satisfies this annual reporting requirement. For additional performance-related information—including a more complete discussion of FSA's mission, organization, and performance management—refer to the Management's Discussion and Analysis section of this document. To read more about FSA's strategic plans, refer to **StudentAid.gov/strategicplan**.

To review the performance metrics transitioned and discontinued from the *FY 2015–19 Strategic Plan*, refer to the Crosswalk between *FY 2015–19* and *FY 2020–24 Strategic Plans*.

**Table 13: Crosswalk between FY 2015–19 and FY 2020–24 Strategic Plans**

| Performance Metrics FY 2015–19 Plan | Disposition in FY 2020–24 Plan |
|---|---|
| **A.1** Percent of First-Time FAFSA® Filers Among High School Seniors | **2.1.B** Percentage of high school seniors submitting the FAFSA®. |
| **A.2** Persistence Among First-Time Filing Aid Recipients | **5.1.E** Persistence among first-time filing aid recipients. |
| **A.3** Customer Visits to StudentAid.gov | **2.1.A** Number of visits (sessions) demonstrating adoption of the updated StudentAid.gov site. |
| **A.4** Social Media Channel Subscribership | **Discontinued in FY 2020** |
| **A.5** ACSI Aid Life Cycle Surveys | **2.2.G** American Customer Satisfaction Index (ACSI) Aid Lifecycle Survey score. |
| **B.1** Improper Payment Rate | **Discontinued in FY 2020** |
| **B.2** Percent of Borrowers > 90 Days Delinquent | **5.3.C** Percent of Borrowers > 90 Days Delinquent. |
| **C.1** Aid Delivery Costs Per Application | **Discontinued in FY 2020** |
| **C.2** Outstanding Direct Loan Portfolio in Current Repayment Status | **5.1.C** Outstanding Direct Loan Portfolio in Current Repayment Status. |
| **D.1** Ease of Doing Business with FSA | **3.2.D** Ease of doing business with FSA. |
| **D.2** Percentage of Contract Dollars Competed by FSA | **Discontinued in FY 2020** |
| **D.3** Collection Rate | **Discontinued in FY 2020** |
| **E.1** Employee Engagement Index | **1.1** Improve Federal Employee Viewpoint Survey score: Employee Engagement Index. FSA's scores will improve the first year and continue to increase 1–2% annually. |

## Federal Student Aid Strategic Goals, Performance Metrics, and Results

**Table 14: Fiscal Year 2020 Strategic Goals, Performance Metrics, and Results**

| Strategic Goal 1: | Empower a High-Performing Organization | | |
|---|---|---|---|
| **Strategic Objective 1.1:** | **Improve employee engagement and workplace inclusion to develop and retain talent, improve employee satisfaction, and engage in effective succession planning.** | | |
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **1.1** Improve Federal Employee Viewpoint Survey score: Employee Engagement Index. FSA's scores will improve the first year and continue to increase 1–2% annually. | 62—63% | N/A | **N/A** |
| **Strategic Objective 1.2** | **Expand employee skills and capabilities to support Next Gen FSA.** | | |
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **1.2.A** Identification, validation, assessment, and prioritization of skill competencies, required grades, and strategic alignment in accordance with the workforce requirements study results. | 50% | 58.2% | **Met** |
| **1.2.B** Development of a multi-year, targeted, training and development plan. | Baseline | N/A | **N/A** |
| **1.2.C** Perform a training analysis at each performance review period within the fiscal period. | Baseline | 27 | **N/A** |
| Strategic Goal 2: | Provide World-Class Customer Experience to the Students, Parents, and Borrowers We Serve | | |
| **Strategic Objective 2.1:** | **Ensure that all students can easily access information on federal student aid, apply for federal student aid, and have information on repayment options.** | | |
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **2.1.A** Number of visits (sessions) demonstrating adoption of the updated StudentAid.gov site. | 190 million | 217 million | **Met** |
| **2.1.B** Percentage of high school seniors submitting the FAFSA. | 66% | 63.8% | **Not Met** |
| **2.1.C** Number of customers submitting the FAFSA via a mobile platform—the myStudentAid mobile app or fafsa.gov. | 2.4 million submissions | 2.5 million submissions | **Met** |

| Strategic Objective 2.2: | Provide seamless, easy, personalized digital interactions equal with top financial institutions in the delivery of financial aid products and services. | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **2.2.A** Number of customers checking loan balances via the myStudentAid mobile app. | 70,000 | 133,417 | **Met** |
| **2.2.B** Number of borrowers who view their aid summary information on StudentAid.gov. | Baseline | 7.6 million | **N/A** |
| **2.2.C** Number of users of "Aidan," the StudentAid. gov virtual assistant. | 25,000 | 545,763 | **Met** |
| **2.2.D** Number of borrowers who complete their annual certification on time for the Annual Student Loan Acknowledgement (ASLA). | Baseline | 858,628 | **N/A** |
| **2.2.E** Transactional email volume for outreach and communications to borrowers. | Baseline | 92.2 million | **N/A** |
| **2.2.F** Recurring campaign email delivery volume for outreach and communications to borrowers. | Baseline | 32.2 million | **N/A** |
| **2.2.G** American Customer Satisfaction Index (ACSI) Aid Lifecycle Survey score. | 72–74 | 73.5 | **Met** |
| **2.2.H** Customer Satisfaction Survey(s) for StudentAid. gov site and associated tools. | Survey Development | No survey developed | **Not Met** |

| Strategic Objective 2.3: | Streamline contact center and back-office operations to improve our customers' integrated experience. | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **2.3.A** Quality Standard for Average Speed to Answer (ASA) at all Call Centers. | 60 seconds or less | 59.0 seconds | **Met** |
| **2.3.B** Quality Standard for Abandon Rate (AR) for Incoming Calls at all Call Centers. | 2% | 3.6% | **Not Met** |

| Strategic Objective 2.4: | Simplify the communication and processes associated with borrower repayment plans. | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **2.4.A** Number of borrowers using Make a Payment feature to pay student loans. | Implement a pilot | Pilot implemented 12, 245 paid | **Met** |
| **2.4.B** Percentage of borrowers using auto-debit. | Baseline | 24.8% | **N/A** |
| **2.4.C** Percentage of Public Service Loan Forgiveness (PSLF) applicants who had used the PSLF Help Tool and who met the requirements for PSLF. | Baseline | N/A | **N/A** |

**Fiscal Year 2020 Organizational Performance**

| Strategic Goal 3: | Increase Partner Engagement and Oversight Effectiveness | | |
|---|---|---|---|

| Strategic Objective 3.1: | Provide effective oversight of FSA's partners utilizing a comprehensive suite of monitoring tools. | | |
|---|---|---|---|

| Performance Metrics | FY 2020 Target | FY 2020 Actual | Result |
|---|---|---|---|
| **3.1.A** FSA will annually conduct an Institutional Review for its participating partners including schools, third-party servicers, and financial institutions. | 40% | 51% | **Met** |
| **3.1.B** Number of Borrower Defense (BD) applications adjudicated (subject to existing BD regulations). | 150,000 | 160,000 | **Met** |

| Strategic Objective 3.2: | Strengthen partner engagement and provide effective outreach and assistance. | | |
|---|---|---|---|

| Performance Metrics | FY 2020 Target | FY 2020 Actual | Result |
|---|---|---|---|
| **3.2.A** FSA will provide comprehensive training and/or specialized technical assistance to its participating schools that receive *Title IV* Aid on behalf of students. | 35% | 70% | **Met** |
| **3.2.B** FSA will measure Partner Participation rates in training programs. | Baseline | 70% | **N/A** |
| **3.2.C** FSA will enhance the self-service training resource and informational platform to improve communication with participating partners, including schools, third-party servicers, and financial institutions. | Baseline | 62% | **N/A** |
| **3.2.D** Ease of doing business with FSA. | 74–76% | 71% | **Not Met** |

| Strategic Goal 4: | Strengthen Data Protection and Cybersecurity Safeguards. | | |
|---|---|---|---|

| Strategic Objective 4.1: | Implement business partner and vendor systems that house, manage, and provide systems supporting FSA business processes, outreach and awareness focused on oversight, enforcement, infrastructure, systems, and data. | | |
|---|---|---|---|

| Performance Metrics | FY 2020 Target | FY 2020 Actual | Result |
|---|---|---|---|
| **4.1** Increase partner/vendor cybersecurity effectiveness by reducing the total number of FSA system assessment findings by 20% per year. | 1,800 | 3,561 | **Not Met** |

| Strategic Objective 4.2*:* | Improve student privacy data and cybersecurity controls of Institutions of Higher Education (IHEs) through outreach and communication, to mitigate future cyber-incidents and breaches. | | |
|---|---|---|---|

| Performance Metrics | FY 2020 Target | FY 2020 Actual | Result |
|---|---|---|---|
| **4.2.A** Increase Institutions of Higher Education cybersecurity effectiveness by reducing GLBA cybersecurity non-compliance by 20% per year. | Baseline | 177 | **N/A** |
| **4.2.B** Reduce incident reporting time at Institutions of Higher Education. | Baseline | 87.5 days | **N/A** |

| **Strategic Objective 4.3:** | **Build an effective cybersecurity culture through employee awareness, training and accountability focused on protecting systems and data.** | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **4.3** Decrease the number of employee-related cybersecurity events associated with inappropriate use, distribution, or storage of Personally Identifiable Information (PII) and financial information by 20% a year. | 1,800 | 1,713 | **Met** |

| **Strategic Goal 5:** | **Enhance the Management and Transparency of the Portfolio** |
|---|---|

| **Strategic Objective 5.1:** | **Improve the management and transparency of FSA's student loan portfolio performance.** | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **5.1.A** Initiate monthly reporting to the public through the FSA data center. | Establish specific number of public reports | 56 | **Met** |
| **5.1.B** Timeliness of FSA's ability to respond to statutorily mandated reports. | 30 days or less | 30 days or less | **Met** |
| **5.1.C** Outstanding Direct Loan Portfolio in Current Repayment Status. | Baseline | 93.7% | **N/A** |
| **5.1.D** Percentage of borrowers who are in a positive repayment status within the first three years of student loan repayment. | Baseline | N/A | **N/A** |
| **5.1.E** Persistence among first-time filing aid recipients. | 83–84% | 81.0% | **Not Met** |

| **Strategic Objective 5.2:** | **Provide analytics and operational support for a customer-centric, data-driven, performance-based organization.** | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **5.2.A** Using the Enterprise Risk Management (ERM) Maturity Model, move the organization towards a "Risk Intelligent" position. The model defines organizational progress in the following way:<br>• 1 = Initial;<br>• 2 = Fragmented;<br>• 3 = Integrated;<br>• 4 = Risk Intelligent. | 1.5 | 1.6 | **Met** |
| **5.2.B** Implementation timeline for FUTURE Act. | Establish a timeline | N/A | **N/A** |
| **5.2.C** Error rate discovered through income verification activities for borrowers on an IDR plan. | Baseline | N/A | **N/A** |

**Fiscal Year 2020 Organizational Performance**

| Strategic Objective 5.3: | Leverage portfolio analytics to drive improved outcomes for customers and taxpayers. | | |
|---|---|---|---|
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **5.3.A** Identify and provide intervention actions for customers at risk of default. | Development and testing of default intervention program | Developed, tested, and deployed two projects | **Met** |
| **5.3.B** Default rate by borrower count. | Baseline | N/A | **N/A** |
| **5.3.C** Percent of borrowers > 90 days delinquent. | Baseline | 4.8% | **N/A** |
| **5.3.D** Percentage of borrowers who did not make the first three payments. | Baseline | N/A | **N/A** |
| **5.3.E** Percentage of customers who borrow less than the maximum loan amount. | Baseline | N/A | **N/A** |
| Strategic Objective 5.4: | Increase vendor performance through quality management activities centered on customer service and product delivery. | | |
| **Performance Metrics** | **FY 2020 Target** | **FY 2020 Actual** | **Result** |
| **5.4** Percentage of quality assurance reviews for the external workforce (servicers) reviewed annually. | 25% | 11.1% | **Not Met** |

# Performance Results by Strategic Goal

This section presents detailed performance results, which include a discussion of progress made to date in achieving the strategic goal and the data used to assess performance.

**How the Remainder of this Section is Organized.** This section is organized by the five strategic goals. For each strategic goal, this section provides an overview of the goal, lists the associated objectives that support the strategic goal, and details the performance metrics used to measure performance.

- **Table**: Identifies the performance metric associated with the strategic goal and provides the historical actual results for the four previous fiscal years (if available); the target and actual result for the current fiscal year; and an indicator as to whether FSA met the performance metric for each fiscal year reported. The following is the legend for the performance result indicator included in the table.

**Table 15: Performance Result Indicator Legend**

| Performance Result | Indicator |
|---|---|
| Performance result met or exceeded the target. | **Met** |
| Performance result did not meet the target. | **Not Met** |
| Performance result is not applicable because:<br>• A target for the performance metric was not developed (i.e., baseline year) or<br>• The performance metric was not fully implemented, or<br>• The required data were not available in time for inclusion, or<br>• The performance metric is a new metric and prior year results are not available. | **N/A** |

The performance metric results reported are as of fiscal year-end, September 30, 2020, unless otherwise noted. If the required data are not available as of fiscal year-end in time for inclusion in this report, data as of the most recent period available are used. Data as of fiscal year-end may not be available in some instances, where the required data are obtained from external sources including state and private nonprofit guaranty agencies, lenders and loan servicers, and grant and loan recipients.

- **Target Context:** Explains the parameters or rationale for targets, especially where anomalies exist.

- **Analysis of Progress:** Provides a discussion of FSA's progress in meeting its targets and includes explanations for unmet targets and actions being taken or planned.

- **Data Quality and Limitations:** Describes the source of data required to calculate the actual result for the performance metric, any calculation required to determine the actual result, and any known data quality issues or limitations. For an overview of FSA's business process to confirm the quality of performance data, refer to the Quality of Performance Data in the Management's Discussion and Analysis section of this *Annual Report.*

## Strategic Goal 1: Empower a High-Performing Organization

FSA's employees are its greatest resource, and their knowledge, skills, and abilities are essential to building and sustaining a high-performing organization. To meet the expectations outlined in the draft *FY 2020-24 Strategic Plan,* it is essential that staff are trained, aligned, and equipped to provide best-in-class customer service while fulfilling the fiduciary responsibilities of the organization.

FSA will assess progress toward preparing its workforce using four related metrics under Strategic Goal 1. The first metric is designed to improve the Federal Employee Viewpoint Survey (FEVS) score, specifically in the Employee Engagement Index. The Index provides an assessment of the engagement potential of a work environment.

The second metric focuses on an organizational workforce requirements study that will provide FSA with the ability to better forecast human capital needs and inform planning for staff training, transfers, promotions, and talent acquisition. The workforce requirements study will also inform the third metric: the degree of alignment between the competencies needed for each position (as identified in the study), and the competencies of individuals in each job.

Lastly, FSA will measure the effectiveness of employee training through detailed analysis and evaluation. Over time, the analysis will help to measure performance growth, provide extant data to support developmental resources, and assess the quality and benefits of attended training to evaluate the return on investment for the employees and the organization.

Strategic Goal 1 includes the two strategic objectives listed below:

- **Strategic Objective 1.1:**

  Improve employee engagement and workplace inclusion to develop and retain talent, improve employee satisfaction, and engage in effective succession planning.

- **Strategic Objective 1.2:**

  Expand employee skills and capabilities to support Next Gen FSA.

In FY 2020, FSA had two objectives under this goal. These objectives included four metrics. Of these four metrics, one metric met the target, two metrics were baselined, and one metric did not have the required data available to provide an actual result in FY 2020.

**Strategic Objective 1.1:** Improve employee engagement and workplace inclusion to develop and retain talent, improve employee satisfaction, and engage in effective succession planning.

**Table 16: Performance Metric 1.1.** Improve Federal Employee Viewpoint Survey score: Employee Engagement Index. FSA's scores will improve the first year and continue to increase 1–2% annually.*

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 67.4% | 69.7% | 62.0% | 61.0% | 62–63% | N/A |
| Performance Result | Met | Met | Not Met | Met | N/A | |

*Note: Formerly E.1 in FSA FY 2019 Annual Report.**

**Target Context:**

The U.S. Office of Personnel Management (OPM) FEVS measures employees' perceptions of whether, and to what extent, conditions characteristic of successful organizations are present in their agencies. The FEVS serves as a tool for employees to share their perceptions in many critical areas including their work experiences, their agency, and leadership. The Engagement Index assesses the critical conditions conducive for employee engagement (e.g., effective leadership, work which provides meaning to employees, etc.). It is made up of three subfactors: Leaders Lead, Supervisors, and Intrinsic Work Experience.

**Analysis of Progress:**

There is no data currently available for this metric.

The FY 2020 data will be released after January 2021 due to a delay in survey administration by OPM. The FY 2020 FEVS began on September 23, 2020 and closed on November 4, 2020. FSA analyzed the results of the FY 2019 FEVS survey and focused on communication, fundamentals for success (recruiting, staffing, training, and resources), leadership, recognition and rewards, and work/life balance as key areas of focus in FY 2020. FSA conducted focus groups with 243 managers and staff to inform its Employee Engagement Action Plans developed by each organizational business unit.

**Data Quality and Limitations:**

OPM has been conducting FEVS since 2002 and maintains a 100 percent accuracy rate for employee security and data integrity. One limitation is that the survey results are provided in real time, and there is at least a one quarter delay in receipt by agencies. This may limit the true interpretation of the data, in that leadership changes, employee attrition and a shift in organizational priorities may impact the relevance of the data.

In addition, FSA continues operating at a near 100 percent virtual capacity, and the lack of direct employee interaction and communication may negatively impact survey participation for FY 2020. FSA will continue using focus group data to assist with employee engagement and other organizational improvements based on feedback. The data source for this performance metric is the FY 2020 FEVS survey.

**Strategic Objective 1.2:** Expand employee skills and capabilities to support Next Gen FSA.

**Table 17: Performance Metric 1.2.A.** Identification, validation, assessment, and prioritization of skill competencies, required grades, and strategic alignment in accordance with the workforce requirements study results.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 50% of organization completed | 58.2% of organization completed |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

FSA worked with a consultant to conduct a workforce requirements study of the process and drivers (input and output measures) that influence organizational staffing needs. Data were collected through questionnaires and follow-up interviews with managers and subject matter experts of various FSA processes.

**Analysis of Progress:**

FSA met its target for this metric with 58.2 percent of FSA offices and positions being analyzed.

Staffing requirements have been validated and documented for 58.2 percent of the FSA workforce for each of 85 organizational entities included in the study population. The entire workforce requirements study is anticipated to be completed and fully validated by January 2021.

**Data Quality and Limitations:**

To inform the workforce requirements study, data from FSA's internal personnel system was utilized. The data provided an organizational resource picture (i.e., the number of staff onboard by organization, occupation, grade, and/or other attributes). The required number of staff per organizational business unit, from which specific staffing needs can be computed, is generated from a staffing dashboard developed by FSA's contractor.

The needs, or staffing gap computation, utilizes current staffing onboard and the numbers derived as staffing required to produce a rationale percentage of staff needed. The study is also required to assist FSA with tools that will enable tracking of full-time equivalent staff and financial execution (i.e., average onboard staffing and aggregate salaries over the course of a fiscal year). This calculation, in conjunction with the staffing gap computation, will provide a more accurate picture of FSA's requirements and capabilities beyond the historical onboard staffing snapshots that have typically been produced.

The initial collection and analysis of workload driver data that will be utilized to determine staffing requirements is currently in progress, so full limitations have not yet been identified. The data sources for this performance metric are the U.S. Department of Interior Business Center

Payroll/Personnel Data, in addition to qualitative interview and resource information from internal FSA sources.

**Table 18: Performance Metric 1.2.B.** Development of a multi-year, targeted, training and development plan.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | N/A |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

FSA began defining the methodology for the targeted training and development plan by identifying the key training programs to be included based on FY 2020 employee participation. In FY 2020, 1,118 employees participated in targeted trainings provided by the Workforce Development Division (WDD), Project Management training program, FSA Leadership Institute pilot program, leadership coaching, Executive Services leadership trainings, and Acquisitions Directorate.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric.

FSA established a working group to develop the framework for a multi-year training and development plan. The working group focused on mission critical competencies essential to the performance of FSA and the Next Gen FSA initiative. The working group identified and tracked several learning initiatives under the technical skills and leadership/management competencies to better understand how FSA is developing and tracking employees needing these skill sets. FSA completed three skill gap analyses to identify enterprise-wide skill needs and offer learning solutions to address gaps based on industry best practices.

The framework and metrics used to capture FSA's baseline projections for FY 2020 will be used to complete the full multi-year training plan in FY 2021. COVID-19 had an impact on training at FSA. Many training programs were converted from classroom-based to virtual instructor-led delivery. For FY 2021, FSA plans to develop and/or identify additional courses to provide additional learning opportunities with either a virtual instructor or self-paced training. FSA has also invested in increasing the number of employees with project management certifications to enhance the capabilities of staff in managing the complex projects associated with Next Gen FSA.

**Data Quality and Limitations:**

A combination of quantitative and qualitative data was collected to assess the effectiveness of the staff trainings. The Kirkpatrick Level evaluation was one of the major assessment instruments used to collect this data. There are four levels to Kirkpatrick Model: Reaction, Learning, Behavior, Results. To evaluate training effectiveness, course satisfaction evaluations (Kirkpatrick Level 1) were administered via paper or electronic format at the end of trainings.

An internal evaluation database was used to track and compare data across training courses to identify trends and areas of improvement. The data limitation at present is that only a Kirkpatrick Level 1 evaluation is performed post-training, which measures the degree to which participants find the training favorable, engaging, and relevant to their jobs. To advance effectiveness of effort in the future, a Kirkpatrick Level 2 or Level 3 will be needed.

**Performance Results by Strategic Goal**

**Table 19: Performance Metric 1.2.C.** Perform a training analysis at each performance review period within the fiscal period.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline year | 27 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

Sixteen trainings were provided by the WDD, aligned under the leadership/supervision and technical skills competencies and the FSA's Retirement Education learning series contract. An additional 11 trainings were provided by WDD leadership initiative pilot, and the Acquisitions Directorate.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric.

FSA used various assessment instruments and data sets such as formative and summative data collection mechanisms, Kirkpatrick Level evaluations, OPM and the Department competency models, participant anecdotal feedback, and after-action briefings/reports. Post-training evaluations were administered via paper or electronically to compare data across training initiatives to identify trends and areas of improvement to make real-time modifications within the current delivery or in future program/course iterations. For example, WDD developed an internal evaluation database to track, monitor, and identify evaluation trend data across programs. The Retirement Education learning series has been crucial for the overall improvement in the work/life balance of FSA employees' by providing more in-depth learning opportunities to understand retirement, savings, and investment options, such as the Thrift Savings Program. The goal of employee training is to not only train them for skill enhancement, but also to improve employee knowledge and welfare as it relates to their overall development.

**Data Quality and Limitations:**

FSA used an internal evaluation database to track and compare data across training iterations to identify various performance trends. WDD used various assessment instruments and data sets such as formative and summative data collection mechanisms, Kirkpatrick Level evaluations, OPM and Department competency models, participant anecdotal feedback, and after-action briefings/reports.

To gauge participant knowledge within these specified trainings and allow for application of learning to address real-life situations or leadership problems/challenges Kirkpatrick Level evaluations were administered during and/or post-training. For the managerial training directed at enhancing leadership competencies, action-based learning through individual activities and/or group capstone projects was utilized. The limitations of the data are that the analysis of results was administered to a subset of trainings offered in specialized areas in FY 2020. The analysis

will need to broaden, to increase the results-based approach beyond knowledge acquisition to behavioral change to support the training investment across the enterprise.

## Strategic Goal 2: Provide World-Class Customer Experience to the Students, Parents, and Borrowers We Serve

FSA will modernize its systems and operations to deliver world-class customer and partner experiences. These efforts include a single point of connection to assist students and borrowers with federal student aid needs, readily available personalized customer information, and informed borrower tools for assistance. Based on enhanced customer analytics and customer feedback, FSA will continuously update these tools to make sure borrowers understand their rights and responsibilities. FSA's intention is to promote positive repayment behaviors and help borrowers understand how they can repay their loans more quickly or at lower cost. Additionally, FSA will enhance contact center operations and simplify and automate back-office operations to reduce errors and accelerate processing. By simplifying these customer-facing processes, engaging customers with innovative communication strategies, and providing self-service options through the mobile application, FSA will be able to quickly respond to the ever-changing financial aid environment and consistently be a trusted resource for students and families.

Strategic Goal 2 includes the four strategic objectives listed below:

- **Strategic Objective 2.1:**

  Ensure that all students can easily access information on federal student aid, apply for federal student aid, and have information on repayment options.

- **Strategic Objective 2.2:**

  Provide seamless, easy, personalized digital interactions equal with top financial institutions in the delivery of financial aid products and services.

- **Strategic Objective 2.3:**

  Streamline contact center and back-office operations to improve our customers' integrated experience.

- **Strategic Objective 2.4:**

  Simplify the communication and processes associated with borrower repayment plans.

In FY 2020, FSA had four objectives under this goal. These objectives included 16 metrics. Of these 16 metrics, 7 were met or exceeded and 3 metrics were not met for this goal. Additionally, six metrics are baselined in FY 2020.

**Strategic Objective 2.1:** Ensure that all students can easily access information on federal student aid, apply for federal student aid, and have information on repayment options.

**Table 20: Performance Metric 2.1.A.** Number of visits (sessions) demonstrating adoption of the updated StudentAid.gov site.*

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 47.2 million | 44.3 million | 44.5 million | 183.7 million | 190 million | 217 million |
| Performance Result | Met | Met | Met | Met | Met | |

*Note: Formerly A.3 in FSA FY 2019 Annual Report.

**Target Context:**

StudentAid.gov is FSA's primary customer-facing digital front door for students, parents, and borrowers who need to be informed about, apply for, and manage their federal student aid. By focusing on total customer visits, this performance metric helps gauge the success of FSA's efforts to become the most trusted and reliable source for accurate student aid information for Americans nationwide and engage customers in completing critical tasks related to federal student aid.

**Analysis of Progress:**

FSA met the target for this metric with more than 217 million visits in FY 2020.

In December 2019, a major redesign of **StudentAid.gov** was completed as part of Next Gen FSA which resulted in the integration of content and functionality from StudentLoans.gov, fsaid.gov, and NSLDS.gov. This effort significantly advanced the goal of providing customers with a single front door for information and key tasks related to federal student aid. Additional features—such as Aid Summary, Annual Student Loan Acknowledgment, Make a Payment pilot, and more—were launched on **StudentAid.gov** during FY 2020, and additional functionality and improvements are planned for FY 2021.

**Data Quality and Limitations:**

FSA operational systems have procedures in place to address potential data quality issues. The process for querying system data is consistent and disciplined. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data. The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data. The data is an absolute number so no calculation and methodology are performed. The metric value is based on the number of visits (as opposed to unique visitors or page views).

The source of the data is FSA's online platform analytics. The metric is a direct reflection of the data platform analytics and FSA constantly monitors the analytics platform to ensure the system is secure and the query results are consistent.

**Table 21: Performance Metric 2.1.B.** Percentage of high school seniors submitting the FAFSA.*

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | 67.4% | 65.9% | 66% | 63.8% |
| Performance Result | N/A | N/A | Met | Not Met | Not Met | |

*Note: Formerly A.1 in FSA FY 2019 Annual Report.

**Target Context:**

A primary goal of FSA is to encourage FAFSA completion among high school seniors.

**Analysis of Progress:**

FSA did not meet the target for this metric with only 63.8 percent of high school seniors submitting the FAFSA.

FY 2020 presented two major challenges on that front. For the first half of the FAFSA filing year, from October 1, 2019–March 15, 2020, there was near record low unemployment in the United States. In periods of low unemployment, FAFSA filing among high school seniors normally decreases as the job market offers better opportunities, greater pay, etc. This likely accounted for some of the decrease in FAFSA filing from 65.9 percent in FY 2019 to 63.8 percent in FY 2020. In March 2020, COVID-19 resulted in most high schools across the country moving to an on-line only model, which meant that students were not in the classroom or in school buildings with guidance counselors, teachers, coaches, and other cues that reminded them to file the FAFSA. Finally, COVID-19 resulted in many low-income families having a change in financial circumstances that may have prevented filing of the FAFSA in favor of work opportunities to help support the family unit. All these factors likely had an impact on lowering FAFSA completion among high school seniors.

**Data Quality and Limitations:**

FSA operational systems have procedures in place to address potential data quality issues. The process for querying system data is consistent and disciplined. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data. Queries and calculations are simultaneously conducted on data from previous years by FSA's Business Intelligence Team to ensure technical definitions remain consistent. The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data and all calculations made with the data. The data is pulled from the FSA's Central Processing System.

Finally, the Financial Reporting and Analysis Branch is responsible for ensuring that documentation is complete and archived. These calculations also restrict the application period to the first nine months of the application cycle (through the close of the fiscal year) rather than the entire 18 months. Since most applicants, including high school seniors, file their FAFSA prior to the start of the upcoming academic year (usually before fiscal year end), this decision

better aligns the performance metric with the fiscal year where most of the performance occurred.

**Table 22: Performance Metric 2.1.C.** Number of customers submitting the FAFSA via a mobile platform—the myStudentAid mobile app or FAFSA.gov.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 2.4 million submissions | 2.5 million submissions |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

A goal of the Next Gen FSA effort is to provide customers with the ability to access federal student aid information and to complete key tasks on the device of their choosing. As such, FSA has focused on making digital products, such as the FAFSA form, mobile-responsive. The FAFSA form is also available on the myStudentAid app. This metric measures FAFSA submissions via a mobile device either through the FAFSA website or the mobile app to help determine customer interest and engagement in using mobile technology to complete online forms.

**Analysis of Progress:**

FSA met the target with more than 2.5 million FAFSA submissions completed on a mobile platform.

FY 2020 serves as a baseline year and FSA expects mobile adoption and usage to grow over time, especially as new features and personalization are added to the myStudentAid app in FY 2021.

**Data Quality and Limitations:**

FSA operational systems have procedures in place to address potential data quality issues. The process for querying system data is consistent and disciplined. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data. The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data. The data is an absolute number so no calculation and methodology are performed.

The source of the data is FSA's online platform analytics. The metric is a direct reflection of the data platform analytics and FSA constantly monitors the analytics platform to ensure the system is secure and the query results are consistent.

**Strategic Objective 2.2:** Provide seamless, easy, personalized digital interactions equal with top financial institutions in the delivery of financial aid products and services.

**Table 23: Performance Metric 2.2.A.** Number of customers checking loan balances via the myStudentAid mobile app.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 70,000 | 133,417 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

A goal of the Next Gen FSA effort is to provide customers with the ability to access federal student aid information and to complete key tasks on the device of their choosing. Customers can view the loan information via an in-app browser on the myStudentAid app. This metric gauges customer engagement in using the myStudentAid app to view their current aid information.

**Analysis of Progress:**

FSA met the target with 133,417 customers checking their loan balances through the myStudentAid app.

FY 2020 serves as a baseline year and FSA expects mobile adoption and usage to grow over time, especially as the Dashboard and Aid Summary features are added to the myStudentAid app in FY 2021.

**Data Quality and Limitations:**

FSA operational systems have procedures in place to address potential data quality issues. The process for querying system data is consistent and disciplined. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data. The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data.

The data is an absolute number as the number of customers checking their loan balances, so no calculation and methodology are performed. The data source is FSA's online platform analytics. This metric is a direct reflection of the data platform analytics. FSA monitors to ensure the system is secure and the query results are consistent.

**Performance Results by Strategic Goal**

**Table 24: Performance Metric 2.2.B.** Number of borrowers who view their aid summary information on StudentAid.gov.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | 7.6 million |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

**StudentAid.gov** is FSA's primary customer-facing digital front door for students, parents, and borrowers who need be informed about, apply for, and manage their federal student aid. In February 2020, the Aid Summary feature was delivered on **StudentAid.gov** providing customers with access to summary and detailed aid information such as loan balances or Pell Grant dollars received. This metric gauges customer engagement in using **StudentAid.gov** to view their current aid information.

**Analysis of Progress:**

FY 2020 serves as a baseline year with more than 7.6 million customers viewing their aid summary information on **StudentAid.gov**.

Since Aid Summary launched in February 2020, FSA expects this figure to increase in FY 2021.

**Data Quality and Limitations:**

The aid summary on the **Studentaid.gov** website was launched on February 23, 2020. Website data collection began on February 23, 2019. The data for this metric covers the timeframe of February 23, 2020–September 30, 2020.

FSA operational systems have procedures in place to address potential data quality issues. The process for querying system data is consistent and disciplined. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data. The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data.

The data is an absolute number as the value is based on the number of users (as opposed to sessions or page views), so no calculation and methodology are performed. The data source is FSA's online platform analytics. This metric is a direct reflection of the data platform analytics. FSA monitors to ensure the system is secure and the query results are consistent.

**Table 25: Performance Metric 2.2.C.** Number of users of "Aidan," the StudentAid.gov virtual assistant.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 25,000 | 545,763 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

To provide increase self-service options for students, families, and borrowers, this metric helps tracks Aidan's usage. Aidan is a virtual assistant that uses advanced technology—artificial intelligence and natural language processing—to answer the most common questions on federal student aid. Whether customers want to find out about their current loan account balances, learn more about grants, make a payment (pilot), or get help contacting their loan servicer, Aidan is available to help them find an answer.

**Analysis of Progress:**

FSA exceed its target for this metric with a result of 545,763 users.

In December 2019, FSA launched a beta version of Aidan, a virtual assistant that helps users get answers to their questions without contacting a call center. Aidan was launched as part of the Next Gen FSA effort to improve the way all of its customers—including students, parents, borrowers, schools, and partners—interact with and manage the programs administered by FSA.

Aidan was available to a group of pilot users during FY 2020 to better understand customer questions to ensure FSA is providing relevant and correct answers that meet its customers' needs. Over time, FSA will analyze customer interactions with Aidan to improve its functionality.

During FY 2020, Aidan was able to augment FSA's CARES Act/COVID-19 communications. All questions to Aidan related CARES Act/COVID-19 were redirected to the Coronavirus and Forbearance info for Students, Borrowers, and Parents on **Studentaid.gov** ensuring customers received the most recent and accurate information.

**Data Quality and Limitations:**

Under this performance metric, the total users are defined as individuals that interact with Aidan beyond the initial greeting button prompt provided to customers. An FSA contractor performs a two-step validation of the Aidan data in the Digital Customer Care (DCC) Tableau system prior to sharing with FSA. The source of the data is FSA's online platform analytics. This metric is a direct reflection of the data platform analytics. FSA monitors to ensure the system is secure and the query results are consistent.

**Table 26: Performance Metric 2.2.D.** Number of borrowers who complete their annual certification on time for the Annual Student Loan Acknowledgement (ASLA).

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | 858,628 |
| **Performance Result** | **N/A*** | **N/A*** | **N/A*** | **N/A*** | **Baseline** | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

**StudentAid.gov** is FSA's primary customer-facing digital front door for students, parents, and borrowers who need be informed about, apply for, and manage their federal student aid. In April 2020, the Annual Student Loan Acknowledgment feature was delivered on StudentAid.gov providing customers who are planning to accept a federal student loan with important information on borrowing and their responsibility to repay the loan. This metric gauges customer interest and engagement in the Annual Student Loan Acknowledgment (ASLA). In FY 2020, the ASLA was provided for informational/educational purposes but was not required.

**Analysis of Progress:**

FY 2020 serves as a baseline year with 858,628 customers completing the ASLA more than 1 million times.

Since the ASLA launched in April 2020, FSA expects this figure to increase in FY 2021. In addition, completion of the ASLA is currently optional, but FSA is planning to make it mandatory for all loan disbursements for the 2021–22 award year.

**Data Quality and Limitations:**

The performance metric result represents the number of unique users who completed the acknowledgment. Users can complete the acknowledgment multiple times and the total number of completed acknowledgments is provided in the Analysis of Progress section. A separate data analyst from a different office within FSA validates the accuracy of the query and the resulting data and validates any anomalous data.

The Customer Analytics Group is responsible for the primary calculation of the metric as well as the technical validation of the metric, which is done by reviewing for accuracy the query used to pull the data. The source of this data is the Common Origination and Disbursement (COD). There is no calculation necessary for this metric as the information is derived directly from COD.

**Table 27: Performance Metric 2.2.E.** Transactional email volume for outreach and communications to borrowers.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | 92.2 million |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric measures the transactional emails that are delivered through our internal communications tool. These emails are vital for students, parents, borrowers to understand updates and notifications regarding their FAFSA application and other important information that needs to be acted on. This metric helps to gauge the health of our email communications and platform in terms of volume and reach.

**Analysis of Progress:**

FY 2020 serves as a baseline year with approximately 92.2 million transactional emails going to customers. As part of DCC, FSA is onboarding transactional communications into a centralized system for a more consolidated and consistent customer experience.

During FY 2020, FSA has onboarded critical transactional communications for its borrowers. This includes FAFSA, COD, and FSA ID real time communications. FSA expects volume numbers to continue to increase as it maintains an ED.GOV email domain and brand authority, as well as onboarding additional communications.

**Data Quality and Limitations:**

There is no calculation necessary for this metric. It is reported by the COD system. Several data analysts pull the data and a data analyst validates the numbers. The source of the data is the Digital Communications Tool & Marketing Communications Platform (Comms platform).

**Table 28: Performance Metric 2.2.F.** Recurring campaign email delivery volume for outreach and communications to borrowers.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | 32.2 million |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric measures the recurring emails that are delivered through the internal communications tool. Recurring campaigns are defined as communications that FSA sends on a consistent cadence that are not tied to immediate transactional interactions, such as the Renewal campaign reminders. This metric helps to gauge the commitment to consistent and proactive communications.

**Analysis of Progress:** FY 2020 serves as a baseline year for this metric with approximately 32.2 million recurring emails going to customers. As part of DCC, FSA is onboarding these recurring communications into a centralized system for a more consolidated and consistent customer experience.

FSA has looked at Renewal campaign data, as well as Auto Closed School Discharge and Temporary Expanded Public Service Loan Forgiveness (TEPSLF) data to get these metrics. These numbers will help to establish the baselines for future FAFSA renewal campaigns. As FSA continues to create and onboard new communications that are recurring, always-on, and not tied to transactional messaging, it will be added to this metric.

**Data Quality and Limitations:**

There is no calculation necessary for this metric. It is reported by the COD system. Several data analysts pull the data and a data analyst validates the numbers. The source of the data is the Comms Platform.

**Table 29: Performance Metric 2.2.G.** American Customer Satisfaction Index (ACSI) Aid Lifecycle Survey score.*

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | 69.9 | 70.6 | 70.0 | 72–74 | 73.5 |
| Performance Result | N/A | Met | Met | Met | Met | |

*Note: Formerly A.5 in FSA FY 2019 Annual Report.

**Target Context:**

This metric provides a measure of the customer experience across the student aid lifecycle, by accessing customer satisfaction scores from FAFSA filers, from financial aid administrators, and from borrowers repaying their loans.

**Analysis of Progress:**

FSA met its target range for this metric with a result of 73.5.

The FY 2020 score of 73.5 is higher than the FY 2019 score of 70.0 and the FY 2018 score of 70.6. The score consists of three groups of borrowers that span the financial aid lifecycle. The most heavily weighted of these measures is borrowers who are currently having their loans serviced—this is the largest segment of the population served by FSA (FSA has more than 32 million borrowers) and therefore accounts for almost 72 percent of the measure. Nearly 24 percent of this metric is made up of scores collected by FAFSA applicants (roughly 18 million FAFSA forms are filed each year) and the smallest component of the metric is the 5 percent of the measure that accounts for students (10 million) still in school who are receiving Title IV funds. Together, the three measures span the three major parts of the financial aid lifecycle.

**Data Quality and Limitations:**

Traditionally, the ACSI survey has been conducted annually for FSA's major programs. The index provides a national, cross-industry, cross-sector economic indicator, using widely accepted methodologies to obtain standardized customer satisfaction information. Survey scores are indexed on a 100-point scale. The ACSI scores for application, in-school experience, and servicing are weighted by the utilization of each process/service and the intensity of the service provided.

This metric is calculated by using weighted customer satisfaction scores from the Multiple Servicer Survey, **FAFSA.gov** and the In-School customer satisfaction survey. Several data analysts pull the data, and a data analyst validates the numbers. The data source for this metric is the Multiple Servicer Survey, **FAFSA.gov**, and (federal student aid recipients) In-School customer satisfaction survey. This metric is a direct reflection of the data collected through the ACSI Aid Life Cycle Survey. FSA monitors to ensure the system is secure and the query results are consistent.

**Table 30: Performance Metric 2.2.H.** Customer Satisfaction Survey(s) for StudentAid.gov site and associated tools.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Survey development and implementation | No survey developed |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Not Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

This metric intends to measure customer satisfaction with the **StudentAid.gov** website, including the applications, tools, and processes available on the site. The measurement of customer satisfaction would encompass activities such as completing entrance and exit counseling, or the usage of the repayment calculator that assist customers in selecting a repayment plan that best fits their needs. Customer satisfaction surveys will assist FSA in developing additional tools and offering website improvements based on their feedback.

**Analysis of Progress:**

FSA did not meet its target for this metric as no surveys were developed for **StudentAid.gov** in FY 2020.

FSA is evaluating Voice of the Customer technologies that would allow the utilization of survey customers on **StudentAid.gov** at a regular cadence, the ability for staff to analyze results of structured and unstructured feedback. Surveys would generally follow the guidance given by OMB as part of OMB Circular A-11, Section 280. FSA expects to have surveys implemented across **StudentAid.gov** in FY 2022.

**Data Quality and Limitations:**

N/A.

**Strategic Objective 2.3:** Streamline contact center and back-office operations to improve our customers' integrated experience.

**Table 31: Performance Metric 2.3.A.** Quality Standard for Average Speed to Answer (ASA) at all Call Centers.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Equal to or less than 60 seconds | 59.0 |
| **Performance Result** | N/A | N/A | N/A | N/A | Met | |

*Notes: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

The goal of this metric is to ensure FSA's loan servicing vendors (Not-For-Profits (NFPs) and Title IV Additional Servicers (TIVAS)) are providing the best customer service to FSA's borrowers. One way that this is measured is through the Average Speed to Answer rate. This is the average number of seconds it takes a borrower to speak with a customer service representative from the moment a borrower calls to the time a customer service representative answers the call. A higher ASA indicates a longer wait time and may result in a higher call abandon rate or increased call frustration.

**Analysis of Progress:**

FSA met its target for this metric with an ASA of 59.0 seconds.

The ASA rate target was achieved in FY2020 for FSA's NFPs and TIVAS. This was predominately a result of the CARES Act forbearance period that began in March 2020 and remained in place until the end of the fiscal year. Before this period, the ASA averaged 102 seconds (October–March) and then became 16 seconds (April–September). Entering FY 2021, the ASA rate remains low due to the extension of the CARES Act forbearance period through December 31, 2020, and related call volumes being more than 50 percent below normal. If the benefits are not extended, FSA expects that the ASA rate will increase in January 2021 as borrowers resume making payments and servicers adjust staffing to reach the right equilibrium. If benefits are extended, then it can be expected that the ASA rate will remain low throughout FY 2021.

**Data Quality and Limitations:**

The source of data for this performance metric is the Federal servicers' quarterly reports. The verification and validation of performance by the nondefault federal student loan servicers is conducted by FSA and includes (but is not limited to): (1) review and validation of federal servicer reports; (2) ongoing/recurring quality assurance discussion with federal servicers; (3) site visits to federal servicer call center sites; and (4) documented on-phone ("mystery caller") evaluations of services.

Because the agency directive is succinct and builds on current contractor operational capabilities, FSA does not anticipate anomalous data or issues with implementation. However, in cases where verification and validation detect anomalies that suggest less-than-complete information, FSA will address any deficiencies through direct contact with federal servicers, requests for information, audits, site visits, and/or other assessment measures of performance, as applicable.

**Table 32: Performance Metric 2.3.B.** Quality Standard for Abandon Rate (AR) for Incoming Calls at all Call Centers.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Equal to or less than 2% | 3.6% |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Not Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The goal of this metric is to ensure the loan servicing vendors (NFPs and TIVAs) are providing the best customer service to our borrowers. One way that this is measured is through the Abandon Rate (AR). This is the average number of calls in which a borrower hangs up (abandons) the call before they speak with a customer service representative. The higher the rate the more borrowers are abandoning a call and likely not getting the information/answers they need.

**Analysis of Progress:**

FSA did not meet its target for this metric with an AR of 3.6 percent.

The AR target was not achieved in FY 2020 for the NFPs and TIVAs, but servicers achieved significant progress in improving their AR throughout the year. This was predominately a result of the CARES Act forbearance period that began in March 2020 and remained in place until the end of the fiscal year. Before this period, the AR averaged 6.1 percent (October–March) and then became 1.0 percent (April–September). Entering FY 2021, the AR remains low due to the extension of the CARES Act forbearance period through December 31, 2020, and related call volumes being more than 50 percent below normal. If the benefits are not extended, FSA can expect the AR to increase in January 2021 as borrowers resume making payments and servicers adjust staffing to reach the right equilibrium. If benefits are extended, then it can be expected that the AR will remain low throughout FY 2021.

**Data Quality and Limitations:**

The source of data for this performance metric is the Federal servicers' quarterly reports. The verification and validation of performance by the nondefault federal student loan servicers is conducted by FSA and includes (but is not limited to): (1) review and validation of federal servicer reports; (2) ongoing/recurring quality assurance discussion with federal servicers; (3) site visits to federal servicer call center sites; and (4) documented on-phone ("mystery caller") evaluations of services.

Because the agency directive is succinct and builds on current contractor operational capabilities, FSA does not anticipate anomalous data or issues with implementation. However, in cases where verification and validation detect anomalies that suggest less-than-complete information, FSA will address any deficiencies through direct contact with federal servicers,

requests for information, audits, site visits, and/or other assessment measures of performance, as applicable.

**Strategic Objective 2.4:** Simplify the communication and processes associated with borrower repayment plans.

**Table 33: Performance Metric 2.4.A.** Number of borrowers using Make a Payment feature to pay student loans.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Implement pilot for Make a Payment feature | 12,245 payments |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

**StudentAid.gov** is FSA's primary customer-facing digital front door for students, parents, and borrowers who need be informed about, apply for, and manage their federal student aid. In February 2020, the Make a Payment pilot was delivered on **StudentAid.gov** providing customers with loans serviced by Great Lakes or Nelnet (both FSA loan servicers) with the ability to make a standard loan payment on **StudentAid.gov**. This metric gauges customer interest and engagement in using **StudentAid.gov** to make a student loan payment.

**Analysis of Progress:**

FY 2020 serves as a baseline year with customers making more than 12,245 student loan payments on **StudentAid.gov**. Since the Make a Payment pilot launched in February 2020, FSA expects this figure to increase in FY 2021. The FY 2020 payments were also impacted by COVID-19 and the suspension of loan payments through December 31, 2020.

**Data Quality and Limitations:**

This figure represents the number of student loan payments made on **StudentAid.gov**. FSA is unable to provide the unique number of customers who made payments. A separate data analyst pulls the data and then a different analyst pulls the data independently to validate the accuracy of the information and any anomalous data.

The source of the data is the DCC Web Logs. No calculation is necessary as the data is an absolute number reported to FSA from the DCC Web Logs.

**Table 34: Performance Metric 2.4.B.** Percentage of borrowers using auto-debit.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | 24.8% |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Baseline | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.*

**Target Context:**

This metric measures the volume of borrowers that are enrolled in auto-debit. Auto-debit allows borrowers to pay their student loan payments without any effort since the payment is extracted from the borrower's financial institution each time a payment is due, allowing borrowers to make payments in full and on time with minimal effort required. Borrowers who enroll in auto-debit are given a 0.25 percent reduction on their interest rate.

**Analysis of Progress:**

FY 2020 will be the baseline year for measuring the percentage of borrowers using auto-debit. Auto-debit percentage will be calculated using the number of borrowers in the National Student Loan Data System (NSLDS) that are reported as enrolled in auto-debit in comparison to the total number of borrowers in repayment (not in school or in grace status). FSA anticipates improvement to the percentage of borrowers using auto-debit as the ease of enrollment and knowledge of the benefits of auto-debit are publicized during the implementation of Next Gen FSA.

COVID-19 and other economic impacts may result in overall reductions in the ability of borrowers to make student loan payments and this may impact any improvements to the auto debit percentages until economic impacts of COVID-19 improve.

**Data Quality and Limitations:**

Enrollment in auto debit is reported by federal loan servicers to NSLDS. Accuracy of that data is validated by FSA using NSLDS monitoring techniques. NSLDS queries will provide the volume of borrowers enrolled in Automatic Direct Debit (auto debit) and the total volume of borrowers in repayment. The auto debit volume will be divided by the total borrowers in repayment volume and rounded to 1/10th percent to calculate auto debit percentage. NSLDS queries and calculations are validated by FSA's Data Review Team for accuracy. The source of the data is the NSLDS.

**Table 35: Performance Metric 2.4.C.** Percentage of Public Service Loan Forgiveness (PSLF) applicants who had used the PSLF Help Tool and who met the requirements for PSLF.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | N/A |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The metric tracks the percentage of users who complete the PSLF Help Tool. Upon completing the PSLF Help Tool, it generates a PSLF form for users to fill out.

**Analysis of Progress:**

FY 2020 serves as a baseline year for this metric, but the methodology to accurately track the performance of the PSLF Help Tool is incomplete. The baseline study will continue into FY 2021.

In FY 2020, FSA updated the PSLF Help Tool to include an employer eligibility database for borrowers to learn early in the process whether their employer is an eligible employer for PSLF purposes. FSA can now compare PSLF Help Tool usage from its inception in December 2018 to present, to see the number of borrowers completing the tool and generating the correct form.

However, PSLF Help Tool usage was impacted as borrowers entered the CARES Act administrative forbearance. Initially, there was noticeable PSLF Help Tool usage decline, but usage increased with the release of the employer eligibility database. A policy determination shifted the timeframe associated with employment certification, which also impacted FSA's ability to assess customer usage of the tool in an effective way. In FY 2021, FSA is on track to delivering an improved PSLF Help Tool with a combined form, so that a borrower is considered for TEPSLF in addition to PSLF.

**Data Quality and Limitations:**

The source of the data is on the COD Portal and provided by an FSA contract resource. The contractor assists with the monitoring of PSLF Help Tool usage and which form is generated based on customer interaction with the PSLF Help Tool.

## Strategic Goal 3: Increase Partner Engagement and Oversight Effectiveness

Strategic Goal 3 is focused on how FSA will assist schools, third-party servicers, and financial institutions to deliver federal student aid, collect borrower payments seamlessly, and safeguard data integrity through oversight and monitoring. FSA will also ensure schools understand and comply with Title IV requirements.

FSA will gauge its performance using six metrics. FSA will utilize a more comprehensive suite of monitoring tools to ensure IHEs appropriately administer Title IV aid. To measure the effectiveness of its oversight, FSA will annually conduct institutional reviews that will include comprehensive compliance reviews, institutional assessment reviews, and general or focused program compliance assessment reviews. These reviews will assess compliance with requirements for aid delivery, return to Title IV and student loan repayment.

Additionally, FSA is committed to continued enhancements in oversight and improving the borrower experience by reducing institutional fraud. An outcome of this effort is demonstrated by the tactical approach for application processing FSA has taken in the area of Borrower Defense (BD) which will afford significant progress in resolving the outstanding applications.

Under Goal 3, FSA is also pursuing opportunities in the Next Gen PPO platform to provide high quality training and encourage partner participation. It is necessary for the organization to provide comprehensive training and specialized technical assistance to participating schools that receive Title IV aid as well as create pathways for institutional feedback that will allow FSA to continuously improve its interactions with partners in the delivery of aid to students and borrowers.

Strategic Goal 3 includes the two strategic objectives listed below:

- **Strategic Objective 3.1:**

  Provide effective oversight of FSA's partners utilizing a comprehensive suite of monitoring tools.

- **Strategic Objective 3.2:**

  Strengthen partner engagement and provide effective outreach and assistance.

In FY 2020, FSA had two objectives under Goal 3 that include six metrics. Of these six metrics, three were met and one metric was not met for this goal. Additionally, two metrics were baselined in FY 2020.

**Strategic Objective 3.1:** Provide effective oversight of FSA's partners utilizing a comprehensive suite of monitoring tools.

**Table 36: Performance Metric 3.1.A.** FSA will annually conduct an Institutional Review for its participating partners including schools, third-party servicers, and financial institutions.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Conduct Institutional Reviews for at least 40% of partners | 51% of partners reviewed |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.*

**Target Context:**

This metric measures the performance of holistic comprehensive compliance reviews of institutions relating to certification actions, deficient audit resolutions, flagged financial statements, program reviews, method of payment actions, and technical assistance.

**Analysis of Progress:**

FSA met its target for this metric with a result of 51 percent of partners reviewed.

In FY 2020, FSA conducted oversight reviews for 2,878 unique institutions of higher education relating to certification, deficient audit resolutions, flagged financial statements, program reviews, method of payment, and technical assistance. FSA completed 1,078 recertifications and 4,410 other institutional eligibility related applications, evaluated more than 2,000 school financial responsibility notifications, processed more than 3,000 deficient audits, and flagged financial statements, and issued 143 Final Program Review Determinations or other close-out actions with a total of approximately $146.7 million in liabilities. FSA accomplished this work while also issuing 211 Automatic Closed School Discharge letters asserting approximately $59.1 million in associated liabilities. FSA also conducted oversight of lenders, lender servicers, and guaranty agencies. FSA conducted 16 program reviews and identified untimely reinsurance requests for more than 38,000 loans impacting approximately $319.2 million.

**Data Quality and Limitations:**

Next Gen PPO's data for the metric measurement and sub-measurements are highly reliable and retained in the Postsecondary Education Participants System (PEPS) and in the eZ-Audit system. Metric calculations are based on data extracts from the data systems. The data extracts are subject to quality checks and validation. After data are compiled, a staff member reviews the queries and formulas to ensure proper functioning and correct counting reviews/schools. Since Next Gen PPO may perform more than one compliance review of an institution during a fiscal year, the data are de-duplicated to ensure an institution is counted only once. The count of unduplicated institutions for whom Next Gen PPO performed a compliance review is compared

with an unduplicated count of participating institutions to calculate the actual percentage for this performance metric.

**Table 37: Performance Metric 3.1.B.** Number of Borrower Defense (BD) applications adjudicated (subject to existing BD regulations).

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 150,000 | 160,000 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

BD to repayment is a type of federal student loan forgiveness where borrowers may be eligible for forgiveness of their federal student loans if the relevant school attended misled the borrower or engaged in other misconduct in violation of certain laws. During the first two months of this fiscal year, FSA adjudicated[17] more than 12,000 applications that remained pending further processing without an approved relief methodology. On December 10, 2019, the Secretary announced the approval of the new tiered relief methodology (2019 relief methodology) which allowed FSA to process applications for relief and progress toward elimination of the backlog of more than 175,000 claims awaiting adjudication. Following approval of the methodology, FSA targeted to build capacity to adjudicate 5,000 applications per week with an ultimate objective of less than 5,000 claims on hand by late Fall 2020.

**Analysis of Progress:**

FSA met its target for this metric with a result of 160,000 BD applications adjudicated.

While receiving an average of more than 750 new applications per week from June through September 2020, FSA continued to build production capacity by hiring more than 52 term attorneys. This capacity helped contribute to adjudicating more than 148,000 applications since December 2019, a reduction of more than 84 percent of the backlog of more than 175,000 cases awaiting adjudication at the time.

**Data Quality and Limitations:**

Weekly production data is derived from the BD case management platform which tracks progress and status of BD applications through intake, adjudication, borrower notification, and loan servicer documentation on effectuated loan relief, where applicable. Weekly data verification reviews are coordinated among the business unit and FSA's enterprise data office. This production data is reported in weekly performance metrics evaluated by FSA and Department Senior Leadership. The source of data for this performance metric is the Customer Engagement Management System.

---

[17] Adjudication refers to the Department's evaluation, and decision on the individual merits, of any given borrower defense application in accordance with applicable rules and regulations. It is an individual process that depends on the information submitted by the borrower as well as any relevant evidence in the Department's possession.

**Strategic Objective 3.2:** Strengthen partner engagement and provide effective outreach and assistance.

**Table 38: Performance Metric 3.2.A.** FSA will provide comprehensive training and/or specialized technical assistance to its participating schools that receive *Title IV* Aid on behalf of students.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | At least 35% of schools will receive comprehensive training and/or specialized technical assistance | 70% |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

Training and technical assistance for this metric is provided and tracked at the individual learner level at participating schools. As a target, professionals (individual learners) in at least 35 percent of all participating schools will receive outreach and assistance, through such means as congressionally mandated training, the annual FSA Training Conference, state and regional professional association conferences and a large portfolio of web-delivered self-service courses, webinars, Ask-a-Fed queries for individualized technical assistance, and systems-oriented job aids. The training is delivered in person as well as via FSA's Learning Management System (LMS) and webinars. School participation in training offerings and technical assistance is almost entirely voluntary.

**Analysis of Progress:**

FSA met its target for this metric by providing comprehensive training and/or specialized technical assistance to 70 percent of participating Title IV eligible schools.

FSA provided 5,471 instances of comprehensive training and/or technical support to individual professionals from 3,955 institutions (70 percent) during FY 2020. Of these total instances, 3,955 instances of support were provided and tracked via LMS; 3,300 instances were provided via Ask-a-Fed query assistance and direct outreach support to meet the unique needs of Minority Serving Institutions (MSIs); and at least 89 instances were provided via mandatory training. All in-person training events were cancelled. The Fundamentals of Title IV course was moved to an all virtual environment. A 4.5 day in-person Fundamentals training session required for participation in the Title IV programs was revamped for Live on-line delivery. Five revised sessions have been delivered. Additional new training and technical assistance/assessment products have been developed, for virtual delivery leveraging lessons learned from re-platforming Fundamentals training.

Because this is a new baseline metric, FSA did not previously track schools associated with individual professionals receiving training or assistance via Ask-a-Fed query and response support. FSA has identified additional data collection requirements to associate queries and individual support to professionals with their associated institution. This more robust data tracking will allow FSA to capture the extent of training and technical assistance more fully for individuals across all participating institutions. Next Gen PPO School Portal capability is necessary to fully capture alignment of training and technical assistance saturation among professionals against associated institutions.

**Data Quality and Limitations:**

The activity is mostly a manual count (e.g., manual inbox count of Ask-a-Fed email inquiries), but FSA does remove duplicate Office of Postsecondary Education Identifications (OPEIDs) to ensure its participation rate is non-duplicative. OPEID is self-reported by users of the training system. Reports run in the LMS (**fsatraining.gov**) identify users of the site. The report is exported to Excel and manipulated to remove users without an OPEID and duplicate OPEIDs. The Federal Student Aid Training Center registrant data is also received from the conference team. Data is pulled from CVENT for registrants at state and regional association conferences where Training and Information Services Group staff presented. This data is merged with the LMS data to produce a list of OPEIDs who have received training. To minimize errors, the assessment process consists of batch loading the performance data in excel spreadsheets from the source databases into the Salesforce assessment tool.

The quality of the data is impacted because not all instances of technical assistance and support have been tracked historically by FSA. Data collection from multiple systems using differing demographic points (e.g., user reported school name variances, branch campus OPEID v Main Campus) and manual counts of user emails can affect the consistency of the information used for analysis. The sources of data for this metric are the following: FSA LMS, PEPS, eZ-Audit, PCnet, FSA Data Center, and NSLDS.

**Performance Results by Strategic Goal**

**Table 39: Performance Metric 3.2.B.** FSA will measure Partner Participation rates in training programs.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline school and partner participation using all documented contacts with the training and technical assistance | 70% |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

FSA measured training participation of 3,955 unduplicated schools out of a total eligible school population of more than 5,600, representing a 70 percent achievement. The participation rate includes individuals participating in person or a webinar delivered state, regional and national professional association conferences as well has the efforts of the Minority Serving and Under-resourced Schools Division (MSURSD). Training was delivered in-person, via live webinars, or via FSA's LMS. In a typical fiscal year, only certain schools (less than 200) are required to attend training, primarily the congressional mandated "Fundamentals of Title IV." Training participation by all other Title IV participating schools is voluntary.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric and the current baseline of a 70 percent partner participation rate will be further analyzed in FY 2021.

FSA transformed its outreach and assistance efforts into dynamic virtual capabilities for institutions and financial aid partners. FSA redesigned its 4-day in-person Title IV Fundamentals training session into a real-time online format for 5 successful sessions with 89 school partners; fielded a new Virtual Technical Assistance tool aimed at MSIs and a virtual Training product for newly approved Title IV schools; and identified 72 MSIs that had not previously used the FSA LMS to virtually instruct on the availability and effective use on on-line learning resources.

Additionally, FSA streamlined its outreach and on-boarding processes for Project Success, a program focused on pairing MSIs with guaranty agencies to address risk factors affecting graduation, retention, and cohort default rates. Specialized technical assistance included webinars, Ask-a-Fed queries for individualized technical assistance, MSURSD consulting to address the specific needs of their school partners for Default Management and Compliance assistance, and school staff training.

Due to the voluntary nature of training, FSA will continue to expand outreach and ensure that products continue to reflect the needs of the schools. All FSA Training events, self-service modules, and annual courses (such as Fundamentals in Title IV) are communicated via Electronic Announcements to Information for Financial Aid Professionals (IFAP) and FSA utilizes a "push notification" system to announce the availability of LMS-based courses. Due to COVID-19, all live training was cancelled from March 2020 through the end of the fiscal year and beyond. Virtual solutions developed and implemented for all required training programs and additional webinar support provided to our institutional partners.

**Data Quality and Limitations:**

The metric is calculated as a numerical count of activities, but duplicate OPEIDs are removed to ensure the participation rate is non-duplicative. OPEID is self-reported by users of the training system. Reports run in the LMS identify users of the site. The report is exported to Excel and manipulated to remove users without an OPEID and duplicate OPEIDs. FSA Training Center registrant data is also received the CVENT registration system from the conference team. Additional conference data is pulled from CVENT for registrants at state and regional association conferences where Training and Information Services Group staff presented. Additional training data is obtained from the Salesforce system used by MSURSD.

This data is merged with the LMS data to produce a list of OPEIDs who have received training. The data is collected from multiple systems using differing demographic collection points (user reported school name variances, branch campus OPEID versus Main Campus, etc.) and manual counts of user emails. The data sources are as follow: FSA LMS, Salesforce, CVENT, PEPS, eZ-Audit, PCnet, FSA DATA Center, NSLDS, and Case Management Information System.

**Table 40: Performance Metric 3.2.C.** FSA will enhance the self-service training resource and informational platform to improve communication with participating partners, including schools, third-party servicers, and financial institutions.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | 62% |
| **Performance Result** | **N/A*** | **N/A*** | **N/A*** | **N/A*** | **Baseline** | |

*****Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric represents enhancements to the FSA LMS—specifically, courses created or revised in FY 2020. It is not only a percentage of self-service courses available—it includes revisions, deletions, new courses added. During FY 2020, FSA created or revised 167 LMS courses which reflects 62 percent of the available 271 courses in FY 2019. This includes revising the learning tracks for new, intermediate, and expert level financial aid administrators. The courses focus on the proper administration of Title IV programs with offerings for new financial aid office to institutional presidents and chief executive officers.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric with 62 percent of the course offered within the LMS being either newly created or revised based on customer needs.

FSA's training platform, the FSA LMS provides on-demand self-service training to registered users. The number of FSA LMS users has increased 22 percent from 44,662 registered users in FY 2018 to 57,487 users in FY 2020. This population represents 3,955 Title IV participating institutions, as well as third party servicers, auditors, and FSA Staff.

FSA continues to innovate and partner with our institutions to support their own internal staff training. LMS now has upgraded functionality that allows Title IV participating schools to create training programs for their own staff and track their progress to a particular goal. The feature been transitioned from a testing phase to full rollout to all interested users. FSA is in the process of integrating the LMS into the Phase Three roll-out of the Next Gen PPO. There are also efforts underway to implement a training referral process for offices within FSA to be able to suggest particular training for Title IV participating institutions or technical assistance resources, as needed.

**Data Quality and Limitations:**

This performance metric is a numerical count of changes within a defined electronic training environment. FSA has a baseline of 260 courses deployed on the training system. The Next Gen PPO team tracks additions, modifications, and removals. The data source for this metric is the FSA LMS.

**Table 41: Performance Metric 3.2.D.** Ease of doing business with FSA.*

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 72.3 | 73.4 | 74.5 | 74.0 | 74–76% | 71% |
| Performance Result | Not Met | Met | Met | Met | Not Met | |

*****Note: Formerly D.1 in FSA FY 2019 Annual Report.**

**Target Context:**

FSA conducts an annual "Ease of Doing Business" survey with its Title IV eligible school partners. The survey is conducted by CFI Group, an independent third-party survey company, and results are provided to the Department and FSA. The FY 2020 Ease of Doing Business Score is an overall measure of post-secondary educational institution financial aid administrators' assessment of their recent experience interacting with FSA (and its contractors) including telephone/email/chat/fax communication regarding FSA's systems and products, policy group, training, and compliance staff.

**Analysis of Progress:**

FSA did not meet its target for this metric with a result of 71 percent.

Many areas remained on trend including compliance issues being resolved fairly and technical assistance requests continuing a modest upward trend. Regular bright spots, such as the training conference, knowledge by FSA trainers, and quality of assistance from FSA and training related metrics, remained high at 83 percent, 81 percent, and 80 percent, respectively. Additionally, some comments of appreciation were provided for FSA's efforts to guide financial aid administrators through the fluid landscape of FY 2020.

The "Overall ease of doing business" score dropped 3 points this fiscal year to 71. From providing guidance for new support programs to determining how to apply old rules in a changed environment, FSA was challenged by the enormity of communicating, training, and implementing clear policies and programs during the COVID-19 national emergency. Further reinforcing these observations and related comments, scores for the "extent policy changes impacted ease of doing business" increased two points (68). One-third of financial aid administrators who responded to the survey expressed issues, changes, and uncertainty related to COVID-19, the CARES Act, and the Higher Education Emergency Relief Fund as circumstances that have made it more challenging. The Ease of Doing Business score is also likely impacted by the reduction in the "usefulness of training scores" in the FY 2020 survey. Survey participants expressed a desire for additional training and guidance related to the COVID-19 pandemic.

Many financial aid administrators commented about the ease of finding information including the ease of searching IFAP, information searches in general, or the ease of finding things in the FSA Handbook. FSA recognizes a clear opportunity for our efforts to better meet customer needs going forward with the execution of Next Gen PPO phased releases, IFAP integration improvements, and site access point integration. The one-stop digital platform will centralize communication, training, and knowledge management for our partner community of schools,

third-party servicers, lenders, and guarantors in efforts to further automate functionality and improve workflows.

**Data Quality and Limitations:**

This performance metric is based on calculations from CFI Group, and the FSA project officer verifies the FY 2020 School Partners survey scores for the *Ease of Doing Business* with FSA metric and coordinated validation through FSA Data Review Team. The source of the data is the FY 2020 Schools Partners Survey. The survey collects this data and calculates the results and presents findings and conclusions to FSA.

## Strategic Goal 4: Strengthen Data Protection and Cybersecurity Safeguards

FSA has a responsibility to protect student and borrower data integrity and confidentiality. Risk management and mitigation—especially regarding data protection and cybersecurity—remains a top priority within the scope of the *FY 2020-24 Strategic Plan* as it has in past years. Additionally, FSA and its third-party vendors must maintain and enforce rigorous cybersecurity standards in accordance with federal requirements to enable the organization to successfully pursue its mission. The Next Gen FSA effort makes it critical for FSA to integrate state-of-the-art cybersecurity protection across the federal student aid lifecycle. These efforts, as outlined under Goal 4, will include increased support for partner institutions and coordination with vendors to provide improved cybersecurity services.

Goal 4 also focuses on improving the protection of Title IV data through increased collaboration with all Title IV participating institutions and third-party servicers, inclusive of sharing best practices and threat information to ensure institutions take the actions needed to protect student data and student privacy. However, success in data protection begins with FSA, and therefore Goal 4 highlights the necessity to ensure that all employees and contractors understand and integrate effective cybersecurity practices and considerations in their daily work and recognize that cybersecurity risk management is everyone's responsibility. This organization-wide emphasis on cybersecurity culture will create a greater focus to gather insights, identify risks, and make well-informed decisions regarding cybersecurity, technology, and data management.

Strategic Goal 4 includes the three strategic objectives listed below:

- **Strategic Objective 4.1:**

  Implement business partner and vendor systems that house, manage, and provide systems supporting FSA business processes, outreach and awareness focused on oversight, enforcement, infrastructure, systems, and data.

- **Strategic Objective 4.2:**

  Improve student privacy data and cybersecurity controls of Institutions of Higher Education (IHEs) through outreach and communication, to mitigate future cyber-incidents and breaches.

- **Strategic Objective 4.3:**

  Build an effective cybersecurity culture through employee awareness, training and accountability focused on protecting systems and data.

In FY 2020, FSA had three objectives under this goal. These objectives included four metrics. Of these four metrics, two metrics were not met for this goal. Additionally, two metrics were baselined in FY 2020.

**Strategic Objective 4.1:** Implement business partner and vendor systems that house, manage, and provide systems supporting FSA business processes, outreach and awareness focused on oversight, enforcement, infrastructure, systems, and data.

**Table 42: Performance Metric 4.1.** Increase partner/vendor cybersecurity effectiveness by reducing the total number of FSA system assessment findings by 20% per year.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 1,800 | 3,561 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Not Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The FY 2020 metric is a measurement of the number of findings discovered during independent assessments or continuous diagnostics and monitoring efforts that are indicative of potential cyber security issues leading to a breach of privacy information or the potential compromise of an information system.

**Analysis of Progress:**

FSA did not meet its target for this metric with a result of 3,561 FSA system assessment findings.

During FY 2020, additional systems were added to the ongoing security authorization program to allow timely assessments and identification of cyber security vulnerabilities. This increased oversight has resulted in earlier discovery of vulnerabilities allowing early correction before they have had an opportunity to be exploited.

The FY 2019 measurements, used to establish the preliminary target for FY 2020, failed to account for increased federal requirements for more frequent assessments, quarterly versus triannual. The increased assessment activity resulted in a significant increase in the number of actual findings over the target number.

The challenge was the introduction of significant modernization efforts, through the Next Gen FSA project, in the form of new and untested capabilities, features, and technologies presenting significant cyber security issues and findings. The introduction of new information systems into a quarterly ongoing security assessment program identified a significant number of findings that were previously not discovered or reported directly impacting the actual number of findings for the year. This is anticipated to continue into FY 2021. For future improvement, FSA will research the availability and applicability automation technologies to rapidly identify, discover, and resolve issues before they become findings.

**Data Quality and Limitations:**

The data for this performance metric is provided by the assessments conducted and utilized by the OCIO for the Department's monthly cybersecurity scorecard. Data is verified through the

assessment process as defined by the National Institute of Standards and Technology, the Department, and FSA guidance. The plan of action and milestone is a description of the vulnerability findings using the National Vulnerability Database. The source of the data is the following: FSA Enterprise Cybersecurity Group; Department Cybersecurity Assessment and Management Shared Service.

**Strategic Objective 4.2:** Improve student privacy data and cybersecurity controls of Institutions of Higher Education (IHEs) through outreach and communication, to mitigate future cyber-incidents and breaches.

**Table 43: Performance Metric 4.2.A.** Increase Institutions of Higher Education cybersecurity effectiveness by reducing GLBA cybersecurity non-compliance by 20% per year.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | 177 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This performance metric measures FSA's effectiveness in reducing GLBA cybersecurity non-compliance at IHEs. FY 2020 was the first year that IHEs were required to comply with cybersecurity metrics as part of GLBA annual audits of institutions.

**Analysis of Progress:**

FSA implemented the major processes and procedures necessary to manage the program and work with IHEs to ensure compliance with GLBA. The baseline scores are a measurement of an institution's ability to meet three cyber security requirements indicative of a basic cybersecurity program designed to protect student data. Due to COVID-19, the lack of comprehensive audit results will skew the baseline year resulting in inaccurate targets for the remaining years. A significant challenge is the lack of institutional processes that clearly identify roles, responsibilities, and requirements to maintain a comprehensive cyber security program. Additional guidance is being developed to assist the institutions in creating and maintaining an effective program. For future improvement, FSA has established a Task Force to develop a comprehensive implementation plan to assist institutions with achieving effective cyber security compliance.

Departmental COVID-19 restrictions placed the FSA response process on hold for the last six months of the fiscal year and created a challenge for FSA during FY 2020. Overall, COVID-19 significantly delayed the annual audits for IHEs resulting in fewer audits being conducted and presented to FSA for analysis.

**Data Quality and Limitations:**

The performance metric is a numerical count of the cybersecurity related audit findings. The finding count is provided by the Next Gen PPO staff and verified against the findings posted in eZ-Audit by the Technology Directorate. The data source is the record of GLBA Audits managed by Next Gen PPO.

**Table 44: Performance Metric 4.2.B.** Reduce incident reporting time at Institutions of Higher Education.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline set in FY 2021 | 87.5 days |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The target is an indicator of a school's ability to discover potential privacy breaches or cybersecurity incidents, which may impact Title IV student or financial information, and report them as required per their agreements.

**Analysis of Progress:**

FY 2021 will be the baseline year for this measurement. Average incident reporting time was 87.5 days in FY 2020.

FSA integrated the institutions of higher education into the existing incident response process and automated case management system allowing accurate tracking of incidents and development of associated metrics.

Significant challenges exist with the institutions of higher education's ability to properly identify and report on privacy breaches and potential compromises of information systems. Part of the challenge is associated with a lack of authoritative reporting standards and enforcement mechanisms. As an FY 2021 deliverable, FSA is addressing this with a task force that is developing implementation guidance and requirements for the institutions.

Throughout FY 2020, it has been noticed that institutions continually fail to report on privacy breaches and information system compromises. Often the incidents are discovered through FSA proactive cyber monitoring efforts or are reported through the news media. To address this metric, FSA is developing communication plans to increase schools' awareness of the requirements and more specifically the need to report incidents as they occur. Briefings at the FSA annual conference is an example of this communication outreach effort.

In addressing COVID-19's need to rapidly transition to remote education delivery environment many cybersecurity requirements and protections were initially overlooked requiring a significant investment in resources to properly protect information systems and student data.

**Data Quality and Limitations:**

The calculation of this performance metric is from the date, hour, and minute that the school detected the event to the time that FSA receives the report. In the event the school does not provide the information, the time is calculated from the time FSA discovers the cybersecurity

**Performance Results by Strategic Goal**

incident and the time that FSA is able to contact the appropriate school point of contact at the institution. The data source for cybersecurity incidents at institutions is self-reports from the schools, discovery through media reports, and information derived from internet research activities. The data is verified through a manual audit process comparing the security event report received from the school and the data discovered through incident response process with the data within Security Operations (SecOps).

**Strategic Objective 4.3:** Build an effective cybersecurity culture through employee awareness, training, and accountability focused on protecting systems and data.

**Table 45: Performance Metric 4.3.** Decrease the number of employee-related cybersecurity events associated with inappropriate use, distribution, or storage of Personally Identifiable Information (PII) and financial information by 20% a year.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 1,800 | 1,713 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The target is an indicator of employees' ability to properly oversee, store and distribute sensitive privacy and financial information.

**Analysis of Progress:**

FSA met its target for this metric with a result of 1,713 employee-related cybersecurity events in FY 2020.

This is a new performance metric for FY 2020 that was defined prior to the full implementation of the Department's data loss prevention email capabilities.

In FY 2020, the Department implemented an email monitoring system that automatically detects, blocks, and notifies the employee of inappropriate transmission of sensitive data reducing the potential for a breach to occur. The capability identified previously undetected behaviors that may be potential breaches.

FSA relies upon self-reporting for those third parties. As part of continuous monitoring FSA is developing automated integration with the third parties for real time data visibility. The proactive blocking of privacy information transmitted through email has reduced the number of email related breaches while increasing employee awareness of their actions through automated notifications.

To address this metric, the expansion of continuous monitoring capabilities and data aggregation using cloud technologies will enhance the ability to rapidly identify and respond to inappropriate use, distribution, or storage of PII or financial information. Additional desktop computer data loss prevention technologies will automate the protection of sensitive data and alert users to potential inappropriate handling.

**Data Quality and Limitations:**

The performance metric is a numerical count of events-based exercise results and actual incident reports over time. The data source FSA SecOps, email reports, exercise results, and OCIO Data Loss Prevention metrics. The data is validated through a manual review of

automated reports from SecOps, which provide the test results for the cybersecurity exercises administer to employees.

## Strategic Goal 5: Enhance the Management and Transparency of the Portfolio

Portfolio management and organizational transparency are two of the most important activities required under FSA's PBO legislation. But equally important, as FSA works to become a more customer-centric and outcome-based organization, is the need for FSA to measure its success based on the success of its customers in making improved borrowing decisions that lessen the burden of debt associated with their education. These efforts, as captured in Goal 5 of the *FY 2020-24 Strategic Plan*, will require enhanced analytic, risk management, performance management, and quality management capabilities to provide better outcomes for students and greater value to taxpayers. Insights from this work will help FSA guide operational interventions and inform policymakers and taxpayers about the risks and opportunities in the portfolio.

FSA will also use these insights to allocate resources, guide customer-centric decisions, and inform legislative or regulatory changes that would allow for better overall portfolio performance. Goal 5 also outlines the necessity to maintain FSA's commitment to transparency through the FSA data center and better management of the loan portfolio by performing analyses to help identify risks. Beyond the work to improve service to borrowers and customers, support responsible borrowing, and encourage repayment, FSA also recognizes the need for enhanced analytical performance management and risk management capabilities.

The strategic objectives under Goal 5 focus on providing data-driven analytics to support borrower decision-making and targeted engagement when interventions become necessary. A final key to success in building a 21st Century organization, particularly with the long-term execution of the Next Gen initiative, is FSA's adoption of an outcome-based approach in its vendor acquisition strategy. The enhanced approach to vendor performance and quality management will improve transparency and collaboration and contribute to better outcomes for students and taxpayers.

Strategic Goal 5 includes the four strategic objectives listed below:

- **Strategic Objective 5.1:**

  Improve the management and transparency of FSA's student loan portfolio performance.

- **Strategic Objective 5.2:**

  Provide analytics and operational support for a customer-centric, data-driven, performance-based organization.

- **Strategic Objective 5.3:**

  Leverage portfolio analytics to drive improved outcomes for customers and taxpayers.

- **Strategic Objective 5.4:**

  Increase vendor performance through quality management activities centered on customer service and product delivery.

In FY 2020, FSA had four objectives under this goal. These objectives included 14 metrics. Of these 14 metrics, 4 were met or exceeded, 2 metrics were not met for this goal, and 1 metric did not have sufficient data. Additionally, seven metrics are baselined in FY 2020.

**Strategic Objective 5.1:** Improve the management and transparency of FSA's student loan portfolio performance.

**Table 46: Performance Metric 5.1.A.** Initiate monthly reporting to the public through the FSA data center.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Establish specific number of public reports | 56 |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

FSA's FY 2020 target related to Performance Metric 5.1.A. was to establish a specific number of published FSA Data Center reports suitable for monthly reporting.

**Analysis of Progress:**

FSA met its target for this metric by establishing 56 specific reports to be published monthly.

In FY 2020, FSA's Enterprise Data Directorate assessed the reports published on its FSA Data Center website to determine feasibility for monthly reporting. Published reports span the student aid lifecycle from application through repayment. In determining the reports most suitable for monthly reporting, FSA considered how likely the data was to change in each month, privacy implications if the data were to be published monthly, and potential benefit to customers.

Most published reports are tied to a specific award year data or represent a snapshot of the outstanding portfolio as of a specific point in time. Award year disbursement data is currently provided quarterly to allow customers to monitor progress throughout an award year. Further segmentation would make it difficult to track comparisons over time and increase the likelihood of a privacy disclosure. Due to the size of FSA's portfolio, most portfolio snapshots do not significantly change from month to month. As a result, FSA focused its efforts on production-based reports, particularly those related to application volume.

Through this analysis, FSA identified a total of 56 reports for monthly reporting, including the FAFSA by High School state-level reports (54), the PSLF Report, and the BD Report. These reports have been published at least monthly on the FSA Data Center website (**Studentaid.gov/data-center**) since January 2020.

**Data Quality and Limitations:**

FSA leverages a data request process to ensure queries are written by one subject matter expert and validated separately by a second subject matter expert to help ensure consistency and accuracy. Queries used to produce FSA Data Center reports are required to go through this

data request process. Subject matter experts also review results prior to publication to help identify any potential areas of concern.

**Table 47: Performance Metric 5.1.B.** Timeliness of FSA's ability to respond to statutorily mandated reports.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Average of no more than 30 days | N/A |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The methodology associated with the Target Context for the performance metric has not been established. No measurable data is available at this time.

**Analysis of Progress:**

FSA is working to define the methodology associated with the specific reports to be included within the performance metric. In FY 2021, FSA will define the statutorily mandated reports, as well as the source to be utilized to manage the submission of the reports to the Department within 30 days or less. There is no measurable data to be provided for FY 2020.

**Data Quality and Limitations:**

N/A.

**Table 48: Performance Metric 5.1.C.** Outstanding Direct Loan Portfolio in Current Repayment Status.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 85.4% | 85.7% | 86.5% | 86.7% | Baseline | 93.7% |
| Performance Result | Met | Met | Met | Met | Baseline | |

*Note: Formerly C.2 in FSA FY 2019 Annual Report.

**Target Context:**

This metric demonstrates an increase or decrease in the percentage of FSA loan portfolio dollars in a current repayment status. Current Repayment is defined as the percentage of Direct Loan principal and interest identified as being in an "active repayment" status. For this metric, loans are defined as being in "active repayment status" if they are being serviced by a non-default servicer, payments are temporarily suspended (in school/grace or deferment/forbearance), and if they have not been identified as being in non-defaulted bankruptcy, at the default servicer or otherwise excluded (e.g., due to a TPD determination). Direct Loans are further categorized as being "Current" if no more than 30 days have passed since the next payment date.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric due to the changes in borrower repayment as a response to COVID-19 and FSA's implementation of the CARES Act legislation.

Through FY 2020, the four-quarter average rate is 93.7 percent. This includes the 100 percent rate for Quarter 4.

Per the CARES Act, Direct Loan servicers cured existing delinquencies and generally also cured the delinquencies of borrowers who "opted out" of the CARES Act forbearance yet did not make payments. Although the CARES Act was first implemented during late March and early April, Quarter 3 (which ended on June 30, 2020) did not have a 100 percent repayment rate because changes in borrower status that occurred within the quarter, which influenced the calculation. However, FSA will not manually adjust Quarter 3 reporting.

The rates for FY 2014 through FY 2019, respectively, are 82.7 percent, 83.9 percent, 85.4 percent, 85.7 percent, 86.5 percent, and 86.7 percent. Performance has improved in recent years primarily due to lower enrollment/loan origination at higher-risk schools over the past decade.

CARES Act related accomplishments include curing loans delinquent as of March 13 and then curing delinquencies which occurred during the CARES Act, such as borrowers who "opted out" of the forbearance but then realized they were not ready to make payments. CARES Act related challenges include setting a baseline—in light of uncertainty about not only the pandemic itself but also how long the borrower benefits will continue and ramping up communications and default aversion efforts after a long period of time when most borrowers were not required to make payments.

With executive action extending CARES Act benefits through December 2020, FSA and servicers will face a heavy burden in "converting" millions of borrowers to active repayment at the same time, with a certain proportion becoming delinquent, at least initially. (According to FSA operations, the first due date after December 2020 would be during February 2021 for most borrowers.) Thus, this metric will remain at 100 percent, or just below, for one or more additional quarters.

**Data Quality and Limitations:**

The data source is NSLDS database. The calculation uses the rounded results appearing in the FSA Data Center's Direct Loan Delinquency report. The fiscal year metric is a moving average of the four quarters. It is the outstanding principal and interest balance of "current" Direct Loans in the active repayment status divided by the total principal and interest balance of Direct Loans in an active repayment status at the non-default servicers. The metric result is calculated as a four-quarter moving average as of September 30 of the current fiscal year (September 30, 2020). This allows FSA to account for changes relating to seasonality and indirect factors that could be false indicators of change. FSA also continues to monitor overall performance of the federal loan servicers to identify any areas where errors have occurred and notifies servicers of results and corrective actions as needed.

The CARES Act requirement for the FSA loan servicers to cure delinquencies highlights small, anomalous data and thus facilitated better understanding, as well as targeted data quality analyses. For example, with so few loans in delinquency, an examination of those loans revealed that most of the remaining loans greater than 360 days delinquent were not actually on their way from the servicer to Debt Management and Collections System (DMCS) but rather are rehabilitations which recently transferred from DMCS to the servicer, with the "days delinquent" reflecting the loan's condition from years ago, prior to the transfer to DMCS. A much-smaller group represents loans transferred to current servicers years ago from decommissioned servicers where reporting is manual.

Thus, while the point-in-time repayment rate for Quarter 4 rounds to 100 percent, Quarter 3 (June-end) was 97.3 percent because the 2.7 percent represented the stale late-state delinquencies discussed above. FSA does not plan to go back and adjust the data for these anomalies and instead the adjustments begin with Quarter 4.

**Table 49: Performance Metric 5.1.D.** Percentage of borrowers who are in a positive repayment status within the first three years of student loan repayment.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | N/A |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This new metric will track the percentage of Direct Loan borrowers whose loans are in a positive repayment status within the first three years after their loans entered repayment (maturity). FSA will use fiscal year maturity cohorts. Similar to College Scorecard and other repayment rate metrics, the universe will exclude military deferments, in-school deferments, and non-defaulted open bankruptcy status, as these are loan statuses wherein borrowers are not billed and not expected to pay. FSA will employ EDWA consolidation linking framework in case there are consolidations during a grace period (which are permitted) or during the early years of repayment, so that those borrowers do not "fall out" of the cohort.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric, but the methodology for the calculation has not been approved. At present, no data is currently available, and the baseline study will continue into FY 2021.

This is a new metric and FSA has developed a preliminary methodology/logic for the queries. The Enterprise Data Team will be looking at examples of results from various timeframes during October 2020. Anticipated challenges include analyzing trends on a comparable basis across fiscal year repayment cohorts and determining whether, for a typical fiscal year ending the previous September 30, the results will be representative by September 30 for annual reporting. This data exploration work will enable FSA to establish a baseline and set a target in FY 2021.

To produce comparable results across time, the methodology, similarly to the cohort default rate, will check for "success" at the end of the third fiscal year. A loan which was in a positive repayment status for 18 months but was not in a positive repayment status at the end of the third fiscal year will not be counted as in a positive repayment status.

Additional challenges to be considered related to the CARES Act include setting a baseline—in light of uncertainty about not only the pandemic itself but also how long the borrower benefits will continue and ramping up communications and due diligence (delinquency resolution) efforts after a long period of time when most borrowers were not required to make payments. With executive action extending CARES Act benefits through December 2020, FSA and servicers will face a heavy burden in "converting" millions of borrowers to active repayment at the same time, with a certain proportion forecasted to initially become delinquent.

For the universe of this metric, the date entered for repayment occurs six months after the borrower graduates, drops out, or drops below half-time. The pandemic may impact the consistency of these lifecycle transitions.

**Data Quality and Limitations:**

The source is the EDWA servicing data. EDWA receives data from the Direct Loan servicers over the Student Aid Internet Gateway connection/interface. Each Direct Loan servicer reports weekly, and not all on the same day. The Direct Loan servicers report on different days of the week in order to manage FSA's operational burden. FSA monitors overall performance of the federal loan servicers to identify any areas where errors have occurred and notifies servicers of results and corrective actions as needed.

**Table 50: Performance Metric 5.1.E.** Persistence among first-time filing aid recipients.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 79.7% | 82.6% | 82.5% | 82.8% | 83–84% | 81.0% |
| Performance Result | Met | Met | Met | Met | Not Met | |

**\*Note: Formerly A.2 in FSA FY 2019 Annual Report.**

**Target Context:**

FAFSA application persistence among first-time filing aid recipients is likely lower this year due to the COVID-19 pandemic and the uncertainty about fall enrollment for many returning students.

**Analysis of Progress:**

FSA did not meet its target for this performance metric with persistence among first-time filing aid recipients measuring 81.0 percent.

In May 2020, an email campaign specifically focused on returning FAFSA filers resulted in an increase in FAFSA filing by returning applicants this summer, which helped to prevent the decline in this metric from being worse, and witnessed FAFSA filing rebounding for this group from an all-time low for the year in March 2020, likely the result of the COVID-19 pandemic and students being sent home.

In March 2020, COVID-19 resulted in most colleges and universities across the country moving to an on-line only model, which meant that students were not in the classroom or on-campus seeing cues to remind them to file the FAFSA. During this time of national emergency, it is likely that some percentage of students hesitated or delayed filing a FAFSA for the sophomore year. In addition, a result of COVID-19 was that many low-income families had a change in financial circumstances and this may have prevented some students from returning to school because the gap between Title IV aid and the cost of attendance was too large for a student or family to fill given their compromised financial situation due to loss of employment.

Once more Americans return to work or find new employment, FSA expects this metric to increase in FY 2021 as more Americans will have the ability to pay for postsecondary education.

**Data Quality and Limitations:**

Data results are ascertained through standardized system queries. These queries are used to rerun and match calculations for earlier cycles as part of the verification and validity assessment. The data source is EDWA and CPS Strategic.

**Strategic Objective 5.2:** Provide analytics and operational support for a customer-centric, data-driven, performance-based organization.

**Table 51: Performance Metric 5.2.A.** Using the Enterprise Risk Management (ERM) Maturity Model, move the organization towards a "Risk Intelligent" position. The model defines organizational progress in the following way:

- 1 = Initial;
- 2 = Fragmented;
- 3 = Integrated; and
- 4 = Risk Intelligent.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | 1.5 | 1.6 |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Met | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

The overall target for FY 2021 is to move the organization from Fragmented to a more Integrated organization where leadership understands the importance of risk management and considers it in decision making. In addition, the metric will move in a positive direction as risk discussions are more structured and occur at varying degrees relating to strategy setting. In an Integrated organization, most risks are aligned to strategies and risk appetite is formally defined and is discussed as part of daily decision making by senior leadership.

FSA's goal is to eventually move the organization to be Risk Intelligent where leadership continually demonstrates a strong commitment to risk management with a strong tone at the top and a formal governance structure is in place with monthly meeting cadence. Additionally, a Risk Intelligent organization has a formal risk appetite which has been communicated and risk assessment methodologies, tools, and templates are standardized, understood, and used throughout the organization and performance is measured against strategic goals and linked to key risk indicators.

**Analysis of Progress:**

FSA met its target for this performance metric by attaining a 1.6 on the Enterprise Risk Management (ERM) Maturity Model.

During FY 2020, Risk Management created risk dashboards, developed risk products for evaluation of risk earlier in the planning/decision-making process, continued promulgation of risk products and created and conducted enterprise-level training. The office continues to build out risk focus areas and work closely with project/program teams to penetrate lower altitudes. The challenge a reliance on survey results and the response rate from key stakeholders.

**Data Quality and Limitations:**

The Risk Maturity Matrix is directly linked to the Committee of Sponsoring Organizations of the Treadway Commission ERM Framework, *Enterprise Risk Management: Integrating with Strategy and Performance.* The data is derived from surveys to stakeholders throughout the organization and is compiled and assessed against the ERM Maturity Matrix. The evaluation and validation of data is subjective within guidelines established by the model.

**Table 52: Performance Metric 5.2.B.** Implementation timeline for FUTURE Act.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Establish specific timeline and collaborative agreement with IRS | N/A |
| Performance Result | N/A* | N/A* | N/A* | N/A* | N/A | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

The FUTURE Act was enacted on December 19, 2019. This law allows the Internal Revenue Service (IRS) to disclose certain federal tax information to the Department for the purposes of providing recertification of income for income-contingent or income-based repayments of student loans; determining discharges of loans based on TPD; and determining the amount of student financial aid under the HEA.

The implementation of the FUTURE Act requires numerous systems changes and security upgrades in FSA to comply with both IRS security requirements and the provisions of the Act itself. FSA is working closely with more than 100 stakeholders and 15 offices from the Department, the IRS, and Treasury to implement the FUTURE Act.

**Analysis of Progress:**

FSA moved forward with specific activities to achieve the target identified within the *FY 2020–24 Strategic Plan*. However, the establishment of a timeline and collaborative agreement with the IRS is beyond FSA's independent authority to achieve and therefore the results are not currently available. The efforts made by the FSA team have laid the groundwork for meeting the target in FY 2021, barring any unforeseen changes.

Since the FUTURE Act was enacted, the Department has completed more than 210 working sessions with more than 130 stakeholders and prepared more than 28 briefings to executive stakeholders and congressional committees. FSA has also been able to accomplish milestones in implementing the law, including but not limited to:

- Submitting the mandatory 90-day joint FUTURE Act report to Congress,

- Finalizing the FY 2020 Interagency Agreement with the IRS,

- Finalizing the schedule and activities for enabling the FUTURE Act Direct Data Exchange with the IRS,

- Working with external partners such as the National College Access Network and the National Association of Financial Aid Administrators to enable the FUTURE Act, and

**Performance Results by Strategic Goal**

- Implementing the FAFSA and TPD simulators, which will allow FSA to gather feedback from students and borrowers on the impacts of the FUTURE Act to the FAFSA and TPD processes. The TPD simulator has been implemented. The FAFSA simulator is not scheduled to be implemented until December 2020.

FSA has established a notional implementation schedule. The following critical dependencies need clarification to ensure that the notional implementation timeline can be finalized:

- The implementation of the FUTURE Act requires numerous systems changes and security upgrades within FSA to comply with both IRS security requirements and the provisions of the Act itself. The timeline of implementing these system changes and upgrades depend on funding available to dedicate towards these activities.

- The Department and the IRS are closely tracking potential changes to the FUTURE Act, which impacts how the FUTURE Act FAFSA solution is implemented by schools, state agencies, scholarship organizations, and their respective third-party contractors.

- The Department is closely coordinating the implementation of the FUTURE Act with several critical Next Gen FSA initiatives to ensure the mitigation of any potential duplication and redundancy in developing the solution for the TPD, Income Driven Repayment (IDR), and FAFSA programs. Any delays or risks associated with implementing the Next Gen FSA initiatives may impact the FUTURE Act development and implementation timeline.

**Data Quality and Limitations:**

As mentioned above, the FUTURE Act team continues to work closely with other offices within the Department, the IRS, and Treasury to establish a FUTURE Act implementation schedule. While the team has established a notional implementation schedule, all offices continue to work on critical dependencies to finalize the implementation schedule. Variances to the schedule caused by these dependences will impact the quality of the implementation timeline. The FUTURE Act team also works closely with the ERM Office to monitor any risks and limitations.

**Table 53: Performance Metric 5.2.C.** Error rate discovered through income verification activities for borrowers on an IDR plan.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | N/A |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric tracks error rate discovered through income verification activities for borrowers on an IDR plan.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric, but the pilot program initiated in FY 2020 to measure this error rate was discontinued due to the changes made by the CARES Act. When borrower payments begin again, and applications for IDR restart, FSA will resume the pilot program. At present, no data is currently available, and the baseline study period will extend into FY 2021.

**Data Quality and Limitations:**

N/A.

**Performance Results by Strategic Goal**

**Strategic Objective 5.3:** Leverage portfolio analytics to drive improved outcomes for customers and taxpayers.

**Table 54: Performance Metric 5.3.A.** Identify and provide intervention actions for customers at risk of default.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Development and testing of default intervention program | Developed, tested, and deployed two projects |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric will track the development, testing, implementation, evaluation, monitoring and updates to Statistical and Machine Learning Models, methodologies, experimental designs, and interventions used in reducing customer risk of negative outcomes such as default. There will be multiple projects wherein models will be developed and deployed for assessing which customers would benefit most from receiving certain interventions such as specific emails, phone calls, skip tracing, and other actions. Benefit shall be measured on a project by project basis but will typically consider default related outcomes as well as costs of performing interventions. This metric will track how many projects exist and what phase of the development lifecycle they are in. Each project will have its own method of measuring its effectiveness once deployed with consideration to its experimental design and goals.

**Analysis of Progress:**

FSA met its target for this performance metric by developing, testing, and deploying two projects in support of the default intervention program. The projects are the applicant risk model and the TPDR (third-party debt relief) company fraud model.

FSA has developed statistical models to measure individual customer and transaction-level risks at different points in the student aid lifecycle. Risk scores are then used to drive action. Development on the first of these types of projects that uses modeling to reduce negative customer outcomes started in calendar year 2018 with a fraud modeling pilot. It has expanded to be the first of FSA's projects in this area, called the TPDR model. To ensure FSA systems and taxpayer funds are protected, FSA has developed models and analysis to support identification of fraudulent activity, conducting outreach to customers at high risk of being harmed by bad actors and assisting them in resolving issues associated with their accounts.

Models are used to support customers by providing targeted, personalized communications, directing customers to self-service tools FSA has made available to support planning and decision making. During FY 2019–20, FSA sent approximately 962,000 emails to customers identified as having high default risk at time of FAFSA submission and 716,000 emails to high risk customers at time of loan disbursement. The efficacy of this second project is yet to be

determined because it will time for borrowers to leave school, enter repayment, and move through the lifecycle, so FSA can perform statistical analyses of the results.

Communications to customers at different points in the student aid lifecycle need to be coordinated to avoid confusing customers. Limited ability to coordinate FSA communications to customers with servicer communications has caused FSA to focus on areas of the lifecycle where servicers do less outreach. With the expectation of increased customer service associated with Next Gen FSA and the COVID-19 related forbearances, FSA now expects a greater opportunity to push these projects into parts of the lifecycle where servicer communications are prevalent.

**Data Quality and Limitations:**

The projects within the default prevention definition are expected to use new interventions and actions to reduce customer risks, therefore it is necessary to first collect data on customer outcomes given they have received the new interventions and actions to support Contextual Bandits model training. Different methodologies for initially collecting data have been designed and implemented in a reusable fashion. Contextual Bandits models have been designed to further collect required model training data, incorporating experimental design into the model development process. Data collected from projects for use in creating and updating models has a high probability of bias due to impacts from COVID-19, especially when analyzing outcomes of default, based on the CARES Act forbearance.

This performance metric will leverage high-level project data as its source: the project plans FSA uses for each individual intervention project, and possibly project specific measures to be determined on a project-by-project basis. Current Information Technology infrastructure makes model development, deployment, and maintenance difficult, complex, and costly. FSA has performed market research on tools that would help with tools the organization would like to acquire in FY 2021 to advance this effort.

**Table 55: Performance Metric 5.3.B.** Default Rate by borrower count.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | N/A |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.

**Target Context:**

This new metric provides the rate of Direct Loan borrowers entering default. It is a quarterly metric and similar to other repayment metrics, uses a four-quarter rolling average to address seasonal variations that are common in the loan program.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric due to the changes in borrower repayment as a response to COVID-19 and FSA's implementation of the CARES Act legislation.

FSA has several years of historical results but did not highlight FY 2020 as a baseline because of the CARES Act. Due to the implementation of the CARES Act, there are close-to-zero new defaults after March 2020. For this reason, FSA did not identify the FY 2020 actual result as the appropriate target or baseline for the performance metric. Developing a baseline will require additional analysis across the Department, FSA operations, and the servicer monitoring team.

Through June 2020 (Quarter 3), the four-quarter average rate is 1.1 percent. This includes the 0 percent default rate in Quarter 3. As required by the CARES Act, Direct Loan servicers cured existing delinquencies and generally also cured the delinquencies of borrowers who "opted out" of the CARES Act forbearance yet did not make payments.

The corresponding four-quarter average for Quarter 3 of the fiscal years 2019, 2018, 2017, and 2016, respectively, are 1.6 percent, 1.6 percent, 1.7 percent, and 1.9 percent. This metric shows a long-term downward trend, interrupted briefly during mid-2019 by the impacts of the 2017 and 2018 natural disasters, particularly three historic hurricanes. Performance has improved in recent years primarily due to lower enrollment/loan origination at higher-risk schools over the past decade.

Defaults, like originations and disbursements, are a flow measure/event, in contrast to loan status, delinquency, and repayment plan, which are point-in-time data elements. For this reason, the data are not available until approximately the middle of the following month. Thus, new defaults in Quarter 4 are not available by the data collection deadline for annual reporting.

**Data Quality and Limitations:**

The metric leverages a report that is used for several other purposes, including the public-facing FSA Data Center. The report methodology was validated through FSA's Data Retrieval Tool in 2015. Because the nature of this metric is to compare to same quarter of earlier years and to calculate rolling four-quarter averages, this helps facilitate spotting anomalies. FSA also

continues to monitor overall performance of the federal loan servicers to identify any areas where errors have occurred and notifies servicers of results and corrective actions as needed. By design, the data directorate is separated from the servicers' staff and systems, so there is currently no systematic way to verify servicer reporting. For this reason, the data directorate worked with the servicer monitoring team during FY 2020 to address reporting issues identified.

**Table 56: Performance Metric 5.3.C.** Percent of Borrowers > 90 days delinquent.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | 11.2% | 10.9% | 10.1% | 9.8% | Baseline | 4.8% |
| Performance Result | Met | Not Met | Met | Met | Baseline | |

*Note: Formerly B.2 in FSA FY 2019 Annual Report.

**Target Context:**

A focus on reducing the number of borrowers more than 90 days delinquent provides FSA with insight on how to communicate information about repayment options in a targeted and timely manner.

The calculation is the count of Direct Loan recipients with loans 91–360 days delinquent divided by the count of Direct Loan recipients with delinquencies 0–360 days. In other words, the denominator includes current repayment as well as delinquency. The calculation uses recipient counts, rather than borrower counts, because borrower counts would approximately double system demands. Delinquency rates by recipient count are slightly higher than by borrower count.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric due to the changes in borrower repayment as a response to COVID-19 and FSA's implementation of the CARES Act legislation.

Through FY 2020, the four-quarter average rate is 4.8 percent. This includes the 0 percent rate for Quarter 4. Per the CARES Act, Direct Loan servicers cured existing delinquencies and generally also cured the delinquencies of borrowers who "opted out" of the CARES Act forbearance yet did not make payments. Although the CARES Act was first implemented during late March and early April, Quarter 3 (June-end) didn't have a 0 percent rate because, as detailed in Data Quality and Limitations below, most of apparently the "late-stage delinquencies" in Quarter 3 turned out to be in current repayment or forbearance. However, FSA will not go back and manually adjust Quarter 3 reporting.

The rates for FY 2014 through FY 2019, respectively, are 14.0 percent, 13.0 percent, 11.2 percent, 10.9 percent, 10.1 percent, and 9.8 percent. Performance has improved in recent years primarily due to lower enrollment/loan origination at higher-risk schools over the past decade.

The challenges in calculating this performance metric as related to CARES/COVID-19 include setting a baseline—in light of uncertainty about not only the pandemic itself but also how long the borrower benefits will continue and ramping up communications and default aversion efforts after a long period of time when most borrowers were not required to make payments. With executive action extending CARES Act benefits through December 2020, FSA and servicers will face a heavy burden in "converting" millions of borrowers to active repayment at the same time, with a certain proportion becoming delinquent, at least initially. (According to FSA operations,

the first due date after December 2020 would be during February 2021 for most borrowers.) Thus, this metric will remain at 0 percent, or just above it, for one or more additional quarters.

**Data Quality and Limitations:**

The data source is the NSLDS. The calculation uses the rounded results appearing in the FSA Data Center's Direct Loan Delinquency report. The fiscal year metric is a moving average of the four quarters. This allows FSA to account for changes relating to seasonality and indirect factors that could be false indicators of change. FSA also continues to monitor overall performance of the federal loan servicers to identify any areas where errors have occurred and notifies servicers of results and corrective actions as needed.

The CARES Act's requirement for the FSA loan servicers to cure delinquencies highlights small anomalous data and thus facilitated better understanding, as well as targeted data quality analyses. For example, with so few loans in delinquency, an examination of those loans revealed that most of the remaining loans greater than 360 days delinquent were not actually on their way from the servicer to DMCS but rather are rehabilitations which recently transferred from DMCS to the servicer, with the "days delinquent" reflecting the loan's condition from years ago, prior to the transfer to DMCS. A much-smaller group represents loans transferred to current servicers years ago from decommissioned servicers where reporting is manual.

Therefore, while the point-in-time rate for Quarter 4 rounds to 0 percent, Quarter 3 (June-end) was 3.2 percent, because the 3.2 percent represented the stale late-state delinquencies discussed above. FSA does not plan to go back and adjust for these anomalies and instead the adjustments begin with Quarter 4.

**Table 57: Performance Metric 5.3.D.** Percentage of borrowers who did not make the first three payments.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| **Performance** | – | – | – | – | Baseline | N/A |
| **Performance Result** | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This new metric will track the percentage of Direct Loan borrowers who make the first three payments after entering repayment (maturity). FSA will use fiscal year maturity cohorts. Similar to College Scorecard and other repayment rate metrics, the universe will exclude military deferments, in-school deferments, and non-defaulted open bankruptcy status, as these are loan statuses where borrowers are not billed and not expected to pay. FSA will employ EDWA's consolidation linking framework in case there are consolidations during a grace period (which are permitted) or early in repayment, so that those borrowers do not "fall out" of the cohort.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric, but the methodology for the calculation has not been approved. At present, no data is currently available, and the baseline study will continue into FY 2021.

This is a new metric and FSA has developed a preliminary methodology/logic for the queries. The Enterprise Data Team will be looking at examples of results from various timeframes during October 2020. Anticipated challenges include analyzing trends on a comparable basis across fiscal year repayment cohorts and determining whether, for a typical fiscal year ending the previous September 30, the results will be representative by September 30 for annual reporting. This data exploration work will enable FSA to establish a baseline and set a target in FY 2021.

Additional challenges to be considered related to CARES Act include setting a baseline—in light of uncertainty about not only the pandemic itself but also how long the borrower benefits will continue; and ramping up communications and due diligence (delinquency resolution) efforts after a long period of time when most borrowers were not required to make payments. With executive action extending CARES Act benefits through December 2020, FSA and servicers will face a heavy burden in "converting" millions of borrowers to active repayment at the same time, with a certain proportion forecasted to initially become delinquent.

For the universe of this metric, the date entered for repayment occurs six months after the borrower graduates, drops out, or drops below half-time. The pandemic may impact the consistency of these lifecycle transitions.

**Data Quality and Limitations:**

The source is the EDWA servicing data. EDWA receives data from the Direct Loan servicers over the Student Aid Internet Gateway connection/interface. Each Direct Loan servicer reports

weekly, and not all on the same day. The Direct Loan servicers report on different days of the week in order to manage FSA's operational burden. FSA monitors overall performance of the federal loan servicers to identify any areas where errors have occurred and notifies servicers of results and corrective actions as needed.

**Table 58: Performance Metric 5.3.E.** Percentage of customers who borrow less than the maximum loan amount.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | Baseline | N/A |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Baseline | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This new metric will track the percentage of borrowers who borrow less than the maximum amount during a particular academic year. This metric will focus on undergraduate student borrowers because there are no maximum borrowing amounts for graduate/professional students. Unlike National Center for Educational Statistics, which collects similar data every four years, FSA will not be able to track non-borrowers and non-Title IV recipients. FSA generally only receives data on its customers.

**Analysis of Progress:**

FY 2020 is a baseline year for this performance metric, but the methodology for the calculation has not been approved. At present, no data is currently available, and the baseline study will continue into FY 2021.

This is a new metric and FSA has developed a preliminary methodology/logic for the queries. The Enterprise Data Team will be looking at examples of results from various timeframes during October 2020. Challenges will include looking at trends on a comparable basis across recent award years and determining whether, for a typical award year ending June 30, the results will be stable/representative by September 30 of each year. This data exploration work will enable FSA to establish a baseline and set a target.

Because the maximum permitted loan amount varies depending on the student's year in school and dependency status, FSA will examine trial results to select the most-consistent, representative results over time for this metric. FSA will use a weighted average of dependent and independent student borrowers. While many students are part-time, FSA will need to accept as correct the reporting of the student's academic level, which determines the maximum amount the student is permitted to borrow. Another challenge will be that a small percentage of undergraduate students have access to much-higher borrowing amounts than normal—students in certain undergraduate health professions programs, such as pharmacy. Without having the access to the actual registrar office data (as National Center for Educational Statistics does), FSA will need to study trial results and work to mitigate these outliers.

During times of regulatory change (the 2000s) or economic stress (the great recession), the pattern of loan origination and disbursement activity tends to change, due to shifts in the types of students and schools driving the disbursement activity. COVID-19 serves as the major unknown here.

**Data Quality and Limitations:**

The source of the data is the origination and disbursement data stored in EDWA. EDWA receives nightly feeds of these loan origination and disbursement data from COD. FSA has found this data stream to be reliable and of high quality, as the data are replicated from COD to EDWA. The EDWA vendor has been running FSA's COD system for nearly two decades and monitors nightly for errors related to production and internal processes.

Data limitations include the time it takes for an award year's results to "settle." As of the end of an award year (June 30), not all the disbursement activity has been reported to FSA. Even after all the disbursement activity has been reported, schools and other data providers continue to submit adjustments, edits, and cancellations for a substantial period. One way to mitigate having to wait too long for settled data would be to use the same approach of the Department's budget office and the agency's financial auditors—pull the data at the same time each year. This method provides comparable results over time.

**Strategic Objective 5.4:** Increase vendor performance through quality management activities centered on customer service and product delivery.

**Table 59: Performance Metric 5.4.** Percentage of quality assurance reviews for the external workforce (servicers) reviewed annually.

| Fiscal Year | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | |
|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Target | Actual |
| Performance | – | – | – | – | 25% | 11.1% |
| Performance Result | N/A* | N/A* | N/A* | N/A* | Not Met | |

**\*Note: New performance metric for FY 2020. Prior-year data is not available under this metric.**

**Target Context:**

This metric tracks the number of quality assurance reviews conducted by Operational Improvement and Oversight (OIO) to measure the performance of loan servicers. The objective is to continuously enhance FSA's oversight and management of loan servicers by evaluating the efficiency and effectiveness of loan servicers' compliance with contractual terms and statutory requirements.

**Analysis of Progress:**

FSA did not meet its target for this metric with a result of 11.1 percent.

In FY 2020, many of the personnel initially assigned to OIO were not experienced in conducting "performance-based" quality assurance reviews. Although these personnel have audit experience, the review and assessment of performance and compliance proved to be a significant challenge. Additionally, the lack of familiarity with the many programs and processes executed by the loan servicers contributed to OIO not meeting the target.

To overcome these challenges and meet the performance metric established, OIO has developed a framework and charter which outlines its purpose, authority, and responsibilities. Additionally, training has been provided to strengthen the performance-based audit capability of assigned staff. Lastly, review plans will be developed prior to all quality assurance reviews to ensure staff's quality assurance review activities focus on performance and compliance.

**Data Quality and Limitations:**

The performance metric is calculated by the number of completed QA reviews for all loan servicers. The source of the data is internal OIO reports, based on number of completed QA reviews.

# Fiscal Year 2020 Accomplishments of Federal Student Aid

During FY 2020, FSA realized additional accomplishments that were not measured specifically by the performance metrics implemented to measure performance against the *FY 2020–24 Strategic Plan*. Although not measured by FSA performance metrics, these accomplishments were the result of initiatives FSA undertook to support the implementation of the strategic plan or legislative changes. This section describes its additional accomplishments.

**FSA realized the following additional accomplishments in support of Strategic Goal 1:** *Empower a High-Performing Organization.*

- FSA established FSA Regional Representatives (RR). Members are senior representatives for their Regional Office, responsible for collaborating with internal and external parties to ensure the health, safety, and welfare of FSA regional staff and day-to-day administrative functions of the region. The RR team meets monthly with the COO to discuss matters, both employee and business-related, that are important to Regional staff.

- The Human Resources Office within FSA launched the FSA Human Capital Working Group (HCWG) comprised of representatives from across the organization. The purpose of the HCWG was to increase the human capital capability throughout FSA, while incorporating best practices in hiring and recruitment to establish FSA as a model PBO and employer of choice. Actions taken by HCWG in FY 2020 include:

  o Developed a staffing position priority process to manage the execution of priority hiring in FY 2020, which allowed for hiring in critical areas to ease workload distribution in the organization. The process was utilized to successfully increase hiring numbers in excess of FY 2019 baseline numbers.

  o Formed three committees to address: processes and systems around preboarding/onboarding and post-boarding of new hires; strategic workforce planning; and employee engagement and morale.

  o Utilized client feedback from FY 2019 and FY 2020 to develop new onboarding framework. Successfully onboarded more than 400 new hires in FY 2020; tripling the number onboarded in FY 2019. In conjunction, the team implemented the Onboarding Contingency Plan for new hires at all FSA locations to continue progress during the COVID-19 global pandemic.

- FSA established a Working Group of key stakeholders across FSA and the Department to conduct a comprehensive study of core competencies for FSA's mission critical positions. Utilized the study to examine FSA's statutory hiring flexibilities in comparison to similar federal financial-related agencies.

- FSA executed the first virtual instructor-led Foundations of Leadership Program, an intensive competency-based development program geared to high-performing General Schedule (GS) 11–13 or equivalent non-supervisory employees.

- FSA established a multifaceted Senior Executive Service Master Class which held a 62 percent average participation rate among eligible participants. The Master Class was inclusive of the following specialized content to strengthen the FSA leadership cadre:

  o Executive Core Qualification: Consultation and Review.

  o Executive Core Qualification: Part II.

  o Next Jump Leadership Academy sessions in alignment with the established Executive Learning Plan requirement.

- FSA collaborated with OCIO through technology support and process documentation that enabled the Department to achieve an A+ on the *Federal Information Technology Acquisition Reform Act* scorecard. FSA's cost savings and cost avoidance contribution were 41 percent of the overall Department score. The systems contributing to the A+ score is Next Generation Data Center, COD investment, Financial Management System investment and Enterprise Business Collaboration investment reported. The results of FSA's effort totaled $96.8 million across the entire Departmental Information Technology Portfolio.

- In response to COVID-19, the Facilities, Security, and Emergency Management Team established a working group and expeditiously created an FSA Business Continuity Plan to ensure that mission essential functions could proceed, either virtually or within Headquarters and Regional locations. The Business Continuity Plan was inclusive of organizational efforts for processing student aid applications and determining eligibility, as well as ensuring staff could access mechanisms to support the delivery of funds to participating postsecondary institutions and the oversight of loan servicers.

**FSA realized the following additional accomplishments in support of Strategic Goal 2:**
*Provide World-Class Customer Experience to the Students, Parents, and Borrowers We Serve.*

- FSA ensured the timely implementation of, and compliance with, CARES Act provisions to ensure that students, parents, and borrowers received the CARES Act benefits to which they were entitled. It was also necessary for FSA to effectively manage the CARES Act funding in accordance with the statute. FSA's execution of the actions is outlined below:

  o Under the CARES Act, approximately 41 million borrowers had their interest rate adjusted to 0 percent and their payments suspended.

  o Ensured all CARES Act refunds were processed timely, within one week of receipt for manual processing. This ensured that borrowers that were still subject to AWG or TOP were promptly refunded as FSA worked to turn off these garnishments (with employers) or offsets (with Treasury).

  o Created a solution to allow pre-default borrowers the opportunity to suspend payments yet still yield the benefits associated with a variety of student loan programs or to opt out of the forbearance. To date, approximately 23.8 million borrowers are taking advantage of the payment suspension period while

approximately 4.6 million borrowers have opted to continue making regular monthly payments.

o   Developed a CARES Act $40 million spending plan to ensure execution and tracking of the $40 million provided for requirements to implement statutory provisions, including making changes to servicer systems/operations that support more than 40 million borrowers; moving more than 31 million borrowers into forbearance/stopped collections to suspend loan payments; expediting $2.5 billion in 2.3 million TOP/AWG refund payments; sending notifications to borrowers; and implementing a communications campaign to inform more than 40 million borrowers about the CARES Act provisions.

- FSA saw robust borrower engagement on emails, which had open rates of nearly 60 percent, two times higher than industry average for this type of communication engagement. Additionally, it provided opportunities for FSA to update email addresses on file for borrowers, thus increasing the reach of FSA to its entire portfolio. For the series of emails that were sent, FSA achieved a 96 percent delivery rate.

- Based upon the July Forbearance/0 percent interest email sent to multiple borrower audiences in July, FSA saw a correlated 88 percent increase in web traffic to **StudentAid.gov** websites, which was likely due in part to the email communication and the fact that borrowers were following the email's call to action.

**FSA realized the following additional accomplishments in support of Strategic Goal 3:** *Increase Partner Engagement and Oversight Effectiveness.*

- FSA published a series of updated data sets, reports, and other information regarding institutional outcomes and financial oversight including quarterly Heightened Cash Monitoring reports, Financial Responsibility Standards Requiring a Letter of Credit Report, Proprietary 90/10 Revenue Percentages Report, Financial Responsibility Composite Scores, Foreign Schools Gifts and Contracts Report, School Fines Report, and the Top 10 Program Review and Audit Findings Report. Starting in FY 2020, FSA also published information regarding Proprietary Institution Conversions in a first-ever disclosure on the FSA Data Center to provide increased transparency on the Department's decisions regarding institutions' nonprofit conversion requests.

- FSA issued more than 5,600 emails to directly inform, and granted requests for regulatory, administrative, or reporting relief and flexibilities to subsequently aid in the recovery efforts of, nearly 3,000 institutions, enrolling more than 2.3 million students touched by disasters such as hurricanes, earthquakes, and wildfires.

- FSA successfully calculated and released the FY 2017 Draft and Official Cohort Default Rates (CDRs) in September 2020 for more than 5,600 schools, guaranty agencies, and lenders. CDRs serve as a valuable compliance tool for FSA to assess school participation in the Direct Loan and Federal Pell Grant Programs. Publication of the CDRs further allows schools to submit appeals for various factors and adjustments to their CDRs, for which FSA also successfully adjudicated more than 140 CDR appeals this fiscal year.

**Fiscal Year 2020 Accomplishments of Federal Student Aid**

- During the COVID national emergency, FSA transformed its outreach and assistance efforts into dynamic virtual capabilities for institutions and financial aid partners. FSA redesigned a four-day in-person Title IV Fundamentals training session into a real-time online format for five successful sessions; fielded a new Virtual Technical Assistance tool aimed at MSIs and a virtual Training product for newly approved Title IV schools; and identified 72 MSIs that had not previously used the FSA LMS to virtually instruct on the availability and effective use on on-line learning resources. Additionally, FSA streamlined its outreach and on-boarding processes for Project Success, a program focused on pairing MSIs with guaranty agencies to address risk factors affecting graduation, retention, and CDRs.

- FSA managed the flood of borrower, school partner, and systems communications related the COVID-19/CARES Act legislation. Employing time-sensitive communications, often around the clock, FSA coordinated with Department-wide officials and stakeholders to execute the publication of more than 20 CARES Act Electronic Announcements to the IFAP website from March through September 2020. FSA overcame extraordinary conditions to disseminate these critical updates and guidance on emergency relief measures, system updates, and flexibilities for school and other partners while not jeopardizing the timely dissemination of more than 100 total Electronic Announcements published to IFAP during the fiscal year.

- Next Gen PPO staff managed the successful implementation of CARES Act provisions assisting students who could not complete the spring term due to the pandemic. These changes, which involved often complex system upgrades done under extreme time pressure, included systematically cancelling $49.6 million in repayment obligations for 11,451 withdrawing students on Direct Loans disbursed during the spring term as well as adjusting student subsidized loan usage limits and Pell Grant lifetime eligibility levels to remove aid disbursed to withdrawing students. Staff also successfully implemented other CARES Act flexibilities allowing schools to adjust Return of Title IV aid calculations and certain elements of the Campus-Based programs to minimize the impact of the pandemic.

- FSA made tremendous progress reviewing and resolving numerous Title IV compliance complaints received in the FSA Feedback Center and concerning institutions that participate in the Title IV programs. FSA began FY 2020 with 3,301 open compliance complaint cases that carried over from previous years, of which 2,742 had aged past 60 days and were in a "backlog" state. Through the course of the year, FSA received an additional 3,837 cases, for a total volume of 7,138 cases. FSA experts reviewed and closed a total of 6,830 cases, leaving only 308 cases remaining open and carried into FY 2021. This represents a 91 percent decrease in the amount of cases that will need to be carried into the next fiscal year; a significant accomplishment that had not been achieved by the business unit since the creation of the FSA Feedback Center in July 2016.

- FSA successfully developed processes to identify and monitor daily BD Refunds to ensure immediate assignment and completion based on requirements to ensure that the standard for refunds is met (two days) and that BD refunds are completed in one day. There are 8,319 BD borrowers who have had 1 or more refunds completed. Of those,

20 refunds were not processed timely. This is less than 1 percent (0.2 percent) untimely refunds processed, with 99.8 percent timely.

- FSA expedited 25,538 BD refund payments totaling $8.5 million to 3,914 borrowers. This effort ensured the Department's compliance with a judicial mandate to make refund payments within established time frames.

**FSA realized the following additional accomplishments in support of Strategic Goal 4:** *Strengthen Data Protection and Cybersecurity Safeguards.*

- FSA's transition to the Amazon Web Service Cloud expanded the Next Generation Data Center boundary to include an Amazon Web Services Cloud component. The cloud environment provides a more efficient, available, resilient, agile, and secure posture, providing the opportunity to apply stricter configuration controls reducing the opportunities for attackers to compromise information systems.

**FSA realized the following additional accomplishments in support of Strategic Goal 5:** *Enhance the Management and Transparency of the Portfolio.*

- In FY 2020, FSA refined its statistically valid methodology to estimate improper payments for the Pell Grant and Direct Loan Programs. These refinements included obtaining additional sample data and using sustained questioned costs.

- In collaboration with the IRS, FSA initiated changes to its programs to help ensure the accuracy of income information used for determining Pell Grant eligibility, which are now possible as a result of the FUTURE Act which was signed into law in December 2019. Implementation of the FUTURE Act will allow FSA to receive income tax data directly from the IRS, thereby simplifying and improving the accuracy of FAFSA filing by prepopulating certain fields.

- FSA increased the transparency and responsiveness of *The Freedom of Information Act* requests with customers and external stakeholders. The *Freedom of Information Act* team began the fiscal year with a backlog of 173 and 432 new requests during FY 2020. By the close of FY 2020, the team successfully closed 569 requests, resulting in a reduction of 96 percent in outstanding requests.

- The Acquisitions directorate executed 1,198 contract actions totaling $2.2 billion in FY 2020. Their effort delivered on FSA's vision with enhancing customer experience through their actions support for Aidan and Loan Simulator updates, partner portal for schools, and new contact centers for Next Gen FSA. In addition, the contract actions also provided the necessary capability for the Department's Cybersecurity Task Force through the awarding of a $14 million bridge contract supporting all cybersecurity requirements which averted a break in service.

  o The three areas reflecting the largest fund investments included are:

    1. Debt Collection via PCAs,
    2. Loan Servicing through the TIVAS, and
    3. NFPs and Title IV Aid Origination and Disbursement.

# Legislative and Regulatory Recommendations

One of FSA's mission responsibilities under the law is to provide input on legislative proposals from Congress and from the administration and to support the Department's regulatory activity. FSA also may suggest legislative or regulatory changes for consideration by the Department's senior policy officials. These recommendations customarily center on improving, simplifying, and streamlining the Title IV federal student assistance programs for our customers, minimizing administrative costs, and improving program integrity. FSA's recommendations inform the Department's policymaking process, including its activities and decisions related to each year's budget process. FSA provides this input and recommendations by direct contact with colleagues in the various policy offices within the Department, including the Office of the Under Secretary, the Office of Postsecondary Education, and the Office of Planning, Evaluation and Policy Development at both the senior policy level and at the staff level. During the past year, FSA provided specific recommendations to policy officials on several issues, including:

- Developing guidance and providing regulatory flexibility and relief for the purpose of assisting students, borrowers, institutions of higher education, and others affected by natural disasters, including the COVID-19 pandemic and the CARES Act;

- Assisting in the development of regulations that clarify and simplify requirements for distance education;

- Supporting revisions of TEACH Grant requirements to minimize the number of TEACH Grants that are converted to Federal Direct Unsubsidized Loans;

- Ending the prohibition on Pell Grants for students incarcerated in Federal and State penal institutions;

- Developing proposals for further amendments to Section 6103 of the tax code to allow data sharing for more accurate and timely filing of the FAFSA, before and after the enactment of the FUTURE Act; and

- Developing legislative proposals regarding the simplification of the needs analysis formula and student loan repayment options.

# Annual Bonus Awards

As required by the 1998 amendments to the HEA, the Annual Report includes performance ratings and related awards for FSA senior managers and Senior Executive Service (SES) staff. Included in this section are the number of senior managers and SES on board as of the end of FY 2020. However, because FY 2020 performance results were not finalized at the time this report was prepared, the section discusses FY 2019 performance results.

At the end of FY 2020, there were 102 FSA senior managers and 5 SES members. The number of senior managers in FY 2020 differed from FY 2019 due to increased hiring and internal promotions. The FSA Executive Committee contained 5 of the 102 senior managers. As members of the FSA Executive Committee, these senior managers reported directly to the COO. The number of FSA Executive Committee members significantly decreased because of the reorganization. The remaining 97 senior managers and 5 SES staff served in a variety of senior positions and capacities within FSA.

The following section discusses FY 2019 performance results.

For performance year 2019, the composition of ratings for the 60 senior managers who did not serve on the FSA Executive Committee last year were as follows: 25 senior managers achieved a performance rating of Exceptional Results; 14 achieved a performance rating of High Results; and 21 achieved a performance rating of Results Achieved.

Award amounts for those senior managers achieving an Exceptional Results rating ranged from $7,052 to $12,000 with a median award of $9,000. Award amounts for those achieving a High Results rating ranged from $3,500 to $10,000 with a median award of $7,035.

There were also 2019 performance ratings and awards for 17 senior manager members of the FSA Executive Committee. The composition of those rated included: six senior managers achieved a performance rating of Exceptional Results; seven achieved a performance rating of High Results; and four achieved a performance rating of Results Achieved. One of the six SES members were on the FSA Executive Committee and achieved a performance rating of Results Achieved. One SES member retired and was not rated. One SES member converted to an Administratively Determined (AD) senior manager. The composition of ratings for the remaining three SES members not on the FSA Executive Committee were as follows: one SES member achieved a performance rating of Exceptional and one achieved a performance rating of High Results and one achieved a performance rating of Results Achieved.

Award amounts for the FSA Executive Committee ranged from approximately $6,000 to $25,000, depending on the performance rating of each individual. Only individuals with performance ratings of High Results Achieved or Exceptional Results achieved were eligible for performance-based awards.

For additional information, please refer to: **Higher Education Amendments 1998/sec101D**.

# Report of the Federal Student Aid Ombudsman

The FSA Ombudsman Group entered its 21st year of service to federal student aid recipients in FY 2020. Established by the 1998 amendments to the HEA, the Ombudsman began operations on September 30, 1999.

The Ombudsman Group addresses disputes regarding Title IV financial aid programs through informal dispute resolution processes. The Ombudsman Group uses a collaborative approach in working with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in the student loan programs. This allows them to conduct fact-finding, review student loan data and records, and facilitate contacts between borrowers and their loan servicers to promote mutually agreeable resolution of issues brought by individual student loan customers.

Since July 2016, the Ombudsman Group also has had the responsibility of administering and managing FSA's comprehensive informal complaint resolution process through the Feedback system. This process engages FSA business units and contracted vendors to receive, review, respond, and report on individual direct customer feedback about the programs FSA administers and the participants it oversees. The Feedback system was designed to augment established operational resources such as FSA websites, resources, contact centers, and loan servicers to give students and borrowers another way to clarify programmatic questions, file complaints, and provide feedback about federal student loan lenders, servicers, collection agencies, institutions of higher education, and the Department.

The Feedback and Dispute Management System (FDMS) is the single point of entry for all federal student financial aid recipients to provide feedback, complaints, and disputes regarding the programs FSA administers. While simplifying the feedback submission process for federal student aid recipients, the FDMS also imposed a more formal structure around FSA's complaint management and resolution process. Customers providing their feedback to FSA have access to a robust, multi-level approach to resolution that includes the primary service/program delivery partner (e.g., the loan servicer, PCA, school, or others), the FSA business unit responsible for oversight of those entities, and as an avenue of last resort, the Ombudsman Group. And because all feedback is documented within one system, it unifies the record of the efforts of multiple parties to resolve a matter.

This report provides information about the volume and nature of all feedback FSA received, reviewed, and resolved during FY 2020.

## Summary of All Feedback Received in Fiscal Year 2020

### All Feedback Classification and Categorization

Customers may submit feedback (cases) about any type of federal student aid. All cases are assigned among two lines of business: Feedback and Dispute. Cases pertaining to federally held loans are researched and resolved through the Feedback line of business. Federally owned loans include all Direct Loan, FFEL, and Perkins Loan Program loans owned by the Department. Cases pertaining to federally insured loans held by schools (Perkins Loans),

commercial lenders, or guaranty agencies are classified as Research cases and researched by the Ombudsman Group

This section of the report summarizes all cases received through both lines of business.

All incoming feedback is classified into a case type based on the customer's perceptions and makes no judgement as to the validity of the feedback. Feedback is classified into one of five case types:

- **General Inquiry**              Cases involving general federal student aid questions,

- **Complaint**                    A customer's dissatisfaction with the federal financial aid experience,

- **Suspicious Activity**          A report or allegation of suspected fraud during the student aid process,

- **Positive Feedback**            Compliment about programs, FSA staff, Department contractors, and other Title IV program participants, or

- **Research**                     Disputes assigned to the Ombudsman Group.

Activity in the system during FY 2020 equated to 48,638 feedback (cases) received. Those cases were comprised of:

- **General Inquiry**                          1,677

- **Complaints**                               44,152

- **[Allegations of] Suspicious Activity**     2,068

- **Positive Feedback**                        347

- **Research**                                 394

**Report of the Federal Student Aid Ombudsman**

### Table 60: All Feedback Received by Case Type by Category in Fiscal Year 2020

| Subcategory (All Cases Received) | Volume |
|---|---|
| **General Inquiry** | |
| Applying for Student Aid (FAFSA) | 259 |
| Credit Reporting | 4 |
| Disbursing Student Financial Aid | 125 |
| Public Service Loan Forgiveness (PSLF) Program | 29 |
| Repaying Student Financial Aid | 850 |
| Repaying Student Financial Aid – In Default | 173 |
| School | 72 |
| Student Eligibility | 70 |
| Department Customer Support | 95 |
| **Total General Inquiry Volume** | **1,677** |
| **Complaint** | |
| Applying for Student Aid (FAFSA) | 7,564 |
| Credit Reporting | 1,195 |
| Disbursing Student Financial Aid | 2,004 |
| Public Service Loan Forgiveness (PSLF) Program | 1,269 |
| Repaying Student Financial Aid | 18,103 |
| Repaying Student Financial Aid – In Default | 2,072 |
| School | 7,066 |
| Student Eligibility | 1,864 |
| Department Customer Support | 3,015 |
| **Total Complaint Volume** | **44,152** |
| **(Allegations of) Suspicious Activity** | |
| Allegation of Identity Theft | 138 |
| Allegation of Misuse of Departmental Resources | 368 |
| Allegation of Misuse of FSA ID | 141 |
| Allegation of Misuse of FSA Intellectual Property or Claim of a Department Affiliate | 1,287 |
| Allegation of a Whistleblower | 134 |
| **Total Suspicious Activity Volume** | **2,068** |
| **Positive Feedback** | |
| My Collection Agency | 4 |
| My Customer Service Experience | 165 |
| My School | 51 |
| My Servicer | 14 |
| Department Website, Application, or Service | 113 |
| **Total Positive Feedback Volume** | **347** |
| **Research** | |
| Credit Reporting | 23 |
| Public Service Loan Forgiveness (PSLF) Program | 13 |
| Repaying Student Financial Aid | 292 |
| Repaying Student Financial Aid – In Default | 38 |
| School | 8 |
| Student Eligibility | 14 |
| Department Customer Support | 6 |
| **Total Research Volume** | **394** |
| **Grand Total** | **48,638** |

In addition to categorizing by case type, all feedback submitted is further categorized into subcategories based on the customer's description. Nearly 100 subcategories further refine the feedback submitted. The breakdown of cases received by Top 5 Category/Subcategory is discussed later in this report.

## How FSA Resolves Feedback

Feedback resolution must be executed within the boundaries established by law and regulation. These are grouped under three common Resolution Types. The Resolution Type "Resolved" designates feedback on which FSA has concluded all review and research activity. "Referred" is most commonly used with the case type of General Inquiry, but also may be used to designate situations on other case types when FSA determines another resource external to FSA should assist the customer because the nature of the feedback does not pertain to Title IV federal student aid programs or must be reported to another agency or entity. "Submission Logged" relates to feedback on which no assistance is provided. The most common use for this Resolution Type is for feedback submitted anonymously or containing specific direction to change Title IV law or regulation.

Resolution Actions indicate the specific way in which the feedback was resolved. Resolution Actions achieved on cases resolved by FSA (not Referred) in FY 2020, most commonly consisted of providing to the customer additional explanation or information about the action or circumstance that prompted the customer to submit feedback to FSA. These are identified with a Resolution Action of "Communication/Process Clarified for Customer."

**Table 61: Resolution Type and Action for All Cases Closed in Fiscal Year 2020**

| Resolution Type | Resolution Action | Volume | Percentage |
|---|---|---|---|
| Resolved | Action Taken | 2,298 | 4.2% |
| | Communication/Process Clarified for Customer | 12,228 | 22.2% |
| Referred | Referred to Accrediting Agency | 529 | 1.0% |
| | Referred to FSA Contact Center | 9,585 | 17.4% |
| | Referred to FSA Website | 1,437 | 2.6% |
| | Referred to Other Government Entity | 1,747 | 3.2% |
| | Referred to Outside Third-Party | 3,077 | 5.6% |
| | Referred to School | 6,746 | 12.3% |
| | Referred within the Department of Education | 9,125 | 16.6% |
| Submission Logged | Feedback Logged | 6,276 | 11.4% |
| | No Response from Customer | 1,979 | 3.6% |
| | Policy Suggestion Logged | 33 | 0.1% |
| **Total** | | **55,060** | **100%** |

Table 61 highlights that 22.2 percent of all cases are resolved with another explanation and/or more information about the circumstances that prompted the customer to submit feedback to FSA. As noted above, FSA must resolve complaints within the framework of existing law and regulation. This means FSA often is constrained from offering a solution to the customer that directly and precisely resolves the matter in a way the customer most desires. For example, a

**Report of the Federal Student Aid Ombudsman**

customer may not like the interest rate on their loans. While this is certainly valid feedback, legislation mandates the interest rate on federal student loans.

There are key factors explaining why so many cases are resolved with FSA providing additional or clarifying information:

- Customer understanding and awareness of how loan balances are affected by interest accrual and/or capitalization, and reduced by monthly payments.

- Customers' difficulty understanding requirements and proving eligibility for loan program benefits such as income-driven repayment plans or loan discharge, cancellation, or forgiveness.

- Customers having difficulty with requirements associated with completing and submitting the FAFSA such as electronic signatures, completing the FAFSA, required income information, and the requirements for obtaining and maintaining a valid FSA ID.

- Unclear, hard-to-understand, or inconsistent information from FSA and its service providers about repayment plan eligibility requirements.

- Customers may not access their online accounts to review servicer notifications or provide updated contact information, leaving them unaware of the loan status.

- Customers needing assistance with and clarification of provisions of the CARES Act and its impact on their federal financial aid.

This method of recording the way individual cases are resolved helps highlight areas of customer confusion versus problems with program implementation that may require legislative, regulatory, or operational changes. It also enables FSA to show how specific categories and subcategories of cases are resolved and provides a more refined picture of the relative flexibility of FSA to meet and satisfy customer expectations as expressed within individual feedback submissions.

## Feedback Cases Assigned to FSA Business Units

The Top 5 categories of feedback received in this line of business are reflected in Figure 23.

**Figure 23: Top 5 Feedback Cases Received by Category/Subcategory in Fiscal Year 2020**



**Repaying Student Financial Aid/Loan Accuracy** pertains to customer's concerns about the accuracy of one or more of their loans. Examples of this subcategory include interest rate; loan disbursement amount; current loan balance; loan payment amount; and current loan status.

> **Case Example 1:** Customer wanted to dispute loan disbursements due to the fact that she withdrew from her school within the three- day time period. She stated she was also told that she accepted loans, but she said she filled out a Master Promissory Note and completed entrance counseling, but never accepted loans.

**Applying for Student Aid (FAFSA)/Completing the FAFSA** pertains to any issue the customer experiences when applying for or receiving federal financial aid. Examples include unable to electronically sign FAFSA; completing the FAFSA takes too long; requirement on two years of tax returns; timing when the FAFSA needs to be filled out; and other challenges related to completion of the FAFSA.

> **Case Example 2:** Customer is trying to complete her FAFSA utilizing her 2018 taxes. She was not married at that time. She would like to know if she needs to add her husband's tax information to the application. I asked the customer if she was completing the FAFSA for the 2019–20 school year. She stated she was filling out the 2020–21 FAFSA.

**Repaying Student Financial Aid/Loan Discharge, Cancellation, or Forgiveness** pertains to any such issue except for TPD, BD, and PSLF, as those are separate categories or subcategories. Examples include: Teacher Loan Forgiveness, Ability to Benefit discharge, False Signature, and Identity Theft.

**Case Example 3:** The customer obtained federal student loans and attended college without obtaining a high school diploma. She's requesting to have the loans discharged through the Ability to Benefit provision.

**Repaying Student Financial Aid/Loan Repayment Plan** pertains to any issue wherein a customer raises concern about their monthly payment amount.

**Case Example 4:** "I re-applied for an IDR plan on 03/05/20, in which I received a formal letter in my inbox confirming that my IDR continuation was approved. I received two emails on 08/22/20 at 5:40 a.m. stating that my IDR plan lapsed because you required additional information that I did not supply, and the deadline of 90 days had passed. These emails are errors, and in trying to remedy this situation, I have been met with convoluted automated phone systems and website links in trying to find the form I supposedly need to fill out to remove this error. I need this IDR plan as I am currently unemployed and my wife and I have absolutely no means to make payments on my loans, certainly not the standard monthly payments."

**Repaying Student Financial Aid/Loan Delinquency or Default** pertains to any issue related to a delinquent or defaulted loan.

**Case Example 5:** Customer says he has never received a bill or correspondence from anyone. Customer is desperate to get his loans out of default because he received no notice.

### School-Related Feedback

The majority of feedback about schools is assigned to the FSA Partner Participation and Oversight office (FSA PPO) for research and resolution. Customers submitted a total of 7,138 school-related feedback, or 14.7 percent of the total volume received.

**Figure 24: Top 5 School-Related Feedback in Fiscal Year 2020**



The school-related feedback identified above is defined as:

- Administrative Capability relates to a school's ability to administer the federal financial aid programs in accordance with law and regulation. Types of feedback would include insufficient number of financial aid staff, lack of financial aid related policies and procedures, or failure to follow school policies regarding financial aid awards.

- Financial Allegations (Tuition and Fee Charges) is customer feedback concerning school tuition, fee charges, or if a customer has a balance owed to the school. These are typically non-Title IV issues the customer describes in the feedback.

- Delays Receiving Aid relates to feedback when a customer expresses that a school is unnecessarily or improperly delaying federal aid disbursement.

- Grant Disbursement (pay out) Process (Pell Grant, TEACH Grant, and Iraq and Afghanistan Service Grant) is regarding the process on how a school pays out funds received in a federal grant to students.

- Loan Disbursement (pay out) Process is regarding the process that either the student or the school must complete to receive a federal loan fund.

FSA PPO staff review the feedback and as needed, contact the school and the customer for additional information. FSA PPO uses data from the school-related feedback to inform its program review and school performance monitoring responsibilities. For optimal application of feedback data to these activities, it is necessary to examine also how most feedback gets resolved. Table 62 examines the most common Resolution Type and Resolution Action for the Top 5 School-Related Feedback.

**Table 62: Top 5 School-Related Feedback by Resolution Type/Resolution Action in Fiscal Year 2020**

| School-Related Feedback Subcategory | Resolution Type | Resolution Action | Volume |
|---|---|---|---|
| Financial Allegations (Tuition and Fee Charges) | Referred | Referred to School | 967 |
| | Resolved | Communication/Process Clarified for Customer | 440 |
| | Submission Logged | No Response from Customer | 147 |
| Administrative Capability | Referred | Referred to School | 607 |
| | Resolved | Communication/Process Clarified for Customer | 452 |
| | Submission Logged | Feedback Logged | 182 |
| Delays Receiving Aid | Referred | Referred to School | 459 |
| | Resolved | Communication/Process Clarified for Customer | 552 |
| | Submission Logged | Feedback Logged | 90 |
| Grant Disbursement (pay out) Process (Pell Grant, TEACH Grant, and Iraq and Afghanistan Service Grant) | Referred | Referred to School | 303 |
| | Resolved | Communication/Process Clarified for Customer | 405 |
| | Submission Logged | Feedback Logged | 40 |
| Loan Disbursement (pay out) Process | Referred | Referred to School | 264 |
| | Resolved | Communication/Process Clarified for Customer | 444 |
| | Submission Logged | No Response from Customer | 32 |
| **Total** | | | **5,384** |

**Report of the Federal Student Aid Ombudsman**

## Loan Servicing-Related Feedback

FSA contracts with 10[18] entities to manage the servicing of non-defaulted federal student loans. These entities are responsible for advising borrowers about resources and benefits to better manage their federal student loan obligations; respond to customer service inquiries; address billing and collecting payments[19] on a loan; and perform other administrative tasks associated with maintaining a loan on behalf of the Department. Collection activities on defaulted loans assigned to the Department are overseen by FSA's Default Resolution Group (DRG) as reflected on the DMCS.

**Figure 25: Top 5 Loan Servicing-Related Feedback in Fiscal Year 2020**



---

[18] One of these servicers, ECSI, services Perkins loans; it does not service loans made under the Direct Loan or FFEL programs.

[19] All payments on non-defaulted federal student loans the Department owns are remitted to Treasury. That agency then reports payment information to the various servicers, which are then credited to the borrower's account.

Table 63 shows the manner in which these most common cases were closed.

**Table 63: Top 5 Loan Servicing-Related Feedback by Resolution Type/Resolution Action**
**Fiscal Year 2020**

| Subcategory | Resolution Type | Resolution Action | Volume |
|---|---|---|---|
| Loan Accuracy | Referred | Referred within the Department | 1,663 |
| | Resolved | Communication/Process Clarified for Customer | 1,364 |
| | Referred | Referred to Outside Third-Party | 712 |
| Loan Discharge, Cancellation, or Forgiveness | Referred | Referred within the Department | 792 |
| | Resolved | Communication/Process Clarified for Customer | 764 |
| | Referred | Referred to FSA Contact Center | 430 |
| Loan Repayment Plan | Referred | Referred within the Department | 1,111 |
| | Resolved | Communication/Process Clarified for Customer | 249 |
| | Referred | Referred to FSA Contact Center | 554 |
| Loan Delinquency or Default | Referred | Referred within the Department | 1,189 |
| | Resolved | Communication/Process Clarified for Customer | 305 |
| | Referred | Referred to Outside Third-Party | 364 |
| Loan Payment Amount | Referred | Referred within the Department | 1,193 |
| | Resolved | Communication/Process Clarified for Customer | 290 |
| | Referred | Referred to Outside Third-Party | 160 |
| **Total** | | | **11,140** |

Table 64 shows the volume of Feedback cases categorized as servicing-related, broken down for each servicer contracted to perform servicing activities on behalf of the Department. It should be noted that the volume of cases assigned to a specific servicer is often affected by the nature of the accounts assigned to the servicer. For example, DMCS services only defaulted loans and FedLoan Servicing is the designated servicer for all PSLF and TEACH grants. ED-ACS is no longer an active servicer under contract to the Department. FSA personnel resolve these cases in which the feedback received may be related to the former servicer's activities.

**Table 64: Feedback by Department Servicer Volume and Borrower Count**
**Fiscal Year 2020**

| Servicer | Feedback Volume | Percent of Servicer Feedback | Number of Borrowers | Percent of Portfolio |
|---|---|---|---|---|
| Debt Management and Collection System/(DMCS/DRG) | 5,958 | 25.96% | 7,731,817 | 18.86% |
| ED-ACS | 23 | 0.10% | 7,784 | 0.02% |
| ED-Cornerstone | 386 | 1.68% | 1,078,498 | 2.63% |
| ED-ECSI Perkins Loan Servicer | 96 | 0.42% | 67,439 | 0.16% |
| ED-FedLoan Servicing (PHEAA) | 4,409 | 19.21% | 7,271,445 | 17.74% |
| ED-Granite State (GSMR) | 401 | 1.75% | 1,144,059 | 2.79% |
| ED-Great Lakes | 2,143 | 9.34% | 7,446,803 | 18.17% |
| ED-HESC/EdFinancial | 696 | 3.03% | 1,762,235 | 4.30% |
| ED-MOHELA | 776 | 3.38% | 2,555,066 | 6.23% |
| ED-Navient | 2,355 | 10.26% | 5,618,684 | 13.70% |
| ED-Nelnet | 5,389 | 23.48% | 5,532,720 | 13.50% |
| ED-OSLA | 320 | 1.39% | 777,950 | 1.90% |
| **Total Volume** | **22,952** | **100%** | **40,994,500** | **100%** |

## Feedback Submitted by Members of the Military, Veterans, or Their Dependents

FSA asks all customers to indicate if they are a member of the military, a veteran, or a dependent of a military member or veteran. FSA collects this information to ensure continued support of Executive Order 13607, signed in April 2012, which established the Principles of Excellence (POE) for Educational Institutions Servicing Service Members, Veterans, Spouses, and Other Family Members.

For all feedback received in FY 2020, POE-identified customers submitted 877 feedback cases specifically related to their military status and/or educational benefits.

## Dispute Cases Assigned to the Ombudsman Group

The Ombudsman Group researches and resolves all cases within the Dispute line of business. Customers who dispute the outcome of a case previously responded to by an FSA business unit or one of FSA's contracted servicers or PCAs may elect to have their issue reviewed by the Ombudsman Group. Cases pertaining to federal loans owned by commercial lenders or guaranty agencies—commonly referred to as commercially-held loans—are also classified as Research cases. Review by the Ombudsman Group is a customer's last opportunity for informal resolution of an issue within the Department.

During FY 2020, the Ombudsman Group received 394 cases for review and resolution. During FY 2020, the Ombudsman Group closed 598 cases.

**Table 65: All Dispute Cases Received in Fiscal Year 2020**

| Dispute Category | Volume |
|---|---|
| Credit Reporting | 23 |
| Public Service Loan Forgiveness (PSLF) Program | 13 |
| Repaying Student Financial Aid | 292 |
| Repaying Student Financial Aid – In Default | 38 |
| School | 8 |
| Student Eligibility | 14 |
| Department Customer Support | 6 |
| **Total** | **394** |

**Figure 26: Top 3 Dispute Cases Category/Subcategory Assigned to the Ombudsman Group in Fiscal Year 2020**



As a neutral, independent third-party separate from FSA operations, the Ombudsman Group fulfills a role as the third tier in FSA's feedback resolution process. The Ombudsman Group can reach across technical and responsibility boundaries within the federal student aid ecosystem to collect facts, review circumstances, and facilitate collaboration among differing parties associated with a dispute to reach a resolution that may not have otherwise been considered. Example cases described below illustrate this activity.

**Case Example 6: Loan Accuracy:** Customer contacted our office regarding her Chapter 7 Bankruptcy. She asserted that she had a portion of her $200,000 FFEL Consolidation loan discharged and only has to repay $30,000. She asserted that the guarantor had not corrected her loan balance. The customer asserted that they are not applying the 0 percent interest rate from the CARES Act and she is entitled to a 0.25 percent reduction with automatic payments.

**Outcome:** Customer has one FFEL Consolidation loan. In accordance with the customer's adversary order, the remaining amount owed on her FFEL Consolidation after the bankruptcy discharge was $30,000 with a 3.25 percent interest rate. Guarantor corrected records to reflect the balance the court ordered and that payments were made by the borrower and posted to her account. Another payment was returned to her as the account had been repurchased by the loan servicer. A 0.25 percent interest reduction for automatic payments is not offered by the lender. The customer is not eligible for the 0 percent interest rate from the CARES Act; only Department-held loans are eligible.

**Case Example 7: Loan Delinquency or Default:** Customer is calling about her student loans from 2001 that in 2007 were consolidated. The guarantor refuses to take payments and sent her to collections and wage garnishment since 2019. The customer stated that her student loans went from $23,900.00 up to $249,344.00. She wants to know what she can do at this time. She stated that all the fees should be taken off the account. I explained that with defaulted loans, fees are added to the account.

**Report of the Federal Student Aid Ombudsman**

**Outcome:** The borrower was advised that the account has been properly serviced, the default was valid, and collection fees are authorized. The customer has the option to pay the loan in full, re-consolidate the FFEL Consolidation or compromise a settlement on the account, in addition to making voluntary monthly payments.

**Case Example 8: Loan Discharge, Cancellation, or Forgiveness:** I have been a nurse since completing school in 2013 and I am not showing a zero balance. I was in the understanding that every year that I submit my proof of work that my tuition was being forgiven.

**Outcome:** The research showed that the customer submitted cancellation applications in prior years and a portion of the loan was forgiven. However, the customer did not submit the cancellation request for the final year of service performed. The customer was advised that she needs to submit the final paperwork to receive the remaining 30 percent of Perkins Loan Cancellation.

**Table 66: All Dispute Cases Closed in Fiscal Year 2020 by Resolution Type**

| Category | Volume |
|---|---|
| Resolved | 532 |
| Referred | 30 |
| Submission Logged | 36 |
| **Total** | **598** |

## Other Case Types

### Suspicious Activity

FSA carefully reviews each customer submission to determine if there is a credible allegation of fraud or illegal activity associated with the federal financial aid programs. Table 67 identifies all Suspicious Activity cases by category.

**Table 67: All Suspicious Activity Cases by Category in Fiscal Year 2020**

| Suspicious Activity Category | Volume |
|---|---|
| Allegation of Identity Theft | 138 |
| Allegation of Misuse of Departmental Resources | 368 |
| Allegation of Misuse of FSA ID | 141 |
| Allegation of Misuse of FSA Intellectual Property or Claim of a Departmental Affiliation | 1,287 |
| Allegation of Whistleblower | 134 |
| **Total** | **2,068** |

**Allegation of Misuse of FSA Intellectual Property or Claim of a Department Affiliation.** This is a broad category that that many resolution types fall under. This can refer to any individual who falsely claims he or she is employed by or affiliated with the Department. The most frequent issue in this category are third-party companies that falsely claim an affiliation with the Department. Their purpose is to entice borrowers to purchase offered services on which that company does not deliver.

**Allegation of Misuse of Department Resources.** This is a claim or assertion that an individual or individuals are not using student aid funds for tuition or other school-based items.

**Allegation of Misuse of FSA ID.** This is the claim or assertion that someone has fraudulently obtained a borrower's FSA ID to illegally gain access to private information and/or FSA funds.

**Allegation of Identity Theft.** This is a claim or assertion that an individual has wrongfully obtained and used another persons' personal data, in some way that involves fraud or deception, to gain access to FSA funds.

**Allegation of a Whistleblower.** This is a claim or assertion by a person who exposes any kind of information or activity that is deemed illegal, unethical, or not correct with regards to practices involving obtaining student aid, and/or any of the processes of student loan borrowing.

As with all other feedback, the way Suspicious Activity cases are resolved is tracked on cases closed by Resolution Type and Resolution Action.

**Table 68: All Suspicious Activity by Resolution Type/Resolution Action**
**Fiscal Year 2020**

| Category | Resolution Type | Resolution Action | Volume |
|---|---|---|---|
| Allegation of Identity Theft | Resolved | Communication/Process Clarified for Customer | 92 |
| | Referred | Referred to Outside Third-Party | 10 |
| | Resolved | Action Taken | 10 |
| | Submission Logged | Feedback Logged | 22 |
| Allegation of Misuse of Department Resources | Resolved | Communication/Process Clarified for Customer | 71 |
| | Referred | Referred to Other Government Entity | 13 |
| | Submission Logged | Feedback Logged | 285 |
| Allegation of Misuse of FSA ID | Resolved | Communication/Process Clarified for Customer | 112 |
| | Referred | Referred to Other Government Entity | 18 |
| | Submission Logged | Feedback Logged | 8 |
| Allegation of Misuse of FSA Intellectual Property or Claim of a Departmental Affiliation | Resolved | Communication/Process Clarified for Customer | 15 |
| | Referred | Referred to Other Government Entity | 1,255 |
| | Submission Logged | Feedback Logged | 33 |
| Allegation of Whistleblower | Resolved | Communication/Process Clarified for Customer | 56 |
| | Referred | Referred to Accreditation Agency | 7 |
| | Submission Logged | Feedback Logged | 176 |
| **Total** | | | **2,183** |

FSA shares investigation and enforcement authority over schools, loan servicers, and other participants in the federal student aid programs with the Department's OIG and other agencies at the federal and state level. All allegations of Suspicious Activity are shared with OIG and the Federal Trade Commission Consumer Sentinel database. Sharing the information with the Sentinel data base renders individual, case-level information available to a broader network of federal and state law enforcement entities.

Based on increased activity of such scams, FSA has tasked the Fraud Risk Group with taking steps to review, track, and act upon allegations of fraudulent actions third party debt relief companies take. The Fraud Risk Group has also taken additional steps such as implementing a tactical plan, enhanced collaboration with federal enforcement agencies and offices, completed

borrower awareness projects, assisted with investigations, and negotiated cease and desist letters that are sent to third party debt relief companies.

**Positive Feedback**

Customers can provide positive feedback regarding their experience with FSA, schools, servicers, and other entities involved with the application, receipt, or repayment of federal student aid, including PCAs.

> **Case Example 9:** "As a military spouse, my family's income is ALWAYS fluctuating since every move means a new period of joblessness before finding work. Just before COVID-19 hit, I had to take off of work to support the kid during my husband's deployment. COVID-19 arrived before he returned, and I was therefore unable to collect unemployment. While I tried to apply for a different repayment amount, I don't think that I did it correctly. Luckily, one of the service members was there.
>
> The Government Bureaucracy can seem impenetrable, and I am especially grateful to your representative for her kind hand-holding, despite all my questions and cluelessness. Thank you. Please pretend that the 'thank you' had an exclamation mark after it, but it is disallowed in this form. Still, I wanted to convey gratitude with an exclamation mark."

For FY 2020, the Ombudsman Group received 347 positive feedback comments from FDMS customers.

**Using Feedback to Improve the Federal Student Aid Programs**

Feedback system data is shared in FSA's EDWA. Data concerning the Suspicious Activity case type is shared with the OIG, and information about the Complaint and Suspicious Activity case types is shared with the Federal Trade Commission's Consumer Sentinel data base. The Ombudsman Group facilitates the sharing of information from feedback that customers submit by responding to ad hoc requests for data about feedback received. Further, the Ombudsman Group shares feedback data that is, in turn, compiled with other sources of feedback (e.g., received through social media or at community outreach events) on a monthly basis and shared with representatives across FSA.

A more specific example of how FSA is using feedback data is connected to the PSLF program. PSLF allows government and non-profit entity employees to have their loans forgiven after 120 qualifying payments, which is generally 10 years.

During FY 2020, the Ombudsman Group received 1,311 cases related to PSLF. This represents a slight decrease from the 1,500 PSLF cases received in FY 2019. The primary reason for feedback about PSLF during FY 2020 related to questions about qualifying for the program from customers who were not on the correct repayment plan.

Congress passed legislation that created the TEPSLF to assist individuals who thought they were on the correct payment plan. TEPSLF is only for those customers who have made 120 payments since 2007 and have been denied PSLF on the basis that they were not on the correct repayment plan. However, the legislation places a restriction on qualifying payments

during the final year of qualifying for PSLF. The law requires that borrower's remit payments under a qualifying repayment plan for the final 12 monthly payments.

FSA implemented further improvements to the PSLF/TEPSLF process during FY 2020, including:

- **Employer Eligibility Database:** In June 2020, FSA delivered its first enhancement to the PSLF Help Tool by providing borrowers with information about employer eligibility in real time through an Employer Database. FSA added an Employer Search Feature where borrowers can use their employer's Federal Employer Identification Number and their dates of employment to search the Employer Database for specific eligibility information.

- **Lump Sum Payments/Prepayments:** In August 2020, FSA worked with the servicer to make an operational improvement by updating the process to qualify a monthly payment, regardless of when or by whom it was made, so long as the payment due was made in full and no later than 15 days after the payment due date.

  - Borrowers may now make prepayments or lump sum payments for up to twelve months or the next time their income-driven repayment plan is due for certification, whichever comes first.

  - Additionally, FSA worked with the PSLF servicer to update borrower communications and account information to clearly display the distinction between "eligible" vs "qualifying" payments.

  **Case Example 10:** I have been in a qualifying public service job for 18 years and have been making payments on my student loans the whole time. I believe I have more than the 120 qualifying payments given the flexibility associated with this new fund, and I would like to find out if, in fact, that is true. My servicer has been difficult in dealing with to get this information.

  **Outcome:** The customer had a joint consolidation loan and the challenge was determining that portion of the loan that was eligible for PSLF. Working with the servicer, the Ombudsman Group was able to determine the correct balance eligible for PSLF and the customer received additional forgiveness of $3,908.86.

**Anonymous Cases**

There are many instances where customers prefer to give feedback anonymously, without providing any name, contact, or personal information. From the beginning days of the Ombudsman Group through to the present time, FSA customers had, and continue to have, the option to submit feedback anonymously.

While feedback is welcomed from any and all customers, it should be noted that when a customer files anonymously, the Ombudsman is unable to further review and resolve their situation because the office does not have the personally identifying information. Anonymous cases can range from something as minor as a comment regarding the website to something more serious as a report of a suspicious activity. In FY 2020, 1,453 cases were submitted anonymously.

**Policy Suggestion Logged**

Policy Suggestion Logged refers to cases where the customer provides feedback regarding their opinion on improvement of specific rules and regulations. Specifically, they offer a particular suggestion regarding a policy that is in place they feel needs to be improved upon.

> **Case Example 11:** Right now, the student is a dependent, and the parents' financial information is considered completely, except for when it comes to household size and how many students are in that household. I can claim my daughter and myself on MY Student FASFA, but I can't claim her and myself on her FASFA when it's MY financials that are being reviewed. This is illogical and unfair. If you are going to look at my financials than please look at the household and number of students from my perspective. Otherwise it is an incomplete picture.

> **Case Example 12:** My issue is students not being able to be declared independent or having to meet strict requirements to be declared independent.

**COVID-19 and FSA**

As one measure of the impact of the COVID-19 pandemic on federal student aid recipients, shortly after passage of the CARES Act, FSA began keyword searches to identify issues customers perceived as occurring because of the pandemic. These cases are tracked using keywords such as, COVID-19, virus, unemployed, out-of-work, laid off, furloughed, forbearance, deferment, CARES Act, closed school, and credit reporting.

**Figure 27: COVID-19 Cases Received Compared to Total Complaint Volume**



From March through September 2020, the Ombudsman received 25,078 complaints. Of this number, the Ombudsman Group received 2,156 complaints related to the pandemic, or 8.6 percent of the total received during the period.

**Third-Party Debt Relief**

Businesses who offer debt relief services to loan borrowers are referred to as TPDR companies. A frequent complaint received via FSA's FDMS involves third-party companies convincing

borrowers to use and pay for their services. Such services include submitting applications for forbearance, deferment, payment plan change, or loan consolidation. Assistance with such applications may be obtained for free from FSA's federal loan servicers. While some companies do perform services as agreed, many do not. Other proposals offered by TPDR companies include lowering the borrower's monthly payments and/or arranging loan forgiveness, typically with an impossible promise of total loan forgiveness within two to three years. These cases are categorized as Suspicious Activity/Allegation of Misuse of FSA Intellectual Property or Claim of a Department Affiliation.

To be effective in inducing borrowers to pay for their services, TPDR companies often attempt to convince borrowers that they are Department/FSA employees, are affiliated with, or somehow represent the Department. Companies make use of the Department seal, FSA logo, or the Department's name in their solicitations and contracts to further persuade borrowers. They make these claims in advertising, during telephone conversations, in emails, and text messages. Believing they are working with the Department/FSA or Ombudsman agents, makes borrowers particularly vulnerable to TPDR scams. FDMS TPDR cases are categorized under Allegation of Misuse of FSA Intellectual Property or Claim of a Department Affiliation. During FY 2020, FDMS received 1,287 inquiries categorized as Allegation of Misuse of FSA Intellectual Property or Claim of a Department Affiliation.

In 2020, FSA created the Fraud Risk Division (FRD) to investigate TPDR complaints and hold these companies accountable for defrauding student loan borrowers. The Ombudsman Group has partnered with the FRD to identify FDMS cases where these companies have infringed on the Department's intellectual property, misled, or deceived borrowers, and violated the Telemarketing Sales Rule. The Ombudsman Group Feedback Operations Team has provided FRD with training, TPDR contract examples, correspondence between borrowers and representatives, conducted case searches, and responded to other FRD inquiries.

This ongoing collaboration has enabled FRD to furnish actionable information to the Department's OIG and state attorneys general in support of criminal investigations. Providing examples of TPDR infringement on FSA intellectual property, the Ombudsman Group worked with one of Department's attorneys to explore the use of cease and desist letters. With a goal of putting violators on notice as a first step toward stopping fraudulent activity, a legal opinion paper was provided to FRD for their consideration. Once cease and desist letters begin going out, the Ombudsman Group will monitor FDMS complaints for continued infractions and promptly notify FRD.

## Other Ombudsman Group Activity

### Supporting the Resolution of School-Related Complaints

During FY 2020, the Ombudsman Group's Feedback Operations division partnered with FSA PPO to provide additional case management and resolution support to resolve school-related customer complaints.

During FY 2020 Quarter 3, the Ombudsman Group's Feedback Operations team initiated a pilot program in collaboration with FSA PPO. The pilot program engaged contractor resources to reach out to schools, customers, and other parties to obtain information and documents needed to resolve these cases. Contractor staff initiated, followed up on, and obtained needed documentation that allowed Program Compliance staff to resolve cases. At the start of the pilot,

Program Compliance had 1,962 cases that were open for more than 60 days. With support from contractor resources, Program Compliance had a total of 493 cases that were opened for more than 60 days. The pilot program resulted in the closure of 1,469 (75 percent) of cases that were open for more than 60 days.

The outcome of the pilot resulted in the permanent implementation of the process as it significantly improves FSA's ability to provide more timely responses to customers seeking resolution of their complaints.

**Customer Satisfaction Survey Results**

The Ombudsman Group contracts with a third-party vendor to conduct the customer satisfaction survey using ACSI methodology. This survey is sent to all customers, regardless of the case type. Approximately two weeks after a case is closed, the vendor sends a survey to all Feedback system customers who provided an email address. The vendor then compiles those results on a quarterly basis, which are then shared with the Ombudsman Group. No information about survey respondents is provided to FSA.

For all surveys completed in FY 2020, the ACSI score for the FDMS was 49, which shows a one-point increase from FY 2019. Analysis of the numbers continues to show the FDMS' ACSI scores are distributed in an inverted Bell curve, with the lowest and highest scores at the upper ends and fewest responses in the middle. This continues to suggest that FDMS customers evaluate the *outcome* of their inquiry and not the *quality of service* provided.

**Student Loan Ombudsman Caucus**

The Ombudsman Group hosted the annual meeting of the Student Loan Ombudsman Caucus (Caucus) in September 2020. The Caucus, chartered by the National Council of Higher Education Resources, is an informal group of individuals who serve as ombudsmen, or in an informal dispute resolution capacity at lenders, loan servicers, and guaranty agencies. The Caucus meets on a bi-monthly basis via conference call, and annually in a face-to-face session. This year's caucus meeting was conducted virtually.

In the past year, the Caucus has added to its membership those who have been appointed by state governments in an ombudsman capacity. A panel discussion led by three of those state officials was featured during the annual meeting in September.

**Coordination with the Consumer Financial Protection Bureau**

In January 2020, the Consumer Financial Protection Bureau (CFPB) Private Loan Ombudsman, Robert Cameron, and the FSA Ombudsman, Joyce DeMoss, signed a Memorandum of Understanding (MOU) in which the two agencies agree to share complaint data from complaints filed by student loan borrowers.

Ombudsman Group and CFPB staff collaborated to provide FSA personnel within, and external to, the Ombudsman Group, access to CFPB's data system. Each week, the Ombudsman Group uploads to CFPB's data system inquiries pertaining to private student loans. Conversely, the Ombudsman Group downloads referrals from CFPB to FSA. Referrals from CFPB are recorded in FDMS and the appropriate actions are taken. Since signing the MOU, FSA has directly

referred 46 private loan inquiries to CFPB. In turn, FSA received 45 referrals of federal student loan inquiries from CFPB.

In accordance with the MOU, CFPB and FSA personnel met two times to go over how each of the agencies intake and analyze the data collected on complaints about student loans that each agency receives. The signing of the MOU also cleared the way for more frequent, informal discussions and information-sharing between agency officials about student loan servicing activities of interest to both agencies.

## Recommendations

The statute provides that the Ombudsman, as part of this annual report, make recommendations for policy changes based on feedback received from federal financial aid recipients. Although the majority of feedback received is resolved with additional information offered or clarified for the customer, the root circumstances driving customers to provide feedback lie in the complexity of the requirements to qualify for aid and to secure benefits during loan repayment, such as IDR and loan discharge. This complexity not only frustrates customers, but it challenges FSA service providers to provide high-quality service.

In each of the two previous annual reports, the Ombudsman recommended statutory changes to allow FSA to match IRS data for borrowers in IDR plans and those completing the monitoring period following TPD discharge of federal student loans. The Ombudsman acknowledges the inclusion of these recommendations in the FUTURE Act signed into law in December 2019 and looks forward to full implementation of this law.

**Recommendation:** The Ombudsman recommends reducing the number of repayment plans offered.

Federal loans, depending on program, loan type, and disbursement date are eligible for as many as eight different repayment plans. Each of these repayment plans has different eligibility criteria, calculations that result in different payment amounts, and different repayment terms. It is difficult for borrowers to understand the differences between plans and impacts of the various plans. Many select the lowest possible payment amount that can be offered, but do not understand the long-term implications of interest accrual, leaving many to express their frustration that monthly payments are having lower-than-expected impact on their total amount owed.

**Recommendation:** Interest capitalization should occur only when a federal student loan borrower consolidates outstanding federal student loans.

The law and regulations mandate or permit interest capitalization in multiple circumstances. The result is an increased principal balance, increased future accrued interest, and increased payment amounts. Interest capitalization serves no purpose, other than to generate additional interest income.

Capitalizing interest cannot be avoided when consolidating because the borrower is taking a new loan for the purpose of paying in full existing federal student loans.

**Report of the Federal Student Aid Ombudsman**

**Recommendation:** IDR plans should be opt-out rather than opt-in.

Student loan borrowers are required to renew their IDR plan annually. Inquiries from customers regularly describe challenges receiving communications about renewal or providing the necessary renewal documentation. When a borrower does not renew their IDR plan, the loan is placed in standard repayment, which is usually substantially higher than the IDR plan, and all outstanding interest is capitalized. These actions frequently result in delinquency and/or default of the loan. Moving to an opt-out strategy that includes automatic data matching with the IRS will help borrowers to effectively manage loan repayment.

**Recommendation:** Borrowers who consolidated jointly with a spouse should have the opportunity to separate the joint consolidation loan.

In instances of PSLF (for Direct Loan borrowers), TPD, and Death Discharges the dollar portion of the loan attributable to the effected party is separated out and processed accordingly. This same principle should be applied to the separation of the Joint Consolidation in cases of divorce. In the case of divorce, it is often difficult for one party to get the cooperation of the other party to complete loan servicing actions (i.e., documentation for IDR Plan, forbearances, deferments) or to even make payments on the loan. The borrowers should have the option to separate the loan into two new Direct Consolidation Loans. An uncooperative spouse should be compelled by statute to agree to the new, separate consolidation loan. There are enough outstanding joint consolidations to warrant review of this recommendation.

**Recommendation:** Use of Two-factor authentication when signing into an FSA website.

Using their FSA ID number, FSA customers can access certain private information contained in FSA's records. The data show customers can be easily duped into providing that information to third-party debt relief entities. Implementing two-factor authentication can help reduce the resulting difficulties addressed earlier in this report because the FSA customer would receive a notification when any changes are made to their FSA ID or someone attempts to access their private data.



## Financial Section

*This page is intentionally left blank*

# Overview of the Financial Section

This section provides a financial presentation of FSA's stewardship and accountability for its resources. The audited financial statements are followed by the accompanying notes to the financial statements, required supplementary information, and the Independent Auditors' Report. The subsections are listed and briefly discussed below:

- **Financial Statements:** The Financial Statements consist of the following comparative statements: Balance Sheet, Statement of Net Cost, Statement of Changes in Net Position and Statement of Budgetary Resources.

- **Notes to the Financial Statements:** The Notes to the Financial Statements provide a description of significant accounting policies and detailed information on select financial statement line items. The Notes also include information that supports the computation of the various financial statement activities.

- **Required Supplementary Information (Unaudited):** The unaudited Required Supplementary Information presents the Combining Statements of Budgetary Resources by Program.

- **Independent Auditors' Report:** The Independent Auditors' Report presents the combined audit report issued by the Independent Auditors. Included in the combined audit report are the Report on the Financial Statements, the Report on Internal Control, and the Report on Compliance and Other Matters. The subsection also includes the Office of Inspector General Audit Transmittal Letter, Management's Response to the Audit, and the Auditors' Response to Management's Response.

# Financial Statements

FSA prepares the following statements: the Consolidated Balance Sheets, the Consolidated Statements of Net Cost, the Consolidated Statements of Changes in Net Position, and the Combining Statements of Budgetary Resources. These statements are prepared pursuant to the requirements of the Chief Financial Officers Act of 1990, the Government Management Reform Act, and OMB Circular A-136, *Financial Reporting Requirements*; and demonstrate FSA's accountability and stewardship of the resources entrusted to it.

Below is a brief description of the principal financial statements included in this section:

- **Consolidated Balance Sheets:** The Consolidated Balance Sheets present, as of a specific time, the amount of resources FSA has to use or distribute (assets), the amounts owed by FSA (liabilities) and the difference between the two (net position).

- **Consolidated Statements of Net Cost:** The Consolidated Statements of Net Cost present the annual cost of agency operations. The gross cost less any offsetting revenue is used to determine the net cost.

- **Consolidated Statements of Changes in Net Position:** The Consolidated Statements of Changes in Net Position report the accounting activities, including changes to Cumulative Results of Operations and Unexpended Appropriations that caused the change in net position during the reporting period.

- **Combining Statements of Budgetary Resources:** The Combining Statements of Budgetary Resources report the budgetary resources that were made available to FSA, the status of those resources at fiscal year-end, along with the outlays of budgetary resources.

## Consolidated Balance Sheet

**United States Department of Education**
**Federal Student Aid**
**Consolidated Balance Sheets**
**As of September 30, 2020 and 2019**
(Dollars in Millions)

|  | FY 2020 | FY 2019 |
|---|---|---|
| **Assets:** | | |
| Intragovernmental: | | |
| Fund Balance with Treasury (Note 3) | $ 70,266 | $ 62,567 |
| Other Intragovernmental Assets (Note 4) | 1 | 7 |
| Total Intragovernmental | 70,267 | 62,574 |
|  | | |
| Public: | | |
| Credit Program Receivables, Net (Note 5) | | |
| Direct Loan Program | 1,100,544 | 1,123,707 |
| FFEL Program | 67,380 | 76,767 |
| Other Credit Programs for Higher Education | 1,690 | 1,618 |
| Other Assets (Note 4) | 2,170 | 2,210 |
| Total Public | 1,171,784 | 1,204,302 |
| **Total Assets (Note 2)** | $ 1,242,051 | $ 1,266,876 |
|  | | |
| **Liabilities:** | | |
| Intragovernmental: | | |
| Debt (Note 7) | | |
| Direct Loan Program | $ 1,160,099 | $ 1,192,138 |
| FFEL Program | 88,986 | 94,671 |
| Other Credit Programs for Higher Education | 722 | 685 |
| Subsidy Due to Treasury General Fund (Note 8) | 3,283 | 10,302 |
| Other Intragovernmental Liabilities (Note 9) | 2,584 | 2,606 |
| Total Intragovernmental | 1,255,674 | 1,300,402 |
| Public: | | |
| Other Liabilities (Note 9) | 5,766 | 11,365 |
| **Total Liabilities (Note 6)** | $ 1,261,440 | $ 1,311,767 |
|  | | |
| Commitments and Contingencies | | |
|  | | |
| **Net Position:** | | |
| Unexpended Appropriations | $ 35,038 | $ 31,400 |
| Cumulative Results of Operations | (54,427) | (76,291) |
|  | | |
| **Total Net Position** | $ (19,389) | $ (44,891) |
|  | | |
| **Total Liabilities and Net Position** | $ 1,242,051 | $ 1,266,876 |

*The accompanying notes are an integral part of these statements.*

## Consolidated Statements of Net Cost

United States Department of Education
Federal Student Aid
Consolidated Statements of Net Cost
For the Years Ended September 30, 2020 and 2019
(Dollars in Millions)

| | | FY 2020 | | FY 2019 |
|---|---|---|---|---|
| **Program Costs** | | | | |
| **EXPAND POSTSECONDARY OPPORTUNITIES, IMPROVE OUTCOMES TO FOSTER ECONOMIC OPPORTUNITY, AND PROMOTE PRODUCTIVE CITIZENRY** | | | | |
| **Direct Loan Program** | | | | |
| Gross Costs | $ | 137,303 | $ | 96,696 |
| Earned Revenue | | (34,970) | | (33,817) |
| Net Cost of Direct Loan Program | $ | 102,333 | $ | 62,879 |
| **FFEL Program** | | | | |
| Gross Costs | $ | 5,419 | $ | 15,759 |
| Earned Revenue | | (3,108) | | (2,870) |
| Net Cost of FFEL Program | $ | 2,311 | $ | 12,889 |
| **Other Credit Programs for Higher Education** | | | | |
| Gross Costs | $ | 53 | $ | 20 |
| Earned Revenue | | (1,306) | | (133) |
| Net Cost of Other Credit Programs for Higher Education | $ | (1,253) | $ | (113) |
| **Non-Credit Programs** | | | | |
| Gross Costs | $ | 28,470 | $ | 32,390 |
| Earned Revenue | | - | | - |
| Net Cost of Non-Credit Programs | $ | 28,470 | $ | 32,390 |
| **Net Program Costs** | $ | 131,861 | $ | 108,045 |
| | | | | |
| **Total Program Gross Costs** | $ | 171,245 | $ | 144,865 |
| **Total Program Earned Revenue** | | (39,384) | | (36,820) |
| **Net Cost of Operations (Notes 10 & 13)** | $ | 131,861 | $ | 108,045 |

*The accompanying notes are an integral part of these statements.*

## Consolidated Statements of Changes in Net Position

**United States Department of Education**
**Federal Student Aid**
**Consolidated Statements of Changes in Net Position**
**For the Years Ended September 30, 2020 and 2019**
(Dollars in Millions)

| | FY 2020 | | FY 2019 | |
| --- | --- | --- | --- | --- |
| | Cumulative Results of Operations | Unexpended Appropriations | Cumulative Results of Operations | Unexpended Appropriations |
| **Beginning Balances:** | | | | |
| Beginning Balances | $ (76,291) | $ 31,400 | $ (23,428) | $ 32,487 |
| **Budgetary Financing Sources:** | | | | |
| Appropriations Received | $ - | $ 164,215 | $ - | $ 73,109 |
| Other Adjustments (Rescissions, etc.) | - | (576) | - | (3,393) |
| Appropriations Used | 160,001 | (160,001) | 70,803 | (70,803) |
| Nonexchange Revenue | - | - | - | - |
| **Other Financing Sources:** | | | | |
| Imputed Financing from Costs Absorbed by Others | 12 | - | 14 | - |
| Negative Subsidy Transfers, Downward Subsidy Re-Estimates, and Other | (6,288) | - | (15,635) | - |
| **Total Financing Sources** | $ 153,725 | $ 3,638 | $ 55,182 | $ (1,087) |
| **Net Cost of Operations:** | $ (131,861) | $ - | $ (108,045) | $ - |
| **Net Change:** | $ 21,864 | $ 3,638 | $ (52,863) | $ (1,087) |
| **Net Position** | $ (54,427) | $ 35,038 | $ (76,291) | $ 31,400 |

*The accompanying notes are an integral part of these statements.*

## Combined Statements of Budgetary Resources

United States Department of Education
Federal Student Aid
Combined Statements of Budgetary Resources
For the Years Ended September 30, 2020 and September 30, 2019
(Dollars in Millions)

| | FY 2020 | | FY 2019 | |
|---|---|---|---|---|
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
| **BUDGETARY RESOURCES** | | | | |
| Unobligated Balance from Prior Year Budget Authority (Net) (Note 12) | $ 14,938 | $ 8,939 | $ 15,378 | $ 14,858 |
| Appropriations (Discretionary and Mandatory) | 163,672 | 349 | 69,804 | - |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | - | 135,300 | - | 148,272 |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | 232 | 65,625 | 409 | 57,418 |
| **Total Budgetary Resources** | $ 178,842 | $ 210,213 | $ 85,591 | $ 220,548 |
| | | | | |
| **STATUS OF BUDGETARY RESOURCES** | | | | |
| New Obligations and Upward Adjustments (Total) | $ 162,465 | $ 187,667 | $ 71,433 | $ 202,405 |
| Unobligated Balance, End of Year: | | | | |
|    Apportioned, Unexpired Accounts | 13,386 | - | 11,361 | - |
|    Unapportioned, Unexpired Accounts | 1,819 | 22,546 | 1,935 | 18,143 |
| **Unexpired Unobligated Balance, End of Year** | $ 15,205 | $ 22,546 | $ 13,296 | $ 18,143 |
| Expired Unobligated Balance, End of Year | 1,172 | - | 862 | - |
| **Unobligated Balance, End of Year (Total)** | $ 16,377 | $ 22,546 | $ 14,158 | $ 18,143 |
| **Total Status of Budgetary Resources** | $ 178,842 | $ 210,213 | $ 85,591 | $ 220,548 |
| | | | | |
| **OUTLAYS, NET, AND DISBURSEMENTS, NET** | | | | |
| Outlays, Net (Discretionary and Mandatory) | $ 160,912 | | $ 69,396 | |
| Distributed Offsetting Receipts (-) (Note 12) | (13,606) | | (12,145) | |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ 147,306 | | $ 57,251 | |
| Disbursements, Net (Total) (Mandatory) | | $ (42,956) | | $ 40,085 |

The accompanying notes are an integral part of these statements.

# Notes to the Financial Statements

- **Note 1:** Summary of Significant Accounting Policies

- **Note 2:** Non-entity Assets

- **Note 3:** Fund Balance with Treasury

- **Note 4:** Other Assets

- **Note 5:** Credit Programs for Higher Education: Credit Program Receivables, Net and Liabilities for Loan Guarantees

- **Note 6:** Liabilities Not Covered by Budgetary Resources

- **Note 7:** Debt

- **Note 8:** Subsidy Due to Treasury General Fund

- **Note 9:** Other Liabilities

- **Note 10:** Net Cost of Operations

- **Note 11:** COVID-19 Activity (See Note 5)

- **Note 12:** Statements of Budgetary Resources

- **Note 13:** Reconciliation of Net Cost to Net Outlays

- **Note 14:** Commitments and Contingencies

# Notes to the Financial Statements for the Years Ended, September 30, 2020 and 2019

## Note 1. Summary of Significant Accounting Policies

### Reporting Entity and Programs

Federal Student Aid (FSA) was created as a Performance Based Organization (PBO) within the U.S. Department of Education (the Department) in 1998, as a result of amendments to the *Higher Education Act of 1965* (HEA), from previously existing Department student financial assistance program offices. FSA operates under the PBO mandate to develop a management structure driven by strong incentives to manage for results. FSA's primary goal is to assist lower-income and middle-income students in overcoming the financial barriers that make it difficult to attend and complete postsecondary education.

FSA is a component of the U.S. Government. For this reason, some of the assets and liabilities reported by FSA may be eliminated for Government-wide reporting. These financial statements should be read with the realization that they are for a component of the U.S. Government, a sovereign entity.

**Federal Student Loan Programs.** FSA and the Department administer the William D. Ford Federal Direct Loan (Direct Loan) program, the Federal Family Education Loan (FFEL) program, the Health Education Assistance Loan program (HEAL), and the Federal Perkins Loan program to help students and their families finance the costs of postsecondary education. A direct loan is any debt instrument issued to the public by the federal government. A FFEL loan guarantee is a guarantee, insurance, or other pledge with respect to the payment of all or part of the principal or interest on any debt obligation of a non-federal borrower to a non-federal lender.

The Direct Loan program, added to the HEA in 1993 by the *Student Loan Reform Act of 1993*, authorizes FSA to make loans through participating schools to eligible undergraduate and graduate students and their parents. The Direct Loan program offers four types of loans: Stafford, Unsubsidized Stafford, Parent Loan for Undergraduate Students (PLUS), and Consolidation. Evidence of financial need is required for an undergraduate student to receive a subsidized Stafford loan. The other three loan programs are available to borrowers at all income levels. Loans can be used only to meet qualified educational expenses.

The FFEL program, authorized by the HEA, operates through state and private nonprofit guaranty agencies that provide loan guarantees on loans made by private lenders to eligible students. The SAFRA Act, which was included in the *Health Care and Education Reconciliation Act of 2010* (HCERA), stated that no new FFEL loans would be made effective July 1, 2010. FFEL program receivables include defaulted FFEL loans and acquired FFEL loans. Acquired FFEL loans include student loan assets acquired using temporary authority provided in the *Ensuring Continued Access to Student Loans Act of 2008* (ECASLA). ECASLA gave FSA temporary authority to purchase FFEL loans and participation interests in those loans. FSA implemented three activities under this authority: loan purchase commitments; purchases of loan participation interests; and a put, or forward purchase commitment, with an Asset-Backed Commercial Paper (ABCP) Conduit. This authority expired after September 30, 2010; as a

result, loan purchase commitments and purchases of loan participation interests concluded. However, under the terms of the Put Agreement with the conduit, ABCP Conduit activity ceased operations in January 2014. (See Notes 5 and 10)

**Grant Programs.** FSA and the Department manage numerous grant programs, which provide financial aid, that in most cases does not need to be repaid, to students with financial need. The largest of these programs is the Federal Pell Grant (Pell Grant) program, which provides need-based grants to low-income undergraduate and certain post baccalaureate students that promotes access to postsecondary education. Other grant programs include Federal Work-Study Program, Federal Supplemental Educational Opportunity Grants (FSEOG), Teacher Education Assistance for College and Higher Education (TEACH) Grants, and Iraq and Afghanistan Service Grants. (See Note 10)

**COVID-19**. Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act providing support for student loan borrowers primarily by suspending nearly all federal loan payments until September 30, interest free. FSA also extended certain provisions of the student loan deferrals not covered by the *CARES Act* to defaulted guaranteed loans held by FSA. The Administration subsequently issued a Presidential Memorandum which extended the student loan deferrals for an additional three months through December 31, 2020. FSA also stopped all federal wage garnishments and collection actions for borrowers with federally held loans in default. Funding for the student debt provisions of the CARES Act and the Presidential Memorandum are provided through indefinite appropriations. (See Notes 5 and 11).

Other regulatory flexibilities and incentives provided in the CARES Act to help students through COVID-19 include:

- Federal Supplemental Educational Opportunity Grants to provide emergency aid to students.

- Work-study payments, which will continue even if students can no longer work on-site.

- Pell Grants, financial aid, and loans originated for this term, which students who have had to leave college campuses will not have to pay back. Moreover, none of this aid will count against students' financial aid lifetime limits.

- Waiving Satisfactory Academic Progress requirements will help to ensure that students do not lose academic standing and the ability to receive federal financial student aid.

- Tax credits that incentivize employers to help pay for student loans.

## Basis of Accounting and Presentation

These financial statements were prepared to report the financial position, net cost of operations, changes in net position, and budgetary resources of FSA as required by the *Chief Financial Officers Act of 1990* and the *Government Management Reform Act of 1994*. The financial statements were prepared from the books and records of the Department and FSA, in accordance with Generally Accepted Accounting Principles (GAAP) accepted in the U.S. for federal entities, issued by the Federal Accounting Standards Advisory Board (FASAB), and the Office of Management and Budget (OMB) Circular No. A-136, *Financial Reporting*

*Requirements*, as revised. These financial statements are different from the financial reports prepared by the Department pursuant to OMB directives that are used to monitor and control FSA's use of budgetary resources.

The accounting structure of federal agencies is designed to reflect both accrual and budgetary accounting transactions. Under the accrual method of accounting, revenues are recognized when earned and expenses are recognized when a liability is incurred, without regard to receipt or payment of cash. Budgetary accounting facilitates compliance with legal constraints and controls over the use of federal funds.

Transactions and balances among FSA funds have been eliminated from the consolidated financial statements.

Accounting standards require all reporting entities to disclose that accounting standard practices allow certain presentations and disclosures to be modified, if needed, to prevent the disclosure of classified information.

## Accounting for Federal Credit Programs

FSA's accounting for its loan and loan guarantees is based on the requirements of the *Federal Credit Reform Act of 1990* (FCRA). The purpose of the FCRA is to record the lifetime subsidy cost of direct loans and loan guarantees, in present value terms, at the time the loan is disbursed (subsidy). Components of subsidy costs for loans and guarantees include defaults (net of recoveries); contractual payments to third-party private loan collectors who receive a set percentage of amounts collected; and, as an offset, origination and other fees collected. For direct loans, the difference between interest rates incurred by FSA on its borrowings from the Department of Treasury (Treasury) and interest rates charged to particular borrowers is also subsidized (or may provide an offset to subsidy if FSA's rate is less).

Under the FCRA, subsidy cost is estimated using the net present value of future cash flows to and from FSA. In accordance with the FCRA, credit programs either estimate a subsidy cost to the government (a "positive" subsidy), breakeven (zero subsidy cost), or estimate a negative subsidy cost. Negative subsidy occurs when the estimated cost of providing loans to borrowers from Treasury borrowing, collection costs and loan forgiveness is less than the value of collections from borrowers for interest and fees, in present value terms.

Subsidy cost is an estimate of the present value cost of providing direct loans, but excludes the administrative costs of issuing and servicing the loans. FSA estimates subsidy expense using a set of econometric and financial models, as well as cash flow models.

FSA estimates subsidy costs annually for new loans disbursed in the current year; updates to the previous cost estimates for outstanding loans disbursed in prior years (subsidy re-estimates); and updates to previous cost estimates based on new legislation or other government actions that change the terms of existing loans (loan modifications) which alter the estimated subsidy cost and the present value of outstanding loans. Loan modifications can also include modification adjustment gains and losses to account for the difference between the discount rate used to calculate the cost of the modification and the interest rate at which the cohort pays or earns interest.

The subsidy cost of direct loan and loan guarantee programs are budgeted and tracked by the fiscal year in which the loan award is made or the funds committed. Such a grouping of loans or guarantees is referred to as a "cohort." A cohort is a grouping of direct loans obligated or loan guarantees committed by a program in the same year even if disbursements occur in subsequent years.

In order to account for the change in the net present value of the loan portfolio over time, the subsidy cost is "amortized" each year. Amortization accounts for the differences in interest rates, accruals, and cash flows over the life of a cohort, ensuring that cost is reflected in subsidy estimates and re-estimates. Amortization of subsidy is calculated as the difference between interest received from borrowers and Treasury (on uninvested funds) and interest paid to Treasury on borrowings.

The FCRA establishes the use of financing, program, and Treasury General Fund receipt accounts for loan guarantees committed and direct loans obligated after September 30, 1991.

- Financing accounts borrow funds from Treasury, make direct loan disbursements, collect fees from lenders and borrowers, pay claims on guaranteed loans, collect principal and interest from borrowers, earn interest from Treasury on any uninvested funds, and transfer excess subsidy to Treasury General Fund receipt accounts. Financing accounts are presented separately in the combined statements of budgetary resources (SBR) as non-budgetary credit reform accounts to allow for a clear distinction from all other budgetary accounts. This facilitates reconciliation of the SBR to the Budget of the United States Government.

- Program accounts receive and obligate appropriations to cover the positive subsidy cost of a direct loan or loan guarantee when the loan is approved and disburses the subsidy cost to the financing account when the loan is issued. Program accounts also receive appropriations for administrative expenses.

- Treasury General Fund receipt accounts receive amounts paid from financing accounts when there are negative subsidies for new loan disbursements or downward re-estimates of the subsidy cost of existing loans. (See Notes 12 and 13)

FSA records an obligation each year for direct loan awards to be made in a fiscal year based on estimates of schools' receipt of aid applications. FSA advances funds to schools based on these estimates. Promissory notes are signed when schools reach individual agreements with borrowers and the schools subsequently report each disbursement of advanced funds to FSA. A new promissory note is usually not required for students in the second or later year of study. Half of all loan awards are issued in the fourth quarter of the fiscal year. Loans awarded are typically disbursed in multiple installments over an academic period. As a result, loans may be disbursed over multiple fiscal years. Loan awards may not be fully disbursed due to students leaving or transferring to other schools. FSA's obligation estimate may also not reflect the actual amount of awards made. Based on historical averages, FSA expects approximately 8.2 percent of the amount obligated for new loan awards will not be disbursed.

When a loan is placed in deferment or forbearance, loan repayment is temporarily suspended with the length of postponement different for each borrower. Interest accrues while a loan is in deferment or forbearance. Loans are cancelled if a person dies, meets disability requirements,

**Notes to the Financial Statements**

or occasionally through the bankruptcy courts. Loans are also cancelled through the Public Service Loan Forgiveness (PSLF) Program, which forgives the remaining balance on a Direct Loan after 120 qualifying monthly payments are made. These payments must be made under a qualifying repayment plan while working full-time for a qualifying employer. In addition, FSA offers the Pay As You Earn (PAYE) program. This student loan repayment program is designed to help borrowers who struggle to make their normal student loan payments. The plan allows payments to be limited to 10 percent of discretionary income if qualifications are met. Under the PAYE program, if all requirements are met, forgiveness of the remaining balance of a student loan is possible after 20 years of consistent payments.

## Budgetary Resources

Budgetary resources are amounts available to enter into new obligations and to liquidate them. FSA's budgetary resources include unobligated balances of resources from prior years and new resources, which include appropriations, authority to borrow from Treasury, and spending authority from collections.

Borrowing authority is an indefinite budgetary resource authorized under the FCRA. This resource, when realized, finances the unsubsidized portion of the Direct Loan, FFEL, and other loan programs. In addition, borrowing authority is requested to cover the cost of the initial loan disbursement as well as any related negative subsidy to be transferred to Treasury General Fund receipt accounts. Treasury prescribes the terms and conditions of borrowing authority and lends to the financing account amounts as appropriate. Amounts borrowed, but not yet disbursed, are included in uninvested funds and earn interest. Treasury uses the same weighted average interest rates for both the interest charged on borrowed funds and the interest earned on uninvested funds. Treasury sets a different fixed interest rate to be used for each loan cohort once the loans are substantially disbursed. FSA may carry forward borrowing authority to future fiscal years provided that cohorts are disbursing loans. All borrowings from Treasury are effective on October 1st of the current fiscal year, regardless of when FSA borrowed the funds, except for amounts borrowed to make annual interest payments.

Authority to borrow from Treasury provides most of the funding for disbursements made under the Direct Loan program, FFEL, and other loan programs. Subsidy and administrative costs of the programs are funded by appropriations. Borrowings are repaid using collections from borrowers, fees, and interest on uninvested funds.

Unobligated balances represent the cumulative amount of budgetary resources that are not obligated and that remain available for obligation under law, unless otherwise restricted. Resources expiring at the end of the fiscal year remain available for five years, but only for upward adjustments of prior year obligations, after which they are cancelled and may not be used. Resources that have not expired at year-end are available for new obligations, as well as upward adjustments of prior-year obligations. Funds are appropriated on an annual, multi-year, or no-year basis. Appropriated funds expire on the last day of availability and are no longer available for new obligations. Amounts in expired funds are unavailable for new obligations, but may be used to adjust previously established obligations.

**Permanent Indefinite Budget Authority.** The Direct Loan, FFEL, and other loan programs have permanent indefinite budget authority through legislation. Parts B, Federal Family Education Loan Program, and D, Federal Direct Student Loan, of the HEA pertain to the existence, purpose, and availability of permanent indefinite budget authority for these programs.

**Reauthorization of Legislation.** Funds for most FSA programs are authorized, by statute, to be appropriated for a specified number of years, with an automatic one-year extension available under Section 422 of the General Education Provisions Act. Congress may continue to appropriate funds after the expiration of the statutory authorization period, effectively reauthorizing the program through the appropriations process. The current Budget of the United States Government presumes all programs continue per congressional budgeting rules. (See Note 12)

## Entity and Non-Entity Assets

Assets are classified as either entity or non-entity assets. Entity assets are those that FSA has authority to use for its operations. Non-entity assets are those held by FSA but not available for use in its operations. FSA non-entity assets are offset by liabilities to third parties and have no impact on net position. FSA combines its entity and non-entity assets on the balance sheets and discloses its non-entity assets in the notes. (See Note 2)

## Fund Balance with Treasury

The Fund Balance with Treasury includes amounts available to pay current liabilities and finance authorized purchases, as well as funds restricted until future appropriations are received. Treasury processes cash receipts and cash disbursements for FSA. FSA's records are reconciled with Treasury's records. (See Note 3)

## Accounts Receivable

Accounts receivable are amounts due to FSA from the public and other federal agencies. Receivables from the public result from overpayments to recipients of grants and other financial assistance programs, and disputed costs resulting from audits of educational assistance programs. Amounts due from federal agencies result from reimbursable agreements entered into by FSA with other agencies to provide various goods and services. Accounts receivable are reduced to net realizable value by an allowance for uncollectible amounts. The estimate of an allowance for loss on uncollectible accounts is based on FSA's experience in the collection of receivables and an analysis of the outstanding balances. (See Note 4)

## Guaranty Agencies' Federal Funds

Guaranty Agencies' Federal Funds are primarily comprised of the federal government's interest in the program assets held by state and nonprofit FFEL program guaranty agencies. Section 422A of the HEA required FFEL guaranty agencies to establish federal student loan reserve funds (federal funds). Federal funds include initial federal start-up funds, receipts of federal reinsurance payments, insurance premiums, guaranty agency share of collections on defaulted loans, investment income, administrative cost allowances, and other assets.

The balance in the Federal Fund represents consolidated reserve balances of the 23 guaranty agencies based on the Guaranty Agency financial reports that each agency submits annually to FSA. Although FSA and the guaranty agencies operate on different fiscal years, all guaranty agencies are subject to an annual audit. A year-end valuation adjustment is made to adjust FSA's balances in order to comply with federal accounting principles and disclose funds held outside of Treasury.

**Notes to the Financial Statements**

Guaranty Agencies' Federal Funds are classified as non-entity assets with the public and are offset by a corresponding liability due to Treasury. The federal funds are held by the guaranty agencies but can only be used for certain specified purposes listed in FSA's regulations. The federal funds are the property of the U.S. and are reflected in the *Budget of the United States Government*. Payments made to the FSA from guaranty agencies' federal funds through a statutory recall or agency closures represent capital transfers and are returned to Treasury's General Fund. (See Notes 2, 4, and 9)

### Credit Program Receivables, Net and Liabilities for Loan Guarantees

The financial statements reflect FSA's estimate of the long-term subsidy cost of direct and guaranteed loans in accordance with the FCRA. Loans and interest receivable are valued at their gross amounts less an allowance for the present value of amounts not expected to be recovered and thus having to be subsidized—called an "allowance for subsidy." The difference between the gross amount and the allowance for subsidy is the present value of the cash flows to, and from, FSA that are expected from receivables over their projected lives. Similarly, liabilities for loan guarantees are valued at the present value of the cash outflows from FSA less the present value of related inflows. The estimated present value of net long-term cash outflows of FSA for subsidized costs is net of recoveries, interest supplements, and offsetting fees.

The liability for loan guarantees presents the net present value of all future cash flows from currently insured FFEL loans, including claim payments, interest assistance, allowance payments, and recoveries from assigned loans. Guaranteed loans that default are initially turned over to guaranty agencies for collection. Defaulted FFEL loans are accounted for as assets and reported at their net present value, similar to direct loans, although they are legally not direct student loans. Credit program receivables, net includes defaulted FFEL loans owned by FSA and held by FSA or guaranty agencies. In most cases, after approximately four years, defaulted guaranteed loans not in repayment are turned over by the guaranty agencies to FSA for collection.

FFEL program receivables include purchased loans and other interests acquired under an expired program. The cash flows related to these receivables include collections on purchased loans and other activities, including transfers of re-estimated subsidy. The cash flows of these authorities also include inflows and outflows associated with the underlying or purchased loans and other related activities, including any positive or negative subsidy transfers.

Capitalization of interest occurs as a result of various initiatives such as loan consolidations. As a result, interest receivable is reduced and loan principal is increased. (See Note 5)

### Property and Equipment, Net and Leases

FSA has very limited acquisition costs associated with buildings, furniture, and equipment as all federal and contractor staff are housed in leased buildings. The Department and FSA also lease information technology and telecommunications equipment, as part of a contractor-owned, contractor-operated services contract. Lease payments associated with this equipment have been determined to be operating leases and, as such, are expensed as incurred. The noncancellable lease term is one year, with the Department holding the right to extend the lease term by exercising additional one-year options. (See Note 4)

## Liabilities

Liabilities represent actual and estimated amounts to be paid as a result of transactions or events that have already occurred.

- Liabilities are classified as covered by budgetary resources if budgetary resources are available to pay them. Credit program liabilities funded by permanent indefinite appropriations are also considered covered by budgetary resources.

- Liabilities are classified as not covered by budgetary resources when congressional action is needed before they can be paid. Although future appropriations to fund these liabilities are likely, it is not certain that appropriations will be enacted to fund these liabilities.

- Liabilities not requiring appropriated budgetary resources include those related to deposit funds, Subsidy Due to Treasury General Fund for Future Liquidating Account Collections (pre-1992 loan guarantee programs), and Federal Perkins Loan Program balances due to be repaid to the Treasury General Fund (See Note 6).

## Debt

FSA borrows from Treasury to provide funding for the Direct Loan, FFEL, and other credit programs for higher education. The liability to Treasury from borrowings represents unpaid principal at year-end. FSA repays the principal based on available fund balances. Interest rates are based on the corresponding rate for 10-year Treasury securities and are set for those borrowings supporting each cohort of loans once the loans for that cohort are substantially disbursed. Interest is paid to Treasury on September 30th. (See Note 7)

## Subsidy Due to Treasury General Fund

FSA must transfer to the Treasury General Fund all excess funding resulting from downward re-estimates of credit program loans that are subject to FCRA requirements. This excess funding is included in the liability for subsidy due to Treasury and will be transferred to Treasury in the succeeding fiscal year upon receipt of authority from OMB. Subsidy due to Treasury also includes future liquidating account collections (estimated collections in excess of estimated outlays) for FSA's pre-1992 FFEL and HEAL loans that, when collected, will also be transferred to the Treasury General Fund. (See Note 8)

## Accounts Payable

Accounts payable include amounts owed by FSA for goods and services received from other entities and scheduled payments transmitted but not yet processed. Accounts payable to the public primarily consists of in-process grant and loan disbursements, including an accrued liability for schools that have disbursed loans prior to requesting funds. (See Note 9)

**Notes to the Financial Statements**

## Accrued Grant Liability

Some grant recipients incur allowable expenditures as of the end of an accounting period but have not been reimbursed by FSA. FSA accrues a liability for these allowable expenditures. The amount is estimated using statistical sampling of unliquidated balances. (See Note 9)

## Personnel Compensation and Other Employee Benefits

**Annual, Sick, and Other Leave.** The liability for annual leave, compensatory time off, and other vested leave is accrued when earned and reduced when taken. Each year, the accrued annual leave account balance is adjusted to reflect current pay rates. Sick leave and other types of nonvested leave are expensed as taken. Annual leave earned but not taken, within established limits, is funded from future financing sources.

**Retirement Plans and Other Retirement Benefits.** Employees participate in either the Civil Service Retirement System (CSRS), a defined benefit plan, or the Federal Employees Retirement System (FERS), a defined benefit and contribution plan. For CSRS employees, FSA contributes a fixed percentage of pay.

FERS consists of Social Security, a basic annuity plan, and the Thrift Savings Plan. FSA and the employee contribute to Social Security and the basic annuity plan at rates prescribed by law. In addition, FSA is required to contribute to the Thrift Savings Plan a minimum of 1 percent per year of the basic pay of employees covered by this system, match voluntary employee contributions up to 3 percent of the employee's basic pay, and match one-half of contributions between 3 percent and 5 percent of the employee's basic pay. For FERS employees, FSA also contributes the employer's share of Medicare.

Contributions for CSRS, FERS, and other retirement benefits are insufficient to fund the programs fully and are subsidized by the Office of Personnel Management (OPM). The Department imputes its share of the OPM subsidy, using cost factors provided by OPM, and reports the full cost of the programs related to its employees in FSA's Statements of Net Cost. These OPM imputed costs are offset by imputed financing sources from costs absorbed by others in FSA's Statements of Changes in Net Position.

**Federal Employees' Compensation Act.** The *Federal Employees' Compensation Act* (FECA) (Pub. L. 103-3) provides income and medical cost protection to covered federal civilian employees injured on the job, to employees who have incurred work-related occupational diseases, and to beneficiaries of employees whose deaths are attributable to job-related injuries or occupational diseases. The FECA program is administered by the U.S. Department of Labor (DOL), which pays valid claims and subsequently seeks reimbursement from FSA for these paid claims.

The FECA liability consists of two elements. The first element, accrued FECA liability, is based on claims paid by DOL but not yet reimbursed by FSA. FSA reimburses DOL for claims as funds are appropriated for this purpose. In general, there is a two- to three-year period between payment by DOL and reimbursement to DOL by FSA. As a result, FSA recognizes an intragovernmental liability, not covered by budgetary resources, for the claims paid by DOL that will be reimbursed by FSA.

The second element, actuarial FECA liability, is the estimated liability for future benefit payments and is recorded as a liability with the public, not covered by budgetary resources. The actuarial FECA liability includes the expected liability for death, disability, medical, and miscellaneous costs for approved compensation cases. DOL determines the actuarial FECA liability annually, as of September 30th, using an actuarial method that considers historical benefit payment patterns, wage inflation factors, medical inflation factors, and other variables. The projected annual benefit payments are discounted to present value. (See Notes 6 and 9)

## Imputed Costs

Services are received from other federal entities at no cost or at a cost less than the full cost to FSA. Consistent with accounting standards, certain costs of the providing entity that are not fully reimbursed by FSA are recognized as imputed cost in the Statements of Net Cost and are offset by imputed revenue in the Statements of Changes in Net Position. Such imputed costs and revenues relate to employee benefits. However, unreimbursed costs of services other than those related to employee benefits are not included in FSA's financial statements.

## Net Cost of Operations

Net cost consists of gross costs and earned revenue. Major components of FSA's net costs include credit program subsidy expense, credit program interest revenue and expense, and grant expenses. Administrative overhead costs are allocated to loan and non-credit programs based on number of applications processed, number of loans serviced, dollar amount of loan originations, cost of school compliance actions, and the cost to collect defaulted loans. (See Note 10)

>**Credit Program Subsidy Expense.** Subsidy expense is an estimate of the present value cost of providing loans, excluding the administrative costs of issuing and servicing the loans. In order to estimate subsidy expense, FSA must project lifetime cash flows associated with loans disbursed in a specific fiscal year (i.e., the loan cohort). FSA projects these lifetime cash flows using a set of econometric and financial models, as well as cash flow models. FSA estimates subsidy expenses annually for new loans disbursed in the current year; updates the previous cost estimates for outstanding loans disbursed in prior years (subsidy re-estimates); and updates previous cost estimates based on changes to terms of existing loans (loan modifications). Loan modifications include actions resulting from new legislation or from the exercise of administrative discretion under existing law, which directly or indirectly alters the estimated subsidy cost of outstanding direct loans (or direct loan obligations). (See Notes 5 and 10)

>**Credit Program Interest Revenue and Expense.** FSA recognizes interest revenue from the public when interest is accrued on Direct Loan program loans, defaulted and acquired FFEL loans, and outstanding principal for other loan programs. Interest due from borrowers is accrued at least monthly and is satisfied upon collection or capitalization into the loan principal. Federal interest revenue is recognized on the unused fund balances with Treasury in the financing accounts.

>Federal interest expense is recognized monthly on the outstanding borrowing from Treasury (debt) used to finance direct loan and loan guarantee programs. Accrued interest to Treasury is paid on September 30th. The interest rate for federal interest expense is the same as the rate used for federal interest revenue.

Interest expense equals interest revenue plus administrative fees accrued for all credit programs due to subsidy amortization. Subsidy amortization is required by the FCRA and accounts for the difference between interest expense and revenue cash flows. For direct loans, the allowance for subsidy is adjusted with the offset to interest revenue. For guaranteed loans, the liability for loan guarantees is adjusted with the offset to interest expense. (See Note 10)

## Net Position

Net position consists of unexpended appropriations and cumulative results of operations. Unexpended appropriations include undelivered orders and unobligated balances, except for federal credit financing and liquidating funds and trust funds. Cumulative results of operations represent the net difference since inception between (1) expenses and (2) revenues and financing sources.

## Taxes

FSA is a Federal entity and is not subject to Federal, state, or local taxes. Therefore, no provision for income taxes is recorded.

## Use of Estimates

FSA and Department management are required to make certain estimates while preparing consolidated financial statements in conformity with GAAP. These estimates are reflected in the assets, liabilities, net cost, and net position of the financial statements and may differ from actual results. FSA's estimates are based on management's best knowledge of current events, historical experiences, and other assumptions that are believed to be reasonable under the circumstances. Significant estimates reported on the financial statements include: allocation of administrative overhead costs; allowance for subsidy and subsidy expense for direct, defaulted guaranteed and acquired loans; the liability for loan guarantees; and grant liability and advance accruals. (See Notes 4, 5, 9, and 10)

FSA's estimates for credit reform programs are calculated using a series of assumption models that are updated using a statistically valid sample of National Student Loan Data System (NSLDS®) data, data from the Debt Management and Collection System (DMCS), and economic assumptions provided by the Office of Management and Budget. Actual results may differ from those assumptions and estimates. Differences between actual results and these estimates may occur in the valuation of credit program receivables and liabilities for loan guarantees under guidelines in the FCRA. FSA recognizes the sensitivity of credit reform modeling. Slight changes in modeling methodology or data used to derive assumptions can produce largely varied results. FSA therefore continually reviews its model factors and statistical modeling techniques to reflect the most accurate credit program costs possible in its annual financial statements. FSA updates its assumption models in accordance with its model update plan, which takes into consideration statutory or new program requirements, major changes to the model structure or methodology, and data updates. This level of granularity in the modeling methodology is essential to the financial reporting and budgeting processes so that FSA can forecast the costs of various program options when making policy decisions. (See Note 5)

## Reclassifications

The following reclassifications were made to the prior year financial statements and notes to conform to the current year presentation. These changes had no effect on total assets, liabilities and net position, net cost of operations, or budgetary resources.

- The FY 2019 Outlays, Net line of Combined Statements of Budgetary Resources was reclassified to present net disbursements associated with credit financing accounts on a separate Disbursements, Net line to conform to FY 2020 changes in OMB Circular A-136.

- Note 13, Reconciliation of Net Cost to Net Outlays, was reclassified to exclude the credit financing account net disbursement amount that was reclassified on the Combined Statements of Budgetary Resources to conform to FY 2020 changes in OMB Circular A-136.

# Note 2. Non-Entity Assets

**Non-Entity Assets**
**(Dollars in Millions)**

|  | 2020 | | 2019 | |
|---|---|---|---|---|
|  | Intragovernmental | With the Public | Intragovernmental | With the Public |
| **Non-Entity Assets** | | | | |
| Credit Program Receivables, Net | $ - | $ 633 | $ - | $ 607 |
| Other Assets | | | | |
| Guaranty Agencies' Federal Funds | - | 1,943 | - | 1,956 |
| Accounts Receivable, Net | - | - | - | 41 |
| **Total Non-Entity Assets** | - | 2,576 | - | 2,604 |
| Entity Assets | 70,267 | 1,169,208 | 62,574 | 1,201,698 |
| **Total Assets** | $ 70,267 | $ 1,171,784 | $ 62,574 | $ 1,204,302 |

FSA's FY 2020 assets are predominantly entity assets (99.8 percent), leaving the small portion of assets remaining as non-entity assets. Non-entity assets with the public primarily consist of guaranty agency reserves (75.4 percent), reported as Guaranty Agencies' Federal Funds, and Federal Perkins Loan program loan receivables (24.6 percent), reported as credit program receivables, net. The corresponding liabilities for these non-entity assets are reflected in various accounts, including intragovernmental accounts payable, Guaranty Agencies' Federal Funds due to Treasury, and other liabilities (See Note 9).

# Note 3. Fund Balance with Treasury

**Fund Balance**
(Dollars in Millions)

| Status of Funds | | 2020 | | 2019 |
|---|---|---|---|---|
| Unobligated Balance | | | | |
| Available | $ | 13,386 | $ | 11,361 |
| Unavailable | | 23,594 | | 18,984 |
| Obligated Balance, Not Disbursed | | 81,054 | | 87,678 |
| Authority Temporarily Precluded from Obligation | | – | | 1 |
| Borrowing Authority Not Yet Converted to Fund Balance with Treasury (Note 11) | | (47,768) | | (55,457) |
| **Total Fund Balance with Treasury** | $ | **70,266** | $ | **62,567** |

Available unobligated balances represent amounts that are apportioned for obligation in the current fiscal year. Unavailable unobligated balances represent amounts that are not apportioned for obligation during the current fiscal year and expired appropriations no longer available to incur new obligations. Total unavailable unobligated balance ($23.6 billion) differs from unapportioned and expired amounts on the SBR ($25.5 billion) due to the Guaranty Agencies' Federal Funds ($1.9 billion).

In both FY 2020 and FY 2019, $25 million of unused funds from canceled appropriations were returned to Treasury. Such balances are excluded from the amount reported as Fund Balance with Treasury in accordance with Treasury guidelines (See Note 12).

# Note 4. Other Assets

**Other Assets**
(Dollars in Millions)

| | 2020 | | 2019 | |
|---|---|---|---|---|
| | Intragovernmental | With the Public | Intragovernmental | With the Public |
| Guaranty Agencies' Federal Funds | $ – | $ 1,943 | $ – | $ 1,956 |
| Accounts Receivable, Net | | 191 | | 209 |
| Advances | – | 30 | 7 | 33 |
| Property and Equipment, Net | – | 5 | – | 6 |
| Other | 1 | 1 | – | 6 |
| **Total Other Assets** | $ 1 | $ 2,170 | $ 7 | $ 2,210 |

Changes in property and equipment balances for the current year were as follows.

**Property and Equipment**
(Dollars in Millions)

| | 2020 | | |
|---|---|---|---|
| | Acquisition Value | Accumulated Depreciation | Net |
| Balance Beginning of the Year | $ 130 | $ (124) | $ 6 |
| Dispositions | (2) | 1 | (1) |
| **Balance At End of Year** | $ **128** | $ **(123)** | $ **5** |

## Note 5. Credit Programs for Higher Education: Credit Program Receivables, Net and Liabilities for Loan Guarantees

**Credit Program Receivables, Net**
(Dollars in Millions)

|  | Principal | Accrued Interest | Allowance for Subsidy | Net |
|---|---|---|---|---|
| **2020** | | | | |
| Direct Loan Program | $ 1,224,816 | $ 92,132 | $ (216,404) | $ 1,100,544 |
| FFEL Program | 84,765 | 24,110 | (41,495) | 67,380 |
| Other Credit Programs for Higher Education | 1,775 | 319 | (404) | 1,690 |
| **Total Credit Program Receivables** | **$ 1,311,356** | **$ 116,561** | **$ (258,303)** | **$ 1,169,614** |
| **2019** | | | | |
| Direct Loan Program | $ 1,164,883 | $ 83,262 | $ (124,438) | $ 1,123,707 |
| FFEL Program | 90,218 | 22,267 | (35,718) | 76,767 |
| Other Credit Programs for Higher Education | 1,692 | 367 | (441) | 1,618 |
| **Total Credit Program Receivables** | **$ 1,256,793** | **$ 105,896** | **$ (160,597)** | **$ 1,202,092** |

The federal student loan programs provide students and their families with the funds to help meet postsecondary education costs. Funding for these programs is provided through permanent indefinite budget authority. The emergency relief measures provided by Congress and the Administration in response to the coronavirus pandemic were recorded as loan modifications and are described in each of the programs below. Per OMB guidance, loan modifications were calculated using the FY 2020 President's Budget formulation discount rates. The net loans receivable or the value of assets related to direct loans is not the same as expected proceeds from selling the loans.

What follows is additional analysis of the activity, costs, and adjustments for each of the loan programs.

**Direct Loan Program.** The federal government makes loans directly to students and parents through participating institutions of higher education under the Direct Loan program. Direct Loans are originated and serviced through contracts with private vendors.

Direct Loan program loan receivables include defaulted and nondefaulted loans owned and held by FSA. Of the $1,317.0 billion in gross loan receivables, as of September 30, 2020, $100.3 billion (7.6 percent) in loan principal was in default and had been transferred to FSA's defaulted loan servicer, compared to $99.7 billion (8.0 percent) as of September 30, 2019.

**Direct Loan Program Loan Disbursements by Loan Type**
(Dollars in Millions)

|  | 2020 | 2019 |
|---|---|---|
| Stafford | 19,126 | $ 19,984 |
| Unsubsidized Stafford | 46,077 | 48,142 |
| PLUS | 21,735 | 22,709 |
| Consolidation | 30,427 | 39,829 |
| **Total Disbursements** | **$ 117,365** | **$ 130,664** |

**Notes to the Financial Statements**

The allocation of disbursements for the first three loan types is estimated based on historical trend information.

Student and parent borrowers may prepay existing loans without penalty through a new consolidation loan. Under the FCRA and requirements provided by OMB regulations, the retirement of direct loans being consolidated is considered a collection of principal and interest. This receipt is offset by the disbursement related to the newly created consolidation loan. Underlying direct or guaranteed loans, performing or nonperforming, are paid off in their original cohort; new consolidation loans are originated in the cohort in which the new consolidation loan was obligated. Consolidation activity is taken into consideration in establishing subsidy rates for defaults and other cash flows. The cost of new consolidations is included in subsidy expense for the current-year cohort; the effect of prepayments on existing loans could contribute to re-estimates of prior cohort subsidy costs. The net receivables include estimates of future prepayments of existing loans through consolidations; they do not reflect subsidy costs associated with anticipated future consolidation loans.

Direct loan consolidations were $30.4 billion during FY 2020 and $39.8 billion during FY 2019. The effect of the early payoff of the existing loans—those being consolidated—is recognized in the future projected cash flows associated with that cohort.

**Direct Loan Program Interest Expense and Revenues** (See Note 10)
(Dollars in Millions)

|  | | 2020 | | 2019 |
|---|---|---|---|---|
| Interest Expense on Treasury Borrowing | $ | 34,705 | $ | 33,817 |
| **Total Interest Expense** | **$** | **34,705** | **$** | **33,817** |
| Interest Revenue from the Public | | 28,161 | | 59,815 |
| Interest Revenue on Uninvested Funds | | 4,786 | | 4,082 |
| Administrative Fees | | 163 | | 210 |
| Amortization of Subsidy | | 1,595 | | (30,290) |
| **Total Revenues** | **$** | **34,705** | **$** | **33,817** |

**Direct Loan Program Subsidy Expense**
**(Dollars in Millions)**

| | 2020 | 2019 |
|---|---|---|
| **Subsidy Expense for Direct Loans Disbursed in the Current Year** | | |
| Interest Rate Differential | $ 19,022 | $ 11,440 |
| Defaults, Net of Recoveries | 1,925 | 1,862 |
| Fees | (1,676) | (1,720) |
| Other | (14,131) | (14,563) |
| **Total Subsidy Expense for Direct Loans Disbursed in the Current Year** | **5,140** | **(2,981)** |
| **Modifications and Re-estimates** | | |
| Loan Modifications | | |
| Modification Adjustment Transfer Gain | (265) | - |
| Modification Adjustment Transfer Loss | 347 | - |
| Loan Modifications | 39,576 | - |
| **Total Loan Modifications** | **39,658** | **-** |
| Net Upward Subsidy Re-estimates | | |
| Interest Rate Re-estimates | (967) | (981) |
| Technical and Default Re-estimates | 57,077 | 65,472 |
| **Total Net Upward Subsidy Re-estimates** | **56,110** | **64,491** |
| **Total Modifications and Re-estimates** | 95,768 | 64,491 |
| **Direct Loan Subsidy Expense** | $ **100,908** | $ **61,510** |

**Notes to the Financial Statements**

**Subsidy Expense for Direct Loans Disbursed in the Current Year.** The two major components of the total subsidy expense for direct loans disbursed in the current year (subsidy transfers) are Interest Rate Differential and Other Components. Interest rate differential is attributable to the difference between the borrowers' interest payments due to FSA and the FSA's estimated cost to finance the direct loan on a present value basis. The Other Components of subsidy transfers primarily consists of contract collection costs, program review collections, fees, and loan forgiveness.

**Loan Modifications.** Loan modifications for the Direct Loan program for FY 2020 included the following:

- CARES Act. The CARES Act automatically suspended principal and interest payments and set interest rates to 0 percent on federally held student loans starting in March through September 30, 2020. The relief for borrowers resulted in an upward modification cost of $24.6 billion, with an additional $459 million for cancelled loans for students that did not complete the semester due to a qualifying emergency. There was a net positive $82 million modification adjustment transfer associated with this modification bringing, the total to $25.0 billion.

- Presidential Memorandum ("Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic"). On August 8, 2020, the Administration issued a Presidential Memorandum that continued the temporary suspension of payments and the waiver of all interest on federally held student loans through December 31, 2020. The relief for borrowers resulted in an upward modification cost of $13.5 billion. There was a net negative $66 million modification adjustment transfer associated with this modification, bringing, the total to $13.6 billion.

- Total and Permanent Disability. FSA recorded an upward modification for costs associated with the regulatory action to provide proactive discharge (unless the borrower elects to reject the discharge) to borrowers for whom the Department of Veterans Affairs provides information showing the borrower has a total and permanent disability. These discharges resulted in an upward modification cost of $1.0 billion. There was a net negative $98 million modification adjustment transfer associated with this modification, bringing, the total to $1.1 billion.

**Net Upward Subsidy Re-estimates for All Prior Year Loan Cohorts.** The Direct Loan program subsidy re-estimate increased subsidy expense in FY 2020 by $56.1 billion. Re-estimated costs only include cohorts that are 90 percent disbursed (i.e., cohort years 1994–2019). The re-estimate reflects the assumption updates and other changes described below.

In addition to the major assumption updates described below, the re-estimate reflects several other assumption updates, including interest rates provided by OMB, loan volume, and contract collection costs.

- IDR Model Changes (including PSLF). FSA completed a standard IDR data update to reflect the immediate prior cycle for defaults, prepayments and Death, Disability, & Bankruptcy (DDB). The DDB update includes adjustments for the Total Permanent Disability for Veterans regulation. In addition, an existing borrower income file was

calibrated using an additional year of IDR application data through 2018. The additional year of borrower income data taken from IDR applications has been substantially lower than projected. As such, FSA reduced its projections of future borrower income by 35%, increasing costs associated with IDR. FSA also analyzed the actual PSLF approval rates and supplementary data. As a result of that analysis, the PSLF approval rate was adjusted downward for initial cohorts to better reflect the actual data. Trends indicate that there has been some improvement in PSLF approval rates over time as borrowers better understand the application process. PSLF estimates were revised to reflect the most recent borrower behavior and adjust the temporal element to ramp up PSLF forgiveness over time. The combined effect of these updates led to a net upward re-estimate of $35.5 billion.

- Repayment Plans. FSA updated the data and made an adjustment to exclude special consolidation of FFEL loans in FY 2012 and FY 2013 from the model. These loans are modeled separately and were less likely to enroll in income dependent repayment plans than typical consolidation loans. The combined effect of these changes led to a net upward re-estimate of $6.5 billion.

- Default. In addition to the adjustments for the CARES Act, FSA updated the data and incorporated actual unemployment rates from the Bureau of Labor Statistics through June 2020. The combined effect of these changes led to a net upward re-estimate of $1.8 billion.

- 2019 Cohort Assumption Changes. The technical re-estimate cannot reflect the impacts of certain assumption changes applicable to the current year loan cohort until the following fiscal year per OMB guidance. The current year's re-estimate includes a net upward adjustment of $4.8 billion for these current year assumption changes attributable to the FY 2019 cohort.

- Interest on the Re-estimate. Interest on re-estimates is the amount of interest that would have been earned or paid by each cohort on the subsidy re-estimate, if the re-estimated subsidy had been included as part of the original subsidy estimate. The interest on the re-estimate calculated on the overall subsidy re-estimate resulted in a net upward re-estimate of $5.9 billion.

- Interactive Effects. The re-estimate includes a net upward re-estimate of $1.5 billion attributed to the interactive effects of the assumption changes described above. Each assumption described above is run independently. The interactive effect is a result of combining all assumptions together to calculate the final re-estimate.

**Direct Loan Subsidy Rates—Cohort 2020**

| | Interest Differential | Defaults | Fees | Other | Total |
|---|---|---|---|---|---|
| Stafford | 25.47% | 2.61% | -1.06% | -12.99% | 14.03% |
| Unsubsidized Stafford | 19.27% | 2.28% | -1.06% | -19.74% | 0.75% |
| PLUS | 8.16% | 1.46% | -4.24% | -18.63% | -13.25% |
| Consolidation | 14.70% | 1.16% | 0.00% | 4.88% | 20.74% |
| Weighted Average Total | 17.01% | 1.88% | -1.33% | -11.66% | 5.90% |

*The Other component reflects costs associated with loan cancellations and the interactive effects of payment plans on the components of subsidy.

The subsidy rates disclosed pertain only to the current year's cohorts. These rates cannot be applied to the direct loans disbursed during the current reporting year to yield the subsidy expense. The subsidy expense for new loans reported in the current year could result from disbursements of loans from both current year cohorts and prior years cohorts. The subsidy expense reported in the current year also includes modifications and re-estimates. The subsidy costs of FSA's student loan programs, especially the Direct Loan program, are highly sensitive to changes in actual and forecasted interest rates. The formulas for determining program interest rates are established by statute; the existing loan portfolio has a mixture of borrower and lender rate formulas. Interest rate projections are based on probabilistic interest rate scenario inputs developed and provided by OMB.

**Direct Loan Program Reconciliation of Allowance for Subsidy**
(Dollars in Millions)

| | 2020 | 2019 |
|---|---|---|
| Beginning Balance of Allowance for Subsidy | $ 124,438 | $ 40,663 |
| Total Subsidy Expense for Direct Loans Disbursed in the Current Year | 5,140 | (2,981) |
| **Adjustments** | | |
| Loan Modifications | 39,658 | - |
| Fees Received | 1,609 | 1,693 |
| Loans Written Off | (7,833) | (9,096) |
| Subsidy Allowance Amortization | (1,595) | 30,290 |
| Other Activities | (1,123) | (622) |
| Ending Balance of Allowance for Subsidy Before Re-estimates | 160,294 | 59,947 |
| Net Upward Subsidy Re-estimates | 56,110 | 64,491 |
| Ending Balance of Allowance for Subsidy | $ 216,404 | $ 124,438 |

The estimation process used to determine the amount of positive or negative subsidy expense each fiscal year, and subsequently the cumulative taxpayer cost of the program (allowance for subsidy), is subject to various external risk factors which often show strong interdependence with one another. These risks include uncertainty about changes in the general economy, changes in the legislative and regulatory environment, and changing trends in borrower performance with regard to contractual cash flows within the loan programs.

Due to the complexity of the Direct Loan program, there is inherent projection risk in the process used for estimating long-term program costs. As stated, some uncertainty stems from potential changes in student loan legislation and regulations because these changes may fundamentally alter the cost structure of the program. Operational and policy shifts may also affect program costs by causing significant changes in borrower repayment timing. Actual performance may deviate from estimated performance, which is not unexpected given the long-term nature of these loans (cash flows may be estimated up to 40 years), and the multitude of projection paths and possible outcomes. The high percentage of borrowers in Income Driven Repayment Plans has made projection of borrower incomes a key input for the estimation process. This uncertainty is directly tied to the macroeconomic climate and is another inherent program element that displays the interrelated risks facing the Direct Loan program.

Loans written off result from borrowers having died, becoming disabled, or declaring bankruptcy. The interest rate re-estimate reflects the cost of finalizing the Treasury borrowing rate to be used for borrowings received to fund the disbursed portion of the loan awards obligated.

**Federal Family Education Loan Program.** FFEL was established in fiscal year 1965, and is a guaranteed loan program. As a result of the *SAFRA Act*, no new FFEL loans have been made since July 1, 2010. Federal guarantees on FFEL program loans and commitments remain in effect for loans made before July 1, 2010, unless they were sold to FSA through an ECASLA authority (acquired FFEL loans), consolidated into a direct loan, or otherwise satisfied, discharged, or cancelled.

**FFEL Guaranteed Loans Outstanding**
(Dollars in Billions)

|  | 2020 |
|---|---|
| Outstanding Principal of Guaranteed Loans, Face Value | $    128.9 |
| Amount of Outstanding Principal Guaranteed | $    128.9 |

As of September 30, 2020, the total principal value of guaranteed loans outstanding and the amount of that principal which is guaranteed is approximately $128.9 billion.

Additionally, the FFEL program guarantees outstanding interest balances. As of September 30, 2020, the interest balances outstanding for guaranteed loans held by lenders was approximately $4.6 billion.

FSA's total FFEL program guarantees (principal and interest) are approximately $133.5 billion as of September 30, 2020. Of the total guaranteed amount, FSA would expect to pay a smaller amount to the guaranty agencies. The guarantee rates range from 75 to 100 percent of the principal and interest balance depending on the type of claim, when the loan was made, and the guaranty agency's claim experience. For purposes of disclosing FSA's total risk exposure for FFEL guarantees, the highest reimbursement rate of 100 percent is assumed.

Defaulted and acquired FFEL loans are accounted for as assets as shown in the following table.

## FFEL Program Loan Receivables
**(Dollars in Millions)**

| | Principal | Accrued Interest | Allowance for Subsidy (Present Value) | Net |
|---|---|---|---|---|
| **2020** | | | | |
| **DEFAULTED FFEL GUARANTEED LOANS** | | | | |
| FFEL GSL Program (Pre-1992) | $ 3,627 | $ 5,809 | $ (8,249) | $ 1,187 |
| FFEL GSL Program (Post-1991) | 33,057 | 9,121 | (22,286) | 19,892 |
| Total Defaulted FFEL Guaranteed Loans | 36,684 | 14,930 | (30,535) | 21,079 |
| **ACQUIRED FFEL LOANS** | | | | |
| Loan Purchase Commitment | 16,009 | 2,797 | (4,102) | 14,704 |
| Loan Participation Purchase | 30,683 | 6,005 | (6,424) | 30,264 |
| ABCP Conduit | 1,389 | 378 | (434) | 1,333 |
| Total Acquired FFEL Loans | 48,081 | 9,180 | (10,960) | 46,301 |
| **FFEL Program Loan Receivables** | $ 84,765 | $ 24,110 | $ (41,495) | $ 67,380 |
| **2019** | | | | |
| **DEFAULTED FFEL GUARANTEED LOANS** | | | | |
| FFEL GSL Program (Pre-1992) | $ 3,729 | $ 5,858 | $ (8,776) | $ 811 |
| FFEL GSL Program (Post-1991) | 33,780 | 8,561 | (20,113) | 22,228 |
| Total Defaulted FFEL Guaranteed Loans | 37,509 | 14,419 | (28,889) | 23,039 |
| **ACQUIRED FFEL LOANS** | | | | |
| Loan Purchase Commitment | 17,536 | 2,519 | (2,531) | 17,524 |
| Loan Participation Purchase | 33,696 | 4,983 | (3,843) | 34,836 |
| ABCP Conduit | 1,477 | 346 | (455) | 1,368 |
| Total Acquired FFEL Loans | 52,709 | 7,848 | (6,829) | 53,728 |
| **FFEL Program Loan Receivables** | $ 90,218 | $ 22,267 | $ (35,718) | $ 76,767 |

## FFEL Program Subsidy Expense
**(Dollars in Millions)**

|  | 2020 | 2019 |
|---|---:|---:|
| **Loan Modification Costs** | | |
| FFEL Guaranteed Loan Program | | |
| Net Modification Adjustment Transfer (Gain) Loss | $ (9) | $ - |
| Loan Modifications | 835 | - |
| Total FFEL Guaranteed Loan Program Loan Modifications | 826 | - |
| Loan Purchase Commitment | | |
| Net Modification Adjustment Transfer (Gain) Loss | (7) | - |
| Loan Modifications | 958 | - |
| Total Loan Purchase Commitment Loan Modifications | 951 | - |
| Loan Participation Purchase | | |
| Net Modification Adjustment Transfer (Gain) Loss | (10) | - |
| Loan Modifications | 1,658 | - |
| Total Loan Participation Purchase Loan Modifications | 1,648 | - |
| **Total Loan Modification Costs** | 3,425 | - |
| **Upward/(Downward) Subsidy Re-estimates** | | |
| FFEL Loan Guarantee Program | (3,451) | 6,866 |
| Loan Purchase Commitment | 802 | 2,144 |
| Loan Participation Purchase | 1,376 | 3,644 |
| **Total FFEL Program Subsidy Re-estimates** | (1,273) | 12,654 |
| **FFEL Program Subsidy Expense** | $ 2,152 | $ 12,654 |

**Loan Modifications.** Loan modifications for the FFEL Loan program for FY 2020 included the following:

- CARES Act. The CARES Act automatically suspended principal and interest payments and set interest rates to 0 percent on federally held student loans, including loans purchased under ECASLA, starting in March through September 30, 2020. The relief for borrowers resulted in a net upward modification cost of $1,755 million that included a positive modification transfer of $15 million.

- Presidential Memorandum ("Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic"). On August 8, 2020, the Administration issued a Presidential Memorandum that continued the temporary suspension of payments and the waiver of all interest on federally held student loans through December 31, 2020. The relief for borrowers resulted in an upward modification cost of $1,051 million that included a positive modification transfer of $9 million.

- Secretary's Discretion. FSA extended certain provisions of the student loan deferrals not covered by the CARES Act to defaulted guaranteed loans held by FSA, resulting in an upward modification cost of $492 million that included a positive modification adjustment transfer of $4 million.

- Total and Permanent Disability. FSA recorded an upward modification for costs associated with the regulatory action to provide proactive discharge (unless the borrower elects to reject the discharge) to borrowers for whom the Department of Veterans Affairs provides information showing the borrower has a total and permanent disability. These discharges resulted in an upward modification cost of $127 million across the FFEL and ECASLA programs.

**Notes to the Financial Statements**

**Net Downward Subsidy Re-estimates.** The FFEL subsidy re-estimate decreased subsidy expense in FY 2020 by $1.3 billion. The net downward re-estimates in these programs were due primarily to interest rates provided by OMB used in the calculation of special allowance payments, updated disability discharges, and prepayment rates.

**FFEL Program Reconciliation of Liabilities for Loan Guarantees**
(Dollars in Millions)

| | 2020 | | 2019 | |
|---|---|---|---|---|
| Beginning Balance of Post-1991 FFEL Loan Guarantee Liability | $ | 5,205 | $ | 2,591 |
| Adjustments | | | | |
| Loan Modifications | | 826 | | - |
| Interest Supplements Paid | | (757) | | (1,332) |
| Claim Payments to Lenders | | (4,285) | | (5,583) |
| Fees Received | | 1,215 | | 1,385 |
| Interest on Accumulation on the Liability Balance | | (1,064) | | (1,096) |
| Other Activities | | 3,195 | | 2,374 |
| Net Upward/(Downward) Subsidy Re-estimates | | (3,451) | | 6,866 |
| Ending Balance of Post-1991 FFEL Loan Guarantee Liability | | 884 | | 5,205 |
| Pre-1992 FFEL Liquidating Account Liability for Loan Guarantees | | 1 | | 1 |
| FFEL Liabilities for Loan Guarantees | $ | 885 | $ | 5,206 |

Liabilities for Loan Guarantees is included as a component of other liabilities on the balance sheet (See Note 9).

Other activity includes negative special allowance collections, collections on defaulted FFEL loans, guaranty agency expenses, and loan cancellations due to death, disability, or bankruptcy.

## Allowance for Subsidy Reconciliation for Acquired FFEL Loans
(Dollars in Millions)

| | Loan Purchase Commitment | | Loan Participation Purchase | | ABCP Conduit | | Total | |
|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | |
| Beginning Balance of Allowance for Subsidy | $ | 2,531 | $ | 3,843 | $ | 455 | $ | 6,829 |
| **Adjustments** | | | | | | | | |
| Loan Modifications | | 951 | | 1,648 | | - | | 2,599 |
| Subsidy Allowance Amortization | | 3 | | (89) | | - | | (86) |
| Loans Written Off | | (140) | | (271) | | (16) | | (427) |
| Other Activities | | (45) | | (83) | | (5) | | (133) |
| **Ending Balance of Allowance for Subsidy Before Re-estimates** | $ | 3,300 | $ | 5,048 | $ | 434 | $ | 8,782 |
| Net Upward Subsidy Re-estimates | | 802 | | 1,376 | | - | | 2,178 |
| **Ending Balance of Allowance for Subsidy** | $ | 4,102 | $ | 6,424 | $ | 434 | $ | 10,960 |
| **2019** | | | | | | | | |
| Beginning Balance of Allowance for Subsidy | $ | 21 | $ | (458) | $ | 426 | $ | (11) |
| **Adjustments** | | | | | | | | |
| Subsidy Allowance Amortization | | 571 | | 1,027 | | 52 | | 1,650 |
| Loans Written Off | | (165) | | (308) | | (18) | | (491) |
| Other Activities | | (40) | | (62) | | (5) | | (107) |
| **Ending Balance of Allowance for Subsidy Before Re-estimates** | $ | 387 | $ | 199 | $ | 455 | $ | 1,041 |
| Net Upward Subsidy Re-estimates | | 2,144 | | 3,644 | | - | | 5,788 |
| **Ending Balance of Allowance for Subsidy** | $ | 2,531 | $ | 3,843 | $ | 455 | $ | 6,829 |

## Other Credit Programs for Higher Education
(Dollars in Millions)

| | Principal | | Accrued Interest | | Allowance for Subsidy | | Net | |
|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | |
| Federal Perkins Loans | $ | 615 | $ | 202 | $ | (184) | $ | 633 |
| TEACH Program Loans | | 764 | | 88 | | (182) | | 670 |
| HEAL Program Loans | | 396 | | 29 | | (38) | | 387 |
| **Total** | $ | 1,775 | $ | 319 | $ | (404) | $ | 1,690 |

| | Principal | | Accrued Interest | | Allowance for Subsidy (Present | | Net | |
|---|---|---|---|---|---|---|---|---|
| **2019** | | | | | | | | |
| Federal Perkins Loans | $ | 532 | $ | 235 | $ | (160) | $ | 607 |
| TEACH Program Loans | | 764 | | 99 | | (247) | | 616 |
| HEAL Program Loans | | 396 | | 33 | | (34) | | 395 |
| **Total** | $ | 1,692 | $ | 367 | $ | (441) | $ | 1,618 |

**Federal Perkins Loan Program.** Loans made through the Federal Perkins Loan program were low-interest federal student loans for undergraduate and graduate students with exceptional financial needs. Schools made these Perkins loans to their students and are responsible for servicing the loans throughout the repayment term. Borrowers who undertake certain public, military, or teaching service employment are eligible to have all or part of their loans cancelled.

**Notes to the Financial Statements**

The Perkins Loan program was a revolving loan program where the loan repayments collected from former students were utilized to make new loans to current students. FSA provided most of the capital used by schools to make these loans to eligible students. Participating schools provided the remaining program funding. In some statutorily defined cases, funds were provided by FSA to reimburse schools for loan cancellations. The above schedule includes only Perkins loans which were assigned to FSA when schools discontinued their participation in the program. For these assigned Perkins loans, collections of principal, interest, and fees, net of amounts paid to cover contract collection costs totaled $38 million and $80 million for FY 2020 and FY 2019, respectively.

The *Federal Perkins Loan Program Extension Act of 2015* (Extension Act) eliminated the authorization for schools to make new Perkins loan disbursements as of September 30, 2017, and ended all Perkins loan disbursements by June 30, 2018. Prior to the authority for new Perkins loans ending, collections made by the schools would go back into each school's Perkins fund to be utilized to make more loans. Schools are required to return to FSA the federal share of any excess beyond what is needed (excess liquid capital).

Schools are not required to liquidate and close out their programs now that no new Perkins loans are being made. Schools continue to take in collections and are required to return the federal share of the capital that is collected to FSA on an annual basis. Schools returned $1,279 million and $10 million to FSA in FY 2020 and FY 2019, respectively, for the federal share of collected cash.

Schools will continue to service outstanding Perkins loans to recover the money they contributed to their Perkins funds for as long as it is feasible to do so or until the eventual wind-down of their portfolios. Schools that liquidate and close out their programs must transfer any outstanding portfolio to FSA and liquidate any final cash. Most recent data from the 2018-2019 reporting year shows a $5.2 billion outstanding principal balance on Perkins loans held by schools, and FSA's equity interest on this portfolio is $4.3 billion.

The amounts collected by FSA annually for defaulted Perkins loans and for the return of the federal share of schools' Perkins capital contributions are returned to the Treasury General Fund (See Note 12)

**TEACH Grant Program.** FSA awards annual grants of up to $4,000 to eligible undergraduate and graduate students who agree to serve as full-time mathematics, science, foreign language, bilingual education, special education, or reading teachers at high-need schools for four years within eight years of graduation. The maximum lifetime grant for students is $16,000 for undergraduate programs and $8,000 for graduate programs. For students failing to fulfill the service requirement, the grants are converted to Direct Unsubsidized Stafford Loans. The program is operated as a loan program under the FCRA for budget and accounting purposes since grants can be converted to direct loans. The relief for borrowers provided by the CARES Act and Executive Action loan deferrals resulted in upward modification costs of $11 million and $5 million, respectively. The regulatory action to provide Total and Permanent Disability discharges resulted in an upward modification of less than $0.1 million.

**TEACH Subsidy Rates—Cohort 2020**

| | Interest Differential | Defaults | Fees | Other | Total |
|---|---|---|---|---|---|
| Subsidy Rates | 70.46% | 0.35% | 0.00% | -41.88% | 28.93% |

*The Other component reflects costs associated with loan cancelations and the interactive effects of payment plans on the components of subsidy.

**HEAL Program.** FSA assumed responsibility in FY 2014 for the HEAL program and the authority to administer, service, collect, and enforce the program. The HEAL program is structured as required by the FCRA. A liquidating account is used to record all cash flows to and from the government resulting from guaranteed HEAL loans committed prior to 1992. All loan activity for 1992 and beyond is recorded in corresponding financing accounts. The relief for borrowers provided by the Executive Action and the FSA's extension of the CARES Act provisions for loan deferrals resulted in upward modification costs of $1 million and $2 million, respectively.

## Note 6. Liabilities Not Covered by Budgetary Resources

**Liabilities Not Covered**
(Dollars in Millions)

| | 2020 Intragovern-mental | 2020 With the Public | 2019 Intragovern-mental | 2019 With the Public |
|---|---|---|---|---|
| **Liabilities Not Covered By Budgetary Resources** | | | | |
| Other Liabilities | | | | |
| Accrued Unfunded Annual Leave | $ - | $ 17 | $ - | $ 12 |
| FECA Liabilities | - | 1 | - | 1 |
| **Total Liabilities Not Covered By Budgetary Resources** | - | 18 | - | 13 |
| **Liabilities Not Requiring Budgetary Resources** | | | | |
| Subsidy Due to Treasury General Fund | 1,436 | - | 1,239 | - |
| Federal Perkins Loan Program | 619 | - | 593 | - |
| Miscellaneous Receipt, Deposit Funds and Clearing Accounts | 19 | - | 55 | - |
| **Total Liabilities Not Requiring Budgetary Resources** | 2,074 | - | 1,887 | - |
| Total Liabilities Covered By Budgetary Resources | 1,253,600 | 5,748 | 1,298,515 | 11,352 |
| **Total Liabilities** | $ 1,255,674 | $ 5,766 | $ 1,300,402 | $ 11,365 |

## Note 7. Debt

**Debt**
(Dollars in Millions)

| | Beginning Balance | Borrowing | Repayments | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|
| **2020** | | | | | |
| Direct Loan Program | $ 1,192,138 | $ 116,883 | $ (148,922) | $ - | $ 1,160,099 |
| FFEL Program | 94,671 | 10,997 | (16,682) | - | 88,986 |
| Other Credit Programs for Higher Education | 685 | 105 | (68) | - | 722 |
| **Total** | $ 1,287,494 | $ 127,985 | $ (165,672) | $ - | $ 1,249,807 |
| **2019** | | | | | |
| Direct Loan Program | $ 1,150,610 | $ 137,583 | $ (96,055) | $ - | $ 1,192,138 |
| FFEL Program | 107,261 | - | (12,590) | - | 94,671 |
| Other Credit Programs for Higher Education | 610 | 106 | (31) | - | 685 |
| **Total** | $ 1,258,481 | $ 137,689 | $ (108,676) | $ - | $ 1,287,494 |

FSA borrows from Treasury's Bureau of the Public Debt to fund the disbursement of new loans and the payment of credit program outlays and related costs. During FY 2020, debt decreased 2.9 percent from $1,287.5 billion in the prior year to $1,249.8 billion. FSA makes periodic principal payments, after evaluating the cash position and liability for future outflows in each program and pays interest, as mandated by the FCRA.

Approximately 92.8 percent of FSA's debt, as of September 30, 2020, is attributable to the Direct Loan program. The majority of the net borrowing activity (borrowing less repayments) for the year was designated for funding new Direct Loan disbursements.

FSA also borrows from Treasury for activity in the Other Credit Programs for Higher Education. During FY 2020, TEACH net borrowing of $59 million was used for the advance of new grants and repayments of principal made to Treasury.

## Note 8. Subsidy Due to Treasury General Fund

**Subsidy Due to Treasury General Fund**
(Dollars in Millions)

|  | | 2020 | | 2019 |
|---|---|---|---|---|
| **Credit Program Downward Subsidy Re-estimates** | | | | |
| Direct Loan Program | $ | 1,773 | $ | 2,718 |
| FFEL Program | | 74 | | 6,345 |
| **Total Credit Program Downward Subsidy Re-estimates** | | **1,847** | | **9,063** |
| Future Liquidating Account Collections | | | | |
| FFEL Program | | 1,436 | | 1,239 |
| **Total Future Liquidating Account Collections** | | **1,436** | | **1,239** |
| **Total Subsidy Due to Treasury General Fund** | $ | **3,283** | $ | **10,302** |

## Note 9. Other Liabilities

**Other Liabilities**
(Dollars in Millions)

|  | 2020 | | 2019 | |
|---|---|---|---|---|
|  | Intragovernmental | With the Public | Intragovernmental | With the Public |
| Accounts Payable | $    - | $    3,561 | $    - | $    3,597 |
| Accrued Grant Liability | - | 1,054 | - | 2,304 |
| Guaranty Agencies' Funds Due to Treasury | 1,943 | - | 1,956 | - |
| Loan Guarantee Liability | - | 1,123 | - | 5,436 |
| Federal Perkins Loan Program | 619 | - | 593 | - |
| Miscellaneous Receipt, Deposit Funds and Clearing Accounts | 19 | - | 55 | - |
| Advances from Others and Deferred Credits | - | - | - | 8 |
| Accrued Unfunded Annual Leave | - | 17 | - | 12 |
| FECA Liabilities | - | 1 | - | 1 |
| Accrued Payroll and Benefits | - | 10 | - | 7 |
| Employer Contributions and Payroll Taxes | 3 | - | 2 | - |
| **Total Other Liabilities** | $    **2,584** | $    **5,766** | $    **2,606** | $    **11,365** |

# Note 10. Net Cost of Operations

## Gross Costs and Exchange Revenue by Program
**(Dollars in Millions)**

| | | 2020 | | 2019 |
|---|---|---:|---|---:|
| **EXPAND POSTSECONDARY OPPORTUNITIES, IMPROVE OUTCOMES TO FOSTER ECONOMIC OPPORTUNITY, AND PROMOTE PRODUCTIVE CITIZENRY** | | | | |
| Direct Loan Program | | | | |
| Gross Cost | | | | |
| Credit Program Interest Expense | $ | 34,705 | $ | 33,817 |
| Subsidy Expense | | 101,173 | | 61,510 |
| Administrative Expenses | | 1,425 | | 1,369 |
| Earned Revenue | | | | |
| Subsidy Expense | | (265) | | - |
| Interest & Administrative Fees | | (33,110) | | (64,107) |
| Subsidy Amortization | | (1,595) | | 30,290 |
| **Net Cost of Direct Loan Program** | | **102,333** | | **62,879** |
| FFEL Program | | | | |
| Gross Cost | | | | |
| Credit Program Interest Expense | | 4,021 | | 3,838 |
| Subsidy Expense | | 2,180 | | 12,654 |
| Subsidy Amortization (Guaranteed Loans) | | (1,064) | | (1,096) |
| Guaranty Agencies | | 126 | | 212 |
| Administrative Expenses | | 156 | | 151 |
| Earned Revenue | | | | |
| Subsidy Expense | | (28) | | - |
| Interest & Administrative Fees | | (2,871) | | (4,392) |
| Subsidy Amortization (Acquired FFEL Loans) | | (86) | | 1,650 |
| Guaranty Agencies | | (123) | | (128) |
| **Net Cost of FFEL Program** | | **2,311** | | **12,889** |
| Other Credit Programs for Higher Education | | | | |
| Gross Cost | | | | |
| Credit Program Interest Expense | | 23 | | 22 |
| Subsidy Expense | | 27 | | (4) |
| Administrative Expenses | | 3 | | 2 |
| Earned Revenue | | | | |
| Interest & Administrative Fees | | (24) | | (50) |
| Subsidy Amortization | | 1 | | 28 |
| Other | | (1,283) | | (111) |
| **Net Cost of Other Credit Programs for Higher Education** | | **(1,253)** | | **(113)** |
| Non-Credit Programs | | | | |
| Gross Cost | | | | |
| Grants | | 28,113 | | 32,208 |
| Other | | 357 | | 182 |
| **Net Cost of Non-Credit Programs** | | **28,470** | | **32,390** |
| **Net Program Costs** | | **131,861** | | **108,045** |
| **Total Program Gross Costs** | | **171,245** | | **144,865** |
| **Total Program Earned Revenue** | | **(39,384)** | | **(36,820)** |
| **Net Cost of Operations** | $ | **131,861** | $ | **108,045** |

**Notes to the Financial Statements**

### Credit Program Interest Expense and Revenues
(Dollars in Millions)

| | Gross Interest Expense | | Subsidy Amortization | Net Interest Expense | Gross Interest and Administrative Fee Revenue | | Subsidy Amortization | Net Revenue |
|---|---|---|---|---|---|---|---|---|
| | Intragovern-mental | With the Public | With the Public | | Intragovern-mental | With the Public | With the Public | |
| **2020** | | | | | | | | |
| Direct Loan Program | $ 34,705 | $ - | $ 34,705 | $ 4,786 | $ 28,324 | $ 1,595 | $ 34,705 |
| FFEL Program | 4,021 | (1,064) | 2,957 | 1,435 | 1,436 | 86 | 2,957 |
| Other Credit Programs for Higher Education | 23 | - | 23 | - | 24 | (1) | 23 |
| **Total** | **$ 38,749** | **$ (1,064)** | **$ 37,685** | **$ 6,221** | **$ 29,784** | **$ 1,680** | **$ 37,685** |
| **2019** | | | | | | | | |
| Direct Loan Program | $ 33,817 | $ - | $ 33,817 | $ 4,082 | $ 60,025 | $ (30,290) | $ 33,817 |
| FFEL Program | 3,838 | (1,096) | 2,742 | 905 | 3,487 | (1,650) | 2,742 |
| Other Credit Programs for Higher Education | 22 | - | 22 | 7 | 43 | (28) | 22 |
| **Total** | **$ 37,677** | **$ (1,096)** | **$ 36,581** | **$ 4,994** | **$ 63,555** | **$ (31,968)** | **$ 36,581** |

Interest expense equals interest revenue plus administrative fees accrued for all credit programs due to subsidy amortization. Subsidy amortization is required by the FCRA and accounts for the difference between interest expense and revenue cash flows. For direct loans, the allowance for subsidy is adjusted with the offset to interest revenue. For guaranteed loans, the liability for loan guarantees is adjusted with the offset to interest expense.

### Grant Expenses
(Dollars in Millions)

| | 2020 | 2019 |
|---|---|---|
| Pell Grants | $ 25,882 | $ 30,530 |
| Federal Work-Study Program | 1,203 | 1,030 |
| Federal Supplemental Educational Opportunity Grants | 1,028 | 648 |
| **Total** | **$ 28,113** | **$ 32,208** |

**Pell Grants** – provides need-based grants to students to promote access to postsecondary education. Grant amounts are dependent on: the student's expected family contribution; the cost of attendance (as determined by the institution); the student's enrollment status (full-time or part-time); and whether the student attends for a full academic year or less. Pell Grants are the single largest source of grant aid for postsecondary education.

**Federal Work-Study Program** – provides funds by formula to enable eligible institutions to offer employment to students based on financial needs. The program is available to full-time or part-time students and encourages community service work. The work is often related to the student's course of study. This program is administered by the schools that participate in the Federal Work-Study program. Hourly earnings under this program must be at least the Federal minimum wage. Federal funding, in most cases, pays 75 percent of a student's hourly wage, with the remaining 25 percent paid by the employer.

**Federal Supplemental Education Opportunity Grants** – provides funds by formula to enable eligible institutions to offer grants to students based on need. Federal grants distributed under this program are administered directly by the financial aid office at each participating school.

# Note 11. COVID-19 Activity (See Note 5)

**COVID-19 Activity**
**(Dollars in Millions)**

| | 2020 | | | | | |
|---|---|---|---|---|---|---|
| | Appropriations | Obligated | Unobligated | Outlays | Transfers to General Fund | Net Costs (See Note 10) |
| **CARES Act** | | | | | | |
| Student Aid Administration | $ 40 | $ 17 | $ 23 | $ 9 | $ – | $ 9 |
| Student Loan Deferrals | | | | | | |
| Direct Loan Program | 25,246 | 25,246 | – | 25,246 | 236 | 25,010 |
| FFEL Program | 1,770 | 1,770 | – | 1,770 | 15 | 1,755 |
| TEACH Program | 11 | 11 | – | 11 | – | 11 |
| **Total CARES Act Student Loan Deferrals** | **27,027** | **27,027** | **–** | **27,027** | **251** | **26,776** |
| **Total CARES Act** | **27,067** | **27,044** | **23** | **27,036** | **251** | **26,785** |
| **Secretary's Discretion Student Loan Deferrals** | | | | | | |
| FFEL Program | 496 | 496 | – | 496 | 4 | 492 |
| HEAL Program | 2 | 2 | – | 2 | – | 2 |
| **Total Secretary's Discretion Student Loan Deferrals** | **498** | **498** | **–** | **498** | **4** | **494** |
| **Presidential Memorandum Student Loan Deferrals** | | | | | | |
| Student Loan Deferrals | | | | | | |
| Direct Loan Program | 13,579 | 13,579 | – | 13,579 | 27 | 13,552 |
| FFEL Program | 1,059 | 1,059 | – | 1,059 | 9 | 1,050 |
| HEAL Program | 1 | 1 | – | 1 | – | 1 |
| TEACH Program | 5 | 5 | – | 5 | – | 5 |
| **Total Presidential Memorandum Student Loan Deferrals** | **14,644** | **14,644** | **–** | **14,644** | **36** | **14,608** |
| **Total COVID-19 Activity** | **$ 42,209** | **$ 42,186** | **$ 23** | **$42,178** | **$ 291** | **$ 41,887** |

Indirect appropriations were provided to fund loan modifications resulting from student loan deferrals authorized under the *CARES Act* and extended by the Administration's Presidential Memorandum. FSA also extended the provisions of the student loan deferrals to guaranteed loans not covered by the *CARES Act.* (See Note 5)

## Note 12. Statements of Budgetary Resources

The SBR compares budgetary resources with the status of those resources. As of September 30, 2020, budgetary resources were $389.1 billion and net agency outlays were $104.4 billion. As of September 30, 2019, budgetary resources were $306.1 billion and net agency outlays were $97.3 billion.

**Net Adjustments to Unobligated Balances Brought Forward**
(Dollars in Millions)

|  | 2020 | | 2019 | |
| --- | --- | --- | --- | --- |
|  | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
| Prior Year Unobligated Balance, End of Year (Total) | $ 14,158 | $ 18,143 | $ 15,033 | $ 23,457 |
| Recoveries of Prior Year Unpaid Obligations | 942 | 18,220 | 738 | 24,840 |
| Borrowing Authority Withdrawn | - | (15,004) | - | (17,520) |
| Actual Repayments of Debt, Prior-Year Balances | - | (12,720) | - | (16,261) |
| Actual Capital Transfers to the Treasury General Fund | (261) | - | (322) | - |
| Canceled Authority | (25) | - | (25) | - |
| Downward Adjustments of Prior-Year Paid Delivered Orders | 125 | 301 | 4 | 342 |
| Other Differences | (1) | (1) | (50) | - |
| Unobligated Balance from Prior Year Budget Authority (Net) | $ 14,938 | $ 8,939 | $ 15,378 | $ 14,858 |

During the years ended September 30, 2020 and September 30, 2019, certain adjustments were made to the balance of unobligated budgetary resources available as of October 1, 2019 and October 1, 2018. These adjustments include, among other things, recoveries of prior year unpaid obligations that result from downward adjustments of undelivered orders that were obligated in a prior fiscal year.

**Unused Borrowing Authority**
(Dollars in Millions)

|  | 2020 | 2019 |
| --- | --- | --- |
| Beginning Balance - Unused Borrowing Authority | $ 55,457 | $ 62,394 |
| Current Year Borrowing Authority | 135,300 | 148,272 |
| Funds Drawn from Treasury | (127,985) | (137,689) |
| Borrowing Authority Withdrawn | (15,004) | (17,520) |
| Ending Balance - Unused Borrowing Authority | $ 47,768 | $ 55,457 |

FSA is given authority to draw funds from Treasury to finance the Direct Loan, FFEL, and other loan programs. Unused borrowing authority is a budgetary resource and is available to support obligations for these programs. FSA periodically reviews its borrowing authority balances in relation to its obligations resulting in the withdrawal of unused amounts.

## Undelivered Orders at the End of the Period
**(Dollars in Millions)**

| | 2020 | | 2019 | |
|---|---|---|---|---|
| | Intragovern-mental | With the Public | Intragovern-mental | With the Public |
| Unpaid | $ 81 | $ 77,543 | $ 76 | $ 82,607 |
| Paid | - | 502 | 7 | 561 |
| **Undelivered Orders** | $ 81 | $ 78,045 | $ 83 | $ 83,168 |

Undelivered orders represent the amount of goods and/or services ordered which have not been actually or constructively received. The paid amount includes any orders which may have been prepaid or advanced but for which delivery or performance has not yet occurred.

## Distributed Offsetting Receipts
**(Dollars in Millions)**

| | 2020 | 2019 |
|---|---|---|
| Negative Subsidies and Downward Re-estimates of Subsidies: | | |
| Direct Loan Program | $ 5,382 | $ 9,906 |
| FFEL Program | 6,865 | 2,099 |
| HEAL Program | - | 34 |
| TEACH Program | 36 | 1 |
| Total Negative Subsidies and Downward Re-estimates of Subsidies | 12,283 | 12,040 |
| Repayment of Perkins Loans and Capital Contributions | 1,317 | 90 |
| Other | 6 | 15 |
| **Distributed Offsetting Receipts** | $ 13,606 | $ 12,145 |

The majority of the distributed offsetting receipts line item on the SBR represents amounts paid from the Direct Loan program and FFEL program financing accounts to Treasury General Fund receipt accounts for downward current fiscal year executed subsidy re-estimates and negative subsidies. The collections are recorded as offsetting receipts and they offset the agency's budget authority and outlays.

## Reconciliation of SBR to Budget of the United States Government
**(Dollars in Millions)**

| | Budgetary Resources | New Obligations and Upward Adjustments (Total) | Distributed Offsetting Receipts | Net Outlays |
|---|---|---|---|---|
| Combined Statements of Budgetary Resources | $ 306,139 | $ 273,838 | $ 12,145 | $ 57,251 |
| Expired Funds | (1,209) | (348) | - | - |
| FFEL Guaranty Agency Amounts Included in the President's Budget | 7,342 | 7,341 | - | - |
| Distributed Offsetting Receipts | - | - | - | 12,145 |
| Other | 1 | - | - | - |
| **Budget of the United States Government[1]** | $ 312,273 | $ 280,831 | $ 12,145 | $ 69,396 |

[1] Amounts obtained from the Appendix, *Budget of the United States Government, FY 2021*.

**Notes to the Financial Statements**

The FY 2022 *Budget of the United States Government* (President's Budget), which presents the actual amounts for the year ended September 30, 2020, has not been published as of the issue date of these financial statements. The FY 2022 President's Budget is scheduled for release in February 2021 and will be made available on OMB's website. The table above reconciles the FY 2019 SBR to the FY 2021 President's Budget (FY 2019 actual amounts) for budgetary resources, new obligations and upward adjustments, distributed offsetting receipts, and net outlays.

Reconciling differences exist because the President's Budget excludes expired funds. Additionally, the President's Budget includes a public enterprise fund that reflects the gross obligations by the FFEL program for the estimated activity of the consolidated federal fund of the guaranty agencies. Ownership by the federal government is independent of the actual control of the assets. Since the actual operation of the federal fund is independent from FSA's direct control, budgetary resources and new obligations and upward adjustments are estimated and disclosed in the President's Budget to approximate the gross activities of the combined federal fund. Amounts reported on the SBR for the federal fund are compiled by combining all guaranty agencies' annual reports to determine a net valuation amount for the federal fund.

# Note 13. Reconciliation of Net Cost to Net Outlays

**Reconciliation of Net Cost**
(Dollars in Millions)

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| | Intragovern-mental | With the Public | Total | Intragovern-mental | With the Public | Total |
| Net Cost of Operations | $ 32,668 | $ 99,193 | $ 131,861 | $ 32,828 | $ 75,217 | $ 108,045 |
| Components of Net Operating Cost Not Part of the Net Budgetary Outlays | | | | | | |
| Excess of Accrual-Basis Expenses Over Budget Outlays | | | | | | |
| Current-Year Subsidy Accrual Costs | - | (52,571) | (52,571) | - | (67,225) | (67,225) |
| Loan Modification Adjustment Transfer Gains/(Losses), Net | - | (56) | (56) | - | - | - |
| Federal Employee Retirement Benefit Costs Paid by OPM | (12) | - | (12) | (14) | - | (14) |
| Other Liabilities | 13 | 1,096 | 1,109 | (61) | (1,260) | (1,321) |
| Excess of Accrual-Basis Revenue Over Budget Receipts | | | | | | |
| Accounts Receivable | - | (43) | (43) | - | 3 | 3 |
| Offset to Non-Entity Accrued Collections | - | (41) | (41) | - | 6 | 6 |
| Total Components of Net Operating Cost Not Part of the Net Budgetary Outlays | 1 | (51,615) | (51,614) | (75) | (68,476) | (68,551) |
| Components of the Net Budgetary Outlays Not Part of Net Operating Costs | | | | | | |
| Current-Year Budget Subsidy Costs | - | 67,227 | 67,227 | - | 17,955 | 17,955 |
| Other Loan Activities, Net | - | (145) | (145) | - | 36 | 36 |
| Other Assets | (7) | (16) | (23) | (12) | (222) | (234) |
| Total Components of the Net Budgetary Outlays Not Part of Net Operating Costs | (7) | 67,066 | 67,059 | (12) | 17,769 | 17,757 |
| Net Outlays (Calculated Total) | $ 32,662 | $ 114,644 | $ 147,306 | $ 32,741 | $ 24,510 | $ 57,251 |
| Related Amounts on the Statement of Budgetary Resources | | | | | | |
| Outlays, Net (Discretionary and Mandatory) | | | 160,912 | | | 69,396 |
| Distributed Offsetting Receipts | | | (13,606) | | | (12,145) |
| Agency Outlays, Net (Discretionary and Mandatory) | | | $ 147,306 | | | $ 57,251 |

This reconciliation explains the relationship between FSA's net cost of operations and its net outlays. Reconciling items result from transactions which did not result in a current period outlay but did result in a current period cost, and current period outlays that did not result in a current period cost.

Disbursements for new FCRA loans and collections of principal and interest on existing FCRA loans are recorded in non-budgetary credit reform financing accounts. These disbursements and collections are reported on the Statement of Budgetary Resources as disbursements, net, and not as agency outlays, net. Since these disbursements and collections affect neither net cost of operations nor agency outlays, net, they are excluded from this reconciliation as are any increases or decreases in the FCRA loan receivable balances.

The two major reconciling differences, both associated with FSA's FCRA loan programs, are for current-year subsidy accrual costs and current-year budget subsidy costs.

- Current-year subsidy accrual costs are the portion of the current-year loan subsidy re-estimates not impacting the current year outlays.

- Current-year budget subsidy costs are current year indirect appropriations provided to fund subsidy costs accrued in the prior year. This includes the portion of the current year's executed President's budget re-estimates not included in this year's net cost subsidy expense.

## Note 14. Commitments and Contingencies

FSA discloses contingencies where any of the conditions for liability recognition are not met and there is at least a reasonable possibility that a loss or an additional loss may have been incurred in accordance with FASAB Standard No. 5, Accounting for Liabilities of the Federal Government. The following commitments are amounts for contractual arrangements that may require future financial obligations.

**Future Minimum Lease Payments**
(Dollars in Millions)

| 2020 | | | 2019 | | |
|---|---|---|---|---|---|
| 2021 | $ | 14 | 2020 | $ | 13 |
| 2022 | | 14 | 2021 | | 13 |
| 2023 | | 14 | 2022 | | 13 |
| 2024 | | 12 | 2023 | | 14 |
| 2025 | | 12 | 2024 | | 14 |
| After 2025 | | 12 | After 2024 | | 14 |
| **Total** | **$** | **78** | **Total** | **$** | **81** |

FSA leases two buildings from the General Services Administration. The table above presents the estimated future minimum lease payments for these buildings.

### Guaranty Agencies

FSA may assist guaranty agencies experiencing financial difficulties. FSA has not done so in fiscal years 2020 or 2019 and does not expect to in future years. No provision has been made in the financial statements for potential liabilities.

### Litigation and Other Claims

The Department is involved in various lawsuits incidental to its operations. In the opinion of management, the ultimate resolution of pending litigation will not have a material effect on FSA's financial position. As appropriate, the Department would seek recovery from Treasury's Judgment Fund for any loss in litigation that may occur. The Judgment Fund is a permanent, indefinite appropriation available to pay judgments against the government, if appropriated funds cannot be used.

The cost of loan forgiveness related to borrower defense claims reflected in the accompanying financial statements is limited to loans originated through September 30, 2020. The final disposition of claims filed and those yet to be filed from loans originated before September 30, 2020, is not expected to have a material impact on these financial statements.

## Other Matters

Some portion of the current-year financial assistance expenses (grants) may include funded recipient expenditures that are subsequently disallowed through program review or audit processes. In the opinion of management, the ultimate disposition of these matters will not have a material effect on the FSA's financial position.

# Required Supplementary Information (Unaudited)

**United States Department of Education**
**Federal Student Aid**
**Combining Statements of Budgetary Resources**
**For the Year Ended September 30, 2020**

(Dollars in Millions)

| | Combined | | Health Education Assistance Loans | |
|---|---|---|---|---|
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $ 14,938 | $ 8,939 | $ - | $ 8 |
| Appropriations (Discretionary and Mandatory) | 163,672 | 349 | 10 | - |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | - | 135,300 | - | - |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | 232 | 65,625 | 5 | 7 |
| **Total Budgetary Resources** | $ 178,842 | $ 210,213 | $ 15 | $ 15 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $ 162,465 | $ 187,667 | $ 11 | $ 3 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | 13,386 | - | - | - |
| Unapportioned, Unexpired Accounts | 1,819 | 22,546 | 4 | 12 |
| **Unexpired Unobligated Balance, End of year** | $ 15,205 | $ 22,546 | $ 4 | $ 12 |
| Expired Unobligated Balance, End of Year | 1,172 | - | - | - |
| **Unobligated Balance, End of Year (Total)** | $ 16,377 | $ 22,546 | $ 4 | $ 12 |
| **Total Status of Budgetary Resources** | $ 178,842 | $ 210,213 | $ 15 | $ 15 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 160,912 | | 6 | |
| Distributed Offsetting Receipts (-) (Note 12) | (13,606) | | - | |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ 147,306 | $ | $ 6 | $ |
| **Disbursements, Net (Total) (Mandatory)** | | (42,956) | | (13) |

**United States Department of Education**
**Federal Student Aid**
**Combining Statements of Budgetary Resources**
**For the Year Ended September 30, 2020**
(Dollars in Millions)

| | Direct Student Loan Program | | Teach Program | |
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
|---|---|---|---|---|
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $      764 | $      691 | $      13 | $      (1) |
| Appropriations (Discretionary and Mandatory) | 114,194 | 347 | 56 | – |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | – | 124,736 | – | 110 |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | – | 46,801 | – | 47 |
| **Total Budgetary Resources** | $  114,958 | $  172,575 | $      69 | $     156 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $  114,194 | $  169,195 | $      56 | $     157 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | – | – | – | – |
| Unapportioned, Unexpired Accounts | – | 3,380 | – | (1) |
| **Unexpired Unobligated Balance, End of year** | $        – | $    3,380 | $       – | $      (1) |
| Expired Unobligated Balance, End of Year | 764 | – | 13 | – |
| **Unobligated Balance, End of Year (Total)** | $      764 | $    3,380 | $      13 | $      (1) |
| **Total Status of Budgetary Resources** | $  114,958 | $  172,575 | $      69 | $     156 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 113,305 | | 54 | |
| Distributed Offsetting Receipts (-) (Note 12) | (5,388) | | (36) | |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ (107,917) | $ | $      18 | $ |
| **Disbursements, Net (Total) (Mandatory)** | | (29,898) | | 54 |

**Required Supplementary Information (Unaudited)**

### United States Department of Education
#### Federal Student Aid
#### Combining Statements of Budgetary Resources
#### For the Year Ended September 30, 2020
(Dollars in Millions)

| | Federal Family Education Loan Program | | Perkins Loans and Grants | Administrative Funds |
| --- | --- | --- | --- | --- |
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Budgetary |
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $ 1,961 | $ 8,241 | $ 12,099 | $ 101 |
| Appropriations (Discretionary and Mandatory) | 16,599 | 2 | 31,004 | 1,809 |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | | 10,454 | | – |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | 228 | 18,770 | (1) | – |
| **Total Budgetary Resources** | $ 18,788 | $ 37,467 | $ 43,102 | $ 1,910 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $ 16,760 | $ 18,312 | $ 29,571 | $ 1,873 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | 219 | - | 13,139 | 28 |
| Unapportioned, Unexpired Accounts | 1,809 | 19,155 | 7 | (1) |
| **Unexpired Unobligated Balance, End of year** | $ 2,028 | $ 19,155 | $ 13,146 | $ 27 |
| Expired Unobligated Balance, End of Year | - | - | 385 | 10 |
| **Unobligated Balance, End of Year (Total)** | $ 2,028 | $ 19,155 | $ 13,531 | $ 37 |
| **Total Status of Budgetary Resources** | $ 18,788 | $ 37,467 | $ 43,102 | $ 1,910 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 16,416 | | 29,369 | |
| Distributed Offsetting Receipts (-) (Note 12) | (6,865) | | (1,317) | |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ 9,551 | $ | $ 28,052 | |
| **Disbursements, Net (Total) (Mandatory)** | | (13,099) | | 1,762 |

**Required Supplementary Information (Unaudited)**

### United States Department of Education
### Federal Student Aid
### Combining Statements of Budgetary Resources
### For the Year Ended September 30, 2019

(Dollars in Millions)

| | Combined | | Health Education Assistance Loans | |
| --- | --- | --- | --- | --- |
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $ 15,378 | $ 14,858 | $ – | $ 21 |
| Appropriations (Discretionary and Mandatory) (Note 12) | 69,804 | – | – | – |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | – | 148,272 | – | 34 |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | 409 | 57,418 | 7 | 7 |
| **Total Budgetary Resources** | $ 85,591 | $ 220,548 | $ 7 | $ 62 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $ 71,433 | $ 202,405 | $ 1 | $ 40 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | 11,361 | – | – | – |
| Unapportioned, Unexpired Accounts | 1,935 | 18,143 | 6 | 22 |
| **Unexpired Unobligated Balance, End of year** | $ 13,296 | $ 18,143 | $ 6 | $ 22 |
| Expired Unobligated Balance, End of Year | 862 | – | – | – |
| **Unobligated Balance, End of Year (Total)** | $ 14,158 | $ 18,143 | $ 6 | $ 22 |
| **Total Status of Budgetary Resources** | $ 85,591 | $ 220,548 | $ 7 | $ 62 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 69,396 | | (6) | |
| Distributed Offsetting Receipts (-) (Note 12) | (12,145) | | (34) | |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ 57,251 | $ | $ (40) | $ |
| **Disbursements, Net (Total) (Mandatory)** | | 40,085 | | 33 |

**Required Supplementary Information (Unaudited)**

## United States Department of Education
### Federal Student Aid
### Combining Statements of Budgetary Resources
### For the Year Ended September 30, 2019

(Dollars in Millions)

| | Direct Student Loan Program | | Teach Program | |
|---|---|---|---|---|
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Non-Budgetary Credit Reform Financing Accounts |
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $ 522 | $ 375 | $ 12 | $ (1) |
| Appropriations (Discretionary and Mandatory) | 33,812 | – | 34 | – |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | – | 148,159 | – | 79 |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | – | 44,443 | – | 46 |
| **Total Budgetary Resources** | $ 34,334 | $ 192,977 | $ 46 | $ 124 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $ 33,812 | $ 187,172 | $ 34 | $ 123 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | – | – | – | – |
| Unapportioned, Unexpired Accounts | – | 5,805 | – | 1 |
| **Unexpired Unobligated Balance, End of year** | $ – | $ 5,805 | $ – | $ 1 |
| Expired Unobligated Balance, End of Year | 522 | – | 12 | – |
| **Unobligated Balance, End of Year (Total)** | $ 522 | $ 5,805 | $ 12 | $ 1 |
| **Total Status of Budgetary Resources** | $ 34,334 | $ 192,977 | $ 46 | $ 124 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 33,235 | – | 31 | – |
| Distributed Offsetting Receipts (-) (Note 12) | (9,906) | – | (1) | – |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ (23,329) | $ – | $ 30 | $ – |
| **Disbursements, Net (Total) (Mandatory)** | | 46,829 | | 32 |

**Required Supplementary Information (Unaudited)**

### United States Department of Education
#### Federal Student Aid
#### Combining Statement of Budgetary Resources
#### For the Year Ended September 30, 2019
(Dollars in Millions)

| | Federal Family Education Loan Program | | Perkins Loans and Grants | Administrative Funds |
|---|---|---|---|---|
| | Budgetary | Non-Budgetary Credit Reform Financing Accounts | Budgetary | Budgetary |
| **Budgetary Resources:** | | | | |
| Unobligated Balance from Prior Year Budget Authority, (Net) (Note 12) | $ 2,049 | $ 14,463 | $ 12,781 | $ 14 |
| Appropriations (Discretionary and Mandatory) | 3,661 | – | 30,618 | 1,679 |
| Borrowing Authority (Discretionary and Mandatory) (Note 12) | | | | |
| Spending Authority from Offsetting Collections (Discretionary and Mandatory) | 403 | 12,922 | (1) | – |
| **Total Budgetary Resources** | $ 6,113 | $ 27,385 | $ 43,398 | $ 1,693 |
| | | | | |
| **Status of Budgetary Resources:** | | | | |
| New Obligations Incurred and Upward Adjustments (Total) | $ 3,913 | $ 15,070 | $ 31,986 | $ 1,687 |
| Unobligated Balance, End of Year: | | | | |
| Apportioned, Unexpired Accounts | 287 | – | 11,070 | 4 |
| Unapportioned, Unexpired Accounts | 1,913 | 12,315 | 17 | (1) |
| **Unexpired Unobligated Balance, End of year** | $ 2,200 | $ 12,315 | $ 11,087 | $ 3 |
| Expired Unobligated Balance, End of Year | – | – | 325 | 3 |
| **Unobligated Balance, End of Year (Total)** | $ 2,200 | $ 12,315 | $ 11,412 | $ 6 |
| **Total Status of Budgetary Resources** | $ 6,113 | $ 27,385 | $ 43,398 | $ 1,693 |
| | | | | |
| **Outlays, Net, and Disbursements, Net** | | | | |
| Outlays, Net (Discretionary and Mandatory) | 3,507 | – | 30,907 | – |
| Distributed Offsetting Receipts (-) (Note 12) | (2,099) | – | (105) | – |
| **Agency Outlays, Net (Discretionary and Mandatory) (Notes 12 & 13)** | $ 1,408 | $ – | $ 30,802 | – |
| Disbursements, Net (Total) (Mandatory) | | (6,809) | | 1,722 |

*This page is intentionally left blank*

# Independent Auditors' Report

## Office of Inspector General Audit Transmittal



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF INSPECTOR GENERAL

THE INSPECTOR GENERAL

November 16, 2020

Mark A. Brown
Chief Operating Officer
Federal Student Aid
Washington, D.C. 20202

Dear Mr. Brown:

The enclosed Independent Auditors' Report (report) presents the results of the audit of Federal Student Aid's (FSA) financial statements for fiscal years 2020 and 2019 to comply with the Higher Education Amendments of 1998. The report should be read in conjunction with FSA's financial statements and notes to fully understand the context of the information contained therein.

We contracted with the independent certified public accounting firm KPMG LLP (KPMG) to audit the financial statements of FSA as of September 30, 2020 and 2019, and for the years then ended. The contract requires that the audit be performed in accordance with U.S. generally accepted government auditing standards and Office of Management and Budget bulletin, *Audit Requirements for Federal Financial Statements*.

**Results of the Independent Audit**

KPMG found:

- The fiscal years 2020 and 2019 financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America.

- One material weakness in internal control over financial reporting:

  ○ Controls over the Reliability of Underlying Data Used in Credit Reform Re-estimates Need Improvement.

- Three significant deficiencies in internal control over financial reporting:

  ○ Information Technology Controls Need Improvement,
  ○ Monitoring Controls over Service Organizations Need Improvement, and
  ○ Entity Level Controls Need Improvement.

- One instance of reportable noncompliance with Federal law in connection with referring delinquent student loan debts to Treasury.

400 MARYLAND AVENUE, S.W., WASHINGTON, DC 20202-1510

*Promoting the efficiency, effectiveness, and integrity of the Department's programs and operations.*

Page 2 – Mark A. Brown

In connection with the contract, we reviewed KPMG's report and related documentation and inquired of its representatives. Our review, as differentiated from an audit of the financial statements in accordance with U.S. generally accepted government auditing standards, was not intended to enable us to express, and we do not express an opinion on FSA's financial statements, or conclusions on internal control over financial reporting, compliance, and other matters.  KPMG is responsible for the report dated November 16, 2020, and the conclusions expressed therein. However, our review disclosed no instances where KPMG did not comply, in all material respects, with U.S. generally accepted government auditing standards.

We appreciate the cooperation given KPMG and my office during the audit.  If you have any questions or would like to discuss the report, please contact me at (202) 245-6900, or your staff may contact Bryon S. Gordon, Assistant Inspector General for Audit, at (202) 245-6051 or through e-mail at Bryon.Gordon@ed.gov.

Sincerely,

Sandra D. Bruce
Acting Inspector General

Enclosure

# Independent Auditors' Report



KPMG LLP
Suite 12000
1801 K Street, NW
Washington, DC 20006

**Independent Auditors' Report**

Acting Inspector General
United States Department of Education

Chief Operating Officer
Federal Student Aid:

**Report on the Financial Statements**

We have audited the accompanying consolidated financial statements of the Federal Student Aid (FSA), a component of the United States Department of Education, which comprise the consolidated balance sheets as of September 30, 2020 and 2019, and the related consolidated statements of net cost and changes in net position, and combined statements of budgetary resources for the years then ended, and the related notes to the consolidated financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America, in accordance with the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, and in accordance with Office of Management and Budget (OMB) Bulletin No. 19-03, *Audit Requirements for Federal Financial Statements*. Those standards and OMB Bulletin No. 19-03 require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

KPMG LLP is a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee.



*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Federal Student Aid as of September 30, 2020 and 2019, and its net costs, changes in net position, and budgetary resources for the years then ended in accordance with U.S. generally accepted accounting principles.

*Other Matters*

Interactive Data

Management has elected to reference to information on websites or other forms of interactive data outside the Fiscal Year 2020 Annual Report to provide additional information for the users of its financial statements. Such information is not a required part of the basic consolidated financial statements or supplementary information required by the Federal Accounting Standards Advisory Board. The information on these websites or the other interactive data has not been subjected to any of our auditing procedures, and accordingly we do not express an opinion or provide any assurance on it.

Required Supplementary Information

U.S. generally accepted accounting principles require that the information in the Management's Discussion and Analysis and Required Supplementary Information sections be presented to supplement the basic consolidated financial statements. Such information, although not a part of the basic consolidated financial statements, is required by the Federal Accounting Standards Advisory Board who considers it to be an essential part of financial reporting for placing the basic consolidated financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic consolidated financial statements, and other knowledge we obtained during our audits of the basic consolidated financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

Other Information

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements as a whole. The information on pages i through xiii, Annual Performance Report section, Overview of the Financial Section, Other Information section, Appendices, and Acknowledgements is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has not been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements, and accordingly, we do not express an opinion or provide any assurance on it.

**Other Reporting Required by *Government Auditing Standards***

*Internal Control over Financial Reporting*

In planning and performing our audit of the consolidated financial statements as of and for the year ended September 30, 2020, we considered the FSA's internal control over financial reporting (internal control) as a basis for designing procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the consolidated financial statements, but not for the purpose of expressing an opinion on the effectiveness of the FSA's internal control. Accordingly, we do not express an opinion on the effectiveness of the FSA's internal control. We did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*.

2

**KPMG**

Our consideration of internal control was for the limited purpose described in the preceding paragraph and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that have not been identified. However, as described in the accompanying exhibits, we did identify certain deficiencies in internal control that we consider to be a material weakness and significant deficiencies.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected, on a timely basis. We consider the deficiency described in the accompanying Exhibit A, *Controls over the Reliability of Underlying Data Used in Credit Reform Re-estimates Need Improvement*, to be a material weakness.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. We consider the deficiencies described in the accompanying Exhibit B, *Information Technology Controls Need Improvement, Monitoring Controls over Service Organizations Need Improvement*, and *Entity Level Controls Need Improvement*, to be significant deficiencies.

*Compliance and Other Matters*

As part of obtaining reasonable assurance about whether the FSA's consolidated financial statements as of and for the year ended September 30, 2020 are free from material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the financial statements. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed an instance of noncompliance or other matters that is required to be reported under *Government Auditing Standards* or OMB Bulletin No. 19-03, and which is described in the accompanying Exhibit C, *Requirement for Referring Delinquent Student Loan Debts to Treasury*.

*FSA's Responses to Findings*

The FSA's responses to the findings identified in our audit are described in Exhibit D. The FSA's responses were not subjected to the auditing procedures applied in the audit of the consolidated financial statements and, accordingly, we express no opinion on the responses.

Our response to FSA's response is included in Exhibit E.

*Purpose of the Other Reporting Required by Government Auditing Standards*

The purpose of the communication described in the Other Reporting Required by *Government Auditing Standards* section is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the FSA's internal control or compliance. Accordingly, this communication is not suitable for any other purpose.



Washington, D.C.
November 16, 2020

Exhibit A

*Material Weakness*

**Controls over the Reliability of Underlying Data Used in Credit Reform Re-estimates Need Improvement**

Under the *Federal Credit Reform Act of 1990* (FCRA), the United States Department of Education (Department) is required to perform periodic interest rate and technical re-estimates of the subsidy costs of its direct loan and guaranty programs. The re-estimates are calculated using an internally developed cash flow model. The cash flow model utilizes assumptions based on internally sourced data elements from Information Technology (IT) systems. The future cash flow outputs generated from the Department's cash flow model, the Student Loan Model (SLM), are then input into the format required by the Office of Management and Budget (OMB) Credit Subsidy Calculator (CSC), a required present value discount tool for agencies with credit reform programs. These procedures are necessary to generate subsidy re-estimates in accordance with the FCRA, as required by U.S. generally accepted accounting principles.

**Condition:**

The Department and FSA did not design and implement effective controls to ensure that the data used to develop the re-estimate is reliable, considering the elevated risk because of the control deficiencies related to IT systems discussed in Exhibit B of this report. Specifically, the Department and FSA rely on the IT systems to provide the data elements used in the cash flow model and do not perform sufficient procedures to ensure that such data is complete and accurate.

**Cause/Effect:**

The Department's and FSA's risk assessment process did not identify completeness and accuracy of the underlying data resulting from the IT system control deficiencies as a risk that required additional compensating controls.

Inadequate controls over the completeness and accuracy of the underlying data used to develop the re-estimate increases the risk that the financial statements could be materially misstated.

**Criteria:**

The following criteria were considered in the evaluation of the material weakness presented in this exhibit:

- The Standards for Internal Control in the Federal Government issued by the Comptroller General of the United States (the Green Book), Principle No. 10, *Design Control Activities*; Principle No. 11, *Design Activities for the Information* System; Principle No. 13, *Use Quality Information*.
- FASAB Technical Release 6, *Preparing Estimates for Direct Loan and Loan Guarantee Subsidies under the Federal Credit Reform Act – Amendments to Technical Release No. 3 Preparing and Auditing Direct Loan and Loan Guarantee Subsidies under the Federal Credit Reforms Act*, Paragraphs 20 and 40.

**Recommendations:**

We recommend that the Department and FSA:

1. Strengthen the risk assessment process by considering the impact of IT control deficiencies on internal controls over the reliability of information in the Department's IT systems. Such considerations should be documented.

2. Design and implement additional controls, over the completeness and accuracy of the underlying data used to develop the re-estimate.

4

Exhibit B

### *Significant Deficiencies*

**A.  Information Technology Controls Need Improvement**

The following control deficiencies in the areas of IT logical access, security management, segregation of IT duties, and application change management are related to both the Department and FSA systems.

**Conditions:**

In FY 2019, we reported a significant deficiency related to Federal Student Aid's (FSA's) IT controls due to persistent unmitigated IT control deficiencies. During FY 2020, the FSA management demonstrated progress implementing corrective actions to remediate some prior-year deficiencies such as system data validation. However, management has not fully remediated prior-year deficiencies related to logical access administration, separated/transferred user access removal, user access reviews and recertification, and configuration management. We noted IT control deficiencies related to security management, segregation of IT duties, and application change control for three of FSA's financial and mixed systems. In addition, we noted deficiencies related to Department-level logical access for its core financial management system. Specifically, we noted the following:

Department:

1.  Weakness in IT logical access controls. New and separated contractors were not consistently and accurately tracked resulting in the inconsistent reporting of start and termination dates and system access that was not always removed upon separation from the Department.

FSA:

1.  Weakness in IT security management controls:
    a.  The System Security Plan for one system was incomplete and did not fully define and document all relevant control enhancements in accordance with National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53, Revision (Rev.) 4, security control requirements.
    b.  Plan of Action and Milestone (POA&M) closure documentation did not always address the root cause of the deficiencies, thereby not preventing future reoccurrences.
2.  Weaknesses in IT controls related to the segregation of IT duties. For one FSA system, users with developer access had access to the system's production staging environment and update access to the production environment.
3.  Weakness in IT application change management controls. The application change management process was not consistently followed for one FSA system. We noted the documentation for a selection of changes indicated a) approvals of testing and/or post implementation validation (PIV) approvals could not be evidenced; and b) one instance of a change that was approved to migrate to the production environment prior to approval of the change testing.

**Cause/Effect:**

There was a lack of effective monitoring controls by the Department and FSA to ensure:

1.  Systems and support processes consistently adhered to documented agency-wide policies and procedures and the NIST security control requirements for the financially and mixed systems hosted and managed by FSA and the Department.

5

Additionally, there was a lack of effective enforcement and monitoring of IT controls by FSA to ensure:

1. Corrective actions to remediate prior-year conditions and associated causes are fully implemented, as well as verifying and validating that these corrective actions were effectively addressing the weakness with adequate documented supporting evidence.
2. Segregation of duties and least privilege principles are followed and enforced.
3. The established change process is followed, and application change tickets accurately document the key control points of the change process, such as approvals to commence with the change, approval of testing results, approval to migrate the change to the production environment, and PIV approvals.

Ineffective IT controls increases the risk of unauthorized use, disclosure, disruption, modification, or destruction of information and information systems that could impact the integrity and reliability of information processed in the associated applications which may lead to misstatements of the financial statements.

**Criteria:**

The following criteria were considered in the evaluation of the significant deficiency presented in this exhibit:

- The Departmental Directive OCIO 3-112, Cybersecurity Policy.
- Department Baseline Cybersecurity Standard, OCIO-STND-01, dated April 1, 2020, Section 3.13. Personnel Access.
- The Standards for Internal Control in the Federal Government issued by the Comptroller General of the United States (the Green Book), Section OV3.08 *Effect of Deficiencies on the Internal Control System*, Principle 3 *Establish Structure, Responsibility, and Authority, Documentation of the Internal Control System*, Principle No. 3.08 *Assignment of Responsibility and Delegation of Authority*, Principle No. 8.07 *Response to Fraud Risks*, Principle No. 10.3 *Design of Appropriate Types of Control Activities*, Principle No.10.12 *Segregation of Duties*, Principle No. 11, *Design Activities for the Information System*, and Principle No. 13, *Use Quality Information*, Principle No.17, *Evaluate Issues and Remediate Deficiencies*.
- National Institute of Standards and Technology Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations, Revision 4, dated April 2013, specifically security control requirements PL-2 System Security Plan, PM-4 Plan of Action and Milestone, AC-2 Account Management, AC-5 Separation of Duties, AC-6 Least Privilege, CM-3 Configuration Change Control, and CM-5 Access Restrictions for Change.

**Recommendations:**

We recommend that the Department:

1. Evaluate, develop, and implement a formal process to track and report all new and separated contractors.
2. Ensure separated contractors are off-boarded and system personnel are notified in a timely manner to disable or remove access to IT resources.
3. Provide training and oversight to Education personnel with on/off-boarding responsibilities to help ensure new/separated contractors are properly tracked.

We recommend that FSA:

4. Validate that financial and mixed system security plans have identified and documented the required security controls and control enhancements and the control implementation statuses in the plans as required by NIST SP 800-53. Additionally, implement a quality review process of the system security plans prior to signing the plans to ensure compliance with NIST 800-53 requirements.

6

5. Implement a process to evaluate the significance of a deficiency by considering the magnitude of impact, likelihood of occurrence, and nature of the deficiency and tailor the corrective actions to remediate the risk and address the root cause. Further, update guidance to ensure that quality reviews over the POA&M closure documentation are conducted to confirm the noted deficiencies are fully addressed to help prevent future reoccurrences.

6. Formally develop and implement a quality control review process to ensure that the application change control process is followed completely and accurately to validate that changes were tested and approved prior to migration and post implementation validation was performed, the relevant documentation and approvals are verified prior to closing the change ticket, as required by policy, and supporting documentation is retained.

7. Ensure segregation of duties and least privilege principles are adhered to when granting user access to prevent users with the ability to develop and/or change application code from having update access to the environment where the final tested and approved changes are staged prior to migration to the financial and mixed systems' production environment; and prevent users with access to develop code from having update access to the production environment.

7

**B.   Monitoring Controls over Service Organizations Need Improvement**

The Department and FSA relies on a certain IT system to store data for student loan programs. The Cost Estimation and Analysis Division (CEAD) within the Department also uses the data in the system for the development and update of the assumptions used in the re-estimation of subsidy allowance, a critical component of management's financial reporting process. The IT system is owned and controlled by FSA, who is responsible for the application-level internal controls, and is hosted by a service organization, who is responsible for internal controls at the data center.

**Condition:**

The Department and FSA did not have effective monitoring controls in place to ensure that the scope of the System and Organization Controls (SOC) 1, Type 2 report for the service organization and/or management's internal control processes sufficiently cover the relevant key controls to support the reliability and integrity of the data stored in the IT system. For example, we noted that there were not sufficient relevant controls identified and tested in the areas of mainframe operating system and security software, financial system production data bases, and financial system mainframe interface controls.

**Cause/Effect:**

FSA did not perform a comprehensive assessment of key relevant controls to appropriately assess the risks in the financial reporting process.

Ineffective monitoring controls over the service organization increases the risk of disruption, modification, or destruction of information that could impact the integrity and reliability of information processed in the associated application which may lead to misstatements of the financial statements.

**Criteria:**

The following criteria were considered in the evaluation of the significant deficiency presented in this exhibit:

- The Standards for Internal Control in the Federal Government issued by the Comptroller General of the United States (the Green Book), Section OV4.01 *Additional Consideration, Service Organizations*, Principle 16.08 - *Perform Monitoring Activities.*
- National Institute of Standards and Technology Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations, Revision 4, dated April 2013, specifically security control requirements SA-9 External Information System Services.

**Recommendations:**

We recommend that FSA:

1. Enhance their risk assessment to identify risks impacting financial reporting processes.
2. Identify the controls at the service organization for the systems that are responsive to risks and that are relevant to FSA's financial statements.
3. Regularly monitor and meet with the service organization to communicate and ensure that controls that are relevant to FSA for financial reporting are adequately tested for design, implementation, and operating effectiveness.
4. Assess the need to implement compensating controls for financial reporting in the event relevant controls at the service organization are not within the scope of the SOC 1 report.

8

### C. Entity Level Controls Need Improvement

The Department and FSA are continually seeking ways to improve accountability in achieving the entity's mission. A key factor in improving accountability in achieving an entity's mission is to implement an effective internal control system. The control environment sets the tone of an organization by influencing the control consciousness of its personnel. It is also the foundation for all components of internal control, providing discipline and structure. The Department and FSA need to address weaknesses in its entity-wide control environment as we have observed two entity-wide control environment conditions through our procedures that have a pervasive influence on the effectiveness of controls. These common themes, which contributed to the deficiencies noted above, are related to the entity's risk assessment and monitoring activities.

**Conditions:**

1. Risk Assessment- The Department and FSA's entity level controls were not designed and implemented appropriately in order to define objectives to enable the identification of risks, define risk tolerances and identified processes and controls responsive to those risks.
2. Monitoring Activities- The Department and FSA's entity level controls were not designed and implemented appropriately in order to remediate identified internal control deficiencies in a timely manner.

**Cause/Effect**

1. Risk Assessment considerations address the risks facing the entity as it seeks to achieve its objectives. This assessment provides the basis for developing appropriate risk responses. Specifically, inadequate risk assessment throughout the Department and FSA, prevented the proper identification and analysis of risks facing the Department and FSA, and from designing appropriate risk responses. For example, the Department did not identify the risk objectives that should have been either addressed by the SOC1, Type 2 report or through compensating controls at the Department and FSA, to support the reliability and integrity of the data used in the financial reporting process.
2. Monitoring Activities considerations address management's processes to establish and implement operations that assess the quality of performance over time and promptly resolve the findings of audits and other reviews. Specifically, insufficient monitoring has prevented the Department and FSA from ensuring that corrective action plans are implemented, and control deficiencies are remediated timely.

**Criteria**

The following criteria were considered in the evaluation of the significant deficiency presented in this Exhibit:

- GAO Standards for Internal Control in the Federal Government (Green Book) Principle 6, *Management should define objectives clearly to enable the identification of risks and define risk tolerances.*

- GAO Standards for Internal Control in the Federal Government (Green Book) Principle 17, *Management should remediate identified internal control deficiencies on a timely basis*

**Recommendations**

We recommend that management implement the following to improve the effectiveness of entity-level controls:

1. In the area of risk assessment, improve risk assessment process at the financial statement assertion level and at the process level to ensure the department is appropriately defining objectives to enable the identification of risks and define risk tolerances.

9

**Independent Auditors' Report**

2.  In the area of monitoring activities, implement key monitoring controls to ensure that corrective action plans are implemented to timely remediate control deficiencies identified. In addition, increase oversight, review, and accountability over the process among various offices and directorates within the Department and FSA.

10

Exhibit C

*Compliance Matter*

Requirement for Referring Delinquent Student Loan Debts to Treasury

In 2014, Federal Law (31 U.S. Code Section 3716(c) (6)) was amended (Public Law 113-101 (*DATA Act*) Section 5) to require agencies to notify the Secretary of the Treasury of valid, delinquent nontax debts that are over 120 days delinquent – 60 days earlier than the previous 180 days requirement – for the purpose of administrative offset (i.e., collection through the reduction of future Federal payments). FSA's current business process, which requires loans to be transferred to the default loan servicer after 360 days of delinquency, is not in alignment with the reporting requirements. Further, due to the number of entities and systems involved in handling student loan debts and the decentralized nature of such processes, FSA is not yet capable of meeting this accelerated timeline. Accordingly, as of September 30, 2020, FSA is not in compliance with the requirement to refer student debt delinquent for 120 days to the Department of the Treasury.

To meet this requirement, the FSA obtained legal clarification in 2015 as to how certain specific requirements of the amended law apply to the Direct Loan Program and other FSA programs. The FSA is improving delinquent debt reporting procedures, increasing the frequency of some debt referrals, and modifying its defaulted loan management system to accommodate this change. The FSA has developed a long-term project plan to incorporate the referral requirements into various servicer contracts and guaranty agency agreements, so it can initiate the required system programming changes.

Recommendation:

We recommend that the FSA continue to execute the corrective actions as outlined in FSA's project plan to comply with the timing requirement for the referral of delinquent non-tax debts.

11

Exhibit D

*Management's Response*


Aᴎ OFFICE of tᴎe U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR *of the* AMERICAN MIND "

November 13, 2020

MEMORANDUM

TO:      Sandra D. Bruce
            Deputy Inspector General
            Delegated the Duties of the
            Inspector General

FROM:   Alison L. Doone
            Chief Financial Officer

SUBJECT:  DRAFT AUDIT REPORTS
            Fiscal Years 2020 and 2019 Financial Statements
            Federal Student Aid
            ED-OIG/A17U0002

With respect to the Fiscal Year 2020 Financial Statement Audit, Federal Student Aid (FSA) received the findings and recommendations as identified in the Independent Auditors' Report and provides the following responses.

*Exhibit A*
*Material Weakness*

**Controls over the Reliability of the Underlying Data Used in Credit Reform Re-estimates Need Improvement**

FSA does not concur with the material weakness and believes the information technology (IT) findings in Exhibit B, individually and in aggregate, do not rise to the level of a material weakness. Further, it appears that the basis of the material weakness is duplicative of the significant deficiencies.

The FSA system that provides data to the Department's Student Loan Model is a High-Value Asset (HVA) as authorized by the Department of Education (ED) Chief Information Officer in accordance with Office of Management and Budget Memoranda M19-03, M16-04, and M-17-09. In compliance with Department of Homeland Security (DHS) requirements, an HVA assessment was performed independently by a DHS assessment team on the FSA HVA, including Risk Vulnerability Assessment (technical testing) and Security Architecture Review (assessment of the system architecture and procedures surrounding system cyber management). Following the initial assessment, FSA implemented additional independent HVA oversight processes including the Ongoing Security Assessment (OSA), Authority to Operate (ATO), and continuous monitoring programs which tests the DHS HVA Control Overlay as part of normal testing processes. FSA measures HVA compliance with these standards through use of the ED Cyber Security Framework Risk Scorecard which uses up-to-date threat information regarding federal information and systems. HVA scores reflect the continuous monitoring and remediation of threats as they are identified for each HVA.

12

Thus, FSA has numerous controls and mechanisms in place to protect the IT system that provides the data used to develop the subsidy re-estimate. The material weakness refers to the control findings and recommendations discussed in Exhibit B of the report. FSA's responses to the findings in Exhibit B are provided in the following section.

*Exhibit B*
*Significant Deficiencies*

### A. Information Technology Controls Need Improvement

FSA does not agree that Plan of Action and Milestone (POA&M) closure documentation did not address the root causes of the deficiencies and that closure evidence was insufficient. FSA has a mature program that ensures POA&Ms are developed to address root causes and document specific deficiencies, recommendations, and corrective action plans. The POA&Ms are reviewed by an independent verification and validation team to ensure all processes are followed and that actions and remediation artifacts are sufficient and appropriate to close POA&Ms. Further, the findings do not consider the compensating controls that prevent inappropriate access, support segregation of duties, and ensure the integrity of application change management.

### B. Monitoring Controls over Service Organizations Need Improvement

FSA does not concur with the findings. In FY 2020, FSA assessed and ensured key relevant controls at the service organization that pertained to FSA's financial reporting process were included in the scope of the service organization's System and Organization Controls (SOC) 1, Type 2 report. FSA also had effective monitoring controls in place to ensure the scope of the SOC1 report for the service organization and management's internal control processes covered the relevant key controls to support the reliability and integrity of the data stored in the IT system. Those included the FISCAM components of security management, access controls, configuration management, segregation of duties, and contingency planning. In FY 2020, FSA worked with the service organization to ensure the SOC1 report provided by the independent auditor covered testing of each FISCAM-defined control technique for each of the five control activities. Relevant controls were identified and tested for design and operating effectiveness where applicable in the areas of mainframe operating system and security software.

### C. Entity Level Controls Need Improvement

FSA does not concur with the findings. FSA entity level controls are designed and implemented to enable the identification of risks, define risk tolerances, identify processes and controls responsive to those risks, and remediate identified internal control deficiencies in a timely manner. FSA has entity-wide processes in place that follow the principles of the GAO Green Book to define objectives, identify risks, and establish control activities for all infrastructure and systems. As noted in the Monitoring Controls over Service Organizations Need Improvement section above, FSA assessed and ensured key relevant controls at the service organization and had effective monitoring controls in place to ensure the scope of the SOC1 report for the service organization and management's internal control processes covered the relevant key controls to support the reliability and integrity of the data stored in the IT system.

13

Exhibit E

### *Auditors' Response to Management's Response*

We appreciate FSA management's response to our report, presented in Exhibit D.

In the area of controls over the reliability of the data used in the credit reform subsidy re-estimate process, we noted that the control deficiencies identified in the area of Information Technology (IT) elevate the risk that the underlying data used in the re-estimate may not be complete and accurate. For example, we noted that FSA's processes, controls and documentation did not demonstrate management's assessment of the risks related to the reliability of the underlying data posed by the IT control deficiencies and how such risks have been properly mitigated. As such, while the deficiencies related to the IT systems continue to be reported a significant deficiency, the lack of compensating controls to support the reliability of the underlying data is considered a material weakness.

In the area of the significant deficiency over IT controls, we identified numerous control deficiencies, including certain deficiencies that continued to exist for a number of years. We noted instances where management corrective actions were not properly designed and implemented to address the root cause of the findings. We also noted that certain corrective action plans where not implemented for the majority of the fiscal year. Moreover, control deficiencies continued to exist in the area of monitoring controls over service organizations. For example, the scope of the System and Organization Controls (SOC) 1, Type 2 reports reviewed by FSA did not always include certain key control objectives for the systems that FSA relies upon. IT controls, combined with IT application-level and manual controls, are critical to ensure accurate and complete processing of transactions and integrity of data stored in the IT systems.

In the area of entity level controls, we noted that the matters presented in our audit report, and reiterated in the preceding paragraphs, are indicative of lack of sufficient entity level controls in the areas of monitoring and risk assessments activities. For example, untimely remediation of repeat control deficiencies from prior years demonstrates the need for improvement in monitoring activities. The lack of properly calibrated risk assessments to address specific risks related to the underlying data used in the financial reporting process illustrates the need for improvement in the entity risk assessment process.

14



## Other Information (Unaudited)

*This page is intentionally left blank*

# Other Information

## Summary of Financial Statement Audit and Management Assurances

### Summary of Financial Statement Audit

**Audit Opinion:** Unmodified

**Restatement:** No

**Table 69: Material Weaknesses**

| Material Weaknesses | Beginning Balance | New | Resolved | Consolidated | Ending Balance |
|---|---|---|---|---|---|
| Total Material Weaknesses | 1 | 1 | 1 | 0 | 1 |

For details on the management assurances related to the FSA programs, please refer to the *Analysis of Systems, Controls and Legal Compliance* discussion in the Management's Discussion and Analysis section of this document as well as the *Summary of Financial Statement Audit and Management Assurances* section in the Other Information section of the Department's *AFR*.

## FSA Management Challenges

For details on FSA Management Challenges, please refer to the *Office of Inspector General's Management Challenges for FY 2020 Executive Summary* found in the Other Information section located within the Department's *AFR*.

## Payment Integrity

### *Payment Integrity Information Act* Reporting Details

The *Payment Integrity Information Act of 2019* (Pub. L. 116-117) requires federal agencies to report information annually on improper payments to the President and Congress. For improper payments information, FSA's activities are part of an overall Departmental integrated reporting effort and reported on https://paymentaccuracy.gov.

In FY 2020, the Pell Grant and Direct Loan Programs are the FSA programs identified as susceptible to significant improper payments and OMB designated high priority programs. FSA continues to place additional emphasis on these important programs as required by OMB guidance to ensure payment integrity and minimize improper payments. Details on FSA's Pell Grant and Direct Loan improper payment estimation methodologies, improper payment estimates, root causes, and corrective actions can be found at **paymentaccuracy.gov**.



**Appendices**

*This page is intentionally left blank*

# Appendix A: Discontinued Strategic Goals and Performance Metrics

In FY 2019, FSA initiated the development of an organizational five-year performance plan that aligned with its vision to create a more student-focused, agile, and transparent organization. The *FY 2020–24 Strategic Plan*, establishes ambitious goals and objectives to ensure that FSA will continue to improve upon its mission while increasing accountability in all areas of organizational performance. The development of the new strategic plan was coordinated with the closing of FSA's *FY 2015–19 Strategic Plan* on September 30, 2019.

To maintain consistency with the previous strategic plan, FSA transitioned eight performance metrics into its new strategic plan, while discontinuing five performance metrics from the previous strategic plan. The discontinued metrics are presented below. For more information on the prior year results of the discontinued metrics, refer to the *FSA FY 2019 Annual Report*.

**Table 70: Discontinued Performance Metrics**

| Performance Metric | Title |
|---|---|
| Performance Metric A.4 | Social Media Channel Subscribership |
| Performance Metric B.1 | Improper Payment Rate |
| Performance Metric C.1 | Aid Delivery Costs per Application |
| Performance Metric D.2 | Percentage of Contract Dollars Competed by FSA |
| Performance Metric D.3 | Collection Rate |

*This page is intentionally left blank*

# Appendix B: Glossary of Acronyms and Terms

| Acronym | Description |
| --- | --- |
| **A** | |
| ABCP Conduit | Asset-Backed Commercial Paper Conduit |
| ACSI | American Customer Satisfaction Index |
| AD | Administratively Determined |
| *AFR* | *U.S. Department of Education FY 2020 Agency Financial Report* |
| *Annual Report* | *Federal Student Aid FY 2020 Annual Report* |
| APG | Agency Priority Goal |
| Appendix A | OMB Circular A-123, Appendix A, Management of Reporting and Data Integrity Risk |
| AR | Abandon Rate |
| ASA | Average Speed to Answer |
| ASLA | Annual Student Loan Acknowledgement |
| AWG | Administrative Wage Garnishments |
| **B** | |
| BD | Borrower Defense |
| BPO | Business Process Operations |
| **C** | |
| CARES Act | *Coronavirus Aid, Relief, and Economic Security Act* |
| Caucus | Student Loan Ombudsman Caucus |
| CDR | Cohort Default Rate |
| COD | Common Origination and Disbursement |
| COO | Chief Operating Officer |
| COVID-19 | Coronavirus Disease 2019 |
| CSRS | Civil Service Retirement System |

**Appendix B: Glossary of Acronyms and Terms**

| D | |
|---|---|
| DCC | Digital Customer Care |
| DDB | Death, Disability, and Bankruptcy |
| the Department | U.S. Department of Education |
| Direct Loan | William D. Ford Federal Direct Loan |
| DMCS | Debt Management and Collection System |
| DOL | U.S. Department of Labor |
| DRG | Default Resolution Group |

| E | |
|---|---|
| ECASLA | *Ensuring Continued Access to Student Loans Act of 2008* |
| EDWA | Enterprise Data Warehouse and Analytics |
| ERM | Enterprise Risk Management |

| F | |
|---|---|
| FAFSA® | Free Application for Federal Student Aid® |
| FASAB | Financial Accounting Standards Advisory Board |
| FCRA | *Federal Credit Reform Act of 1990* |
| FECA | *Federal Employees' Compensation Act* |
| Federal Funds | Federal Student Loan Reserve Funds |
| FERS | Federal Employees Retirement System |
| FEVS | Federal Employee Viewpoint Survey |
| FDMS | Feedback and Dispute Management System |
| FFEL | Federal Family Education Loan |
| FMFIA | *Federal Managers' Financial Integrity Act of 1982* |
| FRD | Fraud Risk Division |
| FSA | Federal Student Aid |
| FSA PPO | Federal Student Aid Partner and Participation Oversight |
| FSATC | Federal Student Aid Training Center |
| FSEOG | Federal Supplemental Educational Opportunity Grant |
| FUTURE Act | *Fostering Undergraduate Talent by Unlocking Resources for Education Act* |
| FY | Fiscal Year |
| *FY 2015–19 Strategic Plan* | *Federal Student Aid for Fiscal Years 2015–19 Strategic Plan* |

| FY 2020–24 Strategic Plan | Federal Student Aid for Fiscal Years 2020 Through 2024 Strategic Plan |
|---|---|
| **G** | |
| GAAP | Generally Accepted Accounting Principles |
| GAO | Government Accountability Office |
| GLBA | *Gramm-Leach-Bliley Act* |
| GS | General Schedule |
| GSMR | Granite State Management and Resources |
| **H** | |
| HCERA | *Health Care and Education Reconciliation Act of 2010* |
| HCWG | Human Capital Working Group |
| HEA | *Higher Education Act of 1965,* as amended |
| HEAL | Health Education Assistance Loan |
| **I** | |
| IDR | Income Driven Repayment |
| IFAP | Information for Financial Aid Professionals |
| IHE | Institution of Higher Education |
| IRS | Internal Revenue Service |
| **L** | |
| LMS | Learning Management System |
| **M** | |
| Met | Performance result met or exceeded target |
| MOU | Memorandum of Understanding |
| MSI | Minority Serving Institution |
| MSURSD | Minority-Serving Under-Resourced Schools Division |
| **N** | |
| N/A | Performance result is not applicable because the performance metric was not developed, the performance metric was not implemented, or the required data were not available in time for inclusion. |
| Next Gen FSA | Next Generation Financial Services Environment |
| Next Gen PPO | Next Generation Partner Participation and Oversight |
| NFP | Not-For-Profit |
| Not met | Performance result did not meet target |

| | |
|---|---|
| NSLDS | National Student Loan Data System |

**O**

| | |
|---|---|
| OCIO | Office of the Chief Information Officer |
| OIG | Office of Inspector General |
| OIO | Operational Improvement and Oversight |
| OMB | U.S. Office of Management and Budget |
| OMB Circular A-123 | OMB Circular A-123, *Management's Responsibility for Enterprise Risk Management and Internal Control* |
| OPEID | Office of Postsecondary Education Identification |
| OPM | U.S. Office of Personnel Management |

**P**

| | |
|---|---|
| PAYE | Pay As You Earn |
| PBO | Performance-Based Organization |
| PCA | Private Collection Agency |
| Pell Grant | Federal Pell Grant Program |
| PEPS | Postsecondary Education Participants System |
| PHEAA | Pennsylvania Higher Education Assistance Agency |
| PLUS | Parent Loan for Undergraduate Students |
| POE | Principles of Excellence |
| President's Budget | *Budget of the United States Government* |
| Pub. L | Public Law |
| PSLF | Public Service Loan Forgiveness |

**S**

| | |
|---|---|
| SBR | Statement of Budgetary Resources |
| Secretary | Secretary of Education |
| SecOps | Security Operations |
| SES | Senior Executive Service |

**T**

| | |
|---|---|
| TEACH Grant | Teacher Education Assistance for College and Higher Education Grant |
| TEPSLF | Temporarily Expanded Public Service Loan Forgiveness |
| Title IV | Title IV of *the Higher Education Act of 1965*, as amended |
| TIVAS | Title IV Additional Servicers |

| | |
|---|---|
| TOP | Treasury Offset Program |
| TPD | Total and Permanent Disability |
| TPDR | Third-Party Debt Relief |
| Treasury | U. S. Department of Treasury |

## U

| | |
|---|---|
| U.S. | United States |

## W

| | |
|---|---|
| WDD | Workforce Development Division |

*This page is intentionally left blank*

# Appendix C: Availability of the Federal Student Aid Annual Report

The *Federal Student Aid FY 2020 Annual Report* and the *Annual Reports* from prior years are available on the following websites:

- **FSA: StudentAid.gov/strategic-planning-reporting**
- **The Department: http://www.ed.gov/about/reports/annual/index.html**

The *Federal Student Aid Fiscal Years 2020 Through 2024 Strategic Plan* and prior years' strategic plans are also available at **StudentAid.gov/strategic-planning-reporting**.

Stay connected to Federal Student Aid through social media:

- Visit the FSA website: **StudentAid.gov**
- Like FSA on Facebook  : **Facebook.com/FederalStudentAid**
- Follow FSA on Twitter  : **@FAFSA**
- Find FSA on YouTube  : **YouTube.com/user/FederalStudentAid**

*This page is intentionally left blank*



# Acknowledgements

The *FSA FY 2020 Annual Report* was prepared with the energies and talents of many Federal Student Aid employees. To these dedicated individuals, the Chief Operating Officer and Chief Financial Officer would like to offer their sincere appreciation and recognition.

In particular, we would like to recognize the following Federal Student Aid offices for their contributions:

- Finance Office.
- Strategic Planning and Reporting.
- Office of the Ombudsman.
- Office of Strategic Communications.
- COO Front Office.

We also offer our sincerest thanks and acknowledgement to the staff of the following other offices within the Department of Education for their contributions:

- Office of Finance and Operations.
- Budget Service.
- Office of the Secretary.
- Office of Legislation and Congressional Affairs.
- Office of Chief Information Officer.

We would also like to acknowledge the Office of Inspector General and KPMG LLP for the professional manner in which they conducted the audit of the FY 2020 Financial Statements.

The *Federal Student Aid FY 2020 Annual Report*

Federal Student Aid
A Principal Office of the U.S. Department of Education
Finance Office
November 2020

