JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
CLAIRE TORCHIANA (SBN 330232)
ctorchiana@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*pro hac vice*)
tomerrill@law.harvard.edu
MARGARET E. O'GRADY (*pro hac vice*)
mogrady@law.harvard.edu
REBECCA C. ELLIS (*pro hac vice*)
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

　　　　　*Plaintiffs*,

　　　v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education,

and

THE UNITED STATES DEPARTMENT OF EDUCATION,

　　　　　*Defendants*.

Case No. 19-cv-03674-WHA

[PROPOSED] **SUPPLEMENTAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Class Action)
(Administrative Procedure Act Case)

**PRELIMINARY STATEMENT**

1. Plaintiffs' Class Action Complaint for Declaratory and Injunctive Relief in this action (ECF No. 1) ("Complaint"), filed on June 25, 2019, alleged that the United States Department of Education ("Department") and its Secretary[1] (together, "Defendants") abdicated their responsibility to decide borrower defense applications on the merits, leaving over 160,000 borrowers in limbo, some for over four years, in contravention of the Administrative Procedure Act.

2. The Defendants' brazen policy of inaction caused members of the certified class of borrowers to lose wealth and opportunity that they will never recover, along with causing significant emotional distress and associated physical harm.

3. Between June 2018 and December 2019, the Department did not issue a single borrower defense decision.

4. Then, in the spring and summer of 2020 — after Plaintiffs and Defendants had entered into a settlement agreement — the Department suddenly ramped up a practice of sending borrowers "alarmingly-curt denial notices" on their borrower defense claims, in an effort to "clear the backlog" of applications and to appear as if they were adjudicating claims on the merits. *See* Order Denying Class Settlement, to Resume Discovery, and to Show Cause ("Discovery Order"), ECF No. 146 at 5.

5. But this flurry of denials — now numbering over 128,000 — is a smokescreen.  The Department did not actually restart the borrower defense adjudication process that, as detailed in Plaintiffs' initial Complaint, it had unlawfully halted. Rather, Defendants began a new process of sending boilerplate denial notices to as many applicants as possible, without adjudicating claims on the merits. *See* https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data (latest decision totals as of 11/30/2020).

---

[1] For most of the time period at issue in this Supplemental Complaint, the Secretary of Education was Elisabeth DeVos. Ms. DeVos resigned her position on January 7, 2021. Miguel Cardona was confirmed as Secretary of Education on March 1, 2021.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

6. The form denial notices and subsequent discovery about the Department's adjudication practices and procedures have demonstrated that, since the Complaint was filed, the Department has not remedied its unlawful policy of refusing to issue decisions on the merits of borrower defense claims. Instead, it has added new legal violations: (1) adopting a policy of near-automatic denial of borrower defense applications regardless of the factual or legal merits of an individual application, in violation of section 706(2) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the Due Process Clause of the U.S. Constitution, amend. 5; and (2) issuing unlawful denials of borrower defense applications in violation of section 555(e) of the APA, 5 U.S.C. § 555(e).

7. The Defendants have refused to decide borrower defense applications on the merits and in accordance with applicable law since February 2017.

8. The Department's refusal to process borrower defense applications on the merits, and its web of policies and procedures designed to reach "no" on nearly every application, remain in place to this day.

9. The harm to borrowers from the Defendants' actions is imminent and ongoing. Borrowers who have received denial notices, which do not represent decisions on the merits, have not been fully informed of their rights. There is no reconsideration process in place. And members of the class face the threat of being thrust back into repayment, which would be economically catastrophic.

10. Plaintiffs submit this Supplemental Complaint to update and conform their claims to the nature of Defendants' present unlawful conduct.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this case, including this Supplemental Complaint, for the reasons set forth in ¶ 11 of the Complaint.

12. This Court is authorized to grant the relief requested in this case, including in this Supplemental Complaint, for the reasons set forth in ¶ 12 of the Complaint.

13. Venue is proper in this judicial district for the reasons set forth in ¶ 13 of the Complaint.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

## PARTIES

14. Plaintiffs incorporate Paragraphs 15-21 of their Complaint (ECF No. 1) as if set forth fully herein.

15. Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Cardona has been substituted for Elisabeth DeVos in his official capacity as Secretary of the United States Department of Education.

## SUPPLEMENTAL ALLEGATIONS COMMON TO THE CLASS

16. Plaintiffs incorporate Paragraphs 24-235 of their Complaint (ECF No. 1) as if set forth fully herein.

### I.   The Department's Policies in Support of Mass Denials

**A.  May 2017: The Genesis of the "No Decisions" Policy**

17. The Department's policy of refusing to issue decisions on BD applications was in place for a significantly longer period of time than Plaintiffs alleged in their original Complaint. In fact, with the exception of a single type of claim for a single six-month period (detailed *infra*), the Department had a "no decisions" policy in place for approximately 31 months — from May 4, 2017, through December 11, 2019.

18. The Defendants have denied the existence of a blanket policy governing the cessation of issuing borrower defense decisions. *See* Class Certification Order, ECF No. 46 at 7 ("[Defendants] complain that plaintiffs do not allege any facts regarding some explicit order from on high within the Department . . . ."); Defs.' Opp. to Pltfs.' Mot. for Class Cert., ECF No. 38 at 10 (arguing that Plaintiffs' claims are "founded on erroneous speculation that the Department has made a universal decision not to grant or deny any pending borrower defense claims," and that Plaintiffs "identify no such policy [of inaction], written or otherwise"); Defs.' Mot. for Summ. J., ECF No. 63 at 19 ("Thus, it is simply not the case that the Department is engaged in a policy of total inaction with respect to borrower defense claims.").

19. However, there *was* such an order from "on high."

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

20. In or around May 2017, then-Secretary DeVos signed a memorandum dated May 4, 2017, from then-Acting Under Secretary James Manning (the "Manning Memo"), which recommended several action items on borrower defense. DOE00002144.

21. The Manning Memo stated that Under Secretary Manning had established a Borrower Defense Review Panel (the "Review Panel") "to examine the claims and background information and make recommendations on how to resolve the pending claims and proceed in the future." *Id.*

22. The Manning Memo described a process by which the Review Panel had sought to rescind the approvals of over 16,000 borrower defense ("BD") applications that had been granted by the previous administration, but for which the borrowers' loans had not yet been discharged. The Review Panel reluctantly concluded that there was no "appropriate basis for taking any actions other than to approve discharge." *Id.* at -2145.

23. Accordingly, the Manning Memo recommended that Secretary DeVos proceed with discharge of these loans, which the Secretary did, signing her name to the memo along with the handwritten phrase, "with extreme displeasure." *Id.* at -2147.

24. As to the borrower defense process generally, the Manning Memo observed that, previously, the borrower defense regulation had been "often liberally applied in the light most favorable to the borrower," raising "significant concerns." The Manning Memo also complained that "[f]lexible interpretations of state law most favorable to student borrowers also appear to have been used to circumvent any requirement that the claimant directly prove damages." Thus, "[g]oing forward, we should establish a balanced process with clear and objective standards that require strong evidence of harm or damages to the student." *Id.* at -2145.

25. Neither the Higher Education Act (HEA) nor the 1995 borrower defense regulations in place at the time of the Manning Memo required a borrower defense claimant to "directly prove damages."

26. Neither the HEA nor the 1995 borrower defense regulations in place at the time of the Manning Memo set out or required a "strong evidence of harm or damages" standard.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

27. To the contrary, the 1995 borrower defense regulations required only that the borrower assert "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable state law." 34 C.F.R. § 685.206(c)(1).

28. Neither the HEA nor the 1995 borrower defense regulations in place at the time of the Manning Memo prevented the Department from construing state law in a light favorable to the borrower.

29. The Manning Memo recommended that Secretary DeVos direct Under Secretary Manning, the Review Panel, and the Internal Control Unit of the Department's Chief Financial Officer to work with Federal Student Aid ("FSA") to develop "interim procedures" to handle pending BD claims until new, permanent borrower defense regulations were implemented — the latter of which would "take at least a year." DOE00002144, at -2146.

30. Under Secretary Manning asked Secretary DeVos to "direct no additional claims be approved until these interim procedures are finalized." *Id.*

31. Under Secretary Manning also recommended that Secretary DeVos request the Department's Office of Inspector General ("OIG") to "conduct an independent and comprehensive review" of the BD program. *Id.* at -2145 to -2146.

32. In a deposition on December 17, 2020, Mr. Manning denied that he had written this memorandum and stated that he did not recall who wrote it. Manning Dep. 67:16 – 68:6.

**B. Spring 2017 Through Summer 2019: "No Decisions" Policy Remains in Place, With One Temporary Exception**

33. After then-Secretary DeVos signed the Manning Memo, she requested that OIG conduct a review of the borrower defense process, as the memo had recommended.

34. On May 4, 2017, the date of the Manning Memo, the Department's Borrower Defense Unit ("BDU") stopped adjudicating any BD claims. *See* OIG Report, appended to Nevin Decl, ECF 56-4, at AR 512.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

35. While the OIG investigation was ongoing, the BDU was instructed to stop developing memoranda on whether additional categories of BD claims qualified for discharge. *Id.* at AR 509, 515.

36. While the OIG investigation was ongoing, the BDU spent a significant amount of time responding to requests from OIG. Nevin Dep. 134:1-11.

37. OIG issued its report on December 8, 2017. *See* OIG Report, AR 496.

38. The OIG report recommended, among other things, that the Chief Operating Officer ("COO") of FSA "[r]equest approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories" – referring to approval criteria developed under the previous administration for certain BD claims from borrowers from Corinthian Colleges, Inc. ("CCI") and ITT Technical Institute ("ITT"). *Id.* at AR 516.

39. OIG also recommended that the COO of FSA "[r]equest approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge." *Id.* at AR 516.

40. OIG required the Department to develop a corrective action plan in response to its report. *Id.* at AR 498.

41. The BDU resumed adjudication of one specific category of BD applications on or about October 30, 2017: applications from borrowers who attended CCI schools and made BD claims based on CCI's misrepresentations of its job placement rates ("JPRs"). Nevin Decl., ECF No. 56-4 ¶ 59.

42. In December 2017, the Department resumed processing relief for approved CCI JPR claims under its newly announced "partial relief" methodology. *Id.* ¶¶ 62-63.

43. At this time, the Department was "focused" on CCI JPR claims, and did not resume adjudication or processing of BD applications from any other school(s) or that asserted any other types of claims. Nevin Dep. 138:13 – 139:3.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

44. BDU Director Colleen Nevin believes that, at some point after the OIG report was issued, there may have been a "conversation" about the resumption of work on other types of claims between then-Under Secretary Manning and then-Chief Enforcement Office of FSA Julian Schmoke. Nevin Dep. 140:12-22.

45. However, the CCI JPR applications "were exceeding" what the limited BDU staff was "able to adjudicate," and thus the BDU did not at this time approve or deny any BD applications other than CCI JPR claims. Nevin Dep. 141:16-25.

46. BDU Director Nevin had requested additional staff for the BDU multiple times, but each time her requests were denied, and she was not given a reason. Nevin Dep. 145:3-9.

47. In spring 2018, litigation in the case *Calvillo Manriquez v. DeVos*, No. 17-cv-07210-SK (N.D. Cal.),[2] challenged the Department's December 2017 "partial relief" methodology. That case concerned **only** borrowers who had made BD claims based on CCI's JPR misrepresentations, because those were the only borrowers subject to the new "partial relief" methodology.

48. In May 2018, the court in *Calvillo Manriquez* issued an injunction that prevented the Department from applying the "partial relief" methodology to *Calvillo Manriquez* class members, because the Department's use of Social Security data to apply the methodology violated the Privacy Act. *See* Order, *Calvillo Manriquez*, No. 17-cv-07210-SK (N.D. Cal. May 25, 2018), ECF No. 60.

49. The *Calvillo Manriquez* injunction affects a specific subset of borrowers and the application of a specific methodology. First, it applies only to members of the *Calvillo Manriquez* class, who are a subset of BD applicants with certain JPR claims who attended certain programs during certain periods of time at schools owned by CCI. Second, the injunction prevents the Department from using Social Security data to determine percentages of relief; using a different formula would be permissible.

---

[2] Members of the class in *Calvillo Manriquez* are not class members in this case. *See* Order on Class Certification, ECF No. 46 at 14.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

50. BDU Director Nevin admitted that, under the *Calvillo Manriquez* injunction, the Department could have issued grants of 100% relief for CCI JPR claims, or any amount of relief for any other type of claim. Nevin Dep. 149:23 – 150:1.

51. BDU Director Nevin testified that, as of August 2019, there had not been any discussion within FSA about granting 100% relief to any class of claims. As of December 9, 2020, BDU Director Nevin could not recall any instances of 100% relief being granted on any application since the *Calvillo Manriquez* injunction went into effect. Nevin Dep. 150:23 – 151:2, 160:23 – 161:5.

52. Despite the limited scope of the *Calvillo Manriquez* injunction, the Department repeatedly cited it as a reason that it could no longer make BD application decisions, stating that because the specific CCI JPR partial relief methodology was on hold, all borrower defense decisions would be, too. *See, e.g.*, DOE00007209, at -7213, -7214.

53. Once the Department devised a new partial relief methodology, however, it acknowledged that "the injunction does not prevent the Department from utilizing the new methodology to process borrower defense applications for borrowers that are not part of the class that has been certified in *Calvillo Manriquez*, including non-JPR Corinthian claims and claims filed by borrowers who attended other institutions." DOE00013647, at -648.

54. The Department ceased issuing *any* borrower defense decisions, including CCI JPR decisions, on or about June 12, 2018.

55. The Department did not issue another borrower defense decision until December 11, 2019.

56. Thus, except for an approximately 6-month period of processing CCI JPR claims (from December 2017 through May 2018), the Department's "no decisions" policy on BD applications remained in place for over 31 months, from May 4, 2017, through December 11, 2019.

57. Meanwhile, members of the Department continued to express open hostility toward borrower defense.

58. A set of talking points created by or for Diane Auer Jones, then the Principal Deputy Under Secretary of the Department, described "[m]any" BD claims as "'stab in the dark' efforts to get

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

loans forgiven because a student didn't like a particular instructor or because, in general, the student feels like the education wasn't what they expected it to be." DOE00007289, at -7290.

59. The same document also claimed that:

    i.  the 2016 BD regulations "enabled activists to destroy an institution financially by making accusations against it" (*id.* at -7289);

    ii.  the 2016 BD regulations "denied institutions due process rights" and wrongly put the Department in the position of "being accuser, judge and jury" of a school against which BD applications are filed, "of course playing this role with other's people's money" (*id.* at -7291);

    iii.  the Department unfairly "force[d] Corinthian Colleges out of business" (*id.* at -7290);

    iv.  the Department has "never itself validated" that Corinthian made widespread job placement rate misrepresentations (*id.* at -7290);

    v.  borrower defense was intended to be only a "last resort" for borrowers in default (*id.* at -7290);

    vi.  borrower defense "eliminates any level of personal responsibility in selecting a school or program that meets the needs of the student" (*id.* at -7291);

    vii.  borrower defense results in unfair outcomes where "taxpayers who didn't have the luxury of going to college are[] stuck with the bill for those who did" (*id.* at -7291);

    viii.  the Department's new 2019 BD regulations would ensure that "specious claims can be more quickly removed" (*id.* at -7291); and

    ix.  the Department's new 2019 regulations would ensure that the BD adjudication process "requires something more than hearsay evidence to find a school guilty" (*id.* at -7291).

60. An internal Department memorandum from 2018 showcased a dismissive stance toward the validity of BD claims based on omissions, likening such claims to statements like, "[m]y school

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

never told me that underwater basket weavers don't get paid well." How to Review a Borrower Allegation in a One-off or Small Batch Application at 2.

61. An internal memorandum recommending the adoption of the Department's 2019 partial relief methodology (discussed *infra* ¶¶ 318-321) argued that calculations for partial relief should uniformly be based on a family size of one, "because decisions borrowers make regarding their family size are not the responsibility of the institution." DOE00013647, at -649.

62. That memorandum ultimately recommended a methodology that would provide full relief to a successful BD applicant only if the earnings "imputed" to that borrower based on group data were within the lowest 2.5% of earnings for graduates of "similar" programs. *Id.* at -651.

63. The Department's 2019 partial relief methodology has resulted in "grants" or "approvals" of BD claims in name only. For example, the Department has "granted" 0% loan cancellation to some borrowers from ITT who are deemed to have an "eligible" borrower defense application — *i.e.*, who are found to have been subject to actionable misrepresentations.

64. As of August 2020, 17 individuals with "eligible" applications had been "granted" 0% relief.  Letter from K. Davis to E. Connor, Connor Dec., ECF No. 108-2, at 9.

65. The Department has never explained how or why a "grant" of 0% relief should be considered an "approval" of a BD claim and not a denial.

**C. Summer 2019: The Backlog and the Excuses**

66. Plaintiffs filed their Complaint in this case on June 25, 2019. At that time, it had been approximately one year since the Department had issued a borrower defense decision.

67. In in an internal presentation dated August 21, 2019, the Department reported that, at that time, over 177,000 BD applications were awaiting adjudication. DOE0009509, at -9510.

68. Between the collapse of CCI in spring 2015 and August 21, 2019, the Department had only approved BD applications for borrowers associated with two school groups: CCI and ITT.[3] As of

---

[3] The Department had also granted a single group borrower defense application, from the Massachusetts Attorney General asserting claims on behalf of Massachusetts students of American

~~[PROPOSED]~~ SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

August 21, 2019, only 70 applications from ITT had been approved, while over 450 had been denied. *Id.* at -9513.

69. BDU Director Nevin testified that it was still true as of December 9, 2020, that the only individual (non-group) BD claims that had been granted since 2015 were for borrowers with claims against CCI and ITT schools.  Nevin Dep. 50:5-12.

70. As of August 21, 2019, the BDU had determined that nearly 11,000 BD applications should be denied. These denials represented applications from over 1,400 schools, including over 4,800 denials from CCI. DOE0009509, at -9510, -9513.

71. As of August 21, 2019, approximately 27,700 BD applications from CCI borrowers had been approved but not yet assigned relief. *Id.*

72. In a slide in the August 21, 2019 presentation titled "Why Are BD Applications on Hold?", the Department stated that "[n]o relief methodology" had been "developed for non-CCI claims." *Id.* at -9514.

73. Also in the slide titled "Why Are BD Applications on Hold?", the Department stated that there had been a "[p]olicy decision (spring 2018) to not issue denials until approvals could also be issued." *Id.*

74. The Department's policy was that approvals could not be issued until a new relief methodology was in place.

75. The Department stated elsewhere in the August 21, 2019 presentation that "[a] decision on the relief methodology would result in the ability to proceed with" the already-denied applications. *Id.* at -9512.

76. Diane Auer Jones, then the Principal Deputy Under Secretary of the Department, testified in her November 20, 2020 deposition that "a decision had been made . . . that we would not issue denials if we were not also issuing approvals." Jones Dep. 174:5-7.

---

Career Institute. The BDU recommended approval of that group claim in a memorandum dated January 4, 2017. *See* DOE00006206, at -6305.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

77. Likewise, Mark Brown, then the COO of FSA, testified in his December 15, 2020 deposition that "we were not issuing denials until we had a methodology so that we could do all at the same time, both approvals and denials." Brown Dep. 134:13-16; *see also id.* 110:1-17.

78. The BD Work Plan for November 2019 stated that "OUS [the Office of the Under Secretary] has requested that FSA hold off on processing the adjudicated borrower defense applications until November 30 with the intent being that FSA would process the following all at the same time:  - 6,000+ 'ineligible/denied CCI applications – 990 CCI non-JPR approvals using the new tiered relief methodology – 70+ ITT approvals using the new tiered relief methodology[.] Additionally, OUS has directed that we adjudicate and process another 20,000+ CCI applications by November 30." DOE00006893.

79. COO Brown also testified, however, that there was "confusion" in 2019 about the Department's directive that the BDU should not issue borrower defense decisions. He stated that Under Secretary Jones had initially told him that she "didn't believe they [the Department] had told the BD unit" to stop issuing decisions, and that she was "not sure why" the BDU was not sending out decisions. Brown Dep. 106:6 – 107:10.

80. BDU Director Nevin testified that following the *Calvillo Manriquez* injunction, "there was a hold put on approvals and the Department made the decision to not issue denials until they could send out approvals as well, and so that coincided with the June 2018 – I think that's – that's when they put the brakes on, essentially."  Nevin Dep. 147:12-20.

81. BDU Director Nevin testified that she did not know who decided to delay all BD decisions (including denials) until a new methodology was developed. Nevin Dep. 147:21 – 148:3.

82. COO Brown testified that he did not know who decided to delay all BD decisions (including denials) until a new methodology was developed, but the decision was communicated to him by Under Secretary Jones. Brown Dep. 110:18-21.

83. Under Secretary Jones testified that she did not know who decided to delay all BD decisions (including denials) until a new methodology was developed, and that she might not have even been in the meeting where this decision was reached. Jones Dep. 174:8-19.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

84. Under Secretary Jones testified that the reason for the "no denials until approvals" policy was that "if the only decisions being issued were denials, that that could be misreported by the media to make borrowers believe that we were not going to approve valid claims and the chilling effect would be that, you know, if somebody has a valid claim, they could have been discouraged from filing them." Jones Dep. 174:25 – 175:6.

85. But in fact, when the Department did start issuing BD decisions in December 2019, they denied BD claims at a rate of over 95% in the first month, and nearly 90% after eight months. *See* Discovery Order, ECF 146 at 5.

86. Also in the slide titled "Why Are BD Applications on Hold?", the Department stated that "[n]o processing systems" were "available" for BD applications "from summer 2018 to present due to platform development and migration." DOE0009509, at -9514.

87. In another internal presentation, dated August 14, 2019, the Department represented that there were "Three Significant Challenges and Corresponding Projects to Facilitate Elimination of the Backlog of Pending [BD] Applications." DOE00003437, at 8.

88. The first "challenge" listed was that "[t]he 2016 regulation added new procedural requirements to the application review process, including notice to the school of the borrower's allegations." This reportedly required updates to the BDU's technology platform. *Id.* at 8.

89. In fact, however, in the next 16 months after this presentation, the BDU only provided such notice to four schools. Nevin 72:23-73:14.

90. The second "challenge" listed in the August 14, 2019 presentation was that additional staffing was needed to adjudicate the backlog of claims. DOE00003437, at 9.

91. Prior to August 2019, BDU Director Nevin had requested additional staffing multiple times. She made these staffing requests to Julian Schmoke, then the Chief Enforcement Officer at FSA. BDU Director Nevin did not know "how regularly he submitted" these staffing requests to political leadership at the Department. Her understanding was that her staffing requests, if submitted, went to Secretary DeVos's chief of staff. Each time, her requests were denied. Nevin Dep. 25:8-27:18, 145:3-9.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

92. BDU Director Nevin testified that the she did not know the reasons why her requests for additional staff were denied: "That's above my pay grade." Nevin Dep. 145:3-9.

93. As of August 21, 2019, the Department stated that it was "in the process of hiring over 60 term appointments" to aid the Borrower Defense Unit ("BDU") in adjudicating the "backlog" of BD applications. DOE0009509, at -9515.

94. The third "challenge" listed in the August 14, 2019 presentation was that approvals were "on hold pending a relief determination." The Department stated that "[t]he vast majority of the 'approved but pending relief' applications are from borrowers who attended" CCI schools; meanwhile, "[f]or non-Corinthian approvals, there currently is no existing relief approach and the Corinthian methodology is inapplicable, so a new tiered relief methodology is required." DOE00003437, at 10.

95. The August 14, 2019 presentation did not mention the "no denials until approvals" policy.

96. As of August 21, 2019, the Department's internal documents did not reflect that the difficulty of reviewing BD applications was the reason for the delay in issuing BD decisions.

97. To the contrary, BDU Director Nevin testified: "[T]he pace of the adjudications was affected by various things that made it difficult, but that didn't mean that they couldn't be issued. That was related to a decision up the food chain." Nevin Dep. 224:10-14.

**D. Summer and Fall 2019: Development of 'Presumption of Denial' Policy**

98. In or around the summer of 2019, the Department adopted a policy of 'presumption of denial' as a means of clearing its backlog of BD applications. This policy assumed that all borrower defense applications should and will be denied, unless they meet an exceedingly narrow set of requirements (explained *infra* ¶¶ 258-288).

*a.   Quotas, Metrics, and Procedures Lead Inexorably to Denial*

99. As of summer 2019, FSA viewed its mandate with respect to borrower defense as "clearing the backlog" of BD applications, and it set aggressive quotas to achieve that goal.

100. Secretary DeVos set the goal of quickly eliminating the backlog. Nevin Dep. 101:21-23.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

101. Concerned about "the sheer volume" of the backlog and that BD cases "were not moving," FSA COO Brown undertook to hire more attorneys to adjudicate claims. Brown Dep. 46:16-49:13.

102. "FSA targeted to build capacity to adjudicate 5,000 applications per week with an ultimate objective of less than 5,000 claims on hand by late Fall 2020." FSA 2020 Annual Report at 95; *see also* Nevin Dep. 101:21-102:1 ("Mark Brown . . . set a target of us for 5,000 adjudications per week.").

103. In addition, FSA set a productivity requirement that "[t]rained reviewers must review, on average, a <u>minimum</u> of 5 cases per hour." Borrower Defense Claim Review Productivity Requirements, Incentives and Support Plan – 2020, DOE00008693; *see also* Training Binder – Borrower Defense to Repayment (July 2019), DOE00006206, at -6327 (same).

104. FSA also limited the time that reviewers could spend on a school-specific analysis memorandum to two hours, and instructed that reviewers should "review evidence at a reasonable rate," subject to spot checks for whether reviewers were "over reporting hours spent on evidence review." DOE00006206, at -6327.

105. Reviewers were warned that "[f]ailure to meet the above metrics will result in remedial action including, but not limited to, probation, re-training, moving back to 100% QC, hoteling at FSA or Sullivan Cove during work hours, or termination from the project at the discretion of the Director of Borrower [D]efense." *Id.*

106. BDU employees or contractors who fell behind the target pace of application review faced the possibility of negative performance reviews and even termination. For example, the Borrower Defense Claim Review Productivity Requirements, Incentives and Support Plan – 2020 provided that "[t]he metrics of Trained Reviewers who do not meet the Required Metrics for the proceeding pay period will be monitored very closely by their Supervisors and the Director of Borrower Defense ("Heightened Monitoring") . . . For Trained Reviewers on Heightened Monitoring for more than two pay periods, the Reviewer and his or her Supervisor will meet with the Director of

Borrower Defense to discuss the Reviewer's failure to meet the requirements of the attorney/law clerk position."  DOE00008693-94 (footnote omitted).

107. FSA assessed its performance with respect to the goal of "clearing the backlog" solely based on speed of adjudications. FSA did not set any targets or measure any metrics regarding whether adjudications accurately assessed the evidence or correctly applied the relevant law.

108. BDU Director Nevin testified that "[i]n a perfect world, we would review all of the evidence relating to the school before adjudicating a single case," but the BDU instead proceeded to adjudicate cases before completing the review of common evidence relating to a school because "we were directed to move forward at a very accelerated pace," and this was "the only way to hit the metrics." Nevin Dep. 100:14 – 101:17.

109. Front-line reviewers of BD applications are empowered to reject an application, but not to approve it (with the exception of CCI JPR claims).  Nevin Dep. 204:24-206:25; DOE00006206, at -6435 to -6436; DOE00008841, at -8842.

110. If front-line reviewers believe a BD application might be eligible for relief, they must elevate it to senior BDU attorneys for further review.

111. BDU Director Nevin testified that it was "too complicated" for a front-line reviewer to determine if a BD application should be approved. She did not, however, believe that it was too complicated for a front-line reviewer to determine whether a claim should be denied. Nevin 206:11-18, 207:1-17.

112. BDU Director Nevin wrote in an internal memorandum that one purpose of the BDU's quality control procedures was to ensure "that no new type of claim is approved without the involvement of multiple attorneys." DOE00008841.

113. That memorandum also stated that "[t]he bar for new approvals is high," and new approval types will only be adopted with the assent of "a majority of the senior attorneys and the [BDU] Director." *Id.* at -8842 to -8843.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

114. Any protocols that set parameters for the *denial* of BD applications can be approved by a senior BDU attorney, but any protocols that set parameters for the potential *approval* of BD applications must be elevated to the BDU Director. DOE00006974.

115. Any BD applications that are set aside for further review under the BDU's potential approval criteria did not count toward backlog clearance targets. Nevin Dep. 178:4-8.

116. An internal BDU memorandum (which, according to metadata, was created by BDU Director Nevin in April 2019) asserted that the historical BD approval rate for CCI borrowers making JPR claims—calculated by the Department to be "about 67%"—was "dramatically higher than we expect to see for all other claims," and that "[o]ur data to date suggests that the approval rate [for other claims] is likely to be approximately under 10%." The memorandum does not specify what this "data" consists of. DOE00009291.

117. On information and belief, the Department had no factual basis to support an estimate that, on a full and fair assessment of the merits of each application, only 10% of BD claims other than CCI JPR would qualify for borrower defense relief under the applicable regulations and state law.

118. The same memorandum stated that "for applications from borrowers who attended schools that have fewer than 20 applications pending, our data to date indicates that the approval rate will be under 5% and may be as low as 2-3%." DOE00009291.

119. On information and belief, the Department had no factual basis to support an estimate that, on a full and fair assessment of the merits of each application, under 5% of BD claims from schools with less than 20 BD applicants would qualify for relief under the applicable regulations and state law.

120. In another internal memorandum, dated August 18, 2019, BDU Director Nevin wrote that "[t]he majority of applications will be denied – based on either the insufficiency of the borrower's allegations or the lack of sufficient evidence to support the borrower's application." DOE00008841, at -8842.

121. The BDU adopted a practice of using "adjudication" as a synonym for "denial."

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

1

### b. Disregarding Sworn Borrower Allegations

2

122. As part of the 'presumption of denial' policy, the Department adopted a policy and

3

practice of disregarding borrower allegations, even though the allegations in BD applications are

4

made under penalty of perjury.

5

123. BDU Director Nevin testified that a borrower's sworn statements alone will never be

6

enough to warrant approving a borrower defense application. Nevin Dep. 95:24-96:4, 97:4-9.

7

124. Training materials provided to BD application reviewers likewise reflected that

8

statements made by borrowers in their applications did not constitute "evidence" in support of

9

those applications. DOE00006206, at -6399 to -6433; DOE0006016, at -6020.

10

125. The Department's policy of disregarding sworn statements by borrowers applied both to

11

individual applications and more broadly: Even where dozens or even hundreds of borrowers made

12

similar allegations against a school, the Department did not consider these similar statements to

13

constitute "common evidence" that could weigh in favor of approval, or even as common evidence

14

suggesting the need for further investigation.

15

126. For example, over 500 borrowers from Strayer University filed BD applications citing

16

misrepresentations regarding the school's employment prospects, program costs, and enrollment

17

tactics. Despite finding, among a sample of 50 claims, that many borrowers reported similar

18

experiences (*e.g.*, 43 of 50 claims raised a program cost allegation, and of those, 25 alleged

19

misrepresentations about the cost of attendance), BDU discounted these allegations as "individual

20

experiences, frustrations, or misunderstandings." DOE00012658; DOE00012664.

21

127. Similarly, allegations from 119 borrowers against Morris Brown College made "very

22

consistent" claims that the school pressured prospective students to enroll, inflated job prospects

23

for their graduates, and misrepresented several aspects of their programs such as the tuition, quality

24

of its instructors, and the ease with which credits could be transferred.  The BDU, however, refused

25

to credit these claims, concluding that there was "insufficient" evidence of a "pattern or practice

26

of misconduct." DOE00011746; DOE00011738.

27

28

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

128. This policy of disregarding borrower testimony was a change from prior practice. When the Department developed its approval criteria for certain CCI and ITT claims in 2016 and early January 2017, it relied extensively on borrower statements.

129. For example, in its "Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims" memorandum, dated October 24, 2016, the BDU stated that "[h]undreds of student applications reviewed to date provide corroborative evidence that Everest admissions personnel regularly made misleading oral representations about transferability." In support of the finding that Everest personnel made widespread misrepresentations, the BDU listed a sampling of averments from BD applications. DOE00000196, at -197 to -199.

130. The memorandum also cited borrowers' statements from BD applications to support the finding that Everest's representations were false and the finding that students derived no value from an Everest education. *Id.* at -204, -213.

131. Likewise, in its "Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment" memorandum, dated January 9, 2017, the BDU stated that "[i]n BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs." DOE00007866.

132. Again, the BDU relied on averments from BD applications to support the finding that misrepresentations occurred with "pervasiveness and consistency." *Id.* at -7867.

133. The BDU similarly relied on borrower testimony from BD applications to support the findings in its memorandum titled "Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment – California Students," dated January 10, 2017. DOE00009399; *see id.* at -9400 to -9403.

134. These memoranda were re-reviewed by the Department in December 2017, and the Department affirmed that it would continue to rely on the findings in these memoranda as a basis for adjudicating BD claims.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

135. In the school-specific memoranda that it developed in 2019 and 2020, however, the BDU has consistently concluded that dozens or even hundreds of allegations by borrowers alleging the same school misconduct do not constitute "evidence to establish a pattern or practice of this type of misconduct."

136. For example, reviewing the claims of 375 borrowers from Carrington College, the BDU noted that nearly all the applications — over 80 percent — alleged that the school had misrepresented its employment prospects. Yet the BDU concluded that the borrowers had failed to provide "any supporting evidence . . . to establish a pattern or practice of this type of misconduct." DOE00010364; DOE00010368.

137. Similarly, in a May 2020 memorandum regarding BD allegations against Universal Technical Institute, the BDU did not consider it significant that *87%* of BD applications from that school (522 out of 601) made employment prospects allegations. DOE00012873, at -875.

138. As another example, eighteen students from Eagle Gate College "all specifically claimed they were guaranteed jobs and that the programs they were interested in had a 100% placement rate." Despite noting this "peculiar" trend, the BDU recommended "adjudication" (denial) because, "unfortunately," most of the misrepresentations were made verbally. DOE00010738; *see also* DOE00011953 (recommending denial where "the few borrowers that do state an adequate claim for misrepresentation, allege that the misrepresentations took place in the form of verbal communications with school administrators and were not supported by any additional evidence").

139. This practice of disregarding borrowers' accounts of oral misrepresentations is a significant change from the BDU's analysis of allegations against CCI and ITT in 2016 and 2017, in which the BDU focused on and credited the prevalence of oral misrepresentations.

140. The BDU's school-specific memoranda never analyzed whether oral misrepresentations would suffice to state a claim under applicable state law, as required under the 1995 borrower defense regulations.

141. Oral misrepresentations are frequently actionable under state consumer protection laws.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

142. Often, the BDU's reviewers note that borrowers make consistent reports of a specific type of misrepresentation, but the reviewers then conclude that there is no consistent pattern of alleged misconduct because the claims are not common to a specific campus or time period.

143. For example, the BDU acknowledged that 19 borrowers' claims against Grantham University about transferability of the school's credits were "frequent enough to evaluate further," but then recommended "adjudicating" (*i.e.*, denying) these claims "[d]ue to the lack of prevalent theme for these individual claims" and purported absence of "commonality among the programs or enrollment year." DOE00011006.

144. By contrast, in the BDU's CCI guaranteed employment memorandum dated January 9, 2017, the BDU had concluded that similar claims of misrepresentations from BD applicants spanning multiple campuses and time periods ***corroborated*** the conclusion that misrepresentations were common and consistent across the school group (rather than showing a lack of commonality). DOE00007866; *see id.* at -7868 to -7870; *see also* DOE00009399 at -9400 to -9403 (same in ITT California memo).

145. In at least some cases, the BDU appears to have set claim sampling criteria for its reviewers that require or permit the reviewers to pull BD applications from different campuses, programs of study, and/or time periods within a school or school group when considering whether there may be "common evidence" supporting such applications. *See, e.g.*, DOE00012664 (sampling 50 claims from Strayer University that spanned enrollment dates from 1997 to 2019, in seven program areas).

146. In other instances, the BDU's memoranda do not specify the campuses, time periods, or program areas represented by samples pulled from a school's BD applicant pool. *See, e.g.*, DOE00012873; DOE00010364.

147. For this reason, any supposedly observed lack of commonality between campuses, program areas, and time periods may be due to the sampling criteria, not to the nature of the claims themselves.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

148. Dozens of the BDU's school-specific memoranda contain no summary or analysis whatsoever of the allegations made by borrowers against that school.

149. Across all the school-specific memoranda in Plaintiffs' possession, the BDU rejected the applications of over 4,500 borrowers without providing any analysis whatsoever of those borrowers' claims. *See, e.g.*, DOE00010297 (denying applications of 37 students); DOE00011569 (same for 36 students); DOE00012822 (35 students); DOE00012087 (34 students); DOE00011207 (33 students).

150. The Department's policy of refusing to credit sworn borrower allegations in BD applications is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### c. *Secret Rules About Allegation Specificity*

151. The BDU applied rules to judge the sufficiency of borrower defense allegations that were not communicated to borrowers and that could not have been anticipated by borrowers when they filled out their BD applications.

152. Whether an application "fails to state a legal claim" is secretly a threshold question. When an application is denied for "failure to state a legal claim," no evidence is reviewed. Nevin Dep. 204:24-205:18; AR 495 ("Standard Protocol" for BD application review).

153. The BDU has never informed borrowers how to successfully "state a legal claim," or that if they do not succeed in doing so, their application will be denied, and no evidence will ever be reviewed.

154. The BDU trained reviewers to deny claims based on specific deficiencies in statements of legal claims that were never explained to applicants.

155. For example, if a borrower stated in their BD application that their school made a misrepresentation, but failed to explicitly state that they relied on that misrepresentation, the application would be denied for "failure to state a legal claim." Nevin Dep. 85:8-20.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

156. This is true even when the context of the borrower's application indicates that the borrower did in fact rely on the misrepresentation, or when the applicable state law (not identified by the BDU in any case) does not include a reliance element.

157. As another example, a document titled "How to Review a Borrower Allegation in a One-off or Small Batch Application" provides examples of "Employment Prospects allegations" that do and do not "potentially state a claim." Acceptable types of allegations include: "My school told me I would make $60K a year upon graduation, but I only made minimum wage"; "My school said they were fully accredited, but when I graduated I was not eligible to get a job in my field of study"; and "My school told me that once I got this degree I could immediately get hired as a nurse; that's not true. I need to have one year of clinical work before I can be hired." Unacceptable allegations, which "should be denied for failure to state a claim," include: "The school promised me a job"; "There were no jobs available in my program when I graduated"; "I thought that I would get a job, but I'm working fast food instead"; and "My school told me 85% of graduates have a job upon graduation, but I didn't have a job upon graduation." How to Review a Borrower Allegation in a One-off or Small Batch Application at 2-3 (produced in response to Interrogatories 17-18).

158. The BDU has never informed borrowers that, as the training document provides, "In order to allege a misrepresentation that states a claim under state law the borrower must allege both a representation and the falsity of that representation in their application. Further, the falsity alleged must match the representation." *Id.* at 1.

159. The BDU considered the following statement a "Career Services allegation[ ] that potentially state[s] a claim and therefore should be denied only if there is insufficient evidence to support the allegation": "My school told me they would provide resume help and have job fairs, but they never did either of those things. All they did was send me links to job postings." *Id.* at 6.

160. However, the statement "My school promised me that they had great career services, but it wasn't useful" "should be denied for failure to state a claim," *id.* at 6, regardless of whether the

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

BDU has in its possession common evidence of specific misrepresentations about the career services office, or whether the student provided extrinsic evidence of promises made and not kept.

161. According to Department policy, *not even* evidence can overcome an allegation that does not meet this secret threshold: *e.g.*, if a student stated "The school promised me a job" (one "element of a misrepresentation"), it would not matter if the student provided evidence of both that misrepresentation and the fact that they did not get the job as promised. Their claim would not make it past this secret standard. Nevin Dep. 204:24-205:18; Nevin Decl, ECF No. 56-4, at AR 495 ("Standard Protocol").

162. The BDU considered "My school told me one price but then I was charged a higher price" to be a "Program Cost and Nature of Loan allegations that potentially state[s] a claim." How to Review a Borrower Allegation in a One-off or Small Batch Application at 4.

163. However, the BDU considered the allegation "My school didn't let me know that there were additional fees in addition to tuition" as an insufficient "Program Cost and Nature of Loan Allegations that Do[es] Not State a Claim and therefore should be denied." *Id.*

164. Nowhere does the BDU inform applicants or explain that only certain types of program costs are relevant in order to "state a claim" regarding program cost misrepresentations.

165. This same document states that "[p]ure omissions without the student alleging that the school had a duty to inform the student of the pertinent information" are "Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim." *Id.* at 2.

166. The BDU has never informed borrowers that to successfully "state a legal claim" for omission, they must both allege the omission and the existence of a duty, or that if they do not succeed in doing so, their application will be denied, and no evidence will ever be reviewed.

167. As one example of how this policy was applied, a BDU memorandum assessing claims regarding Concorde Career Institute stated: "Some applicants have made allegations about not being able to obtain employment because the school that they attended was not accredited. The applications reviewed however do not indicate that the school told them they were accredited and that it turned out to be false." DOE00010571.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

168. The BDU has never informed borrowers that they must allege a "duty to inform" in order to "state a claim" based on a misrepresentation by omission, nor has it suggested what sources a borrower might consult to identify or derive a "duty to inform."

169. Overall, the training that BDU attorneys receive regarding the wording of allegations shows that if borrowers did not phrase the allegations with all the "elements" or with the required specificity—even if personal or common evidence was clear—their claims would be denied and the evidence would never be reviewed.

170. Borrowers were never informed of how to phrase their allegations or the necessary elements of their claims.

171. The Department's policy of applying strict, legalistic standards to the wording of borrower defense applications without informing borrowers of those standards is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### d. Secret, Undefined "Supporting Evidence" Policy

172. Hundreds of memoranda prepared by the BDU consistently show that BD applications are rejected as a matter of course when, according to reviewers, "the borrowers fail to provide any supporting evidence." *See, e.g.*, DOE00010341 (dismissing claims of 437 borrowers regarding Career Point College for lack of supporting evidence); DOE00012862 (same for 55 applications regarding Unitech Training Academy); DOE00010339 (same for 51 applications regarding Career Institute of Health and Technology).

173. The BDU's claim review protocol states that an application should be "denied without further investigation" where "[t]here is no corroborating evidence of the misrepresentation." DOE00006016, at -6020.

174. This policy requiring borrowers to submit "supporting evidence" in order to be considered for approval stands in stark contrast to the Department's own BD application form(s).

175. As of the date of this Supplemental Complaint, there were two BD application forms available on the Department's website. *See* https://studentaid.gov/sites/default/files/BD-General-

Application-Form.pdf (OMB No. 1845-0163); https://studentaid.gov/sites/default/files/borrower-defense-application.pdf (OMB No. 1845-0146).

176. One version of the form states: "While you are not required to submit documentation with your application to be considered for discharge, we recommend that you do so." BD App. Form, OMB No. 1845-0163.

177. This is false. In fact, the Department's internal policy is to ***require*** an application to attach supporting documentation in order to be considered for approval, unless the application happens to fit within an exceedingly narrow set of criteria that are not communicated to borrowers (detailed *infra* ¶¶ 258-288).

178. The other version of the standard BD application form states: "To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review. You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school." BD App. Form, OMB No. 1845-0146.

179. This is misleading. In fact, the Department does ***not*** consider it sufficient for an applicant merely to "complete, sign, and submit this form" in order to be considered for approval.

180. Further, the Department does ***not*** consider transcripts or enrollment agreements to constitute relevant evidence when it assesses a BD application. Nevin Dep. 182:6-19.

181. The Department did not have a standard borrower defense application form available until on or about December 31, 2016. Nevin Decl., ECF No. 56-4 ¶ 30.

182. Before that date, borrowers had no guidance from the Department as to what constituted a viable BD application.

183. Many of the Class Members in this action submitted their BD applications before a standard form was available.

184. The Department has never communicated to borrowers that they must submit supporting documentation in order for their BD applications to be considered for approval.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

185. The Department has never communicated to borrowers what kind of documentation would be sufficient to support an approval of a BD application. Nevin Dep. 96:5-97:3, 183:23 – 184:1.

186. The Department has not developed any internal policy or training regarding what specific kinds of documentation would be sufficient to support an approval of a BD application. Nevin Dep. 96:5-15, 104:11 – 105:18.

187. BDU Director Nevin testified that front-line reviewers are "not weighing evidence" when they review BD applications. Nevin Dep. 104:20-21.

188. Even when borrowers *have* submitted substantial evidence along with their applications, the BDU has concluded that no evidence exists to support their claims.

189. For example, students from Meridian University provided extensive evidence to support their allegations, submitting emails regarding coursework, letters of withdrawal, and school materials regarding fieldwork and internships. The BDU concluded, however, that "there does not exist evidence to substantiate borrowers' claims." DOE00011608.

190. As detailed *supra*, the BDU routinely refused to credit students' own sworn statements as "supporting evidence." For example, in a memorandum analyzing 41 BD applications from students at Mattia College, the BDU initially categorized applicants' signed and emailed statements as "evidence," but then concluded that there was "no evidence to support [the] allegation[s]." DOE00011572.

191. To date, the Department has never approved a BD application based on evidence that a borrower submitted along with their application. Nevin Dep. 108:17-24.

192. Indeed, between the spring of 2015 and December 9, 2020, the Department had never approved an individual (non-group) BD application for any borrower who took out loans in connection with attendance at a school other than CCI or ITT. Nevin Dep. 50:5-12.

193. Neither the HEA nor the 1995 or 2016 borrower defense regulations require borrowers to submit supporting evidence in order for their BD claims to be considered for approval.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

194. The Department's policy of requiring borrowers to submit supporting evidence without informing borrowers of that requirement is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

195. The Department's policy of requiring borrowers to submit supporting evidence without specifying what kinds of documentation are adequate to support approval is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### e. *Disregarding Common Evidence and Maintaining Deliberate Ignorance*

196. The BDU has also consistently disregarded, or chosen not to look into, other potential sources of evidence to support BD allegations.

197. The BDU's school-specific memoranda have disregarded evidence of government investigations, including investigations that resulted in penalties for the schools.

198. For example, the BDU dispensed with 205 applications alleging misrepresentations by Empire Beauty School, despite evidence that the Department's own Administrative Actions and Appeals Service Group (AAASG) had initiated debarment of four admissions officers on charges of falsifying documents to obtain federal financial aid, creating and/or accepting fraudulent high school diplomas and GEDs, and making materially false statements on federal student loan applications. The Empire Beauty School memorandum also noted the existence of a settlement between the school and the Massachusetts Attorney General's Office over allegations that the school failed to provide job placement rates to prospective students and engaged in excessive recruitment calls. Despite describing this evidence in detail, the memorandum nevertheless concludes "there is insufficient evidence to suggest that [the school] engaged in widespread conduct of a type that would warrant borrower defense relief." DOE00010774; DOE00010783; DOE00010792; DOE00010795.

199. As another example, in a memorandum recommending the "adjudication" (denial) of 525 applications concerning Everglades University, the BDU acknowledged and then ignored a settlement agreement between the school and the State of Florida over alleged violations of Florida's Unfair Trade Practices Act. The "Assurance of Voluntary Compliance" signed by the

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

school did not admit guilt, but did establish "disclosure policies in several areas, including the transfer of credits," and required Everglades to offer a "retraining program for students who attended [the school] during the 'relevant period' of 1/1/2008-10/25/2012." Even though more than one hundred BD applicants attended the school during the "relevant period" and raised claims directly related to issues covered by the settlement agreement, the BDU nevertheless concluded that "the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct." DOE00010818; DOE00010826; DOE00010834.

200. The BDU similarly found "no evidence" to suggest that Universal Technical Institute engaged in widespread misrepresentations despite the Department itself having made nine findings of noncompliance at the school, including a finding that UTI "did not provide its students with the required disclosure regarding cost of attendance." Notably, 450 BD applications raised a program cost allegation. This memorandum also acknowledged investigations of UTI conducted by the Department of Justice and the Massachusetts Attorney General's Office, but the BDU failed to acquire evidence from either office. DOE00012873.

201. The BDU's school-specific memoranda have disregarded evidence of lawsuits against the schools, including where a government office is a party.

202. For example, in a memorandum concerning schools owned by Education Management Corporation ("EDMC"), the BDU described in detail two *qui tam* lawsuits and two securities class actions against EDMC, and conceded that the allegations in these four lawsuits "may be relevant to borrower defense." These lawsuits included, *inter alia*, allegations that EDMC schools used "aggressive enrollment quotas," had "inadequate career services employee staffing," and engaged in "predatory recruitment practices, including knowingly enrolling students who could not complete the program." The BDU concluded, however, that all BD applications from EDMC schools relating to enrollment dates between July 1, 2003 and December 31, 2008 should be

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

rejected,[4] because the BDU "does not currently have any documents or evidence to substantiate the claims made in these lawsuits" for that date range. In particular, the BDU claimed that it was unable to review "millions of pages" of documents produced to the Department of Justice in one of the *qui tam* cases — in which the Department of Justice and various states had intervened, and which had resulted in settlement. DOE00009626, at -9627 to -9630.

203. The same EDMC memorandum also described investigations of EDMC by the Pennsylvania and Iowa Attorneys General's Offices, and noted that the BDU had obtained evidence from those offices, some of which did "relate to the [time] period at issue" (7/1/2003 – 12/31/2008). The BDU dismissed this evidence, however, because it reportedly "did not possess the underlying data and internal policies to assess the accuracy of [EDMC's] representations." *Id.* at -9627.[5]

204. As another example, the BDU found "insufficient evidence of widespread misconduct at Suburban Technical School to warrant further investigation" despite the reviewer noting *United States v. Premier Education Group, L.P.*, No. 11-3523, 2016 WL 2747195 (D.N.J. May 11, 2016), a *qui tam* False Claims Act lawsuit against the school's parent company, Premier Education Group, which alleged, *inter alia*, material misrepresentations made to secure Department of Education funding. The memorandum failed to investigate or analyze the case's relevance to borrowers' claims. DOE00012673.

205. In the *Premier Education* ruling cited by the BDU reviewer, the trial court denied the defendants' motion to dismiss relators' claims about job placement rates and transferability of

---

[4] The BDU made one extremely narrow exception to this finding: applications making "professional licensure allegations relating to psychology masters and doctorate level programs at Argosy University" could be held for further investigation. DOE00009626, at -9630.

[5] All redactions in this Supplemental Complaint represent allegations relating to documents that are the subject of an ongoing process under the Protective Order in this matter, by which Plaintiffs have challenged certain confidentiality designations. Plaintiffs expect this process to be resolved by the time the Court rules on Plaintiffs' motion for leave to file this Supplemental Complaint. If the Court grants Plaintiffs leave to file, Plaintiffs will file these allegations and the supporting document(s) either without redactions or under seal, as appropriate.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

course credits. *Premier Educ. Grp.*, 2016 WL 2747195, at \*21. In doing so, the court stated: "Relators identify the various tactics employed to carry out each violation, such as miscounting successful job placements, falsifying employment records, and instructing students that their credits would be transferrable to any other college or university or to any other school offering a similar career program. Relators identify specific individuals at various PEG schools responsible for committing such violations at each school, as well as the senior PEG representatives from whom they received instructions to do so." *Id.* (internal citations omitted). Thereafter, the parties settled claims regarding Suburban Technical School with Department of Education consultation. *See* Letter from Counsel for the U.S. at 1, *Premier Educ. Grp.*, No. 11-3523 (D.N.J. Jun. 4, 2019), ECF No. 222 ("The United States has been apprised by counsel for Relators and for defendants that they have reached agreement on the revised settlement agreement language. The Department of Education . . . , however, is still reviewing the proposed language including the draft release language concerning administrative consequences."); Letter from Counsel for the U.S. at 1, *Premier Educ. Grp.*, No. 11-3523 (D.N.J. Jun. 18, 2019), ECF No. 224 ("[T]he parties have been provided a new draft of the government's proposed settlement agreement incorporating changes required based, in part, on input from the Department of Education."); Order at 1-2, *Premier Educ. Grp.*, No. 11-3523 (D.N.J. Aug. 7, 2019), ECF No. 229 (in order of dismissal with prejudice, "surviving claims . . . concerning certain specified conduct by Defendants at [*inter alia*] Suburban Technical School campuses shall constitute the 'Covered Conduct'").

206. The reviewer who drafted the Suburban Technical School memorandum, and the senior BDU attorney who reviewed it, also ignored additional readily available evidence of misconduct by Premier Education Group. *See, e.g.*, Jeanette DeForge, "Agreement with AG Forces Premier Education Group Out of Massachusetts; Salter College, Others, to Forgive $1.6M in Student Debt," *MassLive* (updated July 14, 2019), https://www.masslive.com/news/2019/07/attorney-general-agreement-to-shut-down-5-colleges-statewide-cancel-students-debt.html.

207. As another example of ignoring relevant litigation, the BDU concluded that there was "insufficient evidence of widespread misconduct" by Mountain State University, despite noting

that over 400 individual lawsuits and four class action lawsuits had been filed against the school in state and federal court. DOE00011761.

208. Similarly, in its review of BD claims relating to Micropower Career Institute, the BDU acknowledged that three of the school's senior executives were prosecuted and found guilty of defrauding the United States of $1 million in education grant funds through a student aid fraud scheme and of running a student visa fraud scheme that generated $7.4 million in illegal revenues. The reviewer specifically noted that the Department's OIG "was involved in the investigation and created a report which could provide further insight if needed," but then proceeded to recommend that the claims be adjudicated (denied) *without even reviewing the OIG's report*, because "these allegations are unsupported by evidence attached to the borrowers' applications." DOE00011644.

209. The BDU found "insufficient evidence of widespread misconduct" in multiple instances where school officials were convicted of fraud. *See, e.g.*, DOE00010957, DOE00010958, DOE00010963 (former director of school convicted and sentenced to prison for "us[ing]. . . a high school 'diploma mill' owned and operated by his wife to make students eligible for federal student aid when they otherwise would not have been qualified" and for "us[ing] the name and social security number [sic] of students to collect student aid even after the students left the institution"); DOE00012629 (former owner of school sentenced to prison in 2019 and forced to pay nearly $300,000 to former students, the Department, and the Department of Veterans Affairs, which she had kept in financial aid refunds).

210. In a memorandum reviewing BD claims related to Berkeley College, the BDU noted that, following an extensive two-year investigation, the New York City Department of Consumer Affairs sued the school for violations of New York consumer protection law, and that this lawsuit was "currently pending in New York State court." The BDU acknowledged that borrowers' applications raised similar claims against the school for alleged misrepresentations about academic grants, credit transfers, and employment prospects, but concluded that the BDU was "not in possession of evidence related to this case." The memorandum did not note any effort to obtain such evidence from the New York City Department of Consumer Affairs. DOE00010089.

211. In an unusual result, the Berkeley College memorandum concluded that the school should be "provided notice of these allegations." However, as of December 9, 2020 — three months after the memorandum was approved by a senior BD attorney — the Department had not actually provided notice to or requested documents from Berkeley College. Nevin Dep. 72:23-73:14.

212. Moreover, before the memorandum was written, the BDU had *already* rejected 11 BD applications from Berkeley College (with 80 still pending). DOE00010089.

213. The BDU's school-specific memoranda have disregarded evidence of violations of the Department's own regulations.

214. For example, in a memorandum reviewing 493 applications related to Remington College, the BDU noted the existence of the following before concluding that there was "insufficient evidence of widespread misconduct . . . to warrant further investigation": four internal Department investigations in 2012, 2013, and 2017, all of which identified issues with financial aid administration at certain Remington campuses and one of which mentioned a "failure to meet the minimum academic year definition for the Medical Assisting program" at the Mobile, Alabama campus; a 2012 Senate Report that recognized "a pattern of complaints for transferring of credits, program cost and nature of loans, and admissions and urgency to enroll against Remington College"; a 2016 settlement with the U.S. Attorney's Office for the District of Hawaii to resolve False Claims Act violations related to educational benefit payments for beneficiaries who were not enrolled in a VA approved program; and a 2010 undercover investigation by ABC News finding that "prospective and enrolled students of Remington College with criminal records were told by Remington College recruiters that they would be able to work in law enforcement." DOE00012245.

215. As another example, the BDU disregarded a Department OIG report indicating that two campuses of Florida Career College were involved in fraudulent production of high school diplomas and misrepresentation of high school graduate status. Glossing over substantial news coverage of an FBI raid of those campuses and a pending student lawsuit alleging predatory admissions practices and false promises of job placement, the BDU concluded that the 374

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

borrower applicants "fail to provide any supporting evidence." DOE00010870; DOE00010871; DOE00010875.

216. Likewise, in evaluating BD claims regarding the Iverson Institute, the BDU concluded that a Department of Education Final Program Review Determination "did not relate to [borrower defense]" even though it found that the school enrolled students without a high school diploma and enrolled students receiving Title IV funds in unapproved programs, resulting in the school losing eligibility to participate in the Title IV program. The BDU recommended "adjudication" (denial) of all claims even though borrowers' allegations "are generally consistent with one another and reveal a pattern of misconduct by the school," because "there is no evidence to support them." DOE00011254; DOE00011255; DOE00011259.

217. In many cases, the BDU has appeared to consider a school's denial of wrongdoing in connection with a settlement agreement to constitute evidence that no wrongdoing actually occurred.

218. For example, the BDU disregarded a settlement from a suit alleging the Lawton School misrepresented job placement rates and educational services to students, stating "[the owners] did not admit any fault in the Settlement Agreement. As such, there is insufficient evidence to warrant further investigation . . . ." DOE00011421; DOE00011422; DOE00011426.

219. In many cases, the BDU has concluded that a school's known misrepresentations to auditors or to the Department itself did not raise any need to investigate whether the school made misrepresentations to borrowers.

220. For example, the BDU noted two Department of Education Program Reviews finding that Brookline College misrepresented its job placement rates to the auditor, but concluded that "there was no evidence to suggest that Brookline made the same misrepresentations to students." The BDU apparently ignored that 65 BD applicants made career services allegations, including about job placement promises. DOE00010201.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

221. The BDU has consistently concluded that no further investigation is necessary into schools' potential misrepresentations even after the BDU has been put on notice of the potential existence of evidence that would support borrowers' allegations.

222. Although the BDU is authorized to request evidence from schools against which BD claims are pending, the Department had only contacted four schools to gather information in connection with borrower defense inquiries as of December 9, 2020. Nevin Dep. 72:23-73:14.

223. An internal Department memorandum (which, according to metadata, was created by BDU Director Nevin in April 2020), stated: "Since notice to the school *creates additional burdens on the school* and also delays the adjudication process, the preliminary review is intended to *eliminate unnecessary notices to schools* where there is no evidence for schools to refute (and, therefore, *no benefit to the school* in receiving the notice)." DOE00004321.

224. From early 2017 until approximately fall 2019, the Department had a policy in place that all communications between the BDU and other federal or state agencies had to be cleared through the Office of Policy and other Department officials outside of FSA. Nevin Dep. 69:14 – 70:16, 233:1-16.

225. As a result, for approximately two and a half years, the BDU did not contact the offices of any state attorneys general to inquire about evidence that those offices had collected and, in some cases, even sent to the BDU in the course of their investigations of schools for misconduct potentially relevant to borrower defense. Nevin Dep. 69:14 – 70:16.

226. The BDU has refused to adjudicate group applications submitted by state attorneys general based on evidence collected during investigations by those attorneys general. DOE00002342.

227. The BDU can, in theory, leverage FSA's Investigations Unit to follow up on information about potential school wrongdoing that may be relevant to borrower defense. However, the Investigations Unit has suffered "major attrition" since 2017, and thus the BDU has not been able to work with that unit on many BD-related cases. Nevin Dep. 66:1 – 68:2.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

228. For example, if the BDU had information that a school had misrepresented its job placement rates for a certain program during a certain period of time, the BDU would *not* be able to ask the Investigations Unit to look into whether that same school had made similar (or other) misrepresentations at other times or in other programs, unless perhaps it happened to be a very recent misrepresentation at a currently open school. Nevin Dep. 70:17 – 71:21.

229. According to BDU Director Nevin, "due to attrition and, I think, policy decisions, I don't think that there was much of anything that came out of those investigations [by the Investigations Unit] that was referred to BD." Nevin Dep. 67:24 – 68:2.

230. When BDU Director Nevin was acting head of the Investigations Unit in 2018, she "raised" to then-Chief Enforcement Officer Julian Schmoke that "we needed to step up investigations," but "it was kind of the same scenario as borrower defense." Nevin Dep. 68:12 – 69:3.

231. In many cases, the BDU appears to have concluded that if evidence is not readily available with a simple Google search, then that evidence either does not exist or is not worth pursuing.

232. For example, the BDU acknowledged that it was aware of multiple lawsuits against Beckfield College "for various claims of deception and misrepresentation," but it declined to analyze the outcomes or relevant evidence from these suits because "the Kentucky Courts website no longer shows any pending cases against Beckfield." DOE00010045. *See also* DOE00011707 (concluding borrowers "have not provided enough evidence" after reviewer "could not locate" an applicant's complaint on the Missouri Attorney General's website); DOE00010571, -10573 (concluding borrowers did not provide "any sufficient evidence" after reviewer was "unable to access the court documents" for two complaints filed against the school "without creating a login" for the court website).

233. The BDU's claim review protocol states that the BDU may "[c]onduct additional investigation of claim or claims where warranted by size of affected group, ability to develop extrinsic evidence, and other operational considerations." DOE00006016, at -6020. "Other operational considerations" are not defined.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

234. Neither the HEA nor the 1995 or 2016 borrower defense regulations limits relief to BD applicants based on the total number of BD applications from the applicant's school.

235. Neither HEA nor the 1995 or 2016 borrower defense regulations limits relief to BD applicants based on the ease of collecting evidence regarding the applicant's school.

236. The Department's policy of disregarding potential common evidence in support of BD applications, including but not limited to similar allegations made by multiple borrowers, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### f. *Failure to Apply Legal Standards*

237. The 1995 borrower defense regulations provide that a borrower may assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable state law." 34 C.F.R. § 685.206(c)(1).

238. The Department has acknowledged, in its BD claim review protocol guidelines, that state law "governing alleged misrepresentations and material omissions" provides the controlling standard. DOE00006016, at -6018.

239. Yet for BD applications concerning loans subject to the 1995 regulations, the Department did not apply state law in deciding whether a BD application stated a claim for relief, in violation of the 1995 regulations.

240. The Department has previously represented that the need to analyze and apply state law was a significant factor in its delay in deciding BD applications. *See, e.g.*, Defs.' Mot. for Summ. J., ECF No. 63 at 18-19; *see also* DOE00007269. This representation was false.

241. The BDU's school-specific memoranda almost never mention state law. Over 150 of the memoranda do not, on their face, even identify the state(s) where the school is located. *See, e.g.*, DOE00010647 (noting allegations "do not . . . violate[] state law" but not identifying states where school is located); DOE00012560 (same); DOE00012388 (same).

242. The school-specific memoranda never engage in choice-of-law analysis (except, reportedly, in one specific memorandum concerning ITT, *see infra* ¶¶ 267-271).

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

243. BDU Director Nevin testified that BD applications "aren't being denied based on, you know, not being able to fulfill a specific element of a particular state law or a specific element of the 2016 regulation. . . . [T]he [denial] letters, so the ones that have gone out so far, we haven't issued any denials that were based on kind of an application of specific elements of, you know, state law where there could be a different answer in California versus Nebraska." Nevin Dpe. 79:6-20.

244. BDU Director Nevin also testified, however, that front-line reviewers are not permitted to approve BD applications in part because "[y]ou'd have to understand what the elements of the claim are, and that's dependent on the regulation and the state law." Nevin Dep. 206:11-22.

245. In some cases, the BDU's memoranda explicitly apply standards that are ***not*** related to whether the borrower would have a cause of action under state law. For example, with respect to Charlotte School of Law ("CSL") — a for-profit law school that lost its accreditation from the American Bar Association ("ABA") and was terminated from federal student loan programs — the BDU determined that any borrower who separated from the school before February 24, 2015 should have their BD application "adjudicated" (denied) because that was "the earliest date that CSL was on clear notice of the gravity of the ABA's ongoing investigation into its compliance." DOE00002528, at -2529. This was despite noting that the ABA uncovered wrongdoing at CSL dating back to at least a year earlier. *Id.*

246. The Charlotte School of Law memorandum does not analyze or even mention the law of North Carolina, where the school was located. The memorandum does not (and, on information and belief, could not) explain how a wrongdoer's "notice" of an investigation into its wrongdoing supplies the standard for whether an applicant has a viable claim under applicable state law.

247. The Department has stated that the "legal threshold for eligibility" for a BD application is "preponderance of the evidence," and has maintained that the BDU "[m]ust base decisions granting or denying relief on a record sufficient to withstand court scrutiny." DOE00006016, at -6018.

248. In fact, however, the BDU's school-specific memoranda never analyze what evidence state law would require under a "preponderance of the evidence" standard.

249. In particular, the BDU's memoranda never justify the BDU's wholesale rejection of borrowers' sworn statements in their BD applications when assessing the evidence that a court might consider in establishing a preponderance.

250. The BDU's school-specific memoranda also never analyze whether particular state laws require proof of reliance to state a claim for certain types of misrepresentations.

251. Nonetheless, BD claim reviewers are permitted to deny a BD application based on a "lack of reliance." DOE00006186 (showing claims in "Flagged for Denial" status with "Decision Reason" listed as "Lack of Reliance"); *see also* Nevin Dep. 85:8-20.

252. The Department's policy of failing to identify or apply state law to borrower defense allegations pursuant to the 1995 regulations is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

253. The borrower defense regulations published in 2016 (which did not become effective until October 16, 2018) provided that a borrower may assert, as a defense to repayment, that "the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan." 34 C.F.R. § 685.222(d)(1). "Substantial misrepresentation" is defined as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 34 C.F.R. § 668.71(c). "Misrepresentation" is defined as "[a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public,

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program." *Id.*

254. An internal Department document (which, according to metadata, was created by BDU Director Nevin in November 2018) estimated that, at the time of the document, less than 5% of pending BD applications would be subject to the 2016 regulations. DOE00004316, at -4320. At the time, this percentage would have represented approximately 7,900 claims, out of 158,110 pending. *See* Nevin Decl., ECF No. 56-4, at AR 397 (borrower defense application statistics as of 12/31/2018).

255. The BDU's school-specific memoranda never discuss the substantial misrepresentation standard.

256. The Department has nonetheless argued that implementation of the 2016 regulations was a reason for the delay in issuing borrower defense decisions. *See, e.g.*, Defs.' Mot. for Summ. J., ECF No. 63 at 10.

257. The Department's policy of failing to identify or apply the substantial misrepresentation standard to borrower defense allegations pursuant to the 2016 regulations is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### g. *Exceedingly Narrow "Common Evidence" Categories Used to Exclude Applications*

258. The Department has identified only an exceedingly narrow subset of BD applications that might — but will not necessarily — qualify for borrower defense relief.

259. For schools that have any potential approval criteria, the BDU's protocol has been to examine whether an application alleging claims against that school meets those pre-determined

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

criteria, usually based on whether the borrower's claims relate to a specific campus, educational program, and/or time period. If the application meets those criteria, it is set aside, purportedly for further review.

260. If an application does not meet the pre-determined criteria, the application is "adjudicated"—which, in practice, means that it is denied.  Nevin Dep. 204:24-206:22.

261. With respect to CCI, the Department has continued to apply approval criteria that were established prior to January 20, 2017. These criteria allow for the approval of BD applications that allege CCI made misrepresentations at specific campuses, within specific periods of time, regarding JPRs, transfer of credits, or guaranteed employment. *See* DOE00000196; DOE00013704; DOE00013708; DOE00007866.

262. The Department has denied thousands of BD applications from CCI borrowers that do not meet the specific parameters for campuses, time periods, and nature of allegations that were set out in those prior memoranda, despite ample evidence that CCI engaged in widespread misrepresentations at other campuses, at other times, and regarding other topics.

263. With respect to ITT, the Department has continued to apply approval criteria that were established prior to January 20, 2017. These criteria allow for the approval of BD applications that allege that ITT made misrepresentations regarding guaranteed employment at its campuses in California from 2005 through ITT's closing. DOE00009399.

264. The January 10, 2017 memorandum setting out the ITT approval criteria noted that "guaranteed job misrepresentations were evident throughout ITT's campuses nationwide," but the BDU at that time recommended approval only for California-based claims because "California law has already been thoroughly analyzed by the Department for the same claim in connection with" CCI. DOE00009399, at n.1.

265. By contrast, in a November 2019 memorandum regarding the Department's new partial relief methodology, Deputy Under Secretary Jones and COO Brown asserted, with respect to ITT, that "the Department had no evidence of widespread misrepresentation that would have qualified a class of borrowers for BD relief. Therefore, it will be up to borrowers to provide evidence of the

41

alleged misrepresentation, and the Department will be required to review those claims based on applicable State consumer protection law." DOE00013647, at -13654.

266. In April and May 2020, the BDU issued three memoranda that *rejected* potential approval criteria for BD applications alleging that ITT made misrepresentations regarding (1) conduct prior to 2005; (2) educational services; or (3) program cost or nature of loans. *See* "The Borrower Defense Unit's Ongoing Investigation of ITT Tech Before and After 2005," dated April 2, 2020; "ITT Technical Institute – Adjudication of Educational Services Allegations," dated May 20, 2020; "ITT Technical Institute – Adjudication of Program Costs and Nature of Loan Allegations," dated May 20, 2020 (all produced in response to Interrogatories 17-18).

267. On December 9, 2020, BDU Director Nevin testified that the BDU had recently completed a new protocol to evaluate ITT employment prospects claims for campuses outside of California. Nevin Dep. 43:3-15.

268. As of the date of this Supplemental Complaint, Plaintiffs do not have access to the memorandum that BDU Director Nevin mentioned in her testimony.

269. BDU Director Nevin testified that, for non-California ITT employment prospects claims, the BDU had decided to apply a rebuttable presumption that the applicable law under the 1995 regulations would be the law of the state where the borrower resided at the time of their separation from the school. Nevin Dep. 52:21 – 53:1.

270. BDU Director Nevin admitted that there are "some challenges with the data," and that "we have to, you know, basically piece it together." Nevin Dep. 54:5-15.

271. There was disagreement within the Department regarding whether the choice of law decision for ITT employment prospects claims should be made by the BDU or by political appointees in the Office of the Under Secretary. Nevin Dep. 56:2-17.

272. The BDU's adjudication protocol for ITT reflects that the Department has reviewed evidence regarding ITT from the Attorneys General of Iowa, Massachusetts, and New Mexico. *See* "ITT Technical Institute – Evidence Considered Protocol" (produced in response to Interrogatories 17-18). However, on information and belief, the Department has not analyzed

whether ITT borrowers have stated a claim based on violations of the laws of any of these three states.

273. From the summer of 2019 through December 24, 2020, the BDU created at least 760 memoranda concerning allegations against specific schools or school groups. Of these, only *23* memoranda (3%) found that potential approval criteria were warranted for certain, often extremely narrow categories of claims.

274. For example, the BDU concluded that all BD applications from EDMC schools relating to enrollment dates between July 1, 2003 and December 31, 2008 should be rejected, except for "professional licensure allegations relating to psychology masters and doctorate level programs at Argosy University," which would be subject to further investigation. DOE00009626.

275. Similarly, the BDU concluded that over 1,500 BD applications relating to schools owned by Anthem Education Group, LLC — which operated seven brands in 15 states and online — should be rejected, except for claims relating to campuses in Minnesota, because "the only relevant evidence BDU has obtained" came from the Minnesota Attorney General. DOE00009519. Notably, this memorandum acknowledged that the Minnesota Attorney General had requested group BD relief for students who attended Anthem campuses in Minnesota; the BDU has not adjudicated that group application.

276. As another example, the BDU limited its potential approval criteria for Lacy Cosmetology School to applications that made allegations regarding accreditation of the Advanced Cosmetology program between July 1, 2009 and June 30, 2011. This was despite the memorandum also acknowledging that (i) in 2011, the Department itself had made 18 findings against Lacy Cosmetology School in a Program Review (the BDU claimed that only one of these findings, the Advanced Cosmetology accreditation, was relevant to borrower defense); (ii) a default judgment had entered against the school in a False Claims Act lawsuit alleging misuse of Title IV funds, in which the United States had intervened; and (iii) a news article reported that the United States Attorney who handled the False Claims Act matter suggested that borrowers may want to file for borrower defense following that judgment. DOE00011396.

277. As of December 9, 2020, **none** of the BDU's analyses of potential approval criteria had actually resulted in a protocol for approving claims from a particular school, other than employment prospects claims from ITT. Nevin 49:9-19.

278. The BDU will proceed to "adjudicate" (deny) BD applications from a particular school before it completes its assessment of "common evidence" relating to that school. Nevin 99:16 – 101:17.

279. At least 260 of the BDU's school-specific memoranda indicate that cases from that school were adjudicated (denied) before the memorandum was written.

280. In this litigation, the Department filed a document summarizing the schools or school groups for which certain BD applications had been set aside for further analysis and eventually, possibly, approval. Defs.' List of Schools, Attachment to Filing in Response to Judge's Inquiry, ECF No. 145-2. This is the only time and the only location where the Department has made public its current criteria for potential BD application approval under so-called "common evidence." Nevin Dep. 183:7-17.

281. As of December 9, 2020, none of the BD applications that had been set aside for further analysis under these "common evidence" categories had ever been approved or denied. Nevin Dep. 178:5-8. On information and belief, as of the date of this Supplemental Complaint, all of these applications remain pending.

282. Borrowers who have loans associated with schools for which the BDU has defined "common evidence" categories have no way of knowing, when they submit their BD applications, whether they fall within or outside that school's "common evidence" categories.

283. Borrowers who have loans associated with schools for which BDU has defined "common evidence" categories have no way of knowing, if their BD applications are denied, whether the reason for denial is that they fell outside a "common evidence" category.

284. Schools contacted by the Department in connection with borrower defense inquiries receive details about the allegations against them, and have the opportunity to respond to each individual application. For instance, the Department notified Capella University that "[w]e

currently have approximately 250 borrower defense applications that make allegations regarding Capella University . . . For each such application, we will email a separate notification (the 'School Notice Email') and a password-protected copy of the borrower's application to the President, Chief Financial Officer, and Financial Aid Officer of record for your school . . . The School Notice Email will also provide your school an opportunity to submit responses to borrower defense applications, either individually or collectively, with instructions for how to do so." DOE00004939 at 1; *see also* DOE00009378; DOE00009380; DOE00009383; DOE00009386.

285. By contrast, borrowers are not given the opportunity to review or respond to evidence submitted by the schools to the Department in response to these inquiries. Nevin Dep. 77:12-17.

286. In developing the BD regulations that were promulgated in 2019, the Department focused on providing "due process rights for institutions" (schools), rather than for borrowers. DOE00007269, at -7270.

287. The Department's policy of excluding BD applications from potential approval based on "common evidence" categories without informing borrowers about the existence or definitions of those categories is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

288. The Department's policy of creating "common evidence" categories based on the narrowest possible interpretation of evidence, including by disregarding evidence contained in borrowers' sworn statements in BD applications, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**E.  Fall 2019: Development of the Form Denial Notices**

289. Meanwhile, at some point in the fall of 2019, individuals in the Department began developing form letters to send to borrowers whose BD applications were denied (the "Form Denial Notices"). Nevin Dep. 87:21 – 88:3.

290. Defendants have declined to identify the individuals who drafted the Form Denial Notices. *See* Supplemental Interrogatory Responses, Resp. to No. 16.

291. BDU Director Nevin testified that her team did not develop the Form Denial Notices. Nevin Dep. 85:21-86:25.

292. Under Secretary Jones testified that she reviewed and provided comments on the Form Denial Notices, but denied that she drafted the Form Denial Notices. Jones Dep. 201:13-202:17.

293. Form Denial Notice A ("Form A") was designed to be sent to borrowers who applied for borrower defense relief based on allegations that CCI made misrepresentations regarding its JPRs. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116 at 2 & Ex. A.

294. Form Denial Notice B ("Form B") was designed to be sent to borrowers who applied for borrower defense relief based on misrepresentations by CCI relating to topics other than, or in addition to, JPRs. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116 at 2 & Ex. B.

295. Form Denial Notice C ("Form C") was designed to be sent to borrowers who applied for borrower defense relief in connection with non-CCI schools that, in the Department's view, do not have any "common evidence" that might apply to the claims of multiple borrowers. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116 at 2 & Ex. C.

296. Form Denial Notice D ("Form D") was designed to be sent to borrowers who applied for borrower defense relief in connection with non-CCI schools that, in the Department's view, do have "common evidence" in the Department's possession. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116 at 2-3 & Ex. D.

297. Each of Forms A, B, C, and D includes a section titled "Applicable Law." In each Form, this section acknowledges that the "borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law."

298. However, none of the Forms includes a place for the Department to identify or insert the state law that actually applies to a given borrower's claim.

299. In denial notices actually received by borrowers, the "Applicable Law" section does not identify any applicable state law.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

300. The Department made a specific policy decision to omit state law information from denial notices sent to borrowers. A memorandum titled "School Notice Letters and Other Open Items" (which, according to metadata, was created by BDU Director Nevin in September 2017) states: "Policy Decision on whether state law needs to be included in adjudication notices for ineligibles: Does the state law have to be added to borrower decision notices?  It is not currently included on the letters for ineligibles." DOE0002653.

301. That same memorandum anticipates that applicable state law *will* be included in notice letters sent to schools to notify them that their schools are named in pending BD applications. A school that receives such a notice letter will then be permitted to "provide evidence to dispute the state law identified," and the "response and evidence" submitted by the school "may result in a change of state law applied." *Id.*

302. Under Secretary Jones testified that she had expected that the Form Denial Notices would have included information about which state law applied. Jones Dep. 282:1-5.  But they do not.

303. BDU Director Nevin testified that "there was discussion of whether or not to include state law as a field" in the Form Denial Notices, "but that would have required more time for my team to go back and, you know, fill in any data that needed to -- with respect to state law where it really wasn't being denied because of state law." Nevin Dep. 91:16-22.

304. Forms C and D include a section titled "Why was my application determined to be ineligible?" Form B includes an analogous section titled "Why was my application determined to

### Allegation 1: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

### Allegation 2: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

### [Allegation X: Repeat as needed]

47

be ineligible for [non-JPR] allegations?" In each Form, under this heading, the Department states that it "reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from NSLDS, and evidence provided by other borrowers." Each Form then provides a fill-in-the-blank template for each allegation, as follows:

305. In denial notices actually received by borrowers, each "Review Recommendation Reason" is filled in with one of four phrases: "Insufficient Evidence," "Failure to State a Legal Claim," "Other," or, in the case of certain CCI borrowers, "Outside coverage windows." No further explanation is ever provided.

306. The Form Denial Notices do not explain that a borrower's sworn statements in their BD application were not considered as evidence in support of their claims.

307. The BDU's school-specific memoranda demonstrate that an individual borrower's BD application is not, in fact, analyzed in light of "evidence provided by other borrowers," despite the Form Denial Notices' statement to the contrary. *See supra* ¶¶ 125-127, 135-144, 188-190.

308. Form D includes a section titled "What evidence was considered in determining my application's ineligibility?" Form B includes an analogous section titled "What evidence was considered in determining my application's ineligibility for [non-JPR] allegations?" In each of those sections, the Department states that it "reviewed evidence provided by you, other borrowers, and the school. Additionally, we considered evidence gathered from the following sources"— followed by a space for the Department to fill in the sources of "common evidence" related to the borrower's school.

309. In denial notices actually received by borrowers, the "evidence considered" section includes descriptions such as "[State] Attorney General's Office"; "Evidence obtained by the Department in conjunction with its regular oversight activities"; and "Publicly available securities filings." *See, e.g.*, Sweet Aff. (Exhibit 3 to Connor Decl.), ECF No. 129-1 at 53; Wright Aff., ECF No. 108-3 at 40. No further explanation is ever provided.

310. Before the Department's October 2020 filing in this litigation (ECF 145-2), borrowers had no way to find out, either before or after filing their BD applications, what categories of claims the Department believes are supported by its "common evidence." Nevin Dep. 183:7-22.

311. Because the Department never made its "common evidence" categories public except in this lawsuit, borrowers never had an opportunity to learn about or review any of the "common evidence" purportedly relied upon by the Department in denying their applications.

312. Forms A, B, C, and D each include a section titled "What if I do not agree with this decision?" In each Form, this section is identical. It informs the borrower that "you may ask ED to reconsider your application," and provides instructions for filing an application for reconsideration.

313. In actuality, as of December 9, 2020, the Department had no reconsideration process in place. Nevin Dep. 218:22-221:9.

314. Forms A, B, and C state that "your loans will not be placed into forbearance during the reconsideration process," and warn that "[f]ailure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation."

315. Form D states that "your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened." However, in practice, borrowers who received Form D denials were unable to access forbearance under this provision, because there was no process in place for the Department to "accept" a reconsideration application. Nevin Dep. 218:11-220:15.

316. None of Forms A, B, C, or D provides the borrower with notice of their right to challenge the denial of their application in federal court.

317. Each of Forms A, B, C, and D fails to provide an adequate "brief statement of the grounds for denial" as required by APA § 555(e).

**D.  December 2019: Announcement of New Partial Relief Methodology**

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

318. On December 10, 2019, the Department announced a new partial relief methodology via press release, which they claimed was designed to protect "students and taxpayers." Brown Dec., ECF No. 71-3 at AR 602.

319. Internal guidance regarding the December 2019 partial relief methodology stated that one purpose of the new formula was to "protect taxpayers from runaway costs." DOE00000584, at -597.

320. The new partial relief methodology used publicly available earnings data to compare median earnings of graduates who asserted BD claims to the average earnings of graduates at "comparable programs." Approved applicants whose earnings were two standard deviations lower than the median would receive full loan relief, while those whose earnings were lower than the median but higher than two standard deviations away from the median would receive 25%, 50% or 75% loan relief.   Brown Dec., ECF No. 71-3 at AR 602. Under the new partial relief methodology, it is possible for a borrower who asserted a meritorious BD claim to receive 0% relief.

321. The announcement of the new partial relief methodology opened the floodgates for the Department to begin issuing mass denials.

## II.     Tens of Thousands of Class Members Receive Form Denial Notices

322. In the first months of 2020, the Parties in this litigation were engaged in settlement discussions.

323. As of January 9, 2020, the Department had issued denials for 15,256 BD applications and had granted just 789 applications since announcing its 2019 partial relief methodology. *See* Discovery Order, ECF No. 146 at 5.

324. The Department justified this denial rate by explaining that it was prioritizing adjudicating and issuing decisions on applications with "little or no relevant evidence." Brown Dec., ECF No. 140-1 ¶ 9; Defs.' Opp. to Mot. to Enforce, ECF No. 140 at 10.

325. At this time, Plaintiffs and their counsel were not aware that the Department was applying its 'presumption of denial' policy, or that it was denying BD applications using the Form Denial Notices.

326. The Parties signed a settlement agreement on April 7, 2020. At that time, Plaintiffs were not aware of the Department's 'presumption of denial' policy or the Department's plan to send Form Denial Notices to the vast majority of Class Members.

327. The Parties submitted their settlement agreement to the Court for preliminary approval on April 10, 2020.

328. The Court granted preliminary approval on May 22, 2020.

329. Between April 7, 2020 and August 24, 2020, the Department issued approximately 78,400 BD decisions to Class Members. All but 4,400 were denials, for a 94.4% denial rate. Discovery Order, ECF No. 146 at 6.

330. During this period, no Class Member who applied for borrower defense with respect to loans from a school other than CCI or ITT received an approval of their BD application.

331. On July 24, 2020, Plaintiffs' counsel notified Defendants' counsel that Plaintiffs had become aware that increasing numbers of Class Members were receiving Form Denial Notices. Connor Decl. in Support of Motion for Case Management Conf., ECF No. 108-2 at 6.

332. On August 20, 2020, Plaintiffs' counsel moved this Court for a case management conference to address Plaintiffs' concerns regarding the Form Denial Notices. Plaintiffs' Motion for Case Management Conf., ECF No. 108.

333. The Court held a case management conference on August 31, 2020, and ordered Defendants to provide certain types of information about BD denials since December 2019.

334. On September 4, 2020, Defendants submitted a filing in which they admitted that the Department had denied 118,300 BD applications since December 2019, while approving only 13,500 applications. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116; *see* Discovery Order, ECF No. 146 at 5.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

335. Defendants also attached to their September 4, 2020 filing the four Form Denial Notice templates. Defs.' Resp. to Aug. 31, 2020 Order, ECF No. 116, Exs. A-D.

336. On October 1, 2020, the Court held a remote fairness hearing over Zoom on the preliminarily approved settlement, which was attended by hundreds of Class Members. Due to time constraints, fourteen borrowers were selected by the Court to share their testimony. The Zoom proceeding also had an active Zoom chat function for borrowers to share their experiences.

337. At the hearing, Class Members shared their dismay at receiving incomprehensible and nearly identical form denial letters after waiting for years for a response from the Department on their applications. *See* Hearing Transcript (Oct. 1, 2020); Zoom Chat Transcript, ECF No. 141.

338. On October 19, 2020, the Court denied final approval of the settlement agreement and issued an Order to Show Cause why the Secretary should not be enjoined from issuing any further denials of Class Members' BD applications until a ruling could be had on the legality of the Form Denial Notices. Discovery Order, ECF No. 146.

339. In response to the Order to Show Cause, Defendants represented that they would voluntarily cease denying Class Members' BD applications until a ruling on the legality of the Form Denial Notices. Defs.' Response to Order to Show Cause, ECF No. 150 at 2-3.

### III.   The Department's Unlawful Conduct Has Harmed Class Members

340. Plaintiffs incorporate Paragraphs 236-370 of their Complaint (ECF No. 1) as if set forth fully herein.

341. The Department's arbitrary and capricious 'presumption of denial' policy, along with its denial notices that contain no explanation and a missing or withheld remedy, have wrongly denied borrowers relief from loans that in many cases are actually invalid.

342. As a result, the Department has exacerbated harm to borrowers' credit, perpetuated their untenable debt-to-income ratios, restricted their employment and education options, prevented opportunities for them to develop wealth (*e.g.*, home equity, retirement), and interfered with their ability to provide for their families.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

343. Class Members have been denied job opportunities because of their debt-to-income ratios. *See, e.g.*, Norton Aff., ECF No. 159 ¶ 11. Their debt loads have prevented them from being able to own or rent a home or a vehicle. *Id.* ¶¶ 15, 16; DePaul Aff., ECF No. 151 ¶¶ 14-15. They have not been able to invest in retirement. Norton Aff., ECF No. 159 ¶ 14.

344. In short, an unlawful borrower defense denial can lock the borrower into a vicious cycle of financial insecurity.

345. Receiving a Form Denial Notice signals to the borrower that their loans will be placed back into collection status from forbearance, potentially leading to unsupportable expenses, default, seizing wages, and garnishing tax refunds.

346. For example, one Class Member, who attended the Illinois Institute of Art ("Ai") (owned by Education Management Corporation / Dream Center Education Holdings), explained that, if she is sent back into repayment, she could not both pay off her student loans and financially provide for her two daughters. Lezan Aff., ECF No. 155 ¶ 10.

347. Another Class Member, who attended Brooks Institute (owned by Career Education Corp.), expressed similar concerns at the prospect of her employer garnishing her wages if she goes back into repayment, sharing that she could not simultaneously have her wages garnished; care for her children, two of whom have special needs; afford a home; and pay her family's bills. Norton Aff., ECF No. 159 ¶¶ 10, 13.

348. The confusion and despair engendered by the Department's actions cause borrowers significant psychological distress.

349. Class Members have experienced suicidal thoughts, intense anxiety, and trauma because of the Department's actions. DePaul Aff., ECF No. 151 ¶¶ 16, 21; Norton Aff., ECF No. 159 ¶ 22. One Class Member explained, of the psychological burden of predatory student loan debt: "[I]f you think there's nothing you can do, you question what's the point of trying." Lezan Aff., ECF No. 155 ¶ 23.

350. The Department's Form Denial Notices have also left borrowers with a lack of faith that their government works for them.

351. One Class Member shared that, "between the Department's delays and its rubber-stamp claim denials, I feel like our government is having a hand in corruption, and aiding the people who want to take advantage of vulnerable students." Lezan Aff., ECF No. 155 ¶¶ 22, 26; *see also* DePaul Aff., ECF No. 151 ¶ 17; Norton Aff., ECF No. 159 ¶¶ 28, 32.

352. The Department's actions, particularly as to borrowers who attended schools that the Department knows engaged in misconduct, have had a tangible and negative impact on Class Members' belief that their government is acting in their interest.

353. The only thing preventing mass immiseration from the Department's unlawful 'presumption of denial' policy and Form Denial Notices has been the coincidental passage of COVID-related CARES Act student loan forbearance in March 2020, and its subsequent executive extensions, now effective through September 2021. But this is a temporary measure for an unrelated emergency.

### *Theresa Sweet*

354. On July 8, 2020, Plaintiff Sweet received a Form Denial Notice D, rejecting her BD application in connection with loans she took out to attend Brooks Institute of Photography ("Brooks"), a Career Education Corp. ("CEC") school. Sweet Affidavit (Exhibit 3 to Connor Decl.), ECF No. 129-1 at 51.

355. The reason stated for rejecting Ms. Sweet's allegations against Brooks regarding employment prospects, program cost & nature of loans, and career services was "Failure to State a Legal Claim." *Id.* at 52. The notice did not include any information about what state law had been applied (if any) or what claim her allegations had failed to state.

356. The reason stated for rejecting Ms. Sweet's allegations against Brooks regarding educational services, transferring credits, and "other" was "Insufficient Evidence." *Id.* at 52-53. The notice did not include any information about what evidence was purportedly missing that would have supported her claims.

357. Ms. Sweet submitted supporting evidence with her BD application. *Id.* at 24.

358. The statements "Failure to State a Claim" and "Insufficient Evidence" left Ms. Sweet without any way to figure out what she failed to allege, what was missing from her application, or what was deficient about the evidence she submitted. *Id.* at 25.

359. The denial notice stated that the Department had "considered evidence gathered from the following sources: NY Attorney General's Office[;] PA Attorney General's Office[;] Evidence obtained by the Department in conjunction with its regular oversight activities[;] Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)[; and] Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)." *Id.* at 53. The notice did not include any information about the nature of the evidence reportedly considered from these various sources, nor any explanation of why none of this evidence was found to support Ms. Sweet's allegations.

360. As of June 19, 2020, the BDU took the position that all BD applications from CEC borrowers who enrolled in any CEC school before January 1, 2008 or after January 1, 2013 should be rejected, because "none of the schools [in the CEC group] – during the specified time period[s] – are the subject of a known investigation or lawsuit that would likely reveal supporting evidence relevant to BD claims." DOE00009550; DOE00009552.

361. As of June 19, 2020, there was evidence readily and publicly available to the BDU demonstrating that this conclusion was inaccurate. For example, in 2019, CEC entered into an Assurance of Voluntary Compliance with 48 states and the District of Columbia that addressed CEC's alleged violations of state laws regarding recruitment and enrollment practices, including misrepresentations regarding the costs of enrollment, transferability of credits, program offerings, employment prospects, and job placement rates. *See* Assurance of Voluntary Compliance, *In re State of Texas & Career Education Corp.*, No. D-1-GN-19-000017 (Tex. Dist. Ct. Travis Cty., 353d Jud. Dist., Jan. 2, 2019), *available at* https://www.texasattorneygeneral.gov/ sites/default/files/images/admin/2019/Press/FINAL%20CEC%20AVC%20attached%20to%20Pe tition%20wCauseNo.pdf. Among other provisions, the Assurance of Voluntary Compliance required CEC to forego collection on nearly $500 million in student debts. This debt forgiveness

applied to students who "either (a) attended a CEC institution which was closed prior to the Effective Date [January 2, 2019] or is currently scheduled to close before December 31, 2018; or (b) whose final day of attendance at [American Intercontinental University] or [Colorado Technical University] occurred on or before December 31, 2013." *Id.* ¶ 116. Both of these conditions apply to students who enrolled both ***before and after*** the BDU's cut-off period of January 1, 2008 through January 1, 2013.

362. There was other evidence available about CEC as well. For instance, in July 2014, the *New York Times* reported that, if the Department's new "gainful employment" regulations were to go into effect, 39% of CEC's programs would fail the gainful employment standards. *See* Kevin Carey, "Corinthian College Is Closing. Its Students May Be Better Off as a Result," *N.Y. Times* (July 3, 2014), https://www.nytimes.com/2014/07/03/upshot/corinthian-colleges-is-closing-its-students-may-be-better-off-as-a-result.html?_r=0.

363. Additionally, in August 2019, the Federal Trade Commission had brought a complaint against CEC, alleging that, "[s]ince at least 2012," CEC had "used an illegal and deceptive telemarketing scheme to lure consumers to their post-secondary and vocational schools." Specifically, CEC had employed "lead generators" to "deceive[] consumers into divulging their contact information under the guise of providing services," including by "pos[ing] online as official U.S. military recruiters or as job-finding services and then call[ing] consumers whose contact information was solicited under false pretenses." CEC's lead generators had also "misrepresent[ed] that the U.S. military or an independent education advisor recommends the CEC school being marketed." *See* Complaint for Permanent Injunction and Other Equitable Relief, *FTC v. Career Education Corp.*, No. 19-cv-5739 (N.D. Ill. Aug. 27, 2019), *available at* https://www.ftc.gov/system/files/documents/cases/career_education_corporation_complaint_8-27-19.pdf. On October 9, 2019, the court approved a settlement in which CEC paid $30 million to the FTC and agreed to various injunctive provisions. *See* Stipulated Order for Permanent Injunction and Monetary Judgment, *FTC v. Career Education Corp.*, No. 19-cv-5739 (N.D. Ill.

Oct. 9, 2019), *available at* https://www.ftc.gov/system/files/documents/cases/de_11_-_stipulated_order_for_permanent_injunction.pdf.

364. Less than six months after finalizing its June 19, 2020 CEC memorandum, the BDU itself acknowledged that its conclusion had been erroneous. On December 2, 2020, the BDU added the following "Update" to its memoranda regarding CEC: "The Department has recently received additional evidence that may require a change in our adjudication protocols for CEC and potentially would support reopening some of the previously adjudicated borrower defense claims. As a result, the Department has paused the adjudication of processing of CEC claims pending its review of the scope of this evidence. This memo will be updated again once we have completed that review." DOE00009550; DOE00009552.

365. Plaintiffs do not know at this time whether this "additional evidence" would affect the disposition of Ms. Sweet's BD application.

366. Plaintiffs do not know at this time whether the BDU has, in fact, changed any of its adjudication protocols relating to CEC or reopened any BD applications from CEC schools based on this "additional evidence."

### *Tresa Apodaca*

367. Plaintiff Apodaca has not received a decision on her BD application, which she submitted in May 2015 in connection with loans she took out to attend Heald College in Roseville, California (a CCI school).

368. Ms. Apodaca does not understand why it has taken, so far, *almost six years* to resolve her BD application, given the findings by the Department and state governments that CCI engaged in widespread fraud and misrepresentation.

369. The BDU's memorandum "Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment," dated January 7, 2017, recognizes that "[i]n BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs." DOE00007866. Again, the BDU relied on averments from BD

applications to support the finding that misrepresentations occurred with "pervasiveness and consistency." *Id.* at -7867.

370. Ms. Apodaca is surprised not to have received a denial notice, given how many thousands have gone out to other class members. She has no idea how she would stay financially afloat if she were to go back into repayment. Currently, she is not employed, her husband is employed part-time for UPS, and they care for their two sons, one of whom is disabled and requires full-time care.

371. Ms. Apodaca and her family have suffered financial stress and an inability to plan for the future because of the unresolved student loan debt hanging over them. Ms. Apodaca and her husband put off having children because they wanted to wait for their financial situation to be more stable and certain. Now, Ms. Apodaca is no longer able to have children for health reasons.

372. Ms. Apodaca has experienced a loss of faith in the Department and the U.S. higher education system generally. She is terrified of sending her sons to college in the future because she does not want them to experience what she has gone through.

### Chenelle Archibald

373. Plaintiff Archibald has not received a decision on her BD application, which she submitted in February 2016 in connection with the loans she took out to attend Salter College ("Salter"), a Premier Education Group school.

374. The Department has not produced a school-specific memorandum from the BDU regarding Salter College. However, other documents indicate that the BDU is aware that Salter College and its parent company, Premier Education Group, were accused of wrongdoing by the Massachusetts Attorney General. *See* DOE00006042, at 9-10.

375. Ms. Archibald has struggled to move forward in her life and to plan for the future while waiting for the Department to rule on her application. She financially supports five children and a grandchild, and is currently working three jobs. She continues to pay the interest on her student loans monthly.

376. Ms. Archibald wants to finish her degree at Worcester State University and attend law school. She has paid for the program out of pocket because of her traumatizing experience taking

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

out student loans. However, this has become financially unmanageable, and she has had to put her education and her dreams of going to law school on hold.

377. None of Ms. Archibald's credits that she earned at Salter College were transferable to Worcester State University.

378. Ms. Archibald has felt stress and anxiety as she has learned of the pro forma denials that have gone out. She does not think she could survive and care for her family if she had to go back into repayment.

### Daniel Deegan

379. On May 7, 2020, Plaintiff Deegan received a Form Denial Notice D, rejecting his BD application in connection with loans he took out to attend Keller Graduate School of Management, a DeVry school ("Keller"). Deegan Aff., ECF No. 108-8 at 9.

380. The reason stated for rejecting Mr. Deegan's allegations against Keller regarding employment prospects and career services was "Insufficient Evidence." *Id.* at 10. The notice did not include any information about what evidence was purportedly missing that would have supported his claims.

381. The notice stated that the Department had "considered evidence gathered from the following sources: Evidence obtained by the Department in conjunction with its regular oversight activities." *Id.* at 11. The notice did not include any information about the nature of the evidence reportedly considered, nor any explanation of why this evidence did not support Mr. Deegan's allegations.

382. The statement "Insufficient Evidence" left Mr. Deegan unable to understand what was missing from his application. *Id.* at 2.

383. The BDU's school-specific memorandum for Keller acknowledges that two groups of former students sued the school under Texas law, alleging misrepresentations. Those two cases were consolidated and were pending as of the date of the memorandum. The memorandum also acknowledges that Keller and its parent company, DeVry, were sued separately for misrepresentations under New Jersey law, in a case that settled in 2016. The BDU disregarded

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

these lawsuits, however, and concluded that applications from Keller should be denied because "[t]here was insufficient commonality of campus and/or time period to suggest a pattern that warrants further investigation, and the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation." DOE00011331.

384. Indeed, the BDU's "Evidence Considered" protocol for Keller specifies that BDU attorneys reviewing BD applications from former Keller students should choose the "Standard Denial with Evidence" status, after which the only option in the dropdown is "Evidence obtained by the Department in conjunction with its regular oversight activities." DOE00009585.

385. Notably, however, in its October 14, 2020 filing in this Court, the Department stated that it had ***not*** denied 31 applications from Keller, representing the 31 borrowers who are plaintiffs in the ongoing lawsuit in Texas. Defs.' List of Schools, Attachment to Filing in Response to Judge's Inquiry, ECF No. 145-2 at 7.

386. In October 2020 at the latest, the Department was aware of common evidence from the FTC investigation of DeVry, and also stated that it would "consider the Department's 2016 Notice of Intent to Limit which concluded that DeVry 'failed to meet the substantiation requirement' with respect to the Since 1975 placement rate representation made in advertisements between at least February 2008 and January 23, 2014." *Id.* at 7.

387. Mr. Deegan describes the feeling of receiving a denial letter as being like finding out about the loss of a family member or a serious illness. He has felt an unmanageable amount of stress knowing that he can never pay off his student loan debt. Mr. Deegan thinks he would have to take at least one other job and stop paying his other bills in order to keep up with his student loans.

388. Mr. Deegan and his wife have put off having children because they would not be able to afford to raise a child and pay for Mr. Deegan's student loans. They want to start a family, but do not feel they can because of the financial uncertainty of his outstanding debt.

***Samuel Hood***

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

389. Plaintiff Hood has not yet received a decision on his BD application, which he submitted in January 2018 in connection with his loans taken out to attend ITT in Cordova, Tennessee.

390. He does not understand why his application is taking so long to resolve, despite findings by the Department and state attorneys general that ITT engaged in widespread fraud.

391. In its memorandum setting out approval criteria for BD applications that allege that ITT made misrepresentations regarding guaranteed employment at its California campuses, the BDU noted that "guaranteed job misrepresentations were evident throughout ITT's campuses nationwide." DOE00009399 at n.1.

392. The lack of resolution on his BD application has kept Mr. Hood and his family in a cloud of financial uncertainty and stress. He and his wife have been denied a home mortgage because of his debt-to-income ratio, and have had to spend time living at her parents' house. Mr. Hood has had to pull money out of his retirement account to pay other bills because his debt-to-income ratio prevents him from qualifying for personal loans.

393. Mr. Hood has been surprised not to receive a denial notice yet, given what he has heard about the pro forma denials received by other class members, and he has experienced intense stress at the prospect of a denial. Mr. Hood financially supports his wife and three-year-old son. He is barely above water as it is, and would not be able to manage student loan payments on top of his other bills.

394. Mr. Hood has lost faith in the Department throughout his experience attending ITT and waiting for a resolution on his BD application. He does not want his son to have to ever deal with the Department, and he is considering home-schooling for that reason.

### *Alicia Davis*

395. In January 2020, Plaintiff Davis received a 10% partial approval of her BD application for her loans taken out in connection with her attendance at Florida Metropolitan University, at Florida Metropolitan University (Everest College), a CCI school.

396. The BDU's memorandum "Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment," dated January 7, 2017, recognizes that "[i]n BD

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs." DOE00007866. Again, the BDU relied on averments from BD applications to support the finding that misrepresentations occurred with "pervasiveness and consistency." *Id*. at -7867.

397. As part of its 2019 partial relief methodology, the Department adopted an alteration to its usual partial relief formula for CCI borrowers: "Because of promises made by the prior administration, and damages likely caused to those borrowers by the Department's continuous efforts to use Corinthian Colleges, Inc. (CCI) institutions as an example, the Department will award no less than 10% relief to all eligible CCI Borrower Defense applicants, regardless of program earnings." Brown Dec., ECF No. 71-3 at AR 602.

398. The grant of 10% relief to Ms. Davis therefore represents a finding by the Department that Ms. Davis was indeed subject to actionable misrepresentations by Everest, but in the Department's view, she did not suffer any harm as a result of these misrepresentations.

399. Ms. Davis does not understand how she could have submitted a valid BD claim but received only 10% relief. Ms. Davis feels that the Department has chosen to side with fraudulent actors rather than giving her application a full and fair review.  She feels penalized for being a victim of fraud by her school, and has lost trust in the Department.

400. Contrary to the Department's conclusion that Ms. Davis suffered no harm, in fact Ms. Davis' student loans have wreaked havoc on her financial life. Ms. Davis is unable to qualify for a personal loan, car loan, or home mortgage because of her debt-to-income ratio. Ms. Davis works in law enforcement and has been denied jobs because of her credit. She has to rely on her husband for major loans and purchases.

401. Ms. Davis has FFEL loans, which are not covered by CARES Act forbearance. She has no idea how she will manage once she has to go back into repayment on her federal Direct Loans: her loans were in default when she applied for BD and her wages could be garnished if the Department resumes collection on class members' loans.

~~[PROPOSED]~~ SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

*Jessica Jacobson*

402. On August 11, 2020, Plaintiff Jacobson received a Form Denial Notice D, rejecting her application in connection with loans she took out to attend the New England Institute of Art ("NEIA"), an EDMC school. Jacobson Aff., ECF No. 108-11 at 4.

403. The reason stated for denying Ms. Jacobson's allegations against NEIA regarding program cost, transferring credits, admissions, and "other" is "failure to state a legal claim." *Id.* at 5. The notice did not include any information about what state law had been applied (if any) or what claim her allegations had failed to state.

404. The reason stated for denying Ms. Jacobson's allegations against NEIA regarding employment prospects, career services, and educational services is "insufficient evidence." *Id.* at 5. The notice did not include any information about what evidence was purportedly missing that would have supported her claims.

405. Ms. Jacobson submitted an 86-page BD application with supporting evidence. The denial letter gives her no understanding of what she would have had to write to establish a legal claim, or why the evidence she provided was not sufficient.

406. The notice stated that the Department had "considered evidence gathered from the following sources: IA Attorney General's Office[;] IL Attorney General's Office[;] CO Attorney General's Office[;] Evidence obtained by the Department in conjunction with its regular oversight activities[;] Senate Hearing Testimony of EDMC career services adviser before the Committee on Health, Education, Labor, and Pensions (September 30, 2010)[;] Materials, including publicly available securities filings, prepared by Education Management Corporation." *Id.* at 6. The notice did not include any information about the nature of the evidence reportedly considered from these various sources, nor any explanation of why none of this evidence was found to support Ms. Jacobson's allegations.

407. The BDU's school-specific memorandum for EDMC / Art Institutes acknowledges that there are a number of lawsuits, including two *qui tam* actions and two securities class actions, alleging misconduct by EDMC such as misrepresenting program costs, employment data, and

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

engaging in predatory recruiting tactics. As detailed above, the BDU concluded it was unable to review much of the relevant evidence. See *supra* ¶¶ 202-203. The BDU also acknowledged reviewing evidence from "(i) exhibits and congressional testimony referenced in the 2021 U.S. Senate committee on Health, Education, Labor & Pensions on for profit higher education, (ii) marketing materials, contractual agreements, and similar documents distributed to students by EDMC schools, (iii) EDMC's SEC financial filings; and (iv) borrower applications with attachments." DOE00009626, at -9627. Ultimately, despite this evidence, the BDU concluded that it "does not have evidence in its possession to substantiate the borrower defense allegations of students" who attended EDMC during the period that Ms. Jacobson attended. *Id.*

### *Other Class Members*

408. Other Class Members have suffered harm similar to the named Plaintiffs.

409. Class Members detailed some of these harms for the Court during the October 1, 2020 fairness hearing. *See* Hearing Transcript (October 1, 2020); "Zoom chat" Transcript, ECF No. 141.

410. Additionally, on March 10, 2021, Plaintiffs' counsel sent an email survey to over 5,000 Class Members, asking how their student loans and experiences in the borrower defense process had affected them, especially during the COVID-19 pandemic.

411. As of the date of this Supplemental Complaint, Plaintiffs' counsel have received 425 responses, spanning 42 states.

412. Sixty percent of respondents are parents.

413. Ten percent of respondents have served in the military.

414. Forty-four percent of respondents filed their borrower defense applications in 2017 or earlier.

415. Respondents were split nearly equally among those who have had their BD application denied and those whose applications are still pending (46% and 48%, respectively).

416. *Ninety-nine percent* of respondents who have received denial notices on their BD applications said that they were not satisfied with the Department's explanation of the denial.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

417. Respondents' descriptions of their experiences receiving the denial notices echoed the prevalent themes that Class Members spoke about at the October 1, 2020 fairness hearing: confusion, distrust, and hopelessness. Below are examples of borrowers' responses to the question "Why are you not satisfied with the explanation provided by the Department?"[6]:

- "There were mass denials for everyone who applied. My responses were not even read and I got the same generic denial as everyone else who applied did."

- "After years of waiting, suddenly everyone was denied. There is no way they could have reasonably looked at so many in so short a time. I honestly don't think anyone actually thoroughly reviewed my application."

- "There were no details on why at all."

- "The reasons were vague. I believe that it was a quick solution to the legal matters at hand."

- "Vague and form letter style. Not specific to me and my situation."

- "It does not provide a thorough answer, and I know that the school was a fraud."

- "Did not explain enough to understand the reason why. I didn't understand."

- "I'm not even sure what failure to state a legal claim means. I answer the questions and provided supporting documents."

- "Denied due to 'failure to state a legal claim'. I completed my application to the best of my ability, providing documentation, names, emails, and answered every question on the application form provided in full. I do not have a legal degree, and nowhere on the application does it show I needed to state a legal claim."

- "Denial based on dates despite predatory practices still in place during my attendence. I witnessed the predatory and fraudulent activity personally.  All denial reasons were essentially that they were not legal arguments as if I were supposed to be a lawyer."

---

[6] Minor typographical errors in survey responses have been corrected here for clarity.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

- "It cited lack of evidence.  But I was never showed to submit any evidence."

- "Said I need to provide more evidence. 60 pages of evidence wasn't enough."

- "The explanation was brief. Simply stating that there was no evidence. Unfortunately several federal and private law suits during my enrollment prove predatory and dishonest enrollment practices. No information was given on how to appeal or get information on why I was denied."

- "Even though the company admitted in court they committed fraud with recruiting, school numbers, finances with students loans & etc. in court, the department of education still wouldn't take that into consideration."

- "Denial stated that I did not have enough evidence. Heald is closed it is impossible to gather 'evidence.'"

- "They said I did not provide enough documentation but did not say what documentation was missing. I wasn't able to find information on the documentation required beyond brochures & enrollment records, which I provided."

- "It said no proof of predatory lending. The predatory sales pitches and guarantees of better employment from the school counselors were made via phone. It's not something I can 'prove', but it is the reason why I continued to pursue an education in a degree program in a field which I am considered by healthcare companies as unemployable."

- "Denied for 'no proof of claims' – doesn't make my statements untrue!"

418. Of respondents who had received a denial notice, more than half (57.8%) have not sought reconsideration from the Department. Many stated that they declined to do so because they did not understand or did not trust the process[7]:

- "I didn't know I could."

- "I am overwhelmed by the process and don't know where to start."

---

[7] Minor typographical errors in survey responses have been corrected here for clarity.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

- "I was told I was only allowed one chance at it."
- "I would like to. I called to ask for advice on what to submit and they said they couldn't give me any advice other than that I was allowed to resubmit."
- "When I called about reconsideration, I was told to look into legalities I don't understand."
- "I tried to find out how and was completely unable to, there is no available information at all on what to do and I thought it was easier to try being forgiven for disability which is profane - I genuinely looked and couldn't find anything about 'reconsideration', it is news as of this survey question that said option exists at all. Not sure why my rights are this obfuscated."
- "Not sure what else to explain to change the decision? I sent all the information I had since it's been several years since I finished school."
- "I also don't know 'how' to apply for reconsideration when I don't know why I was denied in the first place."
- "I'm not sure what else to put to become eligible."
- "I cannot afford an attorney and the letter states I did not state what laws were broken."
- "I thought there was no more recourse. Mrs. Devos make it very clear her and the current administration didn't even care to research claims and would blanket deny everyone."
- "I do not have faith that the Department will read the reconsideration since they obviously didn't read the original BD application."
- "The process is unfair and not realistic."
- "I felt like I simply do not have a fair chance to win."

419. Class Members have been deeply affected by the COVID-19 pandemic. Eighteen percent are currently unemployed, and over a third (34%) applied for unemployment benefits in the last year. Fifty-four percent of respondents have either lost their job, business, or had to leave the

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

workforce to care for a family member, and forty-nine percent have experienced a significant loss in income. Some have lost their housing or had their utilities cancelled. Many described struggling with worsening mental and physical health issues. Nearly half (47%) have worked in a job that requires in-person exposure to the public. Twenty-two percent have contracted the COVID-19 virus, and twenty-one percent have lost a loved one to the disease.

420. Over these hardships, the specter of student debt looms.

421. Seventy-four percent of respondents report experiencing mental or physical hardship related to their student loan debt since February 2020.

422. Since February 2020, 39% of respondents have been unable to apply for or have been rejected from obtaining a loan because of their student loan debt.

423. Since February 2020, many respondents have been denied either housing (19%) or a job (10%) because of their student loan debt.

424. Eighty-four percent of respondents said that being forced back into repayment on their student loans would negatively affect their current financial situation "a great deal."

425. Eighty-three percent of respondents said that the educational program for which they borrowed student loans has helped them "none at all" during the COVID-19 crisis. They borrowed to attend schools such as ITT (21%), a Corinthian-owned school (12%), the Art Institute brand (11%), and University of Phoenix (11%).  Nearly three-quarters (72%) attended school more than a decade ago.

426. Asked to provide their own perspectives on their situations, Class Members provided responses that detailed the wide range of negative impacts from the Department's unlawful policies and practices regarding the borrower defense process[8]:

- "I applied for the borrower defense for repayment in 2015 and have submitted 2 applications with a significant amount of documents to support my case and still

---

[8] Minor typographical errors in survey responses have been corrected here for clarity.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

have not received any decision on my case, these fraudulent student loans are ruining my life."

- "It's ridiculous I haven't received any notification in 6 years."

- "I have stress, anxieties, panic attacks, adhd and I get no help."

- "I wish this issue would be addressed as soon as possible carrying this burden for years has really hurt my life."

- "I haven't been able to live my life because of this[.] I don't want to purchase a home or have children[.] [I]f my borrowers defense gets denied I would be in financial ruin right now."

- "It is very distressing having been deceived by a school and accruing a large sum of debt and then when applying for forgiveness having to wait over 4 years to find out a response about my application, and it's made even worse during a pandemic when there is so much financial insecurity."

- "The mental hardship of waiting 4+ years for a decision on a person's student loan debt (all while interest accrues) is astronomical. It would help a lot to have these loans forgiven since I have a $75K worthless piece of paper but the hardest thing has to be waiting in limbo while the Dept. of Education sits quiet."

- "Feel like I'm in a holding cell; pending for over five years."

- "Attending Everest Institute has ruined my life, it left me homeless, taken away a tax refund and during this pandemic I have received no word from the Dept. Of Education. I haven't heard from them since December 2019 and I have called 3 times since with no status of my forgiveness."

- "I'm a 70% service disabled veteran and am a certified service disabled veteran owned small business owner. The student loans caused me to be denied a small business loan 3x due to the debt to income ratio the loans have had on my credit score. I can't receive any COVID 19 funding because my business is a start up and there is no payroll to report on."

- "im not even sure anymore. i have not heard anything. that school took advantage of an addict that was just starting back into society and wasnt even sure what i wanted to do in life. They took advantage of my weakness and used it to their advantage."

- "Since learning I was a victim of fraud by my former school, The Court Reporting Institute, I have been under a great deal of stress, depression and anxiety. I have been denied opportunities to improve my life and living situations over the course of my life. . . . This has been the most stressful fight of my life. I can't get loans for a business or to buy a home because of these fraudulent loans. I'm forced to live with family members because I can't get a place of my own in my name."

- "My student loans are a large reason I am on disability at all vs. trying to get another job, the stress and duress of being homeless as a result of the loans have caused me a significant amount of mental health duress, it has placed my life on hold, was a major factor in blowing up my marriage into a divorce."

- "i am 60 yrs, a Covid nurse with 80k and someday want retire. My masters education at Kaplan never helped my career. it just placed a bigger financial issue and i dont think i can retire someday."

- "I lost my job offer because I couldn't afford to pay for anything. I'm now living at my parents jobless. I'm very depressed and there is no end in site. I miscarried a child from stress."

- "The Sanford Brown Institute scammed me. I am currently having a very difficult time on a new career path, and seeking adequate education in order to provide for my child. This situation has been not only time consuming but emotionally overwhelming. I am currently in Therapy as i have suffered tremendous depression of not being able to find a job in the Medical Billing field as promised by Sanford Brown Institute. No matter how much work and effort I put into achieving that certification, it is still not Acceptable nor Accredited by any potential employer.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

The inconvenience in this whole endeavor remains a hardship currently. I don't feel this is a fair way to treat struggling and striving human beings."

- "I am a text book example of 'Bait and Switch' loan practices perpetrated by ITT Technical Institute. Instead of taking out a personal lawsuit I followed proper channels. The U.S. Dept. Of Edu. has failed me and failed my family."

- "I feel like an abused dog that just got kicked again - now through no fault of my own I am at risk of losing my home because I cannot get approved for a 50,000 mortgage[,] not trying for a grand manor just a simple home that I can afford."

- "I have come to the realization that attending National American University ensures that I will live in poverty until the day I die."

## SUPPLEMENTAL CLASS ACTION ALLEGATIONS

427. Plaintiffs incorporate Paragraphs 371-376 of their Complaint (ECF No. 1) as if set forth fully herein.

428. Named Plaintiffs file this supplemental complaint on behalf of themselves and all other individuals similarly situated.

429. All Named Plaintiffs continue to seek to represent the § 706(1) Class as set forth in Paragraph 371 of the Complaint in this action (ECF No. 1).

430. Named Plaintiffs Sweet, Deegan, and Jacobson seek to represent a sub-class (the "§ 555(e) Sub-Class") consisting of:

All members of the class certified in this case on October 30, 2019 (ECF No. 46) whose borrower defense applications have been denied since the date of class certification.

431. The proposed § 555(e) Sub-Class satisfies the requirements of Rule 23(a) of the Federal Rule of Civil Procedure.

a. The sub-class is so numerous that joinder of all members is impracticable because, as of the date of this Supplemental Complaint, there are at least 74,000 individuals who are members of the proposed class.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

b. There are questions of law and fact common to the sub-class, including, without limitation, whether the Form Denial Notice sent by the Department to each member of the sub-class unlawfully fails to provide an adequate statement of the grounds for denial.

c. The claims of Named Plaintiffs are typical of (indeed, they are identical to) the claims of the proposed sub-class. Each plaintiff in the sub-class is experiencing the same deprivation: the absence of an adequate explanation of the grounds for denial of their borrower defense applications.

d. The Named Plaintiffs are adequate representatives of the sub-class because their interests do not conflict with the interests of the sub-class they seek to represent, they have retained counsel who are competent and experienced in APA and class action litigation, and they intend to prosecute this action vigorously.

e. Named Plaintiffs are represented by attorneys from the Project on Predatory Student Lending of the Legal Services Center of Harvard Law School (the Project) and the Housing and Economic Rights Advocates (HERA). The Project and HERA have, respectively, represented and/or advised numerous former for-profit college students regarding the borrower defense process, and have represented classes of students against the Department of Education. They have knowledge of and familiarity with the relevant law and regulations concerning federal student loans and borrower defense.

432. A class action is superior to other available means for the fair and efficient adjudication of the claims of Named Plaintiffs and the § 555(e) Sub-Class. Each member has been damaged by reason of the Department's issuance of unlawful denial notices.

433. A sub-class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendants' action in issuing unlawful denial notices applies generally to the sub-class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the sub-

class as a whole. A court order requiring the Department to provide adequate explanation of the grounds for its denials would resolve each sub-class member's claim.

434. A sub-class is also appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions could create inconsistent or varying adjudications that could establish incompatible standards of conduct for the Department. Similarly, the adjudication of one sub-class member's claims would, as a practical matter, be dispositive of the interests of the other members not party to the adjudication.

## SUPPLEMENTAL CAUSES OF ACTION

435. Plaintiffs incorporate Paragraphs 377-389 of their Complaint (ECF No. 1) as if set forth fully herein.

### COUNT 2[9]

#### *Unlawful Denial Notices – APA § 555(e)*

#### (§ 555(e) Sub-Class)

436. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

437. Defendants have violated the APA, 5 U.S.C. § 555(e), because they have issued Form Denial Notices to members of the proposed sub-class that were not accompanied by a legally adequate "brief statement of the grounds for denial."

438. Defendants' actions have harmed and prejudiced Named Plaintiffs and members of the proposed sub-class, including by threatening their health and welfare.

439. The Court should declare that Defendants have violated the APA, compel the Department to cease issuing Form Denial Notices, and, for each Class Member who is in fact not eligible for borrower defense to repayment, issue a denial that provides an adequate statement of the grounds for denial.

---

[9] Plaintiffs' original Count 2, ECF No. 1 ¶¶ 390-404, was previously dismissed. *See* Order Granting Partial Motion to Dismiss, ECF No. 41. Plaintiffs have therefore numbered their Counts in this Supplemental Complaint as following the extant Count 1, ECF No. 1 ¶¶ 377-389.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

1

**COUNT 3**

2

*Arbitrary and Capricious Agency Action – APA § 706(2)*

3

**(All Classes and Sub-Classes)**

4

440. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

5

441. The 'presumption of denial' policy adopted by the Department to deny all borrower

6

defense applications that fall outside of certain narrow categories is arbitrary, capricious, an abuse

7

of discretion, or otherwise not in accordance with law.

8

442. Specifically, the Department's policy is not in accordance with the 1995 Regulations,

9

because the policy requires the denial of applications regardless of whether the borrower's school

10

engaged in acts or omissions that would give rise to a cause of action against the school under

11

applicable state law.

12

443. The Department's policy also is not in accordance with the 2016 Regulations, because the

13

policy requires the denial of applications regardless of whether the borrower's school made a

14

substantial misrepresentation.

15

444. The Department has acted in repeated bad faith in developing and implementing the

16

'presumption of denial' policy.

17

445. Defendants' actions have harmed and prejudiced Named Plaintiffs and members of the

18

class who have received denials of their borrower defense applications during and since December

19

2019, including by threatening their health and welfare.

20

446. Defendants' actions imminently threaten to harm and prejudice Named Plaintiffs and

21

members of the class who have not yet received decisions on their borrower defense applications,

22

because those Class Members face an imminent likelihood of having their BD applications denied

23

pursuant to an unlawful process.

24

447. The Court should declare that Defendants have violated the APA and compel the

25

Department to evaluate each Class Member's individual borrower defense application on its own

26

merits in accordance with applicable law.

27

28

---

74

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT 4

### *Procedural Due Process – U.S. Const. Amend. 5*

### (All Classes and Sub-Classes)

448. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

449. Plaintiffs have a property interest in their right to raise a defense to the repayment of their federal student loans.

450. Plaintiffs also have a property interest in uninterrupted loan forbearance — that is, the right to be free of collection while they contest their debt.

451. Plaintiffs also have a property interest in receiving a decision and notification thereof on their borrower defense to repayment applications.

452. The Defendants have deprived Class Members of their constitutionally protected property interests without due process of law by failing to satisfy their obligation to consider the borrower defense applications on the merits.

453. The Defendants have deprived Class Members of their constitutionally protected property interests without due process of law by failing to satisfy their obligation to provide borrowers with a neutral decision-maker on their borrower defense applications.

454. The Defendants have deprived Class Members of their constitutionally protected property interests without due process of law by providing constitutionally inadequate denial notices, *viz.*, Form Denial Notices A-D, which do not inform borrowers of the reasons for the agency's action.

455. The Defendants have deprived Class Members of their constitutionally protected property interests without due process of law by providing constitutionally inadequate denial notices, *viz.*, Form Denial Notices A-D, which do not inform borrowers about how to challenge the agency decision in federal court.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

## <u>CONSOLIDATED[10] PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and grant the following relief:

A. Declare that the Department's policy of refusing to grant, on the merits, borrower defense applications submitted by members of the class is unlawful;

B. Declare that the Department's policy of refusing to deny, on the merits, borrower defense applications submitted by members of the class is unlawful;

C. Vacate the Department's policy of refusing to grant or deny borrower defense applications on their merits;

D. Declare that named Plaintiffs and members of the class who still have not received any decision on their borrower defense applications are entitled to a decision, on the merits, of their pending claims;

E. Certify the § 555(e) Sub-class, as defined above in paragraph 430, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

F. Declare that the Department's Form Denial Notices are unlawful;

G. Declare that each and every denial of a borrower defense application for which the borrower received a Form Denial Notice was not a decision on the merits of the borrower's application;

H. Declare that the 'presumption of denial' policy adopted by the Department to deny all or almost all borrower defense applications that fall outside of certain narrow categories is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

I. Declare that the 'presumption of denial' policy deprives class members of their constitutional right to procedural due process;

---

[10] For the Court's convenience, Plaintiffs set out here their full Prayer for Relief in this matter, including elements of the Prayer for Relief in the original Complaint that are applicable under this case's current procedural posture.

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

J.  Vacate each and every denial of a borrower defense application that the Department has issued since October 30, 2019 (the date of class certification in this matter);

K.  Compel the Department to lawfully adjudicate each and every borrower defense application submitted by a Class Member that was denied on or after October 30, 2019;

L.  Compel the Department to lawfully adjudicate each and every borrower defense application submitted by a Class Member on which a decision has not yet issued;

M.  Enjoin the Department from applying the 'presumption of denial' policy and associated procedures to evaluate any borrower defense application, whether previously denied or yet to be decided;

N.  Compel the Department to provide an adequate statement of the grounds for denial for any borrower defense application that receives a denial on the merits;

O.  Order the Department to place or maintain Class Members' loans in stopped collection status until their borrower defense is granted or denied or the merits;

P.  Retain jurisdiction as appropriate;

Q.  Award reasonable costs and attorneys' fees as authorized by law; and

R.  Grant such further relief as may be just and proper.

Respectfully submitted,

/s/ *Eileen M. Connor*

JOSEPH JARAMILLO (SBN 178566)
jjarmillo@heraca.org
CLAIRE TORCHIANA (SBN 330232)
ctorchiana@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94612
Tel: (510) 271-8443
Fax: (510) 280-2448

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*pro hac vice*)
tomerrill@law.harvard.edu

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

MARGARET E. O'GRADY (*pro hac vice*)
mogrady@law.harvard.edu
REBECCA C. ELLIS (*pro hac vice*)
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*

[PROPOSED] SUPPLEMENTAL CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF