**Supplemental Complaint**

**Exhibit Index**

**Deposition Transcripts**

| Transcript Order | Deponent |
|---|---|
| 1 | Mark Brown |
| 2 | Diane Auer Jones |
| 3 | James Manning |
| 4 | Colleen Nevin |

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 1 – Mark Brown**

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4      - - - - - - - - - - - - - - X

5      THERESA SWEET, et al., on       :

6      behalf of themselves and all  :  Case No.:

7      others similarly situated,    :  19-cv-03674-WHA

8                    Plaintiffs,      :

9      vs.                            :

10     ELISABETH DEVOS, in her        :

11     official capacity as           :

12     Secretary of the United        :

13     States Department of           :

14     Education, et al.,             :

15                    Defendants.     :

16     - - - - - - - - - - - - - - X

17

18       Remote Videotaped Deposition of MARK BROWN

19             Tuesday, December 15, 2020

20                 10:03 a.m. (EST)

21

22

23     Job No. 332249

24     Pages:  1 - 250

25     Reported by:  Dana C. Ryan, RPR, CRR

Page 2

```
1
2
3                          December 15, 2020
4                          10:03 a.m. (EST)
5
6
7
8        Remote Videotaped Deposition of MARK BROWN,
9    held via Zoom video teleconference, before Dana C.
10   Ryan, Registered Professional Reporter, Certified
11   Realtime Reporter and Notary Public in and for the
12   State of Alabama.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1               A P P E A R A N C E S
2
3        ON BEHALF OF THE PLAINTIFFS:
4            REBECCA ELLIS, Esquire
5            MARGARET O'GRADY, Esquire
6            EILEEN CONNOR, Esquire
7            TOBY R. MERRILL, Esquire
8            Legal Services Center of
9                Harvard Law School
10           122 Boylston Street
11           Jamaica Plain, Massachusetts 02130
12           Telephone:  (617) 390-3003
13           Email: mogrady@law.harvard.edu
14           Email: econnor@law.harvard.edu
15           Email: rellis@law.harvard.edu
16           Email: tmerrill@law.harvard.edu
17
18                   - and -
19
20
21
22
23
24
25
```

Page 4

```
1        A P P E A R A N C E S   C O N T I N U E D
2
3            JOSEPH JARAMILLO, Esquire
4            CLAIRE TORCHIANA, Esquire
5            Housing & Economic Rights Advocates
6            3950 Broadway, Suite 200
7            Oakland, California 94611
8            Telephone:  (510) 271-8443
9            Email: jjaramillo@heraca.org
10           Email: ctorchiana@heraca.org
11
12   ON BEHALF OF THE DEFENDANTS:
13           R. CHARLIE MERRITT, Esquire
14           KEVIN P. HANCOCK, Esquire
15           KATHRYN C. DAVIS, Esquire
16           MARCIA BERMAN, Esquire
17           U.S. Department of Justice
18           Civil Division, Federal Programs Branch
19           1100 L Street, Northwest
20           Washington, D.C. 20530
21           Telephone:  (202) 307-0342
22           Email: robert.c.merritt@usdoj.gov
23           Email: kathryn.c.davis@usdoj.gov
24           Email: kevin.p.hancock@usdoj.gov
25           Email: marcia.berman@usdoj.gov
```

Page 5

```
1        A P P E A R A N C E S   C O N T I N U E D
2
3        Also present:
4            Daniel Macom, Video Technician
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 6

```
 1            C O N T E N T S
 2   EXAMINATION OF MARK BROWN:              PAGE:
 3   By Ms. Torchiana                          12
 4
 5
 6
 7            E X H I B I T S
 8        (Attached to the Transcript)
 9   DEPOSITION                             PAGE:
10   Exhibit 24  Revised Notice Of Deposition   15
11               Of Mark Brown
12   Exhibit 25  Declaration Of Mark Brown      19
13   Exhibit 26  Document Titled Standard       56
14               Protocol With Cover Sheet
15               Titled Exhibit 18
16   Exhibit 27  Declaration Of Mark Brown     136
17               With Cover Sheet Titled
18               Exhibit A
19   Exhibit 28  November 20, 2020 Deposition  141
20               Of Diane Auer Jones
21   Exhibit 29  Borrower Defense Unit Claims  142
22               Review Protocol PowerPoint
23               With Cover Sheet Titled
24               Exhibit 10
25   Exhibit 30  Affidavit Of Rudolph Howell   227
```

## Page 7

```
 1        PREVIOUSLY MARKED EXHIBITS
 2        (Not attached to the transcript)
 3   DEPOSITION                             PAGE:
 4   Exhibit 3   U.S. Department Of Education   73
 5               Office Of Inspector General
 6               Report
 7   Exhibit 7   May 4, 2017 Email              79
 8   Exhibit 10  May 22, 2019 Hearing           91
 9               Transcript
10   Exhibit 12  April 21, 2019 PowerPoint     231
11               Titled Borrower Defense To
12               Repayment
13   Exhibit 13  Defendants' Response To       176
14               August 31, 2020 Order
15   Exhibit 15  Declaration Of Eileen Connor  190
16   Exhibit 17  Politico Article Titled DeVos 127
17               Orders Partial Loan Relief
18               For Many Duped Student
19               Borrowers
20   Exhibit 18  October 27, 2020 Oversight    213
21               Committee Press Release
22               Titled New Documents Show
23               Department Of Education Froze
24               Tool To Help Defrauded
25               Student Borrowers
```

## Page 8

```
 1
 2        PREVIOUSLY MARKED EXHIBITS
 3        (Not attached to the transcript)
 4   DEPOSITION                             PAGE:
 5   Exhibit 19  Defendants' Response Regarding  198
 6               The Court's Request At The
 7               October 1, 2020 Class Hearing
```

## Page 9

```
 1        P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  Good morning.  We're
 3   now on the record.  Participants should be aware
 4   that this proceeding is being recorded and as such
 5   all conversations held will be recorded unless
 6   there's a request and agreement to go off the
 7   record.
 8        This is remote video recorded
 9   deposition of Mr. Mark Brown taken today, Tuesday,
10   December 15th, 2020.  The time is now 15:03 in UTC
11   time.  We're here in the matter of Theresa Sweet
12   versus Elisabeth DeVos, et al.  My name is Dan
13   Macom.  I'm the remote video technician on behalf
14   of U.S. Legal Support which is located at 90 Broad
15   Street, in New York, New York.  I am not related
16   to any party in this action, nor am I financially
17   interested in its outcome.
18        At this time, I'll ask our court
19   reporter, Ms. Dana Ryan, on behalf of U.S. Legal
20   Support to please enter the statement for remote
21   proceedings into the record.
22        THE COURT REPORTER:  The attorneys
23   participating in this deposition acknowledge that
24   I am not physically present in the deposition room
25   and that I will be reporting this deposition
```

Page 10

1    remotely.  They further acknowledge that, in lieu
2    of an oath administered in person, the witness
3    will be sworn remotely and will declare his
4    testimony in this matter is under penalty of
5    perjury.  The parties and their counsel consent to
6    this arrangement and waive any objections to this
7    manner of reporting.
8              If I could now get counsel to please
9    indicate your agreement by stating your name and
10   your agreement on the record.
11             MS. TORCHIANA:  Ms. Claire Torchiana, I
12   agree.
13             THE COURT REPORTER:  I'm sorry.  I
14   didn't hear anybody else.
15             MS. TORCHIANA:  Can you hear me?
16             THE COURT REPORTER:  I can hear you,
17   Claire.
18             MS. TORCHIANA:  Okay.
19             MR. HANCOCK:  Can you hear me?
20             THE COURT REPORTER:  Kind of.  Not
21   really.
22             MR. HANCOCK:  Okay.  Let me go off my
23   earbuds.
24             THE VIDEOGRAPHER:  Yeah, Mr. Hancock,
25   your batteries might be going low on those.  You

Page 11

1    might be able to use those later on.
2              THE COURT REPORTER:  I can't hear you.
3    Try again.
4              MR. HANCOCK:  Let's see.  How about
5    now?
6              THE COURT REPORTER:  Yes.  Very good.
7              MR. HANCOCK:  Great.  All right.
8              THE COURT REPORTER:  Thank you.
9              MR. HANCOCK:  So this is Kevin Hancock,
10   and I agree as well.
11             THE WITNESS:  This is Mark Brown, and I
12   agree.
13             THE COURT REPORTER:  Thank you,
14   Mr. Brown.
15             I'm going to need a government-issued
16   photo ID.  Do you have a license or a passport
17   handy?
18             MR. HANCOCK:  Dana and Dan, sorry, I
19   didn't think of this before.  But can we go off
20   the record for the presentation of the ID, if that
21   would be okay.
22             THE COURT REPORTER:  Sure.
23             THE VIDEOGRAPHER:  If there is no
24   objection.  We'll go off the record.  The time is
25   15:05 UTC time.

Page 12

1              (Written record only.)
2              (Witness presents government
3    photo-issued ID and identity confirmed.)
4              THE VIDEOGRAPHER:  We are now back on
5    the record.  The time is 15:08 UTC time.
6              ************************
7                      MARK BROWN,
8       having been duly sworn, testified as follows:
9              ************************
10       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
11       BY MS. TORCHIANA:
12       Q    Mr. Brown, my name is Claire Torchiana.
13   I'm an attorney with Housing and Economic Rights
14   Advocates for plaintiffs.  I'm just going to go
15   over a couple of things first before we begin.
16   Could you please state your name for the record?
17       A    Mark Brown.
18       Q    Okay.  And could you please communicate
19   that there's no one else in the room with you
20   right now?
21       A    There's no one else in the room with me
22   right now.
23       Q    Okay.  And could you confirm you won't
24   communicate with anyone during the deposition via,
25   you know, smartphone or email or anything like

Page 13

1    that?
2       A    I will not communicate with anyone via
3    any type of device.
4       Q    Okay.  And are there any electronic
5    devices in the room with you right now?
6       A    There are phones on the -- over on the
7    side, and they're turned down, but they're in the
8    room.
9       Q    Okay.  If you could just keep them out
10   of sight, that would be great.
11             And you can take breaks when you need.
12   You can just ask.  All I ask is that we finish
13   questioning before you take a break, so if I'm in
14   the middle of a question, that we finish up that
15   question and then take a break after.
16             Is there anything preventing you from
17   being truthful today?
18       A    There is not.
19       Q    Okay.  And government counsel may
20   object to some questions, but you can still answer
21   unless your counsel instructs you not to.
22             And what did you do today to prepare
23   for this deposition?
24       A    I worked with my --
25       Q    Before today?

Page 14

1    A    Worked with my Department of Justice
2    attorneys.
3    Q    Okay.  And which attorneys did you meet
4    with?
5    A    I -- I have not committed all of their
6    names to memory.  I will say that the lead
7    attorney was Kevin P. Hancock.
8    Q    Okay.  And how long did you meet with
9    them for?
10   A    I don't know the exact amount of time.
11   For several hours on three different occasions.
12   Q    Okay.  And did you consult any
13   documents?
14   A    I read the declarations of myself.  I
15   read the declaration of the lead borrower defense
16   for our organization, borrower defense attorney.
17   And I read the declaration of the under secretary
18   Diane Jones.
19   Q    Okay.  And did those refresh your
20   recollection?
21   A    In some instances, yes, but not in all.
22   Q    Okay.  Okay.  And have you ever been
23   deposed before?
24   A    I've never actually sat through a -- a
25   deposition.

Page 15

1    Q    Okay.  Okay.  So now if you could
2    turn -- our first exhibit is just going to be your
3    deposition notice, and that's behind tab 24.  And
4    in the electronic files it should be bracketed 24?
5    A    Okay.  I will need to open the box and
6    pull them out.
7    Q    Okay.
8    A    Okay.  I have tab 24 in front of me.
9    Q    Okay.  Great.  And did you receive this
10   notice?
11        MS. TORCHIANA:  And can we mark that as
12   Exhibit 24?
13        (Deposition Exhibit 24 was marked for
14   identification and attached to the transcript.)
15        THE WITNESS:  (Reviews document.)
16   I did.
17        BY MS. TORCHIANA:
18   Q    Okay.  Now we're just going to start
19   with some background information.  Could you
20   please tell me about your employment history
21   starting with your graduation from college?
22   A    Yes.  I graduated from Tuskegee
23   Institute University in Tuskegee, Alabama, in May
24   of 1986.  After graduation, I was commissioned a
25   second lieutenant in the United States Air Force.

Page 16

1    Six months prior to going on active duty in the
2    United States Air Force, I worked as an intern on
3    a Southern Bell teleworking company in Atlanta,
4    Georgia.
5         After that, I went to my first military
6    assignment which was in the Republic of the
7    Philippines where I started my military career.  I
8    moved around 16 times in different areas across
9    the country.  I lived in the United Kingdom.  I
10   lived in Spain.  I lived in Turkey.  I worked in
11   Iraq.
12        After 32 years, I retired at the grade
13   of major general as the deputy commander for all
14   of Air Education and Training Command which
15   trains, recruits and develops United States Air
16   Force airmen.
17        Upon retirement, I moved back to
18   Washington, having spent many years in Washington
19   at the Pentagon, and moved into Alexandria,
20   Virginia, where I was a consultant -- defense
21   consultant in the areas of education and training
22   for the defense industry.
23        Upon about -- about one year into that,
24   I was recruited to be a senior advisor at the
25   Department of Education.  I was recruited by the

Page 17

1    deputy of secretary of education.
2         I started that job in October of 2018,
3    and for approximately the next six months, my
4    portfolio involved human capital management where
5    I was looking at how we hired and recruited people
6    and the speed at which we could go through that
7    system of recruiting for Federal Student Aid.  I
8    did that in ten of our regions and across the
9    country in all of the elements that are Federal
10   Student Aid.
11        In March of 2019, I was appointed by
12   the secretary of education to be a chief operating
13   officer, the position that I hold today.
14        The one correction I would say is I may
15   have said October of 2019, meaning October of
16   2018, six months leading into the March of 2019
17   when I became the chief operating officer of
18   Federal Student Aid.
19   Q    I think you said 2018.
20        When you joined as the -- I didn't
21   catch -- what was your position when you joined in
22   October of 2018?
23   A    Senior advisor.
24   Q    Okay.  And other than what you've
25   mentioned, do you have any other involvement in

Page 18

1    higher education before you started this role?
2        A    My involvement in higher education is
3    through the higher education that is presented in
4    the United States Air Force.  I was the deputy
5    commander of air education and training command
6    and would do assignments with oversight of
7    educational facilities, dormitories, as well as
8    curriculum and students and those kinds of things
9    because we are part of Air Force's education.
10       Q    Have you ever had any board member
11   positions that are relative to higher ed?
12       A    I have.  I've been a -- no higher ed,
13   but ed to say to be specific.  I was a board
14   member of the KnowledgeWorks Corporation which is
15   a 501(c) organization that's focused on education.
16   For some time, I let that board membership go to
17   avoid a conflict of interest when I became the
18   chief operating officer here, shortly thereafter.
19   No other board memberships.
20       Q    Okay.  And when did you resign from the
21   board of KnowledgeWorks?
22       A    I don't remember the exact date.  It
23   was probably within three months or so of taking
24   the job as the chief operating officer.
25       Q    Okay.  Did you consider resigning

Page 19

1    before then or . . .
2        A    No.  No, I -- I didn't consider
3    resigning until it appeared to be a conflict of
4    interest, and so I -- I resigned.
5        Q    Okay.  Okay.  And if you could now turn
6    to -- it's tab 25.  And in the electronic files
7    it's bracketed as [25] ECF 71-3.
8            MS. TORCHIANA:  And if we could mark
9    that as Exhibit 25.
10           (Deposition Exhibit 25 was marked for
11   identification and attached to the transcript.)
12           THE WITNESS:  I have the exhibit.
13   BY MS. TORCHIANA:
14       Q    Okay.  So do you recognize this
15   document?
16       A    (Witness reviews document.)
17           I do recognize this as my declaration.
18       Q    Okay.  Did you write it?
19       A    I never write my full declarations.  I
20   do that with the assistance of an attorney.
21       Q    Okay.  And who helped you write it?
22       A    I could not tell you the individual's
23   name.  I could tell you that an attorney within
24   the Office of General Counsel and assisted by
25   whoever assists them inside the Office of General

Page 20

1    Counsel.  I could not give you the individual
2    names.  I don't know them.
3        Q    Okay.  And is that your signature on
4    line --
5            MS. BERMAN:  I'm sorry.  Claire, what
6    tab are you on?
7            MS. TORCHIANA:  Twenty-five.
8            MR. HANCOCK:  I think there may be two
9    25s.
10           MS. TORCHIANA:  Oh, yeah.  It's 25 --
11   it's ECF 71-3, declaration of Mark Brown.
12           MS. BERMAN:  Okay.  Thank you.  There
13   are two tab 25s.  Thank you.
14           MS. TORCHIANA:  Great.  Okay.
15   BY MS. TORCHIANA:
16       Q    Okay.  And if you could turn to
17   paragraph 2, and if you could just tell me -- so
18   your current role is the COO of FSA, and you
19   started March 4th, 2019; is that right?
20       A    That's correct.
21       Q    Okay.  And who was your predecessor?
22       A    My predecessor was Mr. Manning.
23       Q    Okay.  And when you started, did you
24   have any discussions with him about borrower
25   defense?

Page 21

1        A    I did not.
2        Q    Did you meet with him?
3        A    I did not, not -- if your question is
4    did I meet with him on borrower defense, the
5    answer is I did not.
6        Q    Okay.  Did you meet with him at all?
7        A    I did.
8        Q    But you didn't discuss borrower
9    defense?
10       A    I did not.
11       Q    Okay.  What do you recall discussing
12   with him generally?
13       A    Human capital.
14       Q    Okay.  And did you discuss -- by "human
15   capital," do you mean staffing?
16       A    Human capital as it related to my
17   portfolio which was how to hire quicker with
18   unique talents into Federal Student Aid.
19       Q    Okay.  And did you discuss anything
20   about hiring within the borrower defense unit?
21       A    We did not.
22       Q    Okay.  And did he -- did Mr. Manning
23   tell you anything about any concerns about
24   staffing at Federal Student Aid?
25       A    Concerns about the speed at which we

Page 22

1  could hire personnel into Federal Student Aid.
2       Q    Okay.  But not in borrower defense?
3       A    We did not -- again, we did not discuss
4  borrower defense.
5       Q    Okay.  And could you tell me who do you
6  report to?
7       A    I report to the under secretary who is
8  assigned those duties.
9       Q    And has that changed throughout your
10 time at FSA?
11      A    It has not changed since my time as
12 chief operating officer of Federal Student Aid.
13      Q    Okay.  And before you were chief
14 officer, who did you report to?
15      A    Mr. Manning would have been the chief
16 operating officer of Federal Student Aid.
17      Q    So when you were -- just to be clear,
18 so when you were a senior advisor, you were
19 reporting to Mr. Manning?
20      A    Yes.
21      Q    Okay.  And do you report to any
22 political appointees as COO and then before when
23 you were a senior advisor?
24      A    Mr. Manning was a political appointee
25 assigned temporarily to Federal Student Aid.  How

Page 23

1  he was classified at the time, I actually don't
2  know.
3       Q    Uh-huh.
4       A    The under secretary that I report to is
5  a political appointee.
6       Q    Okay.  And how often do you meet
7  with -- by under secretary, I assume you mean
8  Diane Auer Jones.  How often do you meet with her?
9       A    It varies depending on what's going on
10 at the time.  It could be once a week.  It could
11 be more than once a week.  So it varies just
12 depending on the tempo of work at the time.
13      Q    Okay.  And would you say at a minimum,
14 it's one a week?
15      A    I would not.  I would say it varies.
16      Q    Okay.  And do you have any standing
17 meetings?
18      A    I -- I would say that it varies.  I
19 don't believe we have any standing meetings.
20 We -- we have one-on-one sessions, I believe,
21 every week now, but that has not always been the
22 case.  And, so, I'm more comfortable saying it
23 varies.
24      Q    Okay.  And when did you start having
25 weekly meetings?

Page 24

1       A    It was within the last five or six
2  months, I believe.
3       Q    Okay.  And was there a reason you
4  started having weekly meetings?
5       A    Because she requested them.
6       Q    Do you know why she requested them?
7       A    No, I don't.  She's my boss, so when
8  she requested them, I submitted them.
9       Q    And how do you communicate with
10 Ms. Diane Auer Jones?
11      A    Routinely, I call her, or in our
12 situation that we're in now, I do what you and I
13 are doing right now.  I talk to her via some form
14 of social -- some form of platform like we have,
15 Zoom or MS teams, something like that.
16      Q    Okay.  And how often did you meet with
17 the secretary of education?
18      A    I meet with the secretary of education
19 around every two weeks.
20      Q    Okay.  And are those regular meetings
21 scheduled as standing meetings?
22      A    They are regularly scheduled standing
23 meetings.
24      Q    And has that been true since you
25 started as COO?

Page 25

1       A    I believe that has been the case since
2  I started as chief operating officer.
3       Q    Okay.  And what form do these meetings
4  take?  Are they over the phone, in person?
5            I know it's changed since the pandemic.
6       A    It varies.  Routinely, for some time in
7  person.  Now in the method that we are using now,
8  that's how they -- they normally would happen.
9       Q    Okay.  And generally how long were
10 these meetings?  I know it varies, but . . .
11      A    Generally 45 minutes or so, but I would
12 be more comfortable saying it varies.
13      Q    Okay.  And did you ever discuss
14 borrower defense with her?
15      A    Yes, we have had that as an agenda item
16 at times.
17      Q    Okay.  And could you tell me when --
18 well, we'll get into that later.
19            Okay.  So could you tell me what your
20 understanding is of Diane Auer Jones' role within
21 FSA?
22      A    I can tell you that Diane Jones
23 controls the policy of the -- policy element of
24 the department, and -- and, therefore, by virtue
25 of that, has a natural relationship with Federal

Page 26

1  Student Aid that -- that executes policy.
2        And, so, that is how I understand her
3  relationship.  She is delegated the duties of the
4  oversight of FSA from the secretary specifically
5  as it relates to policy.
6     Q    Okay.  And you mentioned -- how often
7  do you meet with not Diane Auer Jones, but members
8  of her team?
9     A    I didn't mention meeting with members
10 of her team.
11    Q    Oh, do you -- do you meet --
12    A    I don't believe --
13    Q    -- with members of her team?
14    A    I do not.
15    Q    Okay.
16    A    I don't meet with members of her team,
17 so no.
18    Q    Okay.  What is your understanding of
19 Ms. Nevin's role within FSA?
20    A    Do you mean Colleen Nevin?
21    Q    Yes.
22    A    Colleen Nevin is the leader of the
23 policy defense team.
24    Q    And does she have a policy role?
25    A    Federal Student Aid does not do policy,

Page 27

1  so no one at Federal Student Aid has a policy
2  role.
3     Q    Okay.  Would you say she does
4  operations, then?
5     A    I would say that everyone at Federal
6  Student Aid does operations.
7     Q    Okay.  And how often do you meet with
8  Ms. Nevin?
9     A    It varies.
10    Q    Okay.  At a minimum, how often do you
11 meet with her?
12    A    Again, I say it varies because I've
13 been the chief of Federal Student Aid since March
14 of 2019, and that varies.  Sometimes I have not
15 met with her on a weekly basis; sometimes I have.
16 It just depends on what things are -- what's going
17 on again and what the issues are.
18        So, you know, I -- if you said you --
19 your question to me was at a minimum if it was
20 weekly.  If I think of that whole period of time,
21 I would still come back to it varies because I
22 can't tell you that more times than not I met with
23 her at least a week -- once a week.  I don't know
24 that to be true.
25    Q    Okay.  Let's say when you started in

Page 28

1  March, how often were you meeting with her in,
2  let's say, the first two months that you were COO?
3     A    Within the first month that I was COO,
4  I met with members of the borrower defense team
5  almost daily because of my interest in the
6  borrower defense issues or my education on the
7  borrower defense issues.
8     Q    Okay.  And what -- what was interesting
9  to you about -- when you say you're interested in
10 borrower defense issues, what do you mean?
11    A    I was interested in the process of
12 borrower defense, the status of borrower defense,
13 our portfolio in borrower defense.  I was
14 interested in it as the chief operating officer
15 because that became the operations of the
16 organization and became my responsibility and that
17 was a part of it.  I had not been exposed to it as
18 the senior advisor.  So that, amongst other
19 issues, I emerged myself into.
20    Q    And was there anything when you started
21 that concerned you about borrower defense?
22    A    The number of cases concerned me, and
23 the amount of staffing available to do those cases
24 concerned me after I became educated on those
25 facts.

Page 29

1     Q    Okay.  And, specifically, what do you
2  mean by the number of cases?
3     A    What I mean is just that; that there
4  were a lot of cases and that represented workload.
5  And as an operating -- a chief operating officer,
6  I would immediately go to "are we sufficiently
7  staffed to do a workload of that -- of that
8  level."  That's what I mean by number of cases.
9     Q    Okay.  And when you started when you
10 were meeting with Ms. Nevin, how did -- why did
11 you understand there to be so many cases?
12    A    Because the borrower defense team
13 showed me the number of cases that they had and
14 the history of the cases, how long they had had
15 them and the history of borrower defense.  And,
16 so, it was very obvious that there were
17 significantly more cases than there had ever been
18 in the history of borrower defense.
19    Q    Right.
20        I meant and why did you understand that
21 to be the case?  What was the reason that there
22 are so many cases?
23        MR. HANCOCK:  Objection: vague.
24 BY MS. TORCHIANA:
25    Q    Okay.  All right.  We'll get into that

Page 30

1    later.
2              Okay.  And is there anyone who reports
3    to you?  Or who reports to you?
4         A    So the way my organization is
5    organized, I have five deputy chief operating
6    officers; all report directly to me.  And other
7    than that, it would be my administrative office
8    that would be in the front office kind of folks,
9    but those are the folks that report to me.
10        Q    Okay.  And could you give me the names
11   of those five deputy chief officers?
12        A    Today -- as of today, those names are
13   Robin Minor, who is the deputy chief operating
14   officer of partner participation and oversight;
15   Dave Albers who is a deputy chief operating
16   officer for strategic planning; Joe Lindsey, who
17   is a principal deputy chief operating officer;
18   Chris Greene, who is a deputy chief operating
19   officer for student engagement and aid delivery;
20   and Colleen McGinnis, who is the deputy chief
21   operating officer for internal controls and those
22   kinds of issues.  And that should make up the five
23   unless I dropped off a name.
24        Q    And are there reports about your
25   performance?

Page 31

1         A    Pardon me, ma'am.  Could you repeat
2    that question, please?
3         Q    Are there reports about your
4    performance?
5         A    Mine, personally?
6         Q    Uh-huh.  Yes.
7         A    Yes, I'm accountable for my performance
8    and there's an annual report.
9         Q    Okay.  And who prepares those reports?
10        A    Who prepares them?  The -- ultimately
11   the secretary of education approves my final
12   report.  I prepare input for that report if that's
13   your question, and I send that input to the deputy
14   under secretary.
15             Was that your question?
16        Q    Yes.
17             And are there any metrics by which your
18   performance is evaluated that you know of?
19             MR. HANCOCK:  Objection: exceeds the
20   scope of the court-ordered discovery.
21             BY MS. TORCHIANA:
22        Q    Well, do you know is anything about
23   borrower defense taken into account in your
24   performance metrics?
25        A    We have many performance metrics in the

Page 32

1    Office of Federal Student Aid if -- if that's your
2    question, and borrower defense has -- has metrics
3    inside of Federal Student Aid.  We're a
4    performance-based organization and by virtue of
5    that, we're a metric of which borrower defense is
6    one.
7         Q    Sorry.  You're cutting out a little
8    bit, but -- but I think I -- I understood that.
9         A    I'm sorry.
10        Q    Okay.  And have you ever been advised
11   to improve your performance as it relates to
12   borrower defense?
13             MR. HANCOCK:  Objection: exceeds the
14   scope of the court-ordered discovery.
15             MS. TORCHIANA:  Okay.  I would say it's
16   pretty relevant, but we can move on for now.
17             BY MS. TORCHIANA:
18        Q    And do you evaluate anyone?
19        A    I -- I ultimately evaluate the five
20   deputy chief operating officers that report to me
21   directly and those inside of my front office.
22        Q    Okay.  And are those formal reviews?
23        A    Yes.  Yes, they have -- they have
24   annual -- we are still a government agency, and so
25   at the end of a reporting period, at the end of a

Page 33

1    fiscal year, we have an end-of-year evaluation
2    done on employees.
3         Q    Okay.  Okay.  And if you could turn to
4    paragraph 3 of your declaration.  You say here
5    that you oversee the management of FSA.
6             Could you explain in more detail how
7    that relates to your work with the borrower
8    defense unit or with borrower defense generally?
9         A    As I stated earlier, I have five deputy
10   chief operating officers.  One of them that I
11   named was Ms. Robin Minor, who is the deputy chief
12   operating officer for partner participation and
13   oversight.  One of Ms. Minor's organizations
14   underneath her as partner participation and
15   oversight is the borrower defense unit.  And, so,
16   in this -- in regards to your question, I manage
17   the deputies who, in turn, manage subordinate
18   units, and one of the subordinate units inside of
19   partner participation and oversight is the
20   borrower defense unit.
21        Q    Okay.  Okay.  And would you say of the
22   five deputies that you oversee, is Robin Minor the
23   only one who works with the BDU; is that true?
24        A    I -- I didn't say that, and it would be
25   difficult to say that.  I -- I wouldn't say that

Page 34

1   because things could go around for, you know,
2   different parts of the organization, so I -- I
3   won't say that none of the other organizations
4   work with the borrower defense unit. I can only
5   say that they report to Robin Minor.
6        Q    Okay. The BDU reports to Robin Minor?
7        A    That's correct.
8        Q    You say here -- we've talked about this
9   a bit. You say here, Federal Student Aid is an
10  apolitical, performance-based organization.
11            Could you tell me a little bit more
12  about what that means?
13       A    That means that we go across -- we
14  don't change in or out based on political
15  appointments; that we go across administrations.
16  Much like the careers of public servants, we -- we
17  don't attribute or work toward any political end.
18  We work toward the execution of whatever
19  legislation and authorities that we are given
20  without regard to political affiliations.
21       Q    Okay. And on that subject, how is your
22  compensation related to your performance?
23            MR. HANCOCK: Objection: exceeds the
24  scope of the court-ordered discovery.
25            BY MS. TORCHIANA:

Page 35

1        Q    Okay. How does your compensation
2   related to processing borrower defense claims?
3            MR. HANCOCK: Objection: exceeds the
4   scope of the court-ordered discovery.
5            BY MS. TORCHIANA:
6        Q    You can still answer unless your
7   counsel instructs you not to.
8            MR. HANCOCK: The witness may answer.
9            THE WITNESS: I'm sorry. I couldn't
10  hear the counsel. Say that again?
11           MR. HANCOCK: The witness may answer.
12           THE WITNESS: How does my -- could you
13  repeat the question again? I'm sorry. I got
14  caught up in the --
15           BY MS. TORCHIANA:
16       Q    I said how -- how is your compensation
17  related to processing borrower defense
18  applications?
19       A    Well, my compensation is not related to
20  processing borrower defense applications. I'm
21  a -- I'm a -- there is no relationship that I'm
22  aware of.
23       Q    Okay. And when you started at FSA in
24  March 2018 -- 2019, sorry, what were your
25  understandings of the goals and priorities of FSA?

Page 36

1        A    When I started at Federal Student Aid?
2        Q    Well, as COO.
3        A    As COO?
4        Q    Uh-huh.
5        A    When I started at Federal Student Aid
6   as COO, I was not clear on what the goals and
7   objectives of Federal Student Aid was at the time,
8   so I couldn't -- if you were to ask me what were
9   they -- which I think you're asking me what were
10  the goals and objectives of Federal Student Aid in
11  March of 2019, I was not given a set of goals and
12  objectives in March of 2019.
13       Q    Okay. So when you started -- so when
14  you started, it was not clear to you that FSA had
15  any goals?
16       A    That's not what I said. No, what I --
17  I thought what you said was what were the goals
18  presented to me when I started at my job as the
19  chief operating officer at Federal Student Aid.
20           Is that your question or --
21       Q    Yes. What were the goals and
22  priorities that were presented to you that FSA
23  had?
24       A    So my answer is that there were no
25  goals or priorities presented to me when I started

Page 37

1   the job as chief operating officer of Federal
2   Student Aid. I -- I read the strategic plans of
3   Federal Student Aid to -- to learn what the -- the
4   goals and objectives had been across several years
5   and found them to be broad.
6        Q    Okay. And did you -- when you started,
7   did you meet with anyone, you know, for example,
8   who onboarded you and explained to you the
9   direction that FSA wanted to go in?
10       A    So I did not go through a formal
11  onboarding process at Federal Student Aid. My --
12  I simply started in March of 2019 and onboarding
13  of myself.
14       Q    Okay. And what did you see as the
15  goals and priorities of FSA?
16       A    I -- I believe we needed -- broadly, we
17  needed to be a student center and responsive, and
18  we needed to deliver on a large transformational
19  objective which was called the next generation of
20  Federal Student Aid.
21       Q    Okay. And when you joined, did you
22  know that the Department of Education had not
23  issued any borrower defense decisions since
24  June 2018?
25       A    I knew what I had read in the media. I

Page 38

1    had not been educated on borrower defense cases
2    until after I joined.
3         Q    Okay.  And was this something that you
4    discussed with your colleagues at FSA?
5         A    As the chief operating officer, I
6    really only have subordinates inside of Federal
7    Student Aid.  I don't actually have what you would
8    consider, I believe, colleagues or peers.  So as I
9    said earlier, I educated myself on borrower
10   defense amongst other things as a part of my
11   immersion into the organization.
12        Q    Okay.  And did you discuss -- when you
13   joined, did you discuss the fact that the
14   department hadn't issued any borrower defense
15   decisions since June 2018 with any of your
16   subordinates?
17        A    When I became the chief operating
18   officer in March of 2019, I met with all four
19   parts of Federal Student Aid, one of which was
20   partner participation and oversight in the
21   borrower defense unit in which the borrower
22   defense unit educated me on the history of
23   borrower defense and where it was, and that
24   included the status which included the fact that
25   borrower defense issue -- borrower defense cases

Page 39

1    had not been issued for some time.
2         Q    Okay.  And who are those discussions
3    with?
4         A    While I don't recall all the names --
5    because, you know, there are more of the names --
6    I do recall that, at that time, the current
7    borrower defense leader was the borrower defense
8    leader at that time.  So Colleen Nevin was -- was
9    in charge of the borrower defense unit at that
10   time and remains so, and Robin Minor was moving
11   into her job that I have her in now, so she was
12   included in that.
13        Off the top of my head, those are the
14   only names that I can recall.  There were likely
15   others, but I don't recall all of their names.
16        Q    Okay.  And did they express any
17   concerns to you about that ED hadn't issued any
18   borrower defense decisions?
19        A    We went through a number of concerns
20   and issues, and as you would expect, we explored
21   the entire process of borrower defense and all of
22   the issues and all of the concerns and where we
23   needed to go to be productive.  It was a dialogue.
24   It was a -- it was a conversation and mainly
25   intended to educate me on the program.

Page 40

1         Q    Okay.  And did you discuss -- when you
2    started, did you discuss that ED hadn't issued any
3    decisions since June 2018, did you discuss that
4    with anyone at the Department of Ed?
5         A    When I met with partner participation
6    and oversight, this element of partner
7    participation and oversight which was the borrower
8    defense team, we did discuss the status of
9    borrower defense cases which included what I will
10   call a backlog and need to clear up backlog.
11        And at that time, those issues that
12   were beyond me or that where I needed clarity, I
13   would discuss them, and I would discuss them with
14   the Department of Ed, if necessary.
15        Q    Okay.  And you said earlier that you
16   met with the secretary of education regularly.
17   When you first joined, did you -- did you meet
18   with her?
19        A    I'm -- I'm sorry.  Your voice went away
20   there toward the end.  I heard your first part,
21   but I didn't --
22        Q    Yeah.  I said earlier you said that you
23   met with the secretary of education regularly.
24   When you joined in March 2019, did you meet with
25   her?

Page 41

1         A    I -- I don't know if I met in the month
2    of March, but I had a routine meeting with her
3    every two weeks, and so possibly one in March
4    depending on that -- that date, and then on -- on
5    pretty much that rhythm of every two weeks having
6    time with the secretary.
7         Q    Okay.  And at those meetings, did you
8    ever discuss that no borrower defense decisions
9    had been issued since June 2018?
10        A    At those meetings -- and I cannot
11   recall each time -- I don't recall -- I certainly
12   don't recall March and April meetings
13   specifically.
14        Over the course of the times that I was
15   attending meetings with the secretary of Ed, I had
16   discussed borrower defense.  I have discussed the
17   status of it.  I routinely talk about it as a
18   backlog.
19        Q    Okay.  And did you discuss the pace of
20   decisions with the secretary of education?
21        A    Details of that level, I don't recall
22   going into those kinds of details, per se, with
23   the secretary.  I would have done that probably at
24   the under secretary level.  But, frankly, I don't
25   recall, you know, the specific conversations.

Page 42

1    Q    Okay.  But you did speak about the pace
2  of decisions with Diane Auer Jones, or you do
3  remember that?
4    A    No, I -- I have not -- while you have
5  used the term "pace of decisions," I have not used
6  that term because I don't remember having a
7  discussion about pace of decisions.
8         I -- I remember having a discussion
9  about the backlog as it related to borrower
10 defense and as an operating officer the desire to
11 get after that issue from a production
12 perspective.
13        I don't remember ever using or -- or
14 having a discussion specifically about the pace of
15 decisions.
16   Q    Okay.  Sure.  So did you speak about
17 the backlog with Diane Auer Jones when you joined?
18   A    I -- I did.
19   Q    Okay.  And how often would you -- how
20 often would that come up?
21   A    Again, that -- that varies.  Understand
22 that I had all of Federal Student Aid, and so it
23 may have been one of several topics at times when
24 I spoke with her.  I -- I could not tell you
25 specifically how often I spoke to her about

Page 43

1  borrower defense and -- and backlogs.
2         I -- I don't know.
3    Q    Okay.  And do you remember what she
4  communicated with you about why there was a
5  backlog?
6    A    I -- I remember that the -- when I
7  initially started that the borrower defense team
8  believed that they had guidance not to move any
9  additional decisions on borrower defense; that
10 they should be adjudicating them.
11        I remember that that was not clear from
12 the department and from under secretary Jones at
13 the time that they had issued that -- that
14 guidance in that manner.  I would call that
15 confusion, confusion on what was to be done and
16 what was communicated.  I do remember that.
17   Q    Okay.  And when you say guidance, how
18 do you mean exactly?  Was that, you know, formal
19 guidance that was written up, or what -- what do
20 you mean by guidance?
21        MR. HANCOCK:  I'm going to object to
22 the extent the question may call for deliberative
23 privileged information.
24        MS. TORCHIANA:  Okay.  Are you
25 instructing the witness not to answer?

Page 44

1         MR. HANCOCK:  No.  General Brown, you
2  may answer.
3         THE WITNESS:  I -- I did not mean
4  either of those.  I meant because guidance can
5  take lots of forms.  It can be verbal or it can be
6  a written decision memorandum.  So I didn't intend
7  to indicate either of those.  I just meant
8  guidance.
9     BY MS. TORCHIANA:
10   Q    Okay.  And what form did that guidance
11 take?
12   A    I think there was -- when I first
13 started in March of 2019, I think there was no
14 specific guidance.  There was confusion.  And,
15 so -- and that's why I didn't indicate written
16 or -- or verbal.  At the time -- at the initial
17 time, I don't believe there was clarity on either
18 of those.
19   Q    Okay.  You did say there was guidance
20 not to issue any decisions when you started; is
21 that right?
22   A    That's not right.  I -- I said that the
23 borrower defense team believed that they had
24 guidance not to issue decisions.  That's what I
25 said.

Page 45

1         There was not -- they didn't have a
2  written document or some memorandum telling them
3  that.  That's from my -- them educating me on
4  borrower defense cases.  They believed that they
5  had that guidance.
6    Q    Okay.  And why did they believe that
7  they had that guidance?
8    A    I can't speculate as to -- as to why.
9  I don't know what their -- what their -- what
10 their thoughts internally were.  I believe when
11 the Manriquez case had been launched that they
12 believed that stopped them from doing anything
13 further in terms of issuing decisions, and they
14 continued to adjudicate and did not issue
15 decisions.
16   Q    Okay.  And why do you think they
17 believed -- where did that belief come from?  Was
18 it -- you know, obviously it didn't fall from the
19 sky.
20        Who -- what -- why do you think they
21 understood that the Calvillo injunction meant they
22 couldn't issue decisions?
23        MR. HANCOCK:  Objection: vague.
24     BY MS. TORCHIANA:
25   Q    You can still answer.

Page 46

```
1        A    I -- I don't know.  As I said earlier,
2   I would classify it as confusion because I -- I
3   don't know why they -- why they thought that.
4        Q    Okay.  So was the stoppage a concern
5   when you joined or, you know, you . . .
6        MR. HANCOCK:  Objection.  Potentially
7   calls for deliberative information.
8        MS. TORCHIANA:  The witness can still
9   answer.
10       THE WITNESS:  I was just trying to make
11  sure I understood your question.  I didn't know if
12  you were through with your question.  You said was
13  this guidance a concern.  For -- for me when I
14  started?
15       BY MS. TORCHIANA:
16       Q    When you started, was it a concern that
17  no decisions had been issued?
18       A    When I started, the overall backlog in
19  production, borrower defense processes and system
20  were a concern to me because of -- of -- as I said
21  earlier, the sheer volume and the fact that they
22  were not moving.
23       And, so, not just -- not just the fact
24  that the decisions weren't going out, but that the
25  methodology and other things needed to be known so
```

Page 47

```
1   that we could move on with the cases.
2        So I would -- I would say borrower
3   defense as a whole was a concern for me when I
4   started in March of 2019.
5        Q    Okay.  And did you take any -- what
6   steps did you take about the backlog when you
7   started?
8        A    Specifically, and through -- through
9   the deliberation with the team, I concluded that
10  we needed more people.  Specifically, we needed
11  more attorneys and we needed more financial
12  resources if we were to fix the systems that --
13  that manage, collect, case management systems that
14  support the team.  And, so, as the operating
15  officer, I went about focusing on -- on that and
16  fixed it in the next several months.
17       Q    Okay.  So when you say "fixed it," what
18  do you mean?
19       A    Hire attorneys, recruit, hire, bring on
20  board attorneys so that there would be more hands
21  doing the work.
22       Q    Okay.  And do you know --
23       A    Secure the financial resources --
24  secure the financial resources necessary to
25  upgrade and fix the systems that those -- that
```

Page 48

```
1   borrower defense cases would be -- would be
2   managed by.  That's when I use the term "fix it."
3   To answer your question, that's what I mean,
4   getting those -- getting those things in place so
5   that this process could start moving.
6        Q    Okay.  And do you know -- we'll discuss
7   this more later, but do you know -- had there been
8   any staff requests for the BDU before you joined?
9        A    I -- I actually don't know if there had
10  been more staff requests for BDU before I joined
11  because I would not have necessarily seen those.
12       Q    Okay.  And how many -- how many staff
13  people were working at the BDU when you joined?
14  Do you remember?
15       A    I -- I don't know precisely, but it
16  was -- in terms of attorneys, I would say probably
17  10 to 12 at the most.
18       Q    Okay.  And how many staff people did
19  you estimate were needed to clear the backlog?
20       A    So estimate being the correct term,
21  I -- I did not estimate.  I -- I went to the
22  borrower defense team and worked with them to see
23  what they thought they needed based on the --
24  based on the caseload.  I can't tell you about
25  their internal workings.  I don't -- I don't know
```

Page 49

```
1   that, but collectively I do know we came out to a
2   number of something around 60 -- we needed
3   somewhere in that amount of attorneys in order to
4   have people to adjudicate what was a growing
5   backlog of cases, but I don't know how much -- I
6   could not tell you today that that was some
7   scientific equation.  I can tell you it was the
8   internal workers of BD team as you would go to
9   your experts and ask about what do we need to --
10  to tackle this issue.
11       Q    Okay.  And did you make any requests to
12  hire more staff for the BDU?
13       A    I did.
14       Q    Okay.  And when -- when was the
15  first -- or just how many times did you make --
16  did you request?
17       A    I don't know.  I don't know how many
18  times I -- I made a request.  I just know that my
19  request was approved.  I believe it was approved
20  the first time I asked, so I don't know that there
21  were more than one -- there was more than one time
22  that I had to ask.
23       Q    And when was the first time you asked?
24       A    Shortly after taking over, but I -- but
25  I can't tell you the exact time, but it was
```

Page 50

1   shortly after taking over, shortly after I had
2   been educated on the process of borrower defense
3   and -- and what we needed.
4       Q    Okay.  And who -- who did you -- when
5   you made a request to hire more staff, who did you
6   make that request to?
7       A    I -- made it through our HR system.
8   I made it verbally to the under secretary, and I
9   made it to the secretary verbally.  And that's
10  what I'm calling the request.  In other words, it
11  was all the same one; right?  I was verbally
12  saying I would like to hire more people in order
13  to address the backlog.
14      Q    And do you have an estimate -- I know
15  you said you don't remember, but do you have a
16  rough estimate of when that was?
17      A    I do not other than what I just said,
18  which is shortly after I took over.
19      Q    Okay.  So sometime in the spring of
20  2019?
21      A    Yes, and -- and I would just emphasize
22  that that's rough.  I don't have a -- I can't -- I
23  can't tell you the exact -- I can't tell you the
24  exact time.  I just simply don't recall that exact
25  time.

Page 51

1       Q    Okay.  And when you made those
2   requests, how did -- for instance, how did the
3   secretary respond?
4            MR. HANCOCK:  Objection; calls for
5   deliberative information.
6            MS. TORCHIANA:  Are you instructing the
7   witness not to answer or --
8            MR. HANCOCK:  I am.
9            MS. TORCHIANA:  Okay.
10  BY MS. TORCHIANA:
11      Q    Okay.  And, generally, how -- when you
12  made those requests, what was the response?
13      A    Yes.
14      Q    Okay.  And do you know before -- you
15  said you don't remember, but what was your
16  understanding of why -- why there wasn't more
17  staff at the BDU?
18      A    I -- I didn't have an understanding of
19  why.  You know, historically, I just wouldn't -- I
20  don't know.  I wasn't -- you know, the borrower
21  defense unit is several years old.  They precede
22  me by several years, and I just don't know what
23  the -- you know, what all the deliberations were.
24           I think, as with most federal agencies,
25  you make decisions on resources and dollars and

Page 52

1   budget, and that normally drives hiring practices,
2   but I don't know what the decisions were prior to
3   March 2019.
4       Q    Okay.  And do you know if there had
5   been any requests for more staff?
6       A    I -- I do not know.  I would have no
7   firsthand knowledge of that.  I'd only started
8   working with issues related to borrower defense
9   March of 2019.  Prior to that, I did not have any
10  relationship with the borrower defense unit.
11      Q    Okay.  Before, when you were a senior
12  advisor and working on human capital management
13  which started in October of 2018, did you have
14  any -- any work relating to hiring for the BDU?
15      A    Again, I was dealing with the speed at
16  which we hire, not -- and there's a nuanced
17  difference here, I think, in your question and
18  what I did.  My job is about process improvement.
19  Why does it take long -- too long to hire a person
20  into -- why did it take too long to recruit them
21  or go find an expertise.  I wasn't dealing with
22  this section or that section, use this person or
23  that person.  I was looking to implement the
24  processing improving, and I don't remember any
25  conversations specifically about borrower defense.

Page 53

1       Q    Okay.  So when you were a senior
2   advisor before you were COO, you hadn't heard of
3   any issues with staffing the borrower defense
4   unit?
5       A    I don't -- I don't recall any
6   discussions about borrower defense group with me,
7   at least, before I became COO.  Our -- our
8   questions were about the process, as I just said,
9   that's required for hiring, the process.
10      Q    So if you could turn to -- still in
11  tab 25, if you could turn to paragraph 4 of your
12  declaration.
13           It says, Among FSA's responsibilities
14  is to make decisions on applications.
15           Could you tell me a bit about what that
16  means in terms of your -- your role?
17      A    One -- one minute, please, if I could
18  read it.
19           (Witness reviews document.)
20           So if -- if I could just make sure I
21  understand your question, what that means as it
22  pertains to my role as the chief operating
23  officer?
24      Q    Uh-huh.  Yes.
25      A    So the responsibilities of Federal

Page 54

```
1    Student Aid includes borrower defense, and -- and
2    my role as chief operating officer is to ensure
3    that borrower defense have what they need to do
4    the responsibilities that are outlined here.
5    That's my role.  So by law, by legislation, they
6    execute the laws of the borrower defense that
7    are -- that are legislated.
8            My role as the chief operating officer
9    is to ensure that they have the resources, the
10   talent and the time to -- to do that so that they
11   can do it effectively.  I don't -- I don't
12   adjudicate cases.  I'm not -- I'm not an attorney.
13   That's my role.
14      Q    Okay.  And do you have any authority to
15   decide or approve an individual borrower defense
16   application?
17      A    Not that I'm aware of, certainly not in
18   a priority that I have ever even contemplated.
19   I'm not an attorney.
20      Q    Okay.
21      A    Nor am I a borrower defense expert.
22      Q    Okay.  And who at the department would
23   you say has that authority to decide an individual
24   application?
25      A    To -- you mean to decide if it has met
```

Page 55

```
1    the criteria for -- for meeting the criteria for
2    borrower defense?
3       Q    Yes.
4       A    While -- while I don't pretend to know
5    all of the internal workings of the borrower
6    defense unit, those authorities are that of the
7    borrower defense unit and within it, they have
8    been delegated down to attorneys who are guided by
9    the law, yet they have a review process within
10   borrower defense.
11           And, so, what I -- what I would say is
12   the authority to do those determinations as you
13   would expect are given to an attorney trained in
14   the business of borrower defense.
15      Q    Okay.  Okay.  If you could now turn --
16   we'll get back to your declaration, but if you
17   could turn to tab 29, and if you could turn to --
18   oh, I'll wait for you to have that in front of
19   you.
20      A    Tab 29, it says Exhibit 10.
21      Q    Yes, that's right.  And if you could
22   turn to page 16.
23      A    I'm on page 16.
24      Q    Okay.  Have you seen this chart before?
25      A    Could I have a minute to look at it,
```

Page 56

```
1    please?
2       Q    Yeah.
3            MS. TORCHIANA:  And could we also mark
4    this as Exhibit 29 -- or, sorry, 20- -- are we at
5    26?
6            (Deposition Exhibit 26 was marked for
7    identification and attached to the transcript.)
8            MR. HANCOCK:  Claire, just to make sure
9    I'm looking at the right page, when you say
10   page 16, are you referring to the ECF stamp at the
11   top of the document?
12           MS. TORCHIANA:  Yes.  Yeah.
13           MR. HANCOCK:  Thank you.
14           THE WITNESS:  (Reviews document.)
15           I have not seen this chart before.  I
16   believe it may precede my time as the chief
17   operating officer.
18   BY MS. TORCHIANA:
19      Q    Okay.  Do you know -- is this -- would
20   you say that this is an accurate representation of
21   how operations are run?
22      A    So I can't say that if you are talking
23   about -- and maybe you can help me with the
24   question here.  Do you mean how operations run for
25   borrower defense today or since March of 2019?
```

Page 57

```
1            Is that your question?  How is there --
2       Q    Since March 2019, yeah.
3       A    So this chart, as I said, obviously
4    predates me, and it is not a representation, I
5    think, of how borrower defense works from the time
6    that I was there.  I -- I don't know how it worked
7    in 2017, and still I don't know about the accuracy
8    of this chart from the time that it was written.
9       Q    Okay.  Okay.
10           MS. TORCHIANA:  Could we go off the
11   record and take a quick break?
12           MR. HANCOCK:  Sure.  That would be
13   fine.
14           THE VIDEOGRAPHER:  Okay.  We're now
15   going off the record.  The time is 16:16 UTC time.
16           (Recess -- 11:16 a.m.)
17           (After recess -- 11:30 a.m.)
18           THE VIDEOGRAPHER:  We're now back on
19   the record.  The time is 16:30 UTC time.
20           MR. HANCOCK:  And sorry to interrupt,
21   Claire.  I just want to ask one clarifying
22   question about the current exhibit we're working
23   with, and maybe you're planning on moving on from
24   the chart, but I just wanted to note that the
25   electronic version for those of us using Dropbox
```

Page 58

1    is oriented sideways, and I -- I don't -- maybe
2    the option exists, but I don't see a way to kind
3    of orient it horizontally, so this --
4              MS. TORCHIANA:  Okay.
5              MR. HANCOCK:  I know General Brown
6    doesn't have that issue since he is using a hard
7    copy, which is great.
8              MS. TORCHIANA:  Right.  Okay.  Yeah,
9    thanks for noting that.
10             MR. HANCOCK:  Okay.
11        BY MS. TORCHIANA:
12        Q     We're going to move on from that
13   exhibit.
14             Mr. Brown, I have a couple of follow up
15   questions from some things that we talked about
16   before.  You mentioned that you meet regularly
17   with Secretary DeVos.  Are there generally agendas
18   for those meetings?
19        A     There are generic agendas that -- that
20   talk about how long we will meet, and I think -- I
21   don't prepare the agendas.  My -- my staff does,
22   so I can't -- I can't tell you, you know, what
23   goes on them other than the time, how long we
24   should expect to be there, and I'm not certain if
25   it -- if the actual topics are on those agendas or

Page 59

1    not.
2         Q     Do you read the agendas before you meet
3    with her?
4         A     I know what topics I'm going to talk
5    about, and I don't necessarily look at the
6    physical agenda itself.  The secretary -- the
7    secretary or administrative help sends that, but I
8    know what topics I'm going to discuss.
9         Q     Okay.  And how do you know what topics
10   you're going to discuss with her?
11        A     Because I decide them.
12        Q     Okay.  And do you take notes during
13   those meetings?
14        A     I -- I do not.  Routinely, I do not.
15   I'm not -- I'm not a great note taker.
16        Q     Okay.  Does anyone else take notes
17   during those meetings?
18        A     Not -- not to my knowledge.
19        Q     And when -- when did you first meet
20   with Secretary DeVos?
21        A     I -- I don't -- I don't recall exactly
22   the very first time I met with her, but in general
23   since becoming the -- the chief operating officer,
24   I have met with her about every two weeks, and so
25   it was likely the -- toward the end of March when

Page 60

1    I probably had the first meeting, I would imagine.
2         Q     Okay.  And do you know whether she was
3    meeting regularly with your predecessor?
4              MR. HANCOCK:  I'm going to --
5              THE WITNESS:  I would not know.
6              MR. HANCOCK:  -- object.  That's
7    exceeding the scope of discovery.
8         BY MS. TORCHIANA:
9         Q     You can still answer.
10        A     I would not know.  I don't know.
11        Q     Okay.  And how do you communicate with
12   Ms. Diane Auer Jones?
13        A     How do I communicate with her?
14        Q     Uh-huh.  Yes.
15        A     So for -- just in general, you mean,
16   or --
17        Q     Yeah.
18        A     -- how do I -- how do I --
19        Q     For example, do you ever --
20        A     So when --
21        Q     Do you ever text with her?
22        A     No, ma'am, I don't text with very many
23   people at all.  I -- I pick up the phone and call
24   her.  I might have a meeting in person with her
25   before we went into the Covid-19 situation.  And

Page 61

1    since that time, it's been a virtual meeting or
2    a -- or a phone call.  I don't -- I don't text
3    very much.
4         Q     Okay.  And do you send any emails to
5    each other?
6         A     We -- yes.  Emails go back and forth
7    around Federal Student Aid for various reasons,
8    yeah.
9         Q     Okay.  And earlier you said that when
10   you started at Federal Student Aid, you weren't
11   aware of any goals or priorities that FSA had?
12        A     No, ma'am.  What I said was that -- if
13   I understood your question right, you said what
14   was presented to me as the goals of Federal
15   Student Aid when I became the chief operating
16   officer.  I thought I understood that to be your
17   question before.
18             And what I -- what I said was nothing
19   was presented to me, per se.  I looked at the
20   strategic plans and those kind of things to see
21   over the years what had been the goals and
22   objectives of Federal Student Aid.
23        Q     Okay.  And what -- do you know when the
24   strategic plan was developed?
25        A     So we have a legislative requirement to

Page 62

1   develop a strategic plan every five years and to
2   update it every year, and when I took office, we
3   were developing the strategic plan that would be
4   done for the five years which is one reason why
5   objectives and goals were all being made as I --
6   as I took the office.  It was good timing.
7           And, so, the last one that we did was
8   completed a couple of months ago and represented,
9   you know, what we -- what we believed to be our
10  goals and objectives.
11      Q    Okay.  And what -- and what did you set
12  as the major goals and objectives?
13      A    So there are over -- there are five
14  major objectives, I believe, but there's lots of
15  key performance indicators in there.  And by that,
16  I mean lots, like, over 40 that support those
17  various -- various goals.  And I would have to,
18  you know, have the plan before me to perfectly
19  recite them to you, but we have, like, five major
20  objectives in -- in broad categories with lots of
21  performance -- what you would find in any
22  strategic plan, with lots of performance
23  indicators and those kinds of things in it.
24      Q    Okay.  Are there any -- did you
25  formulate the performance objectives for FSA in

Page 63

1   that plan?
2       A    So if I understand you right, are you
3   saying did I do it?  It's a -- the way the
4   strategic plan is built is a significant effort.
5   It's a very large effort, so I don't do it, per
6   se, by -- I don't say, here, this will be our
7   objectives and these will be our goals.  There's
8   employee input.  There's public comment.  There's
9   legislative requirements.  There's staffing.
10  There's a public comment period that lasts 90
11  days.
12          And, so, all of these things culminate
13  in what we settle in on as the goals and the
14  objectives for Federal Student Aid because it's
15  not ours.  It's the public's.
16          And, so, that's how -- that's how the
17  strategic plan is -- is formulated in -- in
18  general context.
19      Q    Okay.  Okay.  Could you turn to
20  Exhibit 31 in your binder or in your printout?
21          MS. TORCHIANA:  And for those on
22  electronic copies, it's 31 FSA 2020 Annual Report.
23          BY MS. TORCHIANA:
24      Q    Could you turn to page 91?
25      A    (Witness reviews document.)

Page 64

1           Yes, ma'am, I have it.
2       Q    Okay.  And do you see table 37 at the
3   top of the -- of the page?
4       A    Yes.
5       Q    Okay.  And, so, I see here -- so there
6   are target metrics for the number of BD
7   applications adjudicated for fiscal year 2020.
8       A    Uh-huh.
9       Q    And who -- who set that target number?
10      A    So, ma'am, you're looking at table 37,
11  and you're looking at the fiscal year 2020
12  category?
13      Q    Yes.
14      A    And you're looking at the target of
15  150,000 and the actual of 160,000?
16      Q    Yeah.
17          And who set that target number?
18      A    Like I was saying earlier, this -- this
19  annual plan is -- is essentially an output of the
20  strategic plan, and so when you see numbers and --
21  and targets and goals, it's the collaborative
22  effort of the subject matter experts and their
23  view of what's achievable, what they have
24  resources for, so it's a deliberative process.
25          So if your answer is who, I could

Page 65

1   not -- I could not give you a specific person.  I
2   could only tell you the process that it comes out
3   of -- that comes out of it.  That's how it's
4   derived.
5       Q    Okay.  Did you have to approve this
6   number?
7       A    Not the specific number.  I approve the
8   plan, and I take accountability for all of the
9   numbers that are -- that are in here because I --
10  I'm responsible for the process itself that --
11  that produces the numbers.
12      Q    Okay.  And do you know when this target
13  was set approximately?
14      A    I do not because the strategic planning
15  process goes over the course of a -- of a year, so
16  when this specific target was set, I actually -- I
17  don't know.  Because it is a fiscal year 2020
18  goal, I've got to believe it was sometime in that
19  fiscal year, but I can't tell you exactly when it
20  was set.
21      Q    Okay.  And do you know when -- when
22  discussions started about setting -- setting these
23  target numbers for fiscal year 2020?  Do you
24  remember having discussions about that?
25      A    I remember having discussions about the

Page 66

1  strategic plan and making sure we had measurable
2  objectives and those kinds of things, but because
3  this is one part -- and I -- and I think as you
4  can see, of an almost 300-page document, the --
5  the actual targets for each particular group --
6  and, remember, this group is at least two layers
7  removed from me -- those -- those are derived up
8  over time.
9          So I could not tell you exactly when
10 or, you know, exactly who because -- because
11 that's how it works.  It works as a -- as a
12 collaborative -- collaborative document.
13     Q     Okay.  And who do you think -- who do
14 you think might have set those numbers?  Who would
15 you -- yeah.
16     A     Who do I think?
17     Q     Who do you think may have set those
18 numbers -- those target numbers?
19     A     So I would -- I would just clarify that
20 I don't know who set these numbers.  The -- the
21 borrower defense unit is inside of our partner
22 participation and oversight organization, and the
23 partner participation and oversight organization
24 would be a part of that process.  But the subject
25 matter expertise, very much like I noted on how

Page 67

1  many lawyers I needed, the subject lawyer
2  expertise on what production could be done
3  probably starts within the borrower defense unit.
4      Q     Okay.  So do you think someone within
5  the borrower defense unit probably set those
6  target numbers?
7      MR. HANCOCK:  Objection: asked and
8  answered.
9      BY MS. TORCHIANA:
10     Q     You can still answer.
11     A     Again, ma'am, I don't know.  I really
12 don't know.
13         So, you know, again, I can repeat what
14 I just said, is if you look at our organizational
15 chart, this type of work is done inside of the
16 borrower defense unit.
17     Q     Okay.  And do you know when FSA came up
18 with BDU adjudications as a performance metric?
19     A     So I require all -- all elements of
20 Federal Student Aid -- in the March, April, May
21 time frame, I required all elements of Federal
22 Student Aid to be guided by metrics.  So exactly
23 when this particular one came up, I don't know,
24 but it is likely a part of what has been my
25 philosophy since -- since taking over, and that is

Page 68

1  that we need to have measurable results, we need
2  to document them in a plan and we need to work
3  toward them.
4          So I'm assuming -- or I'm sure that
5  this is one of what has been many performance
6  measurements.
7      Q     Okay.  And how did you express to the
8  BDU that they needed to set these target numbers?
9          How did you make that clear to them?
10     A     So we have performance metric meetings
11 as a part of the -- the management and the
12 governance of Federal Student Aid, and -- and one
13 of the parts of that would be the borrower defense
14 unit coming forward, briefing their metrics and
15 briefing their updates.  And for everybody that
16 came before me, I asked them to have long-, mid-
17 and short-term performance metric production
18 goals.
19         When I told -- when we had that
20 particular meeting and when borrower defense got
21 that message, I don't know, but I'm certain they
22 got it from me because I -- I gave that message to
23 the entire organization.  And, so, the entire
24 organization went about developing metrics and
25 measurements and those kind of things for the

Page 69

1  health of the organization and because I think
2  that's what we were legislated to do.
3      Q     Okay.  And when did the BDU start
4  reporting those metrics?
5      A     So when you -- when you say that
6  they -- when did they start -- you mean when did
7  we have metric meetings as an organization?
8          And -- and the -- the part of that is
9  that --
10     Q     Well, you were saying --
11     A     -- the metrics they are reporting --
12     Q     You were saying that you set metrics
13 that were set in, like, about -- annually and
14 quarterly, et cetera.
15     A     Yes.  Right.
16     Q     When did the BDU start reporting those
17 metrics to FSA?
18     A     So I don't -- I don't know the
19 precise -- I don't know the precise time, but
20 within 90 days of my time there, we -- we began to
21 have metric meetings, and BDU is a -- is a -- is a
22 part and a reporter amongst those metric meetings.
23         So the BDU metrics, much like all the
24 other accounts in our metrics we have, are
25 reported through those processes.  And while I

Page 70

1    don't know the exact time, I believe it was within
2    three or four months of my arrival there as the
3    chief operating officer.
4         Q    Okay.  And when you first started
5    reviewing -- when you first started receiving the
6    metrics from the BDU, what -- what were those
7    numbers like?  Do you remember?
8         A    I guess I need to understand your --
9    what were the numbers like?  Do you mean what were
10   they?  What were they?
11        Q    Yeah, yeah.
12        A    So, unfortunately, I can't tell you
13   exactly what they -- what they were, but I can
14   tell you categorically we looked at how many
15   borrower defense cases there were and how many had
16   been adjudicated.
17        So at my level, at the chief operating
18   officer's level, I look at input and output, and I
19   look at the time it goes from input to output and
20   quality.  That's what I do as a -- as a chief
21   operating officer.
22        So while I don't remember the precise
23   numbers then because it has been some time ago, I
24   do know that those are the general categories that
25   we routinely look at.

Page 71

1         Q    Okay.  And when you first started
2    reviewing performance metrics from the BDU, did
3    you have any concerns?
4         A    As I said earlier, I had some
5    understanding that they were in need of two things
6    in order to do well.  And those were more
7    attorneys and an investment in their systems.
8    Those were the two internal FSA things that they
9    needed to do well.
10        And while I wouldn't necessarily
11   categorize that as a concern, those were
12   objectives that I was working toward to assist the
13   borrower defense unit to be successful.
14        Q    Okay.  And here it says fiscal year
15   2020, actual 160,000.  Do you know when that
16   number was reached?
17        A    (Witness reviews document.)
18        I -- I don't know the exact -- I don't
19   know the exact time.  We -- we look at the
20   progress.  I do know that borrower defense unit
21   has made significant progress since getting the
22   resources, and so I'm certain that they either
23   reached that number or came very close to it
24   because they made significant progress since
25   receiving the resources necessary.

Page 72

1         Q    Okay.  And if you go down to the bottom
2    of page 91, it says, This production data is
3    reported in weekly performance metrics evaluated
4    by FSA and department senior leadership.
5         So when -- when did you start receiving
6    those -- or when did that production data start
7    being reported weekly?  Do you know?
8         A    No, no.
9         Q    Okay.  Do you -- did you review those
10   weekly performance metrics?
11        A    Yes.
12        Q    And do you remember roughly when you
13   started reviewing them?
14        A    No, I -- I don't remember.  And -- and
15   I -- I don't -- I don't remember exactly when, but
16   I certainly remember that I -- that I have been
17   doing it.
18        MS. TORCHIANA:  Okay.  And just to ask,
19   would DOJ be able to produce those weekly
20   performance metrics?
21        I'm asking counsel that.
22        MR. HANCOCK:  I mean, we've had
23   discussions regarding the production.  There's a
24   lot of details involved there.  And I'm not going
25   to commit right here to any specific document that

Page 73

1    I haven't seen or aware of.  So we're happy to
2    have that conversation, but . . .
3         BY MS. TORCHIANA:
4         Q    Okay.  So -- so you mentioned -- well,
5    let's see here.  Okay.  We'll get back to this
6    later.
7         I'd now like you to turn to Exhibit 3.
8         (Exhibit 3 referred to.)
9         THE WITNESS:  Exhibit 3.  It says
10   Exhibit 19.  Is that --
11        BY MS. TORCHIANA:
12        Q    Yeah, that's fine.  That's fine.  Yeah.
13        And would you look -- look over this
14   document?
15        A    (Witness reviews document.)
16        Q    Are you familiar with this document?
17   Have you seen it before?
18        A    (Witness reviews document.)
19        I believe this document is an inspector
20   general's report, the Office of the Inspector
21   General.  But I have not seen this entire -- this
22   entire report.  This is a -- I think this is a
23   2017 report, so it is two chief operating officers
24   ago, and I was not at the Department of Education
25   at that time.

Page 74

1    Q    Okay.  Had you seen it before today?
2    A    No, ma'am.  I don't believe I've seen
3  this entire report before today.
4    Q    Have you seen parts of it before today?
5    A    I -- I believe I've had -- I've been --
6  I've heard references to the OIG report, and
7  that's what I meant in my statement.  I've heard
8  references to according to the OIG report.  I've
9  seen it in things according to the OIG report.
10        And, so, the physical report itself, I
11  don't believe that I have seen it.  I don't recall
12  seeing it.  I only recall hearing references to
13  the OIG report --
14    Q    All right.
15    A    -- and I think that's based on the
16  date.
17    Q    Okay.  And based on that, what do you
18  understand were the conclusions of the OIG report?
19        MR. HANCOCK:  Objection to this line of
20  questioning as exceeding the scope of the
21  court-ordered discovery.
22        BY MS. TORCHIANA:
23    Q    You can still answer.
24    A    Unfortunately, ma'am, I have no -- I
25  have no full understanding of this because it

Page 75

1  is -- it is so dated.  And, so, it simply would
2  not have been relevant for what I was going after
3  in March of 2019 forward.
4    Q    Okay.  So would you say that the
5  conclusions in the report were not relevant to
6  your work going forward?
7    A    I have not read the report.
8    Q    Okay.  Okay.  And did you hear any of
9  your coworkers' opinions of it?
10    A    I did not.  I -- I only know of the
11  report because it's referenced in -- you know,
12  when we -- when we look at some of my education in
13  March, it was referenced that there was an OIG
14  report.
15    Q    Okay.
16    A    I can't -- I don't have an opinion of
17  it one way or the other.
18    Q    Okay.  Did you ever discuss it with any
19  coworkers or anyone at your office?
20    A    I do not recall discussing this report
21  with anyone.
22    Q    So if you turn to page -- it's 509 at
23  the bottom in the -- in the small -- small footer.
24  It's page 193 of 270 in the stamp?
25    A    I have the page.

Page 76

1    Q    Okay.  And if you see at the top of the
2  page, it says, FSA established seven categories of
3  borrower defense claims that supported a cause of
4  action under applicable state law and thus
5  qualified a borrower for a loan discharge.
6        So -- and there are, you know, seven
7  listed there.
8        So is it -- is it accurate that as of
9  January 2017, the BDU had developed seven
10  categories of claims that were subject to
11  approval?
12        MR. HANCOCK:  Objection:  Exceeding the
13  scope of the court's ordered discovery.
14        BY MS. TORCHIANA:
15    Q    You can still answer.
16    A    Yeah, regrettably, ma'am, I don't
17  know -- in 2017, I was -- I was not a part of the
18  Department of Education.
19    Q    Okay.  And do you know -- so these are
20  seven approval categories.  So have you ever heard
21  of BDU's approval protocols?
22    A    Approval criticals?
23    Q    Approval protocols.
24    A    Protocols, oh.
25        I am aware that there are categories

Page 77

1  of -- of claims.  I -- I don't know that I could
2  say that there were -- that there were seven and
3  that there still are seven, but I -- I am aware
4  that there are categories of -- of claims.
5    Q    Okay.  And do you know -- do you know
6  if since you've started there were any more
7  categories of claims that were developed for
8  approval outside of these seven?
9    A    I do not.
10    Q    Okay.  And, so, if you go down in the
11  middle of the page, could you read that paragraph
12  in the middle that starts, From January 20th,
13  2017?
14    A    From -- from January 20th, 2017,
15  through July 31st, 2017, BDU did not complete or
16  begin preparing any legal memoranda establishing
17  whether additional categories of borrower defense
18  claims qualified for discharge.  According to the
19  director of BDU, the BDU staff has been instructed
20  not to continue developing memoranda on whether
21  additional categories of claims qualify for
22  discharge because the borrower defense policies
23  are being reviewed with the change in
24  administrations.
25    Q    Okay.  And do you know who -- had you

Page 78

1  heard of who instructed BDU to stop developing
2  these memoranda?
3           MR. HANCOCK:  Objection: calls for
4  speculation.
5           THE WITNESS:  I don't know, ma'am.
6       BY MS. TORCHIANA:
7       Q    Okay.  And did you ever hear of this
8  decision or learn of it?
9       A    So in -- I -- I would not -- ma'am, I
10  would not be able to tell you what -- you know,
11  what was -- what was told in 2017.  I -- I was not
12  a part of the Department of Education in 2017.
13      Q    Okay.  Okay.  We can move on, then.
14           If you could turn to Exhibit 7 in your
15  hard copies.
16           (Exhibit 7 referred to.)
17           THE WITNESS:  It says it's -- yes,
18  Exhibit 7.
19      BY MS. TORCHIANA:
20      Q    And are you familiar with this
21  document?
22      A    (Witness reviews document.)
23           I'm not familiar with the front part of
24  this memorandum at -- at all, the letter.  But I
25  am aware of the secretary's signature on the back

Page 79

1  that says "with extreme displeasure" because it
2  was a -- it was a matter of a media article that I
3  read.
4           So that's my knowledge of this
5  document.
6       Q    Okay.  And what do you take that to
7  mean, her -- her comment?
8           MR. HANCOCK:  Objection: exceeds the
9  scope of the court-ordered discovery.
10      BY MS. TORCHIANA:
11      Q    You can still answer.
12      A    I don't -- I don't know other than -- I
13  read it in a media article.  I don't know -- I
14  don't know that -- I don't know.
15      Q    Okay.  Do you know what -- what caused
16  her extreme displeasure?
17      A    So I -- I think this was signed in
18  2017, and -- and I was not a part of the
19  Department of Education then, so, no, ma'am, I
20  wasn't a part of this.  I don't know.
21      Q    Okay.  And when you -- since you've
22  started, has the secretary expressed any
23  displeasure with any aspects of the BDU's work?
24      A    With any aspects of the BDU work?
25      Q    Yes.

Page 80

1       A    Not -- not to me, no.  I -- I have
2  the -- no, I can't think of anything that would be
3  considered displeasure or -- if that's your
4  question.
5       Q    Okay.  Okay.  And, you know, to get
6  back to some general questions not about this
7  document specifically -- we'll get back to it
8  after.
9           But before -- just turning back to
10  something you've said, before you mentioned --
11  when we were talking about performance metrics for
12  the BDU, do you remember a couple of moments ago,
13  how -- how do you assess -- you said you -- you
14  installed performance metrics and, you know,
15  you -- you were trying to install metrics at the
16  department.
17           How do you measure the output of the
18  BDU unit?
19           MR. HANCOCK:  Objection: misstates
20  testimony.
21      BY MS. TORCHIANA:
22      Q    Okay.  How do you -- do you assess the
23  output of the BDU unit?
24      A    So with -- with all of Federal Student
25  Aid metrics, they normally are production

Page 81

1  oriented.  How many have -- so we are a
2  performance-based organization, so we're a
3  production organization.
4           And, so, we routinely look at input,
5  output and quality, and that would be the same for
6  the BDU -- the BDU unit.
7       Q    Okay.  And how do you assess the input
8  and the output and the quality of the BDU unit's
9  work?
10      A    So keeping in mind that -- I can just
11  tell you generically, I'm not a borrower defense
12  unit expert.  What I can -- what I can tell you is
13  that we look at how many claims that we have in
14  and how many claims we have adjudicated either
15  positively or -- or negatively or approved or
16  disapproved, and at -- and how we're doing at the
17  overall process of -- of getting those answers
18  to -- to the students.
19           So all of those elements of it would --
20  would be at the macro level how the BDU unit is
21  doing.
22      Q    Okay.  And, so, when you came up with
23  the fiscal year 2020 -- not you, but when the
24  performance metric was set, did you have to
25  approve it or sign off on it?

Page 82

```
1        A    I signed off on all of the -- all of
2   the metrics that go into the strategic plan and
3   the annual plan, one of which is the metric.  And
4   in signing, I denote my confidence in the process
5   of the development of those things.
6        Q    Okay.  So would you ever agree to a
7   performance metric that wasn't reasonable or that
8   you think wasn't attainable?
9        A    So when I look at a performance metric
10  in general, I look to see if we provided the
11  resources necessary to achieve it.  And if we
12  provided the resources necessary to achieve it,
13  then, you know, I would feel comfortable that it
14  was reasonable.
15            But you asked me if I would ever sign
16  off on a performance metric that is not
17  reasonable; am I -- am I correct?
18       Q    Yes.
19       A    I would not knowingly do so; however, I
20  am not beyond flaw and -- and we have a large
21  organization, and as I've said, they all have
22  metrics.  I have to build and trust the process
23  that it would not bring me an unachievable metric,
24  and so -- but it is not without flaw.
25            So there -- there could be one that
```

Page 83

```
1   would have to be changed or adjusted if it were
2   not -- if it were found to be, I think as you
3   said, unrealistic.
4        Q    Okay.  And how did you inform yourself
5   that the BDU -- BDU unit's metrics were achievable
6   or attainable?
7            MR. HANCOCK:  Objection:  vague; and
8   potentially calls for deliberative information.
9            BY MS. TORCHIANA:
10       Q    You can still answer.
11       A    So we have metrics updates as I was --
12  as I was saying, and -- and -- and a process by
13  which they are developed.  So the way I inform
14  myself in general is by listening and having
15  dialogue and asking questions that I think are
16  challenging that would make those who develop and
17  think deeply about them and looking at, you know,
18  their responses and the history and seeing if
19  together we can agree that this is something that
20  can be done.  And then ultimately they are
21  established that way.
22            So I -- I know that's not a one, two,
23  three answer, but neither is the process.  It is a
24  very deliberative back-and-forth process that
25  leads to what you are calling the metrics.
```

Page 84

```
1        Q    Okay.  And, so, when BDU came up with
2   its performance metric, what deliberations did you
3   have with the BDU?  Did you meet with them about
4   the performance metrics?
5            MR. HANCOCK:  Objection: calls for
6   deliberative privileged information.  I instruct
7   the witness not to answer.
8            BY MS. TORCHIANA:
9        Q    Okay.  And how -- when you signed off
10  on the performance metrics, how did you come to
11  understand that that was an achievable goal?  What
12  told you that?
13       A    So what -- so if -- what told me that
14  the goals were achievable?
15       Q    Uh-huh.  Yes.
16       A    From my level -- and I have to explain
17  this a little bit, though -- but from my level,
18  I'm more concerned that the process is in place
19  for the voices to be heard and the development to
20  occur.  And, so, I am spending my time on the
21  process; in other words, are they from the ground
22  up.  Do subject matter experts have an opportunity
23  to say something; are we, you know, not listening
24  to any voices; or how do they look on a historical
25  basis.
```

Page 85

```
1            Those kinds of questions when you
2   manage a large organization, you have to become
3   confident that those will help bring out the best
4   in those you manage.
5            And, so, the way -- the reason I'm
6   confident is because I spend an intense amount of
7   time on the process to make sure the process is in
8   place to deliver that.  I don't -- I'm not a
9   borrower defense attorney.  I don't -- I can't
10  tell you perhaps the intricacies that you're
11  looking for in terms of all of those things that
12  happen inside of the borrower defense unit, but I
13  can tell you what process I had used.
14       Q    And who told you about the processes at
15  the BDU?
16       A    Who told me about how borrower defense
17  unit processes the work?  Is that your question,
18  ma'am?
19       Q    Sure.
20            Well, you said you were listening to --
21  when you set the performance metrics you were
22  listening to different voices and it's a
23  deliberative process.
24            Who were you deliberating with to set
25  those numbers?
```

Page 86

1    A    So in the case of the borrower defense
2  unit, I have a deputy chief operating officer for
3  partner participation and oversight, and my
4  conversations would begin with them.  They, then,
5  would have conversations with the BD unit -- BDU
6  unit who would have conversations internal to the
7  unit, and if we're -- if we're doing it right, all
8  of those voices will be heard at every -- at
9  every -- at every level.
10         So when you ask who am I listening to
11 or who told me, the people that work for me.
12    Q    Okay.  And would that have been Robin
13 Mittner?
14    A    So I believe you mean Robin Minor?
15    Q    Minor, sorry.
16    A    She is the first in the management
17 chain.  She is the first in the management chain
18 of BDU between me and the BDU unit.  And, yes, I
19 would have had conversations with Robin Minor, but
20 they would have not been isolated to that.  She
21 would have had conversations with others as well.
22         The -- so that's, in general, how
23 information flows, if that's your question.
24    Q    Okay.  And -- and when these
25 performance metrics were set, do you know if

Page 87

1  anyone expressed concern about not being able to
2  attain them?
3    A    I -- I don't -- I don't know.  I can't
4  recall any specific concern.  You know, I don't --
5  I'm trying to think here if I can recall it, and I
6  do not.  I don't recall any specific concern about
7  attaining BDU goals.
8    Q    Okay.  So there was no concern about
9  adjudicating 150,000 applications within fiscal
10 year 2020?
11    A    There was concern that I would get the
12 resources necessary to the BDU team, and our -- I
13 think what you may be reading into that is
14 immediately 150,000 claims.
15         Is that a -- is that a concern?
16 There's always -- if you can hire the appropriate
17 number of resources, then we can achieve this
18 goal.  If you aren't allowed or failed to or we
19 can't find them or can't hire them or whatever,
20 then the goal is not achievable.
21         And, so, what I think you may be
22 calling concern, I'm calling the dialogue that
23 goes into the building of metrics.  And so some is
24 on me to go do, right, and some is on the workers
25 to go do.

Page 88

1    I -- I would not use the term "concern"
2  about that because I think it -- that's how you do
3  it.  I mean, that's how -- that's how it happens
4  across the entire organization.  In the case of
5  the BDU unit, it's resources.  It's, you know,
6  people.
7    Q    And, so, what resources were those?
8    A    Attorneys.
9    Q    So you're saying -- what were the
10 resources that were --
11    A    Attorneys.
12    Q    What resources did the BDU think would
13 help them reach their target for the 2020 fiscal
14 year?
15    A    So, again, there were two -- there were
16 two points that had to be addressed.  A number of
17 attorneys, hire to a certain level of attorneys.
18 And then there were also resources to invest in
19 the IT system, the platform that was, in fact, the
20 case management system.
21         And, so, when I say resources and I say
22 attorneys and money, that's what I'm talking
23 about.  We had to collectively achieve those
24 things to achieve the goal.
25    Q    Okay.  So would you say primarily that

Page 89

1  IT resources and attorneys were the two resources
2  that BDU needed to meet its target?
3    A    I -- I did say that.  I said that in
4  order for -- in order for the borrower defense
5  unit to be successful.
6         Now, remember, I'm talking about this
7  at my level, the macro level.  You know, I guess
8  like with anything, if you were three levels down,
9  they may -- they may have concerns of other things
10 that I would not have at my level, but at my -- at
11 my level, my challenges were to have -- have
12 enough attorneys to adjudicate cases and to have
13 the -- to get the money necessary to upgrade the
14 systems, the case management systems that would be
15 needed for the volume of cases we were talking
16 about.
17    Q    And -- and, so, what did you do to get
18 more attorneys in the BDU unit?
19    A    We hired people.  We had hiring fairs.
20 We went nontraditional terms, like --
21 nontraditional for government like Indeed and
22 LinkedIn and we visited law schools with
23 graduating attorneys, and we made offers to -- to
24 get at this situation.
25         That's -- that's what we did, so I

Page 90

1    guess you would put it in a broad -- broad
2    category of recruiting and -- and hiring.  That's
3    what we went about doing in a very aggressive way.
4         Q    Okay.  And when did that start or when
5    did you start doing that?
6         A    Again, I don't know when the very first
7    hiring fair was and when the very first -- I -- I
8    didn't -- I don't conduct the hiring fair myself.
9    I don't physically go.  I tell our experts to do
10   that and I know that they had them.  I don't
11   actually go to the law school and visit and try
12   and -- you know, we send -- we send people who are
13   attorneys who know the business to go do that.
14        I can tell you that shortly after my
15   arrival, we began to try and buildup the number of
16   attorneys after we were -- were given the approval
17   to do so as I said earlier, and then all of those
18   actions began to take place.  It wasn't an
19   overnight thing.  It was -- as you would expect,
20   you get ten, you get five more, you get seven
21   more, you know, until you build up your personnel.
22        Q    And would you say before you joined,
23   were there enough attorneys in the BDU unit?
24        A    So while I would not talk about --
25   because I don't know because enough is -- enough

Page 91

1    would have to do with how many cases you had at
2    the time, so I can't talk to you, ma'am, about
3    anything prior to March 2019.  I really don't know
4    what -- I can tell you that, as I have said
5    earlier, there were around 10 or 12 when I started
6    in March of 2019.  And that was not enough for the
7    number of cases we had to get adjudicated and
8    worked, and therefore we did all those things that
9    I was just going through earlier.
10        Q    Okay.  And did you -- did you have any
11   sense of whether there were any requests to hire
12   more attorneys before you joined?
13        A    As I said earlier, I -- I really don't
14   know.  I don't know.
15        Q    Okay.  Okay.  All right.
16        We'll talk about the IT platform more
17   later.  I'd now like you to go to Exhibit 10.
18        (Exhibit 10 referred to.)
19        THE WITNESS:  Yes, ma'am.
20   BY MS. TORCHIANA:
21        Q    Okay.  And just before we get into
22   that, so when you started in March 2019, it sounds
23   to me like that you made your issues -- or --
24   or -- I guess when you started in March 2019, what
25   was your understanding of why no decisions had

Page 92

1    been issued since June 2018?
2         MR. HANCOCK:  Objection: asked and
3    answered.
4         THE WITNESS:  I think --
5    BY MS. TORCHIANA:
6         Q    You can answer.
7         A    Yeah, I think as I said before, I
8    believe there was confusion, and so it -- my -- my
9    understanding was that there was confusion.
10   That's -- that's how I would classify it.
11        Q    Confusion about what?
12        A    The borrower defense unit believed that
13   they had guidance to -- to not do so, policy
14   guidance not -- not to do so, and had not done so
15   after the Manriquez case, and I'm not certain that
16   the -- at the time that the -- the department was
17   under the understanding that they had provided
18   that guidance.
19        So if you're asking about that time
20   frame when I initially took over in -- in March, I
21   would classify it as confusion.
22        Q    Okay.  So just looking at Exhibit 10,
23   are you familiar with this testimony by Diane Auer
24   Jones?
25        A    I am not familiar with this particular

Page 93

1    testimony.  I know that Ms. Jones provided
2    testimony, but I have not read this document that
3    is -- that you have here as Exhibit 10.
4         Q    So it was in -- on May 22nd, 2019, so
5    after you joined.  Have you ever read through her
6    testimony or looked at it?
7         A    I -- I don't believe so.  At least I
8    don't recall reading through this one.
9         Q    Okay.  And at the top, could you turn
10   to page 50?
11        A    Uh-huh.
12        Q    Okay.  And at the top, could you read
13   the testimony that starts -- so Ms. Jones says,
14   There is not a policy.  Could you read that
15   sentence?
16        A    There is not a policy that prevents the
17   review of claims.  However, we are not able to
18   determine the level of harm or the level of relief
19   that a borrower should get because the methodology
20   we use is now being challenged by the California
21   courts.  So we continue to process.
22        Q    Okay.  And could you tell me what you
23   think this means or explain that statement?
24        MR. HANCOCK:  Objection: Speculative.
25   BY MS. TORCHIANA:

Page 94

1    Q    You can still answer.
2    A    Actually, I can only tell you what I
3 just -- you know, what I just read.  But in terms
4 of what she means by that, I'm not sure I
5 understand your question, ma'am.
6         What would you like me to do with what
7 I just read?  It's --
8    Q    How -- okay.  That sentence, how do you
9 understand it?  What is she saying?
10        MR. HANCOCK:  Objection:  Speculative.
11        BY MS. TORCHIANA:
12   Q    For example, when she says, We are not
13 able to determine the level of harm or the level
14 of relief because the methodology we use is being
15 challenged by the California courts.
16        So with -- do you know which
17 methodology she's referring to?
18   A    So I am only familiar with -- since
19 I've been the chief operating officer, there's
20 only one methodology that the borrower defense
21 unit has used.  And, so, I would only assume here
22 that it's something before that.
23        I have not spent any time on what might
24 have been used in 2017 or '18 or -- or that.  I'm
25 only familiar with it -- meaning, that we have a

Page 95

1 methodology that we use now.
2         But -- but I do think it's important
3 that I clarify that the chief operating officer is
4 not the policy element of this process, and
5 methodology -- the determination of methodology
6 would be a question more appropriate for those who
7 make the policy.
8    Q    Okay.  And when she refers to a case in
9 the California courts, do you know what case that
10 was?
11   A    Well, regrettably we have more than --
12 more than one or two cases in the California
13 courts, so -- so I wouldn't want to speculate
14 on -- on which one of our multiple lawsuits this
15 might be or which -- I don't know what -- since
16 this doesn't say anything other than what you just
17 told me to read, I don't know, ma'am.  I don't
18 know.
19   Q    Okay.  And when you started, did you
20 know that the department had been enjoined from
21 using their 2017 methodology?
22   A    I did.  I did know that the Manriquez
23 case; that one I did know because it was part of
24 my educational process that started in March.  And
25 I mentioned earlier that I was learning about the

Page 96

1 borrower defense process.
2    Q    So that case is called Calvillo.  What
3 was your understanding of the Calvillo injunction,
4 what it did, what it said?
5    A    So my understanding from my team was
6 that it prevented us from issuing -- determining
7 percentages of relief based on an income source
8 that the courts had disagreed with.  And,
9 therefore, the borrower defense team was unable to
10 do that because they weren't allowed to use that
11 methodology according to the courts.
12   Q    Okay.  And do you know who -- who that
13 applied to?
14        When you say that they couldn't use the
15 methodology, who couldn't they use the
16 methodology -- what applications could they not
17 use the methodology with?
18   A    So -- so I know that there was a --
19 there is a -- a set of claims that would be
20 covered under the Manriquez case; that would be
21 the claims for which you could not go forward on
22 and use a methodology.
23        Now, if you're asking me do I know
24 which ones and exactly how many and all of that, I
25 would not be able to give you that level of

Page 97

1 detail, but I do know that there's a class of
2 claims -- I would call them a class, and that
3 those would fall under the Manriquez case.
4    Q    Okay.  And who explained to you that
5 the Calvillo injunction prevented relief for
6 some -- you know, those people that you just
7 mentioned?
8         How did -- how did you understand that?
9 Did you read the case?  Or did someone tell you?
10        MR. HANCOCK:  Objection: ambiguous and
11 compound.
12        MS. TORCHIANA:  Okay.  I'll ask again.
13        BY MS. TORCHIANA:
14   Q    Who told you that the injunction did
15 what we just said it did?
16   A    So in my educational process in March
17 of how BDU worked and what the status of things
18 were, it was part -- I never used the term the
19 Calvillo case that you just used, but if you mean
20 the Manriquez case, because that's the only term
21 that's ever been brought to me in terms of our
22 discussion of this, if we're talking about the
23 same thing, then that was a part of my instruction
24 from the borrower defense team as I was going in
25 learning about what they -- what they do and what

Page 98

1  their challenges were and those kinds of things.
2      Q    And when you were learning and getting
3  instructions about the borrower defense team, who
4  was providing those instructions to you?
5      A    So there were a number of people, but
6  the leader of that team is the same leader that we
7  have now of the borrower defense unit, and that
8  was Colleen Nevin.
9      Q    Okay.  And did she explain the
10 Manriquez case to you?
11     A    She explained to me the impact of it on
12 the borrower defense processes.
13     Q    Okay.
14     A    But of the entirety of the case, my
15 interests were limited to what impact it had on
16 our ability to do operations.
17     Q    Okay.  And how did she explain the
18 impact that it had on the BD process?
19     A    We could not determine the amount of
20 relief because we were unable to use the
21 methodology because the court did not allow us to
22 use it.  And if you don't know the amount of
23 relief, you can't complete those cases that are
24 found to be valid, and so that contributed to the
25 cases that had not moved.  That's the explanation.

Page 99

1          So as I'm exploring BDU and what's
2  going on and why are there cases and those kinds
3  of things, that's where that explanation would
4  come into play.
5      Q    Okay.  Okay.  If you go down the page a
6  little bit, sort of in the bottom, it --
7  Ms. Pressley asks -- and could you read this out
8  to me?  She says, The court case does not apply to
9  all borrowers.
10         Could you read that and then Ms. Jones'
11 answer?
12     A    Are you still on page 50, ma'am?
13     Q    Yes.
14     A    Okay.  Ms. Pressley:  The court case
15 does not apply to all borrowers.  What about the
16 others?  Are you going to process any of them?
17     Q    Are you not going to process any of
18 them.  But, yeah, go on.
19     A    Are you not going to process any of
20 them?
21         We are processing claims.  We continue
22 to process.  What we can't do is determine the
23 level of harm or the level of relief.
24     Q    Okay.  And, so, could you explain when
25 she says, "continue to process," what did that

Page 100

1  mean in your understanding?
2      A    It -- it actually -- I believe this
3  term "processing" may not be used by everyone the
4  same way.  So I can tell you what I -- I believe
5  it to mean.
6          So I believe it to mean that you can go
7  through the stage of an attorney adjudicating a
8  case and determining if it's eligible or
9  ineligible for relief, and that claim has been
10 processed.
11         Others may believe that that processing
12 isn't complete until you apply an approved
13 methodology and determine what level of relief
14 that particular claim has under whatever
15 methodology has been established.
16         Depending on who's using the term, some
17 people stop at that first part.  Others don't stop
18 until a letter goes out to a borrower with the
19 final answer.
20         So what I just gave you was my very
21 limited one-person's definition of how I would use
22 the term "process."
23     Q    And have you ever heard of that being
24 distinguished as Step 1 versus Step 2?  Is that
25 terminology that's familiar to you?

Page 101

1      A    I have heard of the Step 1 and Step 2
2  categorizing the borrower defense overall process.
3      Q    Okay.  And could you explain to me
4  how -- how that works or how you understand those
5  terms?
6      A    Yes, ma'am.  Actually, I can explain to
7  you how I understand it.  The way that I
8  understand it is if a claim comes in and it goes
9  to an attorney and an attorney adjudicates that
10 claim and determines one thing or the other that
11 it has either met whatever the borrower defense
12 laws or rules are and therefore it is eligible for
13 the methodology to be applied, in other words,
14 they're eligible, then that attorney has completed
15 process -- Step 1 in the process, but not Step 2.
16         Step 2 would start when the methodology
17 is applied, some percent of relief is determined
18 based on the mathematical equation in the
19 methodology, and the borrower is notified of what
20 that answer is.
21     Q    Okay.  So when Ms. Jones says, We
22 continue to process, what does that mean in those
23 terms?
24     A    So I don't know again what Ms. Jones --
25 I can't tell you, ma'am, what -- exactly how

Page 102

1  Ms. Jones was using the term because, as I said
2  earlier, how someone uses the term, I think,
3  differs.
4        So I -- I can't tell you how Ms. Jones
5  was using the term.
6     Q    Okay.  And when you joined the
7  department and, you know, no decisions had been
8  made since June 2018, did you understand whether
9  either Step 1 eligibility determinations -- were
10 any of those proceeding?
11    A    Could you -- would you mind repeating
12 the -- the last part of that question?
13    Q    When you started in March 2019 and
14 going forward, did -- no decisions had been issued
15 since June 2018, did you understand whether any
16 Step 1 decisions were continuing, so as you
17 described it, eligibility?
18    A    Step 1, to my knowledge, never stopped.
19    Q    Okay.
20    A    Those -- that part which we now call
21 Step 1, we're talking about it as Step 1, to my
22 knowledge that had never stopped.
23    Q    Okay.  And -- and how -- was that being
24 reported to you?
25    A    So the metrics and the measurements and

Page 103

1  all the things that we've been talking about
2  didn't exist on day one in March to my knowledge,
3  and -- and nothing was being reported to me other
4  than I was aware that we only had 10 to 12
5  attorneys, as I said before, and the numbers were
6  not that large of the number of claims we were
7  able to even get through Step 1 because BD claims
8  were growing, and as I've said earlier, we simply
9  did not have enough of those two things I
10 mentioned, attorneys and the resources against the
11 systems necessary.
12    Q    Okay.  And so how did you know that
13 Step 1 was continuing?
14    A    So in March I started an education --
15    Q    Not just in March, but, you know, when
16 you started and moving forward.
17        How about from March when you started
18 until December of 2019?
19    A    How did I -- how did I know that Step 1
20 was continuing?
21    Q    Uh-huh.  Yes.
22    A    So -- and I know -- I believe I
23 mentioned that when I first started in March, the
24 BD team immersed me into what they were doing.
25 And, so, part of that is we are adjudicating

Page 104

1  claims.  However, we -- we're not able to
2  adjudicate as many as we would like because we
3  don't have enough resources.
4        And, so, when you say how do I know it
5  was continuing, they -- they told me that they
6  were continuing to adjudicate claims.  That didn't
7  automatically get boiled down to a metric that I
8  was getting automatic weekly updates on.  It took
9  a while, some time for that to come about.  And I
10 don't know exactly when that came about, but it
11 didn't happen immediately.
12        But that's -- that's how I knew that
13 that's what we were doing.
14    Q    Okay.  And as part of your performance
15 metrics, so you -- do you know how many claims
16 have gone through Step 1 eligibility or have been
17 processed at Step 1?
18        Was that ever reported?
19    A    Today you mean or --
20    Q    At any point.
21    A    So, yes, at some -- at some point
22 across during the process of metric building and
23 measurements, I would have an indication of how
24 many claims had been processed and adjudicated and
25 if we were at a point where notifications were

Page 105

1  going out, how many notifications had been sent.
2        That would be a part of the metric.
3    Q    Okay.
4    A    Could I ask, ma'am, for a -- a
5  five-minute break?
6    Q    Sure.
7        MR. HANCOCK:  And, Claire, this might
8  be a good time to just talk generally about lunch
9  break.  It's now 12:43 here on the East Coast,
10 so --
11        THE VIDEOGRAPHER:  Do you want to have
12 this conversation off the record?
13        MR. HANCOCK:  Oh, sure.
14        THE VIDEOGRAPHER:  We're now off the
15 record.  The time is 17:43 UTC time.
16        (Lunch recess -- 12:43 p.m.)
17        (After lunch recess -- 1:18 p.m.)
18        THE VIDEOGRAPHER:  Okay.  We're now
19 back on the record.  The time is 18:18 UTC.
20 BY MS. TORCHIANA:
21    Q    Okay.  So, Mr. Brown, we were just
22 talking about the Calvillo or the Manriquez
23 injunction and what you understood the effect of
24 it to be.  You mentioned that there was confusion
25 within the BDU unit and the BDU unit believed that

Page 106

1    it -- that they couldn't issue any decisions.
2              Do you know -- where would you say --
3    all right.  Let me rephrase it.
4              How did you seek clarification about
5    this confusion?
6         A    So I -- I wouldn't say -- and I
7    don't -- I don't believe I said that there was
8    confusion within the BD unit.  I think what I said
9    was that there was confusion, meaning the BD unit
10   believed they had guidance or policy not to go
11   further with decisions, meaning to send them out.
12             When I asked the department if, in
13   fact, that was the case, the answer I got back was
14   that they didn't believe they had told the BD unit
15   that.
16             That, it's those two positions early on
17   in my time, that I define as confusion.
18        Q    Okay.  So who did you ask from the
19   Department of Education about -- about this
20   confusion?  Who did you talk to?
21        A    I -- I spoke with Under Secretary Jones
22   to get clarification on what the -- you know, what
23   had been told to the BD unit.
24        Q    Okay.  And what did she tell you?
25        A    She responded at the time.  This is in

Page 107

1    the March/April time frame.  I didn't know that
2    the BD unit was not sending out -- or I'm not sure
3    why the BD unit is not sending out decisions.
4    That was the initial response, and this was a
5    verbal conversation.  I don't have this in -- in
6    any form of documentation.
7         Q    So she -- she was the one who said to
8    you she wasn't sure why the BDU -- the BDU unit
9    wasn't issuing decisions?
10        A    Initially.
11        Q    Okay.  And did you seek any
12   clarification?
13        A    I -- I did.  At some point, and I -- I
14   cannot specify for you the exact point because I
15   don't recall the exact point, but at some point it
16   moves to the point of a new methodology was being
17   developed, and once that new methodology was
18   developed, it would allow for the issuance of
19   both -- on -- of decisions, meaning both approval
20   and denials.
21        Q    Okay.  That wasn't quite my question in
22   terms of -- so Ms. Diane Auer Jones told you the
23   BDU unit told you they couldn't issue decisions.
24             Did you seek clarification within the
25   BDU unit asking why they thought that they

Page 108

1    couldn't issue decisions?
2         A    No.  No, no, I -- maybe I don't
3    understand -- understand you.  Ms. -- I asked the
4    BD unit as we were going through that educational
5    process, you know, what we were doing, why were
6    decisions not going out.
7              The BD unit believed that after the
8    Manriquez case decision that they were only to
9    adjudicate cases; they were not to send out any --
10   any answers.  They believed that was the guidance
11   that they had.
12             I asked --
13        Q    Did you seek clarify -- did you seek
14   clarification about why they believed that was the
15   guidance that had been issued?
16        A    Yes.  I -- I asked the under secretary
17   why was the BD unit not sending out decisions.
18   The initial answer or response, if you go back,
19   was I didn't know that the BD unit was not sending
20   out decisions.  That was the initial answer when I
21   first -- when I first started in March/April time
22   frame looking into this.
23        Q    Okay.  And did you ask anyone in the
24   BDU why they thought they'd received that
25   guidance?

Page 109

1              MR. HANCOCK:  Objection: asked and
2    answered.
3    BY MS. TORCHIANA:
4         Q    I think he mentioned -- or you can go
5    ahead and answer.
6         A    No, it's -- as I had previously stated,
7    the BD unit believed, which I believe gets to your
8    why, that after the Manriquez case decision that
9    they were not to send out any notifications.  They
10   were simply to continue adjudicating cases.
11        Q    And did you talk to anyone in the BDU
12   unit about that belief?
13        A    I -- no, I don't believe that I -- I
14   didn't go any further into -- any further in the
15   history of it because it was answer right -- the
16   answer is they weren't sending any out because
17   they believed they weren't supposed to at the
18   time.
19        Q    And, so, did you do anything to clarify
20   that confusion?
21        A    Yes.  I stated earlier I asked the
22   under secretary, and the initial reply I got back
23   was I didn't -- I didn't know the BD unit was not
24   sending out, but that was only the initial reply
25   that I got back.

Page 110
Page

1          Later on -- and I can't give you the
2    exact time of this -- it was decided that we would
3    continue that same posture while the new
4    methodology was being developed, and that once the
5    new methodology would be developed, we would be
6    going forward with all types, you know, both the
7    adjudications and the notifications.
8          Q    Okay.  When did you decide -- when you
9    say you decided to continue that posture, what do
10   you mean?
11         A    Not that I decided; that the department
12   at that point decided that we would continue the
13   same posture that we were in and not issue
14   notifications but continue to do adjudications
15   until the point at which the methodology was
16   completed, and then that -- and then we would
17   begin doing both.
18         Q    Okay.  And who made that decision?
19         A    I don't know exactly.  I can tell you
20   that that was a decision communicated to me
21   through the under secretary.  I don't know that I
22   could tell you, you know, if that was her sole
23   decision or if there was some other parties
24   involved.
25              I would not know that.

Page 111
Page

1          Q    Okay.  And how was that communicated to
2    you?
3               When you say the under secretary
4    communicated that to you, how was that
5    communicated?  Was it -- in what form?
6          A    Yeah, to -- to my knowledge it was
7    verbal.  I don't -- I don't know that there's a
8    document that says effective this date.  My
9    recollection of that is just that it was given to
10   me verbally.
11         Q    Okay.  So would you say there was a
12   policy not to issue any decisions until a new
13   relief methodology was in place?
14         A    I don't know if I would go as far as to
15   define it as policy, but I would certainly go far
16   enough to call it a set path going forward.
17         Q    Okay.  And that guidance was coming
18   from the Office of the Under Secretary?
19              MR. HANCOCK:  Objection: asked and
20   answered.
21              BY MS. TORCHIANA:
22         Q    Okay.  You can still answer it.
23         A    Yeah -- yes, ma'am, as I just -- as I
24   just stated.  That's who it was communicated to me
25   from.  Exactly where it was coming from and how it

Page 112
Page

1    was developed, I don't -- I don't know.  Only I
2    can relate to you what was communicated to me.
3          Q    Okay.  If you can turn back to your
4    declaration which is -- it should be behind
5    Exhibit 25 -- behind tab 25, sorry.
6          A    I have it.
7          Q    Okay.  And we'll start at -- we'll get
8    back to paragraph 5.  So, you know, you say, On
9    December 10th, 2019, the department issued a
10   policy statement setting forth a tiered relief
11   methodology.
12              So who -- who came up with this tiered
13   relief methodology?
14         A    Who came up with it?
15         Q    Yes.
16         A    So what I would -- what I would say is
17   that the -- the methodology itself is determined
18   by the department.  In terms of the building of
19   it, if that answers your who that came up with it,
20   I'm sure like most other things, it was collective
21   effort of providing information to help decision
22   makers, but the methodology is a statement of
23   policy of the secretary's, and so it would not be
24   inside of Federal Student Aid.
25         Q    Okay.  So who would you say was the

Page 113
Page

1    main decision maker then in coming up with the
2    tiered relief methodology?
3          A    I -- I wouldn't say that because I --
4    you know, I don't know how to -- I don't know how
5    to measure what you mean by who was the main
6    decision maker.  The methodology is a statement of
7    policy, so it comes from the department.  And then
8    our job is to execute that -- that policy.  Who --
9    who weighed in the most or the least, I -- or
10   made, to use your term, I -- I don't know that
11   name.
12         Q    Okay.  And when was it decided to
13   develop on this tiered relief methodology?
14         A    I don't know exactly when it was
15   decided.  I know that we started using that.  I
16   can tell you that.  But exactly when it was
17   decided, I -- I don't know.
18         Q    Okay.  And when you -- let's say in
19   March 2019 when you joined the department, had
20   you -- was there any development of this
21   alternative methodology?
22              MR. HANCOCK:  Objection: misstates
23   testimony.
24              THE WITNESS:  I don't know if I
25   understand that question.  I'm not sure I

Page 114
Page

1  understand your question.
2       BY MS. TORCHIANA:
3       Q    My question was when did this tiered
4  methodology start being developed, and you say you
5  don't remember.  So, you know, in the spring of
6  2019 when you started, do you remember any
7  discussions about this new tiered relief
8  methodology?
9       A    I don't.
10      Q    Okay.  And when do discussions about
11 this tiered relief methodology begin?
12      A    I don't know when the -- again, I don't
13 know when the discussions or the decisions, the
14 inner workings of what would be the policy making,
15 I can't tell you exactly when that began.
16      What I can -- what I can tell you is
17 that in -- in March, I wasn't aware of it if
18 that's your -- if that's your question.
19      Q    Okay.  What about later on, let's
20 say -- when did you become aware that a tiered
21 methodology was being developed?
22      A    So what -- what I know is that as we
23 got into the April/May time frame -- and I don't
24 remember precisely that time frame, but somewhere
25 within there -- the answer to our question of

Page 115
Page

1  moving forward with notification was related to
2  the fact that a methodology was being developed.
3      But I'm not telling you that it started
4  then or it started before then or later because I
5  don't know other than at that point I became aware
6  that it was being developed.  I can't give you
7  the -- I can't give you the parameters of when it
8  started or when it ended or anything like that
9  other than I -- other than I know it was being
10 developed.
11      Q    Okay.  And did you ever discuss the
12 development of the tiered relief methodology with
13 Diane Auer Jones?
14      A    Did I ever discuss that we were -- that
15 she was -- that she and the department
16 collectively were working on this methodology?
17      Q    Yes.
18      A    Yes, I -- I knew that they were working
19 on it.  I -- I did know that.  After that time
20 frame, after that discussion, I -- I knew that.
21      Q    Okay.  And how was that communicated to
22 you?  How -- how -- what form did those
23 discussions take?
24      A    Just that, discussions in meetings, and
25 the reason it was -- would have been discussed is

Page 116
Page

1  because it was key to us moving forward in the
2  borrower defense.
3      Q    Okay.  And what was your involvement in
4  developing this tiered relief methodology?
5      A    So my personal involvement would have
6  been very limited.  If you mean "my", the
7  organization of Federal Student Aid, I would have
8  a slightly different answer.
9      Q    When you say it was very limited, what
10 did you do as part of developing this tiered
11 relief methodology?
12      A    Little -- little to nothing.  When I
13 say very limited, I am -- I'm referring to the
14 fact that I'm the chief operating officer at
15 Federal Student Aid, so anything that Federal
16 Student Aid might provide data for or those kind
17 of things, I can't totally detach myself from it
18 because they are -- that is my organization.
19      But in terms of my personal
20 involvement, that -- that's not what I do.  I
21 would not have personally been sitting with
22 someone developing methodology.
23      Q    Okay.  And who within FSA was working
24 on it?
25      A    So while I can't -- I wouldn't be able

Page 117
Page

1  to give you the details of who, I can tell you
2  that we have a policy -- the liaison office and we
3  have data people who pull data out of systems and
4  run algorithms and those kind of things.  They
5  provide the decision support to the policy makers
6  to help them understand kind of the -- the numbers
7  and the data and those kind of things that they're
8  trying to make decisions on.
9      So I could tell you organizationally we
10 have sections that do that.  We have data
11 analytics; we have data scientists, if you will,
12 that do those kinds of things, and policy liaisons
13 which do that.  And they would have been involved
14 with running various programs and pulling data to
15 be supportive of that effort.
16      Q    Okay.  And how many staff within FSA
17 would you say were working on developing this
18 partial relief methodology?
19      A    I would not know.  This is a dynamic --
20 dynamic kind of thing.  You know, today I need one
21 person; tomorrow I need two; I need a couple of
22 hours on the phone.
23      It's just -- it's very dynamic, and I
24 could not associate it with a particular number of
25 persons or times, nor do I believe we accounted

Page 118

1   for it in any kind of way.
2           So I would not want to speculate.  I
3   don't know, ma'am.
4       Q   Okay.  Was it time-consuming for FSA to
5   developed this tiered relief methodology?
6       A   So by "time-consuming," do you mean
7   that we had to put some time into it, or do you
8   mean that it took an inordinate amount of time?
9           Can you help me understand what you
10  mean by that?
11      Q   Did it take a lot of time for staff
12  members at FSA to develop this tiered relief
13  methodology?  Was it something that -- how much
14  time would you say staff spent on developing this?
15          MR. HANCOCK:  Objection: misstates
16  testimony.
17          MS. TORCHIANA:  You can still answer.
18          THE WITNESS:  Yeah, I wouldn't want to
19  give you a specific amount of time.  I don't know.
20  I could look back and see if we had written that
21  down somewhere, but, you know, I couldn't -- I
22  couldn't tell you exactly how much time was spent
23  on it, not -- not off the top of my head.
24          BY MS. TORCHIANA:
25      Q   Okay.  And did you have a sense that it

Page 119

1   was taking a lot of time for FSA to -- to develop
2   this partial relief methodology?
3           MR. HANCOCK:  Objection: misstates
4   testimony.
5           THE WITNESS:  So the methodology is
6   developed by the department.  The methodology is a
7   statement of policy, and so the -- the role of
8   FSA, and -- and by association my role, is to
9   provide data and analytics for the decision
10  makers.  But we don't develop that policy document
11  which -- which you referred to as a methodology.
12          BY MS. TORCHIANA:
13      Q   So within FSA, what staff was working
14  on developing this methodology?
15      A   So, again, I cannot give you names.  I
16  don't know all of the names.  I can tell you we
17  have a policy liaison office and that only has a
18  couple of people in it.  And we have data
19  analytics, people who pull data.  That could have
20  been one or -- you know, one or two people that
21  got that request and worked that particular
22  request, but it would have been a combination of
23  those kind of folks.
24      Q   Okay.  And -- and what resources would
25  you say were required to develop this partial

Page 120

1   relief methodology?
2           MR. HANCOCK:  Objection: misstates
3   testimony.
4           THE WITNESS:  Could you say it again,
5   ma'am?  I'm sorry.  I didn't understand.
6           BY MS. TORCHIANA:
7       Q   I said, what resources were required to
8   develop this methodology within FSA?
9           So you mentioned staff . . .
10      A   So we have people that pull out data,
11  do data analytics and metrics.  We have people
12  who -- who I would call policy liaison folks who
13  help -- help understand what -- what the policy
14  (audio distortion) locations of them are.  So
15  within their job jar would be to support this kind
16  of effort.
17          But if you're asking for me to quantify
18  it -- or are you asking for me just to give you
19  those organizational elements within FSA?
20      Q   What were the organizational elements
21  within FSA that were needed?
22      A   Data analytics and policy liaison.
23      Q   Okay.  Could you explain to me how this
24  partial relief methodology -- how it works?
25          MR. HANCOCK:  Objection: exceeds the

Page 121

1   scope of the court-ordered discovery.
2           BY MS. TORCHIANA:
3       Q   Okay.  Okay.  And then -- what is your
4   understanding of why loan relief tied to earnings
5   is a relevant measure, if relevant?
6       A   So I would -- would tell you that
7   that's not something I would have a deep
8   understanding of.  It is -- that's essentially, I
9   think, the policy that you're reading from of how
10  the methodology works, and -- and while we do have
11  technicians that compute it, the how or -- or why
12  of the policy would not be within my -- kind of my
13  statement of work.
14      Q   Okay.  Okay.  And then if we could go
15  to paragraph 6, could you just read the -- the
16  first sentence for me?
17      A   After adoption of the tiered relief
18  methodology discussed in the policy statement, FSA
19  resumed issuing decisions on pending borrower
20  defense claims.  If FSA determined that a borrower
21  had submitted an application which met the
22  requirements for a borrower defense discharge, FSA
23  used the methodology described in the policy
24  statement to determine the amount of relief that
25  would be provided to the borrower.

Page 122

1   Q    Yeah, that's fine.  Thank you.
2       So FSA resumed issuing decisions.  When
3   did FSA cease making decisions on borrower defense
4   applications?
5           MR. HANCOCK:  Objection: vague.
6   BY MS. TORCHIANA:
7   Q    You can still answer.
8   A    So I'm -- I'm trying to understand.  Do
9   you mean after this point in time when did we
10  cease?
11  Q    So it says FSA resumed, so resumed is
12  starting again.  So when did FSA stop issuing
13  decisions?
14  A    Oh, I -- I -- okay.  Yeah, I
15  understand.  I think I understand your -- your
16  question.
17      If you mean prior to this time when
18  were we making decisions and when did we stop, I
19  believe we stopped based on my review of the facts
20  and as I was told -- because during my time coming
21  in in March, I looked into this and it was part of
22  my education on borrower defense, that after the
23  Manriquez case decision, that there were no more
24  decisions being issued out of borrower defense.
25      And, so, I don't know the exact time of

Page 123

1   that, but whatever the timing of that court order
2   was is -- is my understanding of when borrower
3   defense stopped.
4       And, so, that was already in process
5   when I took my position in March of 2019.
6   Q    Okay.  And, so, did the decision stop
7   on both Corinthian students' applications and
8   non-Corinthian students' applications?
9   A    So I'm now talking about my
10  understanding of it.  I was not there when the
11  original Manriquez case decision was made, but no
12  decisions were going out to my knowledge in March
13  of 2019.
14      So that would have been, you know,
15  whatever is -- no decisions were going out.
16  Q    Okay.  When you say FSA resumed issuing
17  decisions, was that decisions on all pending
18  borrower defense applications including both
19  Corinthian and non-Corinthian?
20  A    What -- what I mean in that statement
21  is that all decisions, depending on which ones
22  were -- were right for -- for being made, right,
23  those that had been -- cases that had been
24  adjudicated and decisions were ready to go out,
25  and there was a methodology to use in all of those

Page 124

1   schools that you named, if they had cases that
2   were sitting there ready to go out.
3   Q    Okay.  But the injunction was still in
4   place at that time?
5   A    So the cases for which -- the cases for
6   which the injunction did not cover.
7   Q    Okay.  And when you say resumed, does
8   that include -- we spoke about this a bit before.
9   Let me rephrase.
10      Had both decisions on eligibility as to
11  Step 1 as we talked about it, and relief, Step 2
12  as we talked about it, ceased?
13          MR. HANCOCK:  Objection: vague.
14          THE WITNESS:  I --
15  BY MS. TORCHIANA:
16  Q    You can still answer.
17  A    So had -- had decisions -- had
18  decisions for borrower defense cases ceased until
19  the point in this statement when I said resumed?
20      Is that the question?  I'm trying to
21  make sure I understand your question.
22  Q    Yeah.
23      So when you say -- so we established
24  that decisions had stopped, had ceased, and --
25  before this new methodology came out.  And was it

Page 125

1   both decisions as related -- determinations on
2   eligibility, so whether someone was eligible for
3   borrower defense, and also how much relief they
4   were owed?
5   A    Right.  So, ma'am, again, Step 1
6   involves a case coming in being adjudicated by a
7   borrower defense attorney, and then through that
8   process determining if a claimant is eligible or
9   ineligible for borrower defense, a defense for
10  relief.
11      That first part, that Step 1 part,
12  which I think you are describing in this question,
13  again has never stopped.  And, so, it never
14  stopped.
15      And, so, when I said resumed, I'm
16  talking about completing the process through Step
17  2 as I'm defining it, which means the ability to
18  issue a determination to a borrower because now
19  you have a relief methodology.
20      So it goes back to our discussion
21  earlier about Step 1 and Step 2.
22  Q    Okay.  And do you know -- did you know
23  how many Step 1 decisions were being made during
24  that time from June 2018 to December 2019?
25  A    I can't -- I can't recall.  You mean,

Page 126

Page

1 what was their level of activity, how many they
2 were getting through?
3      Q   Uh-huh.  Yeah.
4      A   I don't -- I don't recall all of the
5 numbers because the focus was on getting in enough
6 attorneys to do significantly more.  I can't -- I
7 can't recall exactly how many, the 10 to 12
8 attorneys and those folks, were getting through a
9 week.  But I'm sure it wasn't enough which is why
10 we needed more people.
11     Q   And were those numbers being reported
12 to you?
13     A   I don't recall having those numbers
14 reported to me.  At the time, my interest was on
15 building up the resources because I thought that
16 had to come first before the numbers would be
17 significant.
18     Q   Okay.  So how did you know Step 1
19 decisions were still being made?
20     A   As I -- as I said earlier, when I came
21 in in March, I went through an educational process
22 with the borrower defense unit in which they
23 explained to me how borrower defense worked.  And
24 part of it was that what you're describing as Step
25 1 which is borrower defense cases coming in, being

Page 127

Page

1 adjudicated by lawyers, how far they can go before
2 they have to sit because they don't have the step
3 two things in place was a part of our discussions
4 in learning there.  And some of my folks told me
5 that they were continuing to adjudicate cases, but
6 that those cases could not go out.  And that had
7 something to do with the numbers that I was
8 seeing.
9      Q   Okay.
10     A   Okay.
11     Q   And when you say folks, who was that?
12     A   I use the term "folks" to describe any
13 of the 1,453 people that were in Federal Student
14 Aid.  I consider them all my folks, my team that
15 does work.  So when I use that term, I'm talking
16 about partner participation and oversight and
17 their subordinate unit, the borrower defense team.
18     Q   Okay.  Could we turn to Exhibit 17.
19         (Exhibit 17 referred to.)
20         THE WITNESS:  I have a newspaper
21 article.
22         BY MS. TORCHIANA:
23     Q   Yes, that's right.
24         Could you turn to the second page?  At
25 the bottom of the page the article describes a

Page 128

Page

1 memorandum signed by DeVos issued in mid November
2 which instructs department officials to resume
3 issuing decisions on some roughly 227,000 pending
4 applications.
5         Are you familiar with this memorandum?
6      A   Can I just ask what you -- so I'm
7 looking at the article, and I'm trying to figure
8 out where you're -- where you're looking at.
9      Q   I'm sorry.  Yeah, so on the second page
10 at the bottom of the page, it says, The memo,
11 comma, which was signed?
12     A   (Witness reviews document.)
13         So the article that I have is entitled,
14 Trump Administration Hires McKinsey to Evaluate
15 Student-Loan Portfolio.
16         Is that the one you're referencing?
17     Q   No.  No, that's not.
18     A   So what, six is what got out of section
19 16?
20     Q   Seventeen.
21     A   POLITICO article?
22     Q   Yes, that's right.
23     A   I think we may have had them -- I got
24 you.  So this is entitled, POLITICO: DeVos Orders
25 Partial Loan Relief for Many Duped Student

Page 129

Page

1 Borrowers?
2      Q   Yes, that's right.
3         So if you turn to the second page, so
4 after the cover, at the bottom of the second page?
5      A   Right.  The memo, which was signed by
6 DeVos in mid-November and hasn't been reported
7 previously, instructs department officials to
8 resume issuing decisions on some of the 227,000
9 pending applications filed by borrowers seeking
10 debt relief.  That process has been stalled for
11 the past 18 months.
12     Q   Yes.
13         Are you familiar with this memorandum?
14     A   So I think this is an art- -- this is
15 an article that Politico writes and I can't -- I'm
16 not sure what Mr. Stafford is referring to.
17         We have -- we did have guidance so
18 maybe that's -- maybe he's referring to something
19 I'm not familiar with.  I'm not saying it doesn't
20 exist, but I don't know what Mr. Stafford is
21 referring to.  I don't believe we're sourced in
22 this article.  I think we -- at least from what I
23 can tell.
24     Q   Okay.  So was there some kind of
25 memorandum signed by DeVos that instructed the

Page 130
Page

1    borrower officials to start issuing decisions
2    again that was signed in mid-November?
3            Does that ring a bell or --
4        A    I believe that we had -- we had
5    guidance to begin processing claims and -- and --
6    but I -- I don't know if I can -- you know, I
7    could not recall an exact memo or take you to an
8    exact memo, but I'm certain we had guidance, and
9    we began in December of 2019.
10       Q    Okay.  And how did you receive that
11   guidance?
12       A    That is what I can't remember
13   specifically, but I'm certain that we -- that we
14   had it.  I'm sure that I knew from my
15   conversations with the under secretary, and so I'm
16   sure that we had guidance because as I look at our
17   numbers, we began December of 2019 to process
18   claims as I said in my earlier statement.
19       Q    Okay.  And just to be clear, this is --
20   this is Exhibit 17 which is already marked.  So --
21   can you turn to the fifth page?
22       A    Okay.
23       Q    And it starts with, The ten-page memo.
24       A    Right.
25       Q    And could you just read that sentence

Page 131
Page

1    for me?
2        A    It says, The ten-page memo was prepared
3    by Diane Auer Jones, a top advisor on higher
4    education issues, and Mark Brown, who leads the
5    department's Office of Federal Student Aid.  The
6    new policy, they wrote, will allow the education
7    department to resolve claims in an efficient, fair
8    and predictable manner that doles out federal loan
9    forgiveness in line with the financial harm that
10   borrowers are estimated to have suffered.
11       Q    Okay.  And do you remember what you
12   wrote in that memo or what the contents of that
13   memo are?
14       A    So I'm not prepared to say that the
15   premise of this statement is correct.
16       Q    Okay.  What is incorrect about it?
17       A    I don't write policy memos.
18       Q    Okay.  And do you -- so did you ever
19   prepare a memo with Diane Auer Jones?
20       A    We may have -- if you mean -- if you
21   mean did I -- did I sign off on the data that we
22   would provide or something like that, that --
23   that's very possible because we would provide the
24   data that would have input to the -- to the
25   policy.

Page 132
Page

1        Q    But I would -- at least as it's written
2    here by Mr. Stratford, it says that I came up with
3    the -- that I wrote the policy.  I don't do that.
4    I wouldn't be allowed to do that.
5        Q    Okay.  So after instructions were given
6    to resume on issuing decisions, what happened in
7    the BDU?  Did those decisions start going out
8    right away or how long did it take for those
9    decisions to start going out?
10           MR. HANCOCK:  Objection: compound.
11           THE WITNESS:  So if I understand you,
12   once we had a policy in place in December, did the
13   BD unit immediately go to work; is that your
14   question?
15           Are you saying how soon?
16       BY MS. TORCHIANA:
17       Q    What happened after these instructions
18   were issued to resume decisions?
19       A    Well, once the --
20       Q    You can go chronologically.
21       A    So I can't talk specifically to the
22   instructions that are noted in this -- this
23   letter, so I'm not -- I'm not totally familiar
24   with exactly what Mr. Stafford is talking about.
25           But if -- but if you mean when a relief

Page 133
Page

1    methodology was determined, which is December, the
2    borrower defense unit began to release cases,
3    notify borrowers.  They were not at full capacity
4    yet in terms of numbers of people, but they did
5    their work.  They went to work to continue to
6    adjudicate cases, but to also do notifications
7    when appropriate.
8        Q    Okay.  And then if you -- I'm sorry.
9    I'm just reading this.
10           So if you turn the page and go to
11   page 6, it says -- could you read the beginning of
12   the last paragraph?
13           MR. HANCOCK:  I'm sorry.  Can we just
14   clarify which page?  There are page numbers that I
15   can see, and so I just want to make sure we're
16   looking at the same.
17           MS. TORCHIANA:  Yeah.  On the
18   electronic copy, let's see -- it would be the
19   sixth page of the PDF.
20           MR. HANCOCK:  Okay.  Thank you.
21           THE WITNESS:  Is the paragraph that
22   you're referring to, does it start with, The
23   department believes?
24       BY MS. TORCHIANA:
25       Q    Yes.

Page 134
Page

1      A      The department believes that if it
2  issued denials in advance of issuing approvals,
3  borrowers could be confused and believe that the
4  department would not be approving any claims,
5  which is not the case, Jones wrote.  Therefore, in
6  order to prevent confusion or distress to
7  borrowers who are eligible for relief, the
8  department decided that it should not issue
9  denials until it has a methodology in place that
10  will allow it to issue approvals and relief.
11      Q      Okay.  And do you agree with this
12  statement?
13      A      I -- I agree that we were not issuing
14  denials until we had a methodology so that we
15  could do all at the same time, both approvals and
16  denials.  And if that is what is communicating
17  here in -- in this quotation of Ms. Jones, then I
18  agree with that.
19      Q      Okay.  And do you think -- was there --
20  was there any concern about causing any confusion
21  or distress to borrowers who are not eligible for
22  relief as far as you know?
23      A      I really could -- I mean, I don't -- I
24  don't know.  You mean was I concerned or --
25      Q      Sure.

Page 135
Page

1              Was your under- -- was the Department
2  of Education concerned, was that a concern?
3              MR. HANCOCK:  Objection.  Potentially
4  calls for privileged, deliberative information.
5              THE WITNESS:  I -- I don't know, ma'am.
6  I couldn't tell you how people are feeling.  I
7  couldn't -- I just -- I'm sorry.  I don't know
8  that.
9  BY MS. TORCHIANA:
10      Q      And do you think generally since the
11  department started issuing decisions again that
12  confusion and distress has been avoided?
13      A      Do I -- do I think that confusion and
14  distress has been avoided?
15      Q      Yes.
16      A      Because we were issuing borrower
17  defense claims?
18      Q      Since you restarted issuing borrower
19  defense claims?
20      A      I don't know.  I would say I don't
21  know, and I would just add that we've got
22  43 million customers.  And while I -- I do
23  provide -- or I do listen to customers through our
24  ombudsman and feedback and different sources, I
25  would never make a statement that any particular

Page 136
Page

1  policy eliminated anxiety or stopped any of the
2  things that you noted because I could never say
3  it.  In total, I would have no way of knowing.
4              MS. TORCHIANA:  Can we take a short
5  break and then get back on the record?
6              MR. HANCOCK:  Certainly.  That would be
7  fine.  How long?
8              THE VIDEOGRAPHER:  We're now going off
9  the record.  The time is 19:05 UTC time.
10              (Recess -- 2:05 p.m.)
11              (After recess -- 2:20 p.m.)
12              THE VIDEOGRAPHER:  We're now back on
13  the record.  The time is 19:20 UTC time.
14              MS. TORCHIANA:  And before I get
15  started, could I ask that we mark as Exhibit 27
16  the FSA 2020 annual report which is bracketed 31?
17              (Deposition Exhibit 27 was marked for
18  identification and attached to the transcript.)
19  BY MS. TORCHIANA:
20      Q      So if you could turn to -- back to your
21  declaration which is behind tab 25, so Exhibit 25?
22      A      I have Exhibit 25.
23      Q      Okay.  And in paragraph 7 you note that
24  on December 11th, 2019, FSA issued a total of
25  16,045 decisions on borrower defense claims and

Page 137
Page

1  that 789 met the conditions for discharge.
2              Do you know how many of those 789 that
3  were approved were from either Corinthian or ITT?
4      A      I -- I don't know.  I -- no, ma'am, I
5  would not know off of the top of my head what the
6  breakout of the 789 borrowers were in terms of
7  schools they attended.
8      Q      Okay.  And do you know if any -- since
9  you've started, do you know if any approvals have
10  gone out for schools other than ITT or Corinthian
11  or for borrowers who attended schools other than
12  ITT or Corinthian?
13      A      I would have to look at the data to
14  be -- for -- and, so, I would not want to
15  speculate, but we -- we do make public this --
16  this kind of data, I think, at the macro level.
17  But I wouldn't want to speculate on -- on exactly
18  what schools have had approvals and disapprovals.
19  I don't have those numbers memorized.
20      Q      Okay.  And where -- if you wanted to
21  check that data, where -- where would you get it
22  from?
23      A      At the -- at the macro level we produce
24  data for the public I think every month, and we
25  publish it on our -- on our Web site, on our

Page 138
Page

1  portal site, and we produce those reports that
2  talk about approvals and disapprovals and how many
3  borrower defense cases are there.
4       Q    Okay.  So it's public data how many
5  approvals there have been for each school group?
6       A    Well, I'm not sure, and again I would
7  have to actually look at a borrower defense report
8  to tell you the details of it.  But that isn't
9  anything that I think that we keep insulated into
10 the organization.  We -- I think we publish
11 borrower defense (audio distortion) reports.
12      THE COURT REPORTER:  I'm sorry.  You
13 said, "I think we publish borrower defense," and
14 then you cut out on me.
15      THE WITNESS:  Reports.  We publish
16 borrower defense reports.
17      BY MS. TORCHIANA:
18      Q    If you go to paragraph 8, it says, FSA
19 in the process of issuing an additional 1,000
20 decisions and anticipates issuing thousands more
21 in the next several weeks on a rolling basis.
22      So how -- how are these numbers set?
23      MR. HANCOCK:  Objection: vague.
24      BY MS. TORCHIANA:
25      Q    How does the number of 1,000 additional

Page 139
Page

1  decisions set and the anticipation -- or -- let's
2  just start with that?
3       A    When you say "set," you mean why would
4  we use that number?
5       Q    Yeah.
6       A    So we know how many claims that we
7  have.  We know how many are pending decisions.  We
8  know how many have been adjudicated thus far, and
9  I think what you see here in this statement in
10 paragraph 8 is our anticipation that when a
11 certain number will be at the next stage of the
12 process.
13      So if an attorney had completed
14 adjudication and it was in the band and ready to
15 go, it would be -- you know, we would be able to
16 look at that and say that fairly soon we will
17 have, you know, more decisions on these thousand
18 and then, you know, could look at how many more
19 you have coming and how many attorneys you have,
20 and you can tell it at about what rate you'll be
21 able to go at that point in time with the amount
22 of resources that you have at that point in time.
23      I believe when I made this statement in
24 this particular declaration, which is at the very
25 beginning of the reissuance -- it's in

Page 140
Page

1  December 2019 -- we were looking at just that.
2       Q    Okay.  And, so, who -- okay.  And did
3  you set performance metrics for how many decisions
4  were going to go out in -- in the weeks following
5  December 2019?
6       A    So as I -- as I said earlier, we -- we
7  have -- we had metrics performance for every part
8  of the -- the performance-based organization.
9  That's -- that's what we -- that's what we do.
10      But I think what you just said in your
11 question was did I set a metric for how many would
12 go out in December of 2019.
13      Q    No, after -- after December 2019.
14      A    If -- if I were to set a metric, it
15 wouldn't be for a month, right.  I mean, if you
16 mean did we have goals to meet.  I'm trying to
17 understand your question, ma'am.
18      Q    I don't just mean in a month.  I mean
19 going forward after December 2019 --
20      A    I don't know -- I don't know if we had
21 the metrics established that early.  I don't know.
22 I'd have to go back and look.  So to answer your
23 question, I can't tell you that there was a metric
24 in December 2019 of how many we would do each
25 month for the remainder of the year.  I don't know

Page 141
Page

1  that we were mature enough in the process at that
2  point to have done that.
3       Somewhere along that road, though, we
4  did establish metrics and measurements for the
5  borrower defense team to work toward.
6       Q    Okay.  Could you turn to tab 32 in your
7  hard copies?  And that's document 145.
8       MS. TORCHIANA:  And could we mark that
9  as Exhibit 28?
10      (Deposition Exhibit 28 was marked for
11 identification and attached to the transcript.)
12      THE WITNESS:  Yes, I have it.
13      BY MS. TORCHIANA:
14      Q    Okay.  And do you recognize this
15 document?
16      A    (Witness reviews document.)
17      This is a declaration that I signed.
18      Q    And did you write it?
19      A    As I -- as I said earlier, I don't
20 actually write all the declarations.  These are
21 done in conjunction with counsel.
22      Q    Okay.  And that's your signature on
23 page 3?
24      A    That is my signature.
25      Q    I'm sorry.  I turned to the -- I turned

Page 142

1    to the wrong one.  I meant -- we'll get back to
2    that one later.  I meant to go to tab 27.
3        MS. TORCHIANA:  And if we can mark that
4    as Exhibit 29.
5        (Deposition Exhibit 29 was marked for
6    identification and attached to the transcript.)
7        THE WITNESS:  Okay.
8    BY MS. TORCHIANA:
9        Q    Okay.  And do you recognize this
10   document?
11       A    (Witness reviews document.)
12            I believe this is my -- this is my
13   declaration.
14       Q    Okay.  And did you write it?
15       A    As I stated earlier, the -- I do these
16   in consultation with counsel.
17       Q    Okay.  Okay.  If you turn to
18   paragraph 6 -- that's on page 4 --
19       A    So I -- paragraph 6; right?  Yeah.  On
20   page -- oh, I think we have different page numbers
21   on the top and the bottom, so you read the number
22   that are on the top of the page?
23       Q    Uh-huh.
24       A    I have paragraph 6.  You're good.
25       Q    And this describes the hiring that

Page 143

1    you -- that the BDU did in September of 2019.  So
2    we talked about this a little bit before, but when
3    was the decision to hire more new term attorneys
4    made?
5        A    So I don't know the exact time, but
6    somewhere soon after I was in office in March of
7    2019, somewhere in the next couple of months, we
8    made the decision to -- we had approval to hire
9    new attorneys, and we went through the process of
10   recruiting and doing all the things that I
11   mentioned earlier to bring them on board.
12       Q    Okay.  And who made the decision to
13   hire more attorneys?
14       A    I made the decision to hire more
15   attorneys once I had approval from the -- from the
16   department.
17       Q    Okay.
18       A    As I -- as I stated earlier, I made a
19   request to the department and they said yes.
20       Q    Okay.  And are these employees
21   full-time?
22       A    The term "term," they work full-time,
23   but it doesn't mean forever.  They are for a
24   specific term.
25       Q    Okay.  And what is the term?  Is

Page 144

1    there --
2        A    I believe it is two years.
3        Q    Okay.  And have you hired any new
4    attorneys since -- since you wrote this?
5        A    So there -- there may have been a few
6    more attorneys hired since this -- since this
7    date.  I can't say exactly, but we may have -- we
8    may have brought a few more on because I believe
9    this has a number, like, 452.  We may be at 54 if
10   a couple were not on board yet when this was
11   written.
12       Q    When you said -- you said we made the
13   decision to hire more attorneys, who do you mean
14   by "we"?
15       A    No, ma'am.  I said I made the decision
16   to hire more attorneys.  I asked the -- I said I
17   asked the Department of Education.  They said yes.
18       Q    And who did -- who did you ask at the
19   Department of Education?
20       MR. HANCOCK:  Objection: asked and
21   answered.
22       THE WITNESS:  So as I -- as I said
23   earlier, I asked more than one person as I
24   explained where we were in borrower defense.  That
25   included the under secretary; that included the

Page 145

1    secretary and the human resources folks who deal
2    with these kinds of things.
3    BY MS. TORCHIANA:
4        Q    Okay.  And what was their response?
5        A    As I said earlier, they said yes.
6        Q    Okay.  And do you know -- had there
7    been any requests before you made the request to
8    hire more attorneys?
9        MR. HANCOCK:  Objection: asked and
10   answered.
11       THE WITNESS:  As I said earlier -- as I
12   said earlier, I'm not -- I'm not aware of any --
13   any specific things that may have occurred like
14   that before I -- before I got here.
15   BY MS. TORCHIANA:
16       Q    Okay.  And was the -- what were some of
17   the priorities that were represented to these new
18   hires, these new staff attorneys?
19       MR. HANCOCK:  Objection: vague.
20       THE WITNESS:  I -- I don't know if I
21   under-- I don't know if I understand your
22   question.  You mean when we brought on new term
23   attorneys, you're asking what we told them or what
24   we --
25   BY MS. TORCHIANA:

Page 146

Q    Yeah.

A    -- told them our plans were?

Q    Yes.

A    So, ma'am, the way we're organized is I'm the chief operating officer, and I have a deputy chief of partner participation and oversight, and the borrower defense unit works for the partner participation and oversight, and we have a borrower defense team lead and then there are other supervisors in borrower defense.

So a line attorney, a brand new attorney, I would not sit down and give them priorities.  So I wasn't in a conversation where I sat down with new attorneys and said these are your priorities.  If that's the question you're asking, that would not have been something that I would have done.

Q    Okay.  And do you know if reducing the backlog was represented as a priority to these new employees?

A    I don't know.  I -- again, that's just not something that I would have -- I would have -- I would have done.

Q    Okay.  Why did you want to hire more attorneys?

Page 147

A    So we wanted to hire more attorneys because we needed more based on the -- the amount of work that was inside of borrower defense, the number of cases.

Q    Okay.  And in the next paragraph, you say that FSA hired three employees to focus on the administrative process end of distributing the decision letters.

What does that mean?  What do you mean by "the administrative process end"?

A    So once a -- once a decision has been made on a -- on a borrower defense case, and by that, I mean we've gone through what we have described earlier as Step 1 and we have gone through what we called earlier Step 2, the second part of Step 2 is that the borrower must be notified of the decision.  And -- and if we took the scenario where the loan was forgiven or -- or reduced by a certain percentage, there is a -- a long administrative tail to that.

There is a -- you know, if you read this on the face, it sounds like we're typing up a letter or writing a letter and that's it, but when you're talking about mass numbers like what we have here, we have to have this loaded into a

Page 148

system to -- to generate the letter that would go out to the individual, and then that has to correlate with the loan servicer somewhere in the country, and that has to correlate to a loan number, and that loan number has a promissory note, and the promissory note has to be reduced by the amount if the loan has been forgiven, and then that has to all be reconciled.

So this -- what we're calling in general this administrative process is -- is a very long and convoluted process that you have to assign people to manage it as well as contractors and other folks because -- because there are so many -- there are so many of these that it doesn't work on autopilot and you have to do those kind of things to manage it.

Q    Okay.  And how many --

A    Hundreds of these.

Q    So you say you hired three employees.  How many attorneys work on the -- on the administrative processing end of distributing those letters?

A    So we hire attorneys to adjudicate cases.  These three people are not attorneys.

Q    Okay.  How many employees work on

Page 149

distributing the letters?

A    I don't know that exact number.  It's more than three.  That's three additional people.  And, ma'am, to understand -- to understand this, we have -- we have contractors; we have contract support; and we have call centers.  It's a large operation.

So when I say three people, I don't mean three people and those three people are going to put out all of the letters and notifications.  That's -- that's not what that means.  That means those three people are going to orchestrate a very, very large process and there are a lot of people in a lot of different places that make it actually -- that actually make it happen.

So how many people are involved in the administrative process?  You know, I would -- I would have to go back and it would be a range of -- you know, it would be a range of folks, and depending on how you wanted to count them.  If you want to count the contractors or government employees, it would just depend, to include loan servicers who ultimately take the action against the loan.

Q    Okay.  Okay.  And then in paragraph 8

Page 150
Page

1    you explain that the increase of personnel within
2    the BDU has enabled FSA to substantially increase
3    the volume of borrower defense decisions it has
4    issued.
5             And, so, if that's the case, why didn't
6    FSA increase its staffing earlier?
7        A    I would not be able -- when you say
8    "earlier," do you mean before March of 2019 when I
9    became the chief operating officer?
10       Q    Before -- before the increased
11   personnel happened.
12       A    So for me, the period that I can talk
13   about, we did it immediately -- started increasing
14   personnel immediately, but it took time to build
15   them up.
16            So, in other words, if you tell me in
17   April or May -- or April that I have approval to
18   hire attorneys and I go out and hire them, I don't
19   know if you're familiar with government hiring,
20   but you have to have a security clearance, and --
21   and you have to go through our process.  You have
22   to fill out an application to -- there are a
23   number of things you have to do that are very
24   bureaucratic.  We simply don't pick a person, hire
25   them and they come to work the next day.

Page 151
Page

1             So I think it is -- it was done in what
2    I would consider immediately in the period of time
3    that I can talk about, which is beginning in March
4    of 2019.  That's the period of time I can speak to
5    directly.  It was done immediately.  It doesn't
6    mean they arrived immediately.
7        Q    Okay.  And you mentioned that, as I
8    understand it, Step 1 -- before you -- you
9    increased this hiring, Step 1 adjudications were
10   still continuing; is that right?
11       A    Yes, as I -- as I said earlier, the
12   Step 1 process, which is the claim coming in,
13   being adjudicated, has never stopped to my
14   knowledge.
15       Q    Okay.  And, so, were all -- when you
16   hired all these new attorneys, were they still
17   working on Step 1 or was it -- I guess were you
18   increasing capacity both for Step 1 and Step 2?
19       A    So we -- we are -- you are asking about
20   what the attorneys were hired for?
21       Q    Yeah.
22       A    They were -- they were hired to
23   adjudicate cases.  And in this particular document
24   in your statement, the conversation is limited to
25   the attorneys, but we increased personnel

Page 152
Page

1    throughout FSA for what would -- I would call the
2    whole picture here of the process by which
3    there's -- the ones I referenced in this statement
4    when I said three additional people came on, they
5    aren't counted in the attorney numbers.
6             So the attorneys came on and -- and
7    they helped in the first part what you're calling
8    Step 1 of the process, and -- and there were
9    others with different specialties that helped with
10   Step 2 of the process to help get this done.
11       Q    Okay.  And -- and do any of these
12   attorneys make any Step 2 determinations?
13       A    So I don't -- I can't speak to all of
14   the internal workings of the borrower defense
15   team, not with any specificity.
16            I can -- I can tell you that in general
17   that there are two different types of things going
18   on, and in Step 1 is purely attorneys for the most
19   part, right, that are adjudicating cases because
20   you have to have an attorney do that.  But letter
21   preparation, the computation of relief using the
22   methodology, the administrative process of getting
23   a letter prepared to go through our digital
24   platform and loading them up on our systems, and
25   then the oversight of those who do that contract

Page 153
Page

1    work are not attorneys.
2             So if you -- if you attribute the
3    increase to -- to something it would -- and you're
4    dividing this into steps, it's Step 1 that
5    increased (audio distortion) attorneys for (audio
6    distortion.)
7        Q    Okay.  So just to be clear, do
8    attorneys make any Step 2 adjudication decisions?
9        A    So I want to define Step 2 to make sure
10   you and I are saying the same thing.
11       Q    Do attorneys make any determination
12   about the percentage of relief that a borrower --
13   that a borrower will get?
14       A    So I would -- I would not call Step 2
15   determination.  I -- I would call Step 2
16   computation because they are not determining --
17   they're not picking winners and losers or
18   percentages.  They're computing a methodology that
19   was given to them as a policy document from the
20   department.  Whatever the number comes out to be,
21   as long as they're compliant with the methodology,
22   that's it.  They're not -- they're not making
23   determinations in that sense.
24       Q    Okay.
25       A    They're technicians performing

Page 154

1   computations, and I think there's a difference.
2        Q    So who -- who performs those
3   computations?
4        A    Policy liaison and technicians that
5   work within the policy liaison teams, the data
6   people.
7        Q    Okay.  And -- and, so -- well, I
8   suppose if -- if you're saying what all the
9   attorneys do is adjudication and Step 1 had been
10  continuing -- had never stopped, why -- why did
11  the BDU need more attorneys?
12        MR. HANCOCK:  Objection: misstates
13  testimony.
14        THE WITNESS:  So is your question why
15  does BDU need more attorneys?
16        BY MS. TORCHIANA:
17        Q    Yes.
18             Why did the BDU need more attorneys?
19        A    Because the volume of claims coming in
20  exceeded the capacity of 10 to 12 attorneys within
21  any reasonable workday.  So if you're receiving
22  2,000-plus claims a week -- and sometimes it was
23  more than that -- and you have 12 attorneys -- 10
24  to 12 attorneys, they can't move that volume.
25  They were not built for that many cases; that

Page 155

1   number was not appropriate for that many cases.
2             So why was there a need for more
3   attorneys?  Like with any organization, we were
4   sizing the workforce to the volume of the work.
5        Q    Okay.  So why did FSA wait until, you
6   know, about September 2019 or so to hire more
7   attorneys?
8        MR. HANCOCK:  Objection: misstates the
9   testimony and asked and answered.
10        THE WITNESS:  So if you decide in March
11  or April and you have approval to hire employees,
12  you start then.  They may not physically be on
13  board until September because government hiring
14  just simply is not as quick as you may think.  It
15  takes several months.  For you to work for Federal
16  Student Aid, you have to pass a security
17  background check which covers your whole life from
18  the time that you were 18 until you get done.  You
19  have to tell them every address that you worked
20  at.  It's a -- it's a full background check.
21             And -- then assuming that process
22  is successful, we then can make an offer to you
23  and establish a date.  That process alone can be a
24  three- or four-month process.  So I can hire you
25  in March, and if you arrive in July, I'm on

Page 156

1   schedule.
2             And in the case of the BD attorneys,
3   you saw decisions and then buildup based on all
4   those required processes.  So as I said earlier,
5   we did begin immediately, and what you see in the
6   numbers is just that, but the process bringing
7   these attorneys on as -- as time would -- would
8   enable it to, given the requirements of working
9   for the federal government.
10        BY MS. TORCHIANA:
11        Q    Okay.  And would you say before this
12  increase of personnel within the BDU, were there
13  not enough attorneys to adjudicate the number of
14  claims coming in?
15        MR. HANCOCK:  Objection: asked and
16  answered.  We've covered this ground a few times
17  now.
18        THE WITNESS:  Yeah, again I'd just say
19  yes.  I don't know what happened before March of
20  2019, ma'am.
21        BY MS. TORCHIANA:
22        Q    Okay.  If you turn to the next
23  paragraph, paragraph 9, you say that the
24  department has issued significantly more decisions
25  finding BD applications ineligible than finding

Page 157

1   them eligible.  This is the result of the
2   department's strategy to prioritize adjudicating
3   and issuing decisions on applications with little
4   or no relevant evidence.
5             So how would you determine what is an
6   application with little or no relevant evidence?
7        A    As the chief operating officer of
8   Federal Student Aid, I don't adjudicate borrower
9   defense claims.  So what we mean by that statement
10  is not how I would determine that.  I would not.
11  I don't adjudicate borrower defense claims.
12             I would -- that is an appropriate
13  question, I think, for one of the borrower defense
14  attorneys who -- whose job is to review the
15  available evidence and in what we have been
16  calling to date to determine if -- if there is
17  evidence sufficient enough to use.
18        Q    Okay.  And would you say from your
19  understanding did the 15,256 denials that were
20  issued in December 2019 -- were those all from
21  applications with little or no relevant evidence?
22        A    I don't know that they all had little
23  or no relevant evidence.  I just know at the time
24  of this report they had been determined to be
25  ineligible.  In -- in the report, I don't -- I

Page 158

1   can't tell you if each one of those cases had --
2   certainly I couldn't tell you if all of them had
3   little to no evidence.  I -- I simply don't know.
4           I could only tell you that they were
5   accounted for as ineligible in our system which
6   is -- which is how I would have been able to write
7   or -- or sign and agree to this -- that number in
8   this report.
9       Q    Okay.  And do you know what the
10  reasoning was to not issue decisions -- denials on
11  applications with little or no relevant evidence
12  until December 2019?
13      A    Could I just ask you to say that one
14  again?  I lost some of it, I think.
15      Q    Yeah.
16          What was the reasoning on not issuing
17  decisions until December 2019 on applications with
18  little or no relevant evidence?
19      A    For -- for all -- for all applications,
20  as I stated earlier, the decision was to wait
21  until we had a methodology developed and to issue
22  decisions, both eligible and ineligible, once that
23  methodology had been produced.  And that
24  methodology was produced, as you said earlier, in
25  around that time frame when we started reissuing

Page 159

1   decisions in December of 2019.
2       Q    Okay.  And you said -- whose decision
3   did you say that was?
4           MR. HANCOCK:  Objection: asked and
5   answered.
6           THE WITNESS:  You're asking me whose
7   decision was it to begin issuing decisions?
8           BY MS. TORCHIANA:
9       Q    To not issue any decisions?
10      A    To not issue decisions.  That was
11  the department's decision to wait until the
12  methodology was -- was developed.
13      Q    Yes, but -- but whose decision in the
14  department was it to wait until the methodology
15  was developed?
16          MR. HANCOCK:  Objection: asked and
17  answered.  This question has been asked and
18  answered at least three times at this point.
19          BY MS. TORCHIANA:
20      Q    You can still answer.
21      A    Yeah, the -- I don't -- I don't know
22  all the inner workings and the conversations of
23  various department officials.  I can say that the
24  under secretary relays those decisions to Federal
25  Student Aid, but I can't tell you -- I can't

Page 160

1   answer your question which is -- which is who made
2   it and when they made it and that kind of thing.
3       Q    Okay.  In paragraph 11, you say, The
4   department may find a claim ineligible when it is
5   not supported by sufficient evidence.
6           And, so, could you tell me what -- what
7   FSA considers sufficient evidence?
8       A    So I -- I would not want to, you know,
9   speak on behalf of the attorneys.  I'm not -- I'm
10  not an attorney.  And, so, the -- the measurement
11  of evidence that qualifies and doesn't qualify
12  those kind of things are within the internal
13  workings of borrower defense.  I wouldn't be in a
14  position to tell you, ma'am.
15      Q    And do you know -- have you heard of a
16  policy within FSA that a signed declaration with a
17  firsthand account is not considered sufficient
18  evidence on its own?
19      A    Can you say that again, ma'am?  A
20  signed what?
21      Q    A signed -- a signed declaration by a
22  borrower is not considered sufficient evidence on
23  its own?
24      A    Right.  I -- I couldn't -- I'm sorry.
25  I couldn't talk to you about that.  I -- I

Page 161

1   wouldn't know.  I couldn't opine even on -- on all
2   of the -- what I would call the legal decisions of
3   adjudicating the claim and determining what
4   evidence rises to the right level to be included,
5   but that would be an appropriate question, I
6   think, for our -- for the internal workings of our
7   borrower defense team.
8       Q    And would you think that something --
9   that if a borrower signs something under penalty
10  of perjury that that should count as evidence?
11      A    I -- I wouldn't have an opinion on that
12  one way or the other.  I would -- I would allow
13  those trained in the legal aspects of what -- what
14  counts, what doesn't count, what's permissible,
15  what's not permissible, what rises to the right
16  level, all those variety of questions would be a
17  part of what the trained attorney would do in --
18  during their adjudication.  They would determine
19  that along with experienced attorneys that are
20  running the borrower defense unit.
21          So, again, I think it's an appropriate
22  question for the attorneys doing the work.
23      Q    Okay.  Okay.  And if you could turn to
24  paragraph 14.  You write, The department's
25  evaluation of, and decision on, any given borrower

Page 162

1  defense application is an individual process.
2          What do you mean by an individual
3  process?
4      A   Can I have a second to reread this,
5  ma'am?
6      Q   Yes.
7      A   (Witness reviews document.)
8      Yes, ma'am.  I -- what I mean in
9  paragraph 14 is that each case on its individual
10 merits and in its own adjudication, so cases are
11 not the same.  And, so, every case deserves to be
12 adjudicated on its own merits by a qualified
13 attorney, and that's why we needed to hire more
14 attorneys because they -- they needed to do that,
15 and that's what I was alluding to in paragraph 14.
16     Q   Would FSA ever do a -- a group
17 discharge for a group of borrower defense
18 applicants who all attended the same school during
19 the same time periods?
20         MR. HANCOCK:  Objection: exceeds the
21 scope of the court-ordered discovery.
22     BY MS. TORCHIANA:
23     Q   You can still answer.
24     A   So I think you said would we ever --
25 would we ever do it.  I -- I wouldn't have an

Page 163

1  answer to an absolute like that.  Would we ever do
2  it?  I don't know if there would be a set of
3  circumstances.  I don't know off the top of my
4  head of a set of circumstances.  But I couldn't
5  tell you if we would ever do it.  I -- I don't
6  know.
7      Q   Okay.  And in paragraph 16, you
8  mentioned that the BDU is continuing its review of
9  common evidence related to several additional
10 schools other than those for which it has so far
11 approved claims, so other than Corinthian and ITT.
12 It has completed a sufficient preliminary review
13 of the common evidence to determine its scope
14 including time periods and particular acts.
15         So do you know where this process is
16 at?
17     A   So borrower defense is an ongoing
18 process.  And by that, I mean, even today I'm sure
19 more cases came in, and so cases come in each
20 week.
21         And part of what we're alluding to
22 there is that as there is evidence on cases and
23 evidence discovered on cases that's unique that
24 borrower defense will continue to review that
25 common evidence and apply it as appropriate if it

Page 164

1  applies to a particular case.  So where are they
2  at?  I don't think they would ever stop that part
3  because the process itself doesn't -- doesn't
4  stop.
5      Q   Okay.  So do you know if there are any
6  approval protocols that have -- that have been
7  developed for schools other than ITT and
8  Corinthian?
9      A   Approval protocols?
10     Q   Yes.
11     A   I -- I'm certain that the director of
12 borrower defense has procedures and processes.
13 I -- I would not be able to enumerate all of them
14 to you, but I'm certain that they -- that the
15 leader of borrower defense -- I'm confident that
16 the leader of borrower defense has procedures and
17 processes in place for multiple different types of
18 claims that come in.
19     Q   Okay.  And as part of setting the
20 metrics of how many borrower defense applications
21 you want to be adjudicated, do you consider how
22 many approval protocols have been developed?
23     A   I -- I do this in collaboration with
24 the subject matter experts, and I take their
25 recommendations, have dialogue on them.  And there

Page 165

1  are a number of things that they consider, some of
2  which I don't know all the things that they
3  consider.  It may -- those -- those capabilities
4  may or may not include approval protocols because
5  that particular term, I'm -- I'm not certain how
6  the borrower defense unit uses that term.
7          So when they -- when the borrower
8  defense unit tells me that, you know, we can get
9  to so many cases per week and if we have these
10 kinds of resources, that's part of the dialogue.
11         There are many things behind there.
12 Approval protocols may be one of them.  I can't
13 say for certain.
14     Q   Okay.  So in paragraph 17, you write,
15 As BDU completes its analysis of common evidence,
16 the department anticipates there may be an
17 increased number of approvals over time.
18         And, so, could you tell me -- do you
19 know how many schools there are -- or how many
20 categories of schools there are where borrowers'
21 applications have been granted so far?
22     A   How many schools -- I just want to
23 repeat and make sure I understand.  How many
24 schools --
25     Q   How many school groups so far are there

Page 166

Page

1  where there have been approvals?

2      A    I -- I don't know that exact number,

3  ma'am.  I -- I -- I don't -- I don't know.

4      Q    Okay.  And then if we could go forward

5  to -- so we don't have to read through them, but

6  in paragraph 23 and 24, you describe some -- some

7  mistaken -- some errors.  So paragraph 23

8  describes mistaken denial letter that went out to

9  a borrower.

10          Have you spotted any other mistaken

11  approval letters that went out?

12      A    (Witness reviews document.)

13          So, ma'am, you mean in paragraph 23

14  when we talk about the letter of ineligibility

15  when it should have been eligibility?

16      Q    Yeah.  Sorry.

17          Has FSA spotted any other mistaken

18  denial letters going out?

19      A    So I -- I don't -- I don't know if

20  we've had any of recent, but it's possible.  It's

21  possible that there could be an error

22  occasionally.

23          I would say that I know that there is

24  not a systemic error or I would know about that,

25  right, because the numbers or the percentages

Page 167

Page

1  would be such that it would rise to a level of

2  discussion.  We have processes in place for that.

3          But if it's an isolated error and we

4  correct it, I may not necessarily know that.

5      Q    So are -- so are any -- would mistaken

6  denial letter, would that error be reported to

7  you, or is there a way to --

8      A    Not necessarily.  You know, again,

9  just -- just so that we have full understanding

10  here, we have -- and I'll give you an example.  We

11  have attorneys in Chicago, and -- and they have

12  supervisors there, and then supervisors within the

13  borrower defense unit within Washington, and they

14  have supervisors that lead up to the borrower

15  defense leader.  Then we have a whole another

16  process for Step 2.

17          There could be -- there could be an

18  error lodged with this customer here, with

19  Ms. Yvette Colon.  There could be an area where we

20  find through our own systems that someone received

21  letter A and should have received another type of

22  error or got our decisions wrong, and we go out

23  and correct it, and that's not necessarily

24  something that would get -- that will get briefed

25  to me.

Page 168

Page

1          If there were large numbers and if

2  there was a systemic problem, that is more likely

3  going to be briefed to me.

4          So -- so knowing that about our process

5  and the scale of it, I could never tell you that

6  there has never been another letter since the one

7  that's referenced in this declaration.

8      Q    Okay.  But you haven't received any

9  reports of any mistaken denial letters?

10      A    Not that I can recall at this moment.

11      Q    Okay.  And have you received any

12  reports of mistaken eligibility letters that went

13  out?

14      A    Not -- not that I can recall at this

15  moment.

16      Q    And have there been reports of any

17  other mistakes by the BDU?

18      MR. HANCOCK:  Objection: overbroad.

19      THE WITNESS:  I -- I don't -- so I

20  don't know if you're asking me -- are you asking

21  me for March 2019 to date have there been any

22  other mistakes by the BDU unit; is that what

23  you're talking about?

24      BY MS. TORCHIANA:

25      Q    Yes, while you've been COO.

Page 169

Page

1      A    Yes, like every other part of our

2  organization -- well, I could never list them to

3  you now -- there are mistakes somewhere within the

4  organization.  How impactful they are, it just

5  depends.  Some are not impactful at all and some

6  may be impactful, but I cannot cite for you any

7  that were of such a significant impact at borrower

8  defense that I would know them right off the top

9  of my head as it relates to what is in question

10  here today.

11      Q    Okay.  Then in paragraph 24 similarly

12  you write, The department will reach out to Sean

13  Doe, who was incorrectly advised that he should

14  file a FOIA request to obtain his records.

15          Do you know if FSA has provided any

16  records to borrowers who have requested them

17  since?

18      A    So if we provided any records to

19  borrowers who have requested them, I would -- I

20  would rather have my folks answer that question

21  because you said "any," and as I said, there --

22  there are a number of cases, and it's -- and it's

23  possible.  I would not want to give you a

24  definitive answer on that.  But I do believe that

25  it's not a matter of a FOIA request as described

Page 170

1    here.
2        Q    Okay.  We're going to switch tacks a
3    little bit and talk about something you mentioned
4    earlier in this declaration.  Sorry to keep going
5    back and forth, but if you go to paragraph 18, you
6    mention that since December 2019, borrower defense
7    applicants whose applications are found ineligible
8    receive one of four form ineligibility letters.
9        Do you know who drafted these form
10   ineligibility letters?
11       A    So the ineligibility letters are -- are
12   drafted.  Do you mean -- and, again, if I can just
13   make sure that I -- that we're using the words the
14   same way.  So the traditional draft, who is the
15   first person that -- that puts the words on a page
16   and -- and asks everyone else what they think
17   about it.
18       That -- drafts would begin in Federal
19   Student Aid inside of our borrower defense unit
20   and of our folks, drafts would begin there.  I'm
21   sure they were created there.
22       Q    Okay.  And who would have drafted them?
23       A    It would have come from our policy
24   liaison and borrower defense units.
25       Q    And who is your policy liaison?

Page 171

1        A    So it's a team of folks.  The -- the
2    leader on the -- in the policy liaison area is a
3    Mr. Ian Foss, and the leader on the borrower
4    defense team I believe is Colleen Nevin.
5        And, so, something like preparing what
6    words should go on a form, which is preparing a
7    draft, would be done collectively between those
8    two parts of the organization.
9        Q    Okay.  So would you say Ian Foss helped
10   draft these form letters?
11       A    Yes, that's what I'm saying.  These
12   letters have been done collaboratively between
13   those two units, one providing --
14       Q    Anybody else?
15       A    Inside of FSA?  I can't say that
16   there's no one else, but from an organizational
17   perspective, it would be those two parts of the
18   organization.  It could be several other people
19   that are involved that have questions or those
20   kind of things, but those two parts of the
21   organization would be involved.
22       Q    Okay.  When you say could be several
23   other people, who do you think those several other
24   people are?
25       A    So what I'm trying to allude to here is

Page 172

1    if they have a question and they go ask somebody
2    that question, it could be anybody in the
3    organization, right.  They may have to ask is this
4    the appropriate line for this or that, and they
5    may want to talk to someone on the loan servicing
6    side or one on the technical writing side.
7    They -- they're working, so they are -- they are
8    bringing their files together to produce a draft.
9        I couldn't tell you everybody they
10   talked to.  I'm just saying that it's possible.
11       Q    And were you involved at all in
12   drafting these form ineligibility letters?
13       A    So when you say "involved," you mean
14   that I knew what was going on?  That I saw the
15   staffing process?  Or do you mean that I was
16   helping to draft it?
17       Q    Any and all of those things.
18       How were you involved in drafting these
19   letters?
20       A    I was not helping to draft the letter.
21   I was not helping to write what words would go on
22   the letter.  I would not be the right person to do
23   that.
24       What I -- what I was doing was making
25   sure that we had an appropriate staffing process

Page 173

1    and that the controls were in place to make sure
2    the right people saw the letter -- letters before
3    they go final.
4        I was very well aware of that.
5        Q    Okay.  And who would you say were the
6    right people to review those letters before they
7    went out?
8        A    The letters are a statement of policy,
9    and -- and so the final letters would have to be
10   gone through the policy outline of the Department
11   of Education and -- and that might be a general
12   counsel review and an ultimate approval through
13   the under secretary.
14       Q    Okay.  So could you -- so would that be
15   Diane Auer Jones would have reviewed them before
16   they went out?
17       A    Yes, if it was a poll- -- it's the
18   policy letter, she or -- now, I don't work inside
19   of her office, so she may have protocols
20   established where someone else in the office sees
21   it.  So I could not say it was absolutely her that
22   saw every letter.
23       I could tell you the Office of the
24   Under Secretary would be a part of the staffing
25   process.

Page 174
Page

1       Q      Okay.  And what was the process for
2   drafting these letters?
3       A      Inside of Federal Student Aid?
4       Q      Yeah.
5       A      I can -- I can tell you that -- I can
6   tell you the offices that worked to put
7   together -- put together these statements and then
8   put together a staff -- what I would call a staff
9   summary sheet for it to be seen by the relevant
10  parties and sent outside Federal Student Aid.
11  That's -- that's essentially the process.
12             So the borrower defense unit, knowing
13  what the law requires in order for a person to
14  come out and come back in with a -- with a claim
15  and then a policy team working to get that on
16  paper and get it approved.
17      Q      Do you know when that process
18  started -- when the process started for drafting
19  these letters?
20      A      No, I don't, and I don't believe it's a
21  specific time because there are four letters, and
22  they don't all begin or end at the same time.  I
23  think they evolved into -- into having four
24  letters.
25             So to answer your questions, no, I

Page 175
Page

1   don't believe I could tell you exactly when the
2   process began.
3       Q      Okay.  We'll -- we'll go through each
4   one and you can tell me when you think the
5   drafting of that specific letter began.
6              And -- and do you know how -- how long
7   it took to develop these letters?
8       A      I do not.
9       Q      Okay.  And in terms of who approved
10  them, it sounds like that was Diane Auer Jones?
11      A      The process --
12      Q      Is that right?
13      A      Yeah, what I would -- what I would say,
14  ma'am, is the approval process involves the policy
15  element, people that could review -- could require
16  review from the Office of General Counsel, and for
17  it to go through the Office of the Under
18  Secretary.
19             As I stated earlier, I can't tell you
20  their internal protocols, if the under secretary,
21  Diane Jones, approved each particular letter.  But
22  I could tell you that the Office of the Under
23  Secretary would have been involved in the approval
24  of those letters.
25      Q      Do you have a sense of how many drafts

Page 176
Page

1   of these letters were produced?
2       A      I do not.
3       Q      Okay.  So if you could turn to
4   Exhibit 13, which has already been marked as
5   Exhibit 13.
6              (Exhibit 13 referred to.)
7       BY MS. TORCHIANA:
8       Q      It will be behind tab 13.  If you could
9   turn to the exhibits, the first one is Exhibit A.
10  There's a cover page that says Exhibit A?
11      A      Okay.
12      Q      So this letter, I can represent to you,
13  is for Corinthian borrowers who assert job
14  placement reclaims that do not meet the
15  eligibility criteria for such a claim.
16             So do you know who prepared this
17  particular letter?
18      A      I do not.
19      Q      Okay.  And do you know --
20      A      Regarding an individual.  When you say
21  "who," you're meaning an individual; correct?
22      Q      Or multiple individuals.  Which people?
23      A      So what I -- what I would say, just to
24  be clear, on none of the letters will I be able to
25  tell you what individual put pen to paper and

Page 177
Page

1   drafted the letter, but I can tell you from an
2   organizational perspective where those kinds of
3   things happen and where -- and where they come
4   from.
5              So if -- if that's the answer to who,
6   you know, that's -- that's what I know about --
7   about the letters and drafting them.
8       Q      Okay.  Sure.  So --
9       A      So if you ask me that question about
10  this particular letter, I would say it is most
11  likely the borrower defense unit and the policy
12  liaison working together collaboratively to
13  bring -- to come together with the draft and then
14  putting it through the staffing process to be seen
15  by the policy element of the Department of
16  Education.
17      Q      Okay.  And do you know if this form is
18  still being used?
19      A      (Witness reviews document.)
20             I don't know if this paper form is
21  still being used, but there is likely a version of
22  this form still being used.
23             So if you mean this exact form produced
24  in this exact way, I don't think so.  I think that
25  hopefully it's been digitized with the other forms

Page 178

1  and being used in that manner.
2      Q    But is it still going out -- is this
3  format of the letter still going out to borrowers?
4  Obviously filled in with relevant information for
5  the borrower specifically.
6      A    I -- I believe in general that is true,
7  but there -- there may be -- you said format, so
8  it doesn't mean it's the exact same letter.  But
9  if you mean the general format is still continuing
10  on today, I don't believe we're sending out
11  notifications.
12      But if we were sending out
13  notifications, if that's your question, would this
14  form be in presence.  I believe in some form, it
15  would be.
16      Q    Okay.  Now could we turn to Exhibit B,
17  which is a couple of pages down.
18      A    Okay.
19      Q    And this is for current payment
20  borrowers who assert the claim other than job
21  placement rights -- or other than job placement
22  reclaim.
23      And if you turn to -- let's see.
24  Sorry.  If you turn to the bottom of page 2, it
25  says, In order to have a successful borrower

Page 179

1  defense claim based on ED's CCI findings, you must
2  have enrolled in one of the covered programs
3  during a listed time period.
4      So do you -- do you know if it's
5  possible for a borrower defense claimant to have a
6  successful claim if he enrolled in CCI outside of
7  the listed time period?
8      A    There may be some other form of --
9  of -- of damage or concern for the borrower, so
10  I -- I wouldn't want to make a blanket statement
11  that said there is nothing.  I -- I would say it
12  just depends on how that attorney would adjudicate
13  the claim.  I don't -- it depends on the
14  circumstances.
15      Q    Okay.  And then if you could turn to
16  Exhibit C, and this form is for non-Corinthian
17  borrowers who attended a school for which the
18  department does not have any common evidence in
19  its possession.
20      And so do you -- what do you understand
21  as -- what is common evidence?
22      A    As I understand it, and I just want to
23  provide the context that I -- I don't adjudicate
24  borrower defense cases, so I'm not an attorney.
25      But my general understanding of this is

Page 180

1  that common evidence is just that; it is things
2  that have been determined, like a program review,
3  where a finding was found against the school and
4  determined to be validated.
5      And, so, it's available for the
6  attorney doing the adjudication to use as a source
7  of evidence.  That could also be Attorney General
8  determinations or other determinations made
9  against a school where -- where if even if the
10  borrower doesn't submit it themselves, it's
11  common -- commonly known and available to be
12  utilized.
13      That's what I believe we -- we mean
14  when we use the term.
15      Q    Okay.  And do you know if --
16      A    I just want to clarify that -- that
17  last -- what I just -- what I just said, I'm
18  giving my understanding of it as a lay -- from
19  a layman's perspective.  That's not something I
20  practice against a borrower defense claim because
21  I don't do it.  So I'm just telling you from a
22  layman's perspective and management of borrower
23  defense, the team, that's how the attorneys have
24  generally explained it.
25      Q    Right.

Page 181

1      And if there's no common evidence, can
2  a borrower's claim be granted?
3      A    So in -- in general and for
4  generalities, can it be?  I would say every --
5  every claim is adjudicated on its own merit as
6  stated earlier, and it just depends on what other
7  things there are and what other things have been
8  brought forth.
9      And, so, I would never say it
10  absolutely could not be or absolutely could be.  I
11  could say that every -- every claim is adjudicated
12  based on its own merit.
13      Q    Okay.  And do you know whether since
14  you've started has any claim been granted for a
15  borrower who attended a school for which there is
16  no common evidence?
17      A    I don't know.
18      Q    Okay.  And if we could turn to the last
19  form, form D, this form is for non-Corinthian
20  borrowers who attended a school for which the
21  department does have common evidence.
22      Could you tell me when form D was
23  developed?
24      A    I -- I could not tell you exactly when
25  it was developed.

Page 182
Page

1    Q    Do you know roughly when it was
2  developed?
3    A    I -- I do not.  I think it evolved over
4  time in the -- in the BD unit and possibly liaison
5  as circumstances dictated that an additional type
6  of form would be needed.
7    Q    Okay.  And what circumstances dictated
8  that an additional form would be needed?
9    A    I don't know exactly other -- other
10  than these -- these forms are created based on
11  what is seen in the claims that are being
12  adjusted.
13        So if you see a circumstance occur
14  enough and you believe that claimants need to be
15  able to have certain information in order to file
16  a particular claim, you might adjust or make sure
17  you design a form with that in mind.
18    Q    Okay.  And, again, for this form D, who
19  designed the form?
20    A    So, again, I would say -- I don't know
21  exactly who, other than forms are a collaboration
22  between our liaison office and our borrower
23  defense office.  That's how forms are drafted and
24  then approved through our policy element at the
25  Department of Education.

Page 183
Page

1    Q    Okay.  And did you have to approve this
2  form before it started being used?
3    A    I don't necessarily approve each form.
4  They go -- they go through the staffing process.
5  The approval of a form is the -- is -- is the
6  policy element of what we do because the forms
7  represent an extension of policy.
8    Q    Okay.  So would you say the denial
9  forms are -- they're under policy?
10    MR. HANCOCK:  Objection: asked and
11  answered.
12    BY MS. TORCHIANA:
13    Q    Okay.  Are the denial forms part of
14  operations?
15    A    So what I -- what I would say is the
16  drafting of policy forms like the ones that we
17  just went through, A through -- through D, begins
18  inside of Federal Student Aid.
19        So it -- it begins as part of
20  operations, but the final form and the decision on
21  what the form -- that the form is appropriate is a
22  policy decision.
23    Q    Okay.  So if you look at form D, it
24  says, applicable law, and is this somewhere where
25  you would expect the state law standard under

Page 184
Page

1  which an application was decided would be if it
2  was decided under the 1995 regs?
3    A    If the appropriate state law?
4    Q    Yes.
5        If -- if a borrower's application was
6  decided according to state law, do you think that
7  law would be stated under the applicable law
8  section?
9    A    Yeah, that would -- exactly where to
10  put something on the form would not be something
11  I'd be prepared to opine on.  Exactly where to put
12  it on the form, I don't know.  I would leave it to
13  those in charge with that to -- tell me --
14    Q    Okay.
15    A    -- the laws.
16    Q    Do you think it would be somewhere on
17  the form?
18    A    I don't know.  I would -- I would look
19  to my attorneys to tell me if state law needed to
20  be on the form or not.  And if -- and if they
21  believe that it would be, it would need to then be
22  put through that staffing process I described
23  earlier to make sure those in charge of the forms
24  and policy elements came to an agreement that, in
25  fact, it should be.

Page 185
Page

1    Q    Okay.  And if you -- if you go to the
2  next page, the section it says, What if I do not
3  agree with this decision?
4    A    Yeah.
5    Q    And then it says, number three is,
6  Identify and provide any evidence that
7  demonstrates why ED should approve your borrower
8  defense repayment claim.
9        And, you know, you noted actually
10  earlier in your declaration -- and we can turn
11  back to it if you want to see that, but you say
12  that FSA will consider any evidence under
13  reconsideration which includes both new evidence
14  and evidence already submitted.
15        When was the choice made to consider
16  any evidence as opposed to new evidence?
17    A    So I don't -- I don't know the exact
18  point -- point in time when that became a matter
19  of policy and certainly a matter of our forms.  I
20  know that it is today, but exactly how -- how long
21  ago that was determined, I -- I don't know.
22    Q    Okay.  And would you say that was a
23  policy decision?
24    A    I'm -- I would -- I would say that
25  those kind of elements on a form, like, time

Page 186

1  periods and what's allowed are policy decisions.
2       Q   Okay.  And if a borrower received a
3  letter, for instance, where the only reason for
4  denial under each allegation was insufficient
5  evidence, how would you expect them to reply?
6           MR. HANCOCK:  Objection: calls for
7  speculation.
8           THE WITNESS:  I'm not -- I'm not
9  certain, ma'am, on how they would reply.  So for
10 an individual, how they would react to that; is
11 that you're asking me?
12      BY MS. TORCHIANA:
13      Q   If they were to submit a request for
14 reconsideration but the only thing that their
15 denial letter said was insufficient evidence, what
16 would you expect them to submit?
17          MR. HANCOCK:  Objection: calls for
18 speculation.
19          THE WITNESS:  So I don't -- I don't
20 believe I'm understanding your question.  Are you
21 asking me to kind of assume what -- what a
22 borrower should do if they get that letter?  What
23 does a borrower do if they have a question; is
24 that -- or -- they don't --
25      BY MS. TORCHIANA:

Page 187

1       Q   No.
2       A   -- know what to do or --
3       Q   We'll get into this more -- we'll get
4  into a specific letter later, but -- but here you
5  say, Identify and provide any evidence that
6  demonstrates why ED should approve your borrower
7  defense to repayment claim.  And let's say that
8  the reason someone got the denial was just
9  insufficient evidence.
10          How do you think -- what would they put
11 in their request for reconsideration?
12          MR. HANCOCK:  Objection: calls for
13 speculation.
14          THE WITNESS:  I -- I don't know.  I
15 don't think I can answer your -- I don't think I
16 can answer your question.
17      BY MS. TORCHIANA:
18      Q   Okay.  Okay.  And do you know -- have
19 any requests for reconsideration been granted that
20 you know of?
21      A   One second, please.
22          (Witness reviews document.)
23          I don't know if any have been -- have
24 been granted.  I only know that some have -- have
25 come in through -- through the process.  I -- I

Page 188

1  don't know -- I can't tell you if any have been
2  granted or where those that have come in stand
3  right now today.
4       Q   Okay.  And how many have come in
5  approximately?
6       A   I don't know.  It's a dynamic process
7  where, you know, things come in each day and
8  they're sorted out, and at some point when we do
9  our next update, if some new have come in, I
10 probably would see it visible through our metrics
11 or be told, but right now today I couldn't
12 speculate on how many would come in.
13      Q   Okay.  When was the last update -- when
14 did you receive the last update that had those
15 numbers?
16      A   I believe it was at end-of-November
17 time frame.
18      Q   Okay.  And at the end of November, do
19 you remember roughly how many requests for
20 reconsideration had been received?
21      A   I do not believe it was that many in
22 relative terms, meaning given the number of claims
23 that we do.  But I don't remember exactly how
24 many.
25      Q   And again, these are -- these are the

Page 189

1  weekly performance metrics we discussed before,
2  correct, that have these numbers?
3       A   They -- they are the metrics for
4  borrower defense, correct.
5           MS. TORCHIANA:  Okay.  And I think I've
6  already asked, but I think we will be asking for
7  those to be produced.
8       BY MS. TORCHIANA:
9       Q   Okay.  Do you know if any requests for
10 reconsideration have been denied?
11      A   As I said earlier, I -- either way, I
12 don't know in the process if we have gotten around
13 to decisions one way or the other on those yet.
14      Q   Okay.
15          MS. TORCHIANA:  Okay.  Why don't we
16 take a ten-minute break if that's okay with
17 everyone.
18          THE WITNESS:  Okay.
19          MR. HANCOCK:  That's fine.
20          THE VIDEOGRAPHER:  Okay.  We are now
21 going off the record.  The time is 20:41 UTC time.
22          (Recess -- 3:41 p.m.)
23          (After recess -- 3:55 p.m.)
24          THE VIDEOGRAPHER:  We're now back on
25 the record.  The time is 20:55 UTC time.

Page 190

1    BY MS. TORCHIANA:
2         Q    Mr. Brown, could you turn to tab 15, so
3    that's Exhibit 15 in the electronic folder.
4              (Exhibit 15 referred to.)
5    BY MS. TORCHIANA:
6         Q    And could you turn to -- it's page 24
7    of 56, and that's in the upper right-hand corner.
8         A    Okay.  I have it.
9         Q    Okay.  And this is the affidavit of
10   Theresa Sweet, the named plaintiff in this case.
11   And as you can see, she -- if you go to
12   paragraph 3, she submitted her application in the
13   fall of 2016.  And if you go to paragraph 4, she
14   received her decision on July 8th, 2020.
15             So how many -- how many years is that
16   just to be clear?
17        A    How many years is it from the fall of
18   2016 to July 8th, 2020; is that -- is that what
19   you're asking me?
20        Q    Yes.
21        A    I believe that is just shy of four
22   years.
23        Q    Okay.  Okay.  And just so we're clear,
24   previously you've said -- what are the -- what are
25   the main reasons you would give for why there was

Page 191

1    a delay in -- in her receiving her answer?
2         A    So just to be clear, I can't give you
3    any information about fall of 2016, '17, '18, up
4    until March 2019.
5              But I can tell you that as of March of
6    2019, the reason that she received, probably,
7    notification is because we addressed the two
8    issues that I brought up.  Those two issues are
9    having enough attorneys to adjudicate a
10   significant workload and investigating in the
11   systems and IT technology required to do this job.
12        Q    Okay.  So would you say the reason she
13   had to wait four years was because there weren't
14   enough attorneys and the IT system needed to be
15   updated?
16        A    I -- I wouldn't because I couldn't talk
17   to you about '16, '17, '18 and some parts of '19.
18   I can only talk to you about March of 2019
19   forward, and I can't even say that this particular
20   case I could tell you that, in general, those are
21   the two reasons that borrower defense wasn't able
22   to move at the speed that they would have liked to
23   have moved.
24        Q    And she attended Brooks Institute, and
25   that is a CEC school, right, the Career Education

Page 192

1    Corporation?
2         A    I -- I wouldn't know.  I have to look
3    on the sheets of paper or sheets that tell you
4    who -- who owns what school.  I haven't committed
5    that to memory, so I don't know.  I don't know.
6         Q    And on that subject, when you
7    communicate with Ms. Diane Auer Jones, do you
8    redact or remove any information related to CEC
9    that you know of?
10             MR. HANCOCK:  Objection: exceeds the
11   scope of the court-ordered discovery.
12   BY MS. TORCHIANA:
13        Q    You can still answer.
14        A    Do I -- do I redact anything as it
15   relates to this particular school?
16        Q    This school group, yes, or remove it or
17   anything like that.
18        A    So I cannot -- I don't know all of
19   the -- I don't know all of the schools, as I said
20   earlier, and the subschools that go -- go under
21   them.  I can tell you that if a -- if a senior
22   official has a conflict of interest because of
23   prior employment or something like that, we would
24   do a redaction.  And in order to say that this
25   particular school and that was required, I can't

Page 193

1    tell you that today.  I would have to go check.
2         Q    Okay.  So when you've exchanged any
3    documents or memos or anything with Diane Auer
4    Jones, have you ever -- do you recall ever seeing
5    CEC removed or redacted or anything like that?
6              MR. HANCOCK:  Objection: exceeds the
7    scope.
8              What category is this relevant to?
9              MS. TORCHIANA:  I would say it's
10   relevant to two and three.
11   BY MS. TORCHIANA:
12        Q    You can still answer unless counsel
13   instructs you not to.
14        A    I -- I don't know the answer, ma'am.
15   I -- I -- again -- I also don't -- I'm not the
16   redactor, and I don't -- I don't redact documents
17   myself, and if it's redacted on a document that I
18   get en route to someone, I don't know what has
19   been redacted.
20             And, so, I'm not in a position to
21   answer your question.
22        Q    Okay.  If you turn to page 28, that's
23   the beginning of Ms. Sweet's application.
24             Have you ever seen an application like
25   this?

Page 194

1      A      (Witness reviews document.)
2             I -- I believe so.  I've seen one with
3      similar categories on it.
4      Q      Okay.  Could you turn to page 30?
5      A      Yes.
6      Q      And here Ms. Brooks [sic] quotes some
7      admissions counselors, so here she says, Admission
8      counselors told her, quote, right out of school,
9      quote -- end of quote that 88 to 90 percent of
10     graduates were employed.
11            There's some quotes in the other
12     paragraphs, et cetera.
13            And then if you could turn to page 44,
14     could you just confirm that this application is
15     signed under penalty of perjury?
16     A      (Witness reviews document.)
17            Do you mean -- do you mean page 45?
18     Q      Yeah.  Sorry.  Page 44 and 45.
19     A      And you're asking me is it signed under
20     penalty of perjury?
21     Q      Yes.
22            And that starts under -- if you start
23     at page 44 at Section 6 and just read through.
24     A      (Witness reviews document.)
25     Q      So is that signed under penalty of

Page 195

1      perjury?
2      A      I'm almost done reading it.
3      Q      Okay.
4      A      (Witness continues to review document.)
5             Yes.  Yes, ma'am.  It says in the
6      second paragraph under Section 6 under penalty of
7      perjury which subsequently she signs on
8      November 4th --
9      Q      Okay.
10     A      -- 2016.
11     Q      Okay.  And so is -- is a firsthand
12     account by a borrower signed like this under
13     penalty of perjury, is that considered evidence?
14     A      I don't know, ma'am.  I would not want
15     to speculate on what our attorneys view as
16     acceptable or unacceptable evidence.  I -- I
17     believe that's -- I would leave that to their --
18     to their decisions space and their expertise.
19     Q      And if you could turn to page 52.  It's
20     a bit -- it's kind of hard to see.  It's a little
21     blacked out.  It's on the top -- top right-hand
22     side.
23     A      I see it.
24     Q      Okay.  And here the -- under allegation
25     number one, it says, This allegation fails for the

Page 196

1      following reasons, failure to state a legal claim.
2             And do you know how -- how would she
3      have written this to state a legal claim?
4             MR. HANCOCK:  Objection: calls for
5      speculation.
6             THE WITNESS:  So, again, I'll just say
7      that I don't adjudicate claims, and I'll leave the
8      adjudication of the actual claims to the borrower
9      defense attorneys that we have.  And beyond that,
10     I could not tell you what to add or delete to a
11     particular claim to make it something different.
12     I -- that's -- that's not my expertise.
13     BY MS. TORCHIANA:
14     Q      On the next page, 53, it says, What
15     evidence was considered in determining my
16     application's ineligibility, and there's a list
17     here.
18            As far as you know, what does it mean
19     to have consulted this evidence?
20     A      So you -- you said consulted this
21     evidence.  Is that term here?  Do we say that
22     here?
23     Q      Considered.  Sure.
24     A      I -- I know the generic meaning of the
25     term "considered."  It means it was included in

Page 197

1      their process; that it was part of the process of
2      things that was looked at.
3      Q      And are there memos or, for example,
4      directives that relate to this evidence as it
5      relates to Brooks as a school?
6             MR. HANCOCK:  Objection: vague.
7             THE WITNESS:  I'm not sure if I
8      understand your question.  Do you mean is there --
9      are there memos within borrower defense or --
10     or --
11     BY MS. TORCHIANA:
12     Q      Yeah.
13     A      -- is there memos --
14     Q      Yes.
15     A      -- that relate to --
16     Q      That relate to this evidence and how
17     it's connected to borrower defense claims from
18     Brooks, for example?
19     A      I believe that -- I believe this is
20     what we consider common evidence, and so whatever
21     it is -- whatever evidence it is is inside of
22     borrower defense.  I don't know if that's
23     answering your question.  I don't know if it comes
24     with a memorandum or if we're just talking
25     documents; I don't know that.

Mark Brown
December 15, 2020                                            198 to 201

Page 198

Page

1              Level of specificity, just that the
2     evidence was reviewed and therefore was probably
3     on hand somewhere within borrower defense.
4         Q      Okay.  We'll -- we'll move on.
5              Could you turn to Exhibit 19 which is
6     behind tab 19?
7              (Exhibit 19 referred to.)
8              THE WITNESS:  I have it here.
9         BY MS. TORCHIANA:
10        Q      Okay.  And -- and just before we --
11    just before we get into that, I wanted to ask a
12    follow-up question about something we were talking
13    about before.
14              Have you seen any documents with
15    redactions -- with, you know, redactions of school
16    groups that are related to borrower defense?
17        A      Have I -- have I seen any documents
18    that were redacted related --
19        Q      Not in --
20        A      -- to borrower defense.
21        Q      Have you seen any documents where the
22    school group -- where any information about a
23    school group is redacted?
24              MR. HANCOCK:  Objection.
25              THE WITNESS:  I have.

Page 199

Page

1              MR. HANCOCK:  Exceeds the scope of
2     court-ordered discovery.
3              THE WITNESS:  So I have seen documents
4     where words are redacted out.
5         BY MS. TORCHIANA:
6         Q      About -- were those words related to
7     specific school groups?
8         A      I don't recall what they were related
9     to, but if you're -- the first part of your
10    question, have I seen documents in the -- in the
11    staffing process and the ruling process where
12    there are -- where there are redactions, I have.
13    I've seen documents where words were redacted out.
14        Q      I don't mean redactions in general.  I
15    meant redactions related to specific school
16    groups.
17        A      That -- that particular -- I -- I just
18    don't recall if it was related to school groups or
19    not.
20        Q      If you could take a look at Exhibit 19.
21    Do you recognize this document -- actually, if you
22    could turn to -- your declaration is in the front,
23    but if you could turn to Attachment 1, that would
24    be helpful.
25              Do you recognize this document?

Page 200

Page

1              MR. HANCOCK:  I'm sorry.  Can I just
2     clarify what document we're looking at?  Is it the
3     Exhibit A in -- in Exhibit 19?
4              MS. TORCHIANA:  No, it's 19, and it's
5     Attachment 1, which is behind Exhibit A.  You see
6     the stamp is page --
7              MR. HANCOCK:  145-2.
8              MS. TORCHIANA:  Yeah, 145-2, page 1 of
9     15.
10             MR. HANCOCK:  Okay.  Thank you.
11             THE WITNESS:  (Reviews document.)
12             This is a -- this is my declaration at
13    Attachment 1, attachment -- or Exhibit A.
14        BY MS. TORCHIANA:
15        Q      Okay.  And when you turn to
16    Attachment 1, have you seen this chart before?
17        A      I -- I have.
18        Q      Okay.  Do you know who put this chart
19    together?
20        A      I -- I don't know specifically who, but
21    I believe it is most likely our borrower defense
22    group and the folks that were in that area.
23        Q      Okay.  And who do you think it would
24    have been in the borrower defense group?
25        A      I would never be able -- I don't know,

Page 201

Page

1     ma'am.  You mean who within all of the borrower
2     defense group that actually did this chart?
3         Q      Yeah, who -- who do you think --
4         A      I don't know.
5         Q      -- compiled it?
6         A      I don't know.
7         Q      Okay.  If you had questions about this
8     chart, about the contents of it, who would you
9     ask?
10        A      So the way we're organized, I would --
11    I would go to the deputy chief operating officer
12    for partner participation and oversight, and I
13    would --
14        Q      And who is that?
15        A      That's Ms. Robin Minor.
16        Q      Okay.
17        A      And I would ask her my question.
18        Q      Okay.
19        A      She might ask who -- whoever is
20    required to get the answer and ultimately I would
21    get my answer then.
22        Q      Okay.  And have you ever -- have you
23    ever asked anybody questions about this chart?
24        A      I don't require -- I don't remember or
25    recall asking questions about this specific

Page 202
Page

1  document.  I do not.
2            However, I see a lot of documents, and
3  I would never tell you in its entirety that this
4  particular document I remember seeing it on that
5  day and I asked or didn't ask questions.  I was --
6  I can only tell you that looking at it now, I
7  don't recall any questions that I would have
8  asked.
9       Q    Okay.  And do you know -- do you know
10  what documents were used to put this chart
11  together, like what are the sources of -- well,
12  why don't you answer that question first.
13       A    What was used to do this chart?
14       Q    Yeah.
15       A    I -- I would assume, and let me answer
16  your -- your question first.  Do -- do I know what
17  documents were used to put together this chart?
18  No.
19       Q    Okay.  What do you -- what do you
20  think -- where do you think this information is
21  coming from or what documents do you think this
22  information is coming from?
23       A    The expertise of the borrower defense
24  unit and their various working papers, those kinds
25  of things.

Page 203
Page

1       Q    Okay.  Okay.  So could you explain to
2  me what column 2 represents?
3       A    Yes, ma'am.  So this chart is -- is
4  listing in column 3 all of the common evidence
5  that has been collected, and in -- and in
6  column 1 -- or available.  And in column 1, the
7  name of the school for which the evidence may
8  relate to.
9            But column 2 sets out some stipulations
10  for which there would be an exclusion -- meaning,
11  if whatever issue is brought up falls within a
12  time frame, for instance, that is not covered, or
13  an enrollment date that's not covered.
14            And while that's not exclusive, it just
15  says in general that the evidence in these time
16  frames are different, and -- and so a claim could
17  be against Apollo Group but be outside the scope
18  of that time period and therefore the common
19  evidence may not apply.
20       Q    So let's take the Apollo Group for
21  example.  So if a borrower is within one of these
22  categories in column 2, that means they don't fit
23  within the evidence that's in column 3; is that
24  right?
25       A    That's -- that's most likely.  That --

Page 204
Page

1  that -- the reasons for which the common evidence
2  is put there is outside of the scope of those
3  dates and things that are provided in column 2.
4       Q    Okay.  So what would happen to an
5  application -- so let's just take this as an
6  example.  What would happen to an application by a
7  borrower who enrolled after October 1st, 2012, and
8  didn't make any allegations relating to
9  partnerships with large companies or programmatic
10  accreditation?
11       A    So if they didn't -- you mean, if they
12  didn't -- if they -- if column 2 applied to them
13  and so none of the common evidence, at least as --
14  as displayed here, was applicable to their case?
15       Q    Yes.
16       A    The -- the attorney would adjudicate
17  the case.
18       Q    Okay.
19       A    And determine it for some other reason
20  that there was reasons for the claim to be
21  relevant.
22       Q    Okay.  And when they were adjudicating
23  the claim, what evidence would they rely on?
24       A    I don't know.  It depends on
25  everything -- every case has to be adjudicated in

Page 205
Page

1  a very individualized way.  So -- so I don't know.
2  I mean, it depends on what came in that case.
3  Maybe something could have been provided by the
4  borrower; maybe there could be something outside
5  of the scope of what's in that common evidence.
6            It just depends.  You could only answer
7  the question that you asked on the specific case
8  and the lawyer here to tell you how that specific
9  case was adjudicated.  I would not want to
10  speculate.
11       Q    Okay.  And you said something that
12  would be outside the scope of common evidence.
13  Can you think of examples of what that would be?
14       A    I -- I could not, but I don't do this
15  on a day-to-day basis.  I'm -- I'm certain that an
16  attorney might find something that if they were
17  seeing all of these, they're familiar with them.
18  They may find something.
19            But if you're asking me what it could
20  be, not -- not knowing Apollo Group or the
21  University of Phoenix or any of these other than
22  the names on the paper, the answer is I don't
23  know.
24       Q    Okay.  And let's say a borrower who
25  fits into this column 2, so let's take a borrower

Page 206

1  from the University of Phoenix who fits into this
2  first category, let's say the only thing they
3  submitted was a firsthand account of their
4  experience signed under penalty of perjury.
5          Would that be considered evidence to
6  support their claim?
7      A    Could you say that again?  I'm sorry,
8  ma'am.  You -- you --
9      Q    I'm sorry.
10     A    Signed under the penalty of perjury,
11  and after that you lost me.  I'm sorry.
12     Q    Okay.  I'll repeat the question.
13         So let's say a borrower who attended
14  University of Phoenix and fits into column 2, so
15  she enrolled after October 1st, 2012, and didn't
16  make any allegations relating to partnerships with
17  large companies or programmatic accreditation, and
18  she had a firsthand account of her experience
19  being defrauded at the University of Phoenix,
20  obviously signed under penalty of perjury.
21         Would her application be considered
22  evidence?
23     A    I -- I couldn't answer.  I would leave
24  the -- kind of the assessment of evidence and what
25  qualifies and what doesn't qualify, what rises to

Page 207

1  the level.  As I stated earlier, that's not an
2  area that I can give you answers on.
3         I go back to my previous answer that an
4  attorney would have to adjudicate this case on its
5  own merits and then they would make the decisions
6  to the kinds of questions and scenarios that you
7  are raising.
8      Q    Okay.  And then what about applications
9  that do fit into the scope of common evidence, so
10  that do fit into column 3?  What happens to those?
11     A    They're adjudicated, and the common
12  evidence is a part of that adjudication.
13     Q    They are adjudicated both at Step 1 and
14  Step 2?
15     A    So to -- kind of recap, Step 1 is
16  the adjudication process.  Step -- Step 2 is when
17  you're using the Department of
18  Education-determined methodology to assess the
19  mathematical part of what percentage of relief
20  will be granted.  And then you'll go on through
21  the administrative process that we talked about
22  for which the borrower would be notified.
23         So at least in the way that I defined
24  it, Step 1 takes care of your adjudication
25  process.

Page 208

1      Q    So to be clear, if an applicant from
2  the University of Phoenix fits into column 3,
3  their application relates to this common evidence,
4  their application would be adjudicated at Step 1?
5          MR. HANCOCK:  Objection: vague.
6          THE WITNESS:  I don't -- I don't know
7  if -- if you're asking me is adjudication going
8  on, do our attorneys the way we describe it here
9  today adjudicate claims in Step 1, then the answer
10  to that question is yes.
11         Again, that answer is yes.  Claims
12  are -- if you're asking me if the Apollo Group
13  and -- and something that's in column 3 absolutely
14  means that a case will be adjudicated under our
15  processes, I can't answer because I don't -- I
16  don't know.  I would -- I would say now the lawyer
17  has the common evidence and the lawyer has
18  everything before them.
19         What they and how they do it is why we
20  have them.  They -- they know those things.  I
21  cannot tell you that absolutely, yes, it would be
22  done, or absolutely, no, it won't be done.  I
23  don't know the answer to that because I'm not a
24  trained attorney.
25         BY MS. TORCHIANA:

Page 209

1      Q    Okay.  And just do you know whether any
2  applicants of the University of Phoenix -- do you
3  know whether any applications have been approved?
4      A    I would want to consult -- I know that
5  there are applications from the University of
6  Phoenix.  I know that they are going through our
7  process.  But rather than just kind of tell you
8  off the top of my head, I would have to have -- I
9  would have to look at the official records and
10  determine.
11     Q    Okay.  And have any been denied?
12     A    Same -- the same answer, ma'am.  I'd
13  have to -- I'd have to look at the official
14  records and then I could cite for you status.
15     Q    Okay.  Let's -- let's go over one more
16  school group.  So could you turn to page 3 of the
17  attachment?  And in the top right corner, it will
18  say page 4 of 5 in the ECF stamp.
19     A    I have 4 of 15; is that right?
20     Q    Yeah, sorry.  Four of 15.
21     A    Okay.
22     Q    So this is Career Education Corp. which
23  we were just speaking about.  And just as a
24  question, do you know whether Diane Auer Jones
25  ever received this fraud list?

Page 210
Page

1    A    Received -- if she received this list?
2    Q    Yeah.
3    A    I -- I don't know.  I --
4    Q    Okay.
5    A    I don't know.
6    Q    And, so, if you could just explain
7  column 2 to me.  It says, Categories of
8  applications determined not to be within the scope
9  of the common evidence listed in column 3.  And
10 then could you -- could you go down and explain --
11 so it says, All schools:  Borrowers who make
12 allegations regarding programmatic accreditations.
13      And then, of course, it says,
14 Applications that do not fit the criteria below.
15      Could you just explain to me how that
16 works?
17    A    Again, column 3 is the available
18 evidence for this particular school that's being
19 characterized as common evidence.  Column 2 is
20 intended to be situations which don't apply to the
21 common evidence found.
22      And, so, I don't know each of these
23 specifics, but at least theoretically that's how
24 that column is designed.  And, so, these things
25 would be those things that don't match to the

Page 211
Page

1  issues that are found in the common evidence in
2  column 3.
3    Q    Okay.  Well -- okay.
4    A    And if you notice, some of these have
5  dates, right.
6    Q    Uh-huh.
7    A    Periods that are very similar to the
8  one we just discussed.
9    Q    Let's say I'm a borrower who attended
10 the Western School of Health and Business or
11 Pittsburgh Career Institute, and I enrolled
12 between May 1, 1999 and May 22, 2004.  Am I within
13 the scope of common evidence or not?
14    A    On the surface of this, based on me
15 reading it, on the surface of it -- and let me
16 just clarify before I answer.  Not for me to
17 determine.  I -- this is not for me to determine.
18      But the intent of, say, that time
19 period does not include what's been found in
20 column 3.  And, so, for the reasons before you,
21 the common evidence of this, I read that to mean
22 that they would not have a claim for that
23 particular common evidence.
24      They may have something else.  There
25 may be other things there.  But that's how I would

Page 212
Page

1  read this.  And the attempt here is to explain
2  that by virtue of -- by virtue of the columns so
3  everyone can see it for these particular schools
4  that are picked.
5      It is not the adjudication of the claim
6  itself.  It's not decisional documents.  Those are
7  things the attorney would be doing for each case
8  individually.
9    Q    Okay.  And do you know how these
10 determinations are made?
11    A    When you say determinations --
12    Q    Of who fits into the scope of common
13 evidence.
14    A    I don't know the particulars about each
15 piece of common evidence because it's -- you know,
16 it's -- it varies.  It depends on which one of
17 these we're talking about and what list we're
18 talking about.
19      But I -- but I do know their findings
20 inside the common evidence, and that's what is --
21 is being used.  And -- and the answer to your
22 question of who determines, I don't know who
23 specifically determines.  I know that this is a
24 function of the borrower defense unit, and
25 therefore this is a product of the borrower

Page 213
Page

1  defense unit.  So the thought for work that has to
2  go into it occurs in there.
3    Q    Okay.  And who do you think would have
4  made these determinations within the borrower
5  defense unit?
6    A    I -- I don't know, ma'am.
7    Q    Okay.  Let's move on to the next
8  exhibit.  Could you turn to Exhibit 18, the -- the
9  oversight committee press release.
10      (Exhibit 18 referred to.)
11      THE WITNESS:  I have it here.
12 BY MS. TORCHIANA:
13    Q    Okay.  And do you recognize this press
14 release?
15    A    I do.
16    Q    I'm sorry.  I didn't -- I didn't catch
17 that?
18    A    I do.
19    Q    Okay.  And have you read it?
20    A    I read this -- if this is an exact
21 copy, which, you know, I'd have to read through it
22 and see.  If this is an exact copy of what was
23 released in the House Oversight Committee, then
24 I've read it.  I have not read what's before me
25 here that I just pulled out of the exhibits.

Page 214

Page

1      I'll just leave it as that.  If it is
2  the -- if it is what was released on around this
3  time from the House committee and I see that --
4  hold on one second and I'll tell you.
5      Q    Okay.
6      A    Hold on.
7           (Witness reviews document.)
8           Yes, ma'am, I read it.
9      Q    Okay.  And do you generally understand
10  the issue that it's discussing?
11      A    I -- I do understand it.
12      Q    Okay.  And had you heard of any issues
13  with this tool that it's discussing?
14           MR. HANCOCK:  I object to the scope --
15  I object to this line of questioning as exceeding
16  the scope of the court-ordered discovery.
17           BY MS. TORCHIANA:
18      Q    You can still answer.
19           THE WITNESS:  Am -- am I required to
20  answer here?
21           MR. HANCOCK:  You may answer, General
22  Brown.
23           THE WITNESS:  Okay.  Can you ask me the
24  question again?  I'm trying to understand.
25           Do I know anything about the press

Page 215

Page

1  release?
2           BY MS. TORCHIANA:
3      Q    No.  Sir, the press release mentions a
4  tool designed to ease the borrower defense
5  application process that was frozen by Diane Auer
6  Jones.
7           And are you familiar with -- with this
8  issue?  Do you remember hearing about it?  Were
9  you involved in it?
10      A    Yes.
11      Q    Okay.  And what was your involvement
12  with this Web tool?
13      A    So whoever wrote this doesn't
14  accurately describe some of the -- the --
15  procedures, the techniques.  And, so, the reason I
16  ask do I have to answer is because I wouldn't use
17  any of the terms that you just read here.
18           You said this tool and a -- I'm
19  familiar with this because we own a digital
20  customer care portal, and the digital customer
21  care portal is a digitized front door for all
22  student engagement products that come out of
23  Federal Student Aid.  It's a part of what we call
24  the next generation of Federal Student Aid.
25           It's -- it's -- so I don't know what

Page 216

Page

1  they mean by tool, but I -- but -- but that's what
2  we -- that's what we had.  The borrower defense
3  form was digitized and placed on the portal so
4  that people could get it and utilize it.
5           This press release is an attempt, I
6  believe, to describe that process.  I would know
7  that process because -- because we own it.  We --
8  Federal Student Aid owns it.  It's the operations
9  of what we do, how we -- how we go out and engage
10  customers of all types and make things intuitive
11  for them to use -- to answer your question of why
12  I would know this particular subject.
13      Q    Okay.  And you said you felt -- or
14  you -- I am -- I suppose you implied you felt this
15  press release was inaccurate.
16           Could you describe to me in your terms
17  or how you understand what happened with -- with
18  this Web tool related to the borrower defense?
19           MR. HANCOCK:  Objection to the scope.
20           BY MS. TORCHIANA:
21      Q    You can still answer.
22      A    So I don't understand this press
23  release.  The distinction here -- the distinction
24  I'm trying to make here is I understand the
25  automation of our forms and the use of them on the

Page 217

Page

1  digital customer care platform.  This is a very
2  technical kind of issue.  I would understand that
3  because it's a part of our operations and what we
4  do.
5           But -- but you're asking me do I
6  understand this press release, I -- I think.
7  And -- and the answer to that is, no, I don't
8  understand this press release other than they're
9  referencing a tool that's a part of what we use in
10  our digital customer care platform.
11      Q    Okay.  And -- and what tool is that?
12  You mentioned it was the -- you mentioned
13  something about the BDU form being placed on the
14  Web site.
15      A    So -- so we automated the form.  We
16  made the form a smart form and placed it as one
17  item on the digital customer care platform.
18           So if you go out to studentaid.gov and
19  you look at the various little symbols out there
20  and you have a FAFSA ID, and you hit this
21  particular icon, you can get into a smart form --
22  or link you can get into a smart form.
23           I believe that's what this press
24  release was attempting to describe.
25      Q    And did Diane Auer Jones stop this

Page 218

1    smart form from going on the FSA Web site or on
2    the digital customer care platform?
3              MR. HANCOCK:  Objection to the scope.
4    BY MS. TORCHIANA:
5         Q    You can still answer.
6              MS. TORCHIANA:  And just for the
7    record --
8    BY MS. TORCHIANA:
9         Q    Well, you can still answer.
10        A    The form is on the -- is on the digital
11   customer care platform today.
12        Q    Okay.  I --
13        A    So nobody stopped it if I understand
14   your question right.  It's there.  It's -- what I
15   describe to you is a reality.  It's the form that
16   people use.
17        Q    Okay.  And at any point, was the form
18   halted or taken down?
19        A    All of our forms, as I spoke of earlier
20   when we were talking about the four different
21   types of forms, all of our forms are -- are
22   elements of policy; they're extensions of policy.
23             And, so, rightfully so, they are
24   staffed through the department, the Office of the
25   General Counsel, the Office of the Under Secretary

Page 219

1    in order to get final approvals.  When those forms
2    are in their final format that they're going to
3    be, we execute by taking them to whatever the
4    delivery mode may be.
5              The form that's attempting -- that
6    we're attempting to describe here today went just
7    like that.  Went through the staffing process.
8    When that staffing process was over, we placed it
9    with our contractor for the purpose of having it
10   on our digital customer care platform.
11        Q    And, so, was it ever removed from the
12   digital customer care platform?
13             MR. HANCOCK:  Objection: scope.
14             THE WITNESS:  Let me make sure I
15   understand your question.  Was it ever removed
16   from the -- you mean, did the form come down and
17   go back up?
18   BY MS. TORCHIANA:
19        Q    Or did it -- was it supposed to --
20   okay.  Did the form go up and then did it go back
21   down?
22        A    Yes.  Yes, the form -- this particular
23   form went up.  It lacked an appropriate control
24   number for what's called paper reduction.  I know
25   this is far more technical maybe than you want,

Page 220

1    but it lacked a control number for paper
2    reduction.  And, so, we took it down to make sure
3    we got that appropriate control number, and then
4    we put back up the exact same form.  So --
5         Q    Okay.  Do you remember how long it was
6    taken down for?
7         A    I don't -- no, ma'am.  I can't tell you
8    how many days.  It wasn't very long.  It did not
9    take very long to -- to do that process and get it
10   back up.  It may -- it may have been three or four
11   days or something like that, but I don't remember
12   exactly how long it was.
13        Q    Okay.  So if you turn to page 3, the
14   press release says, According to the
15   whistleblower, Jones halted the Web tool because
16   it was too user-friendly and would have helped too
17   many borrowers complete the application correctly,
18   without any disqualifying mistakes.
19             Is that accurate?
20        A    I -- I don't know in this case what
21   they are talking about, and that's why I didn't
22   want to comment on the press release.  I -- I
23   don't know -- I couldn't tell you.  I don't know
24   what the whistleblower is referring to.  That's
25   the term they use here, whistleblower said.  I

Page 221

1    don't remember the term "effectively killing"
2    being used in anything or conversation that I've
3    had.
4         Q    Okay.
5         A    I don't know if it's accurate or not,
6    ma'am.
7         Q    Okay.  And have you ever heard anyone
8    with -- or have you ever heard the under secretary
9    suggest that it's too easy to apply for borrower
10   defense?
11             MR. HANCOCK:  Objection to the scope.
12             THE WITNESS:  No, I can't recall her
13   saying it's too easy to apply for borrower
14   defense.
15   BY MS. TORCHIANA:
16        Q    Not necessarily in those words, but
17   anything along those lines?
18             MR. HANCOCK:  Same objection.
19             THE WITNESS:  I don't -- I don't recall
20   her saying that it was too easy to apply for
21   borrower defense.
22             MS. TORCHIANA:  Okay.  Could we take a
23   ten-minute break?  Is that okay with everyone?
24             MR. HANCOCK:  That's fine with me.
25             Is that okay with you, General Brown?

Page 222

1    MS. BERMAN:  Are we wrapping up?
2    THE VIDEOGRAPHER:  You want to go off
3  the record?
4    MS. BERMAN:  Sure.
5    THE VIDEOGRAPHER:  Okay.  We're going
6  off the record.  The time is 21:45 UTC.
7    (Recess -- 4:47 p.m.)
8    (After recess -- 4:55 p.m.)
9    THE VIDEOGRAPHER:  We're now back on
10  the record.  The time is 21:55 UTC.
11  BY MS. TORCHIANA:
12    Q    Okay.  Mr. Brown, I'm -- so there are a
13  couple of questions or topics that I wanted to
14  circle back on.  One thing we've been discussing
15  you mentioned earlier on that there was a decision
16  or guidance not to issue any decisions until the
17  tiered relief methodology was in place.
18    Could you tell me again who made that
19  decision?
20    MR. HANCOCK:  Objection: asked and
21  answered; misstates testimony.
22    THE WITNESS:  So I -- I couldn't -- I
23  couldn't speak to who, specifically the -- kind of
24  the inner workings of what happened at the
25  department.  But I can -- I can tell you that

Page 223

1  policy decisions are -- come to me through the
2  Office of the Under Secretary, and that -- and
3  that this was no different.
4    BY MS. TORCHIANA:
5    Q    So did Diane Auer Jones make the
6  decision that the BDU wouldn't issue any decisions
7  while the Calvillo injunction was in place?
8    MR. HANCOCK:  Objection: asked and
9  answered.
10    THE WITNESS:  I couldn't tell you who,
11  as I said earlier, because I don't know.  But I
12  could tell you that the Office of the Under
13  Secretary would have relayed that decision to me.
14  Lots, you know, could be going on in the decision
15  making process that I'm just not aware of on the
16  policy side.
17    BY MS. TORCHIANA:
18    Q    Did you ask her who came up with that
19  decision?
20    A    No.
21    Q    Okay.  Do you know whether Ms. Colleen
22  Nevin had a role in making that decision?
23    A    So Colleen Nevin is the director of the
24  borrower defense unit, which is part of partner
25  participation and oversight which is within the

Page 224

1  Office of Federal Student Aid.  And I said that to
2  say that they executed decisions on policy.  They
3  don't make them.
4    Q    Do you think Robin Minor would have
5  made that decision?
6    A    So Robin Minor works directly for me as
7  one of the deputy chief operating officers, and
8  the borrower defense unit is under her.  So I say
9  that to say that she works inside of Federal
10  Student Aid, so she would not make a policy
11  decision.  She would execute them.
12    Q    Okay.  And would Secretary DeVos have
13  made that decision?
14    A    So again, as I said earlier, I don't
15  know who made the decision.  The decisions on
16  policy come from the Department of Education and
17  are relayed to me through the Office of the Under
18  Secretary.
19    Q    Okay.  And similarly, for the denial
20  letters, who -- who has the authority -- just
21  going back -- back to that subject -- who has the
22  authority to authorize changes to the form of
23  denial letters?
24    A    Who has the authority to authorize --
25    Q    Any changes to the form of denial

Page 225

1  letters?
2    A    To the denial letter forms?  You mean
3  take off question 3 and put on question 4, those
4  kind of things?
5    Q    Yeah.
6    A    The final -- the final decision on what
7  goes on at what -- what -- how the form will be
8  constructed, what it will have on it is a -- is,
9  in fact, an extension of policy.  It's a policy
10  decision.
11    Q    So would -- would Diane Auer Jones have
12  the final say over whether to approve any changes
13  to the denial forms?
14    A    So I couldn't tell you who, but I -- I
15  could tell you that those -- those policies would
16  go through the process of Office of General
17  Counsel, Office of Under Secretary, and we would
18  have to have something back in general from --
19  from those offices before we would move forward
20  with an approved form.
21    Q    And then to go back to another
22  question, when we spoke about the partial relief
23  methodology, part of that involves earnings
24  tables, it sounds like.  How many schools has the
25  department issued earnings relief tables for?

Page 226
Page

1           MR. HANCOCK:  Objection.  It exceeds
2    the scope of discovery.
3           THE WITNESS:  I don't know, ma'am.
4    BY MS. TORCHIANA:
5       Q    You don't know.
6            Okay.  Do you think knowing that
7    information would have been relevant to setting
8    your -- your target metrics for the number of
9    adjudications going out?
10      A    Just to be clear, I said I didn't know.
11   I didn't say that there wasn't someone who may
12   have known and may have been a part of that and it
13   may have been a part of the setting and the
14   establishing of metrics.
15           But if you are assuming the premise
16   that it wasn't used in that discussion, I can't
17   validate that that premise is correct.  I could
18   only say that I don't know.  You know, I couldn't
19   tell you which ones were in and which ones were
20   out at that time.  I couldn't tell you that the
21   subject matter experts and the technicians and the
22   policy liaison folks and the folks that are inside
23   the bowels of the organization, they may have been
24   familiar with that, and it could have been a part
25   of their deliberations, but I don't know

Page 227
Page

1    personally.
2       Q    Okay.  And that 150,000 number of
3    targeted adjudications for borrower defense
4    applications, by adjudications, is that decisions
5    that have been processed and sent to borrowers, or
6    what do you consider an adjudicated decision that
7    counts towards that 150,000?
8       A    So when I look at the metric, I take a
9    holistic look at it.  And so to get a check in
10   that column, I'm looking for the full circle,
11   which is what we have called today Step 1 and Step
12   2, to have been completed.
13      Q    Okay.  Okay.  I have a couple more
14   things to go over, and then -- so -- so could you
15   turn to tab 33?
16           MS. TORCHIANA:  And could we mark that
17   as Exhibit 30?
18           (Deposition Exhibit 30 was marked for
19   identification and attached to the transcript.)
20   BY MS. TORCHIANA:
21      Q    And are you familiar with this speech
22   by Secretary DeVos?
23      A    (Witness reviews document.)
24           I'm familiar with the event.  The --
25   the speech itself, I have not read through this

Page 228
Page

1    full -- through this full speech.  But if you --
2    by familiar, do you mean if I know when this was
3    given, the title that's up at the top and --
4       Q    Were you there?
5       A    It's all -- it was a virtual
6    conference.
7       Q    Okay.  Were you listening -- did you --
8    did you hear this speech?
9       A    I was virtually there.  I -- I was -- I
10   was on the -- on the platform, I think would be
11   the way to -- to explain it.  And I did the
12   introduction, and I listened while the speech was
13   given.
14      Q    Okay.
15      A    So if -- if that -- if that is what you
16   mean by am I familiar with it, in that regard, I
17   am.  But if -- but if you mean have I read this
18   speech, the script that was provided here in the
19   information that you sent me, then the answer to
20   that is I have not.
21      Q    Okay.  And could you go to page 3 of 6?
22   It's in small -- it's on the bottom right-hand
23   side of the page.
24      A    Yes, ma'am.
25      Q    And could you read me the paragraph

Page 229
Page

1    that starts with, Still more advance?
2       A    Still more advance the truly insidious
3    notion of government gift giving.  We've heard
4    shrill calls to cancel, to forgive, to make it all
5    free.  Any innocuous label out there can't
6    obfuscate what it really is: wrong.
7       Q    Okay.  And what do you -- what did you
8    understand this to mean, or what do you understand
9    this to mean?
10           MR. HANCOCK:  Objection: exceeds the
11   scope of discovery.  What's the relevance of this
12   to the court's three categories?
13   BY MS. TORCHIANA:
14      Q    You can still answer.
15      A    You're asking me what do I believe that
16   statement is?
17      Q    Yeah, what do you understand this
18   statement to mean.
19           MR. HANCOCK:  Calls for speculation.
20           THE WITNESS:  I am -- can you give me a
21   second to read it again?
22   BY MS. TORCHIANA:
23      Q    Yeah.
24      A    (Witness reviews document.)
25           I don't know what it means.  It was --

Page 230

1   it was obviously written by a speechwriter.  Those
2   are not -- those are not terms I use.  I don't --
3   I don't know what it means.
4       Q    Okay.  And -- sure.
5            And have you ever heard Ms. DeVos in
6   your private meetings with her express these same
7   sentiments?
8            MR. HANCOCK:  Object to the scope of
9   discovery, and I'm going to instruct the witness
10  not to answer.
11           MS. TORCHIANA:  Okay.  Could -- could
12  we go off the record?
13           MR. HANCOCK:  Sure.
14           MS. TORCHIANA:  I think that's
15  exactly --
16           THE COURT REPORTER:  Wait, wait, wait.
17  Wait a minute.  Wait a minute.  You're not off.
18  He's got to read you off.
19           MS. TORCHIANA:  I'm sorry.
20           THE COURT REPORTER:  That's okay.
21           THE VIDEOGRAPHER:  We're going off the
22  record; right?
23           THE COURT REPORTER:  Yes.
24           MS. TORCHIANA:  It seems to be --
25           THE COURT REPORTER:  Yes.

Page 231

1            Wait a minute.
2            MS. TORCHIANA:  -- relevant --
3            THE COURT REPORTER:  Wait a minute.
4            MS. TORCHIANA:  -- to point --
5            THE COURT REPORTER:  No.  He asked the
6   question.
7            Dan, yes, please take us off the
8   record.
9            THE VIDEOGRAPHER:  Thank you.  We're
10  now off the record at ten -- 23:07 UTC.
11           (Recess -- 5:07 p.m.)
12           (After recess -- 5:09 p.m.)
13           THE VIDEOGRAPHER:  We're now back on
14  the record.  The time is 22:09 UTC time.
15           BY MS. TORCHIANA:
16      Q    Okay.  And, so, Mr. Brown, are you --
17  are you declining to answer what you think this
18  sentence means?
19      A    The answer is I don't know.
20      Q    You -- you don't know.  Okay.
21           Okay.  Let's move on.  Let's go to our
22  final exhibit, and then we'll be done.
23           Could you turn to Exhibit -- let's
24  see -- Exhibit 12?
25           (Exhibit 12 referred to.)

Page 232

1            THE WITNESS:  Yes.
2            BY MS. TORCHIANA:
3       Q    Okay.  And are you familiar with this
4   PowerPoint?  Have you seen it before?
5       A    (Witness reviews document.)
6            So, ma'am, I believe I have seen it
7   before.
8       Q    Okay.  So when did you see it?
9       A    I cannot -- I cannot tell you when, but
10  I believe in some of our staff at work and our
11  updates, I have seen these charts before.
12      Q    Okay.  And in what context would you
13  have seen it?
14      A    Updates from the borrower defense team,
15  preparing for updates, those kinds of things.
16      Q    Okay.  And did you receive regular
17  updates from the borrower defense team?
18      A    So I don't know.  I would say the
19  updates from the borrower defense team I receive
20  vary, as I stated earlier.  It just depends on
21  what's going on, you know, what needs to be
22  discussed, and I'm not sure if you would consider
23  that regular or not.
24      Q    Okay.  And this presentation is from
25  August 21st, 2019.  And if you turn to page 2, it

Page 233

1   says, Total borrower defense applications as of
2   the week ending August 6th, 2019.
3            Do you know whether these presentations
4   were given weekly or . . .
5       A    (Witness reviews document.)
6            No, I can't tell you that they were
7   given weekly.
8       Q    Okay.  And were you -- was this
9   presentation given to you, or in what context did
10  you see this PowerPoint?
11      A    Because these -- because I have seen, I
12  think, most of these slides at different times and
13  perhaps some more than once over time.  Your
14  particular question of when was this presentation
15  given to me, I don't -- I don't know that date.  I
16  just can say for sure that I have seen the slides
17  that you are talking about.
18      Q    Okay.
19      A    It's not all at the same time is my
20  point.  Different things, different types,
21  different updates.
22      Q    Okay.  And the second line says, 38,700
23  applications have been adjudicated but not yet
24  processed.
25           As -- as we've been describing it,

Page 234

1   would you describe this as Step 1?
2       A   You -- you mean the adjudication part?
3       Q   Adjudication but not yet processed.
4       A   So Step 1 is the adjudication, so I
5   would describe that 38,700 as having completed
6   Step 1.
7       Q   Okay.
8       A   I would not describe it as Step 1 and
9   Step 2 because the sentence says have not been
10  processed.
11      Q   Okay.  And it says over 27,700 approved
12  applications will be finalized.
13          So are these grants?
14      A   I'm sorry.  Did you say "grants"?
15      Q   Yeah.
16      A   No, we don't do grants, ma'am, in
17  borrower defense if I understand your question
18  right.
19      Q   Are -- are these approvals, approved
20  applications where the borrower made a successful
21  claim for borrower defense?
22      A   These are -- these are borrower defense
23  claims that have determined that the borrower is
24  eligible for a borrower defense claim.
25      Q   Okay.

Page 235

1       A   But there's no relief methodology is
2   what that note is saying at the time or one is not
3   ready, and so they can't go through that second
4   part of the process.
5       Q   Okay.  And then if you could turn to
6   the next page, it says the -- the six stages of a
7   BD application, and below intake borrower
8   increase, it says, School response, New under the
9   2016 regulations.
10          As you understand it, what does that
11  entail?
12      A   It -- it entails letting a school know
13  that a claim has been filed against that school
14  and -- and showing the school that the evidence or
15  documentation that was used in providing an
16  appropriate amount of time for the school to
17  respond back so that the lawyer, that part of it,
18  can do the adjudication.
19      Q   Okay.  When did the department start
20  issuing school responses -- or start soliciting
21  them?
22      A   So claims -- claims are covered by the
23  rule, I think, that was in place at the time.
24  And, so, there are -- there are certain dates that
25  fall under the 2016 rule.

Page 236

1       So as soon as you would get to a
2   2016 -- a claim that's filed under the 2016 rule,
3   then you would be required by that requirement to
4   go to the school for notification and -- and
5   whatever documentation or input they would want to
6   bring back.
7       So when?  Whenever we got to a claim
8   that's -- that the dates of that particular claim
9   made it fall under the 2016 rule.  I -- I don't
10  know that exact date, but that's when the borrower
11  defense team would have had to have sent
12  information to the school.
13      Q   Okay.  And do you know how many schools
14  you've sent out this request for responses to?
15      A   I -- I don't.  I don't know how many
16  claims have fallen under the 2016 rule yet.
17      Q   All right.  Okay.  And then I -- on the
18  next page, on page 4, it says at the bottom, A
19  decision on the relief methodology would result in
20  the ability to proceed with approximately 40,000
21  applications.
22          Could you explain to me what -- what
23  that means?
24      A   That -- that Step 1 had been completed.
25  There were 40,000 applications that had come in,

Page 237

1   and that once we had a relief methodology, we
2   could do the mathematical computations if -- if
3   appropriate for these 40,000, and they could be --
4   notifications could be sent out.
5       Q   Okay.  And do you know whether this
6   included schools other than CCI and ITT?
7       A   I don't -- I don't know.  I would have
8   to go back into the numbers and see, but because
9   it says August 2019, the majority of those cases
10  at the front part of the cycle are CCI and ITT.
11          THE COURT REPORTER:  I'm sorry.  I
12  missed the last part.  The majority of those cases
13  at the front part?  Is that what you said?
14          THE WITNESS:  The majority of those
15  cases at the front part of the cycle are CCI and
16  ITT.
17          THE COURT REPORTER:  Thank you.  Thank
18  you.
19          BY MS. TORCHIANA:
20      Q   Okay.  And if you turn to the sixth
21  page of the PowerPoint, it says, Why are BD
22  applications on hold.  And it says, No relief
23  methodology developed for non-CCI claims.
24          So -- so this presentation was given in
25  August of 2019.  So was there any relief

Page 238

1    methodology for non-CCI claims that had started to
2    be developed at that time that you know of?
3         A    Ma'am, could you -- could you repeat
4    that question again?  I'm sorry.
5         Q    Yeah.
6              So this presentation is from
7    August 2019, and it says, No relief methodology
8    developed for non-Corinthian claims.
9              So do you know whether at the time this
10   presentation was given was there any relief
11   methodology being developed?
12        A    August of 2019?
13        Q    Uh-huh.
14        A    Relief methodology was being worked on.
15        Q    Okay.  And why had it not yet been
16   completed?
17        A    The policy element wasn't done is
18   all -- all that I can tell you.  Why?  I don't
19   know other than I can tell you it's not simple.
20   It's a complex work that they have to do.  Beyond
21   that, I couldn't tell you why it wasn't completed.
22   I'm just sure that we weren't using one yet
23   because that happened December of 2019.
24        Q    Okay.  And what did you understand as
25   the -- what -- what was missing for the

Page 239

1    methodology to be completed?  What -- what stage
2    of the process was it at?
3         A    I don't know.
4         Q    And there's also here -- it says, No
5    processing systems available from summer 2018 to
6    the present due to platform development and
7    migration.
8              Could you tell me who decided that
9    applications would not be processed during this
10   platform and migration?
11        A    I don't -- I don't know -- I started
12   work at Federal Student Aid as the chief operating
13   officer in March of 2019, so I don't know if
14   there's a decision in 2018 related to the
15   platform.
16             But as I stated earlier, the two things
17   that needed to get done were more attorneys and
18   more resources in the development of the platform
19   in order to make the borrower defense process
20   work.
21        Q    And what about the platform is being
22   developed?
23        A    So I can't speak again for what's
24   referenced here in 2018.  I don't know.  But we
25   needed a more advanced data collection system so

Page 240

1    that it would match loan -- claims to loan numbers
2    and then follow the data through the system so
3    that accountability was much -- much tighter.
4              The -- the platform was developed for
5    customer inquiries because we never anticipated
6    years ago having over 200,000 claims under --
7    under this statute of borrower defense.
8              And, so that -- using that platform,
9    it had to be upgraded, as you can imagine, to
10   handle more data, to handle more content and to
11   also move data from one system to the next.  All
12   of that was required because this was no longer
13   a -- an Excel spreadsheet operation.  This -- this
14   was a major case management processing, and that's
15   what -- that's what's meant occasionally through
16   here when we reference the platform, the upgrades
17   that needed to happen.
18        Q    Okay.  And have these upgrades -- have
19   they been completed?
20        A    So with technology systems, you know,
21   completed is kind of an optimistic term.  I would
22   say that they are working much better today, and
23   they are fully utilized, but I don't know that
24   there aren't some more upgrades that are planned
25   down the road for -- for this system.

Page 241

1         Q    Okay.  So this says, No processing
2    systems available.  So at what point would you say
3    there was a processing system that was available?
4         A    I -- you know, I -- I can't speak again
5    to 2018, but when we got into the April, May, June
6    timeline -- timeline coming into July and August
7    and September of -- of 2019, we had already begun
8    to resource those upgrades and had what I would
9    call a functioning -- a functioning system from
10   which we could go forward on.
11        Q    Okay.  Well -- okay.  It says, No
12   processing systems available from December 2018 to
13   the present, and the present is August 2019.
14        A    Yeah.
15        Q    And it says, Upgrades to platform to be
16   completed by August 30th.
17             So would you say by August 30th the
18   updates were completed, or what -- what happened
19   there?
20        A    I can't -- I can't recall those exact
21   dates, but I know that we began putting financial
22   instructions into the systems in those months that
23   I just named to -- to make it functional.
24        Q    Okay.  And who made the decision to
25   stop processing applications while these

Page 242

1  processing systems were being updated?
2          MR. HANCOCK: Objection: asked and
3  answered.
4          THE WITNESS: I -- I wasn't there in
5  2018, ma'am. I don't . . .
6      BY MS. TORCHIANA:
7      Q   Okay. And do you think decisions could
8  have been adjudicated while the platform is being
9  upgraded?
10     A   I -- I don't know if I answered your --
11 you're asking me were we allowed to continue
12 adjudicating decisions in -- in 2000- -- if you're
13 asking me from March 2019 through the summer of
14 2019 and the fall, when these system changes
15 continuing to go on and upgrades continued to
16 happen, if we were able to adjudicate cases. I'm
17 just trying to repeat what I think you're -- is
18 that what you're asking me?
19     Q   Yes.
20     A   And, so, again I would say that
21 adjudications have never stopped. They have
22 continued on. But -- but keep in mind what we're
23 talking about is Step 2, the processing of -- of
24 things which is not in Step 1. And, so, the
25 relationships to adjudications, you can do

Page 243

1  adjudications, but you can't do it with a high
2  level of efficiency the processing in the mass
3  numbers we're talking about minus some of the IT
4  support that this briefing that you're referencing
5  here is getting at.
6      Q   And could Step 2 decisions have gone
7  out while the platform was being updated?
8      A   Step 2 decisions or borrower
9  notifications, those kinds of things, required a
10 methodology that would be used to compute things.
11 And, so, we mixed a few things up. Until you had
12 the methodology, platform, no platform, decisions
13 aren't going out at least that require relief.
14 And, so, what caused the decisions to go out was
15 the announcement of a methodology December 2019.
16     Q   Okay. And you've repeatedly mentioned
17 that one of the issues holding back issuing
18 decisions was staff limitations and IT
19 limitations. So when you talk about IT, is this
20 what you're talking about, the processing system
21 that had to be upgraded, or were you speaking
22 about something else?
23         MR. HANCOCK: Objection: misstates
24 testimony.
25         THE WITNESS: Could -- could you say

Page 244

1  some of that again, ma'am, maybe in --
2      BY MS. TORCHIANA:
3      Q   Yeah. So when we've been speaking,
4  you've mentioned that two of the major limitations
5  to the BDU were staffing and IT concerns; is that
6  right?
7      A   That's correct.
8      Q   And was the -- the IT concern in
9  question, was this -- when you were referring to
10 that, were you referring to this processing system
11 that was being updated from summer 2018 to present
12 or something else?
13     A   I was -- I was referring to the
14 platform which is used to process borrower defense
15 applications, and I believe that's the same thing
16 that's being referred to here.
17     Q   Okay. And what changes were made to
18 that platform?
19     A   We've -- we began to use a -- a -- a
20 system known as SalesForce. We upgraded the --
21 the database to be able to hold that. We
22 increased the capacity for numbers of documents
23 and a series of other technical upgrades to the --
24 to the program and software that we're using that
25 I'm certainly not technically qualified to lay out

Page 245

1  for you in total.
2          But it's those kinds of upgrades where
3  you increase both the capacity and the memory; you
4  increase the speed; you increase the level of
5  details that you're able to get out of the -- the
6  system; all of those kind of things.
7      Q   Okay. And how long did it take to
8  upgrade those things?
9      A   I -- I don't remember the total amount
10 of time because they're done in phases, like phase
11 one and phase two and phase three. They're all
12 bringing up, you know, additional capability.
13         But the system was being upgraded and
14 worked on throughout the spring and summer of
15 2019, I believe.
16     Q   Okay. Okay.
17         MS. TORCHIANA: I think -- I think
18 that's it. We've gone through most of my
19 questions and you, know, I'm sure everyone's
20 tired, so . . .
21         MR. HANCOCK: Okay.
22         THE WITNESS: If you're -- if you're
23 done, ma'am --
24         THE VIDEOGRAPHER: Should we conclude?
25         MS. TORCHIANA: Yes.

Page 246

```
Page
1        THE VIDEOGRAPHER:  All right.  This
2   concludes today's deposition.  We're now going off
3   the record.  The time is 22:32 UTC time.
4        MR. HANCOCK:  Before you go -- before
5   you go --
6        MS. TORCHIANA:  Actually, sorry.
7        MR. HANCOCK:  Dan?
8        THE VIDEOGRAPHER:  Yes.
9        MR. HANCOCK:  I would like to reserve
10  the ability for the witness to read and sign the
11  transcript.
12        MS. TORCHIANA:  I would also like to
13  reserve the right to keep the deposition open, and
14  if we learn of anything that we need to, you know,
15  reopen this deposition for . . .
16        THE VIDEOGRAPHER:  Okay.  Shall we
17  close it again?
18        MS. TORCHIANA:  Yes, thank you.
19        THE VIDEOGRAPHER:  We're now off the
20  record.  The time is 22:32 UTC time.
21             (Signature having not been waived, the
22  Remote Videotaped Deposition of MARK BROWN ended
23  at 5:32 p.m.)
24
25
```

Page 247

```
Page
1             REPORTER'S CERTIFICATE
2        I, Dana C. Ryan, Certified Shorthand Reporter in
3   and for the State of Maryland, hereby certify that
4   the deponent was by me first duly sworn and the
5   foregoing testimony was reported by me and was
6   thereafter transcribed with computer-aided
7   transcription; that the foregoing is a full,
8   complete, and true record, to the best of my
9   ability, of said proceedings.
10  I further certify that I am not of counsel or
11  attorney for either or any of the parties in the
12  foregoing proceedings and caption named or in any
13  way interested in the outcome of the cause in said
14  caption.
15  The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's
17  certificate null and void.
18  In witness whereof, I have hereunto set my hand
19  this day: December 18, 2020.
20  ___X____   Reading and Signing was requested.
21  _____   Reading and Signing was waived.
22  _____   Reading and Signing was not requested.
23
24
25  Dana C. Ryan, RPR, CRR
```

Page 248

```
Page
1             INSTRUCTIONS TO WITNESS
2
3             Please read your deposition over
4   carefully and make any necessary corrections.  You
5   should state the reason in the appropriate space
6   on the errata sheet for any corrections that are
7   made.
8             After doing so, please sign the errata
9   sheet and date it.
10             You are signing same subject to the
11  changes you have noted on the errata sheet which
12  will be attached to your deposition.
13             It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to do
17  so, the deposition transcript may be deemed to be
18  accurate and may be used in court.
19
20
21
22
23
24
25
```

Page 249

```
Page
1             E R R A T A   S H E E T
2   IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,
3   in her official capacity as Secretary of the
4   United States Department of Education.
5   RETURN BY: _____
6   PAGE  LINE              CORRECTION AND REASON
7   _____ _____             _____
8   _____ _____             _____
9   _____ _____             _____
10  _____ _____             _____
11  _____ _____             _____
12  _____ _____             _____
13  _____ _____             _____
14  _____ _____             _____
15  _____ _____             _____
16  _____ _____             _____
17  _____ _____             _____
18  _____ _____             _____
19  _____ _____             _____
20  _____ _____             _____
21  _____ _____             _____
22  _____ _____             _____
23  _____ _____             _____
24  _____ _____             _____
25  (DATE)                  (SIGNATURE)
```

Page 250
Page

```
1              ACKNOWLEDGMENT OF DEPONENT
2              I, Mark Brown, do hereby acknowledge
3       that I have read and examined the foregoing
4       testimony, and the same is a true, correct and
5       complete transcription of the testimony given by
6       me and any corrections appear on the attached
7       Errata sheet signed by me.
8
9
10
11      _____    _____
12      (DATE)                   (SIGNATURE)
13
14
15              CERTIFICATE OF NOTARY PUBLIC
16      Sworn and subscribed to before me this
17      _____ day of _____, _____
18
19
20      _____    _____
21      NOTARY PUBLIC            MY COMMISSION EXPIRES
22
23
24
25
```

**Exhibits**

**EX 0024 Brown 121520**
6:10 15:12,13
**EX 0025 Brown 121520**
6:12 19:9,10 112:5
136:21,22
**EX 0026 Brown 121520**
6:13 56:6
**EX 0027 Brown 121520**
6:16 136:15,17
**EX 0028 Brown 121520**
6:19 141:9,10
**EX 0029 Brown 121520**
6:21 56:4 142:4,5
**EX 0030 Brown 121520**
6:25 227:17,18

---

**1**

**1**  100:24 101:1,15
102:9,16,18,21
103:7,13,19 104:16,
17 124:11 125:5,11,
21,23 126:18,25
147:14 151:8,9,12,
17,18 152:8,18 153:4
154:9 199:23 200:5,
8,13,16 203:6
207:13,15,24 208:4,9
211:12 227:11 234:1,
4,6,8 236:24 242:24
**1,000**  138:19,25
**1,453**  127:13
**10**  48:17 55:20 91:5,
17,18 92:22 93:3
103:4 126:7 154:20,
23
**10th**  112:9
**11**  160:3
**11:16**  57:16
**11:30**  57:17
**11th**  136:24
**12**  48:17 91:5 103:4
126:7 154:20,23,24
231:24,25
**12:43**  105:9,16
**13**  176:4,5,6,8
**14**  161:24 162:9,15

**145**  141:7
**145-2**  200:7,8
**15**  190:2,3,4 200:9
209:19,20
**15,256**  157:19
**150,000**  64:15 87:9,14
227:2,7
**15:03**  9:10
**15:05**  11:25
**15:08**  12:5
**15th**  9:10
**16**  16:8 55:22,23
56:10 128:19 163:7
191:17
**16,045**  136:25
**160,000**  64:15 71:15
**16:16**  57:15
**16:30**  57:19
**17**  127:18,19 130:20
165:14 191:3,17
**17:43**  105:15
**18**  94:24 129:11
155:18 170:5 191:3,
17 213:8,10
**18:18**  105:19
**19**  73:10 191:17
198:5,6,7 199:20
200:3,4
**193**  75:24
**1986**  15:24
**1995**  184:2
**1999**  211:12
**19:05**  136:9
**19:20**  136:13
**1:18**  105:17
**1st**  204:7 206:15

---

**2**

**2**  20:17 100:24 101:1,
15,16 124:11 125:17,
21 147:15,16 151:18
152:10,12 153:8,9,
14,15 167:16 178:24
203:2,9,22 204:3,12
205:25 206:14
207:14,16 210:7,19
227:12 232:25 234:9
242:23 243:6,8

**2,000-plus**  154:22
**20-**  56:4
**200,000**  240:6
**2000-**  242:12
**2004**  211:12
**2012**  204:7 206:15
**2016**  190:13,18 191:3
195:10 235:9,25
236:2,9,16
**2017**  57:7 73:23 76:9,
17 77:13,14,15
78:11,12 79:18 94:24
95:21
**2018**  17:2,16,19,22
35:24 37:24 38:15
40:3 41:9 52:13 92:1
102:8,15 125:24
239:5,14,24 241:5,12
242:5 244:11
**2019**  17:11,15,16
20:19 27:14 35:24
36:11,12 37:12 38:18
40:24 44:13 47:4
50:20 52:3,9 56:25
57:2 75:3 91:3,6,22,
24 93:4 102:13
103:18 112:9 113:19
114:6 123:5,13
125:24 130:9,17
136:24 140:1,5,12,
13,19,24 143:1,7
150:8 151:4 155:6
156:20 157:20
158:12,17 159:1
168:21 170:6 191:4,
6,18 232:25 233:2
237:9,25 238:7,12,23
239:13 241:7,13
242:13,14 243:15
245:15
**2020**  9:10 63:22 64:7,
11 65:17,23 71:15
81:23 87:10 88:13
136:16 190:14,18
**20:41**  189:21
**20:55**  189:25
**20th**  77:12,14
**21:45**  222:6
**21:55**  222:10
**21st**  232:25
**22**  211:12

**227,000**  128:3 129:8
**22:09**  231:14
**22:32**  246:3,20
**22nd**  93:4
**23**  166:6,7,13
**23:07**  231:10
**24**  15:3,4,8,12,13
166:6 169:11 190:6
**25**  19:6,7,9,10 20:10
53:11 112:5 136:21,
22
**25s**  20:9,13
**26**  56:5,6
**27**  136:15,17 142:2
**27,700**  234:11
**270**  75:24
**28**  141:9,10 193:22
**29**  55:17,20 56:4
142:4,5
**2:05**  136:10
**2:20**  136:11

**3**

**3**  33:4 73:7,8,9
141:23 190:12 203:4,
23 207:10 208:2,13
209:16 210:9,17
211:2,20 220:13
225:3 228:21
**30**  194:4 227:17,18
**300-page**  66:4
**30th**  241:16,17
**31**  63:20,22 136:16
**31st**  77:15
**32**  16:12 141:6
**33**  227:15
**37**  64:2,10
**38,700**  233:22 234:5
**3:41**  189:22
**3:55**  189:23

**4**

**4**  53:11 142:18 190:13
209:18,19 225:3
236:18
**40**  62:16
**40,000**  236:20,25
237:3

**43**  135:22
**44**  194:13,18,23
**45**  25:11 194:17,18
**452**  144:9
**4:47**  222:7
**4:55**  222:8
**4th**  20:19 195:8

**5**

**5**  112:8 209:18
**50**  93:10 99:12
**501(c)**  18:15
**509**  75:22
**52**  195:19
**53**  196:14
**54**  144:9
**56**  190:7
**5:07**  231:11
**5:09**  231:12
**5:32**  246:23

**6**

**6**  121:15 133:11
142:18,19,24 194:23
195:6 228:21
**60**  49:2
**6th**  233:2

**7**

**7**  78:14,16,18 136:23
**71-3**  19:7 20:11
**789**  137:1,2,6

**8**

**8**  138:18 139:10
149:25
**88**  194:9
**8th**  190:14,18

**9**

**9**  156:23
**90**  9:14 63:10 69:20
194:9

**91**  63:24 72:2

**A**

**a.m.**  57:16,17
**ability**  98:16 125:17
236:20 246:10
**absolute**  163:1
**absolutely**  173:21
181:10 208:13,21,22
**acceptable**  195:16
**account**  31:23 160:17
195:12 206:3,18
**accountability**  65:8
240:3
**accountable**  31:7
**accounted**  117:25
158:5
**accounts**  69:24
**accreditation**  204:10
206:17
**accreditations**  210:12
**accuracy**  57:7
**accurate**  56:20 76:8
220:19 221:5
**accurately**  215:14
**achievable**  64:23 83:5
84:11,14 87:20
**achieve**  82:11,12
87:17 88:23,24
**acknowledge**  9:23 10:1
**action**  9:16 76:4
149:23
**actions**  90:18
**active**  16:1
**activity**  126:1
**acts**  163:14
**actual**  58:25 64:15
66:5 71:15 196:8
**add**  135:21 196:10
**additional**  43:9
77:17,21 138:19,25
149:3 152:4 163:9
182:5,8 245:12
**address**  50:13 155:19
**addressed**  88:16 191:7
**adjudicate**  45:14 49:4
54:12 89:12 104:2,6
108:9 127:5 133:6
148:23 151:23 156:13

157:8,11 179:12,23
191:9 196:7 204:16
207:4 208:9 242:16
**adjudicated** 64:7
70:16 81:14 91:7
104:24 123:24 125:6
127:1 139:8 151:13
162:12 164:21 181:5,
11 204:25 205:9
207:11,13 208:4,14
227:6 233:23 242:8
**adjudicates** 101:9
**adjudicating** 43:10
87:9 100:7 103:25
109:10 152:19 157:2
161:3 204:22 242:12
**adjudication** 139:14
153:8 154:9 161:18
162:10 180:6 196:8
207:12,16,24 208:7
212:5 234:2,3,4
235:18
**adjudications** 67:18
110:7,14 151:9 226:9
227:3,4 242:21,25
243:1
**adjust** 182:16
**adjusted** 83:1 182:12
**administered** 10:2
**Administration** 128:14
**administrations** 34:15
77:24
**administrative** 30:7
59:7 147:7,10,20
148:10,21 149:17
152:22 207:21
**Admission** 194:7
**admissions** 194:7
**adoption** 121:17
**advance** 134:2 229:1,2
**advanced** 239:25
**advised** 32:10 169:13
**advisor** 16:24 17:23
22:18,23 28:18 52:12
53:2 131:3
**Advocates** 12:14
**affidavit** 190:9
**affiliations** 34:20
**agencies** 51:24
**agency** 32:24

**agenda** 25:15 59:6
**agendas** 58:17,19,21,
25 59:2
**aggressive** 90:3
**agree** 10:12 11:10,12
82:6 83:19 134:11,
13,18 158:7 185:3
**agreement** 9:6 10:9,10
184:24
**ahead** 109:5
**aid** 17:7,10,18 21:18,
24 22:1,12,16,25
26:1,25 27:1,6,13
30:19 32:1,3 34:9
36:1,5,7,10,19 37:2,
3,11,20 38:7,19
42:22 54:1 61:7,10,
15,22 63:14 67:20,22
68:12 80:25 112:24
116:7,15,16 127:14
131:5 155:16 157:8
159:25 170:19 174:3,
10 183:18 215:23,24
216:8 224:1,10
239:12
**air** 15:25 16:2,14,15
18:4,5,9
**airmen** 16:16
**Alabama** 15:23
**Albers** 30:15
**Alexandria** 16:19
**algorithms** 117:4
**allegation** 186:4
195:24,25
**allegations** 204:8
206:16 210:12
**allowed** 87:18 96:10
132:4 186:1 242:11
**allude** 171:25
**alluding** 162:15
163:21
**alternative** 113:21
**ambiguous** 97:10
**amount** 14:10 28:23
49:3 85:6 98:19,22
118:8,19 121:24
139:21 147:2 148:7
235:16 245:9
**analysis** 165:15
**analytics** 117:11
119:9,19 120:11,22

**announcement** 243:15
**annual** 31:8 32:24
63:22 64:19 82:3
136:16
**annually** 69:13
**answering** 197:23
**answers** 81:17 108:10
112:19 207:2
**anticipated** 240:5
**anticipates** 138:20
165:16
**anticipation** 139:1,10
**anxiety** 136:1
**apolitical** 34:10
**Apollo** 203:17,20
205:20 208:12
**appeared** 19:3
**applicable** 76:4
183:24 184:7 204:14
**applicant** 208:1
**applicants** 162:18
170:7 209:2
**application** 54:16,24
121:21 150:22 157:6
162:1 184:1,5 190:12
193:23,24 194:14
204:5,6 206:21
208:3,4 215:5 220:17
235:7
**application's** 196:16
**applications** 35:18,20
53:14 64:7 87:9
96:16 122:4 123:7,8,
18 128:4 129:9
156:25 157:3,21
158:11,17,19 164:20
165:21 170:7 207:8
209:3,5 210:8,14
227:4 233:1,23
234:12,20 236:21,25
237:22 239:9 241:25
244:15
**applied** 96:13 101:13,
17 204:12
**applies** 164:1
**apply** 99:8,15 100:12
163:25 203:19 210:20
221:9,13,20
**appointed** 17:11
**appointee** 22:24 23:5

appointees  22:22
appointments  34:15
approval  76:11,20,21,
  22,23 77:8 90:16
  107:19 143:8,15
  150:17 155:11 164:6,
  9,22 165:4,12 166:11
  173:12 175:14,23
  183:5
approvals  134:2,10,15
  137:9,18 138:2,5
  165:17 166:1 219:1
  234:19
approve  54:15 65:5,7
  81:25 183:1,3 185:7
  187:6 225:12
approved  49:19 81:15
  100:12 137:3 163:11
  174:16 175:9,21
  182:24 209:3 225:20
  234:11,19
approves  31:11
approving  134:4
approximately  17:3
  65:13 188:5 236:20
April  41:12 67:20
  150:17 155:11 241:5
April/may  114:23
area  167:19 171:2
  200:22 207:2
areas  16:8,21
arrangement  10:6
arrival  70:2 90:15
arrive  155:25
arrived  151:6
art-  129:14
article  79:2,13
  127:21,25 128:7,13,
  21 129:15,22
asks  99:7 170:16
aspects  79:23,24
  161:13
assert  176:13 178:20
assess  80:13,22 81:7
  207:18
assessment  206:24
assign  148:12
assigned  22:8,25
assignment  16:6
assignments  18:6

assist  71:12
assistance  19:20
assisted  19:24
assists  19:25
associate  117:24
association  119:8
assume  23:7 94:21
  186:21 202:15
assuming  68:4 155:21
  226:15
Atlanta  16:3
attached  15:14 19:11
  56:7 136:18 141:11
  142:6 227:19
attachment  199:23
  200:5,13,16 209:17
attain  87:2
attainable  82:8 83:6
attaining  87:7
attempt  212:1 216:5
attempting  217:24
  219:5,6
attended  137:7,11
  162:18 179:17
  181:15,20 191:24
  206:13 211:9
attending  41:15
attorney  12:13 14:7,
  16 19:20,23 54:12,19
  55:13 85:9 100:7
  101:9,14 125:7
  139:13 146:11,12
  152:5,20 160:10
  161:17 162:13
  179:12,24 180:6,7
  204:16 205:16 207:4
  208:24 212:7
attorneys  9:22 14:2,3
  47:11,19,20 48:16
  49:3 55:8 71:7 88:8,
  11,17,22 89:1,12,18,
  23 90:13,16,23 91:12
  103:5,10 126:6,8
  139:19 143:3,9,13,15
  144:4,6,13,16 145:8,
  18,23 146:14,25
  147:1 148:20,23,24
  150:18 151:16,20,25
  152:6,12,18 153:1,5,
  8,11 154:9,11,15,18,
  20,23,24 155:3,7
  156:2,7,13 157:14

  160:9 161:19,22
  162:14 167:11 180:23
  184:19 191:9,14
  195:15 196:9 208:8
  239:17
attribute  34:17 153:2
audio  120:14 138:11
  153:5
Auer  23:8 24:10 25:20
  26:7 42:2,17 60:12
  92:23 107:22 115:13
  131:3,19 173:15
  175:10 192:7 193:3
  209:24 215:5 217:25
  223:5 225:11
August  232:25 233:2
  237:9,25 238:7,12
  241:6,13,16,17
authorities  34:19
  55:6
authority  54:14,23
  55:12 224:20,22,24
authorize  224:22,24
automated  217:15
automatic  104:8
automatically  104:7
automation  216:25
autopilot  148:15
avoid  18:17
avoided  135:12,14
aware  9:3 35:22 54:17
  61:11 73:1 76:25
  77:3 78:25 103:4
  114:17,20 115:5
  145:12 173:4 223:15

---

**B**

back  12:4 16:17 27:21
  55:16 57:18 61:6
  73:5 78:25 80:6,7,9
  105:19 106:13 108:18
  109:22,25 112:3,8
  118:20 125:20 136:5,
  12,20 140:22 142:1
  149:18 170:5 174:14
  185:11 189:24 207:3
  219:17,20 220:4,10
  222:9,14 224:21
  225:18,21 231:13
  235:17 236:6 237:8
  243:17

**back-and-forth** 83:24

**background** 15:19
155:17,20

**backlog** 40:10 41:18
42:9,17 43:5 46:18
47:6 48:19 49:5
50:13 146:19

**backlogs** 43:1

**band** 139:14

**based** 34:14 48:23,24
74:15,17 96:7 101:18
122:19 147:2 156:3
179:1 181:12 182:10
211:14

**basis** 27:15 84:25
138:21 205:15

**batteries** 10:25

**BD** 40:2 49:8 64:6
86:5 98:18 103:7,24
106:8,9,14,23 107:2,
3 108:4,7,17,19
109:7,23 132:13
156:2,25 182:4 235:7
237:21

**BDU** 33:23 34:6 48:8,
10,13 49:12 51:17
52:14 67:18 68:8
69:3,16,21,23 70:6
71:2 76:9 77:15,19
78:1 79:24 80:12,18,
23 81:6,8,20 83:5
84:1,3 85:15 86:5,18
87:7,12 88:5,12
89:2,18 90:23 97:17
99:1 105:25 107:8,
23,25 108:24 109:11
132:7 143:1 150:2
154:11,15,18 156:12
163:8 165:15 168:17,
22 217:13 223:6
244:5

**BDU's** 76:21 79:23

**began** 69:20 90:15,18
114:15 130:9,17
133:2 175:2,5 241:21
244:19

**begin** 12:15 77:16
86:4 110:17 114:11
130:5 156:5 159:7
170:18,20 174:22

**beginning** 133:11
139:25 151:3 193:23

**begins** 183:17,19

**begun** 241:7

**behalf** 9:13,19 160:9

**belief** 45:17 109:12

**believed** 43:8 44:23
45:4,12,17 62:9
92:12 105:25 106:10
108:7,10,14 109:7,17

**believes** 133:23 134:1

**bell** 16:3 130:3

**BERMAN** 20:5,12 222:1,
4

**binder** 63:20

**bit** 32:8 34:9,11
53:15 84:17 99:6
124:8 143:2 170:3
195:20

**blacked** 195:21

**blanket** 179:10

**board** 18:10,13,16,19,
21 47:20 143:11
144:10 155:13

**boiled** 104:7

**borrower** 14:15,16
20:24 21:4,8,20
22:2,4 25:14 28:4,6,
7,10,12,13,21 29:12,
15,18 31:23 32:2,5,
12 33:7,8,15,20 34:4
35:2,17,20 37:23
38:1,9,14,21,23,25
39:7,9,18,21 40:7,9
41:8,16 42:9 43:1,7,
9 44:23 45:4 46:19
47:2 48:1,22 50:2
51:20 52:8,10,25
53:3,6 54:1,3,6,15,
21 55:2,5,7,10,14
56:25 57:5 66:21
67:3,5,16 68:13,20
70:15 71:13,20 76:3,
5 77:17,22 81:11
85:9,12,16 86:1 89:4
92:12 93:19 94:20
96:1,9 97:24 98:3,7,
12 100:18 101:2,11,
19 116:2 121:19,20,
22,25 122:3,22,24
123:2,18 124:18
125:3,7,9,18 126:22,
23,25 127:17 130:1
133:2 135:16,18

136:25 138:3,7,11,
13,16 141:5 144:24
146:7,9,10 147:3,12,
16 150:3 152:14
153:12,13 157:8,11,
13 160:13,22 161:7,
9,20,25 162:17
163:17,24 164:12,15,
16,20 165:6,7 166:9
167:13,14 169:7
170:6,19,24 171:3
174:12 177:11 178:5,
25 179:5,9,24
180:10,20,22 181:15
182:22 185:7 186:2,
22,23 187:6 189:4
191:21 195:12 196:8
197:9,17,22 198:3,
16,20 200:21,24
201:1 202:23 203:21
204:7 205:4,24,25
206:13 207:22 211:9
212:24,25 213:4
215:4 216:2,18
221:9,13,21 223:24
224:8 227:3 232:14,
17,19 233:1 234:17,
20,21,22,23,24 235:7
236:10 239:19 240:7
243:8 244:14

**borrower's** 181:2
184:5

**borrowers** 99:9,15
129:1,9 131:10 133:3
134:3,7,21 137:6,11
169:16,19 176:13
178:3,20 179:17
181:20 210:11 220:17
227:5

**borrowers'** 165:20

**boss** 24:7

**bottom** 72:1 75:23
99:6 127:25 128:10
129:4 142:21 178:24
228:22 236:18

**bowels** 226:23

**box** 15:5

**bracketed** 15:4 19:7
136:16

**brand** 146:11

**break** 13:13,15 57:11
105:5,9 136:5 189:16
221:23

**breakout** 137:6
**breaks** 13:11
**briefed** 167:24 168:3
**briefing** 68:14,15
  243:4
**bring** 47:19 82:23
  85:3 143:11 177:13
  236:6
**bringing** 156:6 172:8
  245:12
**broad** 9:14 37:5 62:20
  90:1
**broadly** 37:16
**Brooks** 191:24 194:6
  197:5,18
**brought** 97:21 144:8
  145:22 181:8 191:8
  203:11
**Brown** 9:9 11:11,14
  12:7,12,17 20:11
  44:1 58:5,14 105:21
  131:4 190:2 214:22
  221:25 222:12 231:16
  246:22
**budget** 52:1
**build** 82:22 90:21
  150:14
**building** 87:23 104:22
  112:18 126:15
**buildup** 90:15 156:3
**built** 63:4 154:25
**bureaucratic** 150:24
**business** 55:14 90:13
  211:10

---

**C**

**California** 93:20
  94:15 95:9,12
**call** 24:11 40:10
  43:14,22 60:23 61:2
  97:2 102:20 111:16
  120:12 149:6 152:1
  153:14,15 161:2
  174:8 215:23 241:9
**called** 37:19 96:2
  147:15 219:24 227:11
**calling** 50:10 83:25
  87:22 148:9 152:7
  157:16

**calls** 46:7 51:4 78:3
  83:8 84:5 135:4
  186:6,17 187:12
  196:4 229:4,19
**Calvillo** 45:21 96:2,3
  97:5,19 105:22 223:7
**cancel** 229:4
**capabilities** 165:3
**capability** 245:12
**capacity** 133:3 151:18
  154:20 244:22 245:3
**capital** 17:4 21:13,
  15,16 52:12
**care** 207:24 215:20,21
  217:1,10,17 218:2,11
  219:10,12
**career** 16:7 191:25
  209:22 211:11
**careers** 34:16
**case** 23:22 25:1 29:21
  45:11 47:13 86:1
  88:4,20 89:14 92:15
  95:8,9,23 96:2,20
  97:3,9,19,20 98:10,
  14 99:8,14 100:8
  106:13 108:8 109:8
  122:23 123:11 125:6
  134:5 147:12 150:5
  156:2 162:9,11 164:1
  190:10 191:20
  204:14,17,25 205:2,
  7,9 207:4 208:14
  212:7 220:20 240:14
**caseload** 48:24
**cases** 28:22,23 29:2,
  4,8,11,13,14,17,22
  38:1,25 40:9 45:4
  47:1 48:1 49:5 54:12
  70:15 89:12,15 91:1,
  7 95:12 98:23,25
  99:2 108:9 109:10
  123:23 124:1,5,18
  126:25 127:5,6
  133:2,6 138:3 147:4
  148:24 151:23 152:19
  154:25 155:1 158:1
  162:10 163:19,22,23
  165:9 169:22 179:24
  237:9,12,15 242:16
**catch** 17:21 213:16
**categorically** 70:14

**categories** 62:20
  70:24 76:2,10,20,25
  77:4,7,17,21 165:20
  194:3 203:22 210:7
  229:12
**categorize** 71:11
**categorizing** 101:2
**category** 64:12 90:2
  193:8 206:2
**caught** 35:14
**caused** 79:15 243:14
**causing** 134:20
**CCI** 179:1,6 237:6,10,
  15
**cease** 122:3,10
**ceased** 124:12,18,24
**CEC** 191:25 192:8
  193:5
**center** 37:17
**centers** 149:6
**cetera** 69:14 194:12
**chain** 86:17
**challenged** 93:20
  94:15
**challenges** 89:11 98:1
**challenging** 83:16
**change** 34:14 77:23
**changed** 22:9,11 25:5
  83:1
**characterized** 210:19
**charge** 39:9 184:13,23
**chart** 55:24 56:15
  57:3,8,24 67:15
  200:16,18 201:2,8,23
  202:10,13,17 203:3
**charts** 232:11
**check** 137:21 155:17,
  20 193:1 227:9
**Chicago** 167:11
**chief** 17:12,17 18:18,
  24 22:12,13,15 25:2
  27:13 28:14 29:5
  30:5,11,13,15,17,18,
  20 32:20 33:10,11
  36:19 37:1 38:5,17
  53:22 54:2,8 56:16
  59:23 61:15 70:3,17,
  20 73:23 86:2 94:19
  95:3 116:14 146:5,6
  150:9 157:7 201:11
  224:7 239:12

choice  185:15
Chris  30:18
chronologically
  132:20
circle  222:14 227:10
circumstance  182:13
circumstances  163:3,4
  179:14 182:5,7
cite  169:6 209:14
claim  100:9,14 101:8,
  10 151:12 160:4
  161:3 174:14 176:15
  178:20 179:1,6,13
  180:20 181:2,5,11,14
  182:16 185:8 187:7
  196:1,3,11 203:16
  204:20,23 206:6
  211:22 212:5 234:21,
  24 235:13 236:2,7,8
claimant  125:8 179:5
claimants  182:14
claims  35:2 76:3,10
  77:1,4,7,18,21
  81:13,14 87:14 93:17
  96:19,21 97:2 99:21
  103:6,7 104:1,6,15,
  24 121:20 130:5,18
  131:7 134:4 135:17,
  19 136:25 139:6
  154:19,22 156:14
  157:9,11 163:11
  164:18 182:11 188:22
  196:7,8 197:17
  208:9,11 234:23
  235:22 236:16 237:23
  238:1,8 240:1,6
Claire  10:11,17 12:12
  20:5 56:8 57:21
  105:7
clarification  106:4,
  22 107:12,24 108:14
clarify  66:19 95:3
  108:13 109:19 133:14
  180:16 200:2 211:16
clarifying  57:21
clarity  40:12 44:17
class  97:1,2
classified  23:1
classify  46:2 92:10,
  21
clear  22:17 36:6,14
  40:10 43:11 48:19

68:9 130:19 153:7
  176:24 190:16,23
  191:2 208:1 226:10
clearance  150:20
close  71:23 246:17
Coast  105:9
collaboration  164:23
  182:21
collaborative  64:21
  66:12
collaboratively
  171:12 177:12
colleagues  38:4,8
collect  47:13
collected  203:5
collection  239:25
collective  112:20
collectively  49:1
  88:23 115:16 171:7
Colleen  26:20,22
  30:20 39:8 98:8
  171:4 223:21,23
college  15:21
Colon  167:19
column  203:2,4,6,9,
  22,23 204:3,12
  205:25 206:14 207:10
  208:2,13 210:7,9,17,
  19,24 211:2,20
  227:10
columns  212:2
combination  119:22
comfortable  23:22
  25:12 82:13
comma  128:11
command  16:14 18:5
commander  16:13 18:5
comment  63:8,10 79:7
  220:22
commissioned  15:24
commit  72:25
committed  14:5 192:4
committee  213:9,23
  214:3
common  163:9,13,25
  165:15 179:18,21
  180:1,11 181:1,16,21
  197:20 203:4,18
  204:1,13 205:5,12
  207:9,11 208:3,17
  210:9,19,21 211:1,

13,21,23 212:12,15,
  20
commonly  180:11
communicate  12:18,24
  13:2 24:9 60:11,13
  192:7
communicated  43:4,16
  110:20 111:1,4,5,24
  112:2 115:21
communicating  134:16
companies  204:9
  206:17
company  16:3
compensation  34:22
  35:1,16,19
compiled  201:5
complete  77:15 98:23
  100:12 220:17
completed  62:8 101:14
  110:16 139:13 163:12
  227:12 234:5 236:24
  238:16,21 239:1
  240:19,21 241:16,18
completes  165:15
completing  125:16
complex  238:20
compliant  153:21
compound  97:11 132:10
computation  152:21
  153:16
computations  154:1,3
  237:2
compute  121:11 243:10
computing  153:18
concern  46:4,13,16,20
  47:3 71:11 87:1,4,6,
  8,11,15,22 88:1
  134:20 135:2 179:9
  244:8
concerned  28:21,22,24
  84:18 134:24 135:2
concerns  21:23,25
  39:17,19,22 71:3
  89:9 244:5
conclude  245:24
concluded  47:9
concludes  246:2
conclusions  74:18
  75:5
conditions  137:1

conduct  90:8
conference  228:6
confidence  82:4
confident  85:3,6
  164:15
confirm  12:23 194:14
confirmed  12:3
conflict  18:17 19:3
  192:22
confused  134:3
confusion  43:15 44:14
  46:2 92:8,9,11,21
  105:24 106:5,8,9,17,
  20 109:20 134:6,20
  135:12,13
conjunction  141:21
connected  197:17
consent  10:5
considered  80:3
  160:17,22 195:13
  196:15,23,25 206:5,
  21
considers  160:7
constructed  225:8
consult  14:12 209:4
consultant  16:20,21
consultation  142:16
consulted  196:19,20
contemplated  54:18
content  240:10
contents  131:12 201:8
context  63:18 179:23
  232:12 233:9
continue  77:20 93:21
  99:21,25 101:22
  109:10 110:3,9,12,14
  133:5 163:24 242:11
continued  45:14
  242:15,22
continues  195:4
continuing  102:16
  103:13,20 104:5,6
  127:5 151:10 154:10
  163:8 178:9 242:15
contract  149:5 152:25
contractor  219:9
contractors  148:13
  149:5,21
contributed  98:24

control  219:23 220:1,
  3
controls  25:23 30:21
  173:1
conversation  39:24
  73:2 105:12 107:5
  146:13 151:24 221:2
conversations  9:5
  41:25 52:25 86:4,5,
  6,19,21 130:15
  159:22
convoluted  148:11
COO  20:18 22:22 24:25
  28:2,3 36:2,3,6
  53:2,7 168:25
copies  63:22 78:15
  141:7
copy  58:7 133:18
  213:21,22
Corinthian  123:7,19
  137:3,10,12 163:11
  164:8 176:13
corner  190:7 209:17
Corp  209:22
Corporation  18:14
  192:1
correct  20:20 34:7
  48:20 82:17 131:15
  167:4,23 176:21
  189:2,4 226:17 244:7
correction  17:14
correctly  220:17
correlate  148:3,4
counsel  10:5,8 12:10
  13:19,21 19:24 20:1
  35:7,10 72:21 141:21
  142:16 173:12 175:16
  193:12 218:25 225:17
counselors  194:7,8
count  149:20,21
  161:10,14
counted  152:5
country  16:9 17:9
  148:4
counts  161:14 227:7
couple  12:15 58:14
  62:8 80:12 117:21
  119:18 143:7 144:10
  178:17 222:13 227:13
court  9:18,22 10:13,
  16,20 11:2,6,8,13,22

98:21 99:8,14 123:1
  138:12 230:16,20,23,
  25 231:3,5 237:11,17
court's  76:13 229:12
court-ordered  31:20
  32:14 34:24 35:4
  74:21 79:9 121:1
  162:21 192:11 199:2
  214:16
courts  93:21 94:15
  95:9,13 96:8,11
cover  124:6 129:4
  176:10
covered  96:20 156:16
  179:2 203:12,13
  235:22
covers  155:17
Covid-19  60:25
coworkers  75:19
coworkers'  75:9
created  170:21 182:10
criteria  55:1 176:15
  210:14
criticals  76:22
culminate  63:12
current  20:18 39:6
  57:22 178:19
curriculum  18:8
customer  167:18
  215:20 217:1,10,17
  218:2,11 219:10,12
  240:5
customers  135:22,23
  216:10
cut  138:14
cutting  32:7
cycle  237:10,15

D

daily  28:5
damage  179:9
Dan  9:12 11:18 231:7
  246:7
Dana  9:19 11:18
data  72:2,6 116:16
  117:3,7,10,11,14
  119:9,18,19 120:10,
  11,22 131:21,24
  137:13,16,21,24
  138:4 154:5 239:25

240:2,10,11
**database**  244:21
**date**  18:22 41:4 74:16
  111:8 144:7 155:23
  157:16 168:21 203:13
  233:15 236:10
**dated**  75:1
**dates**  204:3 211:5
  235:24 236:8 241:21
**Dave**  30:15
**day**  103:2 150:25
  188:7 202:5
**day-to-day**  205:15
**days**  63:11 69:20
  220:8,11
**deal**  145:1
**dealing**  52:15,21
**debt**  129:10
**December**  9:10 103:18
  112:9 125:24 130:9,
  17 132:12 133:1
  136:24 140:1,5,12,
  13,19,24 157:20
  158:12,17 159:1
  170:6 238:23 241:12
  243:15
**decide**  54:15,23,25
  59:11 110:8 155:10
**decided**  110:2,9,11,12
  113:12,15,17 134:8
  184:1,2,6 239:8
**decision**  44:6 78:8
  108:8 109:8 110:18,
  20,23 112:21 113:1,6
  117:5 119:9 122:23
  123:6,11 143:3,8,12,
  14 144:13,15 147:8,
  11,17 158:20 159:2,
  7,11,13 161:25
  183:20,22 185:3,23
  190:14 222:15,19
  223:6,13,14,19,22
  224:5,11,13,15
  225:6,10 227:6
  236:19 239:14 241:24
**decisional**  212:6
**decisions**  37:23 38:15
  39:18 40:3 41:8,20
  42:2,5,7,15 43:9
  44:20,24 45:13,15,22
  46:17,24 51:25 52:2
  53:14 91:25 102:7,

14,16 106:1,11
  107:3,9,19,23 108:1,
  6,17,20 111:12
  114:13 117:8 121:19
  122:2,3,13,18,24
  123:12,15,17,21,24
  124:10,17,18,24
  125:1,23 126:19
  128:3 129:8 130:1
  132:6,7,9,18 135:11
  136:25 138:20 139:1,
  7,17 140:3 150:3
  153:8 156:3,24 157:3
  158:10,17,22 159:1,
  7,9,10,24 161:2
  167:22 186:1 189:13
  195:18 207:5 222:16
  223:1,6 224:2,15
  227:4 242:7,12
  243:6,8,12,14,18
**declaration**  14:15,17
  19:17 20:11 33:4
  53:12 55:16 112:4
  136:21 139:24 141:17
  142:13 160:16,21
  168:7 170:4 185:10
  199:22 200:12
**declarations**  14:14
  19:19 141:20
**declare**  10:3
**declining**  231:17
**deep**  121:7
**deeply**  83:17
**defense**  14:15,16
  16:20,22 20:25 21:4,
  9,20 22:2,4 25:14
  26:23 28:4,6,7,10,
  12,13,21 29:12,15,18
  31:23 32:2,5,12
  33:8,15,20 34:4
  35:2,17,20 37:23
  38:1,10,14,21,22,23,
  25 39:7,9,18,21
  40:8,9 41:8,16 42:10
  43:1,7,9 44:23 45:4
  46:19 47:3 48:1,22
  50:2 51:21 52:8,10,
  25 53:3,6 54:1,3,6,
  15,21 55:2,6,7,10,14
  56:25 57:5 66:21
  67:3,5,16 68:13,20
  70:15 71:13,20 76:3
  77:17,22 81:11 85:9,

12,16 86:1 89:4
  92:12 94:20 96:1,9
  97:24 98:3,7,12
  101:2,11 116:2
  121:20,22 122:3,22,
  24 123:3,18 124:18
  125:3,7,9 126:22,23,
  25 127:17 133:2
  135:17,19 136:25
  138:3,7,11,13,16
  141:5 144:24 146:7,
  9,10 147:3,12 150:3
  152:14 157:9,11,13
  160:13 161:7,20
  162:1,17 163:17,24
  164:12,15,16,20
  165:6,8 167:13,15
  169:8 170:6,19,24
  171:4 174:12 177:11
  179:1,5,24 180:20,23
  182:23 185:8 187:7
  189:4 191:21 196:9
  197:9,17,22 198:3,
  16,20 200:21,24
  201:2 202:23 212:24
  213:1,5 215:4 216:2,
  18 221:10,14,21
  223:24 224:8 227:3
  232:14,17,19 233:1
  234:17,21,22,24
  236:11 239:19 240:7
  244:14
**define**  106:17 111:15
  153:9
**defined**  207:23
**defining**  125:17
**definition**  100:21
**definitive**  169:24
**defrauded**  206:19
**delay**  191:1
**delegated**  26:3 55:8
**delete**  196:10
**deliberating**  85:24
**deliberation**  47:9
**deliberations**  51:23
  84:2 226:25
**deliberative**  43:22
  46:7 51:5 64:24
  83:8,24 84:6 85:23
  135:4
**deliver**  37:18 85:8

**delivery** 30:19 219:4
**demonstrates** 185:7
  187:6
**denial** 166:8,18 167:6
  168:9 183:8,13
  186:4,15 187:8
  224:19,23,25 225:2,
  13
**denials** 107:20 134:2,
  9,14,16 157:19
  158:10
**denied** 189:10 209:11
**denote** 82:4
**department** 14:1 16:25
  25:24 37:22 38:14
  40:4,14 43:12 54:22
  72:4 73:24 76:18
  78:12 79:19 80:16
  92:16 95:20 102:7
  106:12,19 110:11
  112:9,18 113:7,19
  115:15 119:6 128:2
  129:7 131:7 133:23
  134:1,4,8 135:1,11
  143:16,19 144:17,19
  153:20 156:24
  159:14,23 160:4
  165:16 169:12 173:10
  177:15 179:18 181:21
  182:25 207:17 218:24
  222:25 224:16 225:25
  235:19
**department's** 131:5
  157:2 159:11 161:24
**depend** 149:22
**depending** 23:9,12
  41:4 100:16 123:21
  149:20
**depends** 27:16 169:5
  179:12,13 181:6
  204:24 205:2,6
  212:16 232:20
**deposed** 14:23
**deposition** 9:9,23,24,
  25 12:24 13:23 14:25
  15:3,13 19:10 56:6
  136:17 141:10 142:5
  227:18 246:2,13,15,
  22
**deputies** 33:17,22
**deputy** 16:13 17:1
  18:4 30:5,11,13,15,

17,18,20 31:13 32:20
  33:9,11 86:2 146:6
  201:11 224:7
**derived** 65:4 66:7
**describe** 127:12 166:6
  208:8 215:14 216:6,
  16 217:24 218:15
  219:6 234:1,5,8
**describes** 127:25
  142:25 166:8
**describing** 125:12
  126:24 233:25
**deserves** 162:11
**design** 182:17
**designed** 182:19
  210:24 215:4
**desire** 42:10
**detach** 116:17
**detail** 33:6 97:1
**details** 41:21,22
  72:24 117:1 138:8
  245:5
**determination** 95:5
  125:18 153:11,15
**determinations** 55:12
  102:9 125:1 152:12
  153:23 180:8 212:10,
  11 213:4
**determine** 93:18 94:13
  98:19 99:22 100:13
  121:24 157:5,10,16
  161:18 163:13 204:19
  209:10 211:17
**determined** 101:17
  112:17 121:20 133:1
  157:24 180:2,4
  185:21 210:8 234:23
**determines** 101:10
  212:22,23
**determining** 96:6
  100:8 125:8 153:16
  161:3 196:15
**develop** 62:1 83:16
  113:13 118:12 119:1,
  10,25 120:8 175:7
**developed** 61:24 76:9
  77:7 83:13 107:17,18
  110:4,5 112:1 114:4,
  21 115:2,6,10 118:5
  119:6 158:21 159:12,
  15 164:7,22 181:23,
  25 182:2 237:23

238:2,8,11 239:22
  240:4
**developing** 62:3 68:24
  77:20 78:1 116:4,10,
  22 117:17 118:14
  119:14
**development** 82:5
  84:19 113:20 115:12
  239:6,18
**develops** 16:15
**device** 13:3
**devices** 13:5
**Devos** 9:12 58:17
  59:20 128:1,24
  129:6,25 224:12
  227:22 230:5
**dialogue** 39:23 83:15
  87:22 164:25 165:10
**Diane** 14:18 23:8
  24:10 25:20,22 26:7
  42:2,17 60:12 92:23
  107:22 115:13 131:3,
  19 173:15 175:10,21
  192:7 193:3 209:24
  215:5 217:25 223:5
  225:11
**dictated** 182:5,7
**difference** 52:17
  154:1
**differs** 102:3
**difficult** 33:25
**digital** 152:23
  215:19,20 217:1,10,
  17 218:2,10 219:10,
  12
**digitized** 177:25
  215:21 216:3
**direction** 37:9
**directives** 197:4
**directly** 30:6 32:21
  151:5 224:6
**director** 77:19 164:11
  223:23
**disagreed** 96:8
**disapprovals** 137:18
  138:2
**disapproved** 81:16
**discharge** 76:5 77:18,
  22 121:22 137:1
  162:17

discovered  163:23

discovery  31:20 32:14
  34:24 35:4 60:7
  74:21 76:13 79:9
  121:1 162:21 192:11
  199:2 214:16 226:2
  229:11 230:9

discuss  21:8,14,19
  22:3 25:13 38:12,13
  40:1,2,3,8,13 41:8,
  19 48:6 59:8,10
  75:18 115:11,14

discussed  38:4 41:16
  115:25 121:18 189:1
  211:8 232:22

discussing  21:11
  75:20 214:10,13
  222:14

discussion  42:7,8,14
  97:22 115:20 125:20
  167:2 226:16

discussions  20:24
  39:2 53:6 65:22,24,
  25 72:23 114:7,10,13
  115:23,24 127:3

displayed  204:14

displeasure  79:1,16,
  23 80:3

disqualifying  220:18

distinction  216:23

distinguished  100:24

distortion  120:14
  138:11 153:5,6

distress  134:6,21
  135:12,14

distributing  147:7
  148:21 149:1

dividing  153:4

document  15:15 19:15,
  16 45:2 53:19 56:11,
  14 63:25 66:4,12
  68:2 71:17 72:25
  73:14,15,16,18,19
  78:21,22 79:5 80:7
  93:2 111:8 119:10
  128:12 141:7,15,16
  142:10,11 151:23
  153:19 162:7 166:12
  177:19 187:22 193:17
  194:1,16,24 195:4
  199:21,25 200:2,11
  202:1,4 214:7 227:23

229:24 232:5 233:5

documentation  107:6
  235:15 236:5

documents  14:13
  193:3,16 197:25
  198:14,17,21 199:3,
  10,13 202:2,10,17,21
  212:6 244:22

Doe  169:13

DOJ  72:19

doles  131:8

dollars  51:25

door  215:21

dormitories  18:7

draft  170:14 171:7,10
  172:8,16,20 177:13

drafted  170:9,12,22
  177:1 182:23

drafting  172:12,18
  174:2,18 175:5 177:7
  183:16

drafts  170:18,20
  175:25

drives  52:1

Dropbox  57:25

dropped  30:23

due  239:6

duly  12:8

Duped  128:25

duties  22:8 26:3

duty  16:1

dynamic  117:19,20,23
  188:6

---

**E**

earbuds  10:23

earlier  33:9 38:9
  40:15,22 46:1,21
  61:9 64:18 71:4
  90:17 91:5,9,13
  95:25 102:2 103:8
  109:21 125:21 126:20
  130:18 140:6 141:19
  142:15 143:11,18
  144:23 145:5,11,12
  147:14,15 150:6,8
  151:11 156:4 158:20,
  24 170:4 175:19
  181:6 184:23 185:10
  189:11 192:20 207:1

218:19 222:15 223:11
  224:14 232:20 239:16

early  106:16 140:21

earnings  121:4
  225:23,25

ease  215:4

East  105:9

easy  221:9,13,20

ECF  19:7 20:11 56:10
  209:18

Economic  12:13

ed  18:11,12,13 39:17
  40:4,14 41:15 185:7
  187:6

ED's  179:1

educate  39:25

educated  28:24 38:1,
  9,22 50:2

educating  45:3

education  16:14,21,25
  17:1,12 18:1,2,3,5,
  9,15 24:17,18 28:6
  31:11 37:22 40:16,23
  41:20 73:24 75:12
  76:18 78:12 79:19
  103:14 106:19 122:22
  131:4,6 135:2
  144:17,19 173:11
  177:16 182:25 191:25
  209:22 224:16

Education-determined
  207:18

educational  18:7
  95:24 97:16 108:4
  126:21

effect  105:23

effective  111:8

effectively  54:11
  221:1

efficiency  243:2

efficient  131:7

effort  63:4,5 64:22
  112:21 117:15 120:16

electronic  13:4 15:4
  19:6 57:25 63:22
  133:18 190:3

element  25:23 40:6
  95:4 175:15 177:15
  182:24 183:6 238:17

elements  17:9 67:19,
  21 81:19 120:19,20

184:24 185:25 218:22
**eligibility** 102:9,17
  104:16 124:10 125:2
  166:15 168:12 176:15
**eligible** 100:8
  101:12,14 125:2,8
  134:7,21 157:1
  158:22 234:24
**eliminated** 136:1
**Elisabeth** 9:12
**email** 12:25
**emails** 61:4,6
**emerged** 28:19
**emphasize** 50:21
**employed** 194:10
**employee** 63:8
**employees** 33:2 143:20
  146:20 147:6 148:19,
  25 149:22 155:11
**employment** 15:20
  192:23
**en** 193:18
**enable** 156:8
**enabled** 150:2
**end** 32:25 34:17 40:20
  59:25 147:7,10
  148:21 174:22 188:18
  194:9
**end-of-november**
  188:16
**end-of-year** 33:1
**ended** 115:8 246:22
**ending** 233:2
**engage** 216:9
**engagement** 30:19
  215:22
**enjoined** 95:20
**enrolled** 179:2,6
  204:7 206:15 211:11
**enrollment** 203:13
**ensure** 54:2,9
**entail** 235:11
**entails** 235:12
**enter** 9:20
**entire** 39:21 68:23
  73:21,22 74:3 88:4
**entirety** 98:14 202:3
**entitled** 128:13,24
**enumerate** 164:13

**equation** 49:7 101:18
**error** 166:21,24
  167:3,6,18,22
**errors** 166:7
**essentially** 64:19
  121:8 174:11
**establish** 141:4
  155:23
**established** 76:2
  83:21 100:15 124:23
  140:21 173:20
**establishing** 77:16
  226:14
**estimate** 48:19,20,21
  50:14,16
**estimated** 131:10
**et al** 9:12
**evaluate** 32:18,19
  128:14
**evaluated** 31:18 72:3
**evaluation** 33:1
  161:25
**event** 227:24
**everyone's** 245:19
**evidence** 157:4,6,15,
  17,21,23 158:3,11,18
  160:5,7,11,18,22
  161:4,10 163:9,13,
  22,23,25 165:15
  179:18,21 180:1,7
  181:1,16,21 185:6,
  12,13,14,16 186:5,15
  187:5,9 195:13,16
  196:15,19,21 197:4,
  16,20,21 198:2
  203:4,7,15,19,23
  204:1,13,23 205:5,12
  206:5,22,24 207:9,12
  208:3,17 210:9,18,
  19,21 211:1,13,21,23
  212:13,15,20 235:14
**evolved** 174:23 182:3
**exact** 14:10 18:22
  49:25 50:23,24 70:1
  71:18,19 107:14,15
  110:2 122:25 130:7,8
  143:5 149:2 166:2
  177:23,24 178:8
  185:17 213:20,22
  220:4 236:10 241:20
**EXAMINATION** 12:10

**examples** 205:13
**exceeded** 154:20
**exceeding** 60:7 74:20
  76:12 214:15
**exceeds** 31:19 32:13
  34:23 35:3 79:8
  120:25 162:20 192:10
  193:6 199:1 226:1
  229:10
**Excel** 240:13
**exchanged** 193:2
**exclusion** 203:10
**exclusive** 203:14
**execute** 54:6 113:8
  219:3 224:11
**executed** 224:2
**executes** 26:1
**execution** 34:18
**exhibit** 15:2,12,13
  19:9,10,12 55:20
  56:4,6 57:22 58:13
  63:20 73:7,8,9,10
  78:14,16,18 91:17,18
  92:22 93:3 112:5
  127:18,19 130:20
  136:15,17,21,22
  141:9,10 142:4,5
  176:4,5,6,9,10
  178:16 179:16 190:3,
  4 198:5,7 199:20
  200:3,5,13 213:8,10
  227:17,18 231:22,23,
  24,25
**exhibits** 176:9 213:25
**exist** 103:2 129:20
**exists** 58:2
**expect** 39:20 55:13
  58:24 90:19 183:25
  186:5,16
**experience** 206:4,18
**experienced** 161:19
**expert** 54:21 81:12
**expertise** 52:21 66:25
  67:2 195:18 196:12
  202:23
**experts** 49:9 64:22
  84:22 90:9 164:24
  226:21
**explain** 33:6 84:16
  93:23 98:9,17 99:24
  101:3,6 120:23 150:1

203:1 210:6,10,15
212:1 228:11 236:22
**explained**  37:8 97:4
98:11 126:23 144:24
180:24
**explanation**  98:25
99:3
**explored**  39:20
**exploring**  99:1
**exposed**  28:17
**express**  39:16 68:7
230:6
**expressed**  79:22 87:1
**extension**  183:7 225:9
**extensions**  218:22
**extent**  43:22
**extreme**  79:1,16

---

**F**

**face**  147:22
**facilities**  18:7
**fact**  38:13,24 46:21,
23 88:19 106:13
115:2 116:14 184:25
225:9
**facts**  28:25 122:19
**FAFSA**  217:20
**failed**  87:18
**fails**  195:25
**failure**  196:1
**fair**  90:7,8 131:7
**fairly**  139:16
**fairs**  89:19
**fall**  45:18 97:3
190:13,17 191:3
235:25 236:9 242:14
**fallen**  236:16
**falls**  203:11
**familiar**  73:16 78:20,
23 92:23,25 94:18,25
100:25 128:5 129:13,
19 132:23 150:19
205:17 215:7,19
226:24 227:21,24
228:2,16 232:3
**federal**  17:7,9,18
21:18,24 22:1,12,16,
25 25:25 26:25 27:1,
5,13 32:1,3 34:9

36:1,5,7,10,19 37:1,
3,11,20 38:6,19
42:22 51:24 53:25
61:7,10,14,22 63:14
67:20,21 68:12 80:24
112:24 116:7,15
127:13 131:5,8
155:15 156:9 157:8
159:24 170:18 174:3,
10 183:18 215:23,24
216:8 224:1,9 239:12
**feedback**  135:24
**feel**  82:13
**feeling**  135:6
**felt**  216:13,14
**figure**  128:7
**file**  169:14 182:15
**filed**  129:9 235:13
236:2
**files**  15:4 19:6 172:8
**fill**  150:22
**filled**  178:4
**final**  31:11 100:19
173:3,9 183:20
219:1,2 225:6,12
231:22
**finalized**  234:12
**financial**  47:11,23,24
131:9 241:21
**financially**  9:16
**find**  52:21 62:21
87:19 160:4 167:20
205:16,18
**finding**  156:25 180:3
**findings**  179:1 212:19
**fine**  57:13 73:12
122:1 136:7 189:19
221:24
**finish**  13:12,14
**firsthand**  52:7 160:17
195:11 206:3,18
**fiscal**  33:1 64:7,11
65:17,19,23 71:14
81:23 87:9 88:13
**fit**  203:22 207:9,10
210:14
**fits**  205:25 206:1,14
208:2 212:12
**five-minute**  105:5
**fix**  47:12,25 48:2

**fixed**  47:16,17
**flaw**  82:20,24
**flows**  86:23
**focus**  126:5 147:6
**focused**  18:15
**focusing**  47:15
**FOIA**  169:14,25
**folder**  190:3
**folks**  30:8,9 119:23
120:12 126:8 127:4,
11,12,14 145:1
148:13 149:19 169:20
170:20 171:1 200:22
226:22
**follow**  58:14 240:2
**follow-up**  198:12
**footer**  75:23
**Force**  15:25 16:2,16
18:4
**Force's**  18:9
**forever**  143:23
**forgive**  229:4
**forgiven**  147:18 148:7
**forgiveness**  131:9
**form**  24:13,14 25:3
44:10 107:6 111:5
115:22 170:8,9
171:6,10 172:12
177:17,20,22,23
178:14 179:8,16
181:19,22 182:6,8,
17,18,19 183:2,3,5,
20,21,23 184:10,12,
17,20 185:25 216:3
217:13,15,16,21,22
218:1,10,15,17
219:5,16,20,22,23
220:4 224:22,25
225:7,20
**formal**  32:22 37:10
43:18
**format**  178:3,7,9
219:2
**forms**  44:5 177:25
182:10,21,23 183:6,
9,13,16 184:23
185:19 216:25
218:19,21 219:1
225:2,13
**formulate**  62:25

formulated  63:17
forward  68:14 75:3,6
  96:21 102:14 103:16
  110:6 111:16 115:1
  116:1 140:19 166:4
  191:19 225:19 241:10
Foss  171:3,9
found  37:5 83:2 98:24
  170:7 180:3 210:21
  211:1,19
four-month  155:24
frame  67:21 92:20
  107:1 108:22 114:23,
  24 115:20 158:25
  188:17 203:12
frames  203:16
frankly  41:24
fraud  209:25
free  229:5
front  15:8 30:8 32:21
  55:18 78:23 199:22
  215:21 237:10,13,15
frozen  215:5
FSA  20:18 22:10 25:21
  26:4,19 33:5 35:23,
  25 36:14,22 37:9,15
  38:4 61:11 62:25
  63:22 67:17 69:17
  71:8 72:4 76:2
  116:23 117:16 118:4,
  12 119:1,8,13 120:8,
  19,21 121:18,20,22
  122:2,3,11,12 123:16
  136:16,24 138:18
  147:6 150:2,6 152:1
  155:5 160:7,16
  162:16 166:17 169:15
  171:15 185:12 218:1
FSA's  53:13
full  19:19 74:25
  133:3 155:20 167:9
  227:10 228:1
full-time  143:21,22
fully  240:23
function  212:24
functional  241:23
functioning  241:9

---

G

gave  68:22 100:20

general  16:13 19:24,
  25 44:1 58:5 59:22
  60:15 63:18 70:24
  73:21 80:6 82:10
  83:14 86:22 148:10
  152:16 173:11 175:16
  178:6,9 179:25 180:7
  181:3 191:20 199:14
  203:15 214:21 218:25
  221:25 225:16,18
general's  73:20
generalities  181:4
generally  21:12 25:9,
  11 33:8 51:11 58:17
  105:8 135:10 180:24
  214:9
generate  148:1
generation  37:19
  215:24
generic  58:19 196:24
generically  81:11
Georgia  16:4
gift  229:3
give  20:1 30:10 65:1
  96:25 110:1 115:6,7
  117:1 118:19 119:15
  120:18 146:12 167:10
  169:23 190:25 191:2
  207:2 229:20
giving  180:18 229:3
goal  65:18 84:11
  87:18,20 88:24
goals  35:25 36:6,10,
  11,15,17,21,25 37:4,
  15 61:11,14,21 62:5,
  10,12,17 63:7,13
  64:21 68:18 84:14
  87:7 140:16
good  9:2 11:6 62:6
  105:8 142:24
governance  68:12
government  12:2 13:19
  32:24 89:21 149:21
  150:19 155:13 156:9
  229:3
government-issued
  11:15
grade  16:12
graduated  15:22
graduates  194:10
graduating  89:23

graduation  15:21,24
granted  165:21 181:2,
  14 187:19,24 188:2
  207:20
grants  234:13,14,16
great  11:7 13:10 15:9
  20:14 58:7 59:15
Greene  30:18
ground  84:21 156:16
group  53:6 66:5,6
  138:5 162:16,17
  192:16 198:22,23
  200:22,24 201:2
  203:17,20 205:20
  208:12 209:16
groups  165:25 198:16
  199:7,16,18
growing  49:4 103:8
guess  70:8 89:7 90:1
  91:24 151:17
guidance  43:8,14,17,
  19,20 44:4,8,10,14,
  19,24 45:5,7 46:13
  92:13,14,18 106:10
  108:10,15,25 111:17
  129:17 130:5,8,11,16
  222:16
guided  55:8 67:22

---

H

halted  218:18 220:15
Hancock  10:19,22,24
  11:4,7,9,18 14:7
  20:8 29:23 31:19
  32:13 34:23 35:3,8,
  11 43:21 44:1 45:23
  46:6 51:4,8 56:8,13
  57:12,20 58:5,10
  60:4,6 67:7 72:22
  74:19 76:12 78:3
  79:8 80:19 83:7 84:5
  92:2 93:24 94:10
  97:10 105:7,13 109:1
  111:19 113:22 118:15
  119:3 120:2,25 122:5
  124:13 132:10
  133:13,20 135:3
  136:6 138:23 144:20
  145:9,19 154:12
  155:8 156:15 159:4,
  16 162:20 168:18

---

183:10 186:6,17
187:12 189:19 192:10
193:6 196:4 197:6
198:24 199:1 200:1,
7,10 208:5 214:14,21
216:19 218:3 219:13
221:11,18,24 222:20
223:8 226:1 229:10,
19 230:8,13 242:2
243:23 245:21 246:4,
7,9
**hand** 198:3
**handle** 240:10
**hands** 47:20
**handy** 11:17
**happen** 25:8 85:12
104:11 149:15 177:3
204:4,6 240:17
242:16
**happened** 132:6,17
150:11 156:19 216:17
222:24 238:23 241:18
**happy** 73:1
**hard** 58:6 78:15 141:7
195:20
**harm** 93:18 94:13
99:23 131:9
**head** 39:13 118:23
137:5 163:4 169:9
209:8
**health** 69:1 211:10
**hear** 10:14,15,16,19
11:2 35:10 75:8 78:7
228:8
**heard** 40:20 53:2
74:6,7 76:20 78:1
84:19 86:8 100:23
101:1 160:15 214:12
221:7,8 229:3 230:5
**hearing** 74:12 215:8
**held** 9:5
**helped** 19:21 152:7,9
171:9 220:16
**helpful** 199:24
**helping** 172:16,20,21
**high** 243:1
**higher** 18:1,2,3,11,12
131:3
**hire** 21:17 22:1 47:19
49:12 50:5,12 52:16,
19 87:16,19 88:17

91:11 143:3,8,13,14
144:13,16 145:8
146:24 147:1 148:23
150:18,24 155:6,11,
24 162:13
**hired** 17:5 89:19
144:3,6 147:6 148:19
151:16,20,22
**hires** 128:14 145:18
**hiring** 21:20 52:1,14
53:9 89:19 90:2,7,8
142:25 150:19 151:9
155:13
**historical** 84:24
**historically** 51:19
**history** 15:20 29:14,
15,18 38:22 83:18
109:15
**hit** 217:20
**hold** 17:13 214:4,6
237:22 244:21
**holding** 243:17
**holistic** 227:9
**horizontally** 58:3
**hours** 14:11 117:22
**House** 213:23 214:3
**Housing** 12:13
**HR** 50:7
**human** 17:4 21:13,14,
16 52:12 145:1
**Hundreds** 148:18

---

**I**

---

**Ian** 171:3,9
**icon** 217:21
**ID** 11:16,20 12:3
217:20
**identification** 15:14
19:11 56:7 136:18
141:11 142:6 227:19
**Identify** 185:6 187:5
**identity** 12:3
**imagine** 60:1 240:9
**immediately** 29:6
87:14 104:11 132:13
150:13,14 151:2,5,6
156:5
**immersed** 103:24
**immersion** 38:11

**impact** 98:11,15,18
169:7
**impactful** 169:4,5,6
**implement** 52:23
**implied** 216:14
**important** 95:2
**improve** 32:11
**improvement** 52:18
**improving** 52:24
**inaccurate** 216:15
**include** 124:8 149:22
165:4 211:19
**included** 38:24 39:12
40:9 144:25 161:4
196:25 237:6
**includes** 54:1 185:13
**including** 123:18
163:14
**income** 96:7
**incorrect** 131:16
**incorrectly** 169:13
**increase** 150:1,2,6
153:3 156:12 235:8
245:3,4
**increased** 150:10
151:9,25 153:5
165:17 244:22
**increasing** 150:13
151:18
**indication** 104:23
**indicators** 62:15,23
**individual** 20:1
54:15,23 148:2
162:1,2,9 176:20,21,
25 186:10
**individual's** 19:22
**individualized** 205:1
**individually** 212:8
**individuals** 176:22
**industry** 16:22
**ineligibility** 166:14
170:8,10,11 172:12
196:16
**ineligible** 100:9
125:9 156:25 157:25
158:5,22 160:4 170:7
**inform** 83:4,13
**information** 15:19
43:23 46:7 51:5 83:8
84:6 86:23 112:21

135:4 178:4 182:15
191:3 192:8 198:22
202:20,22 226:7
228:19 236:12
**initial**  44:16 107:4
108:18,20 109:22,24
**initially**  43:7 92:20
107:10
**injunction**  45:21 96:3
97:5,14 105:23
124:3,6 223:7
**innocuous**  229:5
**inordinate**  118:8
**input**  31:12,13 63:8
70:18,19 81:4,7
131:24 236:5
**inquiries**  240:5
**inside**  19:25 32:3,21
33:18 38:6 66:21
67:15 85:12 112:24
147:3 170:19 171:15
173:18 174:3 183:18
197:21 212:20 224:9
226:22
**insidious**  229:2
**inspector**  73:19,20
**install**  80:15
**installed**  80:14
**instance**  51:2 186:3
203:12
**instances**  14:21
**Institute**  15:23
191:24 211:11
**instruct**  84:6 230:9
**instructed**  77:19 78:1
129:25
**instructing**  43:25
51:6
**instruction**  97:23
**instructions**  98:3,4
132:5,17,22 241:22
**instructs**  13:21 35:7
128:2 129:7 193:13
**insufficient**  186:4,15
187:9
**insulated**  138:9
**intake**  235:7
**intend**  44:6
**intended**  39:25 210:20
**intense**  85:6

**intent**  211:18
**interest**  18:17 19:4
28:5 126:14 192:22
**interested**  9:17 28:9,
11,14
**interesting**  28:8
**interests**  98:15
**intern**  16:2
**internal**  30:21 48:25
49:8 55:5 71:8 86:6
152:14 160:12 161:6
175:20
**internally**  45:10
**interrupt**  57:20
**intricacies**  85:10
**introduction**  228:12
**intuitive**  216:10
**invest**  88:18
**investigating**  191:10
**investment**  71:7
**involved**  17:4 72:24
110:24 117:13 149:16
171:19,21 172:11,13,
18 175:23 215:9
**involvement**  17:25
18:2 116:3,5,20
215:11
**involves**  125:6 175:14
225:23
**Iraq**  16:11
**isolated**  86:20 167:3
**issuance**  107:18
**issue**  38:25 42:11
44:20,24 45:14,22
49:10 58:6 106:1
107:23 108:1 110:13
111:12 125:18 134:8,
10 158:10,21 159:9,
10 203:11 214:10
215:8 217:2 222:16
223:6
**issued**  37:23 38:14
39:1,17 40:2 41:9
43:13 46:17 92:1
102:14 108:15 112:9
122:24 128:1 132:18
134:2 136:24 150:4
156:24 157:20 225:25
**issues**  27:17 28:6,7,
10,19 30:22 39:20,22
40:11 52:8 53:3

91:23 131:4 191:8
211:1 214:12 243:17
**issuing**  45:13 96:6
107:9 121:19 122:2,
12 123:16 128:3
129:8 130:1 132:6
134:2,13 135:11,16,
18 138:19,20 157:3
158:16 159:7 235:20
243:17
**item**  25:15 217:17
**ITT**  137:3,10,12
163:11 164:7 237:6,
10,16

---

**J**

**January**  76:9 77:12,14
**jar**  120:15
**job**  17:2 18:24 36:18
37:1 39:11 52:18
113:8 120:15 157:14
176:13 178:20,21
191:11
**Joe**  30:16
**joined**  17:20,21 37:21
38:2,13 40:17,24
42:17 46:5 48:8,10,
13 90:22 91:12 93:5
102:6 113:19
**Jones**  14:18 23:8
24:10 25:22 26:7
42:2,17 43:12 60:12
92:24 93:1,13
101:21,24 102:1,4
106:21 107:22 115:13
131:3,19 134:5,17
173:15 175:10,21
192:7 193:4 209:24
215:6 217:25 220:15
223:5 225:11
**Jones'**  25:20 99:10
**July**  77:15 155:25
190:14,18 241:6
**June**  37:24 38:15 40:3
41:9 92:1 102:8,15
125:24 241:5
**Justice**  14:1

**K**

**keeping** 81:10
**Kevin** 11:9 14:7
**key** 62:15 116:1
**killing** 221:1
**kind** 10:20 30:8 58:2
  61:20 68:25 116:16
  117:4,6,7,20 118:1
  119:23 120:15 121:12
  129:24 137:16 148:16
  160:2,12 171:20
  185:25 186:21 195:20
  206:24 207:15 209:7
  217:2 222:23 225:4
  240:21 245:6
**kinds** 18:8 30:22
  41:22 62:23 66:2
  85:1 98:1 99:2
  117:12 145:2 165:10
  177:2 202:24 207:6
  232:15 243:9 245:2
**Kingdom** 16:9
**knew** 37:25 104:12
  115:18,20 130:14
  172:14
**knowing** 136:3 168:4
  174:12 205:20 226:6
**knowingly** 82:19
**knowledge** 52:7 59:18
  79:4 102:18,22 103:2
  111:6 123:12 151:14
**Knowledgeworks** 18:14,
  21

**L**

**label** 229:5
**lacked** 219:23 220:1
**large** 37:18 63:5
  82:20 85:2 103:6
  149:6,13 168:1 204:9
  206:17
**lasts** 63:10
**launched** 45:11
**law** 54:5 55:9 76:4
  89:22 90:11 174:13
  183:24,25 184:3,6,7,
  19

**laws** 54:6 101:12
  184:15
**lawsuits** 95:14
**lawyer** 67:1 205:8
  208:16,17 235:17
**lawyers** 67:1 127:1
**lay** 180:18 244:25
**layers** 66:6
**layman's** 180:19,22
**lead** 14:6,15 146:9
  167:14
**leader** 26:22 39:7,8
  98:6 164:15,16
  167:15 171:2,3
**leadership** 72:4
**leading** 17:16
**leads** 83:25 131:4
**learn** 37:3 78:8
  246:14
**learning** 95:25 97:25
  98:2 127:4
**leave** 184:12 195:17
  196:7 206:23 214:1
**legal** 9:14,19 77:16
  161:2,13 196:1,3
**legislated** 54:7 69:2
**legislation** 34:19
  54:5
**legislative** 61:25
  63:9
**letter** 78:24 100:18
  132:23 147:23 148:1
  152:20,23 166:8,14
  167:6,21 168:6
  172:20,22 173:2,18,
  22 175:5,21 176:12,
  17 177:1,10 178:3,8
  186:3,15,22 187:4
  225:2
**letters** 147:8 148:22
  149:1,10 166:11,18
  168:9,12 170:8,10,11
  171:10,12 172:12,19
  173:2,6,8,9 174:2,
  19,21,24 175:7,24
  176:1,24 177:7
  224:20,23 225:1
**letting** 235:12
**level** 29:8 41:21,24
  70:17,18 81:20
  84:16,17 86:9 88:17

  89:7,10,11 93:18
  94:13 96:25 99:23
  100:13 126:1 137:16,
  23 161:4,16 167:1
  198:1 207:1 243:2
  245:4
**levels** 89:8
**liaison** 117:2 119:17
  120:12,22 154:4,5
  170:24,25 171:2
  177:12 182:4,22
  226:22
**liaisons** 117:12
**license** 11:16
**lieu** 10:1
**lieutenant** 15:25
**life** 155:17
**limitations** 243:18,19
  244:4
**limited** 98:15 100:21
  116:6,9,13 151:24
**Lindsey** 30:16
**lines** 221:17
**link** 217:22
**Linkedin** 89:22
**list** 169:2 196:16
  209:25 210:1 212:17
**listed** 76:7 179:3,7
  210:9
**listen** 135:23
**listened** 228:12
**listening** 83:14 84:23
  85:20,22 86:10 228:7
**listing** 203:4
**lived** 16:9,10
**loaded** 147:25
**loading** 152:24
**loan** 76:5 121:4
  128:25 131:8 147:18
  148:3,4,5,7 149:22,
  24 172:5 240:1
**located** 9:14
**locations** 120:14
**lodged** 167:18
**long** 14:8 25:9 29:14
  52:19,20 58:20,23
  132:8 136:7 147:20
  148:11 153:21 175:6
  185:20 220:5,8,9,12
  245:7

**long-** 68:16
**longer** 240:12
**looked** 61:19 70:14
   93:6 122:21 197:2
**losers** 153:17
**lost** 158:14 206:11
**lot** 29:4 72:24 118:11
   119:1 149:13,14
   202:2
**lots** 44:5 62:14,16,
   20,22 223:14
**low** 10:25
**lunch** 105:8,16,17

———————

M

**Macom** 9:13
**macro** 81:20 89:7
   137:16,23
**made** 49:18 50:5,7,8,9
   51:1,12 62:5 71:21,
   24 89:23 91:23 102:8
   110:18 113:10
   123:11,22 125:23
   126:19 139:23 143:4,
   8,12,14,18 144:12,15
   145:7 147:12 160:1,2
   180:8 185:15 212:10
   213:4 217:16 222:18
   224:5,13,15 234:20
   236:9 241:24 244:17
**main** 113:1,5 190:25
**major** 16:13 62:12,14,
   19 240:14 244:4
**majority** 237:9,12,14
**make** 30:22 46:10
   49:11,15 50:6 51:25
   53:14,20 56:8 68:9
   83:16 85:7 95:7
   117:8 124:21 133:15
   135:25 137:15
   149:14,15 152:12
   153:8,9,11 155:22
   165:23 170:13 173:1
   179:10 182:16 184:23
   196:11 204:8 206:16
   207:5 210:11 216:10,
   24 219:14 220:2
   223:5 224:3,10 229:4
   239:19 241:23
**maker** 113:1,6

**makers** 112:22 117:5
   119:10
**making** 66:1 114:14
   122:3,18 153:22
   172:24 223:15,22
**manage** 33:16,17 47:13
   85:2,4 148:12,16
**managed** 48:2
**management** 17:4 33:5
   47:13 52:12 68:11
   86:16,17 88:20 89:14
   180:22 240:14
**manner** 10:7 43:14
   131:8 178:1
**Manning** 20:22 21:22
   22:15,19,24
**Manriquez** 45:11 92:15
   95:22 96:20 97:3,20
   98:10 105:22 108:8
   109:8 122:23 123:11
**March** 17:11,16 20:19
   27:13 28:1 35:24
   36:11,12 37:12 38:18
   40:24 41:2,3,12
   44:13 47:4 52:3,9
   56:25 57:2 59:25
   67:20 75:3,13 91:3,
   6,22,24 92:20 95:24
   97:16 102:13 103:2,
   14,15,17,23 113:19
   114:17 122:21 123:5,
   12 126:21 143:6
   150:8 151:3 155:10,
   25 156:19 168:21
   191:4,5,18 239:13
   242:13
**March/april** 107:1
   108:21
**mark** 9:9 11:11 12:7,
   17 15:11 19:8 20:11
   56:3 131:4 136:15
   141:8 142:3 227:16
   246:22
**marked** 15:13 19:10
   56:6 130:20 136:17
   141:10 142:5 176:4
   227:18
**mass** 147:24 243:2
**match** 210:25 240:1
**mathematical** 101:18
   207:19 237:2

**matter** 9:11 10:4
   64:22 66:25 79:2
   84:22 164:24 169:25
   185:18,19 226:21
**mature** 141:1
**Mcginnis** 30:20
**Mckinsey** 128:14
**meaning** 17:15 94:25
   106:9,11 107:19
   176:21 188:22 196:24
   203:10
**means** 34:12,13 53:16,
   21 93:23 94:4 125:17
   149:11 196:25 203:22
   208:14 229:25 230:3
   231:18 236:23
**meant** 29:20 44:4,7
   45:21 74:7 142:1,2
   199:15 240:15
**measurable** 66:1 68:1
**measure** 80:17 113:5
   121:5
**measurement** 160:10
**measurements** 68:6,25
   102:25 104:23 141:4
**media** 37:25 79:2,13
**meet** 14:3,8 21:2,4,6
   23:6,8 24:16,18
   26:7,11,16 27:7,11
   37:7 40:17,24 58:16,
   20 59:2,19 84:3 89:2
   140:16 176:14
**meeting** 26:9 28:1
   29:10 41:2 55:1
   60:1,3,24 61:1 68:20
**meetings** 23:17,19,25
   24:4,20,21,23 25:3,
   10 41:7,10,12,15
   58:18 59:13,17 68:10
   69:7,21,22 115:24
   230:6
**member** 18:10,14
**members** 26:7,9,13,16
   28:4 118:12
**membership** 18:16
**memberships** 18:19
**memo** 128:10 129:5
   130:7,8,23 131:2,12,
   13,19
**memoranda** 77:16,20
   78:2

**memorandum** 44:6 45:2
78:24 128:1,5
129:13,25 197:24
**memorized** 137:19
**memory** 14:6 192:5
245:3
**memos** 131:17 193:3
197:3,9,13
**mention** 26:9 170:6
**mentioned** 17:25 26:6
58:16 73:4 80:10
95:25 97:7 103:10,23
105:24 109:4 120:9
143:11 151:7 163:8
170:3 217:12 222:15
243:16 244:4
**mentions** 215:3
**merit** 181:5,12
**merits** 162:10,12
207:5
**message** 68:21,22
**met** 27:15,22 28:4
38:18 40:5,16,23
41:1 54:25 59:22,24
101:11 121:21 137:1
**method** 25:7
**methodology** 46:25
93:19 94:14,17,20
95:1,5,21 96:11,15,
16,17,22 98:21
100:13,15 101:13,16,
19 107:16,17 110:4,
5,15 111:13 112:11,
13,17,22 113:2,6,13,
21 114:4,8,11,21
115:2,12,16 116:4,
11,22 117:18 118:5,
13 119:2,5,6,11,14
120:1,8,24 121:10,
18,23 123:25 124:25
125:19 133:1 134:9,
14 152:22 153:18,21
158:21,23,24 159:12,
14 207:18 222:17
225:23 235:1 236:19
237:1,23 238:1,7,11,
14 239:1 243:10,12,
15
**metric** 32:5 67:18
68:10,17 69:7,21,22
81:24 82:3,7,9,16,23
84:2 104:7,22 105:2

140:11,14,23 227:8
**metrics** 31:17,24,25
32:2 64:6 67:22
68:14,24 69:4,11,12,
17,23,24 70:6 71:2
72:3,10,20 80:11,14,
15,25 82:2,22 83:5,
11,25 84:4,10 85:21
86:25 87:23 102:25
104:15 120:11 140:3,
7,21 141:4 164:20
188:10 189:1,3
226:8,14
**mid** 128:1
**mid-** 68:16
**mid-november** 129:6
130:2
**middle** 13:14 77:11,12
**migration** 239:7,10
**military** 16:5,7
**million** 135:22
**mind** 81:10 102:11
182:17 242:22
**Mine** 31:5
**minimum** 23:13 27:10,
19
**Minor** 30:13 33:11,22
34:5,6 39:10 86:14,
15,19 201:15 224:4,6
**Minor's** 33:13
**minus** 243:3
**minute** 53:17 55:25
230:17 231:1,3
**minutes** 25:11
**missed** 237:12
**missing** 238:25
**misstates** 80:19
113:22 118:15 119:3
120:2 154:12 155:8
222:21 243:23
**mistaken** 166:7,8,10,
17 167:5 168:9,12
**mistakes** 168:17,22
169:3 220:18
**Mittner** 86:13
**mixed** 243:11
**mode** 219:4
**moment** 168:10,15
**moments** 80:12
**money** 88:22 89:13

**month** 28:3 41:1
137:24 140:15,18,25
**months** 16:1 17:3,16
18:23 24:2 28:2
47:16 62:8 70:2
129:11 143:7 155:15
241:22
**morning** 9:2
**move** 32:16 43:8 47:1
58:12 78:13 154:24
191:22 198:4 213:7
225:19 231:21 240:11
**moved** 16:8,17,19
98:25 191:23
**moves** 107:16
**moving** 39:10 46:22
48:5 57:23 103:16
115:1 116:1
**multiple** 95:14 164:17
176:22

---

## N

**named** 33:11 124:1
190:10 241:23
**names** 14:6 20:2
30:10,12 39:4,5,14,
15 119:15,16 205:22
**natural** 25:25
**necessarily** 48:11
59:5 71:10 167:4,8,
23 183:3 221:16
**needed** 37:16,17,18
39:23 40:12 46:25
47:10,11 48:19,23
49:2 50:3 67:1 68:8
71:9 89:2,15 120:21
126:10 147:2 162:13,
14 182:6,8 184:19
191:14 239:17,25
240:17
**negatively** 81:15
**Nevin** 26:20,22 27:8
29:10 39:8 98:8
171:4 223:22,23
**Nevin's** 26:19
**newspaper** 127:20
**non-cci** 237:23 238:1
**non-corinthian** 123:8,
19 179:16 181:19
238:8

nontraditional  89:20,
  21
note  57:24 59:15
  136:23 148:6 235:2
noted  66:25 132:22
  136:2 185:9
notes  59:12,16
notice  15:3,10 211:4
notification  115:1
  191:7 236:4
notifications  104:25
  105:1 109:9 110:7,14
  133:6 149:10 178:11,
  13 237:4 243:9
notified  101:19
  147:17 207:22
notify  133:3
noting  58:9
notion  229:3
November  128:1 188:18
  195:8
nuanced  52:16
number  28:22 29:2,8,
  13 39:19 49:2 64:6,
  9,17 65:6,7 71:16,23
  87:17 88:16 90:15
  91:7 98:5 103:6
  117:24 138:25 139:4,
  11 142:21 144:9
  147:4 148:5 149:2
  150:23 153:20 155:1
  156:13 158:7 165:1,
  17 166:2 169:22
  185:5 188:22 195:25
  219:24 220:1,3 226:8
  227:2
numbers  64:20 65:9,
  11,23 66:14,18,20
  67:6 68:8 70:7,9,23
  85:25 103:5 117:6
  126:5,11,13,16 127:7
  130:17 133:4,14
  137:19 138:22 142:20
  147:24 152:5 156:6
  166:25 168:1 188:15
  189:2 237:8 240:1
  243:3 244:22

—————————————
             O
—————————————

oath  10:2

obfuscate  229:6
object  13:20 43:21
  60:6 214:14,15 230:8
objection  11:24 29:23
  31:19 32:13 34:23
  35:3 45:23 46:6 51:4
  67:7 74:19 76:12
  78:3 79:8 80:19 83:7
  84:5 92:2 93:24
  94:10 97:10 109:1
  111:19 113:22 118:15
  119:3 120:2,25 122:5
  124:13 132:10 135:3
  138:23 144:20 145:9,
  19 154:12 155:8
  156:15 159:4,16
  162:20 168:18 183:10
  186:6,17 187:12
  192:10 193:6 196:4
  197:6 198:24 208:5
  216:19 218:3 219:13
  221:11,18 222:20
  223:8 226:1 229:10
  242:2 243:23
objections  10:6
objective  37:19
objectives  36:7,10,12
  37:4 61:22 62:5,10,
  12,14,20,25 63:7,14
  66:2 71:12
obtain  169:14
obvious  29:16
occasionally  166:22
  240:15
occasions  14:11
occur  84:20 182:13
occurred  145:13
occurs  213:2
October  17:2,15,22
  52:13 204:7 206:15
offer  155:22
offers  89:23
office  19:24,25 30:7,
  8 32:1,21 62:2,6
  73:20 75:19 111:18
  117:2 119:17 131:5
  143:6 173:19,20,23
  175:16,17,22 182:22,
  23 218:24,25 223:2,
  12 224:1,17 225:16,
  17

officer  17:13,17
  18:18,24 22:12,14,16
  25:2 28:14 29:5
  30:14,16,17,19,21
  33:12 36:19 37:1
  38:5,18 42:10 47:15
  53:23 54:2,8 56:17
  59:23 61:16 70:3,21
  86:2 94:19 95:3
  116:14 146:5 150:9
  157:7 201:11 239:13
officer's  70:18
officers  30:6,11
  32:20 33:10 73:23
  224:7
offices  174:6 225:19
official  192:22
  209:9,13
officials  128:2 129:7
  130:1 159:23
OIG  74:6,8,9,13,18
  75:13
ombudsman  135:24
onboarded  37:8
onboarding  37:11,12
one-on-one  23:20
one-person's  100:21
ongoing  163:17
open  15:5 246:13
operating  17:12,17
  18:18,24 22:12,16
  25:2 28:14 29:5
  30:5,13,15,17,18,21
  32:20 33:10,12 36:19
  37:1 38:5,17 42:10
  47:14 53:22 54:2,8
  56:17 59:23 61:15
  70:3,17,21 73:23
  86:2 94:19 95:3
  116:14 146:5 150:9
  157:7 201:11 224:7
  239:12
operation  149:7
  240:13
operations  27:4,6
  28:15 56:21,24 98:16
  183:14,20 216:8
  217:3
opine  161:1 184:11
opinion  75:16 161:11
opinions  75:9

**opportunity** 84:22
**opposed** 185:16
**optimistic** 240:21
**option** 58:2
**orchestrate** 149:12
**order** 49:3 50:12 71:6
  89:4 123:1 134:6
  174:13 178:25 182:15
  192:24 219:1 239:19
**ordered** 76:13
**Orders** 128:24
**organization** 14:16
  18:15 28:16 30:4
  32:4 34:2,10 38:11
  66:22,23 68:23,24
  69:1,7 81:2,3 82:21
  85:2 88:4 116:7,18
  138:10 140:8 155:3
  169:2,4 171:8,18,21
  172:3 226:23
**organizational** 67:14
  120:19,20 171:16
  177:2
**organizationally**
  117:9
**organizations** 33:13
  34:3
**organized** 30:5 146:4
  201:10
**orient** 58:3
**oriented** 58:1 81:1
**original** 123:11
**outcome** 9:17
**outline** 173:10
**outlined** 54:4
**output** 64:19 70:18,19
  80:17,23 81:5,8
**overbroad** 168:18
**overnight** 90:19
**oversee** 33:5,22
**oversight** 18:6 26:4
  30:14 33:13,15,19
  38:20 40:6,7 66:22,
  23 86:3 127:16
  146:7,8 152:25
  201:12 213:9,23
  223:25
**owed** 125:4
**owns** 192:4 216:8

---

## P

**p.m.** 105:16,17
  136:10,11 189:22,23
  222:7,8 231:11,12
  246:23
**pace** 41:19 42:1,5,7,
  14
**pages** 178:17
**pandemic** 25:5
**paper** 174:16 176:25
  177:20 192:3 205:22
  219:24 220:1
**papers** 202:24
**paragraph** 20:17 33:4
  53:11 77:11 112:8
  121:15 133:12,21
  136:23 138:18 139:10
  142:18,19,24 147:5
  149:25 156:23 160:3
  161:24 162:9,15
  163:7 165:14 166:6,
  7,13 169:11 170:5
  190:12,13 195:6
  228:25
**paragraphs** 194:12
**parameters** 115:7
**Pardon** 31:1
**part** 18:9 28:17 38:10
  40:20 66:3,24 67:24
  68:11 69:8,22 76:17
  78:12,23 79:18,20
  95:23 97:18,23
  100:17 102:12,20
  103:25 104:14 105:2
  116:10 122:21 125:11
  126:24 127:3 140:7
  147:16 152:7,19
  161:17 163:21 164:2,
  19 165:10 169:1
  173:24 183:13,19
  197:1 199:9 207:12,
  19 215:23 217:3,9
  223:24 225:23
  226:12,13,24 234:2
  235:4,17 237:10,12,
  13,15
**partial** 117:18 119:2,
  25 120:24 128:25
  225:22

**Participants** 9:3
**participating** 9:23
**participation** 30:14
  33:12,14,19 38:20
  40:5,7 66:22,23 86:3
  127:16 146:6,8
  201:12 223:25
**particulars** 212:14
**parties** 10:5 110:23
  174:10
**partner** 30:14 33:12,
  14,19 38:20 40:5,6
  66:21,23 86:3 127:16
  146:6,8 201:12
  223:24
**partnerships** 204:9
  206:16
**parts** 34:2 38:19
  68:13 74:4 171:8,17,
  20 191:17
**party** 9:16
**pass** 155:16
**passport** 11:16
**past** 129:11
**path** 111:16
**payment** 178:19
**PDF** 133:19
**peers** 38:8
**pen** 176:25
**penalty** 10:4 161:9
  194:15,20,25 195:6,
  13 206:4,10,20
**pending** 121:19 123:17
  128:3 129:9 139:7
**Pentagon** 16:19
**people** 17:5 47:10
  48:13,18 49:4 50:12
  60:23 86:11 88:6
  89:19 90:12 97:6
  98:5 100:17 117:3
  119:18,19,20 120:10,
  11 126:10 127:13
  133:4 135:6 148:12,
  24 149:3,8,9,12,14,
  16 152:4 154:6
  171:18,23,24 173:2,6
  175:15 176:22 216:4
  218:16
**percent** 101:17 194:9
**percentage** 147:19
  153:12 207:19

**percentages** 96:7
153:18 166:25
**perfectly** 62:18
**performance** 30:25
31:4,7,18,24,25
32:11 34:22 62:15,
21,22,25 67:18 68:5,
10,17 71:2 72:3,10,
20 80:11,14 81:24
82:7,9,16 84:2,4,10
85:21 86:25 104:14
140:3,7 189:1
**performance-based**
32:4 34:10 81:2
140:8
**performing** 153:25
**performs** 154:2
**period** 27:20 32:25
63:10 150:12 151:2,4
179:3,7 203:18
211:19
**periods** 162:19 163:14
186:1 211:7
**perjury** 10:5 161:10
194:15,20 195:1,7,13
206:4,10,20
**permissible** 161:14,15
**person** 10:2 25:4,7
52:19,22,23 60:24
65:1 117:21 144:23
150:24 170:15 172:22
174:13
**personal** 116:5,19
**personally** 31:5
116:21 227:1
**personnel** 22:1 90:21
150:1,11,14 151:25
156:12
**persons** 117:25
**perspective** 42:12
171:17 177:2 180:19,
22
**pertains** 53:22
**phase** 245:10,11
**phases** 245:10
**Philippines** 16:7
**philosophy** 67:25
**Phoenix** 205:21 206:1,
14,19 208:2 209:2,6
**phone** 25:4 60:23 61:2
117:22

**phones** 13:6
**photo** 11:16
**photo-issued** 12:3
**physical** 59:6 74:10
**physically** 9:24 90:9
155:12
**pick** 60:23 150:24
**picked** 212:4
**picking** 153:17
**picture** 152:2
**piece** 212:15
**Pittsburgh** 211:11
**place** 48:4 84:18 85:8
90:18 111:13 124:4
127:3 132:12 134:9
164:17 167:2 173:1
222:17 223:7 235:23
**placement** 176:14
178:21
**places** 149:14
**plaintiff** 190:10
**plaintiffs** 12:10,14
**plan** 61:24 62:1,3,18,
22 63:1,4,17 64:19,
20 65:8 66:1 68:2
82:2,3
**planned** 240:24
**planning** 30:16 57:23
65:14
**plans** 37:2 61:20
146:2
**platform** 24:14 88:19
91:16 152:24 217:1,
10,17 218:2,11
219:10,12 228:10
239:6,10,15,18,21
240:4,8,16 241:15
242:8 243:7,12
244:14,18
**play** 99:4
**point** 104:20,21,25
107:13,14,15,16
110:12,15 115:5
122:9 124:19 139:21,
22 141:2 159:18
185:18 188:8 218:17
231:4 233:20 241:2
**points** 88:16
**policies** 77:22 225:15
**policy** 25:23 26:1,5,
23,24,25 27:1 92:13

93:14,16 95:4,7
106:10 111:12,15
112:10,23 113:7,8
114:14 117:2,5,12
119:7,10,17 120:12,
13,22 121:9,12,18,23
131:6,17,25 132:3,12
136:1 153:19 154:4,5
160:16 170:23,25
171:2 173:8,10,18
174:15 175:14
177:11,15 182:24
183:6,7,9,16,22
184:24 185:19,23
186:1 218:22 223:1,
16 224:2,10,16 225:9
226:22 238:17
**political** 22:22,24
23:5 34:14,17,20
**Politico** 128:21,24
129:15
**poll-** 173:17
**portal** 138:1 215:20,
21 216:3
**portfolio** 17:4 21:17
28:13 128:15
**position** 17:13,21
123:5 160:14 193:20
**positions** 18:11
106:16
**positively** 81:15
**possession** 179:19
**possibly** 41:3 182:4
**posture** 110:3,9,13
**potentially** 46:6 83:8
135:3
**Powerpoint** 232:4
233:10 237:21
**practice** 180:20
**practices** 52:1
**precede** 51:21 56:16
**precise** 69:19 70:22
**precisely** 48:15
114:24
**predates** 57:4
**predecessor** 20:21,22
60:3
**predictable** 131:8
**preliminary** 163:12
**premise** 131:15
226:15,17

preparation  152:21
prepare  13:22 31:12
  58:21 131:19
prepared  131:2,14
  152:23 176:16 184:11
prepares  31:9,10
preparing  77:16
  171:5,6 232:15
presence  178:14
present  9:24 239:6
  241:13 244:11
presentation  11:20
  232:24 233:9,14
  237:24 238:6,10
presentations  233:3
presented  18:3 36:18,
  22,25 61:14,19
presents  12:2
press  213:9,13 214:25
  215:3 216:5,15,22
  217:6,8,23 220:14,22
Pressley  99:7,14
pretend  55:4
pretty  32:16 41:5
prevent  134:6
prevented  96:6 97:5
preventing  13:16
prevents  93:16
previous  207:3
previously  109:6
  129:7 190:24
primarily  88:25
principal  30:17
printout  63:20
prior  16:1 52:2,9
  91:3 122:17 192:23
priorities  35:25
  36:22,25 37:15 61:11
  145:17 146:13,15
prioritize  157:2
priority  54:18 146:19
private  230:6
privileged  43:23 84:6
  135:4
problem  168:2
procedures  164:12,16
  215:15
proceed  236:20
proceeding  9:4 102:10

proceedings  9:21
process  28:11 37:11
  39:21 48:5 50:2
  52:18 53:8,9 55:9
  64:24 65:2,10,15
  66:24 81:17 82:4,22
  83:12,23,24 84:18,21
  85:7,13,23 93:21
  95:4,24 96:1 97:16
  98:18 99:16,17,19,
  22,25 100:22 101:2,
  15,22 104:22 108:5
  123:4 125:8,16
  126:21 129:10 130:17
  138:19 139:12 141:1
  143:9 147:7,10
  148:10,11 149:13,17
  150:21 151:12 152:2,
  8,10,22 155:21,23,24
  156:6 162:1,3
  163:15,18 164:3
  167:16 168:4 172:15,
  25 173:25 174:1,11,
  17,18 175:2,11,14
  177:14 183:4 184:22
  187:25 188:6 189:12
  197:1 199:11 207:16,
  21,25 209:7 215:5
  216:6,7 219:7,8
  220:9 223:15 225:16
  235:4 239:2,19
  244:14
processed  100:10
  104:17,24 227:5
  233:24 234:3,10
  239:9
processes  46:19 69:25
  85:14,17 98:12 156:4
  164:12,17 167:2
  208:15
processing  35:2,17,20
  52:24 99:21 100:3,11
  130:5 148:21 239:5
  240:14 241:1,3,12,25
  242:1,23 243:2,20
  244:10
produce  72:19 137:23
  138:1 172:8
produced  158:23,24
  176:1 177:23 189:7
produces  65:11
product  212:25

production  42:11
  46:19 67:2 68:17
  72:2,6,23 80:25 81:3
productive  39:23
products  215:22
program  39:25 180:2
  244:24
programmatic  204:9
  206:17 210:12
programs  117:14 179:2
progress  71:20,21,24
promissory  148:5,6
protocols  76:21,23,24
  164:6,9,22 165:4,12
  173:19 175:20
provide  116:16 117:5
  119:9 131:22,23
  135:23 179:23 185:6
  187:5
provided  82:10,12
  92:17 93:1 121:25
  169:15,18 204:3
  205:3 228:18
providing  98:4 112:21
  171:13 235:15
public  34:16 63:8,10
  137:15,24 138:4
public's  63:15
publish  137:25
  138:10,13,15
pull  15:6 117:3
  119:19 120:10
pulled  213:25
pulling  117:14
purely  152:18
purpose  219:9
put  90:1 118:7 149:10
  174:6,7,8 176:25
  184:10,11,22 187:10
  200:18 202:10,17
  204:2 220:4 225:3
puts  170:15
putting  177:14 241:21

---

**Q**

qualified  76:5 77:18
  162:12 244:25
qualifies  160:11
  206:25

**qualify** 77:21 160:11
206:25
**quality** 70:20 81:5,8
**quantify** 120:17
**quarterly** 69:14
**question** 13:14,15
21:3 27:19 31:2,13,
15 32:2 33:16 35:13
36:20 43:22 46:11,12
48:3 52:17 53:21
56:24 57:1,22 61:13,
17 80:4 85:17 86:23
94:5 95:6 102:12
107:21 113:25 114:1,
3,18,25 122:16
124:20,21 125:12
132:14 140:11,17,23
145:22 146:15 154:14
157:13 159:17 160:1
161:5,22 169:9,20
172:1,2 177:9 178:13
186:20,23 187:16
193:21 197:8,23
198:12 199:10 201:17
202:12,16 205:7
206:12 208:10 209:24
212:22 214:24 216:11
218:14 219:15 225:3,
22 231:6 233:14
234:17 238:4 244:9
**questioning** 13:13
74:20 214:15
**questions** 13:20 53:8
58:15 80:6 83:15
85:1 161:16 171:19
174:25 201:7,23,25
202:5,7 207:6 222:13
245:19
**quick** 57:11 155:14
**quicker** 21:17
**quotation** 134:17
**quote** 194:8,9
**quotes** 194:6,11

---

**R**

---

**raising** 207:7
**range** 149:18,19
**rate** 139:20
**reach** 88:13 169:12
**reached** 71:16,23

**react** 186:10
**read** 14:14,15,17
37:2,25 53:18 59:2
75:7 77:11 79:3,13
93:2,5,12,14 94:3,7
95:17 97:9 99:7,10
121:15 130:25 133:11
142:21 147:21 166:5
194:23 211:21 212:1
213:19,20,21,24
214:8 215:17 227:25
228:17,25 229:21
230:18 246:10
**reading** 87:13 93:8
121:9 133:9 195:2
211:15
**ready** 123:24 124:2
139:14 235:3
**reality** 218:15
**reason** 24:3 29:21
62:4 85:5 115:25
186:3 187:8 191:6,12
204:19 215:15
**reasonable** 82:7,14,17
154:21
**reasoning** 158:10,16
**reasons** 61:7 190:25
191:21 196:1 204:1,
20 211:20
**recall** 21:11 39:4,6,
14,15 41:11,12,21,25
50:24 53:5 59:21
74:11,12 75:20 87:4,
5,6 93:8 107:15
125:25 126:4,7,13
130:7 168:10,14
193:4 199:8,18
201:25 202:7 221:12,
19 241:20
**recap** 207:15
**receive** 15:9 130:10
170:8 188:14 232:16,
19
**received** 108:24
167:20,21 168:8,11
186:2 188:20 190:14
191:6 209:25 210:1
**receiving** 70:5 71:25
72:5 154:21 191:1
**recent** 166:20
**recess** 57:16,17
105:16,17 136:10,11

189:22,23 222:7,8
231:11,12
**recite** 62:19
**reclaim** 178:22
**reclaims** 176:14
**recognize** 19:14,17
141:14 142:9 199:21,
25 213:13
**recollection** 14:20
111:9
**recommendations**
164:25
**reconciled** 148:8
**reconsideration**
185:13 186:14
187:11,19 188:20
189:10
**record** 9:3,7,21 10:10
11:20,24 12:1,5,16
57:11,15,19 105:12,
15,19 136:5,9,13
189:21,25 218:7
222:3,6,10 230:12,22
231:8,10,14 246:3,20
**recorded** 9:4,5,8
**records** 169:14,16,18
209:9,14
**recruit** 47:19 52:20
**recruited** 16:24,25
17:5
**recruiting** 17:7 90:2
143:10
**recruits** 16:15
**redact** 192:8,14
193:16
**redacted** 193:5,17,19
198:18,23 199:4,13
**redaction** 192:24
**redactions** 198:15
199:12,14,15
**redactor** 193:16
**reduced** 147:19 148:6
**reducing** 146:18
**reduction** 219:24
220:2
**reference** 240:16
**referenced** 75:11,13
152:3 168:7 239:24
**references** 74:6,8,12
**referencing** 128:16
217:9 243:4

**referred**  73:8 78:16
91:18 119:11 127:19
176:6 190:4 198:7
213:10 231:25 244:16
**referring**  56:10 94:17
116:13 129:16,18,21
133:22 220:24 244:9,
10,13
**refers**  95:8
**refresh**  14:19
**regard**  34:20 228:16
**regions**  17:8
**regrettably**  76:16
95:11
**regs**  184:2
**regular**  24:20 232:16,
23
**regularly**  24:22
40:16,23 58:16 60:3
**regulations**  235:9
**reissuance**  139:25
**reissuing**  158:25
**relate**  112:2 197:4,
15,16 203:8
**related**  9:15 21:16
34:22 35:2,17,19
42:9 52:8 115:1
125:1 163:9 192:8
198:16,18 199:6,8,
15,18 216:18 239:14
**relates**  26:5 32:11
33:7 169:9 192:15
197:5 208:3
**relating**  52:14 204:8
206:16
**relationship**  25:25
26:3 35:21 52:10
**relationships**  242:25
**relative**  18:11 188:22
**relayed**  223:13 224:17
**relays**  159:24
**release**  133:2 213:9,
14 215:1,3 216:5,15,
23 217:6,8,24
220:14,22
**released**  213:23 214:2
**relevance**  229:11
**relevant**  32:16 75:2,5
121:5 157:4,6,21,23
158:11,18 174:9
178:4 193:8,10

204:21 226:7 231:2
**relief**  93:18 94:14
96:7 97:5 98:20,23
99:23 100:9,13
101:17 111:13
112:10,13 113:2,13
114:7,11 115:12
116:4,11 117:18
118:5,12 119:2
120:1,24 121:4,17,24
124:11 125:3,10,19
128:25 129:10 132:25
134:7,10,22 152:21
153:12 207:19 222:17
225:22,25 235:1
236:19 237:1,22,25
238:7,10,14 243:13
**rely**  204:23
**remainder**  140:25
**remains**  39:10
**remember**  18:22 42:3,
6,8,13 43:3,6,11,16
48:14 50:15 51:15
52:24 65:24,25 66:6
70:7,22 72:12,14,15,
16 80:12 89:6 114:5,
6,24 130:12 131:11
188:19,23 201:24
202:4 215:8 220:5,11
221:1 245:9
**remote**  9:8,13,20
246:22
**remotely**  10:1,3
**remove**  192:8,16
**removed**  66:7 193:5
219:11,15
**reopen**  246:15
**repayment**  185:8 187:7
**repeat**  31:1 35:13
67:13 165:23 206:12
238:3 242:17
**repeatedly**  243:16
**repeating**  102:11
**rephrase**  106:3 124:9
**reply**  109:22,24
186:5,9
**report**  22:6,7,14,21
23:4 30:6,9 31:8,12
32:20 34:5 63:22
73:20,22,23 74:3,6,
8,9,10,13,18 75:5,7,
11,14,20 136:16

138:7 157:24,25
158:8
**reported**  69:25 72:3,7
102:24 103:3 104:18
126:11,14 129:6
167:6
**reporter**  9:19,22
10:13,16,20 11:2,6,
8,13,22 69:22 138:12
230:16,20,23,25
231:3,5 237:11,17
**reporting**  9:25 10:7
22:19 32:25 69:4,11,
16
**reports**  30:2,3,24
31:3,9 34:6 138:1,
11,15,16 168:9,12,16
**represent**  176:12
183:7
**representation**  56:20
57:4
**represented**  29:4 62:8
145:17 146:19
**represents**  203:2
**Republic**  16:6
**request**  9:6 49:16,18,
19 50:5,6,10 119:21,
22 143:19 145:7
169:14,25 186:13
187:11 236:14
**requested**  24:5,6,8
169:16,19
**requests**  48:8,10
49:11 51:2,12 52:5
91:11 145:7 187:19
188:19 189:9
**require**  67:19 175:15
201:24 243:13
**required**  53:9 67:21
119:25 120:7 156:4
191:11 192:25 201:20
214:19 236:3 240:12
243:9
**requirement**  61:25
236:3
**requirements**  63:9
121:22 156:8
**requires**  174:13
**reread**  162:4
**reserve**  246:9,13
**resign**  18:20

resigned   19:4
resigning   18:25 19:3
resolve   131:7
resource   241:8
resources   47:12,23,24
  51:25 54:9 64:24
  71:22,25 82:11,12
  87:12,17 88:5,7,10,
  12,18,21 89:1 103:10
  104:3 119:24 120:7
  126:15 139:22 145:1
  165:10 239:18
respond   51:3 235:17
responded   106:25
response   51:12 107:4
  108:18 145:4 235:8
responses   83:18
  235:20 236:14
responsibilities
  53:13,25 54:4
responsibility   28:16
responsible   65:10
responsive   37:17
restarted   135:18
result   157:1 236:19
results   68:1
resume   128:2 129:8
  132:6,18
resumed   121:19 122:2,
  11 123:16 124:7,19
  125:15
retired   16:12
retirement   16:17
review   55:9 72:9
  93:17 122:19 157:14
  163:8,12,24 173:6,12
  175:15,16 180:2
  195:4
reviewed   77:23 173:15
  198:2
reviewing   70:5 71:2
  72:13
reviews   15:15 19:16
  32:22 53:19 56:14
  63:25 71:17 73:15,18
  78:22 128:12 141:16
  142:11 162:7 166:12
  177:19 187:22 194:1,
  16,24 200:11 214:7
  227:23 229:24 232:5
  233:5

rhythm   41:5
right-hand   190:7
  195:21 228:22
rightfully   218:23
rights   12:13 178:21
ring   130:3
rise   167:1
rises   161:4,15 206:25
road   141:3 240:25
Robin   30:13 33:11,22
  34:5,6 39:10 86:12,
  14,19 201:15 224:4,6
role   18:1 20:18 25:20
  26:19,24 27:2 53:16,
  22 54:2,5,8,13
  119:7,8 223:22
rolling   138:21
room   9:24 12:19,21
  13:5,8
rough   50:16,22
roughly   72:12 128:3
  182:1 188:19
route   193:18
routine   41:2
routinely   24:11 25:6
  41:17 59:14 70:25
  81:4
rule   235:23,25 236:2,
  9,16
rules   101:12
ruling   199:11
run   56:21,24 117:4
running   117:14 161:20
Ryan   9:19

---

## S

Salesforce   244:20
sat   14:24 146:14
scale   168:5
scenario   147:18
scenarios   207:6
schedule   156:1
scheduled   24:21,22
school   90:11 138:5
  162:18 165:25 179:17
  180:3,9 181:15,20
  191:25 192:4,15,16,
  25 194:8 197:5
  198:15,22,23 199:7,

15,18 203:7 209:16
  210:18 211:10 235:8,
  12,13,14,16,20
  236:4,12
schools   89:22 124:1
  137:7,10,11,18
  163:10 164:7 165:19,
  20,22,24 192:19
  210:11 212:3 225:24
  236:13 237:6
scientific   49:7
scientists   117:11
scope   31:20 32:14
  34:24 35:4 60:7
  74:20 76:13 79:9
  121:1 162:21 163:13
  192:11 193:7 199:1
  203:17 204:2 205:5,
  12 207:9 210:8
  211:13 212:12
  214:14,16 216:19
  218:3 219:13 221:11
  226:2 229:11 230:8
script   228:18
Sean   169:12
secretary   14:17 17:1,
  12 22:7 23:4,7
  24:17,18 26:4 31:11,
  14 40:16,23 41:6,15,
  20,23,24 43:12 50:8,
  9 51:3 58:17 59:6,7,
  20 79:22 106:21
  108:16 109:22 110:21
  111:3,18 130:15
  144:25 145:1 159:24
  173:13,24 175:18,20,
  23 218:25 221:8
  223:2,13 224:12,18
  225:17 227:22
secretary's   78:25
  112:23
section   52:22 128:18
  184:8 185:2 194:23
  195:6
sections   117:10
secure   47:23,24
security   150:20
  155:16
seek   106:4 107:11,24
  108:13
seeking   129:9

sees  173:20
send  31:13 61:4 90:12
  106:11 108:9 109:9
sending  107:2,3
  108:17,19 109:16,24
  178:10,12
sends  59:7
senior  16:24 17:23
  22:18,23 28:18 52:11
  53:1 72:4 192:21
sense  91:11 118:25
  153:23 175:25
sentence  93:15 94:8
  121:16 130:25 231:18
  234:9
sentiments  230:7
September  143:1
  155:6,13 241:7
series  244:23
servants  34:16
servicer  148:3
servicers  149:23
servicing  172:5
sessions  23:20
set  36:11 62:11 64:9,
  17 65:13,16,20
  66:14,17,20 67:5
  68:8 69:12,13 81:24
  85:21,24 86:25 96:19
  111:16 138:22 139:1,
  3 140:3,11,14 163:2,
  4
sets  203:9
setting  65:22 112:10
  164:19 226:7,13
settle  63:13
Seventeen  128:20
sheer  46:21
sheet  174:9
sheets  192:3
short  136:4
short-term  68:17
shortly  18:18 49:24
  50:1,18 90:14
showed  29:13
showing  235:14
shrill  229:4
shy  190:21
sic  194:6

side  13:7 172:6
  195:22 223:16 228:23
sideways  58:1
sight  13:10
sign  81:25 82:15
  131:21 158:7 246:10
signature  20:3 78:25
  141:22,24 246:21
signed  79:17 82:1
  84:9 128:1,11 129:5,
  25 130:2 141:17
  160:16,20,21 194:15,
  19,25 195:12 206:4,
  10,20
significant  63:4
  71:21,24 126:17
  169:7 191:10
significantly  29:17
  126:6 156:24
signing  82:4
signs  161:9 195:7
similar  194:3 211:7
similarly  169:11
  224:19
simple  238:19
simply  37:12 50:24
  75:1 103:8 109:10
  150:24 155:14 158:3
Sir  215:3
sit  127:2 146:12
site  137:25 138:1
  217:14 218:1
sitting  116:21 124:2
situation  24:12 60:25
  89:24
situations  210:20
sixth  133:19 237:20
sizing  155:4
sky  45:19
slides  233:12,16
slightly  116:8
small  75:23 228:22
smart  217:16,21,22
  218:1
smartphone  12:25
social  24:14
software  244:24
sole  110:22
soliciting  235:20

sort  99:6
sorted  188:8
sounds  91:22 147:22
  175:10 225:24
source  96:7 180:6
sourced  129:21
sources  135:24 202:11
Southern  16:3
space  195:18
Spain  16:10
speak  42:1,16 151:4
  152:13 160:9 222:23
  239:23 241:4
speaking  209:23
  243:21 244:3
specialties  152:9
specific  18:13 41:25
  44:14 65:1,7,16
  72:25 87:4,6 118:19
  143:24 145:13 174:21
  175:5 187:4 199:7,15
  201:25 205:7,8
specifically  26:4
  29:1 41:13 42:14,25
  47:8,10 52:25 80:7
  130:13 132:21 178:5
  200:20 212:23 222:23
specificity  152:15
  198:1
specifics  210:23
speculate  45:8 95:13
  118:2 137:15,17
  188:12 195:15 205:10
speculation  78:4
  186:7,18 187:13
  196:5 229:19
Speculative  93:24
  94:10
speech  227:21,25
  228:1,8,12,18
speechwriter  230:1
speed  17:6 21:25
  52:15 191:22 245:4
spend  85:6
spending  84:20
spent  16:18 94:23
  118:14,22
spoke  42:24,25 106:21
  124:8 218:19 225:22
spotted  166:10,17

spreadsheet   240:13
spring   50:19 114:5
  245:14
staff   48:8,10,12,18
  49:12 50:5 51:17
  52:5 58:21 77:19
  117:16 118:11,14
  119:13 120:9 145:18
  174:8 232:10 243:18
staffed   29:7 218:24
staffing   21:15,24
  28:23 53:3 63:9
  150:6 172:15,25
  173:24 177:14 183:4
  184:22 199:11 219:7,
  8 244:5
Stafford   129:16,20
  132:24
stage   100:7 139:11
  239:1
stages   235:6
stalled   129:10
stamp   56:10 75:24
  200:6 209:18
stand   188:2
standard   183:25
standing   23:16,19
  24:21,22
start   15:18 23:24
  48:5 69:3,6,16 72:5,
  6 90:4,5 101:16
  112:7 114:4 130:1
  132:7,9 133:22 139:2
  155:12 194:22
  235:19,20
started   16:7 17:2
  18:1 20:19,23 24:4,
  25 25:2 27:25 28:20
  29:9 35:23 36:1,5,
  13,14,18,25 37:6,12
  40:2 43:7 44:13,20
  46:14,16,18 47:4,7
  52:7,13 61:10 65:22
  70:4,5 71:1 72:13
  77:6 79:22 91:5,22,
  24 95:19,24 102:13
  103:14,16,17,23
  108:21 113:15 114:6
  115:3,4,8 135:11
  136:15 137:9 150:13
  158:25 174:18 181:14
  183:2 238:1 239:11

starting   15:21 122:12
starts   67:3 77:12
  93:13 130:23 194:22
  229:1
state   12:16 76:4
  183:25 184:3,6,19
  196:1,3
stated   33:9 109:6,21
  111:24 142:15 143:18
  158:20 175:19 181:6
  184:7 207:1 232:20
  239:16
statement   9:20 74:7
  93:23 112:10,22
  113:6 119:7 121:13,
  18,24 123:20 124:19
  130:18 131:15 134:12
  135:25 139:9,23
  151:24 152:3 157:9
  173:8 179:10 229:16,
  18
statements   174:7
States   15:25 16:2,15
  18:4
stating   10:9
status   28:12 38:24
  40:8 41:17 97:17
  209:14
statute   240:7
step   100:24 101:1,15,
  16 102:9,16,18,21
  103:7,13,19 104:16,
  17 124:11 125:5,11,
  16,21,23 126:18,24
  127:2 147:14,15,16
  151:8,9,12,17,18
  152:8,10,12,18
  153:4,8,9,14,15
  154:9 167:16 207:13,
  14,15,16,24 208:4,9
  227:11 234:1,4,6,8,9
  236:24 242:23,24
  243:6,8
steps   47:6 153:4
stipulations   203:9
stop   78:1 100:17
  122:12,18 123:6
  164:2,4 217:25
  241:25
stoppage   46:4
stopped   45:12 102:18,
  22 122:19 123:3

  124:24 125:13,14
  136:1 151:13 154:10
  218:13 242:21
strategic   30:16 37:2
  61:20,24 62:1,3,22
  63:4,17 64:20 65:14
  66:1 82:2
strategy   157:2
Stratford   132:2
Street   9:15
student   17:7,10,18
  21:18,24 22:1,12,16,
  25 26:1,25 27:1,6,13
  30:19 32:1,3 34:9
  36:1,5,7,10,19 37:2,
  3,11,17,20 38:7,19
  42:22 54:1 61:7,10,
  15,22 63:14 67:20,22
  68:12 80:24 112:24
  116:7,15,16 127:13
  128:25 131:5 155:16
  157:8 159:25 170:19
  174:3,10 183:18
  215:22,23,24 216:8
  224:1,10 239:12
Student-loan   128:15
studentaid.gov   217:18
students   18:8 81:18
students'   123:7,8
subject   34:21 64:22
  66:24 67:1 76:10
  84:22 164:24 192:6
  216:12 224:21 226:21
submit   180:10 186:13,
  16
submitted   24:8 121:21
  185:14 190:12 206:3
subordinate   33:17,18
  127:17
subordinates   38:6,16
subschools   192:20
subsequently   195:7
substantially   150:2
successful   71:13 89:5
  155:22 178:25 179:6
  234:20
suffered   131:10
sufficient   157:17
  160:5,7,17,22 163:12
sufficiently   29:6

suggest  221:9
summary  174:9
summer  239:5 242:13
  244:11 245:14
supervisors  146:10
  167:12,14
support  9:14,20 47:14
  62:16 117:5 120:15
  149:6 206:6 243:4
supported  76:3 160:5
supportive  117:15
suppose  154:8 216:14
supposed  109:17
  219:19
surface  211:14,15
Sweet  9:11 190:10
Sweet's  193:23
switch  170:2
sworn  10:3 12:8
symbols  217:19
system  17:7 46:19
  50:7 88:19,20 148:1
  158:5 191:14 239:25
  240:2,11,25 241:3,9
  242:14 243:20
  244:10,20 245:6,13
systemic  166:24 168:2
systems  47:12,13,25
  71:7 89:14 103:11
  117:3 152:24 167:20
  191:11 239:5 240:20
  241:2,12,22 242:1

---

T

---

tab  15:3,8 19:6 20:6,
  13 53:11 55:17,20
  112:5 136:21 141:6
  142:2 176:8 190:2
  198:6 227:15
table  64:2,10
tables  225:24,25
tackle  49:10
tacks  170:2
tail  147:20
taker  59:15
takes  155:15 207:24
taking  18:23 49:24
  50:1 67:25 119:1
  219:3

talent  54:10
talents  21:18
talk  24:13 41:17
  58:20 59:4 90:24
  91:2,16 105:8 106:20
  109:11 132:21 138:2
  150:12 151:3 160:25
  166:14 170:3 172:5
  191:16,18 243:19
talked  34:8 58:15
  124:11,12 143:2
  172:10 207:21
talking  56:22 80:11
  88:22 89:6,15 97:22
  102:21 103:1 105:22
  123:9 125:16 127:15
  132:24 147:24 168:23
  197:24 198:12
  212:17,18 218:20
  220:21 233:17 242:23
  243:3,20
target  64:6,9,14,17
  65:12,16,23 66:18
  67:6 68:8 88:13 89:2
  226:8
targeted  227:3
targets  64:21 66:5
team  26:8,10,13,16,23
  28:4 29:12 40:8 43:7
  44:23 47:9,14 48:22
  49:8 87:12 96:5,9
  97:24 98:3,6 103:24
  127:14,17 141:5
  146:9 152:15 161:7
  171:1,4 174:15
  180:23 232:14,17,19
  236:11
teams  24:15 154:5
technical  172:6 217:2
  219:25 244:23
technically  244:25
technician  9:13
technicians  121:11
  153:25 154:4 226:21
techniques  215:15
technology  191:11
  240:20
teleworking  16:3
telling  45:2 115:3
  180:21
tells  165:8

tempo  23:12
temporarily  22:25
ten  17:8 90:20 231:10
ten-minute  189:16
  221:23
ten-page  130:23 131:2
term  42:5,6 48:2,20
  88:1 97:18,20 100:3,
  16,22 102:1,2,5
  113:10 127:12,15
  143:3,22,24,25
  145:22 165:5,6
  180:14 196:21,25
  220:25 221:1 240:21
terminology  100:25
terms  45:13 48:16
  53:16 85:11 89:20
  94:3 97:21 101:5,23
  107:22 112:18 116:19
  133:4 137:6 175:9
  188:22 215:17 216:16
  230:2
testified  12:8
testimony  10:4 80:20
  92:23 93:1,2,6,13
  113:23 118:16 119:4
  120:3 154:13 155:9
  222:21 243:24
text  60:21,22 61:2
theoretically  210:23
Theresa  9:11 190:10
thing  90:19 97:23
  101:10 117:20 153:10
  160:2 186:14 206:2
  222:14 244:15
things  12:15 18:8
  27:16 34:1 38:10
  46:25 48:4 58:15
  61:20 62:23 63:12
  66:2 68:25 71:5,8
  74:9 82:5 85:11
  88:24 89:9 91:8
  97:17 98:1 99:3
  103:1,9 112:20
  116:17 117:4,7,12
  127:3 136:2 143:10
  145:2,13 148:16
  150:23 152:17 160:12
  165:1,2,11 171:20
  172:17 177:3 180:1
  181:7 188:7 197:2
  202:25 204:3 208:20

210:24,25 211:25
212:7 216:10 225:4
227:14 232:15 233:20
239:16 242:24 243:9,
10,11 245:6,8
**thought**  36:17 46:3
48:23 61:16 107:25
108:24 126:15 213:1
**thoughts**  45:10
**thousand**  139:17
**thousands**  138:20
**three-**  155:24
**tied**  121:4
**tiered**  112:10,12
113:2,13 114:3,7,11,
20 115:12 116:4,10
118:5,12 121:17
222:17
**tighter**  240:3
**time**  9:10,11,18
11:24,25 12:5 14:10
18:16 22:10,11 23:1,
10,12 25:6 27:20
36:7 39:1,6,8,10
40:11 41:6,11 43:13
44:16,17 49:20,21,
23,25 50:24,25 54:10
56:16 57:5,8,15,19
58:23 59:22 61:1
66:8 67:21 69:19,20
70:1,19,23 71:19
73:25 84:20 85:7
91:2 92:16,19 94:23
104:9 105:8,15,19
106:17,25 107:1
108:21 109:18 110:2
114:23,24 115:19
118:7,8,11,14,19,22
119:1 122:9,17,20,25
124:4 125:24 126:14
134:15 136:9,13
139:21,22 143:5
150:14 151:2,4
155:18 156:7 157:23
158:25 162:19 163:14
165:17 174:21,22
179:3,7 182:4
185:18,25 188:17
189:21,25 203:12,15,
18 211:18 214:3
222:6,10 226:20
231:14 233:13,19
235:2,16,23 238:2,9

245:10 246:3,20
**time-consuming**  118:4,
6
**timeline**  241:6
**times**  16:8 25:16
27:22 41:14 42:23
49:15,18 117:25
156:16 159:18 233:12
**timing**  62:6 123:1
**tired**  245:20
**title**  228:3
**today**  9:9 13:17,22,25
17:13 30:12 49:6
56:25 74:1,3,4
104:19 117:20 163:18
169:10 178:10 185:20
188:3,11 193:1 208:9
218:11 219:6 227:11
240:22
**today's**  246:2
**told**  68:19 78:11
84:12,13 85:14,16
86:11 95:17 97:14
104:5 106:14,23
107:22,23 122:20
127:4 145:23 146:2
188:11 194:8
**tomorrow**  117:21
**tool**  214:13 215:4,12,
18 216:1,18 217:9,11
220:15
**top**  39:13 56:11 64:3
76:1 93:9,12 118:23
131:3 137:5 142:21,
22 163:3 169:8
195:21 209:8,17
228:3
**topics**  42:23 58:25
59:4,8,9 222:13
**Torchiana**  10:11,15,18
12:11,12 15:11,17
19:8,13 20:7,10,14,
15 29:24 31:21
32:15,17 34:25 35:5,
15 43:24 44:9 45:24
46:8,15 51:6,9,10
56:3,12,18 57:10
58:4,8,11 60:8
63:21,23 67:9 72:18
73:3,11 74:22 76:14
78:6,19 79:10 80:21
83:9 84:8 91:20 92:5

93:25 94:11 97:12,13
105:20 109:3 111:21
114:2 118:17,24
119:12 120:6 121:2
122:6 124:15 127:22
132:16 133:17,24
135:9 136:4,14,19
138:17,24 141:8,13
142:3,8 145:3,15,25
154:16 156:10,21
159:8,19 162:22
168:24 176:7 183:12
186:12,25 187:17
189:5,8,15 190:1,5
192:12 193:9,11
196:13 197:11 198:9
199:5 200:4,8,14
208:25 213:12 214:17
215:2 216:20 218:4,
6,8 219:18 221:15,22
222:11 223:4,17
226:4 227:16,20
229:13,22 230:11,14,
19,24 231:2,4,15
232:2 237:19 242:6
244:2 245:17,25
246:6,12,18
**total**  136:3,24 233:1
245:1,9
**totally**  116:17 132:23
**traditional**  170:14
**trained**  55:13 161:13,
17 208:24
**training**  16:14,21
18:5
**trains**  16:15
**transcript**  15:14
19:11 56:7 136:18
141:11 142:6 227:19
246:11
**transformational**
37:18
**true**  24:24 27:24
33:23 178:6
**Trump**  128:14
**trust**  82:22
**truthful**  13:17
**Tuesday**  9:9
**Turkey**  16:10
**turn**  15:2 19:5 20:16
33:3,17 53:10,11
55:15,17,22 63:19,24

73:7 75:22 78:14
93:9 112:3 127:18,24
129:3 130:21 133:10
136:20 141:6 142:17
156:22 161:23 176:3,
9 178:16,23,24
179:15 181:18 185:10
190:2,6 193:22
194:4,13 195:19
198:5 199:22,23
200:15 209:16 213:8
220:13 227:15 231:23
232:25 235:5 237:20
**turned** 13:7 141:25
**turning** 80:9
**Tuskegee** 15:22,23
**Twenty-five** 20:7
**type** 13:3 67:15
167:21 182:5
**types** 110:6 152:17
164:17 216:10 218:21
233:20
**typing** 147:22

_____

U

**U.S.** 9:14,19
**Uh-huh** 23:3 31:6 36:4
53:24 60:14 64:8
84:15 93:11 103:21
126:3 142:23 211:6
238:13
**ultimate** 173:12
**ultimately** 31:10
32:19 83:20 149:23
201:20
**unable** 96:9 98:20
**unacceptable** 195:16
**unachievable** 82:23
**under-** 135:1 145:21
**underneath** 33:14
**understand** 26:2
29:11,20 42:21 53:21
63:2 70:8 74:18
84:11 94:5,9 97:8
101:4,7,8 102:8,15
108:3 113:25 114:1
117:6 118:9 120:5,13
122:8,15 124:21
132:11 140:17 145:21
149:4 151:8 165:23
179:20,22 197:8

214:9,11,24 216:17,
22,24 217:2,6,8
218:13 219:15 229:8,
17 234:17 235:10
238:24
**understanding** 25:20
26:18 51:16,18 71:5
74:25 91:25 92:9,17
96:3,5 100:1 121:4,8
123:2,10 157:19
167:9 179:25 180:18
186:20
**understandings** 35:25
**understood** 32:8 45:21
46:11 61:13,16
105:23
**unique** 21:18 163:23
**unit** 21:20 33:8,15,20
34:4 38:21,22 39:9
51:21 52:10 53:4
55:6,7 66:21 67:3,5,
16 68:14 71:13,20
80:18,23 81:6,12,20
85:12,17 86:2,5,6,7,
18 88:5 89:5,18
90:23 92:12 94:21
98:7 105:25 106:8,9,
14,23 107:2,3,8,23,
25 108:4,7,17,19
109:7,12,23 126:22
127:17 132:13 133:2
146:7 161:20 165:6,8
167:13 168:22 170:19
174:12 177:11 182:4
202:24 212:24 213:1,
5 223:24 224:8
**unit's** 81:8 83:5
**United** 15:25 16:2,9,
15 18:4
**units** 33:18 170:24
171:13
**University** 15:23
205:21 206:1,14,19
208:2 209:2,5
**unrealistic** 83:3
**update** 62:2 188:9,13,
14
**updated** 191:15 242:1
243:7 244:11
**updates** 68:15 83:11
104:8 232:11,14,15,
17,19 233:21 241:18

**upgrade** 47:25 89:13
245:8
**upgraded** 240:9 242:9
243:21 244:20 245:13
**upgrades** 240:16,18,24
241:8,15 242:15
244:23 245:2
**upper** 190:7
**user-friendly** 220:16
**UTC** 9:10 11:25 12:5
57:15,19 105:15,19
136:9,13 189:21,25
222:6,10 231:10,14
246:3,20
**utilize** 216:4
**utilized** 180:12
240:23

_____

V

**vague** 29:23 45:23
83:7 122:5 124:13
138:23 145:19 197:6
208:5
**valid** 98:24
**validate** 226:17
**validated** 180:4
**varies** 23:9,11,15,18,
23 25:6,10,12 27:9,
12,14,21 42:21
212:16
**variety** 161:16
**vary** 232:20
**verbal** 44:5,16 107:5
111:7
**verbally** 50:8,9,11
111:10
**version** 57:25 177:21
**versus** 9:12 100:24
**video** 9:8,13
**view** 64:23 195:15
**Virginia** 16:20
**virtual** 61:1 228:5
**virtually** 228:9
**virtue** 25:24 32:4
212:2
**visible** 188:10
**visit** 90:11
**visited** 89:22

**voice** 40:19
**voices** 84:19,24 85:22
  86:8
**volume** 46:21 89:15
  150:3 154:19,24
  155:4

---

### W

**wait** 55:18 155:5
  158:20 159:11,14
  191:13 230:16,17
  231:1,3
**waive** 10:6
**waived** 246:21
**wanted** 37:9 57:24
  137:20 147:1 149:20
  198:11 222:13
**Washington** 16:18
  167:13
**Web** 137:25 215:12
  216:18 217:14 218:1
  220:15
**week** 23:10,11,14,21
  27:23 126:9 154:22
  163:20 165:9 233:2
**weekly** 23:25 24:4
  27:15,20 72:3,7,10,
  19 104:8 189:1
  233:4,7
**weeks** 24:19 41:3,5
  59:24 138:21 140:4
**weighed** 113:9
**Western** 211:10
**whistleblower** 220:15,
  24,25
**winners** 153:17
**words** 50:10 84:21
  101:13 150:16
  170:13,15 171:6
  172:21 199:4,6,13
  221:16
**work** 23:12 33:7 34:4,
  17,18 47:21 52:14
  67:15 68:2 75:6
  79:23,24 81:9 85:17
  86:11 121:13 127:15
  132:13 133:5 141:5
  143:22 147:3 148:15,
  20,25 150:25 153:1
  154:5 155:4,15
  161:22 173:18 213:1

  232:10 238:20
  239:12,20
**workday** 154:21
**worked** 13:24 14:1
  16:2,10 48:22 57:6
  91:8 97:17 119:21
  126:23 155:19 174:6
  238:14 245:14
**workers** 49:8 87:24
**workforce** 155:4
**working** 48:13 52:8,12
  57:22 71:12 115:16,
  18 116:23 117:17
  119:13 151:17 156:8
  172:7 174:15 177:12
  202:24 240:22
**workings** 48:25 55:5
  114:14 152:14 159:22
  160:13 161:6 222:24
**workload** 29:4,7
  191:10
**works** 33:23 57:5
  66:11 101:4 120:24
  121:10 146:7 210:16
  224:6,9
**wrapping** 222:1
**write** 19:18,19,21
  131:17 141:18,20
  142:14 158:6 161:24
  165:14 169:12 172:21
**writes** 129:15
**writing** 147:23 172:6
**written** 12:1 43:19
  44:6,15 45:2 57:8
  118:20 132:1 144:11
  196:3 230:1
**wrong** 142:1 167:22
  229:6
**wrote** 131:6,12 132:3
  134:5 144:4 215:13

---

### Y

**year** 16:23 33:1 62:2
  64:7,11 65:15,17,19,
  23 71:14 81:23 87:10
  88:14 140:25
**years** 16:12,18 37:4
  51:21,22 61:21 62:1,
  4 144:2 190:15,17,22
  191:13 240:6

**York** 9:15
**Yvette** 167:19

---

### Z

**Zoom** 24:15

```
                                              Page
 1                E R R A T A   S H E E T

 2      IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,

 3      in her official capacity as Secretary of the

 4      United States Department of Education.

 5      RETURN BY:  Mark A. Brown

 6      PAGE              LINE            CORRECTION AND REASON

 7                                        "let" should be
        18                16              "left"; strike "go"


                                          "policy defense
                                          team" should be
 8      26                23              "borrower defense
                                          team"


 9      28                19              "emerged" should be
                                          "immersed"


                                          "locations" should be
10      120               14              "implications"


                                          "like, 452" should be
11      144               9               "like, 52"


                                          "would this form be
                                          in presence" should
                                          be "would this form
12      178               12-14           be produced"




        January 12, 2021                  Mark A. Brown

          (DATE)                            (SIGNATURE)
```

```
                                                         Page
 1                    ACKNOWLEDGMENT OF DEPONENT

 2                    I, Mark Brown, do hereby acknowledge

 3         that I have read and examined the foregoing

 4         testimony, and the same is a true, correct and

 5         complete transcription of the testimony given by

 6         me and any corrections appear on the attached

 7         Errata sheet signed by me.

 8

 9

10

11         January 12, 2021                Mark A. Brown

12         (DATE)                          (SIGNATURE)

13

14

15                    CERTIFICATE OF NOTARY PUBLIC

16         Sworn and subscribed to before me this

17         _____day of_____,_____

18

19

20         _____     _____

21         NOTARY PUBLIC                 MY COMMISSION EXPIRES

22

23

24

25
```

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**


**Transcript 2 – Diane Auer Jones**

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4      - - - - - - - - - - - - - - X

5      THERESA SWEET, et al., on     :

6      behalf of themselves and all  :

7      others similarly situated,    :

8                  Plaintiffs,       :

9      vs.                           :

10     ELISABETH DEVOS, in her       :

11     official capacity as          :

12     Secretary of the United       :

13     States Department of          :

14     Education, et al.,            :

15                  Defendants.      :

16     - - - - - - - - - - - - - - X

17

18     Remote Videotaped Deposition Of DIANE AUER JONES

19              Friday, November 20, 2020

20                  9:15 a.m. (EST)

21

22

23     Job No. 330599

24     Pages:  1 - 301

25     Reported by:  Dana C. Ryan, RPR, CRR

Page 2

```
 1
 2
 3                          November 20, 2020
 4                          9:15 a.m. (EST)
 5
 6
 7
 8          Remote Videotaped Deposition of DIANE AUER
 9    JONES, held via Zoom video teleconference, before
10    Dana C. Ryan, Registered Professional Reporter,
11    Certified Realtime Reporter and Notary Public in
12    and for the State of Maryland.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFFS:
 4          MARGARET O'GRADY, Esquire
 5          EILEEN CONNOR, Esquire
 6          TOBY R. MERRILL, Esquire
 7          R. ELLIS, Esquire
 8          Legal Services Center of
 9              Harvard Law School
10          122 Boylston Street
11          Jamaica Plain, Massachusetts 02130
12          Telephone:  (617) 390-3003
13          Email: mogrady@law.harvard.edu
14          Email: econnor@law.harvard.edu
15          Email: rellis@law.harvard.edu
16          Email: tmerrill@law.harvard.edu
17
18                    - and -
19
20
21
22
23
24
25
```

Page 4

```
 1          A P P E A R A N C E S   C O N T I N U E D
 2
 3          JOSEPH JARAMILLO, Esquire
 4          CLAIRE TORCHIANA, Esquire
 5          Housing & Economic Rights Advocates
 6          3950 Broadway, Suite 200
 7          Oakland, California 94611
 8          Telephone:  (510) 271-8443
 9          Email: jjaramillo@heraca.org
10          Email: ctorchiana@heraca.org
11
12    ON BEHALF OF THE DEFENDANTS:
13          R. CHARLIE MERRITT, Esquire
14          KEVIN P. HANCOCK, Esquire
15          KATHRYN C. DAVIS, Esquire
16          U.S. Department of Justice
17          Civil Division, Federal Programs Branch
18          1100 L Street, Northwest
19          Washington, D.C. 20530
20          Telephone:  (202) 307-0342
21          Email: robert.c.merritt@usdoj.gov
22          Email: kathryn.c.davis@usdoj.gov
23          Email: kevin.p.hancock@usdoj.gov
24
25
```

Page 5

```
 1          A P P E A R A N C E S   C O N T I N U E D
 2
 3          Also present:
 4          Dan Macom, Video Technician
 5          Asher Trangle
 6          Matt Pachman
 7          Victoria Roytenberg
 8          Jed Brinton
 9          Andrew Teoh
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1                C O N T E N T S
2    EXAMINATION OF DIANE AUER JONES:        PAGE:
3    By Ms. O'Grady                            10
4
5
6
7                E X H I B I T S
8         (Attached to the Transcript)
9    JONES DEPOSITION                        PAGE:
10   Exhibit 1    Revised Notice Of Deposition   13
11   Exhibit 2    Declaration Of Diane Auer      18
12                Jones
13   Exhibit 3    U.S. Department Of Education   48
14                Office Of Inspector General
15                Report
16   Exhibit 4    January 10, 2017 Email         52
17   Exhibit 5    October 24, 2016 Email         57
18   Exhibit 6    January 9, 2017 Email          60
19   Exhibit 7    James 4, 2017 Email            62
20   Exhibit 8    December 14, 2017 Memorandum   64
21   Exhibit 9    Borrower Defense Unit Claims   66
22                Review Protocol
23   Exhibit 10   May 22, 2019 Hearing          111
24                Transcript
25

Page 7

1          E X H I B I T S  C O N T I N U E D
2         (Attached to the Transcript)
3    JONES DEPOSITION                        PAGE:
4    Exhibit 11   Document Titled 84 FR         185
5                 49788-01, 2019 WL 4573049
6                 (F.R.) Rules And Regulations
7                 Department Of Education,
8                 34 CFR Parts 668, 682, And
9                 685, RIN 1840-AD26, [Docket
10                ID ED-2018-OPE-0027] Student
11                Assistance General
12                Provisions, Federal Family
13                Education Loan Program, And
14                William D. Ford Federal
15                Direct Loan Program, Monday,
16                September 23, 2019
17   Exhibit 12   April 21, 2019 PowerPoint     186
18                Titled Borrower Defense To
19                Repayment
20   Exhibit 13   Defendants' Response To       196
21                August 31, 2020 Order
22   Exhibit 14   Affidavit Of Daniel Deegan    216
23   Exhibit 15   Declaration Of Eileen Connor  217
24
25

Page 8

1          E X H I B I T S  C O N T I N U E D
2         (Attached to the Transcript)
3    JONES DEPOSITION                        PAGE:
4    Exhibit 16   Wall Street Journal Titled    230
5                 Trump Administration Hires
6                 McKinsey To Evaluate
7                 Student-Loan Portfolio
8    Exhibit 17   Politico Article Titled DeVos 233
9                 Orders Partial Loan Relief
10                For Many Duped Student
11                Borrowers
12   Exhibit 18   October 27, 2020 Oversight    249
13                Committee Press Release
14                Titled New Documents Show
15                Department Of Education Froze
16                Tool To Help Defrauded
17                Student Borrowers
18   Exhibit 19   Defendants' Response Regarding 263
19                The Court's Request At The
20                October 1, 2020 Class Hearing
21   Exhibit 20   Order Denying Class           289
22                Settlement, To Resume
23                Discovery, And To Show Cause
24
25

Page 9

1              P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We're now on the
3    record.  Participants should be aware that this
4    proceeding is being recorded and as such all
5    conversations held will be recorded unless there
6    is a request and agreement to go off the record.
7    Private conversations and/or attorney-client
8    interactions should be held outside the presence
9    of your remote interface.
10        This is the remote video recorded
11   deposition of Ms. Diane Jones taken today, Friday,
12   November 20th, 2020.  The time is now 14:15 in UTC
13   time.  We're here in the matter of Theresa Sweet
14   versus Elizabeth DeVos.
15        My name is Dan Macom.  I'm the remote
16   video technician on behalf of U.S. Legal Support
17   which is located at 90 Broad Street, New York, New
18   York.  I'm not related to any party in this action
19   nor am I financially interested in its outcome.
20        At this time I'll ask our court
21   reporter Ms. Dana Ryan, on behalf of U.S. Legal
22   Support, to please enter the statement for remote
23   proceedings into the record.
24        THE COURT REPORTER:  The attorneys
25   participating in this deposition acknowledge that

Page 10

```
 1   I am not physically present in the deposition room
 2   and that I will be reporting this deposition
 3   remotely.
 4           They further acknowledge that, in lieu
 5   of an oath administered in person, the witness
 6   will be sworn in remotely and will verbally
 7   declare her testimony in this matter is under
 8   penalty of perjury.
 9           The parties and their counsel consent
10   to this agreement and waive any objections to this
11   manner of reporting.
12           Now if I could ask all parties to
13   please state their agreement to this stipulation
14   on the record.
15           MR. MERRITT:  Yes.  This is Charlie
16   Merritt on behalf of the defendants agreeing to
17   that.
18           MS. O'GRADY:  This is Margaret O'Grady
19   on behalf of plaintiffs also agreeing.
20           THE COURT REPORTER:  Could I now get
21   you to please raise your right hand, Ms. Jones?
22           ************************
23               DIANE AUER JONES,
24       having been duly sworn, testified as follows:
25           ************************
```

Page 11

```
 1       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 2   BY MS. O'GRADY:
 3       Q    Good morning, Ms. Jones.  I'm Margaret
 4   O'Grady.  I'm an attorney with the Project on
 5   Predatory Student Lending.  I go by Maggie, so
 6   it's fine if you refer to me that way today.
 7       A    Okay.
 8       Q    It's nice to meet you in these strange
 9   remote circumstances, so I appreciate everyone's
10   flexibility in figuring out how to do this and
11   hope everything runs smoothly.  And if it doesn't,
12   we can just all work together to ensure that it
13   does.
14           I want to go over a few things, much
15   like what I would say if we were in person but
16   some of it tailored for our remote situation.
17           So one of them is just to confirm that
18   even though we probably all have the ability to
19   communicate privately via our smartphones on the
20   desk or something, that you will not be doing that
21   during this deposition today?
22       A    I will not be.
23       Q    And do you have a smartphone or any
24   kind of device within arm's reach right now?
25       A    I do.  I have my personal phone.  I can
```

Page 12

```
 1   move it.
 2       Q    I would appreciate it if you would move
 3   it.
 4       A    Yep.
 5       Q    Thank you.
 6           And then that's the only other kind of
 7   device that you could use today during the
 8   deposition?
 9       A    Yeah, I just have my computer and a
10   separate monitor in front of me.
11       Q    Okay.  Thanks.  If you can move that
12   out of reach just to ensure that we're sure that
13   there's no communication happening.
14       A    Sure.
15       Q    And that said, if you need breaks
16   today -- I know that we have a break from 11:30 to
17   noon scheduled.  But any other break, you know, to
18   use the restroom, to take a drink of water, to go
19   off the record for a little while just for fatigue
20   sake, just say so.  I'm happy to take breaks at
21   any time as long as there's not a question
22   pending.
23       A    Okay.
24       Q    And just in general, is there anything
25   preventing you from being truthful today?
```

Page 13

```
 1       A    No.
 2       Q    Anything preventing you from, you know,
 3   having your best memory of events that we might be
 4   talking about?
 5       A    No.
 6       Q    And let me just -- we're going to --
 7   the first exhibit is the deposition notice in this
 8   case, so if we -- if you open up the folder, the
 9   files will be in alphabetical order.  There are a
10   couple of extra folders in there, but if we go to
11   the file that is Diane Auer Jones revised
12   deposition notice.
13           MS. O'GRADY:  That's going to be our
14   first exhibit which we'll mark as Exhibit 1.
15           (Jones Deposition Exhibit 1 was marked
16   for identification and attached to the
17   transcript.)
18   BY MS. O'GRADY:
19       Q    Okay.  And, Ms. Jones, do you remember
20   this document?
21           MS. BERMAN:  Sorry, I'm not seeing that
22   exhibit.  Can you tell me where in the zip file it
23   is?
24           MS. O'GRADY:  Sure.  If you open up the
25   zip file, there should be a number of PDFs and
```

Page 14

1   then some folders and subfolders.  This is one of
2   the PDFs and it should be showing up in
3   alphabetical order under D.  Her name is Diane.
4          THE WITNESS:  This does not look
5   familiar to me.  I don't recall seeing this
6   document before.  It's just a three-page document
7   as well?
8          BY MS. O'GRADY:
9      Q   Yes.  It's just the notice deposition
10  for the deposition.  But you're here today, so I'm
11  assuming your counsel saw it.
12         MS. O'GRADY:  Marcy, have you been able
13  to find it.
14         MS. BERMAN:  Yes, I see it.  It's the
15  fourth one down; right?  Yes.  I got it.  Thank
16  you.
17         MS. O'GRADY:  No problem.
18         BY MS. O'GRADY:
19     Q   As we go forward, the PDFs are
20  automatically alphabetized so I will try to read
21  out the file names as clearly as I can.
22         Ms. Jones, I wanted to talk to you
23  about preparation for this deposition.  Did you do
24  anything to prepare for today?
25     A   I reviewed my deposition.

Page 15

1      Q   And which deposition?
2      A   I'm sorry.  The declaration.
3      Q   Okay.
4      A   I reviewed the declaration that had
5   been submitted earlier.
6      Q   Okay.  Did you review any other
7   documents?
8      A   I reviewed the declaration that was
9   submitted by Mark Brown and the one that was
10  submitted I believe by Colleen Nevin and had
11  conversations with folks on the phone today.
12     Q   Who did you have conversations with
13  today?
14     A   Conversations today or conversations
15  prior to today?
16     Q   Conversations -- any conversations
17  preparing for this deposition.  And I'm not asking
18  for anything privileged.  I don't need to know the
19  content of those conversations, but I'm just
20  wondering who you spoke to to prepare for today's
21  deposition.
22     A   So the attorneys from DOJ that are on
23  the call today, Marcy, Katherine, Charlie and then
24  Jed from the Department of Education, and -- and I
25  think -- is it David?  I'm sorry.  Is it David

Page 16

1   from DOJ as well?  Hancock?  Do I have the name
2   right?  I'm sorry.
3      Q   Kevin.
4      A   Kevin.  I'm sorry.  I'm sorry.
5      Q   Okay.  And how many -- how much time
6   would you say you spent preparing for today's
7   deposition, both conversations and then how much
8   time you spent reviewing the previous declaration?
9      A   I wasn't keeping a time log so I can't
10  give you an exact time.
11     Q   Approximately?  Five hours, more or
12  less?
13     A   I would say maybe between eight hours
14  and --
15     Q   Okay.  And besides your declaration,
16  the declaration of Mark Brown and the declaration
17  of Colleen Nevin, did you review any other
18  documents to refresh your recollection?
19     A   I -- no.  I'm trying to think if I
20  looked at anything else.  Oh, I did go back and
21  looked at the time -- I looked at the date when
22  the 2019 Department of Defense regulation
23  finalized just to refresh the timeline.
24     Q   Did you look at the exhibits to those
25  declarations or just the declarations themselves?

Page 17

1      A   The exhibits to my declaration, I don't
2   believe were included, so I did not.  And I think
3   in the case of other documents, there were some
4   exhibits that I saw and some that I did not.
5      Q   Okay.  Do you happen to recall -- well,
6   I'll ask if today we are going through exhibits
7   and they are one you used to prepare, I'd be
8   interested to know that, if you've seen it
9   recently and not just when the document was first,
10  you know, issued or when you first saw it.
11     A   Okay.
12     Q   Okay.  I'm going to ask just a couple
13  of questions about your job history, work history.
14  And I would like to know, have you ever been
15  deposed before?
16     A   Yes.
17     Q   And how many times?
18     A   Twice.
19     Q   And what cases were those?
20     A   Once I served as an expert witness.
21  This was several years ago, and so I was deposed
22  as an expert witness.  And once was when I was a
23  teenager, I was deposed as part of my parents'
24  divorce hearing.
25     Q   And when you served as an expert

Page 18

1  witness, was that on behalf of the Center for
2  Excellence in Higher Education?
3       A    Yes.
4            MS. O'GRADY:  Okay.  We're going to
5  mark as Exhibit 2 the declaration that you had no
6  specific -- that you used to prepare for this
7  deposition.  And in the folder, that is going to
8  be ECF number 56-3, Jones Declaration.  It is
9  about the eighth file down in the folder.
10           THE WITNESS:  This is the declaration?
11           MS. O'GRADY:  Yes, Jones declaration.
12           (Jones Deposition Exhibit 2 was marked
13  for identification and attached to the
14  transcript.)
15  BY MS. O'GRADY:
16      Q    And do you have that open and ready?
17      A    I do.
18      Q    So, Ms. Jones, did you write this
19  document?
20      A    Yes.
21      Q    Did you have anyone assist you in
22  writing it?
23      A    Yes.
24      Q    And who helped you write it?
25      A    Office of General Counsel at the

Page 19

1  Department of Ed.
2       Q    Anything else?
3       A    No.
4       Q    And on the last page, that's your
5  signature?
6       A    Yes, it is.
7       Q    Okay.  And I just want to note for the
8  record you signed this under penalty of perjury?
9       A    Yes.
10      Q    Now, I'm just -- use your declaration
11  as a jumping off point for getting a sense of your
12  job history and then eventually your
13  responsibilities at the Department of Education.
14           So if we can just go to paragraph 2
15  which discusses your job title and
16  responsibilities.
17      A    I can see it.
18      Q    Thank you.  Okay.  I'm hoping you can
19  expound upon this right now and give me a broader
20  sense of what you at this point consider your job
21  responsibilities to be?
22      A    So I serve currently as the principal
23  deputy under secretary and am delegated the duties
24  of under secretary at the Department of Ed.
25      Q    And what are the main areas that you

Page 20

1  are responsible for?
2       A    I'm responsible for overseeing the
3  Office of Postsecondary Education and that
4  includes both the regulatory, the policy and
5  regulatory division of the Office of Postsecondary
6  Ed.  That hasn't -- the direct supervisor of the
7  assistant secretary ultimately reports up to the
8  media office.  That also includes our grant
9  programs and all our postsecondary ed grant
10  programs.
11           I also receive the office of what's
12  called OCTAE, the Office of Career, Technical and
13  Adult Education.  And again, they have a number of
14  grant programs, and the Perkins loan program --
15  I'm sorry, the Perkins Act programs and those
16  report up to me.
17           And then federal student aid also
18  reports to me.  In the case of federal student
19  aid, it is a performance-based organization, and
20  so the relationship between the department and the
21  FSA is slightly different than OPE or OCTAE, the
22  other two divisions that report up to me.
23           With regard to FSA, I am -- I have
24  oversight over the policy that is implemented by
25  FSA.  So policy and operations are divided in

Page 21

1  statute, and the operations of FSA are the domain
2  of the chief operating officer, and then policy
3  oversight is the domain of both the Office of
4  Postsecondary Ed and then my oversight in the
5  Office of the Under Secretary.
6       Q    So who else besides you oversees policy
7  at FSA?
8       A    Do you mean the implementation of
9  policy or the development of policy?
10      Q    I'll ask both.  First the development
11  of policy?
12      A    So the development of policy, you know,
13  it involves the Office of Postsecondary Education,
14  it involves my office, the Office of the Secretary
15  and the Office of General Counsel.
16           Policy development involves all of
17  those offices in the process, and in some cases
18  the Office of Management and Budget as well.
19      Q    And then the implementation of policy,
20  was that the second prong?
21      A    (Witness nods head.)
22      Q    Okay.  And who oversees that?
23      A    So there -- at FSA, there is a policy
24  implementation office.  They are involved in the
25  actual implementation of the policy at which point

Page 22

1    my role becomes making sure that the
2    implementation of the policy aligns with our
3    regulations.
4         Q    Is anyone else besides you performing
5    that role of, I think as you put it, ensuring the
6    implementation of the policies within the
7    regulations?
8         A    Yes, the Office of the Secretary, the
9    Office of General Counsel and, in some cases, the
10   Office of Management and Budget.
11        Q    And when you say "the Office of the
12   Secretary," do you mean the secretary herself, or
13   are there other certain individuals that are
14   tasked with that?
15        A    There are a group of people that are
16   involved depending upon which policy decision
17   you're discussing, so in some cases it would
18   involve the secretary's chief of staff, the
19   Capitol floor to the secretary, the deputy
20   secretary.  And in some cases where there's a
21   formal decision on loans, for example, the
22   secretary, you know, would be the person who would
23   sign off.
24        So it depends on the issue.  It depends
25   on the topic.  But it could involve her, the

Page 23

1    entire group or some subset of that group.
2         Q    With regard to borrower defense
3    policies, does that include the secretary herself?
4         A    Again it would depend on the issue
5    within the -- under the umbrella of borrower
6    defense, there are many, many issues that fall
7    under that.  Some could include the secretary and
8    some might not.
9         Q    And when has the secretary herself been
10   included?
11        A    Are you asking me about conversations
12   or decisions?
13        Q    I'm asking about decisions.  You said
14   there are certain instances where she might become
15   personally involved, and I'm wondering what those
16   instances are if you can give me examples, if not
17   an exhaustive list?
18        A    Right.  I can't give you an exhaustive
19   list because, you know, I haven't been witness to
20   every decision so I'm not always sure who exactly
21   made the decision.  But I can tell you that with
22   regard to the development and approval of the new
23   relief methodology that was announced in
24   December 2019, I believe, the secretary did sign
25   off and authorize the use of a new methodology.

Page 24

1    So in that case she did sign off.  I -- I was part
2    of that meeting.
3         In other cases, I don't always know who
4    the decision maker was.  There were conversations,
5    but I don't always know who the decision maker
6    was.
7         Q    But regarding the 2019 regulations, the
8    secretary herself was a decision maker?
9         A    Oh, you're talking about our -- our
10   rule-making effort in December 2019?
11        Q    Well, I was just talking about the
12   meeting that you just referenced.
13        A    The meeting I just referenced was with
14   regard to the relief methodology --
15        Q    Okay.
16        A    -- that was determined in 2019.
17        If you're asking me about negotiated
18   rule making, that is a fundamentally different
19   process in -- in which case, no, the secretary is
20   not -- does not, you know, directly sign off on
21   that.  There's negotiator rule-making process, a
22   public comment period, a response.  So that is a
23   much longer process.  That is not just an effort
24   of the secretary making a decision.
25        Q    Okay.  And in terms of the relief

Page 25

1    methodology decision, was she involved just in
2    that one meeting or in decision-making meetings up
3    to that meeting?
4         MR. MERRITT:  Objection: scope.
5         BY MS. O'GRADY:
6         Q    I want to get a sense of whether or not
7    there was a single meeting where the secretary
8    signed the relief methodology or if there had been
9    previous involvement with her personally.
10        MR. MERRITT:  Well, the relief
11   technology is not a topic on which the court
12   authorized discovery.
13        MS. O'GRADY:  Well, I would disagree.
14   I believe it's related.  But for purposes of just
15   getting us started, I'll move on.
16        BY MS. O'GRADY:
17        Q    Okay.  Ms. Jones, who do you report to?
18   I just want to get a sense of the general
19   reporting structure in your current role.
20        A    I report to the Secretary of Education.
21        Q    And is there anyone else between you
22   and her that you report to?
23        A    Directly or indirectly?
24        Q    I suppose -- if there's no one
25   directly, I suppose indirectly.

Page 26

1      A     Yeah.  I mean, the secretary's chief of
2  staff performs, and I perform.  So I guess in some
3  sense, you know, one could say that I report to
4  him.  You know, he does that review.
5      Q     Is there anyone else involved in your
6  performance reviews?
7      A     Not that I'm aware of.
8      Q     And how often do you receive those?
9      A     That's an annual process.
10     Q     And whose performance reviews are you
11 responsible for?
12     A     I'm responsible -- that is -- that has
13 changed over time as my role has changed, so I
14 would need to know how do you mean today, this year,
15 in prior years?
16     Q     Would it be too cumbersome to give me
17 the evolution?
18     A     Well, it could be, but I'll try.  When
19 I -- there was a period of time early in my tenure
20 where I was the principal deputy undersecretary,
21 the acting assistant secretary and the acting
22 deputy assistant secretary.  I either had the
23 direct responsibility or was the secondary signer
24 on over 100 performance reviews.
25           As the assistant secretary -- when the

Page 27

1  assistant secretary was finally confirmed, he took
2  much of that responsibility off of my plate.
3           And then in my role as principal deputy
4  undersecretary, I have the oversight over the
5  individual who runs the Historically Black
6  Colleges and University initiative, and then he
7  has staff beneath him under which, you know, I can
8  serve as a secondary reviewer.
9           I have members of my direct staff, so I
10 have three individuals who are either policy
11 advisors or confidential assistants in the Office
12 of the UnderSecretary.  I do their performance
13 reviews.  And Mark Brown, the chief operating
14 officer, I am responsible for his performance
15 review.
16     Q     And are you responsible for anyone's
17 performance review in FSA?
18     A     I'm only responsible for Mark Brown's
19 performance review who is the chief operating
20 officer.
21     Q     But it's just him in FSA?
22     A     Just him.
23     Q     Okay.  Who would say -- separate from
24 the question of performance reviews, who would you
25 say are your direct reports?

Page 28

1      A     My direct reports -- do you want them
2  by name or position?
3      Q     Both, if possible.
4      A     Michael Brickman is a policy advisor in
5  my -- in my office.  Jesse Hokanson is a
6  confidential assistant in my office.  John Lucas
7  Adair -- he goes by Lucas, so I only refer to him
8  as Lucas.  Lucas Adair is a confidential assistant
9  in my office.
10          Johnathan Holifield is the director of
11 the White House Initiative on Historically Black
12 Colleges and Universities.  Technically, I am his
13 supervisor, but because of workload, Michael
14 Brickman has stepped in and does the first-line
15 performance review for Johnathan and does the
16 regular meetings with Johnathan.
17          So I'm ultimately responsible, but
18 Michael Brickman is his day-to-day liaison to my
19 office.
20     Q     Okay.
21     A     There was a period of time where there
22 were other White House initiatives that reported
23 to me, so I also had direct supervision of those
24 directors and their performance review, but they
25 have now moved to the Office of Communications,

Page 29

1  and so I no longer am involved in their
2  performance review or their management.
3      Q     Thank you.
4      A     Uh-huh.
5      Q     If we can go to paragraph 4 of
6  Exhibit 2, your declaration.  And if you could
7  just read paragraph 4 beginning, As part of my
8  responsibilities?
9      A     As part of my responsibilities in the
10 department, I have worked extensively on issues
11 relating to the implementation and administration
12 of the department's regulations regarding borrower
13 defenses to the collection of federal student
14 loans.
15     Q     Okay.  And, Ms. Jones, if you could
16 give me a sense of what that work entailed?
17          Who are the other team members?  You
18 can start there.
19     A     So we engaged in a negotiating
20 rule-making effort on borrower defense.  I had not
21 yet joined the department when the negotiated
22 rule-making process was underway.  But I was at
23 the department for the development of the notice
24 of proposed rule making for the 2019 borrower
25 defense regulations.

Page 30

1    The day-to-day work on that is done by
2  the Office of Postsecondary Education, but I don't
3  have oversight of that and involvement in it.
4            We then -- we got over 38,000 comments
5  in response to the notice of proposed rule making.
6  Obviously we have staff -- career staff in the
7  Office of Postsecondary Ed who reviewed those
8  comments and responded to them, but obviously I
9  reviewed that document before moving forward.
10           Office of Management and Budget and
11 other federal offices are involved in the
12 clearance process of a notice of proposed rule
13 making and as well as in the publication of a
14 final regulation.
15           So, you know, I didn't write the
16 specific responses, but obviously all of that I
17 had oversight over and, you know, was involved in
18 making sure we met the timeline and got that final
19 regulation published.
20     Q     And as you began your role, who got you
21 up to speed?
22     A     On what issue?
23     Q     On -- on the negotiated rule making
24 that had already been taking place?
25     A     I believe that I was brought up to

Page 31

1  speed by a team of people -- and I'm not going to
2  remember every person who was in the room.  It was
3  a group of staff in the Office of Postsecondary
4  Education, the staff in the policy group that
5  actually the rule making and wrote the MPRM.  So
6  there were, you know, maybe five, six, seven
7  members of the Office of Postsecondary Education.
8  There were several members of the Office of
9  General Counsel.  Michael Brickman, who at the
10 time was still in the Office of Postsecondary Ed.
11 So there were -- I was brought up to speed on rule
12 making by engaging in these meetings with Office
13 of General Counsel and office of Postsecondary Ed
14 in the development of the MPRM in those proposed
15 rule making.
16     Q     Did your predecessor have any
17 involvement when you began your role?
18     A     Which predecessor do you mean?
19     Q     Well, who was your direct predecessor?
20     A     Jim Manning was the acting under --
21 well --
22     Q     Yeah.
23     A     To be clear, when we -- when we
24 started -- when I started in my role, I was a
25 policy advisor.  There was no predecessors.  I

Page 32

1  started working on the borrower defense
2  regulation.  It was as a policy advisor in the
3  Office of Postsecondary Ed.  There was no
4  predecessor.  Then I moved into the role of acting
5  assistant secretary.  There -- the predecessor
6  there was Frank Brogan who was serving in the
7  acting assistant secretary role until he became
8  confirmed for his permanent role.
9      Q     Ms. Jones, when you were a policy
10 advisor, how long were you a policy advisor?
11     A     I believe it was some -- somewhere in
12 the neighborhood of maybe four months.  I can't
13 remember exactly when Frank Brogan was confirmed,
14 but I joined the department approximately in
15 February, and I believe that Frank Brogan was
16 confirmed early -- perhaps early in the summer.
17           So there was a period of time of a few
18 months.
19     Q     And that's February 2018?
20     A     That is correct.
21     Q     And before February 2018, what was your
22 job?
23     A     Senior policy advisor to the Secretary
24 of Labor at the U.S. Department of Labor.
25     Q     And how long did you have that

Page 33

1  position?
2      A     From November of 2017 until February of
3  2018.
4      Q     And before that, what was your role?
5      A     I was at the Urban Institute, where I
6  was a fellow working on apprenticeship issues, and
7  that started in 2015.
8      Q     And then before 2015?
9      A     2010 to 2015, I was an employee at the
10 Career Education Corporation.
11     Q     What were your roles there?
12     A     When I joined the company, I was a -- I
13 can't remember if I was a senior vice president or
14 vice president but in regulatory affairs, and
15 I'm -- over time I was promoted, I guess, to
16 senior vice president for regulatory affairs and
17 then ultimately I was promoted to senior vice
18 president for external relations, I think, is the
19 title and chief external affairs officer.
20     Q     At any of those roles at CEC, did you
21 deal with borrower defense?
22     A     Can you define what you mean by "deal
23 with"?
24     Q     Did you give any advice regarding,
25 develop policies about, ever answer anybody's

Page 34

1    questions about it, whatever regarding your job?
2            MR. MERRITT:  Objection.  It's broad,
3    and also it's scope.
4            MS. O'GRADY:  I believe the witness can
5    still answer.
6            MR. MERRITT:  Yeah.  Sorry.  Go ahead.
7            THE WITNESS:  So could you restate the
8    question?
9    BY MS. O'GRADY:
10   Q    I'm wondering if in your role at CEC
11   you ever had to discuss borrower defense?
12   A    I was at CEC during the negotiated rule
13   making.  So while the department was engaged in
14   negotiated rule making for 2016, that negotiated
15   rule-making process began while I was at CEC.  So,
16   yes, I absolutely followed that rule-making
17   process.
18   Q    And did you provide advice to CEC about
19   that rule making -- while that rule-making process
20   was going on?
21           MR. MERRITT:  Objection; scope.
22   BY MS. O'GRADY:
23   Q    You can still answer despite Charlie's
24   objection.
25           MR. MERRITT:  Yeah, you can answer that

Page 35

1    question.  But I guess we'll see how -- see how
2    long -- how deep this line of questioning is going
3    to go.
4            THE WITNESS:  I mean, obviously I
5    followed the negotiated rule-making process and
6    provided updates to the management at CEC about
7    first, what had taken place in rule making, and
8    then subsequently the content of the proposed
9    rule.
10           I can't remember if I was still at CEC
11   when the final BP reg was published.  I just can't
12   remember the timeline.  But I do remember updating
13   CEC employees, leaders about the progress of -- of
14   rule making.
15   BY MS. O'GRADY:
16   Q    And, Ms. Jones, at what point -- you
17   had mentioned a deposition you gave as an expert
18   for CEHE.  When were you working for them, at what
19   point?
20   A    I was never working for them.  You
21   know, I was retained to give a deposition.  And I
22   can't remember the exact date, but it was after I
23   was no longer employed by CEC.  So it would have
24   been after 2015 but before I came back to federal
25   service.

Page 36

1    Q    And when you say "retained," they paid
2    you a fee to do that; correct?
3    A    Correct.
4    Q    Okay.  We're going to go back to
5    Exhibit 2.  Let's look at paragraph 7 of your
6    declaration.  And this is under the heading --
7    excuse me, we don't need to actually just go to
8    paragraph 7.  I just want to go to the heading at
9    the very top of the page --
10   A    I'd also like to add because I think
11   it's important to understand that I also spent ten
12   years working at the Community College of
13   Baltimore County, included time working at the
14   University of Maryland, and I spent several years
15   working at Princeton University.
16           So I do want to make it clear that my
17   past employment in higher education was --
18   included a number of institutions and not just
19   Career Education Corporation.
20   Q    On the top of the third page of the PDF
21   of Exhibit 2, your declaration, the heading there
22   is, The department's federal student aid
23   priorities 2018 to 2019.
24           And when you began your position, what
25   was your understanding of those priorities?

Page 37

1    A    When I began my position, my
2    priority -- the priority in which I was engaged
3    was completing the final rule making for borrower
4    defense.  So when I joined the department, I was
5    in the Office of Postsecondary Ed.  I did not have
6    any oversight role with regard to federal student
7    aid.  So my focus was on -- on the -- completing
8    the final rule.  So first, the notice of proposed
9    rule making and then a final rule for the 2019
10   regulation.
11   Q    Okay.  And in the next -- two pages
12   later, so this is on page 5 of the PDF in
13   paragraph 10.  Here you discuss, Once the court
14   decisions were issued and the 2016 regulations
15   became effective, the start of that paragraph.
16           In the middle of that paragraph you
17   write, The department also had to develop
18   processes for implementing the new financial
19   responsibility requirements of the 2016
20   regulations, which included substantial reporting
21   requirements.  The department spent considerable
22   time and effort identifying which offices would
23   handle different parts of the process and
24   developing the necessary instructions.
25           How much time went into that process?

Page 38

```
1        A     I don't have a record of hours spent,
2   so I can't tell you how many hours, but it was a,
3   you know, very complicated -- it was a very
4   complicated issue that required many meetings
5   which ultimately resulted in the development of an
6   electronic announcement so that we could notify
7   institutions about how to implement the 2016 reg.
8   Initially, I put in a lot of time.  I can tell you
9   that.  But I can't estimate how many hours.
10       Q     In your role do you create timelines
11  and budgets for projects for implementation of
12  regulations?
13       A     In which role?  I mean, are you talking
14  about when I first came to the department?  In my
15  current role?  In which role?
16       Q     Both.  So how about we'll start with
17  when you first came to the department.
18       A     When I first came to the department, I
19  was involved in timelines for publishing final
20  rules.  And then, you know, we launched negotiated
21  rule making for another large regulatory package,
22  so I was involved in -- in developing the timeline
23  for completing those regulations.
24             When I was in the Office of
25  Postsecondary Ed, you know, I oversaw the
```

Page 39

```
1   development -- I mean, the development of the
2   Office of Postsecondary Ed's budget.  I'm involved
3   now in overseeing the development of the Office of
4   the Under Secretary's budget, but it's a very,
5   very tiny budget.  It's a small office.
6             And then FSA develops its own budget,
7   but I am involved in the review of that budget and
8   ultimately our budget services office works with
9   the Office of Management and Budget, you know, to
10  develop the president's budget request.  So, you
11  know, I'm involved in conversations about that,
12  but the Office of Management and Budget ultimately
13  approves the president's budget request.
14       Q     And, Ms. Jones, if you don't mind, I
15  just want to ask you one more question about your
16  role as policy advisor at the department budget.
17             What was your portfolio of policies?
18       A     Any -- any regulation under the Title
19  IV program.  So that would include regulations
20  about our federal student aid programs, the TRIO
21  programs, GEAR UP programs, and then all of the
22  regulations related to our grant programs.  So we
23  have regulations called EDGAR.  I cannot remember
24  what EDGAR stands for, but it's the regulations
25  under which all of our grant programs operate.
```

Page 40

```
1        Q     And borrower defense falls under the
2   Title IV programs that you mentioned?
3        A     That is correct.
4        Q     Okay.  And in Exhibit 2, paragraph 15,
5   which is going to be on PDF page 6.  So this
6   paragraph discusses what was going on in 2017
7   which is before your tenure either as policy
8   advisor or your subsequent roles.
9             With that in your mind --
10       A     If that's your question, yes.
11       Q     With that in mind, I just want to note
12  that I understand this is from before your tenure,
13  but you did write in this declaration about in
14  2017, that the department conducted a thorough
15  review.
16             What's your understanding why that
17  happened, why that review was conducted?
18       A     So when I -- when I -- so this did take
19  place before I came to the department.  And when I
20  came to the department, I was told that there were
21  people at the department who worked to figure out
22  how to provide relief to borrowers who had
23  submitted claims.  And I believe at the time I was
24  told that the focus was on the Corinthian -- the
25  borrowers who had gone to Corinthian Colleges.
```

Page 41

```
1   So, you know, I was told that that methodology had
2   been developed prior to my arrival.
3        Q     And when you say this focus was on
4   borrowers who had gone to Corinthian, what do you
5   mean?
6        A     Meaning that the first group of claims
7   to be reviewed would have been the oldest group of
8   claims, which would have been the claims from
9   Corinthian borrowers.
10       Q     And who told you that?
11       A     I believe it was an individual in the
12  Office of General Counsel.
13       Q     And in this paragraph, you state that
14  the conclusion was it did not have an adequate
15  process to handle the growing list of borrower
16  defense claims.
17             What do you mean by "adequate process"?
18       A     As I understand it, when the Trump
19  administration came into the Department of
20  Education, as I understand it, there was no
21  methodology in place to review claims.  There was
22  no methodology for determining relief.
23             And, in fact, the prior administration
24  had told directly in this Web site and
25  communications to borrowers from ITT that the way
```

Page 42

1    they would be receiving relief would be through
2    closed school loan discharge, so borrowers who had
3    left -- who had been students at ITT were -- were
4    advised to use closed school loan discharge.  So
5    the administration had not directed those students
6    to file borrower defense claims and, to my
7    knowledge, had not developed any methodology for
8    reviewing those claims and had not developed a
9    methodology for assessing financial harm to either
10   Corinthian borrowers or any other borrower that
11   might apply.  So that was my understanding, that
12   there was no methodology.
13          It's also my understanding that there
14   were a number of denials that had been -- that
15   determinations had been made by the prior
16   administration, but the notifications had not been
17   sent to borrowers.
18       Q    Okay.  I want to ask a few questions
19   about what you just said.  So taking the last
20   point, you said there were a number of denials
21   that had been made but not communicated to
22   borrowers?
23       A    That's my understanding.
24       Q    Do you have a sense of how many?
25       A    I -- I know I've seen numbers, but I

Page 43

1    cannot recall what that number is right now.
2        Q    Okay.  And were there grants that had
3    been decided but not communicated?
4        A    I don't know.
5        Q    When you say "there was no
6    methodology," what do you mean by that?
7        A    So the -- there was no way -- so -- so
8    the 2016 regulation, for example, talks about
9    financial harm, but there had been no methodology
10   developed to figure out what that level of
11   financial harm was.  So there was no methodology
12   to determine financial harm.
13          And, to my knowledge, the department
14   had not reviewed the documents that it had
15   collected from Corinthian Colleges, and so it --
16   it had made a decision on a limited number of
17   programs during a limited time period.
18          So the Trump administration had
19   asserted that it had found evidence of
20   misrepresentation in certain programs at certain
21   times, but they hadn't gone beyond that set of
22   programs.
23          And, so, outside of that list of
24   programs and -- and dates, there had been no
25   methodology developed for either reviewing other

Page 44

1    programs at other times or for reviewing, I
2    suppose, applications that students would submit
3    for other programs at other times.
4        Q    So I want to just really understand the
5    timeline we're talking about here.  The time that
6    you're saying there was no methodology for review,
7    which regulations were governing at that time?
8        A    Well, that's complicated as well.  At
9    the time that I joined the department, the
10   1994-1995 regulations were in place.  As my -- you
11   know, as my tenure so continued and ultimately the
12   court determined that we had to implement the 2016
13   regs, then loans that were either taken after a
14   certain point or consolidated after a certain
15   point would then be subject to a different
16   methodology under the 2016 regs.
17          So when I first entered the department,
18   claims were being adjudicated under the '94-95
19   regs using a state standard, and then as the 2016
20   regulation was implemented, that shifted to a
21   federal standard.
22          So it depends when you ask.  The answer
23   changes.
24       Q    Okay.  I'm going to have a few
25   questions about this.  I want to go back to a

Page 45

1    statement you made that previously the department
2    had not reviewed documents from Corinthian.
3          Is it your understanding under the
4    regulations that it's necessary to do so?
5        A    It is my understanding that the
6    Department of Education has to review evidence
7    provided to it and make a determination about
8    whether or not misrepresentation took place.
9        Q    And in your view, that necessitates
10   review of documents sent by the school?
11       A    It could be documents sent by the
12   schools.  It could be documents submitted by a
13   borrower.  It could be documents collected from
14   some other entity, another agency, another state
15   entity.
16          So the sources of those documents, you
17   know, there are multiple sources of those
18   documents.  But, yes, the Department of Education
19   is supposed to review and determine that there has
20   been misrepresentation.
21       Q    But is it your opinion that the -- it's
22   your understanding of the regulation the school
23   must be given the opportunity to respond in some
24   way?
25       A    Well, that depends on which regulation

Page 46

1   you're talking about.
2       Q    So let's first take under the '94-95
3   regulations.
4       A    So the interesting thing here is that
5   when the prior administration started adjudicating
6   claims, technically it was under the '94-95
7   regulations; however, they had also adopted
8   certain practices that would eventually be in the
9   2016 regulations even though they were not in
10  regulation at the time.
11      Q    So what's your understanding of what is
12  different from the 2016 regulations and the '94-95
13  regulations?
14           MR. MERRITT:  Objection:  Overbroad.
15           MS. O'GRADY:  I can narrow that just
16  for clarity.
17  BY MS. O'GRADY:
18      Q    Especially with regard to the state
19  standard.
20           THE WITNESS:  Can I answer that,
21  Charlie?
22           MR. MERRITT:  You go ahead, Diane,
23  yeah.
24           THE WITNESS:  Okay.
25           So the 1995 regulation relied on a

Page 47

1   state standard.  And so, if the institution was in
2   violation of a state law connected to the making
3   of a loan, then it would be adjudicated under that
4   standard.
5            The 2016 regulation replaced the state
6   standard with a federal standard defined -- and
7   defined that standard and defined the kinds of
8   actions or omissions that would constitute
9   misrepresentation.
10  BY MS. O'GRADY:
11      Q    Let me go back to your statement that
12  there was no methodology to review previously.
13           On what -- if there was no methodology
14  to review as you understood it, what is your
15  understanding of the grants that were made for
16  borrowers who attended CCI and ITT?
17      A    It is my understanding that the
18  department received communication from the
19  California AG based on interviews that the
20  California AG conducted.  And based on the results
21  of those interviews, the prior administration had
22  made a determination that misrepresentation had
23  occurred at certain campuses within certain
24  programs and during certain periods of time.  And
25  it is my understanding that it was borrower

Page 48

1   defense applications from among borrowers who were
2   in those programs during that time period whose
3   claims had been adjudicated.  That's my
4   understanding.  I obviously didn't see those
5   adjudications, but that is my understanding.
6            MS. O'GRADY:  Okay.  If we can open --
7   this is going to be marked as Exhibit 3.
8            (Jones Deposition Exhibit 3 was marked
9   for identification and attached to the
10  transcript.)
11           MS. O'GRADY:  In the PDF file, its file
12  name is IG report.
13           THE WITNESS:  Yes.
14  BY MS. O'GRADY:
15      Q    Do you have that open and visible?
16      A    I do.
17      Q    Okay.  And do you recognize this?
18      A    I recognize the title of the report,
19  and I've heard about the report.  I've never read
20  the report.
21      Q    You've never read the report.
22      A    (Witness nods head.)
23      Q    Okay.  Have you discussed the report?
24      A    The element of the report that I have
25  discussed is apparently in that report there was

Page 49

1   climbing that the department did not have the
2   appropriate systems in place to -- to track or
3   record claims.  So as I understand it the
4   department was using Excel spreadsheets to try to
5   manage this process, and it was my understanding
6   that one of the challenges the IG identified that
7   the use of Excel spreadsheets was inadequate.
8            Now, that's just my understanding.  I
9   haven't read the report.
10      Q    Okay.  I just want to talk about,
11  understanding that you haven't read it previously,
12  a few statements and findings in it.
13           This is going to be on the fifth page
14  of the PDF, and if it's easier you can use the 500
15  page number at the very bottom.
16      A    Okay.  Okay.
17      Q    In its findings, the beginning of the
18  third paragraph, if you could just read out loud
19  the first three sentences.
20      A    Are you talking about the paragraph
21  that begins, We found?
22      Q    Yes, please.
23      A    We found that FSA established seven
24  categories of claims that qualified for loan
25  discharge based on characteristics that the claims

Page 50

1    had in common.  We also found that FSA maintained
2    support for its borrower defense loan discharge
3    decisions.  FSA's business operations maintained
4    borrower claim applications, attestations, and
5    other supporting documentation, such as school
6    transcripts.
7        Q    And then the next sentence, also, if
8    you wouldn't mind?
9        A    BDU used this information to make
10   borrower defense claim determinations and maintain
11   documentation.
12       Q    Okay.  And then if you see up under the
13   headline of what we did on this very same page,
14   the last sentence of that paragraph says, Our
15   review covered FSA's borrower defense loan
16   discharge process from the end of June 2016
17   through July 31st, 2017.
18       A    I see that.
19       Q    So is that time period between
20   June 2016 and July 2017 the same time period you
21   were just saying there was no methodology?
22       A    I -- I don't remember -- I don't recall
23   exactly when the department started adjudicating
24   claims, so I -- I don't know whether June 2016 was
25   the beginning date, but it is that general time

Page 51

1    period that I was told that the department's
2    limited work was based on a -- a certain number of
3    programs at a certain number of campuses during a
4    certain period of time.
5        Q    And in the paragraph -- the sentences
6    that I had you read first in that third paragraph
7    regarding the seven categories of claims, are you
8    familiar with those seven categories of claims?
9        MR. MERRITT:  Objection to the scope
10   and use of the IT report.
11       BY MS. O'GRADY:
12       Q    Ms. Jones, you can answer.
13       A    I am aware that there were certain
14   programs during a certain period of time for which
15   the department was informed by the California AG
16   that misrepresentations occurred.
17       I don't remember the count, but I know,
18   for example, that there were job placement rate
19   claims at certain programs at certain campuses
20   during certain time periods.  I don't recall
21   exactly which programs and which time period.
22       Q    And you're aware just of CCI claims
23   being adjudicated?
24       A    During that time frame, yes, I am aware
25   only of CCI claims being adjudicated in those

Page 52

1    particular programs.
2        Q    And what about ITT?
3        A    I'm not aware of ITT claims having been
4    adjudicated other than it is my understanding that
5    there were some ITT campuses in California.  I
6    don't know when the adjudication began of those
7    claims, but it is my understanding that there may
8    have been -- in -- in the California campuses of
9    ITT, there may have been some adjudications.  I
10   just don't know the time frame of when those took
11   place.
12       Q    Okay.  If we could look at the zip file
13   within the zip file that's titled -- actually, it
14   might not be a file; it might just be a regular
15   folder -- ECF 66-2 Declaration and Exhibits.
16       A    I'm sorry.  ECF?
17       Q    It's a folder, not a file.  It's ECF
18   66-2 Declaration and Exhibits.
19       MR. MERRITT:  It appears at the very
20   top of the list, Diane.
21       THE WITNESS:  Okay.
22       BY MS. O'GRADY:
23       Q    Okay.  And if you could open the one
24   that is Exhibit 6.
25       MS. O'GRADY:  So we'll mark this as

Page 53

1    Exhibit 4 for this deposition.
2        (Jones Deposition Exhibit 4 was marked
3    for identification and attached to the
4    transcript.)
5        BY MS. O'GRADY:
6        Q    Have you ever seen this memorandum
7    before?
8        A    Yeah.  Let me scroll through first.
9        (Witness reviews document.)
10       I have seen this document.
11       Q    In what context have you seen this
12   document?
13       A    I first saw this document when I was
14   asked to sign -- and I might use the wrong
15   terminology here.  I'm not an attorney by
16   training.  I think it was a declaration that I had
17   to sign regarding the recusal -- I don't mean
18   recusals -- please help me find the right terms,
19   but there were documents that our Office of
20   General Counsel had to produce, and there's a
21   process by which information is redacted -- maybe
22   redaction is the right term -- and I was asked to
23   review a series of documents to confirm that what
24   was being redacted was deliberative information,
25   and it was in that context that I first saw this

Page 54

1    document.
2        Q    Okay.  And then just briefly for the
3    record, what is this document?
4        A    So this is a document apparently
5    written by somebody at the borrower defense unit
6    to Under Secretary Ted Mitchell.
7        Q    Regarding?
8        A    Regarding recommendation for ITT
9    borrowers based on guarantees for employment.
10       Q    And this is, as far as you can tell at
11   this point, a full and accurate copy of this
12   document?
13       A    It is a full and accurate copy of the
14   document.  I mean, I'm not reading it word for
15   word, but it looks like the document I've seen.
16       Q    So as you said, this is a
17   recommendation from the borrower defense unit for
18   ITT borrowers alleging that they were guaranteed
19   employment.
20            What regulations govern this
21   recommendation, under what borrower defense
22   regulations?
23       A    Well, it's interesting.  So
24   technically, this recommendation would have been
25   made under the 1995 regulations, but it involved

Page 55

1    the imposition of a group discharge process which
2    was created by the 2016 regulations that were not
3    yet in effect.
4        Q    Now, if we could go to page -- it's PDF
5    page 4, page 3 by the footer of this document.
6        A    Okay.
7        Q    And these appear to be a number of
8    quotations from ITT students.
9        A    Yes.
10       Q    You had noted before that under the
11   regulations, the borrower defense unit must review
12   evidence.
13       A    Yes.
14       Q    Are quotations like this evidence in
15   your understanding?
16       A    You know, I would have to have more
17   information.  I -- you know, I -- I think you're
18   asking me to make a decision about evidence that I
19   haven't reviewed.
20       Q    Well, I'm just -- I'm asking you to
21   make a decision, but I suppose my question is just
22   is testimony from a borrower about their
23   experience the kind of evidence that is considered
24   when deciding a borrower defense application?
25       A    It was considered by the prior

Page 56

1    administration.  I believe that the prior
2    administration had determined that this was the
3    basis of their decision about misrepresentation.
4        Q    Just under the prior administration?
5    Would you say the current administration would
6    also consider student testimony as evidence?
7        A    I think that's a really broad question.
8    You know, I think that our borrower defense
9    attorneys look at, you know, a whole variety of
10   evidence.  And I should let you know that, you
11   know, as a nonattorney, I'm not actually involved
12   in reviewing individual claims.  You know, we have
13   trained attorneys.  I personally don't know how
14   you determine what meets the preponderance of
15   evidence standard.
16            You know, those are questions you'd
17   have to ask our borrower defense attorneys.  I
18   don't get involved in those decisions.
19       Q    Is there a specific person who you work
20   with who is most directly involved in those kinds
21   of decisions?
22       A    You know what, I don't -- I wouldn't --
23   I don't directly supervise her, but it is my
24   understanding that Colleen Nevin in the borrower
25   defense unit is the person who leads the group of

Page 57

1    attorneys that would be evaluating evidence and
2    making determinations about what meets the
3    preponderance standard.
4        Q    Okay.  Great.  If we can, in this same
5    folder we're in, open up Exhibit 4.
6        A    ECF 63-3 number 4?
7        Q    Yes.  For the next few minutes, we're
8    just going to be in this folder.  So this
9    Exhibit -- the file name is Exhibit 4, but we're
10   going to mark it for this deposition as Exhibit 5.
11            (Jones Deposition Exhibit 5 was marked
12       for identification and attached to the
13   transcript.)
14       BY MS. O'GRADY:
15       Q    And, Ms. Jones, do you recognize this
16   document?
17       A    (Witness reviews document.)
18            This appears to be similar or the same
19   to the document I've seen.  Again, I don't have
20   the two documents in front of me, but this appears
21   to be a document that I've reviewed in the past.
22       Q    Okay.  Just for the record, can you
23   just say who this is to, from, the date, and what
24   it's regarding?
25       A    Sure.  The date is October 24th, 2016.

Page 58

1    It is from the borrower defense unit and it is a
2    memo with a recommendation to Under Secretary Ted
3    Mitchell.
4         Q    Is this document typical of memoranda
5    that you review currently?
6         A    No.
7         Q    Now, these are recommendations for
8    Everett/WyoTech borrowers alleging transfer of
9    credit claims.
10        A    Uh-huh.
11        Q    Are these recommendations still in
12   effect or has something superseded these?
13        A    For these groups of claims, the
14   department -- this administration -- it is my
15   understanding that this administration has decided
16   to honor the position of the prior administration.
17   So when the prior administration identified
18   certain programs during certain time periods where
19   misrepresentation took place, this administration
20   has accepted that.
21        So I think this administration has
22   accepted the premise or the allegation that
23   misrepresentation took place in certain programs
24   at certain periods of time.
25        Q    So there's been no additional guidance

Page 59

1    given for this group of students?
2         A    About the determination of the merit of
3    their claims?  Is that what you're asking me?
4         Q    Yes.
5         A    For the -- for the borrowers who were
6    in those programs that were listed by the
7    Department of Education on its Web site as
8    programs where it had determined that
9    misrepresentation took placed, it is my
10   understanding that this administration has not
11   gone back to second guess that; that, you know,
12   those programs for which borrowers were told
13   misrepresentation took place, this administration
14   is accepting that determination that
15   misrepresentation took place.
16        In other words, you know, they -- they
17   made a decision that misrepresentation took place,
18   and to my knowledge, we're not challenging or, you
19   know, changing that determination.
20        Q    When you say you're not challenging or
21   determining -- you're not challenging that
22   determination, excuse me, are you separating out a
23   determination of a misrepresentation from the
24   amount of relief?
25        A    Yes, I am.

Page 60

1         Q    We're going to talk more about that.
2    At this point, I would like to just go back to
3    this folder and look at what in the folder is
4    Exhibit 5.
5         MS. O'GRADY:  And for this deposition,
6    it will be marked as Exhibit 6.
7         (Jones Deposition Exhibit 6 was marked
8    for identification and attached to the
9    transcript.)
10   BY MS. O'GRADY:
11        Q    Again, Ms. Jones, my question is have
12   you seen this document before, and, if so, can you
13   state for the record what it is?
14        A    This appears to be a document that I
15   have reviewed before.  It is a January 9th, 2017
16   memo from the borrower defense unit to Under
17   Secretary Ted Mitchell making recommendations
18   about Corinthian borrowers alleging they were
19   guaranteed employment.
20        Q    Okay.  Has this -- has this written
21   recommendation been superseded by any other
22   written recommendation?
23        A    It is my understanding that the
24   programs for which the Obama administration
25   determined that misrepresentation took place, that

Page 61

1    we have honored that determination of
2    misrepresentation.
3         So it is my understanding that the
4    campuses and programs for which the prior
5    administration determined that there was
6    misrepresentation about guaranteed employment, we
7    have honored those determinations of
8    misrepresentation.
9         Q    Under this recommendation made at this
10   time, the amount of relief for these borrowers was
11   100 percent; is that your understanding?
12        A    I'm not sure.  I'm not aware what that
13   determination was.
14        Q    But when you say you're honoring the
15   decision about the misrepresentation, that is
16   separate from a decision made by the previous
17   administration about the percentage of relief; is
18   that right?
19        A    That is correct.
20        Q    But at this point, you don't recall
21   what the previous administration's decision about
22   the percentage of relief was?
23        A    I -- I -- I don't in particular.  I do
24   know that where they issued relief, that they did
25   provide 100 percent relief.

Page 62

1    So in the adjudication that they did,
2  it is my understanding that most, if not all, were
3  issued 100 percent relief. I haven't seen those
4  claims, but it is my understanding that among the
5  claims they completed, borrowers in those programs
6  were afforded -- you know, if not 100 percent
7  relief, the majority were. I haven't seen the
8  exact numbers.
9       Q    Okay. Now, we're going to look at what
10  is Exhibit 7 in this folder.
11       MS. O'GRADY:  And we're going to mark
12  for this deposition as Exhibit 7.
13       (Jones Deposition Exhibit 7 was marked
14  for identification and attached to the
15  transcript.)
16       THE WITNESS:  Okay.
17  BY MS. O'GRADY:
18       Q    Have you seen this document before,
19  and, if so, can you state for the record what it
20  is?
21       A    (Witness reviews document.)
22       You know, because so much of it is
23  redacted, it's hard for me to know if this is
24  exactly, but I -- this may have been one of the
25  documents included in the packet of documents that

Page 63

1  I reviewed for redaction. I -- I don't recall --
2  I don't recall specifically whether this was in
3  that packet, but I know it was a number of
4  documents that I had certified that what was
5  redacted was deliberative, and this may have been
6  in that packet.
7       Q    This is a memo from James Manning to
8  the secretary, May 4th, 2017, and the subject is
9  action items in borrower defense.
10       A    Uh-huh.
11       Q    Have you reviewed this document in any
12  context other than reviewing it for redaction?
13       A    Not to my recollection.
14       Q    Can you turn to the fourth page?
15       A    The fourth page of this memo?
16       Q    Yes. It's actually -- it's the last
17  page of the PDF, so I think it says four of four,
18  but it's probably five of the PDF.
19       A    I've got to get my cursor. I'm sorry.
20  I'm trying to work with two screens here, so --
21       Q    Totally understand. But it's run
22  pretty smoothly so far.
23       A    Okay. So you're looking at the actual
24  page that has the decision.
25       Q    Right.

Page 64

1       Are you familiar with this decision?
2       A    I have been told about this decision.
3       Q    In what context were you told about the
4  decision?
5       A    I -- I -- I can't -- I can't recall
6  exactly when, but at some point in time, you know,
7  early when I joined the department, you know, I --
8  I -- it may have been in the context of the
9  Manriquez decision when I asked for, you know,
10  information about what were we doing. So it may
11  have been when I asked a question about the
12  methodology. I just -- I just don't recall
13  exactly when I -- I, you know, was told that a
14  decision had been made. I just can't remember the
15  exact timeline.
16       Q    I just have -- I have three more
17  documents that we're spending a relatively short
18  amount of time on, and then I think we can take
19  our quick break.
20       Does that sound okay?
21       A    Sure.
22       Q    Okay. So the next one is Exhibit 8 in
23  this folder which we'll mark for this deposition
24  as Exhibit 8.
25       (Jones Deposition Exhibit 8 was marked

Page 65

1  for identification and attached to the
2  transcript.)
3  BY MS. O'GRADY:
4       Q    And, Ms. Jones, if you could just state
5  if you've seen this document before and, if so,
6  what it is?
7       A    (Witness reviews document.)
8       I believe I have seen this document
9  before. It was a memo to James Manning from Steve
10  Menashi, who was then acting general counsel,
11  through Justin Riemer, who also -- he was counsel
12  at the time. And it is their legal bases for
13  approval and discharge of pending borrower defense
14  claims for former Corinthian students qualifying
15  for approval on the grounds of job placement rate,
16  guaranteed jobs, and transfer of credit findings.
17       MR. MERRITT:  I'm going to object to
18  any further questioning regarding this memo as
19  calling for privileged information. It is a
20  document which the department maintains a claim of
21  privilege.
22       MS. O'GRADY:  I'll state for the record
23  that the document is publicly available as a New
24  York Times attachment.
25       MR. MERRITT:  Nonetheless, there has --

Page 66

1   you know, the department still maintains privilege
2   as having not been subject to an authorized
3   disclosure.
4       BY MS. O'GRADY:
5       Q    Okay.  If we can look at Exhibit 9 in
6   the folder.
7       MS. O'GRADY:  And this document I'm
8   going to mark as Exhibit 9 for the deposition.
9       (Jones Deposition Exhibit 9 was marked
10  for identification and attached to the
11  transcript.)
12      BY MS. O'GRADY:
13      Q    Do you recognize this document?
14      A    (Witness reviews document.)
15           I do not recognize this document.
16      Q    The title is borrower defense unit
17  claims review protocol.  Have you ever reviewed
18  such a protocol?
19      A    I don't recall ever reviewing this
20  document.  It would have been put in place before
21  I was at the department, and I -- it is
22  possible that at some point in time, you know,
23  it -- I don't recall it.  I don't recall reviewing
24  this.
25      Q    So I don't understand you don't recall

Page 67

1   reviewing this particular one, but are there
2   borrower defense unit claims review protocols that
3   are currently in effect you would have reviewed?
4       A    The only -- the only protocol, so to
5   speak, that I was involved in is the development
6   of the new methodology for determining review.
7   So, you know, I was involved as part of a team
8   looking for a new methodology when the Northern
9   District of California enjoined the methodology
10  that had been developed in 2017.
11      Q    As a product of that work, was a
12  guidance sheet like this developed?
13      A    I don't know.
14      Q    If it had been, would you have seen it?
15      A    You know, this looks to me like it was
16  more like a standard operating procedure, and I
17  would not have reviewed a standard operating
18  procedure.  That is something that the attorneys
19  in the BD unit would have developed.  It's not a
20  policy document.  It's an operations document.
21  And, so, I -- I mean it --
22      Q    As -- I mean, as your role at -- of --
23  as your role regarding policy implementation, if
24  there was guidance provided to the unit in
25  connection with the new methodology, is that

Page 68

1   something that you would have looked at?
2       A    Only the methodology.  So there may
3   have been questions on the methodology, for
4   example, you know, do we use four-digit or
5   six-digit CIP codes to identify an occupation.
6           So policy questions would have come to
7   me.  Standard operating procedures, no.  I would
8   characterize this as a standard operating
9   procedure, and, no, that would not have come to
10  me.
11      Q    Who would it have gone to?
12      A    No, I -- I would be speculating.  I
13  mean, my guess is that it would go to the attorney
14  of the BD unit, but that's speculation on my part.
15  I don't know.
16      Q    Well, I mean, if the BD unit is giving
17  guidance to attorneys for how to review based on a
18  new methodology, who would be in charge of
19  ensuring that the protocol matched the
20  methodology?
21      A    That would be an operations decision
22  made by FSA.
23      Q    Okay.  If I could just go back to
24  Exhibit 8, and this is the memoranda from Steven
25  Menashi.

Page 69

1       MS. O'GRADY:  Charlie, are there any
2   questions I can ask on this document, or are you
3   claiming that the entire document is privileged?
4       MR. MERRITT:  I'm claiming privilege
5   over the entire document.
6       MS. O'GRADY:  Okay.  If we could take a
7   five-minute break.  Is that all right with
8   everyone?
9       THE WITNESS:  Sure.
10      MR. MERRITT:  Sure.
11      MS. O'GRADY:  Okay.
12      THE VIDEOGRAPHER:  Okay.  We're now
13  going off the record.  The time is 15:42 UTC time.
14      (Recess -- 10:42 a.m.)
15      (After recess -- 10:56 a.m.)
16      THE VIDEOGRAPHER:  We're now back on
17  the record.  The time is 15:56 UTC time.
18      BY MS. O'GRADY:
19      Q    All right.  We're going to return to
20  Exhibit 2, your declaration.  And I'd like to turn
21  to paragraph 15 which is the middle of the page
22  that is PDF page 6.
23      A    I have to figure out how to get back to
24  that document.
25           You know, before we leave this exhibit,

Page 70

1    I just want to make one point of clarification.
2    So I'm a scientist by training, so when I think of
3    methodology -- when I use the word "methodology,"
4    I'm talking about the relief methodology.  I want
5    to make it clear I'm not an attorney, so I don't
6    get involved in any protocols or methods about
7    determining evidence or reviewing evidence.
8             So when I use the term "methodology," I
9    want to be -- I want to make sure that I'm clear
10   that I'm talking about the relief methodology.  So
11   I may not have used those term -- you know, the
12   term consistently, so I just want to make sure
13   that you understand when I say methodology, I mean
14   the relief methodology.
15       Q    Understood.
16       A    Okay.  Now I'm going to go try to find
17   that document.  I am not facile with technology,
18   so --
19       Q    We've been doing pretty well today,
20   so . . .
21       A    So we are now returning to my
22   declaration.  And I found it.
23       Q    All right.
24       A    Here we are.
25       Q    So we're going to page 6 and

Page 71

1    paragraph 15.
2        A    Okay.
3        Q    And if you wouldn't mind, if you could
4    just read that paragraph 15 for the record because
5    this is what we will be discussing.
6        A    In 2017, the department conducted a
7    thorough review of its existing methods for
8    adjudicating borrower defense claims and
9    calculating relief and concluded that it did not
10   have an adequate process to handle the growing
11   list of borrower defense claims.  As a result of
12   that review, the department developed a new
13   methodology for determining the amount of relief
14   to be given to successful borrower defense
15   claimants who attended certain schools operated by
16   Corinthian Colleges.
17       Q    Okay.  And in this paragraph, what is
18   the thorough review that you're referring to?
19       A    So I can only speak to what -- what I
20   was told.  I wasn't part of this review, so I'm
21   not sure exactly what was included in the review.
22   But as I understand it, the review was to look at
23   the resources available to the department to try
24   to identify methods for evaluating financial harm.
25       Q    And was the focus of that review solely

Page 72

1    on financial harm?
2        A    I don't know.  I wasn't part of that
3    review.
4        Q    And the department developed a new
5    methodology for determining the amount of relief.
6    That new methodology is what?
7        A    As I understand it, that was the
8    methodology that was ultimately enjoined by the
9    Northern District of California.
10       Q    And that methodology, you say here,
11   determined the amount of relief to be given to
12   successful borrower defense claimants who attended
13   certain schools operated by Corinthian.  So it was
14   solely for Corinthian?
15       A    As I -- that's it -- that's how it was
16   explained to me.
17       Q    By whom?
18       A    I -- I don't recall exactly who
19   explained it to me.  Yeah, I mean there -- there
20   are -- I can't remember exactly who gave me that
21   explanation.
22       Q    So this new methodology is about the
23   amount of relief and not about -- let me put this
24   a different way.
25            We've discussed step-one and step-two

Page 73

1    determinations.  Have we used those words today?
2    Are those words that you have used when
3    discussing --
4        A    I don't believe so.
5        Q    -- relief methodology?
6        A    I don't know what you mean by step one
7    and step two.  I think I've talked about, you
8    know, the relief methodology.  That's the part I
9    know about.
10            MR. MERRITT:  I don't believe we've
11   used those terms today.
12            MS. O'GRADY:  All right.  You're right.
13   BY MS. O'GRADY:
14       Q    I think I -- let's actually go to --
15   back out to the main exhibit folder.  We're going
16   to go to ECF number 56-4, Nevin declaration.
17            MR. MERRITT:  And do you mean the
18   second one that's only Nevin declaration as
19   opposed to the one that says Exhibit 20?
20            MS. O'GRADY:  Yes.  Thanks for
21   clarifying.
22            THE WITNESS:  Now I'm having trouble
23   getting back.  Give me a second here.
24            So you're looking at ECF -- oh, shoot.
25   There's number 66.  Let me see if I can get back.

Page 74

```
1          MR. MERRITT:  Yeah, you should be able
2   to go back like a folder -- jump back a folder.
3          THE WITNESS:  Okay.
4          MR. MERRITT:  To the one's that
5   called -- well, I don't know what you named yours.
6   Mine was called Jones deposition exhibits.
7          THE WITNESS:  And what document am I
8   looking for?  Oh, I think I see it, ECF number
9   56-4.
10      BY MS. O'GRADY:
11      Q    Yes.  And it says Nevin Declaration.
12          MR. MERRITT:  So to clarify, Diane,
13   it's the second one on the list, because there's
14   also one on top of it that also is called ECF
15   56-4, but it's, like, Exhibit 20.  So it's the
16   second one in alphabetical answer.
17          THE WITNESS:  Yep.  Okay.  I have that
18   open right now.
19      BY MS. O'GRADY:
20      Q    And this one, Ms. Jones, you said
21   that -- is this the document -- the Nevin
22   declaration that you had reviewed in advance of
23   today's deposition?
24      A    This looks like the document I
25   reviewed.
```

Page 75

```
1      Q    And if you would just give me one
2   second to find what page we're going to go to.
3          My apologies.  I actually -- we are
4   going to use this document, but not right now.
5      A    Okay.
6      Q    I apologize for that.
7          If you can go back to your declaration,
8   and if you we could look at paragraph 24, and that
9   is at the very bottom of page 9.
10      A    Yes.
11      Q    So in this paragraph, if you wouldn't
12   mind reading it out loud for the record, this is
13   why I was using that step-one, step-two --
14      A    Okay.
15      Q    -- language.  So if you wouldn't mind
16   reading out loud paragraph 24 there.
17      A    The department's consideration of a
18   borrower's application for a borrower defense
19   discharge includes two steps.  Step number one, a
20   determination of whether the borrower has
21   submitted a borrower defense claim supported by
22   evidence submitted by the borrower or otherwise
23   available to the department in accordance with the
24   applicable standard.  And if -- I'm sorry.  I have
25   to scroll down.
```

Page 76

```
1          And if the borrower satisfied the first
2   step, then number two is a determination of the
3   amount of relief that the borrower should receive.
4      Q    So here is that step-one, step-two
5   classification.  My question was when we were just
6   looking at paragraph 15 and discussing the new
7   methodology for determining the amount of relief,
8   is that solely step two that you refer to in
9   paragraph 24?
10      A    So I don't know about the methodology
11   in total because I wasn't involved in the
12   development, but the element of that methodology,
13   that 27 methodology on which I have been briefed
14   would be committed to step two.
15          So it may have been that the
16   methodology involves, you know, steps beyond step
17   two, but the part that I was briefed on and
18   under-- you know, that I know was put in place
19   is step two.
20      Q    Who would know if there was more to it
21   than the changes for step two?
22      A    The -- the people who wrote that policy
23   document.
24      Q    And which policy document is that?
25      A    So I think you just showed me a
```

Page 77

```
1   document earlier that involves Steve Menashi and
2   Justin Riemer and James Manning.  I would assume
3   that one of those individuals would know.
4      Q    So your sole involvement with the new
5   methodology that you identify in paragraph 15 is
6   as it related to the amount of relief for
7   Corinthian borrowers?
8      A    Ultimately I became involved in the
9   determination of a relief methodology for all --
10   all borrowers, all future claimants.  So they --
11   my involvement was of a methodology that would go
12   beyond Corinthian borrowers, but it was limited to
13   the relief methodology.
14      Q    So were you ever involved in developing
15   a methodology regarding step one?
16      A    I -- I don't ever being in a
17   conversation about step one.  You know, again, I'm
18   not an attorney, so I don't know how you look at
19   evidence.  So I just don't recall ever being in a
20   conversation about step one.
21      Q    So you don't recall in your role ever
22   having a conversation about how to decide the
23   merits of a borrower defense application?
24      A    No, not to my recollection.  No.
25      Q    So your understanding right now, what
```

Page 78

1    methodology is in place to determine whether or
2    not a borrower defense application is
3    successful -- that is, what methodology governs
4    step one?
5         A    Our attorneys in the borrower defense
6    unit under Colleen Nevin's direction evaluate the
7    evidence and make that determination.
8         Q    When you're involved in the rule-making
9    process, did that ever involve step-one
10   determinations?
11        A    Do you mean in the development of the
12   2019 regulation?
13        Q    Yeah.
14        A    So again, those conversations focused
15   on the evidentiary standard, and there was a
16   conversation about the use of the preponderance of
17   evidence versus -- I can't remember what the
18   higher standard was called, but you would know
19   this.  There's a higher standard above
20   preponderance, and I believe in our proposed rule,
21   we put the proposal out using the higher standard,
22   but based on public comments that we got, we
23   ultimately went with the preponderance of evidence
24   standard because that was the standard in the 2016
25   reg.

Page 79

1         Q    So you've been involved in the policy
2    regarding step-two determinations.  How -- how do
3    you know when a step-two determination is needed?
4    I mean, you have to go through step one first;
5    right?
6         A    Right.  But I don't make the
7    determination on a particular borrower's claim
8    even with regard to relief.  My role is to develop
9    a methodology that FSA can employ consistently to
10   determine that relief, but I don't look at any
11   particular claim even on a step-two basis.
12        Q    Okay.  So I guess I'm not asking about
13   particular claims, though.  My question is if
14   you're only doing with step two in your role and
15   have never even had a conversation about policy
16   regarding step one, that means, then, you're only
17   dealing with granted applications; is that right?
18        A    The relief -- the relief methodology
19   would -- would apply to granted applications and
20   with -- with one exception which is that in the
21   case of Corinthian, I believe the 2017 methodology
22   included a minimum guarantee of percent relief, so
23   that was a -- that was a conversation in which I
24   was not involved, and I don't know exactly to whom
25   that applies.

Page 80

1         So I -- I know that there was one group
2    of borrowers for whom there was this base
3    guarantee of 10 percent, so I don't know whether
4    you would -- I don't know how to characterize
5    that.  But in the new methodology, it was -- it
6    was limited only to those borrowers who the
7    attorneys would have deemed eligible for relief.
8         Q    So if you were in charge of policy but
9    only step two, who was in charge of the policy
10   regarding who gets denied?  Because in order to
11   get to step two, you have to have been granted
12   borrower defense relief; right?
13        A    Right.  I mean, Colleen Nevin is the
14   attorney in charge of the BD unit.  She has
15   decision-making power about which claims are, you
16   know, based on the merit of the review to
17   determine whether borrowers are eligible or
18   ineligible, so the determination of eligible and
19   ineligible would be made by Colleen Nevin and her
20   team of attorneys.
21        Q    And who advises Colleen Nevin about how
22   to implement Department of Education policy
23   regarding the merits of the applications?
24        A    I don't believe she's advised.  I
25   believe that she's an attorney who we trust

Page 81

1    understands how to review evidence and make a
2    determination.
3         I -- I -- I don't think anybody advises
4    her on how to review evidence.  I mean, I think
5    that's why we hire attorneys and that --
6         Q    I guess I'm trying to parse out the
7    notion of reviewing evidence as a lawyer and
8    setting policy, and my understanding is your job
9    has been to set policy.
10        A    That's correct.
11        Q    But you have not ever set policy or had
12   a conversation about the policy regarding deciding
13   the application in step one?
14        A    I've never been involved in deciding on
15   a particular application in step one whether a
16   borrower was eligible or ineligible.
17        However, in the process of finalizing
18   the 2019 regs, I was involved in conversations
19   about preponderance of evidence versus whatever
20   that other standard is.  I was involved in
21   conversations about whether or not breach of
22   contract would be included in the 2019 reg.  I was
23   involved in conversations about how we would look
24   at lawsuits brought against a school versus
25   determining judgments on the merits.

Page 82

1        So at a high level in developing the
2   2019 reg, you know, I was involved in
3   conversations about, you know, that kind of
4   evidence; in other words, whether there's breach
5   of contract evidence.  But that doesn't mean I
6   know how to --
7        Q    Right.  Right.  Yeah.  I mean, I know
8   you're not an attorney looking at them in that
9   way.
10       I guess who has final authority to sign
11  off on a borrower defense denial or grant, step
12  one?
13       A    Colleen Nevin or her -- I don't know
14  whether she delegates that to attorneys in her
15  group, but ultimately those attorneys report to
16  her.  She has final say on the determination.
17       Q    And no one else reviews that
18  determination?
19       A    I don't know what her process is.  I
20  don't know who is involved in her process.  But
21  I -- but I know that she makes -- she and her team
22  of attorneys make that determination.
23       Q    And do you know if they have any
24  guidance documents that tell them how to make that
25  determination?

Page 83

1        A    I don't know.
2        Q    So in the memos we looked at before --
3   just give me one moment.  I have to grab my
4   exhibits, too.
5        Well, we can take the . . .
6        A    I do want to clarify.  So you asked me
7   the question about have I ever been involved in
8   conversations.  I did just remember a conversation
9   that I want to make sure I share, and that is at
10  one point, you know, I -- I asked Colleen and her
11  team where they were in the process of reviewing
12  evidence for ITT Tech, and they told me that they
13  had a million pages to review.  So we did have a
14  conversation where they told me they had a million
15  pages of evidence to review, and my answer was,
16  oh, okay.
17       Q    Okay.  So that's the only conversation
18  you've ever had with anyone about step-one
19  determinations?
20       A    Right.  Right.  At a very high level,
21  you know, how far are you in processing -- in
22  reviewing the evidence --
23       Q    Okay.
24       A    -- on that.  Yeah.
25       Q    So it's my -- so I just wanted to go

Page 84

1   back to Exhibit 7 for this deposition, which is --
2   you may not even have to look at it.  It's the one
3   where their recommendation has been given for --
4   it's heavily redacted.  It's from James Manning to
5   the Secretary, May 4th, 2017, and the Secretary
6   signs the granting of the borrower defense.
7        So -- so that -- would you consider
8   this a step-one or a step-two determination, this
9   memorandum?
10       A    You know, there's so much redacted in
11  it that I'm not sure exactly what the content of
12  that memo was.  So I -- I can't -- I can't say
13  what she signed off on because I don't remember
14  what -- you know, I don't know if I've seen the
15  unredacted form.  Let me see if I can pull it back
16  up and . . .
17       (Witness reviews document.)
18       Okay.  I've pulled it --
19       Q    Well, I guess -- I can ask a broader
20  question which is it -- your understanding that
21  Colleen Nevin is the sole authority to sign off on
22  whether a borrower is denied or granted their
23  application, has that always been the case?
24       MR. MERRITT:  Objection as to
25  characterization of her prior statement.

Page 85

1   BY MS. O'GRADY:
2        Q    Okay.  Please correct me if I
3   mischaracterized your prior statement.
4        Could you say it -- could you state
5   that again?
6        Q    So who currently has the authority to
7   sign off on step-one determinations?
8        A    It -- it is my understanding that
9   Colleen Nevin and her group made that decision.
10  I -- I don't know how she delegates authority
11  within that group.  I don't know that she
12  personally signs off on every decision.
13       Q    So she could delegate to someone to
14  sign off on the decision?
15       A    She has a team of attorneys, and it's
16  possible that she has delegated.  I just don't
17  know.
18       Q    Is it your understanding that that
19  has -- how long has that been the case where
20  Colleen or the person in Colleen's position has
21  the authority to sign off on granting or
22  borrowing?
23       A    I don't know the answer to that
24  question.  I'm not aware of the different
25  circumstance, but that doesn't mean it doesn't

Page 86

1   exist.  I just know of the circumstance -- of the
2   circumstance I'm aware of, she has that authority,
3   but I don't know if there were different
4   circumstances earlier.  I just don't know.
5        Q     And -- and to just -- I -- I think I
6   may have asked this again, but I just want to make
7   sure I'm clear on it.
8              What policies guide Ms. Nevin's
9   decisions?
10       A     So the policies that guide her
11  decisions are the '95 regs, the 2016 regs and the
12  2019 regs.  So, for example, a policy had to be
13  established regarding which state standard would
14  be used to evaluate claims.  Now, I don't have the
15  expertise to be able to review the state standards
16  in different states to understand which one should
17  be implied, and so I did ask Colleen to work with
18  our Office of General Counsel to develop a policy
19  for determining which state standard to use.
20             Now --
21       Q     Did they develop that policy?
22             MR. MERRITT:  Objection.  It's calling
23  for privileged information.
24             MS. O'GRADY:  I just wanted to know if
25  the policy was ever completed.

Page 87

1              MR. MERRITT:  Go ahead, Diane.
2              THE WITNESS:  I actually don't know.
3        BY MS. O'GRADY:
4        Q     So you've never seen it?
5        A     I've never seen it.  So I'm not -- you
6   know, I -- I gave the instruction that it needed
7   to be done, but I don't have the expertise to
8   review it.
9        Q     When did you give the instruction that
10  it needed to be done?
11       A     I believe when Colleen notified me that
12  they were ready to start reviewing evidence for
13  ITT claims, and at that point I said, well, then I
14  think we need to figure out, you know, under which
15  state standard will you be evaluating those
16  claims.
17             So I can't remember the exact date, but
18  it was when she said they were getting ready to
19  review those documents and I said, you know, there
20  has to be a policy for under which state standard.
21       Q     Was it a conversation, or did you write
22  her an email or a memo instructing her to do that?
23       A     I remember that we had a conversation.
24  There -- there may have been an email where I
25  asked her if we had determined what it was.

Page 88

1        Q     Okay.  And you said this was around
2   when they were reviewing evidence for ITT.  Was
3   this the same question when she said -- I think
4   you said, you know, there were millions of
5   documents they had to review?
6        A     Yes.
7        Q     Okay.  So this is that one
8   conversation.
9        A     Yes.
10       Q     About what month and year was this?
11       A     It was before Covid, I know, because
12  the conversation took place in my office.
13       Q     Okay.  Even if you just have an
14  approximate range?
15       A     You know, I'm going to have to think
16  about it.  I just can't remember the timeline, but
17  I know it was prior to Covid.  And -- and it is my
18  understanding that they have determined a policy
19  on a -- to identify the state standard.
20       Q     Okay.
21       A     But it involves understanding -- so you
22  know this better that I do.  Different states have
23  different laws about --
24       Q     Right.
25       A     -- what they have for eminent domain.

Page 89

1   I don't know what the right word is.  So I do know
2   Colleen that has come to a decision about how to
3   identify the state standard.  I -- I just -- you
4   know, I -- I can't -- I can't -- I don't know how
5   to evaluate --
6        Q     Sure.
7        A     -- it, so --
8        Q     So you think that she has some sort of
9   memorandum that memorializes which state standard
10  to use at this point?
11       A     I don't know if there's a memorandum,
12  but I do believe that she has determined a way for
13  identifying which state standard to use.
14       Q     Okay.  And that's -- that's the extent
15  you know?  You don't know if it -- it's written
16  down by her anywhere or has been disseminated to
17  her team at all?
18       A     I -- I don't know.
19       Q     Okay.  When you asked her to develop
20  that state standard, why was that important to do
21  at the time?
22       A     It was important because I -- I don't
23  know how state standards work, but it's my
24  understanding that different states have different
25  laws regarding, you know, matters relevant to our

Page 90

1  defense claims.  Consumer protection law I guess
2  is how I would phrase it because I don't know the
3  names of the laws.
4          But it is my understanding that
5  different states have different laws, and when
6  we -- you know, when she told me that she was
7  ready to start looking at evidence for ITT Tech,
8  understanding that they had campuses across the
9  country in multiple states, my question to her was
10  how are you going to figure out -- for loans taken
11  prior to July 1, 2017, how are you going to figure
12  out which state law you're going to use.
13      Q    And previous to giving her this
14  instruction to develop a 50-state -- or develop a
15  state standard policy, what was your understanding
16  of what state standard she'd been using?
17      A    It was my understanding that in the
18  case of Corinthian, they had decided to use the
19  California state law standard.  Corinthian is
20  headquartered in California.
21          So my question to her was, well, ITT is
22  headquartered in Indiana, does that mean you'll
23  use an Indiana state law standard or will you
24  continue to use the California state law standard,
25  and -- and -- and it took -- and that's when --

Page 91

1  you know, there wasn't an answer for that one.
2          So I said, well, I think as a matter of
3  policy, we have to figure out how are you going to
4  determine which state law standard you use.  It
5  becomes very easy for loans after July 1, 2017,
6  but for earlier loans, A, to determine which state
7  standard, and B, to make sure that borrowers and
8  schools would know under which state standard they
9  were evaluated.
10      Q    So part of the reason you gave her this
11  instruction, if I understand what you just said,
12  is so that -- one of the reasons is that a
13  borrower who receives a determination about their
14  application would know which state standard had
15  been used?
16      A    And -- and the school.
17      Q    And the school who's receiving
18  information about the application?
19      A    That's correct.
20      Q    Okay.
21          MS. O'GRADY:  It's 11:28 by my count.
22  And I think, Ms. Jones, you have an obligation
23  from 11:30 to noon; do I have that right?
24          THE WITNESS:  My calendar has been
25  cleared, so we can go until a regular lunchtime.

Page 92

1  That's fine with me.
2          MS. O'GRADY:  Okay.  All right.  Let's
3  continue, then.
4      BY MS. O'GRADY:
5      Q    So you had said that -- you had said
6  that one of the -- one of the reasons you need to
7  know the state law standard is to inform the
8  school about what standard has been used.
9          Is that true under the '95 regulations
10  and the 2016 and the 2019 in your understanding?
11      A    It is not.  Under the 2016 and 2019
12  regulations, it's a federal standard.  So the
13  issue of which state goes away.  So it is only for
14  claims adjudicated under the '95 regulations that
15  the state standard is an important determination.
16      Q    And is it your understanding that under
17  the 1995 regulations, a school must be alerted
18  about the borrower defense application?
19      A    I am not -- I honestly don't know
20  whether or not the '95 regulation requires that.
21      Q    Okay.  All right.
22      A    Let me -- let me make a clarifying
23  statement.
24          However, the way the 2016 regulation
25  was written, it is applied retroactively.  So it

Page 93

1  depends on when you're asking the question, but
2  once the 2016 regulation was in place, many of the
3  requirements, such as notification of the school,
4  then applied to the loans being adjudicated under
5  the '95 regs.
6          So prior to the 2016 reg, I honestly --
7  I just can't -- I don't think we had detailed
8  enough regulations to say one way or the other
9  prior to '95, but I would have to go back and look
10  at that reg.  But then once the 2016 reg went into
11  effect, it then had requirements that applied to
12  loans that were otherwise considered under the '95
13  reg.
14      Q    So we're going to go back to Exhibit 2,
15  your declaration.
16      A    Uh-huh.
17      Q    And we had just been talking about
18  paragraph 15 on the bottom of page 6.  Okay.  And
19  now I want to move on to the middle of page 7
20  which is paragraph 17.  And in the middle of that
21  paragraph, you write, The court enjoined the
22  department from using that methodology as it
23  currently existed to the extent that the secretary
24  relies upon information provided by the Social
25  Security Administration in violation of the

Page 94

1    Privacy Act.

2          So what was your understanding at the
3    time that you wrote this of what the court in
4    Calvillo Manriquez prevented the Department of
5    Education from doing?

6    A    It's my understanding that the court
7    prevented the Department of Education, that it
8    enjoined our methodology which at the time relied
9    on earnings data from the Social Security
10   Administration.  It is my understanding that the
11   court had concerns about potential violation of
12   the Privacy Act in using Social Security data for
13   this purpose.  And it is my understanding that
14   that methodology was enjoined.

15   Q    And was enjoined as to whom?

16   A    That particular ruling would have
17   applied to the class of borrowers that we refer to
18   as the Manriquez class.  There were a group of
19   borrowers.  I do not recall how many.

20        So the particular ruling was related to
21   those borrowers, but the methodology would have
22   been employed by the department otherwise to --
23   you know, to -- to the larger pool of borrowers.

24   Q    Okay.  So the methodology that you
25   describe in paragraph 15 was not just for those

Page 95

1    who attended certain schools operated by
2    Corinthian, but for all borrowers?

3    A    So I -- the answer to your question is
4    I don't know.  It was communicated to me as the
5    methodology that was developed for Corinthian
6    borrowers.  I don't know when it was developed
7    what the intent was for its long-term use.  I -- I
8    don't know.

9    Q    What was your -- what was your role
10   regarding this methodology?  What was your
11   involvement?

12   MR. MERRITT:  Objection.  It's
13   ambiguous.

14   BY MS. O'GRADY:

15   Q    In your role, were you tasked with
16   applying -- of setting policy that applied this
17   methodology to step-two determinations?

18   A    Are you asking me about the 2017
19   methodology?

20   Q    I'm asking you about the methodology
21   that you discuss in paragraph 15, which is what
22   was made after the department conducted a thorough
23   review of its existing methods and developed a new
24   methodology for Corinthian students?

25   A    I believe that paragraph 15 refers to

Page 96

1    the 2017 methodology.  I had no involvement
2    whatsoever in its development or application.

3    Q    So let's go to paragraph 18.  If you
4    want to just read that out loud for the record?

5    A    The department appealed the district
6    court's decision in Manriquez and still waiting
7    for a decision from the appellate court.  In the
8    meantime, the department has undertaken
9    significant efforts to explore and develop an
10   alternative approach for determining the amount of
11   relief to be given not just to Corinthian
12   borrowers, but to all borrowers with approved
13   borrower defense claims.

14   Q    Okay.  So were you involved with the
15   efforts to explore and develop an alternative
16   approach?

17   A    I was.

18   Q    Okay.  And what was the goal of that
19   alternative approach?

20   A    The goal was, you know, should the --
21   should the District Court of Northern California
22   determine that the methodology already in place
23   was one that we could not use but there would be
24   an alternative methodology that we could use for
25   part two, for step two.

Page 97

1    Q    And I think my question was were you
2    involved in developing this.  Did you lead the
3    development of this effort?

4    A    It was -- it was a group that was
5    involved, and I was part of that group.

6    Q    And who was in that group?

7    A    That group included myself, Michael
8    Brickman from my team; Jeff Appel, who was at FSA
9    and who is sadly now deceased.  Ian Foss, who was
10   at Federal Student Aid.  Then there were others
11   who came in and out of discussions.  We had, you
12   know, representatives from the Office of General
13   Counsel who were involved in some meetings.  You
14   know, there were conversations with our different
15   statistical offices.

16        So other people were brought into the
17   conversation, but I'd say the main working group
18   was, you know, myself, Michael, Jeff Appel, Ian
19   and probably Robin Minor was involved.

20   Q    Did you have regular meetings?

21   A    I can't recall whether it was a
22   regularly scheduled meeting, but we had many
23   meetings.

24   Q    When did this -- when did this effort
25   to explore and develop an alternative approach --

Page 98

1  when did that begin?
2      A    I think the group convened to start the
3  formal discussion somewhere in the neighborhood of
4  April, May, June of 2019.  I'd have to go back and
5  look, but I think it was sometime in the spring of
6  2019.
7      Q    And was the secretary involved in these
8  discussions?
9      A    No.
10     Q    Whose idea was it to make significant
11 efforts to explore and develop an alternative
12 approach?
13     A    I think that, you know, Mark Brown had
14 taken his new role and was concerned that we had
15 still not gotten clarity from the Northern
16 District of California, and he raised this issue
17 with me, and I shared his concern that enough time
18 had passed that it was time for us to start
19 thinking about an alternative methodology.
20          The -- the other thing that prompted
21 that is eventually I was told that the Social
22 Security Administration would not be continuing
23 the memorandum of understanding to provide future
24 earnings data.  And, so, that also, you know,
25 triggered in my mind that we -- we did need to

Page 99

1  come up with a new methodology that didn't rely on
2  social security data because while the court would
3  determine for current borrowers, you know, whether
4  they were going to approve the methodology, moving
5  forward I knew we would not have access to social
6  security data.
7      Q    And just to clarify, the methodology
8  we're talking about again is just about the amount
9  of relief, so a step-two determination; correct?
10     A    That is correct.
11     Q    So as this is all going on, Ms. Nevin
12 is continuing her determinations of denial or
13 grants on the merits?
14     A    I don't supervise Colleen directly, and
15 so I can only speculate.  I -- I don't know --
16     Q    Okay.  So you don't know whether
17 step-one determinations are being made at this
18 point because your methodology is just about step
19 two?
20     A    That is correct.
21     Q    And while this -- while your
22 development of this new methodology regarding step
23 two is going on, you weren't having conversations
24 with Colleen or anyone else about step-one
25 determinations; is that right?

Page 100
Page

1      A    I -- I don't believe our conversation
2  about state law standard was taking place during
3  this time period.  No, I think that conversation
4  about the state law standard was subsequent to the
5  development of the step-two methodology.
6      Q    And you've said that was your only
7  conversation with anyone about step one, so there
8  would be no other.
9      A    Right.  I mean, I got reports on
10 numbers -- you know, numbers of claims that were
11 pending, but, you know, it was just a -- you know,
12 a high level number.
13     Q    You got reports on, okay, numbers of
14 borrower defense claims that were pending, so
15 borrower defense claims that were awaiting a
16 step-one determination?
17     A    Early on, I don't even -- early on, I
18 think the reports were just simply, you know, how
19 many claims we have gotten, yes, and how many
20 claims are pending.  I don't know that I would
21 have known a percentage of them were in process.
22 You know, early on, it was just that this is the
23 number.
24     Q    Did you receive information or reports
25 about claims that had a step-one determination and

Page 101
Page

1  were awaiting a step-two determination?
2      A    Later on, after the methodology had
3  been approved and it was being applied, we -- we
4  did start getting updates on, you know, how
5  many -- how many claims were under review under
6  the part-one review.  So that was much later.
7  Like I said, after the methodology had been
8  approved, then I did start getting reports on, you
9  know, total number of claims, number of claims
10 being -- we use the term adjudicated to mean the
11 determination of the merit.
12     Q    So before the methodology was
13 completed, you were not receiving reports about
14 any adjudications occurring?
15     A    Well, you know, again, there -- we --
16 you know, we -- adjudication is different than
17 processing, meaning notifications.
18     Q    So "adjudication" to you means
19 notifying a student of the decision?
20     A    No, adjudication to me means the
21 attorney is reviewing the evidence to determine if
22 there was merit.
23     Q    Okay.  So adjudication is reviewing a
24 step one.
25          So what's processing?

Page 102
Page

1        A    Well, I didn't invent the terminology,
2   but the terminology as I understand it is that
3   adjudication is step one, reviewing the merit.
4   Step two is the determination of relief.  And then
5   when that is done, the borrower is notified.
6        Q    Okay.  So processing is not a term of
7   art, then?  It goes adjudication, decision
8   notification?
9        A    I think FSA uses the term "processing"
10  to mean the notification of the borrower.
11       Q    Okay.  Now, with this step-one,
12  step-two division, if a claim in step one is
13  adjudicated as denied, step two is not necessary;
14  is that right?
15       A    I -- I don't recall exactly how the
16  10 percent decision is applied to Corinthian, so I
17  can't answer the question there.
18       Q    Taking that aside.
19       A    Outside of that group, I -- I wouldn't
20  imagine that if they're ineligible you'd have to
21  do a determination, so I would imagine that step
22  two the sep- -- it would be separate.
23       Q    So in your role, you've only ever had
24  involvement with grants of borrower defense
25  applications; is that right?

Page 103
Page

1        A    I'm not involved in granting any
2   borrower defense applications.  My role has been
3   around the policy for the regulations and the
4   methodology for determination of relief.
5        Q    Okay.  So my question is the
6   methodology for determination of relief is solely
7   about the percentage of relief once an application
8   has been granted; it doesn't involve a denied
9   application?
10       A    That is correct, you know, with this
11  carve-out for this 10 percent Corinthian.
12       Q    Okay.  In paragraph 25, I want to just
13  read the first sentence of that paragraph for the
14  record.  It's a little bit long.
15       A    Sure.
16            As explained in other declarations
17  submitted as part of this administrative record,
18  the department has continued to adjudicate claims
19  since the injunction was issued in Manriquez,
20  consistent with that injunction, including making
21  step-one determinations that some borrowers have
22  established a successful borrower defense in
23  accordance with the applicable standard.
24       Q    Okay.  So this is -- here you say that
25  claims -- this was written in November.  So as of

Page 104
Page

1   November 2019, step-one determinations were being
2   made pending the development of the new partial
3   relief methodology; is that right?
4        A    That's what I've been told.  I mean, I
5   don't have supervision over that unit, so it
6   was -- I guess you could say I'm speculating here,
7   but that is the information I was provided.
8        Q    And, again, by whom?
9        A    It would either -- you know, I -- I
10  am -- I'm sure Mark Brown would have given me that
11  information, but I may have also gotten it from
12  Colleen Nevin in a meeting.
13       Q    Okay.  And the second part of this
14  sentence is, you know, determinations that some
15  borrowers established successful borrower defense
16  in accordance with the applicable standard, and
17  that standard is the standard governing step-one
18  determinations; right?
19       A    That is correct.
20       Q    Okay.  I think -- we've talked a lot
21  about your lack of involvement with that standard?
22       A    Right.
23       Q    I -- I just want to understand your
24  role.  Is there a reason that you have had no
25  involvement in step one?

Page 105
Page

1        A    I -- I think there are two reasons.
2   One is I'm not an attorney.  I -- I have no
3   expertise or professional experience or ability to
4   evaluate evidence.  I just don't.  So I think, you
5   know -- so one of the reasons is that, you know,
6   I'm not an attorney.
7            But the second reason is that the --
8   the legislation that establishes federal student
9   aid as a performance-based organization makes very
10  clear the division between policy and operations.
11  And with the borrower defense unit residing in
12  FSA, those are operational decisions.  The -- the
13  application of a regulation is FSA's decision to
14  make, right.  So when there is a policy question
15  about that, I get involved; but outside of the
16  policy questions, you know, they are a
17  semi-autonomous unit, so not only --
18       Q    So what --
19       A    -- (indiscernible) experience, you
20  know, that would be crossing the separation of
21  labor.
22       Q    I want to understand, though, how --
23  how do you determine what is a policy question
24  that would be appropriate for you to weigh in on?
25       A    You know, I -- it's hard to give a

Page 106

```
 1   general rule, right, because policy -- it depends,
 2   right.  So the answer is it depends.  But I think
 3   the place that maybe best described this is that
 4   policy are questions about regulations versus what
 5   the BD unit which is making decisions about an
 6   individual borrower's application.
 7        Q    So in your understanding, there is no
 8   policy to govern step-one determinations; there's
 9   only an individual attorney-driven adjudication of
10   evidence?
11             And I do not want to put words in your
12   mouth.  I want to understand.
13        A    No, I mean, I think the -- the policy
14   question on step one, as I, you know, explained
15   earlier, was which state standard, right.  So, you
16   know, I think we needed a general policy about how
17   do you figure out which state standard to use.
18             Now, I'm not the one who issued that
19   policy, but, for example, do you use the state
20   where the company is located?  Do you use the
21   state where the campus is located?  Do you use the
22   state where the borrower is located?
23        Q    So your understanding is the only
24   policy question with regard to adjudicating
25   borrower defense applications is which state
```

Page 107

```
 1   standard to use?
 2        A    Outside of the regulatory questions
 3   about whether or not breach of contract is
 4   considered, right.  So we have the high-level
 5   policy decisions defining misrepresentation, and
 6   obviously I'm involved in creating the 2019
 7   regulation which sets forth a definition of
 8   misrepresentation.
 9             But when it comes to determining for an
10   individual borrower whether misrepresentation
11   occurred, that's not a policy decision beyond the
12   regulatory requirement that the definition of
13   misrepresentation be applied.
14        Q    I want to go back to your statement
15   about it being performance based and you being in
16   operations.
17             Can you clarify that for me and just
18   explain what you meant by that for me a little bit
19   more?
20        A    Sure.  Because FSA is a
21   performance-based organization, they have
22   different hiring authority; they have different
23   contracting authority; and they have a different
24   pay scale.  Senior leaders at FSA get bonuses.
25   The COO, the chief operating officer, has the
```

Page 108

```
 1   potential to be the highest paid employee at the
 2   department because of the bonus structure, and
 3   when Congress created the PBO, which I believe was
 4   in 1998, they felt as though FSA as a PBO had to
 5   be held accountable for their performance and
 6   therefore had to have semi-autonomous operational
 7   control.
 8             But Congress did not want them to be
 9   the policy or the regulatory body, and Congress
10   assigned that role to the department.
11        Q    So it's your understanding of that
12   structure -- I hear you saying that that structure
13   determines in part your ability to involve
14   yourself in step-one determinations; is that
15   right?
16        A    Well, I mean, I think it's twofold;
17   right?  I mean, one that is an operational
18   protocol, so I would not be involved because under
19   the way we are managing FSA, I -- I don't get
20   involved in day-to-day operation decisions.  But
21   even if we did, I personally couldn't because I'm
22   not an attorney.
23        Q    Okay.  So what's the difference,
24   though, between step one and step two?
25        A    The difference between step one is it's
```

Page 109

```
 1   the evaluation of legal evidence to make a legal
 2   determination of whether misrepresentation
 3   occurred.  That is very different than the policy
 4   which defines misrepresentation in regulations.
 5        Q    Right.
 6             I suppose I'm getting at so the policy
 7   that defines misrepresentation in regulations and
 8   the policy that sets a schedule for determining,
 9   you know, a percentage of relief borrowers on the
10   whole will be getting, why is your role different
11   with respects to step one and step two?
12        A    Well, again in step two, I am not
13   making the determination for any particular
14   borrower about what level of relief they're
15   getting.  All I'm trying to do is in the same way
16   that a policy process defined misrepresentation, I
17   was involved in a policy process to define
18   financial harm.  And then the BD unit applies that
19   definition.
20             So I think you could look at what I
21   refer to as the methodology as the policy
22   definition of what constitutes financial harm.  So
23   the policy is set at a very high level.  This is
24   how we define financial harm, but it's the BD unit
25   that applies it to any particular borrower.
```

Page 110

1    Q    And why isn't it the case with step one
2    that policy would be set on --
3         A    Policy was set in establishing the
4    definition of misrepresentation.
5         Q    And that's the extent of your
6    involvement with that?
7         A    That is the extent of my involvement is
8    in defining misrepresentation in the 2019 regs.
9    Granted, I was not involved in defining
10   misrepresentation in the 2016 regs or the 1995
11   regs, but I was involved in defining
12   misrepresentation for the 2019 regs.
13        MS. O'GRADY:  Okay.  If we can go to
14   another exhibit.  This will be -- if I could just
15   ask the court reporter, Dana, did I actually mark
16   Exhibit 10 or did I not?  I'm hoping that I did
17   not, but just let me know either way.
18        THE COURT REPORTER:  Can you hear me?
19        MS. O'GRADY:  Now I can.
20        THE COURT REPORTER:  Okay.  Just give
21   me just a second.  I separated files, so I've got
22   to go into the last file.
23        MS. O'GRADY:  By my count, I'm now up
24   to Exhibit 10 because we didn't actually talk
25   about the Nevin declaration.  But if I'm wrong

Page 111

1    about that and it's Exhibit 11, that's fine.  Just
2    please let me know so I don't mess up the
3    numbering.
4         THE COURT REPORTER:  I have 9 as the
5    last one you marked.
6         MS. O'GRADY:  I can tell you which
7    document we're going to open.  It's a PDF in the
8    main folder, Hearing Examining For-Profit College
9    Oversight.
10        THE COURT REPORTER:  I'm sorry, Maggie.
11   Nine is the last one you marked.  Ten is next.
12        Could you hear me then?
13        MS. O'GRADY:  No.  If you could just
14   tell me if the next exhibit is 10 or 11?
15        I see it in the chat.  Thank you.
16        So this exhibit will be Exhibit 10 for
17   this deposition.
18        (Jones Deposition Exhibit 10 was marked
19   for identification and attached to the
20   transcript.)
21        BY MS. O'GRADY:
22        Q    And, Ms. Jones, do you recognize this
23   document?
24        A    Sorry.  I had to get my cursor over to
25   my microphone.

Page 112

1         Q    No problem.
2         A    Yes, this looks like the transcript of
3    my hearing before the House Oversight Committee.
4         Q    Okay.  And who prepared you for this
5    testimony?
6         MR. MERRITT:  Objection to the scope.
7         BY MS. O'GRADY:
8         Q    I believe you can still answer.
9         MR. MERRITT:  Okay.  Go ahead for now.
10        THE WITNESS:  Largely I prepared myself
11   for the hearing, but, you know, there were
12   meetings with, you know, attorneys in the Office
13   of General Counsel.  And -- and certainly people
14   on my team, you know, helped me pull documents to
15   review.
16        BY MS. O'GRADY:
17        Q    Okay.  And what kind of documents did
18   you review?
19        MR. MERRITT:  Objection as to calling
20   for privileged information as well.
21        BY MS. O'GRADY:
22        Q    I certainly don't want any privileged
23   information, but if there were members of your
24   team who were not lawyers that you worked with or
25   to the extent you prepared yourself by reviewing

Page 113

1    previous memoranda, I'd like to know what those
2    were.
3         A    Well, this is a totally different
4    matter.  This has nothing to do with borrower
5    defense.
6         Q    Well, I believe -- I believe some does.
7    We can go to that.  But did -- I take from your
8    answer you mean you did not review any documents
9    about borrower defense in preparation for this
10   testimony?
11        MR. MERRITT:  Again, objection.  It's
12   calling for privileged company.
13        MS. O'GRADY:  That's fine.  I'll move
14   on.
15        BY MS. O'GRADY:
16        Q    I want to talk about your exchange with
17   Congresswoman Pressley, and this is about borrower
18   defense.  I think the easiest page numbering is
19   from the top of the page, and it's 49.
20        A    Yes, I remember this part of the
21   dialogue well.
22        Q    So at the bottom, Congresswoman
23   Pressley asked, Ms. Jones, at this moment, do you
24   know how many claims remain unprocessed?
25        And here she is talking about borrower

Page 114
Page

1  defense claims; correct?
2      A    Yes, so she's asking me about the
3  number of claims.
4      Q    If you want to just read your answer
5  for the record.
6      A    (Witness reviews document.)  Okay.
7      Q    So beginning there, It is a number that
8  changes from time to time.
9      A    Oh, you want me to read it out loud?
10     Q    Yes, if you don't mind.
11     A    Okay.  Let me scroll back up.
12          It is a number that changes from time
13  to time.  It is probably in the neighborhood of
14  160,000.  The last official count I got was
15  158,000, so I'm assuming it's somewhere in the
16  name of 160,000 by now.
17     Q    Okay.  And then on the next page, she
18  says -- this is at the top of the page 50 --
19  Ms. Jones, for the record, yes or no, is there
20  currently a policy which restricts the office of
21  Federal Student Aid from adjudicating or
22  processing any borrower defense claims that did
23  not stem from school closure?
24          And there's a little bit of
25  interruption there.  And the bulk of your answer

Page 115
Page

1  is then where you begin, There is not a policy
2  that prevents.
3          Would you just read that part of your
4  answer out loud for the record?
5      A    Sure.
6          There is not a policy that prevents the
7  review of claims.  However, we are not able to
8  determine the level of harm or the level of relief
9  that a borrower should get because the methodology
10  we use is now being challenged by the California
11  courts, so we continue to process.
12     Q    Okay.  So I want to understand what you
13  mean here by there's not a policy that prevents
14  their view of claims.
15     A    Yes.  There was no policy in place to
16  prevent Colleen Nevin's team from continuing to
17  review evidence, to review claims, to evaluate the
18  merit of an application.
19     Q    And I think you said earlier today that
20  you do not know either way if she and her team
21  were doing that?
22     A    Right.  I mean, I -- you know, I was
23  told on a level that we're continuing to review,
24  but I don't have direct knowledge of that.  I
25  don't supervise her.

Page 116
Page

1      Q    Okay.
2      A    So it was my understanding that they
3  were continuing to look at evidence, but I don't
4  have direct knowledge.
5      Q    And of the pending claims that you've
6  stated were in the neighborhood of 160,000, what
7  schools do those 160,000 borrowers attend?
8          MR. MERRITT:  Objection.  It's
9  overbroad.
10          BY MS. O'GRADY:
11     Q    Are they all CCI?
12     A    I -- I would have to go back and look,
13  but I -- no.  I don't know what percentage of them
14  were CCI, but, no, by this point in time, there
15  were claims from -- from, you know, a list of
16  institutions.
17     Q    Okay.  So I -- I guess I'm still trying
18  to understand why the injunction in the Calvillo
19  Manriquez matter would have prevented step-one and
20  step-two determinations from those who did not
21  attend CCI schools?
22     A    I don't think I've ever suggested that
23  step one stop.  I don't know.  I'm not involved in
24  step one.  I was told it continued, but I don't
25  have direct knowledge.  So I can't tell you for

Page 117
Page

1  certain whether it did or it didn't, but there was
2  certainly no policy to stop step one.
3      Q    Okay.  Assuming step one had continued,
4  what was preventing the department from doing step
5  two for non-CCI students?
6      A    A lack of a methodology to do step two.
7      Q    And what is the reason for the lack of
8  a methodology at this point?
9      A    Because the Northern District of
10  California had determined that our methodology
11  potentially involved a Privacy Act violation.
12     Q    So at the point of the injunction of
13  Calvillo Manriquez, was it Ed's intention to use
14  that partial relief methodology for all pending
15  borrower defense claims step-two determinations?
16     A    I don't know what the intent was of the
17  2017 methodology at the time.
18     Q    Here, you testified that there could be
19  no step-two determinations because of the
20  injunction, and --
21     A    Correct.
22     Q    -- those 160,000 borrowers are not only
23  CCI graduates.  So in effect, that methodology
24  being enjoined prevented all step-two
25  determinations; is that right?

Page 118

Page

1    A    At the time -- yes.  So what -- if your
2  question to me is, you know, when -- when the --
3  let me just take a step back.
4          The application of the methodology by
5  the time I got involved was not just focused on
6  Corinthian Colleges, right.  I get involved in the
7  methodology in the spring of 2019.  So at the time
8  that I engage in the methodology, it is a
9  methodology being developed to be applied broadly.
10         Prior to my involvement, I was not
11 involved in discussions about the methodology.  I
12 could only speculate on its intended use.  But
13 when I became involved in the development of a
14 methodology, the intent was that it would be
15 applicable to any borrower defense claim from any
16 institution at any point in time in the future.
17    Q    Okay.  So the step-one determinations
18 that you believe, but do not know for sure, were
19 being made while the Calvillo injunction was
20 preventing you from making step-two
21 determinations, have they been preserved or kept
22 anywhere or would they be in the normal course?
23         I guess my question is if those
24 step-one determinations were being made, what
25 would have happened to them?

Page 119

Page

1    A    You'd have to ask Colleen Nevin.
2    Q    So the regulations that you were
3  working on, the new methodology, who would be
4  applying step two?
5    A    So --
6         MR. MERRITT:  Objection as vague.
7  BY MS. O'GRADY:
8    Q    We know Colleen and her team do step
9  one.  Who -- who does step two?
10    A    First, I want to clarify that the
11 regulations we were developing are separate from
12 the development of the methodology.
13    Q    Thank you for clarifying.  I should
14 have said methodology.
15    A    Yeah.  So I want to be clear about
16 that.
17    Q    Thank you.
18    A    I don't know who in Colleen's unit
19 conducts the step two.
20    Q    Okay.  So it would be someone else in
21 her unit.  An attorney?
22    A    It would be somebody in FSA.  I don't
23 know who actually does that.  I don't know -- I
24 don't know the qualifications of everybody on her
25 team.

Page 120

Page

1    Q    Is the methodology -- the partial
2  relief methodology that you've been working on to
3  replace, that used in Calvillo, is that complete?
4    A    What do you mean by "complete"?
5    Q    Has there -- is there a document that
6  sets that policy and outlines the methodology?
7    A    The new methodology --
8    Q    Right.
9    A    -- in December 2019?
10    Q    Yeah.
11    A    Yes.  I believe on our Web site we have
12 told borrowers how that methodology works.  I
13 believe it's published on our Web site.
14    Q    And that guidance -- how is that
15 guidance used by somebody in FSA?
16         MR. MERRITT:  Objection to scope.
17 BY MS. O'GRADY:
18    Q    I guess I just want to understand how
19 the step-two workflow goes.
20         So you develop the methodology.  It's
21 been provided to borrowers on the Web site, and
22 then there are individuals who then apply step-two
23 methodology to step-one determinations which are
24 all going to be the grants, obviously.
25         So I -- I'd like to know how that's

Page 121

Page

1  communicated and has been communicated in
2  determining --
3         MR. MERRITT:  I'm still going to object
4  on scope as the step-two processes is not part of
5  the court's discovery order.
6         MS. O'GRADY:  I think it all goes to
7  reasons for -- for delay, but . . .
8         Charlie, are you instructing the
9  witness not to answer or --
10         MR. MERRITT:  Well, what was the
11 question?
12         MS. O'GRADY:  The question is how the
13 step-two policy that has been developed -- the
14 step-two methodology has been communicated to
15 individuals in Ed in FSA who are actually tasked
16 with implementing it to a decision.
17         MR. MERRITT:  You can answer that.
18         THE WITNESS:  So the answer is I don't
19 know.  There is a team in FSA who creates the data
20 tables, who actually analyzes the data.  And there
21 is a second team at FSA who quality controls the
22 data to divide (audio distortion) the tables.
23         I do know there are two teams involved
24 in development and the quality review of the data
25 tables.  I do not know how Colleen's team divides

Page 122
Page

1   up the work.  I -- I don't know how the standard
2   operating procedure brings those data tables into
3   the process.  I don't know.
4           MS. O'GRADY:  It's 12:15.  Do we want
5   to have a break for lunch now?  Does that work for
6   everyone?
7           THE WITNESS:  It's up to you.
8           MS. O'GRADY:  Okay.  I think that would
9   work.  I think we're at a good breaking point
10  right now and that would work for me if that's
11  okay.  I -- I suggest a short lunch just
12  because --
13          THE VIDEOGRAPHER:  You want to go off
14  the record for this convo?
15          MS. O'GRADY:  Yes, thank you.
16          THE VIDEOGRAPHER:  Okay.  We're now
17  going off the record.  The time is 17:14 UTC time.
18  Thank you.
19          (Lunch recess -- 12:15 p.m.)
20          (After lunch recess -- 12:49 p.m.)
21          THE VIDEOGRAPHER:  We are now back on
22  the record.  The time is 17:49 UTC time.
23      BY MS. O'GRADY:
24      Q     Okay.  Ms. Jones, I have a few
25  follow-up questions about what we discussed at

Page 123
Page

1   break and then we'll go on to the next exhibit.
2   So one of my follow-up questions is the partial
3   relief methodology that was developed for CCI
4   students, at what point was it decided that that
5   should apply to everyone?
6       A     Are you asking me about the -- the
7   methodology in 2019 I was a part of developing or
8   the 2017 methodology?
9       Q     Let's take the 2017 first.  So that was
10  first -- my understanding it says in your
11  declaration that was originally developed for the
12  CCI students in those particular windows, and at
13  what point did that become the methodology that Ed
14  wanted to use for students other than CCI
15  students?
16      A     I -- I -- I don't know, and I -- yeah,
17  I don't know when that decision would or would not
18  have been made.
19      Q     Do you know if that decision was made?
20      A     You know, I don't recall it having been
21  a final decision.  I -- I -- it -- I don't recall
22  because I -- yeah, I don't recall whether it was
23  or was not a decision as made.
24      Q     Was there ever an effort to use a
25  different methodology for non-CCI students when

Page 124
Page

1   the Calvillo -- for step-two determinations for
2   non-CCI students when the Calvillo injunction
3   occurred?
4       A     So I was not -- I didn't come into my
5   current role until after that decision, and so I
6   don't exactly know the answer to that question at
7   the time the decision was made.  I came into my
8   role after that.
9       Q     Okay.  Now during the time that you
10  said in your declaration and you testified before
11  Congress that the Calvillo Manriquez injunction
12  prevented the 2017 partial relief methodology from
13  being applied to any borrower, there were no
14  borrower defense decisions mailed out to students;
15  is that correct?
16      A     I don't know.
17      Q     You don't know either way if during
18  that period there were any decisions sent out to
19  students?
20          MR. MERRITT:  Objection: vague.
21      BY MS. O'GRADY:
22      Q     Were there any decisions sent out to
23  students on their borrower defense applications
24  while the Calvillo Manriquez injunction presented
25  step-two determinations from being made?

Page 125
Page

1       A     Do you mean final decisions, or would
2   that include, for example, if somebody submitted
3   an incomplete application and the borrower defense
4   unit reached out to get more information?
5       Q     I'm asking about final decisions.
6       A     You know, I -- I -- I don't recall
7   final decisions being made.  I -- I can't say that
8   absolutely no decision was ever issued, but I
9   don't recall decisions continuing -- well, let me
10  be clear.  I don't know whether -- you know, I --
11  whether or not decisions were being made.  You
12  know, I was told they were processing, but I don't
13  have direct knowledge.  But I also believe it is
14  the case that final decisions were not being
15  mailed -- you know, borrowers were not being told
16  final decisions.
17          So I think I want it clear as to -- you
18  know, it's a little bit separate in our mind about
19  the review of claims versus the notification of
20  borrowers and I do not believe borrowers had been
21  notified of final decisions.
22      Q     Did it concern you that borrowers were
23  not being notified about final decisions?
24      A     I'm not sure what you mean.
25      Q     Were you -- was it something that you

Page 126

1  thought about or had any concerns about, or did
2  you -- it didn't occur to you that that would be a
3  problem?
4        MR. MERRITT:  Objection as calling for
5  privileged information.
6        MS. O'GRADY:  It's calling for
7  privileged information in that -- on what basis
8  are you making that objection?
9        MR. MERRITT:  Her thoughts and opinions
10 on decision department policy at the time before
11 final policy was established.
12       MS. O'GRADY:  So you're saying it's a
13 deliberative process privilege whether or not she
14 was concerned about any decisions going out or
15 not?
16       MR. MERRITT:  Yes.
17       BY MS. O'GRADY:
18       Q    Ms. Jones, in your role did you have
19 authority to ask FSA to make decisions on the
20 merits -- to make step-one decisions?
21       A    Could you -- meaning?
22       Q    Well, we've -- we've talked about how
23 you don't -- your role as -- your policy role did
24 not involve step-one decisions.  We talked a lot
25 about that before break.

Page 127

1             I'm wondering if you had the authority
2  to say to Ms. Nevin or whoever else in her role
3  the pace of step-one decisions needs to be
4  increased, for example.  You know, was that within
5  your authority?
6        A    So it sounds to me like you're asking a
7  couple of different things.  It started to sound
8  like you were asking me do I have the authority to
9  tell them to make decisions, but then later --
10 later it sounded like you were asking me if I have
11 authority to establish a pace.
12       Q    So let's take both questions then.  So
13 do you have authority to tell them to make
14 decisions and to send borrower -- borrower defense
15 decisions?
16       A    No.
17       Q    Do you have authority to tell them the
18 pace that they should be working at to process
19 borrower defense decisions?
20       A    I don't have the authority to tell them
21 the pace.
22       Q    Did you ever discuss the pace with
23 Ms. Nevin?
24       A    I discussed the case with Mark Brown.
25 I don't recall whether or not I discussed the pace

Page 128

1  with Colleen.
2        Q    And when did you discuss the pace with
3  Mr. Brown?
4        A    I believe -- I believe that after the
5  methodology was approved, the secretary wanted
6  regular updates on -- you know, on -- on how
7  things were moving, and so --
8        Q    And are you talking about -- which
9  methodology are you talking about?
10       A    The 20- -- I guess we'll call it the
11 2019 methodology.
12       Q    So the 2019 partial relief methodology?
13       A    Correct.  Once that had been approved
14 and -- to say, you know, had -- had been told to
15 apply that methodology, you know, she wanted
16 regular updates on -- on -- you know, on how that
17 was going.  And so, yes, in that context, you
18 know, I get regular updates from her and we
19 discussed --
20       Q    And regular updates, what kind of
21 information did that include?
22       A    Generally it included how many pending
23 claims were there.  Sometimes he would give
24 updates on how many new claims had come in, and at
25 some point he would report on, excuse me, how many

Page 129

1  claims had been adjudicated, and by adjudication
2  meaning how many claims had the attorneys reviewed
3  for a determination on the merit, et cetera.
4        Q    Okay.  So how many step-one
5  determinations had been made as opposed to step
6  two was included?
7        A    Correct.  Now, there was a separate
8  number for -- for, you know, processing, and I
9  can't remember at what point that got added to the
10 update, but at some point in time we also added to
11 the reports, you know, the number of borrowers who
12 had received their notification, but I just can't
13 remember when that got added.
14       Q    And these were sent by Mark Brown to
15 the secretary?
16       A    Some were sent from Mark Brown to me
17 and then they were regularly also sent to the
18 leadership team.
19       Q    And how regularly were these sent?
20       A    I can't remember if it was weekly or
21 biweekly.  I just can't remember.  I think it was
22 biweekly, but it may have been weekly.
23       Q    And were these, like, written memos, or
24 were they PowerPoints?
25            What format did they take?

Page 130
Page

1       A    Generally it was an email.  There may
2   have at times been an attachment with a table, but
3   I think generally it was an email, and -- and then
4   ultimately I believe that the data warehouse at
5   FSA added this as a public feature.  I believe
6   these data were then posted for public knowledge
7   on the data warehouse.
8       Q    Okay.  And when were these updates --
9   when did they start getting sent?
10      A    I don't remember the exact date, but
11  I -- I recall that it was after the December 2019
12  implementation of the new methodology.  So there
13  may have been, you know, earlier updates from time
14  to time on total numbers, but the regular updates
15  were after the methodology had been approved and
16  implemented.
17      Q    And how were the metrics used?
18      A    What do you mean by "how were the
19  metrics used"?
20      Q    The information was reviewed by the
21  secretary.  What is your understanding of its
22  purpose?  Was the -- I'll ask that question.  If
23  you need clarification, I can add.
24      A    I mean, I think the purpose was
25  twofold.  You know, general information.

Page 131
Page

1   Obviously, a policy decision had been made and
2   people wanted to know if the process was moving.
3       I believe that there -- there was a
4   significant amount of hiring as well, and I think
5   part of that was to, you know, evaluate, you know,
6   the size of the team, you know, do you need more
7   people; do you need fewer people.
8       I'm not involved in personnel
9   decisions, but, you know, I think part of that was
10  also, you know, viewed by people to see if the
11  team was large enough.  I mean, the team expanded
12  significantly during this time period.
13      Q    So you said at the start of that answer
14  that people wanted to know the process was moving.
15  What do you mean by that?
16      A    At a general level, you know, it's one
17  thing to develop a policy, and it's another to
18  make sure that those implementing it can do so.
19      And, so, I think there was interest in
20  making sure that it was a policy that -- you know,
21  that operationally could be implemented.
22      Q    Prior to the -- prior to this time,
23  around December 2019, when these -- when the
24  partial relief methodology went into effect, had
25  there been updates about progress or lack thereof?

Page 132
Page

1       A    I believe at that time the updates were
2   about total number of claims.  What I don't recall
3   is whether or not those updates included numbers
4   on adjudications.  I just can't remember whether
5   they were included at that time.  I just -- I -- I
6   can't remember.
7       Q    So you don't remember if updates had
8   included whether or not any claims -- any
9   decisions on the merits had been communicated to
10  students?
11      A    I -- I -- you know, I just can't
12  remember the specific, you know, updates that came
13  through.  You know, I just can't remember.
14      But at that point before the 2019
15  regulations were in effect and these updates
16  began, had you talked to anyone about the delay?
17      A    What do you mean by "talked to anyone
18  about the delay"?
19      Q    You know, were there any meetings or
20  conversations you had about the fact that
21  decisions were not being sent out?
22      A    Well, when I came into my role, you
23  know, the -- the decision had been made that
24  because the Northern District of California had
25  concerns about the Privacy Act that we could not

Page 133
Page

1   apply that methodology; that we had to wait and
2   find out whether or not it was going to be deemed
3   that the use of Social Security Administration
4   data was a violation of the Privacy Act.
5       Q    While you were waiting, were -- was
6   another method being developed?
7       A    I started developing the team -- you
8   know, I pulled together the team and we started
9   working on that methodology in, you know, I think,
10  that April, May, June time frame of 2019.
11      Q    I want to go back to the memos that
12  updated the secretary on the progress.  Do you
13  know if those metrics were ever used to determine
14  anyone's bonus?
15      A    I'm not involved in the determination
16  of anyone's bonus, so I don't know.
17      Q    Do you know if those metrics were used
18  to determine anyone's job performance rating or
19  job performance review?
20      MR. MERRITT:  Objection to the scope of
21  these questions.
22      BY MS. O'GRADY:
23      Q    Ms. Jones, I think you can still
24  answer.
25      MR. MERRITT:  Go ahead.

Page 134
Page

1          THE WITNESS:  I would have to go back
2    and look at Mark's performance review.  I'd have
3    to go back and look at Mark's performance review,
4    but his performance review was done in December,
5    and we didn't have approval on the methodology
6    yet.  His next performance review will be next
7    month.
8          BY MS. O'GRADY:
9          Q    And is the pace of decision making
10   going to be considered in his performance review?
11         A    Federal Student Aid publishes their
12   strategic plan, and the strategic plan I believe
13   has as a metric, you know, resolving outstanding
14   borrower defense claims.  So I believe -- I'd have
15   to go back and look at the strategic plan.  I
16   haven't looked at it recently because I haven't
17   started Mark's review.  But I do think the
18   strategic plan includes as a goal, you know,
19   coming up-to-date, you know, processing
20   outstanding claims and, you know, eliminating the
21   backlog.
22         So, you know, to the actual pacing, per
23   se, I don't know.  But, yes, it is a goal in the
24   strategic plan to revolve these outstanding cases.
25         Q    So to the extent that resolving the

Page 135
Page

1    backlog, I think you just said, is -- is part of
2    the strategic plan and would be part of the
3    performance review in a positive way, would a
4    failure to eliminate the backlog be part of a
5    performance review in a negative way?
6          A    I mean, I think you're asking me to
7    speculate on somebody's performance review that
8    is, you know, far more complicated than one issue.
9    I can't --
10         Q    Well, I can go to the past in the --
11   you know, for -- for several months until the 2019
12   partial relief methodology went into place, there
13   were no new borrower defense decisions made.
14         Would that reflect negatively on
15   anyone's job performance review?
16         MR. MERRITT:  Objection: beyond the
17   scope.
18         MS. O'GRADY:  I disagree it's beyond
19   the scope.  We can have that discussion, but I
20   think at this point, the witness can answer.
21         MR. MERRITT:  Which of the topics does
22   this go to?
23         MS. O'GRADY:  I think it goes to
24   pretext and the reason for delay.
25         MR. MERRITT:  Is that one of the three

Page 136
Page

1    topics?  I mean, again, the extent to which the
2    difficulty of reviewing borrower defense
3    applications actually caused or justified
4    Secretary's 18-month delay.
5          MS. O'GRADY:  Can we go off the record
6    to talk about this?
7          THE VIDEOGRAPHER:  Do you agree to go
8    off the record?
9          MR. MERRITT:  Sure.
10         THE VIDEOGRAPHER:  We're going off the
11   record.  The time is 18:08 UTC time.
12         (Recess -- 1:08 p.m.)
13         (After recess -- 1:13 p.m.)
14         THE VIDEOGRAPHER:  We're now back on
15   the record.  The time is 18:13 UTC time.
16         MS. O'GRADY:  Would the court reporter
17   mind reading the question that was pending?
18         THE COURT REPORTER:  Can you guys hear
19   me?  Can you guys hear me?
20         MS. O'GRADY:  If that's not possible, I
21   can try and rephrase.
22         THE COURT REPORTER:  I can type it in.
23         MS. O'GRADY:  Oh, we can get it typed.
24   Thank you.
25         So it looked we could get that typed

Page 137
Page

1    in.  I don't think we can, so I'll just move on.
2          BY MS. O'GRADY:
3          Q    So, Ms. Jones, you testified that the
4    metrics in the memo were being circulated
5    regularly once the borrower defense decisions were
6    restarted around December 2019; is that correct?
7          A    Okay.  Correct.
8          Q    And I think you also testified that
9    some of those -- those metrics were important
10   because it -- I don't want to put words in your
11   mouth.  What did you testify about the importance
12   of clearing the backlog?
13         You did use that phrase.
14         A    Yeah, the importance of clearing the
15   backlog is that we wanted to resolve the claims.
16   We wanted to finalize them.
17         Q    And was that -- the importance of
18   clearing the backlog, when you first came into
19   your position, was that something you were aware
20   of, the backlog of claims?
21         A    When I first came into my position, I
22   was aware that a judge in California told us that
23   the methodology for determining relief was
24   potentially a violation of the Privacy Act.
25         Q    My question was, though, when you came

Page 138
Page

1   into your position, did you understand it to be
2   important to clear that backlog?  Not about what
3   caused it, but did you understand that it was
4   important to clear the backlog of claims?
5       A    Absolutely I understood it was
6   important to clear out the backlog of claims, but
7   we had been halted in our path by the judge of the
8   Northern District of California.
9       Q    So throughout the time before the --
10  before the methodology went into effect in
11  December 2019 and the claim decisions restarted,
12  was the backlog an ongoing concern of yours?
13           MR. MERRITT:  Again, objection.  That's
14  calling for mental impressions and deliberative
15  privileged information.
16           MS. O'GRADY:  I'll rephrase.
17  BY MS. O'GRADY:
18      Q    Ms. Jones, what steps did you take to
19  clear the backlog prior to the 2019 methodology
20  going into effect in December of 2019?
21      A    The instructions that the borrower
22  defense unit was operating under was that the
23  Northern District of California had determined
24  that we -- that the methodology was potentially a
25  violation of the Privacy Act.  Quite frankly, you

Page 139
Page

1   know, the question that I asked is have we heard
2   from the Northern District of California.  I mean,
3   the Northern District of California was the
4   decision maker on this.  And, yes, I would have
5   loved for them to have issued a decision promptly.
6       Q    Are you aware that -- that the
7   Department of Education argued in the Ninth
8   Circuit that the methodology was only intended for
9   Corinthian students and not for those who had
10  attended schools other than Corinthian?
11      A    I'm not aware of the testimony one way
12  or the other in that case.
13      Q    So you'd be surprised to know that it
14  was Ed's position in that case that the
15  methodology was only ever intended for Corinthian
16  students?
17      A    I -- the -- I would not be surprised to
18  know that the methodology was developed for
19  Corinthian students.  Those were the students that
20  were at the center of that case.  The question of
21  whether or not that methodology would be applied
22  to additional borrowers was a question that we
23  didn't get to.  I never got an answer to that
24  question because before we finished adjudicating
25  the Corinthian borrowers, the Northern District of

Page 140
Page

1   California enjoined the methodology.
2       So you're asking me to speculate what
3   could of, should of.  At the end of the day, we
4   hadn't completed adjudicating Corinthian claims
5   when the judge enjoined the methodology.
6       Q    So when the injunction came down, it
7   was -- you know, you essentially said pencils
8   down; we'll just wait for a decision?
9       A    I didn't say pencils down.
10      Q    Your understanding was that meant
11  because that was prior to your role, but your
12  understanding was that since the injunction, it
13  was pencils down on --
14      A    My understanding --
15      Q    -- on that methodology?
16      A    My understanding was that because the
17  judge had ruled that this was potentially a
18  violation of the Privacy Act, I -- you know, I
19  don't think the department is in the practice of
20  knowingly violating a law.
21      So when this was in question, I -- I
22  think that everybody was waiting for the judge to
23  determine whether or not it was a violation of the
24  Privacy Act.
25      Q    So when the new methodology was

Page 141
Page

1   developed, was that developed with the express
2   purpose of applying to all schools, not just
3   Corinthian?
4       A    I -- I can't speak to what will
5   ultimately be determined about the borrowers, you
6   know, in -- in involve -- I can't predict what the
7   district -- the district court in the --
8       Q    I'm not asking you about that.  What I
9   want to know is -- so now we have a new
10  methodology --
11      A    Yes.
12      Q    -- not enjoined by the court.
13      Is that new methodology for -- will
14  that be applied to every single step-one
15  determination?  So a step-one determination is
16  made.  The borrower defense claim is granted.  It
17  goes to step two.  And this new methodology is for
18  every single student?
19      A    The new methodology is for every
20  applicant; however, in the case that an applicant
21  has already been awarded more, certainly you're
22  not going to go back and apply the new methodology
23  and tell them that they owe us money back, right.
24  I mean, that -- that -- you know, we're not going
25  to go back in time.  But, yes, moving forward, the

Page 142

1  new methodology is being applied to all -- all
2  borrowers who submit a borrower defense claim.
3        Q    And that includes all borrowers who
4  have submitted a borrower defense claim and a
5  step-one determination hasn't yet been made?
6        A    That is correct.
7        Q    Okay.  Let's go to the exhibit folder.
8  We are going to go the file ECF number 56-3,
9  Exhibit 5, 2019 regulations.
10       A    Okay.
11       Q    Okay.  And this was Exhibit 5 to your
12  declaration.  And do you recall reviewing this in
13  advance of today's deposition?
14       A    I did not review this exhibit prior to
15  today.
16       Q    You've seen it before, though; correct?
17       A    Not in this format, but I've certainly
18  seen the 2019 borrower defense final regulation.
19       Q    Okay.  And who wrote this --
20       A    I don't have a Westlaw subscription, so
21  I've never seen it in this format.
22       Q    Okay.  Fair enough.
23            So who wrote this document?
24            MR. MERRITT:  Objection: scope.
25            MS. O'GRADY:  Can the witness answer?

Page 143

1            MR. MERRITT:  Okay.
2            MS. O'GRADY:  I mean . . .
3            THE WITNESS:  A team of people wrote
4  this document, and that team of people included
5  individuals from our career staff from the Office
6  of Postsecondary Ed, staff from the Office of
7  General Counsel, my office was involved, staff
8  from Office of Management and Budget, staff from
9  the Domestic Policy Council, staff from the
10  Department of Justice, staff from the Small
11  Business Administration.  All those regulations go
12  through an interagency clearance process.  Every
13  one of those agencies is allowed to make a comment
14  which we respond.
15            So, collectively, that entire group is
16  involved in writing a final regulation.
17  BY MS. O'GRADY:
18       Q    And, Ms. Jones, what was your role in
19  developing this?
20       A    My role in the final rule was as
21  reviewer.  So the public comments come in.  They
22  get bucketed by career staff.  Career staff write
23  the responses, and then the document goes through
24  an internal review process which included my
25  review.  So I would have reviewed the final rule

Page 144

1  as well as any responses to comments from the
2  interagency review.
3        Q    Okay.  And we're going to look at
4  page -- on the footer of the document, it's
5  page 85.  I think using the footers is the easiest
6  way to navigate.
7             And this is under the heading which is
8  on the bottom of page 84, Summary of the major
9  provisions of this regulatory action:  For the
10  direct loan program, the final regulations.
11            I'm looking at the third bullet point
12  on page 85.
13       A    Uh-huh.
14       Q    And would you read that for the record,
15  that bullet point beginning, Provides schools and
16  borrowers?
17       A    I must be in the wrong place.
18            MR. MERRITT:  It's the sixth page of
19  the PDF if that's helpful.
20            THE WITNESS:  My scrolling feature is
21  kind of bizarre.
22            Okay.  So I'm on page 85, and it
23  appears to me as though the third bullet says,
24  Provide schools and borrowers.
25            Is that what you mean?

Page 145

1  BY MS. O'GRADY:
2        Q    Yes.
3        A    Okay.  Provides schools and borrowers
4  with opportunities to provide evidence and
5  arguments when a defense to repayment application
6  has been filed and to provide an opportunity for
7  each side to respond to the other's submissions,
8  so that the department can review a full record as
9  part of the adjudication process.
10       Q    So can you walk me through the process
11  of the school and borrowers providing evidence and
12  what that means?
13       A    I can -- I can walk you through the
14  policy.  The process would have to be described by
15  Colleen Nevin because that's --
16       Q    Okay.
17       A    -- her operation.
18       Q    Then please walk me through the policy.
19       A    The policy is that the borrower may
20  allege misrepresentation by a school.  At a policy
21  level, the school would be notified and given an
22  opportunity to respond.  All of the documents,
23  including the response by the institution as well
24  as any evidence that the department is using to
25  adjudicate, is made available to the borrower, and

Page 146

1   the borrower gets the last word in the record
2   before it is reviewed by the Office of General
3   Counsel.
4          So that is -- the policy directive is
5   that everybody gets due process rights, but the
6   borrower has the last word before the directive is
7   reviewed.
8      Q    When you say due process rights, do you
9   mean the school gets due process rights as well?
10     A    The school and the borrower.  The
11  borrower gets to respond to whatever the school
12  submits.
13     Q    Okay.  Is it your understanding --
14  well, what is your understanding of the school's
15  interest in the outcome of a borrower defense
16  application?
17     A    I mean, you're -- you're asking me what
18  a school's interest is in --
19     Q    Well, you said they're afforded due
20  process.  So I'm wondering as a policy matter in
21  developing this policy what the reasoning behind
22  giving the school what you're calling due process
23  in this -- in this borrower defense application
24  review is?
25         Do they have -- if the borrower defense

Page 147

1   application is granted, for example, does the
2   school have to pay any money?
3      A    It -- it depends.  It depends on which
4   regulation the loan is being adjudicated under.
5      Q    So if you could explain that further.
6      A    Yeah.  So there are -- as I understand
7   it, again, I'm not an attorney, but as I
8   understand, there are certain statute of
9   limitations imposed by state law, and so it could
10  be that a borrower, you know, was -- made a claim
11  but it -- it was outside of the statute of
12  limitations in the state in which case, you know,
13  the department would not be able to go to the
14  school to, you know, get reimbursed.
15         In the 2016 regulation, it was a
16  two-step process whereby first, the department
17  adjudicated the claim; and then second, the
18  department made a decision about whether or not it
19  would try to recover damages or money, whatever
20  you call it, from the school.
21         And in the 2019 regulation, the idea
22  was to merge that process.
23         So it is possible that the department
24  could go back to the school to try to, you know,
25  essentially bill them for loan -- loan -- you

Page 148

1   know, loan forgiveness.
2      Q    How is that different from the 2016
3   regulations?
4      A    So there are time limits that a
5   borrower has to meet, so the time limits are
6   different in the 2016 reg and the 2019 reg.
7      Q    That's -- okay.
8          Okay.  Now I'd like to go to page 98.
9   So the footer, page 98.
10     A    Okay.
11     Q    And it's -- the paragraph at the bottom
12  of page 98 that begins with, Discussion, could you
13  read that for the record, please?
14     A    I'm sorry.  My arrows are having me go
15  whole pages.
16         Okay.  Discussion:  The department
17  thanks the commenters for their support of the
18  regulations that require individuals to assert
19  borrower defense claims.  To an extent, we
20  understand the commenters' concerns about, and
21  have already become aware of the evidence of,
22  outside actors attempting to personally gain from
23  the bad acts of institutions as well as unfounded
24  allegations.
25         The evidence --

Page 149

1      Q    Okay.  You can stop right there.
2          What is that sentence referring to?
3      A    I need to read the rest of the page for
4   context if you can just --
5      Q    Okay.  Sure.  Take a minute to review
6   it.  That's fine.
7      A    (Witness reviews document.)
8          Okay.  So this was -- so this
9   discussion was in response to comments that came
10  from commenters, and what this is referring to is
11  the department has unfortunately identified and
12  has worked with other agencies.  There are
13  legitimate groups working to help borrowers submit
14  claims, and that's great.  There are also bad
15  actors that are out there calling borrowers and
16  saying, you know, for $300, we'll guarantee you
17  borrower defense relief, and we don't charge a
18  borrower to submit an application.
19         So we -- you know, there -- there are
20  some of these organizations that are, you know,
21  essentially charging borrowers a fee to file
22  their -- you know, to file their claim, and
23  they're benefiting financially from that process,
24  and that's what this is referring to.
25     Q    Okay.  So the -- so the groups that are

Page 150

1  charging borrowers to file their borrower defense
2  applications, I'm trying to understand the
3  connection between that and the -- the decision
4  here to disallow group claims entirely?
5          A    Well, this is a --
6               MR. MERRITT:  Objection.  What is the
7  connection to the scope of the discovery in this
8  case?
9               MS. O'GRADY:  Well, I'd say the
10  connection to the scope of the discovery is I'm
11  trying to understand the development -- we haven't
12  got there yet, but I'm on the road to further
13  understanding the development of the denials, and
14  also point 3, the extent to which the secretary
15  has denied applications of students who attended
16  schools subject to findings of misconduct.
17              So I'm trying to understand the basis
18  for decisions and the basis for changes in the
19  regulations.
20              MR. MERRITT:  Well, you're not asking
21  about basis for decisions.  It's about statements
22  in the 2019 regulation.
23              MS. O'GRADY:  That relate to the policy
24  of decisions.
25              MR. MERRITT:  Okay.  You can answer the

Page 151

1  question.
2               THE WITNESS:  This policy relates to
3  loans made after July 1st, 2020.  This policy in
4  no way applies to the current outstanding claims,
5  with the rare exception of potentially a borrower
6  that has consolidated their loans since July 1,
7  2020.  So these regulations do not apply to
8  pending BD claims except for that small --
9  potential small group of consolidation loans or
10  new claims that have come in since July 1, 2020,
11  on new loans.
12          BY MS. O'GRADY:
13          Q    I still -- I still want to understand
14  the connection between determining that a group
15  claim is frivolous and the fact that borrowers
16  have been duped into paying for a borrower defense
17  application when they don't have to.
18          A    I -- I don't -- but this regulation has
19  nothing to do with pending claims -- currently
20  pending claims.
21          Q    But I'm asking you about the reasoning
22  behind this regulation because I think it -- it --
23  it speaks to the -- it speaks to the priorities
24  and the decision making of -- of the borrower
25  defense policy.

Page 152

1               So I'm asking about this regulation.
2          A    So I think if you read the full reg,
3  what you will find in the preamble and the other
4  parts of the regulation -- and I haven't read this
5  in a long time so I can't identify the page.  But
6  I think what we explained quite clearly in the
7  preamble and other parts of the reg is that we
8  believe every borrower needs to be evaluated as an
9  individual.  We believe every borrower deserves
10  the right to have their claim adjudicated.  We
11  also believe that only those borrowers who
12  suffered financial harm are entitled to relief.
13  That's in the 2016 reg as well.
14               So you have to do a person-by-person
15  adjudication to make the determination that there
16  was misrepresentation; that they relied upon that
17  misrepresentation; and that they suffered
18  financial harm.
19          Q    Prior to this regulation, was there a
20  group adjudication process?
21          A    There was a permissible group
22  adjudication process in the 2016 reg.
23          Q    And had that been used?
24          A    I -- I don't know.
25          Q    Had -- have you ever looked or

Page 153

1  considered the relative efficiency of a group
2  adjudication process and an individual
3  adjudication process?
4          A    Are you asking me which is quicker?
5          Q    I'm asking if you ever thought about
6  which was quicker or ever did any assessment of
7  which was quicker?
8               MR. MERRITT:  Objection.  Going into
9  her mental impressions and thoughts on the
10  development of policy.  Deliberative privileged
11  material.
12          BY MS. O'GRADY:
13          Q    I can ask a different question to get
14  at the same issue.
15               Whose decision would it have been to
16  invoke a group adjudication process?
17          A    I don't know whose it would have been,
18  but I do know it would not have been mine.
19          Q    Okay.  Okay.  Let's go to the page that
20  is 103 at the footer.
21          A    103?
22          Q    Yes.
23          A    Okay.
24          Q    It's the third paragraph that starts
25  with, We acknowledge.  If you can read that out

Page 154
Page

1   loud for the record?
2        A      We acknowledge that there is a risk
3   that unsubstantiated claims could be filed in
4   large numbers to target institutions for the
5   purpose of damaging their reputations before the
6   department can adjudicate the claims as
7   unsubstantiated.  Indeed, we are aware of firms
8   and advocacy groups that are engaging in such
9   coordinated efforts against certain institutions.
10       Q      So what are you referring to or what is
11  this referring to here?
12       MR. MERRITT:  Objection to the scope.
13  We're not here to litigate the 2019 regulation.
14       MS. O'GRADY:  No, but I think it goes
15  to -- the 2019 regulations are based on -- based
16  on policy views informed by what has happened and
17  what is understood to have happened prior.
18            So this is a -- I'm asking the witness
19  about what this means.  This is the basis for
20  developing new regulations.  So I'll ask my
21  question.  I think will be very much within the
22  scope.
23       BY MS. O'GRADY:
24       Q      What is the basis for the belief that
25  there's a risk of unsubstantiated claims filed in

Page 155
Page

1   large numbers?
2        A      You know, I -- again, I want to -- I
3   want to reiterate, you know, this reg is hundreds
4   of pages long, and there are lots of public
5   comments.  And, so, the answer or the response to
6   one single comment is not the basis for a
7   regulatory decision.  It's hundreds of pages long
8   because there are lots and --
9        Q      Okay.
10       A      -- lots of comments and considerations.
11            So I think you're trying to ask me
12  to --
13       Q      I can simplify the question.
14            Do you believe that there is a risk of
15  unsubstantiated claims that can be filed in large
16  numbers?
17       A      There is always the risk that somebody
18  would submit an application that would not qualify
19  for borrower defense relief.
20       Q      Okay.  One person or large numbers of
21  people?
22       A      I think there could be large numbers of
23  people.
24       Q      Do you think there have been large
25  numbers in the past?

Page 156
Page

1        A      I don't know what you mean by "the
2   past."  Could you -- what's your time frame?
3        Q      During your tenure at the Department of
4   Ed.
5        MR. MERRITT:  I'm going to object to
6   this line of questioning as not within the court's
7   order.
8        MS. O'GRADY:  I think it is within the
9   court's order based on the reason for the delay.
10       MR. MERRITT:  Again, at that level of
11  generality, that's not --
12       MS. O'GRADY:  I'm not being very
13  general.  I'm pointing to a sentence in the 2019
14  regs that these regulations are made based on a
15  belief of a risk of unsubstantiated claims filed
16  in large numbers.  If that is a belief of the
17  department as a whole, I think that's quite
18  germane to whether or not the delay was caused by
19  the difficulty of reviewing borrower defense
20  applications.
21       MR. MERRITT:  I don't see how that's
22  germane.  I mean, it's going to -- as Diane said,
23  the regulation was promulgated for a number of
24  reasons, and your -- and this was included in the
25  regulation, but it's not -- it doesn't apply to

Page 157
Page

1   pending claims, as she said.
2        MS. O'GRADY:  I want to understand the
3   reason for department policy and whether or not a
4   belief in a risk of unsubstantiated claims that
5   can be filed in large numbers is a basis for that
6   policy as written in the regulation.  It's a --
7        MR. MERRITT:  Are you asking her if
8   it's a reason for the delay in this case or -- or
9   whether it justified the 2019 regulation which is
10  not at issue in this case?
11       MS. O'GRADY:  Well, I can -- I can ask
12  the question about delay, but what I would like to
13  know is if the witness, who's in charge of policy,
14  agrees with this statement about the risk of
15  unsubstantiated claims.
16       MR. MERRITT:  You can answer that
17  question.
18       THE WITNESS:  Okay.  First of all, I'm
19  not in charge of policy.  I have oversight
20  responsibility over the policy-making process.  I
21  do not solely own it.  It --
22       BY MS. O'GRADY:
23       Q      I didn't mean -- I didn't mean to
24  misstate your responsibilities there, but if you
25  could answer the question, do you -- do you agree

Page 158
Page

1   with this statement that there is a risk that
2   unsubstantiated claims could be filled in large
3   numbers to target institutions for the purpose of
4   damaging their reputations?
5              MR. MERRITT:  Again, I'm going to
6   object --
7              THE WITNESS:  I do.
8              MR. MERRITT:  -- and instruct not to
9   answer as to enforce a limitation imposed by the
10  court.
11             MS. O'GRADY:  Okay.  Your witness just
12  did answer, "I do."  I don't know if that came on
13  the record.
14        BY MS. O'GRADY:
15        Q    On this topic of unsubstantiated
16  claims, I'll ask specifically about the backlog.
17  So I think we've talked about the backlog of about
18  160,000 claims, and that was in the Congressional
19  hearing testimony we went over earlier today.
20             Of that backlog of 160,000 claims, is
21  it your opinion that some number of those were
22  unsubstantiated?
23        A    I don't understand why my opinion -- I
24  don't review the claims, so I don't have a --
25        Q    I'm asking your opinion, not whether

Page 159
Page

1   you review the claims.  I understand that.
2        A    Well, I can't formulate an opinion if I
3   don't see the claims.
4        Q    Okay.  So you have no opinion about
5   what percentage of that backlog may have been, as
6   it says here, unsubstantiated?
7             That's the word used here.
8             MR. MERRITT:  Objection; speculative.
9             You can answer her question.
10             THE WITNESS:  What I know is that the
11  BD unit has provided us with examples of
12  ineligible claims, and based on that, I am aware
13  that some claims have come in saying they should
14  get relief because their teacher didn't like them.
15             And, again, you know, I don't review
16  these claims, so I'm relying on what the BD unit
17  tells me.  But, you know, I am told there are
18  claims that came in that said my teacher doesn't
19  like me or I didn't like my teacher or, you know,
20  they closed the cafeteria.
21             So I am told that there are claims that
22  come in with those kind of complaints that don't
23  meet the standard for a borrower defense claim,
24  but I am relying on what people are telling me.  I
25  don't review those claims, and I don't know what

Page 160
Page

1   percentage of claims look like that.
2             BY MS. O'GRADY:
3        Q    In what context would you be informed
4   of those claims?
5        A    There was a -- I -- I believe that
6   there was -- I don't recall whether it was a
7   Congressional letter or a question for the record
8   following one of the secretary's hearings, but at
9   one point in time this question came up.  FSA
10  answered it, and, you know, I saw that answer as
11  it came through.  But I cannot recall whether -- I
12  can't remember why that answer was prepared.
13        Q    Okay.  I want to go to the bottom of
14  page 226.  Okay.  And at the bottom of 226 --
15        A    I'm not quite at 226.
16        Q    Okay.
17        A    I don't know what's going on with my
18  scroll bar, but it's either too fast or too slow,
19  so I'm not going there to . . .
20             (Witness scrolls through document.)
21             Okay.  I'm on 226.
22        Q    Okay.  And in the bottom in --
23  beginning second paragraph up from the bottom, In
24  addition, provisions in the 2016 final regulations
25  enabled the secretary to initiate defense

Page 161
Page

1   repayment claims on behalf of entire classes of
2   borrowers.
3             And that's the group discharge process
4   we were just talking about?
5        A    Uh-huh.
6        Q    The next sentence here, Initiating the
7   group discharge process is extremely burdensome on
8   the department and results in inefficiency and
9   delays for individual borrowers.
10             Can you explain why a group discharge
11  process is extremely burdensome as opposed to an
12  individual discharge process?
13        A    I -- I have to think about this.
14  This -- this is in the -- I think this is in the
15  portion of the reg that refers to the potential
16  cost.  I think it's in that section of the reg.
17  So I need to put this in the context.
18             So I believe what this is referring to
19  is that under the 2016 reg, the group discharge
20  process vaguely refers to a process that involves,
21  you know, a special master of some sort, which is
22  not a position that the department currently has.
23             And when -- so -- so the 2016 reg talks
24  about, you know, involving somebody like a special
25  master or Office of Hearing and Appeals, you know,

Page 162
Page

1    some entity in the department to adjudicate these
2    large claims.  And that -- that is burdensome.  We
3    don't -- there isn't a special master.
4            So when it comes to the individual
5    borrowers, the borrower defense unit attorneys can
6    do that adjudication.  But I believe -- I'd have
7    to go back and look at the 2016 rule, but I
8    believe what this refers to is the process that
9    had been -- I don't know if it was described in
10   the reg or just described, but there was this
11   process about engaging a special master in -- in
12   these group claims.
13        Q      Okay.  So your understanding of the
14   change in 2019 is to remove the option of a group
15   claim because then you won't need to appoint a
16   special master?
17        A      No, I think you're mischaracterizing my
18   statement.
19        Q      Okay.  And I don't mean to be doing
20   that.
21        A      Right.
22            So you're asking me in particular what
23   this sentence refers to.  What this sentence is
24   referring to is one of the reasons that we did not
25   include a group discharge in the 2019 regulations.

Page 163
Page

1    One of the reasons is that it is a burdensome
2    process.  That's one of several reasons.  And,
3    yes, that is one of the reasons we describe in
4    this document.
5        Q      Okay.
6        A      And to my knowledge, the 1995 reg also
7    did not have a group discharge process.  I'd have
8    to go back and review, but I don't believe that
9    was part of the '95 reg either.
10       Q      Okay.  And then if we can go to
11   page 90.
12       A      Okay.
13       Q      And at the bottom of page 90, that
14   final paragraph, could you read the first sentence
15   for the record starting with, We agree?
16       A      We agree that a borrower defense to
17   repayment regulation that is poorly constructed
18   under the statute may create a moral hazard by
19   giving students an opportunity to complete their
20   education and raise alleged misrepresentations to
21   avoid paying for that education.
22       Q      And what does that sentence refer to?
23       A      I think you have to read three
24   paragraphs ahead of that where what we explain is
25   that the appropriate way to best serve borrowers

Page 164
Page

1    is to prevent misrepresentation from happening in
2    the first place because there is not just the
3    financial element, there's a time element.
4            So when you read that whole section,
5    what we're referring to is our interest in
6    preventing misrepresentation from the beginning.
7    And as you read this reg, you will see that we
8    have expanded consumer information through our
9    college scorecard so that we are providing data to
10   borrowers that reduces the potential for a school
11   to commit misrepresentation.
12            So when you read this whole section,
13   what you will see is that what we're talking about
14   is that an expanding college scorecard is the
15   better approach.  We want to prevent
16   misrepresentation from ever happening.
17       Q      The borrower defense regulations are
18   concerned with students who are alleging
19   misrepresentation has occurred previously; right?
20       A      This is a prospective regulation that
21   would be implemented after we had the expanded
22   college scorecard.
23            So we're talking about future, and we
24   believe that because the college scorecard put
25   these data out in the public before July 1, 2020,

Page 165
Page

1    for future borrowers covered by this reg, we
2    believed that stopping misrepresentation by the
3    government publishing consistent data on all
4    programs was the best way forward, and that's what
5    this describes.
6        Q      So in this sentence, We agree that a
7    borrower defense to repayment regulation that is
8    poorly constructed, is that referring to previous
9    regulations?
10       A      No, I think it says a borrower defense.
11   We're talking about this regulation.  If we didn't
12   accurately and properly construct this regulation.
13       Q      And the result of not properly
14   constructing this regulation is a moral hazard
15   that gives students an opportunity to complete
16   their education and raise alleged
17   misrepresentations to avoid paying for that
18   education.
19            That's a risk that's created by a
20   poorly constructed regulation?
21       A      It is a potential risk.  That's what it
22   says, that is a potential risk of a poorly
23   constructed regulation.
24       Q      And that's a risk that the 2019
25   regulations, in your view, are constructed to

Page 166

```
Page

 1   mitigate?
 2           MR. MERRITT:  Objection: scope and also
 3   privileged information, getting to her views of
 4   the regulation before the -- before it was
 5   published.
 6           BY MS. O'GRADY:
 7       Q    This sentence refers to a poorly
 8   constructed regulation.  Is that regulation the
 9   2016 regulation?
10           MR. MERRITT:  Objection: asked and
11   answered.
12           MS. O'GRADY:  I don't know if it was
13   answered.  I'm wondering if the witness would mind
14   answering it again.
15           THE WITNESS:  It was a regulation, a
16   poorly constructed -- a conceivable poorly
17   constructed regulation.
18           BY MS. O'GRADY:
19       Q    I'm really not trying to play games
20   here.  I want to understand if one of the reasons
21   this 2019 regulation was written, as I'm reading
22   from it directly, is that the previous regulation
23   was considered poorly constructed creating a moral
24   hazard.
25           That's what the regulation says to
```

Page 167

```
Page

 1   me --
 2           MR. MERRITT:  Objection.
 3           BY MS. O'GRADY:
 4       Q    -- and I want to clarify if I'm reading
 5   the sentence correctly.
 6           MR. MERRITT:  Objection.  That is not
 7   within the scope of what the court authorized as
 8   discovery.
 9           MS. O'GRADY:  All right.  We're going
10   to go to the next exhibit which is in the folder
11   as A09, Borrower Defense Repayment, so it should
12   be one of the first files in the folder.
13           BY MS. O'GRADY:
14       Q    When you have that open, just let me
15   know?
16       A    I have that open.
17       Q    Okay.  Do you recognize this
18   PowerPoint?
19       A    I don't -- I don't know if I recognize
20   this PowerPoint, per se, but the information
21   contained in this PowerPoint is information that
22   I've seen in one format or another.
23       Q    Okay.  And what are some of the other
24   formats you might have seen it in?
25       A    Well, I mean, it could have been that
```

Page 168

```
Page

 1   pages of this document were put in other
 2   PowerPoints, so, you know, I've seen information
 3   that's in this PowerPoint.  I just -- I don't
 4   recall whether I've seen this specific PowerPoint.
 5       Q    The memoranda you were talking about
 6   earlier that reported metrics to the secretary, is
 7   this the format that information was presented in
 8   or is this something different?
 9       A    So this appears to me to be a periodic
10   update that talks -- so this is not what I was
11   referring to.  What I was referring to is a tally,
12   you know, just -- just numbers, not -- not pages
13   of PowerPoints, but just, you know, numbers.
14       Q    Do you know who drafted this?
15       A    No, I don't know who drafts documents
16   at FSA, but it appears to be an FSA document.
17       Q    And in what context would you have seen
18   this information?  Would it have been in a meeting
19   or by email?
20       A    It may have been emailed to me, but I
21   would have seen it in the context of a meeting.
22       Q    If we can go to the -- this is the
23   second page of the PDF, and it helpfully has a two
24   at the bottom left of the footer.
25       A    Oh, okay.  I see that.
```

Page 169

```
Page

 1       Q    Okay.  So this is one of the ones that
 2   is going to match the number on the document and
 3   the number in the PDF, which is always helpful.
 4       A    Uh-huh.
 5       Q    So on this heading, Of the nearly
 6   280,000 borrower defense applications received
 7   since 2015, that first bullet point, 57,000 have
 8   been adjudicated, processed and closed.
 9           I want to understand if that 57,000 --
10   excuse me.  Really what I want to ask about is the
11   second bullet point, 38,700 have been adjudicated
12   but have not yet been processed, and these were
13   the words we were talking about earlier, the
14   difference between adjudication and processing.
15           So what does that mean?
16       A    I don't know in particular for those
17   38,000 claims exactly what's the process they were
18   in, so I can't speak to any particular claim in
19   that group.
20           But, in general, what it means is that
21   the legal team in the borrower defense unit have
22   reviewed the evidence and have made a
23   determination -- let's just use the terminology on
24   the merit of the claim.  That may not be the right
25   legal terminology, but I think you got what I
```

Page 170

1    mean.  They looked at the evidence to decide
2    whether it's substantiated.
3              I believe that when it has been
4    adjudicated but not processed, that means the
5    borrower hasn't yet been notified.
6         Q    Okay.
7         A    Right.  So then -- yeah.
8         Q    And then the 27,700 in the next bullet
9    point, those are approved applications that will
10   be finalized when appropriate relief is
11   determined.
12             So that means they've gotten their
13   step-one determination and are awaiting their step
14   two; is that correct?
15        A    I believe that's what it means.
16        Q    And then it says, Nearly 11,000
17   applications have been adjudicated as denied but
18   have not yet been processed.
19             So those are step-one denials not sent
20   to borrowers?
21        A    I'm not sure.
22        Q    Of the approved applications awaiting
23   their step-two determination, the 27,700, do you
24   know what categories of borrowers those are, from
25   what schools they came from?

Page 171

1         A    I don't.
2         Q    And who has to sign off on the grants,
3    the approved applications?
4         A    Colleen Nevin.  Or let me be clear, she
5    may have delegated others on her team, so it would
6    be Colleen Nevin or her designee.  I don't know if
7    she's authorized others to sign off.  I'm unclear
8    about that.
9         Q    Okay.  And then on PowerPoint -- so on
10   the footer and on the PDF 6, page 6.
11        A    Okay.
12        Q    So this -- the heading is, Why are BD
13   applications on hold, and it says -- the second
14   bullet point under approvals says, No relief
15   methodology developed for non-CCI claims.
16        A    Yes.
17        Q    And that's what we've addressed before.
18   That refers to there being no non-CCI methodology
19   while the injunction was enforced; is that
20   correct?
21             I can ask more open ended if you want
22   to just explain that bullet point.
23        A    I think it means a couple of things.
24   It means that we had a methodology for CCI claims,
25   and that has been enjoined.  I believe -- I think

Page 172

1    this was an August PowerPoint.
2         Q    Yes.
3         A    So -- so the situation becomes further
4    complicated during this time period because now
5    we -- we no longer have an agreement with the
6    Social Security Administration, and so we don't
7    even have access to social security data.
8              So -- so -- so we have, you know, the
9    pending methodology for CCI claims, but now we're
10   in a situation where the original method we had is
11   enjoined.  And further, if the California court
12   decides we can use that methodology for non-CCI
13   schools, we don't have access to even getting
14   those data from the Social Security Administration
15   anymore.
16             So if this is -- if the August time
17   frame is right in my mind, this has become further
18   complicated because now, no matter what the judge
19   says we don't have an agreement with social
20   security.
21             So, in other words, we don't have the
22   ability to apply that methodology even if
23   approved.
24        Q    Okay.  And -- and at the same time, no
25   methodology -- no alternative methodology was

Page 173

1    being developed?
2         A    Well, that -- so that's what's
3    confusing about the August time --
4         Q    It was August 31st, I believe.
5         A    Of what year?
6         Q    2019.
7         A    Okay.  So by then, we were in the
8    process of developing a methodology but it had not
9    yet been reviewed and approved, yes.  We were in
10   the hard work of -- of developing a methodology.
11        Q    Okay.  So this bullet point, No relief
12   methodology developed for non-CCI claims, then
13   what does that mean?
14        A    I believe what it means is that we are
15   still waiting for Corinthian borrowers for the
16   California court to make a decision, and beyond
17   that we now don't have access to social security
18   data for claims beyond those Corinthian claims.
19        Q    Under the next heading, Denials, it
20   says, Policy decision (spring 2018) to not issue
21   denials until approvals also could be issued.
22             What is that referring to?
23        A    So there had been a decision that was
24   made that if -- if the department issued denials
25   without at the same time issuing approvals,

Page 174

1   borrowers could be misinformed and believe that we
2   would not be approving any claims, and there was a
3   concern that that would have a chilling effect on
4   borrowers.
5           So a decision had been made in -- in --
6   that we would not issue denials if we were not
7   also issuing approvals.
8       Q    Who made that decision?
9       A    I do not know.  I was in meetings about
10  that, but I don't -- I can't tell you who actually
11  made that decision.
12      Q    You don't remember?
13      A    I don't even know if I was in a meeting
14  where the final decision was made.  That
15  decision -- you know, I -- I think the original
16  decision was made before I was in my role.  I
17  think it was revisited from time to time, but I
18  don't believe I was involved in the -- in the
19  making of that initial decision.
20      Q    Uh-huh.
21      A    I don't recall.
22      Q    And your understanding, you said, was
23  that you didn't want to have a chilling effect on
24  borrowers.  What do you mean by that?
25      A    I think the concern was that if the

Page 175

1   only decisions being issued were denials, that
2   that could be misreported by the media to make
3   borrowers believe that we were not going to
4   approve valid claims and the chilling effect would
5   be that, you know, if somebody has a valid claim,
6   they could have been discouraged from filing them.
7           We did not want -- I mean, you know, at
8   no point in time did anybody want somebody with a
9   valid claim to not submit it.
10      Q    And whether or not a claim is valid is
11  a step-one determination after they apply;
12  correct?
13      A    That's correct.
14      Q    So -- so it was determined as a matter
15  of policy that it was better to issue no decisions
16  rather than deny -- rather than send out denials
17  of any claims?
18      A    I -- I believe that's the decision that
19  was made in spring of 2018.
20      Q    Was there ever a discussion about
21  sending out approvals so that -- I mean, it seems
22  to me the choice was to either not issue denials,
23  as it says here, until approvals could be issued.
24          Was there a discussion about increasing
25  the pacing of approvals so that you wouldn't have

Page 176

1   to decide between no decisions or just denials?
2           MR. MERRITT:  Objection: calling for
3   privileged information about the deliberations
4   leading to the decision to not do denials.
5           BY MS. O'GRADY:
6       Q    I can move on.  You don't have to
7   answer that.
8           Okay.  Next bullet point is, No
9   processing systems available from summer 2018 to
10  present due to platform development and migration.
11  Now, what is that referring to?
12      A    I believe that was referring to the
13  development of a system to replace Excel
14  spreadsheets as the BD unit's mechanism for
15  managing claims.
16      Q    So when the processing systems were
17  unavailable, were claims still being adjudicated?
18      A    I don't know.
19      Q    Would Colleen Nevin know?
20      A    Yes, I believe she would be the one to
21  know.
22      Q    Okay.  Then issuance of decide --
23  denial note -- excuse me.
24          Issuance of denial decision scheduled
25  to resume by mid September.  What is that

Page 177

1   referring to?
2       A    I didn't write this slide, and so I'm
3   not quite sure what -- what this refers to.
4       Q    So at this point in your role, were you
5   not keeping tabs on the pace of decisions being
6   made?
7       A    In -- in the August time frame, we were
8   still waiting for the California court to rule on
9   the methodology, and so at this point in time, we
10  were still hopeful that there would be a
11  determination, at least for the Corinthian
12  borrowers, about a methodology.  So at -- at this
13  point in time, we're still waiting for the court.
14          Now, by August, we, the working group,
15  had come up with some potential methods to use for
16  adjudicating future claims, but it had not yet
17  been approved.
18          So I think --
19      Q    Okay.
20      A    You know, this may -- whoops, I'm
21  sorry.  This is the time period where we had
22  developed some options.  They weren't yet applied.
23  And in the meantime, there was still the hope that
24  the California court would rule at least for the
25  Corinthian borrowers.

Page 178
Page

1        Q       Regarding the policy decision in spring
2    2018 not to issue denials until approvals could
3    also be issued, I understand that you didn't
4    initially make that decision because it was before
5    your time?
6        A       Right.
7        Q       Could you have reversed it?
8        A       No.
9        Q       Why not?
10       A       Because now there's litigation
11   involved.
12       Q       Say there wasn't litigation involved.
13       A       Yeah, you're asking me to speculate on
14   the circumstance.
15       Q       Well, I guess -- so the decision not to
16   issue any denials until approvals could also be
17   issued, that's actually not related to litigation;
18   right?
19               That was a decision you said made
20   because you didn't want to give borrowers the
21   wrong idea; right?
22       A       Correct.  Initially, but I think the
23   department position was they didn't want to give
24   borrowers the wrong idea.
25       Q       So that decision?  Could you reverse

Page 179
Page

1    that decision?
2        A       So, I mean, you're asking me to tell
3    you what I think might have happened had the world
4    been different and we had --
5        Q       No, no, no.  In the exact world the way
6    it is, if you had wanted to, could you have said,
7    everybody, we're going to send out those denials
8    even though we're not sending out any grants?
9        A       No.
10       Q       Why not?
11       A       Because now that there is litigation
12   involved --
13       Q       But the denials, there's no litigation.
14   They've been denied.  There's no partial relief at
15   issue.  They're waiting there.  They've been
16   denied.  They're ready to go out.
17               There's a policy decision not to send
18   them out because we don't want to spook borrowers
19   and have them think everything is being denied, I
20   have that right; right?
21       A       Yes.
22       Q       So could you have said, we're not doing
23   that; we're going to send out these details?
24       A       No, I could not have done that.
25       Q       Why?

Page 180
Page

1        A       That's what I'm trying to tell you.
2    Because there's litigation involved.  Even if
3    litigation didn't involve denials, there's now
4    litigation around borrower defense.  So I'm not --
5    I'm not a lawyer and I --
6        Q       What litigation?  Are you talking about
7    something different than Calvillo, the Calvillo
8    Manriquez case?
9        A       No.  At this point, Manriquez was the
10   litigation we were waiting.  Yeah, I mean, that --
11       Q       So Calvillo Manriquez, though, was
12   about applying a certain partial relief
13   methodology that violated the Privacy Act.
14               These denials are totally separate.
15   These are not -- they have nothing to do with that
16   partial relief methodology.
17       A       What I'm saying is I'm not an attorney.
18   I'm not involved in that case.  I don't know what
19   the court said.  I don't know --
20       Q       So it would -- so you thought the
21   Calvillo Manriquez injunction meant that no
22   decisions could be issued at all, denial or
23   grants?
24       A       No, I'm saying that once litigation was
25   involved, those decisions were out of my hands.

Page 181
Page

1        Q       In whose hands were they put?
2        A       It would have been a group decision.
3        Q       By who?
4        A       It would have involved input from, you
5    know, our attorneys.  It would have involved input
6    from Office of the Secretary.  You know, FSA and I
7    would have had, you know, a seat at the table.
8                But I --
9        Q       I really want to understand --
10               MR. MERRITT:  Maggie, would you mind if
11   we took a short break right now?
12               MS. O'GRADY:  Can I just finish --
13               MS. BERMAN:  Yeah.  You can do a
14   question or two more.  I was just thinking we've
15   been going for --
16               MS. O'GRADY:  Sure.  I'm almost done
17   with this --
18               MS. BERMAN:  We've been going for more
19   than an hour and a half now.
20               MS. O'GRADY:  Can I just finish this
21   exhibit?
22               MR. MERRITT:  Yeah.  Is it a lot more
23   questions?
24               MS. O'GRADY:  No.  I really want to pin
25   this down and I think there's just a couple of

Page 182

1   more questions, yeah.
2            MR. MERRITT:  Okay.
3       BY MS. O'GRADY:
4       Q    So I just -- it sounds to me, and
5   correct me if I'm wrong -- I really want to
6   understand -- that your position, your
7   understanding of the state of things at this point
8   was that the injunction in Calvillo Manriquez
9   prevented FSA from issuing any borrower defense
10  decisions?
11           MR. MERRITT:  Objection.  It's a
12  mischaracterization of her testimony.
13      BY MS. O'GRADY:
14      Q    Okay.  Please -- please correct me if I
15  misstated that.
16      A    You misstated that.
17      Q    Okay.  So what was your understanding
18  of how Calvillo Manriquez affected FSA's ability
19  to send out borrower defense decisions?
20      A    What I -- what I'm trying to explain to
21  you is that because there was pending litigation,
22  whether a particular decision was related to that
23  litigation or not, because there's pending
24  litigation around borrower defense, I am not a
25  senior enough official to have decision-making

Page 183

1   authority.
2       Q    What was -- so who would have
3   decision-making authority to -- if not you?
4       A    I think that's what I'm trying to tell
5   you is that I -- I -- I -- there's lots of people
6   who could have it.  I don't know who made all the
7   decisions, but I do know it wasn't me.
8       Q    The policy decision not to issue
9   denials until approvals could also be issued, is
10  it your understanding that began immediately with
11  the Calvillo injunction?
12      A    I don't know the precise timing.
13      Q    Okay.  Because I -- so -- and I really
14  want to get to the bottom of this.  I didn't think
15  they were related because I'm reading this bullet
16  point and you explained that it was about not
17  wanting to give borrowers the wrong idea.  And
18  then we have the Calvillo Manriquez injunction
19  that prevents the application of a certain partial
20  methodology towards a number of CCI students.
21           So -- so the approvals have been paused
22  because the approvals demand -- you know, the
23  approvals need that step-two determination of the
24  partial relief that's been enjoined, but the
25  denials don't need to involve step two, and if

Page 184

1   there's denials ready to go out, why couldn't they
2   have gone out?
3            MR. MERRITT:  Objection: asked and
4   answered.
5            MS. O'GRADY:  It has indeed been asked.
6            MR. MERRITT:  And it's been answered.
7       BY MS. O'GRADY:
8       Q    Okay.  I'll ask again.  So you said you
9   could not have reversed that decision because of
10  the litigation?
11      A    That's not exactly what I said.
12      Q    Okay.  And I -- I apologize.  I know
13  this is getting redundant and back and forth and I
14  really just want to make it clear.  I don't mean
15  to -- to be -- to be so repetitive.
16           I really do want to understand is there
17  a person or a number of people, and can you
18  identify them, who could have decided to begin
19  issuing those denials rather than deciding not to
20  issue them until approvals could also be issued?
21      A    It would be speculative, right.  I
22  mean, there are any number of people, but because
23  I don't believe exactly who made each decision, it
24  would be speculative on my part.
25      Q    So who made the decision not to issue

Page 185

1   denials until approvals could also be issued?
2       A    I do not know.
3       Q    You were just told of that decision and
4   went along with it.  Okay.
5       A    I was told that was the decision.
6            MS. O'GRADY:  Okay.  I think we'll take
7   a break now.  Thank you for those extra few
8   minutes.
9            THE WITNESS:  Uh-huh.
10           MS. O'GRADY:  How long do we want the
11  break to be?  Charlie --
12           THE VIDEOGRAPHER:  Hold on one second.
13  The time is 19:24 UTC time.
14           (Recess -- 2:24 p.m.)
15           (After recess -- 2:43 p.m.)
16           THE VIDEOGRAPHER:  Okay.  We're now
17  back on the record.  The time is 19:43 UTC time.
18           MS. O'GRADY:  For the record, I'm just
19  going to state the designations on the last two
20  exhibits.  So file name ECF NO 56-3, Exhibit 5,
21  2019 regulations which is a long PDF file is
22  Exhibit 11.
23           (Jones Deposition Exhibit 11 was marked
24  for identification and attached to the
25  transcript.)

1        MS. O'GRADY:  And file name
2   A09-Borrower Defense to Repayment FSA PowerPoint
3   to the Secretary is marked as Exhibit 12.
4        (Jones Deposition Exhibit 12 was marked
5   for identification and attached to the
6   transcript.)
7        BY MS. O'GRADY:
8        Q    Okay.  And now we are going to go back
9   to Exhibit 2, your declaration.  And this time
10  we're going to look at paragraph 26.
11       A    Okay.  I found it.  Twenty-six?
12       Q    Yes.
13            So the bottom of this page, middle of
14  the paragraph, it states, The department has been
15  working to develop documents to provide a more
16  robust explanation for borrowers whose claims are
17  denied.
18       A    Yeah.  I must be in the wrong place.
19  Where are you again?
20       Q    I am at the bottom of page 10, the end
21  of paragraph 26 that begins on that page.
22       A    Ah, okay.  I'm there now.
23       Q    Okay.  So -- so here you write, The
24  department has been working to develop documents
25  to provide a more robust explanation for borrowers

1        A    Yes.
2        Q    Okay.  So the document -- the document
3   here is referring to a template denial notice?
4        A    Yes.
5        Q    And then on the next page -- well, it's
6   the continuing page of paragraph 26, which is
7   page 11.  So at the top it begins, Once these
8   documents are developed, the department needs to
9   work with each of its servicers to put the process
10  of loan relief and borrower notification in
11  process, which requires contract updates with each
12  of the federal student aid loan servicers that
13  service direct loans.
14            So that's what you were referring to
15  just now, the contractors doing the merge?
16       A    Right.  So every time we ask a servicer
17  to do anything, notify a borrower, create a new
18  letter, anything, it's a change order and an
19  additional fee that has to be negotiated.
20       Q    So that includes sending a denial
21  letter?
22       A    It is my understanding that the
23  servicers issued -- issued all the letters, but
24  you'd have to check with Colleen Nevin.  She would
25  know better than I.

1   whose claims are denied.
2            And what documents is that sentence
3   referring to?
4        A    (Witness reviews document.)
5            I believe this is referring to the
6   letter that the servicer would send to the
7   borrower following a decision.
8        Q    And the servicer meaning what?
9        A    So federal student aid does much of its
10  operational business through contract servicers,
11  and so the servicers would be the entities that
12  would actually send the letter to the borrower.
13       Q    Does FSA draft the letter?
14       A    FSA creates the template and the
15  information to fill the servicer.  It is my
16  understanding that the servicer or some other
17  contractor does the merge file.  That's my
18  understanding.  I haven't -- I -- I don't work in
19  the systems.
20       Q    Right.
21       A    My understanding is that a servicer or
22  a contractor does the merge.
23       Q    And by doing the merge, you mean puts
24  the information about a certain borrower into the
25  template provided by FSA?

1        Q    When you say "servicer," you mean --
2   what is a servicer?  That's different from a loan
3   servicer?
4        A    It is a loan servicer.
5        Q    So you're referring to loan servicers,
6   okay.
7        A    And -- and -- and, you know -- yes.
8   Simply stated yes, we're talking about loan
9   servicers here.
10       Q    So the next sentence, it says, It takes
11  longer to develop decision letters that provide an
12  explanation for each borrower of why their claim
13  was denied, but we believe this investment of time
14  is important so that borrowers understand the
15  basis for the decision, which is vital to
16  instilling confidence in the process.
17            So in this paragraph, you've said the
18  departments are working to develop these
19  documents -- these denial letters.
20            Is that process complete?  Has the
21  department done so?
22       A    The department has developed denial
23  letters that cover the -- that cover the -- the
24  kinds of situations we have seen so far, but it is
25  always possible that some new category arises and

Page 190

Page

1    a new letter has to be developed.
2            So I can't say that this is the full
3    and complete final census, but the attempt was to
4    develop letters that -- that could be used to
5    communicate regardless of the school the borrower
6    attended.
7        Q    Okay.  And then the next sentence is,
8    This has taken longer than we hoped but the
9    notices are finished and we are now working with
10   our contracting officials and loan services to
11   enter these notices into servicer systems.
12           So this has taken longer than we hoped.
13   How long did you hope it would take to develop
14   these letters?
15       A    Our -- I can't remember what -- I can't
16   remember what I hoped.  I -- I just know that, you
17   know, it -- it took what felt like a long time.
18       Q    And what are the factors that made it
19   take what felt like a long time?
20       A    The complexity -- the complexity of the
21   situation.
22       Q    And what do you mean by that?
23       A    For example, there are some borrowers
24   who have loans that will be adjudicated under all
25   three regulations.  How do you -- you know, we

Page 191

Page

1    were trying to figure out what's the right way to
2    manage.  Do we send one letter for all three
3    adjudications?  Do we separate them into three
4    separate adjudications?
5            So it -- it gets complicated.  There's
6    a -- you know, when borrowers consolidate loans,
7    they don't always understand that they've reset,
8    you know, the clock, right.  So there are -- is
9    it -- the student loan program is a very
10   complicated program, and there's just a lot of
11   complexity around the potential combinations.
12       Q    Okay.
13       A    We have borrowers who, you know, left
14   the program and came back or maybe, you know,
15   completed one degree and now they're back for a
16   second.
17           So it's just a complicated --
18       Q    With respect to the letters that were
19   being developed, how do the letters reflect those
20   complications?
21       A    We had to decide, for example, whether
22   the letter should have a fill in the blank.  So
23   let's say a borrower had loans adjudicated under
24   the '95 regs and the 2016 regs, meaning under the
25   state standard and under the federal standard.

Page 192

Page

1            The complexity was do we try in one
2    letter to explain well, these loans were
3    adjudicated under California state law, blah,
4    blah, blah, but these loans were adjudicated under
5    a federal standard.  And the question was is it
6    better to try and do that all in one letter?
7    Should we send two letters, one for each set of
8    adjudications?
9            So it becomes complicated in deciding
10   what -- what content.
11           In addition, because for Corinthian
12   borrowers a decision had been made that all of
13   those borrowers would get a minimum of 10 percent
14   relief if they were part of the class, we had to
15   have letters that explained the 10 percent to
16   Corinthian borrowers, but that 10 percent had not
17   been -- it was not part of a policy for other
18   schools.  It just hadn't -- hadn't, you know,
19   gotten there yet.
20       Q    So the denial letters that identify or
21   that are dealing with loans that you say are under
22   different regulations, has that letter been
23   developed?
24       A    I believe that the letter has been
25   developed for under the state standard.  And let

Page 193

Page

1    me think about if it's been developed for
2    the regs -- and -- under the federal standard.
3            You know, the longer I recall seeing
4    was to respond under the state standard, which is
5    more complicated than the federal standard, I
6    don't recall whether I've seen a federal standard
7    letter yet.
8        Q    Okay.  So and when you say a letter
9    under the state standard, you're referring to a
10   letter under the '95 regulations?
11       A    Correct.
12       Q    Okay.  And that's -- okay.
13           So besides -- and I think my question a
14   couple of questions ago was, you know, what are
15   some of the factors that made the process of
16   developing this letter -- this denial template
17   take longer than you had hoped, and you said one
18   of them was having to do with a letter under the
19   state standard and the federal standard.
20           Is that right?
21       A    More than one.  That was one example.
22       Q    Yeah.  So my next question is what are
23   some other factors besides that one?
24       A    Some other factors are -- and this gets
25   very weedy, but the name of the school that the

Page 194
Page

1    borrower attended may not be the name of the
2    school officially in our records.
3        Q    And what bearing would that have on the
4    letter itself?
5        A    So the borrower may have submitted a
6    letter saying, you know, I went to school A, and
7    we had to figure out how to send a letter back
8    using school A because that school is actually
9    listed in our records as school B, but the
10   borrower might not have known that.
11           So how do you communicate to a
12   borrower -- so we either had to, you know,
13   communicate to the borrower why this looks to be a
14   different name, or they had to have a system
15   adjustment.
16       Q    Is that a -- is that a new problem,
17   though?  I mean, this is -- I guess I'm asking
18   about the development of these letters that are
19   providing, as you say in paragraph 26, a more
20   robust explanation.
21           So is the -- making sure the school
22   names match something that is a challenge to
23   develop a letter that provides a more robust
24   explanation?
25       A    I would say that that is the case, but

Page 195
Page

1    I don't think that was the primary reason for the
2    statement.  I think the primary reason for this
3    statement was the complexity of the many different
4    situations a borrower could be in.
5        Q    Okay.  And, so, what are some of those
6    situations?
7        A    You know, again, if the borrower -- so
8    depending upon how the state standard was decided,
9    you know, the -- the borrower could get one
10   decision under a state standard but his or her
11   friend could get a different decision under a
12   different state standard.
13           So one of the areas of complexity is
14   explaining to the borrower, or at least listing
15   for the borrower the state standard under which
16   the claim was adjudicated.
17       Q    So the effort to provide these decision
18   letters that provide, quote, an explanation for
19   each borrower why their claim was denied, is to
20   include the state standard used to adjudicate
21   their claim?
22       A    It should notify that -- the borrower
23   of the state standard.
24       Q    And does it?
25       A    It is supposed to.

Page 196
Page

1        MS. O'GRADY:  Okay.  So the next
2    exhibit is in the folder as ECF number 116,
3    Defendants Post-CMC Filing.
4        THE WITNESS:  Can you give me the
5    number?  ECF?
6    BY MS. O'GRADY:
7        Q    Sure.  ECF number 116.
8        A    Ah, okay.
9        MS. O'GRADY:  Okay.  And this exhibit
10   will be marked as Exhibit 13.
11           (Jones Deposition Exhibit 13 was marked
12   for identification and attached to the
13   transcript.)
14   BY MS. O'GRADY:
15       Q    Ms. Jones, have you ever seen this
16   filing before?  You may not have.
17       A    (Witness reviews document.)
18           I don't recall having seen this
19   document before.
20       Q    Okay.  Well, I would like to talk about
21   some much the attachments which I think you
22   probably have seen.  So I can represent to you
23   that this document was filed by defendants in this
24   case as a response to the judge -- a judge's
25   question about denial notices.

Page 197
Page

1           And, so, if you go to PDF -- let's
2    see --
3        A    Oh, so, you know, so may -- I do
4    remember seeing these exhibits as -- as part of my
5    review.  So may -- maybe -- maybe this will -- I
6    can't remember if we're talking --
7        Q    We're just going to talk about the
8    exhibits anyway.
9        A    Okay.
10       Q    So if we go to PDF -- so page 7 -- PDF
11   page 7 should be where exhibit A starts?
12       A    Yes.  Okay.  I'm at exhibit A.
13       Q    Okay.  So this -- and if it's all right
14   with you, I'm going to refer to these as form
15   denial A because I -- I think that's what it is.
16       A    (Witness nods head.)
17       Q    So -- so can you tell me what exhibit A
18   is just so I'm clear that we're on -- that
19   we're -- what we're both looking at?
20       A    Okay.  Let me -- let me look at this.
21           (Witness reviews document.)
22       Q    So maybe an efficient way to do this is
23   in the court filing on PDF page 3, there is kind
24   of a short index identifying what each of these
25   denial notices are.  And on the bottom of page 2,

Page 198

1  it says, a sample attached as exhibit A is for
2  Corinthian borrowers to assert only job placement
3  rate claims but who do not meet the eligibility
4  criteria for such a claim, and that that's
5  Exhibit -- that's Form Denial Notice A.  Does
6  that -- that seems accurate to you, this is Form
7  Denial Notice A?
8       A    It does.  I've scrolled through the
9  letter to where it says borrower defense claims
10  based on CCI job placement.  So that comports with
11  that.
12       Q    So is this one of the letters developed
13  as we were just talking in the paragraphs of your
14  declaration that talk about developing a letter
15  with more information for borrowers about why
16  their claims were denied?
17       A    (Witness reviews document.)
18            Yes.  I can't say that this is
19  precisely the version that I saw, but, you know,
20  this comports with the kind of letter that -- that
21  I reviewed.
22       Q    Okay.  And -- and I just want to make
23  sure that we're both on the same page about each
24  one of these letters.  So again, on the bottom of
25  page 2 of the court filing, it identifies exhibit

Page 199

1  B, which I'll call Form Denial B, as a denial
2  letter for Corinthian borrowers who assert other
3  claims in addition to job placement rate claims?
4       A    And as I scroll through, I want to
5  make.  Clear when I saw this document as part of
6  the review process, it did not have the COVID-19
7  notes, so that's applicable --
8       Q    Okay.
9       A    -- of something that's been added that
10  was -- I didn't review that.  That wasn't in the
11  original document.
12       Q    So at what point did you see Form
13  Denial A?
14       A    It would have been in the time frame
15  of, you know, about this time last year.
16       Q    So this is right around when you wrote
17  your declaration saying that the process of
18  developing those letters is complete?
19       A    (Witness nods head.)
20       Q    Okay.  Now, let's look at exhibit C
21  which is, quote, non-Corinthian borrowers who
22  attended schools for which the department does not
23  have any common evidence in its possession.
24       A    Okay.  I'm scrolling down to C.  Okay.
25  I'm at C.

Page 200

1       Q    Okay.  And is this form letter, perhaps
2  without the Covid paragraph, something that you
3  reviewed and approved?
4       A    (Witness reviews document.)
5            So the part that looks different to me
6  which may or may not be different -- it's just my
7  memory -- is the way the allegations are listed.
8  I don't know if in the version that I saw, you
9  know, it had the template for multiple
10  allegations.  The one that I saw may have just had
11  a placeholder.
12            So I don't know if I've seen it
13  precisely laid out this way, you know, the way
14  allegation one was in the middle of the page.  The
15  version I saw may have just had a placeholder.
16       Q    Okay.
17       A    But in general, this is.
18       Q    In general, yes.  That's helpful.
19            Let's look at the last one which is D,
20  and on the bottom of page 2, exhibit D is
21  identified as a letter for, quote, non-Corinthian
22  borrowers who attended schools for which the
23  department does have common evidence in its
24  possession, and then that's going to be exhibit D.
25       A    On this one, I don't recall whether I

Page 201

1  reviewed this particular document.  I -- I don't
2  recall whether this was just based on a template
3  that I had already reviewed and this was just a
4  derivative of it or whether I saw this one de
5  novo.  I just can't remember.
6       Q    Okay.  So as between C and D, you
7  remember reviewing C but with potentially a more
8  general placeholder under Allegation.  But D,
9  you're not sure you've seen?
10       A    Let me look at it again and . . .
11            (Witness reviews document.)
12            This does look familiar to me.
13       Q    So I'll just -- my understanding is
14  that these four denial letters are the result of
15  the efforts you describe in your declaration in
16  paragraph 26 of developing documents to provide a
17  more robust explanation for borrowers whose claims
18  are denied.
19            And is that -- do I have that right?
20       A    You do.  I mean, again, there could
21  have been final editorial changes or format
22  changes after I saw them, but, yes, my memory
23  is -- this is the kind of thing we were
24  discussing, and this document looks very similar
25  to what I reviewed.

**Page 202**
Page

1    Q    Are you the person who would give final
2  sign-off on the use of these templates?
3    A    No.
4    Q    Who is that person?
5    A    Again, I -- I don't -- I don't know who
6  actually signs off on these.  I mean, there's a
7  departmental process, and I -- I can't tell you
8  who the final signer is on -- on this document.
9    Q    Would the secretary review these?
10    A    I don't -- I don't know.  I don't know
11  if the secretary would -- would review this
12  document.  It -- it's possible, but I don't know.
13    Q    And what was your involvement in
14  drafting these?
15    A    As -- as -- you know, it was an editing
16  role.  I -- it would have been an editing role in
17  response to somebody else's document.
18    Q    Okay.  Now, I want to look at -- well,
19  first -- first I'll ask, so C is for
20  non-Corinthian borrowers for schools that do not
21  have common evidence.  And D is for non-Corinthian
22  borrowers who went to school that do have common
23  evidence.
24         What is meant by "common evidence"?
25    A    You'd have to ask Colleen Nevin, but I

**Page 203**
Page

1  think that means -- well, I think you should ask
2  Colleen Nevin, but I -- I think it means to
3  distinguish between evidence provided by the
4  student versus evidence that the department may
5  have in its possession, but you'd need to check
6  with her for the specific terminology.
7    Q    Well, let's look at the paragraph
8  applicable law, and that is -- on exhibit D, it is
9  the first page, middle, and it says, For direct
10  loans first disbursed prior to July 1st, 2017, a
11  borrower may be eligible for a discharge
12  (forgiveness) of part of all of one or more direct
13  loans if the borrower's school engaged in acts or
14  omissions that would give rise to a cause of
15  action against the school under applicable state
16  law.
17    A    Uh-huh.
18    Q    So is there more information about
19  which state law is being applied for these
20  adjudications in these letters?
21    A    Well, you know, if you go up to A
22  for -- I -- I can scroll through this one, but if
23  you go up through A, there's actually a place
24  where it would state the state law standard.
25    Q    Okay.  Let's look at that in A.

**Page 204**
Page

1    A    I think it was A.  It might have been
2  B.  But let's go up to A and look.
3         (Witness reviews document.)
4         So A -- so for the Corinthian
5  borrowers, they were all adjudicated under the
6  California state law, so that's why this letter
7  says California in the template.
8    Q    Right.  On page 2 in the template.
9  Okay.
10    A    But in --
11    Q    And then --
12    A    -- in the others, the attorney in the,
13  you know, decision/reason or whatever, that's
14  where -- that's where they can state which
15  standard was used for the adjudication.
16    Q    Okay.  And on the template, where do
17  they insert the state law?
18    A    So in template B, for example, where it
19  says, Review recommendation reason, right, the
20  reason would be potentially dependent upon the
21  state law so -- so that -- that is -- that's
22  where -- I think that's the place where the
23  attorney would insert it.
24    Q    Okay.  And, so, that review
25  recommendation reason, that's also in -- that's

**Page 205**
Page

1  also under the allegation template in C and D.
2         And, so, your understanding is that's
3  where an attorney would write what state law they
4  were applying?
5    A    That's my understanding.
6    Q    Okay.  And that's true for -- I'm
7  looking at template C, and also let's look at
8  template D, allegation type, so that
9  recommendation reason portion is where they would
10  insert the state law.
11         So when you reviewed these letters, is
12  that your understanding of what would happen?
13    A    Yes.
14    Q    I have a -- I want to go back to the
15  common evidence question.  If several borrowers
16  said the same thing, would that be considered
17  common evidence or individual evidence?
18    A    I don't know.  You'd have to ask
19  Colleen.  I don't know how they review evidence.
20    Q    And your understanding of the meaning
21  of common evidence as being something that the --
22  that the department has, if they had in their
23  possession, you know, a whole group of borrowers
24  making the same allegation, would that -- would
25  that be included just in your definition as you

Page 206
Page

1   understand it?
2       A    I guess in my mind the differentiation
3   is does the department have the evidence from some
4   source other than the borrower or does the
5   borrower provide the evidence.
6            Now, Colleen's group may have, you
7   know, subcategories of definitions when it -- I
8   just think about it in terms of did the borrower
9   submit the evidence or is the evidence somewhere
10  else.
11      Q    Okay.  If -- if borrower A from school
12  X submitted evidence about -- for themselves, but
13  the department has on file evidence about the same
14  exact thing from borrowers B through Z of school
15  X, is the evidence of those borrowers B through Z
16  held by the department as common evidence?
17      A    I don't know.  That would be a
18  determination Colleen and her team would make.
19      Q    Okay.  All right.  The next exhibit is
20  in the folder as ECF number -- this one is labeled
21  confusingly.  It's ECF number, ECF number 108-08
22  Daniel Deegan AFF?
23      A    Okay.
24      Q    And have you ever seen this before?
25      A    (Witness reviews document.)

Page 207
Page

1            I don't recall seeing this before.
2   Since it's redacted, I guess it's possible it was
3   in the documents --
4       Q    There are some -- I can just let you
5   know, there are some redactions just for personal
6   information.
7            So this is an affidavit filed in this
8   case by one of the named plaintiffs, and the
9   reason I'm using it as an exhibit today is I'd
10  like to look at an example of a denial letter that
11  appears to me to be using the templates that we
12  just looked at.
13           So if we can go to -- it's -- well,
14  let's start at PDF page 9.  I'm actually -- here,
15  let me -- I'm going to have to open this up, too,
16  just to make sure I'm in the right PDF.  So --
17  pardon me.  Let's say -- yeah, in PDF page 9, and
18  this is an email.  Daniel Deegan is the borrower.
19  It's dated May 7th, 2020.  We've redacted out for
20  personal reasons the borrower defense application.
21           So if you want to just familiarize
22  yourself with the next few pages, which is -- this
23  is the denial letter he received, I'd just like to
24  ask some questions about it in light of the
25  template that we just saw.

Page 208
Page

1       A    (Witness reviews document.)  Okay.
2       Q    Okay.  So we were just talking about
3   the state law that a claim is adjudicated under,
4   and do you see that anywhere in this document?
5       A    I don't see it in this document, but
6   I -- it is -- there are some determinations that
7   are based on state law, and then there are other
8   situations where state law wouldn't apply.  So,
9   for example, the borrower didn't have a loan, but
10  it --
11      Q    Okay.  But is this one of those
12  situations as you understand it?
13      A    So I don't know because I haven't seen
14  case -- I don't know what he alleges and I don't
15  know --
16      Q    Okay.  Well, let's go to on -- the
17  first page, which is PDF page 9 of this letter,
18  applicable law, and it says the same text was in
19  the template, For direct loans first disbursed
20  prior to July 1st, 2017, et cetera, against the
21  school under applicable state law.
22      A    Right.
23      Q    So that matches the template?
24      A    Yes.
25      Q    And then where you had expected the

Page 209
Page

1   state law to appear was under the allegations
2   listed, so let's look at page 10 of this PDF.  It
3   has, Allegation one, employment prospects.  You
4   allege Keller Graduate School of Management
5   engaged in misconduct related to employment
6   prospects.  This allegation fails for the
7   following reasons, insufficient evidence.
8            And there is no state law listed there;
9   correct?
10      A    There -- there is not, but I also don't
11  know what the borrower submitted.
12      Q    Okay.  Let's -- we can go back to that.
13  The borrower's written application is exhibit A,
14  and that begins on PDF 4.  So this is an email
15  sent to the borrower defense repayment address on
16  November 1st, 2016.
17           So I -- I guess -- I'm wondering what
18  you expect to see in the application that would
19  make defining a state law in the denial
20  unnecessary or impossible?
21      A    No, again, I -- I don't know the state
22  law standard, so it's --
23      Q    Right.
24           But I just want to establish that this
25  denial that he received doesn't include one.  I

Page 210

Page

1  just want to make sure I'm not missing it.
2       A    Yeah, I agree that this denial doesn't
3  include one, but I don't know why.
4       Q    You don't know why.
5            Do you have any idea as to why it might
6  not include one?
7       A    You know, again, I could speculate, but
8  I didn't review the --
9       Q    Speculate away.
10      A    You know, if -- if -- and I don't -- I
11 haven't read -- so, I mean, if -- if the student
12 actually didn't have a loan.
13      Q    If he didn't have a loan, would he
14 receive that form denial D template, or would
15 there be a different kind of notice he would
16 receive saying that you don't even have a loan?
17      A    I can't remember which template would
18 be used for I don't have a loan.  I'm just giving
19 you an example of where there could be a denial
20 that doesn't involve the state standard and it
21 would be because it doesn't involve -- you know,
22 it doesn't meet the federal standard, doesn't have
23 a loan or, you know --
24      Q    So it would be -- is it your view that
25 it would be an unusual case for a denial notice

Page 211

Page

1  based on form denial D to not include the state
2  standard used?
3       A    I don't know what's usual or not usual
4  because I don't do the adjudication.  I --
5       Q    Right.
6       A    -- don't --
7       Q    But when we were talking about the
8  template just now, your expectation was that it
9  would include the specific state standard when it
10 was sent out?
11      A    If the decision was based on the state
12 standard.
13      Q    Okay.  And under what circumstances
14 could a decision not be based on a state standard?
15      A    If it doesn't meet the federal
16 standard, the application was incomplete, no
17 evidence was submitted, no claim of
18 misrepresentation was made, those are some
19 examples I can think of.  But, again, I don't
20 adjudicate claims.  I can't imagine all the
21 examples because I haven't seen them.
22      Q    Okay.  But a standard application, say,
23 that alleges misrepresentation, the person has a
24 loan.
25           It's your expectation that a state

Page 212

Page

1  standard would be applied.  I mean, as the
2  template says, the temp- -- and his letter
3  actually says, For direct loans first disbursed
4  prior to July 1st, 2017, a borrower may be
5  eligible for a discharge, et cetera, for a cause
6  of action under -- against the school under
7  applicable state law.
8            So given that statement of applicable
9  law, that's saying we're going to apply the state
10 law.  And, so, when state law is going to be
11 applied, your expectation would be that the
12 borrower would be told the law of which state is
13 being applied?
14           MR. MERRITT:  Objection: speculative.
15           BY MS. O'GRADY:
16      Q    When a borrower receives a denial
17 notice that gives this notice about what law
18 applies, is it your expectation that the letter
19 would include which law applies?
20           MR. MERRITT:  Objection: speculative.
21           MS. O'GRADY:  I'm really just asking
22 about what the template -- how the template is
23 used and how the witness expects the template to
24 be used.  I do think it's already on the record so
25 I can move on.

Page 213

Page

1            MR. MERRITT:  You have her prior
2  answers, but --
3            MS. O'GRADY:  Okay.
4            MR. MERRITT:  But if you'd like to
5  clarify that answer, you can.
6            BY MS. O'GRADY:
7       Q    When you said one of the reasons it
8  might not include a state law statement was that
9  it didn't meet the federal standard, what did you
10 mean by that?
11      A    To be applicable, it has to meet, you
12 know, the federal definition, meaning it has to be
13 a direct loan.  It has to be a federal loan.  It
14 has to be, you know, associated within enrollment,
15 and --
16      Q    Okay.  So this threshold --
17      A    Yeah, threshold.
18      Q    -- determinations, okay.
19      A    And there has to be evidence against
20 which to make the determination.  I mean, I think
21 that's implicit.
22      Q    Right.
23      A    You know, there has to be evidence to
24 evaluate.
25      Q    So we're in agreement that this denial

Page 214
Page

1    letter that Mr. Deegan received is based on that
2    form D template.  I think that's --
3         A    It appears that's --
4         Q    It appears to be.
5              But this one does not include a mention
6    of which state law applies?
7         A    I would agree.
8         Q    Would it surprise you to know that
9    thousands of these denial letters that have been
10   sent, none include which state law applies?
11             MR. MERRITT:  Objection:  Speculative.
12             MS. O'GRADY:  I don't think that's
13   speculative, and I would like to know if the
14   witness would be surprised to learn that.
15             MR. MERRITT:  She stated her -- that
16   show doesn't have the files before her for each
17   and every application.
18             MS. O'GRADY:  No, but I'm not asking
19   her to look at each and every application.  I want
20   to know if that would be a surprise.
21             MR. MERRITT:  Go ahead.
22             THE WITNESS:  It would -- you know, I'd
23   have to know more of the specifics.
24   BY MS. O'GRADY:
25        Q    But again, going back to the template

Page 215
Page

1    of form D, the intention of form D was to tell
2    borrowers what state law applied; right?
3         A    That was the intent.
4         Q    And when you wrote in your declaration
5    that you were developing documents so that, quote,
6    borrowers would understand the basis for the
7    decision, part of that basis is which state law
8    would apply; right?
9         A    If it -- if the state law is at this --
10   is the subject of the review and the decision,
11   right.  If the state law is the source of the
12   determination.
13        Q    And other sources of determination
14   would be you don't have a loan not meeting those
15   threshold requirements of even being adjudicated;
16   correct?
17        A    Or you provided no evidence.
18        Q    Okay.  Let's -- on Mr. Deegan's denial,
19   let's go to PDF page 10, and it says there, Why
20   was my application determined to be ineligible.
21             And it says, Ed reviewed your borrower
22   defense claims based on any evidence submitted by
23   you in support of your application, your loan data
24   from National Student Loan Data System and
25   evidence provided by other borrowers.

Page 216
Page

1         Does this also include the common
2    evidence that Ed would have for certain schools?
3         A    You know, again that would be something
4    you'd have to ask the BD attorneys.  I don't know
5    how they look at evidence, so I -- I can't answer
6    your question.
7         Q    Okay.  You had said that no state law
8    would have to be applied for a borrower who did
9    not submit any evidence for their claim.  What
10   denial letter would they get, what form?
11        A    You know, I -- I -- I don't know off
12   the top of my head.  I don't -- I don't know.
13        Q    Okay.  We're going to look at the next
14   exhibit which is file name ECF number 129-1,
15   Connor Declaration, Plaintiffs' Motion to Enforce.
16             (Jones Deposition Exhibit 14 was marked
17   for identification and attached to the
18   transcript.)
19             THE WITNESS:  All right.  Okay.  I have
20   it open.
21   BY MS. O'GRADY:
22        Q    Okay.  So this is kind of a bulky
23   document and I can -- it is a document that was
24   submitted to the court that includes an affidavit
25   from another one of the named plaintiffs.  And

Page 217
Page

1    like the previous one we just looked at, I'd like
2    to look at her denial letter.
3              So if you scroll ahead, it's PDF
4    page 24 that that document begins.
5         A    Okay.
6              MS. O'GRADY:  And, for the record, this
7    is Exhibit 15.  And the previous Daniel Deegan
8    affidavit that we just looked at is Exhibit 14.
9              (Jones Deposition Exhibit 15 was marked
10   for identification and attached to the
11   transcript.)
12             BY MS. O'GRADY:
13        Q    Okay.  It's actually page 27 of the PDF
14   it begins.  I apologize.  So like Mr. Deegan's
15   that we just looked at, this is Ms. Sweet's
16   borrower defense application.  And the personal
17   information is redacted, but nothing besides that.
18        A    (Witness reviews document.)
19        Q    And if you can take a -- take a look at
20   the information she provides, she provides
21   narrative information about her experience at
22   Brooks.
23        A    And, so, I'm recused from -- from any
24   matter -- I have voluntarily recused myself from
25   any matter pertaining to a school that was owned

Page 218
Page

1    or operated by Career Education Corporation, so
2    I'm recused from this one.
3         Q    Okay.  So how does that affect your --
4    how does that affect your role more generally?
5         A    I don't review -- I don't review -- I
6    don't make determinations, so --
7         Q    Okay.  You had a role in reviewing the
8    borrower defense denial templates we just looked
9    at, though; correct?
10        A    Yeah, the generic template.
11        Q    And some of those do go out to students
12   who attended the ECC schools?
13        A    That's not how the recusal process
14   works.  The recusal process at the Department of
15   Ed is based on particular matters for a particular
16   institution.
17        Q    How long has this voluntary recusal
18   been in place?
19        A    I voluntarily recused myself from the
20   particular matters with the particular
21   institutions related to CEC from the day I
22   returned to the department.
23        Q    And is there documentation of the
24   recusal?
25        A    Our -- our ethics -- I'm sure our

Page 220
Page

1    with the name of an institution -- and, in fact,
2    that includes -- you know, I have asked Mark to
3    mask the names, right, so I don't -- I don't get
4    statistics that would delineate the CEC schools or
5    outcomes.
6         Q    So he -- he you ask Mark to mask the
7    names when you receive, you know, like a list of
8    pending applications so you don't know how many
9    are from CEC schools?
10        A    Correct.  He sent -- after he sent the
11   first one, I sent an email back saying please
12   don't send me a list with the names of schools.
13        Q    So I want to understand how this works.
14   So he'll redact out all the names of all the
15   schools, then, or else you'd know that it was CEC;
16   right?
17        A    He's just stopped sending me the list
18   with the school names.
19        Q    So you get a list but no school names,
20   or you get no list?
21        A    I get the roll-up numbers.
22        Q    Okay.  So how else does this voluntary
23   recusal affect -- affect your role?
24             MR. MERRITT:  Objection.  She's
25   explained the basis of the recusal, and at this

Page 219
Page

1    ethics officer would have that.  I mean --
2         Q    And how -- so how -- how broad is it?
3    I mean, you're recusing yourself from reviewing
4    this denial letter for a Brooks student.
5         A    Right.  I would not --
6         Q    How else would it affect your job?
7         A    I would not make -- I would not issue a
8    decision on any matter regarding an institution
9    owned and operated by CEC.
10        Q    So can you explain further what that --
11   what that means operationally for your
12   policy-making role or any kind of review that you
13   do of -- of policies that might affect CEC?
14        A    That's not how recusals work.  Recusals
15   are not -- I mean, you know, I worked at Princeton
16   and Community College of Baltimore County.  I
17   don't -- you know, my recusal doesn't mean that I
18   can't look at any matter that might have an impact
19   on Ivy League colleges.  It's particular.
20             So anything -- so in particular, I
21   would not look at something about a student who
22   attended Brooks Institute.  I mean, first of all,
23   I wouldn't look at these anyway because I don't
24   adjudicate the decisions.  I don't review the
25   decisions.  But as a practice, anything that comes

Page 221
Page

1    point it's getting beyond the scope of what the
2    court ordered.
3         BY MS. O'GRADY:
4         Q    Well, I want to understand if this
5    recusal affects in any way your decision to sign
6    off on -- or decision to sign off or not sign off
7    on decisions.
8             We talked a lot about the decision not
9    to send denials.  I want to understand the full
10   scope of it.
11            MR. MERRITT:  She's answered the
12   question.
13            BY MS. O'GRADY:
14        Q    Okay.  So nothing else to add?
15        A    (Witness shakes head.)
16        Q    Okay.  When you were developing your
17   partial -- working on developing the partial
18   relief methodology that went into effect in
19   December 2019, was that -- did you consider CEC
20   schools during that, or were you also --
21        A    There were no -- there were no data on
22   CEC schools, no.  We looked at the methodology
23   based on the data available, which at that point
24   in time was Corinthian and ITT.
25        Q    And no -- and no other schools?

Page 222
Page

1        A      No other schools had data available
2    when we --
3        Q      So if there were no other schools of
4    data available, how was that methodology going to
5    be used for schools other than Corinthian and ITT?
6        A      By methodology, what I mean is the
7    methodology requires earnings tables to be
8    developed, and at the time that we were developing
9    the methodologies, the FSA team had earnings
10   tables only for Corinthian and ITT.
11       Q      And why is that?
12       A      Because it takes time --
13              MR. MERRITT:  Objection to the scope of
14   the questioning.
15   BY MS. O'GRADY:
16       Q      Well, I -- I am going back a couple of
17   topics, but I do want to understand that the
18   partial relief methodology that was -- that was --
19   you've testified you were not able to use because
20   of the Calvillo Manriquez injunction was for all
21   schools, not just CCI and Corinthian; correct?
22              MR. MERRITT:  Objection.  It calls for
23   speculation.
24              Go ahead, Diane.
25              THE WITNESS:  You keep mixing the 2017

Page 223
Page

1    and the 2019 methodology.  I wasn't involved in
2    the 2017 methodology, so I don't know what they
3    looked at or -- I wasn't --
4    BY MS. O'GRADY:
5        Q      But you were involved in the -- the not
6    being able to apply it because it was enjoined.  I
7    mean, that was -- that happened during your
8    tenure, the --
9        A      But it wasn't my decision.
10       Q      Right.  But you testified that that's
11   why -- I mean, before Congress and in your
12   declaration you explained.  I'm asking you about
13   it because you said, you know, we were not going
14   to apply that methodology because it was enjoined
15   by the Calvillo Manriquez court?
16       A      That was the decision that the
17   department had made.  Yes, the methodology was
18   enjoined and until the court issued a final
19   bulleting, yeah, it was enjoined.
20       Q      Okay.  It wasn't because you didn't
21   have data for other schools; it was because it was
22   enjoined?
23       A      So on the 2017 methodology, yes.  You
24   were asking me about the 2019 methodology that I
25   was developing, and what I'm telling you there is

Page 224
Page

1    that relies on earnings data, and the data tables
2    under which I -- I and the team developed the 2019
3    methodology, the data tables had been developed
4    only for Corinthian and ITT.
5        Q      Okay.  So if we can go back to your
6    declaration, which is Exhibit 2?
7        A      Okay.
8        Q      And this is when you say that the
9    department has had to address a number of
10   challenges in developing a new methodology
11   including identification of an accurate, reliable
12   and accessible source of earnings data that would
13   not raise concerns about privacy.
14       A      Yes.
15       Q      So were you able to identify that
16   source of earnings data?
17       A      Ultimately, yes.
18       Q      And when did that identification
19   process begin?
20       A      I can't remember the exact timeline.
21   The college developed the college scorecard, and
22   in that process was able to get earnings data from
23   the IRS.  And, so, once that had happened, we
24   identified that as a potential data source because
25   it was being published in the college scorecard.

Page 225
Page

1        Q      But you recused yourself from looking
2    at the data for CEC schools?
3        A      There was no data for CEC schools.
4        Q      What do you mean there was no data for
5    CEC schools?
6        A      If you're talking about the development
7    of the methodology, there were no data tables on
8    earnings for CEC schools.
9        Q      Why?
10       A      Because they hadn't gotten to it yet.
11       Q      They just hadn't gotten to it yet?
12       A      They just hadn't gotten to it.
13       Q      Because it was delayed or they just --
14   they had a list of schools they just hadn't gotten
15   there?
16       A      I think you don't understand how
17   complicated it is to make these data tables.
18       Q      What was the order of schools to make
19   the data tables for?  Was there a priority of
20   schools?
21       A      Yes, Corinthian and then --
22       Q      Corinthian and then ITT?
23       A      Yes.
24       Q      And then, was the order of schools
25   based on how many borrower defense applications

Page 226

1    had been filed against that school?
2        A    That wasn't my decision to make.  Other
3    than Corinthian and ITT, it was up to the borrower
4    defense unit to determine how they were going to
5    move through the remaining schools.
6        Q    Okay.  At this point, have they moved
7    through those remaining schools?
8        A    I don't know.
9        Q    So it's possible that there are groups
10   of schools for which step-two determinations are
11   still not possible because the earnings data
12   haven't been gathered yet?
13       A    It's possible.
14       Q    Do you know how many schools that might
15   be true for?
16       A    To my knowledge, I've only seen one
17   other earnings data table, so I don't -- I haven't
18   seen the complete set.  I've only seen one other
19   earnings data table in the --
20       Q    What's -- what's the one other you've
21   seen?
22       A    It was for a school group called EDMC.
23       Q    Okay.  So at this point, the only
24   schools you know for sure can have step-two
25   determinations made for them are Corinthian, ITT

Page 227

1    and EDMC schools?
2        A    Those are the only schools for whom
3    I've seen data tables.  It could be they have them
4    for other schools and they haven't shared them
5    with me.
6        Q    Okay.  Is that likely that you wouldn't
7    see them if they existed?
8        A    I certainly wouldn't see it if it
9    existed for a CEC school.
10       Q    Okay.  But other schools you would?
11       A    Potentially.
12       Q    How did you come upon seeing the EDMC
13   data?
14       A    I can't remember.  I can't remember
15   if -- if I saw it because I asked to see it or
16   whether it was sent to me because it was the next
17   school in line.  I -- I can't remember what
18   started the chain, but they -- they did send me
19   the EDMC data table.
20       Q    Okay.  And after you sent -- and when
21   was -- when was that?
22       A    That was recently.
23       Q    Okay.  And is it your expectation that
24   you'll be sent the data for other schools besides
25   CEC?

Page 228

1        A    I don't really have an expectation, and
2    it's all a matter of timing.
3        Q    What do you mean by that?
4        A    I mean, I don't suspect they're going
5    to have data tables for every school by
6    January 20th.
7        Q    Yeah.
8             And that is the end of your tenure, you
9    suspect?
10       A    I suspect.
11       Q    And who is sending you the data?  Is
12   that coming from FSA?
13       A    Yes.
14       Q    Who specifically?
15       A    It comes either from Mark Brown or it
16   comes from Ian Foss.
17       Q    Okay.
18            MS. O'GRADY:  Can we take a five-minute
19   break?  Is that okay?
20            MR. MERRITT:  Yes.
21            MS. O'GRADY:  We can all use one, I
22   suspect.  Okay.  We'll be back here at 3:50, 3:51.
23            THE VIDEOGRAPHER:  We are going off the
24   record.  The time is 20:46 UTC time.
25            (Recess -- 3:46 p.m.)

Page 229

1             (After recess -- 3:56 p.m.)
2             THE VIDEOGRAPHER:  Okay.  We're now
3    back on the record.  The time is 20:56 UTC time.
4        BY MS. O'GRADY:
5        Q    Okay.  Ms. Jones, I'm wondering if in
6    your time at the Department of Ed you've been
7    involved in discussions about the sale of the loan
8    portfolio.
9        A    I'm -- I'm sorry.  Could you -- I'm not
10   sure what you're asking me.
11       Q    Have you been involved in any
12   discussions about the overall valuation of the
13   loan portfolio?
14       A    I have been involved in conversations
15   about the valuation, but that's not the sale of
16   the portfolio.  That's the valuation of the
17   portfolio.
18       Q    Right.
19            And those conversations, what was --
20   what was the purpose of them?
21            MR. MERRITT:  Objection: both scope and
22   potentially calling for privileged information.
23            MS. O'GRADY:  We can use a document as
24   a starting off point if that would be easier.
25            Let's go to -- the document is -- the

Page 230
Page

1    document title is Article, Trump administration
2    hires McKinsey to evaluate student-loan portfolio.
3              And let's mark this as Exhibit 16.
4              (Jones Deposition Exhibit 16 was marked
5    for identification and attached to the
6    transcript.)
7         BY MS. O'GRADY:
8         Q    And have you seen this article?
9         A    No.
10        Q    Are you aware of McKinsey's analysis?
11        A    Yes.
12        Q    And is that what you're referring to,
13   discussion about valuation?
14        A    You know, I -- I think valuation is
15   probably the wrong word.  The determination was
16   to, you know, correctly identify the level of risk
17   in the portfolio, so I think -- I think valuation
18   is the wrong term.  But the idea is that we need
19   to project what the cost of managing the loan
20   program and what the cost of the loan program with
21   gains are going to be to the taxpayer, and so this
22   was a method to determine either the cost or the
23   source of revenue that the loan portfolio would be
24   to the taxpayer.
25        Q    And has a conclusion been reached?

Page 231
Page

1              MR. MERRITT:  Objection to scope.  I'm
2    just going to ask what is the relevance to this
3    line of questioning?
4              MS. O'GRADY:  I think discussions about
5    the valuation of the loan portfolio go into, you
6    know, the reasons for policy handling borrower
7    defense claims, whether or not there's a concern
8    about the cost of granting those claims and the
9    reasons for delaying decisions.
10             MR. MERRITT:  I don't think that goes
11   to the extent to which the difficulty of reviewing
12   borrower defense applications actually caused or
13   justified the Secretary's 18-month delay.
14             MS. O'GRADY:  Well, I think it goes to,
15   you know, the -- the loan portfolio includes
16   claims that are borrower defense claims, so the
17   decision on those borrower defense claims affects
18   the valuation of the portfolio and vice versa.  I
19   think those policies are intertwined.
20             MR. MERRITT:  But that's not a topic
21   the court authorized discovery on.
22             MS. O'GRADY:  The policy of Brown's
23   cancellation of student debt and cancellation of
24   loans based on borrower defense applications,
25   specifically -- I mean, can I ask a few questions

Page 232
Page

1    of the witness to narrow the -- to try to, you
2    know --
3              MR. MERRITT:  I mean, I'm inclined to
4    say this is all beyond the scope of the -- what's
5    been authorized.  I mean, if you think this is
6    going to be a short line of questioning --
7              MS. O'GRADY:  I can -- I can make it
8    short.  Let me -- I'm going to ask --
9         BY MS. O'GRADY:
10        Q    If I can ask you, Ms. Jones, in your
11   policy role at the Department of Ed in evaluating
12   or in determining policy regarding borrower
13   defense, did you consider the valuation of the
14   overall portfolio?
15        A    No.
16        Q    And is -- is the likelihood of
17   default -- has that been considered when you've
18   had a policy role regarding borrower defense?
19        A    Meaning?
20        Q    The population of borrowers who filed
21   borrower defense claims, their likelihood of
22   default, have you evaluated that in your position?
23        A    No.  I mean, I will say none of them
24   are at risk of default because when they file a
25   claim, they're in forbearance.  But, you know,

Page 233
Page

1    there is no analysis because they can't default
2    while they're in forbearance.
3         Q    That's true.  I suppose I'm asking,
4    though, you know, outside the forbearance granted
5    by having filed a borrower defense application, is
6    the population of borrowers who file borrower
7    defense applications their likelihood of default
8    once they are denied and back in repayment, has
9    that been a consideration that you've taken into
10   account in your role?
11        A    No.
12             MS. O'GRADY:  Okay.  The next -- the
13   next document is in the folder as Article, DeVos
14   orders partial loan relief.  And this I'm going to
15   mark as Exhibit 17 to this deposition.
16             (Jones Deposition Exhibit 17 was marked
17   for identification and attached to the
18   transcript.)
19        BY MS. O'GRADY:
20        Q    This is an article from December 6th,
21   2019.  And have you seen this article before?
22        A    Probably.
23        Q    Okay.  Okay.  And then in the middle of
24   this second page it says, DeVos in recent weeks
25   directed the Education Department to carry out a

Page 234

1   new policy that will provide partial loan
2   forgiveness to many borrowers whom the agency
3   determines were duped or cheated by their
4   colleges, according to an internal memo obtained
5   by POLITICO.
6           Is this referring to the -- the partial
7   relief methodology that went into effect in
8   December of 2019 that we've been discussing today?
9           MR. MERRITT:  Objection: speculative.
10          MS. O'GRADY:  How so?
11          MR. MERRITT:  Well, I mean, you're
12  asking her to state what the intent of the
13  article -- the POLITICO article was.
14          BY MS. O'GRADY:
15          Q    Well, is there -- besides the partial
16  relief methodology that went into effect in
17  December of 2019 that we've discussed today, was
18  there another new policy that Secretary DeVos
19  directed the Education Department to carry out in
20  December 2019?
21          MR. MERRITT:  You can answer the
22  question.
23          THE WITNESS:  Oh, okay.
24          I am not aware of another -- of a
25  different methodology or a different policy.

Page 235

1           BY MS. O'GRADY:
2           Q    Okay.  The next paragraph, The memo,
3   which was signed by DeVos in mid-November and
4   hasn't been reported previously, have you seen
5   that memorandum?
6           MS. O'GRADY:  Objection, again -- I
7   mean, it's speculative.
8           BY MS. O'GRADY:
9           Q    Okay.  Ms. Jones, have you seen any
10  memorandum --
11          MR. MERRITT:  You can answer.
12          BY MS. O'GRADY:
13          Q    -- signed by DeVos in mid-November
14  regarding this subject matter?
15          A    I want to be clear.  Are you asking me
16  if I have seen a memo -- asking if I have seen a
17  memo --
18          Q    So this part of the article is
19  discussing a memo signed by Betsy DeVos in
20  mid-November to carry out a new policy that would
21  provide partial loan forgiveness.
22          I'm just wondering if that -- if you've
23  seen such a memo.
24          A    I mean, again, you know, I don't -- I
25  don't know -- Michael Stratford writes lots of

Page 236

1   articles.  I'm not really sure -- yeah, I mean,
2   it's another POLITICO story.  I don't know -- I
3   don't know how to answer the question.
4           Q    Okay.  So do you recall -- if Secretary
5   DeVos sent a memo in November 2019 that directed
6   the Education Department to carry out a new policy
7   that would provide partial loan forgiveness, you
8   would have seen such a memo; right?
9           A    Yes.
10          Q    And as far as you know, there was no
11  other policy in December 2019 that she would have
12  been circulating a memo about besides the one
13  we've been discussing today that was the partial
14  relief policy that went into effect in December of
15  2019; right?
16          A    I -- I don't believe there were other
17  memos.
18          Q    Okay.  And then if we go to PDF page 5
19  of this article -- actually, I'm sorry, Ms. Jones.
20  Let's just -- I want to just stay actually on this
21  first page for a moment.
22          A    Uh-huh.
23          Q    The bottom paragraph, it says that the
24  memo, quote, Instructs department officials to
25  resume issuing decisions on some of the roughly

Page 237

1   225,000 [verbatim] pending applications filed by
2   borrowers seeking debt relief based on their
3   colleges' alleged misconduct.
4           Do you recall a memo instructing
5   department officials to resume issuing decisions?
6           A    Yes.  I don't know if that's the memo
7   that Michael Stratford is referring to, but, yes,
8   I have.
9           Q    Okay.  You've seen a memo like that?
10          A    Yes.
11          MS. O'GRADY:  Okay.  I would just say
12  to counsel, I don't believe we have that memo and
13  we would like it produced.
14          MR. MERRITT:  Okay.
15          BY MS. O'GRADY:
16          Q    Ms. Jones, what was -- what do you
17  remember about the content of that -- of that memo
18  instructing officials to resume issuing decisions?
19          A    All right.  I recall that it described
20  the methodology.  It -- it described options that
21  the team had come up with and it included a
22  recommendation for the option that the group found
23  to be the most scientifically rigorous, defensible
24  methodology.
25          Q    And when you say "group," what group

Page 238
Page

1   are you referring to?
2       A       This is the group I told you about
3   earlier that was primarily my -- myself, Michael
4   Brickman from my office, Ian Foss.  I think by
5   this time Jeff Appel had died, so I think he was
6   no longer involved.  Or, actually, he might not
7   have died yet, but in think he was maybe in the
8   hospital.  I can't remember the timeline.
9               And then there were various
10  representatives of the Office of General Counsel.
11      Q       Okay.
12      A       And potentially Robin Minor and other
13  FSA staff, you know, they came in and out.
14      Q       And to the extent the memo instructs
15  department officials to resume issuing decisions,
16  what officials would that have been instructing?
17      A       FSA.
18      Q       FSA officials, so that's Colleen Nevin?
19      A       The BD team, I mean Mark --
20      Q       Okay.
21      A       -- and whoever his team was.
22      Q       Okay.  And implicit in an instruction
23  to resume issuing decisions is that the decisions
24  have not been ongoing; correct?
25      A       I -- I -- I think -- you know, again,

Page 239
Page

1   there were no notices being issued, but it is --
2   it is my understanding that the unit was
3   continuing to review data and claims.  So, you
4   know, again, I think we need to be careful about
5   our terminology, but I think I've already said
6   that, yes, the department made the decision to not
7   issue denials after the California court ruling.
8   I think I said that a while ago.
9       Q       Okay.  Let's go to PDF page 5 of this
10  article.  So the top paragraph here says, The
11  ten-page memo was prepared by Diane Auer Jones, a
12  top advisor on education issues -- my apologies if
13  I did not pronounce your name correctly -- and
14  Mark Brown who leads the department's Office of
15  Federal Student Aid.
16              Is this correct that the memo that
17  we're talking about was written by you or is this
18  a different memo?
19      A       Again, you know, there is a memo that
20  was prepared by Mark and myself and the teams, and
21  that memo laid out the options for the secretary.
22  Whether or not that's the document Michael
23  Stratford is referring to, I do not know.  He
24  doesn't leave a picture of the document.
25              But, yes, as I said earlier, there was

Page 240
Page

1   a memo.  It did lay out the options.  It included
2   the recommendations --
3       Q       Okay.
4       A       -- as it was prepared by Mark, myself
5   and our teams.
6               MR. MERRITT:  And, Diane, if you need
7   to read the whole article, please take the time to
8   do that.
9               MS. O'GRADY:  Counsel, I will just say
10  I don't believe we have this memo.  To the extent
11  it is the same or differently from the one we just
12  addressed, I ask that it be produced.
13              MR. MERRITT:  Noted.
14  BY MS. O'GRADY:
15      Q       So, Ms. Jones, in the next paragraph
16  that we just looked at, it says, The memo says the
17  department believes that it should determine that
18  a defrauded borrower was harmed financially by a
19  college's misconduct, quote, only when the
20  earnings imputed to the borrower are significantly
21  different than the median wages of other borrowers
22  who attended similar programs across the country.
23              I understand you can't check that
24  quotation because you don't have the memo in front
25  of you, but is that statement generally accurate

Page 241
Page

1   to what the policy was?
2       A       I'm -- I'm trying to find that place in
3   the --
4       Q       Oh, my apologies.  So it's PDF page 5,
5   and it's the second full paragraph.
6       A       I don't think we would have stated it
7   the way that it is stated in POLITICO, but it is
8   true that we used earnings from -- as the
9   indicator of financial harm.
10      Q       And the comparator of other programs,
11  what -- how are -- how are comparator programs
12  identified?
13      A       This is something that federal student
14  aid does through the use of a Classification of
15  Instructional Program code, a CIP code.
16      Q       I have a question regard -- not
17  regarding this article, necessarily.  If a
18  step-one determination for a borrower's
19  application is a grant, and then under the partial
20  relief methodology they are given 0 percent
21  relief, is your understanding that is then an
22  approval of a claim or a denial of a claim?
23      A       We use a two-part process.  There is an
24  adjudication to determine the merit based on a
25  review of the evidence, and then there is the

Page 242
Page

1  second part which is described in the 2016
2  borrower defense reg.  It's a two-part test, I
3  should say, defined in the 2016 reg:  Did
4  misrepresentation occur and was there reliance on
5  that information and financial harm.
6          The attorneys in BD, you know, review
7  the evidence, and then the second part of that
8  two-part test is this methodology which is used to
9  determine financial harm.
10         Yes, that is the -- that two-step
11 process is described in the 2016 BD reg.
12     Q     So step one is misrepresentation plus
13 reliance, and step two is financial harm?
14     A     Well, I know we've used step one and
15 step two in a different context, I think, earlier.
16     Q     Is that a -- oh, was it in a different
17 context?
18     A     I don't know.  I can't even remember.
19 But I would say that it is a two-part test.
20     Q     Okay.  I just -- I want to understand
21 whether or not in your view if someone is -- their
22 claim is adjudicated on the merits, which I'm
23 considering and you have in your declaration as
24 being a step-one determination, yes, their claim
25 has merit.

Page 243
Page

1          But then they go to step two and based
2  on the partial relief formula, they are given
3  0 percent relief.
4          Do you still consider that a -- an
5  approval of a borrower defense claim?
6      A     I don't think we use the words
7  "approval".  I think we used the words "eligible"
8  or "ineligible" for a claim, and that borrower
9  would be notified that they received 0 percent
10 relief.
11     Q     Well, on the -- let's say for example
12 on the pie chart in that PowerPoint we were
13 looking at, which would be -- that's Exhibit 12 of
14 this deposition, and the file is A09.  PDF page 2,
15 here's the pie chart.  So approved -- the two
16 green ones, approved relief pending and approved
17 relief provided, if someone had a step-one
18 determination that they were approved but they got
19 0 percent, would they be in those green pies or
20 would they be in the denied pie slice?
21     A     Let me look at this table.
22         MR. MERRITT:  Take your time, Diane.
23         THE WITNESS:  (Reviews document.)
24         I don't know -- I don't know whether
25 FSA would have grouped them as approved relief

Page 244
Page

1  provided or whether they would have grouped them
2  with denied.  You'd have to ask FSA.
3          BY MS. O'GRADY:
4      Q     So in your role, you didn't provide any
5  guidance about the 0 percent partial relief result
6  being --
7      A     Not --
8      Q     -- approval or denial?
9      A     No.
10     Q     Okay.  I'm going to go back to your
11 declaration once again.  That's Exhibit 2.  And
12 we'll go to paragraph 24.
13     A     Okay.  Paragraph 24.
14     Q     And this is a topic we've touched on
15 today already.  I want to hone in on the -- the
16 evidence.  Evidence submitted by the borrower or
17 otherwise available to the department in
18 accordance with the applicable standard.
19         So that evidence includes information
20 from schools; correct?
21     A     I don't adjudicate the claims, so you'd
22 have to ask Colleen.  I -- I --
23     Q     As a matter of policy when we were
24 discussing the 2019 regulations, we discussed your
25 belief that schools should be afforded due process

Page 245
Page

1  regarding these claims; right?
2      A     Uh-huh.
3      Q     So as a policy matter, how are schools
4  given the opportunity to present evidence?
5      A     You know, again, that's the 2019
6  regulation that applies to loans starting on
7  July 1, 2020.  I don't believe the borrower
8  defense unit had started adjudicating claims that
9  came in on loans issued after July 1, 2020, so I
10 can't answer that question.
11     Q     So at this point, are schools given the
12 opportunity to present evidence?
13     A     I -- you mean on the Corinthian claims?
14     Q     On any borrower defense application.
15     A     Well, Corinthian and ITT are closed.  I
16 don't think there's anybody who can respond on
17 behalf of the institution.
18     Q     But under the -- there is -- I mean,
19 there is -- we had discussed before that under the
20 2016 regulations also there is an option, at
21 least, to notice -- to give schools notice when
22 the borrower defense application has been filed;
23 correct?
24     A     That's correct, but there has to be a
25 school to notice.  And in the case of ITT and

Page 246

1    Corinthian, there is no school to notice.
2         Q    So what about the other schools that
3    borrower defense applications have been filed for?
4         A    So to my knowledge, the borrower
5    defense unit has started notifying other
6    institutions of pending claims, and it is
7    possible, you know, that those schools are
8    providing information.
9         Q    And when you say "starting," do you
10   mean that began recently?
11        A    Recently meaning sometime in the past
12   year?  Yes.  Recently -- I can't remember exactly
13   when it --
14        Q    Sometime in the past year?
15        A    Yeah.
16        Q    Have you -- has -- the time that
17   notifying a school and awaiting a response for
18   them takes, has that factored into decisions about
19   the -- you know, general policy in your role?
20        A    No.
21        Q    Under the 2019 regulations when those
22   were being crafted, did the -- did the amount of
23   time to solicit and then consider information from
24   the school -- was that considered in drafting
25   those regulations?

Page 247

1              MR. MERRITT:  Objection: scope.  It's
2    going to the merits of the 2019 regulation.
3              MS. O'GRADY:  I think what's in the
4    2019 regulation affects the policy priorities of
5    the department which are at issue in terms of why
6    there is delay.
7              MR. MERRITT:  But are not at issue in
8    that level of generality in the court's discovery
9    order.
10             MS. O'GRADY:  We have a disagreement
11   about that.
12        BY MS. O'GRADY:
13        Q    I want to get at the difference between
14   the 2016 and 2019 regulations concerning notice to
15   schools.  In the 2019 regulations it is mandatory
16   that schools be noticed and given a chance to
17   submit evidence; is that right?
18        A    It is mandatory that they be noticed.
19   It is not mandatory that the schools submit
20   evidence.
21        Q    Under the 2016 regulations, what is
22   different about -- about the school's opportunity
23   to provide evidence?
24        A    So, under the 2016 regs, it is a
25   two-step process.  The 2016 reg anticipates the

Page 248

1    department adjudicating a claim and then notify --
2    and then only after making a decision if they have
3    given relief, then they can issue a demand to the
4    institution to provide certain documents, and that
5    is to determine whether or not the department can
6    recover financial losses from the school.
7         Q    The first step is separated from the
8    recovery of any financial losses; correct?
9         A    That is -- yes, that is how the -- the
10   regs -- those two things appear in two different
11   sections, yes.
12        Q    Okay.  And that's your understanding of
13   the 2016 regulations?
14        A    What is my understanding?
15        Q    What -- that's your understanding of
16   it, what you just explained about the -- the
17   two-step process?
18        A    Right.  My -- my -- just to be clear,
19   my understanding is that they notify the
20   institution.  The institution may or may not
21   submit.  The department issues the decision.  And
22   then if the department has forgiven the loan, step
23   two is then the department can demand evidence
24   because this is when they would engage in
25   reclaiming the financial losses from the school.

Page 249

1         Q    Under the 2016 regulations, are
2    students notified -- when a student's claim is
3    denied, is the student notified of what evidence
4    the school provided?
5         A    To my knowledge, that is not a
6    requirement of the 2016 reg.  That is a
7    requirement of the 2019 reg.  I said to my
8    recollection.  I meant to my recollection.
9              MS. O'GRADY:  Okay.  The next document
10   is in the folder, Oversight committee press
11   release.  There are two files that begin with
12   oversight committee, so the first one we're going
13   to look at is press release.
14             MR. MERRITT:  Counsel, for the record,
15   this is going to be Exhibit 18?
16             MS. O'GRADY:  Yes, thank you.  This
17   will be 18.
18             (Jones Deposition Exhibit 18 was marked
19   for identification and attached to the
20   transcript.)
21        BY MS. O'GRADY:
22        Q    Okay.  And, Ms. Jones, do you recognize
23   this document?
24        A    I -- I've never read this before.  I've
25   never seen this before.

Page 250
Page

1      Q     All right.  Well, you can take a minute
2  to familiarize yourself with it.  I can just state
3  what I know it to be which is a press release from
4  the House Committee on Oversight and Reform on
5  October 27th, 2020, regarding the -- a Web tool
6  for borrower defense.  So if you want to just take
7  a minute to flip through it, that would be fine.
8      A     (Witness reviews document.)  Okay.
9  I've read it.
10     Q     So are you familiar with the Web tool
11 that this press release is discussing?
12     A     I am.
13     Q     And this press release refers to
14 allegations made by a whistleblower about you and
15 the Web tool.
16            Are these accurate statements?
17     A     Some are; some aren't.  I did not call
18 for the tool to be stopped.  I did not know the
19 development of the tool was stopped.  So
20 allegations that I called for the development of
21 the tool to be stopped are patently false.  And --
22     Q     And what were --
23     A     But --
24     Q     Sorry.  Go on.
25     A     When you get to the part of the article

Page 251
Page

1  that quotes the contract official, what I learned
2  after the fact -- this was information that I
3  learned recently -- I had no idea that the
4  contract officer had made a change to the
5  contract.
6            But what happened is that the form is
7  linked to a -- a custom -- a customer --
8  Salesforce, customer management system, I guess.
9      Q     Okay.
10     A     And, so, the form is linked to the
11 cus- -- yeah, to Salesforce, and what I didn't
12 realize is in the development of the form, I did
13 not believe -- I believed that more explanation
14 was required and additional examples of potential
15 misrepresentation were required.  And I say to add
16 those.
17     Q     Okay.  So can you -- can you explain
18 more about that?  Why did you think that
19 additional examples of misrepresentations were
20 needed?
21     A     So that borrowers would understand --
22 have more examples of the kinds of things that
23 constitute misrepresentation.
24     Q     Did you provide them with the examples
25 that you thought would be appropriate to add?

Page 252
Page

1      A     Some.
2      Q     And what were they?
3      A     Schools that say they would provide
4  career placement services and career -- and career
5  services staff and then didn't; schools that said
6  the program could be completed in a certain amount
7  of time and then they didn't offer classes in
8  certain semesters which forced the extension.
9            And I'm paraphrasing here.  These
10 aren't my exact words.
11            Schools that lied to the accreditor or
12 other third parties about their rankings for
13 selectivity; schools that misrepresented faculty
14 credentials.
15            Those are the ones I can think of off
16 the top of my head.
17     Q     And those examples you just gave off
18 the top of your head, are those examples of what
19 you would consider, you know, valid borrower
20 defense claims?
21     A     So this form is to implement the 2019
22 regulation, and, yes, those are -- those would
23 constitute misrepresentation under the definition
24 in the 2019 regulation.
25     Q     Okay.  Would they also constitute

Page 253
Page

1  misrepresentation under the definition of the 2016
2  regulation?
3      A     You know, I don't -- there are some
4  additional -- so I think there are some additional
5  kinds of misrepresentation covered by the 2016 reg
6  that would not be in that list.
7      Q     Okay.  So there's a narrower subset of
8  2019 than there would be for 2016?
9      A     For example, breach of contract is
10 included in the 2016 reg and not in the 2019 reg.
11     Q     Okay.  And your -- your goal with
12 adding these additional explanations into the Web
13 site -- the Web tool was to provide more
14 information about what's available under the 2019
15 regulation?
16     A     That's correct.  It's a smart tool, and
17 so what happens is when the borrower applies, the
18 system identifies when they took their loan and
19 then serves up the appropriate questions based on
20 what that borrower -- based on the regulation
21 under which the claim would be adjudicated.
22     Q     Okay.
23     A     It's a smart form.
24     Q     So if a borrower took out their
25 application before the 2017 cut-off date for the

Page 254

1    2016 regulations, then they would be -- excuse me,
2    not the 2017 cut-off date, the 2020 cut-off date
3    for the 2019 regulations, they would get put into
4    the examples that you were adding that are fewer
5    than the examples for those under the 2016
6    regulation?
7        A    Well, no, the list is -- we've expanded
8    the list for the 2019 regulation.
9        Q    So there are more claims available
10   under the 2019 regulation than under the 2016
11   regulation?
12       A    There's more information about the
13   claims available.
14       Q    Okay.  So for 2019, there are fewer
15   claims available but more information about them.
16   And for the 2016, there are more claims available
17   but less information about them?
18       A    I don't know anything about the number
19   of claims.  I mean, that's to be determined.  But
20   the definition of misrepresentation under the 2019
21   reg does not include breach of contract, and the
22   definition of misrepresentation under the 2016
23   rule does include breach of contract.
24            What I'm talking about with regard to
25   the tool is giving more examples to borrowers of

Page 255

1    the kinds of things that constitute
2    misrepresentation.  They would be covered under
3    the 2016 reg, but the department had not provided
4    those examples in -- in the past to borrowers.
5        Q    Okay.  So the smart tool, when you put
6    in your -- your date of loan disbursement -- I
7    mean, people -- most people are still going to be
8    under the 2016 regulations; right?
9        A    Well, you don't put in your date.  You
10   put in your social security number or your FSA ID
11   number and then --
12       Q    Okay.
13       A    -- NSLDS, which is our loan system,
14   serves it up.
15       Q    Thank you.  That's helpful.
16            So still for most people, it's going to
17   be under the 2016 regulations.  Did you add any
18   examples or suggest adding any examples for the
19   2016 regulations?
20       A    Yes.  Because it's a smart form, this
21   list of examples that I listed would show up for
22   both a borrower applying under 2014 and a borrower
23   applying under 2019.
24       Q    Okay.
25       A    I don't know what would happen for an

Page 256

1    applicant under the state law standard.  I don't
2    know.  I don't know how the smart tool works for
3    them.
4        Q    So this Web tool, who developed it
5    initially?
6            MR. MERRITT:  Object on scope.  I'm
7    going to ask which topic is this -- all of this
8    relevant to on the Web tool?
9            MS. O'GRADY:  I would say it's relevant
10   to the reasons for delay because the delay to the
11   extent it's ongoing I think it's appropriate for
12   the reasons for it currently.
13           MR. MERRITT:  So that's not a topic.
14   The extent to which the difficulty of reviewing
15   borrower defense applications actually caused or
16   justified the 18-month delay that has now ended is
17   what the topic is, so I don't think that's --
18           MS. O'GRADY:  I think it's relevant to
19   discuss, though, how they're currently being
20   reviewed since this is the -- the evolution of how
21   they were reviewed, the evolution of the denial
22   notices, I would argue it's all part of the same
23   story, or I'm trying to understand if it is, for
24   the reasons behind the developments that occurred
25   after the 18-month delay shed light on the reason

Page 257

1    for that 18-month delay.
2            MR. MERRITT:  Well, I guess, like, to
3    the extent the court authorized discovery to the
4    post-18-month delay would be for the development
5    used in the form denial letters which you've
6    discussed.  And the extent to which the secretary
7    has denied applications to students, pertaining to
8    school, subject to findings of misconduct, and I'm
9    not seeing how this line of questioning is
10   relevant to any of those topics.
11           MS. O'GRADY:  I think part of it,
12   though, is about systems generally so some of the
13   delay and some of the reasons given for the delay
14   in the past had been the need to develop systems.
15   My understanding is this computer program is one
16   of those systems.
17           So I can ask -- I can ask more
18   questions about the past development of this
19   computer system and -- and when it began.  I'm
20   happy to go there.  I was going to get there.  And
21   I think that falls squarely within the reasons --
22           MR. MERRITT:  I mean I disagree that
23   the development of systems is something the court
24   authorized discovery into.  You know, we've gone
25   into this a little bit.  I think at some point

Page 258
Page

1  soon, though, we would need to close off this line
2  of questioning that appear to be beyond the scope
3  of the discovery order.
4      MS. O'GRADY:  Well, I can -- I can, as
5  a show of good faith, wrap up quickly.  That's
6  helpful.
7      MR. MERRITT:  I thank you for your
8  explanation, too.  Thank you.
9  BY MS. O'GRADY:
10     Q    So is -- we had talked earlier today
11  about your role and -- at -- your role and FSA's
12  role and, you know, the difference between what
13  happens at FSA.
14          And can you -- can you shed some light
15  for me on your involvement with this Web tool
16  given that it's an FSA process?
17     A    Right.  So perhaps that's why I didn't
18  realize that a contract had been let or that this
19  was linked to Salesforce or that a change order
20  was required.  That's all operational.  I had no
21  idea.
22          My role was -- and -- and, by the way,
23  I -- I haven't actually seen the tool.  What we've
24  been working with is a list of data elements.  So
25  there was a list of data elements, and that was

Page 259
Page

1  sent to me for review to make sure that it was
2  consistent with the 2019 reg.
3          And then after I did my review, I was
4  told that it's a smart form that would be used for
5  2016 and 2019, so subsequent reviews took into
6  account the policy in the 2016 reg and the 2019
7  reg in reviewing the element list.
8      Q    Is it your understanding that this Web
9  tool was developed -- you know, before you had
10  said that the borrower defense applications were
11  kept on a spreadsheet.  Is this Web tool part of
12  the development beyond that spreadsheet?
13     A    To my knowledge, this is part of the
14  development of the FSA's digital customer care
15  environment.  So the digital customer care
16  environment is the way in which borrower's
17  interact with their loans.  And over the period of
18  the last year or so, we have launched a new Web
19  site that gives borrowers new access to
20  information about their loans, ways to make a
21  payment online, a mobile app, a public service
22  loan forgiveness tool, so that they can more
23  easily identify if they work for a qualifying
24  employer.
25          And the development of this tool was --

Page 260
Page

1  I don't know if it was phase two or three -- phase
2  three, but it was one of the phases of the digital
3  customer care.
4          So this is part of the digital customer
5  care effort which is about our Web interface with
6  borrowers.  It is my understanding that somehow
7  this information gets communicated to Salesforce
8  and that Salesforce may be one of the systems that
9  the BD unit will use to manage claims.
10          Now, I don't know enough about
11  Salesforce to be able to tell you how, but my --
12  my current understanding -- and, again, I had no
13  idea that this form was linked to Salesforce until
14  recently, but as I understand it, Salesforce is
15  the connection between the digital customer care
16  environment, which is where this tool was
17  developed, and getting information to the borrower
18  defense team's management system with Salesforce
19  being, I presume, their manage -- new management
20  system.
21     Q    Okay.  You were saying that when you
22  had given those suggestions for additional
23  examples of misrepresentation, it's -- it's a
24  process where a person puts in their social
25  security number, other identifying information,

Page 261
Page

1  and then they're -- their claim is assessed under
2  the appropriate standard.
3      A    They are served up questions that
4  relate to the standard under which they're being
5  reviewed.
6      Q    Okay.  And, so, for the 2019
7  regulations, that's the federal standard we
8  discussed?
9      A    (Witness nods head.)
10     Q    And then 2016, it would be the
11  appropriate state law standard; is that right?
12     A    No, that's a federal standard as well.
13     Q    And for 1995, it would be under the
14  appropriate state law standard?
15     A    Correct.  And that's why I don't know
16  how this form interacts with those borrowers.
17     Q    Okay.  Is it your understanding that
18  after a borrower puts their information in the
19  system, then it's adjudicated by the FSA team; is
20  that right?
21     A    Well, this is a new system, and so I --
22  I -- I don't know whether or not borrowers have
23  put their information.  So are you asking me
24  prospectively or are you asking me about currently
25  pending claims that have come through this tool?

Page 262
Page

1       Q     Well, I -- I -- I'm trying to hone in
2   on this -- the question, and you're absolutely
3   right that was not clear.  I'm trying to hone in
4   on the question of which standard is being used,
5   and -- through this tool how individuals who are
6   adjudicating the claims, what they are using to
7   assess which standard is appropriate?
8       A     So they're using the date of the loan.
9   So let's say Diane Jones has two loans, and one
10  was issued on July 2nd, 2017, and one was issued
11  on July 1st, 1999 -- I'm just making this up --
12  actually, I'm going to use a different set of
13  dates because I don't have the explanation on the
14  '95 borrowers.
15      Q     That's okay.  I see where you're going
16  with that, and I think that does clarify something
17  for me.
18            But what I want to get to is once
19  it's -- it's determined by the system that it's
20  not going to be assessed under a federal standard;
21  that it needs -- a state law standard needs to be
22  applied, what happens to the application then?
23      A     I -- I don't know.  I -- I -- I don't
24  know that the -- I don't know how this tool works.
25  You know, I -- my -- for pre-2016 borrowers.

Page 263
Page

1       Q     Okay.  And for -- okay.  Is this tool
2   up and running right now to your knowledge?
3       A     This tool was launched on November 8th.
4   It is my understanding that there was a technical
5   issue and -- and so for a -- a temporary period of
6   time it had to be taken down, and I don't --
7   haven't actually looked today, so I don't know if
8   it's back up.  But it was launched on
9   November 8th, and it was operational maybe until a
10  couple of days ago when -- when this problem was
11  identified.
12      Q     Okay.  So --
13      A     And -- and I want to be clear that
14  even -- that we still have the other application.
15  So there are other ways -- this is only one way
16  for a borrower to apply.  There are other ways.
17  So the other ways still exist for a borrower to
18  apply.  This was one of several.
19      Q     One second.  Just bear with me.
20            MS. O'GRADY:  Okay.  The next exhibit,
21  which will be Exhibit 19, is in the folder as ECF
22  number 145.
23            (Jones Deposition Exhibit 19 was marked
24  for identification and attached to the
25  transcript.)

Page 264
Page

1            THE WITNESS:  I want to make one other
2   point about the tool, which is that the element
3   list for the tool went through two rounds of
4   public comment, so the element list is publicly
5   available.  It's been through two rounds of public
6   comment.
7            Okay.  What exhibit now?
8            BY MS. O'GRADY:
9       Q     ECF number 145, Defendants fraud list.
10  And that is Exhibit 19 for this deposition.
11            THE WITNESS:  I'm going to turn my
12  light on.  Now that it's darker outside, I feel
13  like I'm in a spotlight.
14            BY MS. O'GRADY:
15      Q     Okay.  Do you have that open?
16      A     I do.
17      Q     And do you recognize this filing?  I
18  primarily would like to ask you about the list
19  attached to the declaration of Mark Brown.
20      A     I have not seen this list.
21      Q     Okay.  That -- with that understanding,
22  I would still like to ask you a few things about
23  it and answer to the extent you can.
24            I can represent to you that this is a
25  filing in respect defendants need in response to

Page 265
Page

1   the judge's questions about claims -- borrower
2   defense claims that had been denied where
3   Department of Education has in its possession
4   evidence of wrongdoing.  So I will not ask you
5   about CEC given our discussion about your
6   voluntary recusal.  So we can just take the first
7   column.  So that would be PDF page -- well, if
8   you've already scrolled down to see the exhibit
9   which is the rotated Excel spreadsheet?
10      A     I have.
11      Q     Okay.  Let's look at the first one.
12      A     The Excel spreadsheet -- I'm just
13  looking at a data table.
14      Q     Data table, that's it.  It says 145-2
15  up above and number -- it's page 1 on the bottom
16  and it's a rotated layout; right?
17      A     Yeah.
18      Q     Okay.  So we're at the same place.  So
19  column one, School ownership group (school name),
20  this is the Apollo Group (University of Phoenix).
21  Column two, Categories of applications determined
22  not to be within the scope of the common evidence
23  listed in column three.
24            I want to ask you -- you can finish
25  reading the column names -- if you're familiar

Page 266

Page

1   with the difference between column two and column
2   three as a -- as a general policy matter?
3           MR. MERRITT:  I would also say, if you
4   haven't -- if you're not familiar with the
5   document, there is a description in the
6   declaration if you want to take the chance to look
7   at that as well.
8           THE WITNESS:  Okay.
9           (Reviews document.)
10          So, yeah, I have a high-level
11  understanding of --
12          BY MS. O'GRADY:
13      Q    Okay.  Please share that high-level
14  understanding with me.
15      A    Yeah, I think this is -- as I explained
16  earlier, that there are applications where the
17  borrower has to submit evidence because we -- you
18  know, the -- the department doesn't have -- well,
19  any borrower has the opportunity to submit
20  evidence.  I want that to be clear.  Any borrower
21  can submit evidence.  But there are some borrowers
22  for whom the only evidence the department has is
23  what the borrower submitted, and there are other
24  borrowers that regardless of what they submitted,
25  the department has in its possession from one

Page 267

Page

1   channel or another evidence to use to adjudicate
2   the claim.
3       Q    And borrowers in both of those
4   categories -- or I should say either of those
5   categories, is it possible for their claim to be
6   approved?
7       A    So are you asking me if -- if a --
8   regardless of who supplies the evidence, if the
9   evidence is there and sufficient, can that
10  borrower's claim be approved; is that what you're
11  asking me?
12      Q    We can break it down into two.  So one,
13  a borrower who has submitted no evidence
14  individually but who attended a school during a
15  time period for which there is abundance evidence
16  that the department has, could that borrower's
17  claim be granted?
18      A    So if you're asking me in the
19  theoretical world, yes, but I -- but I don't know
20  how each one of these falls into the category.  So
21  I just want to make sure --
22      Q    That's fine.
23      A    Right.  So are you asking me if the
24  department has evidence that the borrower
25  submitted nothing, could that borrower still be

Page 268

Page

1   approved?
2       Q    Yes.
3       A    It's possible depending on what the
4   borrower's claim is, allegation is.
5       Q    And the converse of that, is it
6   possible for the borrower's claim to be approved
7   if the borrower is the only source of evidence
8   against the school?
9       A    It is possible.
10      Q    And looking here at column two,
11  Categories of applications determined due to be
12  within the scope of common evidence listed in
13  column three, if a borrower falls into that
14  category, what happens to their application?
15      A    I don't know.  These would be the
16  decisions that are made by the BD team, and so
17  I -- I don't know.
18      Q    And what is your understanding of what
19  column three means, All other applications are
20  pending further review of common evidence?
21      A    My understanding is that the department
22  is in possession of evidence that they are
23  reviewing, I believe.
24      Q    And what policy governs how they review
25  that evidence?

Page 269

Page

1       A    So that's a legal determination.  So it
2   is -- it is a legal determination about whether or
3   not the claim meets the definition of
4   misrepresentation and meets the preponderance of
5   the evidence standard.  It's not a policy
6   decision.  It's a legal decision.
7       Q    When you say it's a legal decision and
8   not a policy decision, do you mean that there's --
9   there's no discretion to make a different
10  decision?
11      A    By whom?
12      Q    By -- well, by anyone in the
13  department.  I would say the secretary, but by
14  anyone in the department.
15          I'm wondering really what -- what the
16  effect of -- when you characterize something as a
17  legal question or a legal decision, what the
18  effect of that is.
19      A    So that means that it is not in the
20  hands of a policy person.  So it means that
21  whatever the BD attorneys decide on a legal basis,
22  they have the expertise to judge the evidence and
23  make a decision on the merits.  It is possible
24  that they engage with, you know, other attorneys
25  at the department.  You know, there are career

Page 270

1    attorneys that have been involved in -- in BD, so
2    it is possible they engage.  But on a particular
3    decision, it is strictly a legal decision meaning
4    that nobody else in the department knows what it
5    is, knows that it's happening and can weigh in on
6    it.
7         Q    How has it been determined that no one
8    else in the department can weigh in on it?
9         A    It's been determined because none of us
10   know it's happening.
11        Q    My question is why is that?  I mean,
12   so -- so that is --
13        A    Because it's an operations matter based
14   on legal decisions.
15        Q    Is there a policy that has made that
16   determination?
17        A    Well, I mean, there are policies about
18   who has access to FSA's data systems, and those
19   data systems are limited to certain employees
20   within FSA.  There are all kinds of security
21   protocols.  I don't have access to FSA's data
22   systems, and many people who work at FSA don't
23   have access.  There's --
24        Q    What about people --
25        A    -- a protocol (indiscernible)

Page 271

1    information involved, and so there is a particular
2    clearance that somebody has to go through to have
3    access to this data system.
4         Q    What about people in the Office of the
5    General Counsel?  Did any of those individuals
6    have policy roles?
7         A    They -- they don't have policy-making
8    roles, no.  They advise us on legal
9    interpretations.
10        Q    What I'm trying to understand is is how
11   it became determined that the adjudication of
12   borrower defense applications is purely a legal
13   matter which you have no involvement with as -- as
14   you have said today.
15        A    Because it's a legal matter.  I mean,
16   it's about the evaluation of evidence.  I mean --
17   I mean, frankly, you know, the prior
18   administration established that.  The prior
19   administration established that there would be a
20   separate unit, first with a special master and
21   later with the BD unit.  They made the
22   determination that there would be a BD unit that
23   would review and adjudicate these claims.
24             Now, it is true that the prior
25   administration's BD unit chose to engage the under

Page 272

1    secretary in the evaluation of evidence and
2    perhaps he was qualified, and perhaps that's what
3    that administration elected to do.
4         Q    Is it your view that engaging with the
5    under secretary in -- in that manner was
6    inappropriate?
7         A    It was their decision to make.
8         Q    So that's what I'm getting at.  So it
9    was their decision to make, so it was someone's
10   decision at some point to not do that under the
11   administration that you've served under.
12        A    I -- I mean --
13        Q    It's not a -- I'm just saying it's not
14   your lack of involvement; it's not a foregone
15   conclusion; is that fair?
16        A    Well, it certainly should be because
17   I'm not trained as a lawyer.  It should be a
18   foregone conclusion.  I have no capacity,
19   training, capability to in any way look at
20   evidence and make a legal determination.  I can't
21   do that.
22             In the previous administration
23   regarding your predecessor who reviewed or signed
24   off on borrower defense decisions on a group
25   basis, when was that process stopped?

Page 273

1         A    Well, I -- you know, I -- I mean,
2    you've seen -- you've seen the dates on the memos.
3    I think the most recent memo was January 9th of
4    whatever that was, 2017.
5         Q    Meaning --
6         A    That's the most recent document I've
7    seen where the under secretary was involved in the
8    evaluation of evidence.
9         Q    And at that point, is it your view that
10   that was improper?
11             MR. MERRITT:  Objection, in it calls
12   for speculation.
13             THE WITNESS:  Yeah.  I don't know his
14   background.  I mean, I --
15        BY MS. O'GRADY:
16        Q    But if he was -- I mean, your sense --
17   you've said a few times today you're not a lawyer
18   so you can't make this determination.
19             So if he's not a lawyer, is it your
20   understanding that his involvement was
21   inappropriate?
22             MR. MERRITT:  Objection.  Same reason.
23             MS. O'GRADY:  You don't have to answer
24   that.
25             MR. MERRITT:  I mean, it also goes to

Page 274
Page

1  the scope, too, the relevance of that line of
2  questioning.
3              MS. O'GRADY:  We can move on.
4              I want to go off the record for a very
5  short break, and I would also ask how much time we
6  have left.
7              THE VIDEOGRAPHER:  Going off the
8  record.  The time is 22:01 UTC time.
9              (Recess -- 5:01 p.m.)
10             (After recess -- 5:09 p.m.)
11             THE VIDEOGRAPHER:  All right.  We're
12 now back on the record.  The time is 22:09 UTC
13 time.
14             BY MS. O'GRADY:
15       Q    Okay.  Ms. Jones, I want to move to the
16 topic of reconsideration.  What is your
17 understanding of the reconsideration process?
18       A    When a borrower wishes to have their
19 claim reviewed, they can submit a reconsideration
20 application.  It's my understanding that they can
21 submit a request for review.  I believe they have
22 the option to submit additional evidence to
23 support the claim.  And I believe if they have a
24 new allegation, they're instructed to start a new
25 claim.

Page 276
Page

1       A    I don't know.  I'm not involved in the
2  review of evidence.  I think this would go -- you
3  know, again, this is a legal question of how do
4  you review evidence.
5       Q    So you have no policy opinion about the
6  reconsideration process?
7              MR. MERRITT:  Objection to the opinion.
8              BY MS. O'GRADY:
9       Q    Have you ever been involved in setting
10 policy regarding reconsideration?
11       A    There -- there was -- so there was a
12 policy question that arose out of legal review of
13 reconsideration, and that policy question came to
14 me.
15       Q    What question was that?
16       A    The policy question is -- basically I
17 think I mentioned earlier that programs are
18 identified by a Classification of Instructional
19 Program code, a CIP code.  And the institution
20 gets to pick the CIP code when they register the
21 program with the department.  So in our records,
22 we have programs listed by CIP codes.  But
23 sometimes institutions call their program
24 something different than the name affiliated with
25 the CIP code.

Page 275
Page

1              That's my understanding of that
2  process.
3       Q    Okay.  If we could go to the exhibit
4  marked 14 in this deposition, which is ECF number
5  ECF number 108-08, Daniel Deegan affidavit?
6       A    Okay.
7       Q    Okay.  And then if you scroll to PDF
8  11, we're again within the denial Mr. Deegan
9  received which was based on the form D template.
10      A    Uh-huh.
11      Q    In the middle of that page, the
12 question, What if I do not agree with this
13 decision.
14             So you'll want to just take a moment to
15 read that over.
16      A    (Witness reviews document.)
17      Q    I specifically want to ask about point
18 two -- well, point one and point two, Which
19 allegations you believe that Ed incorrectly
20 decided, and Why you believe that Ed incorrectly
21 decided your borrower defense to repayment
22 application.
23             What's your understanding of what
24 information a borrower would have to provide to
25 successfully answer either of those questions?

Page 277
Page

1              And so the question that came to me is,
2  you know, what if a borrower is saying that they
3  were given relief based on one program name but
4  they really enrolled in a different program.
5       Q    Okay.  So your only policy involvement
6  with reconsideration was about program name
7  reconciliation essentially?
8       A    I mean, but that's the kind of policy
9  question --
10      Q    Right.
11      A    -- that would come to me.
12      Q    So when you were involved in reviewing
13 the form denial letters A through D that we looked
14 at before, had you been involved in reviewing the
15 sections about reconsideration of those denial
16 letters?
17      A    You know, I -- I don't remember -- I
18 mean, I think there were instructions included in
19 those original letters.
20      Q    What do you mean by "instructions"?
21      A    I mean, this language of "if you
22 disagree" looks familiar to me, so I can't
23 remember exactly what it said, but I believe this
24 language about if you disagree with this decision,
25 you may ask Ed to reconsider your application.

Page 278
Page

1        Q     Okay.  So at some point, you signed off
2  on this text or something very similar to it?
3        A     Yeah.  I can't remember if it listed
4  those three points, but -- but, yeah, I mean,
5  there was instructions for reconsideration.
6        Q     Okay.  And when you were reviewing the
7  form denial letters, did you think about or
8  consider whether or not they would provide enough
9  information for a borrower to seek
10 reconsideration?
11        MR. MERRITT:  Objection: calling for
12 privileged information.
13        MS. O'GRADY:  Do you mean deliberative
14 process privilege?
15        MR. MERRITT:  I mean you're asking her
16 what she thought, you know, about the review of
17 the letters before they were final.
18 BY MS. O'GRADY:
19        Q     On this final letter, do you believe
20 there's enough information for a borrower to
21 request reconsideration?
22        A     I believe that there is -- yeah, I
23 believe there is enough information about a
24 borrower that they can request and how they would
25 go about it, like address it in an email or, you

Page 279
Page

1  know --
2        Q     Yes.  In terms of logistics, the email
3  address is there and the fact of the
4  reconsideration process has been described?
5        A     Yes.
6        Q     In terms of the substance in point two,
7  Why you believe that Ed incorrectly decided your
8  borrower defense to repayment application, what
9  information in this denial letter could a borrower
10 use to answer that question?
11        A     And that's the part of this that I -- I
12 don't have the expertise.  I -- you know, those
13 particular questions were developed by the BD
14 unit.
15        Q     Let me ask it a different way.  So if
16 you could put yourself in the shoes of the
17 borrower because the borrower is -- I can tell you
18 this borrower and probably most borrowers are not
19 themselves lawyers either.  How do they determine
20 what information to include to answer the
21 question, Why you believe that Ed incorrectly
22 decided your borrower defense to repayment
23 application?
24        MR. MERRITT:  Objection: speculative.
25        BY MS. O'GRADY:

Page 280
Page

1        Q     I'm looking at this particular
2  document.  So what information in this document
3  could a borrower point to to say, Ed, you got it
4  wrong, because?
5        A     I mean, I think they would explain why
6  they think we got it wrong.
7        Q     And what specifically -- how would that
8  explanation be different than their initial
9  application?  You know, what -- what other --
10 what -- why do you believe that Ed incorrectly
11 decided your borrower defense to repayment
12 application?
13        A     I mean, you know, again, I think a
14 borrower would give an explanation, and the -- the
15 one that I'm aware of is, you know, borrowers who
16 wrote in and said, you know, you assigned relief
17 because you said I was in this program but, you
18 know, the college called it this other program,
19 and -- and -- and that's different on the table.
20        Q     So the one example you can think of is
21 a -- is, again, a problem with the -- again,
22 properly identifying what program or what school
23 somebody went to.
24        If a borrower has included information
25 about a number of allegations and then this denial

Page 281
Page

1  letter, for example, if we just scroll up to
2  page 10 of the PDF, Allegation one, employment
3  prospects:  You allege that Keller Graduate School
4  of Management engaged in misconduct related to
5  employment prospects.  This allegation fails for
6  the following reasons:  Insufficient evidence.
7        Your claim for relief on this basis is
8  therefore denied.
9        What basis -- how would a borrower
10 interpret that paragraph?  I mean, I think you put
11 yourself -- well, that's my question.
12        How should a borrower interpret that
13 paragraph?
14        A     Because I don't know what the borrower
15 submitted originally, I -- I don't know.  I don't
16 know what was in the borrower's original
17 application.
18        Q     When you signed off on the initial form
19 denial letters, I think at one point you had said
20 this is the spot, you know, for the following
21 reasons, and that's where you had expected there
22 to be information about the state law standard
23 applied.
24        That's right?  You testified about that
25 earlier today; correct?

Page 282
Page

1        A      I said that when -- yes, in the section
2   where the attorneys explain -- I can't remember
3   the words, but, right, that little bracketed place
4   that you would be evaluating evidence based on the
5   state standard.
6        Q      And here the only words in that
7   bracketed place, which I think was recommendation
8   reason, is the -- are the words "insufficient
9   evidence."
10              Is that -- when you first looked at the
11  template, is -- you know what, let me just take a
12  moment.  Let's look at the template.  My question
13  is about the template.
14              So we're going to go to Exhibit
15  Number 13 of this deposition, and the file is ECF
16  number 116, Defendants Post-CMC Filing.
17              And this, as you'll recall, have the
18  attachment of these form letters.  Let's go all
19  the way down --
20       A      I'm still looking for it.
21       Q      Oh, sure.  Sorry about that.
22       A      (Witness reviews document.)
23              Okay.  I -- I have it.  Which form do
24  you want me to look at?
25       Q      Okay.  So I want to go all the way to

Page 283
Page

1   PDF page 23, and this is the form D denial
2   template.
3        A      Okay.
4        Q      And there in the highlighted -- it's
5   the highlighted text is what a reviewing attorney
6   would insert; correct?
7        A      It -- it would -- it would be what they
8   would enter into their work papers.
9        Q      Okay.  And we discussed before how your
10  expectation was that the highlighted text of
11  review recommendation reason would include the
12  state law standard.
13              And my question now is did you expect
14  any other information to be within those brackets
15  review recommendation reason?
16              What other information did you think
17  when you reviewed this template would be included
18  there?
19              MR. MERRITT:  Objection.  It's calling
20  for privileged and deliberative information.
21              MS. O'GRADY:  Well, I think the witness
22  has already testified about her expectation that
23  the state law standard would be included here, and
24  I want to know her -- when she signed off on the
25  form D template what she was signing off on.

Page 284
Page

1              MR. MERRITT:  Well, it's still going to
2   what her thoughts and impressions were at the time
3   which is deliberative information, what you're
4   asking her now.
5              BY MS. O'GRADY:
6        Q      Did you discuss -- when these were
7   finalized, did you discuss what review
8   recommendation reason meant?
9              MR. MERRITT:  You can answer that.
10             THE WITNESS:  I -- I -- I don't -- I
11  don't know what date they were considered to be
12  finalized, but, yes, I was engaged in
13  conversations about what I believed that meant.
14             BY MS. O'GRADY:
15       Q      And I'm not asking about the
16  deliberation of the different drafts.  I'm asking
17  what your understanding of this template means
18  right here?  What is the review recommendation
19  reason?
20       A      I had to defer to the expertise of the
21  lawyers.  I -- I -- I don't write legal text, so,
22  you know, the expectation was that lawyers would
23  make a decision and that information would be
24  provided.
25       Q      But in your declaration -- we can go

Page 285
Page

1   back to Exhibit 2 of your declaration which is
2   your declaration, I should say.  We'll go back
3   to -- it's PDF page 10 of Exhibit 2, the bottom of
4   paragraph 26.  And you write here, The department
5   has been working to develop documents to provide a
6   more robust explanation for borrowers whose claims
7   are denied.
8              Is this template the result of that
9   effort to develop documents to provide a more
10  robust explanation?
11       A      The development of these templates is
12  what I was referring to when I said that the
13  department was developing documents.
14       Q      Did you ever, before today, review a
15  form D denial notice as it was provided to a
16  borrower?
17       A      No.  The servicers send those.
18       Q      So you've seen the template, but you
19  have never before today seen what it looked like
20  to a borrower receiving it?
21       A      I -- I believe that there was one
22  letter that I saw that came in.  When I asked Mark
23  about it, he told me that the letter that I saw
24  was not a typical letter.  So I've only seen --
25       Q      Which letter was that?  Do you recall?

Page 286
Page

1      A      It was -- it was a letter that -- that
2  said, you know, fill in the blank, basically.  I
3  mean, it -- you know, it was the letter that had
4  the highlighted insert here.  It still said insert
5  here.
6      Q      Oh, so it still said "insert here."
7      A      (Witness nods head.)
8      Q      Okay.  And, so, he said that wasn't
9  typical.
10             Have you ever seen one -- well, let me
11  just go back.  Why did he show that to you?
12      A      He didn't.
13      Q      Oh.
14      A      He didn't show it to me.  I -- I was --
15  it came to me, and I forwarded it to him to ask
16  what happened here; how could this happen.
17      Q      Okay.  And what was his response?
18      A      That it was just a one-off blip.
19      Q      So besides that letter that still had
20  the mistaken highlights included, before today,
21  you'd never seen another one as it was sent out?
22      A      No.
23      Q      Okay.  And if I were to -- the one that
24  we just looked at that simply said, you know,
25  insufficient evidence in -- in the highlighted

Page 287
Page

1  area of review recommendation reason, is that
2  about what you expected them to look like, or is
3  that less text than you expected --
4             MR. MERRITT:  Objection again to the
5  extent you're talking -- you know, referring to
6  her predecisional state of mind.
7             BY MS. O'GRADY:
8      Q      I can ask right now.  You know, would
9  you be surprised that the highlighted text, review
10  recommendation reason for thousands of borrowers
11  only includes one or two phrases?
12      A      Because I haven't seen those claims,
13  I -- I can't tell you.  I -- I haven't seen the
14  applications.  I don't know what the incoming
15  looked like, so I can't answer that question.
16      Q      When the -- I think you said the -- the
17  sample that you saw that had the mistaken
18  allegation type and, you know, highlighted text
19  still included, was that emailed to you?
20      A      I don't remember.  And I don't know
21  that it had the wrong allegation.  It just -- it
22  just didn't have that -- as best I remember, it
23  just didn't have the justification in it.  You
24  know, it just had the fill in here.  I mean, I
25  know it doesn't say fill in here, but you know

Page 288
Page

1  what I mean.
2      Q      Right.  So it had, like, the
3  highlighted text.
4      A      Yeah.
5      Q      So how did you receive that?  Who sent
6  it to you?
7      A      I can't remember who sent it to me.  I
8  can't remember.  It came from outside of the
9  department, but I can't remember who sent it to
10  me.
11      Q      Could you find out?
12      A      I mean --
13      Q      Would it be possible to go into your
14  email and find out?
15      A      I wouldn't even know what to search on.
16      Q      And then you --
17             MR. MERRITT:  Are you asking that that
18  email -- are you making a request for that email
19  to be produced?
20             MS. O'GRADY:  Yes, I am.
21             MR. MERRITT:  I'm just going to say a
22  broader point.  If after this deposition you have
23  further document requests, you know, please send
24  them along.
25             I was also going to suggest based on

Page 289
Page

1  some of the other ones that you review the
2  Pratt -- the (indiscernible) record in the Pratt
3  case, and it's possible some documents could be in
4  there.
5             MS. O'GRADY:  Yes, there are some
6  documents in there, and they should still be
7  produced in this case.
8             And that said, based on the lack of
9  documents about some of these issues, we would
10  like to keep this deposition open to the extent
11  further documents are produced that involve
12  Ms. Jones as a witness?
13             MR. MERRITT:  What do you mean keep it
14  open?
15             MS. O'GRADY:  If we have to call her
16  back as a witness to address documents that we
17  don't have in our possession yet.
18             MR. MERRITT:  I think we have to
19  consider any requests like that you're going to
20  make at the appropriate time.
21             BY MS. O'GRADY:
22      Q      Ms. Jones, I would like to --
23             MS. O'GRADY:  I'm going to mark -- I
24  think this should be our last exhibit, and this is
25  going to be Exhibit Number 20 of this deposition.

Page 290
Page

1           (Jones Deposition Exhibit 20 was marked
2   for identification and attached to the
3   transcript.)
4           MS. O'GRADY:  The file name is ECF
5   number 146, Order denying settlement show cause.
6   BY MS. O'GRADY:
7       Q    Do you have that open?
8       A    I do.
9       Q    Okay.  And do you recognize this
10  filing --
11      A    It doesn't look familiar --
12      Q    -- or court order?
13      A    -- to me.
14      Q    Okay.  I'll let you know this is a
15  court order in this case that is what ordered the
16  discovery.  It's the genesis of your being here
17  today.
18           So on page 16 of this PDF, if you could
19  scroll there, I just want to use this to ask you
20  some questions about other individuals and their
21  roles if you wouldn't mind.
22           So are you on page 16?
23      A    I am.
24      Q    Okay.  So bullet point one here, these
25  are the topics of discovery.  The development and

Page 291
Page

1   use of the form denial letters including the
2   submission, timeline of review, and disposition of
3   any request for reconsideration; and the form of
4   denial issued before this suit and under the
5   previous administration.
6           Who is the -- which individuals would
7   be the best people for us to ask about those
8   issues?
9       A    Our Office of General Counsel is who
10  you should ask.  All of those requests are handled
11  through our Office of General Counsel.
12      Q    And when you say "all of those
13  requests," what do you mean?
14      A    I mean, you know, request for
15  documents --
16      Q    No, I -- no, I know that.  I just want
17  to know the -- the topics.  So who is closest to
18  the topic of the use and form of the denial
19  letters that we talked about?  So those denial
20  letter forms A through D.  You reviewed them and
21  signed off on them.  Who else is the person
22  closest to that issue?
23      A    I mean, Colleen Nevin is closest to
24  that issue.
25      Q    Anyone else besides Colleen?

Page 292
Page

1       A    I -- I -- I have -- I have no idea -- I
2   have no idea who else works -- I don't know the
3   names of any of Colleen's staff except for one.  I
4   know one staff person by name.  So I think you'd
5   have to ask her.
6       Q    Okay.  And that's true for the
7   disposition of any request for reconsideration.
8   Is there anyone else besides Ms. Nevin that would
9   have knowledge of that topic?
10      A    I don't even know what the disposition
11  of any request for reconsideration --
12      Q    Oh, reconsideration is what we were
13  just talking about.
14      A    Right.  But I honestly don't know what
15  disposition of any request means.
16      Q    Okay.  Let's look at topic two.  The
17  extent to which the difficulty of reviewing
18  borrower defense applications actually caused or
19  justified the Secretary's 18-month delay.
20           Who would be the person closest to that
21  question?
22           MR. MERRITT:  I object to this line of
23  questioning.  I mean, you have other --
24  interrogatories and other lines of asking
25  questions like this.

Page 293
Page

1           MS. O'GRADY:  I want to get a -- I want
2   to get a sense of Ms. Jones' understanding of what
3   her colleagues work on and do especially since we
4   talked a lot today about who has a policy-making
5   role and who doesn't.
6           MR. MERRITT:  We've talked about that
7   and, you know, provided a lot of information about
8   that.  So I think this particular request is
9   getting beyond the scope.  I mean, her specific
10  knowledge of that as opposed to those topics in
11  general, like, who else would be involved.
12           MS. O'GRADY:  I don't understand your
13  objection.  It's the witness' personal knowledge
14  about exactly the scope of the discovery.
15           MR. MERRITT:  I mean, it's somewhat
16  calling for a legal conclusion, I mean, to the
17  extent you're saying who has information relevant
18  to this.
19           I mean, you know, Diane, you've talked
20  about these topics.  You can answer the question.
21           THE WITNESS:  I mean, for -- for number
22  two, it would be our Office of General Counsel.
23  The attorneys that were involved in the Manriquez
24  case.
25           BY MS. O'GRADY:

Page 294

Page

```
 1      Q    Okay.  And what -- the difficulty of
 2 reviewing borrower defense applications, what does
 3 that phrase mean to you?
 4           MR. MERRITT:  Objection:  Speculative.
 5           MS. O'GRADY:  I'm just asking?
 6           MR. MERRITT:  You're asking her to
 7 interpret what the court said.
 8           MS. O'GRADY:  No, I'm asking what she
 9 thinks it means.  I don't want her to interpret
10 the court's words.  I just, you know . . .
11 BY MS. O'GRADY:
12      Q    Difficulty of reviewing borrower
13 defense applications.
14           Are borrower defense applications, in
15 your view, difficult to review?
16      A    I don't review borrower defense
17 applications, so I don't know.
18      Q    Who would know?
19      A    Colleen Nevin reviews borrower defense
20 applications.
21      Q    And regarding the 18-month delay in
22 processing applications, would the secretary have
23 knowledge about that in your -- in your view?
24      A    You know, again, that decision was made
25 before I was involved in BD.  That was made, you
```

Page 295

Page

```
 1 know, after the Manriquez case, so I don't know
 2 who was involved in making that decision, but
 3 that -- that delay was tied to the Manriquez case
 4 and which is why I've said, you know, the lawyers
 5 involved in the Manriquez case would be the ones,
 6 you know, closest to understanding that case.  And
 7 it's a --
 8      Q    Okay.  And your understanding is that
 9 no one -- no one else besides the lawyers involved
10 in the Calvillo Manriquez litigation would have
11 any knowledge about the reason for that delay?
12      A    I'm telling you that I wasn't involved
13 in that decision, but it makes sense to me that of
14 course the lead -- the lawyers who were involved
15 in the Manriquez case would have knowledge of --
16 of that decision and -- and considerations around
17 that decision.
18      Q    To the third point, The extent to which
19 the Secretary has denied applications of students
20 who have attended schools subject to findings of
21 misconduct by the Secretary or any other state or
22 federal body or agency, and the rationale
23 underlying those denials.
24           I'll assume you'll say Colleen Nevin.
25 Is there anyone else besides Ms. Nevin?  And
```

Page 296

Page

```
 1 please correct me if I assumed incorrectly.
 2      A    Colleen Nevin and her team.  I don't
 3 know if she reviews every single one, but her team
 4 does.  Yeah, she and her team would be the only
 5 ones that would have knowledge of this.
 6      Q    And is there anyone else in a
 7 policy-making role that would have any knowledge
 8 of that topic?
 9      A    Not in a policy-making role, no.
10      Q    And what about the second question
11 regarding the delay:  Is there anyone else in a
12 policy-making role that would have knowledge of
13 that topic?
14      A    You know what, again, I wasn't involved
15 in the decision so I don't know who was involved
16 in making it.  You'd have -- you'd have --
17      Q    What about carrying out the decision?
18      A    What do you -- what -- I mean, what do
19 you mean carrying out --
20      Q    I understand the decision was made
21 before your tenure, but the decision was in effect
22 during your tenure.
23           Is there anyone else involved in that
24 decision being the status quo, that -- you know,
25 this . . .
```

Page 297

Page

```
 1      A    Well, the decision had been made and
 2 others executed it.  I mean --
 3      Q    So who executed that decision?
 4      A    Originally Jim Manning and ultimately
 5 Mark Brown.
 6      Q    And when you say they executed that
 7 decision, what do you mean?
 8      A    It means that the decision had been
 9 made to -- to -- to not issue any more final
10 decisions to borrowers until the California court
11 made its decision.  So the -- what carrying it out
12 means is not issuing decisions to students.
13      Q    And the directive to continue not
14 issuing decisions to students came from Jim
15 Manning and Mark Brown?
16           MR. MERRITT:  Objection.  That's a
17 mischaracterization of her testimony.
18           MS. O'GRADY:  Okay.
19 BY MS. O'GRADY:
20      Q    Please correct the mischaracterization.
21      A    You -- you asked me who would carry out
22 that direction.
23      Q    Right.
24      A    But -- but what you said back to me was
25 that -- I think you said they gave the direction.
```

Page 298

1    I don't know who gave the direction.  Certainly it
2    wasn't Mark Brown.  He wasn't there then.
3         Q    But they carried out the direction?
4         A    Correct.
5         Q    Correct.  Okay.
6              And my apologies for the redundancy
7    here.  I just want to go back to the development
8    and use of those form denial letters, and those
9    are the form denial letters A through D that we've
10   been discussing that you reviewed.
11             Who else was involved in their
12   development?
13        A    I think I mentioned this earlier.  So I
14   think -- I'm trying to picture the people around
15   the table.
16        Q    Ms. Jones, I think you did testify to
17   that, and I'm sure it's on the record.  You don't
18   need to repeat yourself there.  I think we have
19   that.  Okay.
20             Just give me one moment.
21        MR. MERRITT:  I just want to make one
22   quick point about to the -- you mentioned keeping
23   this deposition open because of potential
24   documents coming in, just to state for the record,
25   plaintiffs submitted document requests two weeks

Page 299

1    ago on November 6, so the responses to that, you
2    know, aren't due and there would have been no
3    obligation to produce any documents before this
4    deposition.  So, you know, you've had -- you've
5    had seven hours today.
6         BY MS. O'GRADY:
7         Q    I just -- Ms. Jones, I have one last
8    point that I wanted to address.  We've talked a
9    lot today about the policy decisions or lack
10   thereof around borrower defense.
11             In your time at the Department of Ed,
12   have -- would you say there have been policy
13   decisions made regarding borrower defense?
14        A    We finalized the 2019 regulation.  It
15   would be hard to say that's not a policy decision.
16        Q    Besides that.
17        A    Sure.  There have been policy decisions
18   about the new methodology, the 2019 methodology,
19   the development of the -- I mean, the methodology
20   is a methodology.  That's the policy.
21        Q    Okay.  And in terms of granting or
22   denying borrower defense, have there been any --
23   step one, have there been any policy decisions?
24        A    Not to my knowledge.
25        MS. O'GRADY:  Okay.  I think we're

Page 300

1    done.
2         THE VIDEOGRAPHER:  Okay.  Shall we
3    close out the record?  No cross?
4         THE WITNESS:  I think the court
5    reporter wanted me to stay on to give her some
6    spellings.
7         THE VIDEOGRAPHER:  Yeah.  I'll just
8    close out the video record.
9         MR. MERRITT:  Yeah.  No cross.
10        THE VIDEOGRAPHER:  Okay.  We're now
11   going off the record.  The time is 22:41 UTC time.
12   This concludes today's testimony given by
13   Ms. Diane Jones.
14             Thank you, and have a great weekend.
15
16
17
18             (Whereupon, the Remote Videotaped
19   Deposition of DIANE AUER JONES ended at
20   5:41 p.m. EST)
21
22
23
24
25

Page 301

1
2              REPORTER'S CERTIFICATE
3    I, Dana C. Ryan, Certified Shorthand Reporter in
4    and for the State of Maryland, hereby certify that
5    the deponent was by me first duly sworn and the
6    foregoing testimony was reported by me and was
7    thereafter transcribed with computer-aided
8    transcription; that the foregoing is a full,
9    complete, and true record, to the best of my
10   ability, of said proceedings.
11   I further certify that I am not of counsel or
12   attorney for either or any of the parties in the
13   foregoing proceedings and caption named or in any
14   way interested in the outcome of the cause in said
15   caption.
16   The dismantling, unsealing, or unbinding of the
17   original transcript will render the reporter's
18   certificate null and void.
19   In witness whereof, I have hereunto set my hand
20   this day: November 24, 2020.
21        _____  Reading and Signing was requested.
22        _____  Reading and Signing was waived.
23        __X___  Reading and Signing was not requested.
24        _____
25        Dana C. Ryan, RPR, CRR

| Exhibits |
| --- |

**EX 0001 Diane Auer Jon es 112020**  6:10 13:14, 15

**EX 0002 Diane Auer Jon es 112020**  6:11 18:5, 12 29:6 36:5,21 40:4 69:20 93:14 186:9 224:6 244:11 285:1,3

**EX 0003 Diane Auer Jon es 112020**  6:13 48:7,8

**EX 0004 Diane Auer Jon es 112020**  6:16 53:1,2 57:5,6,9

**EX 0005 Diane Auer Jon es 112020**  6:17 57:10, 11 60:4 142:9,11 185:20

**EX 0006 Diane Auer Jon es 112020**  6:18 52:24 60:6,7

**EX 0007 Diane Auer Jon es 112020**  6:19 62:10, 12,13 84:1

**EX 0008 Diane Auer Jon es 112020**  6:20 64:22, 24,25 68:24

**EX 0009 Diane Auer Jon es 112020**  6:21 66:5, 8,9

**EX 0010 Diane Auer Jon es 112020**  6:23 110:16,24 111:16,18

**EX 0011 Diane Auer Jon es 112020**  7:4 111:1 185:22,23

**EX 0012 Diane Auer Jon es 112020**  7:17 186:3, 4 243:13

**EX 0013 Diane Auer Jon es 112020**  7:20 196:10,11 282:14,15

**EX 0014 Diane Auer Jon es 112020**  7:22 216:16 217:8

**EX 0015 Diane Auer Jon es 112020**  7:23 217:7, 9

**EX 0016 Diane Auer Jon es 112020**  8:4 230:3,4

**EX 0017 Diane Auer Jon es 112020**  8:8 233:15, 16

**EX 0018 Diane Auer Jon es 112020**  8:12 249:15,18

**EX 0019 Diane Auer Jon es 112020**  8:18 263:21,23 264:10

**EX 0020 Diane Auer Jon es 112020**  8:21 73:19 74:15 289:25 290:1

| $ |
| --- |

**$300**   149:16

| 0 |
| --- |

**0**   241:20 243:3,9,19 244:5

| 1 |
| --- |

**1**  13:14,15 90:11 91:5 151:6,10 164:25 245:7,9 265:15
**10**  37:13 80:3 102:16 103:11 110:16,24 111:14,16,18 186:20 192:13,15,16 209:2 215:19 281:2 285:3
**100**  26:24 61:11,25 62:3,6
**103**  153:20,21
**108-08**  206:21 275:5
**10:42**  69:14
**10:56**  69:15
**11**  111:1,14 185:22,23 188:7 275:8
**11,000**  170:16
**116**  196:2,7 282:16
**11:28**  91:21
**11:30**  12:16 91:23
**12**  186:3,4 243:13
**129-1**  216:14
**12:15**  122:4,19

**12:49**  122:20
**13**  196:10,11 282:15
**14**  216:16 217:8 275:4
**145**  263:22 264:9
**145-2**  265:14
**146**  290:5
**14:15**  9:12
**15**  40:4 69:21 71:1,4 76:6 77:5 93:18 94:25 95:21,25 217:7,9
**158,000**  114:15
**15:42**  69:13
**15:56**  69:17
**16**  230:3,4 290:18,22
**160,000**  114:14,16 116:6,7 117:22 158:18,20
**17**  93:20 233:15,16
**17:14**  122:17
**17:49**  122:22
**18**  96:3 249:15,17,18
**18-month**  136:4 231:13 256:16,25 257:1 292:19 294:21
**18:08**  136:11
**18:13**  136:15
**19**  263:21,23 264:10
**1994-1995**  44:10
**1995**  46:25 54:25 92:17 110:10 163:6 261:13
**1998**  108:4
**1999**  262:11
**19:24**  185:13
**19:43**  185:17
**1:08**  136:12
**1:13**  136:13
**1st**  151:3 203:10 208:20 209:16 212:4 262:11

| 2 |
| --- |

**2**  18:5,12 19:14 29:6 36:5,21 40:4 69:20 93:14 186:9 197:25 198:25 200:20 204:8 224:6 243:14 244:11 285:1,3

**20**   73:19 74:15 289:25
  290:1
**20-**   128:10
**2010**   33:9
**2014**   255:22
**2015**   33:7,8,9 35:24
  169:7
**2016**   34:14 37:14,19
  38:7 43:8 44:12,16,
  19 46:9,12 47:5
  50:16,20,24 55:2
  57:25 78:24 86:11
  92:10,11,24 93:2,6,
  10 110:10 147:15
  148:2,6 152:13,22
  160:24 161:19,23
  162:7 166:9 191:24
  209:16 242:1,3,11
  245:20 247:14,21,24,
  25 248:13 249:1,6
  253:1,5,8,10 254:1,
  5,10,16,22 255:3,8,
  17,19 259:5,6 261:10
**2017**   33:2 40:6,14
  50:17,20 60:15 63:8
  67:10 71:6 79:21
  84:5 90:11 91:5
  95:18 96:1 117:17
  123:8,9 124:12
  203:10 208:20 212:4
  222:25 223:2,23
  253:25 254:2 262:10
  273:4
**2018**   32:19,21 33:3
  36:23 173:20 175:19
  176:9 178:2
**2019**   16:22 23:24
  24:7,10,16 29:24
  36:23 37:9 78:12
  81:18,22 82:2 86:12
  92:10,11 98:4,6
  104:1 107:6 110:8,12
  118:7 120:9 123:7
  128:11,12 130:11
  131:23 132:14 133:10
  135:11 137:6 138:11,
  19,20 142:9,18
  147:21 148:6 150:22
  154:13,15 156:13
  157:9 162:14,25
  165:24 166:21 173:6
  185:21 221:19 223:1,
  24 224:2 233:21

234:8,17,20 236:5,
  11,15 244:24 245:5
  246:21 247:2,4,14,15
  249:7 252:21,24
  253:8,10,14 254:3,8,
  10,14,20 255:23
  259:2,5,6 261:6
  299:14,18
**2020**   9:12 151:3,7,10
  164:25 207:19 245:7,
  9 250:5 254:2
**20:46**   228:24
**20:56**   229:3
**20th**   9:12 228:6
**225,000**   237:1
**226**   160:14,15,21
**22:01**   274:8
**22:09**   274:12
**22:41**   300:11
**23**   283:1
**24**   75:8,16 76:9 217:4
  244:12,13
**24th**   57:25
**25**   103:12
**26**   186:10,21 188:6
  194:19 201:16 285:4
**27**   76:13 217:13
**27,700**   170:8,23
**27th**   250:5
**280,000**   169:6
**2:24**   185:14
**2:43**   185:15
**2nd**   262:10

---

**3**

**3**   48:7,8 55:5 150:14
  197:23
**31st**   50:17 173:4
**38,000**   30:4 169:17
**38,700**   169:11
**3:46**   228:25
**3:50**   228:22
**3:51**   228:22
**3:56**   229:1

---

**4**

**4**   29:5,7 53:1,2 55:5
  57:5,6,9 209:14

**49**   113:19
**4th**   63:8 84:5

---

**5**

**5**   37:12 57:10,11 60:4
  142:9,11 185:20
  236:18 239:9 241:4
**50**   114:18
**50-state**   90:14
**500**   49:14
**56-3**   18:8 142:8
  185:20
**56-4**   73:16 74:9,15
**57,000**   169:7,9
**5:01**   274:9
**5:09**   274:10
**5:41**   300:20

---

**6**

**6**   40:5 52:24 60:6,7
  69:22 70:25 93:18
  171:10 299:1
**63-3**   57:6
**66**   73:25
**66-2**   52:15,18
**6th**   233:20

---

**7**

**7**   36:5,8 62:10,12,13
  84:1 93:19 197:10,11
**7th**   207:19

---

**8**

**8**   64:22,24,25 68:24
**84**   144:8
**85**   144:5,12,22
**8th**   263:3,9

---

**9**

**9**   66:5,8,9 75:9 111:4
  207:14,17 208:17
**90**   9:17 163:11,13
**94-95**   44:18 46:2,6,12

**95**  86:11 92:9,14,20
93:5,9,12 163:9
191:24 193:10 262:14
**98**  148:8,9,12
**9th**  60:15 273:3

---

**A**

**a.m.**  69:14,15
**A09**  167:11 243:14
**A09-borrower**  186:2
**ability**  11:18 105:3
108:13 172:22 182:18
**absolutely**  34:16
125:8 138:5 262:2
**abundance**  267:15
**accepted**  58:20,22
**accepting**  59:14
**access**  99:5 172:7,13
173:17 259:19
270:18,21,23 271:3
**accessible**  224:12
**accordance**  75:23
103:23 104:16 244:18
**account**  233:10 259:6
**accountable**  108:5
**accreditor**  252:11
**accurate**  54:11,13
198:6 224:11 240:25
250:16
**accurately**  165:12
**acknowledge**  9:25 10:4
153:25 154:2
**Act**  20:15 94:1,12
117:11 132:25 133:4
137:24 138:25
140:18,24 180:13
**acting**  26:21 31:20
32:4,7 65:10
**action**  9:18 63:9
144:9 203:15 212:6
**actions**  47:8
**actors**  148:22 149:15
**acts**  148:23 203:13
**actual**  21:25 63:23
134:22
**Adair**  28:7,8
**add**  36:10 130:23
221:14 251:15,25
255:17

**added**  129:9,10,13
130:5 199:9
**adding**  253:12 254:4
255:18
**addition**  160:24
192:11 199:3
**additional**  58:25
139:22 188:19
251:14,19 253:4,12
260:22 274:22
**address**  209:15 224:9
278:25 279:3 289:16
299:8
**addressed**  171:17
240:12
**adequate**  41:14,17
71:10
**adjudicate**  103:18
145:25 154:6 162:1
195:20 211:20 219:24
244:21 267:1 271:23
**adjudicated**  44:18
47:3 48:3 51:23,25
52:4 92:14 93:4
101:10 102:13 129:1
147:4,17 152:10
169:8,11 170:4,17
176:17 190:24 191:23
192:3,4 195:16 204:5
208:3 215:15 242:22
253:21 261:19
**adjudicating**  46:5
50:23 71:8 106:24
114:21 139:24 140:4
177:16 245:8 248:1
262:6
**adjudication**  52:6
62:1 101:16,18,20,23
102:3,7 106:9 129:1
145:9 152:15,20,22
153:2,3,16 162:6
169:14 204:15 211:4
241:24 271:11
**adjudications**  48:5
52:9 101:14 132:4
191:3,4 192:8 203:20
**adjustment**  194:15
**administered**  10:5
**administration**  29:11
41:19,23 42:5,16
43:18 46:5 47:21
56:1,2,4,5 58:14,15,

16,17,19,21 59:10,13
60:24 61:5,17 93:25
94:10 98:22 133:3
143:11 172:6,14
230:1 271:18,19
272:3,11,22 291:5
**administration's**
61:21 271:25
**administrative**  103:17
**adopted**  46:7
**Adult**  20:13
**advance**  74:22 142:13
**advice**  33:24 34:18
**advise**  271:8
**advised**  42:4 80:24
**advises**  80:21 81:3
**advisor**  28:4 31:25
32:2,10,23 39:16
40:8 239:12
**advisors**  27:11
**advocacy**  154:8
**AFF**  206:22
**affairs**  33:14,16,19
**affect**  218:3,4 219:6,
13 220:23
**affected**  182:18
**affects**  221:5 231:17
247:4
**affidavit**  207:7
216:24 217:8 275:5
**affiliated**  276:24
**afforded**  62:6 146:19
244:25
**AG**  47:19,20 51:15
**agencies**  143:13
149:12
**agency**  45:14 234:2
295:22
**agree**  136:7 157:25
163:15,16 165:6
210:2 214:7 275:12
**agreeing**  10:16,19
**agreement**  9:6 10:10,
13 172:5,19 213:25
**agrees**  157:14
**ahead**  34:6 46:22 87:1
112:9 133:25 163:24
214:21 217:3 222:24
**aid**  20:17,19 36:22
37:7 39:20 97:10
105:9 114:21 134:11

187:9 188:12 239:15
241:14
**alerted** 92:17
**aligns** 22:2
**allegation** 58:22
200:14 201:8 205:1,
8,24 209:3,6 268:4
274:24 281:2,5
287:18,21
**allegations** 148:24
200:7,10 209:1
250:14,20 275:19
280:25
**allege** 145:20 209:4
281:3
**alleged** 163:20 165:16
237:3
**alleges** 208:14 211:23
**alleging** 54:18 58:8
60:18 164:18
**allowed** 143:13
**alphabetical** 13:9
14:3 74:16
**alphabetized** 14:20
**alternative** 96:10,15,
19,24 97:25 98:11,19
172:25
**ambiguous** 95:13
**amount** 59:24 61:10
64:18 71:13 72:5,11,
23 76:3,7 77:6 96:10
99:8 131:4 246:22
252:6
**analysis** 230:10 233:1
**analyzes** 121:20
**and/or** 9:7
**announced** 23:23
**announcement** 38:6
**annual** 26:9
**answering** 166:14
**answers** 213:2
**anticipates** 247:25
**anybody's** 33:25
**anymore** 172:15
**anyone's** 27:16
133:14,16,18 135:15
**Apollo** 265:20
**apologies** 75:3 239:12
241:4 298:6
**apologize** 75:6 184:12
217:14

**app** 259:21
**apparently** 48:25 54:4
**appealed** 96:5
**Appeals** 161:25
**appears** 52:19 57:18,
20 60:14 144:23
168:9,16 207:11
214:3,4
**Appel** 97:8,18 238:5
**appellate** 96:7
**applicable** 75:24
103:23 104:16 118:15
199:7 203:8,15
208:18,21 212:7,8
213:11 244:18
**applicant** 141:20
256:1
**application** 55:24
75:18 77:23 78:2
81:13,15 84:23
91:14,18 92:18 96:2
103:7,9 105:13 106:6
115:18 118:4 125:3
145:5 146:16,23
147:1 149:18 151:17
155:18 183:19 207:20
209:13,18 211:16,22
214:17,19 215:20,23
217:16 233:5 241:19
245:14,22 253:25
262:22 263:14 268:14
274:20 275:22 277:25
279:8,23 280:9,12
281:17
**applications** 44:2
48:1 50:4 79:17,19
80:23 102:25 103:2
106:25 124:23 136:3
150:2,15 156:20
169:6 170:9,17,22
171:3,13 220:8
225:25 231:12,24
233:7 237:1 246:3
256:15 257:7 259:10
265:21 266:16
268:11,19 271:12
287:14 292:18 294:2,
13,14,17,20,22
295:19
**applied** 92:25 93:4,11
94:17 95:16 101:3
102:16 107:13 118:9
124:13 139:21 141:14

142:1 177:22 203:19
212:1,11,13 215:2
216:8 262:22 281:23
**applies** 79:25 109:18,
25 151:4 212:18,19
214:6,10 245:6
253:17
**apply** 42:11 79:19
120:22 123:5 128:15
133:1 141:22 151:7
156:25 172:22 175:11
208:8 212:9 215:8
223:6,14 263:16,18
**applying** 95:16 119:4
141:2 180:12 205:4
255:22,23
**appoint** 162:15
**apprenticeship** 33:6
**approach** 96:10,16,19
97:25 98:12 164:15
**approval** 23:22 65:13,
15 134:5 241:22
243:5,7 244:8
**approvals** 171:14
173:21,25 174:7
175:21,23,25 178:2,
16 183:9,21,22,23
184:20 185:1
**approve** 99:4 175:4
**approved** 96:12 101:3,
8 128:5,13 130:15
170:9,22 171:3
172:23 173:9 177:17
200:3 243:15,16,18,
25 267:6,10 268:1,6
**approves** 39:13
**approving** 174:2
**approximate** 88:14
**approximately** 16:11
32:14
**April** 98:4 133:10
**area** 287:1
**areas** 19:25 195:13
**argue** 256:22
**argued** 139:7
**arguments** 145:5
**arises** 189:25
**arm's** 11:24
**arose** 276:12
**arrival** 41:2

arrows  148:14
art  102:7
article  230:1,8
  233:13,20,21 234:13
  235:18 236:19 239:10
  240:7 241:17 250:25
articles  236:1
assert  148:18 198:2
  199:2
asserted  43:19
assess  262:7
assessed  261:1 262:20
assessing  42:9
assessment  153:6
assigned  108:10
  280:16
assist  18:21
assistant  20:7 26:21,
  22,25 27:1 28:6,8
  32:5,7
assistants  27:11
assume  77:2 295:24
assumed  296:1
assuming  14:11 114:15
  117:3
attached  13:16 18:13
  48:9 53:3 57:12 60:8
  62:14 65:1 66:10
  111:19 185:24 186:5
  196:12 198:1 216:17
  217:10 230:5 233:17
  249:19 263:24 264:19
  290:2
attachment  65:24
  130:2 282:18
attachments  196:21
attempt  190:3
attempting  148:22
attend  116:7,21
attended  47:16 71:15
  72:12 95:1 139:10
  150:15 190:6 194:1
  199:22 200:22 218:12
  219:22 240:22 267:14
  295:20
attestations  50:4
attorney  11:4 53:15
  68:13 70:5 77:18
  80:14,25 82:8 101:21
  105:2,6 108:22
  119:21 147:7 180:17

204:12,23 205:3
  283:5
attorney-client  9:7
attorney-driven  106:9
attorneys  9:24 15:22
  56:9,13,17 57:1
  67:18 68:17 78:5
  80:7,20 81:5 82:14,
  15,22 85:15 112:12
  129:2 162:5 181:5
  216:4 242:6 269:21,
  24 270:1 282:2
  293:23
audio  121:22
Auer  10:23 13:11
  239:11 300:19
August  172:1,16
  173:3,4 177:7,14
authority  82:10 84:21
  85:6,10,21 86:2
  107:22,23 126:19
  127:1,5,8,11,13,17,
  20 183:1,3
authorize  23:25
authorized  25:12 66:2
  167:7 171:7 231:21
  232:5 257:3,24
automatically  14:20
avoid  163:21 165:17
awaiting  100:15 101:1
  170:13,22 246:17
awarded  141:21
aware  9:3 26:7 51:13,
  22,24 52:3 61:12
  85:24 86:2 137:19,22
  139:6,11 148:21
  154:7 159:12 230:10
  234:24 280:15

---

**B**

back  16:20 35:24 36:4
  44:25 47:11 59:11
  60:2 68:23 69:16,23
  73:15,23,25 74:2
  75:7 84:1,15 93:9,14
  98:4 107:14 114:11
  116:12 118:3 122:21
  133:11 134:1,3,15
  136:14 141:22,23,25
  147:24 162:7 163:8
  184:13 185:17 186:8

191:14,15 194:7
  205:14 209:12 214:25
  220:11 222:16 224:5
  228:22 229:3 233:8
  244:10 263:8 274:12
  285:1,2 286:11
  289:16 297:24 298:7
background  273:14
backlog  134:21 135:1,
  4 137:12,15,18,20
  138:2,4,6,12,19
  158:16,17,20 159:5
bad  148:23 149:14
Baltimore  36:13
  219:16
bar  160:18
base  80:2
based  47:19,20 49:25
  51:2 54:9 68:17
  78:22 80:16 107:15
  154:15 156:9,14
  159:12 198:10 201:2
  208:7 211:1,11,14
  214:1 215:22 218:15
  221:23 225:25 231:24
  237:2 241:24 243:1
  253:19,20 270:13
  275:9 277:3 282:4
  288:25 289:8
bases  65:12
basically  276:16
  286:2
basis  56:3 79:11
  126:7 150:17,18,21
  154:19,24 155:6
  157:5 189:15 215:6,7
  220:25 269:21 272:25
  281:7,9
BD  67:19 68:14,16
  80:14 106:5 109:18,
  24 151:8 159:11,16
  171:12 176:14 216:4
  238:19 242:6,11
  260:9 268:16 269:21
  270:1 271:21,22,25
  279:13 294:25
BDU  50:9
bear  263:19
bearing  194:3
began  30:20 31:17
  34:15 36:24 37:1
  52:6 132:16 183:10

246:10 257:19
**begin**  98:1 115:1
  184:18 224:19 249:11
**beginning**  29:7 49:17
  50:25 114:7 144:15
  160:23 164:6
**begins**  49:21 148:12
  186:21 188:7 209:14
  217:4,14
**behalf**  9:16,21 10:16,
  19 18:1 161:1 245:17
**belief**  154:24 156:15,
  16 157:4 244:25
**believed**  165:2 251:13
  284:13
**believes**  240:17
**beneath**  27:7
**benefiting**  149:23
**BERMAN**  13:21 14:14
  181:13,18
**Betsy**  235:19
**bill**  147:25
**bit**  103:14 107:18
  114:24 125:18 257:25
**biweekly**  129:21,22
**bizarre**  144:21
**Black**  27:5 28:11
**blah**  192:3,4
**blank**  191:22 286:2
**blip**  286:18
**body**  108:9 295:22
**bonus**  108:2 133:14,16
**bonuses**  107:24
**borrower**  23:2,5
  29:12,20,24 32:1
  33:21 34:11 37:3
  40:1 41:15 42:6,10
  45:13 47:25 50:2,4,
  10,15 54:5,17,21
  55:11,22,24 56:8,17,
  24 58:1 60:16 63:9
  65:13 66:16 67:2
  71:8,11,14 72:12
  75:18,20,21,22 76:1,
  3 77:23 78:2,5 80:12
  81:16 82:11 84:6,22
  91:13 92:18 96:13
  100:14,15 102:5,10,
  24 103:2,22 104:15
  105:11 106:22,25
  107:10 109:14,25

113:4,9,17,25 114:22
115:9 117:15 118:15
124:13,14,23 125:3
127:14,19 134:14
135:13 136:2 137:5
138:21 141:16 142:2,
4,18 145:19,25
146:1,6,10,11,15,23,
25 147:10 148:5,19
149:17,18 150:1
151:5,16,24 152:8,9
155:19 156:19 159:23
162:5 163:16 164:17
165:7,10 167:11
169:6,21 170:5 180:4
182:9,19,24 187:7,
12,24 188:10,17
189:12 190:5 191:23
194:1,5,10,12,13
195:4,7,9,14,15,19,
22 198:9 203:11
206:4,5,8,11 207:18,
20 208:9 209:11,15
212:4,12,16 215:21
216:8 217:16 218:8
225:25 226:3 231:6,
12,16,17,24 232:12,
18,21 233:5,6
240:18,20 242:2
243:5,8 244:16
245:7,14,22 246:3,4
250:6 252:19 253:17,
20,24 255:22 256:15
259:10 260:17 261:18
263:16,17 265:1
266:17,19,20,23
267:13,24,25 268:7,
13 271:12 272:24
274:18 275:21,24
277:2 278:9,20,24
279:8,9,17,18,22
280:3,11,14,24
281:9,12,14 285:16,
20 292:18 294:2,12,
14,16,19 299:10,13,
22
**borrower's**  75:18 79:7
  106:6 203:13 209:13
  241:18 259:16
  267:10,16 268:4,6
  281:16
**borrowers**  40:22,25
  41:4,9,25 42:2,10,
  17,22 47:16 48:1

54:9,18 58:8 59:5,12
60:18 61:10 62:5
77:7,10,12 80:2,6,17
91:7 94:17,19,21,23
95:2,6 96:12 99:3
103:21 104:15 109:9
116:7 117:22 120:12,
21 125:15,20,22
129:11 139:22,25
141:5 142:2,3
144:16,24 145:3,11
149:13,15,21 150:1
151:15 152:11 161:2,
9 162:5 163:25
164:10 165:1 170:20,
24 173:15 174:1,4,24
175:3 177:12,25
178:20,24 179:18
183:17 186:16,25
189:14 190:23 191:6,
13 192:12,13,16
198:2,15 199:2,21
200:22 201:17
202:20,22 204:5
205:15,23 206:14,15
215:2,6,25 232:20
233:6 234:2 237:2
240:21 251:21 254:25
255:4 259:19 260:6
261:16,22 262:14,25
266:21,24 267:3
279:18 280:15 285:6
287:10 297:10
**borrowing**  85:22
**bottom**  49:15 75:9
  93:18 113:22 144:8
  148:11 160:13,14,22,
  23 163:13 168:24
  183:14 186:13,20
  197:25 198:24 200:20
  236:23 265:15 285:3
**BP**  35:11
**bracketed**  282:3,7
**brackets**  283:14
**breach**  81:21 82:4
  107:3 253:9 254:21,
  23
**break**  12:16,17 64:19
  69:7 122:5 123:1
  126:25 181:11 185:7,
  11 228:19 267:12
  274:5

breaking  122:9
breaks  12:15,20
Brickman  28:4,14,18
  31:9 97:8 238:4
briefed  76:13,17
briefly  54:2
brings  122:2
broad  9:17 34:2 56:7
  219:2
broader  19:19 84:19
  288:22
broadly  118:9
Brogan  32:6,13,15
Brooks  217:22 219:4,
  22
brought  30:25 31:11
  81:24 97:16
Brown  15:9 16:16
  27:13 98:13 104:10
  127:24 128:3 129:14,
  16 228:15 239:14
  264:19 297:5,15
  298:2
Brown's  27:18 231:22
bucketed  143:22
budget  21:18 22:10
  30:10 39:2,4,5,6,7,
  8,9,10,12,13,16
  143:8
budgets  38:11
bulk  114:25
bulky  216:22
bullet  144:11,15,23
  169:7,11 170:8
  171:14,22 173:11
  176:8 183:15 290:24
bulleting  223:19
burdensome  161:7,11
  162:2 163:1
business  50:3 143:11
  187:10

C

cafeteria  159:20
calculating  71:9
calendar  91:24
California  47:19,20
  51:15 52:5,8 67:9
  72:9 90:19,20,24
  96:21 98:16 115:10

117:10 132:24 137:22
138:8,23 139:2,3
140:1 172:11 173:16
177:8,24 192:3
204:6,7 239:7 297:10
call  15:23 128:10
  147:20 199:1 250:17
  276:23 289:15
called  20:12 39:23
  74:5,6,14 78:18
  226:22 250:20 280:18
calling  65:19 86:22
  112:19 113:12 126:4,
  6 138:14 146:22
  149:15 176:2 229:22
  278:11 283:19 293:16
calls  222:22 273:11
Calvillo  94:4 116:18
  117:13 118:19 120:3
  124:1,2,11,24 180:7,
  11,21 182:8,18
  183:11,18 222:20
  223:15 295:10
campus  106:21
campuses  47:23 51:3,
  19 52:5,8 61:4 90:8
cancellation  231:23
capability  272:19
capacity  272:18
Capitol  22:19
care  259:14,15 260:3,
  5,15
career  20:12 30:6
  33:10 36:19 143:5,22
  218:1 252:4 269:25
careful  239:4
carried  298:3
carry  233:25 234:19
  235:20 236:6 297:21
carrying  296:17,19
  297:11
carve-out  103:11
case  13:8 17:3 20:18
  24:1,19 79:21 84:23
  85:19 90:18 110:1
  125:14 127:24
  139:12,14,20 141:20
  147:12 150:8 157:8,
  10 180:8,18 194:25
  196:24 207:8 208:14
  210:25 245:25 289:3,
  7 290:15 293:24

295:1,3,5,6,15
cases  17:19 21:17
  22:9,17,20 24:3
  134:24
categories  49:24
  51:7,8 170:24 265:21
  267:4,5 268:11
category  189:25
  267:20 268:14
caused  136:3 138:3
  156:18 231:12 256:15
  292:18
CCI  47:16 51:22,25
  116:11,14,21 117:23
  123:3,12,14 171:24
  172:9 183:20 198:10
  222:21
CEC  33:20 34:10,12,
  15,18 35:6,10,13,23
  218:21 219:9,13
  220:4,9,15 221:19,22
  225:2,3,5,8 227:9,25
  265:5
CEHE  35:18
census  190:3
center  18:1 139:20
certified  63:4
cetera  129:3 208:20
  212:5
chain  227:18
challenge  194:22
challenged  115:10
challenges  49:6
  224:10
challenging  59:18,20,
  21
chance  247:16 266:6
change  162:14 188:18
  251:4 258:19
changed  26:13
changing  59:19
channel  267:1
characteristics  49:25
characterization
  84:25
characterize  68:8
  80:4 269:16
charge  68:18 80:8,9,
  14 149:17 157:13,19
charging  149:21 150:1

Charlie   10:15 15:23
  46:21 69:1 121:8
  185:11
Charlie's   34:23
chart   243:12,15
chat   111:15
cheated   234:3
check   188:24 203:5
  240:23
chief   21:2 22:18 26:1
  27:13,19 33:19
  107:25
chilling   174:3,23
  175:4
choice   175:22
chose   271:25
CIP   68:5 241:15
  276:19,20,22,25
Circuit   139:8
circulated   137:4
circulating   236:12
circumstance   85:25
  86:1,2 178:14
circumstances   11:9
  86:4 211:13
claim   50:4,10 65:20
  75:21 79:7,11 102:12
  118:15 138:11 141:16
  142:2,4 147:10,17
  149:22 151:15 152:10
  159:23 162:15
  169:18,24 175:5,9,10
  189:12 195:16,19,21
  198:4 208:3 211:17
  216:9 232:25 241:22
  242:22,24 243:5,8
  248:1 249:2 253:21
  261:1 267:2,5,10,17
  268:4,6 269:3
  274:19,23,25 281:7
claimants   71:15 72:12
  77:10
claiming   69:3,4
claims   40:23 41:6,8,
  16,21 42:6,8 44:18
  46:6 48:3 49:3,24,25
  50:24 51:7,8,19,22,
  25 52:3,7 56:12
  58:9,13 59:3 62:4,5
  65:14 66:17 67:2
  71:8,11 79:13 80:15
  86:14 87:13,16 90:1

92:14 96:13 100:10,
  14,15,19,20,25
  101:5,9 103:18,25
  113:24 114:1,3,22
  115:7,14,17 116:5,15
  117:15 125:19
  128:23,24 129:1,2
  132:2,8 134:14,20
  137:15,20 138:4,6
  140:4 148:19 149:14
  150:4 151:4,8,10,19,
  20 154:3,6,25 155:15
  156:15 157:1,4,15
  158:2,16,18,20,24
  159:1,3,12,13,16,18,
  21,25 160:1,4 161:1
  162:2,12 169:17
  171:15,24 172:9
  173:12,18 174:2
  175:4,17 176:15,17
  177:16 186:16 187:1
  198:3,9,16 199:3
  201:17 211:20 215:22
  231:7,8,16,17 232:21
  239:3 244:21 245:1,
  8,13 246:6 252:20
  254:9,13,15,16,19
  260:9 261:25 262:6
  265:1,2 271:23 285:6
  287:12
clarification   70:1
  130:23
clarify   74:12 83:6
  99:7 107:17 119:10
  167:4 213:5 262:16
clarifying   73:21
  92:22 119:13
clarity   46:16 98:15
class   94:17,18 192:14
classes   161:1 252:7
classification   76:5
  241:14 276:18
clear   31:23 36:16
  70:5,9 86:7 105:10
  119:15 125:10,17
  138:2,4,6,19 171:4
  184:14 197:18 199:5
  235:15 248:18 262:3
  263:13 266:20
clearance   30:12
  143:12 271:2
cleared   91:25

clearing   137:12,14,18
climbing   49:1
clock   191:8
close   258:1 300:3,8
closed   42:2,4 159:20
  169:8 245:15
closest   291:17,22,23
  292:20 295:6
closure   114:23
code   241:15 276:19,
  20,25
codes   68:5 276:22
colleagues   293:3
collected   43:15 45:13
collection   29:13
collectively   143:15
Colleen   15:10 16:17
  56:24 78:6 80:13,19,
  21 82:13 83:10 84:21
  85:9,20 86:17 87:11
  89:2 99:14,24 104:12
  115:16 119:1,8 128:1
  145:15 171:4,6
  176:19 188:24 202:25
  203:2 205:19 206:18
  238:18 244:22
  291:23,25 294:19
  295:24 296:2
Colleen's   85:20
  119:18 121:25 206:6
  292:3
college   36:12 111:8
  164:9,14,22,24
  219:16 224:21,25
  280:18
college's   240:19
colleges   27:6 28:12
  40:25 43:15 71:16
  118:6 219:19 234:4
colleges'   237:3
column   265:7,19,21,
  23,25 266:1 268:10,
  13,19
combinations   191:11
comment   24:22 143:13
  155:6 264:4,6
commenters   148:17
  149:10
commenters'   148:20
comments   30:4,8 78:22
  143:21 144:1 149:9

commit 164:11
committed 76:14
committee 112:3
  249:10,12 250:4
common 50:1 199:23
  200:23 202:21,22,24
  205:15,17,21 206:16
  216:1 265:22 268:12,
  20
communicate 11:19
  190:5 194:11,13
communicated 42:21
  43:3 95:4 121:1,14
  132:9 260:7
communication 12:13
  47:18
communications 28:25
  41:25
Community 36:12
  219:16
company 33:12 106:20
  113:12
comparator 241:10,11
complaints 159:22
complete 120:3,4
  163:19 165:15 189:20
  190:3 199:18 226:18
completed 62:5 86:25
  101:13 140:4 191:15
  252:6
completing 37:3,7
  38:23
complexity 190:20
  191:11 192:1 195:3,
  13
complicated 38:3,4
  44:8 135:8 172:4,18
  191:5,10,17 192:9
  193:5 225:17
complications 191:20
comports 198:10,20
computer 12:9 257:15,
  19
conceivable 166:16
concern 98:17 125:22
  138:12 174:3,25
  231:7
concerned 98:14
  126:14 164:18

concerns 94:11 126:1
  132:25 148:20 224:13
concluded 71:9
concludes 300:12
conclusion 41:14
  230:25 272:15,18
  293:16
conducted 40:14,17
  47:20 71:6 95:22
conducts 119:19
confidence 189:16
confidential 27:11
  28:6,8
confirm 11:17 53:23
confirmed 27:1 32:8,
  13,16
confusing 173:3
confusingly 206:21
Congress 108:3,8,9
  124:11 223:11
Congressional 158:18
  160:7
Congresswoman 113:17,
  22
connected 47:2
connection 67:25
  150:3,7,10 151:14
  260:15
Connor 216:15
consent 10:9
considerable 37:21
consideration 75:17
  233:9
considerations 155:10
  295:16
considered 55:23,25
  93:12 107:4 134:10
  153:1 166:23 205:16
  232:17 246:24 284:11
consistent 103:20
  165:3 259:2
consistently 70:12
  79:9
consolidate 191:6
consolidated 44:14
  151:6
consolidation 151:9
constitute 47:8
  251:23 252:23,25
  255:1

constitutes 109:22
construct 165:12
constructed 163:17
  165:8,20,23,25
  166:8,16,17,23
constructing 165:14
consumer 90:1 164:8
contained 167:21
content 15:19 35:8
  84:11 192:10 237:17
context 53:11,25
  63:12 64:3,8 128:17
  149:4 160:3 161:17
  168:17,21 242:15,17
continue 90:24 92:3
  115:11 297:13
continued 44:11
  103:18 116:24 117:3
continuing 98:22
  99:12 115:16,23
  116:3 125:9 188:6
  239:3
contract 81:22 82:5
  107:3 187:10 188:11
  251:1,4,5 253:9
  254:21,23 258:18
contracting 107:23
  190:10
contractor 187:17,22
contractors 188:15
control 108:7
controls 121:21
convened 98:2
conversation 77:17,
  20,22 78:16 79:15,23
  81:12 83:8,14,17
  87:21,23 88:8,12
  97:17 100:1,3,7
conversations 9:5,7
  15:11,12,14,16,19
  16:7 23:11 24:4
  39:11 78:14 81:18,
  21,23 82:3 83:8
  97:14 99:23 132:20
  229:14,19 284:13
converse 268:5
convo 122:14
COO 107:25
coordinated 154:9
copy 54:11,13

**Corinthian** 40:24,25
41:4,9 42:10 43:15
45:2 60:18 65:14
71:16 72:13,14 77:7,
12 79:21 90:18,19
95:2,5,24 96:11
102:16 103:11 118:6
139:9,10,15,19,25
140:4 141:3 173:15,
18 177:11,25 192:11,
16 198:2 199:2 204:4
221:24 222:5,10,21
224:4 225:21,22
226:3,25 245:13,15
246:1

**Corporation** 33:10
36:19 218:1

**correct** 32:20 36:2,3
40:3 61:19 81:10
85:2 91:19 99:9,10,
20 103:10 104:19
114:1 117:21 124:15
128:13 129:7 137:6,7
142:6,16 170:14
171:20 175:12,13
178:22 182:5,14
193:11 209:9 215:16
218:9 220:10 222:21
238:24 239:16 244:20
245:23,24 248:8
253:16 261:15 281:25
283:6 296:1 297:20
298:4,5

**correctly** 167:5
230:16 239:13

**cost** 161:16 230:19,
20,22 231:8

**Council** 143:9

**counsel** 10:9 11:1
14:11 18:25 21:15
22:9 31:9,13 41:12
53:20 65:10,11 86:18
97:13 112:13 143:7
146:3 237:12 238:10
240:9 249:14 271:5
291:9,11 293:22

**count** 51:17 91:21
110:23 114:14

**country** 90:9 240:22

**County** 36:13 219:16

**couple** 13:10 17:12
127:7 171:23 181:25
193:14 222:16 263:10

**court** 9:20,24 10:20
25:11 37:13 44:12
93:21 94:3,6,11
96:7,21 99:2 110:15,
18,20 111:4,10
136:16,18,22 141:7,
12 158:10 167:7
172:11 173:16 177:8,
13,24 180:19 197:23
198:25 216:24 221:2
223:15,18 231:21
239:7 257:3,23
290:12,15 294:7
297:10 300:4

**court's** 96:6 121:5
156:6,9 247:8 294:10

**courts** 115:11

**cover** 189:23

**covered** 50:15 165:1
253:5 255:2

**Covid** 88:11,17 200:2

**COVID-19** 199:6

**crafted** 246:22

**create** 38:10 163:18
188:17

**created** 55:2 108:3
165:19

**creates** 121:19 187:14

**creating** 107:6 166:23

**credentials** 252:14

**credit** 58:9 65:16

**criteria** 198:4

**cross** 300:3,9

**crossing** 105:20

**cumbersome** 26:16

**current** 25:19 38:15
56:5 99:3 124:5
151:4 260:12

**cursor** 63:19 111:24

**cus-** 251:11

**custom** 251:7

**customer** 251:7,8
259:14,15 260:3,4,15

**cut-off** 253:25 254:2

---

**D**

---

**damages** 147:19

**damaging** 154:5 158:4

**Dan** 9:15

**Dana** 9:21 110:15

**Daniel** 206:22 207:18
217:7 275:5

**darker** 264:12

**data** 94:9,12 98:24
99:2,6 121:19,20,22,
24 122:2 130:4,6,7
133:4 164:9,25 165:3
172:7,14 173:18
215:23,24 221:21,23
222:1,4 223:21
224:1,3,12,16,22,24
225:2,3,4,7,17,19
226:11,17,19 227:3,
13,19,24 228:5,11
239:3 258:24,25
265:13,14 270:18,19,
21 271:3

**date** 16:21 35:22
50:25 57:23,25 87:17
130:10 253:25 254:2
255:6,9 262:8 284:11

**dated** 207:19

**dates** 43:24 262:13
273:2

**David** 15:25

**day** 140:3 218:21

**day-to-day** 28:18 30:1
108:20

**days** 263:10

**de** 201:4

**deal** 33:21,22

**dealing** 79:17 192:21

**debt** 231:23 237:2

**deceased** 97:9

**December** 23:24 24:10
120:9 130:11 131:23
134:4 137:6 138:11,
20 221:19 233:20
234:8,17,20 236:11,
14

**decide** 77:22 170:1
176:1,22 191:21
269:21

**decided** 43:3 58:15
90:18 123:4 184:18
195:8 275:20,21
279:7,22 280:11

**decides** 172:12

**deciding** 55:24 81:12,
14 184:19 192:9

decision  22:16,21
  23:20,21 24:4,5,8,24
  25:1 43:16 55:18,21
  56:3 59:17 61:15,16,
  21 63:24 64:1,2,4,9,
  14 68:21 85:9,12,14
  89:2 96:6,7 101:19
  102:7,16 105:13
  107:11 121:16
  123:17,19,21,23
  124:5,7 125:8 126:10
  131:1 132:23 134:9
  139:4,5 140:8 147:18
  150:3 151:24 153:15
  155:7 173:16,20,23
  174:5,8,11,14,15,16,
  19 175:18 176:4,24
  178:1,4,15,19,25
  179:1,17 181:2
  182:22 183:8 184:9,
  23,25 185:3,5 187:7
  189:11,15 192:12
  195:10,11,17 211:11,
  14 215:7,10 219:8
  221:5,6,8 223:9,16
  226:2 231:17 239:6
  248:2,21 269:6,7,8,
  10,17,23 270:3
  272:7,9,10 275:13
  277:24 284:23 294:24
  295:2,13,16,17
  296:15,17,20,21,24
  297:1,3,7,8,11
  299:15
decision-making  25:2
  80:15 182:25 183:3
decision/reason
  204:13
decisions  23:12,13
  37:14 50:3 56:18,21
  86:9,11 105:12 106:5
  107:5 108:20 124:14,
  18,22 125:1,5,7,9,
  11,14,16,21,23
  126:14,19,20,24
  127:3,9,14,15,19
  131:9 132:9,21
  135:13 137:5 138:11
  150:18,21,24 175:1,
  15 176:1 177:5
  180:22,25 182:10,19
  183:7 219:24,25
  221:7 231:9 236:25
  237:5,18 238:15,23

246:18 268:16 270:14
  272:24 297:10,12,14
  299:9,13,17,23
declaration  15:2,4,8
  16:8,15,16 17:1
  18:5,8,10,11 19:10
  29:6 36:6,21 40:13
  52:15,18 53:16 69:20
  70:22 73:16,18
  74:11,22 75:7 93:15
  110:25 123:11 124:10
  142:12 186:9 198:14
  199:17 201:15 215:4
  216:15 223:12 224:6
  242:23 244:11 264:19
  266:6 284:25 285:1,2
declarations  16:25
  103:16
declare  10:7
Deegan  206:22 207:18
  214:1 217:7 275:5,8
Deegan's  215:18
  217:14
deemed  80:7 133:2
deep  35:2
default  232:17,22,24
  233:1,7
defendants  10:16
  196:3,23 264:9,25
  282:16
defense  16:22 23:2,6
  29:20,25 32:1 33:21
  34:11 37:4 40:1
  41:16 42:6 48:1
  50:2,10,15 54:5,17,
  21 55:11,24 56:8,17,
  25 58:1 60:16 63:9
  65:13 66:16 67:2
  71:8,11,14 72:12
  75:18,21 77:23 78:2,
  5 80:12 82:11 84:6
  90:1 92:18 96:13
  100:14,15 102:24
  103:2,22 104:15
  105:11 106:25 113:5,
  9,18 114:1,22 117:15
  118:15 124:14,23
  125:3 127:14,19
  134:14 135:13 136:2
  137:5 138:22 141:16
  142:2,4,18 145:5
  146:15,23,25 148:19
  149:17 150:1 151:16,

25 155:19 156:19
  159:23 160:25 162:5
  163:16 164:17 165:7,
  10 167:11 169:6,21
  180:4 182:9,19,24
  186:2 198:9 207:20
  209:15 215:22 217:16
  218:8 225:25 226:4
  231:7,12,16,17,24
  232:13,18,21 233:5,7
  242:2 243:5 245:8,
  14,22 246:3,5 250:6
  252:20 256:15 259:10
  260:18 265:2 271:12
  272:24 275:21 279:8,
  22 280:11 292:18
  294:2,13,14,16,19
  299:10,13,22
defenses  29:13
defensible  237:23
defer  284:20
define  33:22 109:17,
  24
defined  47:6,7 109:16
  242:3
defines  109:4,7
defining  107:5 110:8,
  9,11 209:19
definition  107:7,12
  109:19,22 110:4
  205:25 213:12 252:23
  253:1 254:20,22
  269:3
definitions  206:7
defrauded  240:18
degree  191:15
delay  121:7 132:16,18
  135:24 136:4 156:9,
  18 157:8,12 231:13
  247:6 256:10,16,25
  257:1,4,13 292:19
  294:21 295:3,11
  296:11
delayed  225:13
delaying  231:9
delays  161:9
delegate  85:13
delegated  19:23 85:16
  171:5
delegates  82:14 85:10
deliberation  284:16

deliberations  176:3
deliberative  53:24
  63:5 126:13 138:14
  153:10 278:13 283:20
  284:3
delineate  220:4
demand  183:22 248:3,
  23
denial  82:11 99:12
  176:23,24 180:22
  188:3,20 189:19,22
  192:20 193:16 196:25
  197:15,25 198:5,7
  199:1,13 201:14
  207:10,23 209:19,25
  210:2,14,19,25 211:1
  212:16 213:25 214:9
  215:18 216:10 217:2
  218:8 219:4 241:22
  244:8 256:21 257:5
  275:8 277:13,15
  278:7 279:9 280:25
  281:19 283:1 285:15
  291:1,4,18,19 298:8,
  9
denials  42:14,20
  150:13 170:19
  173:19,21,24 174:6
  175:1,16,22 176:1,4
  178:2,16 179:7,13
  180:3,14 183:9,25
  184:1,19 185:1 221:9
  239:7 295:23
denied  80:10 84:22
  102:13 103:8 150:15
  170:17 179:14,16,19
  186:17 187:1 189:13
  195:19 198:16 201:18
  233:8 243:20 244:2
  249:3 257:7 265:2
  281:8 285:7 295:19
deny  175:16
denying  290:5 299:22
department  15:24
  16:22 19:1,13,24
  20:20 29:10,21,23
  32:14,24 34:13 37:4,
  17,21 38:14,17,18
  39:16 40:14,19,20,21
  41:19 43:13 44:9,17
  45:1,6,18 47:18
  49:1,4 50:23 51:15
  58:14 59:7 64:7

65:20 66:1,21 71:6,
  12,23 72:4 75:23
  80:22 93:22 94:4,7,
  22 95:22 96:5,8
  103:18 108:2,10
  117:4 126:10 139:7
  140:19 143:10 145:8,
  24 147:13,16,18,23
  148:16 149:11 154:6
  156:3,17 157:3
  161:8,22 162:1
  173:24 178:23
  186:14,24 188:8
  189:21,22 199:22
  200:23 203:4 205:22
  206:3,13,16 218:14,
  22 223:17 224:9
  229:6 232:11 233:25
  234:19 236:6,24
  237:5 238:15 239:6
  240:17 244:17 247:5
  248:1,5,21,22,23
  255:3 265:3 266:18,
  22,25 267:16,24
  268:21 269:13,14,25
  270:4,8 276:21
  285:4,13 288:9
  299:11
department's  29:12
  36:22 51:1 75:17
  239:14
departmental  202:7
departments  189:18
depend  23:4
dependent  204:20
depending  22:16 195:8
  268:3
depends  22:24 44:22
  45:25 93:1 106:1,2
  147:3
deposed  17:15,21,23
deposition  9:11,25
  10:1,2 11:21 12:8
  13:7,12,15 14:9,10,
  23,25 15:1,17,21
  16:7 18:7,12 35:17,
  21 48:8 53:1,2
  57:10,11 60:5,7
  62:12,13 64:23,25
  66:8,9 74:6,23 84:1
  111:17,18 142:13
  185:23 186:4 196:11
  216:16 217:9 230:4

233:15,16 243:14
  249:18 263:23 264:10
  275:4 282:15 288:22
  289:10,25 290:1
  298:23 299:4 300:19
deputy  19:23 22:19
  26:20,22 27:3
derivative  201:4
describe  94:25 163:3
  201:15
describes  165:5
description  266:5
deserves  152:9
designations  185:19
designee  171:6
desk  11:20
detailed  93:7
details  179:23
determination  45:7
  47:22 59:2,14,19,22,
  23 61:1,13 75:20
  76:2 77:9 78:7 79:3,
  7 80:18 81:2 82:16,
  18,22,25 84:8 91:13
  92:15 99:9 100:16,25
  101:1,11 102:4,21
  103:4,6 109:2,13
  129:3 133:15 141:15
  142:5 152:15 169:23
  170:13,23 175:11
  177:11 183:23 206:18
  213:20 215:12,13
  230:15 241:18 242:24
  243:18 269:1,2
  270:16 271:22 272:20
  273:18
determinations  42:15
  50:10 57:2 61:7 73:1
  78:10 79:2 83:19
  85:7 95:17 99:12,17,
  25 103:21 104:1,14,
  18 106:8 108:14
  116:20 117:15,19,25
  118:17,21,24 120:23
  124:1,25 129:5 208:6
  213:18 218:6 226:10,
  25
determine  43:12 45:19
  56:14 78:1 79:10
  80:17 91:4,6 96:22
  99:3 101:21 105:23
  115:8 133:13,18

140:23 226:4 230:22
240:17 241:24 242:9
248:5 279:19
determined   24:16
44:12 56:2 59:8
60:25 61:5 72:11
87:25 88:18 89:12
117:10 138:23 141:5
170:11 175:14 215:20
254:19 262:19 265:21
268:11 270:7,9
271:11
determines   108:13
234:3
determining   41:22
59:21 67:6 70:7
71:13 72:5 76:7
81:25 86:19 96:10
107:9 109:8 121:2
137:23 151:14 232:12
develop   33:25 37:17
39:10 79:8 86:18,21
89:19 90:14 96:9,15
97:25 98:11 120:20
131:17 186:15,24
189:11,18 190:4,13
194:23 257:14 285:5,
9
developed   41:2 42:7,8
43:10,25 67:10,12,19
71:12 72:4 95:5,6,23
118:9 121:13 123:3,
11 133:6 139:18
141:1 171:15 173:1,
12 177:22 188:8
189:22 190:1 191:19
192:23,25 193:1
198:12 222:8 224:2,
3,21 256:4 259:9
260:17 279:13
developing   37:24
38:22 77:14 82:1
97:2 119:11 123:7
133:7 143:19 146:21
154:20 173:8,10
193:16 198:14 199:18
201:16 215:5 221:16,
17 222:8 223:25
224:10 285:13
development   21:9,10,
12,16 23:22 29:23
31:14 38:5 39:1,3
67:5 76:12 78:11

96:2 97:3 99:22
100:5 104:2 118:13
119:12 121:24
150:11,13 153:10
176:10,13 194:18
225:6 250:19,20
251:12 257:4,18,23
259:12,14,25 285:11
290:25 298:7,12
299:19
developments   256:24
develops   39:6
device   11:24 12:7
Devos   9:14 233:13,24
234:18 235:3,13,19
236:5
dialogue   113:21
Diane   9:11 10:23
13:11 14:3 46:22
52:20 74:12 87:1
156:22 222:24 239:11
240:6 243:22 262:9
293:19 300:13,19
died   238:5,7
difference   108:23,25
169:14 247:13 258:12
266:1
differentiation   206:2
differently   240:11
difficult   294:15
difficulty   136:2
156:19 231:11 256:14
292:17 294:1,12
digital   259:14,15
260:2,4,15
direct   20:6 26:23
27:9,25 28:1,23
31:19 115:24 116:4,
25 125:13 144:10
188:13 203:9,12
208:19 212:3 213:13
directed   42:5 233:25
234:19 236:5
direction   78:6
297:22,25 298:1,3
directive   146:4,6
297:13
directly   24:20 25:23,
25 41:24 56:20,23
99:14 166:22
director   28:10

directors   28:24
disagree   25:13 135:18
257:22 277:22,24
disagreement   247:10
disallow   150:4
disbursed   203:10
208:19 212:3
disbursement   255:6
discharge   42:2,4
49:25 50:2,16 55:1
65:13 75:19 161:3,7,
10,12,19 162:25
163:7 203:11 212:5
disclosure   66:3
discouraged   175:6
discovery   25:12 121:5
150:7,10 167:8
231:21 247:8 257:3,
24 258:3 290:16,25
293:14
discretion   269:9
discuss   34:11 37:13
95:21 127:22 128:2
256:19 284:6,7
discussed   48:23,25
72:25 122:25 127:24,
25 128:19 234:17
244:24 245:19 257:6
261:8 283:9
discusses   19:15 40:6
discussing   22:17 71:5
73:3 76:6 201:24
234:8 235:19 236:13
244:24 250:11 298:10
discussion   98:3
135:19 148:12,16
149:9 175:20,24
230:13 265:5
discussions   97:11
98:8 118:11 229:7,12
231:4
disposition   291:2
292:7,10,15
disseminated   89:16
distinguish   203:3
distortion   121:22
district   67:9 72:9
96:5,21 98:16 117:9
132:24 138:8,23
139:2,3,25 141:7

**divide**  121:22
**divided**  20:25
**divides**  121:25
**division**  20:5 102:12
  105:10
**divisions**  20:22
**divorce**  17:24
**document**  13:20 14:6
  17:9 18:19 30:9
  53:9,10,12,13 54:1,
  3,4,12,14,15 55:5
  57:16,17,19,21 58:4
  60:12,14 62:18,21
  63:11 65:5,7,8,20,23
  66:7,13,14,15,20
  67:20 69:2,3,5,24
  70:17 74:7,21,24
  75:4 76:23,24 77:1
  84:17 111:7,23 114:6
  120:5 142:23 143:4,
  23 144:4 149:7
  160:20 163:4 168:1,
  16 169:2 187:4 188:2
  196:17,19,23 197:21
  198:17 199:5,11
  200:4 201:1,11,24
  202:8,12,17 204:3
  206:25 208:1,4,5
  216:23 217:4,18
  229:23,25 230:1
  233:13 239:22,24
  243:23 249:9,23
  250:8 266:5,9 273:6
  275:16 280:2 282:22
  288:23 298:25
**documentation**  50:5,11
  218:23
**documents**  15:7 16:18
  17:3 43:14 45:2,10,
  11,12,13,16,18
  53:19,23 57:20 62:25
  63:4 64:17 82:24
  87:19 88:5 112:14,17
  113:8 145:22 168:15
  186:15,24 187:2
  188:8 189:19 201:16
  207:3 215:5 248:4
  285:5,9,13 289:3,6,
  9,11,16 291:15
  298:24 299:3
**DOJ**  15:22 16:1
**domain**  21:1,3 88:25

**Domestic**  143:9
**draft**  187:13
**drafted**  168:14
**drafting**  202:14
  246:24
**drafts**  168:15 284:16
**drink**  12:18
**due**  146:5,8,9,19,22
  176:10 244:25 299:2
**duly**  10:24
**duped**  151:16 234:3
**duties**  19:23

─────────────────

**E**

**earlier**  15:5 77:1
  86:4 91:6 106:15
  115:19 130:13 158:19
  168:6 169:13 238:3
  239:25 242:15 258:10
  266:16 276:17 281:25
  298:13
**early**  26:19 32:16
  64:7 100:17,22
**earnings**  94:9 98:24
  222:7,9 224:1,12,16,
  22 225:8 226:11,17,
  19 240:20 241:8
**easier**  49:14 229:24
**easiest**  113:18 144:5
**easily**  259:23
**easy**  91:5
**ECC**  218:12
**ECF**  18:8 52:15,16,17
  57:6 73:16,24 74:8,
  14 142:8 185:20
  196:2,5,7 206:20,21
  216:14 263:21 264:9
  275:4,5 282:15 290:4
**ed**  19:1,24 20:6,9
  21:4 30:7 31:10,13
  32:3 37:5 38:25
  121:15 123:13 143:6
  156:4 215:21 216:2
  218:15 229:6 232:11
  275:19,20 277:25
  279:7,21 280:3,10
  299:11
**Ed's**  39:2 117:13
  139:14

**EDGAR**  39:23,24
**editing**  202:15,16
**editorial**  201:21
**EDMC**  226:22 227:1,12,
  19
**education**  15:24 18:2
  19:13 20:3,13 21:13
  25:20 30:2 31:4,7
  33:10 36:17,19 41:20
  45:6,18 59:7 80:22
  94:5,7 139:7 163:20,
  21 165:16,18 218:1
  233:25 234:19 236:6
  239:12 265:3
**effect**  55:3 58:12
  67:3 93:11 117:23
  131:24 132:15
  138:10,20 174:3,23
  175:4 221:18 234:7,
  16 236:14 269:16,18
  296:21
**effective**  37:15
**efficiency**  153:1
**efficient**  197:22
**effort**  24:10,23 29:20
  37:22 97:3,24 123:24
  195:17 260:5 285:9
**efforts**  96:9,15 98:11
  154:9 201:15
**eighth**  18:9
**elected**  272:3
**electronic**  38:6
**element**  48:24 76:12
  164:3 259:7 264:2,4
**elements**  258:24,25
**eligibility**  198:3
**eligible**  80:7,17,18
  81:16 203:11 212:5
  243:7
**eliminate**  135:4
**eliminating**  134:20
**Elizabeth**  9:14
**else's**  202:17
**email**  87:22,24 130:1,
  3 168:19 207:18
  209:14 220:11 278:25
  279:2 288:14,18
**emailed**  168:20 287:19
**eminent**  88:25
**employ**  79:9

employed   35:23 94:22
employee   33:9 108:1
employees   35:13
  270:19
employer   259:24
employment   36:17
  54:9,19 60:19 61:6
  209:3,5 281:2,5
enabled   160:25
end   50:16 140:3
  186:20 228:8
ended   171:21 256:16
  300:19
enforce   158:9 216:15
enforced   171:19
engage   118:8 248:24
  269:24 270:2 271:25
engaged   29:19 34:13
  37:2 203:13 209:5
  281:4 284:12
engaging   31:12 154:8
  162:11 272:4
enjoined   67:9 72:8
  93:21 94:8,14,15
  117:24 140:1,5
  141:12 171:25 172:11
  183:24 223:6,14,18,
  19,22
enrolled   277:4
enrollment   213:14
ensure   11:12 12:12
ensuring   22:5 68:19
entailed   29:16
enter   9:22 190:11
  283:8
entered   44:17
entire   23:1 69:3,5
  143:15 161:1
entities   187:11
entitled   152:12
entity   45:14,15 162:1
environment   259:15,16
  260:16
essentially   140:7
  147:25 149:21 277:7
EST   300:20
establish   127:11
  209:24
established   49:23
  86:13 103:22 104:15
  126:11 271:18,19

establishes   105:8
establishing   110:3
estimate   38:9
ethics   218:25 219:1
evaluate   78:6 86:14
  89:5 105:4 115:17
  131:5 213:24 230:2
evaluated   91:9 152:8
  232:22
evaluating   57:1 71:24
  87:15 232:11 282:4
evaluation   109:1
  271:16 272:1 273:8
events   13:3
eventually   19:12 46:8
  98:21
Everett/wyotech   58:8
everyone's   11:9
evidence   43:19 45:6
  55:12,14,18,23 56:6,
  10,15 57:1 70:7
  75:22 77:19 78:7,17,
  23 81:1,4,7,19 82:4,
  5 83:12,15,22 87:12
  88:2 90:7 101:21
  105:4 106:10 109:1
  115:17 116:3 145:4,
  11,24 148:21,25
  169:22 170:1 199:23
  200:23 202:21,23,24
  203:3,4 205:15,17,
  19,21 206:3,5,9,12,
  13,15,16 209:7
  211:17 213:19,23
  215:17,22,25 216:2,
  5,9 241:25 242:7
  244:16,19 245:4,12
  247:17,20,23 248:23
  249:3 265:4,22
  266:17,20,21,22
  267:1,8,9,13,15,24
  268:7,12,20,22,25
  269:5,22 271:16
  272:1,20 273:8
  274:22 276:2,4 281:6
  282:4,9 286:25
evidentiary   78:15
evolution   26:17
  256:20,21
exact   16:10 35:22
  62:8 64:15 87:17
  130:10 179:5 206:14

224:20 252:10
EXAMINATION   11:1
Examining   111:8
examples   23:16 159:11
  211:19,21 251:14,19,
  22,24 252:17,18
  254:4,5,25 255:4,18,
  21 260:23
Excel   49:4,7 176:13
  265:9,12
Excellence   18:2
exception   79:20 151:5
exchange   113:16
excuse   36:7 59:22
  128:25 169:10 176:23
  254:1
executed   297:2,3,6
exhaustive   23:17,18
exhibit   13:7,14,15,22
  18:5,12 29:6 36:5,21
  40:4 48:7,8 52:24
  53:1,2 57:5,9,10,11
  60:4,6,7 62:10,12,13
  64:22,24,25 66:5,8,9
  68:24 69:20,25
  73:15,19 74:15 84:1
  93:14 110:14,16,24
  111:1,14,16,18 123:1
  142:7,9,11,14 167:10
  181:21 185:20,22,23
  186:3,4,9 196:2,9,
  10,11 197:11,12,17
  198:1,5,25 199:20
  200:20,24 203:8
  206:19 207:9 209:13
  216:14,16 217:7,8,9
  224:6 230:3,4
  233:15,16 243:13
  244:11 249:15,18
  263:20,21,23 264:7,
  10 265:8 275:3
  282:14 285:1,3
  289:24,25 290:1
exhibits   16:24 17:1,
  4,6 52:15,18 74:6
  83:4 185:20 197:4,8
exist   86:1 263:17
existed   93:23 227:7,9
existing   71:7 95:23
expanded   131:11
  164:8,21 254:7

expanding  164:14
expect  209:18 283:13
expectation  211:8,25
  212:11,18 227:23
  228:1 283:10,22
  284:22
expected  208:25
  281:21 287:2,3
expects  212:23
experience  55:23
  105:3,19 217:21
expert  17:20,22,25
  35:17
expertise  86:15 87:7
  105:3 269:22 279:12
  284:20
explain  107:18 147:5
  161:10 163:24 171:22
  182:20 192:2 219:10
  251:17 280:5 282:2
explained  72:16,19
  103:16 106:14 152:6
  183:16 192:15 220:25
  223:12 248:16 266:15
explaining  195:14
explanation  72:21
  186:16,25 189:12
  194:20,24 195:18
  201:17 251:13 258:8
  262:13 280:8,14
  285:6,10
explanations  253:12
explore  96:9,15 97:25
  98:11
expound  19:19
express  141:1
extension  252:8
extensively  29:10
extent  89:14 93:23
  110:5,7 112:25
  134:25 136:1 148:19
  150:14 231:11 238:14
  240:10 256:11,14
  257:3,6 264:23 287:5
  289:10 292:17 293:17
  295:18
external  33:18,19
extra  13:10 185:7
extremely  161:7,11

F

facile  70:17
fact  41:23 132:20
  151:15 220:1 251:2
  279:3
factored  246:18
factors  190:18
  193:15,23,24
faculty  252:13
fails  209:6 281:5
failure  135:4
fair  142:22 272:15
faith  258:5
fall  23:6
falls  40:1 257:21
  267:20 268:13
false  250:21
familiar  14:5 51:8
  64:1 201:12 250:10
  265:25 266:4 277:22
  290:11
familiarize  207:21
  250:2
fast  160:18
fatigue  12:19
feature  130:5 144:20
February  32:15,19,21
  33:2
federal  20:17,18
  29:13 30:11 35:24
  36:22 37:6 39:20
  44:21 47:6 92:12
  97:10 105:8 114:21
  134:11 187:9 188:12
  191:25 192:5 193:2,
  5,6,19 210:22 211:15
  213:9,12,13 239:15
  241:13 261:7,12
  262:20 295:22
fee  36:2 149:21
  188:19
feel  264:12
fellow  33:6
felt  108:4 190:17,19
fewer  131:7 254:4,14
figure  40:21 43:10
  69:23 87:14 90:10,11
  91:3 106:17 191:1
  194:7

figuring  11:10
file  13:11,22,25
  14:21 18:9 42:6
  48:11 52:12,13,14,17
  57:9 110:22 142:8
  149:21,22 150:1
  185:20,21 186:1
  187:17 206:13 216:14
  232:24 233:6 243:14
  282:15 290:4
filed  145:6 154:3,25
  155:15 156:15 157:5
  196:23 207:7 226:1
  232:20 233:5 237:1
  245:22 246:3
files  13:9 110:21
  167:12 214:16 249:11
filing  175:6 196:3,16
  197:23 198:25
  264:17,25 282:16
  290:10
fill  187:15 191:22
  286:2 287:24,25
filled  158:2
final  30:14,18 35:11
  37:3,8,9 38:19
  82:10,16 123:21
  125:1,5,7,14,16,21,
  23 126:11 142:18
  143:16,20,25 144:10
  160:24 163:14 174:14
  190:3 201:21 202:1,8
  223:18 278:17,19
  297:9
finalize  137:16
finalized  16:23
  170:10 284:7,12
  299:14
finalizing  81:17
finally  27:1
financial  37:18 42:9
  43:9,11,12 71:24
  72:1 109:18,22,24
  152:12,18 164:3
  241:9 242:5,9,13
  248:6,8,25
financially  9:19
  149:23 240:18
find  14:13 53:18
  70:16 75:2 133:2
  152:3 241:2 288:11,
  14

findings  49:12,17
 65:16 150:16 257:8
 295:20
fine  11:6 92:1 111:1
 113:13 149:6 250:7
 267:22
finish  181:12,20
 265:24
finished  139:24 190:9
firms  154:7
first-line  28:14
five-minute  69:7
 228:18
flexibility  11:10
flip  250:7
floor  22:19
focus  37:7 40:24 41:3
 71:25
focused  78:14 118:5
folder  13:8 18:7,9
 52:15,17 57:5,8 60:3
 62:10 64:23 66:6
 73:15 74:2 111:8
 142:7 167:10,12
 196:2 206:20 233:13
 249:10 263:21
folders  13:10 14:1
folks  15:11
follow-up  122:25
 123:2
footer  55:5 144:4
 148:9 153:20 168:24
 171:10
footers  144:5
For-profit  111:8
forbearance  232:25
 233:2,4
forced  252:8
foregone  272:14,18
forgiven  248:22
forgiveness  148:1
 203:12 234:2 235:21
 236:7 259:22
form  84:15 197:14
 198:5,6 199:1,12
 200:1 210:14 211:1
 214:2 215:1 216:10
 251:6,10,12 252:21
 253:23 255:20 257:5
 259:4 260:13 261:16
 275:9 277:13 278:7

281:18 282:18,23
 283:1,25 285:15
 291:1,3,18 298:8,9
formal  22:21 98:3
format  129:25 142:17,
 21 167:22 168:7
 201:21
formats  167:24
forms  291:20
formula  243:2
formulate  159:2
forward  14:19 30:9
 99:5 141:25 165:4
forwarded  286:15
Foss  97:9 228:16
 238:4
found  43:19 49:21,23
 50:1 70:22 186:11
 237:22
four-digit  68:4
fourth  14:15 63:14,15
frame  51:24 52:10
 133:10 156:2 172:17
 177:7 199:14
Frank  32:6,13,15
frankly  138:25 271:17
fraud  264:9
Friday  9:11
friend  195:11
frivolous  151:15
front  12:10 57:20
 240:24
FSA  20:21,23,25 21:1,
 7,23 27:17,21 39:6
 49:23 50:1 68:22
 79:9 97:8 102:9
 105:12 107:20,24
 108:4,19 119:22
 120:15 121:15,19,21
 126:19 130:5 160:9
 168:16 181:6 182:9
 186:2 187:13,14,25
 222:9 228:12 238:13,
 17,18 243:25 244:2
 255:10 258:13,16
 261:19 270:20,22
FSA's  50:3,15 105:13
 182:18 258:11 259:14
 270:18,21
full  54:11,13 145:8
 152:2 190:2 221:9

241:5
fundamentally  24:18
future  77:10 98:23
 118:16 164:23 165:1
 177:16

G

gain  148:22
gains  230:21
games  166:19
gathered  226:12
gave  35:17 72:20 87:6
 91:10 252:17 297:25
 298:1
GEAR  39:21
general  12:24 18:25
 21:15 22:9 25:18
 31:9,13 41:12 50:25
 53:20 65:10 86:18
 97:12 106:1,16
 112:13 130:25 131:16
 143:7 146:2 156:13
 169:20 200:17,18
 201:8 238:10 246:19
 266:2 271:5 291:9,11
 293:11,22
generality  156:11
 247:8
generally  128:22
 130:1,3 218:4 240:25
 257:12
generic  218:10
genesis  290:16
germane  156:18,22
give  16:10 19:19
 23:16,18 26:16 29:16
 33:24 35:21 73:23
 75:1 83:3 87:9
 105:25 110:20 128:23
 178:20,23 183:17
 196:4 202:1 203:14
 245:21 280:14 298:20
 300:5
giving  68:16 90:13
 146:22 163:19 210:18
 254:25
goal  96:18,20 134:18,
 23 253:11
good  11:3 122:9 258:5

govern  54:20 106:8
governing  44:7 104:17
government  165:3
governs  78:3 268:24
grab  83:3
Graduate  209:4 281:3
graduates  117:23
grant  20:8,9,14
  39:22,25 82:11
  241:19
granted  79:17,19
  80:11 84:22 103:8
  110:9 141:16 147:1
  233:4 267:17
granting  84:6 85:21
  103:1 231:8 299:21
grants  43:2 47:15
  99:13 102:24 120:24
  171:2 179:8 180:23
great  57:4 149:14
  300:14
green  243:16,19
grounds  65:15
group  22:15 23:1
  31:3,4 41:6,7 55:1
  56:25 59:1 80:1
  82:15 85:9,11 94:18
  97:4,5,6,7,17 98:2
  102:19 143:15 150:4
  151:9,14 152:20,21
  153:1,16 161:3,7,10,
  19 162:12,14,25
  163:7 169:19 177:14
  181:2 205:23 206:6
  226:22 237:22,25
  238:2 265:19,20
  272:24
grouped  243:25 244:1
groups  58:13 149:13,
  25 154:8 226:9
growing  41:15 71:10
guarantee  79:22 80:3
  149:16
guaranteed  54:18
  60:19 61:6 65:16
guarantees  54:9
guess  26:2 33:15 35:1
  59:11 68:13 79:12
  81:6 82:10 84:19
  90:1 104:6 116:17
  118:23 120:18 128:10

178:15 194:17 206:2
  207:2 209:17 251:8
  257:2
guidance  58:25 67:12,
  24 68:17 82:24
  120:14,15 244:5
guide  86:8,10
guys  136:18,19

---

### H

half  181:19
halted  138:7
Hancock  16:1
hand  10:21
handle  37:23 41:15
  71:10
handled  291:10
handling  231:6
hands  180:25 181:1
  269:20
happen  17:5 205:12
  255:25 286:16
happened  40:17 118:25
  154:16,17 179:3
  223:7 224:23 251:6
  286:16
happening  12:13
  164:1,16 270:5,10
happy  12:20 257:20
hard  62:23 105:25
  173:10 299:15
harm  42:9 43:9,11,12
  71:24 72:1 109:18,
  22,24 115:8 152:12,
  18 241:9 242:5,9,13
harmed  240:18
hazard  163:18 165:14
  166:24
he'll  220:14
head  21:21 48:22
  197:16 199:19 216:12
  221:15 252:16,18
  261:9 286:7
heading  36:6,8,21
  144:7 169:5 171:12
  173:19
headline  50:13
headquartered  90:20,
  22

hear  108:12 110:18
  111:12 136:18,19
heard  48:19 139:1
hearing  17:24 111:8
  112:3,11 158:19
  161:25
hearings  160:8
heavily  84:4
held  9:5,8 108:5
  206:16
helped  18:24 112:14
helpful  144:19 169:3
  200:18 255:15 258:6
helpfully  168:23
high  82:1 83:20
  100:12 109:23
high-level  107:4
  266:10,13
higher  18:2 36:17
  78:18,19,21
highest  108:1
highlighted  283:4,5,
  10 286:4,25 287:9,18
  288:3
highlights  286:20
hire  81:5
hires  230:2
hiring  107:22 131:4
Historically  27:5
  28:11
history  17:13 19:12
Hokanson  28:5
hold  171:13 185:12
Holifield  28:10
hone  244:15 262:1,3
honestly  92:19 93:6
  292:14
honor  58:16
honored  61:1,7
honoring  61:14
hope  11:11 177:23
  190:13
hoped  190:8,12,16
  193:17
hopeful  177:10
hoping  19:18 110:16
hospital  238:8
hour  181:19
hours  16:11,13 38:1,
  2,9 299:5

**House** 28:11,22 112:3
250:4
**hundreds** 155:3,7

---

**I**

**Ian** 97:9,18 228:16
238:4
**ID** 255:10
**idea** 98:10 147:21
178:21,24 183:17
210:5 230:18 251:3
258:21 260:13 292:1,
2
**identification** 13:16
18:13 48:9 53:3
57:12 60:8 62:14
65:1 66:10 111:19
185:24 186:5 196:12
216:17 217:10
224:11,18 230:5
233:17 249:19 263:24
290:2
**identified** 49:6 58:17
149:11 200:21 224:24
241:12 263:11 276:18
**identifies** 198:25
253:18
**identify** 68:5 71:24
77:5 88:19 89:3
152:5 184:18 192:20
224:15 230:16 259:23
**identifying** 37:22
89:13 197:24 260:25
280:22
**IG** 48:12 49:6
**imagine** 102:20,21
211:20
**immediately** 183:10
**impact** 219:18
**implement** 38:7 44:12
80:22 252:21
**implementation** 21:8,
19,24,25 22:2,6
29:11 38:11 67:23
130:12
**implemented** 20:24
44:20 130:16 131:21
164:21
**implementing** 37:18
121:16 131:18

**implicit** 213:21
238:22
**implied** 86:17
**importance** 137:11,14,
17
**important** 36:11
89:20,22 92:15 137:9
138:2,4,6 189:14
**imposed** 147:9 158:9
**imposition** 55:1
**impossible** 209:20
**impressions** 138:14
153:9 284:2
**improper** 273:10
**imputed** 240:20
**inadequate** 49:7
**inappropriate** 272:6
273:21
**inclined** 232:3
**include** 23:3,7 39:19
125:2 128:21 162:25
195:20 209:25 210:3,
6 211:1,9 212:19
213:8 214:5,10 216:1
254:21,23 279:20
283:11
**included** 17:2 23:10
36:18 37:20 62:25
71:21 79:22 81:22
97:7 128:22 129:6
132:3,5,8 143:4,24
156:24 205:25 237:21
240:1 253:10 277:18
280:24 283:17,23
286:20 287:19
**includes** 20:4,8 75:19
134:18 142:3 188:20
216:24 220:2 231:15
244:19 287:11
**including** 103:20
145:23 224:11 291:1
**incoming** 287:14
**incomplete** 125:3
211:16
**incorrectly** 275:19,20
279:7,21 280:10
296:1
**increased** 127:4
**increasing** 175:24
**index** 197:24

**Indiana** 90:22,23
**indicator** 241:9
**indirectly** 25:23,25
**indiscernible** 105:19
270:25 289:2
**individual** 27:5 41:11
56:12 106:6,9 107:10
152:9 153:2 161:9,12
162:4 205:17
**individually** 267:14
**individuals** 22:13
27:10 77:3 120:22
121:15 143:5 148:18
262:5 271:5 290:20
291:6
**inefficiency** 161:8
**ineligible** 80:18,19
81:16 102:20 159:12
215:20 243:8
**inform** 92:7
**information** 50:9
53:21,24 55:17 64:10
65:19 86:23 91:18
93:24 100:24 104:7,
11 112:20,23 125:4
126:5,7 128:21
130:20,25 138:15
164:8 166:3 167:20,
21 168:2,7,18 176:3
187:15,24 198:15
203:18 207:6 217:17,
20,21 229:22 242:5
244:19 246:8,23
251:2 253:14 254:12,
15,17 259:20 260:7,
17,25 261:18,23
271:1 275:24 278:9,
12,20,23 279:9,20
280:2,24 281:22
283:14,16,20 284:3,
23 293:7,17
**informed** 51:15 154:16
160:3
**initial** 174:19 280:8
281:18
**initially** 38:8 178:4,
22 256:5
**initiate** 160:25
**Initiating** 161:6
**initiative** 27:6 28:11
**initiatives** 28:22

**injunction**  103:19,20
  116:18 117:12,20
  118:19 124:2,11,24
  140:6,12 171:19
  180:21 182:8 183:11,
  18 222:20
**input**  181:4,5
**insert**  204:17,23
  205:10 283:6 286:4,6
**instances**  23:14,16
**instilling**  189:16
**Institute**  33:5 219:22
**institution**  47:1
  118:16 145:23 218:16
  219:8 220:1 245:17
  248:4,20 276:19
**institutions**  36:18
  38:7 116:16 148:23
  154:4,9 158:3 218:21
  246:6 276:23
**instruct**  158:8
**instructed**  274:24
**instructing**  87:22
  121:8 237:4,18
  238:16
**instruction**  87:6,9
  90:14 91:11 238:22
**Instructional**  241:15
  276:18
**instructions**  37:24
  138:21 277:18,20
  278:5
**instructs**  236:24
  238:14
**insufficient**  209:7
  281:6 282:8 286:25
**intended**  118:12
  139:8,15
**intent**  95:7 117:16
  118:14 215:3 234:12
**intention**  117:13
  215:1
**interact**  259:17
**interactions**  9:8
**interacts**  261:16
**interagency**  143:12
  144:2
**interest**  131:19
  146:15,18 164:5
**interested**  9:19 17:8

**interesting**  46:4
  54:23
**interface**  9:9 260:5
**internal**  143:24 234:4
**interpret**  281:10,12
  294:7,9
**interpretations**  271:9
**interrogatories**
  292:24
**interruption**  114:25
**intertwined**  231:19
**interviews**  47:19,21
**invent**  102:1
**investment**  189:13
**invoke**  153:16
**involve**  22:18,25 78:9
  103:8 108:13 126:24
  141:6 180:3 183:25
  210:20,21 289:11
**involved**  21:24 22:16
  23:15 25:1 26:5 29:1
  30:11,17 38:19,22
  39:2,7,11 54:25
  56:11,18,20 67:5,7
  70:6 76:11 77:8,14
  78:8 79:1,24 81:14,
  18,20,23 82:2,20
  83:7 96:14 97:2,5,
  13,19 98:7 103:1
  105:15 107:6 108:18,
  20 109:17 110:9,11
  116:23 117:11 118:5,
  6,11,13 121:23 131:8
  133:15 143:7,16
  174:18 178:11,12
  179:12 180:2,18,25
  181:4,5 223:1,5
  229:7,11,14 238:6
  270:1 271:1 273:7
  276:1,9 277:12,14
  293:11,23 294:25
  295:2,5,9,12,14
  296:14,15,23 298:11
**involvement**  25:9 30:3
  31:17 77:4,11 95:11
  96:1 102:24 104:21,
  25 110:6,7 118:10
  202:13 258:15 271:13
  272:14 273:20 277:5
**involves**  21:13,14,16
  76:16 77:1 88:21
  161:20

**involving**  161:24
**IRS**  224:23
**issuance**  176:22,24
**issue**  22:24 23:4
  30:22 38:4 92:13
  98:16 135:8 153:14
  157:10 173:20 174:6
  175:15,22 178:2,16
  179:15 183:8 184:20,
  25 219:7 239:7
  247:5,7 248:3 263:5
  291:22,24 297:9
**issued**  17:10 37:14
  61:24 62:3 103:19
  106:18 125:8 139:5
  173:21,24 175:1,23
  178:3,17 180:22
  183:9 184:20 185:1
  188:23 223:18 239:1
  245:9 262:10 291:4
**issues**  23:6 29:10
  33:6 239:12 248:21
  289:9 291:8
**issuing**  173:25 174:7
  182:9 184:19 236:25
  237:5,18 238:15,23
  297:12,14
**items**  63:9
**ITT**  41:25 42:3 47:16
  52:2,3,5,9 54:8,18
  55:8 83:12 87:13
  88:2 90:7,21 221:24
  222:5,10 224:4
  225:22 226:3,25
  245:15,25
**IV**  39:19 40:2
**Ivy**  219:19


                J

**James**  63:7 65:9 77:2
  84:4
**January**  60:15 228:6
  273:3
**Jed**  15:24
**Jeff**  97:8,18 238:5
**Jesse**  28:5
**Jim**  31:20 297:4,14
**job**  17:13 19:12,15,20
  32:22 34:1 51:18
  65:15 81:8 133:18,19
  135:15 198:2,10

199:3 219:6
**jobs**  65:16
**John**  28:6
**Johnathan**  28:10,15,16
**joined**  29:21 32:14
  33:12 37:4 44:9 64:7
**jones**  9:11 10:21,23
  11:3 13:11,15,19
  14:22 18:8,11,12,18
  25:17 29:15 32:9
  35:16 39:14 48:8
  51:12 53:2 57:11,15
  60:7,11 62:13 64:25
  65:4 66:9 74:6,20
  91:22 111:18,22
  113:23 114:19 122:24
  126:18 133:23 137:3
  138:18 143:18 185:23
  186:4 196:11,15
  216:16 217:9 229:5
  230:4 232:10 233:16
  235:9 236:19 237:16
  239:11 240:15
  249:18,22 262:9
  263:23 274:15
  289:12,22 290:1
  298:16 299:7 300:13,
  19
**Jones'**  293:2
**judge**  137:22 138:7
  140:5,17,22 172:18
  196:24 269:22
**judge's**  196:24 265:1
**judgments**  81:25
**July**  50:17,20 90:11
  91:5 151:3,6,10
  164:25 203:10 208:20
  212:4 245:7,9
  262:10,11
**jump**  74:2
**jumping**  19:11
**June**  50:16,20,24 98:4
  133:10
**Justice**  143:10
**justification**  287:23
**justified**  136:3 157:9
  231:13 256:16 292:19
**Justin**  65:11 77:2

### K

**Katherine**  15:23
**keeping**  16:9 177:5
  298:22
**Keller**  209:4 281:3
**Kevin**  16:3,4
**kind**  11:24 12:6 55:23
  82:3 112:17 128:20
  144:21 159:22 197:23
  198:20 201:23 210:15
  216:22 219:12 277:8
**kinds**  47:7 56:20
  189:24 251:22 253:5
  255:1 270:20
**knew**  99:5
**knowingly**  140:20
**knowledge**  42:7 43:13
  59:18 115:24 116:4,
  25 125:13 130:6
  163:6 226:16 246:4
  249:5 259:13 263:2
  292:9 293:10,13
  294:23 295:11,15
  296:5,7,12 299:24

### L

**labeled**  206:20
**labor**  32:24 105:21
**lack**  104:21 117:6,7
  131:25 272:14 289:8
  299:9
**laid**  200:13 239:21
**language**  75:15
  277:21,24
**large**  38:21 131:11
  154:4 155:1,15,20,
  22,24 156:16 157:5
  158:2 162:2
**Largely**  112:10
**larger**  94:23
**launched**  38:20 259:18
  263:3,8
**law**  47:2 90:1,12,19,
  23,24 91:4 92:7
  100:2,4 140:20 147:9
  192:3 203:8,16,19,24
  204:6,17,21 205:3,10
  208:3,7,8,18,21

209:1,8,19,22 212:7,
  9,10,12,17,19 213:8
  214:6,10 215:2,7,9,
  11 216:7 256:1
  261:11,14 262:21
  281:22 283:12,23
**laws**  88:23 89:25
  90:3,5
**lawsuits**  81:24
**lawyer**  81:7 180:5
  272:17 273:17,19
**lawyers**  112:24 279:19
  284:21,22 295:4,9,14
**lay**  240:1
**layout**  265:16
**lead**  97:2 295:14
**leaders**  35:13 107:24
**leadership**  129:18
**leading**  176:4
**leads**  56:25 239:14
**League**  219:19
**learn**  214:14
**learned**  251:1,3
**leave**  69:25 239:24
**left**  42:3 168:24
  191:13 274:6
**legal**  9:16,21 65:12
  109:1 169:21,25
  269:1,2,6,7,17,21
  270:3,14 271:8,12,15
  272:20 276:3,12
  284:21 293:16
**legislation**  105:8
**legitimate**  149:13
**Lending**  11:5
**letter**  160:7 187:6,
  12,13 188:18,21
  190:1 191:2,22
  192:2,6,22,24 193:7,
  8,10,16,18 194:4,6,
  7,23 198:9,14,20
  199:2 200:1,21 204:6
  207:10,23 208:17
  212:2,18 214:1
  216:10 217:2 219:4
  278:19 279:9 281:1
  285:22,23,24,25
  286:1,3,19 291:20
**letters**  188:23
  189:11,19,23 190:4,
  14 191:18,19 192:7,

15,20 194:18 195:18
198:12,24 199:18
201:14 203:20 205:11
214:9 257:5 277:13,
16,19 278:7,17
281:19 282:18 291:1,
19 298:8,9

**level**  43:10 82:1
83:20 100:12 109:14,
23 115:8,23 131:16
145:21 156:10 230:16
247:8

**liaison**  28:18

**lied**  252:11

**lieu**  10:4

**light**  207:24 256:25
258:14 264:12

**likelihood**  232:16,21
233:7

**limitation**  158:9

**limitations**  147:9,12

**limited**  43:16,17 51:2
77:12 80:6 270:19

**limits**  148:4,5

**lines**  292:24

**linked**  251:7,10
258:19 260:13

**list**  23:17,19 41:15
43:23 52:20 71:11
74:13 116:15 220:7,
12,17,19,20 225:14
253:6 254:7,8 255:21
258:24,25 259:7
264:3,4,9,18,20

**listed**  59:6 194:9
200:7 209:2,8 255:21
265:23 268:12 276:22
278:3

**listing**  195:14

**litigate**  154:13

**litigation**  178:10,12,
17 179:11,13 180:2,
3,4,6,10,24 182:21,
23,24 184:10 295:10

**loan**  20:14 42:2,4
47:3 49:24 50:2,15
144:10 147:4,25
148:1 188:10,12
189:2,4,5,8 190:10
191:9 208:9 210:12,
13,16,18,23 211:24
213:13 215:14,23,24

229:7,13 230:19,20,
23 231:5,15 233:14
234:1 235:21 236:7
248:22 253:18 255:6,
13 259:22 262:8

**loans**  22:21 29:14
44:13 90:10 91:5,6
93:4,12 151:3,6,9,11
188:13 190:24 191:6,
23 192:2,4,21
203:10,13 208:19
212:3 231:24 245:6,9
259:17,20 262:9

**located**  9:17 106:20,
21,22

**log**  16:9

**logistics**  279:2

**long**  12:21 32:10,25
35:2 85:19 103:14
152:5 155:4,7
185:10,21 190:13,17,
19 218:17

**long-term**  95:7

**longer**  24:23 29:1
35:23 172:5 189:11
190:8,12 193:3,17
238:6

**looked**  16:20,21 68:1
83:2 134:16 136:25
152:25 170:1 207:12
217:1,8,15 218:8
221:22 223:3 240:16
263:7 277:13 282:10
285:19 286:24 287:15

**losses**  248:6,8,25

**lot**  38:8 104:20
126:24 181:22 191:10
221:8 293:4,7 299:9

**lots**  155:4,8,10 183:5
235:25

**loud**  49:18 75:12,16
96:4 114:9 115:4
154:1

**loved**  139:5

**Lucas**  28:6,7,8

**lunch**  122:5,11,19,20

**lunchtime**  91:25

_____

                M

_____

**Macom**  9:15

**made**  23:21 42:15,21
43:16 45:1 47:15,22
54:25 59:17 61:9,16
64:14 68:22 80:19
85:9 95:22 99:17
104:2 118:19,24
123:18,19,23 124:7,
25 125:7,11 129:5
131:1 132:23 135:13
141:16 142:5 145:25
147:10,18 151:3
156:14 169:22 173:24
174:5,8,11,14,16
175:19 177:6 178:19
183:6 184:23,25
190:18 192:12 193:15
211:18 223:17 226:25
239:6 250:14 251:4
268:16 270:15 271:21
294:24,25 296:20
297:1,9,11 299:13

**Maggie**  11:5 111:10
181:10

**mailed**  124:14 125:15

**main**  19:25 73:15
97:17 111:8

**maintain**  50:10

**maintained**  50:1,3

**maintains**  65:20 66:1

**major**  144:8

**majority**  62:7

**make**  36:16 45:7 50:9
55:18,21 70:1,5,9,12
78:7 79:6 81:1
82:22,24 83:9 86:6
91:7 92:22 98:10
105:14 109:1 126:19,
20 127:9,13 131:18
143:13 152:15 173:16
175:2 178:4 184:14
198:22 199:5 206:18
207:16 209:19 210:1
213:20 218:6 219:7
225:17,18 226:2
232:7 259:1,20 264:1
267:21 269:9,23
272:7,9,20 273:18
284:23 289:20 298:21

**maker**  24:4,5,8 139:4

**makes**  82:21 105:9
295:13

**making**  22:1 24:18,24

29:24 30:5,13,18,23
31:5,12,15 34:13,14,
19 35:7,14 37:3,9
38:21 47:2 57:2
60:17 103:20 106:5
109:13 118:20 126:8
131:20 134:9 151:24
174:19 194:21 205:24
248:2 262:11 288:18
295:2 296:16
**manage** 49:5 191:2
260:9,19
**management** 21:18
22:10 29:2 30:10
35:6 39:9,12 143:8
209:4 251:8 260:18,
19 281:4
**managing** 108:19
176:15 230:19
**mandatory** 247:15,18,
19
**manner** 10:11 272:5
**Manning** 31:20 63:7
65:9 77:2 84:4
297:4,15
**Manriquez** 64:9 94:4,
18 96:6 103:19
116:19 117:13
124:11,24 180:8,9,
11,21 182:8,18
183:18 222:20 223:15
293:23 295:1,3,5,10,
15
**Marcy** 14:12 15:23
**Margaret** 10:18 11:3
**mark** 13:14 15:9 16:16
18:5 27:13,18 52:25
57:10 62:11 64:23
66:8 98:13 104:10
110:15 127:24
129:14,16 220:2,6
228:15 230:3 233:15
238:19 239:14,20
240:4 264:19 285:22
289:23 297:5,15
298:2
**Mark's** 134:2,3,17
**marked** 13:15 18:12
48:7,8 53:2 57:11
60:6,7 62:13 64:25
66:9 111:5,11,18
185:23 186:3,4

196:10,11 216:16
217:9 230:4 233:16
249:18 263:23 275:4
290:1
**Maryland** 36:14
**mask** 220:3,6
**master** 161:21,25
162:3,11,16 271:20
**match** 169:2 194:22
**matched** 68:19
**matches** 208:23
**material** 153:11
**matter** 9:13 10:7 91:2
113:4 116:19 146:20
172:18 175:14
217:24,25 219:8,18
228:2 235:14 244:23
245:3 266:2 270:13
271:13,15
**matters** 89:25 218:15,
20
**Mckinsey** 230:2
**Mckinsey's** 230:10
**meaning** 41:6 101:17
126:21 129:2 187:8
191:24 205:20 213:12
232:19 246:11 270:3
273:5
**means** 79:16 101:18,20
145:12 154:19 169:20
170:4,12,15 171:23,
24 173:14 203:1,2
219:11 268:19
269:19,20 284:17
292:15 294:9 297:8,
12
**meant** 107:18 140:10
180:21 202:24 249:8
284:8,13
**meantime** 96:8 177:23
**mechanism** 176:14
**media** 20:8 175:2
**median** 240:21
**meet** 11:8 148:5
159:23 198:3 210:22
211:15 213:9,11
**meeting** 24:2,12,13
25:2,3,7 97:22
104:12 168:18,21
174:13 215:14
**meetings** 25:2 28:16

31:12 38:4 97:13,20,
23 112:12 132:19
174:9
**meets** 56:14 57:2
269:3,4
**members** 27:9 29:17
31:7,8 112:23
**memo** 58:2 60:16 63:7,
15 65:9,18 84:12
87:22 137:4 234:4
235:2,16,17,19,23
236:5,8,12,24 237:4,
6,9,12,17 238:14
239:11,16,18,19,21
240:1,10,16,24 273:3
**memoranda** 58:4 68:24
113:1 168:5
**memorandum** 53:6 84:9
89:9,11 98:23 235:5,
10
**memorializes** 89:9
**memory** 13:3 200:7
201:22
**memos** 83:2 129:23
133:11 236:17 273:2
**Menashi** 65:10 68:25
77:1
**mental** 138:14 153:9
**mention** 214:5
**mentioned** 35:17 40:2
276:17 298:13,22
**merge** 147:22 187:17,
22,23 188:15
**merit** 59:2 80:16
101:11,22 102:3
115:18 129:3 169:24
241:24 242:25
**merits** 77:23 80:23
81:25 99:13 126:20
132:9 242:22 247:2
269:23
**Merritt** 10:15,16
25:4,10 34:2,6,21,25
46:14,22 51:9 52:19
65:17,25 69:4,10
73:10,17 74:1,4,12
84:24 86:22 87:1
95:12 112:6,9,19
113:11 116:8 119:6
120:16 121:3,10,17
124:20 126:4,9,16
133:20,25 135:16,21,

25 136:9 138:13
142:24 143:1 144:18
150:6,20,25 153:8
154:12 156:5,10,21
157:7,16 158:5,8
159:8 166:2,10
167:2,6 176:2
181:10,22 182:2,11
184:3,6 212:14,20
213:1,4 214:11,15,21
220:24 221:11
222:13,22 228:20
229:21 231:1,10,20
232:3 234:9,11,21
235:11 237:14 240:6,
13 243:22 247:1,7
249:14 256:6,13
257:2,22 258:7 266:3
273:11,22,25 276:7
278:11,15 279:24
283:19 284:1,9 287:4
288:17,21 289:13,18
292:22 293:6,15
294:4,6 297:16
298:21 300:9
**mess** 111:2
**met** 30:18
**method** 133:6 172:10
230:22
**methodologies** 222:9
**methodology** 23:23,25
24:14 25:1,8 41:1,
21,22 42:7,9,12
43:6,9,11,25 44:6,16
47:12,13 50:21 64:12
67:6,8,9,25 68:2,3,
18,20 70:3,4,8,10,
13,14 71:13 72:5,6,
8,10,22 73:5,8 76:7,
10,12,13,16 77:5,9,
11,13,15 78:1,3
79:9,18,21 80:5
93:22 94:8,14,21,24
95:5,10,17,19,20,24
96:1,22,24 98:19
99:1,4,7,18,22 100:5
101:2,7,12 103:4,6
104:3 109:21 115:9
117:6,8,10,14,17,23
118:4,7,8,9,11,14
119:3,12,14 120:1,2,
6,7,12,20,23 121:14
123:3,7,8,13,25

124:12 128:5,9,11,
12,15 130:12,15
131:24 133:1,9 134:5
135:12 137:23
138:10,19,24 139:8,
15,18,21 140:1,5,15,
25 141:10,13,17,19,
22 142:1 171:15,18,
24 172:9,12,22,25
173:8,10,12 177:9,12
180:13,16 183:20
221:18,22 222:4,6,7,
18 223:1,2,14,17,23,
24 224:3,10 225:7
234:7,16,25 237:20,
24 241:20 242:8
299:18,19,20
**methods** 70:6 71:7,24
95:23 177:15
**metric** 134:13
**metrics** 130:17,19
133:13,17 137:4,9
168:6
**Michael** 28:4,13,18
31:9 97:7,18 235:25
237:7 238:3 239:22
**microphone** 111:25
**mid** 176:25
**mid-november** 235:3,
13,20
**middle** 37:16 69:21
93:19,20 186:13
200:14 203:9 233:23
275:11
**migration** 176:10
**million** 83:13,14
**millions** 88:4
**mind** 39:14 40:9,11
50:8 71:3 75:12,15
98:25 114:10 125:18
136:17 166:13 172:17
181:10 206:2 287:6
290:21
**mine** 74:6 153:18
**minimum** 79:22 192:13
**Minor** 97:19 238:12
**minute** 149:5 250:1,7
**minutes** 57:7 185:8
**mischaracterization**
182:12 297:17,20
**mischaracterized** 85:3

**mischaracterizing**
162:17
**misconduct** 150:16
209:5 237:3 240:19
257:8 281:4 295:21
**misinformed** 174:1
**misreported** 175:2
**misrepresentation**
43:20 45:8,20 47:9,
22 56:3 58:19,23
59:9,13,15,17,23
60:25 61:2,6,8,15
107:5,8,10,13 109:2,
4,7,16 110:4,8,10,12
145:20 152:16,17
164:1,6,11,16,19
165:2 211:18,23
242:4,12 251:15,23
252:23 253:1,5
254:20,22 255:2
260:23 269:4
**misrepresentations**
51:16 163:20 165:17
251:19
**misrepresented** 252:13
**missing** 210:1
**misstate** 157:24
**misstated** 182:15,16
**mistaken** 286:20
287:17
**Mitchell** 54:6 58:3
60:17
**mitigate** 166:1
**mixing** 222:25
**mobile** 259:21
**moment** 83:3 113:23
236:21 275:14 282:12
298:20
**money** 141:23 147:2,19
**monitor** 12:10
**month** 88:10 134:7
**months** 32:12,18
135:11
**moral** 163:18 165:14
166:23
**morning** 11:3
**Motion** 216:15
**mouth** 106:12 137:11
**move** 12:1,2,11 25:15
93:19 113:13 137:1
176:6 212:25 226:5

274:3,15
**moved**   28:25 32:4
  226:6
**moving**   30:9 99:4
  128:7 131:2,14
  141:25
**MPRM**   31:5,14
**multiple**   45:17 90:9
  200:9

---

**N**

**named**   74:5 207:8
  216:25
**names**   14:21 90:3
  194:22 220:3,7,12,
  14,18,19 265:25
  292:3
**narrative**   217:21
**narrow**   46:15 232:1
**narrower**   253:7
**National**   215:24
**navigate**   144:6
**necessarily**   241:17
**necessitates**   45:9
**needed**   79:3 87:6,10
  106:16 251:20
**negative**   135:5
**negatively**   135:14
**negotiated**   24:17
  29:21 30:23 34:12,14
  35:5 38:20 188:19
**negotiating**   29:19
**negotiator**   24:21
**neighborhood**   32:12
  98:3 114:13 116:6
**Nevin**   15:10 16:17
  56:24 73:16,18
  74:11,21 80:13,19,21
  82:13 84:21 85:9
  99:11 104:12 110:25
  119:1 127:2,23
  145:15 171:4,6
  176:19 188:24 202:25
  203:2 238:18 291:23
  292:8 294:19 295:24,
  25 296:2
**Nevin's**   78:6 86:8
  115:16
**nice**   11:8

**Ninth**   139:7
**nods**   21:21 48:22
  197:16 199:19 261:9
  286:7
**non-cci**   117:5 123:25
  124:2 171:15,18
  172:12 173:12
**non-corinthian**   199:21
  200:21 202:20,21
**nonattorney**   56:11
**Nonetheless**   65:25
**noon**   12:17 91:23
**normal**   118:22
**Northern**   67:8 72:9
  96:21 98:15 117:9
  132:24 138:8,23
  139:2,3,25
**note**   19:7 40:11
  176:23
**noted**   55:10 240:13
**notes**   199:7
**notice**   13:7,12 14:9
  29:23 30:5,12 37:8
  188:3 198:5,7
  210:15,25 212:17
  245:21,25 246:1
  247:14 285:15
**noticed**   247:16,18
**notices**   190:9,11
  196:25 197:25 239:1
  256:22
**notification**   93:3
  102:8,10 125:19
  129:12 188:10
**notifications**   42:16
  101:17
**notified**   87:11 102:5
  125:21,23 145:21
  170:5 243:9 249:2,3
**notify**   38:6 188:17
  195:22 248:1,19
**notifying**   101:19
  246:5,17
**notion**   81:7
**November**   9:12 33:2
  103:25 104:1 209:16
  236:5 263:3,9 299:1
**novo**   201:5
**NSLDS**   255:13
**number**   13:25 18:8
  20:13 36:18 42:14,20

43:1,16 49:15 51:2,3
55:7 57:6 63:3
73:16,25 74:8 75:19
76:2 100:12,23 101:9
114:3,7,12 129:8,11
132:2 142:8 156:23
158:21 169:2,3
183:20 184:17,22
196:2,5,7 206:20,21
216:14 224:9 254:18
255:10,11 260:25
263:22 264:9 265:15
275:4,5 280:25
282:15,16 289:25
290:5 293:21
**numbering**   111:3
  113:18
**numbers**   42:25 62:8
  100:10,13 130:14
  132:3 154:4 155:1,
  16,20,22,25 156:16
  157:5 158:3 168:12,
  13 220:21

---

**O**

**O'GRADY**   10:18 11:2,4
13:13,18,24 14:8,12,
17,18 18:4,11,15
25:5,13,16 34:4,9,22
35:15 46:15,17 47:10
48:6,11,14 51:11
52:22,25 53:5 57:14
60:5,10 62:11,17
65:3,22 66:4,7,12
69:1,6,11,18 73:12,
13,20 74:10,19 85:1
86:24 87:3 91:21
92:2,4 95:14 110:13,
19,23 111:6,13,21
112:7,16,21 113:13,
15 116:10 119:7
120:17 121:6,12
122:4,8,15,23 124:21
126:6,12,17 133:22
134:8 135:18,23
136:5,16,20,23 137:2
138:16,17 142:25
143:2,17 145:1
150:9,23 151:12
153:12 154:14,23
156:8,12 157:2,11,22
158:11,14 160:2

166:6,12,18 167:3,9,
13 176:5 181:12,16,
20,24 182:3,13
184:5,7 185:6,10,18
186:1,7 196:1,6,9,14
212:15,21 213:3,6
214:12,18,24 216:21
217:6,12 221:3,13
222:15 223:4 228:18,
21 229:4,23 230:7
231:4,14,22 232:7,9
233:12,19 234:10,14
235:1,6,8,12 237:11,
15 240:9,14 244:3
247:3,10,12 249:9,
16,21 256:9,18
257:11 258:4,9
263:20 264:8,14
266:12 273:15,23
274:3,14 276:8
278:13,18 279:25
283:21 284:5,14
287:7 288:20 289:5,
15,21,23 290:4,6
293:1,12,25 294:5,8,
11 297:18,19 299:6,
25
oath  10:5
Obama  60:24
object  65:17 121:3
156:5 158:6 256:6
292:22
objection  25:4 34:2,
21,24 46:14 51:9
84:24 86:22 95:12
112:6,19 113:11
116:8 119:6 120:16
124:20 126:4,8
133:20 135:16 138:13
142:24 150:6 153:8
154:12 159:8 166:2,
10 167:2,6 176:2
182:11 184:3 212:14,
20 214:11 220:24
222:13,22 229:21
231:1 234:9 235:6
247:1 273:11,22
276:7 278:11 279:24
283:19 287:4 293:13
294:4 297:16
objections  10:10
obligation  91:22
299:3

obtained  234:4
occupation  68:5
occur  126:2 242:4
occurred  47:23 51:16
107:11 109:3 124:3
164:19 256:24
occurring  101:14
OCTAE  20:12,21
October  57:25 250:5
offer  252:7
office  18:25 20:3,5,
8,11,12 21:3,5,13,
14,15,18,24 22:8,9,
10,11 27:11 28:5,6,
9,19,25 30:2,7,10
31:3,7,8,10,12,13
32:3 37:5 38:24
39:2,3,5,8,9,12
41:12 53:19 86:18
88:12 97:12 112:12
114:20 143:5,6,7,8
146:2 161:25 181:6
238:4,10 239:14
271:4 291:9,11
293:22
officer  21:2 27:14,20
33:19 107:25 219:1
251:4
offices  21:17 30:11
37:22 97:15
official  114:14
182:25 251:1
officially  194:2
officials  190:10
236:24 237:5,18
238:15,16,18
oldest  41:7
omissions  47:8 203:14
one's  74:4
one-off  286:18
ongoing  138:12 238:24
256:11
online  259:21
OPE  20:21
open  13:8,24 18:16
48:6,15 52:23 57:5
74:18 111:7 167:14,
16 171:21 207:15
216:20 264:15
289:10,14 290:7
298:23

operate  39:25
operated  71:15 72:13
95:1 218:1 219:9
operating  21:2 27:13,
19 67:16,17 68:7,8
107:25 122:2 138:22
operation  108:20
145:17
operational  105:12
108:6,17 187:10
258:20 263:9
operationally  131:21
219:11
operations  20:25 21:1
50:3 67:20 68:21
105:10 107:16 270:13
opinion  45:21 158:21,
23,25 159:2,4 276:5,
7
opinions  126:9
opportunities  145:4
opportunity  45:23
145:6,22 163:19
165:15 245:4,12
247:22 266:19
opposed  73:19 129:5
161:11 293:10
option  162:14 237:22
245:20 274:22
options  177:22 237:20
239:21 240:1
order  13:9 14:3 80:10
121:5 156:7,9 188:18
225:18,24 247:9
258:3,19 290:5,12,15
ordered  221:2 290:15
orders  233:14
organization  20:19
105:9 107:21
organizations  149:20
original  172:10
174:15 199:11 277:19
281:16
originally  123:11
281:15 297:4
other's  145:7
outcome  9:19 146:15
outcomes  220:5
outlines  120:6
outstanding  134:13,
20,24 151:4

overbroad  46:14 116:9
oversaw  38:25
overseeing  20:2 39:3
oversees  21:6,22
oversight  20:24 21:3,
  4 27:4 30:3,17 37:6
  111:9 112:3 157:19
  249:10,12 250:4
owe  141:23
owned  217:25 219:9
ownership  265:19

---

### P

p.m.  122:19,20
  136:12,13 185:14,15
  228:25 229:1 274:9,
  10 300:20
pace  127:3,11,18,21,
  22,25 128:2 134:9
  177:5
pacing  134:22 175:25
package  38:21
packet  62:25 63:3,6
pages  37:11 83:13,15
  148:15 155:4,7
  168:1,12 207:22
paid  36:1 108:1
papers  283:8
paragraph  19:14 29:5,
  7 36:5,8 37:13,15,16
  40:4,6 41:13 49:18,
  20 50:14 51:5,6
  69:21 71:1,4,17
  75:8,11,16 76:6,9
  77:5 93:18,20,21
  94:25 95:21,25 96:3
  103:12,13 148:11
  153:24 160:23 163:14
  186:10,14,21 188:6
  189:17 194:19 200:2
  201:16 203:7 235:2
  236:23 239:10 240:15
  241:5 244:12,13
  281:10,13 285:4
paragraphs  163:24
  198:13
paraphrasing  252:9
pardon  207:17
parents'  17:23

parse  81:6
part  17:23 24:1 29:7,
  9 67:7 68:14 71:20
  72:2 73:8 76:17
  91:10 96:25 97:5
  103:17 104:13 108:13
  113:20 115:3 121:4
  123:7 131:5,9 135:1,
  2,4 145:9 163:9
  184:24 192:14,17
  197:4 199:5 200:5
  203:12 215:7 235:18
  242:1,7 250:25
  256:22 257:11
  259:11,13 260:4
  279:11
part-one  101:6
partial  104:2 117:14
  120:1 123:2 124:12
  128:12 131:24 135:12
  179:14 180:12,16
  183:19,24 221:17
  222:18 233:14 234:1,
  6,15 235:21 236:7,13
  241:19 243:2 244:5
Participants  9:3
participating  9:25
parties  10:9,12
  252:12
parts  37:23 152:4,7
party  9:18
passed  98:18
past  36:17 57:21
  135:10 155:25 156:2
  246:11,14 255:4
  257:14,18
patently  250:21
path  138:7
paused  183:21
pay  107:24 147:2
paying  151:16 163:21
  165:17
payment  259:21
PBO  108:3,4
PDF  36:20 37:12 40:5
  48:11 49:14 55:4
  63:17,18 69:22 111:7
  144:19 168:23 169:3
  171:10 185:21 197:1,
  10,23 207:14,16,17
  208:17 209:2,14
  215:19 217:3,13

236:18 239:9 241:4
  243:14 265:7 275:7
  281:2 283:1 285:3
  290:18
PDFS  13:25 14:2,19
penalty  10:8 19:8
pencils  140:7,9,13
pending  12:22 65:13
  100:11,14,20 104:2
  116:5 117:14 128:22
  136:17 151:8,19,20
  157:1 172:9 182:21,
  23 220:8 237:1
  243:16 246:6 261:25
  268:20
people  22:15 31:1
  40:21 76:22 97:16
  112:13 131:2,7,10,14
  143:3,4 155:21,23
  159:24 183:5 184:17,
  22 255:7,16 270:22,
  24 271:4 291:7
  298:14
percent  61:11,25
  62:3,6 79:22 80:3
  102:16 103:11
  192:13,15,16 241:20
  243:3,9,19 244:5
percentage  61:17,22
  100:21 103:7 109:9
  116:13 159:5 160:1
perform  26:2
performance  26:6,10,
  24 27:12,14,17,19,24
  28:15,24 29:2 107:15
  108:5 133:18,19
  134:2,3,4,6,10
  135:3,5,7,15
performance-based
  20:19 105:9 107:21
performing  22:4
performs  26:2
period  24:22 26:19
  28:21 32:17 43:17
  48:2 50:19,20 51:1,
  4,14,21 100:3 124:18
  131:12 172:4 177:21
  259:17 263:5 267:15
periodic  168:9
periods  47:24 51:20
  58:18,24

perjury  10:8 19:8
Perkins  20:14,15
permanent  32:8
permissible  152:21
person  10:5 11:15
  22:22 31:2 56:19,25
  85:20 155:20 184:17
  202:1,4 211:23
  260:24 269:20 291:21
  292:4,20
person-by-person
  152:14
personal  11:25 207:5,
  20 217:16 293:13
personally  23:15 25:9
  56:13 85:12 108:21
  148:22
personnel  131:8
pertaining  217:25
  257:7
phase  260:1
phases  260:2
Phoenix  265:20
phone  11:25 15:11
phrase  90:2 137:13
  294:3
phrases  287:11
physically  10:1
pick  276:20
picture  239:24 298:14
pie  243:12,15,20
pies  243:19
pin  181:24
place  30:24 35:7
  40:19 41:21 44:10
  45:8 49:2 52:11
  58:19,23 59:13,15,17
  60:25 66:20 76:18
  78:1 88:12 93:2
  96:22 100:2 106:3
  115:15 135:12 144:17
  164:2 186:18 203:23
  204:22 218:18 241:2
  265:18 282:3,7
placeholder  200:11,15
  201:8
placement  51:18 65:15
  198:2,10 199:3 252:4
plaintiffs  10:19 11:1
  207:8 216:25 298:25

Plaintiffs'  216:15
plan  134:12,15,18,24
  135:2
plate  27:2
platform  176:10
play  166:19
point  19:11,20 21:25
  35:16,19 42:20
  44:14,15 54:11 60:2
  61:20 64:6 66:22
  70:1 83:10 87:13
  89:10 99:18 116:14
  117:8,12 118:16
  122:9 123:4,13
  128:25 129:9,10
  132:14 135:20
  144:11,15 150:14
  160:9 169:7,11 170:9
  171:14,22 173:11
  175:8 176:8 177:4,9,
  13 180:9 182:7
  183:16 199:12 221:1,
  23 226:6,23 229:24
  245:11 257:25 264:2
  272:10 273:9 275:17,
  18 278:1 279:6 280:3
  281:19 288:22 290:24
  295:18 298:22 299:8
pointing  156:13
points  278:4
policies  22:6 23:3
  33:25 39:17 86:8,10
  219:13 231:19 270:17
policy  20:4,24,25
  21:2,6,9,11,12,16,
  19,23,25 22:2,16
  27:10 28:4 31:4,25
  32:2,9,10,23 39:16
  40:7 67:20,23 68:6
  76:22,24 79:1,15
  80:8,9,22 81:8,9,11,
  12 86:12,18,21,25
  87:20 88:18 90:15
  91:3 95:16 103:3
  105:10,14,16,23
  106:1,4,8,13,16,19,
  24 107:5,11 108:9
  109:3,6,8,16,17,21,
  23 110:2,3 114:20
  115:1,6,13,15 117:2
  120:6 121:13 126:10,
  11,23 131:1,17,20
  143:9 145:14,18,19,

20 146:4,20,21
  150:23 151:2,3,25
  153:10 154:16 157:3,
  6,13,19 173:20
  175:15 178:1 179:17
  183:8 192:17 231:6,
  22 232:11,12,18
  234:1,18,25 235:20
  236:6,11,14 241:1
  244:23 245:3 246:19
  247:4 259:6 266:2
  268:24 269:5,8,20
  270:15 271:6 276:5,
  10,12,13,16 277:5,8
  299:9,12,15,17,20,23
policy-making  157:20
  219:12 271:7 293:4
  296:7,9,12
POLITICO  234:5,13
  236:2 241:7
pool  94:23
poorly  163:17 165:8,
  20,22 166:7,16,23
population  232:20
  233:6
portfolio  39:17
  229:8,13,16,17
  230:2,17,23 231:5,
  15,18 232:14
portion  161:15 205:9
position  28:2 33:1
  36:24 37:1 58:16
  85:20 137:19,21
  138:1 139:14 161:22
  178:23 182:6 232:22
positive  135:3
possession  199:23
  200:24 203:5 205:23
  265:3 266:25 268:22
  289:17
post-18-month  257:4
Post-cmc  196:3 282:16
posted  130:6
postsecondary  20:3,5,
  9 21:4,13 30:2,7
  31:3,7,10,13 32:3
  37:5 38:25 39:2
  143:6
potential  94:11 108:1
  151:9 161:15 164:10
  165:21,22 177:15
  191:11 224:24 251:14

298:23

potentially   117:11
  137:24 138:24 140:17
  151:5 201:7 204:20
  227:11 229:22 238:12
power   80:15
Powerpoint   167:18,20,
  21 168:3,4 171:9
  172:1 186:2 243:12
Powerpoints   129:24
  168:2,13
practice   140:19
  219:25
practices   46:8
Pratt   289:2
pre-2016   262:25
preamble   152:3,7
precise   183:12
precisely   198:19
  200:13
Predatory   11:5
predecessor   31:16,18,
  19 32:4,5 272:23
predecessors   31:25
predecisional   287:6
predict   141:6
premise   58:22
preparation   14:23
  113:9
prepare   14:24 15:20
  17:7 18:6
prepared   112:4,10,25
  160:12 239:11,20
  240:4
preparing   15:17 16:6
preponderance   56:14
  57:3 78:16,20,23
  81:19 269:4
presence   9:8
present   10:1 176:10
  245:4,12
presented   124:24
  168:7
preserved   118:21
president   33:13,14,
  16,18
president's   39:10,13
press   249:10,13
  250:3,11,13
Pressley   113:17,23

presume   260:19
pretext   135:24
pretty   63:22 70:19
prevent   115:16 164:1,
  15
prevented   94:4,7
  116:19 117:24 124:12
  182:9
preventing   12:25 13:2
  117:4 118:20 164:6
prevents   115:2,6,13
  183:19
previous   16:8 25:9
  61:16,21 90:13 113:1
  165:8 166:22 217:1,7
  272:22 291:5
previously   45:1 47:12
  49:11 164:19 235:4
primarily   238:3
  264:18
primary   195:1,2
Princeton   36:15
  219:15
principal   19:22 26:20
  27:3
prior   15:15 26:15
  41:2,23 42:15 46:5
  47:21 55:25 56:1,4
  58:16,17 61:4 84:25
  85:3 88:17 90:11
  93:6,9 118:10 131:22
  138:19 140:11 142:14
  152:19 154:17 203:10
  208:20 212:4 213:1
  271:17,18,24
priorities   36:23,25
  151:23 247:4
priority   37:2 225:19
privacy   94:1,12
  117:11 132:25 133:4
  137:24 138:25
  140:18,24 180:13
  224:13
Private   9:7
privately   11:19
privilege   65:21 66:1
  69:4 126:13 278:14
privileged   15:18
  65:19 69:3 86:23
  112:20,22 113:12
  126:5,7 138:15
  153:10 166:3 176:3

229:22 278:12 283:20
problem   14:17 112:1
  126:3 194:16 263:10
  280:21
procedure   67:16,18
  68:9 122:2
procedures   68:7
proceeding   9:4
proceedings   9:23
process   21:17 24:19,
  21,23 26:9 29:22
  30:12 34:15,17,19
  35:5 37:23,25 41:15,
  17 49:5 50:16 53:21
  55:1 71:10 78:9
  81:17 82:19,20 83:11
  100:21 109:16,17
  115:11 122:3 126:13
  127:18 131:2,14
  143:12,24 145:9,10,
  14 146:5,8,9,20,22
  147:16,22 149:23
  152:20,22 153:2,3,16
  157:20 161:3,7,11,
  12,20 162:8,11
  163:2,7 169:17 173:8
  188:9,11 189:16,20
  193:15 199:6,17
  202:7 218:13,14
  224:19,22 241:23
  242:11 244:25 247:25
  248:17 258:16 260:24
  272:25 274:17 275:2
  276:6 278:14 279:4
processed   169:8,12
  170:4,18
processes   37:18 121:4
processing   83:21
  101:17,25 102:6,9
  114:22 125:12 129:8
  134:19 169:14 176:9,
  16 294:22
produce   53:20 299:3
produced   237:13
  240:12 288:19 289:7,
  11
product   67:11
professional   105:3
program   20:14 39:19
  144:10 191:9,10,14
  230:20 241:15 252:6
  257:15 276:19,21,23

277:3,4,6 280:17,18,
22
**programs** 20:9,10,14,
15 39:20,21,22,25
40:2 43:17,20,22,24
44:1,3 47:24 48:2
51:3,14,19,21 52:1
58:18,23 59:6,8,12
60:24 61:4 62:5
165:4 240:22 241:10,
11 276:17,22
**progress** 35:13 131:25
133:12
**project** 11:4 230:19
**projects** 38:11
**promoted** 33:15,17
**prompted** 98:20
**promptly** 139:5
**promulgated** 156:23
**prong** 21:20
**pronounce** 239:13
**properly** 165:12,13
280:22
**proposal** 78:21
**proposed** 29:24 30:5,
12 31:14 35:8 37:8
78:20
**prospective** 164:20
**prospectively** 261:24
**prospects** 209:3,6
281:3,5
**protection** 90:1
**protocol** 66:17,18
67:4 68:19 108:18
270:25
**protocols** 67:2 70:6
270:21
**provide** 34:18 40:22
61:25 98:23 144:24
145:4,6 186:15,25
189:11 195:17,18
201:16 206:5 234:1
235:21 236:7 244:4
247:23 248:4 251:24
252:3 253:13 275:24
278:8 285:5,9
**provided** 35:6 45:7
67:24 93:24 104:7
120:21 159:11 187:25
203:3 215:17,25
243:17 244:1 249:4

255:3 284:24 285:15
293:7
**providing** 145:11
164:9 194:19 246:8
**provisions** 144:9
160:24
**public** 24:22 78:22
130:5,6 143:21 155:4
164:25 259:21 264:4,
5
**publication** 30:13
**publicly** 65:23 264:4
**published** 30:19 35:11
120:13 166:5 224:25
**publishes** 134:11
**publishing** 38:19
165:3
**pull** 84:15 112:14
**pulled** 84:18 133:8
**purely** 271:12
**purpose** 94:13 130:22,
24 141:2 154:5 158:3
229:20
**purposes** 25:14
**put** 22:5 38:8 66:20
72:23 76:18 78:21
106:11 137:10 161:17
164:24 168:1 181:1
188:9 254:3 255:5,9,
10 261:23 279:16
281:10
**puts** 187:23 260:24
261:18

---

## Q

**qualifications** 119:24
**qualified** 49:24 272:2
**qualify** 155:18
**qualifying** 65:14
259:23
**quality** 121:21,24
**question** 12:21 27:24
34:8 35:1 39:15
40:10 55:21 56:7
60:11 64:11 76:5
79:13 83:7 84:20
85:24 88:3 90:9,21
93:1 95:3 97:1
102:17 103:5 105:14,
23 106:14,24 118:2,

23 121:11,12 124:6
130:22 136:17 137:25
139:1,20,22,24
140:21 151:1 153:13
154:21 155:13
157:12,17,25 159:9
160:7,9 181:14 192:5
193:13,22 196:25
205:15 216:6 221:12
234:22 236:3 241:16
245:10 262:2,4
269:17 270:11 275:12
276:3,12,13,15,16
277:1,9 279:10,21
281:11 282:12 283:13
287:15 292:21 293:20
296:10
**questioning** 35:2
65:18 156:6 222:14
231:3 232:6 257:9
258:2 274:2 292:23
**questions** 17:13 34:1
42:18 44:25 56:16
68:3,6 69:2 105:16
106:4 107:2 122:25
123:2 127:12 133:21
181:23 182:1 193:14
207:24 231:25 253:19
257:18 261:3 265:1
275:25 279:13 290:20
292:25
**quick** 64:19 298:22
**quicker** 153:4,6,7
**quickly** 258:5
**quo** 296:24
**quotation** 240:24
**quotations** 55:8,14
**quote** 195:18 199:21
200:21 215:5 236:24
240:19
**quotes** 251:1

---

## R

**raise** 10:21 163:20
165:16 224:13
**raised** 98:16
**range** 88:14
**rankings** 252:12
**rare** 151:5
**rate** 51:18 65:15
198:3 199:3

rating  133:18
rationale  295:22
reach  11:24 12:12
reached  125:4 230:25
read  14:20 29:7
 48:19,21 49:9,11,18
 51:6 71:4 96:4
 103:13 114:4,9 115:3
 144:14 148:13 149:3
 152:2,4 153:25
 163:14,23 164:4,7,12
 210:11 240:7 249:24
 250:9 275:15
reading  54:14 75:12,
 16 136:17 166:21
 167:4 183:15 265:25
ready  18:16 87:12,18
 90:7 179:16 184:1
realize  251:12 258:18
reason  91:10 104:24
 105:7 117:7 135:24
 156:9 157:3,8 195:1,
 2 204:19,20,25 205:9
 207:9 256:25 273:22
 282:8 283:11,15
 284:8,19 287:1,10
 295:11
reasoning  146:21
 151:21
reasons  91:12 92:6
 105:1,5 121:7 156:24
 162:24 163:1,2,3
 166:20 207:20 209:7
 213:7 231:6,9
 256:10,12,24 257:13,
 21 281:6,21
recall  14:5 17:5 43:1
 50:22 51:20 61:20
 63:1,2 64:5,12
 66:19,23,25 72:18
 77:16,19,21 94:19
 97:21 102:15 123:20,
 21,22 125:6,9 127:25
 130:11 132:2 142:12
 160:6,11 168:4
 174:21 193:3,6
 196:18 200:25 201:2
 207:1 236:4 237:4,19
 282:17 285:25
receive  20:11 26:8
 76:3 100:24 210:14,
 16 220:7 288:5

received  47:18 129:12
 169:6 207:23 209:25
 214:1 243:9 275:9
receives  91:13 212:16
receiving  42:1 91:17
 101:13 285:20
recent  233:24 273:3,6
recently  17:9 134:16
 227:22 246:10,11,12
 251:3 260:14
recess  69:14,15
 122:19,20 136:12,13
 185:14,15 228:25
 229:1 274:9,10
reclaiming  248:25
recognize  48:17,18
 57:15 66:13,15
 111:22 167:17,19
 249:22 264:17 290:9
recollection  16:18
 63:13 77:24 249:8
recommendation  54:8,
 17,21,24 58:2 60:21,
 22 61:9 84:3 204:19,
 25 205:9 237:22
 282:7 283:11,15
 284:8,18 287:1,10
recommendations  58:7,
 11 60:17 240:2
reconciliation  277:7
reconsider  277:25
reconsideration
 274:16,17,19 276:6,
 10,13 277:6,15
 278:5,10,21 279:4
 291:3 292:7,11,12
record  9:3,6,23 10:14
 12:19 19:8 38:1 49:3
 54:3 57:22 60:13
 62:19 65:22 69:13,17
 71:4 75:12 96:4
 103:14,17 114:5,19
 115:4 122:14,17,22
 136:5,8,11,15 144:14
 145:8 146:1 148:13
 154:1 158:13 160:7
 163:15 185:17,18
 212:24 217:6 228:24
 229:3 249:14 274:4,
 8,12 289:2 298:17,24
 300:3,8,11

recorded  9:4,5,10
records  194:2,9
 276:21
recover  147:19 248:6
recovery  248:8
recusal  53:17 218:13,
 14,17,24 219:17
 220:23,25 221:5
 265:6
recusals  53:18 219:14
recused  217:23,24
 218:2,19 225:1
recusing  219:3
redact  220:14
redacted  53:21,24
 62:23 63:5 84:4,10
 207:2,19 217:17
redaction  53:22 63:1,
 12
redactions  207:5
reduces  164:10
redundancy  298:6
redundant  184:13
refer  11:6 28:7 76:8
 94:17 109:21 163:22
 197:14
referenced  24:12,13
referring  71:18
 149:2,10,24 154:10,
 11 161:18 162:24
 164:5 165:8 168:11
 173:22 176:11,12
 177:1 187:3,5 188:3,
 14 189:5 193:9
 230:12 234:6 237:7
 238:1 239:23 285:12
 287:5
refers  95:25 161:15,
 20 162:8,23 166:7
 171:18 177:3 250:13
reflect  135:14 191:19
Reform  250:4
refresh  16:18,23
reg  35:11 38:7 78:25
 81:22 82:2 93:6,10,
 13 148:6 152:2,7,13,
 22 155:3 161:15,16,
 19,23 162:10 163:6,9
 164:7 165:1 242:2,3,
 11 247:25 249:6,7
 253:5,10 254:21

255:3 259:2,6,7
**regard**   20:23 23:2,22
   24:14 37:6 46:18
   79:8 106:24 241:16
   254:24
**register**   276:20
**regs**   44:13,16,19
   81:18 86:11,12 93:5
   110:8,10,11,12
   156:14 191:24 193:2
   247:24 248:10
**regular**   28:16 52:14
   91:25 97:20 128:6,
   16,18,20 130:14
**regularly**   97:22
   129:17,19 137:5
**regulation**   16:22
   30:14,19 32:2 37:10
   39:18 43:8 44:20
   45:22,25 46:10,25
   47:5 78:12 92:20,24
   93:2 105:13 107:7
   142:18 143:16 147:4,
   15,21 150:22 151:18,
   22 152:1,4,19 154:13
   156:23,25 157:6,9
   163:17 164:20 165:7,
   11,12,14,20,23
   166:4,8,9,15,17,21,
   22,25 245:6 247:2,4
   252:22,24 253:2,15,
   20 254:6,8,10,11
   299:14
**regulations**   22:3,7
   24:7 29:12,25 37:14,
   20 38:12,23 39:19,
   22,23,24 44:7,10
   45:4 46:3,7,9,12,13
   54:20,22,25 55:2,11
   92:9,12,14,17 93:8
   103:3 106:4 109:4,7
   119:2,11 132:15
   142:9 143:11 144:10
   148:3,18 150:19
   151:7 154:15,20
   156:14 160:24 162:25
   164:17 165:9,25
   185:21 190:25 192:22
   193:10 244:24 245:20
   246:21,25 247:14,15,
   21 248:13 249:1
   254:1,3 255:8,17,19
   261:7

**regulatory**   20:4,5
   33:14,16 38:21
   107:2,12 108:9 144:9
   155:7
**reimbursed**   147:14
**reiterate**   155:3
**relate**   150:23 261:4
**related**   9:18 25:14
   39:22 77:6 94:20
   178:17 182:22 183:15
   209:5 218:21 281:4
**relates**   151:2
**relating**   29:11
**relations**   33:18
**relationship**   20:20
**relative**   153:1
**release**   249:11,13
   250:3,11,13
**relevance**   231:2 274:1
**relevant**   89:25 256:8,
   9,18 257:10 293:17
**reliable**   224:11
**reliance**   242:4,13
**relied**   46:25 94:8
   152:16
**relief**   23:23 24:14,25
   25:8,10 40:22 41:22
   42:1 59:24 61:10,17,
   22,24,25 62:3,7
   70:4,10,14 71:9,13
   72:5,11,23 73:5,8
   76:3,7 77:6,9,13
   79:8,10,18,22 80:7,
   12 96:11 99:9 102:4
   103:4,6,7 104:3
   109:9,14 115:8
   117:14 120:2 123:3
   124:12 128:12 131:24
   135:12 137:23 149:17
   152:12 155:19 159:14
   170:10 171:14 173:11
   179:14 180:12,16
   183:24 188:10 192:14
   221:18 222:18 233:14
   234:7,16 236:14
   237:2 241:20,21
   243:2,3,10,16,17,25
   244:5 248:3 277:3
   280:16 281:7
**relies**   93:24 224:1
**rely**   99:1

**relying**   159:16,24
**remain**   113:24
**remaining**   226:5,7
**remember**   13:19 31:2
   32:13 33:13 35:10,
   12,22 39:23 50:22
   51:17 64:14 72:20
   78:17 83:8 84:13
   87:17,23 88:16
   113:20 129:9,13,20,
   21 130:10 132:4,6,7,
   12,13 160:12 174:12
   190:15,16 197:4,6
   201:5,7 210:17
   224:20 227:14,17
   237:17 238:8 242:18
   246:12 277:17,23
   278:3 282:2 287:20,
   22 288:7,8,9
**remote**   9:9,10,15,22
   11:9,16 300:18
**remotely**   10:3,6
**remove**   162:14
**repayment**   145:5 161:1
   163:17 165:7 167:11
   186:2 209:15 233:8
   275:21 279:8,22
   280:11
**repeat**   298:18
**repetitive**   184:15
**rephrase**   136:21
   138:16
**replace**   120:3 176:13
**replaced**   47:5
**report**   20:16,22
   25:17,20,22 26:3
   48:12,18,19,20,21,
   23,24,25 49:9 51:10
   82:15 128:25
**reported**   28:22 168:6
   235:4
**reporter**   9:21,24
   10:20 110:15,18,20
   111:4,10 136:16,18,
   22 300:5
**reporting**   10:2,11
   25:19 37:20
**reports**   20:7,18 27:25
   28:1 100:9,13,18,24
   101:8,13 129:11
**represent**   196:22
   264:24

representatives  97:12
  238:10
reputations  154:5
  158:4
request  9:6 39:10,13
  274:21 278:21,24
  288:18 291:3,14
  292:7,11,15 293:8
requests  288:23
  289:19 291:10,13
  298:25
require  148:18
required  38:4 251:14,
  15 258:20
requirement  107:12
  249:6,7
requirements  37:19,21
  93:3,11 215:15
requires  92:20 188:11
  222:7
reset  191:7
residing  105:11
resolve  137:15
resolving  134:13,25
resources  71:23
respect  191:18 264:25
respects  109:11
respond  45:23 143:14
  145:7,22 146:11
  193:4 245:16
responded  30:8
response  24:22 30:5
  145:23 149:9 155:5
  196:24 202:17 246:17
  264:25 286:17
responses  30:16
  143:23 144:1 299:1
responsibilities
  19:13,16,21 29:8,9
  157:24
responsibility  26:23
  27:2 37:19 157:20
responsible  20:1,2
  26:11,12 27:14,16,18
  28:17
rest  149:3
restarted  137:6
  138:11
restate  34:7
restricts  114:20

restroom  12:18
result  71:11 165:13
  201:14 244:5 285:8
resulted  38:5
results  47:20 161:8
resume  176:25 236:25
  237:5,18 238:15,23
retained  35:21 36:1
retroactively  92:25
return  69:19
returned  218:22
returning  70:21
revenue  230:23
reverse  178:25
reversed  178:7 184:9
review  15:6 16:17
  26:4 27:15,17,19
  28:15,24 29:2 39:7
  40:15,17 41:21 44:6
  45:6,10,19 47:12,14
  50:15 53:23 55:11
  58:5 66:17 67:2,6
  68:17 71:7,12,18,20,
  21,22,25 72:3 80:16
  81:1,4 83:13,15
  86:15 87:8,19 88:5
  95:23 101:5,6
  112:15,18 113:8
  115:7,17,23 121:24
  125:19 133:19 134:2,
  3,4,6,10,17 135:3,5,
  7,15 142:14 143:24,
  25 144:2 145:8
  146:24 149:5 158:24
  159:1,15,25 163:8
  197:5 199:6,10
  202:9,11 204:19,24
  205:19 210:8 215:10
  218:5 219:12,24
  239:3 241:25 242:6
  259:1,3 268:20,24
  271:23 274:21 276:2,
  4,12 278:16 283:11,
  15 284:7,18 285:14
  287:1,9 289:1 291:2
  294:15,16
reviewed  14:25 15:4,8
  30:7,9 41:7 43:14
  45:2 55:19 57:21
  60:15 63:1,11 66:17
  67:3,17 74:22,25
  129:2 130:20 143:25

  146:2,7 169:22 173:9
  198:21 200:3 201:1,
  3,25 205:11 215:21
  256:20,21 261:5
  272:23 274:19 283:17
  291:20 298:10
reviewer  27:8 143:21
reviewing  16:8 42:8
  43:25 44:1 56:12
  63:12 66:19,23 67:1
  70:7 81:7 83:11,22
  87:12 88:2 101:21,23
  102:3 112:25 136:2
  142:12 156:19 201:7
  218:7 219:3 231:11
  256:14 259:7 268:23
  277:12,14 278:6
  283:5 292:17 294:2,
  12
reviews  26:6,10,24
  27:13,24 53:9 57:17
  62:21 65:7 66:14
  82:17 84:17 114:6
  149:7 187:4 196:17
  197:21 198:17 200:4
  201:11 204:3 206:25
  208:1 217:18 243:23
  250:8 259:5 266:9
  275:16 282:22 294:19
  296:3
revised  13:11
revisited  174:17
revolve  134:24
Riemer  65:11 77:2
rights  146:5,8,9
rigorous  237:23
rise  203:14
risk  154:2,25 155:14,
  17 156:15 157:4,14
  158:1 165:19,21,22,
  24 230:16 232:24
road  150:12
Robin  97:19 238:12
robust  186:16,25
  194:20,23 201:17
  285:6,10
role  22:1,5 25:19
  26:13 27:3 30:20
  31:17,24 32:4,7,8
  33:4 34:10 37:6
  38:10,13,15 39:16
  67:22,23 77:21 79:8,

14 95:9,15 98:14
102:23 103:2 104:24
108:10 109:10 124:5,
8 126:18,23 127:2
132:22 140:11
143:18,20 174:16
177:4 202:16 218:4,7
219:12 220:23
232:11,18 233:10
244:4 246:19 258:11,
12,22 293:5 296:7,9,
12
**roles** 33:11,20 40:8
271:6,8 290:21
**roll-up** 220:21
**room** 10:1 31:2
**rotated** 265:9,16
**roughly** 236:25
**rounds** 264:3,5
**rule** 24:18 29:24
30:5,12,23 31:5,11,
15 34:12,14,19 35:7,
9,14 37:3,8,9 38:21
78:20 106:1 143:20,
25 162:7 177:8,24
254:23
**rule-making** 24:10,21
29:20,22 34:15,16,19
35:5 78:8
**ruled** 140:17
**rules** 38:20
**ruling** 94:16,20 239:7
**run** 63:21
**running** 263:2
**runs** 11:11 27:5
**Ryan** 9:21

                S

**sadly** 97:9
**sake** 12:20
**sale** 229:7,15
**Salesforce** 251:8,11
258:19 260:7,8,11,
13,14,18
**sample** 198:1 287:17
**satisfied** 76:1
**scale** 107:24
**schedule** 109:8
**scheduled** 12:17 97:22
176:24

**school** 42:2,4 45:10,
22 50:5 81:24 91:16,
17 92:8,17 93:3
114:23 145:11,20,21
146:9,10,11,22
147:2,14,20,24
164:10 190:5 193:25
194:2,6,8,9,21
202:22 203:13,15
206:11,14 208:21
209:4 212:6 217:25
220:18,19 226:1,22
227:9,17 228:5
245:25 246:1,17,24
248:6,25 249:4 257:8
265:19 267:14 268:8
280:22 281:3
**school's** 146:14,18
247:22
**schools** 45:12 71:15
72:13 91:8 95:1
116:7,21 139:10
141:2 144:15,24
145:3 150:16 170:25
172:13 192:18 199:22
200:22 202:20 216:2
218:12 220:4,9,12,15
221:20,22,25 222:1,
3,5,21 223:21 225:2,
3,5,8,14,18,20,24
226:5,7,10,14,24
227:1,2,4,10,24
244:20,25 245:3,11,
21 246:2,7 247:15,
16,19 252:3,5,11,13
295:20
**scientifically** 237:23
**scientist** 70:2
**scope** 25:4 34:3,21
51:9 112:6 120:16
121:4 133:20 135:17,
19 142:24 150:7,10
154:12,22 166:2
167:7 221:1,10
222:13 229:21 231:1
232:4 247:1 256:6
258:2 265:22 268:12
274:1 293:9,14
**scorecard** 164:9,14,
22,24 224:21,25
**screens** 63:20
**scroll** 53:8 75:25
114:11 160:18 199:4

203:22 217:3 275:7
281:1 290:19
**scrolled** 198:8 265:8
**scrolling** 144:20
199:24
**scrolls** 160:20
**search** 288:15
**seat** 181:7
**secondary** 26:23 27:8
**secretary** 19:23,24
20:7 21:5,14 22:8,
12,19,20,22 23:3,7,
9,24 24:8,19,24
25:7,20 26:21,22,25
27:1 32:5,7,23 54:6
58:2 60:17 63:8 84:5
93:23 98:7 128:5
129:15 130:21 133:12
150:14 160:25 168:6
181:6 186:3 202:9,11
234:18 236:4 239:21
257:6 269:13 272:1,5
273:7 294:22 295:19,
21
**secretary's** 22:18
26:1 39:4 136:4
160:8 231:13 292:19
**section** 161:16 164:4,
12 282:1
**sections** 248:11
277:15
**security** 93:25 94:9,
12 98:22 99:2,6
133:3 172:6,7,14,20
173:17 255:10 260:25
270:20
**seek** 278:9
**seeking** 237:2
**selectivity** 252:13
**semesters** 252:8
**semi-autonomous**
105:17 108:6
**send** 127:14 175:16
179:7,17,23 182:19
187:6,12 191:2 192:7
194:7 220:12 221:9
227:18 285:17 288:23
**sending** 175:21 179:8
188:20 220:17 228:11
**senior** 32:23 33:13,
16,17 107:24 182:25

sense  19:11,20 25:6,
  18 26:3 29:16 42:24
  273:16 293:2 295:13
sentence  50:7,14
  103:13 104:14 149:2
  156:13 161:6 162:23
  163:14,22 165:6
  166:7 167:5 187:2
  189:10 190:7
sentences  49:19 51:5
sep-  102:22
separate  12:10 27:23
  61:16 102:22 119:11
  125:18 129:7 180:14
  191:3,4 271:20
separated  110:21
  248:7
separating  59:22
separation  105:20
September  176:25
series  53:23
serve  19:22 27:8
  163:25
served  17:20,25 261:3
  272:11
serves  253:19 255:14
service  35:25 188:13
  259:21
servicer  187:6,8,15,
  16,21 188:16 189:1,
  2,3,4 190:11
servicers  187:10,11
  188:9,12,23 189:5,9
  285:17
services  39:8 190:10
  252:4,5
serving  32:6
set  43:21 81:9,11
  109:23 110:2,3 192:7
  226:18 262:12
sets  107:7 109:8
  120:6
setting  81:8 95:16
  276:9
settlement  290:5
shakes  221:15
share  83:9 266:13
shared  98:17 227:4
she'd  90:16
shed  256:25 258:14

sheet  67:12
shifted  44:20
shoes  279:16
shoot  73:24
short  64:17 122:11
  181:11 197:24 232:6,
  8 274:5
show  214:16 255:21
  258:5 286:11,14
  290:5
showed  76:25
showing  14:2
side  145:7
sign  22:23 23:24
  24:1,20 53:14,17
  82:10 84:21 85:7,14,
  21 171:2,7 221:5,6
sign-off  202:2
signature  19:5
signed  19:8 25:8
  84:13 235:3,13,19
  272:23 278:1 281:18
  283:24 291:21
signer  26:23 202:8
significant  96:9
  98:10 131:4
significantly  131:12
  240:20
signing  283:25
signs  84:6 85:12
  202:6
similar  57:18 201:24
  240:22 278:2
simplify  155:13
simply  100:18 189:8
  286:24
single  25:7 141:14,18
  155:6 296:3
site  41:24 59:7
  120:11,13,21 253:13
  259:19
situation  11:16
  172:3,10 190:21
situations  189:24
  195:4,6 208:8,12
six-digit  68:5
sixth  144:18
size  131:6
slice  243:20
slide  177:2

slightly  20:21
slow  160:18
small  39:5 143:10
  151:8,9
smart  253:16,23
  255:5,20 256:2 259:4
smartphone  11:23
smartphones  11:19
smoothly  11:11 63:22
social  93:24 94:9,12
  98:21 99:2,5 133:3
  172:6,7,14,19 173:17
  255:10 260:24
sole  77:4 84:21
solely  71:25 72:14
  76:8 103:6 157:21
solicit  246:23
somebody's  135:7
someone's  272:9
sort  89:8 161:21
sound  64:20 127:7
sounded  127:10
sounds  127:6 182:4
source  206:4 215:11
  224:12,16,24 230:23
  268:7
sources  45:16,17
  215:13
speak  67:5 71:19
  141:4 169:18
speaks  151:23
special  161:21,24
  162:3,11,16 271:20
specific  18:6 30:16
  56:19 132:12 168:4
  203:6 211:9 293:9
specifically  63:2
  158:16 228:14 231:25
  275:17 280:7
specifics  214:23
speculate  99:15
  118:12 135:7 140:2
  178:13 210:7,9
speculating  68:12
  104:6
speculation  68:14
  222:23 273:12
speculative  159:8
  184:21,24 212:14,20
  214:11,13 234:9
  235:7 279:24 294:4

speed  30:21 31:1,11
spellings  300:6
spending  64:17
spent  16:6,8 36:11,14
  37:21 38:1
spoke  15:20
spook  179:18
spot  281:20
spotlight  264:13
spreadsheet  259:11,12
  265:9,12
spreadsheets  49:4,7
  176:14
spring  98:5 118:7
  173:20 175:19 178:1
squarely  257:21
staff  22:18 26:2
  27:7,9 30:6 31:3,4
  143:5,6,7,8,9,10,22
  238:13 252:5 292:3,4
standard  44:19,21
  46:19 47:1,4,6,7
  56:15 57:3 67:16,17
  68:7,8 75:24 78:15,
  18,19,21,24 81:20
  86:13,19 87:15,20
  88:19 89:3,9,13,20
  90:15,16,19,23,24
  91:4,7,8,14 92:7,8,
  12,15 100:2,4 103:23
  104:16,17,21 106:15,
  17 107:1 122:1
  159:23 191:25 192:5,
  25 193:2,4,5,6,9,19
  195:8,10,12,15,20,23
  203:24 204:15 209:22
  210:20,22 211:2,9,
  12,14,16,22 212:1
  213:9 244:18 256:1
  261:2,4,7,11,12,14
  262:4,7,20,21 269:5
  281:22 282:5 283:12,
  23
standards  86:15 89:23
stands  39:24
start  29:18 37:15
  38:16 87:12 90:7
  98:2,18 101:4,8
  130:9 131:13 207:14
  274:24
started  25:15 31:24
  32:1 33:7 46:5 50:23

127:7 133:7,8 134:17
  227:18 245:8 246:5
starting  163:15
  229:24 245:6 246:9
starts  153:24 197:11
state  10:13 41:13
  44:19 45:14 46:18
  47:1,2,5 60:13 62:19
  65:4,22 85:4 86:13,
  15,19 87:15,20 88:19
  89:3,9,13,20,23
  90:12,15,16,19,23,24
  91:4,6,8,14 92:7,13,
  15 100:2,4 106:15,
  17,19,21,22,25
  147:9,12 182:7
  185:19 191:25 192:3,
  25 193:4,9,19 195:8,
  10,12,15,20,23
  203:15,19,24 204:6,
  14,17,21 205:3,10
  208:3,7,8,21 209:1,
  8,19,21 210:20
  211:1,9,11,14,25
  212:7,9,10,12 213:8
  214:6,10 215:2,7,9,
  11 216:7 234:12
  250:2 256:1 261:11,
  14 262:21 281:22
  282:5 283:12,23
  287:6 295:21 298:24
stated  116:6 189:8
  214:15 241:6,7
statement  9:22 45:1
  47:11 84:25 85:3
  92:23 107:14 157:14
  158:1 162:18 195:2,3
  212:8 213:8 240:25
statements  49:12
  150:21 250:16
states  86:16 88:22
  89:24 90:5,9 186:14
statistical  97:15
statistics  220:4
status  296:24
statute  21:1 147:8,11
  163:18
stay  236:20 300:5
stem  114:23
step  73:6,7 75:19
  76:2,8,14,16,19,21
  77:15,17,20 78:4

79:4,14,16 80:9,11
  81:13,15 82:11 96:25
  99:18,22 100:7
  101:24 102:3,4,12,
  13,21 104:25 106:14
  108:24,25 109:11,12
  110:1 116:23,24
  117:2,3,4,6 118:3
  119:4,8,9,19 129:5
  141:17 170:13 183:25
  242:12,13,14,15
  243:1 248:7,22
  299:23
step-one  72:25 75:13
  76:4 78:9 83:18 84:8
  85:7 99:17,24
  100:16,25 102:11
  103:21 104:1,17
  106:8 108:14 116:19
  118:17,24 120:23
  126:20,24 127:3
  129:4 141:14,15
  142:5 170:13,19
  175:11 241:18 242:24
  243:17
step-two  72:25 75:13
  76:4 79:2,3,11 84:8
  95:17 99:9 100:5
  101:1 102:12 116:20
  117:15,19,24 118:20
  120:19,22 121:4,13,
  14 124:1,25 170:23
  183:23 226:10,24
stepped  28:14
steps  75:19 76:16
  138:18
Steve  65:9 77:1
Steven  68:24
stipulation  10:13
stop  116:23 117:2
  149:1
stopped  220:17
  250:18,19,21 272:25
stopping  165:2
story  236:2 256:23
strange  11:8
strategic  134:12,15,
  18,24 135:2
Stratford  235:25
  237:7 239:23
Street  9:17

strictly  270:3
structure  25:19
  108:2,12
student  11:5 20:17,18
  29:13 36:22 37:6
  39:20 56:6 97:10
  101:19 105:8 114:21
  134:11 141:18 187:9
  188:12 191:9 203:4
  210:11 215:24 219:4,
  21 231:23 239:15
  241:13 249:3
student's  249:2
student-loan  230:2
students  42:3,5 44:2
  55:8 59:1 65:14
  95:24 117:5 123:4,
  12,14,15,25 124:2,
  14,19,23 132:10
  139:9,16,19 150:15
  163:19 164:18 165:15
  183:20 218:11 249:2
  257:7 295:19 297:12,
  14
subcategories  206:7
subfolders  14:1
subject  44:15 63:8
  66:2 150:16 215:10
  235:14 257:8 295:20
submission  291:2
submissions  145:7
submit  44:2 142:2
  149:13,18 155:18
  175:9 206:9 216:9
  247:17,19 248:21
  266:17,19,21 274:19,
  21,22
submits  146:12
submitted  15:5,9,10
  40:23 45:12 75:21,22
  103:17 125:2 142:4
  194:5 206:12 209:11
  211:17 215:22 216:24
  244:16 266:23,24
  267:13,25 281:15
  298:25
subscription  142:20
subsequent  40:8 100:4
  259:5
subsequently  35:8
subset  23:1 253:7

substance  279:6
substantial  37:20
substantiated  170:2
successful  71:14
  72:12 78:3 103:22
  104:15
successfully  275:25
suffered  152:12,17
sufficient  267:9
suggest  122:11 255:18
  288:25
suggested  116:22
suggestions  260:22
suit  291:4
Summary  144:8
summer  32:16 176:9
superseded  58:12
  60:21
supervise  56:23 99:14
  115:25
supervision  28:23
  104:5
supervisor  20:6 28:13
supplies  267:8
support  9:16,22 50:2
  148:17 215:23 274:23
supported  75:21
supporting  50:5
suppose  25:24,25 44:2
  55:21 109:6 233:3
supposed  45:19 195:25
surprise  214:8,20
surprised  139:13,17
  214:14 287:9
suspect  228:4,9,10,22
Sweet  9:13
Sweet's  217:15
sworn  10:6,24
system  176:13 194:14
  215:24 251:8 253:18
  255:13 257:19
  260:18,20 261:19,21
  262:19 271:3
systems  49:2 176:9,16
  187:19 190:11
  257:12,14,16,23
  260:8 270:18,19,22

T

table  130:2 181:7
  226:17,19 227:19
  243:21 265:13,14
  280:19 298:15
tables  121:20,22,25
  122:2 222:7,10
  224:1,3 225:7,17,19
  227:3 228:5
tabs  177:5
tailored  11:16
takes  189:10 222:12
  246:18
taking  30:24 42:19
  100:2 102:18
talk  14:22 49:10 60:1
  110:24 113:16 136:6
  196:20 197:7 198:14
talked  73:7 104:20
  126:22,24 132:16,17
  158:17 221:8 258:10
  291:19 293:4,6,19
  299:8
talking  13:4 24:9,11
  38:13 44:5 46:1
  49:20 70:4,10 93:17
  99:8 113:25 128:8,9
  161:4 164:13,23
  165:11 168:5 169:13
  180:6 189:8 197:6
  198:13 208:2 211:7
  225:6 239:17 254:24
  287:5 292:13
talks  43:8 161:23
  168:10
tally  168:11
target  154:4 158:3
tasked  22:14 95:15
  121:15
taxpayer  230:21,24
teacher  159:14,18,19
team  29:17 31:1 67:7
  80:20 82:21 83:11
  85:15 89:17 97:8
  112:14,24 115:16,20
  119:8,25 121:19,21,
  25 129:18 131:6,11
  133:7,8 143:3,4
  169:21 171:5 206:18
  222:9 224:2 237:21

238:19,21 261:19
268:16 296:2,3,4
**team's** 260:18
**teams** 121:23 239:20
240:5
**Tech** 83:12 90:7
**technical** 20:12 263:4
**technically** 28:12
46:6 54:24
**technician** 9:16
**technology** 25:11
70:17
**Ted** 54:6 58:2 60:17
**teenager** 17:23
**telling** 159:24 223:25
295:12
**tells** 159:17
**temp-** 212:2
**template** 187:14,25
188:3 193:16 200:9
201:2 204:7,8,16,18
205:1,7,8 207:25
208:19,23 210:14,17
211:8 212:2,22,23
214:2,25 218:10
275:9 282:11,12,13
283:2,17,25 284:17
285:8,18
**templates** 202:2
207:11 218:8 285:11
**temporary** 263:5
**ten** 36:11 111:11
**ten-page** 239:11
**tenure** 26:19 40:7,12
44:11 156:3 223:8
228:8 296:21,22
**term** 53:22 70:8,11,12
101:10 102:6,9
230:18
**terminology** 53:15
102:1,2 169:23,25
203:6 239:5
**terms** 24:25 53:18
73:11 206:8 247:5
279:2,6 299:21
**test** 242:2,8,19
**testified** 10:24
117:18 124:10 137:3,
8 222:19 223:10
281:24 283:22

**testify** 137:11 298:16
**testimony** 10:7 55:22
56:6 112:5 113:10
139:11 158:19 182:12
297:17 300:12
**text** 208:18 278:2
283:5,10 284:21
287:3,9,18 288:3
**theoretical** 267:19
**thereof** 131:25 299:10
**Theresa** 9:13
**thing** 46:4 98:20
131:17 201:23 205:16
206:14
**things** 11:14 127:7
128:7 171:23 182:7
248:10 251:22 255:1
264:22
**thinking** 98:19 181:14
**thinks** 294:9
**thought** 126:1 153:5
180:20 251:25 278:16
**thoughts** 126:9 153:9
284:2
**thousands** 214:9
287:10
**three-page** 14:6
**threshold** 213:16,17
215:15
**tied** 295:3
**time** 9:12,13,20 12:21
16:5,8,9,10,21
26:13,19 28:21 31:10
32:17 33:15 36:13
37:22,25 38:8 40:23
43:17 44:5,7,9 46:10
47:24 48:2 50:19,20,
25 51:4,14,20,21,24
52:10 58:18,24 61:10
64:6,18 65:12 66:22
69:13,17 89:21 94:3,
8 98:17,18 100:3
114:8,12,13 116:14
117:17 118:1,5,7,16
122:17,22 124:7,9
126:10 129:10
130:13,14 131:12,22
132:1,5 133:10
136:11,15 138:9
141:25 148:4,5 152:5
156:2 160:9 164:3
172:4,16,24 173:3,25

174:17 175:8 177:7,
9,13,21 178:5
185:13,17 186:9
188:16 189:13
190:17,19 199:14,15
221:24 222:8,12
228:24 229:3,6 238:5
240:7 243:22 246:16,
23 252:7 263:6
267:15 274:5,8,12,13
284:2 289:20 299:11
300:11
**timeline** 16:23 30:18
35:12 38:22 44:5
64:15 88:16 224:20
238:8 291:2
**timelines** 38:10,19
**times** 17:17 43:21
44:1,3 65:24 130:2
273:17
**timing** 183:12 228:2
**tiny** 39:5
**title** 19:15 33:19
39:18 40:2 48:18
66:16 230:1
**titled** 52:13
**today** 9:11 11:6,21
12:7,16,25 14:10,24
15:11,13,14,15,23
17:6 26:14 70:19
73:1,11 115:19
142:15 158:19 207:9
234:8,17 236:13
244:15 258:10 263:7
271:14 273:17 281:25
285:14,19 286:20
290:17 293:4 299:5,9
**today's** 15:20 16:6
74:23 142:13 300:12
**told** 40:20,24 41:1,
10,24 51:1 59:12
64:2,3,13 71:20
83:12,14 90:6 98:21
104:4 115:23 116:24
120:12 125:12,15
128:14 137:22
159:17,21 185:3,5
212:12 238:2 259:4
285:23
**tool** 250:5,10,15,18,
19,21 253:13,16
254:25 255:5 256:2,
4,8 258:15,23 259:9,

11,22,25 260:16
261:25 262:5,24
263:1,3 264:2,3
**top**  36:9,20 52:20
74:14 113:19 114:18
188:7 216:12 239:10,
12 252:16,18
**topic**  22:25 25:11
158:15 231:20 244:14
256:7,13,17 274:16
291:18 292:9,16
296:8,13
**topics**  135:21 136:1
222:17 257:10 290:25
291:17 293:10,20
**total**  76:11 101:9
130:14 132:2
**totally**  63:21 113:3
180:14
**touched**  244:14
**track**  49:2
**trained**  56:13 272:17
**training**  53:16 70:2
272:19
**transcript**  13:17
18:14 48:10 53:4
57:13 60:9 62:15
65:2 66:11 111:20
112:2 185:25 186:6
196:13 216:18 217:11
230:6 233:18 249:20
263:25 290:3
**transcripts**  50:6
**transfer**  58:8 65:16
**triggered**  98:25
**TRIO**  39:20
**trouble**  73:22
**true**  92:9 205:6
226:15 233:3 241:8
271:24 292:6
**Trump**  41:18 43:18
230:1
**trust**  80:25
**truthful**  12:25
**turn**  63:14 69:20
264:11
**Twenty-six**  186:11
**two-part**  241:23
242:2,8,19
**two-step**  147:16
242:10 247:25 248:17

**twofold**  108:16 130:25
**type**  136:22 205:8
287:18
**typed**  136:23,25
**typical**  58:4 285:24
286:9

---

U

**U.S.**  9:16,21 32:24
**Uh-huh**  29:4 58:10
63:10 93:16 144:13
161:5 169:4 174:20
185:9 203:17 236:22
245:2 275:10
**ultimately**  20:7 28:17
33:17 38:5 39:8,12
44:11 72:8 77:8
78:23 82:15 130:4
141:5 224:17 297:4
**umbrella**  23:5
**unavailable**  176:17
**unclear**  171:7
**under-**  76:18
**underlying**  295:23
**undersecretary**  26:20
27:4,12
**understand**  36:11
40:12 41:18,20 44:4
49:3 63:21 66:25
70:13 71:22 72:7
86:16 91:11 102:2
104:23 105:22 106:12
115:12 116:18 120:18
138:1,3 147:6,8
148:20 150:2,11,17
151:13 157:2 158:23
159:1 166:20 169:9
178:3 181:9 182:6
184:16 189:14 191:7
206:1 208:12 215:6
220:13 221:4,9
222:17 225:16 240:23
242:20 251:21 256:23
260:14 271:10 293:12
296:20
**understanding**  36:25
40:16 42:11,13,23
45:3,5,22 46:11
47:15,17,25 48:4,5
49:5,8,11 52:4,7
55:15 56:24 58:15

59:10 60:23 61:3,11
62:2,4 77:25 81:8
84:20 85:8,18 88:18,
21 89:24 90:4,8,15,
17 92:10,16 94:2,6,
10,13 98:23 106:7,23
108:11 116:2 123:10
130:21 140:10,12,14,
16 146:13,14 150:13
162:13 174:22 182:7,
17 183:10 187:16,18,
21 188:22 201:13
205:2,5,12,20 239:2
241:21 248:12,14,15,
19 257:15 259:8
260:6,12 261:17
263:4 264:21 266:11,
14 268:18,21 273:20
274:17,20 275:1,23
284:17 293:2 295:6,8
**understands**  81:1
**understood**  47:14
70:15 138:5 154:17
**undertaken**  96:8
**underway**  29:22
**unfounded**  148:23
**unit**  54:5,17 55:11
56:25 58:1 60:16
66:16 67:2,19,24
68:14,16 78:6 80:14
104:5 105:11,17
106:5 109:18,24
119:18,21 125:4
138:22 159:11,16
162:5 169:21 226:4
239:2 245:8 246:5
260:9 271:20,21,22,
25 279:14
**unit's**  176:14
**Universities**  28:12
**university**  27:6
36:14,15 265:20
**unnecessary**  209:20
**unprocessed**  113:24
**unredacted**  84:15
**unsubstantiated**
154:3,7,25 155:15
156:15 157:4,15
158:2,15,22 159:6
**unusual**  210:25
**up-to-date**  134:19

update   129:10 168:10
updated   133:12
updates   35:6 101:4
  128:6,16,18,20,24
  130:8,13,14 131:25
  132:1,3,7,12,15
  188:11
updating   35:12
Urban   33:5
usual   211:3
UTC   9:12 69:13,17
  122:17,22 136:11,15
  185:13,17 228:24
  229:3 274:8,12
  300:11

**V**

vague   119:6 124:20
vaguely   161:20
valid   175:4,5,9,10
  252:19
valuation   229:12,15,
  16 230:13,14,17
  231:5,18 232:13
variety   56:9
verbally   10:6
verbatim   237:1
versa   231:18
version   198:19 200:8,
  15
versus   9:14 78:17
  81:19,24 106:4
  125:19 203:4
vice   33:13,14,16,17
  231:18
video   9:10,16 300:8
view   45:9 115:14
  165:25 210:24 242:21
  272:4 273:9 294:15,
  23
viewed   131:10
views   154:16 166:3
violated   180:13
violating   140:20
violation   47:2 93:25
  94:11 117:11 133:4
  137:24 138:25
  140:18,23
visible   48:15

vital   189:15
voluntarily   217:24
  218:19
voluntary   218:17
  220:22 265:6

**W**

wages   240:21
wait   133:1 140:8
waiting   96:6 133:5
  140:22 173:15 177:8,
  13 179:15 180:10
waive   10:10
walk   145:10,13,18
wanted   14:22 83:25
  86:24 123:14 128:5,
  15 131:2,14 137:15,
  16 179:6 299:8 300:5
wanting   183:17
warehouse   130:4,7
water   12:18
ways   259:20 263:15,
  16,17
Web   41:24 59:7
  120:11,13,21 250:5,
  10,15 253:12,13
  256:4,8 258:15
  259:8,11,18 260:5
weedy   193:25
weekend   300:14
weekly   129:20,22
weeks   233:24 298:25
weigh   105:24 270:5,8
Westlaw   142:20
whatsoever   96:2
whistleblower   250:14
White   28:11,22
whoops   177:20
windows   123:12
wishes   274:18
witness'   293:13
wondering   15:20 23:15
  34:10 127:1 146:20
  166:13 209:17 229:5
  235:22 269:15
word   54:14,15 70:3
  89:1 146:1,6 159:7
  230:15

words   59:16 73:1,2
  82:4 106:11 137:10
  169:13 172:21 243:6,
  7 252:10 282:3,6,8
  294:10
work   11:12 17:13
  29:16 30:1 51:2
  56:19 63:20 67:11
  86:17 89:23 122:1,5,
  9,10 173:10 187:18
  188:9 219:14 259:23
  270:22 283:8 293:3
worked   29:10 36:13
  40:21 112:24 149:12
  219:15
workflow   120:19
working   32:1 33:6
  35:18,20 36:12,13,15
  97:17 119:3 120:2
  127:18 133:9 149:13
  177:14 186:15,24
  189:18 190:9 221:17
  258:24 285:5
workload   28:13
works   39:8 120:12
  218:14 220:13 256:2
  262:24 292:2
world   179:3,5 267:19
wrap   258:5
write   18:18,24 30:15
  37:17 40:13 87:21
  93:21 143:22 177:2
  186:23 205:3 284:21
  285:4
writes   235:25
writing   18:22 143:16
written   54:5 60:20,22
  89:15 92:25 103:25
  129:23 157:6 166:21
  209:13 239:17
wrong   53:14 110:25
  144:17 178:21,24
  182:5 183:17 186:18
  230:15,18 280:4,6
  287:21
wrongdoing   265:4
wrote   31:5 76:22 94:3
  142:19,23 143:3
  199:16 215:4 280:16

**Y**

**year**  26:14 88:10
 173:5 199:15 246:12,
 14 259:18
**years**  17:21 26:15
 36:12,14
**York**  9:17,18 65:24

**Z**

**zip**  13:22,25 52:12,13

```
1      I have read the foregoing transcript of

2   my deposition given on November 20, 2020, and

3   it is true, correct and complete, to the best

4   of my knowledge, recollection and belief,

5   except for the corrections noted hereon

6   and/or list of corrections, if any, attached

7   on a separate sheet herewith.
```

8      I used the editing tools available in Adobe (including highlighting, comment

9      bubbles and strike outs) to note corrections on the transcript itself.

10

```
11                              Diane Auer Jones

12          _____

13          DIANE AUER JONES

14          December 24, 2020

15

16

17          Subscribed and sworn to

18          before me this _____ day

19          of _____, 2020.

20

21

22          _____

23          Notary Public

24

25
```

1

2                    E R R A T A   S H E E T

3         I, DIANE AUER JONES, do hereby certify that I

4   have read the foregoing transcript of my testimony, and

5   further certify that it is a true and accurate record

6   of my testimony (with the exception of the corrections

7   listed below).

8   PAGE   LINE    CORRECTION
                        SEE CORRECTIONS ON TRANSCRIPT
9   ____  ____    _____

10  ____  ____    _____

11  ____  ____    _____

12  ____  ____    _____

13  ____  ____    _____

14  ____  ____    _____

15  ____  ____    _____

16  ____  ____    _____

17  ____  ____    _____

18  ____  ____    _____

19  ____  ____    _____

20  ____  ____    _____

21  ____  ____    _____

22  ____  ____    _____

23  ____  ____    _____

24
    12/24/2020                  Diane Auer Jones
25  Date                        DIANE AUER JONES

Page: 16

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:16:04 AM -05'00' |
|---|---|---|---|---|

Borrower Defense

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:15:48 AM -05'00' |
|---|---|---|---|---|

Borrower Defense

Page: 20

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 7:57:53 AM -05'00' |
|---|---|---|---|---|
| | my office | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:16:55 AM -05'00' |
|---|---|---|---|---|
| | my office | | | |

| | Number: 3 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 12:53:44 PM -05'00' |
|---|---|---|---|---|
| | oversee | | | |

| | Number: 4 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:17:30 AM -05'00' |
|---|---|---|---|---|
| | oversee | | | |

Page: 22

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/21/2020 12:55:43 PM -05'00'
Counselor to

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:17:46 AM -05'00'
counselor to

Page: 24

Number: 1        Author: Diane.Jones        Subject: Sticky Note        Date: 12/23/2020 7:59:47 AM -05'00'
a negotiated

Number: 2        Author: Diane.Jones        Subject: Highlight   Date: 12/23/2020 8:18:07 AM -05'00'
a negotiated

Page: 25

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 12:58:48 PM -05'00' |
| methodology |

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:18:18 AM -05'00' |
| methodology |

Page: 26

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:00:24 AM -05'00' |

my performance review

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:18:34 AM -05'00' |

my performance review

Page: 30

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:00:55 AM -05'00' |
| do |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:19:09 AM -05'00' |
| do |

Page: 31

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:01:59 AM -05'00' |

NPRM

| Number: 2 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:02:29 AM -05'00' |

led

| Number: 3 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:19:51 AM -05'00' |

NPRM

| Number: 4 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:02:53 AM -05'00' |

NPRM

| Number: 5 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:20:03 AM -05'00' |

NPRM

Page: 33

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/23/2020 8:20:34 AM -05'00'
that was

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:21:00 AM -05'00'
that was

Page: 36

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:22:03 AM -05'00' |

spent time working

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:22:23 AM -05'00' |

spent time working

Page: 43

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:04:30 AM -05'00' |
| prior |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:22:44 AM -05'00' |
| prior |

Page: 49

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:29:35 PM -05'00' |
finding

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:23:08 AM -05'00' |
finding

Page: 76

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:44:00 PM -05'00' |
2017

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:23:23 AM -05'00' |
2017

| | Number: 3 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:44:15 PM -05'00' |
limited

| T | Number: 4 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:23:58 AM -05'00' |
limited

Page: 89

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:51:28 PM -05'00' |
| --- | --- | --- | --- |

that

| Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 1:51:34 PM -05'00' |
| --- | --- | --- | --- |

Page: 116

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/21/2020 6:32:06 PM -05'00'
stopped

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:24:30 AM -05'00'
stopped

Page: 121

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:05:05 AM -05'00' |

ensure the accuracy of

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:24:53 AM -05'00' |

ensure the accuracy of

## Page: 127

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:40:31 PM -05'00' |
|---|---|---|---|---|

pace

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:25:05 AM -05'00' |
|---|---|---|---|---|

pace

Page: 128

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:41:19 PM -05'00' |
| --- | --- | --- | --- |
| we |

| Number: 2 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:42:00 PM -05'00' |
| --- | --- | --- | --- |
| for |

| Number: 3 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:26:21 AM -05'00' |
| --- | --- | --- | --- |
| for |

| T | Number: 1 | Author: Diane.Jones | Subject: Highlight | Date: 12/21/2020 6:46:26 PM -05'00' |

resolve

Page: 146

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/23/2020 8:29:05 AM -05'00'
evidence

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:11:22 AM -05'00'
evidence

Page: 147

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:12:03 AM -05'00' |

statutes of

Page: 169

Number: 1        Author: Diane.Jones        Subject: Sticky Note        Date: 12/21/2020 7:07:34 PM -05'00'
get

Number: 2        Author: Diane.Jones        Subject: Highlight   Date: 12/23/2020 8:13:00 AM -05'00'
get

Page: 184

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/23/2020 8:29:48 AM -05'00'
know

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:13:34 AM -05'00'
know

Page: 187

Number: 1   Author: Diane.Jones   Subject: Sticky Note   Date: 12/23/2020 8:30:37 AM -05'00'
it for

Page: 190

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:30:49 AM -05'00' |
| --- | --- | --- | --- | --- |

set

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:31:01 AM -05'00' |
| --- | --- | --- | --- | --- |

set

Page: 193

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/21/2020 7:21:17 PM -05'00'
letter

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:31:19 AM -05'00'
letter

## Page: 199

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:24:57 PM -05'00' |
|---|---|---|---|---|

clear

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:39 PM -05'00' |
|---|---|---|---|---|

| | Number: 3 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:30 PM -05'00' |
|---|---|---|---|---|

| | Number: 4 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:46 PM -05'00' |
|---|---|---|---|---|

Page: 223

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:36:30 PM -05'00' |
decision

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:31:57 AM -05'00' |
decision

Page: 224

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:37:16 PM -05'00' |
| Department |

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out  Date: 12/21/2020 7:37:06 PM -05'00' |

Page: 239

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:43:30 PM -05'00' |
include

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:43:18 PM -05'00' |

Page: 255

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:51:13 PM -05'00' |

2016

| Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:51:01 PM -05'00' |

Page: 267

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:39:04 AM -05'00' |
|---|---|---|---|---|
| | but | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:38:51 AM -05'00' |
|---|---|---|---|---|
| | but | | | |