**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 3 – James Manning**

Page 1

1                    - JAMES MANNING -

2   UNITED STATES DISTRICT COURT

3   NORTHERN DISTRICT OF CALIFORNIA

4   ------------------------------- X

5   THERESA SWEET, et al., on behalf

6   of themselves and all others

7   similarly situated,

8               Plaintiffs,

9   vs.

10  ELISABETH DEVOS, in her official

11  capacity as Secretary of the

12  United States Department of

13  Education, et al.

14              Defendants.

15  ------------------------------- X

16

17  DATE:  December 17, 2020

18  TIME:  9:36 a.m.

19

20          VIDEOTAPED VIDEOCONFERENCE DEPOSITION

21  OF JAMES MANNING, pursuant to Agreement, before

22  Hope Menaker, a Shorthand Reporter and Notary

23  Public of the State of New York.

24

25

Page 2

```
1                 - JAMES MANNING -
2    A P P E A R A N C E S
3
4    LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
5    Attorneys for the Plaintiffs
6        122 Boylston Street
7        Jamaica Plain, Massachusetts 02130
8    BY:  TOBY R. MERRILL, ESQ. (Via Zoom)
9         EILEEN CONNOR, ESQ. (Via Zoom)
10        MARGARET O'GRADY, ESQ. (Via Zoom)
11        (617) 390-3003
12        tmerrill@law.harvard.edu
13        econnor@law.harvard.edu
14        mogrady@law.harvard.edu
15
16             - and -
17
18   HOUSING & ECONOMIC RIGHTS ADVOCATES
19        3950 Broadway, Suite 200
20        Oakland, California 94611
21   BY:  JOSEPH JARAMILLO, ESQ. (Via Zoom)
22        CLAIRE TORCHIANA, ESQ. (Via Zoom)
23        (510)271-8443
24        jjaramillo@heraca.org.
25        ctorchiana@heraca.org.
```

Page 3

```
1                 - JAMES MANNING -
2    A P P E A R A N C E S
3
4    U.S. DEPARTMENT OF JUSTICE
5    Attorneys for Defendants
6        Civil Division, Federal Programs Branch
7        1100 L Street, Northeast
8        Washington, D.C.  20530
9    BY:  R. CHARLIE MERRITT, ESQ. (Via Zoom)
10        KEVIN P. HANCOCK, ESQ. (Via Zoom)
11        (202) 307-0342
12        robert.c.merritt@usdoj.gov
13        kevin.p.hancock@usdoj.gov
14
15
16   ALSO PRESENT:  (Via Zoom)
17
18        JOSEPH RAGUSO - Videographer
19
20
21
22
23
24
25
```

Page 4

```
1                 - JAMES MANNING -
2            IT IS HEREBY STIPULATED AND AGREED by
3    and among the attorneys for the respective parties
4    hereto, that the sealing and filing of the within
5    deposition be waived.
6
7            IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form, are
9    reserved to the time of trial.
10
11           IT IS FURTHER STIPULATED AND AGREED
12   that the within examination and any corrections
13   thereto may be signed before any Notary Public
14   with the same force and effect as if signed and
15   sworn to before this Court.
16
17
18
19
20
21
22
23
24             -o0o-
25
```

Page 5

```
1                 - JAMES MANNING -
2            THE VIDEOGRAPHER:  We are now on the
3    record.  Participants should be aware that
4    this proceeding is being recorded and that as
5    such, all conversations held will be recorded
6    unless there is a request and agreement to go
7    off the record.  Private conversations and/or
8    attorney-client interactions should be held
9    outside the presence of the remote interface.
10           This is Media Unit 1 of the
11   video-recorded deposition of James Manning
12   being taken by counsel.
13           Today is Thursday, December 17, 2020.
14   The time now is 14:36 in the UTC time code.
15   We're here in the matter of Theresa Sweet
16   versus Elisabeth DeVos.
17           My name is Joe Raguso, remote video
18   technician on behalf of U.S. Legal Support
19   located at 90 Broad Street, New York, New
20   York and I'm not related to any party in this
21   action nor am I financially interested in the
22   outcome.
23           At this time will the reporter, Hope
24   Menaker, on behalf of U.S. Legal Support
25   please enter the statement for remote
```

Page 6

1            - JAMES MANNING -
2    proceedings into the record.
3            THE REPORTER:  The attorneys
4    participating in this deposition acknowledge
5    that I am not physically present in the
6    deposition room and that I will be reporting
7    this deposition remotely.  They further
8    acknowledge that in lieu of an oath
9    administered in person, the witness will
10   verbally declare his testimony in this matter
11   is under penalty of perjury.  The parties and
12   their counsel consent to this arrangement and
13   waive any objections to this manner of
14   reporting.  Please indicate your agreement by
15   stating your name and your agreement on the
16   record.
17           MR. JARAMILLO:  This is Joseph
18   Jaramillo for plaintiffs and I agree.
19           MR. MERRITT:  This is Charlie
20   Merritt, the defense agrees.
21           THE VIDEOGRAPHER:  We're now off the
22   record.  The time is 14:38 UTC.
23           (Whereupon a brief recess was taken
24   at this time.)
25           THE REPORTER:  Will the witness

Page 7

1            - JAMES MANNING -
2    kindly present his government-issued
3    identification by holding it up to the camera
4    for verification.
5            (Verified.)
6            THE VIDEOGRAPHER:  We are now on the
7    record, the time is 14:38 UTC.
8            JAMES MANNING, called as a witness,
9    having been duly sworn on December 17, 2020,
10   by a Notary Public, was examined and
11   testified as follows:
12               2001 Pennsylvania Avenue NW
13               Washington D.C. 20006
14               (Business)
15
16   EXAMINATION BY MR. JARAMILLO:
17       Q.    Good morning, Mr. Manning.  My name
18   is Joseph Jaramillo and I'm one of the attorneys
19   for the plaintiffs in this case.
20           Can you please state your name for
21   the record?
22       A.    James Manning.
23       Q.    Mr. Manning, thank you for making
24   yourself available today and we appreciate you
25   voluntarily appearing to serve as a witness in

Page 8

1            - JAMES MANNING -
2    this case.
3            I wanted to go over a few of the
4    ground rules for the deposition, particularly
5    since we're doing this over Zoom.  So, first of
6    all, I wanted to confirm there's no one else in
7    the room with you at this point.
8        A.    There's no one else in the room with
9    me.
10       Q.    And can I have your agreement not to
11   communicate with anyone else while we're on the
12   record in the deposition through electronic device
13   or otherwise?
14       A.    Yes.  I'm assuming that means if I
15   need to go off to ask counsel a question, that's
16   permissible; isn't it?
17       Q.    Yes.  Off -- off the record
18   when -- when we're not doing questions and
19   answers, you can speak with your counsel.
20       A.    Okay.
21       Q.    And can you identify any electronic
22   communication devices in the room such as
23   telephones or things of that nature, iPads?
24       A.    Yes.  I have -- well, I'm working
25   from a small laptop and I have two telephones,

Page 9

1            - JAMES MANNING -
2    electronic telephones in the room.
3        Q.    Can you -- can I have your agreement
4    to put those out of reach so that you're not using
5    those during the deposition while we're on the
6    record?
7        A.    Sure.  Let me put them out of reach.
8    They're well out of reach.
9        Q.    Thank you, Mr. Manning.
10       A.    Sure.
11       Q.    Even though we're sitting here in our
12   respective homes or offices, I want to emphasize
13   that the -- the oath that you've taken carries
14   the same weight as if given in a court of law.  Do
15   you understand that?
16       A.    I do.
17       Q.    And the court reporter, Ms. Menaker,
18   is taking down everything we say and it will be
19   produced in a transcript form later and serve as
20   evidence in this case.  For that reason, it's
21   important to give audible answers such as yes or
22   no, rather than nods of the head or uh-huh or
23   uh-uh.  Do you understand that?
24       A.    Yes.
25       Q.    And it's also important that we don't

Page 10

- JAMES MANNING -

1     - JAMES MANNING -
2    talk over each other so that Ms. Menaker can get a
3    clear record of the questions and answers.  I will
4    do my best not to talk over you and I would ask
5    that you could do your best not to talk over me.
6    Is that acceptable?
7         A.    Yes.
8         Q.    Are you represented by legal counsel
9    today in this deposition?
10        A.    Charlie Merritt, the Department of
11   Justice attorneys that are handling this.
12        Q.    And they represent you in this
13   deposition, correct?
14        A.    My understanding.
15        Q.    Okay.  Now, from time to time Mr.
16   Merritt may object to my questions during the
17   deposition.  I just want to explain that unless he
18   instructs you not to answer the question, even
19   though he has objected you are still under an
20   obligation to answer my question.  Do you
21   understand that?
22        A.    Can you repeat that again so it's
23   clear.
24              MR. JARAMILLO:  Ms. Menaker, can you
25        read back my statement.

Page 11

1              - JAMES MANNING -
2              (The question requested was read back
3        by the reporter.)
4         A.    Yes.
5         Q.    In -- in other words, it may seem
6    awkward because I'm going to ask you a question
7    and Mr. Merritt may object, but the next step
8    would be for you to still answer the question
9    unless he instructs you not to answer.  Do you
10   understand that?
11        A.    Yes.
12        Q.    Now, this is not an endurance
13   contest.  We can take breaks whenever we want.
14   You can take a break whenever you want.  My only
15   request is that if I have a question pending, that
16   you answer that question before we take the break.
17   Do you understand that?
18        A.    Yes.
19        Q.    Is there any reason why you can't
20   give truthful testimony today?
21        A.    No.
22        Q.    Now, did you receive a package with
23   the -- the documents that we may look at today?
24        A.    I have a package.  I haven't opened
25   it so I assume it's the documents, but I don't

Page 12

1              - JAMES MANNING -
2    know.
3         Q.    Okay.  Can you open that package,
4    please?
5         A.    Here it is.  Here are the documents.
6         Q.    Great.  Thank you, Mr. Manning.
7              Now, there should be a set of tabbed
8    documents that are tabbed with Numbers 1 through
9    22.  Is that what you see before you?
10        A.    I see Tabs 1 through 22.
11        Q.    So during the course of the
12   deposition, I'm going to ask you to look at some
13   of these documents and I will refer to them by tab
14   numbers.  Do you understand that?
15        A.    Yes, and -- yes.
16        Q.    I'm going to have you look at the
17   document that is marked as Tab 1 and in the
18   electronic files there should simply appear the
19   Number 1 on the PDF file and it would say "Revised
20   Notice of Deposition of James Manning."  Do you
21   see that document?
22        A.    I do.
23        Q.    And have you seen this document
24   before?
25        A.    I don't recall seeing the revised

Page 13

1              - JAMES MANNING -
2    notice.
3              MS. BERMAN:  Sorry.  Joseph, is there
4        a password for the electronic documents?
5              MR. JARAMILLO:  Marcia, I'm sorry,
6        there is.  I just forwarded it to you.
7              MS. BERMAN:  Okay.  Okay, great.
8        Thanks.
9         Q.    So do you recall seeing a Notice of
10   Deposition of James Manning at some point?
11        A.    Well, no, I guess I don't recall.
12        Q.    Did you ever receive a -- I'm sorry,
13   did I cut you off?
14        A.    This is just a declaration I made
15   previously.
16        Q.    Okay.  So you do not recall seeing a
17   notice of your deposition that's dated the -- the
18   time -- or the time and the date of the
19   deposition?
20        A.    I don't recall that.
21        Q.    And you are voluntarily appearing
22   here today for this deposition, correct?
23        A.    Yes.
24        Q.    Have you ever had your deposition
25   taken before?

Page 14

- JAMES MANNING -

1           - JAMES MANNING -
2    A.    No.
3    Q.    Have you ever given testimony in
4  court before?
5    A.    Yes.
6    Q.    How many times?
7    A.    Multiple times years ago.
8    Q.    When was the last time that you
9  recall?
10   A.    About 1983.
11   Q.    Do you recall what court the trial
12 took place in?
13   A.    No.
14   Q.    Do you recall the state in which the
15 trial took place?
16   A.    District of Columbia.
17   Q.    What was your role in that case, if
18 any?
19   A.    I'm trying to -- I'm trying to recall
20 the, the -- the particulars.  I can't recall if it
21 was a trial or not.  I, at the time, was serving
22 as special agent at the security service at the
23 State Department.  There was an incident at the
24 State Department that went to court and I went to
25 testify on it; and I don't remember beyond that

Page 15

1           - JAMES MANNING -
2  because it was a one-time thing.
3    Q.    And you were -- so you were a witness
4  in that case and you gave testimony?
5    A.    Yes.
6    Q.    Do you recall give -- I'm sorry, go
7  ahead.
8    A.    It wasn't '83.  It was -- it was
9  probably -- '81, '82 probably.
10   Q.    Do you recall giving testimony in any
11 other court cases before that?
12   A.    Yes.  I testified regularly in
13 (unintelligible) District Court in Boston,
14 Massachusetts between 1975 and 1978 when I was a
15 university police officer at Northeastern
16 University.
17   Q.    And before those cases do you recall
18 giving testimony in any court cases, any other
19 court cases?
20   A.    The only other court case that I
21 would have testified in was a civil action where I
22 had a two-family house in Boston and a tenant that
23 didn't want to leave or wasn't paying rent to me.
24 I wanted to remove him from the space.
25   Q.    When was that case, approximately?

Page 16

1           - JAMES MANNING -
2    A.    1977, 1978.
3    Q.    And -- and you were a witness in this
4  case?
5    A.    I was the complainant and I
6  testified.
7    Q.    Okay, and what court was that in?
8    A.    West Roxbury District Court, Boston,
9  Massachusetts.
10   Q.    Any other cases that you can recall
11 giving testimony in?
12   A.    No.
13   Q.    What did you do to prepare for
14 today's deposition?
15   A.    I -- I talked to counsel and I
16 revisited my declaration and declarations made by
17 Colleen Nevin and Diane Jones.
18   Q.    How many times did you meet with
19 counsel?
20   A.    A few, like three.  I'm -- I'm not
21 sure how many.
22   Q.    And what are the dates or approximate
23 dates that you met with them?
24   A.    Over the last few days.
25   Q.    About how many hours did you spend

Page 17

1           - JAMES MANNING -
2  meeting with them?
3    A.    Oh, I don't recall specifically, but
4  maybe about four.
5    Q.    Four hours total or four hours in
6  each meeting?
7    A.    Total.  Maybe a little more than four
8  total.  No four-hour meeting.
9    Q.    And how did you meet with them; was
10 this in person or via Zoom or by telephone?
11         I'm sorry, can you repeat your
12 answer.
13   A.    I was, you know, just using this same
14 type of system, the Zoom system.
15   Q.    And who were the counsel that you met
16 with over Zoom?
17   A.    Charlie Merritt, Marcia -- I forget
18 Marcia's last name.  Marcia.  I -- I don't recall
19 Marcia's last name.  Call into Charlie.  And Kevin
20 -- and I don't recall his last name either.  He
21 was on the call with Charlie.
22   Q.    Anybody else?
23   A.    Not that I recall, but --
24   Q.    And you said you reviewed your
25 declaration?

Page 18

- JAMES MANNING -

1       A.      Yes.
2       Q.      When -- when did you give -- when did
3   you -- did you sign that declaration?
4       A.      Yes.
5       Q.      When did you sign it?
6       A.      I don't recall.  I have it here, if
7   you'd like me to pull it out and look at it.
8       Q.      Sure.
9       A.      I signed it on April 12, 2018.
10      Q.      And on the front page of that -- can
11  you just hold up the front page of the declaration
12  to your camera.
13      A.      Of course.  Can you see it?
14      Q.      Yeah.  If you could move it
15  back -- actually, just hold it right there.  Thank
16  you and can you move it back a bit.
17              And how many pages -- you can remove
18  it from the camera now.  How many pages is that
19  declaration?
20      A.      Seven.  There's an exhibit attached
21  to it beyond that.  I said in addition to the
22  declaration, there is an exhibit attached to it.
23      Q.      And what is that exhibit?
24      A.      It looks like it's a -- a

Page 19

- JAMES MANNING -

1   press -- press release looks like entitled
2   "Improved Borrower Defense Discharge Process Will
3   Aid Defrauded Borrowers, Protect Taxpayers."  So
4   and this press release was December 20, 2017.
5       Q.      Did you have any involvement in the
6   creation of that press release?
7       A.      No.  It's from the Press Office of
8   the Department of Education.
9       Q.      And what' the title of the press
10  release?
11      A.      "Improved Borrower Defense Discharge
12  Process Will Aid Defrauded Borrowers, Protect
13  Taxpayers."
14      Q.      Did you -- did you, yourself, write
15  the declaration or did someone draft it for you?
16      A.      It was drafted for me.
17      Q.      And who drafted it?
18      A.      I don't know.  Someone in the General
19  Counsel's Office, I believe.
20      Q.      And you reviewed it and signed it
21  attesting to its accuracy?
22      A.      Yes.
23      Q.      And this was in the Calvillo
24  Manriquez versus Secretary DeVos' case?

Page 20

- JAMES MANNING -

1       A.      Yes.
2       Q.      Were you involved in discussions with
3   counsel about that case during your tenure at the
4   Department of Education?
5       A.      I expect that I had communications
6   with counsel about the issue.  I don't recall any
7   of them specifically.
8       Q.      Were you involved, in any way, with
9   the preparation or production of monthly reports
10  or any periodic reports associated with that case?
11      A.      I don't recall what the reports
12  associated with the case.
13      Q.      Did you follow any of the legal
14  developments in that case such as Court Orders?
15      A.      Not specifically.
16      Q.      We may have further discussions.  In
17  fact, we will have further discussions about that
18  case later on as it impacts this case, but let's
19  move on to discuss about any other documents -- if
20  you could let me know about any other documents
21  that you've reviewed in preparation for today's
22  deposition.
23      A.      As I said, Diane Jones' declaration I
24  reviewed and Colleen Nevin's declaration I

Page 21

- JAMES MANNING -

1   reviewed and the attachments on mine.  I don't
2   recall if there were attachments on the other
3   documents, but whatever was attached to it I
4   looked at.
5       Q.      Any other documents besides those
6   you've listed?
7       A.      Well, I'm just looking at -- there
8   was an Exhibit 2 on my declaration which I also
9   reviewed and it's remarks that I made prior to one
10  of the negotiated rulemaking sessions.
11      Q.      And what was the date of that
12  rulemaking session?
13      A.      Well, looking at the remarks and -- I
14  don't see the date on it, but it was shortly after
15  the 1st of the year.
16      Q.      The 1st of the year 2018?
17      A.      Yes.
18      Q.      And is this a transcript of your
19  remarks?
20      A.      Yes.
21      Q.      And is -- why don't I just -- well,
22  let's do this.  How many pages is that transcript?
23      A.      Six.
24      Q.      And is that transcript an accurate

Page 22

1                    - JAMES MANNING -
2    reflection of the remarks you made in January,
3    2018 of the negotiated rulemaking -- negotiate --
4    wait, Negotiated Rulemaking Committee?
5        A.    Yes.
6        Q.    Do any of these documents refresh
7    your recollection of the facts?
8        A.    I'm -- I'm sure they did, but I
9    couldn't say specifically what at this moment.
10       Q.    Other than meetings with your counsel
11   over Zoom-type platform, did you speak with
12   anybody else about your deposition?
13       A.    No.
14       Q.    You didn't speak with anybody
15   currently at the Department of Education other
16   than counsel, legal counsel, about your
17   deposition?
18       A.    I didn't speak to anybody about the
19   deposition.  I had somebody approach me at a
20   reception who said they heard I was going to be
21   doing a deposition.
22       Q.    And who was that?
23       A.    Someone who knew me, but I -- I
24   didn't know, a young woman.  I think she was in
25   the General Counsel's Office, actually.  I don't

Page 23

1    know her name.
2        Q.    Okay.
3        A.    There was no conversation beyond
4    that.
5        Q.    I'm sorry?
6        A.    I said there was no conversation
7    beyond that.
8        Q.    When was this reception?
9        A.    The day before yesterday.
10       Q.    Where did it take place?
11       A.    In the Barnard Auditorium at the U.S.
12   Department of Education.
13       Q.    How many people were there?
14       A.    Approximately 50.
15       Q.    And what was the occasion for the
16   reception?
17       A.    A holiday reception at the end of
18   an administration.
19       Q.    Was Secretary DeVos there?
20       A.    She stopped by, yes.
21       Q.    Did you speak with her?
22       A.    I did.
23       Q.    Did you speak with her about your
24   deposition?

Page 24

1                    - JAMES MANNING -
2        A.    No.
3        Q.    Did you speak with her about this
4    case?
5        A.    No.
6        Q.    Did you speak with her about the
7    Calvillo Manriquez case?
8        A.    No.
9        Q.    Did you speak with her about borrower
10   defense?
11       A.    No.
12       Q.    And you didn't speak with anybody
13   else about this case that was at that reception?
14       A.    Nobody else.
15       Q.    Besides the -- the unidentified woman
16   that you mentioned?
17       A.    Yes.
18       Q.    Okay.  Did you review any of the
19   deposition transcripts in this case?
20       A.    No.
21       Q.    Okay.
22       A.    I mean, people that have since
23   been -- been deposed previously up to now, is that
24   what you're saying?
25       Q.    Yes.  There are -- as you may be

Page 25

1    aware, there are people who have been deposed
2    previously in this case.
3        A.    No, I have not read any of those
4    depositions.
5        Q.    And you -- you did not talk to
6    Colleen Nevin about your deposition today?
7        A.    No, I did not.
8        Q.    You didn't talk to Diane Auer Jones?
9        A.    I did not.
10       Q.    You did not talk to Mark Brown about
11   it?
12       A.    No, I did not.
13       Q.    Mr. Manning, we're going to be
14   discussing a lot, as -- as you may imagine, the
15   borrower defense to Repayment Discharges of
16   federal student loans today.
17       A.    Yes.
18       Q.    I will refer to those in the
19   shorthand as just borrower defense or sometimes
20   even BD.  Will that make sense to you?
21       A.    Yeah, BDTR would make sense to me to.
22       Q.    BDTR meaning Borrower Defense to
23   Repayment?
24       A.    Yes.

Page 26

- JAMES MANNING -

1
2       Q.      Mr. Manning, do you have a LinkedIn
3    profile?
4       A.      I do.
5       Q.      And did you create that profile?
6       A.      Yes.
7       Q.      Did you, yourself, enter the
8    information in that profile?
9       A.      Nobody else that I'm aware of put
10   anything on my profile.
11      Q.      Okay.  I'll just represent to you
12   that I -- I went on LinkedIn and I looked at your
13   profile and there's a feature on LinkedIn to
14   generate the profile in a resume-type format and I
15   did that so that we could go over your career
16   background and experience at the Department of
17   Education today as sort of a guidepost; and so I
18   would like to have you turn to Tab 2 in your stack
19   of documents.
20      A.      Are we done with Tab 1?
21      Q.      Yes, we're done with Tab 1.
22      A.      Okay.
23              MS. BERMAN:  Joseph, I just want
24   to -- excuse me, I just want to note for the
25   record that I'm not able to open the Dropbox

Page 27

- JAMES MANNING -

1
2    attachments.  I seem to be the only person on
3    our team having trouble with it, but it's
4    not -- it's opening for me.  It's asking me
5    to do all sorts of things like create an
6    account; and I tried to do that, but that
7    didn't even work.
8              MR. JARAMILLO:  Mr. Merritt, can we
9    go off the record for this?
10             MR. MERRITT:  Yes.
11             THE VIDEOGRAPHER:  Going off the
12   record, the time is 15:08 UTC.
13             (Whereupon, a brief discussion was
14   held off record.)
15             THE VIDEOGRAPHER:  We're now on the
16   record, time is 15:11 UTC.
17      Q.      Okay, Mr. Manning, so I'm having you
18   look at Tab 2.
19             MR. JARAMILLO:  And, Ms. Menaker, I
20   would like to have you mark this as --
21   actually, Ms. Menaker, we did not mark the
22   first tab, did we?
23             THE REPORTER:  We did not.
24             MR. JARAMILLO:  Okay.  Can we mark
25   the first tab as Exhibit 31, that would be

Page 28

- JAMES MANNING -

1
2    the Revised Notice of Deposition of James
3    Manning, and I would like to now mark the
4    second tab in the PDF files for Mr. Manning
5    as Exhibit 32.
6              (Whereupon, Exhibit 31 was marked at
7    this time.)
8              (Whereupon, Exhibit 32 was marked for
9    identification.)
10      Q.      Mr. Manning, have you had a chance to
11   look at the document that is Tab 2 in your
12   package?
13      A.      Well, I -- I started to, but I went
14   back because I had seen the Notice, this -- I was
15   just looking for the first time at the actual
16   Notice of Deposition.
17      Q.      Okay.  So, just for clarity, you were
18   looking at a document outside of the packet that
19   you received?
20      A.      No.  I'm looking at the document that
21   was behind Tab 1.
22      Q.      Okay, and that document is called
23   "Revised Notice of Deposition of James Manning"?
24      A.      Yes, and it's just about, you know,
25   today's date basically.  I think that's being the

Page 29

- JAMES MANNING -

1
2    deposition there, right.
3       Q.      Did -- had you received that document
4    before you got it in the package today?
5       A.      No.
6       Q.      Okay.  Well, let's move on to Tab 2.
7       A.      Okay.
8       Q.      And please take a moment to look at
9    that and let me know if that accurately reflects
10   the information from your LinkedIn profile?
11             Mr. Manning, I'm sorry to interrupt
12   your review, I know you're looking carefully --
13      A.      I'm -- I'm on the last page.  It's
14   a -- this is --
15      Q.      I'll let you finish up and then we
16   can talk about it.
17      A.      Okay.
18      Q.      Is this an accurate -- was this
19   information on -- on this document as to Exhibit
20   32 reflect your -- the information that you put on
21   your LinkedIn profile?
22      A.      It seems to be from another document
23   rather than what I put in my LinkedIn profile.
24   This looks like a -- a resume that I've used a
25   number of times.  I didn't -- I don't -- I have to

Page 30

```
 1                   - JAMES MANNING -
 2   go back and look -- to look and see this.  See
 3   this, I don't know how it was attached in all this
 4   detail and things, this type -- I'm not saying
 5   it's not there.  I just don't recall posting this
 6   there.
 7        Q.    Sure, and I'll represent to you that
 8   there's a function on LinkedIn that generates this
 9   type of resume document from the profile.
10        A.    Oh, I didn't -- if that's generated
11   by LinkedIn, then that's -- that's understandable
12   then, but I did not put this on my LinkedIn.
13        I did not put this -- I did not put
14   this document on LinkedIn.  This is a
15   representation of resume that I have used
16   previously, yes.
17        Q.    But the information contained in this
18   document was information that you input into
19   LinkedIn on your profile?
20        A.    I -- I didn't put all this detail in
21   myself.  You -- you had suggested that there's a
22   -- a way that LinkedIn finds outside documents and
23   attaches them; so I asked you what happened with
24   this.  I did not post all of this on this page.
25        Q.    Okay.
```

Page 31

```
 1                   - JAMES MANNING -
 2        A.    But it's a fair representation
 3   of -- of my career.  It's a -- in normally the way
 4   I do things, this is not the same structure, so it
 5   gives years of service.  I would have put months.
 6   I would have typed particular months in.  There --
 7   it's -- it's a close approximation to a resume
 8   that I've used.
 9        It's not what I attached to LinkedIn.
10   If it's on LinkedIn, I'm going on what you
11   suggested that there's a way that LinkedIn, I
12   guess, captures related information and attaches
13   it somehow.  I'll have to go back and look, but
14   the question -- but that is what's happened.
15        I don't need all of this information
16   on this page, but this is -- this is my
17   experience, yes.
18        Q.    I understand, Mr. Manning.  So this
19   generally reflects your work experience?
20        A.    Yes.
21        Q.    And I noticed when you were reviewing
22   the -- the document, you had a pen in your hand.
23   Did you make any notations on the document?
24        A.    Yes, I -- a few places I noticed
25   where there was no month mentioned, where it just
```

Page 32

```
 1                   - JAMES MANNING -
 2   said 2017 to 2017, you know.  I made, you know,
 3   notations January '17 to April '17, you know.
 4        Q.    Okay.  So would that be on Page 3 of
 5   the document?
 6        A.    That is Page 3, yeah.
 7        Q.    And would that be for the entry for
 8   Office of the Secretary of Education, Senior
 9   Advisor to the Secretary of Higher Education where
10   it says "2017 to 2017"?
11        A.    Yes.
12        Q.    And you noted the months for that?
13        A.    January to April, yes.
14        Q.    So you were senior advisor to the
15   Secretary of Higher Education from January to
16   April, 2017?
17        A.    Yes.  January 20 -- well, she didn't
18   come onboard until the first week of February.  My
19   appointment was senior advisor to the Secretary
20   and I had January 7th -- 20th 1970 -- 2017.
21        Okay, yes.  This is my title from
22   January of '17 through April, into April of '17,
23   following which I became, you know, the acting
24   under the Secretary which appears earlier on this
25   list.
```

Page 33

```
 1                   - JAMES MANNING -
 2        Q.    And that entry appears on Page 2 of 5
 3   of the document?
 4        A.    Yes.
 5        Q.    And did you fill in the months for
 6   the -- for that entry for the acting
 7   Undersecretary of Education?
 8        A.    I did it was from April, 2017 to May
 9   of 2018.
10        Q.    And then above that on Page 2 is an
11   entry for Federal Student Aid and Office of the
12   U.S. Department of Education acting chief
13   operating officer.  Are those dates correct;
14   January, 2018 through March, 2019?
15        A.    No, I don't think that's correct.  I
16   don't.
17        Q.    What would you do to correct those
18   dates?
19        A.    I can start by saying I can go back
20   over in my mind, but the timeline on this is not
21   exactly correct.
22        Q.    Okay, and as you sit here today what
23   is your best recollection of your time in the
24   acting chief operating officer position with FSA?
25        A.    Well, I -- I had several different
```

Page 34

1         - JAMES MANNING -
2    periods when I was acting chief operating officer.
3         Q.    During the Trump Administration.
4         A.    During the Trump Administration, so I
5    became acting chief. I was -- I was the Secretary
6    from April -- this is -- this is incorrect. I was
7    not nor have I ever claimed to be acting chief
8    operating officer from January -- what a second.
9    I'm -- I'm mistaken.
10             It's out of order. My resume would
11   have reflected this in chronological order.
12        Q.    Just, Mr. Manning, what's your best
13   recollection of when you served as -- as acting
14   chief operating officer for FSA?
15        A.    During the Trump Administration?
16        Q.    Yes.
17        A.    Okay. I started January, 2017 senior
18   advisor, became Undersecretary in April, served to
19   the following May.
20             There -- there was a -- a career
21   staff person as the chief operating officer in
22   January of 2017, James Franzi, who was retained.
23   He stayed with the Department until May of 2017.
24   That he -- he might have left the first few days
25   of June, in that area, and we began a search

Page 35

1         - JAMES MANNING -
2    immediately for a new chief operating officer and
3    Wayne Johnson became the chief operating officer,
4    the permanent chief operating officer, in July
5    2017.
6             He served in that capacity until late
7    January, 2018 when a major initiative at the
8    Department was going on with Federal Student Aid.
9             Next Gen, Next Generation FSA was
10   started under Dr. Johnson's leadership. That was
11   an important enough issue that in late January of
12   '18, he was moved from the COO position and
13   focused hundred percent of his time on the Next
14   Generation FSA initiative, and at that time I
15   became acting COO.
16        Q.    That would have been January, 2018?
17        A.    Yes. The end of January, you know,
18   first part of February.
19        Q.    And how long did you serve in that
20   position?
21        A.    I'm -- that's not entirely correct
22   here.
23        Q.    Why -- why don't we do this, Mr.
24   Manning: I'm -- I'm finding that this -- this
25   LinkedIn document may not me the best way to go

Page 36

1         - JAMES MANNING -
2    through your career history. Let's put it to the
3    side and draw from your memory, which might be
4    more efficient.
5             The question being: Do you know when
6    you stopped serving as the acting COO of FSA
7    during the Trump Administration?
8         A.    I'm going to miss a block, I'm sorry.
9    I have all this written down somewhere else.
10        Q.    That's okay. This is not -- this is
11   not, you know, a -- you know, a -- there's no
12   right or wrong answer. I just want to know your
13   best recollection. It's whatever you can come up
14   with as you sit here today in recollection of when
15   you stopped working as acting COO for FSA in the
16   Trump Administration.
17             MR. MERRITT: And, Joe, I'll let him
18        answer this question, I just want to -- we
19        have been going for about an hour. I was
20        wondering whether we might have a short break
21        after he answers this question or -- or
22        sometime soon.
23             MR. JARAMILLO: Yeah. Let me -- I
24        would like to ask him just a couple of more
25        questions related to this, but if -- if you

Page 37

1         - JAMES MANNING -
2    don't mind it might just take a minute or
3    two.
4             THE WITNESS: Well, at the rate I'm
5        answering this it might take longer than
6        that, I'm sorry to say.
7             MR. JARAMILLO: Okay. Well, let's
8        see how it goes, but I would like to if you
9        don't mind, Mr. Merritt, to just take a
10       couple more questions just to nail down ome
11       of the dates here.
12             MR. MERRITT: Yeah, that's okay with
13       me. I just wanted to put it on the radar.
14        A.    Let me take a couple of minutes here
15   and see I can reconstitute what I knew yesterday.
16   .I've been thrown off by the way this was
17   presented here today.
18             MR. JARAMILLO: Okay, Mr. Manning,
19       why don't we do this; I'm not sure that that
20       Tab 2 document is -- is the best way to do
21       it.
22             If you want to take a break and try
23       to refresh your recollection as well, we can
24       -- we can do that.
25             THE WITNESS: Yes.

Page 38

```
1                - JAMES MANNING -
2          MR. JARAMILLO:  So, you know, just to
3     be clear; I'm just trying to get your best
4     recollection of the time periods in which you
5     served in, in -- in roles at the Department
6     of Education during the Trump Administration
7     at this point.
8          And we can discuss that when we come
9     back on the record, so we can go ahead and
10    take -- how long would you like, Mr. Merritt,
11    for the break and, Mr. Manning, five or ten
12    minutes?
13         MR. MERRITT:  I will defer to Mr.
14    Manning.  I was thinking it could be five
15    minutes, but what do you think, Jim?
16         THE WITNESS:  I would say give me ten
17    minutes and I'll have this lined up.
18         MR. MERRITT:  All right.  Let's take
19    ten minutes, if that's okay with you.
20         MR. JARAMILLO:  Okay.
21         THE VIDEOGRAPHER:  We are now off the
22    record.  The time is 15:35 UTC.
23         (Whereupon, a brief discussion was
24    held off record.)
25         THE VIDEOGRAPHER:  We are now on the
```

Page 39

```
1                - JAMES MANNING -
2     record, the time is 15:52 UTC.
3      Q.     Mr. Manning, we were talking about
4     your work history during the Trump Administration
5     in the Department of Education.
6      A.     Right.
7      Q.     And I wanted to see if you have any
8     clarity about your time in the role of -- of
9     acting COO of FSA.
10     A.     Yes.  Yes, working backwards I left
11    the Department March 4th, 2019.  I had been the
12    COO until then and I have become the COO after
13    Wayne Johnson in 2018 took over the Next Gen
14    portfolio.  I became the acting COO in February,
15    2018 and served through the beginning of March,
16    2019.
17     Q.     And just to clarify, when were you in
18    the role as acting Undersecretary of Education
19    during the Trump Administration?
20     A.     I think it began in April of 2017 and
21    I've served through May of 2018.  Diane Jones
22    succeeded me.  Diane I think came in in June, but
23    I -- I had left that office near the end of May.
24    '18.
25     Q.     So between February, 2018 and May,
```

Page 40

```
1                - JAMES MANNING -
2     2018, were you wearing two hats; one as the acting
3     COO of FSA and the other as the acting
4     Undersecretary of the Department of Education?
5      A.     Yes, I wore two hats when those
6     positions -- in the timeline there.
7      Q.     And prior to becoming the acting
8     Undersecretary of Education in April, 2017 you
9     served as a senior advisor to the Secretary of
10    Education?
11     A.     Yes, on higher education issues.
12    Yes.
13     Q.     And the dates of -- of that in that
14    role that you -- of senior advisor were January
15    20th, 2017 until April, 2017?
16     A.     Yes.
17     Q.     And prior to serving as senior
18    advisor, did you hold a role on the Trump
19    transition -- I mean, I'm sorry, I didn't want to
20    -- on the Trump transition team?
21     A.     Yes.
22     Q.     When did you start in that position?
23     A.     September of 2016.
24     Q.     And when did you stop work in that
25    role?
```

Page 41

```
1                - JAMES MANNING -
2      A.     January 19th, 2017.  I was a
3     volunteer.
4      Q.     How -- how did you get into that
5     position as a volunteer for the Trump transition
6     team?  Were you recruited or did you just -- did
7     you call somebody and say, I want to do this?
8      A.     No, I was recruited.  I'm trying to
9     remember who contacted me.  Someone that had been
10    working with Governor Christie who led the
11    transition team.  I was just retired at the time
12    working for myself, but I agreed to do that as a
13    volunteer.
14     Q.     What was your role in that -- in that
15    position?
16     A.     Well, initially to think about
17    preparation for the new administration taking
18    responsibility for the Department of Education and
19    then after Trump was elected, began a few weeks
20    later going in and meeting with the staff around
21    the Department to get a sense on where they were
22    and what their activities were and what their
23    projects were.  Obviously no role to in --
24    influence activities; just to learn about what was
25    the status of the Department.
```

Page 42

1                  - JAMES MANNING -
2       Q.     And did you also work on the Trump --
3    what was called the -- the transition landing
4    team?
5       A.     Yes.
6       Q.     And what was that different from the
7    transition team?
8       A.     Well, there's fewer people.  It was a
9    -- it was effectively part of the transition team,
10   but it was the folks that actually went -- went
11   into the Department and met with folks in the
12   Department.
13      Q.     And what was your role on the landing
14   team; did you have a leadership role or did you
15   have a title?
16      A.     I didn't have a title, effectively,
17   as of the transition-- I led the landing team.
18      Q.     And who was on the landing team?
19      A.     Myself, Kent Talbert and Bill, Bill
20   -- Bill Evers.
21      Q.     Just the three of you?
22      A.     Yes.
23      Q.     Did you examine or educate yourself
24   on the Trump -- I mean, I'm sorry, the transition
25   landing team about borrower defense?

Page 43

1                  - JAMES MANNING -
2       A.     Somewhat, yes.
3       Q.     And what did you do in order to
4    educate yourself on that topic?
5       A.     We -- we met once or twice with folks
6    from the Enforcement group.
7       Q.     Do you recall who you met with from
8    the Enforcement group?
9       A.     I -- I know at least one of the
10   meetings was the director and, you know, I don't
11   remember his name -- Robert -- whoever was the
12   director of the Enforcement group was and several
13   of his staffers.  I don't recall any of their
14   names.
15      Q.     Did you meet with Robert Eitel?
16      A.     Eitel.
17      Q.     Yes.
18      A.     How do you spell Eitel?
19      Q.     I think it's E-I-T -- E-I-T-E-L.
20      A.     Bob Eitel.
21      Q.     Eitel.  I'm sorry.
22      A.     Okay.  I know -- I know Bob is in --
23   I know him well, worked with him.  I don't
24   recall -- he didn't have any role on the
25   transition and he had not -- he was -- I don't

Page 44

1                  - JAMES MANNING -
2    believe he was at the Department at that time.  He
3    -- he came onboard in the new administration.
4       Q.     Did you meet with Colleen Nevin?
5       A.     I don't recall if I met with Colleen
6    Nevin during the -- the landing team period.  That
7    would have been, you know, after -- it was
8    actually probably just before Thanksgiving
9    through, you know, January 19th, but I don't know
10   -- I don't believe I met Colleen until after I got
11   onboard at the Department.
12      Q.     Prior -- prior to your work on this
13   transition and landing team, had you done any work
14   or related to borrower defense in your --
15             MR. MERRITT:  Objection.
16      Q.     -- related to this position?
17             MR. MERRITT:  It's a scope objection.
18   What's the relevance to the topics identified
19   by the court in authorizing discovery?
20      Q.     You can answer the question.
21      A.     Could you repeat the question?
22             MR. JARAMILLO:  Can you read back the
23   question, Madam Court Reporter, please.
24             (The question requested was read back
25   by the reporter.)

Page 45

1                  - JAMES MANNING -
2       Q.     Mr. Manning, prior to working in the
3    Trump Administration or on the transition team,
4    had any of your prior work involved borrower
5    defense?
6       A.     Prior to working on the landing team?
7       Q.     Yes.
8       A.     No.
9       Q.     What was your understanding of
10   borrower defense at -- at the time you were on the
11   landing team?
12      A.     I, I -- I don't recall what it was.
13   I'm -- I'm sure that I was learning about it.  You
14   know, part of the, you know, responsibilities of
15   the landing team was to understand what programs
16   were going on.
17      Q.     What did you learn about borrower
18   defense on the landing team?
19      A.     I can't recall specifically, you
20   know, anything in particular that I learned during
21   that period.  Subsequently I, you know, learned
22   more.  I learned more when I came onboard as an
23   employee.
24      Q.     And this would have been in January
25   20, 2017 when you came onboard as an employee?

Page 46

- JAMES MANNING -

1
2     A.    Correct.
3     Q.    And at that time, did you understand
4  that borrower defense entailed the discharge of
5  federal loans available when a borrower can assert
6  a defense to repayment?
7     A.    Yes.
8     Q.    And did you understand that the
9  Department of Education's duty to resolve borrower
10 defense applications was mandatory?
11          MR. MERRITT:  Objection, beyond the
12     scope.
13     Q.    You can answer the question.
14          MR. MERRITT:  I'm going to instruct
15     you not to answer that question beyond the
16     scope of the discovery the court ordered.
17     Q.    When you came on the -- in the
18 administration in January, 2017 were you aware of
19 the significant increase in the number of borrower
20 defense applications?
21     A.    The day I came on, I -- I don't
22 believe I knew that the day I came on.
23     Q.    When did you -- when did you find
24 that out?
25     A.    Shortly thereafter.

Page 47

- JAMES MANNING -

1
2     Q.    Okay.  How did you find it out?
3     A.    I don't recall specifically.  I, I --
4  I just -- I'm sorry.  I'm trying to remember when
5  I actually can authoritatively answer the
6  question.  Ask the question one more time, please.
7     Q.
8          MR. JARAMILLO:  Ms. Menaker, can you
9     repeat the question for me.
10          (The question requested was read back
11     by the reporter.)
12     A.    I think certainly every day that I
13 was on as a -- an employee, I was working to
14 expand my knowledge on operations at the
15 Department; and it was very early on, I'm sure,
16 that I started getting information about this --
17 the status and standing of the student borrower
18 defense issue.
19     Q.    And who gave you that information?
20     A.    I -- any -- any number of people.
21 You know, I met with -- I think before the
22 Secretary got there, Phil Rosenfelt was the acting
23 Secretary.  I met with Phil a number of times
24 during that period; and the acting deputy
25 Secretary, Joe Connolly was there.  We -- you

Page 48

- JAMES MANNING -

1
2  know, we had any number of discussions where they
3  would bring me up to speed on issues.
4     Q.    Anyone else that you recall, as you
5  came into your new position in January of 2017
6  with the administration, who gave you information
7  about the borrower defense?
8     A.    Well, those would have been the first
9  couple of folks as I had known them for the -- the
10 better part of two decades, but that, that -- that
11 group I'm sure got bigger over time and we had a
12 working group that brought in more people.  We
13 had -- there were other attorneys at OGC.
14     Q.    Was this working group specific to
15 borrower defense?
16     A.    Yes.  Yes, and then -- and then
17 ultimately Joe Connolly, the acting deputy
18 Secretary, established a formal working group of
19 borrower defense.  That would have been, you know,
20 after a month or so.
21     Q.    Did the working group have a name?
22     A.    I'm sure it did.  I -- I don't recall
23 offhand what the -- the name was, it was.
24     Q.    Was this the borrower defense Review
25 Panel?

Page 49

- JAMES MANNING -

1
2     A.    Effectively, yes.
3     Q.    Were you on that panel?
4     A.    I was one of the members, yes.
5     Q.    And you met regularly with people on
6  that panel?
7     A.    Well, we met several times.  I can't
8  recall how regularly it was.
9     Q.    Okay.
10     A.    Ultimately Colleen Nevin became part
11 of that.  I think that -- well, actually the --
12 yeah, there were a couple of attorneys that --
13 Justin Riemer was -- was one that came on and
14 spent a significant amount of time working with
15 that group.
16     Q.    What was the purpose of that group?
17     A.    To understand where we were and to
18 think about next steps.
19     Q.    Were any decisions made by that group
20 about borrower defense?
21     A.    I don't know if there was a specific
22 action memo, so to speak, hat -- that resulted in
23 that, but part of the discussion of that group was
24 around the approach to discharge and looking at an
25 approach that would be fundamentally fair to every

Page 50

1              - JAMES MANNING -
2    borrower and also fair to the taxpayer.
3        Q.    Do you have an understanding of why
4    that needed to be looked at?
5        A.    I think the feeling was that it
6    needed to be looked at because there -- there were
7    some that thought that borrowers making a claim,
8    that was accepted to get a hundred percent relief;
9    and the question was raised in that group whether
10   or not that should always be a case or if there
11   was an approach that could look at it through a
12   different lens.
13       Q.    And who suggested that in the group?
14       A.    Who specifically suggested that?
15       Q.    Yes.
16       A.    I, I -- I don't recall who was the
17   first person to -- to say that.  I think that --
18   that when it came up, that there was, you know,
19   further discussion on that; and that ult --
20   ultimately the -- the group decided/recommended an
21   approach to looking at developing methodology that
22   could look at claims and make judgments on whether
23   someone should get a hundred percent or some
24   lesser percentage.  There -- there was a range
25   that went down to ten percent, as I recall.

Page 51

1              - JAMES MANNING -
2              And most of the folks at the table
3    were not expert enough to -- to develop that, but
4    there was an individual that was part of the group
5    who was a career member of the Department from the
6    finance office, Phillip Jeunst, who was -- was
7    qualified and charged to look at the issue and
8    come back with a proposal and a methodology that
9    could be used to make determinations that would
10   allow for forgiveness from ten percent to a
11   hundred percent.
12       Q.    And you said that person's name was
13   Phillip Jeunst?
14       A.    Yeah, I think it was like
15   J-E-U-N-S-T.  I might have spelled that
16   indirectly.  J-U-E-N-S-T I think.  There might
17   have been a G in there, too.  I -- I can't
18   remember how he spelled his name.
19       Q.    And what was his position?
20       A.    He was from the finance office.
21       Q.    Do you know if he's still with the
22   Department of Education?
23       A.    I believe he is, yes.
24       Q.    Do you know his current position?
25       A.    I do not.

Page 52

1              - JAMES MANNING -
2        Q.    And what specifically did he
3    recommend with respect to the -- with the relief
4    methodology?
5        MR. MERRITT:  Objection to the extent
6    it calls for deliberative privileged
7    information.
8        MR. JARAMILLO:  Are you instructing
9    the witness not to answer?
10       MR. MERRITT:  Yes.  Just your
11   question asked for a recommendation, correct?
12       MR. JARAMILLO:  I'll -- I'll
13   rephrase.
14       Q.    Was anything that Phil Jeunst
15   suggested put into writing?
16       A.    Oh, yes, absolutely.  It was put into
17   effect.
18       Q.    How was it put into writing?
19       A.    I -- I don't recall, but it was
20   actually -- it was ultimately put aside by the
21   court.
22       Q.    A partial relief meth -- methodology
23   that resulted from the Borrower Review Defense
24   Panel was -- was put -- set aside by the court in
25   the Calvillo Manriquez case?

Page 53

1              - JAMES MANNING -
2        MR. JARAMILLO:  Can we go off the
3    record.
4        (Whereupon, a brief discussion was
5    held off record.)
6        Q.    Mr. Manning, you froze there on the
7    video screen for a second, so I'm not sure -- I
8    didn't hear an answer.  I'm just -- I'm just going
9    to repeat my question.
10       A.    Go ahead.
11       Q.    When you say that the -- what Mr.
12   Phillip Jeunst suggested was -- was put aside by
13   the court, are you referring to the court's order
14   enjoining the use of the average earnings rule in
15   the Calvillo Manriquez case?
16       A.    Yes, that's correct.
17       Q.    Did anything about the borrower
18   defense Panel review cause a delay in the
19   Department's issuance of borrower defense
20   decisions?
21       MR. MERRITT:  Objection, vague.
22       Q.    You can answer the question.
23       A.    I'm sorry, can you repeat it, please.
24   Did anything?
25       Q.    I'll rephrase it.  Let's back up a

Page 54

- JAMES MANNING -

little bit.

When you came on to the administration, what was your understanding of what the -- how the prior administration had approached borrower defense claims?

A.  Well, when I came on at that point I don't know that I had a position.  I -- I came to find out that over the course of the last several weeks at the end of the previous administration that a number of actions had been taken and decisions made and adjudication being taken on a number of claims prepared and authorized by the -- the Secretary, previous Secretary for discharge.

And, as I recall, there were approximately 16,000 claims that were signed off on that came to my attention early on when I was officially onboard; and we, we -- we looked at those and talked to general counsel and, you know, wanted to come to understand if these had been resolved to the point where the incoming Secretary would need to authorize their approval.

There was a -- much discussion about that and ultimately recognition that the previous administration action had been the final action,

Page 55

- JAMES MANNING -

final Department action that -- that was arrived at with the proper authority.  While it hadn't been discharged, they were necessarily needed to be discharged by the incoming Secretary.

Q.  And were you involved in any action to effectuate these discharges by getting the Secretary's approval?

A.  I -- I did brief the Secretary on the status and, you know, informed her that we had done necessary due diligence and come to understand and appreciate that this action was a -- a lawful action of the previous administration and that the changes needed to happen and, thus, became her responsibility to sign that authorization.

Q.  How did she react to this?

MR. MERRITT:  Objection, beyond the scope of discovery the court authorized.

Q.  You can answer the question.

A.  Well, she -- she wasn't particularly happy about it.

Q.  Did she tell you why she wasn't happy about it?

A.  Not specifically, no.

Page 56

- JAMES MANNING -

Q.  Did you have any understanding about why she wasn't happy about it?

MR. MERRITT:  Objection, calls for speculation.

Q.  You can answer the question.  I just want to know if you had any understanding of why she was unhappy about this decision.

A.  Well, I think in principle there were a -- a number of folks that were not happy about the situation.  I don't know if there were any things to say anyone was happy about the situation, but it was a decision that required action.

I think that, you know, any conversation beyond that, that -- well, I don't know how to say this.  I think that the -- the idea that every individual that made a claim that was to be discharged will a receive a hundred percent of, you know, discharge did strike any number of us as not necessarily the right way to go, but yet still recognized that the Department had taken the action, the previous Secretary approved it, and we, you know, effectively was obligated to move it forward.

Page 57

- JAMES MANNING -

Q.  Why didn't you think it was the right way to go?

MR. MERRITT:  Objection to the extent that calls for deliberative privileged information.

Q.  You can answer the question.

A.  Well, the answer to the -- the specific question is I don't know.

Q.  If you know, why did others think it was not the right way to go?

MR. MERRITT:  Objection, calling for -- to the extent that question calls for deliberative privileged information.

Q.  You can answer the question.

A.  Well --

MR. MERRITT:  I mean, if you're gonna -- if the question is phrased as what do others think about why the discharge shouldn't happen leading up to that decision, then I'll instruct not to answer.  Is that the question?

MR. JARAMILLO:  That wasn't the question.

MR. MERRITT:  Can you rephrase the

Page 58

```
 1              - JAMES MANNING -
 2      question or restate the question?
 3      Q.     Why did others think that this was
 4  not necessarily the right way to go, your words?
 5  Why was this decision not necessarily the right
 6  way to go?
 7      A.     Well -- well, obviously, I can't
 8  speak to what people are thinking, but I can say
 9  during conversations amongst the working group
10  that there was discussion about alternatives to a
11  hundred percent relief.
12             The -- the Secretary had the
13  authority to provide relief in part or in whole
14  and we looked at that carefully and had many
15  discussions about that, and I don't recall anyone
16  ultimately suggesting that, oh, we really ought to
17  just say a hundred percent of the claim is made,
18  which led to further discussion that established
19  the pre -- that worked on the entity of -- of
20  methodology that would be fair to borrowers and
21  taxpayers, that would look at, you know, the
22  situation and the -- and look at records that
23  ultimately the court stopped us from using; but
24  there were records that the -- the Department had
25  in hand, because they were the same records that
```

Page 59

```
 1              - JAMES MANNING -
 2  were used earlier in the previous administration
 3  to address the gainful employment issue.
 4             And so members of the group picked up
 5  from there and looked at the potentiality of using
 6  that information that would be had, that had been
 7  provided by the Social Security Administration for
 8  useful gainful employment, to look at that as part
 9  of the methodology that was put forward in
10  performance and effectuated, until the court ruled
11  that the use of the information was potentially a
12  violation of a privacy act.
13      Q.     And -- and this approach that
14  resulted from the borrower defense Group Review
15  Panel, was this -- in terms of not awarding a
16  hundred percent relief, that was a change in
17  position from how the prior administration
18  approached this issue, correct?
19      A.     That is correct.
20      Q.     And did -- was it your understanding
21  that the prior adminis -- oh, strike that.
22             Did the Department feel a need to
23  balance the interests of student bor -- borrowers
24  who were victims of misconduct by their schools
25  with the interest of taxpayers?
```

Page 60

```
 1              - JAMES MANNING -
 2      A.     It's a question around balancing it
 3  between the bor -- the borrower and -- and the
 4  taxpayer.  That was -- balance -- thinking of it
 5  in terms of -- I don't recall mentioning it quite
 6  like that.
 7      Q.     Was it -- was it the drive to try to
 8  protect interest of taxpayers that resulted in
 9  trying to find ways to limit the relief of -- of
10  applicants for borrower defense?
11             MR. MERRITT:  Objection to the extent
12      it calls for deliberative privileged
13      information.
14      Q.     I'm just asking, in general, at the
15  Department when you were there, was that the --
16  was that the approach?
17      A.     Was what the approach?  Say that
18  again.
19      Q.     To balance the interest of taxpayers
20  by finding ways to limit relief awarded to
21  applicants for borrower defense.
22      A.     I, I -- I don't think that's -- the
23  way you just put it is a fair representation of
24  how the conversation was, but the ideal behind
25  everything that we did from the beginning was to
```

Page 61

```
 1              - JAMES MANNING -
 2  be fair to student borrowers that had been harmed
 3  and to give full consideration to how much harm
 4  was done and if it was worthy of a hundred percent
 5  forgiveness, then that's what should be provided.
 6             If it was something where the
 7  individual had moved forward and been successful
 8  and should have had some relief, at some level,
 9  that should be considered too; and that -- and
10  looking at things through that lens ultimately was
11  fair for the borrower and fair for the taxpayer in
12  respect that it was going to cost something, but
13  out of hand we shouldn't start with respect to
14  that -- that everybody that was harmed was harmed
15  a hundred percent.
16      Q.     So in order to protect the taxpayer,
17  the new administration took an approach that would
18  find ways to -- to measure harm and such that a
19  hundred percent relief was not granted; is that
20  true?
21             MR. MERRITT:  Objection,
22      mischaracterization of prior testimony.
23      Q.     You can answer the question.
24      A.     Can you repeat the question, please.
25      Q.     In order to protect the taxpayer, the
```

Page 62

```
1                    - JAMES MANNING -
2   new administration's approach was to find ways to
3   limit relief commensurate with what the Department
4   viewed as the harm to the borrower; is that true?
5        A.     No, I don't think that is phrased
6   correctly.
7               I don't think we were thinking of the
8   taxpayer, you know, first and then looking to --
9   to have a balance.  I think we were looking to try
10  to make it fair across the board.
11       Q.     So what were you doing to protect the
12  taxpayer?
13              MR. MERRITT:  Objection, overbroad.
14       Q.     You can answer.
15       A.     I -- I think, though, protecting the
16  taxpayer was -- I don't know what happened when we
17  were deciding correctly for borrowers.
18       Q.     Was the interest of schools also a
19  consideration in revising the -- the relief
20  awarded to borrowers?
21       A.     I, I -- I never heard that was raised
22  as a consideration.
23       Q.     So, in your view, the considerations
24  were the taxpayer and the borrower?
25       A.     Yes.
```

Page 63

```
1                    - JAMES MANNING -
2        Q.     Any other considerations?
3        A.     I'm sure there were other
4   considerations discussed at the table.  I don't
5   recall what they were.
6        Q.     In your view, the prior
7   administration did not sufficiently take into
8   account the interest of the taxpayer?
9               MR. MERRITT:  Objection.  We're
10  getting beyond the scope of the discovery the
11  court authorized.
12       Q.     You can answer unless your counsel
13  instructs you not to.
14              MR. MERRITT:  Well, which topic is
15  this relevant to?
16              MR. JARAMILLO:  Well, this is
17  background leading towards the eventual delay
18  in the processing of applications and it has
19  to do with the view of the new administration
20  toward Borrowers Defense claims and what
21  would be used to evaluate them.
22              MR. MERRITT:  I don't think that's a
23  topic.  I mean, if the court's -- as relevant
24  to this witness, the only topic the court
25  authorized discovery into is the extent to
```

Page 64

```
1                    - JAMES MANNING -
2   which the difficulty of reviewing borrower
3   defense applications -- sorry about that.
4               So as relevant to this witness, the
5   only topic that the court authorized
6   discovery into is the extent to which the
7   difficulty of reviewing borrower defense
8   applications actually caused or justified the
9   Secretary's 18-month delay and I don't think
10  that question relates to that topic.
11              MR. JARAMILLO:  Well, the court did
12  say that there was a strong showing of agency
13  pretext, the class had been prejudiced by
14  delay, and the court said we need to know
15  what's really going on and that led him to
16  compel discovery on the topic you listed, but
17  other topics as well that Mr. Manning might
18  have knowledge of including the denial issue
19  before this suit and under the previous
20  administration and the extent to which the
21  Secretary denied applications of students who
22  attended the school subject to findings of
23  misconduct.  This all gets to pretext and
24  potential causes of the delay.
25              Are you going to instruct him not to
```

Page 65

```
1                    - JAMES MANNING -
2   answer that question?
3               MR. MERRITT:  You're correct that
4   some of the topics could be relevant to Mr.
5   Manning.
6               I will state that the court's general
7   statement that the pretext do not set the
8   parameters for a technical discovery, the
9   actual topics that you listed do.
10              At this point we are very, very far
11  before the 18-month delay the court
12  referenced, which as you now began in 2018.
13  So I guess, at this point, I'll -- I'll ask
14  you to restate the question.
15              MR. JARAMILLO:  We can move on.
16       Q.     Mr. -- Mr. Manning, you testified
17  earlier that it was determined that the Secretary
18  needed to approve the applications of
19  approximately 16,000 borrowers of -- that were
20  prelim -- that were approved by the prior
21  administration, but not actually discharged; is
22  that correct?
23       A.     Correct.
24       Q.     And were you involved in the
25  Secretary's approval of those applications?
```

Page 66

- JAMES MANNING -

1      A.     I -- I briefed her that that was the
2   determination after review by the Office of
3   General Counsel.  There was no option and I -- I
4   recommended she sign.
5      Q.     That she sign what?
6      A.     The discharge of those 16,000 loans
7   -- $200 billion worth of loans.
8      Q.     And was that an actual document
9   discharging the loans?
10     A.     She signed recognizing that, that her
11  -- her action authorized the process to go
12  forward.
13     Q.     And were you involved in drafting the
14  written document for that action?
15     A.     I was not.
16     Q.     Did you give her, the Secretary, any
17  written communication about the action?
18     A.     I believe I may have.  I expect I
19  did, yes.
20     Q.     Why don't we look at Tab 11 in your
21  documents and this was previously submitted as
22  Exhibit 7 in the Jones deposition.
23            (Whereupon, Exhibit 7, having been
24  previously marked, was tendered to the

Page 67

- JAMES MANNING -

1   witness for identification.)
2      Q.     And I'll ask you to just skip past
3   the first page that says "Exhibit 7" because that
4   was just used to get it into the court file; and
5   if you turn to the second actual page of the
6   document, do you recognize this document?
7      A.     Uh-huh.
8      Q.     And can you tell me what it is?
9      A.     This is a memo from me to the
10  Secretary.
11            MR. JARAMILLO:  And I'm not sure that
12  I did this, but we should mark this -- I'm
13  sorry, we don't have to mark this.  Strike
14  that.
15     Q.     Did you write this memo, Mr. Manning?
16     A.     I signed it.  I don't believe that I
17  was the author.
18     Q.     Do you know who authored it?
19     A.     Probably a committee.
20     Q.     And what committee would that be?
21     A.     Oh, I, I -- I don't know.  I would
22  say that I, you know, ultimately read it and sent
23  it forward.
24     Q.     Who gave you the draft of it?

Page 68

- JAMES MANNING -

1      A.     I have no recollection of who gave me
2   the draft.
3      Q.     Do you know if this resulted from the
4   borrower defense Review Panel?
5      A.     I do not.  I think that I would say
6   that -- so the paragraph that reads, "We
7   established a review panel consisting of Joe
8   Connolly, Lynn Mahaffy -- we established a review
9   panel consisting of Joe Connolly, Lynn Mahaffy,
10  Phil Rosenfelt, Justin Riemer and myself who
11  examined the claims and background explanation and
12  made recommendations on how to resolve the pending
13  claims and proceed in the future."
14            So this memo preparation was made in
15  and amongst the group of people represented here.
16     Q.     And was this the action you referred
17  to previously of the -- of Secretary DeVos
18  authorizing the discharge of approximately 16,000
19  borrower defense claims?
20     A.     Yes.  It was --
21     Q.     I'm sorry, go ahead.
22     A.     The answer to what you said so far is
23  yes.  It was a recommendation to the Secretary
24  signed by me to "proceed with discharge for direct

Page 69

- JAMES MANNING -

1   and non-direct loans for all impacted borrowers
2   direct for U.S. or in the CFO's Internal Control
3   Unit to set up interim procedures to process
4   claims until new borrower defense regulations are
5   operable and take effect.  Proceeding with
6   requesting OIG launch a review of the borrower
7   defense program."
8      Q.     And you're reading from Page 4 of
9   this exhibit?
10     A.     Correct.
11     Q.     And you see that Secretary DeVos
12  signed it and checked the -- the line that says
13  "Approved"?
14     A.     I do.
15     Q.     And this is a document that shows
16  that she approved the action listed in the
17  recommendation?
18     A.     It is.
19     Q.     And you see your comment at the
20  bottom that says "With extreme displeasure"?
21     A.     I do.
22     Q.     After, did you -- do you recall
23  seeing that after she signed this document?
24     A.     Well, I -- I don't recall that,

Page 70

1            - JAMES MANNING -
2   but --
3       Q.      After she signed this document, did
4   you talk to her about her extreme displeasure?
5           MR. MERRITT:  Objection, asked and
6   answered.
7       Q.      You can answer.
8       A.      Well, I know she was not happy about
9   it and I know that she would have preferred that
10  the action was taken on fully under Trump's
11  administration, but she -- she knew she had an
12  obligation and she signed it and was not happy
13  about it, the way it had been handled up to then.
14      Q.      And after she signed the document, do
15  you know if the 16,000 applications were actually
16  discharged?
17      A.      Yes, they were.
18      Q.      Do you know when they were
19  discharged?
20      A.      I do not.
21      Q.      Do you have an estimate as to when
22  they were discharged?
23      A.      Not long after she signed this.
24      Q.      And were they all discharged with a
25  hundred percent relief?

Page 71

1            - JAMES MANNING -
2       A.      That's my understanding.
3       Q.      During the time period in which the
4   borrower defense Review Panel was -- was meeting
5   to evaluate the borrower defense program, did FSA
6   issue any decisions on borrower defense
7   applications?
8       A.      I don't recall if they issued any or
9   not.  They certainly were receiving applications
10  and were making judgments whether they were
11  acceptable for consideration or not, but I don't
12  recall that.
13      Q.      Do you recall there being -- sorry,
14  go ahead.  I talked over you.
15      A.      That's okay.  Sorry.  I don't recall
16  that there were any that were finally fully
17  settled beyond these.
18      Q.      Was there a decision to put a pause
19  on issuing final decisions during the time period
20  of the borrower defense Review Panel?
21      A.      During a period that involved the
22  panel?  I -- I don't recall a -- a formal
23  decision, but -- I don't -- I don't recall a
24  decision that ordered that.
25           I think there was certainly

Page 72

1            - JAMES MANNING -
2   discussion about moving forward with the
3   methodology and getting to a point where we would
4   be able to move forward, as I said before, fairly
5   for the borrower and the taxpayer by considering
6   the harm that was done to student borrowers and
7   providing relief at an appropriate level that
8   ultimately was between a hundred percent and ten
9   percent.
10      Q.      To your recollection, when was that
11  new methodology put into effect?
12      A.      Oh, I'm -- I'm trying to recall.  I
13  can't remember specifically when it was put into
14  effect, you know, obviously it would take
15  some -- some time to stand up.  It was in
16  effect -- started being worked on through '17.
17           You know, it was in effect for a
18  certain period of time before it was put aside by
19  the court in 2018.  I, I -- I can't remember the
20  specific start date in terms of when it was up for
21  operation.
22      Q.      Until it was up in operation, is it
23  true that the Department did not issue any other
24  final borrower defense decisions except for the
25  approximately 16,000 that were approved by the

Page 73

1            - JAMES MANNING -
2   Secretary in the memo we just looked at?
3       A.      I don't specifically recall, but I
4   expect that it's true though.
5       Q.      And this memo, as you read, did
6   authorize the CFO's Internal Control Unit to set
7   up interim procedures to process claims, right?
8           MR. MERRITT:  Objection, ambiguous.
9   What -- what document?
10          MR. JARAMILLO:  The document we
11  looked at which was the May 4th, 2017 memo
12  that's Exhibit 7 in this case.
13      Q.      Tab 11 for you, Mr. Manning.
14      A.      Yes.  That's Page 4 of Exhibit 7; is
15  that right?
16      Q.      Yes, the authorization of the setting
17  up of interim procedures.
18      A.      Yes, I see what you're saying there.
19  "Direct OUS and the CFO's Internal Control Unit"
20  -- sorry, I'll read the whole thing so you have
21  it.
22           "Proceed with discharge for direct
23  and non-direct loans for all impacted borrowers.
24  Direct OUS and the CFO's Internal Control Unit to
25  set up interim procedures to process claims until

Page 74

1         - JAMES MANNING -
2  new borrower defense regulations are adopted and
3  take effect.  Proceed with requesting OIG launch a
4  review of the borrower defense program."
5         And my reading of the second sentence
6  "direct all OUS and CFOs' Internal Control Unit to
7  set up interim procedures to process claims until
8  new borrower defense regulations are adopted" to
9  me refers to the establishment of the methodology.
10 New borrower defense regulations, actions on that
11 didn't start until the end of 2017.
12     Q.     Right, and -- and this says that the
13 OUS and the CFO's Internal Control Unit was
14 directed to set up interim procedures to process
15 claims un -- until then; is that right?
16     A.     Yes, and I'm saying that the,
17 the -- what was set up in the interim processes
18 was to effectuate the methodology and apply that.
19     Q.     And were the interim procedures set
20 forth in any document, any document that you're
21 aware of?
22     A.     Not that I recall.
23            MR. MERRITT:  Joe, would it be okay
24     if we took a short break sometime soon for
25     five minutes.

Page 75

1         - JAMES MANNING -
2            MR. JARAMILLO:  Yes, let's go ahead
3     and take a break now for five minutes.
4            MR. MERRITT:  Thank you.
5            THE VIDEOGRAPHER:  We are now off the
6     record, the time is 16:53 UTC.
7            (Whereupon, there was a brief recess
8     in the proceedings.)
9            THE VIDEOGRAPHER:  Please standby,
10    everyone.  We're now on the record, the time
11    is 17:07 UTC.
12     Q.     Mr. Manning, we're just back from
13 break and I wanted to ask you if to -- I don't
14 want to know what you talked about.  I want to
15 just ask you if you spoke with anybody during the
16 break.
17     A.     Briefly with the attorneys.
18     Q.     Do you have anything to clarify from
19 your prior testimony?
20     A.     No.
21     Q.     Do you recall any direction -- let's
22 back up a little bit.
23            As acting Undersecretary of Higher
24 Education, who did you report to?
25     A.     In essence I reported to the -- in

Page 76

1         - JAMES MANNING -
2  that position I reported to the Secretary.
3     Q.     How often did you meet with the
4  Secretary in that role?
5     A.     Well, I -- I met with her -- I'm not
6  sure if I met with her in that role specifically
7  or I had started a meeting with her as a senior
8  advisor and I -- I guess I wasn't officially --
9  but I met with her every few weeks in a group with
10 other -- with other senior advisors.  I would have
11 had some individual -- not individual -- some
12 smaller group meetings from time to time.
13     Q.     With the Secretary?
14     A.     With the Secretary, yeah.
15     Q.     And did you discuss borrower defense
16 issues during any of those meetings?
17     A.     During any of them?
18     Q.     Yes.
19     A.     Certainly.
20     Q.     And who else was present when you
21 discussed borrower defense issues?
22     A.     I can't be clear in terms of, you
23 know, who was there when we were discussing
24 borrower defense issues, but generally the folks
25 that would meet with the Secretary and I would

Page 77

1         - JAMES MANNING -
2  include Bob Eitel, Secretary chief of staff
3  depending on who that was at the time.  She had
4  two different chiefs of staff.
5            When Diane Jones came onboard, she
6  was part of that group.  Liz Hill, who was her
7  communications person and press spokesman.
8            Ultimately when Deputy Secretary came
9  on, General Zeiz, Deputy Secretary of Education
10 was in some of those meetings.  The Deputy
11 Secretary of Education, Zeiz is his last name,
12 Z-E-I-Z, former General.
13            When Wayne Johnson ultimately came
14 onboard, he would be part of those meetings as
15 well, initially as COO and then continuing to --
16 as the director of Next Gen, as I said,
17 initiative.
18     Q.     Other than the May 4th, 2017 memo
19 that was from you to Secretary DeVos, did you have
20 any other written communications with Secretary
21 DeVos about borrower defense issues?
22     A.     Separately, not -- not that I recall.
23     Q.     No e-mail?
24     A.     Quite frankly I can't be sure, but
25 e-mails except but for the fact I don't recall

Page 78

1         - JAMES MANNING -
2  sending e-mails to the Secretary.
3         Q.     And no text messages?
4         A.     No, none.
5         Q.     And underneath you as under acting
6  Secretary, was FSA, correct?
7         A.     Yes, in -- in principal the
8  Undersecretary had oversight of the Higher
9  Education programs, so FSA is part of Education
10 and Career Adult Education.
11        Q.     Who from FSA reported directly to
12 you?
13        A.     Oh, a whole cadre of folks at
14 different times.  I mean, there was a group of
15 senior leaders of or ten or so that met regularly
16 with me.
17        Q.     Did any of them meet regularly with
18 you about borrower defense?
19        A.     The issue of borrower defense may
20 have come up from time to time in general
21 meetings, but...
22        Q.     Who at FSA was responsible for
23 overseeing the implementation of borrower defense
24 during your tenure at the Department?
25        A.     The director of the Enforcement group

Page 79

1         - JAMES MANNING -
2  officially had that responsibility.
3         Q.     And who was that during your tenure?
4  And if it was multiple people just tell me who
5  recall, please.
6         A.     Oh, it was multiple people and it
7  was -- I just forgot the name.  I just saw his
8  name on a e-mail not too long ago.  Robert -- I
9  don't remember his last name.  He left actually
10 earlier; he left in February and then Laura Kim
11 and then shortly after that she left and Colleen
12 Nevin effectively was the senior person there.
13               And I would seek Colleen from time to
14 time until -- until Jillian Schmoke became the
15 director of the borrower -- of the, you know,
16 Enforcement Unit in the summer of '17.  So '17
17 probably August.
18        Q.     And, Mr. Manning, you've named people
19 that were, as you described it, in the role of
20 director of Enforcement within FSA, correct?
21        A.     Yes.
22        Q.     Between you and that role of director
23 of Enforcement, was there anybody else in the
24 chain of reporting?
25        A.     Between me and director?

Page 80

1         - JAMES MANNING -
2         Q.     Yes.
3         A.     Not at FSA.
4         Q.     Okay.  Anywhere else?
5         A.     Quite frankly, I don't know -- not
6  that I know of.
7         Q.     Okay.  So these people, when they
8  were in that role, reported directly to you?
9         A.     I -- actually Jillian Schmoke when he
10 came onboard, he came onboard and we had a
11 full-time COO that was Wayne Johnson, and he
12 reported to Wayne while Wayne was COO through
13 July, '17 through January, '18.  That --
14        Q.     And Jillian -- go ahead.  I'm sorry.
15        A.     Yeah, that was the reporting
16 relationship.
17        Q.     So from Julian Schmoke up to Wayne
18 Johnson and then up to you?
19        A.     Yes.
20        Q.     Did Colleen Nevin ever directly
21 report to you?
22        A.     On paper I'm sure she did.  Let's
23 see. It would have after the senior leaders had
24 left -- I'm sorry, I don't know the gentleman's
25 name -- and then Laura Kim.  At -- at that point,

Page 81

1         - JAMES MANNING -
2  Colleen reported directly to me.
3         Q.     It -- go ahead.  I'm sorry.
4         A.     It -- it would have been -- you know,
5  if it wasn't March, '17 it could have been shortly
6  after that, early '17.
7         Q.     And, Mr. -- Mr. Manning, please don't
8  take offense at my question, but I want to do a
9  quick check-in to see if there's any reason that
10 you're having trouble recalling any facts today
11 and you don't have to tell me the reason at this
12 point, but I want to know if you are having
13 trouble.
14        A.     Oh, well, I'm only reporting on what
15 I -- well, I'm trying to remember things that I
16 think I -- I should remember, but that are not
17 coming right to mind.
18        Q.     Okay.
19        A.     I have been away from that for a
20 while.  I've been doing other work and I really
21 haven't been following any issues in and around,
22 you know, the Department or borrower defense or I
23 didn't focus on those things.
24        Q.     I -- I understand, Mr. Manning, but I
25 just want to make sure that there's nothing that

Page 82

1              - JAMES MANNING -
2    might be impeding your recollection today.  For
3    example -- and you don't have to tell me if you
4    don't want to, but sometimes medications may have
5    an impact on recollections.
6            I just wanted to make sure there's
7    nothing that you're aware of that could be
8    impacting your recollection today; and, again, I
9    apologize if this is sensitive for you, I know --
10   I know it is -- it would be for -- for most people,
11   but are you aware of anything that might be
12   impacting your recollection, other than the
13   passage of time between your time at the
14   Department and now?
15       A.     No.  Passage of time.
16       Q.     Okay.  You're not aware of anything
17   else?
18       A.     I'm not aware -- not aware of
19   anything else.
20       Q.     Okay, I know it's kind of awkward,
21   but I just kind of had to ask just because, you
22   know -- I know you're doing your best and you're
23   taking time to think and jog your memory and I
24   just wanted to make sure nothing was --
25       A.     Just the fact that I'm 67 and not 57

Page 83

1              - JAMES MANNING -
2    anymore.
3        Q.     I understand.  I find myself going
4    through some slowdowns as well.
5            So did you communicate directly with
6    Colleen -- strike that.
7            Did you have any written
8    communications with Colleen Nevin about borrower
9    defense?
10       A.     Not that I recall.
11       Q.     No e-mails between you and her about
12   borrower defense?
13       A.     I'm not saying no e-mails, but I
14   don't recall.
15       Q.     Okay.  What involvement did you have,
16   if any, in overseeing the borrower defense program
17   as acting Undersecretary?
18       A.     As acting Undersecretary?  Re --
19   repeat the question.
20       Q.     Did you have a role in overseeing the
21   borrower defense program when you were acting
22   Undersecretary in the Trump Administration?
23       A.     Well, in -- in principle the
24   Undersecretary oversees FSA.  During those periods
25   when there was someone else as COO, I would not

Page 84

1              - JAMES MANNING -
2    take an active role; and when I dealt directly
3    with Colleen who was to get updated on activities,
4    but I had full faith and confidence in her and
5    allowed her to do her job.
6        Q.     So effectively during that time
7    period, was Colleen Nevin in charge of borrower
8    defense for the Department of Education?
9            MR. MERRITT:  Objection,
10   mischaracterization of prior testimony.
11       Q.     You can answer the question.
12       A.     So repeat it again.  Was Colleen
13   what?
14       Q.     Was she effectively the person in
15   charge of -- of the borrower defense program at
16   the Department when she reported directly to you
17   and you had full faith and -- and confidence in
18   her?
19       A.     Well, she was -- she was in charge of
20   the Borrower Defense Unit.  She wasn't -- your --
21   your statement was too broad in terms of, you
22   know, for the whole Department.  There was
23   oversight, but she ran the borrower defense Unit
24   and...
25       Q.     And who gave that oversight to her?

Page 85

1              - JAMES MANNING -
2        A.     Well, the -- the leaders in the
3    Enforcement Unit initially, which would have led
4    to Julian Schmoke spending more of that time.
5        Q.     And what was your understanding of
6    the role of the Borrower Defense Unit?
7        A.     They received an adjudicated
8    applications for borrower defense relief.
9        Q.     So that was one step in the process
10   of borrower defense's claim review and processing
11   during your time at the Department?
12       A.     Yes.
13       Q.     Well, let's go through the whole
14   process step by step.  When -- when claims came
15   into the Department, who was in charge of that
16   intake?
17       A.     Claims for borrower defense came into
18   the Department?
19       Q.     Yes.
20       A.     My understanding is they went
21   directly to the Borrower Defense Unit.
22       Q.     And what did the Borrower Defense
23   Unit do with them?
24       A.     They reviewed them, made decisions on
25   whether or not they were sufficient to be given

Page 86

- JAMES MANNING -

1    further consideration for relief or they made
2    decisions that they were insufficient to be
3    considered.
4        Q.    If they determined that they were
5    sufficient to be given further consideration for
6    relief, what happened to the claim at that point?
7        A.    I don't recall.
8        Q.    Are you aware of anybody else that
9    would look at it, besides the Borrower Defense
10   Unit?
11       A.    I expect that the director of the
12   Enforcement group might look at it, but I
13   expect -- well, I think that -- no.  I expected
14   the -- the defense -- the director of -- I'm
15   sorry -- the Enforcement group.
16       Q.    And what would director of the
17   Enforcement group do at that point?
18       A.    Just have an understanding of where
19   the applications were.
20       Q.    Okay.  So if someone applied and the
21   Borrower Defense Unit determined that their -- it
22   warrants, the application warrants further
23   consideration for relief, who gives that further
24   consideration for relief or who during your tenure
25   

Page 87

- JAMES MANNING -

1    at the admin -- at the Department?
2        A.    Well, initially it was within the
3    Borrower Defense Unit.  Ultimately when there was
4    a methodology, I don't recall how the review
5    process went once the methodology was established.
6        Q.    Once the methodology was established,
7    was there someone in charge of making a relief
8    determination?
9        A.    I don't recall.
10       Q.    Was BDU involved in making -- was the
11   Borrower Defense Unit involved in making a relief
12   determination?
13       A.    Well, I would say that their work was
14   the first step in the process.  I -- I don't
15   recall beyond their adjudication what the
16   additional steps were beyond that.
17       Q.    Have you heard of their work
18   adjudicating claims being referred to as Step 1?
19       A.    I actually don't remember hearing it
20   that way, but --
21       Q.    Do you recall hearing of a -- of the
22   relief determination being referred to as Step 2?
23       A.    I don't recall hearing that.
24       Q.    Were you ever involved in approving

Page 88

- JAMES MANNING -

1    borrower defense applications or denying --
2    approving or denying them?
3        A.    Initially?  I -- I didn't see the
4    borrower defense claims as they were coming in.
5    The -- the reviews took place in the Borrower
6    Defense Unit and I got a report in terms of the
7    numbers that were coming in.  I wasn't engaged in
8    the decisions.
9        Q.    Okay.  You said that was initially,
10   did that change at any point in time during your
11   tenure at the Department in the Trump
12   Administration?
13       A.    Not that I know.  I, I-- I said I
14   can't recall what the additional steps were once
15   the methodology obviously -- I mean, not
16   obviously, but I expect that would have impact the
17   whole process; but I don't recall.
18       Q.    Did you ever receive a package of
19   borrower defense applications with the cover memo
20   to approve or deny?
21       A.    Borrower defense applications to
22   approve or deny?
23       Q.    Yes.
24       A.    No, I do not recall.  I don't

Page 89

- JAMES MANNING -

1    remember ever receiving a package like that.  I
2    don't remember.  I don't recall.
3        Q.    Did you have approve any borrower
4    defense applications yourself?
5        A.    Individually?
6        Q.    Yes.
7        A.    Not -- not that I recall.
8        Q.    How about as a group?
9        A.    Not that I recall.
10       Q.    Did you ever deny borrower defense
11   applications individually?
12       A.    Individually?  No.
13       Q.    How about as a group?
14       A.    If something came to me, I -- I don't
15   recall.
16       Q.    You don't recall ever being directly
17   involved in issuing borrower defense decisions to
18   individual borrowers or individual borrowers in a
19   group?
20       A.    Not to individual borrowers, but
21   individual borrowers in -- in a group says
22   something different to me.  If there's a document
23   that, you know, asks for a -- approval on a group,
24   something like that, it's possible.  Do I recall

Page 90

1              - JAMES MANNING -
2   it, no.
3       Q.     And why do you say it's possible?
4       A.     Well, because -- I would say it's
5   possible because I had -- I certainly received
6   packages for consideration on any number of things
7   for signature to signoff and I do not recall any
8   involving borrower defense.  That -- that was not
9   the way information flowed on that, to my
10  recollection.
11      Q.     Do you know if the Office of the
12  Secretary was ever involved in approving borrower
13  defense applications, putting aside the -- the May
14  4th, 2017 decision to approve those approximately
15  16,000?
16      A.     Do I know whether the Office was
17  involved?  That -- that would be highly unusual,
18  but I don't know.
19      Q.     Beyond the Borrower Defense Unit in
20  Enforcement in FSA, do you have any recollection
21  of any other Department or any other unit being
22  involved in making or issuing borrower defense
23  decisions?
24      A.     Issuing or making borrower defense
25  decisions outside of En -- Enforcement Unit and

Page 91

1              - JAMES MANNING -
2   Borrower Defense Unit?
3       Q.     Yes, that's the question.
4       A.     No, I don't.
5       Q.     Do you know if, if -- if a decision
6   was issued to approve or deny, do you know who
7   would draft the notice of decision?
8              MR. MERRITT:  Objection, calls for
9   speculation.
10      Q.     You can answer.
11      A.     I don't know.
12      Q.     If a borrower application was
13  approved and they were granted full relief, do you
14  know who would be involved in discharging the
15  application -- I mean discharging the loan?  I'm
16  sorry.
17      A.     Well, when you say in "full relief,"
18  you mean a hundred percent?
19      Q.     Well, let's, let's back -- let's
20  strike that question.
21             If a decision was made to grant
22  relief on a borrower defense application, who at
23  the Department would be involved in effectuating
24  that discharge or that -- yeah, or grant --
25  effectuating the relief?

Page 92

1              - JAMES MANNING -
2       A.     I don't recall.
3       Q.     Were you involved in the development
4   of any policies that affected the borrower defense
5   Unit's work?
6       A.     Any policies that affected the
7   borrowers?  I -- I don't recall the process that
8   was followed when the methodology was in place and
9   I -- I'm not sure if the borrower defense -- what,
10  if any, role they had in the final resolution of
11  those applications when the methodology was being
12  applied.
13      Q.     How about any other policy decisions
14  that you were involved in that might have affected
15  the Borrower Defense Unit; are you aware of any
16  others?
17             MR. MERRITT:  Objection.
18      A.     I don't.
19             MR. MERRITT:  Strike that.
20      Q.     And, Mr. Manning, you mentioned that
21  you -- you're not sure whether BDU, Borrower
22  Defense Unit, was involved with methodology, but
23  other than that was there any policies that you're
24  aware of that -- that you had a role in -- in
25  making that affected the Borrower Defense Unit?

Page 93

1              - JAMES MANNING -
2       A.     I don't recall.
3       Q.     Now, the Office of the Undersecretary
4   was involved in making policy for the Department,
5   correct?
6       A.     From time to time.
7       Q.     And if you, if you -- if the Office
8   of the Undersecretary made a policy, did it need
9   or did you need the Secretary's approval for any
10  of policies decisions?
11      A.     I don't recall the process.
12      Q.     Was it the Secretary's authority to
13  make certain policies delegated to the Office of
14  the Undersecretary?
15      A.     That's a good question.  I don't
16  recall.
17      Q.     If -- if the Office of the
18  Undersecretary made policy decisions, how would
19  that be reflected?
20      A.     There was correspondence process that
21  directed it through the executive Secretary, but I
22  don't recall what it was.
23      Q.     Would a written document be generated
24  for a policy made by the Office of the
25  Undersecretary?

Page 94

1              - JAMES MANNING -
2      A.    I expect so, but I don't recall in
3  particular.
4      Q.    Do you recall ever signing off on a
5  policy that was made by the Office of the
6  Undersecretary?
7      A.    I signed off on many letters.  I -- I
8  can't recall if or what -- there were any that
9  were specifically policy directives.
10     Q.    Did FSA have authority to make policy
11 or were they just implementing Department policy?
12     A.    They did not make policy FSA.  FSA
13 was an operation, not a policymaking group.  It
14 was an Office of Policy Liaison, a small team of
15 people at FSA that worked closely with the Office
16 of Postsecondary Education to understand, to be
17 fully appreciative of what the pol -- what the
18 current policies were and to be part of the
19 conversation and ultimately policies were going to
20 change that had impact I would say, they played a
21 role in explaining to the policy arm of the Office
22 of Secretary of Education how that might impact
23 one way or the other operations of FSA, but FSA
24 was not a policymaking organization.
25           They had a liaison and policy was

Page 95

1              - JAMES MANNING -
2  driven from -- Postsecondary Education policies
3  was driven from the Department of Education.
4           Policy was driven from the Office of
5  Postsecondary Education and FSA would receive, you
6  know, that policy and implement it, but we were
7  not a policymaking organization.  We were an
8  operation.
9      Q.    If policy was made by the Secretary
10 or other Department leadership, that would need to
11 be communicated to -- strike that.
12           If policy -- if the policy affecting
13 borrower defense was made by leadership at the
14 Department, that would need to be communicated to
15 the Borrower Defense Unit, correct?
16     A.    Yes.
17     Q.    And, in fact, was it the Office of
18 Undersecretary responsible for communicating
19 policy instructions to the Borrower Defense Unit?
20     A.    That would have been one of the
21 responsibilities, I'm sure.
22     Q.    Would you agree that it's important
23 to have clear communication of policy from the
24 Office of the Undersecretary to the Borrower
25 Defense Unit about borrower defense policies?

Page 96

1              - JAMES MANNING -
2           MR. MERRITT:  Objection, speculative
3  and overbroad.
4      Q.    Are you aware of any problems in
5  communication of policy from the Office of the
6  Undersecretary to the Borrower Defense Unit?
7           MR. MERRITT:  Objection, overbroad.
8      Q.    You can answer the question.
9      A.    I'm not, I'm not -- I'm not aware of
10 any.
11     Q.    You're not aware of any
12 misunderstandings that the Borrower Defense Unit
13 had about policy?
14     A.    I don't remember issues along those
15 lines.
16     Q.    Okay. Did you ever give instructions
17 to the Borrower Defense Unit to stop issuing
18 decisions on borrower defense claims?
19     A.    Do I have a memory of that, no.  I
20 don't remember.
21     Q.    Aren't you aware that the Borrower
22 Defense Unit at some point in time during your
23 tenure had an understanding that they were to stop
24 issuing decisions on borrower defense claims?
25           MR. MERRITT:  Objection, vague and

Page 97

1              - JAMES MANNING -
2  ambiguous.
3      Q.    You can answer the question.
4      A.    Can you repeat the question, please.
5      Q.    Are you aware that during your
6  tenure, the Borrower Defense Unit had an
7  understanding that they were to stop issuing
8  decisions on borrower defense claims?
9      A.    I don't recall.
10     Q.    Do you recall if the Borrower Defense
11 Unit ever stopped issuing decisions on borrower
12 defense claims?
13           MR. MERRITT:  Objection, ambiguous as
14     to timing.
15     Q.    At any time during your tenure, are
16 you aware if the Borrower Defense Unit stopped
17 issuing decisions on borrower defense claims?
18     A.    I don't recall.
19     Q.    At any time during your tenure, are
20 you aware that FSA stopped issuing decisions on
21 borrower defense claims?
22     A.    That FSA stop issuing?
23     Q.    Yes.
24     A.    I -- I don't recall.
25     Q.    At any time during your tenure at the

Page 98

1              - JAMES MANNING -
2   Department, are you aware if the Department of
3   Education stopped issuing borrower defense claims?
4              MR. MERRITT:  Objection, asked and
5        answered.
6              MR. JARAMILLO:  It's not asked and
7        answered.  I'm asking about the full
8        Department.
9        A.    Okay, well, repeat the question then.
10       Q.    Are you aware at any time during your
11  tenure at the Department of Education in the Trump
12  Administration if the Department of Education
13  stopped issuing decisions on borrower defense
14  claims?
15       A.    I, I -- I don't recall specifically
16  that it was stopped -- issued.  I expect --
17       Q.    Go ahead.  I'm sorry.
18       A.    I'm trying to recall the facts and I
19  can't.  It's not coming to me.  If there's
20  something that could refresh my memory, it would
21  help that.  I -- I don't recall.
22       Q.    Between July, 2018 and the time you
23  left the Department of Education in March, 2019
24  are you aware of any borrower defense decisions
25  being noticed to borrowers?

Page 99

1              - JAMES MANNING -
2        A.    Am -- am I aware of any -- of any
3   what?
4        Q.    Borrower defense decisions being
5   noticed or issued to borrowers.
6        A.    I don't recall.
7        Q.    Between July -- July, 2018 and March,
8   2019 when you left the Department, are you aware
9   of any borrower defense applications being
10  approved?
11       A.    Did you say July, 2018 and '19?
12       Q.    Between July, 2018 and the time you
13  left in March, 2019 are you aware of any borrower
14  defense claims being approved by the Department?
15       A.    Between that time?  I don't recall.
16       Q.    Between July, 2018 and March, 2019
17  are you aware of any borrower defense applications
18  being denied?
19       A.    I've had a weekly report on -- on
20  numbers of applications that came in.  I cannot
21  recall whether or not there were reports on the
22  numbers that were acted upon or approved.
23       Q.    During July, 2018 and March, 2019 you
24  don't recall whether or not the Department of
25  Education issued final decisions on borrower

Page 100

1              - JAMES MANNING -
2   defense applications?
3        A.    Between the summer of '18 and when I
4   left in '19, I -- I don't recall.
5        Q.    Now, Mr. Manning, are you aware of
6   what this case is about, Sweet versus DeVos?
7        A.    Not specifically.
8        Q.    Are -- are you aware of the
9   allegations that the Department -- in this case
10  plaintiffs allege that the Department unreasonably
11  delayed in issuing borrower defense applications?
12       A.    I, I -- I've heard that previously at
13  one point.
14       Q.    Are you aware of any delay in issuing
15  borrower defense applications between July, 2018
16  and March, 2019?
17       A.    Am I aware, no.  I don't recall.
18       Q.    Are you aware of any delay in issuing
19  borrower defense applications during your tenure
20  in the Trump Administration at the Department of
21  Education?
22       A.    I don't recall delays specifically.
23  I -- I'll try to -- I'm trying to remember what,
24  if anything, happened around -- during the period
25  of the --

Page 101

1              - JAMES MANNING -
2        Q.    Were you aware of any backlog in
3   processing Borrowers Defense applications during
4   the tenure -- your tenure at the Department of
5   Education?
6        A.    Yes.
7        Q.    Okay.  Tell me about what your
8   awareness is of that backlog.
9        A.    Well, as I said earlier, I got a
10  legal report on the growing numbers.
11             MR. MERRITT:  Joe, just that we're
12        getting close to a lunch break.
13             MR. JARAMILLO:  Yes, and I'm sorry,
14        we did pass a little, but I want to ask a few
15        more questions.  I think we'll be able to
16        wrap up in -- in at least one or two minutes
17        and then --
18             MR. MERRITT:  That's fine.  Thank
19        you.  I just wanted to throw it out there.
20             MR. JARAMILLO:  Thank you, Mr.
21        Merritt.
22       A.    So do you have a question, Joe?
23       Q.    Yes, Mr. Manning.  Just during your
24  tenure at the Department of Education, were you
25  satisfied with the pace at which the Department

Page 102

- JAMES MANNING -

1      - JAMES MANNING -
2   was issuing borrower defense decisions?
3        A.    Was I satisfied with the pace?  I
4   observed that the numbers were growing.  I
5   can't -- I can't recall -- generally that was a
6   concern, that the numbers were growing.  I can't
7   recall anything more specific than that.
8        Q.    So you were -- were you aware or were
9   you not concerned about the pace in which the
10  Department was issuing Borrowers Defense decisions
11  at any time during your tenure in the Trump
12  Administration?
13       A.    I'm trying to recall what information
14  I had in terms of how that number was growing and
15  I'm re -- remembering a report that I saw weekly,
16  but I don't recall -- I can't specifically recall
17  what that number was do -- doing or if I had that
18  number at the time.
19       Q.    So as you sit here today, you don't
20  have any recollection of any concern over the pace
21  at which the Department was issuing decisions?
22       A.    Well, I -- I think it was growing and
23  I think that, you know, it -- it clearly needed
24  additional attention.
25       Q.    Are -- are you aware of the fact that

Page 103

1      - JAMES MANNING -
2   for the quarter ending June 30th, 2018, according
3   to the Department there were 105,998 borrower
4   defense applications pending?
5        A.    In what month was that did you say?
6        Q.    The quarter ending June 30th, 2018.
7        A.    2018, June 30th was what number
8   again?
9        Q.    105,998 applications pending.
10            MR. MERRITT:  Objection, lack of
11       foundation.
12       Q.    Does that sound accurate to you or
13  does that sound way off?
14       A.    I -- I hear that number and it feels
15  low.
16       Q.    Okay.  Well, let's go -- if we go to
17  March 31st, 2019 I'll represent to you that based
18  on information provided by the Department, that
19  number has grown to 179,377 for the quarter ending
20  March 31st, 2019.  Does that sound accurate to
21  you?
22       A.    I don't know.  What was the first
23  number you gave me?
24       Q.    105,998 for the quarter ending June
25  30th, 2018 and 179.377 for the quarter ending

Page 104

1      - JAMES MANNING -
2   March 31st, 2019.  How do those numbers sound in
3   terms of accuracy from what you remember?
4        A.    Well, I can't remember accurately.
5   You know, I'm -- I'm assuming that you have them,
6   they're the correct numbers.
7        Q.    Do you recall the numbers going up by
8   over 73,000 or more between June 30th, 2018 and
9   March 31st, 2019?
10       A.    I specifically do not remember that.
11       Q.    Okay.  Isn't that something that
12  would strike you as a significant increase?
13            MR. MERRITT:  Objection, speculation.
14       Q.    Impending applications, isn't that
15  something that you -- that would sit in your mind
16  as a -- as a lingering concern?
17       A.    I think the numbers growing -- sure,
18  there were concerns they were growing.
19            MR. JARAMILLO:  Okay, I'm happy to
20       take a lunch break now.  Thank you, Mr.
21       Manning.
22            MR. MERRITT:  Okay.  Thanks, Joe.
23            THE VIDEOGRAPHER:  We're off the
24       record, the time is 17:56 UTC.
25            (Whereupon, a lunch break was taken

Page 105

1      - JAMES MANNING -
2        from 1:00 p.m. to 1:30 p.m.)
3            THE VIDEOGRAPHER:  We're now on the
4       record, the time is 18:33.
5        Q.    Hi, Mr. Manning.  I hope you had a
6   good lunch break.
7        A.    Thank you.
8        Q.    Did you have any meetings over this
9   platform or any other platform with anybody during
10  the lunch break?
11       A.    No.  I didn't have any meetings with
12  anyone, but for the attorneys briefly at the
13  beginning and briefly before we came back on.
14       Q.    Okay.  Do you have anything to
15  clarify from your prior testimony today?
16       A.    Not that I recall.
17       Q.    And I hate to ask this again, but I
18  just want to check:  Are you -- have you taken any
19  medication in the past 24 hours that could impact
20  your ability to recall facts?
21       A.    I don't believe the medication that I
22  take affects my ability to recall facts.
23       Q.    Okay.
24       A.    I don't know that I have any
25  medications that are causing an issue.

Page 106

- JAMES MANNING -

1
2      Q.    Okay.  Thank you.
3      A.    But, as I said earlier, being 67 as
4  opposed to when I was 55 I can tell that there are
5  issues there.
6      Q.    Okay.  Let's turn to Tab 10 in the
7  packet of documents and, for the record, this is
8  already admitted as Exhibit 21 in a prior
9  deposition and it's the declaration of Colleen
10 Nevin.
11           (Whereupon, Exhibit 21, having been
12      previously marked, was tendered to the
13      witness for identification.)
14     Q.    And, Mr. Manning, I believe you
15 stated that you reviewed this, the declaration, in
16 preparation for today's deposition; is that
17 correct?
18     A.    I did read through it briefly, yes.
19     Q.    Okay.  If I could have you turn to
20 the last page.
21     A.    Signature page?
22     Q.    Yes, and can you -- can you read me
23 the date on which Ms. Nevin executed this
24 declaration?
25     A.    The 14th day of November, 2019.

Page 107

- JAMES MANNING -

1
2      Q.    Okay.  So it may me obvious, but I
3  think you would understand that her statements in
4  here purports to be accurate as of that date; is
5  that your understanding?
6      A.    I -- I believe that to be true.
7      Q.    Okay.  Let's turn to Page 15 of Ms.
8  Nevin's declaration.
9      A.    Okay, and could I point out that
10 I -- I left the Department on March 14th of 2019.
11     Q.    Yes, we understand that.  Let's turn
12 to Page 15 of Ms. Nevin's declaration.
13     A.    Okay.
14     Q.    And if you look at Paragraph 64,
15 Lines 14 and 15 of Page 15 it says, "Additionally
16 between December, December, 2017 and May, 2018,
17 OUS authorized the denial of over 10,000
18 applications."
19           Do you recall OUS authorizing the
20 denial of over 10,000 applications during that
21 time period?
22     A.    Do I recall it?
23     Q.    Yes.
24     A.    No, I actually do not.  However is it
25 likely to be correct, I expect that it is.

Page 108

- JAMES MANNING -

1
2      Q.    And if OUS did authorize the denial
3  of over 10,000 applications, would you as acting
4  Undersecretary have been involved in that
5  authorization?
6      A.    I would expect the denials to come
7  out of the Borrower Defense Unit as a
8  recommendation.  I didn't actively review
9  individual applications.
10     Q.    Would you have been the person at
11 OUS, as the acting Undersecretary, to authorize
12 the denial?
13     A.    During that period of time, it would
14 have come to my attention; and could I have had a
15 document that I had to sign related to this, I
16 could have.  I could have signed it, but I do not
17 recall.
18     Q.    If OUS authorizes the denial of these
19 applications, would anyone else at OUS besides you
20 have authorized them?
21     A.    During this period of time anyone
22 else at OUS, no.
23     Q.    It would have had to have been you,
24 correct?
25     A.    Yes.

Page 109

- JAMES MANNING -

1
2      Q.    In Paragraph 65, I'm not going to
3  read the -- well, I'll read the whole sentence.
4  Ms. Nevin writes, "While no additional decisions
5  have been issued to borrowers since in or about
6  June, 2018, BDU discontinued to make progress on
7  adjudicating applications."
8            Does this indicate to you that
9  between in or about June, 2018 and the date Ms.
10 Nevin's signed the declaration on November 14th,
11 2019 that no additional decisions were issued to
12 borrowers on their borrower defense applications?
13     A.    "The borrower defense has continued
14 to make progress on adjudicating applications,
15 specifically noting 50,000 applications have been
16 adjudicated on merits" --
17     Q.    I'm sorry to interrupt, Mr. Manning.
18 I'm not asking you about the -- that language that
19 you're reading.  I'm asking you specifically about
20 the first sentence in Paragraph 65 which states,
21 "While no additional decisions have been issued to
22 borrowers since in or about June, 2018."
23           And what I'm asking you is:  Does
24 that indicate to you that no decisions were issued
25 to borrowers between in or about June, 2018 and at

Page 110

1              - JAMES MANNING -
2  least, to your knowledge, the time you left the
3  Department in March, 2019?
4        A.    Well, quite frankly, what I was
5  reading was just the rest of the sentence;
6  and -- and normally when I look at something like
7  this, I look at the whole sentence just to make
8  sure I understand what the whole sentence means.
9        Q.    I -- I understand, Mr. Manning, but I
10  will point out that was not the rest of the
11  sentence, you're starting to read the second
12  sentence and I would like you to focus just on the
13  first part of the first sentence and whether that
14  indicates to you that no decisions were issued to
15  borrowers on the borrower defense applications
16  since in or about June, 2018 up until the date
17  Colleen Nevin signed her declaration on November
18  14th, 2019.  Is that what it indicates to you?
19        A.    Again -- yeah, I had said that that
20  seems to be correct.
21        Q.    Okay, and would it also be correct
22  based on that, that no -- no decisions were issued
23  to borrowers since in or about June, 2018 up until
24  the time you left the Department in March 2019;
25  yes or no?

Page 111

1              - JAMES MANNING -
2        A.    Say that again.  Repeat it, what you
3  just said.
4        Q.    No additional decisions were issued
5  to borrowers under borrower defense applications
6  since on or about June, 2018 --
7        A.    Right, I got that part.  What's the
8  rest?
9        Q.    -- through the time you left the
10  Department and beyond in March, 2019?
11        A.    That appears to be correct.
12        Q.    Do you have any reason to doubt that?
13        A.    Not at all.
14        Q.    Okay.  You're not aware of any
15  decisions being issued during that time period?
16        A.    Not that I recall.
17        Q.    I would like you to turn to Tab 7
18  and, for the record --
19        A.    Tab 7?
20        Q.    Yes, and I would like to mark this as
21  Exhibit 33.
22              (Whereupon, Exhibit 33 was marked at
23        this time.)
24        Q.    And, for the record, this is a
25  document from June 13, 2019 that includes the

Page 112

1              - JAMES MANNING -
2  testimony of Secretary DeVos in response to
3  questions, for the record, submitted by U.S.
4  Senator Patty Murray.
5        A.    Uh-huh.
6        Q.    And it has a total of 48 pages.
7        A.    I see it and I have it in hand.
8        Q.    Okay, I would like you to turn to
9  Page 20 of 48, if you could.
10        A.    Okay, I'm there.
11        Q.    Okay.  At the time bottom third of
12  the page under the heading "Recent Activity on
13  borrower defense approvals, Denials, and
14  Findings," the question was posed "As of March 20,
15  2019 when was the last time the Department, A,
16  approved a borrower defense claim?"
17              Can you read Secretary DeVos' answer
18  to Part A?
19        A.    The last time a borrower defense
20  application was approved was June 12th, 2018.
21        Q.    Okay, and then Part B of the question
22  asks "For the same time period, when was the last
23  time the Department denied a borrower defense
24  claim."  Can you just read for me the first
25  sentence of Secretary DeVos' answer in Part B?

Page 113

1              - JAMES MANNING -
2        A.    The last time a borrower against
3  application was denied was May 24th, 2018.
4        Q.    Does that indicate to you again that
5  there were no borrower defense decisions issued to
6  borrowers between June, 2018 and in this case as
7  of March 28, 2019?
8        A.    I see that.  I'm looking at -- this
9  is all I've been doing.  I'm looking at the -- the
10  -- her answer A and then B and the last time a
11  borrower -- from A, the last time a borrower
12  defense application was approved was June 12,
13  2018.
14        Q.    Are you aware of any reasons why the
15  Department stopped approving or denying borrower
16  defense claims during this time period?
17        A.    I'm not aware.
18        Q.    Do you have any recollection of
19  anything that would have caused the Department of
20  Education to stop issuing borrower defense
21  decisions during this time?
22              MR. MERRITT:  Objection, calls for
23        speculation.
24        Q.    Do you have any recollection, sir?
25        A.    Do I have any recollection?  I'm

Page 114

```
1                  - JAMES MANNING -
2  sorry, repeat the question again.  Do I have any
3  recollection of?
4       Q.    Why did the Department stop issuing
5  borrower defense decisions during this time
6  period?
7       A.    I don't recall.
8       Q.    Can you recall anything happening
9  during this time period that would have caused the
10 Department to stop issuing borrower defense
11 decisions?
12            MR. MERRITT:  Objection, vague.
13      Q.    You can answer the question.
14      A.    Sorry repeat the question.
15      Q.    Mr. Manning, you were acting
16 Undersecretary of the Department of Education, the
17 third-in-command, is that right, during this time
18 period?
19      A.    Yes.
20      Q.    You were the third-in-command in the
21 Department of Education and the Department of
22 Education was responsible for issuing borrower
23 defense decisions to over 100,000 applicants who
24 claimed that they had been harmed by school
25 misconduct and, therefore, their federal student
```

Page 115

```
1                  - JAMES MANNING -
2  loans should be discharged, correct?
3       A.    I'm not sure that 100,000 students is
4  the correct number, but aside from that it does
5  sound like a correct statement.
6       Q.    Well, I'll tell you, sir, I would
7  expect you to have an understanding as the
8  third-in-command of this important program
9  affecting over 100,000 borrowers with pending
10 applications.  I would expect you to know the
11 answer to this.  Is, is -- is my expectation
12 unreasonable?
13            MR. MERRITT:  Objection, misstates
14       prior testimony.  He said he didn't recall.
15            MR. JARAMILLO:  Which means he
16       doesn't know the reason.
17            MR. MERRITT:  Now.
18            THE WITNESS:  That's correct.
19            MR. JARAMILLO:  I didn't ask -- I'm
20       asking him now, what's your recollection.
21      Q.    You have no recollection whatsoever
22 of why -- the Department of which you were
23 third-in-command responsible for FSA, responsible
24 for Borrower's Defense, underneath your chain of
25 command directly reporting to you the Enforcement
```

Page 116

```
1                  - JAMES MANNING -
2  Unit, the Borrower Defense Unit, how could you not
3  know why this important practice or decision was
4  made in or about June, 2018 to stop issuing
5  decisions; how could you not know, sir?
6            MR. MERRITT:  Objection,
7       argumentative.
8       Q.    Did you at one time know?
9       A.    I believe so.
10      Q.    When -- when do you think you knew?
11      A.    I don't recall.
12      Q.    Who would know the answer to this,
13 Mr. Manning?
14            MR. MERRITT:  Objection.
15      Q.    To your personal knowledge within the
16 realm of what you can recall, who do you think
17 would know the answer to this question of why the
18 Department of Education stopped issuing decisions
19 and did not resume issuing decisions for
20 approximately 18 months?  Who would you expect to
21 know the answer to that?
22      A.    I don't know.  I wish I could recall
23 the answer to that, but I don't.
24      Q.    All right.
25      A.    If there was a document that -- that
```

Page 117

```
1                  - JAMES MANNING -
2  would refresh my memory I could consider that, but
3  I do not remember.
4       Q.    Okay.  Who would you have expected to
5  makes such a decision to stop issuing borrower
6  defense decisions for such a long time period?
7            MR. MERRITT:  Objection, calls for
8       speculation.
9       Q.    Who would you expect to know the
10 answer, sir?  That's not speculating.  Either you
11 would expect somebody to know or you wouldn't.
12      A.    I don't know.
13      Q.    I'll represent to you that Colleen
14 Nevin testified in her deposition that she was
15 informed of a decision to stop making -- to stop
16 issuing decisions on borrower defense applications
17 as a result of an injunction order in the
18 Manriquez -- the Calvillo Manriquez case, that she
19 was informed by Justin Riemer.
20            Do you recall any communications with
21 Justin Riemer about the decision to stop issuing
22 applications as a result of the Calvillo Manriquez
23 injunction order?
24      A.    So I don't remember specifically a
25 conversation regarding that.  I don't recall that.
```

Page 118

1              - JAMES MANNING -
2    I -- I do recall that that case effectively put
3    aside the methodology that we had established and
4    to -- to use going forward.
5         Q.   Sir, what category of claims did that
6    methodology apply; do you know?
7         A.   No, I don't recall.
8         Q.   It only applied to the class members
9    involved in to Calvillo Manriquez case; is that
10   right?
11        A.   I don't know if that's correct or
12   not.  I don't recall the specifics of the finding.
13        Q.   And -- and when you submitted the
14   declaration in the Calvillo Manriquez case, did
15   you have an understanding of what that case
16   involved?
17        A.   At that time when I wrote -- when I
18   signed the document I understood all of that, yes.
19        Q.   But as you sit here today you don't
20   have a clear recollection of it?
21        A.   I absolutely do not have a clear
22   recollection of it.
23        Q.   Do you recall that the methodology
24   enjoined in the Calvillo Manriquez case was
25   developed specifically for CCI students, the

Page 119

1              - JAMES MANNING -
2    current in-school students, at issue in that case?
3         A.   Only the CCI students, is that what
4    you said?
5         Q.   For the class members of that case
6    which were CCI students, I believe, with job
7    placement race claims -- I apologize if I'm not
8    getting that correctly -- correct?
9         A.   I specifically didn't recall that was
10   only CCI students.
11        Q.   So your recollection is that the
12   Calvillo Manriquez's case included students other
13   than CCI students?
14        A.   No.  You asked the question -- I
15   didn't recall one way or the other that there was
16   specified schools.  I didn't recall.
17        Q.   Okay.  Did you review the Calvillo
18   injunction order?
19        A.   I don't believe I did review the
20   injunction order.  I'm not an attorney and I would
21   have attorneys like Justin Riemer of -- look at
22   that form.
23        Q.   Is it possible that Justin Riemer
24   made the decision to stop issuing borrower defense
25   --

Page 120

1              - JAMES MANNING -
2         A.   (Unintelligible cross talk)
3         Q.   Please repeat your answer, Mr.
4    Manning, about Mr. Riemer.
5         A.   What was -- what was your question
6    again directly, so I make sure I'm answering the
7    right question.
8         Q.   Okay, I'm sorry.  Did Justin Riemer
9    make the decision?
10        A.   I don't expect that could be the case
11   because he personally didn't have that authority
12   and wouldn't have made a mistake like that.  He
13   would have come to me, if he needed.
14        Q.   Who had the authority to make a
15   decision like that?
16        A.   Well --
17        MR. MERRITT:  Objection, vague.
18        MR. JARAMILLO:  That's not vague.
19        Q.   You just testified Mr. Riemer
20   that -- I mean, excuse me, Mr. Manning, that
21   Justin Riemer did not have the authority to make
22   as such a decision?
23        A.   Well, in the first one -- go back and
24   repeat the original question because I didn't --
25        MR. MERRITT:  I'll say vague as to

Page 121

1              - JAMES MANNING -
2    what the decision was.
3         Q.   What we're talking about here, Mr.
4    Manning, is who made the decision to stop issuing
5    borrower's defense decisions during the time
6    period?
7         A.   Well -- well, in --in Justin Riemer's
8    time?  I'm -- I'm a little confused with --
9         I think that I need to go back and
10   have, you know, the last couple of questions and
11   answers repeated to me so I -- cause I've lost my
12   place in thought here.
13        Q.   Well, why don't we just -- why don't
14   we just move on.  I'm just going to ask -- try to
15   make my questions clear and specific.
16        A.   Well, that would be good.
17        Q.   Yes.  Did Secretary DeVos make a
18   decision to stop issuing decisions on borrower
19   defense applications?
20        A.   I don't know the answer to that
21   question.
22        Q.   Would she have the authority to issue
23   such a decision?
24        A.   Probably counsel -- I'll the
25   double-check with OGC, but I believe that the

Page 122

1           - JAMES MANNING -
2   Secretary has the authority to give a part in the
3   whole in that -- in principle, but again I'd want
4   guidance from general counsel at the Department
5   before going forward but --
6        Q.    Would anyone else besides Secretary
7   DeVos have authority to issue such a decision?
8        A.    I don't know.
9        Q.    Would you have authority to issue
10  such a decision?
11       A.    I would have to see the decisions
12  like in front of me for consideration.  I --
13       Q.    Well, we don't -- I'm not aware of
14  such a decision document per se, but there was
15  obviously as you've seen a stoppage in the
16  issuance of borrower defense claims and for an
17  extended period of time.
18       A.    Right.
19       Q.    So you would expect that decision to
20  come from Department leadership, correct?
21       A.    I would expect that's correct, but I
22  don't know where that decision ultimately came
23  from.
24       Q.    Would you have authority to issue
25  such a decision?

Page 123

1           - JAMES MANNING -
2        A.    I would have -- if I had that option
3   in front of me, I would have discussed so with the
4   general counsel's office to clarify that because
5   it's not clear to me.
6        Q.    But you -- in consultation with the
7   Office of General Counsel, you would have the
8   authority to issue such a decision or not?
9        A.    I, I -- I don't know.  I'd have to
10  have their counsel advise me to that.  I don't
11  know.
12       Q.    But one thing that's absolutely clear
13  is that Secretary DeVos would have that
14  decision-making authority, correct?
15          MR. MERRITT:  Objection,
16  mischaracterization of prior testimony.
17       Q.    I'm just asking the question:  One
18  thing that's clear, Mr. Manning, is that of
19  anybody at the Department of Education, Secretary
20  DeVos would have the authority to issue a decision
21  that would require stopping the issuance of
22  borrower defense approvals and denials; is that
23  right?
24       A.    I expect the Secretary has that
25  authority and so I would expect that she'd be

Page 124

1           - JAMES MANNING -
2   briefed by others, including general counsel on an
3   issue before an action like that was taken.
4        Q.    But she would have the authority to
5   take the action after that briefing, correct?
6        A.    I expect that's correct.  I --
7        Q.    Did you ever at any time issue an
8   order regarding borrower defense?
9          MR. MERRITT:  Objection, vague.
10       Q.    Did you ever issue a decision
11  regarding borrower defense in your tenure at the
12  Department of Education?
13       A.    Did I have --
14          MR. MERRITT:  Objection, vague.
15       Q.    You can answer the question, Mr.
16  Manning, and I'll repeat it.  Did you ever at any
17  time issue a decision regarding borrower defense?
18       A.    A specific decision?
19       Q.    Any decision.
20       A.    I don't recall.
21       Q.    But you might have issued a decision
22  about borrower defense, but you just don't recall;
23  is that right?
24       A.    It's possible.
25       Q.    I want you to turn to Tab 16, if you

Page 125

1           - JAMES MANNING -
2   could.  This was previously marked as Exhibit 12
3   and it appears to be a PowerPoint presentation
4   that's titled "Borrower Defense to Repayment
5   August 21, 2019."
6          (Whereupon, Exhibit 12, having been
7          previously marked, was tendered to the
8          witness for identification.)
9        Q.    And I recognize, Mr. Manning, that
10  this postdates your tenure at the Department, but
11  there is something in this document that I want to
12  ask you about.
13       A.    Okay, fair enough.  I have it.
14       Q.    Okay.  Thank you, Mr. Manning.  If
15  you could turn -- the page numbers are located in
16  the lower left-hand corner.
17       A.    I see them.  What number?
18       Q.    I want to go to Page 6 or Slide 6.
19       A.    Okay.
20       Q.    And there's a question on top "Why
21  are BD applications on Hold" and for approvals it
22  says, "'Manriquez' tier relief methodology for CCI
23  subject to injunction (as of May, 2018) and no
24  alternative methodology available."
25          Do you have any recollection of that

Page 126

- JAMES MANNING -

1       - JAMES MANNING -
2   being a reason why BD applications or borrower
3   defense applications were on hold?
4       A.      Well, I'm trying to understand the
5   page as I look at this.
6       Q.      I just want to ask you about that
7   bullet point.  I really -- I mean, that's what I
8   would like to focus on at this point, if you
9   would.
10          MR. MERRITT:  The witness is entitled
11      to familiarize himself with document you're
12      showing him.
13      Q.      Okay, Mr. Manning, but if I
14  recall and I don't want to rush you, but sometimes
15  you can take a while and I'm not sure it's
16  pertinent to read each and every line of this; but
17  if -- if that's what you want to do we can go off
18  the record so you could do it, if that's okay with
19  Mr. Merritt.
20          MR. MERRITT:  I don't think there's
21      any need to go off the record for that.  I
22      mean, when you show the witness documents he
23      has every right to read them and make sure he
24      understands what it is before he answers.
25          MR. JARAMILLO:  Okay, and use up

Page 127

1       - JAMES MANNING -
2   record time, that's fine.
3           Go ahead, Mr. Manning.
4           Why don't we take a short break, Mr.
5   Merritt, and we'll come back to this.
6       A.      Well, this is just a one-page slide.
7   It's not going to take me a half an hour to read
8   it.
9       Q.      I just want to know what you
10  under -- if you understood the first bullet point,
11  that one reason why BD applications were on hold
12  according to this document was that "the Manriquez
13  tier relief methodology for CCI subject to
14  injunction as of May, 2018 and no alternative
15  methodology available."
16          Do you have -- was that anything that
17  you recall, anything about that statement?
18      A.      Well, this, as you pointed out
19  earlier, happened after.
20      Q.      Certainly the PowerPoint application
21  is after your tenure, but we've already seen
22  documentation and you have -- you testified you
23  have no reason to doubt that there was a -- a
24  stoppage in the issuance of borrower defense
25  decisions between June, 2018 at least until the

Page 128

1       - JAMES MANNING -
2   time you left.
3       A.      Right.
4       Q.      And so we're looking at this document
5   and I want you to tell me if you have any comments
6   or if it refreshes your recollection at all as to
7   the first bullet point, as to that being a reason
8   why borrower defense applications were on hold.
9       A.      "Tiered relief methodology for CCI
10  subject to injunction (as of May, 2018) and no
11  alternative methodology available."  No relief
12  methodology developed for non-CCI claims.
13      Q.      Does this refresh your recollection
14  at all, Mr. Manning, about why borrower defense
15  decisions were put on hold?
16      A.      Not -- no, it doesn't.  I remember
17  that Manriquez put aside methodology; and could
18  that have led to delay in approvals, I expect it
19  could have, but --
20      Q.      Would the Department have been
21  legally required to stop issuing decisions on
22  borrower defense as a result of the Calvillo
23  Manriquez's decision and injunction order, to your
24  knowledge?  I'm not asking you as a lawyer, but
25  just to your understanding.

Page 129

1       - JAMES MANNING -
2       A.      Would the Department be required to
3   what again?
4       Q.      Stop issuing decisions on all
5   borrower defense applications as a result of the
6   Manriquez -- the Calvillo Manriquez injunction
7   order, to your understanding as layperson or the
8   third-in-command at the Department of Education at
9   the time.
10      A.      Well, yes, I am a layperson and this
11  -- that question is something if I -- I was
12  getting at the time, I'd be talking to my
13  attorneys in OGC.
14      Q.      And did you do that?
15      A.      I can't recall.
16      Q.      As you can see, Mr. Manning, I'm
17  trying to get to the bottom of who made the
18  decision to stop issuing the borrower defense
19  approvals and denials; and I appreciate your
20  patience in trying to work with me to jog your
21  memory about it and we're coming up blank from
22  your memory, which it is what it is.  Who would
23  you expect to know the answer to my questions?
24      A.      What somebody in the Department you
25  could go back to and ask, is that what you mean?

Page 130

- JAMES MANNING -

1     - JAMES MANNING -
2         Q.    Who made the decision to stop issuing
3  approvals and denials?
4              MR. MERRITT:  Objection, asked and
5        answered.
6         Q.    Well, the -- the question is, who
7  would you expect to know?  I -- I understand that
8  you say you don't know.  Who would you expect to
9  know?
10             MR. MERRITT:  I believe he answered
11       that as well.
12        Q.    Refresh my memory please, Mr.
13  Manning.  Who would you expect to know, if
14  anybody?
15        A.    Someone in the General Counsel's
16  office.
17        Q.    Can you name somebody in the General
18  Counsel's office that you would expect to know?
19        A.    I probably would go to Phil
20  Rosenfelt.
21        Q.    Is Mr. Rosenfelt still at the Office
22  of General Counsel, to your knowledge?
23        A.    Yes, he is.
24        Q.    Besides Phil Rosenfelt, would you
25  expect anybody else to know who made the decision

Page 131

1     - JAMES MANNING -
2  to stop issuing approvals and denials during the
3  time period?
4         A.    I would expect other people to know,
5  but I don't.
6         Q.    Which other people, sir?
7         A.    I don't know.  I'm saying there
8  certainly would be other people.  I don't know
9  who.
10        Q.    Would you expect Diane Auer Jones to
11  know?
12        A.    Well, she became Undersecretary
13  around this time so --
14        Q.    Would you expect her to know?
15        A.    I would ask her.
16        Q.    Would you expect her to know as the
17  third-in-command as acting Undersecretary?
18             MR. MERRITT:  Objection, asked and
19       answered.
20        Q.    Yes or no, sir, would you expect her
21  to know or not?
22        A.    I would expect she knows.
23        Q.    Would you expect Colleen Nevin to
24  know?
25        A.    I, I -- I do expect that that would

Page 132

1     - JAMES MANNING -
2  go to Colleen.
3         Q.    From -- I'll represent to you, Mr.
4  Manning, that both Colleen Nevin and Diane Auer
5  Jones testified in their depositions they didn't
6  know who made the decision, but that it was
7  communicated -- that Nevin testified that it was
8  communicated by Justin Riemer.
9              Would you expect Wayne Johnson to
10  know?
11        A.    It was communicated by Justin Riemer
12  is what --
13        Q.    What Colleen Nevin testified to.
14        A.    I'm trying to recall.  I'm -- I'm
15  trying to recall the time frame and Julian
16  Schmoke's responsibilities.
17        Q.    You're thinking about Julian Schmoke
18  at this point in time?
19        A.    Yeah, I'm trying to recall when --
20  when he --
21        Q.    Depending on The time frame in which
22  Julian Schmoke worked at the Department, you might
23  expect him to know as well?
24        A.    Well, I'm thinking out loud here.
25  I'm sorry, I shouldn't be doing that, but

Page 133

1     - JAMES MANNING -
2  unfortunately I'm trying to recall when Julian
3  Schmoke was assigned -- was delegated
4  responsibility as chief of the Enforcement Unit.
5         Q.    Okay, that's fine.  We can move on.
6              Let me ask you this:  Would you
7  expect Martin Brown to know?
8         A.    At -- at this time May, 2018?
9         Q.    Well, I think what we saw from the
10  prior documents was that there were no borrower
11  defense decisions issued between June, 2018 until
12  the time that Ms. Colleen Nevin had signed her
13  declaration in November, 2019, but you -- you
14  expect Mark Brown to know who issued that
15  decision?
16        A.    I don't know.  I don't remember.  I
17  don't remember what Mark Brown started at the
18  Department.
19        Q.    Okay.  Would you agree that for
20  decisions to stop on borrower defense applications
21  for such an extended period of time would have
22  required the approval of Department leadership?
23        A.    In principle, I think that's right.
24             MR. JARAMILLO:  Why don't we take a
25       short break.  Is that okay, Charlie?

Page 134

- JAMES MANNING -

1           - JAMES MANNING -
2           MR. MERRITT:  Yes, that's okay.
3           MR. JARAMILLO:  All right.  Let's
4    take -- let's take ten minutes because I need
5    to use the restroom.  Let's go off the
6    record, sorry.
7           THE VIDEOGRAPHER:  We're off the
8    record, the time is 19:12 UTC.
9           (Whereupon, there was a brief recess
10   in the proceedings.)
11          THE VIDEOGRAPHER:  We're now on the
12   record, the time 19:23 UTC.
13   Q.     Hi, Mr. Manning.
14   A.     Hi, Joe.
15   Q.     I don't want to belabor the point,
16   but I do want to kind of ask a little bit more
17   about this time period when there were no borrower
18   defense decisions, which demonstrates in my mind a
19   -- a policy decision for some reason or another
20   to not issue the decisions and I want to ask you:
21   Would such a policy decision to not issue borrower
22   defense approvals or denials for such an extended
23   period of time, would you expect that to be set
24   forth in writing somewhere in the Department?
25   A.     I -- I don't know if that exists or

Page 135

1           - JAMES MANNING -
2    not.  I'd have to --
3    Q.     Yeah, I'm not asking you if it
4    exists.  I'm just asking you what your expectation
5    would be as third-in-command at the time of the
6    Department of Education.  Would you expect such a
7    decision to be put forth in writing within the
8    Department?
9    A.     I'm trying to recall what actually
10   was happening at that time and I don't recall.  I
11   don't know whether there was or was not a -- a
12   document of that type put forward.
13   Q.     And my question is would you expect
14   such a decision to be put in writing, not whether
15   there was or wasn't but would you expect there to
16   be a writing showing such a decision?
17   A.     Are you saying There is not any in
18   writing, no decisions in writing?
19   Q.     I'm just asking you whether you would
20   expect there to be something in writing and, if
21   you don't mind, is there something that you're
22   looking at, at this point?
23   A.     Yeah, I'm actually looking at the
24   last document that you asked me to look at.
25   Q.     And this would be Tab 16 which was

Page 136

1           - JAMES MANNING -
2    Exhibit 12, Page 6 about why are BD applications
3    on hold?
4    A.     No, no, no.  I was looking -- I was
5    looking at this because it frustrated me that I
6    couldn't read the whole thing.
7    Q.     I apologize for not letting you read
8    the whole thing, but that is Tab 16, correct, the
9    PowerPoint?
10   A.     It was this one.
11   Q.     Yes, okay.  That's right.  Let the
12   record reflect that you've shown Tab 16.
13   A.     Yes.
14   Q.     I apologize for the frustration, but
15   I just want to know what -- what your expectation
16   would be for such a decision to put applications
17   on hold for so long.  Would you expect that to be
18   set forth in writing somewhere within the
19   Department of Education?
20   A.     I don't know if I expect that or not.
21   I'm -- I'm -- I'd be interested in trying to find
22   out if it exists or not.
23   Q.     Would it poss -- I'm sorry, sir, I'll
24   let you finish.  I'm sorry for interrupting.
25   A.     I was about to say I'm speculating

Page 137

1           - JAMES MANNING -
2    and I shouldn't be speculating, you know.
3    Q.     All right.  We don't want you to
4    speculate.  We just want to know what your
5    expectation would be.
6           So would it -- would it be normal
7    under your -- to your recollection, would it be
8    normal in the Department to -- at the Department
9    to order FSA to stop issuing decisions on borrower
10   defense applications without that being put forth
11   in writing?
12   A.     Would that be what?
13   Q.     Would that be normal; is that
14   something the Department, you would expect them to
15   engage in?
16   A.     It was -- Well, no, I wouldn't expect
17   that.
18   Q.     Would you expect such a decision to
19   be put in writing?
20          MR. MERRITT:  Objection, asked and
21   answered.
22   Q.     You can answer, sir.
23   A.     I'm -- I --
24   Q.     I'm giving you three choices; yes,
25   no, I don't know?

Page 138

1                    - JAMES MANNING -
2        A.    Well, then it's I don't know.
3        Q.    Okay.  Let's look back at Tab 16,
4    Page 6, what you were looking at before, "Why are
5    BD applications on the hold."
6        A.    Which page?
7        Q.    Page 6.  It's the page we were
8    looking at.
9        A.    Yes.  So what I had left open on the
10   desk here, yeah.
11       Q.    Yes, sir.  So there's a heading in
12   the left-hand side that says "Denials" and the
13   first bullet point says, "Policy decisions spring
14   2018 to not issue denials until approvals could be
15   issued."  Were you aware of such a policy
16   decision?
17       A.    I think I heard some discussion about
18   that issue.  I don't recall policy decision around
19   it.
20       Q.    Who would make such a policy decision
21   if it were in fact made as stated here?
22       A.    I don't know.
23       Q.    Would the Office of the
24   Undersecretary have authority to make such a
25   decision?

Page 139

1                    - JAMES MANNING -
2        A.    I think on this issue, I would have
3    to engage in further discussion.
4        Q.    On this issue, the Office of
5    Undersecretary would have to engage further
6    discussion --
7        A.    This type of a policy decision and
8    policy, you know, the Office of Postsecondary
9    Education has a voice there.  OGC, you know, has a
10   responsibility there, in -- In addition to OUS.
11       Q.    And after that consultation, would
12   you expect such a decision to be set forth in
13   writing?
14       A.    Generally once policy decisions are
15   made as policy decisions, they are memorialized in
16   writing.
17       Q.    What is a regulatory action memo?
18       A.    I don't recall.
19       Q.    What -- what would you call the
20   writing that you would put a policy decision at
21   the Department in; what -- is there a title, a
22   certain title for the document that would reflect
23   the policy decision?
24       A.    I don't recall.
25       Q.    Would it be similar to the memo that

Page 140

1                    - JAMES MANNING -
2    -- that you authored or that has your name on it
3    from May 4th, 2017 that was given to Secretary
4    DeVos and that you looked at as Tab 11 which is
5    Exhibit 7 in this case?
6        A.    Uh-huh.
7        Q.    Is that a yes?
8        A.    No, it's not a yes to the question.
9    I recognize what you're talking about.  Tab 11,
10   I'll look at it again to see what it says.  You
11   said Tab 11?
12       Q.    Yes.
13       A.    What was your question again about
14   this?
15       Q.    Would you expect -- a policy decision
16   like the bullet point under "Denials" to not issue
17   denials until approvals could be issued,
18   would you expect that to be in writing -- strike
19   that.
20             You testified that you would expect
21   that to be in writing and my question is:  Is
22   there a certain title that the document would have
23   if a policy decision like that were put in
24   writing?
25       A.    Well, then you're referring to like

Page 141

1                    - JAMES MANNING -
2    this document that went to the Secretary from me
3    on May 4th, '17 that she signed.  Because, no, I
4    would not expect it to be like this kind of
5    document that I sent to the Secretary.
6        Q.    All right.  What -- what would you --
7    sorry, go ahead.
8        A.    So you know, I had -- I'm saying that
9    this document I'm looking at from the Secretary,
10   that would have been signed by the Secretary, is a
11   memorandum for decision which is different than a
12   policy document.
13             It has a -- has a recommendation to
14   her for approval or disapproval and that's --
15   that's a decision memo, not an -- an established
16   policy.
17       Q.    So is there a certain title that was
18   used at the Department of Education for policy
19   decisions?
20       A.    I don't recall.
21       Q.    But you would expect it to be in
22   writing?
23       A.    Look, if it's -- if there's a new
24   policy that impacts the general public, then it
25   gets published in -- in the public register.  It

Page 142

1              - JAMES MANNING -
2    depends on what level of policy you're talking
3    about.
4         Q.    So what level of policy was the
5    policy decision of spring 2018 to not issue
6    denials until approvals also could be issued?
7    What type of policy would you classify that as?
8         A.    Well, ask me this question again
9    because I don't --
10        Q.    Okay.  You're looking at -- can you
11   look at Page 6 of why are BD applications on hold
12   at Tab 16, Exhibit 12, second bullet point;
13   "Denials:  Policy decision (spring 2018) to not
14   issue denials until approvals could be issued"?
15        A.    Yes.
16        Q.    What type of policy decision do you
17   classify that as?
18        A.    Well, this is a -- this is a --
19        Q.    I'm not asking you about the
20   document, sir.  I'm asking you about the policy
21   decision described in that bullet point.
22              Is that a policy decision that you
23   would expect to be set forth in a certain type of
24   document within the Department?
25        A.    Well, I don't have enough information

Page 143

1              - JAMES MANNING -
2    to know that this is a policy decision that was in
3    place based on what I'm looking at.
4         Q.    Okay.  Well, it says "Policy decision
5    spring 2018" and you were at the Department at
6    that time, correct?
7         A.    Yes.
8         Q.    And you were acting as Undersecretary
9    at that time, correct?
10        A.    'Til May.  May, 2018.
11        Q.    Okay, and you were also COO of FSA at
12   that time, correct?
13        A.    Yes.  I had to stop and think about
14   the calendar again but, yes, that's correct.
15        Q.    So wouldn't you have known about a
16   policy decision like this?
17              MR. MERRITT:  Objection, asked and
18        answered.
19        Q.    Let's just go back to -- to what
20   I'm -- I just want to, you know, just get a solid
21   answer from you.
22        A.    What's the question?
23        Q.    Would there be a certain title to a
24   document that would contain a policy decision as
25   is described here in that bullet point?

Page 144

1              - JAMES MANNING -
2         A.    I don't recall.
3         Q.    Okay.
4               Mark Brown came in as COO of FSA af
5    -- when you left the Department, is that right, he
6    replaced you in that position?
7         A.    Correct.
8         Q.    Did you have any discussions --
9         A.    My -- my answer was -- Joe was
10   correct, that Mark Brown succeeded me as -- as
11   COO.
12        Q.    In connection with the transition
13   from you as COO to Mark Brown as COO, did you have
14   any discussions with Mr. Brown about borrower
15   defense?
16        A.    I don't recall discussions we had.
17   We had -- you know, it was a relatively quick I
18   decided to leave; and I certainly had
19   conversations with him, may have discussed
20   borrower defense.  I don't recall, you know.
21        Q.    Why did you leave the Department?
22              MR. MERRITT:  Objection, beyond the
23        scope of the discovery the -- the court has
24        authorized.
25        Q.    You can answer the question, Mr.

Page 145

1              - JAMES MANNING -
2    Manning.
3         A.    Okay, I had retired -- sorry.
4    (Unintelligible crosstalk.)
5         A.    I retired from the Department in
6    2015, January 3rd, 2015.
7         Q.    I understand, but why -- why did you
8    leave the Department in March, 2019?
9         A.    Keep listening.  I'll answer that
10   question.
11        Q.    Oh, I'm sorry, Mr. Manning.  I
12   didn't know.
13        A.    I -- I expected to be in a state of
14   retirement and do different things; and I was
15   approached to go back on the transition team and
16   then I was asked to stay; and because I've been a
17   public servant all of my life, I agreed to stay
18   for a period of time; and I stayed for more than
19   two years and it was time to, you know, retire
20   again or resign again and did outside consulting
21   myself before I ultimately moved into another
22   position.
23        Q.    How many presidential administrations
24   did you work for?
25        A.    All of them since Carter except for

Page 146

1               - JAMES MANNING -
2    Clinton, but I was a career officer, a career
3    member of the senior executive service.  At the
4    beginning of my service, I was in the Career
5    Foreign Service.
6         Q.    And immediately prior to joining the
7    Trump transition team, were you self-employed
8    doing consulting work?
9         A.    Yes.
10        Q.    So what were the types of clients
11   that you had?
12              MR. MERRITT:  Objection, it's beyond
13        the scope of the discovery that's been
14        authorized.
15        Q.    Did you have any higher education
16   clients?
17        A.    What's your definition of higher
18   education?
19        Q.    How about student loan guarantors?
20        A.    I did work for Strata Education, you
21   know, a former student loan guarantee agency
22   that's no longer a guarantee agency.
23        Q.    Anybody else?
24        A.    Nobody else in higher education.
25        Q.    No -- no institutions of higher

Page 147

1               - JAMES MANNING -
2    education?
3         A.    That I worked for as a consultant?
4         Q.    Yes, prior to joining the Department
5    or the Trump transition team.
6               MR. MERRITT:  I going to object to
7         the scope of this line of questioning and how
8         it's relevant to the discovery the court
9         authorized.
10        Q.    You can answer the question.  You
11   mentioned Stratta Education.  Was there any other
12   higher education-related institution that you had
13   as a client?
14        A.    No.
15        Q.    What about USA Funds?
16        A.    USA -- USA Funds was a pre -- Stratta
17   was spun off from USA Funds.  I did not work for
18   you USA Funds.
19        Q.    Did any of your consulting work
20   involve the discharge of federal student loans?
21              MR. MERRITT:  Objection, it's beyond
22        the scope.
23        Q.    Your answer, sir?
24        A.    No.
25        Q.    And did you ever consult in

Page 148

1               - JAMES MANNING -
2    connection with the Penn Hill Group after leaving
3    the Department of Education?
4               MR. MERRITT:  Objection, and I'm
5         going to object to that question, beyond the
6         scope.  This has gone on long enough.  I'm
7         going to instruct the witness not to answer
8         to enforce a court order limitation on
9         discovery.
10        Q.    Have you done any work after leaving
11   the administration related to the discharge of
12   student loans?
13              MR. MERRITT:  Objection.  Beyond the
14        scope.  I instruct not to answer to protect
15        the limitation, the court ordered limitation
16        on discovery.
17        Q.    Have you done any the work on behalf
18   of institutions of higher education as in your --
19   in your consulting work after leaving the Trump
20   Administration?
21              MR. MERRITT:  Objection to this line
22        of questioning, we objected to it, beyond the
23        scope of what the court authorized discovery
24        on.  Continue to instruct not to answer.
25              MR. JARAMILLO:  Well, I think it's --

Page 149

1               - JAMES MANNING -
2    I think it's relevant.  It goes to
3    credibility and it goes to bias.
4               MR. MERRITT:  Was that one of the
5         topics the court authorized discovery on?
6               MR. JARAMILLO:  That's always an
7         issue when you're talking about a discovery.
8         I don't think Judge Alsup would disagree with
9         that.
10              MR. MERRITT:  And this an ATA case
11        and as you just said the Judge also
12        recognized, a discovery of the agency is
13        favored, that's the presumption.  He
14        obviously authorized discovery in this case,
15        but it must be limited to the topics he
16        actually set forth and this is not related to
17        any of the -- the topics described --
18        (unintelligible crosstalk).
19        Q.    Did your work at the President Forum
20   involve any work for non-for-profit schools?
21              MR. MERRITT:  Objection, still beyond
22        the scope.
23        Q.    Does your work at President Forum,
24   Mr. Manning, involve any discharge of federal
25   student loans?

Page 150

```
1                    - JAMES MANNING -
2            MR. MERRITT:  Objection, beyond the
3       scope of the court-authorized discovery.  I
4       instruct the witness not to answer to protect
5       the limitation ordered by the court.
6       Q.     After leaving the Trump
7   Administration, Mr. Manning, did you have any
8   discussions with anybody at the Department of
9   Education regarding borrower defense issues?
10      A.     After I left the Trump
11  Administration?
12      Q.     Yes, sir.
13      A.     Did I have any conversations with
14  people at the Department about borrower defense,
15  is that what you said?  Repeat the question     ,
16  please.
17      Q.     That's it.  You got it, Mr. Manning.
18  That's -- that's the question.  You repeated it
19  accurately.
20      A.     After I left the Trump
21  Administration, did I have conversations
22  with -- none that I recall.
23      Q.     I would like you to turn to Tab 12
24  and this is a document that we need to mark as the
25  next exhibit, which I believe is 34.
```

Page 151

```
1                    - JAMES MANNING -
2            (Whereupon, Exhibit 34 was marked at
3       this time.)
4       Q.     And this is a document that has on
5   top "U.S. Department of Education Borrower
6   Defenses and Financial Responsibility Negotiated
7   Rulemaking Committee 2017-2018  Session 1."
8       A.     Yes.
9       Q.     Have you seen this document before,
10  Mr. Manning?
11      A.     It looks like a transcript of the
12  remarks I gave at the beginning of this session.
13      Q.     Have you seen it before?
14      A.     Have I seen this document before?
15      Q.     Yes, sir.
16      A.     In this form, not that I recall.
17      Q.     Okay.  I want you to turn to Page 8,
18  please.
19      A.     Happy to.
20      Q.     And I would like you to look at the
21  sentence beginning in the middle of Line 11.
22      A.     Can I just point out, just for my own
23  clarification, this document -- there's a couple
24  of pages Number 1 and the back of the cover page
25  is Number 7, 8, 9, 10.  So is this -- is this a
```

Page 152

```
1                    - JAMES MANNING -
2   complete document?
3       Q.     Well, sir, I -- thanks for pointing
4   that out.  I think that we just excerpted here
5   your -- your remarks as they appear in this
6   transcript.
7       A.     Okay.
8       Q.     If you could turn to Page 8 on Line
9   11.  Can you read for me the second beginning with
10  "As you know"?
11      A.     Yes.  "As you know, the borrower
12  defense regulations enacted in 2016 have been
13  delayed and so the Department has and will
14  continue to consider claims under the regulatory
15  status quo which assesses a claim under applicable
16  state law and commits to the Secretary's
17  discretion how to fashion relief"
18      Q.     And do you recall making that
19  statement to this committee?
20      A.     Yes.
21      Q.     I would like you to turn to Page 10.
22      A.     Okay.
23      Q.     Can you read the sentence beginning
24  at Line 5.
25      A.     "Throughout the winter and early
```

Page 153

```
1                    - JAMES MANNING -
2   spring, a team consisting of both career and
3   non-career Department leadership evaluated the
4   program and worked to implement controls and
5   procedures for reviewing claims and processes for
6   discharging loans for successful claimants."
7       Q.     And was that the Borrower Review
8   Defense Panel that we discussed earlier?
9       A.     I believe so.
10      Q.     And what controls and procedures were
11  implemented?  You -- you say that they "worked to
12  implement controls and procedures for reviewing
13  claims and processes for discharging loans for
14  successful claimants."
15              Do you recall any more about those
16  controls and procedures?
17      A.     Well, what came out of that was the
18  establishment of the methodology.
19      Q.     Did anything else come out of that
20  that was related to controls and procedures for
21  reviewing claims and processes for discharging
22  loans?
23      A.     I don't recall.
24      Q.     Can you look at -- on the same page,
25  the sentence starting at Line 17.
```

Page 154

```
 1                  - JAMES MANNING -
 2             Could you read that one?
 3      A.     Yeah. " Our review uncovered several
 4   areas of concern which required building an
 5   infrastructure to remain, to review claims and
 6   make programmatic tweaks, which in turn
 7   contributed to the time it has taken to adjudicate
 8   additional claims."
 9      Q.     Do you recall what these several
10   areas of concern were?
11      A.     I do not recall.  No, I do not
12   recall.
13      Q.     Do you recall what the programmatic
14   tweaks were?
15      A.     I don't recall that.
16      Q.     Do you recall how all of this
17   contributed to the time it has taken to adjudicate
18   additional claims?
19      A.     I'm -- I'm sorry.  Repeat that,
20   please.
21      Q.     Do you recall how these things
22   contributed to the time it has taken to adjudicate
23   additional claims?
24      A.     I don't recall how this -- no.  No, I
25   don't recall.
```

Page 155

```
 1                  - JAMES MANNING -
 2      Q.     At this point in time which was in
 3   November of 2017, do you recall there being a
 4   delay in the issuance of borrower defense claims
 5   decisions?
 6      A.     I specifically do not recall that.
 7      Q.     If I can have you turn to Page 13.
 8      A.     Okay.
 9      Q.     Can you read -- sorry.  Can you read
10   the sentence starting in the middle of Line 6?
11      A.     "Moving forward"?
12      Q.     Yes.
13      A.     "Moving forward, we have
14   approximately 95,000 pending claims of which
15   roughly 65 percent are from former Corinthian
16   students."
17      Q.     And can you read the next sentence.
18      A.     "While I cannot give you a specific
19   date or number, I can tell you that approval of
20   some these claims is imminent.  While it has taken
21   some time" -- or did you want me to keep on going?
22      Q.     You can keep on going, sir.  Thank
23   you.
24      A.     "While it has some time, I am
25   confident that the work done to assess and make
```

Page 156

```
 1                  - JAMES MANNING -
 2   adjustments to the program during the short-term
 3   hiatus in adjudicating claims will yield long term
 4   improvements and efficiencies beneficial to all."
 5      Q.     So at that point in time in November,
 6   2017 did you believe that the approval of some of
 7   these claims was imminent?
 8      A.     That's what I said.  I believed it
 9   then.
10      Q.     Did -- did anything about your belief
11   change after that point in time whether the
12   approval was imminent or not?
13      A.     I -- I don't recall.
14      Q.     Do you know if any of those claims
15   you believed were about to be approved were, in
16   fact, improved -- approved during your tenure?
17      A.     At this point, I do not recall.
18      Q.     And you mentioned that there was a
19   short-term hiatus in adjudicating claims.  Do you
20   remember what caused the short term hiatus?
21      A.     I do not remember.
22      Q.     Do you remember how long that hiatus
23   actually was?
24      A.     I do not remember.
25      Q.     Do you know if -- up to this point,
```

Page 157

```
 1                  - JAMES MANNING -
 2   November 14th, 2017, do you recall any approvals
 3   other than the 16,000 approximate claims that
 4   were approved in the prior administration that
 5   Secretary DeVos decided to discharge; are you
 6   aware of any other approvals between the time you
 7   started in the Department in January, 2017 up
 8   until now this point in November, 2017?
 9      A.     I don't recall.
10      Q.     You don't know one way or the other
11   whether there were any approvals during that time
12   period?
13      A.     I don't recall one way or the other.
14      Q.     Do you know if there were any denials
15   during that time period?
16      A.     I don't recall.
17      Q.     Do you know when the short -- the
18   hiatus that you call short term, do you know when
19   it ended?
20      A.     I -- no, I don't recall.
21      Q.     Okay.  Do you recall anything about
22   the hiatus?
23      A.     Not -- no, I don't recall anything
24   about the hiatus.  I remember saying it here, but
25   I -- I don't have any recollection now.
```

Page 158

1                  - JAMES MANNING -
2       Q.      Okay.  If we could, turn to Page 14.
3       A.      Okay.
4       Q.      Mr. Manning, could you please read
5   for me the sentence beginning on Line 18.
6       A.      "The Department is also working to
7   adjudicate pending claims related to other
8   schools.  We are making progress on that front.
9       Q.      Was that an accurate statement?
10      A.      I believe it to be true when I said
11  it.
12      Q.      What did you base that statement on?
13      A.      Discussion with others I'm sure at
14  the time, but I don't recall who was consulted on
15  this or who initially had a -- a hand in writing
16  it.
17      Q.      So when you had made these remarks,
18  was --- was it sort of a written speech you had
19  prepared beforehand?
20      A.      It certainly was written and prepared
21  beforehand.
22      Q.      Did you write it yourself or did
23  someone on your staff help you write it?
24      A.      I had help.  I -- there was staff
25  writer, I'm sure.  I don't remember who it was.  I

Page 159

1                  - JAMES MANNING -
2   definitely saw it before I read it -- before I,
3   you know, delivered it and made adjustments.
4       Q.      Have you ever --
5       A.      I can't recall.
6       Q.      Go ahead.  We spoke over each other.
7   Go ahead, Mr. Manning.
8       A.      If I put my voice to it, I couldn't
9   tell you now which -- which parts were written by
10  somebody else or which were written by me.
11      Q.      And you don't recall who would have
12  been involved in -- in writing it besides you?
13      A.      I don't recall.
14      Q.      Normally, who would write your
15  speeches for you or, or -- or write drafts of them
16  for your review?
17      A.      I -- I didn't give that many.
18      Q.      Okay.  That's fine, if you don't
19  recall.
20      A.      I don't.
21      Q.      And is it true that the Department at
22  that time in November, 2017 was also working to
23  adjudicate pending claims related to schools other
24  than Corinthian?
25      A.      If they were doing it at that time,

Page 160

1                  - JAMES MANNING -
2   what did I say here?  I stand by what I said.
3       Q.      And you said the Department is also
4   working to adjudicate pending claims related to
5   other schools.
6       A.      Right.
7       Q.      And you stand by that?
8       A.      Yes.
9       Q.      And you state that "We are making
10  progress on that front."  Do you recall what
11  progress was being made on that front?
12      A.      No, but I expect that it was slow.
13      Q.      Why did you expect that it was slow?
14      A.      Because I'm sure the desire was to
15  move them quicker than they were being moved.
16      Q.      Do you recall being dissatisfied with
17  the pace at which they were moving at that time?
18      A.      My hope always was to move them
19  quicker.  It was a small staff who was handling it
20  at borrower defense, which was an issue and that
21  remained an issue for a long time.  I understand
22  now that the -- the staffing there is much better
23  than it used to be now.
24      Q.      Did you take any steps to try to make
25  the -- the pace of the claim adjudication go more

Page 161

1                  - JAMES MANNING -
2   quickly?
3       A.      I don't recall.
4       Q.      Did you take any steps to increase
5   the -- the staff of the Borrower Defense Unit?
6       A.      There was some discussions about that
7   and in principle supported additional staff.  I
8   know it was some time before there was a
9   significant growth in staff, though.
10      Q.      Did anyone at FSA ever make a request
11  to you for additional staff for the Borrower
12  Defense Unit?
13      A.      Oh, I'm sure I had conversations
14  with Colleen where additional staff were discussed
15  and --
16      Q.      Did Colleen ever request additional
17  staff for the Borrower Defense Unit?
18      A.      We discussed that.
19      Q.      Did she request it?
20      A.      I can't remember a specific request,
21  but she and I agreed that there should be more
22  staff.  I don't know when the -- the staff grew.
23  You know, when it grew I don't recall.
24      Q.      What did Ms. Nevin tell you about her
25  concerns about staff?

Page 162

```
1                  - JAMES MANNING -
2       A.    I don't remember specifically.  Just
3  knowing that we had -- we had the conversation
4  that we needed more staff.
5       Q.    Do you know why it took some time for
6  additional staff to be added to the Borrower
7  Defense Unit?
8       A.    I don't recall.
9       Q.    Did you ever make a request to
10 increase the staff of the DBU or Borrower Defense
11 Unit?
12      A.    I can't remember specifically making
13 that request, but I believe I did.  I don't
14 recall.  I don't recall.
15      Q.    What was the process addition -- for
16 requesting additional staff for the BDU?
17      A.    I don't recall.
18      Q.    And do you recall having a request
19 for additional staff for the BDU ever having been
20 denied by the Department?
21      A.    Denied by who?
22      Q.    Denied by anybody at the Department.
23      A.    I don't recall that.
24      Q.    If you wanted -- if you were to
25 request additional staff for the BDU, what would
```

Page 163

```
1                  - JAMES MANNING -
2  you do?
3            MR. MERRITT:  Objection, calls for
4  speculation.
5       Q.    You can answer the question.
6       A.    You mean now or then?
7       Q.    Then.
8       A.    I don't recall what --
9       Q.    Do you recall now what would be done?
10      A.    I don't recall.  You know, I don't
11 recall.
12      Q.    Do you -- do you recall the number of
13 staffing that was in place when you were acting
14 Undersecretary in terms of staffing at the BDU?
15      A.    No, I don't recall what it was then.
16 I do understand that it's significantly higher
17 now --
18      Q.    Okay.  Would --
19      A.    -- which is a good thing.  I hd added
20 which is a goo thing.  I understand that there's
21 more staffing now and I said which is a good
22 thing.
23      Q.    Are you aware that the contractor
24 staffing at the Borrower Defense Unit went from
25 twenty to six between November, 2016 and
```

Page 164

```
1                  - JAMES MANNING -
2  September, 2017?
3       A.    November, 2016 and November,
4  2017 --
5       Q.    To September, 2017.
6       A.    I do recall, not specifically what
7  you said, but that people left between late '16
8  and is early '17, including both the -- the
9  gentlemen whose names I can't remember; Robert who
10 led the Enforcement Unit left early and his deputy
11 ultimately left as well and there were other
12 attorneys that left.  Colleen Nevin had been
13 principal of -- Number 3 person there and she
14 remains to this day.
15            Staff did go.  I don't recall how low
16 the number got and I know now that they have
17 significantly more staff.
18      Q.    And how do you know that, Mr.
19 Manning?
20      A.    I'm trying to recall who told me
21 that.  I can't remember.
22      Q.    During your tenure at the Department,
23 was there any assessment made of the amount of
24 staff needed to reduce the backlog of pending
25 borrower defense applications?
```

Page 165

```
1                  - JAMES MANNING -
2       A.    A formal assessment, not that I
3  recall.
4       Q.    How about an in formal assessment?
5       A.    Well, I think that Colleen had ideas.
6       Q.    What became of Colleen's ideas, if
7  you know?
8       A.    I don't recall.  I can't remember,
9  you know, what the level fell to or -- or where
10 it, you know, rose to over the following years.  I
11 just don't remember.
12      Q.    I would like to lhave you turn back
13 to Tab 7, which was marked as Exhibit 33.
14      A.    Okay.
15      Q.    And these again are the questions
16 submitted by Senator Patty Murray and Secretary
17 DeVos' answers.
18      A.    All right.  I'm trying to keep these
19 things in order.
20            Okay, I have it.
21      Q.    If you could turn to Page 19 and I'm
22 just going to read to you the question that
23 appears there.
24      A.    Okay.
25      Q.    Are you at Page 19 of 48?
```

Page 166

- JAMES MANNING -

1       - JAMES MANNING -
2       A.      I was making the mistake of reading
3    the page numbers from the top.
4       Q.      I should point out I'm -- I'm going
5    by the ones at the bottom.
6            The ones at the top appear because of
7    electronically filing the document with the court,
8    but I'm just going to go with the bottom.
9       A.      And I found it.  I'm with you.
10   Gotcha.
11      Q.      Okay, Mr. Manning.  At the bottom of
12   the page there is a heading that says "Resources
13   required to address borrower defense backlog."
14           I'm going to read the question and
15   then we can talk about Secretary DeVos' answer.
16   The question at that time --
17      A.      May I ask the time frame when this
18   was happening?
19      Q.      Yes, and I -- this was from June
20   13th, 2019.  Recognize that this postdates your
21   time at the Department, but it does discuss some
22   things that I wanted to ask you about just in case
23   you were involved with any related items during
24   your time at the Department.
25      A.      Okay.

Page 167

1       - JAMES MANNING -
2       Q.      And I'm going to read the question
3    from Senator Murray and then we'll go over Ms.
4    DeVos' answer and I just wanted to pick your brain
5    a little bit about -- I would'nt know anything
6    about what she's saying here.
7            So the question is, "Has the
8    Department conducted any analysis of the
9    resources, including staff full-time equivalencies
10   and any contract funding necessary to clear the
11   backlog of pending borrower defense claims, now
12   totaling at least 158,000 from the end of quarter
13   4 of 2018?  If so, please describe how such
14   analysis was conducted and the principal
15   findings of such analysis, including staffing or
16   contracting resources that could be utilized or
17   necessary."
18           Mr. Manning, can you read for me just
19   the first two sentences of the answer, "Yes" being
20   the first sentence and then after that the second
21   sentence.
22      A.      Only the first two sentences, not the
23   whole response?
24      Q.      Yes, because I -- yeah, I just want
25   to ask you -- after you read that first two

Page 168

1    sentences, I want to ask you about it.  Can you
2    read it out loud for the record.
3       A.      "Yes.  The Department recently
4    completed a preliminary estimate of the full-time
5    and contractor resources needed to eliminate or
6    substantially reduce the number of pending
7    borrower defense applications."
8       Q.      I want to ask you about that, Mr.
9    Manning.
10      A.      Oh, that was two sentences.  "Yes"
11   was the first sentence, okay.  I got it.
12      Q.      Were you involved with this
13   preliminary estimate at all?
14      A.      Well, considering that these were
15   asked after I left, I would say that -- no.  I
16   have no recollection.  I mean, I was gone then and
17   then was not involved in assisting in answering
18   these kind of questions and stuff like that.
19      Q.      I understand, Mr. Manning.  I was
20   just curious as to -- you know -- I wanted to just
21   probe a little bit about whether that estimate was
22   undertaken during the time you were at the
23   Department, and I understand the answers to these
24   questions are from a few months afterward and I

Page 169

1    just wanted to see if you had any knowledge of
2    such an effort being undertaken during your
3    tenure.
4       A.      I don't recall.  May have, but I
5    don't recall.
6       Q.      All right.  So you don't know when
7    this preliminary estimate was undertaken that's
8    described here?
9       A.      I'm looking at the question just to
10   make sure I get it correctly.
11           Yeah, I don't recall.
12      Q.      Are you aware of any time when the
13   Department undertook this type of preliminary
14   estimate of the full-time and contractor resources
15   needed to eliminate or substantially reduce the
16   number of pending BD applications during your
17   tenure?
18      A.      I don't recall.
19      Q.      And, you know, as we discussed, this
20   statement was made in June, 2019.  Assuming that
21   preliminary estimate was in or around that time,
22   do you know why it took the Department so long to
23   conduct such an estimate of resources to reduce
24   the backlog with -- with additional staffing?

Page 170

1                  - JAMES MANNING -
2       A.    I do not.
3       Q.    And you're not aware of any prior
4  estimate made by the Department about this issue?
5       A.    About the time to complete -- I don't
6  recall.
7       Q.    Okay.  I'll just represent to you
8  that the Department has produced a chart that
9  shows the -- the number of staffers of the
10  Borrower Defense Unit from May, 2018 to the
11  present.
12            I'm not going to show it to you, it's
13  not in your packet, but I'll represent to you that
14  it shows the total of sixteen attorneys and
15  contracting staff in May, 2018 when you were at
16  the Department and then it fluctuates, but it ends
17  up at a total of seventeen attorney and contractor
18  staff in March, 2019.
19            Can you explain why there was not an
20  increase in staff to address the backlog in
21  borrower defense applications?
22       A.    Could you just give me those numbers
23  again so I can try to get my head around it.  May,
24  2018 you said was the first thing you gave me.
25       Q.    Yeah, so a total of sixteen attorney

Page 171

1                  - JAMES MANNING -
2  and contractor staff at the BDU.
3       A.    Okay, and then the second date, what
4  was it?
5       Q.    As of March, 2019 that number was
6  seventeen and -- and I'll recognize that there was
7  some fluctuation in the middle, but by March, 2019
8  around the time you left the Department, it was at
9  seventeen.
10       A.    Uh-huh.
11       Q.    My question is; why wasn't there a
12  steady increase to address the backlog in borrower
13  defense applications by hiring more staff for the
14  BDU?
15       A.    You -- you don't have a -- a number
16  that represents what the onboard number is today,
17  by chance?
18       Q.    Well, yes, the number is there, but
19  I'm not asking you about that because you're not
20  at the Department anymore, Mr. Manning.
21       A.    I was -- I wasn't at the Department
22  during this -- this period that you're talking
23  about here either and so...
24       Q.    I'm talking about May, 2018 to March,
25  2019.  My understanding is you started at the

Page 172

1                  - JAMES MANNING -
2  Department in January 20, 2017 and you left
3  March --
4       A.    I misread my own note here.  You're
5  correct.  If I had a plan why there's only an
6  increase of one attorney, is that it?
7       Q.    Were you concerned about this issue
8  of staffing?
9       A.    Yes, in principle I was concerned
10  that they didn't have everyone that they needed to
11  have.
12       Q.    What did you do to address your
13  concern?
14       A.    I don't recall, to tell you the
15  truth.
16       Q.    Do you recall doing anything to
17  address that issue?
18       A.    I do remember, you know, having
19  conversations with, you know, Colleen.
20       Q.    Did you ever have any conversations
21  with Secretary DeVos about the staffing issue?
22       A.    I don't recall.
23       Q.    You don't recall Secretary DeVos ever
24  asking you about whether additional resources were
25  needed for borrower defense?

Page 173

1                  - JAMES MANNING -
2       A.    I don't recall that specific question
3  being asked, and I -- I don't recall specifically
4  having a conversation about this issue, about the
5  staffing issue with Secretary DeVos.  I simply do
6  not recall.  Not to mean that I didn't, but I
7  don't recall.
8       Q.    Do you recall there being a hiring
9  freeze at the Department that affected the ability
10  to hire staff at the beginning of the Trump
11  Administration?
12       A.    Yes, I do understand that.
13       Q.    Do you know how long that hiring
14  freeze lasted?
15       A.    Pretty much from the beginning
16  through most of '17.  That's -- I can't -- I can't
17  say authoritatively when it ended.  It was for a
18  significant period of time, if not most of '17.
19       Q.    Were you surprised at how long that
20  hiring freeze was in place?
21       A.    Well, I've been in federal service
22  for a long time and hiring freezes happen from
23  time to time and so I wasn't completely surprised
24  that there was a freeze.
25       Q.    Who ordered the hiring freeze?

Page 174

- JAMES MANNING -

1       - JAMES MANNING -
2       A.      I have no idea.
3       Q.      How did you find out about the hiring
4  freeze?
5       A.      It was announced, I'm sure.  There
6  was notice given that it would be -- there would
7  be a hiring freeze.
8       Q.      Where did that notice come from?
9       A.      I don't recall.  It came -- normally
10  those kinds of announcements would come from the
11  Office of Administration, but I don't recall
12  specifically where they come from.
13       Q.      What is the Office of Administration?
14       A.      The management office that
15  coordinates general management issues, including
16  personnel.  It was headed by Denise Carter then
17  and I think today --
18       Q.      And is that within the Department of
19  Education?
20       A.      Yes.
21       Q.      How did you find out that the hiring
22  freeze was lifted?
23       A.      I don't recall.
24       Q.      Do you recall ever finding out that
25  it was lifted?

Page 175

1       - JAMES MANNING -
2       A.      I do believe that I was there when it
3  was lifted, but I can't specifically recall when
4  that was or when it was lifted.
5       Q.      How would you expect to find out
6  about whether -- about how it was lifted, would
7  you expect to receive a written document?
8       A.      Well, an announcement of one type or
9  another and I think by that point, you know,
10  e-mails were sent probably, but I don't recall how
11  it actually was done.
12       Q.      Was there some sort of e-mail group
13  at the Department that was for leadership only?
14       A.      I don't know what that means.
15       Q.      In other words, was there a certain
16  e-mail group designated for people such as
17  yourself who were in higher command positions
18  within the Department.
19           MR. MERRITT:  Objection.  Sorry, go
20  ahead.
21           MR. JARAMILLO:  No, go ahead.
22           MR. MERRITT:  I'm am just going to
23  state an objection to that being outside the
24  scope of court-ordered discovery.
25       Q.      You can answer the question.

Page 176

1       - JAMES MANNING -
2       A.      No, I can't recall any e-mail groups
3  like that that -- I was not aware of any e-mail
4  groups like that.
5       Q.      Was this hiring freeze specific to
6  the Department of Education only or was it within
7  particular units of the Department?
8       A.      I think it impacted the entire
9  Department my recollection, but I can't be sure.
10       Q.      After the freeze was lifted, do you
11  recall having any -- any discussions with anyone
12  at FSA about oh, now that the freeze is lifted we
13  can try to get more staff for the borrower defense
14  claims review process?
15       A.      I don't recall.
16       Q.      Let me have you turn, Mr. Manning,
17  back to Tab 7 which is Exhibit 33, the question
18  and answer between Senator Patty Murray and
19  Secretary DeVos.
20       A.      Oh, thank goodness I didn't put it
21  away.  Here it is.  What page?
22       Q.      Turn to Page 21 of 48.
23       A.      Okay, got it.
24       Q.      I'll read the -- the question and
25  then I'll just have you read the answer and we can

Page 177

1       - JAMES MANNING -
2  talk about it.
3       A.      Okay.
4       Q.      This is under "Staff allocated to
5  borrower defense activity.  Question:  "How many
6  full-time equivalent positions with the primary
7  job function of forward-responsibility of
8  reviewing or providing analysis of borrower
9  claims, including attorneys' advisors, were filled
10  with active employees as of January 19, 2017, have
11  become vacant since January 20, 2017, have been
12  listed with a vacancy announcement by the
13  Department since January 20, 2017, have been hired
14  by the Department since January 20, 2017, are
15  employed as of the date of the response inquiry?"
16           And, Mr. Manning, can you read
17  Secretary DeVos's answer for the record?
18       A.      Well, I'm trying to -- answer:  "As
19  of January 19, 2017, there were eleven employees
20  in the borrower defense group.  Since January 20,
21  '17, four of those employees voluntarily separated
22  from the Department.  As of March 31st, 2019,
23  seven employees remained in the borrower defense
24  group which included six full time employees and
25  one part-time employee.  As of January 20th, 2017

Page 178

1                  - JAMES MANNING -
2    no additional employees have been hired in the
3    borrower defense group.  The Department currently
4    is preparing announcements to fill the vacant
5    positions."
6          Q.    Thank you for reading that, Mr.
7    Manning.
8                Do you know why as of this date in
9    this document, since January 20, 2017 no
10   additional employees have been hired into the
11   borrower defense group?
12         A.    In this documentation June 13th,
13   2019, is that what you're saying?
14         Q.    Yes, and we -- and, you know, just
15   because I know you left in March, 2017 so I can
16   rephrase it -- I mean 2019.  I can rephrase the
17   question:  Do you know why since January 20, 2017
18   up until the time you left the Department, no
19   additional employees have been hired in the
20   borrower defense group?
21         A.    That surprises me.
22         Q.    Why does that surprise you?
23         A.    I was -- I would have thought that
24   there had been a one -- you know, minimal number
25   of additional employees hired I would have

Page 179

1                  - JAMES MANNING -
2    guessed, but apparently -- I'm sure the Secretary
3    was correct when she said this, but --
4          Q.    Well, wouldn't you -- wouldn't you
5    have known if there were additional hires?
6          A.    Wouldn't what?
7          Q.    Would -- wouldn't you have known if
8    there had been additional hires in the borrower
9    defense group?
10         A.    You're asking me if I would have
11   known.  If I would have known, is that your
12   question?
13         Q.    That's my question, yes.
14         A.    In -- in principle, yes, but I don't
15   recall.
16         Q.    In principle, yes, you would have
17   known or is should have known what --
18         A.    Because I'm sure I had conversations
19   with Colleen in -- about new hires, so I would
20   have heard that.
21               I -- I specifically don't recall that
22   -- that there were none and I don't recall --
23   obviously if there were none, there were none and
24   I don't -- my recollection --
25         Q.    If -- if there were requests for more

Page 180

1                  - JAMES MANNING -
2    hires for the borrower defense group, would that
3    request necessarily be communicated to you?
4          A.    While I was COO, probably.
5          Q.    What about when you were acting
6    Undersecretary, during the time period you were
7    not COO at the same time?
8          A.    Yeah, I don't recall what we were
9    doing then around this, and I don't recall -- and
10   beyond this, my understanding -- and I'm not with
11   the Department, but my understanding that if you
12   were answering -- if she was answering this
13   question now, there are a significantly more
14   hires that have been made since she answered this.
15         Q.    Thank you for that, Mr. Manning.  We
16   are fully aware the staffing at this point and
17   that's not what I want to ask you about.
18               This response from Ms. DeVos also
19   says "The Department currently is preparing
20   announcements to fill the vacant positions."  Were
21   you aware of any announcement being prepared to
22   fill vacant positions at borrower defense group
23   during your tenure in the Trump Administration?
24         A.    I don't recall.
25         Q.    And this refers to the vacancies

Page 181

1                  - JAMES MANNING -
2    basically for attorneys.  Do you think four
3    additional attorneys at that time would have been
4    sufficient to address the backlog in borrower
5    defense applications.
6          MR. MERRITT:  Objection, calls for
7    speculation.
8          MR. JARAMILLO:  Well, let -- let me
9    rephrase the question.
10         Q.    Do you think at any time during your
11   tenure at the Department of Education in the Trump
12   Administration, that merely adding four attorneys
13   to the borrower defense group would have been
14   sufficient to address the backlog in borrower
15   defense applications that needed to be
16   adjudicated?
17         A.    I don't know what that number would
18   have been, but where I would start was to look and
19   see how many were onboard as of January 19, 2017
20   when there were eleven and that was the number
21   that apparently was working for the previous
22   administration.  That -- that would be a target
23   number to have used.
24         Q.    Mr. Manning, what if the backlog was
25   significantly more in March, 2019 than it was in

Page 182

1                  - JAMES MANNING -
2  January, 2017; would you agree that perhaps more
3  than four staff attorneys would be necessary to
4  address the backlog?
5       A.    No, I'd have to go to experts in the
6  staffing to project what -- how many additional
7  staffing would be needed.
8       Q.    Mr. Manning, one of the remarks that
9  you read earlier which was in Tab 12 -- which I
10  hope we marked as an exhibit, I think we did as
11  Exhibit 34 -- you said "Moving forward we have
12  approximately 95,000 pending claims" and that was
13  in November, 2017.  If we ran that round that up
14  to 100,000 pending claims --
15       A.    I'm sorry, what exhibit was that?
16       Q.    I don't need you to look at it now.
17  I just want -- I'm representing to you
18  what's -- what's in the document.
19       A.    Okay.  Well, go ahead.  Then start
20  over if, you wouldn't mind.
21       Q.    Okay, sir.  You read that the
22  Borrower Defenses and Financial Responsibility
23  Negotiated Rulemaking Committee November 14, 2017,
24  that at that time there were 95,000 pending
25  claims.

Page 183

1                  - JAMES MANNING -
2            And let's just -- let's assume that
3  there were ten staff attorneys at that time and
4  let's round it up to 100,000 claims.
5            Do you think it's reasonable for the
6  Department to expect there to only be ten Borrower
7  Defense Unit attorneys for 100,00 claims, making
8  it like 10,000 claims per attorney if you were to
9  divide through by straight division?  Would that
10  --
11            MR. MERRITT:  Objection.  Sorry.
12       Please, continue.  I'm sorry.
13            MR. JARAMILLO:  Okay.
14            MR. MERRITT:  But if you're done, I'm
15       going to object, court stipulation.
16       Q.    I would think, Mr. Manning, as the
17  third-in-command, also wearing two hats during a
18  certain period of time as COO of FSA and the
19  acting U.S. Undersecretary regularly communicating
20  with Colleen Nevin, the director of the BDU, you
21  would have a sense of whether seven staff
22  attorneys would be sufficient for 95,000 pending
23  claims or even eleven staff attorneys for 95,000
24  claims.  Would that be a reasonable workload to
25  expect of the BDU staff?

Page 184

1                  - JAMES MANNING -
2            MR. MERRITT:  He stated his knowledge
3       about this time period.  You are also making
4       up numbers, so the speculation objection
5       stands.
6       Q.    One of the --
7            MR. MERRITT:  You can -- you can
8       answer the question.
9            THE WITNESS:  I can answer the
10       question?  I can?
11            MR. MERRITT:  Yes, Mr. Manning.  You
12       can answer the question.
13            THE WITNESS:  Okay.
14       A.    The answer is I -- I don't know the
15  right number and I would have to consult with
16  experts and staffing.
17       Q.    Did you ever consult with experts
18  about this staffing issue?
19       A.    I'm sure I discussed the issue.  I
20  can't recall.  Outside of Colleen, I don't -- I
21  can't recall specifically who.
22       Q.    Do you believe you discussed this
23  issue with anybody, but Colleen Nevin who was not
24  in a position to obtain more staffing for the BDU?
25       A.    Yeah, I expect that I talked to

Page 185

1                  - JAMES MANNING -
2  somebody in personnel.  I don't recall who,
3  though.
4       Q.    And what would you have talked to
5  them about?
6       A.    Appropriate numbers of staff under
7  certain criteria, but I don't recall.
8       Q.    What kind of criteria?
9       A.    I don't recall.
10       Q.    Looking back from today's vantage
11  point, would you have approached staffing for the
12  BDU any differently than you did when you were at
13  the Department in the Trump Administration?
14       A.    Perhaps, but I don't -- I don't know.
15  I think that the staffing level that's there right
16  now is better from, what I understand.  I don't
17  have an informed position there.
18       Q.    In -- in hindsight, do you wish you
19  would have got that level of staffing when you
20  were at the Department?
21       A.    I think, you know, any manager always
22  wants to have the proper level of staffing.
23       Q.    That's an important issue, right?
24       A.    Certainly.
25       Q.    And you were aware of Ms. Nevin's

Page 186

1               - JAMES MANNING -
2   concern as a director of BDU that she wanted more
3   staff, correct?
4       A.    Yes.
5       Q.    But as you sit here today you cannot
6   recall taking any concrete action to request more
7   staff for the BDU, correct?
8       A.    I don't recall.
9       Q.    To your knowledge, was -- was the
10  lack of adequate staffing a cause of the delay in
11  issuing borrower defense decisions during your
12  tenure at the Department?
13            MR. MERRITT:  Objection, calls for
14      speculation.
15      Q.    To your knowledge, sir, was the lack
16  of staffing a cause of the delay in processing
17  borrower defense applications?
18      A.    I don't know.
19            MR. MERRITT:  Joe, I'll let you keep
20      going, but I just wanted to ask for a break
21      at some point relatively soon.
22            MR. JARAMILLO:  We can -- we can take
23      a break now.  I actually need it myself.
24            MR. MERRITT:  Okay, great.
25            MR. JARAMILLO:  Thank you.

Page 187

1               - JAMES MANNING -
2            THE WITNESS:  I'll take advantage of
3       it, too.
4            MR. JARAMILLO:  All right.  Okay.
5            THE VIDEOGRAPHER:  We're off the
6       record, the time is 20:36 UTC.
7            (Whereupon, there was a brief recess
8       in the proceedings.)
9            THE VIDEOGRAPHER:  We're back on the
10      record, the time is 20:53 UTC.
11      Q.    Mr. Manning, did you ever have any
12  discussions with a Wayne Johnson about borrower
13  defense when you were at the Department?
14      A.    I -- I must have, but I don't recall
15  any of them.
16      Q.    Do you recall Mr. Johnson expressing
17  any opinions about how the borrower defense claims
18  review was going at the Department?
19      A.    No, not specifically but when Mr.
20  Johnson became the COO he brought Julian Schmoke
21  and put him in the vacant chief enforcement
22  officer position; and Julian -- Wayne Johnson
23  became COO in July of 2017 and Julian came in -- I
24  don't recall.  It would have been a couple of
25  months after that and he became a chief

Page 188

1               - JAMES MANNING -
2   enforcement officer and worked closely with Wayne.
3       Q.    Did you have discussions with Julian
4   Schmoke about borrower defense?
5       A.    I'm sure I did.  I don't recall the
6   discussions that I -- yeah.
7       Q.    Do you recall discussing staffing
8   levels for the BDU with Julian Schmoke?
9       A.    Not specifically.  I would expect
10  that I did, but I can't attest to that I
11  absolutely did.  I don't recall.
12      Q.    Do you recall Julian Schmoke
13  discussing the need for more staffing for the BDU
14  with you?
15      A.    I don't specifically recall that.
16  Could have happened, but I don't recall that.
17      Q.    And when -- when Mr. Johnson left his
18  position of COO of FSA and you took that over in
19  the acting role did, you have discussions with him
20  at that point about the status of borrower
21  defense?
22      A.    Did I have discussions with who at
23  that point?
24      Q.    Mr. Johnson.
25      A.    I don't recall.

Page 189

1               - JAMES MANNING -
2       Q.    Did you do anything to educate
3   yourself more about the operations of BDU or
4   borrower defense claims processing when you took
5   on the acting role as COO of FSA?
6       A.    I don't recall.
7       Q.    I'll have you turn back, Mr. Manning,
8   to Tab 12, which we have marked previously as
9   Exhibit 34.  Your remarks at BD Negotiated
10  Rulemaking Committee on November 14, 2017.
11      A.    Okay, yes.
12      Q.    And if you could turn to Page 13,
13  please:
14      A.    Okay.
15      Q.    And can you read for me the sentence
16  that begins on Line 18?
17      A.    " Even the most strident borrower
18  defense advocate would recognize that undoubtedly
19  some claims are going to be denied. "
20      Q.    What did you mean by "strident
21  borrower defense advocate"?
22      A.    I don't recall.
23      Q.    Well, sitting here today what does
24  that mean to you, "strident borrower defense
25  advocate"?

Page 190

```
 1                  - JAMES MANNING -
 2        A.     It makes me wonder why I used the
 3   word "strident."
 4        Q.     What does the word "strident" mean to
 5   you?
 6        A.     Well, I think I misused the word
 7   here.
 8        Q.     And why do you think you misused it?
 9        A.     I don't know why I misused.  I'm not
10   reading it now thinking that even the most --
11        Q.     Do you have an understanding of what
12   the word "strident" means, Mr. Manning?
13        A.     Yes, I have an understanding.
14        Q.     Please inform us of your
15   understanding.
16        A.     Dogmatic.
17        Q.     Okay.  Anything else?
18               And what do you mean by dogmatic?
19               MR. MERRITT:  Objection.  This is all
20        beyond the scope of the discovery the court
21        ordered.
22               MR. JARAMILLO:  I don't think
23        referring to borrower defense advocates of
24        which -- as strident is beyond --
25        A.     My --
```

Page 191

```
 1                  - JAMES MANNING -
 2        Q.     Go ahead, Mr. Manning.
 3               MR. MERRITT:  Well, I mean just how
 4        does that relate to the extent to which the
 5        difficulty of reviewing borrower defense
 6        applications -- how does relate to any of the
 7        three topics that court authorized discovery
 8        on?
 9               MR. JARAMILLO:  Well, the -- the
10        court-ordered discovery on the extent to
11        which the difficulty of reviewing borrower
12        defense applications contributed to the
13        18-month delay, implicit in that part of it
14        is the extent to which the difficulty did not
15        and the extent to which there were other
16        reasons.
17               And the court in the prior page,
18        before setting forth the three topics, listed
19        a clear showing of pretext as being something
20        that was apparent to him in potentially
21        causing the delay and I'm probing about
22        pretext, because he's referring to both a --
23        a strident borrower defense advocate.
24               In my mind, strident means loud and
25        harsh or grating presenting a point of view,
```

Page 192

```
 1                  - JAMES MANNING -
 2        especially a controversial one, in an
 3        excessively and unpleasant forceful way and
 4        this is how Mr. Manning describes borrower
 5        defense advocate.  This is -- goes directly
 6        to pretext and this goes directly to why
 7        there was potentially other reasons for the
 8        delay beyond any difficulty in reviewing
 9        borrower defense applications and so I'm
10        going to ask him again.
11               MR. MERRITT:  (Unintelligible
12        crosstalk) In response to your point, the
13        court did not authorize an open-ended
14        discovery into pretext.  Pretext was defined
15        -- the court defined pretext as based on the
16        fact that, you know, the described difficulty
17        of reviewing borrower defense applications do
18        not necessary appear on the face of denial
19        notices.
20               He's carefully specified -- Judge
21        Alsup carefully specified three topics in
22        discovery, but certainly we can't interpret
23        that so broadly to mean any kind of inquiries
24        of pretext and some of these inquiries, and
25        particularly in your line of questioning
```

Page 193

```
 1                  - JAMES MANNING -
 2        right now, is particularly, you know, an
 3        open-ended discussion into pretext and not
 4        based on or relevant to any of the topics the
 5        court authorized discovery into.
 6               MR. JARAMILLO:  The Judge did say on
 7        Page 15 of his order on October 19th, 2020,
 8        "In sum, we are faced with a strong showing
 9        of agency pretext and the class has been
10        prejudiced by delaying that.  We need to know
11        what is really going on.  This compels
12        expedited discovery."  And so --
13               MR. MERRITT:  Bearing in my mind,
14        discovery of this agency is disfavored it
15        will be limited, but broad enough to be
16        effective which" -- you know, and then it
17        goes on to say what exactly it will be.  So
18        what discovery is into is the three topics,
19        not pretext stated that broadly.  There would
20        be no limitations on that and this is still
21        an ATA case.
22               MR. JARAMILLO:  This relates to Topic
23        2, and I'm going to press unless you instruct
24        him not to answer.  I want to know what he
25        meant by strident.
```

Page 194

- JAMES MANNING -

1          - JAMES MANNING -
2          MR. MERRITT:  Okay.  I mean, I'm not
3    going to instruct him not to answer that
4    question, but just stating that it's
5    irrelevant to the case, to the topics the
6    court authorized discovery on.
7          MR. JARAMILLO:  Duly noted.
8     Q.   Mr. Manning, why did you refer to
9    borrower defense advocates as strident?
10    A.   I don't recall, reading this now.  I
11   already told you that I'm surprised that word was
12   used.
13    Q.   Do you think -- do you think it would
14   be strident for a borrower defense advocate to
15   assert the rights of student and borrowers?
16    A.   That's not what this sentence has to
17   do with.  This has to do with a borrower -- using
18   a borrower defense advocate to recognize that
19   undoubtedly some claims are going to be denied and
20   that's absolutely true.  Some claims are going to
21   be denied.
22    Q.   How do you define "some claims"?
23    A.   More than one.
24    Q.   Okay.  Would you be surprised --
25   would you expect there to be a 90 percent denial

Page 195

- JAMES MANNING -

1          - JAMES MANNING -
2    rate by the Department of Education for borrower
3    defense claims?
4     A.   I don't know.
5     Q.   Does that surprise you?
6     A.   Well, borrower defense claims are,
7    you know, reviewed one at a time and...
8     Q.   Did you harbor some bias against
9    borrowers --
10    A.   No.
11    Q.   -- if they were just asserting
12   frivolous claims?
13          MR. MERRITT:  Objection.  It's beyond
14   the scope.
15    Q.   You can answer, Mr. Manning.
16    A.   Restate your question.
17    Q.   Did you harbor any --
18    A.   You're halfway through it, but go
19   ahead.
20    Q.   Did you harbor any bias towards
21   student borrower applicants for borrower defense
22   discharge?
23    A.   No, I did not.
24    Q.   Did you ever -- are you familiar with
25   the content of borrower defense applications?

Page 196

- JAMES MANNING -

1          - JAMES MANNING -
2     A.   I was briefed on some, but I didn't
3    review them.  I didn't see them regularly.
4     Q.   And from your briefing, did you have
5    any understanding of whether they were easy to
6    resolve or difficult to resolve?
7     A.   As I recall, some were easy to
8    resolve and some were difficult to resolve.
9     Q.   And what did you understand about the
10   ones that were easy to resolve, why lwere they
11   easy to resolve?
12    A.   Because the attorneys reviewing them
13   made the judgment that they weren't sufficient to
14   be considered further.
15    Q.   And what was your understanding of
16   why they were not sufficient to be considered
17   further?
18    A.   I have no idea.  I -- I relied on the
19   attorneys to make that call.  I didn't review
20   their work or make decisions about those
21   applications.
22    Q.   In your opinion, to what extent did
23   the difficulty of reviewing borrower defense
24   applications actually cause a delay in issuing
25   decisions during your tenure?

Page 197

- JAMES MANNING -

1          - JAMES MANNING -
2     A.   I -- I don't know.  I don't know.
3     Q.   Is it your understanding that
4    generally the applications were easy to be
5    decided?
6     A.   I think there were some very easy to
7    be decide and some that were very difficult, so I
8    don't know specifically; but I would stand by
9    what I said subsequent to the sentence we're
10   talking about, is that we had been working
11   carefully to ensure that any denial until there
12   was a total review of the claim.  We were
13   absolutely committed to that.
14    Q.   And what did you do to demonstrate
15   your commitment to that?
16    A.   I don't recall.
17    Q.   What did anyone at the Department due
18   to demonstrate a commitment to that?
19          MR. MERRITT:  Objection, overbroad.
20    Q.   To the extent you know, what did
21   anyone at the Department do?
22    A.   I think Colleen Nevin was absolutely
23   committed to that with her staff and reviewed
24   every application that came in appropriately.
25    Q.   Were -- were you aware of the use of

Page 198

- JAMES MANNING -
1   - JAMES MANNING -
2   legal mem -- memoranda at the Department that set
3   forth categories of claims that would qualify for
4   discharge under borrower defense?
5       A.    Repeat that again.
6       Q.    Were you aware of any legal memoranda
7   or category of claims that would qual -- that
8   would set forth criteria to qualifying applicants
9   for borrower defense discharge?
10      A.    I don't recall.
11      Q.    You don't recall memoranda in place
12  for seven categories of claims that -- from the
13  prior administration that included job placement
14  rates claims from Hiel and from Ever -- Everest
15  and Wyo -- Wyotech, transfer of credit
16  misrepresentation claims?
17      A.    I -- I remember -- I remember
18  those -- those schools and the issues that you
19  just mentioned because I just heard you say that,
20  but I don't remember -- I do not remember the
21  legal memorandum that were circulated in that
22  during previous administrations, probably have
23  seen them.
24      Q.    Do you know if the Borrower Defense
25  Unit relied on those memoranda in order to make

Page 199

1                    - JAMES MANNING -
2   decisions?
3       A.    If those were provided by the
4   previous administration, I expect fully that the
5   Borrower Defense Unit was, you know, aware for all
6   of them.  That -- that would be my belief.  I
7   don't know for sure.
8       Q.    Were you aware of any memoranda or
9   protocols that the Borrower Defense Unit used in
10  order to adjudicate borrower defense claims?
11      A.    Memoranda?
12      Q.    Let's start with memoranda, yes.
13      A.    Oh, I haven't -- I don't recall any
14  legal memoranda.
15      Q.    What about protocols?
16      A.    I -- I remember that when we
17  conducted the review, before we asked the
18  Inspector General to -- from the beginning on the
19  transition team and then subsequently instruction
20  looking for established protocols and -- you know,
21  and other types of guides for decision-making in
22  the process and recognizing that they were short;
23  that they, the -- the protocols, were not clearly
24  established and that more work had to be done by
25  them to improve those -- those types of documents.

Page 200

1                    - JAMES MANNING -
2       Q.    Mr. Manning, I want to show you
3   something --
4       A.    I can't hear you.
5       Q.    Say it again.
6       A.    I couldn't hear you.  You -- you
7   faded.
8       Q.    I apologize.  Bear with me one
9   second.
10      A.    Yeah, of course.
11      Q.    You mentioned, Mr. Manning, that
12  during the review of the borrower defense program
13  during the transition, that you -- you had
14  reviewed as part of that effort established
15  protocols in place at the time; is that right?
16      A.    I think formerly the -- what that --
17  that issue after the 20th, normally we had -- you
18  know -- had meetings previously raising, you know,
19  the -- the question involved.
20      Q.    Did you review any protocols in place
21  at that time?
22      A.    Not during the transition.
23      Q.    How about once you started on with
24  the Department in the new administration?
25      A.    Yes, absolutely.  We sent two people.

Page 201

1                    - JAMES MANNING -
2   I can't remember the second person, but one was
3   Justin Riemer, attorney from the Department, to
4   look at operations and documentation in the
5   Borrower Defense Unit.
6       Q.    Are you aware of what documentation
7   they looked at?
8       A.    I don't recall.
9       Q.    Did you look at any of that
10  documentation?
11      A.    Personally, no.
12      Q.    Okay.  I'm going to have you look at
13  Tab 4, which was previously marked as Exhibit 9.
14      A.    Okay.
15           (Whereupon, Exhibit 9, having been
16      previously marked, was tendered to the
17      witness for identification.)
18      A.    Okay, I have it.
19      Q.    And the first page we can -- we can
20  ignore.  This is -- it says "Exhibit 9" there
21  because it was submitted to the court as an
22  exhibit, but I want you to look at the second page
23  where it says "Borrowers' Defense Unit Claims
24  Rreview Protocol."
25           Have you ever -- do you ever recall

Page 202

- JAMES MANNING -
1
2    seeing a Borrower Defense Unit Claims Review
3    Protocol?
4        A.    No, I don't recall that.
5        Q.    I don't think you need to read this
6    document line by line, but if you could just flip
7    through and tell me whether any of the contents
8    look familiar to you or whether you don't recall
9    ever seeing those.
10       A.    I don't remember seeing this
11   document.  There's certainly some facts
12   represented here that can be replicated other
13   places I've read outside, but I've never seen this
14   document before.
15       Q.    Can you point out the facts that
16   you've seen replicated in other places, and you
17   can let us know the Bates number?
18       A.    "The legal framework "BD application
19   must state a claim under state law."
20       Q.    And that -- that would be on the
21   third page of this document?  If you look at the
22   lower right-hand corner, there's a 3?
23       A.    Yes.  Yep.
24       Q.    All right, and when did you see that
25   language before?

Page 203

- JAMES MANNING -
1
2        A.    When did I see it before?
3        Q.    Yes.
4        A.    When -- when did I see it before?
5        Q.    That's the question, sir.
6        A.    I was repeating it for, Hope.
7              So I couldn't tell you, but that
8    certainly was a part of the legal framework that
9    BD application must have a state -- must state a
10   claim under state law.  Elsewhere I've seen that,
11   you know, plenty of times.  Like I -- I can't say
12   where -- where.  I have never seen this document
13   in this form.  I mean --
14       Q.    All right.  Have you seen -- is there
15   any other language here that looks familiar to
16   you?
17       A.    I'm -- I'm having to read to make
18   sure to satisfy --
19       Q.    I'll tell you what, if you're going
20   to read line by line we can move on.
21       A.    You are going to do what?
22       Q.    If you want -- if you're going to
23   read to this line by line, I would just like to
24   move on.
25       A.    Let me just take another minute here

Page 204

- JAMES MANNING -
1
2    just to be sure.
3        Q.    Okay.
4              MR. MERRITT:  Just to be clear, you
5    -- you asked specifically whether he was
6    familiar with any of the language in there,
7    so --
8              MR. JARAMILLO:  That's true.
9        A.    The legal threshold for eligibility
10   equals preponderance of the evidence."  I've seen
11   that any number of times.
12             "Must base decisions granting or
13   denying relief on a record sufficient to withstand
14   court scrutiny."  Most of the rest of it I haven't
15   seen.
16       Q.    Okay.  Thank you, Mr. Manning.  I
17   would like you to turn to Tab 5.
18       A.    Okay.
19       Q.    And the first page of this tab has
20   Exhibit 10 and I would like to just move on and
21   ignore that.  That was submitted for purposes of
22   getting it into the court.
23             I want to look at the second page
24   that says "Borrower Defense Unit Claims Review
25   Protocol" and let's mark this --

Page 205

- JAMES MANNING -
1
2              MR. MERRITT:  I'm sorry.  I just want
3    to make sure we're on the same page.  The
4    document I'm looking at doesn't say -- have
5    an exhibit marking.
6              MR. JARAMILLO:  Oh, okay.
7              MR. MERRITT:  It does -- it does say
8    "Borrower Defense Unit Claims Review
9    Protocol."
10             MR. JARAMILLO:  Right, right.
11       A.    It looks like -- it looks similar to
12   the last thing I just looked at.
13       Q.    Okay.
14             MR. JARAMILLO:  And let's just --
15   just to clarify the record, thank you for
16   pointing that out, Charlie.  I think I might
17   have -- when I sent the document, I took off
18   the exhibit page just to go straight to the
19   first page of the actual document.
20             And so this is Tab 5 and I would like
21   to mark it as Exhibit 35.
22             MR. MERRITT:  Again, just to confirm
23   what we're talking about, like at the top
24   it's a document filed in this case;  66-3
25   Page 118 of 137.  I was going to ask a

Page 206

- JAMES MANNING -

1     - JAMES MANNING -
2     question, Mr. Jaramillo, but --
3         MR. JARAMILLO:  I'll, I'll -- let's
4     clarify just to -- I think to identify this.
5     This is Tab 5 which is now Exhibit 35.
6         (Whereupon, Exhibit 35 was marked at
7     this time.)
8         MR. JARAMILLO:  At the top of the
9     page above the title of the document, you
10    can see a case file number, Case
11    3:19-cv-03674-WHA Document 66-3, filed
12    12/23/19, page 118 of 137.
13        And there's another case stamp on the
14    right-hand side.  I'm not going to go over it
15    because I think we've sufficiently identified
16    this.
17        MR. MERRITT:  That's good enough for
18    me.  Thank you.
19    A.     I'll just say that this document
20    looks remarkably like the document you just had me
21    look at previously, that Borrower Defense Unit
22    Claims Review Protocol, the one that was Exhibit 9
23    we looked at just a few minutes ago, and I was --
24    I made some comments about particular lines.
25        This -- what I'm looking at now, the

Page 207

1     - JAMES MANNING -
2     second document you just had us look through,
3     looks very similar.
4     Q.     Okay, great.  Thank you.  Thank you,
5     Mr. Manning.
6     A.     Am I looking at something or --
7     Q.     You know, you were looking at the
8     right thing.  There are some additional pages --
9     there are some pages in this document that were
10    redacted, so it's not exactly the same.
11        And then at the end, there are --
12    it's the last three pages -- I'm sorry, the last
13    one, two, three, four -- the last five pages are
14    what I want to just focus in on --
15    A.     Okay.
16    Q.     -- to identify them.  I'm going --
17    look at case file stamp at the top of the document
18    it looks -- I want you to turn to Page 133 of 137
19    because that's how it's represented.
20    A.     I'm there now.
21    Q.     Gotcha, and there's chart that says
22    "Approvals  Borrower Defense Claims."  Do you see
23    that?
24    A.     Yes, let me just get reorganized here
25    so I -- I'm looking at the right things.

Page 208

1     - JAMES MANNING -
2     Q.     Okay.
3     A.     I see the chart.
4     Q.     And have you ever seen that chart
5     before?
6     A.     I've seen a thousand charts that look
7     like this at first glance, and even with my
8     glasses the printing on these boxes is a -- a
9     little tough.
10        I -- I don't recall specifically
11    seeing this chart.  It was updated on January 30,
12    2017, so --
13    Q.     Yes, it does say "Updated January 30,
14    2017" --
15    A.     Right.
16    Q.     -- and which I recognize is only ten
17    days after you came into the Department under the
18    new administration, correct?
19    A.     Without responsibility for this issue
20    at the time.
21    Q.     Right, because you were senior
22    advisor to the Secretary, correct?
23    A.     That's correct.
24    Q.     And just to do a little side
25    questioning on that, what, what -- did -- did any

Page 209

1     - JAMES MANNING -
2     of that ad -- advisory responsibility include
3     advice on borrower defense for that particular
4     position when you first came into the
5     administration?
6     A.     Not to that particular position, but
7     I -- I did speak with the Secretary on issues
8     around borrower defense, in -- in particular the,
9     the -- the previous administration's actions at
10    the end of the administration that led to the
11    16,000 cases that were to be ultimately discharged
12    by the Secretary.
13    Q.     And when you had those discussions
14    with the Secretary, you at that point were acting
15    Undersecretary?
16    A.     No.
17    Q.     Okay.  You were senior policy
18    advisor?
19    A.     Yes -- no, senior advisor.
20    Q.     Senior advisor, I'm sorry.
21        And besides that particular topic,
22    did you speak to the Secretary as senior advisor
23    about anything else related to borrower defense?
24    A.     Not that I recall.  The issue was,
25    you know, what was there and ready for review and

Page 210

```
 1              - JAMES MANNING -
 2   signature.
 3        Q.    Okay.  Let's turn back to the -- I'm
 4   sorry, did I interrupt you, sir.
 5        A.    Well, I was going to say I don't
 6   remember specifically when she first was
 7   Secretary, but I think it was, you know, the first
 8   week of February.  I could be wrong.
 9        Q.    That's fine.  Looking at this
10   approval chart and what we marked as Exhibit 35 --
11        A.    Am I still on Page 133?
12        Q.    Yes.
13        A.    Okay.  I'm looking at the chart.
14        Q.    Yeah, I'm kind of following like the
15   little people symbols from the left to the right
16   and I see three people and then there's an arrow
17   and then I see a person sitting at a desk and then
18   an arrow going down that says "FSA Internal
19   Control notification."  Do you have any idea what
20   that means?
21        A.    No, I'm not exactly -- I don't recall
22   what that means.  It looks like it's something I
23   -- I'd get from executive Secretary, but this is
24   outside the executive Secretary process.
25        Q.    Okay, and then if I follow the arrows
```

Page 211

```
 1              - JAMES MANNING -
 2   to the right there's two more people sitting at
 3   desks and then I see a diamond.
 4        A.    Yes.
 5        Q.    And inside that diamond it says;
 6   "Fiscal impact greater than 10 million or raises
 7   policy issues?"  Do you know what that means, Mr.
 8   Manning?
 9              And no need to speculate.  I just
10   want to know if you know what it means or not.  If
11   you could -- yeah, if you're familiar with that
12   language.
13        A.    Well, I'm -- I'm reading it.  It --
14   it would mean different things to me depending on
15   what day you were reading it, effectively.
16        Q.    Okay, that's -- that's understood and
17   I don't think we need to get into that in detail.
18              My next question is; from that
19   diamond there's an arrow down with a box that says
20   "Yes"?
21        A.    Yes.
22        Q.    And then there's a person sitting at
23   a desk and to the left it says "Undersecretary
24   Approved."  Were you --
25        A.    Yes.
```

Page 212

```
 1              - JAMES MANNING -
 2        Q.    Do you see that?
 3        A.    I see that.
 4        Q.    Were you aware of any borrower
 5   defense process during your tenure where the
 6   Undersecretary would need to approve a -- a
 7   borrower defense claim if the -- or set of claims
 8   if the impact was greater than 10 million or it
 9   raised policy issues?
10        A.    I don't specifically remember that.
11        Q.    And do you have -- okay, you don't
12   remember that.
13              Let's -- let's just move on to the
14   next page which says Page 134 of 137, "Denials
15   Borrower Defense Claims."
16        A.    Right.
17        Q.    Have you ever seen this chart before?
18        A.    No.  Not to my -- best of my
19   recollection.  I don't remember seeing this.
20        Q.    Okay, and for -- for both of these
21   charts, the approvals and denials, are you aware
22   of the Borrowers Defense Unit ever using them?
23        A.    Using these charts?
24        Q.    Yes.
25        A.    I -- I don't remember if I was ever
```

Page 213

```
 1              - JAMES MANNING -
 2   aware.  I don't recall anything about these charts
 3   at this point.
 4        Q.    Okay.  If we could turn to the next
 5   page of this document.  It's a little hard to read
 6   the page number because the two cases have a Bates
 7   stamp on the top -- or on the right-hand side I
 8   think.
 9              I'm not sure how you're seeing it.  I
10   printed my out a little different, but they seem
11   to be superimposed.
12        A.    It looks like -- it looks like it
13   says 135 of 137 on the -- one of them.
14        Q.    That's correct, and it says "Number
15   of Borrower Defense Claims" and it looks like on
16   the right- hand side there's different lines that
17   represent CCI, ITT and other schools?
18        A.    Yes.
19        Q.    Have you seen this chart before?
20        A.    I, I -- I don't know if I've seen
21   this one before or not.  It has a familiar look to
22   it, but all these kinds of charts they look -- I
23   can't authoritatively attest that I've absolutely
24   seen this before.  I don't know if I've seen this
25   before or not.
```

Page 214

1              - JAMES MANNING -
2      Q.    And can you see on the chart that by
3  January, 2017 according to this chart there were
4  about 60,000 CCI borrower defense claims?
5      A.    Yes, I see that.
6      Q.    And so is that -- did you
7  have -- were you -- did you realize that there
8  were that amount of claims when you came into the
9  administration?
10     A.    I don't recall that I knew when I
11 came into the administration and I don't remember
12 the number was 60,000 in particular.
13     Q.    Okay.  Earlier, Mr. Manning, you had
14 mentioned an Inspector General's report --
15     A.    Yes.
16     Q.    -- do you recall that?
17     A.    Yes.
18     Q.    What do you recall about this
19 Inspector General report?
20     A.    The Secretary asked the Inspector
21 General to do a review of the Enforcement involved
22 defense units.
23     Q.    And did you have any communication
24 yourself with the Inspector General's Office about
25 that review?

Page 215

1              - JAMES MANNING -
2      A.    The Secretary wrote the Inspector
3  General.  I don't recall I had conversation with
4  the Inspector General at that point about this
5  issue.
6            They took it up and they delivered a
7  report later in the year.
8      Q.    And did you see a copy of what the
9  Secretary wrote to the Inspector General?
10     A.    I -- I don't recall I had.  I
11 probably did, but I don't recall.
12     Q.    Do you know if it was a letter?
13     A.    Well, I -- I think most of the
14 correspondence that came from the Secretary go as
15 letters, but I'm not absolutely certain that it
16 was a letter, so it's not something that you'd
17 have to see.  The Secretary wouldn't send an
18 e-mail like that informal request.  I expect it
19 was a letter, but I don't know.
20     Q.    Do you know what the Secretary
21 communicated to the Inspector General about the
22 request?
23     A.    I don't recall what the specific
24 language was that was used, but once again I feel
25 for operations there and if they had the -- the

Page 216

1              - JAMES MANNING -
2  proper -- proper management documents in order to
3  maintain records appropriately and that type of
4  thing.
5      Q.    Did you communicate with the
6  Inspector General's Office about their reviews?
7      A.    Quite possibly.  I don't specifically
8  recall.  I do recall that their -- their review
9  came black with a few findings, some
10 recommendations on improvements and -- but I don't
11 remember the particulars beyond that.
12     Q.    Are you aware of a Department policy
13 that requires developing a corrective action plan
14 within 30 days of the issuance of an Inspector
15 General's report?
16         MR. MERRITT:  Objection as beyond the
17     scope of the court-ordered discovery.
18         MR. JARAMILLO:  Are you instructing
19     him not to answer it?
20         MR. MERRITT:  No.
21     A.    I am familiar with that.
22     Q.    Okay, and are you familiar with
23 communications from the Inspector General to the
24 COO of FSA at the time, Dr. A. Wayne Johnson ad --
25 advising him of that policy?

Page 217

1              - JAMES MANNING -
2      A.    I don't specifically remember that,
3  but I would expect that I saw it, seen it and read
4  it.
5      Q.    I'm sorry, can you -- can you --
6      A.    I -- I can't speak to the particulars
7  because I don't re -- recall particulars in the
8  report.
9      Q.    And are you aware of any final
10 corrective action plan as it -- as developed by
11 FSA in response to the report?
12     A.    I don't recall.
13     Q.    Would you expect that there would
14 have been a corrective action plan developed by
15 FSA in response to the report?
16     A.    I --
17         MR. MERRITT:  Objection, calls for
18     speculation.
19     Q.    Just -- just what you would expect as
20 Undersecretary at the time?
21     A.    I -- I think the -- the question
22 calls for a response that is generally uniformly
23 followed and so I would -- I -- I don't recall
24 seeing a response, but I expect that there was
25 one.

Page 218

- JAMES MANNING -

1          - JAMES MANNING -
2     Q.     You -- you expect that there was a
3  response to this?
4     A.     I -- I expect there would have been a
5  response.
6     Q.     And you expect that that response
7  would have been a corrective action plan?
8     A.     Well, I, I -- I don't know how it
9  might have been structured.  Normally you address
10 some of the issues that were raised and agree with
11 some and disagree with others, but I don't -- I
12 don't recall the specificity what that included.
13    Q.     Did you, yourself, read the Inspector
14 General's report?
15    A.     I believe I did.
16    Q.     And who within the Department would
17 you expect to review such a report when it comes
18 back from the Inspector General?
19    A.     When the report comes back from the
20 Inspector General?
21    Q.     Yes.
22    A.     It goes to the office that makes the
23 request, the leadership there.
24    Q.     Okay, in this case being the Office
25 of the Secretary?

Page 219

- JAMES MANNING -

1          - JAMES MANNING -
2     A.     I -- I'm not -- it might have been
3  delegated to FSA.  Did you say that -- you
4  commented earlier about A. Wayne Johnson and IG,
5  can you refresh my memory on that.  Just a few
6  minutes ago, you mentioned that.
7     Q.     Yeah, sure.  The report has a cover
8  letter from Patrick J. Howard, assistant Inspector
9  General for audit to Dr. A. Wayne Johnson COO of
10 FSA and so does that refresh your recollection as
11 to who the report would have come back to at the
12 Department?
13    A.     Well, is a name on the report?  Is
14 this a report based on the review of the
15 Enforcement and Borrower Defense Unit?
16    Q.     Yeah.  Normally I don't answer like
17 the witness to ask questions, but that is a good
18 question that you just raised and I'll just show
19 it to you.
20           If you could, look to Tab 3 which has
21 been previously introduced as Exhibit 3.
22           (Whereupon, Exhibit 3, having been
23           previously marked, was tendered to the
24           witness for identification.)
25    A.     Does it matter that I don't have Tab

Page 220

- JAMES MANNING -

1          - JAMES MANNING -
2  3?  I have something labeled Exhibit 19.
3     Q.     No, I'll explain that.  This was just
4  previously introduced as an exhibit with the
5  court, so we can skip over that page.
6     A.     Okay.  So here it is, the "Federal
7  Student Aid's Borrower Defense to Repayment -- I
8  have the Inspector General's report entitled
9  "Federal Student Aid's Borrower Defense to
10 Repayment Loan Discharge Process."
11    Q.     All right, and the date on that is
12 December 8, 2017?
13    A.     Date on that is December 8, 2017,
14 correct.
15    Q.     And would you say this is the report
16 that we have been discussing that was requested by
17 the Department for a review of the borrower
18 defense process?
19    A.     I expect it is, yeah, just looking at
20 the letter.
21    Q.     Okay, so you're looking at the page
22 that I'm going -- we'll just look at the -- the
23 court stamp page numbers, so Page 182 of 270 and
24 it looks like it's a December 8, 2017 memo to Dr.
25 A. Wayne Johnson?

Page 221

- JAMES MANNING -

1          - JAMES MANNING -
2     A.     Yes.
3     Q.     And it looks -- you wanted to look at
4  this letter.  Does this refresh your recollection
5  about anything about how the report --
6     A.     Give me a minute.  I was reading.
7     Q.     All right, and I'm just going to
8  request you don't read the whole report during
9  this deposition.
10    A.     But I want to read the letter.
11    Q.     I understand.
12    A.     Read the letter.
13           Okay.
14    Q.     All right.  Does this -- after
15 reviewing the December 8th letter included in this
16 report, does that refresh your recollection about
17 who this report would come back to at the
18 Department?
19    A.     Yes, it was through correspondence
20 from Dr. Johnson and that appears, according to
21 this letter, that they received comments from FSA.
22 Let's see -- just a second.
23    Q.     Do you have anything else to answer,
24 Mr. Manning?  We can move on.
25    A.     Okay, just give me 30 seconds more,

Page 222

```
1                - JAMES MANNING -
2    please.
3              Okay, thank you.
4         Q.    Now, does anything else about this
5    letter refresh your recollection about the report
6    coming back in to the Department?
7         A.    No.
8         Q.    Okay.  If you look at the bottom
9    left-hand corner, there's a CC and it has your
10   name as Acting Undersecretary.  Do you see that?
11        A.    Yes, I do.
12        Q.    And you remember getting a copy of
13   this letter?
14        A.    Not specifically, but I'm sure I got
15   a copy of the report so I --
16        Q.    When a report like this is issued, do
17   you expect people in the Department to read it?
18        A.    The parties that are impacted, yes.
19        Q.    And in this case, who would be the
20   impacted parties?
21        A.    Well, Dr. Johnson, the folks in the
22   borrower defense that were involved in this, the
23   FSA, the Undersecretary, copies would also go to,
24   you know, other senior leaders, OGC.
25        Q.    What other senior leaders?
```

Page 223

```
1                - JAMES MANNING -
2         A.    Deputy Secretary.
3         Q.    And --
4         A.    (Unintelligible crosstalk) Yes,
5    generally the folks that get this routinely.
6         Q.    And would you expect folks in the
7    Department afterwards, let's say relatively
8    shortly afterward would then -- within six months,
9    would you expect them to review a report like this
10   even if they had not been one of the directly
11   impacted parties to begin with?
12              MR. MERRITT:  Objection, vague.
13        Q.    In other words, would ex -- would you
14   be surprised to learn that Diane Auer Jones
15   testified in her deposition that she never read
16   it?
17        A.    I guess it wouldn't surprise me
18   because it was -- she -- she wasn't at the
19   Department for more than a year after this.  Right
20   -- no, December 8th.  It was before -- it was --
21   it was before her time in terms of -- she wasn't
22   at the Department when this was issued.  She
23   started in her position later -- in '17, '18.
24        Q.    But wouldn't it be important
25   background for her to know, taking on a role that
```

Page 224

```
1                - JAMES MANNING -
2    would have borrower defense as part of her
3    portfolio?
4         A.    Yes, and I'm not sure that she didn't
5    get it and read it, but she wouldn't have --
6         Q.    Would you be surprised to learn that
7    she testified she -- she never read it?
8              MR. MERRITT:  Objection, asked and
9    answered.
10        Q.    Would that surprise you, sir?
11        A.    I don't know if that surprises me or
12   not, but there are other avenues of communication
13   when a new senior leader comes and is reassigned
14   issues as important as this one was to the
15   Department and in particular the Undersecretary,
16   but this was the report that was -- I'm assuming
17   that there was a corrective action plan and she
18   might have seen the corrective action plan but,
19   you know, I don't know.
20              I don't know what transpired once she
21   arrived.  I wouldn't expect that she'd be in a
22   position to look back and read every document
23   that, you know, was made available from the
24   Inspector General necessarily.
25        Q.    Okay.  Let's turn to Page 186 of 270
```

Page 225

```
1                - JAMES MANNING -
2    of this document.  I'm just using the court
3    stamps --
4         A.    I got it, 186.
5         Q.    Out of 270.
6         A.    I'm there.
7         Q.    All right.  That was really quick,
8    Mr. Manning.  I appreciate it.  Under -- you see
9    there's a chart there, "Table 1: FSA's Borrower
10   Defense Outcomes"?
11        A.    I see that, yes.
12        Q.    And then underneath that there's
13   some text that starts with "From January 20, 2017?
14        A.    Yes.
15        Q.    All right.  Well just follow along.
16   I'm going to do the reading this time and then I
17   want to pause after some reading and then ask you
18   a few questions.
19        A.    Okay.
20        Q.    "From January" -- this is, I'm
21   reading from the report, "From January 20th, 2017
22   to July 31, 2017 business operations continued to
23   receive borrowers defense claims.  From January
24   20, 2017 through March, 2017 BDU continued to
25   review transfer of credit and guaranteed
```

Page 226

- JAMES MANNING -

1       - JAMES MANNING -
2   employment claims."
3           I want to pause there even though
4   it's mid-sentence just because I want to ask about
5   this date, January 20th, 2017 through March, 2017?
6       A.    Uh-huh.
7       Q.    Do you -- do you have any idea why
8   BDU would have stopped reviewing those claims in
9   March, 2017?
10      A.    I'm sorry, where does it tell me that
11  they stopped March, 2017?
12      Q.    Well, it says that's when they
13  reviewed them.  Let's go a little further.  Maybe
14  it will be more clear.
15      A.    Yeah, it wasn't as clear.  It didn't
16  say stopped at that point, but go ahead.
17      Q.    Right.  So, I mean, implicit in that
18  is that -- that there was -- that they didn't
19  continue after March, 2017.  Would you agree or
20  you disagree about that?
21      A.    Now -- well -- well, let me read it
22  myself again because I -- that's not what I got
23  out of it.  So I'll tell you one thing that
24  surprised me here though is that "January 20th,
25  2017 to July 31st, 2017 business operations

Page 227

- JAMES MANNING -

1       - JAMES MANNING -
2   continued to receive borrower defense claims" --
3   I'm sorry.  I was saying that the -- the sentence
4   at the beginning of the paragraph "From January
5   20, 2017 to July 31, 2017 business operations
6   continued to receive borrower defense claims."
7       Q.    Why does that surprise you, Mr.
8   Manning?
9       A.    Because I, I -- borrower defense
10  claims should have been going to -- directly to
11  the Borrower Defense Unit.
12      Q.    Okay.
13      A.    I wasn't expected to take over
14  directly Borrower Defense Unit business
15  operations; but beyond that "BD continued to
16  review transfer credit and guaranteed employment
17  claims, and from January 20, 2017 through May 4,
18  2017, BDU continued to review job placement rate
19  claims where they were able to make preliminary
20  determinations of denial or approval based on
21  existing legal memoranda or reports.  However, the
22  acting Under Secretary has not approve or denied
23  these claims."
24      Q.    I would like to pause right there if
25  I could and I appreciate you reading it.  The last

Page 228

- JAMES MANNING -

1       - JAMES MANNING -
2   sentence says; "However, the acting Undersecretary
3   has not approved or denied these claims."  You
4   were the under act -- you were the acting
5   Undersecretary at that time, right, Mr. Manning?
6       A.    Not from January 20th but
7   from --
8       Q.    Right.  And refresh my memory was
9   it --
10      A.    April, I think, yeah.
11      Q.    April, okay.  Sorry about that.
12      A.    Then late April.  Yes.
13      Q.    Who was -- was there an Acting
14  Undersecretary before you from January to April?
15      A.    You know, there probably was.  I'm
16  thinking out loud here.  You know, Joe Connolly
17  was Acting Deputy Secretary at the beginning.
18  Phil Rosenfelt was the Acting Secretary.  I don't
19  recall who the person was.  It could have --
20  possibly have been Lynn Haffey who was -- who was
21  the Acting Assistant Secretary to secondary for
22  Postsecondary Education at the time.  She happens
23  to be an attorney in OGC now, but I -- I don't
24  know at the time who was the Acting
25  Undersecretary.

Page 229

- JAMES MANNING -

1       - JAMES MANNING -
2       Q.    Okay, let's, let's -- let's go back
3   to the document.
4       A.    Okay.
5       Q.    What I'm getting from what you read
6   so far, is that the BDU was continuing to review
7   and receive these claims.
8       A.    Right.
9       Q.    And they were able to make
10  preliminary determinations of denial or approval.
11      A.    Right.
12      Q.    Based on existing legal memoranda or
13  reports.  However the acting under Secretary has
14  not approved or denied these claims, understanding
15  that you didn't come into that role or -- or
16  position until April, 2017, but by the time of
17  this report in December, 2017 certainly you had
18  been in -- in that role for several months and I
19  want to ask you why you did not approve or deny
20  those claims at that time?
21      A.    Does it say I didn't approve them by
22  that time?
23      Q.    It says "However, the Acting
24  Undersecretary has not approved or denied these
25  claims" and this report is dated from December,

Page 230

1            - JAMES MANNING -
2    2017.
3        A.    Okay.
4        Q.    So the question is, do you know why
5    you, at that point in time, had not approved or
6    denied those claims?
7        A.    I -- I don't recall.
8        Q.    Okay.  Were you aware that the BDU
9    had made preliminary determinations of denial or
10   approval for those claims?
11       A.    I don't recall when I learned that,
12   but I understood that that was what the BDU did.
13       Q.    That they made preliminary
14   determinations of denial or approval?
15       A.    Yes.
16       Q.    And so who made the final decisions,
17   if their decisions were preliminary?
18       A.    Well, I guess the approval of the
19   Undersecretary apparently.
20       Q.    Okay, but I -- so did you approve or
21   deny claims based on the preliminary
22   determinations of the BDU?
23       A.    Talking about these ones that are
24   referenced here?  I, I -- I don't recall.
25       Q.    Okay.  How about any preliminary

Page 231

1            - JAMES MANNING -
2    determinations -- did you make, did you approve or
3    deny claims based on other claims, any other
4    claims for borrower defense based on the BDU
5    preliminary determination?
6            MR. MERRITT:  Objection, asked and
7        answered.
8            MR. JARAMILLO:  Well, I don't think
9        he answered.  He answered -
10           MR. MERRITT:  We've gone through
11       several -- sorry.
12           MR. JARAMILLO:  He answered about the
13       particular claims that are listed here and
14       I'm asking beyond that about any claims.
15           MR. MERRITT:  We've gone through this
16       several times what his memory of approving or
17       denying borrower defense claims during his
18       tenure but you can answer the question, Mr.
19       Manning.
20       A.    I don't recall.
21       Q.    You don't recall whether you approved
22   or denied any claims based on preliminary
23   determinations from the BDU?
24       A.    I -- I don't -- do not recall.
25       Q.    Okay.  Now, the last sentence on

Page 232

1            - JAMES MANNING -
2    this page that continues on to the next page, I'll
3    just read it and we can talk about it.
4        A.    Okay.
5        Q.    It says "According to the director of
6    BDU, FSA's former Deputy Chief Enforcement Officer
7    communicated to the BDU not to submit additional
8    claims for approval or to continue developing
9    memoranda on additional categories of claims that
10   qualify for discharge because the borrower defense
11   policies are being reviewed with the change in
12   administrations."
13           Now, I want to -- that's a long
14   sentence.  I want to just kind of ask you about
15   different pieces of it, if you don't mind.
16       A.    Sure, and to clarify that begins by
17   saying "According to the director of BDU, FSA's
18   former Deputy Chief Enforcement Officer
19   communicated to the BDU."
20       Q.    Yes, sir.  So let's -- do you know
21   who the director of BDU was at that time?
22       A.    And which dates are we talking about
23   there for that?
24       Q.    I'm talking about -- well, this
25   report was written in December, 2017 and I'll just

Page 233

1            - JAMES MANNING -
2    say that my understanding was it was Collin Nevin
3    was the director of BDU at that time; was that
4    your understanding?
5        A.    Well, Colleen was the director of --
6    of BDU after the gentleman left -- someone should
7    help me with that name -- and -- and Laura Kim was
8    -- was the top two folks and, yes, that's correct
9    that Colleen Nevin became direct -- was definitely
10   director of BDU.
11       Q.    Do you take the sentence to be
12   referring to Colleen Nevin when it says director
13   of BDU?
14       A.    If we -- reading it from the
15   assumption that this is as of, you know, December
16   8th then -- I just don't remember specifically
17   when she became the director of BDU.
18       Q.    Okay, and then it says "FSA's former
19   Deputy Chief Enforcement Officer communicated to
20   the BDU not to submit additional claims for
21   approval."
22       A.    Right.
23       Q.    Are you aware of that communication?
24   Were you aware of that communication when you were
25   at the Department?

Page 234

1                  - JAMES MANNING -
2       A.     I wasn't aware of it when it occurred
3  that former Deputy Chief Enforcement Officer
4  communicated to BDU not to submit additional
5  claims.
6       Q.     Did you ever become aware of that
7  communication?
8       A.     Apparently when I read this, I must
9  have become aware of it, but I skimmed over it.  I
10 don't recall but --
11      Q.     Did you direct FSA's former Deputy
12 Chief Enforcement Officer to communicate to BDU
13 not to submit additional claims for approval?
14      A.     I don't remember anything like that.
15      Q.     Do you --
16             MR. MERRITT:  Joe, we -- oh, sorry.
17             MR. JARAMILLO:  Go ahead.
18             MR. MERRITT:  I was going to say
19      we've gone for a little over an hour again.
20      We missed our break window, sometime soon.
21             MR. JARAMILLO:  All right.  Let's
22      unpack this sentence a little bit and then
23      we'll take our break.  I don't think it will
24      take that long.
25             THE WITNESS:  Sure.

Page 235

1                  - JAMES MANNING -
2             MR. JARAMILLO:  All right.
3       Q.     Do you have any idea who would have
4  made a decision to communicate to the BDU not to
5  submit additional claims for approval?
6       A.     I don't know.  I can't tell from
7  this.  I -- I read this and --
8       Q.     At this time, sir.  I'm just asking
9  for your memory.
10      A.     Well, I, I, I -- I know, but I read
11 this and the "FSA's former Deputy Chief
12 Enforcement Officer communicated to the BDU not to
13 submit additional claims."  According to the
14 director of BDU, FSA's former Deputy Chief
15 Enforcement Officer communicated to the BDU not to
16 submit additional claims for approval or to
17 continue developing memoranda."
18             It goes on, but the confusion for me
19 here is that former Deputy Chief Enforcement
20 Officer, I mean is -- is that Laura Kim?  Is that
21 who we're talking about, communicating to the --
22 the BDU to Colleen Nevin not to submit additional
23 claims?  On whose authority was that?  I don't
24 know.  I can't tell by reading this.
25      Q.     Those are precisely my questions, Mr.

Page 236

1  Manning.
2             So your answer is you don't know.
3  You're telling me that as you sit here today you
4  don't remember one way or another whether you
5  directed FSA to stop issuing decisions for
6  approval?
7       A.     I don't have any recollection of
8  relaying that information to the former Deputy
9  Chief Enforcement Officer to, to -- to relay; and
10 if I had I -- I expect that I would remember that,
11 but I have no recollection of doing anything like
12 that.  That's outside of a normal procedure.
13      Q.     Now, let's put aside the relaying
14 information.  I want to just back up because my
15 question really was focused on whether you
16 directed FSA to stop issuing decisions for
17 approval.
18      A.     I --
19      Q.     Did you?
20      A.     I don't recall doing that, no, but I
21 don't see that reference or inference being made
22 here.
23      Q.     I'm not asking for an inference.  I'm
24 kind of backing up for now because I don't want to

Page 237

1  get caught up in, in the -- you know -- in the
2  relay of information.
3             I just --- really just the important
4  part of this for my purposes is to know whether
5  you directed FSA to stop issuing decisions for
6  approval and your answer was you don't recall; is
7  that correct?
8       A.     I don't recall.
9       Q.     Could you have directed FSA to stop
10 issuing decisions for approval?
11      A.     When are we talking about, what date?
12 As what?
13      Q.     Any time -- any time in your tenure
14 as Acting Undersecretary, could you have directed
15 FSA to stop issuing decisions for approval?
16      A.     Well, would I have had the legal
17 authority?  I'm not -- it's not clear to me that I
18 would have to do that and would have done that.
19      Q.     It's not clear to you whether you had
20 the legal authority to do that?
21      A.     I would have to -- to consult with
22 the attorneys at OGC to be clear on that.
23      Q.     Did you ever direct that no more
24 decisions for borrower defense be issued?

Page 238

1            - JAMES MANNING -
2       A.    I have no recollection of ever saying
3  that.
4       Q.    Is that something that you would have
5  had the authority to do?
6       A.    As I said, I would want to check with
7  the OGC to confirm that before I made a statement
8  like that.
9       Q.    Did you ever check with OGC about
10  that issue?
11      A.    Not that I recall.
12      Q.    Did you ever check with anybody about
13  that issue of being able to direct that no more
14  decisions by borrower defense be issued?
15      A.    No, I don't remember.
16      Q.    And it's your testimony that within
17  the department, it's office-of-the-general-counsel
18  that would know whether or not you had the
19  authority to do something like that?
20      A.    I think checking with the attorneys
21  always a good thing to do at the Department of
22  Education when you have a question about lawful
23  authority.
24      Q.    Certainly Secretary DeVos would have
25  authority to issue such a decision, correct?

Page 239

1            - JAMES MANNING -
2       A.    I -- I expect that is correct.
3       Q.    Did the Secretary ever direct FSA
4  that no mire borrower defense decisions should be
5  issued?
6       A.    I never heard her say that.
7       Q.    Did you ever see any documents that
8  -- implying that she make such a decision?
9       A.    I never -- I don't recall seeing
10  anything like that.
11      Q.    Did anyone ever tell you that she had
12  made such a decision?
13      A.    I don't recall ever hearing that.
14      Q.    Did you ever hear Secretary DeVos
15  express an interest in stopping borrower defense
16  decisions?
17            MR. MERRITT:  Objection, vague.
18      Q.    Did you ever come to know that the
19  Secretary directed that no decisions on borrower
20  defense should be issued?
21      A.    I don't recall ever hearing that.
22      Q.    As you sit here today, you're not
23  aware of Secretary DeVos ever directing that no
24  borrower defense decisions be issued by the
25  Department?

Page 240

1            - JAMES MANNING -
2            MR. MERRITT:  Objection, asked and
3       answered.
4       Q.    You can answer, sir.
5       A.    I don't recall ever hearing Secretary
6  DeVos say that.
7       Q.    And you don't recall anybody ever
8  saying that Secretary DeVos issued such a
9  decision?
10      A.    That -- I don't recall that.
11      Q.    You don't have any awareness that she
12  issued such a decision?
13            MR. MERRITT:  Objection, asked and
14       answered several times.
15      Q.    Do you have any awareness, sir, as
16  you sit here today that she issued such a
17  decision?
18      A.    Awareness as I sit here today?
19      Q.    Yes, sir.
20      A.    Do you have a document here to show
21  me this and I can see --
22      Q.    I'm just asking whether you have any
23  awareness, you can tell me --
24      A.    No, I don't --
25      Q.    You can tell me --

Page 241

1            - JAMES MANNING -
2       A.    I don't have any awareness or
3  recollection.  No, do not.
4       Q.    Okay.  Now, let's turn back to the
5  bottom of Page 3.
6       A.    Do you mind, could I take two
7  minutes.
8            MR. JARAMILLO:  Oh, I'm sorry, you
9       had asked about that earlier.  We can go off
10       the record.
11            THE VIDEOGRAPHER:  Off the record.
12       The time is 22:09 UTC.
13            (Whereupon, there was a brief recess
14       in the proceedings.)
15            THE VIDEOGRAPHER:  We are now on the
16       record, the time is 22:22 UTC.
17      Q.    Mr. Manning, we were looking at Tab 3
18  which has been marked as Exhibit 3.  That's the
19  Inspector General's report and I think when we
20  left off, we were at the bottom of Page 3 of the
21  report and in a sentence that carried over to Page
22  4.
23      A.    Page 3 -- okay, at the bottom?
24      Q.    Or if you want to look at the top, it
25  would say Page 186 of 270.

Page 242

- JAMES MANNING -

1          - JAMES MANNING -
2      A.   No, I got it.  I got it.  I got it.
3      Q.   So that last sentence which is pretty
4  long and -- and pretty packed with information,
5  the second part of that, when it describes the
6  communication from FSA as -- that, you know,
7  according to the -- the director of BDU
8  communications to the BDU.
9      A.   Yeah.
10     Q.   The second part says -- basically
11 says that there was a communication not to
12 continue developing memoranda and additional
13 categories of claims that qualify for discharge
14 because the borrower defense policies are being
15 reviewed with the change in administration.
16          Were you aware of that particular
17 decision not to continue developing memoranda?
18     A.   Well, I -- I wasn't aware that the
19 chief enforcement officer had anything to
20 communicate period.
21     Q.   Okay.  So -- so you were not aware of
22 a communication not to develop legal memoranda?
23     A.   Not that way it's represented here,
24 "the former Deputy Chief Enforcement Officer
25 communicated to the BDU not to submit" -- I -- I

Page 243

1          - JAMES MANNING -
2  don't know whether -- I don't know whether the
3  former Deputy Chief Enforcement Officer would
4  accept that.
5      Q.   Were you aware of any decisions to
6  tell the BDU to stop developing memoranda and
7  additional categories of claims that qualify for
8  discharge?
9      A.   I -- I don't recall that.
10     Q.   Who in -- in your experience at the
11 Department of Education, who would be the person
12 at Department of Education that would make such a
13 decision to tell the BDU to stop developing
14 memoranda on additional categories of claims that
15 qualify for discharge?
16     A.   Well, I don't remember who would be
17 the correct person, perhaps what individual.
18 Potentially it could be the Undersecretary.  It
19 might be the COO at FSA.  It might be the Chief
20 Enforcement Officer relaying that after getting
21 direction from someone else.
22     Q.   After getting direction from someone
23 else?  Who else?
24     A.   Well, like -- like the COO or the
25 Undersecretary and --

Page 244

1          - JAMES MANNING -
2      Q.   Giving directions to the Chief
3  Enforcement Officer?
4      A.   In -- in terms of a chain of command
5  type of thing, that's the way I would have
6  recalled that.
7      Q.   Okay.  Are you aware if the COO of
8  FSA made the decision to -- to tell the B-- to
9  have the BDU stop developing memoranda?
10     A.   No.  I'm -- I'm not aware of that.
11     Q.   Are you aware of anyone issuing such
12 a decision?
13     A.   I'm sorry?
14     Q.   Are you aware of anyone making such a
15 decision?
16     A.   No, I don't -- I don't recall that.
17     Q.   Do you -- do you ever recall BDU
18 stopping their development of memoranda on
19 additional categories of claims that qualify for
20 discharge?
21     A.   I don't recall all that.
22     Q.   Let me turn to Page 193 of 270 in
23 this document, which is Tab 3 in Exhibit 3, that
24 Inspector General's report.
25     A.   Okay.

Page 245

1          - JAMES MANNING -
2      Q.   At the top of the page, the first
3  full sentence says; "FSA established seven
4  categories of borrower defense claims that
5  supported the cause of action under applicable
6  state law and thus qualified the borrowers for a
7  loan discharge."
8          Were you aware of these seven
9  categories when you worked at the Department?
10     A.   Well, let me take a look at them.
11          Okay.  This, this -- these are
12 familiar.  I don't recall specifically all the
13 detail, but when it says "FSA established seven
14 categories, who is FSA in that reference?
15     Q.   I'm not -- you know -- I'm not --
16 you're -- I'm the one asking the questions so --
17     A.   I'm sorry, but I'm reading this and
18 I, I -- I don't know what's meant by that so I --
19     Q.   Okay.  You don't know what's meant
20 FSA, Federal Student Aid?
21     A.   "FSA established seven categories."
22 Well, some -- I mean, there are human beings that,
23 you know, worked on that.  I -- I'm trying to, you
24 know, envision -- you know -- there -- there are
25 plenty of folks that work at FSA that are capable

Page 246

1              - JAMES MANNING -
2  of doing this, of writing this.
3              But, you know, it's like, as I
4  mentioned earlier, importance of chain of command
5  a few minutes ago, I would like to know who the
6  responsible people are and to be able to go to
7  them; and so I read this, I see "FSA established"
8  and my first question is okay, who do I talk to
9  there?
10      Q.    Who would you talk to?
11      A.    Well, I'd -- I'd start with, you
12  know, the -- the COO at FSA, an explanation as to
13  what this is, you know, and where did it come
14  from.
15      Q.    Because the leadership makes the
16  decisions, right?
17      MR. MERRITT:  Objection, overbroad.
18      Q.    You said human -- you want to talk to
19  a human being.  It's not an organization that
20  makes the decision; it's the human being, correct?
21      A.    Well, it's a human being of several
22  human beings in a group of human beings, but it's
23  -- it's ul -- ultimately you can identify folks
24  that were part of the, you know, conversation and
25  discussion and decision and good to know the

Page 247

1              - JAMES MANNING -
2  answer to who they are; so it's sufficient to say
3  they established.
4      Q.    Okay.  So for this particular
5  sentence, you would talk to -- you would start
6  with the COO who was A. Wayne Johnson at the time?
7      A.    Was the COO at the time this was
8  issued, yes.
9      Q.    You would start with Mr. Johnson,
10  right?
11      A.    Yes, but I'm also trying to figure
12  out when this particular act was supposed to have
13  taken place.
14      Q.    Okay, it's not -- it's really not
15  that important, so I'm going to have you put the
16  document down, if you will.
17      A.    Okay, it's down.
18      Q.    So your understanding of the borrower
19  defense review process, could the Borrower Defense
20  Unit adjudicate applications from borrowers whose
21  claims did not fall within the established
22  categories that support -- the claims that
23  supported a cause of action under applicable state
24  law?
25      A.    Re -- repeat the question.

Page 248

1              - JAMES MANNING -
2      Q.    Could the BDU adjudicate applications
3  from borrowers whose claims did not fall within
4  the categories of -- the seven categories?
5      MR. MERRITT:  Objection, ambiguous on
6  timing.
7      Q.    During your tenure at the Department.
8      A.    I -- I don't recall.
9      Q.    So to your recollection, was it
10  possible for the BDU to adjudicate claims that
11  involved pools that were not mentioned in these
12  seven categories?
13      A.    I -- I don't recall.
14      Q.    Do you know if during your tenure the
15  Department ever adopted any one of these seven
16  categories?
17      A.    They -- They look familiar, but I
18  can't, you know, state that they -- whether any of
19  them were specifically adopted.  I would need to
20  get more information.
21      Q.    Okay, and you -- and you looked
22  through the -- each of the seven categories as
23  they're described there, correct?
24      A.    Generally, yeah.  I mean job
25  placement (unintelligible) -- yes.  Yes, I looked

Page 249

1              - JAMES MANNING -
2  at them.
3      Q.    Okay.  And you -- and you saw that
4  each of these categories that describes the
5  particular document or memoranda with -- that that
6  provides the grounds for each of the categories?
7      A.    Well, yes, I can see that.  There are
8  -- as I look at this, there are more questions
9  that are raised I'd be asking yes.
10              Heald College transfer of credit rate
11  misrepresentation claims based on a May, 2015
12  memorandum.  Was that May, 2015 memorandum
13  superseded by a -- another action.
14      Q.    Do -- do you know?
15      A.    I believe it was, but I'm not -- I
16  don't -- can't say authoritatively that --
17      Q.    Okay, and why do you believe it was
18  superseded?
19      A.    I might be confusing it with
20  something else.
21      Q.    Would you agree that all of these
22  seven categories were established by memoranda
23  that were drafted during the prior administration;
24  prior to -- in other words, the Obama
25  Administration?

Page 250

```
1                  - JAMES MANNING -
2       A.    I, I -- I can't be sure that they
3   were all drafted during the Obama Administration.
4       I spent six years in the Obama
5   Administration. The -- questions in my mind are
6   raised about the ones that were based on the
7   January '17 memorandum.
8       Q.    Okay, the question is because January
9   1st through 19th was the Obama Administration and
10  January 20th afterwards was the Trump
11  Administration?
12      A.    Correct.
13      Q.    So in your mind, it's not clear to
14  you whether the memorandum reference that -- that
15  had a January, 2017 date were in -- which
16  administration they were in?
17      A.    Yes.
18      Q.    Okay.
19      A.    Is it clear to you?
20      Q.    I'm sorry?  Go ahead.
21      A.    Is it clear to you?
22      Q.    Well, I'm not -- you're not -- I'm
23  not answering the questions here today.  I just
24  want to know your knowledge.
25      So, I mean, I'll -- I'll represent to
```

Page 251

```
1                  - JAMES MANNING -
2   you that they were -- none of these were adopted
3   or, you know, drafted and put into effect during
4   -- during the Trump Administration.  They're all
5   from the Obama Administration.
6       Did the Trump Administration or the
7   Department during your tenure ever retract any of
8   these -- the memos for these categories?
9       A.    I don't know.
10      Q.    Are you aware of any memoranda
11  regarding borrower defense written during the
12  Trump Administration?
13      A.    Any -- any mem -- memoranda on
14  borrower defense written during Trump
15  Administration?
16      Q.    Yes.
17      A.    I can't specifically recall.  I would
18  expect there were things written.
19      Q.    Are you aware of any eligibility
20  categories beyond the seven listed here that were
21  created during the Trump Administration?
22      A.    I don't recall.
23      Q.    You don't know one way or the other
24  whether there were any additional categories
25  created?
```

Page 252

```
1                  - JAMES MANNING -
2       A.    I don't recall.
3       Q.    Okay.  Are you aware that in
4   November, 2017 COO Johnson of FSA prepared --
5   addressed to Christopher Gamble, Regional
6   Inspector General for Audit of the U.S. Department
7   of Education, a response to the draft review
8   report that we're looking at?
9       A.    Was I aware?  I -- I don't recall
10  that, but I expect that that was possible that
11  was -- that's correct, but I don't know with
12  certainty.
13      It was -- the report was addressed to
14  Wayne Johnson and it was asked that to send a
15  response to Gamble and apparently what you're
16  talking about is a letter that he sent, is that
17  right.  I haven't seen that letter --
18      Q.    All right.
19      A.    -- at least not recently.
20      Q.    Right.  Did you -- did you work with
21  Mr. Johnson on any such response?
22      A.    I -- I don't recall working with him
23  on that letter.  I might have seen it in -- in
24  drafts, but I don't recall that either.
25      Q.    I'll have you turn to Page 30 of this
```

Page 253

```
1                  - JAMES MANNING -
2   report or if you look at the top of Page 213 of
3   270 and the top of it says "Appendix C:  FSA
4   Comments."
5       A.    213 of 270, I got it.  Yeah, okay so
6   this is the document letter that you were talking
7   about.
8       Q.    Have you seen this before?
9       A.    I -- I don't know.  I'll take a look
10  at it and see if I can refresh my memory.
11      Q.    All right, fair enough.  I don't want
12  you to read it line by line, but if you could --
13      A.    I don't know whether I can say I saw
14  it or did not.
15      Q.    Yeah, there you go, Mr. Manning.  You
16  know, I'm trying to -- we don't want this to be a
17  basketball game, you know, with the last fifteen
18  seconds, you know --
19      A.    I have a ball if you want to play
20  though.
21      Q.    I see it, but let's take a look at
22  this and let me know if you've seen the Appendix C
23  document, FSA comments before.
24      Have you had a good enough glance,
25  Mr. Manning, to let us know whether you've seen
```

Page 254

1                  - JAMES MANNING -
2    this before?
3          A.     And the entire letter is just this
4    one page, right.
5          Q.     Well, no.  It's, it's -- I think
6    Appendix C goes on for several pages and I can --
7          A.     The Wayne Johnson letter is it -- was
8    all --
9          Q.     Oh, are you -- you're not looking at
10   Page 30 of the report.  You're now back to the
11   beginning of the report with the cover letter; is
12   that what you're doing, Mr. Manning?
13         A.     I'm looking at Page 30 --
14         Q.     Yes.
15         A.     -- of the report.  It's the November
16   29, 2017 memo from Wayne Johnson to Christopher
17   Gamble, SIG.
18         Q.     There you go.  So have you seen this
19   document before or does it look familiar?
20         A.     I don't recall seeing it before, but
21   I very well could have.
22         Q.     Okay.  Thank you.
23                I want to have you look at Page 31
24   and there's a Footnote 17.
25         A.     Yes.

Page 255

1                  - JAMES MANNING -
2          Q.     All right.  I'm just going to read it
3    and ask you about it --
4          A.     Go ahead.
5          Q.     -- to see if you know about it.
6    Footnote 17 says, "The Report suggests OIG
7    misunderstood the legal memoranda approval process
8    to require that OUS find any legal memorandum that
9    provided the legal framework to approve a
10   particular type of claim.  That was not the
11   process.  OUS's approval is found on the claim
12   'Approval Memos' not on the legal memoranda."
13                Are you aware of -- of any such claim
14   approval memos in which the Office of the
15   Undersecretary registered its approval?
16                MR. MERRITT:  Objection.  This is
17         beyond the scope of the court-ordered
18         discovery.
19                MR. JARAMILLO:  Are you instructing
20         him not to answer the question because this
21         is a pretty vague and ambiguous description
22         here and I would think he could give us some
23         clarity and it may, in fact, relate to why
24         there was a delay.
25                MR. MERRITT:  I would say that

Page 256

1                  - JAMES MANNING -
2    whether it's vague or ambiguous has nothing to do
3    with whether it would be relevant to
4    the topics the court ordered discovery on.
5                MR. JARAMILLO:  I think we need to,
6         to -- to explore this topic.
7                Are you going to instruct him not to
8         answer or let him answer it.
9                MR. MERRITT:  I'll just note, it's a
10        year before the delay began -- or, sorry, a
11        few months before the delay began.  I'm not
12        going to instruct him not to answer yet, but
13        I wanted to lay down a mark on this line of
14        questioning.
15               MR. JARAMILLO:  So he can answer the
16        question.
17               MR. MERRITT:  He can answer the
18        question.
19         Q.     Mr. Manning, this footnote refers to
20   a claim approval memo.  Are you aware of any such
21   document?
22         A.     I don't recall.
23         Q.     Are you aware of any approval from
24   OUS?
25         A.     Regarding what --

Page 257

1                  - JAMES MANNING -
2          Q.     Regarding borrower -- borrower
3    defense decisions during your tenure.
4          A.     So that question has nothing to do
5    with the 17th Footnote, is that correct?  I'm
6    confused.
7          Q.     Yeah, well, no.  I mean, listen, you
8    -- you don't know about the 17th Footnote so let's
9    put that in the past and I'm just asking you if
10   you're aware of any memo that OUS would issue
11   during your tenure at the Department that concerns
12   approval for a decision that had anything to do
13   with borrowers defense?
14         A.     I do not.
15         Q.     Okay.  If you could, turn to Page 33.
16   There's the heading that -- are you there, Mr.
17   Manning?
18         A.     I am.  Thank you.  Thantingview of
19   Claims" in the middle of that paragraph, I'm just
20   going to read it.  "However, BDU's proposed
21   protocols for addressing claims that are unique or
22   unsupported by existing legal memos were included
23   in the February 2017 'Borrower Defense Unit Claims
24   Review Protocol' document presented to the landing
25   team."

Page 258

1                - JAMES MANNING -
2            Does that refresh your recollection
3    about whether you, in your capacity on the landing
4    team, saw a Borrower Defense Unit Claims Review
5    Protocol?
6        A.    Well, they were included in the
7    February, 2017 Borrower Defense Unit Claims Review
8    Protocol.
9        Q.    I really just want to know if you saw
10   any such Borrower Defense Unit Claims --
11       A.    I don't recall, but I'm telling you
12   I'm also confused about what we're talking about
13   February, 2017, a document presented to the
14   landing team.  There was no landing team February,
15   '17.
16       Q.    Okay.  When did the landing team stop
17   its --
18       A.    Well, I, I -- who was the landing
19   team then?  Some of us were already -- we sat in
20   on the first and were -- I don't recall.
21            I'm, I'm, I'm -- I'm reading this
22   and it confused me and I -- presented to the
23   landing team --
24       Q.    I understand, Mr. Manning.  It sounds
25   like, to your recollection, by that time in

Page 259

1                - JAMES MANNING -
2    February, 2017 the landing team had stopped its
3    work and the new administration was in full swing?
4        A.    Well, yes.  Yes, that's my instinct,
5    but could it formally exist still with members
6    that were on the landing team that were -- I -- I
7    don't know, but in -- in principle there could
8    have been; but when we say it was presented to the
9    landing team, that doesn't tell me to who it was
10   presented and --
11       Q.    Okay, and if you look under Item 3,
12   "Processing of Claims Flagged for Denial" --
13       A.    Yes.
14       Q.    -- I'm just going to read it for you.
15   "The Report also cites as a weakness that 'BDU did
16   not have a process for closing out and issuing
17   decisions on borrower defense claims it flagged
18   for denial.'  As described above with respect to
19   the review of unique claims, no procedures had
20   been submitted to the previous administration for
21   approval and these claims were not being
22   processed.  In August OUS, OGC, and FSA agreed on
23   a procedure to deny claims."
24            Do you recall --
25       A.    August when, what year in August?

Page 260

1                - JAMES MANNING -
2        Q.    Well, sir, I'm going to -- because
3    this report was in December, 2017 I'm -- let's
4    assume -- let's just assume for purposes of the
5    question that this is talking about August, 2017.
6        A.    Okay.  I don't recall.
7        Q.    All right, you don't recall -- okay,
8    and you were act -- and just to be clear:  In
9    August of 2017 you were the acting Undersecretary,
10   correct?
11       A.    That's correct.
12       Q.    And would there be anyone else at OUS
13   that would agree with OGC and FSA on a procedure
14   to deny claims at that time?
15       A.    I don't think there would be anyone
16   else in the Office of the Undersecretary that
17   would have had that authority, no.
18       Q.    All right.  Only you would have had
19   that authority, correct?
20       A.    In OUS, correct.
21       Q.    All right.  Well, let me back up --
22   well, let me get through this document.
23       A.    I don't know if -- above it talks
24   about the -- I was just -- I guess I'm not
25   supposed to ask questions though, right?

Page 261

1                - JAMES MANNING -
2        Q.    Well, is there something you want to
3    say, Mr. Manning?
4        A.    Well, I'm just trying to be clear on
5    when things were done and the -- well, in the
6    paragraph above it -- it talks about the review
7    panel to make recommendations to the Secretary on
8    how to address defense claims.
9        Q.    Okay, Mr. Manning, let's move on.  If
10   we could go to Page 34 and just to kind of keep it
11   pointed, I'm just going to read to you the second
12   to the last sentence in the first paragraph of
13   that Page 34; and I'll just represent to you that
14   this is talking about that -- the review panel
15   that looked at borrower defense.
16       A.    Okay.
17       Q.    I'm just going to read it.  It says,
18   "The panel's work also laid the foundation to
19   approve new claims."
20            Are you aware of the Borrower Review
21   Defense Panel laying a foundation to approve new
22   claims?
23       A.    I don't have any specific
24   recollection, but that was kind of what we hoped
25   they would do and I don't -- I don't have any

Page 262

1              - JAMES MANNING -
2    specific recollection.
3       Q.    Who would know from the Borrower
4    Review Defense Panel about this issue of laying
5    the foundation to approving claims?
6       A.    Well, Joe Connolly was the convenor
7    of that panel.  He was then Acting Deputy
8    Secretary.  He might recall.  Phil Rosenfelt might
9    recall.  I'm not sure if Joe Schmoke -- Joe
10   Schmoke is still at the Department.
11      Q.    Okay.  If you could look in the same
12   page underneath "Recommendation 1," I'm just going
13   to read it.
14            "Request approval from the Acting
15   Undersecretary to resume the review, approval, and
16   discharge processes for claims qualifying under
17   the seven established categories, including claims
18   that have been flagged for approval.
19            We agree with this recommendation.
20   Pursuant to OUS' May 4th, 2017 memorandum to the
21   Secretary, OUS, and the Chief Financial Officer's
22   Internal Control's Unit, CFOICU are working with
23   FSA to 'develop interim procedures' to review
24   claims."
25            Do you recall, as Acting

Page 263

1              - JAMES MANNING -
2    Undersecretary, working with FSA to develop
3    interim procedures to review claims?
4       A.    Well, I would say this is to -- to
5    work on the establishment of the methodology.
6       Q.    So you think the interim procedures
7    just to review claims actually meant the
8    development of a relief methodology?
9            MR. MERRITT:  Objection, asked and
10           answered including when we discussed this
11           memorandum before.
12      Q.    You can answer the question.
13      A.    Well, let me take another look at it.
14   I'm getting a little tired and I have -- you know
15   -- to be careful reading.
16      Q.    Understood.
17      A.    Well, I can't say this was intended
18   to say what I -- what we're saying.
19            I will -- I will say that the -- that
20   some of the same -- some of the same people were
21   working on the -- the methodology, but this is
22   something outside of that so, no.
23      Q.    Was -- was this the development of
24   interim procedures to review claims pending the
25   development of a new methodology?

Page 264

1              - JAMES MANNING -
2       A.    I don't recall.
3       Q.    Do you recall anything about interim
4    procedures to review claims?
5       A.    I, I -- I don't recall, no.
6       Q.    Okay.  If we the look at
7    "Recommendation 2" on Page 34, I'm going to read
8    it.
9            "Request approval from the Acting
10   Undersecretary to resume consideration and
11   determination of whether additional categories of
12   claims with common facts qualifies for discharge.
13   We agree with this recommendation.  And with
14   respect to our response to Recommendation 1, we
15   will work with the CFOICU to strengthen BDU's
16   processes and protocols so the work on these
17   claims can proceed."
18            Do you recall receiving a request for
19   approval to resume consideration and determination
20   of whether additional categories of claims with
21   common facts qualify for discharge?
22      A.    I -- I don't recall.
23      Q.    Okay, and so you do recall that this
24   document we're looking at is from A. Wayne
25   Johnson, correct?  The particular response to

Page 265

1              - JAMES MANNING -
2    Christopher Gamble from A. Wayne Johnson; is that
3    correct?
4       A.    The -- the response, the letter is
5    from Wayne Johnson.
6       Q.    And that -- that's what we're looking
7    at here.  Page 34, do you understand that this was
8    part of Mr. Johnson's response?
9       A.    No, I'm -- no.
10      Q.    You don't understand that, Mr.
11   Manning?  What do you think -- as it says, Mr.
12   Manning, there is a recommendation in bold and
13   then there's a response.  Who do you think drafted
14   the response?
15      A.    I don't know -- confused myself.  It
16   is from Wayne Johnson, you're right.
17      Q.    Okay, and Wayne Johnson agreed with
18   this recommendation, correct, approval should be
19   requested from you; is that right?
20      A.    On which question?
21      Q.    "Recommendation 2:  Request approval
22   from the acting Undersecretary to resume
23   consideration and determination of whether
24   additional categories of claims with common facts
25   qualify for discharge."

Page 266

- JAMES MANNING -

2        The response listed here says "We
3  agree with this recommendation?"
4        Doesn't that signal to you, Mr.
5  Manning, that Mr. Johnson is acting -- as COO of
6  FSA is agreeing to request approval from you to
7  "resume consideration and determination of whether
8  additional categories of claims with common facts
9  qualify for discharge"?
10       A.    I don't recall receiving anything
11  from Wayne specific to this.
12       Q.    Okay.  Do you recall receiving
13  anything from anybody specific to this?
14       A.    No, I don't recall.
15       Q.    If can look at Footnote Number 21 at
16  the bottom of this Page 34.  I'm just going to
17  read it.  "We want to clarify statement in the
18  Report regarding the pause in submitting claims
19  for approval and in developing additional
20  memoranda for new categories of claims that
21  qualify for discharge.  Although the Report
22  suggests that the Deputy Chief Enforcement Officer
23  made a decision to stay this work, we wanted to
24  clarify that the Deputy Chief Enforcement Officer
25  actually just communicated to the Director of BDU

Page 267

- JAMES MANNING -

2  the guidance and direction provided by OUS and the
3  Review Panel."
4        So does that refresh your
5  recollection about whether or not OUS provided
6  guidance and direction to the BDU to pause
7  submitting claims for approval?
8        A.    The direction provided by OUS to the
9  Review Panel.
10       Q.    And does that refresh your
11  recollection about providing the guidance and
12  direction?
13       A.    No, it doesn't.
14       Q.    Okay.  What about providing direction
15  for the development of additional memorandum for
16  new categories of claims that qualify for
17  discharge, does that refresh your recollection
18  that the pause --
19       A.    I don't recall that either.  Sorry.
20       Q.    Borrower defense was part of your
21  portfolio in your tenure at the Department as
22  Acting Undersecretary, right?
23       A.    It was housed at FSA, but OUS oversaw
24  all of higher education so, yes, borrower defense
25  is under it.

Page 268

- JAMES MANNING -

2        Q.    And is it your understanding that
3  borrower defense is a matter of policy?
4        A.    Borrower de -- borrower defense is a
5  matter of policy?
6        Q.    Is that your understanding?
7        A.    I -- I'm not sure that I -- I
8  understand what you mean when you say that.
9        Q.    Was the Department's policy during
10  your tenure at Department of Education to
11  implement a -- to have a program for borrowers to
12  discharge their federal student loans based on
13  borrower defense to repayment policies?
14       A.    Yes.
15       Q.    And -- and how was that a matter of
16  policy?
17       A.    I -- I don't understand where you're
18  coming from on that.
19       Q.    That's okay.  Earlier we did have a
20  discussion, if you'll recall, that the Office of
21  the Undersecretary was involved in the policy end
22  in -- in creating policy and FSA was involved in
23  standard operating procedures and implementing
24  policy; is that correct?
25       A.    Generally, and -- but they -- the

Page 269

- JAMES MANNING -

2  Office of the Undersecretary during my tenure --
3  I'm trying to remember how many staff people were
4  there; two or three, the Secretary, young intern.
5  The policy work that it would move forward through
6  involving, you know, other members, including the
7  Office of Postsecondary Education, FSA, the other
8  -- those higher education organizations within
9  FSA.
10       Q.    And, and -- and who was in charge of
11  the borrower defense policy at the Department?
12       A.    I think it was shared responsibility.
13       Q.    Okay.  Who -- who shared the
14  responsibility?
15       A.    All the people that were part of the
16  borrower defense review team.
17       Q.    Anybody else?
18       A.    Well, the head of -- the Acting
19  Deputy Secretary.  Generally those people.
20       Q.    Well, the borrower defense review
21  team, wouldn't they be part of FSA in -- involved
22  in implementing policy rather than establishing
23  and creating policy?
24            MR. MERRITT:  Objection, misstatement
25       of prior testimony.

Page 270

- JAMES MANNING -

1
2      Q.    Would the Borrower Defense Unit be in
3  charge of creating borrower defense policy or
4  would that come from somewhere else in the
5  Department?
6      A.    The Borrower Defense Unit at FSA?
7      Q.    Yes.
8      A.    Would they be in charge of developing
9  policy?
10     Q.    Correct.
11     A.    Without oversight?
12     Q.    Sure, let's start there.  I mean, I'm
13  -- I think I have an idea what the answer is, but
14  I want to hear it from you.
15     A.    No, they didn't develop their own
16  policy.
17     Q.    Okay.  Who developed their policy
18  with regard to borrower defense?
19     A.    I don't recall all the participants
20  who were involved.
21     Q.    Okay.
22         MR. MERRITT:  (Unintelligible
23     crosstalk)  the witness mentioned he was
24     tired, so I mean  we can go off the record if
25     you want to, but I just want to ask for a

Page 271

- JAMES MANNING -

1
2      time check and maybe a break.
3         MR. JARAMILLO:  Let's -- let's -- I
4     mean, if you don't mind, just a couple more
5     questions on this topic and then we can do
6     that.  If that -- unless -- Mr. Manning, are
7     you requesting a break right now or can you
8     bear with a couple more annoying questions?
9         MR. MERRITT:  Okay.
10         THE WITNESS:  You're just doing your
11     job.  How -- how much longer are we going to
12     go?
13         MR. JARAMILLO:  Well, I have a few
14     more questions on this topic and then we
15     might not have that much time left, but with
16     the time left I do have some other things I
17     wanted to cover relatively quickly.
18         THE WITNESS:  Go ahead.  What were
19     you saying?
20         MR. JARAMILLO:  So can I ask you a
21     few more questions or do you want to take a
22     break now?
23         THE WITNESS:  Well, let's power
24     through it because I --
25         MR. JARAMILLO:  All right.  Let me

Page 272

- JAMES MANNING -

1
2      ask you a few more questions and then we'll
3  take the break and then we'll get a time
4  check and wrap up.
5         THE VIDEOGRAPHER:  The time --
6         THE WITNESS:  You know what, if we're
7     going to do it that way, let me go ahead and
8     just take a -- a break now and let's get back
9     and finish it up.
10         MR. JARAMILLO:  Okay, fine.  Off the
11     record.
12         THE WITNESS:  Thank you.
13         THE VIDEOGRAPHER:  And the time is
14     23:09 UTC.
15         (Whereupon, there was a brief recess
16     in the proceedings.)
17         THE VIDEOGRAPHER:  We're now on the
18     record.  The time is 23:17 UTC.
19     Q.    So, Mr. Manning, we were talking
20  about pol -- policy decisions at the Department
21  regarding borrower discharge and I would like to
22  know:  If there was a policy to delay issuing
23  borrower defense decisions for an extended period
24  of time, who is the person responsible in the
25  Department for making such a decision or who would

Page 273

- JAMES MANNING -

1
2      be, to your experience?  Who?
3      A.    I'm thinking.  I just -- you know --
4  who would be the person responsible for
5  recommending a decision like that?
6      Q.    And for making a decision like that.
7      A.    Well, responsible or have the
8  authority or -- I mean --
9      Q.    Okay, let's -- who would have the
10  authority to make a decision like that?
11     A.    Well, it depends on what the policy
12  is you're talking about.
13         Are you talking about real policy or
14  policy changes, then that was the purpose of us
15  reopening the negotiated rulemaking in November,
16  2017.
17     Q.    Okay, let's -- I don't want to talk
18  about the administrative policy that required, you
19  know, publication and notice.
20         I want to talk about an internal
21  Department policy about how to handle borrower
22  discharge claims and specifically a policy or
23  decision that would call for not reviewing -- I
24  mean, strike that -- not issuing decisions on
25  borrower defense claims.

Page 274

1                    - JAMES MANNING -
2       A.    I don't -- I don't know that there's
3  an individual that is responsible for that.
4             Certainly the -- and -- and I don't
5  recall discussions around that particular issue
6  or --
7       Q.    And if there's not one individual,
8  would it be a group of individuals at the
9  Department responsible for making a decision on
10 pausing the issuance of borrower defense decisions
11 for a certain time period?
12      A.    There was no group that was
13 responsible for that.  I don't know --
14      Q.    Was there a group responsible for
15 making such policy decisions about borrower
16 defense?
17      A.    You're talking about decisions on
18 delays and I don't recall.
19      Q.    You don't recall -- you're saying you
20 don't recall delays, but if there were and -- and
21 if there was a decision to delay issuance of
22 approvals and denials of these claims, where would
23 that authority lie within the Department to make
24 such a decision?
25            MR. MERRITT:  Objection.

Page 275

1                    - JAMES MANNING -
2       Q.    Do you know, Mr. Manning, or you just
3  don't know?
4       A.    Oh, oh.  Well, yeah, I'm -- I -- I'm
5  not sure.
6       Q.    Let's say, for example, that there
7  was a decision-maker at the Department that said
8  we -- we ought to hold off on issuing borrower
9  defense decisions until we work out how we're
10 going to measure relief.  Who would make such a
11 decision, to your knowledge, at the Department?
12      A.    Hold off on decisions until we
13 have -- I -- I don't know if there's an individual
14 that is responsible for --
15      Q.    Okay.  Who -- is there a group of
16 individuals responsible?
17      A.    I -- I don't recall who was involved
18 in conversations around that issue.  Again, I
19 don't recall any conversation about that issue.
20      Q.    That's not my question.  I'm asking
21 if you're aware of any group of individuals at the
22 Department that would be involved in making such a
23 decision if it were to be made, to your knowledge?
24      A.    Well, I mean there are any number of
25 folks.  It would be Undersecretary, the -- the

Page 276

1                    - JAMES MANNING -
2  COO, the Deputy Secretary.  I mean, the -- the
3  Assistant Secretary of Postsecondary Education.
4  It's just making this up.  I -- I don't know.
5             I -- I suppose the, you know, the
6  borrower defense panel, the -- the review team put
7  together.  My anticipation was that a group would
8  come up with ideas in terms of how to move
9  forward.
10      Q.    Right, and somebody had to approve
11 these ideas in order to move forward, correct?
12            MR. MERRITT:  Can we get a time
13 check?
14      Q.    You can answer the question, Mr.
15 Manning, and then we'll do the time check.
16      A.    I mean, I don't have to approve some
17 recommendations that could have gone to the
18 Undersecretary's approval.
19      Q.    Didn't -- didn't that group make --
20            MR. MERRITT:  That's -- that's it.
21 Let me -- let's check the time.
22            THE VIDEOGRAPHER:  We just hit seven
23 hours after that.
24            MR. MERRITT:  You said we just hit
25 seven hours?

Page 277

1                    - JAMES MANNING -
2            THE VIDEOGRAPHER:  Yes.
3            MR. JARAMILLO:  Okay.  Mr. Merritt,
4  with your indulgence I just want to have one
5  -- have him just look at one document and
6  then authenticate it, if possible.
7            MR. MERRITT:  We're at seven hours.
8  I'm not gonna -- I think it's over.
9            MR. JARAMILLO:  Okay.  Do you have
10 any questions for the witness?
11            MR. MERRITT:  I do not.
12            MR. JARAMILLO:  Okay.  Mr. Manning, I
13 want to thank you for your time today.  I
14 know you voluntarily appeared here and we
15 appreciate that.
16            And you want the witness to read and
17 sign, Mr. Merritt?
18            MR. MERRITT:  Yes, thank you.  I
19 would like that.
20            MR. JARAMILLO:  I think we're done.
21            THE VIDEOGRAPHER:  We are off the
22 record and this concludes today's testimony
23 given by Jim Manning at 23:25 UTC.
24            (Whereupon, the deposition concluded
25 at 6:25 p.m.)

Page 278

A C K N O W L E D G E M E N T

STATE OF NEW YORK        )
                         ) ss.
COUNTY OF NEW YORK       )

     I, JAMES MANNING, hereby certify that I have

read the transcript of my testimony taken under

oath in my deposition of December 17, 2020; that

the transcript is a true, complete and correct

record of my testimony, and that the answers on

the record as given by me are true and correct.

     _____

          JAMES MANNING

Subscribed and sworn

to before me on this the

_____ day of _____, 2020.

Notary Public, State of New York

Page 279

C E R T I F I C A T E

STATE OF NEW YORK        )
                         ) ss.
COUNTY OF NEW YORK       )

     I, HOPE LYNN MENAKER, a Notary Public within

and for the State of New York, do hereby certify:

     That JAMES MANNING, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by the witness.

     I further certify that I am not related to

any of the parties to this action by blood or

marriage, and that I am in no way interested in

the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 22nd day of December, 2020.

     _____

          HOPE LYNN MENAKER

Page 280

INDEX

WITNESS:  JAMES MANNING

EXAMINATION BY                              PAGE

     MR. JARAMILLO                            7

INSTRUCTED NOT TO ANSWER                    PAGE

And what specifically did he recommend
with respect to the -- with the relief
methodology?                                 52

And did you ever consult in connection
with the Penn Hill Group after leaving
the Department of Education?                147
Have you done any work after leaving the
administration related to the discharge
of student loans?                           148
Have you done any the work on behalf of
institutions of higher education as in
your -- in your consulting work after
leaving the Trump Administration?           148

Does your work at President Forum,
Mr. Manning, involve any discharge
of federal student loans?                   150

EXHIBITS FOR IDENTIFICATION

NUMBER      DESCRIPTION                     PAGE

Exhibit 31   Tab 1                           28

Exhibit 32   Tab 2                           28

Page 281

NUMBER      DESCRIPTION                     PAGE

Exhibit 33   Tab 7                          111

Exhibit 34   Tab 12                         151

Exhibit 35   Tab 5                          206

                                                              Page 282

1
2                              ERRATA SHEET
        THERESA SWEET, ET AL. V. ELISABETH DEVOS, ET AL.
3                 DATE OF DECEMBER 17, 2020
                         JAMES MANNING
4
        PAGE/LINE(S)/    CHANGE            REASON
5       ____/_____/_____/_____
        ____/_____/_____/_____
6       ____/_____/_____/_____
        ____/_____/_____/_____
7       ____/_____/_____/_____
        ____/_____/_____/_____
8       ____/_____/_____/_____
        ____/_____/_____/_____
9       ____/_____/_____/_____
        ____/_____/_____/_____
10      ____/_____/_____/_____
        ____/_____/_____/_____
11      ____/_____/_____/_____
        ____/_____/_____/_____
12      ____/_____/_____/_____
13      _____          _____
        Date                Signature
14
15
16
17
18
19
20
21
22
23
24
25

---

### Exhibits

**EX 0031 James Manning 12
1720**  27:25 28:6 280:22
**EX 0032 James Manning 12
1720**  28:5,8 29:19,20 280:23
**EX 0033 James Manning 12
1720**  111:21,22 165:13
  176:17 281:3
**EX 0034 James Manning 12
1720**  151:2 182:11 189:9
  281:4
**EX 0035 James Manning 12
1720**  205:21 206:5,6 210:10
  281:5

---

### $

**$200**  66:8

---

### --

**--in**  121:7

---

### 1

**1**  5:10 12:8,10,17,19 26:20,
  21 28:21 87:19 151:7,24
  225:9 262:12 264:14
**10**  106:6 151:25 152:21
  204:20 211:6 212:8
**10,000**  107:17,20 108:3
  183:8
**100,00**  183:7
**100,000**  114:23 115:3,9
  182:14 183:4
**105,998**  103:3,9,24
**11**  66:21 73:13 140:4,9,11
  151:21 152:9
**118**  205:25 206:12
**12**  18:10 113:12 125:2,6
  136:2 142:12 150:23 182:9
  189:8
**12/23/19**  206:12
**12th**  112:20
**13**  111:25 155:7 189:12
**133**  207:18 210:11
**134**  212:14

**135**  213:13
**137**  205:25 206:12 207:18
  212:14 213:13
**13th**  166:20 178:12
**14**  107:15 158:2 182:23
  189:10
**14:36**  5:14
**14:38**  6:22 7:7
**14th**  106:25 107:10 109:10
  110:18 157:2
**15**  107:7,12,15 193:7
**158,000**  167:12
**15:08**  27:12
**15:11**  27:16
**15:35**  38:22
**15:52**  39:2
**16**  124:25 135:25 136:8,12
  138:3 142:12 164:7
**16,000**  54:16 65:19 66:7
  68:19 70:15 72:25 90:15
  157:3 209:11
**16:53**  75:6
**17**  5:13 7:9 32:3,22 72:16
  79:16 80:13 81:5,6 141:3
  153:25 164:8 173:16,18
  177:21 223:23 250:7 254:24
  255:6 258:15
**179,377**  103:19
**179.377**  103:25
**17:07**  75:11
**17:56**  104:24
**17th**  257:5,8
**18**  35:12 39:24 80:13 100:3
  116:20 158:5 189:16 223:23
**18-month**  64:9 65:11 191:13
**182**  220:23
**186**  224:25 225:4 241:25
**18:33**  105:4
**19**  99:11 100:4 165:21,25
  177:10,19 181:19 220:2
**193**  244:22
**1970**  32:20
**1975**  15:14
**1977**  16:2
**1978**  15:14 16:2
**1983**  14:10
**19:12**  134:8
**19:23**  134:12
**19th**  41:2 44:9 193:7 250:9

**1:00**  105:2
**1:30**  105:2
**1have**  165:12
**1st**  21:16,17 250:9
**1were**  196:10

---

### 2

**2**  21:9 26:18 27:18 28:11
  29:6 33:2,10 37:20 87:23
  193:23 264:7 265:21
**20**  19:5 32:17 45:25 112:9,
  14 172:2 177:11,13,14,20
  178:9,17 225:13,24 227:5,
  17
**20006**  7:13
**2001**  7:12
**2015**  145:6 249:11,12
**2016**  40:23 152:12 163:25
  164:3
**2017**  19:5 32:2,10,16,20
  33:8 34:17,22,23 35:5 39:20
  40:8,15 41:2 45:25 46:18
  48:5 73:11 74:11 77:18
  90:14 107:16 140:3 155:3
  156:6 157:2,7,8 159:22
  164:2,4,5 172:2 177:10,11,
  13,14,19,25 178:9,15,17
  181:19 182:2,13,23 187:23
  189:10 208:12,14 214:3
  220:12,13,24 225:13,21,22,
  24 226:5,9,11,19,25 227:5,
  17,18 229:16,17 230:2
  232:25 250:15 252:4 254:16
  257:23 258:7,13 259:2
  260:3,5,9 262:20 273:16
**2017-2018**  151:7
**2018**  18:10 21:17 22:3 33:9,
  14 35:7,16 39:13,15,21,25
  40:2 65:12 72:19 98:22
  99:7,11,12,16,23 100:15
  103:2,6,7,25 104:8 107:16
  109:6,9,22,25 110:16,23
  111:6 112:20 113:3,6,13
  116:4 125:23 127:14,25
  128:10 133:8,11 138:14
  142:5,13 143:5,10 167:13
  170:10,15,24 171:24
**2019**  33:14 39:11,16 98:23
  99:8,13,16,23 100:16
  103:17,20 104:2,9 106:25
  107:10 109:11 110:3,18,24

111:10,25 112:15 113:7
125:5 133:13 145:8 166:20
169:21 170:18 171:5,7,25
177:22 178:13,16 181:25
**2020** 5:13 7:9 193:7
**20:36** 187:6
**20:53** 187:10
**20th** 32:20 40:15 177:25
200:17 225:21 226:5,24
228:6 250:10
**21** 106:8,11 125:5 176:22
266:15
**213** 253:2,5
**22** 12:9,10
**22:09** 241:12
**22:22** 241:16
**23:09** 272:14
**23:17** 272:18
**23:25** 277:23
**24** 105:19
**24th** 113:3
**270** 220:23 224:25 225:5
241:25 244:22 253:3,5
**28** 113:7
**29** 254:16

---

### 3

**3** 32:4,6 164:13 202:22
219:20,21,22 220:2 241:5,
17,18,20,23 244:23 259:11
**30** 208:11,13 216:14 221:25
252:25 254:10,13
**30th** 103:2,6,7,25 104:8
**31** 27:25 28:6 225:22 227:5
254:23
**31st** 103:17,20 104:2,9
177:22 226:25
**32** 28:5,8 29:20
**33** 111:21,22 165:13 176:17
257:15
**34** 150:25 151:2 182:11
189:9 261:10,13 264:7
265:7 266:16
**35** 205:21 206:5,6 210:10
**3:19-cv-03674-wha** 206:11
**3rd** 145:6

---

### 4

**4** 69:9 73:14 167:13 201:13
227:17 241:22
**48** 112:6,9 165:25 176:22
**4th** 39:11 73:11 77:18 90:14
140:3 141:3 262:20

---

### 5

**5** 33:2 152:24 204:17 205:20
206:5
**50** 23:15
**50,000** 109:15
**55** 106:4
**57** 82:25

---

### 6

**6** 125:18 136:2 138:4,7
142:11 155:10
**60,000** 214:4,12
**64** 107:14
**65** 109:2,20 155:15
**66-3** 205:24 206:11
**67** 82:25 106:3
**6:25** 277:25

---

### 7

**7** 66:23,24 67:4 73:12,14
111:17,19 140:5 151:25
165:13 176:17
**73,000** 104:8
**7th** 32:20

---

### 8

**8** 151:17,25 152:8 220:12,
13,24
**81** 15:9
**82** 15:9
**83** 15:8
**8th** 221:15 223:20 233:16

---

### 9

**9** 151:25 201:13,15,20

---

206:22
**90** 5:19 194:25
**95,000** 155:14 182:12,24
183:22,23

---

### A

**ability** 105:20,22 173:9
**absolutely** 52:16 118:21
123:12 188:11 194:20
197:13,22 200:25 213:23
215:15
**accept** 243:4
**acceptable** 10:6 71:11
**accepted** 50:8
**account** 27:6 63:8
**accuracy** 19:22 104:3
**accurate** 21:25 29:18
103:12,20 107:4 158:9
**accurately** 29:9 104:4
150:19
**acknowledge** 6:4,8
**act** 59:12 228:4 247:12
260:8
**acted** 99:22
**acting** 32:23 33:6,12,24
34:2,5,7,13 35:15 36:6,15
39:9,14,18 40:2,3,7 47:22,
24 48:17 75:23 78:5 83:17,
18,21 108:3,11 114:15
131:17 143:8 163:13 180:5
183:19 188:19 189:5 209:14
222:10 227:22 228:2,4,13,
17,18,21,24 229:13,23
237:15 260:9 262:7,14,25
264:9 265:22 266:5 267:22
269:18
**action** 5:21 15:21 49:22
54:25 55:2,6,12,13 56:14,23
66:12,15,18 68:17 69:17
70:10 124:3,5 139:17 186:6
216:13 217:10,14 218:7
224:17,18 245:5 247:23
249:13
**actions** 54:11 74:10 209:9
**active** 84:2 177:10
**actively** 108:8
**activities** 41:22,24 84:3
**activity** 112:12 177:5
**actual** 28:15 65:9 66:9 67:6
205:19

ad 209:2 216:24
added 162:6 163:19
adding 181:12
addition 18:22 139:10
  162:15
additional 87:17 88:15
  102:24 109:4,11,21 111:4
  154:8,18,23 161:7,11,14,16
  162:6,16,19,25 169:25
  172:24 178:2,10,19,25
  179:5,8 181:3 182:6 207:8
  232:7,9 233:20 234:4,13
  235:5,13,16,22 242:12
  243:7,14 244:19 251:24
  264:11,20 265:24 266:8,19
  267:15
Additionally 107:15
address 59:3 166:13 170:20
  171:12 172:12,17 181:4,14
  182:4 218:9 261:8
addressed 252:5,13
addressing 257:21
adequate 186:10
adjudicate 154:7,17,22
  158:7 159:23 160:4 199:10
  247:20 248:2,10
adjudicated 85:7 109:16
  181:16
adjudicating 87:19 109:7,14
  156:3,19
adjudication 54:12 87:16
  160:25
adjustments 156:2 159:3
admin 87:2
adminis 59:21
administered 6:9
administration 23:19 34:3,4,
  15 36:7,16 38:6 39:4,19
  41:17 44:3 45:3 46:18 48:6
  54:4,5,10,25 55:13 59:2,7,
  17 61:17 63:7,19 64:20
  65:21 70:11 83:22 88:13
  98:12 100:20 102:12
  148:11,20 150:7,11,21
  157:4 173:11 174:11,13
  180:23 181:12,22 185:13
  198:13 199:4 200:24 208:18
  209:5,10 214:9,11 242:15
  249:23,25 250:3,5,9,11,16
  251:4,5,6,12,15,21 259:3,20
administration's 62:2 209:9

administrations 145:23
  198:22 232:12
administrative 273:18
admitted 106:8
adopted 74:2,8 248:15,19
  251:2
Adult 78:10
advantage 187:2
advice 209:3
advise 123:10
advising 216:25
advisor 32:9,14,19 34:18
  40:9,14,18 76:8 208:22
  209:18,19,20,22
advisors 76:10 177:9
advisory 209:2
advocate 189:18,21,25
  191:23 192:5 194:14,18
advocates 190:23 194:9
af 144:4
affected 92:4,6,14,25 173:9
affecting 95:12 115:9
affects 105:22
afterward 168:25 223:8
agency 64:12 146:21,22
  149:12 193:9,14
agent 14:22
agree 6:18 95:22 133:19
  182:2 218:10 226:19 249:21
  260:13 262:19 264:13 266:3
agreed 41:12 145:17 161:21
  259:22 265:17
agreeing 266:6
agreement 5:6 6:14,15 8:10
  9:3
agrees 6:20
ahead 15:7 38:9 53:10 68:22
  71:14 75:2 80:14 81:3 98:17
  127:3 141:7 159:6,7 175:20,
  21 182:19 191:2 195:19
  226:16 234:17 250:20 255:4
  271:18 272:7
Aid 19:4,13 33:11 35:8
  245:20
Aid's 220:7,9
allegations 100:9
allege 100:10
allocated 177:4
allowed 84:5

Alsup 149:8 192:21
alternative 125:24 127:14
  128:11
alternatives 58:10
ambiguous 73:8 97:2,13
  248:5 255:21 256:2
amount 49:14 164:23 214:8
analysis 167:8,14,15 177:8
and/or 5:7
announced 174:5
announcement 175:8
  177:12 180:21
announcements 174:10
  178:4 180:20
annoying 271:8
answering 37:5 120:6
  168:18 180:12 250:23
answers 8:19 9:21 10:3
  36:21 121:11 126:24 165:17
  168:24
anticipation 276:7
anymore 83:2 171:20
apologize 82:9 119:7 136:7,
  14 200:8
apparent 191:20
apparently 179:2 181:21
  230:19 234:8 252:15
appeared 277:14
appearing 7:25 13:21
appears 32:24 33:2 111:11
  125:3 165:23 221:20
Appendix 253:3,22 254:6
applicable 152:15 245:5
  247:23
applicants 60:10,21 114:23
  195:21 198:8
application 86:23 91:12,15,
  22 112:20 113:3,12 127:20
  197:24 202:18 203:9
applications 46:10,20 63:18
  64:3,8,21 65:18,25 70:15
  71:7,9 85:8 86:20 88:2,20,
  22 89:5,12 90:13 92:11
  99:9,17,20 100:2,11,15,19
  101:3 103:4,9 104:14
  107:18,20 108:3,9,19 109:7,
  12,14,15 110:15 111:5
  115:10 117:16,22 121:19
  125:21 126:2,3 127:11
  128:8 129:5 133:20 136:2,
  16 137:10 138:5 142:11

164:25 168:8 169:17 170:21
171:13 181:5,15 186:17
191:6,12 192:9,17 195:25
196:21,24 197:4 247:20
248:2
applied  86:21 92:12 118:8
apply  74:18 118:6
appointment  32:19
appreciative  94:17
approach  22:19 49:24,25
50:11,21 59:13 60:16,17
61:17 62:2
approached  54:6 59:18
145:15 185:11
appropriately  197:24 216:3
approval  54:22 55:8 65:25
89:24 93:9 133:22 141:14
155:19 156:6,12 210:10
227:20 229:10 230:10,14,18
232:8 233:21 234:13 235:5,
16 236:7,18 237:7,11,16
255:7,11,12,14,15 256:20,
23 257:12 259:21 262:14,
15,18 264:9,19 265:18,21
266:6,19 267:7 276:18
approvals  112:13 123:22
125:21 128:18 129:19 130:3
131:2 134:22 138:14 140:17
142:6,14 157:2,6,11 207:22
212:21 274:22
approve  65:18 88:21,23
89:4 90:14 91:6 212:6
227:22 229:19,21 230:20
231:2 255:9 261:19,21
276:10,16
approved  56:24 65:20
69:14,17 72:25 91:13 99:10,
14,22 112:16,20 113:12
156:15,16 157:4 211:24
228:3 229:14,24 230:5
231:21
approving  87:25 88:3 90:12
113:15 231:16 262:5
approximate  16:22 157:3
approximately  15:25 23:15
54:16 65:19 68:19 72:25
90:14 116:20 155:14 182:12
approximation  31:7
April  18:10 32:3,13,16,22
33:8 34:6,18 39:20 40:8,15
228:10,11,12,14 229:16

area  34:25
areas  154:4,10
argumentative  116:7
arm  94:21
arrangement  6:12
arrived  55:2 224:21
arrow  210:16,18 211:19
arrows  210:25
asks  89:24 112:22
assert  46:5 194:15
asserting  195:11
assess  155:25
assesses  152:15
assessment  164:23 165:2,4
assigned  133:3
assistant  219:8 228:21
276:3
assisting  168:18
assume  11:25 183:2 260:4
assuming  8:14 104:5 169:21
224:16
assumption  233:15
ATA  149:10 193:21
attached  18:21,23 21:4 30:3
31:9
attaches  30:23 31:12
attachments  21:2,3 27:2
attended  64:22
attention  54:17 102:24
108:14
attest  188:10 213:23
attesting  19:22
attorney  119:20 170:17,25
172:6 183:8 201:3 228:23
attorney-client  5:8
attorneys  6:3 7:18 10:11
48:13 49:12 75:17 105:12
119:21 129:13 164:12
170:14 181:2,3,12 182:3
183:3,7,22,23 196:12,19
237:23 238:20
attorneys'  177:9
audible  9:21
audit  219:9 252:6
Auditorium  23:12
Auer  25:9 131:10 132:4
223:14
August  79:17 125:5 259:22,
25 260:5,9

authenticate  277:6
author  67:18
authored  67:19 140:2
authoritatively  47:5 173:17
213:23 249:16
authority  55:3 58:13 93:12
94:10 120:11,14,21 121:22
122:2,7,9,24 123:8,14,20,25
124:4 138:24 235:23
237:18,21 238:5,19,23,25
260:17,19 273:8,10 274:23
authorization  55:16 73:16
108:5
authorize  54:22 73:6 108:2,
11 192:13
authorized  54:13 55:19
63:11,25 64:5 66:12 107:17
108:20 144:24 146:14 147:9
148:23 149:5,14 191:7
193:5 194:6
authorizes  108:18
authorizing  44:19 68:19
107:19
Avenue  7:12
avenues  224:12
average  53:14
awarded  60:20 62:20
awarding  59:15
aware  5:3 25:2 26:9 46:18
74:21 82:7,11,16,18 86:9
92:15,24 96:4,9,11,21 97:5,
16,20 98:2,10,24 99:2,8,13,
17 100:5,8,14,17,18 101:2
102:8,25 111:14 113:14,17
122:13 138:15 157:6 163:23
169:13 170:3 176:3 180:16,
21 185:25 197:25 198:6
199:5,8 201:6 212:4,21
213:2 216:12 217:9 230:8
233:23,24 234:2,6,9 239:23
242:16,18,21 243:5 244:7,
10,11,14 245:8 251:10,19
252:3,9 255:13 256:20,23
257:10 261:20 275:21
awareness  101:8 240:11,15,
18,23 241:2
awkward  11:6 82:20

---

**B**

---

B--  244:8

**back** 10:25 11:2 18:16,17
28:14 30:2 31:13 33:19 38:9
44:22,24 47:10 51:8 53:25
75:12,22 91:19 105:13
120:23 121:9 127:5 129:25
138:3 143:19 145:15 151:24
165:12 176:17 185:10 187:9
189:7 210:3 218:18,19
219:11 221:17 222:6 224:22
229:2 236:15 241:4 254:10
260:21 272:8
**background** 26:16 63:17
68:12 223:25
**backing** 236:25
**backlog** 101:2,8 164:24
166:13 167:11 169:25
170:20 171:12 181:4,14,24
182:4
**backwards** 39:10
**balance** 59:23 60:4,19 62:9
**balancing** 60:2
**ball** 253:19
**Barnard** 23:12
**base** 158:12 204:12
**based** 103:17 110:22 143:3
192:15 193:4 219:14 227:20
229:12 230:21 231:3,4,22
249:11 250:6 268:12
**basically** 28:25 181:2
242:10
**basketball** 253:17
**Bates** 202:17 213:6
**BD** 25:21 125:21 126:2
127:11 136:2 138:5 142:11
169:17 189:9 202:18 203:9
227:15
**BDTR** 25:22,23
**BDU** 87:11 92:21 109:6
162:16,19,25 163:14 171:2,
14 183:20,25 184:24 185:12
186:2,7 188:8,13 189:3
225:24 226:8 227:18 229:6
230:8,12,22 231:4,23 232:6,
7,17,19,21 233:3,6,10,13,
17,20 234:4,12 235:4,12,14,
15,22 242:7,8,25 243:6,13
244:9,17 248:2,10 259:15
266:25 267:6
**BDU's** 257:20 264:15
**bear** 200:8 271:8
**Bearing** 193:13

**began** 34:25 39:20 41:19
65:12 256:10,11
**begin** 223:11
**beginning** 39:15 60:25
105:13 146:4 151:12,21
152:9,23 158:5 173:10,15
199:18 227:4 228:17 254:11
**begins** 189:16 232:16
**behalf** 5:18,24 148:17
**beings** 245:22 246:22
**belabor** 134:15
**belief** 156:10 199:6
**believed** 156:8,15
**beneficial** 156:4
**BERMAN** 13:3,7 26:23
**bias** 149:3 195:8,20
**bigger** 48:11
**Bill** 42:19,20
**billion** 66:8
**bit** 18:17 54:2 75:22 134:16
167:5 168:22 234:22
**black** 216:9
**blank** 129:21
**block** 36:8
**board** 62:10
**Bob** 43:20,22 77:2
**bold** 265:12
**bor** 59:23 60:3
**borrower** 19:3,12 24:9
25:16,20,23 42:25 44:14
45:4,10,17 46:4,5,9,19
47:17 48:7,15,19,24 49:20
50:2 52:23 53:17,19 54:6
59:14 60:3,10,21 61:11
62:4,24 64:2,7 68:5,20 69:5,
7 71:4,5,6,20 72:5,24 74:2,
4,8,10 76:15,21,24 77:21
78:18,19,23 79:15 81:22
83:8,12,16,21 84:7,15,20,23
85:6,8,10,17,21,22 86:10,22
87:4,12 88:2,5,6,20,22 89:4,
11,18 90:8,12,19,22,24
91:2,12,22 92:4,9,15,21,25
95:13,15,19,24,25 96:6,12,
17,18,21,24 97:6,8,10,11,
16,17,21 98:3,13,24 99:4,9,
13,17,25 100:11,15,19
102:2 103:3 108:7 109:12,
13 110:15 111:5 112:13,16,
19,23 113:2,5,11,15,20
114:5,10,22 116:2 117:5,16

119:24 121:18 122:16
123:22 124:8,11,17,22
125:4 126:2 127:24 128:8,
14,22 129:5,18 133:10,20
134:17,21 137:9 144:14,20
150:9,14 151:5 152:11
153:7 155:4 160:20 161:5,
11,17 162:6,10 163:24
164:25 166:13 167:11 168:8
170:10,21 171:12 172:25
176:13 177:5,8,20,23 178:3,
11,20 179:8 180:2,22 181:4,
13,14 182:22 183:6 186:11,
17 187:12,17 188:4,20
189:4,17,21,24 190:23
191:5,11,23 192:4,9,17
194:9,14,17,18 195:2,6,21,
25 196:23 198:4,9,24 199:5,
9,10 200:12 201:5 202:2
204:24 205:8 206:21 207:22
209:3,8,23 212:4,7,15
213:15 214:4 219:15 220:7,
9,17 222:22 224:2 225:9
227:2,6,9,11,14 231:4,17
232:10 237:25 238:14
239:4,15,19,24 242:14
245:4 247:18,19 251:11,14
257:2,23 258:4,7,10 259:17
261:15,20 262:3 267:20,24
268:3,4,13 269:11,16,20
270:2,3,6,18 272:21,23
273:21,25 274:10,15 275:8
276:6
**borrower's** 115:24 121:5
**borrowers** 19:4,13 50:7
58:20 59:23 61:2 62:17,20
63:20 65:19 69:2 72:6 73:23
89:19,21,22 92:7 98:25 99:5
101:3 102:10 109:5,12,22,
25 110:15,23 111:5 113:6
115:9 194:15 195:9 212:22
225:23 245:6 247:20 248:3
257:13 268:11
**Borrowers'** 201:23
**Boston** 15:13,22 16:8
**bottom** 69:21 112:11 129:17
166:5,8,11 222:8 241:5,20,
23 266:16
**box** 211:19
**boxes** 208:8
**brain** 167:4
**break** 11:14,16 36:20 37:22
38:11 74:24 75:3,13,16

101:12 104:20,25 105:6,10
127:4 133:25 186:20,23
234:20,23 271:2,7,22 272:3,
8
**breaks** 11:13
**briefed** 66:2 124:2 196:2
**briefing** 124:5 196:4
**briefly** 75:17 105:12,13
106:18
**bring** 48:3
**broad** 5:19 84:21 193:15
**broadly** 192:23 193:19
**brought** 48:12 187:20
**Brown** 25:11 133:7,14,17
144:4,10,13,14
**building** 154:4
**bullet** 126:7 127:10 128:7
138:13 140:16 142:12,21
143:25
**business** 7:14 225:22
226:25 227:5,14

**C**

**cadre** 78:13
**calendar** 143:14
**call** 17:19,21 41:7 139:19
157:18 196:19 273:23
**called** 7:8 28:22 42:3
**calling** 57:12
**calls** 52:6 56:4 57:5,13
60:12 91:8 113:22 117:7
163:3 181:6 186:13 217:17,
22
**Calvillo** 19:24 24:7 52:25
53:15 117:18,22 118:9,14,
24 119:12,17 128:22 129:6
**camera** 7:3 18:13,19
**capable** 245:25
**capacity** 35:6 258:3
**captures** 31:12
**career** 26:15 31:3 34:20 36:2
51:5 78:10 146:2,4 153:2
**careful** 263:15
**carefully** 29:12 58:14
192:20,21 197:11
**carried** 241:21
**carries** 9:13
**Carter** 145:25 174:16

**case** 7:19 8:2 9:20 14:17
15:4,20,25 16:4 19:25 20:4,
11,13,15,19 24:4,7,13,19
25:3 50:10 52:25 53:15
73:12 100:6,9 113:6 117:18
118:2,9,14,15,24 119:2,5,12
120:10 140:5 149:10,14
166:22 193:21 194:5 205:24
206:10,13 207:17 218:24
222:19
**cases** 15:11,17,18,19 16:10
209:11 213:6
**categories** 198:3,12 232:9
242:13 243:7,14 244:19
245:4,9,14,21 247:22 248:4,
12,16,22 249:4,6,22 251:8,
20,24 262:17 264:11,20
265:24 266:8,20 267:16
**category** 118:5 198:7
**caught** 237:2
**caused** 64:8 113:19 114:9
156:20
**causing** 105:25 191:21
**CCI** 118:25 119:3,6,10,13
125:22 127:13 128:9 213:17
214:4
**certainty** 252:12
**CFO's** 69:3 73:6,19,24 74:13
**CFOICU** 262:22 264:15
**CFOS'** 74:6
**chain** 79:24 115:24 244:2
246:4
**chance** 28:10 171:17
**change** 59:16 88:11 94:20
156:11 232:11 242:15
**charge** 84:7,15,19 85:15
87:8 269:10 270:3,8
**charged** 51:7
**Charlie** 6:19 10:10 17:17,19,
21 133:25 205:16
**chart** 170:8 207:21 208:3,4,
11 210:10,13 212:17 213:19
214:2,3 225:9
**charts** 208:6 212:21,23
213:2,22
**check** 105:18 238:6,9,12
271:2 272:4 276:13,15,21
**check-in** 81:9
**checked** 69:13
**checking** 238:20

**chief** 33:12,24 34:2,5,7,14,
21 35:2,3,4 77:2 133:4
187:21,25 232:6,18 233:19
234:3,12 235:11,14,19
236:10 242:19,24 243:3,19
244:2 262:21 266:22,24
**chiefs** 77:4
**choices** 137:24
**Christie** 41:10
**Christopher** 252:5 254:16
265:2
**chronological** 34:11
**circulated** 198:21
**cites** 259:15
**civil** 15:21
**claim** 50:7 56:18 58:17
85:10 86:7 112:16,24
152:15 160:25 197:12
202:19 203:10 212:7
255:10,11,13 256:20
**claimants** 153:6,14
**claimed** 34:7 114:24
**claims** 50:22 54:6,13,16
63:20 68:12,14,20 69:5
73:7,25 74:7,15 85:14,17
87:19 88:5 96:18,24 97:8,
12,17,21 98:3,14 99:14
113:16 118:5 119:7 122:16
128:12 152:14 153:5,13,21
154:5,8,18,23 155:4,14,20
156:3,7,14,19 157:3 158:7
159:23 160:4 167:11 176:14
177:9 182:12,14,25 183:4,7,
8,23,24 187:17 189:4,19
194:19,20,22 195:3,6,12
198:3,7,12,14,16 199:10
201:23 202:2 204:24 205:8
206:22 207:22 212:7,15
213:15 214:4,8 225:23
226:2,8 227:2,6,10,17,19,23
228:3 229:7,14,20,25 230:6,
10,21 231:3,4,13,14,17,22
232:8,9 233:20 234:5,13
235:5,13,16,23 242:13
243:7,14 244:19 245:4
247:21,22 248:3,10 249:11
257:19,21,23 258:4,7,10
259:12,17,19,21,23 260:14
261:8,19,22 262:5,16,17,24
263:3,7,24 264:4,12,17,20
265:24 266:8,18,20 267:7,
16 273:22,25 274:22

clarification 151:23
clarify 39:17 75:18 105:15
    123:4 205:15 206:4 232:16
    266:17,24
clarity 28:17 39:8 255:23
class 64:13 118:8 119:5
    193:9
classify 142:7,17
clear 10:3,23 38:3 76:22
    95:23 118:20,21 121:15
    123:5,12,18 167:10 191:19
    204:4 226:14,15 237:18,20,
    23 250:13,19,21 260:8
    261:4
client 147:13
clients 146:10,16
Clinton 146:2
close 31:7 101:12
closely 94:15 188:2
closing 259:16
code 5:14
Colleen 16:17 20:25 25:7
    44:4,5,10 49:10 79:11,13
    80:20 81:2 83:6,8 84:3,7,12
    106:9 110:17 117:13 131:23
    132:2,4,13 133:12 161:14,
    16 164:12 165:5 172:19
    179:19 183:20 184:20,23
    197:22 233:5,9,12 235:22
Colleen's 165:6
College 249:10
Collin 233:2
Columbia 14:16
command 115:25 175:17
    244:4 246:4
commensurate 62:3
comment 69:20
commented 219:4
comments 128:5 206:24
    221:21 253:4,23
commitment 197:15,18
commits 152:16
committed 197:13,23
committee 22:4 67:20,21
    151:7 152:19 182:23 189:10
common 264:12,21 265:24
    266:8
communicate 8:11 83:5
    216:5 234:12 235:4 242:20
communicated 95:11,14
    132:7,8,11 180:3 215:21

232:7,19 233:19 234:4
    235:12,15 242:25 266:25
communicating 95:18
    183:19 235:21
communication 8:22 66:18
    95:23 96:5 214:23 224:12
    233:23,24 234:7 242:6,11,
    22
communications 20:6 77:7,
    20 83:8 117:20 216:23
    242:8
compel 64:16
compels 193:11
complainant 16:5
complete 152:2 170:5
completed 168:5
completely 173:23
concern 102:6,20 104:16
    154:4,10 172:13 186:2
concerned 102:9 172:7,9
concerns 104:18 161:25
    257:11
concluded 277:24
concludes 277:22
concrete 186:6
conduct 169:24
conducted 167:8,14 199:17
confidence 84:4,17
confident 155:25
confirm 8:6 205:22 238:7
confused 121:8 257:6
    258:12,22 265:15
confusing 249:19
confusion 235:18
connection 144:12 148:2
Connolly 47:25 48:17 68:9,
    10 228:16 262:6
consent 6:12
consideration 61:3 62:19,22
    71:11 86:2,6,24,25 90:6
    122:12 264:10,19 265:23
    266:7
considerations 62:23 63:2,4
considered 61:9 86:4
    196:14,16
consisting 68:8,10 153:2
consult 147:25 184:15,17
    237:22
consultant 147:3

consultation 123:6 139:11
consulted 158:14
consulting 145:20 146:8
    147:19 148:19
contacted 41:9
contained 30:17
content 195:25
contents 202:7
contest 11:13
continue 148:24 152:14
    183:12 226:19 232:8 235:17
    242:12,17
continued 109:13 225:22,24
    227:2,6,15,18
continues 232:2
continuing 77:15 229:6
contract 167:10
contracting 167:16 170:15
contractor 163:23 168:6
    169:15 170:17 171:2
contributed 154:7,17,22
    191:12
Control 69:3 73:6,19,24
    74:6,13 210:19
Control's 262:22
controls 153:4,10,12,16,20
controversial 192:2
convenor 262:6
conversation 23:4,7 56:16
    60:24 94:19 117:25 162:3
    173:4 215:3 246:24 275:19
conversations 5:5,7 58:9
    144:19 150:13,21 161:13
    172:19,20 179:18 275:18
COO 35:12,15 36:6,15 39:9,
    12,14 40:3 77:15 80:11,12
    83:25 143:11 144:4,11,13
    180:4,7 183:18 187:20,23
    188:18 189:5 216:24 219:9
    243:19,24 244:7 246:12
    247:6,7 252:4 266:5 276:2
coordinates 174:15
copies 222:23
copy 215:8 222:12,15
Corinthian 155:15 159:24
corner 125:16 202:22 222:9
correct 10:13 13:22 33:13,
    15,17,21 35:21 46:2 52:11
    53:16 59:18,19 65:3,22,23
    69:11 78:6 79:20 93:5 95:15
    104:6 106:17 107:25 108:24

110:20,21 111:11 115:2,4,5,
18 118:11 119:8 122:20,21
123:14 124:5,6 136:8 143:6,
9,12,14 144:7,10 172:5
179:3 186:3,7 208:18,22,23
213:14 220:14 233:8 237:8
238:25 239:2 243:17 246:20
248:23 250:12 252:11 257:5
260:10,11,19,20 264:25
265:3,18 268:24 270:10
276:11

**corrective** 216:13 217:10,14
218:7 224:17,18

**correctly** 62:6,17 119:8
169:11

**correspondence** 93:20
215:14 221:19

**cost** 61:12

**counsel** 5:12 6:12 8:15,19
10:8 16:15,19 17:15 20:4,7
22:10,16 54:19 63:12 66:4
121:24 122:4 123:7,10
124:2 130:22

**counsel's** 19:20 22:25 123:4
130:15,18

**couple** 36:24 37:10,14 48:9
49:12 121:10 151:23 187:24
271:4,8

**court** 9:14,17 14:4,11,24
15:11,13,18,19,20 16:7,8
20:15 44:19,23 46:16 52:21,
24 53:13 55:19 58:23 59:10
63:11,24 64:5,11,14 65:11
67:5 72:19 144:23 147:8
148:8,15,23 149:5 150:5
166:7 183:15 190:20 191:7,
17 192:13,15 193:5 194:6
201:21 204:14,22 220:5,23
225:2 256:4

**court's** 53:13 63:23 65:6

**court-authorized** 150:3

**court-ordered** 175:24
191:10 216:17 255:17

**cover** 88:20 151:24 219:7
254:11 271:17

**create** 26:5 27:5

**created** 251:21,25

**creating** 268:22 269:23
270:3

**creation** 19:7

**credibility** 149:3

**credit** 198:15 225:25 227:16
249:10

**criteria** 185:7,8 198:8

**cross** 120:2

**crosstalk** 145:4 149:18
192:12 223:4 270:23

**curious** 168:21

**current** 51:24 94:18 119:2

**cut** 13:13

---

# D

**D.C.** 7:13

**date** 13:18 21:12,15 28:25
72:20 106:23 107:4 109:9
110:16 155:19 171:3 177:15
178:8 220:11,13 226:5
237:12 250:15

**dated** 13:17 229:25

**dates** 16:22,23 33:13,18
37:11 40:13 232:22

**day** 23:10 46:21,22 47:12
106:25 164:14 211:15

**days** 16:24 34:24 208:17
216:14

**DBU** 162:10

**de** 268:4

**dealt** 84:2

**decades** 48:10

**December** 5:13 7:9 19:5
107:16 220:12,13,24 221:15
223:20 229:17,25 232:25
233:15 260:3

**decide** 197:7

**decided** 144:18 157:5 197:5

**decided/recommended**
50:20

**deciding** 62:17

**decision** 56:8,13 57:20 58:5
71:18,23,24 90:14 91:5,7,21
116:3 117:5,15,21 119:24
120:9,15,22 121:2,4,18,23
122:7,10,14,19,22,25 123:8,
20 124:10,17,18,19,21
128:23 129:18 130:2,25
132:6 133:15 134:19,21
135:7,14,16 136:16 137:18
138:16,18,20,25 139:7,12,
20,23 140:15,23 141:11,15
142:5,13,16,21,22 143:2,4,
16,24 235:4 238:25 239:8,

12 240:9,12,17 242:17
243:13 244:8,12,15 246:20,
25 257:12 266:23 272:25
273:5,6,10,23 274:9,21,24
275:11,23

**decision-maker** 275:7

**decision-making** 123:14
199:21

**decisions** 49:19 53:20 54:12
71:6,19 72:24 85:24 86:3
88:9 89:18 90:23,25 92:13
93:10,18 96:18,24 97:8,11,
17,20 98:13,24 99:4,25
102:2,10,21 109:4,11,21,24
110:14,22 111:4,15 113:5,
21 114:5,11,23 116:5,18,19
117:6,16 121:5,18 122:11
127:25 128:15,21 129:4
133:11,20 134:18,20 135:18
137:9 138:13 139:14,15
141:19 155:5 186:11
196:20,25 199:2 204:12
230:16,17 236:6,17 237:6,
11,16,25 238:14 239:4,16,
19,24 243:5 246:16 257:3
259:17 272:20,23 273:24
274:10,15,17 275:9,12

**declaration** 13:14 16:16
17:25 18:4,12,20,23 19:16
20:24,25 21:9 106:9,15,24
107:8,12 109:10 110:17
118:14 133:13

**declarations** 16:16

**declare** 6:10

**defense** 6:20 19:3,12 24:10
25:16,20,23 42:25 44:14
45:5,10,18 46:4,6,10,20
47:18 48:7,15,19,24 49:20
52:23 53:18,19 54:6 59:14
60:10,21 63:20 64:3,7 68:5,
20 69:5,8 71:4,5,6,20 72:24
74:2,4,8,10 76:15,21,24
77:21 78:18,19,23 81:22
83:9,12,16,21 84:8,15,20,23
85:6,8,17,21,22 86:10,15,22
87:4,12 88:2,5,7,20,22 89:5,
11,18 90:8,13,19,22,24
91:2,22 92:4,9,15,22,25
95:13,15,19,25 96:6,12,17,
18,22,24 97:6,8,10,12,16,
17,21 98:3,13,24 99:4,9,14,
17 100:2,11,15,19 101:3
102:2,10 103:4 108:7

109:12,13 110:15 111:5
112:13,16,19,23 113:5,12,
16,20 114:5,10,23 115:24
116:2 117:6,16 119:24
121:5,19 122:16 123:22
124:8,11,17,22 125:4 126:3
127:24 128:8,14,22 129:5,
18 133:11,20 134:18,22
137:10 144:15,20 150:9,14
152:12 153:8 155:4 160:20
161:5,12,17 162:7,10
163:24 164:25 166:13
167:11 168:8 170:10,21
171:13 172:25 176:13
177:5,20,23 178:3,11,20
179:9 180:2,22 181:5,13,15
183:7 186:11,17 187:13,17
188:4,21 189:4,18,21,24
190:23 191:5,12,23 192:5,9,
17 194:9,14,18 195:3,6,21,
25 196:23 198:4,9,24 199:5,
9,10 200:12 201:5,23 202:2
204:24 205:8 206:21 207:22
209:3,8,23 212:5,7,15,22
213:15 214:4,22 219:15
220:7,9,18 222:22 224:2
225:10,23 227:2,6,9,11,14
231:4,17 232:10 237:25
238:14 239:4,15,20,24
242:14 245:4 247:19
251:11,14 257:3,13,23
258:4,7,10 259:17 261:8,15,
21 262:4 267:20,24 268:3,4,
13 269:11,16,20 270:2,3,6,
18 272:23 273:25 274:10,16
275:9 276:6
**defense's** 85:10
**Defenses** 151:6 182:22
**defer** 38:13
**define** 194:22
**defined** 192:14,15
**definition** 146:17
**Defrauded** 19:4,13
**delay** 53:18 63:17 64:9,14,
24 65:11 100:14,18 128:18
155:4 186:10,16 191:13,21
192:8 196:24 255:24
256:10,11 272:22 274:21
**delayed** 100:11 152:13
**delaying** 193:10
**delays** 100:22 274:18,20
**delegated** 93:13 133:3 219:3

**deliberative** 52:6 57:5,14
60:12
**delivered** 159:3 215:6
**demonstrate** 197:14,18
**demonstrates** 134:18
**denial** 64:18 107:17,20
108:2,12,18 192:18 194:25
197:11 227:20 229:10
230:9,14 259:12
**denial.'** 259:18
**denials** 108:6 112:13 123:22
129:19 130:3 131:2 134:22
138:12,14 140:16,17 142:6,
13,14 157:14 212:14,21
274:22
**denied** 64:21 99:18 112:23
113:3 162:20,21,22 189:19
194:19,21 227:22 228:3
229:14,24 230:6 231:22
**Denise** 174:16
**deny** 88:21,23 89:11 91:6
229:19 230:21 231:3 259:23
260:14
**denying** 88:2,3 113:15
204:13 231:17
**department** 10:10 14:23,24
19:9 20:5 22:15 23:13 26:16
33:12 34:23 35:8 38:5 39:5,
11 40:4 41:18,21,25 42:11,
12 44:2,11 46:9 47:15 51:5,
22 55:2 56:22 58:24 59:22
60:15 62:3 72:23 78:24
81:22 82:14 84:8,16,22
85:11,15,18 87:2 88:12
90:21 91:23 93:4 94:11
95:3,10,14 98:2,8,11,12,23
99:8,14,24 100:9,10,20
101:4,24,25 102:10,21
103:3,18 107:10 110:3,24
111:10 112:15,23 113:15,19
114:4,10,16,21 115:22
116:18 122:4,20 123:19
124:12 125:10 128:20
129:2,8,24 132:22 133:18,
22 134:24 135:6,8 136:19
137:8,14 139:21 141:18
142:24 143:5 144:5,21
145:5,8 147:4 148:3 150:8,
14 151:5 152:13 153:3
157:7 158:6 159:21 160:3
162:20,22 164:22 166:21,24
167:8 168:4,24 169:14,23
170:4,8,16 171:8,20,21

172:2 173:9 174:18 175:13,
18 176:6,7,9 177:13,14,22
178:3,18 180:11,19 181:11
183:6 185:13,20 186:12
187:13,18 195:2 197:17,21
198:2 200:24 201:3 208:17
216:12 218:16 219:12
220:17 221:18 222:6,17
223:7,19,22 224:15 233:25
238:17,21 239:25 243:11,12
245:9 248:7,15 251:7 252:6
257:11 262:10 267:21
268:10 269:11 270:5
272:20,25 273:21 274:9,23
275:7,11,22
**Department's** 53:19 268:9
**depending** 77:3 132:21
211:14
**depends** 142:2 273:11
**deposed** 24:23 25:2
**deposition** 5:11 6:4,6,7 8:4,
12 9:5 10:9,13,17 12:12,20
13:10,17,19,22,24 16:14
20:23 22:12,17,19,21 23:25
24:19 25:7 28:2,16,23 29:2
66:23 106:9,16 117:14
221:9 223:15 277:24
**depositions** 25:5 132:5
**deputy** 47:24 48:17 77:8,9,
10 164:10 223:2 228:17
232:6,18 233:19 234:3,11
235:11,14,19 236:9 242:24
243:3 262:7 266:22,24
269:19 276:2
**describe** 167:13
**describes** 192:4 242:5 249:4
**description** 255:21
**designated** 175:16
**desire** 160:14
**desk** 138:10 210:17 211:23
**desks** 211:3
**detail** 30:4,20 211:17 245:13
**determination** 66:3 87:9,13,
23 231:5 264:11,19 265:23
266:7
**determinations** 51:9 227:20
229:10 230:9,14,22 231:2,
23
**determined** 65:17 86:5,22
**develop** 51:3 242:22 262:23
263:2 270:15

**developed** 118:25 128:12
217:10,14 270:17
**developing** 50:21 216:13
232:8 235:17 242:12,17
243:6,13 244:9 266:19
270:8
**development** 92:3 244:18
263:8,23,25 267:15
**developments** 20:15
**device** 8:12
**devices** 8:22
**Devos** 5:16 23:20 68:18
69:12 77:19,21 100:6 112:2
121:17 122:7 123:13,20
140:4 157:5 172:21,23
173:5 176:19 180:18 238:24
239:14,23 240:6,8
**Devos'** 19:25 112:17,25
165:17 166:15 167:4
**Devos's** 177:17
**diamond** 211:3,5,19
**Diane** 16:17 20:24 25:9
39:21,22 77:5 131:10 132:4
223:14
**differently** 185:12
**difficult** 196:6,8 197:7
**difficulty** 64:2,7 191:5,11,14
192:8,16 196:23
**diligence** 55:11
**direct** 68:25 69:3 73:19,22,
24 74:6 233:9 234:11
237:24 238:13 239:3
**directed** 74:14 93:21 236:6,
17 237:6,10,15 239:19
**directing** 239:23
**direction** 75:21 243:21,22
267:2,6,8,12,14
**directions** 244:2
**directives** 94:9
**directly** 78:11 80:8,20 81:2
83:5 84:2,16 85:21 89:17
115:25 120:6 192:5,6
223:10 227:10,14
**director** 43:10,12 77:16
78:25 79:15,20,22,25 86:12,
15,17 183:20 186:2 232:5,
17,21 233:3,5,10,12,17
235:14 242:7 266:25
**disagree** 149:8 218:11
226:20

**disapproval** 141:14
**discharge** 19:3,12 46:4
49:24 54:14 56:20 57:19
66:7 68:19,25 73:22 91:24
147:20 148:11 149:24 157:5
195:22 198:4,9 220:10
232:10 242:13 243:8,15
244:20 245:7 262:16
264:12,21 265:25 266:9,21
267:17 268:12 272:21
273:22
**discharged** 55:4,5 56:19
65:21 70:16,19,22,24 115:2
209:11
**discharges** 25:16 55:7
**discharging** 66:10 91:14,15
153:6,13,21
**discontinued** 109:6
**discovery** 44:19 46:16 55:19
63:10,25 64:6,16 65:8
144:23 146:13 147:8 148:9,
16,23 149:5,7,12,14 150:3
175:24 190:20 191:7,10
192:14,22 193:5,12,14,18
194:6 216:17 255:18 256:4
**discretion** 152:17
**discuss** 20:20 38:8 76:15
166:21
**discussed** 63:4 76:21 123:3
144:19 153:8 161:14,18
169:20 184:19,22 263:10
**discussing** 25:15 76:23
188:7,13 220:16
**discussion** 27:13 38:23
49:23 50:19 53:4 54:23
58:10,18 72:2 138:17 139:3,
6 158:13 193:3 246:25
268:20
**discussions** 20:3,17,18 48:2
58:15 144:8,14,16 150:8
161:6 176:11 187:12 188:3,
6,19,22 209:13 274:5
**disfavored** 193:14
**displeasure** 69:21 70:4
**dissatisfied** 160:16
**District** 14:16 15:13 16:8
**divide** 183:9
**division** 183:9
**document** 12:17,21,23
28:11,18,20,22 29:3,19,22
30:9,14,18 31:22,23 32:5
33:3 35:25 37:20 66:9,15

67:7 69:16,24 70:3,14 73:9,
10 74:20 89:23 93:23
108:15 111:25 116:25
118:18 122:14 125:11
126:11 127:12 128:4
135:12,24 139:22 140:22
141:2,5,9,12 142:20,24
143:24 150:24 151:4,9,14,
23 152:2 166:7 175:7 178:9
182:18 202:6,11,14,21
203:12 205:4,17,19,24
206:9,11,19,20 207:2,9,17
213:5 224:22 225:2 229:3
240:20 244:23 247:16 249:5
253:6,23 254:19 256:21
257:24 258:13 260:22
264:24 277:5
**documentation** 127:22
178:12 201:4,6,10
**documents** 11:23,25 12:5,8,
13 13:4 20:20,21 21:4,6
22:6 26:19 30:22 66:22
106:7 126:22 133:10 199:25
216:2 239:7
**dogmatic** 190:16,18
**double-check** 121:25
**doubt** 111:12 127:23
**draft** 19:16 67:25 68:3 91:7
252:7
**drafted** 19:17,18 249:23
250:3 251:3 265:13
**drafting** 66:14
**drafts** 159:15 252:24
**draw** 36:3
**drive** 60:7
**driven** 95:2,3,4
**Dropbox** 26:25
**due** 55:11 197:17
**duly** 7:9 194:7
**duty** 46:9

**E**

**E-I-T** 43:19
**E-I-T-E-L** 43:19
**e-mail** 77:23 79:8 175:12,16
176:2,3 215:18
**e-mails** 77:25 78:2 83:11,13
175:10
**earlier** 32:24 59:2 65:17
79:10 101:9 106:3 127:19

153:8 182:9 214:13 219:4
241:9 246:4 268:19
**early** 47:15 54:17 81:6
152:25 164:8,10
**earnings** 53:14
**easy** 196:5,7,10,11 197:4,6
**educate** 42:23 43:4 189:2
**education** 19:9 20:5 22:15
23:13 26:17 32:8,9,15 33:7,
12 38:6 39:5,18 40:4,8,10,
11 41:18 51:22 75:24 77:9,
11 78:9,10 84:8 94:16,22
95:2,3,5 98:3,11,12,23
99:25 100:21 101:5,24
113:20 114:16,21,22 116:18
123:19 124:12 129:8 135:6
136:19 139:9 141:18
146:15,18,20,24 147:2,11
148:3,18 150:9 151:5
174:19 176:6 181:11 195:2
228:22 238:22 243:11,12
252:7 267:24 268:10 269:7,
8 276:3
**Education's** 46:9
**education-related** 147:12
**effect** 52:17 69:6 72:11,14,
16,17 74:3 251:3
**effective** 193:16
**effectively** 42:9,16 49:2
56:24 79:12 84:6,14 118:2
211:15
**effectuate** 55:7 74:18
**effectuated** 59:10
**effectuating** 91:23,25
**efficiencies** 156:4
**efficient** 36:4
**effort** 169:3 200:14
**Eitel** 43:15,16,18,20,21 77:2
**elected** 41:19
**electronic** 8:12,21 9:2 12:18
13:4
**electronically** 166:7
**eleven** 177:19 181:20
183:23
**eligibility** 204:9 251:19
**eliminate** 168:6 169:16
**Elisabeth** 5:16
**emphasize** 9:12
**employed** 177:15
**employee** 45:23,25 47:13
177:25

**employees** 177:10,19,21,23,
24 178:2,10,19,25
**employment** 59:3,8 226:2
227:16
**En** 90:25
**enacted** 152:12
**end** 23:18 35:17 39:23 54:10
74:11 167:12 207:11 209:10
268:21
**ended** 157:19 173:17
**ending** 103:2,6,19,24,25
**ends** 170:16
**endurance** 11:12
**enforce** 148:8
**enforcement** 43:6,8,12
78:25 79:16,20,23 85:3
86:13,16,18 90:20,25
115:25 133:4 164:10 187:21
188:2 214:21 219:15 232:6,
18 233:19 234:3,12 235:12,
15,19 236:10 242:19,24
243:3,20 244:3 266:22,24
**engage** 137:15 139:3,5
**engaged** 88:8
**enjoined** 118:24
**enjoining** 53:14
**ensure** 197:11
**entailed** 46:4
**enter** 5:25 26:7
**entire** 176:8 254:3
**entitled** 19:2 126:10 220:8
**entity** 58:19
**entry** 32:7 33:2,6,11
**envision** 245:24
**equals** 204:10
**equivalencies** 167:9
**equivalent** 177:6
**essence** 75:25
**established** 48:18 58:18
68:8,9 87:6,7 118:3 141:15
199:20,24 200:14 245:3,13,
21 246:7 247:3,21 249:22
262:17
**establishing** 269:22
**establishment** 74:9 153:18
263:5
**estimate** 70:21 168:5,14,22
169:8,15,22,24 170:4
**evaluate** 63:21 71:5

**evaluated** 153:3
**eventual** 63:17
**Everest** 198:14
**Evers** 42:20
**evidence** 9:20 204:10
**EXAMINATION** 7:16
**examine** 42:23
**examined** 7:10 68:12
**excerpted** 152:4
**excessively** 192:3
**excuse** 26:24 120:20
**executed** 106:23
**executive** 93:21 146:3
210:23,24
**exhibit** 18:21,23,24 21:9
27:25 28:5,6,8 29:19 66:23,
24 67:4 69:10 73:12,14
106:8,11 111:21,22 125:2,6
136:2 140:5 142:12 150:25
151:2 165:13 176:17
182:10,11,15 189:9 201:13,
15,20,22 204:20 205:5,18,
21 206:5,6,22 210:10
219:21,22 220:2,4 241:18
244:23
**exist** 259:5
**existing** 227:21 229:12
257:22
**exists** 134:25 135:4 136:22
**expand** 47:14
**expect** 20:6 66:19 73:4
86:12,14 88:17 94:2 98:16
107:25 108:6 115:7,10
116:20 117:9,11 120:10
122:19,21 123:24,25 124:6
128:18 129:23 130:7,8,13,
18,25 131:4,10,14,16,20,22,
23,25 132:9,23 133:7,14
134:23 135:6,13,15,20
136:17,20 137:14,16,18
139:12 140:15,18,20 141:4,
21 142:23 160:12,13 175:5,
7 183:6,25 184:25 188:9
194:25 199:4 215:18 217:3,
13,19,24 218:2,4,6,17
220:19 222:17 223:6,9
224:21 236:11 239:2 251:18
252:10
**expectation** 115:11 135:4
136:15 137:5
**expected** 86:14 117:4
145:13 227:13

expedited 193:12
experience 26:16 31:17,19 243:10 273:2
expert 51:3
experts 182:5 184:16,17
explain 10:17 170:19 220:3
explaining 94:21
explanation 68:12 246:12
explore 256:6
express 239:15
expressing 187:16
extended 122:17 133:21 134:22 272:23
extent 52:5 57:4,13 60:11 63:25 64:6,20 191:4,10,14, 15 196:22 197:20
extreme 69:21 70:4

**F**

face 192:18
faced 193:8
fact 20:18 77:25 82:25 95:17 102:25 138:21 156:16 192:16 255:23
facts 22:7 81:10 98:18 105:20,22 202:11,15 264:12,21 265:24 266:8
faded 200:7
fair 31:2 49:25 50:2 58:20 60:23 61:2,11 62:10 125:13 253:11
fairly 72:4
faith 84:4,17
fall 247:21 248:3
familiar 195:24 202:8 203:15 204:6 211:11 213:21 216:21,22 245:12 248:17 254:19
familiarize 126:11
fashion 152:17
favored 149:13
feature 26:13
February 32:18 35:18 39:14, 25 79:10 210:8 257:23 258:7,13,14 259:2
federal 25:17 33:11 35:8 46:5 114:25 147:20 149:24 173:21 220:6,9 245:20 268:12

feel 59:22 215:24
feeling 50:5
feels 103:14
fell 165:9
fewer 42:8
fifteen 253:17
figure 247:11
file 12:19 67:5 206:10 207:17
filed 205:24 206:11
files 12:18 28:4
filing 166:7
fill 33:5 178:4 180:20,22
filled 177:9
final 54:25 55:2 71:19 72:24 92:10 99:25 217:9 230:16
finally 71:16
finance 51:6,20
Financial 151:6 182:22 262:21
financially 5:21
find 46:23 47:2 54:9 60:9 61:18 62:2 83:3 136:21 174:3,21 175:5 255:8
finding 35:24 60:20 118:12 174:24
findings 64:22 112:14 167:15 216:9
finds 60:22
fine 101:18 127:2 133:5 159:18 210:9 272:10
finish 29:15 136:24 272:9
Fiscal 211:6
flagged 259:12,17 262:18
flip 202:6
flowed 90:9
fluctuates 170:16
fluctuation 171:7
focus 81:23 110:12 126:8 207:14
focused 35:13 236:16
folks 42:10,11 43:5 48:9 51:2 56:10 76:24 78:13 222:21 223:5,6 233:8 245:25 246:23 275:25
follow 20:14 210:25 225:15
footnote 254:24 255:6 256:19 257:5,8 266:15
forceful 192:3

Foreign 146:5
forget 17:17
forgiveness 51:10 61:5
forgot 79:7
form 9:19 119:22 151:16 203:13
formal 48:18 71:22 165:2,4
formally 259:5
format 26:14
Forum 149:19,23
forward 56:25 59:9 61:7 66:13 67:24 72:2,4 118:4 122:5 135:12 155:11,13 182:11 269:5 276:9,11
forward-responsibility 177:7
forwarded 13:6
found 166:9 255:11
foundation 103:11 261:18, 21 262:5
four-hour 17:8
frame 132:15,21 166:17
framework 202:18 203:8 255:9
frankly 77:24 80:5 110:4
Franzi 34:22
freeze 173:9,14,20,24,25 174:4,7,22 176:5,10,12
freezes 173:22
frivolous 195:12
front 18:11,12 122:12 123:3 158:8 160:10,11
froze 53:6
frustrated 136:5
frustration 136:14
FSA 33:24 34:14 35:9,14 36:6,15 39:9 40:3 71:5 78:6, 9,11,22 79:20 80:3 83:24 90:20 94:10,12,15,23 95:5 97:20,22 115:23 137:9 143:11 144:4 161:10 176:12 183:18 188:18 189:5 210:18 216:24 217:11,15 219:3,10 221:21 222:23 236:6,17 237:6,10,16 239:3 242:6 243:19 244:8 245:3,13,14, 20,21,25 246:7,12 252:4 253:3,23 259:22 260:13 262:23 263:2 266:6 267:23 268:22 269:7,9,21 270:6

**FSA's** 225:9 232:6,17
233:18 234:11 235:11,14
**full** 61:3 84:4,17 91:13,17
98:7 177:24 245:3 259:3
**full-time** 80:11 167:9 168:5
169:15 177:6
**fully** 70:10 71:16 94:17
180:16 199:4
**function** 30:8 177:7
**fundamentally** 49:25
**funding** 167:10
**Funds** 147:15,16,17,18
**future** 68:14

___

**G**

___

**gainful** 59:3,8
**Gamble** 252:5,15 254:17
265:2
**game** 253:17
**gave** 15:4 47:19 48:6 67:25
68:2 84:25 103:23 151:12
170:24
**Gen** 35:9 39:13 77:16
**general** 19:19 22:25 54:19
60:14 65:6 66:4 77:9,12
78:20 122:4 123:4,7 124:2
130:15,17,22 141:24 174:15
199:18 214:19,21 215:3,4,9,
21 216:23 218:18,20 219:9
224:24 252:6
**General's** 214:14,24 216:6,
15 218:14 220:8 241:19
244:24
**generally** 31:19 76:24 102:5
139:14 197:4 217:22 223:5
248:24 268:25 269:19
**generate** 26:14
**generated** 30:10 93:23
**generates** 30:8
**Generation** 35:9,14
**gentleman** 233:6
**gentleman's** 80:24
**gentlemen** 164:9
**give** 9:21 11:20 15:6 18:3
38:16 61:3 66:17 96:16
122:2 155:18 159:17 170:22
221:6,25 255:22
**giving** 15:10,18 16:11
137:24 244:2

**glance** 208:7 253:24
**glasses** 208:8
**goo** 163:20
**good** 7:17 93:15 105:6
121:16 163:19,21 206:17
219:17 238:21 246:25
253:24
**goodness** 176:20
**Gotcha** 166:10 207:21
**government-issued** 7:2
**Governor** 41:10
**grant** 91:21,24
**granted** 61:19 91:13
**granting** 204:12
**grating** 191:25
**great** 12:6 13:7 186:24 207:4
**greater** 211:6 212:8
**grew** 161:22,23
**ground** 8:4
**grounds** 249:6
**group** 43:6,8,12 48:11,12,
14,18,21 49:15,16,19,23
50:9,13,20 51:4 58:9 59:4,
14 68:16 76:9,12 77:6
78:14,25 86:13,16,18 89:9,
14,20,22,24 94:13 148:2
175:12,16 177:20,24 178:3,
11,20 179:9 180:2,22
181:13 246:22 274:8,12,14
275:15,21 276:7,19
**groups** 176:2,4
**growing** 101:10 102:4,6,14,
22 104:17,18
**grown** 103:19
**growth** 161:9
**guarantee** 146:21,22
**guaranteed** 225:25 227:16
**guarantors** 146:19
**guess** 13:11 31:12 65:13
76:8 223:17 230:18 260:24
**guessed** 179:2
**guidance** 122:4 267:2,6,11
**guidepost** 26:17
**guides** 199:21

___

**H**

___

**Haffey** 228:20
**half** 127:7

**halfway** 195:18
**hand** 31:22 58:25 61:13
112:7 158:15 213:16
**handle** 273:21
**handled** 70:13
**handling** 10:11 160:19
**happen** 55:14 57:20 173:22
**happened** 30:23 31:14
62:16 86:7 100:24 127:19
188:16
**happening** 114:8 135:10
166:18
**happy** 55:22,23 56:3,10,12
70:8,12 104:19 151:19
**harbor** 195:8,17,20
**hard** 213:5
**harm** 61:3,18 62:4 72:6
**harmed** 61:2,14 114:24
**harsh** 191:25
**hat** 49:22
**hate** 105:17
**hats** 40:2,5 183:17
**hd** 163:19
**head** 9:22 170:23 269:18
**headed** 174:16
**heading** 112:12 138:11
166:12 257:16
**Heald** 249:10
**hear** 53:8 103:14 200:4,6
239:14 270:14
**heard** 22:20 62:21 87:18
100:12 138:17 179:20
198:19 239:6
**hearing** 87:20,22,24 239:13,
21 240:5
**held** 5:5,8 27:14 38:24 53:5
**hiatus** 156:3,19,20,22
157:18,22,24
**Hiel** 198:14
**higher** 32:9,15 40:11 75:23
78:8 146:15,17,24,25
147:12 148:18 163:16
175:17 267:24 269:8
**highly** 90:17
**Hill** 77:6 148:2
**hindsight** 185:18
**hire** 173:10
**hired** 177:13 178:2,10,19,25
**hires** 179:5,8,19 180:2,14

**hiring** 171:13 173:8,13,20, 22,25 174:3,7,21 176:5
**history** 36:2 39:4
**hit** 276:22,24
**hold** 18:12,16 40:18 125:21 126:3 127:11 128:8,15 136:3,17 138:5 142:11 275:8,12
**holding** 7:3
**holiday** 23:18
**homes** 9:12
**hope** 5:23 105:5 160:18 182:10 203:6
**hoped** 261:24
**hour** 36:19 127:7 234:19
**hours** 16:25 17:5 105:19 276:23,25 277:7
**house** 15:22
**housed** 267:23
**Howard** 219:8
**human** 245:22 246:18,19,20, 21,22
**hundred** 35:13 50:8,23 51:11 56:19 58:11,17 59:16 61:4,15,19 70:25 72:8 91:18

**I**

**I--** 88:14
**idea** 56:18 174:2 196:18 210:19 226:7 235:3 270:13
**ideal** 60:24
**ideas** 165:5,6 276:8,11
**identification** 7:3 28:9 67:2 106:13 125:8 201:17 219:24
**identified** 44:18 206:15
**identify** 8:21 206:4 207:16 246:23
**IG** 219:4
**ignore** 201:20 204:21
**imagine** 25:15
**immediately** 35:2 146:6
**imminent** 155:20 156:7,12
**impact** 82:5 88:17 94:20,22 105:19 211:6 212:8
**impacted** 69:2 73:23 176:8 222:18,20 223:11
**impacting** 82:8,12
**impacts** 20:19 141:24

**impeding** 82:2
**Impending** 104:14
**implement** 95:6 153:4,12 268:11
**implementation** 78:23
**implemented** 153:11
**implementing** 94:11 268:23 269:22
**implicit** 191:13 226:17
**implying** 239:8
**importance** 246:4
**important** 9:21,25 35:11 95:22 115:8 116:3 185:23 223:24 224:14 237:4 247:15
**improve** 199:25
**improved** 19:3,12 156:16
**improvements** 156:4 216:10
**in-school** 119:2
**incident** 14:23
**include** 77:2 209:2
**included** 119:12 177:24 198:13 218:12 221:15 257:22 258:6
**includes** 111:25
**including** 64:18 124:2 164:8 167:9,15 174:15 177:9 262:17 263:10 269:6
**incoming** 54:21 55:5
**incorrect** 34:6
**increase** 46:19 104:12 161:4 162:10 170:20 171:12 172:6
**indirectly** 51:16
**individual** 51:4 56:18 61:7 76:11 89:19,21,22 108:9 243:17 274:3,7 275:13
**individually** 89:6,12,13
**individuals** 274:8 275:16,21
**indulgence** 277:4
**inference** 236:22,24
**influence** 41:24
**inform** 190:14
**informal** 215:18
**information** 26:8 29:10,19, 20 30:17,18 31:12,15 47:16, 19 48:6 52:7 57:6,14 59:6, 11 60:13 90:9 102:13 103:18 142:25 236:9,15 237:3 242:4 248:20
**informed** 55:10 117:15,19 185:17

**infrastructure** 154:5
**initially** 41:16 77:15 85:3 87:3 88:4,10 158:15
**initiative** 35:7,14 77:17
**injunction** 117:17,23 119:18,20 125:23 127:14 128:10,23 129:6
**input** 30:18
**inquiries** 192:23,24
**inquiry** 177:15
**inside** 211:5
**Inspector** 199:18 214:14,19, 20,24 215:2,4,9,21 216:6, 14,23 218:13,18,20 219:8 220:8 224:24 241:19 244:24 252:6
**instinct** 259:4
**institution** 147:12
**institutions** 146:25 148:18
**instruct** 46:14 57:21 64:25 148:7,14,24 150:4 193:23 194:3 256:7,12
**instructing** 52:8 216:18 255:19
**instruction** 199:19
**instructions** 95:19 96:16
**instructs** 10:18 11:9 63:13
**insufficient** 86:3
**intake** 85:16
**intended** 263:17
**interactions** 5:8
**interest** 59:25 60:8,19 62:18 63:8 239:15
**interested** 5:21 136:21
**interests** 59:23
**interface** 5:9
**interim** 69:4 73:7,17,25 74:7,14,17,19 262:23 263:3, 6,24 264:3
**intern** 269:4
**internal** 69:3 73:6,19,24 74:6,13 210:18 262:22 273:20
**interpret** 192:22
**interrupt** 29:11 109:17 210:4
**interrupting** 136:24
**introduced** 219:21 220:4
**involve** 147:20 149:20,24
**involved** 20:3,9 45:4 55:6 65:24 66:14 71:21 87:11,12,

25 89:18 90:12,17,22 91:14,
   23 92:3,14,22 93:4 108:4
   118:9,16 159:12 166:23
   168:13,18 200:19 214:21
   222:22 248:11 268:21,22
   269:21 270:20 275:17,22
**involvement**  19:6 83:15
**involving**  90:8 269:6
**ipads**  8:23
**irrelevant**  194:5
**issuance**  53:19 122:16
   123:21 127:24 155:4 216:14
   274:10,21
**issue**  20:7 35:11 47:18 51:7
   59:3,18 64:18 71:6 72:23
   78:19 105:25 119:2 121:22
   122:7,9,24 123:8,20 124:3,
   7,10,17 134:20,21 138:14,
   18 139:2,4 140:16 142:5,14
   149:7 160:20,21 170:4
   172:7,17,21 173:4,5 184:18,
   19,23 185:23 200:17 208:19
   209:24 215:5 238:10,13,25
   257:10 262:4 274:5 275:18,
   19
**issued**  71:8 91:6 98:16 99:5,
   25 109:5,11,21,24 110:14,
   22 111:4,15 113:5 124:21
   133:11,14 138:15 140:17
   142:6,14 222:16 223:22
   237:25 238:14 239:5,20,24
   240:8,12,16 247:8
**issues**  40:11 48:3 76:16,21,
   24 77:21 81:21 96:14 106:5
   150:9 174:15 198:18 209:7
   211:7 212:9 218:10 224:14
**issuing**  71:19 89:18 90:22,
   24 96:17,24 97:7,11,17,20,
   22 98:3,13 100:11,14,18
   102:2,10,21 113:20 114:4,
   10,22 116:4,18,19 117:5,16,
   21 119:24 121:4,18 128:21
   129:4,18 130:2 131:2 137:9
   186:11 196:24 236:6,17
   237:6,11,16 244:11 259:16
   272:22 273:24 275:8
**Item**  259:11
**items**  166:23
**ITT**  213:17

**J**

**J-E-U-N-S-T**  51:15
**J-U-E-N-S-T**  51:16
**James**  5:1,11 6:1 7:1,8,22
   8:1 9:1 10:1 11:1 12:1,20
   13:1,10 14:1 15:1 16:1 17:1
   18:1 19:1 20:1 21:1 22:1
   23:1 24:1 25:1 26:1 27:1
   28:1,2,23 29:1 30:1 31:1
   32:1 33:1 34:1,22 35:1 36:1
   37:1 38:1 39:1 40:1 41:1
   42:1 43:1 44:1 45:1 46:1
   47:1 48:1 49:1 50:1 51:1
   52:1 53:1 54:1 55:1 56:1
   57:1 58:1 59:1 60:1 61:1
   62:1 63:1 64:1 65:1 66:1
   67:1 68:1 69:1 70:1 71:1
   72:1 73:1 74:1 75:1 76:1
   77:1 78:1 79:1 80:1 81:1
   82:1 83:1 84:1 85:1 86:1
   87:1 88:1 89:1 90:1 91:1
   92:1 93:1 94:1 95:1 96:1
   97:1 98:1 99:1 100:1 101:1
   102:1 103:1 104:1 105:1
   106:1 107:1 108:1 109:1
   110:1 111:1 112:1 113:1
   114:1 115:1 116:1 117:1
   118:1 119:1 120:1 121:1
   122:1 123:1 124:1 125:1
   126:1 127:1 128:1 129:1
   130:1 131:1 132:1 133:1
   134:1 135:1 136:1 137:1
   138:1 139:1 140:1 141:1
   142:1 143:1 144:1 145:1
   146:1 147:1 148:1 149:1
   150:1 151:1 152:1 153:1
   154:1 155:1 156:1 157:1
   158:1 159:1 160:1 161:1
   162:1 163:1 164:1 165:1
   166:1 167:1 168:1 169:1
   170:1 171:1 172:1 173:1
   174:1 175:1 176:1 177:1
   178:1 179:1 180:1 181:1
   182:1 183:1 184:1 185:1
   186:1 187:1 188:1 189:1
   190:1 191:1 192:1 193:1
   194:1 195:1 196:1 197:1
   198:1 199:1 200:1 201:1
   202:1 203:1 204:1 205:1
   206:1 207:1 208:1 209:1
   210:1 211:1 212:1 213:1
   214:1 215:1 216:1 217:1
   218:1 219:1 220:1 221:1
   222:1 223:1 224:1 225:1
   226:1 227:1 228:1 229:1
   230:1 231:1 232:1 233:1
   234:1 235:1 236:1 237:1
   238:1 239:1 240:1 241:1
   242:1 243:1 244:1 245:1
   246:1 247:1 248:1 249:1
   250:1 251:1 252:1 253:1
   254:1 255:1 256:1 257:1
   258:1 259:1 260:1 261:1
   262:1 263:1 264:1 265:1
   266:1 267:1 268:1 269:1
   270:1 271:1 272:1 273:1
   274:1 275:1 276:1 277:1
**January**  22:2 32:3,13,15,17,
   20,22 33:14 34:8,17,22
   35:7,11,16,17 40:14 41:2
   44:9 45:24 46:18 48:5 80:13
   145:6 157:7 172:2 177:10,
   11,13,14,19,20,25 178:9,17
   181:19 182:2 208:11,13
   214:3 225:13,20,21,23
   226:5,24 227:4,17 228:6,14
   250:7,8,10,15
**Jaramillo**  6:17,18 7:16,18
   10:24 13:5 27:8,19,24 36:23
   37:7,18 38:2,20 44:22 47:8
   52:8,12 53:2 57:23 63:16
   64:11 65:15 67:12 73:10
   75:2 98:6 101:13,20 104:19
   115:15,19 120:18 126:25
   133:24 134:3 148:25 149:6
   175:21 181:8 183:13
   186:22,25 187:4 190:22
   191:9 193:6,22 194:7 204:8
   205:6,10,14 206:2,3,8
   216:18 231:8,12 234:17,21
   235:2 241:8 255:19 256:5,
   15 271:3,13,20,25 272:10
   277:3,9,12,20
**Jeunst**  51:6,13 52:14 53:12
**Jillian**  79:14 80:9,14
**Jim**  38:15 277:23
**job**  84:5 119:6 177:7 198:13
   227:18 248:24 271:11
**Joe**  5:17 36:17 47:25 48:17
   68:8,10 74:23 101:11,22
   104:22 134:14 144:9 186:19
   228:16 234:16 262:6,9
**jog**  82:23 129:20

**Johnson** 35:3 39:13 77:13
80:11,18 132:9 187:12,16,
20,22 188:17,24 216:24
219:4,9 220:25 221:20
222:21 247:6,9 252:4,14,21
254:7,16 264:25 265:2,5,16,
17 266:5
**Johnson's** 35:10 265:8
**joining** 146:6 147:4
**Jones** 16:17 25:9 39:21
66:23 77:5 131:10 132:5
223:14
**Jones'** 20:24
**Joseph** 6:17 7:18 13:3 26:23
**Judge** 149:8,11 192:20
193:6
**judgment** 196:13
**judgments** 50:22 71:10
**Julian** 80:17 85:4 132:15,17,
22 133:2 187:20,22,23
188:3,8,12
**July** 35:4 80:13 98:22 99:7,
11,12,16,23 100:15 187:23
225:22 226:25 227:5
**June** 34:25 39:22 103:2,6,7,
24 104:8 109:6,9,22,25
110:16,23 111:6,25 112:20
113:6,12 116:4 127:25
133:11 166:19 169:21
178:12
**Justice** 10:11
**justified** 64:8
**Justin** 49:13 68:11 117:19,
21 119:21,23 120:8,21
121:7 132:8,11 201:3

## K

**Kent** 42:19
**Kevin** 17:19
**Kim** 79:10 80:25 233:7
235:20
**kind** 82:20,21 134:16 141:4
168:19 185:8 192:23 210:14
232:14 236:25 261:10,24
**kindly** 7:2
**kinds** 174:10 213:22
**knew** 22:23 37:15 46:22
70:11 116:10 214:10
**knowing** 162:3

**knowledge** 47:14 64:18
110:2 116:15 128:24 130:22
169:2 184:2 186:9,15
250:24 275:11,23

## L

**labeled** 220:2
**lack** 103:10 186:10,15
**laid** 261:18
**landing** 42:3,13,17,18,25
44:6,13 45:6,11,15,18
257:24 258:3,14,16,18,23
259:2,6,9
**language** 109:18 202:25
203:15 204:6 211:12 215:24
**laptop** 8:25
**lasted** 173:14
**late** 35:6,11 164:7 228:12
**launch** 69:7 74:3
**Laura** 79:10 80:25 233:7
235:20
**law** 9:14 152:16 202:19
203:10 245:6 247:24
**lawful** 55:13 238:22
**lawyer** 128:24
**lay** 256:13
**laying** 261:21 262:4
**layperson** 129:7,10
**leader** 224:13
**leaders** 78:15 80:23 85:2
222:24,25
**leadership** 35:10 42:14
95:10,13 122:20 133:22
153:3 175:13 218:23 246:15
**leading** 57:20 63:17
**learn** 41:24 45:17 223:14
224:6
**learned** 45:20,21,22 230:11
**learning** 45:13
**leave** 15:23 144:18,21 145:8
**leaving** 148:2,10,19 150:6
**led** 41:10 42:17 58:18 64:15
85:3 128:18 164:10 209:10
**left** 34:24 39:10,23 79:9,10,
11 80:24 98:23 99:8,13
100:4 107:10 110:2,24
111:9 122:3 138:9 144:5
150:10,20 164:7,10,11,12
168:16 171:8 172:2 178:15,

18 188:17 210:15 211:23
233:6,8 241:20 271:15,16
**left-hand** 125:16 138:12
222:9
**legal** 5:18,24 10:8 20:14
22:16 101:10 198:2,6,21
199:14 202:18 203:8 204:9
227:21 229:12 237:17,21
242:22 255:7,8,9,12 257:22
**legally** 128:21
**lens** 50:12 61:10
**lesser** 50:24
**letter** 215:12,16,19 219:8
220:20 221:4,10,12,15,21
222:5,13 252:16,17,23
253:6 254:3,7,11 265:4
**letters** 94:7 215:15
**letting** 136:7
**level** 61:8 72:7 142:2,4
165:9 185:15,19,22
**levels** 188:8
**liaison** 94:14,25
**lie** 274:23
**lieu** 6:8
**life** 145:17
**lifted** 174:22,25 175:3,4,6
176:10,12
**limit** 60:9,20 62:3
**limitation** 148:8,15 150:5
**limitations** 193:20
**limited** 149:15 193:15
**lined** 38:17
**lines** 96:15 107:15 206:24
213:16
**lingering** 104:16
**Linkedin** 26:2,12,13 29:10,
21,23 30:8,11,12,14,19,22
31:9,10,11 35:25
**list** 32:25
**listed** 21:7 64:16 65:9 69:17
177:12 191:18 231:13
251:20 266:2
**listen** 257:7
**listening** 145:9
**Liz** 77:6
**loan** 91:15 146:19,21 220:10
245:7
**loans** 25:17 46:5 66:7,8,10
69:2 73:23 115:2 147:20
148:12 149:25 153:6,13,22

268:12
**located** 5:19 125:15
**long** 35:19 38:10 70:23 79:8
117:6 136:17 148:6 156:3,
22 160:21 169:23 173:13,
19,22 232:13 234:24 242:4
**longer** 37:5 146:22 271:11
**looked** 21:5 26:12 50:4,6
54:18 58:14 59:5 73:2,11
140:4 201:7 205:12 206:23
248:21,25 261:15
**lost** 121:11
**lot** 25:15
**loud** 132:24 168:3 191:24
228:16
**low** 103:15 164:15
**lower** 125:16 202:22
**lunch** 101:12 104:20,25
105:6,10
**Lynn** 68:9,10 228:20

**M**

**Madam** 44:23
**made** 13:14 16:16 21:10
22:2 32:2 49:19 54:12 56:18
58:17 68:13,15 85:24 86:2
91:21 93:8,18,24 94:5 95:9,
13 116:4 119:24 120:12
121:4 129:17 130:2,25
132:6 138:21 139:15 158:17
159:3 160:11 164:23 169:21
170:4 180:14 196:13 206:24
224:23 230:9,13,16 235:4
236:22 238:7 239:12 244:8
266:23 275:23
**Mahaffy** 68:9,10
**maintain** 216:3
**major** 35:7
**make** 25:21,22 31:23 50:22
51:9 62:10 81:25 82:6,24
93:13 94:10,12 109:6,14
110:7 120:6,9,14,21 121:15,
17 126:23 138:20,24 154:6
155:25 160:24 161:10 162:9
169:11 196:19,20 198:25
203:17 205:3 227:19 229:9
231:2 239:8 243:12 261:7
273:10 274:23 275:10
276:19
**makes** 117:5 190:2 218:22

246:15,20
**making** 7:23 50:7 71:10
87:8,11,12 90:22,24 92:25
93:4 117:15 152:18 158:8
160:9 162:12 166:2 183:7
184:3 244:14 272:25 273:6
274:9,15 275:22 276:4
**management** 174:14,15
216:2
**manager** 185:21
**mandatory** 46:10
**manner** 6:13
**Manning** 5:1,11 6:1 7:1,8,17,
22,23 8:1 9:1,9 10:1 11:1
12:1,6,20 13:1,10 14:1 15:1
16:1 17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1 25:1,14
26:1,2 27:1,17 28:1,3,4,10,
23 29:1,11 30:1 31:1,18
32:1 33:1 34:1,12 35:1,24
36:1 37:1,18 38:1,11,14
39:1,3 40:1 41:1 42:1 43:1
44:1 45:1,2 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1,6
54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1
64:1,17 65:1,5,16 66:1 67:1,
16 68:1 69:1 70:1 71:1 72:1
73:1,13 74:1 75:1,12 76:1
77:1 78:1 79:1,18 80:1 81:1,
7,24 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1
91:1 92:1,20 93:1 94:1 95:1
96:1 97:1 98:1 99:1 100:1,5
101:1,23 102:1 103:1 104:1,
21 105:1,5 106:1,14 107:1
108:1 109:1,17 110:1,9
111:1 112:1 113:1 114:1,15
115:1 116:1,13 117:1 118:1
119:1 120:1,4,20 121:1,4
122:1 123:1,18 124:1,16
125:1,9,14 126:1,13 127:1,3
128:1,14 129:1,16 130:1,13
131:1 132:1,4 133:1 134:1,
13 135:1 136:1 137:1 138:1
139:1 140:1 141:1 142:1
143:1 144:1 145:1,2,11
146:1 147:1 148:1 149:1,24
150:1,7,17 151:1,10 152:1
153:1 154:1 155:1 156:1
157:1 158:1,4 159:1,7 160:1
161:1 162:1 163:1 164:1,19
165:1 166:1,11 167:1,18

168:1,10,20 169:1 170:1
171:1,20 172:1 173:1 174:1
175:1 176:1,16 177:1,16
178:1,7 179:1 180:1,15
181:1,24 182:1,8 183:1,16
184:1,11 185:1 186:1 187:1,
11 188:1 189:1,7 190:1,12
191:1,2 192:1,4 193:1
194:1,8 195:1,15 196:1
197:1 198:1 199:1 200:1,2,
11 201:1 202:1 203:1 204:1,
16 205:1 206:1 207:1,5
208:1 209:1 210:1 211:1,8
212:1 213:1 214:1,13 215:1
216:1 217:1 218:1 219:1
220:1 221:1,24 222:1 223:1
224:1 225:1,8 226:1 227:1,8
228:1,5 229:1 230:1 231:1,
19 232:1 233:1 234:1 235:1
236:1,2 237:1 238:1 239:1
240:1 241:1,17 242:1 243:1
244:1 245:1 246:1 247:1
248:1 249:1 250:1 251:1
252:1 253:1,15,25 254:1,12
255:1 256:1,19 257:1,17
258:1,24 259:1 260:1 261:1,
3,9 262:1 263:1 264:1
265:1,11,12 266:1,5 267:1
268:1 269:1 270:1 271:1,6
272:1,19 273:1 274:1 275:1,
2 276:1,15 277:1,12,23
**Manriquez** 19:25 24:7 52:25
53:15 117:18,22 118:9,14,
24 127:12 128:17 129:6
**Manriquez'** 125:22
**Manriquez's** 119:12 128:23
**March** 33:14 39:11,15 81:5
98:23 99:7,13,16,23 100:16
103:17,20 104:2,9 107:10
110:3,24 111:10 112:14
113:7 145:8 170:18 171:5,7,
24 172:3 177:22 178:15
181:25 225:24 226:5,9,11,
19
**Marcia** 13:5 17:17,18
**Marcia's** 17:18,19
**mark** 25:11 27:20,21,24 28:3
67:13,14 111:20 133:14,17
144:4,10,13 150:24 204:25
205:21 256:13
**marked** 12:17 28:6,8 66:25
106:12 111:22 125:2,7
151:2 165:13 182:10 189:8

201:13,16 206:6 210:10
219:23 241:18
**marking** 205:5
**Martin** 133:7
**Massachusetts** 15:14 16:9
**matter** 5:15 6:10 219:25
268:3,5,15
**meaning** 25:23
**means** 8:14 110:8 115:15
175:14 190:12 191:24
210:20,22 211:7,10
**meant** 193:25 245:18,19
263:7
**measure** 61:18 275:10
**Media** 5:10
**medication** 105:19,21
**medications** 82:4 105:25
**meet** 16:18 17:9 43:15 44:4
76:3,25 78:17
**meeting** 17:2,6,8 41:20 71:4
76:7
**meetings** 22:10 43:10 76:12,
16 77:10,14 78:21 105:8,11
200:18
**mem** 198:2 251:13
**member** 51:5 146:3
**members** 49:4 59:4 118:8
119:5 259:5 269:6
**memo** 49:22 67:10,16 68:15
73:2,5,11 77:18 88:20
139:17,25 141:15 220:24
254:16 256:20 257:10
**memoranda** 198:2,6,11,25
199:8,11,12,14 227:21
229:12 232:9 235:17
242:12,17,22 243:6,14
244:9,18 249:5,22 251:10,
13 255:7,12 266:20
**memorandum** 141:11
198:21 249:12 250:7,14
255:8 262:20 263:11 267:15
**memorialized** 139:15
**memory** 36:3 82:23 96:19
98:20 117:2 129:21,22
130:12 219:5 228:8 231:16
235:9 253:10
**memos** 251:8 255:12,14
257:22
**Menaker** 5:24 9:17 10:2,24
27:19,21 47:8

**mentioned** 24:16 31:25
92:20 147:11 156:18 198:19
200:11 214:14 219:6 246:4
248:11 270:23
**mentioning** 60:5
**merits** 109:16
**Merritt** 6:19,20 10:10,16
11:7 17:17 27:8,10 36:17
37:9,12 38:10,13,18 44:15,
17 46:11,14 52:5,10 53:21
55:18 56:4 57:4,12,17,25
60:11 61:21 62:13 63:9,14,
22 65:3 70:5 73:8 74:23
75:4 84:9 91:8 92:17,19
96:2,7,25 97:13 98:4
101:11,18,21 103:10
104:13,22 113:22 114:12
115:13,17 116:6,14 117:7
120:17,25 123:15 124:9,14
126:10,19,20 127:5 130:4,
10 131:18 134:2 137:20
143:17 144:22 146:12
147:6,21 148:4,13,21 149:4,
10,21 150:2 163:3 175:19,
22 181:6 183:11,14 184:2,7,
11 186:13,19,24 190:19
191:3 192:11 193:13 194:2
195:13 197:19 204:4 205:2,
7,22 206:17 216:16,20
217:17 223:12 224:8 231:6,
10,15 234:16,18 239:17
240:2,13 246:17 248:5
255:16,25 256:9,17 263:9
269:24 270:22 271:9 274:25
276:12,20,24 277:3,7,11,17,
18
**messages** 78:3
**met** 16:23 17:15 42:11 43:5,
7 44:5,10 47:21,23 49:5,7
76:5,6,9 78:15
**meth** 52:22
**methodology** 50:21 51:8
52:4,22 58:20 59:9 72:3,11
74:9,18 87:5,6,7 88:16 92:8,
11,22 118:3,6,23 125:22,24
127:13,15 128:9,11,12,17
153:18 263:5,8,21,25
**mid-sentence** 226:4
**middle** 151:21 155:10 171:7
257:19
**million** 211:6 212:8
**mind** 33:20 37:2,9 81:17
104:15 134:18 135:21

182:20 191:24 193:13
232:15 241:6 250:5,13
271:4
**mine** 21:2
**minimal** 178:24
**minute** 37:2 203:25 221:6
**minutes** 37:14 38:12,15,17,
19 74:25 75:3 101:16 134:4
206:23 219:6 241:7 246:5
**mire** 239:4
**mischaracterization** 61:22
84:10 123:16
**misconduct** 59:24 64:23
114:25
**misread** 172:4
**misrepresentation** 198:16
249:11
**missed** 234:20
**misstatement** 269:24
**misstates** 115:13
**mistake** 120:12 166:2
**mistaken** 34:9
**misunderstandings** 96:12
**misunderstood** 255:7
**misused** 190:6,8,9
**moment** 22:9 29:8
**month** 31:25 48:20 103:5
**monthly** 20:10
**months** 31:5,6 32:12 33:5
116:20 168:25 187:25 223:8
229:18 256:11
**morning** 7:17
**move** 18:15,17 20:20 29:6
56:25 65:15 72:4 121:14
133:5 160:15,18 203:20,24
204:20 212:13 221:24 261:9
269:5 276:8,11
**moved** 35:12 61:7 145:21
160:15
**moving** 72:2 155:11,13
160:17 182:11
**multiple** 14:7 79:4,6
**Murray** 112:4 165:16 167:3
176:18

**N**

**nail** 37:10
**named** 79:18

**names** 43:14 164:9
**nature** 8:23
**necessarily** 55:4 56:21 58:4,
  5 180:3 224:24
**needed** 50:4,6 55:4,14 65:18
  102:23 120:13 162:4 164:2
  168:6 169:16 172:10,25
  181:15 182:7
**negotiate** 22:3
**negotiated** 21:11 22:3,4
  151:6 182:23 189:9 273:15
**Nevin** 16:17 25:7 44:4,6
  49:10 79:12 80:20 83:8 84:7
  106:10,23 109:4 110:17
  117:14 131:23 132:4,7,13
  133:12 161:24 164:12
  183:20 184:23 197:22
  233:2,9,12 235:22
**Nevin's** 20:25 107:8,12
  109:10 185:25
**nods** 9:22
**non-career** 153:3
**non-cci** 128:12
**non-direct** 69:2 73:23
**non-for-profit** 149:20
**normal** 137:6,8,13 236:13
**Northeastern** 15:15
**Notary** 7:10
**notations** 31:23 32:3
**note** 26:24 172:4 256:9
**noted** 32:12 194:7
**notice** 12:20 13:2,9,17 28:2,
  14,16,23 91:7 174:6,8
  273:19
**noticed** 31:21,24 98:25 99:5
**notices** 192:19
**notification** 210:19
**noting** 109:15
**November** 106:25 109:10
  110:17 133:13 155:3 156:5
  157:2,8 159:22 163:25
  164:3 182:13,23 189:10
  252:4 254:15 273:15
**number** 12:19 29:25 46:19
  47:20,23 48:2 54:11,13
  56:10,21 90:6 102:14,17,18
  103:7,14,19,23 115:4
  125:17 151:24,25 155:19
  163:12 164:13,16 168:7
  169:17 170:9 171:5,15,16,
  18 178:24 181:17,20,23

  184:15 202:17 204:11
  206:10 213:6,14 214:12
  266:15 275:24
**numbers** 12:8,14 88:8
  99:20,22 101:10 102:4,6
  104:2,6,7,17 125:15 166:3
  170:22 184:4 185:6 220:23
**NW** 7:12

**O**

**oath** 6:8 9:13
**Obama** 249:24 250:3,4,9
  251:5
**object** 10:16 11:7 147:6
  148:5 183:15
**objected** 10:19 148:22
**objection** 44:15,17 46:11
  52:5 53:21 55:18 56:4 57:4,
  12 60:11 61:21 62:13 63:9
  70:5 73:8 84:9 91:8 92:17
  96:2,7,25 97:13 98:4 103:10
  104:13 113:22 114:12
  115:13 116:6,14 117:7
  120:17 123:15 124:9,14
  130:4 131:18 137:20 143:17
  144:22 146:12 147:21
  148:4,13,21 149:21 150:2
  163:3 175:19,23 181:6
  183:11 184:4 186:13 190:19
  195:13 197:19 216:16
  217:17 223:12 224:8 231:6
  239:17 240:2,13 246:17
  248:5 255:16 263:9 269:24
  274:25
**objections** 6:13
**obligated** 56:25
**obligation** 10:20 70:12
**observed** 102:4
**obtain** 184:24
**obvious** 107:2
**occasion** 23:16
**occurred** 234:2
**October** 193:7
**offense** 81:8
**offhand** 48:23
**office** 19:8,20 22:25 32:8
  33:11 39:23 51:6,20 66:3
  90:11,16 93:3,7,13,17,24
  94:5,14,15,21 95:4,17,24
  96:5 123:4,7 130:16,18,21

  138:23 139:4,8 174:11,13,
  14 214:24 216:6 218:22,24
  255:14 260:16 268:20
  269:2,7
**office-of-the-general-
  counsel** 238:17
**officer** 15:15 33:13,24 34:2,
  8,14,21 35:2,3,4 146:2
  187:22 188:2 232:6,18
  233:19 234:3,12 235:12,15,
  20 236:10 242:19,24 243:3,
  20 244:3 266:22,24
**Officer's** 262:21
**offices** 9:12
**officially** 54:18 76:8 79:2
**OGC** 48:13 121:25 129:13
  139:9 222:24 228:23 237:23
  238:7,9 259:22 260:13
**OIG** 69:7 74:3 255:6
**ome** 37:10
**onboard** 32:18 44:3,11
  45:22,25 54:18 77:5,14
  80:10 171:16 181:19
**one-page** 127:6
**one-time** 15:2
**open** 12:3 26:25 138:9
**open-ended** 192:13 193:3
**opened** 11:24
**opening** 27:4
**operable** 69:6
**operating** 33:13,24 34:2,8,
  14,21 35:2,3,4 268:23
**operation** 72:21,22 94:13
  95:8
**operations** 47:14 94:23
  189:3 201:4 215:25 225:22
  226:25 227:5,15
**opinion** 196:22
**opinions** 187:17
**opposed** 106:4
**option** 66:4 123:2
**order** 34:10,11 43:3 53:13
  61:16,25 117:17,23 119:18,
  20 124:8 128:23 129:7
  137:9 148:8 165:19 193:7
  198:25 199:10 216:2 276:11
**ordered** 46:16 71:24 148:15
  150:5 173:25 190:21 256:4
**Orders** 20:15
**organization** 94:24 95:7
  246:19

organizations 269:8
original 120:24
OUS 73:19,24 74:6,13
  107:17,19 108:2,11,18,19,
  22 139:10 255:8 256:24
  257:10 259:22 260:12,20
  262:21 267:2,5,8,23
OUS' 262:20
OUS's 255:11
outcome 5:22
Outcomes 225:10
overbroad 62:13 96:3,7
  197:19 246:17
oversaw 267:23
overseeing 78:23 83:16,20
oversees 83:24
oversight 78:8 84:23,25
  270:11

P

p.m. 105:2 277:25
pace 101:25 102:3,9,20
  160:17,25
package 11:22,24 12:3
  28:12 29:4 88:19 89:2
packages 90:6
packed 242:4
packet 28:18 106:7 170:13
pages 18:18,19 21:23 112:6
  151:24 207:8,9,12,13 254:6
panel 48:25 49:3,6 52:24
  53:18 59:15 68:5,8,10 71:4,
  20,22 153:8 261:7,14,21
  262:4,7 267:3,9 276:6
panel's 261:18
paper 80:22
paragraph 68:7 107:14
  109:2,20 227:4 257:19
  261:6,12
parameters 65:8
part 35:18 42:9 45:14 48:10
  49:10,23 51:4 58:13 59:8
  77:6,14 78:9 94:18 110:13
  111:7 112:18,21,25 122:2
  191:13 200:14 203:8 224:2
  237:5 242:5,10 246:24
  265:8 267:20 269:15,21
part-time 177:25
partial 52:22

participants 5:3 270:19
participating 6:4
particulars 14:20 216:11
  217:6,7
parties 6:11 222:18,20
  223:11
parts 159:9
party 5:20
pass 101:14
passage 82:13,15
password 13:4
past 67:3 105:19 257:9
patience 129:20
Patrick 219:8
Patty 112:4 165:16 176:18
pause 71:18 225:17 226:3
  227:24 266:18 267:6,18
pausing 274:10
paying 15:23
PDF 12:19 28:4
pen 31:22
penalty 6:11
pending 11:15 68:13 103:4,
  9 115:9 155:14 158:7
  159:23 160:4 164:24 167:11
  168:7 169:17 182:12,14,24
  183:22 263:24
Penn 148:2
Pennsylvania 7:12
people 23:14 24:22 25:2
  42:8 47:20 48:12 49:5 58:8
  68:16 79:4,6,18 80:7 82:10
  94:15 131:4,6,8 150:14
  164:7 175:16 200:25
  210:15,16 211:2 222:17
  246:6 263:20 269:3,15,19
percent 35:13 50:8,23,25
  51:10,11 56:20 58:11,17
  59:16 61:4,15,19 70:25
  72:8,9 91:18 155:15 194:25
percentage 50:24
performance 59:10
period 44:6 45:21 47:24
  71:3,19,21 72:18 84:7
  100:24 107:21 108:13,21
  111:15 112:22 113:16
  114:6,9,18 117:6 121:6
  122:17 131:3 133:21
  134:17,23 145:18 157:12,15
  171:22 173:18 180:6 183:18
  184:3 242:20 272:23 274:11

periodic 20:11
periods 34:2 38:4 83:24
perjury 6:11
permanent 35:4
permissible 8:16
person 6:9 17:10 27:2 34:21
  50:17 77:7 79:12 84:14
  108:10 164:13 201:2 210:17
  211:22 228:19 243:11,17
  272:24 273:4
person's 51:12
personal 116:15
personally 120:11 201:11
personnel 174:16 185:2
pertinent 126:16
Phil 47:22,23 52:14 68:11
  130:19,24 228:18 262:8
Phillip 51:6,13 53:12
phrased 57:18 62:5
physically 6:5
pick 167:4
picked 59:4
pieces 232:15
place 14:12,15 23:11 88:6
  92:8 121:12 143:3 163:13
  173:20 198:11 200:15,20
  247:13
placement 119:7 198:13
  227:18 248:25
places 31:24 202:13,16
plaintiffs 6:18 7:19 100:10
plan 172:5 216:13 217:10,14
  218:7 224:17,18
platform 22:11 105:9
play 253:19
played 94:20
plenty 203:11 245:25
point 8:7 13:10 38:7 54:7,21
  65:10,13 72:3 80:25 81:12
  86:7,18 88:11 96:22 100:13
  107:9 110:10 126:7,8
  127:10 128:7 132:18 134:15
  135:22 138:13 140:16
  142:12,21 143:25 151:22
  155:2 156:5,11,17,25 157:8
  166:4 175:9 180:16 185:11
  186:21 188:20,23 191:25
  192:12 202:15 209:14 213:3
  215:4 226:16 230:5
pointed 127:18 261:11

pointing 152:3 205:16
pol 94:17 272:20
police 15:15
policies 92:4,6,23 93:10,13
94:18,19 95:2,25 232:11
242:14 268:13
policy 92:13 93:4,8,18,24
94:5,9,10,11,12,14,21,25
95:4,6,9,12,19,23 96:5,13
134:19,21 138:13,15,18,20
139:7,8,14,15,20,23 140:15,
23 141:12,16,18,24 142:2,4,
5,7,13,16,20,22 143:2,4,16,
24 209:17 211:7 212:9
216:12,25 268:3,5,9,16,21,
22,24 269:5,11,22,23 270:3,
9,16,17 272:20,22 273:11,
13,14,18,21,22 274:15
policymaking 94:13,24 95:7
pools 248:11
portfolio 39:14 224:3 267:21
posed 112:14
position 33:24 35:12,20
40:22 41:5,15 44:16 48:5
51:19,24 54:8 59:17 76:2
144:6 145:22 184:24 185:17
187:22 188:18 209:4,6
223:23 224:22 229:16
positions 40:6 175:17 177:6
178:5 180:20,22
poss 136:23
possibly 216:7 228:20
post 30:24
postdates 125:10 166:20
posting 30:5
Postsecondary 94:16 95:2,5
139:8 228:22 269:7 276:3
potential 64:24
potentiality 59:5
potentially 59:11 191:20
192:7 243:18
power 271:23
Powerpoint 125:3 127:20
136:9
practice 116:3
pre 58:19 147:16
precisely 235:25
preferred 70:9
prejudiced 64:13 193:10
prelim 65:20

preliminary 168:5,14 169:8,
14,22 227:19 229:10 230:9,
13,17,21,25 231:5,22
preparation 20:10,22 41:17
68:15 106:16
prepare 16:13
prepared 54:13 158:19,20
180:21 252:4
preparing 178:4 180:19
preponderance 204:10
presence 5:9
present 6:5 7:2 76:20
170:11
presentation 125:3
presented 37:17 257:24
258:13,22 259:8,10
presenting 191:25
President 149:19,23
presidential 145:23
press 19:2,5,7,8,10 77:7
193:23
presumption 149:13
pretext 64:13,23 65:7
191:19,22 192:6,14,15,24
193:3,9,19
pretty 173:15 242:3,4
255:21
previous 54:10,14,24 55:13
56:23 59:2 64:19 181:21
198:22 199:4 209:9 259:20
previously 13:15 24:23 25:3
30:16 66:22,25 68:18
100:12 106:12 125:2,7
189:8 200:18 201:13,16
206:21 219:21,23 220:4
primary 177:6
principal 78:7 164:13
167:14
principle 56:9 83:23 122:3
133:23 161:7 172:9 179:14,
16 259:7
printed 213:10
printing 208:8
prior 21:10 40:7,17 44:12
45:2,4,6 54:5 59:17,21
61:22 63:6 65:20 75:19
84:10 105:15 106:8 115:14
123:16 133:10 146:6 147:4
157:4 170:3 191:17 198:13
249:23,24 269:25

privacy 59:12
Private 5:7
privileged 52:6 57:5,14
60:12
probe 168:22
probing 191:21
problems 96:4
procedure 236:13 259:23
260:13
procedures 69:4 73:7,17,25
74:7,14,19 153:5,10,12,16,
20 259:19 262:23 263:3,6,
24 264:4 268:23
proceed 68:14,25 73:22
74:3 264:17
proceeding 5:4 69:6
proceedings 6:2 75:8
134:10 187:8 241:14 272:16
process 19:3,13 66:12 69:4
73:7,25 74:7,14 85:9,14
87:6,15 88:18 92:7 93:11,20
162:15 176:14 199:22
210:24 212:5 220:10,18
247:19 255:7,11 259:16
processed 259:22
processes 74:17 153:5,13,
21 262:16 264:16
processing 63:18 85:10
101:3 186:16 189:4 259:12
produced 9:19 170:8
production 20:10
profile 26:3,5,8,10,13,14
29:10,21,23 30:9,19
program 69:8 71:5 74:4
83:16,21 84:15 115:8 153:4
156:2 200:12 268:11
programmatic 154:6,13
programs 45:15 78:9
progress 109:6,14 158:8
160:10,11
project 182:6
projects 41:23
proper 55:3 185:22 216:2
proposal 51:8
proposed 257:20
protect 19:4,13 60:8 61:16,
25 62:11 148:14 150:4
protecting 62:15
Protocol 201:24 202:3
204:25 205:9 206:22 258:5,
8

Protocol' 257:24
protocols 199:9,15,20,23
  200:15,20 257:21 264:16
provide 58:13
provided 59:7 61:5 103:18
  199:3 255:9 267:2,5,8
providing 72:7 177:8
  267:11,14
public 7:10 141:24,25
  145:17
publication 273:19
published 141:25
pull 18:8
purports 107:4
purpose 49:16 273:14
purposes 204:21 237:5
  260:4
Pursuant 262:20
put 9:4,7 26:9 29:20,23
  30:12,13,20 31:5 36:2 37:13
  52:15,16,18,20,24 53:12
  59:9 60:23 71:18 72:11,13,
  18 118:2 128:15,17 135:7,
  12,14 136:16 137:10,19
  139:20 140:23 159:8 176:20
  187:21 236:14 247:15 251:3
  257:9 276:6
putting 90:13

## Q

qual 198:7
qualified 51:7 245:6
qualifies 264:12
qualify 198:3 232:10 242:13
  243:7,15 244:19 264:21
  265:25 266:9,21 267:16
qualifying 198:8 262:16
quarter 103:2,6,19,24,25
  167:12
question 8:15 10:18,20
  11:2,6,8,15,16 31:14 36:5,
  18,21 44:20,21,23,24 46:13,
  15 47:6,9,10 50:9 52:11
  53:9,22 55:20 56:6 57:7,9,
  13,15,18,22,24 58:2 60:2
  61:23,24 64:10 65:2,14 81:8
  83:19 84:11 91:3,20 93:15
  96:8 97:3,4 98:9 101:22
  112:14,21 114:2,13,14
  116:17 119:14 120:5,7,24

121:21 123:17 124:15
125:20 129:11 130:6 135:13
140:8,13,21 142:8 143:22
144:25 145:10 147:10 148:5
150:15,18 163:5 165:22
166:14,16 167:2,7 169:10
171:11 173:2 175:25
176:17,24 177:5 178:17
179:12,13 180:13 181:9
184:8,10,12 194:4 195:16
200:19 203:5 206:2 211:18
217:21 219:18 230:4 231:18
236:16 238:22 246:8 247:25
250:8 255:20 256:16,18
257:4 260:5 263:12 265:20
275:20 276:14
questioning 147:7 148:22
  192:25 208:25 256:14
questions 8:18 10:3,16
  36:25 37:10 101:15 112:3
  121:10,15 129:23 165:15
  168:19,25 219:17 225:18
  235:25 245:16 249:8 250:5,
  23 260:25 271:5,8,14,21
  272:2 277:10
quick 81:9 144:17 225:7
quicker 160:15,19
quickly 161:2 271:17
quo 152:15

## R

race 119:7
radar 37:13
Raguso 5:17
raised 50:9 62:21 212:9
  218:10 219:18 249:9 250:6
raises 211:6
raising 200:18
ran 84:23 182:13
range 50:24
rate 37:4 195:2 227:18
  249:10
rates 198:14
reach 9:4,7,8
react 55:17
read 10:25 11:2 25:4 44:22,
  24 47:10 67:23 73:5,20
  106:18,22 109:3 110:11
  112:17,24 126:16,23 127:7
  136:6,7 152:9,23 154:2

155:9,17 158:4 159:2
165:22 166:14 167:2,18,25
168:3 176:24,25 177:16
182:9,21 189:15 202:5,13
203:17,20,23 213:5 217:3
218:13 221:8,10,12 222:17
223:15 224:5,7,22 226:21
229:5 232:3 234:8 235:7,10
246:7 253:12 255:2 257:20
259:14 261:11,17 262:13
264:7 266:17 277:16
reading 69:9 74:5 109:19
  110:5 166:2 178:6 190:10
  194:10 211:13,15 221:6
  225:16,17,21 227:25 233:14
  235:24 245:17 258:21
  263:15
reads 68:7
ready 209:25
real 273:13
realize 214:7
realm 116:16
reason 9:20 11:19 81:9,11
  111:12 115:16 126:2
  127:11,23 128:7 134:19
reasonable 183:5,24
reasons 113:14 191:16
  192:7
reassigned 224:13
recall 12:25 13:9,11,16,20
  14:9,11,14,19,20 15:6,10,17
  16:10 17:3,18,20,23 18:7
  20:7,12 21:3 30:5 43:7,13,
  24 44:5 45:12,19 47:3 48:4,
  22 49:8 50:16,25 52:19
  54:15 58:15 60:5 63:5
  69:23,25 71:8,12,13,15,22,
  23 72:12 73:3 74:22 75:21
  77:22,25 79:5 83:10,14 86:8
  87:5,10,16,22,24 88:15,18,
  25 89:3,8,10,16,17,25 90:7
  92:2,7 93:2,11,16,22 94:2,4,
  8 97:9,10,18,24 98:15,18,21
  99:6,15,21,24 100:4,17,22
  102:5,7,13,16 104:7 105:16,
  20,22 107:19,22 108:17
  111:16 114:7,8 115:14
  116:11,16,22 117:20,25
  118:2,7,12,23 119:9,15,16
  124:20,22 126:14 127:17
  129:15 132:14,15,19 133:2
  135:9,10 138:18 139:18,24
  141:20 144:2,16,20 150:22

151:16 152:18 153:15,23
154:9,11,12,13,15,16,21,24,
25 155:3,6 156:13,17 157:2,
9,13,16,20,21,23 158:14
159:5,11,13,19 160:10,16
161:3,23 162:8,14,17,18,23
163:8,9,10,11,12,15 164:6,
15,20 165:3,8 169:5,6,12,19
170:6 172:14,16,22,23
173:2,3,6,7,8 174:9,11,23,
24 175:3,10 176:2,11,15
179:15,21,22 180:8,9,24
184:20,21 185:2,7,9 186:6,8
187:14,16,24 188:5,7,11,12,
15,16,25 189:6,22 194:10
196:7 197:16 198:10,11
199:13 201:8,25 202:4,8
208:10 209:24 210:21 213:2
214:10,16,18 215:3,10,11,
23 216:8 217:7,12,23
218:12 228:19 230:7,11,24
231:20,21,24 234:10 236:21
237:7,9 238:11 239:9,13,21
240:5,7,10 243:9 244:16,17,
21 245:12 248:8,13 251:17,
22 252:2,9,22,24 254:20
256:22 258:11,20 259:24
260:6,7 262:8,9,25 264:2,3,
5,18,22,23 266:10,12,14
267:19 268:20 270:19
274:5,18,19,20 275:17,19

**recalled** 244:6

**recalling** 81:10

**receive** 11:22 13:12 56:19
88:19 95:5 175:7 225:23
227:2,6 229:7

**received** 28:19 29:3 85:7
90:5 221:21

**receiving** 71:9 89:2 264:18
266:10,12

**Recent** 112:12

**recently** 168:4 252:19

**reception** 22:20 23:9,17,18
24:13

**recess** 6:23 75:7 134:9
187:7 241:13 272:15

**recognition** 54:24

**recognize** 67:7 125:9 140:9
166:20 171:6 189:18 194:18
208:16

**recognized** 56:22 149:12

**recognizing** 66:11 199:22

**recollection** 22:7 33:23
34:13 36:13,14 37:23 38:4
68:2 72:10 82:2,8,12 90:10,
20 102:20 113:18,24,25
114:3 115:20,21 118:20,22
119:11 125:25 128:6,13
137:7 157:25 168:17 176:9
179:24 212:19 219:10
221:4,16 222:5 236:8,12
238:2 241:3 248:9 258:2,25
261:24 262:2 267:5,11,17

**recollections** 82:5

**recommend** 52:3

**recommendation** 52:11
68:24 69:18 108:8 141:13
262:12,19 264:7,13,14
265:12,18,21 266:3

**recommendations** 68:13
216:10 261:7 276:17

**recommended** 66:5

**recommending** 273:5

**reconstitute** 37:15

**record** 5:3,7 6:2,16,22 7:7,
21 8:12,17 9:6 10:3 26:25
27:9,12,14,16 38:9,22,24
39:2 53:3,5 75:6,10 104:24
105:4 106:7 111:18,24
112:3 126:18,21 127:2
134:6,8,12 136:12 168:3
177:17 187:6,10 204:13
205:15 241:10,11,16 270:24
272:11,18 277:22

**recorded** 5:4,5

**records** 58:22,24,25 216:3

**recruited** 41:6,8

**redacted** 207:10

**reduce** 164:24 168:7 169:16,
24

**refer** 12:13 25:19 194:8

**reference** 236:22 245:14
250:14

**referenced** 65:12 230:24

**referred** 68:17 87:19,23

**referring** 53:13 140:25
190:23 191:22 233:12

**refers** 74:9 180:25 256:19

**reflect** 29:20 136:12 139:22

**reflected** 34:11 93:19

**reflection** 22:2

**reflects** 29:9 31:19

**refresh** 22:6 37:23 98:20
117:2 128:13 130:12 219:5,
10 221:4,16 222:5 228:8
253:10 258:2 267:4,10,17

**refreshes** 128:6

**regard** 270:18

**Regional** 252:5

**register** 141:25

**registered** 255:15

**regularly** 15:12 49:5,8
78:15,17 183:19 196:3

**regulations** 69:5 74:2,8,10
152:12

**regulatory** 139:17 152:14

**relate** 191:4,6 255:23

**related** 5:20 31:12 36:25
44:14,16 108:15 148:11
149:16 153:20 158:7 159:23
160:4 166:23 209:23

**relates** 64:10 193:22

**relationship** 80:16

**relay** 236:10 237:3

**relaying** 236:9,14 243:20

**release** 19:2,5,7,11

**relevance** 44:18

**relevant** 63:15,23 64:4 65:4
147:8 149:2 193:4 256:3

**relied** 196:18 198:25

**relief** 50:8 52:3,22 58:11,13
59:16 60:9,20 61:8,19 62:3,
19 70:25 72:7 85:8 86:2,7,
24,25 87:8,12,23 91:13,17,
22,25 125:22 127:13 128:9,
11 204:13 263:8 275:10

**reliefl** 152:17

**remain** 154:5

**remained** 160:21 177:23

**remains** 164:14

**remarkably** 206:20

**remarks** 21:10,14,20 22:2
151:12 152:5 158:17 182:8
189:9

**remember** 14:25 41:9 43:11
47:4 51:18 72:13,19 79:9
81:15,16 87:20 89:2,3
96:14,20 100:23 104:3,4,10
117:3,24 128:16 133:16,17
156:20,21,22,24 157:24
158:25 161:20 162:2,12
164:9,21 165:8,11 172:18

198:17,20 199:16 201:2
202:10 210:6 212:10,12,19,
25 214:11 216:11 217:2
222:12 233:16 234:14
236:5,11 238:15 243:16
269:3
**remembering** 102:15
**remote** 5:9,17,25
**remotely** 6:7
**remove** 15:24 18:18
**rent** 15:23
**reopening** 273:15
**reorganized** 207:24
**repayment** 25:16,24 46:6
125:4 220:7,10 268:13
**repeat** 10:22 17:11 44:21
47:9 53:9,23 61:24 83:19
84:12 97:4 98:9 111:2
114:2,14 120:3,24 124:16
150:15 154:19 198:5 247:25
**repeated** 121:11 150:18
**repeating** 203:6
**rephrase** 52:13 53:25 57:25
178:16 181:9
**replaced** 144:6
**replicated** 202:12,16
**report** 75:24 80:21 88:7
99:19 101:10 102:15
214:14,19 215:7 216:15
217:8,11,15 218:14,17,19
219:7,11,13,14 220:8,15
221:5,8,16,17 222:5,15,16
223:9 224:16 225:21
229:17,25 232:25 241:19,21
244:24 252:8,13 253:2
254:10,11,15 255:6 259:15
260:3 266:18,21
**reported** 75:25 76:2 78:11
80:8,12 81:2 84:16
**reporter** 5:23 6:3,25 9:17
11:3 27:23 44:23,25 47:11
**reporting** 6:6,14 79:24 80:15
81:14 115:25
**reports** 20:10,11,12 99:21
227:21 229:13
**represent** 10:12 26:11 30:7
103:17 117:13 132:3 170:7,
13 213:17 250:25 261:13
**representation** 30:15 31:2
60:23

**represented** 10:8 68:16
202:12 207:19 242:23
**representing** 182:17
**represents** 171:16
**request** 5:6 11:15 161:10,
16,19,20 162:9,13,18,25
180:3 186:6 215:18,22
218:23 221:8 262:14 264:9,
18 265:21 266:6
**requested** 11:2 44:24 47:10
220:16 265:19
**requesting** 69:7 74:3 162:16
271:7
**requests** 179:25
**require** 123:21 255:8
**required** 56:13 128:21 129:2
133:22 154:4 166:13 273:18
**requires** 216:13
**resign** 145:20
**resolution** 92:10
**resolve** 46:9 68:13 196:6,8,
10,11
**resolved** 54:21
**resources** 166:12 167:9,16
168:6 169:15,24 172:24
**respect** 52:3 61:12,13
259:18 264:14
**respective** 9:12
**response** 112:2 167:23
177:15 180:18 192:12
217:11,15,22,24 218:3,5,6
252:7,15,21 264:14,25
265:4,8,13,14 266:2
**responsibilities** 45:14 95:21
132:16
**responsibility** 41:18 55:15
79:2 133:4 139:10 151:6
182:22 208:19 209:2
269:12,14
**responsible** 78:22 95:18
114:22 115:23 246:6 272:24
273:4,7 274:3,9,13,14
275:14,16
**rest** 110:5,10 111:8 204:14
**restate** 58:2 65:14 195:16
**restroom** 134:5
**result** 117:17,22 128:22
129:5
**resulted** 49:22 52:23 59:14
60:8 68:4

**resume** 29:24 30:9,15 31:7
34:10 116:19 262:15
264:10,19 265:22 266:7
**resume-type** 26:14
**retained** 34:22
**retire** 145:19
**retired** 41:11 145:3,5
**retirement** 145:14
**retract** 251:7
**review** 24:18 29:12 48:24
52:23 53:18 59:14 66:3
68:5,8,9 69:7 71:4,20 74:4
85:10 87:5 108:8 119:17,19
153:7 154:3,5 159:16
176:14 187:18 196:3,19
197:12 199:17 200:12,20
202:2 204:24 205:8 206:22
209:25 214:21,25 216:8
218:17 219:14 220:17 223:9
225:25 227:16,18 229:6
247:19 252:7 257:24 258:4,
7 259:19 261:6,14,20 262:4,
15,23 263:3,7,24 264:4
267:3,9 269:16,20 276:6
**reviewed** 17:24 19:21 20:22,
25 21:2,10 85:24 106:15
195:7 197:23 200:14 226:13
232:11 242:15
**reviewing** 31:21 64:2,7
153:5,12,21 177:8 191:5,11
192:8,17 196:12,23 221:15
226:8 273:23
**reviews** 88:6 216:6
**revised** 12:19,25 28:2,23
**revising** 62:19
**revisited** 16:16
**Riemer** 49:13 68:11 117:19,
21 119:21,23 120:4,8,19,21
132:8,11 201:3
**Riemer's** 121:7
**right-** 213:16
**right-hand** 202:22 206:14
213:7
**rights** 194:15
**Robert** 43:11,15 79:8 164:9
**role** 14:17 39:8,18 40:14,18,
25 41:14,23 42:13,14 43:24
76:4,6 79:19,22 80:8 83:20
84:2 85:6 92:10,24 94:21
188:19 189:5 223:25
229:15,18

roles 38:5
room 6:6 8:7,8,22 9:2
rose 165:10
Rosenfelt 47:22 68:11
  130:20,21,24 228:18 262:8
roughly 155:15
round 182:13 183:4
routinely 223:5
Roxbury 16:8
Rreview 201:24
rule 53:14
ruled 59:10
rulemaking 21:11,13 22:3,4
  151:7 182:23 189:10 273:15
rules 8:4
rush 126:14

## S

sat 258:19
satisfied 101:25 102:3
satisfy 203:18
Schmoke 79:14 80:9,17
  85:4 132:17,22 133:3
  187:20 188:4,8,12 262:9,10
Schmoke's 132:16
school 64:22 114:24
schools 59:24 62:18 119:16
  149:20 158:8 159:23 160:5
  198:18 213:17
scope 44:17 46:12,16 55:19
  63:10 144:23 146:13 147:7,
  22 148:6,14,23 149:22
  150:3 175:24 190:20 195:14
  216:17 255:17
screen 53:7
scrutiny 204:14
search 34:25
secondary 228:21
seconds 221:25 253:18
Secretary 19:25 23:20 32:8,
  9,15,19,24 34:5 40:9 47:22,
  23,25 48:18 54:14,21 55:5,9
  56:23 58:12 64:21 65:17
  66:17 67:11 68:18,24 69:12
  73:2 76:2,4,13,14,25 77:2,8,
  9,11,19,20 78:2,6 90:12
  93:21 94:22 95:9 112:2,17,
  25 121:17 122:2,6 123:13,
  19,24 140:3 141:2,5,9,10

157:5 165:16 166:15
  172:21,23 173:5 176:19
  177:17 179:2 208:22 209:7,
  12,14,22 210:7,23,24
  214:20 215:2,9,14,17,20
  218:25 223:2 227:22
  228:17,18,21 229:13 238:24
  239:3,14,19,23 240:5,8
  261:7 262:8,21 269:4,19
  276:2,3
Secretary's 55:8 64:9 65:25
  93:9,12 152:16
security 14:22 59:7
seek 79:13
self-employed 146:7
Senator 112:4 165:16 167:3
  176:18
send 215:17 252:14
sending 78:2
senior 32:8,14,19 34:17
  40:9,14,17 76:7,10 78:15
  79:12 80:23 146:3 208:21
  209:17,19,20,22 222:24,25
  224:13
sense 25:21,22 41:21
  183:21
sensitive 82:9
sentence 74:5 109:3,20
  110:5,7,8,11,12,13 112:25
  151:21 152:23 153:25
  155:10,17 158:5 167:20,21
  168:12 189:15 194:16 197:9
  227:3 228:2 231:25 232:14
  233:11 234:22 241:21 242:3
  245:3 247:5 261:12
sentences 167:19,22 168:2,
  11
separated 177:21
Separately 77:22
September 40:23 164:2,5
servant 145:17
serve 7:25 9:19 35:19
served 34:13,18 35:6 38:5
  39:15,21 40:9
service 14:22 31:5 146:3,4,5
  173:21
serving 14:21 36:6 40:17
session 21:13 151:7,12
sessions 21:11
set 12:7 52:24 65:7 69:4
  73:6,25 74:7,14,17,19

134:23 136:18 139:12
  142:23 149:16 198:2,8
  212:7
setting 73:16 191:18
settled 71:17
seventeen 170:17 171:6,9
shared 269:12,13
she'd 123:25 224:21
short 36:20 74:24 127:4
  133:25 156:20 157:17,18
  199:22
short-term 156:2,19
shorthand 25:20
shortly 21:15 46:25 79:11
  81:5 223:8
show 126:22 170:12 200:2
  219:18 240:20
showing 64:12 126:12
  135:16 191:19 193:8
shown 136:12
shows 69:16 170:9,14
side 36:3 138:12 206:14
  208:24 213:7,16
SIG 254:17
sign 18:4,6 55:15 66:5,6
  108:15 277:17
signal 266:4
signature 90:7 106:21 210:2
signed 18:10 19:21 54:16
  66:11 67:17 68:25 69:13,24
  70:3,12,14,23 94:7 108:16
  109:10 110:17 118:18
  133:12 141:3,10
significant 46:19 49:14
  104:12 161:9 173:18
significantly 163:16 164:17
  180:13 181:25
signing 94:4
signoff 90:7
similar 139:25 205:11 207:3
simply 12:18 173:5
sir 113:24 115:6 116:5
  117:10 118:5 131:6,20
  136:23 137:22 138:11
  142:20 147:23 150:12
  151:15 152:3 155:22 182:21
  186:15 203:5 210:4 224:10
  232:20 235:8 240:4,15,19
  260:2
sit 33:22 36:14 102:19
  104:15 118:19 186:5 236:4

239:22 240:16,18
**sitting** 9:11 189:23 210:17
211:2,22
**situation** 56:11,13 58:22
**sixteen** 170:14,25
**skimmed** 234:9
**skip** 67:3 220:5
**slide** 125:18 127:6
**slow** 160:12,13
**slowdowns** 83:4
**small** 8:25 94:14 160:19
**smaller** 76:12
**Social** 59:7
**solid** 143:20
**sort** 26:17 158:18 175:12
**sorts** 27:5
**sound** 103:12,13,20 104:2
115:5
**sounds** 258:24
**space** 15:24
**speak** 8:19 22:11,14,18
23:22,24 24:3,6,9,12 49:22
58:8 209:7,22 217:6
**special** 14:22
**specific** 48:14 49:21 57:9
72:20 102:7 121:15 124:18
155:18 161:20 173:2 176:5
215:23 261:23 262:2
266:11,13
**specifically** 17:3 20:8,16
22:9 45:19 47:3 50:14 52:2
55:25 72:13 73:3 76:6 94:9
98:15 100:7,22 102:16
104:10 109:15,19 117:24
118:25 119:9 155:6 162:2,
12 164:6 173:3 174:12
175:3 179:21 184:21 187:19
188:9,15 197:8 204:5
208:10 210:6 212:10 216:7
217:2 222:14 233:16 245:12
248:19 251:17 273:22
**specificity** 218:12
**specifics** 118:12
**speculate** 137:4 211:9
**speculating** 117:10 136:25
137:2
**speculation** 56:5 91:9
104:13 113:23 117:8 163:4
181:7 184:4 186:14 217:18
**speculative** 96:2

**speech** 158:18
**speeches** 159:15
**speed** 48:3
**spell** 43:18
**spelled** 51:15,18
**spend** 16:25
**spending** 85:4
**spent** 49:14 250:4
**spoke** 75:15 159:6
**spokesman** 77:7
**spring** 138:13 142:5,13
143:5 153:2
**spun** 147:17
**stack** 26:18
**staff** 34:21 41:20 77:2,4
158:23,24 160:19 161:5,7,9,
11,14,17,22,25 162:4,6,10,
16,19,25 164:15,17,24
167:9 170:15,18,20 171:2,
13 173:10 176:13 177:4
182:3 183:3,21,23,25 185:6
186:3,7 197:23 269:3
**staffers** 43:13 170:9
**staffing** 160:22 163:13,14,
21,24 167:15 169:25 172:8,
21 173:5 180:16 182:6,7
184:16,18,24 185:11,15,19,
22 186:10,16 188:7,13
**stamp** 206:13 207:17 213:7
220:23
**stamps** 225:3
**stand** 72:15 160:2,7 197:8
**standard** 268:23
**standby** 75:9
**standing** 47:17
**stands** 184:5
**start** 33:19 40:22 61:13
72:20 74:11 181:18 182:19
199:12 246:11 247:5,9
270:12
**started** 28:13 34:17 35:10
47:16 72:16 76:7 133:17
157:7 171:25 200:23 223:23
**starting** 110:11 153:25
155:10
**starts** 225:13
**state** 7:20 14:14,23,24 65:6
145:13 152:16 160:9 175:23
202:19 203:9,10 245:6
247:23 248:18

**stated** 106:15 138:21 184:2
193:19
**statement** 5:25 10:25 65:7
84:21 115:5 127:17 152:19
158:9,12 169:21 238:7
266:17
**statements** 107:3
**states** 109:20
**stating** 6:15 194:4
**status** 41:25 47:17 55:10
152:15 188:20
**stay** 145:16,17 266:23
**stayed** 34:23 145:18
**steady** 171:12
**step** 11:7 85:9,14 87:15,19,
23
**steps** 49:18 87:17 88:15
160:24 161:4
**stipulation** 183:15
**stop** 40:24 96:17,23 97:7,22
113:20 114:4,10 116:4
117:5,15,21 119:24 121:4,
18 128:21 129:4,18 130:2
131:2 133:20 137:9 143:13
236:6,17 237:6,10,16 243:6,
13 244:9 258:16
**stoppage** 122:15 127:24
**stopped** 23:21 36:6,15
58:23 97:11,16,20 98:3,13,
16 113:15 116:18 226:8,11,
16 259:2
**stopping** 123:21 239:15
244:18
**straight** 183:9 205:18
**Strata** 146:20
**Stratta** 147:11,16
**Street** 5:19
**strengthen** 264:15
**strident** 189:17,20,24 190:3,
4,12,24 191:23,24 193:25
194:9,14
**strike** 56:20 59:21 67:14
83:6 91:20 92:19 95:11
104:12 140:18 273:24
**strong** 64:12 193:8
**structure** 31:4
**structured** 218:9
**student** 25:17 33:11 35:8
47:17 59:23 61:2 72:6
114:25 146:19,21 147:20
148:12 149:25 194:15

195:21 220:7,9 245:20
268:12

**students** 64:21 115:3
118:25 119:2,3,6,10,12,13
155:16

**stuff** 168:19

**subject** 64:22 125:23 127:13
128:10

**submit** 232:7 233:20 234:4,
13 235:5,13,16,22 242:25

**submitted** 66:22 112:3
118:13 165:16 201:21
204:21 259:20

**submitting** 266:18 267:7

**subsequent** 197:9

**subsequently** 45:21 199:19

**substantially** 168:7 169:16

**succeeded** 39:22 144:10

**successful** 61:7 153:6,14

**sufficient** 85:25 86:6 181:4,
14 183:22 196:13,16 204:13
247:2

**sufficiently** 63:7 206:15

**suggested** 30:21 31:11
50:13,14 52:15 53:12

**suggesting** 58:16

**suggests** 255:6 266:22

**suit** 64:19

**sum** 193:8

**summer** 79:16 100:3

**superimposed** 213:11

**superseded** 249:13,18

**support** 5:18,24 247:22

**supported** 161:7 245:5
247:23

**suppose** 276:5

**supposed** 247:12 260:25

**surprise** 178:22 195:5
223:17 224:10 227:7

**surprised** 173:19,23 194:11,
24 223:14 224:6 226:24

**surprises** 178:21 224:11

**Sweet** 5:15 100:6

**swing** 259:3

**sworn** 7:9

**symbols** 210:15

**system** 17:14

## T

**tab** 12:13,17 26:18,20,21
27:18,22,25 28:4,11,21 29:6
37:20 66:21 73:13 106:6
111:17,19 124:25 135:25
136:8,12 138:3 140:4,9,11
142:12 150:23 165:13
176:17 182:9 189:8 201:13
204:17,19 205:20 206:5
219:20,25 241:17 244:23

**tabbed** 12:7,8

**table** 51:2 63:4 225:9

**Tabs** 12:10

**taking** 9:18 41:17 82:23
186:6 223:25

**Talbert** 42:19

**talk** 10:2,4,5 25:6,9,11 29:16
70:4 120:2 166:15 177:2
232:3 246:8,10,18 247:5
273:17,20

**talked** 16:15 54:19 71:14
75:14 184:25 185:4

**talking** 39:3 121:3 129:12
140:9 142:2 149:7 171:22,
24 197:10 205:23 230:23
232:22,24 235:21 237:12
252:16 253:6 258:12 260:5
261:14 272:19 273:12,13
274:17

**talks** 260:23 261:6

**target** 181:22

**taxpayer** 50:2 60:4 61:11,16,
25 62:8,12,16,24 63:8 72:5

**taxpayers** 19:4,14 58:21
59:25 60:8,19

**team** 27:3 40:20 41:6,11
42:4,7,9,14,17,18,25 44:6,
13 45:3,6,11,15,18 94:14
145:15 146:7 147:5 153:2
199:19 257:25 258:4,14,16,
19,23 259:2,6,9 269:16,21
276:6

**technical** 65:8

**technician** 5:18

**telephone** 17:10

**telephones** 8:23,25 9:2

**telling** 236:4 258:11

**ten** 38:11,16,19 50:25 51:10
72:8 78:15 134:4 183:3,6

208:16

**tenant** 15:22

**tendered** 66:25 106:12
125:7 201:16 219:23

**tenure** 20:4 78:24 79:3
86:25 88:12 96:23 97:6,15,
19,25 98:11 100:19 101:4,
24 102:11 124:11 125:10
127:21 156:16 164:22
169:4,18 180:23 181:11
186:12 196:25 212:5 231:18
237:14 248:7,14 251:7
257:3,11 267:21 268:10
269:2

**term** 156:3,20 157:18

**terms** 59:15 60:5 72:20
76:22 84:21 88:7 102:14
104:3 163:14 223:21 244:4
276:8

**testified** 7:11 15:12,21 16:6
65:16 117:14 120:19 127:22
132:5,7,13 140:20 223:15
224:7

**testify** 14:25

**testimony** 6:10 11:20 14:3
15:4,10,18 16:11 61:22
75:19 84:10 105:15 112:2
115:14 123:16 238:16
269:25 277:22

**text** 78:3 225:13

**Thanksgiving** 44:8

**Thantingview** 257:18

**Theresa** 5:15

**thing** 15:2 73:20 123:12,18
136:6,8 163:19,20,22
170:24 205:12 207:8 216:4
226:23 238:21 244:5

**things** 8:23 27:5 30:4 31:4
56:12 61:10 81:15,23 90:6
145:14 154:21 165:19
166:22 207:25 211:14
251:18 261:5 271:16

**thinking** 38:14 58:8 60:4
62:7 132:17,24 190:10
228:16 273:3

**third-in-command** 114:17,
20 115:8,23 129:8 131:17
135:5 183:17

**thought** 50:7 121:12 178:23

**thousand** 208:6

**threshold** 204:9

throw 101:19
thrown 37:16
Thursday 5:13
tier 125:22 127:13
Tiered 128:9
Til 143:10
time 5:14,23 6:22,24 7:7
  10:15 13:18 14:8,21 27:12,
  16 28:7,15 33:23 35:13,14
  38:4,22 39:2,8 41:11 44:2
  45:10 46:3 47:6 48:11 49:14
  71:3,19 72:15,18 75:6,10
  76:12 77:3 78:20 79:13,14
  82:13,15,23 84:6 85:4,11
  88:11 93:6 96:22 97:15,19,
  25 98:10,22 99:12,15
  102:11,18 104:24 105:4
  107:21 108:13,21 110:2,24
  111:9,15,23 112:11,15,19,
  22,23 113:2,10,11,16,21
  114:5,9,17 116:8 117:6
  118:17 121:5,8 122:17
  124:7,17 127:2 128:2 129:9,
  12 131:3,13 132:15,18,21
  133:8,12,21 134:8,12,17,23
  135:5,10 143:6,9,12 145:18,
  19 151:3 154:7,17,22 155:2,
  21,24 156:5,11 157:6,11,15
  158:14 159:22,25 160:17,21
  161:8 162:5 166:16,17,21,
  24 168:23 169:13,22 170:5
  171:8 173:18,22,23 177:24
  178:18 180:6,7 181:3,10
  182:24 183:3,18 184:3
  187:6,10 195:7 200:15,21
  206:7 208:20 216:24 217:20
  223:21 225:16 228:5,22,24
  229:16,20,22 230:5 232:21
  233:3 235:8 237:14 241:12,
  16 247:6,7 258:25 260:14
  271:2,15,16 272:3,5,13,18,
  24 274:11 276:12,15,21
  277:13
timeline 33:20 40:6
times 14:6,7 16:18 29:25
  47:23 49:7 78:14 203:11
  204:11 231:16 240:14
timing 97:14 248:6
tired 263:14 270:24
title 19:10 32:21 42:15,16
  139:21,22 140:22 141:17
  143:23 206:9

titled 125:4
today 5:13 7:24 10:9 11:20,
  23 13:22 25:7,17 26:17 29:4
  33:22 36:14 37:17 81:10
  82:2,8 102:19 105:15
  118:19 171:16 174:17 186:5
  189:23 236:4 239:22
  240:16,18 250:23 277:13
today's 16:14 20:22 28:25
  106:16 185:10 277:22
told 164:20 194:11
top 125:20 151:5 166:3,6
  205:23 206:8 207:17 213:7
  233:8 241:24 245:2 253:2,3
topic 43:4 63:14,23,24 64:5,
  10,16 193:22 209:21 256:6
  271:5,14
topics 44:18 64:17 65:4,9
  149:5,15,17 191:7,18
  192:21 193:4,18 194:5
  256:4
total 17:5,7,8 112:6 170:14,
  17,25 197:12
totaling 167:12
tough 208:9
transcript 9:19 21:19,23,25
  151:11 152:6
transcripts 24:19
transfer 198:15 225:25
  227:16 249:10
transition 40:19,20 41:5,11
  42:3,7,9,24 43:25 44:13
  45:3 144:12 145:15 146:7
  147:5 199:19 200:13,22
transition-- 42:17
transpired 224:20
trial 14:11,15,21
trouble 27:3 81:10,13
true 61:20 62:4 72:23 73:4
  107:6 158:10 159:21 194:20
  204:8
Trump 34:3,4,15 36:7,16
  38:6 39:4,19 40:18,20 41:5,
  19 42:2,24 45:3 83:22 88:12
  98:11 100:20 102:11 146:7
  147:5 148:19 150:6,10,20
  173:10 180:23 181:11
  185:13 250:10 251:4,6,12,
  14,21
Trump's 70:10
truth 172:15

truthful 11:20
turn 26:18 67:6 106:6,19
  107:7,11 111:17 112:8
  124:25 125:15 150:23
  151:17 152:8,21 154:6
  155:7 158:2 165:12,21
  176:16,22 189:7,12 204:17
  207:18 210:3 213:4 224:25
  241:4 244:22 252:25 257:15
tweaks 154:6,14
twenty 163:25
two-family 15:22
type 17:14 30:4,9 135:12
  139:7 142:7,16,23 169:14
  175:8 216:3 244:5 255:10
typed 31:6
types 146:10 199:21,25

## U

U.S. 5:18,24 23:12 33:12
  69:3 112:3 151:5 183:19
  252:6
uh-huh 9:22 67:8 112:5
  140:6 171:10 226:6
uh-uh 9:23
ul 246:23
ult 50:19
ultimately 48:17 49:10 50:20
  52:20 54:24 58:16,23 61:10
  67:23 72:8 77:8,13 87:4
  94:19 122:22 145:21 164:11
  209:11 246:23
un 74:15
uncovered 154:3
underneath 78:5 115:24
  225:12 262:12
Undersecretary 33:7 34:18
  39:18 40:4,8 75:23 78:8
  83:17,18,22,24 93:3,8,14,
  18,25 94:6 95:18,24 96:6
  108:4,11 114:16 131:12,17
  138:24 139:5 143:8 163:14
  180:6 183:19 209:15 211:23
  212:6 217:20 222:10,23
  224:15 228:2,5,14,25
  229:24 230:19 237:15
  243:18,25 255:15 260:9,16
  262:15 263:2 264:10 265:22
  267:22 268:21 269:2 275:25
Undersecretary's 276:18

understand 9:15,23 10:21 11:10,17 12:14 31:18 45:15 46:3,8 49:17 54:20 55:12 81:24 83:3 94:16 107:3,11 110:8,9 126:4 130:7 145:7 160:21 163:16,20 168:20,24 173:12 185:16 196:9 221:11 258:24 265:7,10 268:8,17

understandable 30:11

understanding 10:14 45:9 50:3 54:4 56:2,7 59:20 71:2 85:5,20 86:19 96:23 97:7 107:5 115:7 118:15 128:25 129:7 171:25 180:10,11 190:11,13,15 196:5,15 197:3 229:14 233:2,4 247:18 268:2,6

understands 126:24

understood 118:18 127:10 211:16 230:12 263:16

undertaken 168:23 169:3,8

undertook 169:14

undoubtedly 189:18 194:19

unhappy 56:8

unidentified 24:15

uniformly 217:22

unintelligible 15:13 120:2 145:4 149:18 192:11 223:4 248:25 270:22

unique 257:21 259:19

unit 5:10 69:4 73:6,19,24 74:6,13 79:16 84:20,23 85:3,6,21,23 86:11,22 87:4, 12 88:7 90:19,21,25 91:2 92:15,22,25 95:15,19,25 96:6,12,17,22 97:6,11,16 108:7 116:2 133:4 145:5,12, 17 162:7,11 163:24 164:10 170:10 183:7 198:25 199:5, 9 201:5,23 202:2 204:24 205:8 206:21 212:22 219:15 227:11,14 247:20 257:23 258:4,7,10 262:22 270:2,6

Unit's 92:5

units 176:7 214:22

university 15:15,16

unpack 234:22

unpleasant 192:3

unreasonable 115:12

unreasonably 100:10

unsupported 257:22

unusual 90:17

updated 84:3 208:11,13

USA 147:15,16,17,18

UTC 5:14 6:22 7:7 27:12,16 38:22 39:2 75:6,11 104:24 134:8,12 187:6,10 241:12, 16 272:14,18 277:23

utilized 167:16

___

## V

vacancies 180:25

vacancy 177:12

vacant 177:11 178:4 180:20, 22 187:21

vague 53:21 96:25 114:12 120:17,18,25 124:9,14 223:12 239:17 255:21 256:2

vantage 185:10

verbally 6:10

verification 7:4

Verified 7:5

versus 5:16 19:25 100:6

victims 59:24

video 5:17 53:7

video-recorded 5:11

view 62:23 63:6,19 191:25

viewed 62:4

violation 59:12

voice 139:9 159:8

voluntarily 7:25 13:21 177:21 277:14

volunteer 41:3,5,13

___

## W

wait 22:4

waive 6:13

wanted 8:3,6 15:24 37:13 39:7 54:20 75:13 82:6,24 101:19 162:24 166:22 167:4 168:21 169:2 186:2,20 221:3 256:13 266:23 271:17

warrants 86:23

Washington 7:13

Wayne 35:3 39:13 77:13 80:11,12,17 132:9 187:12, 22 188:2 216:24 219:4,9 220:25 247:6 252:14 254:7, 16 264:24 265:2,5,16,17

266:11

ways 60:9,20 61:18 62:2

weakness 259:15

wearing 40:2 183:17

week 32:18 210:8

weekly 99:19 102:15

weeks 41:19 54:10 76:9

weight 9:14

West 16:8

what' 19:10

whatsoever 115:21

window 234:20

winter 152:25

withstand 204:13

woman 22:24 24:15

wondering 36:20

word 190:3,4,6,12 194:11

words 11:5 58:4 175:15 223:13 249:24

wore 40:5

work 27:7 31:19 39:4 40:24 42:2 44:12,13 45:4 81:20 87:14,18 92:5 129:20 145:24 146:8,20 147:17,19 148:10,17,19 149:19,20,23 155:25 196:20 199:24 245:25 252:20 259:3 261:18 263:5 264:15,16 266:23 269:5 275:9

worked 43:23 58:19 72:16 94:15 132:22 147:3 153:4, 11 188:2 245:9,23

working 8:24 36:15 39:10 41:10,12 45:2,6 47:13 48:12,14,18,21 49:14 58:9 158:6 159:22 160:4 181:21 197:10 252:22 262:22 263:2,21

workload 183:24

worth 66:8

worthy 61:4

would'nt 167:5

wrap 101:16 272:4

write 19:15 67:16 158:22,23 159:14,15

writer 158:25

writes 109:4

writing 52:15,18 134:24 135:7,14,16,18,20 136:18 137:11,19 139:13,16,20

140:18,21,24 141:22 158:15
159:12 246:2
**written** 36:9 66:15,18 77:20
83:7 93:23 158:18,20 159:9,
10 175:7 232:25 251:11,14,
18
**wrong** 36:12 210:8
**wrote** 118:17 215:2,9
**Wyo** 198:15
**Wyotech** 198:15

---

## Y

---

**year** 21:16,17 215:7 223:19
256:10 259:25
**years** 14:7 31:5 145:19
165:10 250:4
**yesterday** 23:10 37:15
**yield** 156:3
**York** 5:19,20
**young** 22:24 269:4

---

## Z

---

**Z-E-I-Z** 77:12
**Zeiz** 77:9,11
**Zoom** 8:5 17:10,14,16
**Zoom-type** 22:11

January 29, 2021

Lindsey Withem
WilmerHale Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA  02130

Re:    Deposition of **James Manning Transcript**
          12/17/2020
          Theresa Sweet v. Elisabeth Devos

Dear Attorney Withem:

The witness did not waive the right to read and sign his/her deposition in the above referenced matter.  Enclosed are the completed and signed errata sheet, and the signed original signature page.  These should be attached to the original transcript in your possession. Should you have any questions, please don't hesitate to call.

Sincerely,


Rose Heath
U.S. Legal Support

No. 335262
Enclosures


 cc:   Robert C. Merritt, Esquire

```
 1
 2                     C E R T I F I C A T E
 3   STATE OF NEW YORK          )
 4                              )  ss.
 5   COUNTY OF NEW YORK         )
 6
 7       I, HOPE LYNN MENAKER, a Notary Public within
 8   and for the State of New York, do hereby certify:
 9       That JAMES MANNING, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13       I further certify that I am not related to
14   any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17               IN WITNESS WHEREOF, I have hereunto
18   set my hand this 22nd day of December, 2020.
19
20               _____
21                  HOPE LYNN MENAKER
22
23
24
25
```

1

2                    A C K N O W L E D G E M E N T

3

4    STATE OF NEW YORK          )

5                               )   ss.

6    COUNTY OF NEW YORK         )

7

8         I, JAMES MANNING, hereby certify that I have

9    read the transcript of my testimony taken under

10   oath in my deposition of December 17, 2020; that

11   the transcript is a true, complete and correct

12   record of my testimony, and that the answers on

13   the record as given by me are true and correct.

14

15                   *James S. Manning*

16           JAMES MANNING        1/23/2

17

18   Subscribed and sworn

19   to before me on this the

20   _____ day of _____, 2020.

21   Notary Public, State of New York

22

23

24

25

                          ERRATA SHEET
    THERESA SWEET, ET AL. V. ELISABETH DEVOS, ET AL.
                 DATE OF DECEMBER 17, 2020
                      JAMES MANNING

PAGE/LINE(S)/       CHANGE                REASON

_34_ / _5_ /INSERT UNDER_____/ I WAS UNDER SECRETARY. NOT SECRETARY

_34_ / _22_ / STRIKE FRANZI___/ THE NAME IS RUNCIE

44+45 /12|13 2.5 / ASKE Q. TO BE READ BACK  THE REDBACK WAS NOT IDENTICAL

47,48 / 25+17 STRIKE CONNOLLY / THE NAME IS CONATY. THIS ERROR IS ACROSS the DOCUMENT

_50_ / _16_ / STRIKE INDIRECTLY / SP. ERROR REPLACE W/ INCORRECTLy

_68_ / _9+10_ / STRIKE CONNOLLY / NAME IS CONATY

_69_ / _3_ / DIRECT FOR U.S. ← STRIKE FOR U.S. INSERT OUS - STRIKE OR IN INSERT

_70_ / _10_ / STRIKE TRUMP'S / INSERT THE PREVIOUS  THIS TO READ DIRECT OUS AND

_79_ / _14_ / STRIKE JILLIAN - / INSERT JULIAN

_80_ / _9+11+_ / STRIKE JILLIAN / INSERT JULIAN

_94_ / _14_ / STRIKE WAS INSERT HAS - (CORRECT WORD

_101_ / _10_ / STRIKE LEGAL / INSERT REGULAR

_107_ / _10_ / STRIKE 14TH / INSERT 4TH

_133_ / _7+17_ / STRIKE MARTIN wwm / INSERT MARK AND WHEN

_163_ / _19+20_ / STRIKE  hd A d to GOO  CORECTION Goo to GOOD

JANUARY 23, 2021            James J. Manning
Date                          Signature

PAGE   LINE   CHANGE           REASON
223 / 23 / STRIKE '17 / IT IS AN ERROR

228 / 16 / STRIKE CONNOLLY / NAME IS CONATY

246 / 21 / STRIKE OF / INSERT OR

257 / 18 / A WORD HERE MAKES NO SENSE "THANTINGVIEW" IT IS NOT CORRECT
                                    BUT I DO NOT KNOW HOW TO CORRECT IT

262 / 6+9 / ⑥ STRIKE CONNOLLY / CORRECT NAME IS CONATY

            ⑨ STRIKE JOE / INSERT JULIAN

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 4 – Colleen Nevin**

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4    - - - - - - - - - - - - - - X

 5    THERESA SWEET, et al., on      :

 6    behalf of themselves and all  :  Case No.:

 7    others similarly situated,     :  19-cv-03674-WHA

 8                 Plaintiffs,       :

 9    vs.                            :

10    ELISABETH DEVOS, in her        :

11    official capacity as           :

12    Secretary of the United        :

13    States Department of           :

14    Education, et al.,             :

15                 Defendants.       :

16    - - - - - - - - - - - - - - X

17

18    Remote Videotaped Deposition of COLLEEN M. NEVIN

19             Wednesday, December 9, 2020

20                  9:11 a.m. (EST)

21

22

23    Job No. 332242

24    Pages:  1 - 268

25    Reported by:  Dana C. Ryan, RPR, CRR
```

Page 2

```
1
2
3                        December 9, 2020
4                        9:11 a.m. (EST)
5
6
7
8        Remote Videotaped Deposition of COLLEEN M.
9   NEVIN, held via Zoom video teleconference, before
10  Dana C. Ryan, Registered Professional Reporter,
11  Certified Realtime Reporter and Notary Public in
12  and for the State of Alabama.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1             A P P E A R A N C E S
2
3       ON BEHALF OF THE PLAINTIFFS:
4         REBECCA ELLIS, ESQ.
5         MARGARET O'GRADY, ESQ.
6         EILEEN CONNOR, ESQ.
7         TOBY R. MERRILL, ESQ.
8         Legal Services Center of
9            Harvard Law School
10        122 Boylston Street
11        Jamaica Plain, Massachusetts 02130
12        Telephone:  (617) 390-3003
13        Email: mogrady@law.harvard.edu
14        Email: econnor@law.harvard.edu
15        Email: rellis@law.harvard.edu
16        Email: tmerrill@law.harvard.edu
17
18              - and -
19
20
21
22
23
24
25
```

Page 4

```
1      A P P E A R A N C E S  C O N T I N U E D
2
3         JOSEPH JARAMILLO, ESQ.
4         CLAIRE TORCHIANA, ESQ.
5         Housing & Economic Rights Advocates
6         3950 Broadway, Suite 200
7         Oakland, California 94611
8         Telephone:  (510) 271-8443
9         Email: jjaramillo@heraca.org
10        Email: ctorchiana@heraca.org
11
12     ON BEHALF OF THE DEFENDANTS:
13        R. CHARLIE MERRITT, ESQ.
14        KEVIN P. HANCOCK, ESQ.
15        KATHRYN C. DAVIS, ESQ.
16        MARCIA BERMAN, ESQ.
17        U.S. Department of Justice
18        Civil Division, Federal Programs Branch
19        1100 L Street, Northwest
20        Washington, D.C. 20530
21        Telephone:  (202) 307-0342
22        Email: robert.c.merritt@usdoj.gov
23        Email: kathryn.c.davis@usdoj.gov
24        Email: kevin.p.hancock@usdoj.gov
25        Email: marcia.berman@usdoj.gov
```

Page 5

```
1      A P P E A R A N C E S  C O N T I N U E D
2
3       Also present:
4         Joe Raguso, Video Technician
5
```

Page 6

```
 1              C O N T E N T S
 2  EXAMINATION OF COLLEEN M. NEVIN:        PAGE:
 3  By Ms. Ellis                              10
 4  By Mr. Merritt                           262
 5
 6
 7
 8
 9              E X H I B I T S
10      (Attached to the Transcript)
11  DEPOSITION                              PAGE:
12  Exhibit 21   Declaration Of              17
13               Colleen M. Nevin
14  Exhibit 22   Defendants' Responses And   29
15               Objections To Plaintiffs'
16               First Set Of Interrogatories
17  Exhibit 23   Exhibit 18 To The Declaration  184
18               Of Colleen M. Nevin Titled
19               Standard Protocol
20
21
22
23
24
25
```

Page 7

```
 1          PREVIOUSLY MARKED EXHIBITS
 2  DEPOSITION                              PAGE:
 3  Exhibit 5    October 24, 2016 Email     237
 4  Exhibit 7    May 4, 2017 Email          129
 5  Exhibit 12   April 21, 2019 PowerPoint  157
 6               Titled Borrower Defense To
 7               Repayment
 8  Exhibit 13   Defendants' Response To     80
 9               August 31, 2020 Order
10  Exhibit 15   Declaration Of Eileen Connor  92
11  Exhibit 19   Defendants' Response Regarding  173
12               The Court's Request At The
13               October 1, 2020 Class Hearing
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  We are now on the
 3  record.  Participants should be aware that this
 4  proceeding is being recorded and as such all
 5  conversations held will be recorded unless there
 6  is a request and agreement to go off the record.
 7          Private conversations and
 8  attorney-client interactions should be held
 9  outside the presence of the remote interface.
10  This is the remote video recorded deposition of
11  Colleen Nevin being taken by counsel.
12          Today is Wednesday, December 9th, 2020.
13  The time now is 14:11 in the UTC time code.  We're
14  here in the matter of Theresa Sweet versus
15  Elisabeth DeVos.
16          My name is Joe Raguso, the remote video
17  technician, on behalf of U.S. Legal Support
18  located at 90 Broad Street, New York, New York.
19  I'm not related to any party in this action, nor
20  am I financially interested in the outcome.
21          At this time will the reporter, Dana
22  Ryan, on behalf of U.S. Legal Support, please
23  enter the statement for remote proceedings into
24  the record.
25          THE COURT REPORTER:  The attorneys
```

Page 9

```
 1  participating in this deposition acknowledge that
 2  I am not physically present in the room and that I
 3  will be reporting this deposition remotely.
 4          They further acknowledge that, in lieu
 5  of an oath administered in person, the witness
 6  will be sworn in remotely and will verbally
 7  declare her testimony in this matter is under
 8  penalty of perjury.
 9          The parties and their counsel consent
10  to this arrangement and waive any objections to
11  this manner of reporting.
12          Now, if I could ask all parties to
13  please state their agreement to the stipulation on
14  the record.
15          MS. ELLIS:  We agree.
16          MR. MERRITT:  I agree.
17          THE COURT REPORTER:  All right.  Now,
18  Ms. Nevin, if I could have you please hold up your
19  driver's license for me.
20          THE WITNESS:  This is going to be part
21  of the record, part of the videotape, you know,
22  the personal information?
23          THE COURT REPORTER:  I guess we could
24  actually get him to cut that off while I look at
25  it.
```

Page 10

1          MR. MERRITT:  Yeah, I think last time
2    we did this part off the record, and we can do
3    that off the record.
4          THE COURT REPORTER:  Okay.
5          THE VIDEOGRAPHER:  So would you like me
6    to go off the record real quick?
7          THE COURT REPORTER:  Please, Joe.
8          THE VIDEOGRAPHER:  We are now off the
9    record.  Time is 14:13 UTC.
10         (Witness presents government-issued
11   photo ID to the camera and identity is verified.)
12         THE VIDEOGRAPHER:  We are now on the
13   record.  Time is 14:13 UTC.
14         ************************
15              COLLEEN M. NEVIN,
16     having been duly sworn, testified as follows:
17         ************************
18   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19   BY MS. ELLIS:
20    Q    Okay.  And will the witness please
21   state your name for the record?
22    A    Colleen Nevin.
23    Q    And since we're in remote deposition,
24   can I please ask you to confirm that there's
25   nobody else in the room with you right now?

Page 11

1    A    There is nobody else in the room with
2    me.
3    Q    And can you please confirm that you
4    won't communicate with anyone during the
5    deposition while we're on the record by email,
6    chat or text, other electronic means?
7    A    I agree.
8    Q    Sorry.
9         Do you have a smartphone in the room
10   with you right now?
11    A    No, I put it in the other room.
12    Q    Okay.  Great.  Thank you.
13         So as we talked about before we got
14   started, we can take breaks whenever you need, not
15   when a question is pending, but we'll take short
16   breaks throughout the day.
17         We do have a video recording of this
18   deposition, but please answer questions yes or no
19   out loud so that we have a record for the written
20   transcript.  I know you're an attorney, so you're
21   probably familiar with all this initial matter,
22   but I'm going to go through it anyway.
23         Government counsel might object to some
24   questions today on bases other than privilege, but
25   you can still answer those questions unless

Page 12

1    counsel instructs you not to answer.
2         There's nothing that's preventing you
3    from answering truthfully today?
4    A    That's correct, yes.
5    Q    And what did you do to prepare for this
6    deposition?
7    A    I met with DOJ and our Office of
8    General Counsel a few times, and they asked me to
9    review some records.
10    Q    Okay.  You reviewed those records to
11   refresh your recollection?
12    A    Yes.
13    Q    What records did you review?
14    A    My declaration, the declarations of
15   Diane Jones and I think two declarations of Mark
16   Brown, the attachments.  I think the
17   administrative record generally, I believe, and
18   the attachments to those declarations.
19    Q    Okay.  About how long did you spend
20   meeting with the government attorneys to prepare
21   for this deposition?
22    A    Total over the course of a few days, I
23   would say -- I'm tallying it up.  Twelve hours,
24   somewhere in that neighborhood.
25    Q    Okay.  And did you discuss this

Page 13

1    deposition with anyone else?
2    A    My team is aware that I'm being
3    deposed, and they were assisting me with pulling
4    documents for the discovery responses and things
5    along those lines.  My boss was aware of me being
6    deposed, probably some other folks in the office
7    that I'm not thinking of right now; Mark Brown is
8    aware that I'm being deposed, and I would imagine
9    that there's some people I'm not remembering
10   within FSA with just awareness that I'm being
11   deposed.  I think that's it.
12    Q    When you referred to your boss, who is
13   that?
14    A    Robin Minor.
15    Q    I'm sorry.  The audio was a little
16   funny.  Can you say that again?
17    A    Sure.  Robin Minor, M-I-N-O-R.
18    Q    Okay.
19    A    She's the acting chief enforcement
20   officer.
21    Q    Okay.  Great.  Thank you.
22         Have you been deposed before?
23    A    I have not.
24    Q    Okay.  Fun.
25         So we're just going to start with some

Page 14

1  background first.  When did you graduate from
2  college?
3      A       1993.
4      Q       And law school?
5      A       '97.
6      Q       And after you graduated from law
7  school, what was your first job?
8      A       I was in private practice.  I worked at
9  a firm in Chicago named Clausen Miller, and I was
10 there for a few years, and then I went to another
11 firm named Vedder Price.
12             Do you want me to go through -- I
13 changed jobs a few times.  I was at the AA -- the
14 Illinois -- excuse me, Illinois State's Attorney's
15 Office.  Then I moved to Massachusetts and joined
16 Adler Pollock & Sheehan, was there for several
17 years, and, then, just prior to coming to the
18 Department of Education, I was an assistant
19 attorney general in Massachusetts for a few years.
20     Q       When you were at the Illinois State's
21 Attorney's Office, did you work at all on student
22 loan issues?
23     A       No, I was handling criminal appeals.
24     Q       And at the Mass AG's office, did you
25 work on student loans issues?

Page 15

1      A       I did.  Yes, I was in the consumer
2  protection division, so that was some of our work.
3      Q       Okay.  Could you describe some of the
4  work you did at Mass consumer protection with
5  respect to student loans?
6      A       Primarily, I was the lead on the
7  investigation of the lawsuit relating to a
8  proprietary school called American Career
9  Institute.  I also did some work related to
10 servicers and probably was tangentially involved
11 with some other kind of unrelated issues, but
12 those were the main focuses.
13     Q       And when did you start in your current
14 position?
15     A       October of 2016.
16     Q       At -- sorry.
17     A       I'm sorry.  That was my fault.
18             October of 2016 is when I started.
19     Q       And that position is as the director of
20 the borrower defense unit?
21     A       That's correct.
22     Q       That's still your position today?
23     A       It is.
24     Q       When you started as the director of the
25 borrower defense unit, what was your understanding

Page 16

1  of the goals and priorities for the unit?
2      A       That's a broad question.  I mean, as
3  a -- the main goal was to adjudicate the borrower
4  defense claims that were coming in, and in order
5  to do that, extend a process and systems that
6  would allow us to do that.
7      Q       And is that still your understanding of
8  the goals and priorities?
9      A       As a general proposition, yes, yes.
10     Q       What about specifically?
11     A       Can you reframe, rephrase?
12     Q       Well, you said, as a general matter,
13 you have the same understanding of the goals and
14 priorities, so I was asking, rather than
15 generally, in the specific is there -- are there
16 things that -- where your understanding about
17 goals and priorities have changed?
18     A       That's the overarching goal.  There are
19 a lot of components to that, so I was just
20 intending to state that, obviously, there are a
21 lot of pieces to that, but that's the overarching
22 goal.
23     Q       Okay.  Understood.  And we'll get into
24 some of the specifics.
25             So I'd like to look at tab 22 in your

Page 17

1  materials and on the Dropbox.  That's the document
2  with the bracketed number 22, ECF56-4 Declaration
3  of Colleen M. Nevin.
4             MS. ELLIS:  And I would like to mark
5  this as an exhibit.  The judge's standing order
6  asks us to do consecutive numbering, so I'd like
7  to pick up where we left off.  The last deposition
8  in the -- the last exhibit in the Jones deposition
9  was 20, so I'd like to mark the Declaration of
10 Colleen Nevin as Exhibit 21.
11             (Deposition Exhibit 21 was marked for
12 identification and attached to the transcript.)
13     BY MS. ELLIS:
14     Q       So do you recognize this document?
15     A       I do.
16     Q       And on the last page, page 17, that's
17 your signature?
18     A       (Witness reviews document.)  Yes.
19     Q       Did you write the document?
20     A       Yes.
21     Q       Did anyone help you write it?
22     A       I believe I worked with our Office of
23 General Counsel and the Department of Justice
24 attorneys on some of it, but it's my work.
25     Q       Okay.  So if you'll turn to

Page 18

1  paragraph 2, please.  You write here, I'm the
2  director of the borrower defense unit within the
3  Enforcement Office within the Office of Federal
4  Student Aid for the United States Department of
5  Education.
6        So is that still an accurate
7  description of your job title?
8        A     Technically, we've had a restructuring
9  within Federal Student Aid since this was filed,
10  so the borrower defense unit is now referred to as
11  the borrower defense group.  Additionally, the
12  Enforcement Office is now known as the Partner
13  Enforcement and Consumer Protection Directorate.
14        So the naming conventions have changed,
15  but the scope of my work has not.
16        Q     Okay.  Is it all right if we refer to
17  it as the borrower defense unit today --
18        A     Sure.
19        Q     -- since that's how it's called in the
20  documents generally?
21        A     That's fine.
22        Q     So who do you report to?
23        A     Robin Minor, M-I-N-O-R.  She's the
24  acting director -- acting chief enforcement
25  officer and also the deputy chief operating

Page 19

1  officer at FSA.
2        Q     Okay.  And throughout your time at the
3  department, has the person who you report to
4  changed?
5        A     Yes.
6        Q     Okay.  So starting -- starting from now
7  and working backwards, can you tell me who are the
8  different people you've reported to and what their
9  roles are?
10        A     Well, I've always reported to the
11  person in the role of chief enforcement officer.
12  That has changed.  So for the past just about a
13  year, Robin Minor has been in that position in an
14  acting capacity.  Prior to that, it was Jeffrey
15  Appel, A-P-P-E-L.  Prior to Mr. Appel, it was
16  Julian Schmoke, S-C-H-M-O-K-E.
17        And prior to Julian Schmoke, Laura Kim,
18  I believe, who was originally the deputy chief
19  enforcement officer, was in an acting role for a
20  period of time, so I believe she was the acting
21  chief enforcement officer for some period of 2017.
22  And prior to that -- and this was when I was
23  hired -- the chief enforcement officer was Robert
24  Kaye, K-A-Y-E.
25        Q     Okay.  Is the chief enforcement officer

Page 20

1  a political appointee?
2        A     No.
3        Q     How often do you meet with the chief
4  enforcement officer?
5        A     It's very ad hoc.  I mean, at a
6  minimum, I have a weekly meeting, but borrower
7  defense has a lot of things going on, so I would
8  say at least maybe -- formal meetings, probably
9  not more than once or twice a week, but I speak
10  with Robin Minor regularly.
11        Q     And how often do you meet with the
12  chief operating officer of FSA?
13        A     Over what period of time?
14        Q     Well, I know 2020 is unusual, but, yes,
15  let's start with 2020 and work backwards.
16        A     Specific to borrower defense, twice a
17  week.  I think it was three times a week for some
18  period of 2020, but I provide very regular updates
19  to him regarding our progress on adjudicating the
20  cases.
21        In addition to the, you know, regular
22  meetings to report on the status of BD, we also
23  have fairly regular meetings in anticipation of
24  his meetings.  He has weekly meetings with the
25  under secretary, Diane Jones, and so I generally

Page 21

1  participate in meetings with him to address any
2  open questions that either he has for me or to
3  find out what the open issues are that we have for
4  the -- for OUS for the under secretary.
5        In addition to that, I think, you know,
6  broader things in terms of FSA that other managers
7  and supervisors may participate in, so they're not
8  specific to borrower defense, that's probably
9  weekly or more.
10        Q     Okay.  In terms of the organizational
11  structure, how does the chief enforcement officer
12  relate to the chief operating officer?
13        A     The chief enforcement officer reports
14  to the deputy COO, deputy chief operating officer,
15  and that's Robin Minor since she's in an acting
16  chief enforcement officer capacity.  She's wearing
17  two hats in that role right now, and, then, she
18  reports directly to Mark Brown, who's the chief
19  operating officer.  That's been the structure
20  since the reorganization.
21        I believe at some point it changed to
22  the chief enforcement officer reporting to the
23  deputy COO.  That was probably 2019, but I'm not
24  sure exactly what the timing was.  Prior to that,
25  I believe the chief enforcement officer reported

Page 22

1  directly to the chief operating officer.
2      Q      And how often do you meet with Under
3  Secretary Diane Auer Jones?
4      A      Not often.  Maybe a -- it's not
5  scheduled.  It's very ad hoc, and I think that
6  there's probably been a total of somewhere in five
7  to ten meetings together since we were both at the
8  department.
9      Q      Have you reviewed the transcript of
10  Ms. Jones' deposition?
11     A      No.
12     Q      And how often have you met with
13  Secretary DeVos?
14     A      I've never met her.  Actually, I take
15  that back.  The day she started, she did a walk
16  around, and I think I saw her then, so I don't
17  know if that counts as meeting, but . . .
18     Q      Okay.  So then who reports to you?
19     A      I have a team of attorneys that report
20  to me.  That number has varied pretty dramatically
21  from 2016 to the present, but they're all
22  attorneys that report to me.
23            Since we staffed up starting last fall,
24  some of my original team moved into supervisory
25  roles, and, then, we also hired some additional

Page 23

1  more senior attorneys to -- acting in supervisory
2  roles because I was bringing on several dozen
3  junior attorneys.
4      Q      So when you say your "original team,"
5  are those people who have been in the borrower
6  defense unit since you started in 2016?
7      A      Yes, that's correct.
8      Q      Okay.  How many of those people are
9  there?
10     A      Five full-time and one part-time.
11     Q      And can you tell me their names,
12  please?
13     A      Brian Bayne, B-A-Y-N-E; Mike Garry,
14  G-A-R-R-Y; Mike Page, P-A-G-E; John Stephenson,
15  S-T-E-P-H-E-N-S-O-N; Andrew Bronstein
16  B-R-O-N-S-T-E-I-N; and the part-time attorney is
17  Erin (phonetic) Joyce, J-O-Y-C-E.
18     Q      Thank you.
19            And, so, those original attorneys are
20  in supervisory roles within the unit now?
21     A      Not all of them.  Four of them are.
22     Q      Okay.  And you referred to staffing up
23  in the fall.  When did you start hiring additional
24  attorneys for the borrower defense unit in 2019?
25     A      When you say "hiring," do you mean when

Page 24

1  did we, you know, post the job and start, you
2  know, interviewing candidates or when did they
3  start?
4      Q      Let's start with when did you post the
5  jobs.
6      A      I believe that was the summer of
7  2019 -- was when we first started posting to --
8  actually, that was for what we call backfills, so
9  we had attrition in the borrower defense unit
10  between 2016 and 2019 and had not been able to
11  replace the attorneys that had left.  So we were
12  able to post to -- to fill those positions, and
13  then also bring on -- we got the authority to hire
14  up to 60 term-appointed attorneys.
15            They were at varying levels.  As I
16  mentioned, some of the folks that we brought on
17  are in more senior roles who have supervisory
18  positions.  The vast majority are recent law
19  grads, junior attorneys.  And they started
20  onboarding, which is the term we used for starting
21  in -- the first group of junior attorneys started
22  in September of 2019.
23     Q      Okay.  When you say "term-appointed,"
24  what is the term?
25     A      In the federal government -- two years.

Page 25

1  It's -- but there's a potential for kind of
2  reupping it or extending their period of service,
3  but the initial term that they were hired for is
4  two years.
5      Q      Why had you been unable to replace the
6  attorneys who you lost due to attrition since
7  2017?
8      A      Well, in early 2017, there was a hiring
9  freeze put in place, and that lasted for a fairly
10  extended period of time across all of -- I think
11  all of the departments, certainly all of FSA.
12            And, then, you know, beyond that, there
13  was a process for getting approval to hire
14  additional staff that went through leadership at
15  FSA and then over to senior leadership at -- at --
16  when I say LBJ, I'm referring to senior leadership
17  in the department, as opposed to within FSA.  But
18  the folks over at LBJ were making the calls on who
19  we could hire back then.
20            So we didn't get the authority to hire
21  anybody in borrower defense until May of 2019 --
22  or summer of 2019.
23     Q      Had you requested to hire additional
24  attorneys before May 2019?
25     A      Yes.

Page 26

1    Q    When did you make that request?
2    A    Several times.
3    Q    When was the first time that you recall
4    requesting to hire additional attorneys?
5    A    Well, we were considering bringing on
6    additional staff at the time of the transition
7    from one administration to the next, And then did
8    not end up doing that.  And, obviously, during the
9    hiring freeze, nobody was allowed to hire anybody,
10   so I don't think that -- you know, I had raised
11   concerns about staffing throughout that period of
12   time, but there was kind of a department-wide
13   freeze.
14        Once there was a change in the process
15   in terms of hiring, Julian Schmoke was the chief
16   enforcement officer at the time, and I would, you
17   know, in my weekly meetings with him reiterate
18   that we needed to increase our staffing.  So that
19   happened on a very regular basis, and he would
20   submit the requests up, and we wouldn't get
21   authority to do that.
22        I don't know how regularly he submitted
23   them, but I know it was kind of a recurring issue.
24   Q    Do you know why the hiring freeze was
25   put in place?

Page 27

1    A    I don't.
2    Q    And was there a specific time when the
3    department-wide hiring freeze ended?
4    A    I'm sure there was.  I don't recall
5    what it was.
6    Q    Do you know who ultimately was
7    responsible for the decision whether or not to
8    approve a hiring request?  Once Julian Schmoke
9    submitted that request, do you know who ultimately
10   was the decision maker?
11   A    My understanding from discussions with
12   him is that it was the -- that the request went to
13   the secretary's chief of staff.  I don't know if
14   he made the decisions or if they went to the
15   secretary or some other process, but, you know, he
16   would communicate to me that he had heard back
17   from the chief of staff that we weren't getting
18   approved.
19   Q    Okay.  So let's talk a minute about the
20   COO.  That's currently Mark Brown?
21   A    That's correct.
22   Q    And what -- how overall would you
23   describe the COO's role with respect to borrower
24   defense?
25   A    Fairly active.

Page 28

1    Q    It sounds like you meet with the COO
2    frequently to discuss borrower defense issues?
3    A    That's correct.
4    Q    Is the COO responsible for setting
5    policy for borrower defense?
6    A    No.  Federal Student Aid does not make
7    the policy at all.
8    Q    Uh-huh.
9    A    The department makes policy, and then
10   Federal Student Aid implements it.
11   Q    When you say "the department," are
12   there specific individuals you're referring to?
13   A    Not for the -- for the general
14   proposition I just stated, I -- it could be.  I
15   have no idea how many different people would be
16   involved, so, no.
17   Q    Okay.  When -- when you draw the
18   distinction between -- you say FSA doesn't make
19   policy; the department makes policy, could you
20   explain what you mean?
21   A    Yeah.  You know, FSA is not -- it's a
22   performance-based apolitical organization, so the
23   top of the Federal Student Aid organization is the
24   chief operating officer who -- I don't know how
25   else to explain it.  It's a performance-based

Page 29

1    organization that's apolitical.
2         We apply the policies that are made by
3    the political appointees within the Department of
4    Education, so everybody from the secretary down
5    through whatever her structure is for -- for the
6    different parts that inform policy for
7    student-loan-related issues.
8    Q    Okay.  I'd like to turn for a second to
9    the defendants' responses to -- responses and
10   objections to plaintiffs' first set of
11   interrogatories.  I believe you have -- you said
12   you have a copy of that?
13   A    I do.  I do not have a second screen,
14   so I'm going to put it up.  I'm not going to be
15   able to see you or anyone else.  I just wanted
16   everybody to be aware of that.
17   Q    Okay.  No problem.
18        And in the Dropbox, this is -- the
19   document, it does not have a bracketed number
20   before it.  The file name is Sweet Defendants'
21   Interrogatory Responses 12/7/20, and I'd like to
22   mark this as Exhibit 22.
23        (Deposition Exhibit 22 was marked for
24   identification and attached to the transcript.)
25   BY MS. ELLIS:

Page 30

1    Q    So if you could please turn to page 3,
2  and at the top of page 3 is interrogatory number
3  2.
4        Could you read that, please?
5    A    (Witness reviews document.)
6        Sorry.  Just want to make sure --
7        Okay.  Identify every person who has
8  knowledge of the facts and circumstances alleged
9  in the complaint and in this -- in this action,
10 and for each person identified describe with
11 specificity each person's knowledge.
12   Q    Okay.  And then you can see at the
13 bottom of page 3 begins the response, and that
14 continues onto page 4.  You'll see at the top of
15 page 4 is your name, and it describes your
16 knowledge as borrower defense processes and
17 decisions.
18       Would you say that's accurate?
19   A    Yes, I think so.
20   Q    Okay.  And then right beneath your name
21 is Jim Manning, and it describes his knowledge as
22 borrower defense policy and processes.
23       Do you see that?
24   A    I do.
25   Q    And a little further down the list is

Page 31

1  Robin Minor, also describing her knowledge as
2  borrower defense policies and processes?
3    A    Right.
4    Q    And a couple of lines down from that,
5  Julian Schmoke, borrower defense policies and
6  processes?
7    A    Right.
8    Q    So is it accurate to say that all three
9  of those people were within FSA?
10       MR. MERRITT:  Object to the form.
11       BY MS. ELLIS:
12   Q    Robin Minor and Julian Schmoke?
13   A    Jim Manning wore multiple hats, but
14 Robin Minor and Julian Schmoke have always just
15 been within FSA.
16       Jim Manning was the acting under
17 secretary in 2017.  And I'm not sure about what
18 the dates were, but he wore two hats in that he
19 also was the chief operating officer of FSA.  So
20 he's been involved in multiple roles.
21   Q    Uh-huh.
22       And they -- they would have knowledge
23 of borrower defense policy even though FSA, you
24 say, was not the policymaker?
25   A    That's right.  Yeah, they would have

Page 32

1  knowledge of the policy in order to oversee
2  implementation of it.
3    Q    And where were they getting their
4  knowledge or instructions regarding the policies
5  from?
6    A    Who specifically are you asking about?
7    Q    Okay.  Jim Manning, you said, wore
8  multiple hats, so that's a little more
9  complicated.  But for Robin Minor and Julian
10 Schmoke, who was instructing them on department
11 policy?
12   A    I think it depends on what period of
13 time.
14   Q    Okay.
15   A    Can you be more specific?
16   Q    Yes, let's take them one at a time.  So
17 Julian Schmoke, you said, he at one time was the
18 chief enforcement officer at FSA?
19   A    Correct.
20   Q    And do you know the dates he held that
21 role?
22   A    Oh, gosh.  He started in 2018.  I -- I
23 don't remember exactly.  Yeah, I wouldn't want to
24 guess.
25   Q    Okay.  During the time that Julian

Page 33

1  Schmoke was chief enforcement officer, who was
2  instructing him on borrower defense policy?
3    A    Well, the chief operating officer
4  position has also changed.  There have been five
5  since I started in 2016.  So the first chief
6  operating officer when I was there was James
7  Runcie.  He left early in 2017, I believe, and the
8  acting chief officer was Matthew Sessa.
9        I believe both of them precede Julian
10 Schmoke because he was hired by the third person
11 on that list, Wayne Johnson, who was the chief
12 operating officer -- I don't know if he started
13 maybe in late 2017, early 2018 -- maybe a little
14 bit later than that, but -- so Julian first
15 reported to Wayne Johnson.
16       Johnson was subsequently moved to a
17 different position, and I believe that's when
18 James Manning took over as the acting chief
19 operating officer, and then Julian reported to him
20 for some period of time.
21       And when Manning was the chief
22 operating officer, he, I believe, brought over
23 from LBJ a deputy chief operating officer named
24 Kathleen Smith, and I think Julian met regularly
25 with her as well.

Page 34

1    I think those were all the people that
2 he reported to.
3    Q    Okay.  Did instructions on borrower
4 defense policy come from the Office of the Under
5 Secretary during the period when James Manning was
6 the acting under secretary?
7    A    Yes.
8    Q    And what about the current period when
9 Diane Jones has been the secretary?
10    A    Well, the chain of communication has
11 changed a little bit, so when Mark Brown became
12 the chief operating officer, he put a number of
13 processes, kind of chains of communication or
14 paths of communication in place.
15    So, generally speaking, I think most of
16 the instruction from the Office of the Under
17 Secretary during Mark Brown's tenure has been
18 through him.
19    Q    Okay.  But it's your understanding that
20 the Office of the Under Secretary sets borrower
21 defense policy and those policy instructions then
22 come to FSA through Mark Brown?
23    A    I don't know that the Office of the
24 Under Secretary sets all policy.  I know that OUS
25 sets some policy.  I believe Robert Eitel, who is

Page 35

1 the fifth person on the list, and Nathan Bailey,
2 who is the secretary's chief of staff, I believe,
3 have both been involved as well.  So I'm not
4 exactly sure what the structure is over there, but
5 it -- whatever the LBJ policy is -- would
6 typically come to Mark Brown.
7    Q    But the Office of the Under Secretary
8 is one source of borrower defense policy at least?
9    A    Yes.
10    Q    And is that true with respect to policy
11 on the adjudication of borrower defense
12 applications?
13    A    That some of the policy comes from the
14 Office of the Under Secretary?
15    Q    Yes.
16    A    Yes.
17    Q    Specifically, can you identify any
18 policy directives on the adjudication of borrower
19 defense applications that comes from the Office of
20 the Under Secretary?
21    A    Well, that's communicated from the
22 Office of the Under Secretary to FSA?
23    Q    Yes.
24    A    Sure.  So I don't know if staffing is a
25 policy issue that went through the under secretary

Page 36

1 to the secretary's office, but I think the under
2 secretary's office may have had input on that.
3    Policy in terms of applications with
4 the schools, how we advise schools of the claim
5 against them, the, you know, evidence-exchange
6 process, things along those lines, and the
7 development of any kind of written communications
8 are all areas that -- that the Office of the Under
9 Secretary would provide input on.
10    Q    Did anyone summarize Diane Auer Jones'
11 deposition testimony for you?
12    A    No.
13    Q    Okay.  If we could turn back to your
14 declaration, which we've marked as Exhibit 21.
15 You know, before -- before we do that, I just want
16 to follow up on one thing you just said that OUS
17 sets or contributes to policy on written
18 communications.
19    Written communications with who?
20    A    With schools, with borrowers.
21    Those would be the two main ones.
22    Q    Okay.  Thank you.
23    So next I wanted to turn to paragraph 4
24 of your declaration -- that's on page 2 -- to just
25 walk through some of your responsibilities as the

Page 37

1 director of BDU?
2    MR. MERRITT:  I'm sorry.  Rebecca, can
3 you state again what that document -- how it's
4 labeled?  I have to --
5    MS. ELLIS:  Sorry, yes that's the --
6    MR. MERRITT:  -- click in separately
7 each document.
8    MS. ELLIS:  The Declaration of Colleen
9 Nevin in the Dropbox, that is tab 22.  We've
10 marked it as Exhibit 21.
11    MR. MERRITT:  Thank you.
12 BY MS. ELLIS:
13    Q    Okay.  So you have here a list of your
14 responsibilities as director of BDU.  The first
15 one says, Conducting legal research and analyses
16 of borrower defense claims.
17    So can you describe what sort of legal
18 research and analyses you do or that you oversee?
19    A    Sure.  Well, so one of the three
20 regulations that apply to borrower defense claims
21 is the 1995 regulation which is based on an
22 application in state law, and that means that the
23 borrower's application has to be adjudicated to
24 determine whether the borrower states an act or
25 omission that would provide a cause of action

Page 38

1  under state law.
2        So that requires legal analysis and
3  research in connection with those individual state
4  laws.  There are other related issues in terms of,
5  you know, state licensing requirements, different
6  things related to accreditation, but the kind of
7  legal research is related to those '95 claims.
8        Q    Okay.  Does your department -- does the
9  borrower defense unit create memoranda describing
10 the research and analysis of state law for
11 purposes of the 1995 regs?
12       A    Yes.
13       Q    Are those memoranda communicated to the
14 attorneys who are reviewing borrower defense
15 applications?
16       A    Can you rephrase that?  Can you repeat
17 it?
18       Q    So -- so memoranda are created
19 describing the research and analysis of state law;
20 correct?
21       A    Yes.
22       Q    Okay.  So do -- do the individuals who
23 are actually reviewing individual borrower defense
24 applications have access to those memoranda in
25 order to apply state law to an individual claim?

Page 39

1        A    Oh, I see.  Okay.  They have access to
2  them, but our process is -- there's kind of a --
3  an order to it.  We start with determining what
4  the evidence -- if there's common evidence related
5  to the school.  We start with an analysis of the
6  evidence.
7        Then based on what the -- our
8  determinations are with respect to the facts, then
9  there's a legal memo that discusses how the law is
10 applied to those specific sets of facts.
11       Then once we've reached a legal
12 conclusion that, you know, we have evidence to
13 support claims under, you know, X state law
14 because these elements are met, or we don't have
15 sufficient evidence on a certain element for
16 another state law, then that identifies what the
17 borrower would have to provide evidence to support
18 in order to have an approved case.
19       That document then, in terms of the
20 legal analysis, turns into a written protocol, so
21 generally speaking, for any school where there's
22 common evidence, there will be kind of the
23 precursor documents to the protocol in terms of
24 the facts and the law, and then from those facts
25 and law, we determine what elements the borrower

Page 40

1  would need to meet.  That goes into the written
2  protocol.
3        The reviews are primarily done by the
4  junior attorneys; although, my senior team does as
5  well.  But for the most part, the heavy lifting is
6  done by the junior attorneys.  They're following
7  very specific protocols for what they need to look
8  for in each of the applications to see whether the
9  borrower's case should be approved.
10       So that's kind of how the process
11 breaks down.
12       Q    Okay.  How many of those protocols that
13 you just described currently exist?
14       A    How many -- well, we have probably 500
15 schools or more that we've done a preliminary
16 assessment of the evidence to determine the scope
17 of what we're reviewing.  Because we didn't have
18 staffing for such a long period of time, there's
19 still a lot of work to be done on any -- well, on
20 most of the schools that have a lot of common
21 evidence.
22       So in order to move forward with
23 adjudicating, you know, whatever cases that we
24 can, we try to determine upfront what it -- what
25 we're continuing to look at and what we need more

Page 41

1  time to develop and what we don't have evidence
2  relating to and, therefore, would have to look to
3  what the borrowers provide.
4        So we have about, I'd say, 500 or so
5  schools where at least some of the cases can be
6  adjudicated, and so there's a memo describing what
7  it is that we've done to reach the conclusion as
8  to who can be what we call cleared for
9  adjudication and move into an adjudication
10 process.  And those protocols, because there's not
11 common evidence to support the applications at
12 issue, are going to be dependent on what the
13 borrower provides.
14       In addition to that, we have -- I don't
15 know how many total protocols relate to the --
16 we've got job-placement-rate claims for
17 Corinthian, the employment-prospects claims for
18 Corinthian, transfer ability of credit for
19 Corinthian, and then ITT California
20 employment-prospects protocol, and we just
21 finished the protocols for all employment --
22 employment prospects for ITT.
23       So to the extent that those are --
24 those will be in addition to the 500 that I was
25 referencing.

Page 42

1      Q      Okay.  Let me try to walk through that
2   more specifically.  So the Corinthian
3   job-placement-rates protocol, that was already in
4   place when you joined the borrower defense unit;
5   is that correct?
6      A      We've made improvements to it, I think,
7   over time, so it's not going to be in the exact
8   same form, but, yes, the criteria for all intents
9   and purposes go back to 2016.
10     Q      Okay.  And then the Corinthian
11  employment-prospects protocol, that was -- or at
12  least in its initial form developed -- that was in
13  place as of January 2017; correct?
14     A      That's correct.
15     Q      And the Corinthian transfer of credit
16  claim protocol in place as of January 2017?
17     A      Correct.
18     Q      The ITT California employment-prospects
19  protocol, also January 2017?
20     A      By January 20th, yeah, it was probably
21  the second week in January, somewhere in there.
22     Q      Okay.  And you just said you have
23  recently completed a protocol for all ITT
24  employment prospects claims?
25     A      Right.  The initial one was related

Page 43

1   only to California.
2      Q      Uh-huh.
3      A      And, so, we now have one that applies
4   to all ITT employment-prospects claims.
5      Q      When was that completed?
6      A      Well, there are two -- one protocol,
7   there are multiple documents because we had the
8   2016 legal analysis and also the '95 legal
9   analysis.  So the protocol was updated when we
10  completed the -- we completed 2016 first.  That
11  was probably a few weeks ago.  I don't remember
12  exactly what the timing was.  And, you know, so we
13  made updates to it when we were able to move
14  forward on the '95 ones, and that was really just
15  in the last several days.
16     Q      Okay.  Have those protocols been
17  provided to the DOJ attorneys for production in
18  this case?
19     A      We're still pulling records together,
20  but we're going to be producing a lot of the
21  protocols to our Office of General Counsel.
22     Q      Okay.  Well, we would specifically
23  request that these new ITT protocols be included
24  in the production.
25            So, now, I want to back up to the 500

Page 44

1   schools that you referred to as having preliminary
2   evidence.  Can you explain a little more what
3   preliminary evidence means?
4      A      I don't think I said preliminary
5   evidence.  I think I said preliminary assessment
6   or preliminary review or something.
7            But if we have common evidence -- and
8   that can come in many forms.  But if we have
9   common evidence, we first look at it to see -- you
10  know, before we have time to do a comprehensive
11  review of it, we look at what the scope is.
12            So, for example, if we got a package of
13  materials from an attorney general's office and it
14  related to an investigation they did regarding
15  the, you know, employment prospects at a school
16  between 2010 and 2012, we would try to get a sense
17  of whether the evidence really is limited to the
18  2010 to 2012 period of time, whether it's specific
19  to a certain program or group of programs, whether
20  it's related to certain campuses, whether it's
21  more broadly applicable to places outside of that
22  state because AGs generally are focused on
23  their -- you know, the claims of their own
24  constituents.
25            And then we write up a summary of, you

Page 45

1   know, what our understanding is of the evidence,
2   and then we make an assessment of what it doesn't
3   apply to.
4            So, for example, if that package is
5   specific to the criminal justice program for a
6   certain school, you know, we review to make sure
7   that it doesn't, you know, go into anything beyond
8   that and we determine at that point now there's
9   nothing related to the nursing program or medical
10  assistant or things like that, and then those get
11  cleared for adjudication.
12            And then continue to work on the
13  criminal justice piece, and ultimately that will
14  end up with a summary of what we conclude that
15  that evidence supports in terms of findings or
16  facts that may satisfy an element or multiple
17  elements of a borrower's claim whether it's under
18  the 2016 reg or the '95 reg.
19            So the cases that have been adjudicated
20  so far in terms of schools where we have common
21  evidence are the ones that we don't think the
22  common evidence is going to help the borrower get
23  to an approval essentially because of their
24  circumstances because they are not in the program
25  that's at issue or they attended ten years before

Page 46

1    the evidence is relevant or they're in a state
2    outside of, you know, the one that we have
3    evidence for that doesn't seem more broadly
4    applicable.
5         Q    So when you say "cleared for
6    adjudication," what does that mean procedurally?
7         A    That means we write up a protocol, and
8    the protocol says -- you know, just kind of going
9    back to my example of if it's for a certain
10   program for a certain state, open the application.
11   You know, there's a bunch of things that they do
12   upfront.
13        And then one of the first things,
14   though, is -- you know, is the borrower in state
15   X, and if so, did the borrower attend a criminal
16   justice program.  If so, set that case aside.  And
17   then it gets moved into kind of a holding status
18   until we can continue to review and complete the
19   assessment of the evidence that would be related.
20        If the borrower is not in the
21   categories that are relevant to the common
22   evidence, then they would complete the
23   adjudication just like they would for what we call
24   our one-off claims where you have, you know, an
25   individual borrower who brings a claim.  And, so,

Page 47

1    it will depend on, you know, what evidence the
2    borrower support -- provides to support the claim.
3         Q    Okay.  So for -- for about 500 -- I
4    just want to make sure I'm understanding this.
5         For about 500 schools, there's been an
6    assessment of common evidence that would allow
7    reviewers to direct certain claims that fit the
8    common evidence into this bucket of cleared for
9    adjudication where those claims are on hold
10   waiting for a final protocol?
11        A    I'm not sure about that exactly.  Can
12   you say that one more time?
13        Q    So I'm just trying to understand -- so
14   there are 500 schools for which the department has
15   what it considers to be common evidence.
16        Is that correct at the first step?
17        A    I'm approximating, so I probably
18   shouldn't have given an exact number.  I didn't
19   intend to give an exact number.  I think it's
20   somewhere in the ballpark of 500.  And that
21   would -- you know, there are school groups, so
22   that could be individual schools within school
23   groups as well, but, yeah, there are somewhere in
24   the neighborhood of about 500 schools where we've
25   reached that preliminary step.

Page 48

1         Q    Okay.  And, so, for each of those 500
2    schools, are there instructions that are given to
3    reviewers of how to assess whether an individual
4    claim fits within that common evidence?
5         A    Whether -- whether the claim fits
6    within the common evidence?
7         Q    Yeah.
8         A    I think it's the opposite of what
9    you're describing.  So it -- it tells them what
10   they should not move forward on because there may
11   be common evidence that's relevant.
12        Q    Okay.  So the -- let's try to take a --
13   try to make it a little more concrete.  So say --
14   say you receive a package of evidence from a state
15   attorney general about school X and it's about
16   school X making employment-prospect
17   misrepresentations in 2010 to 2012.
18        And does BDU provide instructions to
19   the reviewers essentially saying if you come
20   across an application from school X criminal
21   justice 2010 to 2012, then you set that aside?
22        A    Yes.
23        Q    Okay.  Are those instructions written
24   up?  Are there --
25        A    That's part --

Page 49

1         Q    -- instructions that the reviewers
2    receive?
3         A    Yes, that's part of the written
4    protocol.
5         Q    Okay.  And those are among the
6    documents that you've been gathering to be
7    produced in this action?
8         A    That is correct.
9         Q    Okay.  So then for each of those
10   buckets of applications that are set aside as
11   potentially fitting within the common evidence
12   that you have, for how many schools has BDU
13   proceeded to the next step to actually having a
14   system for granting those applications?
15        A    We're working on -- how many? -- but a
16   lot of schools along those lines.  But we haven't
17   created that for any other than ITT at this point,
18   and that's just limited to the employment
19   prospects.
20        Q    Which other schools are you working on?
21        A    Beckwood (phonetic), the EDMC schools,
22   the American ALO (phonetic), the Court Reporting
23   institutes -- I mean, there are dozens, but those
24   are the ones that come to mind right now.
25        We also have a whole lot of open

Page 50

1    schools where we have claims, but there are some
2    additional processes that need to happen on those,
3    so the ones we've made the most headway on are
4    primarily the closed schools.
5        Q    Since you started your position at BDU,
6    the only claims that have been granted, the only
7    borrower defense claims that have been granted are
8    from Corinthian and ITT?
9        A    With the exception with the American
10   Career Institute cases in January --
11       Q    Right.
12       A    -- of 2017.  Right.
13       Q    ACI was a group application; is that
14   correct?
15       A    That's right.
16       Q    Has BDU developed any group discharge
17   process?
18       A    We wouldn't develop the process, and my
19   understanding is that the department has not
20   developed a process.
21       Q    Who in the department would be
22   responsible for developing a group discharge
23   process?
24       A    I can't answer that hypothetically.  I
25   really don't know if they would -- I don't know if

Page 51

1    they decided to do it.  But, yeah, I don't have an
2    answer to that.
3        Q    Well, aside from an individual, do you
4    have an understanding of what unit or what
5    division of the department would be responsible or
6    would have the authority to create a group
7    discharge process?
8        A    Well, obviously, the secretary would.
9    I don't know who she -- OUS is involved in higher
10   Ed, so that's a possibility, but I really can't
11   answer.  Like I said, it's a hypothetical because
12   my understanding is that there is no such process.
13       Q    Okay.
14       A    There's no such -- yeah, there's no
15   such process.
16       Q    Okay.  For these protocols for other
17   schools that are -- that have some common evidence
18   and are in development, those -- do those analyses
19   involve a determination of what state law will
20   apply to those claims?
21       A    For the '95 applications, before we can
22   adjudicate any application, we would need to --
23   yeah, we would need to determine what the -- what
24   state law will be that will be used to determine
25   the case.

Page 52

1        Q    Do you know about what percentage of
2    pending applications fall under the '95 regs?
3        A    I really don't.  A good number, but
4    I -- I don't know percentage-wise what the
5    breakdown is between '95 and 2016, and it's not as
6    simple as you'd think probably because it -- it
7    involves whether or not they have FFEL loans that
8    would result in the case being consolidated, so
9    there's just a variety of factors that go into it.
10       There are a lot of borrowers who
11   are covered by both because it's dependent on the
12   date of the loan, so they may have loans that --
13   some of them are subject to the '95 reg and others
14   are 2016.
15       Q    Okay.  For claims that are subject to
16   the '95 reg, who decides ultimately what state law
17   should apply?
18       A    Well, currently?  Is that what --
19       Q    Currently.
20       A    -- what time period?
21       Currently, we have -- basically, we
22   have concluded with respect to ITT in particular
23   for the employment prospects that we would apply
24   the state where the borrower resided at the time
25   of separation from the school as a rebuttable

Page 53

1    presumption.  And that's because we're dealing
2    with hundreds of thousands of applications overall
3    and something like 30-something thousand ITT
4    cases.
5        And you can't really do an individual
6    choice of law assessment on each individual case.
7    I mean, as you know, those can get litigated for
8    months on one single case in a lawsuit.  So for
9    the purpose of doing it in a way that's
10   administratively possible, we have a default to
11   the -- I believe it's the state where the borrower
12   lived at the time of separation from the school,
13   and we have different data points that we use to
14   try to determine that.
15       But if the borrower thinks that a
16   different law -- thinks that we got it wrong on
17   determining that based on the data or thinks that
18   a different law should have been applied, then
19   that's something that they can seek
20   reconsideration on, and we would certainly look to
21   that unless the borrower had specifically asked
22   that a certain law be applied.  That would be the
23   exception.  It's very rare, but there are
24   borrowers that say my case should be adjudicated
25   under X law because that's where my campus was

Page 54

1   located or something along those lines.
2        Q    Who made the decision that that was the
3   standard that will be applied to the ITT claims?
4        A    We worked with general counsel in it.
5   You know, there are some challenges with the data
6   in terms of, you know, borrowers around where they
7   live at the time they applied is often different
8   than where they lived when they went to school or
9   where they would have lived when they were, you
10  know, on the receiving end of the alleged
11  misrepresentation.
12       There are a lot of different factors
13  and our, you know, data limitations that we have
14  on that mean that we have to, you know, basically
15  piece it together.
16       So that -- that, we thought, was the
17  most administratively possible and also supported
18  by choice of law principles, so, you know, we
19  looked at the various choice of law principles in,
20  you know, all the different states to try to get a
21  sense of where they would land generally, and that
22  seemed to be the most consistent.
23       Q    Did you make the final decision that
24  that would be the policy you follow or that that
25  would be the choice of law analysis you follow?

Page 55

1        A    Yeah, I wouldn't consider that a policy
2   decision.  Yeah, that was a recommendation from my
3   senior team and -- or some of the members of my
4   senior team, and I reviewed their -- their
5   analysis and agreed with it.
6        Q    So, ultimately, for these other schools
7   that have protocols under process, you also would
8   be the final decision maker on what state law
9   applies to them under the '95 regs?
10       A    Well, I wouldn't state it as such a
11  general proposition because if it were related
12  to -- for example, if an AG submitted something
13  and, you know, had indicated that the attorney
14  general of a particular state had made findings
15  related to state law that would be applicable,
16  there may be circumstances where we would, you
17  know, rely on something along those lines.
18       So I wouldn't say that there's an
19  absolute rule there, but that -- we thought that
20  that was a good framework generally for -- for
21  schools where we have to make that determination.
22       Q    I guess what I'm asking is does the
23  chief enforcement officer or anyone else have to
24  approve these decisions of what state law applies,
25  or is that a decision that you can make as the

Page 56

1   director of BDU?
2        A    Well, I did, but I -- it has been a
3   discussion.  There was a -- there were discussions
4   about whether it's a policy-related issue and
5   whether LBJ could determine what the appropriate
6   choice of law was.  I pushed back and submitted
7   what I thought was the appropriate framework, and
8   as, I said, we worked closely with OGC on it, and
9   they reviewed it and concluded that it was
10  appropriate.
11       Q    Who did you -- who did you have
12  discussions with about this question of whether
13  OUS could decide the choice of law standard?
14       A    I didn't directly have discussions, but
15  I know that there were some communications in
16  LBJ -- in LBJ with their Office of General
17  Counsel, I believe.
18       Q    LBJ's Office of General Counsel which
19  is separate from FSA's Office of General Counsel?
20       A    FSA doesn't have an Office of General
21  Counsel.  When I refer to Office of General
22  Counsel, that's actually the Department of
23  Education's Office of General Counsel.
24       Q    Okay.  I'm just trying to understand
25  the --

Page 57

1        A    Sorry.  We have alphabet --
2        Q    -- relationships.
3        A    -- soup.  I apologize for that.
4        Yeah.  No, the Department of Education,
5   which OUS is, you know, obviously directly under
6   the secretary, has an Office of General Counsel,
7   and they provide legal advice throughout the
8   entirety of the department including Federal
9   Student Aid.  So to the extent that there are
10  legal issues, they would go through the Office of
11  General Counsel over the department.
12       Q    Okay.  So you didn't directly
13  participate in, but you were aware of a question
14  whether OUS would weigh in on what's the
15  appropriate state law standard to use?
16       A    For ITT in particular.
17       Q    For ITT?
18       A    Yeah.
19       Q    And you don't -- do you know who was
20  involved in those discussions on the side of OUS?
21       A    Diane Jones.  And he's not in OUS, but
22  I think Robert Eitel might have been involved as
23  well.
24       Q    Okay.
25       MS. ELLIS:  We've been going for about

Page 58

1  an hour.  Why don't we take just a quick
2  two-minute break here.
3              THE WITNESS:  That sounds great.  Thank
4  you.
5              THE VIDEOGRAPHER:  All parties agree to
6  go off the record?
7              MS. ELLIS:  Yes.
8              MR. MERRITT:  Yes.
9              THE VIDEOGRAPHER:  We are now off the
10 record.  The time is 15:19 UTC.
11             (Recess -- 10:19 a.m.)
12             (After recess -- 10:25 a.m.)
13             THE VIDEOGRAPHER:  We are now on the
14 record.  The time is 15:25 UTC.
15             BY MS. ELLIS:
16     Q     Okay.  So I want to turn back to -- we
17 had been talking about schools for which the
18 department has identified what we've been calling
19 common evidence.  So I wanted to ask more
20 specifically what is considered common evidence?
21 What rises to the level of common evidence?
22     A     Well, it can come in a lot of different
23 forms.  The department, in its oversight -- FSA,
24 in its oversight function, often will look into
25 various issues and may have records relating to

Page 59

1  the school so, you know, that would be our --
2  formerly known as program compliance team or the
3  administrative actions and appeals group.
4              Particularly, if there was a fine
5  against the school or if there was some action
6  taken to either exclude a program or a campus from
7  continuing participation in Title IV funding, all
8  those things -- there may be related documents
9  with respect to the school.
10             We also have evidence from a number of
11 different law enforcement agencies, so CFPB, FTC,
12 the attorneys general.  There are a whole bunch of
13 different schools that have been investigated and
14 been involved in law enforcement actions, and some
15 of those documents have been provided to the
16 department.
17             You know, we could get -- we have
18 applications where borrowers or groups of
19 borrowers submitted a fair amount of evidence
20 themselves.  Your -- or Harvard's program has
21 actually submitted evidence with respect to at
22 least one of the schools I can think of.
23             So it comes from a variety of different
24 sources, and, yeah, those -- those are the ones
25 that come to mind.  I might even be forgetting

Page 60

1  something.  Anything that's available, you know,
2  to the public online, so we look at whether there
3  are things we're not aware of.  We do Internet
4  searches to see if there's something we might not
5  be aware of.
6              So lot of different ways that we get
7  materials.
8      Q     So if you have a group of borrowers who
9  are all submitting applications about the same
10 school and submitting the same kinds of evidence,
11 that would be sort of collated into common
12 evidence?
13     A     We -- that's not as common as you would
14 think, so -- but as we assess the common evidence,
15 we look to see if there are any borrowers who have
16 anything that would be more broadly applicable.
17 You know, sometimes a borrower will have something
18 very specific.  It could be like an email from an
19 admissions rep that is just related to something
20 that particular borrower encountered.
21             But, you know, I remember at least one
22 school where we didn't think that we had anything
23 at all, and in kind of doing a sampling of the
24 cases -- that's one of the things that we do
25 before we adjudicate anything is do some sampling

Page 61

1  and, you know, go through some of the applications
2  to see what kind of materials are being
3  provided -- and found a judgment that one of the
4  borrowers had obtained that would potentially be
5  more broadly applicable to not just that borrower.
6              So -- so that's a possibility, too, but
7  generally speaking, there are -- you know, the
8  vast majority of the borrowers do not have much by
9  way of evidence to support their claims
10 individually, so it's more often the case that we
11 would have to rely on, typically, like I said, our
12 oversight documentation and materials that
13 provided by AGs or legal aid or somebody else.
14     Q     Could you describe that sampling
15 process you that just mentioned?  How does that
16 work?
17     A     Well, you know, depending on how many
18 applications there are from a school because if
19 there are only, you know, 50 to a 100 and -- you
20 know, it would probably be a somewhat smaller
21 size.  I think on ITT, we did a sampling on
22 probably a 100.  I'm guessing, actually.  I
23 shouldn't give an exact number.
24             We did a sampling -- a fairly good size
25 sample of BD applicants relating to

Page 62

1   employment-prospects claims to see what, if any,
2   materials they attached to their applications and
3   what their -- what their allegations looked like
4   and whether there were any specifics to them
5   because that can be a pretty broad range of what's
6   in the allegations themselves.
7        Q    So if you have a school with a smaller
8   number of applicants, you mentioned, say, 50 to
9   100, would you look at all of those applications
10  rather than doing a sample to look for
11  commonalities?
12       A    I don't remember what our number is for
13  that range.  But we wouldn't look at all of them,
14  but we would look at a good distribution of them.
15       And we also allow for the possibility
16  that if we -- in that scenario, if you had 50 or
17  100, you know, those would all be -- if they were
18  all cleared for adjudication based on, you know,
19  not having common evidence or not having
20  identified anything in the sampling, if in the
21  course of reviewing the applications, we find
22  that, you know, the last application we looked at
23  has a judgment that we weren't aware of, then we
24  would probably pull those back before they got
25  processed so that they would be set aside for --

Page 63

1   for further analysis.
2        And, so, the junior attorney would, you
3   know, flag that issue for one of my senior team,
4   and then there would probably be a hold on those
5   until we assess, you know, whether any results
6   would be different.
7        But that would be a decision that
8   wouldn't be made on the first pass.
9        Q    When you say we would do sampling or
10  a -- you know, who -- who is "we" in that scenario
11  who is reviewing the samples?
12       A    Memos are generally done by a
13  combination of somebody on the senior team,
14  sometimes multiple people on the senior team
15  working with junior attorneys to -- it really
16  depends on how much common evidence there is, but
17  usually there would be a member of the senior team
18  either leading the effort or maybe even just
19  handling it him or herself.  It sort of depends on
20  the scope and availability of resources we have.
21       Q    Maybe it would be useful to sort of
22  walk through the process for how an application is
23  adjudicated, so, you know, from -- from the time
24  that somebody opens up an application, what
25  happens to it?

Page 64

1        A    At what period of time are you talking
2   about?
3        Q    Currently.
4        A    So for current applications, you know,
5   the -- the reviewing attorney would --
6   particularly assigned cases, the attorney would
7   open up the case, look at the -- by the way, case
8   is the same thing as an application.  It's just a
9   naming convention from the Salesforce platform, so
10  those are terms that we use interchangeably, but a
11  case is an application.
12       But they would open up the Salesforce
13  case that contains the actual document that's
14  submitted by the borrower, and then there are a
15  series of steps.  I think, actually, there are a
16  couple of protocols in the record, but, you know,
17  they open it up first to see if it's complete,
18  and, you know, there are certain things that --
19  sometimes we get applications in that are
20  incomplete, and, then, they get sent back to our
21  in-state team to follow up with the borrower to
22  get, you know, whatever information was missing
23  from the document.
24       But assuming that it's not something
25  that needs to be sent back to intake, you know,

Page 65

1   they would basically follow the protocols, and the
2   steps in the protocol will depend on what the
3   nature of the claim is.
4        So I don't know that I can give you
5   exact steps because it would depend.
6        Q    Okay.  You mentioned judgments --
7   judgments from private lawsuits as one kind of
8   evidence that's considered.
9        A    Right.
10       Q    What about if a lawsuit has been
11  filed -- if you receive evidence that a lawsuit
12  has been filed but has not yet come to final
13  judgment?
14       A    We would try to get the evidence
15  related to the lawsuit.
16       Q    You would request it from who?
17       A    Well, it depends.  The instance that I
18  was referring to is an individual borrower.  We
19  have a separate investigations unit, so we have a
20  process where if something like that were to
21  surface the investigations unit would reach out to
22  the borrower.
23       If the borrower has an attorney, which
24  is often the case if they have a lawsuit and
25  judgment or would be the case, I guess, then we

Page 66

1    would ask permission from the borrower to speak to
2    his or her attorney, and then -- when I say "we"
3    really I meant investigations.
4            And then they might ask the borrower's
5    attorney if they have any additional supporting
6    materials because maybe, you know, there might be
7    some discovery that they had that they didn't
8    provide or maybe they didn't realize that that
9    would be useful or helpful to them.
10           You know, it depends on whether the
11   judgment is for the borrower, him or herself, or
12   whether they're attaching a copy of a judgment
13   that somebody else brought.  But that's just one
14   scenario.
15       Q   What are some other situations where
16   you might refer a case to the investigations unit
17   to find out more information about the
18   allegations?
19       A   Well, investigations has had major
20   attrition and doesn't have much by way of
21   staffing.  So there's not too much that we've been
22   able to work with them on so far in terms of
23   enlisting their assistance.
24           But on those particular kinds of issues
25   where we think that borrowers maybe just weren't

Page 67

1    aware that, you know, something that they
2    referenced is -- would be potentially helpful to
3    their case, those are some of the scenarios where
4    we've asked investigations to reach out.
5            But I can't think of anything else that
6    they're working on with us right now.
7        Q   Was there a time during your tenure
8    when the investigations unit had more staffing
9    than it does now?
10       A   Yes.
11       Q   When was that?
12       A   Well, I think in 2016, 2017, they had
13   about -- they had a lot more people then.  They've
14   had some pretty major attrition.
15       Q   During 2016 to 2017, did the borrower
16   defense unit work more often or on more issues
17   with the investigations unit when they were better
18   staffed?
19       A   At that point, we were building both
20   units.  They were both new in 2016.  They had a
21   number of investigations that, I think, it was
22   anticipated that potentially would lead to
23   documents that would be relevant to borrower
24   defense, but due to attrition and, I think, policy
25   decisions, I don't think that there was much of

Page 68

1    anything that came out of those investigations
2    that was referred to BD.
3        Q   Do you know if anyone in the
4    investigations unit has asked for more staffing?
5        A   Yes.
6        Q   And do you know what happened to those
7    requests?
8            MR. MERRITT:  Objection to the scope of
9    these questions.
10   BY MS. ELLIS:
11       Q   You can answer.
12       A   I think similar to borrower defense,
13   they've had attrition early on in 2017 going into
14   2018.  And, you know, they would have been subject
15   to the same hiring freeze that everybody else was.
16           I was acting director of investigations
17   for a period of time and Julian Schmoke was the
18   chief enforcement officer, and I had raised that
19   we needed to step up investigations during our
20   meetings during that period of time, but it was
21   kind of the same scenario as borrower defense.
22       Q   During what period were you the acting
23   director of investigations?
24       A   I knew you were going to ask me that,
25   and now I don't remember.  I believe it was around

Page 69

1    spring of 2018 to towards the end of 2018, but I'm
2    not -- I'm not sure about the dates, but somewhere
3    in that general vicinity.
4        Q   Going back to common evidence, what
5    about settlements of lawsuits?
6        A   What about them?
7        Q   Would -- would they -- would that be
8    considered common evidence?
9        A   The settlement would not.  The fact of
10   the lawsuit would be something that we'd want to
11   explore.  So if there was a lawsuit and whoever
12   brought the lawsuit had evidence, then that would
13   be evidence that we would like to consider.
14       Q   So, for instance, if a state attorney
15   general settled a lawsuit with a school, you might
16   ask the attorney general to share the evidence
17   that they had in the course of their investigation
18   that led to the lawsuit?
19       A   At what period of time are you talking
20   about.
21       Q   Any period of time.
22       A   So that's been the case probably --
23   yeah.  Well, this year, that's the case.  Probably
24   for about a year or so.  We have had
25   communications with AGs where we know that they

Page 70

1  participated in and brought -- maybe even not just
2  a lawsuit.  Sometimes we're aware that there was
3  an investigation that didn't result in a filing of
4  a complaint.
5          We would reach out to them to ask them,
6  you know, what the scope of their investigation
7  was, and if, you know, some of them are in the
8  process of submitting materials, so we would want
9  to know before we adjudicate the cases if they are
10 in the process of putting any materials together
11 to send to us if that's their intention.
12         So we try to do that upfront before we
13 adjudicate anything.
14     Q    What about before this year?
15     A    We really didn't have communications
16 with the AGs until probably last fall, I'd say.
17     Q    Does BDU ever initiate or request
18 another group in the department to initiate a
19 further investigation of a school based on common
20 evidence that you have?
21         So, for instance, if you have -- if you
22 have information that a school was misrepresenting
23 its job placement rates for criminal justice in
24 2010 to 2012, would you ever investigate or ask
25 someone to investigate whether they also were

Page 71

1  making similar misrepresentations for other
2  programs during that period of time or for that
3  same program during other periods of time?
4      A    Investigations isn't -- investigations
5  isn't really staffed to handle that much right
6  now, but we, I think, have been -- they're focused
7  generally, we know, for the last few years for
8  something that is currently ongoing and, you know,
9  therefore, potentially going forward.
10         So what we're keeping an eye open for
11 by way of referring to them is if we see something
12 that has happened recently at an open school, you
13 know, whether that's something that they would
14 look at and I think that that would kind of fall
15 within their -- their purview right now.
16         In terms of if we know of, like, the
17 criminal justice program and whether we would
18 refer it for something -- you know, for a school
19 that's been closed or, you know, for something
20 that happened a long time ago, we probably would
21 not.
22     Q    If investigations were properly
23 staffed, is -- would you be able to make those
24 kind of requests for investigations into conduct
25 that happened in the past?

Page 72

1      A    I don't know that I would opine on what
2  a proper staffing is for them because it's not my
3  unit, but I think it would allow for maybe some
4  further exploration on their part.  I'm just
5  working with what we have at this point, so, you
6  know, to the extent that we're already taking up a
7  fair amount of their time in terms of the things
8  that I had already mentioned.
9          Given their very limited resources, we
10 haven't had conversations about expanding that.
11     Q    Again, in terms of what's considered
12 among the common evidence, does BDU consider
13 evidence that's provided by the schools
14 themselves?
15     A    Yes.
16     Q    Under what circumstances does BDU
17 communicate with a school to get evidence
18 regarding borrower defense?
19     A    Well, currently there are some open
20 policy issues or discussions relating to that, but
21 in the spring we -- I'm sorry.  Can you restate
22 your question?
23     Q    Under -- under what circumstances does
24 BDU reach out to a school to ask for evidence
25 regarding a borrower defense issue?

Page 73

1      A    Yeah.  Well, obviously, if the school
2  is closed and no longer doing business, there's
3  nothing we can do about that.
4          If the school is still open, then
5  starting this past spring, there were four school
6  groups that we had reached out to for two reasons.
7  One is to let them know that they were about to
8  receive individual applications as part of the
9  notification process under the 2016 regulations,
10 so really more of just a heads up that their email
11 box was about to get flooded with a whole lot of
12 applications.  But also to request documents that
13 we thought would be helpful in our assessment of
14 the -- the borrower applications.
15         So we had done kind of a preliminary
16 review of what the nature of the claims were with
17 respect to those schools and had come up with a
18 list of documents that we thought would be
19 relevant to that -- that fact-finding process.
20     Q    And what were those four school groups
21 that you reached out to in the spring?
22     A    DeVry, Phoenix, Ashford, I guess,
23 depends on how you define "school group."
24 Technically speaking, DeVry is a school group and
25 a school.  Phoenix, I think, really is just a

Page 74

1  school.  Within a school group, Charlotte School
2  of Law, and Ashford which is part of Bridgepoint,
3  I believe.
4      Q    So from each of those schools, you
5  requested a list of documents that you thought
6  would be helpful to your assessment?
7      A    We wrote them a letter, and that letter
8  included a number of requests, yes.
9      Q    Did you also invite them to submit any
10 other evidence that they wanted you to see?
11     A    The -- that's related to what I was
12 saying in terms of flooding their in-box.  So when
13 they receive an individual borrower's application,
14 they can respond to that application individually
15 with evidence, or they could submit something to
16 us more globally in terms of responses to the
17 overall applications.
18     Q    Okay.  You referred to an ongoing
19 policy debate.  Could you describe what you mean
20 by that?
21     A    I don't know if I would call it a
22 debate, but there's an open question on what that
23 process will look like going forward in terms of
24 what the communications to the school will look
25 like.

Page 75

1      Q    And who's involved in those
2  discussions?
3      A    OUS and with the assistance of the
4  Office of General Counsel.
5      Q    Does OGC make policy decisions
6  regarding borrower defense?
7      A    I think you'd have to ask them.  I
8  don't really understand exactly what the
9  relationship is, or it has some folks that kind of
10 have moved in and out of lane.  So I don't know,
11 as a general proposition, what the answer to that
12 would be.
13     Q    Okay.  Whose idea was it or whose
14 decision was it to reach out to these four schools
15 in spring 2020?
16     A    I don't think it was an idea.  I think
17 it -- my and my senior team's reading of the 2016
18 regulations is that it requires a fact-finding
19 process, and in order to do that fact-finding
20 process for, you know, the circumstances in these
21 schools, we felt like we needed records from the
22 school.
23          So -- so I made the decision to -- to
24 have my team draft those letters and send them.
25     Q    Before the 2016 regs went into effect,

Page 76

1  did BDU ever contact schools to ask for relevant
2  evidence?
3      A    Before the regs went into effect --
4  that was late 2018 -- we were just treading water
5  trying to keep up with Corinthian applications, so
6  we really weren't even at that point.
7      Q    Have -- have any of the four schools
8  who you reached out to in spring 2020 provided the
9  documents that you asked for?
10     A    All have responded, and some have sent
11 most or all of what we requested, and I think one
12 of them may have said that they were sending
13 something, but I don't know if we ever got it.
14     Q    And how is that information used by
15 BDU?
16     A    The documents that they provide?
17     Q    Uh-huh.  Yes.
18     A    We review the evidence regardless of
19 the source.  You know, we might request from them
20 a program manual that we might otherwise have
21 gotten in the course of our oversight at FSA or
22 that might have been provided from an AG's office.
23          So I would look at the nature of the
24 evidence based -- I don't think it's used
25 differently in that sense.  It's -- you know, it's

Page 77

1  what the document purports to be.  Obviously, the
2  source is important to know for the purpose of
3  kind of veracity of the document, but beyond that
4  we don't necessarily treat a program manual or,
5  you know, different kind of advertising material
6  differently depending on the source.
7      Q    So the information you received from
8  schools is incorporated into the general pool of
9  evidence that you're considering regarding that
10 school?
11     A    Yes.
12     Q    In -- you said that the school has the
13 option to respond to an application individually.
14 Is there a mechanism for the borrower to see the
15 evidence that the school submits in response to
16 their application?
17     A    Not under the 2016 regulations.  There
18 will be for the 2020 regulation.
19     Q    Okay.  What about the -- does the 2019
20 regulation have any rule there?
21     A    Sorry.  So when I say 2020, the 2019
22 regulation went into effect July 1, 2020.
23     Q    Oh, I see.
24     A    I refer to that as the 2020 regulation.
25 So that's the new one.

Page 78

1   And just to clarify, the '95 regulation
2  is the old regulation. 2016, we refer to as the
3  2016 regulation because that's when it was
4  published, but it actually went into effect by
5  court order in 2018. We still refer to it as the
6  2016 regulation.
7   Q   Okay. Understood.
8       Let's switch back for a second to the
9  law applicable to -- to claims under the '95 regs.
10 So you said that you've just recently developed
11 protocols for ITT claims, non-California
12 employment-prospect-ITT claims under both the '95
13 and 2016 regs; is that correct?
14  A   That's correct.
15  Q   Okay. So how would a borrower know
16 what law applies to their claim?
17  A   I'm not sure. Are you asking about the
18 letters? I'm not sure I understand.
19  Q   Yes, in communications to the borrower.
20      Do communications to the borrower state
21 what law has been applied to their claim?
22  A   I think the CCI ones reference
23 California law. I don't think the non-CCI ones
24 state an applicable state law. With respect to
25 those applications, though, because either the

Page 79

1  borrower failed to make an allegation that's
2  potentially the kind that could be approved or the
3  evidence to support it, so regardless of what law
4  you would apply, it's our position that the
5  application would be denied.
6       So those aren't being denied based on,
7  you know, not being able to fulfill a specific
8  element of a particular state law or a specific
9  element of the 2016 regulation. They're either
10 just kind of something that wouldn't get through a
11 12(b)(6) analysis or they're just lacking in
12 evidence.
13  Q   Are you talking specifically about ITT
14 claims?
15  A   No. I thought you were referring to
16 the letters, so the ones that have gone out so
17 far, we haven't issued any denials that were based
18 on kind of an application of specific elements of,
19 you know, state law where there could be a
20 different answer in California versus Nebraska.
21  Q   Okay. Let's look at the denial
22 letters. That is tab -- give me a second. That's
23 tab 13 in the hard copies. On the Dropbox, that's
24 the bracket number 13 ECF 116, Defendants'
25 Response to 8/31. I think that should say 2020

Page 80

1  Order.
2       And that was marked as Exhibit 13 in
3  the Jones deposition.
4       (Exhibit 13 referred to.)
5       THE WITNESS: Just to make sure I have
6  the right document, it's Defendants' Response to
7  August 31, 2020 Order.
8   BY MS. ELLIS:
9   Q   Yes, that's correct.
10  A   Okay.
11  Q   So this document, I'll represent to
12 you, is a filing in this case where -- where the
13 government attached the four types of form denial
14 letters, which we've been referring to as forms A,
15 B, C and D according to their attachment letters
16 here in this document.
17      So if you flip to the bottom of page 2
18 of the motion which is page 3 of the document,
19 there's a heading near the bottom of the page,
20 Form of denial letters utilized by the department
21 since December 2019.
22      Do you see that?
23  A   Yes.
24  Q   Okay. And then at the bottom of the
25 page going onto the next page, it lists -- it

Page 81

1  describes the purposes of the four different
2  letters that are attached as exhibits A, B, C and
3  D to the motion.
4       So for applications from ITT that have
5  been so far denied, which of these four form
6  denial letters would they have received?
7   A   I think it's D. Yes, I think D is the
8  one that's non-Corinthian but where there is
9  common evidence related to the school.
10  Q   Okay. So let's flip to form D. That's
11 the page 22 of the PDF for those looking at it
12 electronically. And then the actual text of it
13 starts on page 23 of the PDF. It's document 116-4
14 on the ECF stamps at the top of the page.
15  A   Thank you.
16  Q   So this is an example of form D, and
17 then you can see at the bottom of this first page
18 it shows where someone would fill in blanks for
19 allegation type, primary school and review
20 recommendation reason.
21  A   Correct.
22  Q   Okay. Is it the case that review
23 recommendation reason is sometimes filled in with
24 the phrase failure to state a claim?
25  A   It's a -- it's a drop-down in our

Page 82

1 platform, but it's filled in by my team, and then
2 that's used to populate these letters by our
3 contractor.
4     Q       Uh-huh.
5           And one of the options in the drop-down
6 is failure to state a claim?
7     A       Correct.
8     Q       So what -- what does that mean?
9     A       It's like a 12(b)(6) analysis, does the
10 borrower make an allegation that could potentially
11 lead to, you know, an illegal case filed in court.
12 Is it something that a court would not dismiss on
13 a 12(b)(6) motion kind of thing.  So an example
14 will be does the borrower allege that the school
15 made a misrepresentation to the borrower on which
16 they relied to, you know, enroll in the school or
17 whatever, based -- something along those lines.
18     Q       How is it determined that an
19 application fails to state a claim if it hasn't
20 yet been determined what law applies?
21     A       It's -- the bar is just -- you know, is
22 an alleged misrepresentation, generally, would be
23 the most common.  So, you know, we get
24 applications on folks who say my loans were too
25 expensive; my school is terrible; my teacher was

Page 83

1 abusive; things that are not borrower
2 defense-related issues; sexual harassment by a
3 staff member; didn't get the classes I wanted.
4           You know, just a whole variety of
5 different things that borrowers may include in
6 their application, but are not something that are
7 of the type that would, you know, provide
8 eligibility for borrower defense relief
9 potentially.
10     Q       Do you know how many form D notices
11 have been mailed out since this form was --
12 started being used?
13     A       I don't.
14     Q       Do you have a sense of what percentage
15 of claims denied under form D fit the description
16 you're giving of someone who doesn't provide any
17 allegation that could potentially state a borrower
18 defense claim?
19     A       As to one of the allegations?  So, in
20 other words, if you see in this letter, there
21 are -- I don't know how many are here -- there's
22 two on this example, but there could be five
23 different allegations in one claim or one
24 application, so those would be five separate
25 claims, and one of the claims might be denied for

Page 84

1 failure to state a claim and another might be
2 denied for insufficient evidence.  It depends on
3 the nature of the claim and what the borrower
4 states for that particular claim.
5     Q       So you're saying that you -- you can't
6 estimate the number of applications that have been
7 denied -- that have received a form denial letter
8 solely because they failed to state any sort of
9 claim?
10     A       I -- I don't know the number off the
11 top of my head, no.
12     Q       Are there department records that would
13 show how many applicants who received form D
14 denial letters -- it was based solely on failure
15 to state a claim?
16     A       It's data in our system, so I'm sure
17 there's some way to pull that.  Yeah, I'm sure
18 there's some way to pull it out of our system, but
19 I don't know that there's a record existing
20 somewhere.  I think somebody would have to do some
21 kind of a data pull.
22     Q       So if -- if an allegation was this
23 school made job-placement-rate-misrepresentation
24 claims, that would not be rejected for failure to
25 state a claim?

Page 85

1     A       It should not be.  I can't say that we
2 have never made a mistake, but the protocol would
3 be that that would then go to, you know, whether
4 there's evidence.  So that would not -- the -- the
5 claim itself, if it were rejected or if the -- if
6 that particular claim was denied, would not be
7 denied based on that.
8     Q       If someone alleged that the school made
9 a job-placement-rate-misrepresentation claim, but
10 the applicant did not specifically state that they
11 relied on that misrepresentation, would that be
12 denied for failure to state a claim?
13     A       I believe so.  I'm trying to remember
14 the drop-downs and what the available drop-down --
15 what the protocol calls for.  The -- I believe the
16 protocol references lack of reliance, so it
17 actually -- that might be an option -- I don't
18 recall, though.  I'd have to look at the protocols
19 to see what -- what the particular entry would be
20 that would show up there.
21     Q       Other than a new protocol that's been
22 developed for ITT non-California
23 employment-prospects claims, has BDU also
24 developed a new form of denial letter to go with
25 that protocol, or would claims denied under that

Page 86

1  protocol continue to receive form D letters?
2       A    Well, your question assumes that BDU
3  develops the letters, and we -- these are not our
4  letters.
5       Q    Okay.  Let me -- let me back up, then,
6  to ask more generally about the -- about the
7  denial letters.
8            So who did develop forms A through D
9  denial letters?
10      A    I think there were a lot of folks
11 involved in it.  At the time, the crew at Mark
12 Brown had wanted my team, the borrower defense
13 unit, to focus on adjudications.  So there was an
14 FSA communications team and our borrower defense
15 program management team, which was a new -- new
16 group, that were kind of tasked with sharing the
17 process for having the letters done.
18           And that was approval letters and
19 denial letters because that -- there were several
20 approval letters, I believe, that were originally
21 developed.  So it's all kind of done at the same
22 time.
23           And then they worked with our senior
24 leadership at the department and the Office of
25 General Counsel on the letters.

Page 87

1       Q    Who ultimately was responsible for
2  approving the form denial letters?
3       A    I can't answer that.  I don't know that
4  there was one person, but I think Mark Brown would
5  probably be a better person to ask because he
6  would have interacted with the folks at LBJ on
7  whether they were given the green light to
8  proceed.
9       Q    How did you find out about the form
10 denial letters?
11      A    About their existence?
12      Q    Yes.
13      A    I was always kind of kept in the loop
14 because my team -- the data that shows up -- so
15 all of these kind of highlighted areas -- it's
16 gray on mine, but I think the original versions
17 are yellow highlights.  Those are fields that are
18 in our platform.  So, you know, we were kind of in
19 a consulting role for what available fields could
20 be pulled into the letter.
21           So I was -- I was on a number of the
22 calls and emails and things along those lines to
23 get the letters finalized, so I don't know when I
24 first became aware -- I mean, I became aware that
25 they were drafting them around the time of when

Page 88

1  they finalized the relief methodology or were
2  close to finalizing the relief methodology for the
3  approvals.
4       Q    And who did you -- who did you consult
5  with about this information that BDU was able to
6  provide for the denial letters?
7       A    Like who asked for input on them?
8       Q    Yeah.
9       A    The head of the communications team
10 that was working on this was a woman named Nicki
11 Meoli.  M-E-O-L-I.  And we worked closely with
12 Chad Schrecengost.  I'm going to get the spelling
13 wrong on this, I think.  S-C-H-R-E-C-E-N-G-O-S-T.
14 I'm pretty sure that's wrong, but that's close.
15      Q    Good effort.
16      A    And I think those were the two folks at
17 FSA who would have asked me or my team for, you
18 know, what is this field; how do you we -- what do
19 we have to fill out, that kind of thing.
20           And then I -- I was also on some calls
21 to that effect with GC.
22      Q    With who?
23      A    Our Office of General Counsel.  I'm
24 sorry.
25      Q    Okay.

Page 89

1       MR. MERRITT:  I'll note for the record
2  that Chad Schrecengost is listed in defendants'
3  response, interrogatory number 2, for spelling and
4  whatever else.
5       BY MS. ELLIS:
6       Q    Okay.  But then beyond Meoli,
7  Schrecengost and some people from OGC, you don't
8  know who was actually involved in the drafting or
9  approval of these letters?
10      A    You broke up a little bit there.  I'm
11 sorry, Rebecca.  Could you repeat that again?
12      Q    No problem.
13           So besides Meoli, Schrecengost and
14 certain people from OGC, you don't know who else
15 was involved in drafting or approving the letters?
16      A    Well, I think those are two different
17 things, the drafting and the approving.  And I
18 don't know all of the people who had a hand in
19 drafting the letter.  I know it was a weeks' long
20 process, so I'm sure there were a lot of people
21 who worked on them.
22           And then I was not involved in, you
23 know, kind of the final sign-off on it, so as I
24 said, I think Mark Brown would probably be the
25 best person to ask that.

Page 90

1       Q       Do you think he would know who was
2   involved in the final sign-off process?
3       A       I would think so.  That would be the
4   typical process, yeah.
5       Q       Okay.  You said you believe it took a
6   matter of weeks to develop these form letters.
7       A       That's my recollection, yes.
8       Q       Do you know what -- what made it
9   complicated or time-consuming to put these
10  together?
11      A       I don't know.
12      Q       Is there anywhere in -- in this form D
13  letter where the applicable law would be filled
14  in?
15      A       I mean, there's an applicable law
16  section.  It doesn't -- I think this letter is for
17  both.  I'm sorry.  I'm just reading.  It's been a
18  while.
19      Q       Go ahead.
20      A       (Witness reviews document.)
21              Yeah, it looks like this is for both
22  regulations.  The applicable state law is not in
23  here for the 2016 regulation.  Obviously, it's a
24  federal standard, so there wouldn't be anything
25  along this line.

Page 91

1       Q       Were you ever involved in any
2   discussions about whether the applicable state law
3   under the '95 regs would be listed in a denial
4   letter?
5       A       There was a conversation about that,
6   and the -- that was not necessarily populated in
7   all of the cases for the reason I mentioned
8   before, which is that the cases that were going
9   out with this letter -- this letter was drafted
10  after a bunch of cases were already adjudicated
11  and not the other way around.
12              And, so, the intent was to send out --
13  actually, I don't know if it was this letter or C
14  because they're pretty similar.  I think it might
15  have been C actually that I'm thinking of.
16              But I -- my recollection is that there
17  was discussion of whether or not to include state
18  law as a field but that would have required more
19  time for my team to go back and, you know, fill in
20  any data that needed to -- with respect to state
21  law where it really wasn't being denied because of
22  state law; it was being denied for the reasons
23  that I mentioned before.
24      Q       Uh-huh.
25      A       And, so, I think the conclusion was

Page 92

1   that that wasn't necessary because it was argued
2   that regardless of what state law might have
3   applied that the application would be denied.
4       Q       So I'd like to look at an example of a
5   completed form D denial letter.
6           MS. ELLIS:  So this will be behind tab
7   15 in your hard copies.  On the Dropbox, the
8   bracket 15 ECF 129-1, Connor declaration.  This
9   was marked as Exhibit 15 in the deposition of
10  Diane Jones.
11          (Exhibit 15 referred to.)
12      BY MS. ELLIS:
13      Q       And there's a number of attachments
14  here.  I'm looking at the affidavit of Theresa
15  Sweet that begins at page 24 of the PDF, page 24
16  of the ECF filing.
17      A       Okay.
18      Q       And then attached to -- further
19  attached to the affidavit of Theresa Sweet all the
20  way down at page 51 of the document is a -- an
21  example of form D.  This is the form D that
22  Theresa Sweet, the named plaintiff in this case,
23  received.
24      A       That's exhibit B to her affidavit?
25      Q       Exhibit B to her declaration.

Page 93

1       A       Yeah.  Got it.
2       Q       Okay.  So if you -- if you go down to
3   the second page of this attachment, there's that
4   section as we were just looking at in the form
5   denial where it lists the allegations and then the
6   reasons for denial.
7               Allegation 1:  Employment Prospects.
8   You allege that Brooks Institute engaged in
9   misconduct related to employment prospects.  This
10  allegation fails for the following reason(s):
11  Failure to state a legal claim.
12              Is there any way that we could tell
13  from reading this letter what was wrong with
14  Theresa Sweet's employment-prospects allegations?
15      A       Well, clearly, all we can tell from
16  this is my team concluded that their -- the
17  specific claim with respect to the employment
18  prospects did not state a legal claim.  That's
19  what's in here.
20      Q       And is that also the case with regard
21  to allegations 2 and 3?
22      A       That is the -- the reason that's
23  included, right.
24      Q       We discussed earlier that it should be
25  unlikely that an allegation of employment

Page 94

1  prospects would be denied for failure to state a
2  legal claim.
3           Is there any way to tell from this
4  letter why --
5      A   Sorry. I --
6      Q   Wait.
7      A   You broke up again. And I don't know
8  if it's a problem on my end or if it's other folks
9  or -- I missed the first half of the question,
10 though. Would you please repeat it?
11     Q   Okay. We talked earlier that an
12 allegation of misrepresentation of employment
13 prospects should probably be unlikely to be denied
14 for the reason of failure to state a legal claim.
15          Is there any way to tell from this
16 letter why her particular allegations were
17 insufficient?
18         MR. MERRITT: Objection to the
19 characterization of the prior testimony.
20         BY MS. ELLIS:
21     Q   You can answer.
22     A   I'm not sure I can. Can you rephrase?
23     Q   It's all right. I'll move on.
24          Let's move down to allegations 4 and 5.
25 The letter states that these allegations were

Page 95

1  rejected for insufficient evidence; is that
2  correct?
3      A   That's what it says, yes.
4      Q   Is there any way to tell from this
5  letter what about Theresa Sweet's evidence was
6  insufficient?
7      A   Well, your -- I think you're assuming
8  that there was evidence, which I don't know from
9  this, necessarily, but, you know, it could be that
10 there was no evidence, but the drop-down -- the
11 available drop-down is insufficient evidence. So
12 the conclusion was that whatever it was that was
13 included was insufficient to support the claim.
14     Q   Are borrowers' own statements on their
15 applications considered evidence?
16     A   They're -- they're evidence. The
17 statement in and of itself without any
18 corroborating evidence would not be sufficient to
19 approve an application, though.
20     Q   The statements on -- of our defense
21 application are made under the penalties of
22 perjury; is that correct?
23     A   Yes.
24     Q   So why wouldn't the borrower's sworn
25 statement be considered sufficient evidence?

Page 96

1      A   That's always been a policy in borrower
2  defense going back to 2016; that one borrower's
3  statement without corroboration would not be
4  sufficient to -- to approve an application.
5      Q   What sort of documentation does BDU
6  expect borrowers to provide in order to rise to
7  the level of sufficient evidence?
8      A   I would take issue with the way you
9  framed that. We don't have any particular
10 expectation one way or another. We're just
11 adjudicating based on the evidence in front of us,
12 so, you know, whether that comes from the borrower
13 or from some other source, we make an assessment
14 of the evidence. But I don't have a particular
15 expectation one way or the other.
16     Q   Does the borrower defense application
17 state that the applicant must submit corroborating
18 materials in order for their claim to be
19 considered?
20     A   Which application are you referring to?
21     Q   I'm referring to the standard form
22 application that's available on the department's
23 Web site.
24     A   I don't recall exactly what the wording
25 is. I know it requires the borrower to provide

Page 97

1  detailed information, encourages the borrower to
2  provide supporting evidence, but I don't remember
3  exactly what the language is.
4      Q   Do you know who originally set the
5  policy that the borrower's statement alone would
6  be insufficient to make out a borrower defense
7  claim?
8      A   I don't, but that was the policy when I
9  joined in October of 2016.
10     Q   Is that a written policy?
11     A   It's in -- I remember seeing documents
12 somewhere along the way back at that point, so I
13 guess it depends on what you mean by a written
14 policy, but it's -- it's recorded in -- I can
15 remember PowerPoints or something. I'm sure
16 there's other documentation going back that far.
17     Q   Do you know if that PowerPoint has been
18 provided for production in this case?
19     A   I don't know.
20     Q   Would that be considered a policy
21 decision?
22     A   Yes.
23     Q   So that's a decision that would not be
24 made by someone at FSA?
25     A   That's correct.

Page 98

1     Q     Looking back at tab 15, Exhibit 15, the
2  first page of Theresa Sweet's denial letter states
3  that she was enrolled at Brooks Institute; is that
4  correct?
5     A     I'm sorry.  You're on her affidavit
6  now?
7     Q     Yeah.  I'm sorry.  It's the first page
8  of the denial letter which is page 51 of the ECF
9  filing.
10    A     Yes, it says she was enrolled at Brooks
11 Institute.
12    Q     Yes.
13          Is Brooks Institute a school for which
14 BDU has common evidence?
15    A     If memory serves, Brooks Institute is
16 part of the CEC school group, if I am remembering
17 correctly.  I could be wrong on that, but I think
18 it is.  And we do have common evidence relating to
19 CEC.  Whether or not it specifically relates to
20 Brooks, I don't recall.
21    Q     Let's look back at your declaration,
22 tab 21, marked as Exhibit 21.  And I'm looking at
23 paragraph 68 which is on page 16.
24    A     Okay.
25    Q     Could you read the second sentence of

Page 99

1  that paragraph, please?
2     A     Sure.  The second sentence?
3     Q     Of paragraph 68, beginning with,
4  Additionally?
5     A     Additionally, BDU has initiated its
6  review and analysis of the evidence relating to
7  ITT (including campuses outside of California),
8  DeVry University and Brooks Institute but has not
9  had available staff to complete that work and
10 proceed to adjudicate applications from borrowers
11 who attended those schools.
12    Q     So does that refresh your recollection
13 on whether there's common evidence on Brooks
14 Institute?
15    A     Yes.
16    Q     If the review and analysis of common
17 evidence for Brooks Institute was not yet
18 complete, how could Theresa Sweet's application be
19 denied for insufficient evidence?
20    A     Well, your question, I think, is
21 premised on a timing -- you know, if it's not
22 true, it's not true.  This was in November of
23 2019, and I don't know what the date of her letter
24 is.  July of 2020.  So we were in a different
25 stage when we issued her letter.

Page 100

1     Q     So the review and analysis of evidence
2  relating to Brooks Institute is now complete?
3     A     No, but we've done the preliminary
4  analysis that I referred to earlier more generally
5  in terms of the scope of the evidence.  So we must
6  have included that whatever time period that she
7  attended or her program or whatever it is that we
8  concluded the scope of Brooks is, that she falls
9  outside that scope.
10    Q     Whose decision was it to take an
11 approach to borrower defense adjudication where
12 applications would be ruled out by common evidence
13 rather than ruled in by common evidence?
14    A     Well, in 2019, we were directed to move
15 forward at a very accelerated pace, and so, you
16 know, there were a lot of discussions about how to
17 do that and how to get through the backlog in
18 2020.  They wanted all of the cases adjudicated in
19 2020.
20          And the only way to hit the metrics
21 that were required of us were to focus on cases
22 that had established protocols, so the same ones
23 that we were talking about earlier, and cases
24 where either there was no common evidence, which
25 we did those first, or where we could assess what

Page 101

1  the scope of the common evidence was and then move
2  forward on adjudicating other cases.
3          So it was kind of a sequencing issue so
4  that we could continue to meet the -- the weekly
5  numbers that we needed to meet in order to
6  adjudicate the cases.
7          In a perfect world, we would review all
8  of the evidence relating to the school before
9  adjudicating a single case, but if that were the
10 case, then we probably would not be issuing
11 decisions for most of 2020 because, you know, to
12 the extent that, you know, most of the cases that
13 are left right now, at least potentially, are
14 related to some common evidence or the borrower
15 provided substantial evidence of their own or at
16 least some evidence that could potentially support
17 the claim.
18          So it's a -- it was just a sequencing
19 issue that been ordered to the numbers.  That's
20 the way we moved forward.
21    Q     Who set the target numbers?
22    A     The secretary set the elimination of
23 the backlog, and my understanding is that, based
24 on the numbers that were pending at the time, that
25 Mark Brown just did the math essentially and set a

Page 102

1  target of us for 5,000 adjudications per week.
2      Q     But it was the secretary who said this
3  number of cases in the backlog must be eliminated
4  in 2020?
5      A     I don't know that she said anything
6  about the number.  I think she just said -- it was
7  actually eliminate the backlog and adjudicate any
8  new case that comes in within 90 days.
9      Q     And when did that directive come down?
10     A     That specific directive, I believe, was
11 the fall of 2019, but there were already
12 conversations to that effect earlier in 2019.
13     Q     I'm sorry.  It glitched a little.
14           What was earlier in 2019?
15     A     There were already conversations about
16 elimination of the backlog in early 2019.  The
17 specific directive of elimination of the backlog
18 and adjudicating cases within 90 days of receipt,
19 I believe, was in the fall of 2019.
20     Q     And who are the conversations among
21 that were earlier in 2019 about elimination of the
22 backlog?
23     A     Well, I don't know who over in LBJ,
24 but, certainly, Mark Brown made all of us within
25 FSA that are related to BD aware, so that included

Page 103

1  Robin Minor, the then chief enforcement officer
2  Jeffrey Appel, the -- I'm trying to think.  There
3  were other policy folks that were involved because
4  they were working on the relief methodology, so,
5  particularly, it was communicated to FSA to just
6  get it done, essentially.
7      Q     So once that directive came down, whose
8  decision was it about how to approach the
9  sequencing of which claims would get adjudicated
10 first?
11     A     Well, it wasn't really a point in time.
12 I know initially there was a lot of interest in --
13 there's always been a lot of interest in getting
14 through the Corinthian cases, so that was one of
15 the big priorities.
16           But, then, I know some of the folks
17 over in LBJ wanted us to do ITT next, and I -- at
18 the time, we had five full-time and one part-time
19 attorney, so we just didn't have the bandwidth to
20 hit any kind of numbers and review the volume of
21 evidence that we had on ITT because I think we
22 have not quite a million pages of records, but
23 there was a lot of documents that we had, that we
24 weren't in a position to adjudicate the cases
25 because we were pretty confident that there were

Page 104

1  documents in there that would support other claims
2  that we just didn't know what they were or where
3  they were.
4            So I pushed back on that and there were
5  a lot of conversations about what else could be
6  done, and, you know, one of the things that could
7  be done was first the cases that didn't have
8  common evidence and then the cases where the
9  common evidence didn't seem to be related to those
10 cases, so that's kind of how it evolved.
11     Q     For the cases that didn't have common
12 evidence, what would a borrower need to provide in
13 order to be eligible for relief?
14     A     I can't answer that hypothetically.  It
15 really depends on the claim.
16     Q     Are -- are the people who are reviewing
17 individual applications given any instructions on
18 how to assess whether a borrower has provided
19 enough to support their claim?
20     A     They're not really making an assessment
21 of -- they're not weighing evidence.  They're, you
22 know, issue spotting and flagging cases that have
23 something that could potentially warrant approval.
24 So it's a very low bar at that review stage.
25           And, so, the junior attorney, if they

Page 105

1  think there's anything that could lead at all to a
2  possibility of approval, they're supposed to
3  escalate it to one of the senior attorneys.
4            So those cases are all supposed to be
5  set aside.
6      Q     Are they given written instructions on
7  what to look for in order to set aside an
8  application?
9      A     They're trained on that.  The protocols
10 to some extent include that, but there's also --
11 you know, when new attorneys come on, we do a full
12 week of training, and then they go through kind of
13 a probationary period where every case that they
14 adjudicate gets adjudicated by somebody more
15 senior who, you know, walks them through what is
16 or isn't something that states a claim or what is
17 or isn't something that would potentially support
18 approval that they should be setting aside.
19           So they get fairly extensive training
20 on that.
21           MS. ELLIS:  Okay.  Let's take a
22 five-minute break.
23           THE VIDEOGRAPHER:  All parties agree to
24 go off the record?
25           MR. MERRITT:  Agree.

Page 106

1    THE VIDEOGRAPHER:  We're going off the
2  record.  The time is 16:35 UTC.
3    (Recess -- 11:35 a.m.)
4    (After recess -- 11:45 a.m.)
5    THE VIDEOGRAPHER:  We are now on the
6  record.  The time is 16:45 UTC.
7    BY MS. ELLIS:
8    Q    Okay.  I wanted to just briefly circle
9  back to a phrase you used earlier which is
10  "cleared for adjudication."
11    Could you specify what you mean when
12  you say that an application has been cleared for
13  adjudication?
14    A    Yeah.  It's just a shorthand term that
15  we use within BDU that we have concluded that
16  we've done what we needed to do to develop a
17  protocol for review, essentially.  So that's the
18  first prerequisite, essentially.  There has to be
19  a protocol that would allow you to review that
20  specific application, and sometimes that's a
21  school-specific protocol because of the things
22  that we've talked about before in terms of setting
23  aside cases related to common evidence.
24    So cleared for adjudication means that
25  there's an available protocol.

Page 107

1    Q    Does that include both the
2  school-specific protocols and a general protocol
3  such as here's what you do for a claim with no
4  common evidence, or are you talking about just the
5  school-specific protocols?
6    A    Well, we have, you know, kind of like a
7  one-off claim.  There's a standard protocol.  So
8  there's a default protocol that is used when, you
9  know, there isn't common evidence kind of thing.
10  And, so, all of the cases, it just walks through
11  what you look for in terms of the borrower's
12  allegations and the evidence that the borrower
13  provides.  But we do specific protocols if there
14  are things that we know need to be set aside so
15  that cases don't get adjudicated before we've been
16  able to complete the review of the evidence.
17    Q    Okay.  I guess what I'm trying to
18  understand is, does cleared for adjudication mean
19  this is a case that could potentially be granted?
20    A    No.  It's just cleared to be reviewed.
21    Q    So it's a complete, a complete
22  application?
23    A    No, that's actually a different
24  question.  It's just that we've determined what
25  the review protocol for that case would be.  It

Page 108

1  makes no predecision at all as to whether or not
2  the borrower, him or herself, provides sufficient
3  information to state a claim or whether or not
4  they provide evidence.  It could go either way.
5    But, you know, in our experience, there
6  are just a whole lot of applications that don't
7  have a lot of supporting evidence and often no
8  supporting evidence.  So, you know, a lot of those
9  do end up getting denied, but they're cleared for
10  adjudication in the sense they can be reviewed one
11  way or the other.
12    Q    So cleared for adjudication means a
13  determination that this application will be judged
14  either under the standard protocol or under some
15  other school-specific protocol?
16    A    Correct.
17    Q    Okay.  Have any -- any claims cleared
18  for adjudication, other than for CCI or ITT, ever
19  been granted?
20    A    We don't have the protocols -- we don't
21  have the approval categories in the protocols yet
22  because we're still reviewing the common evidence
23  for the schools that have potential protocols.
24    So, no, because we're not looking for
25  whether or not they meet (audio distortion) for

Page 109

1  specific elements under state law or under the
2  2016 regs.  We haven't got to that point yet.
3    So as I said, the cases that are being
4  reviewed, it's to look at the borrower's
5  allegations because there's been a determination
6  that there's not common evidence, and if the
7  borrower has, his or her cases aren't adjudicated
8  either because they're set aside for review by a
9  senior team member.
10    Q    Okay.  So Corinthian and ITT have been
11  the only schools with claims granted so far?
12    A    That's right, and they're the two
13  biggest schools by far, and they account
14  collectively for, I think, over half the
15  applications.
16    Q    Before the form denial notices A
17  through D that we talked about earlier started
18  being used, did BDU have a different format for
19  denial letters?
20    A    You broke up again there a little bit.
21  Did you just ask me if we had a different denial
22  letter before forms A through D?
23    Q    Yes.
24    A    There was a denial letter that was
25  conceptually similar to letter A, I believe.

Page 110

1   Letter A is the letter that was used for people
2   who only alleged a job-placement-rate claim.
3   There were job-placement-rate claims that were
4   adjudicated late 2017 to 2018, and there was a
5   letter that met that same criteria, essentially,
6   in terms of who it would go out to that was a
7   different letter.
8        Q    Who drafted that letter, that form
9   letter?
10       A    I believe we did.  I think it was
11  edited by OGC, but I know my team did the initial
12  draft, I believe.
13       Q    And it contained basically the same
14  information that's now in form denial A?
15       A    I don't remember to be honest with you.
16  I mean, it was intended to address the same
17  claims, but I don't remember exactly what the
18  contents were in that one versus this one.
19       Q    Before form denials B, C and D started
20  being used, had any claims other than Corinthian
21  job-placement claims been denied?
22       A    In terms of denied, meaning just not
23  sent out?
24       Q    Meaning had any borrowers been notified
25  of the denial of their claims other than CCI JPR

Page 111

1   applicants?
2        A    There were two denials issued in 2017,
3   summer of 2017, I think.
4        Q    Two denials total, not two schools?
5        A    Two -- two individuals, yeah.
6        Q    Did they receive individual denial
7   letters, or was there a form in place?
8        A    They were individual letters.
9        Q    Okay.
10       A    You froze again there for half a
11  second.  Did you ask me if it was a form?
12       Q    Yeah.  You -- you froze as well.
13            Did you say that they got individual
14  denial letters?
15       A    They received individual denial
16  letters, yes.
17       Q    Okay.  And other than those two
18  individuals, no other borrowers were notified of
19  the denial of their claims until forms B, C and D
20  started going out?
21       A    Other than --
22       Q    Other than Corinthian JPR?
23       A    Yes, making sure I understand your
24  question.  Other than two individual denials in
25  summer of 2017 and the job-placement-rate denials

Page 112

1   in 2017 to 2018, no denials went out.
2        Q    All right.  Thank you.
3            I'm going to back up in time a little
4   bit back to 2017.  When the new administration
5   came in in January '17, did you have any
6   discussions with the transition team about
7   borrower defense?
8            MR. MERRITT:  Objection as beyond the
9   scope.
10           MS. ELLIS:  Are you instructing the
11  witness not to answer?
12           MR. MERRITT:  You can answer that
13  question.  I just do want to note that that is not
14  related to one of the topics the court has
15  authorized discovery on, so . . .
16           MS. ELLIS:  Well, I disagree, and if
17  you'd like to move to strike after today, you can
18  feel free to.
19           MR. MERRITT:  Okay.  You can answer
20  that question, but . . .
21           THE WITNESS:  Yes.
22           BY MS. ELLIS:
23       Q    So did you have any discussions about
24  borrower defense with the Trump transition team in
25  January, February of 2017?

Page 113

1        A    Yes.
2        Q    Who did you discuss that with?
3        A    Oh.  Well, there was the -- a beachhead
4   team and a landing team.  I can't remember which
5   was which.  But there was, you know, the team that
6   came in prior to the inauguration, and we had
7   meetings with them, and then there was a team that
8   came in after that, and we had meetings with them.
9        Q    So what did you talk about with members
10  either of the beachhead team or the landing team
11  with regard to borrower defense?
12           MR. MERRITT:  Objection: beyond the
13  scope.  I'm going to instruct not to answer to
14  enforce the limitation order by the court.
15           MS. ELLIS:  I don't believe that's
16  consistent with the judge's standing order on
17  depositions.
18           MR. MERRITT:  It's consistent with
19  Federal Rule of Civil Procedure 30(c)(2).
20           MS. ELLIS:  Can we talk about this off
21  the record?
22           MR. MERRITT:  Okay.
23           THE VIDEOGRAPHER:  We are now off the
24  record.  The time is 16:56 UTC.
25           (Recess -- 11:57 a.m.)

Page 114

1        (After recess -- 12:13 p.m.)
2        THE VIDEOGRAPHER:  We are now on the
3   record.  The time is 17:13 UTC.
4        BY MS. ELLIS:
5        Q      In January and February of 2017, did
6   you have any conversations with members of the
7   transition team about the process of BDU's
8   adjudication of borrower defense applications?
9        A      Yes, yes.
10       Q      Who did you have those conversations
11  with?
12       A      I'm trying to remember who was on the
13  transition team.  The main point person was Justin
14  Riemer, R-I-E-M-E-R, but there were several
15  members of the transition team, and I can't
16  remember who all of them were.
17       Q      Okay.  And what did you discuss with
18  respect to borrower defense adjudications?
19       A      It wasn't one conversation.  It was a
20  continuing conversation over weeks, and, you know,
21  as with all transitions, as I understand it, when
22  they come in, they ask for data and documents and
23  things like that, so a lot of it was just getting
24  them information to get up to speed.
25       Q      Okay.  I want to turn back to your

Page 115

1   declaration.  That's tab 21, Exhibit 21, starting
2   at paragraph 55 which is at the bottom of page 13.
3        A      Okay.
4        Q      Could you read paragraph 55, please?
5        A      The whole paragraph or just the first
6   sentence?
7        Q      The whole paragraph.  I think it's only
8   two sentences, so the whole paragraph.
9        A      Okay.  In March 2017, the department
10  leadership convened a borrower defense review
11  panel (the review panel) to make recommendations
12  on a borrower defense process.  It is my
13  understanding that the review panel recommended
14  and the secretary subsequently requested a
15  comprehensive review of the borrower defense work
16  and processes by the department's Office of the
17  Inspector General.
18       Q      In March 2017, what was your knowledge
19  about the review panel?
20       A      Not much other than that it was being
21  created, and I think I became aware of a few of
22  the people who were on it, but that's probably the
23  extent of my knowledge at that point except for to
24  the extent that we were getting requests for data
25  and documents and things along these lines.

Page 116

1        Q      So you responded to requests for data
2   and documents from the review panel?
3        A      Yes.
4        Q      Did you ever provide any other
5   information to them?
6        A      Well, the "them" included Justin
7   Riemer, and I don't really, in my mind, delineate
8   between what is requested by him for the review
9   panel as opposed to just in the ordinary course of
10  his responsibilities getting up to speed, so I'm
11  sure there was some overlap there.
12       Q      Understood.
13       Did you ever meet with the review
14  panel?
15       A      Yeah.
16       Q      Were you consulted on the decision to
17  request an OIG review of the borrower defense
18  process?
19       A      No.
20       Q      Did you provide information to OIG
21  during the course of their work?
22       A      Yeah, over a (audio distortion), that
23  was a very labor-intensive process.
24       Q      Did you have an understanding of why
25  the IG review was recommended?

Page 117

1        MR. MERRITT:  Objection: beyond the
2   scope.
3        BY MS. ELLIS:
4        Q      Okay.  I'll move on.
5        Did you ever receive any written
6   decisions or directives or any other written
7   materials from the borrower defense review panel?
8        A      I don't know if it was immediately at
9   the time, but you said "did you ever."  At some
10  point I received the memo recommending to the
11  secretary that she ask the IG to do a review, and
12  I think that there were other things in the memo
13  about -- I don't know if there were conclusions
14  that they reached, but that was the only document
15  to my knowledge.
16       Q      Okay.  Do you know whether that
17  document has been provided for production in this
18  case?
19       A      I don't know.
20       MR. MERRITT:  I'll just note generally
21  that discovery is ongoing as are the document
22  productions, so it's an ongoing process.
23       BY MS. ELLIS:
24       Q      Let's look at the next paragraph of
25  your declaration, paragraph 56.  Could you read

Page 118

1   that for the record, please?
2       A    Enforcement was advised in the spring
3   of 2017 that the department might make significant
4   changes to the BDU processes and that no
5   additional approvals would be processed until the
6   completion of the work of the review panel and,
7   subsequently, by the IG.
8       Q    Who advised enforcement that no
9   approvals would be processed?
10      A    I don't know that it was just one
11  time -- well, I guess when we first were advised I
12  think it was communicated to me by the then deputy
13  chief enforcement officer Laura Kim, but I don't
14  know who exactly communicated that to her.
15      Q    So do you know who, ultimately, was
16  responsible for making the decision that no
17  approvals would be processed?
18      A    No, I don't know.
19      Q    But you -- you were told that no
20  approvals would be processed by deputy chief
21  enforcement officer Kim?
22      A    Yes.  She wasn't making that decision.
23  She was communicating that decision, and I just
24  don't know who at LBJ she had those conversations
25  with or even if she had those directly herself.

Page 119

1       Q    Was that -- was that fact that no
2   approvals would be processed ever memorialized in
3   writing to your knowledge?
4       A    Well, we don't process approvals, so
5   there very well may have been something in writing
6   that, at the time, the issuance of decisions and
7   the handling of the loans was managed by our
8   business operations team.  I don't remember
9   whether there was a document sent to me that I was
10  copied on or something advising them to -- to not
11  send decisions out, but it would have gone to
12  them, not to me.
13      Q    What does it mean -- in this context,
14  what does it mean to process an approval?
15      A    Once the decision is made, whether it's
16  an approval or a denial, that's just the first
17  step.  Then that has to be translated into a
18  communication to the borrower, a communication to
19  the servicer, and all of the loans need to be
20  handled in accordance with the decision.
21          So we call it post adjudication
22  processing in some, you know, of our kind of
23  parlance, but it's -- those are the two main
24  pieces, essentially -- is the decision is part of
25  the processing, the decision to the borrower, and

Page 120

1   then handling the loans, which is work that's
2   handled by somebody either within FSA or a
3   contractor.
4          Previously, it was our business
5   operations unit -- working with the servicers
6   to -- to handle the loans.  So processing for an
7   approval would require a discharge of or whatever
8   the amount of the -- or the percentage of the
9   discharge depending on the circumstances, and then
10  putting loans back in repayment and taking the
11  borrower out of forbearance, typically.  Although
12  in the current climate because of COVID, I think
13  all loans are remaining in forbearance, but our
14  usual process, that would be it.
15      Q    Okay.  When deputy CEO Kim told you no
16  additional approvals would be processed, did she
17  say anything to you about the reason or the
18  purpose for this policy going into effect?
19          MR. MERRITT:  Objection: scope; and
20  potentially calling for privileged information --
21  deliberative information.
22          MS. ELLIS:  It's not a predecisional
23  question.  The decision had been made.
24          MR. MERRITT:  What was the question?
25  Sorry.

Page 121

1          MS. ELLIS:  The question was whether
2   deputy CEO Kim communicated a reason behind the
3   decision to stop processing approvals.
4          MR. MERRITT:  Okay.  I'll note the
5   objection to scope, but the witness can answer.
6          THE WITNESS:  What she communicated to
7   me was that -- well, two things, really.  One,
8   that the department was taking a close look at the
9   borrower defense adjudication processes, and, two,
10  that -- that we probably should cut back on
11  staffing at that point because any work that we
12  had been doing may have to be redone.
13          So, you know, in the interest of budget
14  constraints and whatnot, those were the parts of
15  the equation that FSA has responsibility in terms
16  of addressing budget issues and that kind of
17  thing, so those were the two things that I
18  remember her communicating to me.
19      BY MS. ELLIS:
20      Q    Okay.  You stated in your declaration
21  that no additional approvals would be processed
22  until the completion of the work of the review
23  panel.
24          Did you have any understanding at the
25  time of how long the work of the review panel

Page 122

1    might take?
2        A    No idea.
3        Q    Flipping back to paragraph 54 of your
4    declaration -- that's on the previous page --
5    could you read that for the record, please?
6        A    On January 20, 2017 through March 2017,
7    the BDU continued to adjudicate CCI transfer of
8    credits and guaranteed employment borrower defense
9    claims and from January 20, 2017 through May 4,
10   2017, BDU continued to adjudicate CCI JPR claims.
11       Q    Why did you stop adjudicating CCI JPR
12   claims on May 4th, 2017?
13       A    Yeah, I had forgotten about that piece.
14   I believe when Laura Kim advised me that, you
15   know, things were on hold, the -- the JPR review
16   process is very different and has a specific
17   application form, and we also had contractors that
18   were specifically trained on that, and that it
19   seemed like they were taking less of an interest
20   in making changes to that, at least at that early
21   stage.
22            So I think -- I'm trying to remember
23   the timing now.  I believe we continued to work on
24   those for a little bit longer and ask whether we
25   should hold off, and it may have taken some time

Page 123

1    to -- to get that decision, so I think that --
2    that accounts for the time difference, and then,
3    ultimately, we did stop working on those as well.
4        Q    At the time you were told that
5    approvals would no longer be processed, were you
6    also told to stop adjudicating applications?
7        A    Yes.
8        Q    Were you given reason why you should
9    stop adjudicating applications?
10       A    Well, again, it was that the department
11   was making an assessment of whether they wanted to
12   make some -- you know, the way it was put to me,
13   it was they were taking a hard look at what we
14   were doing and what changes they want to make to
15   it, and, secondarily, that any work that we were
16   doing was probably going to have to be reworked
17   because it wasn't going to comply with whatever
18   new processes or policies they might come up with.
19       Q    Was there discussion at that time that
20   the legal basis for relief under the 1995 regs
21   would change?
22            MR. MERRITT:  Objection to the extent
23   it calls for privileged information.
24            THE WITNESS:  I don't think there was
25   any discussion about relief at that time.  Let

Page 124

1    me -- that's too strong a statement.  I think we
2    were asked some questions about relief
3    determinations that had previously been made with
4    respect to the protocols, but I don't recall a
5    discussion about a new relief approach at that
6    time.
7            BY MS. ELLIS:
8        Q    Would you agree that in the disposition
9    of borrower defense applications there is a
10   question of whether the borrower is entitled to
11   borrower defense relief and a separate question of
12   how much relief they are entitled to?
13       A    If any, yes, I think that's -- that's
14   two parts.  So whether or not the application
15   should be approved or denied, and if it's
16   approved, so there's only a second part if it's
17   approved, but if it's approved, what, if any,
18   relief is to be given to the borrower, yes.
19       Q    Okay.  So in the spring of 2017, was
20   there a discussion that department policy around
21   that step one, whether the borrower is entitled to
22   relief, was there discussion that policy around
23   that was going to change?
24       A    Yeah, that's the piece -- that's what
25   my team does.  So what I was referring to before

Page 125

1    is there, you know, may have been -- it didn't
2    turn out that there were a lot of them, but there
3    may have been imminent policy changes that would
4    in some minor or major fashion affect how we
5    adjudicated the cases.
6        Q    And, then, did you have any knowledge
7    or discussions around step 2, the level of relief?
8        A    In -- in the spring of 2017?
9        Q    (Indicated affirmative.)
10       A    No, I don't believe.
11       Q    Okay.  When -- as of the spring of
12   2017, when BDU adjudicated that a claim should be
13   granted, did someone have to sign off on that
14   decision?
15       A    Well, I guess there's always someone
16   who has to sign off.  You mean someone above me?
17       Q    Yes.
18       A    During that time period and before,
19   there was a process that had been set up in 2016
20   that an approval package or a denial package would
21   be sent out to OUS.  In 2016, early 2017, it
22   actually went through the chief enforcement
23   officer to -- to the Office of the Under Secretary
24   and copied to the Office of General Counsel.
25       Q    Did there come a point when that

Page 126

1   process changed?
2       A    Yes, it was a pretty similar process in
3   2017 when we resumed issuing approvals into 2018,
4   but then following the -- the power decision when
5   the 2016 reg went into effect in 2018, there was a
6   process in the 2016 regulation that laid out what
7   should be done to adjudicate cases.
8            So from that point forward, we haven't
9   gone that route of submitting things up through
10  FSA to the Office of the Under Secretary or to the
11  Office of General Counsel.
12      Q    What was the new process that was laid
13  out in the 2016 regs?
14      A    It calls for a department official to
15  adjudicate the cases, do the fact-finding process
16  and adjudicate the cases, and that's -- the
17  consensus is that's me and my team.
18      Q    So after Bauer, since the 2016
19  regulation went into effect, you have the final
20  sign-off on approvals.
21      A    Yes.  That's the way it currently is.
22  Now, it could change with the new administration
23  coming in, but that's the current way.
24      Q    All right.  And are we talking about
25  approval just of step 1, the entitlement to

Page 127

1   relief, or also approval of step 2, the amount of
2   relief?
3       A    Item used to -- as an approval.  It's
4   basically -- the department's position is that
5   relief is a policy decision, so the Office of the
6   Under Secretary twice has issued policy directives
7   that were then implemented by FSA on what the
8   appropriate relief is for -- for the claims that
9   are subject to those particular methodologies.
10           And our policy implementation team
11  worked in both instances with the Office of the
12  Under Secretary -- I believe more so on the second
13  one in 2019 -- and, eventually, that turns into
14  percentages that were handed to us, essentially.
15           So our role with respect to relief
16  under both the 2017 and 2019 methodologies (audio
17  distortion) administerial, essentially.
18      Q    So you have, essentially, a formula
19  that -- once an application is approved, you have
20  a formula that you plug in that determines the
21  amount of relief?
22      A    It's even less involved than that.  We
23  get a chart, and it says, Medical assisting
24  certificate, 25 percent.  And it's just a data
25  entry.

Page 128

1       Q    I see.  And who actually inputs those
2   relief numbers?
3       A    We're working to implement an update to
4   the platform so that it actually doesn't even go
5   through my team at all because, like I said, we're
6   just kind of doing data entry on that.  So what it
7   will look like will be that the data will be fed
8   into the system and then, you know, when it's
9   adjudicated, you just press a button and it will
10  get populated.
11           Right now for the most part, we -- the
12  policy team comes up with a chart, so they crunch
13  the numbers that relate to the specific school and
14  apply the methodology and convert that into
15  percentages.  And then they put it on a chart that
16  they put on -- to hand off to my team, and, then,
17  you know, if we approve a case for, like I said,
18  medical assisting certificate program for CCI,
19  then here's the percentage.
20      Q    How many schools have these charts
21  prepared for them right now?
22      A    Under the 2019 methodology?
23      Q    Yes.
24      A    I don't know.  I mean, I know there's
25  Corinthian and ITT, and I know that we have kept

Page 129

1   in touch with the policy team in terms of schools
2   that we think will have at least some approvals,
3   but I don't know where they are in the process on
4   that, and I think that there are some ongoing
5   policy discussions on how they're applied to
6   particular schools, but we're not really
7   participants in those conversations.
8       Q    In 2016 when you joined BDU, was it
9   also the case then that relief was considered to
10  be a policy decision?
11      A    I don't know.  I don't know.  It was a
12  recommendation from my team to the chief
13  enforcement officer, and then it was recommended
14  to the -- yeah, I guess it would be a policy
15  decision based on a recommendation.
16      Q    A recommendation from who?
17      A    From us, from -- from the enforcement
18  office by way of, you know, borrower defense
19  providing a recommendation to enforcement and then
20  enforcement conveying it to the under secretary.
21      Q    I'd like to look for a minute at
22  Exhibit -- tab 7, which is also Exhibit 7 from the
23  Jones deposition, on the Dropbox that's bracket 7
24  Manning memo 5/4/2017.
25           (Exhibit 7 referred to.)

Page 130

BY MS. ELLIS:

Q    Is this a document that you've seen
before?

A    Yes.

Q    And this is a memorandum recommending
the -- the discharge of approximately 16,000 loans
that have been adjudicated before January 20th,
2017; is that correct?

A    That's correct.

Q    If you look at the last page, please,
this document is signed by Secretary DeVos and
under the other/comment section she wrote, With
extreme displeasure.

Is that accurate?

A    That's what she wrote.

Q    When did you first see this document?

A    It was later.  It was quite a bit
later.  I don't remember exactly.  It might have
been in even 2018 or later.

Q    What did you take the Secretary's
comment to mean?

A    That she was not happy to be signing
off on discharges for the previously
(indiscernible) cases or the loans related to the
previously (indiscernible) cases.

Page 131

Q    Were you aware of the secretary
expressing displeasure about BDU's adjudication of
borrower defense applications, otherwise?

MR. MERRITT:  Objection: beyond the
scope.

MS. ELLIS:  Can the witness answer?

MR. MERRITT:  Can you explain how it's
relevant for one of the topics?

MS. ELLIS:  It's relevant to the
reasons for the delay.

MR. MERRITT:  That's not one of the
topics.

MS. ELLIS:  I'll move on.

BY MS. ELLIS:

Q    In the spring of 2017 when -- when you
were told that no more approvals would be
processed, was it also your understanding that no
denials would be processed?

A    Yes, but we weren't really positioned
to issue denials at that point.  As I mentioned,
there's kind of a -- it's not just sending out a
notice which, you know, it's not just drafting a
letter.  We also have to have requirements with
the servicers set up so that they know how to
handle it.

Page 132

So if a case were denied in total, then
the servicers have to have instructions for how to
take the borrower out of forbearance.  There were
discussions going on -- I don't know if it was
this early, but in 2017 about, you know, whether
there would be some kind of an interest credit
because some of these borrowers' claims were
pending for a while, so there was some
conversation about that.

So long story short, we weren't -- we
weren't holding off on issuing a whole lot of
denials in early 2017 because there weren't that
many that we had ready to send out at that point.

Q    At that time, were you told to stop
developing memoranda or protocols for additional
categories of claims other than the Corinthian and
ITT protocols that were already in place?

A    We were told to stop seeking approval
for such things, but we weren't told to stop
reviewing evidence, that kind of thing.

So that work continued, but we weren't
staffed at the level that would have allowed us to
develop a whole lot of new review protocols at
that point anyway.

Q    So you weren't -- you weren't

Page 133

developing protocols during that period, but you
were reviewing evidence?

A    Yes.

Q    And what -- what was the result of --
of that review?  Was it -- was it memorialized in
any way other than in a application-review
protocol?

A    We didn't even get to the review
protocols at that point.  A lot of 2017 we spent,
you know, a fair amount of time working on both
the IG review, the development of a system because
we've been working off of, you know, I don't know
how many -- I think over a thousand Excel
spreadsheets.  There was no system.

So that was my biggest priority when I
came in, in terms of operations, was to -- to
develop some kind of a system that we could use so
that we could track the cases and pull data and do
reports and things like that.

So there was a lot of work going on
with that in 2017, and there were just a number of
different kind of moving parts operationally that
we were working on so that we were better
positioned to move out once we got the green light
to move forward, whatever that looked like.

Page 134

1  Q    Okay.  So could you estimate about how
2  much time you and your staff spent in 2017
3  reviewing evidence regarding potential school
4  misconduct?
5  A    I don't know.  I -- I don't think I
6  could give an accurate estimate at this point, but
7  it wasn't -- it wasn't a high percentage because
8  we were very short staffed, and we basically were,
9  like I said, working on the IG review, the systems
10 and a whole bunch of various issues that pulled a
11 lot of our attention at that point.
12 Q    You said you were told to stop seeking
13 approval for any kind of new protocol.
14      Who was in charge of approving a new
15 protocol?
16 A    We didn't have any to send up at that
17 point, so presumably it would have gone up through
18 Laura Kim to the Office of the Under Secretary
19 like we had done before, not the protocols, but
20 the underlying documents like the legal
21 memorandum.
22 Q    If you had developed any legal
23 memoranda, then you would have sent it to Laura
24 Kim?
25 A    Yes.

Page 135

1  Q    Would she be the one who would approve
2  you to move forward with that if -- if the --
3  A    No, that would -- go ahead.
4  Q    -- if it had occurred, right?
5  A    Sorry.
6  Q    I understand.
7  A    Yeah, I mean, hypothetically, it would
8  have gone through her to the Office of the Under
9  Secretary just like we had done for the previous
10 memos.
11 Q    For the ITT protocols that you
12 developed this year, the non-California
13 employment-prospects claims, who approved those?
14 A    The protocols?
15 Q    Yes, yes, sorry.
16      Who approved the protocols -- the new
17 protocols?
18 A    Yeah, I did.  I -- you know, I relied
19 heavily on my supervisors.  I reviewed very
20 closely the -- the facts and the legal memoranda,
21 so the 2016 and the '95 memos.  And those
22 basically delineate what's going into the
23 protocol.  And then I also looked at the protocol,
24 but, you know, a couple of my supervisors that
25 were working on it, you know, were very in the

Page 136

1  weeds on making sure that it clearly spelled out,
2  you know, what happens to a Michigan claim as
3  opposed to a California claim and that kind of
4  thing.
5  Q    Did you have to get approval from
6  anyone above you in the chain of command to
7  proceed with adjudicating applications under these
8  new protocols?
9  A    No.
10      MS. ELLIS:  Okay.  It's 12:45 now.  I
11 think this is a fine time to break for lunch, so
12 let's plan to get back on the record at 1:15.
13 Does that work?
14      MR. MERRITT:  Yeah, that works.
15      Work for you, Colleen?  Just making
16 sure that works for you, Colleen?
17      THE WITNESS:  Yep, that's fine.  Thank
18 you.
19      THE VIDEOGRAPHER:  We are now off the
20 record.  Time is 17:47 UTC.
21      (Recess -- 12:48 p.m.)
22      (After recess -- 1:18 p.m.)
23      THE VIDEOGRAPHER:  We are now on the
24 record.  The time is 18:18 UTC.
25      BY MS. ELLIS:

Page 137

1  Q    I'd like to turn to page -- page 14,
2  paragraph 59 of your declaration.  That's tab and
3  Exhibit 21.
4       So paragraph 59 states, BDU received
5  permission to resume adjudication of CCI JPR
6  claims (only) on or about October 30th, 2017.
7       Is that accurate?
8  A    I'm sure it is if I included that date.
9  I don't remember off the top of my head what the
10 date was, but I'm sure I checked records to do
11 that.
12 Q    Okay.  Who gave the permission to
13 resume adjudication?
14 A    My recollection is that it was Jim
15 Manning.  I think it was Jim Manning.
16 Q    And do you know why the -- he made the
17 decision to resume adjudication of CCI JPR claims
18 at this time?
19 A    I -- I don't know.
20 Q    Do you know why he made the decision
21 that only CCI JPR claims would resume at this
22 time?
23 A    That might have been the "ask" at that
24 time.  I believe Julian Schmoke had spoken with
25 him about the fact that we -- you know, the review

Page 138

1    panel had completed their work.  The IG
2    investigation was wrapping up.  There wasn't a
3    report yet.  I don't know if there was preliminary
4    information given, but they weren't going to make
5    any changes to JPR.
6          So I don't know exactly what it was,
7    but I think that the ask might have been specific
8    to JPR claims.
9          Q    When you say that was an ask, that was
10   a request you believe Julian Schmoke made to Jim
11   Manning?
12        A    I believe so, yes.
13        Q    Okay.  And in this time in October,
14   November 2017, was BDU making progress towards
15   adjudication of any other claims besides CCI JPR?
16        A    We were focused on JPR at that point.
17   I don't know what the numbers were at that point,
18   but it was probably in the range of 100,000
19   Corinthian cases or more.  It might have been a
20   lot more than that, actually.
21        And the priority -- which was true
22   under the previous administration as well, but was
23   true under this one, is they wanted us to work
24   through the Corinthian claims that the department
25   had represented would be handled in an expedited

Page 139

1    fashion, so that was what our focus was for when
2    we were -- you know, as soon as we were allowed to
3    proceed, yeah, in that period of time.
4          Q    Okay.  Flipping back to paragraph 23 of
5    your declaration, which is on page 7.  In the
6    second sentence, you write, Starting in 2018 after
7    processing of adjudications were resumed, we were
8    given authority to increase our contractor staff.
9          Do you see that?
10        A    I do.
11        Q    So, excuse me, when in 2018 did the
12   processing resume?
13        A    Again, we don't do the processing, so I
14   don't know exactly when that piece started, but
15   the approval that happened prior to processing, so
16   when we would send the package to OUS and they
17   would sign off, started, I believe, in 2017.  It
18   coincided with the relief methodology -- when that
19   relief methodology was finalized.
20        And we started submitting -- they
21   wanted us then to move quickly on submitting
22   approval packages.  So I think it was actually
23   2017 when we started sending them up.  It may be
24   that they didn't actually get processed until
25   early 2018.

Page 140

1          Q    I see.
2          Was there a point where BDU began
3    adjudicating other claims again in addition to CCI
4    JPR?
5          A    Yes.
6          Q    And when was that?
7          A    Well, the results of the IG
8    investigation were that they didn't recommend any
9    changes to our review protocols, and, similarly,
10   nothing came out of the BDU review panel in
11   connection with that.
12        So once the IG report was done, which I
13   believe was around the end of November, beginning
14   of December, basically there was nothing else to,
15   you know, hold us back at that point, I think.
16        So we had already started moving
17   forward to J- -- on JPR claims at that point, and
18   I'm sure it was probably soon after that Julian
19   would have had a conversation with Manning about,
20   you know, we should get started on these other
21   ones again, too, but I don't remember the exact
22   timing.
23        Q    And, so, sometime in 2018, you got
24   authority to increase your contractor staff to
25   work on this resumed process of adjudication?

Page 141

1          A    Correct.
2          Q    Who gave the authority to increase the
3    contractor staff?
4          A    Well, it was conveyed to me by Julian
5    Schmoke, but, you know, there are budget
6    implications to that, so it would have gone up
7    through FSA, and at that point, I think, Jim
8    Manning was both acting chief operating officer
9    and also the acting under secretary.  So I don't
10   know in which capacity he approved it, but I'm
11   pretty sure he's the one who signed off on the
12   additional money needed to hire the contractors.
13        Q    And then after the IG report came out,
14   did the development of new protocols for other
15   schools also resume?
16        A    We were just trying to catch up.
17   The -- the cases that were coming in for
18   Corinthian were exceeding what we were able to
19   adjudicate, so the week over week because of the
20   limited staff we had up to and including when we
21   had these additional contractors, I think, we
22   weren't even keeping pace.  So we were just trying
23   to keep up with the Corinthian cases at that
24   point.  There really was no time to work on other
25   protocols.

Page 142

1    Q     And you had requested additional staff
2  by this point?
3    A     I'm sure multiple times, yes.
4    Q     The contractors who you hired in 2018,
5  what was their role?
6    A     2018.  We've had three different
7  contracting companies, so I'm just thinking which
8  one.  But -- I mean, first and foremost the
9  contractors were to focus on job-placement-rate
10  claim because there is zero discretion,
11  essentially, on those.  It's a matter of what
12  program was the person in, what campus did they
13  attend, what time period did they attend and then
14  how does that line up with the findings.
15        So those we typically pushed to -- to
16  the contracting staff.
17        In 2018, we also were starting to look
18  at the one-off claims and how those could be
19  handled, and there was a lot of trial and error
20  about that and fits and starts or however you want
21  to put it.  We did some kind of pilot testing to
22  see how the contractors did in terms of kind of
23  summarizing the borrower claim or, you know,
24  looking at if we had a school that had fewer than
25  ten claims but, you know, at least seven or eight

Page 143

1  kind of summarizing what the claims were to see if
2  there was any, you know, common theme or anything
3  that included evidence that would support it.
4        So that was all kind of going on in
5  2018 with the contractors, but a lot of it was not
6  very successful, unfortunately, so most of it
7  didn't end up advancing the ball too much.
8    Q     What was the point at which or was
9  there a point at which BDU had sufficient staff to
10  resume working on creating new protocols for other
11  schools other than Corinthian?
12    A     Well, we've been working towards that
13  since we started staffing up a year ago.  One of
14  the things that I did that I think has helped is
15  we phased out of using contractors and brought on
16  term-appointed attorneys that are actually
17  full-time attorneys, and I had control over who we
18  hired and we got really good people, and I think
19  it was just a much higher caliber of people that
20  were working on the claims at that point than some
21  of our contractor staff, unfortunately.
22        So that definitely helped us both in
23  terms of numbers and capabilities.
24        And, so, really since we started
25  staffing up towards the end of last year, I've

Page 144

1  divided people up into teams and kind of different
2  work flows so that we're moving forward on a whole
3  bunch of schools at the same time while also
4  trying to meet the metrics that are required of us
5  in terms of hitting our adjudication numbers.
6        So, you know, it takes a while to get
7  people up to speed, though, once they join BDU,
8  and there's a pretty robust training period and
9  learning curve, so it's a few months at least
10  before people are making, you know, pretty
11  significant contributions, so it wasn't really
12  until this spring, I think, when we were in a
13  position to -- to make really appreciable progress
14  on -- on other schools.
15        So there are a bunch of things that are
16  kind of moving along at a parallel track right
17  now, so it could be that -- it's not going to be
18  that we'll hit one school and then not another one
19  for a long time.  I think there will be several of
20  them that will kind of reach of point of having a
21  review protocol pretty close in time.
22    Q     So it was about three years, from
23  spring 2017 to spring 2020, that, in your opinion,
24  BDU was not really in a position to make any
25  significant progress on protocols for

Page 145

1  non-Corinthian schools?
2    A     Yes.
3    Q     I think I might have asked this before,
4  but just to be clear, do you have any
5  understanding of the reasons why your requests for
6  additional staff were denied after the
7  department-wide hiring freeze ended?
8    A     That's above my pay grade.  I don't
9  know.
10    Q     Okay.  So I'm going to flip over to
11  paragraph 64 of your declaration.  That's on
12  page 15.  That paragraph says, Additionally,
13  between December 2017 and May 2018, OUS authorized
14  the denial of over 10,000 applications.
15        Is that right?
16    A     That's what it says, yes.
17    Q     Do you remember what the basis was for
18  the denial of these applications?
19    A     I believe the ones that were done at
20  that time were Corinthian denials where the
21  borrowers had only asserted a job-placement-rate
22  claim.
23    Q     And they didn't fit into the
24  job-placement-rate evidence, and so they had no
25  other basis for relief?

Page 146

```
1       A    Correct.
2       Q    So this was during the period when OUS
3  had to authorize the denial of borrower defense
4  applications?
5       A    That was the system that was set up at
6  the time.  Yeah, we just followed the same thing
7  that we were doing for the approvals at that
8  point, so similar thing.  It was a package with a
9  cover memo, a letter and a list of applications
10 that are -- claims that would be getting that
11 letter, so it was similar for both approvals and
12 denials.
13      Q    And, so, at this time today, since the
14 2016 regulations went into effect after the Bauer
15 decision, does OUS have to sign off on denials
16 before they become final?
17      A    No.
18      Q    Are you the final decision maker on
19 denials?
20      A    Myself and the supervisors on my team,
21 yes.
22      Q    So then in the next paragraph,
23 paragraph 65 of your declaration, it states that,
24 No additional decisions have been issued to
25 borrowers since in or about June 2018.
```

Page 147

```
1           And this declaration, you signed it in
2  November 2019; correct?
3       A    Yes, correct.
4       Q    So between June 2018 and November 2019,
5  no decisions -- no borrower defense decisions had
6  been issued to borrowers?
7       A    That's my understanding, yes.
8       Q    Why -- why did BDU stop issuing
9  decisions at that time in June 2018?
10      A    BDU doesn't issue decisions, period,
11 but FSA stopped issuing decisions.
12      Q    Why did FSA stop issuing decisions in
13 June 2018?
14      A    Well, my understanding is that
15 following the Manriquez injunction, there was a
16 hold put on approvals and the department made the
17 decision to not issue denials until they could
18 send out approvals as well, and so that coincided
19 with the June 2018 -- I think that's -- that's
20 when they put the brakes on, essentially.
21      Q    Do you know who made the decision to
22 not issue anymore approvals at that time?
23      A    I don't.
24      Q    Do you know who -- excuse me.
25           Do you know who made the decision to
```

Page 148

```
1  not issue any denials until approvals started
2  issuing?
3       A    I don't.
4       Q    Who did you find out about these
5  decisions from?
6       A    I believe it was Justin Riemer who
7  communicated that to me.
8       Q    So Justin Riemer might know who the
9  ultimate decision maker was?
10      A    Presumably, yeah.
11      Q    So have you seen the injunction order
12 in the Calvillo Manriquez case?
13      A    A while ago.  But, yeah, I read it,
14 yeah.
15      Q    Do you have an understanding of who is
16 in the class in that case?
17      A    Yes.
18      Q    What's your understanding of that?
19      A    Borrowers with approved
20 job-placement-rate claims that attended Corinthian
21 colleges.
22      Q    And is it your understanding that the
23 injunction prevents the department from using the
24 December 2017 partial relief methodology for that
25 class of borrowers?
```

Page 149

```
1       A    Yes.
2       Q    So is it your understanding that FSA
3  could have, consistent with the Calvillo
4  injunction, issued approvals of borrower defense
5  claims for 100 percent relief?
6       A    I don't believe the injunction
7  precludes that.  I think it specifically says that
8  the department could, if I'm remembering
9  correctly.
10      Q    Was there a policy in place so the
11 department would not grant 100 percent relief to
12 Calvillo class members?
13      A    Policy was the relief methodology.  I
14 believe the 2017 methodology did actually have as
15 one of the potential outcomes 100 percent relief.
16 It was fairly narrow, I believe, but that's my
17 recollection is that there was some percentage
18 that -- or some -- some subset depending on the
19 program that they attended that they could have
20 gotten 100 percent.  And then under the
21 methodology, all of the other borrowers would get
22 a different percentage.
23      Q    Do you know whether any grants of
24 100 percent relief were actually issued following
25 the Calvillo Manriquez injunction?
```

Page 150

1      A      Not that I recall, but it's possible.
2      Q      So consistent with the Calvillo
3  Manriquez injunction, FSA could have processed
4  borrower defense application grants for people who
5  were not making Corinthian JPR claims; is that
6  correct?
7      A      The -- are you asking whether it
8  applied to -- it didn't apply to people who had
9  other -- if their approval was based on something
10 other than job placement rates, the injunction did
11 not apply, yes.
12     Q      Here in paragraph 65 of your
13 declaration, which we were looking at a minute
14 ago, you write in the middle of the paragraph
15 that, Approximately 1,000 applications from CCI
16 and ITT borrowers have been adjudicated as
17 approvals and are not subject to the Manriquez
18 injunction.
19            Was that correct?
20     A      I'm sure it is.  I'm sure I looked at
21 the data at the time.
22     Q      So do you know why those approvals were
23 not processed?
24     A      I don't know what the rationale for the
25 policy was, but my understanding that was -- there

Page 151

1  was a policy that we were not issuing any
2  decisions on borrower defense at that point.
3      Q      Do you know why -- well, let me back
4  up.
5             Do you know who made the decision that
6  no decisions would issue on borrower defense even
7  for borrowers who are not part of the Calvillo
8  Manriquez class?
9      A      I don't know.
10     Q      Did you discuss that decision with
11 anyone?
12     A      I'm sure I did.  I would have told
13 my -- I don't have a specific recollection of it,
14 but I would have told my team.  And I'm sure I
15 became aware somehow, but I don't remember who
16 told me.
17            Again, we don't process the decision,
18 so it was just kind of an FYI sort of thing for me
19 and my team, but impact what -- you know, whether
20 or not we would move forward on the adjudications.
21     Q      During this period when no approvals or
22 denials were issuing, was BDU continuing to
23 adjudicate applications?
24     A      Yes.
25     Q      And we talked earlier about there being

Page 152

1  a sort of step 1 and step 2 of the disposition of
2  borrower defense applications where step 1 is
3  entitlement to relief and step 2 was the amount of
4  relief.
5             So BDU was continuing with step 1 at
6  this time between June 2018 and November 2019?
7      A      That's correct.
8      Q      Were you -- did you at any time become
9  aware of a decision that the partial relief
10 methodology originally developed for the CCI JPR
11 claims would be applied to other types of claims?
12     A      Yes.  It involved getting data from
13 Social Security, and the department had worked
14 with Social Security to get the data for ITT.
15            I don't know if there were any other
16 schools.  That's the only one that I can recall.
17     Q      Do you know who made the decision to
18 expand that methodology to ITT?
19     A      I don't know.  No, I don't know.  I'm
20 sorry.
21     Q      Do you remember when you became aware
22 that the department had gathered this Social
23 Security information for the purpose of using it
24 for ITT relief?
25     A      Well, I was aware pretty early on

Page 153

1  because to get the data from Social Security they
2  needed data from the platform that my team uses to
3  come up with a list of borrowers that were being
4  submitted, so we were kind of a subject-matter
5  expert on how you would do that, I think.
6             And we had a fairly new system that had
7  sort of -- we had actually really two new systems.
8  We had an Access platform that became live in late
9  2017, and then around that time would have been
10 when we were migrating the data to our new
11 Salesforce platform.
12            So I'm sure I knew very early on.  I
13 don't remember exactly what the timing was.
14     Q      Would that have been in 2017?
15     A      I think it was probably early 2018, or
16 more like spring of 2018, maybe.
17     Q      So it would have been after the partial
18 relief methodology was announced but before the
19 Calvillo Manriquez injunction?
20     A      Yes, we received the data from Social
21 Security just prior to the injunction, I believe.
22 So I don't remember how long it took for Social
23 Security to do that, but whatever that time frame
24 is.
25     Q      Okay.  So was it your understanding

Page 154

1  that the delay -- or that the policy of not
2  issuing any grants following the Calvillo
3  injunction was related to a desire by the
4  department to formulate a new partial relief
5  methodology?
6       A     At what point in time?
7       Q     I guess this would be beginning in the
8  summer of 2018 and if it -- if it changed at any
9  point along the way?
10      A     I don't think there was any discussion
11 of a new relief methodology that early.  The
12 injunction was issued in May.  I -- I don't
13 remember any conversation about a new relief
14 methodology until at least 2019, and I don't
15 remember exactly when that was.  Probably not even
16 very early in 2019.
17      Q     Okay.  Do you know if work continued on
18 the -- on the old methodology with the ITT data
19 after the Calvillo injunction?
20      A     It did not, so two things I remember
21 happening right after the injunction.  I told my
22 team to stop entering any of those percentages
23 into our platform right after I saw the order, and
24 then, you know, pending discussions with OGC, but
25 that didn't change.  And separately, I believe --

Page 155

1  I don't know who made the call on it, but somebody
2  made the call that the folks who worked on kind of
3  converting the Social Security data into a relief
4  percentage were told to stand down.
5            That's my recollection.
6       Q     For the -- for the CCI JPR claims
7  that -- at the time of the Calvillo injunction,
8  they had been approved as eligible for relief, but
9  not processed, in your -- in your declaration you
10 say there were about 31,000 of those in -- in the
11 Manriquez class that were approved, but not
12 processed.
13            Was it your understanding that -- that
14 there was any rationale under state law for
15 awarding 100 percent relief to those borrowers?
16      A     I don't think the department saw it as
17 solely a question of state law, but certainly --
18 you know, for that, I believe that's why they came
19 up with the relief methodology.  They saw it as a
20 policy decision, but I think when the special
21 master, which predates the existence of the
22 borrower defense unit, first recommended approval
23 of job placement rates, they were relying on
24 California law when they concluded that
25 100 percent relief would be appropriate.

Page 156

1       Q     Do you know who in the department made
2  the determination that the amount of relief was a
3  policy question that was not necessarily governed
4  by state law?
5       A     I might need counsel's advice on
6  whether I can answer that question because it
7  was -- the information was given to me by the
8  Office of General Counsel.
9            MR. MERRITT:  Yeah, I mean, to the
10 extent that question is calling for privileged
11 information, we would object to it.  And it's
12 questionable whether that's within the scope of
13 the discovery the court ordered.
14            MS. ELLIS:  Okay.  Well, I accept that
15 the witness is not answering on the basis of
16 privilege.
17 BY MS. ELLIS:
18      Q     Do you believe there's anything in
19 the -- I believe it's California state law that
20 applies to the CCI JPR claims; is that correct?
21      A     That's what -- yes, that's what we've
22 plied to the JPR claims.
23      Q     Is it your understanding there's
24 anything in California law that would preclude
25 100 percent relief?

Page 157

1            MR. MERRITT:  Objection.  It goes
2  beyond the scope.
3            MS. ELLIS:  Can the witness answer?
4            THE WITNESS:  You want me to answer?
5            I'm not aware of anything that would
6  preclude 100 percent.
7            MS. ELLIS:  I'd like to look for a
8  minute at Exhibit 12.  That's tab 12 in the hard
9  copies.  On the Dropbox, it's bracketed number
10 12ED PowerPoint 8/21/2019.  This was marked as
11 Exhibit 12 in the Jones deposition.
12            (Exhibit 12 referred to.)
13 BY MS. ELLIS:
14      Q     Does this document look familiar to
15 you?
16      A     Vaguely.  I'm sure I probably worked on
17 it myself, but it's been a while.
18      Q     Do you remember what purpose this was
19 prepared for?
20      A     One minute.
21            (Witness reviews document.)
22            I think -- I believe this was to
23 prepare somebody new to the department in
24 leadership.  It might have been -- or somebody who
25 was newly working on BD in leadership.  I don't

Page 158

1   remember who, though.  We've done similar decks
2   for each time we had a new chief operating
3   officer, which doesn't match up with this
4   timeline.  So it might have been the deputy
5   secretary or someone else, but I think it was a
6   briefing to prepare somebody or to kind of give a
7   general status to someone new in leadership or
8   someone newly involved in BD.
9        Q    Okay.  On page 5 of the document.  It's
10   numbered as slide 5, and, also, it has a Bates at
11   the bottom AR-A-0227.  So this slide appears to be
12   giving an update on applications adjudicated, but
13   not processed, as of August 2019.  It states,
14   there are over 1,400 schools with denied
15   applications that are pending processing.
16             That's the second major bullet down.
17        And it specifically mentions denied
18   applications for Wright Career College and
19   Marinello School of Beauty.
20             Do you see that?
21        A    I do.
22        Q    Do you recall the reasons why those two
23   schools had a significant number of claims denied?
24        A    I don't.  We have thousands of schools,
25   so I apologize.  I don't remember the specifics on

Page 159

1   these.
2        Q    Okay.  On the next slide, the slide is
3   titled Why Are BD Applications on Hold.
4             The first topic listed is approvals,
5   and on the second bullet it says, No relief
6   methodology developed for non-CCI claims.
7             Can you explain what that meant as of
8   August 2019 when this slide was written?
9        A    I don't know.  As I'm looking at this
10   deck, this is not exactly what I was thinking it
11   was because the first -- slide 2 is something that
12   I'm very familiar with.  Slide 3 is one that I've
13   worked on, but these other slides, I'm not sure
14   who put them together.
15             As with the second bullet, that's true.
16   And maybe it was in reference to ITT.  That's all
17   I can think of.
18        Q    For -- for non-CCI claims, was there --
19   were you involved in any discussions about
20   development of a new relief methodology?
21        A    Yes.  Mostly as a subject-matter expert
22   for our policy team who was involved in
23   conversations with LBJ on it.
24        Q    Who was --
25        A    I should say policy implementation

Page 160

1   team.  They don't make policy.  They -- they
2   implement the policy that we get from LBJ.
3        Q    Who's -- who makes up the policy
4   implementation team?
5        A    Currently, the acting director of
6   policy implementation is Ian Foss, and he was also
7   one of the leads with respect to -- and is with
8   respect to FSA applying the 2019 methodology to
9   school-specific data.  He's got people on his team
10   that work on that.
11        Q    When was the policy implementation team
12   created?
13        A    Oh, that's a long-standing -- I mean,
14   that -- the name, I think, also changed during the
15   restructuring last fall, but they're not related
16   in particular to BD.  That's part of FSA.
17             Any time there's a new regulation or,
18   you know, kind of global policy on anything, in
19   fact -- that affects student loans, they work very
20   closely.  They're also involved in, like,
21   negotiated-rulemaking process and all that.
22        Q    Okay.  Thank you.
23             Was there ever any discussion of giving
24   100 percent relief to any claims as of
25   approximately August 2019?

Page 161

1        A    The -- not in FSA.  The kind of
2   direction that we've been given and, I mean the
3   royal "we," but that the policy team had been
4   given was focused on developing a new methodology
5   since Manriquez was still pending.
6        Q    Who did that direction come from?
7        A    The Office of the Under Secretary,
8   Diane Jones.
9        Q    Moving down to the next section of this
10   slide under Denials, the first bullet says, Policy
11   decisions (spring 2018) to not issue denials until
12   approvals also could be issued.
13             And I think we may have mentioned this
14   earlier, but do you know who made that policy
15   decision?
16        A    I do not, not -- no.
17        Q    Do you know why that policy decision
18   was put into place?
19        A    I don't.
20        Q    Then looking down at the third bullet
21   up here in the section Denials, it says, Issuance
22   of denial decisions scheduled to resume by
23   mid-September.
24             Do you recall that expectation in
25   August 2019?

Page 162

1    A    Yes.  The -- that didn't happen,
2 obviously.  I believe the -- that was to coincide
3 with -- no, I'm sorry.  I'm trying to remember the
4 timeline here.  It was a decision to hold off, and
5 I don't know if it was this particular time,
6 but -- I'm not sure.  I'm sorry.
7    Q    As of August 2019, had the form A
8 through D denial letters been finalized?
9    A    No, they had not.  In fact, I don't --
10 I don't know if they even started.
11    Q    Was the -- was the ongoing development
12 of those letters one of the reasons why denial
13 decisions did not resume by mid-September?
14    A    No, they were held until we had the
15 approval -- the (audio distortion) approvals which
16 was tied to the relief methodology.
17    Q    So does it follow then that issuance of
18 approvals were scheduled to resume by
19 mid-September 2019?
20    A    Well, like I said, I didn't draft this
21 and I don't know who did, but it may have been in
22 connection with whether or not to hold them.  I'm
23 guessing, so I really -- I don't know.
24    Q    Okay.  So going -- going back to your
25 declaration, looking at paragraph 66, could you

Page 163

1 read the first sentence of paragraph --
2    A    Sorry.  Sixty-six?
3    Q    Yes, 66 at the top of page 16.
4         Could you read the first sentence,
5 please?
6    A    Because BDU has been instructed to
7 maximize the number of applications adjudicated
8 per week, the streamlined JPR claims have been
9 prioritized.  For the same reason, BDU also has
10 focused on application from borrowers who did not
11 provide any evidence and who attended schools for
12 which BDU is not aware of evidence that would
13 support the approval of the applications.
14    Q    Okay.  So this is circling back to
15 something we talked about early on, but who made
16 the decision to maximize the number of
17 applications adjudicated per week?
18    A    That was the direction that we were
19 given from the department leadership, and it was
20 carried out by the chief operating officer and his
21 very clear mandate to me.
22    Q    When did you receive this instruction
23 to maximize the number of applications adjudicated
24 per week?
25    A    Really, as soon as Mark Brown started

Page 164

1 as the chief operating officer, he was very
2 focused on the backlog, the issues that were kind
3 of keeping us from getting through the backlog,
4 and how do we -- how do we eliminate the backlog.
5 So almost from the get-go I would say --
6         THE COURT REPORTER:  I'm sorry.  I'm
7 sorry.  You cut out.
8         THE WITNESS:  I think --
9         THE COURT REPORTER:  Excuse me.  You
10 cut out on me.  Right after you said, Really, as
11 soon as Mark Brown started as the chief operating
12 officer, he was very focused on the backlog, the
13 issues that were kind of keeping us from getting
14 through the backlog, and how do we -- how do we
15 eliminate the backlog, and then you distorted on
16 me.  Sorry.
17         THE WITNESS:  Okay.  I don't think I
18 said anything helpful after that so -- and I don't
19 remember exactly what I said.
20         But, yeah, that was his focus so I
21 guess it was -- you know, when he started at that
22 period of time in February, March 2019, that he
23 started asking about it, and probably very soon
24 thereafter, you know, started pushing us to hit
25 numbers and, you know, have to report on it very

Page 165

1 regularly.
2         I'd say no later than the fall of 2019,
3 but it might have been a little earlier than that,
4 too.
5 BY MS. ELLIS:
6    Q    Did the -- did the number of --
7    A    (Inaudible.)
8    Q    I'm sorry.  What?
9    A    Sorry.  Everybody just froze on me
10 there, so -- I don't know if it's my connection
11 or --
12         MR. MERRITT:  It might be yours, I
13 think, from my perspective at least you're --
14         THE WITNESS:  Can you hear me?
15         MR. MERRITT:  Now, yes.
16 BY MS. ELLIS:
17    Q    Okay.  Can you hear me?
18    A    I can hear you, yep.
19    Q    Okay.  We'll keep going and see what
20 happens.
21    A    Yep.
22    Q    So did -- did the number of
23 applications adjudicated become part of FSA's
24 annual performance metrics this year?
25    A    I believe so, but, yes.

Page 166

1    Q    Had the number of applications
2  adjudicated been a performance metric before 2020?
3    A    I'm so sorry.  I'm having trouble.  Can
4  you say that one more time?
5    Q    It's okay.  I understand.
6         Had the number of borrower defense
7  applications adjudicated been part of FSA's annual
8  performance goals before 2020?
9    A    Not -- not formally.  I think in 2019
10 we were reporting on them very regularly, but, you
11 know, FSA has very defined -- a strategic plan
12 with very defined goals, and borrower defense is
13 now part of those goals, but I don't think it was
14 in 2019 part of the formal goals for the --
15   Q    What about --
16   A    -- organization generally.
17   Q    What about in 2018?
18   A    Like I said, I don't think it was
19 anything formal.  It was a new unit, so it
20 sometimes takes a while for all of the -- for
21 everything to catch up with new -- new parts of
22 the organization, so I think it was really 2020
23 before it became a formal part of the goals.
24   Q    Does meeting that goal affect your
25 compensation?

Page 167

1    A    Not per se, but it, I suppose, is part
2  of my job, so if we, you know, completely fall
3  down on the job, I would imagine my reviews
4  wouldn't be very good, but there's not a
5  specific -- I don't have a quota or anything along
6  those lines in -- in my performance plan, if
7  that's what you're asking.
8    Q    Who -- who reviews the data showing
9  progress toward the goal of maximizing
10 adjudications per week?
11   A    I'm really struggling here with the
12 phrasing.  Should I maybe log out and log back in.
13 And the tech folks can tell me what I can do to
14 make it better.
15        MR. MERRITT:  I suggest we take a
16 break -- a short break and try and troubleshoot
17 it.
18        MS. ELLIS:  Yeah, let's take a
19 five-minute break off the record.
20        THE VIDEOGRAPHER:  We're now going off
21 the record.  The time is 19:08 UTC.
22        (Recess -- 2:08 p.m.)
23        (After recess -- 2:14 p.m.)
24        THE VIDEOGRAPHER:  We're now on the
25 record.  The time is 19:14 UTC.

Page 168

1         MS. ELLIS:  And I'll just say for the
2  record that we fixed or tried to fix our technical
3  issues here by having Ms. Nevin connect via her
4  phone audio, and for that purpose, we have no
5  issue with her phone being in the room even though
6  we had talked earlier about putting it aside, so I
7  just wanted to make sure that was clear for the
8  record.
9         THE WITNESS:  Thank you.
10        BY MS. ELLIS:
11   Q    So, let's see, I think let's pick back
12 up in November of 2019.  Around that time, did you
13 become aware of a memorandum describing a new
14 partial relief methodology for borrower defense
15 claims?
16   A    Yes.
17   Q    Do you know who wrote that memorandum?
18   A    I believe it was Jeffrey Appel and Ian
19 Foss in consultation with Diane Jones and
20 potentially other folks on her end.
21   Q    Okay.  Do you know whether that
22 memorandum has been provided for production in
23 this case?
24   A    I don't know.
25   Q    Okay.  Do you have a copy of it in your

Page 169

1  possession in your computer files?
2    A    I'm sure I do.
3    Q    Okay.  What was your involvement in
4  developing the 2019 partial relief methodology?
5    A    In -- sometime in the fall of 2019, I
6  remember Mark Brown instructing Jeff -- Jeffrey
7  Appel and Ian Foss to follow up with OUS on what
8  she was looking for or what they were looking for
9  as senior leadership at LBJ.
10        And I was, kind of same thing as
11 before, in a consulting role on what data points
12 we had available in terms of borrower applications
13 and -- and it's OUS data and things that would be
14 in our system that could potentially be relevant.
15        And, then, Jeff and Ian came up with
16 options -- a series of options, I guess, and, you
17 know, to the extent they needed input on data,
18 that was -- that was my role there.
19        And then there was a meeting that I
20 participated in or attended with -- with the under
21 secretary, with Diane Jones, and Jeff and Ian, and
22 some other folks where the options were discussed.
23   Q    Was it your understanding in the fall
24 of 2019 that no borrower defense decisions were
25 being processed because this relief methodology

Page 170

1  had not been finalized yet?
2      A     I don't know that it was ever framed
3  that way, but they weren't being issued until we
4  could issue approvals, and we couldn't issue
5  approvals until there was a release methodology,
6  so that's how it was framed.
7      Q     What's your understanding of what the
8  2019 partial relief methodology prescribes?
9      A     I won't even begin to try to opine on
10 standard deviations, so, you know, lawyers and
11 math, I'm definitely one of those folks.
12          It's, I believe, an effort to compare
13 ascribed average earning, something along those
14 lines, to other data sets.
15     Q     But it's based on -- it is not based on
16 in any way on the borrower's actual earnings; is
17 that correct?
18          MR. MERRITT:  Objection.  What is
19 the -- this is not in the scope of the court's
20 order, the actual merits of the methodology.
21     BY MS. ELLIS:
22     Q     So was -- was it after the 2019 partial
23 relief methodology was announced that the pace of
24 adjudications of borrower defense applications
25 increased?

Page 171

1      A     Well, that affected the pace of issuing
2  decisions.  The pace of adjudications was more
3  closely related to the hiring of additional staff.
4      Q     Was the hiring of additional staff in
5  the fall of 2019 made in anticipation of a new
6  relief methodology being announced?
7      A     Not directly.  It was related to the
8  desire to -- to complete review of all the cases
9  in the backlog, so I don't think it was
10 specifically intended to be tied to the release
11 methodology.
12     Q     As of right now, how many full-time,
13 nonterm attorneys are working in BDU?
14     A     Oh, there are a couple I'm trying to
15 remember whether they're term or permanent, but I
16 believe it's 11 plus myself.
17     Q     And you -- you mentioned hiring a
18 number of term attorneys as well.  About how many
19 of those are there?
20     A     I want to say it's 40 -- it's either 47
21 or 52.  It might be 52.  Actually, we just had one
22 person leave for another position.  It might be
23 51.  Somewhere in that range, though.
24     Q     Okay.  And of the full-time and term
25 attorneys working at BDU, how many of them are

Page 172

1  currently working on developing protocols for
2  non-Corinthian schools?
3      A     Well, again the protocols follows the
4  development of the summary of the facts, and then
5  a legal analysis on 2016, and then a legal
6  analysis on 50 different states, if it's a school
7  that's that expansive, and if it's not, then
8  whatever states are relevant to that analysis.  So
9  if they're was only one state, then you would only
10 need the legal memo for '95 on that particular
11 state.
12          But, I guess, your question assumes
13 that they're only working on one thing.  I have a
14 lot of people who are kind of working on multiple
15 work streams, so I would say probably half are
16 working at least part of their time on reviewing
17 the evidence, summarizing the evidence, developing
18 the facts, developing the legal memoranda and
19 then, ultimately, the protocol to adjudicate
20 cases.
21     Q     And while all of that research and
22 analysis is underway, are applicants from the
23 schools under review held up, or are they in the
24 work stream for adjudication.
25     A     I'm not sure I understand the question.

Page 173

1  Can you say that again?
2      Q     Okay.  So if the school is in this
3  process of having evidence reviewed, having the
4  law analyzed, are actual borrower defense
5  applications related to that school -- are they
6  put aside waiting for the completion of the
7  protocol or are they put into a general pool for
8  adjudication?
9      A     No, they would be -- they're not --
10 they're not adjudicated right now.  They would
11 be -- remain pending.  Our platform is set up so
12 that we have sort of different statuses and ways
13 to track where people are in the process.  They
14 would not end up in a pool for adjudication unless
15 somebody makes a mistake, but, generally speaking,
16 the -- the people who have applications related to
17 the common evidence remain pending.
18     Q     Okay.  I'd like to look at tab 19 of
19 the materials on the Dropbox.  This is bracket 19
20 ECF 145 Defendants' Response re frog list.  This
21 was introduced as -- as Exhibit 19 at Diane Jones'
22 deposition.
23          (Exhibit 19 referred to.)
24     BY MS. ELLIS:
25     Q     So this is a filing in this case.  The

Page 174

1 title of the filing is Defendants' Response
2 Regarding the Court's Request at the October 1st,
3 2020 Class Hearing.
4          Do you see that?
5     A    I do.
6     Q    Okay.  And appended to this document --
7 appended to the main filing is the declaration of
8 Mark Brown, and then appended to the declaration
9 of Mark Brown, a document called Attachment 1 is a
10 chart.
11          Do you see -- it starts -- the 13th
12 page of the PDF, the 13th page of the document.
13    A    Yes.
14    Q    Have you seen this document before?
15    A    Yes.  My team put this together at my
16 direction.
17    Q    Sorry.  I didn't catch that.  Who put
18 it together at your direction?
19    A    I'm sorry.  My team.
20    Q    Which is --
21    A    Some of the senior members of my team,
22 yeah.
23    Q    Okay.  And did you ask them to do so
24 for the purposes of this filing, or was it a
25 document that existed before?

Page 175

1     A    It was created for this filing.
2     Q    Okay.  So in column 3, if I'm reading
3 this correctly, column 3 describes the common --
4 the sources of common evidence for each school
5 that's listed in column 1.
6     A    That's correct.
7     Q    Okay.  If we could look at page 3 of
8 this chart, the school ownership group listed in
9 column 1 is Career Education Corp.?
10    A    Yes, I see that.
11    Q    And this includes Brooks Institute,
12 which we were discussing earlier?
13    A    Right.
14    Q    So, I guess, could you explain a little
15 bit how -- how you get from the common evidence
16 listed in column 3 to the exclusions listed in
17 common 2 -- in column 2?
18    A    The exclusions listed in -- so common
19 evidence is in 3.
20    Q    Yes.
21    A    That -- that's the documents and, you
22 know, the evidence that my team is aware of and is
23 in the course of reviewing to develop or to hold
24 for potential approvals.  And in assessing the
25 scope of these various -- so for -- you know, for

Page 176

1 CEC, New York AG's office, Pennsylvania AG's
2 office, and accessing the scope of these materials
3 that were provided, they summarized that in a memo
4 and then determined what kinds of cases
5 potentially may have supporting evidence in -- in
6 here, and then from there what cases could be
7 cleared for adjudication because we didn't have
8 common evidence.
9          So that's where you get to column 2.
10 Column 2 is basically a summary of what got
11 cleared for adjudication, I believe, if I'm
12 remembering correctly.
13    Q    Okay.  So an application that fits a
14 description in column 2, the borrower could
15 theoretically provide sufficient evidence
16 themselves to have their application granted, but
17 they're not going to be within -- considered to be
18 within the scope of common evidence.
19          Is that accurate?
20    A    Well, this is worded that it's
21 applications that do not fit the criteria below,
22 so I think there was some variation on how it
23 was -- you know, for different schools, how it was
24 framed.
25          But for this one, it looks like for

Page 177

1 CEC, this is identifying having categories of
2 applications determined not to be within the scope
3 of common evidence.
4          So it's kind of a double negative,
5 which makes it confusing, so I'm going to read
6 this again.
7          (Witness reviews document.)
8     Q    So -- so does this will say that for
9 CEC, the way it's phrased, does this mean that
10 the -- the bullets here in column 2 for CEC are
11 the types of claims that do fit the common
12 evidence?
13    A    That may, may.
14    Q    May --
15    A    You know, there are not going to be any
16 kind of final conclusions at this point because
17 there's still more work to be done on this, but
18 these are the categories of applications that
19 would be satisfied under the protocol or not
20 assigned at all.  To the extent from the data that
21 we can determine that someone attended during this
22 period of time, they wouldn't even get assigned.
23          But if they did get through to a
24 reviewer, the reviewer would see that, for
25 example, if the borrower enrolled between May 1st,

Page 178

1  '99 and May 22nd, 2004, at Western School of,
2  whatever, Health and Business, that claim would be
3  set aside.
4       Q    I see.
5            Do the claims set aside pending further
6  analysis of common evidence count in any way
7  toward the goal of clearing the backlog?
8       A    No, they're just still pending.
9       Q    So if more claims were set aside, it
10  would affect BDU's ability to meet the
11  adjudication targets?
12      A    If more claims were set aside, it just
13  would mean that we'd probably would be
14  prioritizing other claims.  We've got a lot of
15  cases to get through, so -- so, yeah, I mean,
16  we're not setting aside claims just to meet our
17  metrics.  I get yelled at.  It's okay.  I move on.
18  But, you know, we're trying to get through them as
19  efficiently as possible under the mandate, but
20  we're not, you know, shortchanging reviews in
21  order to do that.
22      Q    So the column 3 evidence listed here
23  for CEC, it doesn't appear to include evidence
24  that is culled from -- from borrower defense
25  applications themselves; is that correct?

Page 179

1       A    Well, if there is such evidence that's
2  broadly applicable and it shows up in the
3  sampling, then it potentially would be described
4  here, but I'm not aware of us having seen anything
5  from CEC borrowers that was kind of -- of the
6  scope that would be that broadly applicable.  I'd
7  have to check with my team to see if they're aware
8  of anything, but I'm not.
9       Q    What about if many borrowers describe
10  the same type of misconduct?  Is there any sort of
11  critical mass that -- that warrants those
12  allegations being treated as evidence or at least
13  further looked into?
14      A    It's -- it's not necessarily a critical
15  mass, but, certainly, if there are a lot of
16  borrowers who are making the same specific
17  allegations, then that would be something that --
18  that we would consider.
19            And, I believe, that's actually
20  reflected in the ITT facts; that it's
21  corroborating evidence, essentially.  It's not the
22  only evidence.  We have other evidence, too.  But
23  that borrowers are making the same kinds of claims
24  or referring to the same documents that they think
25  was misrepresenting something to them.  If it's --

Page 180

1  if it's, you know, specific, it certainly could be
2  corroborating evidence.
3       Q    Are you aware of that kind of
4  corroborating evidence for any school other than
5  ITT?
6       A    Well, that's the only one that we've
7  completed recently, so I know there are others.  I
8  couldn't tell you what their names are.  You know,
9  some of them are smaller schools that wouldn't
10  necessarily be, you know, the kind of schools that
11  you would know off the top of your head, but there
12  certainly are others.
13      Q    So looking again at CEC, so for -- just
14  to make sure I understand, so someone who enrolled
15  at Western School of Health and Business between
16  May 1st, '99 and May 22nd, '04, they would
17  potentially meet the common evidence and be set
18  aside?
19      A    They would be set aside.  The common
20  evidence may provide support for some -- one or
21  more elements of their application, so, you know,
22  if somebody alleges a misrepresentation claim,
23  there's the -- was the representation-made piece
24  and then the is-it-false piece or misleading or
25  deceptive or whatever the standard is.

Page 181

1            The common evidence may support part of
2  that and not the other part, so it's very specific
3  to the regulation and the lot at the end of the
4  day.  But these cases are set aside because there
5  may be some common evidence that will get them
6  over the hurdle on one or more of the elements
7  potentially depending on what the law is that
8  applied to their case.
9       Q    Okay.  So if someone applied -- if
10  someone enrolled at Western School of Health and
11  Business other than during that date range, they
12  would still have the opportunity to make out their
13  claim by evidence they submit themselves; they
14  just wouldn't be assisted by the common evidence?
15      A    That's right.
16      Q    Would that be treated under what you've
17  called the one-off claim protocol?
18      A    Well, yes, because basically it will
19  tell the reviewer to set that case aside for
20  further review by a senior attorney who will then
21  look at whether or not there's sufficient evidence
22  on all of these different issues.
23            So if -- if the borrower is not during
24  that time period, so we're looking at what their
25  own evidence is to satisfy each of the elements.

Page 182

1   If the reviewer sees any borrower evidence to
2   support even some of it, then that's it.  They
3   stop and it gets set aside, you know, escalated,
4   essentially, for consideration by one of the
5   senior team.
6        Q    So if an applicant provides any
7   documentation to support their claim, it gets set
8   aside?
9        A    Not any documentation because a lot of
10  what we get is -- you know, we have borrowers who
11  allege, you know, an employment prospect, kind of
12  they guaranteed me a job type of thing.  And then
13  the evidence that they attached may be relevant to
14  something but not to that, so like a transcript or
15  a program manual that doesn't have any
16  representations regarding employment prospects,
17  things like that.  There would have to be evidence
18  relevant to the claim that would potentially
19  support the claim.
20            If they make multiple claims and the
21  evidence is relevant to any of that, then it would
22  be set aside.
23       Q    Does the department make available any
24  guidance to borrowers about the types of documents
25  they should submit to support their claims?

Page 183

1        A    We -- the new application form, we
2   tried to build that into it to, you know, give
3   borrowers an indication of the kinds of things
4   that would be helpful.  So to some extent, I think
5   that's in the newer application.  I'm not aware of
6   anything that was out there, though, previously.
7        Q    Did the department make publicly
8   available any sort of list or other reference
9   of -- of schools, programs, time periods for which
10  common evidence exists?
11       A    Well, I think this is public now, so --
12       Q    Right.
13       A    -- I guess, yes.
14       Q    But before -- let's say before
15  October 14th, 2020, when this was filed, was any
16  sort of list like that publicly available?
17       A    No.
18       Q    So a borrower, at the time they apply,
19  wouldn't have a way of knowing whether their claim
20  could potentially fit into existing common
21  evidence?
22       A    That's correct.
23       Q    And they wouldn't necessarily know what
24  kind of documentation they would have to submit in
25  order to have their claim considered?

Page 184

1        A    That's probably fair.
2        Q    I'd like to look at tab 25 in the
3   printed materials on the -- on the Dropbox.  This
4   is bracket 25 Nevin Declaration Exhibit 18
5   standard protocol.
6            MS. ELLIS:  And this has not previously
7   been marked.  I'd like to -- I'd like to mark
8   this -- I believe we're on Exhibit 23 now.
9            (Deposition Exhibit 23 was marked for
10  identification and attached to the transcript.)
11       BY MS. ELLIS:
12       Q    Do you recognize this document?
13       A    Yes.
14       Q    Can you describe what this document is?
15       A    It's a standard protocol, so this is
16  what would be used for -- like we were referring
17  to before, the cases that, you know, are a one-off
18  kind of scenario or, you know, where there's not
19  common evidence that would result in a separate
20  protocol being developed for that particular
21  school.
22       Q    And when -- when you say "one-off,"
23  that doesn't necessarily mean that there was only
24  one claim from that school; right?
25       A    That's right, because one turns into

Page 185

1   two as soon as somebody else files one.  So, yeah,
2   we use that loosely to mean generally, you know,
3   very small number of claims.  I think, typically,
4   we've viewed the threshold that, you know, under
5   ten historically, but there are cases where we
6   have probably somewhere in the 10 to 20 range that
7   might still get this.
8        Q    Would this be a protocol that's applied
9   to claims where there might actually be many from
10  a particular school, but they've been determined
11  to fall outside the common evidence?
12       A    What do you mean by "many"?
13       Q    Well, for instance, let's say Art
14  Institutes, potentially thousands of claims.
15       A    No, this would never be for anything
16  like that.
17            If you look at the 2A -- 2A, you move
18  on to part II.  2B, 6 to 20, there's a memo
19  template that's completed as soon as the school
20  hits six claims to determine whether the
21  department, you know, has got any records
22  regarding the school.
23            We do that for -- for part A, that's
24  kind of done on the back end in the clearance
25  process, but, you know, the schools that are in --

Page 186

1  that fall into that 2A are typically, you know,
2  state school, you know, kind of -- could be
3  anything.  We've got Ivy league schools that fit
4  into that category.
5          But 2B, as soon as you hit that
6  threshold, there's an Internet search.  We look to
7  see if there's, you know, AG actions, things like
8  that.  So there's kind of a short memo where we
9  summarize whether there's anything out there that
10 we know about.  And, then, once it hits 20, then
11 it gets kind of a longer memo with sampling.
12     Q    So what -- what would be the protocol
13 applicable to a school that has more than a
14 hundred cases?
15     A    So we'll be producing those, but they
16 would each have their own individual protocol, so
17 it wouldn't be the standard protocol that would be
18 used, and it will define the categories that would
19 match up with that spreadsheet that we -- or the
20 chart that we were just looking at.  So, you know,
21 depending on what the parameters are of the
22 evidence -- the scope of the evidence generally,
23 then we would determine what's going to get set
24 aside, essentially.
25          So it may be that it's all campuses,

Page 187

1  all, you know, programs for some period of time,
2  and then anything that's inside that window gets
3  set aside.  It might be that it's limited to a
4  certain program like, you know, the criminal
5  justice one that I was referring to before, so a
6  nursing program, we would go ahead and adjudicate
7  it.
8          And in that instance, it will probably
9  mirror the standard protocol to a large extent for
10 things that fall outside, but it has very specific
11 instructions on things that are related to or
12 potentially related to the common evidence.
13     Q    So for one of those schools that has
14 its own school specific protocol, the reviewer
15 first would compare the application to the scope
16 of the common evidence as it's been determined so
17 far; is that correct?
18     A    Not the reviewer.  The reviewer opens
19 the application, looks at the school.  There's a
20 spreadsheet that identifies what the appropriate
21 protocol is for that school.  They pull up the
22 protocol.  That protocol has already kind of
23 delineated what's related to the common evidence
24 and what's not by telling them what cannot
25 adjudicate, so, you know, if you find that your

Page 188

1  borrower enrolled between 2010 and 2012, advise
2  your supervisor, move on, or move the case to
3  status X and move on.
4          If it doesn't do that, then next look
5  for this because maybe we have common evidence
6  related to a specific campus somewhere during a
7  different period of time.  If so, advise your
8  supervisor and move on, or move it to status,
9  whatever, and move on.
10         If you jump through those hurdles and
11 it's not matching up with anything that's in that
12 chart, then you kind of get to what mirrors the
13 standard protocol, and, then, it's based on what
14 the borrower has, him or herself.
15     Q    Okay.  So once -- once you've
16 determined that it should not be set aside based
17 on the common evidence protocol, you would go to
18 something that looks like what's called part II
19 here in the standard protocol?
20     A    Correct.
21     Q    Okay.  So here for these schools where
22 there's less than 100 cases, there might be this
23 small-batch or medium-batch memo created depending
24 on the number of claims.
25          And, then, what happens to those memos

Page 189

1  once they're created?
2     A    What do you mean what happens to them?
3     Q    The instruction number -- part I,
4  instruction 3 here says, Once you complete the
5  appropriate memo, email the appropriate borrower
6  defense attorney to tell them you've completed the
7  memo, then what does the borrower defense attorney
8  do with the memo?
9     A    So, then, it's in somebody else's
10 court, so if your question is what would happen
11 with respect to the reviewer, it tells them to go
12 on to the cases where -- you know, that's not the
13 case.
14         But the memo itself then would be
15 reviewed and edited and probably follow-up
16 questions and discussions and maybe further work
17 with respect to the memo before it's finalized.
18 So that kind of gets handed off to one of the more
19 senior team members at that point.
20     Q    What's the usual turnaround time for
21 the senior team member reviewing the memo and
22 getting back to the person who wrote it you?
23     A    I don't know, but I'm sure it varies
24 pretty considerably based on workloads.  Nearly
25 all of my senior attorneys and a good number of

Page 190

1  junior attorneys work on multiple things, so it
2  probably varies quite a bit.
3      Q    Do you know how many small- and
4  medium-batched memos have been written?
5      A    I don't know what the breakdown is.
6  Like I said, we have about 500 memos altogether, I
7  think, somewhere in that neighborhood.  So it's
8  some subset of that, but I couldn't give you
9  ballpark on that.
10     Q    These are included -- when you say,
11 generally, you have about 500 school-specific
12 memos, that includes these ones for the smaller
13 schools?
14     A    Yes.
15     Q    Okay.  This document is watermarked as
16 a draft.  Is it actually a draft?
17     A    I don't -- I'd have to do kind of a
18 line-by-line comparison.  It may be just that --
19 when was this produced?  Last November?
20     Q    Yes, this was attached to your book
21 number 2019 declaration.
22     A    Yeah, I can't say for sure, but if it
23 was -- what was it attached to?
24     Q    It was exhibit 18 to your declaration
25 from November 2019.

Page 191

1      A    Oh, we might have just enclosed the
2  wrong document, then.
3           We certainly had a final version of
4  this, and this looks, if not exactly like that --
5  or it very well may be the final version and just
6  the watermark wasn't removed.
7           Or, you know, we've had so many
8  platform updates, so if you see in here in a
9  couple of places it has, like, status numbers and
10 things like that, so we've tweaked the protocol
11 any time there's a change in the platform that
12 requires something to be adjusted to make sure
13 that the data is appropriately corrected.  I'm
14 wondering if it was in connection with something
15 along those lines that maybe there was an update
16 and they added a draft stamp and we just didn't
17 take it off.
18     Q    But this is at least very close to the
19 final form of this document that reviewers
20 actually use?
21     A    Yeah, it definitely looks to be, if not
22 the document, to be very close to it.
23     Q    Great.
24           Moving down to part II, entitled Case
25 Review, part II instruction 2, refers to -- and it

Page 192

1  looks like in the original it hyperlinked to a
2  document called Types of Claims 10/23/2018.
3           Can you describe what that document is?
4      A    Yeah, so it -- it kind of breaks down
5  examples of, you know, what states a claim and
6  what doesn't state a claim just to make it kind of
7  more concrete for training purposes and to refresh
8  people's memories when they're doing these if they
9  haven't done that particular claim for a while.
10          So an example would be -- I think one
11 of the things in there would say something -- it
12 says something like, doesn't state a claim would
13 be my credits didn't transfer, but the borrower
14 doesn't make any allegation that the school ever
15 told them that their credits would transfer.
16          And then the corollary of what does
17 state a claim is the school told me that my
18 credits would transfer, but they didn't.
19          So it kind of gives different kinds of
20 examples.
21          Similarly, I couldn't get a job would
22 be, you know, not something that includes the
23 representation or some kind of conduct on the part
24 of the school, but the school promised me that I
25 would get a job when I graduated, that --

Page 193

1  that's -- so it's things like that, and it's based
2  on kind of the type of common allegations that we
3  have.
4      Q    Do you know if that document has been
5  updated since 10/23/2018?
6      A    I don't think so because that kind of
7  thing doesn't change.  I would have to check, but
8  I believe it's still actually the same document in
9  our current protocols and that would be produced
10 to you with our other protocols.
11     Q    Okay.  What if there's an allegation
12 that doesn't sort of comfortably fit within the
13 types of claims that are described in that
14 document?  What would a reviewer do with that?
15     A    Yeah, we have an "other" bucket on the
16 application, so, you know, they're kind of our
17 common kinds of allegations, and then there's an
18 "other" at the end.  So we do typically get that
19 phrase, but if they see anything that's not
20 clearly covered by something that they have a
21 protocol for, that they should contact their
22 supervisor and get further instruction.  So that
23 would be set aside until they had clear
24 parameters.
25          If it was something novel, that could

Page 194

1  potentially end up in all the cases for that
2  school being put on hold until we figure out
3  whether there's any common evidence related to it,
4  be, but it doesn't happen that often believe it or
5  not.  We tend to see a lot of the same kinds of
6  things over and over again.
7      Q    Okay.  On instruction 4, If the
8  borrower attaches any evidence that supports that
9  borrower's particular allegation, but does not
10  indicate any larger action against the school,
11  email your assigned QC attorney, et cetera, and
12  stop work on the case.
13          So that's the situation we were talking
14  about earlier, right, where, if the reviewer
15  thinks that there's sufficient evidence to support
16  the claim, they're to elevate it?
17      A    Not even sufficient.  Any evidence that
18  supports the claim.
19      Q    How -- how do you draw the distinction
20  between evidence that supports a borrower's claim,
21  but not a more general claim -- or not a larger
22  action against the school as it's put here?
23      A    You know, the latter -- the sort of
24  borrower-specific scenario.  It could be an email
25  that a recruiter sent to an individual borrower,

Page 195

1  so, you know, making a promise in that email,
2  that's not something that was publicly
3  disseminated to a whole bunch of other people
4  unless there's evidence that that recruiter, you
5  know, was making similar allegations to other
6  people and, you know, this would suggest that
7  we're not aware of any common evidence to that
8  effect.  Then that would be borrower specific, so
9  it wouldn't give enough to get somebody else over
10  that hurdle.
11          So that would be a borrower-specific
12  scenario.
13          More often, though, if we see common
14  evidence, if in doubt, it kind of gets thrown into
15  the pool of common evidence and is considered
16  broadly if it's not clearly borrower specific.
17      Q    So in -- in that sort of scenario, if a
18  borrower attached an email from a recruiter where
19  the recruiter, you know, clearly was
20  misrepresenting guaranteed employment or something
21  like that, and the reviewer then elevated that
22  application and said, you know, here's this email
23  that I think supports the claim, would that
24  trigger any sort of investigation or claim
25  sampling from other students at that school to

Page 196

1  say, you know, let's see if other students also
2  were alleging guaranteed employment,
3  misrepresentations around that time?
4      A    Well, a couple of different things
5  could happen there.  You know, once you have the
6  name of a specific -- you know, if it was an email
7  from a recruiter, and now we know that the
8  recruiter is John Smith, we can search our -- you
9  know, our claims.  We have the ability to search
10  somewhat in our system to see if John Smith shows
11  up in other borrower applications, so we would
12  probably do that to see if other borrowers has had
13  an allegation regarding him.
14          Any time that we discovered new
15  evidence, we also would potentially consider
16  reopening other cases.  So it could be that
17  something like that would give rise to
18  (indiscernible) what we have, and if it's an open
19  school, maybe requesting documents from the
20  school.
21          But we haven't had that happen very
22  often to be honest with you.  So I think that
23  there's a pretty small number where the borrowers
24  have that level of information, usually
25  (inaudible) --

Page 197

1          THE COURT REPORTER:  Guys, I'm not
2  hearing her at all.
3          MR. MERRITT:  Yeah, she just cut out.
4          MS. ELLIS:  Colleen, your audio just
5  went out.
6          MR. MERRITT:  Now, it says you're on
7  mute, Colleen, for whatever that's worth,
8  but . . .
9          THE WITNESS:  Can you hear me?
10          MS. ELLIS:  Now, we can.
11          MR. MERRITT:  Yes.
12          THE WITNESS:  I'm going to dial back
13  in.  My call just dropped for whatever reason.
14  I'm so sorry.
15          THE VIDEOGRAPHER:  Okay.
16          THE WITNESS:  I've go to go through
17  this process again.  Joe, can you walk me through
18  this again?  It doesn't look like I'm getting the
19  same options.
20          THE VIDEOGRAPHER:  Yes.
21          Would you like to go off the record,
22  Counsel?
23          MS. ELLIS:  Yes, could we go off the
24  record a minute to fix this?
25          THE VIDEOGRAPHER:  Sure.

Page 198

1    MR. MERRITT:  Yes.
2         THE VIDEOGRAPHER:  We are now off the
3  record.  The time is 19:58 -- excuse me,
4  19:59 UTC.
5         (Recess -- 2:59 p.m.)
6         (After recess -- 3:00 p.m.)
7         THE VIDEOGRAPHER:  We are now on the
8  record.  The time is 20:00 UTC.
9         MS. ELLIS:  Could the reporter please
10 read the last couple lines that you were able to
11 get before the audio cut out?  Dana, can you hear
12 me?
13        THE COURT REPORTER:  I'm sorry.  Were
14 you not hearing me?  I'm sorry.
15        MS. ELLIS:  Yeah, I think you were on
16 mute.
17        THE COURT REPORTER:  Okay.
18        MS. ELLIS:  Would you mind --
19        THE COURT REPORTER:  Sure.
20        MS. ELLIS:  -- just back those last few
21 lines?  Thank you.
22        THE COURT REPORTER:  Sure.
23        (The Record was read as requested.)
24        THE WITNESS:  Okay.
25    BY MS. ELLIS:

Page 199

1    Q    Do you have anything you'd want to add
2  to what you were saying?
3    A    No, I think that covers it.
4    Q    Okay.  So are reviewers given
5  anything -- any guidance that's sort of similar to
6  that types of claims 10/23/18 document for
7  evidence, something that would tell -- tell them,
8  here's the sort of evidence that supports a claim,
9  and here's the sort of evidence that does not
10 support a claim?
11   A    I don't recall.  There may be something
12 in the training materials, but, like I said, the
13 threshold is very low.  If they see anything that
14 could potentially support approval, they're
15 supposed to escalate it.
16   Q    I guess I'm just trying to understand
17 how they would identify a thing that could
18 potentially support approval?
19   A    I mean, I think we cover in the
20 training the kinds of things that we see in cases
21 and what borrowers typically include and whether
22 that does or doesn't support it, so going back to
23 my example, the most often scenario is we get a
24 borrower who alleges employment prospect kind of
25 claim and then attaches a transcript, so that

Page 200

1  would not support the employment-prospect claim.
2         But if the borrower alleged a
3  programmatic accreditation misrepresentation and
4  attached a manual that had any reference at all to
5  accreditation, that would be set aside.
6         So I don't know that it -- it may
7  actually be covered (indiscernible) done on type
8  of claim documents -- well, I can't remember.  But
9  that's the kind of thing we go over in the
10 training.
11   Q    Is that written down in training
12 materials, PowerPoints or handouts, anything like
13 that?
14   A    I don't recall.
15   Q    Do you know if anyone has searched for
16 materials like that for discovery in this case?
17   A    If we had searched for it?
18   Q    Yes.
19   A    I think -- I think we're pulling the
20 training materials in connection with one of the
21 requests.  I can't remember which one.
22   Q    Okay.  So I just want to understand.
23 The applications that are elevated either because
24 they might fit within common evidence or because
25 they provide some of their own evidence, those are

Page 201

1  elevated to the senior borrower defense attorneys;
2  is that correct?
3    A    You said -- you say this a couple of
4  times, "fit within the common evidence," and I
5  think I would say it's not that the application
6  fits within the common evidence.  It's that we've
7  concluded that the common evidence potentially
8  supports some part of the element of the
9  borrower's application.
10        And that said, in terms of elevated,
11 this is specific to kind of the scenarios of, you
12 know, one-offs and, you know, where it's outside
13 of the common evidence is the conclusion already.
14        So these are getting escalated to a
15 senior attorney to have a more meaningful
16 discussion about what the specific allegations or
17 evidence is, et cetera, and determine what the
18 next steps are.
19        So kind of different tasks.
20   Q    Okay.  So I'll take them one at a time.
21        If we're talking about the one-off or
22 no common evidence types of claims that have some
23 supporting documentation on their own, those are
24 elevated, you just said, to a more senior attorney
25 for a discussion of next steps.

Page 202

1          When -- how long does it generally take
2    between when an application is elevated and when a
3    final decision is reached?
4     A    That assumes that that's getting worked
5    on right away, and it's not.  So those are pretty
6    much set aside because they're more complex and
7    they're going to take more time to address.
8          So it's not that, you know, the
9    reviewer identifies it this morning, and then in
10   the afternoon they get feedback on it and the case
11   gets adjudicated.  If it's set aside, it's
12   probably set aside for some period of time until
13   someone has the bandwidth to, you know, dive into
14   the school a little more deeply and see if there
15   are additional steps that need to be taken.
16    Q    Okay.  Any -- can you make a
17   generalization about what that "some period of
18   time" might be?
19    A    No, there's no set time period.
20    Q    Okay.  So is it the case that many
21   applications that get elevated may be set aside
22   for weeks?
23    A    Sure.
24    Q    Yeah.
25    A    Yep.

Page 203

1     Q    Then -- but some -- have -- have any
2    applications that have been elevated under that
3    kind of protocol been finally adjudicated?
4     A    You know, if the reviewer is fairly new
5    and they're -- you know, they're following our
6    instructions, that the bar is very low, so if they
7    have any question at all, to kind of escalate it,
8    they may be escalating way too much and actually,
9    you know, escalating things that aren't evidence
10   that's actually related to the claim.
11         So I'm sure there have been some where
12   the supervising attorney works with the junior
13   attorney to explain why that actually wasn't
14   evidence that was related to the claim and,
15   therefore, it could be -- could move forward with
16   adjudication.
17         But there haven't been cases
18   adjudicated where there was a weighing of the
19   evidence.  So if the supervising attorney agreed
20   that it was evidence that was relevant to the
21   claim, then that would still be pending at this
22   point.
23    Q    Why haven't any of those been
24   adjudicated?
25    A    We're just -- it's a sequencing issue

Page 204

1    with priorities and trying to make sure that we
2    can adjudicate as many cases as possible.  Those
3    are much more time-consuming.  We probably would
4    want to document either way whether there was
5    sufficient evidence to approve it or that we
6    determined that it wasn't sufficient evidence.  So
7    those are still on hold while we work on the cases
8    that have protocols.
9     Q    Okay.  Is there -- is this generally a
10   written feedback process or a verbal one where the
11   senior attorney would tell the reviewing attorney
12   this is not really enough evidence; go ahead and
13   deny the claim?
14    A    I think it's often email or we use
15   Teams Chat or I think at one point we used Skype.
16   We also have very frequent training, so it could
17   take different forms depending on whether it's the
18   kind of thing that would -- you know, that more
19   than one reviewer might see.  Then it might be
20   something that would be addressed in a
21   supplemental training so that not just that
22   reviewer, but all of the reviewers, could get the
23   benefit of that information.
24    Q    So, then, as we continue looking down
25   the standard protocol, number 5 says, If the

Page 205

1    allegation does not state a claim, does not state
2    a BD claim or does not have sufficient evidence to
3    support a claim, set the allegation review
4    recommendation as denied.
5          So does this mean that -- that a
6    first-level reviewing attorney can deny a claim
7    based on their review of the evidence, but cannot
8    approve a claim based on their review of the
9    evidence?
10    A    Well, no, I would disagree with the
11   premise because they're not -- they're not denying
12   it based on a review of the evidence.  They're
13   denying it based on a lack of evidence, or they're
14   basing it on failure to state a claim or failure
15   to state a claim as actionable under BD.
16         But if your question is they deny it,
17   yes, the protocol clearly sets out what they're
18   allowed to do.
19    Q    When I said "review of the evidence,"
20   what I meant, essentially, was opening up the
21   application, looking at the application itself and
22   anything attached to it, and on the basis of
23   looking at those documents, they can deny the
24   claim.
25         Is that accurate?

Page 206

1    A    That's accurate.
2    Q    But they cannot approve the claim?
3    A    Well, once there's a protocol, they
4  will be able to.  So for Corinthian job prospects,
5  for Corinthian transfer of the credits, for
6  Corinthian JPR claims, all of those, ITT, they can
7  approve the claim.  It's just that it has to be
8  reduced to a very clear protocol with very
9  specific parameters.
10   Q    Understood.
11        But a line reviewer can't approve a
12 claim based on individual evidence submitted by
13 the borrower?
14   A    That's right.  We don't have them do an
15 assessment of, you know, kind of a weighing of the
16 evidence or determining the sufficiency.  It's too
17 complicated at that level to try to just open a
18 claim.  You'd have to understand what the elements
19 of the claim are, and that's dependent on the
20 regulation and the state law and, you know,
21 whether there's common evidence that supports some
22 element.
23        So the only way to make sure that we're
24 giving consistent and fair results is to give them
25 very clear criteria.

Page 207

1    Q    Why is it important to have consistent
2  and clear criteria for approvals, but not denials?
3    A    I disagree with your premise.  I think
4  that they're both consistent.
5    Q    Is there a protocol like the protocol
6  for approvals that lays things out consistently
7  and clearly to determine whether a claim should be
8  denied?
9    A    I think our protocols do lay that out
10 consistently and allow for a consistent and fair
11 adjudication either way.
12   Q    Are you referring to this standard
13 protocol as one example that allows a consistent
14 and clear result either way?
15   A    I said consistent and fair.
16   Q    I'm -- I'm sorry.  Yes.
17   A    Yes.
18   Q    The borrower defense senior attorneys
19 perform quality control review of the line
20 attorneys; is that correct?
21   A    We have a quality control team, and
22 then we also -- we have sort of different stages.
23 When somebody new joins BD, they go through a full
24 week of training and probationary period, so all
25 of their claims are reviewed at that point by

Page 208

1  either by somebody on the quality control team or
2  their supervisor or potentially both.  And then,
3  you know, throughout their, you know, review
4  process, depending on whether they're off of the
5  probationary period, then, you know, there's a
6  certain percentage of claims that are reviewed as
7  well.
8        So it kind of depends on how long
9  they've been with us and where they are in the
10 process, but we have a pretty robust training
11 process.
12   Q    I'd like to look at the responses to
13 interrogatories.  This is Exhibit 22.  I'm looking
14 at page 16 which if you flip back to page 15
15 you'll see this is the response to interrogatory
16 number 12 which asks about training for people who
17 adjudicate borrower defense claims.
18        At the bottom of page 16, this
19 interrogatory response refers to follow up
20 trainings to improve the quality of draft denial
21 letters around the end of 2018.
22        I was -- I want to ask about what --
23 what form of denial letter was being used at the
24 end of 2018?
25   A    These were -- people were trained on

Page 209

1  but they never went out.  These draft letters
2  were --
3        Let me read the paragraph for a second.
4        (Witness reviews document.)
5        Yeah.  So the earliest iteration of the
6  letters for one-off claims were not one of the
7  automated templates.  They were draft letters that
8  I mentioned before (indiscernible) trying to
9  figure out how to handle the one-off.
10        And, so, we had contract attorneys take
11 a crack at drafting the letters, and then they
12 were reviewed -- each letter would be reviewed by,
13 you know, a permanent member of the BD team and
14 work with the contract attorney to both review the
15 substance and the -- the form of the letter.
16        It was a very time-consuming and,
17 ultimately, not very successful effort to use the
18 contract attorneys in that capacity, so none of
19 those cases actually resulted in the receipt of
20 these letters.  They, ultimately, became, I think,
21 some of the letters -- the letters that went out
22 in 2019.
23   Q    In 2018 in -- around the end of 2018,
24 that was during the period when no decisions were
25 being processed; is that right?

Page 210

1    A    Yes.
2    Q    So this was a project you were working
3 on in anticipation of when processing began again?
4    A    Yeah.  Yeah.
5    Q    So for all of the borrowers who have
6 received form C or D denial letters since the end
7 of 2019, and those are the ones for non-Corinthian
8 claims, is it fair to say that none of -- none of
9 those applications had any evidence weighed in
10 relation to their claim?
11   A    Unless it was an ITT case for which we
12 had a protocol, so that would have been -- the
13 reviewer didn't do the weighing, but the weighing
14 was done before the approval protocol, but I think
15 with that exception your statement is correct.
16   Q    Okay.
17   A    One thing I just wanted to clarify
18 because I'm not sure I was clear on before.  When
19 we were talking about -- I think it was
20 Ms. Sweet's letter, you were also asking about
21 reliance kind of in a related thread.  I just
22 wanted to make clear that the letters C and D that
23 have gone out were not -- those were not based on
24 a denial related to reliance.
25        Those were based on the reasons that we

Page 211

1 just talked about.  Either a failure to state a
2 claim in the sense that they said, you know, I
3 couldn't transfer my credits, but they didn't say
4 that they -- you know, that there was a
5 misrepresentation.
6        That kind of thing is the failure to
7 state a claim that would be reflected in what went
8 out for the C and D category.
9        MS. ELLIS:  Okay.  I think we've been
10 going for a while with the exception for our tech
11 breaks, so let's take a real five-minute break
12 here if that's all right.
13       THE WITNESS:  Great.
14       MR. MERRITT:  Yes.
15       THE WITNESS:  Thank you.
16       MS. ELLIS:  All right.  Thank you.
17       THE VIDEOGRAPHER:  We are now off the
18 record.  The time is 20:21 UTC.
19       (Recess -- 3:21 p.m.)
20       (After recess -- 3:37 p.m.)
21       THE VIDEOGRAPHER:  We're now on the
22 record.  The time is 20:37 UTC.
23       BY MS. ELLIS:
24   Q    Okay.  So I'd like to go back to the
25 denial letter that Theresa Sweet received that we

Page 212

1 were looking at earlier that was tab 15,
2 Exhibit 15 from the Jones deposition and the
3 denial letter starts at page 51 of that document.
4    A    Sorry.  Is this the declaration of
5 Eileen Connor document?
6    Q    Yes, that's right.  And attached to the
7 declaration of Eileen Connor is the affidavit of
8 Theresa Sweet and attached to that is the denial
9 letter near the end of the document.
10   A    Got it.  Okay.
11   Q    Okay.  So looking down on the third
12 page of the denial letter, which is page 53 of
13 this document overall, there's a heading, What if
14 I do not agree with this decision.
15        Do you see that?
16   A    Yes.
17   Q    And it continues on the next page, In
18 your request for reconsideration, please provide
19 the following information, and there's a list of
20 three things to include in the reconsideration
21 application.
22        Do you see that?
23   A    I do.
24   Q    Okay.  Can you read item 2 on that
25 list, please?

Page 213

1    A    Item 2 is, Why you believe that ED
2 incorrectly decided your borrower defense
3 repayment application.
4    Q    Okay.  Based on reading this form D
5 denial letter, what basis would a borrower have to
6 assert that ED incorrectly decided her borrower
7 defense application?
8    A    Which claim, I guess, is she requesting
9 reconsideration on?
10   Q    Well, let's start theoretically with
11 Allegation 1, Employment Prospects.
12   A    So failure to state a legal claim.  I'm
13 sorry.  Can you repeat your question?
14   Q    I guess I'll -- I can rephrase.  How
15 would the borrower know what failure to state a
16 legal claim means in this context?
17   A    I don't really have an answer to that.
18 I don't know.
19   Q    Is there a standard reconsideration
20 form that a borrower can fill out?
21   A    Not currently.  There's a whole process
22 that has to happen for forms that collect data
23 from borrowers, so that was something that was
24 discussed a while back.  We've actually expanded
25 the reconsideration process beyond what the

Page 214

1   regulation requires because under the 2016
2   regulation, you can only -- well, you can seek
3   reconsideration if you have new evidence that
4   wasn't considered in connection with your
5   application.
6          I had already advocated for having a
7   reconsideration process, period, going back to the
8   beginning of time, but in particular I think with
9   respect to the pace that we're working on these
10  adjudications now, we wanted to make sure that we
11  had a mechanism for correcting any mistakes that
12  we made.
13         So -- so we've actually got a more
14  expansive reconsideration.  You know, it's more
15  expansive in terms of who can -- who can seek it.
16         You know, to the extent that these
17  letters maybe aren't perfect and could provide
18  better information, I don't know what the borrower
19  would look to in particular, but, you know,
20  certainly if they -- on that one if she, you know,
21  articulated her claim more fully -- sometimes we
22  get very short statements in the allegations, and
23  if she gave more information that perhaps could
24  lead to a different result.
25         We do have a lot of applications that

Page 215

1   came in before there was even an application, so
2   they were on emails, there was a template or an
3   entity called the Debt Collective.  I think
4   there's still an entity called the Debt Collective
5   that had their own form.  Sometimes it's just a
6   factor of how it came in, and there could be a
7   scenario where a borrower could provide more
8   detail in the request for reconsideration that
9   would result in a different result.
10  Q      Okay.  But there's nothing in the
11  denial letter that explains that to the borrower;
12  is that correct?
13  A      I think that's fair.
14  Q      And then looking at -- back at the list
15  of what to provide in the reconsideration
16  application, item 3 says, Identify and provide any
17  evidence that demonstrates why ED should approve
18  your borrower defense to repayment under the
19  applicable law set forth above.
20         So do I understand from what you've
21  just said that this isn't meant to require new
22  evidence; it's any evidence?
23  A      It could be new evidence.  It could be
24  that the borrower referenced evidence and then
25  didn't actually include it.  Maybe they thought we

Page 216

1   had.  I don't know.
2          But, you know, certainly, if they have
3   evidence that they didn't provide that wasn't with
4   their application, then that would be something
5   that would be helpful to do.  But it could just
6   be, you know, identifying evidence that may be
7   available elsewhere, too, because we may not know
8   about it.
9   Q      Okay.  But if a -- if a borrower were
10  to resubmit the same evidence they submitted the
11  first time but with a more fulsome explanation,
12  that would receive review as a -- as a complete
13  reconsideration application?
14  A      Under current policy, yes.
15  Q      Right above this section here above,
16  What if I do not agree with this decision, there's
17  another section that's titled, What evidence was
18  considered in determining my application's
19  ineligibility.
20         Is there any way for the borrower to
21  find out more about what was considered under this
22  heading beyond the description provided here?
23  A      Currently, no.
24  Q      How many people have applied for
25  reconsideration in 2020?

Page 217

1   A      I don't know if I've seen data on that
2   lately.  I believe it was at least a few thousand
3   as of a couple of months ago, but I can't be sure
4   of exact numbers.
5   Q      And what's the process for handling
6   reconsideration applications when they come in?
7   A      Well, we're -- we're adding some
8   enhancements to our -- our platform to kind of
9   provide a -- a better mechanism to do it, but
10  right now the -- the request comes in -- it can
11  come in -- sometimes it's immediately in response
12  to the email, so these notifications go out to the
13  borrower by email, and this tells them how to
14  respond.  So sometimes shortly after they get
15  their decision, they submit a request.  Other
16  times, they gather additional evidence and then
17  submit it later.
18         But it goes through our intake process
19  kind of -- sort of along the lines of the way the
20  application comes in, and then it's associated
21  with their application on the review platform.
22  Q      And then how long does it take between
23  when the application gets entered into the review
24  platform and someone actually reviews it?
25  A      We haven't actually started the reviews

Page 218

1  for reconsideration yet.  We just started building
2  up the reconsideration process for the
3  job-placement-rate claims in particular because
4  those have been the ones that have probably been
5  decided the longest, but we've been focusing on
6  trying to get through -- getting original
7  decisions to the entirety of the 340,000 people
8  that applied first and then reconsideration.  Once
9  I have a little bit more bandwidth, we'll start
10 moving forward on getting responses to those.
11      Q    Okay.  On -- I'm going down to the next
12 page again with the items 1 through 3.  And
13 looking at the paragraph following those numbers 1
14 through 3, the third sentence in that paragraph
15 says, Additionally, your loans will not be placed
16 into forbearance unless your request for
17 reconsideration is accepted and your case is
18 reopened.
19         What does "accepted" mean in this
20 context?
21      A    Well, we haven't really had to deal
22 with that yet because of the CARES Act and the
23 fact that all loans are in forbearance currently,
24 but that's something that we're trying to figure
25 out between now and the end of the year; although,

Page 219

1  I understand the secretary now just extended the
2  forbearance period into February because we want
3  to see if we can get that preliminary decision
4  issued before anybody's loans are affected.
5         But, essentially, you know, the way
6  that the regulation is set up, the borrower can
7  request reconsideration, and the department can
8  decide not to agree to essentially reconsider the
9  case.
10        So that's the framework that exists,
11 and so under that framework, it's not until the
12 department agrees to accept the request for
13 reconsideration and kind of do a rereview or
14 whatever that process looks like that the
15 borrower's loans are put into forbearance.
16        But one of the tricky things about that
17 is that by the time you've made that decision,
18 then it might be a pretty short window between
19 when you open the case and then actually issue a
20 new decision, so the borrower may not be in
21 forbearance very long in connection with that.
22        So we're trying to figure out how to
23 address that process.  I think we'll have probably
24 a better understanding of what that looks like in
25 a month or so.  Like I said, we're trying to

Page 220

1  figure that out before the CARES Act expires so
2  that we can address that.
3      Q    Is there a standard that's applied for
4  whether a reconsideration application will be
5  accepted?
6      A    There will be.  Like I said, we haven't
7  really filled out that process because we've been
8  focusing on trying to get results to the folks who
9  still have pending original claims.
10     Q    But it sounds like the acceptance
11 process does involve some sort of preliminary
12 review of the reconsideration application?
13     A    Potentially, but I think we're kind of
14 getting into a deliberative area right now in
15 terms of what way we go on it.
16     Q    Okay.  So you mentioned the 2016
17 regulations having a reconsideration process in
18 place.
19     A    It calls for a reconsideration process,
20 yes.
21     Q    Yes.
22         Had -- had a reconsideration process
23 been set up under the 2016 regs before these form
24 denial letters started going out?
25     A    The -- the groundwork for it in the

Page 221

1  sense that we had the mechanisms to kind of
2  collect the requests and that kind of thing, but
3  we don't have all the pieces in the platform that
4  we'd like before we can kind of efficiently handle
5  them.
6         So part of it, yes, enough for the
7  borrower to make the request to be associated with
8  a case and all that kind of thing, but not for an
9  efficient adjudication process yet.
10     Q    Okay.  So are there -- did the
11 department receive reconsideration applications in
12 2019?
13     A    I don't think so.  I think the earliest
14 ones came in in 2020.
15     Q    And that is likely because decisions
16 hadn't been issuing for most of 2018 and 2019;
17 correct?
18     A    Yeah.
19     Q    Okay.
20     A    Well, going back that to that time, I
21 was thinking because we had -- the first decisions
22 that went out in 2019 were at the end of 2019, and
23 there wasn't a reconsideration process before that
24 associated with the '95 reg.
25     Q    Okay.  So if -- if someone whose

Page 222

1  borrower defense application was decided under the
2  '95 reg had wanted to ask for reconsideration of a
3  denial, would they have had the option to do that?
4      A    At what point in time?
5      Q    Before the Bauer decision put the 2016
6  regs into effect.
7      A    No, there was no reconsideration
8  process before that.
9      Q    So, as you know, this case primarily is
10 about why there was such a long delay in issuing
11 borrower defense decisions.
12          In your view, what are the main reasons
13 why so few borrower defense decisions were issued
14 between January 2017 and January 2020?
15          MR. MERRITT:  Objection on the scope of
16 that question and to the characterization of the
17 case.
18          MS. ELLIS:  Can the witness answer?
19          MR. MERRITT:  Yes.
20          THE WITNESS:  I don't know that there's
21 one answer for that entire time period.  Can you
22 maybe break it up for me?
23     BY MS. ELLIS:
24     Q    Sure.
25          Well, let's start in 2017.

Page 223

1      A    Well, there were no decisions issued
2  for many months in 2017 associated with the
3  decision not to do anything with respect to what
4  we had already adjudicated and not to have more
5  claims pending the review panel and the AG review
6  and then the release methodology -- the
7  development of the release methodology.  So that
8  was 2017.
9          We did issue decisions between end of
10 2017 and May of 2018 primarily on Corinthian
11 cases.
12          And then in 2018 to November 2019, I
13 think it was tied to the relief methodology issue
14 and the policy to not issue decisions on denials
15 while they couldn't issue decisions on approvals
16 or felt that they couldn't issue decisions on
17 approvals.
18     Q    In your view, would it have been
19 possible to issue decisions on approvals in
20 between May 2018 and November 2019?
21     A    Not Corinthian job-placement-rate
22 decisions because of the relief methodology at
23 least under that methodology.
24          On the others, like I said, I think it
25 was a policy decision.

Page 224

1      Q    Was the difficulty of reviewing
2  borrower defense applications a primary reason for
3  the delay in issuing decisions?
4      A    The difficulty affected the volume of
5  the adjudication in the sense of -- you know, the
6  cases got a lot more complicated when the 2016
7  regulation went into effect in 2018 because now we
8  have a lot of cases that are subject to both, and
9  that determination needs to be made.
10          So I think that the -- the pace of the
11 adjudications was affected by various things that
12 made it difficult, but that didn't mean that they
13 couldn't be issued.  That was related to a
14 decision up the food chain.
15     Q    Was the staffing level of BDU a factor
16 in why there was a delay in issuing decisions?
17     A    It was a factor in the number of
18 decisions that were adjudicated.  So to the extent
19 that that was related, I guess it was a factor.
20 But it wasn't -- it didn't prevent decisions from
21 going out.
22     Q    Was the difficulty of discerning or
23 applying state law under the '95 regs a major
24 factor in why so few decisions were issued?
25     A    At what time?

Page 225

1      Q    Did -- did -- is the answer different
2  at different times?
3      A    Yeah, because the Corinthian cases were
4  adjudicated under California law, so that once we
5  had fully explored California law with respect to,
6  you know, the first memo, that really wasn't a
7  factor for Corinthian, which was our focus for a
8  good percentage of the time period at issue.
9      Q    Of the claims that have been
10 adjudicated since December 2019, why have there
11 been so few approvals?
12     A    Well, the premise of your question, I
13 think, is that, you know, it's not that the cases
14 are -- how do I frame that? -- we have a lot of
15 potential approvals, but they're not going out,
16 and we have a lot of decided approvals that are
17 not going out.  So we have -- I don't know what
18 the number is on Corinthian job-placement-rate
19 claims now, but we've proved well over 30,000 of
20 those over that time period that can't be issued.
21 So we've certainly done a lot of approvals on that
22 end.
23          We -- for sequencing purposes, like I
24 said, have focused on the cases that were the most
25 quickly adjudicated which was the Corinthian

Page 226

1  cases, the ITT California cases -- which is a
2  fairly small pool -- and then the cases that
3  didn't have common evidence or that didn't fall
4  within the parameters of, you know, the scope of
5  the evidence for schools where we do have common
6  evidence.
7         So those are just going to be more
8  likely than not denials, but that doesn't mean
9  that there aren't cases from those schools that
10 will be approved.  It's just that they're not done
11 yet.  So a lot of what we have left has a, you
12 know, much better shot at getting an approval than
13 the cases that we did before.
14        So we've kind of had a -- a weird cycle
15 of -- at the beginning of BD, it was all
16 approvals.  Then there was a period of time where
17 it was primarily denials, not all because we were
18 still doing all those Corinthian cases.  And now
19 we're probably moving into an area where we'll
20 have a lot more approvals again.
21        So it's largely a factor of sequencing.
22     Q    So your -- your assumption going into
23 this project in 2020 to clear the backlog, was
24 that claims not falling within common evidence
25 would likely be denied?

Page 227

1      A    No, just that they would likely have to
2  stand on their own merits, and so it would depend
3  on what the borrower had -- had provided, him or
4  herself.  I didn't make any -- I didn't have any
5  expectation one way or the other as to what the
6  borrower would have, as I said.  But we knew that
7  it wouldn't be supported by the common evidence to
8  satisfy the elements of the case, and so it would
9  depend on what individual borrowers came up with.
10     Q    And you expected that would be faster
11 to review than claims involving common evidence?
12     A    We knew it would be, yeah.
13     Q    How did you know?
14     A    Because all that time that you have to
15 spend to summarize the common evidence and develop
16 the legal memos and develop the protocols that are
17 specific to those memos, that all has to happen
18 first where there's common evidence.  And for
19 cases where that's not true, they can just move
20 into adjudication.
21        So like I said, very much an issue of
22 just sequencing to adjudicate what didn't require
23 all that front-end work that's so incredibly
24 time-consuming.
25     Q    So you expected that there would not be

Page 228

1  a -- as significant amount of time spent analyzing
2  the evidence that an individual borrower provided
3  with their claim?
4      A    I expect that we would spend whatever
5  time is needed to be spent to look at the
6  borrower's evidence, but, you know, the time that
7  it takes to review an individual application
8  varies a lot depending on what they attached.
9         If they've got a lot of materials,
10 though, there's a pretty good chance that the
11 reviewer just figured there's got to be something
12 in there that potentially supports it and sets it
13 aside.
14        So, you know, for the most part that's
15 why these were much quicker adjudications, because
16 anything that looked like there's something there,
17 there -- there was, you know, a set aside for
18 those.
19     Q    You had mentioned earlier that a
20 mandate came from the under secretary to clean out
21 the backlog and also wanting BDU to adjudicate any
22 application within 90 days.
23        When did you receive that mandate?
24     A    Fall of 2019, I believe.
25     Q    Was that communicated to you verbally

Page 229

1  or in writing?
2      A    I know it was verbally, but I don't --
3  I don't know -- I mean, when you say was the
4  mandate communicated, it's kind of very commonly
5  known, I think, probably for FSA.  Borrower
6  defense is a popular topic of the -- of the COO,
7  of the chief operating officer, that we're
8  expected to hit the 5,000 per week, and we do
9  weekly briefings, and our weekly performance
10 metrics are broadly circulated.
11        So I don't know when I first knew about
12 it.  It probably was first told to me and then
13 maybe I saw something in writing.  But, certainly,
14 I was told verbally, so I guess that's all I can
15 say for sure.
16     Q    And who told you?
17     A    Robin Minor.
18     Q    And then did you discuss with her the
19 strategy for how BDU was going to accomplish that
20 mandate?
21     A    Yeah.  After I said I need a whole lot
22 more attorneys, probably.  I think we were already
23 having conversations about -- we were already
24 hiring and -- interviewing and hiring people at
25 that point when I was told that the backlog needed

Page 230

1  to be fully eliminated this year, but we'd already
2  had conversations about how difficult that was
3  going to be and that we needed more staff to do
4  it.
5       Q     What's the status of the backlog as of
6  now?
7       A     Well, it depends on whether you're
8  talking about decisions issued or cases
9  adjudicated.  The decisions issued, that's kind of
10 not my lane, so I'm not exactly sure what the data
11 shows on that one.
12            But on the cases adjudicated, we've
13 probably got somewhere in the 50- to 55,000
14 neighborhood that still need most or all of the
15 work for review because they're probably waiting
16 for these review protocols that we've been talking
17 about.  And then there are probably another 10- to
18 15,000 that are in various stages of review.
19            So, you know, like we talked about one
20 application might have five claims, and there may
21 be a review protocol for two of them, and, you
22 know, not for the other three.  But if we can --
23 you know, if we had -- you know, this would mostly
24 be for Corinthian for or ITT.
25            But if we have an ITT review protocol,

Page 231

1  we can review that employment-prospects claim, and
2  if it's been proved, then the borrower can get
3  relief and we wouldn't have to wait for developing
4  the review protocols on the other pieces.
5            So sometimes we'll sequence it so that
6  we can try to get those cases out.  So that's why
7  I said there are probably a lot of cases that are
8  in process of being reviewed but not completed
9  yet.
10      Q     On average, how many borrower defense
11 applications are you getting each week nowadays?
12      A     Receiving?
13      Q     Yeah.
14      A     It's down a lot.  I think the last week
15 it was a very low number maybe related to the
16 holiday.  I think it was only in the hundreds --
17 like 3- or 400, which is low.
18            Prior to that, it was in a 500 to a
19 1,000 range, but this year has sort of been weird.
20 And it sort of depends also on, you know, whether
21 there's an announcement on a settlement with
22 respect to a school with these sites and things
23 like that.
24      Q     At any point since you joined BDU, have
25 you revisited the -- the policy regarding

Page 232

1  borrowers' statements being insufficient alone to
2  make out a claim?
3       A     You know, we probably will revisit a
4  lot of things with the incoming administration.  I
5  have had conversations with my team on a regular
6  basis about what we can do to, you know,
7  constantly improve our processes and what -- what,
8  if anything, we have found that would cause us to
9  want to revisit something.  But we haven't had any
10 policy discussions on that.
11      Q     Have borrower defense cases ever been
12 reopened based on later discovered evidence?
13      A     Not yet, but I'm pretty sure we will be
14 soon.  We had adjudicated some cases relating to a
15 school and then subsequently received some
16 evidence from an attorney general that could
17 change the outcome.  So I think that there were
18 potentially decisions that were issued that might
19 be covered.  I believe a lot of them are set aside
20 for a different reason relating to an internal
21 document, like a whatever oversight issue.
22            But that's something that we certainly
23 expect.  We're moving at a pretty fast pace, and
24 we're very likely going to have to reopen cases if
25 evidence comes in after the fact.

Page 233

1       Q     You mentioned earlier that before this
2  year you hadn't been in active communication with
3  state AG's offices.
4            Why was that?
5       A     There was a department policy about
6  external communications -- that they were to go
7  through -- I don't remember who.  I think the
8  office of policy and something or other over in
9  LBJ.
10            So we were not having any
11 communications with AGs or federal agencies for an
12 extended period.
13      Q     Do you remember when that policy went
14 into effect that you had to go through this office
15 in the main department?
16      A     Early 2017.
17      Q     And has that policy since been
18 eliminated?
19      A     Well, I don't know exactly how the
20 policy was documented, but we revisited it a few
21 times, and when I revisited it in 2019, my
22 understanding from Mark Brown and Robin Minor was
23 that we were given the green light to start
24 reaching out and having communications with --
25 particularly with attorneys general who had

Page 234

1  provided us with materials because for some of
2  them we got them, you know, the document in no
3  particular order and no index, and so we kind of
4  needed a road map for what did you send us, what
5  is this, what does it show, what do you think that
6  it establishes.
7         So we started having those
8  communications in late 2019.
9      Q    So during 2017 and 2018, if you -- if
10  an attorney general's office, you know, mailed you
11  a box of documents, it -- you wouldn't be able to
12  reach out and talk to them about it without going
13  through this other policy office?
14     A    That's correct.
15     Q    Okay.  Are you aware of any political
16  appointees in the department having recused them
17  self -- themselves from -- from consideration of
18  issues involving particular schools?
19          MR. MERRITT:  Objection.  That's not
20  within the scope of the discovery authorized.
21          MS. ELLIS:  Can we take a quick break?
22          MR. MERRITT:  Sure.  Yeah.
23          THE VIDEOGRAPHER:  We are now off the
24  record.  The time is 21:12 UTC.
25          (Recess -- 4:12 p.m.)

Page 235

1          (After recess -- 4:25 p.m.)
2          THE VIDEOGRAPHER:  We are now on the
3  record.  The time is 21:25 UTC.
4  BY MS. ELLIS:
5      Q    So we've talked a few times today about
6  these 500 or so memos regarding common evidence.
7  Is there a single place on the BDU's computer
8  system where those are stored?
9      A    Yeah, but I couldn't tell you off the
10  top of my head where.
11     Q    Okay.  And what -- are they named with
12  any sort of consistent naming convention?
13     A    My hope is yes.  They -- I mean, they
14  kind of evolved over time, so when we first
15  started doing these, we had a number of different
16  attorneys working on them and they didn't look
17  very uniform.  We started a project this summer to
18  make them more uniform, so there are a number of
19  them that actually have two versions, whatever the
20  original version was that wasn't uniform, and then
21  when you get them, you'll see.  I think it has a
22  date and then in parens an updated date to try to
23  make them kind of fit, not a template, but kind
24  of -- same format.
25         So I think they have a common naming

Page 236

1  convention for the later version.  I don't know
2  about the former.
3      Q    They generally have the school's name
4  in the file name?
5          MR. MERRITT:  Objection.  What is the
6  relevance of this line of questioning?
7          MS. ELLIS:  I'm trying to understand
8  how we can easily identify these documents when we
9  receive them.
10          MR. MERRITT:  Okay.  You can answer the
11  question.
12          THE WITNESS:  We can just produce them
13  as a folder.  Probably not that --
14  BY MS. ELLIS:
15     Q    That would be great.
16     A    -- complicated.  I'd defer to DOJ on
17  how to produce it, obviously, but, yeah, I don't
18  think you'll have any trouble recognizing them.
19          MR. MERRITT:  As I said, you know, as
20  we mentioned, the document -- the responses to
21  written discovery are ongoing, and we are working
22  on collecting documents and producing them to you,
23  and we'll do that in the normal course.
24  BY MS. ELLIS:
25     Q    I want to look for a minute in tab 5 in

Page 237

1  the hard copy.  On the Dropbox, that's bracket 5
2  Everest/WyoTech POC Memo, and that was marked as
3  Exhibit 5 in the Jones deposition.
4          (Exhibit 5 referred to.)
5          THE WITNESS:  Okay.
6  BY MS. ELLIS:
7      Q    Do you recognize this document?
8      A    Yes.
9      Q    And what is it?
10     A    This is the memorandum that was drafted
11  in 2016 by the borrower defense unit regarding the
12  conclusions that we reached and the recommendation
13  with respect to the transfer of credits claims for
14  borrowers who attended Everest or Wyotech.
15     Q    And this is dated right around the time
16  that you began working at BDU; correct?
17     A    Yes.
18     Q    Were you involved at all in the
19  creation of this document?
20     A    No, I don't believe so.  I'm pretty
21  sure it was already over sitting on Ted Mitchell's
22  desk by the time I even became aware of the
23  document.
24     Q    Were you involved in working on any of
25  the other Corinthian -- Corinthian protocols that

Page 238

1  were similar to this?
2      A    Yeah, I believe the employment
3  prospects followed this one, at least the approval
4  of it. I think I worked on that one a little bit.
5  And then ITT employment prospects came last of
6  this batch, and I worked on that one with -- with
7  my team.
8      Q    Okay. If you flip to the second page
9  of this document, Roman numeral I says, Summary of
10 evidence of representations of transferability.
11 And then under heading A, Student accounts of
12 in-person oral representations of transferability.
13          And following that there's a series of
14 bullet points taken from -- the memos, those were
15 taken from a sample of claims relating to a
16 certain Everest campus.
17          Do you see where that is?
18     A    Yes.
19     Q    In its review of common evidence, is
20 BDU currently undertaking any project similar to
21 this of collating student testimony regarding
22 misrepresentations that were made by a certain
23 school program or campus?
24     A    Yes, that's part of the process for
25 drafting the fact summary.

Page 239

1      Q    And how many schools are currently part
2  of a process of collecting student testimony like
3  this?
4      A    Well, it's not -- it's not like that's
5  a separate project. We look at all of the
6  evidence. So regardless of what it is or where it
7  came from, just like a courtroom drafts a
8  findings-of-fact document regardless of whether
9  the plaintiff or defendant submitted it, we
10 summarize the evidence and cite to what the
11 specific document or evidence is. Sometimes it's
12 recordings. It could be anything.
13          And part of that analysis would be if
14 there are consistent allegations that -- you know,
15 in this particular instance, it was a specific
16 campus where we were seeing the same thing over
17 and over again. That's the kind of thing that we
18 would expect to see in the facts.
19     Q    How -- how are those patterns
20 identified from the applications that BDU has
21 received?
22     A    Well, the applications are in a
23 database, Salesforce platform. One of the things
24 that we typically would do is pull up all, you
25 know, of the cases for -- let's say we wanted to

Page 240

1  look at a specific campus, pull up all the
2  employment-prospects allegations, and then, you
3  know, that can be distilled to a spreadsheet, and
4  kind of review each of the allegations and see
5  where the themes are, see if there's any comments,
6  reference to a document.
7          You know, for one particular school I'm
8  thinking of, there was repeated reference by the
9  borrowers to a specific document, and so we were
10 able to use the data to pick out individual
11 borrower statements that aligned with that and
12 corroborated that evidence.
13     Q    So let's say, for instance, you had a
14 few hundred applications from Art Institute
15 Chicago. You might line up all the allegations.
16 You might see, okay, there's consistent testimony
17 about employment prospects. Then what happens?
18     A    Well, it's -- that would probably be
19 used, then, to support whatever the conclusions
20 were related to the fact, so that would be
21 corroborating evidence.
22          Ideally, it would be supporting other
23 evidence, but, you know, it depends on the school
24 and what we have to work with and, you know, then
25 we would make an assessment of the strength of the

Page 241

1  evidence.
2      Q    Would applications from -- let's call
3  it Art Institute Chicago -- that make
4  employment-prospects claims at that point be set
5  aside instead of being kept in the pool for
6  adjudication?
7      A    At what point?
8      Q    At the point where you've identified
9  that there's consistent evidence of
10 misrepresentations.
11     A    I'm not sure where you're thinking that
12 fits in the process, but we -- you know, like I
13 said, we'll do sampling for these larger schools
14 to get a sense of what the kinds of things are, so
15 that would be part of the whole fact-finding
16 process.
17          And then we view the evidence overall
18 to figure out what -- what things are supported by
19 the evidence. And then that -- that work related
20 to individual borrower's statement would be cited
21 in our document that outlines the evidence.
22          So that doesn't mean that we'll catch
23 every single borrower who said something similar.
24 We're looking for whether there's corroborating
25 evidence in the applications, but it very well may

Page 242

1  be that we only get 10 percent of them and that's
2  enough, and then that's used to develop the legal
3  memos and the review protocols that ultimately
4  would lead to that person probably getting
5  approved assuming there wasn't some other element
6  that they failed to meet.
7       Q    While you're in the process of
8  developing that protocol, are other applicants
9  from Art Institute Chicago being adjudicated even
10 if they make employment-prospects claims that
11 might be consistent with the evidence that you've
12 collected?
13      A    I'm not sure I understand your
14 question.  Can you rephrase?
15      Q    Yes.
16           So say that you've -- you've seen a
17 pattern.  You've taken a sample of students from
18 this school, this campus, and you've seen, okay, a
19 lot of students are saying that there were
20 employment-prospects misrepresentations.  We're
21 going to include that in our analysis of this
22 school and this campus.
23           What's the point at which applications
24 from that school, that campus are pulled aside
25 from the adjudication pool?

Page 243

1       A    I think your question assumes something
2  that's not accurate.  Just alleging an
3  employment-prospects-type of allegation is a very
4  broad statement, and there's a whole bunch of
5  different things that people could be including in
6  that claim.  Some of them might be related to the
7  percentage of job-placement rates; some of them
8  might be talking about a specific document that
9  says everybody gets a job; another one might be
10 referring to some kind of advertisement that says
11 that they have connections with Fortune 100
12 schools.
13           Those wouldn't be corroborative of each
14 other independently without something else that
15 ties that together.  So we're looking for
16 allegations, not just by the overall type, but
17 what actually the borrower is alleging.
18           So, you know, it can vary.
19      Q    Okay.  At what point are claims
20 similar -- strike that.
21           I guess what I'm asking is if you have
22 a sample of -- if you have a sample of claims from
23 one school, one campus that a certain kind of
24 misrepresentation is consistently being made, how,
25 if at all, do you identify other applications that

Page 244

1  make similar allegations and make sure that they
2  don't get denied while you're in the process of
3  writing the protocol?
4       A    Well, first of all, it's not just that
5  they make the same kind of allegation either, so
6  it would have to be specific as I said.  But,
7  also, it has to be within a time period that would
8  corroborate.
9           So if somebody said something and their
10 application was related to their enrollment in
11 1975, and we have applications in the '70s, and
12 people are enrolled in the '70s, that doesn't
13 support somebody's application who attended school
14 in 2020 or 2010.
15           So we look at whether it truly is
16 corroborative, and if we find that in the course
17 of reviewing the applications, that a pattern
18 unfolds that wasn't clear when we originally
19 cleared cases for adjudication, we would stop
20 adjudicating those cases, figure out if there's
21 something else that we should be looking at.  If
22 it's an open school, figure out if we should be
23 reaching out to the school in connection with
24 something.  And then there may be a reason to
25 reopen the cases.

Page 245

1           But there are a lot of variables in
2  what I just described, so it sort of depends on,
3  you know, if there are a lot of borrowers saying
4  this or, you know, if it's just two.  You know,
5  there's a whole range of scenarios based on what
6  you just described.
7       Q    I can understand why a claim relating
8  to 1975 wouldn't relate to a claim in 2020, but
9  what about a claim relating to 2012 and a claim
10 relating to 2013, same school, same campus.
11           Would those be considered corroborative
12 of each other?
13      A    Yeah, I mean, potentially.  If it
14 turned out that it was about two different career
15 service officers and they were not both there at
16 the same time, then, no, but depending on what we
17 can find out about what the statements are.  So in
18 the example that you described, that's quite
19 possibly corroborative evidence, yeah.
20      Q    Are applications ever removed from --
21 are applications ever set aside for later review
22 and adjudication based on their similarities to
23 other corroborating allegations in other
24 applications?
25      A    Well, once we have decided that there

Page 246

1  are corroborating allegations in our sampling,
2  then that could potentially be a reason to set
3  them aside there so -- if I'm understanding your
4  question correctly.
5      Q    I think what I'm getting at
6  generally -- and maybe I should ask it
7  generally -- is how do you make sure that claims
8  are not wrongly denied while protocols are still
9  in the process of being written?
10     A    I wouldn't say they're wrongly denied.
11 We adjudicate them based on the protocol as
12 written.  If there's a reason to revisit the
13 protocol because we discover new evidence in a
14 later application, then we would potentially
15 reopen the case.
16          But there's always going to be another
17 application, so if we decide today's the point in
18 time where we've reviewed all the evidence and
19 then tomorrow some new evidence comes in, that
20 could change everything that we did based on what
21 we saw today.
22          So we always have to allow for the
23 possibility that we could get something new in
24 that would change the result, so I disagree with
25 the way you phrase the question.

Page 247

1          I don't think that those applications
2  that were denied would be wrongly denied, but I
3  think that if they were denied and we subsequently
4  find out about new evidence, that we would reopen
5  the cases where the new evidence would change the
6  results or potentially change the results.
7      Q    How often do you pull samples from
8  these large volume schools to analyze the
9  similarity of student's allegations?
10     A    Are you -- I don't understand your
11 question.  How often?
12     Q    Yes.
13          So if -- if you have -- have you, you
14 know, only ever pulled one sample from Brooks, or
15 do you pull a sample, you know, every six months
16 as new claims come in?
17          How often do you sample them?
18     A    Well, that, I think, assumes things
19 that are not true as well.  Once we -- once we're
20 in a position to adjudicate the cases with the
21 protocol, then we typically -- unless it's a huge
22 volume of cases like in ITT, which Brooks is not,
23 we would get through most of the adjudication in a
24 pretty short period of time.
25          So those -- you know, any kind of

Page 248

1  corroborating evidence would show up to the
2  reviewers because they're doing a large number of
3  the Brooks cases at the same time and would be
4  able to issue -- spot something like that.  And if
5  they saw that there were corroborating statements,
6  then they would flag that for the supervisor.
7      Q    Well, I'm actually asking about an
8  earlier stuff about the development of the
9  protocols.
10          So as you're developing a protocol for
11 a school, maybe you have some attorney general
12 evidence, maybe you have some evidence from FSA
13 oversight, are students' statements part of that
14 pool of common evidence that you used to create
15 the protocol to begin with?
16     A    Yes, the sampling.  That's part of that
17 first process.
18     Q    Right.  And that's what I'm asking.
19          Is each school only sampled once, or is
20 there periodic monitoring for patterns that appear
21 in applications from different schools?
22     A    Well, we're still working on all those
23 cases, so your question kind of assumes that,
24 like, we sampled them a year ago and we're done
25 with that and now there's a whole bunch of other

Page 249

1  cases.  But we're still working on all of these
2  apps, so I'm not sure I follow what you're asking.
3      Q    So are you saying that the protocols
4  are still evolving?
5      A    The protocols will always be subject to
6  change based on the discovery of new evidence.
7      Q    Okay.  And I'm asking how often you
8  review borrower testimony to develop new evidence?
9      A    We don't -- we -- we review
10 applications and, you know, again, if people are
11 spotting similarities, then they would flag it for
12 their supervisor, but we're not sampling every
13 day, if that's what you're asking.
14     Q    I -- I don't think I would expect you
15 to sample every day, but, you know, a sample that
16 would create something like what we see in this
17 Corinthian protocol, a collection of borrower
18 testimony of -- that shows a pattern of
19 misrepresentations.
20     A    Well, we did it, and it led to an
21 approval process for those claims, so we wouldn't
22 need to do it again.
23     Q    Right, right, not for Corinthian,
24 though.  I'm saying a similar process for other
25 schools.

Page 250

    1        A    Again, since we're still working on
    2    them, I'm not sure I understand the question.
    3        Q    I'm trying to think of -- if -- if
    4    there's a way I can explain this more clearly.
    5             So for -- for a number of schools now
    6    at this point, you have a collection of common
    7    evidence, and that evidence has been analyzed and
    8    put into memos.
    9             That part is correct?
   10        A    They're in process.
   11        Q    Okay.
   12        A    They're generally not completed.
   13        Q    Okay.  So --
   14        A    Let me -- let me -- let me reframe
   15    that, I'm sorry, because I don't want to get
   16    confused the memos that you're going to get with
   17    respect to the schools are the summary of the
   18    preliminary review for the scope of the evidence.
   19    The facts are -- you know, it's a statement of
   20    common facts, so that's different from the memos
   21    to the extent that -- I'm not sure which one
   22    you're asking about.
   23        Q    I'm sorry.  Can you -- can you explain
   24    the difference between the statement of facts and
   25    the memos because maybe I don't --

Page 251

    1        A    The --
    2        Q    -- have --
    3        A    -- memos --
    4        Q    -- a clear understanding.
    5        A    The preliminary review assesses what --
    6    you know, it's kind of an overview of what we
    7    have, what we know about department documents,
    8    things that we've received from outside agencies,
    9    things that we saw on the Internet, whatever it
   10    is, things we got from the school.  It's just an
   11    overview.
   12             It's not, like, specific facts that
   13    we've identified as having been established by the
   14    evidence.  That would be in a statement of common
   15    facts that cites to the evidence that supports it,
   16    and that's where you would see things like what
   17    we're seeing in those bullets.
   18        Q    Okay.  So -- but there's some -- for at
   19    least some of these schools, there are common
   20    evidence protocols or outlines that instruct
   21    reviewers on which applications to set aside and
   22    which ones to proceed to adjudication; is that
   23    correct?
   24        A    Correct.
   25        Q    Okay.  So I guess at what -- at what

Page 252

    1    point in this process did BDU collect the -- a
    2    sample or would BDU collect a sample of borrower
    3    testimony to see if there are common threads?
    4        A    Shortly before we complete the protocol
    5    to proceed with deciding those cases.
    6        Q    Okay.  And is that ever updated?  Does
    7    the department ever -- does BDU ever go back and
    8    take another sample on a more recent set of
    9    applications to see if there were any new and
   10    emerging commonalities?
   11        A    Most of these are fairly recently
   12    completed, so, no, we haven't done that yet.
   13    Maybe at some point we -- you know, once we get
   14    through all of the other schools, that might be
   15    something we would consider doing.  But these are
   16    not -- it's not something that was done three
   17    years ago and stuck on a shelf.  These are all
   18    fairly recent.
   19        Q    Got it.
   20             So for -- for applicants from a school
   21    that has a protocol still in development, when, if
   22    ever, are those applications set aside to say
   23    these need to wait for the protocol?
   24        A    I think we've talked about this a few
   25    times, so I'm not sure I'm following what your

Page 253

    1    question is asking me.  Are you trying to
    2    basically rereview what we talked about before?
    3        Q    I'm just not sure that I understood the
    4    answer before.
    5             If you're, you know, in the process of
    6    developing a protocol for Brooks, are any Brooks
    7    applications set aside awaiting the protocol, or
    8    might some Brooks applications stay in the queue,
    9    be denied even though it turns out they might have
   10    fallen within the protocol?
   11        A    So I think we might be talking about
   12    two different things, but the initial task is the
   13    evidence, the initial summary of what the scope of
   14    the common evidence is results in a protocol that
   15    allows us to move forward with the cases that
   16    don't fall within the scope of what we think the
   17    common evidence potentially supports.
   18             Those cases are adjudicated.  They
   19    don't get put in -- however you phrased it, but
   20    they're not on hold.
   21             The cases that fall within the scope of
   22    the protocol potentially or would potentially be
   23    supported by something -- not protocol, excuse
   24    me -- it's cases that potentially fall within the
   25    scope of the evidence, the common evidence that we

Page 254

1  have are not adjudicated.  If we come across them
2  in the course of trying to adjudicate cases that
3  are outside the parameters, they get set aside.
4  But otherwise, you know, they're usually not
5  assigned.
6       Once the facts are fully analyzed and
7  reduced to a statement of common facts where we
8  have such evidence, and then there's a legal memo
9  for 2016 if that's the regs that would apply to
10 the loans at issue, or for '95 where that's the
11 regs that apply to the loans at issue, then
12 there's a new -- it's probably an update to the
13 previous protocol that will change that so that
14 instead of saying if you see a claim between 2012
15 and 2014, move on to the next case -- set that one
16 aside and go on to the next.
17      Now, there's a framework for whether or
18 not that case would be adjudicated as an approval.
19 So it will replace that case once we have the
20 criteria that would allow for the yea or nay
21 decision on somebody who's potentially covered by
22 the common evidence.
23      Does that answer your question?
24 Q    I think I understand that part of the
25 process.

Page 255

1       During the period before the parameters
2  of the common evidence are fully known, what
3  happens to applications from those schools?
4  A    They're not assigned.
5  Q    They're just held until there's some
6  parameters of common evidence?
7  A    I mean, "held" suggests that they're
8  picked up and put down or something.  We can
9  assign based on schools.  We can assign based on
10 different parameters with the Salesforce database.
11 So they're just not selected to be assigned to
12 adjudicators.
13 Q    Yes, yes, held in the database is --
14 A    Yes.  They --
15 Q    Yes.
16 A    They're just still there, yes.
17 Q    Yes.
18      And then once the parameters of the
19 common evidence are defined, those are released to
20 the reviewers to determine whether they should be
21 set aside or adjudicated right now?
22 A    Correct.
23 Q    And as part of the process of defining
24 the parameters of the common evidence, that's when
25 BDU would review a sampling of borrower testimony?

Page 256

1  A    Correct.
2  Q    And it's too early yet to say
3  whether -- whether that sampling will be done
4  again to update the protocols?
5  A    I mean, if we're not getting in a whole
6  lot more applications from the school, then
7  probably not.  I think it will depend on the
8  school, and chances are if there's a huge uptick
9  in cases from a school, it's probably related to
10 something happening outside of BD.  That there was
11 a law enforcement action; that there was some kind
12 of fine by the department; something that might
13 cause us to revisit those cases anyway.
14      And then we would probably do an
15 entirely new or updated version of what originally
16 led to the, you know, clearing cases for
17 adjudication, and figure out if there are cases
18 that we need to revisit.
19 Q    What size samples were you taking on a
20 percentage?
21 A    I don't remember to be honest with you.
22 I know for -- for ITT, I remember seeing 500
23 because that has a large volume of applications,
24 and we were trying to get samples, you know, for
25 as many as we could.

Page 257

1       Obviously, we can't review every
2  application before we develop a protocol because
3  then we'll be reviewing every application at least
4  twice if not more than that, and we'd just -- you
5  know, we'd never get through any of the cases.
6       But I think if there's a range, though,
7  we have specific requirements depending on the
8  number of applications that we have from the
9  school.  I just don't recall off the top of my
10 head what they are.
11 Q    Are there written records of how the
12 sampling process was conducted?
13 A    Well, the memo discusses, you know,
14 generally what they saw that -- I guess it depends
15 on what you mean by "written records."
16 Q    What -- what about the sampling process
17 is memorialized in the memos?
18 A    How many cases were looked at, that
19 kind of thing, if there were patterns.  Generally,
20 the sampling results in fairly generic responses,
21 but where we see, you know, John Smith told me X
22 kind of thing or reference to a specific kind of
23 document or anything that's of any more specific
24 nature would -- would go into that discussion in
25 the sampling.

Page 258

1    Q    So if -- if a student said, someone in
2 admissions told me my credits would transfer and
3 then they didn't, that, that, in your view, would be too
4 generic?
5    A    I don't want to speak to hypotheticals.
6 It depends on what else we've seen and what the
7 other, you know, evidence is.
8    Q    If a couple of hundred students said,
9 someone in admissions told me that my credits
10 would transfer and then they didn't, would that
11 rise to the level of being considered for common
12 evidence?
13    A    A couple hundred out of how many?
14    Q    How many were there for ITT?
15    A    Well, again, ITT was 50 states.  I
16 don't know how many campuses.  So there are a lot
17 of variables that your question doesn't answer.
18 Is it a couple of hundred at the same campus at
19 roughly the same period of time.  Or is it a
20 couple hundred over 30 years across 50 states.
21         Those are going to be very different
22 scenarios; right?  So we would look at the
23 specific circumstances of the borrowers and the
24 sample size and see if it matches up and
25 corroborates, not just as a general proposition.

Page 259

1         With exceptions, if it -- a couple
2 hundred across various campuses but it's related
3 to something that was produced universally across
4 the enterprise, so job-placement rates,
5 advertising, some kind of document that's handed
6 out in the admissions process, that would be
7 corroborating, but it's -- I can't give you an
8 answer to the hypothetical because it's just
9 dependent on too many variables that are not built
10 into the question.
11    Q    If you had a couple hundred people
12 making that same allegation and it was around the
13 same period of time but spread out over campuses
14 in ten states, would that warrant looking into it
15 further?
16    A    I don't know.  I'd have to see exactly
17 what the language is that the borrowers are
18 stating and how closely they mirror each other and
19 if there's anything else that corroborates that.
20    Q    Earlier you said that you thought it's
21 possible some cases will have to be reopened in
22 the coming months because of -- because of
23 mistakes that were made in the adjudication
24 process.
25         Do you remember saying that?

Page 260

1    A    No, not -- I think there were -- there
2 were some mistakes that we were aware of that
3 relate -- there were different kinds of mistakes
4 that can happen in terms of the adjudication or
5 the processing of the letters, and so if we become
6 aware of that, then, you know, it depends on
7 whether the -- the mistake or the issue would
8 change the outcome of the decision and what it is,
9 but, you know, I think there are certainly will be
10 instances where we find that we -- either my team
11 got it wrong or the processing team got it wrong
12 and that we would reopen the case.
13         I don't remember saying that, but I
14 think that's probably true.
15    Q    Do you think the pace at which the team
16 has been working over the past year is a factor in
17 the likelihood of mistakes?
18    A    I think it's not ideal, but we've done
19 everything that we can to mitigate against that.
20 Like I said, I -- we've put in place a really
21 robust training program, probationary periods for
22 the new attorneys.  We have a pretty strong QC
23 process.  Twenty percent of every case is
24 rereviewed, essentially, and, you know, it's kind
25 of a second-level review by the QC team.

Page 261

1         But, you know, when you're talking
2 about hundreds of thousands of cases and there are
3 humans that are doing it, and, you know, it can be
4 as simple as a click.
5         So, for example, on the letter -- I
6 think a couple of the things that we've identified
7 as mistakes were things like it said failure to
8 state a claim instead of insufficient evidence
9 because those are right next to each other in the
10 drop-down menu, and if somebody just accidentally
11 clicks on one as opposed to the other, then, you
12 know, that's a mistake.  That's an error.
13         It wouldn't have changed the outcome of
14 the borrower's application in the scenario that I
15 just gave you, so we're still trying to figure out
16 what that looks like in terms of do we need to
17 issue a corrected decision just for the borrower's
18 record, but, you know, they still would not have
19 been an approved application in that scenario.
20         So there's different things that we
21 need to figure out how to address, but if we did
22 it wrong, we want to -- we want to correct it and
23 get it right.  We certainly don't want borrowers
24 getting the wrong decision.
25    Q    Okay.

Page 262

1          MS. ELLIS:  Those are all the questions
2  that I have today.
3          Charlie, do you have any questions for
4  the witness.
5          MR. MERRITT:  Yeah, just one or two
6  follow-up questions really briefly.
7      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
8      BY MR. MERRITT:
9      Q     Colleen, earlier you mentioned about --
10  I think you made reference to 30,000 claims that
11  have been approved but were currently being held
12  with -- or the decisions were not issued on those
13  30,000 claims.
14          Do you remember mentioning that?
15      A     Yes.
16      Q     Can you explain a little bit about what
17  those 30,000 approvals are?
18      A     Yeah.  It's well over 30.  They're --
19  they're Corinthian claims that have been approved
20  for job-placement rates, and under the Manriquez
21  injunction, excuse me, the department can't apply
22  the 2017 methodology to those.  I think that's
23  still the intent of the department, to the best of
24  my knowledge, so they're waiting to see how that
25  plays out in the court.

Page 263

1          But until then, those cases are -- the
2  decisions on those cases are not being issued, but
3  the cases from my team's perspective are done.  We
4  have adjudicated them.  They're completed.
5  They're ready to go whenever there is an
6  appropriate relief methodology to apply to them
7  and issue the decision.
8      Q     And are those cases that would receive
9  less than 100 percent relief?
10      A     I believe so, yeah.  I'm pretty sure we
11  continued to issue decisions on the 100 percent,
12  the cases that under the 2017 relief methodology
13  got 100 percent.  But I don't know that for sure
14  because we don't issue the decisions, but I
15  believe that's the case.
16          MR. MERRITT:  Okay.  That's all I have.
17          MS. ELLIS:  Okay.
18          MR. MERRITT:  And I would just like to
19  request the opportunity for the witness to read
20  and sign the transcript.
21          MS. ELLIS:  Fine by me.
22          Joe, could you please tell us how long
23  we've been on the record?
24          THE VIDEOGRAPHER:  Sure.  You want me
25  to go off the record first real quick and then

Page 264

1  tell you?
2          MS. ELLIS:  Sure.
3          THE VIDEOGRAPHER:  We are now off the
4  record.  The time is 22:04 UTC, and this concludes
5  today's testimony given by Colleen Nevin.
6          Thank you.
7
8
9
10          (Signature having not been waived, the
11  Remote Videotaped Deposition of COLLEEN M. NEVIN
12  ended at 5:04 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2          I, Dana C. Ryan, Registered Professional
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken
5  do hereby certify that the foregoing transcript is
6  a true and correct record to the best of my
7  ability of the proceedings; that said proceedings
8  were taken by me stenographically and thereafter
9  reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14          IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 14th day
16  of December 2020.
17  My Commission expires:
18  November 23, 2024
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR THE
24  STATE OF ALABAMA
25

Page 266

INSTRUCTIONS TO WITNESS

1

2

3          Please read your deposition over

4   carefully and make any necessary corrections.  You

5   should state the reason in the appropriate space

6   on the errata sheet for any corrections that are

7   made.

8          After doing so, please sign the errata

9   sheet and date it.

10          You are signing same subject to the

11   changes you have noted on the errata sheet which

12   will be attached to your deposition.

13          It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the

16   deposition transcript by you.  If you fail to do

17   so, the deposition transcript may be deemed to be

18   accurate and may be used in court.

19

20

21

22

23

24

25

Page 268

ACKNOWLEDGMENT OF DEPONENT

1

2          I, Colleen M. Nevin, do hereby

3   acknowledge that I have read and examined the

4   foregoing testimony, and the same is a true,

5   correct and complete transcription of the

6   testimony given by me and any corrections appear

7   on the attached Errata sheet signed by me.

8

9

10

11   _____     _____

12   (DATE)                      (SIGNATURE)

13

14

15          CERTIFICATE OF NOTARY PUBLIC

16   Sworn and subscribed to before me this

17   _____ day of _____, _____

18

19

20   _____     _____

21   NOTARY PUBLIC              MY COMMISSION EXPIRES

22

23

24

25

Page 267

1          E R R A T A   S H E E T

2   IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,

3   in her official capacity as Secretary of the

4   United States Department of Education.

5

6   PAGE  LINE          CORRECTION AND REASON

7   _____ _____          _____

8   _____ _____          _____

9   _____ _____          _____

10   _____ _____          _____

11   _____ _____          _____

12   _____ _____          _____

13   _____ _____          _____

14   _____ _____          _____

15   _____ _____          _____

16   _____ _____          _____

17   _____ _____          _____

18   _____ _____          _____

19   _____ _____          _____

20   _____ _____          _____

21   _____ _____          _____

22   _____ _____          _____

23   _____ _____          _____

24   _____      _____

25   (DATE)                (SIGNATURE)

| | | |
|---|---|---|
| **Exhibits** | **12:13** 114:1 | **2012** 44:16,18 48:17,21 |
| | **12:45** 136:10 | 70:24 188:1 245:9 254:14 |
| EXH. | **12:48** 136:21 | **2013** 245:10 |
| **0021 COLLEEN NEVIN 120** | **12ED** 157:10 | **2014** 254:15 |
| **92020 (1)** 6:12 17:10,11 | **13** 79:23,24 80:2,4 115:2 | **2016** 15:15,18 22:21 23:6 |
| 36:14 37:10 98:22 115:1 | **13th** 174:11,12 | 24:10 33:5 42:9 43:8,10 |
| 137:3 | **14** 137:1 | 45:18 52:5,14 67:12,15,20 |
| EXH. | **145** 173:20 | 73:9 75:17,25 77:17 78:2,3, |
| **0022 COLLEEN NEVIN 120** | **14:11** 8:13 | 6,13 79:9 90:23 96:2 97:9 |
| **92020 (2)** 6:14 29:22,23 | **14:13** 10:9,13 | 109:2 125:19,21 126:5,6,13, |
| 208:13 | **14th** 183:15 | 18 129:8 135:21 146:14 |
| EXH. | **15** 92:7,8,9,11 98:1 145:12 | 172:5 214:1 220:16,23 |
| **0023 COLLEEN NEVIN 120** | 208:14 212:1,2 | 222:5 224:6 237:11 254:9 |
| **92020 (3)** 6:17 184:8,9 | **15,000** 230:18 | **2017** 19:21 25:7,8 31:17 |
| | **15:19** 58:10 | 33:7,13 42:13,16,19 50:12 |
| **0** | **15:25** 58:14 | 67:12,15 68:13 110:4 111:2, |
| | **16** 98:23 163:3 208:14,18 | 3,25 112:1,4,25 114:5 |
| **04** 180:16 | **16,000** 130:6 | 115:9,18 118:3 122:6,9,10, |
| | **16:35** 106:2 | 12 124:19 125:8,12,21 |
| **1** | **16:45** 106:6 | 126:3 127:16 130:8 131:15 |
| | **16:56** 113:24 | 132:5,12 133:9,21 134:2 |
| **1** 77:22 93:7 126:25 152:1,2, | **17** 17:16 112:5 | 137:6 138:14 139:17,23 |
| 5 174:9 175:5,9 213:11 | **17:13** 114:3 | 144:23 145:13 148:24 |
| 218:12,13 | **17:47** 136:20 | 149:14 153:9,14 222:14,25 |
| **1,000** 150:15 231:19 | **18** 184:4 190:24 | 223:2,8,10 233:16 234:9 |
| **1,400** 158:14 | **18:18** 136:24 | 262:22 263:12 |
| **10** 185:6 242:1 | **19** 173:18,19,21,23 | **2018** 32:22 33:13 68:14 69:1 |
| **10,000** 145:14 | **1975** 244:11 245:8 | 76:4 78:5 110:4 112:1 |
| **10-** 230:17 | **1993** 14:3 | 126:3,5 130:19 139:6,11,25 |
| **10/23/18** 199:6 | **1995** 37:21 38:11 123:20 | 140:23 142:4,6,17 143:5 |
| **10/23/2018** 192:2 193:5 | **19:08** 167:21 | 145:13 146:25 147:4,9,13, |
| **100** 61:19,22 62:9,17 149:5, | **19:14** 167:25 | 19 152:6 153:15,16 154:8 |
| 11,15,20,24 155:15,25 | **19:58** 198:3 | 161:11 166:17 208:21,24 |
| 156:25 157:6 160:24 188:22 | **19:59** 198:4 | 209:23 221:16 223:10,12,20 |
| 243:11 263:9,11,13 | **1:15** 136:12 | 224:7 234:9 |
| **100,000** 138:18 | **1:18** 136:22 | **2019** 21:23 23:24 24:7,10,22 |
| **10:19** 58:11 | **1st** 174:2 177:25 180:16 | 25:21,22,24 77:19,21 80:21 |
| **10:25** 58:12 | | 99:23 100:14 102:11,12,14, |
| **11** 171:16 | **2** | 16,19,21 127:13,16 128:22 |
| **116** 79:24 | | 147:2,4 152:6 154:14,16 |
| **116-4** 81:13 | **2** 18:1 30:3 36:24 80:17 89:3 | 158:13 159:8 160:8,25 |
| **11:35** 106:3 | 93:21 125:7 127:1 152:1,3 | 161:25 162:7,19 164:22 |
| **11:45** 106:4 | 159:11 175:17 176:9,10,14 | 165:2 166:9,14 168:12 |
| **11:57** 113:25 | 177:10 191:25 212:24 213:1 | 169:4,5,24 170:8,22 171:5 |
| **12** 157:8,11,12 208:16 | **20** 17:9 122:6,9 185:6,18 | 190:21,25 209:22 210:7 |
| **12(b)(6)** 79:11 82:9,13 | 186:10 | 221:12,16,22 223:12,20 |
| **12/7/20** 29:21 | **2004** 178:1 | 225:10 228:24 233:21 234:8 |
| **129-1** 92:8 | **2010** 44:16,18 48:17,21 | **2020** 8:12 20:14,15,18 75:15 |
| | 70:24 188:1 244:14 | 76:8 77:18,21,22,24 79:25 |
| | | 80:7 99:24 100:18,19 |
| | | 101:11 102:4 144:23 166:2, |
| | | 8,22 174:3 183:15 216:25 |
| | | 221:14 222:14 226:23 |

244:14 245:8
**20:00** 198:8
**20:21** 211:18
**20:37** 211:22
**20th** 42:20 130:7
**21** 17:10,11 36:14 37:10
  98:22 115:1 137:3
**21:12** 234:24
**21:25** 235:3
**22** 16:25 17:2 29:22,23 37:9
  81:11 208:13
**22nd** 178:1 180:16
**23** 81:13 139:4 184:8,9
**24** 92:15
**25** 127:24 184:2,4
**2:08** 167:22
**2:14** 167:23
**2:59** 198:5
**2A** 185:17 186:1
**2B** 185:18 186:5

---

### 3

**3** 30:1,2,13 80:18 93:21
  159:12 175:2,3,7,16,19
  178:22 189:4 215:16
  218:12,14
**3-** 231:17
**30** 258:20 262:18
**30(c)(2)** 113:19
**30,000** 225:19 262:10,13,17
**30-something** 53:3
**30th** 137:6
**31** 80:7
**31,000** 155:10
**340,000** 218:7
**3:00** 198:6
**3:21** 211:19
**3:37** 211:20

---

### 4

**4** 30:14,15 36:23 94:24
  122:9 194:7
**40** 171:20
**400** 231:17
**47** 171:20
**4:12** 234:25

**4:25** 235:1
**4th** 122:12

---

### 5

**5** 94:24 158:9,10 204:25
  236:25 237:1,3,4
**5,000** 102:1 229:8
**5/4/2017** 129:24
**50** 61:19 62:8,16 172:6
  258:15,20
**50-** 230:13
**500** 40:14 41:4,24 43:25
  47:3,5,14,20,24 48:1 190:6,
  11 231:18 235:6 256:22
**51** 92:20 98:8 171:23 212:3
**52** 171:21
**53** 212:12
**54** 122:3
**55** 115:2,4
**55,000** 230:13
**56** 117:25
**59** 137:2,4

---

### 6

**6** 185:18
**60** 24:14
**64** 145:11
**65** 146:23 150:12
**66** 162:25 163:3
**68** 98:23 99:3

---

### 7

**7** 129:22,23,25 139:5
**70s** 244:11,12

---

### 8

**8/21/2019** 157:10
**8/31** 79:25

---

### 9

**90** 8:18 102:8,18 228:22
**95** 38:7 43:8,14 45:18 51:21
  52:2,5,13,16 55:9 78:1,9,12
  91:3 135:21 172:10 221:24

222:2 224:23 254:10
**97** 14:5
**99** 178:1 180:16
**9th** 8:12

---

### A

**A-P-P-E-L** 19:15
**a.m.** 58:11,12 106:3,4
  113:25
**AA** 14:13
**ability** 41:18 178:10 196:9
**absolute** 55:19
**abusive** 83:1
**accelerated** 100:15
**accept** 156:14 219:12
**acceptance** 220:10
**accepted** 218:17,19 220:5
**access** 38:24 39:1 153:8
**accessing** 176:2
**accidentally** 261:10
**accomplish** 229:19
**accordance** 119:20
**account** 109:13
**accounts** 123:2 238:11
**accreditation** 38:6 200:3,5
**accurate** 18:6 30:18 31:8
  130:14 134:6 137:7 176:19
  205:25 206:1 243:2
**ACI** 50:13
**acknowledge** 9:1,4
**act** 37:24 218:22 220:1
**acting** 13:19 18:24 19:14,19,
  20 21:15 23:1 31:16 33:8,18
  34:6 68:16,22 141:8,9 160:5
**action** 8:19 30:9 37:25 49:7
  59:5 194:10,22 256:11
**actionable** 205:15
**actions** 59:3,14 186:7
**active** 27:25 233:2
**actual** 64:13 81:12 170:16,
  20 173:4
**ad** 20:5 22:5
**add** 199:1
**added** 191:16
**adding** 217:7
**addition** 20:21 21:5 41:14,
  24 140:3

**additional** 22:25 23:23 25:14,23 26:4,6 50:2 66:5 118:5 120:16 121:21 132:15 141:12,21 142:1 145:6 146:24 171:3,4 202:15 217:16

**Additionally** 18:11 99:4,5 145:12 218:15

**address** 21:1 110:16 202:7 219:23 220:2 261:21

**addressed** 204:20

**addressing** 121:16

**adjudicate** 16:3 51:22 60:25 70:9,13 99:10 101:6 102:7 103:24 105:14 122:7,10 126:7,15,16 141:19 151:23 172:19 187:6,25 204:2 208:17 227:22 228:21 246:11 247:20 254:2

**adjudicated** 37:23 41:6 45:19 53:24 63:23 91:10 100:18 103:9 105:14 107:15 109:7 110:4 125:5,12 128:9 130:7 150:16 158:12 163:7, 17,23 165:23 166:2,7 173:10 202:11 203:3,18,24 223:4 224:18 225:4,10,25 230:9,12 232:14 242:9 253:18 254:1,18 255:21 263:4

**adjudicating** 20:19 40:23 96:11 101:2,9 102:18 122:11 123:6,9 136:7 140:3 244:20

**adjudication** 35:11,18 41:9 45:11 46:6,23 47:9 62:18 100:11 106:10,13,24 107:18 108:10,12,18 114:8 119:21 121:9 131:2 137:5,13,17 138:15 140:25 144:5 172:24 173:8,14 176:7,11 178:11 203:16 207:11 221:9 224:5 227:20 241:6 242:25 244:19 245:22 247:23 251:22 256:17 259:23 260:4

**adjudications** 86:13 102:1 114:18 139:7 151:20 167:10 170:24 171:2 214:10 224:11 228:15

**adjudicators** 255:12

**adjusted** 191:12

**Adler** 14:16

**administered** 9:5

**administerial** 127:17

**administration** 26:7 112:4 126:22 138:22 232:4

**administrative** 12:17 59:3

**administratively** 53:10 54:17

**admissions** 60:19 258:2,9 259:6

**advancing** 143:7

**advertisement** 243:10

**advertising** 77:5 259:5

**advice** 57:7 156:5

**advise** 36:4 188:1,7

**advised** 118:2,8,11 122:14

**advising** 119:10

**advocated** 214:6

**affect** 125:4 166:24 178:10

**affected** 171:1 219:4 224:4, 11

**affects** 160:19

**affidavit** 92:14,19,24 98:5 212:7

**affirmative** 125:9

**afternoon** 202:10

**AG** 55:12 186:7 223:5

**AG's** 14:24 76:22 176:1 233:3

**agencies** 59:11 233:11 251:8

**agree** 9:15,16 11:7 58:5 105:23,25 124:8 212:14 216:16 219:8

**agreed** 55:5 203:19

**agreement** 8:6 9:13

**agrees** 219:12

**AGS** 44:22 61:13 69:25 70:16 233:11

**ahead** 90:19 135:3 187:6 204:12

**aid** 18:4,9 28:6,10,23 57:9 61:13

**aligned** 240:11

**allegation** 79:1 81:19 82:10 83:17 84:22 93:7,10,25 94:12 192:14 193:11 194:9 196:13 205:1,3 213:11 243:3 244:5 259:12

**allegations** 62:3,6 66:18 83:19,23 93:5,14,21 94:16,

24,25 107:12 109:5 179:12, 17 193:2,17 195:5 201:16 214:22 239:14 240:2,4,15 243:16 244:1 245:23 246:1 247:9

**allege** 82:14 93:8 182:11

**alleged** 30:8 54:10 82:22 85:8 110:2 200:2

**alleges** 180:22 199:24

**alleging** 196:2 243:2,17

**allowed** 26:9 132:22 139:2 205:18

**ALO** 49:22

**alphabet** 57:1

**altogether** 190:6

**American** 15:8 49:22 50:9

**amount** 59:19 72:7 120:8 127:1,21 133:10 152:3 156:2 228:1

**analyses** 37:15,18 51:18

**analysis** 38:2,10,19 39:5,20 43:8,9 54:25 55:5 63:1 79:11 82:9 99:6,16 100:1,4 172:5,6,8,22 178:6 239:13 242:21

**analyze** 247:8

**analyzed** 173:4 250:7 254:6

**analyzing** 228:1

**Andrew** 23:15

**announced** 153:18 170:23 171:6

**announcement** 231:21

**annual** 165:24 166:7

**answering** 12:3 156:15

**anticipated** 67:22

**anticipation** 20:23 171:5 210:3

**anybody's** 219:4

**anymore** 147:22

**apolitical** 28:22 29:1

**apologize** 57:3 158:25

**appeals** 14:23 59:3

**appears** 158:11

**Appel** 19:15 103:2 168:18 169:7

**appended** 174:6,7,8

**applicable** 44:21 46:4 55:15 60:16 61:5 78:9,24 90:13, 15,22 91:2 179:2,6 186:13 215:19

**applicant** 85:10 96:17 182:6
**applicants** 61:25 62:8 84:13
  111:1 172:22 242:8 252:20
**application** 37:22,23 46:10
  48:20 50:13 51:22 62:22
  63:22,24 64:8,11 74:13,14
  77:13,16 79:5,18 82:19
  83:6,24 92:3 95:19,21 96:4,
  16,20,22 99:18 105:8
  106:12,20 107:22 108:13
  122:17 124:14 127:19 150:4
  163:10 176:13,16 180:21
  183:1,5 187:15,19 193:16
  195:22 201:5,9 202:2
  205:21 212:21 213:3,7
  214:5 215:1,16 216:4,13
  217:20,21,23 220:4,12
  222:1 228:7,22 230:20
  244:10,13 246:14,17 257:2,
  3 261:14,19
**application's** 216:18
**application-review** 133:6
**applications** 35:12,19 36:3
  38:15,24 40:8 41:11 49:10,
  14 51:21 52:2 53:2 59:18
  60:9 61:1,18 62:2,9,21 64:4,
  19 73:8,12,14 74:17 76:5
  78:25 81:4 82:24 84:6 95:15
  99:10 100:12 104:17 108:6
  109:15 114:8 123:6,9 124:9
  131:3 136:7 145:14,18
  146:4,9 150:15 151:23
  152:2 158:12,15,18 159:3
  163:7,13,17,23 165:23
  166:1,7 169:12 170:24
  173:5,16 176:21 177:2,18
  178:25 196:11 200:23
  202:21 203:2 210:9 214:25
  217:6 221:11 224:2 231:11
  239:20,22 240:14 241:2,25
  242:23 243:25 244:11,17
  245:20,21,24 247:1 248:21
  249:10 251:21 252:9,22
  253:7,8 255:3 256:6,23
  257:8
**applied** 39:10 53:18,22 54:3,
  7 78:21 92:3 129:5 150:8
  152:11 181:8,9 185:8
  216:24 218:8 220:3
**applies** 43:3 55:9,24 78:16
  82:20 156:20
**apply** 29:2 37:20 38:25 45:3
  51:20 52:17,23 79:4 128:14

**applying** 160:8 224:23
**appointee** 20:1
**appointees** 29:3 234:16
**appreciable** 144:13
**approach** 100:11 103:8
  124:5
**appropriately** 191:13
**approval** 25:13 45:23 86:18,
  20 89:9 104:23 105:2,18
  108:21 119:14,16 120:7
  125:20 126:25 127:1,3
  132:18 134:13 136:5
  139:15,22 150:9 155:22
  162:15 163:13 199:14,18
  210:14 226:12 238:3 249:21
  254:18
**approvals** 88:3 118:5,9,17,
  20 119:2,4 120:16 121:3,21
  123:5 126:3,20 129:2
  131:16 146:7,11 147:16,18,
  22 148:1 149:4 150:17,22
  151:21 159:4 161:12
  162:15,18 170:4,5 175:24
  207:2,6 223:15,17,19
  225:11,15,16,21 226:16,20
  262:17
**approve** 27:8 55:24 95:19
  96:4 128:17 135:1 204:5
  205:8 206:2,7,11 215:17
**approved** 27:18 39:18 40:9
  79:2 124:15,16,17 127:19
  135:13,16 141:10 148:19
  155:8,11 226:10 242:5
  261:19 262:11,19
**approving** 87:2 89:15,17
  134:14
**approximately** 130:6 150:15
  160:25
**approximating** 47:17
**apps** 249:2
**AR-A-0227** 158:11
**area** 220:14 226:19
**areas** 36:8 87:15
**argued** 92:1
**arrangement** 9:10
**Art** 185:13 240:14 241:3
  242:9
**articulated** 214:21

**ascribed** 170:13
**Ashford** 73:22 74:2
**asks** 17:6 208:16
**assert** 213:6
**asserted** 145:21
**assess** 48:3 60:14 63:5
  100:25 104:18
**assesses** 251:5
**assessing** 175:24
**assessment** 40:16 44:5 45:2
  46:19 47:6 53:6 73:13 74:6
  96:13 104:20 123:11 206:15
  240:25
**assign** 255:9
**assigned** 64:6 177:20,22
  194:11 254:5 255:4,11
**assistance** 66:23 75:3
**assistant** 14:18 45:10
**assisted** 181:14
**assisting** 13:3 127:23
  128:18
**assumes** 86:2 172:12 202:4
  243:1 247:18 248:23
**assuming** 64:24 95:7 242:5
**assumption** 226:22
**attached** 17:12 29:24 62:2
  80:13 81:2 92:18,19 182:13
  184:10 190:20,23 195:18
  200:4 205:22 212:6,8 228:8
**attaches** 194:8 199:25
**attaching** 66:12
**attachment** 80:15 93:3
  174:9
**attachments** 12:16,18 92:13
**attend** 46:15 142:13
**attended** 45:25 99:11 100:7
  148:20 149:19 163:11
  169:20 177:21 237:14
  244:13
**attention** 134:11
**attorney** 11:20 14:19 23:16
  44:13 48:15 55:13 63:2
  64:5,6 65:23 66:2,5 69:14,
  16 103:19 104:25 181:20
  189:6,7 194:11 201:15,24
  203:12,13,19 204:11 205:6
  209:14 232:16 234:10
  248:11
**Attorney's** 14:14,21
**attorney-client** 8:8

**attorneys** 8:25 12:20 17:24
22:19,22 23:1,3,19,24
24:11,14,19,21 25:6,24 26:4
38:14 40:4,6 43:17 59:12
63:15 105:3,11 143:16,17
171:13,18,25 189:25 190:1
201:1 207:18,20 209:10,18
229:22 233:25 235:16
260:22

**attrition** 24:9 25:6 66:20
67:14,24 68:13

**audio** 13:15 108:25 116:22
127:16 162:15 168:4 197:4
198:11

**Auer** 22:3 36:10

**August** 80:7 158:13 159:8
160:25 161:25 162:7

**authority** 24:13 25:20 26:21
51:6 139:8 140:24 141:2

**authorize** 146:3

**authorized** 112:15 145:13
234:20

**automated** 209:7

**availability** 63:20

**average** 170:13 231:10

**awaiting** 253:7

**awarding** 155:15

**aware** 8:3 13:2,5,8 29:16
57:13 60:3,5 62:23 67:1
70:2 87:24 102:25 115:21
131:1 151:15 152:9,21,25
157:5 163:12 168:13 175:22
179:4,7 180:3 183:5 195:7
234:15 237:22 260:2,6

**awareness** 13:10


**B**

**B-A-Y-N-E** 23:13
**B-R-O-N-S-T-E-I-N** 23:16
**back** 22:15 25:19 27:16
36:13 42:9 43:25 46:9 56:6
58:16 62:24 64:20,25 69:4
78:8 86:5 91:19 96:2 97:12,
16 98:1,21 104:4 106:9
112:3,4 114:25 120:10
121:10 122:3 136:12 139:4
140:15 151:3 162:24 163:14
167:12 168:11 185:24
189:22 197:12 198:20
199:22 208:14 211:24
213:24 214:7 215:14 221:20

252:7

**backfills** 24:8
**background** 14:1
**backlog** 100:17 101:23
102:3,7,16,17,22 164:2,3,4,
12,14,15 171:9 178:7
226:23 228:21 229:25 230:5
**backwards** 19:7 20:15
**Bailey** 35:1
**ball** 143:7
**ballpark** 47:20 190:9
**bandwidth** 103:19 202:13
218:9
**bar** 82:21 104:24 203:6
**based** 37:21 39:7 53:17
62:18 70:19 76:24 79:6,17
82:17 84:14 85:7 96:11
101:23 129:15 150:9 170:15
188:13,16 189:24 193:1
205:7,8,12,13 206:12
210:23,25 213:4 232:12
245:5,22 246:11,20 249:6
255:9
**bases** 11:24
**basically** 52:21 54:14 65:1
110:13 127:4 134:8 135:22
140:14 176:10 181:18 253:2
**basing** 205:14
**basis** 26:19 123:20 145:17,
25 156:15 205:22 213:5
232:6
**batch** 238:6
**Bates** 158:10
**Bauer** 126:18 146:14 222:5
**Bayne** 23:13
**BD** 20:22 61:25 68:2 102:25
157:25 158:8 159:3 160:16
205:2,15 207:23 209:13
226:15 256:10
**BDU** 37:1,14 48:18 49:12
50:5,16 56:1 70:17 72:12,
16,24 76:1,15 85:23 86:2
88:5 96:5 98:14 99:5 106:15
109:18 118:4 122:7,10
125:12 129:8 137:4 138:14
140:2,10 143:9 144:7,24
147:8,10 151:22 152:5
163:6,9,12 171:13,25
224:15 228:21 229:19
231:24 237:16 238:20
239:20 252:1,2,7 255:25

**BDU's** 114:7 131:2 178:10
235:7
**beachhead** 113:3,10
**Beauty** 158:17
**Beckwood** 49:21
**began** 140:2 210:3 237:16
**begin** 170:9 248:15
**beginning** 99:3 140:13
154:7 214:8 226:15
**begins** 30:13 92:15
**behalf** 8:17,22
**beneath** 30:20
**benefit** 204:23
**big** 103:15
**biggest** 109:13 133:15
**bit** 33:14 34:11 89:10 109:20
112:4 122:24 130:17 175:15
190:2 218:9 238:4 262:16
**blanks** 81:18
**book** 190:20
**borrower** 15:20,25 16:3
18:2,10,11,17 20:6,16 21:8
23:5,24 24:9 25:21 27:23
28:2,5 30:16,22 31:2,5,23
33:2 34:3,20 35:8,11,18
37:16,20,24 38:9,14,23
39:17,25 41:13 42:4 45:22
46:14,15,20,25 47:2 50:7
52:24 53:11,15,21 60:17,20
61:5 64:14,21 65:18,22,23
66:1,11 67:15,23 68:12,21
72:18,25 73:14 75:6 77:14
78:15,19,20 79:1 82:10,14,
15 83:1,8,17 84:3 86:12,14
96:1,12,16,25 97:1,6 100:11
101:14 104:12,18 107:12
108:2 109:7 112:7,24
113:11 114:8,18 115:10,12,
15 116:17 117:7 119:18,25
120:11 121:9 122:8 124:9,
10,11,18,21 129:18 131:3
132:3 142:23 146:3 147:5
149:4 150:4 151:2,6 152:2
155:22 166:6,12 168:14
169:12,24 170:24 173:4
176:14 177:25 178:24
181:23 182:1 183:18 188:1,
14 189:5,7 192:13 194:8,25
195:8,16,18 196:11 199:24
200:2 201:1 206:13 207:18
208:17 213:2,5,6,15,20
214:18 215:7,11,18,24

216:9,20 217:13 219:6,20
221:7 222:1,11,13 224:2
227:3,6 228:2 229:5 231:2,
10 232:11 237:11 240:11
241:23 243:17 249:8,17
252:2 255:25

**borrower's** 37:23 40:9 45:17
66:4 74:13 95:24 96:2 97:5
107:11 109:4 170:16 194:9,
20 201:9 219:15 228:6
241:20 261:14,17

**borrower-specific** 194:24
195:11

**borrowers** 36:20 41:3 52:10
53:24 54:6 59:18,19 60:8,15
61:4,8 66:25 83:5 96:6
99:10 110:24 111:18 145:21
146:25 147:6 148:19,25
149:21 150:16 151:7 153:3
155:15 163:10 179:5,9,16,
23 182:10,24 183:3 196:12,
23 199:21 210:5 213:23
227:9 237:14 240:9 245:3
258:23 259:17 261:23

**borrowers'** 95:14 132:7
232:1

**boss** 13:5,12

**bottom** 30:13 80:17,19,24
81:17 115:2 158:11 208:18

**box** 73:11 234:11

**bracket** 79:24 92:8 129:23
173:19 184:4 237:1

**bracketed** 17:2 29:19 157:9

**brakes** 147:20

**break** 58:2 105:22 136:11
167:16,19 211:11 222:22
234:21

**breakdown** 52:5 190:5

**breaks** 11:14,16 40:11 192:4
211:11

**Brian** 23:13

**Bridgepoint** 74:2

**briefing** 158:6

**briefings** 229:9

**briefly** 106:8 262:6

**bring** 24:13

**bringing** 23:2 26:5

**brings** 46:25

**broad** 8:18 16:2 62:5 243:4

**broader** 21:6

**broadly** 44:21 46:3 60:16
61:5 179:2,6 195:16 229:10

**broke** 89:10 94:7 109:20

**Bronstein** 23:15

**Brooks** 93:8 98:3,10,13,15,
20 99:8,13,17 100:2,8
175:11 247:14,22 248:3
253:6,8

**brought** 24:16 33:22 66:13
69:12 70:1 143:15

**Brown** 12:16 13:7 21:18
27:20 34:11,22 35:6 86:12
87:4 89:24 101:25 102:24
163:25 164:11 169:6 174:8,
9 233:22

**Brown's** 34:17

**bucket** 47:8 193:15

**buckets** 49:10

**budget** 121:13,16 141:5

**build** 183:2

**building** 67:19 218:1

**built** 259:9

**bullet** 158:16 159:5,15
161:10,20 238:14

**bullets** 177:10 251:17

**bunch** 46:11 59:12 91:10
134:10 144:3,15 195:3
243:4 248:25

**business** 73:2 119:8 120:4
178:2 180:15 181:11

**button** 128:9

---

## C

**caliber** 143:19

**California** 41:19 42:18 43:1
78:23 79:20 99:7 136:3
155:24 156:19,24 225:4,5
226:1

**call** 24:8 41:8 46:23 74:21
119:21 155:1,2 197:13
241:2

**called** 15:8 18:19 174:9
181:17 188:18 192:2 215:3,
4

**calling** 58:18 120:20 156:10

**calls** 25:18 85:15 87:22
88:20 123:23 126:14 220:19

**Calvillo** 148:12 149:3,12,25
150:2 151:7 153:19 154:2,
19 155:7

**camera** 10:11

**campus** 53:25 59:6 142:12
188:6 238:16,23 239:16
240:1 242:18,22,24 243:23
245:10 258:18

**campuses** 44:20 99:7
186:25 258:16 259:2,13

**candidates** 24:2

**capabilities** 143:23

**capacity** 19:14 21:16 141:10
209:18

**career** 15:8 50:10 158:18
175:9 245:14

**CARES** 218:22 220:1

**carried** 163:20

**case** 39:18 40:9 43:18 46:16
51:25 52:8 53:6,8,24 61:10
64:7,11,13 65:24,25 66:16
67:3 69:22,23 80:12 81:22
82:11 92:22 93:20 97:18
101:9,10 102:8 105:13
107:19,25 117:18 128:17
129:9 132:1 148:12,16
168:23 173:25 181:8,19
188:2 189:13 191:24 194:12
200:16 202:10,20 210:11
218:17 219:9,19 221:8
222:9,17 227:8 246:15
254:15,18,19 260:12,23
263:15

**cases** 20:20 40:23 41:5
45:19 50:10 53:4 60:24 64:6
70:9 91:7,8,10 100:18,21,23
101:2,6,12 102:3,18 103:14,
24 104:7,8,10,11,22 105:4
106:23 107:10,15 109:3,7
125:5 126:7,15,16 130:24,
25 133:18 138:19 141:17,23
171:8 172:20 176:4,6
178:15 181:4 184:17 185:5
186:14 188:22 189:12 194:1
196:16 199:20 203:17
204:2,7 209:19 223:11
224:6,8 225:3,13,24 226:1,
2,9,13,18 227:19 230:8,12
231:6,7 232:11,14,24
239:25 244:19,20,25 247:5,
20,22 248:3,23 249:1 252:5
253:15,18,21,24 254:2
256:9,13,16,17 257:5,18
259:21 261:2 263:1,2,3,8,12

**catch** 141:16 166:21 174:17
241:22

**categories** 46:21 108:21
  132:16 177:1,18 186:18
**category** 186:4 211:8
**CCI** 78:22 108:18 110:25
  122:7,10,11 128:18 137:5,
  17,21 138:15 140:3 150:15
  152:10 155:6 156:20
**CEC** 98:16,19 176:1 177:1,9,
  10 178:23 179:5 180:13
**CEO** 120:15 121:2
**certificate** 127:24 128:18
**cetera** 194:11 201:17
**CFPB** 59:11
**Chad** 88:12 89:2
**chain** 34:10 136:6 224:14
**chains** 34:13
**challenges** 54:5
**chance** 228:10
**chances** 256:8
**change** 26:14 123:21 124:23
  126:22 154:25 191:11 193:7
  232:17 246:20,24 247:5,6
  249:6 254:13 260:8
**changed** 14:13 16:17 18:14
  19:4,12 21:21 33:4 34:11
  126:1 154:8 160:14 261:13
**characterization** 94:19
  222:16
**charge** 134:14
**Charlie** 262:3
**Charlotte** 74:1
**chart** 127:23 128:12,15
  174:10 175:8 186:20 188:12
**charts** 128:20
**chat** 11:6 204:15
**check** 179:7 193:7
**checked** 137:10
**Chicago** 14:9 240:15 241:3
  242:9
**chief** 13:19 18:24,25 19:11,
  18,21,23,25 20:3,12 21:11,
  12,13,14,16,18,22,25 22:1
  26:15 27:13,17 28:24 31:19
  32:18 33:1,3,5,8,11,18,21,
  23 34:12 35:2 55:23 68:18
  103:1 118:13,20 125:22
  129:12 141:8 158:2 163:20
  164:1,11 229:7
**choice** 53:6 54:18,19,25
  56:6,13

**circle** 106:8
**circling** 163:14
**circulated** 229:10
**circumstances** 30:8 45:24
  55:16 72:16,23 75:20 120:9
  258:23
**cite** 239:10
**cited** 241:20
**cites** 251:15
**Civil** 113:19
**claim** 36:4 38:25 42:16
  45:17 46:25 47:2 48:4,5
  65:3 78:16,21 81:24 82:6,19
  83:18,23 84:1,3,4,9,15,25
  85:5,6,9,12 93:11,17,18
  94:2,14 95:13 96:18 97:7
  101:17 104:15,19 105:16
  107:3,7 108:3 110:2 125:12
  136:2,3 142:10,23 145:22
  178:2 180:22 181:13,17
  182:7,18,19 183:19,25
  184:24 192:5,6,9,12,17
  194:16,18,20,21 195:23,24
  199:8,10,25 200:1,8 203:10,
  14,21 204:13 205:1,2,3,6,8,
  14,15,24 206:2,7,12,18,19
  207:7 210:10 211:2,7 213:8,
  12,16 214:21 228:3 231:1
  232:2 243:6 245:7,8,9
  254:14 261:8
**claims** 16:4 37:16,20 38:7
  39:13 41:16,17 42:24 43:4
  44:23 46:24 47:7,9 50:1,6,7
  51:20 52:15 54:3 61:9 62:1
  73:16 78:9,11,12 79:14
  83:15,25 84:24 85:23,25
  103:9 104:1 108:17 109:11
  110:3,17,20,21,25 111:19
  122:9,10,12 127:8 132:7,16
  135:13 137:6,17,21 138:8,
  15,24 140:3,17 142:18,25
  143:1,20 146:10 148:20
  149:5 150:5 152:11 155:6
  156:20,22 158:23 159:6,18
  160:24 163:8 168:15 177:11
  178:5,9,12,14,16 179:23
  182:20,25 185:3,9,14,20
  188:24 192:2 193:13 196:9
  199:6 201:22 206:6 207:25
  208:6,17 209:6 210:8 218:3
  220:9 223:5 225:9,19
  226:24 227:11 230:20
  237:13 238:15 241:4 242:10

**circle** 106:8

243:19,22 246:7 247:16
  249:21 262:10,13,19
**clarify** 78:1 210:17
**class** 148:16,25 149:12
  151:8 155:11 174:3
**classes** 83:3
**Clausen** 14:9
**clean** 228:20
**clear** 145:4 163:21 168:7
  193:23 206:8,25 207:2,14
  210:18,22 226:23 244:18
  251:4
**clearance** 185:24
**cleared** 41:8 45:11 46:5 47:8
  62:18 106:10,12,24 107:18,
  20 108:9,12,17 176:7,11
  244:19
**clearing** 178:7 256:16
**click** 37:6 261:4
**clicks** 261:11
**climate** 120:12
**close** 88:2,14 121:8 144:21
  191:18,22
**closed** 50:4 71:19 73:2
**closely** 56:8 88:11 135:20
  160:20 171:3 259:18
**code** 8:13
**coincide** 162:2
**coincided** 139:18 147:18
**collated** 60:11
**collating** 238:21
**collect** 213:22 221:2 252:1,2
**collected** 242:12
**collecting** 236:22 239:2
**collection** 249:17 250:6
**Collective** 215:3,4
**collectively** 109:14
**Colleen** 8:11 10:15,22 17:3,
  10 37:8 136:15,16 197:4,7
  262:9
**college** 14:2 158:18
**colleges** 148:21
**column** 175:2,3,5,9,16,17
  176:9,10,14 177:10 178:22
**combination** 63:13
**comfortably** 193:12
**command** 136:6
**comment** 130:21
**comments** 240:5

**common** 39:4,22 40:20
41:11 44:7,9 45:20,22 46:21
47:6,8,15 48:4,6,11 49:11
51:17 58:19,20,21 60:11,13,
14 62:19 63:16 69:4,8 70:19
72:12 81:9 82:23 98:14,18
99:13,16 100:12,13,24
101:1,14 104:8,9,11 106:23
107:4,9 108:22 109:6 143:2
173:17 175:3,4,15,17,18
176:8,18 177:3,11 178:6
180:17,19 181:1,5,14
183:10,20 184:19 185:11
187:12,16,23 188:5,17
193:2,17 194:3 195:7,13,15
200:24 201:4,6,7,13,22
206:21 226:3,5,24 227:7,11,
15,18 235:6,25 238:19
248:14 250:6,20 251:14,19
252:3 253:14,17,25 254:7,
22 255:2,6,19,24 258:11

**commonalities** 62:11
252:10

**commonly** 229:4

**communicate** 11:4 27:16
72:17

**communicated** 35:21 38:13
103:5 118:12,14 121:2,6
148:7 228:25 229:4

**communicating** 118:23
121:18

**communication** 34:10,13,14
119:18 233:2

**communications** 36:7,18,19
56:15 69:25 70:15 74:24
78:19,20 86:14 88:9 233:6,
11,24 234:8

**companies** 142:7

**compare** 170:12 187:15

**comparison** 190:18

**compensation** 166:25

**complaint** 30:9 70:4

**complete** 46:18,22 64:17
99:9,18 100:2 107:16,21
171:8 189:4 216:12 252:4

**completed** 42:23 43:5,10
92:5 138:1 180:7 185:19
189:6 231:8 250:12 252:12
263:4

**completely** 167:2

**completion** 118:6 121:22
173:6

**complex** 202:6

**compliance** 59:2

**complicated** 32:9 90:9
206:17 224:6 236:16

**comply** 123:17

**components** 16:19

**comprehensive** 44:10
115:15

**computer** 169:1 235:7

**conceptually** 109:25

**concerns** 26:11

**conclude** 45:14

**concluded** 52:22 56:9 93:16
100:8 106:15 155:24 201:7

**conclusion** 39:12 41:7
91:25 95:12 201:13

**conclusions** 117:13 177:16
237:12 240:19

**concrete** 48:13 192:7

**conduct** 71:24 192:23

**conducted** 257:12

**Conducting** 37:15

**confident** 103:25

**confirm** 10:24 11:3

**confused** 250:16

**confusing** 177:5

**connect** 168:3

**connection** 38:3 140:11
162:22 165:10 191:14
200:20 214:4 219:21 244:23

**connections** 243:11

**Connor** 92:8 212:5,7

**consecutive** 17:6

**consensus** 126:17

**consent** 9:9

**considerably** 189:24

**consideration** 182:4 234:17

**considered** 58:20 65:8 69:8
72:11 95:15,25 96:19 97:20
129:9 176:17 183:25 195:15
214:4 216:18,21 245:11
258:11

**considers** 47:15

**consistent** 54:22 113:16,18
149:3 150:2 206:24 207:1,4,
10,13,15 235:12 239:14
240:16 241:9 242:11

**consistently** 207:6,10
243:24

**consolidated** 52:8

**constantly** 232:7

**constituents** 44:24

**constraints** 121:14

**consult** 88:4

**consultation** 168:19

**consulted** 116:16

**consulting** 87:19 169:11

**consumer** 15:1,4 18:13

**contact** 76:1 193:21

**contained** 110:13

**contents** 110:18

**context** 119:13 213:16
218:20

**continue** 45:12 46:18 86:1
101:4 204:24

**continued** 122:7,10,23
132:21 154:17 263:11

**continues** 30:14 212:17

**continuing** 40:25 59:7
114:20 151:22 152:5

**contract** 209:10,14,18

**contracting** 142:7,16

**contractor** 82:3 120:3 139:8
140:24 141:3 143:21

**contractors** 122:17 141:12,
21 142:4,9,22 143:5,15

**contributes** 36:17

**contributions** 144:11

**control** 143:17 207:19,21
208:1

**convened** 115:10

**convention** 64:9 235:12
236:1

**conventions** 18:14

**conversation** 91:5 114:19,
20 132:9 140:19 154:13

**conversations** 8:5,7 72:10
102:12,15,20 104:5 114:6,
10 118:24 129:7 159:23
229:23 230:2 232:5

**convert** 128:14

**converting** 155:3

**conveyed** 141:4

**conveying** 129:20

**COO** 21:14,23 27:20 28:1,4
229:6

**COO's** 27:23

**copied** 119:10 125:24

copies 79:23 92:7 157:9
copy 29:12 66:12 168:25
  237:1
Corinthian 41:17,18,19
  42:2,10,15 50:8 76:5 103:14
  109:10 110:20 111:22
  128:25 132:16 138:19,24
  141:18,23 143:11 145:20
  148:20 150:5 206:4,5,6
  223:10,21 225:3,7,18,25
  226:18 230:24 237:25
  249:17,23 262:19
corollary 192:16
Corp 175:9
correct 12:4 15:21 23:7
  27:21 28:3 32:19 38:20
  42:5,13,14,17 47:16 49:8
  50:14 78:13,14 80:9 81:21
  82:7 95:2,22 97:25 98:4
  108:16 130:8,9 141:1 146:1
  147:2,3 150:6,19 152:7
  156:20 170:17 175:6 178:25
  183:22 187:17 188:20 201:2
  207:20 210:15 215:12
  221:17 234:14 237:16 250:9
  251:23,24 255:22 256:1
  261:22
corrected 191:13 261:17
correcting 214:11
correctly 98:17 149:9 175:3
  176:12 246:4
corroborate 244:8
corroborated 240:12
corroborates 258:25 259:19
corroborating 95:18 96:17
  179:21 180:2,4 240:21
  241:24 245:23 246:1 248:1,
  5 259:7
corroboration 96:3
corroborative 243:13
  244:16 245:11,19
counsel 8:11 9:9 10:18
  11:23 12:1,8 17:23 43:21
  54:4 56:17,18,19,21,22,23
  57:6,11 75:4 86:25 88:23
  125:24 126:11 156:8 197:22
  262:7
counsel's 156:5
count 178:6
counts 22:17
couple 31:4 64:16 135:24
  171:14 191:9 196:4 198:10

201:3 217:3 258:8,13,18,20
  259:1,11 261:6
court 8:25 9:17,23 10:4,7
  49:22 78:5 82:11,12 112:14
  113:14 156:13 164:6,9
  189:10 197:1 198:13,17,19,
  22 262:25
court's 170:19 174:2
courtroom 239:7
cover 146:9 199:19
covered 52:11 193:20 200:7
  232:19 254:21
covers 199:3
COVID 120:12
crack 209:11
create 38:9 51:6 248:14
  249:16
created 38:18 49:17 115:21
  160:12 175:1 188:23 189:1
creating 143:10
creation 237:19
credit 41:18 42:15 132:6
credits 122:8 192:13,15,18
  206:5 211:3 237:13 258:2,9
crew 86:11
criminal 14:23 45:5,13 46:15
  48:20 70:23 71:17 187:4
criteria 42:8 110:5 176:21
  206:25 207:2 254:20
critical 179:11,14
crunch 128:12
culled 178:24
current 15:13 34:8 64:4
  120:12 126:23 193:9 216:14
curve 144:9
cut 9:24 121:10 164:7,10
  197:3 198:11
cycle 226:14

D

Dana 8:21 198:11
data 53:13,17 54:5,13 84:16,
  21 87:14 91:20 114:22
  115:24 116:1 127:24 128:6,
  7 133:18 150:21 152:12,14
  153:1,2,10,20 154:18 155:3
  160:9 167:8 169:11,13,17
  170:14 177:20 191:13
  213:22 217:1 230:10 240:10

database 239:23 255:10,13
date 52:12 99:23 137:8,10
  181:11 235:22
dated 237:15
dates 31:18 32:20 69:2
day 11:16 22:15 181:4
  249:13,15
days 12:22 43:15 102:8,18
  228:22
deal 218:21
dealing 53:1
debate 74:19,22
Debt 215:3,4
December 8:12 80:21
  140:14 145:13 148:24
  225:10
deceptive 180:25
decide 56:13 219:8 246:17
decided 51:1 213:2,6 218:5
  222:1 225:16 245:25
decides 52:16
deciding 252:5
decision 27:7,10 54:2,23
  55:2,8,25 63:7 75:14,23
  97:21,23 100:10 103:8
  116:16 118:16,22,23
  119:15,20,24,25 120:23
  121:3 123:1 125:14 126:4
  127:5 129:10,15 137:17,20
  146:15,18 147:17,21,25
  148:9 151:5,10,17 152:9,17
  155:20 161:15,17 162:4
  163:16 202:3 212:14 216:16
  217:15 219:3,17,20 222:5
  223:3,25 224:14 254:21
  260:8 261:17,24 263:7
decisions 27:14 30:17 55:24
  67:25 75:5 101:11 117:6
  119:6,11 146:24 147:5,9,10,
  11,12 148:5 151:2,6 161:11,
  22 162:13 169:24 171:2
  209:24 218:7 221:15,21
  222:11,13 223:1,9,14,15,16,
  19,22 224:3,16,18,20,24
  230:8,9 232:18 262:12
  263:2,11,14
deck 159:10
decks 158:1
declaration 12:14 17:2,9
  36:14,24 37:8 92:8,25 98:21
  115:1 117:25 121:20 122:4
  137:2 139:5 145:11 146:23

147:1 150:13 155:9 162:25
174:7,8 184:4 190:21,24
212:4,7
**declarations** 12:14,15,18
**declare** 9:7
**deeply** 202:14
**default** 53:10 107:8
**defendant** 239:9
**DEFENDANTS** 262:7
**defendants'** 29:9,20 79:24
80:6 89:2 173:20 174:1
**defense** 15:20,25 16:4 18:2,
10,11,17 20:7,16 21:8 23:6,
24 24:9 25:21 27:24 28:2,5
30:16,22 31:2,5,23 33:2
34:4,21 35:8,11,19 37:16,20
38:9,14,23 42:4 50:7 67:16,
24 68:12,21 72:18,25 75:6
83:8,18 86:12,14 95:20
96:2,16 97:6 100:11 112:7,
24 113:11 114:8,18 115:10,
12,15 116:17 117:7 121:9
122:8 124:9,11 129:18
131:3 146:3 147:5 149:4
150:4 151:2,6 152:2 155:22
166:6,12 168:14 169:24
170:24 173:4 178:24 189:6,
7 201:1 207:18 208:17
213:2,7 215:18 222:1,11,13
224:2 229:6 231:10 232:11
237:11
**defense-related** 83:2
**defer** 236:16
**define** 73:23 186:18
**defined** 166:11,12 255:19
**defining** 255:23
**delay** 131:10 154:1 222:10
224:3,16
**deliberative** 120:21 220:14
**delineate** 116:7 135:22
**delineated** 187:23
**demonstrates** 215:17
**denial** 79:21 80:13,20 81:6
84:7,14 85:24 86:7,9,19
87:2,10 88:6 91:3 92:5 93:5,
6 98:2,8 109:16,19,21,24
110:14,25 111:6,14,15,19
119:16 125:20 145:14,18
146:3 161:22 162:8,12
208:20,23 210:6,24 211:25
212:3,8,12 213:5 215:11
220:24 222:3

**denials** 79:17 110:19 111:2,
4,24,25 112:1 131:18,20
132:12 145:20 146:12,15,19
147:17 148:1 151:22
161:10,11,21 207:2 223:14
226:8,17
**denied** 79:5,6 81:5 83:15,25
84:2,7 85:6,7,12,25 91:21,
22 92:3 94:1,13 99:19 108:9
110:21,22 124:15 132:1
145:6 158:14,17,23 205:4
207:8 226:25 244:2 246:8,
10 247:2,3 253:9
**deny** 204:13 205:6,16,23
**denying** 205:11,13
**department** 14:18 17:23
18:4 19:3 22:8 25:17 28:9,
11,19 29:3 32:10 38:8 47:14
50:19,21 51:5 56:22 57:4,8,
11 58:18,23 59:16 70:18
80:20 84:12 86:24 115:9
118:3 121:8 123:10 124:20
126:14 138:24 147:16
148:23 149:8,11 152:13,22
154:4 155:16 156:1 157:23
163:19 182:23 183:7 185:21
219:7,12 221:11 233:5,15
234:16 251:7 252:7 256:12
262:21,23
**department's** 96:22 115:16
127:4
**department-wide** 26:12 27:3
145:7
**departments** 25:11
**depend** 47:1 65:2,5 227:2,9
256:7
**dependent** 41:12 52:11
206:19 259:9
**depending** 61:17 77:6 120:9
149:18 181:7 186:21 188:23
204:17 208:4 228:8 245:16
257:7
**depends** 32:12 63:16,19
65:17 66:10 73:23 84:2
97:13 104:15 208:8 230:7
231:20 240:23 245:2 257:14
258:6 260:6
**deposed** 13:3,6,8,11,22
**deposition** 8:10 9:1,3 10:23
11:5,18 12:6,21 13:1 17:7,8,
11 22:10 29:23 36:11 80:3
92:9 129:23 157:11 173:22

184:9 212:2 237:3
**depositions** 113:17
**deputy** 18:25 19:18 21:14,23
33:23 118:12,20 120:15
121:2 158:4
**describe** 15:3 27:23 30:10
37:17 61:14 74:19 179:9
184:14 192:3
**describes** 30:15,21 81:1
175:3
**describing** 31:1 38:9,19
41:6 48:9 168:13
**description** 18:7 83:15
176:14 216:22
**desire** 154:3 171:8
**desk** 237:22
**detail** 215:8
**detailed** 97:1
**determination** 51:19 55:21
108:13 109:5 156:2 224:9
**determinations** 39:8 124:3
**determine** 37:24 39:25
40:16,24 45:8 51:23,24
53:14 56:5 177:21 185:20
186:23 201:17 207:7 255:20
**determined** 82:18,20 107:24
176:4 177:2 185:10 187:16
188:16 204:6
**determines** 127:20
**determining** 39:3 53:17
206:16 216:18
**develop** 41:1 50:18 86:8
90:6 106:16 132:23 133:17
175:23 227:15,16 242:2
249:8 257:2
**developed** 42:12 50:16,20
78:10 85:22,24 86:21
134:22 135:12 152:10 159:6
184:20
**developing** 50:22 132:15
133:1 161:4 169:4 172:1,17,
18 231:3 242:8 248:10
253:6
**development** 36:7 51:18
133:11 141:14 159:20
162:11 172:4 223:7 248:8
252:21
**develops** 86:3
**deviations** 170:10
**Devos** 8:15 22:13 130:11

**Devry** 73:22,24 99:8
**dial** 197:12
**Diane** 12:15 20:25 22:3 34:9
36:10 57:21 92:10 161:8
168:19 169:21 173:21
**difference** 123:2 250:24
**differently** 76:25 77:6
**difficult** 224:12 230:2
**difficulty** 224:1,4,22
**direct** 47:7
**directed** 100:14
**direction** 161:2,6 163:18
174:16,18
**directive** 102:9,10,17 103:7
**directives** 35:18 117:6 127:6
**directly** 21:18 22:1 56:14
57:5,12 118:25 171:7
**director** 15:19,24 18:2,24
37:1,14 56:1 68:16,23 160:5
**Directorate** 18:13
**disagree** 112:16 205:10
207:3 246:24
**discerning** 224:22
**discharge** 50:16,22 51:7
120:7,9 130:6
**discharges** 130:23
**discover** 246:13
**discovered** 196:14 232:12
**discovery** 13:4 66:7 112:15
117:21 156:13 200:16
234:20 236:21 249:6
**discretion** 142:10
**discuss** 12:25 28:2 113:2
114:17 151:10 229:18
**discussed** 93:24 169:22
213:24
**discusses** 39:9 257:13
**discussing** 175:12
**discussion** 56:3 91:17
123:19,25 124:5,20,22
154:10 160:23 201:16,25
257:24
**discussions** 27:11 56:3,12,
14 57:20 72:20 75:2 91:2
100:16 112:6,23 125:7
129:5 132:4 154:24 159:19
189:16 232:10
**dismiss** 82:12
**displeasure** 130:13 131:2

**disposition** 124:8 152:1
**disseminated** 195:3
**distilled** 240:3
**distinction** 28:18 194:19
**distorted** 164:15
**distortion** 108:25 116:22
127:17 162:15
**distribution** 62:14
**dive** 202:13
**divided** 144:1
**division** 15:2 51:5
**document** 17:1,14,18,19
29:19 30:5 37:3,7 39:19
64:13,23 77:1,3 80:6,11,16,
18 81:13 90:20 92:20
117:14,17,21 119:9 130:2,
11,16 157:14,21 158:9
174:6,9,12,14,25 177:7
184:12,14 190:15 191:2,19,
22 192:2,3 193:4,8,14 199:6
204:4 209:4 212:3,5,9,13
232:21 234:2 236:20 237:7,
19,23 238:9 239:8,11 240:6,
9 241:21 243:8 257:23
259:5
**documentation** 61:12 96:5
97:16 182:7,9 183:24
201:23
**documented** 233:20
**documents** 13:4 18:20
39:23 43:7 49:6 59:8,15
67:23 73:12,18 74:5 76:9,16
97:11 103:23 104:1 114:22
115:25 116:2 134:20 175:21
179:24 182:24 196:19 200:8
205:23 234:11 236:8,22
251:7
**DOJ** 12:7 43:17 236:16
**double** 177:4
**doubt** 195:14
**dozen** 23:2
**dozens** 49:23
**draft** 75:24 110:12 162:20
190:16 191:16 208:20
209:1,7
**drafted** 91:9 110:8 237:10
**drafting** 87:25 89:8,15,17,19
131:22 209:11 238:25
**drafts** 239:7
**dramatically** 22:20

**draw** 28:17 194:19
**driver's** 9:19
**drop-down** 81:25 82:5 85:14
95:10,11 261:10
**drop-downs** 85:14
**Dropbox** 17:1 29:18 37:9
79:23 92:7 129:23 157:9
173:19 184:3 237:1
**dropped** 197:13
**due** 25:6 67:24
**duly** 10:16

---

## E

**earlier** 93:24 94:11 100:4,23
102:12,14,21 106:9 109:17
151:25 161:14 165:3 168:6
175:12 194:14 212:1 228:19
233:1 248:8 259:20 262:9
**earliest** 209:5 221:13
**early** 25:8 33:7,13 68:13
102:16 122:20 125:21
132:5,12 139:25 152:25
153:12,15 154:11,16 163:15
233:16 256:2
**earning** 170:13
**earnings** 170:16
**easily** 236:8
**ECF** 79:24 81:14 92:8,16
98:8 173:20
**ECF56-4** 17:2
**Ed** 51:10 213:1,6 215:17
**edited** 110:11 189:15
**EDMC** 49:21
**Education** 14:18 18:5 29:4
57:4 175:9
**Education's** 56:23
**effect** 75:25 76:3 77:22 78:4
88:21 102:12 120:18 126:5,
19 146:14 195:8 222:6
224:7 233:14
**efficient** 221:9
**efficiently** 178:19 221:4
**effort** 63:18 88:15 170:12
209:17
**Eileen** 212:5,7
**Eitel** 34:25 57:22
**electronic** 11:6
**electronically** 81:12

**element** 39:15 45:16 79:8,9
201:8 206:22 242:5
**elements** 39:14,25 45:17
79:18 109:1 180:21 181:6,
25 206:18 227:8
**elevate** 194:16
**elevated** 195:21 200:23
201:1,10,24 202:2,21 203:2
**eligibility** 83:8
**eligible** 104:13 155:8
**eliminate** 102:7 164:4,15
**eliminated** 102:3 230:1
233:18
**elimination** 101:22 102:16,
17,21
**Elisabeth** 8:15
**ELLIS** 9:15 10:19 17:4,13
29:25 31:11 37:5,8,12 57:25
58:7,15 68:10 80:8 89:5
92:6,12 94:20 105:21 106:7
112:10,16,22 113:15,20
114:4 117:3,23 120:22
121:1,19 124:7 130:1 131:6,
9,13,14 136:10,25 156:14,
17 157:3,7,13 165:5,16
167:18 168:1,10 170:21
173:24 184:6,11 197:4,10,
23 198:9,15,18,20,25 211:9,
16,23 222:18,23 234:21
235:4 236:7,14,24 237:6
262:1 263:17,21
**else's** 189:9
**email** 11:5 60:18 73:10
189:5 194:11,24 195:1,18,
22 196:6 204:14 217:12,13
**emails** 87:22 215:2
**emerging** 252:10
**employment** 41:21,22 42:24
44:15 49:18 52:23 93:7,9,
17,25 94:12 122:8 182:11,
16 195:20 196:2 199:24
213:11 238:2,5 240:17
**employment-prospect**
48:16 200:1
**employment-prospect-itt**
78:12
**employment-prospects**
41:17,20 42:11,18 43:4 62:1
85:23 93:14 135:13 231:1
240:2 241:4 242:10,20

**employment-prospects-
type** 243:3
**enclosed** 191:1
**encountered** 60:20
**encourages** 97:1
**end** 26:8 45:14 54:10 69:1
94:8 108:9 140:13 143:7,25
168:20 173:14 181:3 185:24
193:18 194:1 208:21,24
209:23 210:6 212:9 218:25
221:22 223:9 225:22
**ended** 27:3 145:7
**enforce** 113:14
**enforcement** 13:19 18:3,12,
13,24 19:11,19,21,23,25
20:4 21:11,13,16,22,25
26:16 32:18 33:1 55:23
59:11,14 68:18 103:1 118:2,
8,13,21 125:22 129:13,17,
19,20 256:11
**engaged** 93:8
**enhancements** 217:8
**enlisting** 66:23
**enroll** 82:16
**enrolled** 98:3,10 177:25
180:14 181:10 188:1 244:12
**enrollment** 244:10
**enter** 8:23
**entered** 217:23
**entering** 154:22
**enterprise** 259:4
**entire** 222:21
**entirety** 57:8 218:7
**entitled** 124:10,12,21 191:24
**entitlement** 126:25 152:3
**entity** 215:3,4
**entry** 85:19 127:25 128:6
**equation** 121:15
**Erin** 23:17
**error** 142:19 261:12
**escalate** 105:3 199:15 203:7
**escalated** 182:3 201:14
**escalating** 203:8,9
**essentially** 45:23 48:19
101:25 103:6 106:17,18
110:5 119:24 127:14,17,18
142:11 147:20 179:21 182:4
186:24 205:20 219:5,8
260:24

**established** 100:22 251:13
**establishes** 234:6
**estimate** 84:6 134:1,6
**eventually** 127:13
**Everest** 237:14 238:16
**Everest/wyotech** 237:2
**evidence** 39:4,6,12,15,17,22
40:16,21 41:1,11 44:2,3,5,7,
9,17 45:1,15,21,22 46:1,3,
19,22 47:1,6,8,15 48:4,6,11,
14 49:11 51:17 58:19,20,21
59:10,19,21 60:10,12,14
61:9 62:19 63:16 65:8,11,14
69:4,8,12,13,16 70:20
72:12,13,17,24 74:10,15
76:2,18,24 77:9,15 79:3,12
81:9 84:2 85:4 95:1,5,8,10,
11,15,16,18,25 96:7,11,14
97:2 98:14,18 99:6,13,17,19
100:1,5,12,13,24 101:1,8,
14,15,16 103:21 104:8,9,12,
21 106:23 107:4,9,12,16
108:4,7,8,22 109:6 132:20
133:2 134:3 143:3 145:24
163:11,12 172:17 173:3,17
175:4,15,19,22 176:5,8,15,
18 177:3,12 178:6,22,23
179:1,12,21,22 180:2,4,17,
20 181:1,5,13,14,21,25
182:1,13,17,21 183:10,21
184:19 185:11 186:22
187:12,16,23 188:5,17
194:3,8,15,17,20 195:4,7,
14,15 196:15 199:7,8,9
200:24,25 201:4,6,7,13,17,
22 203:9,14,19,20 204:5,6,
12 205:2,7,9,12,13,19
206:12,16,21 210:9 214:3
215:17,22,23,24 216:3,6,10,
17 217:16 226:3,5,6,24
227:7,11,15,18 228:2,6
232:12,16,25 235:6 238:10,
19 239:6,10,11 240:12,21,
23 241:1,9,17,19,21,25
242:11 245:19 246:13,18,19
247:4,5 248:1,12,14 249:6,8
250:7,18 251:14,15,20
253:13,14,17,25 254:8,22
255:2,6,19,24 258:7,12
261:8
**evidence-exchange** 36:5
**evolved** 104:10 235:14

**evolving** 249:4
**exact** 42:7 47:18,19 61:23
  65:5 140:21 217:4
**EXAMINATION** 10:18 262:7
**examples** 192:5,20
**exceeding** 141:18
**Excel** 133:13
**exception** 50:9 53:23 210:15
  211:10
**exceptions** 259:1
**exclude** 59:6
**exclusions** 175:16,18
**excuse** 14:14 139:11 147:24
  164:9 198:3 253:23 262:21
**exhibit** 17:5,8,10,11 29:22,
  23 36:14 37:10 80:2,4 92:9,
  11,24,25 98:1,22 115:1
  129:22,25 137:3 157:8,11,
  12 173:21,23 184:4,8,9
  190:24 208:13 212:2 237:3,
  4
**exhibits** 81:2
**exist** 40:13
**existed** 174:25
**existence** 87:11 155:21
**existing** 84:19 183:20
**exists** 183:10 219:10
**expand** 152:18
**expanded** 213:24
**expanding** 72:10
**expansive** 172:7 214:14,15
**expect** 96:6 228:4 232:23
  239:18 249:14
**expectation** 96:10,15
  161:24 227:5
**expected** 227:10,25 229:8
**expedited** 138:25
**expensive** 82:25
**experience** 108:5
**expert** 153:5 159:21
**expires** 220:1
**explain** 28:20,25 44:2 131:7
  159:7 175:14 203:13 250:4,
  23 262:16
**explains** 215:11
**explanation** 216:11
**exploration** 72:4
**explore** 69:11
**explored** 225:5

**expressing** 131:2
**extend** 16:5
**extended** 25:10 219:1
  233:12
**extending** 25:2
**extensive** 105:19
**extent** 41:23 57:9 72:6
  101:12 105:10 115:23,24
  123:22 156:10 169:17
  177:20 183:4 187:9 214:16
  224:18 250:21
**external** 233:6
**extreme** 130:13
**eye** 71:10

**F**

**fact** 69:9 119:1 137:25
  160:19 162:9 218:23 232:25
  238:25 240:20
**fact-finding** 73:19 75:18,19
  126:15 241:15
**factor** 215:6 224:15,17,19,
  24 225:7 226:21 260:16
**factors** 52:9 54:12
**facts** 30:8 39:8,10,24 45:16
  135:20 172:4,18 179:20
  239:18 250:19,20,24
  251:12,15 254:6,7
**failed** 79:1 84:8 242:6
**fails** 82:19 93:10
**failure** 81:24 82:6 84:1,14,24
  85:12 93:11 94:1,14 205:14
  211:1,6 213:12,15 261:7
**fair** 59:19 72:7 133:10 184:1
  206:24 207:10,15 210:8
  215:13
**fairly** 20:23 25:9 27:25 61:24
  105:19 149:16 153:6 203:4
  226:2 252:11,18 257:20
**fall** 22:23 23:23 52:2 70:16
  71:14 102:11,19 160:15
  165:2 167:2 169:5,23 171:5
  185:11 186:1 187:10 226:3
  228:24 253:16,21,24
**fallen** 253:10
**falling** 226:24
**falls** 100:8
**familiar** 11:21 157:14 159:12
**fashion** 125:4 139:1

**fast** 232:23
**faster** 227:10
**fault** 15:17
**February** 112:25 114:5
  164:22 219:2
**fed** 128:7
**federal** 18:3,9 24:25 28:6,10,
  23 57:8 90:24 113:19
  233:11
**feedback** 202:10 204:10
**feel** 112:18
**felt** 75:21 223:16
**fewer** 142:24
**FFEL** 52:7
**field** 88:18 91:18
**fields** 87:17,19
**figure** 194:2 209:9 218:24
  219:22 220:1 241:18
  244:20,22 256:17 261:15,21
**figured** 228:11
**file** 29:20 236:4
**filed** 18:9 65:11,12 82:11
  183:15
**files** 169:1 185:1
**filing** 70:3 80:12 92:16 98:9
  173:25 174:1,7,24 175:1
**fill** 24:12 81:18 88:19 91:19
  213:20
**filled** 81:23 82:1 90:13 220:7
**final** 47:10 54:23 55:8 65:12
  89:23 90:2 126:19 146:16,
  18 177:16 191:3,5,19 202:3
**finalized** 87:23 88:1 139:19
  162:8 170:1 189:17
**finalizing** 88:2
**finally** 203:3
**financially** 8:20
**find** 21:3 62:21 66:17 87:9
  148:4 187:25 216:21 244:16
  245:17 247:4 260:10
**findings** 45:15 55:14 142:14
**findings-of-fact** 239:8
**fine** 18:21 59:4 136:11,17
  256:12 263:21
**finished** 41:21
**firm** 14:9,11
**first-level** 205:6
**fit** 47:7 83:15 145:23 176:21
  177:11 183:20 186:3 193:12
  200:24 201:4 235:23

**fits** 48:4,5 142:20 176:13
 201:6 241:12
**fitting** 49:11
**five-minute** 105:22 167:19
 211:11
**fix** 168:2 197:24
**fixed** 168:2
**flag** 63:3 248:6 249:11
**flagging** 104:22
**flip** 80:17 81:10 145:10
 208:14 238:8
**Flipping** 122:3 139:4
**flooded** 73:11
**flooding** 74:12
**flows** 144:2
**focus** 86:13 100:21 139:1
 142:9 164:20 225:7
**focused** 44:22 71:6 138:16
 161:4 163:10 164:2,12
 225:24
**focuses** 15:12
**focusing** 218:5 220:8
**folder** 236:13
**folks** 13:6 24:16 25:18 75:9
 82:24 86:10 87:6 88:16 94:8
 103:3,16 155:2 167:13
 168:20 169:22 170:11 220:8
**follow** 36:16 54:24,25 64:21
 65:1 162:17 169:7 208:19
 249:2
**follow-up** 189:15 262:6
**food** 224:14
**forbearance** 120:11,13
 132:3 218:16,23 219:2,15,
 21
**foremost** 142:8
**forgetting** 59:25
**forgotten** 122:13
**form** 31:10 42:8,12 80:13,20
 81:5,10,16 83:10,11,15
 84:7,13 85:24 86:1 87:2,9
 90:6,12 92:5,21 93:4 96:21
 109:16 110:8,14,19 111:7,
 11 122:17 162:7 183:1
 191:19 208:23 209:15 210:6
 213:4,20 215:5 220:23
**formal** 20:8 166:14,19,23
**formally** 166:9
**format** 109:18 235:24
**forms** 44:8 58:23 80:14 86:8
 109:22 111:19 204:17

213:22
**formula** 127:18,20
**formulate** 154:4
**Fortune** 243:11
**forward** 40:22 43:14 48:10
 71:9 74:23 100:15 101:2,20
 126:8 133:25 135:2 140:17
 144:2 151:20 203:15 218:10
 253:15
**Foss** 160:6 168:19 169:7
**found** 61:3 232:8
**frame** 153:23 225:14
**framed** 96:9 170:2,6 176:24
**framework** 55:20 56:7
 219:10,11 254:17
**free** 112:18
**freeze** 25:9 26:9,13,24 27:3
 68:15 145:7
**frequent** 204:16
**frequently** 28:2
**frog** 173:20
**front** 96:11
**front-end** 227:23
**froze** 111:10,12 165:9
**FSA** 13:10 19:1 20:12 21:6
 25:11,15,17 28:18,21 31:9,
 15,19,23 32:18 34:22 35:22
 56:20 58:23 76:21 86:14
 88:17 97:24 102:25 103:5
 120:2 121:15 126:10 127:7
 141:7 147:11,12 149:2
 150:3 160:8,16 161:1
 166:11 229:5 248:12
**FSA's** 56:19 165:23 166:7
**FTC** 59:11
**fulfill** 79:7
**full** 105:11 207:23
**full-time** 23:10 103:18
 143:17 171:12,24
**fully** 214:21 225:5 230:1
 254:6 255:2
**fulsome** 216:11
**Fun** 13:24
**function** 58:24
**funding** 59:7
**funny** 13:16
**FYI** 151:18

## G

**G-A-R-R-Y** 23:14
**Garry** 23:13
**gather** 217:16
**gathered** 152:22
**gathering** 49:6
**gave** 137:12 141:2 214:23
 261:15
**GC** 88:21
**general** 12:8 14:19 16:9,12
 17:23 28:13 43:21 48:15
 54:4 55:11,14 56:16,18,19,
 20,21,23 57:6,11 59:12
 69:3,15,16 75:4,11 77:8
 86:25 88:23 107:2 115:17
 125:24 126:11 156:8 158:7
 173:7 194:21 232:16 233:25
 248:11 258:25
**general's** 44:13 234:10
**generalization** 202:17
**generally** 12:17 16:15 18:20
 20:25 34:15 39:21 44:22
 54:21 55:20 61:7 63:12 71:7
 82:22 86:6 100:4 117:20
 166:16 173:15 185:2 186:22
 190:11 202:1 204:9 236:3
 246:6,7 250:12 257:14,19
**generic** 257:20 258:4
**get-go** 164:5
**give** 47:19 61:23 65:4 79:22
 134:6 158:6 183:2 190:8
 195:9 196:17 206:24 259:7
**giving** 83:16 158:12 160:23
 206:24
**glitched** 102:13
**global** 160:18
**globally** 74:16
**goal** 16:3,18,22 166:24
 167:9 178:7
**goals** 16:1,8,13,17 166:8,12,
 13,14,23
**good** 52:3 55:20 61:24 62:14
 88:15 143:18 167:4 189:25
 225:8 228:10
**gosh** 32:22
**governed** 156:3
**globally** 74:16
**government** 11:23 12:20
 24:25 80:13

government-issued 10:10
grade 145:8
grads 24:19
graduate 14:1
graduated 14:6 192:25
grant 149:11
granted 50:6,7 107:19
    108:19 109:11 125:13
    176:16
granting 49:14
grants 149:23 150:4 154:2
gray 87:16
great 11:12 13:21 58:3
    191:23 211:13 236:15
green 87:7 133:24 233:23
groundwork 220:25
group 18:11 24:21 44:19
    50:13,16,22 51:6 59:3 60:8
    70:18 73:23,24 74:1 86:16
    98:16 175:8
groups 47:21,23 59:18 73:6,
    20
guaranteed 122:8 182:12
    195:20 196:2
guess 9:23 32:24 55:22
    65:25 73:22 97:13 107:17
    118:11 125:15 129:14 154:7
    164:21 169:16 172:12
    175:14 183:13 199:16
    213:8,14 224:19 229:14
    243:21 251:25 257:14
guessing 61:22 162:23
guidance 182:24 199:5
Guys 197:1

## H

half 94:9 109:14 111:10
    172:15
hand 89:18 128:16
handed 127:14 189:18 259:5
handle 71:5 120:6 131:25
    209:9 221:4
handled 119:20 120:2
    138:25 142:19
handling 14:23 63:19 119:7
    120:1 217:5
handouts 200:12
happen 50:2 162:1 189:10
    194:4 196:5,21 213:22

227:17 260:4
happened 26:19 68:6 71:12,
    20,25 139:15
happening 154:21 256:10
happy 130:22
harassment 83:2
hard 79:23 92:7 123:13
    157:8 237:1
Harvard's 59:20
hats 21:17 31:13,18 32:8
head 84:11 88:9 137:9
    180:11 235:10 257:10
heading 80:19 212:13
    216:22 238:11
heads 73:10
headway 50:3
Health 178:2 180:15 181:10
hear 165:14,17,18 197:9
    198:11
heard 27:16
hearing 174:3 197:2 198:14
heavily 135:19
heavy 40:5
held 8:5,8 32:20 162:14
    172:23 255:5,7,13 262:11
helped 143:14,22
helpful 66:9 67:2 73:13 74:6
    164:18 183:4 216:5
high 134:7
higher 51:9 143:19
highlighted 87:15
highlights 87:17
hire 24:13 25:13,19,20,23
    26:4,9 141:12
hired 19:23 22:25 25:3 33:10
    142:4 143:18
hiring 23:23,25 25:8 26:9,
    15,24 27:3,8 68:15 145:7
    171:3,4,17 229:24
historically 185:5
hit 100:20 103:20 144:18
    164:24 186:5 229:8
hits 185:20 186:10
hitting 144:5
hoc 20:5 22:5
hold 9:18 47:9 63:4 122:15,
    25 140:15 147:16 159:3
    162:4,22 175:23 194:2
    204:7 253:20

holding 46:17 132:11
holiday 231:16
honest 110:15 196:22
    256:21
hope 235:13
hour 58:1
hours 12:23
huge 247:21 256:8
humans 261:3
hundred 186:14 240:14
    258:8,13,18,20 259:2,11
hundreds 53:2 231:16 261:2
hurdle 181:6 195:10
hurdles 188:10
hyperlinked 192:1
hypothetical 51:11 259:8
hypothetically 50:24 104:14
    135:7
hypotheticals 258:5

## I

Ian 160:6 168:18 169:7,15,
    21
ID 10:11
idea 28:15 75:13,16 122:2
ideal 260:18
Ideally 240:22
identification 17:12 29:24
    184:10
identified 30:10 58:18 62:20
    239:20 241:8 251:13 261:6
identifies 39:16 187:20
    202:9
identify 30:7 35:17 199:17
    215:16 236:8 243:25
identifying 177:1 216:6
identity 10:11
IG 116:25 117:11 118:7
    133:11 134:9 138:1 140:7,
    12 141:13
II 185:18 188:18 191:24,25
illegal 82:11
Illinois 14:14,20
imagine 13:8 167:3
immediately 117:8 217:11
imminent 125:3
impact 151:19
implement 128:3 160:2

implementation 32:2 127:10
159:25 160:4,6,11
implemented 127:7
implements 28:10
implications 141:6
important 77:2 207:1
improve 208:20 232:7
improvements 42:6
in-box 74:12
in-person 238:12
in-state 64:21
inaudible 165:7 196:25
inauguration 113:6
include 83:5 91:17 105:10
107:1 178:23 199:21 212:20
215:25 242:21
included 43:23 74:8 93:23
95:13 100:6 102:25 116:6
137:8 143:3 190:10
includes 175:11 190:12
192:22
including 57:8 99:7 141:20
243:5
incoming 232:4
incomplete 64:20
incorporated 77:8
incorrectly 213:2,6
increase 26:18 139:8 140:24
141:2
increased 170:25
incredibly 227:23
independently 243:14
index 234:3
indication 183:3
indiscernible 130:24,25
196:18 200:7 209:8
individual 38:3,23,25 46:25
47:22 48:3 51:3 53:5,6
65:18 73:8 74:13 104:17
111:6,8,13,15,24 186:16
194:25 206:12 227:9 228:2,
7 240:10 241:20
individually 61:10 74:14
77:13
individuals 28:12 38:22
111:5,18
ineligibility 216:19
inform 29:6
information 9:22 64:22
66:17 70:22 76:14 77:7 88:5

97:1 108:3 110:14 114:24
116:5,20 120:20,21 123:23
138:4 152:23 156:7,11
196:24 204:23 212:19
214:18,23
initial 11:21 25:3 42:12,25
110:11 253:12,13
initially 103:12
initiate 70:17,18
initiated 99:5
injunction 147:15 148:11,23
149:4,6,25 150:3,10,18
153:19,21 154:3,12,19,21
155:7 262:21
input 36:2,9 88:7 169:17
inputs 128:1
inside 187:2
Inspector 115:17
instance 65:17 69:14 70:21
185:13 187:8 239:15 240:13
instances 127:11 260:10
Institute 15:9 50:10 93:8
98:3,11,13,15 99:8,14,17
100:2 175:11 240:14 241:3
242:9
institutes 49:23 185:14
instruct 113:13 251:20
instructed 163:6
instructing 32:10 33:2
112:10 169:6
instruction 34:16 163:22
189:3,4 191:25 193:22
194:7
instructions 32:4 34:3,21
48:2,18,23 49:1 104:17
105:6 132:2 187:11 203:6
instructs 12:1
insufficient 84:2 94:17 95:1,
6,11,13 97:6 99:19 232:1
261:8
intake 64:25 217:18
intend 47:19
intended 110:16 171:10
intending 16:20
intent 91:12 262:23
intention 70:11
intents 42:8
interacted 87:6
interactions 8:8
interchangeably 64:10

interest 103:12,13 121:13
122:19 132:6
interested 8:20
interface 8:9
internal 232:20
Internet 60:3 186:6 251:9
interrogatories 29:11
208:13
interrogatory 29:21 30:2
89:3 208:15,19
interviewing 24:2 229:24
introduced 173:21
investigate 70:24,25
investigated 59:13
investigation 15:7 44:14
69:17 70:3,6,19 138:2 140:8
195:24
investigations 65:19,21
66:3,16,19 67:4,8,17,21
68:1,4,16,19,23 71:4,22,24
invite 74:9
involve 51:19 220:11
involved 15:10 28:16 31:20
35:3 51:9 57:20,22 59:14
75:1 86:11 89:8,15,22 90:2
91:1 103:3 127:22 152:12
158:8 159:19,22 160:20
237:18,24
involvement 169:3
involves 52:7
involving 227:11 234:18
is-it-false 180:24
issuance 119:6 161:21
162:17
issue 26:23 35:25 41:12
45:25 56:4 63:3 72:25 96:8
101:3,19 104:22 131:20
147:10,17,22 148:1 151:6
161:11 168:5 170:4 203:25
219:19 223:9,13,14,15,16,
19 225:8 227:21 232:21
248:4 254:10,11 260:7
261:17 263:7,11,14
issued 79:17 99:25 111:2
127:6 146:24 147:6 149:4,
24 154:12 161:12 170:3
219:4 222:13 223:1 224:13,
24 225:20 230:8,9 232:18
262:12 263:2
issues 14:22,25 15:11 21:3
28:2 29:7 38:4 57:10 58:25

66:24 67:16 72:20 83:2
121:16 134:10 164:2,13
168:3 181:22 234:18
**issuing** 101:10 126:3 132:11
147:8,11,12 148:2 151:1,22
154:2 171:1 221:16 222:10
224:3,16
**item** 127:3 212:24 213:1
215:16
**items** 218:12
**iteration** 209:5
**ITT** 41:19,22 42:18,23 43:4,
23 49:17 50:8 52:22 53:3
54:3 57:16,17 61:21 78:11
79:13 81:4 85:22 99:7
103:17,21 108:18 109:10
128:25 132:17 135:11
150:16 152:14,18,24 154:18
159:16 179:20 180:5 206:6
210:11 226:1 230:24,25
238:5 247:22 256:22
258:14,15
**IV** 59:7
**Ivy** 186:3

---

**J**

**J-** 140:17
**J-O-Y-C-E** 23:17
**James** 33:6,18 34:5
**January** 42:13,16,19,20,21
50:10 112:5,25 114:5 122:6,
9 130:7 222:14
**Jeff** 169:6,15,21
**Jeffrey** 19:14 103:2 168:18
169:6
**Jim** 30:21 31:13,16 32:7
137:14,15 138:10 141:7
**job** 14:7 18:7 24:1 70:23
150:10 155:23 167:2,3
182:12 192:21,25 206:4
243:9
**job-placement** 110:21 243:7
259:4 262:20
**job-placement-rate** 41:16
110:2,3 111:25 142:9
145:21,24 148:20 218:3
223:21 225:18
**job-placement-rate-
misrepresentation** 84:23
85:9

**job-placement-rates** 42:3
**jobs** 14:13 24:5
**Joe** 8:16 10:7 197:17 263:22
**John** 23:14 196:8,10 257:21
**Johnson** 33:11,15,16
**join** 144:7
**joined** 14:15 42:4 97:9 129:8
231:24
**joins** 207:23
**Jones** 12:15 17:8 20:25 22:3
34:9 57:21 80:3 92:10
129:23 157:11 161:8 168:19
169:21 212:2 237:3
**Jones'** 22:10 36:10 173:21
**Joyce** 23:17
**JPR** 110:25 111:22 122:10,
11,15 137:5,17,21 138:5,8,
15,16 140:4,17 150:5
152:10 155:6 156:20,22
163:8 206:6
**judge's** 17:5 113:16
**judged** 108:13
**judgment** 61:3 62:23 65:13,
25 66:11,12
**judgments** 65:6,7
**Julian** 19:16,17 26:15 27:8
31:5,12,14 32:9,17,25 33:9,
14,19,24 68:17 137:24
138:10 140:18 141:4
**July** 77:22 99:24
**jump** 188:10
**June** 146:25 147:4,9,13,19
152:6
**junior** 23:3 24:19,21 40:4,6
63:2,15 104:25 190:1
203:12
**justice** 17:23 45:5,13 46:16
48:21 70:23 71:17 187:5
**Justin** 114:13 116:6 148:6,8

---

**K**

**K-A-Y-E** 19:24
**Kathleen** 33:24
**Kaye** 19:24
**keeping** 71:10 141:22 164:3,
13
**Kim** 19:17 118:13,21 120:15
121:2 122:14 134:18,24

**kind** 15:11 25:1 26:12,23
34:13 36:7 38:6 39:2,22
40:10 46:8,17 60:23 61:2
65:7 68:21 71:14,24 73:15
75:9 77:3,5 79:2,10,18
82:13 84:21 86:16,21 87:13,
15,18 88:19 89:23 101:3
103:20 104:10 105:12
107:6,9 119:22 121:16
128:6 131:21 132:6,20
133:17,22 134:13 136:3
142:21,22 143:1,4 144:1,16,
20 151:18 153:4 155:2
158:6 160:18 161:1 164:2,
13 169:10 172:14 177:4,16
179:5 180:3,10 182:11
183:24 184:18 185:24
186:2,8,11 187:22 188:12
189:18 190:17 192:4,6,19,
23 193:2,6,16 195:14
199:24 200:9 201:11,19
203:3,7 204:18 206:15
208:8 210:21 211:6 217:8,
19 219:13 220:13 221:1,2,4,
8 226:14 229:4 230:9 234:3
235:14,23 239:17 240:4
243:10,23 244:5 247:25
248:23 251:6 256:11
257:19,22 259:5 260:24
**kinds** 60:10 66:24 176:4
179:23 183:3 192:19 193:17
194:5 199:20 241:14 260:3
**knew** 68:24 153:12 227:6,12
229:11
**knowing** 183:19
**knowledge** 30:8,11,16,21
31:1,22 32:1,4 115:18,23
117:15 119:3 125:6 262:24

---

**L**

**labeled** 37:4
**labor-intensive** 116:23
**lack** 85:16 205:13
**lacking** 79:11
**laid** 126:6,12
**land** 54:21
**landing** 113:4,10
**lane** 75:10 230:10
**language** 97:3 259:17
**large** 187:9 247:8 248:2
256:23

largely 226:21
larger 194:10,21 241:13
lasted 25:9
late 33:13 76:4 110:4 153:8
234:8
Laura 19:17 118:13 122:14
134:18,23
law 14:4,6 24:18 37:22 38:1,
10,19,25 39:9,13,16,24,25
51:19,24 52:16 53:6,16,18,
22,25 54:18,19,25 55:8,15,
24 56:6,13 57:15 59:11,14
74:2 78:9,16,21,23,24 79:3,
8,19 82:20 90:13,15,22
91:2,18,21,22 92:2 109:1
155:14,17,24 156:4,19,24
173:4 181:7 206:20 215:19
224:23 225:4,5 256:11
laws 38:4
lawsuit 15:7 53:8 65:10,11,
15,24 69:10,11,12,15,18
70:2
lawsuits 65:7 69:5
lawyers 170:10
lay 207:9
lays 207:6
LBJ 25:16,18 33:23 35:5
56:5,16 87:6 102:23 103:17
118:24 159:23 160:2 169:9
233:9
LBJ's 56:18
lead 15:6 67:22 82:11 105:1
214:24 242:4
leadership 25:14,15,16
86:24 115:10 157:24,25
158:7 163:19 169:9
leading 63:18
leads 160:7
league 186:3
learning 144:9
leave 171:22
led 69:18 249:20 256:16
left 17:7 24:11 33:7 101:13
226:11
legal 8:17,22 37:15,17 38:2,
7 39:9,11,20 43:8 57:7,10
61:13 93:11,18 94:2,14
123:20 134:20,22 135:20
172:5,10,18 213:12,16
227:16 242:2 254:8

letter 74:7 83:20 84:7 85:24
87:20 89:19 90:13,16 91:4,
9,13 92:5 93:13 94:4,16,25
95:5 98:2,8 99:23,25
109:22,24,25 110:1,5,7,8,9
131:23 146:9,11 208:23
209:12,15 210:20 211:25
212:3,9,12 213:5 215:11
261:5
letters 75:24 78:18 79:16,22
80:14,15,20 81:2,6 82:2
84:14 86:1,3,4,7,9,17,18,19,
20,25 87:2,10,23 88:6 89:9,
15 90:6 109:19 111:7,8,14,
16 162:8,12 208:21 209:1,6,
7,11,20,21 210:6,22 214:17
220:24 260:5
level 58:21 96:7 125:7
132:22 196:24 206:17
224:15 258:11
levels 24:15
license 9:19
licensing 38:5
lieu 9:4
lifting 40:5
light 87:7 133:24 233:23
likelihood 260:17
limitation 113:14
limitations 54:13
limited 44:17 49:18 72:9
141:20 187:3
line-by-line 190:18
lines 13:5 31:4 36:6 49:16
54:1 55:17 82:17 87:22
115:25 167:6 170:14 191:15
198:10,21 217:19
list 30:25 33:11 35:1 37:13
73:18 74:5 146:9 153:3
173:20 183:8,16 212:19,25
215:14
listed 89:2 91:3 159:4 175:5,
8,16,18 178:22
lists 80:25 93:5
litigated 53:7
live 54:7 153:8
lived 53:12 54:8,9
loan 14:22 52:12
loans 14:25 15:5 52:7,12
82:24 119:7,19 120:1,6,10,
13 130:6,24 160:19 218:15,
23 219:4,15 254:10,11

located 8:18 54:1
log 167:12
long 12:19 40:18 71:20
89:19 121:25 132:10 144:19
153:22 202:1 208:8 217:22
219:21 222:10 263:22
long-standing 160:13
longer 73:2 122:24 123:5
186:11
longest 218:5
looked 54:19 62:3,22 133:25
135:23 150:20 179:13
228:16 257:18
loop 87:13
loosely 185:2
lost 25:6
lot 16:19,21 20:7 40:19,20
43:20 49:16,25 52:10 54:12
58:22 60:6 67:13 73:11
86:10 89:20 100:16 103:12,
13,23 104:5 108:6,7,8
114:23 125:2 132:11,23
133:9,20 134:11 138:20
142:19 143:5 172:14 178:14
179:15 181:3 182:9 194:5
214:25 224:6,8 225:14,16,
21 226:11,20 228:8,9
229:21 231:7,14 232:4,19
242:19 245:1,3 256:6
258:16
loud 11:19
low 104:24 199:13 203:6
231:15,17
lunch 136:11

## M

M-E-O-L-I 88:11
M-I-N-O-R 13:17 18:23
made 27:14 29:2 42:6 43:13
50:3 54:2 55:14 63:8 75:23
82:15 84:23 85:2,8 90:8
95:21 97:24 102:24 119:15
120:23 124:3 137:16,20
138:10 147:16,21,25 151:5
152:17 155:1,2 156:1
161:14 163:15 171:5 214:12
219:17 224:9,12 238:22
243:24 259:23 262:10
mailed 83:11 234:10
main 15:12 16:3 36:21

114:13 119:23 174:7 222:12
233:15
**major** 66:19 67:14 125:4
158:16 224:23
**majority** 24:18 61:8
**make** 26:1 28:6,18 30:6
45:2,6 47:4 48:13 54:23
55:21,25 71:23 75:5 79:1
80:5 82:10 96:13 97:6
115:11 118:3 123:12,14
138:4 144:13,24 160:1
167:14 168:7 180:14 181:12
182:20,23 183:7 191:12
192:6,14 202:16 204:1
206:23 210:22 214:10 221:7
227:4 232:2 235:18,23
240:25 241:3 242:10 244:1,
5 246:7
**maker** 27:10 55:8 146:18
148:9
**makes** 28:9,19 108:1 160:3
173:15 177:5
**making** 25:18 48:16 71:1
104:20 111:23 118:16,22
122:20 123:11 136:1,15
138:14 144:10 150:5
179:16,23 195:1,5 259:12
**managed** 119:7
**management** 86:15
**managers** 21:6
**mandate** 163:21 178:19
228:20,23 229:4,20
**manner** 9:11
**Manning** 30:21 31:13,16
32:7 33:18,21 34:5 129:24
137:15 138:11 140:19 141:8
**Manriquez** 147:15 148:12
149:25 150:3,17 151:8
153:19 155:11 161:5 262:20
**manual** 76:20 77:4 182:15
200:4
**map** 234:4
**March** 115:9,18 122:6
164:22
**Marinello** 158:19
**mark** 12:15 13:7 17:4,9
21:18 27:20 29:22 34:11,17,
22 35:6 86:11 87:4 89:24
101:25 102:24 163:25
164:11 169:6 174:8,9 184:7
233:22

**marked** 17:11 29:23 36:14
37:10 80:2 92:9 98:22
157:10 184:7,9 237:2
**mass** 14:24 15:4 179:11,15
**Massachusetts** 14:15,19
**master** 155:21
**match** 158:3 186:19
**matches** 258:24
**matching** 188:11
**material** 77:5
**materials** 17:1 44:13 60:7
61:2,12 62:2 66:6 70:8,10
96:18 117:7 173:19 176:2
184:3 199:12 200:12,16,20
228:9 234:1
**math** 101:25 170:11
**matter** 8:14 9:7 11:21 16:12
90:6 142:11
**Matthew** 33:8
**maximize** 163:7,16,23
**maximizing** 167:9
**meaning** 110:22,24
**meaningful** 201:15
**means** 11:6 37:22 44:3 46:7
106:24 108:12 213:16
**meant** 66:3 159:7 205:20
215:21
**mechanism** 77:14 214:11
217:9
**mechanisms** 221:1
**medical** 45:9 127:23 128:18
**medium-batch** 188:23
**medium-batched** 190:4
**meet** 20:3,11 22:2 28:1 40:1
101:4,5 108:25 116:13
144:4 178:10,16 180:17
242:6
**meeting** 12:20 20:6 22:17
166:24 169:19
**meetings** 20:8,22,23,24 21:1
22:7 26:17 68:20 113:7,8
**member** 63:17 83:3 109:9
189:21 209:13
**members** 55:3 113:9 114:6,
15 149:12 174:21 189:19
**memo** 39:9 41:6 117:10,12
129:24 146:9 172:10 176:3
185:18 186:8,11 188:23
189:5,7,8,14,17,21 225:6
237:2 254:8 257:13

**memoranda** 38:9,13,18,24
132:15 134:23 135:20
172:18
**memorandum** 130:5 134:21
168:13,17,22 237:10
**memorialized** 119:2 133:5
257:17
**memories** 192:8
**memory** 98:15
**memos** 63:12 135:10,21
188:25 190:4,6,12 227:16,
17 235:6 238:14 242:3
250:8,16,20,25 251:3
257:17
**mentioned** 24:16 61:15 62:8
65:6 72:8 91:7,23 131:20
161:13 171:17 209:8 220:16
228:19 233:1 236:20 262:9
**mentioning** 262:14
**mentions** 158:17
**menu** 261:10
**Meoli** 88:11 89:6,13
**merits** 170:20 227:2
**MERRITT** 9:16 10:1 31:10
37:2,6,11 58:8 68:8 89:1
94:18 105:25 112:8,12,19
113:12,18,22 117:1,20
120:19,24 121:4 123:22
131:4,7,11 136:14 156:9
157:1 165:12,15 167:15
170:18 197:3,6,11 198:1
211:14 222:15,19 234:19,22
236:5,10,19 262:5,8 263:16,
18
**met** 12:7 22:12,14 33:24
39:14 110:5
**methodologies** 127:9,16
**methodology** 88:1,2 103:4
128:14,22 139:18,19 148:24
149:13,14,21 152:10,18
153:18 154:5,11,14,18
155:19 159:6,20 160:8
161:4 162:16 168:14 169:4,
25 170:5,8,20,23 171:6,11
223:6,7,13,22,23 262:22
263:6,12
**metric** 166:2
**metrics** 100:20 144:4 165:24
178:17 229:10
**Michigan** 136:2
**mid-september** 161:23
162:13,19

**middle** 150:14
**migrating** 153:10
**Mike** 23:13,14
**Miller** 14:9
**million** 103:22
**mind** 49:24 59:25 116:7
  198:18
**mine** 87:16
**minimum** 20:6
**minor** 13:14,17 18:23 19:13
  20:10 21:15 31:1,12,14 32:9
  103:1 125:4 229:17 233:22
**minute** 27:19 129:21 150:13
  157:8,20 197:24 236:25
**mirror** 187:9 259:18
**mirrors** 188:12
**misconduct** 93:9 134:4
  179:10
**misleading** 180:24
**misrepresentation** 54:11
  82:15,22 85:11 94:12
  180:22 200:3 211:5 243:24
**misrepresentations** 48:17
  71:1 196:3 238:22 241:10
  242:20 249:19
**misrepresenting** 70:22
  179:25 195:20
**missed** 94:9
**missing** 64:22
**mistake** 85:2 173:15 260:7
  261:12
**mistakes** 214:11 259:23
  260:2,3,17 261:7
**Mitchell's** 237:21
**mitigate** 260:19
**money** 141:12
**monitoring** 248:20
**month** 219:25
**months** 53:8 144:9 217:3
  223:2 247:15 259:22
**morning** 202:9
**motion** 80:18 81:3 82:13
**move** 40:22 41:9 43:13
  48:10 94:23,24 100:14
  101:1 112:17 117:4 131:13
  133:24,25 135:2 139:21
  151:20 178:17 185:17
  188:2,3,8,9 203:15 227:19
  253:15 254:15
**moved** 14:15 22:24 33:16

46:17 75:10 101:20
**moving** 133:22 140:16
  144:2,16 161:9 191:24
  218:10 226:19 232:23
**multiple** 31:13,20 32:8 43:7
  45:16 63:14 142:3 172:14
  182:20 190:1
**mute** 197:7 198:16

---

## N

**named** 14:9,11 33:23 88:10
  92:22 235:11
**names** 23:11 180:8
**naming** 18:14 64:9 235:12,
  25
**narrow** 149:16
**Nathan** 35:1
**nature** 65:3 73:16 76:23
  84:3 257:24
**nay** 254:20
**Nebraska** 79:20
**necessarily** 77:4 91:6 95:9
  156:3 179:14 180:10 183:23
  184:23
**needed** 26:18 68:19 75:21
  91:20 101:5 106:16 141:12
  153:2 169:17 228:5 229:25
  230:3 234:4
**negative** 177:4
**negotiated-rulemaking**
  160:21
**neighborhood** 12:24 47:24
  190:7 230:14
**Nevin** 8:11 9:18 10:15,22
  17:3,10 37:9 168:3 184:4
**newer** 183:5
**newly** 157:25 158:8
**Nicki** 88:10
**non-california** 78:11 85:22
  135:12
**non-cci** 78:23 159:6,18
**non-corinthian** 81:8 145:1
  172:2 210:7
**nonterm** 171:13
**normal** 236:23
**note** 89:1 112:13 117:20
  121:4
**notice** 131:22

**notices** 83:10 109:16
**notification** 73:9
**notifications** 217:12
**notified** 110:24 111:18
**November** 99:22 138:14
  140:13 147:2,4 152:6
  168:12 190:19,25 223:12,20
**nowadays** 231:11
**number** 17:2 22:20 29:19
  30:2 34:12 47:18,19 52:3
  59:10 61:23 62:8,12 67:21
  74:8 79:24 84:6,10 87:21
  89:3 92:13 102:3,6 133:21
  157:9 158:23 163:7,16,23
  165:6,22 166:1,6 171:18
  185:3 188:24 189:3,25
  190:21 196:23 204:25
  208:16 224:17 225:18
  231:15 235:15,18 248:2
  250:5 257:8
**numbered** 158:10
**numbering** 17:6
**numbers** 101:5,19,21,24
  103:20 128:2,13 138:17
  143:23 144:5 164:25 191:9
  217:4 218:13
**numeral** 238:9
**nursing** 45:9 187:6

---

## O

**oath** 9:5
**object** 11:23 31:10 156:11
**objection** 68:8 94:18 112:8
  113:12 117:1 120:19 121:5
  123:22 131:4 157:1 170:18
  222:15 234:19 236:5
**objections** 9:10 29:10
**obtained** 61:4
**occurred** 135:4
**October** 15:15,18 97:9 137:6
  138:13 174:2 183:15
**office** 12:7 13:6 14:15,21,24
  17:22 18:3,12 34:4,16,20,23
  35:7,14,19,22 36:1,2,8
  43:21 44:13 56:16,18,19,20,
  21,23 57:6,10 75:4 76:22
  86:24 88:23 115:16 125:23,
  24 126:10,11 127:5,11
  129:18 134:18 135:8 156:8
  161:7 176:1,2 233:8,14

234:10,13

**officer** 13:20 18:25 19:1,11, 19,21,23,25 20:4,12 21:11, 12,13,14,16,19,22,25 22:1 26:16 28:24 31:19 32:18 33:1,3,6,8,12,19,22,23 34:12 55:23 68:18 103:1 118:13,21 125:23 129:13 141:8 158:3 163:20 164:1, 12 229:7

**officers** 245:15

**offices** 233:3

**official** 126:14

**OGC** 56:8 75:5 89:7,14 110:11 154:24

**OIG** 116:17,20

**omission** 37:25

**onboarding** 24:20

**one-off** 46:24 107:7 142:18 181:17 184:17,22 201:21 209:6,9

**one-offs** 201:12

**ongoing** 71:8 74:18 117:21, 22 129:4 162:11 236:21

**online** 60:2

**open** 21:2,3 46:10 49:25 64:7,12,17 71:10,12 72:19 73:4 74:22 196:18 206:17 219:19 244:22

**opening** 205:20

**opens** 63:24 187:18

**operating** 18:25 20:12 21:12,14,19 22:1 28:24 31:19 33:3,6,12,19,22,23 34:12 141:8 158:2 163:20 164:1,11 229:7

**operationally** 133:22

**operations** 119:8 120:5 133:16

**opine** 72:1 170:9

**opinion** 144:23

**opportunity** 181:12 263:19

**opposed** 25:17 116:9 136:3 261:11

**opposite** 48:8

**option** 77:13 85:17 222:3

**options** 82:5 169:16,22 197:19

**oral** 238:12

**order** 16:4 17:5 32:1 38:25 39:3,18 40:22 75:19 78:5

80:1,7 96:6,18 101:5 104:13 105:7 113:14,16 148:11 154:23 170:20 178:21 183:25 234:3

**ordered** 101:19 156:13

**ordinary** 116:9

**organization** 28:22,23 29:1 166:16,22

**organizational** 21:10

**original** 22:24 23:4,19 87:16 192:1 218:6 220:9 235:20

**originally** 19:18 86:20 97:4 152:10 244:18 256:15

**other/comment** 130:12

**OUS** 21:4 34:24 36:16 51:9 56:13 57:5,14,20,21 75:3 125:21 139:16 145:13 146:2,15 169:7,13

**outcome** 8:20 232:17 260:8 261:13

**outcomes** 149:15

**outlines** 241:21 251:20

**overarching** 16:18,21

**overlap** 116:11

**oversee** 32:1 37:18

**oversight** 58:23,24 61:12 76:21 232:21 248:13

**overview** 251:6,11

**ownership** 175:8

---

## P

**P-A-G-E** 23:14

**p.m.** 114:1 136:21,22 167:22,23 198:5,6 211:19, 20 234:25 235:1

**pace** 100:15 141:22 170:23 171:1,2 214:9 224:10 232:23 260:15

**package** 44:12 45:4 48:14 125:20 139:16 146:8

**packages** 139:22

**pages** 103:22

**panel** 115:11,13,19 116:2,9, 14 117:7 118:6 121:23,25 138:1 140:10 223:5

**paragraph** 18:1 36:23 98:23 99:1,3 115:2,4,5,7,8 117:24, 25 122:3 137:2,4 139:4 145:11,12 146:22,23 150:12,14 162:25 163:1

209:3 218:13,14

**parallel** 144:16

**parameters** 186:21 193:24 206:9 226:4 254:3 255:1,6, 10,18,24

**parens** 235:22

**parlance** 119:23

**part** 9:20,21 10:2 40:5 48:25 49:3 72:4 73:8 74:2 98:16 119:24 124:16 128:11 151:7 160:16 165:23 166:7,13,14, 23 167:1 172:16 181:1,2 185:18,23 188:18 189:3 191:24,25 192:23 201:8 221:6 228:14 238:24 239:1, 13 241:15 248:13,16 250:9 254:24 255:23

**part-time** 23:10,16 103:18

**partial** 148:24 152:9 153:17 154:4 168:14 169:4 170:8, 22

**participants** 8:3 129:7

**participate** 21:1,7 57:13

**participated** 70:1 169:20

**participating** 9:1

**participation** 59:7

**parties** 9:9,12 58:5 105:23

**Partner** 18:12

**parts** 29:6 121:14 124:14 133:22 166:21

**party** 8:19

**pass** 63:8

**past** 19:12 71:25 73:5 260:16

**paths** 34:14

**pattern** 242:17 244:17 249:18

**patterns** 239:19 248:20 257:19

**pay** 145:8

**PDF** 81:11,13 92:15 174:12

**penalties** 95:21

**penalty** 9:8

**pending** 11:15 52:2 101:24 132:8 154:24 158:15 161:5 173:11,17 178:5,8 203:21 220:9 223:5

**Pennsylvania** 176:1

**people** 13:9 19:8 23:5,8 28:15 31:9 34:1 63:14 67:13 89:7,14,18,20 104:16 110:1

115:22 143:18,19 144:1,7,
10 150:4,8 160:9 172:14
173:13,16 195:3,6 208:16,
25 216:24 218:7 229:24
243:5 244:12 249:10 259:11
**people's** 192:8
**percent** 127:24 149:5,11,15,
20,24 155:15,25 156:25
157:6 160:24 242:1 260:23
263:9,11,13
**percentage** 52:1 83:14
120:8 128:19 134:7 149:17,
22 155:4 208:6 225:8 243:7
256:20
**percentage-wise** 52:4
**percentages** 127:14 128:15
154:22
**perfect** 101:7 214:17
**perform** 207:19
**performance** 165:24 166:2,8
167:6 229:9
**performance-based** 28:22,
25
**period** 19:20,21 20:13,18
25:2,10 26:11 32:12 33:20
34:5,8 40:18 44:18 52:20
64:1 68:17,20,22 69:19,21
71:2 100:6 105:13 125:18
133:1 139:3 142:13 144:8
146:2 147:10 151:21 164:22
177:22 181:24 187:1 188:7
202:12,17,19 207:24 208:5
209:24 214:7 219:2 222:21
225:8,20 226:16 233:12
244:7 247:24 255:1 258:19
259:13
**periodic** 248:20
**periods** 71:3 183:9 260:21
**perjury** 9:8 95:22
**permanent** 171:15 209:13
**permission** 66:1 137:5,12
**person** 9:5 19:3,11 30:7,10
33:10 35:1 87:4,5 89:25
114:15 142:12 171:22
189:22 242:4
**person's** 30:11
**personal** 9:22
**perspective** 165:13 263:3
**phased** 143:15
**Phoenix** 73:22,25

**phone** 168:4,5
**phonetic** 23:17 49:21,22
**photo** 10:11
**phrase** 81:24 106:9 193:19
246:25
**phrased** 177:9 253:19
**phrasing** 167:12
**physically** 9:2
**pick** 17:7 168:11 240:10
**picked** 255:8
**piece** 45:13 54:15 122:13
124:24 139:14 180:23,24
**pieces** 16:21 119:24 221:3
231:4
**pilot** 142:21
**place** 25:9 26:25 34:14 42:4,
13,16 111:7 132:17 149:10
161:18 220:18 235:7 260:20
**placement** 70:23 150:10
155:23
**places** 44:21 191:9
**plaintiff** 92:22 239:9
**PLAINTIFFS** 10:18
**plaintiffs'** 29:10
**plan** 136:12 166:11 167:6
**platform** 64:9 82:1 87:18
128:4 153:2,8,11 154:23
173:11 191:8,11 217:8,21,
24 221:3 239:23
**plays** 262:25
**plied** 156:22
**plug** 127:20
**POC** 237:2
**point** 21:21 45:8 49:17 67:19
72:5 76:6 97:12 103:11
109:2 114:13 115:23 117:10
121:11 125:25 126:8 131:20
132:13,24 133:9 134:6,11,
17 138:16,17 140:2,15,17
141:7,24 142:2 143:8,9,20
144:20 146:8 151:2 154:6,9
177:16 189:19 203:22
204:15 207:25 222:4 229:25
231:24 241:4,7,8 242:23
243:19 246:17 250:6 252:1,
13
**points** 53:13 169:11 238:14
**policies** 29:2 31:2,5 32:4
123:18
**policy** 28:5,7,9,19 29:6
30:22 31:23 32:1,11 33:2

34:4,21,24,25 35:5,8,10,13,
18,25 36:3,17 54:24 55:1
67:24 72:20 74:19 75:5 96:1
97:5,8,10,14,20 103:3
120:18 124:20,22 125:3
127:5,6,10 128:12 129:1,5,
10,14 149:10,13 150:25
151:1 154:1 155:20 156:3
159:22,25 160:1,2,3,6,11,18
161:3,10,14,17 216:14
223:14,25 231:25 232:10
233:5,8,13,17,20 234:13
**policy-related** 56:4
**policymaker** 31:24
**political** 20:1 29:3 234:15
**Pollock** 14:16
**pool** 77:8 173:7,14 195:15
226:2 241:5 242:25 248:14
**popular** 229:6
**populate** 82:2
**populated** 91:6 128:10
**position** 15:14,19,22 19:13
33:4,17 50:5 79:4 103:24
127:4 144:13,24 171:22
247:20
**positioned** 131:19 133:24
**positions** 24:12,18
**possession** 169:1
**possibility** 51:10 61:6 62:15
105:2 246:23
**possibly** 245:19
**post** 24:1,4,12 119:21
**posting** 24:7
**potential** 25:1 108:23 134:3
149:15 175:24 225:15
**potentially** 49:11 61:4 67:2,
22 71:9 79:2 82:10 83:9,17
101:13,16 104:23 105:17
107:19 120:20 168:20
169:14 176:5 179:3 180:17
181:7 182:18 183:20 185:14
187:12 194:1 196:15
199:14,18 201:7 208:2
220:13 228:12 232:18
245:13 246:2,14 247:6
253:17,22,24 254:21
**power** 126:4
**Powerpoint** 97:17 157:10
**Powerpoints** 97:15 200:12
**practice** 14:8

precede 33:9
preclude 156:24 157:6
precludes 149:7
precursor 39:23
predates 155:21
predecision 108:1
predecisional 120:22
preliminary 40:15 44:1,3,4,
   5,6 47:25 73:15 100:3 138:3
   219:3 220:11 250:18 251:5
premise 205:11 207:3
   225:12
premised 99:21
prepare 12:5,20 157:23
   158:6
prepared 128:21 157:19
prerequisite 106:18
prescribes 170:8
presence 8:9
present 9:2 22:21
presents 10:10
press 128:9
presumption 53:1
pretty 22:20 62:5 67:14
   88:14 91:14 103:25 126:2
   141:11 144:8,10,21 152:25
   189:24 196:23 202:5 208:10
   219:18 228:10 232:13,23
   237:20 247:24 260:22
   263:10
prevent 224:20
preventing 12:2
prevents 148:23
previous 122:4 135:9
   138:22 254:13
previously 120:4 124:3
   130:23,25 183:6 184:6
Price 14:11
primarily 15:6 40:3 50:4
   222:9 223:10 226:17
primary 81:19 224:2
principles 54:18,19
printed 184:3
prior 14:17 19:14,15,17,22
   21:24 94:19 113:6 139:15
   153:21 231:18
priorities 16:1,8,14,17
   103:15 204:1
prioritized 163:9

prioritizing 178:14
priority 133:15 138:21
private 8:7 14:8 65:7
privilege 11:24 156:16
privileged 120:20 123:23
   156:10
probationary 105:13 207:24
   208:5 260:21
problem 29:17 89:12 94:8
procedurally 46:6
Procedure 113:19
proceed 87:8 99:10 136:7
   139:3 251:22 252:5
proceeded 49:13
proceeding 8:4
proceedings 8:23
process 16:5 25:13 26:14
   27:15 36:6 39:2 40:10 41:10
   50:17,18,20,23 51:7,12,15
   55:7 61:15 63:22 65:20
   70:8,10 73:9,19 74:23
   75:19,20 86:17 89:20 90:2,4
   114:7 115:12 116:18,23
   117:22 119:4,14 120:14
   122:16 125:19 126:1,2,6,12,
   15 129:3 140:25 151:17
   160:21 173:3,13 185:25
   197:17 204:10 208:4,10,11
   213:21,25 214:7 217:5,18
   218:2 219:14,23 220:7,11,
   17,19,22 221:9,23 222:8
   231:8 238:24 239:2 241:12,
   16 242:7 244:2 246:9
   248:17 249:21,24 250:10
   252:1 253:5 254:25 255:23
   257:12,16 259:6,24 260:23
processed 62:25 118:5,9,
   17,20 119:2 120:16 121:21
   123:5 131:17,18 139:24
   150:3,23 155:9,12 158:13
   169:25 209:25
processes 30:16,22 31:2,6
   34:13 50:2 115:16 118:4
   121:9 123:18 232:7
processing 119:22,25 120:6
   121:3 139:7,12,13,15
   158:15 210:3 260:5,11
produce 236:12,17
produced 49:7 190:19 193:9
   259:3
producing 43:20 186:15
   236:22

production 43:17,24 97:18
   117:17 168:22
productions 117:22
program 44:19 45:5,9,24
   46:10,16 59:2,6,20 71:3,17
   76:20 77:4 86:15 100:7
   128:18 142:12 149:19
   182:15 187:4,6 238:23
   260:21
programmatic 200:3
programs 44:19 71:2 183:9
   187:1
progress 20:19 138:14
   144:13,25 167:9
project 210:2 226:23 235:17
   238:20 239:5
promise 195:1
promised 192:24
proper 72:2
properly 71:22
proposition 16:9 28:14
   55:11 75:11 258:25
proprietary 15:8
prospect 182:11 199:24
prospects 41:22 42:24
   44:15 49:19 52:23 93:7,9,18
   94:1,13 182:16 206:4
   213:11 238:3,5 240:17
protection 15:2,4 18:13
protocol 39:20,23 40:2
   41:20 42:3,11,16,19,23
   43:6,9 46:7,8 47:10 49:4
   65:2 85:2,15,16,21,25 86:1
   106:17,19,21,25 107:2,7,8,
   25 108:14,15 133:7 134:13,
   15 135:23 144:21 172:19
   173:7 177:19 181:17 184:5,
   15,20 185:8 186:12,16,17
   187:9,14,21,22 188:13,17,
   19 191:10 193:21 203:3
   204:25 205:17 206:3,8
   207:5,13 210:12,14 230:21,
   25 242:8 244:3 246:11,13
   247:21 248:10,15 249:17
   252:4,21,23 253:6,7,10,14,
   22,23 254:13 257:2
protocols 40:7,12 41:10,15,
   21 43:16,21,23 51:16 55:7
   64:16 65:1 78:11 85:18
   100:22 105:9 107:2,5,13
   108:20,21,23 124:4 132:15,
   17,23 133:1,9 134:19

135:11,14,16,17 136:8
140:9 141:14,25 143:10
144:25 172:1,3 193:9,10
204:8 207:9 227:16 230:16
231:4 237:25 242:3 246:8
248:9 249:3,5 251:20 256:4
**proved** 225:19 231:2
**provide** 20:18 36:9 37:25
39:17 41:3 48:18 57:7 66:8
76:16 83:7,16 88:6 96:6,25
97:2 104:12 108:4 116:4,20
163:11 176:15 180:20
200:25 212:18 214:17
215:7,15,16 216:3 217:9
**provided** 43:17 59:15 61:3,
13 72:13 76:8,22 97:18
101:15 104:18 117:17
168:22 176:3 216:22 227:3
228:2 234:1
**providing** 129:19
**public** 60:2 183:11
**publicly** 183:7,16 195:2
**published** 78:4
**pull** 62:24 84:17,18,21
133:18 187:21 239:24 240:1
247:7,15
**pulled** 87:20 134:10 242:24
247:14
**pulling** 13:3 43:19 200:19
**purports** 77:1
**purpose** 53:9 77:2 120:18
152:23 157:18 168:4
**purposes** 38:11 42:9 81:1
174:24 192:7 225:23
**purview** 71:15
**pushed** 56:6 104:4 142:15
**pushing** 164:24
**put** 11:11 25:9 26:25 29:14
34:12 90:9 123:12 128:15,
16 142:21 147:16,20 159:14
161:18 173:6,7 174:15,17
194:2,22 219:15 222:5
250:8 253:19 255:8 260:20
**putting** 70:10 120:10 168:6

**Q**

**QC** 194:11 260:22,25
**quality** 207:19,21 208:1,20
**question** 11:15 16:2 56:12
57:13 72:22 74:22 86:2 94:9

99:20 107:24 111:24
112:13,20 120:23,24 121:1
124:10,11 155:17 156:3,6,
10 172:12,25 189:10 203:7
205:16 213:13 222:16
225:12 236:11 242:14 243:1
246:4,25 247:11 248:23
250:2 253:1 254:23 258:17
259:10
**questionable** 156:12
**questioning** 236:6
**questions** 11:18,24,25 21:2
68:9 124:2 189:16 262:1,3,6
**queue** 253:8
**quick** 10:6 58:1 234:21
263:25
**quicker** 228:15
**quickly** 139:21 225:25
**quota** 167:5

**R**

**R-I-E-M-E-R** 114:14
**Raguso** 8:16
**raised** 26:10 68:18
**range** 62:5,13 138:18 171:23
181:11 185:6 231:19 245:5
257:6
**rare** 53:23
**rates** 70:23 150:10 155:23
243:7 259:4 262:20
**rationale** 150:24 155:14
**reach** 41:7 65:21 67:4 70:5
72:24 75:14 144:20 234:12
**reached** 39:11 47:25 73:6,21
76:8 117:14 202:3 237:12
**reaching** 233:24 244:23
**read** 30:4 98:25 115:4
117:25 122:5 148:13 163:1,
4 177:5 198:10,23 209:3
212:24 263:19
**reading** 75:17 90:17 93:13
175:2 213:4
**ready** 132:13 263:5
**real** 10:6 211:11 263:25
**realize** 66:8
**reason** 81:20,23 91:7 93:22
94:14 120:17 121:2 123:8
163:9 197:13 224:2 232:20
244:24 246:2,12

**reason(s)** 93:10
**reasons** 73:6 91:22 93:6
131:10 145:5 158:22 162:12
210:25 222:12
**Rebecca** 37:2 89:11
**rebuttable** 52:25
**recall** 26:3 27:4 85:18 96:24
98:20 124:4 150:1 152:16
158:22 161:24 199:11
200:14 257:9
**receipt** 102:18 209:19
**receive** 48:14 49:2 65:11
73:8 74:13 86:1 111:6 117:5
163:22 216:12 221:11
228:23 236:9 263:8
**received** 77:7 81:6 84:7,13
92:23 111:15 117:10 137:4
153:20 210:6 211:25 232:15
239:21 251:8
**receiving** 54:10 231:12
**recent** 24:18 252:8,18
**recently** 42:23 71:12 78:10
180:7 252:11
**recess** 58:11,12 106:3,4
113:25 114:1 136:21,22
167:22,23 198:5,6 211:19,
20 234:25 235:1
**recognize** 17:14 184:12
237:7
**recognizing** 236:18
**recollection** 12:11 90:7
91:16 99:12 137:14 149:17
151:13 155:5
**recommend** 140:8
**recommendation** 55:2
81:20,23 129:12,15,16,19
205:4 237:12
**recommendations** 115:11
**recommended** 115:13
116:25 129:13 155:22
**recommending** 117:10
130:5
**reconsider** 219:8
**reconsideration** 53:20
212:18,20 213:9,19,25
214:3,7,14 215:8,15 216:13,
25 217:6 218:1,2,8,17
219:7,13 220:4,12,17,19,22
221:11,23 222:2,7
**record** 8:3,6,24 9:14,21
10:2,3,6,9,13,21 11:5,19

12:17 58:6,10,14 64:16
  84:19 89:1 105:24 106:2,6
  113:21,24 114:3 118:1
  122:5 136:12,20,24 167:19,
  21,25 168:2,8 197:21,24
  198:3,8,23 211:18,22
  234:24 235:3 261:18
  263:23,25
recorded 8:4,5,10 97:14
recording 11:17
recordings 239:12
records 12:9,10,13 43:19
  58:25 75:21 84:12 103:22
  137:10 185:21 257:11,15
recruiter 194:25 195:4,18,19
  196:7,8
recurring 26:23
recused 234:16
redone 121:12
reduced 206:8 254:7
refer 18:16 56:21 66:16
  71:18 77:24 78:2,5
reference 78:22 159:16
  183:8 200:4 240:6,8 257:22
  262:10
referenced 67:2 215:24
references 85:16
referencing 41:25
referred 13:12 18:10 23:22
  44:1 68:2 74:18 80:4 92:11
  100:4 129:25 157:12 173:23
  237:4
referring 25:16 28:12 65:18
  71:11 79:15 80:14 96:20,21
  124:25 179:24 184:16 187:5
  207:12 243:10
refers 191:25 208:19
reflected 179:20 211:7
reframe 16:11 250:14
refresh 12:11 99:12 192:7
reg 45:18 52:13,16 126:5
  221:24 222:2
regard 93:20 113:11
regs 38:11 52:2 55:9 75:25
  76:3 78:9,13 91:3 109:2
  123:20 126:13 220:23 222:6
  224:23 254:9,11
regular 20:18,21,23 26:19
  232:5
regularly 20:10 26:22 33:24
  165:1 166:10

regulation 37:21 77:18,20,
  22,24 78:1,2,3,6 79:9 90:23
  126:6,19 160:17 181:3
  206:20 214:1,2 219:6 224:7
regulations 37:20 73:9
  75:18 77:17 90:22 146:14
  220:17
reiterate 26:17
rejected 84:24 85:5 95:1
relate 21:12 41:15 128:13
  245:8 260:3
related 8:19 15:9 38:4,6,7
  39:4 42:25 44:14,20 45:9
  46:19 55:11,15 59:8 60:19
  65:15 74:11 81:9 93:9
  101:14 102:25 104:9 106:23
  112:14 130:24 154:3 160:15
  171:3,7 173:5,16 187:11,12,
  23 188:6 194:3 203:10,14
  210:21,24 224:13,19 231:15
  240:20 241:19 243:6 244:10
  256:9 259:2
relates 98:19
relating 15:7 41:2 58:25
  61:25 72:20 98:18 99:6
  100:2 101:8 232:14,20
  238:15 245:7,9,10
relation 210:10
relationship 75:9
relationships 57:2
release 170:5 171:10 223:6,
  7
released 255:19
relevance 236:6
relevant 46:1,21 48:11 67:23
  73:19 76:1 131:8,9 169:14
  172:8 182:13,18,21 203:20
reliance 85:16 210:21,24
relied 82:16 85:11 135:18
relief 83:8 88:1,2 103:4
  104:13 123:20,25 124:2,5,
  11,12,18,22 125:7 127:1,2,
  5,8,15,21 128:2 129:9
  139:18,19 145:25 148:24
  149:5,11,13,15,24 152:3,4,
  9,24 153:18 154:4,11,13
  155:3,8,15,19,25 156:2,25
  159:5,20 160:24 162:16
  168:14 169:4,25 170:8,23
  171:6 223:13,22 231:3
  263:6,9,12

rely 55:17 61:11
relying 155:23
remain 173:11,17
remaining 120:13
remember 32:23 43:11
  60:21 62:12 68:25 85:13
  97:2,11,15 110:15,17 113:4
  114:12,16 119:8 121:18
  122:22 130:18 137:9 140:21
  145:17 151:15 152:21
  153:13,22 154:13,15,20
  157:18 158:1,25 162:3
  164:19 169:6 171:15 200:8,
  21 233:7,13 256:21,22
  259:25 260:13 262:14
remembering 13:9 98:16
  149:8 176:12
remote 8:9,10,16,23 10:23
remotely 9:3,6
removed 191:6 245:20
reopen 232:24 244:25
  246:15 247:4 260:12
reopened 218:18 232:12
  259:21
reopening 196:16
reorganization 21:20
rep 60:19
repayment 120:10 213:3
  215:18
repeat 38:16 89:11 94:10
  213:13
repeated 240:8
rephrase 16:11 38:16 94:22
  213:14 242:14
replace 24:11 25:5 254:19
report 18:22 19:3 20:22
  22:19,22 138:3 140:12
  141:13 164:25
reported 19:8,10 21:25
  33:15,19 34:2
reporter 8:21,25 9:17,23
  10:4,7 164:6,9 197:1 198:9,
  13,17,19,22
reporting 9:3,11 21:22 49:22
  166:10
reports 21:13,18 22:18
  133:19
represent 80:11
representation 192:23
representation-made
  180:23

representations 182:16
238:10,12
represented 138:25
request 8:6 26:1 27:8,9,12
43:23 65:16 70:17 73:12
76:19 116:17 138:10 174:2
212:18 215:8 217:10,15
218:16 219:7,12 221:7
263:19
requested 25:23 74:5 76:11
115:14 116:8 142:1 198:23
requesting 26:4 196:19
213:8
requests 26:20 68:7 71:24
74:8 115:24 116:1 145:5
200:21 221:2
require 120:7 215:21 227:22
required 91:18 100:21 144:4
requirements 38:5 131:23
257:7
requires 38:2 75:18 96:25
191:12 214:1
rereview 219:13 253:2
rereviewed 260:24
research 37:15,18 38:3,7,
10,19 172:21
resided 52:24
resources 63:20 72:9
respect 15:5 27:23 35:10
39:8 52:22 59:9,21 73:17
78:24 91:20 93:17 114:18
124:4 127:15 160:7,8
189:11,17 214:9 223:3
225:5 231:22 237:13 250:17
respond 74:14 77:13 217:14
responded 76:10 116:1
response 30:13 77:15 79:25
80:6 89:3 173:20 174:1
208:15,19 217:11
responses 13:4 29:9,21
74:16 208:12 218:10 236:20
257:20
responsibilities 36:25 37:14
116:10
responsibility 121:15
responsible 27:7 28:4 50:22
51:5 87:1 118:16
restate 72:21
restructuring 18:8 160:15
resubmit 216:10

result 52:8 70:3 133:4
184:19 207:14 214:24 215:9
246:24
resulted 209:19
results 63:5 140:7 206:24
220:8 247:6 253:14 257:20
resume 137:5,13,17,21
139:12 141:15 143:10
161:22 162:13,18
resumed 126:3 139:7
140:25
reupping 25:2
review 12:9,13 44:6,11 45:6
46:18 73:16 76:18 81:19,22
99:6,16 100:1 101:7 103:20
104:24 106:17,19 107:16,25
109:8 115:10,11,13,15,19
116:2,8,13,17,25 117:7,11
118:6 121:22,25 122:15
132:23 133:5,8,11 134:9
137:25 140:9,10 144:21
171:8 172:23 181:20 191:25
205:3,7,8,12,19 207:19
208:3 209:14 216:12
217:21,23 220:12 223:5
227:11 228:7 230:15,16,18,
21,25 231:1,4 238:19 240:4
242:3 245:21 249:8,9
250:18 251:5 255:25 257:1
260:25
reviewed 12:10 22:9 55:4
56:9 107:20 108:10 109:4
135:19 173:3 189:15 207:25
208:6 209:12 231:8 246:18
reviewer 177:24 181:19
182:1 187:14,18 189:11
193:14 194:14 195:21 202:9
203:4 204:19,22 206:11
210:13 228:11
reviewers 47:7 48:3,19 49:1
191:19 199:4 204:22 248:2
251:21 255:20
reviewing 38:14,23 40:17
62:21 63:11 64:5 104:16
108:22 132:20 133:2 134:3
172:16 175:23 189:21
204:11 205:6 224:1 244:17
257:3
reviews 17:18 30:5 40:3
90:20 157:21 167:3,8 177:7
178:20 209:4 217:24,25
revisit 232:3,9 246:12

256:13,18
revisited 231:25 233:20,21
reworked 123:16
Riemer 114:14 116:7 148:6,
8
rise 96:6 196:17 258:11
rises 58:21
road 234:4
Robert 19:23 34:25 57:22
Robin 13:14,17 18:23 19:13
20:10 21:15 31:1,12,14 32:9
103:1 229:17 233:22
robust 144:8 208:10 260:21
role 19:11,19 21:17 27:23
32:21 87:19 127:15 142:5
169:11,18
roles 19:9 22:25 23:2,20
24:17 31:20
Roman 238:9
room 9:2 10:25 11:1,9,11
168:5
roughly 258:19
route 126:9
royal 161:3
rule 55:19 77:20 113:19
ruled 100:12,13
Runcie 33:7
Ryan 8:22

S

S-C-H-M-O-K-E 19:16
S-C-H-R-E-C-E-N-G-O-S-T
88:13
S-T-E-P-H-E-N-S-O-N 23:15
Salesforce 64:9,12 153:11
239:23 255:10
sample 61:25 62:10 238:15
242:17 243:22 247:14,15,17
249:15 252:2,8 258:24
sampled 248:19,24
samples 63:11 247:7
256:19,24
sampling 60:23,25 61:14,21,
24 62:20 63:9 179:3 186:11
195:25 241:13 246:1 248:16
249:12 255:25 256:3
257:12,16,20,25
satisfied 177:19

**satisfy** 45:16 181:25 227:8
**scenario** 62:16 63:10 66:14 68:21 184:18 194:24 195:12,17 199:23 215:7 261:14,19
**scenarios** 67:3 201:11 245:5 258:22
**scheduled** 22:5 161:22 162:18
**Schmoke** 19:16,17 26:15 27:8 31:5,12,14 32:10,17 33:1,10 68:17 137:24 138:10 141:5
**school** 14:4,7 15:8 39:5,21 44:15 45:6 47:21,22 48:15, 16,20 52:25 53:12 54:8 59:1,5,9 60:10,22 61:18 62:7 69:15 70:19,22 71:12, 18 72:17,24 73:1,4,5,20,23, 24,25 74:1,24 75:22 77:10, 12,15 81:9,19 82:14,16,25 84:23 85:8 98:13,16 101:8 128:13 134:3 142:24 144:18 158:19 172:6 173:2,5 175:4, 8 178:1 180:4,15 181:10 184:21,24 185:10,19,22 186:2,13 187:14,19,21 192:14,17,24 194:2,10,22 195:25 196:19,20 202:14 231:22 232:15 238:23 240:7,23 242:18,22,24 243:23 244:13,22,23 245:10 248:11,19 251:10 252:20 256:6,8,9 257:9
**school's** 236:3
**school-specific** 106:21 107:2,5 108:15 160:9 190:11
**schools** 36:4,20 40:15,20 41:5 44:1 45:20 47:5,14,22, 24 48:2 49:12,16,20,21 50:1,4 51:17 55:6,21 58:17 59:13,22 72:13 73:17 74:4 75:14,21 76:1,7 77:8 99:11 108:23 109:11,13 111:4 128:20 129:1,6 141:15 143:11 144:3,14 145:1 152:16 158:14,23,24 163:11 172:2,23 176:23 180:9,10 183:9 185:25 186:3 187:13 188:21 190:13 226:5,9 234:18 239:1 241:13 243:12 247:8 248:21 249:25 250:5,

17 251:19 252:14 255:3,9
**Schrecengost** 88:12 89:2,7, 13
**scope** 18:15 40:16 44:11 63:20 68:8 70:6 100:5,8,9 101:1 112:9 113:13 117:2 120:19 121:5 131:5 156:12 157:2 170:19 175:25 176:2, 18 177:2 179:6 186:22 187:15 222:15 226:4 234:20 250:18 253:13,16,21,25
**screen** 29:13
**search** 186:6 196:8,9
**searched** 200:15,17
**searches** 60:4
**second-level** 260:25
**secondarily** 123:15
**secretary** 20:25 21:4 22:3, 13 27:15 29:4 31:17 34:5,6, 9,17,20,24 35:7,14,20,22,25 36:9 51:8 57:6 101:22 102:2 115:14 117:11 125:23 126:10 127:6,12 129:20 130:11 131:1 134:18 135:9 141:9 158:5 161:7 169:21 219:1 228:20
**secretary's** 27:13 35:2 36:1, 2 130:20
**section** 90:16 93:4 130:12 161:9,21 216:15,17
**Security** 152:13,14,23 153:1,21,23 155:3
**seek** 53:19 214:2,15
**seeking** 132:18 134:12
**sees** 182:1
**selected** 255:11
**send** 70:11 75:24 91:12 119:11 132:13 134:16 139:16 147:18 234:4
**sending** 76:12 131:21 139:23
**senior** 23:1 24:17 25:15,16 40:4 55:3,4 63:3,13,14,17 75:17 86:23 105:3,15 109:9 169:9 174:21 181:20 182:5 189:19,21,25 201:1,15,24 204:11 207:18
**sense** 44:16 54:21 76:25 83:14 108:10 211:2 221:1 224:5 241:14
**sentence** 98:25 99:2 115:6

139:6 163:1,4 218:14
**sentences** 115:8
**separate** 56:19 65:19 83:24 124:11 184:19 239:5
**separately** 37:6 154:25
**separation** 52:25 53:12
**September** 24:22
**sequence** 231:5
**sequencing** 101:3,18 103:9 203:25 225:23 226:21 227:22
**series** 64:15 169:16 238:13
**serves** 98:15
**service** 25:2 245:15
**servicer** 119:19
**servicers** 15:10 120:5 131:24 132:2
**Sessa** 33:8
**set** 29:10 46:16 48:21 49:10 62:25 97:4 101:21,22,25 105:5,7 107:14 109:8 125:19 131:24 146:5 173:11 178:3,5,9,12 180:17,19 181:4,19 182:3,7,22 186:23 187:3 188:16 193:23 200:5 202:6,11,12,19,21 205:3 215:19 219:6 220:23 228:17 232:19 241:4 245:21 246:2 251:21 252:8,22 253:7 254:3,15 255:21
**sets** 34:20,24,25 36:17 39:10 170:14 205:17 228:12
**setting** 28:4 105:18 106:22 178:16
**settled** 69:15
**settlement** 69:9 231:21
**settlements** 69:5
**sexual** 83:2
**share** 69:16
**sharing** 86:16
**Sheehan** 14:16
**shelf** 252:17
**short** 11:15 132:10 134:8 167:16 186:8 214:22 219:18 247:24
**shortchanging** 178:20
**shorthand** 106:14
**shortly** 217:14 252:4
**shot** 226:12
**show** 84:13 85:20 234:5

248:1
**showing** 167:8
**shows** 81:18 87:14 179:2
196:10 230:11 249:18
**side** 57:20
**sign** 125:13,16 139:17
146:15 263:20
**sign-off** 89:23 90:2 126:20
**signature** 17:17
**signed** 130:11 141:11 147:1
**significant** 118:3 144:11,25
158:23 228:1
**signing** 130:22
**similar** 68:12 71:1 91:14
109:25 126:2 146:8,11
158:1 195:5 199:5 238:1,20
241:23 243:20 244:1 249:24
**similarities** 245:22 249:11
**similarity** 247:9
**similarly** 140:9 192:21
**simple** 52:6 261:4
**single** 53:8 101:9 235:7
241:23
**site** 96:23
**sites** 231:22
**sitting** 237:21
**situation** 194:13
**situations** 66:15
**Sixty-six** 163:2
**size** 61:21,24 256:19 258:24
**Skype** 204:15
**slide** 158:10,11 159:2,8,11,
12 161:10
**slides** 159:13
**small** 185:3 196:23 226:2
**small-** 190:3
**small-batch** 188:23
**smaller** 61:20 62:7 180:9
190:12
**smartphone** 11:9
**Smith** 33:24 196:8,10
257:21
**Social** 152:13,14,22 153:1,
20,22 155:3
**solely** 84:8,14 155:17
**somebody's** 244:13
**sort** 37:17 60:11 63:19,21
84:8 96:5 151:18 152:1
153:7 173:12 179:10 183:8,
16 193:12 194:23 195:17,24

199:5,8,9 207:22 217:19
220:11 231:19,20 235:12
245:2
**sounds** 28:1 58:3 220:10
**soup** 57:3
**source** 35:8 76:19 77:2,6
96:13
**sources** 59:24 175:4
**speak** 20:9 66:1 258:5
**speaking** 34:15 39:21 61:7
73:24 173:15
**special** 155:20
**specific** 16:15 20:16 21:8
27:2 28:12 32:15 39:10 40:7
44:18 45:5 60:18 79:7,8,18
93:17 102:10,17 106:20
107:13 109:1 122:16 128:13
138:7 151:13 167:5 179:16
180:1 181:2 187:10,14
188:6 195:8,16 196:6
201:11,16 206:9 227:17
239:11,15 240:1,9 243:8
244:6 251:12 257:7,22,23
258:23
**specifically** 16:10 32:6
35:17 42:2 43:22 53:21
58:20 79:13 85:10 98:19
122:18 149:7 158:17 171:10
**specificity** 30:11
**specifics** 16:24 62:4 158:25
**speed** 114:24 116:10 144:7
**spelled** 136:1
**spelling** 88:12 89:3
**spend** 12:19 227:15 228:4
**spent** 133:9 134:2 228:1,5
**spoken** 137:24
**spot** 248:4
**spotting** 104:22 249:11
**spread** 259:13
**spreadsheet** 186:19 187:20
240:3
**spreadsheets** 133:14
**spring** 69:1 72:21 73:5,21
75:15 76:8 118:2 124:19
125:8,11 131:15 144:12,23
153:16 161:11
**staff** 25:14 26:6 27:13,17
35:2 83:3 99:9 134:2 139:8
140:24 141:3,20 142:1,16
143:9,21 145:6 171:3,4
230:3

**staffed** 22:23 67:18 71:5,23
132:22 134:8
**staffing** 23:22 26:11,18
35:24 40:18 66:21 67:8 68:4
72:2 121:11 143:13,25
224:15
**stage** 99:25 104:24 122:21
**stages** 207:22 230:18
**stamp** 191:16
**stamps** 81:14
**stand** 155:4 227:2
**standard** 54:3 56:13 57:15
90:24 96:21 107:7 108:14
170:10 180:25 184:5,15
186:17 187:9 188:13,19
204:25 207:12 213:19 220:3
**standing** 17:5 113:16
**start** 13:25 15:13 20:15
23:23 24:1,3,4 39:3,5
213:10 218:9 222:25 233:23
**started** 11:14 15:18,24
22:15 23:6 24:7,19,21 32:22
33:5,12 50:5 83:12 109:17
110:19 111:20 139:14,17,
20,23 140:16,20 143:13,24
148:1 162:10 163:25
164:11,21,23,24 217:25
218:1 220:24 234:7 235:15,
17
**starting** 19:6 22:23 24:20
73:5 115:1 139:6 142:17
**starts** 81:13 142:20 174:11
212:3
**state** 9:13 10:21 16:20 37:3,
22 38:1,3,5,10,19,25 39:13,
16 44:22 46:1,10,14 48:14
51:19,24 52:16,24 53:11
55:8,10,14,15,24 57:15
69:14 78:20,24 79:8,19
81:24 82:6,19 83:17 84:1,8,
15,25 85:10,12 90:22 91:2,
17,20,22 92:2 93:11,18
94:1,14 96:17 108:3 109:1
155:14,17 156:4,19 172:9,
11 186:2 192:6,12,17 205:1,
14,15 206:20 211:1,7
213:12,15 224:23 233:3
261:8
**State's** 14:14,20
**stated** 28:14 121:20
**statement** 8:23 95:17,25
96:3 97:5 124:1 210:15

241:20 243:4 250:19,24
251:14 254:7
**statements** 95:14,20 214:22
232:1 240:11 245:17 248:5,
13
**states** 18:4 37:24 54:20 84:4
94:25 98:2 105:16 137:4
146:23 158:13 172:6,8
192:5 258:15,20 259:14
**stating** 259:18
**status** 20:22 46:17 158:7
188:3,8 191:9 230:5
**statuses** 173:12
**stay** 253:8
**step** 47:16,25 49:13 68:19
119:17 124:21 125:7 126:25
127:1 152:1,2,3,5
**Stephenson** 23:14
**steps** 64:15 65:2,5 201:18,
25 202:15
**stipulation** 9:13
**stop** 121:3 122:11 123:3,6,9
132:14,18,19 134:12 147:8,
12 154:22 182:3 194:12
244:19
**stopped** 147:11
**stored** 235:8
**story** 132:10
**strategic** 166:11
**strategy** 229:19
**stream** 172:24
**streamlined** 163:8
**streams** 172:15
**Street** 8:18
**strength** 240:25
**strike** 112:17 243:20
**strong** 124:1 260:22
**structure** 21:11,19 29:5 35:4
**struggling** 167:11
**stuck** 252:17
**student** 14:21,25 15:5 18:4,
9 28:6,10,23 57:9 160:19
238:11,21 239:2 258:1
**student's** 247:9
**student-loan-related** 29:7
**students** 195:25 196:1
242:17,19 258:8
**students'** 248:13
**stuff** 248:8

**subject** 52:13,15 68:14
127:9 150:17 224:8 249:5
**subject-matter** 153:4 159:21
**submit** 26:20 74:9,15 96:17
181:13 182:25 183:24
217:15,17
**submits** 77:15
**submitted** 26:22 27:9 55:12
56:6 59:19,21 64:14 153:4
206:12 216:10 239:9
**submitting** 60:9,10 70:8
126:9 139:20,21
**subsequently** 33:16 115:14
118:7 232:15 247:3
**subset** 149:18 190:8
**substance** 209:15
**substantial** 101:15
**successful** 143:6 209:17
**sufficiency** 206:16
**sufficient** 39:15 95:18,25
96:4,7 108:2 143:9 176:15
181:21 194:15,17 204:5,6
205:2
**suggest** 167:15 195:6
**suggests** 255:7
**summarize** 36:10 186:9
227:15 239:10
**summarized** 176:3
**summarizing** 142:23 143:1
172:17
**summary** 44:25 45:14 172:4
176:10 238:9,25 250:17
253:13
**summer** 24:6 25:22 111:3,
25 154:8 235:17
**supervising** 203:12,19
**supervisor** 188:2,8 193:22
208:2 248:6 249:12
**supervisors** 21:7 135:19,24
146:20
**supervisory** 22:24 23:1,20
24:17
**supplemental** 204:21
**support** 8:17,22 39:13,17
41:11 47:2 61:9 79:3 95:13
101:16 104:1,19 105:17
143:3 163:13 180:20 181:1
182:2,7,19,25 194:15
199:10,14,18,22 200:1
205:3 240:19 244:13

**supported** 54:17 227:7
241:18 253:23
**supporting** 66:5 97:2 108:7,
8 176:5 201:23 240:22
**supports** 45:15 194:8,18,20
195:23 199:8 201:8 206:21
228:12 251:15 253:17
**suppose** 167:1
**supposed** 105:2,4 199:15
**surface** 65:21
**Sweet** 8:14 29:20 92:15,22
211:25 212:8
**Sweet all** 92:19
**Sweet's** 93:14 95:5 98:2
99:18 210:20
**switch** 78:8
**sworn** 9:6 10:16 95:24
**system** 49:14 84:16,18
128:8 133:11,14,17 146:5
153:6 169:14 196:10 235:8
**systems** 16:5 134:9 153:7

---

**T**

**tab** 16:25 37:9 79:22,23 92:6
98:1,22 115:1 129:22 137:2
157:8 173:18 184:2 212:1
236:25
**takes** 144:6 166:20 228:7
**taking** 72:6 120:10 121:8
122:19 123:13 256:19
**talk** 27:19 113:9,20 234:12
**talked** 11:13 94:11 106:22
109:17 151:25 163:15 168:6
211:1 230:19 235:5 252:24
253:2
**talking** 58:17 64:1 69:19
79:13 100:23 107:4 126:24
194:13 201:21 210:19
230:8,16 243:8 253:11
261:1
**tallying** 12:23
**tangentially** 15:10
**target** 101:21 102:1
**targets** 178:11
**task** 253:12
**tasked** 86:16
**tasks** 201:19
**teacher** 82:25
**team** 13:2 22:19,24 23:4

40:4 55:3,4 59:2 63:3,13,14, 17 64:21 75:24 82:1 86:12, 14,15 87:14 88:9,17 91:19 93:16 109:9 110:11 112:6, 24 113:4,5,7,10 114:7,13,15 119:8 124:25 126:17 127:10 128:5,12,16 129:1,12 146:20 151:14,19 153:2 154:22 159:22 160:1,4,9,11 161:3 174:15,19,21 175:22 179:7 182:5 189:19,21 207:21 208:1 209:13 232:5 238:7 260:10,11,15,25

team's 75:17 263:3

teams 144:1 204:15

tech 167:13 211:10

technical 168:2

Technically 18:8 73:24

technician 8:17

Ted 237:21

telling 187:24

tells 48:9 189:11 217:13

template 185:19 215:2 235:23

templates 209:7

ten 22:7 45:25 142:25 185:5 259:14

tend 194:5

tenure 34:17 67:7

term 24:20,24 25:3 106:14 171:15,18,24

term-appointed 24:14,23 143:16

terms 21:6,10 26:15 36:3 38:4 39:19,23 45:15,20 54:6 64:10 66:22 71:16 72:7,11 74:12,16,23 100:5 106:22 107:11 110:6,22 121:15 129:1 133:16 142:22 143:23 144:5 169:12 201:10 214:15 220:15 260:4 261:16

terrible 82:25

testified 10:16

testimony 9:7 36:11 94:19 238:21 239:2 240:16 249:8, 18 252:3 255:25

testing 142:21

text 11:6 81:12

theme 143:2

themes 240:5

theoretically 176:15 213:10

Theresa 8:14 92:14,19,22 93:14 95:5 98:2 99:18 211:25 212:8

thing 36:16 64:8 82:13 88:19 107:9 121:17 132:20 136:4 146:6,8 151:18 169:10 172:13 182:12 193:7 199:17 200:9 204:18 210:17 211:6 221:2,8 239:16,17 257:19, 22

things 13:4 16:16 20:7 21:6 36:6 38:6 45:10 46:11,13 59:8 60:3,24 64:18 72:7 83:1,5 87:22 89:17 104:6 106:21 107:14 114:23 115:25 117:12 121:7,17 122:15 126:9 132:19 133:19 143:14 144:15 154:20 169:13 182:17 183:3 186:7 187:10,11 190:1 191:10 192:11 193:1 194:6 196:4 199:20 203:9 207:6 212:20 219:16 224:11 231:22 232:4 239:23 241:14,18 243:5 247:18 251:8,9,10,16 253:12 261:6,7,20

thinking 13:7 91:15 142:7 159:10 221:21 240:8 241:11

thinks 53:15,16,17 194:15

thought 54:16 55:19 56:7 73:13,18 74:5 79:15 215:25 259:20

thousand 53:3 133:13 217:2

thousands 53:2 158:24 185:14 261:2

thread 210:21

threads 252:3

threshold 185:4 186:6 199:13

thrown 195:14

tied 162:16 171:10 223:13

ties 243:15

time 8:13,21 10:1,9,13 19:2, 20 20:13 25:10 26:3,6,12,16 27:2 32:13,16,17,25 33:20 40:18 41:1 42:7 44:10,18 47:12 52:20,24 53:12 54:7 58:10,14 63:23 64:1 67:7 68:17,20 69:19,21 71:2,3,20 72:7 86:11,22 87:25 91:19 100:6 101:24 103:11,18

106:2,6 112:3 113:24 114:3 117:9 118:11 119:6 121:25 122:25 123:2,4,19,25 124:6 125:18 132:14 133:10 134:2 136:11,20,24 137:18,22,24 138:13 139:3 141:24 142:13 144:3,19,21 145:20 146:6, 13 147:9,22 150:21 152:6,8 153:9,23 154:6 155:7 158:2 160:17 162:5 164:22 166:4 167:21,25 168:12 172:16 177:22 181:24 183:9,18 187:1 188:7 189:20 191:11 196:3,14 198:3,8 201:20 202:7,12,18,19 211:18,22 214:8 216:11 219:17 221:20 222:4,21 224:25 225:8,20 226:16 227:14 228:1,5,6 234:24 235:3,14 237:15,22 244:7 245:16 246:18 247:24 248:3 258:19 259:13

time-consuming 90:9 204:3 209:16 227:24

timeline 158:4 162:4

times 12:8 14:13 20:17 26:2 142:3 201:4 217:16 225:2 233:21 235:5 252:25

timing 21:24 43:12 99:21 122:23 140:22 153:13

title 18:7 59:7 174:1

titled 159:3 216:17

today 8:12 11:24 12:3 15:22 18:17 112:17 146:13 235:5 246:21 262:2

today's 246:17

told 118:19 120:15 123:4,6 131:16 132:14,18,19 134:12 151:12,14,16 154:21 155:4 192:15,17 229:12,14,16,25 257:21 258:2,9

tomorrow 246:19

top 28:23 30:2,14 81:14 84:11 137:9 163:3 180:11 235:10 257:9

topic 159:4 229:6

topics 112:14 131:8,12

total 12:22 22:6 41:15 111:4 132:1

touch 129:1

track 133:18 144:16 173:13

trained 105:9 122:18 208:25

**training** 105:12,19 144:8
192:7 199:12,20 200:10,11,
20 204:16,21 207:24
208:10,16 260:21
**trainings** 208:20
**transcript** 11:20 17:12 22:9
29:24 182:14 184:10 199:25
263:20
**transfer** 41:18 42:15 122:7
192:13,15,18 206:5 211:3
237:13 258:2,10
**transferability** 238:10,12
**transition** 26:6 112:6,24
114:7,13,15
**transitions** 114:21
**translated** 119:17
**treading** 76:4
**treat** 77:4
**treated** 179:12 181:16
**trial** 142:19
**tricky** 219:16
**trigger** 195:24
**trouble** 166:3 236:18
**troubleshoot** 167:16
**true** 35:10 99:22 138:21,23
159:15 227:19 247:19
260:14
**Trump** 112:24
**truthfully** 12:3
**turn** 17:25 29:8 30:1 36:13,
23 58:16 114:25 125:2
137:1
**turnaround** 189:20
**turned** 245:14
**turns** 39:20 127:13 184:25
253:9
**tweaked** 191:10
**Twelve** 12:23
**Twenty** 260:23
**two-minute** 58:2
**type** 81:19 83:7 179:10
182:12 193:2 200:7 243:16
**types** 80:13 152:11 177:11
182:24 192:2 193:13 199:6
201:22
**typical** 90:4
**typically** 35:6 61:11 120:11
142:15 185:3 186:1 193:18
199:21 239:24 247:21

**U**

**U.S.** 8:17,22
**Uh-huh** 28:8 31:21 43:2
76:17 82:4 91:24
**ultimate** 148:9
**ultimately** 27:6,9 45:13
52:16 55:6 87:1 118:15
123:3 172:19 209:17,20
242:3
**unable** 25:5
**underlying** 134:20
**understand** 47:13 56:24
75:8 78:18 107:18 111:23
114:21 135:6 166:5 172:25
180:14 199:16 200:22
206:18 215:20 219:1 236:7
242:13 245:7 247:10 250:2
254:24
**understanding** 15:25 16:7,
13,16 27:11 34:19 45:1 47:4
50:19 51:4,12 101:23
115:13 116:24 121:24
131:17 145:5 147:7,14
148:15,18,22 149:2 150:25
153:25 155:13 156:23
169:23 170:7 219:24 233:22
246:3 251:4
**understood** 16:23 78:7
116:12 206:10 253:3
**undertaking** 238:20
**underway** 172:22
**unfolds** 244:18
**uniform** 235:17,18,20
**unit** 15:20,25 16:1 18:2,10,
17 23:6,20,24 24:9 38:9
42:4 51:4 65:19,21 66:16
67:8,16,17 68:4 72:3 86:13
120:5 155:22 166:19 237:11
**United** 18:4
**units** 67:20
**universally** 259:3
**University** 99:8
**unrelated** 15:11
**unusual** 20:14
**update** 128:3 158:12 191:15
254:12 256:4
**updated** 43:9 193:5 235:22
252:6 256:15

**updates** 20:18 43:13 191:8
**upfront** 40:24 46:12 70:12
**uptick** 256:8
**usual** 120:14 189:20
**UTC** 8:13 10:9,13 58:10,14
106:2,6 113:24 114:3
136:20,24 167:21,25 198:4,
8 211:18,22 234:24 235:3
**utilized** 80:20

**V**

**Vaguely** 157:16
**variables** 245:1 258:17
259:9
**variation** 176:22
**varied** 22:20
**varies** 189:23 190:2 228:8
**variety** 52:9 59:23 83:4
**vary** 243:18
**varying** 24:15
**vast** 24:18 61:8
**Vedder** 14:11
**veracity** 77:3
**verbal** 204:10
**verbally** 9:6 228:25 229:2,14
**verified** 10:11
**version** 191:3,5 235:20
236:1 256:15
**versions** 87:16 235:19
**versus** 8:14 79:20 110:18
**vicinity** 69:3
**video** 8:10,16 11:17
**videotape** 9:21
**view** 222:12 223:18 241:17
258:3
**viewed** 185:4
**volume** 103:20 224:4 247:8,
22 256:23

**W**

**wait** 94:6 231:3 252:23
**waiting** 47:10 173:6 230:15
262:24
**waive** 9:10
**walk** 22:15 36:25 42:1 63:22
197:17

walks 105:15 107:10
wanted 29:15 36:23 58:19
  74:10 83:3 86:12 100:18
  103:17 106:8 123:11 138:23
  139:21 168:7 210:17,22
  214:10 222:2 239:25
wanting 228:21
warrant 104:23 259:14
warrants 179:11
water 76:4
watermark 191:6
watermarked 190:15
Wayne 33:11,15
ways 60:6 173:12
wearing 21:16
Web 96:23
Wednesday 8:12
weeds 136:1
week 20:9,17 42:21 102:1
  105:12 141:19 163:8,17,24
  167:10 207:24 229:8
  231:11,14
weekly 20:6,24 21:9 26:17
  101:4 229:9
weeks 43:11 90:6 114:20
  202:22
weeks' 89:19
weigh 57:14
weighed 210:9
weighing 104:21 203:18
  206:15 210:13
weird 226:14 231:19
Western 178:1 180:15
  181:10
whatnot 121:14
window 187:2 219:18
woman 88:10
wondering 191:14
worded 176:20
wording 96:24
words 83:20
wore 31:13,18 32:7
work 14:21,25 15:2,4,9
  17:24 18:15 20:15 40:19
  45:12 61:16 66:22 67:16
  99:9 115:15 116:21 118:6
  120:1 121:11,22,25 122:23
  123:15 132:21 133:20
  136:13,15 138:1,23 140:25
  141:24 144:2 154:17

160:10,19 172:15,24 177:17
  189:16 190:1 194:12 204:7
  209:14 227:23 230:15
  240:24 241:19
worked 14:8 17:22 54:4 56:8
  86:23 88:11 89:21 127:11
  152:13 155:2 157:16 159:13
  202:4 238:4,6
working 19:7 49:15,20 63:15
  67:6 72:5 88:10 103:4 120:5
  123:3 128:3 133:10,12,23
  134:9 135:25 143:10,12,20
  157:25 171:13,25 172:1,13,
  14,16 210:2 214:9 235:16
  236:21 237:16,24 248:22
  249:1 250:1 260:16
workloads 189:24
works 136:14,16 203:12
world 101:7
worth 197:7
wrapping 138:2
Wright 158:18
write 17:19,21 18:1 44:25
  46:7 139:6 150:14
writing 119:3,5 229:1,13
  244:3
written 11:19 36:7,17,19
  39:20 40:1 48:23 49:3
  97:10,13 105:6 117:5,6
  159:8 190:4 200:11 204:10
  236:21 246:9,12 257:11,15
wrong 53:16 88:13,14 93:13
  98:17 191:2 260:11 261:22,
  24
wrongly 246:8,10 247:2
wrote 74:7 130:12,15 168:17
  189:22
Wyotech 237:14

---

## Y

yea 254:20
year 19:13 69:23,24 70:14
  135:12 143:13,25 165:24
  218:25 230:1 231:19 233:2
  248:24 260:16
years 14:10,17,19 24:25
  25:4 45:25 71:7 144:22
  252:17 258:20
yelled 178:17

yellow 87:17
York 8:18 176:1

```
1              E R R A T A   S H E E T

2    IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,

3    in her official capacity as Secretary of the

4    United States Department of Education.

5
                           CORRECTION AND REASON
6    PAGE  LINE
                         "has" should be
7    _19__ _12__         "hasn't"_____
                         Beckwood should be
8    _49__ __21_         Westwood_____

9    _49__ __22_         American should be "Marinello"
                         "in-state" should be
10   __64__ _21__        "intake"_____
                         "an illegal" should be "a
11   __82_ __11__        legal"_____
                         "crew at" should be
12   __86_ __11__        "COO"_____
                         "included" should be
13   _100_ __6__         "concluded"_____
                         "power" should be
14   _126__ __4__        "Bauer"_____
                         "plied" should be
15   _156__ __22_        "applied"_____
                         "release" should be
16   _170__ __5__        "relief"_____
                         "lot" should be
17   _181_ ___3__        "law"_____
                         "AG" should be
18   _223__ __5__        "IG"_____ _____
                         _"release" should be
19   _223__ _6 and 7     "relief"_____ _____
                         _"proved" should be "approved"
20   225_ _19__
                         _"proved should be "approved"____
21   _231__ _2____
                         __document should be
22   __234_ _2____       "documents"_____
                         "courtroom" should be "court"
23   _239__ __7__
                         _____
24   ____1.12.21_____
                         _Colleen M. Nevin_____
25      (DATE)                (SIGNATURE)
```

```
1              ACKNOWLEDGMENT OF DEPONENT

2                   I, Colleen M. Nevin, do hereby

3       acknowledge that I have read and examined the

4       foregoing testimony, and the same is a true,

5       correct and complete transcription of the

6       testimony given by me and any corrections appear

7       on the attached Errata sheet signed by me.

8

9

10

11       _1.12.21_____        _Colleen M. Nevin_____

12       (DATE)                          (SIGNATURE)

13

14

15              CERTIFICATE OF NOTARY PUBLIC

16       Sworn and subscribed to before me this

17       _____ day of _____, _____

18

19

20       _____     _____

21       NOTARY PUBLIC                MY COMMISSION EXPIRES

22

23

24

25
```