**Supplemental Complaint**

**Exhibit Index**

**Bates Stamped Documents**

Documents appear in this order, with Bates-Numbered Slip-Sheets Between them. The documents are cited **by Bates Number** in the Supplemental Complaint.

| Document Order | Bates Range | Document Title / Identifier |
|---|---|---|
| 1. | DOE00000196-DOE0000213 | Everest/Wyotech Transfer of Credits Memo |
| 2. | DOE00000584-DOE0000603 | Borrower Defense to Repayment Claims Evaluation |
| 3. | DOE00002144-DOE00002147 | "Manning Memo" |
| 4. | DOE00002342 | Submissions by Attorneys General Seeking Relief for Constituents |
| 5. | DOE00002528-DOE00002529 | Charlotte School of Law Memo |
| 6. | DOE00002653 | School Notice Letters and Other Open Items |
| 7. | DOE00003427- | Next Gen FSA Key Actions |
| 8. | DOE00004316-DOE00004320 | Summary of Information Requested by Diane Regarding Loan Discharges Pursuant to 2016 Regulation |
| 9. | DOE00004321-DOE00004322 | Borrower Defense – Summary of Notice to Schools Process |
| 10. | DOE00004939-4940 | Capella School Notice Letter |

**DOE00000196-DOE00000213**

To:      Under Secretary Ted Mitchell

From:   Borrower Defense Unit

Date:    October 24, 2016

Re:      Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims

---

The Borrower Defense team recommends borrower defense (BD) relief for students who: (1) enrolled at any Corinthian-operated, nationally accredited Everest[1] campus or at WyoTech's Laramie campus[2] between the time Corinthian opened or acquired the campus and April 2015; and (2) alleges that Corinthian misrepresented the transferability of credits earned at that campus. Corinthian represented that credits earned at these Everest campuses were generally transferable. These representations were false and misleading. Accordingly, for the reasons explained below, full BD relief is appropriate for all Everest and WyoTech Laramie borrowers alleging misrepresentations regarding the transferability of credits, subject to reduced relief for those borrowers impacted by the statute of limitations.

### BACKGROUND

Everest consistently misled prospective students about the transferability of credits earned at their campuses in two ways. First, school staff made explicit representations regarding transferability. Second, staff strongly implied transferability by emphasizing the school's accreditation status.

The misleading nature of these statements hinges on the key differences between national career-related and regional institutional accreditation. Traditionally, national accreditors accredit mainly for-profit, career-based, single-purpose institutions, both degree and non-degree.[3] By contrast, regional accreditors accredit public and private, mainly non-profit and degree-granting, two- and four-year institutions.[4] Broadly speaking, credits earned at nationally accredited colleges "are rarely accepted at regionally accredited schools;"[5] and have never been generally transferable.[6] Almost every Everest campus was nationally accredited since its inception, and Corinthian personnel were fully aware of the negative impact of their accreditation on transferability.[7] Nevertheless, as Senator Tom Harkin notes in his 2012 report on the for-profit college sector (the "Harkin Report"), recruiters at for-profits "sometimes play on prospective students' ignorance about accreditation in order to use their schools' accreditation as a selling point."[8]

As discussed below, Everest personnel regularly led prospective students to believe, either through express or strongly implied representations, that credits earned at Everest would generally be

---

[1] Everest schools include Florida Metropolitan University campuses, which Corinthian acquired in 1996 and later rebranded as Everest University.

[2] To date, the BD Team has only reviewed WyoTech claims from the Laramie campus. While we have no reason to believe the facts and recommendations in this memorandum do not apply to other WyoTech campuses, at this time we are not extending our analysis to those campuses. For the purposes of this memorandum, references to "Everest" include WyoTech Laramie.

[3] *See Council for Higher Education Accreditation: An Overview of US Accreditation*, http://www.chea.org/pdf/Overview%20of%2US%Accreditation%202015.pdf. For this memorandum, "national" refers to national career-related accreditors or accreditation.

[4] *Id.*p. 2.

[5] Harkin Report, p. 56, citing Council for Higher Education Accreditation, *The Fundamentals of Accreditation: What Do You Need to Know, Council for Higher Education Accreditation*, p. 7, September 2002, http://www.chea.org/pdf/fund_accred_20ques_02.pdf (accessed May 24, 2012).

[6] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm.

[7] *See* Mark Pelesh's statement at https://www.insidehighered.com/news/2007/02/26/transfer.

[8] Harkin Report at 55.

1

DOE00000196

accepted at regionally accredited post-secondary institutions. In actuality, those credits generally did not transfer to or were not accepted at regionally accredited schools.

## I.    Summary of Evidence of Representations of Transferability

Everest staff orally represented to potential students that they could generally transfer their Everest credits to any other school. These oral representations occurred both in person and during telephone calls with prospective students. Specifically, the school personnel: (a) stated credits were generally transferable; and/or (b) "play[ed] on prospective students' ignorance about accreditation" to make claims about national accreditation that strongly implied general transferability.[9]

### A.  Student Accounts of In-Person Oral Representations of Transferability

Hundreds of student applications reviewed to date provide corroborative evidence that Everest admissions personnel regularly made misleading oral representations about transferability. Indeed, our review of claims spanning from 1998 through 2010 shows that personnel made consistent transferability claims throughout the entire time that Corinthian operated the schools.

A sample of claims from the Everest Brandon campus demonstrates the consistency and specificity of false transferability claims made by school representatives:

- "In my entrance interview, I was told that I should enroll in the paralegal program if I planned on being a lawyer. I was told guarantee that my credits would be good to transfer to USF or UT and then Stetson Law."[10]
- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."[11]
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them I was told that employers will recognize the degree from them and they laugh at me."[12]
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."[13]
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[14]
- "The representative for FMU, asked what my goals were for my education. I stated that I wanted to attend USF for a bachelors degree. He said my credits would absolutely transfer and that he worked hand in hand with the academic advisers over at USF, to help students transition smoothly. He said that my credits would transfer even mid-way through the program."[15]
- "The admissions department also ensured me that earned credits would be accepted by other educational institutions... later discovered that credits from Everest University were not honored at state and local universities."[16]

---

[9] As discussed below, in Section III(B)(1), footnote 102, the implied representations also constitute actionable material omissions.
[10] BD151795
[11] BD150990
[12] BD151323
[13] BD150355
[14] BD151723
[15] BD150789
[16] BD153129

DOE00009197

- "I asked if I decided to transfer after rec associates degree would all credits transfer to any college? I was told, an associates is an associates no matter where it comes from."[17]
- "Brian Walker admissions representative had stated that if I wanted to get a Masters degree from another college that my credits will transfer with no problem as FMU (now Everest) is accredited university"[18]
- "I asked if I could transfer my credits to get my Bachelor's degree after earning my Associate's and i was told they would transfer but I would receive a discount if i was to get my Bachelor's with them. They told me i could get my Master's anywhere because my credits would transfer. I asked for specific schools which would take the credits and I was told they don't see why anyone wouldn't take them . . . I was going to pursue my Master's but found out my credits do not transfer."[19]

In all of the above examples, the school explicitly misrepresented the transferability of its credits to the student.

Applicants also state that the school represented general transferability via statements that Everest was "accredited" or "fully accredited." Such implied representations of transferability are supported by the Harkin Report, as well as the Corinthian telephone audits and recordings discussed below. That this "accreditation" tactic, in context, created a strongly implied representation of transferability is illustrated by the fact that students who were unable to transfer their credits believe that Everest lied about being accredited at all (italics added):

- "FLORIDA METROPOLITAN UNIVERSITY-ONLINE (FMU-ONLINE) *LIED BY STATING THAT THEY WERE AN ACCREDITED UNIVERSITY WHEN IN FACT THEY KNOW THEY WERE NOT* . . . THE MISCONDUCT FROM FMU-ONLINE PREVENTED ME TO TRANSFER ANY OF THE CLASSESS I HAD TAKEN THERE, TO BE TRANSFERABLE."[20]
- "Before i applied for the loan i was told my credit can be tranfer if need when i was attending class *i found out thats not true they* [sic] *are not a acrredited school.*"[21]
- "I DID NOT KNOW THAT THE SCHOOL WAS NOT PROPERLY ACCREDITED. CREDIT WERE NOT TRANSFERABLE"[22]
- "Everest University misrepresented their accreditation I was told during my school interview that the school was accredited, *and later found out once I applied to other colleges that the school was not accredited.*"[23]
- "I actually went to Valencia once and they told me that they [Everest] are not accredited, thus I'd have to start all over again."[24]
- "Throughout the course, there was speculation that the school was not accredited, but they continuously posted fake documents around the school claiming that they were accredited and that any credits we received would transfer over without any problem."[25]
- "I was told that credits would transfer to other schools offering the same classes but when i tried to transfer after having ear problems i was told that *NONE of my credits could transfer because FMU [later Everest] was not an accredited school.*"[26]

---

[17] BD153757
[18] BD150139
[19] BD150545
[20] BD154282
[21] BD153723
[22] BD152794
[23] BD152222
[24] BD150941
[25] BD150786

3

DOE00000198

- 'I am struggling to have my credits transfer to Southern New Hampshire University. They told me that since Everest is closing it may be difficult to get any credits to transfer *because Everest is not an accredited institution. Everest told me that they were accredited*.'[27]

Whether students allege an explicit misrepresentation about transferability ("I was told all my credits would transfer") or a strongly implied misrepresentation ("I was told the school was accredited, but then I found out my credits wouldn't transfer"), the student statements are unprompted,[28] specific, and consistent across a span of years.

For example, of the 303 claims reviewed to date at the Everest-Brandon campus, 52 include the allegation that admissions personnel made express representations regarding transferability (examples of which were quoted above) and an additional 6 allege an implied misrepresentation (tying accreditation to transferability).[29] The student statements are consistent regarding the representations made, including details such as specific schools that would accept Everest credits, or the suggestion that credits earned in Everest's paralegal program would enable students to continue on to law school.

The 58 Everest-Brandon transferability claims come from students who attended between 1998 and 2010.[30] Corinthian owned and controlled the Everest-Brandon location beginning in 1996, and the first claim alleging a transferability misrepresentation comes from a student who enrolled in 1998. We have transferability claims from this campus for each year from 1998 through 2010, with a spike in the late-2000s. We have fewer claims from earlier years, but those earlier claims bear the same indicia of reliability as the later claims. Significantly, the student statements about the admissions representatives' misrepresentations exhibit consistency across the span of years:

- 1998: "I attended the school due to the flexible hours and the fact that I was told by the [the school] that my credits in fact would transfer over to other schools."[31]
- 2000: "I was also told that my credits could transfer to any local college or university that was regionally accredited."[32]
- 2006: "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[33]
- 2010: "...Also, was told that credits would transfer to any University (not true)."[34]

The pervasiveness and consistency of the misrepresentation over time at Everest-Brandon corroborate students' allegations about transferability claims throughout the entirety of Corinthian's control of the school.

---

[26] BD150315

[27] BD152848

[28] All of the above student statements came from a variety of different types of applications including the Everest/WyoTech attestation form ED created for JPR claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form specifically ask about transfer of credits, but others do not, and ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."

[29] These figures do not include applications on the Debt Collective form where the applicant only checked the box indicating they were misled about "[t]he fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college" without providing any narrative.

[30] Review Group 15, from which these sample claims are taken, includes any Everest or WyoTech claim from students who enrolled before 2010. A few claims from students enrolled in 2010 can also be found in the review group.

[31] BD1617575

[32] BD1600530

[33] BD151723

[34] BD1613824

DOE00000199

Significantly, just as the 58 Everest-Brandon claims corroborate each other, the number of similar allegations at and across multiple other campuses further corroborates students' allegations of transferability representations made by Everest personnel.  Across campuses and across years, the similarity of student statements indicates that the misrepresentations were system-wide and, indeed, part of the Corinthian culture, discussed below, of enticing students to enroll at any cost.[35]

| Campus | Applications reviewed | Applications alleging an express or implied transferability representation | % |
|---|---|---|---|
| Everest Brandon | 303 | 58 | 19 |
| Everest Grand Rapids | 46 | 11 | 24 |
| Everest Orange Park | 36 | 9 | 25 |
| Everest Orlando North | 45 | 11 | 24 |
| Everest Orlando South | 157 | 56 | 36 |
| Everest Phoenix[36] | 81 | 22 | 27 |
| Everest Pompano Beach | 28 | 10 | 36 |
| Everest Rochester | 53 | 15 | 28 |
| Everest Tampa | 26 | 10 | 38 |
| WyoTech Laramie | 18 | 6 | 33 |
| **TOTAL** | **793** | **198** | **25** |

The campuses shown above represent the nine Everest campuses, and one WyoTech campus, for which we have the most claims. The campuses are located in five separate states (AZ, FL, MI, NY, and WY) and the total applications reviewed are from the period of time when Corinthian gained control of the campus[37] through 2010. Every campus from which we have reviewed a significant number of applications has revealed that between one-fifth and one-third of total applicants allege a misrepresentation about transferability of credits. Just like the Everest-Brandon campus discussed above, the transferability claims from these campuses are distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students are making extremely similar allegations about what the schools said about transferability – whether that student enrolled at Brandon in 1998 or Rochester in 2008.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for every one of the over ninety Everest campuses as unnecessary. The hundreds of claims reviewed corroborate that Everest personnel made representations that credits were generally transferable beginning shortly after Corinthian opened or gained control of a campus.

## B. Telephone Scripts, Audits, and Recordings

Not surprisingly, Corinthian's training documents do not contain express misrepresentations about transferability.  However, they lay the foundation for abuses by failing to emphasize the non-transferability of credits or other potentially important information and in some cases tacitly encouraging misinformation.  For example, in a Corinthian presentation entitled "Overcoming Phone Obstacles" attached to the Harkin Report, Corinthian instructs its admissions representatives to provide limited

---

[35] *See* discussion below, Section III(C), detailing Corinthian's high-pressure sales techniques and internal emphasis on enrolling as many students as possible whether or not it is in the students' interest.
[36] Although Everest Phoenix was a regionally accredited campus, these figures are included for their corroborative value in establishing that Everest personnel regularly made representations regarding transferability.
[37] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The nine campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

DOE00000200

information.[38]  By encouraging its admissions representatives to listen more and talk less, Corinthian believed it could give the student "limited information that will bring the student into the school."[39]  Similarly, a training manual for admissions representatives attached to the Harkin Report contains call scripts for admissions representatives.[40]  One section of the script suggests that representatives tell students who ask that credits "will probably not be transferable,"[41] but a later sample conversation instructs the representatives to tell students: "… you'll need to ask the receiving institution that question. I can't tell you what their policy might be because every institution sets their own policy regarding credit transfer."[42]

However, an internal Corinthian audit shows that even to the extent the scripts accurately described the transferability of Corinthian credits, admissions representatives under pressure to enroll students frequently did not follow them.  A 2012 audit of Everest's Online Learning Division – Colorado Springs, Tempe,[43] and Tampa (which includes Brandon, South Orlando, and Pompano Beach) – identified substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students.  Specifically, representatives for the Colorado Springs campus "failed to or incorrectly mentioned" credit transferability 31% of the time when students asked; at Tempe and Tampa, these errors occurred in 40% of audited calls.[44]  Karen Fleming, a quality assurance and compliance auditor for Corinthian, summed up the inaccurate information on transferability in an April 13, 2012 email to colleagues, stating: "Admissions representative[s] did not inform the student that if they wish to transfer their credits from Everest to another institution, that the acceptance of those credits would be at the judgment of the receiving institution…"[45]

Recordings of phone calls supplied by the Illinois Attorney General further illustrate that Corinthian employees misled potential students to believe that credits would be accepted at other schools.  In summaries of 9 out of 29 recorded calls between Everest call center employees and prospective students provided to us by the Illinois Attorney General's office, Everest representatives gave prospective students information about transferability that was either false or technically accurate but misleading.[46]  In one phone call, the representative directly links accreditation to transferability stating:  "We are a nationally accredited school. So you can use that almost anywhere you go."[47]  Another representative, after confirming the school was accredited, refused to answer a prospective student's question about transferability.[48]

---

[38] Harkin report, Appendix 25, CoCo Document 3.

[39] *Id.* at p. 7

[40] Harkin report, Appendix 25, CoCo Document 4

[41] Harkin report, Appendix 25, CoCo Document 4, pp. 7-8

[42] Harkin report, Appendix 25, CoCo Document 4, p. 14

[43] Everest Tempe was one of the regionally accredited campuses in Arizona. While the effect of accreditation on transferability for the AZ campus is not the same as for nationally accredited schools, the fact that representatives for that campus either failed to provide accurate information, or affirmatively provided inaccurate information, regarding transferability between 20% and 40% of the time when observed serves to corroborate allegations that such representations were regularly made regarding other campuses nationwide.

[44] Quach Decl. Ex. 40, at CCICA156477. After a "corrective action plan" was initiated, those numbers dropped to 18% at Colorado Springs, 20% at Tempe, and 26% at Tampa. *See* Quach Decl. Ex. 40, at CCICA156454

[45] *Id.*

[46] IL AG "Hot Call" table

[47] IL AG; 3333182367_3333182298_efb49c0853f315387993e156

[48] ""The school will obviously give you the education and credentials with regard to certification"    24:00 "Are you guys accredited." A: "Absolutely." Student then asked about transfer of credits.  She wouldn't answer. IL AG; Second Leg, 3333592713_3333592639_13469370fa1b53e21c997bc8

DOE00000201

## II.      Summary of Evidence of Falsity of Representation

Three main sources of evidence demonstrate that credits from Everest were not generally transferable to most other schools. The first is the nature of the schools' accreditation. The second is the *Transfer Credit Practices* guide, which admissions officers use to determine how other schools treat a school's credits. The third is a survey we conducted of transfer policies in a few states that had large populations of Everest students. Additionally, public statements by Corinthian executives show that Corinthian was aware that credits from their schools were not generally transferable.

### A.    Accreditation

Regionally accredited schools generally do not accept transfer credit from nationally accredited schools. Most of the nation's two- and four-year degree-granting post-secondary schools are regionally accredited, while national accrediting agencies accredit career, vocational, and trade schools. Generally, schools that are regionally accredited will not accept credits from nationally accredited schools.

A 2014 study by the National Center for Education Statistics found that 81.4% - 84.3% of students who transfer to, from, or between nationally accredited schools have none of their earned credits transfer (compared to 37% of students transferring between regionally accredited schools),[49] and that the average student transferring to, from, or between nationally accredited schools lost 83% - 90% of their credits upon transfer (compared to an average loss of 39% for regional to regional transfers).[50] The California State University system, the largest four-year public university system in the US, does not generally accept credits from *any* institution without regional accreditation.[51] Similarly, major systems in Florida, Georgia, Texas, Minnesota, and Massachusetts only generally accept credits from regionally accredited schools.[52]

Similarly, a GAO report found that among regionally accredited schools, 63% specified that they accepted credits from *any* regionally accredited school, whereas only 14% specified that they accepted transfer credits from nationally accredited schools;[53] less than one percent of post-secondary institutions specified that accreditation was not a factor in their transfer decisions.[54] Nationally accredited institutions told the GAO that their students "often have difficulty transferring credits and that . . . regionally accredited institutions did not always accept courses taken at a nationally accredited institution."[55] Nationally accredited institutions reported that they "advised students to assume that credits would not transfer to regionally accredited institutions."[56]

---

[49] Simone, S.A. (2014). *Transferability of Postsecondary Credit Following Student Transfer or Coenrollment* (NCES 2014-163). U.S. Department of Education. Washington, DC: National Center for Education Statistics. p. 36

[50] *Id.* at 37. While the study did not conclude there was a direct link between accreditation status and credit transfer, it did find that accreditation status was a factor in credit transfer. The importance of that "factor" is highlighted in the percentage of transfer credits lost when nationally accredited students attempts to transfer those credits. Moreover, experts in the field consider accreditation to be a major factor in credit transferability. According to Christine Kerlin, Ed.D., the "type of accreditation is one of the first considerations, and often the primary consideration, by a receiving institution in reviewing transfer credit." See Expert Rebuttal Report to Expert Report by Dennis M. Cariello in the Matter of *State of Minnesota by its Attorney General, Lori Swanson v. Minnesota School of Business, Inc. et al.* at 4 (July 2015). *See also* statements of Herman Bounds, Ed.D, Director of Accreditation Group at the Department of Education, referenced in FN 6.

[51] *Transfer Credit Practices*, 2015 Edition

[52] See "Survey of Two- and Four-Year Schools in Selected States", Section II(C).

[53] GAO-06-22, p. 9

[54] GAO-06-22, p. 9

[55] *Id*, p. 10

[56] *Id*

DOE00000202

The fact that regionally accredited schools generally do not accept nationally accredited credits has always been true. The 2005 GAO report treats the issue as the status quo, and not a recent development.[57] Until the last couple decades, credit transfer between nationals and regionals was a non-issue since, historically, nationally accredited schools offered technical certificates, not degree programs.[58] However, in the last 15-20 years, more nationally accredited schools have started offering degree programs, and the inability of those credits to transfer has become a larger issue.[59]

Corinthian itself was sufficiently aware of the impact of national accreditation on transferability that it supported various regulatory and/or legislative efforts to require schools to "state that they will not automatically reject credit from nationally accredited institutions."[60] In 2007, Corinthian's VP for legislative and regulatory affairs, Mark Pelesh, stated: "Students are required too often to repeat coursework, pay for something twice, use the public's resources in terms of federal and state financial aid, and have impediments put in the way to advancing their career objectives… it's high time we do something that has some regulatory teeth and impact."[61]

**B.   Transfer Credit Practices of Designated Educational Institutions**

The *Transfer Credit Practices of Designated Educational Institutions,* a reference guide published by the American Association of Collegiate Registrars and Admissions Officers, also demonstrates that these credits were not generally transferable as Corinthian frequently told borrowers. It reports the transfer acceptance practices of one major institution in each state, usually the flagship campus of the state university system, regarding credit from institutions in that state. Other schools are not required to follow the reporting school's policies, but the guide is useful for determining how institutions' credits are treated generally.

In a review of *Transfer Credit Practices* from the last twenty years,[62] none of the reporting institutions, outside of Arizona, had a policy of generally accepting credits from Everest. Outside of Arizona, the most favorable policy regarding credits from Everest was one university system that accepted them "on a provisional basis subject to validation as prescribed by the reporting institution".[63] All other reporting institutions either had no official policy or did not normally accept credits from Everest.[64]

---

[57] *See also* https://www.americanprogress.org/issues/higher-education/report/2015/12/14/127200/hooked-on-accreditation-a-historical-perspective/; https://en.wikipedia.org/wiki/Regional_accreditation; El-Kwahas, Elaine (2001) *Accreditation in the USA: Origins, Developments, and Future Prospects* http://unesdoc.unesco.org/images/0012/001292/129295e.pdf; Brittingham, Barbara (2009) *Accreditation in the United States: How Did We Get to Where We Are?*
http://onlinelibrary.wiley.com/doi/10.1002/he.331/pdf; http://www.acics.org/accreditation/content.aspx?id=2258

[58] *See* "Council for Higher Education Accreditation: Transfer and the Public Interest" (Nov. 2000) available at http://www.chea.org/pdf/transfer_state_02.pdf, where, without addressing for-profits specifically, the reports states that "higher education is experiencing a significant change in how students attend college and who provides higher education"; *see also* "History of Accreditation" available on a major national accreditor's website at
http://www.acics.org/accreditation/content.aspx?id=2258.

[59] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm. *See also* 2006 Spellings Report (ED report arguing that something needs to be done about credit transfer practices).

[60] https://www.insidehighered.com/news/2005/10/19/transfer

[61] https://www.insidehighered.com/news/2007/02/26/transfer

[62] The 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.

[63] California State University, Northridge, for certain Everest campuses, but only in 2006 and 2012. Of the 6 Everest campuses from which CSU would accept credits on a provisional basis, credits from 5 of those were limited to "graduate, professional, or technical programs only". By 2015, CSU Northridge policy for all Everest/WyoTech campuses was "credit not normally accepted".

[64] Florida statute allows nationally accredited schools to participate in the Statewide Course Numbering System, which may allow credits taken at those schools to transfer, but for the Everest campuses that participated in the System, "the credentials of

8

### C. Survey of Two- and Four-Year Schools in Selected States

In May 2016, the BD Team also surveyed the transfer policies of two- and four-year schools in three of the states with high numbers of Everest students (FL, GA, and TX), regarding credits earned at Everest. We reviewed the schools' credit transfer acceptance policies available online, emailed admissions officers, and/or spoke directly with admissions officers. None of the state four-year school systems had a policy of generally accepting credits from nationally accredited schools, including Everest.[65] Most of the two-year community colleges would only accept credits from regionally accredited schools on a general basis (one two-year school in FL and one in TX regularly accepted credits from ACICS schools, including Everest).

Similarly, as part of their investigation into Everest campuses in Massachusetts, MA AGO contacted several two- and four-year schools within commuting distance of the Everest schools. None of the schools normally accepted credits from Everest, with all of the four-year and one of the two-year schools specifying that they only had acceptance policies for regionally accredited schools.[66] The UMass flagship campus either was not contacted or did not reply, but according to its website, "the following courses generally will not transfer to UMass: Taught by a school which does not have regional academic accreditation at the post-secondary level."[67]

### D. Student Accounts

Unsurprisingly, student accounts also show that other institutions of higher learning did not accept credits earned at Everest:

- "I am currently a student at Daytona State College and have been forced to repeat many of the courses I took and paid for at Florida Metropolitan University [Everest Orlando North]. Daytona State does not recognize any of credits earned at FMU, forcing me to repeat them and continue to pay a student loan on worthless education."[68]
- "I tried to enroll at University of Central Florida, Seminole State College and Valencia College. UCF did not even respond to me. SSC and Valencia informed me that they could not accept my credits."[69]
- "I was Told all college credits would transfer, it didn't matter that this college was private, I spoke with a community college advisor and none of these credits transfer."[70]
- "Credits were not transferable. I checked with Western Dakota Tech in Rapid City SD at the time as I felt I was not getting the education I was promised."[71]

In some instances, students even lost the majority of credits earned at one Everest campus when they transferred or re-enrolled at another Everest campus. One student writes: "The fact is none of them [credits earned at Tampa] were accepted by Tempe Everest even though it was from their OWN sister

---

faculty teaching each course are considered in determining the number assigned to the course and the transferability of the course"; those Everest campuses are still listed as "credits not normally accepted".
[65] University of Florida (Gainesville), University of West Florida, the Georgia State University system, University of Georgia (Athens), University of Texas (Austin), University of Texas (San Antonio), Baylor University, and Rice University. Florida State University (Tallahassee) would accept, and has accepted, Everest credits on a provisional basis, upon review, as noted above.
[66] MA AGO, Ex. 34
[67] https://www.umass.edu/registrar/students/transfer-information/transfer-credit
[68] BD151803
[69] BD1604707
[70] BD150366
[71] BD155798

9

school."[72] Another student reports: "They told me that I will be able to use my previous credit… but [Everest Orlando South] made me take the class again."[73]

This inability to transfer credits to other institutions is consistent both at individual campuses and between campuses during the time they were operated by Corinthian.

## III.    Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[74] The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. For the following reasons, the cohort of Everest students identified below applying for borrower defense relief predicated on Everest's transferability misrepresentations: 1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL. Moreover, given the lack of value conferred by Everest credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A.    Everest Students Have Standing Under California's UCL

Both students who attended Everest programs in California and those who attended campuses in other states have standing under the California UCL. First, students attending Everest programs in California can demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Everest regarding the transferability of Everest course credits. Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[75] Second, while California statutes do not generally have effect outside of California, "[California] statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."[76] Courts look to "where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising and other promotional literature decisions were made"[77] when determining whether non-California residents may avail themselves of California's consumer protection statutes. Corinthian and its subsidiaries, through which it operated Everest schools, had their primary places of business and headquarters in California,[78] had more campuses in California than any other state,[79] produced and coordinated marketing and advertising in California,[80] and developed and promulgated the policies and training materials for their personnel in California.[81] Further, the single

---

[72] BD1603868

[73] BD155063

[74] 34 C.F.R. § 685.206(c).

[75] CAL. BUS. & PROF. CODE §17204.

[76] *Norwest Mortgage, INc. v. Super. Ct.*, 72 Cal.App.4th 214, 224-25, 85 Cal.Rptr.2nd 18(Cal.Ct.App. 1999)

[77] *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1237 -1238 (N.D.Cal., 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)).

[78] CCI Answer CA Amended Complaint ¶¶9-27

[79] There were 27 Corinthian campuses in California (14 Everest, 3 WyoTech, and 10 Heald). The other states with large numbers of Corinthian campuses were Florida (15 Everest and 1 WyoTech campuses) and Texas (9 Everest campuses).

[80] Tim Evans Interview, WI AG Sutherlin Affidavit Ex. 12 ("Evans said that all advertising was done by corporate."); Mark Sullivan interview, WI AG Sutherlin Affidavit Ex. 13 ("He [Sullivan] didn't do any of the marketing. That wasn't done by the local campuses."); Deposition of Scott Lester, WI AG Sutherlin Ex. 15 ("Every bit of marketing came out of corporate. Every marketing decision came from corporate.")

[81] WI Educational Approval Board letters to Everest Milwaukee, WI AG Sutherline Affidavit, Ex. 10

DOE00000205

incoming call facility for prospective Everest students from the throughout the nation was located in California.[82]

Additionally, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment:

- "Q: And when the Admissions Reps were making representations to the students about the externships, about the career possibilities, about what life could be, were those accurate representations given the state of the school?
  A: *They were the representations that they were given by corporate as part of their -- the way they were told to do the job.* Were they accurate? No."[83]
- Call center representatives "were trained to lie."[84]
- "There is a huge cultural issue at Corinthian Colleges that quietly promotes dishonesty & fraud at all the Everest campuses. *This culture of dishonesty & intimidation is generated by the corporate office* that has spread all over the company like cancer."[85]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, and that decisions and policies made by its California based corporate leadership harmed Everest students across the nation – Everest students from campuses nationwide have standing under the California UCL.

**B.   Everest Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[86] Here, Everest's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[87]

**1.   The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[88] Thus, if a business practice violates any law, this is *per se* a UCL violation.[89]

Corporate misrepresentations like those Everest made regarding transferability are prohibited by a number of state and federal laws. In particular, Everest's misrepresentation of the transferability of its

---

[82] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.
[83] Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15
[84] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.
[85] Letter from Anonymous former Everest employee to ACCSC Commissioner, Ex. 54 of CA AG Motion for Default at CCICA179681
[86] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).
[87] Although not discussed here, Everest's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair…business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code        § 172000 Practice at 3:212 (2016).
[88] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).
[89] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

DOE00000206

credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act"). [90] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[91]

As described above, Everest's representations about the transferability of its credits were false, erroneous and misleading. Everest's transfer of credits representations misled students about the value of the credits they would be earning at Everest. Based on the school's misrepresentations, individuals considering enrolling at Everest would have the false belief that Everest credits would not only allow them to obtain an Everest degree, but would also provide them with credits generally transferable to any other institution.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[92] Everest's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In applications submitted to the Department,[93] these borrowers have specifically identified false representations regarding transferability as some of the misconduct giving rise to their claim. Many students' applications specifically state that they intended to continue their educations at four-year schools.[94] For other students intent on beginning a career as soon as possible, the transferability of credits and ability to continue academically offered an alternative if they were unable to find a job immediately.[95] Finally, students considered the transferability of credits earned at an institution to be an indicator of the quality and value of that institution's instruction.[96]

---

[90] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[91] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

[92] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[93] Although many of these applicants submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of the Department's form and therefore made unsworn statements.

[94] "They claimed that all credits earned would be accepted by any other colleges... I wanted to continue my education and perhaps attend law school but was told that a majority, if not all of my credits from Everest, would not be accepted." BD150202; "I was told that after completing my AA in Forensics I would be able to take the credits and pursue a Bachelors degree in Forensic Psychology which would double/triple my future earnings..." BD150303

[95] "After graduating and not being able to get into the career I had studied for. I tried transfering credits and could not find schools that wanted to accept them." BD151251; "One of my first questions once I enrolled in Everest University was regarding the credibility and accreditation of the school. I wanted to make sure that upon graduation, I would be able to find a job and/or be able to further my education using Everest as a foundation." BD1602822

[96] "'Students who may not even be interested in transferring credits nonetheless will ask us whether other institutions will accept their credits,' [Corinthian Executive Vice President for Legislative and Regulatory Affairs Mark] Pelesh said. 'What they're really asking is, is this a legitimate institution? Is it part of the legitimate postsecondary higher education world?' And policies

DOE00000207

These students' reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Everest students after the institution closed.   Thus, Everest's transferability misrepresentations constitute unlawful business practices under the UCL.

### 2.   The Fraudulent Prong

Everest's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Everest students.   To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[97] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[98]   Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[99]   As noted, the transferability representations that Everest made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[100] However, for a consumer who was deceived into purchasing a product[101]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions[102] of the entity.[103]

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[104] the individual's decision.   Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[105]

As discussed above, the evidence shows that students relied on Everest's transferability representations when they enrolled.[106]   Indeed, express or implied claims like those made by Everest about

---

that openly distinguish between credits earned at for-profit and nonprofit colleges -- turning down their nose at the former -- send a signal that answers that question No, he said." https://www.insidehighered.com/news/2007/02/26/transfer

[97] *See Bank of the West*, 2 Cal. 4th at 1254.

[98] CAL. CIV. C. § 1709.

[99] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[100] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[101] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[102] Everest's implied representations of transferability are also actionable as deceptive half-truth omissions. A half-truth omission occurs when an affirmative representation is misleading in the absence of material qualifying information. *See* Deception Policy Statement, 103 F.T.C. at 176; *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive."). An advertisement can be deceptive because it failed to disclose material information even if it does not contain any false statements. *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). Here, Everest's affirmative statements about being "accredited" were deceptive absent further information distinguishing between regional and national accreditation and explaining the impact of national accreditation on transferability.

[103] *See, e.g.*, *Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").

[104] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[105] *Id.* (internal quotation marks omitted).

[106] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a transferability misrepresentation, regardless of subsequent efforts to transfer.

13

the transferability of credits are presumptively material.[107]  Moreover, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[108]  Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C. Weak Disclaimers In Some of Everest's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Everest's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials. In many instances enrollment agreements and course catalogs contained technically accurate information about transferability, but such written information did not change the overall impression created by the oral representations.

If a student examined the enrollment agreement, the student would have to read through four pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[109]  Midway through that box of fine print, item number 5 provides some information on transferability. That item is not highlighted or bolded in any way. The text cautioned students that Corinthian could not *guarantee* the transferability of credits to another school, but did not go so far as to cast doubt on the general transferability of Corinthian credits.[110]  The agreement then continues on with two additional pages of fine print disclaimers. Everest's course catalogs generally contained limiting language similar to the enrollment agreements, and that language was similarly buried.[111]

These disclaimers do not cure the falsity of Everest's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[112]  The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[113]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised general transferability. Moreover, here, Everest's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.

---

[107] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[108] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

[109] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement.

[110] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement: "The School does not guarantee the transferability of credits to any school, university or institution. The student should contact a receiving institution regarding transfer of credit from The School prior to enrollment." MA AGO Ex. 9 at AGO-MA02062

[111] Most course catalogs stated that the acceptance of credits was at the discretion of the receiving institution. We found one outlier example, the Everest Miami course catalog, which declared Everest credits were not generally transferable.

[112] *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[113] *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

DOE00000209

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[114] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[115]  Corinthian advertised on daytime TV,[116] targeting the un- or under-employed.  In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[117] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Moreover, the nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission.  Students were rushed through the enrollment process at Corinthian and were not provided an opportunity to read and digest the enrollment agreement.[118] As the Harkin Report found, this practice stemmed from the emphasis on growth:  "Enrollment growth is critical to the business success of for-profit education companies... In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible to sign up for their programs."[119] The report quotes a 2005 Corinthian hiring manual as stating: "remember that this is a sales position and the new hire must understand that from the very beginning."[120] At Corinthian, internal documents make clear that recruiters were not trained or expected to advise students,[121] but to sell the program – to "enroll your brains out."[122]

Many Everest students state that they did not choose their own classes[123] or sometimes even their own program of study, making it even less likely they would see disclosures in course catalogs.[124] These student reports back up the Harkin report's conclusion that Corinthian recruiters were effectively salespersons, with the goal to enroll the student in whichever classes or programs made the most sense for

---

[114] CA AG Quach Decl. Ex 113.
[115] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).
[116] CA AG Quach Decl. Ex 113.
[117] CA AG Decl. of Holly Harsh.
[118] "After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process." Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891; "The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision." Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914; "They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour." Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887
[119] Harkin Report, p. 387.
[120] *Id.*
[121] Harkin Report, p. 387.
[122] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, WI AG, Sutherlin Affidavit Exhibit 15 , p. 49
[123] "I ended up taking courses that were not even applicable to my degree or not necessary for me to complete my degree. In other words, *I paid additional for classes I didn't really need to take.*" BD150455; "My student advisor when I first got started was explaining how classes were available for a few hundred dollars for the courses. While there may have been some for that price, not many were *the classes they said I had to take.*" BD150813
[124] "I went to school from Jan 2011 to March 2014 and was enrolled in the Associates Billing and Coding and then they *convinced me to move to a BS in Health Care Administration*… As I approached my end of my degree I ran out of money and realized *they had made me take classes I did not need* in my program and had 4 classes to finish and I was stuck…" BD151750; "They totally mislead me when I was requesting to sign up for their Crime Scene Investigator program. My student adviser had actually put me into their Criminal Justice Program instead and the mistake wasn't figured out until it was past their drop/add time frame of classes so I was stuck taking classes that had NOTHING to do with my actual program I wanted to study. They told me there was nothing they could do and I had to just wait til the time frame of starting their next term." BD153136

DOE00000210

the school, not the student. Students were not provided the time to read any written materials because the students' interests were not at the heart of the transaction.[125]

Finally, the fact that 198 of the 793 (25%) Everest/WyoTech claims reviewed to date allege that Corinthian represented that credits would generally be accepted at other schools, with no mention of any written disclaimer, strongly supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations we know Corinthian personnel to have employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D. Eligible Borrowers

Based on the above analysis, the following Everest and WyoTech Laramie students alleging transfer of credits claims should be eligible for relief:

1. Any claimant who attended a nationally accredited Everest campus or WyoTech's Laramie campus and who:

   a. alleges that Everest expressly represented that credits earned there would be generally transferable; or

   b. alleges that Everest misrepresented the nature and/or value of their accreditation, in a manner that implied that their credits were generally transferable.

2. Borrowers who allege that their credits did not transfer, but do not allege a corresponding misrepresentation, will not be eligible for relief on this basis.

3. Eligible borrowers will be limited to students first enrolling after Corinthian acquired the campus in question.

### E. Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[126] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[127]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to

---

[125] "I was also provided with a course catalog/program disclosure statement stating in writing that the placement rate was 72%. *These written materials were provided only after I had signed up.*" MA AGO Ex. 03 at AGO-MA00180
[126] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).
[127] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

16

the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[128]

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim. The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[129]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[130]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."[131]

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of … remedies."[132] Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Everest education. *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student cannot generally transfer credits, a chief value conferred by such credits is greatly diminished.

Second, and perhaps more importantly, the Department has found that Everest and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its

---

[128] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[129] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

[130] 34 C.F.R. § 685.206(c)(2).

[131] *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).

[132] *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively).

DOE00000212

accreditation.[133]  Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest education has been severely limited.

Borrower defense applications confirm the lack of value of an Everest education as many Everest students report that their coursework from Everest has been an impediment rather than an asset as they seek employment.  For example, one student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[134]  Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[135]  Yet another student states: "Employers will not touch me. After graduating I posted a resume online. I did not receive any responses until I removed Everest Online from my resume."[136]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

---

[133] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).
[134] BD1614100
[135] BD1602593
[136] BD151191

18

DOE00000213

**DOE00000584-DOE00000603**



# BORROWER DEFENSE TO REPAYMENT CLAIMS EVALUATION

DECEMBER 2019

DOE00000584

# GROUND RULES

- This is a BACKGROUND briefing
- Nothing said or shown is for attribution, unless explicitly stated
- Information is EMBARGOED until 1 p.m. Eastern Time Wednesday, December 20

2



DOE00000585

# HISTORICAL CONTEXT

- Pre-2015
  - Only a handful of BD claims filed over two decades
- June 8, 2015
  - ED announces it will work to approve claims by group in instances where ED has evidence of widespread misrepresentations
  - These claims must be adjudicated under the 1995 regulations based on state law standards
  - Appoints Special Master
- February 8, 2016
  - BD team formed
- October 28, 2016
  - Then-Secretary King issues final 2016 BD regulations that apply to claims filed after July 1, 2017



3

Email, snail mail, text

DOE00000586

# HISTORICAL CONTEXT

- January 2017
  - Approval of ACI Claims
  - Finalization of Corinthian Guaranteed Employment Claim Category
  - Finalization of ITT Guaranteed Job Category
  - Dispatch of 16,000+ approval letters with assurances that loans would be discharged within an unworkable time period
- February 2017
  - Began internal review of Enforcement Office policies, processes, and protocols
  - Inspector General review initiated

4

DOE00000587

# HISTORICAL CONTEXT

- **May 2017**
  - CAPPS lawsuit delayed implementation of 2016 BD Rule

- **June 2017**
  - Department announced regulatory reset to start negotiated rulemaking

- **November 2017**
  - Inspector General review concludes; no change to review process standard

- **December 2017**
  - Department announced tiered relief methodology
  - Class action lawsuit—*Manriquez v. DeVos*—was filed against the Department over borrower defense applications associated with Corinthian schools

5

DOE00000588

# HISTORICAL CONTEXT

- May 2018
  - *Manriquez* court rules that the Department's collection of novel Social Security Administration data for claimants in the tiered relief methodology is a violation of the *Privacy Act*
- September 2018
  - Court ordered the Department to implement the 2016 Borrower Defense Rules
- December 2018
  - Department began issuing automatic closed school loan discharges as part of its implementation of the 2016 Borrower Defense Rule

6

DOE00000589

# HISTORICAL CONTEXT

- September 2019
  - The Department finalized new rules and regulations to replace the 2016 rule
  - The new, 2019 BD regulation will take effect in July 2020
- November 2019
  - The Department finalized a new tiered relief methodology using publicly available Gainful Employment data
- December 2019
  - The Department begins determining levels of relief and notifying schools and borrowers for adjudicated applications not covered by the *Manriquez* lawsuit

7

# OIG REPORT

- The Secretary requested the OIG Report, which found:

  - "(W)e identified weaknesses with FSA's procedures for:

    1. documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge

    2. reviewing borrower defense claims

    3. processing claims approved for loan discharge and flagged for denial

    4. establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met."



8

https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf

DOE00000591

# PREVIOUS ADJUDICATION CRITERIA FOR CORINTHIAN BORROWERS

- Student submits attestation form
  - time enrolled
  - program enrolled
  - school/campus enrolled
- Selects basis for the claim (for borrowers in one of the classes for which the Department had "findings")
  - job placement rates
  - credit transfer
  - employment guarantee
- "All or nothing"

9

DOE00000592



DOE00000593

# STATUS ON INAGURATION DAY

- Claims already adjudicated and discharged
    - 15,452
- Claims already adjudicated but not discharged
    - 16,315
- Denials
    - Denials were "processed" but no borrowers were notified of their denial
    - Thousands (~9000) were identified for denial but not discharged
- Claims not yet adjudicated
    - ~48,000

11

# POST-JANUARY 20, 2017

- CAPPS lawsuit required delay of the implementation of the 2016 BD regulation
- Announced regulatory reset to start negotiated rulemaking
- Promises made, promises kept
    - 16,000+ approvals carried over
    - all dispersed but <400 of the most complex cases, which are near resolution or require additional borrower action to complete.
- Began internal review of enforcement unit policies, processes and protocols

12

# CHALLENGES WE'VE ADDRESSED

Creating discharge mechanism for 16,000+ claims (non-direct loan) approved in January 2017

- No standardized process
  - No submission form pre-December 2016
- Limited information from borrowers
  - Student reported information doesn't match school data
  - Variation on program and credentials (identifying the fit)
- No database or system for claim management
- Need to secure and normalize reference data
- No denial process
- Need to improve documentation and review process
- Need to consider consolidations loans, which may need to be adjudicated under the 2016 regulations and a Federal standard.

13

DOE00000596

# IMPROVED DISCHARGE CRITERIA

## PROTECTING STUDENTS AND TAXPAYERS

- Guiding principles:

1. Need to treat borrowers fairly, equitably and as individuals

2. Need to evaluate and provide commensurate relief for harm suffered by borrowers

3. Need to distinguish between borrowers who were genuinely harmed and those who submitted false claims or claims that do not meet BD requirements

4. Need to acknowledge value of education received – many programs resulted in earnings similar to other programs

5. Need to protect taxpayers from runaway costs

6. Need for replicable and scalable system

14

# IMPROVED DISCHARGE CRITERIA

LEGAL AUTHORITY

- Clinton-era Regulation [34 CFR 685.206 (C)(2)]
  - If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to **repay all or part** of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such **further relief as the Secretary determines is appropriate** under the circumstances.

- 2016 Borrower Defense Regulation
  - "The final regulations make clear that the Department will determine in a reasonable and practicable way the **appropriate relief** for a borrower defense claim, **taking into account any educational benefit received.**"

15



Claire McCann Quote: https://www.insidehighered.com/news/2017/10/26/education-dept-officials-debate-partial-debt-relief-student-borrowers

"Many who applied for borrower defense likely do deserve full relief," McCann said. "It's also reasonable to say some of the people got value out of their education and, therefore, the amount of relief [the department is] going to provide is not going to be the same as for someone who got a totally valueless education."

# IMPROVED DISCHARGE CRITERIA

PROTECTING STUDENTS AND TAXPAYERS

- Adjudication criteria for previously established groups of claims remains the same
- No *Privacy Act* violation
  - Calculations based on publicly available Gainful Employment data
- Relief methodology considers the median earnings of graduates of the borrower's program as compared to the median earnings of graduates of comparable programs
  - Lower median earnings monetize "harm"
  - Earnings lower than two standard deviations from the median result in full releif
  - Successful BD applicants whose imputed program earnings are lower than the median but higher than two standard deviations from the median received tiered relief of 25%, 50%, or 70%

16

# IMPROVED DISCHARGE CRITERIA



17

# IMPROVED DISCHARGE CRITERIA

BENEFITS THE BORROWER

- All successful BD applicants whose imputed program earnings are below the comparison group median get at least 25% relief

- Used better of mean or median earnings as compared to GE

- If enrolled in multiple programs, program with the highest level of relief is used to award relief

- Interest credit applied to all **currently-pending** Corinthian and ITT claims, regardless of whether they are approved or denied

- **No change in adjudication criteria from previous administration.**

18

DOE00000601

# ACTION TODAY

- 780 approvals
  - Letters will go to mostly Corinthian and a small number of ITT borrowers
  - Servicers will discharge the loans
  - Interest waived from date of claim submission to notice date
- 16,000 ineligible
  - Letters will go to Corinthian and non-Corinthian students
  - Put back into the same repayment status as the borrower was in before filing application
  - Interest waived from date of claim submission to notice date
- 32,000 approvals await Department Office of General Counsel and Department of Justice
  - Court approval required to apply new relief methodology to *Manriquez*-covered applications
- Remaining claims being adjudicated systematically

19





**DOE00002144-DOE00002147**

*CONFIDENTIAL AND DELIBERATIVE*

### PURPOSE: ACTION

| | |
|---|---|
| **DATE:** | May 4, 2017 |
| **TO:** | The Secretary |
| **FROM:** | James Manning, Acting Undersecretary |
| **SUBJECT:** | Action Items on Borrower Defense |

**SUMMARY:**

The previous administration approved approximately 16,000 borrower defense to repayment claims that have not yet been processed, and the Department has received an additional approximately 58,600 claims it has not yet approved. This memo provides some background information and recommendations on how to proceed with the review and processing of these claims.

We established a Review Panel consisting of Joe Conaty, Lynn Mahaffie, Phil Rosenfelt, Justin Riemer, and myself to examine the claims and background information and make recommendations on how to resolve the pending claims and proceed in the future. The Review Panel met on a number of occasions over the past several weeks and reviewed a large volume of information related to the program. While the Review Panel uncovered several flaws in various parts of the processing of the claims, there was a legally defensible basis for the approvals and the review has revealed nothing that provides the Department with justification to rescind the approvals. The only justification to not proceed would be if the approval was truly without legal authority (a very high bar). Notwithstanding these weaknesses, both Department of Justice (DOJ) and Office of the General Counsel (OGC) attorneys agree the challenges in the process do not meet that bar.

**REASON FOR NEEDED ACTION:**

In January of 2017, the Department sent approval emails to approximately 16,000 borrower defense claimants informing them their loans should be discharged within either 60 or 90 to 120 days (with 120 days from receipt being approximately mid-May). No further action has been taken to discharge those loans, and I understand that it will take 30 to 45 days to execute the discharge after sign off. Borrowers are expecting discharges soon, and the Department needs to resolve these claims as soon as possible. The risk for litigation by borrowers will increase each day we exceed the mid-May window.

There are also over 330 claims approved for non-direct Federal loans (Federal Family Education Loans (FFEL) and Perkins Loans) that have not been put into forbearance which means the borrowers must continue to make payments until the Department decides how to proceed. Finally, there is continuous and increasing interest from members of Congress and others on the status of these claims and borrower defense generally.

**SUMMARY OF CONCERNS:**

The Panel's review of borrower defense revealed several weaknesses, a few of which are highlighted here.

DOE00002144

*CONFIDENTIAL AND DELIBERATIVE*

- **Improve Business Practices:**  Current business practices such as standard operating procedures (SOPs) to process claims are inadequate and should be strengthened.  For example, written review instructions or SOPs are in place to process only two of the several categories of claims. As a result the review process is at risk for inconsistent and nonreplicable results.

- **Improve Legal Justifications for Awarding Claims:**  There are also significant concerns regarding the legal justifications used for awarding claims. Under the borrower defense regulation, claims are analyzed under applicable state law which appears to have been often liberally applied in the light most favorable to the borrower to award full relief to as many as possible. In the American Career Institute (ACI) matter, Massachusetts state law was used as a justification to award relief to borrowers who did not submit claims notwithstanding the fact the existing regulation contemplates a borrower asserting a claim him or herself. Flexible interpretations of state law most favorable to student borrowers also appear to have been used to circumvent any requirement that the claimant directly prove damages. The result is that to date all borrowers approved have been awarded full loan relief even though the regulation allows for a partial offset. Going forward, we should establish a balanced process with clear and objective standards that require strong evidence of harm or damages to the student.

- **Improve Internal Controls:**  It appears that stronger internal controls in the review process are warranted.  For example, there are concerns that, particularly in the early stages of approving claims, senior Department leadership likely directed staff to complete or modify already signed and submitted applications that were incomplete or insufficient.  Strong checks and balances would help ensure that a vibrant, objective process is in place.

**RECOMMENDATIONS:**

In summary, after consulting with legal counsel, including the DOJ and the Borrower Defense Review Panel, I make the following four recommendations:

First, despite the Review Panel's significant concerns regarding the review and approval process for these 16,000 borrower defense claims, it does not believe there is an appropriate basis for taking any actions other than to approve discharge of all the claims approved.

Second, I recommend you approve the consolidation and discharge of approved claims for non-direct loans.

Third, I recommend that you direct me, the Internal Control Unit of the Department's Chief Financial Officer (CFO), and the Review Panel (as needed) to work with Federal Student Aid (FSA) to develop interim procedures to handle pending claims until permanent borrower defense regulations are implemented.

And finally, as a matter of due diligence and because the borrower defense issues are complex and involve significant Federal funds, I recommend you request that the Office of Inspector General

DOE00002145

## CONFIDENTIAL AND DELIBERATIVE

(OIG) conduct an independent and comprehensive review of the program, with a focus on lessons learned to improve the process going forward.

**Proceed with Discharge:**  After extensive and repeated consultation with counsel at the DOJ, they strongly advised against taking any action but discharge of all approved loans. Based on this, we believe that the only supportable choice is to sign off on discharging the approximately 16,315 loans for the borrower defense claims approved and not yet discharged. The estimated loan relief amounts to approximately $206,000,000.

The Review Panel hoped to be able to set up a process to require the 2,800 ACI borrowers, particularly the vast majority of whom did not submit claims, to return an attestation or official claim application before receiving discharge. However, after a thorough analysis, including consultation with DOJ counsel, the Review Panel has concluded that doing so would likely result in a lawsuit from the Massachusetts Attorney General's office and/or impacted borrowers that would be difficult to defend, given the fact the previous Undersecretary's approval of the claims constituted a "final agency action" which can only be rescinded in limited circumstances not present here.

**Proceed with Consolidation:**  A part of the new (and soon-to-be delayed) borrower defense regulations authorizes the Department to approve claims for private FFEL and Perkins Loan holders prior to their consolidation into direct loans. This part of the regulation was flagged for early implementation, announced in a Dear Colleague Letter, and is technically now in effect.

While this is a technical issue there are two main items worth noting. First, the impact to Treasury for consolidating these loans is different than for direct loans because Treasury must reimburse the private lender upon consolidation versus merely writing off losses on direct loans. Second, most borrowers prefer waiting to consolidate until after receiving approval because they would be better off not consolidating if their claims are denied. In short, the pre-determination leaves them with options. While only a small number of the approved claims are non-direct loans (~347), there are currently over 10,000 FFEL borrowers with pending claims. I recommend proceeding with consolidation for the approved claims for largely the same reasons discussed above for discharging the direct loans. I also recommend that you direct FSA to set up the necessary processes to handle consolidation for pending claims. I do not believe there are any other good options.

**Develop Interim Procedures:**  The work done by the Review Panel should be furthered by the Office of the Undersecretary (OUS) and the CFO's Internal Control Unit who will collaborate with FSA to stand up a robust procedure to review claims in the interim period before the Department can finalize new borrower defense regulations, a process that will take at least a year. I ask that you direct no additional claims be approved until these interim procedures are finalized. Moving forward, while the Review Panel may be consulted as needed, the work will be primarily administered by the OUS and the CFO's Internal Control Unit. Enclosed are a memo from the Review Panel and additional supporting information compiled during its findings.

**OIG Review:**  I strongly recommend that the OIG review the borrower defense program given the challenges to the existing processes and procedures required for a program of its scale. The program was developed and expanded under a number of challenges and at times seemed skewed towards student relief even in light of potential legal or budgetary considerations. Accordingly, as part of its review, the OIG should assess the due diligence of the process under which, in my view, the

Page 3 of 4

DOE00002146

*CONFIDENTIAL AND DELIBERATIVE*

Department so aggressively solicited claims before there was a lack of formally defined processes and procedures or infrastructure in place to process them.

**DECISION:**

**Recommendation**: Proceed with discharge for direct and non-direct loans for all impacted borrowers. Direct OUS and the CFO's Internal Control Unit to set up interim procedures to process claims until new borrower defense regulations are adopted and take effect. Proceed with requesting OIG launch a review of the borrower defense program.

Approve_____✗_____ Signature_____

Disapprove_____ Signature_____

Needs more discussion_____Signature_____

Modify_____Signature_____

Other/Comments:
_____with extreme displeasure_____
_____

CONTACT:      James Manning, Acting Undersecretary, HQ-LBJ-7E303, (202) 453-6236

Page 4 of 4

DOE00002147

**DOE00002342-DOE00002342**

Name:      2021 FSA Senate QFRs With Notes_BD
           Questions for
           SMEs.docx^Microsoft_Excel_Worksheet.x
           lsx

Comments:  Document Provided in Native only

Durbin Question 6.4

## Submissions by Attorneys General Seeking Relief for Constituents – Updated August 6, 2019

| SCHOOL/SCHOOL GROUP | DIPLOMA PROGRAM(S) IF APPLICABLE | ATTORNEY GENERAL | STATE | SUBMISSION DATE |
|---|---|---|---|---|
| American Career Institute | | Maura Healy | Massachusetts | • 7/20/2016<br>• 7/26/2016<br>• 8/3/2016<br>• 8/12/2016<br>• 11/16/2016<br>• 11/23/2016<br>• 1/3/2017 |
| Anthem University | | Lori Swanson | Minnesota | • 5/3/2016<br>• 7/22/2016<br>• 10/19/2016<br>• 2/13/2017<br>• 3/9/2017<br>• 4/4/2017 |
| Corinthian Colleges, Inc. | | Maura Healy | Massachusetts | • 11/30/2015 |
| Corinthian Colleges, Inc. | | Brad Schimel | Wisconsin | • 2/4/2016 |
| Corinthian Colleges, Inc. | • Dental Assistant<br>• Electrician<br>• Massage Therapy<br>• Medical Administrative Assistant<br>• Medical Assistant<br>• Medical Insurance Billing and Coding<br>• Pharmacy Technician | Lisa Madigan<br>Kwame Raoul | Illinois | • 12/16/2016<br>• 6/3/2019 |
| Corinthian Colleges, Inc. | | Bob Ferguson | Washington | • 12/20/2016 |
| Corinthian Colleges, Inc. | Submission for discharge for students enrolled at programs covered by the Department's job placement rate misrepresentation findings. | Lisa Madigan<br>Bob Ferguson<br>Maura Healy<br>Xavier Becerra<br>George Jepsen<br>Matthew Dean<br>Douglas Chin<br>Tom Miller<br>Andy Beshear<br>Brian E. Frosh<br>Janet T. Mills<br>Lori Swanson<br>Jim Hodd<br>Hector Balderas<br>Eric T. Schneiderman<br>Ellen F. Rosenblum<br>Josh Shapiro<br>Mark R. Herring<br>Karl A. Racine | Illinois<br>Washington<br>Massachusetts<br>California<br>Connecticut<br>Delaware<br>Hawaii<br>Iowa<br>Kentucky<br>Maryland<br>Maine<br>Minnesota<br>Mississippi<br>New Mexico<br>New York<br>Oregon<br>Pennsylvania<br>Virginia<br>District of Columbia | • 6/5/2017 |
| Court Reporting Institute | Submission for discharge for students enrolled at CRI's Seattle and Tacoma campuses. | Bob Ferguson | Washington | • 11/21/16 |
| Globe University & Minnesota School of Business | | Lori Swanson | Minnesota | • 6/7/2016 |
| Illinois Institute of Art and Art Institute of Colorado | Submission requests students have any federal student loan used to pay for schooling at the affected campuses from January 1, 2018 onward discharged and any amounts paid on those loans refunded. | Kwame Raoul<br>Phil Weiser | Illinois<br>Colorado | • 6/3/2019 |
| Kaplan University | • Medical Assistant<br>• Medical Billing and Coding | Maura Healy | Massachusetts | • 5/6/2016<br>• 5/31/2016 |
| Lincoln Technical Institute | • Criminal Justice | Maura Healy | Massachusetts | • 1/14/2016 |
| Westwood College | • Criminal Justice | Lisa Madigan<br>Kwame Raoul | Illinois | • 12/13/2016<br>• 6/3/2019 |

DOE00002342- produced in native

**DOE00002528-DOE00002529**

## MEMORANDUM

TO: Colleen Nevin

FROM: Erin Conroy

DATE: May 12, 2020

RE: Borrower Defense Unit Investigation of Charlotte School of Law prior to 2015

Charlotte School of Law (CSL) was founded in 2004 as part of the Infilaw System, a group of for-profit law schools that also includes Arizona Summit Law School and Florida Coastal School of Law.[1] CSL was granted a license to operate by the state of North Carolina in 2005, and the school was actively enrolling students at its sole campus in Charlotte, North Carolina from 2006 until its closure in 2017.[2]

As of May 18, 2020, the Borrower Defense Unit (BDU) has received approximately 1,000 applications from borrowers who attended CSL. These cases span the entire history of CSL's existence, with the bulk of the cases coming from borrowers who first enrolled from 2011 to 2015.[3]

As of the date of this memorandum, the BDU has obtained evidence relevant to the borrower defense allegations filed against CSL. In particular, in addition to what is attached by borrowers in their applications, the BDU has reviewed evidence in connection with the following:  (1) an American Bar Association (ABA) investigation against CSL which resulted in the ABA placing CSL on probationary accreditation status in November of 2016; (2) The Department's decision to deny CSL's application for recertification to participate in federal student financial assistance programs; and (3) a letter to the Department of Education from North Carolina Department of Justice requesting that the Department extend the closed school discharge window for CSL borrowers.

Based on its review of the above evidence, the BDU recommends individual adjudication of all claims where the borrower separated from CSL prior to February 24, 2015. While the ABA's investigation officially began in 2014 and its report from its March 2014 site visit represents the BDU's earliest evidence against CSL, the ABA did not issue its first decision letter to CSL until February 24, 2015[4] and did not find CSL to be out of compliance with the Standards that led to it being put on probation until February 3, 2016.[5] Further, there is no indication that the ABA's findings were intended to be retroactive. Similarly, the Department's decision to deny CSL's application for recertification was based on the ABA's findings, as well as statements made by CSL in 2016.[6] Finally, while both the University of North Carolina Board of Governors and the North Carolina Department of Justice requested documents from CSL

---

[1] U.S. Department of Education Denial of Recertification Letter, at 2 (Dec. 19, 2016).
[2] ABA Inspection Report on Charlotte School of Law, at 2 (Sept. 15, 2014).
[3] Salesforce reports generated by BDU personnel (on file with the Department).
[4] ABA Decision Letter to President Lively and Dean Conison (February 24, 2015).
[5] ABA Decision Letter to President Ogene and Dean Conison, at 1 (February 3, 2016).
[6] U.S. Department of Education Denial of Recertification Letter (Dec. 19, 2016).

DOE00002528

going back as far as 2014, this was largely to obtain the documents that the ABA used to make its decision.[7]

February 24, 2015 represents the earliest date that CSL was on clear notice of the gravity of the ABA's ongoing investigation into its compliance, and therefore it is appropriate to adjudicate borrowers who separated from the school prior to that date individually. February 2015 also serves as an appropriate cutoff date because the evidence suggests that CSL began administering its Path Program in 2015, which paid students to postpone sitting for the bar exam and therefore would only apply to their bar data reported past 2015. The BDU is not in possession of, nor aware of, any evidence to corroborate borrowers' claims of misconduct prior to this cut-off date. As of May 11, 2020, BDU is in possession of 406 cases where the borrower alleges a date of separation prior to February 24, 2015.[8]

In order to adjudicate these cases, the BDU will open each case and review each allegation and any evidence the borrower attached to the case. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. In cases where the borrower provides no evidence or the evidence provided does not prove any allegation, then the case will be flagged for denial. If additional evidence is discovered in the future, these pre-February 24, 2015 cases may be revisited.

---

[7] University of North Carolina Required Documents Letter to Dean Conison (Jan. 24, 2017).
[8] Extracted on 5/11/20 using Salesforce program report, filtering for program end dates less than Feb. 24, 2015.

**DOE00002653-DOE00002653**

**School Notice Letters and Other Open Items**

1. <u>New guidance on Heroes Act</u>: OGC advises that the Secretary will be filing a federal register notice announcing use of authority under HEROES Act to adjudicate certain cases with consolidated loans under the 2016 regulation.  This will include non-direct loan borrowers who filed applications prior to July 1, 2020 as well as direct loan borrowers who consolidate after July 1, 2020 but prior to the adjudication of their cases.  OGC agreed to send us an email so that we can be working the cases while they finalize the federal register notice.

2. <u>Revised templates</u>:  OGC will be providing revised templates of the school notice letters. They will include the template for borrowers whose cases will be adjudicated under both 95 and 2016 regs.

3. <u>Policy Decision on Schools that Previously received notice letters</u>:  For schools that have already responded to the previous version of the school notice letters, how do we handle notice letters for new applications that came in since then?

   | | |
   |---|---|
   | Option 1: | Send the new templates for new applications and resend with new template for all notice letters previously sent. |
   | Option 2: | Send the new templates for new applications and do not re-do the notice letters previously sent. |
   | Option 3: | Send the previous version of the template for the new applications so that we can move forward with adjudication on cases where the school already has substantially responded. |

4. <u>Confirm process re: school response on state law</u>:  Confirm that schools can provide evidence to dispute the state law identified on the school notice letter.  The school's response and evidence will be considered in adjudicating the application and may result in a change of state law applied.  However, we do not have to re-send the notice letter (and re-set the clock) if we agree with the school on the state law that should be applied.

5. <u>Policy Decision on whether state law needs to be included in adjudication notices for ineligibles</u>:  Does the state law have to be added to the borrower decision notices?  It is not currently included on the letters for ineligibles.

6. <u>Confirm process on type of claim under 2016</u>:  Confirm that the type of claim identified in the school notice letter for 2016 applications (substantial misrepresentation, judgment, breach of contract) is for informational purposes, but an incorrect or incomplete identification of the type(s) does not require re-sending to the school.

7. <u>Confirm no additional procedural changes</u>:   Confirm that there are no changes in any procedures for 95 v. 2016 regulation other than the different school notice letter templates.

8. <u>Need Guidance on cases under 2020:</u> (Not as urgent) – OGC will work on letters for borrowers whose cases have loans under 95 or 2016 *and* 2020.

[ PAGE  \* MERGEFORMAT ]

DOE00002653

DOE00003427

# DOCUMENT INFO

Name:      Next Gen FSA Key Actions 08.14.1
           (1).pptx

Comments:  An installation of eDrawings 2013 was
           not found. (ErrCode=9603, Line=480)

Bates Number DOE00003427, produced in Native and converted to PDF

DOE00003437



# Next Gen FSA Key Actions

August 14, 2019

Federal Student Aid an office of the U.S. Department of Education – INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

Bates Number DOE00003427, produced in Native and converted to PDF

Bates Number DOE00003437, produced in Native and converted to PDF

**Next Gen FSA**

# Highlights
### August 14, 2019

## Next Gen FSA Acting Program Manager

- James Davis arrived in FSA on August 12. He serves as the Next Gen FSA Acting Program Manager. James comes to FSA after serving in the Air Force for 33 years.

## Solicitation Updates

- Enhanced Processing Solution:
  - Objective: As part of Next Gen, FSA will be moving roughly 40 million existing borrowers from multiple servicing systems onto a single system. This transition process, which is expected to begin by January 2021, requires us to award a new contract to manage the single processing system.
  - Status: We have reviewed proposals and recently began discussions with multiple vendors with the hope of making an award in first quarter FY 2020.

- Business Process Operations:
  - Objective: Next Gen will also include multiple contracts to operate contact and manual processing centers for all student aid customer and partner interactions.
  - Status: Proposals were received and are being evaluated by the Contracting Officer. Review teams are in clearance with OGC and kick-off meetings are expected this week.

- Optimal Processing Solution:
  - Objective: We are seeking new processing systems for the full suite of student aid activities from aid application through loan servicing and debt collection; these new systems will leverage the latest technology to increase efficiency, reduce cost, and enhance cybersecurity.
  - Status: We expect to finalize an amendment in mid to late August to include the proposal due date; this timing will support a December 2019 award.

2

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL



Bates Number DOE00003427, produced in Native and converted to PDF



# Borrower Defense

Federal Student Aid an office of the U.S. Department of Education – INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Borrower Defense to Repayment

A type of loan discharge based on a determination that the borrower's school engaged in certain acts or omissions, generally *misrepresentations*, *fraud*, or *breach of contract* that unlawfully caused the borrower to enroll or continue enrollment at the school.

- Borrower Defense (BD) loan discharges were very rarely requested prior to 2015
- Total borrower defense applications went from a few dozen to 24,000 in one year
- Borrower Defense Group in FSA created in 2016
- Applications received to date now total nearly 280,000
- We are currently receiving an average of 1,600 new applications per week



| School Ownership Groups | Total Cases | Percentage |
|---|---|---|
| Corinthian Colleges, Inc. | 130,556 | 48.93% |
| ITT Educational Services Inc. | 26,553 | 9.95% |
| DeVry | 16,225 | 6.08% |
| University of Phoenix | 12,771 | 4.79% |
| EDMC | 10,334 | 3.87% |
| CEC | 9,237 | 3.46% |
| Westwood | 3,577 | 1.34% |
| Dream Center Education Holdings (DCEH) | 3,392 | 3,392 1.27% |
| All Other Schools | 54,182 | 20.31% |

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Borrower Defense Legal Framework

### *Statute*

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), specifies that the Secretary must, through regulation, specify the acts or omissions of a school that could give rise to a borrower defense discharge.

### *Regulations*

**"1995 Rule":**
- Generally applies to loans issued before July 1, 2017
- Discharge based on act or omission of the school that would give rise to a cause of action against the school under applicable state law

**"2016 Rule":**
- Generally applies to loans issued on or after July 1, 2017
- Establishes a federal standard
- Loan discharge must be as a result of a substantial misrepresentation by a school, a breach of contract by the school, or a judgment against a school
- Adds procedural requirements, including an opportunity for the school to respond and provide evidence to refute the borrower's claims

The Department also is in the process of finalizing a new borrower defense regulation (the "2020 Rule")

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL



**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**
# Six Stages of a Borrower Defense Application



Intake

School Response
(NEW under 2016 Rule)

Adjudication

Post-adjudication processing

Application closure

Reconsideration
(NEW under 2016 Rule)

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**
# Status of Borrower Defense Applications Received

**Of the nearly 280,000 Borrower Defense applications received since 2015:**

- 57,000 have been adjudicated, processed, and closed

- 38,700 have been adjudicated but have not yet been processed

    o Over 27,700 approved applications will be finalized when appropriate relief is determined

    o Nearly 11,000 applications have been adjudicated as denied applications but have not yet been processed







Total Borrower Defense Applications: 279,520
As of Week Ending 08/06/2019

7

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

Federal **Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Challenges and Solutions

**Three Significant Challenges and Corresponding Projects to Facilitate Elimination of the Backlog of Pending Applications:**

- Platform
- Staffing Increase
- Relief Approach for Approvals

**Challenge #1:  Implementation of the 2016 Regulation (following court order):**

The 2016 regulation added new procedural requirements to the application review process, including notice to the school of the borrower's allegations and the opportunity for the school to provide a response and evidence to refute the borrower's allegations.

**Solution:  Updates to Borrower Defense (Salesforce) Platform**

- Enhancements to the Salesforce platform to comply with the 2016 regulation are currently in the build phase

- Completion date in late August

**Borrower Defense "Systems" Over Time**

2015/2016 – 1000s of Excel Spreadsheets

2017 – Access platform (short-term solution)

2018 – CEMS Salesforce platform

2019 – Updated CEMS Salesforce platform to implement 2016 Borrower Defense Rule

2020 (projected) – Moving to Next Gen  CEMS Salesforce platform will become part of the technological backbone to the Next Gen DCC

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Challenges and Solutions

## Challenge #2:  Additional Staffing Resources are needed to Adjudicate the Growing Backlog of Pending Borrower Defense Applications:

- New borrower defense applications are being filed at a quicker pace than the existing staff can adjudicate, resulting in a growing backlog

- Borrower Defense Unit previously had well over 30 staff and contractors adjudicating borrower defense applications when the number of pending applications was under 70,000

- Due to attrition and other factors, there currently are only five (5) full-time and one (1) part-time Borrower Defense staff and seven (7) contractors.

## Solution – Increased Staffing

FSA is in the process of hiring and onboarding over 25 additional staff and contractors.  Onboarding is expected to begin in late August.

9

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Challenges and Solutions

## Challenge #3: Approvals on Hold Pending Relief Determinations

An approved application cannot be processed until a determination is made regarding the appropriate relief for the borrower. Currently, there are over 27,700 approved applications that are on hold pending a relief determination.

- The vast majority of the "approved but pending relief" applications are from borrowers who attended Corinthian Colleges, Inc.

  o Corinthian tiered relief methodology subject to injunctive order (entered in Manriquez case)

- For non-Corinthian approvals, there currently is no existing relief approach, and the Corinthian methodology is inapplicable, so a new tiered relief methodology is required

## Solution – New Relief Approach(es)

- FSA has been working with OUS and OGC on alternative methodologies

- A new tiered relief approach is currently under consideration by senior leadership

- FSA hopes to have a final decision in the next 30 days so that we can begin processing the approved applications.

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**Next Gen FSA**

# Other Challenges

**Lawsuits:**

- Manriquez – injunctive order entered regarding Corinthian tiered relief methodology

- Bauer – court held that ED delay of 2016 regulation was impermissible and ordered immediate implementation

- Sweet – alleges unreasonable delay and bad faith regarding pending borrower defense applications

- Nearly 20 lawsuits involving borrower defense filed since 2017

**Congressional and public scrutiny:**

- Quarterly reporting to Congress required

- Frequent communications from borrowers

Borrower Defense attorneys work with the Office of General Counsel (OGC) and the Department of Justice (DOJ) on the specific borrower allegations, gather documents for the administrative record, and provide information, documents, and input requested by OGC and DOJ in connection with the lawsuit.

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

Bates Number DOE00003427, produced in Native and converted to PDF

**DOE00004316-DOE00004320**

**Summary of Information Requested by Diane**
**Regarding Loan Discharges Pursuant to 2016 Regulation**

### 1. Overview of Status of Implementation of the 2016 Regulation

FSA is in the process of gathering information and compiling questions and issues for discussion with OUS, OPE, and OGC in connection with the implementation of the 2016 regulation. With respect to the Automatic Closed School Discharge ("ACSD"), work is underway to set up processes at the servicers for implementation once we have the list of borrowers who are eligible for discharge.

### 2. How do we determine who qualifies for ACSD?

Under the 2016 regulation, ACSD applies with respect to schools that closed on or after November 1, 2013. The regulation stipulates that the Secretary shall discharge loans without an application from a borrower if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed. Borrowers who qualify for an ACSD include those who did not complete their program of study at the school because the school closed while the student was enrolled, or those who withdrew from the school not more than 120 days before the school closed. The Secretary may extend the 120-day period if the Secretary determines that exceptional circumstances related to a school's closing justify an extension. In the case of Corinthian, the former Secretary extended the period to include borrowers who withdrew on or after June 20, 2014.

FSA has developed, and is currently refining, an algorithm to query the National Student Loan Data System (NSLDS) to identify those borrowers who are eligible for ACSD. We currently are making adjustments to the algorithm to account for the multiple OPEID numbers under which Corinthian operated to ensure that an accurate list of borrowers who are eligible for relief is compiled. With respect to Corinthian, the algorithm will produce a list of non-completers who had attended a Corinthian school when it closed, or who had withdrawn from such a school on or after June 20, 2014, and who had not subsequently re-enrolled in any title IV-eligible institution within a period of three years from April 27, 2015.

- Closing Date

Program Compliance has an official closure date for each school closure. It is the date that the school last offered instruction. This is the date reflected as the closing date in NSLDS, which is what will be pulled into the algorithm developed to address a specific school closure.

- Subsequent Enrollment

Another component of the algorithm pulled from the NSLDS data is the borrower's student aid information (specifically, grant and loan disbursements subsequent to the school closure) to determine whether or not the student had a subsequent enrollment.

The ACSD process only applies to those borrowers as described above.  For other situations, the closed school discharge process operates as it otherwise has.  These other situations include, for example, borrowers who re-enroll in another institution, but not in a comparable program; and, borrowers who re-enroll in a comparable program at another institution but do not complete the program.  In these cases, borrowers must apply for the discharge, and only the loans the borrowers received at the closed school are eligible for discharge.  Borrowers who transfer credits and complete their program at another institution are not eligible for a closed school discharge.

### 3.  Processes and Timeline for ACSD and Approximate Number of Eligible Borrowers

FSA recommends a phased approach to implementing the ACSD.  Specifically, the first phase probably would be limited to borrowers who had attended a Corinthian school that closed and who had no loan disbursements after the school closure.  The second phase will include borrowers who attended other closed schools.

On a parallel track with finalizing the algorithm, FSA is working on the servicer requirements and other operational pieces.  We will supplement our response with a projected timeline for implementing Phase I early next week, including the timing for an initial email to the borrower from FSA advising that he or she is eligible for ACSD and will be receiving a notice of the loan discharge from the servicer.

The estimate of approximately 5,000 eligible borrowers previously referenced by OGC was a preliminary number generated using a preliminary version of the algorithm.  FSA found some data anomalies in the result, and we currently are in the process of making adjustments to the algorithm that will likely change the number of eligible Corinthian borrowers identified.

### 4.  ACSD Overlap with Borrower Defense Claims

The above-referenced 5,000 number was not solely borrowers who also have a borrower defense application – it was intended to include Corinthian borrowers eligible for ACSD, regardless of whether they have filed a BD or standard CSD application.  Once we have finalized and re-run the algorithm, FSA will cross-reference the ACSD list with the list of Corinthian borrowers who have pending BD claims to determine the overlap.

The algorithm will identify borrowers who previously received partial relief in connection with a BD claim because these borrowers' loans were not fully discharged.  Those loans will be discharged in full under the ACSD and any payments made on the loans will be refunded.

[ PAGE  \* MERGEFORMAT ]

### 5. ITT Tech Claims Eligible for ACSD

ITT's official closure date was September 3, 2016.  Therefore, no borrowers from ITT will be eligible for ACSD until September 2019.  Because it is possible that some former ITT students may enroll in other schools between now and next September, any projections likely would be over-inclusive.  However, once the algorithm is finalized, FSA can run a modified version to provide projected numbers and anticipated cost based on the closure date.   FSA also will provide projected costs assuming an expanded window for discharge that would allow for immediate discharges.

FSA is in the process of compiling data to provide the loan total for pending BD claims from ITT Tech students.  Because the data currently is on two different systems, FSA estimates that it will take two to three weeks to gather and merge the data, which then will have to be validated.  In the interim, FSA will provide next week the total number of currently pending BD claims from ITT borrowers.

### 6. Closed School History re: Corinthian and ITT

To date, there have been no closed school discharges without an application; students were required to apply individually.  Although there are many borrowers from Corinthian who applied for both BD and closed school, the processes are separate.  Part of the BD intake process includes a review of whether the borrower already has received a closed school discharge; if so, the BD claim is closed.  Additionally, there is a follow-up step during the BD adjudication phase to carve out any claims for borrowers who received a closed school discharge after the BD application was filed but while BD application was still pending.[1]

Currently, for borrowers who applied for BD only and have not filed a closed school discharge application, there is no assessment of the borrower's eligibility for closed school discharge (even if it would provide greater relief).  The closed school discharges are a separate process handled by the servicers under the supervision of Business Operations, and an application is required.  FSA can explore adding a preliminary closed school discharge assessment to the BD review process, if desired.

### 7. Group Claims from AGs

Regarding requests from Attorneys General seeking group discharges on behalf of their constituents, FSA has received the following lists:

- American Career Institute ("ACI"):
    - MA AG list identifying 4,458 borrowers (all loans previously were discharged in connection with group BD discharge process in January 2017)

---

[1] This step was added in late 2016.  Prior to the addition of that step to the process, there were borrowers who had BD applications approved after their loans already had been discharged under the closed school discharge process.

DOE00004318

- Anthem:
  - MN AG submitted four different lists identifying a total of 49 borrowers (most or all borrowers listed appear to have submitted individual applications as well)
- Corinthian:
  - IL AG list identifying 3,368 borrowers
  - MA AG list identifying 2,444 borrowers
  - WA AG list identifying 3,637 borrowers
- Globe/Minnesota School of Business:
  - MN AG list identifying 1,949 borrowers
- Kaplan:
  - MA AG submitted two lists identifying a total of 97 borrowers
- Lincoln Tech:
  - MA AG list identifying 351 borrowers
- Westwood:
  - IL AG list identifying 1,243 borrowers

**8. Breakdown of Costs – Borrowers Currently eligible for ACSD from Corinthian, ITT, ACI and Globe and Aggregate Loan Balance for Each**

Once FSA finalizes the algorithm, it will re-run it to determine the borrowers who currently are eligible for ACSD. Phase I will focus on borrowers who attended a Corinthian school that closed. FSA will pull the aggregate loan total once the list is generated.

As previously noted, the list of borrowers currently eligible for ACSD will not include any ITT borrowers; ITT did not close until September 2016 and, therefore, no ITT borrowers will be eligible until next September unless the window is extended. Similarly, because Globe campuses closed at various times between June 24, 2016 and September 14, 2017, the first Globe borrowers will not be eligible until June 24, 2019 unless the 120 day window is extended. The list also will not include any ACI borrowers because the school closed in January of 2013, and the ACSD regulation only applies to borrowers from schools that closed on or after November 1, 2013.

**9. Additional cost if time period for ACSD is extended to the longer timeframe afforded to Corinthian borrowers – for ITT, Globe and ACI**

Once the algorithm is finalized, FSA can run a modified algorithm to provide a projection of costs using both the closing date and any other time period requested for comparison and policy decisions regarding ITT and Globe borrowers. For the reason noted above, the 2016 ACSD provisions do not apply to ACI.

**10. How do we notify the holder of student records of the names of those who received loan discharge and are therefore not entitled to an official transcript?**

There currently is no process in place to advise closed schools (or the holder of records for a closed school) that the borrower has received a closed school discharge. Although it does not

[ PAGE  \* MERGEFORMAT ]

DOE00004319

appear that such notification is required under title IV or regulation, FSA can explore options in consultation with OGC for providing such a notice, if desired.

### 11. School Closures Since 2013

FSA has compiled a list of schools with closures between November 1, 2013 and November 7, 2018.  Please see the attached Excel spreadsheet.

### 12. BD Claims Subject to 2016 Regulation (Loans issued on or after July 1, 2017)

Our _very rough_ preliminary estimate is that fewer than 5% of the pending BD claims will be reviewed under the 2016 regulation.  We currently are transitioning BD data from one system to another, so we are in the process of pulling and merging the data from the two different systems. We will have a more accurate/complete picture in 2-3 weeks and will provide the requested data as soon as it is validated.

For borrowers who have loans both before and after July 1, 2017, FSA has had preliminary discussions with OGC on this issue and will provide a response once OGC has confirmed the required approach.

### 13. Closed School Discharge Applications from Mount Ida

FSA will request this data from the servicers.

### 14. Closing Date and Approach for Closed School Discharge Applications from Art Institute Students

Regarding whether we have received applications from Art Institute borrowers, FSA will request this information from the servicers.  Art Institute borrowers currently attending school will not be eligible for ACSD until 3 years from the date of closure, which is planned for December 31, 2018.

The ACSD provision requires that the closing date be the basis for determining eligibility (rather than the proposed announcement date).  However, as a policy matter, the Secretary could decide to extend the 120 day window in order to provide additional relief as was done in connection with Corinthian's closure.

### 15. Weekly Report from FSA Re: Implementation of 2016 Regulation

FSA will develop a weekly report advising of discharge numbers, costs and other data and information requested.

[ PAGE  \* MERGEFORMAT ]

**DOE00004321-DOE00004322**

**Borrower Defense – Summary of Notice to Schools Process**

1. BD does a preliminary overview of the applications from borrowers who attended ABC to get a sense of the nature of the allegations commonly asserted against the school and generally, a sampling of the evidence that the borrowers are providing, if any, in support of their claims. Additionally, we determine whether there are findings against the school by the Department and whether there is potentially relevant evidence in the Department's possession that must be considered. We also determine whether the school is open or closed and, if closed, whether there is a letter of credit that may be used to collect against the school for any approved BD applications.

2. After that preliminary overview, we make a determination as to whether to send a notice to the school. Since notice to the school creates additional burdens on the school and also delays the adjudication process, the preliminary review is intended to eliminate unnecessary notices to schools where there is no evidence for the school to refute (and, therefore, no benefit to the school in receiving the notice). However, notice will be sent to any school where there is evidence and, therefore, at least a possibility of approval, so that the school can respond and provide evidence to refute the borrowers' allegations:

   a. **No Notice**:
      i. If the preliminary overview leads to the conclusion that the school is closed and does not have a letter of credit or other assets available (*e.g.*, an open affiliated school with common ownership), there would be nobody to put on notice.
      ii. If the preliminary overview leads to the conclusion that there is no evidence in the Department's possession relating to the school, there is no evidence to refute.
         1. Exception: If an individual borrower provides evidence that supports his or her application, we would then send notice to the school and the application would be set aside so that the school's response and evidence, if any, can be considered with the borrower's evidence in adjudicating the application.
      iii. If there are 2,000 applications from borrowers who attended ABC, and the preliminary overview leads to the conclusion that there is no evidence in the Department's possession relating to ABC borrowers other than, for example, 300 borrowers who attended the medical assisting program between 2010 and 2014, there is no evidence to refute for the 1,700 borrowers who did not attend the medical assisting program between 2010 and 2014. Therefore, we would proceed as follows:
         1. Notices <u>would</u> be sent to the school regarding the 300 borrowers who attended the medical assisting program between 2010 and 2014 (see section (b) below);
         2. Notices <u>would not</u> be sent to the school regarding the applications of the other 1,700 borrowers.
            a. Exception: If an individual borrower provides evidence that supports his or her application, we would then send notice to the school and the application would be set aside so that the school's response and evidence, if any, can be considered with the borrower's evidence in adjudicating the application.

      b. **Notice required**:
          i. If there are ED findings against the school, we would send notices to the school for any applications of borrowers potentially covered by the findings;
          ii. If the Department is in possession of evidence potentially relevant to multiple borrowers (by campus, program, attendance dates, etc.). we would send notice to the school for any applications for which the evidence is potentially probative of the borrower allegations.
          iii. If an individual borrower provides evidence that supports his or her own application, we would then send notice to the school.

3. Regular School Notice Process:  Where notice is required regarding the application(s) of an individual borrower or small group of borrowers, the attached "School Notice Template" would be sent to the school.  The email is sent through the BD platform so that it can be tracked and associated to the borrower's application.

4. Advance Notice:   Additionally, if we have many applications relating to a school and for which notice is required, we also will send an "Advance Notice Letter," a draft of which also is attached.  This letter would be sent first so that the school is aware that they are about to receive numerous applications.  It also advises the school of the nature of any common allegations so that the school can begin to consider a response.

5. School Response:  Schools have two different options for responding to the borrower defense applications.

      a. Borrower-Specific:  If the school wishes to respond to an individual borrower's allegations, the school can respond by replying to the School Notice email.  Any response or evidence attached to the email will be attached to the borrower's case.

      b. General Response:  Additionally or alternatively, if the school wishes to respond generally and/or provide evidence that would be applicable to many or all borrowers who filed applications relating to the school, we have a SharePoint site set up for the school to access and load its responsive documents.   The response and evidence would be considered with respect to all applications to which the response and evidence is relevant, regardless of whether an individual borrower is specifically identified.

6. Finally, if borrower requests reconsideration of a denied claim because his or her school was not notified, we will send a notice to the school and reconsider the claim in light of the school's response.  (This is per OGC to avoid litigation on the off chance that a borrower takes the position that the school would have provided evidence that corroborates a claim that otherwise would be denied).

**DOE00004939-DOE00004940**



July 14, 2020

Mr. Richard Senese, President
Mr. Mike Wickard, Chief Financial Officer
Ms. Jillian Klein, Vice President, Government and Regulatory Affairs
Mr. Jarod Paulson, Financial Aid Administrator

Capella University
225 South 6th Street
Minneapolis, MN 55402

Dear School Officials:

Under 34 CFR §§ 685.206 and 685.222, borrowers of federal student loans may apply for a discharge of some or all of their federal student loans based on certain types alleged misconduct by their (or their children's) school. We currently have approximately 250 borrower defense applications that make allegations regarding Capella University and that will require a fact-finding process pursuant to 34 CFR § 685.222(e)(3)(i).

For each such application, we will email a separate notification (the "School Notice Email") and a password-protected copy of the borrower's application to the President, Chief Financial Officer, and Financial Aid Officer of record for your school. You and the other officials will receive the same School Notice Email and attachment. We will send password information in a separate email. The School Notice Email will also provide your school an opportunity to submit responses to borrower defense applications, either individually or collectively, with instructions for how to do so.

> **Note:** Given the volume of email notifications you are about to receive, you may want to set up a rule within your email client to place the emails in a location other than your inbox. The School Notice Emails will be sent from [ HYPERLINK "mailto:borrowerdefense@ed.gov" \h ].

After preliminary review of the borrower defense applications, we have some general requests that will assist us in evaluating those applications. Borrowers who have filed applications against your school allege misrepresentations concerning the time it would take to complete their doctoral programs, doctoral program costs, employment prospects, career services assistance, graduation rates, and other types of claims.

To facilitate the fact-finding process for these borrower claims, we request that you send us documents as described below.

- Copies of any and all types of enrollment agreements utilized by Capella for the doctoral program and/or signed by doctoral students for the years 2010 to 2019; and
- Copies of any and all advertisements or promotional materials:



830 First Street, NE, Washington, DC 20202
StudentAid.gov

DOE00004939

Page
[PAGE] 1

  o Used to solicit prospective doctoral students;
  o That were placed in any advertising medium or shared with doctoral students prior to enrollment at Capella; and
  o Specifically related to the time to complete doctoral programs or doctoral program costs.
- The actual cost of each doctoral program per year, per program for the years 2010 to 2019.
- The actual number of terms for each doctoral program per year, per program for the years 2010 to 2019.

We are also aware of the pending *Wright et al v. Capella University* lawsuit filed in the U.S. District Court for the District of Minnesota, in which the plaintiffs allege that Capella marketing materials and recruiters misled prospective and current students about the time to completion and cost of their doctoral degrees.

**Please note that your responses and any evidence are due within 30 days of your receipt of the School Notice Email for each borrower defense application.** Please contact us at [ HYPERLINK "mailto:BDSchoolEvidence@ed.gov" \h ] to arrange for the transmittal of your responses and documents. Include the name of your school in the subject of the email and provide a description of the materials that your school plans to submit and the estimated byte size in the body of the email. We will assess and advise how to transmit the materials to us.

As part of our initial fact-finding process, we may reach out to you in the future with follow-up questions. For additional information regarding the borrower defense to loan repayment process and applicable regulations, visit us at [ HYPERLINK "https://studentaid.gov/borrower-defense" ].

If you have questions about this communication, email us at [ HYPERLINK "mailto:BDSchoolEvidence@ed.gov" ].

Sincerely,

U.S. Department of Education
Office of Federal Student Aid
Borrower Defense Unit