**Supplemental Complaint**

**Exhibit Index**

**Bates Stamped Documents**

Documents appear in this order, with Bates-Numbered Slip-Sheets Between them. The documents are cited **by Bates Number** in the Supplemental Complaint.

| Document Order | Bates Range | Document Title / Identifier |
|---|---|---|
| 11. | DOE00006016-6022 | Borrower Defense Unit Claims Review Protocol |
| 12. | DOE00006206-DOE00006508 | Training Binder – Borrower Defense To Repayment |
| 13. | DOE00006893-DOE0006895 | Bd Work Plan For November 2019 |
| 14. | DOE00006974 | FSA FY 2020 A-123A Assessment |
| 15. | DOE00007209-DOE00007214 | Detailed Briefing: Borrower Defense and 2016 Rule – Corinthian Colleges and ITT Technical Institute |
| 16. | DOE00007269-DOE00007271 | Talking Points – Institutional Accountability Regulations |
| 17. | DOE00007289-DOE00007291 | Talking points – Borrower Defense to Repayment |
| 18. | DOE00007866-DOE00007879 | CCI guaranteed employment memo |
| 19. | DOE00008693-DOE00008694 | Borrower Defense Claim Review Productivity Requirements, Incentives and Support Plan |
| 20. | DOE00008841-DOE00008843 | Borrower Defense Quality Control Procedures |

**DOE00006016-DOE00006022**

DOE00006016

# BORROWER DEFENSE UNIT CLAIMS REVIEW PROTOCOL

DOE00006016

DOE00006017

# GUIDING PRINCIPLES FOR PROTOCOL

- Develop and implement an administrative process capable of ensuring supportable and timely decisions

- Achieve consistency among similarly-situated borrowers

- Base decisions on evidence

- Provide relief for harmed borrowers and protect taxpayers

[ PAGE  \* MERGEFORMAT ]

# LEGAL FRAMEWORK FOR ELIGIBILITY

- BD application must state a claim under state law:

  o "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c).

  o Applicable state law typically is law governing alleged misrepresentations and material omissions made by a school

- Legal threshold for eligibility = preponderance of the evidence

- Must base decisions granting or denying relief on a record sufficient to withstand court scrutiny

[ PAGE   \* MERGEFORMAT ]

DOE0006018

DOE00006018

DOE0006019

# ELIGIBILTY AND RELIEF SEPARATE DETERMINATIONS

- First – determine eligibility of BD application under the regulation

  o *i.e.*, whether preponderance of the evidence establishes a valid claim under applicable state law

- Second – determine any appropriate relief only for claims determined eligible

[ PAGE  \* MERGEFORMAT ]

# PROTOCOL FOR DETERMINING ELIGIBILITY

- Evaluate all available relevant evidence to determine whether preponderance is satisfied:
  - o Possible sources of evidence:
    - BD claim
    - Evidence from ED investigations
    - Evidence from other law enforcement investigations
    - Evidence obtained from whistleblower suits
    - Corroborating evidence from other similar BD claims

- Preponderance and thus eligibility is not met when there is a single uncorroborated claim

- Single claim may be denied without further investigation where:
  - o Application does not state a claim (e.g., applicant does not identify any misrepresentation actionable under state law); or
  - o There is no corroborating evidence of the misrepresentation
    - Consistent with ED's false certification rules
    - Consistent with other agencies deciding benefits claims

- Conduct additional investigation of claim or claims where warranted by size of affected group, ability to develop extrinsic evidence efficiently, and other operational considerations.

[ PAGE  \* MERGEFORMAT ]

DOE00006020

DOE00006020

# EXAMPLE OF ELIGIBILITY DETERMINATION

**BD Claims Regarding Transferability of Credits:** Corinthian misrepresented to students at nationally accredited Everest and Wyotech campuses that the credits they earned would be generally transferable to other institutions

- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them."
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere."

**Evidence that representation was made:**

- Claims are consistent regarding the representation made, include specific details, and are consistent between campuses and over time
- Claims are corroborated by the school's own internal audits finding substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students, as well as by calls provided by state investigators.

**Evidence of falsity:**

- Regionally accredited schools, including the in-state institutions where students often sought to transfer, overwhelmingly do not accept credits from nationally accredited schools such as Everest and WyoTech.
- Evidenced by National Center for Education Statistics study; GAO report; the American Association of Collegiate Registrars and Admissions Officers transfer practices guide; a survey of schools conducted by the Borrower Defense unit; as well as numerous student accounts.

**Misrepresentation gives "rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c):**

- Applicable California law prohibits deceptive or misleading representations, including material misrepresentations reasonably relied on by students.
- Misrepresentations about the general transferability of credits earned are highly material to students deciding whether to enroll (and take on debt to do so) and it was reasonable for students to rely on such representations made by school personnel.

[ PAGE   \* MERGEFORMAT ]

DOE00006021

# RELIEF DETERMINATION

- **Full Relief:** In recognition of the considerable impact a material misrepresentation or omission has on a person's decision to enter a transaction (*e.g.* to take out loans to enroll at a school), many state laws provide for full restitution to restore the person to the status quo.

  o Full relief may be particularly appropriate when a student did not receive a central attribute of the education the student was promised, such as certain programmatic accreditation (*e.g.*, promised ability to sit for law enforcement or nursing exam).

- **Partial relief:** State law also may recognize an "offset" of the full amount of restitution for the value of goods or services a person subject to a material misrepresentation or omission nonetheless received.

  o An offset may be appropriate where there is substantial value provided by school and the amount of that value can be readily calculated for all eligible students.

  o Note: individualized determinations of value are likely to be administratively burdensome (*e.g.*, determining post-attendance employment outcomes for every student in a large group)

DOE0006022

**DOE00006022**

**DOE00006016**

## Metadata

| Custodian | Nevin, Colleen | SEMANTIC |
|---|---|---|
| **Date** | 2018/09/05 | SEMANTIC |

**DOE00006206-DOE00006508**

TRAINING BINDER

BORROWER DEFENSE TO REPAYMENT

JULY 2019

DOE00006206

**TABLE OF CONTENTS**

1. Overview of Borrower Defense.................................................................p4
2. Legal Foundation
   a. 1995 Borrower Defense Regulation..................................................p9
   b. 2016 Borrower Defense Regulation.................................................p12
   c. Heald Job Placement Rate Memo....................................................p23
   d. Everest/Wyotech Transfer of Credits Memo...................................p28
   e. Heald Transfer of Credits Memo.....................................................p47
   f. Corinthian Guaranteed Employment Memo....................................p66
   g. ITT Tech Guaranteed Employment Memo.......................................p81
   h. Statute of Limitations Memo..........................................................p96
   i. American Career Institute Group Discharge Memo........................p99
   j. Dear Colleague Letter (FFEL Guidance)..........................................p111
3. Process Documents
   a. Borrower Defense Glossary............................................................p117
   b. Case Review Metrics......................................................................p121
   c. Corinthian Job Placement Rate Review Protocol..........................p123
   d. Everest/WyoTech Job Placement Rate Findings............................p135
   e. Heald Job Placement Rate Findings...............................................p160
   f. Corinthian OPEID Chart.................................................................p167
   g. JPR QC Protocol.............................................................................p175
   h. Types of BD Claims........................................................................p182
   i. Types of BD Claims Worksheet......................................................p192
   j. Standard Process Protocol............................................................p228
   k. Standard Process Template...........................................................p232
   l. Standard Process QC Protocol.......................................................p234
   m. Reconsideration Denial Template.................................................p237
   n. Reporting.......................................................................................p241
   o. Quality Checks of Contractor Resources.......................................p243
4. Forms
   a. Salesforce Webform.......................................................................p246
   b. Universal Form...............................................................................p256
   c. Everest/WyoTech Attestation Form................................................p266
   d. Heald Attestation Form..................................................................p271

    e.  Debt Collective Form.........................................................................p276

5.  Onboarding Information

    a.  CEMS Access Form............................................................................p288

    b.  Relativity Access Form.....................................................................p292

    c.  PIV Enrollment Form........................................................................p299

    d.  Help Desk Information......................................................................p302

# Introduction

## Background

### Statute and Regulations Pertaining to Borrower Defense

The Student Loan Reform Act of 1993 (Public Law 103-66) amended the Higher Education Act of 1965 to establish the William D. Ford Federal Direct Loan Program (Direct Loan). Section 455(h) of the Higher Education Act, as amended, required the Secretary to specify in regulation the acts or omissions of a borrower's school that a borrower may assert as a defense to repayment of a Direct Loan, commonly called "borrower defense."

The Department established regulations covering such borrower defenses at 34 CFR § 685.206(c), effective July 1, 1995. The regulations specified that a borrower may assert as a defense against repayment, any act or omission of the borrower's school that would give rise to a cause of action against the school under applicable State law.

In response to the collapse of Corinthian Colleges, Inc., the Department issued revised regulations on borrower defense, which were scheduled to be effective July 1, 2017. These revised regulations established a Federal standard for borrower defense claims. On June 16, 2017, the Department announced a delay in the implementation, until further notice, of the revised borrower defense regulations due to pending litigation. The Department established a rulemaking committee to review and revise the borrower defense regulations. The Department announced that the rulemaking committee would meet from November 2017 through February 2018 to develop proposed borrower defense regulations. On October 24, 2017, the Department announced that it would continue to preserve the regulatory status quo until July 1, 2018, and proposed further delay until July 1, 2019. Until the delay in implementing the 2017 regulations is lifted or new regulations are issued, all claims are subject to the regulations that became effective July 1, 1995.

### Increase in Borrower Defense Claims and Appointment of Special Master

Before 2015, borrowers had made only a handful of borrower defense claims. Claims significantly increased when Corinthian Colleges closed in April 2015 and ITT Technical Institutes closed in September 2016, and thousands of borrowers submitted borrower defense claims to FSA to have their Federal student loans discharged. Because the Department did not have an established infrastructure for accepting, processing, and reviewing large numbers of loan defense claims, in June 2015, the Under Secretary appointed a Special Master to advise the Department on the creation of a borrower defense process. The Department also announced on June 8, 2015, that it would use

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

DOE00006209

existing evidence, where appropriate, to ease borrowers' burden in establishing their eligibility for borrower defense relief: "Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers." The Special Master served as an advisor in the borrower defense claim process from June 24, 2015, through June 23, 2016, after which the FSA Enforcement Unit's BDU took over the process.

Table 2 shows the increase in borrower defense claims over time.

**Table 2. Increase in Borrower Defense Claims**

| Time Period | Number of Claims Received |
|---|---|
| July 1, 1995, through June 24, 2015 <br> *(Implementation of Borrower Defense Regulations to Appointment of the Special Master)* | 5 |
| June 25, 2015, through June 29, 2016[a] <br> *(Appointment of Special Master through last Special Master Report)* | 26,603 |
| June 30, 2016, through January 20, 2017 <br> *(Formation of BDU through end of the prior administration)* | 46,274 |
| January 21, 2017, to July 24, 2017[b] <br> *(Beginning of current administration through the end of our review period)* | 25,991 |

[a] Source: Special Master Report, June 29, 2016.

[b] The end of our review period was July 31, 2017; however, FSA issued a periodic report of claims received on July 24, 2017. Source: Data from FSA's list of claims.

Of the 26,603 claims FSA received while the Special Master was authorized, 3,787 claims, associated with about $73 million in loans, were approved for full loan discharges during the Special Master period.[7]

---

[7] Source: Special Master Report, June 29, 2016.

DOE00006210

## Duties of the Special Master and Team of Attorneys

The Special Master was appointed to advise the Office of the Under Secretary in the creation of a process to evaluate borrower defense claims and interpret State laws. He was to provide advice on legal and administrative procedures for borrower defense claims and train staff to implement the borrower defense loan discharge process. The Special Master provided advisory services as a consultant and did not perform or supervise operating functions.

The Special Master worked with a team of four attorneys within FSA to analyze laws and regulations, review claims, and develop templates for the claims intake and review process; three additional attorneys were added in the spring of 2016. The team of attorneys operated without the support of contractors for the review of claims. The team of attorneys focused its efforts on job placement rate misrepresentation claims related to borrowers who attended the Heald College, Everest, and WyoTech campuses of Corinthian Colleges.

FSA's Business Operations managed the claims intake process, maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. The team of attorneys used this information to make borrower defense claim determinations. The Special Master recommended claims that the Under Secretary should approve for a borrower defense loan discharge. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

## Creation of FSA's Borrower Defense Unit

In late June 2016, the Department completed the transition of borrower defense oversight from the Special Master and the team of attorneys working with him to the Enforcement Unit's BDU. In late June, when the transition from the Special Master to the Enforcement Unit was complete, there were seven full-time BDU attorneys and no contractors. By early November 2016, BDU was staffed with 10 attorneys, a director, and 19 contracted staff from 2 contractors.[8] As of September 2017, BDU had only six contracted staff from the two contractors.

In addition to continuing to process discharges under the memorandum developed prior to the creation of BDU, BDU also developed additional memoranda to justify loan discharges. In addition to job placement rate discharges, BDU focused its efforts on determining whether categories of claims sharing common facts qualified for discharge

---

[8] BDU contracted with Midtown Personnel, Inc. and GCC Technologies, LLC. to review claims.

DOE00006211

and then determining whether individual claims qualified for discharge under approved categories. BDU concentrated on processing job placement rate, transfer of credit, and guaranteed employment claims related to borrowers who attended Heald, Everest, and WyoTech campuses of Corinthian Colleges, California campuses of ITT, and American Career Institute—Massachusetts. BDU sent memoranda to the Under Secretary to recommend claims that the Under Secretary should approve for a borrower defense loan discharge; these approval memoranda were signed by the Under Secretary. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

According to its functional statement, BDU issues written decisions on borrower defense claims that constitute the final decision of the Secretary, in collaboration with OGC. In practice, BDU reviewed the claims and then made a recommendation to the Under Secretary on whether the Department should approve claims for loan discharge. The Under Secretary made the decision on whether to accept BDU's recommendation.

### Borrower Defense Loan Discharge Process

Borrowers submitted borrower defense claims for loan discharge to FSA either online, through email, or by mail. Business Operations and its contractor received the borrower defense claims and, as part of the intake process, entered claim data into the borrower defense database and into a spreadsheet that it used to track the status of claims. Then, Business Operations notified loan servicers to place borrowers' loans into forbearance; when a loan is in forbearance, the borrower is not required to make payments but interest continues to accumulate against the outstanding loan balance.[9] BDU and its contractors reviewed claims for eligibility using criteria established in legal memoranda as the basis for approval. BDU and its contractors made claim determinations and performed quality control reviews on the claims. Then BDU recommended claims for approval and the associated loans for discharge to the Under Secretary. The Under Secretary approved the list of claims, and Business Operations notified loan servicers to discharge the borrowers' loans associated with the approved claims. Business Operations also updated the approval status in the database and spreadsheet used to track claims. Servicers updated the National Student Loan Database System (NSLDS) and Business Operations later verified that the loans statuses were discharged in NSLDS.

---

[9] Borrowers can choose not to have their loans placed in forbearance by selecting that option on the borrower defense application.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

DOE00006212

# **LEGAL FOUNDATION**

DOE00006213

# 1995 BORROWER DEFENSE REGULATION

DOE00006214



**ARCHIVED**

IFAP HOME    CLOSE WINDOW

SFA Information for Financial Aid Professionals



U.S. Department of Education

**Citations: (R)685.206**
**AsOfDate: 12/1/94**

Sec. 685.206 Borrower responsibilities and defenses.

(a) The borrower shall give the school the following
information as part of the origination process for a Direct Subsidized,
Direct Unsubsidized, or Direct PLUS Loan:

(1) A statement, as described in 34 CFR Part 668, that the
loan will be used for the cost of the student's attendance.

(2) Information demonstrating that the borrower is eligible
for the loan.

(3) Information concerning the outstanding FFEL Program
and Direct Loan Program loans of the borrower and, for a parent
borrower, of the student, including any Federal Consolidation Loan or
Direct Consolidation Loan.

(4) A statement authorizing the school to release to the
Secretary information relevant to the student's eligibility to borrow or
to have a parent borrow on the student's behalf (e.g., the student's
enrollment status, financial assistance, and employment records).

(b)(1) The borrower shall promptly notify the Secretary of
any change of name, address, student status to less than half-time,
employer, or employer's address; and

(2) The borrower shall promptly notify the school of any
change in address during enrollment.

(c) Borrower defenses. (1) In any proceeding to collect on a
Direct Loan, the borrower may assert as a defense against repayment,
any act or omission of the school attended by the student that would

DOE00006215

give rise to a cause of action against the school under applicable State law. These proceedings include, but are not limited to, the following:

(i) Tax refund offset proceedings under 34 CFR 30.33.

(ii) Wage garnishment proceedings under section 488A of the Act.

(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31.

(iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f).

(2) If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include, but is not limited to, the following:

(i) Reimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection.

(ii) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(iii) Updating reports to credit bureaus to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

(3) The Secretary may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies. However, the Secretary does not initiate such a proceeding after the period for the retention of records described in Sec. 685.309(c) unless the school received actual notice of the claim during that period.

(Authority: 20 U.S.C. 1087a et seq.)

---

DOE00006216

2016 BORROWER DEFENSE REGULATION

DOE00006217

requirements and procedures for obtaining a discharge.

(iii) The lender shall file a closed school claim with the guaranty agency in accordance with § 682.402(g) no later than 60 days after the lender receives a completed application described in paragraph (d)(3) of this section from the borrower, or notification from the agency that the Secretary approved the borrower's appeal in accordance with paragraph (d)(6)(ii)(K)(*3*) of this section.

*       *       *       *       *

(8) *Discharge without an application.* (i) A borrower's obligation to repay a FFEL Program loan may be discharged without an application from the borrower if the—

(A) Borrower received a discharge on a loan pursuant to 34 CFR 674.33(g) under the Federal Perkins Loan Program, or 34 CFR 685.214 under the William D. Ford Federal Direct Loan Program; or

(B) Secretary or the guaranty agency, with the Secretary's permission, determines that the borrower qualifies for a discharge based on information in the Secretary or guaranty agency's possession.

(ii) With respect to schools that closed on or after November 1, 2013, a borrower's obligation to repay a FFEL Program loan will be discharged without an application from the borrower if the Secretary or guaranty agency determines that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed.

*       *       *       *       *

■ 20. Section 682.405 is amended by redesignating paragraph (b)(4) as paragraph (b)(4)(i) and adding paragraph (b)(4)(ii).

The addition reads as follows:

**§ 682.405   Loan rehabilitation agreement.**

*       *       *       *       *

(b) * * *

(4) * * *

(ii) The lender must not consider the purchase of a rehabilitated loan as entry into repayment or resumption of repayment for the purposes of interest capitalization under § 682.202(b).

*       *       *       *       *

■ 21. Section 682.410 is amended:

■ A. In paragraph (b)(4) by adding, after the words "to the lender", the words and punctuation ", but shall not capitalize any unpaid interest thereafter".

■ B. By adding paragraph (b)(6)(viii).

The addition reads as follows:

**§ 682.410   Fiscal, administrative, and enforcement requirements.**

*       *       *       *       *

(b) * * *

(6) * * *

(viii) Upon notification by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k), the guaranty agency must suspend all collection activities on the affected loan for the period designated by the Secretary.

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 22. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 23. Section 685.200 is amended by adding paragraphs (f)(3)(v) and (f)(4)(iii) to read as follows:

**§ 685.200   Borrower eligibility.**

*       *       *       *       *

(f) * * *

(3) * * *

(v) A borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge that results in a remaining eligibility period greater than zero is no longer responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of the loan, as described in paragraph (f)(3)(i) of this section.

(4) * * *

(iii) For a first-time borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge on a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan, the Subsidized Usage Period is reduced. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in full, the Subsidized Usage Period of those loans is zero years. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in part, the Subsidized Usage Period may be reduced if the discharge results in the inapplicability of paragraph (f)(4)(i) of this section.

*       *       *       *       *

■ 24. Section 685.205 is amended by revising paragraph (b)(6) to read as follows:

**§ 685.205   Forbearance.**

*       *       *       *       *

(b) * * *

(6) Periods necessary for the Secretary to determine the borrower's eligibility for discharge—

(i) Under § 685.206(c);

(ii) Under § 685.214;

(iii) Under § 685.215;

(iv) Under § 685.216;

(v) Under § 685.217;

(vi) Under § 685.222; or

(vii) Due to the borrower's or endorser's (if applicable) bankruptcy;

*       *       *       *       *

■ 25. Section 685.206 is amended by revising paragraph (c) to read as follows:

**§ 685.206   Borrower responsibilities and defenses.**

*       *       *       *       *

(c) *Borrower defenses.* (1) For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph. A "borrower defense" refers to any act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.

(ii) A claim to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(2) The order of objections for defaulted Direct Loans are as described in § 685.222(a)(6). A borrower defense claim under this section must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k).

(3) For an approved borrower defense under this section, except as provided in paragraph (c)(4) of this section, the Secretary may initiate an appropriate proceeding to collect from the school whose act or omission resulted in the borrower defense the amount of relief arising from the borrower defense, within the later of—

(i) Three years from the end of the last award year in which the student attended the institution; or

(ii) The limitation period that State law would apply to an action by the borrower to recover on the cause of action on which the borrower defense is based.

(4) The Secretary may initiate a proceeding to collect at any time if the

DOE00006218

institution received notice of the claim before the end of the later of the periods described in paragraph (c)(3) of this section. For purposes of this paragraph, notice includes receipt of—

(i) Actual notice from the borrower, from a representative of the borrower, or from the Department;

(ii) A class action complaint asserting relief for a class that may include the borrower; and

(iii) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower.

\*    \*    \*    \*    \*

§ 685.209    [Amended]

■ 26. Section 685.209 is amended:
■ A. In paragraph (a)(1)(ii), by adding ", for purposes of determining whether a borrower has a partial financial hardship in accordance with paragraph (a)(1)(v) of this section or adjusting a borrower's monthly payment amount in accordance with paragraph (a)(2)(ii) of this section," after the words "*Eligible loan*".
■ B. In paragraph (c)(1)(ii), by adding ", for purposes of adjusting a borrower's monthly payment amount in accordance with paragraph (c)(2)(ii) of this section," after the words "*Eligible loan*".
■ C. In paragraph (c)(2)(ii)(B) introductory text, by removing the word "Both" and adding in its place the words "Except in the case of a married borrower filing separately whose spouse's income is excluded in accordance with paragraph (c)(1)(i)(A) or (B) of this section, both".
■ D. In paragraph (c)(2)(v), by removing the words "or the Secretary determines the borrower does not have a partial financial hardship".
■ E. In paragraph (c)(4)(iii)(B), by removing the citations "(c)(2)(iv), (c)(4)(v), and (c)(4)(vi)" and adding, in their place, the citations "(c)(2)(iv) and (c)(4)(v)".
■ 27. Section 685.212 is amended by revising paragraphs (a)(1) and (2) and adding paragraph (k) to read as follows:

§ 685.212    Discharge of a loan obligation.

(a) *Death.* (1) If a borrower (or a student on whose behalf a parent borrowed a Direct PLUS Loan) dies, the Secretary discharges the obligation of the borrower and any endorser to make any further payments on the loan based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges a loan based upon other reliable documentation of the borrower's or student's death that is acceptable to the Secretary.

\*    \*    \*    \*    \*

(k) *Borrower defenses.* (1) If a borrower defense is approved under § 685.206(c) or § 685.222—

(i) The Secretary discharges the obligation of the borrower in whole or in part in accordance with the procedures in §§ 685.206(c) and 685.222, respectively; and

(ii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the loan that exceed the amount owed on that portion of the loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim subject to § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or

(B) For a claim subject to § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(2) In the case of a Direct Consolidation Loan, a borrower may assert a borrower defense under § 685.206(c) or § 685.222 with respect to a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act that was repaid by the Direct Consolidation Loan.

(i) The Secretary considers a borrower defense claim asserted on a Direct Consolidation Loan by determining—

(A) Whether the act or omission of the school with regard to the loan described in paragraph (k)(2) of this section, other than a Direct Subsidized, Unsubsidized, or PLUS Loan, constitutes a borrower defense under § 685.206(c), for a Direct Consolidation Loan made before July 1, 2017, or under § 685.222, for a Direct Consolidation Loan made on or after July 1, 2017; or

(B) Whether the act or omission of the school with regard to a Direct Subsidized, Unsubsidized, or PLUS Loan made on after July 1, 2017 that was paid off by the Direct Consolidation Loan, constitutes a borrower defense under § 685.222.

(ii) If the borrower defense is approved, the Secretary discharges the appropriate portion of the Direct Consolidation Loan.

(iii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the Direct Consolidation Loan that exceed the amount owed on that portion of the Direct Consolidation Loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim asserted under § 685.206(c), the limitation period under the law applicable to the claim on which relief was granted; or

(B) For a claim asserted under § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(iv) The Secretary returns to the borrower a payment made by the borrower or otherwise recovered on the loan described in paragraph (k)(2) of this section only if—

(A) The payment was made directly to the Secretary on the loan; and

(B) The borrower proves that the loan to which the payment was credited was not legally enforceable under applicable law in the amount for which that payment was applied.

\*    \*    \*    \*    \*

■ 28. Section 685.214 is amended by:
■ A. Revising paragraphs (c)(2) and (f)(4).
■ B. Redesignating paragraphs (f)(5) and (6) as paragraphs (f)(6) and (7), respectively.
■ C. Adding a new paragraph (f)(5).
The revisions and addition read as follows:

§ 685.214    Closed school discharge.

\*    \*    \*    \*    \*

(c) \*    \*    \*
(2) If the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for the discharge of a loan under this section, the Secretary—

(i) May discharge the loan without an application from the borrower; and

(ii) With respect to schools that closed on or after November 1, 2013, will discharge the loan without an application from the borrower if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

\*    \*    \*    \*    \*

DOE00006219

(f) * * *

(4) If a borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(5) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

* * * * *

■ 29. Section 685.215 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Revising paragraph (c) introductory text.
■ C. Revising paragraph (c)(1).
■ D. Redesignating paragraphs (c)(2) through (8) as paragraphs (c)(3) through (8), respectively.
■ E. Adding a new paragraph (c)(2).
■ F. Revising redesignated paragraph (c)(8).
■ G. Revising paragraph (d).

The revisions and addition read as follows:

**§685.215   Discharge for false certification of student eligibility or unauthorized payment.**

(a) *Basis for discharge*—(1) *False certification.* The Secretary discharges a borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if a school falsely certifies the eligibility of the borrower (or the student on whose behalf a parent borrowed) to receive the proceeds of a Direct Loan. The Secretary considers a student's eligibility to borrow to have been falsely certified by the school if the school—

(i) Certified the eligibility of a student who—

(A) Reported not having a high school diploma or its equivalent; and

(B) Did not satisfy the alternative to graduation from high school requirements under section 484(d) of the Act that were in effect at the time of certification;

(ii) Certified the eligibility of a student who is not a high school graduate based on—

(A) A high school graduation status falsified by the school; or

(B) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(iii) Signed the borrower's name on the loan application or promissory note without the borrower's authorization;

(iv) Certified the eligibility of the student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment (in the student's State of residence when the loan was originated) in the occupation for which the training program supported by the loan was intended; or

(v) Certified the eligibility of a student for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (c)(5)(ii) of this section.

* * * * *

(c) *Borrower qualification for discharge.* To qualify for discharge under this section, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraph (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.

(1) *High school diploma or equivalent.* In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative to graduation from high school eligibility requirements under section 484(d) of the Act applicable at the time the loan was originated, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student on whose behalf a parent received a PLUS loan)—

(i) Reported not having a valid high school diploma or its equivalent at the time the loan was certified; and

(ii) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable at the time the institution certified the loan.

(2) *Disqualifying condition.* In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan)—

(i) Did not meet State requirements for employment (in the student's State of residence) in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

(ii) [Reserved]

* * * * *

(8) *Discharge without an application.* The Secretary discharges all or part of a loan as appropriate under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge. Such information includes, but is not limited to, evidence that the school has falsified the Satisfactory Academic Progress of its students, as described in § 668.34.

(d) *Discharge procedures.* (1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower an application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(3) If the borrower submits the application described in paragraph (c) of this section, the Secretary determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the Secretary's records and gathered by the Secretary from other sources, including guaranty agencies, other Federal agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations. The Secretary issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The Secretary considers any response from the borrower and any additional information from the borrower, and notifies the borrower whether the determination is changed.

DOE00006220

(4) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(5) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination.

\*       \*       \*       \*       \*

### § 685.220   [Amended]

■ 30. Section 685.220 is amended by:
■ A. Removing the words "subpart II of part B" from paragraph (b)(21) and adding in their place the words "part E".
■ B. Removing paragraph (d)(1)(i).
■ C. Redesignating paragraph (d)(1)(ii) and (iii) as paragraphs (d)(1)(i) and (ii).
■ 31. Section 685.222 is added to subpart B to read as follows:

### § 685.222   Borrower defenses.

(a) *General.* (1) For loans first disbursed prior to July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with the provisions of § 685.206(c), unless otherwise noted in § 685.206(c).

(2) For loans first disbursed on or after July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with this section. To establish a borrower defense under this section, a preponderance of the evidence must show that the borrower has a borrower defense that meets the requirements of this section.

(3) A violation by the school of an eligibility or compliance requirement in the Act or its implementing regulations is not a basis for a borrower defense under either this section or § 685.206(c) unless the violation would otherwise constitute a basis for a borrower defense under this section or § 685.206(c), as applicable.

(4) For the purposes of this section and § 685.206(c), "borrower" means—
(i) The borrower; and
(ii) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(5) For the purposes of this section and § 685.206(c), a "borrower defense" refers to an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and
(ii) A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(6) If the borrower asserts both a borrower defense and any other objection to an action of the Secretary with regard to that Direct Loan, the order in which the Secretary will consider objections, including a borrower defense, will be determined as appropriate under the circumstances.

(b) *Judgment against the school.* The borrower has a borrower defense if the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction. A borrower may assert a borrower defense under this paragraph at any time.

(c) *Breach of contract by the school.* The borrower has a borrower defense if the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. A borrower may assert a defense to repayment of amounts owed to the Secretary under this paragraph at any time after the breach by the school of its contract with the student. A borrower may assert a right to recover amounts previously collected by the Secretary under this paragraph not later than six years after the breach by the school of its contract with the student.

(d) *Substantial misrepresentation by the school.* (1) A borrower has a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan. A borrower may assert, at any time, a defense to repayment under this paragraph (d) of amounts owed to the Secretary. A borrower may assert a claim under this paragraph (d) to recover funds previously collected by the Secretary not later than six years after the borrower discovers, or reasonably could have discovered, the information constituting the substantial misrepresentation.

(2) For the purposes of this section, a designated Department official pursuant to paragraph (e) of this section or a hearing official pursuant to paragraph (f), (g), or (h) of this section may consider, as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation, whether the school or any of the other parties described in paragraph (d)(1) engaged in conduct such as, but not limited to:
(i) Demanding that the borrower make enrollment or loan-related decisions immediately;
(ii) Placing an unreasonable emphasis on unfavorable consequences of delay;
(iii) Discouraging the borrower from consulting an adviser, a family member, or other resource;
(iv) Failing to respond to the borrower's requests for more information including about the cost of the program and the nature of any financial aid; or
(v) Otherwise unreasonably pressuring the borrower or taking advantage of the borrower's distress or lack of knowledge or sophistication.

(e) *Procedure for an individual borrower.* (1) To assert a borrower defense under this section, an individual borrower must—
(i) Submit an application to the Secretary, on a form approved by the Secretary—
(A) Certifying that the borrower received the proceeds of a loan, in whole or in part, to attend the named school;
(B) Providing evidence that supports the borrower defense; and
(C) Indicating whether the borrower has made a claim with respect to the information underlying the borrower defense with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and
(ii) Provide any other information or supporting documentation reasonably requested by the Secretary.

(2) Upon receipt of a borrower's application, the Secretary—
(i) If the borrower is not in default on the loan for which a borrower defense has been asserted, grants forbearance and—
(A) Notifies the borrower of the option to decline the forbearance and to continue making payments on the loan; and
(B) Provides the borrower with information about the availability of the income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221; or

(ii) If the borrower is in default on the loan for which a borrower defense has been asserted—

(A) Suspends collection activity on the loan until the Secretary issues a decision on the borrower's claim;

(B) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and

(C) Notifies the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

(3) The Secretary designates a Department official to review the borrower's application to determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official.

(i) As part of the fact-finding process, the Department official notifies the school of the borrower defense application and considers any evidence or argument presented by the borrower and also any additional information, including—

(A) Department records;

(B) Any response or submissions from the school; and

(C) Any additional information or argument that may be obtained by the Department official.

(ii) Upon the borrower's request, the Department official identifies to the borrower the records the Department official considers relevant to the borrower defense. The Secretary provides to the borrower any of the identified records upon reasonable request of the borrower.

(4) At the conclusion of the fact-finding process, the Department official issues a written decision as follows:

(i) If the Department official approves the borrower defense in full or in part, the Department official notifies the borrower in writing of that determination and of the relief provided as described in paragraph (i) of this section.

(ii) If the Department official denies the borrower defense in full or in part, the Department official notifies the borrower of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected, and informs the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application. The Department official also informs the borrower of the opportunity to request reconsideration of the claim based on new evidence pursuant to paragraph (e)(5)(i) of this section.

(5) The decision of the Department official is final as to the merits of the claim and any relief that may be granted on the claim. Notwithstanding the foregoing—

(i) If the borrower defense is denied in full or in part, the borrower may request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" is relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision. If accepted for reconsideration by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans; and

(ii) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(6) The Secretary may consolidate applications filed under this paragraph (e) that have common facts and claims, and resolve the borrowers' borrower defense claims as provided in paragraphs (f), (g), and (h) of this section.

(7) The Secretary may initiate a proceeding to collect from the school the amount of relief resulting from a borrower defense under this section—

(i) Within the six-year period applicable to the borrower defense under paragraph (c) or (d) of this section;

(ii) At any time, for a borrower defense under paragraph (b) of this section; or

(iii) At any time if during the period described in paragraph (e)(7)(i) of this section, the institution received notice of the claim. For purposes of this paragraph, notice includes receipt of—

(A) Actual notice from the borrower, a representative of the borrower, or the Department of a claim, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c);

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, for underlying facts that may form the basis of a claim under this section or § 685.206(c).

(f) *Group process for borrower defense, generally.* (1) Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant, the Secretary may initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense.

(i) The members of the group may be identified by the Secretary from individually filed applications pursuant to paragraph (e)(6) of this section or from any other source.

(ii) If the Secretary determines that there are common facts and claims that apply to borrowers who have not filed an application under paragraph (e) of this section, the Secretary may identify such borrowers as members of a group.

(2) Upon the identification of a group of borrowers under paragraph (f)(1) of this section, the Secretary—

(i) Designates a Department official to present the group's claim in the fact-finding process described in paragraph (g) or (h) of this section, as applicable;

(ii) Provides each identified member of the group with notice that allows the borrower to opt out of the proceeding;

(iii) If identified members of the group are borrowers who have not filed an application under paragraph (f)(1)(ii) of this section, follows the procedures in paragraph (e)(2) of this section for granting forbearance and for defaulted loans for such identified members of the group, unless an opt-out by such a member of the group is received; and

(iv) Notifies the school of the basis of the group's borrower defense, the initiation of the fact-finding process described in paragraph (g) or (h) of this section, and of any procedure by which the school may request records and respond. No notice will be provided if notice is impossible or irrelevant due to a school's closure.

(3) For a group of borrowers identified by the Secretary, for which the Secretary determines that there may be a borrower defense under paragraph (d) of this section based upon a substantial misrepresentation that has been widely disseminated, there is a rebuttable presumption that each member

DOE00006222

reasonably relied on the misrepresentation.

(g) *Procedures for group process for borrower defenses with respect to loans made to attend a closed school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to a Direct Loan to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses arising from borrower defenses, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses—

(1) A hearing official resolves the borrower defense through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official also considers any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in § 668.174(b), if practicable. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision states that determination and the relief provided on the basis of that claim as determined under paragraph (i) of this section.

(ii) If the hearing official denies the borrower defense in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that if any balance remains on the loan, the loan will return to its status prior to the group claim process.

(iii) The Secretary provides copies of the written decision to the members of the group and, as practicable, to the school.

(2) The decision of the hearing official is final as to the merits of the group borrower defense and any relief that may be granted on the group claim.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (g)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(h) *Procedures for group process for borrower defenses with respect to loans made to attend an open school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to Direct Loans to attend a school that is not covered by paragraph (g) of this section, the claim is resolved in accordance with the procedures in this paragraph (h).

(1) A hearing official resolves the borrower defense and determines any liability of the school through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision establishes the basis for the determination, notifies the members of the group of the relief as described in paragraph (i) of this section, and notifies the school of any liability to the Secretary for the amounts discharged and reimbursed.

(ii) If the hearing official denies the borrower defense for the group in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that their loans will return to their statuses prior to the group borrower defense process. The decision notifies the school of any liability to the Secretary for any amounts discharged or reimbursed.

(iii) The Secretary provides copies of the written decision to the members of the group, the Department official, and the school.

(2) The decision of the hearing official becomes final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. In the case of an appeal—

(i) The decision of the hearing official does not take effect pending the appeal; and

(ii) The Secretary renders a final decision.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (h)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(5)(i) The Secretary collects from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under this paragraph (h).

(ii) For a borrower defense under paragraph (b) of this section, the Secretary may initiate a proceeding to collect at any time.

(iii) For a borrower defense under paragraph (c) or (d) of this section, the Secretary may initiate a proceeding to collect within the limitation period that would apply to the borrower defense, provided that the Secretary may bring an action to collect at any time if, within the limitation period, the school received notice of the borrower's borrower defense claim. For purposes of this paragraph, the school receives notice of the borrower's claim by receipt of—

(A) Actual notice of the claim from the borrower, a representative of the borrower, or the Department, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c); or

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, of underlying facts that may form the basis of a claim under this section or § 685.206(c).

(i) *Relief.* If a borrower defense is approved under the procedures in

DOE00006223

paragraph (e), (g), or (h) of this section, the following procedures apply:

(1) The Department official or the hearing official deciding the claim determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount.

(2) For a borrower defense brought on the basis of—

(i) A substantial misrepresentation, the Department official or the hearing official will factor the borrower's cost of attendance to attend the school, as well as the value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received, and/or the value of the education the borrower should have expected given the information provided by the institution, into the determination of appropriate relief. A borrower may be granted full, partial, or no relief. Value will be assessed in a manner that is reasonable and practicable. In addition, the Department official or the hearing official deciding the claim may consider any other relevant factors;

(ii) A judgment against the school—

(A) Where the judgment awards specific financial relief, relief will be the amount of the judgment that remains unsatisfied, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations; and

(B) Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment; and

(iii) A breach of contract, relief will be determined according to the common law of contracts, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations.

(3) In a fact-finding process brought against an open school under paragraph (h) of this section on the basis of a substantial misrepresentation, the school has the burden of proof as to any value of the education.

(4) In determining the relief, the Department official or the hearing official deciding the claim may consider—

(i) Information derived from a sample of borrowers from the group when calculating relief for a group of borrowers; and

(ii) The examples in Appendix A to this subpart.

(5) In the written decision described in paragraphs (e), (g), and (h) of this

section, the designated Department official or hearing official deciding the claim notifies the borrower of the relief provided and—

(i) Specifies the relief determination;

(ii) Advises that there may be tax implications; and

(iii) Advises the borrower of the requirements to file a request for reconsideration upon the identification of new evidence.

(6) Consistent with the determination of relief under paragraph (i)(1) of this section, the Secretary discharges the borrower's obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay and, if applicable, reimburses the borrower for amounts paid toward the loan voluntarily or through enforced collection.

(7) The Department official or the hearing official deciding the case, or the Secretary as applicable, affords the borrower such further relief as appropriate under the circumstances. Such further relief includes, but is not limited to, one or both of the following:

(i) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(ii) Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

(8) The total amount of relief granted with respect to a borrower defense cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense. The relief to the borrower may not include non-pecuniary damages such as inconvenience, aggravation, emotional distress, or punitive damages.

(j) *Cooperation by the borrower.* To obtain relief under this section, a borrower must reasonably cooperate with the Secretary in any proceeding under paragraph (e), (g), or (h) of this section. The Secretary may revoke any relief granted to a borrower who fails to satisfy his or her obligations under this paragraph (j).

(k) *Transfer to the Secretary of the borrower's right of recovery against third parties.* (1) Upon the granting of any relief under this section, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary

any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense and for the same loan for which the discharge was granted under this section.

(2) The provisions of this paragraph (k) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(3) Nothing in this paragraph (k) limits or forecloses the borrower's right to pursue legal and equitable relief against a party described in this paragraph (k) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

(Authority: 20 U.S.C. 1087a *et seq.*; 28 U.S.C. 2401; 31 U.S.C. 3702)

■ 32. Section 685.223 is added to subpart B to read as follows:

**§ 685.223  Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

■ 33. Appendix A to subpart B of part 685 is added to read as follows:

**Appendix A to Subpart B of Part 685—Examples of Borrower Relief**

The Department official or the hearing official deciding a borrower defense claim determines the amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. The following are some conceptual examples demonstrating relief. The actual relief awarded will be determined by the Department official or the hearing official deciding the claim, who shall not be bound by these examples.

DOE00006224

1. A school represents to prospective students, in widely disseminated materials, that its educational program will lead to employment in an occupation that requires State licensure. The program does not in fact meet minimum education requirements to enable its graduates to sit for the exam necessary for them to obtain licensure. The claims are adjudicated in a group process.

Appropriate relief: Borrowers who enrolled in this program during the time that the misrepresentation was made should receive full relief. As a result of the schools' misrepresentation, the borrowers cannot work in the occupation in which they reasonably expected to work when they enrolled. Accordingly, borrowers received limited or no value from this educational program because they did not receive the value that they reasonably expected.

2. A school states to a prospective student that its medical assisting program has a faculty composed of skilled nurses and physicians and offers internships at a local hospital. The borrower enrolls in the school in reliance on that statement. In fact, none of the teachers at the school other than the Director is a nurse or physician. The school has no internship program. The teachers at the school are not qualified to teach medical assisting and the student is not qualified for medical assistant jobs based on the education received at the school.

Appropriate relief: This borrower should receive full relief. None of the teachers at the school are qualified to teach medical assisting, and there was no internship. In contrast to reasonable students' expectations, based on information provided by the school, the typical borrower received no value from the program.

3. An individual interested in becoming a registered nurse meets with a school's admissions counselor who explains that the school does not have a nursing program but that completion of a medical assisting program is a prerequisite for any nursing program. Based on this information, the borrower enrolls in the school's medical assisting program rather than searching for another nursing program, believing that completing a medical assisting program is a necessary step towards becoming a nurse. After one year in the program, the borrower realizes that it is not necessary to become a medical assistant before entering a nursing program. The borrower's credits are not transferrable to a nursing program.

Appropriate relief: This borrower should receive full relief. Because it is not necessary to become a medical assistant prior to entering a nursing program, she has made no progress towards the career she sought, and in fact has received an education that cannot be used for its intended purpose.

4. A school tells a prospective student, who is actively seeking an education, that the cost of the program will be $20,000. Relying on that statement, the borrower enrolls. The student later learns the cost for that year was $25,000. There is no evidence of any other misrepresentations in the enrollment process or of any deficiency in value in the student's education.

Appropriate relief: This borrower should receive partial relief of $5,000. The borrower

received precisely the value that she expected. The school provides the education that the student was seeking but misrepresented the price.

5. A school represents in its marketing materials that three of its undergraduate faculty members in a particular program have received the highest award in their field. A borrower choosing among two comparable, selective programs enrolls in that program in reliance on the representation about its faculty. However, although the program otherwise remains the same, the school had failed to update the marketing materials to reflect the fact that the award-winning faculty had left the school.

Appropriate relief: Although the borrower reasonably relied on a misrepresentation about the faculty in deciding to enroll at this school, she still received the value that she expected. Therefore, no relief is appropriate.

6. An individual wishes to enroll in a selective, regionally accredited liberal arts school. The school gives inflated data to a well-regarded school ranking organization regarding the median grade point average of recent entrants and also includes that inflated data in its own marketing materials. This inflated data raises the place of the school in the organization's rankings in independent publications. The individual enrolls in the school and graduates. Soon after graduating, the individual learns from the news that the school falsified admissions data. Notwithstanding this issue, degrees from the school continue to serve as effective, well-regarded liberal arts credentials.

The Department also determines that the school violated the title IV requirement that it not make substantial misrepresentations pursuant to 34 CFR 668.71, which constitutes an enforceable violation separate and apart from any borrower defense relief.

Appropriate Relief: The borrower relied on the misrepresentation about the admissions data to his detriment, because the misrepresentation factored into the borrower's decision to choose the school over others. However, the borrower received a selective liberal arts education which represents the value that he could reasonably expect, and gets no relief.

■ 34. Section 685.300 is amended by:
■ A. Redesignating paragraph (b)(11) as paragraph (b)(12).
■ B. Adding a new paragraph (b)(11).
■ C. Adding paragraphs (d) through (i).
The additions read as follows:

**§685.300   Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.**

\*    \*    \*    \*    \*
(b) \* \* \*
(11) Comply with the provisions of paragraphs (d) through (i) of this section regarding student claims and disputes.
\*    \*    \*    \*    \*
(d) *Borrower defense claims in an internal dispute process.* The school will not compel any student to pursue a complaint based on a borrower defense claim through an internal dispute process before the student

presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

(e) *Class action bans.* (1) The school will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action that is related to a borrower defense claim, including to seek a stay or dismissal of particular claims or the entire action, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2) Reliance on a predispute arbitration agreement, or on any other predispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:
(i) Seeking dismissal, deferral, or stay of any aspect of a class action.
(ii) Seeking to exclude a person or persons from a class in a class action.
(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action.
(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action.
(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved.
(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court in that class action has granted a motion to dismiss the claim and, in doing so, the court noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed.

(3) *Required provisions and notices.* (i) The school must include the following provision in any agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding predispute arbitration or any other predispute agreement addressing class actions and that are entered into after the effective date of this regulation: "We agree that neither we nor anyone else will use this agreement to stop you from being part of a class action lawsuit in

DOE00006225

court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement or any other predispute agreement addressing class actions has been entered into before the effective date of this regulation and does not contain a provision described in paragraph (e)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (e)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (e)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (e)(3)(ii) of this section is amended to contain the provision specified in paragraph (e)(3)(iii)(A) or must provide the notice specified in paragraph (e)(3)(iii)(B) to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this agreement will use it to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit in court even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute arbitration agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even

if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(f) *Predispute arbitration agreements.* (1)(i) The school will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim.

(ii) A student may enter into a voluntary post-dispute arbitration agreement with a school to arbitrate a borrower defense claim.

(2) Reliance on a predispute arbitration agreement with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student, including joinder with others in an action;

(ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and

(iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

(3) *Required provisions and notices.* (i) The school must include the following provision in any predispute arbitration agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding arbitration and that are entered into after the effective date of this regulation: ''We agree that neither we nor anyone else will use this agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to lawsuits concerning other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of

educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement has been entered into before the effective date of this regulation that did not contain the provision specified in paragraph (f)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (f)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (f)(3)(ii) of this section is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or must provide the notice specified in paragraph (f)(3)(iii)(B) of this section to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this predispute arbitration agreement will use it to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.''

(g) *Submission of arbitral records.* (1) A school must submit a copy of the

DOE00006226

following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim filed in arbitration by or against the school concerning a borrower defense claim:

(i) The initial claim and any counterclaim.

(ii) The arbitration agreement filed with the arbitrator or arbitration administrator.

(iii) The judgment or award, if any, issued by the arbitrator or arbitration administrator.

(iv) If an arbitrator or arbitration administrator refuses to administer or dismisses a claim due to the school's failure to pay required filing or administrative fees, any communication the school receives from the arbitrator or arbitration administrator related to such a refusal.

(v) Any communication the school receives from an arbitrator or an arbitration administrator related to a determination that a predispute arbitration agreement regarding educational services provided by the school does not comply with the administrator's fairness principles, rules, or similar requirements, if such a determination occurs.

(2) A school must submit any record required pursuant to paragraph (g)(1) of this section within 60 days of filing by the school of any such record with the arbitrator or arbitration administrator and within 60 days of receipt by the school of any such record filed or sent by someone other than the school, such as the arbitrator, the arbitration administrator, or the student.

(h) *Submission of judicial records.* (1) A school must submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim concerning a borrower defense claim filed in a lawsuit by the school against the student or by any party, including a government agency, against the school:

(i) The complaint and any counterclaim.

(ii) Any dispositive motion filed by a party to the suit; and

(iii) The ruling on any dispositive motion and the judgment issued by the court.

(2) A school must submit any record required pursuant to paragraph (h)(1) of this section within 30 days of filing or receipt, as applicable, of the complaint, answer, or dispositive motion, and within 30 days of receipt of any ruling on a dispositive motion or a final judgment.

(i) *Definitions.* For the purposes of paragraphs (d) through (h) of this section, the term—

(1) "Borrower defense claim" means a claim that is or could be asserted as a borrower defense as defined in § 685.222(a)(5), including a claim other than one based on § 685.222(c) or (d) that may be asserted under § 685.222(b) if reduced to judgment;

(2) "Class action" means a lawsuit in which one or more parties seek class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process analogous to Federal Rule of Civil Procedure 23;

(3) "Dispositive motion" means a motion asking for a court order that entirely disposes of one or more claims in favor of the party who files the motion without need for further court proceedings;

(4) "Predispute arbitration agreement" means any agreement, regardless of its form or structure, between a school or a party acting on behalf of a school and a student providing for arbitration of any future dispute between the parties.

\*    \*    \*    \*    \*

■ 35. Section 685.308 is amended by revising paragraph (a) to read as follows:

**§ 685.308   Remedial actions.**

(a) The Secretary collects from the school the amount of the losses the Secretary incurs and determines that the institution is liable to repay under § 685.206, § 685.214, § 685.215(a)(1)(i), (ii), (iii), (iv) or (v), § 685.216, or § 685.222 or that were disbursed—

(1) To an individual, because of an act or omission of the school, in amounts that the individual was not eligible to receive; or

(2) Because of the school's violation of a Federal statute or regulation.

\*    \*    \*    \*    \*

■ 36. Section 685.310 is added to subpart C to read as follows:

**§ 685.310   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

**PART 686—TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION (TEACH) GRANT PROGRAM**

■ 37. The authority citation for part 686 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, *et seq.*, unless otherwise noted.

■ 38. Section 686.42 is amended by revising paragraph (a) to read as follows:

**§ 686.42   Discharge of an agreement to serve.**

(a) *Death.* (1) If a grant recipient dies, the Secretary discharges the obligation to complete the agreement to serve based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the grant recipient's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges the obligation to complete the agreement to serve based on other reliable documentation of the grant recipient's death that is acceptable to the Secretary.

\*    \*    \*    \*    \*

[FR Doc. 2016–25448 Filed 10–31–16; 8:45 am]

**BILLING CODE 4000–01–P**

HEALD JPR MEMO

DOE00006228

*Privileged/Deliberative/Confidential*

Draft of May 14, 2015

## I.     Elements of the UCL applied to Heald Borrowers

### A. The misrepresentation of placement rates identified in ED's Heald fine letter constitutes unfair competition under the Unfair Competition Law.

The UCL prohibits unfair competition, which it defines in a number of categories established by the UCL.  A business practice need only fall under one of these categories to constitute unfair competition.[1]

1. Heald's misrepresentation of placement rates violated federal law, specifically, 34 C.F.R. § 668, as determined by ED.  The UCL defines unfair competition to include any "unlawful...business act or practice."  The Legislature intended unfair competition "to include anything that can properly be called a business practice and that at the same time is forbidden by law."[2] If a business practice violates any law, this is *per se* a UCL violation.[3] Therefore, Heald's misrepresentations constitute unlawful business practices and unfair competition under the UCL.

2. Heald's misrepresentation of placement rates also constitute fraudulent business practices under the UCL, another form of unfair competition.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[4] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[5] True statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[6]

   In the Heald fine letter, ED found as follows:

   > Heald's inaccurate or incomplete placement rate disclosures were misleading or false; [] they overstated the employment prospects of graduates of Heald's programs; and [] current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures.

---

[1] *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[2] *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992) (citations omitted).

[3] *See Kasky v. Nike*, 45 P.3d 243, 249 (Cal. 2002); *see also People v. E.W.A.P. Inc.*, 165 Cal.Rptr. 73, 75 (Cal. Ct. App. 1980).

[4] *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983)35 Cal.3d 197, 211 (Sup. Ct. 1983) superseded by statute, 2004 Cal. Legis. Serv. Prop. 64 on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006). Note: The "likely to be deceived" standard does not establish a private plaintiff's standing.

[5] CAL. CIV. C. § 1709.

[6] *Boschma v. Home Loan Center*, 129 Cal.Rpt.3d 874, 893 (Cal. Ct. App. 2011).

DOE00006229

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

Heald fine letter at 10. This finding places Heald's misrepresentations squarely within the UCL's definition of fraudulent business practices and thus within its definition of unfair competition.

3. Heald's misrepresentation of placement rates may also be unfair competition under two other prongs of 17200, "unfair, deceptive or untrue advertising" and "unfair...business act or practice." The advertising prong is considered to be very similar to the fraudulent business practice prong. *See* Stern, Business and Professional Code § 172000 Practice at 3-70 (2015).

Regarding unfair business practices, "[t]he state of the law...is somewhat unsettled."[7] However, the trend appears to be in favor of using section 5 of the Federal Trade Commission Act ("FTCA") to define unfairness. To find unfairness under the FTCA: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.[8] "... [C]onsumers cannot have reasonably avoided the injury . . . if their free market decisions were unjustifiably hampered by the conduct of the seller."[9] The placement rate misrepresentations at issue here easily could be described as meeting these standards.

## B. Borrowers who relied on Heald's misrepresented placement rates in deciding to attend Heald programs suffered economic harm.

Section 17204 requires that an individual seeking relief under the UCL have "suffered injury in fact and [have] lost money or property as a result of" the unfair completion of which the person complains. In *Kwikset v. Superior Court*, the California Supreme Court set out numerous ways a consumer can show economic injury and meet these requirements. "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."[10]

Regarding false labeling, the *Kwikset* court also stated,
A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer

---

[7] *Davis v. Ford Motor Credit Co.*, 101 Cal.Rptr.3d 697, 706 (Cal. Ct. App. 2009).

[8] *Id.* at 709.

[9] *Camacho v. Automobile Club of Southern California*, 48 Cal.Rptr.3d 770, 777-78 (Cal. Ct. App. 2006).

[10] *Kwikset Corp.*, 246 P.3d at 885-86.

DOE00006230

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[11]

Other cases have made clear that a consumer suffers economic harm when he or she makes a purchase in reliance on false representations and thereby is denied benefits or value promised by the seller. For example, a federal district court ruled in *Johnson v. Gen. Mills, Inc.* that a consumer satisfied the UCL's harm requirement based on his reliance on false statements about a food's health benefits. The court stated,

> [The plaintiff] has UCL ... standing because he alleges that he bought YoPlus in reliance on General Mills' allegedly deceptive representations concerning the digestive health benefit of YoPlus as communicated by the second generation YoPlus packaging and a television commercial for YoPlus. He further asserts that he suffered economic injury because he purchased YoPlus but did not receive the promised digestive health benefit.[12]

In *Daghlian v. DeVry University, Inc.*, plaintiff student enrolled at the school and incurred debt "in reliance on defendants' misrepresentations and omissions about the transferability of credits."[13] Plaintiff did not attempt to transfer the credits, and he did not allege that he had to restart his education at a different school.[14] Plaintiff alleged "he did not receive what he bargained for."[15] The court found the plaintiff suffered an injury in fact sufficient to bring a UCL cause of action.[16]

Here, students who were deceived by Heald's inflated placement rates can plausibly argue that they got far less than they bargained for, thus suffering an economic injury. Judging the quality and value of education is a notoriously difficult task. It would be reasonable for prospective students to look at placement rates (especially placement rates disclosed under legal requirements) as one significant benchmark of quality. For example, a student selecting a medical assistant training program might well have looked differently at Heald's offering had he known that the placement rate was 33% rather than the advertised 78 %. *See* Heald Fine Letter of April 14, 2015 at 9-10. The prospective

---

[11] *Id.* at 329-30.

[12] 275 F.R.D. 282, 286 (C.D. Cal. 2011).

[13] 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006).

[14] *Id.*

[15] *Id.* at 1155.

[16] *Id.* at 1156. *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (consumer alleged economic harm where he purchased merchandise advertised as having been marked down from a fictitious original price; "the bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore has a higher resale value.")

DOE00006231

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

student might have determined the Heald program was not worth the offering price. (A factual note is relevant here: the tuition at Heald was significantly higher than at community colleges. Indeed, one argument we have heard is that some students have said that had they known the actual success rate of the Corinthian schools, they would have chosen community colleges.)

The reputational and credentialing purpose of education further supports the argument that an inflated placement rate was part of what a purchaser might have valued in selecting a Heald program. Besides the training one receives in one's education, part of the utility of a degree is what it represents to others. According to some, Heald has enjoyed a relatively good local reputation. It is over 100 years old and was regarded as the best asset among the Corinthian chains. That reputation is largely in tatters with the Department of Education's revelations about the school's inflated placement rates. Had students known the true placement rates in the Heald programs, they would have known that Heald's reputation was inflated beyond its reality, and they might have judged that the value of their credential was vulnerable to significant deflation if the truth were discovered. In this sense, too, then, students got far less than they bargained for, and this loss will be suffered every time one shows a resume that shows a Heald degree.

## E. Statute of Limitations

In 2013, the California Supreme Court resolved a split regarding whether Section 17208's four-year statute of limitations was rigid, or whether the discovery rule and other equitable doctrines applied to UCL claims. In *Aryeh v. Canon Business Solutions*, the court held the discovery rule applied, and thus the statute of limitations only begins accruing "when a reasonable person would have discovered the factual basis for a claim."[17] Because a reasonable person would not have known about Heald's placement rate violations until ED's Heald fine letter, published April 14, 2015, no claims based on those misrepresentations are now barred by the statute of limitations.

---

[17] 55 Cal.4th 1185, 1195-96 (Cal. 2013).

4

DOE00006232

# EVEREST/WYOTECH TRANSFERABILITY MEMO

# OCTOBER 2016

**DOE00006233**

To:      Under Secretary Ted Mitchell

From:   Borrower Defense Unit

Date:    October 24, 2016

Re:      Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims

     The Borrower Defense team recommends borrower defense (BD) relief for students who: (1) enrolled at any Corinthian-operated, nationally accredited Everest[1] campus or at WyoTech's Laramie campus[2] between the time Corinthian opened or acquired the campus and April 2015; and (2) alleges that Corinthian misrepresented the transferability of credits earned at that campus. Corinthian represented that credits earned at these Everest campuses were generally transferable. These representations were false and misleading. Accordingly, for the reasons explained below, full BD relief is appropriate for all Everest and WyoTech Laramie borrowers alleging misrepresentations regarding the transferability of credits, subject to reduced relief for those borrowers impacted by the statute of limitations.

**BACKGROUND**

     Everest consistently misled prospective students about the transferability of credits earned at their campuses in two ways. First, school staff made explicit representations regarding transferability. Second, staff strongly implied transferability by emphasizing the school's accreditation status.

     The misleading nature of these statements hinges on the key differences between national career-related and regional institutional accreditation. Traditionally, national accreditors accredit mainly for-profit, career-based, single-purpose institutions, both degree and non-degree.[3] By contrast, regional accreditors accredit public and private, mainly non-profit and degree-granting, two- and four-year institutions.[4] Broadly speaking, credits earned at nationally accredited colleges "are rarely accepted at regionally accredited schools;"[5] and have never been generally transferable.[6] Almost every Everest campus was nationally accredited since its inception, and Corinthian personnel were fully aware of the negative impact of their accreditation on transferability.[7] Nevertheless, as Senator Tom Harkin notes in his 2012 report on the for-profit college sector (the "Harkin Report"), recruiters at for-profits "sometimes play on prospective students' ignorance about accreditation in order to use their schools' accreditation as a selling point."[8]

     As discussed below, Everest personnel regularly led prospective students to believe, either through express or strongly implied representations, that credits earned at Everest would generally be

---

[1] Everest schools include Florida Metropolitan University campuses, which Corinthian acquired in 1996 and later rebranded as Everest University.

[2] To date, the BD Team has only reviewed WyoTech claims from the Laramie campus. While we have no reason to believe the facts and recommendations in this memorandum do not apply to other WyoTech campuses, at this time we are not extending our analysis to those campuses. For the purposes of this memorandum, references to "Everest" include WyoTech Laramie.

[3] *See Council for Higher Education Accreditation: An Overview of US Accreditation*, http://www.chea.org/pdf/Overview%20of%2US%Accreditation%202015.pdf. For this memorandum, "national" refers to national career-related accreditors or accreditation.

[4] *Id.*p. 2.

[5] Harkin Report, p. 56, citing Council for Higher Education Accreditation, *The Fundamentals of Accreditation: What Do You Need to Know, Council for Higher Education Accreditation*, p. 7, September 2002, http://www.chea.org/pdf/fund_accred_20ques_02.pdf (accessed May 24, 2012).

[6] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm.

[7] *See* Mark Pelesh's statement at https://www.insidehighered.com/news/2007/02/26/transfer.

[8] Harkin Report at 55.

1

DOE00006234

accepted at regionally accredited post-secondary institutions.  In actuality, those credits generally did not transfer to or were not accepted at regionally accredited schools.

## I.   Summary of Evidence of Representations of Transferability

Everest staff orally represented to potential students that they could generally transfer their Everest credits to any other school.  These oral representations occurred both in person and during telephone calls with prospective students.  Specifically, the school personnel:  (a) stated credits were generally transferable; and/or (b) "play[ed] on prospective students' ignorance about accreditation" to make claims about national accreditation that strongly implied general transferability.[9]

### A.   Student Accounts of In-Person Oral Representations of Transferability

Hundreds of student applications reviewed to date provide corroborative evidence that Everest admissions personnel regularly made misleading oral representations about transferability.  Indeed, our review of claims spanning from 1998 through 2010 shows that personnel made consistent transferability claims throughout the entire time that Corinthian operated the schools.

A sample of claims from the Everest Brandon campus demonstrates the consistency and specificity of false transferability claims made by school representatives:

- "In my entrance interview, I was told that I should enroll in the paralegal program if I planned on being a lawyer. I was told guarantee that my credits would be good to transfer to USF or UT and then Stetson Law."[10]
- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."[11]
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them I was told that employers will recognize the degree from them and they laugh at me."[12]
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."[13]
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[14]
- "The representative for FMU, asked what my goals were for my education. I stated that I wanted to attend USF for a bachelors degree. He said my credits would absolutely transfer and that he worked hand in hand with the academic advisers over at USF, to help students transition smoothly. He said that my credits would transfer even mid-way through the program."[15]
- "The admissions department also ensured me that earned credits would be accepted by other educational institutions… later discovered that credits from Everest University were not honored at state and local universities."[16]

---

[9] As discussed below, in Section III(B)(1), footnote 102, the implied representations also constitute actionable material omissions.
[10] BD151795
[11] BD150990
[12] BD151323
[13] BD150355
[14] BD151723
[15] BD150789
[16] BD153129

2

DOE00006235

- "I asked if I decided to transfer after rec associates degree would all credits transfer to any college? I was told, an associates is an associates no matter where it comes from."[17]
- "Brian Walker admissions representative had stated that if I wanted to get a Masters degree from another college that my credits will transfer with no problem as FMU (now Everest) is accredited university"[18]
- "I asked if I could transfer my credits to get my Bachelor's degree after earning my Associate's and i was told they would transfer but I would receive a discount if i was to get my Bachelor's with them. They told me i could get my Master's anywhere because my credits would transfer. I asked for specific schools which would take the credits and I was told they don't see why anyone wouldn't take them . . . I was going to pursue my Master's but found out my credits do not transfer."[19]

In all of the above examples, the school explicitly misrepresented the transferability of its credits to the student.

Applicants also state that the school represented general transferability via statements that Everest was "accredited" or "fully accredited." Such implied representations of transferability are supported by the Harkin Report, as well as the Corinthian telephone audits and recordings discussed below. That this "accreditation" tactic, in context, created a strongly implied representation of transferability is illustrated by the fact that students who were unable to transfer their credits believe that Everest lied about being accredited at all (italics added):

- "FLORIDA METROPOLITAN UNIVERSITY-ONLINE (FMU-ONLINE) *LIED BY STATING THAT THEY WERE AN ACCREDITED UNIVERSITY WHEN IN FACT THEY KNOW THEY WERE NOT* . . . THE MISCONDUCT FROM FMU-ONLINE PREVENTED ME TO TRANSFER ANY OF THE CLASSESS I HAD TAKEN THERE, TO BE TRANSFERABLE."[20]
- "Before i applied for the loan i was told my credit can be tranfer if need when i was attending class *i found out thats not true they* [sic] *are not a accredited school.*"[21]
- "I DID NOT KNOW THAT THE SCHOOL WAS NOT PROPERLY ACCREDITED. CREDIT WERE NOT TRANSFERABLE"[22]
- "Everest University misrepresented their accreditation I was told during my school interview that the school was accredited, *and later found out once I applied to other colleges that the school was not accredited.*"[23]
- "I actually went to Valencia once and they told me that they [Everest] are not accredited, thus I'd have to start all over again."[24]
- "Throughout the course, there was speculation that the school was not accredited, but they continuously posted fake documents around the school claiming that they were accredited and that any credits we received would transfer over without any problem."[25]
- "I was told that credits would transfer to other schools offering the same classes but when i tried to transfer after having ear problems i was told that *NONE of my credits could transfer because FMU [later Everest] was not an accredited school.*"[26]

---

[17] BD153757
[18] BD150139
[19] BD150545
[20] BD154282
[21] BD153723
[22] BD152794
[23] BD152222
[24] BD150941
[25] BD150786

3

DOE00006236

- 'I am struggling to have my credits transfer to Southern New Hampshire University. They told me that since Everest is closing that it may be difficult to get any credits to transfer *because Everest is not an accredited institution. Everest told me that they were accredited.*"[27]

Whether students allege an explicit misrepresentation about transferability ("I was told all my credits would transfer") or a strongly implied misrepresentation ("I was told the school was accredited, but then I found out my credits wouldn't transfer"), the student statements are unprompted,[28] specific, and consistent across a span of years.

For example, of the 303 claims reviewed to date at the Everest-Brandon campus, 52 include the allegation that admissions personnel made express representations regarding transferability (examples of which were quoted above) and an additional 6 allege an implied misrepresentation (tying accreditation to transferability).[29]  The student statements are consistent regarding the representations made, including details such as specific schools that would accept Everest credits, or the suggestion that credits earned in Everest's paralegal program would enable students to continue on to law school.

The 58 Everest-Brandon transferability claims come from students who attended between 1998 and 2010.[30]  Corinthian owned and controlled the Everest-Brandon location beginning in 1996, and the first claim alleging a transferability misrepresentation comes from a student who enrolled in 1998.  We have transferability claims from this campus for each year from 1998 through 2010, with a spike in the late-2000s. We have fewer claims from earlier years, but those earlier claims bear the same indicia of reliability as the later claims. Significantly, the student statements about the admissions representatives' misrepresentations exhibit consistency across the span of years:

- 1998: "I attended the school due to the flexible hours and the fact that I was told by the [the school] that my credits in fact would transfer over to other schools."[31]
- 2000: "I was also told that my credits could transfer to any local college or university that was regionally accredited."[32]
- 2006: "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[33]
- 2010: "…Also, was told that credits would transfer to any University (not true)."[34]

The pervasiveness and consistency of the misrepresentation over time at Everest-Brandon corroborate students' allegations about transferability claims throughout the entirety of Corinthian's control of the school.

---

[26] BD150315
[27] BD152848
[28] All of the above student statements came from a variety of different types of applications including the Everest/WyoTech attestation form ED created for JPR claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form specifically ask about transfer of credits, but others do not, and ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."
[29] These figures do not include applications on the Debt Collective form where the applicant only checked the box indicating they were misled about "[t]he fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college" without providing any narrative.
[30] Review Group 15, from which these sample claims are taken, includes any Everest or WyoTech claim from students who enrolled before 2010. A few claims from students enrolled in 2010 can also be found in the review group.
[31] BD1617575
[32] BD1600530
[33] BD151723
[34] BD1613824

4

DOE00006237

Significantly, just as the 58 Everest-Brandon claims corroborate each other, the number of similar allegations at and across multiple other campuses further corroborates students' allegations of transferability representations made by Everest personnel.   Across campuses and across years, the similarity of student statements indicates that the misrepresentations were system-wide and, indeed, part of the Corinthian culture, discussed below, of enticing students to enroll at any cost.[35]

| Campus | Applications reviewed | Applications alleging an express or implied transferability representation | % |
|---|---|---|---|
| Everest Brandon | 303 | 58 | 19 |
| Everest Grand Rapids | 46 | 11 | 24 |
| Everest Orange Park | 36 | 9 | 25 |
| Everest Orlando North | 45 | 11 | 24 |
| Everest Orlando South | 157 | 56 | 36 |
| Everest Phoenix[36] | 81 | 22 | 27 |
| Everest Pompano Beach | 28 | 10 | 36 |
| Everest Rochester | 53 | 15 | 28 |
| Everest Tampa | 26 | 10 | 38 |
| WyoTech Laramie | 18 | 6 | 33 |
| **TOTAL** | **793** | **198** | **25** |

The campuses shown above represent the nine Everest campuses, and one WyoTech campus, for which we have the most claims. The campuses are located in five separate states (AZ, FL, MI, NY, and WY) and the total applications reviewed are from the period of time when Corinthian gained control of the campus[37] through 2010. Every campus from which we have reviewed a significant number of applications has revealed that between one-fifth and one-third of total applicants allege a misrepresentation about transferability of credits. Just like the Everest-Brandon campus discussed above, the transferability claims from these campuses are distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students are making extremely similar allegations about what the schools said about transferability – whether that student enrolled at Brandon in 1998 or Rochester in 2008.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for every one of the over ninety Everest campuses as unnecessary. The hundreds of claims reviewed corroborate that Everest personnel made representations that credits were generally transferable beginning shortly after Corinthian opened or gained control of a campus.

### B. Telephone Scripts, Audits, and Recordings

Not surprisingly, Corinthian's training documents do not contain express misrepresentations about transferability.  However, they lay the foundation for abuses by failing to emphasize the non-transferability of credits or other potentially important information and in some cases tacitly encouraging misinformation.  For example, in a Corinthian presentation entitled "Overcoming Phone Obstacles" attached to the Harkin Report, Corinthian instructs its admissions representatives to provide limited

---

[35] *See* discussion below, Section III(C), detailing Corinthian's high-pressure sales techniques and internal emphasis on enrolling as many students as possible whether or not it is in the students' interest.

[36] Although Everest Phoenix was a regionally accredited campus, these figures are included for their corroborative value in establishing that Everest personnel regularly made representations regarding transferability.

[37] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The nine campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

DOE00006238

information.[38]  By encouraging its admissions representatives to listen more and talk less, Corinthian believed it could give the student "limited information that will bring the student into the school."[39] Similarly, a training manual for admissions representatives attached to the Harkin Report contains call scripts for admissions representatives.[40]  One section of the script suggests that representatives tell students who ask that credits "will probably not be transferable,"[41] but a later sample conversation instructs the representatives to tell students: "… you'll need to ask the receiving institution that question. I can't tell you what their policy might be because every institution sets their own policy regarding credit transfer."[42]

However, an internal Corinthian audit shows that even to the extent the scripts accurately described the transferability of Corinthian credits, admissions representatives under pressure to enroll students frequently did not follow them.  A 2012 audit of Everest's Online Learning Division – Colorado Springs, Tempe,[43] and Tampa (which includes Brandon, South Orlando, and Pompano Beach) – identified substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students.  Specifically, representatives for the Colorado Springs campus "failed to or incorrectly mentioned" credit transferability 31% of the time when students asked; at Tempe and Tampa, these errors occurred in 40% of audited calls.[44] Karen Fleming, a quality assurance and compliance auditor for Corinthian, summed up the inaccurate information on transferability in an April 13, 2012 email to colleagues, stating: "Admissions representative[s] did not inform the student that if they wish to transfer their credits from Everest to another institution, that the acceptance of those credits would be at the judgment of the receiving institution…"[45]

Recordings of phone calls supplied by the Illinois Attorney General further illustrate that Corinthian employees misled potential students to believe that credits would be accepted at other schools. In summaries of 9 out of 29 recorded calls between Everest call center employees and prospective students provided to us by the Illinois Attorney General's office, Everest representatives gave prospective students information about transferability that was either false or technically accurate but misleading.[46] In one phone call, the representative directly links accreditation to transferability stating:  "We are a nationally accredited school. So you can use that almost anywhere you go."[47] Another representative, after confirming the school was accredited, refused to answer a prospective student's question about transferability.[48]

---

[38] Harkin report, Appendix 25, CoCo Document 3.

[39] *Id.* at p. 7

[40] Harkin report, Appendix 25, CoCo Document 4

[41] Harkin report, Appendix 25, CoCo Document 4, pp. 7-8

[42] Harkin report, Appendix 25, CoCo Document 4, p. 14

[43] Everest Tempe was one of the regionally accredited campuses in Arizona. While the effect of accreditation on transferability for the AZ campus is not the same as for nationally accredited schools, the fact that representatives for that campus either failed to provide accurate information, or affirmatively provided inaccurate information, regarding transferability between 20% and 40% of the time when observed serves to corroborate allegations that such representations were regularly made regarding other campuses nationwide.

[44] Quach Decl. Ex. 40, at CCICA156477. After a "corrective action plan" was initiated, those numbers dropped to 18% at Colorado Springs, 20% at Tempe, and 26% at Tampa. *See* Quach Decl. Ex. 40, at CCICA156454

[45] *Id.*

[46] IL AG "Hot Call" table

[47] IL AG; 3333182367_3333182298_efb49c0853f315387993e156

[48] ""The school will obviously give you the education and credentials with regard to certification"     24:00 "Are you guys accredited." A: "Absolutely." Student then asked about transfer of credits.  She wouldn't answer. IL AG; Second Leg, 3333592713_3333592639_13469370fa1b53e21c997bc8

6

DOE00006239

## II.      Summary of Evidence of Falsity of Representation

Three main sources of evidence demonstrate that credits from Everest were not generally transferable to most other schools. The first is the nature of the schools' accreditation. The second is the *Transfer Credit Practices* guide, which admissions officers use to determine how other schools treat a school's credits. The third is a survey we conducted of transfer policies in a few states that had large populations of Everest students. Additionally, public statements by Corinthian executives show that Corinthian was aware that credits from their schools were not generally transferable.

### A.   Accreditation

Regionally accredited schools generally do not accept transfer credit from nationally accredited schools. Most of the nation's two- and four-year degree-granting post-secondary schools are regionally accredited, while national accrediting agencies accredit career, vocational, and trade schools. Generally, schools that are regionally accredited will not accept credits from nationally accredited schools.

A 2014 study by the National Center for Education Statistics found that 81.4% - 84.3% of students who transfer to, from, or between nationally accredited schools have none of their earned credits transfer (compared to 37% of students transferring between regionally accredited schools),[49] and that the average student transferring to, from, or between nationally accredited schools lost 83% - 90% of their credits upon transfer (compared to an average loss of 39% for regional to regional transfers).[50] The California State University system, the largest four-year public university system in the US, does not generally accept credits from *any* institution without regional accreditation.[51] Similarly, major systems in Florida, Georgia, Texas, Minnesota, and Massachusetts only generally accept credits from regionally accredited schools.[52]

Similarly, a GAO report found that among regionally accredited schools, 63% specified that they accepted credits from *any* regionally accredited school, whereas only 14% specified that they accepted transfer credits from nationally accredited schools;[53] less than one percent of post-secondary institutions specified that accreditation was not a factor in their transfer decisions.[54] Nationally accredited institutions told the GAO that their students "often have difficulty transferring credits and that . . . regionally accredited institutions did not always accept courses taken at the nationally accredited institution."[55] Nationally accredited institutions reported that they "advised students to assume that credits would not transfer to regionally accredited institutions."[56]

---

[49] Simone, S.A. (2014). *Transferability of Postsecondary Credit Following Student Transfer or Coenrollment* (NCES 2014-163). U.S. Department of Education. Washington, DC: National Center for Education Statistics. p. 36
[50] *Id.* at 37. While the study did not conclude there was a direct link between accreditation status and credit transfer, it did find that accreditation status was a factor in credit transfer. The importance of that "factor" is highlighted in the percentage of transfer credits lost when nationally accredited students attempts to transfer those credits. Moreover, experts in the field consider accreditation to be a major factor in credit transferability. According to Christine Kerlin, Ed.D., the "type of accreditation is one of the first considerations, and often the primary consideration, by a receiving institution in reviewing transfer credit." See Expert Rebuttal Report to Expert Report by Dennis M. Cariello in the Matter of *State of Minnesota by its Attorney General, Lori Swanson v. Minnesota School of Business, Inc. et al.* at 4 (July 2015). *See also* statements of Herman Bounds, Ed.D, Director of Accreditation Group at the Department of Education, referenced in FN 6.
[51] *Transfer Credit Practices*, 2015 Edition
[52] See "Survey of Two- and Four-Year Schools in Selected States", Section II(C).
[53] GAO-06-22, p. 9
[54] GAO-06-22, p. 9
[55] *Id*, p. 10
[56] *Id*

DOE00006240

The fact that regionally accredited schools generally do not accept nationally accredited credits has always been true. The 2005 GAO report treats the issue as the status quo, and not a recent development.[57] Until the last couple decades, credit transfer between nationals and regionals was a non-issue since, historically, nationally accredited schools offered technical certificates, not degree programs.[58] However, in the last 15-20 years, more nationally accredited schools have started offering degree programs, and the inability of those credits to transfer has become a larger issue.[59]

Corinthian itself was sufficiently aware of the impact of national accreditation on transferability that it supported various regulatory and/or legislative efforts to require schools to "state that they will not automatically reject credit from nationally accredited institutions."[60] In 2007, Corinthian's VP for legislative and regulatory affairs, Mark Pelesh, stated: "Students are required too often to repeat coursework, pay for something twice, use the public's resources in terms of federal and state financial aid, and have impediments put in the way to advancing their career objectives... it's high time we do something that has some regulatory teeth and impact."[61]

**B. Transfer Credit Practices of Designated Educational Institutions**

The *Transfer Credit Practices of Designated Educational Institutions,* a reference guide published by the American Association of Collegiate Registrars and Admissions Officers, also demonstrates that these credits were not generally transferable as Corinthian frequently told borrowers. It reports the transfer acceptance practices of one major institution in each state, usually the flagship campus of the state university system, regarding credit from institutions in that state. Other schools are not required to follow the reporting school's policies, but the guide is useful for determining how institutions' credits are treated generally.

In a review of *Transfer Credit Practices* from the last twenty years,[62] none of the reporting institutions, outside of Arizona, had a policy of generally accepting credits from Everest. Outside of Arizona, the most favorable policy regarding credits from Everest was one university system that accepted them "on a provisional basis subject to validation as prescribed by the reporting institution".[63] All other reporting institutions either had no official policy or did not normally accept credits from Everest.[64]

---

[57] *See also* https://www.americanprogress.org/issues/higher-education/report/2015/12/14/127200/hooked-on-accreditation-a-historical-perspective/; https://en.wikipedia.org/wiki/Regional_accreditation; El-Kwahas, Elaine (2001) *Accreditation in the USA: Origins, Developments, and Future Prospects* http://unesdoc.unesco.org/images/0012/001292/129295e.pdf; Brittingham, Barbara (2009) *Accreditation in the United States: How Did We Get to Where We Are?* http://onlinelibrary.wiley.com/doi/10.1002/he.331/pdf; http://www.acics.org/accreditation/content.aspx?id=2258

[58] *See* "Council for Higher Education Accreditation: Transfer and the Public Interest" (Nov. 2000) available at http://www.chea.org/pdf/transfer_state_02.pdf, where, without addressing for-profits specifically, the reports states that "higher education is experiencing a significant change in how students attend college and who provides higher education"; *see also* "History of Accreditation" available on a major national accreditor's website at http://www.acics.org/accreditation/content.aspx?id=2258.

[59] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm. *See also* 2006 Spellings Report (ED report arguing that something needs to be done about credit transfer practices).

[60] https://www.insidehighered.com/news/2005/10/19/transfer

[61] https://www.insidehighered.com/news/2007/02/26/transfer

[62] The 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.

[63] California State University, Northridge, for certain Everest campuses, but only in 2006 and 2012. Of the 6 Everest campuses from which CSU would accept credits on a provisional basis, credits from 5 of those were limited to "graduate, professional, or technical programs only". By 2015, CSU Northridge policy for all Everest/WyoTech campuses was "credit not normally accepted".

[64] Florida statute allows nationally accredited schools to participate in the Statewide Course Numbering System, which may allow credits taken at those schools to transfer, but for the Everest campuses that participated in the System, "the credentials of

8

C.  **Survey of Two- and Four-Year Schools in Selected States**

In May 2016, the BD Team also surveyed the transfer policies of two- and four-year schools in three of the states with high numbers of Everest students (FL, GA, and TX), regarding credits earned at Everest.  We reviewed the schools' credit transfer acceptance policies available online, emailed admissions officers, and/or spoke directly with admissions officers. None of the state four-year school systems had a policy of generally accepting credits from nationally accredited schools, including Everest.[65]  Most of the two-year community colleges would only accept credits from regionally accredited schools on a general basis (one two-year school in FL and one in TX regularly accepted credits from ACICS schools, including Everest).

Similarly, as part of their investigation into Everest campuses in Massachusetts, MA AGO contacted several two- and four-year schools within commuting distance of the Everest schools. None of the schools normally accepted credits from Everest, with all of the four-year and one of the two-year schools specifying that they only had acceptance policies for regionally accredited schools.[66] The UMass flagship campus either was not contacted or did not reply, but according to its website, "the following courses generally will not transfer to UMass: Taught by a school which does not have regional academic accreditation at the post-secondary level."[67]

D.  **Student Accounts**

Unsurprisingly, student accounts also show that other institutions of higher learning did not accept credits earned at Everest:

- "I am currently a student at Daytona State College and have been forced to repeat many of the courses I took and paid for at Florida Metropolitan University [Everest Orlando North]. Daytona State does not recognize any of credits earned at FMU, forcing me to repeat them and continue to pay a student loan on worthless education."[68]
- "I tried to enroll at University of Central Florida, Seminole State College and Valencia College. UCF did not even respond to me. SSC and Valencia informed me that they could not accept my credits."[69]
- "I was Told all college credits would transfer, it didn't matter that this college was private, I spoke with a community college advisor and none of these credits transfer."[70]
- "Credits were not transferable.  I checked with Western Dakota Tech in Rapid City SD at the time as I felt I was not getting the education I was promised."[71]

In some instances, students even lost the majority of credits earned at one Everest campus when they transferred or re-enrolled at another Everest campus. One student writes: "The fact is none of them [credits earned at Tampa] were accepted by Tempe Everest even though it was from their OWN sister

---

faculty teaching each course are considered in determining the number assigned to the course and the transferability of the course"; those Everest campuses are still listed as "credits not normally accepted".
[65] University of Florida (Gainesville), University of West Florida, the Georgia State University system, University of Georgia (Athens), University of Texas (Austin), University of Texas (San Antonio), Baylor University, and Rice University. Florida State University (Tallahassee) would accept, and has accepted, Everest credits on a provisional basis, upon review, as noted above.
[66] MA AGO, Ex. 34
[67] https://www.umass.edu/registrar/students/transfer-information/transfer-credit
[68] BD151803
[69] BD1604707
[70] BD150366
[71] BD155798

DOE00006242

school."[72] Another student reports: "They told me that I will be able to use my previous credit… but [Everest Orlando South] made me take the class again."[73]

This inability to transfer credits to other institutions is consistent both at individual campuses and between campuses during the time they were operated by Corinthian.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[74]  The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.  For the following reasons, the cohort of Everest students identified below applying for borrower defense relief predicated on Everest's transferability misrepresentations:  1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL.  Moreover, given the lack of value conferred by Everest credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A.   Everest Students Have Standing Under California's UCL

Both students who attended Everest programs in California and those who attended campuses in other states have standing under the California UCL.  First, students attending Everest programs in California can demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Everest regarding the transferability of Everest course credits.  Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[75]  Second, while California statutes do not generally have effect outside of California, "[California] statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."[76]  Courts look to "where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising and other promotional literature decisions were made"[77] when determining whether non-California residents may avail themselves of California's consumer protection statutes. Corinthian and its subsidiaries, through which it operated Everest schools, had their primary places of business and headquarters in California,[78] had more campuses in California than any other state,[79] produced and coordinated marketing and advertising in California,[80] and developed and promulgated the policies and training materials for their personnel in California.[81] Further, the single

---

[72] BD1603868
[73] BD155063
[74] 34 C.F.R. § 685.206(c).
[75] CAL. BUS. & PROF. CODE §17204.
[76] *Norwest Mortgage, INc. v. Super. Ct.*, 72 Cal.App.4th 214, 224-25, 85 Cal.Rptr.2nd 18(Cal.Ct.App. 1999)
[77] *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1237 -1238 (N.D.Cal., 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)).
[78] CCI Answer CA Amended Complaint ¶¶9-27
[79] There were 27 Corinthian campuses in California (14 Everest, 3 WyoTech, and 10 Heald). The other states with large numbers of Corinthian campuses were Florida (15 Everest and 1 WyoTech campuses) and Texas (9 Everest campuses).
[80] Tim Evans Interview, WI AG Sutherlin Affidavit Ex. 12 ("Evans said that all advertising was done by corporate."); Mark Sullivan interview, WI AG Sutherlin Affidavit Ex. 13 ("He [Sullivan] didn't do any of the marketing. That wasn't done by the local campuses."); Deposition of Scott Lester, WI AG Sutherlin Ex. 15  ("Every bit of marketing came out of corporate. Every marketing decision came from corporate.")
[81] WI Educational Approval Board letters to Everest Milwaukee,  WI AG Sutherline Affidavit, Ex. 10

DOE00006243

incoming call facility for prospective Everest students from the throughout the nation was located in California.[82]

Additionally, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment:

- "Q: And when the Admissions Reps were making representations to the students about the externships, about the career possibilities, about what life could be, were those accurate representations given the state of the school?
  A: *They were the representations that they were given by corporate as part of their -- the way they were told to do the job.* Were they accurate? No."[83]
- Call center representatives "were trained to lie."[84]
- "There is a huge cultural issue at Corinthian Colleges that quietly promotes dishonesty & fraud at all the Everest campuses. *This culture of dishonesty & intimidation is generated by the corporate office* that has spread all over the company like cancer."[85]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, and that decisions and policies made by its California based corporate leadership harmed Everest students across the nation – Everest students from campuses nationwide have standing under the California UCL.

### B. Everest Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[86] Here, Everest's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[87]

#### 1. The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[88] Thus, if a business practice violates any law, this is *per se* a UCL violation.[89]

Corporate misrepresentations like those Everest made regarding transferability are prohibited by a number of state and federal laws. In particular, Everest's misrepresentation of the transferability of its

---

[82] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013), taken by CA AG Office.
[83] Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15
[84] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013), taken by CA AG Office.
[85] Letter from Anonymous former Everest employee to ACCSC Commissioner, Ex. 54 of CA AG Motion for Default at CCICA179681
[86] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).
[87] Although not discussed here, Everest's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair…business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code       § 172000 Practice at 3:212 (2016).
[88] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).
[89] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

DOE00006244

credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[90] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[91]

As described above, Everest's representations about the transferability of its credits were false, erroneous and misleading.  Everest's transfer of credits representations misled students about the value of the credits they would be earning at Everest.  Based on the school's misrepresentations, individuals considering enrolling at Everest would have the false belief that Everest credits would not only allow them to obtain an Everest degree, but would also provide them with credits generally transferable to any other institution.

A false or misleading misrepresentation violates the FTC Act if it is material.  To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[92]  Everest's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In applications submitted to the Department,[93] these borrowers have specifically identified false representations regarding transferability as some of the misconduct giving rise to their claim. Many students' applications specifically state that they intended to continue their educations at four-year schools.[94] For other students intent on beginning a career as soon as possible, the transferability of credits and ability to continue academically offered an alternative if they were unable to find a job immediately.[95] Finally, students considered the transferability of credits earned at an institution to be an indicator of the quality and value of that institution's instruction.[96]

---

[90] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a).  While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right.  Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits.  *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200")  (citing cases); *see also  Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[91] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

[92] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[93] Although many of these applicants submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of the Department's form and therefore made unsworn statements.

[94] "They claimed that all credits earned would be accepted by any other colleges… I wanted to continue my education and perhaps attend law school but was told that a majority, if not all of my credits from Everest, would not be accepted." BD150202; "I was told that after completing my AA in Forensics I would be able to take the credits and pursue a Bachelors degree in Forensic Psychology which would double/triple my future earnings…" BD150303

[95] "After graduating and not being able to get into the career I had studied for. I tried transfering credits and could not find schools that wanted to accept them." BD151251; "One of my first questions once I enrolled in Everest University was regarding the credibility and accrreditation of the school. I wanted to make sure that upon graduation, I would be able to find a job and/or be able to further my education using Everest as a foundation." BD1602822

[96] "'Students who may not even be interested in transferring credits nonetheless will ask us whether other institutions will accept their credits,' [Corinthian Executive Vice President for Legislative and Regulatory Affairs Mark] Pelesh said. 'What they're really asking is, is this a legitimate institution? Is it part of the legitimate postsecondary higher education world?' And policies

DOE00006245

These students' reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Everest students after the institution closed.    Thus, Everest's transferability misrepresentations constitute unlawful business practices under the UCL.

### 2.  The Fraudulent Prong

Everest's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Everest students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[97] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[98]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[99]  As noted, the transferability representations that Everest made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[100] However, for a consumer who was deceived into purchasing a product[101]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions[102] of the entity.[103]

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[104] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[105]

As discussed above, the evidence shows that students relied on Everest's transferability representations when they enrolled.[106] Indeed, express or implied claims like those made by Everest about

---

that openly distinguish between credits earned at for-profit and nonprofit colleges -- turning down their nose at the former -- send a signal that answers that question No, he said." https://www.insidehighered.com/news/2007/02/26/transfer
[97] *See Bank of the West*, 2 Cal. 4th at 1254.
[98] CAL. CIV. C. § 1709.
[99] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).
[100] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).
[101] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[102] Everest's implied representations of transferability are also actionable as deceptive half-truth omissions. A half-truth omission occurs when an affirmative representation is misleading in the absence of material qualifying information. *See* Deception Policy Statement, 103 F.T.C. at 176; *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive."). An advertisement can be deceptive because it failed to disclose material information even if it does not contain any false statements. *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). Here, Everest's affirmative statements about being "accredited" were deceptive absent further information distinguishing between regional and national accreditation and explaining the impact of national accreditation on transferability.
[103] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").
[104] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[105] *Id.* (internal quotation marks omitted).
[106] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a transferability misrepresentation, regardless of subsequent efforts to transfer.

13

DOE00006246

the transferability of credits are presumptively material.[107] Moreover, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[108] Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C. Weak Disclaimers In Some of Everest's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Everest's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials. In many instances enrollment agreements and course catalogs contained technically accurate information about transferability, but such written information did not change the overall impression created by the oral representations.

If a student examined the enrollment agreement, the student would have to read through four pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[109] Midway through that box of fine print, item number 5 provides some information on transferability. That item is not highlighted or bolded in any way. The text cautioned students that Corinthian could not *guarantee* the transferability of credits to another school, but did not go so far as to cast doubt on the general transferability of Corinthian credits.[110] The agreement then continues on with two additional pages of fine print disclaimers. Everest's course catalogs generally contained limiting language similar to the enrollment agreements, and that language was similarly buried.[111]

These disclaimers do not cure the falsity of Everest's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[112] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[113]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised general transferability. Moreover, here, Everest's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.

---

[107] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[108] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

[109] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement.

[110] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement: "The School does not guarantee the transferability of credits to any school, university or institution. The student should contact a receiving institution regarding transfer of credit from The School prior to enrollment." MA AGO Ex. 9 at AGO-MA02062

[111] Most course catalogs stated that the acceptance of credits was at the discretion of the receiving institution. We found one outlier example, the Everest Miami course catalog, which declared Everest credits were not generally transferable.

[112] *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[113] *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

14

DOE00006247

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[114] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[115] Corinthian advertised on daytime TV,[116] targeting the un- or under-employed.  In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[117] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Moreover, the nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission.  Students were rushed through the enrollment process at Corinthian and were not provided an opportunity to read and digest the enrollment agreement.[118] As the Harkin Report found, this practice stemmed from the emphasis on growth:  "Enrollment growth is critical to the business success of for-profit education companies... In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible to sign up for their programs."[119] The report quotes a 2005 Corinthian hiring manual as stating: "remember that this is a sales position and the new hire must understand that from the very beginning."[120]At Corinthian, internal documents make clear that recruiters were not trained or expected to advise students,[121] but to sell the program – to "enroll your brains out."[122]

Many Everest students state that they did not choose their own classes[123] or sometimes even their own program of study, making it even less likely they would see disclosures in course catalogs.[124] These student reports back up the Harkin report's conclusion that Corinthian recruiters were effectively salespersons, with the goal to enroll the student in whichever classes or programs made the most sense for

---

[114] CA AG Quach Decl. Ex 113.

[115] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[116] CA AG Quach Decl. Ex 113.

[117] CA AG Decl. of Holly Harsh.

[118] "After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process." Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891; "The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision." Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914; "They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour." Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887

[119] Harkin Report, p. 387.

[120] *Id.*

[121] Harkin Report, p. 387.

[122] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, WI AG, Sutherlin Affidavit Exhibit 15 , p. 49

[123] "I ended up taking courses that were not even applicable to my degree or not necessary for me to complete my degree. In other words, *I paid additional for classes I didn't really need to take.*" BD150455; "My student advisor when I first got started was explaining how classes were available for a few hundred dollars for the courses. While there may have been some for that price, not many were *the classes they said I had to take.*" BD150813

[124] "I went to school from Jan 2011 to March 2014 and was enrolled in the Associates Billing and Coding and then they *convinced me to move to a BS in Health Care Administration…* As I approached my end of my degree I ran out of money and realized *they had made me take classes I did not need* in my program and had 4 classes to finish and I was stuck…" BD151750; "They totally mislead me when I was requesting to sign up for their Crime Scene Investigator program. My student adviser had actually put me into their Criminal Justice Program instead and the mistake wasn't figured out until it was past their drop/add time frame of classes so I was stuck taking classes that had NOTHING to do with my actual program I wanted to study. They told me there was nothing they could do and I had to just wait til the time frame of starting their next term." BD153136

DOE00006248

the school, not the student. Students were not provided the time to read any written materials because the students' interests were not at the heart of the transaction.[125]

Finally, the fact that 198 of the 793 (25%) Everest/WyoTech claims reviewed to date allege that Corinthian represented that credits would generally be accepted at other schools, with no mention of any written disclaimer, strongly supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations we know Corinthian personnel to have employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D. Eligible Borrowers

Based on the above analysis, the following Everest and WyoTech Laramie students alleging transfer of credits claims should be eligible for relief:

1. Any claimant who attended a nationally accredited Everest campus or WyoTech's Laramie campus and who:

   a. alleges that Everest expressly represented that credits earned there would be generally transferable; or

   b. alleges that Everest misrepresented the nature and/or value of their accreditation, in a manner that implied that their credits were generally transferable.

2. Borrowers who allege that their credits did not transfer, but do not allege a corresponding misrepresentation, will not be eligible for relief on this basis.

3. Eligible borrowers will be limited to students first enrolling after Corinthian acquired the campus in question.

### E. Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[126] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[127]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to

---

[125] "I was also provided with a course catalog/program disclosure statement stating in writing that the placement rate was 72%. *These written materials were provided only after I had signed up.*" MA AGO Ex. 03 at AGO-MA00180

[126] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[127] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00006249

the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[128]

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim.  The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[129]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages.  Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay.  The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[130]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."[131]

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering.  An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of … remedies."[132]  Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Everest education.  *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).   First, if a student cannot generally transfer credits, a chief value conferred by such credits is greatly diminished.

Second, and perhaps more importantly, the Department has found that Everest and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its

---

[128] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).
[129] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).
[130] 34 C.F.R. § 685.206(c)(2).
[131] *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).
[132] *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively).

DOE00006250

accreditation.[133]  Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest education has been severely limited.

Borrower defense applications confirm the lack of value of an Everest education as many Everest students report that their coursework from Everest has been an impediment rather than an asset as they seek employment.  For example, one student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[134]  Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[135]  Yet another student states: "Employers will not touch me. After graduating I posted a resume online. I did not receive any responses until I removed Everest Online from my resume."[136]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

---

[133] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).
[134] BD1614100
[135] BD1602593
[136] BD151191

18

DOE00006251

# HEALD TRANSFERABILITY MEMO

# OCTOBER 2016

DOE00006252

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

To:     Under Secretary Ted Mitchell

From:   Borrower Defense Unit

Date:   October 20, 2016

Re:     Recommendation for Borrower Defense Relief for Heald College Borrowers Alleging
        Transfer of Credit Claims

---

The Borrower Defense Unit proposes loan relief for students who enrolled in degree, certificate or Associate in Applied Science ("AAS") programs at the California campuses of Heald College after the school was acquired by Corinthian Colleges, Inc. ("Corinthian")[1], and who state that Heald misrepresented their ability to transfer to other schools after completing a degree at Heald.  Heald made false and misleading representations to these students that they could generally transfer their credits, including to schools in the California State University ("CSU") system.  These students are eligible for relief under the borrower defense regulation, 34 C.F.R. § 685.206(c), because these misrepresentations constitute a valid consumer protection claim under California's Unfair Competition Law ("UCL").  Moreover, full loan discharges, subject to the UCL's four-year statute of limitations, are appropriate in this circumstance given the lack of value conferred by Heald credits and/or degrees.  Such relief is consistent with the Department's prior borrower defense relief to Corinthian borrowers.

## I.     Heald Represented That Heald Credits Were Transferable And Would Permit Students to Transfer to the CSU System To Earn A Bachelor's Degree

Numerous borrowers report that Heald representatives told them that attending Heald would permit them to transfer into other schools, particularly in the CSU system, and that their Heald credits would be accepted by those schools.  Moreover, documents collected by the California AG's office and submitted in support of a default judgment against Heald corroborate these students' general transferability claims.

### A.     Oral Representations of Transferability

In a recent review of 738 borrower defense ("BD") claims submitted by former students of Heald's California campuses, 49 students enrolled in degree, certificate or Associate in Applied Science ("AAS") programs seek borrower defense relief based on oral representations about their ability to transfer their Heald credits to other schools, particularly schools in the CSU system.[2]  In addition, in sworn witness statements obtained by the California Attorney General's Office, seven former students of Heald allege that school staff made oral representations that credits earned at Heald would transfer to other colleges and universities.[3]  Heald borrowers seeking BD relief report that school representatives orally promised that they would be able to

---

[1] Further research needs to be conducted regarding the falsity of Heald's representations to students at its two non-California campuses, in Honolulu, Hawaii and Portland, Oregon.

[2] Our review of Heald claims is ongoing and we anticipate reviewing additional BD applications making transferability allegations.

[3] *See* Declaration of Nancy Quach, AGPA, in Support of Plaintiff's Application for Entry of Default Judgment Against All Defendants, *California v. Heald et al.* (Mar. 14, 2016) ("Quach Decl."), Ex. 105-11.

1

DOE00006253

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer to other schools and use their Heald credits towards a degree at those schools.  For example, borrowers state the following:

1.  "When I first enrolled at Heald College in March of 2010, I explained to my representative that was assigned to me, that I wanted to go to Fresno State for my Bachelors Degree after graduating from Heald and while working...I was told by Elias Astuto my Heald Representative, that all of my credits would transfer to Fresno State…"[4]

2.  "Also throughout my time at Heald I was told they are accredited (which I believe they were) and that if we wanted to continue our education at Fresno State (for example) our credits would transfer and we could continue our education.  What they failed to tell us Is that when you go to apply to Fresno State they do not accept any of your units as they are not accredited the same as Heald led you to believe.  We had meetings with the head of Heald's financial aid department and I remember a student asked 'will my units transfer to Fresno State' without hesitation he stated 'Yes they will transfer.'"[5]

3.  "They had told me I was going to be able to transfer to a university such as San Jose State."[6]

4.  "I was told I would be able to transfer to any 4 year college with my Heald credits."[7]

5.  "They lied saying I could take my credits anywhere if I decided to leave the school…They said I could transfer my credits anywhere which I found out later was a lie."[8]

6.  "I was also told when i was done i could transfer out to any university."[9]

7.  "they told me that all the classes i took from heald college will be transferred to other schools."[10]

8.  "I was also informed by my admissions advisor that all of my credits would be completely transferable, which I also later found to be false."[11]

---

[4] Claim No. BD1614388.
[5] Claim No. BD154156.
[6] Claim No. BD152391.
[7] Claim No. BD1604229.
[8] Claim No. BD151373.
[9] Claim No. BD156458.
[10] Claim No. BD150682.
[11] Claim No. BD1619101.

DOE00006254

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.    Corroborating Written Representations of Transferability**

The Heald website and promotional materials corroborate and/or support students' reports of oral assurances that they would be able to transfer to other schools and use their Heald credits towards a degree at those schools.[12]  Heald's marketing materials contain the following statements:

1.    The Heald website advertised that, "Because Heald is regionally accredited, it has articulation agreements with other regionally accredited institutions that accept Heald credits toward bachelor's degree programs.  This means that you can transfer your credits if you choose to pursue further education."[13]

2.    The website also stated:  "For those students who transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs."[14]  Moreover, the website listed the "California State University (CSU) system" and seven specific schools in the CSU system as schools with which Heald has articulation agreements and/or documented transfer practices.

3.    On another page on the Heald website, the "California State University (CSU) system" and eight specific CSU campuses were described as "Partner Schools," along with the statement "For students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs.[15]

4.    The Heald College "Viewbook" promised:  "use your Heald credits towards a bachelor's degree" and *Heald has articulation agreements or documented transfer guidance with a number of accredited institutions that accept Heald credits toward bachelor's degree programs.  This allows students to transfer and apply coursework toward a higher degree.*"[16]  (emphasis added.)  The Viewbook listed the CSU system and seven specific CSU schools as institutions that had articulation agreements or documented transfer guidance with Heald.

As discussed further below in Section III.C., limited disclaimers attendant to the claims on the website and in the Viewbook fail to cure the deceptive net impression of the transferability claims Heald representatives made to students.

---

[12] The Heald written representations described in this section are attached as Exhibit A to this memorandum.  All red markings on the documents were made by the California AG.
[13] Quach Decl. Ex. 90.
[14] *Id.*
[15] Quach Decl. Ex. 91-92.
[16] Quach Decl. Ex. 94.

3

DOE00006255

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

## II.   Heald's Representations of Transferability Were False and Misleading

Heald's representations that credits earned at Heald were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree were false and misleading. Obtaining a Heald diploma, certificate or AAS degree did not permit students to transfer into the CSU system using Heald credits alone. These students would have insufficient credits to transfer as upper-division transfer students, and the CSU schools generally only accept upper-division transfer students. Therefore, as a practical matter, Heald credits were not transferable to the CSU system.

Significantly, in its answer to the California Attorney General's first amended complaint, Heald admitted that "students who complete Heald diploma, certificate, or AAS degree programs do not, without further coursework, appear to qualify for admission as upper division transfers to CSU."[17] A review of Heald's Course Catalog and Transfer Guide confirms that the diploma and certificate programs did not provide the 90 quarter units that CSU schools require for upper-division transfers.[18] The AAS degree programs required 100 quarter credits, but some of the courses within these programs were not considered "college level" by the CSU system, and therefore AAS degree program graduates also would not have the 90 quarter units required for an upper-division transfer. Even if individual Heald credits were technically transferable to a CSU school, Heald students could not actually transfer their credits because they could not enroll as an upper-division transfer using just their Heald credits.

The falsity of Heald's representations about transfer into the CSU system is particularly significant for several reasons. First, the CSU system is "California's primary undergraduate teaching institution" and the "greatest producer of bachelor's degrees"[19] in the state, making it likely that students who sought to transfer credits from Heald's California campuses would seek to transfer those credits to the CSU system. Second, Heald's representations regarding transferability focused on the ease of transferring to the CSU system—its website and other marketing materials specifically discuss the process for transferring to the CSU system.

The California State University system's public statements confirm that, dating back to at least 2012, students typically cannot transfer to CSU as lower-division transfer students. The California State University System's CSUMentor website contains a page with information for transfer applicants. That page states:

> *Most CSU campuses do not accept lower-division transfers, so be sure to check with the campus if you are considering transferring as a lower-division student.*[20]

---

[17] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, Permanent Injunction, and Other Equitable Relief at ¶ 86(b), 26, *California v. Heald et al.*, No. CGC-13-534793 (Ca. Super. Ct. Mar. 17, 2014).

[18] "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016), http://www.cci.edu/multimedia/closure/Heald-Student-Guide-to-Transfer.pdf; Heald College Academic Catalog, Effective July 2014.

[19] "2016 Facts About the CSU," The California State University (Aug. 23, 2016), *available at* http://www.calstate.edu/csufacts/2016Facts/.

[20] "Transfer Applicant Overview and Definitions," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/ (emphasis added).

4

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

The CSU Lower-Division Transfer Requirements website further states: "Please be aware that most CSU campuses do not admit lower-division transfer students."[21]  In fact, twenty out of twenty-three individual CSU campuses report on their websites that they do not accept lower-division transfer students:

1. **Channel Islands**:  On a site entitled "Transfer Admission Requirements," the school states: "California State University Channel Islands (CI) accepts transfer applications for upper-division transfer students: students with more than 60 transferable semester units, or 90 transferable quarter units."[22]  The website does not mention the admission of lower-division transfer students.  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

2. **Chico**:  The school's "Eligibility Requirements" for transfer admissions website states: "Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."[23]

3. **Dominguez Hills**:  On a site entitled "Admissions Criteria for Transfer Students," the school lists only requirements for upper-division transfer students, and does not mention lower-division transfer students.[24]  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

4. **East Bay**:  The school's "Transfer Admission" page states "CSUEB only accepts applications from upper-division transfer students."[25]

5. **Fresno**:  The school's transfer website states "Fresno State does not accept lower division transfer students at this time."[26]

6. **Fullerton**:  Fullerton's "Transfer Undergraduate Students" website states that "CSU Fullerton does not accept lower division transfer applicants.[27]

---

[21] "Lower Division Transfer Requirements," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/lower_div.asp; *see also* Quach Decl. Ex. 95; and "Transfer Applicant Overview and Definitions," CSU Mentor (Dec. 10, 2012), https://web.archive.org/web/20121610333100/http://www.csumentor.edu/planning/transfer/lower_div.asp.
[22] "Transfer Admission Requirements," CSU (May 31, 2016), http://www.csuci.edu/admissions/transfer/ud-requirements.htm.
[23] "Eligibility Requirements: Transfer Students," California State University: Chico (May 31, 2016), http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml.
[24] "Admissions Criteria for Transfer Students," California State University: Dominguez Hills (May 31, 2016), http://www4.csudh.edu/admissions/transfer-students/admission-requirements/index.
[25] "Transfer Student Admission," California State University: East Bay (May 31, 2016), http://www.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/; *see also* Quach Decl. Ex. 98.
[26] "Student Affairs and Enrollment Management," Fresno State (May 31, 2016), http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html; *see also* Quach Decl. Ex. 99.
[27] "Upper Division Transfers," California State University Fullerton (May 31, 2016), http://admissions.fullerton.edu/prospectivestudent/transferlocaladmissionarea.php.

DOE00006257

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

7. **Humboldt**: The school's Admissions website for lower-division transfer students states "HSU is not currently accepting lower division transfer applications."[28]

8. **Los Angeles**: The "Transfer Admission" page of the school's website states "Cal State LA is currently not accepting lower division transfer applicants."[29]

9. **Monterey Bay**: The school's "Transfer Admissions" website states "Cal State Monterey Bay is currently not accepting lower division transfer students. You must meet the upper division requirements for admissions purposes."[30]

10. **Northridge**: On a site entitled "Apply Lower-Division Transfer Student," the school states "NOTE: Due to increased enrollment demands, Cal State Northridge does not currently admit lower-division transfer applicants. No exceptions are anticipated at this time."[31]

11. **Pomona**: The Pomona transfer admissions website includes the following statement: "NOTE: We are currently not accepting applications from Lower-Division Transfers - applicants who have completed less than 60 semester transferable college units (90 quarter units)."[32]

12. **Sacramento**: The "Transfer Admission" webpage on the Sacramento State website states: "CSU, Sacramento is not accepting applications from lower division transfers."[33]

13. **San Bernardino**: In a section called "Lower-Division Transfer Students" on its Transfer FAQs, the school states "CSUSB is not able to accept applications from or admit lower division transfer students."[34]

14. **San Diego**: San Diego State's Fall 2016 Admissions Criteria include the following: "SDSU accepts transfer applications only from upper-division transfer or readmission applicants who will have completed 60 or more transferable semester (or 90 or more quarter) units by the end of spring 2016. We do not

---

[28]"Lower Division Transfer Requirements," Humboldt State University (May 31, 2016), http://www2.humboldt.edu/admissions/apply/transfers/lowerdivision.html.

[29] "Transfer Admission," Cal State LA (May 31, 2016), http://www.calstatela.edu/admissions/transfer-admission.

[30] "Transfer Requirements," CSU Monterey Bay (May 31, 2016), https://csumb.edu/admissions/transfer-requirements; *see also* Quach Decl. Ex. 100.

[31] "Apply Lower Division Transfer Student," CSU Northridge (May 31, 2016), http://www.csun.edu/admissions-records/apply-lower-division-transfer-student.

[32] "Admission Requirements and Deadlines," CAL POLY POMONA (May 31, 2016), https://www.cpp.edu/~admissions/undergraduate/transfer/before/requirements-deadlines.shtml.

[33] "Transfer Admission," Sacramento State (May 31, 2016), http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html; *see also* Quach Decl. Ex. 101.

[34] "Admissions and Student Recruitment," CSU San Bernardino (May 31, 2016), http://admissions.csusb.edu/transfer/h_transferstatus.shtml.

DOE00006258

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

accept transfer applications from lower-division students with fewer than 60 transferable semester units."[35]

15. **San Francisco**: On the transfer section of the school's website, the school provides: "SF State is not currently accepting applications from lower division transfer students. Freshman and sophomore students who have completed fewer than 60 transferable semester units (90 quarter units) are considered lower-division transfer students."[36]

16. **San Jose**: On a page called "Lower division transfers (Freshmen/Sophomores)," the school notes that "SJSU no longer admits lower division transfers. A lower division transfer has completed 59 transferable semester units (89 quarter units) or fewer."[37]

17. **San Luis Obispo**: The school's Transfer Students Admissions website states: "Cal Poly does NOT accept applications for these categories: … Lower-division transfer applicants (less than 60 transferable semester units or 90 transferable quarter units upon transfer)."[38]

18. **San Marcos**: Under the "Transfer" section of its website, the school states "California State University San Marcos accepts upper-division transfer student applications each year between October 1 and November 30 for admission to the following fall term."[39] The website does not mention the admission of lower-division transfer students. The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

19. **Sonoma**: Under "Fall 2016 Admissions" the school's website states "Lower Division Transfer – CLOSED." Under "Spring 2017 Admissions" the website states "Closed to lower-division applicants."[40]

---

[35] "Fall 2016 Transfer Admission Criteria," San Diego State University (May 31, 2016), http://arweb.sdsu.edu/es/admissions/transfers/index.html.
[36] "How to Apply – Transfer," San Francisco State University (May 31, 2016), http://www.sfsu.edu/future/apply/transfer.html.
[37] Quach Decl. Ex. 102; *see also* "Lower Division Transfers," San Jose State University (May 31, 2016), http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327,10793.html.
[38] "Transfer Students," Cal Poly San Luis Obispo (May 31, 2016), http://admissions.calpoly.edu/applicants/transfer/.
[39] "Transfer Student," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/transfer/index.html. This campus appears to accept out-of-state and international lower-division transfers, but not in-state lower-division transfers. *See* "Out-of-State Students," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/out-of-state/index.html. Heald California students would be applying as California residents and therefore would not be able to obtain admission this way.
[40] "Filing Information, Dates, and Deadlines," Sonoma State University (May 31, 2016), http://www.sonoma.edu/admissions/filing.html; *see also* Quach Decl. Ex. 104, "Office of Admissions: Admission Requirements for Transfers," Sonoma State University (Jan. 28, 2014), http://www.sonoma.edu/admissions/ts/requirements.

DOE00006259

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

20. **Stanislaus**:  The Stanislaus website states that "[w]e are closed to Lower-Division Transfers (transfers with fewer than 60 semester/90 quarter units)" for both the Fall 2016 and Spring 2016 semesters.[41]

The only CSU schools that <u>do</u> appear to accept lower-division transfer students are CSU Bakersfield[42], the Maritime Academy, and CSU Long Beach.  The Maritime Academy is a specialized school with a student body of less than 1,000 students offering six majors relating to the maritime industry.[43]  CSU Long Beach only accepts lower-division transfers for a few majors.[44]  CSU Bakersfield seems to be the only CSU institution that offers a standard undergraduate curriculum and accepts lower-division transfer students.

We also conducted a historical review of websites of seven CSU campuses identified by Heald as "partner schools" in the school's marketing materials.  None of our research into the historical transfer policies at CSU campuses, dating as far back as 2010, suggests the policies described above have changed.[45]

In sum, it is nearly impossible for a student to transfer into the CSU system as a lower-division transfer student.  Since no Heald degree, certificate or AAS graduate would have sufficient credits to qualify for transfer as an upper-division transfer student, representations that Heald graduates could transfer to the CSU system or specific CSU schools to "pursue further education" were false and misleading.[46]

---

[41] "Dates and Deadlines," Stanislaus State (May 31, 2016), https://www.csustan.edu/admissions/dates-deadlines.
[42] "Admission Requirements for Transfer Students," CSU Bakersfield (May 31, 2016), http://www.csub.edu/admissions/apply/transfer/admission_requirements/.
[43] "Academics," California State University Maritime (May 31, 2016), https://www.csum.edu/web/academics.
[44] "Lower Division Transfer Requirements," California State University Long Beach (May 31, 2016), http://web.csulb.edu/divisions/aa/catalog/current/admissions/ld_transfer_requirements.html.
[45] *See* "Eligibility Requirements, Transfer Students," CSU Chico (Jan. 5, 2010), https://web.archive.org/web/20110105090936/http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml ("Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."); "Transfer Student Admission," CSU East Bay (Apr. 9, 2010), https://web.archive.org/web/20100409052353/http://www20.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/ ("Cal State East Bay no longer accepts applications from lower-division transfers."); "Transfer Requirements," CSU Fresno (November 17, 2012), https://web.archive.org/web/20121117011918/http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html ("Fresno State does not accept lower division transfer students at this time."); "Transfer Admission," CSU Sacramento (Aug. 18, 2010), https://web.archive.org/web/20100818083106/http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html  ("CSU, Sacramento is not accepting applications from lower division transfers."); "Lower division transfers (Frosh/Sophomore)," CSU San Jose (October 21, 2014), https://web.archive.org/web/20141021203825/http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html ("SJSU no longer admits lower division transfers."); "Office of Admissions: Admission Requirements for Upper-Division Transfers," CSU Sonoma (July 5, 2011), https://web.archive.org/web/20110705071536/http://sonoma.edu/admissions/ts/requirements (No process is described for lower division transfers); "Dates and Deadlines," CSU Stanislaus (Mar 29, 2014), https://web.archive.org/web/20140329215220/http://www.csustan.edu/admissions/dates-deadlines ("We are closed to Lower-Division Transfers").
[46] Heald's statements may have been particularly misleading to students seeking to transfer into the CSU system, given recent changes in the law governing the transfer of credits into the CSU system.  On September 29, 2010 the Student Transfer Agreement Reform Act ("STAR Act") was signed into law, making it easier for students attending

8

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

It should be noted that there is an articulation agreement between Heald and the CSU system, which provides that certain Heald coursework will be accepted by CSU to meet certain general education requirements.[47]  Also, according to a higher education advisory publication listing the transfer credit practices of major public institutions, CSU Northridge did have a general policy of accepting Heald credits from certain Heald campuses.[48]  The possibility that some Heald courses might be transferable into the CSU system, however, does not change the misleading nature of Heald's transferability representations, because students who enrolled in Heald's diploma, certificate and AAS programs would never have enough credits from Heald to qualify for transfer admission into the CSU system in the first place.  The fact that some Heald credits might be transferable after a Heald student was accepted as a transfer into CSU is immaterial when the student could not transfer into CSU at all using Heald credits alone.

Heald California students also faced challenges trying to transfer to other institutions outside the CSU system.  For example, in reviewed applications students report that they were unable to transfer all or a majority of their credits to the following institutions:

1.  Modesto Junior College,[49]

2.  Contra Costa College,[50]

3.  University of California, Berkeley,[51] and

4.  Unnamed Nevada community college.[52]

In fact, one student stated that Everest College – another school owned by Corinthian – would not accept Heald credits.[53]  Other students reported that their credits were not transferable to the school they transferred to, but did not specify the institution.[54]

---

California public community colleges to transfer into the CSU system as an upper division student.  SB 1440 – Padilla. This program went into effect in the 2011-2012 academic year.  Under that law, students who have earned a transfer associate degree at a public California community college are guaranteed junior standing and priority admission consideration over all other transfer students when applying to a CSU program that has been deemed similar to the student's community college program.  Once admitted to CSU, the transfer associate degree student will only be required to complete 60 additional units to earn a bachelor's degree in the program.  The misleading nature of Heald's statements about the ease of transferring to CSU may have been enhanced by the new law.

[47] *See* CSU General Education-Breadth Certification List for Heald College, last updated April 2010 *available at* https://www.calstate.edu/APP/documents/GeneralEducation/Heald-GE-Breadth-certifications.pdf.  An articulation agreement, as defined by the Higher Education Act, is an "agreement between or among institutions of higher education that specifies the acceptability of courses in transfer toward meeting specific degree or program requirements."  Section 486A of the Higher Education Act, 20 U.S.C. §1093a.

[48] *See* American Association of Collegiate Registrars and Admissions Officers, TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2012 and TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2015 (noting that Heald credits were transferable to CSU Northridge).

[49] Claim No. BD156389 (Heald Salida/Modesto student).

[50] Claim No. BD153784 (Heald San Francisco student).

[51] Claim No. BD152473 (Heald Heyward student).

[52] Claim No. BD150563 (Heald Stockton student).

[53] Claim No. BD154681 (Heald Concord student).

DOE00006261

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

In sum, the nearly-universal inability of Heald diploma, certificate and AAS students to transfer into the CSU system, combined with student-submitted evidence of credits not transferring to other schools, establishes that Heald's representations of general transferability were false and misleading.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[55]  The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.  For the following reasons, the cohort of Heald students identified below applying for borrower defense relief predicated on Heald's transferability misrepresentations:  1) have standing under the California UCL;  and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL.  Moreover, given the lack of value conferred by Heald credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid as applicable, subject to the UCL's four-year statute of limitations.[56]  Such relief is consistent with the Department's award of full borrower defense relief to Corinthian students to date.

### A.   Heald Students Have Standing Under California's UCL

Students attending Heald programs in California demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Heald regarding the transferability of Heald course credits.  Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[57]  California courts have interpreted the UCL to apply only to violations occurring inside the state.[58]  Significantly, however, injured non-residents have standing to assert UCL claims for such conduct provided they allege that the conduct occurred in the state.[59]  Here, all the students attended Heald's California campuses, and the misrepresentations at issue were made by Heald employees of campuses located in California.  Thus, whether or not the students resided in California when they submitted their BD claim or at the time they enrolled, they have standing to bring a California UCL claim.

---

[54] Claim No. BD151150 (Heald Milipitas student); Claim No. BD153655 (Heald Milipitas student); Claim No. BD156458 (Heald Salinas student); Claim No. BD152391 (Heald Salinas student); Claim No. BD157356 (Heald Hayward student); Claim No. BD152589 (Heald Stockton).
[55] 34 C.F.R. § 685.206(c).
[56] CAL. BUS. & PROF. CODE §17208.
[57] CAL. BUS. & PROF. CODE §17204.
[58] *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999).
[59] *Id.*

DOE00006262

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.   Heald Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[60] Here, Heald's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[61]

**1.   The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[62] Thus, if a business practice violates any law, this is *per se* a UCL violation.[63]

Corporate misrepresentations like those Heald made regarding transferability are prohibited by a number of state and federal laws.  In particular, Heald's misrepresentation of the transferability of its credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[64]  Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[65]

As described above, Heald made oral and written representations that its credits were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree.  These statements were false and misleading.  Heald's

---

[60] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[61] Although not discussed here, Heald's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair...business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong.  *See* Stern, Business and Professional Code § 172000 Practice at 3:212 (2016).

[62] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

[63] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[64] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a).  While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right.  Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits.  *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[65] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

DOE00006263

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer of credits representations misled students about the value of the credits they would be earning at Heald.  Based on the school's misrepresentations, individuals considering enrolling at Heald would have the false belief that Heald credits would not only allow them to obtain a Heald degree, but would also give them a direct entrée into the CSU system as a transfer student, where they would be able to complete a bachelor's degree using their Heald credits.  This was in nearly all cases impossible.

A false or misleading misrepresentation violates the FTC Act if it is material.  To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor;" furthermore, express claims are presumptively material.[66]  Heald's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision.  In attestations submitted to the Department,[67] these borrowers have noted the importance of Heald's transferability claim.  Furthermore, their reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Heald students after the institution closed.  Moreover, Heald's express assurances in its marketing and other materials that Heald credits transferred to other schools make such statements presumptively material, and demonstrate that Heald recognized how important the issue was for its students.  Thus, Heald's transferability misrepresentations constitute unlawful business practices under the FTC Act, and therefore the UCL.

## 2.  The Fraudulent Prong

Heald's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Heald students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[68]  The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[69]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[70]  As noted, the transferability representations that Heald made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[71]  However, for a consumer who was deceived into purchasing a product—or a student who was

---

[66] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims … are presumed to be material.").

[67] Although the large majority of these applications submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of Department's form and therefore made unsigned statements.

[68] *See Bank of the West*, 2 Cal. 4th at 1254.

[69] CAL. CIV. C. § 1709.

[70] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[71] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

DOE00006264

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

deceived into enrolling at a school[72]—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.[73]   Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[74] the individual's decision.   Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[75]

As discussed above, the evidence shows that students relied on Heald's transferability representations when they enrolled.  Moreover, Heald widely advertised the transferability of its credits online and in other marketing materials, thereby recognizing its materiality to a prospective student's enrollment.  Indeed, express claims like those made by Heald about the transferability of credits are presumptively material.[76]  Under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[77]  Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C.   Weak Disclaimers In Some of Heald's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Heald's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials as follows:

1. At the bottom of the Heald webpages containing representations regarding transferability is the following disclaimer:  "It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing."[78]

2. Similarly, after misleading statements about transferability, the Heald Viewbook contains the following statement: "Acceptance standards vary by program and institution.  Transfer of credits from Heald to another college is determined by the receiving school."[79]

3. In its answer to the California AG's complaint, Heald argued that a disclosure form signed by incoming students titled "Notice Concerning Transferability of Units and Degrees Earned at Our School," gave notice to students that credits

---

[72] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[73] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").
[74] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[75] *Id.* (internal quotation marks omitted).
[76] *See, e.g., Telebrands Corp.*, 140 F.T.C. 278, 292 (2005); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013).
[77] *In re Tobacco II Cases*, 46 Cal. 4th at 298.
[78] Quach Decl. Ex. 90-92.
[79] Quach Decl. Ex. 93.

DOE-00006265

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

might not transfer to other schools. Allegedly, the disclosure states: "As with any accredited school, the transferability of credits to another institution is determined exclusively by each receiving institution. Units I earn in my programs, in most cases, will not be transferable to any other college or university.... I acknowledge that it has not been guaranteed or implied by any employee of the School that my credits, diploma or degree will be transferable to another institution."[80] However, this document was not attached to the answer and we have been unable to locate it to date.[81]

These disclaimers do not cure the falsity of Heald's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations. *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers). The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract. *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

Indeed, the disclaimers described above are not even sufficient to cure the otherwise false and misleading statements made by Heald regarding transferability in the written marketing materials. An advertisement "may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[82] The written marketing materials, when reviewed as a whole, still clearly convey that enrolling at Heald would allow a student to directly transfer from Heald to a CSU school in order to complete a bachelor's degree program, which, as explained above, is generally false and misleading. The materials' prominent references to CSU and other institutions as "Partner Schools" create the impression that a student would be able to transfer easily to Heald's "partner school," CSU. A disclaimer at the bottom of the webpage that the receiving institution would ultimately decide which specific credits transfer does not diminish the expectation that students could transfer to CSU, which they generally could not do.

Moreover, here, Heald's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices. Corinthian documents show that the school sought to enroll vulnerable people who

---

[80] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, *supra* note 20 at 87.
[81] Heald did not allege in its answer in the California litigation that there were any disclaimers its course catalog that cured any misrepresentations about transferability. A 2014 edition of a Heald course catalog contains similar language to the written disclaimers described above, but there is no reason to think that any student would have reviewed the course catalog prior to enrollment, given what students report about the enrollment process.
[82] *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases).

DOE00006266

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[83] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[84] Corinthian advertised on daytime TV,[85] targeting the un- or under-employed. In some instances,, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[86]

Furthermore, regardless of the precise language in any documents provided at the time of enrollment, the nature of the enrollment process made it unlikely that students ever read them. Students repeatedly reported being pressured by school sales representatives to enroll immediately, including being rushed through the enrollment process and not being provided an opportunity to read and review the enrollment agreement.[87]

**D.    Eligible Borrowers**

Based on the above analysis, the following Heald students alleging transfer of credits claims should be eligible for relief, subject to the UCL's four-year statute of limitations:

    1.    Any claimant who attended a Heald California campus and who:

        a.    enrolled in any diploma, certificate, or AAS degree program (i.e., programs for which fewer than 90 quarter units were transferable to CSU schools) on or after January 4, 2010[88], and

---

[83] CA AG Quach Decl. Ex 113.

[84] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[85] CA AG Quach Decl. Ex 113.

[86] CA AG Decl. of Holly Harsh.

[87] *See, e.g.*, BD Claim No. BD152166 ("I told [the admissions representative] I wasn't comfortable . . . and didn't understand the process and why I was signing for a loan if I was covered. I asked for more time to think. She continued to pressure and reassure me my financial aid was fully covered, how Heald guarantees student job placement and how the drop out ratings at Heald was lower than other schools in Honolulu. I felt pressured but trusted and enrolled in Heald College anyway."); Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891("After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process."); Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914 ("The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision."); Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887 ("They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour.").

[88] Because Corinthian purchased all of the Heald campuses on January 4, 2010 (through its purchase of Heald Capital, LLC), for the purposes of granting any potential relief to students, we can reasonably assume that these practices occurred from that point going forward.  The transaction was signed on October 19, 2009.  However, in its answer to the California AG's first amended complaint, Heald's acknowledgment that the diploma, certificate and AAS degree programs were not transferable to CSU schools was not time-limited.  There is also evidence that Heald College made representations regarding the transferability of its credits to the CSU schools as far back as

DOE00006267

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

     b. states the school misrepresented that credits were generally transferable, or that credits would be transferable to the CSU system or one of the 23 CSU campuses.

## IV. Full BD Relief Should Be Provided to Eligible Borrowers

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act. *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015). In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief. *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim. The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[89]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and

---

January 2006. *See* http://www.heald.edu/programs/partner_colleges.htm ("For those students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements with many other accredited institutions that accept Heald credits toward bachelor's degree programs. Below is a sampling of those schools: …California State University (CSU) system") (accessed January 2, 2006 via the Wayback Machine). Therefore, after further research and review, there may be a basis on which to provide relief to a larger cohort of students alleging a misrepresentation regarding transferability of credits.

[89] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

16

DOE00006268

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

associated costs and fees that the borrower would otherwise be obligated to pay.  The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[90]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering.  An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of … remedies."  *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively).  Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Heald education.  *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).  First, if a student cannot transfer credits without great difficulty, a chief value conferred by such credits is greatly diminished.  Likewise, there is diminished value in a degree conferred by an institution that issues credits generally not worthy of transfer towards admission.

Second, and perhaps more importantly, the Department has found that Heald and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[91]  Given this well-documented, pervasive, and

---

[90] 34 C.F.R. § 685.206(c)(2).

[91] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthan (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

DOE00006269

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

highly publicized misconduct at Corinthian, the value of a Heald education has been severely limited.

Indeed, borrower defense applications confirm the lack of value of a Heald education as many Heald students report that their coursework from Heald has been an impediment rather than an asset as they seek employment.  For example, a Heald student reported that "After graduation, I was not able to get any jobs whatsoever with my degree and in many interviews, the employer questioned the validity of my degree with a Heald institution."[92]  Another reports: "there is a stigma that follows [Heald].  I feel that when employers see where my degree comes from it will be seen as a joke because it came from a school that committed fraud and lied to their students."[93]  Yet another student states "The word 'Heald' in my resume actually made employers turn down my [job application]."[94]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to the UCL's four-year statute of limitations.

---

[92] Claim No. BD154195.
[93] Claim No. BD151006.
[94] Claim No. BD150260.

18

DOE00006270

CORINTHIAN GUARANTEED EMPLOYMENT MEMO

JANUARY 2017

DOE00006271

To:      Under Secretary Ted Mitchell
From:    Borrower Defense Unit
Date:    January 9, 2017
Re:      Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment

Corinthian Colleges, Inc. ("Corinthian") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. Accordingly, the Borrower Defense Unit recommends full relief for Corinthian borrower defense (BD) applicants who submit "guaranteed employment allegations" – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

I.       **Summary of Corinthian's Representations to Borrowers Promising Employment**

In BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs. These oral representations sometimes took the form of a guarantee regarding the individual student and sometimes took the form of a guarantee of universal employment for graduates. In both cases, the obvious impression to students would have been that 1) the value of the education would be substantial; and 2) they would get jobs upon graduation.

These representations occurred both in person and during telephone calls with prospective students. Borrowers' allegations of "guaranteed employment" are unprompted,[1] specific, and consistent across a span of years. Indeed, the Department has received consistent guaranteed employment claims from borrowers at every campus sampled, including borrowers who enrolled between 1998 and 2013, demonstrating that personnel made consistent guaranteed employment representations throughout the entire time that Corinthian operated its schools. Taken together, based on an evaluation of the credibility of those statements, as well as Corinthian's record of making misrepresentations to prospective students,[2] a preponderance of the evidence demonstrates that Corinthian promised borrowers that they would receive jobs upon graduation.

A.       **Guaranteed Employment Representations at Heald College**

At Heald, of the 1015 claims sampled, 141 (13.9% of the total) include allegations of guaranteed employment.[3] The high incidence of guaranteed employment allegations was evident at all Heald campuses. At Heald Modesto, for example, of 61 BD claims sampled, 9 allege guaranteed employment (14.8% of the

---

[1] All of the above student statements came from a variety of different types of applications including the Heald, Everest, and WyoTech attestation forms ED created for job placement rate claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."

[2] *See* discussion below, Section II, describing Corinthian's misrepresentations regarding job placement rates.

[3] This count excludes allegations that may pertain to guaranteed jobs but that were not sufficiently clear or specific to qualify for relief. For example, allegations that Corinthian's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment allegations.

DOE00006272

total).[4]  A sample of claims from Modesto borrowers demonstrates the consistency and specificity of guaranteed employment representations made by school representatives:

- "Heald college recruiters stated, 'I was guaranteed' to obtain a job after graduation."[5]
- "I was told that when I finished my program I would automatically have job placement and never received that placement."[6]
- "Heald promised me a job placement in the field.  To this day, I haven't been able to find a job in my field, or a good paying job."[7]
- "I was given the false pretense that I could obtain a career in law enforcement with an Associate's degree and was guaranteed job placement."[8]

Guaranteed employment allegations appeared with similar pervasiveness and consistency at all of the other 11 Heald campuses.  A sample of these claims, detailed below, demonstrates the high incidence of guaranteed employment misrepresentations at the school.

- Heald Concord: "During my experience, they promised me jobs after graduation . . . I still have the same jobs after graduation and Heald did nothing to help me . . . Heald College promised that they will find job for me upon graduation."[9]
- Heald Honolulu: "Upon admission, my admission's advisor, Roy Honjo, informed that an associate's degree in applied science in Health Information Technology (HIT) would provide me many job opportunities . . . He insisted I would find a job that would suit me and would be a smart decision to pursue."[10]
- Heald Roseville: "When I first looked into Heald College and spoke with the Academic Advisor, I was promised a job position within six months.  It is now 2015 and I have yet to have ever worked in a medical office.  The degree has done nothing for me."[11]
- Heald Salinas: "When I first enrolled, they said I had a job at the end of my education."[12]
- Heald San Jose: "They stated on many occasions that after I graduate and complete the program that I would be placed in job where I would be able to pay off my student loans easily... They guaranteed job placement and never delivered."[13]
- Heald San Francisco: "Heald College's promises of guaranteed job placement after graduation sold me on becoming a student."[14]

---

[4] The Modesto campus was selected because relatively few Modesto borrowers qualified for relief based on ED's findings regarding job placement rates.  Modesto was a relatively new campus, and therefore had calculated placement rates for fewer years in the period surveyed.
[5] BD155524.
[6] BD155784.
[7] BD155698.
[8] BD154018.
[9] BD151426.
[10] BD1600328.
[11] BD157436.
[12] BD151163.
[13] BD153799.
[14] BD153784.

DOE00006273

| | Heald Claims | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Heald Modesto | 61 | 9 | 14.8% |
| Heald San Jose | 151 | 29 | 19.2% |
| Heald Rancho Cordova | 40 | 5 | 12.5% |
| Heald Roseville | 56 | 9 | 16.1% |
| Heald Hayward | 138 | 18 | 13.0% |
| Heald Stockton | 125 | 11 | 8.8% |
| Heald Concord | 150 | 22 | 14.7% |
| Heald Fresno | 103 | 11 | 10.7% |
| Heald Honolulu | 63 | 10 | 15.9% |
| Heald Portland | 24 | 3 | 12.5% |
| Heald Salinas | 43 | 4 | 9.3% |
| Heald San Francisco | 61 | 10 | 16.4% |
| **TOTAL** | **1015** | **141** | **13.9%** |

**B.    Guaranteed Employment Representations at Everest and WyoTech**

**The high incidence of guaranteed employment allegations at Heald was evident at Everest and WyoTech, as well.** At Everest, 231 out of 1277 BD claims sampled, or 18.1%, made guaranteed employment allegations. At Everest Brandon, for example, 45 of 305 claims sampled, or 14.8% of the total, alleged guaranteed employment. A sample of claims from Everest Brandon borrowers follows:

- "They told me that every student that graduated the program was placed."[15]
- "I was told that I would be able to attain a job in my field with no problem. I have applied to multiple agencies and was told I was not qualified."[16]
- "I was told I would find a job in my field . . . I 'graduated' and still can't find a job that will honor my degree."[17]
- "I was told that I would be placed into a career field of my studies, but I was not."[18]

The Department sampled claims at 22 Everest campuses[19] across ten separate states (AZ, FL, MI, MA, TX, VA, CO, WI, NY, CA). Just like the Everest Brandon campus discussed above, the guaranteed employment allegations were common at all of these campuses and were distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students made substantially similar guaranteed employment allegations – whether the student enrolled at Brandon in 1998 or Rochester in 2008.

---

[15] BD151311.
[16] BD150332
[17] BD1612793.
[18] BD1614055.
[19] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The 22 campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

3

DOE00006274

**Similarly, at WyoTech, 64 out of 455 BD claims sampled, or 14.1%, alleged guaranteed employment.** At WyoTech Laramie, for example, 8 of 31 claims, or 25.8% of the total, alleged guaranteed employment. A sample of claims from WyoTech Laramie borrowers follows:

- "They promised me a high paying career and said they would find it for me after graduation. They stated that all of the students who pass the program . . . will have jobs waiting for them."[20]
- "The education was sold as a way to guarantee future employment, with access to a nationwide network of job placement experts."[21]
- "The school was promising a career in the field after schooling."[22]
- "[They] would say that just by speaking the name Wyotech you so get hired and make over 100K a year. They said it would be automatic hiring and that the industry knows the Wyotech name."[23]
- "We were recruited hard and we were promised [that] [name redacted] . . . would have his choice of many fine, well-paying positions once he completed his studies."[24]

The tables below summarize the number of guaranteed employment allegations at Everest and WyoTech for all of the sampled campuses:

| Everest Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Everest Brandon | 305 | 45 | 14.8% |
| Everest Grand Rapids | 46 | 3 | 6.5% |
| Everest Largo | 31 | 6 | 19.4% |
| Everest Ontario Metro | 34 | 7 | 20.6% |
| Everest Orange Park | 36 | 9 | 25.0% |
| Everest Orlando North | 47 | 6 | 12.8% |
| Everest Orlando South | 226 | 33 | 14.6% |
| Everest Phoenix | 81 | 40 | 49.4% |
| Everest Pompano Beach | 97 | 9 | 9.3% |
| Everest Rochester | 53 | 14 | 26.4% |
| Everest Tampa | 32 | 9 | 28.1% |
| Everest San Bernardino | 15 | 1 | 6.6% |
| Everest Milwaukee | 38 | 6 | 15.8% |
| Everest Colorado Springs | 37 | 10 | 27.0% |
| Everest Ft. Worth South | 54 | 8 | 14.8% |
| Everest Tyson's Corner | 15 | 2 | 13.3% |
| Everest Vienna | 21 | 2 | 9.5% |
| Everest Arlington | 31 | 4 | 12.9% |
| Everest Aurora | 50 | 3 | 6% |
| Everest Thornton | 4 | 1 | 25% |
| Everest Chelsea | 12 | 6 | 50% |
| Everest Brighton | 12 | 7 | 58.3% |
| **TOTAL** | 1277 | 231 | 18.1% |

---

[20] BD150863.
[21] BD152602.
[22] BD155621.
[23] BD151128.
[24] BD151903.

DOE00006275

| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
|---|---|---|---|
| WyoTech Laramie | 31 | 8 | 25.8% |
| WyoTech Fremont | 135 | 16 | 11.8% |
| WyoTech Blairsville | 157 | 18 | 11.4% |
| WyoTech West Sacramento | 132 | 22 | 16.6% |
| **TOTAL** | **455** | **64** | **14.1%** |

Significantly, just as the aforementioned Heald, Everest, and WyoTech claims at each campus corroborate each other, the number of similar allegations at and across all Corinthian schools and campuses strongly suggests that promises of employment were endemic to Corinthian's institutional culture.

### C.  Guaranteed Employment Claims Consistent Across a Span of Years

Although the Borrower Defense Unit has received fewer claims from borrowers that attended Corinthian schools in earlier years,[25] such claims bear the same indicia of reliability as claims from students who attended more recently.  Student statements about admissions representatives' misrepresentations are consistent across a span of years, as demonstrated by claims from former students at Everest – Orlando South:

- [1999]: "Everest recruiters told students that they were **'guaranteed' to obtain jobs.**"[26]
- [2001]: "They . . . told me I would be **guaranteed a job once I graduated.**"[27]
- [2002]: "I was told **I would get a job right away…**"[28]
- [2003]: "I was lured into this organization with false promises of **100% job placement…**"[29]
- [2005]: "They said I was **guaranteed job placement after I graduated.**"[30]
- [2006]: "Everest **guaranteed me career placement upon graduation.**"[31]
- [2007]: "They told me that I will be **guaranteed a job placement after I graduate.**"[32]
- [2008]: "They told me I was **guaranteed a job.**"[33]
- [2009]: "**I was promised job placement, high salaries and success.**"[34]
- [2010] "I was **guaranteed a job** from my Academic advisor and Career Counselor."[35]
- [2011] "…told me I **was guaranteed a job** in my profession **after I graduated** making twice as much as minimum wage at least."[36]
- [2012]: "I was **promised employment after graduation.**"[37]

---

[25] The Department's outreach has targeted borrowers from more recent years in an attempt to reach borrowers that may be eligible for relief on the basis of misrepresented job placement rates.
[26] BD155177.
[27] BD156179.
[28] BD1600004
[29] BD151816
[30] BD150148.
[31] BD157758.
[32] BD153166.
[33] BD153136.
[34] BD156038
[35] BD1605002.
[36] BD155731.
[37] BD1615288.

DOE00006276

- [2013]: "They called me over and over and promise jobs after graduating..."[38]

### D.    Corinthian Employee Statements and Other Employment-Related Misrepresentations Corroborate Guaranteed Employment Claims

The similarity of student statements across schools, campuses, and years strongly suggests that the misrepresentations were system-wide and, indeed, part of Corinthian's institutional culture. This conclusion finds further support in the affidavits of former employees, who admitted that Corinthian employees misled prospective students about their employment prospects. For example, a former instructor at Everest's Chelsea campus stated, "People in corporate told prospective students they guaranteed jobs . . . They saw job placement not as job placement in the students' fields of study, but as a student getting any job."[39] An admissions representative from the same campus stated, "Admissions representatives told prospective students that medical assistants are in high-demand and that they would have no problem finding jobs . . . and they will definitely find jobs."[40]

Furthermore, guaranteeing jobs to prospective students appears to have been part of a pattern of employment-related misrepresentations at Corinthian. An internal Corinthian audit of admissions calls from one its campuses found that that 21% of admissions representatives "provided [a] false or misleading statement (such as best case scenario)," which likely pertained to employment outcomes.[41] Further, in a letter issuing a nearly $30 million fine to Heald, the Department found that Heald "represented with regard to many of its programs that it placed 100% of its graduates in jobs," but Heald was unable to provide evidence to substantiate these representations. The Department further noted that based on the evidence that Heald was able to provide, the job placement rates appeared to be substantially lower than 100%, and for several programs, below 50%.[42] At the same time that Corinthian was making false representations about its job placement rates, executives at Corinthian were putting heavy pressure on campuses to attract new students. One admissions director reported that his superiors at Corinthian instructed him to "enroll your brains out."[43] In this context, it is unsurprising that staff at the campus level would be guaranteeing students a job.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for additional Corinthian campuses. The hundreds of claims reviewed corroborate that Corinthian personnel made guaranteed employment representations beginning shortly after Corinthian opened or gained control of a campus.

## II.    Evidence of the Falsity of the Alleged Representations

Corinthian's own records show that the school was unsuccessful at placing large numbers of Corinthian graduates. The Everest records, for example, reveal that nearly half of the school's programs placed 50% or fewer of the program graduates. Further, evidence from Corinthian's internal communications shows that they were aware that the school could not live up to their promises of employment. For example, an internal email from Corinthian's Vice President for Operations stated that, "at some campuses" they had "not been

---

[38] BD1617088.

[39] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, *Medolo* Aff. ¶ 4, June 26, 2015.

[40] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, Morrison Aff. ¶ 5, July 6, 2015.

[41] Exhibit 40 - CA AG Default Motion at 278.

[42] Heald Fine Letter, http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.

[43] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, Exhibit 36 - CA AG Default Motion.

6

DOE00006277

consistently delivering" on the promise to students to "find a position that will help them launch a successful career."[44]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations—and many other BD applicants—state that they were unable to find a job upon graduation; that they were unable to find employment that used their degree; or that they were forced to remain in the job that they had prior to enrolling at Heald, Everest, or WyoTech. In sum, the evidence overwhelmingly shows that Corinthian campuses could not truthfully guarantee prospective students employment upon graduation.

**III.    Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

For the reasons set forth below, the Corinthian borrowers' applications for borrower defense relief predicated on a guaranteed employment allegation: a) are reviewed under California law; and b) have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[45] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. Moreover, given the lack of value conferred by Corinthian credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

**A.    The Department will apply California Law to These Claims.**

To prevail with a defense to repayment, a borrower must assert acts or omissions "that would give rise to a cause of action against the school under applicable state law."[46] With the assistance of the Office of General Counsel, we have examined specifically whether borrowers making the claims described in this memo could bring a cause of action in California and determined that they could. Specifically, the Department has concluded not only that students who were subjected in California to the acts complained of here would have been able to bring their cases in California courts under California law, but also that borrowers who attended Corinthian in other states could have brought their claims in the context of a class action in a California court, which would have applied California law.

California has general jurisdiction over Corinthian.[47] As to the law a California court would have applied, California courts have recognized that a forum state (such as California) "may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'" *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001) (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)). California is neither an arbitrary nor an unfair state for a class of Corinthian borrowers to bring a

---

[44] Exhibit 36 - CA AG Default Motion.

[45] CAL. BUS. & PROF. CODE § 17200, et seq.

[46] 34 C.F.R. § 685.206(c) (emphasis added).

[47] Corinthian was headquartered in California, and was therefore a resident corporation subject to the state's general jurisdiction. Furthermore, even a non-resident corporation is subject to a forum's general jurisdiction "if [its] contacts in the forum state are substantial[,] continuous and systematic." *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1092 (Cal. 1996) (internal quotation marks and alterations omitted). In such a case, "defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction," and there is no need to determine whether the specific acts alleged in the suit meet the threshold for specific jurisdiction. *Id.* Such is the case with Corinthian; the largest numbers of both campuses and students were located in California.

7

claim, and the conduct at issue had significant contacts with California insofar as the students were enrolling in a California-based school and recruiters were receiving at least some of their training from high levels of administration at the school.

Furthermore, under California's choice-of-law test, the court considers both the defendant's headquarters and the state where many students attended the school.[48] Another key factor in the choice-of-law analysis under California law is the location "where the wrong occurred."[49] At Corinthian, the largest numbers of both campuses and students were located in California. Further, as proved to be the case in the Department's investigation of Corinthian, the fact that a school is headquartered in a given state will often mean that "*some or all* of the challenged conduct emanates" from that state, another common factor in choice of law determinations.[50] At Corinthian, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment.[51]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, that the largest numbers of its campuses and students were located in California, and that decisions and policies made by its California based corporate leadership harmed students across the nation – it is reasonable for the Department to determine that a California court would apply California law to these claims. Therefore, BD claims submitted by former students from all Corinthian campuses will be considered under the California UCL.

**B.    Corinthian Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[52] Here, Corinthian's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.    The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[53] Thus, if a business practice violates any law, this is *per se* a UCL violation.[54] Corporate

---

[48] *See, e.g., In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)) (considering, among other factors, "where the defendant does business [and] whether the defendant's principal offices are located in California...").

[49] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). *See also McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("Although California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred without regard to the nature of the issue that was before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." (internal citation and quotation marks omitted)).

[50] *See, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612 (Ct. App. 1987).

[51] *See* Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15; Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013).

[52] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[53] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

8

DOE00006279

misrepresentations like Corinthian's promises of employment are prohibited by a number of state and federal laws.[54] In particular, Corinthian's misrepresentation regarding its students' employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[56] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[57]

Applying that three step inquiry, Corinthian clearly violated the FTC Act.

1. As described above, Corinthian made representations to students regarding guaranteed employment;
2. As described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[58] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that Corinthian schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Students enrolled "primarily to gain skills and find a position that will help them launch a successful career."[59] Corinthian's own marketing materials emphasized that the school was a pathway to employment, often noting "solid industry employment contacts"[60] and the availability of "lifetime career services." For many students, the principal purpose of attending a career college like

---

[54] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).
[55] Though the analysis below focuses exclusively on the FTC Act, Corinthian's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that Corinthian's conduct violates the FTC Act, this memo does not reach the issue of whether it may be unlawful under other applicable rules.
[56] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").
[57] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).
[58] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").
[59] Exhibit 36 - CA AG Default Motion.
[60] Exhibit 179, Part 1; Declaration of Jacinto P. Fernandez (CA AG), Exhibit Y

9

DOE00006280

Everest, Heald or WyoTech was to obtain employment in a particular field.[61]  Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, Corinthian's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

### 2.  The Fraudulent Prong

Corinthian's misrepresentations regarding employment prospects also are a fraudulent business practice under the UCL, and therefore are another form of unfair competition providing an independent basis for borrower defense relief for Corinthian students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[62] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[63]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[64]  As noted, the representations Corinthian made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and... lost money or property" as a result of the deceptive practice alleged.[65] However, for a consumer who was deceived into purchasing a product[66]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[67] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[68]

Express or implied claims like those made by Corinthian about employment prospects are presumptively material,[69] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[70] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to

---

[61] Under these circumstances, students' reliance on a guarantee of employment was reasonable.  Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery."  The large volume of claims making guaranteed employment allegations is a clear indication that students believed what they were told.
[62] *See Bank of the West*, 2 Cal. 4th at 1254.
[63] CAL CIV. C. § 1709.
[64] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).
[65] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).
[66] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[67] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[68] *Id.* (internal quotation marks omitted).
[69] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).
[70] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

10

DOE00006281

enroll.[71] Statements by large numbers of borrowers across Corinthian campuses make clear that the promise of employment entered substantially into their choice to attend a Corinthian school.

### C.   Weak Disclaimers In Some of Everest and WyoTech's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

Corinthian's promises of employment were false and misleading, despite the limited disclaimers on some Everest and WyoTech enrollment agreements. Although those enrollment agreements state that the school does not guarantee "job placement" or "a salary," such written information did not change the overall impression created by the oral representations.

For example, if a student examined an Everest enrollment agreement, the student would have to read through two pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[72] Part of the way through that box of fine print, item number 2 states that Everest "does not guarantee job placement to graduates upon program / course completion or upon graduation, and does not guarantee a salary or salary range to graduates."[73] That item is not highlighted or bolded in any way. The agreement then continues on with an additional page of fine print disclaimers. The WyoTech enrollment agreement includes a similar disclaimer on its first page: "The school does not guarantee employment following graduation, but does offer placement assistance to graduates." This is included as item "(a)" in a list of nine fine print disclaimers following a paragraph-long disclaimer about the cost of books and tools.

These disclaimers do not cure the falsity of Everest and WyoTech's oral promises regarding employment prospects. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[74] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[75]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, Corinthian's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.[76]

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want[ed] quick solutions."[77] Corinthian's CEO, in a letter to

---

[71] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

[72] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement.

[73] BD150633, Attachment #3, page 7.

[74] *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[75] *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[76] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics.

[77] CA AG Quach Decl. Ex 113.

11

Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions.  Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[78]  Corinthian advertised on daytime TV,[79] targeting the un- or under-employed.  In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[80]  In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Finally, the fact that the 436 Corinthian claims reviewed to date that allege Corinthian guaranteed employment make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective.  As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations that Corinthian personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.   Eligible Borrowers

Based on the above analysis, the following Corinthian students making guaranteed jobs allegations should be eligible for relief: any claimant who attended a Corinthian campus and who alleges that they were promised, guaranteed, or otherwise assured employment or job placement.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment.  As we found in the job-placement-rate analysis, the misrepresentation in this case went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of the borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E.   Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[81]  In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[82]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[78] Letter from Jack D. Massimino, CEO, Corinthian, to James W.  Runcie, Chief Operating Officer, U.S.  Office of Federal Student Aid (Nov.  12, 2014).

[79] CA AG Quach Decl.  Ex 113.

[80] CA AG Decl.  of Holly Harsh.

[81] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D.  631, 637-8 (S.D.  Cal.  2015).

[82] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir.  2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir.  1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir.  1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D.  Nev.  2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00006283

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[83]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Corinthian education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). The Department has found that Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[84] Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest, Heald or WyoTech education has been severely limited.

Borrower defense applications confirm the lack of value of a Corinthian education as many Corinthian students report that their degree or affiliation with the school has been an impediment rather than an asset as they seek employment. For example, one Everest student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[85] Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[86] A student from WyoTech states: "Any association with WyoTech hurts my chances for employment. I was promised jobs with big salaries, a career I would hold for life and all WyoTech gave me was debt and shame. I was told by two interviewers, that they would NEVER hire a WyoTech graduate..."[87] And a Heald student states: "The school is not reputable no other institution recognizes the credits earned and jobs stray away from Heald graduates, claiming they lack in teaching students current and up to date information in the coding industry. I have yet to work in my field of study and utilize my degree. I have a useless degree from a closed college."[88]

Finally, awarding full relief to students who make guaranteed employment allegations is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inconsistent to limit the relief of students who make guaranteed employment allegations—which are essentially 100% job placement claims—while providing full relief to those students who qualify for job placement rate relief.

---

[83] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[84] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CORINTHIAN-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

[85] BD1614100.

[86] BD1602593.

[87] BD151191.

[88] BD157356.

DOE00006284

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, [89] it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.


CONCUR:

John C. DiPaolo                          1/12/17
Office of the General Counsel            Date

---

[89] This approach also is consistent with the Department's new regulations in that the Department has considered whether the value of the education provided by Corinthian was such that it would be appropriate to offset the relief provided to borrowers who were guaranteed employment. The Department has concluded that the Corinthian education lacked sufficient value to do so.

14

DOE00006285

# ITT TECH GUARANTEED EMPLOYMENT MEMO

# JANUARY 2017

DOE00006286

To:      Under Secretary Ted Mitchell
From:    Borrower Defense Unit
Date:    January 10, 2017
Re:      Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment -- California
         Students

---

ITT Technical Institute ("ITT") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. This memorandum addresses borrower defense (BD) claims premised on these misrepresentations submitted by borrowers who attended an ITT campus in California.[1] As set forth below, the Borrower Defense Unit recommends full relief (subject to the statute of limitations) for borrowers[2] who (1) enrolled at any ITT California campus between January 1, 2005[3] and ITT's closing and (2) whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including representations that all graduates obtain employment.

I.      **Summary of ITT's Representations to Borrowers Promising Employment**

Like former Corinthian students,[4] former ITT students have submitted guaranteed employment claims that are factually consistent, pervasive across campuses, and constant over a span of years. In these BD applications, ITT borrowers (both from California and throughout the country) consistently allege, each in their own words,[5] that ITT staff promised, guaranteed, or otherwise assured that they would be placed in jobs. These oral representations occurred both in person and during phone calls with prospective students. The Department has received guaranteed employment claims from borrowers at every campus sampled, dating back to the 1990s. Based on those statements, as well as corroborating evidence from former ITT employees, a preponderance of the evidence demonstrates that ITT guaranteed or otherwise assured borrowers future job placement.[6]

---

[1] As discussed below, guaranteed jobs misrepresentations were evident throughout ITT's campuses nationwide. Because California law has already been thoroughly analyzed by the Department for the same claim in connection with Corinthian Colleges, we recommend proceeding with discharges for ITT California students with guaranteed jobs allegations, as set forth below.

[2] For purposes of this memorandum, Parent PLUS borrowers are included in the definition of California students.

[3] Although this memorandum only addresses borrowers who enrolled on or after January 1, 2005, additional evidence (including from additional BD claims) may support future relief for applicants who enrolled prior to 2005. The Department will evaluate this evidence on an ongoing basis and may update this recommendation accordingly.

[4] *See* Memorandum from Borrower Defense Unit to Under Secretary Mitchell re: Corinthian Borrowers Alleging That They Were Guaranteed Employment (Jan. 9, 2017).

[5] The Department has received ITT BD applications submitted via narratives in Word documents and emails, as well as via forms provided to borrowers by the Debt Collective. A vast majority of these allegations are unprompted. Some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but the Department's BD website has only instructed borrowers to provide "other information…that you think is relevant."

[6] We have reviewed the ITT evidence on a nationwide level as well as on a California-specific level. As set forth below, ITT's conduct with respect to guaranteed jobs was consistent nationwide; we have found nothing unique about ITT's conduct in California as compared to other states. Thus, the fact section addresses both California-specific evidence as well as nationwide evidence.

## A.    Guaranteed Employment Representations Consistent in Nature

Of 320 randomly sampled BD applications submitted by ITT borrowers, 103 (32% of the total) state that the borrower was promised, guaranteed, or otherwise assured employment.[7] The unprompted factual similarity of these BD claims evidence a strong indicia of reliability.  For example, at ITT-San Diego, where 7 of 19 BD applications sampled alleged guaranteed employment, borrowers submitted the following highly consistent statements:

- "The school assured me that I would find employment in my field of study and that the industry of my field of study was in high demand." [8]
- "I was also told by the recruiters from the school about wages I could make that I have yet to be able to earn due to the fact that the school is and was not very credible. . . .The ITT Tech recruiters assured me A.A. students graduate making around 50-60K a year and the B.S. graduates would be around $80k a year. They misrepresented their product, their name brand and their education."[9]
- "The promises were that it would be easy to find a high paying job right away."[10]
- "I was promised that once I graduated I would be able to get into any field of my choice from Crime Scene Investigator, Crime Mapping, Probation to Detective to many many more. The promise of salaries starting at 50K upward depending on my field of choice and my recruiter said employers are beating down their door saying we want to hire the graduates as they know the latest and the best information available."[11]
- "They promised to place me into a good job making a middle class wage but were unable to put myself or other students into anything but a low paying temp job. Then it was promised that I would be better off with a Bachelors from ITT in order to get the higher pay job. I and multiple other students were duped into thinking that."[12]
- "They additionally gave promises of placement in good jobs, while in reality I have been swamped with a large amount of debt, inability to attain a job in the degree field or of even better earnings."[13]
- "I was also told that they have a great job placement program and that all students that seek help would be placed with a job within my new field after the first six months of school."[14]

## B.    Guaranteed Employment Representations Pervasive Throughout ITT

Guaranteed employment representations were not limited to ITT-San Diego.  In fact, such representations were pervasive throughout ITT's network of campuses in California and nationwide.  Former students alleged guaranteed employment at each of the 22 ITT campuses sampled, which were located across 17 states (CA, IL, MI, PA, WA, AK, VA, MO, FL, NM, TX, OR, TN, AL, NY, OK, and WI).  A sample of these claims, detailed below, demonstrates the pervasiveness of guaranteed employment misrepresentations throughout ITT:

---

[7] This total excludes allegations that may pertain to guaranteed jobs but were not sufficiently specific to qualify for relief. For example, allegations that ITT's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment claims.
[8] BD1655184.
[9] BD1639392.
[10] BD1655377.
[11] BD1605233.
[12] BD1655410.
[13] BD1655354.
[14] BD1638087.

DOE00006288

- ITT-Orange (CA): "I was told that ITT had a 100% job placement upon graduating students."[15]
- ITT-Anaheim (CA): "I was promised that immediately after graduating, I would be placed in a job within my field of study."[16]
- ITT-Sylmar (CA): "I was told that my degree would guarantee me employment."[17]
- ITT- Rancho Cordova (CA): "The sales representative stated that after completion of my education courses I would make between $50,000 and $75,000 USD per year."[18]
- ITT-Oak Brook (IL): "They advised me that I would have a job waiting for me.  The credits for the field I was in were not accredited.  The degree is not worth anything and the school is a scam."[19]
- ITT-Swartz Creek (MI): "They guarantee jobs right after graduating."[20]
- ITT-Harrisburg (PA): "I was told on several occasions by ITT Admissions Representatives that the school has 100% job placement upon completion for students"[21]
- ITT-Seattle (WA):  "They said that 100% job placement and that I should have no problem finding a job in my field."[22]
- ITT-Little Rock (AK): "They promised that they had companies like Blizzard Entertainment, Electronic Arts, Sony, Nintendo, etc. fighting for graduates for their companies . . . They not only lied about the job placement but they lied about the fact that we could be making a 5 figure salary."[23]
- ITT-Springfield (VA): "I WAS LED BY THE RECRUITER TO BELIEVE THAT THE JOB OPPORTUNITIES WOULD BE POURING IN."[24]
- ITT-Arnold (MO): "I was told that I would get a job in my field"[25]
- ITT-Albuquerque (NM): "ITT lied about job prospects and guaranteed a job after graduation."[26]
- ITT-Richardson (TX): "After the tour ended, the counselor told me the multimedia program was game development and stated that upon completion of the program I would have a guaranteed job through their job placement program and that the starting base pay for such a job was $70,000/year."[27]
- ITT-Portland (OR): "Told me they would have me in a career by the end of my first year in school."[28]
- ITT-Knoxville (TN): "I was told that they had 100's of jobs waiting for only their graduates. No one but ITT Tech graduates could apply to these jobs"[29]
- ITT-Bessemer (AL): "I was promised job placement upon completing my courses . . . I was also given an estimated range of amount of starting salary/hourly pay."[30]
- ITT-Greenfield (WI): "They also provided misleading stories about how their program would land me the job of tomorrow and how much people in my field were being paid during and after graduation."[31]
- ITT-Tulsa (OK): "They said they would have me working in the gaming industry....they told me to look in the classifieds."[32]

---

[15] BD156693.
[16] BD1651614.
[17] BD1639208.
[18] BD1601288.
[19] BD156627.
[20] BD153161.
[21] BD156697.
[22] BD1600120.
[23] BD153747.
[24] BD155274.
[25] BD1659434.
[26] BD1604365.
[27] BD1659402.
[28] BD1607247.
[29] BD1619298.
[30] BD1655120.
[31] BD1604587.

3

DOE00006289

| | ITT Claims | | |
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
|---|---|---|---|
| San Diego (CA) | 19 | 7 | 42.11% |
| Anaheim (CA) | 10 | 4 | 40.00% |
| Rancho Cordova (CA) | 15 | 2 | 13.33% |
| Sylmar (CA) | 16 | 2 | 12.5% |
| Dayton (OH) | 12 | 5 | 41.66% |
| Arnold (MO) | 23 | 6 | 26.09% |
| Greenfield (WI) | 17 | 6 | 35.29% |
| Knoxville (TN) | 18 | 5 | 27.78% |
| Portland (OR) | 14 | 2 | 14.29% |
| Richardson (TX) | 15 | 3 | 20.00% |
| Spokane Valley (WA) | 30 | 10 | 33.33% |
| Tampa (FL) | 17 | 4 | 23.53% |
| Arlington Heights (IL) | 11 | 3 | 27.27% |
| Getzville (NY) | 10 | 1 | 10% |
| Albuquerque (NM) | 9 | 3 | 33.33% |
| Various Campuses[33] | 84 | 39 | 46.43% |
| **TOTAL** | **320** | **102** | **31.90%** |

Moreover, BD applications alleging guaranteed employment are buttressed by numerous borrower statements in connection with government investigations and private litigation, as well as statements provided to the Borrower Defense Unit by veterans targeted by ITT for enrollment.[34]

### C.   Guaranteed Employment Representations Constant Across Years

Guaranteed employment representations also are constant across a span of years. Importantly, the claims of borrowers who attended in earlier years are consistent with claims submitted by students who attended more recently. Just as the claims sampled at each campus corroborate each other, the following allegations over time strongly suggest that representations of guaranteed employment were endemic at ITT:

- [2005]: "Promised great jobs and prosperous careers . . ."[35]

---

[32] BD153174.

[33] This number includes a random sample of 84 claims from 22 campuses across 18 states.

[34] In response to government investigations, ITT borrowers consistently alleged that they were "guaranteed to get a job," *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Civil Action 14-00292-SEB-TAB (S.D. Ind.) (hereinafter "*CFPB Case*"), Declaration of MT at ¶ 3 (July 11, 2016); that they would be placed in "jobs in their field of study within nine months of graduating," *Commonwealth of Massachusetts v. ITT Educational Services, Inc.*, Civil Action 16-0411 (Mass. Sup. Ct. Compl. at ¶ 55, filed Mar. 31, 2016) (hereinafter "*MA AG Case*"); and that "recruiters guarantee ITT will find you a job," S. Health, Educ., Labor & Pensions Comm., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012) (hereinafter "*Harkin Report*"), p. 539, *available at* https://www.help.senate.gov/imo/media/for_profit_report/PartII/ITT.pdf. These statements are corroborated by 90 allegations of guaranteed employment cited in a recent class action filed by the Harvard Legal Services Center, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No. 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), as well as by dozens of guaranteed employment allegations submitted by veterans who attended ITT, *Veterans Education Success*, "ITT Trends" (2016) (compiling summaries of interviews and student quotations) (on file) (hereinafter "*ITT Trends*").

[35] BD156898 (ITT Torrance).

4

DOE00006290

- [2006]: "I was told that I would be able to make about 64K once I graduated because I was going into a Bachelors program degree. I got promised the stars and the sky."[36]
- [2007]: "I was also led to believe that what I was going to school for would be a sure job after graduation."[37]
- [2009]: "I was told that I would definitely have a job if I enrolled."[38]
- [2011]: "We were told that there would be no problem getting a job and they would help."[39]
- [2013]: "I was told I would obtain a job in the field upon graduation, easily with a high salary."[40]

As further discussed below, these claims are supported by corroborating evidence from former employees and spanning the period of at least 2005 to the school's closure.

### D.   Statements of Former ITT Employees Corroborate Guaranteed Employment Claims

ITT borrower defense claims based on guaranteed employment misrepresentations are substantiated by the affidavits, interviews, and testimony of former employees at campuses nationwide. This former employee evidence establishes that, in response to oral directives from management, recruiters from at least 2005 through ITT's closing led prospective students to believe that employment was guaranteed.

ITT orally directed staff to present recruitment documents in a manner that guaranteed or otherwise assured employment. ITT employees were trained to provide these oral promises of employment despite the existence of written documents to the contrary.[41] For example, one former employee explained that "[w]ritten instruction from ITT headquarters was contradicted by oral instructions from the District Manager or a Senior Vice President . . . [ITT] was interested in getting students into the school no matter what it took to do so."[42] Another former employee, in testimony before the National Advisory Committee on Institutional Quality and Integrity (NACIQI), explained that recruiters "were consistently trained . . . to go verbally around the requirements" and that, even if recruiters did not expressly guarantee employment, "it was taken that way."[43]

As a result, former employees at ITT consistently report that staff guaranteed or otherwise assured employment. Some employees guaranteed employment expressly. For example, one former employee stated, "[m]arketing told students not to worry about prior felonies and they would get placed in jobs."[44] Another stated, "I heard recruiters assure students that they would get a great job that would enable them to pay back

---

[36] BD156228 (ITT-Sylmar).

[37] BD1659496 (ITT-Rancho Cordova).

[38] BD157549 (ITT-Indianapolis).

[39] BD156506 (ITT-Swartz Creek).

[40] BD154555 (ITT-Murray).

[41] *State of New Mexico v. ITT Educational Services, Inc.*, Civil Action D-202-CV-2014 (D.N.M) (hereinafter "*NM AG Case*"), ITT Training Document entitled "The Importance of our Language: Comments to Avoid," dated July 18, 2011, ITT-NMAG 0006448 (Feb. 26, 2014) (explaining that ITT disseminated a document on "Comments to Avoid," which barred personnel from promising job placement and stated, "[w]e do not guarantee jobs to any student or graduate").

[42] *CFPB Case*, Interview of Wendy Maddox-Wright, former employee from April 2005 to August 2011, ITT-Louisville (Jan. 28, 2014). See also *id.*, Interview of Amy St. Clair Lachman, former employee, ITT-Johnson City (April 9, 2014) ("[E]mployees knew what ITT wanted and it was not about helping people. Rather, it was about how many people ITT could get into a chair.").

[43] Transcript of Testimony of ITT Recruiter Matthew Mitchell before NACIQI at 217 (June 23, 2016) (Mitchell was employed as a recruiter in 2013).

[44] *CFPB Case*, Interview of former employee Sarah Doggett (employed from late 2005 to 2009) at 6 (ITT-Louisville, Feb. 26, 2014).

DOE00006291

their loans."[45] And another explained that "[b]efore showing any forms or numbers to students, financial aid staff was trained to emphasize all of the benefits students would receive from their education.  From 2004 to 2007, this was done with the guidance of a 'return on investment document' that [the President and CEO of ITT] developed" which "contained misleading information about the average salaries of graduates of different programs."[46]

Recruiters, under pressure to enroll students, used a variety of tactics to pave the way for these false employment promises, including presenting documents in a manner that led students to believe employment was assured.  A review of ITT's internal "Mystery Shopper" audio files corroborated testimony that recruiters deceived prospective students with a "wink and a nod."  In one recording, for example, a recruiter displayed a "Career Wheel" and reassured the borrower regarding his chances of landing one of the entry level jobs listed: "As long as you have the foundation to be able to go in there and experience some of this, you'll be good to go."[47]

Guaranteed employment claims are further corroborated by recent ACICS findings against ITT[48] as well as by numerous former employee statements regarding falsification of student documents and manipulation of job placement statistics. [49]  Based on the widespread evidence cited herein that ITT guaranteed or otherwise assured employment to its prospective students during the period of 2005 until the school's closure in 2016, we recommend no further year-by-year or campus-by-campus breakdown for additional ITT campuses.

## II.   Evidence of the Falsity of the Alleged Representations

ITT's own records show that for the students who managed to graduate, the school was unsuccessful at placing thousands of them. Moreover, former employee statements show the school knew it could not live up to its employment promises.  For example, according to a former employee from ITT-Louisville, marketing representatives told prospective students that they could get jobs creating PlayStation games with a certain Bachelor's degree; however, not a single student with the degree obtained employment.[50]  Another former

---

[45] *CFPB Case,* Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[46] *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No. 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), Affidavit of Dawn Lueck (Dec. 20, 2016) Lueck began working at ITT's Henderson, Nevada, campus in 1999. In 2002, she began working at ITT's corporate office in Carmel, Indiana, as a student loan refund coordinator. In 2003, she moved to ITT's Murray, Utah campus, where she began working as a financial aid administrator, and was promoted to director of finance in 2006. In 2007, she moved to ITT's new Phoenix, Arizona campus to set up their financial aid department, and was employed there until she left ITT in 2009.

[47] *Audiotape: ITT Mystery Shopper Investigation,* ITDS0000009 at 30 mins (Nov. 21, 2012) (on file).

[48] ACICS found that ITT violated its requirements for reporting job placements rates. *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016), *available at* http://acics.org/commission%20actions/content.aspx?id=6712.

[49] *CFPB Case,* Interview of former employee Bradley Parrish, ITT-Knoxville (April 23, 2014) (explaining that some graduate employment verification forms, or GEI's, "had been falsified and student signatures had been fabricated . . . These were called 'magic GEI's' because magic tape was used to either transfer a student signature from another form to the GEI or to have the student sign a blank GEI"); *CFPB Case,* Complaint at ¶ 33 (alleging that "placement rates do not include former students who did not graduate . . . may include jobs that do not require the degrees students paid for . . . and may include positions that were merely seasonal"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.,* 388 F. Supp. 2d 932, 938 (S.D. Ind. 2005) (former ITT employee who worked as a mater admissions representative at ITT-San Bernardino (CA) allegedly "concealed adverse student statistics by switching students from program to program"); *id.* (former ITT employee from the Torrence, California Campus stated that ITT fabricated and stretched its student statistics and that ITT's graduate placement figures were inaccurate by at least 20%).

[50] *CFPB Case,* Interview of former employee Sarah Doggett, ITT-Louisville (Feb. 26, 2014) (employed from late 2005 to 2009).

DOE00006292

employee, who served as the Dean of Academic Affairs at ITT-Tallahassee, stated that recruiters asked prospective students if they were familiar with the show "CSI Miami" and then guaranteed future employment as crime scene investigators, even though he was "not aware of a single student who graduated from the Criminal Justice program and became a CSI."[51] Instead, most of those students became security guards – "positions that didn't require a degree at all."[52]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations – and many other ITT BD applicants – state that they were unable to find a job at graduation; that they were unable to find employment that used their degree; and/or that they were forced to remain in a job that they had prior to enrolling at ITT.[53] These narratives are consistent with student accounts provided to law enforcement agencies[54] and non-profit organizations regarding their inability to find employment related to their fields of study.[55] In sum, the evidence overwhelmingly shows that ITT could not truthfully guarantee employment upon graduation.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for California Students Making Guaranteed Employment BD Claims Under California Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations

For the reasons set forth below, California students with borrower defense claims predicated on a guaranteed employment allegation have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[56] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.[57]

Moreover, California students with guaranteed employment allegations should, under California law, be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A.   The Department Will Apply California Law to Claims by California Students

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from

---

[51] *CFPB Case,* Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[52] *Id.*

[53] *See supra,* Section I and *infra* Section III(E).

[54] *CFPB Case,* Complaint at ¶¶ 36-49 (providing that numerous students complained that ITT promised better results than they were able to achieve and that ITT misled potential students through job placement rates which inappropriately included temporary work); *Id.* Declaration of Jacy Belyeu at ¶ 8 (ITT-Tucson July 14, 2016) (stating that "[i]n the three years since I graduated, my ITT degree hasn't increased my pay of my job opportunities as promised"); *Id.* Declaration of Michael Tolliver at ¶ 10 (ITT-Chattanooga, July 11, 2016) (stating that since graduating, the "degree has been worthless to me. I have applied for hundreds of jobs in the IT field and I haven't been hired in the field. The job opportunities the recruiter talked about have not been available as he promised").

[55] *See ITT Trends* (providing dozens of statements by veteran borrowers attending California campuses, as well as campuses nationwide, that ITT promised them jobs upon graduation).

[56] CAL. BUS. & PROF. CODE § 17200.

[57] Although we elected to review applications of borrowers attending California campuses based on California law, *see supra* note 1, we note that claims by such borrowers may also be reviewed under Indiana law, the location of ITT's corporate headquarters. Indiana law would support relief for guaranteed jobs claims under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a) *et seq,* as well as under the Indiana common law theory of constructive fraud, *Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind. 1996); *Harmon v. Fisher,* 56 N.E.3d 95, 100 (Ind. App. 2016).

7

DOE00006293

the Secretary, in any action arising from or relating to a [Direct] loan…, an amount in excess of the amount such borrower has repaid on such loan."[58] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[59]

At the time of its closing, there were more ITT students *and* campuses in California than in any other state.[60] ITT was incorporated in Delaware but operated no campuses there. ITT's corporate headquarters were located in Indiana, but at the time of closing fewer than 3% of its students were Indiana residents, a smaller number of residents than each of the following eleven states (in order from most to least)— California, Texas, Florida, Ohio, Virginia, Pennsylvania, Michigan, Georgia, Tennessee, North Carolina and Alabama.

Here, the Department has determined that it is appropriate to apply California law to claims by California students. This approach is reasonable and consistent with common state choice-of-law analyses, which look primarily to the location of the wrong (and only secondarily to the place of incorporation or location of corporate headquarters). Indeed, the key factor in the choice-of-law analysis under California law,[61] Indiana law,[62] and the Restatement (2nd) of Conflict of Laws is the location "where the wrong occurred."[63] Accordingly, because the wrong for California students occurred in California, it is reasonable for the Department to determine that a California court would apply California law in addressing the claims of ITT's California students.

### B.   California Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the California UCL

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[64] Here, ITT's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

#### 1.   The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[65] Thus, if a business practice violates any law, this is *per se* a UCL violation.[66]  Corporate

---

[58] 20 USC § 1087e(h).

[59] 34 C.F.R. § 685.206(c)(1).

[60] At the time of closing, ITT operated fourteen campuses in California. No other state operated more than nine. Similarly, ITT enrolled 4,482 California residents, over 1,100 more than Texas, the state with the second largest student population.

[61] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). See also *Hernandez v. Burger*, 102 Cal.App.3d 795, 802, 162 Cal. Rptr. 564 (1980), *cited with approval by Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (holding that the state with "the predominant interest" is the state "where the wrong occurred.")

[62] Indiana treats a consumer protection claim as recovery in tort. See *McKinney v. State*, 693 N.E.2d 65, 72 (Ind. 1998) (finding that, despite the fact that "fraud is not an element of" an IDCSA claim, "the action is nonetheless based on fraud"). Under Indiana law, the choice-of-law rule governing tort actions is *lex loci delicti*—"the law of the place where the tort was committed is the law of the resulting litigation." *Eby v. York-Div., Borg-Warner*, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983).

[63] Restatement (Second) of Conflict of Laws § 145 (1971) ("Subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection.").

[64] Cal. Bus. & Prof. Code §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[65] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

8

DOE00006294

misrepresentations like ITT's promises of employment are prohibited by a number of state and federal laws.[67] In particular, ITT's misrepresentation regarding its student's employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[68] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[69]

Applying that three step inquiry, ITT clearly violated the FTC Act.

1. As described above, ITT made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[70] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that ITT schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Indeed, for many students, the principal purpose of attending a career college like ITT was to obtain employment in a particular field.[71] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, ITT's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

---

[66] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[67] Though the analysis below focuses exclusively on the FTC Act, ITT's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that ITT's conduct violates the FTC Act, this memorandum does not reach the issue of whether it may be unlawful under other applicable rules.

[68] *See* FTC Act § 5(a)(1), 15 U.S.C.§ 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[69] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[70] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[71] Under these circumstances, students' reliance on a guarantee of employment was reasonable. Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of ITT claims making guaranteed employment allegations is a clear indication that students believed what they were told.

9

## 2. The Fraudulent Prong

ITT's misrepresentations regarding employment prospects are also a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for ITT students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[72] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[73] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[74] As noted, the representations ITT made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and . . . lost money or property" as a result of the deceptive practice alleged.[75] However, for a consumer who was deceived into purchasing a product[76]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[77] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[78]

Express or implied claims like those made by ITT about employment prospects are presumptively material,[79] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[80] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to enroll.[81] Statements by large numbers of borrowers across ITT campuses make clear that the promise of employment entered substantially into their choice to attend ITT.

## C. Weak Disclaimers In Some of ITT's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

ITT's promises of employment were false and misleading, despite the limited, fine print disclaimers on some enrollment agreements that the school does not guarantee "job placement" or "a salary." As set forth

---

[72] *See Bank of the West*, 2 Cal. 4th at 1254.

[73] CAL. CIV. C. §1709.

[74] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[75] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[76] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[77] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[78] *Id.* (internal quotation marks omitted).

[79] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept.17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[80] *In re Tobacco II Cases*, 46 Cal.4th at 298.

[81] Because deception occurs at the time of decision, it is sufficient for ITT students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

DOE00006296

below, these fine print disclaimers do not change the overall impression created by the oral representations described above.

For example, if a student examined an ITT enrollment agreement, the student would have to read through two pages of fine print to find a list of twenty-eight fine print disclaimers, the eleventh of which states that ITT "does not represent, promise or guarantee that Student or any other student will obtain employment."[82] This disclaimer is not highlighted or bolded in any way. The agreement then continues on with four more pages of fine print.

These disclaimers do not cure the falsity of ITT's oral promises regarding employment prospects. Courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[83] The California Supreme Court also has held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[84]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, ITT's disclaimers were particularly ineffective when considered in the context of its unsophisticated student population and high-pressure admissions practices.[85] Indeed, there is evidence that some ITT students were not afforded the opportunity to even review the enrollment agreement prior to enrollment and that admission representatives would go so far as to e-sign enrollment paperwork on behalf of students, without their consent.[86] Moreover, as with Corinthian, ITT advertised heavily on daytime TV, targeting the un- or under-employed. Indeed, admissions representatives were under such tremendous pressure to enroll new students that even homeless veterans were recruited despite the additional challenges

---

[82] *See, e.g.,* ITT Albuquerque Enrollment Agreement (September 1, 2011) (on file).

[83] *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[84] *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("[T]he fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[85] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics. ITT's high pressure enrollment tactics are described in detail by numerous sources. *See, e.g.,* Harkin Report at 527-531; *CFPB Case,* Complaint at ¶¶64-66 ("In contrast to the lengthy sales pitch, the enrollment and financial aid processes were much faster, so that many consumers did not know or did not understand what they signed up for. Recruiters induced prospective students to sign forms without giving them sufficient information about what they were signing [and] required potential students to sign an Enrollment Agreement before they could receive information about their financial aid options . . .")

[86] *CFPB Case,* Affidavit of former admissions representative Ricky Bueche at ¶ 15 (ITT-Baton Rouge, 2010-2014) (explaining that "[m]any times, when students left the campus without agreeing to apply, the Director of Admissions would instruct representatives to go back to the computer to e-sign on behalf of the students to apply to ITT, without the students being present and without the students' knowledge or agreement"); *Villalba* Compl. at Ex. 19, Student Statement 14 ("First and foremost I never physically signed an enrollment agreement (I have a copy). The recruiter signed for myself and my dad via computer, and because of this dishonest tactic my dad is on the hook for a parent plus loan."); *Id.* at Student Statement 49 ("There are MANY instances that I have found on all the enrollment paperwork (that I have since gotten copies of) where my signature/initials were forged, and not in my handwriting. There were many things that weren't explained to me AT ALL, where I was told to 'sign' electronically.").

DOE00006297

they would face in completing their studies.[87] In sum, the net impression of the oral misrepresentations on the typical ITT student likely would not have been altered by buried written disclosures.

Finally, the fact that the ITT guaranteed employment claims reviewed to date make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population ITT targeted, and the high pressure sales tactics and oral representations that ITT personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.  Eligible Borrowers

Based on the above analysis, the following ITT students should be eligible for relief: any BD claimant who enrolled at an ITT campus in California on or after January 1, 2005 and whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including those told that all graduates obtain employment.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis for Corinthian, the type of misrepresentation at issue here went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E.  Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, California courts rely on cases interpreting the Federal Trade Commission Act.[88] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[89]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[87] *CFPB Case*, Affidavit of former admissions representative Pearl Gardner at ¶¶ 11-12 (ITT-Atlanta South, 2008-2014) ("There was enormous pressure on me and the other representatives and financial aid coordinators ("FACS") to make sales calls, enroll students, complete financial aid packages, and get students to attend an ITT class. This pressure was relentless . . . To solicit interest in ITT programs, I would go to job fairs, workforce events, and Stand Down events for homeless veterans (events where homeless veterans are given supplies and services, such as food, clothing, shelter, health screenings, and other assistance)."); *see also CFPB Case*, Complaint at ¶¶ 55-84 (summarizing mystery shopper evidence related to high pressure sales tactics).

[88] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[89] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00006298

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[90]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value provided by ITT.[91] The facts described above closely resemble those relating to Corinthian Colleges, where the Department determined that borrowers should receive full relief. That determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by:

- Repeated misleading statements to students, regulators and accreditors;
- Elaborate job placement fraud; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Given such pervasive and highly publicized misconduct, the Department determined that the value of the education provided by Corinthian was severely limited.

ITT's conduct was as flagrant as Corinthian's. Hundreds of unprompted student statements confirm the lack of value of an ITT education, as ITT students time and again report that their education was sub-standard and that their degree or affiliation with the school was an impediment rather than an asset as they sought employment. These include numerous statements in BD claims,[92] statements to VES,[93] and over 500 statements attached to the *Villalba* Class Action Complaint.[94]

Furthermore, the ITT "brand" became severely tarnished in the lead-up to and wake of its collapse. Over the past several years, ITT has been the subject of a steady stream of federal, state, and private lawsuits and investigations detailing misleading statements to students regarding (among other things) placement rates, employment prospects, expected salaries, transferability of credits, and the quality of the education.[95] This

---

[90] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[91] *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).

[92] *See, e.g.* BD1655232, BD1619298, BD1658596, BD155745, and BD153269 (alleging that employers "will not hire ITT grads because they find the college to be subpar," that borrowers "had to take ITT off [their] resume" in order to get a job, that ITT grads were considered to have "no college education," and that they were "mocked because of [their] education at ITT").

[93] *See, e.g., ITT Trends* (containing statements from dozens of veterans who attended various ITT California campuses alleging, among other things, that "I feel scammed out of a proper education," that "employers do not see the school as a real school," that "no one would even consider me for employment," and that "I wasted over 50k and 2 years of my life I can never get back").

[94] The exhibits attached to the *Villalba* Complaint include the following: 521 statements explaining how an ITT degree operates as a disadvantage in the job market (Ex. 1); 326 statements explaining how ITT misrepresented the quality of instructors, training, curriculum, or facilities (Ex. 6); 62 statements describing how ITT is "ruining people's lives" (Ex. 25); 473 statements about how ITT prevented other opportunities (Ex. 27); and 18 statements about how ITT debt has driven borrowers into or to the brink of homelessness (Ex. 28).

[95] *See, e.g.* CFPB Case, MA AG Case, NM AG Case, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), and *Lipscomb v. ITT Ed. Servs. Inc.* (M.D. FL Compl. filed Apr. 8, 2015). In addition, over 15 state AGs have issued subpoenas or CIDs relating to fraud and deceptive marketing against ITT from the beginning of 2004 through the end of May 2014. These states include: Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Hawaii, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, Tennessee and Washington. *See* ITT Form 10-Q Quarterly Report (June 30, 2014).

DOE00006299

conduct has also led to actions against ITT by the Department[96] and ACICS,[97] as well as to numerous negative national news stories.[98]

Given this extensively well-documented, pervasive, and highly publicized misconduct, the Department has determined that the value of an ITT education—like Corinthian—is likely either negligible or non-existent. In a court proceeding, ITT would very likely be unable to produce any persuasive evidence showing why the amount of recovery should be offset by value received by the borrowers from ITT education so as to preclude full recovery. Accordingly, it is appropriate for the Department to award eligible borrowers full relief.

CONCUR:

_____

Office of the General Counsel

_____

Date

---

[96] In the years leading up to its closure, the Department increased financial oversight over ITT and required it to increase its cash reserves to cover potential damages to taxpayers and students. The nature and scope of the Department's actions against ITT are contained within a series of letters from the Department to ITT dated: August 19, 2014, August 21, 2014, May 20, 2015, June 08, 2015, October 19, 2015, December 10, 2015, June 6, 2016, July 6, 2016, and August 25, 2016.

[97] *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016).

[98] *See, e.g.* Mary Beth Marklein, Jodi Upton and Sandhya Kambhampati, "College Default Rates Higher Than Grad Rates," USA TODAY (July 2, 2013) (listing more than 50 ITT campuses as "red flag" schools because student loan default rates were higher than graduation rates); Kim Clark, "The 5 Colleges that Leave the Most Students Crippled by Debt" Time.com (Sept. 24, 2014) (ranking ITT second on the list of schools that leave the most students crippled by debt).

14

DOE00006300

# STATUTE OF LIMITATIONS MEMO

# JANUARY 2017

DOE00006301

To:      Office of General Counsel
From:    Borrower Defense Unit
Date:    January 12, 2017
Re:      Statute of Limitations Analysis Under the California UCL for Corinthian and ITT Borrower
         Defense Claims re: Guaranteed Jobs and Transfer of Credits

This memorandum addresses application of the statute of limitations for Corinthian transfer of credits and guaranteed jobs claims as well as for ITT guaranteed jobs claims by borrowers attending a California ITT campus (collectively "Eligible Borrowers"). As set forth in four separate memoranda from the Enforcement Unit to the Under Secretary, California's Unfair Competition Law ("UCL") provides the bases for relief for each of these claim-types.[1]

The UCL has a four-year statute of limitations for actions brought by individual plaintiffs.[2] The California Supreme Court has held that common law defenses to the application of the UCL's statute of limitations apply, including the "discovery rule."[3] As set forth below, we recommend that the Department apply a one year extension to the UCL's four year SOL under the discovery rule. Accordingly, Eligible Borrowers who submit claims within five years of their graduation or withdrawal from Corinthian or ITT should not be affected by the statute of limitations.

### A.  Discovery Rule

Under the discovery rule, a UCL claim generally accrues "only when a reasonable person would have discovered the factual basis for a claim."[4] Here, it is reasonable to assume that Eligible Borrowers, upon withdrawal or graduation, would not have discovered the falsity of the guaranteed employment or transfer of credits representation for one year.

With respect to guaranteed jobs, it is reasonable to conclude that borrowers only discovered the falsity of the employment guarantee after exercising "reasonable diligence"[5] in seeking employment. Based on our review of claims to date, it was the experience of many CCI and ITT graduates that they had prolonged, fruitless communications with their school's career services departments before ultimately concluding that the school would not be delivering on the promise of employment. As one ITT borrower explained, "I attempted to reach [the Career Services Office] many times after my graduation for further assistance with resumes and more agencies hiring but they would only take my information and never call me back. I was not able to get a job in the field of study."[6] There is ample evidence with respect to the students at both schools that they sent numerous resumes over an extended period before determining that the school guarantee of employment was false. In short, reasonable CCI and ITT borrowers may not have discovered the falsity of the guaranteed employment promise until they exercised reasonable diligence

---

[1] *See* Recommendation for Borrower Defense Relief for Heald College Borrowers Alleging Transfer of Credit Claims (October 20, 2016); Recommendation for Borrower Defense Relief for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims (October 24, 2016); Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment (January 2017); and Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment -- California Students (January 2017).

[2] Cal. Bus & Prof. Code § 17208.

[3] *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (Cal. 2013).

[4] *Id.* at 1195; *E-Fab, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1318 (Cal. 2007).

[5] *Yumul v. Smart Balance, Inc*, 733 F. Supp. 2d 1117, 1120 (C.D. Cal. 2010).

[6] BD1658942. The claims from both schools are replete with similar statements.

through a prolonged period of job-seeking. We, therefore, propose a presumptive one-year discovery period for both Corinthian and ITT.[7]

With respect to the transfer of credits, external factors, corroborated by student's claims, suggest that students often did not discover that Corinthian credits could not be transferred until well after they left Corinthian. Many students attempted to enter the job market immediately after leaving Corinthian, a "career school," and therefore would not immediately be in position to determine that their credits would not be accepted at other schools. Other students delayed returning to school for a variety of reasons. As explained by one Corinthian borrower: "First, [E]verest stated to me that the credits would be able to be transferred if I ever wanted to go back to school. A couple years after I graduated . . . I wanted to attend another school and go for my Bachelors. . . . After researching some schools I was told that none of my credits were transferable, I could not find any school that would take my credits."[8] Accordingly, we propose a one-year discovery period for Corinthian transferability claims.

### B. Recommendation

For the reasons set forth above, the Department should consider BD claims by Eligible Borrowers to accrue five years after graduation or withdrawal from the school. As such, Eligible Borrowers who submit claims within five years of their graduation or withdrawal should not be affected by the statute of limitations.

CONCUR:

_John C. DiPaolo_  
Office of the General Counsel

_1/12/17_  
Date

---

[7] The Borrower Defense team intends to apply the proposed discovery period as a rebuttable resumption. Students whose claims for refunds are deemed barred by the statute of limitations (after applying a one-year discovery period) will have the opportunity to challenge that determination if they can produce evidence or otherwise show why a longer discovery period should be applied to their claims.

[8] BD1628616.

2

DOE00006303

# AMERICAN CAREER INSTITUTE GROUP RELIEF MEMO

## JANUARY 2017

DOE00006304

To: Under Secretary Ted Mitchell
From: Borrower Defense Unit
Date: January 4, 2017
Re: Recommendation for Full Borrower Defense Relief for Borrowers Who Attended American
  Career Institute's Massachusetts Campuses

## I. Introduction

The American Career Institute, Inc. (ACI) was a for-profit school that operated five campuses in Massachusetts beginning in late 2009 and ending with the school's closure on January 9, 2013.[1] During this time, ACI enrolled almost 4,500 students in Massachusetts.[2]

On November 21, 2013, the Massachusetts Attorney General's Office (MA AGO) filed a complaint against ACI and its principals alleging that the school engaged in "a range of deceptive schemes to meet accreditation requirements."[3] Over the course of the investigation and discovery that followed, the MA AGO obtained hundreds of thousands of pages of records, issued over 100 subpoenas, and interviewed and/or deposed more than 350 witnesses. On June 1, 2016, the MA AGO entered into a Consent Judgment[4] with ACI and its corporate and individual owners. The Consent Judgment included numerous admissions that ACI made a series of false and misleading representations to prospective students and engaged in other misconduct. The admissions cover a variety of misconduct actionable under Massachusetts state law, including misrepresenting job placement rates, wrongfully representing that certain employers had previously hired ACI graduates, and failing to inform students that a substantial number of ACI instructors were not authorized to teach by the Massachusetts Division of Professional Licensure. As described in more detail below, the evidence provided by the MA AGO confirms these admissions.

On July 26, the MA AGO sent an application to the Department requesting that all Massachusetts borrowers who attended ACI receive a full discharge of their federal loans under the borrower defense regulation without individual application. Because of the far-reaching scope of ACI's admitted misconduct, and the substantial evidence supporting these admissions, the Borrower Defense Unit recommends providing full borrower defense relief to all borrowers who attended ACI's Massachusetts campuses.

## II. ACI's Misconduct

### A. Falsification of Job Placement Rates

---

[1] ACI also had three campuses in Maryland. Because the evidence provided to the Department does not pertain to these campuses, the recommendation in this memo concerns only ACI's campuses in Massachusetts.

[2] *See* Commonwealth's Cover Letter for ACI Group Discharge Application at 2 (July 26, 2016) (asking the Department to discharge loans for "all 4,458 students who attended ACI").

[3] Press Release, Massachusetts Attorney General's Office, American Career Institute Sued for Falsifying Student Documents, Failing to Provide Service (Nov. 21, 2013), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2013/2013-11-21-aci-complaint-regs.html.

[4] We recognize that admissions in consent judgments may have limited probative value. Notwithstanding, the Borrower Defense Unit has independently reviewed Consent Judgment admissions where relied upon, along with any accompanying analysis performed by the MA AGO, and verified any factual findings detailed throughout this memo.

1

DOE00006305

Both the corporate and the individual defendants admitted in the Consent Judgment that ACI "made false or misleading representations to students and prospective students regarding the School's completion and placement percentages."[5] As described below, the defendants specifically admitted to misrepresenting placement rates that ACI provided to fifteen cohorts of students who enrolled between June 2011 and December 2012,[6] and admitted to specific methods of falsifying those rates.[7] The MA AGO conducted an extensive investigation through which it recalculated the placement rates for the fifteen cohorts and nine additional cohorts. The Borrower Defense Unit reviewed these investigative materials, including deposition testimony, interview notes, and subpoenaed records, and confirmed the MA AGO's conclusions.

ACI inflated its job placement rates in two ways. First, ACI staff under-reported the number of students who graduated by removing students who did not receive job placements. The MA AGO found many instances where ACI had reported more graduates to the Massachusetts Division of Professional Licensure than it reported to its accreditor. Indeed, ACI admitted in the Consent Judgment that "[t]he School improperly and inaccurately increased numerous Cohort placement percentages by excluding from the data some of the Students who were graduates but who had not obtained employment."[8] By under-reporting graduates who did not find relevant employment, ACI was able to inflate its placement rates.

Second, ACI falsely claimed that graduates found work in their field of study by falsifying graduates' employer, position, or employment status on Employment Verification Forms (EVFs) that ACI submitted to its accreditor. For example, many EVFs indicated that graduates were self-employed freelancers working in their field of study, when in fact those graduates were working part-time or unemployed. At other times, ACI fabricated job titles to make it appear that graduates were working in positions relevant to their field of study when they were not. ACI also claimed graduates were working with purely fictitious employers, or with companies where the graduates did not work, and improperly hired ACI's own recent graduates, reporting them as being employed in-field.[9]

Depositions of ACI employees confirm that ACI purposefully manipulated documents to publish higher rates and maintain ACI's accreditation. For example, the Manager of Career Services and Externships at ACI's Cambridge campus, Marcea Taylor-Nicholson, admitted that she fabricated student completion records and EVFs, and understood that she would be fired if the records did not satisfy the school's accreditor (ACCET).[10] In fact, Taylor-Nicholson testified that she and ACI employees even falsified documents during the accreditor's site visits to the school:

---

[5] *Massachusetts v. The Career Institute*, LLC, No. 2013-CV-4128H at ¶ 20 (Mass. Supp. July 1, 2016) ("Consent Judgment")Consent Judgment.
[6] "Cohort" refers to the group of students that enrolled during a particular time period for a particular campus and program, (for example, the 2011 Medical Assisting Program at the Braintree campus). Each cohort corresponds to a particular published rate (*e.g.*, the rate that would students who enrolled in Medical Assisting in 2011 at the Braintree campus would have seen).
[7] Consent Judgment at ¶ 26-29, 31.
[8] Consent Judgment at ¶ 31(e).
[9] "ACI was the single largest employer of its own graduates, having reportedly hired more than 50 of them." Aprahamian Aff., No. 2013-CV-4128H at ¶ 9 (Mass. Supp. July 24, 2015).
[10] Taylor-Nicholson Dep. 48:6-8, 49:10-12, March 31, 2015.

DOE00006306

A. When the site visit was actually happening, the forms were being altered and
stuff still. They were in a back room secretly.
Q. While ACCET was there?
A. While ACCET was there. That's what we would do. We'd get up, we'd leave
the office, run to the back room, "This is what they said, this is what I need,"
because they would give us a few minutes to get together what they asked for and
I'd go in. It was almost like a stock market, "All right. Get this together. Look at
this file."[11]

Significantly, ACI used this manipulated and fabricated data to calculate job placement rates
that ACI published in program disclosures it provided to every prospective student.[12] Each incoming
student had to sign one of these disclosures certifying that they had received that information. In
addition to the disclosure forms that each enrolling student signed, ACI also published the falsified
placement rates on its website, for prospective students; ACI continued publishing these rates until its
final day of operation.[13]

In fact, ACI specifically admitted to misrepresenting placement rates that it provided to fifteen
cohorts of incoming students.[14] The MA AGO recalculated ACI's job placement rates and found that
the actual rates were at least 25% lower than the rates ACI disseminated to the fifteen cohorts.
Specifically, the MA AGO used ACI's accreditor submissions and internal documents to determine
which students were counted as placed, and which students appear to have graduated but were omitted
from the job placement calculations. MA AGO then reviewed the EVFs of those students who had
been listed as placed, and contacted students and employers to confirm what ACI had claimed on the
EVFs. It also obtained employment records and/or affidavits to verify reported placements. Finally,
working from a more accurate number of students who graduated and/or found employment, the MA
AGO was able to re-calculate placement rates.

Using documents provided by the MA AGO, the Borrower Defense Unit validated these
recalculations. The MA AGO provided information detailing their recalculation for each of the
cohorts, and we used this information to recalculate the rates. Additionally, for two of the larger
cohorts that ACI admitted had falsified placement rates, we reviewed all of the underlying data,
including 28.1 forms, tracking spreadsheets, EVFs, interview notes, affidavits, and employer records.
For all cohorts, our recalculations of placement rates showed substantial discrepancies between the
actual and the published rates, consistent with the findings of the MA AGO.

---

[11] *Id.* at 167:19-168:5.
[12] ACI's disclosure form for the 2010 Digital Media Program at its Framingham campus falsely stated that "there were no
completers in the period January – December 2010", and therefore did not provide a placement rate; the MA AGO
discovered that there were two students who graduated in that time, and that neither of them had ever worked in their field
of study. Therefore, the actual placement rate was 0%.
[13] https://web.archive.org/web/20130108043123/http://www.aci.edu/disclosures/.
[14] "Cohort" refers to the group of students that enrolled during a particular time period for a particular campus and
program, (for example, the 2011 Medical Assisting Program at the Braintree campus). Each cohort corresponds to a
particular published rate (*e.g.*, the rate that students who enrolled in Medical Assisting in 2011 at the Braintree campus
would have seen).

3

DOE00006307

Following the Consent Judgment, the MA AGO continued its work, and identified an additional nine cohorts of students that ACI induced to enroll based on falsified job placement rates;[15] all nine additional cohorts had discrepancies of at least 17% between the published and recalculated rates, with six of them being inaccurate by 20% or more.[16] Although these cohorts are not specifically covered by ACI's admissions in the Consent Judgment, the MA AGO identified them using the same method of recalculating placement rates used to identify the cohorts included in the admissions. The Borrower Defense Unit also validated these recalculations.

## B. Misrepresentations That Specified Employers Had Hired ACI Graduates

ACI and its owners also admitted that they provided prospective students with lists of employers who had hired previous graduates from the school, when, in fact, "many of the businesses listed on the flyers had not hired any of the School's graduates."[17] Flyers published for the various programs offered at ACI each prominently featured the school's name and logo, followed by the heading "EMPLOYERS THAT HAVE HIRED OUR [program name] GRADUATES," and then a list of employers. There were a total of 425 employers included on these lists. The MA AGO issued a number of civil investigative demands as part of its investigation, including a request for "documents sufficient to identify the employer and title for each ACI graduate who obtained employment."[18] According to a sworn affidavit, MA AGO staff searched all of the over 527,000 pages of records produced by ACI for any record of a student being employed by one of these 425 purported employers.[19] None of the employers appeared to have employed any ACI graduates.[20] There were, however, 69 graduates whom ACI listed as "employed" but did not have any record specifying an employer. Even assuming that the each of these graduates worked at a different one of the listed employers, that leaves over 350 (82%) that had never hired an ACI graduate.[21]

Based on documents provided by the MA AGO, ACI widely disseminated these flyers to prospective ACI students. They were considered "Admissions documents" and saved in ACI's "Admissions folder."[22] Prospective students enrolling as early as February of 2010 reported being given one of these lists during the admissions process.[23] A number of other students, across campuses and programs, reported having received the flyer during the admissions process and factoring it into

---

[15] The Consent Judgment acknowledged that the list of cohorts contained in the admissions was not intended to be a complete list of cohorts which were misrepresented. Consent Judgment at ¶ 32 ("Exhibit #1 reflects only the Cohorts for which the Commonwealth has made specific findings to date that the completion and/or placement data reported was significantly overstated. Nothing contained in the Consent Judgment should be construed as stating or implying that the School's completion and placement data for Cohorts that are not contained in Exhibit #1 was accurately represented to Students and prospective students.")

[16] If all evidence was viewed in the light most favorable to ACI, eight of these nine additional cohorts had discrepancies of at least 10% between the published and recalculated rates.

[17] Consent Judgment at ¶ 28.

[18] See Aprahamian Aff., No. 2013-CV-4128H at ¶ 5 (Mass. Supp. July 24, 2015).

[19] See Id. at ¶ 12.

[20] Id. at ¶ 13. Four of the employers were referenced in some way in an email, completion tracker, or employment verification form. Id. at ¶ 13(a)-(d). However, for each of these four, other information in the EVF indicated that the student was employed elsewhere, or no EVF verifying the employment could be located. Id.

[21] See Aprahamian Aff., No. 2013-CV-4128H at ¶ 15 (Mass. Supp. July 24, 2015); Commonwealth's Opp. To Motion for Protective Order, No. 2013-CV-4128H at 3 n.4 (Mass. Supp. July 24, 2015).

[22] Id.

[23] See, e.g., Memorandum of Interview with Patrick Laflamme.

4

DOE00006308

their decision to enroll.[24] Several students even provided MA AGO with copies of their enrollment materials, which included copies of the flyers for their program.[25] Furthermore, an email from ACI's Marketing Director on January 16th, 2012, stated that they were printing copies of the flyers "to hang outside every classroom in MA."[26] In short, evidence shows that ACI provided the deceptive flyers to prospective students throughout its campuses and programs, and used them broadly to market the school.

### C. Employment of Instructors Not Authorized to Teach Under Massachusetts State Law

Under Massachusetts law, instructors at schools such as ACI must be approved by the Division of Professional Licensure (DPL).[27] Nevertheless, ACI admitted allowing "individuals who were not approved to teach by the DPL to be instructors, including recent School graduates, current Students with little or no experience in the field of study, and individuals who had no teaching experience."[28] DPL's predecessor investigated one student's complaints about ACI and found that, of the six instructors that student identified as teaching her classes, four were "not approved by OPS to provide instruction", and a fifth was approved by OPS, but not to teach the courses she was teaching.[29] A comparison of ACI's list of employees with DPL's list of approved instructors shows that 19% of ACI's roster of teachers was never approved to teach.

However, that 19% figure is not the full measure of ACI's use of unapproved instructors because not everyone who taught classes at ACI appeared on payroll records as an instructor. ACI also used temporary employment agencies to provide instructors for their courses.[30] With the exception of a handful who were later hired permanently, these temporary workers never appeared in ACI's employment records. As an example, RDH Temps, Inc., which specialized in providing dental assistants for short term assignments, placed more than twenty dental assistants in assignments *as instructors* with ACI, for periods ranging from one day to seventeen weeks. None of these instructors were approved by DPL to provide instruction when they began their assignments.[31]

Additionally, ACI utilized former students to provide classroom instruction, both as occasional substitutes and on an ongoing basis. Multiple former students stated that they were taught by recent

---

[24] *See* Memorandum of Interview with Angela Salmon-Collins (enrolled in Medical Assisting at the Braintree campus); Memorandum of Interview with Lynda Stockwell (enrolled in Medical Assisting Billing and Coding at Braintree); Memorandum of Interview with David Kee (enrolled in Digital Gaming Design at the Woburn campus).
[25] *See* AGO0000891, AGO0000718.
[26] *See* TCI00583457.
[27] Massachusetts law requires that, "Prior to employment a school… obtain the [DPL's] approval of all candidates for teaching positions," and that schools "submit to [DPL] an application for approval of each teacher." 603 CMR 3.15.
[28] Consent Judgment at ¶ 46.
[29] Office of Proprietary Schools, Preliminary Findings Student Complaint #081011 (ACIHUD001583-001587).
[30] ACI's December 11, 2012 letter to ACCET, Escobales Deposition Exhibit 1, ACCET0004034-0004036.
[31] RDH's Employment Agreement states that "the Employee is desirous of seeking temporary placement as a dentist, dental hygienist, dental assistant or dental receptionist and the Employer can provide such placement"; no provision is made for employment as an instructor in either the Employee Agreement, the Staffing Services Agreement between RDH and its clients, or the Facility Questionnaire RDH has clients fill out to determine what skills are necessary for temporary placements.

5

DOE00006309

ACI graduates, or that they themselves taught at ACI subsequent to their graduation.[32] One student testified that during the course of a program that lasted less than eleven months, three of his instructors were recent ACI graduates.[33] Another former student testified that between April and September of 2012, she was the primary teacher for one of the Dental Assisting program sections, despite no actual experience in the field.

The MA AGO has provided a list of more than a dozen former or current ACI students who were identified as teaching classes, without DPL approval or the experience required for such approval.[34] This list of former or current ACI students is separate from the list of instructors that ACI admits were hired as teachers without proper approval.

### D. Other Misrepresentations by ACI

ACI, as well as its owners and employees, also admitted to making numerous other misrepresentations. The most egregious, widely-disseminated misrepresentations include:

- Routinely falsifying the number of students that *completed* ACI programs within a reasonable period after enrollment and widely disseminating these falsified completion rates to prospective students in the same disclosures that contained misleading job placement rates.

- Promising students lifetime career services, "but provid[ing] no more than links to listings on Craigslist or other employment hiring websites."[35]

- Creating "a false and misleading sense of urgency in prospective students, pressuring them to enroll immediately to ensure their place in the class even though the School had open and rolling enrollment."[36]

MA AGO has provided copies of marketing materials, deposition testimony and other evidence that confirms that ACI made these misrepresentations.

### III.    The Borrower Defense Regulation Supports Eligibility and Full Relief for ACI Borrowers Under Massachusetts State Law

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a [Direct] loan...,

---

[32] See Deposition of John Burrows at 23:8-23, 75:8-15; Deposition of Mary Ann Escobales at 20:11-21:16, 22:8-24:7, 67:17-68:19; Deposition of Kevin Ronald Haverty at 9:21-10:8, 12:1-13:5; Memorandum of Interview with Patrick LaFlamme; Memorandum of Interview with Melissa Jimenez; Memorandum of Interview with Benny Arce; Memorandum of Interview with April Leshore.

[33] Deposition of John Burrows at 23:8-23, 75:8-15.

[34] ACI Unapproved Instructors MASTER CHART updated 2015 08 13.

[35] Consent Judgment at ¶ 36. Also, the MA AGO conducted dozens of interviews in which students commented on the lack or complete absence of career services assistance. See, e.g., Interview Memoranda of Benny Arce, Julie Rifai, and Richard Burgess.

[36] Consent Judgment at ¶ 35.

6

DOE00006310

an amount in excess of the amount such borrower has repaid on such loan."[37] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[38]

For the reasons set forth below, borrowers who attended ACI campuses in Massachusetts have a valid claim under the Massachusetts Consumer Protection Act (MCPA),[39] and are therefore eligible for borrower defense. It is appropriate to grant relief without individual applications in this case because the MA AGO has identified all eligible borrowers and the Department has all necessary evidence to show that these borrowers were subject to ACI's substantial and pervasive misrepresentations. Given the widespread dissemination of ACI's extensive misrepresentations and the lack of value conferred by ACI, these borrowers should be granted full loan discharges and refunds of amounts already paid. The number of eligible borrowers is approximately 3,850.[40]

Although claims under the MCPA are subject to a four-year statute of limitations,[41] "this limitations period is subject to tolling until the plaintiff knew or should have known of the alleged injury."[42] The earliest that any ACI borrowers reasonably could have discovered ACI's misrepresentations and omissions would have been in November of 2013, when the MA AGO announced its complaint against ACI.[43] Since the four-year period would not run until November of 2017, all ACI borrowers fall within the statute of limitations.

### A. The Misrepresentations and Omissions Described Above State a Claim Under the MCPA

The MCPA, as interpreted by Massachusetts state courts, contains an expansive definition of "unfair or deceptive acts or practices."[44] No proof of intent or knowledge is required to find a violation of the MCPA.[45] In fact, a "practice is 'deceptive' if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."[46] The Department has already determined that misleading or false job placement rates reasonably influence the enrollment decision of prospective students. Similarly, substantially false lists of employers that have previously employed ACI graduates would reasonably influence a prospective student to attend ACI when they would not

---

[37] 20 USC § 1087e(h).

[38] 34 C.F.R. § 685.206(c)(1).

[39] M.G.L. c. 93A.

[40] The total number of ACI borrowers who attended Massachusetts campuses is approximately 4,500. Approximately 650 have already received closed school discharges, which reduces the number of borrowers eligible for BD relief to about 3,850.

[41] M.G.L. c. 260, § 5A.

[42] *Lambert v. Fleet Nat. Bank*, 865 N.E.2d 1091, 1097 (Mass. 2007).

[43] Press Release, Massachusetts Attorney General's Office, American Career Institute Sued for Falsifying Student Documents, Failing to Provide Service (Nov. 21, 2013), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2013/2013-11-21-aci-complaint-regs.html.

[44] M.G.L. c. 93A, § 2(a).

[45] *See, e.g., Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 786 n.15 (2013) ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof . . . that the defendant intended to deceive . . . or even knowledge on the part of the defendant that the representation was false." (internal citation omitted)).

[46] *Lowell Gas Co. v. Attorney Gen.*, 377 Mass. 37, 51 (1979).

7

DOE00006311

otherwise. The same is true of substantially misrepresented completion rates, false promises that lifetime career services would be provided, and statements that led prospective students to believe that they had to enroll immediately or miss the opportunity to do so. Therefore, all such representations constitute actionable claims under the MCPA.

In addition, the MCPA covers any failure to provide information "the disclosure of which may have influenced a person not to enter into a transaction."[47] Accordingly, the omission of material information – such as the fact that a substantial number of ACI's teachers were not authorized to teach – also violates the MCPA.[48] The fact that 19% of the instructors on ACI's payroll were teaching in violation of Massachusetts law, and that a significant number of classes were taught by temporary employees with no teaching experience and/or recent graduates with no relevant work experience, certainly would reasonably influence ACI students not to enroll.

### B.  Granting Relief to ACI Borrowers Without Individual Applications is Appropriate and Consistent with the MCPA

The circumstances here warrant granting borrower defense relief, without an application, to every borrower who attended ACI's Massachusetts campuses. There is no need for an application from each of these borrowers because the evidence provided by the MA AGO has already established that those borrowers have a cause of action against the school under state law, and because ACI's misrepresentations were both substantial and pervasive. This approach is consistent with Massachusetts law, which does not require proof of individual reliance and provides for relief for groups of consumers harmed by violations of the MCPA.

Massachusetts courts have explicitly stated that a showing of individual reliance on a representation is not required under the MCPA: "the plaintiffs need not prove individual physical harm in order to recover for the defendants' deception. Nor need the plaintiffs show that each individual consumer relied on the defendants' false promise."[49] There need only be a "causal connection between the seller's deception and the buyer's loss."[50]

Here, the loss to ACI borrowers was clearly connected to ACI's misrepresentations and omissions, which were both substantial and widespread. Prior to enrollment, each ACI student was required to sign a program disclosure provided by ACI. As detailed above, many of these disclosures contain misrepresentations as to completion rates and job placement rates across a wide range of programs. Additionally, borrowers across ACI's campuses and programs received flyers containing falsified lists of employers who purportedly hired ACI graduates. ACI distributed these with other admissions documents starting immediately after the school opened, and later posted these deceptive

---

[47] *Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982) ("[F]ailure to disclose any fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of c. 93A."). *See also Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 700-04 (1975) (failure to disclose that engine was defective at time of sale constituted a violation of the MCPA).

[48] *Schwartz v. Rose*, 418 Mass. 41, 46 (1994). *See also Commonwealth v. AmCan Enter., Inc.*, 5 Mass. L. Rptr. 53, *3 (1996) ("[A] solicitation package is deceptive if it contains material . . . omissions which are likely to mislead the recipients."), *aff'd*, 47 Mass. App. Ct. 330 (1999).

[49] *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 397 (2004), *citing Nei v. Burley*, 388 Mass. 307, 313, 446 N.E.2d 674 (1983).

[50] M.G.L. c. 93A, § 9(b).

DOE00006312

lists outside of *every* classroom. Similarly, ACI's failure to inform students about its severe lack of state-qualified teachers extended to *every* prospective student.

Under the MCPA, individuals who have been harmed are not required to bring suit on their own behalf to obtain relief. The MCPA allows individual consumers to bring class action cases and to obtain relief for any other "similarly injured and situated persons."[51] The MCPA also authorizes the Attorney General to seek relief on behalf of Massachusetts citizens.[52] The MA AGO is authorized to obtain "such orders or judgments as may be necessary to restore any person who has suffered any ascertainable loss of any moneys or property, real or personal…"[53] Therefore, providing relief to students without individual applications is consistent with state law.[54]

### C. Full Relief Should Be Provided to ACI Borrowers

Under the MCPA, plaintiffs are entitled to recovery "in the amount of actual damages… [i]n addition, the court shall award such other equitable relief… as it deems to be necessary and proper."[55] Actual damages include "all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice."[56]  It may also include out of pocket damages.[57]  A court may treble the damages if the act or practice was a knowing or willful violation of the law.[58]

In calculating actual damages under the MCPA, Massachusetts courts have used a benefit of the bargain approach, comparing the amount paid against how something would have been valued absent the misrepresentation.[59]  Where valuing the actual product delivered may be impracticable, however, the courts have recognized that the benefit of the bargain rule should not "operat[e] to defeat a just recovery where misrepresentation has caused real damage but where values cannot easily be proved."[60]  To address this, the benefit of the bargain rule may be modified, so that "[w]here the proof is so vague as to cast virtually no light upon the value of the property had it conformed to the representations, damages will be awarded equal to the loss sustained."[61]

---

[51] M.G.L. c. 93A, § 9(b).
[52] M.G.L. c. 93A, § 2. In fact, the MCPA originally did not permit any private causes of action, allowing only the AGO to enforce the law. *See, e.g., Feeney v. Dell, Inc.*, 454 Mass. 192, 201 (2009) ("When originally enacted in 1967, G.L. c. 93A contained no provision for private remedies; only the Attorney General was empowered to bring enforcement proceedings.").
[52] M.G.L. c. 93A, § 2.
[53] M.G.L. c. 93A, § 2.
[54] Moreover, although not required, in this instance, the MA AGO has submitted an application on behalf of all borrowers that attended ACI's campuses in Massachusetts.
[55] M.G.L. c. 93A § 9(3).  *See also Schwartz v. Rose*, 418 Mass. 41, 47-48 (1994); *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 787 n.16 (2013).
[56] *Rivera v. Commerce Ins. Co.*, 84 Mass. App. Ct. 146, 149, 993 N.E.2d 1208, 1210 (2013); *see also DiMarzo v. Amer. Mut. Ins. Co.*, 389 Mass. 85, 101 (1983) (successful Chapter 93A plaintiff is "entitled to recover for all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice").
[57] *See Blue Hill Chiropractic Grp., Inc. v. Encompass Ins. Co.*, No. SUCV200502075, 2011 WL 3672049, at *11 (Mass. Super. May 5, 2011) ("Out of pocket damages compensate the party for the actual loss it suffered as a result of the fraud.")
[58] M.G.L. c. 93A § 9(3).
[59] *Aspinall*, 442 Mass. at 399.
[60] *Rice v. Price*, 340 Mass. 502, 510, 164 N.E.2d 891, 896 (1960).
[61] *Id.*(citing Prosser, Torts (2d ed.) (ellipses and brackets omitted)).

9

DOE00006313

In the case of students deceived into enrolling at ACI, actual damages under Massachusetts law would include, at a minimum, the amount paid by the student to attend the school.[62] The proof of the value of ACI's product, if any, is "vague" at best – indeed, what evidence the Department possesses indicates the programs had minimal or no value – so that full relief is appropriate. The facts described above with respect to ACI's practices and product resemble those for Corinthian Colleges, where the Department determined that borrowers should receive full relief. This determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by factors mirrored at ACI:

- Repeated misleading statements to students, regulators and accreditors;
- Misrepresentations regarding completion rates;
- Elaborate job placement fraud;
- Many student accounts testifying as to the lack of value provided by ACI; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Moreover, like Corinthian Colleges, the ACI programs at issue were career training programs. The inherent value of such programs lies in their ability to place students, so that placement rate advertising plays a significant role in establishing their value. An understanding that the value of the programs was not what it was purported to be can also be inferred from ACI employees' efforts to manipulate job placement rates.

ACI's misconduct was as flagrant as, if not worse than, Corinthian's. Documents provided by the MA AGO, including depositions with former ACI employees, portray a culture where falsifying information was routine. ACI employees, as well as top company executives, admitted that many students never attended class, and that unsuccessful students were simply erased from records documenting completion and job placement rates. Moreover, the school had a track record of providing demonstrably sub-standard educational services, including by hiring dozens of teachers who were not authorized to teach.

Given ACI's record of misconduct and poor results, the Department has determined that there is extremely limited proof of any value that ACI provided to its students, and what evidence there is indicates that the value provided by ACI was minimal.[63] In light of the above, it is appropriate to award eligible borrowers full relief.[64]

---

[62] As discussed above, damages under the MCPA may also include other expenses incurred as a result of the contract and, where a violation is knowing or willful, punitive damages in an amount two to three times the actual damages. However, 455(h) of the HEA limits borrower defense relief to the amount of the loan.

[63] We also note that in the Consent Judgment, ACI admitted to a failure to provide lifetime placement services as promised. While we have not independently verified this admission, such a failure would constitute a breach of ACI's contractual promises with its students and would establish a borrower defense under 34 C.F.R. § 685.206(c).

[64] Under the MCPA, a court may also award such equitable relief "as it deems to be necessary and proper," M.G.L. 93A §9(3), and courts sometimes apply the equitable approach of rescission of contract in these cases. It appears the result of such an approach in this case would also yield full relief for affected borrowers. Rescission seeks to put both parties in the position they would have been absent the contract. *See, e.g., Ann & Hope, Inc.*, 42 Mass. App. Ct. at 230 (upholding an award of damages in part because "it returned to each party the consideration it provided under the contract to the greatest extent possible"). Sometimes it may be impossible for a product to be returned by a plaintiff, but "the value of the property not restored may be considered in determining the plaintiffs' damages." *Id.* In this case, given the evidence indicating a

10

DOE00006314

I accept the above recommendation. For all borrowers that attended an ACI campus in Massachusetts, I direct the granting of borrower defense relief as set out in this memorandum.

1/13/17
_____
Date

_____
Ted Mitchell
Under Secretary
U.S. Department of Education

CONCUR:

1/13/17
_____
Date

_____
Office of General Counsel

---

lack of value of ACI's educational program, as described above, rescission would also properly yield recovery by ACI students of all they had paid the school.

11

DOE00006315

# 2017 DEAR COLLEAGUE LETTER

# FFEL GUIDANCE

DOE00006316



Publication Date: January 18, 2017

DCL ID: GEN-17-01

Subject: Treatment of Federal Family Education Loan (FFEL) Program Loans When a Borrower Asserts a Defense to Repayment

Summary: This letter provides lenders and guaranty agencies participating in the FFEL Program (collectively referred to herein as "FFEL loan holders") with additional details about two provisions of the recently finalized borrower defense regulations - 34 CFR 682.211(I)(7) and 34 CFR 682.410(b)(6)(viii). This letter also outlines the process FFEL loan holders will follow to implement these regulations, whether they do so on the effective date of July 1, 2017, or if they choose to implement them early, per the Secretary's designation.

Dear Colleague:

The Department of Education (the Department) has received a number of inquiries from borrowers and their representatives seeking clarification on the treatment of FFEL Program Loans on which borrowers may wish to assert a defense to repayment of the loan, known as a "borrower defense."  The purpose of this letter is to clarify this process for FFEL loan holders.

On November 1, 2016, the Department issued final regulations related to borrower defense (81 FR 75926).  One provision of those regulations (34 CFR 682.211(i)(7)) states that "[t]he lender must grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief..."  The lender will grant this forbearance in yearly increments or for a period designated by the Secretary until the loan is consolidated or until the lender is notified by the Secretary to discontinue the forbearance.  Another provision of these regulations (34 CFR 682.410(b)(6)(viii)) states, "Upon notification by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief... the guaranty agency must suspend all collection activities on the affected loan for the period designated by the Secretary."

DOE00006317

The Secretary designated 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) for early implementation.  Therefore, FFEL loan holders may implement these provisions before they become mandatory on July 1, 2017, and we encourage them to do so.

Preliminary Determination of Potential Eligibility for Borrower Defense Claims

The Department is reviewing FFEL borrower defense claims that it has already received and will provide FFEL borrowers with a preliminary determination as to whether the borrowers are eligible for borrower defense loan discharge under Direct Loan regulations.  In contrast to what would be required for a borrower to qualify for a borrower defense loan discharge on a FFEL Program Loan under 34 CFR 682.209(g), a borrower may qualify for a borrower defense loan discharge on a Direct Consolidation Loan that repays a FFEL Program Loan without having to establish the provision of an improper inducement, or a referral or affiliate relationship, between the lender of the underlying FFEL Program Loan and the school.

Consolidation

For borrowers who are preliminarily determined to have a valid borrower defense claim, the Department will provide the borrower with information on how to consolidate their loans into a Direct Consolidation Loan to be eligible for relief under a borrower defense.  Borrowers whose claims are determined to be ineligible for relief under a borrower defense even if they were to consolidate will be notified that their claim would not be successful.

Forbearance or Suspension of Collection Activity

When a borrower submits a borrower defense claim to the Department in connection with a FFEL Program Loan, and after the Department has determined that the borrower has provided all required information, the Department will notify the FFEL loan holder in writing to place the borrower's loan(s) into administrative forbearance (if the borrower is not in default on the loan(s)) or to suspend collection activity on the borrower's loan(s) (if the borrower is in default on the loan(s)).

When a request is made by the Department that a FFEL loan holder grant forbearance or suspend collection activity on a FFEL Program Loan, lenders and guaranty agencies who have implemented section 682.211(i)(7) or 682.410(b)(6)(viii) early will be required to place the borrower's loan(s) into forbearance or to suspend collection, whichever is applicable.  For a defaulted borrower, the suspension of collection activity would include suspending any Treasury offset and/or wage garnishment processes.

FFEL Program lenders may also, for a non-defaulted FFEL loan, apply an administrative

DOE00006318

forbearance to cover any period of delinquency that exists at the time the prospective period of forbearance is granted (34 CFR 682.211(f)(2)). The administrative forbearance should be applied to the borrower's account as soon as practicable after the Department makes the request.

If a borrower contacts a FFEL loan holder requesting to shorten or remove the administrative forbearance or suspension of collection activity, or to restrict it to certain loans, the FFEL loan holder must honor the borrower's request. The Department will advise borrowers to contact their FFEL loan holder with those specific requests.

Existing regulations require the lender to notify the borrower whenever an administrative forbearance is granted and about specific items, including giving the borrower the opportunity to decline the forbearance (34 CFR 682.211(e)(1) and (e)(2)(vi)). These have not changed, and nothing in this letter affects those requirements.

If a borrower inquires about forbearance related to a borrower defense claim, FFEL loan holders should direct the borrower to the borrower defense hotline (855-279-6207) for assistance with that claim or to the borrower defense webpage, available at StudentAid.gov/borrower-defense.

Other Borrower Repayment Options

If a FFEL loan holder has applied an administrative forbearance due to a borrower defense claim, the FFEL loan holder is not precluded from discussing other available options to aid the borrower in managing his or her loan payments. For example, a borrower who is eligible for administrative forbearance who might be eligible for a zero dollar payment under the Income-Based Repayment (IBR) plan could be counseled about the benefits of the IBR plan.

Similarly, nothing in this letter prevents a FFEL borrower from entering into a voluntary agreement to repay the loan through a rehabilitation agreement, loan consolidation, other satisfactory repayment arrangements, or any other voluntary payment, as provided under current regulations. A payment on a loan for which the borrower has asserted a defense to repayment claim will not prevent the borrower's claim from being granted.

We believe that these procedures will streamline the process for borrowers and FFEL loan holders. If you have any questions about this guidance, please contact the borrower defense hotline at (855) 279-6207.

Sincerely,

Gail McLarnon,

DOE00006319

Acting Deputy Assistant Secretary
for Policy, Planning, and Innovation

Attachments/Enclosures:

GEN-17-01: Treatment of Federal Family Education Loan (FFEL) Program Loans When
a Borrower Asserts a Defense to Repayment in PDF Format, 928KB, 3 Pages



Plugins & Viewers

FOIA  |  Privacy  |  Security  |  Notices                    WhiteHouse.gov  |  USA.gov  |  ED.gov

DOE00006320

# PROCESS DOCUMENTS

DOE00006321

# GLOSSARY OF BD TERMS

DOE00006322

<u>Borrower Defense Terminology</u>

**GENERAL TERMS:**

<u>Accreditation:</u> Institutions must be accredited to be eligible for Title IV aid.  The Department recognizes many accreditors, which in turn accredit schools and/or programs.

- **Institutional Accreditation**: The accreditation of the school itself, so that student borrowers may receive Title IV aid to attend. There are two types of institutional accreditation.
  - **Regional**: There are seven regional accreditation agencies which foster articulation between secondary schools and higher education institutions, particularly evaluation of prospective students by colleges and universities. The overwhelming majority of public schools and non-profit private schools are regionally accredited.
  - **National**: National accreditors generally accredit schools that are career oriented and/or vocational in nature, generally operating on a for-profit basis.  Credits from nationally accredited schools are not generally transferable to regionally accredited schools.
- **Programmatic Accreditation**: Accreditation that is specific to a program of study, overseen by organizations such as the American Bar Association for law schools, or the Commission on Accreditation of Allied Health Education Programs for allied health programs (such as medical assistants). Graduation from an appropriately accredited program is frequently necessary to be eligible for licensing or certification purposes.

<u>Allegation</u>: A borrower's explanation or narrative that their school engaged in improper conduct.  Not all allegations borrowers make will state an actionable BD claim, but allegations that do state a BD claim typically fall into the following categories: job placement rate, employment prospects, program cost/nature of loans, transferability of credits, career services, educational services, or other.

<u>Case</u>: A borrower's application and any supporting documentation.

<u>Forbearance:</u> Forbearance allows borrowers to temporarily stop making payments on their student loans.  Loans in forbearance continue to accrue interest.  Borrowers who submit a BD application are entitled have their loans in placed in forbearance, however they may opt out.

<u>NSLDS</u>: National Student Loan Data System - the central database that records student loan information.

<u>OPEID</u>: Office of Postsecondary Education Identification number, used to identify schools and/or campuses whose students are eligible to participate in Federal Student Financial Assistance programs under Title IV regulations.

<u>Tier 1</u>: The team of intake workers assigned to borrower defense.  Prior to Tier 1 taking over intake the Department had a team in San Francisco conducting intake for borrower defense.

**CASE REVIEW SPECIFIC TERMS:**

<u>Controlling Date</u>: In approved borrower defense cases, the date after which a borrower's loans will be discharged or reduced.

<u>Dual Program</u>: A situation in which a borrower applies for JPR relief, however the first program is not covered by the Department's findings, but the subsequent programs are.

**Major Error**: An error that changes the outcome of the case.

> Examples: marking a claim as an approval when it should be a denial; using an improper controlling date that leaves out approvable loans; incorrect global fields.

**Minor Error**: An error that does not change the outcome of the particular case but is the result of not following the proper protocol.

Examples: marking a claim as in due to QC when it should be an approval; using an improper controlling date but the borrower's loans are not affected; marking an allegation as failing to state a claim when it should be insufficient evidence.

**One Off**: A school that has one claim against it and the Department has no evidence of wrongdoing by the school.

**LOAN TYPES**

**Direct Loans:** Loans made directly to the borrower by the Department. While the Department made the loans, private loan servicers administer and manage those loans.

**FFEL Loans**: Federal Family Education Loans are loans that are backed by the federal government but may not be owned by the government.  FFEL Loans were discontinued in 2010. Before a borrower may be eligible to have these loans forgiven, the borrower may have to consolidate their loans into a Direct Loan.

**Perkins Loans**: Low-interest federal student loans for undergraduate and graduate students with exceptional financial need, with the school acting as the lender.  The authority for schools to make new Perkins Loans ended on Sept. 30, 2017, no Perkins loan disbursements have been made since June 30, 2018.  Before a borrower may be eligible to have these loans forgiven, the borrower may have to consolidate their loans into a Direct Loan.

**Parent PLUS loans**: Federal loans that parents may take out to help their child attend college. PLUS loans may be either Direct or FFEL loans.  Parent PLUS borrowers may submit an application for borrower defense to repayment even though they did not attend the school they are alleging committed wrongdoing.

**DISCHARGE TYPES**:

**Borrower Defense (BD):** Discharge or reduction of a borrower's loans based on misconduct by the school that is related to the loan or the education the loan was meant to finance.

**Closed School (CSD)**: Discharge of a borrower's loans based on their inability to finish the program they enrolled in due to their school's closure.  This discharge is not handled by the BD Unit, but many borrowers apply for BD relief based on their school's closure.

**False Certification:** Discharge of a borrower's loans based on the school falsely certifying the borrower's eligibility for those loans.  This discharge is not handled by the BD Unit, but many borrowers make non-BD allegations that would be more appropriate for False Certification discharge.

**Job Placement Rate Allegation**: An allegation that the school the borrower attended misrepresented their job placement rates.  Typically, but not always, JPR allegations refer to allegations from borrowers

DOE00006324

that attended Corinthian Colleges.  The Department did an investigation into Corinthian Colleges and published findings with the dates, campuses, and programs that Corinthian Colleges misrepresented their job placement rates.  JPR claims account for a substantial percentage of the borrower defense cases.

**Non-Job Placement Rate Allegation:** An alleging anything other than a job placement rate allegation. These allegations typically fall into on of the following categories: job placement rate, employment prospects, program cost/nature of loans, transferability of credits, career services, educational services, other.  The term typically, but not always, will refer to an allegation from a Corinthian Colleges borrower.

DOE00006325

# CASE REVIEW METRICS

DOE00006326

<u>Case Review Metrics</u>

Contractor claim review rates and proficiency will be reviewed on a weekly basis, or at reasonable intervals at the discretion of the Director of Borrower Defense.  In addition to a weekly review of proficiency and claim review rates contractors will be subject to spot checking at the discretion of the Director of Borrower Defense.  Based on past performance, FSA requires contractors to exceed the following metrics on a weekly basis:

**Job Placement Rate Claims:**
<u>Review Rate</u>: five cases per hour.
<u>Maximum Error Rate</u>: one major error and one minor error.

Failure to meet the above review rate and error rate will result in remedial action including, but not limited to, probation, re-training, moving back to 100% QC, hoteling at FSA or Sullivan Cove during work hours, or termination from the project at the discretion of the Director of Borrower defense.

**Standard Protocol Claim Review:**
<u>Review Rate</u>: five cases per hour.
<u>Maximum Error Rate</u>: one major error and one minor error.

Failure to meet the above metrics/error rate will result in remedial action including, but not limited to, probation, re-training, moving back to 100% QC, hoteling at FSA or Sullivan Cove during work hours, or termination from the project at the discretion of the Director of Borrower defense.

**Standard Protocol Memo Writing:**
<u>Rate</u>: a memo should take, on average, no more than two hours to complete.  The memos should be a final work product free to typographical and/or grammatical errors.
Failure to meet the above metrics will result in remedial action including, but not limited to, probation, re-training, moving back to 100% QC, hoteling at FSA or Sullivan Cove during work hours, or termination from the project at the discretion of the Director of Borrower defense.

**Evidence Review**
Due to the nature of evidence review, FSA does not have set metrics.  However, contractors are expected to review evidence at a reasonable rate.  FSA will conduct weekly spot checks of the contractor's reported hours reviewing evidence.  If a contractor is found to be over reporting hours spent on evidence review, they will be subject to remedial action, including termination from the project, at the discretion of the Director of Borrower Defense.

**100% QC**
Contractors will remain on 100% QC until the below metrics are met:

<u>JPR</u>: A contractor reviews 20 JPR allegations with a maximum of one error.

<u>Standard Protocol</u>: A contractor reviews at least 100 allegations with a maximum 10% minor error rate and no major errors.

JPR PROTOCOL

DOE00006328

**JPR Instructions**

Steps:

1.  Check the school that the borrower says he/she attended against the Primary School listed in Salesforce.

2.  Check for Official School document and any Related Cases.

3.  Determine if the borrower made a job placement rate allegation.

4.  Determine if one or more programs fall within the coverage dates found in the findings lists.

5.  Adjudicate the JPR claim and add one of the following reviews into Salesforce:
    a.  Approve
    b.  In due to QC
    c.  Dual program first out
    d.  Dual program due to QC
    e.  Outside Coverage dates
    f.  Out due to QC
    g.  Incomplete Application
    h.  Non-Reliance

6.  Determine if the borrower is potentially eligible for greater relief under a non-JPR allegation
    a.  If yes then transcribe (or add an allegation and put "See Application at X) all non-JPR allegations

1

DOE-00006329

<u>**STEP ONE:  CHECK THE OPEID AND "SCHOOL 1 NAME" INFORMATION AND CHECK FOR RELATED CASES**</u>

Check the school that the borrower says he/she attended against the Primary School listed in Salesforce. The "Customer-Provided School" is the school the borrower wrote on their application, while the "Primary School" field is automatically pulled into Salesforce from the assigned OPEID.

**If the application is against a completely different school than the school listed as the "Primary School"** (e.g. application is against CCI and "Primary School" is DeVry), create a task to the Tier 1 reviewer stating "Application is against CCI, but the Primary School is listed as DeVry" and change the status to 1.4.[1]

**Move on to your next case.**

**If the school/campus named by the borrower is the same as the school/campus reflected by the Primary School in Salesforce you may continue.**

<u>**Look for Related Cases**</u>:  If a case has a "related case" you must assign the case to the individual designated by FSA and move on to the next claim until you are instructed the claim is able to be adjudicated.  To look for a related case review the "Related Cases" field on the case page.  Additionally, click into "Contacts" by clicking the borrower's name and selecting "Details" in the "Primary Cases" tab. If there are no related cases the claim may be adjudicated:

**MOVE ONTO STEP TWO**

---

[1] If Salesforce or NSLDS indicates a claim is against Bryman or Alterius treat the case as against Corinthian.

2

DOE00006330

## STEP TWO:  CHECK FOR OFFICIAL SCHOOL DOCUMENT

Check to see whether the borrower has attached a transcript, enrollment agreement, or some other official school document that records campus/program/date information.

**If there is an official school document**:

Click on "New Program & Credential"
- You will fill in the school document type, the first program from the school document, and the start date for the first program from the school document. If there are second (and third, fourth, etc.) programs/dates also reflected in the school document, add an additional program and credential. An
- If there is more than one official school document in the file, the order of preference for which document to use is: transcript, enrollment agreement, and other.  Loan documents are not "official school documents."  Loan documents rarely contain information required to complete these steps.

  **NOTE:   The school name, campus, program information, and enrollment start date contained on the official school document will serve as the definitive data points for the adjudication of the programs contained on the school document.**  This means that the official school document overrides what the borrower wrote in their application as well as the school provided data.  However, it is important to remember that the borrower data and/or the school provided data may contain information on additional programs not contained within the official school document.

MOVE ON TO STEP THREE

**If there is NOT an official school document:**

MOVE ON TO STEP THREE

3

DOE00006331

## STEP THREE:  RECORD THE JPR ALLEGATION

Add a JPR allegation into the tool.
- If there is a JPR allegation you can simply write "yes" for the text of the allegation
- If there NOT a JPR allegation you can simply write "no" for the text of the allegation

How to determine if a JPR allegation was made:

If the borrower's application is on an attestation form:
- Check if the form is signed. Any indication that the student intended to sign in the signature box, including a typed name, is acceptable. The file may also contain a separate piece of paper signed by the student which is fine. Unless there is a signature on a separate page, an empty signature box does not count. Attached photos* of the borrower will be accepted as a signature.  *Must be a photo of a real person (no cartoons, etc.).

For all other application types
- Check if the form has an eligible checkbox for job placement rates that states: "Citing false and/or misleading job placement statistics and salary information to convince me to enroll." If the form has *exactly* that language, and the box is checked, then the borrower made a JPR allegation.[2] For the universal form, if the borrower checks "yes" under the Employment Prospects box, we will accept this as constituting reliance on JPR.
- If there is no such checkbox, or if the checkbox is not checked, does borrower allege in the text of their application that they were presented with job placement rates?

Examples of what kind of statements indicate the borrower made a placement rate allegation:
- Would count:
  - "...told me their job placement in your field of study was 90%..."
  - "Heald College drew me in by their promising rates of employment after graduation."
  - "...they also had shown me brochure/papers that showed high job numbers for their past students and promising careers."
- Would NOT count:[3]
  - "told me that they had lifetime career assistance…"
  - "...enrolled because of the job placement program they had."
  - "The school told me they would help me find a job."
  - "They said they would also assist in finding me employment"
  - "They promised/guaranteed me a job"

Whether or not the borrower made a JPR allegation, move onto STEP FOUR.

---

[2] Note: Keep an eye out for forms with *similar* language. There is one form in particular that has a checkbox followed by: "Misleading me about how this program would prepare me for a job…" and then language about both job placement statistics and other possible misrepresentations. That is not an eligible checkbox.
[3] In these examples, it's unclear whether the borrower is alleging a false rate or making a claim about career services/employment.

4

DOE00006332

## STEP FOUR:  DETERMINE WHICH PROGRAMS FALL WITHIN THE FINDINGS

**Determine the appropriate campus, date, and program to use:**
**Campus: If the CAMPUS named by the borrower is a completely different campus than the OPEID found in the NSLDS data:**

Check to see if the CCI data confirms one of the data points, if so use the confirmed campus.

If the CCI data does NOT confirm one of the data points, review the findings at both campuses.

**If the borrower leaves the CAMPUS field blank:**

If the CCI data and NSLDS data match, use the confirmed campus.

If the CCI data and NSLDS data do NOT match, change the status to **1.4** and task the Tier 1 reviewer with reaching out to the borrower to confirm their campus.

**Program & Credential:** If the program and credential listed by the borrower in their application matches the CCI data (or there is no CCI data available) treat the program and credential as being confirmed.

If the program and credential listed by the borrower in their application DO NOT match the CCI data treat them as separate programs.[4]

If the borrower leaves his program and/or credential blank and there is no CCI data, set to 1.4 with a task to ask the borrower about the programs/credential.

**Enrollment Start Date:** Check to see if the enrollment start date on the borrower's application, the CCI data, and NSLDS data match.  If two of the three data points match, the date is confirmed and the date will be your Enrollment Start Date.

If the data points do not match:
- And all three data points are within the findings period, the earliest date within the findings will be your Enrollment Start Date.
- And one data point is outside the findings period, but the dates from the other two data points are within **30 days** of each other AND both data points fall within the findings, use the earliest date within the findings as the Enrollment Start Date.
- And there is no CCI data, use the borrower's date as the Enrollment Start Date.
- IF all you have is an NSLDS date (no CCI data and borrower's date is blank), set it to 1.4 with a task to ask the borrower about the enrollment date.

**Repeat the above steps for each distinct program found on the application/CCI data.**

**Review the Findings:**

1. Using the Everest/WyoTech Findings list or the Heald Findings list, locate the first campus attended by the borrower as alleged on the borrower's application and then the corresponding program.

---

[4] If the borrower does not have a program/credential/date listed you may still be able to adjudicate the case if there is CCI data.

5

DOE00006333

          i.   **NOTE:** if the borrower's application does not contain the enrollment begin date or the program (on either the application itself or an attached official school document) but we have CCI data, you may use the CCI data to adjudicate the claim.  If there is no CCI data available and you are unable to adjudicate the claim, set the status to **1.4** and task the Tier 1 reviewer with reaching out to the borrower.

    b.  If the campus is not on the findings lists, then there are no eligible programs at this campus.

    c.  If the program is not on the findings list for a given campus then that program has no eligible coverage dates.

          i.   **NOTE:** this is not necessarily the case for California campuses.  If the program is not listed under a given California campus on the findings lists, please consult the California Exception Instructions at the end of this packet to determine whether there are eligible coverage dates for that program at the campus.

2.  Using the findings lists determine whether the enrollment start date for this program is within the listed coverage dates for the program.

    a.  **NOTE:** on the early attestation forms the earliest date a borrower could enter was July 2010, however some borrowers wrote their actual date in the comment section of the form.

3.  Repeat steps 1 and 2 for all other programs.

4.  Determine how many programs fall within the findings and go to the appropriate next step:

    **a.**  **Go to STEP FIVE Approval Instructions if:**

          i.   The earliest program (either from borrower application or school provided data) falls within the findings

          ii.  The earliest program alleged on the borrower's application falls within the findings (even if an earlier program from the school provided data falls outside the findings)

    **b.**  **Go to STEP FIVE Dual Program instructions if:**

          i.   The earliest program alleged **on the borrower's application** falls outside the findings, but a later program falls within the findings

    **c.**  **Go to STEP FIVE Denial instructions if:**

          i.   All programs fall outside the findings.

6

DOE00006334

**STEP FIVE:  ADJUDICATING THE JPR CLAIM**

<u>Approval Instructions</u>

You should only be here if the earliest program (either from borrower application or school provided data) falls within the findings or the earliest program alleged on the borrower's application falls within the findings (even if an earlier program from the school provided data falls outside the findings).

**If the earliest approvable program** is found on the borrower's application or official school document, add a review with the Recommendation as **"Approved"** and the Recommendation Reason as **"Approve**." However, if the borrower has an approvable program and date on their application, but the CCI data **AND** NSLDS loan information indicate the borrower attended that program at a time NOT covered by the findings add a review stating "**Out due to QC**" as opposed to "Approve."

If the earliest approvable program is found <u>only</u> in the CCI data, add a review stating **"In due to QC."**

<u>Add the Controlling Date & Source to Your Review:</u>
The controlling date will be the earliest Enrollment Start Date (from Step 4) <u>within the findings period</u>. Enter the source that corresponds to your controlling date.[5]

Remember: Check if the enrollment start date on the borrower's application, the CCI data, and NSLDS data match.  If two of the three data points match, the date is confirmed and the date will be your Enrollment Start Date.

If the data points do not match:
- And all three data points are within the findings period, the earliest date within the findings will be your Enrollment Start Date.
- And one data point is outside the findings period, but the dates from the other two data points are within **30 days** of each other AND both data points fall within the findings, use the earliest date within the findings as the Enrollment Start Date.
- And there is <u>no CCI data,</u> use the borrower's date as the Enrollment Start Date.

<u>Add the Applicable Program & Source to Your Review:</u>
Enter the program the borrower attended and the credential.  For consistency, enter the program and credential as it appears on the findings sheet.  Select the source for the program.[6]  If the borrower attended multiple programs that fall within the findings write "Update at Relief" as the Applicable Program.

**NOTE:**  Often if there is no school provided data it is because the application is from a parent for a parent plus loan.  If there is no school provided data, double check the "Student SSN" in Salesforce.  You will often be able to find the CCI data by searching the "Student SSN."

If the borrower has NOT made a JPR allegation (see STEP THREE):
- If the application is an attestation form and the borrower has an approvable JPR allegation add a review stating **Incomplete Application.**  Change global status to **1.4** and leave a comment saying that the attestation is not signed.

---

[5] Currently in Salesforce there is no dropdown for CCI data.  If your controlling date comes from CCI data, select NSLDS as the drop down.
[6] Remember an official school document will override any other data source.

7

DOE00006335

- If the application is not an attestation form and the borrower does not make a JPR allegation (see STEP THREE), add a review with the Recommendation as **"Denied"** and the Recommendation Reason as **"Lack of Reliance"**

Save your review.  Propagate the review up to the allegation.  Propagate the allegation up to the case. Change the case status to **2.21 (Ready for QC)** if you are off 100% QC and change the case owner to the "BD Quality Control Queue."  Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer if you are on 100% QC.

8

DOE00006336

## STEP FIVE:  ADJUDICATING THE JPR CLAIM

### Dual Program Instructions

You should only be in this section if the earliest program alleged **on the borrower's application** falls outside the findings, but a later program falls within the findings.  If the date on the borrower's application is outside the findings, but the date from the CCI data, and the date from the NSLDS data are within **30 days** of each other AND both the CCI date and NSLDS date falls within the findings, use the earliest date within the findings and move to **STEP FIVE: Approval Instructions.**

If the later program, that falls within the findings, is only found in the CCI data add a review with the Recommendation at "Partial" and the Recommendation Reason as **"Dual Program Due to QC."**

If the later program, that falls within the findings, is listed on the borrower's application add a review Recommendation at "Partial" and the Recommendation Reason as **"Dual Program, First Out."**

### Add the Controlling Date & Source to Your Review:
The controlling date will be the earliest Enrollment Start Date (from Step 4) <u>within the findings period</u>. Enter the source that corresponds to your controlling date.

### Add the Applicable Program & Source to Your Review:
Enter the program the borrower attended and the credential.  For consistency, enter the program and credential as it appears on the findings sheet.  Select the source for the program.[7]

### Determine if Borrower May be Eligible for Non-JPR Relief:
If the borrower made substantive non-JPR allegations <u>against the earlier program that is outside the findings period</u> there is an opportunity for greater relief.  If necessary, transcribe any additional allegations into Salesforce[8]

If the borrower has NOT made a JPR allegation (see STEP FIVE):
- If the application is an attestation form and the above instructions lead you to put **Dual Program first out, or Dual program due to QC,** as the JPR recommendation; instead put **Incomplete Application.**  Change global status to **1.4** and leave a comment saying that the attestation is not signed.
- If the application is **NOT** an attestation form and the below instructions lead you to put **Dual Program first out, or Dual program due to QC** as the JPR recommendation; instead put **Non-Reliance.**

Save your review.  Propagate the review up to the allegation.  Propagate the allegation up to the case.  If the borrower made substantive non-JPR allegations, change the case status to **2.2 (EU Review in Progress)**.  If the borrower made no substantive non-JPR allegations, change the case status to **2.21 (Ready for QC)** if you are off 100% QC and change the case owner to the "BD Quality Control Queue." Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer if you are on 100% QC.

---

[7] Remember an official school document will override any other data source.
[8] If the allegations are more than a few sentences you may just add the allegation and type "See Application."

DOE00006337

## STEP FIVE:  ADJUDICATING THE JPR CLAIM

### Denial Instructions

Double check that all programs fall outside the coverage dates

Add JPR review with a Recommendation of **"Deny"** and the Recommendation Reason as "**Outside Coverage Dates**."

### Determine if Borrower May be Eligible for Non-JPR Relief:

If the borrower made substantive non-JPR allegations there is an opportunity for greater relief.   If necessary, transcribe any additional allegations into Salesforce[9]

Save your review.  Propagate the review up to the allegation.  Propagate the allegation up to the case.  If the borrower made substantive non-JPR allegations, change the case status to **2.2 (EU Review in Progress)**.  If the borrower made no substantive non-JPR allegations, change the case status to **2.21 (Ready for QC)** if you are off 100% QC and change the case owner to "BD Quality Control Queue." Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer if you are on 100% QC.

---

[9] If the allegations are more than a few sentences you may just add the allegation and type "See Application."

10

DOE00006338

## California Exception Instructions

If a program is not listed under a given California campus on the findings lists you will have to consult the master list for California campuses.

If a particular program appears on the master list but not on the findings list, it is because that program published correct rates. Thus, that program is ineligible for relief. However, if the borrower enrolled in a program that does not appear on either list see if the program the borrower applied for is eligible at any campus (to find the correct relief percentage).  If so, enter the program as the controlling program and the appropriate relief percentage.  This will generally apply only to WyoTech programs **for California campuses only**!

EXAMPLES:

EXAMPLE 1: The borrower enrolled in Motorsports Chassis Fabrication with Automotive Technology at Wyotech West Sacramento. This program is ineligible because it is on the master list but not on the findings list.

EXAMPLE 2: The borrower enrolled in Automotive Technology with Light Duty Diesel at Wyotech West Sacramento. This program is eligible because it is not on either list, but the findings list does show a similarly-sounding eligible Auto Tech program.

EXAMPLE 3: The borrower enrolled in medical assisting at Wyotech West Sacramento. This program is ineligible because, even though it is not on either the findings or master lists, there is no similarly sounding program on the findings list.

If you come across a situation like Example 2 at a non-California campus, please email John Stephenson with the BD# and move onto the next claim. This should be a rare situation.

**If you have any questions about program eligibility, especially regarding Wyotech programs, please email John**

DOE00006339

EVEREST/WYOTECH JOB PLACEMENT RATE FINDINGS

DOE00006340

**List of Everest/WyoTech Programs and Enrollment Dates Covered by Department of Education Findings**
**Updated June 15, 2016**

| STATE | CAMPUS/PROGRAM | FIRST DATE OF ENROLLMENT |
|---|---|---|
| CA | Everest Alhambra-Business Operations (Diploma) | 7/1/2010 – 9/30/2013 |
| CA | Everest Alhambra-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Alhambra-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest Alhambra-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Alhambra-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Alhambra-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Alhambra-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2013 |
| | | |
| CA | Everest Anaheim-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 |
| CA | Everest Anaheim-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Anaheim-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Anaheim-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 |
| | | |
| CA | Everest City of Industry-Business Management/Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest City of Industry-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 |
| CA | Everest City of Industry-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest City of Industry-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest City of Industry-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| CA | Everest City of Industry-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest City of Industry-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| CA | Everest Gardena-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Gardena-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Gardena-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Gardena-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest Gardena-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| CA | Everest Hayward-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Hayward-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Hayward-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Hayward-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| CA | Everest Los Angeles Wilshire-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Los Angeles Wilshire-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Los Angeles Wilshire-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Los Angeles Wilshire-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Los Angeles Wilshire-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |

1

DOE00006341

| CA | Everest Los Angeles Wilshire-Pharmacy Technician (all credential levels) | 7/1/2010 – 9/30/2014 |
|----|----|----|
| CA | Everest Ontario-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest Ontario-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Applied Management (Bachelor) | 7/1/2011 – 9/30/2014 |
| CA | Everest Ontario Metro-Business (Associate) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Business (Bachelor) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Business Administration (AAS) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2014 |
| CA | Everest Ontario Metro-Nursing (Associate) | 7/1/2012 – 9/30/2014 |
| CA | Everest Ontario Metro-Paralegal (Associate) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest Reseda-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest Reseda-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Bernardino-Business (Associate) | 7/1/2012 – 9/30/2014 |
| CA | Everest San Bernardino-Criminal Justice (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| CA | Everest San Bernardino-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Bernardino-Electrician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Bernardino-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Bernardino-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Bernardino-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Francisco-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Francisco-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Francisco-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest San Francisco-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Jose-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Jose-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Jose-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Jose-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest San Jose-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |

DOE000006342

| CA | Everest Torrance-Medical Assistant (Diploma) | 7/1/2012 – 9/30/2014 |
| CA | Everest Torrance-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2014 |
| | | |
| CA | Everest West Los Angeles-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 |
| CA | Everest West Los Angeles-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest West Los Angeles-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | Everest West Los Angeles-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest West Los Angeles-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest West Los Angeles-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | Everest West Los Angeles-Paralegal (Associate) | 7/1/2013 – 9/30/2014 |
| CA | Everest West Los Angeles-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| CA | WyoTech Fremont-Applied Automotive Technology  - Advanced Diagnostics Concentration (Diploma) | 7/1/2010 – 9/30/2013 |
| CA | WyoTech Fremont-Applied Automotive Technology (Diploma) | 7/1/2010 – 9/30/2013 |
| CA | WyoTech Fremont-Automotive Technology/ Concentration in Automotive Diagnostics (Associate) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Fremont-Automotive Technology/ Concentration in Service Management (Associate) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Fremont-Commercial Heating Ventilation and Air Conditioning (CHVAC) (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | WyoTech Fremont-Electrician (Diploma) | 7/1/2011 – 9/30/2012 |
| CA | WyoTech Fremont-Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2011 – 9/30/2013 |
| CA | WyoTech Fremont-Motorcycle Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| CA | WyoTech Fremont-Plumbing Technology (Diploma) | 7/1/2011 – 9/30/2012 |
| CA | WyoTech Fremont-Residential Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| CA | WyoTech Long Beach-Automotive Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Long Beach-Automotive Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Long Beach-Electrician (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Long Beach-Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2010 – 9/30/2013 |
| CA | WyoTech Long Beach-Industrial Electrical Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Long Beach-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech Long Beach-Plumbing Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| CA | WyoTech West Sacramento-Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech West Sacramento-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech West Sacramento-Automotive Technology with Advanced Automotive Diagnostics (all credential levels) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech West Sacramento-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| CA | WyoTech West Sacramento-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |

3

DOE00006343

| | | |
|---|---|---|
| CO | Everest Aurora (CO)-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| CO | Everest Aurora (CO)-Business (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| CO | Everest Aurora (CO)-Criminal Justice (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| CO | Everest Aurora (CO)-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| CO | Everest Aurora (CO)-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| CO | Everest Aurora (CO)-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| CO | Everest Aurora (CO)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| CO | Everest Aurora (CO)-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012 |
| | | |
| CO | Everest Colorado Springs-Accounting (Associate) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Business (Associate) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Criminal Justice (Associate) | 7/1/2011 – 9/30/2013 |
| CO | Everest Colorado Springs-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| CO | Everest Colorado Springs-Legal Assistant/Paralegal (Associate) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| CO | Everest Colorado Springs-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2013 |
| CO | Everest Colorado Springs-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2013 |
| | | |
| CO | Everest Thornton-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Business (Associate) | 7/1/2011 – 9/30/2014 |
| CO | Everest Thornton-Business Accounting (Diploma) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| CO | Everest Thornton-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 |
| CO | Everest Thornton-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| CO | Everest Thornton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2013 |
| CO | Everest Thornton-Surgical Technologist (Associate) | 7/1/2010 – 9/30/2014 |
| | | |
| FL | Everest Brandon-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 - 9/30/2014 |
| FL | Everest Brandon-Accounting (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Applied Management (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Brandon-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Business (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Business Administration (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |

DOE000006344

| FL | Everest Brandon-Business Administration (Masters) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
|----|---|---|
| FL | Everest Brandon-Computer Information Science (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Computer Information Science (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Computer Office Technology and Applications (all credential levels) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Criminal Justice (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Criminal Justice (Masters) | 7/1/2010 – 9/30/2012 |
| FL | Everest Brandon-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Nursing (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Paralegal (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Paralegal (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Brandon-Radiologic Technician (Associate) | 7/1/2013 – 9/30/2014 |
| FL | Everest Brandon-Surgical Technologist (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Fort Lauderdale-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Fort Lauderdale-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Fort Lauderdale-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Fort Lauderdale-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Fort Lauderdale-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Hialeah-Business (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Hialeah-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Hialeah-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Hialeah-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Hialeah-Criminal Justice Social and Youth Services (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Hialeah-Diagnostic Card Sonogram (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Hialeah-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Hialeah-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Hialeah-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 |

5

DOE00006345

| FL | Everest Hialeah-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
|----|---|---|
| FL | Everest Hialeah-Patient Care Technician (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Hialeah-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Hialeah-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| | | |
| FL | Everest Jacksonville-Accounting (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Jacksonville-Applied Management (Associate) | 7/1/2011 – 9/30/2013 |
| FL | Everest Jacksonville-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Jacksonville-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Jacksonville-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Jacksonville-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Jacksonville-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Jacksonville-Business Administration (Master) | 7/1/2010 – 9/30/2014 |
| FL | Everest Jacksonville-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012– 9/30/2014 |
| FL | Everest Jacksonville-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Jacksonville-Criminal Justice (Master) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Jacksonville-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Jacksonville-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| FL | Everest Jacksonville-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| FL | Everest Jacksonville-Medical Assistant  (Diploma) | 7/1/2010 – 9/30/2011 |
| FL | Everest Jacksonville-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Jacksonville-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| FL | Everest Jacksonville-Paralegal (Associate) | 7/1/2010 – 9/30/2011 |
| FL | Everest Jacksonville-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 |
| | | |
| FL | Everest Kendall (Miami)-Applied Management (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Business (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Business Sales and Customer Design (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Criminal Investigations (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Kendall (Miami)-Patient Care Technician (Diploma) | 7/1/2013 – 9/30/2014 |
| | | |
| FL | Everest Lakeland-Accounting (Associate) | 7/1/2011 – 9/30/2012 |
| FL | Everest Lakeland-Applied Management (Associate) | 7/1/2013 – 9/30/2014 |

DOE00006346

| FL | Everest Lakeland-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
|---|---|---|
| FL | Everest Lakeland-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Lakeland-Business (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Lakeland-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Lakeland-Criminal Justice (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Lakeland-Criminal Justice (Bachelor) | 7/1/2013 – 9/30/2014 |
| FL | Everest Lakeland-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2013 |
| FL | Everest Lakeland-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Lakeland-Medical Assistant (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| FL | Everest Lakeland-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| FL | Everest Lakeland-Paralegal (Associate) | 7/1/2013 – 9/30/2014 |
| FL | Everest Lakeland-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2014 |
| | | |
| FL | Everest Largo-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Largo-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Business (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Business Administration (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Largo-Business Administration (Master) | 7/1/2010 – 9/30/2011 |
| FL | Everest Largo-Business Office Administration (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Business Sales and Customer Service (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Computer Information Science (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Largo-Computer Information Science (Bachelor) | 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Medical Insurance Billing and Coding (Associate) | 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Largo-Paralegal (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Largo-Paralegal (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Largo-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| FL | Everest Melbourne-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Melbourne-Business (Associate) | 7/1/2012 – 9/30/2013 |
| FL | Everest Melbourne-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Melbourne-Business Administration (Associate) | 7/1/2012 – 9/30/2013 |
| FL | Everest Melbourne-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Melbourne-Business Administration (Master) | 7/1/2011 – 9/30/2014 |

7

DOE00006347

| FL | Everest Melbourne-Business Office Administration (Diploma) | 7/1/2012 – 9/30/2013 |
|----|----|----|
| FL | Everest Melbourne-Computer Information Science (Associate) | 7/1/2010– 9/30/2011 |
| FL | Everest Melbourne-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Melbourne-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Melbourne-Film and Video (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Melbourne-Health Care Administration (Bachelor) | 7/1/2012 – 9/30/2013 |
| FL | Everest Melbourne-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Melbourne-Paralegal (Bachelor) | 7/1/2013 – 9/30/2014 |
| FL | Everest Melbourne-Pharmacy Technician (Associates) | 7/1/2013 – 9/30/2014 |
| FL | Everest Melbourne-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 |
| FL | Everest Miami-Applied Management (Associate) | 7/1/2013 – 9/30/2014 |
| FL | Everest Miami-Business (Associate) | 7/1/2011 – 9/30/2013 |
| FL | Everest Miami-Business Office Administration (Diploma) | 7/1/2011 – 9/30/2013 |
| FL | Everest Miami-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Miami-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Miami-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Miami-Heating. Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 |
| FL | Everest Miami-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Miami-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Miami-Medical Insurance Billing and Coding (Associates) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Miami-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Miami-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Miami-Pharmacy Technician (Diploma) | 7/1/2010 –9/30/2013 |
| FL | Everest Orange Park-Applied Management (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| FL | Everest Orange Park-Applied Management (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orange Park-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orange Park-Business (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orange Park-Business Office Administration | 7/1/2010 – 9/30/2014 |
| FL | Everest Orange Park-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orange Park-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orange Park-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orange Park-Electrician (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orange Park-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orange Park-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orange Park-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |

8

DOE00006348

| FL | Everest Orange Park-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
|---|---|---|
| FL | Everest Orange Park-Medical Insurance Billing and Coding (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orange Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orange Park-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| FL | Everest Orlando North – Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Accounting (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Accounting (Bachelor) | 7/1/2012 – 9/30/2013 |
| FL | Everest Orlando North-Business (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orlando North-Business Accounting (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Business Administration (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orlando North-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando North-Business Administration (Master) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Orlando North-Business Sales and Customer Service (Diploma) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orlando North-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2013 |
| FL | Everest Orlando North-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Orlando North-Criminal Justice (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Film and Video (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Health Care Administration (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011 |
| FL | Everest Orlando North-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orlando North-Medical Assistant (Associate) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orlando North-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orlando North-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2011 |
| FL | Everest Orlando North-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 |
| FL | Everest Orlando North-Paralegal (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando North-Pharmacy Technician (Associate) | 7/1/2012 – 9/30/2013 |
| FL | Everest Orlando North-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| FL | Everest Orlando South-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando South-Accounting (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Orlando South-Applied Management (Associate) | 7/1/2012 – 9/30/2014 |

9

DOE00006349

| FL | Everest Orlando South-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
|----|----|----|
| FL | Everest Orlando South-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Business (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Business Administration (Masters) | 7/1/2010 – 9/30/2012 |
| FL | Everest Orlando South-Business Sales and Customer Service (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando South-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2012 |
| FL | Everest Orlando South-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Orlando South-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Healthcare Administration (Bachelor) | 7/1/2012 – 9/30/2014 |
| FL | Everest Orlando South-Homeland Security (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orlando South-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Orlando South-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando South-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Orlando South-Paralegal (Associate) | 7/1/2010 – 9/30/2011 |
| FL | Everest Orlando South-Paralegal (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Orlando South-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Orlando South-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
|  |  |  |
| FL | Everest Pompano Beach-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Pompano Beach-Accounting (Bachelor) | 7/1/2010 – 9/30/2011 |
| FL | Everest Pompano Beach-Applied Management (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Pompano Beach-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Pompano Beach-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Business (Bachelor) | 7/1/2011– 9/30/2014 |
| FL | Everest Pompano Beach-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Business Administration (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Pompano Beach-Business Administration (Masters) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 |
| FL | Everest Pompano Beach-Computer Information Science (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |

10

DOE00006350

| FL | Everest Pompano Beach-Criminal Justice (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
|----|------|------|
| FL | Everest Pompano Beach-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Criminal Justice (Master) | 7/1/2011 – 9/30/2014 |
| FL | Everest Pompano Beach-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Pompano Beach-Homeland Security (Associate) | 7/1/2010 – 9/30/2011 |
| FL | Everest Pompano Beach-Hospitality Management (Associate) | 7/1/2010 – 9/30/2012 |
| FL | Everest Pompano Beach-Hospitality Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Pompano Beach-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Pompano Beach-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| FL | Everest Pompano Beach-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Pompano Beach-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 |
| FL | Everest Pompano Beach-Paralegal (Associate) | 7/1/2010  – 9/30/2013 |
| FL | Everest Pompano Beach-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2013 |
| FL | Everest Pompano Beach-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2013 |
|  |  |  |
| FL | Everest Tampa-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 |
| FL | Everest Tampa-Applied Management (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Applied Management (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Business (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Tampa-Business (Bachelor) | 7/1/2010 – 9/30/2014 |
| FL | Everest Tampa-Business Administration (Master) | 7/1/2010 – 9/30/2014 |
| FL | Everest Tampa-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Tampa-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2013 |
| FL | Everest Tampa-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 |
| FL | Everest Tampa-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Tampa-Criminal Justice (Bachelor) | 7/1/2012 – 9/30/2014 |
| FL | Everest Tampa-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| FL | Everest Tampa-Electrician (Diploma) | 7/1/2012 – 9/30/2014 |
| FL | Everest Tampa-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Medical Assistant (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |

DOE00006351

| FL | Everest Tampa-Medical Insurance Billing and Coding (Associates) | 7/1/2012 – 9/30/2013 |
|----|----|----|
| FL | Everest Tampa-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 |
| FL | Everest Tampa-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Paralegal (Bachelor) | 7/1/2013 – 9/30/2014 |
| FL | Everest Tampa-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011 |
| FL | Everest Tampa-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 |
| | | |
| GA | Everest Atlanta (Greenbriar)-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| GA | Everest Atlanta (Greenbriar)-Medical Administrative Assistant (Diploma) | 7/1/2013  – 9/30/2014 |
| GA | Everest Atlanta (Greenbriar)-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| GA | Everest Atlanta (Greenbriar)-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| GA | Everest Atlanta (Greenbriar)-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 |
| | | |
| GA | Everest Decatur-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| GA | Everest Decatur-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| GA | Everest Decatur-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| GA | Everest Decatur-Respiratory Care | 7/1/2010 – 9/30/2014 |
| | | |
| GA | Everest Jonesboro-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Jonesboro-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Jonesboro-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Jonesboro-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 |
| GA | Everest Jonesboro-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| GA | Everest Jonesboro-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 |
| | | |
| GA | Everest Marietta-Massage Therapy (all credential levels) | 7/1/2010 – 9/30/2014 |
| GA | Everest Marietta-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Marietta-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Marietta-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 |
| GA | Everest Marietta-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| | | |
| GA | Everest Norcross-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| GA | Everest Norcross-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2012 |
| GA | Everest Norcross-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| GA | Everest Norcross-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| GA | Everest Norcross-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| | | |
| IL | Everest Burr Ridge-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |

12

DOE000006352

| IL | Everest Burr Ridge-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
|----|----|----|
| IL | Everest Burr Ridge-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Burr Ridge-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| IL | Everest Chicago-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| IL | Everest Chicago-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| IL | Everest Chicago-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| IL | Everest Chicago-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| IL | Everest Melrose Park-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Melrose Park-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Melrose Park-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Melrose Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Melrose Park-Pharmacy Technician (Associate) | 7/1/2013 – 9/30/2014 |
| | | |
| IL | Everest Merrionette Park-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Merrionette Park-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Merrionette Park-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| IL | Everest Merrionette Park-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| IL | Everest Merrionette Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Merrionette Park-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| | | |
| IL | Everest North Aurora (IL)-Electrician (Diploma) | 7/1/2012 – 9/30/2014 |
| IL | Everest North Aurora (IL)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| IL | Everest North Aurora (IL)-Medical Assistant (all credential levels) | 7/1/2010 – 9/30/2014 |
| IL | Everest North Aurora (IL)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| IL | Everest Skokie-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2013 |
| IL | Everest Skokie-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Skokie-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| IL | Everest Skokie-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 |
| IL | Everest Skokie-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| IL | Everest Skokie-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| | | |
| IN | Everest Merrillville-Business Accounting (all credential levels) | 7/1/2010 – 9/30/2014 |
| IN | Everest Merrillville-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| IN | Everest Merrillville-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 |

13

DOE00006353

| IN | Everest Merrillville-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012  – 9/30/2013 |
|----|----|----|
| IN | Everest Merrillville-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| IN | Everest Merrillville-Practical Nursing (Diploma) | 7/1/2013 – 9/30/2014 |
| | | |
| MA | Everest Brighton-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| MA | Everest Brighton-Massage Therapy (all credential levels) | 7/1/2010 – 9/30/2014 |
| MA | Everest Brighton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MA | Everest Brighton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| MA | Everest Chelsea-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2013 |
| MA | Everest Chelsea-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| MA | Everest Chelsea-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| MA | Everest Chelsea-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| MA | Everest Chelsea-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| MI | Everest Dearborn-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| MI | Everest Dearborn-Massage Therapy (Associates) | 7/1/2013 – 9/30/2014 |
| MI | Everest Dearborn-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 |
| MI | Everest Dearborn-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| MI | Everest Dearborn-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| MI | Everest Dearborn-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 |
| MI | Everest Dearborn-Patient Care Technician (Diploma) | 7/1/2013 – 9/30/2014 |
| MI | Everest Dearborn-Pharmacy Technician (all credential levels) | 7/1/2010 – 9/30/2014 |
| | | |
| MI | Everest Detroit-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| MI | Everest Detroit-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| MI | Everest Detroit-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| MI | Everest Detroit-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| MI | Everest Grand Rapids-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| MI | Everest Grand Rapids-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| MI | Everest Grand Rapids-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Grand Rapids-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Grand Rapids-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Grand Rapids-Practical Nursing (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| | | |
| MI | Everest Kalamazoo-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 |
| MI | Everest Kalamazoo-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| MI | Everest Kalamazoo-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 |
| MI | Everest Kalamazoo-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |

14

DOE00006354

| MI | Everest Kalamazoo-Medical Assistant (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
|---|---|---|
| MI | Everest Kalamazoo-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| MI | Everest Kalamazoo-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 |
| | | |
| MI | Everest Southfield-Computer Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Southfield-Electronics Computer Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Southfield-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 |
| MI | Everest Southfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Southfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MI | Everest Southfield-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| MN | Everest Eagan-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| MN | Everest Eagan-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MN | Everest Eagan-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MN | Everest Eagan-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 |
| MN | Everest Eagan-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| MO | Everest Springfield-Accounting (AAS) | 7/1/2010 – 9/30/2013 |
| MO | Everest Springfield-Accounting (Associate) | 7/1/2010 – 9/30/2013 |
| MO | Everest Springfield-Accounting (Bachelor) | 7/1/2010 – 9/30/2011 |
| MO | Everest Springfield-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011 |
| MO | Everest Springfield-Business Accounting (Diploma) | 7/1/2010 – 9/30/2011 |
| MO | Everest Springfield-Business Administration (AAS) | 7/1/2010 – 9/30/2014 |
| MO | Everest Springfield-Business Administration (Associate) | 7/1/2010 –9/30/2014 |
| MO | Everest Springfield-Computer Information Science (AAS) | 7/1/2011 –9/30/2014 |
| MO | Everest Springfield-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 |
| MO | Everest Springfield-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| MO | Everest Springfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MO | Everest Springfield-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| MO | Everest Springfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| MO | Everest Springfield-Paralegal (Associate) | 7/1/2010 –9/30/2014 |
| MO | Everest Springfield-Paralegal (Bachelor) | 7/1/2010 – 9/30/2014 |
| | | |
| MO | Everest St. Louis (Earth City)-Business Accounting (Diploma) | 7/1/2010 – 9/30/2014 |
| MO | Everest St. Louis (Earth City)-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| MO | Everest St. Louis (Earth City)-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| MO | Everest St. Louis (Earth City)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |

15

DOE00006355

| MO | Everest St. Louis (Earth City)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
|---|---|---|
| MO | Everest St. Louis (Earth City)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 |
| MO | Everest St. Louis (Earth City)-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| NJ | Everest South Plainfield-Electrician (Diploma) | 7/1/2012 – 9/30/2014 |
| NJ | Everest South Plainfield-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| NJ | Everest South Plainfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| NJ | Everest South Plainfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| NJ | Everest South Plainfield-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 |
| NJ | Everest South Plainfield-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| NV | Everest Henderson-Accounting (Associate) | 7/1/2010 – 9/30/2011 7/1/2012 – 9/30/2014 |
| NV | Everest Henderson-Business (Associate) | 7/1/2012 – 9/30/2014 |
| NV | Everest Henderson-Criminal Justice – SAS | 7/1/2010 – 9/30/2014 |
| NV | Everest Henderson-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| NV | Everest Henderson-Massage Therapy | 7/1/2010 – 9/30/2014 |
| NV | Everest Henderson-Nursing (Associate) | 7/1/2013 – 9/30/2014 |
| NV | Everest Henderson-Paralegal – SAS | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| NV | Everest Henderson-Paralegal (Associate) | 7/1/2010 – 9/30/2011 7/1/2012 – 9/30/2013 |
| | | |
| NY | Everest Rochester-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| NY | Everest Rochester-Administrative Office Technology (Associate) | 7/1/2011 – 9/30/2013 |
| NY | Everest Rochester-Business (Associate) | 7/1/2011 – 9/30/2014 |
| NY | Everest Rochester-Business Accounting and Applications (Diploma) | 7/1/2010 – 9/30/2014 |
| NY | Everest Rochester-Business Management (Diploma) | 7/1/2010 – 9/30/2014 |
| NY | Everest Rochester-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| NY | Everest Rochester-Medical Assistant (AAS) | 7/1/2010 – 9/30/2013 |
| NY | Everest Rochester-Medical Assistant (Associate) | 7/1/2010 – 9/30/2013 |
| NY | Everest Rochester-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| | | |
| OH | Everest Columbus (Gahanna)-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 |
| OH | Everest Columbus (Gahanna)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| OH | Everest Columbus (Gahanna)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| OH | Everest Columbus (Gahanna)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| OH | Everest Columbus (Gahanna)-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| | | |
| OR | Everest Portland-Accounting (Associate) | 7/1/2011 – 9/30/2014 |

16

DOE00006356

| OR | Everest Portland-Accounting (Diploma) | 7/1/2011 – 9/30/2014 |
|---|---|---|
| OR | Everest Portland-Administrative Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Criminal Justice (Associate) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 |
| OR | Everest Portland-Network and Internet Security Specialist (Diploma) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Paralegal (Associate) | 7/1/2011 – 9/30/2014 |
| OR | Everest Portland-Pharmacy Technician (Associate) | 7/1/2011 – 9/30/2013 |
| OR | Everest Portland-Pharmacy Technician (Diploma) | 7/1/2011 –9/30/2014 |
| | | |
| OR | Everest Tigard- Massage Therapy (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| OR | Everest Tigard-Massage Therapy Spa Specialist (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| OR | Everest Tigard-Massage Therapy Sports Specialist (Diploma) | 7/1/2010 – 9/30/2014 |
| OR | Everest Tigard-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| OR | Everest Tigard-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2012 |
| OR | Everest Tigard-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 |
| | | |
| PA | Everest Bensalem-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| PA | Everest Bensalem-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| PA | Everest Bensalem-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| | | |
| PA | Everest Pittsburgh-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| PA | Everest Pittsburgh-Business (Associate) | 7/1/2010 – 9/30/2014 |
| PA | Everest Pittsburgh-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| PA | Everest Pittsburgh-Career Access Program | 7/1/2010 – 9/30-2014 |
| PA | Everest Pittsburgh-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 |
| PA | Everest Pittsburgh-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| PA | Everest Pittsburgh-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| PA | Everest Pittsburgh-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| PA | Everest Pittsburgh-Paralegal (Associate) | 7/1/2010 – 9/30/2011 |
| PA | Everest Pittsburgh-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| PA | Everest Pittsburgh-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| PA | Everest Pittsburgh-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| | | |
| PA | WyoTech Blairsville-Auto/Diesel Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 |

17

DOE-00006357

| PA | WyoTech Blairsville-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 |
|---|---|---|
| PA | WyoTech Blairsville-Automotive Technology with High Performance Power Transmission (Diploma) | 7/1/2010 – 9/30/2014 |
| PA | WyoTech Blairsville-Automotive Technology with Light Duty Diesel (Diploma) | 7/1/2010 – 9/30/2014 |
| PA | WyoTech Blairsville-Automotive Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| PA | WyoTech Blairsville-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2011 – 9/30/2013 |
| PA | WyoTech Blairsville-Collision/Refinishing Technology and Management (Associate) | 7/1/2011 – 9/30/2014 |
| PA | WyoTech Blairsville-Diesel Technology and Management (Associate) | 7/1/2012 – 9/30/2014 |
| PA | WyoTech Blairsville-Diesel Technology with High Performance Power Transmission (Diploma) | 7/1/2012 – 9/30/2014 |
| PA | WyoTech Blairsville-Diesel/Auto Vehicle Technology (Diploma) | 7/1/2012 – 9/30/2014 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Automotive Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Diesel Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2011 – 9/30/2014 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2011 – 9/30/2014 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Diesel Technology (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Business (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Electrical Technician (Diploma) | 7/1/2012 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Electrician (Diploma) | 7/1/2012 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Medical Assistant (Associate) | 7/1/2010 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| TX | Everest Arlington (Mid Cities)-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |

18

DOE00006358

| | | |
|---|---|---|
| TX | Everest Austin-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| TX | Everest Austin-Electrical Technician (Diploma) | 7/1/2012 – 9/30/2014 |
| TX | Everest Austin-Electrician (Diploma) | 7/1/2012 – 9/30/2014 |
| TX | Everest Austin-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| TX | Everest Austin-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Austin-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Austin-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 |
| | | |
| TX | Everest Dallas-Business Administration (Associate) | 7/1/2011 – 9/30/2014 |
| TX | Everest Dallas-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 |
| TX | Everest Dallas-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| TX | Everest Dallas-Medical Assistant (Associate) | 7/1/2013 – 9/30/2014 |
| TX | Everest Dallas-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| TX | Everest Dallas-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Dallas-Paralegal (Associate) | 7/1/2012 – 9/30/2014 |
| | | |
| TX | Everest Fort Worth North-Business (Associate) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Business Administration (AAS) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Business Administration (AS) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 |
| TX | Everest Fort Worth North-Dental Assisting (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Fort Worth North-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Medical Assisting (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 |
| TX | Everest Fort Worth North-Paralegal (AAS) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Paralegal (Associate) | 7/1/2010 – 9/30/2014 |
| TX | Everest Fort Worth North-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| | | |
| TX | Everest Fort Worth South-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 |
| TX | Everest Fort Worth South-Medical Administrative Assistant (Diploma) | 7/1/2012 – 9/30/2013 |
| TX | Everest Fort Worth South-Medical Assistant (Diploma) | 7/1/2012 – 9/30/2013 |
| TX | Everest Fort Worth South-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| TX | Everest Houston (Bissonnet)-Carpentry (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Houston (Bissonnet)-Electrical Technician (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Houston (Bissonnet)-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2012 – 9/30/2014 |
| TX | Everest Houston (Bissonnet)-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| TX | Everest Houston (Bissonnet)-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |

19

DOE00006359

| TX | Everest Houston (Bissonnet)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
|---|---|---|
| TX | Everest Houston (Bissonnet)-Plumbing Technology (Diploma) | 7/1/2011 – 9/30/2014 |
| | | |
| TX | Everest Houston (Greenspoint)-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| TX | Everest Houston (Greenspoint)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012. |
| TX | Everest Houston (Greenspoint)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| | | |
| TX | Everest Houston (Hobby)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Houston (Hobby)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| TX | Everest Houston (Hobby)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2012 |
| | | |
| TX | Everest San Antonio-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| TX | Everest San Antonio-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| TX | Everest San Antonio-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 |
| TX | Everest San Antonio-Pharmacy Technology (all credential levels) | 7/1/2010 – 9/30/2014 |
| | | |
| UT | Everest Salt Lake City-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Computer Information Science (Bachelor) | 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Criminal Justice (Bachelor) | 7/1/2011 – 9/30/2014 |
| UT | Everest Salt Lake City-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Criminal Justice Social and Youth Services (Diploma) | 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| UT | Everest Salt Lake City-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 |
| UT | Everest Salt Lake City-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 |
| UT | Everest Salt Lake City-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 |
| UT | Everest Salt Lake City-Paralegal (Associate) | 7/1/2011 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Pharmacy Technician (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| UT | Everest Salt Lake City-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| | | |
| VA | Everest Arlington-Business (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Arlington-Business Administration (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Arlington-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |

DOE00006360

| VA | Everest Arlington-Homeland Security Specialist (Diploma) | 7/1/2010 – 9/30/2014 |
|----|----|----|
| VA | Everest Arlington-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| VA | Everest Arlington-Paralegal (Associate) | 7/1/2011 – 9/30/2014 |
| | | |
| VA | Everest Chesapeake-Accounting (Associate) | 7/1/2010 – 9/30/2013 |
| VA | Everest Chesapeake-Business (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Chesapeake-Business Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Chesapeake-Criminal Justice (Associate) | 7/1/2011 – 9/30/2013 |
| VA | Everest Chesapeake-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| VA | Everest Chesapeake-Electrician (Diploma) | 7/1/2012 – 9/30/2013 |
| VA | Everest Chesapeake-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2012 – 9/30/2013 |
| VA | Everest Chesapeake-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| VA | Everest Chesapeake-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| VA | Everest Chesapeake-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| VA | Everest Chesapeake-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| VA | Everest Chesapeake-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 |
| | | |
| VA | Everest Newport News-Business (Associate) | 7/1/2010 – 9/30/2013 |
| VA | Everest Newport News-Business Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Newport News-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 |
| VA | Everest Newport News-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 |
| VA | Everest Newport News-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| VA | Everest Newport News-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| VA | Everest Newport News-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 |
| | | |
| VA | Everest Tyson's Corner (McLean/Vienna)-Business Administration (Associate) | 7/1/2012 – 9/30/2014 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 |
| | | |
| WA | Everest Bremerton-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 |
| WA | Everest Bremerton-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Bremerton-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| WA | Everest Bremerton-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Bremerton-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |

21

DOE00006361

| WA | Everest Bremerton-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 |
|---|---|---|
| WA | Everest Bremerton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Everett-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 |
| WA | Everest Everett-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| WA | Everest Everett-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 |
| WA | Everest Everett-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 |
| WA | Everest Everett-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Renton-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Renton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Renton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Renton-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Renton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Seattle-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2013 |
| WA | Everest Seattle-Massage Therapy Spa Specialist (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Seattle-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Seattle-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WA | Everest Seattle-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 |
| WA | Everest Tacoma-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 |
| WA | Everest Tacoma-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| WA | Everest Tacoma-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 |
| WA | Everest Tacoma-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 |
| WA | Everest Tacoma-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 |
| WA | Everest Vancouver-Accounting (Associate) | 7/1/2010 – 9/30/2014 |
| WA | Everest Vancouver-Accounting/Business Administration (Diploma) | 7/1/2010– 9/30/2014 |
| WA | Everest Vancouver-Administrative Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Vancouver-Executive Assistant (Associate) | 7/1/2010 – 9/30/2012 |
| WA | Everest Vancouver-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 |
| WA | Everest Vancouver-Massage Therapy Spa Specialist (Diploma) | 7/1/2011 – 9/30/2014 |
| WA | Everest Vancouver-Massage Therapy Sports Specialist (Diploma) | 7/1/2011 – 9/30/2014 |
| WA | Everest Vancouver-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 |

22

DOE-00006362

| WA | Everest Vancouver-Medical Assistant (Associate) | 7/1/2010 – 9/30/2012 |
|---|---|---|
| WA | Everest Vancouver-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Vancouver-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 |
| WA | Everest Vancouver-Paralegal/Legal Assistant (Associate) | 7/1/2010 – 9/30/2011 |
| | | |
| WI | Everest Milwaukee-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 |
| | | |
| WV | Everest Cross Lanes-Electronics, Computer and Communication Technology (Associate) | 7/1/2010 – 9/30/2014 |
| WV | Everest Cross Lanes-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 |
| WV | Everest Cross Lanes-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WV | Everest Cross Lanes-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| | | |
| WY | WyoTech Laramie-Auto/Diesel Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Automotive Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Collision Technology (all credential levels) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Collision/Refinishing (all credential levels) | 7/1/2010 – 9/30/2012 |
| WY | WyoTech Laramie-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2012 |
| WY | WyoTech Laramie-Collision/Refinishing Technology and Management (Associate) | 7/1/2010 – 9/30/2012 |
| WY | WyoTech Laramie-Collision/Refinishing w/ St Rod & Mgmt (Diploma) | 7/1/2010 – 9/30/2012 |
| WY | WyoTech Laramie-Collision/Refinishing with Specialization in Automotive Fabrication (Diploma) | 7/1/2010 – 9/30/2012 |
| WY | WyoTech Laramie-Diesel Technician (all credential levels) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel Technology  (all credential levels) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel Technology Advanced (Diploma) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel Technology and Management (Associate) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel/Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Diesel/Automotive Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Diesel Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 |

DOE00006363

| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
|----|----|----|
| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |
| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Diesel Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 |

24

DOE00006364

HEALD JOB PLACEMENT RATE FINDINGS

DOE00006365

List of HEALD COLLEGE Programs and Enrollment Dates Covered by Department of Education Findings

| CAMPUS NAME | CAMPUS PROGRAM | ENROLLMENT ON OR AFTER |
|---|---|---|
| CONCORD | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration - Software Technologies Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | Dental Assisting | 7/1/2010 |
| | IT – Network Security | 7/1/2010 |
| | IT – Network Systems Administration | 7/1/2010 |
| | Medical Administrative Asst | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2011 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| FRESNO | Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration - Software Technologies Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Criminal Justice | 7/1/2010 |
| | IT Network Systems Administration | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2010 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| HAYWARD | Accounting | 7/1/2010 |

DOE00006366

| | | |
|---|---|---|
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Business Administration – Sales/Marketing Emphasis | 7/1/2010 |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | Dental Assisting | 7/1/2010 |
| | IT – Network Security | 7/1/2010 |
| | IT – Network Systems Administration | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2011 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| | | |
| HONOLULU | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Hospitality and Tourism | 7/1/2010 |
| | Business Administration – Sales and Marketing | 7/1/2010 |
| | Business Administration – Software Technologies | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Business Administration – Hospitality/Tourism Emphasis | 7/1/2010 |
| | Business Administration – Sales/Marketing Emphasis | 7/1/2010 |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2012 |
| | Dental Assisting | 7/1/2010 |

DOE00006367

| | | |
|---|---|---|
| | Electronics Technology | 7/1/2010 |
| | Health Information Technology | 7/1/2010 |
| | IT – Network Systems Administration | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Networking Technology (all emphases) | 7/1/2010 |
| | Office Skills | 7/1/2010 |
| | Paralegal | 2/13/2014 |
| | Pharmacy Technology | 7/1/2012 |
| | Web Design | 7/1/2010 |
| | | |
| MILIPITAS / SAN JOSE | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | Electronics Technology | 7/1/2010 |
| | IT – Network Security (all emphases) | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2010 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| PORTLAND | Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | Dental Assisting | 2/3/2014 |
| | IT – Network Systems Administration | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |

DOE00006368

| | | |
|---|---|---|
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2011 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| RANCHO CORDOVA | Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | IT – Network Security | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2010 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| ROSEVILLE | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | IT – Network Security | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2012 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| SALIDA / MODESTO | Accounting | 2/13/2014 |

DOE00006369

| | | |
|---|---|---|
| | Business Administration | 2/13/2014 |
| | Criminal Justice | 7/1/2012 |
| | Dental Assisting | 7/1/2011 |
| | Medical Assisting | 7/1/2011 |
| | Medical Insurance Billing & Coding | 7/1/2012 |
| | Medical Office Administration | 2/13/2014 |
| | Paralegal | 2/13/2014 |
| | | |
| SALINAS | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Criminal Justice | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |
| | Medical Office Administration | 7/1/2010 |
| | Office Skills | 7/1/2010 |
| | Paralegal | 7/1/2011 |
| | Pharmacy Technology | 7/1/2012 |
| | | |
| SAN FRANCISCO | Accounting | 7/1/2010 |
| | Business Accounting | 7/1/2010 |
| | Business Administration | 7/1/2010 |
| | Business Administration – Accounting | 7/1/2010 |
| | Business Administration – Criminal Justice | 7/1/2010 |
| | Business Administration – Software Technologies | 7/1/2010 |
| | Business Administration – Accounting Emphasis | 7/1/2010 |
| | Business Administration – Software Technology Emphasis | 7/1/2010 |
| | Entrepreneurship | 7/1/2010 |
| | Construction Management | 7/1/2012 |
| | Criminal Justice | 7/1/2010 |
| | Electronics Technology | 7/1/2010 |
| | IT – Network Security (all emphases) | 7/1/2010 |
| | IT – Network Systems Administration | 7/1/2010 |
| | Medical Assisting | 7/1/2010 |
| | Medical Insurance Billing & Coding | 7/1/2010 |

DOE00006370

|  |  |  |
|---|---|---|
|  | Medical Office Administration | 7/1/2010 |
|  | Office Skills | 7/1/2010 |
|  | Paralegal | 7/1/2011 |
|  | Pharmacy Technology | 7/1/2012 |
|  |  |  |
|  |  |  |
| STOCKTON | Accounting | 7/1/2010 |
|  | Business Administration | 7/1/2010 |
|  | Business Administration – Accounting | 7/1/2010 |
|  | Business Administration – Criminal Justice | 7/1/2010 |
|  | Business Administration – Accounting Emphasis | 7/1/2010 |
|  | Entrepreneurship | 7/1/2010 |
|  | Construction Management | 7/1/2012 |
|  | Criminal Justice | 7/1/2010 |
|  | Dental Assisting | 7/1/2010 |
|  | IT – Network Systems Administration | 7/1/2010 |
|  | Networking Technology – all emphases | 7/1/2010 |
|  | Medical Assisting | 7/1/2010 |
|  | Medical Insurance Billing & Coding | 7/1/2010 |
|  | Medical Office Administration | 7/1/2010 |
|  | Office Skills | 7/1/2010 |
|  | Paralegal | 7/1/2011 |
|  | Pharmacy Technology | 2/3/2014 |

DOE00006371

CORINTHIAN OPEID CHART

DOE00006372

### Heald/Everest/WyoTech Campuses – By State[*]
Source: Corinthian Colleges, Inc. FY 2011 10-K, available at
https://www.sec.gov/Archives/edgar/data/1066134/000104746911007635/a2205217z10-k.htm

| STATE | CAMPUS | DATE OF ACQUISITION/ OPENING | DATE OF DIVESTMENT/ CLOSING | OPEID(s) |
|---|---|---|---|---|
| AZ | Everest Mesa (no JPR findings) 5416 E. Baseline Road, Suite 200, Mesa, AZ 85206 | 11/15/2005 | 04/27/2015, closed (not bought by Zenith) | 02295000; 02295001; 02295002; 02295003 "A branch of the Phoenix Campus" |
| AZ | Everest Phoenix (no JPR findings) 10400 N. 25th Ave, Suite 190 Phoenix, AZ 85021 | 6/1/2000 | 04/27/2015, closed (not bought by Zenith) | 02295000/01/02/03 |
| | | | | |
| CA | Everest Alhambra 2215 W Mission Rd, Alhambra, CA 91803 | 1/1/1996 | 04/27/2015, closed (not bought by Zenith) | 00809000 |
| CA | Everest Anaheim 511 N Brookhurst St #300, Anaheim, CA 92801 | 7/1/1995 | 04/27/2015, closed (not bought by Zenith) | 01110700 |
| CA | Everest City of Industry 12801 Crossroads Pkwy. South City of Industry, CA 91746 (Identified as a WyoTech campus on the closure list) | 10/1/2000 | 04/27/2015, closed (not bought by Zenith) | 01287302 "A Branch of WyoTech, Long Beach, CA" |
| CA | Everest Gardena 1045 W. Redondo Beach Blvd., Suite 275, Gardena, CA 90247 | 1/1/1996 | 04/27/2015, closed (not bought by Zenith) | 01112300 |
| CA | Everest Hayward 22336 Main Street, Hayward, CA 94541 | 9/1/2001 | Closed 07/24/2014 | 00853200; 00853201 |
| CA | Everest Los Angeles Wilshire 3460 Wilshire Boulevard, Suite 500, Los Angeles, CA 90010 | 1/1/1996 | Closed 07/24/2014 | 00760600 |
| CA | Everest Ontario 1460 S. Milliken Ave., Ontario, CA 91761 | 10/1/2000 | 04/27/2015, closed (not bought by Zenith) | 03072300 |
| CA | Everest Ontario Metro 1819 South Excise Avenue, Ontario, CA 91761-8525 | 1/1/2001 | 04/27/2015, closed (not bought by Zenith) | 02250602 ("An Additional Location of Everest College, Springfield, MO") |
| CA | Everest Reseda 18040 Sherman Way, Suite 400, Reseda, CA 91335 | 7/1/1995 | 04/27/2015, closed (not bought by Zenith) | 01110900 |
| CA | Everest San Bernardino 217 E. Club Center Drive, Suite A San Bernardino, CA 92408-3752 | 7/1/1995 | 04/27/2015, closed (not bought by Zenith) | 00449400 |
| CA | Everest San Francisco 814 Mission St, San Francisco, CA 94103 | 10/1/1995 | Closed 07/24/2014 | 01102400 |
| CA | Everest San Jose 1245 S Winchester Blvd #102, San Jose, CA 95128 | 10/1/1995 | Closed 07/24/2014 | 01206100 |

[*] Campuses that did not have Job Placement Rate (JPR findings) are noted within this document.

| | | | | |
|---|---|---|---|---|
| CA | Everest Santa Ana (no JPR findings)<br>500 West Santa Ana Blvd. Santa Ana, CA92701-4559 | 9/20/2010 | 04/27/2015, closed (not bought by Zenith) | 00450302 |
| CA | Everest Torrance<br>1231 Cabrillo Ave., Torrance, CA 90501-2867 | 1/1/2000 | 04/27/2015, closed (not bought by Zenith) | 03195400 |
| CA | Everest West Los Angeles<br>3000 Robertson Blvd Ste. 300, Los Angeles, CA 90034<br>(Identified as a WyoTech campus on the closure list) | 10/1/2000 | 04/27/2015, closed (not bought by Zenith) | 01287301 |
| CA | Heald Concord<br>5130 Commercial Circle, Concord CA 94520 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723404 |
| CA | Heald Fresno<br>255 West Bullard, Fresno, CA 93704-1706 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723412 |
| CA | Heald Hayward<br>25500 Industrial Blvd., Hayward, CA 94545-2352 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723406 |
| CA | Heald Milpitas (San Jose)<br>341 Great Mall Parkway, Milpitas, CA95035-8008 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723405 |
| CA | Heald Modesto (Salida)<br>5260 Pirrone Court, Salida, CA 39568-9095 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723407 |
| CA | Heald Rancho Cordova<br>2910 Prospect Park Drive, Rancho Cordova, CA 95670-6005 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723411;  00747700 |
| CA | Heald Roseville<br>Seven Sierra Gate Plaza, Roseville, CA 95678-5303 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723408 |
| CA | Heald Salinas<br>1450 North Main Street, Salinas, CA 93906-5100 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723409 |
| CA | Heald San Francisco<br>875 Howard St., San Francisco, CA 94103-3032 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723400 |
| CA | Heald Stockton<br>1605 East March Lane, Stockton, CA 95210-5667 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723410 |
| CA | WyoTech Fremont<br>200 Whitney Place, Fremont, CA 94539-7663 | 8/7/2003 | 04/27/2015, closed (not bought by Zenith) | 00719000 |
| CA | WyoTech Long Beach<br>2161 Technology Place, Long Beach, CA 90810-3800 | 10/1/2000 | 04/27/2015, closed (not bought by Zenith) | 01287300 |
| CA | WyoTech West Sacramento<br>980 Riverside Pkwy, West Sacramento, CA 95605 | 1/27/2004 | Closed 11/06/2013 (not bought by Zenith) | 00915707; 00915706 |
| CO | Everest Aurora<br>14280 East Jewell Ave., Aurora CO 80012-5692 | 10/1/1996 | 02/02/2015, acquired by Zenith | 00450701 |
| CO | Everest Colorado Springs<br>1815 Jet Wing Drive, Colorado Springs, CO 80916 | 10/1/1996 | 02/02/2015, acquired by Zenith | 00450300 |

DOE00006374

| CO | Everest Thornton<br>9065 Grant St., Thornton, CO 80229-4339 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00450700 |
|---|---|---|---|---|
| FL | Everest Brandon<br>3924 Coconut Palm Dr., Tampa FL 33619-1354 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149905; 00153408 |
| FL | Everest Fort Lauderdale<br>1040 Bayview Dr., Fort Lauderdale, FL 33304 | 9/30/2003 | Closed 03/20/2012 | 3003201 |
| FL | Everest Hialeah<br>530 W 49th St, Hialeah, FL 33012 | 4/1/2002 | Closed 07/13/2013<br>(not bought by<br>Zenith) | 02121801 |
| FL | Everest Jacksonville<br>8226 Phillips Highway Jacksonville, FL 32256 | 7/1/2000 | 02/02/2015,<br>acquired by Zenith | 00149909; 02599805 |
| FL | Everest Kendall (Miami)<br>9020 SW 137th Avenue, Miami, FL 33186 | 4/1/2002 | Closed 10/30/2014<br>(not bought by<br>Zenith) | 00149914; 03003200 |
| FL | Everest Lakeland<br>995 East Memorial Blvd., Lakeland FL 33801-3801 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149908; 02599801 |
| FL | Everest Largo<br>1199 East Bay Dr., Largo, FL 33770-2556 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149907; 02599800 |
| FL | Everest Melbourne<br>2401 North Harbor City Blvd, Melbourne, FL 32935 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149902<br>("Additional<br>Location of Everest<br>University,<br>N. Orlando, FL") |
| FL | Everest Miami<br>111 Northwest 183rd Street, Miami, FL 33169-4759 | 4/1/2002 | Closed 11/14/2014<br>(not bought by<br>Zenith) | 00149913; 02121800 |
| FL | Everest Orange Park<br>805 Wells Rd, Orange park, FL 32073-1111 | 3/3/2004 | 02/02/2015,<br>acquired by Zenith | 00149906; 00153409 |
| FL | Everest Orlando North<br>541 Diplomat Circle, Orlando FL 32810-5601 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149900; 00149915 |
| FL | Everest Orlando South<br>9200 South Park Center Loop, Orlando, FL 32819 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149901 |
| FL | Everest Pompano Beach<br>225 North Federal Highway Pompano Beach, FL 33062-2522 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00814600; 00149910 |
| FL | Everest Tampa<br>5701 E. Hillsborough Avenue, Suite 2300, Tampa, FL 33610 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith | 00149904; 00153400 |
| FL | WyoTech Ormond Beach (Daytona Beach) (no JPR findings)<br>470 Destination Daytona Lane, Ormand Beach, FL 32174-1010 | 8/4/2004 | 02/02/2015,<br>acquired by Zenith | 02346200 |
| GA | Everest Atlanta (Greenbriar)<br>2841 Greenbriar Parkway SW, Atlanta, GA 30331-2620 | 11/15/2010 | 02/02/2015,<br>acquired by Zenith | 01110902; 00982808 |
| GA | Everest Atlanta (West) (no JPR findings)<br>101 Marietta Street NW Suite 600, Atlanta, GA 30303-8340 | 10/17/1996 | Closed 07/25/2008 | 02318600 |
| GA | Everest Decatur<br>2460 Wesley Chapel Rd,  Ste 25A Decatur, GA 30035 | 5/1/2000 | Closed or<br>12/31/2012 | 1035601 |
| GA | Everest Jonesboro<br>6431 Tara Blvd., Jonesboro, GA 30236 | 4/1/2000 | 02/02/2015,<br>acquired by Zenith | 03372304 |
| GA | Everest Marietta<br>1600 Terrell Mill Road, Suite G, Marietta, GA 30067-4163 | 4/1/2000 | 02/02/2015,<br>acquired by Zenith | 01110901 |

| GA | Everest Norcross<br>1750 Beaver Ruin Rd., Suite 500, Norcross, GA 30093 | 3/31/2003 | 02/02/2015, acquired by Zenith | 01112301 ("A Branch of Everest Institute, Southfield, MI"); 00982811 |
|---|---|---|---|---|
| HI | Heald Honolulu<br>1500 Kapliolani Blvd., Honolulu, HI 96814-3704 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723401 |
| IL | Everest Bedford Park (no JPR findings)<br>7414 South Cicero Ave., Bedford Park, IL 60629-5819 | 1/26/2011 | 02/02/2015, acquired by Zenith | 00809003 |
| IL | Everest Burr Ridge<br>6880 North Frontage Road, Suite 400, Burr Ridge, IL 60527-7826 | 7/2/2002 | 02/02/2015, acquired by Zenith | 01185802 |
| IL | Everest Chicago<br>247 South State Street #400; Chicago, IL 60604 (needs to be verified) | 6/26/2003 | 06/20/2012 | 1102401 |
| IL | Everest Melrose Park<br>1101 West North Avenue, Suite 1, Melrose park, IL 60160-1516 | 2/24/2011 | 02/02/2015, acquired by Zenith | 01185803 |
| IL | Everest Merrionette Park<br>11560 South Kedzie Ave., Merrionette Park, IL 60803-4517 | 10/19/2005 | 02/02/2015, acquired by Zenith | 0014991; 00814604 |
| IL | Everest North Aurora<br>150 South Lincoln Way, Suite 100, North Aurora, IL 60542-1610 | 2/1/2005 | Closed 10/27/2014 (not bought by Zenith) | 01151002 |
| IL | Everest Skokie<br>9811 Woods Drive, Suite 200, Skokie, IL 60077-1074 | 5/1/2001 | 02/02/2015, acquired by Zenith | 01185800 |
| IN | Everest Merrillville<br>8585 Broadway, Suite 200, Merrillville, IN 46410 | 2/1/2001 | 02/02/2015, acquired by Zenith, teach-out | 02100402 ("A Branch of Everest Institute, Grand Rapids, MI 49525") |
| MA | Everest Brighton<br>1505 Commonwealth Avenue, Brighton, Massachusetts 02135 | 1/1/1996 | Closed 10/27/2014 (not bought by Zenith) | 01151000 |
| MA | Everest Chelsea<br>70 Everett Avenue, Chelsea, Massachusetts 02150 | 3/30/2004 | 02/02/2015, acquired by Zenith, teach-out | 00809002; 00982809 |
| MD | Everest Silver Spring (no JPR findings)<br>8757 Georgia Ave, Silver Spring, MD 20910 | 2/8/2005 | 02/02/2015, acquired by Zenith, teach-out | 00907906 |
| MI | Everest Dearborn<br>23400 Michigan Ave., Dearborn, MI 48124-1927 | 3/1/2001 | 02/02/2015, acquired by Zenith | 00982801 |
| MI | Everest Detroit<br>300 River PlaceDrive, Suite 1000, Detroit 48207-4297 | 12/23/2003 | 02/02/2015, acquired by Zenith | 00982803 |
| MI | Everest Grand Rapids<br> 1750 Woodworth St NE, Grand Rapids, MI 49525 | 2/2/2001 | 02/02/2015, acquired by Zenith, teach-out | 02100400 |
| MI | Everest Kalamazoo<br>5177 W Main St, Kalamazoo, MI 49009 | 2/1/2001 | 02/02/2015, acquired by Zenith, teach-out | 02100401 |

| MI | Everest Southfield<br>21107 Lahser Road, Southfield, Michigan 48033-4400 | 1/1/1996 | 02/02/2015, acquired by Zenith | 00982800 |
|----|---|---|---|---|
| MN | Everest Eagan<br>1000 Blue Gentian Rd #250, Eagan, MN 55121 | 6/17/2004 | 02/02/2015, acquired by Zenith, teach-out | 01035602 |
| MO | Everest Kansas City (no JPR findings)<br>1740 West 92nd St., Kansas City, MO 64114-3246 | 01/27/2012 | 02/02/2015, acquired by Zenith | 00149912 |
| MO | Everest Springfield<br>1010 West Sunshine, Springfield, MO 65807-2446 | 10/1/1996 | 02/02/2015, acquired by Zenith | 02250600 |
| MO | Everest St. Louis (Earth City)<br>3420 Rider Trail S, Earth City, MO 63045 | 3/31/2005 | 02/02/2015, acquired by Zenith, teach-out | 02300105 |
| NJ | Everest South Plainfield<br>5000 Hadley Road, Suite 100, South Plainfield, NJ 07080-1125 | 12/13/2005 | 02/02/2015, acquired by Zenith | 00982804 |
| NV | Everest Henderson<br>170 North Stephanie Street, Henderson, NV 89014-8810 | 10/1/1996 | 02/02/2015, acquired by Zenith | 02237501; 02237500 |
| NY | Everest Rochester<br>1630 Portland Ave., Rochester, NY 14621-3007 | 10/1/1996 | 04/27/2015, closed (not bought by Zenith) | 00481100 |
| OH | Everest Columbus (Gahanna)<br>825 Tech Center Drive, Gahanna, OH 43230 | 9/7/2004 | 02/02/2015, acquired by Zenith | 03072303 ("A Branch of Everest Institute, Southfield, MI"); 00982805 |
| OR | Everest Portland<br>425 SW Washington Ave., Portland OR 97204-2296 | 10/1/1996 | 02/02/2015, acquired by Zenith | 00907900 |
| OR | Everest Tigard<br>9600 Southwest Oak Street, 4th Floor, Tigard, OR 97223 | 8/4/2003 | 02/02/2015, acquired by Zenith | 02617506 |
| OR | Heald Portland<br>6035 Northeast 78th Court, Portland, OR 97218-9852 | 01/04/2010 | 04/27/2015, closed (not bought by Zenith) | 00723402 |
| PA | Everest Bensalem<br>3050 Tillman Drive Bensalem PA 19020 | 08/23/2011 | 02/02/2015, acquired by Zenith, teach-out | 02617507 |
| PA | Everest Pittsburgh<br>Town Place, Suite 1200, 100 Forbes Avenue Pittsburgh, Pennsylvania 15222 | 10/1/1996 | 02/02/2015, acquired by Zenith | 00709100 |
| PA | WyoTech Blairsville<br>500 Innovation Drive, Blairsville, PA 15717-8060 | 7/1/2002 | 02/02/2015, acquired by Zenith | 00915705 |
| TX | Everest Arlington (Mid Cities)<br>300 Six Flags Dr., Suite 100, Arlington, TX 76011-6630 | 6/9/2003 | 02/02/2015, acquired by Zenith | 00481102; 02250603 |
| TX | Everest Austin<br>9100 US Highway 290 East, Suite 100, Austin, TX 78754 | 10/2/2002 | 02/02/2015, acquired by Zenith | 00982802 |

DOE00006377

| TX | Everest Dallas<br>6080 North Central Expressway, Dallas, TX 75206-5209 | 2/3/2003 | 02/02/2015,<br>acquired by Zenith | 00907905 |
|---|---|---|---|---|
| TX | Everest Fort Worth<br>5237 North Riverside Drive, Suite 100,  Fort Worth, TX 76137 | 8/24/2004 | 02/02/2015,<br>acquired by Zenith,<br>teach-out | 02298501 |
| TX | Everest Fort Worth South<br>4200 South Freeway, Suite 1940, Fort Worth, TX76115-1407 | 3/22/2010 | 02/02/2015,<br>acquired by Zenith | 00450303 |
| TX | Everest Houston (Bissonnet)<br>9700 Bissonet Street, Houston, TX 77036-8014 | 6/30/2004 | 02/02/2015,<br>acquired by Zenith | 02606202; 00982812 |
| TX | Everest Houston (Greenspoint)<br>255 Northpoint Dr., Houston, TX 77060-3249 | 1/1/2000 | 02/02/2015,<br>acquired by Zenith | 02261302 |
| TX | Everest Houston (Hobby)<br>7151 Office City Dr., Houston, TX 77087-2737 | 12/1/2001 | 02/02/2015,<br>acquired by Zenith | 02261303 |
| TX | Everest San Antonio<br>6550 First Park Ten Blvd., San Antonio, TX 78213-3841 | 7/1/1995 | 02/02/2015,<br>acquired by Zenith | 02261300 |
| UT | Everest Salt Lake City<br>3280 3500 S, Salt Lake City, UT 84119 | 10/1/1996 | 02/02/2015,<br>acquired by Zenith,<br>teach-out | 02298500 |
| VA | Everest Arlington<br>801 N Quincy St-Ste 500, Arlington, VA 22203 | 1/2/2002 | Closed 04/7/2013 | 00450702 |
| VA | Everest Chesapeake<br>825 Greenbrier Circle, Chesapeake VA 23320-2637 | 3/1/1999 | 02/02/2015,<br>acquired by Zenith | 00926701 |
| VA | Everest Newport News<br>803 Diligence Dr., Newport News, VA 23606-4203 | 10/1/1995 | 02/02/2015,<br>acquired by Zenith | 00926700 |
| VA | Everest Tyson's Corner (McLean/Vienna)<br>8620 Westwood Center Dr, Vienna, VA 22182 | 6/2/2004 | 02/02/2015,<br>acquired by Zenith,<br>teach-out | 00450301 |
| VA | Everest Woodbridge (no JPR findings)<br>14555 Potomac Mills Road, Woodbridge, VA 22192-6808 | 07/01/2011* | 02/02/2015,<br>acquired by Zenith | 02617508 |
| WA | Everest Bremerton<br>155 Washington Ave., Suite 200, Bremerton, WA 98367-1835 | 8/4/2003 | 02/02/2015,<br>acquired by Zenith | 02300100 |
| WA | Everest Everett<br>906 SE Everett Mall Parkway, Everett, WA 9808-2610 | 8/4/2003 | 02/02/2015,<br>acquired by Zenith | 02300103 |
| WA | Everest Renton<br>981 Powell Avenue SW, Renton WA 98055-2990 | 7/1/1996 | 02/02/2015,<br>acquired by Zenith | 02606200 |
| WA | Everest Seattle<br>2111 N Northgate Way, Suite 218, Seattle, WA 98133-9018 | 8/4/2003 | 02/02/2015,<br>acquired by Zenith | 02617500 |
| WA | Everest Tacoma<br>2156 Pacific Avenue, Tacoma, WA 98402-3004 | 8/4/2003 | 02/02/2015,<br>acquired by Zenith | 02300104 |
| WA | Everest Vancouver<br>120 Northeast 136th Ave., Vancouver, WA 98684-6950 | 10/1/1996  8/4/2003 | 02/02/2015,<br>acquired by Zenith | 00907901 |
| WI | Everest Milwaukee<br>1311 N 6th St, Milwaukee, WI 53212 | 10/18/2010 | Closed 07/15/2013 | 00153410 |
| WV | Everest Cross Lanes<br>5514 Big Tyler Rd, Cross Lanes, WV 25313 | 7/1/1995 | 02/02/2015,<br>acquired by Zenith,<br>teach-out | 01035600 |

DOE00006378

| WY | WyoTech Laramie<br>4373 North 3rd Street, Laramie, WY 82072-9519 | 7/1/2002 | 02/02/2015,<br>acquired by Zenith | 00915700 |

109 Campuses total
- 28 campuses closed 04/27/2015, not purchased by Zenith
  https://studentaid.ed.gov/sites/default/files/corinthian-accreditors-state-agencies.pdf
- 53 Campuses acquired by Zenith, 02/02/2015, for continued operation
  https://studentaid.ed.gov/sites/default/files/corinthian-sale-list.xlsx
- 12 campuses acquired by Zenith, 02/02/2015, for teach out
  https://studentaid.ed.gov/sites/default/files/corinthian-teach-out-list-zenith.xlsx
- 16 closed prior to 2015
  https://www2.ed.gov/offices/OSFAP/PEPS/docs/closedschoolsearch.xlsx

DOE00006379

# JOB PLACEMENT RATE QC PROCESS

DOE00006380

**Contractor QC Process**

**100% QC:**

(1) During 100% QC contractors will be tasking completed cases to you for a QC review.  To access these claims click on "Cases" and select "My BD Cases" from the drop down.



(2) Click into your first case by selecting the first case number.  Scroll down to the "Allegations" section and click into the first allegation you are QCing:



(3) Once you are in the allegation, click "New Second-Level Review"



DOE00006381

(4) In the second level review, select the first level reviewer as the initial reviewer and fill in the applicable sections in the "Review" section.  If your review matches the first level review change the "Outcome" to "Pass" and save your review.

If your review does NOT match the first level review change the "Outcome" to "Fail."

Repeat this step for all applicable allegations (JPR/Guaranteed Employment/Transferability).

DOE00006382

(5) Note the case number/reviewer name/error in your QC report. **You do not need to make a note of every case you review; only those with major errors.** Major errors would be anything that changes the relief:

- Wrong controlling date *that changes the relief*. If the reviewer incorrectly used the CCI date instead of the borrower date, or vice versa, but either date is before the corresponding NSLDS date, then no harm no foul. We only care about a wrong controlling date when there are earlier loans that should be forgiven that would not be with the wrong date. (Or the opposite situation, where the controlling date is too early, thus forgiving loans that shouldn't be forgiven.)
- Wrong controlling program or wrong relief percentage
- Wrong recommendation *that changes the relief*. So yes, we absolutely want to know if a reviewer approved a claim that should be a denial, or vice versa. We want to know if a claim was marked approved that should be non-reliance or incomplete, or vice versa. We also want to know if a claim was marked dual program but should be full approval, or vice versa. But we do not care if a claim was marked "approve" but should be "in due to QC" as those recommendations lead to the same result.
- Wrong person is associated with the claim. (Eg: the claim was submitted for Mary Smith but the Tool information is for Joe Schmoe.)
- Adjudicated as a JPR claim but makes a non-JPR allegation that would potentially change the relief percentage or controlling date.
- Any missing information – eg: there is a correct review controlling date but the reviewer forgot to add it into the global controlling date.

(6) Please use the template below for your QC report. Please send all reports you've completed for the week to John Stephenson at the end of each week. In the feedback column, please briefly describe the error. If you have discovered no major errors, then the spreadsheet portion of the report can remain blank.

MAJOR ERRORS:

| BD# | Reviewer Name | Feedback |
|-----|---------------|----------|
|     |               |          |
|     |               |          |
|     |               |          |

(7) Move the case to status 2.3 and change the owner to "BD Adjudication Queue"

DOE-00006383

## Non-100% QC Process

(1) Open Salesforce and go to Cases.  In the drop down select "BD Quality Control Queue."



(2) Click into your first case by selecting the first case number.  Scroll down to the "Allegations" section and click into the first allegation you are QCing:



(3) Once you are in the allegation, click "New Second-Level Review"



(4) In the second level review, select the first level reviewer as the initial reviewer and fill in the applicable sections in the "Review" section.  If your review matches the first level review change the "Outcome" to "Pass" and save your review.

If your review does NOT match the first level review change the "Outcome" to "Fail."

Repeat this step for all applicable allegations (JPR/Guaranteed Employment/Transferability).

DOE00006384



(5) Click back to the case back and scroll down to "New Quality Control Review"



Select the initial reviewer as the user, change the outcome to "Pass" or "Fail" depending on your review of the allegations (Note – if even one allegation is incorrect you should mark the outcome here as "Fail").  If there is an error, add a note to the "Resolution Details" section for the initial reviewer regarding what was incorrect with the claim.

DOE00006385



(6) If the case fails the QC review, select the allegation that should drive the case. The update the case select the appropriate allegation by checking the box next two the allegation and selecting "Update Case."



(7) Note the case number/reviewer name/error in your QC report. **You do not need to make a note of every case you review; only those with major errors.** Major errors would be anything that changes the relief:

MAJOR ERRORS:

| BD# | Reviewer Name | Feedback |
|-----|---------------|----------|
|     |               |          |
|     |               |          |
|     |               |          |

(8) Move the case to status 2.3. and change the case owner to "BD Adjudication Queue"
(9) E-mail John Stephenson the QC Batch ID for every 5th batch you complete.

DOE00006386

# TYPES OF BD CLAIMS

DOE00006387

### How to Review a Borrower Allegation in a One-off or Small Batch Application

**Step One:  Did the borrower allege an act or omission by their school**
- In order to make a borrower defense claim the borrower must allege an act or omission by the school listed on their application.
  - If a borrower alleges an act or omission by someone or something other than the school on their application (for example another school, their loan servicer, or another student) then use the "borrower makes no allegations regarding the school" stock language from the protocol.  Otherwise move to step two.

**Step Two:  Does the act or omission by their school violate state law**
- The most common type of allegation we see allegations of misrepresentations.  In order to allege a misrepresentation that states a claim under state law the borrower must allege both a representation and the falsity of that representation in their application.  Further, the falsity alleged must match the representation.[1]
  - If the borrower has not alleged an act or omission by their school that violates state law use the "Allegation does not state a claim" stock language.  Otherwise move to step three.
    - **NOTE:**  The representation and the falsity may appear in different parts of the application
    - **NOTE:**  Checking the box on the universal form does not meet either the representation or falsity requirements, with the exception of Transfer claims.  If a the borrower checks the transfer claim box this checked box can be used to either meet the representation element or the falsity element for a transfer claim, but not both.

**Step Three:  Is the act or omission by the school covered by the borrower defense regulation**
- A borrower is not eligible for borrower defense relief based on claims that are not directly related to their loans or the educational services provided by the school.  For example personal injury claims or claims based on allegations of harassment are not bases for a borrower defense claim.
  - If the borrower alleges one of these violations of state law then we use the "not a BD type claim" stock language or, if there is the potential that the borrower can receive a different type of discharge, the appropriate stock language for that type of discharge. Otherwise move to Step four.

**Step Four:  Does the borrower provide evidence to support his/her claim**
- In order to be approved for a borrower defense claim the department must have evidence that proves all elements of the borrower's allegation.
  - If you think the borrower's allegation is proved by attached evidence or that the attached evidence would allow the department to discover additional material evidence through a limited targeted investigation then this allegation cannot be denied and you must contact your QCer for further direction.
  - If the borrower's allegation is not supported by sufficient evidence then the claim should be denied using the "insufficient evidence" stock language.

---

[1] Example:  "I was told that 85% of students have a job upon graduation, but in reality the percentage is much lower" states a claim.  However, "I was told that 85% of students have a job upon graduation, but I don't have a job" does not state a claim because the fact that the borrower doesn't have a job does not mean that the statement that 85% of students have a job upon graduation is false.

DOE00006388

<u>Treatment of Common Allegations - DRAFT</u>

<u>Employment Prospects</u>

Regardless of which narrative box someone uses, Employment Prospects claims are about representations regarding someone's employment outcomes as a result of going to that school/program – a guarantee of employment, the % of graduates working/working in the field, the salary they can expect to earn, the kinds of jobs for which they would be eligible with that degree, eligibility to sit for licensing examinations, etc.

**Employment Prospects allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**
- Misrepresentations of guaranteed jobs
  - Ex. "My school  promised me a job after I graduated, but I never got a job"
- Misrepresentations regarding salary/wages
  - Ex. "My school  told me I would make $60K a year upon graduation, but I only made minimum wage"
  - Ex. "My school told me dental assistants earn $30 per hour; but actually they only earn $12 per hour."
- Misrepresentations of Job Placement Rates
  - Ex. "My school told me 85% of graduates have jobs within 6 months of graduation, but that isn't true."
- Misrepresentations regarding a graduate's ability to work in field or sit for licensing exam
  - Ex. "My school said they were fully accredited, but when I graduated I was not eligible to get a job in my field of study."
  - "Ex. "My school told me that once I got this degree I could immediately get hired as a nurse; that's not true.  I need to have one year of clinical work before I can be hired."
  - Ex. "My school told me that after I graduated I could sit for the licensing exam, however when I went to take the exam I was told that my school was not properly accredited so I can't sit for the exam."
- Misrepresentations regarding an externship resulting in job placement
  - Ex. "My school promised me they would place me in an externship that would hire me after it ended.  My externship did not hire me."

**Employment Prospects Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**
- Allegations that include only one element of a misrepresentation
  - Ex. "The school promised me a job"
  - Ex. "I never got a job"
  - Ex. "There were no jobs available in my program when I graduated"
  - Ex. "I thought that I would get a job, but I'm working fast food instead"
- Allegations of misrepresentations where the falsity doesn't match the representation
  - Ex. "My school told me 85% of graduates have a job upon graduation, but I didn't have a job upon graduation."
- Pure omissions without the student alleging that the school had a duty to inform the student of the pertinent information
  - Ex. "My school never told me it would be hard to get a job as an underwater basket weaver"
  - Ex. "My school never told me that underwater basket weavers don't get paid well"

3

- General Claims regarding the value of education in getting a job, even if framed as misrepresentations
    - o   Ex. "My school told me that it is easier to get hired with a bachelors degree than with just a high school diploma"
    - o   Ex. "My school told me that people with masters degrees often have higher salaries than people with bachelors degrees"

<div align="center">

**Program Cost and Nature of Loan**

</div>

Regardless of which narrative box someone uses, Program Cost and Nature of Loan claims are about how much the program cost, how it was to be paid for, loans, repayment terms, etc.

**Program Cost and Nature of Loan allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of program cost
  - Ex. "My school told me one price but then I was charged a higher price"
- Misrepresentation of the nature of the financial aid (grants vs. loans)
  - Ex. "My school made me think I was getting all grants, but instead it turned out to be loans"
- Misrepresentation of loan repayment terms
  - Ex. "My school told me that I wouldn't have to start paying back my loans until six months after graduation, but after I graduated my loans became due immediately."
- Misrepresentations regarding what equipment was provided with tuition/fees
  - Ex. "My school promised that haircutting supplies were part of the tuition, but I never got the supplies and instead had to pay for them separately."

**Program Cost and Nature of Loan Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omissions
  - Ex. "My school didn't let me know that there were additional fees in addition to tuition"
- Misrep claims that leave out an element
  - Ex. "My school promised me that tuition would only be $10K a year"
- Misrep claims where falsity doesn't match the rep
  - "My school promised me that tuition would only be $10K a year, but when I got to school my dorm room was in bad condition"
- Complaints about school cost
  - Ex "the school cost too much"
- Complaints regarding value of school, even if framed as misrepresentations
  - Ex. "the school shouldn't have cost so much, I could have gotten the same education at as state school for half the tuition.
- Failure to inform borrower of other available forms of financial aid
  - Ex. "Nobody told me I could have gotten a grant from a private charity or from the state."
- Complaints about having to take out loans
  - "I couldn't afford this school so I had to take out massive loans"
- Failure to inform borrower of basic loan information
  - Ex. "The school never told me that my loans would accrue interest"
- Misrep re: loan counseling or failure to provide loan counseling
  - Ex. "The school did not provide me loan counseling."
  - Ex. "The school promised me loan counseling, but is wasn't useful"
  - Ex. "The school promised me loan counseling, but I never got it"

DOE-00006391

5

### Transferring Credits

Regardless of which narrative box someone uses, Transferring Credits claims are typically about whether a borrower is able to transfer credits from, or into, that school.

**Transfer of Credits allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**
- Misrepresentations of whether credits earned would be accepted by other schools
  - Ex.  "[checked box] my credits didn't transfer"
  - Ex. "[checked box] my school told me my credits would transfer"
  - Ex "[NO checked box] my school told me my credits would transfer to any other school, but when I tried to transfer nobody would accept my credits"
- Misrepresentations of whether degrees earned at that school would allow continuation into grad school
  - Ex. "My school told me that this degree would let me go on to any law school in the country"
- Misrepresentations that previously earned credits would transfer into this school
  - Ex. "My school told me that that they would accept all my community college credits, but when I enrolled only some credits were accepted."
  - Ex. "My school told me that they would accept all my community college credits, but when I enrolled I had to retake classes."
- Misrepresentations regarding institutional accreditation
  - Ex. "My school said they were fully accredited, but when I tried to transfer my credits not school would accept them."

**Transfer of Credits Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**
- Pure omission regarding transfer of credits
  - Ex. "My school never told me my credits wouldn't be accepted by other schools"
- Withholding transcripts
  - Ex. "I couldn't transfer because my school won't release my transcript until I pay them the balance of the tuition cost.
- Misrepresentation missing an element about transferring into a school
  - Ex. "[checked box] my former credits did not transfer into this school"
- School failed to assisted with the transfer process
  - Ex. "I was confused about how to transfer credits, when I asked the school to help me with the process nobody would help me."
- Transferability of some credits
  - Ex. "I tried to transfer my credits to [community college/state college], but they would only take 6 out of my 72 credits."

<u>**Career Services**</u>

Regardless of which narrative box someone uses, Career Services claims are about what the school promised to do to *help* the borrower find a job – not through the education itself, but through Career Services representatives, job fair, resume workshops, industry connections, etc.

**Career Services allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of the nature/type or availability of career services
  - Ex. "My school told me they would help me find a job, but when I went to the career services office nobody was ever there.  When I called nobody ever picked up the phone."
  - Ex. "My school told me they would provide resume help and have job fairs, but they never did either of those things.  All they did was send me links to job postings"
- Misrepresentations of the relationships the school has with employers
  - Ex. "My school promised me that they had strong relationships with local business, but when I contacted them they said they never heard of my school."

**Career Services Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omission
  - Ex. "My school never told me that they did not have a career services office"
- Misrepresentation allegation with missing element
  - Ex. "My school promised me that career services would help me find a job"
- Misrepresentation allegation where falsity doesn't match the representation
  - Ex. "My school promised to help me find a job, but I don't have a job"
- Complaints about quality of career services, even if framed as misrepresentations
  - Ex. "My school promised me that they had great career services, but it wasn't useful"

### Educational Services

Regardless of which narrative box someone uses, Educational Services claims are about curriculum, methods, instruction and instructors, etc.

**Educational Services allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Specific misrepresentations regarding what will be taught/how classes will be taught
  - Ex. "the school promised to teach me programming language X, but instead they taught me programing language Y"
  - Ex. "the school promised hands on training, but we were never allowed to use any of the equipment. We only learned by reading a book."
- Misrepresentations regarding to qualifications/certifications of the instructors
  - Ex. "My school told me that all of the instructors in the paralegal program were attorneys; that wasn't true"
- Misrepresentations of the availability of services such as tutoring
  - Ex. "I was told there would be tutoring opportunities if I needed extra help with classes, but when I tried to get a tutor there weren't any."
- Allegations that teachers were not licensed to teach in state or otherwise does not meet state's statutory or regulatory standards
  - "I found out that my teachers were not licensed to teach in the state of Massachusetts."
- Allegations that a given class did not have a teacher
  - Ex. "Our class had no teacher, meaning there was no instruction. We would just show up to a class room and nobody was there. We just read our textbooks to ourselves. "
  - Ex. "Our teacher was absent the second half of the semester and there was no substitute"
- Misrepresentations about program length/time to complete, number of credits necessary to complete, or number of hours of instruction that would be provided
  - Ex. "I told the school that I was being deployed in 9 months, and was told that the program only lasted 6 months. I enrolled, but a few months in learned that the program was actually 12 months long, which meant I couldn't complete the course.
- Misrepresentations regarding internship/externship availability or nature
  - Ex. "My school promised to place me in an externship, but they never did
  - Ex. "My school promised to place me in a nursing externship, but they placed in a record keeping position"
- Misrepresentation regarding which program a student is enrolling in
  - Ex. "I signed up for a medical billing and coding program, but I later found out that they enrolled me in a Pharmacy tech program"
- Misrepresentations regarding medical or other accommodations
  - Ex. "My school told me that because of my medical condition I would get extra time on tests. However, once I enrolled nobody gave me extra time on tests."
  - Ex. "My school told me I would be able to take a leave of absence for my pregnancy but instead they failed me and made me pay for the classes again"
  - Ex. "I was told that the school had flexible schedules and that it was not a problem that I worked during the day. After I enrolled I learned that most of their classes are only taught during the day making it impossible to take the classes I need to take."

**Educational Services Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omission
  - Ex. "The school didn't tell me how redundant the classes would be"
  - Ex. "The school didn't tell me that the teachers had little experience in the field"

DOE-00006394

- Misrep that is missing an element
  - Ex. "The school promised that the my teachers would be ivy league educated"
- Misrep where falsity doesn't match the representation
  - Ex. "My school promised that my teachers would be ivy league educated, but they didn't seem to know anything"
- Complaints about how a class is taught
  - Ex. "The school taught me programing language X, but after graduation I realized it would have been more helpful if they taught me programing language Y"
  - Ex. "I would have learned more if I got more hands on experience"
  - Ex. "They promised me that this was the best program. That was a lie"
- Complaints about quality of instructors, even if framed as misrepresentations
  - Ex. "My teachers didn't seem to know very much and couldn't answer my questions"
  - Ex. "My school said they had the best teachers, but that is a lie"
- Complaints about instructors not being helpful or playing favorites, even if framed as misrepresentations
  - Ex. "The professor in my econ 101 course did not seem interested in teaching the class. All he did was read off a power point"
  - Ex. "My teacher didn't answer my questions and just told me to look up the answer in the book"
  - Ex. "My teacher liked certain students more than others and always gave them more attention"
- Complaints about normal instructor absences
  - Ex. "Our teacher was sick and had to cancel a day of class"
  - Ex. "Our teacher went on maternity leave and the sub wasn't as good"
  - Ex. "The school had high teacher turnover"
- Complaints that a specific instructor wasn't available, even if framed as misrepresentations
  - Ex. "I enrolled at the school to take classes with a certain professor but she retired before I could take a class with her"
- Deviations from the syllabus or student handbook, even if framed as misrepresentations
  - Ex. "we were supposed to learn about X in the third week, but we fell behind and didn't get to it until week 4. That meant the last week of class was rushed"
  - Ex. "According to the student handbook you are allowed three make up tests, but I never got one"
- Complaints about internship quality
  - Ex. "I didn't learn anything in my internship"
- Grading unfairness
  - Ex. "I think my work was great and I should have gotten an A. the only reason I didn't was because the teacher didn't like me."
- Difficulty or ease of the program
  - Ex. "The class was too easy, I already knew everything"
  - Ex. "The class was too hard for an intro class"

DOE00006395

## Other

**Other Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim**

- Loss of accreditation
  - Ex. "My school lost its accreditation while I was there"
- Mere existence of lawsuits against the school
  - Ex. "My school is being sued by its former dining services provider"
- Borrower was expelled
  - Ex. "My school wrongfully expelled me for not following safety procedures in the lab"
- School didn't mail diploma
  - Ex. "I never received my paper diploma"
- School or program closure
  - Ex. "My school had to cancel the program I was in due to lack of interest"
  - Ex. "My school closed"
- Urgency to enroll
  - Ex. "I was told that I should enroll in class today so that I could begin schooling as soon as possible."

**Other Allegations that are not covered by the Borrower Defense Regulation:**

- Discrimination claims
  - Ex. "My teacher failed me because of my [race, gender, sexual orientation, etc]"
- False Certification claims
  - Ex. "I never signed up for loans, but later found out that my school took loans out in my name"
- Teacher harassment
  - Ex. "My teacher was verbally abusive to me"
  - Ex. "My teacher sexually harassed me"
- Violence by teachers or Students
  - Ex. "I got into a fist fight with my teacher"
- Drug use
  - Ex. "My teacher was high during class"
- School sanctioned cheating on tests
  - Ex. "The school had a policy of letting students cheat on tests so that we could graduate with good grades"

DOE-00006396

TYPES OF BD CLAIMS WORKSHEETS

DOE00006397

DOE00006398

## Transferring Credits

The following five claims appeared in the educational services section of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations:

DOE00006398

## Transferring Credits

| | |
|---|---|
| Borrower Narrative | They told me that the community college or state university would accept credits from this school and they do not... no one does. |
| Denial Reason | Insufficient evidence |
| Reason | Borrower explicitly alleges both the representation (general transferability)and the falsity of that representation, but provides no evidence |
| Letter | You allege that LMU misrepresented the transferability of credits to other schools. You wrote that "they told me that the community college or state university would accept credits from this school and they do not... no one does." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006399

DOE00006399

DOE00006400

## Transferring Credits

| | |
|---|---|
| Borrower Narrative | When I went to the school to visit it, the admissions lady asked me what I was interested in, I told her what I really wanted to do was get a nursing masters someday. She told me that the AS in medical assisting was the best bet for that, that the medical assisting degree would give me a head start into nursing school.  That's not true at all. |
| Denial Reason | Insufficient evidence |
| Reason | Borrower explicitly alleges both the representation (general transferability)and the falsity of that representation, but provides no evidence |
| Letter | You allege that LMU misrepresented the ability to use a degree earned there to continue your education at other schools. Specifically, you wrote that you were told that "the AS in medical assisting was the best bet" to continue into a masters program in nursing, and that "the medical assisting degree would give [you] a head start into nursing school." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006400

| Transferring Credits | |
|---|---|
| Borrower Narrative | And now after all of that and all my hard work I'm left with nothing and I can't even transfer my credits because I can't get my transcripts because I owe the school money and I wish I never made this mistake. |
| Denial Reason | Doesn't state a claim |
| Reason | Withholding of transcript and/or school closure do not constitute a violation of state law. |
| Letter | You allege that LMU is withholding your transcripts, due to an unpaid balance. You wrote that you "can't even transfer [your] credits because [you] can't get [your] transcripts because [you] owe the school money." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006401

## Transferring Credits

| | |
|---|---|
| Borrower Narrative | I already had an associate degree from the community college when I started at LMU, but I ended up having to take all those classes over again even though they told me that I wouldn't. |
| Denial Reason | Insufficient evidence |
| Reason | Borrower explicitly alleges both the representation (that previously earned credits would be accepted) and the falsity of that representation. |
| Letter | You allege that LMU misrepresented your ability to transfer previously earned credits into LMU. You wrote that you "already had an associate degree from the community college" but you "ended up having to take all those classes over again even though they told [you] that [you] wouldn't." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006402

DOE00006402

## Transferring Credits

| | |
|---|---|
| Borrower Narrative | LMU lied to me about being accredited. They said they were but no other schools will take my LMU credits and I have to take those classes again if I ever want to finish my degree |
| Denial Reason | Insufficient evidence |
| Reason | Borrower alleges a misrepresentation of the nature and/or value of the school's accreditation, combined with an allegation of an inability to transfer credits. |
| Letter | You allege that LMU misrepresented the nature and value of its accreditation. You wrote that "they said they were [accredited] but no other schools will take [your] LMU credits." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006403

DOE00006404

## **Program Cost and Nature of Loan**

- The following five claims appeared in the program cost and nature of loan section of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations

DOE00006404

DOE00006405

## Program Cost and Nature of Loan

| | |
|---|---|
| Borrower Narrative | I never knew I would have to pay these loans back. When I filled out the forms, they told me they were for grants, so I did it. |
| Denial Reason | Insufficient evidence |
| Reason | Borrower alleges a misrepresentation of the nature of the aid. |
| Letter | You allege that LMU misrepresented the nature of your financial aid. Specifically, you wrote that when you "filled out the forms, they told [you] they were for grants, so [you] did it," and that you "never knew [you]would have to pay these loans back." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006405

## Program Cost and Nature of Loan

| | |
|---|---|
| Borrower Narrative | All the hair styling materials were supposed to be included in the tuition, but I had to spend an extra $200 buying dyes and colors. I feel ripped off. |
| Denial Reason | Insufficient evidence |
| Reason | Borrower alleges a misrepresentation regarding what materials were included with the tuition. |
| Letter | You allege that LMU misrepresented what was included with your tuition. Specifically, you wrote that "all the hair styling materials were supposed to be included in the tuition, but [you] had to spend an extra $200 buying dyes and colors." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006406

## Program Cost and Nature of Loan

| | |
|---|---|
| Borrower Narrative | The school did not inform me about The National Defense Student Loan Discharge Program. When applying for financial aid, I was told programs like this do not exist.  After trying to find programs like these, the school could not provide me with the information. I was told that I do not qualify for any special programs relating to military service. |
| Denial Reason | Doesn't state a claim |
| Reason | Basis of allegation is that the school did not inform the borrower of other financial aid options. |
| Letter | You allege that LMU failed to inform you of other financial aid programs. Specifically, the failed to inform you "about the National Defense Student Loan Discharge Program." You wrote that "when applying for financial aid, [you were] told programs like this do not exist." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006407

DOE00006407

## Program Cost and Nature of Loan

| Borrower Narrative | I never knew how interest worked. The school should have given me loan counseling before I finished but they didn't |
| --- | --- |
| Denial Reason | Doesn't state a claim |
| Reason | Failure to provide loan counseling does not state a claim. |
| Letter | You allege that LMU failed to provide loan counseling. You wrote that as a result, you "never knew how interest worked." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006408

DOE00006408

DOE00006409

## Program Cost and Nature of Loan

| | |
|---|---|
| Borrower Narrative | This school was a total rip-off! People laugh at my degree I paid $10K for and I could have gone to the same program at LCC for half the tuition. |
| Denial Reason | Doesn't state a claim |
| Reason | Basis of allegation is the price and/or comparative lack of value of program. |
| Letter | You allege that LMU was overpriced and failed to deliver appropriate value for the cost. You wrote that "people laugh at [the] degree [you] paid $10K for" and that you could have attended a similar program at the local community college for "half the tuition." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006410

- **Employment Prospects**

  - The following five claims appeared in the employment prospects section of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations:

DOE00006410

## Employment Prospects

| | |
|---|---|
| Borrower Narrative | My school engaged in misleading marketing. I thought I was going to get a job. My recruiter Josephine told me overly optimistic statistics about graduation and employment rates— all the while just wanted to overcharge the federal government and me loans that perpetuated their lies of higher earnings and job prospects. I owe tons of debt, with a monthly payment of 800 dollars. |
| Denial Reason | Insufficient evidence |
| Reason | Misrepresented employment statistics and future earnings |
| Letter | You allege that your school misrepresented your employment prospects. Specifically, you allege that your school presented "overly optimistic statistics about graduation and employment rates." You further allege that your school "perpetuated their lies of higher earnings." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006411

DOE00006412

## Employment Prospects

| | |
|---|---|
| Borrower Narrative | I was supposed to get a job. They told me 80% of students get jobs but I never got one. I did everything they told me to. I studied hard, got good grades. Still, no job. |
| Denial Reason | Doesn't state a claim |
| Reason | Potential misrepresentation where the falsity doesn't match the representation |
| Letter | You allege you never found a job, despite the school advertising high placement rates. Specifically, you allege that your school "told [you] 80% of students get jobs but [you] never got one." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006413

## Employment Prospects

| | |
|---|---|
| Borrower Narrative | They told me it would be easy, that if I signed up they were gonna give me a quality education so I could be successful. But they never told me how hard it would be to get a job. It took me 3 months just to get a job and then I barely got paid any more money. This was such a rip off. |
| Denial Reason | Doesn't state a claim |
| Reason | Pure omissions without the student alleging that the school had a duty to inform the student of the pertinent information |
| Letter | You allege that your school failed to provide information about the job market. Specifically, you allege that your school told that "if [you] signed up they were gonna [sic] give [you] a quality education so [you] could be successful," but that your school never informed you "how hard it would be to get a job." You further stated that, when you got a job, you "barely got paid any more money." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006413

## Employment Prospects

| | |
|---|---|
| Borrower Narrative | When I signed up at Lemur U they told me I would for sure get a job. They never helped me at all and I never got a job. |
| Denial Reason | Insufficient evidence |
| Reason | Guaranteed Job |
| Letter | You allege that Lemur University falsely guaranteed you a job after graduation. You wrote that "they told [you that you] would for sure get a job" but you "never got a job." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006414

DOE00006415

## Employment Prospects

| | |
|---|---|
| Borrower Narrative | I went to Lemur University (Go LMU!) because of the awesome externships they offered. They told me that I was guaranteed to get an externship that would turn into a full-time phlebotomist gig. I couldn't get the externship so I never got a job. |
| Denial Reason | Insufficient evidence |
| Reason | Misrep regarding an externship resulting in job placement |
| Letter | You allege that your school misrepresented your employment prospects. Specifically, you allege that your school misrepresented that you were "guaranteed to get an externship that would turn into a full-time phlebotomist gig." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006416

- **Career Services [worksheet with questions and answers]**

  - The following five claims appeared in the career services section of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations:

DOE00006416

## Career Services

| | |
|---|---|
| Borrower Narrative | When I met with Nancy the recruiter she said this would change my life and not to worry because they would help me find a job. |
| Denial Reason | Doesn't State a claim |
| Reason | No allegation of falsity |
| Letter | You allege that your school's recruiter promised the school would provide career services assistance. Specifically, you allege that your school told you "they would help [you] find a job This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law.  Your claim for relief on this basis, therefore, is denied. |

DOE00006417

DOE00006417

## Career Services

| | |
|---|---|
| Borrower Narrative | We were assured the school had partnerships with top employers to recruit graduates. The career services office would meet with me but none of the top employers would hire Lemur U graduates. |
| Denial Reason | Insufficient evidence |
| Reason | Misrep of the relationships the school has with employers |
| Letter | You allege that your school misrepresented its relationship with employers. Specifically, you allege that your school represented that it "had partnerships with top employers to recruit graduates," but that, in reality, "none of the top employers would hire Lemur U graduates." This claim fails because you have provided insufficient evidence to support this allegation. Your claim for relief on this basis, therefore, is denied. |

DOE00006418

## Career Services

| | |
|---|---|
| Borrower Narrative | Lemur U told me that its career services department was what set it apart, but all they did was send me to Monster.com! |
| Denial Reason | Doesn't State a claim |
| Reason | Complaints about quality of career services |
| Letter | You allege that your school misrepresented the quality of its career services. Specifically, you allege that your school represented that "its career services department was what set it apart, but all they did was send me to Monster.com!" This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006419

## Career Services

| Borrower Narrative | They PROMISED they would help me get a job. I worked my butt off and got perfect grades. No job. |
| --- | --- |
| Denial Reason | Doesn't State a claim |
| Reason | Misrep allegation with missing element |
| Letter | You allege that you have not found a job, despite the school's promise of career services assistance. You wrote that your school "promised they would help [you] get a job," but you have not found a job. This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006420

DOE00006420

## Career Services

| | |
|---|---|
| Borrower Narrative | Career services was terrible.  They never helped me at all and I never got a job. |
| Denial Reason | Doesn't State a claim |
| Reason | Misrep allegation with missing element |
| Letter | You allege that Lemur University had poor career services.  Specifically, you wrote "[c]areer services was terrible" at your school.  You further allege that your school's career services "never helped [you] at all."  This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006421

DOE00006421

DOE00006422

## **Educational Services**

- The following five claims appeared in the educational services section of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations:

**DOE00006422**

DOE0006423

## Educational Services

| | |
|---|---|
| Borrower Narrative | My school told me that there would be many opportunities to get extra help from teachers.  However, when I tried to get extra help nobody was ever available to help me. |
| Denial Reason | Insufficient evidence |
| Reason | Misrepresentation regarding the availability of services such as tutoring |
| Letter | You allege that your school misrepresented the availability of extra help from your teachers.  Specifically, you state that your school told you that "there would be many opportunities to get extra help from teachers."  However, you further state that "when [you] tried to get extra help nobody was ever available to help [you]." This claim fails because you have provided insufficient evidence to support this allegation.  Your claim for relief on this basis, therefore, is denied. |

## Educational Services

| | |
|---|---|
| Borrower Narrative | When I was first deciding whether on whether to attend this school an admissions office told me that the teachers loved teaching and always worked to make sure all students would succeed. However, once I started classes I quickly learned that this was a lie. The teachers did not seem invested in our future and only seemed to help the students they personally liked or the students who already knew the material. If you fell behind in class the teachers basically ignored you. |
| Denial Reason | Doesn't state a claim |
| Reason | Complaint about teachers not being helpful or playing favorites |
| Letter | You allege that your school misrepresented how helpful and supportive your teachers would be. Specifically, you state that an admissions officer told you that "the teachers loved teaching and always worked to make sure all students would succeed." However you go on to state that "the teachers did not seem invested in [your] future and only seemed to help the students they personally liked or the students who already knew the material." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006424

## Educational Services

| Borrower Narrative | My school promised to assign me to an externship so that I could get hands on training in the field. My externship was terrible. There was hardly any work to do and almost no supervision. The closest thing to work I did was sort through mail, but most of the time I was just sitting around with nothing to do. |
| --- | --- |
| Denial Reason | Doesn't state a claim |
| Reason | Externship Quality |
| Letter | You allege that your school placed you in a low quality externship. Specifically you state that your school "promised to place [you] into an externship so that [you] could get hands on training in the field." However, you go on to state that "there was hardly any work to do and almost no supervision." Further, you state that "the closest thing to work [you] did was sort through mail." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006425

## Educational Services

| | |
|---|---|
| Borrower Narrative | I am a single parent and work a full time job so that I can support my kids. Before I enrolled at BDU I asked the school whether I could take all my classes at night because I work during the day. John Doe, an admissions officer, told me that their schedules are very flexible and that I would have no problem designing my class schedule around my work schedule.  After two years of classes I learned that in order to graduate you have to take a course that is only offered during the day. |
| Denial Reason | Insufficient evidence |
| Reason | Misrepresentation regarding class schedule |
| Letter | You allege that your school misrepresented the flexibility of its class schedule.  Specifically, you state that before you enrolled you asked "whether [you] could take all [your] classes at night because [you] work during the day" and you state that you were told that you "would have no problem designing [your] class schedule around [your] work schedule." However, you further state that "after two years of classes [you] learned that in order to graduate you have to take a course that is only offered during the day." This claim fails because you have provided insufficient evidence to support this allegation.  Your claim for relief on this basis, therefore, is denied. |

DOE00006426

## Educational Services

| | |
|---|---|
| Borrower Narrative | BDU advertises that their teachers have years of in field experience and are experts in the field. My experience at BDU is that the teachers are terrible and don't know anything. I knew more than my diesel repair teacher and would have done a better job teaching the class. The school was a total waste of money. |
| Denial Reason | Doesn't state a claim |
| Reason | Teacher Quality/falsity not matching the misrep |
| Letter | You allege that Borrower Defense University had poor quality teachers despite the school claiming that their teachers were experts in the field. Specifically, you state that the school "advertises that their teachers have years of in field experience and are experts in the field," but that you felt that that "the teachers are terrible" and that you "knew more than [your] diesel repair teacher." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006427

DOE00006428

# • Other Allegations

- •

- • The following five claims appeared in various sections of BD applications. Assuming there is no evidence to support these claims please determine which denial reason to use in order to deny these allegations:

DOE00006428

DOE00006429

## Other Allegations

| Borrower Narrative | After I graduated my school lost its accreditation.  Now nobody wants to hire me. |
| --- | --- |
| Denial Reason | Doesn't state a claim |
| Reason | Loss of accreditation |
| Letter | You allege that after you graduated your school lost its accreditation.  Specifically, you state that because your school lost its accreditation "nobody wants to hire [you]."  This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law.  Your claim for relief on this basis, therefore, is denied. |

DOE00006429

DOE00006430

## Other Allegations

| | |
|---|---|
| Borrower Narrative | My school promised to that its teachers would help all students excel in class. However, my teacher only helped white students. Anytime myself or any other minority student tried to get extra help my teacher would say he was too busy. But when a white student asked for help he would provide extra help. |
| Denial Reason | Not a BD type Claim |
| Reason | Discrimination |
| Letter | You allege that your professor at Borrower Defense University discriminated against you on the basis of race. Specifically, you state that your teacher "only helped white students" and that "anytime [you] or any other minority student tried to get extra help [your] teacher would say he was too busy." This claim fails because this allegation, even if true, does not directly relate to the reason you took out your loan or the educational services for which it was intended to pay and, therefore, does not provide a basis for a borrower defense discharge. Your claim for relief on this basis therefore is denied. Please note that allegations regarding discrimination are handled by the Department's Office of Civil Rights. For more information, please go to: https://www2.ed.gov/about/offices/list/ocr/complaintintro.html |

DOE00006431

## Other Allegations

| | |
|---|---|
| Borrower Narrative | After I graduating from BDU I never received my diploma.  I was told they would mail me my paper diploma a few weeks after graduation.  When I called the school they told me that I graduated and that paper diploma isn't important. |
| Denial Reason | Doesn't State a Claim |
| Reason | Failure to receive hard copy of diploma |
| Letter | You allege that Borrower Defense University failed to provide you with a paper diploma.  Specifically, you state that you were told that Borrower Defense University "would mail [you your] paper diploma a few weeks after graduation," but that you "never received [your] diploma."  This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law.  Your claim for relief on this basis, therefore, is denied. |

## Other Allegations

| | |
|---|---|
| Borrower Narrative | I was sexually harassed in the school dorm. When I reported the incident to the school the school did nothing to investigate my claim or punish my assaulter. |
| Denial Reason | Not a BD type Claim |
| Reason | Sexual harassment |
| Letter | You allege that you were sexually harassed while attending Borrower Defense University. Specifically, you state that you were "sexually harassed in the school dorm" and that "the school did nothing to investigate [your] claim or punish [your] assaulter. This claim fails because this allegation, even if true, does not directly relate to the reason you took out your loan or the educational services for which it was intended to pay and, therefore, does not provide a basis for a borrower defense discharge. Your claim for relief on this basis, therefore, is denied. |

DOE00006432

DOE00006432

DOE00006433

## Other Allegations

| | |
|---|---|
| Borrower Narrative | A recruiter for BDU came to an event at my work. The recruiter pressured me to sign up for classes saying that a degree would help my career. He said that I could start classes as soon as the next week if I signed up that day. The recruiter didn't give me a chance to read the forms before I signed them. |
| Denial Reason | Doesn't state a claim |
| Reason | Urgency to Enroll |
| Letter | You allege that Borrower Defense University pressured you into enrolling. Specifically, you state that a recruiter told you that you "could start classes as soon as the next week if [you] signed up that day." Further you state the recruiter "didn't give [you] a chance to read the forms before [you] signed them." This claim fails because this allegation, even if true, does not amount to an act or omission by the school that violates state law. Your claim for relief on this basis, therefore, is denied. |

DOE00006433

# STANDARD CLAIM REVIEW PROTOCOL

DOE00006434

## STANDARD PROTOCOL

1. Open SalesForce, go to Reports -> BD Enforcement Unit Reports, and open/run the report that has been assigned to you.
2. Open the files and/or attachments for the case you are reviewing. Confirm the application is actually against your school (if not, send to 1.4 with a task to the Tier 1 reviewer identifying the school claimed against for correction and/or asking whether there are outstanding loans against the school). Review any documents provided, noting anything that may support a BD claim.
3. Review all the allegations individually, using the Types of Claims 10.23.2018 document as a guide to identify allegations that do not state a claim, allegations that do not state a BD claim, and allegations which state a potentially approvable claim.
   a. Make sure the allegations are properly labeled, i.e., that allegations in the "Educational Services" narrative box relate to Educational Services, and not another type of allegation. You can either edit the allegation type dropdown or create new allegations, as appropriate.
   b. If the allegations have not been transcribed, you do not need to transcribe the application into the tool. Create a new allegation of the appropriate type(s), and enter the narrative "See attached." Identify the page number and, if there are multiple documents, identify which document to refer to ("[Transfer of Credits]: See attached, 'John Smith Letter,' p. 3").
4. If the borrower attaches any evidence that indicates a larger attorney general action or class action or any lawsuit has been undertaken against the school,
   a. Email your assigned QC attorney with the case # and explanation of the evidence/action
   b. Stop work on the school. Do not open another case for this school at this time.
5. If the borrower attaches any evidence that supports that borrower's particular allegation, but does not indicate any larger action against the school,
   a. Email your assigned QC attorney with the case # and why you think the evidence supports the allegation
   b. Stop work on the case. Move onto the next case.
6. If the allegation does not state a claim, does not state a BD claim, or does not have sufficient evidence to support a claim,
   a. set the allegation review recommendation as "denied"
   b. select the appropriate denial reason:
      i. does not state a claim = "No claim stated"
      ii. does not state a BD claim = "Failure to state a claim actionable under BD reg"
      iii. insufficient evidence = "Lack of evidence"
   c. Update the allegation.
   d. Move onto the next allegation.

7. Once all the allegations have been reviewed, update the application decision and status
   a. Set the application decision to "Flagged for Denial," and select the appropriate denial reason (use "other" if there are multiple allegations that were denied for different reasons):
      i. If all allegations were denied for the same reason, select that reason;
      ii. If the allegations were denied for multiple reasons, one of which was "Lack of Evidence", select "Lack of Evidence";
      iii. If the allegations were denied for a combination of "No Claim Stated" and "Failure to state a claim actionable under BD reg", select "No Claim Stated."
   b. Update the status to 2.22 and assign the case to your QC attorney (please choose the option to not send an email).
8. Move on to the next case in the list, periodically running the report again so that cases that have been reviewed drop out.

STANDARD CLAIM REVIEW PROTOCOL TEMPLATE

DOE00006437

# Initial Review of Medium Batch Applications

## BACKGROUND

| | |
|---|---|
| Name of Institution | |
| Corporate Owner(s) | |
| Open or Closed | |
| Total Number of Applications | |
| Patterns of Alleged Misconduct | |
| Evidence/Litigation | |
| Name of Reviewer | |
| Date Review Completed | |

## SUMMARY APPLICATION OVERVIEW

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## RECOMMENDATION:

## APPROVED BY:
## DATE:

# STANDARD CLAIM REVIEW QC PROTOCOL

**Standard Protocol QC Process**

(1) During 100% QC contractors and staff will be tasking completed cases to you for a QC review.  To access these claims, click on "Cases" and select "My BD Cases" from the drop down.



During non-100% QC the designated QCer will review all medium batch claims in 2.22 not assigned to a BD attorney.

(2) Click into your first case by selecting the first case number.  Scroll down to the "Allegations" section and click into the first allegation you are QCing:



(3) Once you are in the allegation, click "New Second-Level Review"



DOE00006440

(4) In the second level review, select the first level reviewer as the initial reviewer and fill in the applicable sections in the "Review" section.  If your review matches the first level review change the "Outcome" to "Pass" and save your review.

If your review does NOT match the first level review change the "Outcome" to "Fail."

Repeat this step for all applicable allegations (JPR/Guaranteed Employment/Transferability).



(5) Ensure that the case level information (i.e. application decision and decision reason) is completed correctly.  If this information is incorrect, correct it.
(6) Add a QC review following steps (5) - (7) of the "Contractor QC Process for Salesforce" protocol.
(7) Move the case to status 2.3 and change the owner to "BD Adjudication Queue"

DOE00006441

RECONSIDERATION DENIAL TEMPLATE

DOE00006442

[DATE]

Sally Jones
123 Fake Street
Apt. 5C
Washington, DC 20002

Case: 0000001

Dear Sally Jones:

The U.S. Department of Education (the Department) has completed its review of your
application under the Borrower Defense regulations for discharge of your Federal student
loans taken out in connection with your enrollment at [School].  Your application has
been denied, which means that your Federal student loans will not be discharged.

**Why was my application denied?**

The Department reviewed your application, any evidence attached to your application, as
well as loan documents and associated data from the National Student Loan Data System
(NSLDS).

<center>Allegation 1:  Employment Prospects</center>

You allege that SCHOOL _____.  Specifically you state [quote to the extent
possible]. This claim fails because [insert denial reason].  Your claim for relief on this
basis, therefore, is denied.

Additionally you allege that SCHOOL _____.  Specifically you state [quote to the
extent possible ALLEGATION 1]. This claim fails because [insert denial reason].  Your
claim for relief on this basis, therefore, is denied.

<center>Allegation 2:  Cost and Nature of the Loan</center>

You allege that SCHOOL _____.  Specifically you state [quote to the extent
possible]. This claim fails because [insert denial reason].  Your claim for relief on this
basis, therefore, is denied.

**Applicable Law**

A borrower may be eligible for a discharge (forgiveness) of one or more Direct Loans if
the borrower's school engaged in acts or omissions that would give rise to a cause of
action against the school under applicable State law.  *See* § 455(h) of the Higher
Education Act, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c)(1) (the Borrower
Defense regulation).  The Department will recognize a borrower's defense to repayment

of a loan only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provided. U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**What if I do not agree with this decision?**

This is the Department's final decision on all allegations raised to date in connection with your Federal student loans for your attendance at [SCHOOL]. If you disagree with this decision, you may file a lawsuit in U.S. District Court.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in the application (Case: Click here to enter text.) that you believe support a valid borrower defense claim, please refer to the information and application available on the Department's website on borrower defense at StudentAid.ed.gov/borrower-defense. In that application, you should explain in the relevant section(s) the basis for your new borrower defense claim and submit all supporting evidence.

**What should I do now?**

Because the Department has denied your borrower defense claim, you are responsible for repayment of your loans. If your loans were placed in forbearance as a result of your borrower defense application, those loans will be removed from forbearance by your servicer.

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of State and Federal payments you may be owed, and litigation.

If your application was pending for more than one year and your applicable loans are owned by the Department, the Department will take steps to reduce the amount of interest that has accrued on your loan(s). Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted.

If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s) or the Default Resolution Group (if your loan is in default) at 1-800-621-3115. If you do not know the name of your loan servicer, you can find that information at nslds.ed.gov. For further information on Federal Student Loan repayment and discharge, please visit: https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation.

Sincerely,

2

DOE00006444

Borrower Defense Unit
Federal Student Aid
U.S. Department of Education



3

DOE00006445

REPORTING

DOE00006446

<u>Reporting</u>

The designated team lead will be responsible for creating the following reports:

**Daily Report:** Each contractor is expected to keep track of the number of hours worked per day, the number of JPR claims moved to 2.21, the number of JPR claims moved to 1.4/2.2, the number of non-JPR cases reviewed, the number of files reviewed if on evidence review, the number of cases QCd if applicable, and any other workstream at the direction of FSA.  Each contractor must track the number of hours devoted to each workstream.  At the end of each day contractors must send their data to the team lead.  The following day the team lead will compile a daily report, using the template provided by FSA.[1]  The daily report will be sent to individuals designated by FSA and the vendor company.  A copy of the report will also be uploaded to a designated folder.

**Error Report:**  At the end of each week the designated QCer will send the errors found during QC to the team lead.  The team lead will review the errors for accuracy and categorize the errors as major or minor using the established criteria.  The team lead will compile the errors into a report, using a template provided by FSA.  The error report will be sent to FSA and the vendor company weekly with the weekly report. A copy of the report will also be uploaded to a designated folder.

**Weekly Report:** At the end of each week the team lead will compile the daily reports into a weekly report, using a template provided by FSA.  The team lead will review the report to ensure it accurately reflects the week's work by contractors.  The team lead will address anticipated concerns, such as a contractor underperforming or lost time due to technical issues, in the comments section of the report.  The team lead will send the weekly report to individuals designated by FSA and the vendor company.  A copy of the report will also be uploaded to a designated folder.

**Monthly Report:** At the end of each month the team lead will compile the weekly reports into a monthly report, using a template provided by FSA.  The team lead will send the monthly report to individuals designated by FSA and the vendor company.  A copy of the report will also be uploaded to a designated folder.

---

[1] All report templates are subject to change at FSA's request.

# QUALITY CHECKS OF CONTRACTOR RESOURCES

DOE00006448

<u>Quality Checks on Contractor Resources</u>

The Borrower Defense Unit has implemented several systems to ensure cases are reviewed accurately and proper oversight is given to contractor resources.

<u>QC of the QC</u>

A BDU team member is responsible for checking the accuracy of the designated QCer.  The QCer will inform the designated team member of every 5th batch of claims they QCd.  The team member is responsible for ensuring the accuracy of the batch.  If the designated team member discovers an error during QC the team lead will send the case number and a description of the error to individuals designated by FSA.  The team lead will also inform FSA if no errors are found.

<u>Check of Relativity</u>

If any evidence review is conducted in a week, a BDU team member will spot check a randomly selected contractor's self-reported hours and files reviewed.  To perform this check the designated team member will log into Relativity and select the database currently being reviewed.  The designated team member will select "Reporting" and then select "History."  The team member is then able to filter down to a selected day and contractor to review how many files were tagged as "1st Pass Review Complete."  If there is a discrepancy with the number reported by the contractor remedial action may be taken.

<u>Spot Check of Claims Adjudicated</u>

Once per week a BDU team member will spot check two randomly selected contractors self-reported hours and claims adjudicated.  To perform this check, the team member will open Salesforce and go to the "Latest Contractor Work" report in the "BD Enforcement Unit" report folder.  The team member will change the date field to "Reviews: Created Date" and modify the date range to the appropriate date.  The report will show the number of reviews created by each contractor for the selected date.  If there is a discrepancy with the number reported by the contractors remedial action may be taken.

# **FORMS**

DOE00006450

# SALESFORCE WEBFORM

DOE00006451



## U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE
## TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**: To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school.  Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name *(First, Middle, Last)* | *Date of Birth *(mm/dd/yyyy)* | *Social Security Number |
|---|---|---|

| *Telephone Number | *Email Address | | | |
|---|---|---|---|---|
| *Street Address | | *City | *State | *Zipcode |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes     ☐ No

*If yes, please enter the full name of the student *(Last, First, Middle)*:

*If yes, please enter the student's Social Security Number:

## SECTION II: SCHOOL INFORMATION

*School

Campus *(including on-line campuses for distance education borrowers)*

*Location *(City, State)*

* Enrollment Dates at this school:
*From *(month/year)*:                    *To *(month/year)*:

☐  If you are still attending this school/campus, please indicate by checking the box.

☐  Check if the enrollment dates above are approximate, or if you are unsure of them.

DOE00006452

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

_____

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal).*

_____

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters).*

_____

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

_____

*Current Status at school listed above

☐ Graduated     ☐ Transferred Out     ☐ Withdrew     ☐ Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐ Yes     ☐ No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

_____

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for example, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐ Yes     ☐ No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1. How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2. The name/title of people who you believe misled you *(if known)*

3. What the school told you or failed to tell you.

4. Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

DOE00006453

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

DOE00006454

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

DOE00006455

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

DOE00006456

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

☐ Yes    ☐ No

Is there some other reason you feel your school misled you?

☐ Yes    ☐ No

If yes, you must provide detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

\*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds**. Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

DOE00006457

*Are you requesting forbearance/stopped collections?

☐ Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

☐ No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed.  During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently *(as applicable)*.

## SECTION VI.  CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| *Signature | Date |
|---|---|
| | |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov  or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

DOE00006458

## PRIVACY ACT NOTICE

Information required by subsection (e)(3) of the *Privacy Act of 1974*, as amended (*Privacy Act*) (5 U.S.C. 552a(e) (3))requires the following notice be provided to you:

The authorities for collecting the requested information from and about you are Section 455(h) of the *Higher Education Act of 1965*, as amended (*HEA*) (20 U.S.C. 1087e(h)) and 34 C.F.R. § 685.206(c) and the authorities for collecting and using your Social Security Number (SSN) are the same but also include 31 U.S.C. 7701(b). The primary purpose of the information collected is for the use and administration of the U.S. Department of Education's office of Federal Student Aid (ED/we) for borrower defense to loan repayment program. The information you provide ED on this form and your SSN are voluntary, but you may need to provide the requested information on this form, including your SSN and/or a Federal Student Aid ID (FSA ID) that provides ED your verified SSN and other individual information pertaining to a student's or parent's Student Financial Assistance Programs account(s), for ED to process or complete our review of your borrower defense to loan repayment application. You may submit a form without your SSN or an FSA ID by filling out a form and sending it to ED via email or physical mail because disclosure of the information requested on this form is voluntary. However, without providing all the requested information on this form, ED may not be able to conduct a full investigation and complete the review of your application.

We use the information that you provided on this form including your name, SSN, date of birth, address, email address, telephone number(s), and / or an FSA ID, to receive, review, evaluate, and process requests for relief under the borrower defense to loan repayment regulations, to render decisions on the merits of such requests for relief, and, where requests for borrower defense to loan repayment are successful, to determine the relief that is appropriate to borrowers under the circumstances as well as to initiate appropriate proceedings to require schools whose acts or omissions resulted in the successful defenses against repayment to pay ED the amounts of the loans that apply to the defenses. Without your consent, ED may disclose the information that you provided and as otherwise allowed by the *Privacy Act*, pursuant to the routine uses identified in the system of records notice (SORN) entitled "Customer Engagement Management System (CEMS)" (18-11-11) and published in the Federal Register as 83 FR 27587-27591 (June 13, 2018). These routine uses include, but are not limited to, a routine use that permits ED to disclose your information to foreign agencies, Federal agencies, State agencies, Tribal, or local agencies, accreditors, schools, lenders, guaranty agencies, servicers, and private collection agencies when further information is relevant to ED's resolution of your complaint, request, or other inquiry, tracking your application or your inquiry, and, where a request for borrower defense to loan repayment is successful, to determine the relief that is appropriate under the circumstances as well as to initiate the appropriate proceeding to require the school whose acts or omissions resulted in the successful defense against loan repayment to pay ED the amount of the loan that apply to the defenses. We may use your information for reporting, analyzing the data to make recommendations in student financial assistance programs, and assisting in the informal resolution of disputes. Disclosure of relevant information also may be made to the responsible foreign, Federal, State, Tribal or local agencies charged with investigating or prosecuting a violation or potential violation of law in the event that information indicates, either on its face or in connection with other information, a violation or potential violation of any applicable statute, regulation, or order of a competent authority.

In the event of litigation or alternative dispute resolution (ADR) involving ED or that we have an interest in and if that a party is either any component of ED, any ED employee in his or her official capacity, any ED employee in his or her individual capacity where representation for the employee has been requested or has been agreed to by ED or the Department of Justice (DOJ), or the United States where ED determines that the litigation is likely to affect ED or any of its components, we may disclose your information to DOJ, a court, adjudicative body, a person or an entity designated by ED or otherwise empowered to resolve or mediate disputes, or a counsel, party, representative, or witness if the disclosure is relevant and necessary to the litigation or ADR. ED also may disclose your information to DOJ to the extent necessary for obtaining DOJ's advice on any matter relevant to an audit, inspection, or other inquiry. We may send information to members of Congress if you ask them to help you with federal student aid or Student Financial Assistance Programs account(s) questions. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. As part of such a contract, we will require the contractor to maintain safeguards to protect the security and confidentiality of the records that are disclosed to the contractor. If a record is relevant and necessary to a borrower complaint regarding participants in any Federal Student Financial Assistance Programs under title IV of the *HEA*, ED may disclose a record only during the course of

DOE00006459

processing, reviewing, investigating, fact-finding, or adjudicating the complaint to: any party to the complaint; the party's counsel or representative; a witness; or a designated fact-finder, mediator, or other person designated to resolve issues or decide the matter. ED also may disclose records to the DOJ or Office of Management and Budget (OMB) if ED concludes that disclosure is desirable or necessary in determining whether particular records are required to be disclosed under the *Freedom of Information Act* (*FOIA*) or the *Privacy Act*. ED may disclose your information to appropriate agencies, entities, and persons when ED suspects or has confirmed that there has been a breach of the system maintaining your information; which poses a risk of harm to individuals, ED (including its information systems, programs, and operation), the Federal agencies, or national security and the disclosure made to such agencies, entities, and persons is reasonably necessary to assist ED's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm. ED also may disclose your information to another Federal agency or Federal entity, when ED determines that your information is reasonably necessary to assist the recipient agency or entity in responding to a suspected or confirmed breach or preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal agencies, or national security, resulting from a suspected or confirmed breach.

## PAPERWORK REDUCTION ACT NOTICE

According to the *Paperwork Reduction Act of 1995*, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

DOE00006460

UNIVERSAL FORM

# U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE TO LOAN REPAYMENT

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt, and may include reimbursement for amounts paid.

**FORM INSTRUCTIONS**: To apply, you must complete and sign this form. Submit this form and any additional documents you believe will help us review your application by email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 194407, San Francisco, CA 94119.

## SECTION I. BORROWER INFORMATION

Name (Last, First, Middle) _____

Date of Birth (mm/dd/yyyy) _____

Social Security Number (last 4 digits only - XXXX) _____

Telephone Number _____

Email Address _____

Street Address _____

City _____ State _____ ZIP Code _____

Are you a PARENT who took out a federal loan on behalf of the student? ◯ Yes ◯ No

    If yes, please enter the full name of the student (Last, First, Middle): _____

## SECTION II. PROGRAM INFORMATION

School Name: _____

Campus Name: _____

Location (City, State): _____

Dates of Enrollment: From (Month, Year): _____ To (Month, Year): _____ (if you are still attending this school/campus, please indicate "still enrolled")

Program Name or Major (e.g. Nursing, Medical Assistant, Law) _____

Credential/Degree Sought (e.g. Certificate, Diploma, Associates, Bachelors, Masters) _____

Current Status at school: ____Graduated ____Transferred ____Withdrew ____Attending

1

DOE00006462

Have you made any claims for loan relief from anyone else (for example, a tuition recovery program or a closed school discharge from the U.S. Department of Education)? ◯ Yes ◯ No

If yes, please describe the other claim(s), including the amount of any payment or loan relief that you received: _____

_____

## SECTION III.  BASIS FOR BORROWER DEFENSE

Provide a **detailed** description of why you believe you are entitled to borrower defense:
1. Details about what the school told you or failed to tell you.
2. Details about how the school communicated with you, whether in a brochure, online, over the phone, or in person.
3. The name/title of people who you believe misled you (if known).
4. Details about why you believe you were misled.

You should also attach any documents related to your application.  **Please note that you only need to provide information for the sections below that apply to you.**

## EMPLOYMENT PROSPECTS

Did the school mislead you (or fail to tell you important information) about future employment, job placement rates, graduation rates, and/or post-graduate earnings? ◯ Yes ◯ No
If yes, please provide <u>detailed</u> information in this section.

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

2

DOE00006463

## PROGRAM COST AND NATURE OF LOANS

Did the school mislead you (or fail to tell you important information) about tuition and fees, how you would repay the loan, the terms of repayment, and/or other issues about the cost of your education?

◯ Yes ◯ No

If yes, please provide _detailed_ information in this section.

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

## TRANSFERABILITY OF CREDITS

Did the school mislead you (or fail to tell you important information) about the transferability of credits?

◯ Yes ◯ No

If yes, please provide _detailed_ information in this section.

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

3

DOE00006464

## CAREER SERVICES

Did the school mislead you (or fail to tell you important information) about the availability of job or career services assistance? ◯ Yes ◯ No

If yes, please provide <u>detailed</u> information in this section.

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

## EDUCATIONAL SERVICES

Did the school mislead you (or fail to tell you important information) about educational services, such as the availability of externships, teachers qualifications, the method of instruction, or other types of educational services? ◯ Yes ◯ No

If yes, please provide <u>detailed</u> information in this section.

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

4

DOE00006465

## ADMISSIONS & THE URGENCY TO ENROLL

Did the school mislead you (or fail to tell you important information) about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process? ◯ Yes ◯ No

If yes, please provide <u>detailed</u> information in this section.

<br><br><br><br><br><br><br>

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board?  For more information about the basis for borrower defense relief, see StudentAid.gov/borrower-defense.

If yes, please provide <u>detailed</u> information in this section.

<br><br><br><br><br><br><br>

Did you choose to enroll in your school based in part on the issues you describe above? ◯ Yes ◯ No

5

DOE00006466

## SECTION IV. FORBEARANCE/STOPPED COLLECTIONS

By completing this form, you may have all of your federal loans placed into forbearance and have collections on any federal loans in default stopped ("stopped collections") while we review your application. **However, please note that interest will continue to accrue (accumulate) on all of these federal loans, including subsidized loans.  If your application for borrower defense is denied, then when you are taken out of forbearance or stopped collections, the interest that accumulated will be added to the amount you owed when you entered forbearance or stopped collections, and the total amount you owe in the future will be higher.**

**You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.**  Please read the following question and answer ("Q & A") section carefully before you choose whether you want the U.S. Department of Education to place your loans into forbearance or stopped collections.

**Q.**    **What does forbearance or stopped collections status mean?**

**A.**    During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default.  If your loans are already in default, when you enter stopped collections status, collections on your loans will stop.  This will continue until the borrower defense review process of your application is completed.  Your servicer will notify you when your loan has been placed into forbearance or stopped collections status.  <u>Until you receive that notice, you should continue to make payments.</u>

**Q.**    **Which of my loans are eligible to go into forbearance or stopped collections status?**

**A.**    Initially, if you choose forbearance or stopped collections, it will affect <u>all</u> of your federal student loans that are owned by the U.S. Department of Education and are being serviced by a federal loan servicer, including loans that are <u>not</u> eligible for borrower defense loan forgiveness, such as (1) loans taken out to attend another institution, and (2) any loans you have for which you are not asserting borrower defense.  If you select forbearance and you have commercially held Federal Family Education Loans (FFEL) loans, the Department will request forbearance on your behalf.

**Q.**    **Can I remove some or all of my loans from forbearance or stopped collections status?**

**A.**    If you want the forbearance or stopped collections to apply <u>only</u> to those loans related to your borrower defense application, <u>you must contact your loan servicer after you hear from them confirming the forbearance or stopped collection</u>. Also, after your loans enter forbearance or stopped collection status, if at any time you want to remove <u>all</u> of your loans from forbearance or stopped collections, you must also contact your loan servicer.

**Q.**    **Can I make payments on my loans that are in forbearance or stopped collections?**

**A.**    <u>Yes</u>.  While your federal loans are in forbearance or stopped collections, you are not required to pay your loans.  However, you are allowed to make payments on any of your loans that are in forbearance or stopped collections, including payments for accrued interest.  As noted above, interest will continue to accrue on all of these loans while they are in forbearance or stopped collections.

6

DOE00006467

**Q.      What happens if my borrower defense application against the school noted in Section II (above) is successful?**

A.      Your federal loans related to your application may be discharged partially or completely.  If you receive a partial discharge, you will be responsible for repaying any amounts that are not discharged through borrower defense.  Also at that time, the forbearance or stopped collections period for any of your other federal loans will end.  You will be responsible for repaying those other loans, <u>if applicable, including interest that accrued during the forbearance or stopped collections period</u>.

**Q.      What happens if my borrower defense application against the school noted in Section II (above) is denied?**

A.      You will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, <u>including interest that accrued during the forbearance or stopped collections period</u>.

**Are you requesting forbearance or stopped collections?**

**__ Yes, I want all of my federal loans to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed.  During this time period, I understand that interest will continue to accrue.**

**__ No, I do not want all of my federal loans to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed.  During this time period, I understand that interest will continue to accrue.**

**If you do not select one of the forbearance or stopped collection options immediately above, your federal loans will be placed into forbearance or stopped collection, and the Department will request forbearance or stopped collection for any commercially held FFEL program loans that you have currently.**

## <u>SECTION V. CERTIFICATION</u>

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus in Section II (above).

I understand that if my application is granted, I am deemed to have assigned my claim to, and relinquished it in favor of, the Secretary of the U.S. Department of Education.

7

DOE-00006468

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

Signature: _____ Date: _____

Submit this form and any additional documents you believe will help us review your application by email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 194407, San Francisco, CA 94119.

## PRIVACY ACT NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087aa *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty

8

DOE-00006469

agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

## **PAPERWORK REDUCTION ACT NOTICE**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-NEW. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov directly.

9

DOE00006470

EVEREST/WYOTECH ATTESTATION FORM

DOE00006471



# UNITED STATES DEPARTMENT OF EDUCATION

## ATTESTATION FOR CERTAIN EVEREST AND WYOTECH STUDENTS
## APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 11/30/2018

The Department of Education has found that at various times between 2010 and 2014, Everest Institute, Everest College, and Everest University ("Everest"), and WyoTech published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Everest and WyoTech students to enroll in these programs. This form covers federal Direct Loans (including Parent PLUS loans issued to parents of Everest and WyoTech students) received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/ev-wy-findings. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Everest and WyoTech students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 429060, San Francisco, CA 94142.

## SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I,_____, attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Everest/WyoTech program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note:** This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at **https://studentaid.ed.gov/ev-wy-findings**. The earliest enrollment date covered is July 1, 2010.

DOE00006472

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date*** (MM/YYYY) | **Enrollment End Date*** (MM/YYYY) |
| | | |

| Program Name | | Credential | |
|---|---|---|---|
| | | | |

1. Prior to my enrollment in this Everest/WyoTech program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

   ☐ Brochures advertising Everest/WyoTech academic programs or other printed materials, including those provided by Everest/WyoTech representatives or recruiters;

   ☐ Emails, online materials, or online disclosures from or by Everest/WyoTech.

2. I believed that the job placement rates related to my program of study indicated the level of quality an Everest/WyoTech education offered to students. I chose to enroll at Everest/WyoTech based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3. I applied for and received a federal Direct Loan to cover the cost of attendance of the Everest/WyoTech program in which I enrolled.

4. As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Everest/WyoTech that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Everest/WyoTech and dates of enrollment.) The document(s) I have attached are:

   ☐ *Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. (Deselect the check box to remove any enrollment dates added in error.)

| **Add Campus Program** | **Remove Campus Program** |
|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Everest/WyoTech that you believe is relevant: (2,000 characters max)

DOE00006473

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend an Everest and/or WyoTech program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Everest and/or WyoTech programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Everest/WyoTech program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____   Date _____

DOE00006474

*Privacy Act Notice.* The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a) *et seq.*, and 20 U.S.C. 1087(a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have any comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

DOE00006475

HEALD ATTESTATION FORM

DOE00006476



# UNITED STATES DEPARTMENT OF EDUCATION

## ATTESTATION FOR CERTAIN HEALD COLLEGE STUDENTS
## APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 12/31/2015

The Department of Education has found that at various times between 2010 and 2014, Heald College published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Heald College students to enroll in these programs. This form covers federal Direct Loans received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Heald College students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at studentaid.ed.gov.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 429060, San Francisco, CA 94142.

## SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I, _____, attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Heald program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting. If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note:** This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf.
**The earliest enrollment date covered is July 1, 2010.**

DOE00006477

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date\*** (MM/YYYY) | **Enrollment End Date\*** (MM/YYYY) |
| | | |

| Program Name | | Credential | |
|---|---|---|---|
| | | | |

1. Prior to my enrollment in this Heald College program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

   ☐ Brochures advertising Heald College's academic programs or other printed materials, including those provided by Heald College representatives or recruiters;

   ☐ Emails, online materials, or online disclosures from or by Heald College.

2. I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3. I applied for and received a federal Direct Loan to cover the cost of attendance of the Heald program in which I enrolled.

4. As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Heald College that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Heald College and dates of enrollment.) The document(s) I have attached are:

   | |
   |---|
   | |

   ☐ \*Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| **Add Campus Program** | **Remove Campus Program** |
|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Heald College that you believe is relevant: *(2,000 characters max)*

| |
|---|
| |

DOE00006478

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend a Heald College program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Heald College programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Heald College program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐   Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐   No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I have read and understand all of the information in this form.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

**Signature** _____    **Date** _____

DOE00006479

*Privacy Act Notice.* The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087a *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

DOE00006480

DEBT COLLECTIVE FORM

DOE00006481

# Borrower Defense to Repayment

Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and Master Promissory Note (MPN) under the William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program

As detailed below, I, [sample]                                    , am hereby applying for a full discharge of my federal student loans according to the "Defense to Repayment" provisions of the Higher Education Act and promulgating regulations.

---

## Section 1: Borrower Information

SSN                    -        -

Name

Address

City                                        State

Zip Code

Telephone              -        -            Telephone              -        -
(primary)                                    (alternate)

Email
(optional)

Borrower is      ◯   Employed

                 ◯   In field of study

                 ◯   Out of field of study

                 ◯   Unemployed

Loan
Servicer

DOE00006482

## Section 2: School Information

School Name

School Address

Dates of Attendance          From   01          /                    To   01          /

Name of program

Type of Credential

---

Status                    ⬭  Completed

                          ☐  Withdrew

---

## Section 3: Illegal Conduct Of School

I assert that certain acts and omissions by  [school]                                    and/or its agents/representatives give me a defense to repayment of my federal student loan(s) under state and federal law and the terms of my federal student loan agreement(s).

**The illegal conduct by** [school]                                    **includes:**

Misleading me about how this program would affect my job prospects, including:

☐     Citing false and/or misleading job placement statistics and salary information to convince me to enroll in
      [school]                                    . Explain:

☐ Misleading me about the type of job placement assistance the school intended to provide me. Explain.

☐ Other false/misleading conduct relating to job prospects. Explain:

Misleading me about the quality of the program, including:

☐ The pass rate of program graduates in required licensing exams/certifications. Explain:

☐ The fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college. Explain:

DOE00006484

☐   Other false/misleading conduct relating to the quality of the program. Explain:

---

Misleading me about how I would pay for the program, including:

☐   Misleading me about the true cost of the program. Explain:

☐   Misleading me about whether I would have to borrow money to attend  [school]          , rather than having it paid for entirely in grants. Explain:

☐   Misleading me about the amount of student loans I was borrowing. Explain:

☐ Misleading me about whether my loans were federal or private. Explain:

☐ Misleading me about the terms of repayment on my federal student loans, including what my monthly payments would be. Explain:

☐ Other false/misleading conduct in relation to financial aid. Explain:

Misleading me about my options as the school shut down, including:

☐    Misleading me about the likelihood that the school would shut down. Explain:

☐    Misleading me about my rights and options regarding the teach-out at School, including failing to inform me that I had a right to decline the teach out and receive a full discharge of my federal student loans. Explain:

Other misleading behavior, including:

DOE00006487

Furthermore, the long history of systematic illegal activity and inadequate programs created a high likelihood that school's reputation would be irreparably damaged to the point where the degrees they issued would be worthless. [school]                              never notified me or otherwise made me aware that that my degree would be worthless due to   [school]                                        's misconduct.

Absent this conduct, I would not have chosen to attend and/or continue attending [school]
I decided to pursue a postgraduate education because I wanted to gain the relevant skills to find a more fulfilling career with higher earning potential than I was able to obtain previously. I chose to attend  [school] because they represented to me that their program would give me useful skills, that their degree would allow me to earn more than I did previously, and that these benefits would outweigh the burden of paying off the obligations I would incur to finance the degree.

Because of this conduct, I have suffered injury, including:

☐  Federal student loan debt, which has caused me stress, forced me to divert funds from other aspects of my life and otherwise unduly burdened me. Explain:

☐  The inability to enroll in another degree-granting program. Explain:

☐  A difficult time finding employment, either in the field I went to school for or otherwise. Explain:

☐ Missing the opportunity to go to another, better higher education institution and lacking the eligibility for enough federal loans to do so now.

☐ Other injury, including pain and suffering. Explain:

DOE00006489

## Section 4:  Defense To Repayment of Federal Student Loans

The above conduct gives rise to a cause or causes of action under [state]                          law, which relate(s) directly to my loan and/or the provision of educational services for which the loan was given, including:

[state law description]

Common law action for Fraudulent Misrepresentation;
and/or common law action for Fraudulent Concealment.

Additionally, the above conduct violates federal law, including:

1. The Federal Trade Commission Act and Federal Trade Commission regulations, which prohibit "a school, in promoting a course of training, to misrepresent the availability of employment after graduation from a course, the success that the member graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment." 16 C.F.R. § 254.4(d).
2. Title IV of the Higher Education Act and Amendments, and Department of Education regulations, which prevent schools from participating in Title IV programs from committing "substantial misrepresentation" in interactions with students and prospective students.

## Section 5:  Requested Relief

Therefore, I request that the Servicer and/or Department of Education take the following steps:

1. Cancel any remaining principal, interest, fees and costs associated with my federal student loans, borrowed to attend [school]
2. Cease any collection actions against me in relation to my federal student loans, borrowed to attend [school]
3. Return any sums paid, whether voluntarily or involuntarily, toward my federal student loans, borrowed to attend [school]
4. Remove any adverse reports related to my federal student loans, borrowed to attend School, from all consumer credit reporting agencies.
5. Restore my eligibility to receive funds under Title IV, including by restoring any portions of my lifetime eligibility for Pell Grants and federal student loans previously used in order to attend [school]

I request a notification of a hearing or a determination of my asserted defense to repayment within thirty (30) days, in writing. Should you deny any or all of my defense, please inform me of the process for appealing this decision, in writing.  I reserve the right to submit supplementary information in support of this application.

DOE00006490

## Section 6: Borrower Acknowledgment, Certifications, Assignment, And Authorization

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097.

I certify, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education (the Department) in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein.

I hereby assign and transfer to the U.S. Department of Education (the Department) any right to a refund on the amount discharged that I may have received from the school and/or any owners, affiliates, or assignees of the school, and from any third party that may pay claims for a refund because of the actions or omissions of the school, up to the amount discharged by the Department on my loan(s).

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

Borrower's Signature  _____      Date  _____

DOE00006491

## **ONBOARDING INFORMATION**

DOE00006492

CEMS USER ACCESS FORMS

DOE00006493

**Instructions for Filling Out and Submitting the**
**CEMS User Access Request Form**
**For Department of Education and Contract Users**

Please find embedded the **Customer Engagement Management System (CEMS) User Access Request Form and Rules of Behavior**.  Please note the CEMS User Access Request Form includes options for the Feedback and Dispute Management System, Borrower Defense, Office of the Inspector General, Awareness and Outreach and Minority Serving and Under Resourced Schools Division.  Below are some important notes for completing your form.

### Background Investigations

To be granted access to CEMS as a user, you must have an active background investigation at the minimum level of a 5C.  The background investigation must have originated within the last 5 years.  If your last background investigation was not initiated in the last 5 years, you may be denied access.  To be granted access to CEMS as an ISSO or System administration you must have an active background investigation at the minimum level of 6C.

### Completing the Forms

**AIMS ID**

If you already have an AIMS ID (NSLDS login ID), provide it in the necessary field on the form.  If you do not have an AIMS ID, after the processing of your request form, a separate email will be sent from the AIMS team providing you your assigned AIMS username and password.   Please keep an eye out for the email from the AIMS team after you submit your form, as you will need the information to log in the application.  If you know you have an AIMS ID but don't know what it is, you can obtain the information by contacting the AIMS team at Aimssupport@ed.gov.

**Selecting Roles**

Please see the below table of CEMS roles to determine your selection when completing the form.  Questions about selecting your role should be addressed with your business unit's lead.

| Role | Description |
| --- | --- |
| A&O User | Awareness and Outreach staff only |
| Borrower Defense Enforcement Unit | Borrower Defense Enforcement Unit staff only |
| Borrower Defense Tier 1 Specialist | Borrower Defense Tier 1 Specialists only |
| DC Team Lead | FDMS Ombudsman Group Team Leads only |
| Dispute Management | FDMS Ombudsman Group Management staff only |
| ED External User | Staff with read-only access to records with the ability to create tasks |
| FDMS Tier 1 Supervisor | FDMS Tier 1 Supervisors only |
| FDMS Tier 1 Specialist | FDMS Tier 1 Specialists only |
| Feedback Management | Feedback Management staff only |
| Feedback Tier 2 – Controlled Correspondence | Oversees cases that come in with controlled correspondence associated |
| Feedback Tier 2 – CPS | Oversees cases that involve school additions/deletions to the FAFSA, orrecting a processed FAFSA, EFC calculations and Student Aid Reports. |
| Feedback Tier 2 – DMCS | Oversees cases that involve defaulted ED-held loans and are handled by the DMCS Contractor |
| Feedback Tier 2 – Escalated Issues | Oversees escalated cases, Suspicious Activity cases, and triage for cases in question |
| Feedback Tier 2 – FSAIC | Oversees cases in relation to the Federal Student Aid Information Center |
| Feedback Tier 2 – Grant & Loan Program | Oversees cases that involve issues related to the origination and disbursement of federal aid |
| Feedback Tier 2 – ISE | Oversees cases related to the website/online experience for StudentAid.gov |
| Feedback Tier 2 – NSLDS | Oversees case that involve data issues that can be corrected by the NSLDS team or contractor |
| Feedback Tier 2 – PCA Monitoring | Oversees cases  that involve defaulted loans and are handled by private collection agencies |
| Feedback Tier 2 – Program Compliance | Oversees cases that involve complaints against schools |

| Feedback Tier 2 – PSLF | Oversees cases that relate to Public Service Loan Forgiveness |
| Feedback Tier 2 – Servicer Liaison | Oversees cases that involve non-defaulted loans and are handled by ED's servicers |
| Feedback Tier 2 – Technology Office/FSA ID | Oversees cases related to FSA IDs, including the FSA ID website and help desk |
| OIG Content User | OIG staff who oversees the uploading of content |
| OIG Fraud Analyst | OIG staff and contractors who oversee the processing of allegations of fraud |
| SE/MSURSD User | MSURSD staff who oversee identifying service needs of all postsecondary education institutions |

**Providing Comments**

For FDMS Feedback users, specify if additional **queue** access is required (other than the system role specified).  If you are unsure if you require additional queue access, please contact your FDMS point of contact.  For OIG and SE users, specify if the **enhanced user permission** is required. For OIG, this will allow users to edit the Final Disposition field. For SE, this will give data loader access as well as edit access to certain objects/fields.

<div align="center">

**Submitting Forms**

</div>

Please submit the below list of completed documents to Victoria Malone, Lisa D. Washington, Krystle Wright and ShaVon Holland at victoria.malone@ed.gov; lisa.s.washington@ed.gov;  krystle.wright@ed.gov and shavon.holland@ed.gov :

- The completed and signed CEMS User Access Request Form
- Signed and checked Rules of Behavior
- Your most recent Cyber Security and Privacy Awareness Certificate (Obtain a copy of your Cyber Security and Privacy Awareness Certificate from the TMS system or provide a screenshot of the completed training from Fed Talent.)
- Save your files in the following formats:
  - **Lastname_Firstname CEMS Access Form**
  - **Lastname_Firstname CEMS Rules of Behavior**
  - **Lastname_Firstname Cyber Security Certificate**
- The information requested on the form is considered personally identifiable information (PII) and to protect your information, we recommend you **send all three separate documents in 1 zip file and password protect** it before sending.  Please do not scan all the documents into 1 PDF, there should be 3 separate files within your zip file saved in the format provided above.
- Send the password to unzip the files in a separate email

<div align="center">

**Receiving Emails from the Service Desk**

</div>

To receive email messages from the CEMS Service Desk (and avoid them going to spam), please add the email address as a "safe sender." The email address for the CEMS Service Desk is currently FDMS.Support@accenturefederal.com. Instructions on how to add an email address to your safe senders list in Outlook are below:

1. In Outlook, go to the Home tab
2. Click Junk > Junk Email Options
3. Select Safe Senders tab and Click Add
4. In the Add address or domain box, enter FDMS.Support@accenturefederal.com
5. Select Safe Recipients tab and Click Add
6. In the Add address or domain box, enter FDMS.Support@accenturefederal.com
7. Click OK and close the window

<div align="center">

**What to Expect Next**

</div>

- Keep an eye out for any emails from FDMS.Support@accenturefederal.com.
- If you do not have an AIMS ID, look out for an email from their email address, aimssupport@ed.gov that will provide your AIMS ID.

- After your access has been granted, you will receive an email from one of the CEMS ISSO's (Victoria, Lisa, Krystle or ShaVon) with instructions on logging into the application. **Upon the receipt of that email, you will have 7 days to log in to your account to avoid deactivation.**
- Please have your departmental issued token readily available, it will be needed to login to the application.
- Issues with logging in should be sent to FDMS.Support@accenturefederal.com

### Deactivation/Departed Staff

To maintain your access, you are required to login to CEMS at least every **90 days**. If you do not login with the designated 90 days, you will be deactivated due to inactivity. To be reactivated, you will be required to complete the access request process again.

If a user is no longer associated with the Department of Education, the user or the responsible party should complete the user access request form, with selection **"deactivation"** selected. Deactivation forms should be submitted with 24 hours of the user's departure. Signatures are not required for deactivation.

Submit the CEMS User Access Request Form to Victoria Malone, Lisa D. Washington, Krystle Wright and ShaVon Holland at victoria.malone@ed.gov; lisa.d.washington@ed.gov; krystle.wright@ed.gov and shavon.holland@ed.gov. In addition:
- Save your files in the following formats:
    - **Lastname_Firstname CEMS Access Form - Deactivation**
- The information requested on the form is considered personally identifiable information (PII) and to protect your information, we recommend you **zip the file and password protect** before sending.
- Send the password to unzip the files in a separate email

### Forms

Below are the embedded Customer Engagement Management System (CEMS) User Access Request Form and Rules of Behavior. Please download, complete and submit using the above guidelines.



CEMS_User_Request
_Form_16Nov18.doc



CEMS_Rules of
Behavior_15June18.c

RELATIVITY ACCESS FORMS

DOE00006497

Print Form

# Civil Division MEGA4 Automated Litigation Support System
## Account Request and Approval Form
### For Non-Civil Division Users
Experts, Other Agency Users, Non-Civil Users

## Case/Project Information:

DJ NUMBER: N/A

OLS CASE NAME: Dept of Education FSA

LEAD CIVIL DIVISION ATTORNEY NAME AND PHONE NUMBER:

CIVIL/OLS CASE MANAGER NAME AND PHONE NUMBER:
Leonard Caston 202-616-5014

## Application Information:

OMEGA-☐   MEGANOC-☐   PCTS-☐   PHARMA-☐   CORA-☐   LAWeb-☐   OTHER _____
ORCA-☐   MARS-☐   MORE-☐                          LARS-☐

LIST OF SPECIFIC CASES/PROJCTS FOR WHICH ACCESS IS REQUIRED:

Dept of Education  FSA

## End User Information:

| FULL NAME: | TELPHONE NUMBER: |
|---|---|
| COMPANY/ORGANIZATION: | JOB TITLE: |
| DATE OF BIRTH: | EMAIL ADDRESS: |
| SSN* <br><br>*PLEASE CALL AND GIVE THIS INFORMATION TO THE OLS SECURTY PROJECT MANAGER, DEBBIE POWELL AT (202) 305-0084. | WORK MAILING ADDRESS: |
| PLACE OF BIRTH: | COUNTRY OF CITIZENSHIP: |
| DO YOU HAVE A GOVERNMENT CLEARANCE? <br><br> *If you answered "Yes", please complete items below.  If you answered "No", proceed to the next section.* | |
| CLEARANCE LEVEL/TYPE: | GRANTING AUTHORITY: |
| DATE OF CLEARANCE: | STATUS (ACTIVE/INACTIVE): |
| ACTIVATION DATE | |

APPROVED BY: OLS CASE MANAGER_____  Date_____

OLS SECURITY:  PSTS ☐   DOJ/CIVIL/OA ☐   OTHER          Date:

MEGA4 System Access – Non-CIV
Revised December 2013

DOE00006498

**U.S Department of Justice - Civil Division**
**General Rules of Behavior**
**Revised: April 8, 2013**

*Introduction*
As a user of Department of Justice (DOJ) Information Technology (IT) data and systems, you are the first line of defense in support of Department and Component IT security. As a knowledgeable user, you are the foundation of a successful security program. The Rules of Behavior (ROB) for General Users concern use, security, and acceptable level of risk for Department systems. The rules also highlight that taking personal responsibility for the security of an information system and the data it contains is an essential part of your job. The intent of the ROB is to summarize for you, a user of DOJ IT resources, the applicable laws and requirements from various Federal and DOJ documents. These include, but are not limited to, the Office of Management and Budget (OMB) Circular A-130, DOJ Order 2640.2 (series), DOJ Order 2740.1 (series), and the DOJ IT Security Standard. To remain compliant with all applicable laws, Federal regulations, and DOJ Standards, the Department reserves the right to update these ROB at any time. Your organization may also include additional requirements. Please direct all questions relating to the ROB to your Help Desk, Security Manager, or Supervisor.

*Who is covered by these rules?*
These rules apply to all personnel (government employees and contractors) performing general, non-administrator-type work on DOJ systems, DOJ information, or providing services to DOJ. They also apply to any other persons using DOJ IT or accessing DOJ systems under formally established agreements. These rules are written for the vast majority of people for the vast majority of time. However, some people (e.g. Investigators) may be exempt from a specific item for a specific situation when performing their official duties and with proper authorization. In a similar manner, equipment and/or software limitations may prevent operation in accordance with some of these rules. These situations must be documented, the risks accepted, and the applicable processes approved by the system Authorizing Official. All users are required to review and provide signature or electronic verification acknowledging compliance with these rules. Users with advanced permissions and authorities shall also agree to and sign the ROB for Privileged Users.

*What are the penalties for noncompliance?*
Compliance with applicable laws, policies and standards will be enforced through sanctions commensurate with the level of infraction. Actions may include a verbal or written warning, removal of system access for a specific period of time, reassignment to other duties, or termination, depending on the severity of the violation. In addition, activities that lead to or cause the disclosure of classified information may result in criminal prosecution under the U.S. Code, Title 18, Section 798, and other applicable statutes. Unauthorized browsing or inspection of Federal Taxpayer Information (Internal Revenue Code Sec. 7213A) is punishable with a fine of up to $1,000 and/or up to one year imprisonment. Unauthorized disclosure of Tax Return information (Internal Revenue Code Sec. 7213) is a felony punishable with a fine of up to $5,000 and/or up to five years in prison. In addition to these penalties, any Federal employee convicted under Sec. 7213 or Sec. 7213A will be dismissed from employment.

**Your Responsibilities as a User –**
**General:**
 1. Comply with all Federal laws and Department and Component policies and requirements, including DOJ Orders and Standards. Use DOJ information and information systems for lawful, official use, and authorized purposes only.
2. Do not generate, download, store, copy, or send offensive or inappropriate e-mail messages, documents, images, videos, sound files, etc. Limit distribution of e-mail to only those with a "need to know".
3. Do not open e-mails from suspicious sources (e.g., people you don't recognize, know, or normally communicate with) and do not visit untrusted or inappropriate Websites (unless authorized). Only download files from known and reliable sources and use virus-checking procedures prior to file use.
4. Protect and safeguard all DOJ information, including that containing personally identifiable information (PII), commensurate with the sensitivity and value of the data at risk. Protect and safeguard all DOJ information and information systems from unauthorized access, unauthorized or inadvertent modification, disclosure, damage, destruction, loss, theft, denial of service, improper sanitization, and/or improper use.
5. Verify that each computer-readable data extract containing sensitive data has been erased within 90 days

DOE-00006499

of origination or that its use is still required.

6. Upon discovery of a known or suspected security incident, report the incident to your Help Desk, Security Manager, or Supervisor. The incident should be reported regardless of whether data was lost, PII disclosed, or classified information revealed. Immediately report lost or stolen devices (e.g., laptop, phone, tablet, thumb drive).

7. Unless authorized by an approved waiver, encrypt all Departmental Sensitive but Unclassified (SBU) data on mobile computers, laptops, tablets, and/or removable media (e.g., removable hard drives, thumb drives, and DVDs) using Department-approved solutions. Use only authorized removable media (e.g., Component approved thumb drives). For classified environments, follow the procedures required for those networks for data storage and transport. (Remember all data is considered sensitive unless designated as non-sensitive by the Component Director.)

8. Read and understand the DOJ standard security warning banner that appears prior to logging onto the network or mobile device.

9. Screen-lock or log-off your computer when leaving the work area. Log-off when departing for the day.

10. Keep all government-furnished equipment (GFE) mobile devices assigned to you in your physical presence whenever possible. When it is necessary for you to be away from your GFE, particularly at a non-secure location, secure all your portable electronic devices and removable media, preferably out-of-sight (e.g. in a locked container). In some locations, hotel safes are not considered very secure and hotel staff may not be trustworthy.

11. Do not use Peer-to-Peer (P2P) technology on the Internet, such as Skype, BitTorrent, etc. P2P is expressly forbidden throughout the Department unless a waiver is obtained from the Department's Chief Information Officer (CIO) or his/her designee.

12. Do not auto-forward emails from your DOJ email account to your personal email account (e.g., Gmail, Yahoo, and Hotmail).

13. Ensure that individuals have the proper clearance, authorization, and need-to-know before providing access to any DOJ information.

14. Consent to monitoring and search of any IT equipment that is brought into or removed from DOJ owned, controlled, or leased facilities.

15. Properly mark and label classified and sensitive documents, electronic equipment, and media in accordance with the DOJ Security Program Operating Manual (SPOM) and DOJ Order 2620.7. 16. Adhere to Separation of Duties principles. Understand conflict of interest in responsibilities, roles, and functions within a system or application. Duties of the System Administrator and Information System Security Officer (ISSO) should not be combined.

17. Unless specifically authorized, do not change any configurations and/or settings of the operating system and security-related software. Do not attempt to circumvent or test the security controls of the system. Do not bypass native mobile device operating system controls to gain increased privileges (i.e., jailbreaking or rooting the device).

18. Do not use anonymizer sites on the Internet, which bypass the Department security mechanisms designed to protect systems from malicious Internet sites.

19. Follow your organization's telework guidelines when working remotely and/or accessing DOJ information remotely.

**Classified Systems/Information**

20. Do not process classified information on an unclassified system. Send classified email only on systems authorized for that purpose and for the highest level of the classified data involved.

21. When in use, operate IT systems only in those areas or facilities certified for the highest classification or sensitivity level of the information involved. When not in use, store a classified computer, hard drive, removable media, etc. in an approved security container or in a facility approved for open storage.

22. Use classified laptops and similar devices only upon receiving approval from your security office, which must coordinate with the Department Security Officer (DSO) and Chief Information Officer (CIO).

**Passwords:**

23. Adhere to at least the minimum password requirements for the system on which you are working. Change the default password upon using your account for the first time.

24. Do not share account passwords with anyone and protect passwords at the highest classification and sensitivity level of the system to which they apply.

25. Never use the same or similar password for multiple accounts and especially between/among your personal accounts and DOJ or other government systems.

DOE-00006500

**Hardware:**

26. Unless specifically authorized, do not add, modify, or remove hardware, nor connect unauthorized accessories or communications connections to Department IT resources.

27. Unless specifically authorized, do not access the internal components of the computer, nor remove the computer or its hard drive from DOJ facilities.

28. Wipe all devices prior to reissue. There is no expectation of maintaining any personal information, data, or applications on these devices.

**Software:**

29. Do not copy or distribute intellectual property — including music, software, documentation, and other copyrighted materials — without permission or license from the copyright owner. Only use DOJ-licensed and authorized software.

30. Unless specifically authorized, do not install any software.

31. Unless specifically authorized, do not attempt to access any electronic audit trails that may exist on the computer.

**Travel Users:**

32. While travelling, minimize the information on your IT system to what is required to perform that particular mission and destroy copies of sensitive data when no longer required.

33. Power down IT devices when possible and not needed. If the IT device is needed but not the associated network capability, turn off/disable the network/wireless network functionality. (See the *Secure Use of Wireless Networks FAQ* at http://dojnet.doj.gov/jmd/irm/itsecurity/ises_team.php)

34. In a foreign country or airline, assume your transmissions (including cellular services) and conversations are being intercepted, read, and/or heard. 35. When possible, keep your remote access token separate from the laptop/tablet (preferably on your person).

**Mobile Computing & Remote Access Users:**

36. Use mobile GFE (e.g., laptop, tablet, Smartphone) for official business and authorized uses. Mobile GFE is for use by DOJ personnel only (no spouse or relative) and shall only connect through an authorized DOJ remote access network when accessing the Internet.

37. Software and applications can only be downloaded and installed on Departmental mobile GFE as authorized. Ensure that all software is properly purchased, licensed, and obtained from DOJ approved sources before installing it on mobile GFE.

38. Limit Short Message Service (SMS) messages to non-sensitive information if SMS is approved by the Authorizing Official.

39. Only connect to secure wireless networks where possible and take precautionary measures to prevent the compromise of DOJ data when insecure wireless networks must be used. (See the *Secure Use of Wireless Networks FAQ* at http://dojnet.doj.gov/jmd/irm/itsecurity/ises_team.php) **Remote Web Access:**

40. Ensure the confidentiality of government information when using remote web access (e.g., OWA) from a non-GFE client (public or private). This includes the following: a. When downloading attachments to registered non-GFE private computers, immediately remove any attachments, encrypt them locally, or transfer them to an approved encrypted USB drive; b. Delete attachments when finished on registered non-GFE private computers; and c. Do not download attachments on non-GFE public computers.

41. Do not print emails in public areas and with public non-GFE printers. Users may print with non-GFE private printers at home. Users will be held responsible for the compromise of Government information through negligence or a willful act.

42. Maintain a reasonable security posture (i.e., updated antivirus, local firewall, updated OS and software patch levels) on registered non-GFE private computers used for remote web access.

**Civil Division Password Requirements -**

☐      All passwords must be at least twelve characters in length.
☐      Passwords are case-sensitive.
☐      Passwords must contain characters from at least three (3) of the following four (4) categories (the table below includes several examples of acceptable and unacceptable passwords):

| Description | Example |
|---|---|
| Upper case letters | A, B, C, ... Z |
| Lower case letters | a, b, c, ... z |
| Numerals | 0, 1, 2, ... 9 |

DOE00006501

Non-alphanumeric characters $, #, @, &, *, !, +, and other punctuation symbols

- [ ] Passwords may not contain your username or any part of your full name.
- [ ] Passwords will expire no later than every 90 days. You will receive notification before the password expires and will be required to choose a new one.
- [ ] The system will track up to the last 24 passwords that you used. It will not permit you to reuse any old passwords within the group of 24. For example, if you have a password of *Civil#4954* then you will be unable to reuse that password until 24 other password changes have occurred.
- [ ] A maximum of five failed logon attempts will be permitted. After five attempts, if you still have not logged on successfully, you will be locked out from logging on and will need to have the Help Desk reactivate your account.

**Do not process or store classified information on your PC** – OLS Servers is <u>not</u> approved for handling classified information. Should you need to process or store classified information, please contact Jeff Ryan at 202-305-7969. Classified information shall only be processed in accordance with applicable security procedures. Removable media containing classified information must be stored in approved security containers when not in use.

If you have any questions, please contact:

John Palm
202-616-5014
john.palm@usdoj.gov

I acknowledge receipt of, understand my responsibilities as identified in, and will comply with the DOJ IT Security ROB for General Users. This includes my responsibility to ensure protection of PII that I may handle.

_____Date

_____ Email Address

_____ Phone

_____ Signature

_____ Printed Name

DOE00006502

## DOJ/CIVIL MEGA4 ALS System
## User Security Guide & Confidentiality Agreement

In consideration of being provided access to the Department of Justice (DOJ), Civil Division MEGA4 Automated Litigation Support System (System), the User hereby agrees to the following:

1   The provisions of this agreement shall apply to and be binding upon the User, the User's company, business, employees, agents, officers, successors and assigns, and any person acting upon behalf of the User in relation to the DOJ case(s) or project(s) he or she is authorized to access.

2   Except as required by law, as otherwise provided in this agreement, or as directed in writing by the Department of Justice, no information obtained, developed, gathered, or created as a result of work performed in connection with this matter, including any training materials or guidance concerning the System, shall be provided or disclosed orally, in writing, or in any other form, including the transmission of electronic data, to any third party or person who is not a part of this agreement. In any case in which disclosure of such information is or may be appropriate, no disclosures shall be made without prior written approval of the Department of Justice.  This prohibition includes, but is not limited to, communications with any person representing the media, any industry representatives, and any colleagues or fellow researchers.  Disclosures may be made to persons who have signed and filed Confidentiality Agreements with the Department of Justice in connection with this case or project, as well as your management, supervisory, or support personnel as they may be necessary to execute your role as an authorized User in connection with this case or project.

3   Except as required by law, as otherwise provided in this agreement, or as directed by the Department of Justice, all documents, information, electronic data, or other work obtained, developed, gathered, or created as a result of System access, including documents or other information provided by the United States or other parties, shall be treated as privileged Sensitive But Unclassified (SBU) information.  The User shall not reveal such materials to any third party or person without prior written approval from the Department of Justice, except for those persons who have signed and filed Confidentiality Agreements with the Department of Justice in connection with this case or project.

4   Should any documents, information, or electronic data, provided, obtained, developed, gathered, or created in connection with this System be lost, discovered missing, or mistakenly or inadvertently turned over without DOJ consent to an unauthorized person or third party, the User shall immediately report the details of such incident to the lead Department of Justice attorney responsible for this case or matter and the Office of Litigation Support (OLS) Case Manager assigned to this case or project.  In the event the User receives any requests in any form for such information, the User shall immediately notify the lead Department of Justice attorney and OLS Case Manager and await and follow DOJ instructions on how to proceed.

5   The User is responsible for notifying the OLS Case Manager when his or her involvement in this case or matter has concluded, at which time the User will request termination of access to the System.  The User shall deliver upon request, within 30 days of notification that System access has been terminated, all documents, devices, electronic data, and other information provided, obtained, developed, gathered, or created in connection with System access and related to the case or project he or she was supporting to the Department of Justice.

6   Notwithstanding the terms of this agreement, documents created by third-parties and gathered as evidence in litigation that are stored as images on the System will not be deemed to be privileged or confidential by virtue of this agreement. Nothing in this agreement limits the authority of agents or attorneys assigned to the matters in which that evidence is, was or will be collected from disclosing that evidence to witnesses, courts, or other persons who are not parties to this agreement in any manner authorized by law as necessary for those assigned agents and attorneys to discharge their duties in investigating and prosecuting the matters.

Should you have any questions regarding these documents or your responsibilities, please contact your OLS Case Manager or John Palm, Information Systems Security Manager, at (202) 616-5014 or at john.palm@usdoj.gov.

---

**I acknowledge receipt of the "DOJ/CIVIL MEGA4 ALS System Rules of Behavior for General Users" and the "DOJ/CIVIL MEGA4 ALS System User Security Guide & Confidentiality Agreement" and understand my responsibilities as identified. This includes my responsibility to ensure the protection of PII that I may handle.**

Signature: _____   Date: _____

Printed Name: _____

Employing Organization: _____

---

DOE00006503

PIV ENROLLMENT FORMS

DOE00006504

# DEPARTMENT OF EDUCATION
## REQUEST FOR PERSONAL IDENTIFICATION VERIFICATION

PRIVACY ACT STATEMENT: Department of Education (ED) is authorized to ask for the information requested on this form by Homeland Security Presidential Directive (HSPD)-12, and 31 USC 7701. The information and biometrics collected as part of the Federal identity-proofing program under HSPD-12 are used to verify the personal identity of ED applicants for employment, employees, contractors, and affiliates (such as students or interns) prior to issuing a Department identification credential. The credentials are used to authenticate electronic access requests from ED employees, contractors, and affiliates issued a Department identification credential to gain access to ED facilities and networks (where available) through digital access control systems, as well as to other federal government agency facilities and systems where permitted by law. The information collected on this form is protected by the Privacy Act, 5 USC Section 552(a) and maintained under the authority of 38 USC Section 501 and 38 USC Sections 901-905 in ED system of records.

The Privacy Act (5 U.S.C. § 552a(b)) permits ED to disclose the information you provide on this form in accordance with published routine uses, which include but are not limited to the following: civil or criminal law enforcement, constituent congressional communications initiated at your request, litigation or administrative proceedings, administration of the program, including verification of identity and status, personnel administration by Federal agencies, to contractors performing agency functions, FOIA administration, intelligence activities, employment, benefits, and contracting disclosure, employee grievance, complaint, or conduct, responding to breach of data, safety and security of Department employees, customers, and facilities.

Failure to provide all of the requested information may result in ED being unable to process your request for a Personal Identity Verification Card (PIV), or denial of issuance of a PIV. If you do not have a PIV, you may not be granted access to ED facilities or networks, which could have an adverse impact on your application to become, or status as, an ED employee, contractor or affiliate where such access is required to perform your assigned duties or responsibilities.

**\*\*To complete the PIV enrollment process you must have this completed form and two (2) forms of Photo ID (as listed on Table 1)\*\***

### SECTION I – APPLICANT INFORMATION (Completed by Applicant)

| | | |
|---|---|---|
| 1. LEGAL NAME OF APPLICANT (Last, First, Middle, Suffix Name) | 2. DATE OF BIRTH (MM/DD/YYYY) | 3. SOCIAL SECURITY NO. |
| 4. WORK ADDRESS | 5. EMPLOYEE TYPE | |
| | 6. WORK PHONE NUMBER (Include Area Code) | |
| 7. HOME ADDRESS (Street, City, State, ZIP) | 8. PLACE OF BIRTH (City, State, Country) | |
| | 9. COUNTRY OF CITIZENSHIP | |

| 10. GENDER | 11. EYE COLOR | 12. HAIR COLOR | 13. HEIGHT Feet / Inches | 14. WEIGHT (LBS) | 15. RACE | 16. MARITAL STATUS |
|---|---|---|---|---|---|---|
| | | | | | | |

| | |
|---|---|
| 17. CONTRACTOR COMPANY NAME (N/A If Not Applicable) | 18. COR NAME (N/A If Not Applicable) |

19. Do you currently possess a PIV ID from another agency? ☐ Yes ☐ No

    19 a. If yes, what agency issued the ID?

20. What is your Active Directory Login ID or your ED email address?

| | |
|---|---|
| 21. SIGNATURE OF APPLICANT | 22. DATE SIGNED |

### SECTION II – SECURITY OFFICE USE ONLY

| | |
|---|---|
| 1. ID DOCUMENT 1 | 2. ID DOCUMENT 2 |

| | | |
|---|---|---|
| 3. PRINCIPAL OFFICE | 4. ENROLLMENT OFFICIAL | 5. DATE OF ENROLLMENT |

6. COMMENTS

ED PIV ENROLLMENT APPLICATION

February 2016
Previous Editions Obsolete

DOE00006505

### PIV ACCEPTABLE DOCUMENTS
### U.S. Department of Justice, Immigration and Naturalization Service, Form I-9
*All forms of ID must be up-to-date (unexpired).*
*All forms of ID must have the same exact name printed.*

#### LIST A

The primary identity source document shall be one of the following forms of identification:

1. U.S. Passport or a U.S. Passport Card
2. Permanent Resident Card or an Alien Registration Receipt Card (Form I-551)
3. foreign passport
4. Employment Authorization Document that contains a photograph (Form I-766)
5. Driver's license or an ID card issued by a state or possession of the United States provided it contains a photograph
6. U.S. Military ID card
7. U.S. Military dependent's ID card
8. PIV Card (*unexpired*)

#### LIST B

The secondary identity source document may also be one of the following:

1. U.S. Social Security Card issued by the Social Security Administration
2. original or certified copy of a birth certificate issued by a state, county, municipal authority, possession, or outlying possession of the United States bearing an official seal
3. ID card issued by a federal, state, or local government agency or entity, provided it contains a photograph
4. voter's registration card
5. U.S. Coast Guard Merchant Mariner Card
6. Certificate of U.S. Citizenship (Form N-560 or N-561)
7. Certificate of Naturalization (Form N-550 or N-570)
8. U.S. Citizen ID Card (Form I-197);an Identification Card for Use of  Resident Citizen in the United States (Form I-179)
9. Certification of Birth Abroad or Certification of Report of Birth issued by the Department of State (Form FS-545 or Form DS-1350)
10. Temporary Resident Card (Form I-688)
11. Employment Authorization Card (Form I-688A)
12. Reentry Permit (Form I-327)
13. Refugee Travel Document (Form I-571)
14. Employment authorization document issued by Department of Homeland Security (DHS)
15. Employment Authorization Document issued by DHS with photograph (Form I-688B)
16. Driver's License issued by a Canadian government entity
17. Native American tribal document

March 15, 2016

DOE00006506

HELP DESK INFORMATION

DOE00006507

# HELP DESK CONTACT INFORMATION

**Main ED Help Desk**: (202) 708-4357

**Relativity Help Desk**: (202) 719-7704

**Salesforce Help Desk**: CEMS.SUPPORT@accenturefederal.com

**John Stephenson**: (202) 377-3836/John.Stephenson@ed.gov

**Brian Bayne**: (202) 377-3807/Brian.Bayne@ed.gov

**DOE00006893-DOE00006895**

## Borrower Defense (BD) Work Plan – November 2019

**Purpose**:

OUS has requested that FSA hold off on processing the adjudicated borrower defense applications until November 30 with the intent being that FSA would process the following all at the same time:

- 6,000+ "ineligible"/denied CCI applications
- 990 CCI non-JPR approvals using the new tiered relief methodology
- 70+ ITT approvals using the new tiered relief methodology

Additionally, OUS has directed that we adjudicate and process another 20,000+ CCI applications by November 30.

While it is highly unlikely that we will be able to adjudicate the volume that OUS has requested in the next few weeks, we will focus all adjudication work on the CCI (non-JPR) applications in order to optimize the number of applications that can be processed on November 30.

The following is a summary of the BD work plan for November.

**Assumptions:**

- There are only 14 business days between November 8 and November 30.
- Available resources for November:
  - There are only 6 fully trained senior BD attorneys (one of which is part-time);
    - One of the 6 is on extended medical leave.
    - Additionally, several of the senior BD attorneys have scheduled leave over the next three weeks, and there are two holidays between now and November 30.
  - Nine of the term-appointment law clerks/attorneys have been onboarded and are trained on the established review protocols.  They will require further training to implement the new relief methodology when finalized.
  - Nine contractor resources also are trained on established protocols but will need additional training to implement the new relief methodology.

**BD Team Work Streams for the Senior BD Attorneys in November**:

November will be an exceptionally busy month for the senior BD attorneys – a team that is routinely very busy even during a "slow" month due to the many high-priority, time-sensitive projects and work streams assigned to them.

- **Training New Staff** – A large percentage of the available man hours in November will be spent on training new staff:
  - We are onboarding and training 10 additional law clerks/attorneys starting on November 12.

- o Training includes on-site training for a week (Phase I), followed by closely monitored and controlled reviews, generally for the following two to three weeks to ensure proficiency (Phase II).
- o Two of the senior BD attorneys are scheduled to conduct the onsite training for the next two weeks: the training in DC will be next week, followed by training in Atlanta the week of November 18.
- o The remaining senior BD attorneys will be expected to spend a significant portion of their time for the next three weeks on the Phase II controlled reviews for the 10 new staff members.



- **Technology/platform work**:
  - o User Testing for the November BD platform updates is scheduled for next week.
  - o DCC and 2020 BD Regulation implementation design meetings begin the week of the 18th and will require 10 to 20 hours per week for the two senior attorneys assigned to platform design/development.
    - This work is required now in order to not delay DCC implementation for other business units.
    - In order to develop the requirements for the platform to accommodate the new 2020 BD Regulation, the team – and the two assigned senior attorneys, in particular – also will need to fully analyze the regulation.
  - o Data cleanup: the transition and data migration to the Salesforce platform in late 2018 resulted in numerous data anomalies, errors and other problems, many of which have only recently been exposed. The BD team is working with Accenture to fix the recently identified data problems.

- **Work Required to Process the Approved and Denied Applications:**
  - o BD is consulting with and assisting Bus Ops in developing approval and denial processes for the servicers and vendor so that the adjudicated decisions can be implemented soon after there is a signed relief decision memo.
- **Inspector General (IG) Action Items:**
  - o We have several action items due in December.  We already received an extension from the IG and are unlikely to get another one.
  - o Many of the action items were assigned to Sara Hayhurst, so BD likely will need time to review her drafts and consult with others as to additional work that is required before the materials can be submitted to the IG.
- Contractor oversight and monitoring of productivity/proficiency reporting
- Supervising the new law clerks and attorneys


The above-referenced work is likely to consume all or nearly all available man hours in November for the five available senior attorneys.  Any remaining time will be used to adjudicate

# "C – Adjudication" Tab Excerpt from Spreadsheet Bates No. DOE00006974

This document is "C – Adjudication" Tab Excerpt from Spreadsheet Bates No. DOE00006974, produced in Native (PDF Converted Page 1 of 2. This notation in red font was added by Plaintiffs for attachment to Supplemental Complaint; not on original.

**Borrower Defense to Repayment**
Adjudication Process

C – Borrower Defense to Repayment: Adjudication Process



Enforcement Office Borrower Defense Unit

Page 2

# Borrower Defense to Repayment
## Adjudication Process

This document is "C – Adjudication" Tab Excerpt from Spreadsheet Bates No. DOE00006974, produced in Native (PDF Converted Page 2 of 2. This notation in red font was added by Plaintiffs for attachment to Supplemental Complaint; not an original.

A senior attorney determines what evidnce is relevant and works with a team to review the evidence.

attorney logs into CEMS and pulls up assigned cases

If there is no evidence relevant to a school or categories of borrowers relating to a school, the cases are reviewed under the standard protocol.

attorney checks file in CEMS to identify correct review protocol

If there is evidence, the senior attorney(s) work with the team to develop an appropriate protocol. For schools or categories with over X cases or where there are potential approvals supported by the evidence, the protocol is reviewed by the Director. If not, it can be approved by a senior attorney. The senior attorney will consult with the Director on any novel or challenging issues.

attorney reviews case in accordance with protocol

For protocols that set parameters for potential approvals, they must be approved by the Director.

last step in completed review is to move case into 2.21 (ready for QC) unless reviewer is still in training, in which case the last step is to move the case into 2.22 (QC in progress)

all cases in 2.22 are QC'd and then moved into 2.23 (evidence clearance)

Each night, 2.12 cases are "rolled over." 20% are loaded into 2.22 for QC, and the remainder go into 2.23 (evidence clearance).

after 2.23, if the case is approved, it is moved into 2.31 (awaiting relief determination) for application of the Sec's relief methodology or a hold status due to litigation, pending policy decisions, etc.

A "final QC" check by a senior team member is performed before the case moves into 3.1 for processing.  At this step, the adjudication decision is final.

On reconsideration, the borrower can request reconsideration of the decision (if the case was denied) or relief (if the case was approved).  The platform updates needed to address reconsideration requests have not yet been completed. Appropriate protocols will be developed once the platform is updates and pending policy issues are addressed.

**DOE00007209-DOE00007214**

## I.   Detailed Briefing: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)

**Overview:**
- **Background:**
  - Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify, in regulation, which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan, i.e., borrower defense (BD).
  - The original BD regulation went into effect in 1995 and allowed for borrowers to assert, as a defense to repayment, an act or omission by the institution that violated state law. The 1995 regulation was rarely used until the collapse of Corinthian Colleges Incorporated (CCi) in 2015, when the previous administration leveraged it to expand loan forgiveness to CCi students.
  - In 2016, in response to an influx of BD discharge requests, the Department established an Enforcement Office within FSA, which is responsible for adjudicating BD applications, among other oversight-related activities.
  - In the wake of a school closure, students may also apply for loan forgiveness through Closed School Loan Discharge (CSLD).
    - As of December 31, 2018, the Department has issued $164 million in CSLD relief to over 14,000 former CCi students and $251 million in CSLD relief to 18,000 former ITT students. *[Internal note: this does not include the recent automatic closed school discharges (ACSD) as a result of the 2016 rule implementation.]*
    - The Secretary has discretion to extend the CSLD withdraw window to allow students who withdrew earlier to qualify.
  - In order to expand the number of CCi students entitled to loan discharge, after CCi closed in 2015, the Department extended the CSLD withdrawal window for students and recommended that CCi borrowers apply for BD relief. Additionally, the Internal Revenue Service (IRS) waived the tax liability typically associated with BD student loan forgiveness for CCi students.
  - After ITT Technical Institute (ITT) closed in 2016, the Department did not make a similar recommendation that ITT students apply for BD relief.  Instead, the Department recommended that ITT students apply for CSLD but did not extend the withdrawal window for ITT students nor did the IRS provide an exemption from BD loan discharge tax liability.

- **BD Rulemaking:**
  - Under the 1995 regulation, the previous administration discharged loans for borrowers, including CCi and ITT loans.
  - In November 2016, the previous administration issued a new BD regulation (the 2016 rule) that replaced the 1995 regulation and was to take effect July 2017. Prior to July 2017, following a change in administration, the Department delayed the implementation of the 2016 rule due to pending litigation.
  - In 2017, the Department also began a negotiated rulemaking process to revise and replace the 2016 rule. The Department's efforts are ongoing and a final rule is expected to be issued by November 2019, with a July 2020 effective date.

DOE-00007209

- In October 2018, a federal district court found that the Department's delay of the 2016 rule was legally impermissible. Consequently, the 2016 rule instantly came into effect, retroactive to July 2017.

- **BD Adjudication of Applications:**
  - As of September 2018, the Department has issued $534 million in BD relief to 48,000 borrowers. About a third of those borrowers received BD discharge under this administration. *[Internal note: be careful with the wording; approx. 1/3 of borrowers received discharged under this admin but not all borrowers were approved for discharge under this admin. According to DRT, approximately 16,169 borrowers received discharge during this administration, which is 33.7 percent of all approved BD applications.]*
  - In 2017, the current administration announced a new methodology (2017 methodology) for processing approved BD applications for CCi students. Under the 2017 methodology, BD applications are reviewed for their legitimacy and the Department seeks to determine the harm suffered by a student as a result of institutional fraud or misrepresentation. The Department determined the level of student harm by relying on gainful employment (GE) program data to compare average earnings of BD claimants to average earnings of students in similar programs at other schools. The methodology compensates borrowers with legitimate BD applications based on damages incurred rather than the previous administration's "all or nothing" approach to discharge.
  - The 2017 methodology relied on earnings data provided by the Social Security Administration (SSA). However, in May 2018, a federal court determined that this was an impermissible use of SSA data thus halting the Department's ability to process approved CCi BD applications. The Department is appealing this decision. Although the court found this use of SSA data to be impermissible, it did recognize the Department's discretion to establish a tiered relief methodology. The Department is working diligently to evaluate the best course of action given the lawsuit on the Department's BD relief methodology and the court injunction preventing the Department from using it.
  - Additionally, the Department recently transitioned to a new BD application management platform with increased functionality, while also making modifications to the platform to reflect the requirements and provisions of the 2016 rule. Once the data migration to the new application management platform is complete and the platform is consistent with the 2016 rule, the Department may resume evaluating applications that are not otherwise delayed due to the 2017 methodology lawsuit.

**Response:**
- The Department is currently implementing provisions of the 2016 rule in response to the federal district court ruling.
  - The provisions of the 2016 rule are broader than just borrower defense issues, and also include provisions on: automatic closed school discharge (ACSD), certain consumer disclosures, false certification, etc.
- The Department is pursuing an appeal of the court ruling that found the 2017 methodology for BD relief impermissible. Approved CCi applications cannot be processed until the Department decides how to address calculating BD relief in light of this litigation. The

DOE00007210

Department can either develop an alternative BD relief methodology or hold all approved CCi applications pending the final outcome of the litigation.

- o Additionally, other BD relief methodologies will have to be developed for non-CCi programs and schools.

**Current Action:**

- The Department continues to implement and operationalize the 2016 rule.
  - o The Department is working to publish guidance implementing the 2016 rule's financial protection provisions and the ban on pre-dispute mandatory arbitration agreements and class action waivers. *[Internal Note: Guidance is currently under review with OMB.]*
  - o In December 2018, the Department began implementing the 2016 rule's ACSD provision by processing ACSD for eligible borrowers. To date, the Department has processed ACSD for almost 12,000 borrowers amounting to over $129 million in relief, over 6,000 of which are CCi borrowers amounting to over $67 million in relief. *[Internal note: Because the main campus for ITT will not hit the three-year closed requirement until September 2019, we do not currently have numbers for ITT.]* The Department will continue to perform ongoing monthly ACSD for eligible borrowers. This will allow the Department to close pending BD applications, if the same borrower receives an ACSD.
    - ▪ The Secretary also has discretion to extend the ACSD withdraw window to allow students who withdrew earlier to qualify. The previous administration extended this withdraw window and the Secretary affirmed it for CCi applicants, which provided a greater number of borrowers ACSD relief. The Secretary may decide to also extend the withdraw window for ITT borrowers.

## II. Talking Points: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)

**Issue 1: The Department delayed the previous administration's borrower defense regulations (2016 rule) from taking effect in July 2017.**

Current status/position or action taken by ED: In October 2018, a federal court found the Department's delay of the 2016 rule was legally impermissible and the 2016 rule instantly came into effect. The Department is currently implementing provisions of the 2016 rule and efforts to revise borrower defense regulations are ongoing.

Reaction (push back/support): Multiple news outlets and congressional members (e.g., Senator Dick Durbin (D-IL) and Senator Elizabeth Warren (D-MA))  believe that the delay of the 2016 rule was a tactic to prevent students from getting the relief they deserved while the administration rewrote the rules to make it harder for students to get relief.

Talking Points:

- We found the previous administration's borrower defense regulations to be a muddled process that was unfair to students and schools, while leaving taxpayers on the hook for significant costs. We felt it was time to take a step back and make sure these rules achieved

DOE00007211

their purpose: helping harmed students. It is the Department's aim and this Administration's commitment to protect students from predatory practices while also providing clear, fair, and balanced rules for colleges and universities to follow.

- The Department is currently implementing the provisions of the 2016 rule.

- Specifically, the Department is working to publish guidance implementing the 2016 rule's financial protection provisions and the ban on pre-dispute mandatory arbitration agreements and class action waivers.

- Furthermore, the Department has made considerable progress in implementing the 2016 rule's Automatic Closed School Discharge (ACSD) provision. The Department will process ACSDs on a monthly basis ensuring that eligible students receive relief and allowing the Department to close pending BD applications, if the same borrower receives an ACSD.

- The Department's first priority is to protect students, so we're undergoing a rulemaking process to ensure that the BD regulations are fair, effective, and improved. The newly proposed regulations will propose a process intended to be clearer to the applicant and more consistent in outcomes. It will propose measures to hold institutions, rather than hardworking taxpayers, accountable for making whole these students who were harmed by an institution's deceptive practices.

**Issue 2: In 2017, the Department changed the methodology, to a tiered approach, for determining the borrower defense relief granted to approved CCi applicants.**

Current status/position or action taken by ED: The 2017 methodology compensates students based on damages incurred. The 2017 methodology relied on SSA earnings data, but a federal court found the use of these data impermissible, thus halting the Department's ability to process approved CCi borrower defense applications.

Reaction (push back/support): "For the tens of thousands of students and families still waiting for help, being stuck in limbo is causing tremendous mental and financial anguish," wrote 26 Members of Congress in a Nov. 2017 letter that also stated "the idea that borrowers may continue to be saddled with at least some of the debt they incurred to attend institutions that misrepresented information to them is simply unacceptable and does not pass the most basic test of fairness."

Talking Points:

- We are committed to providing borrower defense relief to eligible students. Institutional fraud and acts of misrepresentation are simply unacceptable. However, it is also unacceptable for students who were not victims of fraud or misrepresentation and who did not suffer harm to be forgiven of their loan repayment obligations, while other borrowers are making sacrifices to repay their loans.  It is equally unacceptable for taxpayers to absorb the cost of loan forgiveness when such forgiveness is not well justified.

*Controlled, unclassified information; not for distribution outside agency*          Page 4 of 6

- The 2017 methodology allows applications to be adjudicated quickly and harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder massive costs that may be unjustified.

- The tiered relief assesses borrower harm by comparing average earnings of borrower defense claimants to average earnings of students who had completed similar programs at other schools.

- The principle of relief based on value of education received is consistent with the legal authorization of borrower defense under the HEA and existing regulations.

- This improved methodology was developed following a report from the Inspector General (IG) that found weaknesses with FSA's previous procedures for application review and processing. The Department has worked diligently to address the issues cited in this report, which led to the new methodology for tiered relief, among other improvements.

- The Department's processing of borrower defense applications was abruptly halted by the court's injunction preventing the use of the tiered relief methodology, which the Department is appealing.

- The Department appreciates the importance of providing relief to defrauded borrowers and is actively implementing other forms of relief such as Automatic Closed School Discharge, etc.

### III. <u>Q&As: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)</u>

**Issue 1: The Department delayed the previous administration's borrower defense regulations (2016 rule) from taking effect in July 2017.**

<u>Question</u>: Why did you delay implementation of the 2016 rule? What are you doing now to implement it? Why are you not moving faster? Why haven't you done more?

<u>Proposed Response</u>: No fraud or acts of misrepresentation are acceptable and students deserve relief, if the school they attended acted dishonestly. The Department has been working to get this right for students since day one. We found the previous administration's borrower defense regulations to be unfair to students and schools, while putting taxpayers on the hook for significant costs. However, the Department acknowledges the court's recent decision to implement the 2016 rule and is making the necessary changes.

**Issue 2: In 2017, the Department changed the methodology, to a tiered approach, for determining the relief granted to approved CCi BD applicants.**

<u>Question</u>: Why did you change the relief methodology to a tiered approach?

DOE00007213

Proposed Response: The Department is committed to providing justified BD relief to eligible students, which is why the tiered approach takes into account the harm suffered, while protecting taxpayers from being forced to shoulder massive costs. In May 2018, a federal court enjoined the Department from using the tiered methodology, which we are appealing.

**Issue 3: The borrower defense report for the quarter ending in September 2018 shows that the number of received claims has increased by 35K since the June 2018 report was released. However, the numbers of approved claims, denied claims, and total amount discharged have remained the same.**

Question: Why is the Department not processing claims?

Proposed Response: Our first priority is to protect harmed students, which is why a third of the borrowers who have received BD discharge have had their loans discharged under this administration. In May 2018, the Department was halted from processing claims when a federal court enjoined the Department from using the tiered methodology. We are appealing this ruling.

**Issue 4: FSA's Enforcement Office staff has greatly decreased under the current administration.**

Question: Why is the Department purposefully reducing the staffing in FSA's Borrower Defense Group and Investigations Groups? Is the Department no longer investigating allegations of institutional fraud and misrepresentation to students?

Proposed Response: The Department recognizes the importance of ensuring compliance with laws and regulations governing student financial assistance programs. FSA's Enforcement Office continues to investigate fraudulent activities at colleges and universities. The office also continues to pursue justified penalties against institutions of higher education. The decrease in the total number of staff under the current administration is the result of routine attrition. The Department is not purposefully reducing the staffing of the Enforcement Office.

DOE00007214

**DOE00007269-DOE00007271**

DELIBERATIVE DRAFT DOCUMENT

# Institutional Accountability Regulations
(Formerly called the Borrower Defense to Repayment Regulations)

## Full Talking Points

1. The Department of Education is embarking on rulemaking to replace the 2016 borrower defense to repayment (BDR) regulations originally scheduled to take effect on July 1, 2017, but now delayed until 2019.
2. The rulemaking process will proceed as follows:
    a. The Department conducted public hearings in 2017
    b. Three four-day, formal negotiated rulemaking sessions from December 2017 to February 2018 did not reach consensus
    c. The Department developed its own proposal, which it will publish as a Notice of Proposed Rulemaking (NPRM) the week of July 23;
    d. The Department will accept public comments on the NPRM for 30 days
        i. Only 30 days as the Department has conducted two public hearings and three negotiated rulemaking sessions on these issues
    e. The Department will respond to those comments in a Final Regulation, which the Department intends to   publish by November 1, 2018
3. The current regulation:
    a. Has been effective since 1995
    b. Was designed to allow borrowers in collections proceedings on a defaulted loan ("defensive" claim) to seek loan forgiveness if the borrower relied upon misinformation provided by the institution that resulted in harm to the borrower
    c. Claims were evaluated based on state standards, which made the review process complicated and inequitable since state standards vary considerably
    d. From 1994-2015, the Department received on average fewer than 10 claims per year
4. The prior administration solicited claims from certain borrowers still in repayment ("affirmative claims").
    a. Between 2015 and 2018, the Department received nearly 170,000 claims, of which 12,000 have been denied or closed and 48,000 have been approved, averaging $11,315 per borrower
    b. Department must base its review of these claims on State legal standards, the process has been prolonged, and borrowers suffering the same harm may not receive the same relief due to different legal standards among the States
    c. Institutions receive no notice of claims and have no opportunity to respond to claims under the current rule
    d. The Secretary can recover losses from an institution only if the claim was approved within three years after the student left the institution.
5. In 2016, the prior administration promulgated new defense to repayment regulations that included the following provisions:
    a. Changed the review of claims from a state standard to a federal standard
    b. Created a wildly expansive federal standard that went far beyond cases of fraud to cover breach of contract and a lax misrepresentation standard

DELIBERATIVE DRAFT DOCUMENT

    c. Allowed the Secretary to initiate group claims on behalf of borrowers, with no effective requirement that a borrower show individual reliance on an institution's conduct or financial harm

    d. Failed to provide notice to institutions prior to the adjudication of the claim

    e. Failed to allow institutions the opportunity to respond to allegations of wrongful conduct prior to the adjudication of the claim

    f. Disallowed institutions from responding to claims made against them until after the Department adjudicated the claim  and the Department sought reimbursement from the institution for the cost of the claim

    g. Disallowed institutions to require students to engage in mandatory arbitration prior to legal action or to prevent students from participating in class action suits

    h. Implemented mandatory financial triggers based on allegations asserted in a lawsuit or borrower defense claims that would enable the Department to require a letter of credit from an institution

    i. Provided for automatic student loan relief if a borrower who attended a closed school did not re-enroll at another institution within three years

    j. Was estimated to cost the taxpayer $10 billion over 10 years

6. Our proposed regulation provides a fair, impartial approach to the borrower defense to repayment review process and includes  due process rights for institutions, which will result in more data and information for the Department to decide defenses to repayment.  It also ensures that institutions, rather than taxpayers, bear the financial costs when institutions commit a misrepresentation. The proposed regulation :

    a. Rescinds that portion of the 2016 borrower defense to repayment regulations that did not become effective July 1, 2017

    b. Provides two options on which we will seek comment, including one which restores the Clinton-era interpretation that limits borrower defense to repayment to collection proceedings  and another option that allows for affirmative claims outside of collection proceedings

    c. Establishes a single Federal standard for both options

    d. Provides institutions with the opportunity to respond to a borrower's defense to repayment claim Requires institutions that use mandatory arbitration and class action waiver agreements to provide clear, plain language disclosures to students and prospective students and to post those disclosures on a website available to the public

    e. Eliminates the ability for the Secretary to initiate group claims because the Department needs an application from each borrower to determine the harm suffered by that borrower;

    f. Limits financial triggers to those that impact the institution's composite score (financial responsibility ratio) and those that are a sign of imminent closure of the school

    g. Imposes mandatory and discretionary financial triggers on institutions arising from certain events and occurrences that have a negative impact on a school's composite score

    h. Implements changes in the way composite scores are calculated to conform with changes in FASB standards regarding the treatment of leases in audited financial statements

    i. Extends the closed school student loan discharge period from 120 to 180 days

    j. Encourages closing institutions to conduct orderly teach-outs and to avoid precipitous closures by disallowing closed school discharges for schools that offer an accreditor

DELIBERATIVE DRAFT DOCUMENT

approved teach-out plan that enables students to complete their programs at the institution or another institution

k.  Enables students who are unable to obtain an official high school transcript or diploma to attest to the fact that they have completed high school but disallows such students from receiving loan forgiveness based on false certification if they submitted a false attestation

l.  Prohibits guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency

**DOE00007289-DOE00007291**

Borrower Defense to Repayment

- The revised 2019 BD regulation continues to provide student loan relief to students who have been the victim of misrepresentation – and our regulation extends that right to all students, regardless of the tax status of their institution.  In other words, students who attend non-profit law schools that misrepresent their job placement rates and large universities that misrepresent their selectivity or admissions requirements to ranking agencies, or who once claimed to adhere to EEO laws and now admit to systemic racism are eligible for BD relief in the same way that students whose proprietary institutions engaged in misrepresentations about job placement rates are.

- The revised 2019 BD ensures due process rights to all involved – which is a fundamental American principle.  It also ensures that the student and the institution have access to all of the information the Secretary will use to adjudicate the claim, and it gives the student the last word in responding to that evidence. No longer can the Department serve as prosecutor, judge and jury based on "secret" evidence.

- The 2016 regulation allowed the Department to require institutions to post large letters of credit simply because the institution had been sued or was subject to an investigation that *could* result in a financial settlement that would impact the institution's financial stability.  This enabled activists to destroy an institution financially by making accusations against it, even if in the end the institution is not found guilty of the allegations made against it or the investigation results in no findings.  The 2019 regulation limits financial penalties, such as letters of credit, to instances when an institution has actually been required to make a financial payment or settlement that changes the institution's financial viability.

- 

- *Borrower Defense to Repayment*
- Federal Student Aid also released monthly borrower defense data reports through August. As of August 2020, more than 330,000 borrower defense to repayment applications have been submitted. Of those applications, 39 percent are pending decision, including approximately 85,000 applications that are awaiting adjudication and approximately 45,000 applications that

DOE00007289

are pending notification. More than 61,000 applications were deemed eligible for borrower defense to repayment, 129,000 applications were deemed ineligible, and the remaining 10,000 applications were closed.

Of the over 128,000 BD claims the Department has adjudicated so far, less than 70,000 were actually valid claims.  Many claims are "stab in the dark" efforts to get loans forgiven because a student didn't like a particular instructor or because, in general, the student feels like the education wasn't what they expected it to be.  Disappointment and dissatisfaction are not grounds for BD relief – a disappointed student should have transferred to another institution. It is important to keep in mind that when frivolous BD claims result in student loan relief,ACKGROUND

When the Department of Education decided to force Corinthian Colleges out of business, it re-interpreted a 1995 regulation that had rarely been used in the past to provide loan forgiveness to certain Corinthian students.  Called the Borrower Defense to Repayment (BD) provision, the statutory purpose of BD was to provide borrowers in default, who otherwise lose access to borrower benefits such as alternative payment arrangements, a "last resort" opportunity to shed the debt in the event that the institution violated a relevant state law (meaning consumer protection laws related to the making of a student loan).

- The Department decided to launch the attack against a school in California – the state with the most liberal consumer protection laws – and worked closely with the California AG to investigate the school.  In fact, when the Department required Corinthian to produce volumes of student records, the Department merely boxed them up and shipped them to the CA AG so that her office could review them.  Based on claims by the CA AG that the institution had misrepresented job placement rates (a claim that the Department has never itself validated, except for Heald Colleges, one of Corinthian's brand names), the Department determined that there had been widespread misrepresentations by all Corinthian schools, and using CA law, promised BD relief to students who had attended certain Corinthian programs during certain periods of time, regardless of the state in which the student or campus that student attended was located.  Documents show that often times the determination of "widespread" abuse was based on interviews with as few as 15 students – despite the fact that tens of thousands of students completed Corinthian programs over the years.
- In 2016, the Obama Administration promulgated new regulations for BD that moved from a state law standard to a Federal standard, added breach of contract as a source of BD relief, and eliminated the reference to "intent" with regard to misrepresentation.  This meant that even if the misrepresentation was really just puffery (i.e. – a student who says that the colleges is "the best" or a faculty member who says that a group of students they are teaching are "the brightest" they've ever taught), the school could be found guilty of a misrepresentation and the student's loan would be forgiven.
  - Importantly, the 2016 Obama regulation stated directly that if the institution guilty of misrepresentation was a non-profit institution, then the borrower would not be entitled to relief because he or she would have gotten a good education despite the misrepresentation.  On the other hand, the presumption was that all proprietary institutions offer poor quality education, and therefore, if the institution engaged in misrepresentation the student was naturally harmed.

DOE00007290

- o  The 2016 regulation also required institutions to obtain large letters of credit based on allegations made against them – as opposed to final judgments on the merits – meaning that as activist AGs banded together to file large lawsuits, they could literally force a school out of business even if the school was ultimately found not guilty of the allegations made against them.
- o  The 2016 regulation denied institutions due process rights and put the Department in the position of being accuser, judge and jury – of course playing this role with other people's money.
- o  ***Because the 2016 regulation eliminated the need for intent, all institutions that promised a ground based experience last spring, but then switched to on-line due to COVID-19, are now subject to BD claims.  This could mean that institutions would be required to reimburse the Department for all student loans for students who were enrolled during the Spring, and the reimbursement would not be limited to their Spring loans – it would include the entire federal student loan debt accumulated for the program in which the student was enrolled during the spring term.***

- Unfortunately, when students who are not harmed by an institution receive loan relief, that means that taxpayers who may have not been able to send their own kids to college are stuck footing the bill for a person who had the advantage of attending college.  It also suggests that students are incapable of making good choices or of being wise consumers – and it eliminates any level of personal responsibility in selecting a school or program that meets the needs of the student.
- In 2019, we promulgated new BD regulations that maintained the focus on providing BD relief for students who were harmed by misrepresentations – regardless of the tax status of the institution that committed the misrepresentation.  resOur regulation continues to provide relief to borrowers who have been the victim of misrepresentation – regardless of the tax status of the institution.  However, institutions have due process rights restored, specious claims can be more quickly removed so that we can focus on students who have truly been harmed, the adjudication process requires something more than hearsay evidence to find a school guilty (though the regulation does not require the borrower to meet the level of evidence required to prove that he or she was defrauded), and each claim will be reviewed to ensure that taxpayers who didn't have the luxury of going to college aren't stuck with the bill for those who did

DOE00007291

**DOE00007866-DOE00007879**

To:      Under Secretary Ted Mitchell
From:    Borrower Defense Unit
Date:    January 9, 2017
Re:      Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment

Corinthian Colleges, Inc. ("Corinthian") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. Accordingly, the Borrower Defense Unit recommends full relief for Corinthian borrower defense (BD) applicants who submit "guaranteed employment allegations" – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

**I.      Summary of Corinthian's Representations to Borrowers Promising Employment**

In BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs. These oral representations sometimes took the form of a guarantee regarding the individual student and sometimes took the form of a guarantee of universal employment for graduates. In both cases, the obvious impression to students would have been that 1) the value of the education would be substantial; and 2) they would get jobs upon graduation.

These representations occurred both in person and during telephone calls with prospective students. Borrowers' allegations of "guaranteed employment" are unprompted,[1] specific, and consistent across a span of years. Indeed, the Department has received consistent guaranteed employment claims from borrowers at every campus sampled, including borrowers who enrolled between 1998 and 2013, demonstrating that personnel made consistent guaranteed employment representations throughout the entire time that Corinthian operated its schools. Taken together, based on an evaluation of the credibility of those statements, as well as Corinthian's record of making misrepresentations to prospective students,[2] a preponderance of the evidence demonstrates that Corinthian promised borrowers that they would receive jobs upon graduation.

**A.      Guaranteed Employment Representations at Heald College**

At Heald, of the 1015 claims sampled, 141 (13.9% of the total) include allegations of guaranteed employment.[3] The high incidence of guaranteed employment allegations was evident at all Heald campuses. At Heald Modesto, for example, of 61 BD claims sampled, 9 allege guaranteed employment (14.8% of the

---

[1] All of the above student statements came from a variety of different types of applications including the Heald, Everest, and WyoTech attestation forms ED created for job placement rate claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."

[2] *See* discussion below, Section II, describing Corinthian's misrepresentations regarding job placement rates.

[3] This count excludes allegations that may pertain to guaranteed jobs but that were not sufficiently clear or specific to qualify for relief. For example, allegations that Corinthian's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment allegations.

total).[4]  A sample of claims from Modesto borrowers demonstrates the consistency and specificity of guaranteed employment representations made by school representatives:

- "Heald college recruiters stated, 'I was guaranteed' to obtain a job after graduation."[5]
- "I was told that when I finished my program I would automatically have job placement and never received that placement."[6]
- "Heald promised me a job placement in the field.  To this day, I haven't been able to find a job in my field, or a good paying job."[7]
- "I was given the false pretense that I could obtain a career in law enforcement with an Associate's degree and was guaranteed job placement."[8]

Guaranteed employment allegations appeared with similar pervasiveness and consistency at all of the other 11 Heald campuses.  A sample of these claims, detailed below, demonstrates the high incidence of guaranteed employment misrepresentations at the school.

- Heald Concord: "During my experience, they promised me jobs after graduation . . . I still have the same jobs after graduation and Heald did nothing to help me . . . Heald College promised that they will find job for me upon graduation."[9]
- Heald Honolulu: "Upon admission, my admission's advisor, Roy Honjo, informed that an associate's degree in applied science in Health Information Technology (HIT) would provide me many job opportunities . . . He insisted I would find a job that would suit me and would be a smart decision to pursue."[10]
- Heald Roseville: "When I first looked into Heald College and spoke with the Academic Advisor, I was promised a job position within six months.  It is now 2015 and I have yet to have ever worked in a medical office.  The degree has done nothing for me."[11]
- Heald Salinas: "When I first enrolled, they said I had a job at the end of my education."[12]
- Heald San Jose: "They stated on many occasions that after I graduate and complete the program that I would be placed in job where I would be able to pay off my student loans easily... They guaranteed job placement and never delivered."[13]
- Heald San Francisco: "Heald College's promises of guaranteed job placement after graduation sold me on becoming a student."[14]

---

[4] The Modesto campus was selected because relatively few Modesto borrowers qualified for relief based on ED's findings regarding job placement rates.  Modesto was a relatively new campus, and therefore had calculated placement rates for fewer years in the period surveyed.
[5] BD155524.
[6] BD155784.
[7] BD155698.
[8] BD154018.
[9] BD151426.
[10] BD1600328.
[11] BD157436.
[12] BD151163.
[13] BD153799.
[14] BD153784.

2

DOE00007867

| Heald Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Heald Modesto | 61 | 9 | 14.8% |
| Heald San Jose | 151 | 29 | 19.2% |
| Heald Rancho Cordova | 40 | 5 | 12.5% |
| Heald Roseville | 56 | 9 | 16.1% |
| Heald Hayward | 138 | 18 | 13.0% |
| Heald Stockton | 125 | 11 | 8.8% |
| Heald Concord | 150 | 22 | 14.7% |
| Heald Fresno | 103 | 11 | 10.7% |
| Heald Honolulu | 63 | 10 | 15.9% |
| Heald Portland | 24 | 3 | 12.5% |
| Heald Salinas | 43 | 4 | 9.3% |
| Heald San Francisco | 61 | 10 | 16.4% |
| **TOTAL** | **1015** | **141** | **13.9%** |

### B.    Guaranteed Employment Representations at Everest and WyoTech

**The high incidence of guaranteed employment allegations at Heald was evident at Everest and WyoTech, as well.** At Everest, 231 out of 1277 BD claims sampled, or 18.1%, made guaranteed employment allegations. At Everest Brandon, for example, 45 of 305 claims sampled, or 14.8% of the total, alleged guaranteed employment. A sample of claims from Everest Brandon borrowers follows:

- "They told me that every student that graduated the program was placed."[15]
- "I was told that I would be able to attain a job in my field with no problem. I have applied to multiple agencies and was told I was not qualified."[16]
- "I was told I would find a job in my field . . . I 'graduated' and still can't find a job that will honor my degree."[17]
- "I was told that I would be placed into a career field of my studies, but I was not."[18]

The Department sampled claims at 22 Everest campuses[19] across ten separate states (AZ, FL, MI, MA, TX, VA, CO, WI, NY, CA). Just like the Everest Brandon campus discussed above, the guaranteed employment allegations were common at all of these campuses and were distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students made substantially similar guaranteed employment allegations – whether the student enrolled at Brandon in 1998 or Rochester in 2008.

---

[15] BD151311.

[16] BD150332

[17] BD1612793.

[18] BD1614055.

[19] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The 22 campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

3

DOE00007868

Similarly, at WyoTech, 64 out of 455 BD claims sampled, or 14.1%, alleged guaranteed employment. At WyoTech Laramie, for example, 8 of 31 claims, or 25.8% of the total, alleged guaranteed employment. A sample of claims from WyoTech Laramie borrowers follows:

- "They promised me a high paying career and said they would find it for me after graduation. They stated that all of the students who pass the program . . . will have jobs waiting for them."[20]
- "The education was sold as a way to guarantee future employment, with access to a nationwide network of job placement experts."[21]
- "The school was promising a career in the field after schooling."[22]
- "[They] would say that just by speaking the name Wyotech you so get hired and make over 100K a year. They said it would be automatic hiring and that the industry knows the Wyotech name."[23]
- "We were recruited hard and we were promised [that] [name redacted] . . . would have his choice of many fine, well-paying positions once he completed his studies."[24]

The tables below summarize the number of guaranteed employment allegations at Everest and WyoTech for all of the sampled campuses:

| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
|---|---|---|---|
| | | Everest Claims | |
| Everest Brandon | 305 | 45 | 14.8% |
| Everest Grand Rapids | 46 | 3 | 6.5% |
| Everest Largo | 31 | 6 | 19.4% |
| Everest Ontario Metro | 34 | 7 | 20.6% |
| Everest Orange Park | 36 | 9 | 25.0% |
| Everest Orlando North | 47 | 6 | 12.8% |
| Everest Orlando South | 226 | 33 | 14.6% |
| Everest Phoenix | 81 | 40 | 49.4% |
| Everest Pompano Beach | 97 | 9 | 9.3% |
| Everest Rochester | 53 | 14 | 26.4% |
| Everest Tampa | 32 | 9 | 28.1% |
| Everest San Bernardino | 15 | 1 | 6.6% |
| Everest Milwaukee | 38 | 6 | 15.8% |
| Everest Colorado Springs | 37 | 10 | 27.0% |
| Everest Ft. Worth South | 54 | 8 | 14.8% |
| Everest Tyson's Corner | 15 | 2 | 13.3% |
| Everest Vienna | 21 | 2 | 9.5% |
| Everest Arlington | 31 | 4 | 12.9% |
| Everest Aurora | 50 | 3 | 6% |
| Everest Thornton | 4 | 1 | 25% |
| Everest Chelsea | 12 | 6 | 50% |
| Everest Brighton | 12 | 7 | 58.3% |
| **TOTAL** | **1277** | **231** | **18.1%** |

---

[20] BD150863.
[21] BD152602.
[22] BD155621.
[23] BD151128.
[24] BD151903.

4

DOE00007869

| WyoTech Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| WyoTech Laramie | 31 | 8 | 25.8% |
| WyoTech Fremont | 135 | 16 | 11.8% |
| WyoTech Blairsville | 157 | 18 | 11.4% |
| WyoTech West Sacramento | 132 | 22 | 16.6% |
| **TOTAL** | **455** | **64** | **14.1%** |

Significantly, just as the aforementioned Heald, Everest, and WyoTech claims at each campus corroborate each other, the number of similar allegations at and across all Corinthian schools and campuses strongly suggests that promises of employment were endemic to Corinthian's institutional culture.

### C.   Guaranteed Employment Claims Consistent Across a Span of Years

Although the Borrower Defense Unit has received fewer claims from borrowers that attended Corinthian schools in earlier years,[25] such claims bear the same indicia of reliability as claims from students who attended more recently.  Student statements about admissions representatives' misrepresentations are consistent across a span of years, as demonstrated by claims from former students at Everest – Orlando South:

- [1999]: "Everest recruiters told students that they were **'guaranteed' to obtain jobs.**"[26]
- [2001]: "They . . . told me I would be **guaranteed a job once I graduated.**"[27]
- [2002]: "I was told **I would get a job right away…**"[28]
- [2003]: "I was lured into this organization with false promises of **100% job placement…**"[29]
- [2005]: "They said I was **guaranteed job placement after I graduated.**"[30]
- [2006]: "Everest **guaranteed me career placement upon graduation.**"[31]
- [2007]: "They told me that I will be **guaranteed a job placement after I graduate.**"[32]
- [2008]: "They told me I was **guaranteed a job.**"[33]
- [2009]: "**I was promised job placement, high salaries and success.**"[34]
- [2010] "I was **guaranteed a job** from my Academic advisor and Career Counselor."[35]
- [2011] "…told me I **was guaranteed a job** in my profession **after I graduated** making twice as much as minimum wage at least."[36]
- [2012]: "I was **promised employment after graduation.**"[37]

---

[25] The Department's outreach has targeted borrowers from more recent years in an attempt to reach borrowers that may be eligible for relief on the basis of misrepresented job placement rates.
[26] BD155177.
[27] BD156179.
[28] BD1600004
[29] BD151816
[30] BD150148.
[31] BD157758.
[32] BD153166.
[33] BD153136.
[34] BD156038
[35] BD1605002.
[36] BD155731.
[37] BD1615288.

DOE00007870

- [2013]: "They called me over and over and promise **jobs after graduating…**"[38]

### D. Corinthian Employee Statements and Other Employment-Related Misrepresentations Corroborate Guaranteed Employment Claims

The similarity of student statements across schools, campuses, and years strongly suggests that the misrepresentations were system-wide and, indeed, part of Corinthian's institutional culture. This conclusion finds further support in the affidavits of former employees, who admitted that Corinthian employees misled prospective students about their employment prospects. For example, a former instructor at Everest's Chelsea campus stated, "People in corporate told prospective students they guaranteed jobs . . . They saw job placement not as job placement in the students' fields of study, but as a student getting any job."[39] An admissions representative from the same campus stated, "Admissions representatives told prospective students that medical assistants are in high-demand and that they would have no problem finding jobs . . . and they will definitely find jobs."[40]

Furthermore, guaranteeing jobs to prospective students appears to have been part of a pattern of employment-related misrepresentations at Corinthian. An internal Corinthian audit of admissions calls from one its campuses found that that 21% of admissions representatives "provided [a] false or misleading statement (such as best case scenario)," which likely pertained to employment outcomes.[41] Further, in a letter issuing a nearly $30 million fine to Heald, the Department found that Heald "represented with regard to many of its programs that it placed 100% of its graduates in jobs," but Heald was unable to provide evidence to substantiate these representations. The Department further noted that based on the evidence that Heald was able to provide, the job placement rates appeared to be substantially lower than 100%, and for several programs, below 50%.[42] At the same time that Corinthian was making false representations about its job placement rates, executives at Corinthian were putting heavy pressure on campuses to attract new students. One admissions director reported that his superiors at Corinthian instructed him to "enroll your brains out."[43] In this context, it is unsurprising that staff at the campus level would be guaranteeing students a job.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for additional Corinthian campuses. The hundreds of claims reviewed corroborate that Corinthian personnel made guaranteed employment representations beginning shortly after Corinthian opened or gained control of a campus.

## II. Evidence of the Falsity of the Alleged Representations

Corinthian's own records show that the school was unsuccessful at placing large numbers of Corinthian graduates. The Everest records, for example, reveal that nearly half of the school's programs placed 50% or fewer of the program graduates. Further, evidence from Corinthian's internal communications shows that they were aware that the school could not live up to their promises of employment. For example, an internal email from Corinthian's Vice President for Operations stated that, "at some campuses" they had "not been

---

[38] BD1617088.

[39] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, *Medolo* Aff. ¶ 4, June 26, 2015.

[40] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, Morrison Aff. ¶ 5, July 6, 2015.

[41] Exhibit 40 - CA AG Default Motion at 278.

[42] Heald Fine Letter, http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.

[43] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, Exhibit 36 - CA AG Default Motion.

DOE00007871

consistently delivering" on the promise to students to "find a position that will help them launch a successful career."[44]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations—and many other BD applicants—state that they were unable to find a job upon graduation; that they were unable to find employment that used their degree; or that they were forced to remain in the job that they had prior to enrolling at Heald, Everest, or WyoTech. In sum, the evidence overwhelmingly shows that Corinthian campuses could not truthfully guarantee prospective students employment upon graduation.

## III. Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations

For the reasons set forth below, the Corinthian borrowers' applications for borrower defense relief predicated on a guaranteed employment allegation: a) are reviewed under California law; and b) have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[45] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. Moreover, given the lack of value conferred by Corinthian credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A. The Department will apply California Law to These Claims.

To prevail with a defense to repayment, a borrower must assert acts or omissions "that would give rise to a cause of action against the school under applicable state law."[46] With the assistance of the Office of General Counsel, we have examined specifically whether borrowers making the claims described in this memo could bring a cause of action in California and determined that they could. Specifically, the Department has concluded not only that students who were subjected in California to the acts complained of here would have been able to bring their cases in California courts under California law, but also that borrowers who attended Corinthian in other states could have brought their claims in the context of a class action in a California court, which would have applied California law.

California has general jurisdiction over Corinthian.[47] As to the law a California court would have applied, California courts have recognized that a forum state (such as California) "may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'" *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001) (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)). California is neither an arbitrary nor an unfair state for a class of Corinthian borrowers to bring a

---

[44] Exhibit 36 - CA AG Default Motion.

[45] CAL. BUS. & PROF. CODE § 17200, et seq.

[46] 34 C.F.R. § 685.206(e) (emphasis added).

[47] Corinthian was headquartered in California, and was therefore a resident corporation subject to the state's general jurisdiction. Furthermore, even a non-resident corporation is subject to a forum's general jurisdiction "if [its] contacts in the forum state are substantial[,] continuous and systematic." *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1092 (Cal. 1996) (internal quotation marks and alterations omitted). In such a case, "defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction," and there is no need to determine whether the specific acts alleged in the suit meet the threshold for specific jurisdiction. *Id.* Such is the case with Corinthian; the largest numbers of both campuses and students were located in California.

7

DOE00007872

claim, and the conduct at issue had significant contacts with California insofar as the students were enrolling in a California-based school and recruiters were receiving at least some of their training from high levels of administration at the school.

Furthermore, under California's choice-of-law test, the court considers both the defendant's headquarters and the state where many students attended the school.[48] Another key factor in the choice-of-law analysis under California law is the location "where the wrong occurred."[49]  At Corinthian, the largest numbers of both campuses and students were located in California. Further, as proved to be the case in the Department's investigation of Corinthian, the fact that a school is headquartered in a given state will often mean that *"some or all* of the challenged conduct emanates" from that state, another common factor in choice of law determinations.[50]  At Corinthian, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment.[51]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, that the largest numbers of its campuses and students were located in California, and that decisions and policies made by its California based corporate leadership harmed students across the nation – it is reasonable for the Department to determine that a California court would apply California law to these claims. Therefore, BD claims submitted by former students from all Corinthian campuses will be considered under the California UCL.

**B.      Corinthian Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[52] Here, Corinthian's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.  The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[53]  Thus, if a business practice violates any law, this is *per se* a UCL violation.[54]  Corporate

---

[48] *See, e.g., In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)) (considering, among other factors, "where the defendant does business [and] whether the defendant's principal offices are located in California…").

[49] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). *See also McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("Although California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred without regard to the nature of the issue that was before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." (internal citation and quotation marks omitted)).

[50] *See, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612 (Ct. App. 1987).

[51] *See* Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15; Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013).

[52] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[53] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

DOE00007873

misrepresentations like Corinthian's promises of employment are prohibited by a number of state and federal laws.[54] In particular, Corinthian's misrepresentation regarding its students' employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[56] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[57]

Applying that three step inquiry, Corinthian clearly violated the FTC Act.

1.  As described above, Corinthian made representations to students regarding guaranteed employment;
2.  Also as described above, those representations were false, erroneous, and misleading; and
3.  As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[58] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that Corinthian schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Students enrolled "primarily to gain skills and find a position that will help them launch a successful career."[59] Corinthian's own marketing materials emphasized that the school was a pathway to employment, often noting "solid industry employment contacts"[60] and the availability of "lifetime career services." For many students, the principal purpose of attending a career college like

---

[54] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).
[55] Though the analysis below focuses exclusively on the FTC Act, Corinthian's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that Corinthian's conduct violates the FTC Act, this memo does not reach the issue of whether it may be unlawful under other applicable rules.
[56] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").
[57] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).
[58] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").
[59] Exhibit 36 - CA AG Default Motion.
[60] Exhibit 179, Part 1; Declaration of Jacinto P. Fernandez (CA AG), Exhibit Y

9

Everest, Heald or WyoTech was to obtain employment in a particular field.[61]  Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, Corinthian's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

### 2.  The Fraudulent Prong

Corinthian's misrepresentations regarding employment prospects also are a fraudulent business practice under the UCL, and therefore are another form of unfair competition providing an independent basis for borrower defense relief for Corinthian students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[62] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[63]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[64]  As noted, the representations Corinthian made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[65] However, for a consumer who was deceived into purchasing a product[66]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[67] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[68]

Express or implied claims like those made by Corinthian about employment prospects are presumptively material,[69] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[70] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to

---

[61] Under these circumstances, students' reliance on a guarantee of employment was reasonable.  Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of claims making guaranteed employment allegations is a clear indication that students believed what they were told.
[62] *See Bank of the West*, 2 Cal. 4th at 1254.
[63] CAL CIV. C. § 1709.
[64] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).
[65] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).
[66] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[67] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[68] *Id.* (internal quotation marks omitted).
[69] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).
[70] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

DOE00007875

enroll.[71] Statements by large numbers of borrowers across Corinthian campuses make clear that the promise of employment entered substantially into their choice to attend a Corinthian school.

## C.     Weak Disclaimers In Some of Everest and WyoTech's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

Corinthian's promises of employment were false and misleading, despite the limited disclaimers on some Everest and WyoTech enrollment agreements. Although those enrollment agreements state that the school does not guarantee "job placement" or "a salary," such written information did not change the overall impression created by the oral representations.

For example, if a student examined an Everest enrollment agreement, the student would have to read through two pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[72] Part of the way through that box of fine print, item number 2 states that Everest "does not guarantee job placement to graduates upon program / course completion or upon graduation, and does not guarantee a salary or salary range to graduates."[73] That item is not highlighted or bolded in any way. The agreement then continues on with an additional page of fine print disclaimers. The WyoTech enrollment agreement includes a similar disclaimer on its first page: "The school does not guarantee employment following graduation, but does offer placement assistance to graduates." This is included as item "(a)" in a list of nine fine print disclaimers following a paragraph-long disclaimer about the cost of books and tools.

These disclaimers do not cure the falsity of Everest and WyoTech's oral promises regarding employment prospects. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[74] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[75]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, Corinthian's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.[76]

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want[ed] quick solutions."[77] Corinthian's CEO, in a letter to

---

[71] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

[72] See, e.g., Everest Institute Brighton/Chelsea Enrollment Agreement.

[73] BD150633, Attachment #3, page 7.

[74] See, e.g., FTC v. Minuteman Press, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); see also Chapman v. Skype Inc., 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[75] Chern v. Bank of Am., 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[76] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics.

[77] CA AG Quach Decl. Ex 113.

11

DOE00007876

Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions.  Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[78]  Corinthian advertised on daytime TV,[79] targeting the un- or under-employed.  In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[80]  In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Finally, the fact that the 436 Corinthian claims reviewed to date that allege Corinthian guaranteed employment make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective.  As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations that Corinthian personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.    Eligible Borrowers

Based on the above analysis, the following Corinthian students making guaranteed jobs allegations should be eligible for relief: any claimant who attended a Corinthian campus and who alleges that they were promised, guaranteed, or otherwise assured employment or job placement.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment.  As we found in the job-placement-rate analysis, the misrepresentation in this case went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment.  Furthermore, in this case, the Department's review of the borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E.    Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[81]  In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[82]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[78] Letter from Jack D. Massimino, CEO, Corinthian, to James W.  Runcie, Chief Operating Officer, U.S.  Office of Federal Student Aid (Nov.  12, 2014).

[79] CA AG Quach Decl.  Ex 113.

[80] CA AG Decl.  of Holly Harsh.

[81] *See, e.g., Makaeff v.  Trump Univ.*, 309 F.R.D.  631, 637-8 (S.D.  Cal.  2015).

[82] *See, e.g., FTC v.  Stefanchik*, 559 F.3d 924, 931 (9th Cir.  2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v.  Figgie International*, 994 F.2d 595, 606 (9th Cir.  1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v.  Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir.  1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v.  Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D.  Nev.  2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00007877

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[83]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Corinthian education. *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). The Department has found that Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[84] Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest, Heald or WyoTech education has been severely limited.

Borrower defense applications confirm the lack of value of a Corinthian education as many Corinthian students report that their degree or affiliation with the school has been an impediment rather than an asset as they seek employment. For example, one Everest student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[85] Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[86] A student from WyoTech states: "Any association with WyoTech hurts my chances for employment. I was promised jobs with big salaries, a career I would hold for life and all WyoTech gave me was debt and shame. I was told by two interviewers, that they would NEVER hire a WyoTech graduate..."[87] And a Heald student states: "The school is not reputable no other institution recognizes the credits earned and jobs stray away from Heald graduates, claiming they lack in teaching students current and up to date information in the coding industry. I have yet to work in my field of study and utilize my degree. I have a useless degree from a closed college."[88]

Finally, awarding full relief to students who make guaranteed employment allegations is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inconsistent to limit the relief of students who make guaranteed employment allegations—which are essentially 100% job placement claims—while providing full relief to those students who qualify for job placement rate relief.

---

[83] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[84] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CORINTHIAN-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

[85] BD1614100.

[86] BD1602593.

[87] BD151191.

[88] BD157356.

DOE00007878

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, [89] it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

CONCUR:

Office of the General Counsel

Date

---

[89] This approach also is consistent with the Department's new regulations in that the Department has considered whether the value of the education provided by Corinthian was such that it would be appropriate to offset the relief provided to borrowers who were guaranteed employment. The Department has concluded that the Corinthian education lacked sufficient value to do so.

14

DOE00007879

**DOE00008693-DOE00008694**

**Borrower Defense Claim Review Productivity
Requirements, Incentives and Support Plan - 2020**

All Borrower Defense Unit ("BDU") attorneys and law clerks are expected to perform accurate and efficient claim review as an essential element of the position. From the outset of training, you have been advised that BDU attorneys and law clerks are required to adjudicate a minimum of five cases per hour while also maintaining a very low error rate. The following is intended to further clarify how your metrics are evaluated, as well as the thresholds for incentive eligibility and support available for those needing to improve their performance. Please note that these apply for junior attorneys and law clerks who have worked at FSA for three months after completion of claim review training (hereinafter "Trained Reviewers").[1]

<u>**Required Metrics**</u>

- <u>**Case Review**</u>:  **Trained Reviewers must review, on average, a <u>minimum</u> of 5 cases per hour.**[2]
  - o   Claim review rate averages will be determined on a weekly basis.
  - o   Assigning any case to a new status constitutes "reviewing a case."[3]
  - o   Exceptions may apply at supervisors' discretion depending on the nature of the claims at issue.
- <u>**Error Rates**</u>:  **Trained Reviewers are required to maintain an error rate under 5%.**
  - o   The error rate is based on all allegations reviewed over the past four weeks, including both minor and major errors, as determined by QC staff.

<u>**Incentives**</u>

- <u>**Credit Hours**</u>: Trained Reviewers who regularly exceed the Required Metrics for claim review productivity and error rates are eligible for credit hours in accordance with FSA policies.
  - o   Eligibility will be reevaluated for any Trained Reviewer whose performance declined in the preceding pay period.
- <u>**Compensatory Time / Overtime**</u>: Trained Reviewers who maintain a minimum average of 7 cases reviewed per hour with an error rate under 3%, subject to BDU workflow and supervisor approval, are eligible for compensatory time and/or overtime in accordance with FSA policies.[4]
  - o   Eligibility will be reevaluated for any Trained Reviewer whose performance declined in the preceding pay period.
- <u>**Individual Awards**</u>: The Director of the Borrower Defense Unit may, at her discretion and subject to availability, approve monetary bonuses or time-off awards to high achievers in claim review and QC.

---

[1] Junior attorneys and law clerks who have served on the BDU for fewer than three months after their claim review training will adhere to the claim review expectations set by their supervisors and will work to ramp up to the above standard (5 cases per hour, on average, with an error rate under 5%).
[2] BDU Supervisors will collect and analyze Trained Reviewers' self-reported case review rate data, perform spot-checking validation, and perform periodic audits to ensure the accuracy of self-reported data. Inaccurate self-reported data may result in a full audit of the Trained Reviewers' work and appropriate disciplinary action.
[3] Inappropriately assigning a case to a new status is an error. Any Trained Reviewer who appears to be assigning cases to new statuses in order to increase review numbers may be subject to a full audit of the Reviewer's completed work and appropriate disciplinary action.
[4] This category will also include active members of the QC Team.

DOE00008693

**Support**

- **Training**:  To promote claim review accuracy and efficiency, and to assist Trained Reviewers in achieving the higher metrics required for incentives, the BDU will provide ongoing and remedial training.  This may include:
  - Continual Training
    - Weekly question and answer sessions
    - Training sessions on topics such as increasing speed and accuracy, identifying and distinguishing between different federal student loans, producing Salesforce reports and using Excel to extrapolate data, determining whether an allegation states a claim, and other topics, as necessary
  - Remedial Training
    - Mandatory attendance at targeted continual training sessions
    - One on one sessions with a member of the QC team
    - One on one sessions with your supervisor

- **Heightened Monitoring**:  The metrics of Trained Reviewers who do not meet the Required Metrics for the preceding pay period[5] will be monitored very closely by their Supervisors and the Director of Borrower Defense ("Heightened Monitoring").
  - Trained Reviewers who meet all Required Metrics for two consecutive pay periods will be removed from Heightened Monitoring.
  - Attendance at supplemental or remedial training sessions may be required.
  - For Trained Reviewers on Heightened Monitoring for more than two pay periods, the Reviewer and his or her Supervisor will meet with the Director of Borrower Defense to discuss the Reviewer's failure to meet the requirements of the attorney/law clerk position.

---

[5] While this process is consistent with the current informal monitoring, formal Heightened Monitoring will begin on June 22, 2020 for any Trained Reviewer who fails to meet Required Metrics for the pay period beginning June 8, 2020.

DOE00008694

**DOE00008841-DOE00008843**

To:       Mark Brown
          Robin Minor
From:    Colleen M. Nevin
CC:      Jeff Appel
Date:    August 18, 2019
Re:      Borrower Defense Quality Control Procedures

There are layers of quality control ("QC") built into the borrower defense adjudication process, both at the reviewer level and at the claim level.  The QC processes are designed to ensure both that the attorney adjudicators have very low error rates and also that no new type of claim is approved without the involvement of multiple attorneys.

Because of the decision to hire approximately sixty (60) new attorneys that will be comprised of primarily recent law graduates, as discussed below, we are revisiting the percentage of applications that are re-reviewed in the general adjudication quality control process and likely will be adjusting that level to ensure closer scrutiny with respect to the less experienced attorneys.

The various QC aspects of the adjudication process are discussed below:

**<u>Adjudicator Proficiency and Low Error Rates</u>**

The Borrower Defense Unit has proficiency and error rate requirements that must be met.  When a new attorney (whether FSA staff or contractor) is onboarded, the attorney goes through a five (5) day introductory training process which includes extensive testing designed to ensure that the attorney understands and is able to follow the BD protocols.  After the training, the attorney is on what we refer to as "100% QC" – which means that 100% of the attorney's adjudications will be reviewed over the course of at least a few days.  During that time, the new attorney receives additional one-on-one training until the attorney has achieved a proficiency level with a nearly error-free rate.

When the senior attorney conducting the training is satisfied that the new attorney can be moved "off of 100% QC," the senior attorney makes that recommendation to the BD Director, and the senior attorney and BD Director meet to review the data on the new attorney's adjudications.  If the BD Director is satisfied, the new attorney is moved into the general quality control category.

The senior attorneys and BD Director periodically review the proficiency and error rates of all attorneys.  If an attorney's error rate increases, additional training may be required.  In the past, BD has released contractors whose error rates were unacceptable.  If any of the new attorneys or contractors fail to maintain satisfactory error rates after a reasonable period of time, it is expected that we similarly would release those employees or contractors.

**General Adjudication Quality Control**

From 2016 until the fall of 2018, the BD Unit had a quality control process that required a second level of review (a full re-review by a second attorney) for 20% of all claims and 100% of any new types of claims.  In the interest of more efficiently adjudicating claims, in 2018, a decision was made to reduce the QC on all claims to 5%, and the CFO Internal Controls Unit agreed that that level of QC was sufficient.

At the time, all of the attorneys working on BD adjudications – both full-time staff and contractors – were very experienced at BD adjudications and, therefore, the risk of lowering the percentage of claims that received a second look was low.  Nevertheless, it is noteworthy that both BD Unit and the Director expressed a preference in maintaining the 20% to ensure that the quality of the decisions was maintained at the level that we expect.  While we were overruled then, we now know that there will be many new attorneys adjudicating BD claims, and the likelihood of mistakes is now higher.  Therefore, we will be revisiting the quality control percentages and likely, raising them to the previous levels.  Alternatively or additionally, we will significantly increase the "spot checking" referenced below based on the seniority and error rates of the attorneys.

**New Types of Approvals**

The bar for new approvals is high.  To date, BD has reviewed and adjudicated applications from over 1,400 schools; only three schools have approvals, and all of the approvals to date are based on existing criteria that were subject to the IG investigation.

The majority of applications will be denied – based on either the insufficiency of the borrower's allegations or the lack of sufficient evidence to support the borrower's application.  BD has denied thousands of applications from borrowers due to a lack of evidence just in the last several months.

For applications where there is no existing memorandum and protocol (*i.e.*, not Corinthian or ITT), but where there is evidence to support a sufficiently stated claim, those applications will <u>not</u> be approved by the new attorneys on initial review.  Rather, if the new attorney reviews an application that is potentially approvable but does not have an existing memorandum and protocol, the new attorney will refer the case to a senior attorney.  That attorney will review the evidence from both the borrower and the school (where the school responds) and any findings and evidence from the Department; if the evidence is voluminous, additional attorneys may be assigned to assist.  The attorney or group of attorneys then will summarize the evidence, consider the applicable regulation, and decide whether the claim (the new approval type) should be approved.

All new approval types will be reviewed by the senior BD attorneys. If a majority of the senior attorneys and the Director agree that approval is supported by a preponderance of the evidence, the new claim type will be approved; if not, the claim will be denied for insufficient evidence.

OGC will be apprised as new approval types for other (non-CCI and ITT) schools are established. This will allow OGC to assess the applicability of the available methodologies, and where necessary, identify the need for the development of alternative methodologies.

**Additional Review for Some Approvals**

To the extent that a new relief methodology may require reopening borrower applications and data, it is likely that the implementation of the new methodology may also serve as another check on the application decision. This possibility will be revisited when a final approach is determined.

**Spot Checking by BD Director and Sr. Attorneys**

In addition to the training, and the general adjudication QC, the BD Director and senior attorneys periodically do spot checking of the adjudicated applications to ensure that they were decided correctly. (The spot checking is not exclusive to approvals as borrowers previously were advised to file lawsuits if they did not agree with the denial of their applications). Because we will be onboarding a large number of very junior attorneys and law clerks with limited relevant experience, we will be increasing the spot checking to identify any attorneys who require additional training or supervision.

DOE00008843