**Supplemental Complaint**

**Exhibit Index**

**Bates Stamped Documents**

Documents appear in this order, with Bates-Numbered Slip-Sheets Between them. The documents are cited **by Bates Number** in the Supplemental Complaint.

| Document Order | Bates Range | Document Title / Identifier |
|---|---|---|
| 21. | DOE00009291 | "Approval Rates" Memo |
| 22. | DOE00009378-DOE00009379 | DeVry School Notice letter |
| 23. | DOE00009380-DOE00009382 | Ashford School Notice Letter |
| 24. | DOE00009383-DOE00009385 | Infilaw School Notice Letter |
| 25. | DOE00009386-DOE00009388 | University of Phoenix School Notice Letter |
| 26. | DOE00009399-DOE00009412 | ITT Guaranteed Employment Memo |
| 27. | DOE00009509-DOE00009518 | Borrower Defense Presentation |
| 28. | DOE00009519-DOE00009520 | Anthem Education Group Memo |
| 29. | DOE00009550-DOE00009551 | CEC Memo With December 2020 Update |
| 30. | DOE00009552-DOE00009553 | CEC Memo |
| 31. | DOE00009583 | DeVry Memo |
| 32. | DOE00009585 | Keller Memo |
| 33. | DOE00009626-DOE00009630 | EDMC Memo |
| 34. | DOE00010045-DOE00010049 | Beckfield College Memo |
| 35. | DOE00010089-DOE00010093 | Berkeley College Memo |
| 36. | DOE00010201-DOE00010205 | Brookline College Memo |

| 37. | DOE00010297-DOE00010298 | Business Industrial Resources Memo |
| 38. | DOE00010339-DOE00010340 | Career Institute of Health and Technology |
| 39. | DOE00010341-DOE00010345 | Career Point College Memo |
| 40. | DOE00010364-DOE00010367 | Carrington College Memo |

**DOE00009291-DOE00009291**

<u>Approval Rates</u>

The historical data demonstrating the high percentage of approvals among the borrower defense applications processed since 2015 is not representative of the likely adjudication outcomes for most of the 158,000 pending applications.  To date, the Department has prioritized one type of claim:  job placement rate (JPR) claims asserted by CCI borrowers based on the Department's explicit findings that CCI had engaged in widespread misrepresentations regarding its job placement rates.  JPR claims from CCI borrowers should be viewed differently than all other claims for two reasons:

      1) The Department set up a specific, "expedited" process for handling these claims in light of the (correctly) anticipated high volume of applications; and

      2) Using data obtained from CCI, the Department performed fairly extensive outreach to borrowers who appeared to be eligible for borrower defense discharges based on the CCI JPR misrepresentations.

Therefore, the CCI JPR applications – using the expedited process with an application specific to CCI JPR claims – require a much shorter period of time to review.  All other applications and types of claims are reviewed under a less streamlined process that requires an assessment of evidence.

Further, the approval rates for CCI JPR claims are dramatically higher than we expect to see for all other claims.  Because the Department performed outreach to borrowers who were likely to be have successful JPR claims, it is not surprising that many of those borrowers' applications were, in fact, approved after the borrower applied and their claims were reviewed.  The approval rate for CCI JPR applications historically is about 67%.

Our data to date suggests that the approval rate for all other claims will be <u>much</u> lower.  For non-JPR applications, the data indicates that the approval rate is likely to be approximately under 10%.  We anticipate (based on the limited data available) that the approval rate for other schools with a large volume of applications similarly will be under 10%.

Further, for applications from borrowers who attended schools that have fewer than 20 applications pending, our data to date indicates that the approval rate will be under 5% and may be as low as 2-3%.

    <u>As Applied to Pending Claims</u>:

      We have approximately 15,000 to 20,000 JPR claims remaining to review and would expect that about 67% of them will be approved unless there is a departure from the percentage applicable to the tens of thousands reviewed to date.

      For the other CCI allegations and the "other big schools" buckets, we would expect under 10% approvals.

      For the borrowers who attended schools that have fewer than 20 applications pending, our data to date indicates that the approval rate will be under 5% and may be as low as 2-3%.

DOE00009291

**DOE00009378-DOE00009379**



June 23, 2020

Mr. F. Willis Caruso, Jr., Interim President and CEO
Mr. John Lorenz, Chief Financial Officer
Ms. Barbara Bickett, Chief Financial Aid Director

Cogswell Education LLC
DeVry University
1200 East Diehl Road
Naperville, IL 60563

Dear School Officials:

Under 34 CFR §§ 685.206 and 685.222, borrowers of federal student loans may apply for a discharge of some or all of their federal student loans based on certain types alleged misconduct by their (or their children's) school. We currently have several thousand borrower defense applications that make allegations regarding DeVry University and that will require a fact-finding process pursuant to 34 CFR § 685.222(e)(3)(i).

For each such application, we will email a separate notification (the "School Notice Email") and a password-protected copy of the borrower's application to the President, Chief Financial Officer, and Financial Aid Officer of record for your school. You and the other officials will receive the same School Notice Email and attachment. We will send password information in a separate email. The School Notice Email will also provide your school an opportunity to submit responses to borrower defense applications, either individually or collectively, with instructions for how to do so.

> **Note:** Given the large volume of email notifications you are about to receive, you may want to set up a rule within your email client to place the emails in a location other than your inbox. The School Notice Emails will be sent from borrowerdefense@ed.gov.

After preliminary review of the borrower defense applications, we have some general requests that will assist us in evaluating those applications. Borrowers who have filed applications against your school allege misrepresentations concerning job prospects, transferability of credits, program cost, and other types of claims.

To facilitate the fact-finding process for these borrower claims, we request that you send us documents as described below. For each category of document, please provide responsive documents from 2008 to 2015.

- Copies of any civil investigative demands served on your institution along with an inventory of the records produced in response to the civil investigative demand. In particular, we would like to see the civil investigative demand served by the U.S. Department of Justice in 2019.



Federal Student Aid
An office of the U.S. Department of Education

830 First Street, NE, Washington, DC 20202
StudentAid.gov

DOE00009378

Page 2

- Copies of any accreditor or auditor reviews or reports regarding:
    a) Job placement rates, including methodologies used to calculate the rates, for the years 2008-2015;
    b) Advertisements focused on job placement rates; and
    c) Job prospects for graduates of DeVry.
- Any and all annual employment rate disclosures and methodologies used to calculate the disclosures made to any accreditor, state agency, governmental agency or other entity, for any and all years available, but specifically the years 2008-2015.
- For each advertisement used to solicit prospective students, that was placed in any advertising medium, documents sufficient to identify the name of the advertising medium and all dates and times and locations each advertisement ran in the United States.

**Please note that your responses and any evidence are due within 30 days of your receipt of the School Notice Email for each borrower defense application.** Please contact us at BDSchoolEvidence@ed.gov to arrange for the transmittal of your responses and documents. Include the name of your school in the subject of the email and provide a description of the materials that your school plans to submit and the estimated byte size in the body of the email. We will assess and advise how to transmit the materials to us.

As part of our initial fact-finding process, we may reach out to you in the future with follow-up questions. For additional information regarding the borrower defense to loan repayment process and applicable regulations, visit us at StudentAid.gov/borrower-defense.

If you have questions about this communication, email us at BDSchoolEvidence@ed.gov.

Sincerely,

U.S. Department of Education
Office of Federal Student Aid
Borrower Defense Unit

**DOE00009380-DOE00009382**



7/7/2020

Mr. Craig Swenson
President
Ashford University
8320 Spectrum Center Boulevard
San Diego, CA 92123

Dear Mr. Swenson,

Under 34 CFR §§ 685.206 and 685.222, borrowers of federal student loans may apply for a discharge of some or all of their federal student loans based on certain types of alleged misconduct by their (or their children's) school. We currently have over a thousand borrower defense applications that make allegations regarding your school and that will require a fact-finding process pursuant to 34 CFR § 685.222(e)(3)(i).

For each such application, we will email a separate notification (the "School Notice Email") and a password-protected copy of the borrower's application to the President, Chief Financial Officer, and Financial Aid Officer of record for your school. You and the other officials will receive the same School Notice Email and attachment. We will send password information in a separate email. The School Notice Email will also provide your school an opportunity to submit responses to borrower defense applications, either individually or collectively, with instructions for how to do so.

**Note:** Given the large volume of email notifications you are about to receive, you may want to set up a rule within your email client to place the emails in a location other than your inbox. The School Notice Emails will be sent from borrowerdefense@ed.gov.

After preliminary review of the borrower defense applications, we have some general requests that will assist us in evaluating those applications. Borrowers who have filed applications against your school allege misrepresentations concerning the transferability of credits and the ability to obtain a teaching license with an Ashford degree. We are also aware of your 2014 Assurance of Voluntary Compliance with the State of Iowa and your ongoing litigation with the State of California.

To facilitate the fact-finding process for these borrower claims, we request that you send us documents as described below. For each category of document, if a date is not specified, please provide responsive documents from January 1, 2005 through April 8, 2016.

    **A.** Documents sufficient to show whether and where an online Ashford degree would qualify a graduate to obtain a state teaching certification;

    **B.** Documents sufficient to show Ashford policies and procedures for determining whether a student or prospective student's credits from another institution would be accepted by Ashford;



Federal Student Aid
AN OFFICE OF THE U.S. DEPARTMENT OF EDUCATION

830 First Street, NE, Washington, DC 20202
StudentAid.gov

DOE00009380

Page 2

**C.** Copies of any civil investigative demands, document requests, or subpoenas (collectively, "demand") served on or sent to your institution by a federal agency, state agency, local agency, state attorney general, or other law enforcement or oversight entity that relate to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford, including an inventory of the records produced in response to such demands;

**D.** Copies of any reports or findings by your current or former accreditor (the Western Association of Schools and Colleges Senior College and University Commission, and the Higher Learning Commission, respectively) or by your state licensing authorities concerning the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;

**E.** Copies of the following:

- o Call-monitoring reports generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;
- o Speech analytics transcripts generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;
- o Mystery shopping reports generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;
- o Whistleblower hotline reports and transcripts generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;
- o Issue Resolution Committee reports generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;

**F.** Copies of all Marketing Compliance and Marketing Accuracy Committee reports generated between January 1, 2008 and January 1, 2012 that make any reference to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford;

**G.** All documents relating to employee and contractor training that refers, in any way, to the ability to obtain a teaching license with an Ashford degree, or the ability to transfer credits into Ashford used between January 1, 2008 and January 1, 2010, and between May 15, 2014 and May 15, 2016, including, but not limited to, the review and approval of any training material including:

Page 3

     o  Documents sufficient to show all formal or informal, approved or unapproved, scripts, instructions, and guidelines referred to or used in any way during Ashford's recruitment, admissions, enrollment, or financial aid processes;

**H.** Course Catalogs, Student Handbooks, and exemplar Enrollment Agreements in effect from January 1, 2005 to April 8, 2016; and

**I.** A cover letter and table of contents cataloguing the documents you have provided in response to the requests above.

**Please note that for each borrower defense application, your responses and any evidence are due within 30 days of your receipt of the School Notice Email.** Please contact us at BDSchoolEvidence@ed.gov to arrange for the transmittal of your responses and documents. Include the name of your school in the subject of the email and provide a description of the materials that your school plans to submit and the estimated byte size in the body of the email. We will assess and advise how to transmit the materials to us.

As part of our initial fact-finding process, we may reach out to you in the future with follow-up questions. For additional information regarding the borrower defense to loan repayment process and applicable regulations, visit us at StudentAid.gov/borrower-defense.

If you have questions about this communication, email us at BDSchoolEvidence@ed.gov.

Sincerely,

U.S. Department of Education
Office of Federal Student Aid

**DOE00009383-DOE00009385**



6/10/2020

Mr. Rick Inatome
President
Infilaw Holding, LLC
8625 Tamiami Trail North, Suite 500
Naples, FL 34108

Dear Mr. Inatome:

Under 34 CFR §§ 685.206 and 685.222, borrowers of federal student loans may apply for a discharge of some or all of their federal student loans based on certain types of alleged misconduct by their (or their children's) school. We currently have several hundred borrower defense applications that make allegations regarding Charlotte School of Law and that will require a fact-finding process pursuant to 34 CFR § 685.222(e)(3)(i).

For each such application, we will email notification (the "School Notice Email") and a password-protected copy of the borrower's application to you and Kyle J. Schobloher, who have been designated as the recipients on behalf of Charlotte School of Law. We will send password information in a separate email. If there is somebody else who should receive the School Notice Emails please let us know by emailing BDSchoolEvidence@ed.gov.

**Note:** Given the large volume of email notifications you are about to receive, you may want to set up a rule within your email client to place the emails in a location other than your inbox. The School Notice Emails will be sent from borrowerdefense@ed.gov.

After preliminary review of the borrower defense applications, we have some general requests that will assist us in evaluating those applications. Borrowers who have filed applications against your school allege misrepresentations concerning the school's accreditation, the rigorousness of your school's academic program, your school's admissions process, and your school's bar passage rates. We also are aware of the *Barchiesi v. Charlotte School of Law* litigation as well as the investigations conducted by the American Bar Association, the University of North Carolina Board of Governors, and the North Carolina Department of Justice.

To facilitate the fact-finding process for these borrower claims, we request that you send us documents as described below. For each category of document, if a date is not specified, please provide responsive documents from 2014 to 2017.

    1.    Copies of your responses to the January 24, 2017 Document Request from the Licensure Division at the University of North Carolina-General Administration ("UNC") with respect to the following requests:
       a) Description of curriculum approval procedures
       b) Description of course approval methods
       c) Description of course evaluation procedures
       d) Copy of admissions policy and copies of recruitment, advertisement, and marketing materials describing that policy
       e) Graduation and job placement rates (2014-2017) and explanation of how rates were calculated
       f) Job placement records for students who graduated in 2014-2017 and copies of recruitment, advertising, and marketing materials mentioning CSL job placement record



Federal Student Aid
AN OFFICE OF THE U.S. DEPARTMENT OF EDUCATION
830 First Street, NE, Washington, DC 20202
StudentAid.gov

DOE000009383

Page 2

g) Description of job placement assistance provided by CSL and copies of recruitment, advertising, and marketing materials containing that description
h) Copy of annual Compliance Report
i) List of any significant correspondence with regulatory agencies and officials
j) Advertising, marketing, recruiting, and promotional materials
k) Bar examination pass rate and other indicators of student/graduates' success
l) Statement about ongoing and pending litigation
m) Description of all adverse regulatory and accreditation actions from 2014-2017
n) Record/log of student complaints from 2014-2017 and summary of resolution

2.      Copies of your responses to the March 10, 2017 Investigative Demand issued by the North Carolina Department of Justice (NC DOJ) with respects to the following requests:
   a. All promotional materials intended to be reviewed by prospective CSL students and made available by CSL to students at any time from January 1, 2016 to the present (NC DOJ Request #5)
   b. All documents related to the program under which CSL financially assisted students who deferred taking the bar examination after graduation ("Deferral Program"), including but not limited to:
      i) The total amount of financial assistance provided to students who participated in the Deferral Program
      ii) The total number of students who received financial assistance under the Deferral Program
      iii) The total number who participated in the Deferral Program and ultimately took the bar; and
      iv) The total number of students who participated in the Deferral Program and ultimately passed a bar exam (NC DOJ Request #12)
   c. All records of the interview Mr. Ogene had with the *Charlotte Business Journal* on or about November 30, 2016 (NC DOJ Request #16)

3.      With respect to CSL's compliance certificate program and any other non-JD program, please provide the following documents:
      a. All marketing and promotional material related to the compliance certificate program
      b. A timeline of when the program was created
      c. The total number of students who participated in the program
      d. A breakdown of when in their law school career students signed up for the program
      e. The total number of students who participated in the compliance certificate program who ultimately took the bar and of those how many ultimately passed the bar.

4.      Course Catalogs and Student Handbooks from 2014-2017
5.      All required public disclosures to students and public relating to Charlotte School of Laws accreditation status
6.      Documents sufficient to show Charlotte School of Law's document retention or destruction policies during the relevant time period
7.      Copies of any litigation holds in effect between 2014 and the present.


**Please note that for each borrower defense application, your responses and any evidence are due within 30 days of your receipt of the School Notice Email.** Please contact us at BDSchoolEvidence@ed.gov to arrange for the transmittal of your responses and documents. Include the name of your school in the subject of the email

DOE00009384

Page 3

and provide a description of the materials that your school plans to submit and the estimated byte size in the body of the email. We will assess and advise how to transmit the materials to us.

As part of our initial fact-finding process, we may reach out to you in the future with follow-up questions. For additional information regarding the borrower defense to loan repayment process and applicable regulations, visit us at StudentAid.gov/borrower-defense.

If you have questions about this communication, email us at BDSchoolEvidence@ed.gov.

Sincerely,

U.S. Department of Education
Office of Federal Student Aid

**DOE00009386-DOE00009388**



June 24, 2020

Mr. Peter Cohen, President
Mr. Chris Lynn, Chief Financial Officer
Ms. Sandra Perez, Financial Aid Officer

University of Phoenix
4035 South Riverpoint Parkway
Phoenix, AZ 85040

Dear School Officials:

Under 34 CFR §§ 685.206 and 685.222, borrowers of federal student loans may apply for a discharge of some or all of their federal student loans based on certain types of alleged misconduct by their (or their children's) school. We currently have thousands of borrower defense applications that make allegations regarding the University of Phoenix and that will require a fact-finding process pursuant to 34 CFR § 685.222(e)(3)(i).

For each such application, we will email notification (the "School Notice Email") and a password-protected copy of the borrower's application to the President, Chief Financial Officer, and Financial Aid Officer of record for your school. You and the other officials will receive the same School Notice Email and attachment. We will send password information in a separate email. If there is somebody else who should receive the School Notice Emails please let us know by emailing BDSchoolEvidence@ed.gov.

**Note:** Given the large volume of email notifications you are about to receive, you may want to set up a rule within your email client to place the emails in a location other than your inbox. The School Notice Emails will be sent from borrowerdefense@ed.gov.

After preliminary review of the borrower defense applications, we have some general requests that will assist us in evaluating those applications. Borrowers who have filed applications against your school allege misrepresentations concerning relationships with Microsoft, American Red Cross, Adobe, Cisco, Methodist Hospital System, and other potential employers. We are also aware of your 2019 settlement with the Federal Trade Commission, and the Department of Veterans Affairs' 2020 findings.

To facilitate the fact-finding process for these borrower claims, we request that you send us documents as described below. For each category of document, if a date is not specified, please provide responsive documents from January 1, 2012 through December 31, 2016.

1. A list identifying each company with which your school established a partnership or other relationship, including the group within your school that established or was responsible for the relationship (e.g. Workforce Solutions, Phoenix Career Services, others as relevant), the benefits provided to students by the relationship, the active dates of the relationship and, if the relationship was terminated, any communications with the company or within UOP regarding the decision to terminate;

2. Copies of exemplar agreements establishing the types of relationships responsive to Request A above;



830 First Street, NE, Washington, DC 20202
StudentAid.gov

DOE-00009386

Page 2

3. Copies of correspondence between your school and any company requesting or directing your school to discontinue use of its brand or name in the *Let's Get to Work* advertising campaign or any other advertising;

4. Copies of your agreements establishing the partnership with the following companies advertised in certain *Let's Get to Work* advertisements:

   A. Adobe

   B. American Red Cross

   C. AT&T

   D. Cisco

   E. Methodist Hospital System

   F. Microsoft

   G. Sodexo

   H. Twitter

   I. Yahoo!

5. Documents relating to substantiation of the representations in the *Let's Get to Work* advertising campaign, including but not limited to copies of each Research Request Form in the form of document AEGFTC0044099, or any other format of a request for substantiation, and any response to the request;

6. Exemplar Enrollment Agreements, Course Catalogs, and Student Handbooks in effect from January 1, 2012 to the present;

7. Copies of your responses to the July 23, 2015 Federal Trade Commission (FTC) Civil Investigative Demands (CID) with respect to the following requests:

   A. Documents sufficient to show the Company's organizational structure relating, in any way, to UOP's advertising and marketing, recruiting and enrollment, financial aid, academic advising, student retention, billing and debt collection, legal, compliance, or the military (FTC Request 1);

   B. Documents sufficient to show the Company's document retention or destruction policies during the relevant time period (FTC Request 4);

   C. All documents relating to any Mystery Shopper Program operated by or on behalf of UOP, including, but not limited to, any determinations, findings, recommendations, or reports (FTC Request 15);

8. Copies of your responses to the following requests from the July 23, 2015 FTC CID only with respect to the advertisements *Parking Lot*, *Train Stops*, *Hall of Success*, and any other advertisement that references UOP's corporate partnerships and their benefits to students:

   A. All documents relating to any training that refers, in any way, to UOP's marketing, recruiting, admissions, enrollment, cost of education, financial aid, student advisement, billing or debt collection, withdrawal, leave of absence, complaints, or audits, including, but not limited to, the review and approval of any training material (FTC Request 19);

DOE00009387

Page 3

    **B.**  Documents sufficient to show all formal or informal, approved or unapproved, scripts, instructions, guidelines, applications, agreements, handbooks, notices or any other materials referred to or used in any way during UOP's recruitment, admissions, enrollment, or financial aid processes (FTC Request 20);

    **C.**  Documents sufficient to show all marketing or promotional material, including advertisements in any medium, used to promote UOP to prospective, current, or former students, including documents relating to the review and approval of any such material (FTC Request 22);

9.    Copies of any litigation holds in effect between January 1, 2012 and the present.

**Please note that for each borrower defense application, your responses and any evidence are due within 30 days of your receipt of the School Notice Email.** Please contact us at BDSchoolEvidence@ed.gov to arrange for the transmittal of your responses and documents. Include the name of your school in the subject of the email and provide a description of the materials that your school plans to submit and the estimated byte size in the body of the email. We will assess and advise how to transmit the materials to us.

As part of our initial fact-finding process, we may reach out to you in the future with follow-up questions. For additional information regarding the borrower defense to loan repayment process and applicable regulations, visit us at StudentAid.gov/borrower-defense.

If you have questions about this communication, email us at BDSchoolEvidence@ed.gov.

Sincerely,

U.S. Department of Education
Office of Federal Student Aid

**DOE00009399-DOE00009412**

To:       Under Secretary Ted Mitchell
From:     Borrower Defense Unit
Date:     January 10, 2017
Re:       Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment -- California
          Students

---

ITT Technical Institute ("ITT") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. This memorandum addresses borrower defense (BD) claims premised on these misrepresentations submitted by borrowers who attended an ITT campus in California.[1] As set forth below, the Borrower Defense Unit recommends full relief (subject to the statute of limitations) for borrowers[2] who (1) enrolled at any ITT California campus between January 1, 2005[3] and ITT's closing and (2) whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including representations that all graduates obtain employment.

I.        **Summary of ITT's Representations to Borrowers Promising Employment**

Like former Corinthian students,[4] former ITT students have submitted guaranteed employment claims that are factually consistent, pervasive across campuses, and constant over a span of years. In these BD applications, ITT borrowers (both from California and throughout the country) consistently allege, each in their own words,[5] that ITT staff promised, guaranteed, or otherwise assured that they would be placed in jobs. These oral representations occurred both in person and during phone calls with prospective students. The Department has received guaranteed employment claims from borrowers at every campus sampled, dating back to the 1990s. Based on those statements, as well as corroborating evidence from former ITT employees, a preponderance of the evidence demonstrates that ITT guaranteed or otherwise assured borrowers future job placement.[6]

---

[1] As discussed below, guaranteed jobs misrepresentations were evident throughout ITT's campuses nationwide. Because California law has already been thoroughly analyzed by the Department for the same claim in connection with Corinthian Colleges, we recommend proceeding with discharges for ITT California students with guaranteed jobs allegations, as set forth below.

[2] For purposes of this memorandum, Parent PLUS borrowers are included in the definition of California students.

[3] Although this memorandum only addresses borrowers who enrolled on or after January 1, 2005, additional evidence (including from additional BD claims) may support future relief for applicants who enrolled prior to 2005. The Department will evaluate this evidence on an ongoing basis and may update this recommendation accordingly.

[4] See Memorandum from Borrower Defense Unit to Under Secretary Mitchell re: Corinthian Borrowers Alleging That They Were Guaranteed Employment (Jan. 9, 2017).

[5] The Department has received ITT BD applications submitted via narratives in Word documents and emails, as well as via forms provided to borrowers by the Debt Collective. A vast majority of these allegations are unprompted. Some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but the Department's BD website has only instructed borrowers to provide "other information…that you think is relevant."

[6] We have reviewed the ITT evidence on a nationwide level as well as on a California-specific level. As set forth below, ITT's conduct with respect to guaranteed jobs was consistent nationwide; we have found nothing unique about ITT's conduct in California as compared to other states. Thus, the fact section addresses both California-specific evidence as well as nationwide evidence.

DOE-00009399

## A.   Guaranteed Employment Representations Consistent in Nature

Of 320 randomly sampled BD applications submitted by ITT borrowers, 103 (32% of the total) state that the borrower was promised, guaranteed, or otherwise assured employment.[7]  The unprompted factual similarity of these BD claims evidence a strong indicia of reliability.  For example, at ITT-San Diego, where 7 of 19 BD applications sampled alleged guaranteed employment, borrowers submitted the following highly consistent statements:

- "The school assured me that I would find employment in my field of study and that the industry of my field of study was in high demand." [8]
- "I was also told by the recruiters from the school about wages I could make that I have yet to be able to earn due to the fact that the school is and was not very credible. . . .The ITT Tech recruiters assured me A.A. students graduate making around 50-60K a year and the B.S. graduates would be around $80k a year. They misrepresented their product, their name brand and their education."[9]
- "The promises were that it would be easy to find a high paying job right away."[10]
- "I was promised that once I graduated I would be able to get into any field of my choice from Crime Scene Investigator, Crime Mapping, Probation to Detective to many many more. The promise of salaries starting at 50K upward depending on my field of choice and my recruiter said employers are beating down their door saying we want to hire the graduates as they know the latest and the best information available."[11]
- "They promised to place me into a good job making a middle class wage but were unable to put myself or other students into anything but a low paying temp job. Then it was promised that I would be better off with a Bachelors from ITT in order to get the higher pay job. I and multiple other students were duped into thinking that."[12]
- "They additionally gave promises of placement in good jobs, while in reality I have been swamped with a large amount of debt, inability to attain a job in the degree field or of even better earnings."[13]
- "I was also told that they have a great job placement program and that all students that seek help would be placed with a job within my new field after the first six months of school."[14]

## B.   Guaranteed Employment Representations Pervasive Throughout ITT

Guaranteed employment representations were not limited to ITT-San Diego.  In fact, such representations were pervasive throughout ITT's network of campuses in California and nationwide.  Former students alleged guaranteed employment at each of the 22 ITT campuses sampled, which were located across 17 states (CA, IL, MI, PA, WA, AK, VA, MO, FL, NM, TX, OR, TN, AL, NY, OK, and WI).  A sample of these claims, detailed below, demonstrates the pervasiveness of guaranteed employment misrepresentations throughout ITT:

---

[7] This total excludes allegations that may pertain to guaranteed jobs but were not sufficiently specific to qualify for relief. For example, allegations that ITT's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment claims.
[8] BD1655184.
[9] BD1639392.
[10] BD1655377.
[11] BD1605233.
[12] BD1655410.
[13] BD1655354.
[14] BD1638087.

DOE00009400

- ITT-Orange (CA): "I was told that ITT had a 100% job placement upon graduating students."[15]
- ITT-Anaheim (CA): "I was promised that immediately after graduating, I would be placed in a job within my field of study."[16]
- ITT-Sylmar (CA): "I was told that my degree would guarantee me employment."[17]
- ITT- Rancho Cordova (CA): "The sales representative stated that after completion of my education courses I would make between $50,000 and $75,000 USD per year."[18]
- ITT-Oak Brook (IL): "They advised me that I would have a job waiting for me. The credits for the field I was in were not accredited. The degree is not worth anything and the school is a scam."[19]
- ITT-Swartz Creek (MI): "They guarantee jobs right after graduating."[20]
- ITT-Harrisburg (PA): "I was told on several occasions by ITT Admissions Representatives that the school has 100% job placement upon completion for students"[21]
- ITT-Seattle (WA): "They said that 100% job placement and that I should have no problem finding a job in my field."[22]
- ITT-Little Rock (AK): "They promised that they had companies like Blizzard Entertainment, Electronic Arts, Sony, Nintendo, etc. fighting for graduates for their companies . . . They not only lied about the job placement but they lied about the fact that we could be making a 5 figure salary."[23]
- ITT-Springfield (VA): "I WAS LED BY THE RECRUITER TO BELIEVE THAT THE JOB OPPORTUNITIES WOULD BE POURING IN."[24]
- ITT-Arnold (MO): "I was told that I would get a job in my field"[25]
- ITT-Albuquerque (NM): "ITT lied about job prospects and guaranteed a job after graduation."[26]
- ITT-Richardson (TX): "After the tour ended, the counselor told me the multimedia program was game development and stated that upon completion of the program I would have a guaranteed job through their job placement program and that the starting base pay for such a job was $70,000/year."[27]
- ITT-Portland (OR): "Told me they would have me in a career by the end of my first year in school."[28]
- ITT-Knoxville (TN): "I was told that they had 100's of jobs waiting for only their graduates. No one but ITT Tech graduates could apply to these jobs"[29]
- ITT-Bessemer (AL): "I was promised job placement upon completing my courses . . . I was also given an estimated range of amount of starting salary/hourly pay."[30]
- ITT-Greenfield (WI): "They also provided misleading stories about how their program would land me the job of tomorrow and how much people in my field were being paid during and after graduation."[31]
- ITT-Tulsa (OK): "They said they would have me working in the gaming industry....they told me to look in the classifieds."[32]

---

[15] BD156693.
[16] BD1651614.
[17] BD1639208.
[18] BD1601288.
[19] BD156627.
[20] BD153161.
[21] BD156697.
[22] BD1600120.
[23] BD153747.
[24] BD155274.
[25] BD1659434.
[26] BD1604365.
[27] BD1659402.
[28] BD1607247.
[29] BD1619298.
[30] BD1655120.
[31] BD1604587.

3

DOE00009401

| Campus | ITT Claims | | |
|---|---|---|---|
| | Applications reviewed | Applications alleging guaranteed employment representation | % |
| San Diego (CA) | 19 | 7 | 42.11% |
| Anaheim (CA) | 10 | 4 | 40.00% |
| Rancho Cordova (CA) | 15 | 2 | 13.33% |
| Sylmar (CA) | 16 | 2 | 12.5% |
| Dayton (OH) | 12 | 5 | 41.66% |
| Arnold (MO) | 23 | 6 | 26.09% |
| Greenfield (WI) | 17 | 6 | 35.29% |
| Knoxville (TN) | 18 | 5 | 27.78% |
| Portland (OR) | 14 | 2 | 14.29% |
| Richardson (TX) | 15 | 3 | 20.00% |
| Spokane Valley (WA) | 30 | 10 | 33.33% |
| Tampa (FL) | 17 | 4 | 23.53% |
| Arlington Heights (IL) | 11 | 3 | 27.27% |
| Getzville (NY) | 10 | 1 | 10% |
| Albuquerque (NM) | 9 | 3 | 33.33% |
| Various Campuses[33] | 84 | 39 | 46.43% |
| **TOTAL** | **320** | **102** | **31.90%** |

Moreover, BD applications alleging guaranteed employment are buttressed by numerous borrower statements in connection with government investigations and private litigation, as well as statements provided to the Borrower Defense Unit by veterans targeted by ITT for enrollment.[34]

**C.   Guaranteed Employment Representations Constant Across Years**

Guaranteed employment representations also are constant across a span of years.  Importantly, the claims of borrowers who attended in earlier years are consistent with claims submitted by students who attended more recently.  Just as the claims sampled at each campus corroborate each other, the following allegations over time strongly suggest that representations of guaranteed employment were endemic at ITT:

- [2005]: "Promised great jobs and prosperous careers . . ."[35]

---

[32] BD153174.

[33] This number includes a random sample of 84 claims from 22 campuses across 18 states.

[34] In response to government investigations, ITT borrowers consistently alleged that they were "guaranteed to get a job," *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Civil Action 14-00292-SEB-TAB (S.D. Ind.) (hereinafter "*CFPB Case*"), Declaration of MT at ¶ 3 (July 11, 2016); that they would be placed in "jobs in their field of study within nine months of graduating," *Commonwealth of Massachusetts v. ITT Educational Services, Inc.*, Civil Action 16-0411 (Mass. Sup. Ct. Compl. at ¶ 55, filed Mar. 31, 2016) (hereinafter "*MA AG Case*"); and that "recruiters guarantee ITT will find you a job," S. Health, Educ., Labor & Pensions Comm., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012) (hereinafter "*Harkin Report*"), p. 539, *available at* https://www.help.senate.gov/imo/media/for_profit_report/PartII/ITT.pdf. These statements are corroborated by 90 allegations of guaranteed employment cited in a recent class action filed by the Harvard Legal Services Center, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), as well as by dozens of guaranteed employment allegations submitted by veterans who attended ITT, *Veterans Education Success*, "ITT Trends" (2016) (compiling summaries of interviews and student quotations) (on file) (hereinafter "*ITT Trends*").

[35] BD156898 (ITT Torrance).

DOE00009402

- [2006]: "I was told that I would be able to make about 64K once I graduated because I was going to a Bachelors program degree. I got promised the stars and the sky."[36]
- [2007]: "I was also led to believe that what I was going to school for would be a sure job after graduation."[37]
- [2009]: "I was told that I would definitely have a job if I enrolled."[38]
- [2011]: "We were told that there would be no problem getting a job and they would help."[39]
- [2013]: "I was told I would obtain a job in the field upon graduation, easily with a high salary."[40]

As further discussed below, these claims are supported by corroborating evidence from former employees and spanning the period of at least 2005 to the school's closure.

### D.   Statements of Former ITT Employees Corroborate Guaranteed Employment Claims

ITT borrower defense claims based on guaranteed employment misrepresentations are substantiated by the affidavits, interviews, and testimony of former employees at campuses nationwide. This former employee evidence establishes that, in response to oral directives from management, recruiters from at least 2005 through ITT's closing led prospective students to believe that employment was guaranteed.

ITT orally directed staff to present recruitment documents in a manner that guaranteed or otherwise assured employment. ITT employees were trained to provide these oral promises of employment despite the existence of written documents to the contrary.[41] For example, one former employee explained that "[w]ritten instruction from ITT headquarters was contradicted by oral instructions from the District Manager or a Senior Vice President . . . [ITT] was interested in getting students into the school no matter what it took to do so."[42] Another former employee, in testimony before the National Advisory Committee on Institutional Quality and Integrity (NACIQI), explained that recruiters "were consistently trained . . . to go verbally around the requirements" and that, even if recruiters did not expressly guarantee employment, "it was taken that way."[43]

As a result, former employees at ITT consistently report that staff guaranteed or otherwise assured employment. Some employees guaranteed employment expressly. For example, one former employee stated, "[m]arketing told students not to worry about prior felonies and they would get placed in jobs."[44] Another stated, "I heard recruiters assure students that they would get a great job that would enable them to pay back

---

[36] BD156228 (ITT-Sylmar).

[37] BD1659496 (ITT-Rancho Cordova).

[38] BD157549 (ITT-Indianapolis).

[39] BD156506 (ITT-Swartz Creek).

[40] BD154555 (ITT-Murray).

[41] *State of New Mexico v. ITT Educational Services, Inc.*, Civil Action D-202-CV-2014 (D.N.M) (hereinafter "*NM AG Case*"), ITT Training Document entitled "The Importance of our Language: Comments to Avoid," dated July 18, 2011, ITT-NMAG 0006448 (Feb. 26, 2014) (explaining that ITT disseminated a document on "Comments to Avoid," which barred personnel from promising job placement and stated, "[w]e do not guarantee jobs to any student or graduate").

[42] *CFPB Case*, Interview of Wendy Maddox-Wright, former employee from April 2005 to August 2011, ITT-Louisville (Jan. 28, 2014). See also *id.*, Interview of Amy St. Clair Lachman, former employee, ITT-Johnson City (April 9, 2014) ("[E]mployees knew what ITT wanted and it was not about helping people. Rather, it was about how many people ITT could get into a chair.").

[43] Transcript of Testimony of ITT Recruiter Matthew Mitchell before NACIQI at 217 (June 23, 2016) (Mitchell was employed as a recruiter in 2013).

[44] *CFPB Case*, Interview of former employee Sarah Doggett (employed from late 2005 to 2009) at 6 (ITT-Louisville, Feb. 26, 2014).

5

DOE00009403

their loans."[45] And another explained that "[b]efore showing any forms or numbers to students, financial aid staff was trained to emphasize all of the benefits students would receive from their education. From 2004 to 2007, this was done with the guidance of a 'return on investment document' that [the President and CEO of ITT] developed" which "contained misleading information about the average salaries of graduates of different programs."[46]

Recruiters, under pressure to enroll students, used a variety of tactics to pave the way for these false employment promises, including presenting documents in a manner that led students to believe employment was assured. A review of ITT's internal "Mystery Shopper" audio files corroborated testimony that recruiters deceived prospective students with a "wink and a nod." In one recording, for example, a recruiter displayed a "Career Wheel" and reassured the borrower regarding his chances of landing one of the entry level jobs listed: "As long as you have the foundation to be able to go in there and experience some of this, you'll be good to go."[47]

Guaranteed employment claims are further corroborated by recent ACICS findings against ITT[48] as well as by numerous former employee statements regarding falsification of student documents and manipulation of job placement statistics.[49] Based on the widespread evidence cited herein that ITT guaranteed or otherwise assured employment to its prospective students during the period of 2005 until the school's closure in 2016, we recommend no further year-by-year or campus-by-campus breakdown for additional ITT campuses.

## II.  Evidence of the Falsity of the Alleged Representations

ITT's own records show that for the students who managed to graduate, the school was unsuccessful at placing thousands of them. Moreover, former employee statements show the school knew it could not live up to its employment promises. For example, according to a former employee from ITT-Louisville, marketing representatives told prospective students that they could get jobs creating PlayStation games with a certain Bachelor's degree; however, not a single student with the degree obtained employment.[50] Another former

---

[45] *CFPB Case*, Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[46] *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No. 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), Affidavit of Dawn Lueck (Dec. 20, 2016) Lueck began working at ITT's Henderson, Nevada, campus in 1999. In 2002, she began working at ITT's corporate office in Carmel, Indiana, as a student loan refund coordinator. In 2003, she moved to ITT's Murray, Utah campus, where she began working as a financial aid administrator, and was promoted to director of finance in 2006. In 2007, she moved to ITT's new Phoenix, Arizona campus to set up their financial aid department, and was employed there until she left ITT in 2009.

[47] *Audiotape: ITT Mystery Shopper Investigation*, ITDS0000009 at 30 mins (Nov. 21, 2012) (on file).

[48] ACICS found that ITT violated its requirements for reporting job placements rates. *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016), *available at* http://acics.org/commission%20actions/content.aspx?id=6712.

[49] *CFPB Case*, Interview of former employee Bradley Parrish, ITT-Knoxville (April 23, 2014) (explaining that some graduate employment verification forms, or GEI's, "had been falsified and student signatures had been fabricated . . . These were called 'magic GEI's' because magic tape was used to either transfer a student signature from another form to the GEI or to have the student sign a blank GEI"); *CFPB Case*, Complaint at ¶ 33 (alleging that "placement rates do not include former students who did not graduate . . . may include jobs that do not require the degrees students paid for . . . and may include positions that were merely seasonal"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 938 (S.D. Ind. 2005) (former ITT employee who worked as a mater admissions representative at ITT-San Bernardino (CA) allegedly "concealed adverse student statistics by switching students from program to program"); *id.* (former ITT employee from the Torrence, California Campus stated that ITT fabricated and stretched its student statistics and that ITT's graduate placement figures were inaccurate by at least 20%).

[50] *CFPB Case*, Interview of former employee Sarah Doggett, ITT-Louisville (Feb. 26, 2014) (employed from late 2005 to 2009).

DOE00009404

employee, who served as the Dean of Academic Affairs at ITT-Tallahassee, stated that recruiters asked prospective students if they were familiar with the show "CSI Miami" and then guaranteed future employment as crime scene investigators, even though he was "not aware of a single student who graduated from the Criminal Justice program and became a CSI."[51] Instead, most of those students became security guards – "positions that didn't require a degree at all."[52]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations – and many other ITT BD applicants – state that they were unable to find a job at graduation; that they were unable to find employment that used their degree; and/or that they were forced to remain in a job that they had prior to enrolling at ITT.[53] These narratives are consistent with student accounts provided to law enforcement agencies[54] and non-profit organizations regarding their inability to find employment related to their fields of study.[55] In sum, the evidence overwhelmingly shows that ITT could not truthfully guarantee employment upon graduation.

**III.     Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for California Students Making Guaranteed Employment BD Claims Under California Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

For the reasons set forth below, California students with borrower defense claims predicated on a guaranteed employment allegation have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[56] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.[57]

Moreover, California students with guaranteed employment allegations should, under California law, be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

**A.     The Department Will Apply California Law to Claims by California Students**

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from

---

[51] *CFPB Case,* Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[52] *Id.*

[53] *See supra,* Section I and *infra* Section III(E).

[54] *CFPB Case,* Complaint at ¶¶ 36-49 (providing that numerous students complained that ITT promised better results than they were able to achieve and that ITT misled potential students through job placement rates which inappropriately included temporary work); *Id.* Declaration of Jacy Belyeu at ¶ 8 (ITT-Tucson July 14, 2016) (stating that "[i]n the three years since I graduated, my ITT degree hasn't increased my pay of my job opportunities as promised"); *Id.* Declaration of Michael Tolliver at ¶ 10 (ITT-Chattanooga, July 11, 2016) (stating that since graduating, the "degree has been worthless to me. I have applied for hundreds of jobs in the IT field and I haven't been hired in the field. The job opportunities the recruiter talked about have not been available as he promised").

[55] *See ITT Trends* (providing dozens of statements by veteran borrowers attending California campuses, as well as campuses nationwide, that ITT promised them jobs upon graduation).

[56] CAL. BUS. & PROF. CODE § 17200.

[57] Although we elected to review applications of borrowers attending California campuses based on California law, *see supra* note 1, we note that claims by such borrowers may also be reviewed under Indiana law, the location of ITT's corporate headquarters. Indiana law would support relief for guaranteed jobs claims under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a) *et seq,* as well as under the Indiana common law theory of constructive fraud, *Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind. 1996); *Harmon v. Fisher,* 56 N.E.3d 95, 100 (Ind. App. 2016).

DOE00009405

the Secretary, in any action arising from or relating to a [Direct] loan..., an amount in excess of the amount such borrower has repaid on such loan."[58] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[59]

At the time of its closing, there were more ITT students *and* campuses in California than in any other state.[60] ITT was incorporated in Delaware but operated no campuses there. ITT's corporate headquarters were located in Indiana, but at the time of closing fewer than 3% of its students were Indiana residents, a smaller number of residents than each of the following eleven states (in order from most to least)— California, Texas, Florida, Ohio, Virginia, Pennsylvania, Michigan, Georgia, Tennessee, North Carolina and Alabama.

Here, the Department has determined that it is appropriate to apply California law to claims by California students. This approach is reasonable and consistent with common state choice-of-law analyses, which look primarily to the location of the wrong (and only secondarily to the place of incorporation or location of corporate headquarters). Indeed, the key factor in the choice-of-law analysis under California law,[61] Indiana law,[62] and the Restatement (2nd) of Conflict of Laws is the location "where the wrong occurred."[63] Accordingly, because the wrong for California students occurred in California, it is reasonable for the Department to determine that a California court would apply California law in addressing the claims of ITT's California students.

**B.    California Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the California UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[64] Here, ITT's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.    The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[65] Thus, if a business practice violates any law, this is *per se* a UCL violation.[66] Corporate

---

[58] 20 USC § 1087e(h).
[59] 34 C.F.R. § 685.206(c)(1).
[60] At the time of closing, ITT operated fourteen campuses in California. No other state operated more than nine. Similarly, ITT enrolled 4,482 California residents, over 1,100 more than Texas, the state with the second largest student population.
[61] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). See also *Hernandez v. Burger*, 102 Cal.App.3d 795, 802, 162 Cal. Rptr. 564 (1980), *cited with approval by Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (holding that the state with "the predominant interest" is the state "where the wrong occurred.")
[62] Indiana treats a consumer protection claim as recovery in tort. See *McKinney v. State*, 693 N.E.2d 65, 72 (Ind. 1998) (finding that, despite the fact that "fraud is not an element of" an IDCSA claim, "the action is nonetheless based on fraud"). Under Indiana law, the choice-of-law rule governing tort actions is *lex loci delicti*—"the law of the place where the tort was committed is the law of the resulting litigation." *Eby v. York-Div., Borg-Warner*, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983).
[63] Restatement (Second) of Conflict of Laws § 145 (1971) ("Subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection.").
[64] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).
[65] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

DOE00009406

misrepresentations like ITT's promises of employment are prohibited by a number of state and federal laws.[67] In particular, ITT's misrepresentation regarding its student's employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[68] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[69]

Applying that three step inquiry, ITT clearly violated the FTC Act.

1. As described above, ITT made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[70] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that ITT schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Indeed, for many students, the principal purpose of attending a career college like ITT was to obtain employment in a particular field.[71] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, ITT's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

---

[66] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[67] Though the analysis below focuses exclusively on the FTC Act, ITT's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that ITT's conduct violates the FTC Act, this memorandum does not reach the issue of whether it may be unlawful under other applicable rules.

[68] *See* FTC Act § 5(a)(1), 15 U.S.C.§ 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[69] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[70] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[71] Under these circumstances, students' reliance on a guarantee of employment was reasonable. Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of ITT claims making guaranteed employment allegations is a clear indication that students believed what they were told.

9

DOE00009407

### 2. The Fraudulent Prong

ITT's misrepresentations regarding employment prospects are also a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for ITT students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[72] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[73] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[74] As noted, the representations ITT made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and . . . lost money or property" as a result of the deceptive practice alleged.[75] However, for a consumer who was deceived into purchasing a product[76]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[77] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[78]

Express or implied claims like those made by ITT about employment prospects are presumptively material,[79] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[80] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to enroll.[81] Statements by large numbers of borrowers across ITT campuses make clear that the promise of employment entered substantially into their choice to attend ITT.

### C. Weak Disclaimers In Some of ITT's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

ITT's promises of employment were false and misleading, despite the limited, fine print disclaimers on some enrollment agreements that the school does not guarantee "job placement" or "a salary." As set forth

---

[72] *See Bank of the West*, 2 Cal. 4th at 1254.

[73] CAL. CIV. C. §1709.

[74] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[75] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[76] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[77] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[78] *Id.* (internal quotation marks omitted).

[79] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept.17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[80] *In re Tobacco II Cases*, 46 Cal.4th at 298.

[81] Because deception occurs at the time of decision, it is sufficient for ITT students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

DOE00009408

below, these fine print disclaimers do not change the overall impression created by the oral representations described above.

For example, if a student examined an ITT enrollment agreement, the student would have to read through two pages of fine print to find a list of twenty-eight fine print disclaimers, the eleventh of which states that ITT "does not represent, promise or guarantee that Student or any other student will obtain employment."[82] This disclaimer is not highlighted or bolded in any way. The agreement then continues on with four more pages of fine print.

These disclaimers do not cure the falsity of ITT's oral promises regarding employment prospects. Courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[83] The California Supreme Court also has held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[84]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, ITT's disclaimers were particularly ineffective when considered in the context of its unsophisticated student population and high-pressure admissions practices.[85] Indeed, there is evidence that some ITT students were not afforded the opportunity to even review the enrollment agreement prior to enrollment and that admission representatives would go so far as to e-sign enrollment paperwork on behalf of students, without their consent.[86] Moreover, as with Corinthian, ITT advertised heavily on daytime TV, targeting the un- or under-employed. Indeed, admissions representatives were under such tremendous pressure to enroll new students that even homeless veterans were recruited despite the additional challenges

---

[82] See, e.g., ITT Albuquerque Enrollment Agreement (September 1, 2011) (on file).
[83] See, e.g., FTC v. Minuteman Press, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); see also Chapman v. Skype Inc., 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).
[84] Chern v. Bank of Am., 15 Cal. 3d 866, 876 (Cal. 1976) ("[T]he fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").
[85] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics. ITT's high pressure enrollment tactics are described in detail by numerous sources. See, e.g., Harkin Report at 527-531; CFPB Case, Complaint at ¶¶64-66 ("In contrast to the lengthy sales pitch, the enrollment and financial aid processes were much faster, so that many consumers did not know or did not understand what they signed up for. Recruiters induced prospective students to sign forms without giving them sufficient information about what they were signing [and] required potential students to sign an Enrollment Agreement before they could receive information about their financial aid options . . .")
[86] CFPB Case, Affidavit of former admissions representative Ricky Bueche at ¶ 15 (ITT-Baton Rouge, 2010-2014) (explaining that "[m]any times, when students left the campus without agreeing to apply, the Director of Admissions would instruct representatives to go back to the computer to e-sign on behalf of the students to apply to ITT, without the students being present and without the students' knowledge or agreement"); Villalba Compl. at Ex. 19, Student Statement 14 ("First and foremost I never physically signed an enrollment agreement (I have a copy). The recruiter signed for myself and my dad via computer, and because of this dishonest tactic my dad is on the hook for a parent plus loan."); Id.at Student Statement 49 ("There are MANY instances that I have found on all the enrollment paperwork (that I have since gotten copies of) where my signature/initials were forged, and not in my handwriting. There were many things that weren't explained to me AT ALL, where I was told to 'sign' electronically.").

DOE00009409

they would face in completing their studies.[87] In sum, the net impression of the oral misrepresentations on the typical ITT student likely would not have been altered by buried written disclosures.

Finally, the fact that the ITT guaranteed employment claims reviewed to date make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population ITT targeted, and the high pressure sales tactics and oral representations that ITT personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

**D.    Eligible Borrowers**

Based on the above analysis, the following ITT students should be eligible for relief: any BD claimant who enrolled at an ITT campus in California on or after January 1, 2005 and whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including those told that all graduates obtain employment.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis for Corinthian, the type of misrepresentation at issue here went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

**E.    Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

When determining the amount of relief due to plaintiffs under the UCL, California courts rely on cases interpreting the Federal Trade Commission Act.[88] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[89]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[87] *CFPB Case*, Affidavit of former admissions representative Pearl Gardner at ¶¶ 11-12 (ITT-Atlanta South, 2008-2014) ("There was enormous pressure on me and the other representatives and financial aid coordinators ("FACS") to make sales calls, enroll students, complete financial aid packages, and get students to attend an ITT class. This pressure was relentless . . . To solicit interest in ITT programs, I would go to job fairs, workforce events, and Stand Down events for homeless veterans (events where homeless veterans are given supplies and services, such as food, clothing, shelter, health screenings, and other assistance)."); *see also CFPB Case*, Complaint at ¶¶ 55-84 (summarizing mystery shopper evidence related to high pressure sales tactics).

[88] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[89] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00009410

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[90]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value provided by ITT.[91] The facts described above closely resemble those relating to Corinthian Colleges, where the Department determined that borrowers should receive full relief. That determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by:

- Repeated misleading statements to students, regulators and accreditors;
- Elaborate job placement fraud; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Given such pervasive and highly publicized misconduct, the Department determined that the value of the education provided by Corinthian was severely limited.

ITT's conduct was as flagrant as Corinthian's. Hundreds of unprompted student statements confirm the lack of value of an ITT education, as ITT students time and again report that their education was sub-standard and that their degree or affiliation with the school was an impediment rather than an asset as they sought employment. These include numerous statements in BD claims,[92] statements to VES,[93] and over 500 statements attached to the *Villalba* Class Action Complaint.[94]

Furthermore, the ITT "brand" became severely tarnished in the lead-up to and wake of its collapse. Over the past several years, ITT has been the subject of a steady stream of federal, state, and private lawsuits and investigations detailing misleading statements to students regarding (among other things) placement rates, employment prospects, expected salaries, transferability of credits, and the quality of the education.[95] This

---

[90] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[91] *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).

[92] *See, e.g.* BD1655232, BD1619298, BD1658596, BD155745, and BD153269 (alleging that employers "will not hire ITT grads because they find the college to be subpar," that borrowers "had to take ITT off [their] resume" in order to get a job, that ITT grads were considered to have "no college education," and that they were "mocked because of [their] education at ITT").

[93] *See, e.g., ITT Trends* (containing statements from dozens of veterans who attended various ITT California campuses alleging, among other things, that "I feel scammed out of a proper education," that "employers do not see the school as a real school," that "no one would even consider me for employment," and that "I wasted over 50k and 2 years of my life I can never get back").

[94] The exhibits attached to the *Villalba* Complaint include the following: 521 statements explaining how an ITT degree operates as a disadvantage in the job market (Ex. 1); 326 statements explaining how ITT misrepresented the quality of instructors, training, curriculum, or facilities (Ex. 6); 62 statements describing how ITT is "ruining people's lives" (Ex. 25); 473 statements about how ITT prevented other opportunities (Ex. 27); and 18 statements about how ITT debt has driven borrowers into or to the brink of homelessness (Ex. 28).

[95] *See, e.g.* CFPB Case, MA AG Case, NM AG Case, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), and *Lipscomb v. ITT Ed. Servs. Inc.* (M.D. FL Compl. filed Apr. 8, 2015). In addition, over 15 state AGs have issued subpoenas or CIDs relating to fraud and deceptive marketing against ITT from the beginning of 2004 through the end of May 2014. These states include: Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Hawaii, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, Tennessee and Washington. *See* ITT Form 10-Q Quarterly Report (June 30, 2014).

DOE00009411

conduct has also led to actions against ITT by the Department[96] and ACICS,[97] as well as to numerous negative national news stories.[98]

Given this extensively well-documented, pervasive, and highly publicized misconduct, the Department has determined that the value of an ITT education—like Corinthian—is likely either negligible or non-existent. In a court proceeding, ITT would very likely be unable to produce any persuasive evidence showing why the amount of recovery should be offset by value received by the borrowers from ITT education so as to preclude full recovery. Accordingly, it is appropriate for the Department to award eligible borrowers full relief.

CONCUR:

_John K. DiPaolo_          _1/12/17_
Office of the General Counsel        Date

---

[96] In the years leading up to its closure, the Department increased financial oversight over ITT and required it to increase its cash reserves to cover potential damages to taxpayers and students. The nature and scope of the Department's actions against ITT are contained within a series of letters from the Department to ITT dated: August 19, 2014, August 21, 2014, May 20, 2015, June 08, 2015, October 19, 2015, December 10, 2015, June 6, 2016, July 6, 2016, and August 25, 2016.
[97] See Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016).
[98] See, e.g. Mary Beth Marklein, Jodi Upton and Sandhya Kambhampati, "College Default Rates Higher Than Grad Rates," USA TODAY (July 2, 2013) (listing more than 50 ITT campuses as "red flag" schools because student loan default rates were higher than graduation rates); Kim Clark, "The 5 Colleges that Leave the Most Students Crippled by Debt" Time.com (Sept. 24, 2014) (ranking ITT second on the list of schools that leave the most students crippled by debt).

DOE00009412

**DOE00009509-DOE00009518**

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

# Borrower Defense to Repayment

August 21, 2019

Federal Student Aid an office of the U.S. Department of Education — INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0223

DOE00009509

DOE00009510

# Status of Borrower Defense Applications Received

## Of the nearly 280,000 Borrower Defense applications received since 2015:

- 57,000 have been adjudicated, processed, and closed
- 38,700 have been adjudicated but have not yet been processed
  - o Over 27,700 approved applications will be finalized when appropriate relief is determined
  - o Nearly 11,000 applications have been adjudicated as denied applications but have not yet been processed



**Total Borrower Defense Applications: 279,520**
As of Week Ending 08/06/2019

- Pending/Not Adjudicated 177,295
- Approved-Relief Provided 47,940
- Approved-Relief Pending 27,770
- Application Denied-Pending 10,975
- Denied-Processed 9,076
- Closed 6,464



**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0224

2



# Six Stages of a BD Application

**75 Borrower Defense Specialists in Contact Center**

**(Additional new hire ramp of 35+ FTEs forthcoming in August)**

*FTE numbers do not include contact center support staff

**Intake/ Borrower Inquiries**

**[School Response] (new under 2016 reg)**

**Adjudication**

**Post-Determination Processing**

**Application Closure**

**[Reconsideration] (new under 2016 reg)**

**Servicers**

Note: Approximately 120-175 servicer FTEs support BD throughout the application lifecycle.

**6 FSA Attorney Staff & 12 Attorney Contractors**

**Servicers**

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

Federal**Student**Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

AR-A-0225

3

DOE00009511

# Growth Progression for BD Applications

## Applications Approved Pending

MAY — 24,882

JUNE — 26,695

BD Application

JULY — 26,976

AUGUST — 27,978

## Application Denied-Pending

MAY — 7,881

JUNE — 8,935

BD Application

JULY — 10,218

AUGUST — 11,477

A decision on the relief methodology would result in the ability to proceed with approximately 40,000 applications

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND ®

INTERNAL CONFIDENTIAL — DELIBERATIVE — PRE-DECISIONAL

AR-A-0226

4

DOE00009512
DOE00009512

DOE00009513

# Borrower Defense Applications Adjudicated But Not Processed

- **Two (2) Schools with Approved Applications that are Pending Relief Determinations and Processing**
  - Corinthian Colleges, Inc. (CCI): 27,000+
    - 26,000+ Job Placement Rate (JPR) Approvals
    - 700+ Employment Prospects Approvals
    - 300+ Transferability of Credits Approvals
  - ITT: 70 approvals (all Employment Prospects)

- **Over 1,400 Schools with Denied Applications that are Pending Processing**
  - CCI: 4,800+
  - ITT: 450+
  - Wright Career College: 300+
  - Marinello School of Beauty: 250+
  - Remainder of 1,400 Schools with Adjudicated Denials: 4,900
    - Each school currently has fewer than 100 denied applications

**CCI Job Placement Rate Claims**

- Unique type of claim for several reasons:
  - Very high approval percentage (historically over 66%)
  - Department findings, special JPR form, and expedited process
  - Department estimated approximately 300,000 CCI borrowers eligible based on JPR findings and did widespread outreach to potentially eligible borrowers
- Other types of CCI claims have much lower approval percentages
  - Historically 5-7%

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0227

DOE00009513

DOE00009514

# Why are BD Applications on Hold?

**Approvals:**

- "Manriquez" tiered relief methodology for CCI subject to injunction (as of May 2018) and no alternative methodology available

- No relief methodology developed for non-CCI claims

**Denials:**

- Policy decision (spring 2018) to not issue denials until approvals also could be issued

- No processing systems available from summer 2018 to present due to platform development and migration

  - Updates to platform to be completed by August 30

- Issuance of denial decisions scheduled to resume by mid-September

**Notice to Schools and Other Platform Updates Needed to Comply with the 2016 Regulation's New Requirements:**

- BD platform designed to comply with 1995 Regulation and completed in fall 2018

  - FSA was advised that 2016 Regulation would not go into effect and should not be considered in platform design

- Key provisions of the 2016 Regulation that were not required under the 1995 Regulation require significant platform updates, including:

  - Notice to Schools

  - Collection of Evidence that schools provide to refute borrower claims

  - Reconsideration process for denied claims

Federal **Student** Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0228

6

# The Way Ahead

## Updates to Borrower Defense (Salesforce) Platform

- Enhancements to the Salesforce platform to comply with the 2016 regulation are currently in the build phase

- Completion date in late August

## Additional Staffing Resources are being added to Adjudicate the Growing Backlog of Pending Borrower Defense Applications

- FSA is in the process of hiring over 60 term appointments.  This includes twenty term-appointment offers recently issued.

- Additionally, FSA is backfilling previous positions and recently onboarded 12 contractors.

- Includes additional litigation support for OGC given the number, complexity, sensitivity and high profile cases involving the Department and the processing of BD applications.

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0229

7

DOE00009515

DOE00009516

# The Way Ahead (cont.)

**New Relief Approach(es)**

- Like Manriquez approach, proposed approach assesses injury based on program-level earnings and provides "tiered-relief," which the court did not object to.

- Unlike Manriquez, program earnings associated with approved BD applicants compared to earnings of same/similar programs at all other institutions (rather than, "passing" GE programs).

- Earnings comparison provides a measure of the difference in value between a program at an institution that is found to have engaged in misconduct versus the typical earnings of programs in the same field at other institutions and, thereby, what the student could have reasonably expected.

- An applicant whose program earnings at/above median of all others **(ceiling earnings)** deemed to have suffered no injury & no relief warranted, despite institutional misconduct.

  - For CCI BD applicants, however, relief of 10% will be provided even if no injury is assessed under the new methodology in light of the prior OGC memorandum establishing the Manriquez methodology that found "…[CCI] borrowers suffered some basic harm by virtue of the misrepresentations such that the Department cannot conclude that denying relief is appropriate."

Federal Student Aid

PROUD SPONSOR of
the AMERICAN MIND®

An OFFICE of the U.S. DEPARTMENT of EDUCATION

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0230

8

DOE00009517

# The Way Ahead (cont.)

**New Relief Approach(es) (cont.)**

- An applicant whose program had atypically low earnings compared to all other programs is deemed to have received no value from the program and full (100%) relief is warranted.  Statistically, those programs with earnings among the lowest 2.5% of all programs (i.e., 2 standard deviations from the average) will be used to establish **floor earnings**, below which 100% relief will be warranted.

- An applicant whose program earnings was above the floor and below the ceiling (median earnings of programs) would warrant tiered relief of 75%, 50%, or 25%, proportional to the gap between the floor and ceiling earnings amounts.

  - *For illustrative purposes, assume median wages for a comparison group for an associate degree program in medical assisting is $2,000, with a standard deviation of $2000, such that earnings two standard deviations below the median would be $18,000.  For wages between $18,000 and $22,000 dollars, the following percentage relief would be provided:  75% relief for wages between 18,000 and $19,333; 50% relief for wages above $19,333 and up to $20,666; and 25% relief for wages above $20,666 but below $22,000.*

Federal Student Aid

An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0231

# The Way Ahead (cont.)

**New Relief Approach(es) (cont.)**

- Data to administer relief will be drawn from publicly available GE data.  In the future, College Scorecard data can be used.

- In a smaller number of cases where there are no earnings data available for those programs attended by BD applicants, an individual BD applicant's income information may need to be collected.

- Prior to the availability of College Scorecard data, there may be isolated instances where there are a lack of program earnings data to use for comparison programs.  The team has identified a publicly available data set of program-level earnings data for programs offered by public institutions in Texas.  The team is assessing the potential use of these data.

- Team currently finalizing additional details of alternative relief methodology and calculating impact.

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0232

Federal**Student**Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

10

DOE00009518

DOE00009518

**DOE00009519-DOE00009520**

**MEMORANDUM**

TO: Colleen Nevin

FROM: Alana Smith

DATE: June 1, 2020

RE: Borrower Defense Unit Investigation of Anthem Education Group

---

Anthem Education Group, LLC was founded in 1965 under the name High Tech Institute, Inc. and included schools operating under the names of High-Tech Institute, Anthem Career College, Anthem College, Anthem College Online, Anthem Institute, Morrison University, and the Bryman School of Arizona.[1] At its peak, Anthem Education Group included 22 campuses in 15 states and an online division.[2] In 2014, Anthem Education Group, LLC declared bankruptcy and closed.[3]

As of June 1, 2020, the Borrower Defense Unit (BDU) has received approximately 1,508 applications from borrowers who attended a school under the Anthem Education Group, LLC umbrella. These cases span the entire history of Anthem's existence with the bulk of the cases from borrowers who first enrolled from 2007 to 2010.[4]

As of the date of this memorandum, the BDU has obtained limited evidence relevant to the borrower defense allegations filed against Anthem Education Group. BDU has reviewed evidence in connection with the following: (1) information from the Minnesota Attorney General's Office, (2) letters to the Department of Education from the Minnesota Attorney General requesting that the Department provide federal loan forgiveness to the borrowers, and (3) final program review determination reports generated by the Department. BDU also reviewed Anthem Education Group's website from 2008 on for representations that the school was registered with Minnesota Office of Higher Education[5]. The only relevant evidence BDU has obtained pertains to the campus in Minnesota. BDU has been unable to locate evidence to support the allegations of students who attended campuses in other states.

Based upon a review of the above evidence, the BDU recommends individual adjudication of all claims where the borrower attended a campus located in states other than Minnesota. To adjudicate these cases, the BDU will open each case and review each allegation and any evidence the borrower attached to the case. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. In cases where the borrower provides no evidence or the evidence provided does not prove any

---

[1] For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, 2012 U.S. Senate Committee Findings, Senate Health, Education, Labor and Pensions (HELP) Committee, 254.
[2] For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, 2012 U.S. Senate Committee Findings, Senate Health, Education, Labor and Pensions (HELP) Committee, 254.
[3] See Tyson, Charlie, Anthem Bows Out, INSIDE HIGHER ED, August 29, 2014, https://www.insidehighered.com/news/2014/08/29/profit-anthem-education-abruptly-closes-campuses-after-filing-bankruptcy.
[4] Salesforce reports generated by BDU personnel (on file with the Department)
[5] https://web.archive.org/web/20110326054346/http://anthem.edu/accreditations/

DOE00009519

allegation, then the case will be flagged for denial. If additional evidence is discovered in the future, these cases at campuses other than in Minnesota may be revised.

DOE00009520

**DOE00009550-DOE00009551**

To:      Colleen Nevin
From:   Michael Alonso
Date:   June 19, 2020 (**Updated December 2, 2020**)
Re:      Career Education Corporation (CEC) n/k/a Perdoceo Education Corporation (PEC)

**December 2, 2020 Update:  The Department has recently received additional evidence that may require a change in our adjudication protocols for CEC and potentially would support reopening some of the previously adjudicated borrower defense claims.  As a result, the Department has paused the adjudication or processing of CEC claims pending its review of the scope of this evidence.  This memo will be updated again once we have completed that review.**

## Introduction

The Borrower Defense Unit (BDU) recommends adjudication of certain Borrower Defense (BD) applications submitted by borrowers attending Career Education Corporation schools, including those currently owned by Perdoceo Education Corporation (collectively, "CEC"). School brands currently or previously owned by CEC include the following:

- American Intercontinental University
- Briarcliffe College
- Brooks College
- Brooks Institute (a/k/a/ Brooks Institute of Photography)
- Brown College
- Brown Institute
- Collins College (a/k/a Al Collins Graphic Design School)
- Colorado Technical University
- Harrington College of Design (a/k/a Harrington Institute of Interior Design)
- International Academy of Design & Technology (a/k/a School of Computer Technology; a/k/a International Academy of Merchandising & Design)
- Le Cordon Bleu College of Culinary Arts (a/k/a Le Cordon Bleu Institute of Culinary Arts; a/k/a Kitchen Academy; a/k/a Southern California School of Culinary Arts; a/k/a California School of Culinary Arts; a/k/a Pennsylvania Culinary Institute; a/k/a Orlando Culinary Academy; a/k/a Cooking and Hospitality Institute of Chicago; a/k/a Scottsdale Culinary Institute; a/k/a/ Western Culinary Institute; a/k/a California Culinary Academy)
- Lehigh Valley College (a/k/a Allentown Business School)
- Katharine Gibbs School (a/k/a Gibbs College; a/k/a Washington Business School)
- McIntosh College
- Missouri College
- Sanford-Brown College (a/k/a Ultrasound Diagnostic Schools)
- Sanford-Brown Institute (a/k/a Western School of Health and Business Careers; n/k/a Pittsburgh Career Institute[1])
- SBI Campus—An Affiliate of Sanford-Brown Institute

---

[1] "In 2014, New Opportunity Calling LLC purchased Sanford-Brown Institute and changed its name to Pittsburgh Career Institute." About Pittsburgh Career Institute, *available at* https://pci.edu/about-pci/ (last reviewed on 3/30/2020).

DOE00009550

All CEC's school brands are currently closed (or were sold and remained open, in the case of schools now known as Pittsburgh Career Institute), except for the brands American Intercontinental University and Colorado Technical University, which remain open.

**RECOMMENDATION**

BDU recommends adjudication of applications from borrowers who attended any CEC school and had an enrollment start date on or after January 1, 2013.

Based on a review of public information and filings on Westlaw, none of the schools above – during the specified time period – are the subject of a known investigation or lawsuit that would likely reveal supporting evidence relevant to BD claims.  In light of the absence of any such evidence in the Department's possession regarding CEC schools after 2012, BDU will apply a standard protocol and open each claim, review all allegations and any evidence appended by individual borrowers, and conduct an individual adjudication of each case. If evidence attached by the borrower proves any of his/her allegations, then the case will be set aside for consideration for approval. However, where the borrower provides no evidence or evidence provided fails to satisfactorily prove any allegations, will be denial of the application is appropriate.

**DOE00009552-DOE00009553**

To:      Colleen Nevin
From:    Michael Alonso
Date:    April 2, 2020 (**Updated December 2, 2020**)
Re:      Career Education Corporation (CEC) n/k/a Perdoceo Education Corporation (PEC)

**December 2, 2020 Update:  The Department has recently received additional evidence that may require a change in our adjudication protocols for CEC and potentially would support reopening some of the previously adjudicated borrower defense claims. As a result, the Department has paused the adjudication or processing of CEC claims pending its review of the scope of this evidence.  This memo will be updated again once we have completed that review.**

The Borrower Defense Unit (BDU) recommends adjudication of certain Borrower Defense (BD) applications submitted by borrowers attending Career Education Corporation schools, including those currently owned by Perdoceo Education Corporation (collectively, "CEC"). School brands currently or previously owned by CEC include the following:

- American Intercontinental University
- Briarcliffe College
- Brooks College
- Brooks Institute (a/k/a/ Brooks Institute of Photography)
- Brown College
- Brown Institute
- Collins College
- Al Collins Graphic Design School
- Colorado Technical University
- Harrington College of Design (a/k/a Harrington Institute of Interior Design)
- International Academy of Design & Technology (a/k/a School of Computer Technology; a/k/a International Academy of Merchandising & Design)
- Le Cordon Bleu College of Culinary Arts (a/k/a Le Cordon Bleu Institute of Culinary Arts; a/k/a Kitchen Academy; a/k/a Southern California School of Culinary Arts; a/k/a California School of Culinary Arts; a/k/a Pennsylvania Culinary Institute; a/k/a Orlando Culinary Academy; a/k/a Cooking and Hospitality Institute of Chicago; a/k/a Scottsdale Culinary Institute; a/k/a/ Western Culinary Institute; a/k/a California Culinary Academy)
- Lehigh Valley College (a/k/a Allentown Business School)
- Katharine Gibbs School (a/k/a Gibbs College; a/k/a Washington Business School)
- McIntosh College
- Missouri College
- Sanford-Brown College (a/k/a Ultrasound Diagnostic Schools)
- Sanford-Brown Institute (a/k/a Western School of Health and Business Careers; n/k/a Pittsburgh Career Institute[1])
- SBI Campus—An Affiliate of Sanford-Brown Institute

All CEC's school brands are currently closed (or were sold, in the case of schools now known as Pittsburgh Career Institute), except for the brands American Intercontinental University and Colorado Technical University, which remain open.

---

[1] "In 2014, New Opportunity Calling LLC purchased Sanford-Brown Institute and changed its name to Pittsburgh Career Institute."  "About Pittsburgh Career Institute, *available at* https://pci.edu/about-pci/ (last reviewed on 3/30/2020).

DOE00009552

BDU recommends adjudication of applications from borrowers who attended any CEC school and had an enrollment start date prior to January 1, 2008.

Based on a review of public information and filings on Westlaw, none of the schools above – during the specified time period – are the subject of a known investigation or lawsuit that would likely reveal supporting evidence relevant to BD claims.  In light of the absence of any such evidence in the Department's possession regarding CEC schools before 2008, BDU will apply a standard protocol and open each claim, review all allegations and any evidence appended by individual borrowers, and conduct an individual adjudication of each case. If evidence attached by the borrower proves any of his/her allegations, then the case will be set aside for consideration for approval.  However, where the borrower provides no evidence or evidence provided fails to satisfactorily prove any allegations, will be denial of the application is appropriate.

DOE00009553

**DOE00009583-DOE00009583**

Memorandum

To:     Colleen Nevin
From:   Sarah Angilello, Michael Page, Conor Kruger
Date:   June 15, 2020

Re: DeVry University – Borrowers Without Employment Prospects or Job Placement Rates Allegations Enrolled Between January 1, 2008 and September 30, 2015

DeVry University ("DeVry") is a proprietary higher education institution, originally founded in 1931.[1]  From 1988 until 2018, DeVry was owned and operated by DeVry, Inc. DeVry Inc. (which had changed its name to Adtalem Global Education in 2017[2]) sold DeVry University to Cogswell Education, LLC, its current owner, in 2018.[3]

The Borrower Defense Unit ("BDU") has received thousands of applications from borrowers that attended DeVry.  These applications contain allegations of misconduct occurring at DeVry campuses nationwide. Of all DeVry applications received, the earliest enrollment periods are as early as 1980, and the latest are as recent as 2020.[4]

As of the date of this memorandum, the BDU has received a substantial volume of evidence relevant to the borrower defense allegations at DeVry campuses nationwide and continues to review this evidence. This evidence in BDU's possession relates to potential misrepresentations made by DeVry University regarding employment prospects, specifically job placement rates, for the period between January 1, 2008, and September 30, 2015. The BDU's investigation of DeVry University's representations regarding employment prospects alleging job placement for the period between January 1, 2008, and September 30, 2015, is ongoing.

The BDU has not received records regarding any state or federal investigations alleging misconduct, outside of representations regarding employment prospects alleging job placement, by DeVry, between January 1, 2008, and September 30, 2015 that would be relevant to the borrower defense applications of borrowers who enrolled during the stated time frame. Further, BDU is not in possession of evidence, from within the Department or through other sources, that would establish a pattern or practice, outside of potential employment prospects alleging job placement representations, by DeVry between January 1, 2008, and September 30, 2015.

Accordingly, because the BDU is not currently in possession of evidence that could substantiate allegations of misconduct, outside of employment prospects alleging job placement rate allegations, occurring between January 1, 2008, and September 30, 2015, we recommend that all DeVry University applications that do not make an employment prospects alleging job placement rate allegation with an enrollment date between January 1, 2008, and September 30, 2015, enrollment date be adjudicated in accordance with the standard review protocol.

---

[1] https://www.devry.edu/about.html
[2] https://www.chicagobusiness.com/article/20170524/NEWS13/170529959/devry-education-group-changes-name-to-adtalem-global-education
[3] Adtalem Global Education, Inc., Annual Report (Form 10-K), at 3 (June 30, 2018).
[4] See CEMS Reports generated by BDU personnel on 05/29/20 (on file with department).

DOE00009583

**DOE00009585-DOE00009585**

**Keller Graduate School of Management** – Evidence Considered Protocol

<u>Applicable to</u>:

Keller Graduate School of Management

<u>Entering Evidence Considered Manually</u>:

1. Open a case with a suggested closing correspondence value of Standard Denial with Evidence Considered in status 3.10
2. In the "Evidence Considered" field on the case select the following:
    a. Evidence obtained by the Department in conjunction with its regular oversight activities
3. The case is now ready to process following the normal borrower notification letter creation process.

<u>Bulk Update Options</u>:

1. Bulk update (by work ticket to Accenture) all Keller Graduate School of Management cases in 3.10 with the following:

    a. In the "Evidence Considered" dropdown, select "Evidence obtained by the Department in conjunction with its regular oversight activities."

2. Process following the normal borrower notification letter creation process.

**DOE00009622-DOE00009625**

To: Colleen Nevin
From: Daniel Davis and Kristen Yarows
Date: August 13, 2020
Re: Borrower Defense Unit Investigation of Argosy University, South University, and Western State University College of Law [1]

## I.   **Introduction**

Education Management Corporation ("EDMC"), a for-profit education company organized as a Pennsylvania corporation in 1962,[2] brought together and consolidated a number of educational institutions under the following brands: (i) The Art Institutes; (ii) Argosy University; (iii) Brown Mackie College; (iv) South University; and (v) Western State College of Law ("EDMC Schools").[3] The EDMC Schools operated across as many as 109 campuses (both physical and exclusively online) with an active enrollment of over 158,000 students.[4]

As of August 13, 2020, the Borrower Defense Unit ("BDU") has approximately 13,000 pending applications from borrowers who attended EDMC Schools.[5]

This memorandum solely addresses borrower defense applications alleging misconduct at Argosy University, South University, and Western State College of Law (the "Other Brands") and specifically excludes borrowers who (i) make professional licensure allegations for psychology masters and doctorate programs at Argosy University; (ii) make professional licensure allegations for the South University nursing program in 2009; and (iii) make any allegation while Dream Center Educational Holdings owned EDMC Schools ("Excluded Allegations").

## II.   **Evidence Regarding Other Brand Allegations**

Although BDU's investigation into EDMC Schools is ongoing, the BDU does not have sufficient evidence in its possession to substantiate claims of borrowers who attended the Other Brand, potentially excepting the Excluded Allegations.

As of the date of this memorandum, the BDU has obtained the following evidence relating to borrowers' Other Brand Allegations: (i) exhibits and congressional testimony referenced in the 2012 U.S. Senate Committee on Health, Education, Labor & Pensions on for profit higher education;[6] (ii) marketing materials, contractual agreements, and similar documents

---

[1]    This memorandum should be read in conjunction with the previously submitted "Borrower Defense Unit Investigation of EDMC Schools Prior to July 1, 2003," "Borrower Defense Unit Investigation of EDMC Schools from January 1, 2016 to September 30, 2017," and "Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2008)." Further, the BDU's investigation of EDMC Schools is ongoing and the BDU will draft a memorandum to provide a more comprehensive view of the EDMC Schools' conduct.

[2]    Educ. Mgmt. Corp., Annual Report (Form 10-K), at 2 (June 30, 2003).

[3]    Educ. Mgmt. Corp., Annual Report (Form 10-K), at 6 (June 30, 2011); Educ. Mgmt. Corp., Annual Report (Form 10-K), at 10 (June 30, 2002).

[4]    Educ. Mgmt. Corp., Annual Report (Form 10-K), at 3 (June 30, 2012); S. REP. NO. 112-37, pt. 2, at 451 (2012).

[5]    See Salesforce reports generated by BDU personnel (on file with the department).

[6]    See S. REP. NO. 112-37, pt. 2, at 449 (2012).

Confidential - Subject to Protective Order

DOE00009622

distributed to students by EDMC Schools;[7] (iii) EDMC's SEC financial filings;[8] and (iv) borrower applications with attachments.

The BDU has also obtained evidence from the Pennsylvania attorney general's office and the Iowa attorney general's office. Most of this evidence relates to allegations against the Art Institutes and Brown Mackie College.

BDU has received some materials relate to the Other Brands, but the evidence relates only to the existence of representations and not to whether they were false or misleading. These materials include a selection of South University's representations of employment prospects and job placement rates to prospective students, as well as professional licensure exam passage rates for various programs at EDMC Schools. Absent evidence that these representations were, in fact, misrepresentations, the materials do not substantiate borrowers' claims regarding these Other Brands. Additionally, no external body has found that EDMC engaged in any misconduct during this period.

Finally, while the BDU has also identified lawsuits that potentially relate to borrowers' claims regarding the Other Brands, the BDU has not obtained[9] any evidence from those cases.[10] The relevant lawsuits include the following:

### A. *Sobek v. EDMC*

Jason Sobek, a former employee for South University, brought a *qui tam* action against EDMC pursuant to the False Claims Act alleging that EDMC failed to adequately track student progress and misrepresented (1) programmatic accreditation, (2) job placement rates and (3) cost of attendance in 2009.[11] The parties settled the dispute without EDMC admitting liability pursuant to the joint settlement agreement in *Washington and Mahoney ex rel. US v. EDMC*.[12] The BDU was unable to obtain any evidence from the *Sobek* action.

### B. *Washington and Mahoney ex rel. US v. EDMC*

In 2007, Lynntoya Washington, then employed by EDMC Schools, instituted *qui tam* false claims act litigation alleging that EDMC Schools violated the incentive compensation ban as far

---

[7]       *See, e.g.*, Argosy University Forensic Psychology (Online) Associates Degree: Facts you should know about the program (on file with the department).

[8]       *See, e.g.*, Educ. Mgmt. Corp., Annual Report (Form 10-K) (June 30, 2003).

[9]       *See* Section II.B. *infra* for a discussion of boxes of materials currently in BDU's possession.

[10]      For a more extensive discussion of *Washington and Mahoney ex rel. US v. EDMC, Gaer v. Education Management Corporation, Robb v. Education Management Corporation, and Laukaitis v. Education Management Corporation, see* "Re: Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2007)" dated July 21, 2020.

[11]      Second Amended Complaint at ¶ 42-72, United States ex rel. Sobek v. Educ. Mgmt. Corp., No. 2:10-cv-00131 (W.D. Pa. Feb. 10, 2012).

[12]      Settlement Agreement, United States and Educ. Mgmt. Corp. (Nov. 12, 2015).

2

Confidential - Subject to Protective Order

DOE00009623

back as 2003.[13]  The Department of Justice ("DOJ"), along with certain states intervened in the case in 2011.[14] The case ultimately settled without EDMC admitting to any wrongdoing.[15]

While the case was pending, and under the supervision of a special master, EDMC Schools and DOJ engaged in extensive written discovery.[16]  Based on a review of public records, EDMC produced millions of pages of documents given in this litigation.[17] However, BDU was unable to obtain any of these documents as they were destroyed, or returned to EDMC in light of the confidentiality agreement in the case.[18] As EDMC ceased operating its schools in 2017[19] and subsequently closed, BDU was unable to request the records from the school, and BDU, therefore, is not able to ascertain whether the documents would have provided corroborating evidence for any borrower defense claims.

On or about August 3, 2020, relator Washington's counsel returned to the Department approximately 60 file boxes of documents that, on information, the Department of Education originally produced in discovery and that are unlikely to corroborate BD applications.  However, given the current state of the COVID-19 pandemic, and current COVID-19 Federal Student Aid policies for employees in response to current health and safety risks, BDU has been unable to review the contents of the returned files to confirm that the materials are not relevant to the cases at issue in this memo or are insufficient to corroborate the borrowers' claims.   While BDU recommends proceeding with adjudication based on its current understanding of the Department materials, BDU will confirm the contents of the returned Department materials as soon as it is safe to do so.  Once the BDU is able to review these documents, it will update this memorandum accordingly.  In the unlikely event that the documents would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

---

[13]    Second Amended Complaint, Washington v. Educ. Mgmt. Corp., No. 07-cv-461 (W.D. Pa. May 2, 2011) (Michael Mahoney was EDMC's Director of Training for the Online Higher Education Division from 2006 – 2007 and joined the litigation in the Second Amended Complaint).

[14]    See Joint Complaint in Intervention by the United States of America, and the States of California, Florida, Illinois, and Indiana. United States ex rel. Washington v. Educ. Mgmt. Corp., No. 07-CV-461 (W.D. Pa. Aug. 8, 2011).

[15]    See Settlement Agreement, United States and Educ. Mgmt. Corp. (Nov. 12, 2015). This settlement agreement also resolved other pending qui tam lawsuits against EDMC including the settlement referenced above in Sobek. Id. at 9.

[16]    See Docket in Washington v. EDMC, et al., No. 2:07-cv-00461-NBF (W.D. Pa. 2007)

[17]    See Report & Recommendation #2 of the Special Master [Plaintiff's Motions to Compel the Production of Documents and Answers to Interrogatories] filed in Washington v. EDMC, et al., No. 2:07-cv-00461-NBF (W.D. Pa. May 14, 2013); Protective Order Governing Confidential Materials filed in Washington v. EDMC, et al., No. 2:07-cv-00461-NBF (W.D. Pa. April 12, 2013); Case Management Order No. 2 filed in Washington v. EDMC, et al., No. 2:07-cv-00461-NBF (W.D. Pa. September 13, 2013) Report & Recommendation #4 of the Special Master [Plaintiffs' and Defendants' Submissions Regarding Ongoing Discovery Disputes] filed in Washington v. EDMC, et al., No. 2:07-cv-00461-NBF (W.D. Pa. November 24, 2013);

[18]    Project Predatory Lending of the Legal Services Center of Harvard Law School v. United States Department of Justice, 17-CV-00210, ECF No. 80, Memorandum Opinion, p. 22 (W.D. Penn. 2017) (J. Fischer).

[19]    See Third Annual Report of the Settlement Administrator Under the Consent Judgments with Education Management Corporation (EDMC) as Succeeded by Dream Center Education Holdings, Thomas J. Perrelli as Settlement Administrator, September 30, 2018, 1.

3

Confidential - Subject to Protective Order

III.       **Conclusion and Recommendations**

Although BDU's investigation of EDMC Schools is ongoing, BDU currently does not have evidence[20] in its possession that substantiates the borrower defense allegations of students who attended EDMC's Other Brands, potentially excepting the Excluded Allegations.

As a result, the BDU recommends that all applications from borrowers who attended the Other Brands – Argosy University, South University, and Western State University College of Law – be adjudicated unless they fall into the following categories that allege the Excluded Allegations:

- Professional licensure allegations for psychology masters and doctorate programs at Argosy University;
- Professional licensure allegations for the South University nursing program in 2009; and
- Allegations while Dream Center Educational Holdings owned EDMC Schools.

All other applications from borrowers who attended Other Brands should be adjudicated in accordance with the following standard review protocol: BDU attorneys will individually adjudicate each application by opening each claim and reviewing all allegations made by the borrower and any supporting evidence provided by the borrower.  If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review.  However, where the borrower provides no evidence, or the evidence provided is insufficient to prove any allegations, denial of the application is appropriate.  If additional evidence is obtained in the future, these claims may be subject to redetermination as warranted.

---

[20] As noted with respect to the *Washington* case, while it is BDU's understanding that the returned Department records are not likely to contain corroborative evidence, BDU will confirm the contents and revise this memorandum as needed to the extent there is any corroborating evidence in the materials.  In the unlikely event that the document would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

Confidential - Subject to Protective Order

DOE00009625

Memorandum

To: Colleen Nevin
From: Daniel Davis
Date: August 7, 2020
Re: Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2008)[1]

## I.   Introduction

Education Management Corporation ("EDMC"), a for-profit education company organized as a Pennsylvania corporation in 1962,[2] brought together and consolidated a number of educational institutions under the following brands: (i) The Art Institutes; (ii) Argosy University; (iii) Brown Mackie College; (iv) South University; and (v) Western State College of Law ("EDMC Schools").[3] The EDMC Schools operated across as many as 109 campuses (both physical and exclusively online) with an active enrollment of over 158,000 students.[4]

As of August 7, 2020, the Borrower Defense Unit ("BDU") has approximately 13,000 pending applications from borrowers who attended EDMC Schools.[5]

This memorandum solely addresses borrower defense applications alleging misconduct at EDMC Schools from July 1, 2003 through December 31, 2008,[6] excluding borrowers who make professional licensure allegations for psychology masters and doctorate programs at Argosy University.[7]

## II.   Evidence Regarding Alleged Misconduct at EDMC Schools

---

[1]     The July 21, 2020 version of this memorandum (previously "Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2017) has been amended, effective August 7, 2020, to also include borrowers who enrolled at EDMC Schools between January 1, 2008 through December 31, 2008. Further, this memorandum should be read in conjunction with the previously submitted "Borrower Defense Unit Investigation of EDMC Schools Prior to July 1, 2013" and "Borrower Defense Unit Investigation of EDMC Schools from January 1, 2016 to September 30, 2017." Finally, the BDU's investigation of EDMC Schools is ongoing and the BDU will draft a memorandum to provide a more comprehensive view of the EDMC Schools' conduct.
[2]     Educ. Mgmt. Corp., Annual Report (Form 10-K), at 2 (June 30, 2003).
[3]     Educ. Mgmt. Corp., Annual Report (Form 10-K), at 6 (June 30, 2011); Educ. Mgmt. Corp., Annual Report (Form 10-K), at 10 (June 30, 2002).
[4]     Educ. Mgmt. Corp., Annual Report (Form 10-K), at 3 (June 30, 2012); S. Rep No. 112-37, at 451 (2012).
[5]     See Salesforce reports generated by BDU personnel (on file with the department).
[6]     See "Borrower Defense Unit Investigation of EDMC Schools Prior to July 1, 2003" for an assessment of borrower defense applications alleging misconduct against EDMC Schools prior to July 1, 2003 and "Borrower Defense Unit Investigation of EDMC Schools from January 1, 2016 to September 30, 2017" for an assessment of borrower defense applications alleging misconduct against EDMC Schools between January 1, 2016 and September 30, 2017. Further, as noted above, the BDU investigation of EDMC Schools is ongoing and the BDU will provide a more comprehensive analysis of EDMC School conduct.
[7]     BDU's investigation into borrower defense applications during this period of time who make professional licensure allegations related to nursing and psychology, along with borrowers who enrolled between January 1, 2009 and December 31, 205 and those who enrolled after September 30, 2017 are subject to ongoing investigation.

1

DOE00009626

Although BDU's investigation is ongoing, the BDU does not have sufficient evidence in its possession to substantiate the borrower defense ("BD") allegations against EDMC schools submitted by borrowers who enrolled between July 1, 2003 through December 31, 2008.

As of the date of this memorandum, the BDU has obtained the following evidence relevant to July 1, 2003 through December 31, 2008: (i) exhibits and congressional testimony referenced in the 2012 U.S. Senate Committee on Health, Education, Labor & Pensions on for profit higher education;[8] (ii) marketing materials, contractual agreements, and similar documents distributed to students by EDMC Schools;[9] (iii) EDMC's SEC financial filings;[10] and (iv) borrower applications with attachments.

The BDU has also obtained evidence from the Pennsylvania attorney general's office and the Iowa attorney general's office. While most of this evidence relates to times beyond the scope of this memorandum, some of the materials do relate to the period at issue. These materials include EDMC School's representations of employment prospects and job placement rates to prospective students as well as school brochures. However, BDU does not possess the underlying data and internal policies to assess the accuracy of these representations.[11]

The above evidence obtained by the BDU relating to the borrower defense applications at issue in this memorandum is not sufficient to corroborate borrower allegations against EDMC Schools. Additionally, no external body has found that EDMC engaged in any misconduct during this period.

Finally, while the BDU has identified a number of lawsuits that included allegations potentially related to some of the allegations asserted by EDMC borrowers, the BDU has not received[12] any evidence to substantiate the BD-related allegations from those cases. The cases include the following:

## A.  *Washington and Mahoney ex rel. US v. EDMC*

In 2007, Lynntoya Washington, then employed by EDMC Schools, instituted *qui tam* false claims act litigation alleging that EDMC Schools violated the incentive compensation ban as

---

[8]     *See, e.g., The Federal Investment in For-Profit Education: Are Students Succeeding? Hearing of the Committee on Health, Education, Labor, And Pensions United States Senate*, S. HRG. 111–1162, 111 Cong. 2 (Sept. 30, 2010) (Statement of Kathleen Bittel). Kathleen Bittel, a former EDMC employee testified that the work was "all about hitting [enrollment] quotas" and that the career services numbers were not realistic since EDMC had 1,600 admissions recruiters and only nine career services advisors to work with the graduates of all EDMC online programs. *Id.* Absent external evidence corroborating her allegations, which the BDU does not possess, Kathleen Bittel's testimony does not independently substantiate BD allegations of students who attended EDMC Schools from July 1, 2003 through December 31, 2008.

[9]     *See, e.g.,* The Art Institute employment statistics and representations of graduate job placement rates obtained by the BDU in borrower application attachments (on file with the department).

[10]    *See, e.g.,* Educ. Mgmt. Corp., Annual Report (Form 10-K) (June 30,2003).

[11]    While BDU has EDMC career services policies and in-field employment data for nine EDMC Schools for graduates starting in 2008, this data was first provided to students in 2009 and does not impact borrowers who enrolled at EDMC Schools in 2008.

[12]    *See* Section II.A. *infra* for a discussion of boxes of materials currently in BDU's possession.

2

DOE00009627

far back as 2003.[13]  The Department of Justice ("DOJ"), along with certain states intervened in the case in 2011.[14] The case ultimately settled without EDMC admitting to any wrongdoing.[15]

While the case was pending, and under the supervision of a special master, EDMC Schools and DOJ engaged in extensive written discovery.[16]  Based on a review of public records, EDMC produced millions of pages of discovery in this litigation.[17] However, BDU was unable to obtain any of these documents as they were destroyed, or returned to EDMC in light of the confidentiality agreement in the case.[18] As EDMC ceased operating its schools in 2017[19] and subsequently closed, BDU was unable to request the records from the school, and BDU, therefore, is not able to ascertain whether the documents would have provided corroborating evidence for any borrower defense claims.

On or about August 3, 2020, relator Washington's counsel returned to the Department approximately 60 file boxes of documents that, on information, the Department of Education originally produced in discovery and that are unlikely to corroborate BD applications.  However, given the current state of the COVID-19 pandemic, and current COVID-19 Federal Student Aid policies for employees in response to current health and safety risks, BDU has been unable to review the contents of the returned files to confirm that the materials are not relevant to the cases at issue in this memo or are insufficient to corroborate the borrowers' claims.    While BDU recommends proceeding with adjudication based on its current understanding of the Department materials, BDU will confirm the contents of the returned Department materials as soon as it is safe to do so.    Once the BDU is able to review these documents, it will update this memorandum accordingly.  In the unlikely event that the documents would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

## B.  *Gaer*

---

13      Second Amended Complaint, *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. May 2, 2011) (Michael Mahoney was EDMC's Director of Training for the Online Higher Education Division from 2006 – 2007 and joined the litigation in the Second Amended Complaint).

14      *See* Joint Complaint in Intervention by the United States of America, and the States of California, Florida, Illinois, and Indiana.  *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. August 8, 2011)

15      *See* Settlement Agreement in *Washington v. Education Management Corporation*, No. 07-CV-461 (W.D. Pa. Nov. 12, 2015).  This settlement agreement also resolved other pending *qui tam* lawsuits against EDMC including the settlement referenced below in *Laukaitis. Id.* at 9.

16      *See* Docket in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. 2007)

17      *See* Report & Recommendation #2 of the Special Master [Plaintiff's Motions to Compel the Production of Documents and Answers to Interrogatories] filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. May 14, 2013); Protective Order Governing Confidential Materials filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. April 12, 2013); Case Management Order No. 2 filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. September 13, 2013) Report & Recommendation #4 of the Special Master [Plaintiffs' and Defendants' Submissions Regarding Ongoing Discovery Disputes] filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. November 24, 2013);

18      *Project Predatory Lending of the Legal Services Center of Harvard Law School v. United States Department of Justice*, 17-CV-00210, ECF No. 80, Memorandum Opinion, p. 22 (W.D. Penn. 2017) (J. Fischer).

19      *See* Third Annual Report of the Settlement Administrator Under the Consent Judgments with Education Management Corporation (EDMC) as Succeeded by Dream Center Education Holdings, Thomas J. Perrelli as Settlement Administrator, September 30, 2018, 1.

3

Confidential - Subject to Protective Order

The complaint in *Gaer*, a securities class action claim brought against EDMC, includes allegations from confidential witnesses who purportedly worked at EDMC Schools during the relevant period of time.[20] Allegations from confidential witnesses focused primarily on incentive compensation issues, aggressive enrollment quotas, inadequate career services employee staffing, and inaccurate job placement rates.[21] The BDU is unable to assess the voracity the allegations made by the confidential witnesses in the *Gaer* complaint and is not aware of the identifies of the confidential witnesses. The case ultimately concluded with no admission of wrongdoing on the part of EDMC.

### C. *Laukaitis*

In 2011, former EDMC employees brought a *qui tam* action against EDMC and alleged False Claims Act violations for misrepresenting "recruiter compensation, information provided to prospective students, and the amount of revenue that may be received from federal financial aid sources."[22] The relators in *Laukaitis* also alleged, without providing additional detail, that EDMC and its "admissions representatives misrepresent[ed] graduation and retention rates, employment statistics, and the salaries that students can expect to earn upon completing their program of study."[23] The case ultimately settled without EDMC admitting liability or admitting to making any misrepresentations.[24]

### D. *Robb*

The complaint in *Robb*, a securities class action claim brought against EDMC, includes allegations from confidential witnesses who purportedly worked at EDMC Schools during the relevant time frame.[25] The confidential witnesses alleged that EDMC Schools engaged in predatory recruitment practices including knowingly enrolling students who could not complete the program, and falsifying employment data.[26] The Robb action settled in 2015 for $2,500,000 without EDMC admitting to any wrongdoing.[27] The BDU has been unable to determine the identities of, or otherwise assess the voracity of claims made by, the confidential witnesses referenced in the Robb complaint for the period July 1, 2003 through December 31, 2008.

---

[20]     Second Amended Complaint, *Gaer v. Education Management Corporation, et al.*, No. 2:10-cv-01061-NBF-RCM (W.D. Pa. Jan. 10/2011) (the sixteen confidential witnesses purportedly included various admissions representatives, human resources personnel, and an Associate Director of Finance).

[21]     *Id.* at 19-37.

[22]     Third Amended Complaint, *United States, ex. rel. Laukaitis v. Education Management Corporation, et. al.*, at ¶ 4, No. 11-602 (W.D. Pa. Oct. 22, 2013).

[23]     *Id.* at 45.

[24]     Settlement Agreement in *Washington v. Education Management Corporation*, No. 07-CV-461 (W.D. Pa. Nov. 12, 2015) at 9.

[25]     *See* Consolidated Amended Complaint, *Robb v. Education Management Corporation, et al.*, No. 2:14-cv-01287-DSC (W.D. Pa. April 8, 2015).

[26]     *Robb v. Education Management Corporation, et al.*, No. 2:14-cv-01287-DSC (W.D. Pa.); *see id.* at ¶109 (describing a situation where the confidential witness' manager ordered the witness to enroll a student who could not read or write).

[27]     Stipulation of Settlement, Robb v. Education Management Corporation, et al., No. 2:14-cv-01287-DSC (W.D. Pa. Sept. 17, 2015).

4

DOE00009629

Although the allegations in *Washington, Gaer, Laukaitis,* and *Robb* may be relevant to borrowers' allegations, the BDU does not currently have any documents or evidence[28] to substantiate the claims made in these lawsuits for the period July 1, 2003 through December 31, 2008. The existence of these lawsuits, absent corroborating evidence, does not constitute evidence to substantiate the borrower allegations against EDMC schools during the July 1, 2003 through December 31, 2008 timeframe.

### III.   Conclusion and Recommendations

Although BDU's investigation of EDMC Schools is ongoing, BDU currently does not have evidence in its possession to substantiate the borrower defense allegations of students who are the subject of this memorandum.

As a result, the BDU recommends that all EDMC Schools applications reflecting an enrollment date between July 1, 2003 and December 31, 2008, excluding those who make professional licensure allegations relating to psychology masters and doctorate level programs at Argosy University, be adjudicated in accordance with the following standard review protocol: BDU attorneys will individually adjudicate each application by opening each claim and reviewing all allegations made by the borrower and any supporting evidence provided by the borrower. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. However, where the borrower provides no evidence, or the evidence provided is insufficient to prove any allegations, denial of the application is appropriate. If additional evidence is obtained in the future, these claims may be subject to redetermination as warranted.

---

[28] As noted with respect to the *Washington* case, while it is BDU's understanding that the returned Department records are not likely to contain corroborative evidence, BDU will confirm the contents and revise this memorandum as needed to the extent that there is any corroborating evidence in the materials. In the unlikely event that the records would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

Confidential - Subject to Protective Order                                    DOE00009630

**DOE00010045-DOE00010049**



## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| Name of Institution and OPEID | Beckfield College 02491100 |
|---|---|
| Open or Closed | Open |
| Date Advanced Letter Sent | N/A No Approvals |
| Additional Locations<br>• **Add closure date if applicable** | 02491101- Beckfield College - Louisville[1]<br>02491102- Beckfield College - Springdale |
| Corporate Owner(s) | Quad Partners III-A LP |
| Total Number of Applications | As of 7/22/2020, there are 32 applications. |
| Patterns of Alleged Misconduct | Beckfield College does not have any current litigation pending. Based on a review of the applications, the borrowers do not present evidence that indicate Beckfield College committed overt or repetitive misconduct, fraud, or misrepresentations. The application narratives provide individual experiences, frustrations, or issues encountered as a customer of Beckfield College. Additionally, although some of the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| Internal ED Investigation(s)<br>• **PC, AAASG, OIG** | **Program Compliance**<br>After review, Borrower Defense found no past or pending Final Program Review Determinations (FRPD).<br><br>**AAASG and OIG Investigations**<br>After review, Borrower Defense found no past or pending AAASG or OIG investigations.<br><br>**OGC/DOJ**<br>After review, Borrower Defense found no past or pending OGC/DOJ investigations. |

---

[1] The ownership timeline of the Louisville Campus is as follows:
1995-1998 Kentucky Career Institute
1998-2001 Beckfield
2001- Daymar
The OPEID on the NSLDS data will accurately reflect the ownership of the school at the time of borrower's attendance. For all applications with a customer provided school of Beckfield-Louisville after 2001, the NSLDS data will reflect that the borrower was enrolled in Daymar.

| Internal Contact(s) for Further Investigation | N/A |
|---|---|
| External Investigations (AG), Evidence or Litigation Related to Borrower Defense | Beckfield College was formerly Kentucky Career Institute, one branch of Kentucky Career Institute was purchased by Daymar College.[2] In 2015 there was a settlement by Daymar College, paid out 1.2 million dollars to former students.[3] Daymar denied the violations as part of the settlement. Beckfield is not a named party in the complaint or the settlement.<br><br>An earlier Borrower Defense memo notes that there were various suits against Beckfield College for various claims of deception and misrepresentation.[4] However, the Kentucky Courts website no longer shows any pending cases against Beckfield. |
| External Contact(s) for Further Investigation | N/A |
| External Investigations, Evidence or Litigation NOT related to Borrower Defense | N/A |
| News Articles/Media | According to this article, two Plaintiffs brought against Beckfield for violations of the Kentucky Consumer Protection Act, negligent misrepresentation, fraud and breach of contract. The plaintiffs allege that they were excessively charged for classes and misled as the transferability of credits. There is no information on the resolution of this case. There is no evidence of this suit elsewhere on the internet.<br><br>This news clip from WKRC CBS 12 Cincinnati purportedly shows an interview with a student suing Beckfield College over "worthless" credits but the video does not play.<br><br>Beckfield failed to meet Department's standard for "gainful employment" in a recognized occupation in 2017. |
| Name of Reviewer | Conor Kruger |
| Date Review Completed | 7/22/2020 |

## SUMMARY OF ALLEGATIONS AND RECOMMENDATION

---

[2] https://www.in.gov/iara/3146.htm

[3] The Attorney General of Kentucky charged the school with denying students access to financial aid to buy their textbooks from vendors other than Daymar's bookstore, which allegedly charged significantly higher prices than other vendors; misrepresenting students' ability to transfer credits earned at Daymar to other institutions; admitting students who failed Daymar's admissions assessment in violation of the school's own admissions policy, and hiring unqualified faculty who lacked the required credentials.

[4] Schmidt, Jacqueline M. vs. Beckfield College – 15-S-00038

Jones, Sonia L, Et al vs. Beckfield College, LLC – 12-CI-01908

Becker, Alicia, Et al vs. Beckfield College, LLC – 11-CI-00654

2

DOE0001 0046

| | |
|---|---|
| **Summary of Allegations Reviewed** | **Summary of Allegations**<br><br>Borrower Defense reviewed a sample of 20 applications to identify potential trends and/or salient information provided by the applicant pool.  The enrollment dates for the applicant pool range from May 1, 1992 through September 20, 2019, with the majority of applicants having enrollment dates between 2006 and 2011.  The narrative allegations include complaints relating to: (i) the inability to transfer credits; (ii) misrepresentations regarding cost; and (iii) the perceived failures of the career services department.<br><br>**Admissions and Urgency to Enroll**<br>Of the 32 total applications, 15 raise an admissions allegation. Of the 15 allegations, two are of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegations that might warrant Borrower Defense relief, borrowers allege that they were deceived as to the transferability of credits and loan costs. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Beckfield. The most common allegations deal with the borrowers' dissatisfaction with the speed of the enrollment, many felt that the process was too quick. These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation.<br><br>**Career Services**<br>Of the 32 total applications, 17 raise a career services allegation. Of the 17 allegations, zero are of the type that might warrant Borrower Defense relief, if supported by evidence. The borrowers in the sampled cases express general frustrations with employment and job placement assistance. These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation.<br><br>**Educational Services**<br>Of the 32 total applications, 14 raise an educational services allegation. Of the 14 allegations, three are of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegations that might warrant Borrower Defense relief, borrowers allege that they were deceived as to the transferability of credits. The borrowers' allegations discuss their issues with the misrepresentation of the accreditation of the school. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Beckfield.<br><br>**Employment Prospects** |

3

DOE00010047

Of the 32 total applications, 20 raise an employment allegation. Of the 20 allegations, one is of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegation that might warrant Borrower Defense relief, the borrower alleges that they misled as to their eligibility to receive a certain job. The borrowers in the sampled cases express general frustrations with employment and job placement assistance. These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation.

### Other

Of the 32 total applications, 20 raise an "other" allegation. Of the 20 allegations, two are of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegations that might warrant Borrower Defense relief, borrowers allege that they were deceived as to the accreditation of the school or the wage they would earn upon graduation. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Beckfield. In most of the allegations, borrowers provided general explanatory narratives relevant to their experiences with accreditation, certification, and fees associated with the school. These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation.

### Program Cost and Nature of Loans

Of the 32 total applications, 18 raise a program cost allegation. Of the 18 allegations, three are of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegations that might warrant Borrower Defense relief, borrowers allege that Beckfield lied about the cost of attendance, did not properly explain the cost of attendance, or lied about the amount of financial assistance a borrower would receive. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Beckfield.

### Transferring Credits

Of the 32 total applications, 21 raise a transfer of credits allegation. Of the 21 allegations; 15 allegations assert that Beckfield that might warrant Borrower Defense relief, if supported by evidence. Most of the claims allege that Beckfield representatives told Borrowers that credits were generally transferable to any college or university, Beckfield credits did not transfer to other institutions but make no allegation as to any representations by the school, and that Borrowers were unable or had difficulty transferring credits from other institutions into Beckfield including some cases where Beckfield made representations to the contrary. Although the allegations asserted are

4

DOE00010048

|  | of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Beckfield. |
|---|---|
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, there is insufficient evidence of widespread misconduct Beckfield to warrant further investigation. As such, it is recommended the cases be adjudicated.<br><br>Additionally, as there is no evidence of widespread misconduct, notice to the school on these claims is not required. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 08/28/2020 |

| **Evidence Considered** | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☒ Evidence Obtained by the Department in conjunction with its regular oversight activities<br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state)<br>☐ Other<br>☐ No Other Evidence Considered |
|---|---|

| **Advanced Letter Requests** | ☐Standard Letter<br>☐Standard Letter Plus:<br>• |
|---|---|

**Links:** In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.

• Salesforce Allegation Report

DOE00010049

**DOE00010089-DOE00010093**



## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| Name of Institution and OPEID | Berkeley College<br>00739400 (New York); 00750200 (New Jersey) |
|---|---|
| Open or Closed | Open |
| Date Advanced Letter Sent | N/A |
| Additional Locations<br><br>• Add closure date if applicable | New York:<br>00739402<br><br>New Jersey:<br>00750201; 00750202; 00750204 |
| Corporate Owner(s) | Level I:<br>Berkeley Educational Services of New Jersey, Inc. (NJ)<br>Berkeley Educational Services of New York, Inc. (NY)<br><br>Level II:<br>Randy B. Luing (25%)<br>Kevin L. Luing (25%)<br>Timothy D. Luing (25%)<br>Brian D. Luing (25%) |
| Total Number of Applications | As of September 3, 2020, there are 11 applications already adjudicated and 80 applications awaiting adjudication. |
| Patterns of Alleged Misconduct | In 2018, after engaging in a nearly two-year investigation, the New York City Department of Consumer Affairs (the "DCA") filed suit against the school for alleged violations of New York consumer protection laws. The DCA's complaint alleged that Berkeley College engaged in deceptive trade practices, including but not limited to (1) misrepresenting the total cost of attending the school, including the availability of grants and repayment plans; (2) misleading students as to the transferability of credits; (3) misrepresenting employment prospects; (4) misrepresenting graduation rates; and (5) violating local debt collecting rules.<br><br>Of the allegations sampled, borrowers discuss some issues that are raised in the New York City DCA's lawsuit, including misrepresentations related to the availability and award of academic grants, the transferability of credits, and the likelihood of obtaining employment (see below). However, this lawsuit is currently pending in New York State court and Borrower Defense is not in possession of evidence related to this case.<br><br>An additional lawsuit filed by former employees, alleges that recruitment staff were evaluated solely on the number of |

| | students they enrolled. This lawsuit is currently pending in Federal court. |
|---|---|
| **Internal ED Investigation(s)**<br>• PC, AAASG, OIG | **Program Compliance**<br>Program reviews were conducted in 1996, 1999, 2005, 2009, and 2010, however, none of the findings were relevant to borrower defense.<br><br>**AAASG and OIG Investigations**<br>Borrower Defense found no past or pending AAASG or OIG investigations.<br><br>**OGC/DOJ**<br>Borrower Defense found no past or pending OGC/DOJ investigations. |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BORROWER DEFENSE** | *City of N.Y., et al. v. Berkeley Educ. Servs. Of N.Y., Inc.*, No. 452025/2018 (N.Y. Sup. Ct. Oct. 10, 2018) (for a relevant published opinion, see *City of N.Y., et al. v. Berkeley Educ. Servs. Of N.Y., Inc.*, 118 N.Y.S. 3d 556 (Sup. Ct. 2020)).<br>The New York City Department of Consumer Affairs (the "DCA") filed suit against the school in 2018 for alleged violations of New York consumer protection laws. The DCA's complaint alleged that Berkeley College engaged in deceptive trade practices, including but not limited to (1) misrepresenting the total cost of attending the school, including the availability of grants and repayment plans; (2) misleading students as to the transferability of credits; (3) misrepresenting the employment prospects; (4) misrepresenting graduation rates; and (5) violating local debt collecting rules. This lawsuit is currently pending in New York State court.<br><br>*Estevez et al. v. Berkeley College, et al.*, No. 7:18-cv-10350, at ¶ 40–42 (S.D.N.Y. Nov. 7, 2018).<br>This is a lawsuit filed by former employees alleging hostile work environment and other gender discrimination claims. While the central allegations are not relevant to borrower defense, the complaint further alleges that recruitment staff were evaluated solely on the number of students they enrolled. If true, this type of misconduct may also be relevant to borrower defense. This lawsuit is currently pending in Federal court. |
| **External Contact(s) for Further Investigation** | For *DCA* Action:<br>Media Contacts: Gloria Chin / Christine Gianakis<br>Department of Consumer Affairs<br>(212) 436-0042<br>press@dca.nyc.gov<br><br>For *Estevez* Action: |

2

DOE00010090

| | LAW OFFICE OF DANIELA NANAU P.C.<br>89-03 Rutledge Avenue<br>Glendale, New York 11385<br>Telephone: (888) 404-4975<br>Email: dn@danielananau.com |
|---|---|
| **External Investigations, Evidence or Litigation NOT related to BORROWER DEFENSE** | N/A |
| **News Articles/Media** | This press release by the New York City DCA outlines its investigation and subsequent lawsuit against Berkeley College.<br><br>Several news outlets report about the lawsuit, including Inside Higher Ed, and The Century Foundation. The Century Foundation article reports that the New York City DCA received 169 complaints against for-profit schools, with 112 coming from Berkeley College students. Of those 112, 71 concerned misrepresentations made by the school to prospective students. |
| **Name of Reviewer** | Brian Gibbons |
| **Date Review Completed** | September 3, 2020 |

## SUMMARY OF ALLEGATIONS AND RECOMMENDATION

| Summary of Allegations Reviewed | <div align="center">**Summary of Allegations**</div><br>Borrower Defense reviewed a sample of 10 allegations of each category outlined below to identify potential trends and/or salient information provided by the applicant pool. The enrollment dates for the applicant pool range from November 6, 1990 through April 23, 2018, with the majority of applicants having enrollment dates between 2006 and 2012. The narrative allegations include complaints relating to: (i) misrepresenting the availability of job placement or career services assistance; (ii) misrepresenting the transferability of credits; and (iii) a lack of student loan counseling.<br><br><div align="center">**Employment Prospects**</div><br>Of the 10 allegations sampled, most of them allege that the school promised students job placement and/or career services assistance, but the students did not receive these services. Although that allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.<br><br><div align="center">**Program Costs**</div> |
|---|---|

<div align="center">3</div>

DOE-00-010091

Of the 10 allegations sampled, most of them relate to complaints about a lack of counseling when taking out student loans (e.g. repayment and the repercussions of not paying off loans). These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation. Some borrowers note that the school promised them grants, but they did not receive those grants. Although that allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Career Services

Of the 10 allegations sampled, most allege that the school promised the availability of career services for graduating students, but that they did not receive such services. Some borrowers also allege that the school promised job placement services. Although that allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Transferring Credits

Of the 10 allegations sampled, most state that the school misrepresented the transferability of credits or mislead students as to the impact of the school's accreditation on transferability. Although that allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Educational Services

Of the 10 allegations sampled, most were complaints about the quality of the educational services, including their instructors. These claims are not of the type that would warrant Borrower Defense relief absent a misrepresentation. Some allegations provided that the school promised the availability for paid internships, which were not actually given. Although that allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Admissions and Urgency to Enroll

Of the 10 allegations sampled, most of them were complaints about the high-pressure recruitment tactics engaged in by the school. These claims are not

4

DOE00010092

| | |
|---|---|
| | the type that would warrant Borrower Defense relief absent a misrepresentation. |
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, it appears that there may be sufficient evidence of widespread misconduct by Berkeley College to warrant further investigation. If additional evidence is discovered or received in the future, these claims may be revisited as warranted. As such, it is recommended the school be provided notice of these allegations. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 09/08/2020 (updated 11/20/2020) |

| | |
|---|---|
| **Evidence Considered** | ☐ Attorney Submission |
| | ☐ Borrower Submission |
| | ☐ Consumer Protection Financial Bureau (CPFB) |
| | ☐ Department of Education-Office of Investigator General (OIG) |
| | ☐ Documents Submitted by the school in response to your application |
| | ☒ Evidence Obtained by the Department in conjunction with its regular oversight activities |
| | ☐ Federal Trade Commission (FTC) |
| | ☐ Department of Justice (DOJ) |
| | ☐ U.S. Securities and Exchange (SEC) |
| | ☐ Attorney General _____ (state) |
| | ☒ Other |
| | ☐ No Other Evidence Considered |

| | |
|---|---|
| **Advanced Letter Requests** | ☒Standard Letter |
| | ☐Standard Letter Plus: |
| | • |

Links:
- [Salesforce Allegation Report](Salesforce Allegation Report)

DOE00010093

**DOE00010201-DOE00010205**



## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Brookline College<br>02218800 |
| **Open or Closed** | Open |
| **Date Advanced Letter Sent** | N/A |
| **Additional Locations**<br>•     Add closure date if applicable | 022188-00: Phoenix<br>022188-01: Mesa (Closed: 06/15/2001)<br>022188-02: Phoenix (Closed: 11/24/2006)<br>022188-04: Tempe<br>022188-05: Tucson<br>022188-06: Mesa<br>022188-07: Mesa<br>022188-08: Albuquerque<br>022188-09: Albuquerque (Closed: 04/15/2013)<br>022188-10: Albuquerque<br>022188-11: Albuquerque<br>040623-00: Oklahoma City, OK (Closed: 10/27/2013) |
| **Corporate Owner(s)** | Brookline College, LLC |
| **Total Number of Applications** | As of August 14, 2020, there are 98 applications. |
| **Internal ED Investigation(s)**<br>•     PC, AAASG, OIG | **Program Compliance**<br>Program Reviews were conducted in 2005[1] and 2017.[2] The reviews found that Brookline College misrepresented its job placement rates to the auditor, however there was no evidence to suggest that Brookline made the same misrepresentations to students. Additionally, as there is no evidence of widespread misconduct, notice to the school on these claims is not required.<br><br>**AAASG and OIG Investigations**<br>Borrower Defense found a past AAASG finding, however it is unrelated to borrower defense. Borrower Defense found no past or present OIG investigations.<br><br>**OGC/DOJ**<br>Borrower Defense found no past or pending OGC/DOJ investigations. |

---

[1] PRCN:2005-3-09-24114
[2] PRCN:2012-1-09-27729

1

DOE00010201

# Federal Student Aid

An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND™

| | |
|---|---|
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BORROWER DEFENSE** | Borrower Defense found no past or pending external investigations, evidence, or litigation related to borrower defense. |
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BD** | After review, Borrower Defense found no past or pending external investigations or litigation not related to Borrower Defense. |
| **News Articles/Media** | After review, Borrower Defense found no news articles related to Borrower Defense. |
| **Name of Reviewer** | Nastashia Matos |
| **Date Review Completed** | 08/10/2020 |

## SUMMARY OF ALLEGATIONS AND RECOMMENDATION

| | |
|---|---|
| **Summary of Allegations Reviewed** | **Summary of Allegations**<br><br>Borrower Defense reviewed all ninety-eight applications to identify potential trends and/or salient information provided by the applicant pool. The enrollment dates for the applicant pool range from September 1, 1994 through May 22, 2019 with the majority of applicants having enrollment dates between 2006 and 2014. The narrative allegations include complaints relating to: (i) the promise of job placement; (ii) being told that the credits were able to transfer to other schools; and (iii) being told that they were getting grants.<br><br>**Employment Prospects**<br><br>Of the ninety-eight applications, seventy-six applications made an employment prospects allegation. The narrative of the allegations include: (i) the promise to help student find a job; (ii) being told that they were guaranteed a job after completing the program; and (iii) being told that they would complete their GED while completing the program at Brookline College. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.<br><br>**Program Cost and Nature of Loans** |

2

DOE-00010202

Federal **Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND™

Of the ninety-eight applications, sixty-one applications made a program cost and nature of loans allegation. The narrative of the allegations include: (i) the promise of grants; (ii) the promise that the tuition included all books, scrubs and everything needed to complete the program; and (iii) that Brookline College representatives never explained the actual cost of the program to the borrower. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Transferring Credits

Of the ninety-eight applications, thirty-nine applications made a transferring of credits allegation. The narrative of the allegations include: (i) the promise that any credits obtain at Brookline will be able to transfer to any school; and (ii) Brookline College representatives told the borrower that the school was accredited. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Career Services

Of the ninety-eight applications, sixty-five applications made a career services allegation. The narrative of the allegations include: (i) the promise of job placement; (ii) that Brookline would find the borrower a job; and (iii) that job placement was guaranteed. Although the allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Education Services

Of the ninety-eight applications, sixty applications made an education services allegation. The narrative of the allegations include: (i) the promise of externships; (ii) that the program would prepare them for them to become certified and sit for the state exam; and (iii) that Brookline College representatives told the borrower that they were affiliated with hospitals and would get them an externship there. Although the allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

### Admissions and Urgency to Enroll

3

DOE00010203

Federal **Student** Aid | PROUD SPONSOR *of*
An OFFICE *of the* U.S. DEPARTMENT *of* EDUCATION | *the* AMERICAN MIND™

|  | Of the ninety-eight applications, fifty-eight applications made an admissions and urgency to enroll allegation. The narrative of the allegations include: (i) the promise of grants; (ii) the promise that the tuition included all books, scrubs and everything needed to complete the program; and (iii) that Brookline College representatives never explained the actual cost of the program to the borrower. Although the allegation asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.<br><br>**Other**<br><br>Of the ninety-eight applications, fifty-eight applications made an other allegation. The narrative of the allegations include: (i) statements about the school closing; (ii) complaints about the lectures and curriculum taught at Brookline College; and (iii) statements about violating customer protection laws. These claims are not the type that would warrant Borrower Defense relief absent a misrepresentation. |
|---|---|
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, there is insufficient evidence of widespread misconduct by Brookline College are to warrant further investigation. As such, it is recommended the cases be adjudicated. |
| **Recommended Focus Area(s)** |  |
| **APPROVED BY:** | Linda Reid |
| **DATE:** | 8/18/2020 |

| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings) and Department of Education internal resources (FRPDs, AASG, and OIG investigations), there is insufficient evidence of widespread misconduct Brookline College to warrant further investigation.   If additional evidence is discovered or received in the future, these claims may be revisited as warranted.  As such, it is recommended the cases be adjudicated. Additionally, as there is no evidence of widespread misconduct, notice to the school on these claims is not required. |
|---|---|
| **Recommended Focus Area(s)** |  |
| **APPROVED BY:** | Linda Reid |

4

DOE00010204

# Federal **Student** Aid
## *An* OFFICE *of the* U.S. DEPARTMENT *of* EDUCATION

| PROUD SPONSOR *of*
*the* AMERICAN MIND™

| **DATE:** | 8/18/2020 (Updated 11/22/2020/0 |
|---|---|

| **Evidence Considered** | ☐ Attorney Submission |
|---|---|
| | ☐ Borrower Submission |
| | ☐ Consumer Protection Financial Bureau (CPFB) |
| | ☐ Department of Education-Office of Investigator General (OIG) |
| | ☐ Documents Submitted by the school in response to your application |
| | ☐ Evidence Obtained by the Department in conjunction with its regular oversight activities |
| | ☐ Federal Trade Commission (FTC) |
| | ☐ Department of Justice (DOJ) |
| | ☐ U.S. Securities and Exchange (SEC) |
| | ☐ Attorney General _____ (state) |
| | ☐ Other |
| | ☒ No Other Evidence Considered |

| **Advanced Letter Requests** | ☐Standard Letter |
|---|---|
| | ☐Standard Letter Plus: |

**Links:** In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.
- Advanced Letter (if applicable)
- Salesforce Allegation Report
- Program Review Report

5

**DOE00010297-DOE00010298**



## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| Name of Institution and OPEID | Business Industrial Resources<br>03448300 |
|---|---|
| **Open or Closed** | Closed (7/31/2018) |
| **Date Advanced Letter Sent** | N/A |
| **Additional Locations**<br>• **Add closure date if applicable** | N/A |
| **Corporate Owner(s)** | Irene Zakron; Business Industrial Resources |
| **Total Number of Applications** | As of August 5, 2020, there are 25 applications already adjudicated and 12 applications awaiting adjudication. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | **Program Compliance**<br>Program reviews were conducted in April 2008, February 2013 and February 2015. None of the findings were relevant to borrower defense.<br><br>**AAASG and OIG Investigations**<br>Borrower Defense found no past or pending AAASG or OIG investigations.<br><br>**OGC/DOJ**<br> Borrower Defense found no past or pending OGC/DOJ investigations. |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BORROWER DEFENSE** | A review of publicly available information found no evidence related to Borrower Defense. |
| **External Contact(s) for Further Investigation** | N/A |
| **Name of Reviewer** | Serena Anand |
| **Date Review Completed** | 8/5/2020 |

| Recommended Next Steps | Based on our search for public information (including public records, news articles, court documents and filings) and Department of Education internal resources (FRPDs, AASG, and OIG investigations), there is insufficient evidence of widespread misconduct by Business Industrial Resources to warrant further investigation.  If additional evidence is discovered or received |
|---|---|

DOE00010297

| | in the future, these claims may be revisited as warranted.  As such, it is recommended the cases be adjudicated. |
|---|---|
| **Recommended Focus Area(s)** | |
| **APPROVED BY:** | Linda Reid |
| **DATE:** | 8/5/2020 |

| | |
|---|---|
| **Evidence Considered** | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☒ Evidence Obtained by the Department in conjunction with its regular oversight activities<br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state)<br>☐ Other<br>☒ No Other Evidence Considered |

| | |
|---|---|
| **Advanced Letter Requests** | ☐Standard Letter<br>☐Standard Letter Plus:<br>   • |

2

DOE00010298

**DOE00010339-DOE00010340**

**Initial Review of Medium Batch Applications**

**BACKGROUND**

| Name of Institution | Career Institute of Health and Technology |
|---|---|
| Corporate Owner(s) | Computer Career Center, Inc. |
| Open or Closed | Closed |
| Total Number of Applications | 51 |
| Patterns of Alleged Misconduct | Inability to find employment, school closure. |
| Evidence/Litigation | None found. |
| Name of Reviewer | Kathy Ludunge |
| Date Review Completed | 8/8/19 |

**SUMMARY APPLICATION OVERVIEW**

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| 01603554 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2007 | Employment Prospects, Program Cost, Educational Services, Career Services, Admissions | None |
| 01262984 | Career Institute Of Health And Technology - NY | Automotive Repair (Certificate) | 2011 | Employment Prospects, Program Cost, Educational Services, Career Services, Admissions, Other | None |
| 01280698 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2011 | Employment Prospects, Program Cost, Educational Services, Career Services, Admissions, | None |
| 01368438 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Diploma) | 2012 | Employment Prospects | None |
| 01378873 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2009 | Employment Prospects, Program Cost, Educational Services, Career Services, Admissions, Transferring Credits, Other | None |
| 01416194 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2010 | Employment Prospects | None |
| 01422971 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2012 | Other | None |
| 01432599 | Career Institute | Microsoft | 2010 | Employment Prospects, | None |

| | Of Health And Technology - (Brooklyn, NY) | Certified Systems Engineer Nt (Certificate) | | Career Services, Admissions, Other | |
|---|---|---|---|---|---|
| 01498552 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Diploma) | 2008 | Employment Prospects, Educational Services, Career Services, Admissions, Transferring Credits | None |
| 01582925 | Career Institute Of Health And Technology - (Brooklyn, NY) | Medical Assistant (Certificate) | 2013 | Other | None |

**RECOMMENDATION:**

Majority of claims are substantially similar to those seen in other JPR reviews and do not contain evidentiary support, so do not appear to be "self-approving". Generally, the claims do not reveal any specific pattern within the 10 claims sampled, except to the extent that most had multiple allegations.

Recommend review of all claims since there is no evidence of borrower litigation associated with this school and no evidence indicating the need for further investigation.

**APPROVED BY:** John Stephenson

**DATE:** 8/9/2019

**DOE00010341-DOE00010345**



Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION | PROUD SPONSOR of the AMERICAN MIND™

## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| Name of Institution and OPEID | Career Point College 02591100 |
|---|---|
| Open or Closed | Closed October 16, 2016 |
| Date Advanced Letter Sent | N/A |
| Additional Locations<br>• Add closure date if applicable | 02591101 Career Point College- Tulsa, OK<br>02591102 Career Point College- San Antonio, TX<br>02591103 Career Point College- Austin, TX |
| Corporate Owner(s) | Dickinson College of San Antonio, Incorporated dba Career Point, A Closely Held Corporation |
| Total Number of Applications | As of August 25, 2020, there are 437 applications. |
| Patterns of Alleged Misconduct | Career Point College does not have any current litigation pending. Based on a sample of 30 applications, the borrowers do not present evidence that indicate Career Point College committed overt or repetitive misconduct, fraud, or misrepresentations. The application narratives provide individual experiences, frustrations, or issues encountered as a customer of Career Point College. Additionally, although some of the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| Internal ED Investigation(s)<br>• PC, AAASG, OIG | **Program Compliance**<br>Program reviews were conducted on March 24, 2014 and November 16, 1992, however, none of the findings were relevant to borrower defense.<br><br>**AAASG and OIG Investigations**<br>Borrower Defense found no past or pending AAASG or OIG investigations.<br><br>**OGC/DOJ**<br>Borrower Defense found no past or pending OGC/DOJ investigations. |
| Internal Contact(s) for Further Investigation | N/A |
| External Investigations (AG), Evidence or Litigation Related to BORROWER DEFENSE | Kinna, et al. v Dickinson of San Antonio, Inc et al.<br>Students filed a complaint against Career Point College alleging that the school engaged in false, misleading, and deceptive acts by representing to Plaintiffs that they would be eligible to obtain education service. The case is noted as |

| | |
|---|---|
| | disposed in the Bexar County Court records.[1] There is no publicly available information regarding the disposition of the action. |
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BORROWER DEFENSE** | In re Dickinson of San Antonio, Inc., No. 16-52492-RBK, 2020 WL 3443920, at *1 (Bankr. W.D. Tex. June 23, 2020) Suit by Career Point College alleging that a loan servicer engaged in a scheme to bypass federal student aid rules and defraud the college and the government. The College won the case and trustee for the college was awarded $8 million. |
| **News Articles/Media** | 52 Students Sue Career Point College for More than $1 million Students filed a complaint against the school after its closure. There were no further actions in that litigation after the filing of the complaint. |
| | Former Career Point College Owner Settled Fraud Allegations Plaintiffs alleged that they were able to identify at least $3.5 million in "improper dividends" paid to the school's owners over the four years prior to the college's bankruptcy filing. The owners settled the case and denied all of the allegations raised in the lawsuit. |
| | Career Point College filed for Bankruptcy The school filed for bankruptcy in October 2016 reported assets of less than $50,000 and liabilities ranging from $1 million to $10 million in the emergency Chapter 11 petition filed in U.S. Bankruptcy Court in San Antonio. |
| **Name of Reviewer** | Conor Kruger |
| **Date Review Completed** | 8/25/2020 |

# SUMMARY OF ALLEGATIONS AND RECOMMENDATION

| Summary of Allegations Reviewed | **Summary of Allegations** Borrower Defense reviewed a sample of 30 applications to identify potential trends and/or salient information provided by the applicant pool. The enrollment dates for the applicant pool range from June 1, 1989 through November 3, 2019, with the majority of applicants having enrollment dates between 2006 and 2012. The narrative allegations include complaints relating to: (i) the length of the course; (ii) the quality of the instructors; and (iii) the ability to obtain certification. |
|---|---|

---

[1] https://search.bexar.org/Case/CaseDetail?r=b834437f-9b4b-4119-a5d9-e26d9a685941&st=l&l=kinna&fn=christopher&m=&&p=2_2016CI18306++++DC0000100000

DOE00010342

## Admissions and Urgency to Enroll

Of the 437 applications, 195 made allegations regarding Admissions and Urgency to Enroll. Of the 30 allegations in sampled applications, two are of the type that might warrant Borrower Defense relief, if supported by evidence. The borrowers allege that representatives misled them regarding scholarships and job placement during admissions interviews. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

## Career Services

Of the 437 applications, 240 raise a career services allegation. Of the 30 allegations in sampled applications, ten are of the type that might warrant Borrower Defense relief, if supported by evidence. The borrowers in the sampled applications allege that they were guaranteed job placement, assistance with job placement, or that they would receive a certain job. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

## Educational Services

Of the 437 applications, 180 raise an educational services allegation. Of the 30 allegations in sampled applications, ten are of the type that might warrant Borrower Defense relief, if supported by evidence. The borrowers' allegations discuss their issues with the misrepresentation of program length and instructor qualifications. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Career Point College.

## Employment Prospects

Of the 437 applications, 298 raise an employment allegation. Of the 30 allegations in sampled applications, 13 are of the type that might warrant Borrower Defense relief, if supported by evidence. The borrowers allege that representatives lied about job placement assistance, employment outcomes, and guaranteed salaries. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

## Other

Of the 437 applications, 337 raise an "other" allegation. Of the 30 allegations in sampled applications, one is of the type that might warrant

3

| | |
|---|---|
| | Borrower Defense relief, if supported by evidence. Most of the borrowers provided explanatory narratives relevant to the closure of the school and litigation involving the school. Borrowers have used this "other" section to echo allegations made in other sections regarding accreditation, certification, and fees associated with the school. In the sole allegation of the type that might warrant relief, the borrower alleges that they were misled about job placement assistance. Although the allegation asserted is of the type that might warrant Borrower Defense relief, the borrower failed to provide relevant supporting evidence with their claim and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Career Point College.<br><br>**Program Cost and Nature of Loans**<br>Of the 437 applications, 277 raise a program cost allegation. Of the 30 allegations in sampled applications, two are of the type that might warrant Borrower Defense relief, if supported by evidence. Most of the claims allege the school lied about the cost of attendance, did not properly explain the cost of attendance, or misled them regarding the amount of financial assistance a borrower would receive. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Career Point College.<br><br>**Transferring Credits**<br>Of the 437 applications, 201 raise a transfer of credits allegation. Of the 30 allegations in sampled applications; 15 are of the type that might warrant Borrower Defense relief, if supported by evidence. In the allegations that might warrant Borrower Defense relief, borrowers allege that they were misled as to the transferability of credits, and the accreditation of the school. Although the allegations asserted are of the type that might warrant Borrower Defense relief, borrowers failed to provide relevant supporting evidence. |
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, there is insufficient evidence of widespread misconduct Career Point College to warrant further investigation.   If additional evidence is discovered or received in the future, these claims may be revisited as warranted.  As such, it is recommended the cases be adjudicated. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 08/31/2020 |

4

DOE00010344

| Evidence Considered | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☒ Evidence Obtained by the Department in conjunction with its regular oversight activities<br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state)<br>☐ Other<br>☐ No Other Evidence Considered |
|---|---|

| Advanced Letter Requests | ☐Standard Letter<br>☐Standard Letter Plus:<br>   • |
|---|---|

**Links:** In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.

- Salesforce Allegation Report

5

**DOE00010364-DOE00010367**



PROUD SPONSOR *of*
*the* AMERICAN MIND™

### Initial Review of Mid-Size Batch Applications

**BACKGROUND**

| | |
|---|---|
| **Name of Institution and OPEID** | Carrington College<br>00974800; 02100600; 02218000; 03042500 |
| **Open or Closed** | Open |
| **Date Advanced Letter Sent** | N/A No approvals |
| **Additional Locations**<br>• **Add closure date if applicable** | See Carrington College – Additional Locations |
| **Corporate Owner(s)** | San Joaquin Valley College, Inc. |
| **Total Number of Applications** | As of March 31, 2020, there are 375 applications. |
| **Patterns of Alleged Misconduct** | The most common allegations concern promises of job placement or job placement assistance upon graduation. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | A program review was conducted at Carrington College Phoenix during the 2012-2013 and 2013-2014 award years, and found job placement misrepresentations involving 7 borrowers out of a sample of 30. The job placement representations were made in violation since graduates were either not employed in the field, not employed in the location listed in the graduate's file, or the placement was an externship and not a paid job. Carrington College addressed and resolved the discrepancies in their records and no additional action was taken against the school.<br><br>Another program review was conducted at Carrington College California during the 2012-2013 and 2013-2014 award years, however, none of the findings were relevant to borrower defense. |
| **Internal Contact(s) for Further Investigation** | None. |
| **External Investigations (AG), Evidence or Litigation Related to BD** | None. |
| **External Contact(s) for Further Investigation** | None. |
| **External Investigations, Evidence or Litigation NOT related to BD** | None. |
| **News Articles/Media** | In 2018, an article highlighted an alleged situation where Carrington College submitted paperwork for a federal Parent Plus loan on behalf of a student despite the student and parent claiming they never signed for it. |

| Name of Reviewer | Ashley Bykerk |
|---|---|
| Date Review Completed | 3/31/2020 |

**SUMMARY OF ALLEGATIONS AND RECOMMENDATION**

| Summary of Allegations Reviewed | **Allegation Type: Employment Prospects:** |
|---|---|
| | 315 out of 375 applications make allegations regarding employment prospects. Of the allegations sampled, the most common allegations concern promises of job placement or job placement assistance at the end of the program. A few allege they were promised to have jobs within 6 months of graduating from their programs with other borrowers allege representations made by the school regarding a job placement rate ranging from 90% to 98%. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| | **Allegation Type: Program Costs and Nature of Loans:** |
| | 221 out of 375 applications make allegations regarding program costs and nature of loans. Of the allegations sampled, the most common allege that the school represented a specific price for the program but charged more than was initially discussed. Borrowers also make general allegations about the school's failure to explain how loans work and loan payments being too high. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| | **Allegation Type: Transferring Credits:** |
| | 176 out of 375 applications make allegations regarding transfer of credits. Of the allegations sampled, the most common allege that the school represented that credits earned would be transferable to other colleges and universities even though borrowers later found out that credits would not transfer. Other borrowers allege that the school made omissions when it came to the transferability of credits or their accreditation type. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| | **Allegation Type: Career Services:** |
| | 275 out of 375 applications make allegations regarding career services. Of the allegations sampled, the most common allegations allege that borrowers were promised job placement or job placement assistance but never received any help from the school. A borrower also alleged that he was told |

2

DOE00010365

| | their felony conviction would not be an issue in obtaining a job in his field even though this found to be untrue. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.<br><br>**Allegation Type: Educational Services:**<br>218 out of 375 applications make allegations regarding educational services. Of the allegations sampled, the most common concern promises by the school about externship opportunities at the end of the program that ended up not being provided by the school. A few borrowers alleged that they were promised externships with Kaiser but were then told that the school had no connections with the medical provider. Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.<br><br>**Allegation Type: Admissions and Urgency to Enroll:**<br>192 out of 375 applications make allegations regarding the admissions process. Of the allegations sampled, the most common allege a rush to enroll based on representations that classes were starting soon and there was limited space availability. These claims are not of the type that would warrant BD relief absent a misrepresentation.<br><br>**Allegation Type: Other:**<br>238 out of 375 applications make allegations in the other category. The allegations sampled revealed that most concerned general dissatisfaction with the services provided by the school and general mentions of litigation against the school. These claims are not of the type that would warrant BD relief absent a misrepresentation. |
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, there is insufficient evidence of widespread misconduct by Carrington College to warrant further investigation. As such, it is recommended the cases be adjudicated. Additionally, as there is no evidence of widespread misconduct, notice to the school on these claims is not required. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Michael Page |
| **DATE:** | 3/31/2020 |

| **Evidence Considered** | ☐ Attorney Submission<br>☐ **Borrower Submission** |
|---|---|

3

DOE00010366

| | |
|---|---|
| | ☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☐ **Evidence** Obtained **by the Department in conjunction with its regular oversight activities**<br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state)<br>☐ Other<br>☐ No Other Evidence Considered |
| **Advanced Letter Requests** | ☐Standard Letter<br>☐Standard Letter Plus:<br>• |

**Links:**

- **Salesforce Allegation Report**

- **Program Review Reports**
  - **PRCN: 201440928688**
  - **PRCN: 201430928576**

- **Carrington College – Additional Locations**

4

DOE00010367