JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
REBECCA C. ELLIS *(pro hac vice)*
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

     *Plaintiffs*,

     v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

     *Defendants*.

Case No.: 19-cv-03674-WHA

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**HEARING DATE: July 28, 2022**

(Class Action)
(Administrative Procedure Act Case)

1

## <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION ...................................................................................... 1

RELIEF REQUESTED ..................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITY ............................................ 2

I. Introduction ................................................................................................ 2

II. Statement of Facts ...................................................................................... 3

    A.    Statutory and Regulatory Framework ............................................ 3

    B.    The 'No Decisions' Policy: ED Abdicates Its Obligation to Decide Applications (Section 706(1) Claim) ................................... 3

    C.    The 'Presumption of Denial' Policy Jettisons BD Applications Regardless of Merit (Section 706(2) and Due Process Claims) ........................... 9

    D.    The Form Denial Notices: Operationalizing the Presumption of Denial (Section 555(e) and Due Process Claims) ................................... 13

        1.    Content of the Form Denial Notices.............................................. 14

        2.    The Massive Wave of Denials ................................................ 14

    E.    Harm to the Class ....................................................................... 15

III. Procedural History ..................................................................................... 16

IV. Standard of Review..................................................................................... 17

V. Argument ................................................................................................... 19

    A.    Defendants Have Unreasonably Delayed Decisions on BD Applications in Violation of APA § 706(1) .................................. 19

        1.    Defendants Have Failed to Perform a Discrete Agency Action ....... 20

        2.    Defendants' Failure to Fulfill Their Mandatory Duty Is Not Reasonable ........................................................................... 21

    B.    The 'Presumption of Denial' Policy Is Unlawful ............................ 23

        1.    The Policy Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law, in Violation of APA § 706(2) ............................ 23

            a)   The Policy Is a "Final Agency Action" Under Section 706(2) ... 24

            b)   The Policy Contravenes the 1994 and 2016 Regulations .......... 24

            c)   The Policy Is Arbitrary, Capricious, and Was Developed and Implemented in Bad Faith ........................................................ 26

        2.    The 'Presumption of Denial' Policy Deprives Class Members of Their Property Interests Without Due Process of Law ................... 28

i

a)  Class Members Have a Property Interest in Raising a Defense to Repayment of Their Federal Student Loans ................................ 28

b)  ED Deprived Class Members of These Interests Without Due Process of Law ...................................................................... 29

C.   The Form Denial Notices Are Unlawful ...........................…............ 30

    1.   The Notices Violate APA § 555(e) ............................................. 30

    2.   The Notices Violate the Due Process Clause ............................. 32

D.   The Court Is Authorized to Grant the Relief that Plaintiffs Seek ...................…...... 33

    1.   The HEA's Anti-Injunction Provision Does Not Foreclose Relief ................................................................................................... 34

    2.   Remand to ED Would Be Futile ................................................ 34

VI. Conclusion ........................................................................................................ 37

ii

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) .......................................... 15

*Air Line Pilots Ass'n, Intl. v. Civil Aeronautics Bd.*, 750 F.2d 81 (D.C. Cir. 1984).................... 20

*Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ............................................................................................... 19, 33, 35

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ...................................... 31

*Armstrong v. Reynolds*, 22 F.4th 1058 (9th Cir. 2022).................................................... 27

*Baystate Medical Center v. Leavitt*, 587 F. Supp. 2d 37 (D.D.C. 2008) ...................................... 35

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) .................................................... 28

*Bennett v. Spear*, 520 U.S. 154 (1977) ................................................................................ 23

*Boliero v. Holder*, 731 F.3d 32 (1st Cir. 2013)........................................................................ 33

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ................................ 31

*Butte Cty., Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)............................................... 29, 30

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ...................................... 3, 4

*Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097 (D.N.J. 1993) ................................... 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 16

*Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982)............................................... 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ....................................... 23

*City of Providence v. Barr*, 385 F. Supp. 3d 160 (D.R.I. 2019) ............................................ 20

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ............................................................. 22

*Conner v. City of Santa Ana*, 897 F.2d 1487 (9th Cir. 1990) ............................................. 29

*Crossley v. California*, 479 F. Supp. 3d 901 (S.D. Cal. 2020) ........................................... 32

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) .................................................. 22

*Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995)........................................ 31

*Donovan ex rel. Anderson v. Stafford Constr. Co.*, 732 F.2d 954 (D.C. Cir. 1984).................... 34

*E.V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018)............................................................ 33

*Eldredge v. Carpenters 46*, 94 F.3d 1366 (9th Cir. 1996)................................................ 34

iii

*Empire Health Found. v. Becerra*, No. cv 20-2149-JEB, 2022 WL 370559 (D.D.C. Feb. 8, 2022) ................................................................................................................................. 35

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203 (D.D.C. 2021) ................................. 20

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ................................................... 33

*Food & Water Watch v. U.S. Envtl. Protection Agency*, 20 F.4th 506 (9th Cir. 2021) .... 17, 22, 23

*Fouts v. Cnty. of Clark*, 76 F. App'x 825 (9th Cir. 2003) ................................................. 29

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ............................. 17

*Gearhart v. U.S. Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798 (N.D. Cal. Oct. 25, 2019) .................................................................................................................................. 33

*George Hyman Const. Co. v. Brooks*, 963 F.2d 1532 (D.C. Cir. 1992) ............................ 34

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ............................................................... 28, 31, 32

*Gonzalez v. Sullivan*, 914 F.2d 1197 (9th Cir. 1990) ....................................................... 32

*Higgins v. Spellings*, 663 F. Supp. 2d 788 (W.D. Mo. 2009) ................................... 27, 30

*Home Box Office, Inc. v. Fed. Commc'ns Comm'n*, 567 F.2d 9 (D.C. Cir. 1977) ............. 18

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) .......................................................... 20

*In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) ....................... 17, 20

*Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ............................................ 16

*Iraqi & Afghan Allies v. Pompeo*, Civ. A. No. 18-cv-01388 (TSC), 2019 WL 4575565 (D.D.C. Sept. 20, 2019) ...................................................................................................................... 21

*Islander East Pipeline Co. v. Conn. Dep't of Envt'l Protection*, 482 F.3d 79 (2d Cir. 2006) ...... 26

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) ........................ 28

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) ................................................................... 31

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ................................................. 17

*Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342 (11th Cir. 1994) ..................... 27

*Levenstein v. Salafsky*, 164 F.3d 345 (7th Cir. 1998) ...................................................... 28

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ................................................................ 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................... 16

*MCI Telecomms. Corp. v. FCC*, 627 F.2d 322 (D.C. Cir. 1980) ..................................... 20

iv

*Meadville Master Antenna, Inc. v. F.C.C.*, 443 F.2d 282 (3d Cir. 1971) ..................................... 30

*Meina Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015) .......................................................... 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .....

......................................................................................................................... 17, 23, 25

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......................................... 32

*Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30 (D.D.C. 2000) .......................................... 21

*N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759 (1969) ........................................................ 33, 35

*Natural Resources Def. Council v. Train*, 510 F.2d 692 (D.C. Cir. 1975) ..................................... 1

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................................ 16, 18

*Nozzi v. Housing Auth. of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015) ..................................... 27

*Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) ................................. 23

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990)........................................... 34

*Pacharne v. Dep't of Homeland Sec.*, No. 1:21-CV-115-SA-DAS, 2021 WL 4497481 (N.D.

Miss. Sept. 30, 2021) ..................................................................................................... 19, 20

*Portland Audubon Soc'y v. Endangered Species Cmte.*, 984 F. 2d 1534 (9th Cir. 1993) ........... 17

*Pub. Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983)..................... 20

*Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074 (D.D.C. Sept. 27, 2021)..................... 19

*Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7 (D.D.C. 2018) ........................... 35

*San Francisco BayKeeper v. Whitman*, 297 F.3d 877 (9th Cir. 2002) ....................................... 17

*Sierra Club v. Thomas*, 658 F. Supp. 165 (N.D. Cal. 1987)..................................................... 1

*Simmons v. Smith*, 888 F.3d 994 (8th Cir. 2018) .................................................................. 27

*Singh v. Holder*, 558 F. App'x 76 (2d Cir. 2014) ................................................................. 33

*State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........... 31

*Steffel v. Thompson*, 415 U.S. 452 (1974) ........................................................................... 32

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984)................................ 16

*Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731 (D.C. Cir. 2001) ............. 29, 31

*Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ........ 27, 34

*Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974)................................................................. 31

v

*Vascular Imaging Prods., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005 (S.D. Cal. 2019)........... 32

*Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068 (9th Cir. 2016) .............. 16, 18

*Watson v. Geren* 569 F.3d 115 (2d Cir. 2009)........................................................ 34

*Williams v. DeVos*, No. CV 16-11949-LTS, 2018 WL 5281741 (D. Mass. Oct. 24, 2018)......... 28

*Withrow v. Larkin*, 421 U.S. 35 (1975)............................................................ 29

**Statutes**

5 U.S.C. § 551 *et seq.*......................................................................... 16, 17, 30

**Other Authorities**

81 Fed. Reg. 75,926 (Nov. 1, 2016)................................................................ 2, 19

83 Fed. Reg. 6,458, 6,467 (Feb. 14, 2018) ........................................................ 6

84 Fed. Reg. 49788 (Sept. 23, 2019) .............................................................. 2

**Regulations**

34 C.F.R. § 668.71 ............................................................................... 25

34 C.F.R. § 685.206 .............................................................................. 2, 23

34 C.F.R. § 685.222 .............................................................................. 25, 27, 28, 30

Plaintiffs' Motion for Summary Judgment
Case No.: 19-cv-03674-WHA

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on July 28, 2022, at 8:00 am at the U.S. District Courthouse, 450 Golden Gate Avenue, San Francisco, before the Honorable Judge William H. Alsup, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for an Order granting summary judgment in their favor. Plaintiffs move for summary judgment on the ground that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. This Motion is supported by the pleadings and other papers filed in this case, the accompanying memorandum of points and authorities, oral argument, and any other matter of which this Court takes notice.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court:

1) Declare the Department of Education ("ED") has a mandatory duty to resolve on the merits the borrower defense ("BD") applications of the Named Plaintiffs and the Class, and that Defendants have failed to do so in violation of section 706(1) of the Administrative Procedure Act ("APA");

2) Declare Defendants' Form Denial Notices (as defined *infra*) violate section 555(e) of the APA and class members' rights to procedural due process, and therefore do not constitute lawful decisions on the merits of class members' BD applications;

3) Vacate each and every Form Denial Notice issued by ED, and reinstate the BD applications of all class members who received such a notice;

4) Declare the 'presumption of denial' policy adopted by ED (as defined *infra*) arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of section 706(2) of the APA, and deprives class members of their constitutional right to procedural due process;

5) Vacate the 'presumption of denial' policy, including all guidance and/or procedures designed to implement that policy, and enjoin Defendants from applying that policy and associated procedures to evaluate any BD application, whether previously denied or yet to be decided;

6) Order Defendants to show cause, within thirty days of the Court's ruling on this Motion, why each and every class member's BD application should not be granted immediately;

7) Declare that, should Defendants show cause why any class member's application should be denied, Defendants have a legal obligation to provide that class member with an

1

1  adequate statement of the grounds for denial; and

2      8)  Grant such further relief as may be just and proper.

3                    **MEMORANDUM AND POINTS OF AUTHORITY**

4  **I.      INTRODUCTION**

5          For more than five years—since February 2017—the Department of Education ("ED") has

6  failed to lawfully adjudicate borrower defense ("BD") applications submitted by federal student

7  loan borrowers. For most of this time period, ED has simply refused to issue BD decisions. When,

8  after this lawsuit was filed, ED did issue some decisions, it did so pursuant to unlawful policies

9  that disregarded the merits of borrowers' claims, and via unlawful form notices that failed to

10 explain the bases for ED's decisions—because in truth, those decisions lacked any valid bases.

11 The vast majority of the class remains in limbo, with no end in sight.

12         This is the second time Plaintiffs have sought summary judgment. The first time, the sole

13 issue was ED's blanket policy of delay. Since then, ED has engaged in an entirely new course of

14 unlawful conduct—the use of the form denial notices—and discovery has sharpened the contours

15 of ED's actual policies, which in many cases were quite different than ED publicly claimed them

16 to be. Plaintiffs have raised new claims under Section 706(2) of the Administrative Procedure Act

17 ("APA") and constitutional due process. New leadership has taken over at ED; although it has

18 issued some BD decisions, these account for only a small fraction of the backlog, which has in fact

19 *grown* since Betsy DeVos resigned as Secretary of Education. Hundreds of thousands of

20 borrowers, including some who applied for BD up to *seven years ago*, are still laboring under ED's

21 delay. ED has no timeline for when these applicants can expect decisions.

22         ED has not fulfilled its obligation to "in good faith employ[] the utmost diligence in

23 discharging [its] statutory responsibilities." *Sierra Club v. Thomas*, 658 F. Supp. 165, 171 (N.D.

24 Cal. 1987) (quoting *Natural Resources Def. Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975)).

25 Rather, ED "has failed to demonstrate any diligence whatever . . . and has in fact ignored that duty

26 for several years." *Id.* at 172. Plaintiffs are entitled to summary judgment, and seek an order to

27

28
                                          2

show cause why each class member's BD application should not be granted immediately.

## II.   **STATEMENT OF FACTS**

### A.   **Statutory and Regulatory Framework**

Plaintiffs incorporate by reference the detailed background set out in their prior Opposition to Defendants' Motion and Cross Motion for Summary Judgment ("Pls.' 1st MSJ"), ECF 67, at 4-8. It suffices to note that the vast majority of class members' claims fall under the 1994 BD regulations, which set out a substantive standard based on state law, or the 2016 regulations, which created a federal misrepresentation standard. *See* 34 C.F.R. § 685.206 (state law standard); 81 Fed. Reg. 75,926 (Nov. 1, 2016) (2016 regulations). On July 1, 2020, yet another set of BD regulations went into effect, but these regulations apply only to federal student loans disbursed on or after July 1, 2020. *See* 84 Fed. Reg. 49788 (Sept. 23, 2019). To Plaintiffs' knowledge, ED has never adjudicated any BD applications under the 2020 regulations.

### B.   **The 'No Decisions' Policy: ED Abdicates Its Obligation to Decide Applications (Section 706(1) Claim)**

As soon as former Secretary of Education Betsy DeVos took office in February 2017, ED began adopting a series of policies that had a singular purpose: to delay, obstruct, and avoid the agency's duty to fairly and timely resolve BD applications. ED sought, and soon achieved, a complete halt to the process of even assessing, let alone granting, BD claims. Plaintiffs incorporate by reference their prior recitation of facts about these actions. *See* Pls.' 1st MSJ at 12-15.

Discovery has revealed a blanket policy ordering the cessation of BD decisions—the existence of which Defendants had denied.[1] In May 2017, DeVos signed a memorandum from James Manning, then the Acting Under Secretary, which recommended that ***no additional claims should be approved***. *See* Ex. 1 ("Manning Memo"). The Manning Memo stated that the BD

---

[1] *See* Class Certification Order, ECF 46 at 7 ("[Defendants] complain that plaintiffs do not allege any facts regarding some explicit order from on high . . . ."); Defs.' Opp. to Pls.' Mot. for Class Cert., ECF 38 at 10 (arguing Plaintiffs' claims were "erroneous speculation that the Department has made a universal decision not to grant or deny any pending borrower defense claims").

regulation had previously been "liberally applied in the light most favorable to the borrower," raising "significant concerns." *Id.* at DOE2145. The memo complained that "[f]lexible interpretations of state law most favorable to student borrowers also appear to have been used to circumvent any requirement that the claimant directly prove damages." *Id.* Thus, the memo recommended that, "[g]oing forward, [ED] should establish a balanced process with clear and objective standards that require strong evidence of harm or damages to the student." *Id.* Neither the Higher Education Act ("HEA") nor the BD regulations required a BD claimant to "directly prove damages" or meet a "strong evidence of harm or damages" standard.

The Manning Memo recommended that Federal Student Aid ("FSA") develop "interim procedures" to handle pending BD claims until new BD regulations were implemented. *Id.* at DOE2146. Manning asked DeVos to "direct no additional claims be approved until these interim procedures are finalized." *Id.* On May 4, 2017, the date of the Manning Memo, the Borrower Defense Unit within FSA (the "BDU") stopped adjudicating any BD claims. *See* Ex. 2 at AR512. ***But no "interim procedures" were ever created***. *See* Joint Status Report at 2, ECF 194.

Pursuant to the Manning Memo, ED's Office of the Inspector General ("OIG") reviewed the BD process. Pending this review, the BDU was instructed to stop developing memoranda on whether additional categories of BD claims qualified for discharge. *See* Ex. 2 at AR512. The OIG Report, issued on December 8, 2017, recommended, among other things, that FSA "resume the review, approval, and discharge processes for claims qualifying under the seven established categories" for approval, and "resume consideration and determination of whether additional categories of claims with common facts qualify for discharge." *Id.* at AR517. ***But ED did not follow OIG's recommendations.*** Instead, with only a limited exception,[2] the 'no decisions' policy

---

[2] In December 2017, ED announced a "partial relief" methodology for a specific subset of claims relating to Corinthian Colleges, Inc. ("CCI"), and began issuing decisions using that methodology. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1090 (N.D. Cal. 2018). In May 2018, however, the Northern District of California issued an injunction that prevented ED from applying this methodology. *Id.* at 1110. The *Calvillo Manriquez* class is excluded from the instant class.

4

remained in place for 31 months, until December 2019. Then, for approximately 10 months, ED deviated from this policy in order to send its unlawful Form Denial Notices, detailed *infra*. Once Plaintiffs challenged those denials in court, the 'no decisions' policy resumed.

ED has put forward numerous excuses for its delay in issuing BD decisions, none of which is supported by the record:

- **Excuse:** ED could not adjudicate claims because of staffing shortages and technology challenges. *See* Defs.' Motion for Summary Judgment, ECF 63 ("Defs.' 1st MSJ") at 10-11; Ex. 3 (Brown Dep. 239:16-20).
- **Fact:** The staffing and resource shortages were self-inflicted and deliberate.
  - *See* Pls.' 1st MSJ at 14, 26-27.
  - Colleen Nevin, then-Director of the BDU, testified that ED repeatedly denied her requests to hire additional staff. Ex. 4 (Nevin Dep. 25:8–27:18, 141:16-25, 145:3-9). Nevin did not know the reasons for this refusal: "That's above my pay grade." *Id.*; *see also id.* at 224:10-14 (reason why decisions weren't being issued was "related to a decision up the food chain").
  - ED did not hire additional staff for the BDU until it was ready to implement the unlawful 'presumption of denial' policy, detailed below. *See* Ex. 5 at DOE9515.
  - ED avoided preparations for technological compliance with the 2016 regulations because it aimed, through a process of illegal delay, to never implement them. *See* Pls.' 1st MSJ at 25; Pls.' Reply in Support of Motion for Summary Judgment, ECF 77 ("Pls.' 1st MSJ Reply") at 9.
  - ED has never explained how or why the development of new technologies would have prevented the BDU's attorneys from performing their job to decide BD claims and issue decisions.

- **Excuse:** The *Calvillo Manriquez v. DeVos* litigation was holding up BD decisions and/or the creation of a new relief methodology. *See, e.g.*, Ex. 6 at DOE7213-7214.
- **Fact:** The *Calvillo Manriquez* injunction only ever applied to a limited subset of BD claims, and to a specific aspect of the relief methodology.
  - The *Calvillo Manriquez* class included *only* borrowers whose BD claims were based on CCI's misrepresentations about job placement rates at certain programs during certain periods of time, because those were the only borrowers subject to the "partial relief" methodology. *See Calvillo Manriquez*, 345 F. Supp. 3d at 1094.
  - Once ED had devised a new "partial relief" methodology, it acknowledged that "the injunction ***does not*** prevent the Department from utilizing the new methodology to process BD applications for borrowers that are not part of the class that has been certified

5

in *Calvillo Manriquez*." Ex. 7 at DOE13648 (emphasis added); Ex. 4 (Nevin Dep. 149:23–150:1).

- **Excuse:** ED could not issue BD approvals until it created a new relief methodology. *See* Defs.' 1st MSJ at 9-10, 21.
- **Fact:** The legal obligation to resolve the merits of BD applications does not allow for an indefinite hiatus while the Secretary searches for means to reach a preferred outcome.
  - *See* Pls.' 1st MSJ at 19-20, 23-24; Pls.' 1st MSJ Reply at 8-10.
  - Nevin testified that ED could have issued BD approvals with 100% relief, but that was never even considered: As of December 9, 2020, Nevin could not recall ***any*** instances of 100% relief being granted on ***any*** application since the *Calvillo Manriquez* injunction went into effect. *See* Ex. 4 (Nevin Dep. 149:23–150:1, 160:23–161:5).
  - The current administration has rescinded the "partial relief" methodology,[3] so this is no longer a factor that can explain ED's continuing delay.

- **Excuse:** ED would not issue BD denials until it issued approvals under a new relief methodology, to avoid borrower confusion or a "chilling effect" on BD submissions. *See* Defs.' 1st MSJ at 12; Ex. 8 (Jones Dep. 173:23–174:7).
- **Fact:** It was, to a large extent, *true* that ED "would not be approving any claims." Jones Dep. 173:23–174:7. Borrowers would not have been "misinformed" to believe this.
  - As of October 2020, ED under DeVos had denied nearly 90% of all decided BD claims. *See* Order Denying Class Settlement, to Resume Discovery, and to Show Cause ("Disc. Order") at 5, ECF 146.
  - None of ED's witnesses could explain where this policy supposedly came from. *See* Ex. 4 (Nevin Dep. 147:12–148:3); Ex. 8 (Jones Dep. 174:5-19).
  - It is not credible that ED feared borrowers would be "chilled" by its issuing lawful decisions, but not "chilled" by the fact that ED officials were publicly denigrating BD applicants as seeking "free money" handouts. *See* Ex. 9 at 5:10 (DeVos remarks at Mackinac Conference, Sept. 2017); *see also* Ex. 10 at DOE7290 (Diane Auer Jones talking points describing "[m]any" BD claims as "'stab in the dark' efforts to get loans forgiven" and expressing hostility toward BD process); Ex. 1 at DOE2147 (DeVos signing off on approved BD claims "with extreme displeasure").

- **Excuse:** The pre-2017 BD process was "arbitrary and haphazard," and thus needed to be replaced. Defs.' 1st MSJ at 2.

---

[3] *See* Ex. 12. The Court may take judicial notice of information published on government websites. *See Mont. Green Party v. Jacobsen*, 17 F.4th 919, 927-28 (9th Cir. 2021).

6

- **Fact:** That process was more efficient than anything that has happened since, and was supported by the OIG Report. *See* Disc. Order at 3 (pre-DeVos procedures had cleared 31,773 applications in approximately 6 months); Ex. 2 at AR517-18 (OIG recommending that FSA request approval to resume "the review, approval, and discharge processes" for qualifying claims under pre-DeVos standards and resume creation of new standards).
  - o While the OIG Report found some deficiencies in the BDU's recordkeeping and organizational matters—including, notably, the need to establish timeframes for claim processing, *see id.* at AR517—it did not in any way suggest the BDU could not or should not continue deciding applications.

- **Excuse:** ED's resources were diverted and decisions were delayed by a shifting regulatory framework. *See* Defs.' 1st MSJ at 10, 19-20.
- **Fact:** The vast majority of the class falls under either the 1994 or 2016 regulations.
  - o In claiming that its delay in implementing the 2016 BD regulations was in the public interest, ED stated it would continue to process pending BD applications under the 1994 regulations. *See* 83 Fed. Reg. 6,458, 6,467 (Feb. 14, 2018). This was not true.
  - o ED also promised that "[e]fforts to improve the efficiency of claims processing are ongoing and are not contingent upon implementation of the 2016 final regulations[s]." *Id.* at 6,460.
  - o ED has never explained why the development of new regulations prevented BDU's attorneys from deciding BD claims and issuing decisions. The BDU attorneys were not involved in policy matters. *See* Ex. 4 (Nevin Dep. 28:6-10).
  - o Moreover, through at least 2020, the regulations' substantive standards were irrelevant to BD decisions. Nevin testified that, for BD applications subject to the 1994 regulations, the BDU did *not* analyze or apply state law in deciding whether an application stated a claim for relief. *See* Ex. 4 (Nevin Dep. 79:6-20); *see also* sources cited *in* Supplemental Class Action Complaint ("Supp. Compl.") ¶¶ 241–251 & 269–272, ECF 198. For applications subject to the 2016 regulations, the BDU likewise did *not* analyze or apply the "substantial misrepresentation" standard. *See* Supp. Compl. ¶¶ 254-255; Defs.' Answer to Supplemental Complaint ("Supp. Ans.") ¶¶ 254-255, ECF 206.

- **Excuse:** "The relevant regulatory framework entails a time-intensive analysis to determine whether a borrower defense application and any supporting evidence establishes the borrower's entitlement to a defense to repayment under the governing standard." Defs.' 1st MSJ at 2; *see also id.* at 18-19; Ex. 14 (talking points claiming that state law standard made BD evaluation "complicated").
- **Fact:** The Court has already found this reason was pretextual and offered in bad faith. *See* Disc. Order at 11-15.
  - o Once ED did start issuing BD decisions using "perfunctory" denial notices, those decisions "b[ore] *no indication* of such 'time-consuming,' 'complex,' legal analysis of

7

both borrower-submitted and agency evidence, 'under applicable State law,' to 'reach considered results.'" Disc. Order at 13 (emphasis in original).

- In reality, ED was not performing a time-intensive analysis, but was instead applying the unlawful presumption of denial policy. *See infra* Section II.C.

- **Excuse:** This lawsuit prevents ED from issuing BD decisions, including but not limited to retracting the Form Denial Notices. *See* Plaintiffs' Response to Court's Order Dated Jan. 27, 2022, ECF 220 ("Pls.' Feb. 2022 Filing") at 12-13, Ex. C ¶¶ 15-17, Ex. F ¶¶ 8-9.
- **Fact:** The Department is free at any time to adjudicate BD applications on an individual or group basis, and/or to rescind any Form Denial Notice. The only thing the Department cannot do—by the Department's own voluntary agreement—is issue any more form denial letters to class members or enforce previously issued form denials against borrowers. *See* Defs.' Response to October 19, 2020 Order to Show Cause at 2-3, ECF 150.

Finally, Defendants will argue that because they have issued *some* BD decisions in the past year, the 'no decisions' policy is over. *See* Opp'n to Pls.' Motion for Summary Judgment and Reply in Support of Defs.' Motion for Summary Judgment, ECF 72 ("Defs.' 1st MSJ Reply") at 1, 3-4, 9-11. Yet ED's most recent publicly available data show that, as of December 31, 2021, there were 109,953 pending BD applications. *See* Ex. 15. This count does *not* include the approximately 128,000 borrowers who received Form Denial Notices.[4] As detailed *infra*, these borrowers' applications cannot be considered lawfully resolved. Moreover, the data show that ED has "adjudicated" 47,139 BD applications but has not yet informed applicants of those decisions. *See id.* ED has not provided any information about when these decisions were made, what criteria or processes were used to make them, what evidence was consulted, or why ED is withholding notice of them. *See* Pls.' Feb. 2022 Filing at 10. Regardless, from the perspective of borrowers, their applications are not resolved if they have not received notice of a decision. Thus, there are ***more than 280,000 borrowers*** who are still waiting for a lawful decision on their BD applications.

---

[4] Plaintiffs calculate the number of Form Denial Notices by subtracting the number of denials ED had issued as of September 30, 2019—the last report before ED began sending those Notices—from the total number of denials currently reported. *Compare* Ex. 15 (Dec. 2021 BD data listing 137,438 denied applications), *with* Ex. 20 (Sept. 2019 BD data listing 9,077 denied applications).

Under the current administration, some BD grants have indeed issued: between June 2021 and February 2022, ED announced three tranches of claim approvals, totaling approximately 14% of all unresolved BD applications. *See* Pls.' Feb. 2022 Filing at 13-14.[5] But the vast majority of the class is still being held in limbo, with no reason to expect their applications will be adjudicated within a reasonable time. *See* Pls.' Feb. 2022 Filing at 10, 14-15.[6] Applications that have languished for years do not appear to be getting priority in the decision-making queue. *See, e.g.*, *id.* at 3, 4, 6, 8 (describing four class members who applied for BD in 2016 and 2017).

In short, for the vast majority of BD applicants, the policy of non-adjudication continues. From February 2017 to today, a period of *over five years*, ED has approved just 39,900 BD applications presumptively belonging to members of the *Sweet* class,[7] and has not issued a single lawful denial, while the backlog of pending applications has ballooned. ED has not set a timeline for when it expects to issue any further decisions.

## C.   The 'Presumption of Denial' Policy Jettisons BD Applications Regardless of Merit (Section 706(2) and Due Process Claims)

Plaintiffs filed their Complaint on June 25, 2019. *See* ECF 1. In an internal presentation dated August 21, 2019, ED reported that over 177,000 BD applications were awaiting adjudication. Ex. 5 at DOE9510. Around this time, ED adopted the 'presumption of denial' policy as a means

---

[5] For details on who received relief, *see* Exs. 16-18 (ED press releases). ED also recently announced that it would discharge certain loans associated with Marinello Schools of Beauty regardless of whether those borrowers had submitted BD applications, *see* Ex. 19; this action might affect additional class members.

[6] Very recently, on June 1, 2022, ED announced that it would discharge the loans of all CCI borrowers, regardless of whether they had submitted a BD application. *See* Ex. 21. While this decision will affect members of the *Sweet* class, it is not a borrower defense determination. Rather, it is a broader application of conclusions ED reached in 2015-2016 regarding CCI's wrongdoing. The decision also pertains in substantial part to the *Calvillo Manriquez* class, members of which are not part of the *Sweet* class.

[7] This calculation assumes that all applications approved in 2021-2022 belonged to *Sweet* class members, and adds to that total the 4,400 approvals ED reported to this Court in September 2020, *see* ECF 116.

Plaintiffs' Motion for Summary Judgment
Case No.: 19-cv-03674-WHA

of clearing the BD backlog. This policy established, in effect, a tiny and artificial cap on the number of BD applications ED would approve, and then reverse-engineered a process to deny nearly all other applications. This policy flew in the face of both ED's own regulations and the evidence before the agency at the time. The policy was deliberately kept hidden—from applicants, from the general public, and from the Plaintiffs in this case, who were attempting to negotiate a settlement while this policy was secretly at work behind the scenes.

The 'presumption of denial' policy was reflected in a series of sub-regulatory memoranda, procedures, and guidance documents. For example, in one 2019 memorandum, Nevin wrote that, although the historical BD approval rate for CCI borrowers making job placement rate claims was "about 67%," this was "dramatically higher than [BDU] expect[s] to see for all other claims." Ex. 22. She stated, "[o]ur data to date suggests that the approval rate . . . is likely to be approximately under 10%" for borrowers from "large volume" schools, and "under 5%" or perhaps "as low as 2-3%" for schools with less than 20 pending applications. *Id.* The memorandum does not, however, specify what this "data" consisted of. In fact, neither the administrative record nor documents produced in discovery in this case include any "data" supporting Nevin's assertion that less than 10% of BD claims meet the standards set out by the 1994 or 2016 Regulations.[8]

In another memorandum, dated August 18, 2019, Nevin wrote frankly that "[t]he majority of applications will be denied." Ex. 23 at DOE8842. She explained, "[t]he bar for new approvals is high": only three schools had *any* approvals, and all of these were "based on existing criteria" pre-dating February 2017. *Id.* BD reviewers were required to refer any potentially approvable applications to a senior attorney, who in turn had to submit any proposed approval to a vote of all senior BDU attorneys and the Director. *Id.* at DOE8842-43. By contrast, a senior BDU attorney

---

[8] To the contrary, the discovery record contains ample evidence that ED knew of wrongdoing by dozens of schools affecting tens of thousands of BD claims. *See* sources cited *in* Supp. Compl. ¶¶ 126-138, 167, 189-190, 198-220, 232, 245-246, 261-276, 280, 361-364, 369, 374, 383-386, 391, 396, 407.

could unilaterally approve any protocols for the *denial* of applications. *See* Ex. 24. In practice, these onerous procedures barred new approvals: as of December 9, 2020, the BDU had not issued a single new protocol for approving claims from a particular school.[9] Ex. 4 (Nevin Dep. 49:9-19).

Having thus established that "[t]he majority"—90% or more—of BD applications "will be denied," ED designed procedural and substantive guidelines to achieve that goal. For example:

- Contractors had to adjudicate a minimum of five BD applications per hour. *See* Ex. 26. Reviewers could spend no more than two hours on school-specific factual analysis, and were warned their work would be spot-checked for "over reporting hours spent on evidence review." Ex. 27 at DOE6327. Failure to meet quotas could result in termination. *Id.*

- The BDU adjudicated cases before completing the review of common evidence relating to a school, because they "were directed to move forward at a very accelerated pace," and this was "the only way to hit the metrics." Ex. 4 (Nevin Dep. 99:16–101:17).

- The BDU disregarded borrower allegations, even though each BD application was made under penalty of perjury. Nevin testified that a borrower's sworn statements alone will ***never*** be enough to warrant approving a BD application. *See* Ex. 4 (Nevin Dep. 95:24–96:4, 97:4-9). Reviewer training materials likewise reflected that statements made by borrowers in their applications did not constitute supporting "evidence." *See* Ex. 27 at DOE6399-6433; Ex. 28 at DOE6020; *see generally* sources cited *in* Supp. Compl. ¶¶ 125-149.

- The BDU applied rules to judge BD allegations that were not communicated to borrowers and could not have been anticipated by borrowers when they filled out their BD applications. For instance, whether an application "fails to state a legal claim" is secretly a threshold question. *See* Ex. 4 (Nevin Dep. 204:24–205:18); Ex. 30. But the BDU never informed borrowers how to successfully "state a legal claim," or that if they do not succeed in doing so their application will be denied and no evidence will ever be reviewed. *See generally* sources cited *in* Supp. Compl. ¶¶ 155-170.

- The BDU required borrowers to submit "supporting evidence" to be considered for approval, *see, e.g.*, Ex. 28 at DOE6020, even though this requirement does not appear on ED's own

---

[9] As of that date, the BDU had "just finished" extending one set of ITT Tech criteria, originally established in January 2017, to additional ITT campuses. Ex. 4 (Nevin Dep. 41:20-23, 42:18-25).

BD application forms.[10] Neither the HEA nor BD regulations require borrowers to submit supporting evidence in order for their BD claims to be considered for approval.

- Even where "supporting evidence" existed, the BDU consistently disregarded, or chose not to look into, potential sources of evidence to support BD allegations, including (but not limited to) government investigations and legal findings or settlements—even investigations by ED itself. *See* sources cited *in* Supp. Compl. ¶¶ 198–233. Nevin justified the BDU's failure to pursue information directly from schools named in BD applications by claiming such requests "create[] additional burdens on the school." Ex. 35.

- As explained *supra*, the BDU did not analyze or apply either state law or the 2016 regulations' federal standard in deciding whether an application stated a claim for relief.

- The BDU denied thousands of applications from schools that, according to its own findings and evidence in its possession, had engaged in widespread misconduct; if applications did not meet exceedingly specific criteria for campuses, time periods, and nature of allegations, they would be denied. *See* sources cited *in* Supp. Compl. ¶¶ 259–266, 274–276.

- From the summer of 2019 through December 24, 2020, the BDU created at least 760 memoranda concerning allegations against specific schools or school groups. Of these, only **23** memoranda (3%) found that potential approval criteria were warranted for certain, often extremely narrow categories of claims. *See* Ex. 61.

As a result of the 'presumption of denial' policy, ED had not, as of December 9, 2020, approved a ***single*** individual BD application from any borrower who attended a school other than CCI or ITT. *See* Ex. 4 (Nevin Dep. 50:5-12). In total, the BD applications of class members adjudicated during DeVos's tenure had a 94.4% denial rate, *see* Disc. Order at 6 (citing ECF 116)—precisely in line with the numerical goal set out in Nevin's 2019 memorandum.

Since 2021, ED has not announced any policy changes with respect to the 'presumption of denial' policy. It has not retracted any of the guidelines or memoranda that constituted the policy.[11]

---

[10] One version of the form states that "you are not required to submit documentation with your application to be considered for discharge," Ex. 32, while another version states that "[y]ou *may* attach additional documents," Ex. 33 (emphasis added).

[11] This raises significant concerns about the approximately 47,000 BD applications that ED reports as "adjudicated, pending notification." *See supra* at 7. Because ED has not rescinded the

12

Nor has it rescinded any of the Form Denial Notices. It has not announced any new, replacement standards to make BD decisions, and has not issued any new guidelines that could help borrowers discern what kinds of allegations or evidence will be considered to support an approval decision. Colleen Nevin, the key architect of the policy, remains employed at the agency.

ED also appears to still be limiting BD approvals to applicants who made allegations of specific misstatements during specific periods of time, even if the evidence indicates the institution's misconduct was wide-ranging and widespread—a hallmark of the 'presumption of denial' policy.[12] Moreover, the majority of the applications approved by the new administration have been for borrowers from CCI or ITT, the two schools with approval criteria dating back to January 2017. *See* Feb. 2022 Filing at 13-14.

### D.    The Form Denial Notices: Operationalizing the Presumption of Denial (Section 555(e) and Due Process Claims)

At some point in fall 2019—as the 'presumption of denial' policy was ramping up—individuals within ED were developing form letters to send to the many borrowers whose BD applications would be denied under this policy.[13] These efforts resulted in the Form Denial Notices: communications that failed to provide borrowers with any coherent reasons why their applications had been rejected, leaving them with no effective means to challenge the decisions. As this Court has recognized, after receiving a Form Denial Notice, a "borrower's path forward rings disturbingly Kafkaesque." Disc. Order at 8.

---

'presumption of denial' policy, it is reasonable to infer that the 'presumption of denial' may have been applied in making these decisions.

[12] *See, e.g.*, Ex. 16 (approving claims for ITT students who specifically claimed misrepresentation of employment prospects between 2005-2016 or misrepresentation regarding transfer of credits from January 2007 to October 2014).

[13] Defendants have declined to identify the individuals who drafted the Form Denial Notices; both Nevin and Jones denied that they did so. *See* Ex. 37 (supplemental response to Interrogatory No. 16); Ex. 4 (Nevin Dep. 85:21–86:25); Ex. 8 (Jones Dep. 201:13–202:17).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Content of the Form Denial Notices

ED developed four versions of the Form Denial Notices. *See* Defs.' Resp. to Aug. 31, 2020 Order, ECF 116 at 2 & Exs. A-D. Each version, however, was the same in certain key respects:

- All Form Denial Notices included a section titled "Applicable Law," but none actually identified any applicable state law for BD claims subject to the 1994 Regulations. *See* Suppl. Compl. ¶¶ 297–299; Supp. Ans. ¶¶ 297–299.

- Three of the four versions included a section titled "Why was my application determined to be ineligible?" (or similar), which led to a fill-in-the-blank template, filled in with one of four phrases: "Insufficient Evidence," "Failure to State a Legal Claim," "Other," or, in the case of certain CCI borrowers, "Outside coverage windows." No further explanation was provided. *See* Suppl. Compl. ¶¶ 304–305; Supp. Ans. ¶¶ 304–305.[14]

- Two of the four versions—those for schools with "common evidence"—included sections titled "What evidence was considered in determining my application's ineligibility?" ECF 116 at Exs. B, D. This section was filled in with vague descriptions such as "[State] Attorney General's Office"; "Evidence obtained by the Department in conjunction with its regular oversight activities"; and "Publicly available securities filings." *See, e.g.*, Ex. 13 (Sweet Aff. Ex. B); Ex. 25 (Wright Aff. Ex. B). Because ED never made its "common evidence" public, except to a limited extent in this lawsuit,[15] borrowers never had an opportunity to review this "common evidence" purportedly relied upon in denying their applications.

- Each Form Denial Notice included a section titled "What if I do not agree with this decision?," which informs the borrower: "you may ask ED to reconsider your application." ECF 116 at Exs. A-D. In fact, as of December 9, 2020, ED had no reconsideration process in place. Ex. 4 (Nevin Dep. 218:21–221:9); Supp. Ans. ¶ 313. None of the Form Denial Notices notify the borrower of their right to challenge the denial in federal court.

### 2.    The Massive Wave of Denials

On December 10, 2019, ED announced a new "partial relief" methodology, replacing the one enjoined in *Calvillo Manriquez*. *See* Ex. 60. This opened the floodgates, and by January 9,

---

[14] Defendants deny Plaintiffs' allegation that the "Review Recommendation [denial] Reason" field was filled in with one of those four phrases. Supp. Ans. ¶ 305. However, the summary judgment record does not show that that field was ever filled in with any other phrase. There is thus no dispute of material fact.

[15] *See* Defs.' List of Schools, Attachment to Filing in Response to Judge's Inquiry, ECF 145-2.

14

2020, ED had issued 15,256 denials and granted just 789 applications. *See* Disc. Order at 5. ED claimed it was prioritizing decisions on applications with "little or no relevant evidence." Ex. 29 (Brown Decl. ¶ 9); *see* Defs.' Opp. to Mot. to Enforce at 10, ECF 140. Between April 7, 2020—the date on which Plaintiffs signed a settlement agreement with Defendants—and August 24, 2020, ED issued approximately 78,400 BD decisions to class members; all but 4,400 were denials. *See* Disc. Order at 6. On July 24, 2020, Plaintiffs' counsel notified Defendants' counsel of their awareness that increasing numbers of class members were receiving Form Denial Notices. *See* Connor Decl. in Support of Mot. for Case Management Conf. at 6, ECF 108-2. This Court is familiar with what happened next. On October 19, 2020, the Court denied final approval of the settlement and issued an Order to Show Cause why the Secretary should not be enjoined from issuing any further denials until a ruling could be had on the legality of the Form Denial Notices. Disc. Order at 17. In response, Defendants agreed to voluntarily cease using the Form Denial Notices and hold all class members' loans in forbearance/stopped collection status during the pendency of this litigation. Defs.' Response to Order to Show Cause at 2-3, ECF 150.

### E.    Harm to the Class

As this Court recognized nearly two years ago, "We don't enjoy the luxury of seeking simply to forestall harm—it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans." Disc. Order at 15. The 'no decisions' policy, the 'presumption of denial' policy, and the Form Denial Letters have imposed serious harms on the class. Class members' professional and personal lives have been forced into limbo while they wait for a lawful BD decision. ED has exacerbated harm to borrowers' credit, perpetuated their untenable debt-to-income ratios, restricted their employment and education options, prevented opportunities for them to develop wealth, and interfered with their ability to provide for their families. *See, e.g.*, Ex. 31 ¶¶ 14-15; Ex. 34 ¶ 10; Ex. 36 ¶¶ 10-16; *see generally, e.g.*, Zoom Chat Transcript at 15, ECF 141 (two class members stating that they became homeless because of their loans). The continuing existence of these fraudulent debts and the threat of collection hangs over class members constantly and causes them serious mental and physical distress, even thoughts of

15

suicide. *See, e.g.*, Ex. 31 ¶¶ 16, 21; Ex. 34 ¶ 23; Ex. 36 ¶ 22. Class members have lost faith in their government. *See, e.g.*, Ex. 31 ¶ 17; Ex. 34 ¶¶ 22, 26; Ex. 36 ¶¶ 28, 32.

The Form Denial Notices, in particular, expose borrowers to the risk of collection on illegitimate loans, by purporting to conclude their BD cases without giving them a legally sufficient decision on the merits. As explained above, the Notices do not give borrowers adequate guidance on how to seek reconsideration or redress in court—and even if they had, discovery shows that ED's purported reconsideration process did not actually exist. *See supra* Section II.D.

## III.   PROCEDURAL HISTORY

Plaintiffs filed this lawsuit as a proposed class action on June 25, 2019. ECF 1. The class, which was certified on October 30, 2019, includes "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to [ED], whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*." ECF 46 at 14.

ED answered the Complaint (ECF 55), submitted a certified administrative record (ECF 56), and moved for summary judgment (ECF 63). Plaintiffs opposed (ECF 67) and filed their own motion for summary judgment or, in the alternative, to order discovery (ECF 76). After these motions were argued and submitted (ECF 93), the parties notified the Court of their agreement in principle to settle the case (ECF 94).

The parties entered into a settlement agreement on April 7, 2020, and this Court granted preliminary approval on May 22, 2020. ECF 103. As detailed above, however, ED's decision to deny tens of thousands of BD applications under the presumption of denial policy, using the Form Denial Notices, undermined this agreement. This Court denied final approval of the settlement on October 19, 2020, finding there was "no meeting of the minds." Disc. Order at 10. The Court ordered the parties to conduct expedited discovery, because the case required "an updated record . . . to determine what is going on before we again attempt to resolve the merits." *Id.* at 11. The parties conducted discovery between November 2020 and spring 2021.

16

1

## IV.     STANDARD OF REVIEW

2

       Summary judgment is warranted where "there is no genuine dispute as to any material fact"

3

and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred*

4

*Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

5

(1986). The moving party bears the burden of demonstrating that no genuine issue of material fact

6

exists. *Celotex*, 477 U.S. at 322. The court must draw all reasonable inferences in favor of the non-

7

moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see*

8

*Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997). The facts in this case are not

9

disputed. To the contrary, they are drawn largely from Defendants' own documents, public

10

statements, and the testimony of high-ranking ED employees. The parties dispute only the legal

11

conclusions to be drawn from the facts, making this case ripe for summary judgment.

12

       The APA governs judicial review of ED's actions with respect to the BD process. *See* 5

13

U.S.C. §§ 702, 704. Section 706(1) of the APA requires that a court "compel agency action

14

unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "A court can compel agency

15

action under this section when there is 'a specific, unequivocal command' placed on the agency to

16

take a 'discrete agency action,' and the agency has failed to take that action." *Viet. Veterans of Am.*

17

*v. Cent. Intelligence Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citing *Norton v. S. Utah*

18

*Wilderness All.*, 542 U.S. 55, 63-64 (2004) (*SUWA*)).[16] Although a statutory timeline may create

19

an "unequivocal command" for agency action, one is not required for a court to find a section

20

706(1) violation. *See id.* at 1081.

21

       If an agency has delayed fulfilling its duty to act, courts assess whether an "unreasonable

22

23

---

24

[16] The APA itself also requires that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b), and that "[p]rompt notice shall be given of the denial in whole or in part of a written application," 5 U.S.C. § 555(e). This has been interpreted to mean that "an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)).

25

26

27

28

delay" has occurred in violation of section 706(1) by weighing six factors first articulated in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984) (*TRAC*): (1) "the time agencies take to make decisions," or the "rule of reason," (2) the existence of a statutory timeline, (3) whether "health and human welfare are at stake," (4) whether action will affect "agency activities of a higher or competing priority," (5) the "nature and the extent of injuries prejudiced by the delay," and (6) although not required, whether agency "impropriety [is] lurking behind agency lassitude." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813 (9th Cir. 2015).

Section 706(2) of the APA provides that a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court must set aside an agency's decision if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Food & Water Watch v. U.S. Envtl. Protection Agency*, 20 F.4th 506, 513-14 (9th Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency cannot merely offer "post hoc rationalizations"; rather, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50.

Although APA cases typically rely on an administrative record, "when a court considers a claim that an agency has failed to act in violation of a legal obligation, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)). Moreover, in this case the Court ordered supplemental discovery based on "a strong showing of agency pretext," Disc. Order at 15, and material produced in discovery is proper to consider on summary judgment, *see, e.g.*, *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (courts may admit extra-record evidence in APA cases where, *inter alia*, such evidence is "necessary to determine whether

18

the agency has considered all relevant factors and has explained its decision," if "the agency has relied on documents not in the record," and "when plaintiffs make a showing of agency bad faith" (internal quotation marks omitted)). *Cf. Portland Audubon Soc'y v. Endangered Species Cmte.*, 984 F. 2d 1534, 1548 (9th Cir. 1993) ("An incomplete record must be viewed as a 'fictional account of the actual decisionmaking process.'" (quoting *Home Box Office, Inc. v. Fed. Commc'ns Comm'n*, 567 F.2d 9, 54 (D.C. Cir. 1977))).

## V.   **ARGUMENT**

Tens of thousands of members of this class have waited years for *any* correspondence from ED regarding their BD applications. This amount of delay in agency decision-making is facially unreasonable, and ED has offered no legitimate reason to explain its dilatory conduct. The class is entitled to judgment on its claim that ED has violated section 706(1) of the APA.

This case is not just about delay, however. As discovery has borne out, ED's treatment of BD applications was not a result of reasoned policy decisions or necessary allocations of agency resources, but rather of a blanket policy to halt all BD decision-making based on antipathy toward the very concept of borrower defense. When faced with this lawsuit, ED put in place a 'presumption of denial' policy that reasoned backward from a desired outcome of approving as few BD applications as possible. This policy deprives BD applicants of a neutral decision-maker, in violation of APA § 706(2) and class members' due process rights. The Form Denial Notices failed to satisfy both APA § 555(e) and due process requirements. As this Court saw, class members "have waited for relief, or at least decision, for eighteen months. Many have waited much longer; and many are still waiting." Disc. Order at 15. Those words remain true today. Plaintiffs are entitled to summary judgment and an adequate remedy.

### A.   **Defendants Have Unreasonably Delayed Decisions on BD Applications in Violation of APA § 706(1)**

Summary judgment for Plaintiffs on their unreasonable delay claim was appropriate when the parties first briefed this issue in 2019, and remains so now. ED has engaged in an ongoing policy of delay, leaving hundreds of thousands of borrowers waiting for up to seven years. Under

19

no conceivable interpretation of the law is this protracted delay "reasonable."

        **1.**      **Defendants Have Failed to Perform a Discrete Agency Action**

        The threshold question in a section 706(1) case is whether the agency has failed to take a "discrete agency action." *SUWA*, 542 U.S. at 63; *see also Viet. Veterans*, 811 F.3d at 1068. Here, it is undisputed that ED has a mandatory duty to adjudicate BD applications in a timely manner. ED has repeatedly acknowledged this: "Because borrowers have a right to submit defense to repayment claims, the Department ***must*** set up a process to review and ***adjudicate them***." Ex. 38 at 3 (emphasis added); *see also id.* (ED "has a legal responsibility to timely provide" protection to "harmed borrowers"); 81 Fed. Reg. 75,926, 75,973 (Nov. 1, 2016) ("[B]y directing the Secretary to designate acts and omissions that constitute borrower defenses to repayment in section 455(h) of the HEA, Congress has explicitly charged the Department, under the current and new regulations, to adjudicate the merits of claims brought alleging such acts and omissions."); Defs.' 1st MSJ at 20. ED has not disputed—because it cannot—that this obligation exists.

        But in early 2017, ED simply stopped. It refused to identify any new grounds for relief or to recommend any BD claim for discharge, pursuant to a directive issued at the top levels of the agency. *See supra* Section II.B. For reasons Plaintiffs have explained, this refusal on its own violated the APA. *See* Pls.' 1st MSJ at 19-21; Pls.' 1st MSJ Reply at 7-10. As the Southern District of California recently explained in granting summary judgment on a section 706(1) claim, the "aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action"—constitutes a failure to take a discrete agency action "to which the court should compel compliance." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *5 (S.D. Cal. Sept. 2, 2021). On this basis alone, Plaintiffs are entitled to summary judgment on their section 706(1) claim.

        Defendants cannot argue that the policy of delay has now ended, and so they win. When a delay has been "created and perpetuated by [the agency's] inefficiencies," and "has not been significantly reduced" under current policy, the agency retains a duty to rectify that delay. *Pacharne v. Dep't of Homeland Sec.*, No. 1:21-CV-115-SA-DAS, 2021 WL 4497481, at *12 (N.D.

Miss. Sept. 30, 2021); *cf. Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074, at *7 (D.D.C. Sept. 27, 2021) (although the unlawful policy underlying plaintiffs' claims had been revoked, their claims were not moot because the effects of the resulting delay had not been "completely or irrevocably eradicated" (citation omitted)).

Moreover, there is no authority to support the position that "because an agency acts on some similarly situated applications, it cannot be sued for unreasonably delaying or unlawfully withholding other applications." *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021). In truth, for the vast majority of the class, ED's refusal to decide BD applications continues today. ED has not announced any standards or timelines to address these claims. It also apparently has made decisions on tens of thousands of applications but has declined to notify members of the class—presumably because it cannot figure out how to write a legally sufficient denial notice.

### 2.    Defendants' Failure to Fulfill Their Mandatory Duty Is Not Reasonable

If the Court finds it necessary to engage in a balancing analysis, it still should grant summary judgment. Plaintiffs incorporate by reference their prior briefing on this topic. *See* Pls.' 1st MSJ at 22-29. Pursuant to the "*TRAC* factors," a court assesses whether an "unreasonable delay" has occurred in violation of section 706(1) by weighing six factors. *See In re Pesticide Action Network N. Am.*, 798 F.3d at 813. Defendants fail at each step.

***Factor 1: The delay is unreasonable by any measure.*** Although the HEA does not set a specific timeline for BD decision-making,[17] Congress could not have contemplated that ED would delay decisions for years with no end in sight. *See, e.g.*, *In re A Cmty. Voice*, 878 F.3d 779, 787 (9th Cir. 2017) ("[A] reasonable time for agency action is typically counted in weeks or months, not years."); *Pacharne*, 2021 WL 4497481, at *12 (eleven-month delay unreasonable); *City of Providence v. Barr*, 385 F. Supp. 3d 160, 165 (D.R.I. 2019) (one-year delay unreasonable); *Air Line Pilots Ass'n, Intl. v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984) (five-year delay

---

[17] For this reason, the second *TRAC* factor, whether a statutory timeline exists, is neutral. *See Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1096 (E.D. Cal. 2016).

unreasonable); *Pub. Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157-59 (D.C. Cir. 1983) (per curiam) (three-year delay unreasonable); *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 324-25, 338-42 (D.C. Cir. 1980) (four-year delay unreasonable). Congress expects borrowers to pay back their Direct Loans within ten years; meanwhile, ED has sat on BD applications for up to seven years, with no timeline for future decisions.

ED's conduct since February 2017, up to and including its conduct to this day, does not "support the notion that resources are being dispatched in a manner consistent with mitigating unreasonable delay." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 36 (D.D.C. 2000); *see also id.* (explaining agency's "noncommittal estimate coupled with the specific history of interaction between th[e] parties [gave] rise to a finding of 'unreasonable delay'"). The fact that there is no evidence that ED has **any** timeline for decisions for the class as a whole compounds the unreasonableness. *See, e.g.*, *Iraqi & Afghan Allies v. Pompeo*, Civ. A. No. 18-cv-01388 (TSC), 2019 WL 4575565, at *8 (D.D.C. Sept. 20, 2019) (finding first *TRAC* factor weighed in favor of plaintiffs where, *inter alia*, "Defendants have not proffered a time frame for when they expect to adjudicate Plaintiffs' applications"); *Muwekma Tribe*, 133 F. Supp. 2d at 39 (court did "not believe . . . Congress intended petitions to languish in the review process indefinitely.").

*Factors 3 and 5: Health and human welfare are at stake, and class members' injuries are profound.* The effect on human welfare and class members' interests weighs heavily in favor of the borrowers. *See supra* Section II.E (detailing harm to class members from delay and uncertainty in BD process); Pls.' 1st MSJ at 27-29 (same); ECF Nos. 151-159 (class member affidavits describing same). As this Court has recognized, the harm "descended upon the class long ago," and class members have been forced to "live under the severe financial burden of their loans." Disc. Order at 15.

*Factor 4: Claims of competing agency priorities have been false.* As explained *supra* at Section II.B, ED's purported reasons for its delay have been entirely pretextual. To review just a few examples: The *Calvillo Manriquez* injunction did not, factually or legally, prevent ED from adjudicating BD claims. ED's excuse that it did not issue any decisions for nearly two years

because it was afraid of creating the impression that no claims would be granted is laughable, because it was *true* that ED had no plans to adjudicate any claims favorably within any reasonable timeframe. ED kept the BDU understaffed, knowing additional staff was required to adjudicate claims. ED claimed it needed time to do complicated analyses of fact and law, yet its Form Denial Notices and evidence regarding the 'presumption of denial' policy show that it was not doing anything of the sort. Contrary to ED's recent statements to borrowers, this litigation is not what prevented ED from adjudicating claims and notifying class members of outcomes, either.

Even if Defendants' claims that the delay was due to resource allocation difficulties had been true—which they were not—"neither a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay, nor can the government claim it has become subject to unreasonable expectations," when officials have been "aware of their . . . obligations" for years and "yet little progress has been made in discharging those duties." *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001).

**Factor 6: Agency impropriety was, indeed, lurking behind agency lassitude.** When "presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decision-making process," courts "cannot ignore the disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (cited in Disc. Order at 12). Just such a disconnect plagues all of ED's excuses. "Pretext is the paradigm of agency bad faith," Disc. Order at 12, and discovery in this case has borne out that pretext is all ED had to offer. *See supra* Sections II.B, II.C. As this Court suspected, "where there's smoke, there's fire." Disc. Order at 15. ED's delay was originally driven by bad faith, and its continuing delay is, at best, inexcusable neglect.

**B.     The 'Presumption of Denial' Policy Is Unlawful**

> **1.     The Policy Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law, in Violation of APA § 706(2)**

The 'presumption of denial' policy is not a lawful agency response to the BD application backlog. The uncontested facts establish no rational basis for the policy or its constituent

23

procedures and guidance. To begin, the policy directly contravenes both the 1994 and 2016 regulations, which require ED to apply state law or a federal misrepresentation standard, respectively, to resolve BD claims. The decision to cap the number of BD approvals also runs "counter to the evidence before the agency," *Food & Water Watch*, 20 F.4th at 513-14 (quoting *State Farm*, 463 U.S. at 43); that evidence provides no basis to assume that less than 10% of BD applications are meritorious. Rather, the evidence shows that dozens of schools have misled tens of thousands of students. Nor is the policy "a product of agency expertise.'" *Id.* To the contrary, the policy was developed in bad faith by an administration openly hostile to BD applicants.

a)    The Policy Is a "Final Agency Action" Under Section 706(2)

The question of whether an agency action is "final" is "pragmatic and flexible," looking to its "practical and legal effects." *Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citation omitted). A "final agency action" is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1977) (citations omitted). It cannot be disputed that legal consequences flowed from the 'presumption of denial' policy: thousands of BD applications were denied because the BDU put that policy into action. The fact that there is no single formal decision document setting out the reasons for ED's adoption of the policy does not prevent it from being a final agency action. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971) (despite absence of formal findings, there was "no ambiguity" that "the Secretary ha[d] approved" a specific course of reviewable action). As detailed *infra*, the very reason there is no such document is that ED's reasons for adopting the policy were facially arbitrary, capricious, and in bad faith.

b)    The Policy Contravenes the 1994 and 2016 Regulations

The 1994 regulations provide that "[a] borrower may assert as a defense against repayment, any act or omission of the school attended by the student that *would give rise to a cause of action against the school under applicable state law*." 34 C.F.R. § 685.206 (emphasis added). Simply, state law provides the standard by which ED is to determine whether a BD applicant is entitled to discharge of their federal student loans. Yet Colleen Nevin testified that BD applications

24

aren't being denied based on, you know, not being able to fulfill a specific element of a particular state law or a specific element of the 2016 regulation. . . . [T]he [denial] letters, so the ones that have gone out so far, we haven't issued any denials that were based on kind of an application of specific elements of, you know, state law where there could be a different answer in California versus Nebraska.

Ex. 4 (Nevin Dep. 79:6-20).[18]

Instead, the 'presumption of denial' policy mandated denial regardless of whether the borrower's school engaged in acts or omissions that give rise to a cause of action under applicable state law. As one example, the policy directed reviewers to disregard allegations of oral misrepresentations, without considering whether oral statements would support a claim under state law. *See* sources cited *in* Supp. Compl. ¶¶ 136-138. For another, the policy imposed a reliance requirement, regardless of whether applicable state law required the borrower to specifically allege reliance on a misrepresentation. *See* Ex. 4 (Nevin Dep. 85:8-20); Ex. 11 at 1-3; Ex. 40 (showing claims in "Flagged for Denial" status with "Decision Reason" listed as "Lack of Reliance"). The BDU rejected applications asserting a misleading omission if they didn't allege a duty to inform, again regardless of whether state law required such an allegation. Ex. 11 at 2. Often, the BDU's memoranda did not even *identify the state(s) where the school was located*, let alone the laws of those states.[19] *See, e.g.*, Ex. 41 (stating allegations "do not . . . violate[] state law" but not identifying states where school is located); Ex. 42 (same); Ex. 43 (same). Even where the state was identified, at least some memoranda applied standards *not* based on state law. *See, e.g.*, Ex. 44 (denying applications based on when the school was "on notice of the gravity of" an accreditor's investigation, without considering whether such "notice" was relevant under state law).

Indeed, as this Court observed, class member Yvette Colon received a Form Denial Notice

---

[18] Notably, one of the BDU's excuses for why front-line reviewers were not permitted to approve BD applications was that "[y]ou'd have to understand what the elements of the claim are, and that's dependent on the regulation and the state law." Ex. 4 (Nevin Dep. 206:11-22).

[19] Only one memorandum, out of many hundreds, engaged in a choice-of-law analysis. *See* Ex. 4 (Nevin Dep. 52:21–53:1).

even though she had already received a restitution check from the New York Attorney General's lawsuit against her school. *See* Disc. Order at 7, 14. This Court asked, "why did a student who already qualified for relief based on her school's misconduct under state law not now qualify for relief based on a claim 'that would give rise to a cause of action against the school under applicable State law?'" *Id.* at 14. The 'presumption of denial' policy is why.

The policy's stance with respect to the 2016 regulations was identical. The 2016 regulations imposed a uniform federal standard, such that a BD applicant can assert as a defense to repayment that their school (or its agents) "made a substantial misrepresentation . . . that the borrower reasonably relied on to the borrower's detriment." 34 C.F.R. § 685.222(d)(1). The regulations define both "misrepresentation" and "substantial misrepresentation." 34 C.F.R. § 668.71(c). Yet those definitions—much less any analysis of how they might apply—never appear in the BDU's school-specific memoranda. Notably, the Regulations specifically mandate that oral misrepresentations can meet the "substantial misrepresentation" standard, *id.*, but as explained, the 'presumption of denial' policy required BD reviewers to disregard allegations of oral misrepresentations. The definition of "misrepresentation" also includes "any statement that omits information in such a way as to make the statement false, erroneous, or misleading," with no mention of a duty to disclose, *id.*—but the 'presumption of denial' policy regularly required applicants to allege that such a duty existed. Nevin admitted that BD denials were not being based on a borrower's inability to "fulfill . . . a specific element of the 2016 regulation." Ex. 4 (Nevin Dep. 79:6-20). Rather, the 'presumption of denial' policy mandated the denial of applications regardless of whether the borrower met the 2016 misrepresentation standard. It was openly, explicitly contrary to ED's own regulations, and violated section 706(2) of the APA.

### c)   The Policy Is Arbitrary, Capricious, and Was Developed and Implemented in Bad Faith

To survive "arbitrary and capricious" review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The 'presumption of denial' policy

26

was not based on "relevant data" and lacks any such "rational connection." *See id.*

To begin, discovery has not revealed *any* evidence to support ED's conclusion that less than 10% of BD applications outside of the CCI job placement rate category would satisfy the 1994 or 2016 regulations. *See* Ex. 22. To the contrary, internal documents show ED was aware of serious misconduct by dozens of schools which accounted for thousands of BD claims. *See, e.g.*, Exs. 46-58 (evidence of misconduct by ITT Technical Institute, CCI, EDMC, Anthem Education Group, Career Education Corp., DeVry/Keller Graduate School of Management, Empire Beauty School, Everglades University, Universal Technical Institute, Premier Education Group, and Florida Career College); ECF 145-2 (Defendants' "fraud list").

By the same token, there was no factual or legal support for ED's decision to establish a set of procedures by which "[t]he majority of [BD] applications will be denied." Ex. 23 at DOE8842. What ED did, instead, was reason backward from its leaders' belief that borrowers should not get "free money" from the BD program. Secretary DeVos and those who answered to her were clear about their intentions: they wanted to deny as many BD applications as they could. *See supra* Sections II.B, II.C. So they set up a process that would reach that result, regardless of whether it was supported by the evidence or comported with ED's own regulations.

In developing and applying the 'presumption of denial' policy, ED allowed its bias against BD applicants to infect the claims assessment process, thus depriving class members of a neutral decision-maker. This bias is apparent in ED's repeated rejection of applications from borrowers who attended schools ED *already knew* had misled students under applicable state law. The lead Plaintiff in this action, Theresa Sweet, is one example: she attended Brooks Institute of photography, a Career Education Corp. ("CEC") school, and received a Form Denial Notice in 2020. *See* Ex. 13 at 28-33; Supp. Ans. ¶ 354. Yet in 2019, CEC entered into an agreement with 48 states and the District of Columbia to address alleged violations of state laws on recruitment and enrollment, and forewent collection on nearly $500 million in student debts. *See* Ex. 59.

As the Second Circuit observed, "[a]ny effort by [an agency] to pursue a 'strategy' to justify a foreordained opposition" is "incompatible" with the agency's "mandate to use its expertise to

27

come to a reasoned decision supported by substantial evidence." *Islander East Pipeline Co. v. Conn. Dep't of Envt'l Protection*, 482 F.3d 79, 105 (2d Cir. 2006). Yet a "foreordained opposition" is exactly what ED pursued here. This type of bad faith conduct is the essence of arbitrary and capricious agency action. *See Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994) ("proof of subjective bad faith by [agency] officials," including evidence that officials "predetermin[ed]" an outcome or "harbor[ed] a prejudice against the plaintiff," will "generally constitute[] arbitrary and capricious action" (internal quotation marks omitted)); *see also, e.g.*, *Simmons v. Smith*, 888 F.3d 994, 1001 (8th Cir. 2018) ("Agencies may act arbitrarily and capriciously if . . . they act with bad faith.").

### 2. The 'Presumption of Denial' Policy Deprives Class Members of Their Property Interests Without Due Process of Law

The right to seek loan cancellation through the BD process is a property right. By refusing to decide BD applications on the merits and failing to provide a neutral decisionmaker, ED has deprived class members of their property interests without due process of law.

#### a) Class Members Have a Property Interest in Raising a Defense to Repayment of Their Federal Student Loans

"Key to a property interest determination is whether the person alleging a due process violation has an entitlement to the benefit at issue, conferred through statute, regulation, contract, or established practice." *Armstrong v. Reynolds*, 22 F.4th 1058, 1067 (9th Cir. 2022). There are three relevant property interests in this matter. First, members of the class, like all federal student loan borrowers, have a right to seek cancellation of their loans because of school misconduct. *Cf. Higgins v. Spellings*, 663 F. Supp. 2d 788, 794-95 (W.D. Mo. 2009) (finding a property interest in discharge of federally guaranteed student loans). Second, Defendants have an obligation to consider those borrower defenses. *See* Class Cert. Order at 12, ECF 46 (referring to Defendants' "obligation to process borrower defense claims"); *Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679, at *26, *32 (D. Mass. June 25, 2020) (holding ED is required by law to render reasoned decisions on BD applications and to follow its own "settled course of adjudication" in

28

doing so). Third, Plaintiffs have a property interest in uninterrupted loan forbearance while waiting for a final decision on the merits of their BD applications. *See* 34 C.F.R. § 685.222(e)(2); *Nozzi v. Housing Auth. of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015) ("[P]laintiffs have a property interest in Section 8 Benefits to which the procedural protections of due process apply . . . ."); *see also Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 576 (1972) ("[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process."). While an application is pending, members of the class are also protected from collection. 34 C.F.R. § 685.222(e)(2) ("Upon receipt of a borrower's application," the Secretary "grants forbearance" and/or "suspends collection activity until the Secretary issues a decision on the borrower's claim"); *see also Williams v. DeVos*, No. CV 16-11949-LTS, 2018 WL 5281741, at *15 (D. Mass. Oct. 24, 2018) (vacating Secretary's certification of defaulted student loan debts for collection through Treasury offset while BD application pending).

### b)   ED Deprived Class Members of These Interests Without Due Process of Law

Above and beyond violating the APA, ED's refusal to consider BD applications on their merits and its failure to provide a neutral decision-maker rendered its 'presumption of denial' policy unconstitutional.

When an administrative procedure is a "sham through and through, there has not been a constitutionally sufficient opportunity to respond." *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998); *see also Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) ("Due process requires that a hearing 'must be a real one, not a sham or a pretense.'" (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring))). Here, ED created a sham process by which nearly every BD application would be first ignored, then denied. The BDU *began* its assessment of applications by concluding that 90% or more would be denied. As detailed above, adjudicators of BD claims relied on memoranda that presumptively denied claims even when the memoranda themselves noted extensive evidence of wrongdoing. Adjudicators checked boxes stating borrowers failed to state a claim under state law, even though

29

they hadn't consulted state law at all.

A neutral decision-maker—and the appearance of one—is "essential" to due process of law. *Goldberg*, 397 U.S. at 251; *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law."). Although an agency may investigate the facts and institute proceedings, *see Withrow v. Larkin*, 421 U.S. 35, 53 (1975), that does not mean the process of adjudication may lead to a foregone conclusion. The crux of procedural due process is that individuals or groups petitioning the government have the opportunity to be heard. *See, e.g.*, *Fouts v. Cnty. of Clark*, 76 F. App'x 825, 826 (9th Cir. 2003) (quoting *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990)). BD applicants have not been heard. Thousands have been met with years of stony silence; thousands of others, after waiting patiently, found ED had closed its ears to them.

## C.     The Form Denial Notices Are Unlawful

As this Court has found, the "perfunctory" Form Denial Notices are "utterly devoid of meaningful explanation." Disc. Order at 15. They do not provide borrowers with a substantive reason for the denial, a description of the evidence considered, or any information to determine what additional evidence would aid in the reconsideration process. As a result, the Notices violate both the APA and the Due Process Clause. The class members who received them are still subject to an unlawful delay.

### 1.     The Notices Violate APA § 555(e)

APA section 555(e) requires an agency to give "[p]rompt notice . . . of the denial in whole or in part of a written application, petition, or other request," and that any such notice "shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e). This "brief statement" requirement mandates the agency explain the reasons for the denial. *See Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("The agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action." (quoting *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir.

2001))). The explanation must provide a "basis upon which [a court] could conclude that [the denial] was the product of reasoned decisionmaking." *Id.* at 195 (quoting *Tourus Records*, 259 F.3d at 737); *see also id.* ("Reasoned decisionmaking [under § 555(e) is not a procedural requirement. It stems directly from § 706 of the APA." (citation omitted)).

ED's own regulations reflect its awareness of its obligations under section 555(e): the Secretary is required to "designate a Department official" to "resolve the [BD] claim through a fact-finding process," and in the event the official denies the claim, she must "notif[y] the borrower of the reasons for the denial, the evidence that was relied upon," and "inform[] the borrower of the opportunity to request reconsideration." 34 C.F.R. § 685.222(e)(3), (e)(4)(ii).

The Form Denial Notices do not meet these standards. To begin, the Notices fail to provide class members with an adequate explanation of the grounds for denial of their BD applications. In the section of the Notices that ostensibly provided the "Review Recommendation Reason," ED simply plugged in undefined, vague, conclusory, and boilerplate responses, including "Failure to State a Claim," "Insufficient Evidence," "Outside Coverage Date," and "Other." *See* Suppl. Compl. ¶¶ 304-305; Supp. Ans. ¶¶ 304-305. These cut-and-paste phrases are resolutely not self-explanatory. *See* 5 U.S.C. § 555(e) ("Except . . . when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for the denial."). They are not "reasons," and they do not "articulate a satisfactory explanation." *Butte Cty.*, 613 F.3d at 194.

The Notices do not tell applicants *how* or *why* they have "failed to state a claim" or have provided "insufficient evidence." *See, e.g.*, Ex. 13 ¶¶ 7-10; Ex. 39 ¶¶ 6-18; Ex. 62 ¶¶ 6-9; Ex. 63 ¶¶ 9-15. Compounding the problem, borrowers are not able to access or even see a description of the evidence ED has supposedly consulted to deny their claims. *See* Ex. 4 (Nevin Dep. 183:7-22). These failures render the Form Denial Notices legally insufficient. *See, e.g.*, *Meadville Master Antenna, Inc. v. F.C.C.*, 443 F.2d 282, 290 (3d Cir. 1971) (agency "must state with specificity its objections to the showing made by petitioner and not rely on conclusory and undefined terms"); *Higgins v. Spellings*, 663 F. Supp. 2d 788, 797-98 (W.D. Mo. 2009) (finding notice of denial for "medical review failure" inadequate because "the term is not defined in the letter").

31

Further, the Form Denial Notices fail to identify the law ED applied. Although the Notices claim that certain applications were decided under state law, they do not state *which* state law ED used to evaluate the merits of the claim. *See* Supp. Compl. ¶¶ 297-299; Supp. Ans. ¶¶ 297-299. And, when pressed in discovery, Defendants admitted they did not actually apply state law at all. *See* Ex. 4 (Nevin Dep. 79:6-20). This is critical, because an agency response that "merely parrot[s] the language of the standard" of review is "not a statement of reasoning, but of conclusion[,]" and violates the APA. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cited in *State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1169 (N.D. Cal. 2019)).

Bare-bones notices such as these have repeatedly been rejected by courts. For example, the D.C. Circuit held that a letter from an agency alerting a claimant that its application was "not adequately supported" was an insufficient legal conclusion, and not the required "statement" of the grounds for denial. *Tourus Records*, 259 F.3d at 737 ("[The denial] does not 'articulate a satisfactory explanation' for the agency's action . . . because it does not explain 'why' the [agency] regarded [the petition] as unsupported."). Similarly, that court rejected notices denying discharge upgrade requests using "boilerplate language" that made it "impossible to discern" any "rational connection between the facts found and the choice made." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404-05 (D.C. Cir. 1995) (internal quotation marks omitted). So too here. The Form Denial Notices are unsupportable under the APA.

## 2. The Notices Violate the Due Process Clause

As a guiding principle, "[i]n order to be constitutionally adequate, notice of benefits determinations must provide claimants with enough information to understand the reasons for the agency's action." *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)). Here, as this Court has recognized, the perfunctory Form Denial Notices provide class members with no way of knowing why their claims were denied, or how to challenge the denials. *See* Disc. Order at 14. BD applicants "cannot know whether a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action." *Kapps*, 404 F.3d at 125

32

1   (citing *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974)).

2       Plaintiffs are left with no real recourse to challenge the denials, but "[t]he Due Process

3   Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary

4   presentation." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 288 n.4 (1974);

5   *see Goldberg*, 397 U.S. at 270-71. "One of the fundamental requirements of procedural due

6   process is that a notice must be reasonably calculated to afford parties their right to present

7   objections." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) (citing *Mullane v. Central

8   Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). This requirement demands that notice

9   "accurately state how a claimant might appeal an initial burden," and not "introduce[] a high risk

10  of error into the . . . decision making process." *Id*. As this Court has already recognized, "the

11  borrower's path forward rings disturbingly Kafkaesque" after receiving a Form Denial Notice.

12  Disc. Order at 8. The Notice also completely omits the borrower's option to seek recourse in

13  federal court. The Form Denial Notices are thus fatally defective under the Due Process Clause.

14      **D.**    **The Court Is Authorized to Grant the Relief that Plaintiffs Seek**

15      If it finds summary judgment is warranted, Plaintiffs respectfully request the Court (i) issue

16  a declaratory judgment that the 'no decisions' policy and the 'presumption of denial' policy are

17  unlawful, and (ii) issue an order for Defendants to show cause why each and every class member's

18  BD application should not be granted immediately.

19      As to the declaratory judgment, the probability of future violations "is real and substantial"

20  without one, and the situation is "of sufficient immediacy and reality to warrant the issuance of a

21  declaratory judgment." *Crossley v. California*, 479 F. Supp. 3d 901, 920 (S.D. Cal. 2020) (quoting

22  *Steffel v. Thompson*, 415 U.S. 452, 460 (1974)). A declaratory judgment will "resolve uncertainties

23  or disputes that may result in future litigation" regarding BD processes. *Vascular Imaging Prods.,

24  Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019).

25      As to the order to show cause, this remedy is proper because remand to the agency would

26  only prolong, rather than cure, the APA and due process violations against the class.

33

### 1.    The HEA's Anti-Injunction Provision Does Not Foreclose Relief

Defendants have previously argued that the HEA's anti-injunction provision forecloses any relief in this case. *See* Defs.' 1st MSJ at 15-16. Plaintiffs incorporate by references their previous responses. Pls.' 1st MSJ at 21-22; Pls.' 1st MSJ Reply at 6-7. Where, as here, plaintiffs seek "specific relief requiring the Secretary of Education to perform a duty imposed by law" and "the conduct alleged is determined to be beyond the statutory limits on the Secretary's power," courts may issue injunctive relief against the Department. *See Gearhart v. U.S. Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798, at *2 (N.D. Cal. Oct. 25, 2019); *Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1102 (D.N.J. 1993). Defendants' contrary position would cut citizens off from any ability to hold ED accountable for *ultra vires* actions.

Additionally, since the prior summary judgment briefing, Plaintiffs have added a constitutional due process claim against the Secretary. *See* Supp. Compl. ¶¶ 448-455. "[U]ltra vires claims independent of the APA . . . can be brought against federal officers" who "violated the Constitution." *Al Otro Lado*, 2021 WL 3931890 at *7 (quoting *E.V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018)). Claims alleging constitutional violations by federal officers "are not 'against the government' for purposes of sovereign immunity." *E.V.*, 906 F.3d at 1098.

### 2.    Remand to ED Would Be Futile

Though "the proper way to handle an agency error in the ordinary circumstance is to remand to the agency for additional investigation or explanation," these are *not* ordinary circumstances. *Boliero v. Holder*, 731 F.3d 32, 38 (1st Cir. 2013) (describing the "ordinary remand rule"); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (holding there is no need to remand a matter to an agency when such a procedure "would be an idle and useless formality."). Courts are "not strictly bound to [the] ordinary remand rule when it is clear that remand would be futile." *Singh v. Holder*, 558 F. App'x 76, 81 (2d Cir. 2014). Remand here would be futile, because ED clearly has *no lawful process in place* to timely decide the backlog of BD applications, and, even if it did, it is wholly unable to produce *lawful denial notices*. Ordering Defendants to show cause why class

34

members should not receive immediate approvals of their BD applications is permissible, and vital.

First, the delay in this case has already been unreasonable, and the outcome of remand would be painfully foreseeable. Further delay and violations of section 706 are the likely outcomes because ED currently has no discernable process in place for deciding BD applications in a manner that comports with its obligations.

Second, remand would pose a significant risk of re-creating the same conditions that scuttled the earlier proposed settlement in this case. That is, after a remand, ED could very well unleash a mass of legally insufficient denial notices. Significantly, ED has ***never once*** provided a denial notice with a lawful explanation of its reasoning.

Under these circumstances, an order to show cause is an appropriate remedy, because it provides ED with an opportunity to place its best evidence on the record. If ED cannot provide any supportable reason for continuing to withhold decisions from class members, and cannot provide any concrete evidence that it is able to issue lawful decisions on pending claims within a reasonable period of time, then this Court will be justified in ordering ED to grant class members' applications as a form of relief. In that situation, "the record [will] contain[] no basis in fact for denial of [an] application," and thus remand to the agency would be futile. *Watson v. Geren* 569 F.3d 115, 134–35 (2d Cir. 2009); *see also Donovan ex rel. Anderson v. Stafford Const. Co*., 732 F.2d 954, 961 (D.C. Cir. 1984) (remand is unnecessary where "only one conclusion would be supportable"); *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) (same); *cf. Vara*, 2020 WL 3489679, at *30-31 (declining to remand group BD application to ED). In other words, if the record shows ED is incapable of honoring the class's legal rights, the only solution is to take matters out of its hands.[20] *See, e.g.*, *Eldredge v. Carpenters 46*, 94 F.3d 1366, 1371-72

---

[20] This Court also has broad authority to appoint a special master to remedy systemic government misconduct. *See* Fed. R. Civ. P. 53(a)(1); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*,402 U.S. 1, 15 (1971). If the Court opts for some form of remand, a master would be justified by ED's history of non-compliance with its legal obligations, the complexity of this litigation, and the potential complexity of compliance. *See, e.g.*, *Hook v. Ariz.*, 120 F.3d 921, 926 (9th Cir. 1997).

(9th Cir. 1996) (where defendant has displayed "recalcitrance and foot-dragging," prescriptive injunctive relief is appropriate); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 561-68 (9th Cir. 1990) (upholding permanent injunction based on persistent pattern of government misconduct that violated plaintiffs' rights).

Finally, Plaintiffs do not seek "broad programmatic improvements" of a federal program. *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018). Rather, Plaintiffs have identified a "discrete and particularized action by Defendants . . . in violation of their statutory obligations." *Al Otro Lado*, 2021 WL 3931890 at *8: ED's refusal to issue lawful decisions on BD applications. This "defeats any argument that the record reflects a 'broad programmatic attack' on agency action that is not permitted under § 706(1)." *Id.* at *9; *see also Ramirez*, 310 F. Supp. 3d at 20-21; *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015). *Compare Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (plaintiffs did not identify "some specific order or regulation," but rather made "a generic challenge to all aspects" of the program at issue). That ED's unlawful policy "span[ned] several years" and purportedly rested on a variety of "factual bases" does not change the result: "The fact that Defendants sought to [delay and deny BD applications] in different contexts does not transform Plaintiffs' claim into a programmatic attack." *Al Otro Lado*, 2021 WL 3931890 at *10.

APA review need not be "a ping-pong game." *Wyman-Gordon Co.*, 394 U.S. at 766 n.6. If ED is able to show cause why some BD applications should be denied, or cannot yet be decided, then a remand may be justified[21]; otherwise, class members deserve swift clarity. Nearly ***three hundred thousand borrowers***—more than at the end of the DeVos administration—are currently

---

[21] This Court's findings of bad faith by ED support retention of jurisdiction even in the event of remand. *See Empire Health Found. v. Becerra*, No. cv 20-2149 (JEB), 2022 WL 370559, at *5 (D.D.C. Feb. 8, 2022) (court "has the discretion to retain jurisdiction over a case pending completion of a remand" in cases involving "unreasonable delay of agency action . . . , or for cases involving a history of agency noncompliance with court orders or resistance to the fulfillment of legal duties" (quoting *Baystate Medical Center v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008))).

being harmed by ED's denial of their rights. The only reasonable remedy for the harm borrowers have suffered is an order to show cause why class members' applications should not be granted immediately.

## VI.  **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant summary judgment in their favor on all claims and order the relief that Plaintiffs seek.

Dated: June 9, 2022

/s/ *Eileen M. Connor*

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
REBECCA C. ELLIS *(pro hac vice)*
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

37