# Exhibit 1

## CONFIDENTIAL AND DELIBERATIVE

### PURPOSE: ACTION

**DATE:**      May 4, 2017

**TO:**        The Secretary

**FROM:**      James Manning, Acting Undersecretary

**SUBJECT:**   Action Items on Borrower Defense

### SUMMARY:

The previous administration approved approximately 16,000 borrower defense to repayment claims that have not yet been processed, and the Department has received an additional approximately 58,600 claims it has not yet approved. This memo provides some background information and recommendations on how to proceed with the review and processing of these claims.

We established a Review Panel consisting of Joe Conaty, Lynn Mahaffie, Phil Rosenfelt, Justin Riemer, and myself to examine the claims and background information and make recommendations on how to resolve the pending claims and proceed in the future. The Review Panel met on a number of occasions over the past several weeks and reviewed a large volume of information related to the program. While the Review Panel uncovered several flaws in various parts of the processing of the claims, there was a legally defensible basis for the approvals and the review has revealed nothing that provides the Department with justification to rescind the approvals. The only justification to not proceed would be if the approval was truly without legal authority (a very high bar). Notwithstanding these weaknesses, both Department of Justice (DOJ) and Office of the General Counsel (OGC) attorneys agree the challenges in the process do not meet that bar.

### REASON FOR NEEDED ACTION:

In January of 2017, the Department sent approval emails to approximately 16,000 borrower defense claimants informing them their loans should be discharged within either 60 or 90 to 120 days (with 120 days from receipt being approximately mid-May). No further action has been taken to discharge those loans, and I understand that it will take 30 to 45 days to execute the discharge after sign off. Borrowers are expecting discharges soon, and the Department needs to resolve these claims as soon as possible. The risk for litigation by borrowers will increase each day we exceed the mid-May window.

There are also over 330 claims approved for non-direct Federal loans (Federal Family Education Loans (FFEL) and Perkins Loans) that have not been put into forbearance which means the borrowers must continue to make payments until the Department decides how to proceed. Finally, there is continuous and increasing interest from members of Congress and others on the status of these claims and borrower defense generally.

### SUMMARY OF CONCERNS:

The Panel's review of borrower defense revealed several weaknesses, a few of which are highlighted here.

DOE00002144

*CONFIDENTIAL AND DELIBERATIVE*

- **Improve Business Practices:**  Current business practices such as standard operating procedures (SOPs) to process claims are inadequate and should be strengthened.  For example, written review instructions or SOPs are in place to process only two of the several categories of claims. As a result the review process is at risk for inconsistent and nonreplicable results.

- **Improve Legal Justifications for Awarding Claims:**  There are also significant concerns regarding the legal justifications used for awarding claims. Under the borrower defense regulation, claims are analyzed under applicable state law which appears to have been often liberally applied in the light most favorable to the borrower to award full relief to as many as possible. In the American Career Institute (ACI) matter, Massachusetts state law was used as a justification to award relief to borrowers who did not submit claims notwithstanding the fact the existing regulation contemplates a borrower asserting a claim him or herself.  Flexible interpretations of state law most favorable to student borrowers also appear to have been used to circumvent any requirement that the claimant directly prove damages. The result is that to date all borrowers approved have been awarded full loan relief even though the regulation allows for a partial offset.  Going forward, we should establish a balanced process with clear and objective standards that require strong evidence of harm or damages to the student.

- **Improve Internal Controls:**  It appears that stronger internal controls in the review process are warranted.  For example, there are concerns that, particularly in the early stages of approving claims, senior Department leadership likely directed staff to complete or modify already signed and submitted applications that were incomplete or insufficient.  Strong checks and balances would help ensure that a vibrant, objective process is in place.

**RECOMMENDATIONS:**

In summary, after consulting with legal counsel, including the DOJ and the Borrower Defense Review Panel, I make the following four recommendations:

First, despite the Review Panel's significant concerns regarding the review and approval process for these 16,000 borrower defense claims, it does not believe there is an appropriate basis for taking any actions other than to approve discharge of all the claims approved.

Second, I recommend you approve the consolidation and discharge of approved claims for non-direct loans.

Third, I recommend that you direct me, the Internal Control Unit of the Department's Chief Financial Officer (CFO), and the Review Panel (as needed) to work with Federal Student Aid (FSA) to develop interim procedures to handle pending claims until permanent borrower defense regulations are implemented.

And finally, as a matter of due diligence and because the borrower defense issues are complex and involve significant Federal funds, I recommend you request that the Office of Inspector General

DOE00002145

*CONFIDENTIAL AND DELIBERATIVE*

(OIG) conduct an independent and comprehensive review of the program, with a focus on lessons learned to improve the process going forward.

**Proceed with Discharge:** After extensive and repeated consultation with counsel at the DOJ, they strongly advised against taking any action but discharge of all approved loans. Based on this, we believe that the only supportable choice is to sign off on discharging the approximately 16,315 loans for the borrower defense claims approved and not yet discharged. The estimated loan relief amounts to approximately $206,000,000.

The Review Panel hoped to be able to set up a process to require the 2,800 ACI borrowers, particularly the vast majority of whom did not submit claims, to return an attestation or official claim application before receiving discharge. However, after a thorough analysis, including consultation with DOJ counsel, the Review Panel has concluded that doing so would likely result in a lawsuit from the Massachusetts Attorney General's office and/or impacted borrowers that would be difficult to defend, given the fact the previous Undersecretary's approval of the claims constituted a "final agency action" which can only be rescinded in limited circumstances not present here.

**Proceed with Consolidation:** A part of the new (and soon-to-be delayed) borrower defense regulations authorizes the Department to approve claims for private FFEL and Perkins Loan holders prior to their consolidation into direct loans. This part of the regulation was flagged for early implementation, announced in a Dear Colleague Letter, and is technically now in effect.

While this is a technical issue there are two main items worth noting. First, the impact to Treasury for consolidating these loans is different than for direct loans because Treasury must reimburse the private lender upon consolidation versus merely writing off losses on direct loans. Second, most borrowers prefer waiting to consolidate until after receiving approval because they would be better off not consolidating if their claims are denied. In short, the pre-determination leaves them with options. While only a small number of the approved claims are non-direct loans (~347), there are currently over 10,000 FFEL borrowers with pending claims. I recommend proceeding with consolidation for the approved claims for largely the same reasons discussed above for discharging the direct loans. I also recommend that you direct FSA to set up the necessary processes to handle consolidation for pending claims. I do not believe there are any other good options.

**Develop Interim Procedures:** The work done by the Review Panel should be furthered by the Office of the Undersecretary (OUS) and the CFO's Internal Control Unit who will collaborate with FSA to stand up a robust procedure to review claims in the interim period before the Department can finalize new borrower defense regulations, a process that will take at least a year. I ask that you direct no additional claims be approved until these interim procedures are finalized. Moving forward, while the Review Panel may be consulted as needed, the work will be primarily administered by the OUS and the CFO's Internal Control Unit. Enclosed are a memo from the Review Panel and additional supporting information compiled during its findings.

**OIG Review:** I strongly recommend that the OIG review the borrower defense program given the challenges to the existing processes and procedures required for a program of its scale. The program was developed and expanded under a number of challenges and at times seemed skewed towards student relief even in light of potential legal or budgetary considerations. Accordingly, as part of its review, the OIG should assess the due diligence of the process under which, in my view, the

Page 3 of 4

DOE00002146

*CONFIDENTIAL AND DELIBERATIVE*

Department so aggressively solicited claims before there was a lack of formally defined processes and procedures or infrastructure in place to process them.

**DECISION:**

**Recommendation**: Proceed with discharge for direct and non-direct loans for all impacted borrowers. Direct OUS and the CFO's Internal Control Unit to set up interim procedures to process claims until new borrower defense regulations are adopted and take effect. Proceed with requesting OIG launch a review of the borrower defense program.

Approve_____ ✗_____ Signature_____

Disapprove_____ Signature_____

Needs more discussion_____Signature_____

Modify_____Signature_____

Other/Comments:
_____with extreme displeasure_____
_____

CONTACT:    James Manning, Acting Undersecretary, HQ-LBJ-7E303, (202) 453-6236

Page 4 of 4

# Exhibit 2



U.S. Department of Education
Office of Inspector General

# Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process

December 8, 2017
ED-OIG/I04R0003

000496

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL

Audit Services

December 8, 2017

TO:         Dr. A. Wayne Johnson
            Chief Operating Officer
            Federal Student Aid

FROM:       Patrick J. Howard
            Assistant Inspector General for Audit

SUBJECT:    Management Information Report, "Review of Federal Student Aid's Borrower Defense to
            Repayment Loan Discharge Process," Control Number ED-OIG/I04R0003


Attached is the subject final management information report that consolidates the results of our review
of Federal Student Aid's borrower defense to repayment loan discharge process. We have provided an
electronic copy to your audit liaison officer. We received your comments generally agreeing with the
recommendations in our draft report.

U.S. Department of Education policy requires that you develop a final corrective action plan within
30 days of the issuance of this report. The corrective action plan should set forth the specific action
items and targeted completion dates necessary to implement final corrective actions on the findings and
recommendations contained in this final report. Corrective actions that your office proposes and
implements will be monitored and tracked through the Department's Audit Accountability and
Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is
required to report to Congress twice a year on the reports that remain unresolved after 6 months from
the date of issuance.

We appreciate your cooperation during this review. If you have any questions, please contact me at
(202) 245-6949, or Christopher Gamble at (404) 974-9417.

cc: James F. Manning, Acting Under Secretary

Attachment

# Table of Contents

Results in Brief ......................................................................................................... 1

Introduction ............................................................................................................. 5

Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student
Loan Borrower Defense Loan Discharge Process ............................................. 9

Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense
Claim Data ............................................................................................................ 21

Appendix A. Scope and Methodology ............................................................... 24

Appendix B. Acronyms and Abbreviations ...................................................... 29

Appendix C. FSA Comments ............................................................................. 30

# Results in Brief

## What We Did

The objectives of our review were to (1) determine Federal Student Aid's (FSA) policies and procedures over its Federal student loan borrower defense loan discharge process, (2) determine the documentation FSA maintains to support its borrower defense loan discharge decisions, and (3) determine the outcomes of FSA's borrower defense loan discharge proceedings. We obtained and analyzed the information presented in this report through interviews and documentation requests of FSA's Borrower Defense Unit (BDU) and Business Operations office, U.S. Department of Education's (Department) Office of General Counsel (OGC), and three contractors. Our review covered FSA's borrower defense loan discharge process from the end of June 2016, when the BDU assumed management of the process, through July 31, 2017.

## What We Found

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to reviewing borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with FSA's procedures for: (1) documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met.

We found that FSA established seven categories of claims that qualified for loan discharge based on characteristics that the claims had in common. We also found that FSA maintained support for its borrower defense loan discharge decisions. FSA's Business Operations maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. BDU used this information to make borrower defense claim determinations and maintained documentation. BDU also maintained supporting documentation for the legal memoranda that it relied on for its loan discharge decisions. Specifically, as support for its memoranda to establish the legal basis for borrower defense claims, BDU maintained copies of the factual evidence cited, such as deposition transcripts provided by state attorneys general. However, we found that FSA did not have documentation of an OGC opinion specifically supporting the eligibility of one category of claims for discharge or documenting the legal basis supporting the amount of loan discharges for two categories of claims.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

1

We reviewed a sample of 50 borrower defense claims that BDU approved for loan discharges, consisting of 45 claims submitted by individual borrowers and 5 claims associated with borrowers who attended the American Career Institute. BDU and Business Operations maintained documentation to support the determinations for all 50 claims. For each of the 45 claims submitted by individual borrowers, Business Operations maintained the claim applications, attestations, and other supporting documentation; and BDU maintained spreadsheets containing the claim information and determinations for each claim. For each of the 5 claims associated with borrowers who attended the American Career Institute, BDU maintained the list provided by the Massachusetts Attorney General's office of all students who attended the school. According to documentation FSA provided, of the 50 claims we reviewed, 49 claims resulted in 249 loans discharged or pending discharge.[1] We randomly selected one loan associated with each of these 49 claims and found that each loan's status on FSA's documentation matched information in student loan database. However, for 2 of the 49 loans, we found that although FSA's documentation and student data system showed the loans were pending discharge, another system showed the loans had been discharged on July 17, 2017, and July 25, 2017, respectively. FSA took steps to correct the status of these two loans and put in place system edits to correct this situation for future discharges. On October 13, 2017, we verified that the information for the two loans had been corrected. We also reviewed the only two claims that FSA denied.[2] BDU and Business Operations maintained documentation to support the determinations for both claims.[3]

We found that FSA did not have an adequate information system to manage borrower defense claim data. Specifically, it could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

---

[1] Of the 50 claims we reviewed, 1 claim was associated with a borrower whose loans were already cancelled or paid in full.

[2] Although BDU did not have a process for closing out claims that have been denied, these two claims were handled on an ad hoc basis due to extensive communication associated with the claims, which included many Department and claimant emails and ombudsman involvement.

[3] We also confirmed that the associated loans for both claims were removed from forbearance.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                          2

FSA provided the following outcomes (as of July 2017) of its borrower defense loan discharge proceedings. FSA also reported that about $73 million in loans were associated with borrower defense claims approved prior to July 1, 2016, and that about $376 million in loans were associated with borrower defense claims approved between July 1, 2016, and January 20, 2017. The Under Secretary under the previous administration approved 27,986 claims; of these, about 16,000 claims were approved from January 1, 2017, through January 17, 2017.[4] No claims were approved after January 20, 2017. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the outcome data provided by FSA.[5]

**Table 1. FSA's Borrower Defense Outcomes**

| Claims | Before July 1, 2016[a] | July 1, 2016, through January 20, 2017 | After January 20, 2017 | Total |
|---|---|---|---|---|
| Received | 26,603 | 46,274 | 25,991 | 98,868 |
| Approved | 3,787 | 27,986 | 0 | 31,773 |
| Denied | 0 | 0 | 2 | 2 |

[a] This does not include claims received prior to the Special Master's tenure of June 25, 2015, through June 29, 2016.

From January 20, 2017 to July 31, 2017, Business Operations continued to receive borrower defense claims. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. However, the Acting Under Secretary has not approved or denied these claims. According to the Director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval or to continue developing memoranda on additional categories of claims that qualify for discharge because the borrower defense policies are being reviewed with the

---

[4] Source:  Lists of approved claims associated with 10 approval memoranda that the Under Secretary signed in January 2017. These lists include claims that were approved and had loans available for discharge, and approved claims that may not have loans available for discharge.

[5] FSA provided additional data on October 26, 2017; however, we did not have time to review the data and therefore, did not incorporate the data into this report.

change in administrations. While awaiting specific instructions, BDU's contractors summarized allegations made in unique claims. Also, BDU and Business Operations continued to develop a new claims management tool that adds an interface to the borrower defense database. In addition, Business Operations continued to discharge loans, after receiving approval from the Acting Under Secretary in June 2017, that were associated with the 16,000 claims approved[6] before January 20, 2017, and that the new administration agreed to honor.

## What We Recommend

We made several recommendations for FSA to develop, document, and implement policies and procedures over the Federal student loan borrower defense loan discharge process. We also recommended that FSA improve its information system for the borrower defense loan discharge process.

We provided a draft of this report to FSA for comment. FSA generally agreed with the report and recommendations. We include the full text of FSA's comments in Appendix C of this report. FSA also provided technical corrections; we made revisions to the report where appropriate. In response to FSA's request, we provided FSA with a copy of the final report and resolved any concerns about possible privileged material in this report or FSA's comments.

---

[6] These claims were not discharged prior to January 20, 2017.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                    4

# Introduction

## Background

### Statute and Regulations Pertaining to Borrower Defense

The Student Loan Reform Act of 1993 (Public Law 103-66) amended the Higher Education Act of 1965 to establish the William D. Ford Federal Direct Loan Program (Direct Loan). Section 455(h) of the Higher Education Act, as amended, required the Secretary to specify in regulation the acts or omissions of a borrower's school that a borrower may assert as a defense to repayment of a Direct Loan, commonly called "borrower defense."

The Department established regulations covering such borrower defenses at 34 CFR § 685.206(c), effective July 1, 1995. The regulations specified that a borrower may assert as a defense against repayment, any act or omission of the borrower's school that would give rise to a cause of action against the school under applicable State law.

In response to the collapse of Corinthian Colleges, Inc., the Department issued revised regulations on borrower defense, which were scheduled to be effective July 1, 2017. These revised regulations established a Federal standard for borrower defense claims. On June 16, 2017, the Department announced a delay in the implementation, until further notice, of the revised borrower defense regulations due to pending litigation. The Department established a rulemaking committee to review and revise the borrower defense regulations. The Department announced that the rulemaking committee would meet from November 2017 through February 2018 to develop proposed borrower defense regulations. On October 24, 2017, the Department announced that it would continue to preserve the regulatory status quo until July 1, 2018, and proposed further delay until July 1, 2019. Until the delay in implementing the 2017 regulations is lifted or new regulations are issued, all claims are subject to the regulations that became effective July 1, 1995.

### Increase in Borrower Defense Claims and Appointment of Special Master

Before 2015, borrowers had made only a handful of borrower defense claims. Claims significantly increased when Corinthian Colleges closed in April 2015 and ITT Technical Institutes closed in September 2016, and thousands of borrowers submitted borrower defense claims to FSA to have their Federal student loans discharged. Because the Department did not have an established infrastructure for accepting, processing, and reviewing large numbers of loan defense claims, in June 2015, the Under Secretary appointed a Special Master to advise the Department on the creation of a borrower defense process. The Department also announced on June 8, 2015, that it would use

existing evidence, where appropriate, to ease borrowers' burden in establishing their eligibility for borrower defense relief: "Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers." The Special Master served as an advisor in the borrower defense claim process from June 24, 2015, through June 23, 2016, after which the FSA Enforcement Unit's BDU took over the process.

Table 2 shows the increase in borrower defense claims over time.

**Table 2. Increase in Borrower Defense Claims**

| Time Period | Number of Claims Received |
|---|---|
| July 1, 1995, through June 24, 2015<br>*(Implementation of Borrower Defense Regulations to Appointment of the Special Master)* | 5 |
| June 25, 2015, through June 29, 2016[a]<br>*(Appointment of Special Master through last Special Master Report)* | 26,603 |
| June 30, 2016, through January 20, 2017<br>*(Formation of BDU through end of the prior administration)* | 46,274 |
| January 21, 2017, to July 24, 2017[b]<br>*(Beginning of current administration through the end of our review period)* | 25,991 |

[a] Source: Special Master Report, June 29, 2016.

[b] The end of our review period was July 31, 2017; however, FSA issued a periodic report of claims received on July 24, 2017. Source: Data from FSA's list of claims.

Of the 26,603 claims FSA received while the Special Master was authorized, 3,787 claims, associated with about $73 million in loans, were approved for full loan discharges during the Special Master period.[7]

---

[7] Source: Special Master Report, June 29, 2016.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

6

## Duties of the Special Master and Team of Attorneys

The Special Master was appointed to advise the Office of the Under Secretary in the creation of a process to evaluate borrower defense claims and interpret State laws. He was to provide advice on legal and administrative procedures for borrower defense claims and train staff to implement the borrower defense loan discharge process. The Special Master provided advisory services as a consultant and did not perform or supervise operating functions.

The Special Master worked with a team of four attorneys within FSA to analyze laws and regulations, review claims, and develop templates for the claims intake and review process; three additional attorneys were added in the spring of 2016. The team of attorneys operated without the support of contractors for the review of claims. The team of attorneys focused its efforts on job placement rate misrepresentation claims related to borrowers who attended the Heald College, Everest, and WyoTech campuses of Corinthian Colleges.

FSA's Business Operations managed the claims intake process, maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. The team of attorneys used this information to make borrower defense claim determinations. The Special Master recommended claims that the Under Secretary should approve for a borrower defense loan discharge. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

## Creation of FSA's Borrower Defense Unit

In late June 2016, the Department completed the transition of borrower defense oversight from the Special Master and the team of attorneys working with him to the Enforcement Unit's BDU. In late June, when the transition from the Special Master to the Enforcement Unit was complete, there were seven full-time BDU attorneys and no contractors. By early November 2016, BDU was staffed with 10 attorneys, a director, and 19 contracted staff from 2 contractors.[8] As of September 2017, BDU had only six contracted staff from the two contractors.

In addition to continuing to process discharges under the memorandum developed prior to the creation of BDU, BDU also developed additional memoranda to justify loan discharges. In addition to job placement rate discharges, BDU focused its efforts on determining whether categories of claims sharing common facts qualified for discharge

---

[8] BDU contracted with Midtown Personnel, Inc. and GCC Technologies, LLC. to review claims.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

7

and then determining whether individual claims qualified for discharge under approved categories. BDU concentrated on processing job placement rate, transfer of credit, and guaranteed employment claims related to borrowers who attended Heald, Everest, and WyoTech campuses of Corinthian Colleges, California campuses of ITT, and American Career Institute—Massachusetts. BDU sent memoranda to the Under Secretary to recommend claims that the Under Secretary should approve for a borrower defense loan discharge; these approval memoranda were signed by the Under Secretary. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

According to its functional statement, BDU issues written decisions on borrower defense claims that constitute the final decision of the Secretary, in collaboration with OGC. In practice, BDU reviewed the claims and then made a recommendation to the Under Secretary on whether the Department should approve claims for loan discharge. The Under Secretary made the decision on whether to accept BDU's recommendation.

### Borrower Defense Loan Discharge Process

Borrowers submitted borrower defense claims for loan discharge to FSA either online, through email, or by mail. Business Operations and its contractor received the borrower defense claims and, as part of the intake process, entered claim data into the borrower defense database and into a spreadsheet that it used to track the status of claims. Then, Business Operations notified loan servicers to place borrowers' loans into forbearance; when a loan is in forbearance, the borrower is not required to make payments but interest continues to accumulate against the outstanding loan balance.[9] BDU and its contractors reviewed claims for eligibility using criteria established in legal memoranda as the basis for approval. BDU and its contractors made claim determinations and performed quality control reviews on the claims. Then BDU recommended claims for approval and the associated loans for discharge to the Under Secretary. The Under Secretary approved the list of claims, and Business Operations notified loan servicers to discharge the borrowers' loans associated with the approved claims. Business Operations also updated the approval status in the database and spreadsheet used to track claims. Servicers updated the National Student Loan Database System (NSLDS) and Business Operations later verified that the loans statuses were discharged in NSLDS.

---

[9] Borrowers can choose not to have their loans placed in forbearance by selecting that option on the borrower defense application.

## Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to the review of borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with the following FSA procedures: (1) consistently documenting the review and approval of the legal memoranda related to borrower defense claims, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for the claims intake, claims review, loan discharge, and claims denial processes. Some of these weaknesses could harm borrowers by negatively affecting their credit reports and increasing the amounts owed by borrowers. For example, if BDU eventually denies a claim, the loan could then be reported as delinquent or in default and accumulated interest could be added to the amount the borrower owed.

According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, Federal agencies are required to establish internal controls. Agencies should design control activities, such as policies and procedures, to achieve objectives and respond to risks. Agencies should document those policies and procedures. Agencies should also document and maintain readily available evidence of all significant transactions and events, such as the results of quality control reviews. In addition, agencies should establish performance measures and indicators, such as timeframes for processing claims.

### Documentation of the Legal Basis for Borrower Defense Claims

We found that the review and approval of the legal memoranda was not consistently documented, that FSA did not have a legal memorandum or other documentation[10] specifically concluding that the job placement rate misrepresentation findings for Everest and WyoTech supported a cause of action under State law that qualified borrowers for a loan discharge, and that FSA did not maintain in its documentation any OGC opinion supporting the amount of loan discharges for job placement rate

---

[10] We refer to "legal memorandum or other documentation" as OGC advice or concurrence can be documented by formal memorandum, less formal writing, or by documenting oral advice.

misrepresentation claims. FSA established seven categories of borrower defense claims that supported a cause of action under applicable State law and thus qualified a borrower for a loan discharge. These included:

1. Heald College job placement rate misrepresentation claims, based on a May 2015 memorandum prepared by the OGC and findings in a fine action letter prepared by FSA's Administrative Actions & Appeals Service Group;

2. Everest and WyoTech job placement rate misrepresentation claims, based on findings in an April 2015 document prepared by FSA's Administrative Actions & Appeals Service Group;

3. Heald College transfer of credit misrepresentation claims, based on an October 2016 memorandum prepared by BDU;

4. Everest and WyoTech transfer of credit misrepresentation claims based on an October 2016 memorandum prepared by BDU;

5. Corinthian Colleges guaranteed employment misrepresentation claims, based on a January 2017 memorandum prepared by BDU;

6. ITT Technical guaranteed employment misrepresentation claims for California campuses, based on a January 2017 memorandum prepared by BDU; and

7. American Career Institute, Massachusetts campuses claims, based on a January 2017 memorandum prepared by BDU.

From January 20, 2017, through July 31, 2017, BDU did not complete or begin preparing any legal memoranda establishing whether additional categories of borrower defense claims qualified for discharge. According to the Director of BDU, the BDU staff has been instructed not to continue developing memoranda on whether additional categories of claims qualify for discharge because the borrower defense policies are being reviewed with the change in administrations.

### Documentation of Review and Approval of Legal Basis

OGC and BDU prepared memoranda to establish the legal basis for borrower defense claims. However, OGC, the Special Master, and BDU did not consistently document review and approval of the legal memoranda.

Specifically, we found the following inconsistencies:

- One memorandum, which also served as an approval memorandum, that BDU attorneys prepared was signed by both the Under Secretary and the Deputy General Counsel for Postsecondary Education.

- Two memoranda that BDU attorneys prepared were signed by only the Deputy General Counsel for Postsecondary Education.

- One memorandum that OGC prepared was unsigned in draft form.

- Two memoranda that BDU attorneys prepared were not signed, but the Deputy General Counsel reviewed and concurred with them.

## No Legal Memorandum for Everest and WyoTech Job Placement Rate Claims

FSA did not have a legal memorandum or other documentation specifically addressing the eligibility for discharge of borrowers affected by job placement rate misrepresentation at Everest and WyoTech. According to the approval memoranda for borrower defense claims concerning the misrepresentation of job placement rates at Heald, Everest, and WyoTech, the Special Master relied on FSA findings that the schools misrepresented job placement rates and the determination by OGC that these misrepresentations violated California unfair competition law.

FSA's documentation included a May 2015 OGC legal memorandum addressing the qualification for borrower defense loan discharges of students who relied on job placement rate misrepresentations by Heald College. This legal memorandum addressed the qualification for discharge of students at Heald College; it did not address the qualification of students at Everest and WyoTech. When approving job placement rate claims for Everest and WyoTech, BDU followed the same practice as the Special Master.

## Legal Basis for Appropriate Relief

FSA did not maintain in its documentation an OGC opinion or other documented advice supporting the amount of the loan discharges for job placement rate misrepresentation claims.

For all of the other claim categories, the legal memoranda developed by the BDU documented the legal justification for the relief to be provided. For these categories, BDU also maintained documentation of OGC concurrence in the appropriate amount of relief.

### Claims Intake Process

FSA's Business Operations implemented an intake process for borrower defense claims in April 2015. FSA contracted with the Missouri Higher Education Loan Authority (MOHELA), one of the Department's loan servicers, to perform the intake for borrower defense claims. Since implementation, the claims intake process was as shown in the following figure.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

11

**Figure 1. Claim Intake Process**



*Note:  Borrowers may choose not to place their loans in forbearance.*

Borrowers can submit borrower defense claim applications three ways: online, by postal mail, or by email. Business Operations receives the borrower defense claims either directly from the borrower or via spreadsheets from the MOHELA. For claims received through postal mail, MOHELA reconciled the count of claim envelopes to the accompanying list of claims, scanned the claim documents, and entered the data from the scanned documents into spreadsheets. For online application claims borrowers submitted through the internet portal, MOHELA transferred the claim data from the claim applications to spreadsheets. MOHELA then sent the processed claims (from postal mail and online applications) to Business Operations.

Business Operations imported the MOHELA claim spreadsheets into the borrower defense database, assigned a case number, and ensured that MOHELA included all key elements the borrower provided. Business Operations then used NSLDS to match the borrower's Social Security number and also inputted certain information from NSLDS regarding the borrower's loans, the associated Office of Postsecondary Education Identification for the borrower's school, and loan servicer information.

For claims borrowers submitted through email, Business Operations input the claim into the borrower defense database, assigned a case number, and confirmed the borrowers

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                      12

provided all the key elements. Business Operations then used NSLDS to obtain and input the same information as described above with the MOHELA processed claims.

Business Operations ran a claims query for all claims on the borrower defense database, which generated a spreadsheet for BDU to review. Business Operations also maintained an online folder for each claimant that stored all their information and documentation. In addition, Business Operations created a spreadsheet for each loan servicer that contained claimants' loan information so that the loan servicers could place the claimant's loans into forbearance whereby no collections would be pursued and no payments would be due for 12 months. If the borrower defense loan discharge process took longer than 10 or 11 months for claimants, Business Operations created a spreadsheet for each loan servicer with the claimants' loan information and requested a 12 month extension to the forbearance.

## Review of Borrower Defense Claims

BDU had policies and procedures for reviewing and making determinations for borrower defense to repayment claims associated with the seven established categories. To be eligible for a Federal loan discharge, the borrower must have

- met the following three eligibility criteria: (1) attended specific schools at specific locations, (2) been enrolled in specific programs of study during specific time periods, and (3) specified in the claim application or attestation form that the school misrepresented information regarding job placement rates, transfer of credit, or guaranteed employment; or

- attended a Massachusetts campus of American Career Institute.

BDU did not implement policies and procedures for reviewing and making determinations on unique claims that do not fit into one of the seven established categories; claims with no common factual bases; or claims for which there was no associated legal memorandum. When borrowers filed a claim that did not fit into the established categories, their loans were placed in forbearance and all collection actions were halted. While in this status, borrowers do not have to make payments, but their debts remains on record and interest continues to accumulate on the loan balances.

From July 1, 2016, through January 20, 2017, BDU reviewed borrower defense claims, made claim determinations, and recommended claims to the Under Secretary for loan discharge. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. All other claims were on hold pending review.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

13

BDU reviewed claims to determine if the borrower qualified under one of the seven established categories. BDU first reviewed whether a claim qualified under the job placement rate categories. If the claim did not qualify under those categories, BDU would review whether the claim qualified under the transfer of credit or guaranteed employment categories. The following sections describe BDU's processes for reviewing claims, according to BDU's written policies and procedures and interviews with BDU attorneys and contracted reviewers.

## Review Process for Job Placement Rate Claims

BDU hired contractors to review borrower defense claims. A contracted reviewer verified key information relating to the claim contained in a spreadsheet and the borrower's claim file that Business Operations provided. The contracted reviewer checked whether the borrower met the three eligibility criteria listed above. If the borrower met all conditions, then the contracted reviewer recommended the claim for approval. If the borrower did not meet all conditions, the contracted reviewer flagged the claim for further review by a BDU attorney. The contracted reviewer generally reviewed batches of about 100 claims per spreadsheet.

Each batch of claims then went through a quality control review. From November 2016 through March 2017, BDU's quality control policy did not specify that all claims in the batch could be selected for a quality control review. From November 2016 through March 2017, the quality control process consisted of two levels of review. The first level of the quality control process varied depending on the experience and past performance of the contracted reviewer who initially reviewed the batch of claims. For experienced contracted reviewers, quality control consisted of spot check reviews performed by another contracted reviewer (generally 20 percent of the claims). These spot check reviews consisted of checking for notations in the spreadsheet that BDU considered to be susceptible to errors. For less experienced contracted reviewers, quality control consisted of claim-by-claim reviews performed by another contracted reviewer (generally five claims at a time), where the contracted quality control reviewer reperformed the review and determined whether the contracted reviewer made the appropriate determination. The contracted reviewer then made any necessary corrections. The contracted quality control reviewer or contracted reviewer sent the spreadsheet of claims to BDU for a second level of quality control review.

After March 2017, the policy for the first level of the quality control changed to require that 20 percent of each contracted reviewer's claims be reviewed and that the contracted quality control reviewer reperform the entire review and make corrections, if necessary. The quality control reviewer then sends the spreadsheet of claims to BDU for a second level of quality control review.

The second level of the quality control review process was established September 2016 and refined through February 2017. A BDU attorney compiled spreadsheets into a single group of about 1,000 claims and performed a quality control review by scanning the claims in the spreadsheet for missing, incomplete, or inconsistent information. The BDU attorney spot checked all the claims. If the BDU attorney found errors, the BDU attorney corrected and documented them and then notified the initial contracted reviewer of the errors. If the BDU attorney found too many errors, the BDU attorney sent the spreadsheet back to the contracted reviewer. BDU's policies did not define how many errors would be considered too many. BDU attorneys used professional judgment to determine whether a spreadsheet had too many errors and should be returned to the contracted reviewer. FSA acknowledged that evidence related to quality control reviews was not readily available because BDU lacked a database for tracking such information. We could not confirm that BDU conducted a second level of review for all claims and could not determine whether all claims were subject to a second level of review. Once the quality control process was completed, the claims that were recommended for approval went through the final approval and discharge process.

### Review Process for Transfer of Credit and Guaranteed Employment Claims

Before reviewing a claim for misrepresentations of transfer of credit and guaranteed employment, a BDU attorney verified that the claim was not eligible for a loan discharge based on job placement rate. If the claim was not eligible for discharge based on the school's misrepresentation of job placement rates, the BDU attorney reviewed the claim based first on the school's misrepresentation of transfer of credit and then on the school's misrepresentation of guaranteed employment. The BDU attorney checked whether the borrower met the three eligibility criteria. If the borrower met all criteria, then the BDU attorney recommended the claim for approval. If the borrower did not meet all criteria and the borrower did not make allegations in other categories, the BDU attorney recommended it for denial.

We did not identify any weaknesses in BDU's quality control process for its review of guaranteed employment and transfer of credit claims. BDU attorneys described the quality control process for the review of claims associated with guaranteed employment and transfer of credit as follows: After a BDU attorney performed an initial review of the claims and input a claims decision into a spreadsheet, a second BDU attorney reperformed the review, input a claims decision into the spreadsheet, and determined whether the first attorney made the appropriate determination. If the attorneys disagreed on whether the claim should be approved, then a third attorney reperformed the review, input a decision into the spreadsheet, and made a final recommendation. Once the quality control process was complete, the claims that a BDU attorney recommended for approval go through the final approval and discharge process.

000514

### Review Process for American Career Institute Claims

Borrowers who attended the Massachusetts campuses of the American Career Institute were not required to submit a borrower defense claim. Instead, the Massachusetts Attorney General's office provided FSA with a list of all students who attended the school. Using the list of students, Business Operations identified the borrowers' loans that were eligible for discharge. These loans then went through the final approval and discharge process.

### Analysis of Unique Claims

For claims other than those related to the seven established categories for job placement rate, transfer of credit, and guaranteed employment, BDU analyzed claims received to identify common allegations and conducted research to develop a legal basis to establish additional categories of valid borrower defense claims. As of January 20, 2017, BDU had identified additional categories of claims warranting further research. However, this research was placed on hold. Starting January 20, 2017, BDU tasked contractors with summarizing the allegations made in unique claims. BDU has not established any additional categories of valid borrower defense claims since January 20, 2017.

### The Processing of Claims Approved for Discharge and Flagged for Denial

Business Operations had policies and procedures to discharge most loans associated with approved claims under borrower defense. However, as of July 31, 2017, the policies and procedures did not address approved claims with certain characteristics. As a result, the progress of these claims stopped before discharging the associated loans. Similar to the situation with the lack of policies and procedures for reviewing and making determinations on claims for which there was no associated legal memorandum, this weakness of no action on the claims could adversely impact borrowers' credit reports.

Also, BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial, which is a preliminary determination. BDU provided a list of 7,285 claims it had flagged for denial as of July 31, 2017.[11] The Director of BDU told us that because the process for denying claims had not been fully developed, these claims were not submitted to the Acting Under Secretary with a recommendation for

---

[11] According to FSA, a proposed process was agreed upon by the Office of the Under Secretary, the Office of General Counsel, and FSA in August 2017; the process was implemented in September 2017.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

16

denial. Loans associated with the claims flagged for denial remain in forbearance and continue to accumulate interest until FSA denies the claim and notifies the servicer to end forbearance. When forbearance ends, the accumulated interest may be added to the amount the borrower owed. As a result, borrowers may end up owing more than they did before submitting a claim. According to FSA, in September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.

According to Business Operations personnel and its written policies and procedures, the process for discharging Direct Loans approved under borrower defense was as follows.

- BDU notified Business Operations of claims recommended for approval.

- Business Operations used NSLDS to identify loans associated with the claims.

- BDU drafted a memorandum recommending that the Under Secretary approve the loans associated with the claims for discharge.

- After the Under Secretary's approval, BDU notified Business Operations that the loans were approved for discharge.

- Business Operations created a list for each servicer of the loans approved for discharge and sent it to the servicers.

- The servicer discharged the loans.

- Business Operations verified that the loans were discharged by querying NSLDS every 2 weeks.

- Servicers notified borrowers that their loans were discharged.[12]

FSA did not have a process for discharging loans associated with approved claims with the following characteristics:

- the borrower was enrolled in multiple programs and at least one of the programs was eligible for relief under borrower defense;

- the borrower received a loan disbursement after the borrower's Corinthian campus changed ownership;

---

[12] For the first set of discharges of Heald College claims made under the Special Master, FSA (rather than the servicer) notified the borrowers that their loans were discharged.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

17

- the borrower's loan discharge was impacted by a State's statute of limitations; or

- the borrower's loan was a Federal Family Education Loan program loan or a Perkins loan.

## FSA Did Not Establish Timeframes for the Processing of Claims

FSA did not establish timeframes for claims intake, claims review, loan discharge, and claims denial processes. According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, agencies should establish performance measures and indicators, such as timeframes for processing claims.

As part of our review, we tested 50 approved claims. We found the following:

- loans associated with 6 claims were discharged within 180 days of receipt;

- loans associated with 25 claims were discharged within 181 through 365 days of receipt;

- loans associated with 11 claims were discharged more than 365 days after receipt;

- loans associated with 7 claims (received by FSA between July 10 2015, and November 15, 2016; 2 claims were approved on December 29, 2016, and 5 were approved on January 17, 2017) have not been discharged as of September 28, 2017; and

- 1 claim did not have any loans requiring discharge.

We also tested the only two claims BDU denied. We found that both claims were denied more than 365 days after FSA received them.

## Recommendations

We recommend that the Chief Operating Officer for FSA—

1. Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.

2. Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge.

3. Ensure consistent documentation of the review and approval of legal memoranda or other findings used to justify discharges.

4. Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement rate claims and (2) the amount of relief for all job placement rate misrepresentation claims.

5. Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.

6. Document and maintain readily available evidence for all quality control reviews.

7. Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.

8. Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.

9. Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.

## FSA Comments

FSA generally agreed with the recommendations. In regards to the section titled "Documentation of Review and Approval of Legal Basis," FSA maintained documentation of OGC's approval of the five legal memoranda developed by BDU.  For the job placement rate claims associated with Heald, Everest, and WyoTech, BDU will draft a memorandum documenting OGC's prior advice regarding the legal basis for these borrower defense claims. OIG misunderstood the legal memoranda approval process to require that the Under Secretary sign any legal memorandum concerning borrower defense claims. OIG's confusion was likely due to the fact that one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum.

FSA does not believe that its policies and procedures resulted in harm to the borrowers. In September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.  In addition, OIG incorrectly stated in the report that interest that accrues during forbearance when a borrower files a borrower defense claim is capitalizing; such interest is actually non-capitalizing.

## OIG Response

Our report notes that BDU documented OGC concurrence with the five legal memoranda developed by BDU. FSA's plans to document OGC's advice regarding the job placement rate claims appear responsive to our recommendation. However, we did not misunderstand the legal memoranda approval process. Rather, the issue we raise is that the approval of legal memoranda concerning borrower defense claims were not consistently documented: some memoranda were unsigned and other memoranda were signed by different Department officials. We revised the report to note that the one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum. BDU addressed each legal memorandum to the Under Secretary with a recommendation that relief be granted for a category of borrowers. We did not state that the Under Secretary was required to sign legal memoranda concerning borrower defense claims.

The Department's decision to provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed will help reduce harm to borrowers. Regarding FSA's statement that the forbearances applied are non-capitalizing, borrowers are still harmed if interest accumulates during a period of extended consideration of a borrower defense claim that is denied. We revised our report to describe the treatment of accumulated interest during a forbearance associated with a borrower defense claim in the manner described on FSA's website, specifically, that "interest that accumulated will be added to the amount [the borrower] owed."

## Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data

Since FSA had not received borrower defense claims in significant numbers prior to 2015, FSA did not have an established information system to manage a large volume of claims. The information system that FSA has developed to date is not adequate to manage the claims it has received since 2015.

FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not readily available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

FSA's information system for borrower defense to repayment claims consisted of (1) a database managed by Business Operations containing all of the claimant's application information for the claims received and (2) spreadsheets created by Business Operations and used by BDU contractors and attorneys to review claims and to record the outcomes determined by the BDU. Before January 2017, the database was not updated with any claim outcomes; however, in January 2017, Business Operations began to record in the database a flag indicating all final claim decisions approved by the Under Secretary. The status of other claims remained in the spreadsheets without a process to integrate those statuses back to the database. The statuses of the other claims consist of reviewed and flagged for denial by BDU, reviewed and flagged for approval by BDU, reviewed and pending a decision by BDU, and those that have not been reviewed by BDU. Although FSA does not update the database, Business Operations periodically generates a review ready spreadsheet with a general status[13] of each claim as of a specific point in time. However, when FSA provided us with one of its review ready spreadsheets, a Senior Advisor for Business Operations explained that the statuses may not be accurate because of duplicate claims and changes/updates to the status tracking process over time. As of September 2017, FSA was testing a claims management tool that is intended to allow BDU to list claims by status and report the number of claims by status, school, or allegation.

---

[13] In general, the statuses are approved, pending, and ready for review.

Because of the way that FSA maintained its data, information on the status of loan discharges was not readily available. Consequently, it took FSA at least 3 weeks to produce outcome data on the status of claims. We did not verify the accuracy and completeness of this data. Table 3 presents borrower defense claim outcome data FSA provided and the amount of time it took for FSA to provide us with the data.

**Table 3. Borrower Defense Outcome Data**

| Description | Number of Claims | Number of Days Before FSA Provided the Data |
|---|---|---|
| Claims received through July 24, 2017[a] | 98,868 | 21 days |
| Claims reviewed for determination through July 24, 2017 | 72,842 | 63 days |
| Claims not reviewed for determination as of July 24, 2017 | 26,026 | 63 days |
| Claims approved, with any associated loans discharged as of July 24, 2017 | 26,964 | 69 days |
| Claims approved, with any associated loans pending discharge as of July 24, 2017 | 4,809 | 69 days |
| Claims flagged for approval by BDU, but not yet approved by the Under Secretary as of July 31, 2017 | 11,857 | 29 days |
| Claims flagged for denial by BDU, but not yet denied by the Under Secretary as of July 31, 2017 | 7,285 | 29 days |
| Claims reviewed but no determination has been made by BDU as of July 24, 2017 | 21,927 | 70 days |
| Claims denied as of July 31, 2017 | 2 | N/A (FSA provided this information at the entrance meeting) |

[a] We requested July 31, 2017 data; however, FSA had issued a periodic report of claims received on July 24, 2017.

The U.S. Government Accountability Office's Standards for Internal Control in the Federal Government states that management should design the entity's information system and related control activities to achieve objectives and respond to risks.

Information systems should provide management with quality information. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Management needs quality information to make informed decisions and evaluate the entity's performance in achieving objectives and addressing risks.

Because FSA did not have ready access to current and complete information on borrower defense claims, FSA cannot ensure that the borrower defense process meets its objectives, management may be unable to respond to risks that may arise, and management may be unable to make well-informed business decisions.

Further, FSA uses more than a thousand spreadsheets to track borrower defense claim outcomes, which can potentially result in the loss of data if any of the spreadsheets are misplaced or corrupted. If FSA loses a borrower's claim outcome, FSA may have to reperform a claim review and the borrower may have to wait for an extended duration for a decision on their claim. In addition, if a borrower contacts FSA to request a status update on their claim, FSA may not be able to readily find that information. Finally, because FSA has no controls to prevent or detect problems with the integrity of the outcome data contained in the spreadsheets, FSA is at risk of having data changed erroneously or fraudulently.

## Recommendation

We recommend the Chief Operating Officer for FSA—

1. Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.

### FSA Comments

FSA agreed with the recommendation.

# Appendix A. Scope and Methodology

To achieve our objectives, we performed the following procedures:

1. Reviewed documentation related to the following:

    a. FSA's policies and procedures over (1) Business Operations' claims intake process; (2) the review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation; and (3) Business Operations' loan discharge process for approved claims;

    b. the development, review, and approval of memoranda that provide the legal basis for claim approval;

    c. BDU's review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation;

    d. the Special Master's appointment;

    e. FSA's claims management tool;

    f. quality control processes associated with FSA's borrower defense loan discharge process, including intake, review of claims, and discharge of approved loans;

    g. laws, regulations, memoranda of understanding, and decision letters related to the borrower defense loan discharge process; and

    h. FSA findings related to Corinthian's misrepresentation of job placement rates.

2. We interviewed the following people to determine FSA's policies related to the borrower defense loan discharge process and areas lacking in policies and procedures related to the borrower defense loan discharge process, and to gain an understanding of procedures related to the borrower defense loan discharge process:

    a. from FSA's BDU, the Director and attorneys;

    b. from FSA's Business Operations, a Senior Advisor, Branch Chief and Loan Analyst;

    c. FSA's Chief Compliance Officer;

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

24

     d.   from the Office of General Counsel, Division of Post-Secondary Education attorney;

     e.   from the Department, the Director of Financial Improvement Operations;

     f.   from MOHELA, contractors that perform the claims intake process;

     g.   from Midtown Personnel, Inc., contracted attorneys that review claims;

     h.   from GCC Technologies, LLC., contracted analysts that review claims.

3.   Performed testing on a sample of 50 borrower defense claims that BDU approved for discharge under borrower defense between July 1, 2016, and July 31, 2017, and the only 2 claims that BDU denied for discharge during the same time period, to determine the documentation FSA maintains to support its borrower defense loan discharge decisions.

We held an entrance meeting with FSA on July 31, 2017, and an exit meeting on October 6, 2017.

## Sampling Methodology

We selected random samples of borrower defense claims FSA approved and all claims FSA denied to determine whether FSA maintained documentation to support its approval and denial decisions. In addition, for the selected claims that FSA approved, we randomly selected one loan associated with each claim to determine whether the discharge status in FSA's records matched the loan status in NSLDS. For the two claims that FSA denied, we used NSLDS to verify that the students did not have any loans that were discharged under borrower defense. The results from our testing of approved claims pertain only to the approved borrower defense claims and associated loans we reviewed and should not be projected to the entire universe of approved claims and associated loans.

### Samples of Borrower Defense Claims

FSA provided us with 27,996 claim numbers or borrower names that it had approved for loan discharge under borrower defense from July 1, 2016, through January 20, 2017. The claim numbers and borrower names are associated with the 13 approval memoranda BDU drafted and the Under Secretary signed. We stratified the universe of claim numbers and borrower names into five categories, according to the basis for the approval. The five categories were job placement rate,[14] transfer of credit,[15] Corinthian

---

[14] We combined two of the seven established categories related to job placement rates into one category for sampling purposes.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

25

Colleges guaranteed employment, ITT guaranteed employment, and ACI. We then selected random sample of claim numbers or borrower names, herein referred to as "claims," from each of the five categories, resulting in a selection of 50 claims. Table 4 below shows the number of approved claims for each of the five categories and the sample size we selected for each group. Because FSA had denied only two borrower defense claims between July 2016 and July 2017, we reviewed both claims.

**Table 4. Universes and Sample Sizes of Approved Borrower Defense Claims or Borrower Names**

| Basis for Approval | Universe of Claims | Sample Size of Claims |
|---|---|---|
| Job placement rates | 24,504 | 30 |
| Transfer of Credit | 426 | 5 |
| Guaranteed Employment—Corinthian Colleges | 169 | 5 |
| Guaranteed Employment—ITT Technical Institute | 33 | 5 |
| American Career Institute | 2,864 | 5 |
| **Total** | **27,996** | **50** |

To determine whether FSA maintained documentation to support its approval or denial for all 52 selected claims, we reviewed the following:

1. For the sample of 45 approved job placement rate, transfer of credit, and guaranteed employment claims, we reperformed reviews of the claims and determined (a) whether the approval was documented in the spreadsheet where BDU made the claim determination, (b) the legal basis for the approval, (c) the accuracy of the data in the spreadsheet compared to the supporting documentation, (d) whether the claim contained an attestation form or similar document, (e) whether the file contained documentation to support the approval, (f) whether the borrower was enrolled in a program approved for relief at the approved time and location, (g) whether there was evidence that

---

[15] We combined two of the seven established categories related to transfer of credit into one category for sampling purposes.

the determination spreadsheet containing the claim went through the first level of BDU's quality control process, and (h) the number of days from the date the claim was received to the date the associated loans were discharged.

2. For a sample of five borrowers that attended American Career Institute, we verified that the borrower was included on the list of American Career Institute students provided by the Massachusetts' State Attorney General's office.[16]

3. For the two claims that BDU denied, we tested to determine whether (a) the denial was documented in the claim file, (b) the claim was associated with a legal memorandum as a basis for approval, (c) the reason the claim was denied was documented, (d) the borrower was notified of the denial, (e) the file contained documentation to support the denial determination, (f) the claim included an attestation form or similar document, and (g) whether the borrower was enrolled in a program approved for relief at the approved time and location. In addition, we calculated the number of days from the date the claim was received by FSA to the date of the denial notification letter issued to the borrower.

### Samples of Loans Associated with Selected Borrower Defense Claims

For the 50 sampled claims that FSA approved, 49 of them had a total of 249 loans that were eligible for discharge, according to a list of loans provided by FSA. We randomly selected one loan associated with each of the 49 claims. According to FSA's records the 49 loans were either discharged or pending discharge as of July 31, 2017. We used NSLDS to determine whether the loans' discharge status in FSA's records coincided with the loan status in NSLDS.

For the two claims that FSA denied, there was not a list of loans associated with the claims, so we used NSLDS to determine whether the borrowers had any loans associated with the schools named in their claims. The borrowers had a total of 16 loans. We confirmed in NSLDS that none of the 16 loans had been discharged under borrower defense.

### Use of Computer-Processed Data

We obtained computer-processed data related to outcomes of the borrower defense loan discharge proceedings. Specifically, we obtained lists of claims that FSA

---

[16] American Career Institute borrowers were approved as a group.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

27

- received as of July 24, 2017;

- reviewed as of July 24, 2017;

- did not review as of July 24, 2017;

- denied as of July 31, 2017;

- flagged for denial as of July 31, 2017;

- approved through July 24, 2017, with associated loans; and

- flagged for approval as of July 31, 2017;

- reviewed but no decision made as of July 24, 2017.

As noted in Finding 2, FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the data provided by FSA. However, FSA obtained the outcome data from its borrower defense database, which is FSA's primary system managing borrower defense claims and the main resource for FSA to provide information on the management of such claims. Therefore, we decided to use the borrower defense claims data FSA provided to determine the outcomes of the borrower defense loan discharge proceedings.

## Support for Borrower Defense Loan Discharge Decisions

The only computer-processed data we relied on was the list of denied claims, approved claims, and the list of loans associated with those claims. Although we could not determine the completeness of those lists, we tested both of the denied claims and a sample of the approved claims and the associated loans to determine whether the claim approvals and denials were adequately supported and appropriate under BDU's policies and procedures, and whether the associated loans were discharged or pending discharge. To answer our objective, we reported the data that FSA provided.

We conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency Inspection and Evaluation Standards. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our objectives.

## Appendix B. Acronyms and Abbreviations

| | |
|---|---|
| BDU | Borrower Defense Unit |
| Department | U.S. Department of Education |
| Direct Loan | William D. Ford Federal Direct Loan Program |
| FSA | Federal Student Aid |
| MOHELA | Missouri Higher Education Loan Authority |
| NSLDS | National Student Loan Database System |
| OGC | Office of General Counsel |

## Appendix C. FSA Comments

**DATE:**    November 29, 2017

**TO:**      Christopher Gamble
             Regional Inspector General for Audit
             U.S. Department of Education

**FROM:**    A. Wayne Johnson
             Chief Operating Officer
             Federal Student Aid

**SUBJECT:** Response to Draft Review Report, "Federal Student Aid's Borrower Defense to
             Repayment Loan Discharge Process"
             Review Control Number ED-OIG/I04N0003

Thank you for the opportunity to review and respond to the Office of Inspector General's Draft Review Report, "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process," (the "Report") (Review Control Number ED-OIG/I04N0003). Federal Student Aid ("FSA") appreciates the review by the Office of Inspector General ("OIG") of the policies, procedures and documentation relating to the borrower defense claims review and loan discharge processes.

As you know, the period of time at issue in this Report begins at the end of June 2016, when FSA's new Enforcement Office ("Enforcement") assumed full management and oversight of the Borrower Defense Unit ("BDU") from the Special Master. At that time, we were expeditiously building processes while also making every effort to respond in a timely manner to the over 27,000 borrower defense claims that had been filed between the closing and sale of campuses owned by Corinthian Colleges, Inc. in early 2015 and the expiration of the Special Master's tenure in June 2016. Predictably, this scenario created a number of challenges. The need to timely perform the work of reviewing and processing claims while also creating and implementing new processes and protocols competed with the delays sometimes inherent in taking the time to fully document in detail the processes and protocols being implemented.

Despite these challenges, we are pleased to note that OIG did not identify any errors in the adjudicated claims, and that the review for each of the sampled claims was properly documented. In addition, OIG found that FSA created policies and procedures for borrower defense that have evolved over time as FSA has continued to refine its processes. While the Report notes that these policies and procedures were not always reduced to writing in formal policy documents, the policies and procedures were consistently communicated and understood throughout the borrower defense program as demonstrated by the absence of errors identified by OIG. FSA understands the importance of documenting all policies and procedures and will continue to improve upon and formally document both new and previously existing processes and protocols.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                      30

**Finding 1:  FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process**

We generally agree that policies and procedures always can be improved and, therefore, FSA has continued to refine and strengthen its policies and procedures throughout the period at issue in the Report and continuing. While improvements were needed in the establishment of policies and procedures, we do not believe that the former policies and procedures resulted in harm to the borrowers.

1. Legal Memoranda

We agree that documentation of the review and approval by the Office of the General Counsel ("OGC")[17] of the legal memoranda submitted by the Borrower Defense Unit ("BDU") should be consistent.  With respect to all five categories of approved claims for which the legal framework, review criteria and legal basis for relief were developed by FSA, we consistently maintained written documentation of OGC's approval of the FSA legal memoranda.  The inconsistencies that OIG described by FSA in applying established procedures to document the review and approval of legal memoranda, was a demonstration of the evolution of its approval process over a period of time.

**Summer 2015 through June 2016 – Processes That
Pre-Date FSA Oversight of Claims Review**

As a preliminary matter, the legal framework, review criteria, and legal basis for granting BD claims all were established by the Office of the Under Secretary ("OUS"),  OGC, and the Special Master in 2015 – prior to the establishment of the borrower defense claim review process in FSA. It was OUS, OGC and the Special Master who determined in 2015 that "full relief" (defined as a full discharge of loans associated with the program at issue and a full refund of amounts paid) was appropriate for Heald, Everest and WyoTech borrowers with approved Job Placement Rate ("JPR") claims.

> **Summer and Early Fall 2016 – Enforcement Unit Continued the Review of JPR Claims under the Previously Established Framework and Created a New Approval Process for Groups of "non-JPR" claims based on Legal Memoranda to be Approved by OGC and Approval Memoranda to be Approved by OUS**

---

[17] The Report suggests that OIG misunderstood the legal memoranda approval process to require that OUS sign any legal memorandum that provided the legal framework to approve a particular type of claim. That was not the process.  OUS's approval is found on the claim "Approval Memos," not on the legal memoranda.  OIG's confusion likely is due to the fact that the American Career Institute ("ACI") memo *is* signed by OUS because, as discussed on page 4 below, ACI was a "group discharge" for which the legal memo also <u>was</u> the approval memo that authorized discharge of the loans of ACI Massachusetts borrowers.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                      31

The first types of claim reviews originated by FSA were the transfer of credits claims detailed in two legal memoranda.  OIG correctly notes that these two memoranda were not signed by OGC. There was no signature block for OGC because that was not the process in Fall 2016. Instead, the memos were discussed in a series of meetings with OUS, OGC and Enforcement, and OGC gave a verbal concurrence in those meetings and also confirmed with a written concurrence via email.

BD attorneys continued review of JPR claims under the same review criteria, legal framework, and relief previously established by OUS, OGC and the Special Master.  Enforcement agreed with OGC's legal conclusions that: 1) borrowers who met the criteria required in the Heald and Everest/WyoTech attestation forms were eligible for borrower defense discharges; and 2) that full relief was appropriate.[18] Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos.[19]

### November 2016 - January 2017 – BDU's Approval Process for Legal Memoranda Evolved

BDU submitted pre-decisional legal memoranda recommending legal frameworks, review criteria and proposed relief for two new types of non-JPR claims[20] between November 2016 and January 2017.  Improving upon the previously established process of obtaining the written concurrence of OGC via email, BDU included a signature block for OGC on the face of each legal memorandum. As OIG correctly notes, each of the two documents was, in fact, signed by OGC's Deputy General Counsel.  Consistent with the previously established non-JPR approval processes, the approval of OUS is found on each of the Approval Memos for the claims approved pursuant to said legal memoranda.

### American Career Institute was the First "Group Discharge" Approval and Therefore had a Different Approval Process

The American Career Institute ("ACI") memo is different because the nature of the approval was different and first of its kind. ACI was a "group discharge" for which no individual claim applications were required. Accordingly, the usual approval memo (to be executed by OUS) could not be used because there were no application numbers to attach to the memo.  Therefore, the legal memo also <u>was</u> the approval memo in that circumstance, and OUS's signature on the document authorized discharge of the loans of all ACI Massachusetts borrowers.

### April 2015 Administrative Actions & Appeals Service Group Memorandum

---

[18] *See e.g.,* the OGC-approved Guaranteed Employment memo (citing to OGC's previous determination that borrowers should receive full relief, without offset) and the OGC Concurrence re: Transferability Concurrence (appropriate relief is "full discharge of Direct loan debt" and "refund of amounts paid ... subject to the statute of limitations").

[19] From the summer of 2016 through mid-January 2017, Enforcement also met weekly with OGC's Deputy General Counsel and OUS regarding the claims, and there was no uncertainty regarding OGC's legal positions on review criteria, legal framework, or relief.

[20] These were the Corinthian guaranteed employment and ITT guaranteed employment memoranda.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

32

The Report identifies an April 2015 Administrative Actions & Appeals Service Group letter (and specifically, the fact that the letter was signed only by AAASG's director) as evidence that BDU was inconsistent in documenting OGC's approvals of BDU's legal memoranda. The letter was appropriately signed by the director of AAASG – because it is an AAASG document, and not a legal memorandum drafted by the Special Master or OGC for approval of borrower defense claims. The reason that the document surfaced in connection with this Report is that it was considered and relied upon in 2015 by OUS and OGC when they published findings regarding misrepresented job placement rates at Corinthian.

2. Review of Claims

The Report cites as another weakness that "BDU did not have policies and procedures for reviewing and making determinations [regarding] unique claims that do not fit into one of the seven established categories; claims with no common factual basis; or claims for which there was no associated legal memorandum." Prior to February 2017, these claims were not being processed, and no policies and procedures had been submitted for approval to the prior administration. However, BDU's proposed protocols for addressing claims that are unique or unsupported by existing legal memos were included in the February 2017 "Borrower Defense Unit Claims Review Protocol" document presented to the landing team. Shortly thereafter, the Department initiated the Review of Pending Borrower Defense Claims project led by the Borrower Defense Review Panel (the "Review Panel") to make recommendations to the Secretary on how to address pending claims going forward.

3. Processing of Claims Flagged for Denial

The Report also cites as a weakness that "BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial." As described above with respect to the review of unique claims, no procedures had been submitted to the previous administration for approval and these claims were not being processed. In August, OUS, OGC and FSA agreed on a procedure to deny claims.

We also wanted to clarify two other statements in this section. First, the Report states that "[a]ccording to the Director of BDU, FSA is currently considering providing relief to borrowers for interest accrued [after the claim is pending for one year]." We wanted to clarify that the Director stated that the Department (not specifically FSA) was considering the interest credit; Department leadership made that decision.

**Harm to Borrowers**

FSA takes issue with OIG's conclusion that weaknesses in the processes may have harmed borrowers. The Report fails to recognize that the change in administrations necessarily required time for the Secretary and Acting Under Secretary and their staffs to familiarize themselves with the history of the borrower defense claim review process in order to determine and advise FSA as to any policy changes that would be made. To that end, in March 2017, Department leadership

created the aforementioned Review Panel to make recommendations,[21] and in May 2017, based on the Panel's recommendations, the Secretary determined that the claims already approved prior to January 20, 2017 would be processed. The panel's work also laid the foundation to approve new claims. Additionally, a denial process now has been approved.[22]

The Department recognizes that the interest on pending claims has continued to accrue and, therefore, the Department has authorized an interest credit for borrowers whose claims are adjudicated and denied more than one year after submittal of the claim. We also note that the Report in three different places inaccurately states that the borrowers with pending claims will be harmed because their accrued interest will be capitalized. The forbearance applied when a borrower files a borrower defense claim is non-capitalizing.

**Recommendation 1**: Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.

We agree with this recommendation. Pursuant to OUS's May 4, 2017 memorandum to the Secretary, OUS and the Chief Financial Officer's Internal Controls Unit ("CFOICU") are working with FSA to "develop interim procedures" to review claims. We have been working to implement those processes and protocols with respect to the seven established categories so that the review, approval and discharge processes for these categories of claims may resume as soon as possible.

With respect to the over 11,000 Corinthian claims flagged for approval during this Report period, as publicly stated by the Acting Under Secretary, approval of some of these claims is imminent.

**Recommendation 2**: Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge.

We agree with this recommendation. As with respect to our response to Recommendation 1, we will work with the CFOICU to strengthen BDU's processes and protocols so that the work on these claims can proceed.

---

[21] We want to clarify a statement in the Report regarding the pause in submitting claims for approval and in developing additional memoranda for new categories of claims that qualify for discharge. Although the Report suggests that the Deputy Chief Enforcement Officer made a decision to stay this work, we wanted to clarify that the Deputy Chief Enforcement Officer actually just communicated to the Director of BDU the guidance and direction provided by OUS and the Review Panel.

[22] As of January 20, 2017, FSA had adjudicated over 40% of the claims received. While the volume of pending claims has increased significantly since January, once the approval and denial processes are finalized, we anticipate being able to begin processing the currently pending CCI claims very soon.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                    34

**Recommendation 3: Ensure consistent documentation of the review and approval of legal memorandums or other findings used to justify discharges.**

As previously discussed, FSA has consistently documented OGC's approvals of its legal memoranda and will continue to do so using the same process that was utilized for the Guaranteed Employment legal memoranda unless the CFOICU requires a different process. Additionally, FSA will continue to document OUS's approval (of eligibility) on the Approval Memos unless the CFOICU requires a different process.

**Recommendation 4: Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement misrepresentation rate claims and, (2) the amount of relief for all job placement rate misrepresentation claims.**

Enforcement agrees to document in its "desk book" or standard operating procedures the following regarding claims approved to date: (1) Enforcement's concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal basis and eligibility determinations pursuant to which the claims have been approved to date; and, (2) Enforcement's concurrence with OGC's previously articulated legal conclusions on the appropriate relief for JPR claims.

OGC established the legal framework, review criteria and legal basis for relief for both the Heald and Everest/WyoTech JPR claims – pursuant to which there were three separate sets of approvals and the discharge of the loans of over 3,800 borrowers during the time when claim review was overseen by OUS, OGC and the Special Master. Enforcement documented its <u>concurrence</u> in each of the Approval Memos that it submitted based on the previously established legal framework, review criteria and legal basis for relief for the JPR claims.

Therefore, regarding the Report's recommendation that BDU seek further "advice" from OGC regarding the eligibility of Everest and WyoTech students who enrolled in programs covered by the Department's published findings (that Everest and WyoTech mispresented the job placement rates for those programs), Enforcement and BDU previously confirmed said advice and applied it during the Report period. Also, to the extent that the recommendation implies that BDU has to seek written guidance from OGC regarding claim eligibility on every claim, BDU's existing protocols provide for obtaining OGC's approval on any new types of claims where the legal framework, review criteria and legal basis for relief are developed by BDU. To bolster the written documentation detailing the legal framework, review criteria and legal basis for relief for the Heald and Everest/WyoTech JPR claims, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal bases and eligibility determinations pursuant to which the claims have been approved to date.

With respect to part (2) of this recommendation, Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos and also is reflected in the Corinthian Guaranteed Employment memo. However, in the interest of ensuring detailed documentation regarding the work performed during the Report period, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions on the appropriate relief for Heald, Everest, and WyoTech JPR claims.

FSA will ensure that OGC's advice in connection with any future relief determinations will be formally documented and incorporated into FSA's existing borrower defense protocols and processes.

**Recommendation 5: Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.**

The February 2017 Protocol provides for reviewing and adjudicating claims that are "unique" and/or for which there is no associated legal memorandum. For example, the Protocol states that the "[p]reponderance [of the evidence standard] and thus eligibility is not met when there is a single uncorroborated claim."[23] We will work with the Department to implement such protocols, so that these claims can be adjudicated by BDU and submitted to OUS and other designated officials for approval or authorization to deny.

**Recommendation 6: Document and maintain readily available evidence for all quality control reviews.**

We agree with this recommendation and concede that evidence relating to BDU reviews and quality control was not "readily available" because BDU lacked a database for tracking such information throughout the Report period. Therefore, accessing this data required pulling it from BDU's over 1,000 Excel spreadsheets. Upon inheriting oversight of the claim reviews in 2016, Enforcement was acutely aware of the need for a claim review system that would store the data, track reviews and changes in claims status, and provide reporting capabilities. As discussed with respect to Finding 2 below, FSA began the process for creating that system in 2016, and as of October 2017, BDU now has an Access claim review platform that records each review. BDU currently is documenting new and adjusted processes and protocols utilizing the claim review platform.

**Recommendation 7: Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.**

We agree with this recommendation for establishing documented policies and procedures for discharging loans both generic and character-specific. To that end, for each of the four types of claims referenced, BDU has developed draft policies and procedures that incorporate use of the new review platform discussed in our response to Finding 2. These protocols will be reviewed by CFOICO before final implementation. Additionally, we have initiated Change Request (CR) 4280 (October 2017) which requires the loan servicers to accept any special processing instructions provided by ED. As part of the implementation of that CR, FSA will define the procedures to

---

[23] *See* Protocol at p. 7.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                      36

determine which loans require special processing and how the instructions will be provided to the servicers to discharge the loans. It is anticipated that this CR will be implemented at the loan servicers early in CY 2018.

**Recommendation 8: Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.**

We agree with this recommendation; it is a fundamental activity critical to quality customer service to ensure that borrowers are aware of the disposition of their claims in a timely and consistent manner. As discussed, a process for obtaining authorization to deny claims has been agreed upon by OUS, OGC and FSA. BDU has begun implementation of the agreed-upon denial process.

Also, an interest credit was approved by OUS in September, and Change Requests (CRs) 4379 (which addresses interest adjustments) and 4280 (see Recommendation 7) have been initiated with anticipated implementation in early CY 2018. Through these CRs, Business Operations will refine its procedures for notifying borrowers of the denial decisions and enhance processes/procedures currently utilized at the servicers for executing denial processing.

**Recommendation 9: Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.**

We agree with the recommendation that there should be set timeframes for processing claims from intake to review to final decision and through discharge; further, controls should be in place to ensure that those timeframes are met. Because many processes for review, adjudication and final decision/authorization require work to be performed by OUS and/or OGC, Enforcement will work with OUS and OGC to develop mutually agreeable timelines. Additionally, Business Operations will review all steps in the process to ensure that we have accounted for the various scenarios involved, both generic and as pertains to any school specific considerations. As stated in Recommendation 7, once current procedures have been reviewed for operational accuracy, documented and approved, timeframes for milestone steps will be developed and implemented.

**Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data.**

**Recommendation: Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.**

We agree with this recommendation. Accordingly, we have been working toward the development of a claims management system since the summer of 2016. Because of the timeline for obtaining funding for, and completing the design, development and operationalizing of, a new Claims Management System, we also worked on a parallel track to find short-term alternatives. We recognized the potential problems and limitations noted by OIG regarding the storage of data on Excel spreadsheets, and we therefore worked with U.S. Digital Services (USDS) personnel who made several recommendations and agreed to build an Access review platform for BDU. The

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                37

USDS platform, which is now fully functioning, is a short-term solution, but we believe that it achieves the objectives in this recommendation and significantly enhances efficiencies and reporting capabilities.

FSA is further developing the USDS platform to meet new review and processing requirements arising from policy changes and will continue to document these new processes and protocols as they are developed. Additionally, FSA is in the process of developing new requirements and obtaining funding for a long-term, more robust system.

**Technical Corrections – Appendix A**

We have enclosed a list of technical corrections in Appendix A. We request that the final Report be corrected to accurately reflect these facts.

**Redactions**

In the draft Report, OIG discloses attorney-client privileged communications and information and data that are confidential and deliberative, and the Report also includes statements which require the disclosure of attorney-client privileged communications in order to respond. FSA respectfully requests that OIG confer with FSA, OGC and OUS as to appropriate redactions to the Report and this response so that OIG does not waive privileges and appropriate objections on behalf of the Department.

We appreciate the opportunity to comment on the draft Report. Please let us know if you have any questions about our comments or need further information.

Enclosure

cc.     Jeffrey Nekrasz, Auditor, Student Financial Assistance Advisory and Assistance Team

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                    38

# Exhibit 3

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4      - - - - - - - - - - - - - - X

 5      THERESA SWEET, et al., on      :

 6      behalf of themselves and all   :  Case No.:

 7      others similarly situated,     :  19-cv-03674-WHA

 8                    Plaintiffs,      :

 9      vs.                            :

10      ELISABETH DEVOS, in her        :

11      official capacity as           :

12      Secretary of the United        :

13      States Department of           :

14      Education, et al.,             :

15                    Defendants.      :

16      - - - - - - - - - - - - - - X

17

18        Remote Videotaped Deposition of MARK BROWN

19             Tuesday, December 15, 2020

20                 10:03 a.m. (EST)

21

22

23      Job No. 332249

24      Pages:  1 - 250

25      Reported by:  Dana C. Ryan, RPR, CRR
```

Page 2

1
2
3                          December 15, 2020
4                          10:03 a.m. (EST)
5
6
7
8          Remote Videotaped Deposition of MARK BROWN,
9    held via Zoom video teleconference, before Dana C.
10   Ryan, Registered Professional Reporter, Certified
11   Realtime Reporter and Notary Public in and for the
12   State of Alabama.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              A P P E A R A N C E S
2
3        ON BEHALF OF THE PLAINTIFFS:
4          REBECCA ELLIS, Esquire
5          MARGARET O'GRADY, Esquire
6          EILEEN CONNOR, Esquire
7          TOBY R. MERRILL, Esquire
8          Legal Services Center of
9               Harvard Law School
10         122 Boylston Street
11         Jamaica Plain, Massachusetts 02130
12         Telephone:  (617) 390-3003
13         Email: mogrady@law.harvard.edu
14         Email: econnor@law.harvard.edu
15         Email: rellis@law.harvard.edu
16         Email: tmerrill@law.harvard.edu
17
18               - and -
19
20
21
22
23
24
25

Page 4

1         A P P E A R A N C E S   C O N T I N U E D
2
3          JOSEPH JARAMILLO, Esquire
4          CLAIRE TORCHIANA, Esquire
5          Housing & Economic Rights Advocates
6          3950 Broadway, Suite 200
7          Oakland, California 94611
8          Telephone:  (510) 271-8443
9          Email: jjaramillo@heraca.org
10         Email: ctorchiana@heraca.org
11
12   ON BEHALF OF THE DEFENDANTS:
13         R. CHARLIE MERRITT, Esquire
14         KEVIN P. HANCOCK, Esquire
15         KATHRYN C. DAVIS, Esquire
16         MARCIA BERMAN, Esquire
17         U.S. Department of Justice
18         Civil Division, Federal Programs Branch
19         1100 L Street, Northwest
20         Washington, D.C. 20530
21         Telephone:  (202) 307-0342
22         Email: robert.c.merritt@usdoj.gov
23         Email: kathryn.c.davis@usdoj.gov
24         Email: kevin.p.hancock@usdoj.gov
25         Email: marcia.berman@usdoj.gov

Page 5

1         A P P E A R A N C E S   C O N T I N U E D
2
3          Also present:
4               Daniel Macom, Video Technician
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 238
Page

1 methodology for non-CCI claims that had started to
2 be developed at that time that you know of?
3      A    Ma'am, could you -- could you repeat
4 that question again?  I'm sorry.
5      Q    Yeah.
6           So this presentation is from
7 August 2019, and it says, No relief methodology
8 developed for non-Corinthian claims.
9           So do you know whether at the time this
10 presentation was given was there any relief
11 methodology being developed?
12      A    August of 2019?
13      Q    Uh-huh.
14      A    Relief methodology was being worked on.
15      Q    Okay.  And why had it not yet been
16 completed?
17      A    The policy element wasn't done is
18 all -- all that I can tell you.  Why?  I don't
19 know other than I can tell you it's not simple.
20 It's a complex work that they have to do.  Beyond
21 that, I couldn't tell you why it wasn't completed.
22 I'm just sure that we weren't using one yet
23 because that happened December of 2019.
24      Q    Okay.  And what did you understand as
25 the -- what -- what was missing for the

Page 239
Page

1 methodology to be completed?  What -- what stage
2 of the process was it at?
3      A    I don't know.
4      Q    And there's also here -- it says, No
5 processing systems available from summer 2018 to
6 the present due to platform development and
7 migration.
8           Could you tell me who decided that
9 applications would not be processed during this
10 platform and migration?
11      A    I don't -- I don't know -- I started
12 work at Federal Student Aid as the chief operating
13 officer in March of 2019, so I don't know if
14 there's a decision in 2018 related to the
15 platform.
16           But as I stated earlier, the two things
17 that needed to get done were more attorneys and
18 more resources in the development of the platform
19 in order to make the borrower defense process
20 work.
21      Q    And what about the platform is being
22 developed?
23      A    So I can't speak again for what's
24 referenced here in 2018.  I don't know.  But we
25 needed a more advanced data collection system so

Page 240
Page

1 that it would match loan -- claims to loan numbers
2 and then follow the data through the system so
3 that accountability was much -- much tighter.
4           The -- the platform was developed for
5 customer inquiries because we never anticipated
6 years ago having over 200,000 claims under --
7 under this statute of borrower defense.
8           And, so, that -- using that platform,
9 it had to be upgraded, as you can imagine, to
10 handle more data, to handle more content and to
11 also move data from one system to the next.  All
12 of that was required because this was no longer
13 a -- an Excel spreadsheet operation.  This -- this
14 was a major case management processing, and that's
15 what -- that's what's meant occasionally through
16 here when we reference the platform, the upgrades
17 that needed to happen.
18      Q    Okay.  And have these upgrades -- have
19 they been completed?
20      A    So with technology systems, you know,
21 completed is kind of an optimistic term.  I would
22 say that they are working much better today, and
23 they are fully utilized, but I don't know that
24 there aren't some more upgrades that are planned
25 down the road for -- for this system.

Page 241
Page

1      Q    Okay.  So this says, No processing
2 systems available.  So at what point would you say
3 there was a processing system that was available?
4      A    I -- you know, I -- I can't speak again
5 to 2018, but when we got into the April, May, June
6 timeline -- timeline coming into July and August
7 and September of -- of 2019, we had already begun
8 to resource those upgrades and had what I would
9 call a functioning -- a functioning system from
10 which we could go forward on.
11      Q    Okay.  Well -- okay.  It says, No
12 processing systems available from December 2018 to
13 the present, and the present is August 2019.
14      A    Yeah.
15      Q    And it says, Upgrades to platform to be
16 completed by August 30th.
17           So would you say by August 30th the
18 updates were completed, or what -- what happened
19 there?
20      A    I can't -- I can't recall those exact
21 dates, but I know that we began putting financial
22 instructions into the systems in those months that
23 I just named to -- to make it functional.
24      Q    Okay.  And who made the decision to
25 stop processing applications while these

Exhibit 4

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - X

5    THERESA SWEET, et al., on      :

6    behalf of themselves and all  :  Case No.:

7    others similarly situated,     :  19-cv-03674-WHA

8               Plaintiffs,         :

9    vs.                            :

10   ELISABETH DEVOS, in her        :

11   official capacity as           :

12   Secretary of the United        :

13   States Department of           :

14   Education, et al.,             :

15               Defendants.        :

16   - - - - - - - - - - - - - - X

17

18   Remote Videotaped Deposition of COLLEEN M. NEVIN

19           Wednesday, December 9, 2020

20                9:11 a.m. (EST)

21

22

23   Job No. 332242

24   Pages:  1 - 268

25   Reported by:  Dana C. Ryan, RPR, CRR

Page 2

```
 1
 2
 3                           December 9, 2020
 4                           9:11 a.m. (EST)
 5
 6
 7
 8          Remote Videotaped Deposition of COLLEEN M.
 9  NEVIN, held via Zoom video teleconference, before
10  Dana C. Ryan, Registered Professional Reporter,
11  Certified Realtime Reporter and Notary Public in
12  and for the State of Alabama.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3       ON BEHALF OF THE PLAINTIFFS:
 4          REBECCA ELLIS, ESQ.
 5          MARGARET O'GRADY, ESQ.
 6          EILEEN CONNOR, ESQ.
 7          TOBY R. MERRILL, ESQ.
 8          Legal Services Center of
 9               Harvard Law School
10          122 Boylston Street
11          Jamaica Plain, Massachusetts 02130
12          Telephone:  (617) 390-3003
13          Email: mogrady@law.harvard.edu
14          Email: econnor@law.harvard.edu
15          Email: rellis@law.harvard.edu
16          Email: tmerrill@law.harvard.edu
17
18                  - and -
19
20
21
22
23
24
25
```

Page 4

```
 1       A P P E A R A N C E S   C O N T I N U E D
 2
 3          JOSEPH JARAMILLO, ESQ.
 4          CLAIRE TORCHIANA, ESQ.
 5          Housing & Economic Rights Advocates
 6          3950 Broadway, Suite 200
 7          Oakland, California 94611
 8          Telephone:  (510) 271-8443
 9          Email: jjaramillo@heraca.org
10          Email: ctorchiana@heraca.org
11
12       ON BEHALF OF THE DEFENDANTS:
13          R. CHARLIE MERRITT, ESQ.
14          KEVIN P. HANCOCK, ESQ.
15          KATHRYN C. DAVIS, ESQ.
16          MARCIA BERMAN, ESQ.
17          U.S. Department of Justice
18          Civil Division, Federal Programs Branch
19          1100 L Street, Northwest
20          Washington, D.C. 20530
21          Telephone:  (202) 307-0342
22          Email: robert.c.merritt@usdoj.gov
23          Email: kathryn.c.davis@usdoj.gov
24          Email: kevin.p.hancock@usdoj.gov
25          Email: marcia.berman@usdoj.gov
```

Page 5

```
 1       A P P E A R A N C E S   C O N T I N U E D
 2
 3       Also present:
 4          Joe Raguso, Video Technician
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 22

1  directly to the chief operating officer.
2      Q    And how often do you meet with Under
3  Secretary Diane Auer Jones?
4      A    Not often. Maybe a -- it's not
5  scheduled. It's very ad hoc, and I think that
6  there's probably been a total of somewhere in five
7  to ten meetings together since we were both at the
8  department.
9      Q    Have you reviewed the transcript of
10 Ms. Jones' deposition?
11     A    No.
12     Q    And how often have you met with
13 Secretary DeVos?
14     A    I've never met her. Actually, I take
15 that back. The day she started, she did a walk
16 around, and I think I saw her then, so I don't
17 know if that counts as meeting, but . . .
18     Q    Okay. So then who reports to you?
19     A    I have a team of attorneys that report
20 to me. That number has varied pretty dramatically
21 from 2016 to the present, but they're all
22 attorneys that report to me.
23          Since we staffed up starting last fall,
24 some of my original team moved into supervisory
25 roles, and, then, we also hired some additional

Page 23

1  more senior attorneys to -- acting in supervisory
2  roles because I was bringing on several dozen
3  junior attorneys.
4      Q    So when you say your "original team,"
5  are those people who have been in the borrower
6  defense unit since you started in 2016?
7      A    Yes, that's correct.
8      Q    Okay. How many of those people are
9  there?
10     A    Five full-time and one part-time.
11     Q    And can you tell me their names,
12 please?
13     A    Brian Bayne, B-A-Y-N-E; Mike Garry,
14 G-A-R-R-Y; Mike Page, P-A-G-E; John Stephenson,
15 S-T-E-P-H-E-N-S-O-N; Andrew Bronstein
16 B-R-O-N-S-T-E-I-N; and the part-time attorney is
17 Erin (phonetic) Joyce, J-O-Y-C-E.
18     Q    Thank you.
19          And, so, those original attorneys are
20 in supervisory roles within the unit now?
21     A    Not all of them. Four of them are.
22     Q    Okay. And you referred to staffing up
23 in the fall. When did you start hiring additional
24 attorneys for the borrower defense unit in 2019?
25     A    When you say "hiring," do you mean when

Page 24

1  did we, you know, post the job and start, you
2  know, interviewing candidates or when did they
3  start?
4      Q    Let's start with when did you post the
5  jobs.
6      A    I believe that was the summer of
7  2019 -- was when we first started posting to --
8  actually, that was for what we call backfills, so
9  we had attrition in the borrower defense unit
10 between 2016 and 2019 and had not been able to
11 replace the attorneys that had left. So we were
12 able to post to -- to fill those positions, and
13 then also bring on -- we got the authority to hire
14 up to 60 term-appointed attorneys.
15          They were at varying levels. As I
16 mentioned, some of the folks that we brought on
17 are in more senior roles and have supervisory
18 positions. The vast majority are recent law
19 grads, junior attorneys. And they started
20 onboarding, which is the term we used for starting
21 in -- the first group of junior attorneys started
22 in September of 2019.
23     Q    Okay. When you say "term-appointed,"
24 what is the term?
25     A    In the federal government -- two years.

Page 25

1  It's -- but there's a potential for kind of
2  reupping it or extending their period of service,
3  but the initial term that they were hired for is
4  two years.
5      Q    Why had you been unable to replace the
6  attorneys who you lost due to attrition since
7  2017?
8      A    Well, in early 2017, there was a hiring
9  freeze put in place, and that lasted for a fairly
10 extended period of time across all of -- I think
11 all of the departments, certainly all of FSA.
12          And, then, you know, beyond that, there
13 was a process for getting approval to hire
14 additional staff that went through leadership at
15 FSA and then over to senior leadership at -- at --
16 when I say LBJ, I'm referring to senior leadership
17 in the department, as opposed to within FSA. But
18 the folks over at LBJ were making the calls on who
19 we could hire back then.
20          So we didn't get the authority to hire
21 anybody in borrower defense until May of 2019 --
22 or summer of 2019.
23     Q    Had you requested to hire additional
24 attorneys before May 2019?
25     A    Yes.

Page 26

1    Q    When did you make that request?
2    A    Several times.
3    Q    When was the first time that you recall
4  requesting to hire additional attorneys?
5    A    Well, we were considering bringing on
6  additional staff at the time of the transition
7  from one administration to the next, And then did
8  not end up doing that.  And, obviously, during the
9  hiring freeze, nobody was allowed to hire anybody,
10 so I don't think that -- you know, I had raised
11 concerns about staffing throughout that period of
12 time, but there was kind of a department-wide
13 freeze.
14        Once there was a change in the process
15 in terms of hiring, Julian Schmoke was the chief
16 enforcement officer at the time, and I would, you
17 know, in my weekly meetings with him reiterate
18 that we needed to increase our staffing.  So that
19 happened on a very regular basis, and he would
20 submit the requests up, and we wouldn't get
21 authority to do that.
22        I don't know how regularly he submitted
23 them, but I know it was kind of a recurring issue.
24   Q    Do you know why the hiring freeze was
25 put in place?

Page 27

1    A    I don't.
2    Q    And was there a specific time when the
3  department-wide hiring freeze ended?
4    A    I'm sure there was.  I don't recall
5  what it was.
6    Q    Do you know who ultimately was
7  responsible for the decision whether or not to
8  approve a hiring request?  Once Julian Schmoke
9  submitted that request, do you know who ultimately
10 was the decision maker?
11   A    My understanding from discussions with
12 him is that it was the -- that the request went to
13 the secretary's chief of staff.  I don't know if
14 he made the decisions or if they went to the
15 secretary or some other process, but, you know, he
16 would communicate to me that he had heard back
17 from the chief of staff that we weren't getting
18 approved.
19   Q    Okay.  So let's talk a minute about the
20 COO.  That's currently Mark Brown?
21   A    That's correct.
22   Q    And what -- how overall would you
23 describe the COO's role with respect to borrower
24 defense?
25   A    Fairly active.

Page 28

1    Q    It sounds like you meet with the COO
2  frequently to discuss borrower defense issues?
3    A    That's correct.
4    Q    Is the COO responsible for setting
5  policy for borrower defense?
6    A    No.  Federal Student Aid does not make
7  the policy at all.
8    Q    Uh-huh.
9    A    The department makes policy, and then
10 Federal Student Aid implements it.
11   Q    When you say "the department," are
12 there specific individuals you're referring to?
13   A    Not for the -- for the general
14 proposition I just stated, I -- it could be.  I
15 have no idea how many different people would be
16 involved, so, no.
17   Q    Okay.  When -- when you draw the
18 distinction between -- you say FSA doesn't make
19 policy; the department makes policy, could you
20 explain what you mean?
21   A    Yeah.  You know, FSA is not -- it's a
22 performance-based apolitical organization, so the
23 top of the Federal Student Aid organization is the
24 chief operating officer who -- I don't know how
25 else to explain it.  It's a performance-based

Page 29

1  organization that's apolitical.
2        We apply the policies that are made by
3  the political appointees within the Department of
4  Education, so everybody from the secretary down
5  through whatever her structure is for -- for the
6  different parts that inform policy for
7  student-loan-related issues.
8    Q    Okay.  I'd like to turn for a second to
9  the defendants' responses to -- responses and
10 objections to plaintiffs' first set of
11 interrogatories.  I believe you have -- you said
12 you have a copy of that?
13   A    I do.  I do not have a second screen,
14 so I'm going to put it up.  I'm not going to be
15 able to see you or anyone else.  I just wanted
16 everybody to be aware of that.
17   Q    Okay.  No problem.
18        And in the Dropbox, this is -- the
19 document, it does not have a bracketed number
20 before it.  The file name is Sweet Defendants'
21 Interrogatory Responses 12/7/20, and I'd like to
22 mark this as Exhibit 22.
23        (Deposition Exhibit 22 was marked for
24 identification and attached to the transcript.)
25 BY MS. ELLIS:

Page 38

1  under state law.
2       So that requires legal analysis and
3  research in connection with those individual state
4  laws.  There are other related issues in terms of,
5  you know, state licensing requirements, different
6  things related to accreditation, but the kind of
7  legal research is related to those '95 claims.
8       Q    Okay.  Does your department -- does the
9  borrower defense unit create memoranda describing
10 the research and analysis of state law for
11 purposes of the 1995 regs?
12      A    Yes.
13      Q    Are those memoranda communicated to the
14 attorneys who are reviewing borrower defense
15 applications?
16      A    Can you rephrase that?  Can you repeat
17 it?
18      Q    So -- so memoranda are created
19 describing the research and analysis of state law;
20 correct?
21      A    Yes.
22      Q    Okay.  So do -- do the individuals who
23 are actually reviewing individual borrower defense
24 applications have access to those memoranda in
25 order to apply state law to an individual claim?

Page 39

1       A    Oh, I see.  Okay.  They have access to
2  them, but our process is -- there's kind of a --
3  an order to it.  We start with determining what
4  the evidence -- if there's common evidence related
5  to the school.  We start with an analysis of the
6  evidence.
7            Then based on what the -- our
8  determinations are with respect to the facts, then
9  there's a legal memo that discusses how the law is
10 applied to those specific sets of facts.
11           Then once we've reached a legal
12 conclusion that, you know, we have evidence to
13 support claims under, you know, X state law
14 because these elements are met, or we don't have
15 sufficient evidence on a certain element for
16 another state law, then that identifies what the
17 borrower would have to provide evidence to support
18 in order to have an approved case.
19           That document then, in terms of the
20 legal analysis, turns into a written protocol, so
21 generally speaking, for any school where there's
22 common evidence, there will be kind of the
23 precursor documents to the protocol in terms of
24 the facts and the law, and then from those facts
25 and law, we determine what elements the borrower

Page 40

1  would need to meet.  That goes into the written
2  protocol.
3            The reviews are primarily done by the
4  junior attorneys; although, my senior team does as
5  well.  But for the most part, the heavy lifting is
6  done by the junior attorneys.  They're following
7  very specific protocols for what they need to look
8  for in each of the applications to see whether the
9  borrower's case should be approved.
10           So that's kind of how the process
11 breaks down.
12      Q    Okay.  How many of those protocols that
13 you just described currently exist?
14      A    How many -- well, we have probably 500
15 schools or more that we've done a preliminary
16 assessment of the evidence to determine the scope
17 of what we're reviewing.  Because we didn't have
18 staffing for such a long period of time, there's
19 still a lot of work to be done on any -- well, on
20 most of the schools that have a lot of common
21 evidence.
22           So in order to move forward with
23 adjudicating, you know, whatever cases that we
24 can, we try to determine upfront what it -- what
25 we're continuing to look at and what we need more

Page 41

1  time to develop and what we don't have evidence
2  relating to and, therefore, would have to look to
3  what the borrowers provide.
4            So we have about, I'd say, 500 or so
5  schools where at least some of the cases can be
6  adjudicated, and so there's a memo describing what
7  it is that we've done to reach the conclusion as
8  to who can be what we call cleared for
9  adjudication and move into an adjudication
10 process.  And those protocols, because there's not
11 common evidence to support the applications at
12 issue, are going to be dependent on what the
13 borrower provides.
14           In addition to that, we have -- I don't
15 know how many total protocols relate to the --
16 we've got job-placement-rate claims for
17 Corinthian, the employment-prospects claims for
18 Corinthian, transfer ability of credit for
19 Corinthian, and then ITT California
20 employment-prospects protocol, and we just
21 finished the protocols for all employment --
22 employment prospects for ITT.
23           So to the extent that those are --
24 those will be in addition to the 500 that I was
25 referencing.

Page 42

1    Q    Okay.  Let me try to walk through that
2    more specifically.  So the Corinthian
3    job-placement-rates protocol, that was already in
4    place when you joined the borrower defense unit;
5    is that correct?
6         A    We've made improvements to it, I think,
7    over time, so it's not going to be in the exact
8    same form, but, yes, the criteria for all intents
9    and purposes go back to 2016.
10        Q    Okay.  And then the Corinthian
11   employment-prospects protocol, that was -- or at
12   least in its initial form developed -- that was in
13   place as of January 2017; correct?
14        A    That's correct.
15        Q    And the Corinthian transfer of credit
16   claim protocol in place as of January 2017?
17        A    Correct.
18        Q    The ITT California employment-prospects
19   protocol, also January 2017?
20        A    By January 20th, yeah, it was probably
21   the second week in January, somewhere in there.
22        Q    Okay.  And you just said you have
23   recently completed a protocol for all ITT
24   employment prospects claims?
25        A    Right.  The initial one was related

Page 43

1    only to California.
2         Q    Uh-huh.
3         A    And, so, we now have one that applies
4    to all ITT employment-prospects claims.
5         Q    When was that completed?
6         A    Well, there are two -- one protocol,
7    there are multiple documents because we had the
8    2016 legal analysis and also the '95 legal
9    analysis.  So the protocol was updated when we
10   completed the -- we completed 2016 first.  That
11   was probably a few weeks ago.  I don't remember
12   exactly what the timing was.  And, you know, so we
13   made updates to it when we were able to move
14   forward on the '95 ones, and that was really just
15   in the last several days.
16        Q    Okay.  Have those protocols been
17   provided to the DOJ attorneys for production in
18   this case?
19        A    We're still pulling records together,
20   but we're going to be producing a lot of the
21   protocols to our Office of General Counsel.
22        Q    Okay.  Well, we would specifically
23   request that these new ITT protocols be included
24   in the production.
25        So, now, I want to back up to the 500

Page 44

1    schools that you referred to as having preliminary
2    evidence.  Can you explain a little more what
3    preliminary evidence means?
4         A    I don't think I said preliminary
5    evidence.  I think I said preliminary assessment
6    or preliminary review or something.
7         But if we have common evidence -- and
8    that can come in many forms.  But if we have
9    common evidence, we first look at it to see -- you
10   know, before we have time to do a comprehensive
11   review of it, we look at what the scope is.
12        So, for example, if we got a package of
13   materials from an attorney general's office and it
14   related to an investigation they did regarding
15   the, you know, employment prospects at a school
16   between 2010 and 2012, we would try to get a sense
17   of whether the evidence really is limited to the
18   2010 to 2012 period of time, whether it's specific
19   to a certain program or group of programs, whether
20   it's related to certain campuses, whether it's
21   more broadly applicable to places outside of that
22   state because AGs generally are focused on
23   their -- you know, the claims of their own
24   constituents.
25        And then we write up a summary of, you

Page 45

1    know, what our understanding is of the evidence,
2    and then we make an assessment of what it doesn't
3    apply to.
4         So, for example, if that package is
5    specific to the criminal justice program for a
6    certain school, you know, we review to make sure
7    that it doesn't, you know, go into anything beyond
8    that and we determine at that point now there's
9    nothing related to the nursing program or medical
10   assistant or things like that, and then those get
11   cleared for adjudication.
12        And then continue to work on the
13   criminal justice piece, and ultimately that will
14   end up with a summary of what we conclude that
15   that evidence supports in terms of findings or
16   facts that may satisfy an element or multiple
17   elements of a borrower's claim whether it's under
18   the 2016 reg or the '95 reg.
19        So the cases that have been adjudicated
20   so far in terms of schools where we have common
21   evidence are the ones that we don't think the
22   common evidence is going to help the borrower get
23   to an approval essentially because of their
24   circumstances because they are not in the program
25   that's at issue or they attended ten years before

Page 46

1   the evidence is relevant or they're in a state
2   outside of, you know, the one that we have
3   evidence for that doesn't seem more broadly
4   applicable.
5        Q     So when you say "cleared for
6   adjudication," what does that mean procedurally?
7        A     That means we write up a protocol, and
8   the protocol says -- you know, just kind of going
9   back to my example of if it's for a certain
10  program for a certain state, open the application.
11  You know, there's a bunch of things that they do
12  upfront.
13            And then one of the first things,
14  though, is -- you know, is the borrower in state
15  X, and if so, did the borrower attend a criminal
16  justice program.  If so, set that case aside.  And
17  then it gets moved into kind of a holding status
18  until we can continue to review and complete the
19  assessment of the evidence that would be related.
20            If the borrower is not in the
21  categories that are relevant to the common
22  evidence, then they would complete the
23  adjudication just like they would for what we call
24  our one-off claims where you have, you know, an
25  individual borrower who brings a claim.  And, so,

Page 47

1   it will depend on, you know, what evidence the
2   borrower support -- provides to support the claim.
3        Q     Okay.  So for -- for about 500 -- I
4   just want to make sure I'm understanding this.
5            For about 500 schools, there's been an
6   assessment of common evidence that would allow
7   reviewers to direct certain claims that fit the
8   common evidence into this bucket of cleared for
9   adjudication where those claims are on hold
10  waiting for a final protocol?
11       A     I'm not sure about that exactly.  Can
12  you say that one more time?
13       Q     So I'm just trying to understand -- so
14  there are 500 schools for which the department has
15  what it considers to be common evidence.
16            Is that correct at the first step?
17       A     I'm approximating, so I probably
18  shouldn't have given an exact number.  I didn't
19  intend to give an exact number.  I think it's
20  somewhere in the ballpark of 500.  And that
21  would -- you know, there are school groups, so
22  that could be individual schools within school
23  groups as well, but, yeah, there are somewhere in
24  the neighborhood of about 500 schools where we've
25  reached that preliminary step.

Page 48

1        Q     Okay.  And, so, for each of those 500
2   schools, are there instructions that are given to
3   reviewers of how to assess whether an individual
4   claim fits within that common evidence?
5        A     Whether -- whether the claim fits
6   within the common evidence?
7        Q     Yeah.
8        A     I think it's the opposite of what
9   you're describing.  So it -- it tells them what
10  they should not move forward on because there may
11  be common evidence that's relevant.
12       Q     Okay.  So the -- let's try to take a --
13  try to make it a little more concrete.  So say --
14  say you receive a package of evidence from a state
15  attorney general about school X and it's about
16  school X making employment-prospect
17  misrepresentations in 2010 to 2012.
18            And does BDU provide instructions to
19  the reviewers essentially saying if you come
20  across an application from school X criminal
21  justice 2010 to 2012, then you set that aside?
22       A     Yes.
23       Q     Okay.  Are those instructions written
24  up?  Are there --
25       A     That's part --

Page 49

1        Q     -- instructions that the reviewers
2   receive?
3        A     Yes, that's part of the written
4   protocol.
5        Q     Okay.  And those are among the
6   documents that you've been gathering to be
7   produced in this action?
8        A     That is correct.
9        Q     Okay.  So then for each of those
10  buckets of applications that are set aside as
11  potentially fitting within the common evidence
12  that you have, for how many schools has BDU
13  proceeded to the next step to actually having a
14  system for granting those applications?
15       A     We're working on -- how many? -- but a
16  lot of schools along those lines.  But we haven't
17  created that for any other than ITT at this point,
18  and that's just limited to the employment
19  prospects.
20       Q     Which other schools are you working on?
21       A     Beckwood (phonetic), the EDMC schools,
22  the American ALO (phonetic), the Court Reporting
23  institutes -- I mean, there are dozens, but those
24  are the ones that come to mind right now.
25            We also have a whole lot of open

Page 50

```
 1  schools where we have claims, but there are some
 2  additional processes that need to happen on those,
 3  so the ones we've made the most headway on are
 4  primarily the closed schools.
 5      Q    Since you started your position at BDU,
 6  the only claims that have been granted, the only
 7  borrower defense claims that have been granted are
 8  from Corinthian and ITT?
 9      A    With the exception with the American
10  Career Institute cases in January --
11      Q    Right.
12      A    -- of 2017.  Right.
13      Q    ACI was a group application; is that
14  correct?
15      A    That's right.
16      Q    Has BDU developed any group discharge
17  process?
18      A    We wouldn't develop the process, and my
19  understanding is that the department has not
20  developed a process.
21      Q    Who in the department would be
22  responsible for developing a group discharge
23  process?
24      A    I can't answer that hypothetically.  I
25  really don't know if they would -- I don't know if
```

Page 51

```
 1  they decided to do it.  But, yeah, I don't have an
 2  answer to that.
 3      Q    Well, aside from an individual, do you
 4  have an understanding of what unit or what
 5  division of the department would be responsible or
 6  would have the authority to create a group
 7  discharge process?
 8      A    Well, obviously, the secretary would.
 9  I don't know who she -- OUS is involved in higher
10  Ed, so that's a possibility, but I really can't
11  answer.  Like I said, it's a hypothetical because
12  my understanding is that there is no such process.
13      Q    Okay.
14      A    There's no such -- yeah, there's no
15  such process.
16      Q    Okay.  For these protocols for other
17  schools that are -- that have some common evidence
18  and are in development, those -- do those analyses
19  involve a determination of what state law will
20  apply to those claims?
21      A    For the '95 applications, before we can
22  adjudicate any application, we would need to --
23  yeah, we would need to determine what the -- what
24  state law will be that will be used to determine
25  the case.
```

Page 52

```
 1      Q    Do you know about what percentage of
 2  pending applications fall under the '95 regs?
 3      A    I really don't.  A good number, but
 4  I -- I don't know percentage-wise what the
 5  breakdown is between '95 and 2016, and it's not as
 6  simple as you'd think probably because it -- it
 7  involves whether or not they have FFEL loans that
 8  would result in the case being consolidated, so
 9  there's just a variety of factors that go into it.
10      There are also a lot of borrowers who
11  are covered by both because it's dependent on the
12  date of the loan, so they may have loans that --
13  some of them are subject to the '95 reg and others
14  are 2016.
15      Q    Okay.  For claims that are subject to
16  the '95 reg, who decides ultimately what state law
17  should apply?
18      A    Well, currently?  Is that what --
19      Q    Currently.
20      A    -- what time period?
21      Currently, we have -- basically, we
22  have concluded with respect to ITT in particular
23  for the employment prospects that we would apply
24  the state where the borrower resided at the time
25  of separation from the school as a rebuttable
```

Page 53

```
 1  presumption.  And that's because we're dealing
 2  with hundreds of thousands of applications overall
 3  and something like 30-something thousand ITT
 4  cases.
 5      And you can't really do an individual
 6  choice of law assessment on each individual case.
 7  I mean, as you know, those can get litigated for
 8  months on one single case in a lawsuit.  So for
 9  the purpose of doing it in a way that's
10  administratively possible, we have a default to
11  the -- I believe it's the state where the borrower
12  lived at the time of separation from the school,
13  and we have different data points that we use to
14  try to determine that.
15      But if the borrower thinks that a
16  different law -- thinks that we got it wrong on
17  determining that based on the data or thinks that
18  a different law should have been applied, then
19  that's something that they can seek
20  reconsideration on, and we would certainly look to
21  that unless the borrower had specifically asked
22  that a certain law be applied.  That would be the
23  exception.  It's very rare, but there are
24  borrowers that say my case should be adjudicated
25  under X law because that's where my campus was
```

Page 78

```
1            And just to clarify, the '95 regulation
2   is the old regulation.  2016, we refer to as the
3   2016 regulation because that's when it was
4   published, but it actually went into effect by
5   court order in 2018.  We still refer to it as the
6   2016 regulation.
7        Q    Okay.  Understood.
8            Let's switch back for a second to the
9   law applicable to -- to claims under the '95 regs.
10  So you said that you've just recently developed
11  protocols for ITT claims, non-California
12  employment-prospect-ITT claims under both the '95
13  and 2016 regs; is that correct?
14       A    That's correct.
15       Q    Okay.  So how would a borrower know
16  what law applies to their claim?
17       A    I'm not sure.  Are you asking about the
18  letters?  I'm not sure I understand.
19       Q    Yes, in communications to the borrower.
20           Do communications to the borrower state
21  what law has been applied to their claim?
22       A    I think the CCI ones reference
23  California law.  I don't think the non-CCI ones
24  state an applicable state law.  With respect to
25  those applications, though, because either the
```

Page 79

```
1   borrower failed to make an allegation that's
2   potentially the kind that could be approved or the
3   evidence to support it, so regardless of what law
4   you would apply, it's our position that the
5   application would be denied.
6            So those aren't being denied based on,
7   you know, not being able to fulfill a specific
8   element of a particular state law or a specific
9   element of the 2016 regulation.  They're either
10  just kind of something that wouldn't get through a
11  12(b)(6) analysis or they're just lacking in
12  evidence.
13       Q    Are you talking specifically about ITT
14  claims?
15       A    No.  I thought you were referring to
16  the letters, so the ones that have gone out so
17  far, we haven't issued any denials that were based
18  on kind of an application of specific elements of,
19  you know, state law where there could be a
20  different answer in California versus Nebraska.
21       Q    Okay.  Let's look at the denial
22  letters.  That is tab -- give me a second.  That's
23  tab 13 in the hard copies.  On the Dropbox, that's
24  the bracket number 13 ECF 116, Defendants'
25  Response to 8/31.  I think that should say 2020
```

Page 80

```
1   Order.
2            And that was marked as Exhibit 13 in
3   the Jones deposition.
4            (Exhibit 13 referred to.)
5            THE WITNESS:  Just to make sure I have
6   the right document, it's Defendants' Response to
7   August 31, 2020 Order.
8       BY MS. ELLIS:
9       Q    Yes, that's correct.
10      A    Okay.
11      Q    So this document, I'll represent to
12  you, is a filing in this case where -- where the
13  government attached the four types of form denial
14  letters, which we've been referring to as forms A,
15  B, C and D according to their attachment letters
16  here in this document.
17           So if you flip to the bottom of page 2
18  of the motion which is page 3 of the document,
19  there's a heading near the bottom of the page,
20  Form of denial letters utilized by the department
21  since December 2019.
22           Do you see that?
23      A    Yes.
24      Q    Okay.  And then at the bottom of the
25  page going onto the next page, it lists -- it
```

Page 81

```
1   describes the purposes of the four different
2   letters that are attached as exhibits A, B, C and
3   D to the motion.
4            So for applications from ITT that have
5   been so far denied, which of these four form
6   denial letters would they have received?
7       A    I think it's D.  Yes, I think D is the
8   one that's non-Corinthian but where there is
9   common evidence related to the school.
10      Q    Okay.  So let's flip to form D.  That's
11  the page 22 of the PDF for those looking at it
12  electronically.  And then the actual text of it
13  starts on page 23 of the PDF.  It's document 116-4
14  on the ECF stamps at the top of the page.
15      A    Thank you.
16      Q    So this is an example of form D, and
17  then you can see at the bottom of this first page
18  it shows where someone would fill in blanks for
19  allegation type, primary school and review
20  recommendation reason.
21      A    Correct.
22      Q    Okay.  Is it the case that review
23  recommendation reason is sometimes filled in with
24  the phrase failure to state a claim?
25      A    It's a -- it's a drop-down in our
```

Page 82

1  platform, but it's filled in by my team, and then
2  that's used to populate these letters by our
3  contractor.
4      Q      Uh-huh.
5             And one of the options in the drop-down
6  is failure to state a claim?
7      A      Correct.
8      Q      So what -- what does that mean?
9      A      It's like a 12(b)(6) analysis, does the
10 borrower make an allegation that could potentially
11 lead to, you know, an illegal case filed in court.
12 Is it something that a court would not dismiss on
13 a 12(b)(6) motion kind of thing.  So an example
14 will be does the borrower allege that the school
15 made a misrepresentation to the borrower on which
16 they relied to, you know, enroll in the school or
17 whatever, based -- something along those lines.
18     Q      How is it determined that an
19 application fails to state a claim if it hasn't
20 yet been determined what law applies?
21     A      It's -- the bar is just -- you know, is
22 an alleged misrepresentation, generally, would be
23 the most common.  So, you know, we get
24 applications on folks who say my loans were too
25 expensive; my school is terrible; my teacher was

Page 83

1  abusive; things that are not borrower
2  defense-related issues; sexual harassment by a
3  staff member; didn't get the classes I wanted.
4             You know, just a whole variety of
5  different things that borrowers may include in
6  their application, but are not something that are
7  of the type that would, you know, provide
8  eligibility for borrower defense relief
9  potentially.
10     Q      Do you know how many form D notices
11 have been mailed out since this form was --
12 started being used?
13     A      I don't.
14     Q      Do you have a sense of what percentage
15 of claims denied under form D fit the description
16 you're giving of someone who doesn't provide any
17 allegation that could potentially state a borrower
18 defense claim?
19     A      As to one of the allegations?  So, in
20 other words, if you see in this letter, there
21 are -- I don't know how many are here -- there's
22 two on this example, but there could be five
23 different allegations in one claim or one
24 application, so those would be five separate
25 claims, and one of the claims might be denied for

Page 84

1  failure to state a claim and another might be
2  denied for insufficient evidence.  It depends on
3  the nature of the claim and what the borrower
4  states for that particular claim.
5      Q      So you're saying that you -- you can't
6  estimate the number of applications that have been
7  denied -- that have received a form denial letter
8  solely because they failed to state any sort of
9  claim?
10     A      I -- I don't know the number off the
11 top of my head, no.
12     Q      Are there department records that would
13 show how many applicants who received form D
14 denial letters -- it was based solely on failure
15 to state a claim?
16     A      It's data in our system, so I'm sure
17 there's some way to pull that.  Yeah, I'm sure
18 there's some way to pull it out of our system, but
19 I don't know that there's a record existing
20 somewhere.  I think somebody would have to do some
21 kind of a data pull.
22     Q      So if -- if an allegation was this
23 school made job-placement-rate-misrepresentation
24 claims, that would not be rejected for failure to
25 state a claim?

Page 85

1      A      It should not be.  I can't say that we
2  have never made a mistake, but the protocol would
3  be that that would then go to, you know, whether
4  there's evidence.  So that would not -- the -- the
5  claim itself, if it were rejected or if the -- if
6  that particular claim was denied, would not be
7  denied based on that.
8      Q      If someone alleged that the school made
9  a job-placement-rate-misrepresentation claim, but
10 the applicant did not specifically state that they
11 relied on that misrepresentation, would that be
12 denied for failure to state a claim?
13     A      I believe so.  I'm trying to remember
14 the drop-downs and what the available drop-down --
15 what the protocol calls for.  The -- I believe the
16 protocol references lack of reliance, so it
17 actually -- that might be an option -- I don't
18 recall, though.  I'd have to look at the protocols
19 to see what -- what the particular entry would be
20 that would show up there.
21     Q      Other than a new protocol that's been
22 developed for ITT non-California
23 employment-prospects claims, has BDU also
24 developed a new form of denial letter to go with
25 that protocol, or would claims denied under that

Page 86

1  protocol continue to receive form D letters?
2      A    Well, your question assumes that BDU
3  develops the letters, and we -- these are not our
4  letters.
5      Q    Okay.  Let me -- let me back up, then,
6  to ask more generally about the -- about the
7  denial letters.
8          So who did develop forms A through D
9  denial letters?
10     A    I think there were a lot of folks
11 involved in it.  At the time, the crew at Mark
12 Brown had wanted my team, the borrower defense
13 unit, to focus on adjudications.  So there was an
14 FSA communications team and our borrower defense
15 program management team, which was a new -- new
16 group, that were kind of tasked with sharing the
17 process for having the letters done.
18         And that was approval letters and
19 denial letters because that -- there were several
20 approval letters, I believe, that were originally
21 developed.  So it's all kind of done at the same
22 time.
23         And then they worked with our senior
24 leadership at the department and the Office of
25 General Counsel on the letters.

Page 87

1      Q    Who ultimately was responsible for
2  approving the form denial letters?
3      A    I can't answer that.  I don't know that
4  there was one person, but I think Mark Brown would
5  probably be a better person to ask because he
6  would have interacted with the folks at LBJ on
7  whether they were given the green light to
8  proceed.
9      Q    How did you find out about the form
10 denial letters?
11     A    About their existence?
12     Q    Yes.
13     A    I was always kind of kept in the loop
14 because my team -- the data that shows up -- so
15 all of these kind of highlighted areas -- it's
16 gray on mine, but I think the original versions
17 are yellow highlights.  Those are fields that are
18 in our platform.  So, you know, we were kind of in
19 a consulting role for what available fields could
20 be pulled into the letter.
21         So I was -- I was on a number of the
22 calls and emails and things along those lines to
23 get the letters finalized, so I don't know when I
24 first became aware -- I mean, I became aware that
25 they were drafting them around the time of when

Page 88

1  they finalized the relief methodology or were
2  close to finalizing the relief methodology for the
3  approvals.
4      Q    And who did you -- who did you consult
5  with about this information that BDU was able to
6  provide for the denial letters?
7      A    Like who asked for input on them?
8      Q    Yeah.
9      A    The head of the communications team
10 that was working on this was a woman named Nicki
11 Meoli.  M-E-O-L-I.  And we worked closely with
12 Chad Schrecengost.  I'm going to get the spelling
13 wrong on this, I think.  S-C-H-R-E-C-E-N-G-O-S-T.
14 I'm pretty sure that's wrong, but that's close.
15     Q    Good effort.
16     A    And I think those were the two folks at
17 FSA who would have asked me or my team for, you
18 know, what is this field; how do you we -- what do
19 we have to fill out, that kind of thing.
20         And then I -- I was also on some calls
21 to that effect with GC.
22     Q    With who?
23     A    Our Office of General Counsel.  I'm
24 sorry.
25     Q    Okay.

Page 89

1          MR. MERRITT:  I'll note for the record
2  that Chad Schrecengost is listed in defendants'
3  response, interrogatory number 2, for spelling and
4  whatever else.
5          BY MS. ELLIS:
6      Q    Okay.  But then beyond Meoli,
7  Schrecengost and some people from OGC, you don't
8  know who was actually involved in the drafting or
9  approval of these letters?
10     A    You broke up a little bit there.  I'm
11 sorry, Rebecca.  Could you repeat that again?
12     Q    No problem.
13         So besides Meoli, Schrecengost and
14 certain people from OGC, you don't know who else
15 was involved in drafting or approving the letters?
16     A    Well, I think those are two different
17 things, the drafting and the approving.  And I
18 don't know all of the people who had a hand in
19 drafting the letter.  I know it was a weeks' long
20 process, so I'm sure there were a lot of people
21 who worked on them.
22         And then I was not involved in, you
23 know, kind of the final sign-off on it, so as I
24 said, I think Mark Brown would probably be the
25 best person to ask that.

Page 94

```
 1   prospects would be denied for failure to state a
 2   legal claim.
 3              Is there any way to tell from this
 4   letter why --
 5        A    Sorry.  I --
 6        Q    Wait.
 7        A    You broke up again.  And I don't know
 8   if it's a problem on my end or if it's other folks
 9   or -- I missed the first half of the question,
10   though.  Would you please repeat it?
11        Q    Okay.  We talked earlier that an
12   allegation of misrepresentation of employment
13   prospects should probably be unlikely to be denied
14   for the reason of failure to state a legal claim.
15              Is there any way to tell from this
16   letter why her particular allegations were
17   insufficient?
18              MR. MERRITT:  Objection to the
19   characterization of the prior testimony.
20              BY MS. ELLIS:
21        Q    You can answer.
22        A    I'm not sure I can.  Can you rephrase?
23        Q    It's all right.  I'll move on.
24              Let's move down to allegations 4 and 5.
25   The letter states that these allegations were
```

Page 95

```
 1   rejected for insufficient evidence; is that
 2   correct?
 3        A    That's what it says, yes.
 4        Q    Is there any way to tell from this
 5   letter what about Theresa Sweet's evidence was
 6   insufficient?
 7        A    Well, your -- I think you're assuming
 8   that there was evidence, which I don't know from
 9   this, necessarily, but, you know, it could be that
10   there was no evidence, but the drop-down -- the
11   available drop-down is insufficient evidence.  So
12   the conclusion was that whatever it was that was
13   included was insufficient to support the claim.
14        Q    Are borrowers' own statements on their
15   applications considered evidence?
16        A    They're -- they're evidence.  The
17   statement in and of itself without any
18   corroborating evidence would not be sufficient to
19   approve an application, though.
20        Q    The statements on -- of our defense
21   application are made under the penalties of
22   perjury; is that correct?
23        A    Yes.
24        Q    So why wouldn't the borrower's sworn
25   statement be considered sufficient evidence?
```

Page 96

```
 1        A    That's always been a policy in borrower
 2   defense going back to 2016; that one borrower's
 3   statement without corroboration would not be
 4   sufficient to -- to approve an application.
 5        Q    What sort of documentation does BDU
 6   expect borrowers to provide in order to rise to
 7   the level of sufficient evidence?
 8        A    I would take issue with the way you
 9   framed that.  We don't have any particular
10   expectation one way or another.  We're just
11   adjudicating based on the evidence in front of us,
12   so, you know, whether that comes from the borrower
13   or from some other source, we make an assessment
14   of the evidence.  But I don't have a particular
15   expectation one way or the other.
16        Q    Does the borrower defense application
17   state that the applicant must submit corroborating
18   materials in order for their claim to be
19   considered?
20        A    Which application are you referring to?
21        Q    I'm referring to the standard form
22   application that's available on the department's
23   Web site.
24        A    I don't recall exactly what the wording
25   is.  I know it requires the borrower to provide
```

Page 97

```
 1   detailed information, encourages the borrower to
 2   provide supporting evidence, but I don't remember
 3   exactly what the language is.
 4        Q    Do you know who originally set the
 5   policy that the borrower's statement alone would
 6   be insufficient to make out a borrower defense
 7   claim?
 8        A    I don't, but that was the policy when I
 9   joined in October of 2016.
10        Q    Is that a written policy?
11        A    It's in -- I remember seeing documents
12   somewhere along the way back at that point, so I
13   guess it depends on what you mean by a written
14   policy, but it's -- it's recorded in -- I can
15   remember PowerPoints or something.  I'm sure
16   there's other documentation going back that far.
17        Q    Do you know if that PowerPoint has been
18   provided for production in this case?
19        A    I don't know.
20        Q    Would that be considered a policy
21   decision?
22        A    Yes.
23        Q    So that's a decision that would not be
24   made by someone at FSA?
25        A    That's correct.
```

Page 98

1    Q    Looking back at tab 15, Exhibit 15, the
2 first page of Theresa Sweet's denial letter states
3 that she was enrolled at Brooks Institute; is that
4 correct?
5    A    I'm sorry.  You're on her affidavit
6 now?
7    Q    Yeah.  I'm sorry.  It's the first page
8 of the denial letter which is page 51 of the ECF
9 filing.
10   A    Yes, it says she was enrolled at Brooks
11 Institute.
12   Q    Yes.
13        Is Brooks Institute a school for which
14 BDU has common evidence?
15   A    If memory serves, Brooks Institute is
16 part of the CEC school group, if I am remembering
17 correctly.  I could be wrong on that, but I think
18 it is.  And we do have common evidence relating to
19 CEC.  Whether or not it specifically relates to
20 Brooks, I don't recall.
21   Q    Let's look back at your declaration,
22 tab 21, marked as Exhibit 21.  And I'm looking at
23 paragraph 68 which is on page 16.
24   A    Okay.
25   Q    Could you read the second sentence of

Page 99

1 that paragraph, please?
2    A    Sure.  The second sentence?
3    Q    Of paragraph 68, beginning with,
4 Additionally?
5    A    Additionally, BDU has initiated its
6 review and analysis of the evidence relating to
7 ITT (including campuses outside of California),
8 DeVry University and Brooks Institute but has not
9 had available staff to complete that work and
10 proceed to adjudicate applications from borrowers
11 who attended those schools.
12   Q    So does that refresh your recollection
13 on whether there's common evidence on Brooks
14 Institute?
15   A    Yes.
16   Q    If the review and analysis of common
17 evidence for Brooks Institute was not yet
18 complete, how could Theresa Sweet's application be
19 denied for insufficient evidence?
20   A    Well, your question, I think, is
21 premised on a timing -- you know, if it's not
22 true, it's not true.  This was in November of
23 2019, and I don't know what the date of her letter
24 is.  July of 2020.  So we were in a different
25 stage when we issued her letter.

Page 100

1    Q    So the review and analysis of evidence
2 relating to Brooks Institute is now complete?
3    A    No, but we've done the preliminary
4 analysis that I referred to earlier more generally
5 in terms of the scope of the evidence.  So we must
6 have included that whatever time period that she
7 attended or her program or whatever it is that we
8 concluded the scope of Brooks is, that she falls
9 outside that scope.
10   Q    Whose decision was it to take an
11 approach to borrower defense adjudication where
12 applications would be ruled out by common evidence
13 rather than ruled in by common evidence?
14   A    Well, in 2019, we were directed to move
15 forward at a very accelerated pace, and so, you
16 know, there were a lot of discussions about how to
17 do that and how to get through the backlog in
18 2020.  They wanted all of the cases adjudicated in
19 2020.
20        And the only way to hit the metrics
21 that were required of us were to focus on cases
22 that had established protocols, so the same ones
23 that we were talking about earlier, and cases
24 where either there was no common evidence, which
25 we did those first, or where we could assess what

Page 101

1 the scope of the common evidence was and then move
2 forward on adjudicating other cases.
3        So it was kind of a sequencing issue so
4 that we could continue to meet the -- the weekly
5 numbers that we needed to meet in order to
6 adjudicate the cases.
7        In a perfect world, we would review all
8 of the evidence relating to the school before
9 adjudicating a single case, but if that were the
10 case, then we probably would not be issuing
11 decisions for most of 2020 because, you know, to
12 the extent that, you know, most of the cases that
13 are left right now, at least potentially, are
14 related to some common evidence or the borrower
15 provided substantial evidence of their own or at
16 least some evidence that could potentially support
17 the claim.
18        So it's a -- it was just a sequencing
19 issue that been ordered to the numbers.  That's
20 the way we moved forward.
21   Q    Who set the target numbers?
22   A    The secretary set the elimination of
23 the backlog, and my understanding is that, based
24 on the numbers that were pending at the time, that
25 Mark Brown just did the math essentially and set a

Page 138

1  panel had completed their work.  The IG
2  investigation was wrapping up.  There wasn't a
3  report yet.  I don't know if there was preliminary
4  information given, but they weren't going to make
5  any changes to JPR.
6         So I don't know exactly what it was,
7  but I think that the ask might have been specific
8  to JPR claims.
9         Q    When you say that was an ask, that was
10  a request you believe Julian Schmoke made to Jim
11  Manning?
12         A    I believe so, yes.
13         Q    Okay.  And in this time in October,
14  November 2017, was BDU making progress towards
15  adjudication of any other claims besides CCI JPR?
16         A    We were focused on JPR at that point.
17  I don't know what the numbers were at that point,
18  but it was probably in the range of 100,000
19  Corinthian cases or more.  It might have been a
20  lot more than that, actually.
21         And the priority -- which was true
22  under the previous administration as well, but was
23  true under this one, is they wanted us to work
24  through the Corinthian claims that the department
25  had represented would be handled in an expedited

Page 139

1  fashion, so that was what our focus was for when
2  we were -- you know, as soon as we were allowed to
3  proceed, yeah, in that period of time.
4         Q    Okay.  Flipping back to paragraph 23 of
5  your declaration, which is on page 7.  In the
6  second sentence, you write, Starting in 2018 after
7  processing of adjudications were resumed, we were
8  given authority to increase our contractor staff.
9         Do you see that?
10         A    I do.
11         Q    So, excuse me, when in 2018 did the
12  processing resume?
13         A    Again, we don't do the processing, so I
14  don't know exactly when that piece started, but
15  the approval that happened prior to processing, so
16  when we would send the package to OUS and they
17  would sign off, started, I believe, in 2017.  It
18  coincided with the relief methodology -- when that
19  relief methodology was finalized.
20         And we started submitting -- they
21  wanted us then to move quickly on submitting
22  approval packages.  So I think it was actually
23  2017 when we started sending them up.  It may be
24  that they didn't actually get processed until
25  early 2018.

Page 140

1         Q    I see.
2         Was there a point where BDU began
3  adjudicating other claims again in addition to CCI
4  JPR?
5         A    Yes.
6         Q    And when was that?
7         A    Well, the results of the IG
8  investigation were that they didn't recommend any
9  changes to our review protocols, and, similarly,
10  nothing came out of the BDU review panel in
11  connection with that.
12         So once the IG report was done, which I
13  believe was around the end of November, beginning
14  of December, basically there was nothing else to,
15  you know, hold us back at that point, I think.
16         So we had already started moving
17  forward to J-- -- on JPR claims at that point, and
18  I'm sure it was probably soon after that Julian
19  would have had a conversation with Manning about,
20  you know, we should get started on these other
21  ones again, too, but I don't remember the exact
22  timing.
23         Q    And, so, sometime in 2018, you got
24  authority to increase your contractor staff to
25  work on this resumed process of adjudication?

Page 141

1         A    Correct.
2         Q    Who gave the authority to increase the
3  contractor staff?
4         A    Well, it was conveyed to me by Julian
5  Schmoke, but, you know, there are budget
6  implications to that, so it would have gone up
7  through FSA, and at that point, I think, Jim
8  Manning was both acting chief operating officer
9  and also the acting under secretary.  So I don't
10  know in which capacity he approved it, but I'm
11  pretty sure he's the one who signed off on the
12  additional money needed to hire the contractors.
13         Q    And then after the IG report came out,
14  did the development of new protocols for other
15  schools also resume?
16         A    We were just trying to catch up.
17  The -- the cases that were coming in for
18  Corinthian were exceeding what we were able to
19  adjudicate, so the week over week because of the
20  limited staff we had up to and including when we
21  had these additional contractors, I think, we
22  weren't even keeping pace.  So we were just trying
23  to keep up with the Corinthian cases at that
24  point.  There really was no time to work on other
25  protocols.

Page 142

1    Q    And you had requested additional staff
2  by this point?
3    A    I'm sure multiple times, yes.
4    Q    The contractors who you hired in 2018,
5  what was their role?
6    A    2018.  We've had three different
7  contracting companies, so I'm just thinking which
8  one.  But -- I mean, first and foremost the
9  contractors were to focus on job-placement-rate
10 claim because there is zero discretion,
11 essentially, on those.  It's a matter of what
12 program was the person in, what campus did they
13 attend, what time period did they attend and then
14 how does that line up with the findings.
15        So those we typically pushed to -- to
16 the contracting staff.
17        In 2018, we also were starting to look
18 at the one-off claims and how those could be
19 handled, and there was a lot of trial and error
20 about that and fits and starts or however you want
21 to put it.  We did some kind of pilot testing to
22 see how the contractors did in terms of kind of
23 summarizing the borrower claim or, you know,
24 looking at if we had a school that had fewer than
25 ten claims but, you know, at least seven or eight

Page 143

1  kind of summarizing what the claims were to see if
2  there was any, you know, common theme or anything
3  that included evidence that would support it.
4        So that was all kind of going on in
5  2018 with the contractors, but a lot of it was not
6  very successful, unfortunately, so most of it
7  didn't end up advancing the ball too much.
8    Q    What was the point at which or was
9  there a point at which BDU had sufficient staff to
10 resume working on creating new protocols for other
11 schools other than Corinthian?
12   A    Well, we've been working towards that
13 since we started staffing up a year ago.  One of
14 the things that I did that I think has helped is
15 we phased out of using contractors and brought on
16 term-appointed attorneys that are actually
17 full-time attorneys, and I had control over who we
18 hired and we got really good people, and I think
19 it was just a much higher caliber of people that
20 were working on the claims at that point than some
21 of our contractor staff, unfortunately.
22        So that definitely helped us both in
23 terms of numbers and capabilities.
24        And, so, really since we started
25 staffing up towards the end of last year, I've

Page 144

1  divided people up into teams and kind of different
2  work flows so that we're moving forward on a whole
3  bunch of schools at the same time while also
4  trying to meet the metrics that are required of us
5  in terms of hitting our adjudication numbers.
6        So, you know, it takes a while to get
7  people up to speed, though, once they join BDU,
8  and there's a pretty robust training period and
9  learning curve, so it's a few months at least
10 before people are making, you know, pretty
11 significant contributions, so it wasn't really
12 until this spring, I think, when we were in a
13 position to -- to make really appreciable progress
14 on -- on other schools.
15        So there are a bunch of things that are
16 kind of moving along at a parallel track right
17 now, so it could be that -- it's not going to be
18 that we'll hit one school and then not another one
19 for a long time.  I think there will be several of
20 them that will kind of reach of point of having a
21 review protocol pretty close in time.
22   Q    So it was about three years, from
23 spring 2017 to spring 2020, that, in your opinion,
24 BDU was not really in a position to make any
25 significant progress on protocols for

Page 145

1  non-Corinthian schools?
2    A    Yes.
3    Q    I think I might have asked this before,
4  but just to be clear, do you have any
5  understanding of the reasons why your requests for
6  additional staff were denied after the
7  department-wide hiring freeze ended?
8    A    That's above my pay grade.  I don't
9  know.
10   Q    Okay.  So I'm going to flip over to
11 paragraph 64 of your declaration.  That's on
12 page 15.  That paragraph says, Additionally,
13 between December 2017 and May 2018, OUS authorized
14 the denial of over 10,000 applications.
15       Is that right?
16   A    That's what it says, yes.
17   Q    Do you remember what the basis was for
18 the denial of these applications?
19   A    I believe the ones that were done at
20 that time were Corinthian denials where the
21 borrowers had only asserted a job-placement-rate
22 claim.
23   Q    And they didn't fit into the
24 job-placement-rate evidence, and so they had no
25 other basis for relief?

Page 146

1    A    Correct.
2    Q    So this was during the period when OUS
3  had to authorize the denial of borrower defense
4  applications?
5    A    That was the system that was set up at
6  the time.  Yeah, we just followed the same thing
7  that we were doing for the approvals at that
8  point, so similar thing.  It was a package with a
9  cover memo, a letter and a list of applications
10 that are -- claims that would be getting that
11 letter, so it was similar for both approvals and
12 denials.
13   Q    And, so, at this time today, since the
14 2016 regulations went into effect after the Bauer
15 decision, does OUS have to sign off on denials
16 before they become final?
17   A    No.
18   Q    Are you the final decision maker on
19 denials?
20   A    Myself and the supervisors on my team,
21 yes.
22   Q    So then in the next paragraph,
23 paragraph 65 of your declaration, it states that,
24 No additional decisions have been issued to
25 borrowers since in or about June 2018.

Page 147

1         And this declaration, you signed it in
2  November 2019; correct?
3    A    Yes, correct.
4    Q    So between June 2018 and November 2019,
5  no decisions -- no borrower defense decisions had
6  been issued to borrowers?
7    A    That's my understanding, yes.
8    Q    Why -- why did BDU stop issuing
9  decisions at that time in June 2018?
10   A    BDU doesn't issue decisions, period,
11 but FSA stopped issuing decisions.
12   Q    Why did FSA stop issuing decisions in
13 June 2018?
14   A    Well, my understanding is that
15 following the Manriquez injunction, there was a
16 hold put on approvals and the department made the
17 decision to not issue denials until they could
18 send out approvals as well, and so that coincided
19 with the June 2018 -- I think that's -- that's
20 when they put the brakes on, essentially.
21   Q    Do you know who made the decision to
22 not issue anymore approvals at that time?
23   A    I don't.
24   Q    Do you know who -- excuse me.
25        Do you know who made the decision to

Page 148

1  not issue any denials until approvals started
2  issuing?
3    A    I don't.
4    Q    Who did you find out about these
5  decisions from?
6    A    I believe it was Justin Riemer who
7  communicated that to me.
8    Q    So Justin Riemer might know who the
9  ultimate decision maker was?
10   A    Presumably, yeah.
11   Q    So have you seen the injunction order
12 in the Calvillo Manriquez case?
13   A    A while ago.  But, yeah, I read it,
14 yeah.
15   Q    Do you have an understanding of who is
16 in the class in that case?
17   A    Yes.
18   Q    What's your understanding of that?
19   A    Borrowers with approved
20 job-placement-rate claims that attended Corinthian
21 colleges.
22   Q    And is it your understanding that the
23 injunction prevents the department from using the
24 December 2017 partial relief methodology for that
25 class of borrowers?

Page 149

1    A    Yes.
2    Q    So is it your understanding that FSA
3  could have, consistent with the Calvillo
4  injunction, issued approvals of borrower defense
5  claims for 100 percent relief?
6    A    I don't believe the injunction
7  precludes that.  I think it specifically says that
8  the department could, if I'm remembering
9  correctly.
10   Q    Was there a policy in place so the
11 department would not grant 100 percent relief to
12 Calvillo class members?
13   A    Policy was the relief methodology.  I
14 believe the 2017 methodology did actually have as
15 one of the potential outcomes 100 percent relief.
16 It was fairly narrow, I believe, but that's my
17 recollection is that there was some percentage
18 that -- or some -- some subset depending on the
19 program that they attended that they could have
20 gotten 100 percent.  And then under the
21 methodology, all of the other borrowers would get
22 a different percentage.
23   Q    Do you know whether any grants of
24 100 percent relief were actually issued following
25 the Calvillo Manriquez injunction?

Page 150

1    A    Not that I recall, but it's possible.
2    Q    So consistent with the Calvillo
3 Manriquez injunction, FSA could have processed
4 borrower defense application grants for people who
5 were not making Corinthian JPR claims; is that
6 correct?
7    A    The -- are you asking whether it
8 applied to -- it didn't apply to people who had
9 other -- if their approval was based on something
10 other than job placement rates, the injunction did
11 not apply, yes.
12    Q    Here in paragraph 65 of your
13 declaration, which we were looking at a minute
14 ago, you write in the middle of the paragraph
15 that, Approximately 1,000 applications from CCI
16 and ITT borrowers have been adjudicated as
17 approvals and are not subject to the Manriquez
18 injunction.
19         Was that correct?
20    A    I'm sure it is.  I'm sure I looked at
21 the data at the time.
22    Q    So do you know why those approvals were
23 not processed?
24    A    I don't know what the rationale for the
25 policy was, but my understanding that was -- there

Page 151

1 was a policy that we were not issuing any
2 decisions on borrower defense at that point.
3    Q    Do you know why -- well, let me back
4 up.
5         Do you know who made the decision that
6 no decisions would issue on borrower defense even
7 for borrowers who are not part of the Calvillo
8 Manriquez class?
9    A    I don't know.
10    Q    Did you discuss that decision with
11 anyone?
12    A    I'm sure I did.  I would have told
13 my -- I don't have a specific recollection of it,
14 but I would have told my team.  And I'm sure I
15 became aware somehow, but I don't remember who
16 told me.
17         Again, we don't process the decision,
18 so it was just kind of an FYI sort of thing for me
19 and my team, but impact what -- you know, whether
20 or not we would move forward on the adjudications.
21    Q    During this period when no approvals or
22 denials were issuing, was BDU continuing to
23 adjudicate applications?
24    A    Yes.
25    Q    And we talked earlier about there being

Page 152

1 a sort of step 1 and step 2 of the disposition of
2 borrower defense applications where step 1 is
3 entitlement to relief and step 2 was the amount of
4 relief.
5         So BDU was continuing with step 1 at
6 this time between June 2018 and November 2019?
7    A    That's correct.
8    Q    Were you -- did you at any time become
9 aware of a decision that the partial relief
10 methodology originally developed for the CCI JPR
11 claims would be applied to other types of claims?
12    A    Yes.  It involved getting data from
13 Social Security, and the department had worked
14 with Social Security to get the data for ITT.
15         I don't know if there were any other
16 schools.  That's the only one that I can recall.
17    Q    Do you know who made the decision to
18 expand that methodology to ITT?
19    A    I don't know.  No, I don't know.  I'm
20 sorry.
21    Q    Do you remember when you became aware
22 that the department had gathered this Social
23 Security information for the purpose of using it
24 for ITT relief?
25    A    Well, I was aware pretty early on

Page 153

1 because to get the data from Social Security they
2 needed data from the platform that my team uses to
3 come up with a list of borrowers that were being
4 submitted, so we were kind of a subject-matter
5 expert on how you would do that, I think.
6         And we had a fairly new system that had
7 sort of -- we had actually really two new systems.
8 We had an Access platform that became live in late
9 2017, and then around that time would have been
10 when we were migrating the data to our new
11 Salesforce platform.
12         So I'm sure I knew very early on.  I
13 don't remember exactly what the timing was.
14    Q    Would that have been in 2017?
15    A    I think it was probably early 2018, or
16 more like spring of 2018, maybe.
17    Q    So it would have been after the partial
18 relief methodology was announced but before the
19 Calvillo Manriquez injunction?
20    A    Yes, we received the data from Social
21 Security just prior to the injunction, I believe.
22 So I don't remember how long it took for Social
23 Security to do that, but whatever that time frame
24 is.
25    Q    Okay.  So was it your understanding

Page 158

```
1   remember who, though.  We've done similar decks
2   for each time we had a new chief operating
3   officer, which doesn't match up with this
4   timeline.  So it might have been the deputy
5   secretary or someone else, but I think it was a
6   briefing to prepare somebody or to kind of give a
7   general status to someone new in leadership or
8   someone newly involved in BD.
9       Q    Okay.  On page 5 of the document.  It's
10  numbered as slide 5, and, also, it has a Bates at
11  the bottom AR-A-0227.  So this slide appears to be
12  giving an update on applications adjudicated, but
13  not processed, as of August 2019.  It states,
14  there are over 1,400 schools with denied
15  applications that are pending processing.
16           That's the second major bullet down.
17           And it specifically mentions denied
18  applications for Wright Career College and
19  Marinello School of Beauty.
20           Do you see that?
21      A    I do.
22      Q    Do you recall the reasons why those two
23  schools had a significant number of claims denied?
24      A    I don't.  We have thousands of schools,
25  so I apologize.  I don't remember the specifics on
```

Page 159

```
1   these.
2       Q    Okay.  On the next slide, the slide is
3   titled Why Are BD Applications on Hold.
4            The first topic listed is approvals,
5   and on the second bullet it says, No relief
6   methodology developed for non-CCI claims.
7            Can you explain what that meant as of
8   August 2019 when this slide was written?
9       A    I don't know.  As I'm looking at this
10  deck, this is not exactly what I was thinking it
11  was because the first -- slide 2 is something that
12  I'm very familiar with.  Slide 3 is one that I've
13  worked on, but these other slides, I'm not sure
14  who put them together.
15           As with the second bullet, that's true.
16  And maybe it was in reference to ITT.  That's all
17  I can think of.
18      Q    For -- for non-CCI claims, was there --
19  were you involved in any discussions about
20  development of a new relief methodology?
21      A    Yes.  Mostly as a subject-matter expert
22  for our policy team who was involved in
23  conversations with LBJ on it.
24      Q    Who was --
25      A    I should say policy implementation
```

Page 160

```
1   team.  They don't make policy.  They -- they
2   implement the policy that we get from LBJ.
3       Q    Who's -- who makes up the policy
4   implementation team?
5       A    Currently, the acting director of
6   policy implementation is Ian Foss, and he was also
7   one of the leads with respect to -- and is with
8   respect to FSA applying the 2019 methodology to
9   school-specific data.  He's got people on his team
10  that work on that.
11      Q    When was the policy implementation team
12  created?
13      A    Oh, that's a long-standing -- I mean,
14  that -- the name, I think, also changed during the
15  restructuring last fall, but they're not related
16  in particular to BD.  That's part of FSA.
17           Any time there's a new regulation or,
18  you know, kind of global policy on anything, in
19  fact -- that affects student loans, they work very
20  closely.  They're also involved in, like,
21  negotiated-rulemaking process and all that.
22      Q    Okay.  Thank you.
23           Was there ever any discussion of giving
24  100 percent relief to any claims as of
25  approximately August 2019?
```

Page 161

```
1       A    The -- not in FSA.  The kind of
2   direction that we've been given and, I mean the
3   royal "we," but that the policy team had been
4   given was focused on developing a new methodology
5   since Manriquez was still pending.
6       Q    Who did that direction come from?
7       A    The Office of the Under Secretary,
8   Diane Jones.
9       Q    Moving down to the next section of this
10  slide under Denials, the first bullet says, Policy
11  decisions (spring 2018) to not issue denials until
12  approvals also could be issued.
13           And I think we may have mentioned this
14  earlier, but do you know who made that policy
15  decision?
16      A    I do not, not -- no.
17      Q    Do you know why that policy decision
18  was put into place?
19      A    I don't.
20      Q    Then looking down at the third bullet
21  up here in the section Denials, it says, Issuance
22  of denial decisions scheduled to resume by
23  mid-September.
24           Do you recall that expectation in
25  August 2019?
```

Page 182

1    If the reviewer sees any borrower evidence to
2    support even some of it, then that's it.  They
3    stop and it gets set aside, you know, escalated,
4    essentially, for consideration by one of the
5    senior team.
6         Q    So if an applicant provides any
7    documentation to support their claim, it gets set
8    aside?
9         A    Not any documentation because a lot of
10   what we get is -- you know, we have borrowers who
11   allege, you know, an employment prospect, kind of
12   they guaranteed me a job type of thing.  And then
13   the evidence that they attached may be relevant to
14   something but not to that, so like a transcript or
15   a program manual that doesn't have any
16   representations regarding employment prospects,
17   things like that.  There would have to be evidence
18   relevant to the claim that would potentially
19   support the claim.
20        If they make multiple claims and the
21   evidence is relevant to any of that, then it would
22   be set aside.
23        Q    Does the department make available any
24   guidance to borrowers about the types of documents
25   they should submit to support their claims?

Page 183

1         A    We -- the new application form, we
2    tried to build that into it to, you know, give
3    borrowers an indication of the kinds of things
4    that would be helpful.  So to some extent, I think
5    that's in the newer application.  I'm not aware of
6    anything that was out there, though, previously.
7         Q    Did the department make publicly
8    available any sort of list or other reference
9    of -- of schools, programs, time periods for which
10   common evidence exists?
11        A    Well, I think this is public now, so --
12        Q    Right.
13        A    -- I guess, yes.
14        Q    But before -- let's say before
15   October 14th, 2020, when this was filed, was any
16   sort of list like that publicly available?
17        A    No.
18        Q    So a borrower, at the time they apply,
19   wouldn't have a way of knowing whether their claim
20   could potentially fit into existing common
21   evidence?
22        A    That's correct.
23        Q    And they wouldn't necessarily know what
24   kind of documentation they would have to submit in
25   order to have their claim considered?

Page 184

1         A    That's probably fair.
2         Q    I'd like to look at tab 25 in the
3    printed materials on the -- on the Dropbox.  This
4    is bracket 25 Nevin Declaration Exhibit 18
5    standard protocol.
6         MS. ELLIS:  And this has not previously
7    been marked.  I'd like to -- I'd like to mark
8    this -- I believe we're on Exhibit 23 now.
9         (Deposition Exhibit 23 was marked for
10   identification and attached to the transcript.)
11        BY MS. ELLIS:
12        Q    Do you recognize this document?
13        A    Yes.
14        Q    Can you describe what this document is?
15        A    It's a standard protocol, so this is
16   what would be used for -- like we were referring
17   to before, the cases that, you know, are a one-off
18   kind of scenario or, you know, where there's not
19   common evidence that would result in a separate
20   protocol being developed for that particular
21   school.
22        Q    And when -- when you say "one-off,"
23   that doesn't necessarily mean that there was only
24   one claim from that school; right?
25        A    That's right, because one turns into

Page 185

1    two as soon as somebody else files one.  So, yeah,
2    we use that loosely to mean generally, you know,
3    very small number of claims.  I think, typically,
4    we've viewed the threshold that, you know, under
5    ten historically, but there are cases where we
6    have probably somewhere in the 10 to 20 range that
7    might still get this.
8         Q    Would this be a protocol that's applied
9    to claims where there might actually be many from
10   a particular school, but they've been determined
11   to fall outside the common evidence?
12        A    What do you mean by "many"?
13        Q    Well, for instance, let's say Art
14   Institutes, potentially thousands of claims.
15        A    No, this would never be for anything
16   like that.
17        If you look at the 2A -- 2A, you move
18   on to part II.  2B, 6 to 20, there's a memo
19   template that's completed as soon as the school
20   hits six claims to determine whether the
21   department, you know, has got any records
22   regarding the school.
23        We do that for -- for part A, that's
24   kind of done on the back end in the clearance
25   process, but, you know, the schools that are in --

Page 202

1    When -- how long does it generally take
2 between when an application is elevated and when a
3 final decision is reached?
4    A    That assumes that that's getting worked
5 on right away, and it's not.  So those are pretty
6 much set aside because they're more complex and
7 they're going to take more time to address.
8        So it's not that, you know, the
9 reviewer identifies it this morning, and then in
10 the afternoon they get feedback on it and the case
11 gets adjudicated.  If it's set aside, it's
12 probably set aside for some period of time until
13 someone has the bandwidth to, you know, dive into
14 the school a little more deeply and see if there
15 are additional steps that need to be taken.
16    Q    Okay.  Any -- can you make a
17 generalization about what that "some period of
18 time" might be?
19    A    No, there's no set time period.
20    Q    Okay.  So is it the case that many
21 applications that get elevated may be set aside
22 for weeks?
23    A    Sure.
24    Q    Yeah.
25    A    Yep.

Page 203

1    Q    Then -- but some -- have -- have any
2 applications that have been elevated under that
3 kind of protocol been finally adjudicated?
4    A    You know, if the reviewer is fairly new
5 and they're -- you know, they're following our
6 instructions, that the bar is very low, so if they
7 have any question at all, to kind of escalate it,
8 they may be escalating way too much and actually,
9 you know, escalating things that aren't evidence
10 that's actually related to the claim.
11        So I'm sure there have been some where
12 the supervising attorney works with the junior
13 attorney to explain why that actually wasn't
14 evidence that was related to the claim and,
15 therefore, it could be -- could move forward with
16 adjudication.
17        But there haven't been cases
18 adjudicated where there was a weighing of the
19 evidence.  So if the supervising attorney agreed
20 that it was evidence that was relevant to the
21 claim, then that would still be pending at this
22 point.
23    Q    Why haven't any of those been
24 adjudicated?
25    A    We're just -- it's a sequencing issue

Page 204

1 with priorities and trying to make sure that we
2 can adjudicate as many cases as possible.  Those
3 are much more time-consuming.  We probably would
4 want to document either way whether there was
5 sufficient evidence to approve it or that we
6 determined that it wasn't sufficient evidence.  So
7 those are still on hold while we work on the cases
8 that have protocols.
9    Q    Okay.  Is there -- is this generally a
10 written feedback process or a verbal one where the
11 senior attorney would tell the reviewing attorney
12 this is not really enough evidence; go ahead and
13 deny the claim?
14    A    I think it's often email or we use
15 Teams Chat or I think at one point we used Skype.
16 We also have very frequent training, so it could
17 take different forms depending on whether it's the
18 kind of thing that would -- you know, that more
19 than one reviewer might see.  Then it might be
20 something that would be addressed in a
21 supplemental training so that not just that
22 reviewer, but all of the reviewers, could get the
23 benefit of that information.
24    Q    So, then, as we continue looking down
25 the standard protocol, number 5 says, If the

Page 205

1 allegation does not state a claim, does not state
2 a BD claim or does not have sufficient evidence to
3 support a claim, set the allegation review
4 recommendation as denied.
5        So does this mean that -- that a
6 first-level reviewing attorney can deny a claim
7 based on their review of the evidence, but cannot
8 approve a claim based on their review of the
9 evidence?
10    A    Well, no, I would disagree with the
11 premise because they're not -- they're not denying
12 it based on a review of the evidence.  They're
13 denying it based on a lack of evidence, or they're
14 basing it on failure to state a claim or failure
15 to state a claim as actionable under BD.
16        But if your question is they deny it,
17 yes, the protocol clearly sets out what they're
18 allowed to do.
19    Q    When I said "review of the evidence,"
20 what I meant, essentially, was opening up the
21 application, looking at the application itself and
22 anything attached to it, and on the basis of
23 looking at those documents, they can deny the
24 claim.
25        Is that accurate?

Page 206

1     A     That's accurate.
2     Q     But they cannot approve the claim?
3     A     Well, once there's a protocol, they
4  will be able to.  So for Corinthian job prospects,
5  for Corinthian transfer of the credits, for
6  Corinthian JPR claims, all of those, ITT, they can
7  approve the claim.  It's just that it has to be
8  reduced to a very clear protocol with very
9  specific parameters.
10    Q     Understood.
11          But a line reviewer can't approve a
12  claim based on individual evidence submitted by
13  the borrower?
14    A     That's right.  We don't have them do an
15  assessment of, you know, kind of a weighing of the
16  evidence or determining the sufficiency.  It's too
17  complicated at that level to try to just open a
18  claim.  You'd have to understand what the elements
19  of the claim are, and that's dependent on the
20  regulation and the state law and, you know,
21  whether there's common evidence that supports some
22  element.
23          So the only way to make sure that we're
24  giving consistent and fair results is to give them
25  very clear criteria.

Page 207

1     Q     Why is it important to have consistent
2  and clear criteria for approvals, but not denials?
3     A     I disagree with your premise.  I think
4  that they're both consistent.
5     Q     Is there a protocol like the protocol
6  for approvals that lays things out consistently
7  and clearly to determine whether a claim should be
8  denied?
9     A     I think our protocols do lay that out
10  consistently and allow for a consistent and fair
11  adjudication either way.
12    Q     Are you referring to this standard
13  protocol as one example that allows a consistent
14  and clear result either way?
15    A     I said consistent and fair.
16    Q     I'm -- I'm sorry.  Yes.
17    A     Yes.
18    Q     The borrower defense senior attorneys
19  perform quality control review of the line
20  attorneys; is that correct?
21    A     We have a quality control team, and
22  then we also -- we have sort of different stages.
23  When somebody new joins BD, they go through a full
24  week of training and probationary period, so all
25  of their claims are reviewed at that point by

Page 208

1  either by somebody on the quality control team or
2  their supervisor or potentially both.  And then,
3  you know, throughout their, you know, review
4  process, depending on whether they're off of the
5  probationary period, then, you know, there's a
6  certain percentage of claims that are reviewed as
7  well.
8          So it kind of depends on how long
9  they've been with us and where they are in the
10  process, but we have a pretty robust training
11  process.
12    Q     I'd like to look at the responses to
13  interrogatories.  This is Exhibit 22.  I'm looking
14  at page 16 which if you flip back to page 15
15  you'll see this is the response to interrogatory
16  number 12 which asks about training for people who
17  adjudicate borrower defense claims.
18          At the bottom of page 16, this
19  interrogatory response refers to follow up
20  trainings to improve the quality of draft denial
21  letters around the end of 2018.
22          I was -- I want to ask about what --
23  what form of denial letter was being used at the
24  end of 2018?
25    A     These were -- people were trained on

Page 209

1  but they never went out.  These draft letters
2  were --
3          Let me read the paragraph for a second.
4          (Witness reviews document.)
5          Yeah.  So the earliest iteration of the
6  letters for one-off claims were not one of the
7  automated templates.  They were draft letters that
8  I mentioned before (indiscernible) trying to
9  figure out how to handle the one-off.
10          And, so, we had contract attorneys take
11  a crack at drafting the letters, and then they
12  were reviewed -- each letter would be reviewed by,
13  you know, a permanent member of the BD team and
14  work with the contract attorney to both review the
15  substance and the -- the form of the letter.
16          It was a very time-consuming and,
17  ultimately, not very successful effort to use the
18  contract attorneys in that capacity, so none of
19  those cases actually resulted in the receipt of
20  these letters.  They, ultimately, became, I think,
21  some of the letters -- the letters that went out
22  in 2019.
23    Q     In 2018 in -- around the end of 2018,
24  that was during the period when no decisions were
25  being processed; is that right?

Page 218

1  for reconsideration yet.  We just started building
2  up the reconsideration process for the
3  job-placement-rate claims in particular because
4  those have been the ones that have probably been
5  decided the longest, but we've been focusing on
6  trying to get through -- getting original
7  decisions to the entirety of the 340,000 people
8  that applied first and then reconsideration.  Once
9  I have a little bit more bandwidth, we'll start
10  moving forward on getting responses to those.
11     Q    Okay.  On -- I'm going down to the next
12  page again with the items 1 through 3.  And
13  looking at the paragraph following those numbers 1
14  through 3, the third sentence in that paragraph
15  says, Additionally, your loans will not be placed
16  into forbearance unless your request for
17  reconsideration is accepted and your case is
18  reopened.
19          What does "accepted" mean in this
20  context?
21     A    Well, we haven't really had to deal
22  with that yet because of the CARES Act and the
23  fact that all loans are in forbearance currently,
24  but that's something that we're trying to figure
25  out between now and the end of the year; although,

Page 219

1  I understand the secretary now just extended the
2  forbearance period into February because we want
3  to see if we can get that preliminary decision
4  issued before anybody's loans are affected.
5          But, essentially, you know, the way
6  that the regulation is set up, the borrower can
7  request reconsideration, and the department can
8  decide not to agree to essentially reconsider the
9  case.
10          So that's the framework that exists,
11  and so under that framework, it's not until the
12  department agrees to accept the request for
13  reconsideration and kind of do a rereview or
14  whatever that process looks like that the
15  borrower's loans are put into forbearance.
16          But one of the tricky things about that
17  is that by the time you've made that decision,
18  then it might be a pretty short window between
19  when you open the case and then actually issue a
20  new decision, so the borrower may not be in
21  forbearance very long in connection with that.
22          So we're trying to figure out how to
23  address that process.  I think we'll have probably
24  a better understanding of what that looks like in
25  a month or so.  Like I said, we're trying to

Page 220

1  figure that out before the CARES Act expires so
2  that we can address that.
3     Q    Is there a standard that's applied for
4  whether a reconsideration application will be
5  accepted?
6     A    There will be.  Like I said, we haven't
7  really filled out that process because we've been
8  focusing on trying to get results to the folks who
9  still have pending original claims.
10     Q    But it sounds like the acceptance
11  process does involve some sort of preliminary
12  review of the reconsideration application?
13     A    Potentially, but I think we're kind of
14  getting into a deliberative area right now in
15  terms of what way we go on it.
16     Q    Okay.  So you mentioned the 2016
17  regulations having a reconsideration process in
18  place.
19     A    It calls for a reconsideration process,
20  yes.
21     Q    Yes.
22          Had -- had a reconsideration process
23  been set up under the 2016 regs before these form
24  denial letters started going out?
25     A    The -- the groundwork for it in the

Page 221

1  sense that we had the mechanisms to kind of
2  collect the requests and that kind of thing, but
3  we don't have all the pieces in the platform that
4  we'd like before we can kind of efficiently handle
5  them.
6          So part of it, yes, enough for the
7  borrower to make the request to be associated with
8  a case and all that kind of thing, but not for an
9  efficient adjudication process yet.
10     Q    Okay.  So are there -- did the
11  department receive reconsideration applications in
12  2019?
13     A    I don't think so.  I think the earliest
14  ones came in in 2020.
15     Q    And that is likely because decisions
16  hadn't been issuing for most of 2018 and 2019;
17  correct?
18     A    Yeah.
19     Q    Okay.
20     A    Well, going back that to that time, I
21  was thinking because we had -- the first decisions
22  that went out in 2019 were at the end of 2019, and
23  there wasn't a reconsideration process before that
24  associated with the '95 reg.
25     Q    Okay.  So if -- if someone whose

Page 222

1 borrower defense application was decided under the
2 '95 reg had wanted to ask for reconsideration of a
3 denial, would they have had the option to do that?
4     A     At what point in time?
5     Q     Before the Bauer decision put the 2016
6 regs into effect.
7     A     No, there was no reconsideration
8 process before that.
9     Q     So, as you know, this case primarily is
10 about why there was such a long delay in issuing
11 borrower defense decisions.
12           In your view, what are the main reasons
13 why so few borrower defense decisions were issued
14 between January 2017 and January 2020?
15           MR. MERRITT:  Objection on the scope of
16 that question and to the characterization of the
17 case.
18           MS. ELLIS:  Can the witness answer?
19           MR. MERRITT:  Yes.
20           THE WITNESS:  I don't know that there's
21 one answer for that entire time period.  Can you
22 maybe break it up for me?
23     BY MS. ELLIS:
24     Q     Sure.
25           Well, let's start in 2017.

Page 223

1     A     Well, there were no decisions issued
2 for many months in 2017 associated with the
3 decision not to do anything with respect to what
4 we had already adjudicated and not to have more
5 claims pending the review panel and the AG review
6 and then the release methodology -- the
7 development of the release methodology.  So that
8 was 2017.
9           We did issue decisions between end of
10 2017 and May of 2018 primarily on Corinthian
11 cases.
12           And then in 2018 to November 2019, I
13 think it was tied to the relief methodology issue
14 and the policy to not issue decisions on denials
15 while they couldn't issue decisions on approvals
16 or felt that they couldn't issue decisions on
17 approvals.
18     Q     In your view, would it have been
19 possible to issue decisions on approvals in
20 between May 2018 and November 2019?
21     A     Not Corinthian job-placement-rate
22 decisions because of the relief methodology at
23 least under that methodology.
24           On the others, like I said, I think it
25 was a policy decision.

Page 224

1     Q     Was the difficulty of reviewing
2 borrower defense applications a primary reason for
3 the delay in issuing decisions?
4     A     The difficulty affected the volume of
5 the adjudication in the sense of -- you know, the
6 cases got a lot more complicated when the 2016
7 regulation went into effect in 2018 because now we
8 have a lot of cases that are subject to both, and
9 that determination needs to be made.
10           So I think that the -- the pace of the
11 adjudications was affected by various things that
12 made it difficult, but that didn't mean that they
13 couldn't be issued.  That was related to a
14 decision up the food chain.
15     Q     Was the staffing level of BDU a factor
16 in why there was a delay in issuing decisions?
17     A     It was a factor in the number of
18 decisions that were adjudicated.  So to the extent
19 that that was related, I guess it was a factor.
20 But it wasn't -- it didn't prevent decisions from
21 going out.
22     Q     Was the difficulty of discerning or
23 applying state law under the '95 regs a major
24 factor in why so few decisions were issued?
25     A     At what time?

Page 225

1     Q     Did -- did -- is the answer different
2 at different times?
3     A     Yeah, because the Corinthian cases were
4 adjudicated under California law, so that once we
5 had fully explored California law with respect to,
6 you know, the first memo, that really wasn't a
7 factor for Corinthian, which was our focus for a
8 good percentage of the time period at issue.
9     Q     Of the claims that have been
10 adjudicated since December 2019, why have there
11 been so few approvals?
12     A     Well, the premise of your question, I
13 think, is that, you know, it's not that the cases
14 are -- how do I frame that? -- we have a lot of
15 potential approvals, but they're not going out,
16 and we have a lot of decided approvals that are
17 not going out.  So we have -- I don't know what
18 the number is on Corinthian job-placement-rate
19 claims now, but we've proved well over 30,000 of
20 those over that time period that can't be issued.
21 So we've certainly done a lot of approvals on that
22 end.
23           We -- for sequencing purposes, like I
24 said, have focused on the cases that were the most
25 quickly adjudicated which was the Corinthian

# Exhibit 5

DOE00009509

![Federal Student Aid logo — PROUD SPONSOR of the AMERICAN MIND®. An OFFICE of the U.S. DEPARTMENT of EDUCATION]

# Borrower Defense to Repayment

August 21, 2019

Federal Student Aid an office of the U.S. Department of Education – INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0223

DOE00009510

# Status of Borrower Defense Applications Received

## Of the nearly 280,000 Borrower Defense applications received since 2015:

- 57,000 have been adjudicated, processed, and closed

- 38,700 have been adjudicated but have not yet been processed

  o Over 27,700 approved applications will be finalized when appropriate relief is determined

  o Nearly 11,000 applications have been adjudicated as denied applications but have not yet been processed



Total Borrower Defense Applications: 279,520
As of Week Ending 08/06/2019

Application Denied-Pending 10,975
Denied-Processed 9,076
Closed 6,464
Approved-Relief Pending 27,770
Approved-Relief Provided 47,940
Pending/Not Adjudicated 177,295

Cases Received vs Cases Pending vs Cases Processed



DOE00009511





# Growth Progression for BD Applications

## Application Denied-Pending

MAY — 7,881
JUNE — 8,935
JULY — 10,218
AUGUST — 11,477

**BD** Application

## Applications Approved Pending

MAY — 24,882
JUNE — 26,695
JULY — 26,976
AUGUST — 27,978

**BD** Application

A decision on the relief methodology would result in the ability to proceed with approximately 40,000 applications

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0226

4

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

DOE00009512

DOE00009513

# Borrower Defense Applications Adjudicated But Not Processed

- **Two (2) Schools with Approved Applications that are Pending Relief Determinations and Processing**
  - Corinthian Colleges, Inc. (CCI): 27,000+
    - 26,000+ Job Placement Rate (JPR) Approvals
    - 700+ Employment Prospects Approvals
    - 300+ Transferability of Credits Approvals
  - ITT: 70 approvals (all Employment Prospects)

- **Over 1,400 Schools with Denied Applications that are Pending Processing**
  - CCI: 4,800+
  - ITT: 450+
  - Wright Career College: 300+
  - Marinello School of Beauty: 250+
  - Remainder of 1,400 Schools with Adjudicated Denials: 4,900
    - Each school currently has fewer than 100 denied applications

**CCI Job Placement Rate Claims**

- Unique type of claim for several reasons:
  - Very high approval percentage (historically over 66%)
  - Department findings, special JPR form, and expedited process
  - Department estimated approximately 300,000 CCI borrowers eligible based on JPR findings and did widespread outreach to potentially eligible borrowers

- Other types of CCI claims have much lower approval percentages
  - Historically 5-7%

**Federal Student Aid**
AN OFFICE *of the* U.S. DEPARTMENT *of* EDUCATION

PROUD SPONSOR *of*
*the* AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0227

5

DOE00009514

# Why are BD Applications on Hold?

**Approvals:**

- "Manriquez" tiered relief methodology for CCI subject to injunction (as of May 2018) and no alternative methodology available

- No relief methodology developed for non-CCI claims

**Denials:**

- Policy decision (spring 2018) to not issue denials until approvals also could be issued

- No processing systems available from summer 2018 to present due to platform development and migration

  - Updates to platform to be completed by August 30

- Issuance of denial decisions scheduled to resume by mid-September

**Notice to Schools and Other Platform Updates Needed to Comply with the 2016 Regulation's New Requirements:**

- BD platform designed to comply with 1995 Regulation and completed in fall 2018

  - FSA was advised that 2016 Regulation would not go into effect and should not be considered in platform design

- Key provisions of the 2016 Regulation that were not required under the 1995 Regulation require significant platform updates, including:

  - Notice to Schools

  - Collection of Evidence that schools provide to refute borrower claims

  - Reconsideration process for denied claims

## Federal Student Aid

An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0228

6

# The Way Ahead

## Updates to Borrower Defense (Salesforce) Platform

- Enhancements to the Salesforce platform to comply with the 2016 regulation are currently in the build phase

- Completion date in late August

## Additional Staffing Resources are being added to Adjudicate the Growing Backlog of Pending Borrower Defense Applications

- FSA is in the process of hiring over 60 term appointments. This includes twenty term-appointment offers recently issued.

- Additionally, FSA is backfilling previous positions and recently onboarded 12 contractors.

- Includes additional litigation support for OGC given the number, complexity, sensitivity and high profile cases involving the Department and the processing of BD applications.

Federal **Student** Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0229

7

DOE00009515

DOE00009516

# The Way Ahead (cont.)

**New Relief Approach(es)**

- Like Manriquez approach, proposed approach assesses injury based on program-level earnings and provides "tiered-relief," which the court did not object to.

- Unlike Manriquez, program earnings associated with approved BD applicants compared to earnings of same/similar programs at all other institutions (rather than, "passing" GE programs).

- Earnings comparison provides a measure of the difference in value between a program at an institution that is found to have engaged in misconduct versus the typical earnings of programs in the same field at other institutions and, thereby, what the student could have reasonably expected.

- An applicant whose program earnings at/above median of all others **(ceiling earnings)** deemed to have suffered no injury & no relief warranted, despite institutional misconduct.

  - For CCI BD applicants, however, relief of 10% will be provided even if no injury is assessed under the new methodology in light of the prior OGC memorandum establishing the Manriquez methodology that found "...[CCI] borrowers suffered some basic harm by virtue of the misrepresentations such that the Department cannot conclude that denying relief is appropriate."

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
PROUD SPONSOR of the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0230

8

DOE00009517

# The Way Ahead (cont.)

**New Relief Approach(es) (cont.)**

- An applicant whose program had atypically low earnings compared to all other programs is deemed to have received no value from the program and full (100%) relief is warranted. Statistically, those programs with earnings among the lowest 2.5% of all programs (i.e., 2 standard deviations from the average) will be used to establish **floor earnings**, below which 100% relief will be warranted.

- An applicant whose program earnings was above the floor and below the ceiling (median earnings of programs) would warrant tiered relief of 75%, 50%, or 25%, proportional to the gap between the floor and ceiling earnings amounts.

  - *For illustrative purposes, assume median wages for a comparison group for an associate degree program in medical assisting is $22,000, with a standard deviation of $2000, such that earnings two standard deviations below the median would be $18,000. For wages between $18,000 and $22,000 dollars, the following percentage relief would be provided: 75% relief for wages between 18,000 and $19,333; 50% relief for wages above $19,333 and up to $20,666; and 25% relief for wages above $20,666 but below $22,000.*

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0231

DOE00009517

DOE00009518

# The Way Ahead (cont.)

**New Relief Approach(es) (cont.)**

- Data to administer relief will be drawn from publicly available GE data. In the future, College Scorecard data can be used.

- In a smaller number of cases where there are no earnings data available for those programs attended by BD applicants, an individual BD applicant's income information may need to be collected.

- Prior to the availability of College Scorecard data, there may be isolated instances where there are a lack of program earnings data to use for comparison programs. The team has identified a publicly available data set of program-level earnings data for programs offered by public institutions in Texas. The team is assessing the potential use of these data.

- Team currently finalizing additional details of alternative relief methodology and calculating impact.

Federal**Student**Aid

An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

INTERNAL CONFIDENTIAL – DELIBERATIVE – PRE-DECISIONAL

AR-A-0232

10

DOE00009518

# Exhibit 6

# I.   Detailed Briefing: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)

**Overview:**
- **Background:**
  - Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify, in regulation, which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan, i.e., borrower defense (BD).
  - The original BD regulation went into effect in 1995 and allowed for borrowers to assert, as a defense to repayment, an act or omission by the institution that violated state law. The 1995 regulation was rarely used until the collapse of Corinthian Colleges Incorporated (CCi) in 2015, when the previous administration leveraged it to expand loan forgiveness to CCi students.
  - In 2016, in response to an influx of BD discharge requests, the Department established an Enforcement Office within FSA, which is responsible for adjudicating BD applications, among other oversight-related activities.
  - In the wake of a school closure, students may also apply for loan forgiveness through Closed School Loan Discharge (CSLD).
    - As of December 31, 2018, the Department has issued $164 million in CSLD relief to over 14,000 former CCi students and $251 million in CSLD relief to 18,000 former ITT students. *[Internal note: this does not include the recent automatic closed school discharges (ACSD) as a result of the 2016 rule implementation.]*
    - The Secretary has discretion to extend the CSLD withdraw window to allow students who withdrew earlier to qualify.
  - In order to expand the number of CCi students entitled to loan discharge, after CCi closed in 2015, the Department extended the CSLD withdrawal window for students and recommended that CCi borrowers apply for BD relief. Additionally, the Internal Revenue Service (IRS) waived the tax liability typically associated with BD student loan forgiveness for CCi students.
  - After ITT Technical Institute (ITT) closed in 2016, the Department did not make a similar recommendation that ITT students apply for BD relief.  Instead, the Department recommended that ITT students apply for CSLD but did not extend the withdrawal window for ITT students nor did the IRS provide an exemption from BD loan discharge tax liability.

- **BD Rulemaking:**
  - Under the 1995 regulation, the previous administration discharged loans for borrowers, including CCi and ITT loans.
  - In November 2016, the previous administration issued a new BD regulation (the 2016 rule) that replaced the 1995 regulation and was to take effect July 2017. Prior to July 2017, following a change in administration, the Department delayed the implementation of the 2016 rule due to pending litigation.
  - In 2017, the Department also began a negotiated rulemaking process to revise and replace the 2016 rule. The Department's efforts are ongoing and a final rule is expected to be issued by November 2019, with a July 2020 effective date.

DOE00007209

- o In October 2018, a federal district court found that the Department's delay of the 2016 rule was legally impermissible. Consequently, the 2016 rule instantly came into effect, retroactive to July 2017.

- **BD Adjudication of Applications:**
  - o As of September 2018, the Department has issued $534 million in BD relief to 48,000 borrowers. About a third of those borrowers received BD discharge under this administration. *[Internal note: be careful with the wording; approx. 1/3 of borrowers received discharged under this admin but not all borrowers were approved for discharge under this admin. According to DRT, approximately 16,169 borrowers received discharge during this administration, which is 33.7 percent of all approved BD applications.]*
  - o In 2017, the current administration announced a new methodology (2017 methodology) for processing approved BD applications for CCi students. Under the 2017 methodology, BD applications are reviewed for their legitimacy and the Department seeks to determine the harm suffered by a student as a result of institutional fraud or misrepresentation. The Department determined the level of student harm by relying on gainful employment (GE) program data to compare average earnings of BD claimants to average earnings of students in similar programs at other schools. The methodology compensates borrowers with legitimate BD applications based on damages incurred rather than the previous administration's "all or nothing" approach to discharge.
  - o The 2017 methodology relied on earnings data provided by the Social Security Administration (SSA). However, in May 2018, a federal court determined that this was an impermissible use of SSA data thus halting the Department's ability to process approved CCi BD applications. The Department is appealing this decision. Although the court found this use of SSA data to be impermissible, it did recognize the Department's discretion to establish a tiered relief methodology. The Department is working diligently to evaluate the best course of action given the lawsuit on the Department's BD relief methodology and the court injunction preventing the Department from using it.
  - o Additionally, the Department recently transitioned to a new BD application management platform with increased functionality, while also making modifications to the platform to reflect the requirements and provisions of the 2016 rule. Once the data migration to the new application management platform is complete and the platform is consistent with the 2016 rule, the Department may resume evaluating applications that are not otherwise delayed due to the 2017 methodology lawsuit.

**Response:**
- The Department is currently implementing provisions of the 2016 rule in response to the federal district court ruling.
  - o The provisions of the 2016 rule are broader than just borrower defense issues, and also include provisions on: automatic closed school discharge (ACSD), certain consumer disclosures, false certification, etc.
- The Department is pursuing an appeal of the court ruling that found the 2017 methodology for BD relief impermissible. Approved CCi applications cannot be processed until the Department decides how to address calculating BD relief in light of this litigation. The

DOE00007210

Department can either develop an alternative BD relief methodology or hold all approved CCi applications pending the final outcome of the litigation.
- o Additionally, other BD relief methodologies will have to be developed for non-CCi programs and schools.

**Current Action:**
- The Department continues to implement and operationalize the 2016 rule.
  - o The Department is working to publish guidance implementing the 2016 rule's financial protection provisions and the ban on pre-dispute mandatory arbitration agreements and class action waivers. *[Internal Note: Guidance is currently under review with OMB.]*
  - o In December 2018, the Department began implementing the 2016 rule's ACSD provision by processing ACSD for eligible borrowers. To date, the Department has processed ACSD for almost 12,000 borrowers amounting to over $129 million in relief, over 6,000 of which are CCi borrowers amounting to over $67 million in relief. *[Internal note: Because the main campus for ITT will not hit the three-year closed requirement until September 2019, we do not currently have numbers for ITT.]* The Department will continue to perform ongoing monthly ACSD for eligible borrowers. This will allow the Department to close pending BD applications, if the same borrower receives an ACSD.
    - ▪ The Secretary also has discretion to extend the ACSD withdraw window to allow students who withdrew earlier to qualify. The previous administration extended this withdraw window and the Secretary affirmed it for CCi applicants, which provided a greater number of borrowers ACSD relief. The Secretary may decide to also extend the withdraw window for ITT borrowers.

## II. <u>Talking Points: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)</u>

**Issue 1: The Department delayed the previous administration's borrower defense regulations (2016 rule) from taking effect in July 2017.**

<u>Current status/position or action taken by ED</u>: In October 2018, a federal court found the Department's delay of the 2016 rule was legally impermissible and the 2016 rule instantly came into effect. The Department is currently implementing provisions of the 2016 rule and efforts to revise borrower defense regulations are ongoing.

<u>Reaction (push back/support):</u> Multiple news outlets and congressional members (e.g., Senator Dick Durbin (D-IL) and Senator Elizabeth Warren (D-MA)) believe that the delay of the 2016 rule was a tactic to prevent students from getting the relief they deserved while the administration rewrote the rules to make it harder for students to get relief.

<u>Talking Points:</u>

- We found the previous administration's borrower defense regulations to be a muddled process that was unfair to students and schools, while leaving taxpayers on the hook for significant costs. We felt it was time to take a step back and make sure these rules achieved

DOE00007211

their purpose: helping harmed students. It is the Department's aim and this Administration's commitment to protect students from predatory practices while also providing clear, fair, and balanced rules for colleges and universities to follow.

- The Department is currently implementing the provisions of the 2016 rule.

- Specifically, the Department is working to publish guidance implementing the 2016 rule's financial protection provisions and the ban on pre-dispute mandatory arbitration agreements and class action waivers.

- Furthermore, the Department has made considerable progress in implementing the 2016 rule's Automatic Closed School Discharge (ACSD) provision. The Department will process ACSDs on a monthly basis ensuring that eligible students receive relief and allowing the Department to close pending BD applications, if the same borrower receives an ACSD.

- The Department's first priority is to protect students, so we're undergoing a rulemaking process to ensure that the BD regulations are fair, effective, and improved. The newly proposed regulations will propose a process intended to be clearer to the applicant and more consistent in outcomes. It will propose measures to hold institutions, rather than hardworking taxpayers, accountable for making whole these students who were harmed by an institution's deceptive practices.

**Issue 2: In 2017, the Department changed the methodology, to a tiered approach, for determining the borrower defense relief granted to approved CCi applicants.**

Current status/position or action taken by ED: The 2017 methodology compensates students based on damages incurred. The 2017 methodology relied on SSA earnings data, but a federal court found the use of these data impermissible, thus halting the Department's ability to process approved CCi borrower defense applications.

Reaction (push back/support): "For the tens of thousands of students and families still waiting for help, being stuck in limbo is causing tremendous mental and financial anguish," wrote 26 Members of Congress in a Nov. 2017 letter that also stated "the idea that borrowers may continue to be saddled with at least some of the debt they incurred to attend institutions that misrepresented information to them is simply unacceptable and does not pass the most basic test of fairness."

Talking Points:

- We are committed to providing borrower defense relief to eligible students. Institutional fraud and acts of misrepresentation are simply unacceptable. However, it is also unacceptable for students who were not victims of fraud or misrepresentation and who did not suffer harm to be forgiven of their loan repayment obligations, while other borrowers are making sacrifices to repay their loans. It is equally unacceptable for taxpayers to absorb the cost of loan forgiveness when such forgiveness is not well justified.

DOE00007212

- The 2017 methodology allows applications to be adjudicated quickly and harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder massive costs that may be unjustified.

- The tiered relief assesses borrower harm by comparing average earnings of borrower defense claimants to average earnings of students who had completed similar programs at other schools.

- The principle of relief based on value of education received is consistent with the legal authorization of borrower defense under the HEA and existing regulations.

- This improved methodology was developed following a report from the Inspector General (IG) that found weaknesses with FSA's previous procedures for application review and processing. The Department has worked diligently to address the issues cited in this report, which led to the new methodology for tiered relief, among other improvements.

- The Department's processing of borrower defense applications was abruptly halted by the court's injunction preventing the use of the tiered relief methodology, which the Department is appealing.

- The Department appreciates the importance of providing relief to defrauded borrowers and is actively implementing other forms of relief such as Automatic Closed School Discharge, etc.

### III. <u>Q&As: Borrower Defense and 2016 Rule - Corinthian Colleges (CCi) and ITT Technical Institute (ITT)</u>

**Issue 1: The Department delayed the previous administration's borrower defense regulations (2016 rule) from taking effect in July 2017.**

<u>Question</u>: Why did you delay implementation of the 2016 rule? What are you doing now to implement it? Why are you not moving faster? Why haven't you done more?

<u>Proposed Response</u>: No fraud or acts of misrepresentation are acceptable and students deserve relief, if the school they attended acted dishonestly. The Department has been working to get this right for students since day one. We found the previous administration's borrower defense regulations to be unfair to students and schools, while putting taxpayers on the hook for significant costs. However, the Department acknowledges the court's recent decision to implement the 2016 rule and is making the necessary changes.

**Issue 2: In 2017, the Department changed the methodology, to a tiered approach, for determining the relief granted to approved CCi BD applicants.**

<u>Question</u>: Why did you change the relief methodology to a tiered approach?

DOE00007213

Proposed Response: The Department is committed to providing justified BD relief to eligible students, which is why the tiered approach takes into account the harm suffered, while protecting taxpayers from being forced to shoulder massive costs. In May 2018, a federal court enjoined the Department from using the tiered methodology, which we are appealing.

**Issue 3: The borrower defense report for the quarter ending in September 2018 shows that the number of received claims has increased by 35K since the June 2018 report was released. However, the numbers of approved claims, denied claims, and total amount discharged have remained the same.**

Question: Why is the Department not processing claims?

Proposed Response: Our first priority is to protect harmed students, which is why a third of the borrowers who have received BD discharge have had their loans discharged under this administration. In May 2018, the Department was halted from processing claims when a federal court enjoined the Department from using the tiered methodology. We are appealing this ruling.

**Issue 4: FSA's Enforcement Office staff has greatly decreased under the current administration.**

Question: Why is the Department purposefully reducing the staffing in FSA's Borrower Defense Group and Investigations Groups? Is the Department no longer investigating allegations of institutional fraud and misrepresentation to students?

Proposed Response: The Department recognizes the importance of ensuring compliance with laws and regulations governing student financial assistance programs. FSA's Enforcement Office continues to investigate fraudulent activities at colleges and universities. The office also continues to pursue justified penalties against institutions of higher education. The decrease in the total number of staff under the current administration is the result of routine attrition. The Department is not purposefully reducing the staffing of the Enforcement Office.

DOE00007214

# Exhibit 7

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

## DECISION MEMO

DATE:        November 12, 2019

TO:          Betsy DeVos, Secretary

FROM:        Diane Auer Jones, Principal Deputy Under Secretary
             Mark Brown, Chief Operating Officer, Federal Student Aid

SUBJECT:     Request to implement a new, tiered-relief methodology to adjudicate current
             and future BD claims

---

### BACKGROUND

In December 2017, the Department announced that it would use a tiered methodology to
adjudicate borrower defense to repayment (BD) claims submitted by students who had
attended Corinthian Colleges, Inc. (CCI or Corinthian), and whose claims were based upon
findings regarding job placement rate (JPR) misrepresentations by CCI during specified time
periods. That methodology ("the 2017 methodology") assessed the relief owed to borrowers
based on the extent to which BD applicants had earnings similar to those of graduates of similar
programs that had a passing debt-to-earnings ratio under the Gainful Employment (GE)
regulations (34 CFR part 668, subpart Q). The level of student loan relief calculated and
provided under this methodology ranged from a discharge of 10% to 100% of the amount
borrowed. Any borrower who was eligible for more than 50 percent relief was given full loan
relief.

To obtain earnings data for use in calculating relief, FSA grouped CCI BD applicants into cohorts
(based on program and credential level, using 6-digit Classification of Instructional Program
(CIP) codes) and submitted those cohorts to the Social Security Administration (SSA). SSA
provided the Department with the mean and median calendar year 2014 earnings for each
cohort. The Department then compared the lower of the mean and median earnings of the
applicants to the median earnings of similar programs at other institutions that achieved a
passing GE score.

The Department was sued by several CCI borrowers with JPR BD claims in a class action, in the
lawsuit *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal.). The borrowers sought a
preliminary injunction against the Department to enjoin its use of the methodology. In granting
the plaintiffs' request in May 2018[1]. The court enjoined the Department from using the
methodology based on its conclusion that the plaintiffs were likely to succeed on their
argument that obtaining earnings data for a group of BD applicants from SSA violated the

---

[1] The Department appealed the court's preliminary injunction order to the United States Court of Appeals for the
Ninth Circuit, where it is pending. *Manriquez v. DeVos*, No. 18-16375 (9th Cir.).

AR-A-0213

DOE00013647

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

Privacy Act. The Department remains under a preliminary injunction on the use of that methodology or any of the data that we obtained from SSA for cohorts of Corinthian BD applicants who filed a claim based on allegations of Job Placement Rate misrepresentations.

The court, however, did find that the Department had a likelihood of ultimately prevailing on its argument that it has the authority to award partial relief to BD claimants, based upon a methodology developed by the Department. Therefore, the Department has developed a new methodology for determining the level of harm to BD applicants and the corresponding amount of relief it should provide to successful BD applicants. Under the terms of the preliminary injunction, the Department may not use this methodology to provide partial relief to CCI JPR BD applicants (who are the majority of Corinthian borrower defense applicants). However, the injunction does not prevent the Department from utilizing the new methodology to process borrower defense applications for borrowers that are not part of the class that has been certified in *Manriquez*, including non-JPR Corinthian claims and claims filed by borrowers who attended other institutions. Aside from a handful of previously approved categories of borrower defense claims (the largest among them being the JPR claims at issue in *Manriquez*), the Department does not yet have a practice or precedent regarding the amount of relief to offer borrowers in other categories of borrower defense claims, so this methodology represents the Department's first such policy with regard to those categories.

## METHODOLOGY

The Department was hopeful that we would ultimately prevail in court and be able to move forward in adjudicating BD claims using the 2017 methodology. However, SSA did not renew the memorandum of agreement between SSA and the Department that allowed the Department to obtain borrower earnings data, decreasing the utility of the SSA data exchange aspect of the 2017 methodology for purposes of broader application. Thus, while awaiting the court's decision on appeal, we sought a new methodology that avoided the areas of concern raised in the *Manriquez* case but would allow us to award partial or full relief in a fair and equitable manner. We believe that the key principles of any new methodology should continue to be that:

1. Relief is based on the financial harm suffered by a successful BD applicant, as determined by comparing earnings imputed to the BD applicant against earnings of a representative comparison group. Financial harm is quantifiable and generally forms the basis for the kinds of claims underlying borrower defense applications; calculation of financial harm based on comparative earnings makes use of generally available data while focusing on the harm attributable to the school and program attended in contrast to a similar comparable school and program that the applicant might have otherwise attended.

2. Earnings determinations will be imputed to a BD applicant using the median earnings of graduates of the program in which the borrower was enrolled, rather than the individual's earnings. Although in the 2017 methodology we used the lower of the median or mean of the applicant's program's earnings and the higher of the median or mean of the comparison group earnings, since the College Scorecard provides only

DOE00013648

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

median earnings, we will use median earnings in this methodology regardless of whether GE disclosure earnings data or College Scorecard data is used, in order to be consistent. Also, mean values can be heavily influenced by outliers who have exceptionally high earnings or exceptionally low earnings, which is why we believe that median earnings is the more appropriate data point to use for this analysis. While an individual's earnings could be influenced by a multitude of factors other than the education they received at a college or university, taking the median of earnings across the program provides a summary statistic based primarily on the common experience of program participants, giving more weight to factors shared among participants because of their shared participation in the program than to factors that vary across the different participants and therefore are less likely to represent the shared experience attributable to participation in that specific program.

The Department has considered a number of potential methodologies to calculate partial relief to successful BD applicants. Below are summaries of each methodology considered, including the methodology the Department recommends for adjudicating BD claims.

### Potential Methodology: Income-Driven Repayment Comparison Approach

One methodology we considered focused on a comparison between the required monthly payment under an income driven repayment (IDR) plan as compared to the required monthly payment under a standard, 10-year repayment plan for federal student loan borrowers. Under this methodology, program level median debt and earnings would be used to calculate the standard payment amount associated with that earnings and debt level as well as the corresponding IDR payment amount (based on a family size of one). The inverse of the quotient of these two payments, as a percentage, would determine the level of relief that would be provided to the borrower on loans associated with the enrollment for which the BD claim was awarded. Under this methodology, the Department would use publicly available program-level median debt and median earnings data (such as those calculated by SSA and reported to the public via the income data disclosures pursuant to the Gainful Employment regulations,[2] or those calculated by the Internal Revenue Service (IRS) and made publicly available through the College Scorecard[3]) to impute earnings to the BD applicant as well as to a comparison group consisting of graduates of similar programs at other schools. For the purpose of the IDR calculation, the Department would use a family size of one because decisions borrowers make regarding their family size are not the responsibility of the institution.

This methodology has serious shortcomings, including that student borrowing is not limited to costs imposed by institutions. Since borrowing limits, as well as eligible repayment programs, are authorized by Congress, not created by institutions, it is not obvious that a borrower's decision to maximize his or utilization of the Federal loan program or to take full advantage of

---

[2] Presently, the Department only has Gainful Employment earnings data from 2014. The Department no longer has an agreement in place with SSA to obtain such data. Moreover, the GE regulations will be rescinded as of July 2020. As a result, the Department will not have such data for any other years.

[3] The IRS began providing income data for College Scorecard disclosure purposes under a memorandum of agreement with the Department beginning in 2019.

DOE00013649

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

his or her opportunity to minimize his monthly student loan payment is a sign that the institution did something wrong. For example, it may be that an astute borrower takes full advantage of low-interest Federal loans as well as IDR plans in order to prioritize payment of debts that are at higher interest rates or securitized by personal property.

It is difficult to fault institutions for the fact that statute enables students to take loans that generate cash payments, which can be used for non-educational expenses.[4] In addition, to the extent that IDR plans are designed to enable low-income students to select a job based on their interests and passions rather than the wages a job pays, it would be inappropriate to then suggest that students who take advantage of this policy were somehow harmed by the school they attended. Therefore, a student's choice to rely on IDR repayment should not be viewed as a sign of harm, especially since the presence of IDR repayment programs may have encourage students to borrow more than they would have otherwise borrowed had such repayment options not been available.

Finally, since Congress has established higher borrowing limits for students over the age of 25, it is unreasonable to attribute financial harm to an institution simply because it serves adult learners who are permitted by Congress to borrow more. Doing so would discourage institutions from serving adult learners. The Department has already determined that debt-to-earnings ratios are not an accurate or legitimate proxy for institutional quality since many factors other than program quality influence both earnings and debt.[5] Therefore, such a proxy would also not serve as a reasonable basis for attributing financial harm to a borrower in the case of a successful BD application. As a result, we do not recommend the use of this methodology.

### Proposed Methodology: Standard Deviation-Based Approach

The second methodology we have considered relies on a standard deviation model that would award full relief to an otherwise successful BD applicant if the borrower's imputed median earnings were less than or equal to wages that are two standard deviations below the median wages of the comparison group. Similar to the method described above, earnings would be imputed to a borrower and to a comparison group based on the median earnings of graduates of the program in which the applicant was enrolled or median earnings of graduates of similar programs. The median wage for the comparison group would be the median of the medians of the program level earnings calculated for graduates based on a 4-digit CIP code and the credential level. Although the 2017 methodology was based on 6-digit CIP code data available from SSA, that data is no longer available to the Department and that aspect of the

---

[4] *See* 20 U.S.C. § 1087ll ("Cost of attendance").

[5] *See* Program Integrity: Gainful Employment, 84 Fed. Reg. 31392 (Jul 1, 2019) ("the Department has determined that the GE regulations rely on a debt-to earnings (D/E) rates formula that is fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs, fails to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes, fails to provide transparency regarding program-level debt and earnings outcomes for all academic programs, and wrongfully targets some academic programs and institutions while ignoring other programs that may result in lesser outcomes and higher student debt.").

DOE00013650

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

methodology has been specifically enjoined. As a result, available data based on 4-digit CIP codes

There is merit to using standard deviations to identify earnings outliers since even among programs of equal quality, median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students (which could influence the likelihood that graduates would choose part-time work over full-time work) or the selectivity of the institution, among other things. Standard deviations can be used to quantify the amount of variation within a set of data. In other words, the standard deviation demonstrates the distributions of earnings within a data set of all programs that share the same CIP code and credential level. A low standard deviation indicates that the values in the data set tend to be close to the mean (which is also called the average), while a high standard deviation indicates that the values are spread over a wider range. When comparison group earnings have a low standard deviation, this means that there may not be much variability in earnings across the country, so even a small deviation below the median may trigger an outlier. On the other hand, if the comparison group has a larger standard deviation, this suggests that earnings vary considerably from one program to another, and only when the earnings imputed to the borrower are significantly different from the median wages should we make the determination that financial harm has occurred. In determining how the median wages of a successful BD applicant's wages compare to the comparison group, we need to consider this data point in relation to the general level of variability in earnings among graduates of other similar programs.

In a normal distribution, around 68 percent of the data points in the sample will fall within one standard deviation and one standard deviation below the median. Around 95 percent of all data points in the sample will fall within two standard deviations from the median. Therefore, we suggest that median earnings at or below the earnings that are two standard deviations from the median result in full relief to successful BD applicants. This does not mean that programs with earnings lower than two standard deviations from the median are necessarily bad programs, but in attempting to identify a methodology to determine the financial harm suffered by a borrower, we believe that wages at or lower than the lowest 2.5% of earnings in a sample would be outliers and should qualify a successful BD applicant for full relief.

Successful BD applicants whose earnings are higher than the threshold that is two standard deviations from the median, but lower than the median would receive partial relief. To determine the level of partial relief such a borrower would receive, the Department could simply divide the difference between median wages and wages two standard deviations below the median by three to establish three tiers of relief between 0% and 100%. In other words, successful BD applicants whose program earnings were less than the median could be awarded 25, 50, 75 or 100 percent relief, depending upon where their program median earnings fall in the range. This option will be considered Option One. Conversely, the Department could simply have three categories of relief, which would include 0 percent if a successful BD applicant's program level median earnings were above the comparison group earnings that are one standard deviation from the mean, 50 percent if the successful BD applicant's program level median earnings were above two standard deviations from the median but at or lower than

DOE00013651

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

one standard deviation from the median, and 100 percent if the successful BD applicant's program level median earnings were at or below the earnings two standard deviations from the median among the comparison group. This option will be considered Option Two.



We believe that Option One provides more gradual differentiation between differently situated borrowers, and is the most favorable to borrowers overall, so we recommend that you select that option for awarding partial relief.

**Potential Methodology: Percentage Earnings-Based Approach**

The final methodology, which is the one that most closely parallels the 2017 methodology, uses publicly available GE earnings disclosure data or IRS data to calculate the quotient of the median earnings of the BD applicant's program and the median earnings of the graduates of other similar programs (the comparison group). The inverse of that quotient, expressed as a percentage, would be the percentage of loan relief provided to successful BD applicants for eligible loans. Relief would be provided in increments of 10%, with the Department rounding up to the next higher percentage. The Department could then follow the practice used in the 2017 methodology in which borrowers who would qualify for more than 50 percent relief would be given 100 percent relief.

This percentage methodology does not take into account that there is normal variation in median earnings among programs even when misrepresentation does not occur, so this methodology does not take into account the variability in earnings among all of the programs in the comparison group to assign relief to the borrower based on the median earnings of his or her program graduates.

**Avoiding Areas of Concern Regarding the 2017 Methodology**

Each of the methods described above avoids the areas of concern raised by the court regarding the 2017 methodology since each relies on publicly available earnings data to impute earnings to the BD applicant. Unlike under the 2017 methodology, the Department will not be submitting a cohort of BD applicants to SSA or IRS to determine their income; instead, we will

AR-A-0218

DOE00013652

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

use publicly available earnings data to impute earnings to both the applicant and the comparison group.

A more detailed description of the methodology for imputing earnings is described below.

1. Imputing earnings to the BD Applicant: Using 4-digit CIP codes and credential levels, the Department will impute earnings to the borrower by determining the median earnings of the graduates of the BD applicant's program. While the Department could use 4-digit or 6- digit CIP codes to impute earnings, the use of the 4-digit CIP code provides greater coverage and enables us to adjudicate a larger number of claims using the borrower's program and credential level. For borrowers with claims made against institutions that are no longer in operation and for which gainful employment data have been published, earnings data will be sourced from publicly available GE earnings disclosures based on data provided by SSA. For other institutions and for determining relief for future BD claims in the future, the Department will use another publicly available data source, such as the College Scorecard, to impute earnings to the applicant.

2. Comparison group earnings: Using 4-digit CIP Codes and credential levels the Department will calculate the median earnings of the graduates of like programs offered by other institutions. For complaints adjudicated using publicly available 2014 GE earnings data, generated by SSA, comparison group data will also come from publicly available GE earnings disclosure data. For non-GE programs, and in the future, data will be sourced from the College Scorecard or other publicly available data source using data produced by a Federal agency, such as the IRS.

### Relief when imputed earnings data are not available

In some instances, a successful BD applicant may have been enrolled in or graduated from a program so small that the Department cannot obtain median earnings of the program's graduates as a result of privacy protocols. It is also possible, but less likely, that a successful BD applicant's program is offered only by the institution he or she attended, or by other institutions only at a different credential level. In such a case, the Department recommends that we use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next highest credential level, to impute borrower and comparison group earnings. If sufficient data are not available to make that determination, then the Department would review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and if not, the next lower credential level) and award to borrowers the highest level of relief that would be awarded to borrowers in any of those programs. In the event that there are no other programs with the same 2-digit CIP code, the Department will award to those successful BD applicants the highest level of relief awarded to any successful BD applicant who received relief calculated under the 2017 methodology or the future methodology.

### ADJUDICATING CLAIMS

Page 7 of 10

DOE00013653

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

*Corinthian Claims*

We have consulted with OGC, and OGC has advised that under the preliminary injunction entered in *Manriquez*, the Department is permitted at this time to use the new methodology to grant 100 percent relief to Corinthian borrowers who are part of the *Manriquez* class, and to adjudicate approximately 30,000 pending BD applications from Corinthian borrowers who allege that the misrepresentation was something other than a job placement rate misrepresentation (meaning that they are not part of the *Manriquez* class). In addition, there are approximately 6,500 claims from Corinthian borrowers who are ineligible for defense to repayment relief, such as instances when the borrower was not enrolled at Corinthian or was not enrolled in a program deemed by the Department to make the borrower eligible for relief. Borrowers who have submitted claims resulting in partial relief can be notified that their claim is being held as a result of the court injunction.

We recommend adjudicating the non-*Manriquez* BD applications using the new partial relief methodology. In addition, we recommend that we provide at least 10 percent relief to any eligible Corinthian borrower who has a successful claim, even if there is no evidence of financial harm, in following with approach taken in the 2017 methodology establishing a ten percent relief floor for all eligible Corinthian borrowers. We also recommend notifying the 6,500 Corinthian applicants deemed ineligible, either because they do not meet existing criteria for approved claims or because they do not state a cause of action under state law, of that determination.

*ITT Tech*

Borrowers who submitted defense to repayment claims related to their enrollment at ITT Tech are not subject to the court's injunction on awarding partial relief. Therefore, the Department will use the new methodology to award relief to ITT Tech borrowers who submitted successful defense to repayment claims. The Department has already awarded automatic closed school loan discharge (ACSLD) to all eligible ITT borrowers who had not enrolled in a new program three years following the closure of ITT campuses.

Unlike in the case of Corinthian Colleges, where the Department asserted that it had evidence of misrepresentation for several programs offered by CCI campuses, the Department made no such determination for ITT schools or programs. In fact, the Department instructed students to file closed school loan discharge applications when ITT closed and did not recommend that students file BD claims since the Department had no evidence of widespread misrepresentation that would have qualified a class of borrowers for BD relief. Therefore, it will be up to borrowers to provide evidence of the alleged misrepresentation, and the Department will be required to review those claims based on applicable State consumer protection laws.[6]

---

[6] Under the borrower defense regulations, a borrower may assert a borrower defense claim for Direct Loans first disbursed before July 1, 2017, if there is a cause of action under state law. 34 C.F.R. § 685.206(c). Since ITT shut down in the fall of 2016, all ITT borrower defense claims must be reviewed under this standard.

DOE00013654

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

This means that in the case of ITT claims, the Department must review each application and make a determination, based on the information provided, of whether the borrower is eligible for BD relief There are currently 28,000 outstanding ITT application, of which only 71 have been adjudicated on the merits of the application. Of these 71 applications, approximately 50 were determined to be successful. Adjudicating these claims will be a manual process that will take months to complete.

We recommend that the Department first adjudicate the non-*Manriquez* BD claims, and then move to ITT claims as well as those filed by borrowers at other institutions.

*Other claims*

We recommend that the Department adjudicate the remaining claims, and any additional claims we receive, using the new methodology selected using this Decision Memo. The Department will continue to monitor eligibility for automatic closed school loan discharges until such time as the 2019 Borrower Defense regulations go into effect, thus eliminating automatic closed school loan discharges for loans taken out subsequent to July 1, 2020. Those borrowers who are eligible for ACSLD will receive it, including those borrowers who may have already received partial receive through a successful BD claim.

## Potential Concerns from Outside Constituencies

Some organizations and entities will continue to argue that a borrower subjected to any level of misrepresentation should receive 100 percent loan relief. However, were we to follow that model, students who a received education that is serving them well could still have their loans forgiven based on, for example (under the 2016 regulations) something as minimal as a student worker in the admissions office making an exaggerated claim about the opportunities provided by the campus or the success of its graduates. As a further example, depending upon the results of the respective investigations at the different institutions involved, the recent admissions scandals could result in total loan forgiveness for every student enrolled during the time period when inappropriate practices were in place at each of the institutions involved. Similarly, depending upon the results of the respective investigations students who enrolled at Temple University or University of California, Berkeley during the years when those institutions provided inaccurate information to *U.S. News* could be eligible for full relief, even though it is likely that those students still had good educational outcomes. Taxpayers who did not have the privilege of attending Temple or Berkeley or the many other elite institutions that engaged in substantial misrepresentation about their admissions practices and selectivity should not be required to repay the loans for those who did.

Therefore, in order to ensure that taxpayers are not left with the cost burden of paying for an education that is serving a borrower well, it is imperative that we consider the level of harm a student experienced in providing loan relief.

AR-A-0221

DOE00013655

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

There will be some who argue with the specifics of our methodology; however, at least one court has found as a preliminary matter that the Department likely has the authority to award partial relief on the basis of a methodology that provides broad guidelines for relief.

## RECOMMENDATIONS

1. We recommend that you approve the Standard Deviation alternative methodology described above to enable FSA to adjudicate and provide appropriate loan relief to successful BD applicants in an efficient, fair, and predictable manner. We recommend that you select Option One as the method for determining the level of relief a successful BD applicant is entitle to.

| Approve | ✕ | Signature | |
| Disapprove | | Signature | |
| Needs more discussion | | Signature | |
| Modify | | Signature | |

2. We recommend that you permit FSA to notify ineligible Corinthian borrowers and those who will receive 100 percent relief of the outcome of their claim.

| Approve | ✕ | Signature | |
| Disapprove | | Signature | |
| Needs more discussion | | Signature | |
| Modify | | Signature | |

3. We recommend that you permit the Department to use the Standard Deviation methodology to complete the adjudication of the non-*Manriquez* BD applications, as well any other claims pending from borrowers.

| Approve | ✕ | Signature | |
| Disapprove | | Signature | |
| Needs more discussion | | Signature | |
| Modify | | Signature | |

AR-A-0222

DOE00013656

# Exhibit 8

Page 1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4       - - - - - - - - - - - - - - X

5       THERESA SWEET, et al., on      :

6       behalf of themselves and all   :

7       others similarly situated,     :

8                   Plaintiffs,        :

9       vs.                            :

10      ELISABETH DEVOS, in her        :

11      official capacity as           :

12      Secretary of the United        :

13      States Department of           :

14      Education, et al.,             :

15                  Defendants.        :

16      - - - - - - - - - - - - - - X

17

18      Remote Videotaped Deposition Of DIANE AUER JONES

19              Friday, November 20, 2020

20                  9:15 a.m. (EST)

21

22

23      Job No. 330599

24      Pages:  1 - 301

25      Reported by:  Dana C. Ryan, RPR, CRR

Page 2

1

2

3                      November 20, 2020

4                      9:15 a.m. (EST)

5

6

7

8          Remote Videotaped Deposition of DIANE AUER

9   JONES, held via Zoom video teleconference, before

10  Dana C. Ryan, Registered Professional Reporter,

11  Certified Realtime Reporter and Notary Public in

12  and for the State of Maryland.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1        A P P E A R A N C E S   C O N T I N U E D

2

3          JOSEPH JARAMILLO, Esquire

4          CLAIRE TORCHIANA, Esquire

5          Housing & Economic Rights Advocates

6          3950 Broadway, Suite 200

7          Oakland, California 94611

8          Telephone:  (510) 271-8443

9          Email: jjaramillo@heraca.org

10         Email: ctorchiana@heraca.org

11

12  ON BEHALF OF THE DEFENDANTS:

13         R. CHARLIE MERRITT, Esquire

14         KEVIN P. HANCOCK, Esquire

15         KATHRYN C. DAVIS, Esquire

16         U.S. Department of Justice

17         Civil Division, Federal Programs Branch

18         1100 L Street, Northwest

19         Washington, D.C. 20530

20         Telephone:  (202) 307-0342

21         Email: robert.c.merritt@usdoj.gov

22         Email: kathryn.c.davis@usdoj.gov

23         Email: kevin.p.hancock@usdoj.gov

24

25

Page 3

1              A P P E A R A N C E S

2

3     ON BEHALF OF THE PLAINTIFFS:

4          MARGARET O'GRADY, Esquire

5          EILEEN CONNOR, Esquire

6          TOBY R. MERRILL, Esquire

7          R. ELLIS, Esquire

8          Legal Services Center of

9             Harvard Law School

10         122 Boylston Street

11         Jamaica Plain, Massachusetts 02130

12         Telephone:  (617) 390-3003

13         Email: mogrady@law.harvard.edu

14         Email: econnor@law.harvard.edu

15         Email: rellis@law.harvard.edu

16         Email: tmerrill@law.harvard.edu

17

18              - and -

19

20

21

22

23

24

25

Page 5

1        A P P E A R A N C E S   C O N T I N U E D

2

3     Also present:

4          Dan Macom, Video Technician

5          Asher Trangle

6          Matt Pachman

7          Victoria Roytenberg

8          Jed Brinton

9          Andrew Teoh

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170
Page

1    mean.  They looked at the evidence to decide
2    whether it's substantiated.
3            I believe that when it has been
4    adjudicated but not processed, that means the
5    borrower hasn't yet been notified.
6        Q    Okay.
7        A    Right.  So then -- yeah.
8        Q    And then the 27,700 in the next bullet
9    point, those are approved applications that will
10   be finalized when appropriate relief is
11   determined.
12           So that means they've gotten their
13   step-one determination and are awaiting their step
14   two; is that correct?
15       A    I believe that's what it means.
16       Q    And then it says, Nearly 11,000
17   applications have been adjudicated as denied but
18   have not yet been processed.
19           So those are step-one denials not sent
20   to borrowers?
21       A    I'm not sure.
22       Q    Of the approved applications awaiting
23   their step-two determination, the 27,700, do you
24   know what categories of borrowers those are, from
25   what schools they came from?

Page 171
Page

1        A    I don't.
2        Q    And who has to sign off on the grants,
3    the approved applications?
4        A    Colleen Nevin.  Or let me be clear, she
5    may have delegated others on her team, so it would
6    be Colleen Nevin or her designee.  I don't know if
7    she's authorized others to sign off.  I'm unclear
8    about that.
9        Q    Okay.  And then on PowerPoint -- so on
10   the footer and on the PDF 6, page 6.
11       A    Okay.
12       Q    So this -- the heading is, Why are BD
13   applications on hold, and it says -- the second
14   bullet point under approvals says, No relief
15   methodology developed for non-CCI claims.
16       A    Yes.
17       Q    And that's what we've addressed before.
18   That refers to there being no non-CCI methodology
19   while the injunction was enforced; is that
20   correct?
21           I can ask more open ended if you want
22   to just explain that bullet point.
23       A    I think it means a couple of things.
24   It means that we had a methodology for CCI claims,
25   and that has been enjoined.  I believe -- I think

Page 172
Page

1    this was an August PowerPoint.
2        Q    Yes.
3        A    So -- so the situation becomes further
4    complicated during this time period because now
5    we -- we no longer have an agreement with the
6    Social Security Administration, and so we don't
7    even have access to social security data.
8            So -- so -- so we have, you know, the
9    pending methodology for CCI claims, but now we're
10   in a situation where the original method we had is
11   enjoined.  And further, if the California court
12   decides we can use that methodology for non-CCI
13   schools, we don't have access to even getting
14   those data from the Social Security Administration
15   anymore.
16           So if this is -- if the August time
17   frame is right in my mind, this has become further
18   complicated because now, no matter what the judge
19   says we don't have an agreement with social
20   security.
21           So, in other words, we don't have the
22   ability to apply that methodology even if
23   approved.
24       Q    Okay.  And -- and at the same time, no
25   methodology -- no alternative methodology was

Page 173
Page

1    being developed?
2        A    Well, that -- so that's what's
3    confusing about because of the August time --
4        Q    It was August 31st, I believe.
5        A    Of what year?
6        Q    2019.
7        A    Okay.  So by then, we were in the
8    process of developing a methodology but it had not
9    yet been reviewed and approved, yes.  We were in
10   the hard work of -- of developing a methodology.
11       Q    Okay.  So this bullet point, No relief
12   methodology developed for non-CCI claims, then
13   what does that mean?
14       A    I believe what it means is that we are
15   still waiting for Corinthian borrowers for the
16   California court to make a decision, and beyond
17   that we now don't have access to social security
18   data for claims beyond those Corinthian claims.
19       Q    Under the next heading, Denials, it
20   says, Policy decision (spring 2018) to not issue
21   denials until approvals also could be issued.
22           What is that referring to?
23       A    So there had been a decision that was
24   made that if -- if the department issued denials
25   without at the same time issuing approvals,

1    borrowers could be misinformed and believe that we
2    would not be approving any claims, and there was a
3    concern that that would have a chilling effect on
4    borrowers.
5           So a decision had been made in -- in --
6    that we would not issue denials if we were not
7    also issuing approvals.
8        Q    Who made that decision?
9        A    I do not know.  I was in meetings about
10   that, but I don't -- I can't tell you who actually
11   made that decision.
12       Q    You don't remember?
13       A    I don't even know if I was in a meeting
14   where the final decision was made.  That
15   decision -- you know, I -- I think the original
16   decision was made before I was in my role.  I
17   think it was revisited from time to time, but I
18   don't believe I was involved in the -- in the
19   making of that initial decision.
20       Q    Uh-huh.
21       A    I don't recall.
22       Q    And your understanding, you said, was
23   that you didn't want to have a chilling effect on
24   borrowers.  What do you mean by that?
25       A    I think the concern was that if the

1    only decisions being issued were denials, that
2    that could be misreported by the media to make
3    borrowers believe that we were not going to
4    approve valid claims and the chilling effect would
5    be that, you know, if somebody has a valid claim,
6    they could have been discouraged from filing them.
7           We did not want -- I mean, you know, at
8    no point in time did anybody want somebody with a
9    valid claim to not submit it.
10       Q    And whether or not a claim is valid is
11   a step-one determination after they apply;
12   correct?
13       A    That's correct.
14       Q    So -- so it was determined as a matter
15   of policy that it was better to issue no decisions
16   rather than deny -- rather than send out denials
17   of any claims?
18       A    I -- I believe that's the decision that
19   was made in spring of 2018.
20       Q    Was there ever a discussion about
21   sending out approvals so that -- I mean, it seems
22   to me the choice was to either not issue denials,
23   as it says here, until approvals could be issued.
24          Was there a discussion about increasing
25   the pacing of approvals so that you wouldn't have

1    to decide between no decisions or just denials?
2           MR. MERRITT:  Objection: calling for
3    privileged information about the deliberations
4    leading to the decision to not do denials.
5       BY MS. O'GRADY:
6       Q    I can move on.  You don't have to
7    answer that.
8           Okay.  Next bullet point is, No
9    processing systems available from summer 2018 to
10   present due to platform development and migration.
11          Now, what is that referring to?
12       A    I believe that was referring to the
13   development of a system to replace Excel
14   spreadsheets as the BD unit's mechanism for
15   managing claims.
16       Q    So when the processing systems were
17   unavailable, were claims still being adjudicated?
18       A    I don't know.
19       Q    Would Colleen Nevin know?
20       A    Yes, I believe she would be the one to
21   know.
22       Q    Okay.  Then issuance of decide --
23   denial note -- excuse me.
24          Issuance of denial decision scheduled
25   to resume by mid September.  What is that

1    referring to?
2       A    I didn't write this slide, and so I'm
3    not quite sure what -- what this refers to.
4       Q    So at this point in your role, were you
5    not keeping tabs on the pace of decisions being
6    made?
7       A    In -- in the August time frame, we were
8    still waiting for the California court to rule on
9    the methodology, and so at this point in time, we
10   were still hopeful that there would be a
11   determination, at least for the Corinthian
12   borrowers, about a methodology.  So at -- at this
13   point in time, we're still waiting for the court.
14          Now, by August, we, the working group,
15   had come up with some potential methods to use for
16   adjudicating future claims, but it had not yet
17   been approved.
18          So I think --
19       Q    Okay.
20       A    You know, this may -- whoops, I'm
21   sorry.  This is the time period where we had
22   developed some options.  They weren't yet applied.
23   And in the meantime, there was still the hope that
24   the California court would rule at least for the
25   Corinthian borrowers.

Page 198

1    it says, a sample attached as exhibit A is for
2    Corinthian borrowers to assert only job placement
3    rate claims but who do not meet the eligibility
4    criteria for such a claim, and that that's
5    Exhibit -- that's Form Denial Notice A.  Does
6    that -- that seems accurate to you, this is Form
7    Denial Notice A?
8        A     It does.  I've scrolled through the
9    letter to where it says borrower defense claims
10   based on CCI job placement.  So that comports with
11   that.
12       Q     So is this one of the letters developed
13   as we were just talking in the paragraphs of your
14   declaration that talk about developing a letter
15   with more information for borrowers about why
16   their claims were denied?
17       A     (Witness reviews document.)
18       Yes.  I can't say that this is
19   precisely the version that I saw, but, you know,
20   this comports with the kind of letter that -- that
21   I reviewed.
22       Q     Okay.  And -- and I just want to make
23   sure that we're both on the same page about each
24   one of these letters.  So again, on the bottom of
25   page 2 of the court filing, it identifies exhibit

Page 199

1    B, which I'll call Form Denial B, as a denial
2    letter for Corinthian borrowers who assert other
3    claims in addition to job placement rate claims?
4        A     And as I scroll through, I want to
5    make.  Clear when I saw this document as part of
6    the review process, it did not have the COVID-19
7    notes, so that's applicable --
8        Q     Okay.
9        A     -- of something that's been added that
10   was -- I didn't review that.  That wasn't in the
11   original document.
12       Q     So at what point did you see Form
13   Denial A?
14       A     It would have been in the time frame
15   of, you know, about this time last year.
16       Q     So this is right around when you wrote
17   your declaration saying that the process of
18   developing those letters is complete?
19       A     (Witness nods head.)
20       Q     Okay.  Now, let's look at exhibit C
21   which is, quote, non-Corinthian borrowers who
22   attended schools for which the department does not
23   have any common evidence in its possession.
24       A     Okay.  I'm scrolling down to C.  Okay.
25   I'm at C.

Page 200

1        Q     Okay.  And is this form letter, perhaps
2    without the Covid paragraph, something that you
3    reviewed and approved?
4        A     (Witness reviews document.)
5        So the part that looks different to me
6    which may or may not be different -- it's just my
7    memory -- is the way the allegations are listed.
8    I don't know if in the version that I saw, you
9    know, it had the template for multiple
10   allegations.  The one that I saw may have just had
11   a placeholder.
12       So I don't know if I've seen it
13   precisely laid out this way, you know, the way
14   allegation one was in the middle of the page.  The
15   version I saw may have just had a placeholder.
16       Q     Okay.
17       A     But in general, this is.
18       Q     In general, yes.  That's helpful.
19       Let's look at the last one which is D,
20   and on the bottom of page 2, exhibit D is
21   identified as a letter for, quote, non-Corinthian
22   borrowers who attended schools for which the
23   department does have common evidence in its
24   possession, and then that's going to be exhibit D.
25       A     On this one, I don't recall whether I

Page 201

1    reviewed this particular document.  I -- I don't
2    recall whether this was just based on a template
3    that I had already reviewed and this was just a
4    derivative of it or whether I saw this one de
5    novo.  I just can't remember.
6        Q     Okay.  So as between C and D, you
7    remember reviewing C but with potentially a more
8    general placeholder under Allegation.  But D,
9    you're not sure you've seen?
10       A     Let me look at it again and . . .
11       (Witness reviews document.)
12       This does look familiar to me.
13       Q     So I'll just -- my understanding is
14   that these four denial letters are the result of
15   the efforts you describe in your declaration in
16   paragraph 26 of developing documents to provide a
17   more robust explanation for borrowers whose claims
18   are denied.
19       And is that -- do I have that right?
20       A     You do.  I mean, again, there could
21   have been final editorial changes or format
22   changes after I saw them, but, yes, my memory
23   is -- this is the kind of thing we were
24   discussing, and this document looks very similar
25   to what I reviewed.

Page 202

1    Q    Are you the person who would give final
2    sign-off on the use of these templates?
3        A    No.
4        Q    Who is that person?
5        A    Again, I -- I don't -- I don't know who
6    actually signs off on these.  I mean, there's a
7    departmental process, and I -- I can't tell you
8    who the final signer is on -- on this document.
9        Q    Would the secretary review these?
10       A    I don't -- I don't know.  I don't know
11   if the secretary would -- would review this
12   document.  It -- it's possible, but I don't know.
13       Q    And what was your involvement in
14   drafting these?
15       A    As -- as -- you know, it was an editing
16   role.  I -- it would have been an editing role in
17   response to somebody else's document.
18       Q    Okay.  Now, I want to look at -- well,
19   first -- first I'll ask, so C is for
20   non-Corinthian borrowers for schools that do not
21   have common evidence.  And D is for non-Corinthian
22   borrowers who went to school that do have common
23   evidence.
24            What is meant by "common evidence"?
25       A    You'd have to ask Colleen Nevin, but I

Page 203

1    think that means -- well, I think you should ask
2    Colleen Nevin, but I -- I think it means to
3    distinguish between evidence provided by the
4    student versus evidence that the department may
5    have in its possession, but you'd need to check
6    with her for the specific terminology.
7        Q    Well, let's look at the paragraph
8    applicable law, and that is -- on exhibit D, it is
9    the first page, middle, and it says, For direct
10   loans first disbursed prior to July 1st, 2017, a
11   borrower may be eligible for a discharge
12   (forgiveness) of part of all of one or more direct
13   loans if the borrower's school engaged in acts or
14   omissions that would give rise to a cause of
15   action against the school under applicable state
16   law.
17       A    Uh-huh.
18       Q    So is there more information about
19   which state law is being applied for these
20   adjudications in these letters?
21       A    Well, you know, if you go up to A
22   for -- I -- I can scroll through this one, but if
23   you go up through A, there's actually a place
24   where it would state the state law standard.
25       Q    Okay.  Let's look at that in A.

Page 204

1        A    I think it was A.  It might have been
2    B.  But let's go up to A and look.
3            (Witness reviews document.)
4            So A -- so for the Corinthian
5    borrowers, they were all adjudicated under the
6    California state law, so that's why this letter
7    says California in the template.
8        Q    Right.  On page 2 in the template.
9    Okay.
10       A    But in --
11       Q    And then --
12       A    -- in the others, the attorney in the,
13   you know, decision/reason or whatever, that's
14   where -- that's where they can state which
15   standard was used for the adjudication.
16       Q    Okay.  And on the template, where do
17   they insert the state law?
18       A    So in template B, for example, where it
19   says, Review recommendation reason, right, the
20   reason would be potentially dependent upon the
21   state law so -- so that -- that is -- that's
22   where -- I think that's the place where the
23   attorney would insert it.
24       Q    Okay.  And, so, that review
25   recommendation reason, that's also in -- that's

Page 205

1    also under the allegation template in C and D.
2            And, so, your understanding is that's
3    where an attorney would write what state law they
4    were applying?
5        A    That's my understanding.
6        Q    Okay.  And that's true for -- I'm
7    looking at template C, and also let's look at
8    template D, allegation type, so that
9    recommendation reason portion is where they would
10   insert the state law.
11           So when you reviewed these letters, is
12   that your understanding of what would happen?
13       A    Yes.
14       Q    I have a -- I want to go back to the
15   common evidence question.  If several borrowers
16   said the same thing, would that be considered
17   common evidence or individual evidence?
18       A    I don't know.  You'd have to ask
19   Colleen.  I don't know how they review evidence.
20       Q    And your understanding of the meaning
21   of common evidence as being something that the --
22   that the department has, if they had in their
23   possession, you know, a whole group of borrowers
24   making the same allegation, would that -- would
25   that be included just in your definition as you

# Exhibit 9

Video available at
https://perma.cc/XQ6L-NR9Q

# Exhibit 10

Borrower Defense to Repayment

- The revised 2019 BD regulation continues to provide student loan relief to students who have been the victim of misrepresentation – and our regulation extends that right to all students, regardless of the tax status of their institution. In other words, students who attend non-profit law schools that misrepresent their job placement rates and large universities that misrepresent their selectivity or admissions requirements to ranking agencies, or who once claimed to adhere to EEO laws and now admit to systemic racism are eligible for BD relief in the same way that students whose proprietary institutions engaged in misrepresentations about job placement rates are.

- The revised 2019 BD ensures due process rights to all involved – which is a fundamental American principle. It also ensures that the student and the institution have access to all of the information the Secretary will use to adjudicate the claim, and it gives the student the last word in responding to that evidence. No longer can the Department serve as prosecutor, judge and jury based on "secret" evidence.

- The 2016 regulation allowed the Department to require institutions to post large letters of credit simply because the institution had been sued or was subject to an investigation that *could* result in a financial settlement that would impact the institution's financial stability. This enabled activists to destroy an institution financially by making accusations against it, even if in the end the institution is not found guilty of the allegations made against it or the investigation results in no findings. The 2019 regulation limits financial penalties, such as letters of credit, to instances when an institution has actually been required to make a financial payment or settlement that changes the institution's financial viability.

- 

---

- *Borrower Defense to Repayment*
- Federal Student Aid also released monthly borrower defense data reports through August. As of August 2020, more than 330,000 borrower defense to repayment applications have been submitted. Of those applications, 39 percent are pending decision, including approximately 85,000 applications that are awaiting adjudication and approximately 45,000 applications that

DOE00007289

are pending notification. More than 61,000 applications were deemed eligible for borrower defense to repayment, 129,000 applications were deemed ineligible, and the remaining 10,000 applications were closed.

Of the over 128,000 BD claims the Department has adjudicated so far, less than 70,000 were actually valid claims. Many claims are "stab in the dark" efforts to get loans forgiven because a student didn't like a particular instructor or because, in general, the student feels like the education wasn't what they expected it to be. Disappointment and dissatisfaction are not grounds for BD relief – a disappointed student should have transferred to another institution. It is important to keep in mind that when frivolous BD claims result in student loan relief,ACKGROUND

> When the Department of Education decided to force Corinthian Colleges out of business, it re-interpreted a 1995 regulation that had rarely been used in the past to provide loan forgiveness to certain Corinthian students. Called the Borrower Defense to Repayment (BD) provision, the statutory purpose of BD was to provide borrowers in default, who otherwise lose access to borrower benefits such as alternative payment arrangements, a "last resort" opportunity to shed the debt in the event that the institution violated a relevant state law (meaning consumer protection laws related to the making of a student loan).

- The Department decided to launch the attack against a school in California – the state with the most liberal consumer protection laws – and worked closely with the California AG to investigate the school. In fact, when the Department required Corinthian to produce volumes of student records, the Department merely boxed them up and shipped them to the CA AG so that her office could review them. Based on claims by the CA AG that the institution had misrepresented job placement rates (a claim that the Department has never itself validated, except for Heald Colleges, one of Corinthian's brand names), the Department determined that there had been widespread misrepresentations by all Corinthian schools, and using CA law, promised BD relief to students who had attended certain Corinthian programs during certain periods of time, regardless of the state in which the student or campus that student attended was located. Documents show that often times the determination of "widespread" abuse was based on interviews with as few as 15 students – despite the fact that tens of thousands of students completed Corinthian programs over the years.

- In 2016, the Obama Administration promulgated new regulations for BD that moved from a state law standard to a Federal standard, added breach of contract as a source of BD relief, and eliminated the reference to "intent" with regard to misrepresentation. This meant that even if the misrepresentation was really just puffery (i.e. – a student who says that the colleges is "the best" or a faculty member who says that a group of students they are teaching are "the brightest" they've ever taught), the school could be found guilty of a misrepresentation and the student's loan would be forgiven.

  - Importantly, the 2016 Obama regulation stated directly that if the institution guilty of misrepresentation was a non-profit institution, then the borrower would not be entitled to relief because he or she would have gotten a good education despite the misrepresentation. On the other hand, the presumption was that all proprietary institutions offer poor quality education, and therefore, if the institution engaged in misrepresentation the student was naturally harmed.

DOE00007290

- o The 2016 regulation also required institutions to obtain large letters of credit based on allegations made against them – as opposed to final judgments on the merits – meaning that as activist AGs banded together to file large lawsuits, they could literally force a school out of business even if the school was ultimately found not guilty of the allegations made against them.

- o The 2016 regulation denied institutions due process rights and put the Department in the position of being accuser, judge and jury – of course playing this role with other people's money.

- o ***Because the 2016 regulation eliminated the need for intent, all institutions that promised a ground based experience last spring, but then switched to on-line due to COVID-19, are now subject to BD claims. This could mean that institutions would be required to reimburse the Department for all student loans for students who were enrolled during the Spring, and the reimbursement would not be limited to their Spring loans – it would include the entire federal student loan debt accumulated for the program in which the student was enrolled during the spring term.***

- Unfortunately, when students who are not harmed by an institution receive loan relief, that means that taxpayers who may have not been able to send their own kids to college are stuck footing the bill for a person who had the advantage of attending college. It also suggests that students are incapable of making good choices or of being wise consumers – and it eliminates any level of personal responsibility in selecting a school or program that meets the needs of the student.

- In 2019, we promulgated new BD regulations that maintained the focus on providing BD relief for students who were harmed by misrepresentations – regardless of the tax status of the institution that committed the misrepresentation. resOur regulation continues to provide relief to borrowers who have been the victim of misrepresentation – regardless of the tax status of the institution. However, institutions have due process rights restored, specious claims can be more quickly removed so that we can focus on students who have truly been harmed, the adjudication process requires something more than hearsay evidence to find a school guilty (though the regulation does not require the borrower to meet the level of evidence required to prove that he or she was defrauded), and each claim will be reviewed to ensure that taxpayers who didn't have the luxury of going to college aren't stuck with the bill for those who did

Exhibit 11

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al.*,

               Plaintiffs,

    v.

DR. MITCHELL ZAIS, in his official capacity
as Acting Secretary of Education, and the
UNITED STATES DEPARTMENT OF
EDUCATION

               Defendants.

No. 3:19-cv-03674-WHA

---

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants hereby supplement their responses to Plaintiffs' First Set of Interrogatories (the "Interrogatories"), served on November 6, 2020.

### BACKGROUND

On December 7, 2020, undersigned counsel for the Defendants timely submitted, via email, Defendants' written responses and objections to Plaintiffs' first set of interrogatories ("December 7 Responses"). In response to several of Plaintiffs' interrogatories, Defendants noted that they intended to supplement their narrative responses by producing particular documents. Defendants have now produced and/or identified each of the referenced documents, as set forth below:

- **Interrogatory No. 3**: In their December 7 Responses, Defendants stated that they would supplement their response with a "chart that includes case-level data from the borrower defense system" demonstrating various "relevant case characteristics." Defendants produced this supplemental document by email dated December 14, 2020.

1

- **Interrogatory No. 9**:  In their December 7 Responses, Defendants stated that they would supplement their response with a "chart that shows the number of career staff and contractors working for FSA in the Borrower Defense Unit during each month of the relevant time period."  Defendants produced this supplemental document by email dated December 11, 2020.

- **Interrogatory No. 10**:  In their December 7 Responses, Defendants stated that they would supplement their response with three categories of documents: "(1) the initial letters sent to schools thus far requesting information and advising schools that they would be receiving notice of individual borrower applications against them, (2) the template for the form letters sent to the school with the individual borrower application, and (3) documents describing the protocol and procedures for sending initial and form letters to schools that were in effect at the time that the notices were sent."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory No. 11**:  In their December 7 Responses, Defendants stated that they would supplement their response with documents reflecting the "criteria for approval" for claims submitted by borrowers who attended certain schools and the "policies and procedures regarding approvals."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory No. 12**:  In their December 7 Responses, Defendants stated that they would supplement their response with certain "written training materials."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory Nos. 17 and 18**:  In their December 7 Responses, Defendants stated that they would supplement their responses to these two interrogatories with "(1) school-specific memos regarding the scope of evidence considered and (2) related adjudication protocols."  By email dated January 14, 2021, Defendants produced and/or identified these supplemental documents (many of which were included in Defendants' document productions) to Plaintiffs.

- **Interrogatory No. 19**:  In their December 7 Responses, Defendants stated that they would supplement their response with a chart demonstrating "which class members received each form denial letter and relevant case characteristics, including the date of the letter and school name(s) associated with the borrower's claim."  Defendants produced this supplemental document by email dated January 14, 2021.

In addition, Defendants hereby submit these supplemental responses to certain of Plaintiffs' interrogatories.  For any interrogatory not specifically addressed herein, Defendants refer Plaintiffs to Defendants' December 7 Responses.  Unless otherwise noted, these responses are subject to the objections set forth in the December 7 Responses.

2

### How to Review a Borrower Allegation in a One-off or Small Batch Application

**Step One:  Did the borrower allege an act or omission by their school**
- In order to make a borrower defense claim the borrower must allege an act or omission by the school listed on their application.
  - If a borrower alleges an act or omission by someone or something other than the school on their application (for example another school, their loan servicer, or another student) then use the "borrower makes no allegations regarding the school" stock language from the protocol.  Otherwise move to step two.

**Step Two:  Does the act or omission by their school violate state law**
- The most common type of allegation we see allegations of misrepresentations.  In order to allege a misrepresentation that states a claim under state law the borrower must allege both a representation and the falsity of that representation in their application.  Further, the falsity alleged must match the representation.[1]
  - If the borrower has not alleged an act or omission by their school that violates state law use the "Allegation does not state a claim" stock language.  Otherwise move to step three.
    - **NOTE:**  The representation and the falsity may appear in different parts of the application
    - **NOTE:**  Checking the box on the universal form does not meet either the representation or falsity requirements, with the exception of Transfer claims.  If a the borrower checks the transfer claim box this checked box can be used to either meet the representation element or the falsity element for a transfer claim, but not both.

**Step Three:  Is the act or omission by the school covered by the borrower defense regulation**
- A borrower is not eligible for borrower defense relief based on claims that are not directly related to their loans or the educational services provided by the school.  For example personal injury claims or claims based on allegations of harassment are not bases for a borrower defense claim.
  - If the borrower alleges one of these violations of state law then we use the "not a BD type claim" stock language or, if there is the potential that the borrower can receive a different type of discharge, the appropriate stock language for that type of discharge. Otherwise move to Step four.

**Step Four:  Does the borrower provide evidence to support his/her claim**
- In order to be approved for a borrower defense claim the department must have evidence that proves all elements of the borrower's allegation.
  - If you think the borrower's allegation is proved by attached evidence or that the attached evidence would allow the department to discover additional material evidence through a limited targeted investigation then this allegation cannot be denied and you must contact your QCer for further direction.
  - If the borrower's allegation is not supported by sufficient evidence then the claim should be denied using the "insufficient evidence" stock language.

---

[1] Example:  "I was told that 85% of students have a job upon graduation, but in reality the percentage is much lower" states a claim.  However, "I was told that 85% of students have a job upon graduation, but I don't have a job" does not state a claim because the fact that the borrower doesn't have a job does not mean that the statement that 85% of students have a job upon graduation is false.

Produced in Response to Interrogatory 17-18, No Bates Number Provided

## Treatment of Common Allegations - DRAFT

### Employment Prospects

Regardless of which narrative box someone uses, Employment Prospects claims are about representations regarding someone's employment outcomes as a result of going to that school/program – a guarantee of employment, the % of graduates working/working in the field, the salary they can expect to earn, the kinds of jobs for which they would be eligible with that degree, eligibility to sit for licensing examinations, etc.

**Employment Prospects allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of guaranteed jobs
  - Ex. "My school  promised me a job after I graduated, but I never got a job"
- Misrepresentations regarding salary/wages
  - Ex. "My school  told me I would make $60K a year upon graduation, but I only made minimum wage"
  - Ex. "My school told me dental assistants earn $30 per hour; but actually they only earn $12 per hour."
- Misrepresentations of Job Placement Rates
  - Ex. "My school told me 85% of graduates have jobs within 6 months of graduation, but that isn't true."
- Misrepresentations regarding a graduate's ability to work in field or sit for licensing exam
  - Ex. "My school said they were fully accredited, but when I graduated I was not eligible to get a job in my field of study."
  - "Ex. "My school told me that once I got this degree I could immediately get hired as a nurse; that's not true.  I need to have one year of clinical work before I can be hired."
  - Ex. "My school told me that after I graduated I could sit for the licensing exam, however when I went to take the exam I was told that my school was not properly accredited so I can't sit for the exam."
- Misrepresentations regarding an externship resulting in job placement
  - Ex. "My school promised me they would place me in an externship that would hire me after it ended.  My externship did not hire me."

**Employment Prospects Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Allegations that include only one element of a misrepresentation
  - Ex. "The school promised me a job"
  - Ex. "I never got a job"
  - Ex. "There were no jobs available in my program when I graduated"
  - Ex. "I thought that I would get a job, but I'm working fast food instead"
- Allegations of misrepresentations where the falsity doesn't match the representation
  - Ex. "My school told me 85% of graduates have a job upon graduation, but I didn't have a job upon graduation."
- Pure omissions without the student alleging that the school had a duty to inform the student of the pertinent information
  - Ex. "My school never told me it would be hard to get a job as an underwater basket weaver"
  - Ex. "My school never told me that underwater basket weavers don't get paid well"
- General Claims regarding the value of education in getting a job, even if framed as misrepresentations

Produced in Response to Interrogatory 17-18, No Bates Number Provided

3

- o Ex. "My school told me that it is easier to get hired with a bachelors degree than with just a high school diploma"
- o Ex. "My school told me that people with masters degrees often have higher salaries than people with bachelors degrees"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

### Program Cost and Nature of Loan

Regardless of which narrative box someone uses, Program Cost and Nature of Loan claims are about how much the program cost, how it was to be paid for, loans, repayment terms, etc.

**Program Cost and Nature of Loan allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of program cost
  - Ex. "My school told me one price but then I was charged a higher price"
- Misrepresentation of the nature of the financial aid (grants vs. loans)
  - Ex. "My school made me think I was getting all grants, but instead it turned out to be loans"
- Misrepresentation of loan repayment terms
  - Ex. "My school told me that I wouldn't have to start paying back my loans until six months after graduation, but after I graduated my loans became due immediately."
- Misrepresentations regarding what equipment was provided with tuition/fees
  - Ex. "My school promised that haircutting supplies were part of the tuition, but I never got the supplies and instead had to pay for them separately."

**Program Cost and Nature of Loan Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omissions
  - Ex. "My school didn't let me know that there were additional fees in addition to tuition"
- Misrep claims that leave out an element
  - Ex. "My school promised me that tuition would only be $10K a year"
- Misrep claims where falsity doesn't match the rep
  - "My school promised me that tuition would only be $10K a year, but when I got to school my dorm room was in bad condition"
- Complaints about school cost
  - Ex "the school cost too much"
- Complaints regarding value of school, even if framed as misrepresentations
  - Ex. "the school shouldn't have cost so much, I could have gotten the same education at a state school for half the tuition.
- Failure to inform borrower of other available forms of financial aid
  - Ex. "Nobody told me I could have gotten a grant from a private charity or from the state."
- Complaints about having to take out loans
  - "I couldn't afford this school so I had to take out massive loans"
- Failure to inform borrower of basic loan information
  - Ex. "The school never told me that my loans would accrue interest"
- Misrep re: loan counseling or failure to provide loan counseling
  - Ex. "The school did not provide me loan counseling."
  - Ex. "The school promised me loan counseling, but is wasn't useful"
  - Ex. "The school promised me loan counseling, but I never got it"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

**Transferring Credits**

Regardless of which narrative box someone uses, Transferring Credits claims are typically about whether a borrower is able to transfer credits from, or into, that school.

**Transfer of Credits allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of whether credits earned would be accepted by other schools
  - Ex.  "[checked box] my credits didn't transfer"
  - Ex. "[checked box] my school told me my credits would transfer"
  - Ex "[NO checked box] my school told me my credits would transfer to any other school, but when I tried to transfer nobody would accept my credits"
- Misrepresentations of whether degrees earned at that school would allow continuation into grad school
  - Ex. "My school told me that this degree would let me go on to any law school in the country"
- Misrepresentations that previously earned credits would transfer into this school
  - Ex. "My school told me that that they would accept all my community college credits, but when I enrolled only some credits were accepted."
  - Ex. "My school told me that they would accept all my community college credits, but when I enrolled I had to retake classes."
- Misrepresentations regarding institutional accreditation
  - Ex. "My school said they were fully accredited, but when I tried to transfer my credits not school would accept them."

**Transfer of Credits Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Pure omission regarding transfer of credits
  - Ex. "My school never told me my credits wouldn't be accepted by other schools"
- Withholding transcripts
  - Ex. "I couldn't transfer because my school won't release my transcript until I pay them the balance of the tuition cost.
- Misrepresentation missing an element about transferring into a school
  - Ex. "[checked box] my former credits did not transfer into this school"
- School failed to assisted with the transfer process
  - Ex. "I was confused about how to transfer credits, when I asked the school to help me with the process nobody would help me."
- Transferability of some credits
  - Ex. "I tried to transfer my credits to [community college/state college], but they would only take 6 out of my 72 credits."

Produced in Response to Interrogatory 17-18, No Bates Number Provided

### Career Services

Regardless of which narrative box someone uses, Career Services claims are about what the school promised to do to *help* the borrower find a job – not through the education itself, but through Career Services representatives, job fair, resume workshops, industry connections, etc.

**Career Services allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Misrepresentations of the nature/type or availability of career services
  - Ex. "My school told me they would help me find a job, but when I went to the career services office nobody was ever there. When I called nobody ever picked up the phone."
  - Ex. "My school told me they would provide resume help and have job fairs, but they never did either of those things. All they did was send me links to job postings"
- Misrepresentations of the relationships the school has with employers
  - Ex. "My school promised me that they had strong relationships with local business, but when I contacted them they said they never heard of my school."

**Career Services Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omission
  - Ex. "My school never told me that they did not have a career services office"
- Misrepresentation allegation with missing element
  - Ex. "My school promised me that career services would help me find a job"
- Misrepresentation allegation where falsity doesn't match the representation
  - Ex. "My school promised to help me find a job, but I don't have a job"
- Complaints about quality of career services, even if framed as misrepresentations
  - Ex. "My school promised me that they had great career services, but it wasn't useful"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

**Educational Services**

Regardless of which narrative box someone uses, Educational Services claims are about curriculum, methods, instruction and instructors, etc.

**Educational Services allegations that potentially state a claim and therefore should be denied only if there is insufficient evidence to support the allegation:**

- Specific misrepresentations regarding what will be taught/how classes will be taught
  - Ex. "the school promised to teach me programming language X, but instead they taught me programing language Y"
  - Ex. "the school promised hands on training, but we were never allowed to use any of the equipment. We only learned by reading a book."
- Misrepresentations regarding to qualifications/certifications of the instructors
  - Ex. "My school told me that all of the instructors in the paralegal program were attorneys; that wasn't true"
- Misrepresentations of the availability of services such as tutoring
  - Ex. "I was told there would be tutoring opportunities if I needed extra help with classes, but when I tried to get a tutor there weren't any."
- Allegations that teachers were not licensed to teach in state or otherwise does not meet state's statutory or regulatory standards
  - "I found out that my teachers were not licensed to teach in the state of Massachusetts."
- Allegations that a given class did not have a teacher
  - Ex. "Our class had no teacher, meaning there was no instruction. We would just show up to a class room and nobody was there. We just read our textbooks to ourselves. "
  - Ex. "Our teacher was absent the second half of the semester and there was no substitute"
- Misrepresentations about program length/time to complete, number of credits necessary to complete, or number of hours of instruction that would be provided
  - Ex. "I told the school that I was being deployed in 9 months, and was told that the program only lasted 6 months. I enrolled, but a few months in learned that the program was actually 12 months long, which meant I couldn't complete the course.
- Misrepresentations regarding internship/externship availability or nature
  - Ex. "My school promised to place me in an externship, but they never did
  - Ex. "My school promised to place me in a nursing externship, but they placed in a record keeping position"
- Misrepresentation regarding which program a student is enrolling in
  - Ex. "I signed up for a medical billing and coding program, but I later found out that they enrolled me in a Pharmacy tech program"
- Misrepresentations regarding medical or other accommodations
  - Ex. "My school told me that because of my medical condition I would get extra time on tests. However, once I enrolled nobody gave me extra time on tests."
  - Ex. "My school told me I would be able to take a leave of absence for my pregnancy but instead they failed me and made me pay for the classes again"
  - Ex. "I was told that the school had flexible schedules and that it was not a problem that I worked during the day. After I enrolled I learned that most of their classes are only taught during the day making it impossible to take the classes I need to take."

**Educational Services Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim:**

- Omission
  - Ex. "The school didn't tell me how redundant the classes would be"
  - Ex. "The school didn't tell me that the teachers had little experience in the field"
- Misrep that is missing an element
  - Ex. "The school promised that the my teachers would be ivy league educated"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

- Misrep where falsity doesn't match the representation
  - Ex. "My school promised that my teachers would be ivy league educated, but they didn't seem to know anything"
- Complaints about how a class is taught
  - Ex. "The school taught me programing language X, but after graduation I realized it would have been more helpful if they taught me programing language Y"
  - Ex. "I would have learned more if I got more hands on experience"
  - Ex. "They promised me that this was the best program. That was a lie"
- Complaints about quality of instructors, even if framed as misrepresentations
  - Ex. "My teachers didn't seem to know very much and couldn't answer my questions"
  - Ex. "My school said they had the best teachers, but that is a lie"
- Complaints about instructors not being helpful or playing favorites, even if framed as misrepresentations
  - Ex. "The professor in my econ 101 course did not seem interested in teaching the class. All he did was read off a power point"
  - Ex. "My teacher didn't answer my questions and just told me to look up the answer in the book"
  - Ex. "My teacher liked certain students more than others and always gave them more attention"
- Complaints about normal instructor absences
  - Ex. "Our teacher was sick and had to cancel a day of class"
  - Ex. "Our teacher went on maternity leave and the sub wasn't as good"
  - Ex. "The school had high teacher turnover"
- Complaints that a specific instructor wasn't available, even if framed as misrepresentations
  - Ex. "I enrolled at the school to take classes with a certain professor but she retired before I could take a class with her"
- Deviations from the syllabus or student handbook, even if framed as misrepresentations
  - Ex. "we were supposed to learn about X in the third week, but we fell behind and didn't get to it until week 4. That meant the last week of class was rushed"
  - Ex. "According to the student handbook you are allowed three make up tests, but I never got one"
- Complaints about internship quality
  - Ex. "I didn't learn anything in my internship"
- Grading unfairness
  - Ex. "I think my work was great and I should have gotten an A. the only reason I didn't was because the teacher didn't like me."
- Difficulty or ease of the program
  - Ex. "The class was too easy, I already knew everything"
  - Ex. "The class was too hard for an intro class"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

## Other

**Other Allegations that Do Not State a Claim and therefore should be denied for failure to state a claim**

- Loss of accreditation
  - o Ex. "My school lost its accreditation while I was there"
- Mere existence of lawsuits against the school
  - o Ex. "My school is being sued by its former dining services provider"
- Borrower was expelled
  - o Ex. "My school wrongfully expelled me for not following safety procedures in the lab"
- School didn't mail diploma
  - o Ex. "I never received my paper diploma"
- School or program closure
  - o Ex. "My school had to cancel the program I was in due to lack of interest"
  - o Ex. "My school closed"
- Urgency to enroll
  - o Ex. "I was told that I should enroll in class today so that I could begin schooling as soon as possible."

**Other Allegations that are not covered by the Borrower Defense Regulation:**

- Discrimination claims
  - o Ex. "My teacher failed me because of my [race, gender, sexual orientation, etc]"
- False Certification claims
  - o Ex. "I never signed up for loans, but later found out that my school took loans out in my name"
- Teacher harassment
  - o Ex. "My teacher was verbally abusive to me"
  - o Ex. "My teacher sexually harassed me"
- Violence by teachers or Students
  - o Ex. "I got into a fist fight with my teacher"
- Drug use
  - o Ex. "My teacher was high during class"
- School sanctioned cheating on tests
  - o Ex. "The school had a policy of letting students cheat on tests so that we could graduate with good grades"

Produced in Response to Interrogatory 17-18, No Bates Number Provided

# Exhibit 12

6/6/22, 10:49 AM          Department of Education Announces Action to Streamline Borrower Defense Relief Process | U.S. Department of Education

Case 3:19-cv-03674-WHA    Document 245-1    Filed 06/09/22    Page 131 of 192

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) | FAQs (https://www.ed.gov/answers/) | Language Assistance ▾

Search...

## ARCHIVED INFORMATION

# Department of Education Announces Action to Streamline Borrower Defense Relief Process

MARCH 18, 2021

**Contact:**  Contact: Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Today, the U.S. Department of Education (Department) announced it will streamline debt relief determinations for borrowers with claims approved to date that their institution engaged in certain misconduct. The Department will be rescinding the formula for calculating partial relief and adopting a streamlined approach for granting full relief under the regulations to borrower defense claims approved to date. The Department anticipates this change will ultimately help approximately 72,000 borrowers receive $1 billion in loan cancellation.

"Borrowers deserve a simplified and fair path to relief when they have been harmed by their institution's misconduct," said Secretary of Education Miguel Cardona. "A close review of these claims and the associated evidence showed these borrowers have been harmed and we will grant them a fresh start from their debt."

Current provisions in federal law called "borrower defense to repayment" or "borrower defense" allow federal borrowers to seek cancellation of their William D. Ford Direct Loan (Direct Loan) Program loans if their institution engaged in certain misconduct. Beginning today, the Department will ensure that borrowers with approved borrower defense claims to date will have a streamlined path to receiving full loan discharges. This includes borrowers with previously approved claims that received less than a full loan discharge.

Full relief under the regulations will include:

- 100 percent discharge of borrowers' related federal student loans.
- Reimbursement of any amounts paid on the loans, where appropriate under the regulations.
- Requests to credit bureaus to remove any related negative credit reporting. And,
- Reinstatement of federal student aid eligibility, if applicable.

This new approach replaces a methodology first announced in December 2019 (https://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) to determine the amount of relief granted to borrowers with approved claims. After completing a comprehensive review of that methodology, the Department determined that it did not result in an appropriate relief determination.

This is the Department's first step in addressing borrower defense claims as well as the underlying regulations. The Department will be pursuing additional actions, including re-regulation, in the future.

The Department will begin applying this new approach today and affected borrowers will receive notices from the Department over the next several weeks with discharges following after that. Updated information for borrowers will be posted to StudentAid.gov/borrower-defense (https://studentaid.gov/borrower-defense/?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=).

**Tags:**    Defense Relief (/category/keyword/defense-relief)
Federal Student Loans (/category/keyword/federal-student-loans)
Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Constitution Day (https://www2.ed.gov/policy/fund/guid/constitutionday.html)

# Search press releases

Search...

# Find By Month

- June 2022 (/news/press-releases/monthly/202206)
- May 2022 (/news/press-releases/monthly/202205)
- April 2022 (/news/press-releases/monthly/202204)
- March 2022 (/news/press-releases/monthly/202203)
- February 2022 (/news/press-releases/monthly/202202)
- January 2022 (/news/press-releases/monthly/202201)
- December 2021 (/news/press-releases/monthly/202112)
- November 2021 (/news/press-releases/monthly/202111)
- October 2021 (/news/press-releases/monthly/202110)
- September 2021 (/news/press-releases/monthly/202109)
- August 2021 (/news/press-releases/monthly/202108)
- July 2021 (/news/press-releases/monthly/202107)

# Exhibit 13

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education, <br><br> And <br><br> THE UNITED STATES DEPARTMENT OF EDUCATION, <br><br> *Defendants.* | Case No.: 19-cv-03674-WHA <br><br><br><br> **AFFIDAVIT OF THERESA SWEET** |

I, Theresa Sweet, state as follows:

1.    I am submitting this affidavit in relation to the above-captioned case. I am a named Plaintiff in this matter.

2.    I borrowed federal student loans in order to attend Brooks Institute of Photography (Brooks).

3.    In or around Fall 2016, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A. Although I did submit evidence with my application, I have not been able to retrieve a copy of that evidence to include here.

4.    On July 8, 2020, I received correspondence from the Department of Education, stating that my claim had been denied. A copy of that correspondence is attached as Exhibit B.

5.    In between the time that I first submitted an application for loan cancellation and when I received the notification of denial, I did not hear from the Department about my

1

1     application or aspects of my application that were deficient. The only information I got from the

2     Department was upon my initiative. I called them a few times and was just told that my

3     application was in process.

4          6.      In between the time that I first submitted an application for loan cancellation and

5     when I received the notification of denial, my loans were in administrative forbearance.

6          7.      The denial notice I received from the Department states "failure to state a claim"

7     as the reason for denying my allegations regarding "employment prospects," "program cost and

8     nature of loans," "career services," and "other." *See* Ex. B.

9          8.      I do not understand what "failure to state a claim" means. In my application, I

10    explained the actions of Brooks' staff that I believed were fraudulent. The Department's

11    response leaves me without any way of determining what I failed to allege. "Failure to state a

12    claim" does not provide any information on what is missing in my application.

13          9.      The denial notice I received from the Department also states "insufficient

14    evidence" as the reason for denying my allegations regarding "educational services" and

15    "transferring credits." *See* Ex. A. I submitted evidence with my application. But "insufficient

16    evidence" does not explain what was deficient about the evidence I submitted.

17         10.     Overall, this feels like a blanket denial, without explanation or due consideration.

18         11.     I was shocked to receive the denial notice, in light of all of the evidence I believe

19    the Department has received through the many borrowers I know who attended Brooks and

20    submitted applications with allegations similar to mine and the external investigations by state

21    attorneys general.

22         12.     The notification of denial states that I may ask for reconsideration. It requires me

23    to specify what about the Department's decision was wrong and what evidence would

24    demonstrate that I am eligible.

25         13.     The Department has not provided me any information to understand what was

26    missing from my application in the first place. They merely have told me that I failed to state a

27    claim and didn't provide sufficient evidence. Thus, the Department has told me that my

28

2

T. SWEET AFFIDAVIT

1   application was deficient, but it has not told me what about my application was deficient or how
2   to fix it.
3          14.     Because this feels like a blanket denial and the Department has given me no
4   information to improve upon my previous application, seeking reconsideration feels like a fool's
5   errand.
6          15.     Nearly four years after I submitting my application, this denial feels like a cursory
7   email, not the result of true consideration of the facts and evidence that I presented.
8
9          I swear under penalty of perjury that the foregoing is true.
10
11         Executed on:   August 16, 2020
12                        Los Gatos, California
13
14                                                  _Theresa A. Sweet_
15                                                  Theresa Sweet
16
17
18
19
20
21
22
23
24
25
26
27
28

                                  3
                                                          T. SWEET AFFIDAVIT

# EXHIBIT A

**Brooks Institute of Photography (BIP) & Brooks Institute (BI)**
**Borrower defense to repayment Application**

Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and Master Promissory Note (MPN) under the
William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program
As detailed below, I, __**Theresa Ann Sweet**_____ , am hereby applying for a full discharge of my federal student loans according to the "Defense to Repayment" provisions of the Higher Education Act and promulgating regulations.

## Section 1: Borrower Information

**SSN**

**Name**
Theresa Ann Sweet

**Address**

| City | State | Zip Code |
|------|-------|----------|
| Los Gatos | CA | |

**Telephone**                **Telephone**

**Email**
(optional)

**Borrower is**
 X Employed
 ☐ In field of study
 X Out of field of study
 ☐ Unemployed

**Loan Servicer**
**Navient**

## Section 2: School Information

**School Name** (the school changed its name)
Brooks Institute of Photography
321 Alameda Padre Serra
Santa Barbara, CA 93103-1809
**AND**
Brooks Institute
5301 N Ventura Ave.
Ventura, CA 93001

**Dates of Attendance** (From-To)
January 2003- May 2006

**Name of program**
**Bachelor of Arts in Professional Photography**

**Type of Credential**

**Status**
X Completed
☐ Withdrew

## Section 3: Illegal Conduct Of School

I assert that certain acts and omissions by Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA and/or its agents/representatives give me a defense to repayment of my federal student loan(s) under state and federal law and the terms of my federal student loan agreement(s).

**The illegal conduct by** Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA **includes:**

**Misleading me about how this program would affect my job prospects, including:**

X Citing false and/or misleading job placement statistics and salary information to convince me to enroll in
X Brooks Institute of Photography, Santa Barbara CA
X Brooks Institute, Ventura CA

**Explain:**

X **Misleading me about the type of job placement assistance the school intended to provide me.**

**Explain:** When I sent for information about Brooks, a person identifying themselves as an "Admissions Counselor" contacted me right away and started telling me what turned out to be a string of falsehoods about the school, it's high level of academic preparation, and it's excellent reputation in the media Industry. They also told me how their students got a lot of job placement assistance after graduation (either through faculty networking or from the job placement assistance office). This turned out not to be true at all. As I got closer to graduation, I asked Instructors for any job leads and nearly all of them told me that when you are starting out, it is very difficult to find any paid work at all and that most students spend years as unpaid interns or as unpaid "assistants" so they could build their portfolio. I received only a few calls from the "placement office" after graduating, and the calls were all to tell me about "opportunities" to work for free, or to read Craigslist postings to me that I had already found on my own. After graduation, I found out that the "Admissions Counselors" were just commissioned sales people.

X **Other false/misleading conduct relating to job prospects.**

**Explain:** "Admissions Counselors" repeatedly told me that because Brooks had such a great reputation in the industry, 80-90% of graduates were employed "right out of school". I had no reason to doubt them since they told me they had to follow the same rules as all other colleges; only years later did I find out that private schools at that time DID NOT have to report this information to students and that there was no way to verify it until a couple of years ago until the Obama Administration required that private schools also had to provide the info. Many, if not most of my classmates DO NOT work in the media/photography industry- there simply weren't any jobs and many people in the industry said that Brooks' reputation has declined precipitously after the school was purchased by CEC and due to all the legal drama surrounding the school.

**Misleading me about the quality of the program, including:**

X **The pass rate of program graduates in required licensing exams/certifications.**

**Explain:** There aren't really Licensing Exams in Photography, but my "Admissions Counselor" told me that the program I was interested in was academically rigorous and that graduation rates were very high because students "knew" that once they had a degree from Brooks, they would have an advantage over their peers when it came to job hunting and gaining a foothold in the industry.

**X The fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college.**

**Explain:** My "Admissions Counselor" told me that she "had never had a student call and tell her their credits didn't transfer to another school" so I could *"feel certain it shouldn't be a problem"*. Again, I had no reason to doubt her; only later did I find out that private schools were not required at that time to report this information to students and that there would have been no way to verify it anyhow.

**X Other false/misleading conduct relating to the quality of the program.**

**Explain:**
My "Admissions Counselor" told me that the admissions process was rigorous and that they had very tough standards on which students could get in because they didn't want unqualified people sullying the industry reputation of the school. I was told that the quality of education was extremely high and that we would be expected to excel academically as well as artistically if we wanted to graduate. It turns out that as long as you graduated from high school (or had a GED) and could find a way to pay (mostly through loans that were forced upon us), you could get in and start a program.

**X Misleading me about how I would pay for the program, including:**
X **Misleading me about the true cost of the program.**

**Explain:**
I was told there would be no tuition increases during the program. This turned out to be entirely false. The amount of tuition per session increased at least once, if not twice during my enrollment. It was also not explained to me that unlike most schools, there was no student health insurance, nor was the cost of housing included in the massive dollar amount of tuition. I was told that we could check out equipment as we needed it for assignments, but with so many students it would have been impossible to complete a program without buying at least a film camera for the beginning of the program and a digital one for the end of the program. Many students were encouraged to take out additional "Equipment Loans" because of the lack of supplies available for us to rent out.

**X Misleading me about whether I would have to borrow money to attend,**
**X Brooks Institute of Photography, Santa Barbara CA**
☐ **Brooks Institute, Ventura CA**
**rather than having it paid for entirely in grants.**

**Explain:**

When I was accepted and contacted by admissions, I was told that I needed to contact the financial aid office. Once I contacted financial aid, they told me that I would get guaranteed Federal loans and that they also "had a CEC Signature Loan" agreement with Sallie Mae and that I would be approved for those loans as well, without question, and not to worry. It was only after I graduated that I realized that the CEC Signature Loans were not part of any Federal Student loan program and that not only were my interest rates extremely high, but that there were no payment plans that I could afford.

X **Misleading me about the amount of student loans I was borrowing.**

**Explain:**

I would say that hey misled me about what the actual cost of attendance was and how much I would actually have to borrow until it was too late- I was already in Santa Barbara taking classes.

X **Misleading me about whether my loans were federal or private.**

**Explain:**

I definitely feel as though I were misled about the type of loans I was receiving. As stated above, the Financial Aid office told me that I would get several types of "Guaranteed Loans" "through" Brooks. There would be **Stafford Loans** and **CEC Signature Loans**. They made no attempt whatsoever to explain that there were vast differences between the two loans. I think using the term "two types of Guaranteed Loans" was intentionally misleading. Looking back, even saying that the loans were given "through" Brooks makes it seem as though they were trying to mislead us- after all, you cannot borrow Federal student loans unless you are getting them while attending an accredited school.

I also feel that I should mention that for my **"CEC Signature Loans"**, Sallie Mae harassed me relentlessly over the phone, calling me dozens of time each day, demanding fees to put my loan on "Economic Hardship" even when they were unable to explain to me where in my loan paperwork it said that such fees would be expected. They called and harassed people whose contact information I never gave them such as former room mates, family members, and even an ex boyfriend and left my personal financial information on answering machines and voice mails. They demanded absurd monthly payment amounts even when I offered to pay an amount I could. They refused to work with me to even when I filed a complaint with the Consumer Financial Protection Beareau. At one point, they demanded that I pay them more than 50% of my take home pay, which would have left me no money to live on. I cannot even begin to explain the emotional toll this harassment took on me. I was embarrassed and ashamed of the fact

that they were calling people they should not have been calling in their attempts to harass me into paint what was at one time, a monthly payment of more than $4000.00/ month. Sallie Mae also actively encouraged me to stay on forbearance when I could not afford payments whiteout making it clear how much this was going to exponentially increase the amount of my loan balance. The last time I opened an envelope from Sallie Mae about my CEC signature Loans, the balance was somewhere in the neighborhood of **$400,000.00. That is not a typo. My balance is nearly half a million dollars.** I also assert that Sallie Mae did not do a remotely acceptable amount of due diligence that would be expected of any company loaning students money. It is absurd that anyone would loan out money in amounts so high to what were essentially Arts Majors.

**X Misleading me about the terms of repayment on my federal student loans, including what my monthly payments would be.**

**Explain:**
All through the financial aid process. I was told "not to worry" about my Federal Loans as "the government has payment plans you can afford", and "you can always put them in forbearance if you can't make payments". They also mentioned that I didn't need to worry about making payments while I was in school, only after. They made no attempt to explain that the interest on the (unsubsidized) Federal and Private loans would continue to accrue and that it would capitalize at the time of graduation/repayment.

**X Other false/misleading conduct in relation to financial aid.**

**Explain:**
Essentially, I feel the the financial aid process was part of the larger scam going on at the school. I am especially disgusted by how they booked the Federal Student Loan system to the point where students had to max out the amount they borrowed in order to attend as it left students in a position not to be able to borrow if they tried to attend a legitimate degree program later on.

**Misleading me about my options as the school shut down, including:**
☐ **Misleading me about the likelihood that the school would shut down.**

**Explain:**
I had already graduated when the school finally shut down, however there was at least one incident with the accrediting body while I was attending Brooks and we received letters from Greg Strick (I believe his title was President of the school at that time) assuring us that the school would be continued to allow to operate. St that time, I was

already so far into the program that I just hoped to finish. THere were also lawsuits against the school gaining steam.

☐ **Misleading me about my rights and options regarding the teach-out at School, including failing to inform**
**me that I had a right to decline the teach out and receive a full discharge of my federal student loans.**

**Explain:**
I am not sure what "Teach Out" is. I don't recall ever being asked to attend such a thing. I don't want to answer this question improperly since I don't know what it is referring to, but again, I can definitively say I was never asked to attend such a meeting. I have a feeling that the school didn't follow most of the rules/laws that a well run, legitimate business should be following, so this does not surprise me.

☐ **Other misleading behavior, including:**

**Explain:**
I feel that essentially, my entire experience at Brooks was a giant scam. From the "competitive admissions process" to financial aid, to accreditation, to career services. Looking back, I feel that Brooks and CEC followed to a tee the same unethical and misleading practices that have gotten similar trade schools in trouble in the recent past.

Throughout the admissions process. I was called frequently by agents of the school. They used information in my application (such as the fact that I was the first in my family to attend college) as "pain points" in their high pressure sales tactics.

It doesn't take much in the way of a Google search to put together a time line of legal actions against CEC (the owner of the school when I attended) and their unethical and fraudulent practice. The fact that they have mostly (if not always) settled out of court does nothing to prove their innocence.

**Superior Court of the State of California for the County of Los Angeles 2006**
**(Class Members enrolled 1999-2005)**

**I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit *and I accepted the settlement*

*offer.*
**Plaintiffs**
**vs.**
Careeer Education Corporation (CEC)
Brooks Institute of Photography
**Defendants**

☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

I know that I was a part of a class action lawsuit in which CEC settled out of court but I cannot remember the name of it so I don't want to misstate which one it was. It was related to their shady admissions practices and unethical business practices. I was compensated about $6000.00 if I remember correctly, but since I was unemployed or under employed for several years after graduation, I had to use the money to live on. Besides, the amount I was compensated was not enough to put a dent in the combined amount of Private and Federal student loans I owed.

CEC, of course, settled out of court without admitting any wrongdoing but as I am sure you are aware, CEC has had a trail of lawsuits following them, including those by shareholders, former students, and I believe Attorneys General across the country.

☐ **I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit *and I recused myself from the Class and settlement offer in order to reserve the right to potentially pursue SallieMae for the fraud, crime and harm committed* in conjunction with
*with their Private Loans, including the CEC Signature Loan, Financial Aid office kickbacks, disregard and elimination of content stated in Promissory Note, radical increase of percentage rate after six month grace period and bills sent to students in the 5 and 6 figure realm, demanded payment in full, harassment of borrowers employer/s, family members and friends, payment to defer or forebear due to economic hardship, refusal to put things in writing or give mailing address when asked numerous times, hours spent in attempt to find a solution for repayment and SallieMae all or nothing attitude etc...*
**Plaintiffs**
**vs.**
Careeer Education Corporation (CEC)
Brooks Institute of Photography
**Defendants**

☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.


X **I was not part** of the said Class Action Lawsuit, **and I attended during the Class Action period** of
1999-2005.
I do not think this is the lawsuit that I was a part of, but after reading the reasons that the lawsuit was brought, I can confirm that this is exactly the type of behavior that Sallie Mae engaged in with my CEC signature Loans. Their harassment was relentless even after I begged them to stop calling me constantly and communicate by mail. They called all manner of people that had never been added to my paperwork including my parents, former room mates, an ex boyfriend. It seems as though they looked at my address history and called every house on that list. They left personal financial information with all of these people. They demanded that I make monthly payments far exceeding the actual amount of my take home pay even when I told them I didn't even make that much money. I made multiple attempts to negotiate my payment amount to something I could afford and at every turn they refused and demanded all or nothing. The only thing they were willing to do, at one point, was to offer me a payment plan that required me to pay more than 50% of my take home pay. Since this is clearly unsustainable, not even a bankruptcy court would be this unreasonable, I could only make payments for a few months before living expenses had to take precedence and I dropped out of the program and defaulted. It is appalling to me that this same company is the one that handles the Federal Student Loan program. Despite changing their name to Navient, it is still the same company and they are blatantly making money off students despite their horrific reputation. Even if you only look on the surface, you will seed that their history is rife with such behavior.


☐ **I was not part** of the said Class Action Lawsuit, and **I attended after the Lawsuit** (note name change to BI from BIP due to post-settlement "restructuring").
☐ **Brooks Institute of Photography, Santa Barbara CA**
☐ **Brooks Institute, Ventura CA**
**in 2006, and was told almost the same fraudulent things (see above description) the people in the Class Action Lawsuit experienced, which was the basis for their suit.**


☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

Furthermore, the long history of systematic illegal activity and inadequate programs created a high likelihood that school's reputation would be irreparably damaged to the point where the degrees they issued would be worthless.

**X** Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

never notified me or otherwise made me aware that that my degree would be worthless due to misconduct.

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

Absent this conduct, I would not have chosen to attend and/or continue attending

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

I decided to pursue a *postgraduate education* because I wanted to gain the relevant skills to find a more fulfilling career with higher earning potential than I was able to obtain previously. I chose to attend

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

because they represented to me that their program would give me useful skills, that their degree would allow me to earn more than I did previously, and that these benefits would outweigh the burden of paying off the obligations I would incur to finance the degree.

**Because of this conduct, I have suffered injury, including:**

**X Federal student loan debt, which has caused me stress, forced me to divert funds from other aspects of my life and otherwise unduly burdened me.**

**Explain:**
Brooks actively encouraged/arranged it so that students had to maximize the amount of Federal loans students borrowed, and I frankly think that this was an intentional, willful money grab from the Federal Loan Program. Since I am maxed out on Federal Student loans, I cannot afford to attend a reputable school for a legitimate BA/BS degree.

**X The inability to enroll in another degree-granting program.**

**Explain:**
As stated above, I am maxed out on Federal student loans for a BA/BS degree and

cannot afford to attend a legitimate program. Not only thins, but any of the general education requirements/classes I took at Brooks are not accepted to most of the schools that I sought to attend part time to chip away at a useful degree over the years.


### X A difficult time finding employment, either in the field I went to school for or otherwise.

**Explain:**
I NEVER found employment using the education I got at Brooks. I had one photography job, several years after graduation, where I was told in the interview that my Brooks degree made them LESS likely to hire me. Besides that fact, they had a proprietary 2 week training program of the system that they used and my Brooks "education' was unnecessary and did not apply.


### X Missing the opportunity to go to another, better higher education institution and lacking the eligibility for
### enough federal loans to do so now.

**Explain:**
This is due to both the lack of "real" accreditation (and non transferable credits) and the fact that Brooks required students to max out the amount of Federal loans they borrowed in order to afford the cost of attendance.


### X Other injury, including pain and suffering.

**Explain:**
I spent 3 1/2 struggling desperately to afford the cost of attending Brooks. I have massive loans that I will never be able to afford to repay. My credit is ruined. I cannot buy a car, let alone a home. My own mother no longer speaks to me because she co-signed on a loan that I cannot repay. I have had relationships end due to this massive debt. I feel like a fool for having fallen for the Brooks scam.

The emotional trauma and shame of being the first person in my family to graduate from college and have that degree turn out to be a useless albatross around my neck has brought me to tears more time than I can count. I thought I was doing the right thing by getting "an education" to improve my life and it turns out he only education I got was that giant corporations can run amok and defraud thousands of people with no repercussions.

I was ceaselessly harassed by Sallie Mae for my CEC Signature Loans for years after graduation. Called dozens of times per day. They harassed my family and friends in their attempts to shame me into repaying loans with terms so onerous and usurious that few are the people who could afford to repay them. They shared my personal financial

problems with people that had no right to know, and in violation of Federal Law. They robo dialed myself and people in my life for years until I told them I knew it was illegal and that I would take legal action if they did not stop. They willfully misled me about the true cost of my loans. It sickens me every time I think of it.

**Section 4: Defense To Repayment of Federal Student Loans**

The above conduct gives rise to a cause or causes of action under California law, which relate(s)
directly to my loan and/or the provision of educational services for which the loan was given, including:

## California EDUCATION CODE
## SECTION 94928-94929.9

94928. As used in this article, the following terms have the following meanings:
 (a) "Cohort population" means the number of students that began a program on a cohort start date.
 (b) "Cohort start date" means the first class day after the cancellation period during which a cohort of students attends class for a specific program.
 (c) "On-time graduates" means the number of students who complete a program within 100 percent of the published program length. An institution may separately state completion information for students completing the program within 150 percent of the original contracted time, but that information may not replace completion information for students completing within the original scheduled time. Completion information shall be separately stated for each campus or branch of the institution.
 (d) "Graduates available for employment" means the number of graduates minus the number of graduates unavailable for employment.
 (e) (1) "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program. For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the examination results for the first examination available after a student completes an applicable educational

program.

(2) The bureau shall define by July 1, 2014, specific measures and standards for determining whether a student is gainfully employed in a full-time or part-time position for which the institution represents the program prepares its graduates, including self-employment or conducting freelance work, and may set the standards for the hours per week and duration of employment and utilize any job classification methodology the bureau determines appropriate for this purpose, including, but not limited to, the United States Department of Labor's Standard Occupational Classification codes.

(3) This subdivision shall not prohibit the bureau from authorizing an institution to aggregate single positions held by a graduate for purposes of meeting the hours per week standards established by the bureau.

(f) "Graduates unavailable for employment" means graduates who, after graduation, die, become incarcerated, are called to active military duty, are international students that leave the United States or do not have a visa allowing employment in the United States, or are continuing their education at an accredited or bureau-approved postsecondary institution.

(g) "Students available for graduation" means the cohort population minus the number of students unavailable for graduation.

(h) "Students unavailable for graduation" means students who have died, been incarcerated, or called to active military duty.

94929. (a) An institution shall annually report to the bureau, as part of the annual report, and publish in its School Performance Fact Sheet, the completion rate for each program. Except as provided in subdivision (b), the completion rate shall be calculated by dividing the number of on-time graduates by the number of students available for graduation.

(b) In lieu of calculating graduation data pursuant to subdivision (a), an institution may report graduation data reported to, and calculated by, the Integrated Postsecondary Education Data System of the United States Department of Education.

94929.5. (a) An institution shall annually report to the bureau, as part of the annual report, and shall publish in its School

Performance Fact Sheet, all of the following:

(1) The job placement rate, calculated by dividing the number of graduates employed in the field by the number of graduates available for employment for each program that is either (1) designed, or advertised, to lead to a particular career, or (2) advertised or promoted with any claim regarding job placement.

(2) The license examination passage rates for the immediately preceding two years for programs leading to employment for which passage of a state licensing examination is required, calculated by dividing the number of graduates who pass the examination by the number of graduates who take the licensing examination the first time that the examination is available after completion of the educational program. The institution shall use state agency licensing data to calculate license examination passage rates. If those data are unavailable, the institution shall calculate the license examination passage rate in a manner consistent with regulations adopted by the bureau.

(3) Salary and wage information, consisting of the total number of graduates employed in the field and the annual wages or salaries of those graduates stated in increments of five thousand dollars ($5,000).

(4) If applicable, the most recent official three-year cohort default rate reported by the United States Department of Education for the institution and the percentage of enrolled students receiving federal student loans.

(b) Nothing in this section shall limit the bureau's authority to collect information from an institution to comply with this section and ensure, by regulation and other lawful means, that the information required by this section, and the manner in which it is collected and reported, is all of the following:

(1) Useful to students.

(2) Useful to policymakers.

(3) Based upon the most credible and verifiable data available.

(4) Does not impose undue compliance burdens on an institution.

(c) Data and information disclosed pursuant to paragraphs (1) to (3), inclusive, of subdivision (a) is not required to include students who satisfy the qualifications specified in subdivision (d) of Section 94909, but an institution shall disclose on its fact sheet and to the bureau whether its data, information, or both, excludes

any students pursuant to this subdivision.

94929.7.  (a) The information used to substantiate the rates and information calculated pursuant to Sections 94929 and 94929.5 shall do both of the following:

   (1) Be documented and maintained by the institution for five years from the date of the publication of the rates and information.

   (2) Be retained in an electronic format and made available to the bureau upon request.

   (b) An institution shall provide a list of employment positions used to determine the number of graduates employed in the field for purposes of calculating job placement rates pursuant to this article.

   (c) The bureau shall identify the specific information that an institution is required to document and maintain to substantiate rates and information pursuant to this section.

94929.8.  (a) On or before January 1, 2011, and pursuant to Section 94877, the bureau shall establish, by regulation, a uniform method for institutions to obtain statistically valid, current, and representative data to comply with this article.

   (b) A violation of the regulations adopted pursuant to subdivision (a) is a material violation of this chapter.

94929.9.  (a) The bureau shall consider the graduate salary and other outcome data and reporting requirements that are utilized by the United States Department of Education, the Student Aid Commission, accrediting agencies, and student advocate associations. The bureau shall consider the reporting requirements of public postsecondary institutions in California to evaluate the feasibility of adopting these reporting requirements for private postsecondary institutions. The bureau shall make recommendations to the Legislature, on or before December 31, 2016, on how reporting requirements under this chapter should be altered to ensure accurate, useful, and consistent reporting by private postsecondary institutions to the bureau and students.

   (b) The bureau is authorized to enter into a personal services contract with an appropriate independent contractor to assist in the evaluation required by subdivision (a). In this connection, the Legislature finds, pursuant to Section 19130 of the Government Code,

that this is a new state function.

  (c) (1) A report to be submitted to the Legislature pursuant to
subdivision (a) shall be submitted in compliance with Section 9795 of
the Government Code.

  (2) Pursuant to Section 10231.5 of the Government Code, this
section is repealed January 1, 2017.


Common law action for Fraudulent Misrepresentation;
and/or common law action for Fraudulent Concealment.

Additionally, the above conduct violates federal law, including:

1. The Federal Trade Commission Act and Federal Trade Commission regulations,
which prohibit "a school, in
promoting a course of training, to misrepresent the availability of employment after
graduation from a course,
the success that the member graduates have realized in obtaining such employment, or
the salary that the
member's graduates will receive in such employment." 16 C.F.R. § 254.4(d).

2. Title IV of the Higher Education Act and Amendments, and Department of Education
regulations, which
prevent schools from participating in Title IV programs from committing "substantial
misrepresentation" in
interactions with students and prospective students.


## Section 5: Requested Relief

Therefore, I request that the Servicer and/or Department of Education take the following
steps:

1. Cancel any remaining principal, interest, fees and costs associated with my federal
student loans, borrowed to attend
**X Brooks Institute of Photography, Santa Barbara CA**
☐ **Brooks Institute, Ventura CA**

2. Cease any collection actions against me in relation to my federal student loans,
borrowed to attend
**X Brooks Institute of Photography, Santa Barbara CA**
☐ **Brooks Institute, Ventura CA**

3. Return any sums paid, whether voluntarily or involuntarily, toward my federal student

loans, borrowed to attend

**X** Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

4. Remove any adverse reports related to my federal student loans, borrowed to attend School, from all consumer credit reporting agencies.

**X** Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

5. Restore my eligibility to receive funds under Title IV, including by restoring any portions of my lifetime eligibility for Pell Grants and federal student loans previously used in order to attend **Brooks Institute of Photography, Santa Barbara, CA**_____

I request a notification of a hearing or a determination of my asserted defense to repayment within thirty (30) days, in writing. Should you deny any or all of my defense, please inform me of the process for appealing this decision, in writing. I reserve the right to submit supplementary information in support of this application.

## Section 6: Borrower Acknowledgment, Certifications, Assignment, And Authorization

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097.

I certify, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education (the Department) in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein.

I hereby assign and transfer to the U.S. Department of Education (the Department) any right to a refund on the

amount discharged that I may have received from the school and/or any owners, affiliates, or assignees of the

school, and from any third party that may pay claims for a refund because of the actions or omissions of the

school, up to the amount discharged by the Department on my loan(s).

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any

future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

**Borrower's Signature** *[signature]* _____ **Date**
*November 4, 2016*

# Brooks Institute

## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Student:** Theresa A Sweet  **Student ID:** 23252  **DOB:**  **HS:**  **LDA:**

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|

**Program: Professional Photography - Undeclared**
**Award: Bachelor of Arts**
**Enrollment #: 23252**  **Enroll Status: Internal Program Transfer**
**Start Date: 01/13/2003**  **LDA: 06/21/2006**

**Program: Professional Photography**
**Award: Bachelor of Arts**
**Concentration(s): Commercial Advertising**
**Enrollment #: SW06011983**  **Enroll Status: Graduate**
**Start Date: 01/13/2003**  **Grad Date: 06/24/2006**

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0301** | **Session 1 2003** | | | **01/10/2003** | **03/01/2003** |
| CUL188 | Cultural Studies 1 | 3.00 | 3.00 | B | 9.00 |
| PHO100 | Basic Photojournalism | 6.00 | 6.00 | B- | 16.20 |
| | **Term GPA:** 2.80 | **Cum GPA:** 2.80 | 9.00 | 9.00 | 25.20 |

**Program: Visual Journalism**
**Award: Bachelor of Arts**
**Enrollment #: SW03010466**  **Enroll Status: Transfer to Other Program**
**Start Date: 01/13/2003**  **LDA: 06/21/2006**

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0303** | **Session 2 2003** | | | **03/17/2003** | **04/26/2003** |
| MAT181 | Math | 3.00 | 3.00 | D | 3.00 |
| PHO101 | Fundamentals of Photography | 6.00 | 6.00 | C+ | 13.80 |
| | **Term GPA:** 1.87 | **Cum GPA:** 2.33 | 9.00 | 9.00 | 16.80 |

Visual Journalism  **GPA:** 0.00  0.00  0.00

**Program: Professional Photography - Undeclared**
**Award: Bachelor of Arts**
**Enrollment #: SW03036852**  **Enroll Status: Transfer to Other Program**
**Start Date: 01/13/2003**  **LDA: 06/21/2006**

Professional Photography - Undeclared  **GPA:** 0.00  0.00  0.00

\*\* Indicates Retaken Course
R\* Indicates Retaken Override

Date: 07/17/2009

# Brooks Institute

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Unofficial Transcript**

Page 2 of 4

Student: Theresa A Sweet

Student ID:  HS:

Address:

## Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0305** | **Session 3 2003** | **05/02/2003** | **06/21/2003** | | |
| PHO102 | Basic Photography Fundame | 6.00 | 6.00 | C | 12.00 |
| PSY187 | Theories of Personality | 3.00 | 3.00 | B | 9.00 |
| Term GPA: 2.33 | Cum GPA: 2.33 | 9.00 | 9.00 | | 21.00 |
| **Term: 0307** | **Session 4 2003** | **07/11/2003** | **08/30/2003** | | |
| ENG184 | English Composition | 3.00 | 3.00 | B | 9.00 |
| PHO103 | Intermediate Principles | 6.00 | 6.00 | C+ | 13.80 |
| Term GPA: 2.53 | Cum GPA: 2.38 | 9.00 | 9.00 | | 22.80 |
| **Term: 0309** | **Session 5 2003** | **09/05/2003** | **10/25/2003** | | |
| PHO200 | Lighting Theory | 6.00 | 6.00 | C | 12.00 |
| Term GPA: 2.00 | Cum GPA: 2.33 | 6.00 | 6.00 | | 12.00 |
| **Term: 0311** | **Session 6 2003** | **10/31/2003** | **12/20/2003** | | |
| CUL189 | Cultural Studies 2 | 3.00 | 3.00 | C+ | 6.90 |
| PHO201 | Lighting People | 6.00 | 6.00 | D- | 4.20 |
| Term GPA: 1.23 | Cum GPA: 2.14 | 9.00 | 9.00 | | 11.10 |
| **Term: 0401** | **Session 1 2004** | **01/09/2004** | **02/28/2004** | | |
| PHO202 | Lighting Studio | 6.00 | 6.00 | B- | 16.20 |
| Term GPA: 2.70 | Cum GPA: 2.19 | 6.00 | 6.00 | | 16.20 |
| **Term: 0403** | **Session 2 2004** | **03/05/2004** | **04/24/2004** | | |
| DIM253 | Digital Imaging | 6.00 | 6.00 | C | 12.00 |
| Term GPA: 2.00 | Cum GPA: 2.18 | 6.00 | 6.00 | | 12.00 |
| **Term: 0405** | **Session 3 2004** | **05/07/2004** | **06/26/2004** | | |
| ENG280 | Advanced English Composition | 3.00 | 3.00 | D | 3.00 |
| PHO203 | Advanced Photography | 6.00 | 6.00 | C- | 10.20 |
| Term GPA: 1.47 | Cum GPA: 2.09 | 9.00 | 9.00 | | 13.20 |

** Indicates Retaken Course
R* Indicates Retaken Override

# Brooks Institute

## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Student:** Theresa A Sweet    **Student ID:**    **HS:**    **LDA:**

**Addres**

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0407** | **Session 4 2004** | | | 07/09/2004 | 08/28/2004 |
| ADV311 | Commercial Photo 1 | 6.00 | 6.00 | C- | 10.20 |
| PSY285 | Psychology of Mass Commun | 3.00 | 3.00 | A- | 11.10 |
| Term GPA: 2.37 | Cum GPA: 2.12 | 9.00 | 9.00 | | 21.30 |
| **Term: 0409** | **Session 5 2004** | | | 09/03/2004 | 10/23/2004 |
| ACC281 | Accounting | 3.00 | 3.00 | A- | 11.10 |
| BUS282 | Basic Business | 3.00 | 3.00 | A | 12.00 |
| ECO281 | Economics | 3.00 | 3.00 | C+ | 6.90 |
| Term GPA: 3.33 | Cum GPA: 2.24 | 9.00 | 9.00 | | 30.00 |
| **Term: 0411** | **Session 6 2004** | | | 10/29/2004 | 12/18/2004 |
| IND314 | Photography as an Analyti | 6.00 | 6.00 | D | 6.00 |
| MRK284 | Marketing | 3.00 | 3.00 | A | 12.00 |
| Term GPA: 2.00 | Cum GPA: 2.22 | 9.00 | 9.00 | | 18.00 |
| **Term: 0501** | **Session 1 2005** | | | 01/07/2005 | 02/26/2005 |
| BUS480 | Business Law | 3.00 | 3.00 | B+ | 9.90 |

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0503** | **Session 2 2005** | | | 03/04/2005 | 04/23/2005 |
| MPV161 | Video Production | 6.00 | 6.00 | B | 18.00 |
| Term GPA: 3.10 | Cum GPA: 2.29 | | | | |
| ADT291 | Advanced Topics | 6.00 | 6.00 | D+ | 7.80 |
| SCI182 | Science | 3.00 | 3.00 | D+ | 3.90 |
| Term GPA: 1.30 | Cum GPA: 2.22 | 9.00 | 9.00 | | 11.70 |
| **Term: 0505** | **Session 3 2005** | | | 05/06/2005 | 06/25/2005 |
| ADV312 | Commercial Photo 2 | 6.00 | 0.00 | F | 0.00 |
| FIN382 | Finance | 3.00 | 3.00 | A- | 11.10 |
| Term GPA: 1.23 | Cum GPA: 2.15 | 9.00 | 3.00 | | 11.10 |
| **Term: 0507** | **Session 4 2005** | | | 07/08/2005 | 08/27/2005 |
| ENG390 | Writing for Publication | 3.00 | 3.00 | C | 6.00 |
| Term GPA: 2.00 | Cum GPA: 2.14 | 3.00 | 3.00 | | 6.00 |

** Indicates Retaken Course
R* Indicates Retaken Override

# Brooks Institute

## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Student:** Theresa A A Sweet

**Address:**

**Student ID:**

**HS:**

**LDA:**

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0509** | **Session 5 2005** | | 09/02/2005 | | 10/22/2005 |
| POR280 | Celebrity Portraiture | 6.00 | 6.00 | C | 12.00 |
| Term GPA: | 2.00 | Cum GPA: 2.14 | 6.00 | 6.00 | 12.00 |
| **Term: 0511** | **Session 6 2005** | | 10/28/2005 | | 12/17/2005 |
| DIM350 | Digital Illustration | 6.00 | 6.00 | D | 6.00 |
| Term GPA: | 1.00 | Cum GPA: 2.09 | 6.00 | 6.00 | 6.00 |
| **Term: 0601** | **Session 1 2006** | | 01/13/2006 | | 03/04/2006 |
| ADV290 | Art Director's Point of View | 6.00 | 6.00 | B- | 16.20 |
| Term GPA: | 1.00 | Cum GPA: 2.11 | 6.00 | 6.00 | 16.20 |
| **Term: 0603** | **Session 2 2006** | | 03/10/2006 | | 04/29/2006 |
| ADT286 | Advanced Topics | 6.00 | 6.00 | A | 24.00 |
| HUM430 | History and Systems | 3.00 | 3.00 | B | 9.00 |
| SPE283 | Speech | 3.00 | 3.00 | B+ | 9.90 |
| Term GPA: | 2.70 | Cum GPA: 2.22 | 6.00 | 6.00 | 16.20 |

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| Term GPA: | 3.58 | Cum GPA: 2.22 | 12.00 | 12.00 | 42.90 |
| **Term: 0605** | **Session 3 2006** | | 05/05/2006 | | 06/24/2006 |
| PEO411 | People Photography | 6.00 | 6.00 | D+ | 7.80 |
| Term GPA: | 1.30 | Cum GPA: 2.19 | 6.00 | 6.00 | 7.80 |

Professional Photography    GPA: 2.19    165.00    159.00

| Degrees awarded for Professional Photography enrollment | | |
|---|---|---|
| Degree | Date Awarded | Date Cleared |
| Bachelor of Arts | 06/24/2006 | 07/05/2006 |

*** End of Transcript ***

** Indicates Retaken Course
R* Indicates Retaken Override

Unofficial Transcript

# EXHIBIT B

## Fwd: Borrower defense discharge ineligibility information for you [ ref:_00Dt0Gyiq._500t0DPyIG:ref ]

**Theresa S.** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  Wed, Jul 8, 2020 at 2:41 PM

---------- Forwarded message ----------
From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Wed, Jul 8, 2020 at 10:18 AM
Subject: Borrower defense discharge ineligibility information for you [ ref:_00Dt0Gyiq._500t0DPyIG:ref ]
To:



7/8/2020

Borrower Defense Application #:

Dear Theresa Sweet:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Brooks Institute. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Brooks Institute. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Employment Prospects

You allege that Brooks Institute engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 2: Program Cost and Nature of Loans

You allege that Brooks Institute engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 3: Career Services

You allege that Brooks Institute engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 4: Educational Services

You allege that Brooks Institute engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 5: Transferring Credits

You allege that Brooks Institute engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 6: Other

You allege that Brooks Institute engaged in misconduct related to Other. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

## What evidence was considered in determining my application's ineligibility?

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

NY Attorney General's Office
PA Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

## What if I do not agree with this decision?

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [ ref:_ 00Dt0Gyiq._500t0DPyIG:ref ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following

information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage

garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you

have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



830 First Street, NE, Washington, D.C. 20202
StudentAid.gov/borrower-defense

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Exhibit 14

DELIBERATIVE DRAFT DOCUMENT

# Institutional Accountability Regulations
## (Formerly called the Borrower Defense to Repayment Regulations)

## Full Talking Points

1. The Department of Education is embarking on rulemaking to replace the 2016 borrower defense to repayment (BDR) regulations originally scheduled to take effect on July 1, 2017, but now delayed until 2019.
2. The rulemaking process will proceed as follows:
   a. The Department conducted public hearings in 2017
   b. Three four-day, formal negotiated rulemaking sessions from December 2017 to February 2018 did not reach consensus
   c. The Department developed its own proposal, which it will publish as a Notice of Proposed Rulemaking (NPRM) the week of July 23;
   d. The Department will accept public comments on the NPRM for 30 days
      i. Only 30 days as the Department has conducted two public hearings and three negotiated rulemaking sessions on these issues
   e. The Department will respond to those comments in a Final Regulation, which the Department intends to   publish by November 1, 2018
3. The current regulation:
   a. Has been effective since 1995
   b. Was designed to allow borrowers in collections proceedings on a defaulted loan ("defensive" claim) to seek loan forgiveness if the borrower relied upon misinformation provided by the institution that resulted in harm to the borrower
   c. Claims were evaluated based on state standards, which made the review process complicated and inequitable since state standards vary considerably
   d. From 1994-2015, the Department received on average fewer than 10 claims per year
4. The prior administration solicited claims from certain borrowers still in repayment ("affirmative claims").
   a. Between 2015 and 2018, the Department received nearly 170,000 claims, of which 12,000 have been denied or closed and 48,000 have been approved, averaging $11,315 per borrower
   b. Department must base its review of these claims on State legal standards, the process has been prolonged, and borrowers suffering the same harm may not receive the same relief due to different legal standards among the States
   c. Institutions receive no notice of claims and have no opportunity to respond to claims under the current rule
   d. The Secretary can recover losses from an institution only if the claim was approved within three years after the student left the institution.
5. In 2016, the prior administration promulgated new defense to repayment regulations that included the following provisions:
   a. Changed the review of claims from a state standard to a federal standard
   b. Created a wildly expansive federal standard that went far beyond cases of fraud to cover breach of contract and a lax misrepresentation standard

DELIBERATIVE DRAFT DOCUMENT

    c. Allowed the Secretary to initiate group claims on behalf of borrowers, with no effective requirement that a borrower show individual reliance on an institution's conduct or financial harm

    d. Failed to provide notice to institutions prior to the adjudication of the claim

    e. Failed to allow institutions the opportunity to respond to allegations of wrongful conduct prior to the adjudication of the claim

    f. Disallowed institutions from responding to claims made against them until after the Department adjudicated the claim  and the Department sought reimbursement from the institution for the cost of the claim

    g. Disallowed institutions to require students to engage in mandatory arbitration prior to legal action or to prevent students from participating in class action suits

    h. Implemented mandatory financial triggers based on allegations asserted in a lawsuit or borrower defense claims that would enable the Department to require a letter of credit from an institution

    i. Provided for automatic student loan relief if a borrower who attended a closed school did not re-enroll at another institution within three years

    j. Was estimated to cost the taxpayer $10 billion over 10 years

6. Our proposed regulation provides a fair, impartial approach to the borrower defense to repayment review process and includes  due process rights for institutions, which will result in more data and information for the Department to decide defenses to repayment.  It also ensures that institutions, rather than taxpayers, bear the financial costs when institutions commit a misrepresentation. The proposed regulation :

    a. Rescinds that portion of the 2016 borrower defense to repayment regulations that did not become effective July 1, 2017

    b. Provides two options on which we will seek comment, including one which restores the Clinton-era interpretation that limits borrower defense to repayment to collection proceedings  and another option that allows for affirmative claims outside of collection proceedings

    c. Establishes a single Federal standard for both options

    d. Provides institutions with the opportunity to respond to a borrower's defense to repayment claim Requires institutions that use mandatory arbitration and class action waiver agreements to provide clear, plain language disclosures to students and prospective students and to post those disclosures on a website available to the public

    e. Eliminates the ability for the Secretary to initiate group claims because the Department needs an application from each borrower to determine the harm suffered by that borrower;

    f. Limits financial triggers to those that impact the institution's composite score (financial responsibility ratio) and those that are a sign of imminent closure of the school

    g. Imposes mandatory and discretionary financial triggers on institutions arising from certain events and occurrences that have a negative impact on a school's composite score

    h. Implements changes in the way composite scores are calculated to conform with changes in FASB standards regarding the treatment of leases in audited financial statements

    i. Extends the closed school student loan discharge period from 120 to 180 days

    j. Encourages closing institutions to conduct orderly teach-outs and to avoid precipitous closures by disallowing closed school discharges for schools that offer an accreditor

DELIBERATIVE DRAFT DOCUMENT

approved teach-out plan that enables students to complete their programs at the institution or another institution

k.  Enables students who are unable to obtain an official high school transcript or diploma to attest to the fact that they have completed high school but disallows such students from receiving loan forgiveness based on false certification if they submitted a false attestation

l.  Prohibits guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency

DOE00007271

Exhibit 15

## Borrower Defense - Quarterly Report - for quarter end 12/31/2021*

| | | | |
|---|---|---|---|
| Total Received Applications | 423,191 | Total Amount Discharged** | $1,226,156,299 |
| Total Pending Applications, Awaiting Adjudication*** | 109,953 | Percentage of the total approved applications receiving partial discharge | 9.7% |
| Total Adjudicated Applications, Pending Notification | 47,139 | Percentage of the total approved Applications receiving 100% discharge | 90.3% |
| Total Approved Applications | 115,955 | Total dollar amount of outstanding debt prior to discharge | $1,438,023,551 |
| Total Denied Applications | 137,438 | Median dollar amount of outstanding debt prior to discharge | $10,112 |
| Total Closed Applications | 12,706 | Median loan debt remaining for applications receiving partial discharge | $8,875 |

### State Level Breakouts:

#### Total Received Applications

| Borrower State of Residence | Application Count | Change since Last Month |
|---|---|---|
| Total Received Applications | 423,191 | 3,424 |
| California | 78,563 | 396 |
| Texas | 37,144 | 255 |
| Florida | 35,040 | 232 |
| Illinois | 20,544 | 124 |
| Georgia | 19,757 | 133 |
| Ohio | 13,761 | 91 |
| New York | 13,166 | 99 |
| Pennsylvania | 12,916 | 116 |
| Washington | 12,369 | 67 |
| Michigan | 11,806 | 89 |
| North Carolina | 11,436 | 97 |
| Virginia | 9,792 | 57 |
| Arizona | 9,128 | 92 |
| Massachusetts | 9,040 | 54 |
| Indiana | 8,785 | 73 |
| Tennessee | 8,267 | 50 |
| Missouri | 7,408 | 46 |
| Colorado | 7,310 | 53 |
| New Jersey | 7,234 | 57 |
| Maryland | 6,871 | 36 |
| Minnesota | 6,375 | 41 |
| Nevada | 5,881 | 28 |
| South Carolina | 5,714 | 48 |
| Oregon | 5,705 | 32 |
| Alabama | 5,372 | 34 |
| Wisconsin | 5,195 | 30 |
| Kentucky | 4,570 | 53 |
| Louisiana | 3,994 | 42 |
| Hawaii | 3,267 | - |
| Mississippi | 3,251 | 19 |
| Oklahoma | 3,084 | 15 |
| Utah | 2,880 | 27 |
| Kansas | 2,446 | 10 |
| Arkansas | 2,308 | 11 |
| Connecticut | 2,152 | 13 |
| Iowa | 2,037 | 23 |
| West Virginia | 1,923 | - |
| Idaho | 1,683 | 15 |
| New Mexico | 1,671 | - |
| Nebraska | 1,366 | 11 |
| District of Columbia | 959 | - |
| New Hampshire | 891 | - |
| Delaware | 834 | - |
| Maine | 738 | - |
| Montana | 697 | - |
| Rhode Island | 614 | 16 |
| South Dakota | 559 | - |
| Wyoming | 528 | - |
| Alaska | 443 | - |
| North Dakota | 434 | - |
| Vermont | 267 | 13 |
| Foreign Country | 266 | - |
| Puerto Rico | 205 | - |
| US Virgin Islands | 98 | - |
| Armed Forces Pacific | 88 | - |
| Federated Micronesia | 60 | - |
| Guam | 48 | - |
| Less than 30 | 4,220 | 726 |

#### Total Pending Applications, Awaiting Adjudication

| Borrower State of Residence | Application Count | Change since Last Quarter |
|---|---|---|
| California | 13,909 | 2,098 |
| Texas | 9,610 | 1,784 |
| Florida | 8,876 | 1,869 |
| Illinois | 5,385 | 607 |
| Georgia | 5,287 | 969 |
| Ohio | 4,476 | 790 |
| New York | 4,133 | 739 |
| Pennsylvania | 3,898 | 704 |
| North Carolina | 3,506 | 635 |
| Arizona | 3,204 | 619 |
| Indiana | 2,667 | 405 |
| New Jersey | 2,660 | 490 |
| Washington | 2,537 | 594 |
| Virginia | 2,358 | 478 |
| Tennessee | 2,123 | 441 |
| Missouri | 2,116 | 419 |
| Michigan | 2,085 | 403 |
| Colorado | 2,028 | 272 |
| Maryland | 1,914 | 333 |
| South Carolina | 1,887 | 338 |
| Kentucky | 1,873 | 322 |
| Minnesota | 1,845 | 270 |
| Alabama | 1,593 | 346 |
| Nevada | 1,519 | 277 |
| Wisconsin | 1,396 | 299 |
| Oregon | 1,107 | 218 |
| Louisiana | 1,050 | 254 |
| Utah | 948 | 188 |
| Oklahoma | 880 | 201 |
| Connecticut | 773 | 122 |
| Kansas | 742 | 133 |
| Mississippi | 690 | 176 |
| Iowa | 650 | 129 |
| Arkansas | 564 | 114 |
| Idaho | 534 | 152 |
| New Mexico | 518 | 91 |
| West Virginia | 448 | 105 |
| Nebraska | 350 | 80 |
| Hawaii | 280 | 56 |
| Delaware | 275 | 46 |
| New Hampshire | 265 | 73 |
| Rhode Island | 220 | 31 |
| District of Columbia | 202 | 27 |
| Montana | 190 | 27 |
| South Dakota | 177 | 29 |
| Rhode Island | 176 | 30 |
| Wyoming | 125 | 21 |
| North Dakota | 56 | - |
| Vermont | 47 | - |
| Alaska | 31 | - |
| Foreign Country | 34 | - |
| Less than 30 | 3,547 | 3,011 |

#### Total Adjudicated Applications, Pending Notification

| Borrower State of Residence | Application Count | Change since Last Quarter |
|---|---|---|
| Total | 47,139 | 1,357 |
| California | 9,441 | 342 |
| Florida | 4,445 | 114 |
| Texas | 4,027 | 111 |
| Illinois | 2,065 | 306 |
| Georgia | 1,863 | 121 |
| Ohio | 1,534 | (27) |
| Michigan | 1,411 | 33 |
| Pennsylvania | 1,372 | - |
| North Carolina | 1,346 | 48 |
| New York | 1,272 | - |
| Indiana | 1,208 | - |
| Virginia | 1,162 | 52 |
| Washington | 1,127 | 34 |
| Tennessee | 1,046 | - |
| Missouri | 1,019 | - |
| Maryland | 968 | 61 |
| Arizona | 920 | - |
| Minnesota | 878 | 11 |
| Colorado | 860 | 100 |
| Wisconsin | 719 | - |
| Nevada | 696 | - |
| South Carolina | 665 | (10) |
| Alabama | 614 | - |
| New Jersey | 588 | 22 |
| Oregon | 569 | 20 |
| Massachusetts | 504 | - |
| Kentucky | 466 | - |
| New Jersey | 465 | - |
| Louisiana | 449 | - |
| Kansas | 361 | - |
| Utah | 309 | - |
| West Virginia | 301 | - |
| Hawaii | 285 | 11 |
| Oklahoma | 245 | - |
| Connecticut | 234 | - |
| Iowa | 190 | - |
| New Mexico | 188 | - |
| Idaho | 187 | - |
| Iowa | 171 | - |
| Nebraska | 137 | - |
| Delaware | 137 | - |
| District of Columbia | 104 | - |
| Wyoming | 101 | 10 |
| Rhode Island | 86 | - |
| New Hampshire | 68 | - |
| Maine | 65 | - |
| North Dakota | 56 | - |
| Alaska | 47 | - |
| Vermont | 41 | 14 |
| Less than 30 | 115 | (2) |

#### Total Approved Applications

| Borrower State of Residence | Application Count | Change since Last Quarter |
|---|---|---|
| TOTAL | 115,955 | - |
| California | 30,804 | - |
| Florida | 9,220 | - |
| Texas | 8,463 | - |
| Illinois | 5,263 | - |
| Georgia | 5,066 | - |
| Washington | 4,997 | - |
| Michigan | 3,963 | - |
| Ohio | 3,094 | - |
| Virginia | 2,862 | - |
| North Carolina | 2,808 | - |
| Pennsylvania | 2,669 | - |
| New York | 2,181 | - |
| Missouri | 2,051 | - |
| Oregon | 1,865 | - |
| Indiana | 1,860 | - |
| Colorado | 1,824 | - |
| Hawaii | 1,601 | - |
| Tennessee | 1,423 | - |
| Nevada | 1,398 | - |
| Minnesota | 1,345 | - |
| Maryland | 1,335 | - |
| Arizona | 1,287 | - |
| New Jersey | 1,254 | - |
| Alabama | 1,194 | - |
| South Carolina | 1,089 | - |
| Mississippi | 1,056 | - |
| Wisconsin | 910 | - |
| Louisiana | 888 | - |
| Kentucky | 867 | - |
| Utah | 678 | - |
| West Virginia | 661 | - |
| Arkansas | 602 | - |
| Oklahoma | 513 | - |
| Kansas | 446 | - |
| Iowa | 404 | - |
| Idaho | 392 | - |
| New Mexico | 357 | - |
| Nebraska | 323 | - |
| Connecticut | 296 | - |
| District of Columbia | 221 | - |
| Wyoming | 207 | - |
| New Hampshire | 203 | - |
| Montana | 174 | - |
| Delaware | 154 | - |
| Maine | 141 | - |
| Foreign Country | 129 | - |
| Rhode Island | 129 | - |
| South Dakota | 113 | - |
| Alaska | 112 | - |
| North Dakota | 110 | - |
| South Dakota | 108 | - |
| Rhode Island | 96 | - |
| Vermont | 64 | - |
| Puerto Rico | 64 | - |
| US Virgin Islands | 42 | - |
| Armed Forces Euro | 34 | - |
| Less than 30 | 126 | - |

#### Total Denied Applications

| Borrower State of Residence | Application Count | Change since Last Quarter |
|---|---|---|
| TOTAL | 137,438 | - |
| California | 21,200 | - |
| Florida | 13,772 | - |
| Texas | 12,000 | - |
| Illinois | 7,269 | - |
| Georgia | 6,908 | - |
| New York | 5,190 | - |
| Pennsylvania | 4,631 | - |
| Ohio | 4,275 | - |
| Washington | 3,815 | - |
| Michigan | 3,616 | - |
| North Carolina | 3,548 | - |
| Virginia | 3,160 | - |
| Missouri | 2,876 | - |
| Indiana | 2,868 | - |
| Tennessee | 2,648 | - |
| New Jersey | 2,510 | - |
| Maryland | 2,468 | - |
| Colorado | 2,443 | - |
| Minnesota | 2,216 | - |
| Oregon | 2,170 | - |
| Nevada | 2,119 | - |
| Wisconsin | 2,024 | - |
| Oregon | 1,994 | - |
| Colorado | 1,947 | - |
| Alabama | 1,802 | - |
| Massachusetts | 1,654 | - |
| Louisiana | 1,505 | - |
| South Carolina | 1,255 | - |
| Mississippi | 1,049 | - |
| Oklahoma | 1,020 | - |
| Utah | 888 | - |
| Arkansas | 851 | - |
| Hawaii | 850 | - |
| Iowa | 846 | - |
| Connecticut | 805 | - |
| Kansas | 734 | - |
| West Virginia | 622 | - |
| New Mexico | 594 | - |
| Idaho | 510 | - |
| Nebraska | 459 | - |
| District of Columbia | 403 | - |
| New Hampshire | 341 | - |
| Delaware | 286 | - |
| Montana | 243 | - |
| Rhode Island | 237 | - |
| South Dakota | 209 | - |
| Alaska | 150 | - |
| North Dakota | 146 | - |
| Wyoming | 135 | - |
| Vermont | 82 | - |
| Foreign Country | 73 | - |
| US Virgin Islands | 35 | - |
| Armed Forces Europe | 30 | - |
| Less than 30 | 268 | - |

#### Total Closed Applications

| Borrower State of Residence | Application Count | Change since Last Quarter |
|---|---|---|
| TOTAL | 12,706 | 369 |
| California | 3,209 | 51 |
| Texas | 940 | 34 |
| Florida | 831 | 33 |
| Georgia | 633 | 14 |
| Illinois | 542 | 16 |
| New York | 390 | 13 |
| Ohio | 382 | 14 |
| Pennsylvania | 346 | 26 |
| North Carolina | 322 | 10 |
| Washington | 314 | 12 |
| Massachusetts | 292 | 17 |
| Michigan | 279 | 15 |
| Hawaii | 251 | - |
| Virginia | 250 | - |
| Missouri | 236 | 15 |
| Arizona | 189 | - |
| Indiana | 189 | - |
| Maryland | 186 | - |
| Minnesota | 173 | - |
| Oregon | 170 | - |
| South Carolina | 169 | 11 |
| Alabama | 169 | - |
| Tennessee | 168 | 18 |
| New Jersey | 158 | 11 |
| Colorado | 155 | 11 |
| Mississippi | 155 | 12 |
| Nevada | 151 | - |
| Wisconsin | 146 | 11 |
| South Carolina | 128 | 10 |
| Kentucky | 109 | - |
| Louisiana | 102 | 10 |
| Arkansas | 83 | - |
| Oklahoma | 83 | - |
| Iowa | 58 | - |
| Utah | 57 | - |
| Kansas | 55 | - |
| West Virginia | 55 | - |
| Connecticut | 44 | 13 |
| New Mexico | 44 | - |
| Idaho | 32 | - |
| Nebraska | 30 | - |
| Connecticut | 30 | - |
| Less than 30 | 611 | (8) |

#### Total Amount Discharged**

| Borrower State of Residence | Total Discharged | Change since Last Quarter |
|---|---|---|
| Total Discharged | $1,226,156,299 | $14,683,899 |
| California | $350,901,986 | $(189,064) |
| Florida | $97,329,872 | $495,238 |
| Texas | $70,587,015 | $404,742 |
| Georgia | $52,021,291 | $166,622 |
| Washington | $47,353,796 | $62,185 |
| Massachusetts | $57,966,453 | $12,440,908 |
| Illinois | $42,562,966 | |
| Michigan | $40,541,871 | $79,436 |
| North Carolina | $38,787,360 | $121,510 |
| Pennsylvania | $33,745,704 | $96,045 |
| Ohio | $29,011,685 | $37,014 |
| Virginia | $28,101,922 | $95,304 |
| New York | $25,834,356 | $200,808 |
| Missouri | $21,972,690 | |
| Hawaii | $21,460,343 | |
| Oregon | $21,129,865 | $(44,439) |
| Nevada | $18,394,459 | $(50,029) |
| Indiana | $18,089,249 | $73,017 |
| Colorado | $16,781,901 | $(37,708) |
| South Carolina | $14,634,624 | $79,977 |
| New Jersey | $13,451,959 | |
| Mississippi | $13,371,617 | $(38,360) |
| Tennessee | $13,195,756 | $45,375 |
| Maryland | $13,016,132 | $79,260 |
| Minnesota | $12,011,499 | |
| Arizona | $8,821,975 | |
| Alabama | $8,578,982 | |
| South Carolina | $8,521,439 | |
| Wisconsin | $8,026,152 | |
| Kentucky | $7,832,878 | |
| Arkansas | $6,876,214 | $(84,050) |
| West Virginia | $6,312,338 | |
| Oklahoma | $5,176,637 | |
| Kansas | $5,036,362 | $49,268 |
| Iowa | $4,101,361 | $64,415 |
| New Mexico | $3,611,152 | |
| Idaho | $3,487,375 | |
| Nebraska | $3,459,047 | |
| Connecticut | $3,329,774 | |
| Wyoming | $3,130,170 | |
| Foreign Country | $3,060,882 | |
| New Hampshire | $2,800,173 | $309,156 |
| Maine | $2,046,262 | |
| Montana | $1,922,176 | |
| South Dakota | $1,585,286 | |
| Delaware | $1,537,722 | |
| Rhode Island | $1,649,574 | $172,668 |
| District of Columbia | $1,403,767 | |
| Vermont | $1,281,781 | |
| Nebraska | $1,074,065 | |
| Alaska | $990,422 | |
| US Virgin Islands | $880,742 | |
| Guam | $225,183 | |
| Puerto Rico | $163,289 | $42,433 |
| Less than $100,000 | $476,814 | $22,198 |

*NOTES

Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate Applications. As a result, the methodology of this report now excludes duplicate applications.

Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.

As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the state data for received applications has not been updated in the event the borrower count has changed less than ten. Application status counts by state have not been updated in the event the borrower count has changed less than ten or if the discharged dollar amount has changed less than $35,000. These changes are included in the bucket, "Less than 30" or "Less than $100,000" as to not impact the total numbers. These buckets also include those applications for which no borrower address is reported.

**Discharged dollar amounts, total dollar amount of outstanding debt prior to discharge, median dollar amount of outstanding debt prior to discharge and median loan debt for applications receiving partial discharge remaining reflect those approved applications for which a discharge has been processed. It typically takes 90-120 days from the approval notification until the borrower's discharge is processed. This includes the values referenced: Total Amount Discharged, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge, and Median loan debt remaining for applications receiving partial discharge. Discharge data is sourced from the Enterprise Data Warehouse and leverages the most recent address of the borrower, which could result in changes by state if a borrower relocates.

Data Descriptions:
Total Received Applications: Total count of individual applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.

Total Pending Applications, Awaiting Adjudication: Total count of applications under review prior to a determination.

Total Adjudicated Applications, Pending Notification: Total count of applications for which a determination has been made, but the borrower notification has not been sent (Please note that this count includes approximately 37k applications which are pending court approval of relief methodology.)

*Total Approved Applications: Total count of applications approved or preliminarily approved for discharge in which the borrower notification has been sent.*

*Total Denied Applications: Total count of applications denied for discharge in which the borrower notification has been sent.*

*Total Closed Applications: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application or the borrower receives another benefit such as loan forgiveness or discharge.)*

*Total Amount of Discharges: Total dollar amount associated with approved applications for which the discharge has been processed.*

Sources:

   *CEMS Borrower Defense System*

   *Enterprise Data Warehouse (EDWA)*

# Exhibit 16

6/6/22, 11:08 AM    Department of Education Announces Approval of New Categories of Borrower Defense Claims Totaling $500 Million in Loan Relie…

Case 3:19-cv-03674-WHA  Document 245-1  Filed 06/09/22  Page 175 of 192

Skip to main content │ About Us (https://www2.ed.gov/about/landing.jhtml) │ Contact Us (https://www2.ed.gov/about/contacts/gen) │ FAQs (https://www.ed.gov/answers/) │ Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Department of Education Announces Approval of New Categories of Borrower Defense Claims Totaling $500 Million in Loan Relief to 18,000 Borrowers

JUNE 16, 2021

**Contact:** Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

The U.S. Department of Education (Department) announced today the approval of 18,000 borrower defense to repayment (borrower defense) claims for individuals who attended ITT Technical Institute (ITT). These borrowers will receive 100 percent loan discharges, resulting in approximately $500 million in relief. This brings total loan cancellation under borrower defense by the Biden-Harris Administration to $1.5 billion for approximately 90,000 borrowers.

"Our action today will give thousands of borrowers a fresh start and the relief they deserve after ITT repeatedly lied to them," said Education Secretary Miguel Cardona. "Today's action is part of the Biden-Harris Administration's continued commitment to stand up for borrowers when their institutions take advantage of them. Many of these borrowers have waited a long time for relief, and we need to work swiftly to render decisions for those whose claims are still pending. This work also emphasizes the need for ongoing accountability so that institutions will never be able to commit this kind of widespread deception again."

These approvals cover two categories of claims submitted by borrowers who attended ITT: their likely employment prospects and the ability to transfer credits. This is the first approval of a new category of borrower defense claims by the Department since January 2017.

On employment prospects, the Department is expanding findings that it had previously made just for students who attended ITT in California to cover borrowers regardless of where they attended. ED's review of the evidence found that ITT made repeated and significant misrepresentations to students related to how much they could expect to earn and the jobs they could obtain after graduation between 2005 and the institution's closure in 2016. In reality, borrowers repeatedly stated that including ITT attendance on resumes made it harder for them to find employment, and their job prospects were not improved by attending ITT.

Similarly, the Department found that ITT misled students about the ability to transfer their credits to other institutions from January 2007 through October 2014. The Department found that credits rarely transferred and borrowers made little to no progress along their educational journey, yet were saddled with student loan debt as a result of their time at ITT.

6/6/22, 11:08 AM   Department of Education Announces Approval of New Categories of Borrower Defense Claims Totaling $500 Million in Loan Relie…

Case 3:19-cv-03674-WHA   Document 245-1   Filed 06/09/22   Page 176 of 192

These findings were made possible thanks to evidence provided by partners at the Consumer Financial Protection Bureau and the Iowa Office of the Attorney General, as well as Veterans Education Success. The Department looks forward to continuing to work with these organizations and others whenever schools engage in conduct that harms borrowers.

The Department will begin notifying borrowers of their approvals in the coming weeks and will then work expeditiously to discharge the approximately $500 million loan balances for these borrowers.

Today's action continues efforts by the Department to provide targeted loan relief to student borrowers and ensure borrower defense and other relief programs are delivering promised assistance to borrowers. In March, the agency took action to grant $1 billion in relief to 72,000 borrowers with previously approved borrower defense claims. The Department also suspended requests for earnings documentation from borrowers who had received a total and permanent disability discharge. This action reinstated discharges for 41,000 borrowers and will help protect another 190,000 borrowers from the risk of losing their discharges. Additionally, the Department announced plans to conduct rulemaking on borrower defense, total and permanent disability discharges, and other items, starting with public hearings on June 21, 23, and 24.

For more information about borrower defense, visit StudentAid.gov/borrower-defense. For more information on the upcoming public hearings, click here (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html? utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=).

Tags:   Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html? src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Constitution Day (https://www2.ed.gov/policy/fund/guid/constitutionday.html)

# Search press releases

Search...

# Find By Month

Exhibit 17

6/6/22, 11:16 AM Department of Education Approves Borrower Defense Claims Related to Three Additional Institutions | U.S. Department of Educat…

Case 3:19-cv-03674-WHA Document 245-1 Filed 06/09/22 Page 178 of 192

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | Language Assistance ▾

Search…

**ARCHIVED INFORMATION**

# Department of Education Approves Borrower Defense Claims Related to Three Additional Institutions

JULY 9, 2021

**Contact:** Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

The U.S. Department of Education (Department) announced today the approval of over 1,800 borrower defense to repayment (borrower defense) claims for borrowers who attended three institutions: Westwood College, Marinello Schools of Beauty and the Court Reporting Institute. This is the first time the Department has announced approved borrower defense claims for students who attended institutions besides Corinthian Colleges, ITT Technical Institute, and American Career Institute since 2017.

These borrowers will receive 100 percent loan discharges, resulting in approximately $55.6 million in relief. This brings total loan cancellation based on borrower defense by the Biden Administration to over $1.5 billion for nearly 92,000 borrowers.

"Today's announcement continues the U.S. Department of Education's commitment to standing up for students whose colleges took advantage of them," said U.S. Secretary of Education Miguel Cardona. "The Department will continue doing its part to review and approve borrower defense claims quickly and fairly so that borrowers receive the relief that they need and deserve. We also hope these approvals serve as a warning to any institution engaging in similar conduct that this type of misrepresentation is unacceptable."

*Westwood College*

The Department is approving two types of claims related to Westwood College (Westwood). First, the Department found that, from 2002 through its 2015 closure, all of Westwood's campuses across the country engaged in widespread misrepresentations about the ability of students to transfer credits. Despite claims by Westwood, students were generally unable to transfer their credits to other institutions. The inability of Westwood students to transfer their credits meant that they had to—or would have to—restart their education at a different school.

Second, the Department found that, from 2004 until its closure in 2015, Westwood made widespread, substantial misrepresentations to students that its criminal justice program would lead to careers as police officers in Illinois, particularly in the Chicago area. The institution told students they would be able to find employment with the Chicago Police Department and other law enforcement agencies when, in fact, these agencies would not accept Westwood credits in their hiring processes. Borrowers said that instead of obtaining employment as a police

officer after graduation from Westwood, they often had to accept minimum wage jobs or jobs that required no degree at all. The result was that students were worse off after attending Westwood. The Department has approved over 1,600 claims, representing approximately $53 million in relief for former Westwood students.

Westwood College was owned by Alta College, Inc. (Alta), which was located in Colorado. Major executives at Alta included co-founder Kirk Riedinger and George Burnett. In 2002, Alta was acquired by Housatonic Partners, a private equity firm located in California and Massachusetts.

*Marinello Schools of Beauty*

The Department found that Marinello Schools of Beauty (Marinello) made widespread, substantial misrepresentations about the instruction that would be offered at its campuses across the country. These misrepresentations occurred from 2009 until the schools closed in 2016 after the Department denied Marinello's application for continued participation in federal student aid programs. Borrowers regularly asserted that the schools failed to train them about key elements of a cosmetology program, such as how to cut hair. The Department found that Marinello left students without instructors for weeks or months at a time as part of a pattern of failing to provide the education it promised. As a result, students found it extremely difficult to pass necessary state licensing tests and receive any return on their educational investment. As of today, the Department has approved over 200 claims, representing approximately $2.2 million in relief for former Marinello students.

At all times relevant to the findings, Marinello was owned by B&H Education Inc. (B&H), which was a Delaware corporation. The leaders of B&H included Rashad Elyas, Nagui Elyas, Mike Benvenuti, and Michael Flecker in 2013 when it was sued under the False Claims Act in a lawsuit that resulted in an $8.6 million settlement (https://www.justice.gov/usao-cdca/pr/defunct-cosmetology-school-s-insurer-pays-86-million-resolve-claims-school-improperly?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) in 2016.

*Court Reporting Institute*

The Department found that from 1998 through its 2006 closure, the Court Reporting Institute (CRI) made widespread, substantial misrepresentations about the time it would take to complete its court reporting program. The majority of CRI students were never able to complete the court reporting program and, therefore, could not become court reporters. In fact, data reviewed by the Department showed that just two to six percent of students graduated and those who did finish the program took much longer to do so than the institution claimed. These findings cover each of the institution's locations, which were in Washington, California, and Idaho. As of today, the Department has approved 18 claims, representing approximately $340,000 in relief for former CRI students.

During the findings period and at the time of its closure, CRI was owned by Alen Janisch.

The findings regarding Westwood and CRI were made possible by evidence provided by law enforcement partners at the offices of the Washington, Colorado, and Illinois attorneys general. The Department will continue working with these law enforcement partners and others to identify institutional misconduct that harms federal student loan borrowers.

Today's action continues efforts by the Biden Administration to ensure borrower defense and other targeted loan cancellation, forgiveness, and discharge programs deliver relief to students and borrowers. In March, the agency announced that it would grant $1 billion in relief to 72,000 borrowers (https://www.ed.gov/news/press-releases/department-education-announces-action-streamline-borrower-defense-relief-process?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) with approved borrower defense claims related to Corinthian Colleges and ITT Technical Institute (ITT). Subsequently, the Department announced an additional $500 million in relief for 18,000 borrowers (https://www.ed.gov/news/press-releases/department-education-announces-approval-new-categories-borrower-defense-claims-totaling-500-

6/6/22, 11:16 AM Department of Education Approves Borrower Defense Claims Related to Three Additional Institutions | U.S. Department of Educat…

Case 3:19-cv-03674-WHA Document 245-1 Filed 06/09/22 Page 180 of 192

million-loan-relief-18000-borrowers?
utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) with approved borrower
defense claims related to ITT. The Department also suspended requests for earnings documentation
(https://www.ed.gov/news/press-releases/education-department-announces-relief-student-loan-borrowers-total-
and-permanent-disabilities-during-covid-19-emergency?
utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) from borrowers who had
received a total and permanent disability discharge; this action reinstated discharges for 41,000 borrowers and
will help protect another 190,000 borrowers from the risk of losing their discharges for this reason.

The Department is considering a future rulemaking on borrower defense and held public hearings
(https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?
utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) to receive stakeholder
feedback in late June.

For more information about borrower defense, visit StudentAid.gov/borrower-defense
(https://studentaid.gov/borrower-defense/?
utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=).

**Tags:** Borrower Defense (/category/keyword/borrower-defense)
Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?
  src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Constitution Day (https://www2.ed.gov/policy/fund/guid/constitutionday.html)

# Search press releases

Search...

# Find By Month

- June 2022 (/news/press-releases/monthly/202206)
- May 2022 (/news/press-releases/monthly/202205)

# Exhibit 18

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | Language Assistance ▾

---

Search...

# Education Department Approves $415 Million in Borrower Defense Claims Including for Former DeVry University Students

*More claims approved related to new findings at Westwood College, ITT Technical Institute, and Minnesota School of Business/Globe University*

FEBRUARY 16, 2022

**Contact:** Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Nearly 16,000 borrowers will receive $415 million in borrower defense to repayment discharges following the approval of four new findings and the continued review of claims. This includes approximately 1,800 former DeVry University (DeVry) students who will receive approximately $71.7 million in full borrower defense discharges after the U.S. Department of Education (Department) determined that the institution made widespread substantial misrepresentations about its job placement rates. These are the first approved borrower defense claims associated with a currently operating institution, and the Department will seek to recoup the cost of the discharges from DeVry. The Department anticipates that the number of approved claims related to DeVry will increase as it continues reviewing pending applications.

In addition to the DeVry findings, the Department is announcing several other actions that will provide an additional approximately $343.7 million in borrower defense discharges to almost 14,000 borrowers. This includes new findings related to Westwood College and the nursing program at ITT Technical Institute, as well as recent findings about the criminal justice programs at Minnesota School of Business/Globe University and another $284.5 million in discharges to over 11,900 students who attended institutions such as Corinthian Colleges and Marinello Schools of Beauty whose applications were reviewed after earlier announcements of relief.

"The Department remains committed to giving borrowers discharges when the evidence shows their college violated the law and standards," said U.S. Secretary of Education Miguel Cardona. "Students count on their colleges to be truthful. Unfortunately, today's findings show too many instances in which students were misled into loans at institutions or programs that could not deliver what they'd promised."

Today's actions bring the total amount of approved relief under borrower defense to repayment to approximately $2 billion for more than 107,000 borrowers.

Case 3:19-cv-03674-WHA   Document 245-1   Filed 06/09/22   Page 183 of 192

"When colleges and career schools put their own interests ahead of students, we will not look the other way," said Federal Student Aid Chief Operating Officer Richard Cordray. "We are grateful to have strong enforcement and oversight partners, such as the Federal Trade Commission and attorneys general in Colorado, Illinois, and New Mexico. These offices provided key evidence that played a significant role in reaching the findings announced today. Moving forward, we intend to expand our collaboration with federal and state partners to serve students."

**DeVry University**

After a review of voluminous amounts of evidence, the Department found that from 2008 to 2015 DeVry repeatedly misled prospective students across the country with claims that 90 percent of DeVry graduates who actively seek employment obtained jobs in their field of study within six months of graduation. This claim was the foundation of a national advertising campaign called, "We Major in Careers" to brand DeVry as a "Career Placement University" where it used the 90 percent placement statistic as the way to convince prospective students to enroll.

In fact, the institution's actual job placement rate was around 58 percent. The Department found that more than half of the jobs included in the claimed 90 percent placement rate were held by students who obtained them well before graduating from DeVry and often before they even enrolled. These jobs were not attributable to a DeVry education and their inclusion was contrary to the plain language of the 90 percent claim. Moreover, DeVry excluded from its calculation large numbers of graduates who were in fact actively looking for work simply because they did not conduct a search in the manner that the University's Career Services department preferred.

The Department also found that senior DeVry officials knew of the problems with the 90 percent statistic for years, in part due to concerns about its accuracy raised by alumni.

In 2016, the FTC reached a $100 million settlement (https://www.ftc.gov/news-events/press-releases/2016/12/devry-university-agrees-100-million-settlement-ftc?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) with DeVry around similar allegations. The Department also reached a settlement with DeVry (https://www2.ed.gov/documents/press-releases/devry-settlement-agreement.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) related to older job placement rate statistics in 2015. The attorneys general of New York (https://ag.ny.gov/press-release/2017/ag-schneiderman-obtains-settlement-devry-university-providing-225-million?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) and Massachusetts (https://www.mass.gov/news/ag-healey-secures-455000-in-refunds-for-students-deceived-by-online-for-profit-school?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) also reached agreements with DeVry in 2017 to resolve allegations of misleading job placement rates.

To date, the Department has identified approximately 1,800 borrowers who will be eligible for approximately $71.7 million in discharges because they relied upon DeVry's misrepresentation in deciding to enroll. The number of approvals is anticipated to grow as the Department reviews outstanding claims from former DeVry students. All borrowers with approved claims will receive full relief.

During this period of misrepresentation, DeVry was a publicly traded company owned by DeVry Education Group Inc., which was later renamed Adtalem Global Education. Senior leaders at DeVry during this time included Daniel Hamburger, who served as President and CEO from 2002 through 2016 and David Pauldine, who served as the executive vice president and/or president of DeVry University from 2005 through 2014. Adtalem sold DeVry in 2018.

**Westwood College Employment Prospects**

The Department has also found that from 2002 through its closure in 2015, Westwood College (Westwood) made widespread and substantial misrepresentations to students about their salary potential and likelihood of finding a job after graduating. Westwood made an "employment pledge" to students that they would find a job within six months of graduating or get help paying their bills, and admissions representatives made similar guarantees of employment. Westwood also claimed graduates would make salaries of $50,000 or more and had placement rates of 80 percent or higher. The Department has no evidence Westwood made good on its pledge. In fact, its job placement rates were grossly inflated, and its salary promises were based upon national federal data while actual Westwood graduates often made half or as little as one-fourth of those amounts.

The Department will approve full discharges of approximately $53.1 million for approximately 1,600 borrowers who submitted claims covered by these findings. The Department is also in the process of identifying cases that were previously denied but could be reopened and approved based upon this additional evidence.

This is the third finding against Westwood. In July 2021, the Department found that Westwood had also made widespread and substantial misrepresentations about the ability of students to transfer credits and that students in its criminal justice program in Illinois would be able to find jobs as police officers. Combined, the Department has now approved approximately 4,100 claims and approximately $130 million in discharges for students who attended Westwood.

Westwood College was owned by Alta College, Inc. (Alta), which was located in Colorado. In 2002, Alta was acquired by Housatonic Partners, a private equity firm located in California and Massachusetts. Major executives at Alta included co-founder Kirk Riedinger and George Burnett.

## ITT Nursing

The Department also found that, from July 2007 through its 2016 closure, ITT Technical Institute (ITT) misled prospective students about the programmatic accreditation of its associate degree in nursing program. ITT falsely told students that its nursing program had or would shortly obtain necessary programmatic accreditation that played a significant role in a student's ability to get a nursing job. However, the school repeatedly failed to obtain programmatic accreditation for years as the accreditors found that ITT failed to meet standards for job placement and licensure pass rates, had insufficient physical and fiscal resources, and unqualified faculty. As a result, the Department will approve full discharges of approximately $3.1 million for approximately 130 students.

This is the fourth finding against ITT Technical Institute following findings in 2021 that the school lied about employment prospects and the ability to transfer credits and a 2017 finding that ITT made false claims of guaranteed employment to California students. Combined, these findings have resulted in approximately $660 million in discharges for approximately 23,000 students.

ITT was a publicly traded company during this time. Its senior leadership included Kevin Modany, who served as CEO and President of ITT until 2014 and Eugene Feichtner who served as President and CEO from August 2014 until 2016.

## Minnesota School of Business/Globe University

The Department recently determined that borrowers who attended the criminal justice programs at the Minnesota School of Business (MSB) and/or Globe University (Globe) are entitled to full borrower defense discharges. The Minnesota Office of the Attorney General sued the schools, and, in September 2016, a Minnesota judge found that the schools committed fraud in telling students that the criminal justice programs at those schools would allow them to become a Minnesota police officer or parole/probation officer. However, those programs lacked the necessary accreditation and certifications making it impossible for graduates of those programs to obtain those positions with the state. As a result, the Department approved approximately $3 million in discharges for 270 students. The Department previously announced in January that it had approved discharges for 921 other students who have more than $23 million in outstanding loan balances. The Department has received $7 million

as part of a 2021 bankruptcy settlement (https://studentaid.gov/announcements-events/msb-globe?
utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) with the schools to help
offset the cost of these discharges.

Globe and MSB were owned by the Myhre family. Terry Myhre owned 50 percent of Globe and 80 percent of
MSB. Jeff Myhre served as Chief Executive Officer, Terry Myhre served as President, and Kaye Myhre served as
Vice President.

**Additional Approvals**

Once the Department reaches findings against an institution, it will continue to approve any applications it
subsequently receives from borrowers who attended during the period of demonstrated misconduct and that
raise allegations that are supported by the evidence we have reviewed. As part of those ongoing reviews, the
Department has already identified another approximately $284.5 million in discharges for over 11,900 students
who attended institutions such as Corinthian Colleges, where the Department previously issued findings.

**Continued Commitment to Targeted Relief**

Including today's actions, the Department has now approved approximately $16 billion in loan discharges for
more than 680,000 borrowers. This includes:

- Almost $5 billion for 70,000 borrowers through improvements to the Public Service Loan Forgiveness
  program.
- $7.8 billion for more than 400,000 borrowers who have a total and permanent disability.
- $1.2 billion for borrowers who previously attended ITT Technical Institutes before it closed.

The Department is also working on new regulations that will improve borrower defense and other discharge
programs and provide greater protections for students and taxpayers. This includes writing a new borrower
defense regulation, proposing to re-establish a gainful employment regulation to hold career training programs
accountable for unaffordable debt, and proposing to create financial triggers so that the Department has
monetary protection against potential losses, including borrower defense liabilities.

**Tags:**   Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?
  src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

Exhibit 19

6/6/22, 11:19 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borro…

Case 3:19-cv-03674-WHA  Document 245-1  Filed 06/06/22  Page 187 of 192

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) | FAQs (https://www.ed.gov/answers/) | Language Assistance ▾

Search...

# Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrower Defense Findings

**Actions mark first time Biden-Harris Administration has discharged debt of a group of borrowers based on borrower defense findings**

APRIL 28, 2022

**Contact:**  Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Today, the Department of Education announced it will deliver relief to tens of thousands of borrowers harmed by pervasive and widespread misconduct at Marinello Schools of Beauty. Borrowers who enrolled in the schools from 2009 through its closure in February 2016 will receive loan discharges based on borrower defense findings. These 28,000 borrowers will receive loan discharges totaling approximately $238 million. This group discharge will provide relief to borrowers who enrolled at Marinello during this period, including those who have not yet applied for a borrower defense discharge.

While the Department continues its work to review borrower defense claims, it is also bringing on four key hires in the Federal Student Aid (FSA) Office of Enforcement with significant federal, congressional, and state oversight experience.

"Marinello preyed on students who dreamed of careers in the beauty industry, misled them about the quality of their programs, and left them buried in unaffordable debt they could not repay," said U.S. Secretary of Education Miguel Cardona. "Today's announcement will streamline access to debt relief for thousands of borrowers caught up in Marinello's lies. At the Department of Education, we will continue to strengthen oversight and enforcement for colleges and career schools that engaged in misconduct and uphold the Biden-Harris Administration's commitment to helping students who have been harmed."

This Marinello group discharge reflects the Department's findings that the school engaged in pervasive and widespread misconduct that negatively affected all borrowers who enrolled at Marinello during the covered time period. These findings led the Department to approve individual borrower defense claims last summer. This group discharge will facilitate relief to additional borrowers harmed by Marinello's actions, including many who have not yet applied for borrower defense. It is the first group discharge for defrauded borrowers to be approved since 2017, after the prior administration did not approve any group claims or new findings.

Today's actions bring the total amount of approved relief based on borrower defense findings during the Biden-Harris Administration to approximately $2.1 billion for 132,000 borrowers.

6/6/22, 11:19 AM    Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borro…

Case 3:19-cv-03674-WHA    Document 245-1    Filed 06/06/22    Page 188 of 192

To date, the Department had approved approximately 300 borrower defense claims at Marinello under findings reached last July that Marinello made widespread, substantial misrepresentations about the instruction that would be offered at its campuses across the country. The Department found that the schools failed to train students in key elements of a cosmetology program, such as how to cut hair. It also found that Marinello left students without instructors for weeks or months at a time as part of a pattern of failing to provide the education it promised.

As a result, students would have found it extremely difficult to pass necessary state licensing tests and receive the promised return on their educational investment. Not only did Marinello fail to teach its students, class-action lawsuits filed in Nevada and California alleged that the school used salons as profit centers and exploited students as a source of unpaid labor.

The Department has continued to analyze the evidence related to Marinello and concluded that the misconduct was so widespread across all the school's campuses over a period of years that all borrowers who attended between 2009 and the schools' closures in 2016 are entitled to full student loan.

The Department's Marinello findings stem primarily from the agency's investigative work that began in 2015 and that resulted in the Department removing the school from the federal student aid programs.

At all times relevant to the findings, Marinello was owned by B&H Education Inc. (B&H), which was a Delaware corporation. The leaders of B&H included Rashed Elyas as president, Mike Flecker as chief financial officer, and Nancy Alpough as financial aid administrator. Department records also identify the following individuals as board members at some point during the period of these borrower defense findings: Nagui Elyas, Erik Brooks, Bob Pan, Tomer Yosef-Or, Brent Stone, James Goodman, Daniel Neuwirth, Anna Keeling, James Rich, Frank Lincoln, and Gerald Taylor.

The Department will soon begin notifying students who attended Marinello of their approvals for discharge, with discharges following in the months after. Borrowers will not have to take any additional actions to receive their discharges.

**New Hires in the Office of Enforcement**

Holding schools accountable is a priority for the Biden-Harris Administration, and FSA has made four key new hires to bolster its Enforcement Office's leadership team.

**Dawn Bilodeau** has joined FSA as the Enforcement Office's senior advisor for policies and oversight after more than 20 years at the Department of Defense, which included roles as the senior advisor to the assistant secretary of defense for readiness and the director of Defense Voluntary Education Programs. Dawn twice received the Secretary of Defense Medal for Exceptional Civilian Service, and in 2020, she received the Council of College and Military Educators President's Award.

**Christopher J. Madaio** joins FSA as the Enforcement Office's director of investigations. Christopher joins FSA from Veterans Education Success, where he served as the vice president for legal affairs. Prior to that, Christopher served for nearly six years as an assistant attorney general in the Consumer Protection Division of Maryland's Office of the Attorney General, where he led multi-state investigations into large institutions of higher education and secured significant relief for students victimized by misconduct.

**Brad Middleton** will join FSA as the Enforcement Office's senior advisor for strategy. For the last 14 years, Brad has served on the staff of U.S. Sen. Richard J. Durbin of Illinois, including serving as his education policy director since 2013. During his time in the Senate, Brad has focused on institutional accountability and providing student loan debt relief for defrauded borrowers.

**Nina Schichor** joins FSA as the Enforcement Office's director of borrower defense following nearly five years at the National Labor Relations Board and seven years at the Consumer Financial Protection Bureau (CFPB). Most recently, Nina served as senior litigation counsel in the CFPB's Office of Enforcement, where she led teams to conduct investigations into student-related businesses and obtained substantial relief for students harmed by violations of federal consumer financial law.

**Continued commitment to targeted relief**

Including today's actions, the Department has now approved more than $18.5 billion in loan discharges for more than 750,000 borrowers. This includes:

- $6.8 billion in for more than 113,000 borrowers through Public Service Loan Forgiveness (PSLF).
- More than $8.5 billion in total and permanent disability discharges for more than 400,000 borrowers.
- Last week the Department also announced fixes to long-standing problems in income-driven repayment that will help thousands of borrowers receive forgiveness through that program as well as 40,000 borrowers receive PSLF.

The Department is also working on new regulations that will improve a variety of the existing student loan relief programs and provide greater protections for students and taxpayers.

Tags:   Press Releases (/news/press-releases)

# How Do I Find…?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About…

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Constitution Day (https://www2.ed.gov/policy/fund/guid/constitutionday.html)

# Search press releases

Search...

# Find By Month

- June 2022 (/news/press-releases/monthly/202206)
- May 2022 (/news/press-releases/monthly/202205)

Exhibit 20

**Borrower Defense - Quarterly Report - for quarter end 9/30/2019***

| | | | | |
|---|---|---|---|---|
| Total Received Applications | 287,824 | Percentage of the total approved applications receiving partial discharge | | 31.3% |
| Total Pending Applications | 223,569 | Percentage of the total approved Applications receiving 100% discharge | | 68.7% |
| Total Approved Applications | 47,942 | Total dollar amount of outstanding debt prior to discharge | $ | 602,445,930 |
| Total Denied Applications | 9,077 | Median dollar amount of outstanding debt prior to discharge | $ | 11,542 |
| Total Closed Applications | 7,236 | Median loan debt remaining for applications receiving partial discharge | $ | 7,851 |
| Total Amount Discharged | $534,765,563 | | | |

**State Level Breakouts:**

**Total Received**

| Borrower State of Residence | Total Received | Change since Last Quarter |
|---|---|---|
| TOTAL | 287,824 | 15,103 |
| California | 60,822 | 2,601 |
| Florida | 24,448 | 1,359 |
| Texas | 22,704 | 1,291 |
| Illinois | 14,584 | 666 |
| Georgia | 12,958 | 805 |
| Washington | 9,673 | 304 |
| Ohio | 9,042 | 537 |
| Pennsylvania | 8,559 | 545 |
| New York | 8,558 | 548 |
| Michigan | 7,916 | 381 |
| North Carolina | 7,467 | 371 |
| Massachusetts | 7,274 | 193 |
| Virginia | 6,686 | 314 |
| Indiana | 5,806 | 378 |
| Missouri | 5,600 | 280 |
| Arizona | 5,325 | 387 |
| Colorado | 4,842 | 246 |
| New Jersey | 4,822 | 268 |
| Minnesota | 4,701 | 235 |
| Maryland | 4,449 | 274 |
| Tennessee | 4,421 | 309 |
| Oregon | 4,108 | 174 |
| Nevada | 3,853 | 219 |
| Wisconsin | 3,403 | 170 |
| South Carolina | 3,395 | 250 |
| Alabama | 3,140 | 235 |
| Hawaii | 2,879 | 112 |
| Kentucky | 2,835 | 193 |
| Louisiana | 2,447 | 140 |
| Mississippi | 2,258 | 125 |
| Utah | 1,836 | 107 |
| Oklahoma | 1,801 | 139 |
| Kansas | 1,573 | 95 |
| Arkansas | 1,515 | 78 |
| West Virginia | 1,397 | 63 |
| Connecticut | 1,273 | 92 |
| Iowa | 1,241 | 82 |
| New Mexico | 1,050 | 61 |
| Idaho | 992 | 48 |
| Nebraska | 876 | 81 |
| District of Columbia | 669 | 33 |
| New Hampshire | 561 | 56 |
| Delaware | 505 | 33 |
| Maine | 467 | 42 |
| Montana | 464 | 17 |
| Rhode Island | 397 | 29 |
| Wyoming | 383 | 0 |
| South Dakota | 372 | 26 |
| Alaska | 284 | 17 |
| North Dakota | 283 | 17 |
| Foreign Country | 226 | 15 |
| Vermont | 174 | 17 |
| Puerto Rico | 126 | 18 |
| US Virgin Islands | 76 | 0 |
| Armed Forces Europe | 68 | 0 |
| Federated Micronesia | 43 | 11 |
| Armed Forces Pacific | 30 | 0 |
| Less than 30 | 164 | 33 |

**Total Pending**

| Borrower State of Residence | Pending | Change since Last Quarter |
|---|---|---|
| TOTAL | 223,569 | 13,401 |
| California | 41,736 | 1,934 |
| Texas | 19,879 | 1,294 |
| Texas | 17,818 | 1,180 |
| Illinois | 11,511 | 603 |
| Georgia | 10,174 | 680 |
| Ohio | 7,867 | 489 |
| New York | 7,500 | 501 |
| Pennsylvania | 7,127 | 511 |
| Washington | 6,701 | 277 |
| North Carolina | 6,193 | 345 |
| Michigan | 6,005 | 360 |
| Virginia | 5,281 | 298 |
| Indiana | 5,019 | 356 |
| Arizona | 4,888 | 370 |
| Missouri | 4,606 | 260 |
| New Jersey | 4,128 | 255 |
| Tennessee | 3,950 | 292 |
| Minnesota | 3,921 | 225 |
| Colorado | 3,836 | 228 |
| Maryland | 3,754 | 258 |
| Nevada | 3,188 | 206 |
| Massachusetts | 3,133 | 166 |
| Wisconsin | 3,000 | 170 |
| Oregon | 2,950 | 135 |
| South Carolina | 2,911 | 250 |
| Alabama | 2,740 | 235 |
| Kentucky | 2,584 | 182 |
| Louisiana | 2,079 | 126 |
| Mississippi | 1,774 | 109 |
| Oklahoma | 1,600 | 125 |
| West Virginia | 1,586 | 32 |
| Utah | 1,572 | 100 |
| Kansas | 1,394 | 87 |
| Arkansas | 1,213 | 65 |
| Connecticut | 1,105 | 86 |
| West Virginia | 1,087 | 63 |
| Iowa | 1,052 | 78 |
| New Mexico | 947 | 57 |
| Idaho | 864 | 48 |
| Nebraska | 742 | 72 |
| District of Columbia | 522 | 28 |
| New Hampshire | 443 | 51 |
| Delaware | 414 | 32 |
| Maine | 385 | 38 |
| Montana | 379 | 13 |
| Rhode Island | 341 | 29 |
| South Dakota | 311 | 25 |
| Wyoming | 262 | 0 |
| North Dakota | 233 | 17 |
| Alaska | 231 | 13 |
| Foreign Country | 130 | 14 |
| Puerto Rico | 109 | 0 |
| Vermont | 109 | 10 |
| Armed Forces Europe | 54 | 0 |
| US Virgin Islands | 51 | 0 |
| **Federated Micronesia | 33 | 33 |
| Less than 30 | 142 | -17 |

**Total Approved**

| Borrower State of Residence | Approved | Change since Last Quarter |
|---|---|---|
| TOTAL | 47,942 | NA |
| California | 15,047 | NA |
| Massachusetts | 3,857 | NA |
| Texas | 3,464 | NA |
| Florida | 3,230 | NA |
| Washington | 2,289 | NA |
| Georgia | 1,875 | NA |
| Illinois | 1,727 | NA |
| Michigan | 1,463 | NA |
| Virginia | 1,039 | NA |
| North Carolina | 976 | NA |
| Pennsylvania | 972 | NA |
| Hawaii | 913 | NA |
| Ohio | 841 | NA |
| Oregon | 836 | NA |
| Colorado | 774 | NA |
| Missouri | 729 | NA |
| New York | 699 | NA |
| Minnesota | 643 | NA |
| Indiana | 522 | NA |
| New Jersey | 515 | NA |
| Nevada | 433 | NA |
| South Carolina | 382 | NA |
| Maryland | 369 | NA |
| Tennessee | 359 | NA |
| Mississippi | 342 | NA |
| Alabama | 307 | NA |
| Arizona | 307 | NA |
| Wisconsin | 273 | NA |
| Louisiana | 273 | NA |
| Arkansas | 235 | NA |
| Wisconsin | 231 | NA |
| West Virginia | 230 | NA |
| Utah | 182 | NA |
| Kentucky | 177 | NA |
| Iowa | 147 | NA |
| Kansas | 138 | NA |
| Oklahoma | 137 | NA |
| Connecticut | 130 | NA |
| Idaho | 109 | NA |
| Wyoming | 109 | NA |
| Nebraska | 101 | NA |
| New Hampshire | 97 | NA |
| New Mexico | 87 | NA |
| District of Columbia | 81 | NA |
| Foreign Country | 71 | NA |
| Delaware | 70 | NA |
| Maine | 62 | NA |
| Alaska | 56 | NA |
| South Dakota | 48 | NA |
| Rhode Island | 46 | NA |
| North Dakota | 43 | NA |
| Vermont | 36 | NA |
| Less than 30 | 71 | NA |

**Total Denied**

| Borrower State of Residence | Denied | Change since Last Quarter |
|---|---|---|
| TOTAL | 9,077 | NA |
| California | 1,683 | NA |
| Illinois | 1,039 | NA |
| Texas | 962 | NA |
| Florida | 936 | NA |
| Georgia | 528 | NA |
| Washington | 486 | NA |
| Michigan | 318 | NA |
| Pennsylvania | 278 | NA |
| Virginia | 245 | NA |
| Maryland | 241 | NA |
| Oregon | 210 | NA |
| Colorado | 163 | NA |
| Nevada | 162 | NA |
| New York | 160 | NA |
| Indiana | 159 | NA |
| Hawaii | 155 | NA |
| Missouri | 138 | NA |
| Ohio | 122 | NA |
| North Carolina | 115 | NA |
| Wisconsin | 105 | NA |
| New Jersey | 103 | NA |
| Massachusetts | 93 | NA |
| Arizona | 58 | NA |
| South Carolina | 57 | NA |
| Utah | 48 | NA |
| West Virginia | 47 | NA |
| Tennessee | 45 | NA |
| Louisiana | 44 | NA |
| District of Columbia | 42 | NA |
| Mississippi | 38 | NA |
| Minnesota | 37 | NA |
| Alabama | 33 | NA |
| Less than 30 | 227 | NA |

**Total Closed**

| Borrower State of Residence | Closed | Change since Last Quarter |
|---|---|---|
| TOTAL | 7,236 | 1,702 |
| California | 2,356 | 667 |
| Texas | 460 | 111 |
| Florida | 403 | 65 |
| Georgia | 381 | 125 |
| Illinois | 307 | 63 |
| Hawaii | 225 | 80 |
| Ohio | 212 | 48 |
| New York | 199 | 47 |
| Washington | 197 | 27 |
| Massachusetts | 191 | 27 |
| North Carolina | 183 | 26 |
| Pennsylvania | 182 | 34 |
| Michigan | 130 | 21 |
| Missouri | 127 | 20 |
| Virginia | 121 | 16 |
| Louisiana | 112 | 39 |
| Indiana | 106 | 22 |
| Mississippi | 104 | 16 |
| Minnesota | 100 | 10 |
| Maryland | 85 | 16 |
| New Jersey | 76 | 13 |
| Arizona | 72 | 17 |
| Wisconsin | 67 | 0 |
| Nevada | 70 | 13 |
| Alabama | 63 | 0 |
| Colorado | 69 | 18 |
| Tennessee | 67 | 17 |
| Kentucky | 46 | 11 |
| South Carolina | 45 | 0 |
| Arkansas | 48 | 13 |
| Kentucky | 46 | 11 |
| Oklahoma | 44 | 14 |
| West Virginia | 33 | 0 |
| **Utah | 34 | 34 |
| Less than 30 | 273 | 58 |

**Total Amount Discharged**

| Borrower State of Residence | Total Discharged | Change since Last Quarter |
|---|---|---|
| TOTAL | $ 534,765,563 | NA |
| California | $ 181,534,402 | NA |
| Florida | $ 42,988,608 | NA |
| Massachusetts | $ 30,668,621 | NA |
| Texas | $ 25,655,187 | NA |
| Georgia | $ 21,052,061 | NA |
| Washington | $ 18,933,760 | NA |
| Illinois | $ 14,977,977 | NA |
| North Carolina | $ 14,869,393 | NA |
| Michigan | $ 14,153,986 | NA |
| Hawaii | $ 12,586,221 | NA |
| Pennsylvania | $ 12,221,510 | NA |
| Oregon | $ 10,492,104 | NA |
| Ohio | $ 10,464,715 | NA |
| Virginia | $ 10,213,707 | NA |
| New York | $ 9,693,155 | NA |
| Colorado | $ 8,620,865 | NA |
| Missouri | $ 7,151,531 | NA |
| Nevada | $ 6,375,115 | NA |
| South Carolina | $ 6,033,202 | NA |
| Indiana | $ 5,863,532 | NA |
| Tennessee | $ 5,714,017 | NA |
| Maryland | $ 5,222,339 | NA |
| Mississippi | $ 4,884,964 | NA |
| Minnesota | $ 4,859,559 | NA |
| New Jersey | $ 4,527,620 | NA |
| Alabama | $ 4,442,081 | NA |
| Louisiana | $ 4,015,068 | NA |
| Louisiana | $ 3,850,660 | NA |
| Kentucky | $ 3,021,453 | NA |
| Wisconsin | $ 2,842,269 | NA |
| Arkansas | $ 2,693,604 | NA |
| West Virginia | $ 2,475,106 | NA |
| Kansas | $ 2,074,561 | NA |
| Iowa | $ 1,821,799 | NA |
| Oklahoma | $ 1,618,205 | NA |
| Connecticut | $ 1,467,437 | NA |
| Idaho | $ 1,242,733 | NA |
| Nebraska | $ 1,050,695 | NA |
| New Mexico | $ 1,023,916 | NA |
| Wyoming | $ 1,023,545 | NA |
| Delaware | $ 997,437 | NA |
| New Hampshire | $ 975,557 | NA |
| Foreign Country | $ 918,270 | NA |
| Montana | $ 889,874 | NA |
| District of Columbia | $ 797,028 | NA |
| Alaska | $ 688,630 | NA |
| Maine | $ 685,578 | NA |
| Rhode Island | $ 612,237 | NA |
| South Dakota | $ 559,250 | NA |
| North Dakota | $ 432,410 | NA |
| US Virgin Islands | $ 357,365 | NA |
| Vermont | $ 300,486 | NA |
| Armed Forces Europe | $ 134,934 | NA |
| Guam | $ 133,611 | NA |
| Less than $100,000 | $ 179,611 | NA |

NOTES*
*Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate Applications. As a result, the methodology of this report now excludes duplicate applications.*
*Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.*

*As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the state data has not been updated in the event that the borrower count has changed less than 10 since the previous report.  These changes are included in the bucket, "Less than 30," as to not impact the total numbers.*

*All dollar amounts and percent elements in the 9/30/2019 Quarterly report that are unchanged from the 6/30/2019 Quarterly report reflect the fact that ED deferred processing of discharges during this quarter as a result of ongoing litigation. This includes the values referenced: Total Amount Discharged, Percentage of the total approved Applications receiving partial discharge, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge and Median loan debt remaining for Applications receiving partial discharge.*

*\*\*This is the first time the location reached the 30-application threshold for the indicated status.  Previously, the location was reported in the "Less than 30" category.*

Data Descriptions:

*Total Received Applications: Total count of applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.*

*Total Pending Applications: Total count of applications under review prior to a determination.*

*Total Approved Applications: Total count of applications approved for discharge.*

*Total Denied Applications: Total count of applications that ED reviewed and signed off as denied applications.*

*Total Closed Applications: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application.)*

*Total Amount of Discharges: Total dollar amount associated with discharged applications.*

Sources:

*CEMS Borrower Defense System*
*NSLDS (National Student Loan Data System)*