# Exhibit 31

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br>    Plaintiffs,<br>        v.<br>ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,<br>    And<br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br>    Defendants. | Case No.: 19-cv-03674-WHA<br><br><br>**AFFIDAVIT OF COREY DEPAUL** |

I, Corey DePaul, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans in order to attend ITT Technical Institute in Richmond, Virginia.

3. On May 10, 2019, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4. I have not yet received a decision regarding my borrower defense application.

5. On Friday, October 23, 2020, I received an email from the Department of Education stating as follows: "**This is a courtesy reminder that your borrower defense application is incomplete**" and that "Due to system improvements, incomplete applications that are not submitted by November 7, 2020 will be removed." A copy of that correspondence is attached as Exhibit B.

1

Affidavit of Corey DePaul

6. Despite the email's statement that it is a "reminder," I have never before received notice from the Department of Education that my application was "incomplete." In fact, this is the first and only correspondence I have received about my borrower defense application from the Department of Education.

7. I do not know what the Department of Education means by "incomplete." The email offers no explanation.

8. I do not know what the Department of Education means by "removed." I do not know if this means my initial application will be considered denied. The email offers no explanation.

9. I do not know if my loans will go into repayment until I "resubmit," or, if so, "resubmission" will result in forbearance. The email offers no explanation. My loans have been in forbearance since I submitted my borrower defense application.

10. I understand that if I receive a denial notice, or if "remov[al]" has the same effect, my administrative forbearance from the Department of Education will end.

11. I also understand that if my administrative forbearance from the Department of Education ends, my federal loans may still be in forbearance due to the CARES Act. However, I am terrified of what will happen when CARES Act forbearance expires.

12. I have both private and federal loans. I borrowed from my 401K to pay my private loans. I have defaulted on the remainder of my private loans.

13. I am currently employed by FedEx, where I oversee drivers and office staff. I am an essential worker and in contact with individuals in the public. Though we of course take the necessary precautions, my job does pose some risk of COVID transmission.

Affidavit of Corey DePaul

14. Prior to COVID. I was living with my grandparents because I could not afford to live on my own. However, my Grandfather has COPD, which puts him in a high-risk category. I could not risk his health by living with him any longer, so I now have my own apartment.

15 If my loans are no longer in forbearance, I will not be able to afford my apartment. Because of my Grandfather's health condition, I no longer have the option of living there. This means that if my loans go back into repayment, I do not know how I will be able to afford a place to live.

16 . The pressure of these loans has negatively affected not just my ability to enjoy life, but every choice I make, including what to eat.

17 . I no longer have any faith in the government and their ability to help me.

18 . If my claim is denied, I would be interested in challenging the denial, but I would not be able to pay an attorney to help me or know how to find one.

19 . I have heard that there is a reconsideration process, but I do not know what that means or what evidence I could submit.

20 . If my claim is denied, my ability to support myself will be in danger. I am afraid that my wages will be garnished, as they have been before.

21 . The notice that my application was "incomplete" and may be "removed" has caused me extreme stress, because I do not know whether and when my loans will go back into repayment, or what I can do to ask the Department to consider my application.

I swear under penalty of perjury that the foregoing is true.

Executed on:   October 29, 2020

3

Affidavit of Corey DePaul

Richmond, VA

_____

Corey DePaul

Affidavit of Corey DePaul

# Exhibit A



## U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE
## TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**: To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school. Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name *(First, Middle, Last)* | *Date of Birth *(mm/dd/yyyy)* | *Social Security Number |
|---|---|---|
| Corey Louis DePaul | ▮▮▮▮ | ▮▮▮▮ |

| *Telephone Number | *Email Address | |
|---|---|---|
| ▮▮▮▮ | | |

| *Street Address | *City | *State | *Zipcode |
|---|---|---|---|
| ▮▮▮▮ | Midlothian | VA | 23112 |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes    ☒ No

*If yes, please enter the full name of the student *(Last, First, Middle)*:

*If yes, please enter the student's Social Security Number:

## SECTION II: SCHOOL INFORMATION

*School
**ITT Technical Institute**

Campus *(including on-line campuses for distance education borrowers)*
**Richmond**

*Location *(City, State)*
**Richmond, Virginia**

* Enrollment Dates at this school:
*From *(month/year)*: 09/05          *To *(month/year)*: 06/07

☐ If you are still attending this school/campus, please indicate by checking the box.

☐ Check if the enrollment dates above are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal).*
Digital Entertainment and Game Design Bachelor of Science Degree

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters).*

Bachelor's

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

*Current Status at school listed above

☐ Graduated   ☐ Transferred Out   ☒ Withdrew   ☐ Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐ Yes   ☒ No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for example, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐ Yes   ☒ No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1.  How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2.  The name/title of people who you believe misled you *(if known)*

3.  What the school told you or failed to tell you.

4.  Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

Towards the end of my senior year of high school, I was struggling to figure out a career path I wanted to pursue. I had come across a brochure that mentioned that ITT Technical Institute offered a game design program (Digital Entertainment and Game Design Bachelor of Science Degree). I enjoyed video games and had always considered game design as a career, but until that point, I never knew a program of that nature was available to me so close to home (Richmond, VA). I called ITT and spoke with a recruiter concerning the game design program and was enthusiastically told how great it was and that the school had a very high job placement rate (80%) and a career services department that would help me get a job in my desired field. I was ecstatic. After taking courses for my bachelors, at this point, I wasn't just frustrated with ITT, I was now worried about my abilities to obtain a job in game design or visual communications in general. I didn't feel I was being prepared, or taught the skills necessary to get a job in my desired field. I met with the head of the game design department, Wally Jones, and advised him of my concerns. I spoke with him about how poor of quality the books the school provided were. I also advised him of my concerns with the lack of proper instruction during class and how any questions I had regarding the software were met with, "I'm not sure" or "check the Internet." This is another one of the selling points that helped convince me that this was the school for me. Small class sizes and one-on-one time with the instructors. Except for the fact I could never get real answers to my questions from the instructors. The department head whispered to me, "Why are you even in this school?" This was a question I was trying to figure out myself.

See Ex. 1 at ¶¶ 169-226, 367-391; Ex. 2.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

During my on-site meeting with an ITT recruiter, I brought up a concern with the overall price of the program and was immediately advised that the field I was going in, being a part of the entertainment industry, pays extremely well and that the price reflects the quality of the education I would be receiving from their school and the knowledge of their instructors. I was also advised that receiving an education from ITT would have me earn my bachelor's degree in nearly half the time of a traditional college. I was also told that I wouldn't need to worry about paying anything towards my student loans while I was attending their school. I ultimately decided I would sign up with ITT and they had me schedule a meeting with a financial aid advisor on campus. Being the first in my family to go to college, I was confused by what was needed from me in order to receive a school loan. The financial aid advisor sat me down and had me fill out paperwork to receive a loan from Sallie Mae. In hindsight, knowing what I know now, I find it strange that they were setting me up for private loans before exhausting my federal loan options.

See Ex. 1 at ¶¶ 110-116, 227-336; Ex. 3.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

I had received my Associate's degree and would take those credits to another school to receive my bachelor's. At this point, I realized how difficult it was to transfer ITT credits. Outside of basic English and math credits, none of my other credits would transfer to other school programs. I ended up having to settle with DeVry University and apply myself towards receiving a bachelor's degree in Web Design & Development. After receiving my bachelor's degree and finishing school, my student loans started to come due. My payments were astronomical and income-based repayment plans didn't help lower my payments enough. Between owing on private loans, federal loans, and parent-plus (co-signed) loans, none of which were taken into consideration when applying to lower my payments, I could barely afford to live in my own house with my girlfriend. I would frequent have to apply for forbearance to make a house payment or to pay for a repair. This led to an incredible hardship which caused my girlfriend and I to split. Since that time, I have moved in with my grandparents while trying to get myself back on my feet. I've attempted multiple times to create a budget that would allow me to pay my student loans and also live on my own, but I would not be able to afford a house or apartment and live comfortably while also paying towards my student loans. Outside of my vehicle, the only debt I have is my student loans. I cannot afford to have any other debt. When paying nearly $800 each month across all of my student loans, I would watch balances climb instead of fall and interest capitalize on interest. It's the most debilitating feeling watching my total student loan balance climb over $130,000 with no end in sight. I was never able to find a job in my field and I'm currently with the same company I was with before I started at ITT.

See Ex. 1 at ¶¶ 93-109, 118, 450; Ex. 4.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

During my on-site meeting with an ITT Tech recruiter, I was told they had a career services department that would help me get a job in my desired field. After I left the school with an Associate's degree in Visual Communication, I reached out to career services at ITT to see what companies they could help me get a job with. They looked over the resume I had made and didn't offer any suggestions for improvement. They were unable to help me find any positions in visual communications and instead wanted to set me up on an interview with a local computer repair company. The position offered less than the customer service job I already had when I asked for their help. I had started that customer service job straight out of high school before I started attending ITT. During the recruiting phase, ITT had also boasted about mock interviews that they held on-site with people in our desired field. When it came time for my mock interview, I found out that they didn't have anyone in the field of game design to have a mock interviews with, so instead they had someone from ITT's financial aid department conduct my interview. The position offered less than the customer service job I already had when I asked for their help. I had started that customer service job straight out of high school before I started attending ITT I came to find out that they had one instructor (Wally Jones) who taught any game design courses and that he had no real game design experience. This instructor was unable to answer any questions I had outside the context of the books provided by the school without telling me to look on the Internet for an answer.

See Ex. 1 at ¶¶ 169-184, 190-201, 208-226; Ex. 5.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

I was advised by an ITT recruiter that their instructors were extremely knowledgeable in the field I was applying for (game design). This was something the recruiter mentioned to me when I showed concern over the cost of the program. He advised me that the instructors were not only knowledgeable, but I would be given the opportunity to have one-on-one time with the instructors to ask questions due to the small class sizes. Actual instruction during classes was very rare and when instruction did take place, it was read from the book assigned for that class. Any questions I asked the instructor one-on-one were answered by telling me to look in the book or search the Internet for an answer. The game design course had a single instructor (Wally Jones, who was also the department head for the program) without actual game design experience. During my time with ITT, I started to become frustrated with the instruction, or lack thereof. A typical class day would consist of the performing assignments in our school books while the instructor would sit at a computer at the front of the class. Very rarely was any actual instruction given by the instructors and when there was, it was read from the school book and demonstrated on a projector screen. People in my classes often joked and referred to ITT as "expensive daycare". Homework was provided and instead of providing students with legitimate copies of 3D Studio Max to use at home (the software our classes focused on) they passed around "cracked" copies of the software on burned CDs that automatically generated a software license key. After I received my Visual Communications Associate of Applied Science degree from ITT, I began taking courses towards my bachelor's.

See Ex. 1 at ¶¶ 119-168; Ex. 6.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☒ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

I scheduled a meeting with the recruiter at the Richmond, VA campus. During the on-site meeting, the recruiter showed me information regarding courses I would take, skills I would learn, and provided the names of companies that regularly hired ITT students (I do not recall specific company names). At the end of the meeting, the recruiter asked if I was ready to sign up and meet with someone in their on-site financial aid department. I had advised him that I wanted to take the information home and look over it further before making a decision. I ultimately decided to sign up with ITT. During my initial on-site meeting with an ITT recruiter, I was asked if I was ready to meet with a financial aid advisor. When I mentioned I wanted to take time to look over the materials I was provided with during the meeting, he advised me that I would need to make a decision fast in order to guarantee myself a spot in the fall semester. I was putting forth an incredible amount of effort into my work while noticing others barely putting forth any effort and getting similar grades as me. I started to feel as if it didn't matter what I did at this school, so long as I signed further documents to obtain new loans when they needed me to, I would get my degree. I wasn't there to just pay for a degree, I was paying for an education. After that meeting with my department head, I decided to withdraw from ITT.

See Ex. 1 at ¶¶ 65-117; Ex. 7.

*Did you choose to enroll in your school based in part on the issues you describe above?

☒ Yes    ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

[X] Yes  [ ] No

Is there some other reason you feel your school misled you?

[X] Yes  [ ] No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

ITT failed to deliver on everything it promised me. The school is no longer around for many of those reasons. They boasted to me about their job placement rates, yet they were unable to provide me any assistance in finding a job in the field I went there to study for. Instead, they wanted to set me up on an interview with a local computer repair company.

Numerous lawsuits against ITT allege facts and violations of law that would qualify me for borrower defense. See Ex. 1 (Student Claimants' compl. against ITT Educational Services, Inc., et al.); Deborah J. Caruso, the Chapter 7 Trustee for ITT Educational Services, Inc. et al. v. Kevin Modany, et al., No. 16-07207-JMC-7A (Bankr. S.D. Ind. May 31, 2018), ECF No. 2562; Consumer Financial Protection Bureau v. ITT Educational Services, Inc., No. 1:14-cv-292 (S.D. Ind. Feb. 26, 2014), ECF No. 1; see also ITT Educational Services, Inc. and Daniel Webster College, Inc., No. 16-07207-JMC-7A (Bankr. S.D. Ind. Nov. 30, 2018), ECF No. 3079 (final order granting Trustee's Motion to Settle with Student Clamaints in the ITT bankruptcy case).My answers contained above, in "Section IV. Basis for Borrower Defense," also support my belief that I have a state law cause of action against ITT.I request that, in additional to the information provided in this form, including exhibits and attachments, any other information or findings in the Department's possession that would support my claim be used and applied in the evaluation of my borrower defense application.

*Did you choose to enroll in your school based in part on the issues you describe above?

[X] Yes  [ ] No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds**. Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

[X] Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

[ ] No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently *(as applicable)*.

## SECTION VI.  CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| *Signature | Date |
|------------|------|
|            | 5/10/2019 |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov  or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

## PRIVACY ACT NOTICE

Information required by subsection (e)(3) of the *Privacy Act of 1974*, as amended (*Privacy Act*) (5 U.S.C. 552a(e) (3))requires the following notice be provided to you:

The authorities for collecting the requested information from and about you are Section 455(h) of the *Higher Education Act of 196*5, as amended (*HEA*) (20 U.S.C. 1087e(h)) and 34 C.F.R. § 685.206(c) and the authorities for collecting and using your Social Security Number (SSN) are the same but also include 31 U.S.C. 7701(b). The primary purpose of the information collected is for the use and administration of the U.S. Department of Education's office of Federal Student Aid (ED/we) for borrower defense to loan repayment program. The information you provide ED on this form and your SSN are voluntary, but you may need to provide the requested information on this form, including your SSN and/or a Federal Student Aid ID (FSA ID) that provides ED your verified SSN and other individual information pertaining to a student's or parent's Student Financial Assistance Programs account(s), for ED to process or complete our review of your borrower defense to loan repayment application. You may submit a form without your SSN or an FSA ID by filling out a form and sending it to ED via email or physical mail because disclosure of the information requested on this form is voluntary. However, without providing all the requested information on this form, ED may not be able to conduct a full investigation and complete the review of your application.

We use the information that you provided on this form including your name, SSN, date of birth, address, email address, telephone number(s), and / or an FSA ID, to receive, review, evaluate, and process requests for relief under the borrower defense to loan repayment regulations, to render decisions on the merits of such requests for relief, and, where requests for borrower defense to loan repayment are successful, to determine the relief that is appropriate to borrowers under the circumstances as well as to initiate appropriate proceedings to require schools whose acts or omissions resulted in the successful defenses against repayment to pay ED the amounts of the loans that apply to the defenses. Without your consent, ED may disclose the information that you provided and as otherwise allowed by the *Privacy Act*, pursuant to the routine uses identified in the system of records notice (SORN) entitled "Customer Engagement Management System (CEMS)" (18-11-11) and published in the Federal Register as 83 FR 27587-27591 (June 13, 2018). These routine uses include, but are not limited to, a routine use that permits ED to disclose your information to foreign agencies, Federal agencies, State agencies, Tribal, or local agencies, accreditors, schools, lenders, guaranty agencies, servicers, and private collection agencies when further information is relevant to ED's resolution of your complaint, request, or other inquiry, tracking your application or your inquiry, and, where a request for borrower defense to loan repayment is successful, to determine the relief that is appropriate under the circumstances as well as to initiate the appropriate proceeding to require the school whose acts or omissions resulted in the successful defense against loan repayment to pay ED the amount of the loan that apply to the defenses. We may use your information for reporting, analyzing the data to make recommendations in student financial assistance programs, and assisting in the informal resolution of disputes. Disclosure of relevant information also may be made to the responsible foreign, Federal, State, Tribal or local agencies charged with investigating or prosecuting a violation or potential violation of law in the event that information indicates, either on its face or in connection with other information, a violation or potential violation of any applicable statute, regulation, or order of a competent authority.

 In the event of litigation or alternative dispute resolution (ADR) involving ED or that we have an interest in and if that a party is either any component of ED, any ED employee in his or her official capacity, any ED employee in his or her individual capacity where representation for the employee has been requested or has been agreed to by ED or the Department of Justice (DOJ), or the United States where ED determines that the litigation is likely to affect ED or any of its components, we may disclose your information to DOJ, a court, adjudicative body, a person or an entity designated by ED or otherwise empowered to resolve or mediate disputes, or a counsel, party, representative, or witness if the disclosure is relevant and necessary to the litigation or ADR. ED also may disclose your information to DOJ to the extent necessary for obtaining DOJ's advice on any matter relevant to an audit, inspection, or other inquiry. We may send information to members of Congress if you ask them to help you with federal student aid or Student Financial Assistance Programs account(s) questions. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. As part of such a contract, we will require the contractor to maintain safeguards to protect the security and confidentiality of the records that are disclosed to the contractor. If a record is relevant and necessary to a borrower complaint regarding participants in any Federal Student Financial Assistance Programs under title IV of the *HEA*, ED may disclose a record only during the course of

processing, reviewing, investigating, fact-finding, or adjudicating the complaint to: any party to the complaint; the party's counsel or representative; a witness; or a designated fact-finder, mediator, or other person designated to resolve issues or decide the matter. ED also may disclose records to the DOJ or Office of Management and Budget (OMB) if ED concludes that disclosure is desirable or necessary in determining whether particular records are required to be disclosed under the *Freedom of Information Act* (*FOIA*) or the *Privacy Act*. ED may disclose your information to appropriate agencies, entities, and persons when ED suspects or has confirmed that there has been a breach of the system maintaining your information; which poses a risk of harm to individuals, ED (including its information systems, programs, and operation), the Federal agencies, or national security and the disclosure made to such agencies, entities, and persons is reasonably necessary to assist ED's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm. ED also may disclose your information to another Federal agency or Federal entity, when ED determines that your information is reasonably necessary to assist the recipient agency or entity in responding to a suspected or confirmed breach or preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal agencies, or national security, resulting from a suspected or confirmed breach.

## PAPERWORK REDUCTION ACT NOTICE

According to the *Paperwork Reduction Act of 1995*, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

# Exhibit B

**From:**



---------- Forwarded message ---------
From: **U.S. Department of Education** <noreply@studentaid.gov>
Date: Fri, Oct 23, 2020 at 9:01 AM
Subject: Your Incomplete Borrower Defense Application is Expiring
To: <

Click here to view this email as a web page.

Seal of the U.S. Department of Education

Dear Borrower:

**This is a courtesy reminder that your borrower defense application is incomplete.**

Incomplete applications must be submitted by 11:59 p.m. Eastern time on November 7, 2020. Due to system improvements, incomplete applications that are not submitted by November 7, 2020 will be removed. You can start and submit a new application any time after November 7, 2020 by visiting borrowerdischarge.ed.gov.

If you have questions, you may call our borrower defense hotline at 1-855-279-6207. Representatives are available Monday through Friday from 8 a.m. to 8 p.m. Eastern time.

Sincerely,

U.S. Department of Education (ED)
Federal Student Aid
Borrower Defense Unit



830 First Street, NE, Washington, D.C. 20202
StudentAid.gov/borrower-defense

# Exhibit 32



# U.S. DEPARTMENT OF EDUCATION
# BORROWER DEFENSE
# TO REPAYMENT APPLICATION

OMB Number: 1845-0163
Form Approved
Expiration Date: 11/30/2023

## INSTRUCTIONS

Under the Borrower Defense to Repayment provision of law, certain conduct by a school you attended might make you eligible to receive a discharge of some or all of your federal student loans. The type of conduct that might make you eligible for student loan relief and the process by which the Department of Education will review your claim may differ based upon when you took out your loan. In general, loans taken out or consolidated prior to June 30, 2017 will be evaluated under one set of regulations, while those taken or consolidated between July 1, 2017 and June 30, 2020 will be evaluated under a second set of regulations, and those taken or consolidated after July 1, 2020 will be evaluated under a third set of regulations. For that reason, in completing this application you may be asked different questions about different loans or may receive a different determination regarding your eligibility for loans taken or consolidated at different points in time.

The most common types of conduct that might make a borrower eligible for loan relief through borrower defense to repayment discharge are misrepresentations of the truth made by the school or its representatives during their efforts to recruit you to enroll at the school or to continue your enrollment at the school. These misrepresentations typically take the form of untruthful representations of the school's selectivity in admitting students, its rankings as compared to other schools, the job placement and earnings outcomes of its prior graduates, or the likelihood that its credits will be accepted by another school or that it will accept credits from other schools.

There are other kinds of experiences that may leave a student dissatisfied with their educational choices; however, these experiences do not make a borrower eligible for federal student loan relief under the borrower defense to repayment provision.  Examples of such experiences that would likely not make a borrower eligible for relief include, but are not limited to:

- Dissatisfaction with the school's program or classes, the grades a student received, or the perceived teaching skills of otherwise qualified instructors;

- Disappointment with the school's housing or facilities, availability of on-campus housing, parking availability, the performance of a school's athletic teams, the availability of or access to student activities on campus, or campus eating facilities, food quality or meal plans;

- A student's inability to live in their dormitory of choice, enroll in the program of their choice *unless otherwise guaranteed admission to the program), or the departure of a distinguished faculty member under whom the student wished to study;

- Informal comments made by other students who are or in the past were enrolled at the school, but who are not spokespeople for the school and are not participating in school-sponsored student recruitment activities;

- General findings of a school's non-compliance with certain U.S. Department of Education's rules for administering Federal Aid;

- Violations of local, state, or federal laws unrelated to the making of a Federal student loan, such as those that govern truth in advertising or misrepresentation;

- Personal injury, loss of property, sexual harassment or other violations of law or civil rights; or

- Academic disputes and disciplinary matters.

It is also important to understand that to be eligible for full or partial federal student loan relief through borrower defense to repayment, you must also have suffered monetary harm. The act of taking a loan or holding student debt is not, by itself, considered to be monetary harm. Instead, the Department compares earnings of prior graduates of your program to graduates of other similar programs and makes a determination of monetary harm, if the earnings of graduates of your program are below the range of normal variation of earnings among graduates of other similar programs. The data used to calculate earnings for purposes of determining monetary harm are based on data provided by a Federal agency, such as the Internal Revenue Service or in some instances, the Social Security Administration.

If you believe you are eligible for borrower defense to repayment relief, please complete this application.

**When answering questions on this application, please be as detailed as possible. While you are not required to submit documentation with your application to be considered for discharge, we recommend that you do so.**

## SECTION 1: BORROWER INFORMATION

Please provide contact information for the borrower:

| First Name | Middle Name | Last Name |
|---|---|---|
| | | |

| Date of Birth *(mm/dd/yyyy)* | Social Security Number | Telephone Number |
|---|---|---|
| | | |

Email Address

| Street Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

Are you a PARENT who took out a federal loan on behalf of the student?
☐ Yes  ☐ No

If yes, please enter the full name of the student *(Last, First, Middle)*:

If yes, please enter the student's Social Security Number:

## SECTION 2: SCHOOL INFORMATION

School Name:

Campus Name (if you attended a multi-campus system or school):

Campus Location *(City, State)*:

In what state(s) did you live during the enrollment period that is the subject of this claim, and when did you live in each state listed (month, year to month, year)?

Enrollment Dates at this school (month, year to month, year). (If you have multiple enrollments at the school, please list all that are the subject of this claim):

Are you still enrolled at this school? ☐ Yes ☐ No

Did you enroll at the school subsequent to the enrollment which is the subject of this claim? If so, when?

Are the enrollment dates listed above approximate or exact? ☐ Approximate ☐ Exact

Program Name or Major *(e.g. Engineering, Law, Nursing)*.

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters)*.

If you are seeking relief for multiple programs, please submit a separate application for each program.

Current Enrollment Status at school listed above:

☐  Graduated    ☐  Transferred Out    ☐  Withdrew    ☐  Attending

Note:  if you are enrolled at this school, indicate that you are "attending" even if at the time you complete this application you are on a scheduled break, an approved leave of absence, or have decided to not attend classes during the current term, but plan to resume attendance in the near future.

## SECTION 3: OTHER REFUNDS, REMEDIES, LOAN REDUCTION OR TUITION RECOVERY REQUESTS OR ACTIONS:

Have you made any attempt, other than submitting this application, to recover tuition or fees that you paid to your school or to have your student loans forgiven (for example, submitting a closed school loan discharge application to the U.S. Department of Education or seeking relief as part of a class action lawsuit or other settlement)?

☐  Yes    ☐  No

If yes, please describe these other request(s), and attach any documentation about the requests, if available.

Have you received financial relief as a result of any of these attempts?    ☐  Yes    ☐  No

If so, how much relief did you receive?

Have you been denied financial relief for any of the attempts you have made or that were made by others on your behalf?

☐  Yes    ☐  No

If so, which ones and why?

Have you been, or are you currently in, arbitration with the school that is the subject of this application?

☐  Yes    ☐  No

If yes, what was the date that a written request for arbitration was filled, by either yourself or the school?

Documentation: Please attach any relevant documents related to the arbitration:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation that you believe is related to the arbitration.

## SECTION 4 - CONDUCT THAT RESULTS IN ELIGIBILITY FOR BORROWER DEFENSE TO REPAYMENT RELIEF

### ADMISSIONS SELECTIVITY

Did your school misrepresent or fail to tell you important information about their admissions practices or admissions selectivity?

Examples of such behavior include, but are not limited to misrepresenting: the average grade point average or entrance exam scores of current students; the percentage of applicants who were accepted by the school; the percentage of applicants who submitted standardized test scores or met other admissions criteria; or the ranking of the school or program relative to other schools or programs.  Please select all that apply:

☐ My school misrepresented the selectivity of the school, meaning the percentage of applicants who are admitted or denied admission to the school or their qualifications (such as test scores, GPAs, or prior experience).

☐ My school claimed to be an open-enrollment school, but failed to disclose that some programs are not open enrollment and instead have entrance requirements, such as minimum GPA, test scores, or volunteer experience in the field that limit admissions to the program.

☐ My school made a misrepresentation concerning its criteria for admission, meaning the basis upon which a school determines who it will admit.

☐ My school made a misrepresentation concerning the ranking of the school or a program offered by the school.

☐ Other, please identify:

Per item selected above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about its admission process? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per the item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information? If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes   ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## REPRESENTATIONS TO THIRD PARTIES

Did your school provide misleading or incorrect data about the school's admissions requirements, selectivity, or student outcomes to an accreditor or an organization that ranks or rates schools of higher education? Please select all that apply:

☐ My school misrepresented information about itself or enrolled students to a ranking organization, such as *U.S. News and World Report* or *Barron's Profile of American Colleges*.

☐ My school misrepresented information about itself or enrolled students to an accrediting agency.

☐ My school misrepresented information about itself or enrolled students to a state higher education authorizing agency such as the New York State Department of Education, Office of College and University Evaluation or the Illinois Board of Higher Education.

☐ My school misrepresented information about itself or enrolled students to a Federal agency, such as the U.S. Department of Veterans Affairs or the the U.S. Department of Education.

☐ Other, please identify:

When did you discover that the information that the school provided was inaccurate?

Please explain:

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees, or third party to which the information was reported
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Copies of the information that was reported to a third party and that you saw
- Any other documentation you believe supports your application.

## URGENCY TO ENROLL

**Urgency to enroll is not itself a grounds for Borrower Defense to Repayment discharge, but can be considered as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation. Thus applicants completing this section must also make a separate allegation of school misconduct to be considered for Borrower Defense to Repayment discharge.**

Did your school tell you that you had to enroll right away (such as the same day you contacted or visited the school) or you would miss out on an enrollment spot or scholarship opportunity?

☐ Yes    ☐ No

If so, was that false information?

☐ Yes    ☐ No

If yes, please explain.


Who at the school told you that you had to enroll on the spot or on the same day as your visit or inquiry? If known, please provide their names and titles of these individuals.


How did the school communicate with you about its admission process? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.


When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes   ☐ No

Please explain.

---

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities

## EDUCATIONAL SERVICES

Did the school misrepresent or fail to tell you important information about the availability of educational opportunities or support services provided by the school? Please select all that apply:

☐ My school misrepresented the availability of internships or externships.

☐ My school misrepresented the qualifications of its faculty.

☐ My school misrepresented the services that would be provided by its career services staff or department.

☐ My school misrepresented how my course of study would be taught (for example, ground-based versus online).

☐ My school misrepresented the prerequisites required for my course of study.

☐ My school misrepresented how often required courses would be available or when those courses would be scheduled (i.e. you were promised you could complete the program by enrolling on weekends, and then you learned that a required course was available only on weekdays during regular business hours when you are working)

☐ My school misrepresented the number of credits required to graduate.

☐ My school told me I would be able to graduate in a certain amount of time, but then did not offer enough sections of required classes so that I could complete the program on time.

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

---

How did the school communicate with you about its educational services? Please select all that apply:

- ☐ In person
- ☐ Online
- ☐ Over the phone
- ☐ Over email
- ☐ TV advertisements
- ☐ Written brochures
- ☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

---

Who at the school provided you with the allegedly misrepresented information? If known, please provide the names and titles of these individuals.

---

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes   ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## EMPLOYMENT PROSPECTS

Did your school misrepresent employment outcomes that would be available to you or the employment outcomes of prior graduates? Please select all that apply:

☐ My school did not fulfill its promise that I would find future employment.

☐ My school misrepresented its job placement rates.

☐ My school misrepresented the demand for graduates in my field.

☐ My school misrepresented its partnerships with employers.

☐ My school misrepresented my eligibility for a certification or a licensure in my field of study.

☐ My school exaggerated the earnings of prior graduates or my likely earnings after graduation.

☐ My school misrepresented that it was accredited when it was not.

☐ My school misrepresented that my program had the accreditation necessary to qualify graduates for licensure or certification when it did not.

☐ My school failed to tell me that my programs did not have the accreditation necessary to qualify graduates for certification or licensure.

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your employment prospects? Please select all that apply:

- ☐ In person
- ☐ Online
- ☐ Over the phone
- ☐ Over email
- ☐ TV advertisements
- ☐ Written brochures
- ☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

Please provide information about the difficulties you have had getting a job in your field of study that lead you to believe that the school misrepresented the employment outcomes or earnings of past graduates or your likely employment outcomes or earnings.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?
☐ Yes   ☐ No

Please explain.

---

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you, or fail to tell you, important information about your program cost or the nature of your loan? Please select all that apply:

☐ My school told me I was receiving only grants and scholarships, but I found out later that some or all of those funds were loans.

☐ My school offered me a payment plan without telling me that the plan would convert to a loan without accurately disclosing the terms of the payment plan or resulting loan.

☐ My school misrepresented the repayment terms or total cost of loans it provided to me or that were provided to me by a lender recommended by the school.

☐ My school misrepresented the overall cost of my program.

☐ My school misrepresented what costs were or were not included in the published tuition and fees.

☐ My school misrepresented the cost of living in campus-owned or campus-operated housing.

☐ My school offered me a full scholarship when admitting me to the school, but then reduced the scholarship amount or failed to renew the scholarship even though I met the requirements of the scholarship, such as by maintaining a certain GPA, enrolling in a particular program, performing required community or volunteer service, or some other criteria that I satisfied.

☐ Other, please identify:

---

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

- ☐ In person
- ☐ Online
- ☐ Over the phone
- ☐ Over email
- ☐ TV advertisements
- ☐ Written brochures
- ☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you.

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain.

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?
☐ Yes    ☐ No

Please explain.

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## TRANSFERRING CREDITS

Did your school make a misrepresentation to you about the likelihood of credits earned at the school being accepted by other schools as transfer credits or about its likelihood to give you transfer credit for courses or work experiences completed elsewhere? Please select all that apply:

☐ My school told me that my credits were transferrable to a specific school, but they were not.

☐ My school told me credits earned at the school were generally transferrable to other schools, but they were not.

☐ My school told me it would accept credits earned elsewhere if I enrolled, but then, after I enrolled, it told me that it would not accept some or all of my transfer credits.

☐ My school told me they would accept my credits, but did not inform me until after I enrolled that those credits would not be counted toward my major.

☐ Other, please identify:

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item above selected:

Please describe how the school communicated with you:

_____

Who at the school provided you with the allegedly misleading information?  If known, please provide the names and titles of these individuals.

_____

When did you discover that the information that the school provided was inaccurate?

_____

Please explain:

_____

Documentation: Please attach any relevant documents that support these allegations including:

• Transcripts

• Enrollment agreements

• Promotional materials from your school

• Communications with school officials or employees

• Student Manual

• Course Catalog

•  Legal documents

•  Findings or determinations made by government entities

• Any other documentation you believe supports your application.

## CAREER SERVICES

Did your school make a misrepresentation to you about the scope and availability of career services support it would provide? Please select all that apply:

☐ My school failed to provide the career services assistance it promised (including, but not limited to: resume writing help, mock interviews, and responding to job listings)

☐ My school promised that it would find me a job when I graduated but it did not.

☐ Other, please identify:

Per item selected, above:

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.

How did the school communicate with you about your program cost and the nature of your loan? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with you:

Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

How were you financially affected by the misrepresentation?

When did you discover that the information that the school provided was inaccurate?

Please explain:

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain:

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Any other documentation you believe supports your application.

## JUDGMENT

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2017 and prior to July 1, 2020.*

Did you successfully file suit and obtain one or more nondefault, contested judgments against your school in a Federal or State court or from a Federal or State administrative tribunal or did you benefit from a government enforcement action or from a nondefault, contested judgment that arose from your participation in class action litigation?

☐ Yes   ☐ No

Have you received the full amount awarded in the judgment or judgments?

☐ Yes   ☐ No

If not, what is the outstanding balance of the judgment or judgments owed to you?


Please attach the judgment or judgments and all relevant documents relating to your judgment or judgments.

## BREACH OF CONTRACT

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2017 and prior to July 1, 2020.*

Did you ever enter into a contract with your school (e.g. enrollment agreement or other agreement)?

Yes     No

Did your school fail to perform any obligations under the contract? For example, your school may have breached a contract with you if they denied you the right to defend yourself against an accusation of a Title IX violation (sexual advancement/misconduct) based on your school's disciplinary policy.)

Yes     No

If so, please provide a copy of the contract.

State when the school failed to perform any obligation(s) of that contract.


Please explain:




Provide a detailed description why you believe the school breached the contract.

## OTHER

Did your school make a misrepresentation to you, or fail to tell you, important information other than what you have already alleged in this application?

Yes          No

Please describe your communication with the school. Please describe in detail what the school told you, or failed to tell you, and why you believe it was a misrepresentation.




How did the school communicate with you? Please select all that apply:

☐ In person

☐ Online

☐ Over the phone

☐ Over email

☐ TV advertisements

☐ Written brochures

☐ Other, please identify:

Per item selected, above:

Please describe how the school communicated with you:




Who at the school provided you with the allegedly misrepresented information?  If known, please provide the names and titles of these individuals.

When did you discover that the information that the school provided was inaccurate?

Please explain:

---

Was the alleged misrepresentation the basis of or pivotal to your decision to attend the school?

☐ Yes    ☐ No

Please explain:

---

Documentation: Please attach any relevant documents that support these allegations including:

- Transcripts
- Enrollment agreements
- Promotional materials from your school
- Communications with school officials or employees, or third party to which the information was reported
- Student Manual
- Course Catalog
- Legal documents
- Findings or determinations made by government entities
- Copies of the information that was reported to a third party and that you saw
- Any other documentation you believe supports your application.

## SECTION 5: FINANCIAL HARM

*Note: This section only applies to borrowers who receive a Direct Loan, including a Direct Consolidation Loan, on or after July 1, 2020.*

You are eligible to receive full or partial loan discharge as a result of an eligible borrower defense claim only if you have suffered financial harm as a result of your school's misrepresentation. We can only discharge federal student loans, and the amount of a discharge that you may be eligible to receive cannot be more than what you borrowed. For example, we cannot consider private student loans you may have borrowed. Financial harm does not include:

- Nonmonetary loss, such as personal injury, inconvenience, aggravation, emotional distress, pain and suffering, punitive damages, or opportunity costs.
- The act of taking out a federal student loan or merely having federal student loan debt.
- Your voluntary decision to pursue less than full-time work.
- Your decision to not work.
- Your decision to voluntarily change occupations or pursue a different line of work.
- Payments you made other than through the use of federal student loans.

What is the total monetary loss associated with your federal student loans that you have incurred due to your school's alleged misrepresentation?

Please note that you are not required to complete this field, and that the Department will not limit the amount you are owed to the amount you reported in this field. The information you provide helps us review financial harm, but the Department also considers published earnings information from prior graduates to determine whether or not you were financially harmed, and how much harm you incurred. If you complete this field, you may, but are not required, to include the amount of your federal student loans (the Department has this information already).

Please explain how you determined that amount:

For which jobs did the program say it would prepare you, if any?

When and how did the school provide you with this information?

Have you actively pursued employment in the field for which your education was intended to prepare you?

Yes        No

If yes, list jobs in your field for which you applied, and the date on which you applied for each, as well as any reason you may have been given for not being selected for that or those jobs. You may limit the list to jobs for which you have applied during the most recent year.

| Job Title | Date Applied | Reason for Not Being Selected for the Position |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

If yes, please include documents that demonstrate this pursuit. These may include:

- Job application confirmation emails
- Correspondence with potential employers
- Registration at job fairs
- Enrolling with a job recruiter
- Attendance at a resume workshop

Have you failed to meet other requirements or qualifications for employment in your field of study for reasons unrelated to your school's misrepresentation such as, but not limited to, your ability to pass a drug test, satisfy driving record requirements, or meet health qualifications?

    Yes     No

If yes, please explain:

## SECTION 6: FORBEARANCE AND STOPPED COLLECTIONS

If you are not currently in default on any Federal student loan, you may request **forbearance** status on the Federal student loans that are the subject of this application while your application is under review. "Forbearance" means that you do not have to make loan payments, and your loans will not go into default, while your application for a borrower defense discharge is pending with the U.S. Department of Education. Your servicer will notify you when your loans have been placed into forbearance status.

If your Federal student loans are in default, you may request stopped collections status on the Federal student loans that are the subject of this application while your application is under review. "Stopped collections status" means that the Federal government or debt collection companies will not attempt to collect on the defaulted, including efforts to withhold money from your wages or Federal income tax refunds, while your borrower defense application is pending with the U.S. Department of Education.

If you have more questions about forbearance or stopped collections, visit StudentAid.gov/borrower-defense or contact your servicer. If you do not know who your servicer is, please visit StudentAid.gov/aid-summary or call 1-800-4-FED-AID.

Interest will continue to accumulate on all Federal student loans regardless of their status, including subsidized loans. If your application for borrower defense is denied or partially approved, the total amount you owe on those loans may be higher, and outstanding interest may capitalize (meaning that they will be added to your principal balance)  If you wish to make interest payments while your loans are in a forbearance or stopped collections status, please contact your servicer.

You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief. Instead, you may opt to continue making payments on your loans, especially if you are in a repayment program like loan rehabilitation to remove your loans from default. If you received loans for attendance at a school for which you are not filing a claim, you still must repay those loans.

You can learn more about repayment options at StudentAid.gov/manage-loans.

Are you in default on any Federal student loans?
If the answer is no, do you wish to request forbearance on the loan(s) for which you have filed a borrow defense application?

☐ Yes, to be placed in forbearance.    ☐ No.

If your answer is yes, do you wish to request stopped collections status?

☐ Yes    ☐ No.

If you do not select one of the options above and you are not in default on any Federal student loan, the U.S. Department of Education will automatically place the Federal student loan(s) into forbearance that is the subject of your borrower defense application pending the Department's review of the application.

If you do not select one of the options set forth above and you are in default, the Department will place into stopped collections status the Federal student loan(s) that is the subject of your borrower defense application pending the Department's review of the application.

The Department will also make these requests to commercial holders of Federal Family Education Loan (FFEL) program loans not held by the Department.

## SECTION 7. CERTIFICATION

By signing this attestation I certify that:

All of the information that I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education additional information that is reasonably available to me that will verify the accuracy of my completed attestation.

I also agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section 2 above.

I certify that I have not received a refund, tuition recovery, settlement, or other financial restitute to repay the loans that are the subject of this borrower defense to repayment claim.

I certify that I have accurately reported other efforts I have made to receive loan relief, including by filing suit against the school, participating in a class action suit, entering into arbitration, applying to a tuition recovery fund, or similar.

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am transferring my interest in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other financial losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097. I sign this application under penalty of perjury.

I understand that in the event that I receive a 100 percent discharge of my loan balance for which the defense to repayment application has been submitted, the school may, if not prohibited by other applicable law, refuse to verify or to provide an official transcript that verifies my completion of credits or a credential associated with the discharged loan.

I understand that, should the Department receive any documentation from the school, in response to the Department's request for records and evidence, the Department will provide me with those documents as well as any evidence otherwise in the possession of the Department.  If my application is based on a loan that I received on or after July 1, 2020, then I further understand that my application and supporting evidence will be sent to my school, and I will have a time-limited opportunity to review and respond to any evidence that my school submits in response to my application.

I agree to allow the school that is the subject to this defense to repayment application to provide the Department with items from my student educational record relevant to this defense to repayment application.

| Signature | Date |
|---|---|
|  |  |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or by mail to: U.S. Department of Education, PO Box 1854, Monticello, KY 42633. If you have questions while your application is pending you may contact the Department at: 1-855-279-6207.

## PRIVACY ACT NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., and 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

## PAPERWORK REDUCTION ACT NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0163. Public reporting burden for this collection of information is estimated to average .5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

# Exhibit 33



# U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE
## TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 06/30/2023

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**:  To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school.  Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name *(First, Middle, Last)* | *Date of Birth *(mm/dd/yyyy)* | *Social Security Number *(Last   Digits)* |
|---|---|---|
| *Telephone Number | *Email Address | |
| *Street Address | *City | *State | *Zipcode |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes    ☐ No

*If yes, please enter the full name of the student *(Last, First, Middle)*:

*If yes, please enter the student's Social Security Number *(last   digits)*:

## SECTION II: SCHOOL INFORMATION

*School

Campus *(including on line campuses for distance education borrowers)*

*Location *(City, State)*

* Enrollment Dates at this school:

*From *(month/year)*:              *To *(month/year)*:

☐ If you are still attending this school/campus, please indicate by checking the box.

☐ Check if the enrollment dates above are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

_____

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal).*

_____

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters).*

_____

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

_____

*Current Status at school listed above

☐  Graduated    ☐  Transferred Out    ☐  Withdrew    ☐  Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for e ample, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐  Yes    ☐  No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

_____

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for e ample, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐  Yes    ☐  No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

_____

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1.  How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2.  The name/title of people who you believe misled you *(if  nown)*

3.  What the school told you or failed to tell you.

4.  Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word  you  in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☐ Yes  ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes  ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☐ Yes  ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes  ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes   ☐ No

If yes, you must provide underlined information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☐ Yes   ☐ No

If yes, you must provide underlined information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

☐ Yes    ☐ No

Is there some other reason you feel your school misled you?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## SECTION V: FORBEARANCE STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income ta   refunds**. Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common    uestions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidi ed loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

\*Are you requesting forbearance/stopped collections?

☐ Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

☐ No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently *(as applicable)*.

## SECTION VI.  CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| \*Signature | Date |
| --- | --- |
|  |  |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov  or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

## PRIVACY ACT NOTICE

Information required by subsection (e)(3) of the *Privacy Act of 1974*, as amended (*Privacy Act*) (5 U.S.C. 552a(e) (3))requires the following notice be provided to you:

The authorities for collecting the requested information from and about you are Section 455(h) of the *Higher Education Act of 196*5, as amended (*HEA*) (20 U.S.C. 1087e(h)) and 34 C.F.R. § 685.206(c) and the authorities for collecting and using your Social Security Number (SSN) are the same but also include 31 U.S.C. 7701(b). The primary purpose of the information collected is for the use and administration of the U.S. Department of Education's office of Federal Student Aid (ED/we) for borrower defense to loan repayment program. The information you provide ED on this form and your SSN are voluntary, but you may need to provide the requested information on this form, including your SSN and/or a Federal Student Aid ID (FSA ID) that provides ED your verified SSN and other individual information pertaining to a student's or parent's Student Financial Assistance Programs account(s), for ED to process or complete our review of your borrower defense to loan repayment application. You may submit a form without your SSN or an FSA ID by filling out a form and sending it to ED via email or physical mail because disclosure of the information requested on this form is voluntary. However, without providing all the requested information on this form, ED may not be able to conduct a full investigation and complete the review of your application.

We use the information that you provided on this form including your name, SSN, date of birth, address, email address, telephone number(s), and / or an FSA ID, to receive, review, evaluate, and process requests for relief under the borrower defense to loan repayment regulations, to render decisions on the merits of such requests for relief, and, where requests for borrower defense to loan repayment are successful, to determine the relief that is appropriate to borrowers under the circumstances as well as to initiate appropriate proceedings to require schools whose acts or omissions resulted in the successful defenses against repayment to pay ED the amounts of the loans that apply to the defenses. Without your consent, ED may disclose the information that you provided and as otherwise allowed by the *Privacy Act*, pursuant to the routine uses identified in the system of records notice (SORN) entitled "Customer Engagement Management System (CEMS)" (18-11-11) and published in the Federal Register as 83 FR 27587-27591 (June 13, 2018). These routine uses include, but are not limited to, a routine use that permits ED to disclose your information to foreign agencies, Federal agencies, State agencies, Tribal, or local agencies, accreditors, schools, lenders, guaranty agencies, servicers, and private collection agencies when further information is relevant to ED's resolution of your complaint, request, or other inquiry, tracking your application or your inquiry, and, where a request for borrower defense to loan repayment is successful, to determine the relief that is appropriate under the circumstances as well as to initiate the appropriate proceeding to require the school whose acts or omissions resulted in the successful defense against loan repayment to pay ED the amount of the loan that apply to the defenses. We may use your information for reporting, analyzing the data to make recommendations in student financial assistance programs, and assisting in the informal resolution of disputes. Disclosure of relevant information also may be made to the responsible foreign, Federal, State, Tribal or local agencies charged with investigating or prosecuting a violation or potential violation of law in the event that information indicates, either on its face or in connection with other information, a violation or potential violation of any applicable statute, regulation, or order of a competent authority.

 In the event of litigation or alternative dispute resolution (ADR) involving ED or that we have an interest in and if that a party is either any component of ED, any ED employee in his or her official capacity, any ED employee in his or her individual capacity where representation for the employee has been requested or has been agreed to by ED or the Department of Justice (DOJ), or the United States where ED determines that the litigation is likely to affect ED or any of its components, we may disclose your information to DOJ, a court, adjudicative body, a person or an entity designated by ED or otherwise empowered to resolve or mediate disputes, or a counsel, party, representative, or witness if the disclosure is relevant and necessary to the litigation or ADR. ED also may disclose your information to DOJ to the extent necessary for obtaining DOJ's advice on any matter relevant to an audit, inspection, or other inquiry. We may send information to members of Congress if you ask them to help you with federal student aid or Student Financial Assistance Programs account(s) questions. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. As part of such a contract, we will require the contractor to maintain safeguards to protect the security and confidentiality of the records that are disclosed to the contractor. If a record is relevant and necessary to a borrower complaint regarding participants in any Federal Student Financial Assistance Programs under title IV of the *HEA*, ED may disclose a record only during the course of

processing, reviewing, investigating, fact-finding, or adjudicating the complaint to: any party to the complaint; the party's counsel or representative; a witness; or a designated fact-finder, mediator, or other person designated to resolve issues or decide the matter. ED also may disclose records to the DOJ or Office of Management and Budget (OMB) if ED concludes that disclosure is desirable or necessary in determining whether particular records are required to be disclosed under the *Freedom of Information Act* (*FOIA*) or the *Privacy Act*. ED may disclose your information to appropriate agencies, entities, and persons when ED suspects or has confirmed that there has been a breach of the system maintaining your information; which poses a risk of harm to individuals, ED (including its information systems, programs, and operation), the Federal agencies, or national security and the disclosure made to such agencies, entities, and persons is reasonably necessary to assist ED's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm. ED also may disclose your information to another Federal agency or Federal entity, when ED determines that your information is reasonably necessary to assist the recipient agency or entity in responding to a suspected or confirmed breach or preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal agencies, or national security, resulting from a suspected or confirmed breach.

## PAPERWORK REDUCTION ACT NOTICE

According to the *Paperwor   Reduction Act of 1    , no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average .5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

# Exhibit 34

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, ALICIA DAVIS, TRESA
APODACA, CHENELLE ARCHIBALD,
DANIEL DEEGAN, SAMUEL HOOD, and
JESSICA JACOBSON on behalf of themselves
and all others similarly situated,
         Plaintiffs,
         v.
ELISABETH DEVOS, in her official capacity
as Secretary of the United States Department of
Education,
         And
THE UNITED STATES DEPARTMENT OF
EDUCATION,
         Defendants.

Case No.: 19-cv-03674-WHA

**AFFIDAVIT OF JENNIFER LEZAN**

I, Jennifer Lezan, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans in order to attend the Illinois Institute of Art Chicago and Illinois Institute of Art Schaumberg ("Ai") (owned by Education Management Corporation / Dream Center Education Holdings).

3. In 2018, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. I am unable at this time to locate a copy of my original application. In my application, I included evidence of misconduct that I had gathered myself and that other students of Ai had found.

4. On August 6, 2020, I received correspondence from the Department of Education, stating that my claim had been denied. A copy of that correspondence is attached as Exhibit A.

1

Affidavit of Jennifer Lezan

5. On October 1, 2020, I participated in the Zoom chat for the class hearing in this case. In that chat, I expressed that the denial letter another class member read aloud was identical to the denial letter I had received, as had many other former Ai students.

6. For most of the time between when I submitted my application for loan cancellation and when I received the notification of denial, my loans were in forbearance.

7. I did get unexpectedly removed from forbearance in the summer of 2019, and I had to go through an extended process of calling the Department of Education and signing new documents to get my forbearance restored. I was told that there was some sort of "glitch in the system" that affected many people with pending borrower defense applications. This was a long and frustrating process because most of the people at the Department who I spoke to on the phone didn't understand my problem or know who to send me to for help.

8. As of now, my loans are still in forbearance due to the CARES Act, which extended forbearance for student loans through January 2021. However, if CARES Act forbearance is not extended, I will suffer serious financial hardship.

9. With accrued interest, my student loans currently total over $180,000. If I have to go into repayment, I will re-apply for income-based repayment ("IBR"), but I don't know if I will qualify or what my monthly payment would be. The IBR process is also complicated and intimidating. Based on my experiences with the Department of Education, I do not necessarily trust them to treat my IBR application fairly.

10. If I cannot get a zero monthly payment through IBR, I simply would not be able to pay my loans. I am currently employed as an adjunct professor with a very low salary and no benefits, and I have two daughters to support.

2

Affidavit of Jennifer Lezan

11. I do not understand whether the Department looked at the evidence that I submitted, and I do not understand how the evidence I did submit was not enough. My application contains details about my experience and publicly available information about Ai's use of high-pressure and deceptive practices.

12. There have already been findings of fraud against Ai and its parent companies from government investigations, including the Department of Justice. Multiple Ai campuses have been closed down nationwide. The Attorney General in Illinois is still investigating Ai for misrepresentations regarding gainful employment. I do not understand how the Department of Education could conclude that there was no misconduct when these facts are already publicly known.

13. I am frustrated that the denial I received seems to have been a "rubber stamp" denial, as a representative could not possibly have thoroughly reviewed the information I provided.

14. The fact that Department of Education delayed my borrower defense application for three years and then issued this vague, incomplete denial has caused me, and is causing me, financial and emotional harm.

15. I applied to Ai as a first-generation Latina college student. Now, years later, I know that their claims of 98% job placement and high salaries should have been a red flag, but at the time I wasn't in a position to know better.

16. I graduated from Ai in 2008. For the first 3-4 years afterward, I was constantly battling with loan servicers; they were asking for payments the size of a home mortgage, when I was 20 years old, underemployed, and had a 1-year-old child. I was not told about IBR, and instead they would push forbearance, where more interest would accrue. I was working multiple jobs just to survive.

3

Affidavit of Jennifer Lezan

17. I suffer from anxiety and PTSD due to trauma I experienced in childhood and in my first marriage, so having to deal with student loan collections on top of these difficulties was emotionally overwhelming.

18. I've faced backlash from people who think I "just don't want to be responsible" because I've tried to get my student loan debt cancelled. Even though I know it's not true, it is still emotionally difficult to face these kinds of attitudes.

19. Eventually, with hard work, I was able to turn many of my feelings of sadness, embarrassment, and fear into anger and a determination do something to help others who faced my same situation.

20. I am now an adjunct professor of marketing and graphic design & illustration at Southern New Hampshire University. I dedicate a lot of time to talking to my students about their student loan debt, such as how to consolidate loans and their options through community college.

21. In order to get the job I have now, I had to take on more debt to go to graduate school. When I applied to graduate programs, I had to take extra steps to prove that I was capable of doing the work because I had a for-profit school degree.

22. Even though I'm glad to be able to help others learn more about student debt, I feel frustrated that this work falls to me, a person who was defrauded, instead of the government using its power to help fix the problem of predatory for-profit colleges. In fact, my experience has shown me that it's the opposite – between the Department's delays and its rubber-stamp claim denials, I feel like our government is having a hand in corruption, and aiding the people who want to take advantage of vulnerable students.

4

Affidavit of Jennifer Lezan

23. When I've talked with other people in my same situation, I've heard many of them talk about being suicidal because of their experiences with predatory student loan debt. I felt that way sometimes when I was in my 20s, because if you think there's nothing you can do, you question what's the point of trying. I'm angry and mournful that young people are still being made to feel that way because of a broken system, especially young people of color, who are even more at risk of being taken advantage of.

24. I have two daughters, and they don't deserve this fate. They deserve to get a higher education and create opportunities to do good for the world and themselves. But because of my student loan debt, I can't save money for them. I can't buy a house or car because of my debt-to-income ratio.

25. Even though I love teaching, my experience with my borrower defense application sometimes makes me feel like just another part of a broken system.

26. I know there are thousands of people with experiences like mine. Through this lawsuit, we have learned that so many of us got "copy and paste" denials of our borrower defense applications, with just the name of the school changed. I simply cannot believe that these denials were the product of due diligence and good faith. It is so frustrating to see that, while we are just trying to make a living and care for our families, the government agency that is supposed to protect students and borrowers is not taking us seriously.

27. The denial notice states that I may ask for reconsideration. I am not sure what this means, nor what information I would need to provide to be reconsidered. I have not filed for reconsideration.

28. I have considered challenging the denial of my application in court, but I cannot afford a lawyer to do so.

Affidavit of Jennifer Lezan

I swear under penalty of perjury that the foregoing is true.


Executed on:   October 28, 2020
              Naperville, Illinois

Jennifer M. Lezan (Oct 28, 2020 17:46 CDT)

Jennifer Lezan

6

Affidavit of Jennifer Lezan

# Exhibit A



From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Thu, Aug 6, 2020 at 10:31 AM
Subject: Borrower defense discharge ineligibility information for you [
█████████████████████ ]
To: ███████████████████████████████



8/6/2020

Borrower Defense Application #: ████████

Dear Jennifer Lezan:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Illinois Institute of Art (The). "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Illinois Institute of Art (The). ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment

of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Employment Prospects

You allege that Illinois Institute of Art (The) engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 2: Program Cost and Nature of Loans

You allege that Illinois Institute of Art (The) engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 3: Transferring Credits

You allege that Illinois Institute of Art (The) engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 4: Career Services

You allege that Illinois Institute of Art (The) engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 5: Educational Services

You allege that Illinois Institute of Art (The) engaged in misconduct related

to Educational Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 6: Admissions and Urgency to Enroll

You allege that Illinois Institute of Art (The) engaged in misconduct related to Admissions and Urgency to Enroll. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 7: Other

You allege that Illinois Institute of Art (The) engaged in misconduct related to Other. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

IA Attorney General's Office
IL Attorney General's Office
CO Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Senate Hearing Testimony of EDMC career services adviser before the Committee on Health, Education, Labor, and Pensions (September 30, 2010)
Materials, including publicly available securities filings, prepared by Education Management Corporation

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [███████████████████ ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the

name of your federal loan servicer, you may go to StudentAid.gov to find
your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid





CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the
sole use of the intended recipient and may contain confidential and privileged information.
Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the
intended recipient, please contact the sender by reply e-mail and destroy all copies of the
original message.

--



Exhibit 35

**Borrower Defense – Summary of Notice to Schools Process**

1. BD does a preliminary overview of the applications from borrowers who attended ABC to get a sense of the nature of the allegations commonly asserted against the school and generally, a sampling of the evidence that the borrowers are providing, if any, in support of their claims. Additionally, we determine whether there are findings against the school by the Department and whether there is potentially relevant evidence in the Department's possession that must be considered. We also determine whether the school is open or closed and, if closed, whether there is a letter of credit that may be used to collect against the school for any approved BD applications.

2. After that preliminary overview, we make a determination as to whether to send a notice to the school. Since notice to the school creates additional burdens on the school and also delays the adjudication process, the preliminary review is intended to eliminate unnecessary notices to schools where there is no evidence for the school to refute (and, therefore, no benefit to the school in receiving the notice). However, notice will be sent to any school where there is evidence and, therefore, at least a possibility of approval, so that the school can respond and provide evidence to refute the borrowers' allegations:

   a. **No Notice**:
      i. If the preliminary overview leads to the conclusion that the school is closed and does not have a letter of credit or other assets available (*e.g.*, an open affiliated school with common ownership), there would be nobody to put on notice.
      ii. If the preliminary overview leads to the conclusion that there is no evidence in the Department's possession relating to the school, there is no evidence to refute.
         1. Exception: If an individual borrower provides evidence that supports his or her application, we would then send notice to the school and the application would be set aside so that the school's response and evidence, if any, can be considered with the borrower's evidence in adjudicating the application.
      iii. If there are 2,000 applications from borrowers who attended ABC, and the preliminary overview leads to the conclusion that there is no evidence in the Department's possession relating to ABC borrowers other than, for example, 300 borrowers who attended the medical assisting program between 2010 and 2014, there is no evidence to refute for the 1,700 borrowers who did not attend the medical assisting program between 2010 and 2014. Therefore, we would proceed as follows:
         1. Notices <u>would</u> be sent to the school regarding the 300 borrowers who attended the medical assisting program between 2010 and 2014 (see section (b) below);
         2. Notices <u>would not</u> be sent to the school regarding the applications of the other 1,700 borrowers.
            a. Exception: If an individual borrower provides evidence that supports his or her application, we would then send notice to the school and the application would be set aside so that the school's response and evidence, if any, can be considered with the borrower's evidence in adjudicating the application.

DOE00004321

      b.  **Notice required**:
          i.  If there are ED findings against the school, we would send notices to the school for any applications of borrowers potentially covered by the findings;
         ii.  If the Department is in possession of evidence potentially relevant to multiple borrowers (by campus, program, attendance dates, etc.). we would send notice to the school for any applications for which the evidence is potentially probative of the borrower allegations.
        iii.  If an individual borrower provides evidence that supports his or her own application, we would then send notice to the school.

3.  Regular School Notice Process:  Where notice is required regarding the application(s) of an individual borrower or small group of borrowers, the attached "School Notice Template" would be sent to the school.  The email is sent through the BD platform so that it can be tracked and associated to the borrower's application.

4.  Advance Notice:   Additionally, if we have many applications relating to a school and for which notice is required, we also will send an "Advance Notice Letter," a draft of which also is attached.  This letter would be sent first so that the school is aware that they are about to receive numerous applications.  It also advises the school of the nature of any common allegations so that the school can begin to consider a response.

5.  School Response:  Schools have two different options for responding to the borrower defense applications.

      a.  Borrower-Specific:  If the school wishes to respond to an individual borrower's allegations, the school can respond by replying to the School Notice email.  Any response or evidence attached to the email will be attached to the borrower's case.

      b.  General Response:  Additionally or alternatively, if the school wishes to respond generally and/or provide evidence that would be applicable to many or all borrowers who filed applications relating to the school, we have a SharePoint site set up for the school to access and load its responsive documents.   The response and evidence would be considered with respect to all applications to which the response and evidence is relevant, regardless of whether an individual borrower is specifically identified.

6.  Finally, if borrower requests reconsideration of a denied claim because his or her school was not notified, we will send a notice to the school and reconsider the claim in light of the school's response. (This is per OGC to avoid litigation on the off chance that a borrower takes the position that the school would have provided evidence that corroborates a claim that otherwise would be denied).

DOE00004322

# Exhibit 36

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br> v. <br> ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education, <br> And <br> THE UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No.: 19-cv-03674-WHA <br><br><br> **AFFIDAVIT OF REBEKAH NORTON** |

I, Rebekah Norton, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans in order to attend Brooks Institute of Photography ("Brooks"), which was owned by Career Education Corporation ("CEC").

3. On November 3, 2016, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4. After my initial application, I sent voluminous follow-up materials to support my application, including a full flat rate postal box of documents providing information on additional lawsuits and findings against CEC related to fraudulent practices. In fact, I submitted additional materials to the Department of Education to support my application in May 2020, just two months before I received a denial notice. A copy of the email confirming receipt is attached as Exhibit B.

1

Affidavit of Rebekah Norton

5.   While my borrower defense application was pending for years, I had to spend a lot of time on phone calls with the Department of Education and my servicer to get my administrative forbearance in place and keep it in place. At one point, my servicer told me that the Department wasn't giving it the right information to stay in forbearance, and I had to deal with months of collection calls.

6.   On July 10, 2020, I received correspondence from the Department of Education, stating that my claim had been denied.  A copy of that correspondence is attached as Exhibit C. I read this denial notice into the public record during the October 1, 2020 class hearing in this case.

7.   Mysteriously, the electronic documentation that the Department had eventually sent to confirm that I was entitled to forbearance status disappeared from the "inbox" of my online account with my servicer just two weeks before I got the denial letter.

8.   My loans are still in forbearance due to the CARES Act, which extended forbearance for federal student loans through January 2021.  However, if CARES Act forbearance is not extended, I will suffer extreme financial hardship.

9.   I borrowed approximately $72,000 to attend Brooks. But in order to be eligible for the job I have now, I needed additional education, and Brooks credits were not transferrable, so I had to borrow an additional $20,000. With accrued interest, my total federal student loans are now over $170,000. The monthly amount of my student loan payments would be more than the monthly mortgage on my family's home. There is no way that my family can come up with that kind of money. We won't be able to pay our other bills, including the daycare we pay for just so that I can go to work.

Affidavit of Rebekah Norton

10. I'm also extremely concerned about what would happen if the Department of Education contacts my current employer to garnish my wages.

11. In the past, I've been denied job opportunities when potential employers checked my credit and saw my debt-to-income ratio caused by the amount of student loans that I owed. I failed background checks for state and county jobs because my debt-to-income ratio supposedly made me "vulnerable to inappropriate relationships." Other employers have said that they liked me as an applicant but HR would think that I'm irresponsible.

12. These employment challenges are just one example of the hardships I've experienced, and fear I will continue to experience, because of the Department of Education's delay in fairly resolving my borrower defense application.

13. I have also suffered in my ability to provide for my family. I have four children, two of whom have special needs. My oldest daughter has finished college, and was not able to take out parent loans to support her education because of my own student loan debts. I have private student loans that are in default (my federal loans have been in default before, but they were not in default at the time I entered forbearance based on my borrower defense application).

14. I am 45 years old and have been unable to contribute to a retirement fund. I fear now that I will have to work until the day I die because of my student loan debt.

15. I have been denied loans for vehicles. If I did take out a vehicle loan, the interest rate would be higher than on a credit card. To this day, I drive a car that is not registered in my own name.

Affidavit of Rebekah Norton

16. I can't rent my own apartment or buy a home. I had to sign away my ownership interest in the house that my husband and I have lived in for over a decade because of my bad credit.

17. I don't include my Brooks degree on my resumé if at all possible, because I've been mocked professionally for it.

18. Because I was defrauded by Brooks, and because the Department has refused to fairly consider my application for borrower defense, my financial life had been destroyed. This situation had stopped me from participating in normal parts of life that other people can. I feel like a child who can't venture out on my own. I have worked so hard in my life, but I don't have same freedoms as normal people.

19. Even worse is the toll this has taken on my family relationships. Financial issues have threatened my marriage. Other members of my family who provided financial support for me lost faith in me. I come from a military family that believes in "pull yourself up by your bootstraps." I suffer knowing that they assume I just wasn't trying hard enough, or that I was too stupid to ask the right questions. It has seriously affected my self-esteem to have everyone say, "Why didn't you know?"

20. In truth, when I did ask questions about my education I was provided with false information. In other cases, I just didn't know what questions to ask. For instance, as a young single mother seeking a college degree, I didn't understand the different kinds of accreditation that would make it so that my Brooks degree wouldn't qualify me for a job that required a bachelors' degree. My grandparents, who helped support me during those years, also weren't in a position to understand these kinds of technical issues. I just

Affidavit of Rebekah Norton

wanted to provide for my daughter; my mother had recently died; and Brooks' career salary bait made me think I could raise my daughter by pursuing this degree.

21. At Brooks, the instructors would say that this is "good debt" because it's investing in your future, and you need to do whatever it takes to get an education. I didn't understand (and most students there didn't understand either) that we were maxing out our student loan eligibility and that these debts couldn't be paid off with the actual income people would make after graduation. By the time everyone found out it was a useless degree, we either couldn't go back to school because we'd maxed out our loans, or we'd have to pay for another private college for another degree and take on more debt (if another school would even admit us).

22. I was in a pit of depression for years because of my student loan debt. My car was repossessed, and I had to work in a string of minimum-wage jobs. This was humiliating to me after I had been at the top of my class and had always seen myself as a go-getter and an achiever.

23. The opportunity to apply for borrower defense gave me some hope. I believed, naively, that my government would do the right thing. I provided so much information that was so clear, I believed it would be impossible to deny what happened to myself and other CEC students – that this company was feeding off of vulnerable people. I thought our government would do what they're supposed to do: correct this injustice and prevent it from happening again to others.

24. I didn't expect that just because I had submitted an application that it would necessarily be fully approved, but I felt confident in the accuracy and thoroughness of the information I'd provided. As just one example, I was able to provide a form where the

Affidavit of Rebekah Norton

Brooks career center literally crossed out information that I'd written down in order to make my file falsely show that I was a placement of theirs. The fraud was clear.

25. When I finally received my denial notice after years of waiting for a decision, I didn't understand it because it was confusing and vague. There was no explanation of why my claim was denied.

26. I do not understand whether the Department looked at the evidence that I submitted, and I do not understand how the evidence I did submit was not enough to make out a borrower defense claim. My application contains details about my experience and evidence of publicly available information about Brooks' and CEC's use of high-pressure and deceptive practices.

27. It was so disheartening to see that the denial notice only referenced two articles when I sent literally pounds of information in support of my application. I felt deflated because the denial seemed arbitrary and dismissive of my efforts to convey how we were wronged as borrowers and what it was like to be taken advantage of. I felt like I had been tricked, because the Department of Education is supposed to be set up to review these problems, and the problems are not being taken seriously.

28. Instead, they just let CEC change its name and continue to grift vulnerable people. I feel now, not just that I was wronged, but that my own government has endorsed this fraudulent behavior. It's like they are saying that those of us who were victimized don't matter, and it's okay to destroy lives if the victims just weren't "smart enough" to figure out they were being taken advantage of.

29. The denial notice states that I may ask for reconsideration, but I am not sure what this means, nor what information I would need to provide to be reconsidered. I have not filed

6

Affidavit of Rebekah Norton

for reconsideration because I'm too scared to continue interacting with the Department of Education. I don't feel justice could be had with them.

30. The notice did not say that I had a right to go to court.

31. I have thought about getting an attorney to represent me in my student loan case, but I can't get one – not just because I can't afford it, but because it doesn't exist. Nobody wants to take on the Department of Education.

32. This experience will haunt me forever. I worked full time the entire time I was at Brooks, and I missed out on 3 years of spending time with my daughter – all for nothing. This experience has even had a negative emotional impact on my ability to enjoy photography, which I went to Brooks to study. This activity that I gave so much time, energy, and effort to is now a source of pain.

I swear under penalty of perjury that the foregoing is true.

Executed on:   October 29, 2020
                Camarillo, California

 10/29/2020

Rebekah Norton

7

Affidavit of Rebekah Norton

# Exhibit A

# Borrower Defense to Repayment Application
## Brooks Institute of Photography (BIP) & Brooks Institute (BI)

Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and Master Promissory Note (MPN) under the William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program As detailed below, I, **Rebekah Norton**, am hereby applying for a full discharge of my federal student loans according to the "Defense to Repayment" provisions of the Higher Education Act and promulgating regulations.

## Section 1: Borrower Information

SSN

Name            Rebekah Ann Norton

Address

City                         State                    Zip Code

Telephone                                Telephone
                                         N/A

Email

**Borrower is**

X  Employed
☐  In field of study
X  Out of field of study
☐  Unemployed

**Loan Servicer**
DEPT OF ED/FEDLOAN SERVICING (PHEAA)
PO BOX 530210
ATLANTA, GA 30353-0210
800-699-2908

## Section 2: School Information

**School Name** (The school changed its name)
**Brooks Institute of Photography  (BIP)**
801 Alston Road
Santa Barbara, CA 92108

**AND**

## Section 2: School Information Continued...

**Brooks Institute of Photography (BIP)**
321 Alameda Padre Serra
Santa Barbara, CA 93103-1809

**AND**

**Brooks Institute (BI)**
5301 N Ventura Ave.
Ventura, CA 93001

**Dates of Attendance**  From  September 1999  To  August 2002

**Name of program**
Undergraduate Still Photography

**Type of Credential**
Bachelor degree

---

**Status**
**X** Completed
☐ Withdrew

---

## Section 3: Illegal Conduct of School

I assert that certain acts and omissions by **Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA** and/or its agents/representatives give me a defense to repayment of my federal student loan(s) under state and federal law and the terms of my federal student loan agreement(s).

**The illegal conduct by Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA includes:**

**Misleading me about how this program would affect my job prospects, including:**

**X  Citing false and/or misleading job placement statistics and salary information to convince me to enroll in Brooks Institute of Photography, Santa Barbara CA**

**Explain:**
The school's job placement rate in writing that had always been provided to myself and other students was 87%, as noted on page 34 of the 1999 catalog (see attached supplemental documentation, copy of full catalog available upon request).  My recollection was that of even higher promises verbally being over 90% every time the admissions office and counselors would discuss it.  This was also the main claim in the 2005 lawsuit Nilsen

2

and Limon brought by the Braun law group, which claimed that the school promsed a 98% placement rate and starting salaries of over $75,000.

My specific recollection was that both Inge Kautzmann, who was the director of admissions at the time my application was submitted and when I signed my initial tuition agreement, and counselor Daisy Moschitto, had reiterated numerous times verbally, as did other staff members in career services, and even the general education teaching staff, that there was "guaranteed job placement" and that the previous years' graduating classes never had less than an 85%-95% employment rate in the field of photography.

The numerous in-person as well as over the phone discussions I had with both Inge and Daisy continually promised and reassured me that immediately out of school I could expect to make at $50,000 a year and that most students made immediately after graduation earned between $50,000 and $70,000. That salary number was significant to me at the time and always remained engrained in my memory because my close friend had recently begun teaching full time at a public school and he was earning slightly over $40,000 at the time and I was impressed that my all but guaranteed earning potential was higher than his current salary. Entering Brooks as a non-traditional student who had completed all general education requirements needed to enter a public and WASC accredited university, I had the opportunity to pursue other college options as well as the need since I was a mother of a 4 year old daughter. I was still a single mother when I applied to Brooks and my earnings potential was essential for the livelihood for myself and my daughter and was not something I was able to gamble with. I was provide reassurance over and over of the high numbers and received continued promises of employment rates, placements through career services, and my ability to pay on the loans I would need to take out for the high rate of tuition noting over and over that the prestige and name of the school would guarantee me full time employment, with their guidance and assistance, upon completion of their bachelors program. As a responsible parent and adult, I never would have enrolled at this school had not been able meet salary requirements that would allow me to financially provide for my child while also paying for the debt I was incurring in school to obtain said degree, and the promises and guarantees made to me over and over that the job placement and minimum salaries earned by Brooks alumni would be sufficient to do so. Instead my independent income was below poverty level at graduation and has been until just this year, 14 years later.

The career planning exit interview (see attached supplemental forms) which was required by all students to be completed and submitted to the office of career services prior to receiving our degree had multiple choice options for selection of pre-determined denominations noting "current salary range". I had selected the box that was $21,000-$24,000. I had also indicated in the selected box that I was actively seeking new employment and that I had been working at that current job since December of 2000, approximately less 1/3 of the way through my tenure as a Brooks student. In the section provided for me to fill in the blank I wrote: "Film Sales" as I was working retail sales at the film counter at a local camera shop, Samy's Camera. I was a cashier that sold film at a retail job that I had obtained independently without assistance from anyone at Brooks, and certainly was not considered to be "in the industry" as a retail sales employee. I had stated my Salary desired to be "$35,000 yr (negotiable...I'm starving)" as at the last month of school it had been made apparent in the lack of action, assistance, and interest of the school the $50,000 a year or higher rate of pay I had been promised at admission and throughout my course of studies was not going to be attainable upon graduation that month nor shortly thereafter.

3

When I requested a copy of my file from the school in or around 2005 I received a copy of the afore mentioned exit interview and attached to the top of it was a form hand written and completed by Dave Oldrich, as identified by his initial D (how he had signed off on all of his forms I had witnessed previously) on the line reading "verified by". When looking at the form it appears that it was either meant to be completed by the student, and clearly was not as it was the same hand writing as the verifying personnel and attached to the document handwritten by me; either there had been original one I do not recollect that had been replaced by this document that was completed by Mr. Oldrich, or it was never provided to me nor perhaps other students.

The information on the form reported my current employer as Samy's Camera, accurate and the same as what I had reported on my attached form. Most of the rest of the document was completed with false information, again written by someone other than myself, and stapled to the top of the documentation I provided, noting it's inaccurate and dishonest reporting. On the line that stated "Your Title" Mr. Oldrich had begun to write what looks to be the partial words "Cust Se" and a line had been drawn through it and the words next that were "Lab Mgr". I am assuming that he was intending to write Customer Service and changed his mind. Samy's Camera in Santa Barbara, CA did not have a Lab for anyone to manage. Additionally, the falsified information provided on the next line of "Start Date" the date of 4-1-02 was filled in, when my document clearly noted my employment at Samy's Camera for my retail sales job began on 12-00, which of course can be corroborated by my federal tax forms and the FASFA forms I filled out each year as well. The next line "Annual Salary" reported "$27,000" when I had clearly stated my salary at the time was in the range of $21,000-$24,000, and was on the lower end of the report. The next line was truthful in that "Basic Duties" was reported as "Cust Service / Film Sales". One can assume that by changing the information and title I was being reported as a "Lab Manger" as working in the industry, though even with the falsified over estimation of my salary I would have been earning almost half of what had been guaranteed to me to be a minimum salary upon graduation.

## X Misleading me about the type of job placement assistance the school intended to provide me.

**Explain:**
As noted above throughout the application and admissions process the job placement rate and promises of assistance directly from the school through it's claimed "Strong Alumni Network", working professors, and The Placement Office. The Placement Office was re-named Career Services in 2000 or 2001, I can't recall which, but upon my application and admissions process it was called The Placement Office.

The misrepresentation was not limited to pre-enrollment as it continued well in to the first year of instruction as well and also included misleading information from the teaching staff. The professors that were encountered 1st year of school were not the professors who taught classes to the students the last year of school. The professors that taught the incoming students continually discussed, in class during course work and lectures, that there would be job fairs, other networking events with Alumni and other industry professionals, and by leaving good impressions without allegedly well connected professors throughout our 3 years we would be connected to employers seeking out the skill set we were being taught. Even the teaching staff promised of assistance and opportunities and reminded us to connect with The Placement Office (noted later as being called Career Services) our last year of classes to make sure we could take advantage of all of the opportunities that we were told flooded the school by industry employers who were desperate for Brooks students to work for them.

4

Not only were there no job fairs, no networking events but there was no REAL Career Services office. There was no job placement, no assistance or support, nor guidance provided, but the career services the admissions representatives and counselors touted was only that in title. The office was run by one man, the above mentioned Dave Oldrich. Mr. Oldrich had no experience in, understanding of, nor connections in the industry but was a retired military recruiter. When I did go to his office I asked if he could provide any leads or job interview possibilities and he offered no leads, no opportunities, job searching tools, no ideas, or even a name of any alumni need even a low paying assistant for a day. Instead he did to me what he would do to all the other students who attempted to elicit help from him, he would point at the bulletin board hanging in the hallway across from his office door. The bulletin board never had anything more than minimum wage customer service or childcare help wanted ads posted from local food service and/or families in search of inexpensive labor. The last 7 week session I completed (as the school ran in sessions not in trimesters nor semesters) before graduating I made my final attempt, out of desperation, to elicit help from the Career Services office. After entering Mr. Oldrich's office I received the then familiar silent point to the bulletin board, and I tearfully asked him why he felt it was acceptable to pretend he was offering any assistance to students by posting on the bulletin board that month which was for a local ice cream shop or if he had enjoyed humiliating us. I furthered that as a mother of a 7 year old child, who was graduating at the top of my class, having received awards and nominates for honors from my photography professors, and who also had incurred tens of thousands of dollars in student loan debt, it was fair of me to desire the help promised me from Career Services. He made no response that I recall, just a smirk as I walked away helpless and in tears. I will never forget the desperation nor humiliation of that day in August of 2002.

**X Other false/misleading conduct relating to job prospects.**

**Explain:**
See above for inclusion of the falsified documents of my employment at graduation information as reported as "working in industry" for future students.

---

**Misleading me about the quality of the program, including:**

**X The fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college.**

**Explain:** Approximately half way through my course of studies, and this is a 14 year old recollection so I may be off by a few months, school administrators notified the students, staff, and faculty that they were in the last stages of the process of regaining the WASC accreditation, understanding now that again it was deception on the school's part, and stating their belief at the start of each and every registration period (every 6-8 weeks depending on student's scheduling availability) that the WASC accreditation could be achieved prior to my graduation date. And of course by my last session making promises it would be done shortly thereafter and would be retro-active making my Bachelor's under the umbrella of their new accreditation. There were auditors that sat in classes and we were told to behave and ask specific questions. The faculty often taught different lesson plans that were incongruent to what we had been learning the weeks before as well as after while the auditor was present in the back of the classroom. The hope that our degree would be considered more legitimate academically (as at this juncture and that far in I had looked in to transferring and found out

5

that I would have had to start all over to achieve a degree at a different college as the units and coursework were considered academically legitimate and were more of a "trade school" courses) and eligible for a higher accreditation kept the staff, faculty, and students in line out of desperation to not make matters worse for our financial and potential academic futures.

Of course it's not to be overlooked that during my initial application and admissions process whenever questions about transferring coursework/credits to another college would arise Daisy Moschitto would switch the conversation around to either address the coursework from my previous years at community college IN to Brooks or she would state, "Most colleges will accept our classes but each school can have different class requirements which might make you repeat a class or two" always skirting the issue and deceptively acting as though there would be a possibility for transferring but also following it up with dismissive statements that reassured me of a high completion rates and no need to worry about transferring because that's just for students who aren't able to "hack it" to worry about and her assurance that I would do very well at their school.

**X Other false/misleading conduct relating to the quality of the program.**
**Explain:** In the recruitment catalogs, on the campus/facility tours, and when talking with Daisy Moschitto and Inge Kautzmann class sizes were promised to be small, providing historical date that graduating class sizes, again noted in the 1999 catalog in the employment outlook statistics (same copied document attached) as noting there had been 44 graduates in the Bachelors of Arts program the previous year. I was told, as were my peers whom I talked with at the time of admission, that only the most elite of students would be accepted to the school, once again noting how that tied in hand in hand with job placement as it was "the cream of the crop" only who attended and that there high academic standards and general education requirements in place to assure only students with academic maturity were participating in the same classes, as they were alleged to be intimate in size, citing often less than 15 people in a classroom. This was also false and the class size was over doubled as we were welcomed the first day on campus as "the largest class ever to attend Brooks". That many students straight out of high school had been accepted and would be required to take some classes at the local community college for the general education requirements but that they were going to work on getting more general education instruction held on campus as well.

**Misleading me about how I would pay for the program, including:**
**X Misleading me about the true cost of the program.**

**Explain:**
It is important to first not that while I received loans and grants I still had to maintain a full time job, which I did throughout the entire 3 years, in order to meet my monthly needs for housing food etc.

The 1999 catalog lists the cost of attendance in a very deceptive way. First and simply the estimate for tuition costs and supplies is not only underestimated dramatically but it is also done in a format a-typical of usual student budget lists. This alone seems very bizarre that there was never a list provided to myself or other

students that broke down the annual costs in a way that has been standard in the education-industry. Usually the breakdown of total cost of school is done annually and listed like a list, such as:

| | |
|---|---|
| Tuition | $amount |
| Room and Board | $amount |
| Incidentals & Travel expenses | $amount |
| Insurance | $amount |
| | |
| Total average cost per year | $amount |

Brooks instead does not ever provide any form of list either within their catalog nor when applying for admissions nor financial aid and the only way to ascertain it, as no one at the school ever provided a straight answer always stating something to the effect of "we can't give accurate answers because each class has different costs associated with it".

Brooks reported the costs in a way that is not a list nor did it have all of the pertinent information available for reference next to each other in the catalog. The potential and/or current student would have to piece-meal the information together and calculate the math themselves.

On Page 21 of the 1999 catalog, which is entitled tuition and expenses, it refers you to the 7 week sessions and the current tuition of $2500, which was I did start at when I enrolled. After several it states that any change in tuition/fees will be announced at least 30 days prior to inception. Without accounting for any increase in tuition a student then would have to turn to page 4 of the catalog to see how many sessions would be paid for and do the math that way. Per that catalog and calculation the tuition would have been 18 sessions and totally approximately $48,120 without lab fees etc. But again, the only way to know the tuition except for in increments of the first 7 week session, is to turn from page 21 to page 4.

Page 21 also notes that the cost of supplies "averages about $500 per month, the amount varies with course requirements and individual student use" and states that there are used equipment packages starting at $1500, which was not the case. Neither of the local supplying retailers had used packages available prior to or after the start of the first session and that the new equipment package started at $2800 which was also a gross underestimation by well over $1000.

Tuition Costs

| | |
|---|---|
| Sept 99-Dec 99 | $5, 150 |
| Jan 00-Dec 00 | $15, 510 |
| Jan 01-Dec 01 | $16, 320 |
| Jan 02-Aug 02 | $11, 420 |
| Total for Tuition only: | $48,400 |

Supplies and Materials
$2800 Brooks' estimate for 1st session fees for basic equipment package
$500 per month $18,000
Total
Housing without meals etc.
1999 Catalog stated "$800 starting cost for 2 bedroom apartment" x36 months = $28,800

And "$650 starting cost for 1 bedroom apartment" x36 months = $23,400

However, part of the acceptance letter packet included an additional letter, see supplemental attachments, welcoming students to Brooks and the 3rd paragraph reads "a one=bedroom apartment at about $800. A tow-bedroom apartment will begin at approximately $1200" which was also an intentional underestimation as Santa Barbara California rent was substantially higher than that and I was forced to commute from 30 miles south to find a more affordable apartment in Ventura that was $950.

Subsidized Federal Student Loans Received:

| | |
|---|---|
| Sept 99-April 00 | $2, 625 |
| April 00-Dec 00 | $3, 500 |
| Jan 01-Aug 01 | $5, 500 |
| Sept 01-April 02 | $5, 500 |
| April 02-Aug 02 | $2,750 |
| Total for Subsidized: | $19,875 |

UnSubsidized Federal Student Loans Received:

| | |
|---|---|
| Sept 99-April 00 | $4, 000 |
| April 00-Dec 00 | $4, 000 |
| Jan 01-Aug 01 | $5, 000 |
| Sept 01-April 02 | $5, 000 |
| April 02-Aug 02 | $2,500 |
| Total for UnSubsidized: | $20,500 |

Pel Grant

| | |
|---|---|
| 1999-2000 | $2,675 |
| 2000-2001 | $1,050 |
| 2001-2002 | Not Awarded Unknown as to why |
| 2002 | $313 Grant Disbursed vs. Grant Awarded $2,350 |
| Total Pel Grants received: | $4038 |

SEOG Grant

| | |
|---|---|
| 1999-2000 | $500 |
| 2000-2001 | $500 |
| 2001-2002 | $500 |
| 2002-2003 | $500 |
| Total SEOG Grants received: | $2000 |

Cal Grant

| | |
|---|---|
| 1999-2000 | $11,775 |
| 2000-2001 | $9,708 |
| 2001-2002 | $7,834 |
| 2002-2003 | $4,248 And received a demand letter for return of $ 2355 of it, stating Brooks had issued a |

check to me in error (see attached supplemental documents) – I have no recollection of whether or not I had received an refund check from them in that amount but he stated amount and the letter had been sent to me almost a year after graduation.

8

Total Cal Grants received: $33,565

All Grants received in total:     $39,603

| | |
|---|---|
| Total Tuition: | $48,400 |
| Total Materials Per Brooks' Estimate: | $18,000 |
| Housing Per Brooks' addendum Estimate: | $28,800 |
| *note without board | Missing from Brooks' estimate |
| Personal and Transportation expenses | Missing from Brooks' estimate |
| Insurance/Medical/Auto /Photographic Equip | Missing from Books' estimate |

*welcome letter noted need for insuring equipment as well as vehicle

TOTAL EXCLUDING THE NOTED MISSING NECESSARY STUDENT BUDGET/NEED REQUIREMENTS: $95,200

Noting what wasn't included that is typically in college financial aid estimates is an additional $ 21,600
- 3 years of board (meals and not including my own childcare needs that were several thousands of dollars each year) at a conservative estimate of $2800 per year individually would be an additional $8400
- 3 years of personal incidentals and transportation expenses (not including a car payment) at an average of $3,000 per year would be an additional $9,000
- insurance for 3 years average of $1400 (medical for myself only, not including my child) per year for all 3 types of insurance an additional $4200

Making:
TOTAL COST  OF $116,800
- utilizing their purposefully deflated estimates and approximates on supplies and materials, housing etc…

| | |
|---|---|
| Total Federal Loans: | $40,375 |
| Private Loans | $11,000 |
| Total Grants | $39, 603 |

_____

Total Fin Aid Received  $90,978

Brook's conservative estimate with the omissions of noted missing standard common practice allocation of student financial need was:
- Total cost $95,200
- Leaving me with an additional unmet need of $4,222

With the conservative estimate that DID include the room and board typically in student financial aid budgeting as,  I was required to provide the information and demonstrate said need to be eligible for the amount of loans I acquired – but not including that of childcare need for an additional bedroom allowance and my daughter's extensive medical expenses my 3rd year in school:

- Total cost $116,800
- Leaving me with an additional unmet need of $25,822 (without the multi-thousand dollars of real actual figures and need)

As noted earlier the deception of what was needed financially to attend was done in a sneaky and misleading way and the estimates provided were GROSSLY misrepresented. The original cost of standard equipment was significantly more than the stated $2800 and the monthly supplies fees were thousands of dollars more per year than estimated. My father and grandfather and extended family members had to come to my aid financially numerous times in order for this deficiency to be met.

I want to reiterate the TOTAL underestimated intentionally deflated amount by Brooks still had an unmet need of thousands of dollars while I was maxing out on federal student loans and receiving grants and working full time trying to stay afloat.


**X  Misleading me about whether I would have to borrow money to attend,  Brooks Institute of Photography, Santa Barbara CA / Brooks Institute, Ventura CA, rather than having it paid for entirely in grants.**

**Explain:**
Verbally I had been reassured numerous times by admissions representatives as well as financial aid that I would be eligible for substantial grants and gift aid that would cover a significant amount of my financial need. One of the grants I was awarded, Cal-Grant for the first year I  attended I received a CAR program award letter from the California Student Aid Commission dated on 7/15/99 that stated it had awarded me the Cal Grant A award in the amount of $14, 130.  When I arrived at Brooks the financial aid award letter given to me  and dated on 9/15/99 notes my award of only $11,775 from Cal Grant, which I was not notified of the change until I had already begun classes as they did not provide us our financial aid awards until the first day of school. The office had been in contact with me previously but did not notify me that I would be taking out additional loans due to a decrease in Grants until I was already attending class.  Both documents are attached in supplemental documentation.


**X  Misleading me about the amount of student loans I was borrowing.**

**Explain:**
When I was told that the amount of loans I was allowed to take out would cover the cost it was always masked in sessions. There were never totals provided and when we asked about annual rates we were always told that the fee schedule wasn't broken down that way and that we would have calculate it out in weeks while our loans were disbursed as though we were in a trimester program.  No one would have give us actual figures.


**X  Misleading me about the terms of repayment on my federal student loans, including what my monthly payments would be.**

**Explain:**

When exploring the federal student loan .gov sites the month prior to graduation I plugged what I owed and the 8.25% interest in to the loan payment calculator linked from finaid.org. It generated the payment information and also stated that I would need an estimated annual salary of at least $59, 425.50 to be able to afford to repay the loan if I would be able to pay 10% of my gross monthly income. It noted also that if I were to pay 15% of my income I would need at least $39, 616.80 as a minimum annual salary and that I "may experience some financial difficulty". The latter figure was almost double the amount I made my first year out Brooks and it didn't get any better. I brought this information with me for my appointment for the exit process with Brooks' financial aid department where they continually assured me that I could defer my loans with both the federal and private loans until I was able to find employment that was conducive to the inflated payment in proportion to my income specifically highlighting I could go without making payments as long as I needed to until I found a better paying job.

**X   Other false/misleading conduct in relation to financial aid.**
**Explain:**
Also during my exit process with Brooks' financial aid department, while I sat in the office terrified and not knowing what to do, I noted that I had no job prospects and was still making approximately $1700 a month before taxes at my retail sales job, while also supporting my daughter. I had just learned that my student loan payment to the federal loans alone would be $495 per month and that Sallie Mae private loan was going to be almost $200 per month. $700 dollar per month in student loans was close to half of my monthly income.

The school informed me that I really only had 2 options and encouraged me to do the latter. I could defer the loans initially and stated I could do so for up to 3 years, or I could apply to Brooks' graduate program, where I could receive my Master's Degree and defer payments without accruing interest while in school and continue to hunt for a job. I was terrified I wouldn't be able to make the $495 per month payments and their solution was for me to provide MORE money to the school and take on MORE debt.

The school also assured me that I would be able to defer my private loan with Sallie Mae, which became Navient, and stated that because it was a private loan instead of federal that I would be able to negotiate a lower payment. Neither of those statements were true. I was unable to defer with the private SallieMae loan, after the initial 3 months post graduation, they refused options for lowering payments due to income, and I entered into default, my loan was sold to a collections agency in less than a year's time, where it continues to be sold to differing agencies year after year. My initial private student loan, that would not allow for lower minimum payments, was for $11,000 and currently is owned by Northstar Location Services and has a balance owed on it of $47, 867.47 which the entire balance has been demanded of me, in full, by each company the loan has been sold to for the last 13 years. This loan has continued to impair my ability to obtain jobs I have applied for and could have been avoided all together if the financial aid office at Brooks met ethical standards and has been honest in disclosing the significant difficulty repayment would be, instead of stating it would be the same repayment options offered to me as the federally backed loans.

---

**Superior Court of the State of California for the County of Los Angeles 2006**
**(Class Members enrolled 1999-2005)**

☐ **I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit **and I accepted the settlement offer.**
**Plaintiffs**
**vs.**
**Careeer Education Corporation (CEC)**
**Brooks Institute of Photography**
**Defendants**

X I do not have a recollection of being included but I do have documentation received from the lawsuite showing the claims against the school.  **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

---

**X** I **was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit **and I believe, to the best of my knowledge, that I recused myself from the Class and settlement offer.** *I state I believe in that I have no recollection of receiving payment and my recollection was that **I did so in order to reserve the right to potentially pursue SallieMae for the fraud, crime and harm committed** in conjunction with their Private Loans, Financial Aid office kick-backs, disregard and elimination of content stated in Promissory Note, radical increase of percentage rate after six month grace period, repayment demands/bills sent to students for several thousand dollars, demands for payment in full, harassment of borrowers employer/s, family members and friends, refusal to allow payment to defer or forebear due to economic hardship after initial 6 months post-graduation, refusal to provide documentation of their demands and/or promises when asked and lack of real attempt to find a solution for repayment to SallieMae as they would not negotiate anything and would only accept the payment they established without options.*
**Plaintiffs**
**vs.**
**Careeer Education Corporation (CEC)**
**Brooks Institute of Photography**
**Defendants**

**X  I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents.  I was one of the students deposed, for several hours and questioned by Brooks/CEC attorneys repeatedly regarding the false job placement rates and the inflated employment statistics.  I contacted the attorney's office while preparing this document, by email as well as phone, and did not receive a response from him nor his office staff regarding my deposition nor the status of whether or not I had indeed recused myself, as again I have not recollection of receiving any more than reimbursement of little more than $100 for travel and reproduction expenses.

---

Furthermore, the long history of systematic illegal activity and inadequate programs created a high likelihood that school's reputation would be irreparably damaged to the point where the degrees they issued would be worthless. **Brooks Institute of Photography, Santa Barbara CA /Brooks Institute, Ventura CA** never notified me, or otherwise made me aware that that my degree would be worthless due to misconduct.

**Because of this conduct, I have suffered injury, including:**

**X  Federal student loan debt, which has caused me stress, forced me to divert funds from other aspects of my life and otherwise unduly burdened me.**

**Explain:**
The extent to which this has harmed me and my family is far reaching and the reality I face on a daily basis.  I am financially destroyed and because I was not provided with a skill set nor actual degree that would allow for repayment of debt that high, I have been unable to provide for myself in the way that most adults my age can and do.  I am 41 years old and unable to contribute to any retirement fund, I am limited to employment opportunities due to the debt to income ratio I have making me incompatible for county and state job employment opportunities.  I was limited due to the accreditation to attending an additional proprietary school as other schools would not accept the degree so the debt I incurred was even higher.

I am unable to purchase a home as I am ineligible due to the debt ratio to my income and I cannot finance my own vehicle as the interest rate is higher than that of a credit card so I am required to drive a vehicle completely financed in my husband's name and have no ownership of any property.

I was unemployed in 2005 and applied for disability due to the emotional distress the financial ruin on my debt load has caused me.  During that time I had also defaulted on my federal loans, having exhausted my deferment/forbearance opportunities.  I was able to consolidate in a forgiveness student loan through William D. Ford and the interest I had accrued was so high what had been over $40,000 of student loan debt then became over $60,000.  It has been insurmountable.


**X  A difficult time finding employment, either in the field I went to school for or otherwise.**

**Explain:**  It was impossible finding employment in the field of study from Brooks. I spent years worker vigilantly, I knocked on doors and entered studios of famous photographers and other companies that others didn't have the ability or tenacity to even call and yet I was unable to find employment.  Often mocked by industry professionals and told things like "How much did you spend to be an lowly assistant your whole life" "Brooks makes the best assistants, but you'll never be a photographer".  Some of the best people I knew who continued to work ended up filing bankruptcy and over a decade later are still forced to live with their parents in their 30s and 40s because of their lack of ability to financially support themselves from their Brooks education.

I returned to school to enter a different field and this is the first year of my life I will make over $30,000.  Still not achieving what I was begging for on my exit paper for Career Services, a salary of $35,000 when I had been promised a starting minimum of $50,000.


**X Other injury, including pain and suffering.**

**Explain:**

This question is what took me weeks to complete my application. There isn't a facet of my life that Brooks has not created pain and suffering in. This was painful to revisit and reopen the wound as Brooks has literally financially destroyed me. That's not an exaggeration, complete financial destruction that feels impossible to repair.

More than the financial decimation it destroyed my self-worth and self-esteem for years, and is still something I struggle with. I have so much regret and remorse and self-loathing for the way I was deceived. The humiliation of being so foolish and not knowing what questions to ask or understanding how things should be presented and what I should have known to inquire about as I was the first person in my immediate family to graduate from college. The feeling of worthlessness from failing at something that I was so passionate about that I moved my child to a different city, away from our extended family because I believed, and the faculty who were trusted and touted professionals, reassured me I that was "so amazing and talented". I was unable to achieve the dream of working in the industry, and that dream cost me tens of thousands of dollars and excruciating pain and distress, and truly continues to as the emotional destruction and stress and anxiety it has caused me has haunted me for 14 years now.

It strained and/or severed multiple relationships with my extended family members as I had a received financial assistance and their emotional support during my 3 years of attendance. I had made them the same promises that were made to me, that I would be employed in a lucrative career because I was made to believe it was a guarantee. And when I was unable to produce those promises and I continued to not only work at a sales counter, but actually become in MORE need of assistance financially due to my huge debt incurred they questioned my ability, my perseverance, and my integrity when none of those things had anything to do with it.

My husband and I feel the financial constraints of my poor decision to attend on a daily basis. There have been numerous times it has been the cause for us to doubt the longevity of our marriage, and who can blame anyone for wanting to be rid of the financial albatross that my Brooks student loan debt began. It is now a mountain of money owed that I will never be able to reach the top of. Though I have tried to forgive myself for not understanding I was being deceived I have to remember I was young, impressionable, and school was invested in sales and spinning the truth, not academics not launching the careers of the numerous hopeful artists that applied who were dreamers that didn't know they were being lied to. I was young foolish artist and today I am very financially poor woman with a useless bachelor's degree and a mile of paperwork demanding private loans be paid.

## Section 4: Defense To Repayment of Federal Student Loans

The above conduct gives rise to a cause or causes of action under California law, which relate(s) directly to my loan and/or the provision of educational services for which the loan was given, including:

**California EDUCATION CODE**
**SECTION 94928-94929.9**

94928. As used in this article, the following terms have the

following meanings:

(a) "Cohort population" means the number of students that began a program on a cohort start date.

(b) "Cohort start date" means the first class day after the cancellation period during which a cohort of students attends class for a specific program.

(c) "On-time graduates" means the number of students who complete a program within 100 percent of the published program length. An institution may separately state completion information for students completing the program within 150 percent of the original contracted time, but that information may not replace completion information for students completing within the original scheduled time. Completion information shall be separately stated for each campus or branch of the institution.

(d) "Graduates available for employment" means the number of graduates minus the number of graduates unavailable for employment.

(e) (1) "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program. For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the examination results for the first examination available after a student completes an applicable educational program.

(2) The bureau shall define by July 1, 2014, specific measures and standards for determining whether a student is gainfully employed in a full-time or part-time position for which the institution represents the program prepares its graduates, including self-employment or conducting freelance work, and may set the standards for the hours per week and duration of employment and utilize any job classification methodology the bureau determines appropriate for this purpose, including, but not limited to, the United States Department of Labor's Standard Occupational Classification codes.

(3) This subdivision shall not prohibit the bureau from authorizing an institution to aggregate single positions held by a graduate for purposes of meeting the hours per week standards established by the bureau.

(f) "Graduates unavailable for employment" means graduates who, after graduation, die, become incarcerated, are called to active military duty, are international students that leave the United States or do not have a visa allowing employment in the United States, or are continuing their education at an accredited or bureau-approved postsecondary institution.

(g) "Students available for graduation" means the cohort population minus the number of students unavailable for graduation.

(h) "Students unavailable for graduation" means students who have died, been incarcerated, or called to active military duty.

94929.  (a) An institution shall annually report to the bureau, as part of the annual report, and publish in its School Performance Fact

Sheet, the completion rate for each program. Except as provided in subdivision (b), the completion rate shall be calculated by dividing the number of on-time graduates by the number of students available for graduation.

(b) In lieu of calculating graduation data pursuant to subdivision (a), an institution may report graduation data reported to, and calculated by, the Integrated Postsecondary Education Data System of the United States Department of Education.

94929.5. (a) An institution shall annually report to the bureau, as part of the annual report, and shall publish in its School Performance Fact Sheet, all of the following:

(1) The job placement rate, calculated by dividing the number of graduates employed in the field by the number of graduates available for employment for each program that is either (1) designed, or advertised, to lead to a particular career, or (2) advertised or promoted with any claim regarding job placement.

(2) The license examination passage rates for the immediately preceding two years for programs leading to employment for which passage of a state licensing examination is required, calculated by dividing the number of graduates who pass the examination by the number of graduates who take the licensing examination the first time that the examination is available after completion of the educational program. The institution shall use state agency licensing data to calculate license examination passage rates. If those data are unavailable, the institution shall calculate the license examination passage rate in a manner consistent with regulations adopted by the bureau.

(3) Salary and wage information, consisting of the total number of graduates employed in the field and the annual wages or salaries of those graduates stated in increments of five thousand dollars ($5,000).

(4) If applicable, the most recent official three-year cohort default rate reported by the United States Department of Education for the institution and the percentage of enrolled students receiving federal student loans.

(b) Nothing in this section shall limit the bureau's authority to collect information from an institution to comply with this section and ensure, by regulation and other lawful means, that the information required by this section, and the manner in which it is collected and reported, is all of the following:

(1) Useful to students.

(2) Useful to policymakers.

(3) Based upon the most credible and verifiable data available.

(4) Does not impose undue compliance burdens on an institution.

(c) Data and information disclosed pursuant to paragraphs (1) to (3), inclusive, of subdivision (a) is not required to include students who satisfy the qualifications specified in subdivision (d) of Section 94909, but an institution shall disclose on its fact sheet and to the bureau whether its data, information, or both, excludes any students pursuant to this subdivision.

94929.7. (a) The information used to substantiate the rates and information calculated pursuant to Sections 94929 and 94929.5 shall do both of the following:

(1) Be documented and maintained by the institution for five years from the date of the publication of the rates and information.

(2) Be retained in an electronic format and made available to the bureau upon request.

(b) An institution shall provide a list of employment positions used to determine the number of graduates employed in the field for purposes of calculating job placement rates pursuant to this article.

(c) The bureau shall identify the specific information that an institution is required to document and maintain to substantiate rates and information pursuant to this section.

94929.8. (a) On or before January 1, 2011, and pursuant to Section 94877, the bureau shall establish, by regulation, a uniform method for institutions to obtain statistically valid, current, and representative data to comply with this article.

(b) A violation of the regulations adopted pursuant to subdivision (a) is a material violation of this chapter.

94929.9. (a) The bureau shall consider the graduate salary and other outcome data and reporting requirements that are utilized by the United States Department of Education, the Student Aid Commission, accrediting agencies, and student advocate associations. The bureau shall consider the reporting requirements of public postsecondary institutions in California to evaluate the feasibility of adopting these reporting requirements for private postsecondary institutions. The bureau shall make recommendations to the Legislature, on or before December 31, 2016, on how reporting requirements under this chapter should be altered to ensure accurate, useful, and consistent reporting by private postsecondary institutions to the bureau and students.

(b) The bureau is authorized to enter into a personal services contract with an appropriate independent contractor to assist in the evaluation required by subdivision (a). In this connection, the Legislature finds, pursuant to Section 19130 of the Government Code, that this is a new state function.

(c) (1) A report to be submitted to the Legislature pursuant to subdivision (a) shall be submitted in compliance with Section 9795 of the Government Code.

(2) Pursuant to Section 10231.5 of the Government Code, this section is repealed January 1, 2017.

---

Common law action for Fraudulent Misrepresentation; and/or common law action for Fraudulent Concealment.

Additionally, the above conduct violates federal law, including:

1. The Federal Trade Commission Act and Federal Trade Commission regulations, which prohibit "a school, in promoting a course of training, to misrepresent the availability of employment after graduation from a course, the success that the member graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment." 16 C.F.R. § 254.4(d).

2. Title IV of the Higher Education Act and Amendments, and Department of Education regulations, which prevent schools from participating in Title IV programs from committing "substantial misrepresentation" in interactions with students and prospective students.

## Section 5: Requested Relief

Therefore, I request that the Servicer and/or Department of Education take the following steps:

1. Cancel any remaining principal, interest, fees and costs associated with my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

2. Cease any collection actions against me in relation to my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

3. Return any sums paid, whether voluntarily or involuntarily, toward my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

4. Remove any adverse reports related to my federal student loans, borrowed to attend School, from all consumer credit reporting agencies.
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

5. Restore my eligibility to receive funds under Title IV, including by restoring any portions of my lifetime eligibility for Pell Grants and federal student loans previously used in order to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

I request a notification of a hearing or a determination of my asserted defense to repayment within thirty (30) days, in writing. Should you deny any or all of my defense, please inform me of the process for appealing this decision, in writing. I reserve the right to submit supplementary information in support of this application.

## Section 6: Borrower Acknowledgment, Certifications, Assignment, And Authorization

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097.

I certify, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education (the Department) in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein.

I hereby assign and transfer to the U.S. Department of Education (the Department) any right to a refund on the amount discharged that I may have received from the school and/or any owners, affiliates, or assignees of the school, and from any third party that may pay claims for a refund because of the actions or omissions of the school, up to the amount discharged by the Department on my loan(s).

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

Borrower's Signature _____ Date __11 | 1 | 16___

Attachments :
Diploma
Transcript
Brooks' Career Planning Exit Interview & Employment Information
Page 34 of Brooks 1999 Catalog re: Employment
Page 21 of Brooks 1999 Catalog  re: Tuition and materials fees
Page 4 of Brooks 1999 Catalog re: Academic Calendar / session breakdown – every 7 weeks
Page 32 of Brooks 1999 Catalog re: Housing Costs & Necessity of Independent Vehicle
Welcome letter from Brooks noting average cost for Housing and requirement for Vehicle
California Aid Report (CAR)
1999-00 Financial Aid Award Letter
Brooks Institute Welcome Letter
Brooks Letter requesting return of CalGrant monies
Annual Enrollment Agreements
Federal Student Loan Payment Schedule
Wells Fargo Account Statement for 1st payment due, 6 months post Graduation
Lawsuits from California courts in 2005

# BROOKS INSTITUTE

has conferred the

# BACHELOR *of* ARTS DEGREE

## *in* PROFESSIONAL PHOTOGRAPHY

upon

# Rebekah Ann Norton

who has honorably fulfilled the requirements prescribed by the Institute for that degree
with a major in

## COMMERCIAL/ADVERTISING & PORTRAITURE

Given under our hand and seal

this **30** day of **August**, 20 **02**

in the city of Santa Barbara, California

PRESIDENT

ACADEMIC DEAN

BROOKS INSTITUTE OF PHOTOGRAPHY
FOUNDED
1945
SANTA BARBARA

Rebekah Ann Norton ████████ ████████ BA
Professional PhotCOM/ADV

```
        TRANSFER CREDIT
ENG184        English Composition              3.00      T
ENG385        Journalism                       3.00      T
PSY187        Theories of Personality          3.00      T
CUL188        Cultural Studies 1               3.00      T
ENG280        Advanced English Composit        3.00      T
MAT181        Math                             3.00      T
        TOTALS:                               18.00

Session 149   09/07/1999 - 10/22/1999
FP1           Fundamentals Photograph   6.00    6.00    B   3.06    18.36
DE1           Design                    3.00    3.00    A   4.00    12.00
Session Totals:                         9.00    9.00        3.373   30.36

Session 150   11/01/1999 - 12/17/1999
FC1           Film And Culture          3.00    3.00    A   4.00    12.00
BA2           Basic Photographic Fund   6.00    6.00    A-  3.70    22.20
Session Totals:                         9.00    9.00        3.800   34.20
              · Honor Roll

Session 151   01/10/2000 - 02/25/2000
PHO103        Intermediate Principles   6.00    6.00    B+  3.42    20.52
SCI182        Science                   3.00    3.00    B   3.17     9.51
Session Totals:                         9.00    9.00        3.337   30.03

Session 152   03/06/2000 - 04/21/2000
ACC381        Accounting                3.00    3.00    A-  3.74    11.22
PHO200        Lighting Theory           6.00    6.00    B   3.00    18.00
Session Totals:                         9.00    9.00        3.247   29.22

Session 153   05/01/2000 - 06/16/2000
BUS480        Business Law              3.00    3.00    A   4.00    12.00
PHO201        Lighting People           6.00    6.00    A-  3.70    22.20
Session Totals:                         9.00    9.00        3.800   34.20
              Honor Roll

Session 154   07/10/2000 - 08/25/2000
PHO202        Lighting Studio           6.00    6.00    A   3.75    22.50
Session Totals:                         6.00    6.00        3.750   22.50
              Honor Roll
```

Rebekah Ann Norton                    07/05/2001
████████ ████

Rebekah Ann Norton          ████████    ████████    BA
                                                    Professional PhotCOM/ADV


```
Session 155  09/05/2000 - 10/20/2000
PHO203       Advanced Photography      6.00    6.00    A- 3.75   22.50
Session Totals:                        6.00    6.00       3.750  22.50
             Honor Roll

Session 156  11/06/2000 - 12/22/2000
PSY285       Psychology of Mass Comm   3.00    3.00    A  4.00   12.00
DIM253       Digital Imaging           6.00    6.00    A- 3.90   23.40
Session Totals:                        9.00    9.00       3.933  35.40
             Honor Roll

Session 157  01/08/2001 - 02/23/2001
PHO231       Color Printing Methods    6.00    6.00    A- 3.73   22.38
BUS282       Basic Business            3.00    3.00    A  4.00   12.00
Session Totals:                        9.00    9.00       3.820  34.38
             Honor Roll

Session 158  03/05/2001 - 04/20/2001
SPE283       Speech                    3.00    3.00    A- 3.85   11.55
POR241      ·Professional Portrait F   6.00    6.00    B  3.00   18.00
Session Totals:                        9.00    9.00       3.283  29.55

Session 159  05/07/2001 - 06/22/2001
MPV161       Video Production          6.00    6.00    A- 3.80   22.20
FIN382       Finance                   3.00    3.00    A  4.00   12.00
Session Totals:                        9.00    9.00       3.800  34.20
             Honor Roll

Session 160  07/16/2001 - 08/31/2001
ADV311       Commercial Photo 1        6.00    0.00                0.00
Session Totals:                        0.00    0.00                0.00
```
--------------------------------------------------------------------------------
```
        cGPA: 3.619  Credit Earned: 111.00   Quality Points: 336.54
Status: ** Active
```

----------NO ENTRIES BELOW THIS LINE ---------------


Rebekah Ann Norton                    07/05/2001
████████  ██

Rebekah Ann Norton ███████ ███████ BA       COM/ADV
Professional Phot& POR

```
Session 163   01/07/2002 - 02/22/2002
MRK284        Marketing              3.00      3.00    A  4.00    12.00
POR299        Beyond Portraiture     6.00      6.00    A  4.00    24.00
Session Totals:                      9.00      9.00       4.000   36.00
              Honor Roll

Session 164   03/04/2002 - 04/19/2002
POR242        Intermediate/Advanced P  6.00    6.00    A- 3.70    22.20
Session Totals:                      6.00      6.00       3.700   22.20

Session 165   05/06/2002 - 06/21/2002
ADV313        Advanced Advertising 1   6.00    6.00    A  4.00    24.00
Session Totals:                      6.00      6.00       4.000   24.00
              Honor Roll

Session 166   07/15/2002 - 08/30/2002
ADT492        Advanced Topics          6.00    6.00    A  4.00    24.00
Session Totals:                      6.00      6.00       4.000   24.00
              Honor Roll
```

---

cGPA: 3.649  Credit Earned: 159.00    Quality Points: 514.44
Status: ** Graduated 08/30/2002

---------NO ENTRIES BELOW THIS LINE --------------


Rebekah Ann Norton                09/17/2002

# Employment Information

Name _REBEKAH NORTON_ Graduation Date _AUG 02_

Major _COMM / DOR_

Company Name _SAMYS_ Department _____

Street _910 E. HALEY_

City _SANTA BARBARA_ State _CA_ ZIP _93001_

Telephone _963-7269_ E-Mail _____

Your Title _~~cust~~ CAB Mgr_ Start Date _4-1-02_ Annual Salary _27,600_

Basic Duties _Cust service / film Sales_

Supervisor Name/Title _JUSTIN WHEELER_

---

### Career Services use only

Verification _D_ Date _9-2-02_

Comments _____

# Career Planning Exit Interview

Name: __Norton, Rebekah Ann S.__   Graduation Date __08__ __02__
       Last      First      Middle Initial                    Month   Year

Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         Street          City        State        Zip Code

Phone: (▮▮▮)▮▮▮▮▮▮   Fax: N/A      Email: ▮▮▮▮▮▮▮▮▮

Alternate Contact Name: __N/A__                Phone: _____
                        Last       First

Alternate Contact Address: _____
                           Street      City        State      Zip Code

I understand that Career Services is not solely responsible for my future employment after graduation
and I must actively seek employment in order to be properly assisted by them.

Current Employer: __Samy's Camera__   Supervisor: __Justin Wheeler__

Address: __910 E. Haley, Santa Barbara, CA__ __93001__
         Street          City          State        Zip Code

Your Job Title: __Film Sales__   Employer's Phone __(805)963-7269__   Start Date: __12-00__

Do you have benefits at current employer? Yes __X__   No _____

After graduation I am planning to:
Stay at current employer _____
Actively seek new employment __X__

Current salary range (check one):
Less than $15,000 _____

| | | | |
|---|---|---|---|
| $15,000 - $18,000 _____ | $27,000 - $30,000 _____ | $38,000 - $41,000 _____ | $50,000 - $53,000 _____ |
| $18,000 - $21,000 _____ | $30,000 - $33,000 _____ | $41,000 - $44,000 _____ | $53,000 - $56,000 _____ |
| $21,000 - $24,000 __X__ | $33,000 - $35,000 _____ | $44,000 - $47,000 _____ | $56,000 - $59,000 _____ |
| $24,000 - $27,000 _____ | $35,000 - $38,000 _____ | $47,000 - $50,000 _____ | $59,000 - $62,000 _____ |
| | | | Greater than $62,000 _____ |

If you are not currently employed, list the specific job you would like and the location you wish to work: __Los Angeles__
__area ... assisting in commercial/celebrity__ (editorial too)
__photographer__   Salary desired: __$35,000__ /yr
                   (negotiable ... I'm starving!)

Career Services Use Only
Initial: _____   Date: _____

## The Student Right-to-Know and Campus Security Act

*The Student Right-to-Know and Campus Security Act requires institutions to disclose the following information to all students and potential students.* (In accordance with CEC 94312(h)(8), 94312(I)(1), (3) regulations)

### Campus Security Policy and Procedures

Our policy is to provide a safe, comfortable environment for both students and employees.

There are three separate campuses comprising Brooks Institute of Photography. Each has separate security procedures based on campus activities as well as blanket procedures for the whole school.

There are no on-campus living quarters for students at Brooks Institute of Photography. Therefore, all security procedures are designed for work, study and classroom facilities only.

All campuses are closed to students and employees by 12:00 a.m. each evening, (exceptions are made through the campus administrator's office under special circumstances). Guidelines and campus passes for use of specific areas are available from department heads or the campus administrator.

All parking lots, entrances, and hallways are provided with adequate lighting systems. Many lights are automatic, motion sensitive light systems. All exterior lab, office and classroom doors are equipped with locks. Some areas have electronic keypad access. Some areas of the Jefferson Campus are covered by video surveillance cameras. Gated access is provided on the Montecito and Jefferson campuses. All crimes, incidents, and emergencies are reported in writing to the campus administrator and other appropriate administrators through the *Emergency and Crime Information Report.*

Procedures for dealing with students and employees convicted of crimes are covered in the school catalog and employee's handbook respectively. Victims of crimes are referred to the school counselor for consultation and referral as necessary.

### Campus Crime Report

The incident of crime on Brooks Institute of Photography campuses has traditionally been very low. The following statistics have been reported between July 1997 and May 1998:

- Three reports of petty theft
- One report of a hit and run accident involving a motor vehicle.

### Completion Rates - Bachelor of Arts program

For the period beginning January 10, 1994 and ending December 16, 1994 a total of 139 students enrolled in the introductory photography class, Fundamentals of Photography (101). (Students enrolled as Pre-Grads, or Special Status are not included in this data.) Of these 139 students, 64 (46%) completed the program and graduated between January and December 1997; 4 (3%) are still attending.

A student may complete the B.A. program in 3 years with the necessary prerequisites, however, students may take up to 4.5 years to complete the B.A. program.

### Completion Rates - Diploma program

For the period beginning January 10, 1994 and ending December 16, 1994 a total of 19 students enrolled in the introductory photography class, Fundamentals of Photography (101). (Students enrolled as Pre-Grads or Special Status are not included in this data).

Of these 19 students, 7 (37%) completed the program and graduated between January and December 1997.

A student may complete the Diploma program in 3 years with the necessary prerequisites, however, students may take up to 4.2 years to complete the Diploma program.

### Completion Rates - Graduate program

A total of 7 students entered the Graduate program in January and September 1994. Of these 7, 3 students (43%) graduated between January and December 1997; 4 students (57%) have completed all course work and are continuing work on their thesis or project.

The Graduate program is designed to be completed in three years; one year to complete course work and two years to complete the thesis/ project. However, a student may take up to 4.5 years to complete the program.

### Employment Outlook

A survey of graduates from the academic year 1997/1998 has shown the following: of the 44 graduates from the Bachelor of Arts degree program eligible to work in the United States, 38 (87%) were employed in their field; of the 7 graduates from the Diploma program eligible to work in the United States, 5 (72%) were employed in their field; and of the 7 graduates from the Graduate program eligible to work in the United States, 6 (86%) were employed in their field.

# Brooks Institute Alumni Association

As students progress through their program of study, they will come to recognize the many contributions which alumni make to their education, and to the general welfare of the Institute. Many alumni contribute their time and talents to appear on campus for seminars, lectures, and programs which are part of the educational program. Alumni are continually publicizing Brooks Institute, hiring graduates and advising on matters of curriculum and expectations in the profession. Nearly all are acting ambassadors of the Institute and are instrumental in encouraging prospective students to obtain the finest professional education possible at this Institute.

Alumni of Brooks Institute may be found all over the world successfully engaged in rewarding careers. The goals of the Alumni Association are to give service and to promote the general welfare of the profession.

# Tuition and Expenses - Undergraduate

## Tuition

Undergraduate tuition at Brooks Institute is based on a fifteen week trimester consisting of two seven-week sessions and one transition week. A student is permitted to take 12 to 18 credits per trimester. Tuition is currently $2500.00 plus a non-refundable $75.00 lab fee, per each seven week session. (See *Tuition Addendum for updated tuition information or contact the Admissions Office. Availability of financial aid may be determined by contacting the Financial Aid Office.*) Tuition payment is required at time of registration.

All entering students must pay their first trimester's tuition of $5000.00 plus non-refundable lab fees of $150.00. The tuition due date for all incoming new students is thirty days prior to the start of class. Any funds placed on a student's account are accepted for tuition/lab fee purposes only; credit balances on account are not permitted. All financial aid check(s) received will first be applied to any outstanding tuition.

Payment programs on a per session or annual basis may be arranged with the Accounting Office. These plans are sponsored by Brooks Institute of Photography. Failure to meet the terms of these plans will result in a non-registered status.

Tuition per session is the same for the degree and diploma programs, however, a few specialized courses do require nominal additional fees. After the initial registration, tuition and lab fees cover the full cost of registration and instruction in the Institute's resident programs.

Tuition is required at the time of registration (see *Calendar of Events for Registration dates, page 30*). Grant or loan checks cannot be released until students have actually started classes, or before the first day of the loan period. *Students should not depend solely on grant or loan checks for tuition*

*payments, especially the first trimester's tuition, which is required 30 days prior to the entrance date.*

The Institute reserves the right to make changes in its regulations, tuition, lab fees, and course offerings. Any change in tuition/fees will be announced at least 30 days prior to effect.

## Equipment and Supplies

Used equipment packages start from about $1,500. Used equipment can usually be purchased from the graduating students. New equipment packages start from about $2,800. Supply lists are provided by each instructor at the beginning of each course. A supply list for the first course is available upon request from the Admissions Office. While supplies average about $500 per month, the amount varies with course requirements and individual student use.

The following is a general list of equipment required for both Still Photography and Motion Picture majors enrolled in the first photographic course (Fundamentals of Photography 101), unless otherwise indicated:

- 35mm manually adjustable camera with interchangeable lens capability
- Tripod sufficient to support 4x5 camera (Motion Picture students need to support 35mm camera)
- Incident light meter
- Cable release (minimum length 20")
- Magnifier 4x or 8x
- Dial thermometer (type that can be recalibrated)
- Three graduated cylinders (size dependent on tank capacity)
- One graduated cylinder (1-2 ounces and also calibrated in millimeters)

- One 16 ounce invertible stainless steel film processing tank
- Two 35mm stainless steel processing reels

The following items are required for Still majors *but not required for Motion Picture majors*:

- 4x5 studio view camera and case
- 210mm lens with lens board to fit 4x5 camera
- Polaroid back for 4x5 camera
- 4x5 sheet film holders (minimum 6)
- Film holder cleaning brush
- Focusing cloth for 4x5 camera

The following items are required for Motion Picture and Digital Media majors *but not required for other still majors*:

- 16mm, 1200' split reels (minimum 2)
- 16mm film splicer for work print

21

# Undergraduate Academic Calendar

## Entrance Dates

Each trimester is composed of two seven-week sessions with a transition week between each session. During transition week, students are given an assignment to be completed by the first day of their next class. There is usually a three or four week break in mid-summer, and two or three weeks in the winter as indicated.

Students may enter the Institute six times per year on the entry dates shown below, with a few exceptions. Motion Picture/Video majors should enter in January, April, and September, and some upper division courses are not offered every session.



# Undergraduate Curriculum

Brooks Institute operates on a trimester basis and offers a three-year program leading to a Bachelor of Arts Degree in Professional Photography. Students may take up to four and one-half years to complete the program. The carefully structured curriculum has been developed to be responsive to the expanding needs of the photographic and motion picture industry. A continuous dialog with Brooks' alumni and other successful professionals provides valuable information concerning current trends and potential future developments within the broad spectrum of photographic/filmmaking careers.

The first half of the program, Lower Division, consists of training considered to be the foundation of career specialization. Fundamental photography and general education courses are taken concurrently to broaden the overall development of the individual, and direction is offered for the eventual selection of a photographic/filmmaking major.

The Upper Division of the program focuses attention on the student's selected major and specific career objectives. Career-oriented photographic/filmmaking courses are complemented by a variety of business courses to complete the framework for a successful career in photography or film.

In addition to the Bachelor of Arts Program, a three-year Diploma Program is offered. Both Programs are available to international students depending on their qualifications. A Master of Science Degree in Professional Photography is also offered (see Graduate Program, page 23).

4

## Facilities and Services

Facilities include classrooms, studios, laboratories, library, and galleries for student and professional exhibits.

Each of the school's three campuses is fully equipped with a wide variety of photographic equipment and facilities. The audio-visual, motion picture and video departments have complete editing, sound recording, and ancillary facilities. The still photography labs have a total of seventy-one cubicles for enlarging black and white photographs, and twenty-five enlargers and printers for color. Studios, with a total coverage of over 8,000 square feet, are equipped with tungsten and / or electronic light sources. They can accommodate approximately twenty set-ups at any given time. Still and motion picture check-out facilities provide equipment for on and off campus use by students.

The largest studio facility is a modern working environment which enables upper division students to work in a commercial studio or stage, suitable for large-set photography. Our digital imaging laboratory incorporates Power Macintosh and Pentium computers networked to a variety of scanners and printers. CD's and photographic quality prints can be produced for class assignments and projects. Multimedia and animation represents an area of rapid growth and exciting software applications. Computer labs are also available for writing and business applications, as well as Web browsing and video digital post-production.

## Library

Brooks Institute has an excellent library geared toward photographic education. It contains approximately 7000 books and 35,000 journals and technical publications. Current photographic journals, not otherwise indexed, are indexed at the library for the benefit of the students. In addition to photography, the library includes material on advertising, art, business management, marketing, digital imaging and graphics pertaining to photography.

While this facility is primarily for Brooks Institute students, (only enrolled students may borrow) the public is welcome to use its resources for research. Visuals are continually being added. The library is open Monday through Friday and specific Saturdays when the Institute is in session.

## Galleries

Brooks Institute's galleries reflect the diversity of the photographic medium. Exhibits rotate regularly featuring student, alumni and faculty work, internationally known professional photographers and research studies.

## Photographic Competitions

Students are encouraged to enter photographic competitions held throughout the country. Brooks' students have an excellent record in competitions, including those held by the Professional Photographers of America, Hasselblad, Kodak, American Photo, AMI, CPOY, regional photographic associations, magazines, and the Santa Barbara community.

## Advisement Requirements & Counseling

Initial information about the curriculum and the Institute's policies is provided by the Admissions Office Staff.

Faculty serve as program advisors to students about photographic studies and career opportunities. Students are assigned a faculty advisor during their first year of study. Students are required to meet with their assigned faculty advisor prior to programming a major course of study.

The Counselor is available for consultation about personal growth and academic concerns.

## Insurance

It is recommended that students insure all photographic equipment either before or upon arrival in Santa Barbara. Verification of adequate coverage, with an insurance agent, is also recommended.

An insured automobile is necessary for travel to and between campuses, and for transporting equipment to assignment locations. The State of California requires registration of automobiles and adequate vehicle insurance. Proof of insurance must be carried in the vehicle. Vehicles must be registered with the state when a person has resided here for 20 days. This law applies to students and to parents who provide vehicles for students attending schools in California. Upon arrival in Santa Barbara, students should contact the Department of Motor Vehicles for current information. Students are required to have a valid California Driver's License. International students must apply for a social security number first. Applications may be obtained from the Admissions Office. Processing takes about two weeks.

The Institute makes no provisions for medical insurance for its students.

## Housing

Brooks Institute has no on-campus housing. The Student Services Office maintains housing lists of current vacancies to assist students after they arrive. Furnished rooms, with kitchen privileges, start at approximately $400 per month. Studio apartments start at $550, while one-bedroom apartments start at about $650. Shared rental is usually about $400 per month. Two bedroom apartments start at about $800. Applicants should arrive at least two weeks before their starting date to find housing.

Applicants should also plan for additional living costs and personal expenses.

## Meal Service

Refreshments and snacks can be obtained on each campus. The Institute has no provisions for serving complete meals.

## Parking

Student parking is provided at all three campuses and there is no registration or fee required. We encourage car pooling to improve local air quality and conserve fuel.

## Disabled Students

Brooks Institute of Photography reviews applicants with learning and / or psychological challenges on a case by case basis. It is in this

32

# Brooks Institute of Photography

A World Leader in Professional Photographic Education.

## WELCOME TO
## BROOKS INSTITUTE OF PHOTOGRAPHY

Congratulations on your acceptance to Brooks Institute!

We are sure that you have many questions about making the move to Santa Barbara. Relocating is not always easy, so we would like to provide some information that should help to make your transition into student life here as smooth as possible.

The campuses of Brooks Institute are located some distance apart, and students attend classes in more than one location. Some of your photographic/film assignments may require you to travel out of town. Furthermore, you will need to transport your equipment to campus and to assignment locations. A car is essential. If you are planning to purchase a car here in Santa Barbara, be sure to allow enough time to complete the transaction before your first day of class. If you are from out of state, check with the Department of Motor Vehicles about registering your car. The local number is 805-963-9741. We also suggest that you check with your insurance company about car and photographic equipment insurance.

Our housing office maintains a file of current vacancies in the area. These listings may be sent to you, upon request only. They are also available to you at the Montecito campus when you arrive to register for classes. The following will give you an idea of typical costs: A room in a private home with kitchen privileges will start around $500 and a One-bedroom apartment at about $800. A Two-bedroom apartment will begin at approximately $1200. Allow yourself at least three to four weeks to find housing and get settled. If you do not have family or friends in the area, you may wish to make reservations with a motel on our list.

801 Alston Road · Santa Barbara · California 93108 · (805) 966-3888 · FAX (805) 564-1475
website: http://www.brooks.edu · e-mail: brooks@brooks.edu

BROOKS INSTITUTE OF PHOTOGRAPHY
801 Alston Rd
Santa Barbara, CA 93108

FINANCIAL AID AWARD LETTER FOR 1999-00
09/15/99

We are pleased to offer, subject to the terms and conditions described in this letter, the following financial
assistance for the 99-00 Award Year.

REBEKAH A COHO                                                                              SSN: ███████

| TYPE | PROGRAM | AMOUNT |
|------|---------|--------|
| Grants: | Federal Pell: | $ 2,675 |
| | FSEOG: | 500 |
| Loans: | FFEL Sub: | 2,625 |
| | FFEL Unsub: | 4,000 |
| Other: | GRANT: | 11,775 |
| | Total All Programs: | $ 21,575 |

| FEDERAL PELL | | | FSEOG | | | FEDERAL PERKINS | | |
|--------------|--------|-----------|--------|--------|-----------|--------|--------|-----------|
| PERIOD | AMOUNT | DISB DATE | PERIOD | AMOUNT | DISB DATE | PERIOD | AMOUNT | DISB DATE |
| 1st Payment | $ 668.00 | 09/07/99 | 1st Payment | $ 125.00 | 09/07/99 | | | |
| 2nd Payment | $ 669.00 | 11/01/99 | 2nd Payment | $ 125.00 | 11/01/99 | | | |
| 3rd Payment | $ 669.00 | 01/10/00 | 3rd Payment | $ 125.00 | 01/10/00 | | | |
| 4th Payment | $ 669.00 | 03/06/00 | 4th Payment | $ 125.00 | 03/06/00 | | | |

COMMENTS:

Form 5142                                        - 1 -

# California Aid Report (CAR)
# Cal Grant Programs



The California Student Aid Commission is pleased to make this offer of Cal Grant assistance to you. Please read all of the information provided and follow the instructions both on this report and in the enclosed New Recipient Cal Grant Reference Manual.

| | | | |
|---|---|---|---|
| REBEKAH A COHO | Date | | 7/15/99 |
| | Grant ID number | | |
| | Social Security number | | |
| | Academic year | | 1999-00 |
| | GPA | | 3.63 |

## Eligibility Information

| School choice | Cal Grant A | Cal Grant B | Cal Grant C |
|---|---|---|---|
| BROOKS INSTITUTE | $14,130 | SEE CODE #10 | SEE CODE #74 |
| | | | |
| | | | |

- **Award Information** --The data provided above is a best estimate of the Cal Grant you may receive based on current state funding. Availability of funding is subject to change. You are responsible for reading your New Recipient Cal Grant Reference Manual.

- **Information Change/Correction** -- If the school you plan to attend is not the first school listed above, you must inform the Commission. If the school is not listed, submit this CAR to the Financial Aid Office and notify the Commission by completing and returning the enclosed Recipient Change Form.

- **Non-Award Definitions** --These can be found in the enclosed New Recipient Cal Grant Reference Manual.

- **Cal Grant Status** -- Enrollment of at least half-time is required to retain your grant. If you do not meet this requirement, contact the Commission and request a Leave of Absence.

- **Community College (CC) Reserve Grant** -- If the Cal Grant A above is a CC Reserve award, your award will be held in reserve for up to two years until you attend a four-year/private two-year school. See page 6 of the manual under CC Reserve for more information.

- **Cal Grant B Community College (CC) Grant** -- If the Cal Grant B designated above is a CC Grant, it will not be possible for you to use your grant at a four-year/private two-year school during the above academic year. If you attend a four-year/private two-year school at any time during the above academic year, you must notify the Commission. Your award will be held for you until the following academic year.

- **Cal Grant B Award Recipients** -- Students who have already completed more than one full-time semester, two full-time quarters, 4 1/2 months at a vocational/technical college or more than 16 part-time college units prior to the June 30th preceding the award year are not eligible for award activation. If you have completed more than these amounts, you must notify the Commission on the enclosed Recipient Change Form.

- **Eligibility** -- The school which you attend is required to confirm your continued eligibility prior to payment of this award.

- **Information Disclosure** -- Information for students eighteen (18) years of age or older will not be released to parents without written authorization.

- **Indefault** -- If the Default Status box is marked below, information received from the United States Department of Education indicates you are in default on a student loan or owe a refund on an educational grant. Your school must certify that you have made satisfactory repayment arrangements prior to your receipt of Cal Grant funds.

## School Use Only

| | Commission records | | Commission records |
|---|---|---|---|
| Education level; Verify [X] Yes | 2 | Remaining Cal Grant eligibility | 300.00 % |
| Housing status | OFF CAMPUS | Dependency status | INDEPENDENT |
| Family contribution | $ 427 | Default Status | |

L9973017/15/99556490548      PAGE 1 OF 2

G-16 (3/99) SACARG

# Brooks Institute of Photography

A World Leader in Professional Photographic Education

April 24, 2003

Rebekah Ann Norton

███████████

Dear Rebekah:

During a routine reconciliation of our accounts on April 22, 2003 we discovered an administrative error on our part relating to your account at Brooks Institute. On September 17, 2002 we applied by mistake to your account $2,355.00 in Cal Grant funds you were not eligible for (because it was after you had already graduated). We have now refunded those funds from your account to correct the mistake. The correction of our error means that you now have an outstanding balance on your account in the amount of $2,355.00. You can make arrangements with the Student Accounts Office to pay this balance by calling (888) 304-3456, ext. 7605. Please contact the Financial Aid Office at (888) 304-3456, ext. 7631 if you have any questions regarding this matter. We truly apologize for any inconvenience this may cause.

Sincerely,

Stacey Eymann
Assistant Director of Financial Aid
Brooks Institute of Photography

Registration Form and Enrollment Agreement

### Entering Session: **September 1999**

Student Name: Rebekah Norton  ID # ██████

Address ████████  Telephone (█ █ █) ████████

[X] Bachelor of Arts     [ ] Diploma     [ ] Pre-Graduate

[ ] Graduate (MS)     [ ] Special Status

| New Course(s) | Tuition & Fees | Length of Term |
|---|---|---|
| Fundamentals of Photo B<br>Design B | $2500 | September 7, 1999 to October 22, 1999 |
| Basic Photo<br>General Education Course | $2500 | November 1, 1999 to December 17, 1999 |
| Lab Fees | $150 | *Non-refundable* |
| Total Paid | $2575 | 8/5/99 |

If you fail to attend the above New Course(s) for which you have registered, you will receive a WF for each course. "Tuition and Fees" represents the total amount for all fees, charges and services the student is obligated to pay for the new course(s) of instruction. "New Course(s)"; the name, description and number of hours required to complete the New Course(s) indicated above are set forth in the Institute's current catalog, which is incorporated herein by reference.

Verify all information on this sheet. If any information is incorrect, or if you wish to change your schedule, you must see the Registrar, if after the term has commenced, and the Admissions Office if prior to the start of class.

Buyer's Right to Cancel: The student has the right to cancel this enrollment agreement and obtain a refund in accordance with Brooks Institute's Refund Policy by giving written notice to the Registrar's Office - Jefferson Campus, 1321 Alameda Padre Serra, Santa Barbara Ca 93103.

This agreement is a legally binding instrument when signed by the student and accepted by the school. The Consent and Release and Refund Policy form is incorporated herein and made a part of this Agreement by this reference. A copy of this agreement may be obtained upon request to the Registrar's Office. **Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau for Private Postsecondary & Vocational Education. 1027 10th St. 4th Flr. Sacramento CA 93814, (916) 445-3427.**

**My signature below certifies that I have read, understood, and agreed to my rights and responsibilities, and that the institute's cancellation and refund policies have been clearly explained to me.**

Student Signature     Date 8/27/99

Admissions Authorization Signature     Date 8/27/99

## Student Enrollment Agreement

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)

Montecito Facility - 801 Alston Road, Santa Barbara, CA  93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA  93103
Media Center - 1722 State Street, Santa Barbara, CA  93101
(805) 966-3888/(888) 304-3456

Rebekah Ann S. Norton

Student's Name (the Student) _____ Student's Social Security Number _____ State ___ Zip Code ___

Date of Birth (Month, Date, Year) _____  Country of Citizenship  USA

**EDUCATIONAL OBJECTIVE:**

[X] Bachelor of Arts Degree Program   [ ] Diploma Program   [ ] Other _____

18 Sessions/ 153 Semester Credits   _____ Sessions/_____ Semester Credits   _____ Session(s)/_____ Semester Credits

Program Start Date  Sept. 6, 1999   Scheduled Completion Date  August 30, 2002

**SCOPE OF THIS AGREEMENT:**

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of 6 (six) Session(s) beginning on 3-6-00 and ending on 2-23-01

**TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:**

|  | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 | Registration Fee Non-refundable | Academic Year NA |
|---|---|---|---|---|---|---|---|---|
| TUITION | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |  |  |
| LAB FEES non-refundable | $85 | $85 | $85 | $85 | $85 | $85 |  |  |
| TOTAL DUE | $2,585 | $2,585 | $2,585 | $2,585 | $2,585 | $2,585 | $15,510 |  |
| Payment Due Date | 2-18-00 | 4-14-00 | 6-9-00 | 8-18-99 | 10-13-00 | 12-15-00 |  |  |

THE STUDENT IS RESPONSIBLE FOR THIS AMOUNT →  BALANCE DUE  $15,510

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

Signature of Student _____ Date  1-28-00

Signature of Institutional Representative _____ Date  1.28.00

Signature of Parent/Guardian (required only for minor applicants) _____ Date

Any questions or problems concerning this school which have not been satisfactorily answered or resolved
by the school should be directed to the Bureau for Private Postsecondary and Vocational Education,
1027 10th Street, 4th Floor, Sacramento, CA  95814.  (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN IT IS SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

ACCEPTED BY: _____ Date  1.28.00   Student's Brooks ID  20238

Signature of Authorized Institutional Official

## Student Enrollment Agreement

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)
Montecito Facility - 801 Alston Road, Santa Barbara, CA 93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA 93103
Media Center - 1722 State Street, Santa Barbara, CA 93101
(805) 966-3888/(888) 304-3456

Rebekah Ann Norton
Student's Name (the Student)

St.
Student's Mailing Address | City | State | Zip Code

USA
Date of Birth (Month, Date, Year) | Country of Citizenship

EDUCATIONAL OBJECTIVE:

[X] Bachelor of Arts Degree Program    [ ] Diploma Program    [ ] Other _____

_____ Sessions/_____ Semester Credits    _____ Sessions/_____ Semester Credits    _____ Session(s)/_____ Semester Credits

Program Start Date _____    Scheduled Completion Date _____

SCOPE OF THIS AGREEMENT:

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of _____ Session(s) beginning on _____ and ending on _____

TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:

| | 158 | 159 | 160 | 161 | 142 | 163 Registration Fee Non-refundable | Academic Year N/A |
|---|---|---|---|---|---|---|---|
| | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 | |
| TUITION | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 | |
| ACTIVITY FEE non-refundable | 85.00 | 85.00 | 100.00 | 100.00 | 100.00 | 100.00 | |
| TOTAL DUE | 2,710.00 | 2,710.00 | 2,725.00 | 2,725.00 | 2,725.00 | 2,725.00 | 16,320.00 |
| Payment Due Date | 2·16·01 | 4·13·01 | 6·15·01 | 8·24·01 | 10·19·01 | 12·13·01 | |

THE STUDENT IS RESPONSIBLE FOR THIS AMOUNT →    BALANCE DUE    16,320.00

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

_____ Signature of Student    Date 2/12/01

_____ Signature of Institutional Representative    Date 2-12-01

_____ Signature of Parent/Guardian (required only for minor applicants)    Date

Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau for Private Postsecondary and Vocational Education, 1027 10th Street, 4th Floor, Sacramento, CA 95814. (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN IT IS SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

ACCEPTED BY: _____    2-12-01    # 20238
Signature of Authorized Institutional Official    Date    Student's Brooks ID

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)
Montecito Facility - 801 Alston Road, Santa Barbara, CA 93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA 93103
State Street Facility - 1722 State Street, Santa Barbara, CA 93101
Ventura Facility – 5301 N. Ventura Blvd., Ventura CA 93001
(805) 966-3888/(888) 304-3456

| Rebekah Ann Norton | | |
|---|---|---|
| Student's Name (the Student) | Student's Social Security Number | Student's Home Phone |

| | | | | | |
|---|---|---|---|---|---|
| Student's Mailing | City | State | Country | Zip Code |

Date of Birth (Month, Date, Year)   Country of Citizenship: USA

EDUCATIONAL OBJECTIVE BEGINNING _9/7/99_

☒ Bachelor of Arts Degree Program (18 Session/159 Semester Credits)
  ___ Film and Video Production
  X Professional Photography
  ___ Visual Journalism

☐ Associate of Arts Degree Program (8 Sessions/72 Semester Credits)
  ___ Visual Journalism

☐ Diploma Program (17 Sessoins/108 Semester Credits)
  ___ Film and Video Production
  ___ Professional Photography

☐ Pre-Grad Studies (in preparation for the MS Degree)
  _____ Sessions/_____ Semester Credits

SCOPE OF THIS AGREEMENT:

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of _4_ Session(s) beginning on _3/4/02_ and ending on _10/25/02_

TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:

| | | | | | | | Academic Year |
|---|---|---|---|---|---|---|---|
| | | | | | Application Fee | | $ |
| | | | | | Registration Fee non-refundable | | $ |

| | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 | |
|---|---|---|---|---|---|---|---|
| TUITION | $2,755 | $2,755 | $2,755 | $2,755 | $2,755 | $2,755 | |
| ACTIVITY FEES Non-refundable | $100 | $100 | $100 | $100 | $100 | $100 | |
| TOTAL | $2,855 | $2,855 | $2,855 | $2,855 | $2,855 | $2,855 | $17,130.00 |
| Payment Due Date | 2-15-02 | 4-12-02 | 6-14-02 | 8-23-02 | 10-18-02 | 12-13-02 | |

Annual Tuition and Fees

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

| _(signature)_ | 2/4/02 | | |
|---|---|---|---|
| Signature of Student | Date | Signature of Parent/Guardian (Required only for minor applicants) | Date |

| _(signature)_ | 2/4/02 |
|---|---|
| Signature of Institutional Representative | Date |

Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau for Private Postsecondary and Vocational Education, 400 R Street, Suite 500, Sacramento, CA 95814. (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

| ACCEPTED BY: _(signature)_ | 2/4/02 | 20238 |
|---|---|---|
| Signature of Authorized Institutional Official | Date | Student's Brooks ID |



**FinAid!**

Site Map   About FinAid

The Smart Student Guide
to **Financial Aid**



**⦿ Loans**

**❸ Scholarships**

**✪ Military Aid**

Other Types of Aid

Financial Aid Applications

Answering Your Questions

Calculators

Beyond Financial Aid



**SEARCH**

## Loan Payments Calculator

| | |
|---|---|
| Loan Balance: | $40,375.00 |
| Loan Interest Rate: | 8.25% |
| Loan Term: | 10 years |
| Minimum Payment: | $50.00 |
| **Monthly Loan Payment:** | **$495.21** |
| Number of Payments: | 120 |
| Cumulative Payments: | $59,425.20 |
| Total Interest Paid: | $19,050.20 |

*Note: The monthly loan payment was calculated at 119 payments of $495.21 plus a final payment of $495.21 .*

It is estimated that you will need an annual salary of at least $59,425.20 to be able to afford to repay this loan. This estimate assumes that 10% of your gross monthly income will devoted to repaying your student loans. If you use 15% of your gross monthly income to repay the loan, you will need an annual salary of only $39,616.80 , but you may experience some financial difficulty.

These results assume that the student is paying the interest charges on any unsubsidized loans and is not capitalizing the interest while in school. If the student is capitalizing the interest, the cumulative payments and total interest charges will be higher than shown here.

---

### Payment Schedule

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 1 | $495.21 | $277.58 | $217.63 | $277.58 | $217.63 | $40,157.37 |
| 2 | $495.21 | $276.08 | $219.13 | $553.66 | $436.76 | $39,938.24 |
| 3 | $495.21 | $274.58 | $220.63 | $828.24 | $657.39 | $39,717.61 |
| 4 | $495.21 | $273.06 | $222.15 | $1,101.29 | $879.55 | $39,495.45 |
| 5 | $495.21 | $271.53 | $223.68 | $1,372.83 | $1,103.22 | $39,271.78 |
| 6 | $495.21 | $269.99 | $225.22 | $1,642.82 | $1,328.44 | $39,046.56 |
| 7 | $495.21 | $268.45 | $226.76 | $1,911.26 | $1,555.21 | $38,819.79 |
| 8 | $495.21 | $266.89 | $228.32 | $2,178.15 | $1,783.53 | $38,591.47 |
| 9 | $495.21 | $265.32 | $229.89 | $2,443.47 | $2,013.42 | $38,361.58 |
| 10 | $495.21 | $263.74 | $231.47 | $2,707.20 | $2,244.90 | $38,130.10 |
| 11 | $495.21 | $262.14 | $233.07 | $2,969.35 | $2,477.96 | $37,897.04 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 12 | $495.21 | $260.54 | $234.67 | $3,229.89 | $2,712.63 | $37,662.37 |
| 13 | $495.21 | $258.93 | $236.28 | $3,488.82 | $2,948.91 | $37,426.09 |
| 14 | $495.21 | $257.30 | $237.91 | $3,746.12 | $3,186.82 | $37,188.18 |
| 15 | $495.21 | $255.67 | $239.54 | $4,001.79 | $3,426.36 | $36,948.64 |
| 16 | $495.21 | $254.02 | $241.19 | $4,255.81 | $3,667.55 | $36,707.45 |
| 17 | $495.21 | $252.36 | $242.85 | $4,508.18 | $3,910.39 | $36,464.61 |
| 18 | $495.21 | $250.69 | $244.52 | $4,758.87 | $4,154.91 | $36,220.09 |
| 19 | $495.21 | $249.01 | $246.20 | $5,007.88 | $4,401.11 | $35,973.89 |
| 20 | $495.21 | $247.32 | $247.89 | $5,255.20 | $4,649.00 | $35,726.00 |
| **Payment Number** | **Payment** | **Interest** | **Principal** | **Cumulative Interest** | **Cumulative Principal** | **Remaining Balance** |
| 21 | $495.21 | $245.62 | $249.59 | $5,500.82 | $4,898.59 | $35,476.41 |
| 22 | $495.21 | $243.90 | $251.31 | $5,744.72 | $5,149.90 | $35,225.10 |
| 23 | $495.21 | $242.17 | $253.04 | $5,986.89 | $5,402.94 | $34,972.06 |
| 24 | $495.21 | $240.43 | $254.78 | $6,227.33 | $5,657.71 | $34,717.29 |
| 25 | $495.21 | $238.68 | $256.53 | $6,466.01 | $5,914.24 | $34,460.76 |
| 26 | $495.21 | $236.92 | $258.29 | $6,702.93 | $6,172.53 | $34,202.47 |
| 27 | $495.21 | $235.14 | $260.07 | $6,938.07 | $6,432.60 | $33,942.40 |
| 28 | $495.21 | $233.35 | $261.86 | $7,171.42 | $6,694.46 | $33,680.54 |
| 29 | $495.21 | $231.55 | $263.66 | $7,402.97 | $6,958.12 | $33,416.88 |
| 30 | $495.21 | $229.74 | $265.47 | $7,632.72 | $7,223.58 | $33,151.42 |
| 31 | $495.21 | $227.92 | $267.29 | $7,860.63 | $7,490.88 | $32,884.12 |
| 32 | $495.21 | $226.08 | $269.13 | $8,086.71 | $7,760.01 | $32,614.99 |
| 33 | $495.21 | $224.23 | $270.98 | $8,310.94 | $8,030.99 | $32,344.01 |
| 34 | $495.21 | $222.37 | $272.84 | $8,533.30 | $8,303.84 | $32,071.16 |
| 35 | $495.21 | $220.49 | $274.72 | $8,753.79 | $8,578.56 | $31,796.44 |
| 36 | $495.21 | $218.60 | $276.61 | $8,972.39 | $8,855.17 | $31,519.83 |
| 37 | $495.21 | $216.70 | $278.51 | $9,189.09 | $9,133.68 | $31,241.32 |
| 38 | $495.21 | $214.78 | $280.43 | $9,403.88 | $9,414.10 | $30,960.90 |
| 39 | $495.21 | $212.86 | $282.35 | $9,616.73 | $9,696.46 | $30,678.54 |
| 40 | $495.21 | $210.91 | $284.30 | $9,827.65 | $9,980.75 | $30,394.25 |
| **Payment Number** | **Payment** | **Interest** | **Principal** | **Cumulative Interest** | **Cumulative Principal** | **Remaining Balance** |
| 41 | $495.21 | $208.96 | $286.25 | $10,036.61 | $10,267.00 | $30,108.00 |
| 42 | $495.21 | $206.99 | $288.22 | $10,243.60 | $10,555.22 | $29,819.78 |
| 43 | $495.21 | $205.01 | $290.20 | $10,448.61 | $10,845.42 | $29,529.58 |
| 44 | $495.21 | $203.02 | $292.19 | $10,651.63 | $11,137.61 | $29,237.39 |
| 45 | $495.21 | $201.01 | $294.20 | $10,852.63 | $11,431.82 | $28,943.18 |
| 46 | $495.21 | $198.98 | $296.23 | $11,051.62 | $11,728.04 | $28,646.96 |
| 47 | $495.21 | $196.95 | $298.26 | $11,248.57 | $12,026.30 | $28,348.70 |
| 48 | $495.21 | $194.90 | $300.31 | $11,443.46 | $12,326.62 | $28,048.38 |
| 49 | $495.21 | $192.83 | $302.38 | $11,636.30 | $12,628.99 | $27,746.01 |
| 50 | $495.21 | $190.75 | $304.46 | $11,827.05 | $12,933.45 | $27,441.55 |
| 51 | $495.21 | $188.66 | $306.55 | $12,015.71 | $13,240.00 | $27,135.00 |
| 52 | $495.21 | $186.55 | $308.66 | $12,202.26 | $13,548.66 | $26,826.34 |
| 53 | $495.21 | $184.43 | $310.78 | $12,386.69 | $13,859.44 | $26,515.56 |
| 54 | $495.21 | $182.29 | $312.92 | $12,568.99 | $14,172.35 | $26,202.65 |
| 55 | $495.21 | $180.14 | $315.07 | $12,749.13 | $14,487.42 | $25,887.58 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 56 | $495.21 | $177.98 | $317.23 | $12,927.11 | $14,804.65 | $25,570.35 |
| 57 | $495.21 | $175.80 | $319.41 | $13,102.91 | $15,124.06 | $25,250.94 |
| 58 | $495.21 | $173.60 | $321.61 | $13,276.51 | $15,445.67 | $24,929.33 |
| 59 | $495.21 | $171.39 | $323.82 | $13,447.90 | $15,769.49 | $24,605.51 |
| 60 | $495.21 | $169.16 | $326.05 | $13,617.06 | $16,095.54 | $24,279.46 |
| **Payment Number** | **Payment** | **Interest** | **Principal** | **Cumulative Interest** | **Cumulative Principal** | **Remaining Balance** |
| 61 | $495.21 | $166.92 | $328.29 | $13,783.98 | $16,423.83 | $23,951.17 |
| 62 | $495.21 | $164.66 | $330.55 | $13,948.64 | $16,754.38 | $23,620.62 |
| 63 | $495.21 | $162.39 | $332.82 | $14,111.04 | $17,087.19 | $23,287.81 |
| 64 | $495.21 | $160.10 | $335.11 | $14,271.14 | $17,422.30 | $22,952.70 |
| 65 | $495.21 | $157.80 | $337.41 | $14,428.94 | $17,759.71 | $22,615.29 |
| 66 | $495.21 | $155.48 | $339.73 | $14,584.42 | $18,099.44 | $22,275.56 |
| 67 | $495.21 | $153.14 | $342.07 | $14,737.56 | $18,441.51 | $21,933.49 |
| 68 | $495.21 | $150.79 | $344.42 | $14,888.36 | $18,785.92 | $21,589.08 |
| 69 | $495.21 | $148.42 | $346.79 | $15,036.78 | $19,132.71 | $21,242.29 |
| 70 | $495.21 | $146.04 | $349.17 | $15,182.82 | $19,481.88 | $20,893.12 |
| 71 | $495.21 | $143.64 | $351.57 | $15,326.46 | $19,833.45 | $20,541.55 |
| 72 | $495.21 | $141.22 | $353.99 | $15,467.69 | $20,187.43 | $20,187.57 |
| 73 | $495.21 | $138.79 | $356.42 | $15,606.47 | $20,543.86 | $19,831.14 |
| 74 | $495.21 | $136.34 | $358.87 | $15,742.81 | $20,902.73 | $19,472.27 |
| 75 | $495.21 | $133.87 | $361.34 | $15,876.69 | $21,264.06 | $19,110.94 |
| 76 | $495.21 | $131.39 | $363.82 | $16,008.07 | $21,627.89 | $18,747.11 |
| 77 | $495.21 | $128.89 | $366.32 | $16,136.96 | $21,994.21 | $18,380.79 |
| 78 | $495.21 | $126.37 | $368.84 | $16,263.33 | $22,363.05 | $18,011.95 |
| 79 | $495.21 | $123.83 | $371.38 | $16,387.16 | $22,734.43 | $17,640.57 |
| 80 | $495.21 | $121.28 | $373.93 | $16,508.44 | $23,108.36 | $17,266.64 |
| **Payment Number** | **Payment** | **Interest** | **Principal** | **Cumulative Interest** | **Cumulative Principal** | **Remaining Balance** |
| 81 | $495.21 | $118.71 | $376.50 | $16,627.15 | $23,484.86 | $16,890.14 |
| 82 | $495.21 | $116.12 | $379.09 | $16,743.27 | $23,863.95 | $16,511.05 |
| 83 | $495.21 | $113.51 | $381.70 | $16,856.78 | $24,245.65 | $16,129.35 |
| 84 | $495.21 | $110.89 | $384.32 | $16,967.67 | $24,629.97 | $15,745.03 |
| 85 | $495.21 | $108.25 | $386.96 | $17,075.92 | $25,016.93 | $15,358.07 |
| 86 | $495.21 | $105.59 | $389.62 | $17,181.50 | $25,406.56 | $14,968.44 |
| 87 | $495.21 | $102.91 | $392.30 | $17,284.41 | $25,798.86 | $14,576.14 |
| 88 | $495.21 | $100.21 | $395.00 | $17,384.62 | $26,193.86 | $14,181.14 |
| 89 | $495.21 | $97.50 | $397.71 | $17,482.12 | $26,591.57 | $13,783.43 |
| 90 | $495.21 | $94.76 | $400.45 | $17,576.88 | $26,992.02 | $13,382.98 |
| 91 | $495.21 | $92.01 | $403.20 | $17,668.89 | $27,395.22 | $12,979.78 |
| 92 | $495.21 | $89.24 | $405.97 | $17,758.12 | $27,801.20 | $12,573.80 |
| 93 | $495.21 | $86.44 | $408.77 | $17,844.57 | $28,209.96 | $12,165.04 |
| 94 | $495.21 | $83.63 | $411.58 | $17,928.20 | $28,621.54 | $11,753.46 |
| 95 | $495.21 | $80.81 | $414.40 | $18,009.01 | $29,035.94 | $11,339.06 |
| 96 | $495.21 | $77.96 | $417.25 | $18,086.96 | $29,453.20 | $10,921.80 |
| 97 | $495.21 | $75.09 | $420.12 | $18,162.05 | $29,873.32 | $10,501.68 |
| 98 | $495.21 | $72.20 | $423.01 | $18,234.25 | $30,296.33 | $10,078.67 |
| 99 | $495.21 | $69.29 | $425.92 | $18,303.54 | $30,722.25 | $9,652.75 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 100 | $495.21 | $66.36 | $428.85 | $18,369.90 | $31,151.10 | $9,223.90 |
| 101 | $495.21 | $63.41 | $431.80 | $18,433.32 | $31,582.89 | $8,792.11 |
| 102 | $495.21 | $60.45 | $434.76 | $18,493.76 | $32,017.66 | $8,357.34 |
| 103 | $495.21 | $57.46 | $437.75 | $18,551.22 | $32,455.41 | $7,919.59 |
| 104 | $495.21 | $54.45 | $440.76 | $18,605.67 | $32,896.17 | $7,478.83 |
| 105 | $495.21 | $51.42 | $443.79 | $18,657.08 | $33,339.97 | $7,035.03 |
| 106 | $495.21 | $48.37 | $446.84 | $18,705.45 | $33,786.81 | $6,588.19 |
| 107 | $495.21 | $45.29 | $449.92 | $18,750.74 | $34,236.73 | $6,138.27 |
| 108 | $495.21 | $42.20 | $453.01 | $18,792.94 | $34,689.74 | $5,685.26 |
| 109 | $495.21 | $39.09 | $456.12 | $18,832.03 | $35,145.86 | $5,229.14 |
| 110 | $495.21 | $35.95 | $459.26 | $18,867.98 | $35,605.12 | $4,769.88 |
| 111 | $495.21 | $32.79 | $462.42 | $18,900.77 | $36,067.54 | $4,307.46 |
| 112 | $495.21 | $29.61 | $465.60 | $18,930.39 | $36,533.13 | $3,841.87 |
| 113 | $495.21 | $26.41 | $468.80 | $18,956.80 | $37,001.93 | $3,373.07 |
| 114 | $495.21 | $23.19 | $472.02 | $18,979.99 | $37,473.95 | $2,901.05 |
| 115 | $495.21 | $19.94 | $475.27 | $18,999.93 | $37,949.22 | $2,425.78 |
| 116 | $495.21 | $16.68 | $478.53 | $19,016.61 | $38,427.75 | $1,947.25 |
| 117 | $495.21 | $13.39 | $481.82 | $19,030.00 | $38,909.57 | $1,465.43 |
| 118 | $495.21 | $10.07 | $485.14 | $19,040.07 | $39,394.71 | $980.29 |
| 119 | $495.21 | $6.74 | $488.47 | $19,046.81 | $39,883.18 | $491.82 |
| 120 | $495.21 | $3.38 | $491.82 | $19,050.20 | $40,375.00 | $0.00 |

Loan Balance: 40375

Interest Rate: 8.25%

Loan Term (Years): 10

Minimum Payment: 50

Print payment schedule? ⦿ Yes ○ No

CALCULATE

Copyright ©2000 FinAid Page, LLC. All rights reserved.
Mark Kantrowitz, Publisher
www.FinAid.org

# WELLS FARGO

Education Financial Services
P.O. Box 5185
Sioux Falls, SD 57117-5185
Email: studentloans@wellsfargoefs.com
800-658-3567

**Account Statement**

03/12/2003

000627-00627-0500-4
REBEKAH A NORTON

**Account Number** 

Questions? Call us at 800-658-3567
Email: studentloans@wellsfargoefs.com

## Account Activity

**Last Payment Received**

Transaction Date

Applied to Principal

Applied to Interest

Applied to Fees

**Current Principal Balance** $42,520.62

## Current Payment Due

| | |
|---|---|
| **Due Date** | 04/01/2003 |
| Current Payment Amount | $431.71 |
| Amount Past Due | $0.00 |
| Late Fees | $0.00 |
| **Total Due** | $431.71 |

This statement is current as of the date above. If you recently sent a payment, we may not have credited it to your account when th' statement was printed.

Partial payments will not advance your due date. Full payments in excess of your monthly payment will advance your due date unl..ss you inform Wells Fargo Education Financial Services to do otherwise.

## News From Wells Fargo

Don't have Direct Deposit yet? Ask for it today and have more time for other important things. With Direct Deposit your check is automatically deposited into your account, saving you time by allowing you to avoid teller and ATM lines. And it's absolutely free. Ask for details on whether your regularly received checks may be direct deposited. Just stop by any branch, or call 1-800-869-3557.


REBEKAH A NORTON

## PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| Account Number | Due Date | Total Amount Due | Amount Enclosed |
|---|---|---|---|
| | 04/01/2003 | $431.71 | |

**Change of name, address, or telephone number?**

| Name | Telephone Number |
|---|---|
| Address | Apt. # |
| City | State | Zip Code |

☐ Please do not apply excess payment to advance my due date.

Please make check or money order payable to:
Wells Fargo Education Financial Services
P.O. Box 5151
Sioux Falls, SD 57117-5151

556490548999999000431710401031

1  Michael D. Braun (167416)
   Marc L. Godino (182689)
2  BRAUN LAW GROUP, P.C.
   12400 Wilshire Boulevard
3  Suite 920
   Los Angeles, CA 90025
4  Tel:    (310) 442-7755
   Fax:    (310) 442-7756
5
   Janet Lindner Spielberg (221926)
6  LAW OFFICES OF JANET LINDNER SPIELBERG
   12400 Wilshire Boulevard
7  Suite 400
   Los Angeles, California 90025
8  Tel:    (310) 392-8801
   Fax:    (310) 278-2938
9
   *Attorneys for Plaintiffs*

10

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**FEB 0 4 2005**

GARY M. BLAIR, Executive Officer
BY _Merilee A. Jay_
Merilee A. Jay, Deputy Clerk

11

12          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13              **FOR THE COUNTY OF SANTA BARBARA**                    **BY**
                                                                       **"FAX"**
14

| | |
|---|---|
| 15  MARK NILSEN and ANTONIO LIMON On Behalf of Themselves And All Others Similarly 16  Situated, | CASE NO.: 1165597 |
| 17          Plaintiffs, | **CLASS ACTION** |
| 18      vs. | **COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| 19  CAREER EDUCATION CORPORATION, BROOKS INSTITUTE OF PHOTOGRAPHY, 20  GREG STRICK and DOES 1 through and including 100, | **JURY TRIAL DEMANDED** |
| 21          Defendants. | Assigned To: Dept: |
| 22 | |

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\F\\server\share\docs\BLG\BROOKS\BROOKSINSTITUTEComplaint2701final/revision.wpd

02/04/2005 FRI 13:08 [TX/RX NO 8366] @004

1         Plaintiffs, by their attorneys, allege upon personal knowledge as to their own acts, and as to

2 all other matters upon information and belief based upon, inter alia, the investigation made by and

3 through their attorneys.

## SUMMARY OF ALLEGATIONS

5      1.     This is a class action brought by current and former students of Brooks Institute of

6 Photography ("Brooks"), a learning institution wholly owned and operated by Career Education

7 Corporation ("CEC"), on behalf of all Brooks students since from February 4, 2001 to present for

8 violations of the California Education Code, Consumer Legal Remedies Act, and California

9 Business and Professions Code.

## JURISDICTION AND VENUE

11      2.     This Court has jurisdiction over this action pursuant to Code of Civil Procedure

12 §410.10. In the aggregate, Class damages exceed the jurisdictional minimum of this Court.

13      3.     Venue is proper in this Court and the acts of the defendants occurred in this County.

## THE PARTIES

15      4.     Plaintiff Mark Nilsen, attended Brooks Institute of Photography from March 2001 to

16 December 2002 and was damaged thereby. Plaintiff Nilsen sues on behalf of himself, all others

17 similarly situated, and on behalf of the General Public pursuant to the "Private Attorney General"

18 provisions of the Unfair Competition Laws embodied in *California Business and Professions Code*

19 §§17200 and 17500 *et seq.*

20      5.     Plaintiff Antonio Limon attended Brooks Institute of Photography from July 2002 to

21 December 2003 and was damaged thereby. Plaintiff Limon sues on behalf of himself, all others

22 similarly situated, and on behalf of the General Public pursuant to the "Private Attorney General"

23 provisions of the Unfair Competition Laws embodied in *California Business and Professions Code*

24 §§17200 and 17500 *et seq.*

25      6.     Defendant Career Education Corporation claims to be the world's largest on-campus

26 provider of private, for-profit post-secondary education. It owns and operates 82 different schools,

27 in 5 different countries.

28

<center>1</center>

---

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\Fileserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint001finalrevision.wpd

1       7.     Defendant Brooks Institute of Photography has been owned an operated by CEC

2  since May 1999 and currently has three campuses (Santa Barbara, Ventura and Milpitas).  Brooks

3  offers degrees in Photography, Visual Communication, Video Production and Video Journalism.

4       8.     Defendant Greg Strick is president of Brooks Institute of Photography.

5       9.     The true names and capacities of defendants sued herein under C.C.P. §474 as Does 1

6  through 100, inclusive, are presently unknown to plaintiffs who therefore sue these defendants by

7  such fictitious names.  Plaintiffs will seek to amend this Complaint and include these Doe

8  defendants' true names and capacities when they are ascertained.  Each of the fictitiously named

9  defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered

10  by plaintiffs and the members of the class and the general public.

11      10.    At all times mentioned in the causes of action alleged herein, each and every

12  defendant was an agent and/or employee of each and every other defendant.  In doing the things

13  alleged in the causes of action stated herein, each and every defendant was acting within the course

14  and scope of this agency or employment and was acting with the consent, permission and

15  authorization of each of the remaining defendants.  All actions of each defendant as alleged in the

16  causes of action stated herein were ratified and approved by every other defendant or their officers or

17  managing agents.

18                    **STATEMENT OF FACTS**

19      11.    Defendants embarked on a course of conduct designed to purposefully mislead

20  potential students into believing that Brooks was a quality institute of higher learning, whose

21  graduates were well received by employers.  As part of its sales effort to convince students to enroll

22  in CEC schools, defendants claimed that a CEC education will "equip them to compete successfully

23  in today's demanding job markets."  To bolster this representation, CEC's website and promotional

24  literature claimed that it " provides expert placement assistance for [its] graduates and alumni." In

25  addition, CEC promised that its Career Services Departments  will provide "quality personnel" who

26  will work with students on career planning, interviewing techniques, resume writing, and job-search

27  techniques."

28

<div align="center">2</div>

12. The culmination of CEC's recruitment efforts was the representation that:

CEC placement professionals help students turn dreams into futures by assisting them in finding and securing the job that will launch them on a rewarding and fulfilling career. In 2003, CEC once again achieved an outstanding placement record, as 93 percent of our graduates system-wide found a job in their chosen field within six months of graduation.

Graduates of CEC schools benefit from career-focused academic programs that equip them to compete successfully in today's demanding job markets, and from our longstanding relationships with leading employers across the country.

13. In addition to representations made by CEC, Brooks also touts its reputation, extensive alumni network and placement services.

- The carefully structured curriculum has been developed to be responsive to the expanding needs of the photographic and motion picture industry.

- A continuous dialog with Brooks' alumni and other successful professionals provides valuable information concerning current trends and potential future developments within the broad spectrum of photographic/filmmaking careers

- Brooks Institute's programs are designed for anyone who aspires to a career in photography or filmmaking as well as working photographers who seek new skills to advance their careers. As we enter the era of global communication, we will continue to provide one of the finest educations in photography and filmmaking available.

- If you've begun to think about college and are seeking industry current education in imaging, photography, film, video... Then you are probably ready for Brooks Institute of Photography, simply one of the best schools of its kind in the world.

  Graduate Placement Services:
- Brooks Institute of Photography places a great deal of emphasis on helping graduates in their search for rewarding career positions. The Student Career Services Office encourages a working partnership with each student.

- Career Education Corporation provides expert placement assistance for our graduates and alumni. Our Career Services Departments are located on each of our campuses and have global access to candidates and job opportunities both domestically and internationally. We strive to provide quality personnel in response to the job opportunities that are available by working with our students on career planning, interviewing techniques, resume writing, and job-search techniques. By being fully aware of a candidate's work ethic, job skills, personal

3

1    history, and educational background, we are able to provide the perfect
2    match for the job. Our goal is provide "the right" candidate to the
     "right employer", as our goal is to satisfy the needs of both the
     candidate and the employer.

3

4    14.    In addition to false promises in their promotional materials, potential Brooks students

5    were each subject to high pressure sales pitches in which school recruiters made, inter alia, the

6    following false and misleading representations:

7          a.    98% job placement rates;

8          b.    Jobs that paid starting salaries of $75,000 plus;

9          c.    Extensive and active alumni network to assist students in their professional

10               endeavors;

11         d.    Competitive application process in which only the elite are selected for

12               admission;

13   15.    In truth, Brooks' placement rates were far below their touted percentages.  Students

14   that were able to find jobs, did so most often without assistance from the school and almost never in

15   the salary range touted by Brooks representatives.

16   16.    Students place great importance on placement statistics when deciding which

17   academic institution to pay for an education.  In fact, job placement statistics are a fundamental

18   consideration of accreditation.

19   17.    Brooks is accredited by the Accrediting Council for Independent Colleges and

20   Schools ("ACICS") and by the California Postsecondary Educational Commission ("CPEC") and

21   also by Bureau for Private Postsecondary and Vocational Education ("BPPVE").  According to

22   ACICS statements of value, one of the four keys to accreditation is accountability.

23   "The Council believes that institutions must be accountable to rigorous educational,

24   administrative, and fiscal standards.... Accountability is operationalized through

25   standards on institutional tracking of students' satisfactory academic progress,

26   institutional effectiveness planning girded in criteria, and retention and placement

27   reporting that requires institutions to account for student achievement leading to

28   gainful employment."

4

18. The Bureau for Private Postsecondary and Vocational Education ("Bureau") is responsible for regulating California's post secondary educational institutions and their educational services in compliance with the Private Postsecondary and Vocational Education Reform Act of 1989. In order to operate legally in California, schools that are not exempt must obtain approval to operate from the Bureau and meet minimum educations standards under California Education Code §94831.

19. On November 8, 2004 the Bureau for Private Postsecondary and Vocational Education ("Bureau") conducted an on-site assessment of Brooks' records pursuant to a claim by a former Brooks employee regarding certain unethical business practices. Bureau representatives randomly selected 162 student records for review and determined that Brooks was not operating in compliance with California Education Code Title 3, Division 10, Part 59, Chapter 7 and Title 5 Division 7.5 of the California Code of Regulations and that accordingly their ability to operate as an educational institution in California was in jeopardy. Among the most egregious findings were:

    a. Institutions operating under Bureau's jurisdiction are required to disclose all information and material facts likely to affect the decision of the student to enroll. California Education Code §§94814(a)(8), 94810, 94816. "While [the catalog] is a publication that is visually appealing, it is an instrument that does little to inform the student of what he or she can expect in regards to the rigor of the programs or the financial considerations that result from residing in a geographical area in California known for its high cost of living."

    b. Brook's practice of requiring students to sign a new enrollment agreement every year is of concern. It is unclear if students have to hit a moving target as to graduation requirements. The Bureau is also concerned that the enrollment agreement is signed by students several months before the actual start date of the educational program for which they enroll. "The institution's current enrollment agreements were reviewed and found to be not in complete compliance with §94810."

5

c. "The undergraduate enrollment agreement does not include all charges and fees, nor clearly illustrate those that are not refundable. It does not specify charges that a student will be obligated to pay upon enrollment. It does not include a line item for the Student Tuition Recovery Fund assessment or the activity fee referred to in the catalog.

d. The institution does not have a school performance fact sheet with currently appropriate data, as required by §94816(a). Consequently, prospective students are not aware of the completion or placement rates for the educational program they are interested in. Based on the institutions printed material, such as the catalog and brochure, it is obvious that the goal of Brooks Institute of Photography is to prepare students for employment. The catalog on page 5 states, "training methods, course materials, and counseling are designed to lead you through the steps in preparation for employment, the main goal of the entire program." The marketing brochure submitted in the renewal application states, "graduates of this program have learned the skills necessary to successfully compete for jobs with top movie and television studios, design firms and advertising agencies." It also states, "our students have the opportunity to fully immerse themselves into their classes and learn applicable , industry required skills that will help them build successful careers in the real world of entertainment." The catalog states, "Brooks Institute of Photography can provide the tools for you to pursue to job you want." Finally the institutions mission states that it is to "prepare students to successfully pursue careers in professional commercial, still photography, professional filmmaking, visual journalism or visual communication." Based on its own publications the institution indicates that it is preparing its graduates for a particular vocation, trade or career field. ... Thus Brooks is required to provide a School Performance Fact Sheet to every prospective student;

6

1         e.      The institution has violated 94816(b) by failing to produce a School

2               Performance Fact Sheet with current information thereby failing to ensure that

3               each prospective student receives the institution completion and placement

4               disclosure before enrollment;

5         f.      The Brooks Institute Student Disclosure Form does not reflect the exact

6               language required by §94816(b) regarding the transferability of credits;

7         g.     The institution has violated §94816(b) in regards to the statement concerning

8               the transferability of units and degrees earned at our school.  This statement

9               must be disclosed in its entirety and be signed and dated by both the student

10             and representative of the institution;

11        h.     The institution has not established compliance with §94814(b) which requires

12             that no institution shall enter into an enrollment agreement with a student

13             unless the student has first received the institutions catalog and all required

14             disclosures;

15        i.      The institution is not in compliance with California Code of Regulations

16             §71770(a) which requires that "the institution shall not admit any student who

17             is obviously unqualified or who does not appear to have a reasonable prospect

18             of completing the program;"

19        j.      The institution is not in compliance with California Code of Regulations

20             §71775 as there is insufficient evidence that the institution maintains and

21             implements procedures designed to measure student academic progress.

22        k.    78% of the students receive financial aid but it is unclear how many receive

23             federal financial aid and how many receive alternative loans which must be

24             paid back at much higher interest rates.  Alternative loans are not discussed in

25             the catalog but many of the general ledgers included these types of loans.

26        l.      The Institution is not in compliance with §94825 as it has not sufficiently

27             established that it provides to students and prospective students a current

28             schedule of all student charges

<div align="center">7</div>

1    20.    The Bureau concluded that the institution's advertisements and promotional materials

2  were false and misleading.  As stated in relevant part:

3          Ethical Principles and Practices: As outlined in the issues regarding
          the School Performance Fact Sheet, the institution's printed material
4          and statements therein, indicate that its main objective is to prepare
          students for a particular vocation, trade, or career field. The brochure
5          submitted in the renewal application indicates that career "outcomes"
          for Brooks Institute of Photography graduates include job titles from
6          Production Artist for Web to Cartoonists and Animators. The lowest
          salary is given as $34,466 (of which 25% of graduates in that job title
7          will make less than that salary) and the highest is stated at $76,573.
          The catalog also includes a "Partial List of Employers" depicting 119
8          names of corporations and business. Of the fifty graduate files
          reviewed, which included the placement files, only three placement
9          sheets reflected any of the employers and one of those was the
          institution itself.

10
          The Bureau was able to contact eleven of the graduates. The students
11          were asked if they had received job placement from the institution and
          if they were currently working in a field related to their degree. Of the
12          eleven, ten of the graduates stated that they had not received job
          placement from the institution. One graduate indicated that he had not
13          received job placement services, and further stated the institution only
          referred him to Monster.com, an on-line job service. Another stated
14          that all the jobs that the institution referred were for $7.00 an hour
          dead-end jobs while another stated her job, a now closed photo lab,
15          paid $10.50 per hour. Another stated that she has only been able to
          work as an intern and no one has hired her to date.

16
          Graduate responses to whether they are currently employed indicated
17          that one is working for the institution as an assistant, two are in the
          masters degree program and another is attending California State
18          University, Chico, although the yellow data sheet in that student's file
          indicates that she is employed by Chico State. Five of the graduates
19          are currently unemployed. The graduates that are employed include a
          job at Sunwest Studios at a salary of $600 per month and another is
20          working while enrolled in the masters program at a local camera shop.
          Of the graduates that are employed all but one stated that they sought
21          and were hired on their own volition although the institution has
          indicated on the yellow data sheets in the placement files that they
22          have been placed. One of the employers listed on the yellow sheet
          was, according to the graduate, an internship for which he was not
23          momentarily compensated.

24          Compliance Violations: The institution's advertisement and promotion
          is false and misleading as it depicts job titles and salaries that are
25          considerable, particularly when juxtaposed to the small sampling of
          the graduates. (California Education Code §94832.)

26

27

28

8

1      21.    As current and prior attendees of Brooks, plaintiffs and members of the

2  Class have all been directly and proximately injured by defendants' conduct.  Such injury includes

3  the payment of money for tuition to Brooks and CEC which would not have occurred had there been

4  no misrepresentations or deception on the part of the defendants.

5                       **CLASS ACTION ALLEGATIONS**

6      22.    Plaintiffs bring this class action on behalf of themselves as representatives of the

7  General Public and as a representatives of a proposed plaintiff class.  Plaintiffs bring this class action

8  on behalf of themselves and all others similarly situated as members of a proposed California-wide

9  plaintiff class.  The proposed plaintiff class, which plaintiffs seek to represent, are current and prior

10  attendees of Brooks Institute of Photography (the "Class").  Excluded from the Class are defendants,

11  any entity which defendants have a controlling interest, and any of the defendants' subsidiaries,

12  affiliates, and officers, directors, or employees, and any legal representative, heir, successor, or

13  assignee of defendants.

14      23.    This action has been brought and may properly be maintained as a class action

15  pursuant to California Code of Civil Procedure §382 and Civil Code §1781, and case law

16  thereunder, to which the California trial courts have been directed by the California Supreme Court

17  to look for guidance.

18      24.    The members of the Class are so numerous that joinder of all members is

19  impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and

20  can only be ascertained through appropriate discovery, plaintiffs are informed and believe, and on

21  that basis alleges, that thousands of persons are members of the Class.  The precise number of Class

22  members and their addresses are currently unknown to plaintiffs.  The latest statistics provided by

23  the California Post Secondary Education Commission indicates that in 2003 alone over 2100

24  students were enrolled at Brooks  Class members may be notified of the pendency of this action by

25  published and/or mailed notice.

26      25.    There is a well-defined community of interest in the questions of law and fact

27  affecting the parties represented in this action.

28

9

26. Common questions of law and fact exist as to all members of the Class. These common questions predominate over the questions affecting only individual Class members.

27. The questions common to members of the Class are, inter alia:

    a. whether through defendants' conduct, defendants engaged in unfair business practices;

    b. whether the defendants violated the California Education Code;

    c. whether the defendants violated the Consumer Legal Remedies Act; and

    d. the nature and extent of damages and other remedies to which Class members are entitled as a result to defendants' wrongful conduct.

28. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct. Plaintiffs have no interests antagonistic to the interests of the other members of the Class. Plaintiffs and all members of the Class have sustained monetary damages arising out of the defendants' violations of common and statutory law as alleged herein.

29. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by plaintiffs and their counsel.

30. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this class action. Individualized litigation presents the potential for inconsistent or contradictory judgments. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

10

1

## FIRST CAUSE OF ACTION

2
3

### Unlawful, Unfair and Deceptive Business Practices in Violation of California Business & Professions Code §17200, *et seq.* (Against All Defendants)

4       31.    Plaintiffs reallege and incorporate herein by reference each of the foregoing

5   paragraphs.

6       32.    The California Business and Professions Code 17200 defines unfair business

7   competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. The statute

8   is liberally construed to protect California consumers, and it provides for injunctive relief and

9   restitution for violations.

10       33.    Defendants intentionally made misleading statements regarding placement services in

11   order to attract students to their school. This deliberate misrepresentation was the substantial factor

12   in causing plaintiffs to attend defendant's school which resulted in plaintiffs' harm. Plaintiffs

13   suffered a monetary loss in the amount they paid and or still owe for tuition.

14       34.    Defendants' actions, in intentionally making their placement data appear more

15   favorable than it really was, resulted in members of the public being deceived. A reasonable person

16   would have no knowledge of the inaccuracies of these representations.

17       35.    The acts, misrepresentations, omissions and practices of the defendants as alleged

18   above constitute unfair, misleading, false advertising, and unlawful business practices within the

19   meaning of California Business and Professions Code 17200, *et seq.* Plaintiffs were damaged as a

20   result of this conduct.

21       36.    Defendants, through their acts of unfair competition, have acquired money from

22   plaintiffs and the members of the proposed Class in the amounts that plaintiffs and members of the

23   proposed Class have paid CEC in tuition fees. Plaintiffs and members of the Class request this

24   Court restore this money to them, and to enjoin defendants from continuing to violate the California

25   Unfair Competition Law in the future.

26       37.    Such conduct is ongoing and continues to this date. Plaintiffs, the Class members

27   and the general public are therefore entitled to the relief described below.

28

11

**SECOND CAUSE OF ACTION**

**Unlawful, Unfair and Deceptive Business Practices in Violation of
California Business & Professions Code §17500, *et seq.*
(Against All Defendants)**

38.     Plaintiffs hereby incorporate by reference the allegations contained above. This Cause of Action is brought by Plaintiffs on behalf of the general public.

39.     Defendants use advertising to call attention to their education programs . Defendants are disseminating advertising concerning their services which by its very nature is unfair, deceptive, untrue, or misleading within the meaning of *California Business & Professions Code* §17500, *et seq.* Such advertisements are likely to deceive, and continue to deceive, members of the General Public, including prospective students.

40.     In making and disseminating the statements alleged herein, Defendants knew or should have known that the statements were untrue or misleading, and acted in violation of *California Business & Professions Code* §17500, *et seq.*

41.     The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of, *California Business & Professions Code* §17500, *et seq.*

42.     Through their deceptive acts and practices, Defendants have improperly and illegally obtained money from members of the General Public. As such, Plaintiff requests that this Court cause Defendants to restore this money to such members of the General Public, and to enjoin Defendants from continuing to violate *California Business & Professions Code* §17500, *et seq.*, as discussed above. Otherwise, the General Public will continue to be harmed by Defendants' false and/or misleading advertising.

43.     Pursuant to *California Business & Professions Code* §§17203 and 17535, Plaintiff seeks an order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations. Plaintiff additionally requests an order requiring Defendants to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendants by means of such acts of unfair competition and false advertising, plus interest and attorneys fees so as to restore any and all monies to the general public which were acquired and obtained by means of

12

1  such unfair competition, untrue and misleading advertising, misrepresentations and omissions, and

2  which ill-gotten gains are still retained by Defendants. The general public may be irreparably

3  harmed and/or denied an effective and complete remedy if such an order is not granted.

4      44.    Such conduct is ongoing and continues to this date. The General Public are therefore

5  entitled to the relief described below.

6  ## THIRD CAUSE OF ACTION

7  **Violations of the Consumer Legal Remedies Act**
**Civil Code   1750 et seq.**

8  **(Against All Defendants)**

9      45.    Plaintiffs reallege and incorporate herein by reference each of the foregoing

10  paragraphs.

11      46.    The Consumer Legal Remedies Act established a nonexclusive statutory remedy for

12  unfair methods of competition and unfair or deceptive acts or practices undertaken by any person or

13  company in a transaction intended to result or which results in the sale of goods or services to any

14  consumer.

15      47.    Plaintiffs and the members of the Class are consumers who purchased goods and

16  services intended for sale from defendants.

17      48.    In advertising that their school had the characteristic of exceptional placement

18  services along with exceedingly high career placement rates, and in failing to adequately disclose

19  information as to the transferability of units and degrees earned at the school, defendants

20  misrepresented their services as having characteristics, benefits, or qualities which they do not have,

21  all of which are prohibited acts under Section 1770 of the California Legal Remedies Act.

22      49.    Section 1780 of the Consumer Legal Remedies Act specifically defines damages as

23  *any damage.* Plaintiffs and members of the Class were damaged in that they were assessed charges

24  for tuition for attending defendant's school based upon these false representations. Therefore,

25  plaintiffs and members of the class are entitled to monetary compensation in an amount to be

26  determined by the court.

27      50.    Plaintiffs and the members of the Class have all been directly and proximately injured

28  by defendants' conduct. Such injury includes the payment of money for tuition to Brooks and CEC

<div align="center">13</div>

---

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\Fileserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint001finalrevision.wpd

1  which would not have occurred had there been no misrepresentations or deception on the part of the
2  defendants.

3      51.    In accordance with Civil Code  1780(a) and 1782(d), by this Complaint plaintiffs
4  seek injunctive relief as to defendants' violation of the CLRA.  Plaintiffs request that this Court
5  grant such other relief as provided in Civil Code 1780 and in the Prayer for Relief.

6

7                    **Notice Pursuant to Civil Code Section 1782**

8      52.    Plaintiffs hereby demand that within 30 days from service of this complaint,
9  defendants correct or otherwise rectify the deceptive practices complained of herein for the entire
10  Class pursuant to California Civil Code 1770.  Failure to do so will result in plaintiffs amending this
11  complaint to seek damages for such deceptive practices pursuant to California Civil Code 1782.

12                        **FOURTH CAUSE OF ACTION**

13              **Violation of California Education Code Section 94832**
                        **(Against All Defendants)**
14

15      53.    Plaintiffs reallege and incorporate herein by reference each of the foregoing
16  paragraphs.

17      54.    Section 94832 of the California Education Code subsections (a), (b), and (h) indicate
18  "no institution or representative of an institution shall make or cause to be made any statement that
19  is in any manner untrue or misleading, either by actual statement, omission, or intimation." "No
20  institution or representative of an institution shall engage in any false, deceptive, misleading, or
21  unfair act in connection with any matter, including the institution's advertising and promotion, the
22  recruitment of students for enrollment in the institution,........education materials, or loan or grant
23  funds from a student,......or job placement." "No institution or any representative of an institution
24  shall in any manner make any untrue or misleading change in, or untrue or misleading statement
25  related to, any test score, grade, record of grades....record indicating student completion or
26  employment, financial information...."

27

28

                                    14

55. CEC's practices of representing career placement data in a knowingly fraudulent manner in order to boost enrollment in CEC's schools is a direct violation of Section 94832 of the California Education Code.

56. California Education Code Sections 94877, 94985(b)(6) and 94985(d) indicate if an institution is in violation of Section 94832 of the Code, the institution shall refund all consideration paid by or on behalf of the student. Furthermore, a prevailing student shall be entitled to the recovery of damages, equitable relief and reasonable attorney's fees and costs. If a court finds that a violation was willfully committed, upon the student's written demand, the court shall award a civil penalty of up to two times the amount of the damages sustained by the student.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for relief as follows:

A. For declaration of this action to be a proper class action, with plaintiffs as class representatives, and designating their counsel as lead counsel for plaintiffs;

B. For injunctive relief, enjoining CEC and Brooks from continuing the practice of computing and advertising their Career Placement statistics in a misleading and deceptive manner;

C. For restitution in the form of the disgorgement of any monetary benefits to CEC and Brooks which were the result of this unfair business practice;

D. For restoration to plaintiffs of all funds acquired by means of any act or practice declared by this court to be unlawful, fraudulent, or to constitute unfair competition or untrue or misleading business practices;

E. For punitive and exemplary damages according to proof, including pre-judgment and post-judgment interest as allowed by the State of California;

F. For attorney's fees and expert witness fees, as provided by law; and

///
///
///

15

1      G.    For such other, further and different relief as the nature of this case may require or

2  may be deemed just and proper by this Court.

3                            **JURY DEMAND**

4      Plaintiffs demand a trial by jury.

5

6  Dated: February 4, 2005          Michael D. Braun

                                  Marc L. Godino

7                              BRAUN LAW GROUP, P.C.

8

9               By:                                            

                              Marc L. Godino

10                           12400 Wilshire Boulevard

                              Suite 920

11                           Los Angeles, CA 90025

                              Tel:   (310) 442-7755

12                           Fax:  (310) 442-7756

13                           Janet Lindner Spielberg

                            LAW OFFICES OF JANET LINDNER SPIELBERG

14                         12400 Wilshire Boulevard

                            Suite 400

15                         Los Angeles, California 90025

                            Tel:   (310) 392-8801

16                           Fax:  (310) 278-5938

17                         *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

<div align="center">16</div>

STATE OF CALIFORNIA                                                    ARNO. D SCHWARZENEGGER, *Governor*



## BUREAU FOR PRIVATE POSTSECONDARY
## AND VOCATIONAL EDUCATION
Physical Address: 400 "R" Street, Suite 5000 • Sacramento, CA, 958' 4-6200
Mailing Address: P.O. Box 980818 • West Sacramento, CA 95798 1818
Phone: (916) 445-3427 • FAX: (916) 323-6571



July 11, 2005

Dr. Greg Strick, President                          Certified Mail Number 7004 ::890 0000 2794 8983
Brooks Institute of Photography                     Return Receipt Requested
801 Alston Road
Santa Barbara, CA  93108

RE: Notice of Conditional Approval to Operate
    Institution Code No. 4201871

Dear Dr. Strick:

Under the authority granted the Bureau for Private Postsecondary and Vocational Education ("Bureau") under
sections 94900 and 94901 of the California Education Code, the Bureau notifies you, Dr. Greg Strick,
President of Brooks Institute of Photography ("Brooks Institute"), that the Bureau has determined that an
unconditional grant of approval to operate is not in the public interest. Based upon the Renewal Application,
information and materials submitted by Brooks Institute in response to the subsequent Compliance Visit
Report and materials and information reviewed during the Unannounced Visit that followed, Brooks Institute
of Photography is granted a *Conditional Approval* to operate effective from July 11, 2005 through June 30,
2007 (a period of not more than two years). This expiration date may be earlier as a consequence of action
taken by the Bureau resulting from site visit findings or other information brought to the attention of this
Bureau. This *Conditional Approval* is limited to the following programs:

**Diploma in Professional Photography**
**Diploma in Film and Video Production**
**Associate of Arts in Visual Journalism**
**Bachelor of Arts in Visual Communication**
**Bachelor of Arts in Professional Photography**
**Bachelor of Arts in Film and Video Production**
**Bachelor of Arts in Visual Journalism**
**Master of Science in Photography**

Under California Education Code section 94840, an application for re-approval must be submitted at least
ninety days prior to the termination of your approval. Please reference the attached *Conditional Approval*
documents listing the school title, site address and code number, approved programs and term of approval.
You will be contacted prior to a Site Visit, informed of the composition and qualifications of the Visiting
Committee, and given an opportunity to challenge that composition.



Bureau for Private Postsecondary and Vocational Education

From:     Michele Hedding, Staff Services Analyst
          Administrative Unit
          Telephone: (916) 445-3427, extension 3168
          Fax number: (916) 322-2615
          E-mail: michele_hedding@dca.ca.gov

Subject:  Public Record Act Request -- Brooks Institute of Photography

**Please be advised:**

**The enclosed action by the Bureau is not yet final.  The institution has the
right to appeal any allegations contained in the enclosed Notice.  If you
would like to find out whether the decision of the Bureau has become final,
please check back with the Bureau and make another public records
request at a later date.**

Number of pages including the cover sheet 20 23

*Brooks Institute of Photography*
*July 11, 2005*
*Page 2 of 19*

## INSTITUTION'S RIGHT TO A HEARING

Pursuant to Education Code sections 94901(c)(3), 94965, and 94975, and Government Code section 11500 and following, you may make a written request for a hearing within 15 days of the date on which this letter is served on you by certified mail. A written request for a hearing may be made by delivering or mailing, within 15 days of service of this letter, a signed and dated statement to the effect that Brooks Institute of Photography requests a hearing of the Bureau's conditional approval of its application for renewal to operate to: Sheila Hawkins, Education Administrator, Bureau for Private Postsecondary and Vocational Education, 400 R Street, Suite 5000, Sacramento, CA 95814.

Should you request a hearing, you may, but need not be, represented by counsel at all stages of the proceeding. You also have the right to be present at the hearing, to cross-examine witnesses, and to present evidence.

If you request a hearing, further information regarding your right to discovery and to request a postponement of the hearing for good cause will be provided to you with the notice of hearing. Unless a written request for a hearing is signed by you or on your behalf, and is delivered or mailed to the Bureau within 15 days after service of this letter, Brooks Institute of Photography will waive or forfeit the right to an administrative hearing, and the Bureau's conditional approval of Brooks Institute's renewal application will become final on the day following the last day to request a hearing.

## NOTICE REGARDING STIPULATED SETTLEMENTS

Education Code section 94975 provides for the disposition of any issues involved in the hearing by stipulation or settlement prior to the hearing date. A stipulated settlement is a binding written agreement between you and the Bureau regarding any or all of the matters charged and the consequences thereof. Such a stipulation must have the approval of the Bureau but, once approved, would be incorporated into a final order.

## I. BACKGROUND AND HISTORY OF THE APPLICATION

The Bureau is within the Department of Consumer Affairs and is responsible for regulating California's private postsecondary educational institutions in compliance with the Private Postsecondary and Vocational Education Reform Act of 1989 ("Act" – California Education Code sections 94700 and following). In order to operate legally in California, schools that are not exempt must obtain "approval to operate" from the Bureau and meet minimum educational standards under the Act (Education Code section 94831).

Brooks Institute of Photography is owned and operated exclusively as a Limited Liability Corporation, which is wholly owned by Career Education Corporation located at 2985 Greenspoint Parkway, Suite 600, Hoffman Estates, Illinois. The Bureau approved Career Education Corporation's ownership of Brooks Institute on May 4, 1999. Brooks Institute submitted an application for renewal to operate in the State of California, received on October 4, 2004. As part of the evaluation of the renewal application, the Bureau conducted an on-site assessment of Brooks Institute's records on November 8 and 9, 2004. The on-site review was prompted, in part, by allegations of unethical business practices made by a former employee of Brooks Institute to Brooks Institute's accrediting agency, the Accrediting Council for Independent Colleges and Schools (ACICS). The following is a brief chronology of Brooks Institute's application for renewal to operate:

October 4, 2004            The Bureau receives Brooks Institute's application for renewal to operate.

November 8, 2004          Bureau for Private Postsecondary and Vocational Education
                          representatives Marcia Trott and Lynnelle Case conduct an on-site

Case 3:09-cv-06731-WHA Document 24-59 Filed 06/09/22 Page 143 of 282

|  |  |
|---|---|
|  | assessment of Brooks Institute by randomly selecting student records for review, including fifty student records from the drop/cancellation list. |
| December 1, 2004 | Marcia Trott, Senior Education Specialist, sends a report to Brooks Institute detailing general findings and issues of non-compliance and violations of the Act. |
| December 31, 2004 | The Bureau receives Brooks Institute's response to the December 1, 2004 report. |
| January 31, 2005 | The Bureau receives Brooks Institute's revised response to the December 1, 2004 report. |
| February 23, 2005 | Nicole L. Burke, an employee of the Bureau for Private Postsecondary and Vocational Education, visits Brooks Institute posing as a potential student. |
| February 28, 2005 | Bureau for Private Postsecondary and Vocational Education representatives Marcia Trott, Lynnelle Case, and Deborah Godfrey conduct an unannounced visit to Brooks Institute. |

### Reconciliation of the December 1, 2004 Compliance Visit Report

The Bureau has completed an evaluation of Brooks Institute's application for renewal to operate as a private postsecondary educational institution. The November 8 and 9, 2004 on-site evaluation culminated in a compliance report, dated December 1, 2004, outlining findings and specific areas of non-compliance by Brooks Institute. Brooks Institute responded to this report on December 31, 2004, and provided additional and amended information on January 31, 2005. Non-compliance issues included, in part, offering an unapproved program entitled "Pre-Graduate Studies"; the failure to provide prospective students with the "Transferability of Units and Degrees Earned at Our School" disclosure form; and the omission of required information in the catalog and on the enrollment agreement. Also cited were issues regarding Brooks Institute's admissions policies and procedures, as well the omission of material facts in the catalog regarding loan indebtedness a student may incur while enrolled in a Brooks Institute program. Brooks Institute satisfactorily responded to several of the non-compliance issues identified by the Bureau, including:

- admissions policies and procedures
- catalog omissions
- unapproved educational titles
- organization of student records
- enrollment agreements
- Notice Concerning Transferability of Units and Degrees Earned at Our School
- scholastic regulations and graduation requirements
- tuition, fee and refund schedules

The December 1, 2004 compliance report also cited violations, including one regarding the "School Performance Fact Sheet" and another regarding "Ethical Principles and Practices" among others, that have not been sufficiently resolved. In consideration of these unresolved issues, the Bureau conducted an unannounced visit to Brooks Institute in February 2005, which also yielded evidence of non-compliance related to the

Student Tuition Recovery Fund (STRF). It is these violations and acts of non-compliance that are the bases for each of the allegations outlined in Sections A through C of this document.

## II.  BASES FOR CONDITIONAL APPROVAL

The Bureau has completed its review and assessment of the Brooks Institute of Photography renewal application to operate as a private postsecondary educational institution pursuant to Education Code section 94900.  Education Code section 94901(c)(2) defines the circumstances under which it is appropriate for the Bureau to grant a Conditional Approval to operate:

> "If the institution is in compliance with this chapter, but has operated within three years before the filing of the application in violation of this chapter then in effect, or if the council determines that an unconditional grant of approval to operate is not in the public interest, the council may grant a conditional approval to operate subject to whatever restrictions the council deems appropriate.  The council shall notify the institution of the restrictions or conditions, the basis for the restrictions or conditions, and the right to request a hearing to contest them. Conditional approval shall not exceed two years."

The following violations substantiate the Bureau's reasons why it is not in the public interest to grant a full, unconditional approval to operate to Brooks Institute at this time.

### A.  BROOKS INSTITUTE PRESENTED FALSE OR MISLEADING INFORMATION TO PROSPECTIVE STUDENTS REGARDING EMPLOYMENT OPPORTUNITIES.

Brooks Institute presented false and misleading information to prospective students regarding employment opportunities in three respects: (1) availability of jobs; (2) potential salaries; and (3) career placement services provided.

Generally, the Bureau may refuse to issue or renew an approval if the institution violates any standard, rule, or regulation under the chapter governing private postsecondary and vocational institutions. (Education Code § 94830(a).)  The Bureau has the authority to refuse to issue or renew an approval if the institution presents to prospective students information that is false or misleading relating to employment opportunities.  (Education Code § 94830(h).)  In addition, the Reform Act prohibits an institution or representative of an institution from "advertis[ing] concerning job availability, degree of skill and length of time required to learn a trade or skill unless the information is accurate and in no way misleading." (Education Code § 94831(f).)

The Act enumerates certain misrepresentations that violate the Act:

> "No institution or representative of an institution shall make or cause to be made any statement that is in any manner untrue or misleading, either by actual statement, omission, or intimation." (Education Code § 94832(a).)

> "No institution or representative of an institution shall engage in any false, deceptive, misleading, or unfair act in connection with any matter, including the institution's advertising and promotion, the recruitment of students for enrollment in the institution, the offer or sale of a program of instruction, course length, course credits, the withholding of equipment, educational materials, or loan or grant funds from a student, training and instruction, the collection of payments, or job placement." (Education Code § 94832(b).)

*Brooks Institute of Photography*
*July 11, 2005*
*Page 5 of 19*

The Act then mandates that certain disclosures be made to prospective students: "Each institution offering a degree or diploma program designed to prepare students for a particular vocational, trade, or career field shall provide to each prospective student a school performance fact sheet disclosing all of the following information:

...

(3) The number and percentage of students who begin the program and secure employment in the field for which they were trained. In calculating this rate, the institution shall consider as not having obtained employment, any graduate for whom the institution does not possess evidence, documented in his or her file, showing that he or she has obtained employment in the occupation for which the program is offered.

(4) The average annual starting wages or salary of graduates of the institution's program, if the institution makes a claim to prospective students regarding the starting salaries of its graduates, or the starting salaries or local availability of jobs in a field. The institution shall disclose to the prospective student the objective sources of information necessary to substantiate the truthfulness of the claim.

Each school that offers or advertises placement assistance for any course of instruction shall file with the council its placement statistics for the 12-month period or calendar year immediately preceding the date of the school's application for annual review for every course of instruction." (Education Code § 94816(a).)

<u>Allegations:</u>

1. <u>BROOKS INSTITUTE PROVIDED FALSE OR MISLEADING INFORMATION REGARDING EMPLOYMENT OPPORTUNITIES.</u>

Representatives of Brooks Institute provided false and misleading information regarding employment opportunities to then-prospective students who graduated in 2003, as well as to prospective students entering programs in 2005. Deceptive practices misrepresented job placement and employment tenure that were in direct contradiction with its own placement records, as well as national and state labor statistics.

On or about April 4-5, 2005, the Bureau sent out 121 e-mail surveys to a sampling of 2003 graduates asking what representations were made by Brooks Institute regarding employment opportunities. Of those, fourteen graduates responded.[1] Brooks Institute made the following representations to these prospective students with regards to career opportunities:

Graduate # 3[2]: "I enrolled in the program because I loved photography and was told that after going to Brooks I would have a 95% chance of finding a job after graduation. The admissions representative told me I would have a 95% chance of finding a job after graduation. Brooks did no [sic] meet those expectations, as I don't have a photo related job."

---

[1] The e-mail addresses were provided by Institute from its database. Many were no longer viable.
[2] Individual students are referred to herein by number to protect the privacy of the students. The identities of students will be disclosed at any potential hearing or pursuant to any valid request for discovery. At any potential hearing, complainant will move for an order limiting the disclosure of the identities of these students to this proceeding and/or resulting appeals.

Case 3:19-cv-03674-WHA Document 245-9 Filed 06/09/22 Page 146 of 282

Brooks Institute records indicate this 2003 baccalaureate graduate in Professional Photography was "college-placed" in part-time[3] employment. As recorded, this graduate's employment began eight months after graduation as a "Web Developer" with a wage of $12.00 per hour. "Web Developer" is not a placement in the field of Professional Photography. Institute records also reflect total loan indebtedness for this 2003 graduate of approximately $7.,600.

Graduate # 6: "I was told that job placement was almost 100% after graduation with income sufficient to warrant the loans necessary for me to attend. This turned out to be un-true. It took me fifteen months to find industry work, and still it isn't earning me as much as I spent in school." In response to the Bureau's survey question, *"Are you working in an occupation for which your degree or diploma prepared you for?"* Graduate #6 stated, "Yes. To the extent that I am a courier for a production company. I still am not using the skills that I honed in school."

Brooks Institute records indicate this 2003 baccalaureate graduate in Film/Video Production was self-placed in part-time hourly employment seven months prior to graduation. The job title listed by Brooks Institute was "film/video production." In other Brooks Institute records (*Employment Verification Form*), the job title for this graduate is listed as a "film screener" at a movie theater with a wage of $6.50 per hour. Institute records also reflect total loan indebtedness for this 2003 baccalaureate graduate of approximately $112,000.

Brooks Institute also made representations to prospective students for programs beginning in 2005 when it provided the *Student Performance Fact Sheet* with figures and statistics for the 2003 graduates. The *Fact Sheet* represented the following:

| Program | Of those Students who Completed Their Program in 2003, the Number and Percentage who Secured Employment in the Field |
|---|---|
| Bachelor of Arts in Professional Photography | 92 / 8 :% |
| Diploma in Professional Photography | 2 / 67 % |
| Bachelor of Arts in Film and Video Production | 13 / 8 %% |
| Diploma in Film and Video Production | There were no starts in this program that were scheduled to complete in 2003. |
| Bachelor of Arts in Visual Journalism | 6 / 8: % |
| Associate of Arts in Visual Journalism | 6 / 8: % |
| Master of Science in Photography | 1 / 10 .% |
| Bachelor of Arts in Visual Communication | There were no starts in this program that were scheduled to complete in 2003. |

These representations have proven false. The Bureau's review and verification of Brooks Institute records resulted in lower placement figures than those reported above because the records were contradicted by graduates and employers during the Bureau's investigation. Five of the fourteen 2003 graduates (#s 1, 3, 6, 11 and 13) are not working in a field related to their degree, yet Brooks Institute records reflect all five as employed in industry-related jobs.

The difficulty experienced by these and other 2003 graduates of Brooks Institute's educational programs in securing employment in the field of study is borne out by state and national employment

---

[3] Brooks Institute did not provide a definition of "part time" employment. However, "part time" employment is defined in Education Code § 94854(k)(2) as at least 17.5 hours, but less than 32 hours, per week for a period of at least 6 ? days in the occupations or job titles to which the program of instruction is represented to lead, provided the student completes a handwritten statement at the beginning of the program and at the end of the program which states that the student's educational objective is part-time employment.

projections and other labor statistics. Nationally, the job outlook for Photographers projects average growth, but competition for job openings will be intense. In California, this occupation is projected to increase by only 5.8 percent, representing 400 net openings in the ten-year period beginning in 2002, with just 180 employment openings per year statewide.[4]

In addition to its diploma and degree programs in Photography, Brooks Institute offers three other degree programs with a different, but shared, focus:

- Associate of Arts in Visual Journalism
- Bachelor of Arts in Visual Journalism
- Bachelor of Arts in Film and Video Production

Graduates of these programs expect to be employed as film and video editors and skilled camera operators. As with Professional Photographers, the national job outlook for Film and Video Editors projects average growth coupled with keen competition for job openings through 2012. However, growth will be tempered by the increase in offshore motion picture production. In California, the demand for Film and Video Editors is projected to have average growth of just 200 annual openings statewide in the ten-year period beginning in 2002.

The demand for Television, Video, and Motion Picture Camera Operators in California is projected to have average growth tempered by increased offshore movie production, resulting in only 170 annual openings statewide through 2012. Nationally, the job outlooks for the Television, Video, and Motion Picture film and video editors and camera operators is expected to grow about as fast as the average for all occupations through 2012. However, as with the Photographer occupational outlook, the competition for job openings will be intense because the number of individuals interested in positions as videographers and movie camera operators usually is much greater than the number of openings. Growth will also be tempered by the increase in offshore motion picture production.

## 2. BROOKS INSTITUTE PROVIDED FALSE AND MISLEADING INFORMATION REGARDING POTENTIAL SALARIES TO PROSPECTIVE STUDENTS.

On or about February 23, 2005, a Bureau employee posing as a potential student, met with admission representative Hank Aizpuru at Brooks Institute. She asked about how much she could anticipate making once she graduated, and Mr. Aizpuru replied, "The sky's the limit." When she asked again, he stated, "I don't know ... $50,000 to $150,000 in your first year." He repeated to her that the "sky's the limit," and that with that income she would be able to pay for her tuition at Brooks Institute.

This type of misrepresentation is pervasive. Information obtained by the Bureau from its surveys of 2003 graduates indicate that Brooks Institute made the following representations to prospective students with regard to potential salaries:

Graduate # 3: "I was told, while I was at school, that a starting wage for an apprentice in the field for which I was training was $150/day." Brooks Institute records indicate this 2003 baccalaureate program graduate in Professional Photography was "college-placed" in part-time employment, nine months after graduation, as a "Web Developer" with a wage of $12.00 per hour. ("Web Developer" is not considered a placement in the field of Professional Photography.) Institute records also show total loan indebtedness for this baccalaureate-degree recipient of approximately $76,600.

---

[4] Data source: *2002-2012 Employment Projections by Occupation*, Labor Market Information Division, California Employment Development Department.

Graduate # 6: "I was told that job placement was almost 100% after graduation with income sufficient to warrant the loans necessary for me to attend. I have to work 60-80 hours a week in order to cover the substantial debt incurred at Brooks. The admissions rep had me expecting almost twice the income that I earn now. I am a courier for a production company. I still am not using the skills that I honed in school." Brooks Institute records indicate this 2003 baccalaureate graduate in Film/Video Production was self-placed in part-time hourly employment seven months prior to graduation. The position's job title is listed in Brooks Institute records as a "film screener" at a movie theater with a wage of $6.50 per hour. Brooks Institute records also show total loan indebtedness for this 2003 baccalaureate-degree recipient of approximately $112,000.

Further, Bureau investigation of Brooks Institute records regarding student salaries and wages found the following:

- Brooks Institute's placement records indicate that 106 (67.5 percent) of 157[5] graduates in 2003 were employed part-time.
- For the 45 graduates in 2003 who were reported in Brooks Institute records as employed full-time[6], the average income was approximately $26,000. The average loan indebtedness of this same[7] group of 2003 graduates was approximately $74,000.
- Six 2003 graduates, with an average loan indebtedness of approximately $97,700 each -- the earliest of which had graduated 22 months earlier -- were reported in Brooks Institute records as still not placed as of February 2005.
- Brooks Institute records show that there was not a single 2003 diploma or degree recipient, at any degree level, whose reported wages coupled with the individual's employment tenure, was sufficient to generate even the lower $50,000 estimate of earning potential represented by Mr. Aizpuru to the Bureau employee who posed as a potential student.

## 3. INSTITUTE PRESENTED FALSE AND MISLEADING INFORMATION TO PROSPECTIVE STUDENTS REGARDING CAREER PLACEMENT SERVICES.

In November 2004, the Bureau contacted eleven of the 2003 Brooks Institute graduates. Results of the November 2004 and April 2005 surveys show that students who graduated in 2003 were told during their pre-enrollment interviews, as well as throughout their educational tenure at Brooks Institute, that they would receive career placement assistance. Additionally, Brooks Institute's 2003 catalog (for prospective students beginning a program in 2003) advertised the career placement services provided to enrolled students:

"Career Services – Brooks Institute has a department specifically designed to assist students in finding employment upon graduation. Career Services offers assistance in resume writing and alumni networking. Additionally, the faculty and the Alumni Association are constantly being informed of opportunities for graduates through photographic conventions and personal contacts with members of the profession. The increasing network of Brooks Institute alumni also enhances employment prospects for graduates, and many alumni either refer employers to the Institute or recruit from Brooks

---

[5] Six 2003 graduates were reported in Brooks Institute placement records as "waived," meaning they were unavailable or ineligible for employment. As such, they are exempt from "placement" consideration and are not included here.
[6] Brooks Institute did not provide a definition of "full-time" employment. However, "full-time" employment is defined in Education Code § 94854(k)(2) as at least 32 hours per week for a period of at least 60 days in the occupations or job titles to which the program of instruction is represented to lead.
[7] Indebtedness information for one of the forty-five 2003 graduates was not found in Brooks Institute records.

Institute themselves. Career Services maintains a listing of these professional jobs opportunities for students about to graduate and for alumni wishing to relocate."

These statements were misrepresentations. Eleven of the 2003 Brooks Institute graduates the Bureau contacted in November 2004 stated that they had not received job placement services from Brooks Institute. Of the fourteen Brooks Institute graduates contacted by e-mail in April 2005, all except Graduate #11 indicated that they did not receive any placement assistance from Brooks Institute.[8] Graduate # 11 stated that he had received "some" assistance. Information obtained by the Bureau from its surveys of former students indicate that Brooks Institute made the following representations to prospective and enrolled students with regard to placement services:

Graduate #9 (April 2005 survey): "My expectations were that if I worked hard at Brooks and excelled in my degree program (which I did) that I would have assistance in gaining employment. I was lead to believe on many occasions that I would have opportunities upon graduation that I do not have. I feel it is unfair for them to claim that they will assist their graduates in gaining employment when they do not. I do not mean to say that I think Brooks should be directly responsible for finding me a job, but when they imply that they will help and then do not, it is frustrating. I, like many others who have attended Brooks, have very large student loans. I counted on finding a good job, even entry level employment in my field after graduation, to work my way up and begin to pay them off. I feel that I was misled to believe that Brooks would assist me in finding a good job in my field, and I am disappointed with the school's lack of support."

Institute records indicate this 2003 baccalaureate graduate in Professional Photography, whose total loan indebtedness is approximately $73,350, was self-placed in part-time employment, beginning on January 1, 2003, as a Digital Artist with a wage of $8.00 per hour. Brooks Institute recorded this placement on October 24, 2003, the day before the student's graduation.

Graduate # 14 (April 2005 survey): "My admissions rep told me, my grandparents, and my parents about the 98% placement after graduation, which was the major reason I chose to attend Brooks. I later found out, AFTER I GRADUATED AND BEGAN LOOKING FOR JOBS, that any job after graduation was counted as "placement" even if it had nothing to do with photography. Even though this made me really mad and disappointed, I did get a job through career services. However, it is teaching students after school, ONE HOUR A WEEK. I feel like I have been lied to and no, my expectations are far far far from being met." The graduate reported the employer as a local public charter school.

Brooks Institute records indicate this 2003 baccalaureate graduate in Professional Photography was employed by Brooks Institute itself – not by a local public charter school, as stated by the graduate – to "assist teachers with shoots." According to the student's description, it appears that the placement was not in the field of "Professional Photography." The electronic record submitted by Brooks Institute in February 2005 lists a part-time wage of $6.00 per hour while the Employment Verification Form in the placement file for the same individual indicates an annual salary of $9,000. Institute records also show this 2003 graduate's total loan indebtedness of more than $18,200.

In summary, it is alleged that Brooks Institute engaged in a pervasive pattern of misrepresentations made to prospective students regarding employment opportunities, salaries, and career placement services. The pervasive nature of Brooks Institute's conduct is reflected in the scripts included in the training manual for

---

[8] One 2003 Brooks Institute graduate was contacted and responded both during the Bureau's November 2004 and February 2005 surveys. Her response has been recounted only once.

Admissions Representatives. The segment called *Looking at Other Schools* instructs the representatives to offer as enticement: "Brooks job placement while they're in school, and career placement once they graduate – lifetime career placement. Compare where our graduates are (salary, employers, types of jobs) with a Brooks education." It is clear that the representatives influenced students' decisions to attend Brooks Institute, only to find that the job market was not how it was represented and students could receive no assistance in finding the jobs they were told existed.

<u>Determination of Violation(s):</u>

Based on the foregoing, it is alleged that Brooks Institute provided false and misleading information regarding the potential salaries, employment opportunities of graduates in their chosen fields of study, and the availability of career placement services. Providing false information to prospective students is in violation of Education Code Section 94830(h) and is grounds for refusal to issue or renew an application.

## B. <u>INSTITUTE FURNISHED FALSE, MISLEADING, OR INCOMPLETE INFORMATION TO THE BUREAU.</u>

Education Code section 94830(b) authorizes the Bureau to refuse to issue or renew an approval to operate, if the institution furnishes "false, misleading, or incomplete information to the council, or the failure to furnish information requested by the council or required by this chapter."

Education Code section 94830(g) authorizes the Bureau to refuse to issue or renew an approval if the institution fails to "maintain the minimum educational standards prescribed by this chapter, or to maintain standards that are the same as, or substantially equivalent to, those represented in the school's applications and advertising."

An Annual Report must be submitted to the Bureau. "Each institution approved to operate under this chapter shall be required to report to the council, by July 1 of each year, or another date designated by the council, the following information for educational programs offered in the prior fiscal year:

(a) (1) The total number of students enrolled, by level of degree or type of diploma program.
  (2) The number of degrees and diplomas awarded, by level of degree.
  (3) The degree levels offered.
  (4) Program completion rates.
  (5) The schedule of tuition and fees required for each term, program, course of instruction, or degree offered.
  (6) Financial information demonstrating compliance with subdivisions (b) and (c) of Section 94804 and subdivisions (b) and (c) of Section 94855, if applicable.
  (7) Institutions having a probationary or conditional status shall submit an annual report reviewing their progress in meeting the standards required for approval status.
  (8) A statement indicating whether the institution is or is not current on its payments to the Student Tuition Recovery Fund.
  (9) Any additional information that the council may prescribe." (Education Code § 94808(a).)

Brooks Institute must also make disclosures to prospective students in a *School Performance Fact Sheet.* "Each institution offering a degree or diploma program designed to prepare students for a particular vocational, trade, or career field shall provide to each prospective student a school performance fact sheet disclosing all of the following information:

...

(3) The number and percentage of students who begin the program and secure employment in the field for which they were trained. In calculating this rate, the institution shall consider as not having obtained employment, any graduate for whom the institution does not possess evidence, documented in his or her file, showing that he or she has obtained employment in the occupation for which the program is offered.

(4) The average annual starting wages or salary of graduates of the institution's program, if the institution makes a claim to prospective students regarding the starting salaries of its graduates, or the starting salaries or local availability of jobs in a field. The institution shall disclose to the prospective student the objective sources of information necessary to substantiate the truthfulness of the claim.

Each school that offers or advertises placement assistance for any course of instruction shall file with the council its placement statistics for the 12-month period or calendar year immediately preceding the date of the school's application for annual review for every course of instruction." (Education Code § 94816(a).)

## Allegations:

Brooks Institute furnished false, misleading or incomplete information to the Bureau with regard to school performance, both in the Annual Report and in the *School Performance Fact Sheet.*

As part of Brooks Institute's response to the Bureau's December 2004 report of non-compliance, Brooks Institute's *School Performance Fact Sheet* was submitted to the Bureau. The *Fact Sheet* consists of three categories of information: (1) the number of students who were scheduled to complete their program in 2003; (2) the number and percentage of those students who actually completed their program in 2003; and (3) of those students who completed their program in 2003, the number and percentage who secured employment in the field for which they were trained. Information in these three areas is listed on the *Fact Sheet* for each degree program offered by Brooks Institute.

The Bureau attempted to verify the figures reported by Brooks Institute on its *School Performance Fact Sheet* by seeking comparable data posted on the U. S. Department of Education (USDE) internet website. During this verification process, the Bureau found a single statement regarding Brooks Institute's graduate rate (or completion rate, as used by Bureau): "Graduation rates are not present because of an insufficient number of cases." This statement is false and misleading because 1) sufficient student records exist with which Brooks Institute could generate a "graduation rate;" and 2) Brooks Institute reported program completion figures (or graduation rates) to the Bureau through its *School Performance Fact Sheet.*

Brooks Institute's records obtained by the Bureau during the February 2005 site visit contradicted the program completion figures reported on the *Fact Sheet* for each of the six degree programs for which numbers and percentages were reported. The Bureau also found additional inaccurate and contradictory information in February 2005 regarding the percentage of students who completed their programs in 2003 (on schedule) that was reported to the Bureau on Annual Report Form 2003-2a, Line 9 of Brooks Institute's 2003 Annual Report. The Bureau noted that Brooks Institute's Annual Report figures for 2003 regarding program completion, which should have been the same as the figures reported by Brooks Institute on its *School Performance Fact Sheet,* were different from each other. Further, the Bureau found that neither set of figures were accurate when compared to Institute records for the same period that were submitted to the Bureau in February 2005.

In the third category of the *Fact Sheet*, with regard to those students who completed their program in 2003, listing the number and percentage who secured employment in the field, Brooks Institute's records obtained by the Bureau during the February 2005 site visit contradicted the figures reported on the *Fact Sheet* for each of the six degree programs for which numbers and percentages were reported.

Education Code 94816(a)(4) requires the disclosure of starting salary and wage information on *School Performance Fact Sheets*. The Bureau has also incorporated the reporting of this information in institution Annual Reports. Such information is required to be reported for all programs that lead to a specific career, as in the case of Professional Photography. Brooks Institute's 2003 Annual Report to the Bureau also contained false and misleading information, or was incomplete in substantive respects with regard to salaries and wages of graduates. In all cases, the average annual starting wages of Brooks Institute graduates was omitted from the Annual Report Forms [2003-2a (Degree), Line 13] for all degree programs offered by Brooks Institute, even though these data were found in Brooks Institute's records that were submitted to the Bureau.

Further, placement figures reported in Brooks Institute's 2003 Annual Report, as well as its *School Performance Fact Sheet*, was subsequently proven false or inaccurate by graduates and employers contacted by the Bureau during its April 2005 verification process.

During April 2005, the Bureau interviewed eleven employers of 2003 Brooks Institute graduates to verify the information on the *Employment Verification Forms* ("*Form*") included by Brooks Institute in the placement files for those graduates. The following is a narrative of the Bureau's review of this information and related Brooks Institute records, including responses regarding placement from the November 2004 survey:

- According to Brooks Institute records, Graduate #15 completed his educational program in June 2003, with approximately $57,200 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. The *Form* for Graduate #15, completed by Brooks Institute on December 28, 2003, indicates that he was employed as a photo assistant starting on August 1, 2003, two months after graduation, with a wage of $9.00 per hour. Other Brooks Institute records indicate this employment placement was Institute-generated.

  In April 2005, the employer confirmed to the Bureau that Graduate #15 did some freelance work as an "intern" approximately three to four years prior. Thus, the employment would have occurred in 2001 or 2002 (while the graduate was still in school), not shortly after graduation in mid-2003 as reflected on the *Form*. In addition, internships[9] are student assignments conducted for education credit, whether compensated or not and, as such, do not constitute employment for "placement" purposes. Even if Graduate #15 did not receive education credits, freelance work does not constitute a placement.

- According to Brooks Institute records, Graduate #16 completed her educational program in June 2003, with approximately $53,600 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. The *Form* for Graduate #16, completed by Brooks Institute on February 2, 2004, indicates that she was placed in employment eight months after graduation as a part-time photo

---

[9] The term "internship" is synonymous with "practicum" and is defined by Brooks Institute's accrediting agency, the Accrediting Council for Independent Colleges and Schools (ACICS), as "a supervised practical experience that is the application of previously studied theory. Normally, three hours of work in a practical setting has the credit equivalency of one hour of classroom lecture. Under the supervision of a faculty or staff member, a written agreement shall be developed that outlines the arrangement between the institution and the practicum site, including specific learning objectives, course requirements, and evaluation criteria." ACICS Glossary of Definitions, pg. GLO-6, May 1, 2005.

assistant on February 1, 2004, at $21.00 per hour. Other Brooks Institute records indicate this employment placement was Institute-generated.

When contacted by the Bureau in April 2005, the employer stated that Graduate #16 had not been a paid employee, but that she had been an unpaid intern for a couple of months. Although this position does not appear to have been a for-credit "internship" since it occurred post-graduation, it clearly was not a "placement."

- According to Brooks Institute records, Graduate #17 completed her educational program in June 2003, with approximately $57,100 in total loan indebtedness, receiving an associate of arts degree in Visual Journalism. The *Form* for Graduate #17, completed by Brooks Institute on November 4, 2003, indicates that she was employed as a photo editor beginning on September 1, 2003, but the *Form* does not list any wage or salary data. Data submitted to the Bureau in February 2005 shows Graduate # 17 was placed by Brooks Institute in part-time employment with a wage of $7.00 per hour.

  When contacted by the Bureau in April 2005, the employer confirmed that Graduate #17 did work as an "intern" in 2004 – not in 2003 as recorded on the Brooks Institute *Form* – for a total of three months, earning a total of $750.00. Although this position does not appear to have been a for-credit "internship" since it occurred post-graduation, it clearly was not a "placement."

- According to Brooks Institute records, Graduate #18 completed his educational program in August 2003, with approximately $18,300 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. The *Form* for Graduate #18 was completed by Brooks Institute on August 2, 2003, the day after graduation. It indicates that Graduate # 18 was employed a full year prior to graduation, on August 1, 2002 as a photo assistant with a part-time annual salary of $17,000. When the Bureau reviewed this individual's placement file, it also indicated that Graduate #18 had been employed beginning on August 1, 2002, but as an Industrial Photographer with a part-time wage of $16.00 per hour.

  In response to the Bureau November 2004 survey, Graduate #18 stated that his status with the employer of record was that of an unpaid internship that he used for experience in handling and operating scientific cameras. As previously noted, internships are student assignments conducted for education credit, whether compensated or not and, as such, do not constitute employment for "placement" purposes.

- According to Brooks Institute records, Graduate # 19 completed her educational program in December 2003, with approximately $145,000 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. Brooks Institute placement information for Graduate # 19 indicates that she was self-placed in full-time employment, as of the first day she enrolled as a student at Brooks Institute, as a "Portrait Photographer" with an annual salary of $26,000. The *Form* for Graduate # 19, however, indicates the position title as a "Groomer & Photographer" with job duties described as "Groom pets (dogs) & take their portrait for clients."

  The placement was recorded on the Brooks Institute *Form* on March 1, 2004, three months after graduation, but reflected an employment start date three and a half years earlier (on September 1, 2000). The Bureau does not consider this case to meet the definition of placement since the graduate was already employed in the position prior to enrollment at Brooks Institute, and prior to acquiring the baccalaureate degree.

The contradictory information recorded by Brooks Institute in its placement files vis-à-vis the confirmed statements of facts outlined above are evidence of Brooks Institute's false, misleading, or incomplete representations to the Bureau on the *School Performance Fact Sheet* and in the 2003 Annual Report in connection with student placements.

### Determination of Violation(s):

Based on the foregoing, the Bureau has determined that Brooks Institute provided false, misleading or incomplete information to the Bureau regarding the placement and salaries of its 2003 graduates, in violation of Education Code section 94808 and 94816. A violation of the Reform Act is grounds to refuse to issue or renew an application under Education Code section 94830(b).

### C. INSTITUTE PROVIDED INACCURATE AND UNDERREPORTED STUDENT TUITION RECOVERY FUND (STRF) DATA TO THE BUREAU.

Education Code section 94830(q) authorizes the Bureau to refuse to issue or renew an approval to operate, or to revoke an institution's approval, if the institution fails "to pay any fees, order for costs and expenses under Section 94935, assessments, or penalties owed to the council, as provided in this chapter."

Each institution is required to "collect the amount assessed by the bureau in the form of a Student Tuition Recovery Fund fee from its new students, and remit these fees to the bureau during the quarter immediately following the quarter in which the fees were collected from the students, or from loans funded on behalf of the students, except that an institution may waive collection of the Student Tuition Recovery Fund fee and assume the fee as a debt of the institution." (Education Code § 94945(a)(1)(B).)

Education Code section 94945(a)(3) requires that assessments made pursuant to this section shall be made in accordance with both of the following:

(A) Each new student shall pay a Student Tuition Recovery Fund assessment for the period of January 1, 2002, to December 31, 2002, inclusive, at the rate of three dollars ($3) per thousand dollars of tuition paid, rounded to the nearest thousand dollars.

(B) Commencing January 1, 2003, Student Tuition Recovery Fund fees shall be collected from new students at the rate of two dollars and fifty cents ($2.50) per thousand dollars of tuition charged, rounded to the nearest thousand dollars. For new students signing enrollment agreements between January 1, 2002, and December 31, 2002, inclusive, the assessment rate of three dollars ($3) per thousand dollars of tuition paid, rounded to the nearest thousand dollars, as provided in subparagraph (A) of this paragraph, shall remain the assessment rate for the duration of the student's enrollment agreement.

### Allegations:

Brooks Institute submitted incomplete Student Tuition Recovery Fund (STRF)-related information to the Bureau and underreported, underpaid, and incorrectly assessed and remitted students' STRF fees to the Bureau in violation of Education Code section 94945. The inconsistencies can be grouped into two categories: 1) the calculations by Brooks Institute to assess STRF fees on eligible (and ineligible) students enrolled; and 2) the application of STRF assessments by the institution with regard to California residency and non-residency of enrolled students.

The Bureau reviewed the general ledgers of the 2003 graduates, which were collected during the February 2005 visit, as well as fifty student records of those students who dropped or withdrew in the 2003 and 2004 calendar year, collected during the November 2004 visit. During the review of these documents, the Bureau found that the institution incorrectly calculated the students' fee for the STRF assessment. The incorrect calculations for some of the assessments were due to inaccurate rounding of tuition charged to the nearest thousand dollars, while other assessments were simply miscalculated. However, the Bureau could not determine the formulas or methodologies used by Brooks Institute that resulted in the miscalculated assessments, as there was no consistency in the formulas used.

While these instances may appear minimal as individual cases, when multiplied by the total number of eligible students, the difference is significant. The Bureau's investigation found evidence of thirty-five additional STRF-eligible students than the 1,277 that were reported by Brooks Institute for a total of 1,312 for 2002. According to an audit by the Bureau's STRF unit of the submitted data, the lower figure reported by Brooks Institute resulted in underpayment to the STRF of at least $3,117. The audit also found that Brooks Institute's misapplication of the STRF assessment on California resident and non-resident students in 2002 resulted in the underpayment to the STRF of $8,354.45.

As stated in the previous paragraph, the Bureau found that the California residency and non-residency of the students for the STRF is inconsistently and incorrectly applied. The Bureau randomly selected 39 student records and reviewed the general ledger for each year the student was enrolled. The findings are as follows:

- Fifteen of 39 randomly selected student records reviewed for compliance were determined to be non-California residents and, therefore, non-eligible for STRF assessments. However, twelve of these fifteen non-eligible (non-California resident) students were assessed STRF fees.

- Application of the STRF assessment on both STRF-eligible (California resident) and non-eligible (non-California resident) students was inconsistent from year to year. The Bureau found that Student #39 – who was not a California resident and, therefore, was non-eligible for STRF – was assessed for STRF by Brooks Institute in the first year she was enrolled, but not in the second year. She was then assessed STRF fees in the third year.

- Brooks Institute reported 1,277 STRF-eligible students to the Bureau for the 2002 Reporting Year (Line B). However, the Bureau found evidence of 1,312 STRF-eligible students for that same period. This under-reporting has resulted in underpayment by Brooks Institute to the STRF.

In Brooks Institute's 2003 Annual Report to the Bureau, it reported total enrollment of 2,806 students enrolled in all degree programs for the 2003 calendar year. This same total student enrollment figure for calendar year 2003 is required to be reported on STRF assessment forms filed by Brooks Institute with the Bureau. However, according to the Bureau's STRF unit review of the records supporting its 2003 STRF assessments, the 2003 Annual Report figure of 2,806 total students reported by Brooks Institute "does not reconcile to the number of students reported on either Line (A) or Line (B) of the assessment reports as filed for the 2003 year."

<u>Determination of Violation(s):</u>

Based on the foregoing, the Bureau has determined that Brooks Institute under-reported, underpaid, and incorrectly assessed STRF fees in violation of Education Code section 94945. A violation of the Act is grounds for refusal to issue or renew an application under Education Code section 94830(q). In addition,

the foregoing provides the basis for the Bureau's determination that Brooks Institute has provided false information to the Bureau, in violation of Education Code section 94830(a).

## III. RESTRICTIONS OR CONDITIONS ON APPROVAL

The conditions under which Brooks Institute receives this approval are as follows:

**Condition 1.** Brooks Institute will report quarterly to the Bureau on its progress toward full compliance with the conditions of this approval. The first quarterly report will be due within thirty days from the last day of the month of the quarter in which Brooks Institute receives the Conditional Approval. In the first report, Brooks Institute will develop a timeline, which will be subject to approval by the Bureau, establishing target dates for compliance with each Condition as set forth herein. In each subsequent report, Brooks Institute will report on its progress toward fulfillment of each condition within the timelines established, and provide the Bureau with copies of any forms, manuals, or guidelines developed. This report shall be sent to the following address until the Conditional Approval has been removed:

<div align="center">

Marcia Trott
Senior Education Specialist-Degree Program
Bureau for Private Postsecondary and Vocational Education
400 R Street, Suite 5000
Sacramento, CA. 95814

</div>

The first report will become the foundation for subsequent reports submitted to the Bureau by Brooks Institute for future and currently enrolled students, and shall include the following:

- The names, addresses, and telephones numbers of each student currently enrolled in Brooks Institute, as well as the title of the degree program in which the students are enrolled.
- For each individual named above, Brooks Institute will provide the date the student was admitted and the date of the first class attended.
- For each individual named above, Brooks Institute will provide the student's status as a California resident or non-resident student.
- For each individual named above that withdraws or cancels, Brooks Institute will provide the last day attended, as well as the reason provided for the discontinuation of the program and the total amount of federal financial aid loans and/or private loans each student is obligated to pay for his or her education as of the last date attended at Brooks Institute.

The first report shall also include the following verifiable information for 2003 graduates and all graduates thereafter:

- The names, addresses, and telephones numbers of each graduate of Brooks Institute (sorted by graduation year) that includes the title of the degree earned, the date of graduation, the date of placement, the placement start date, and the date that the placement was verified.
- For each individual named above, Brooks Institute will provide the total amount of federal financial aid loans and/or private[10] loans that students and/or their parents (in the form of Parent PLUS[11] loans) have

---

[10] When grants, scholarships, and federally sponsored loans are not enough to cover the cost of a student's education, the student and/or their parents can obtain additional funding through one of several alternative private loan options: a Signature Student Loan or a Tuition Answer Loan (SM). Although neither of these loans is federally sponsored, they are both education loans designed to help

incurred to pay for the education to include all loan disbursements made through Brooks Institute. This information will be the foundation for disclosing potential long-term debt upon graduation, a realistic average of the dollars borrowed, and disclosure in the catalog.

- For each individual named above, Brooks Institute will provide the current or starting salary or wage for each graduate who has secured employment, and indicate whether the job is in a field related to the area of study.

Condition 2. Brooks Institute will meet with Bureau staff within six months of the date of this approval letter to monitor progress toward compliance with the conditions of approval as set forth herein. All conditions shall be met prior to the submission of the Brooks Institute's application of re-approval.

Condition 3. Brooks Institute will evaluate its current placement policies and procedures vis-à-vis the Bureau's findings noted herein and provide this information to the Bureau with the first quarterly report. Brooks Institute will provide to the Bureau notification of any future changes made to these policies and procedures and be able to demonstrate at the request of the Bureau that the process has been utilized and monitored with regard to the placement of students. For each current graduate and all future graduates, Brooks Institute must demonstrate that those graduates have secured employment based on criteria that shall include the following:

- The process and policies developed by Brooks Institute for placement will include a definition of "secure employment" that is not considered temporary or unpaid and will not include internships or one-time events.
- Brooks Institute will provide a written statement from the employer that the graduate is employed along with a brief description of his or her job duties, or a written statement *from the graduate* that he or she has secured employment along with a brief description of his or her job duties.
- Brooks Institute will provide a description of each document it will require in the placement file for each graduate.
- Brooks Institute will provide its process for auditing the placement information, including what will be required in the placement file and how it will be verified.

Condition 4. Brooks Institute will refrain from enrolling students into any of its degree or non-degree programs until the following have been demonstrated to the Bureau:

- Brooks Institute will verify the placement information for each 2003 graduate, determine if each has obtained secure employment, and provide to the Bureau accurate "placement" numbers and percentages for 2003 graduates. This information will be submitted in the form of a corrected *School Performance Fact Sheet*, with a revision date. This corrected form will immediately be distributed and explained to prospective and currently enrolled students. This notice shall be signed by both the student and a representative of Brooks Institute and evidenced in the student's file.
- Brooks Institute will assure that any manuals developed or used by its Admission Representatives include accurate information, scripts based upon real and verifiable data, and portrayal of Brooks Institute's ratio of the number of enrollments allotted versus the number of students enrolled that is not unrealistically

students obtain the funding needed to attend the school of their choice. Each of these loan options enable students to borrow up to the full cost of their education, including tuition and fees, room and board, books and supplies, transportation and even living expenses.
[11] The federally sponsored Parent Loan for Undergraduate Students (PLUS) Loans enable parents to borrow to pay the education expenses of each child who is a dependent undergraduate student enrolled at least half time in an approved college or university. These loans are available through both the Direct Loan and FFEL programs. Most of the benefits to parent borrowers are identical in the two programs. Generally, repayment must begin within 60 days after the loan is fully disbursed. There is no grace period for these loans. This means interest begins to accumulate at the time the first disbursement is made. Parents must begin repaying both principal and interest while the student is in school.

inflated or otherwise misleading. Any such manual will include a comprehensive and accurate analysis of the national and state labor statistics regarding employment opportunities in the field of study. This information is to be portrayed as a material fact in the Brooks Institute catalog.

<u>Condition 5.</u> Should Brooks Institute request Bureau approval to add new educational programs while it is operating under a Conditional Approval, the Bureau will consider any such request contingent upon the progress, or lack thereof, Brooks Institute has made in meeting the Conditions outlined herein.

<u>Condition 6.</u> Brooks Institute must provide the following disclosure to each current student and potential student in writing:

"This Institute has received a conditional approval to operate from the Bureau for Private Postsecondary and Vocational Education ("Bureau"). A conditional approval means that this Institute was found to be operating in violation of the statutes and regulations that govern private postsecondary educational institutions, and therefore it was not in the public interest to give this Institute a full unconditional approval to operate in this State. This designation allows Brooks Institute to operate while the Bureau monitors compliance with applicable regulations, statutes and restrictions placed upon this Institute."

This notice shall be signed by both the student and a representative of Brooks Institute and evidenced in the student's file. This disclosure must also be placed in Brooks Institute's current catalog under "Institutional Authority to Grant Degrees" so that students and potential students know that Brooks Institute is operating under a conditional approval.

<u>Condition 7.</u> The full and qualitative review of Brooks Institute's application for renewal will be comprehensive and, as such, the review will not be limited to the findings in this approval document.

<u>Condition 8.</u> Brooks Institute will review the assessments it made to the Student Tuition Recovery Fund for 2002, 2003, 2004, and to-date in 2005. Brooks Institute will determine the amount that should have been charged for each student enrolled during this time period and the amount actually charged. Brooks Institute will remit the difference to the Bureau. It will also provide verifiable documentation that it has refunded those assessments incorrectly assessed or calculated to each student, if applicable. Further, if students were not assessed sufficiently, Brooks Institute will pay that amount to the Bureau and *will not* charge the students.

<u>Condition 9.</u> Brooks Institute of Photography violated provisions of California Education Code 94816, 94831, and 94832, which may result in the unenforceability of any contract or agreement arising from the transaction in which the violation occurred, pursuant to Education Code section 94985(a). No later than August 31, 2005, Brooks Institute of Photography must provide a plan to the Bureau that provides in detail how it will provide equitable restitution to all students enrolled from May 4, 1999 to the present. The Bureau must approve this plan before it is implemented.

Note: Brooks Institute is permitted to submit to the Bureau much of the required information electronically on CD-ROMs or DVDs.

Brooks Institute may, not less than one year after the effective date of this Notice, petition the Bureau for a modification of the Conditional Approval.

Violation of any conditions of the conditional approval is grounds for revocation of the approval to operate. If any violation of the conditional approval occurs, the bureau shall serve respondent with a

*Brooks Institute of Photography*
*July 11, 2005*
*Page 19 of 19*

notice of revocation, and after notice and hearing, impose the discipline of revocation on respondent's license. If during the period of probation, an accusation, statement of issues, or other notice of administrative action has been filed against respondent's approval to operate, or the attorney general's office has been requested to prepare such an accusation, or other notice of administrative action, the effective dates of the conditional approval set forth in this decision shall be automatically extended and shall not expire until the accusation, or notice of administrative action has been acted upon by the bureau.

## IV. GROUNDS FOR CONDITIONAL APPROVAL:

Brooks Institute of Photography violated the Reform Act by willfully misleading, falsifying, and omitting critical information that persuaded prospective students to enroll in educational programs that were advertised and promoted as preparation for a high paying career in their respective fields of study. Brooks Institute then encouraged students to constantly apply and receive student financial loans from governmental and private lenders in considerable excess of the students' potential earnings to repay those loans. Further, required data submitted by Brooks Institute to the Bureau was found to be inaccurate, incomplete, and misleading. These actions are prohibited by Education Code sections 94832(a), (b). Violations of the Reform Act are grounds for denial of a renewal application and revocation of a current approval to operate under Education Code section 94830(a). Violation of Section 94832 provides further grounds for denial of a renewal application and revocation of a current approval to operate under Education Code section 94985(a). Further, fraudulent and deceptive acts constitute grounds for denial of Brooks Institute's renewal application for approval to operate under Business and Professions Code section 480(a)(2).

Although these acts are cause for a denial of Brooks Institute's approval to operate, the Bureau is cognizant of the number of students currently enrolled and the negative impact a revocation and denial would have on the students and their families. The Bureau finds that the resources available to Brooks Institute are sufficient to meet the minimum standards of California Education Code and its regulations. If compliance is not met within the reasonable period of time set forth in this document, the Bureau will move to revoke Brooks Institute's approval to operate.

In closing, again please be advised that unless a timely appeal is received by the Bureau, Brooks Institute of Photography waives its right to an administrative hearing on this action.

Sincerely,

*Barbara Ward*

BARBARA WARD
Chief
Bureau for Private Postsecondary and Vocational Education

Attachments



STATE OF CALIFORNIA, STATE AND CONSUMER SERVICES AGENCY

**Consumer Affairs**

Bureau for Private Postsecondary and Vocational Education
400 R Street Suite 5000, Sacramento, CA 95814-6200
P.O. Box 980818, West Sacramento, CA 95798-0818
(916) 445-3427
www.bppve.ca.gov

*In accordance with the provisions of California Education Code § 94900 and/or 94915*
*Postsecondary and Vocational Education approves (conditional)*

# BROOKS INSTITUTE OF PHOTOGRAPHY

1321 Alameda Padre Serra
Santa Barbara, CA 93103
School Code #: 4201871

## INSTITUTIONAL APPROVAL

This institution has received conditional approval to operate from the Bureau for Private Postsecondary and Vocational Education ("Bureau"). A conditional approval to operate means that the Bureau has determined that the institution is in compliance with this chapter, but has operated within three years before the filing of the application in violation of this chapter. Therefore, the Bureau has determined that an unconditional grant of approval to operate is not in the public interest.

Subject to earlier termination in accordance with the law.



Approval #: 20021

Effective Date: July 11, 2005

Expiration Date: June 30, 2007

Sheila Hawkins, Private Postsecondary Education Administrator

This document is valid if all fees are current. Subject to earlier termination in accordance with the law.

JUL-22-2005 FRI 10:12 AM BPPVE    FAX NO. 916 323 3780    P. 22

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    ARNOLD SCHWARZENEGGER, Governor



**Bureau for Private Postsecondary and Vocational Education**
400 R Street, Suite 5000, Sacramento, CA 95814-6200
P.O. Box 980818, West Sacramento, CA 95798-0818
(916) 445-3427
www.bppve.ca.gov



State of
California
Department of
**Consumer
Affairs**

# Approved/Registered Program List

*In accordance with the provisions of California Education Code 94900 and/or 94915 and/or Article 9.5, the Bureau
for Private Postsecondary and Vocational Education conditionally approves:*

## *BROOKS INSTITUTE OF PHOTOGRAPHY*

*1321 Alameda Padre Sierra*
*Santa Barbara, Ca 93108*

*School Code #: 4201871*
*Site Type: Main*

*to offer the following program(s)/course(s):*

| Program Name | Program Approved | Program Type |
|---|---|---|
| AA VISUAL JOURNALISM | 04/04/2001 | Degree |
| BA FILM & VIDEO PRODUCTION | 06/26/2001 | Degree |
| BA PROFESSIONAL PHOTOGRAPHY | 01/01/1995 | Degree |
| BA VISUAL COMMUNICATION | 09/05/2001 | Degree |
| BA VISUAL JOURNALISM | 04/04/2001 | Degree |
| MS PHOTOGRAPHY | 01/01/1995 | Degree |
| FILM & VIDEO PRODUCTION | 06/29/2001 | Non-Degree |

*The program list above represents all currently approved/registered educational services for this institution. The Main, Branch, or
Satellite locations of this institution may offer any subset of this list. Branch and Satellite location(s) may only offer educational
services that are approved at the Main location as stated in Section 94719 and 94742(a) of the Private Postsecondary and Vocational
Education Reform Act.*

*Marcia Trott, Senior Education Specialist*
This document is valid if all fees are current. Subject to earlier termination in
accordance with the law.

*Approved/Registered Program list associated with Institution Approval # 20021, which expires on June 30, 2007.*

*Page 1 of 2*
*Printed: 7/11/2005*

Approved/Registered Program List

School Name: BROOKS INSTITUTE OF PHOTOGRAPHY
School Code: 4201871   (Institution Code: 4201871.........Site Type: Main)

| Program Name | Program Approved | Program Type |
|---|---|---|
| PROFESSIONAL PHOTOGRAPHY | 01/01/1995 | Non-Degree |

Degree Programs: 6
Non-Degree (Vocational) Programs\Courses: 2
Total Programs/Courses: 8

*The program list above represents all currently approved/registered educational services for this institution. The Main, Branch, or Satellite locations of this institution may offer any subset of this list. Branch and Satellite location(s) may only offer educational services that are approved at the Main location as stated in Section 94719 and 94742(a) of the Private Postsecondary and Vocational Education Reform Act.*

Marcia Trott, Senior Education Specialist
This document is valid if all fees are current. Subject to earlier termination in accordance with the law.

*Approved/Registered Program list associated with Institution Approval # 30021, which expires on June 30, 200 .*

# Exhibit B



From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Tue, May 19, 2020 at 12:03 PM
Subject: FSA Borrower Defense Application: 01350173 [ ref: _00Dt0Gyiq._500t0DPQQS:ref ]
To:



Dear Rebekah Norton:

We have received the additional information you provided regarding your application for borrower defense ▮▮▮▮▮▮.

You will be notified once a decision has been made on your application.

If you have questions, you may respond to this email or call our borrower defense hotline: **(855) 279-6207**. Representatives are available Monday through Friday from 8 a.m. to 8 p.m. Eastern time.

Sincerely,
U.S. Department of Education (ED)
Federal Student Aid
Borrower Defense Unit

*To respond to this email, please reply to this email thread without modifying the Subject line. That way, your response will automatically attach to your application.*





ref: ██████████████████████

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**Exhibit C**



From: **Borrower Defense** <<u>borrowerdefense@ed.gov</u>>
Date: Fri, Jul 10, 2020 at 7:02 AM
Subject: Borrower defense discharge ineligibility information for you [
]
To:

7/10/2020

Borrower Defense Application #:

Dear Rebekah Norton:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Brooks Institute. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Brooks Institute. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20

U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Other

You allege that Brooks Institute engaged in misconduct related to Other. This allegation fails for the following reason(s):Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 2: Educational Services

You allege that Brooks Institute engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 3:Transferring Credits

You allege that Brooks Institute engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 4: Career Services

You allege that Brooks Institute engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Insufficient Evidence.
Your claim for relief on this basis therefore is denied.

Allegation 5: Program Cost and Nature of Loans

You allege that Brooks Institute engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 6: Employment Prospects

You allege that Brooks Institute engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.
Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular oversight activities
> Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
> Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮]"
to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

*COVID-19 Note:* On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Exhibit 37

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>          Plaintiffs,<br><br>   v.<br><br>DR. MITCHELL ZAIS, in his official capacity<br>as Acting Secretary of Education, and the<br>UNITED STATES DEPARTMENT OF<br>EDUCATION<br><br>          Defendants. | No. 3:19-cv-03674-WHA |

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants hereby supplement their responses to Plaintiffs' First Set of Interrogatories (the "Interrogatories"), served on November 6, 2020.

## BACKGROUND

On December 7, 2020, undersigned counsel for the Defendants timely submitted, via email, Defendants' written responses and objections to Plaintiffs' first set of interrogatories ("December 7 Responses"). In response to several of Plaintiffs' interrogatories, Defendants noted that they intended to supplement their narrative responses by producing particular documents. Defendants have now produced and/or identified each of the referenced documents, as set forth below:

- **Interrogatory No. 3**: In their December 7 Responses, Defendants stated that they would supplement their response with a "chart that includes case-level data from the borrower defense system" demonstrating various "relevant case characteristics." Defendants produced this supplemental document by email dated December 14, 2020.

1

- **Interrogatory No. 9**:  In their December 7 Responses, Defendants stated that they would supplement their response with a "chart that shows the number of career staff and contractors working for FSA in the Borrower Defense Unit during each month of the relevant time period."  Defendants produced this supplemental document by email dated December 11, 2020.

- **Interrogatory No. 10**:  In their December 7 Responses, Defendants stated that they would supplement their response with three categories of documents: "(1) the initial letters sent to schools thus far requesting information and advising schools that they would be receiving notice of individual borrower applications against them, (2) the template for the form letters sent to the school with the individual borrower application, and (3) documents describing the protocol and procedures for sending initial and form letters to schools that were in effect at the time that the notices were sent."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory No. 11**:  In their December 7 Responses, Defendants stated that they would supplement their response with documents reflecting the "criteria for approval" for claims submitted by borrowers who attended certain schools and the "policies and procedures regarding approvals."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory No. 12**:  In their December 7 Responses, Defendants stated that they would supplement their response with certain "written training materials."  Defendants produced these supplemental documents by email dated December 11, 2020.

- **Interrogatory Nos. 17 and 18**:  In their December 7 Responses, Defendants stated that they would supplement their responses to these two interrogatories with "(1) school-specific memos regarding the scope of evidence considered and (2) related adjudication protocols."  By email dated January 14, 2021, Defendants produced and/or identified these supplemental documents (many of which were included in Defendants' document productions) to Plaintiffs.

- **Interrogatory No. 19**:  In their December 7 Responses, Defendants stated that they would supplement their response with a chart demonstrating "which class members received each form denial letter and relevant case characteristics, including the date of the letter and school name(s) associated with the borrower's claim."  Defendants produced this supplemental document by email dated January 14, 2021.

In addition, Defendants hereby submit these supplemental responses to certain of Plaintiffs' interrogatories.  For any interrogatory not specifically addressed herein, Defendants refer Plaintiffs to Defendants' December 7 Responses.  Unless otherwise noted, these responses are subject to the objections set forth in the December 7 Responses.

2

## SUPPLEMENTAL RESPONSES AND OBJECTIONS

**Interrogatory No. 4**

Identify the person or persons who "tabled" Enforcement's request for approval to hire "several additional attorneys" for BDU.  Nevin Dec. ¶ 21 (ECF No. 56-4).

**Objections**:  Defendants incorporate by reference the objections set forth in the December 7 Responses, which made clear that this request seeks information that is plainly not relevant based on the limited discovery that has been authorized and is, thus, disproportionate to the needs of the case.  Nevertheless, in furtherance of their meet-and-confer responsibilities, Defendants provide the following additional information in response.

**Response:**  As discussed in the referenced Declaration of Colleen Nevin, in the Fall of 2016, the Enforcement Unit in FSA requested approval to hire additional attorneys for the Borrower Defense Unit.  After the election in November 2016, the Borrower Defense Unit was informed orally by leaders in the Enforcement Unit that this request was tabled until the new Administration was in place.  The individuals likely to have more specific knowledge left the Department prior to 2020.

**Interrogatory No. 5**

Identify how and by whom both the "request" for approval to hire "several additional attorneys" for BDU and its "tabl[ing]" were communicated, including by identifying documents reflecting both the "request" and its "tabl[ing]."  Nevin Dec. ¶ 21 (ECF No. 56-4).

**Objections:**  Defendants incorporate by reference the objections set forth in the December 7 Responses, which made clear that this request seeks information that is plainly not relevant based on the limited discovery that has been authorized and is, thus, disproportionate to the needs of the

case.  Nevertheless, in furtherance of their meet-and-confer responsibilities, Defendants provide the following additional information in response.

**Response:**  The leadership of the Enforcement Unit met with Department leadership in the Fall of 2016 to review a staffing proposal and discussed options for BDU staffing increases.  After the election in November 2016, the Borrower Defense Unit was informed orally by leaders in the Enforcement Unit that the request for additional staffing was tabled until the new Administration was in place.  The individuals likely to have more specific knowledge left the Department prior to 2020.

**Interrogatory No. 14**

Identify who in "Department leadership convened a Borrower Defense Review Panel," and explain the reasoning behind the formation of the panel.  Nevin Dec. ¶ 55 (ECF No. 56-4).

**Objections:**  Defendants incorporate by reference the objections set forth in the December 7 Responses, which made clear that this request seeks information that is plainly not relevant based on the limited discovery that has been authorized and, thus, disproportionate to the needs of the case.  Nevertheless, in furtherance of their meet-and-confer responsibilities, Defendants provide the following additional information in response.

**Response:**  As reflected in the deposition testimony of Jim Manning, the Department leadership as a group decided that it would be helpful to review the Department's process for handling and considering claims for borrower defense discharges.  The group was convened by Joe Conaty.

**Interrogatory No. 16**

Identify the individuals who drafted and approved form Denials A, B, C, and D, and explain the process for review and approval of the letters.  *See* ECF No. 116.

**Objections**: Defendants incorporate by reference the objections set forth in the December 7 Responses.

**Response:** Staff members within FSA prepared a set of draft decision letters; each letter was specific to a certain group of claims and circumstances. That set of draft letters was sent to other officials in the Department, including Jed Brinton (then Deputy General Counsel for Postsecondary Education with the Department's Office of General Counsel) and other attorneys in the Office of the General Counsel, as well as Diane Jones (the Principal Deputy Under Secretary) and Robert Eitel (then Counselor to the Secretary). Those attorneys and officials provided comments back to FSA. Based on those original drafts and the comments from those officials, FSA prepared what became form letters A and C. FSA staff then used form letters A and C to draft form letters B and D. Form letter B built on form letter A to address circumstances requiring a combination of the other letters, and form letter D built on form letter C to incorporate school-dependent evidence considered. The Department did not have an established process that mandated any further review or approval before the form letters could be used. Based on the Department's original and supplemental inquiries, there is no indication that former Secretary DeVos was involved in the review or approval of the template letters A, B, C or D.

### SIGNATURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 33(b)(5)

For interrogatory responses: See the attached certification pages.

Dated: January 14, 2021                              As to objections,

                                                     JENNIFER B. DICKEY
                                                     Acting Assistant Attorney General

                                                     MARCIA BERMAN
                                                     Assistant Branch Director

5

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

Exhibit 38



DATE:       JUN 0 4 2015

TO:         Sharon Mar
            Office of Information and Regulatory Affairs
            Office of Management and Budget

THROUGH:    Kathy Axt
            Privacy, Information Collection Clearance Division
            U.S. Department of Education

FROM:       James W. Runcie
            Chief Operating Officer, Federal Student Aid

SUBJECT:    Emergency Clearance of Information Collection to Allow for Receipt of Borrower
            Defense to Repayment Loan Discharge Claims

*Background on Borrower Defense to Repayment Loan Discharge Regulations*

Following a negotiated rulemaking process, the U.S. Department of Education (the
"Department") published amendments to the Federal Direct Loan Program (Direct Loan)
regulations on December 1, 1994. These regulations included borrower defenses specified in 34
CFR 685.206(c). The regulation, in part, states "(1) [i]n any proceeding to collect on a Direct
Loan, the borrower may assert as a defense against repayment, an act or omission of the school
attended by the student that would give rise to a cause of action against the school under
applicable State law."

A subsequent negotiated rulemaking process was established for the purpose of developing
regulations for borrower defenses for both the Direct Loan and the Federal Family Education
Loan Program (FFEL) programs. However, during the first session of the negotiations, the non-
Federal negotiators recommended to the Department that no additional sessions were warranted
and that no further regulatory provisions for borrower defenses would be needed. It was
determined that borrower defenses could be adequately addressed by current regulation and
administrative procedures. A further discussion of this is in the Federal Register, Vol. 60, No.
140, July 21, 1995, 37767-37770.

Prior to 2015, the borrower defense identified above was rarely asserted by any borrowers and no
specific methods of collecting information regarding borrower defense claims have been defined
or found necessary.



*Borrower Defense Claims from Corinthian Colleges, Inc. Borrowers*

Corinthian Colleges, Inc. (CCI) was the owner of a number of for-profit postsecondary education institutions across the country. In January 2010, CCI purchased Heald College, which had 14 locations in California, Oregon, and Hawaii. At the time of its purchase by CCI, Heald College participated in the federal student financial assistance programs authorized under Title IV of the Higher Education Act of 1965 (HEA), as amended. CCI was also the owner of other title IV eligible institutions, including the Everest and Wyotech chains of schools.

In January 2014, the Department sent a letter to CCI in which the Department requested that CCI provide a copy of school performance disclosure documents for every CCI location, including Heald College institutions, for the calendar years 2010, 2011, 2012, and, when available, 2013. The Department also asked that CCI provide the evidence upon which CCI relied to derive each of the placement rates cited in the disclosures, including a list of all students either placed or omitted from the placement calculation due to any type of waiver, and the academic, employment, and/or waiver information specified by the Department.

In June 2014 the Department placed CCI on an increased level of financial oversight after the company failed to address concerns about its practices, including concerns that it was falsifying job placement data used in marketing claims to prospective students and allegations of altered grades and attendance. CCI subsequently agreed to gradually wind down activity as part of an operating agreement with the Department. As a part of this, CCI sold 56 Everest and Wyotech campuses to the ECMC Group in November 2014. Over 70,000 students were enrolled in the programs that were transferred to ECMC.

In April 2015, the Department issued a notice of intent to fine Heald College $30 million upon finding that Heald misrepresented placement rates for a number of its programs going back to 2010. Upon the issuance of the Department's fine letter, CCI announced it would close its remaining programs immediately, including all its Heald locations and several Everest and Wyotech locations that were not part of the sale to the ECMC group. Almost 16,000 students were enrolled in these programs.

Over the past several months, as the events related to CCI have unfolded, former CCI students, supported by various organizations and non-profits, have organized a campaign to assert that the Department should discharge their student loan debt pursuant to the borrower defense regulations. Over 1,000 students have already submitted borrower defense claims to the Department. Several prominent Congressional offices have also voiced their support for this position. Many media outlets have also written about the CCI closure and the Department's findings of misrepresentation. While coverage has been mixed, most stories imply that the Department has not taken sufficient action to protect CCI students. Overall, pressure is mounting for the Department to act.

In the 20 years prior, the Department received 5 claims for borrower defense. Over the last several months, the Department has received over 1,000 such claims due to a building debt activism movement as well as the notoriety of Corinthian's collapse, creating a need for a clearer

2

process for potential claimants. This exponential increase in demand was unexpected and outside of the Department's control.

Given that borrowers have a right to assert a defense to repayment claim and that the Department has made findings against a number of CCI's former programs, we expect thousands of more claims to be submitted as several advocacy groups are working to organize CCI borrowers. Many of these borrowers are struggling or behind on their loan payments or in default. Because borrowers have a right to submit defense to repayment claims, the Department must set up a process to review and adjudicate them.

To respond to these events and protect harmed borrowers, which the Department has a legal responsibility to timely provide, the Department seeks to announce on June 8, 2015 that:

- Student borrowers who attended the Heald College programs that the Department has found made false representations will have their loans discharged if they complete the attached attestation. These borrowers need not prove that Heald College's actions violated State law as the Department's findings show a State law violation. The Department estimates that there are potentially 50,000 borrowers in this category.

- A process will be set up to review and adjudicate borrower defense claims from other borrowers, including other CCI borrowers. Although we will advise that borrowers hold their submissions until this process is made public, we cannot bar the submission of claims. Thus, the Department will post on its website the attached language directing those borrowers who choose not to wait to send their claims to the address provided and a short list of information they should include. The Department estimates that there are potentially 100,000 borrowers who may exercise this defense. It is important to note that borrowers from other schools could also submit borrower defense claims if they believe that their school has engaged in a State law violation related to their education that has harmed them.

- All former CCI borrowers who have filed, or plan to file, an application for borrower defense will have the opportunity to enter forbearance while they submit their applications and the Department reviews their claim.

The Department requests that OMB approve the attached Attestation and website language by June 4, 2015 and waive the requirement under §1320.5(a)(1)(iv) to publish notice of the Attestation in the Federal Register, as authorized under §1320.13(d). The Department anticipates announcing guidance on the borrower defense process on June 8, 2015. The closure of the Corinthian schools was unexpected and outside of the Department's control. To preserve borrowers' rights and meet its fiduciary responsibilities of the Direct Loan program, the Department is requesting an emergency approval for an information collection that will allow the Department to collect the information in the attestation for Heald College borrowers and the information needed for borrower defense claims from other borrowers. If the Department is unable to collect this information, borrowers will not be able to immediately take advantage of the relief being announced. This will raise questions from borrowers and our call centers risk becoming overwhelmed to the point of breaking. Without the attached Attestation, many

borrowers may submit incomplete or improperly prepared claims. All of this confusion may undermine our efforts to provide relief to harmed borrowers and result in a belief that there is no effective recourse available.

We believe that the facts described here meet the standards for emergency clearance in §1320.13(a)(2)(i) and (iii)  because the inability to provide for public comment and notice regarding the Attestation would, if normal clearance procedures are followed, cause public harm to the borrowers who were enrolled in Heald Colleges. In addition, the use of normal clearance procedures would disrupt the Department's ability to protect the borrowers affected by closure of the Heald colleges and cause grievous harm to the integrity of the Federal Direct Loan program.

Thank you for your prompt consideration of this request. If you have additional questions, please contact Colleen McGinnis at Colleen.McGinnis@ed.gov or (202)377-4330.

# Exhibit 39

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

Case No.: 19-cv-03674-WHA

Plaintiffs,

v.

**AFFIDAVIT OF JESSICA JACOBSON**

ELISABETH DEVOS, in her official capacity
as Secretary of the United States Department
of Education,

And

THE UNITED STATES DEPARTMENT OF
EDUCATION,

Defendants.

I, Jessica Jacobson, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case. I am a named plaintiff in this class action.

2. I borrowed federal student loans in order to attend the New England Institute of Art ("NEIA") Media Arts and Animation Program.

3. On Mach 4, 2015, attorney Toby Merrill submitted a borrower defense application on my behalf to the United States Department of Education ("Application"), asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4. On August 11, 2020, I received correspondence from the Department of Education, stating that my claim had been denied ("Denial Notice"). A copy of the Denial Notice is attached as Exhibit B.

5. In between the time that I first submitted my Application for loan cancellation and when I received the Denial Notice, my federal student loans have been in forbearance.

6. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to the Program Cost and Nature of Loans.

7. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to Transferring Credits.

8. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to Admissions and Urgency to Enroll.

9. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to "Other."

10. I do not know what "Other" refers to.

11. The Department's application form did not ask me to state a legal claim. Even so, my Application stated the following legal claims: Unfair and Deceptive Acts and Practices in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; Fraudulent Misrepresentation; Fraudulent Inducement; Unconscionability; Breach of the Covenant of Good Faith and Fair Dealing.

12. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Career Services.

13. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Educational Services.

14. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Employment Prospects.

15. My Application was 86 pages long and included a detailed letter summarizing and supporting my legal claims, an affidavit of my first-hand account of experiences with NEIA, and several pieces of documentary evidence including NEIA brochures and course descriptions I relied upon, loan documentation, my enrollment agreement, admissions correspondence, my transcript, a contemporaneous letter recounting my experience at the school, the student handbook, and NEIA's disclosures regarding loan repayment, employment, and graduation

pursuant to Massachusetts Law.

16. The Denial Notice does not respond to any of the claims I made or information I provided.

17. The Denial Notice offers no information about whether any of the evidence I submitted was reviewed, let alone considered, or what was found to be deficient. I do not know whether my evidence was reviewed and how it was found deficient.

18. The Denial Notice states that I may ask for reconsideration. I am not aware of any additional information I could possibly submit.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on:     August ___, 2020

August 14 2020

Jessica Jacobson

2                                   AFFIDAVIT



**From:** Borrower Defense <borrowerdefense@ed.gov>
**Date:** August 11, 2020 at 8:51:52 AM EDT
**To:** "j_m_jacobson@yahoo.com"

**Subject: Borrower defense discharge ineligibility information for you    [ ref:_00Dt0Gyiq._500t0DPCh4:ref ]**



8/11/2020

Borrower Defense Application #: 

Dear Jessica Jacobson:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at New England Institute of Art (The). "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at New England Institute of Art (The). ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Employment Prospects

You allege that New England Institute of Art (The) engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

### Allegation 2: Program Cost and Nature of Loans

You allege that New England Institute of Art (The) engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

### Allegation 3: Transferring Credits

You allege that New England Institute of Art (The) engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

### Allegation 4: Career Services

You allege that New England Institute of Art (The) engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

### Allegation 5: Educational Services

You allege that New England Institute of Art (The) engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

### Allegation 6: Other

You allege that New England Institute of Art (The) engaged in misconduct related to Other. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

### Allegation 7: Admissions and Urgency to Enroll

You allege that New England Institute of Art (The) engaged in misconduct related to Admissions and Urgency to Enroll. This allegation fails for the

following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

IA Attorney General's Office
IL Attorney General's Office
CO Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Senate Hearing Testimony of EDMC career services adviser before the Committee on Health, Education, Labor, and Pensions (September 30, 2010)
Materials, including publicly available securities filings, prepared by Education Management Corporation

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [ ref:_00Dt0Gyiq._500t0DPCh4:ref ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please

contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and

parents is located at [StudentAid.gov/coronavirus](StudentAid.gov/coronavirus). Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



Federal **Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

830 First Street, NE, Washington, D.C. 20202
[StudentAid.gov/borrower-defense](StudentAid.gov/borrower-defense)



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



## LEGAL SERVICES CENTER
### CENTRO DE SERVICIOS LEGALES

The WilmerHale Legal Services Center of Harvard Law School

122 Boylston Street • Jamaica Plain, MA 02130
Telephone: 617-522-3003 • Facsimile: 617-522-0715 • TTY: 617-522-3575
*www.law.harvard.edu/academics/clinical/lsc/*

March 4, 2015

Navient Federal Loan Servicing
PO Box 740351
Atlanta, GA 30348

   Re: Borrower Account #0███████ Jessica Jacobson

To Whom it May Concern:

  I write on behalf of Jessica Jacobson, a former student of the New England Institute of Art ("NEIA") Media Arts and Animation Program. NEIA provided Ms. Jacobson with a useless education and no meaningful job placement assistance despite arranging for and profiting from nearly $100,000 in student loans. Because of NEIA's dishonest recruitment, admissions, and financial aid practices, Ms. Jacobson is now being hounded for over $150,000, and despite years of effort, has been unable to find a single job in the field for which NEIA promised to prepare her. In violation of Massachusetts law, NEIA unfairly and deceptively misrepresented the nature of its program, its career placement services, and its financial aid to Ms. Jacobson prior to enrollment; taught her none of the useful or marketable skills for the career it had promised her; and made no attempts to connect Ms. Jacobson to appropriate employment as it had promised it would. NEIA's many unfair and deceptive acts and practices in violation of Massachusetts law provide Ms. Jacobson a full defense to the repayment of her student loans.

### Basis for Requesting Relief

  Pursuant to the terms of her Direct Consolidated Loan Master Promissory Note and to federal statute and regulations, Ms. Jacobson is entitled to assert state law defenses to the collection of her federal loans. The Higher Education Act grants the Secretary of the Department of Education broad authority to "compromise, waive or release any right, title, claim, lien, or demand."[1] The Secretary is further empowered to specify "acts or omissions of an institution . . . a borrower may assert as a defense to repayment of a loan."[2]

  This broad authority is reflected in federal regulations, which state that "the Secretary may compromise a debt, or suspend or terminate collection of a debt."[3] Federal regulations of the Direct Loan program echo a borrower's right to relief when her rights under state law have been violated by her school: "the borrower may assert as a defense against repayment [of her Direct

---

[1] 20 U.S.C. § 1082(a)(6) (2012).
[2] 20 U.S.C. § 1087(h) (2012).
[3] 34 C.F.R. § 30.70(h) (2014).

Loan] any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[4]

These statutory and regulatory provisions are incorporated into Ms. Jacobson's Direct Loan Master Promissory Note, which states: "you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done . . . If you believe that you have a defense against repayment of your loan, contact your servicer."[5] This provision makes clear that Ms. Jacobson need not sue or obtain a judgment to be granted such relief by the Secretary.

Ms. Jacobson's right to assert state law claims in this manner was recently confirmed by the Secretary in a letter to Senator Elizabeth Warren. Secretary Duncan explained:

> With respect to your question about borrowers' right to present claims to the Department, the Department recognizes as a defense to repayment of Direct Loans a claim that the borrower has against the school that is based on the making of the loan or the provision of educational services, if State law recognizes such a claim and if the borrower proves the elements required to establish the claim. . . . . [T]he borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department.[6]

Ms. Jacobson asks that the Secretary use his authority to relieve her of student loan debt based on unfair, deceptive, and oppressive business practices. NEIA's actions violate Massachusetts law, rendering it liable for damages and rendering Ms. Jacobson's repayment obligations unenforceable. This relief is authorized by federal regulation, which states that "if a borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay."[7] In addition to full cancellation of her federal student loan debt, Ms. Jacobson seeks a determination that she has not been in default and the clearing of all negative credit history related to these loans. The Secretary has broad discretion to authorize the determination, and credit repair that Ms. Jacboson requests.[8]

---

[4] 34 C.F.R. § 685.206(c)(1) (2014).
[5] Attachment 1, Affidavit of Jessica Jacobson ("Jacobson Aff.") Ex. K, at 8.
[6] Attachment 2, Letter from Arne Duncan, Secretary of Education, to Elizabeth Warren, United States Senator (Aug. 4, 2014).
[7] 34 C.F.R. § 685.206(c)(2) (2014).
[8] *Id.* ("The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include, but is not limited to... (i) Reimbursing the borrower . . . . (ii) Determining that the borrower is not in default . . . . (iii) Updating reports to consumer reporting agencies").

## Summary

When she enrolled at NEIA, Ms. Jacobson had already graduated from community college and was seeking a career in visual effects. NEIA representatives repeatedly told her that its program was very difficult to get into, but that her portfolio "looked great." NEIA's glossy brochures promised high-end equipment and technology, appealing job prospects, and all the skills and equipment necessary to succeed in the industry. An NEIA representative showed Ms. Jacobson around a state-of-the-art facility, including a high-end green screen studio specifically for use in visual effects work. NEIA assured Ms. Jacobson that its name had weight in the industry, and promised industry connections, job leads, networking contacts, and an industry-appropriate portfolio to get her started on a career in visual effects. NEIA did not tell her that its program was focused on gaming and animation and therefore ill-suited to train her in visual effects, nor did it reveal that its tuition and costs of nearly $100,000 would require payments far beyond the average salary of its graduates. She did not know that most of her loans accrued interest while she was in school, and had no idea that most of her loans were not federal student loans.

NEIA's promises and assertions bore no relationship to the courses, program, facilities, or job placement opportunities actually offered to Ms. Jacobson. NEIA's admission process is not at all selective, and the green screen studios it showed Ms. Jacobson on her tour were not available for use by students in her program. She was trained to use software that was obsolete, non-professional, and irrelevant to the field.

NEIA did everything it could to maximize its profits from Ms. Jacobson. Although she had taken and passed twenty-three classes at Mount Wachusett Community College, NEIA accepted only seven classes for transfer credit, maximizing the number of credits she would have to take to earn her degree at NEIA and by extension, the amount of money she would have to borrow. As a result, her degree took three and a half years, even though Ms. Jacobson had already completed two years of community college. NEIA led her to believe that all of her loans were federal when in fact, Ms. Jacobson borrowed over $67,000 in private loans with higher interest rates.

Throughout her time at NEIA, which had a strict attendance policy, Ms. Jacobson was sent out of her classes to the financial aid office, where financial aid advisors would not allow her to go back to class unless she signed forms that they did not explain. In this way, she was coerced into signing loan documents at a moment's notice to avoid risking academic failure. Ms. Jacobson signed everything, believing that the advisors were looking out for her best interests.

NEIA's promised industry contacts never materialized. NEIA never put Ms. Jacobson in touch with a single employer in her field. Its employment advisors directed students and graduates to jobs posted on Craigslist. In a class meant to prepare Ms. Jacobson for her job search, NEIA's career staff distributed a sheet titled "Tips for Applying to a Job from Craigslist." She sought work on her own, with no assistance from NEIA, and secured a single internship, which was her first and last position related to her field. Nevertheless, NEIA's employment office sought to list Ms. Jacobson as an example of employment success.

Ms. Jacobson made good faith efforts to make her time at NEIA fruitful. As Ms. Jacobson progressed in her program and worried she was not getting appropriate skills, she reached out by letter and phone to NEIA's teachers and administrators about her misgivings and made suggestions about how to improve the program to make it more relevant. NEIA simply ignored her, and made no effort to improve her experience. Ms. Jacobson is not the only dissatisfied student: NEIA and other Education Management Corporation-owned schools are currently under investigation by the Massachusetts Attorney General and at least nine other states for unfair and deceptive practices.[9]

Today, Ms. Jacobson holds a worthless degree and has no job prospects. As a result of her crushing student loan debt, her credit has been destroyed, imperiling her ability to rent an apartment, save money, or consider buying a car or home. She has been pursued and harassed by debt collectors. Because of the hopelessness of ever paying off these loans or being employed in the field in which she was trained, she has suffered anxiety and depression, for which she has sought medical treatment.

NEIA's many violations of Massachusetts law, detailed below, provide Ms. Jacobson with a complete defense to repayment of her student loans.

## Legal Claims and Defenses

1) Unfair and Deceptive Acts and Practices in Violation of the Massachusetts Consumer Protection Act, MASS. GEN. LAWS. ch. 93A

NEIA engaged in numerous unfair business practices within the meaning of the Massachusetts Consumer Protection Act, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[10] NEIA violated the Consumer Protection Act by misrepresenting numerous relevant facts, such as the quality, character, and merits of its program[11] and employment outcomes.[12] NEIA's use of deceptive sales tactics to secure Ms. Jacobson's enrollment in an exorbitantly overpriced educational program that dooms students to near-certain default is precisely the kind of oppressive practice barred by the Consumer Protection Act.

NEIA advertised both in brochures and by statements to Ms. Jacobson that its competitive program would prepare her for a career in visual effects.[13] NEIA recruiters gave her glossy brochures promising high-end equipment in a state-of-the-art facility that would give Ms.

---

[9] See Megan Woolhouse, For-Profit Colleges Get Harsh Grades by Former Students, BOSTON GLOBE, Oct. 20, 2014, at A1; Todd Wallack, Coakley Widens Schools Inquiry; Targets Lending and Recruiting at For-Profit Facilities, BOSTON GLOBE, Feb. 4, 2013, at A1.
[10] MASS. GEN. LAWS. ch. 93A, § 2(a).
[11] Jacobson Aff. ¶¶ 7, 10-15, 21-22, 25-29, 34, 37, 40, 46-50, 52-53.
[12] Ms. Jacobson was told that most of NEIA's graduates secured great jobs in the visual effects industry. NEIA's disclosures pursuant to recent state regulation 940 MASS. CODE REGS. 31 (2014) show a 22% employment rate in 2012-2103 for the Media Arts and Animation program. See Attachment 3, Disclosures.
[13] Jacobson Aff., ¶¶ 7, 10; Jacobson Aff. Ex. A.

4

Jacobson all the skills she would need to succeed in visual effects.[14] Recruiters implied that spots within NEIA's program were highly coveted.[15] The reality, however, bore no resemblance to these misrepresentations. NEIA does not appear to have any admissions criteria other than eligibility for student loans. Ms. Jacobson was not even enrolled in a program intended to prepare students for careers in visual effects, but a "Media Arts and Animation" program that focused nearly exclusively on video gaming and animation, and did not include any training in visual effects.[16]

The facilities displayed in NEIA's brochures and on Ms. Jacobson's tour, including the vaunted green screen studio, were not available for her use. For the one project for which she needed a green screen, Ms. Jacobson was prohibited from using the school's studio because it was not for the use of students in her program.[17] To complete that project, Ms. Jacobson and her classmates taped green pieces of construction paper to a wall.[18]

Additionally, Ms. Jacobson was forced to complete assignments on obsolete and non-professional-grade software or face academic discipline.[19] She attempted to teach herself Adobe Premiere, a more professional program that would likely be used in the visual effects industry and that NEIA's brochures promised students would learn.[20] In response, her professor penalized her and made her begin the project from scratch using Windows Movie Maker, a basic, consumer-level software program that comes free with all Windows computers.[21] NEIA's Media Arts and Animation program was incapable of providing Ms. Jacobson the facilities, skills, or experience she would need to succeed in visual effects.

### Financial Aid Misrepresentations

NEIA representatives led Ms. Jacobson to believe that her private loans, which accounted for more than two-thirds of her financing, were actually federal loans.[22] NEIA never informed Ms. Jacobson that interest would accrue on some of her loans while she was enrolled, and gave her no idea of her staggering projected loan payments.[23] NEIA's disclosures showed that employed graduates were paid an average starting salary of $26,014.[24] In other words, even if NEIA assumed that, upon her graduation, Ms. Jacobson would find employment and would not be among the graduates making less than that average starting salary, she would nonetheless face projected payments totaling nearly half of that average salary, or almost four times the maximum acceptable amount determined by the U.S. Department of Education.[25] NEIA knew or should

---

[14] *Id.*
[15] Jacobson Aff. ¶¶ 8, 15.
[16] Jacobson Aff. ¶¶ 25-29, 40.
[17] Jacobson Aff. ¶ 37.
[18] Jacobson Aff. ¶ 38.
[19] Jacobson Aff. ¶¶ 34, 39-40.
[20] Jacobson Aff. ¶ 39, Jacobson Aff. Ex. B, at 2.
[21] Jacobson Aff. ¶ 39.
[22] Jacobson Aff. ¶ 22.
[23] Jacobson Aff. ¶¶ 21, 24.
[24] Attachment 4, "Evolve" Handout listing graduation data.
[25] One measure of whether a program prepares students for gainful employment in a recognized occupation pursuant to U.S. Department of Education regulations is if the program's annual loan payment is less than or equal to 12% of annual earnings. *See* Gainful Employment in a Recognized Occupation, 34 C.F.R. § 668.7(a)(1)(ii)(B) (2012).

have known that this information would dissuade Ms. Jacobson from enrolling and did not disclose it, which was unfair and deceptive.[26]

NEIA's promises of exclusive industry contacts, an industry-appropriate portfolio, and a comprehensive job placement program were also false and misleading in violation of the Consumer Protection Act.[27] NEIA shared no industry employment leads and its courses did not prepare Ms. Jacobson with an industry-appropriate portfolio.[28] Not once did NEIA connect Ms. Jacobson to anyone in the field or any relevant job listing.[29] Instead, NEIA offered a one-page handout on how to apply to Craigslist jobs.[30] NEIA never hosted anyone in the visual effects field to give a talk or to network with students.[31] Ms. Jacobson's instructors had gaming backgrounds and were unable to help her prepare an appropriate portfolio.[32] Ms. Jacobson was left to find relevant internships and jobs without any assistance whatsoever from NEIA, and has been completely unable to find further work in her field after being laid off from her only internship.[33]

Many of NEIA's numerous misrepresentations about its program, the employment prospects of its graduates, and its resources are unfair and deceptive under the Consumer Protection Act as interpreted by the Attorney General's recently-promulgated regulations of for-profit colleges.[34]

The Attorney General's regulations prohibit: false advertising,[35] such as the glossy brochures NEIA showed to Ms. Jacobson; false representation of placement services,[36] like NEIA's promises to assist Ms. Jacobson in her employment search; false statements concerning

---

[26] Jacobson Aff. ¶¶ 16, 57.

[27] Jacobson Aff. ¶¶ 13-14, 51-56.

[28] Jacobson Aff. ¶¶ 40, 52.

[29] Jacobson Aff. ¶ 52.

[30] Jacobson Aff. ¶ 53, Jacobson Aff. Ex. J.

[31] Jacobson Aff. ¶ 27.

[32] Jacobson Aff. ¶¶ 25-26, 29.

[33] Jacobson Aff. ¶¶ 51-55.

[34] 940 MASS. CODE REGS. 31.00-31.08 (2014).

[35] "It is an unfair or deceptive act or practice for a school to make or publish, or cause or permit to be made or published, any false, untrue, or deceptive statement or representation or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students or any other person, by way of advertising or otherwise, concerning the school, its activities in attempting to enroll students, the character, nature, quality, value, or scope of any course or program offered, the school's influence in obtaining employment for its students, graduation rates, graduation time, program cost, loan amount, repayment amount, transferability of credits, or in any other material respect." 940 MASS. CODE REGS. 31.04(1). The specific actions prohibited, while illustrative of practices that are always violative of the Consumer Protection Act, are "not intended to be all inclusive as to the types of activities prohibited" by the statute, and thus NEIA's conduct may be considered unfair or deceptive even in the absence of such explicit rulemaking. 940 MASS. CODE REGS. 31.02.

[36] "It is an unfair or deceptive act or practice for a school to make any false, untrue, unsubstantiated, or deceptive statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person as to placement, graduate placement rates, total placement rates, or placement services." 940 MASS. CODE REGS. 31.04(5).

6

the nature or character of classroom instruction,[37] as NEIA made by holding out its program as a hands-on course in real-world visual effects skills; misrepresentation of recruitment personnel as "advisors" or "counselors,"[38] as NEIA's representatives held themselves out to be; misleading statements regarding student loans,[39] such as telling Ms. Jacobson her private loans were from NEIA's "preferred federal lender"; and misrepresentation of opportunity and employment,[40] including NEIA's promises to Ms. Jacobson that it had industry contacts in visual effects and that she would find employment in that field.

The regulations also require schools to disclose "any fact relating to the school or program, disclosure of which is likely to influence the prospective student not to enter into the transaction with the school."[41] NEIA knew that, even if Ms. Jacobson obtained relevant employment, she would be unable to pay back the extraordinary cost of the program. To pay back her federal and private loans over their standard terms would have required a combined monthly payment of over $1,200, or almost $15,000 a year. In other words, NEIA arranged a debt load that would require payments of more than 56% of the average gross income of its employed graduates, which it reports to be $26,014.[42] Federal regulations sanction schools when graduates' loan payments exceed 12% of annual earnings.[43] In order to pay off her loans without a partial economic hardship as defined by the Department of Education,[44] Ms. Jacobson would have needed an adjusted gross income of well over $100,000, or almost four times NEIA's average among its employed graduates.

Unsurprisingly, given the extraordinary cost of her degree and its low value, Ms. Jacobson has never been able to keep up with her loan payments.[45] NEIA put Ms. Jacobson on

---

[37] "It is an unfair or deceptive act or practice for a school to make a statement or representation through advertising or otherwise concerning the nature or character of classroom instruction provided by the school that is false, untrue, deceptive, or which has the tendency or capacity to mislead students or prospective students." 940 MASS. CODE REGS. 31.04(14).

[38] "It is an unfair or deceptive act or practice for a school to refer to salespersons or recruiters as 'counselors' or 'advisors' to imply that a salesperson or recruiter is an academic advisor or counselor, when: (a) the primary role of such person is to sell the school's programs or enroll students in the school; or (b) such person is evaluated or compensated in any part based on student recruitment." 940 MASS. CODE REGS. 31.06(10).

[39] "It is an unfair or deceptive act or practice for a school to make any statement or representation to students, prospective students, or any other person as to student loans or financial aid that is misleading or has the capacity to deceive students or prospective students." 940 MASS. CODE REGS. 31.07(1).

[40] "It is an unfair or deceptive act or practice for a school to make any false, untrue, or deceptive statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person regarding: (a) any opportunity in any job or occupation, or the likelihood of employment in any job or occupation; (b) the necessity, requirement, or usefulness of any program in obtaining professional licensure, employment in the field of study." 940 MASS. CODE REGS. 31.04(7).

[41] 940 MASS. CODE REGS. 31.05(1).

[42] See Attachment 4.

[43] Gainful Employment in a Recognized Occupation, 34 C.F.R. § 668.7(a)(ii)(B).

[44] A partial economic hardship exists when a borrower's loan payments are more than 15% of her "discretionary income." Discretionary income is defined as the difference between the borrower's income and 150% of the poverty level as determined by the borrower's family size and state of residence. 34 C.F.R. § 682.215(a)(4).

[45] Jacobson Aff. ¶ 58.

7

an inescapable path to default in violation of the Consumer Protection Act.[46] NEIA knew or should have known that Ms. Jacobson would almost certainly be unable to pay her loans, yet it used false and misleading statements, and unfair statements to induce her to enroll.

NEIA's actions constitute unfair and deceptive business practices in violation of the Massachusetts Consumer Protection Act, and entitle Ms. Jacobson to damages and equitable relief well beyond the value of her federal student loans.

2) Fraudulent Misrepresentation; Fraudulent Inducement[47]

NEIA fraudulently induced Ms. Jacobson to enroll with false claims to provide a career-oriented education that would qualify her for entry-level work in post-production visual effects. NEIA's false statements and numerous failures to disclose material information to Ms. Jacobson constitute fraudulent misrepresentation under Massachusetts law. NEIA employees intentionally misrepresented to Ms. Jacobson the nature, character, resources, facilities, employment prospects, and institutional assistance it would provide students in its Media Arts and Animation program. Massachusetts law prohibits the fraudulent "misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction."[48] Ms. Jacobson reasonably relied on NEIA's numerous false statements and assurances and acted on them to her detriment,[49] rendering NEIA liable for the harm it caused.

NEIA misrepresented matters of material fact to induce Ms. Jacobson enroll and did so with knowledge that its statements were false or with reckless disregard for the truth[50]:

- Recruiters, who were familiar with NEIA's admissions process and enrollment statistics, described NEIA as competitive when it was not and congratulated Ms. Jacobson on a portfolio that "looked great."[51] Its recruitment staff knew that its program was not competitive.

---

[46] Lending that dooms a borrower to default is an unfair practice within the meaning of the Consumer Protection Act. *See Commonwealth v. Fremont Inv. & Loan*, No. 07-4373-BLS1, 2008 WL 517279, at *10 (Mass. Super. Feb. 26, 2008), aff'd, 452 Mass. 733, (2008) (finding mortgage loans that the lender reasonably should have recognized were "doomed to foreclosure" presumptively unfair).

[47] In Massachusetts, fraudulent misrepresentation is a defense, the proof of which avoids a contract, *see, e.g.*, *McGrath v. C.T. Sherer Co.*, 291 Mass. 35, 58 (1935), as well as an independent claim for damages, *see, e.g.*, *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411 (2005).

[48] *Graphic Arts Finishers, Inc. v. Boston Redev. Auth.*, 357 Mass. 40, 44 (1970); *see also Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 431 (1990) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.") (citing Second Restatement of Contracts).

[49] Jacobson Aff. ¶¶ 16, 57.

[50] *See Alpine v. Friend Bros.*, 244 Mass. 164, 167 (1923) (holding misrepresentations include a statement "made with knowledge of its untruth or was made of a fact susceptible of actual knowledge with recklessness as to its truth or falsehood, or was the utterance of a half truth which in effect is a lie, or was the failure to disclose known facts when there was a duty . . . to disclose").

[51] Jacobson Aff. ¶ 8.

- NEIA enrolled Ms. Jacobson in its Media Arts and Animation program, which it claimed would prepare her for a career in visual effects. It knew or should have known that its Media Arts and Animation program was poorly suited to prepare Ms. Jacobson to gain employment in visual effects, as it failed to deliver even the most limited access to the kinds of technology and skill-building she would need to succeed in any field in which it claimed to be training her.

- NEIA's transfer credit policy, which restricted the use of transfer credits to elective courses, further prevented Ms. Jacobson from enrolling in any courses related to visual effects.[52] NEIA's faculty and student advisors had no background in the field Ms. Jacobson intended to pursue,[53] and thus were similarly ill-equipped to prepare her with an industry-appropriate portfolio.

- NEIA represented that Ms. Jacobson would have access to the impressive facilities it had shown her on her tour. She was not permitted to use those facilities when she was enrolled as a student.[54]

- NEIA represented that it would train Ms. Jacobson on industry-appropriate software used by media and animation professionals and would provide the opportunity to build a competitive portfolio for her job search.[55] In fact, NEIA knew or should have known that she could never build such a portfolio, as NEIA gave her access to only obsolete and inadequate tools, such as dated and non-professional software.[56]

- NEIA also misrepresented the nature of the loans Ms. Jacobson was borrowing in order to induce additional borrowing. Financial aid advisors induced Ms. Jacobson to borrow tens of thousands of dollars in private loans, implying that they were federal loans.[57] NEIA did not disclose Ms. Jacobson's expected repayment amount,[58] knowing that the information would give pause to anyone choosing to pursue its programs. The recruiters misled her by telling her she was receiving the "best possible" loan package.[59]

- Although NEIA promised industry connections, exclusive job leads, and placement assistance from NEIA staff, it knew or should have known it would not provide them to Ms. Jacobson.[60] Career services staff did not put Ms. Jacobson in contact with anyone in her field,[61] providing her only with a handout on how to apply to jobs on Craigslist[62] but no relevant job leads.

---

[52] Jacobson Aff. ¶¶ 30-36.
[53] Jacobson Aff. ¶ 26.
[54] *See supra* notes 17-18 and accompanying text.
[55] Jacobson Aff. ¶¶ 7-14; Jacobson Aff. Exs. A & B.
[56] *See supra* notes 17-21 and accompanying text.
[57] Jacobson Aff. ¶ 22.
[58] Jacobson Aff. ¶ 24.
[59] Jacobson Aff. ¶ 22.
[60] Jacobson Aff. ¶¶ 7, 11-14, 25-27, 29, 34-43, 51-52.
[61] Jacobson Aff. ¶ 52.
[62] Jacobson Aff. ¶ 53, Jacobson Aff. Ex. J

In sum, NEIA knew or should have known that its Media Arts and Animation program was poorly suited to help Ms. Jacobson gain employment in visual effects and would not allow her to earn enough money to pay off her debts. Its own statistics showed that graduates of NEIA's programs were unlikely to be employed in their industries or earn a salary sufficient to pay back their loans.[63]

Ms. Jacobson reasonably relied on NEIA's misrepresentations when she enrolled, and as she completed NEIA's program of study. Ms. Jacobson had no way to know the scope and depth of NEIA's misrepresentations. She signed everything NEIA's recruiters asked her to, believing that her future career was in good hands. Had NEIA been honest—had it not fraudulently misrepresented its lack of job placement, low employment rate, incompetent advisors, woefully inadequate facilities, and the improbability of Ms. Jacobson ever getting even a fraction of the skills she would need to succeed in her chosen career or to pay back her loans—she would have never enrolled.[64] Ms. Jacobson has been deeply harmed by NEIA recruiters' misrepresentations. She faces an extraordinary debt burden,[65] her credit is ruined, she has a worthless degree, and she has no relevant job skills.[66] As a result, Ms. Jacobson struggles with depression, anxiety, and feelings of self-doubt and worthlessness, for which she has sought medical treatment.[67] NEIA's misrepresentations violate Massachusetts law and provide Ms. Jacobson with a complete defense to repayment.

3) Unconscionability

NEIA used deceptive sales tactics to trap Ms. Jacobson in a contract with terms so one-sided that no reasonable person in Ms. Jacobson's position (a twenty-one-year-old with no assets and no substantial income) would voluntarily agree. NEIA's enrollment and financial aid practices are so oppressive that they are an affront to decency, amounting to both procedural and substantive unconscionability. Under Massachusetts law, unconscionability is "determined on a case by case basis, giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party."[68] Such judgments must be based on the contract's "commercial setting, purpose, and effect" at origination.[69]

NEIA is part of a sophisticated, national corporation with trained recruiters whose job is to enroll as many students in its programs as they can, without regard to the consequences for

---

[63] Attachment 3, "Evolve" Handout listing graduation data; *see also* Second Amended Qui Tam Complaint at 16-19, *United States ex rel. Sobek v. Educ. Mgmt. Co.*, No. 10-0131 (W.D. Pa. Feb. 10, 2012).
[64] Jacobson Aff. ¶¶ 16, 57.
[65] Jacobson Aff. ¶ 60.
[66] Jacobson Aff. ¶¶ 40, 60.
[67] Jacobson Aff. ¶ 60.
[68] *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 292-93 (1980) (internal citation omitted).
[69] MASS. GEN. LAWS. ch. 106, § 2-302(2).

10

students.[70] It offers non-negotiable enrollment contracts to prospective students.[71] As a young woman with no experience reviewing contracts, Ms. Jacobson did not understand how one-sided the terms of her enrollment agreement were, and would have been unable to negotiate to change them. In addition to committing Ms. Jacobson to borrowing extraordinary sums of money, NEIA's contract significantly limited Ms. Jacobson's rights and privileges by including a mandatory, binding arbitration clause.[72] NEIA enrollment staff never identified or explained this aspect of the contract,[73] and used its vastly superior bargaining power to induce Ms. Jacobson to waive her right to a jury trial without her knowledge. NEIA's representatives encouraged Ms. Jacobson to sign the documents to enroll as quickly as possible.[74]

After she enrolled, Ms. Jacobson faced continued pressure to borrow more money with little information or explanation. Throughout her time at NEIA, which has a strict attendance policy,[75] Ms. Jacobson was sent from her classes by her teachers to report to the financial aid office.[76] There, she was presented with forms she was required to sign before she was allowed to return to class.[77] Rather than explain to Ms. Jacobson what she was signing, the financial aid advisors in effect threatened her with academic discipline. In this way, she was coerced into signing even more loan documents at a moment's notice or risk academic failure. Because of the significant investment she had already made in her NEIA degree, Ms. Jacobson felt she had little choice but to sign anything put in front of her.[78]

Ms. Jacobson's contract with NEIA was also substantively unconscionable in that her program was exorbitantly priced compared to other, similar institutions[79] and compared to the salaries of its own graduates.[80] Payments on a debt load like Ms. Jacobson's[81] would require over

---

[70] The Senate Committee on Health, Education, Labor and Pensions conducted a comprehensive investigation of NEIA's parent company, Education Management Corporation. The report found intense internal pressure to recruit students. STAFF OF S. COMM. ON HEALTH, EDUC., LABOR AND PENSIONS, 112TH CONG., FOR-PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 499 (COMM. PRINT 2012) (describing threatening emails to recruiting staff such as "WE ARE FAR BEHIND WHERE WE NEED TO BE!!!" and rewards such as leaving work early or taking company-paid vacations).

[71] Jacobson Aff. Ex. D.

[72] Id. at 2. ("Any dispute or civil claim (other than disputes or claims regarding non-payment, grades, or their academic evaluations) between the student and The New England Institute of Art . . . not resolved with the College or regulatory officials shall be submitting [sic] to binding arbitration in the City of Boston, Massachusetts pursuant to the commercial arbitration rules of the American Arbitration Association. . . . Any award entered shall be final and binding on both parties.")

[73] Jacobson Aff. ¶ 18.

[74] Jacobson Aff. ¶ 15.

[75] Jacobson Aff. Ex. H.

[76] Jacobson Aff. ¶ 45.

[77] Jacobson Aff. ¶¶ 46-47; Jacobson Aff. Ex. I.

[78] The Consumer Financial Protection Bureau has determined that similar practices at another for-profit college were unfair, deceptive, and subjected consumers to undue influence or were coercive. See Complaint ¶ 160, Consumer Fin. Protection Bureau v. ITT Educ. Servs., Inc., No. 1:14-cv-292 (S.D. Ind. Feb. 26, 2014).

[79] See STAFF OF S. COMM. ON HEALTH, EDUC., LABOR, AND PENSIONS, 112TH CONG., FOR-PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 498 (COMM. PRINT 2012) ("We are already priced higher than any of our competitors.").

[80] Attachment 2, "Evolve" Handout listing graduation data.

$12,000 per year, which was more than 200% of the annual discretionary income[82] of the average employed graduate of NEIA's programs. Employed graduates earning less than the average, as well as NEIA's many unemployed graduates like Ms. Jacobson, faced even more dire consequences.

NEIA willfully put Ms. Jacobson on an inescapable path to defaulting on her student loans. In order to pay off her loans without a partial economic hardship as defined by the Department of Education, Ms. Jacobson would have needed an adjusted gross income of well over $100,000, or almost four times NEIA's average among its employed graduates. Given these figures, NEIA knew that Ms. Jacobson would almost certainly default on her student loans, and nonetheless pursued its own profit with disregard for the disastrous consequences for Ms. Jacobson.

NEIA's manufactured sense of urgency to induce Ms. Jacobson to borrow additional money, its knowledge that its actions would doom Ms. Jacobson to default, and its undisclosed arbitration clause are oppressive business practices that offend any sense of decency, and are unconscionable. Because Ms. Jacobson's contract with NEIA is unconscionable, it is unenforceable.

4) Breach of the Implied Covenant of Good Faith and Fair Dealing

NEIA failed to provide Ms. Jacobson relevant skill-building opportunities or meaningful job placement assistance, which deprivations prevented her from obtaining the benefit of their contract. The covenant of good faith and fair dealing is a "pervasive requirement"[83] of Massachusetts contracts that "requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."[84] Breach is shown by a party's "manner of performance" and the "totality of the circumstances" surrounding performance of the contract.[85]

NEIA breached this covenant in its dealings with Ms. Jacobson. Once she enrolled, NEIA lost all interest in Ms. Jacobson beyond profiting from her loans. She was trained on obsolete software and denied access to the facilities and tools she needed to complete her work and learn

---

[81] Ms. Jacobson borrowed $24,736 in private loans with an interest rate of 6.25%, $42,317 in private loans with an interest rate of 8.25%, $14,500 in subsidized federal loans with an interest rate of 2.47%, and $10,500 in unsubsidized federal loans with an interest rate of 6.80%. The estimated monthly payment for her private loans with 6.25% interest is $277.74, and the estimated monthly payment for the private loan with 8.25% interest is $519.03. *See* Repayment Calculator, FINAID, http://www.finaid.org/calculators/loanpayments.phtml. The monthly payment for all of her federal loans would be $257. *See* Repayment Estimator, FEDERAL STUDENT AID, https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action. Together, her loan payments would be $1,053.77 per month, or $12,645.25 per year.

[82] NEIA's 2004 graduate employment disclosures indicate an average salary of $26,014 for its graduates. *See* Attachment 4. 150% of the federal poverty guideline for a single person in 2004 was $13,965. *See* Notice, Annual Update of the HHS Poverty Guidelines, 69 Fed. Reg. 7336, (Feb. 13, 2004). Therefore, a graduate with average earnings of $26,014 had a discretionary income of $12,049: the difference between her income ($26,014) and 150% of the poverty line ($13,965). *See* 34 C.F.R. § 682.215(a)(4)(defining discretionary income). Her annual loan obligation of $12,645.25 per year amounted to 105% of the discretionary income NEIA's average graduates earned.

[83] *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 102 (1977).

[84] *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010) (internal citations and quotations omitted).

[85] *Id.*

12

her trade.[86] Ms. Jacobson made good faith efforts to remedy her situation. When she was assigned to use Windows Movie Maker, a beginner-level software program that was irrelevant to industry professionals, she asked her teacher for more relevant training, but was rebuffed.[87] She then attempted to teach herself Adobe Premiere, which would be more appropriate, but she was penalized and made to start over using Windows Movie Maker.[88] Ms. Jacobson reached out to the school's president, her advisor, and the program's department head to share her misgivings about the program and seek changes to make her educational experience more relevant. NEIA ignored her.[89] She was therefore unable to gain any professional training or advantage from her enrollment at NEIA.

Despite its promises, NEIA never provided Ms. Jacobson any career support. The most Ms. Jacobson ever received was a handout with "tips" on how to apply for free internet bulletin board postings.[90] She was not introduced to a single employer in her field, sent on any interviews, or invited to attend any networking or job search training events.[91]

In three and a half years of classes, NEIA failed to provide any educational training of value or make any attempt to remedy the program's defects and inadequacies, even after Ms. Jacobson's requests. NEIA prevented Ms. Jacobson from benefiting from their contract at every turn, and in doing so, breached its implied covenant of good faith and fair dealing. NEIA's breach provides Ms. Jacobson with a complete defense to repayment.

## Conclusion

NEIA created a deplorable situation for Ms. Jacobson: she graduated enormously indebted for an education that lacked any value. Meanwhile, Education Management Corporation, NEIA's parent company, posted $2.5 billion dollars in revenue for the most recent reported year.[92] She endures long-term unemployment because NEIA did not have any of the industry contacts or job preparedness training that it boasted to induce Ms. Jacobson to enroll. NEIA frequently caused her to act against her own interests in pursuit of its own profit, employing high-pressure tactics to ensure Ms. Jacobson was not fully informed about her decisions or able to make them freely.

Ms. Jacobson has been devastated by her student loan debt. With her credit ruined, she is unable to rent an apartment or consider purchasing a home or car.[93] Still unemployed at thirty-one, Ms. Jacobson is in no position to begin saving or planning for her future, nor to pursue further education to help her become employable in her field or any other.[94] She has been

---

[86] *See supra* notes 17-21 and accompanying text.
[87] *See supra* notes 19-21 and accompanying text.
[88] Jacobson Aff. ¶ 39.
[89] Jacobson Aff. ¶¶ 41-43.
[90] Jacobson Aff. ¶ 53; Jacobson Aff. Ex. J.
[91] Jacobson Aff. ¶¶ 27, 52.
[92] Education Management Corporation, 2013 Annual Report (Form 10-K) 3 (Sept. 3, 2013).
[93] Jacobson Aff. ¶ 60.
[94] *Id.*

13

pursued and harassed by debt collectors.[95] Each day she watches her student loan debt climb while her career goals and dreams for the future fall. Depressed, anxious, and feeling hopeless about her present situation and the future, Ms. Jacobson has sought medical treatment and legal help.[96]

As detailed in this letter, Ms. Jacobson has numerous causes of action against NEIA, which provide complete defenses to repayment of her student loans under Massachusetts law. Pursuant to federal law, regulation, and the terms of her promissory note, she requests full cancellation of her federal student loan debt, a determination that she has not been in default, and the clearing of all negative credit history related to these loans.[97] If you have any questions about her claims or the evidence supporting them, please contact me. Thank you in advance for your attention to this matter.

Sincerely,

Toby Merrill
Attorney for Jessica Jacobson
617-390-2576
tomerrill@law.harvard.edu

Torie Atkinson
Student Advocate

CC:     United States Senator Elizabeth Warren
        Massachusetts Attorney General Maura Healey

---

[95] Jacobson Aff. ¶ 61.

[96] Jacobson Aff. ¶ 62.

[97] Following the cancellation of Ms. Jacobson's loan debt, the Department of Education can and should recover these funds from NEIA. *See* 34 C.F.R. § 685.206(c)(3) ("The Secretary may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies.").

14

# ATTACHMENT 1

### AFFIDAVIT OF JESSICA JACOBSON
### IN SUPPORT OF HER LETTER ASSERTING STATE LAW DEFENSES

1. My name is Jessica Jacobson. I am thirty-one years old.

2. I reside at 33 Crescent Heights in Fitchburg, Massachusetts.

3. I graduated from Mount Wachusett Community College in May of 2004 with an Associate's Degree in Web Design.

4. In 2004, I was twenty-one years old and living with my parents. I had no assets or significant income and had never lived on my own.

5. I became interested in a career in post-production visual effects and began reaching out to schools with visual effects programs, including the New England Institute of Art ("NEIA").

**Recruitment**

6. In September of 2004, I visited NEIA and met with an admissions representative.

7. The admissions representative asked me about my interests and told me that NEIA's Media Arts and Animation program would prepare me for a career in visual effects.

8. The admissions representative told me that NEIA's program was difficult to get into but that my portfolio "looked great."

9. The admissions representative gave me several brochures, pamphlets, and handouts about NEIA's programs, copies of which are attached as Exhibits A and B.

10. NEIA's brochures and pamphlets convey that NEIA is a great school.

11. NEIA's admissions representative said the Media Arts and Animation Program was new but did not tell me that I would be in the very first class of students and that NEIA had never offered this program before.

12. NEIA's admissions representative gave me a tour of NEIA's facilities, including a high-end green screen studio that she said was for use specifically in visual effects work.

13. NEIA's admissions representative told me that the school's name had weight in the visual effects industry, and that the school and its career services office had exclusive connections, job leads, and networking opportunities in visual effects. The representative said that NEIA would help me through all stages of my job search and most of its graduates got great jobs.

1

14. NEIA's admissions representative told me that NEIA's career services office would work tirelessly to put me in touch with relevant job leads and connect me to alumni and professionals in the visual effects industry.

15. I felt pressured to apply to NEIA right away because of the representative's statements that the school was competitive.

16. I would not have enrolled at NEIA If I had known that the admission representative's statements about the quality of the Media Arts program, the high chance I would gain visual effects employment, and the resources NEIA would provide to connect me to visual effects jobs, were all false.

17. On November 12, 2004, I completed and signed a Stafford Loan Promissory Note, a copy of which is attached as Exhibit C.

18. On November 14, 2004, I completed and signed an Enrollment Agreement with NEIA, a copy of which is attached as Exhibit D. I did not know that the Enrollment Agreement included a mandatory binding arbitration clause or what that meant.

19. Around November 18, 2004, I received a letter from NEIA, a copy of which is attached hereto as Exhibit E, informing me that I had been accepted for admission into the Media Arts and Animation program to begin in January of 2005.

20. Between 2004 and 2007, I borrowed $92,053 in federal and private student loans, all of which were paid to NEIA.

21. I did not know that some of my loans would accrue interest while I was in school.

22. I did not know that $67,053 of my loans were private loans. The financial aid advisor told me that all of my loans were from NEIA's "preferred federal lender," and that I was receiving "the best possible loans." Therefore, I thought all of my loans were federal loans.

23. I was not asked to have any cosigners or speak to anyone before signing the loan applications or promissory notes.

24. I had no idea what my repayment amount upon graduation would be.

**Media Arts and Animation Program**

25. Once enrolled, I discovered that the Media Arts and Animation program's courses were geared toward aspiring animators and video game designers, not visual effects artists.

26. None of my professors had a background in visual effects.

27. No visual effects professionals ever visited the school.

2

28. The only class I took related to visual effects, Digital Composition, was taught by Jason Weiner, whose background was in video games.

29. Nobody at NEIA knew how to help me prepare an industry-appropriate portfolio.

30. NEIA accepted credits from only seven of my twenty-three classes from Mount Wachusett Community College. A copy of my NEIA Unofficial Transcript for Winter 2005, a copy of which is attached as Exhibit F. As a result, the program cost more and took longer than NEIA originally led me to believe.

31. I repeatedly contacted the administration, including the head of the Media Arts and Animation Program, Jason Donati, to accept additional transfer credits. Despite numerous meetings, calls, and office visits, NEIA refused.

32. The transfer credits they did accept were only allowed as electives, even if they were substantially equivalent to NEIA's required prerequisites.

33. For example, though I was a web design major at Mount Wachusett, NEIA required me to take "Intro to Computers."

34. I was also required to take "Digital Ink and Paint" because Jason Donati, the director of the Media Arts and Animation program, told me I would learn the program Toon Boom, an industry-appropriate software program. We never used that program. I re-learned Macromedia Flash, a program not relevant to visual effects, which I had already learned at Mount Wauchsett Community College.

35. In "Digital Editing Video and Audio," the professor told us he had taught himself the program we were using three weeks prior to class starting.

36. NEIA did not permit me to enroll in the only 3D visual effects course it offered because my transfer credits had satisfied all of my elective requirements. To take another elective I would have had to pay additional tuition above and beyond what I had already paid.

37. The green screen studio I had been shown on my tour was not available to students enrolled in the Media Arts and Animation program, and I was not permitted to use it for any of my projects.

38. To complete the only class assignment I ever received that required a green screen, I taped green pieces of construction paper to a wall.

39. One professor required me to use Windows Movie Maker to create a movie. This program would never be used in a professional setting. I asked my professor if I could teach myself a more appropriate program, such as Adobe Premiere, which the brochures NEIA's admissions representative had given me promised I would learn. My professor responded by docking my grade, and forced me to begin the project again using Windows Movie Maker.

3

40. Despite completing the Media Arts and Animation program, I am unprepared for a career in visual effects work. I lack experience with the kind of software that would be used in the visual effects industry and was never able to build an appropriate portfolio.

41. I repeatedly contacted Jason Donati about problems I was having taking relevant courses and being forced to retake courses I had already completed at Mount Wachusett Community College.

42. I wrote to NEIA's president, Stacy Sweeney, to discuss my concerns about NEIA's program, including the use of obsolete software and the dearth of relevant job connections. My draft letter is attached as Exhibit G.

43. No employee or representative of NEIA ever responded to my calls or letters.

**Lending Practices**

44. NEIA has a strict attendance policy described in its Student Handbook, excerpts of which are attached as Exhibit H.

45. Nearly every day, professors sent students out of class to report to the financial aid office.

46. I was frequently sent from my classes to report to the financial aid office, where financial aid officers told me to sign more financial forms.

47. One such document was the Creative Education Loan Promissory Note that I signed on October 19, 2006, attached as Exhibit I.

48. Financial aid officers did not explain the forms they asked me to sign and I was told that if I refused to sign, I would not be allowed to return to class. If I did not return to class, my grades would be penalized.

49. I believed that the financial aid advisors were looking out for my best interests. I signed everything they gave me.

50. I understand now that the forms I was signing were actually loan documents.

**Post-Graduation Job Search**

51. I repeatedly reached out to the Career Services Office about getting an internship in visual effects.

52. I was never put in touch with a single employer in visual effects.

53. During my final year, I was enrolled in a course called "Animation Seminar and Portfolio," which was meant to prepare me for my job search. In the course, the professor distributed a flyer titled "Tips for Applying to a Job from Craigslist," attached as Exhibit J.

4

54. With no assistance from NEIA, I found one unpaid internship with Brickyard Visual Effects, where I worked as an unpaid intern for several years, and then briefly earned $10 per hr as a part-time, paid intern.

55. I was laid off by Brickyard in 2010 and have not been hired for any job remotely related to visual effects since then.

56. Despite NEIA's inability to help me find an internship and a job and my inability to find any paid work in visual effects, NEIA's career office asked if they could list me as a "success" for their records.

57. If I had known of NEIA's inability to prepare me for and assist me in pursuing a visual effects career, or that my loan payments would be so unaffordable, I never would have enrolled.

58. Soon after I graduated, I was unable to afford my loan payments and all of my loans went into default.

59. On August 30, 2013, I consolidated my federal loans into a Direct Consolidation Loan and enrolled in Income-Based Repayment. A copy of the Master Promissory Note for that loan is attached as Exhibit K.

60. My credit is ruined and I am unable to rent an apartment or consider purchasing a home or car. I cannot save money or plan for my future.

61. I have been pursued and harassed by debt collectors since my graduation.

62. Unemployed and over $140,000 in debt, I fell into a deep depression and suffered from anxiety and panic attacks for which I have sought medical treatment.


I have read the foregoing statement and it is true to the best of my knowledge and belief under the pains and penalties of perjury.

Date: February 28, 2015

Jessica Jacobson

5

# EXHIBIT A

So, are you going to sit still or are you going to **evolve**



## Become the next generation of you

This is where you and your ideas will evolve

*[faded paragraph]*

*[faded paragraph]*

### Study in an environment that nurtures creativity
Our school and facilities are designed to help launch your career. We have six computer labs, two television studios, two digital editing labs, three record production studios, a MIDI lab, three recording studios, Web radio station, and four graphic design classrooms. We also have a record label company called Naked Ear Records and a video production company called Naked Eye Video.

Our library houses a collection of communications and design-related books, career-related periodicals, videotapes, computers, and CDs. Students may *[faded]* the library to access online databases.

### Keep yourself well-rounded
*[faded paragraph]* Independent Radio broadcasts entirely on the Net. Staffed and programmed by students and faculty, it broadcasts daily across the globe. Naked Ear Records *[faded]*

**Financial Aid**
We are here to help you find ways to make your education affordable. Financial assistance is available to those who qualify.

**Career Services: We're here to help**
The Career Services Department aids our soon-to-be graduates with their job search — and also assists students in finding part-time employment while they're in school.

## your talent? Change happens here. What's it take? A

The New England Institute of Art is dedicated to helping men and women become intellectually aware, socially responsible people as well as actively engaged, technically competent design and communications professionals.

Many of our faculty work outside the classroom in their field of expertise.

our record label and releases compilation and single artist recordings. The New Media Group allows students to explore new media, the Internet, and the Web in general. Naked Truth is the College's literary magazine published twice a year. Naked Eye Video is the College's production company and produces music videos, documentaries, theatrical productions, and more. The Graphic Design Club gives students the opportunity to work on pro bono and freelance projects outside of the classroom. Drama Club students enjoy various activities including attending theatrical productions at local venues and preparing for auditions.

### Housing services: Become an artist in residence
Our goal at the Student Services Department is to help you find comfortable, affordable housing that suits your budget and lifestyle. Limited college-sponsored housing is available each semester on a first-come, first-served basis. The College assists students seeking independent housing in the area by providing roommate referrals and rental information.



### The New England Institute of Art™
*50 Years of Creative Education in Art & Communications*

10 Brookline Place West
Brookline, MA 02445-7295
1-617-739-1700 or 1-800-903-4425
Fax 1-617-582-4500
www.neia.aii.edu



### Programs of Study

Audio & Media Technology (BS)
Audio Production (AS)
Broadcasting, Radio or Television (BS)

Graphic Design (BS)
Interactive & Web Design (BS)

(AS) Associate of Science
(BS) Bachelor of Science

There will be video games, light years ahead of anything you've ever played before. There are cars, yet to be driven, whose beautiful curves will sing siren's songs of "try me, buy me" to you from the sales lot. Or envision a new fusion restaurant, where the cuisine of two countries are melded for the first time.

New ideas are floating around everywhere, and it takes a special kind of person to tap into them. Someone who understands that creativity doesn't just happen overnight. Someone who isn't afraid to take chances and challenge everything, including themselves. Someone who is willing to push conventional thought past the limits into a fresh, workable idea.

Chances are, you're one of those people. The art of creativity demands an open mind that asks "What if?" and "Why not?" It requires pushing ideas and never settling for mediocrity — advancing thought toward

fresh, new solutions. This process keeps art, and those people involved with the creation of art, vibrant and ever forward-thinking.

At The Art Institutes, we provide a launching pad for your personal and professional creative evolution. The tools we provide can give you the means to make your ideas unfold. And you won't be alone. Synapses are firing everywhere; imagine tossing around ideas with a classroom of students who also want to push the envelope, encouraged by faculty who have the experience and commitment to help make those ideas happen. Watch good concepts transform into even better ideas and eventually into creative solutions.

Creativity takes talent, determination, and legwork. You'll be challenged here, cooking up and developing your ideas and learning how to work in the real world and a changing marketplace. **Expect to evolve.**



**Media**

The digital art of storytelling





→ When you start your first quarter at The Art Institutes you may have some misconceptions about the media arts industry, and you'll be surprised and enlightened as we dispel these for you. Things like, "If you know the software, you can design an effective web site." Or "If something looks cool, it works." Well, this isn't always the case.

Fact is, there's a systematic process and lots of thinking behind every cool Web site, video game and award-winning TV commercial. There are foundations that are learned before you start creating the world's next infamous superhero. You'll learn to profile your target audience and work as part of a team combining all elements of the creative to begin to develop a plan and communicate effectively. The best communicators, whether visual artists, multimedia designers and programmers are curious and eager to keep up with the frenzied evolution of software. It's about growing and learning as new technologies emerge. It's conceptual, problem solving and self expression. It means thinking like a communicator and a storyteller.

**Media drives business.**

Whether it's advertising on TV, a corporate industrial video, a radio spot, or a Web site, businesses depend on a variety of media arts professionals to bring their messages to life in original and interesting ways. That's why the media programs at The Art Institutes emphasize business principles as much as creative ones.

Have you ever seen a TV spot that was cool to look at but didn't give you a sense of why that product was better than anything else on the market? It happens all the time. That's why it's so important, as a communicator, that you learn to use the creative tools at hand to capture the attention of your audience while never losing sight of what your client wants to achieve. If your piece looks great but didn't achieve its goals, time and money have been wasted. Our dedicated faculty will teach you to approach every project as a problem in need of a solution. This means knowing what's going on in the heads of a potential client — knowing what their goals are, and why they want what they want. It also means learning how to work and think as part of a team. You'll learn to pay attention to detail, listen



and create designs that work. Doing your homework, keeping up with industry and technology trends, and studying how to develop effective concepts will make you a more well-rounded professional. So, whether it's designing a Web site that teaches children about safety, a broadcast message that has to appeal to female grocery shoppers over 35, spending hours on a photo shoot to create pictures that speak for themselves, or creating the hottest selling new video game, you'll see that it all comes down to solving real-world problems.

Making progress in an industry of change.

As you move through your courses in media arts, you will notice that you're not only becoming a vital part of change, but that your talent, skills, and ideas about the role of media arts is also progressing. And because technology continues to evolve at an astounding rate, The Art Institutes provide the necessary training, access, equipment, time, mentors, and practice you'll need. You will acquire knowledge about the stages of the production process and learn how to be part of a creative team. Start-to-finish projects enable you to learn important concept and execution skills, while also giving you the opportunity to learn more about yourself as you grow and refine your

skills. Your passion will turn into techniques in courses taught by faculty who know their business. You'll learn to bring your imagination to life in an effective way that speaks to your audience. Faculty and classmates will critique your work and your efforts will improve through good, constructive feedback. You'll spend hours coming up with ideas and refining them. This could mean being in an edit suite making up for less-than-perfect shoot conditions. Or in an audio session coaching the voiceover talent on her delivery. Your storyboards and designs will be scrutinized. And you'll learn that there is much more to learn than you had ever imagined. Ultimately, your own style and innovation will evolve. Each quarter, you'll realize that the creative process does not always follow a straight and narrow path, it can actually be quite chaotic as all sorts of things bubble to the surface while you explore your ideas. You'll also discover that in the midst of the chaos, there will be those "a-ha" moments when it all comes together.

The pay off.

In the final quarter of your program, professional development courses will help you build the skills and confidence you'll need to begin your job search. Our



"In critiques, you learn to start listening to what others are saying and you learn to look at your work objectively. It makes you more well-rounded."

**Ashley Summerlin,** Graphic Design, Student
The Art Institute of Atlanta

→ **Imagine.**

Animated epics that inspire. Game designs that captivate. Special effects that fascinate. Media arts professionals combine imagination and technology to surprise, inform, and entertain via the Internet, television, and the silver screen. They're inspired by the energy of motion and the power of sound. They examine how shadows dance across moving objects. And how movement affects color and proportion. They're the next generation of storytellers.

Career Services staff will guide you through those first steps into the working world through job leads and networking opportunities that can get your foot in the door and your career on the right track. By the time you're ready to graduate from your media arts program, you will have culminated a portfolio of your finest work for potential employers to see — a demonstration of your hard work and imagination. Our goal is to prepare you for entry-level positions in the media arts field. All this, combined with your new-found appreciation for how this industry works, will help you to make an impact in this fast-paced and continuously changing field.

**Media Arts Programs of Study**
Program offerings vary by location.

**Animation**
Master's, bachelor's, and associate's degree programs; diploma and certificate programs
**Audio Production**
Bachelor's and associate's degree programs; diploma and certificate programs
**Broadcasting**
Associate's degree program

**Digital Media Production**
Bachelor's degree program
**Game Art & Design**
Bachelor's degree program; diploma and certificate programs
**Multimedia & Web Design**
Bachelor's and associate's degree programs; diploma and certificate programs
**Photography**
Bachelor's and associate's degree programs; diploma program
**Video Production**
Master's, bachelor's, and associate's degree programs; diploma and certificate programs
**Visual Effects & Motion Graphics**
Bachelor's degree program; diploma and certificate programs

08 | 09



COPY

Career Services

Ai The New England Institute of Art®

50 Years of Creative Education in Art & Communications



## ABOUT THE COLLEGE

The New England Institute of Art provides a balance of career and liberal arts education to prepare graduates for employment in their chosen field. Industry-experienced faculty use a student-centered approach and market-driven curricula to support students in developing the tools and skills necessary to achieve their goals.

## DEGREE PROGRAMS

### Audio and Media Technology
The Bachelor of Science degree program in Audio and Media Technology is for students who are serious about the audio industry and their future. Students get a solid grounding in critical listening, computer music, and the physics of sound, plus exposure to the actual situations that they run into in their professional career.

### Graphic Design
The Bachelor of Science degree program in Graphic Design is the first step toward a career in commercial design. Initially, students develop an understanding of color and composition, design and typography, and drawing skills. As they progress through the program, students are trained in creative problem solving and learn to offer solutions that are effective in the business of Graphic Design.

### Digital Media Production
The Bachelor of Science degree program in Digital Media Production provides an intensive study of digital production in three highly competitive areas: Digital Cinema, Corporate and Commercial Video Production, and E-Journalism. The degree gives all students a solid base of foundational material to develop critical thinking skills in History of Mass Communications, History of the Moving Image, The First Amendment and Media Literacy and Popular Culture. It also immerses students in the digital technology for shooting, editing, writing, graphics, and communications on the web.

### Interior Design
The Bachelor of Science degree program in Interior Design offers students the opportunity to learn foundation art skills, drafting, contract/commercial design, residential design, and furniture history and design to help then solve client problems. Students will develop abilities in all aspects of the design of three-dimensional residential and commercial spaces. Students start with courses in drawing, perspective, proportion, color theory, basic design and other fundamentals. The program also incorporates courses in 2-D and 3-D computer-aided design, history of Interior Design and cultural contexts, furniture design, materials, textiles, environmental systems, architectural detailing, lighting design, building codes, computer rendering, 3-D modeling, accessory design and other topics related to the field.

### Media Arts & Animation
The Bachelor of Science degree program in Media Arts & Animation refines and synthesizes the students' competencies in the field of computer animation. Students apply advanced techniques in drawing characterization, animation in both 2-D and 3-D computerized environments, and interactive technologies. Students will develop a graduate project which represents a unique style and demonstrates conceptual abilities. This program prepares graduates for entry-level positions such as 2-D animators, 3-D animators, special effects animators, broadcast graphic artist, or other animation and art specialties.

### Interactive Media Design
The Bachelor of Science degree program in Interactive Media Design offers hands-on experiences on everything from designing streaming media to managing Web site growth and exploring new dimensions with electronic shopping and interactivity. Students can study a wide range of areas, from designing virtual worlds to marketing on the Internet. Students learn to develop and manage Web activities and create e-commerce applications. Students work in the college's Internet labs, where they learn about Web site development and management, marketing and e-commerce, measuring the success of online activities, and protecting secure access. Students graduate with skills in building and maintaining Web sites and developing Internet-based strategies to help organizations integrate the Web into their operations.

### Audio Production
The Associate of Science degree program in Audio Production allows students to learn a basic skill set covering the fundamentals of various audio applications. Included are courses that require the student to produce projects that demonstrate their creative and technical abilities.

### Broadcasting-Radio & TV
In the Associate of Science degree program in Broadcasting, students can concentrate in either radio or television. Students acquire essential skills of radio or TV broadcasting, from announcing and videography to editing and producing. Students also learn to produce a high-quality product and bring it to market, with assignments built around real-world broadcast situations such as shooting, writing, and editing a TV news story or producing a music video under deadline.

## CAREER PLANNING & PROFESSIONAL PLACEMENT ASSISTANCE

Whether your industry is Graphic Design, Broadcasting, Sound Engineering or Interactive/Multimedia, New England Institute of Art graduates have the training and skills to be valued employees with your company. Career Services takes pride in working closely with employers, students and alums to ensure that our candidates are referred to only appropriate employment opportunities.



The New England Institute of Art and Career Services are committed from the student's very first semester to begin to prepare them for career success. Initially, assistance is offered in finding part-time jobs, via the Student Employment Advisor. The Student Employment Advisor manages the on-campus work study program, however many students choose to work off-campus. Chances are if you have a part-time job available - The New England Institute of Art has a student that can fill that job. Typical student employment jobs are in the following areas: customer service, office/administrative, retail, technical support, audio/video, etc.

Our approach is simple. Students work with specifically assigned Career Advisors to devise a job search strategy. Career Advisors help students determine their interests, skills, abilities during their last semester and work intensively with them after graduation to help them find appropriate field-related positions.

Post your jobs with Career Services! You can feel confident that you'll get a quick response, your positions will be shared only with candidates who are appropriate and as a result you'll receive resumes/inquiries from students and grads who are qualified.

## INTERNSHIPS

At The New England Institute of Art we believe hands-on experience and internships are an integral part of how students learn about the industry they plan to enter. Therefore, it's a requirement that all students complete at least 120 hours of an internship prior to graduation. The Internship Program is administered and overseen by the Office of Career Services. Career Advisors assist students in identifying appropriate internship sites.

Internships are:

- Required (120 hours) additional internships are strongly encouraged.
- Usually done in the student's final year of study.
- Done for college credit.
- Are either paid or unpaid.
- Usually done part-time – students intern an average of 15-20 hours per week.

## WAYS TO GET INVOLVED

We value participation and input from our employer partners. Here are a few ways to get involved with The New England Institute of Art.

ON-CAMPUS RECRUITMENT: Save valuable time! Save on advertising costs! You're always welcome to our campus (conveniently located in Brookline Village) to meet with and interview students and/or recent grads for your open positions.

CAREER FAIR: Promote your company! Meet new and future grads for open positions! Usually held in the Spring, The New England Institute of Art career fair is a great way to meet potential candidates for your open positions.

PANEL DISCUSSIONS/GUEST SPEAKING: Share your knowledge and experience with our students and future grads! A number of times per year, Career Services invites employers to share their vast knowledge and experience with students and recent grads.

## ◤ ABOUT CAREER SERVICES

The New England Institute of Art prides itself on a strong emphasis on career preparation. These services include career planning, internships, close employer involvement and job placement assistance for our graduates. Each program has a specific career advisor who works with students, grads and employers in their industry and oversees internship and job placement for students in their major.



# RECENT NEW ENGLAND INSTITUTE OF ART GRADUATES:

## AUDIO PRODUCTION

- Mike LaPierre, Recording Engineer, Long View Farm Studios, Brookfield, MA
- Elissa Young, Label Manager, Gigantic Music, NYC
- Andy Geel, Pro Tools Editor, Daddy's House, NYC
- Zach McNees, Assistant Engineer, The Hit Factory, NYC
- Carlyie Simmons, Distribution Representative, Sony Records, NYC
- Lora Halstrom, Promotions Assistant, Warner Bros Music Group, NYC
- Alex Brahms, Assistant Director, Presentation Services, Boston, MA
- Andrew Antczak, Customer Service/Sales, Cakewalk, Boston, MA
- Austin Lemieux, Purchase Controller, Pro Audio Design, Rockland, MA
- Jill Mattie, Audio Engineer, Cramer Productions, Norwood, MA
- Raphael Sofer, Assistant Engineer, Q Division Studios, Somerville, MA

## RADIO BROADCASTING

- Lynne Hoffman, Host, VH1 Classic, NYC
- Ramiro Torres, On Air Personality, WJMN JAM'N 94.5 FM, Waltham, MA
- George Knight, On Air Personality, WBOS 92.9 FM, Boston, MA
- Angelie Wood, On Air Personality, WFNX 101.7 FM, Boston, MA
- Leslie Hicks, On Air Personality, WWFX FM, Worcester, MA
- Marc Nazzaro, On Air Personality, WJYY FM, Concord, NH
- William Cooksey, On Air Personality, WESX AM, Marblehead, MA
- Stephen Budwitis, Local Music Director/Night Jock, WKKB FM, Fairhaven, MA
- James Stewart, Producer, WEEI AM Sports Radio, Boston, MA
- Christina Curcuru, Production Assistant, VH1 Satellite Radio XM-156

## TELEVISION BROADCASTING

- Ernesto Jerez, Announcer, ESPN Deportes, Bristol, CT
- Vrien Ysaais, News Technician, ESPN, Bristol, CT
- Steve Begin, Production Assistant, ESPN, Bristol, CT
- Devon Sayers, Assignment Editor, Hearst-Argyle, Albuquerque, NM
- Bonnie Clifton, Editor, WNEP-TV, Scranton, PA
- Yoko Nakamura, Master Control Operator, New England Cable News, Newton, MA
- Deanna Olcott, Production Coordinator, Comcast, Boston, MA
- Samantha Selig, Technical Support Rep, AVID, Tewksbury, MA
- Leigh Willis, Video Technician, VideoLink Boston, Watertown, MA

## INTERACTIVE MEDIA DESIGN

- David Bozzi, IT Support Associate, Harvard Medical School, Boston, MA
- Ron Blindeau, Book Production Specialist, Boston Common Press, Brookline, MA
- Tim Taylor, Designer, Flipp Sports, Canton, MA
- Paul Dagnello, Multimedia Producer, Boston College/Office of Marketing & Communications, Chestnut Hill, MA
- Adam Krueger, Designer/Developer, Code Lab Technology, Wakefield, MA
- Jeremy Lassetter, Multimedia Producer, The MITRE Corporation, Bedford, MA
- Jose Medeiros, Multimedia Designer, Glad Works, Pawtucket, RI
- Chris Saint-Amant, Software Engineer, BIT Group, Inc, Somerville, MA
- Dominic Taormina, Production Assistant, Sky Publishing, Cambridge, MA
- Jennifer Boone, Assistant Web Master, WHDH NBC7, Boston, MA

## GRAPHIC DESIGN

- Christopher Ellsworth, Designer/Owner, CGE Design, Boston, MA
- David Oliva, Production Assistant, Versal Editorial Group, Andover, MA
- Jeffery Jalovec, Graphic Designer, AgaMatrix, Cambridge, MA
- Jeff Silvestris, Graphic Designer, DiBona Bornstein & Random, Boston, MA
- Rich Gorzinski, Graphic Designer/Marketing Assistant, Boston Acoustics, Peabody, MA

# The New England Institute of Art

50 Years of Creative Education in Art & Communications

10 Brookline Place West, Brookline, MA 02445
Tel: (617) 739-1700  Fax: (617) 582-4604
Visit us on the web: www.neia.aii.edu

# Media Arts & Animation Course Descriptions
Please note all courses are subject to change. All courses are three credits unless otherwise indicated.

**GD 101   Drawing and Perspective**
A fundamental drawing course in which students learn how to use a variety of drawing tools, draw three-dimensional objects in one, two, and three point perspective, and generate drawings that demonstrate correct proportions. Students are also introduced to the various means of visual indication in design. *Prerequisite: None*

**GD 102   Fundamentals of Design**
An exploration of the basic principles of design and an introduction to the creative process. Design elements and relationships are identified and employed to establish a basis for aesthetic sensitivity and critical analysis. Color theory is explored as well as the cultural and psychological impact of color in relation to design. *Prerequisite: None*

**GD 103   Life Drawing**
The human figure is analyzed and interpreted. Students practice their drawing skills, applying correct proportions, and showing form and gestures through the use of line and tone. *Prerequisite: GD 101 Drawing and Perspective*

**GD 120   Digital Imaging**
An introduction to photo retouching, image manipulation, and the creation of original artwork using computers and bitmap software. Scanning methods, color adjustment, and special effects through the use of filters are stressed. *Prerequisite: CSI 101 Understanding Computer Technology*

**MA 110   Principles of Animation**
Students learn to identify various types of animation. The illusion of artistic animation is analyzed and executed through exercises. This course also involves discussions of new developments and future trends in the industry, analysis of major sectors of the industry and career opportunities within them. *Prerequisite: None*

**MA 210   Advanced Life/Anatomy**
Building on skills developed in previous drawing courses, students will further refine drawing skills as applied to animation. Emphasis will be placed on simplifying drawing through contour line, generating impressions of form under time constraints and expressing emotion through the user of abstract line and form. *Prerequisite: GD 103 Life Drawing*

**MA 220   Acting and Movement**
The introduction of acting as a tool of research through studies of animated movement. Characters' personality, expression, motivation, body language, and posture will be studied through classroom exercises in a variety of media. *Prerequisite: None*

**MA 230   Storyboarding for Animation**
This course focuses on industry-standard storyboarding and scripting techniques to animation. Contents to be covered include the various purposes and formats of storyboards, the basic terminology and concepts used in storyboarding, and the

application of storyboarding techniques to the creation of storyboards with or without a written script. *Prerequisite: MA 210 Advanced Life/Anatomy*

**MA 240   Character/Object Design**
In this course students will design and draw characters or objects for animation using line to accurately delineate the form. Students will learn appropriate proportion and form for an animated character or object. Course assignments include gesture drawing, action poses, turnarounds, and the creation of 3D characters or objects. Students will animate their characters and objects through the use of flip books and/or stop motion animation. *Prerequisite: MA 210 Advanced Life/Anatomy*

**MA 250   Digital Ink and Paint**
This is course is an introduction to the computer as an ink and paint media for animation. Scanning, clean up, ink and paint, camera will be explored. *Prerequisite: CSI 101 Understanding Computer Technology*

**MA 260   2D Animation**
Students will study the basis of timing, weight, and anticipation. Use of a capture device, pencil tests, and other 2D animation skills will be explored. The students will apply these skills through storyboarding and character studies. *Prerequisite: MA 210 Advanced Life/Anatomy, MA 230 Storyboarding for Animation*

**MA 270   3D Modeling**
In this course, students expand their knowledge and skills in a computer-based 3D modeling environment. Topics to be covered include: skinning, beveling, displacement mapping, terrain modeling, metaball modeling, match perspective, 3D scanning, and texture modeling. *Prerequisite: MA 240 Character/Object Design*

**MA 280   Background Design and Layout**
This course focuses on the fundamentals of background layout with an emphasis on perspective, composition, design basics, staging, mood, texture and lighting. Students will also learn the basics of using props as background and foreground design elements. *Prerequisite: MA 210 Advanced Life/Anatomy, MA 230 Storyboarding for Animation*

**MA 310   Digital Editing - Video and Audio**
This course introduces students to the basic concepts and techniques in videography and audio as related to animation. Students will be exposed to basic theories and terminology in video production and the handling of basic gear including tripod, cables, camera, etc. Emphasis is placed on hands-on experience in video production so that students can translate the physical sense of video images into their computer environment for animation. Students will also learn to digitize sound and apply it for audio enhancement of their animations as well as how to produce appropriate audio effect and transition in computer animation. *Prerequisite: MA 230 Storyboarding for Animation, MA 260 2D Animation*

**MA 320   3D Animation**
This course explores the various techniques to create animation in a 3D environment on a computer. Specific animation features and functions of the given software will be discussed and applied to the production of short 3D animation projects. Emphasis will be placed on synthesized use of animation techniques. *Prerequisites: MA 270 3D Modeling*

**MA 330   Advanced 2D Animation**
In this course, building on the principles of 2D animation, students are responsible for organizing the elements necessary to complete a 2D second animation short. Addition of increases the level of complexity and necessitates a storyline. Use of a capture device, pencil tests, and other 2D animation skills will be utilized. *Prerequisites: MA 230 Storyboarding for Animation, MA 260 2D Animation*

**MA 350   Advanced 3D Modeling & Animation**
Built upon the foundation of 3D modeling and animation, this course continues to explore the more advanced techniques needed to create animation in a 3D environment on a computer. Specific animation features and functions of the given software will be discussed and applied to the production of an animation project. Emphasis will be placed on use of advanced animation techniques in a computer-generated 3D animation. *Prerequisites: MA 320 3D Animation*

**MA 410   Digital Compositing**
This course will expose students to the disciplines used in finalizing a composited project utilizing various software. The class will reinforce composing concepts and techniques that students have learned in previous classes. Each student will produce a final edited project that combines live-action, stills, CG imagery, and/or stop motion puppets and miniatures. *Prerequisites: MA 260 2D Animation, MA 310 Digital Editing - Video and Audio, MA 320 3D Animation*

**MA 420   3D Visual Effects**
Effects animation takes students through the basics of making special effects. Students will be using such tools as particles, soft bodies, dynamics and expressions to create several scenes. *Prerequisites: MA 250 2D Animation, MA 270 3D Animation, MA 310 Digital Editing - Video and Audio*

**MA 430   Animation Studio**
Students create a full-length animation with a purpose. In this advanced course, all nuances of project creation, production, and post-production are taught. *Prerequisite: MA 310 Digital Editing - Video and Audio, MA 330 Advanced 2D Animation, MA 320 3D Animation*





## Media Arts & Animation

*Bachelor of Science Degree Program*

### Program Overview

**Bachelor of Science in Media Arts & Animation**

Whether it's information or entertainment, the wide appeal of the electronic media has created a growing need for people skilled in media and animation arts. The Media Arts & Animation program at The New England Institute of Art provides intensive training in the skills necessary to succeed in this fast-paced, creative field.

The Bachelor of Science degree in Media Arts & Animation refines and synthesizes the students' competencies in the field of computer animation. Students apply advanced techniques in drawing characterization, animation in both 2-D and 3-D computerized environments, and interactive technologies. Students will develop a graduate project which represents a unique style and demonstrates conceptual abilities. This program prepares graduates for entry-level positions as 2-D animators, 3-D animators, special effects animators, broadcast graphic artist, or other animation and art specialties. The length of the program is eight 15-week semesters.

Students' creativity and critical thinking are nurtured within the liberal arts (general education) component of the program. By fostering intellectual and aesthetic growth, these courses help students develop a perspective about the interaction of their own discipline with other forms of creativity.

Media Arts & Animation graduates are prepared to market their new skills, uniting their creative ability and technical expertise to fulfill the demands of employers who have a need for computer animation, media design, and digital image production and manipulation.



|  | Sequence A | Sequence B | Sequence C | Sequence D | Sequence E |
|---|---|---|---|---|---|
| 1st Semester | CSI 101 or CSI 120 (Pre: CSI 100) | English Selection | SEM 101 Freshman Seminar | GD 101 Advanced Perspective | GD 102 Fundamentals of Design |
| 2nd Semester | HIS100 History of Communications | English Selection | Humanities Selection | GD 103 Life-Drawing (Pre:GD 101) | MA 110 Principles of Animation |
| 3rd Semester | GD 120 Digital Imaging (Pre:CSI 101) | English Selection | Social Science Selection | MA 210 Advanced Life/Anatomy (Pre: GD163) | MA 220 Acting and Movement |
| 4th Semester | MA 259 7 Digital Ink and Paint (Pre:CSI 101) | Math Selection | Physical Science Selection | MA 240 Character/Object Design (Pre: MA210) | MA 230 Storyboarding for Animation (Pre: MA210) |
| 5th Semester | MA 280 Background Design & Layout (Pre:MA 210) | Math Selection | Social Science Selection | MA 270 3D Modeling (Pre:MA 240) | MA 260 2D Animation (Pre: MA 210, MA 230) |
| 6th Semester | MA 310 Digital Editing Video & Audio (Pre: MA230 & MA 260) | MM 260 Animation Graphics for the Web (Pre:GD 120) | SCI 200 Physical Science of Visual Communication | MA 350 3D Animation (Pre: MA 270) | MA 330 Advanced 2D Animation |
| 7th Semester | MA 410 Digital Compositing (Pre:MA260, MA310, MA320) | MM 360 Interactive Web Graphics (Pre: MM260) | General Elective | MA 350 Advanced 3D Modeling & Animation (Pre:MA 320) | MA 430 Animation Studio (Pre: MA330, MA320) |
| 8th Semester | MA 497 Animation Seminar | MA 498 Animation Internship | General Elective | MA 420 3D Visual Effects (Pre: MA250, MA270, MA310) | MA 450 Animation Production Team (Pre: MA350, MA430, MA410) |

# EXHIBIT B





**Peter Hart** | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate



**Wayne Chen** | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate

### What makes media arts and animation so exciting?

The field of Media Arts & Animation is as limitless as your imagination. It constantly evolves as new technology is released and forward-thinking individuals embrace it. Dazzling sports graphics, special effects, animation that entertains as it educates — whatever it takes to amaze the eye and the mind is the focus of this exciting profession. Artists in this field are three-dimensional thinkers. They combine their creativity and technical skills to produce work for nearly every industry and take us to new places we've never been before.

To media artists, the world is in constant motion. They find ways to capture the movement of everyday life and re-create it in a digital environment. These artists strive to make their work as lifelike as possible — from studying how shadows shift on moving objects, how movement affects color and proportion, and how technology itself will innovate to respond to the demand of creating such work.

A Media Arts & Animation professional is computer savvy and eager to keep up with the quick and constant evolution of software. It's about artistic ability and the desire to continually improve it. It means to think like a communicator and storyteller. The payoff is being involved in one of the most creative professions today.

**Inspire yourself. Evolve your ideas.**
Before you can jump into creating ultra-cool spinning logos or characters that have been dancing around in your head, you've got to become comfortable with the groundwork. That means starting with the basics — drawing, character and object design, color theory, video production, and computer applications.

Hands-on studies immerse you in computer graphics, image manipulation, and 2-D and 3-D animation techniques. You'll learn how to develop a storyboard and write a script. You'll become knowledgeable in background and scenic layout, audio for animation, and digital video editing. Faculty, many of whom are working professionals in the field, will show you how to work on industry-related Pentium-class PC and Macintosh platforms, along with equipment and software such as Adobe Photoshop, Autodesk 3-D Studio, and Premier.

As you advance through your program, class assignments simulate real-working experiences.





## To media artists, the world is in constant motion. They find ways to capture the movement of everyday life and re-create it in a digital environment.

Program-related activities such as community-service projects and trips to computer animation industry events will give you practical, professional exposure to the working world of animation. Putting your knowledge into practice for your first "real world" position — it's also a lot of fun.

**Go out there — do great things.**
Where will our Media Arts & Animation program take you? Network and cable television companies, for starters. Major corporations and commercial post-production facilities, along with interactive, game design, and film companies are also in need of talented animation artists.

After graduation, you'll be prepared for entry-level positions such as animation or digital artist, special effects artist, storyboard artist, background artist, broadcast graphics designer, or lighting designer. With experience, you can advance to such positions as animation project manager or 2-D or 3-D artist to make the most of your skills.

Our Career Services Department has the job and industry connections to help you get your career off the ground. In addition, late-quarter

career development courses will bring your résumé and interviewing skills up to speed. Most importantly, you'll want to have your digital portfolio in order. Special courses will help you compile and polish this collection of your best work, and show you how to present it professionally to prospective employers upon your graduation.

Ready to get started? Give us a call. Come in and tour our facilities. Talk with faculty and students. Ask questions. Our admissions staff can help you make an appointment today.



Shiew Yen Loh | Media Arts & Animation
The Art Institute of California – San Francisco, Student



Daniel Falconer | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate

A media artist lives a double life. Since their work relies on realism — re-creating movement digitally — they must not only understand the intricacies of their technology, but how to translate anatomy, lighting, and physics into the electronic realm. But that's where the science ends and the fun begins. A hair dryer may influence them to give their new animated spaceman character a blast-o-ray to fend off pesky aliens. These artists know how to have a good time, and they can draw creative inspiration from anywhere.

www.neia.artinstitutes.edu



The New England Institute of Art

50 Years of Graphic Education in Art & Communications

Visit The New England Institute of Art at 10 Brookline Place West, Brookline, MA 02445 or call 1.800.903.4425.

© 2004 by The Art Institutes International, Inc.® 10595-02/04 PRBRO

# EXHIBIT C

Federal Family Education Loan Program (FFELP)

# Federal Stafford Loan
# Master Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both, under the United States Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0006
Form approved
Exp. date 9-30-2005

**Guarantor, Program or Lender Assistance:**

**United Student Aid Funds**

## Borrower Information

*Please print neatly or type. Read the instructions carefully.*

1. Last Name: Jacobson   First Name: Jessica   MI: M
2. Social Security Number: 021 662 887
3. Permanent Street Address (If P.O. Box, see instructions.): MA 01462
   City: Lunenburg   State: MA   Zip Code: 01462
4. Home Area Code/Telephone Number: (978) 345 1434
5. Date of Birth (Month/Day/Year): 08-01-83
6. Driver's License State and Number: MA S50141737
7. E-mail Address:
8. Lender Name: Nellie Mae Trust, Attn: EXPORTSS, P.O. Box 59012, Panama City, FL 32412-9012
9. Lender Code, If known: 829076

10. **References:** You must provide two separate references with different U.S. addresses. The first reference should be a parent (if living) or legal guardian. Both references must be completed in full.

| | A. | B. |
|---|---|---|
| Name | Diane Lemay | Judy Gray |
| Permanent Address | 65 Flanders Rd | 23 Farmer Ave |
| City, State, Zip Code | Leominster, MA 01453 | Fitchburg, MA 01420 |
| E-mail Address | | |
| Area Code/Telephone Number | (978) 537 8057 | (978) 345 1434 |
| Relationship to Borrower | Aunt | Family friend |

11. **Requested Loan Amount:** I request a total amount of subsidized and unsubsidized loans under this Master Promissory Note not to exceed the allowable maximums under the Higher Education Act. My school will notify me of the type(s) and amount(s) of loan(s) that I am eligible to receive. I may cancel my loan or request a lower amount by contacting my lender or school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and Disclosure Statements that have been or will be provided to me.

12. **Interest Payments (Optional):**
☐ I want to pay unsubsidized interest while I am in school.

## Borrower Certifications and Authorizations

*Read carefully before signing below.*

13. Under penalty of perjury I certify that:
   A. The information I have provided on this Master Promissory Note and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.
   B. I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.
   C. (i) I do not now owe an overpayment on a Federal Pell Grant, Supplemental Educational Opportunity Grant, or a Leveraging Educational Assistance Partnership Grant (formerly State Student Incentive Grant); or, if I owe an overpayment, I have made repayment arrangements with the holder to repay the amount owed. (ii) I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans), the Federal Direct Loan Program, or the Federal Family Education Loan Program ("FFELP" as defined in the Borrower's Rights and Responsibilities Statement); or (iii) I am in default on a loan, and I have made satisfactory arrangements with the holder of the defaulted loan.
14. For all subsidized and unsubsidized Federal Stafford Loans (as described in the additional MPN provisions and the Borrower's Rights and Responsibilities Statement) I receive under this Master Promissory Note, and for certain other loans as described below, I make the following authorizations:
   A. I authorize my school to certify my eligibility for loans under this Master Promissory Note.
   B. I authorize my school to transfer loan proceeds received by electronic funds transfer (EFT) or master check to my student account.

   C. I authorize my school to pay to the lender any refund that may be due up to the full amount of the loan(s).
   D. I authorize the lender, the guarantor, or their agents, to investigate my credit record and report information concerning my loan status to persons and organizations permitted by law to receive such information.
   E. I request and authorize my lender to: (i) during the in-school and grace periods of any loans made under this Master Promissory Note, defer and align the repayment of principal on all of my FFELP loans that are in repayment status; and (ii) add unpaid interest that accrues on all my FFELP loans to the principal balance of such loans ("capitalization") including such loans made under this Master Promissory Note, during forbearance periods, and for unsubsidized loans, during in-school, grace, and deferment periods as provided under the Act. "Capitalization" will increase the principal balance on my loans and the total amount of interest charges I must pay.
   F. I authorize the release of information pertinent to my loans: (i) by the school, the lender, and the guarantor, or their agents, to the references on the applicable loans and to members of my immediate family unless I submit written directions otherwise; and, (ii) by and among my schools, lenders, guarantors, the Department of Education and their agents.
   G. So that the loans requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to the school, the lender, and to state agencies and nonprofit organizations that administer financial aid programs under the FFELP.

## Promise to Pay

*In this Master Promissory Note (MPN), "lender" refers to, and this MPN benefits, the original lender and its successors and assigns, including any subsequent holder of this MPN.*

15. I promise to pay to the order of the lender all amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that multiple loans may be made to me under this MPN. I understand that by accepting any disbursements issued at any time under this MPN, I agree to repay the loans. I understand that, within certain time frames, I may cancel or reduce the amount of any loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that accrues on my unsubsidized loans during in-school, grace, and deferment periods will be added as provided under the Act to the principal balance of such loans. If I do not make any payment on any loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Certifications and Authorizations printed above, the Notice About Subsequent Loans Made Under This MPN, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

16. Borrower's Signature: 
17. Today's Date (Month/Day/Year): 11/12/04

BORROWER COPY B

*Additional MPN provisions follow*

# Master Promissory Note (continued)

**Disclosure of Loan Terms**

This MPN applies to both subsidized and unsubsidized Federal Stafford Loans described in the Interest section below. I agree that the lender may sell or assign this MPN and/or my loans and acknowledge that any loan may be assigned independently of any other loan to which this MPN applies. I agree that each loan is separately enforceable based on a true and exact copy of this MPN. Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified in the Higher Education Act of 1965, as amended, 20 U.S.C. 1070, et seq., and applicable U.S. Department of Education regulations (collectively referred to as the "Act"). Under this MPN, the principal amount that I owe, and am required to repay, will be the sum of all disbursements issued (unless I reduce or cancel any disbursements as provided below).

My lender will determine whether to make any loan under this MPN after my loan eligibility is determined by the school where I am enrolled on at least a half-time basis. At or before the time of the first disbursement for each loan, a disclosure statement will be sent to me identifying the amount of the loan and additional terms of the loan. Important additional information is also disclosed in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The Borrower's Rights and Responsibilities Statement and any disclosure statement I receive in connection with any loan under this MPN are hereby incorporated into this MPN.

I may request additional loan funds for my educational costs (up to the annual and aggregate loan limits). If my school determines that I am eligible for any additional or adjusted loan amount, my school may certify such amount. My eligibility for subsidized and/or unsubsidized loans may change based on changes in my financial circumstances. My school will notify me of any changes in my eligibility. I will be notified of any changes or additions to my subsidized and/or unsubsidized loans in a separate disclosure statement.

**Loan Cancellation**

I may pay back all or a part of a disbursement within timeframes set by the Act, as explained in the Borrower's Rights and Responsibilities Statement or other disclosure statement I receive at or before disbursement. In such case, the origination fee and guarantee fee will be reduced or eliminated in proportion to the amount of the disbursement returned within those timeframes. I will not have to pay interest charges if I return the full loan amount as provided in the Act.

**Interest**

Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loans are those specified in the Act. The interest rate information is presented in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The interest rate is presented in a disclosure statement that is issued to me.

Interest accrues on the unpaid principal balance of each loan from the date of disbursement by the lender until the loan is paid in full. I agree to pay all interest charges on my subsidized Federal Stafford Loans except interest payable by the federal government under the Act. I agree to pay all interest charges on my unsubsidized Federal Stafford Loans. If I fail to make required payments of interest before the beginning or resumption of principal repayment, or during a period of deferment or forbearance, I agree that the lender may capitalize such interest as provided under the Act. There is no federal interest subsidy on unsubsidized loans, so the total amount of interest I am required to repay on unsubsidized loans will be higher than on subsidized loans.

**Origination Fee and Guarantee Fee**

For each subsidized and unsubsidized loan, the federal government charges an origination fee equal to the amount required by the Act. The guaranty agency(ies) that guarantee(s) my loan(s) (in each case, the "guarantor") may charge a per loan guarantee fee not to exceed a maximum amount specified in the Act. I will pay these fees, as

identified in the disclosure statement, which will be deducted proportionately from each disbursement of my loans. I understand the origination and guarantee fees may be refundable only to the extent permitted by the Act.

**Late Charges and Collection Costs**

The lender may collect from me: **(i)** a late charge for each late installment payment if I fail to make any part of a required installment payment within 15 days after it becomes due, and **(ii)** any other charges and fees that are permitted by the Act for the collection of my loans. If I default on any loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees.

**Repayment**

I must repay the full amount of the loans made under this MPN and accrued interest. Federal Stafford Loans have a repayment grace period, which will be disclosed in my disclosure statement. I will repay the principal of each loan in periodic installments during a repayment period that begins on the day immediately following the end of the applicable grace period. Payments submitted by me or on my behalf (exclusive of refunds) may be applied first to charges and collection costs that are due, then to accrued interest that has not been capitalized, and finally to the principal amount.

I understand that the school's certification of my loan eligibility determines whether my loans must be repaid as subsidized and/or unsubsidized loans.

The lender will provide me with a repayment schedule that identifies my payment amounts and due dates. Except as otherwise provided in the Act, the minimum annual payment required on all my FFELP loans is $600 or the amount of interest due and payable, whichever is larger. My lender must provide me with a choice of repayment plans consistent with the provisions of the Act.

If I am unable to make my scheduled loan payments, the lender may allow me to reduce my payment amount, to extend the time for making payments, or to temporarily stop making payments as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance. The lender may align payment dates on my loans or grant me a forbearance to eliminate a delinquency that persists even though I am making scheduled payments.

I may prepay all or any part of the unpaid balance on my loans at any time without penalty. If I do not specify which loans I am prepaying, the lender will determine how to apply the prepayment in accordance with the Act. Upon repayment in full of each loan under this MPN, I agree to accept written notification of such loan payoff in place of receiving the original MPN.

**Acceleration and Default**

At the option of the lender, the entire unpaid balance of the applicable loan(s) made under this MPN will become immediately due and payable, (this is called "acceleration"), upon the occurrence of any one of the following events: **(i)** I fail to enroll as at least a half-time student at the school that certified my loan eligibility, **(ii)** I fail to use the proceeds of the loan solely for educational expenses, **(iii)** I make a false representation(s) that results in my receiving a loan for which I am not eligible, or **(iv)** I default on the loan.

The following events shall constitute a default on my loan: **(i)** I fail to pay the entire unpaid balance of the applicable loans after the lender has exercised its option under items (i), (ii), or (iii) in the preceding paragraph; **(ii)** I fail to make installment payments when due, provided my failure has persisted for at least 270 days for payments due monthly or 330 days for payments due less frequently than monthly; or **(iii)** I fail to comply with other terms of the loans, and the lender or guarantor reasonably concludes I no longer intend to honor my repayment obligation. If I default, the guarantor may purchase my loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.

If I default, the default will be reported to all national credit bureaus and will significantly and adversely affect my credit history. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement. Following default, the loans may be subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

**Governing Law and Notices**

The terms of this MPN will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.

If a particular loan under this MPN is made by the school, or if the proceeds of a particular loan made under this MPN are used to pay tuition and charges of a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract, or business arrangement, any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan. My recovery under this provision shall not exceed the amount I paid on such loan.

If I reside in the state in which the principal office of the guarantor is located, the guarantor may sue to enforce the applicable loans in the county in which the guarantor's office is located. However, if I object to being sued there and I mail a written objection to the guarantor that is postmarked no later than 30 days after I am served with the suit, the guarantor will either have the court transfer the suit to the county in which I live or will dismiss the lawsuit.

Any notice required to be given to me will be effective if sent by first class mail to the latest address the lender has for me or by electronic means to an electronic address that I have provided. I will immediately notify the lender of any change of address or status as specified in the Borrower's Rights and Responsibilities Statement. Failure by the lender to enforce or insist on compliance with any term on this MPN shall not be a waiver of any right of the lender. No provision of this MPN may be modified or waived except in writing. If any provision of this MPN is determined to be unenforceable, the remaining provisions shall remain in force.

---

**Notice About Subsequent Loans Made Under This Master Promissory Note**

This Master Promissory Note authorizes the lender to disburse multiple loans during the multi-year term of this MPN upon my request and upon the school's certification of my loan eligibility. Subsequent loans may be made under this MPN for the same or subsequent periods of enrollment only at schools designated by the Secretary of the U.S. Department of Education.

I understand that no subsequent loans will be made under this MPN after the earliest of the following dates: (i) the date my lender receives my written notice that no further loans may be disbursed under the MPN; (ii) one year after the date of my signature on this MPN if no disbursement is made during such twelve month period; or (iii) ten years after the date of my signature on this MPN or the date the lender receives this MPN.

Any amendment to the Act governs the terms of any loans disbursed on or after the effective date of such amendment, and such amended terms are hereby incorporated into this MPN.

# EXHIBIT D

**Ai** The New England
**Institute of Art™**

50 Years of Creative Education in Art & Communications
10 BROOKLINE PLACE WEST, BROOKLINE, MA 02445
800.903.4425 Fax:617.582.4500
e-mail:neiaadmin@aii.edu
www.aine.artinstitutes.edu

## ENROLLMENT AGREEMENT

Name _Jacobson_ _Jessica_ _M_
(Last Name) (First Name) (Middle)

Social Security · _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_

Present Address _159 Howard St_
(Street or PO Box)
_Lunenburg_ _MA_ _01462_
City State Zip

Telephone: Home _978.345.1434_ Business ( )

Cell Phone: _____

E-mail Address: _blondy_311@yahoo.com_

Check the major course for which you are applying

**Associate of Science degree:**
☐ Broadcasting / Radio or Television (61 credits)
☐ Audio Production (61 credits)

**Bachelor of Science degree:**
☐ Multimedia & Web Design (120 credits)
☐ Graphic Design (120 credits)
☐ Audio & Media Technology (120 credits)
☐ Digital Media Production (120 credits)
☐ Interior Design (120 credits)
☑ Media Arts & Animation (120 credits)

Start Date:
☐ September 7, 2004
☑ January 10, 2005
☐ May 16, 2005
☐ September 6, 2005

### Financial Information

For those who begin their program September 1, 2004 through May 31, 2005 tuition is charged at $565 per credit (15 credits per semester).
Tuition increases with the start of each Fall Semester. Students enrolling or re-entering for semesters beginning after September 1, 2005 must confirm the tuition rate in effect at that time.
Tuition and fees applicable to The New England Institute of Art programs are as follows:

| | Graphic Design (120 credits) | Multimedia & Web Design (120 credits) | Audio & Media Technology (120 credits) | Broadcasting: Radio (61 credits) | Broadcasting: Television (61 credits) | Audio Production (61 credits) | Digital Media Production (120 credits) | Interior Design (120 credits) | Media Arts & Animation (120 credits) |
|---|---|---|---|---|---|---|---|---|---|
| Application Fee* | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 |
| Enrollment Fee* | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Tuition per semester (15 credits) | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 |
| Activities and Technology Fee (per semester) | 125 | 125 | 125 | 125 | 125 | 325 | 125 | 125 | 125 |
| Supply Kit** | 785 | 735 | 515 | 540 | 700 | 515 | 700 | 785 | 785 |
| TOTAL PROGRAM TUITION AND FEES | 69,735 | 69,685 | 71,065 | 35,655 | 35,815 | 36,430 | 69,650 | 69,735 | 69,735 |
| Estimate of books and supplies cost per semester | 350 | 300 | 225 | 225 | 225 | 225 | 225 | 350 | 350 |

*The Application and Enrollment fees are paid by new and transfer students.
**Supply Kit is charged only in the first semester.

The total tuition charged for any program will be increased from the above stated charges if a student is required to take transitional studies courses. Additional tuition for those courses can vary between $1,614 and $3,228, depending on the number of transitional studies courses required.

By this Enrollment Agreement, The New England Institute of Art agrees not to increase the per credit hour tuition charge for the duration of the program provided that the student does all of the following: submits the enrollment fee and signed enrollment agreement on or before the start date of this agreement; remains enrolled maintaining a minimum of 12 credits in the fall and winter semester and 9 credits in the summer semester; completes their education within 150% of the standard program length in semesters [i.e. must complete an eight semester program within twelve semesters] and completes their program without interruption, taking Fall,Winter and Summer semesters, without voluntary withdrawal, suspension or termination. Bachelor's degree students are allowed one semester of leave during their program without an increase in tuition. Reentering students will be subject to the per credit hour tuition charge in effect at the time of re-enrollment. Exceptions to this policy may only be made for emergencies, such as serious illness; school-controlled reasons, such as course availability; or major, unforeseen changes in a student's living situation, if these occurrences necessitate a student attending less than full-time or not at all. Exceptions must be requested in writing at the time of the occurrence and be approved by The New England Institute of Art's President.

### Student's Right to Cancel without Penalty or Obligation

You, the student may cancel your enrollment without any penalty or obligation at any time prior to midnight of the fifth business day after signing this enrollment agreement. You may also cancel your enrollment if upon a doctor's order, you cannot physically receive the services, or you may cancel your enrollment if the service ceases to be offered by the institute. [See reverse side for refund policy prior to matriculation].

Please do not sign this Enrollment Agreement before you read it in its entirety. You will be given an exact copy of the agreement you sign. Please also note that the provisions of any attached rider[s] signed by you are also part of the Enrollment Agreement.

### Student Acknowledgments

I have received and read a copy of The New England Institute of Art current catalog, the provisions of which I accept. **I have read and understand all provisions of this Agreement, and I have been given a copy of it for my records.** (Parents must also sign the enrollment agreement if you are under 18 years of age.)
I understand that my enrollment and The New England Institute of Art's obligations under this Enrollment Agreement (except the cancellation and refund provisions) may be terminated by The New England Institute of Art if I fail to comply with The New England Institute of Art attendance, conduct, academic, financial or other requirements. I understand that The New England Institute of Art also reserves the right to cancel my enrollment if The New England Institute of Art determines (1) that I have demonstrated poor academic potential (as determined by evaluation of academic evaluations or any other academic evaluations deemed appropriate for the program selected), and/or (2) that I do not meet all financial obligations related to enrollment and continuing enrollment. I understand that my financial obligations to The New England Institute of Art must be paid in full before a degree may be awarded and before transcripts will be issued.

Both sides of this agreement and the financial plan shall constitute the entire enrollment agreement. I understand and agree that they supersede any prior or contemporaneous oral or written agreements or statements and may not be modified without the written agreement of the President of the The New England Institute of Art. I also understand that this agreement shall not be binding until it is accepted by The New England Institute of Art.

### Student's Agreement

Now, having read and received a copy of this Enrollment Agreement and intending to be legally bound by it, the parties have signed this Enrollment Agreement on the dates below written.

Student's signature _____ Date _11/19/04_

Signature of accepting official from
The New England Institute of Art _____ Date _1/7/04_

Title of accepting official _Art Chair_ Date _____

Parent's (or Guardian's) signature (if applicant is under 18 years of age) _____ Date

Parent's (or Guardian's) address _____ Date

White: Admissions    Yellow: SFS    Pink: Student
1 of 2

**Further Financial Information**

An application fee of $50 is to be submitted with your application for admission. The enrollment fee of $100.00 is due within 10 days after this Enrollment Agreement is signed. The tuition charge shown above is subject to adjustment each September. The adjustment will not be applied to continuing students as explained in the Financial Information section on page 1. Students are given a notice of 90 days in the event of an adjustment.

For any student enrolling on or after August 1, 2002, the student understands and agrees that s/he will be liable for interest charges that will be assessed on his/her account balance until the balance is paid in full. Interest will be charged at 12% per annum on the student's adjusted outstanding balance at the end of each month. The adjusted outstanding balance is defined as all charges incurred by the student for attendance at the school at the end of the prior month, including but not limited to tuition, fees, housing charges, late registration fees, fines, damages, etc., less the total amount paid to the student's account at the end of the current month, including financial aid that the student has been awarded but has not been paid for the semester provided that the student and/or the student's parent(s) have completed all of the requirements for the award. The student understands and agrees that his/her adjusted outstanding balance is different from his/her student payment plan and that the student's financial aid award may be reduced or eliminated if the student does not complete all of the requirements for financial aid.

**The Application Process**

As part of the application process, applicants must independently conceive and write an essay of approximately 150 words stating how their education at The New England Institute of Art will help them to attain their career goals. Applicants must also present a record of accomplishment and core academic courses as evidence through high school transcript, grade point average or upon evaluation of GED scores. Successful admission into The New England Institute of Art and a satisfactory program start is dependent on the level of accomplishment exhibited in the areas of grade point average, evaluation of GED scores, a personal interview with an admissions representative, and meeting all other requirements stated in this Agreement.

First semester tuition and fees for new students become due 30 days prior to entry. Thereafter, semester tuition for each succeeding semester is due upon registration, approximately two weeks prior to the end of each academic semester. Students may not register for any academic semester of study unless all tuition and fees that are due have been paid, or unless students have made arrangements for, and adhered to an approved alternative payment plan. Tuition is charged on a semester-by-semester basis. Students are not obligated beyond the semester they are currently attending. Tuition for repeat courses is charged on a per credit basis.

**Refund Policy Prior to Matriculation**

Applicants may cancel their enrollment in person or in writing before the beginning of classes. An applicant not requesting cancellation before the scheduled starting date indicated on this Enrollment Agreement will be considered a student.

1. Enrollment fees paid by applicants will be refunded if they are not accepted for admission.

2. Applicants requesting cancellation before the first scheduled class date will receive a refund of all monies paid, less the $50 application fee and $100 enrollment fee.

3. All monies paid by applicants will be refunded, if requested, within three business days after their first visit to The New England Institute of Art or within three business days of the regularly scheduled orientation program for their starting semester, whichever is sooner.

4. Refunds will be made within 30 calendar days after the applicant's/student's request or within 30 calendar days after his/her first scheduled class day.

5. The application and enrollment fee is valid for three consecutive semesters, including the original start date semester. Students wishing to reapply after three semesters will be required to submit a new application and enrollment fee.

**Refund Policy After Matriculation - All Semesters**

In the event of withdrawal by the student or suspension by The New England Institute of Art from all courses registered during any semester of study:

1. Prepaid tuition for any period beyond the student's current semester will be refunded in full.

2. The student may voluntarily withdraw from The New England Institute of Art by notifying the their Department Chair in person or in writing.

3. Refunds due shall be paid within 30 days of the notification date, unless the student is withdrawing at the end of the semester. Refunds for a student notifying The New England Institute of Art prior to the end of a semester that s/he will be withdrawing at the end of that semester will be paid within 14 days of the last day of that semester

4. Refunds for a student who completes a previous semester of study and does not notify The New England Institute of Art prior to the end of that semester that s/he will not be returning for the following semester will be paid within 30 days of the first day of that following semester in which the student was expected to return.

5. In the event of a fully documented extreme illness or personal emergency that makes it impractical for the student to complete the program, The New England Institute of Art may modify the tuition refund policy as deemed appropriate to the circumstances.

6. Each academic semester is 15 weeks in duration (summer semesters are 12 weeks in duration). The calculation of refunds is based upon the last day of attendance within the semester. Any portion of a week's attendance is considered a full week of attendance for refund purposes.

**Refund policy - The New England Institute of Art**

**Return of Federal Title IV Aid:**

A percentage of Federal Title IV Aid will be returned if the student withdraws during the first 60% of the semester. The amount returned will be based on the percentage of days remaining in the semester. The school will determine the calendar days completed in the semester divided by the total number of calendar days in the semester. If the amount is less than or equal to 60%, than that percent of the Federal Title IV Aid received is the amount that can be retained. The difference will be returned to the Federal Title IV Aid program from which funds were received in this order: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan, Pell Grant, SEOG.

If Federal Title IV Aid funds have been given to the student, and if the student withdraws during the first 60% of the semester, the student may need to return some of those funds. If the student needs to return funds, the school will notify the student how much is owed, and how it is to be returned.

**Adjustment of charges**

In accordance with school policy, the school will earn tuition and fees as follows:

Week One - 25%
Week Two - 50%
Week Three and Four - 75%
After Week Four - 100%

The Art Institute will first calculate how much needs to be returned under the federal return of Title IV Aid Policy. The amount will then be subtracted from the amount that was paid for the quarter of withdrawal to get the adjusted amount paid. The Art Institute will then calculate how much of the charges can be retained based on the schools policy. The amount that can be retained will be subtracted from the adjusted amount paid. If there is additional money to be refunded from Federal funds after calculating the Return of Title IV formula and the refund policy, the refund will be made to the student, or, with the student's authorization, to the Federal loan program(s) in the following order: up to the amount received, for the term of withdrawal: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan. If there is an additional credit balance made up of non-Title IV funds, it will be refunded in the following order: up to the amount received for the term of withdrawal: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan, other loans, other aid (if required), and student.

If loss, components of the kit, books, or supplies, are returned to the book store in resalable condition within 21 days of withdrawal, a credit will be given.

All refunds or return of funds will be made within 30 days of the date that the student notifies the Art Institute of the withdrawal.

Examples of the calculations for this new policy are available in the Student Accounting office.

**General Information and Understandings**

**Handling of Student Complaints**

If a student feels that a concern or complaint has not been adequately resolved using the Student Grievance Procedure described in the Student Handbook, the student may direct his/her complaint or concern in writing to The New England Association of Schools and Colleges, 209 Burlington Road, Bedford MA 01730-1433 or to the Commonwealth of Massachusetts, Board of Higher Education, One Ashburton Place, Room 1401, Boston, MA 02108-1696.

**Arbitration**

Any dispute or civil claim (other than disputes or claims regarding non-payment, grades, or their academic evaluations) between the student and The New England Institute of Art or any company that is an affiliate of the College or any officer, director, trustee, employee or agent of the College or any such affiliated company not resolved with the College or regulatory officials shall be submitting to binding arbitration in the City of Boston, Massachusetts pursuant to the commercial arbitration rules of the American Arbitration Association. The parties acknowledge that this is a transaction in interstate commerce and that the Federal Arbitration Act will apply. Any award entered shall be final and binding on both parties. Information about the arbitration process is available in the Office of the President.

**Housing**

The New England Institute of Art offers limited housing opportunities. Please see Student Services for more information on housing assistance.

**Transfer of Credits**

The New England Institute of Art is licensed by the State of Massachusetts Board of Higher Education to confer the Bachelor of Science degree, Associate of Science degree, and Diploma and accredited by the New England Association of Schools and Colleges, an accrediting agency recognized by the United States Department of Education. However, the fact that a school is licensed and accredited is not necessarily an indication that credits earned at that school will be accepted by another school. In the U.S. higher education system, transferability of credit is determined by the receiving institution taking into account such factors as course contents, grades, accreditation and licensing.

The mission of The New England Institute of Art is to help you to prepare for entry-level employment in your chosen field of study. The value of degree programs like those offered by The New England Institute of Art is their deliberate focus on marketable skills. The credits earned are not intended as a stepping-stone for transfer to another institution. For this reason, it is unlikely that the academic credits you earn at The New England Institute of Art will transfer to another school.

Programs offered by one school within the Art Institute system may be similar to but not identical to programs offered at another school within the system. This is due to differences

imposed by state law, use of different instructional models, and local employer needs. Therefore, if you decide to transfer to another school within The Art Institutes system, not all of the credits you earn at The New England Institute of Art may be transferable into that school's program.

If you are considering transferring to either another Art Institute or an unaffiliated school it is your responsibility to determine whether that school will accept your Art Institute credits. We encourage you to make this determination as early as possible. The New England Institute of Art does not imply, promise, or guarantee transferability of its credits to any other institution.

**Employment Assistance**

The New England Institute of Art does not guarantee employment or any particular level of compensation following graduation. The Institute does, however, offer assistance in finding employment to all graduates at no additional charge. Graduates who confine employment considerations within the metropolitan area served by The New England Institute of Art may limit the particular employment opportunities available to them.

**Policies and Procedures**

Each student is enrolled on a continuing semester-by-semester basis and agrees to comply with all published Institute policies and procedures. The New England Institute of Art reserves the right to add, delete, or modify its policies and procedures without notice.

**Student Withdrawal**

A student may voluntarily withdraw from The New England Institute of Art by notifying their Department Chair in writing or in person. The refund policies outlined above shall apply in the event that a student withdraws, is suspended, or is terminated from the Institute.

**Class Sessions**

Classes are in session six (6) days a week, Monday through Saturday. Class sessions are normally between 9-11:50, 12:30-3:20, 4:00-6:50, 7:10-10:00.

The New England Institute of Art reserves the right to change a class session schedule from time to time, without notice, according to classroom, studio and/or lab availability, and academic and student distribution circumstances. From time to time, instructional activities may occur at an off campus location appropriate for the particular activity.

**Instructional Equipment**

Use of instructional equipment will be made available according to the program curriculum. Each student will be provided the opportunity to acquire an understanding of the fundamental principles that s/he would encounter in an entry-level position in the field. Such equipment must be shared by the students. Accordingly, The New England Institute of Art cannot guarantee hands-on usage of such equipment beyond that called for in the curriculum. To complete the requirements of the program, each student will likely find it necessary to schedule use of the equipment outside normal classroom hours.

**Homework**

In addition to regular attendance at scheduled classes each student will be required to devote additional time each week outside the classroom to study and work on assigned projects.

**Curriculum**

The New England Institute of Art reserves the right to revise course contents, course titles, and the sequence of classes subject to applicable regulatory approval.

**Cancellation of Start Date**

Cancellation of a scheduled class start date for any program shall entitle the enrollee to elect either: (1) a guaranteed reservation in the next scheduled class for that program, or (2) cancellation of enrollment with a full refund of all monies paid.

**Non-Discrimination**

The New England Institute of Art does not discriminate on the basis of race, color, creed, religion, national origin, ancestry, sex, age, sexual orientation, or disability in the administration of any of its educational programs or activities, or with respect to admission or employment. For information on The New England Institute of Art's equal opportunity policy and grievance procedures, please contact the Dean of Education. The New England Institute of Art, 10 Brookline Place West, Brookline, MA 02445.

**Sale, Discount, or Transfer of Agreement**

The student consents to the sale, discount, or other transfer of this Agreement with the understanding that, in such event, the cancellation and refund policies would continue to apply.

**Consent for publication of photograph, artwork, video tape, film, and/or verbal or written statements**

I hereby give my consent to The New England Institute of Art (and to those whom it may authorize) to photograph, film, and/or videotape me, and/or to use a photographic reproduction of me or my work, to identify me by name, and/or with school and employment information, and/or to quote or record statements made by me, for any editorial, promotional, advertising trade, or other purpose on a royalty-free, perpetual, worldwide basis.

**Requirements for Graduation**

To be qualified to graduate, the student must:

1. Receive a passing grade or credit for all required course work.

2. Earn the required credits in each of the disciplines for their major.

3. Achieve a minimum CGPA of 2.0.

4. Satisfy all financial obligations with The New England Institute of Art.

5. Satisfy the residence requirements of 30 credits minimum for the Associate of Science degree and 60 credits for the Bachelor of Science degree at The New England Institute of Art.

6. Complete an internship.

7. Complete a loan counseling exit interview with Student Financial Services.

# EXHIBIT E





**The New England
Institute of Art**™

*50 Years of Creative Education in Art & Communications*

November 18, 2004

Jessica Jacobson
189 Howard St.
Lunenburg, MA  01462

Dear Jessica,

Congratulations! The Admissions Committee is very pleased to offer you
admission to The New England Institute of Art.

You have been admitted to the Bachelor Degree program in Media Arts &
Animation beginning 2005, Winter.

You will receive information about orientation and registration prior
to your scheduled class start.  In the meantime, if there is any way
we can be of assistance to you, please call Meredith S. Seiberg,
Assistant Director of Admissions.

We look forward to welcoming you to The New England Institute of Art.
Again, congratulations!

Sincerely,

Deborah Brent
Director of Admissions

# EXHIBIT F



```
                    Unofficial Transcript
              The New England Institute of Art
                   10 Brookline Place West

Ms. Jessica Jacobson            ID... 140456
  189 Howard St.                Class......... Academic year 1
  Lunenburg, MA  01462          Major......... Media Arts & Animation
                                Concentration.
                                Degree Date...
Start Date... 01/10/2005        Degree........ Bachelor of Science
Major2.....                     Concen2....
Minor1.....                     Minor2.....
======================================================================
----------------------- Advanced Winter 2005 ----------------------
Major:  MAA
Course Code       Course Title         Credits Grade
ENG011       English Fundamentals         3.0    WV
MAT011       Basic Mathematics            3.0    WV
SEM101       Freshman Seminar             3.0    P
             ** Proficiency/Experience **

Transfer work from Mount Wachusett Community Colleg
GD102        Fundamentals of Design       3.0    TR
GD101        Drawing and Perspective      3.0    TR
ENG101       English I                    3.0    TR
ENG200       English II                   3.0    TR
GD120        Digital Imaging              3.0    TR
GD230        Web Page Auth for Graphic Des. 3.0  TR
MM150        Survey of New Media          3.0    TR

        attempt   earn   pass  quality  points   gpa
ses      0.0     24.0   24.0    0.0      0.0     0.0
cum      0.0     24.0   24.0    0.0      0.0     0.0
```

```
======================================================================
        The Family Educational Rights and Privacy Act of
         1974 prohibits the release of this information
              without the student's written consent.
======================================================================
```

# EXHIBIT G

Dear Stacy,

I am a fifth semester student in the new animation program here at AI. I am amoung the first group of students enrolled in this program and feel as though there are a few issues that should be brought to your attention in hopes to seek a resolution.

I enrolled in this school with high hopes of a great education. Sadly, I have had nothing but problems from my transfer credits, teachers, and now my classes. During admissions interviews I was told that I would be able to focus on digital special effects to lure me into this particular program. Since I was sure of the area that I wanted to focus on prior to coming to this school. I understand that it is a new program but sadly feel that I am not receiving the education that I was promised. I expected as the first set of students that you as the school would want (help us out more until the program gets on its feet)  and not only to see your students do well but the program to do so as well. I feel that we are struggling....with no help insight.

 I have had a few disappointing classes already, promised to learn something and the teachers not being able to follow through. Take ,for example ,digital ink and paint I was told that I needed to take that class because I would be learning a program called ToonBoom but to my dismay we never touched that program. The class was just another intro class to Macromedia Flash. Which, I did not need since in my prevous college I obtained a web design degree and already learned all the basics of Flash. Back ground

design layout another class where we should have focused on background designs that turned into a crash course of 3ds max. Which was not the point of this class to my understanding and had to relearn everything that had to do with 3Ds Max, since we learned the wrong way to do things in 3ds max in this crash course. But what really makes me feel cheated is that I was looking forward to taking this class called Digital Editing Video and Audio. This particular class pertains to what I want to concentrate on. My first disappointment was that the teacher taught him self the program that he was going to teach us three weeks before the class started. I don't know weather he wanted to teach this class or was just thrown into it, but as a student I feel that I should be confident that my teacher knows what he is teaching. This class the teacher could not really help me with many of the problems that I encountered and sent me to another fellow student to figure out the problem because he was also learning the program with us. Plus for a video and audio class we only went over editing audio one day out of the semester, two weeks before the final project was due. On top of it,I don't feel we learned real world practical techniques of learning how to do things or the right programs for editing and importing video. This school has soo many programs for editing video and audio and he taught us to import it using window movie maker. I am scared to continue with this program but I have already put so much time into it and I am feeling too much like a test dummy and cheated out of my education that I am paying so much for.

I have gone to Jason Donati the head of our department (check spelling of his name) about these problems and have received no resolution. I have went to twice with concerns but I don't feel comfortable talking to him as a advisor and receive a unbiased opinion.

*I am afraid you are stretching Donati's talents too far.*

He is a very busy man being the head of the department and the advisor to all the animation student on top of writing a book and helping out in SIGGRAPH. Understanding this is a new program and he is doing the best he can and not all of it is bad, I must say that the class I took with Jason Donati was great, But you can stretch a man only so far and now has other priorities and duties. There is another teacher that is great Micheal McCarthy he knows what he is teaching and cares that we are learning real world techniques. I have also notice by sitting in on the other classes that were taught for a first time with me, that the teachers teaching the classes for a second time are getting a better grasp on the material and getting the hang of teaching but that doesn't help me and my situation.

This is my second college and I have had teachers that I just didn't like but I have never encounter this problem before. I t has gotten so bad that I have stopped taking MAA classes that I don't know who the teacher is in fear that it is another class where the teacher is not prepared to teach or classes that have not been taught before in fear that I will not learn the proper ways of doing things. I was hoping that writing a letter to you being the president of this school would help me in deciding if it was worth continuing my education in this school. I would like to set up a meeting with you to further discus these matters and seek some sort of resolution.

1) Future Students ~ ways to make it better

Digital Video Editing

taught by a DMP teacher
until they have one suitable
to teach that class. one who
really knew the programs for
digital video editing + Audio!

2) Digital Ink & Paint
Intro Flash Class?
or Toon Boon Class

3) Background Design Layout
or 3Ds Max Class

~ As the a president of the school
— or tell the people who may be interested in
would it matter or up to her [it?]
to fix ~~discussions~~ ~~[scribbled out]~~
~~students~~.

● ~ transfer credit people
have more on staff or have
an advisor for each majors
(your advisor be incharge of
that?) - I herd alot of people have
had transfer credit problems.

● ~ Donati just being the <u>head</u>
<u>of the deptartment</u> not both
"or "Class advisor" →

(Don't make him look bad explain ●
how both are big jobs 4/1 person!)

# EXHIBIT H

COPY



# The New England
# Institute of Art[SM]

*50 Years of Creative Education in Art & Communications*

# 2004/2005 Student Handbook

2004/2005 Student Handbook

# TABLE OF CONTENTS

College Administration.......................................5

Student Organizations.........................................7

Information/Communication...............................9

Facilities.............................................................10

Transportation...................................................14

Academic Support Services..............................14

Personal Support Services................................15

Career Services ................................................16

Policies and Procedures ...................................18

Enrollment Policies...........................................26

Student Rights and Responsibilities................29

Student Code of Conduct..................................42

Policy on Computing Ethics ............................45

Where to go for Assistance ..............................47

2003/2005 Academic Calendar.........................49

4

letter from the Office of Student Affairs, explaining what accommodations are appropriate, will be given to the student to share with her/his instructors, department chair, and staff as deemed appropriate by the student. We support the concept of self-advocacy in all students and do not provide faculty or staff with prior notification of a student's disability. Since all accommodations are individualized to meet the needs of each student, they may vary depending upon the disability and/or course content. The Office of Student Affairs considers all information and documentation concerning a student's disability confidential and will not share the information without the permission of the student.

If you have a concern or complaint in this regard, please contact the Associate Dean of Student Affairs or Dean of Student Affairs. Complaints will be handled in accordance with the school's complaint procedures.

### Health Information and Referrals
Boston has long been known for its excellent health care facilities. The Student Affairs Department can help you locate an area facility for your health care needs. The Department maintains a referral list of local services including walk-in health centers, mental health clinics, and targeted services for substance abuse, nutrition, and many others. All referrals are confidential.

### Emergency Medical Information Form
All students are requested to complete and return the Emergency Medical Information Form to the Associate Dean of Student Affairs. Any information provided on this form will be relayed to emergency medical personnel in the event of illness in order to facilitate better medical treatment.

### Health Insurance/Immunization
Massachusetts law requires that all students must have health insurance and certain immunizations and provide proof of such insurance and immunization prior to class start. The New England Institute of Art makes available a health insurance package for any student who needs insurance. For more information on health insurance, please contact the Student Accounting Department on the second floor Administrative area. For more information on immunizations, please contact the Admissions Department. Please be aware that students will not be permitted to attend classes until proof of insurance and required immunizations is received.

### CAREER SERVICES



We know that the vast majority of students, upon completion of their program, wish to secure professional employment in their field of study. Therefore, The New England Institute of Art offers many career-related

16

services designed to guide you during your time as a student and after graduation.

## Internships

At The New England Institute of Art we believe hands-on experience and internships are an integral part of how our students learn about the industry they plan to enter. Therefore, it is a requirement that all students complete at least 120 hours of internship experience prior to graduation. All students must register for this internship, complete all necessary documentation, and take this internship in conjunction with the Seminar Course. Students are welcome to take additional internships for experience earlier in their academic career as long as those internships are appropriately registered. Please be aware that some degree programs may require additional internships in order to graduate. Please refer to the college catalog or your academic advisor for more information. For more information and assistance with acquiring an internship, please contact the Career Services Office.

## Career Advising/Placement Assistance

Students are assigned a Career Advisor who works with all students in a particular program major. The Advisor provides career counseling and job placement assistance prior to and after graduation. These services are designed to assist each student with the job search process and identify appropriate employers and positions. Career Advisors are available for all students at any point in their academic career. During your last semester and after graduation, your Career Advisor will guide you and assist you as you search for your first job in your field of study. Some examples of career advising assistance include resume review, interview practice, an evaluation of career prospects, individual strengths, and job search techniques.

## Career Workshops

Career Advisors conduct workshops to assist students with job search skills. These workshops are given in the Seminar Course to prepare students for internships and the eventual job search. Workshop topics covered include resume and cover letter writing, interview techniques and researching the industry among others. For individual assistance, you may schedule an appointment with Career Services.

## Student Employment

A Student Employment Advisor is available to meet with all currently registered students regarding part time employment opportunities for students. There are a variety of employment opportunities including on and off campus jobs.

## Career Fair/Career Events

Each year, Career Services hosts a Career Fair and other career-related networking events for students and alumni. Students and alumni meet industry professionals and participate in panel discussions and seminars pertaining to careers and topics of relevance. Past guest speakers have included representatives from MTV Networks, Interactive Planet, ESPN, major record labels and design firms.

## Alumni Services

The New England Institute of Art has a full time Alumni Coordinator who works with graduates of the College. The Alumni Coordinator highlights alumni success and helps to establish and

maintain a cohesive alumni community. Alumni can take advantage of the system-wide alumni web site, graduate newsletters and events.

**Transfer of The New England Institute of Art Credits to other Institutions**

The New England Institute of Art is licensed by the Commonwealth of Massachusetts, Board of Higher Education to confer Bachelor and Associate of Science degrees and accredited by the New England Association of Schools & Colleges, Inc., an accrediting agency recognized by the United States Department of Education. However, the fact that a school is licensed and accredited is not necessarily an indication that credits earned at that school will be accepted by another school. In the U.S. higher education system, transferability of credit is determined by the receiving institution taking into account such factors as course content, grades, accreditation and licensing.

The mission of The New England Institute of Art is to help you to prepare for entry-level employment in your chosen field of study. The value of degree programs like those offered by The New England Institute of Art is their deliberate focus on marketable skills. The credits earned are not intended as a stepping stone for transfer to another institution. For this reason, it is unlikely that the academic credits you earn at The New England Institute of Art will transfer to another school.

Programs offered by one school within The Art Institutes system may be similar to but not identical to programs offered at another school within the system. This is due to differences imposed by state law, use of different instructional models, and local employer needs. Therefore, if you decide to transfer to another school within The Art Institutes system, not all of the credits you earn at The New England Institute of Art may be transferable into that school's program.

If you are considering transferring to either another Art Institute or an unaffiliated school, it is your responsibility to determine whether that school will accept your Art Institute credits. We encourage you to make this determination as early as possible. The New England Institute of Art does not imply, promise, or guarantee transferability of its credits to any other institution.

## POLICIES AND PROCEDURES

At The New England Institute of Art, we strive to provide a student-centered environment conducive to learning. We have created procedures and policies to ensure that all students have a safe, comfortable environment for learning, a support network, and access to services. Please review these policies and procedures and refer any questions to the appropriate department.

**Attendance**

Course work at The New England Institute of Art is very hands-on and students are expected to attend class on a regular basis. Poor attendance will affect a student's final grade in a class as follows:

A student with more than 3 absences (2 during Summer Semester) will have their earned academic grade lowered one letter grade (ex: B+ to C+). More than 4 absences (3 during Summer Semester) will lower their grade to D.

If a student arrives late or leaves early from class, it is noted in the attendance roster. Four late arrivals/early departures count the same as a full absence. Further, if a student is more than 30 minutes late to a class or leaves more than 30 minutes before the conclusion of a class he or she will be marked with a one-half absence for that class. Two half absences count the same as missing an entire class.

Faculty members may set individual attendance policies that are stricter that the above policy. Their individual course syllabi will provide information on allowed absenteeism and the effects that absenteeism will have on a student's final grade if it is stricter than the standard. In no case can a student fail a course based on their attendance. Course failure is strictly based on academic performance.

Students are responsible for making up assignments and communicating with their instructors regarding missing classes. All faculty members have school voice mail and email to help students contact them.

The New England Institute of Art does not distinguish between excused or unexcused absences.

A student who misses all of his or her classes for two consecutive weeks will be withdrawn from the college.

## Grades

Grades for each course are issued at the conclusion of each semester. The numerical equivalent of grades is as follows:

| | | | | | |
|---|---|---|---|---|---|
| A | 4.0 | 93-100 | C+ | 2.4 | 77-79 |
| A- | 3.7 | 90-92 | C | 2.0 | 73-76 |
| B+ | 3.4 | 87-89 | C- | 1.7 | 70-72 |
| B | 3.0 | 83-86 | D | 1.0 | 60-69 |
| B- | 2.7 | 80-82 | F | 0.0 | 59 and below |

Additional Letter Codes

| | |
|---|---|
| I | Incomplete |
| NR | No grade submitted |
| W | Withdrawal |
| K | External Transfer Credit |
| P | Proficiency Credit by Exam or Portfolio |
| S | Suspension from Course |
| T | Termination from College |
| WV | Waived Course |
| WF | Withdrawal Failing |

# EXHIBIT I

# Creative Education Loan

*Application and Promissory Note*

For Loan Applications Received by May 31, 2007

**SallieMae**

**Academic Year 2006-2007**

1-800-984-2944 | XS | 9009510000

## Section A: Borrower Information   Please read instructions before completing this section.

| Social Security Number 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 | Last Name and Suffix JACOBSON | First Name JESSICA | MI M |

| Permanent Address (No P.O. Boxes) 189 HOWARD ST | City LUNENBURG | State MA | ZIP Code 02467 |

| Permanent Phone Number (978) 582-7279 | Cellular Phone Number | Time at Address (if less than one year, provide prior address) | Years 23 | Months 0 |

| Prior Address | City | State | ZIP Code |

| Address While in School | City | State | ZIP Code |

| Phone Number While in School | Date of Birth (mm/dd/yy) 08/01/1983 | Email Address NONE@SLMA.COM |

Citizenship (check one) a) U.S. Citizen [X]  b) Non-Citizen Permanent Resident [ ]  c) Foreign Resident [ ]   d) Foreign Resident not eligible for a Social Security Number [ ]  Note: For options b, c or d see instructions

Have you ever defaulted on a student loan? (check one) Yes [ ] No [X]   If yes, see instructions for required action

| Total Loan Amount Requested   We encourage you to borrow conservatively, but try to borrow the full amount you need so you will not have to submit another application. (see instructions) $ 6,000.00 | Enrollment Period for which you want to borrow money (cannot exceed 12 months) | From (mm/yy) 09/06 | To (mm/yy) 04/07 |

| School Name THE NEW ENGLAND INSTITUTE OF ART | City BROOKLINE | State MA |

| Grade Level (refer to instructions) 03 | Course of Study (refer to instructions) OTH | Current Outstanding Student Loan Debt (refer to instructions) $ |

References—You must provide two (2) adult references other than the cosigner

1) Last Name and Suffix Jacobson | First Name Donna | MI m | Relationship to Borrower mom

Email Address | Permanent Phone Number 978-582-7279 | Alternate Phone Number

2) Last Name and Suffix Gray | First Name Cindy | MI | Relationship to Borrower friend

Email Address | Permanent Phone Number 978-243-6784 | Alternate Phone Number

## Section B: Cosigner Information   Please read instructions before completing this section.

| Social Security Number | Last Name and Suffix | First Name | MI |

| Address (No P.O. Boxes) | City | State | ZIP Code |

| Permanent Phone Number | Cellular Phone Number | Time at Residence (if less than one year, provide prior address) | Years | Months |

| Prior Address (No P.O. Boxes) | City | State | ZIP Code |

Citizenship (check one) a) U.S. Citizen [ ]  b) Non-Citizen Permanent Resident [ ]   Date of Birth (mm/dd/yy)   Note: For option b, see instructions

Have you ever defaulted on a student loan? Yes [ ] No [ ]   If yes, see instructions for required action

| Present Employer Name | Employer Address (City, State, ZIP Code) | Work Phone Number |

| Gross Monthly Income (see instructions) Note: You do not have to reveal alimony, child support or separate maintenance income unless you wish it to be considered as a basis for loan repayment   Salary $   Other $   Source | Monthly Mortgage/Rent Amount (check one) $   Own [ ] Rent [ ] | Cosigner's Email Address |

References—You must provide two (2) adult references other than the borrower

1) Last Name and Suffix | First Name | MI | Relationship to Cosigner

Email Address | Permanent Phone Number | Alternate Phone Number

2) Last Name and Suffix | First Name | MI | Relationship to Cosigner

Email Address | Permanent Phone Number | Alternate Phone Number

## Section C: Borrower and Cosigner Signature   Please read instructions before completing this section.

**CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. I, THE COSIGNER, HAVE READ THE APPLICABLE COSIGNER NOTICE.**

**Notice to Customer** (a) Do not sign this before you read the Promissory Note even if otherwise advised. (b) Do not sign this if it contains any blank spaces. (c) You are entitled to an exact copy of any agreement you sign. (d) You have the right at any time to pay in advance the unpaid balance due under this agreement and you may be entitled to a partial refund of the finance charge.

I declare that the information provided above is true and complete to the best of my knowledge and belief. I have read the Promissory Note accompanying this application and the Notice to Cosigner. **Promise to pay:** Jointly and severally with the other signers below, I promise to pay the lender or any other holder of this loan all sums disbursed under the terms of the Promissory Note, plus interest and all other charges that may become due. The terms and conditions set forth in the Promissory Note constitute the entire agreement between us.

Borrower Signature _____ (seal) Date 10/19/06

Cosigner Signature (if applicable) _____ (seal) Date

## Section D: School Certification   Must be completed by an authorized school official.

| School Name THE NEW ENGLAND INSTITUTE OF ART | School Code/Branch 0074860000 | Disbursement Date (mm/dd/yy) | Disbursement Amount |

For the Enrollment Period (not to exceed 12 months)   From Date (mm/dd/yy) 09/05/2006   To Date (mm/dd/yy) 04/28/2007

Grade Level (circle one) Please refer to instructions.   Undergraduate 1 2 (3) 4 5   Graduate A B C D

| | | 1. / / | 1. $ |
| | | 2. / / | 2. $ |
| | | 3. / / | 3. $ |
| | | 4. / / | 4. $ |

Enrollment Status (check one) Full-time [X] Half-time [ ] | Course of Study (refer to instructions) OTH | Anticipated Graduation Date (mm/dd/yy)

Total Certified Amount: $

I hereby certify that the Borrower is eligible for a Creative Education Loan; that the Total Certified Amount does not exceed the student's cost of attendance minus other financial aid; that the School will, at the request of the lender, provide the lender or any other holder of this loan with subsequent information regarding the Borrower's whereabouts; that this School will comply with all applicable loan policies and provisions; and that information provided in Sections A and B is true, complete and correct to the best of my knowledge and belief.

Authorized school official Sign and date: _____ | Please type or print name and title | Phone (617) 582-4482

# EXHIBIT J

# Tips for applying to a job from Craigslist.

Reply to: anon-101949754@craigslist.org
Date: Tue Oct 04 18:51:46 2005

*Dear prospective job hunters.*

Thank you for taking the time to look at our site, and thank you for being interested in working with us.

Most applications I receive go straight to the deleted-items folder because of a few simple mistakes. I'm beginning to feel bad, so if you are going to make the effort to apply for a job here, or anywhere else, I'd like to offer you some advice.

To successfully interest me in hiring you, you need understand what we as business owners face on the other side of the fence. Hiring is the most important task I face, but it is also 76th on my list of a hundred other things to do today. When we put a posting on Craigslist, we usually get around 100 responses within 48 hours. They flood into my inbox, and I have to push them aside until I have time to give them the attention they deserve. In the meantime, I have phones ringing, deadlines to meet, problems with our systems, employees with questions, and much more to compete for the limited capacity of my brain.

But, don't let this put you off. It doesn't take much to distinguish yourself. Here's how :

## 1. YOUR COVER LETTER MUST ANSWER OUR NEEDS.

When I do get round to your email, I do not have time to look at every detail. I make quick and rapid decisions about whether I will call you or not. I don't even get to most resume's because the cover letter is so drab. If you want to stand a chance at getting a response, you ABSOLUTLY MUST spend some time on this.

So, how should you write a cover letter? - Simple, read our post, and tell me quickly how you can meet the needs we have listed. Use examples wherever possible. Take a look at these two different letters....

# EXHIBIT K

# Federal Direct Consolidation Loan
## Application and Promissory Note

OMB No. 1845-0053
Form Approved
Exp. Date 02/28/2014

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying documentation is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

Borrower's Name (please print)   Jessica m Jacobson

Social Security Number   021662887

### Section E: Borrower Understandings, Certifications, and Authorizations

22. I understand that:

A. My Direct Consolidation Loan will, to the extent used to pay off loans made under the Federal Family Education Loan (FFEL), Direct Loan, and Federal Perkins Loan (Perkins Loan) programs, count against the applicable aggregate loan limits under the Act. The term "the Act" is defined under "Governing Law" on page 4 of this Note.

B. The amount of my Direct Consolidation Loan is the sum of the balances of my outstanding eligible loans that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest and late charges as defined by federal regulations and as certified by the loan holder. Collection costs may also be included. For a Direct Loan Program or FFEL Program loan that is in default, the amount of any collection costs that may be included in the payoff balances of the loans is limited to a maximum of 18.5% of the outstanding principal and interest. For any other defaulted federal education loans, all collection costs that are owed may be included in the payoff balances of the loans.

C. Applying for a Direct Consolidation Loan does not obligate me to agree to take the Direct Consolidation Loan. The U.S. Department of Education (ED) will provide me with: (1) a notice containing information about the loans and payoff amounts that ED has verified with the holders of my loans or through ED's National Student Loan Data System (NSLDS) before the actual payoffs occur; and (2) the deadline by which I must notify ED if I want to cancel the Direct Consolidation Loan, or if I do not want to consolidate any of the loans that ED has verified. The notice that ED sends will include information about loans eligible for consolidation that I listed in Section C1 of this Note ("Education Loan Indebtedness – Loans You Want to Consolidate"). It may also include information about additional loans eligible for consolidation that I did not list in Section C1, if I have additional eligible loans with a holder of a loan listed in Section C1. If I do not inform ED otherwise by the deadline specified in the notice that ED sends to me, all of the loans listed in the notice will be consolidated.

D. If the amount ED sends to my loan holders is more than the amount needed to pay off the balances of the selected loans, the holders will refund the excess amount to ED and this excess amount will be applied against the outstanding balance of my Direct Consolidation Loan. If the amount that ED sends to my holders is less than the amount needed to pay off the balances of the loans selected for consolidation, ED will include the remaining amount in the Direct Consolidation Loan.

E. Unless I am: (1) consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion; (2) consolidating a defaulted Federal Consolidation Loan; (3) consolidating a Federal Consolidation Loan to use the Public Service Loan Forgiveness Program; or (4) consolidating a Federal Consolidation Loan to use the no accrual of interest benefit for active duty service members, I may consolidate an existing Federal Consolidation Loan or Direct Consolidation Loan only if I include at least one additional eligible loan in the consolidation.

F. If I am consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion or a defaulted Federal Consolidation loan, and I am not including another eligible loan, I must agree to repay my Direct Consolidation Loan under the ICR Plan or the IBR Plan.

G. If I consolidate my loans, I may no longer be eligible for certain deferments, subsidized deferment periods, certain types of loan discharges or loan forgiveness, or reduced interest rates that were available on the loans I am consolidating.

H. Any payments made prior to the date of consolidation on the loans I am consolidating will not count toward (1) the 25 years of repayment required for loan forgiveness under the IBR Plan or the ICR Plan (see Item 10 of the Borrower's Rights and Responsibilities Statement in this Note), or (2) the 120 qualifying payments required for Public Service Loan Forgiveness (see Item 17 of the Borrower's Rights and Responsibilities Statement).

I. If I am consolidating a Perkins Loan: (1) I will no longer be eligible for interest-free periods while I am enrolled in school at least half time, in the grace period on my loan, and during deferment periods; and (2) I will no longer be eligible for full or partial loan cancellation under the Perkins Loan Program based on years of service in one of the following occupations: teacher in a low-income elementary or secondary school; staff member in an eligible preschool program; special education teacher; member of the Armed Forces who qualifies for special pay; Peace Corps volunteer or volunteer under the Domestic Volunteer Service Act of 1973; law enforcement or corrections officer; attorney in an eligible defender organization; teacher of mathematics, science, foreign languages, bilingual education or any other high-need field; nurse or medical technician providing health care services; employee of a public or private nonprofit child or family service agency that services high-risk children from low-income families and their families; fire fighter; faculty member at a Tribal College or University; librarian; or speech language pathologist.

J. If I am consolidating a Direct PLUS Loan or a Federal PLUS loan that I obtained to help pay for my dependent child's undergraduate education, I will not be eligible to repay my Direct Consolidation Loan under the IBR Plan. However, I may repay my Direct Consolidation Loan under the ICR Plan.

K. If I am consolidating any Direct Loan Program loans on which I received an up-front interest rebate, and I have not yet made the first 12 required on-time payments on those loans at the time the loans are consolidated, I must make the first 12 required monthly payments on my Direct Consolidation Loan on time to keep the interest rebate (see Item 9 of the Borrower's Rights and Responsibilities Statement).

23. Under penalty of perjury, I certify that:

A. The information that I have provided on this Note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

B. All of the loans selected for consolidation have been used to finance my education or the education of my dependent child(ren).

C. All of the loans selected for consolidation are in a grace period or in repayment ("In repayment" includes loans in deferment or forbearance).

D. If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science and Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements with the holder to repay the amount owed.

E. If I am in default on any loan I am consolidating (except as provided above in Item 22.F.), I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay my Direct Consolidation Loan under the ICR Plan or the IBR Plan.

F. If I have been convicted of, or pled nolo contendere or guilty to, a crime involving fraud in obtaining federal student aid funds under the Act, I have completed the repayment of those funds to ED, or to the loan holder in the case of a Title IV federal student loan.

24. I make the following authorizations:

A. I authorize ED to contact the holders of the loans selected for consolidation to determine the eligibility for consolidation and the payoff amounts of the loans listed in Section C1 of this Note and any of my other federal education loans that are held by a holder of a loan listed in Section C1. I further authorize release to ED or its agent of any information required to consolidate my education loans in accordance with the Act.

B. I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holders of the selected loans to pay off the debts.

C. I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

D. I authorize my school(s) and ED to release information about my Direct Consolidation Loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise.

E. I authorize my school(s), ED, or their agents to verify my Social Security Number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct Social Security Number to these parties.

F. I authorize my schools, ED, and their respective agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages.

### Section F: Promissory Note (continued on page 4) – to be completed and signed by the borrower.

25. Promise to Pay. I promise to pay to the ED all sums disbursed under the terms of this Note to pay off my prior loan obligations, plus interest and other charges and fees that may become due as provided in this Note. Unless I make interest payments, interest that accrues on my loan during forbearance periods and on the unsubsidized portion of my loan during deferment periods may be added, as provided under the Act, to the principal balance of my loan. If I do not make payments on this Note when due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees.

If ED accepts my application, I understand that ED will send funds to the holders of the loans that I want to consolidate to pay off those loans. I further understand that the amount of my Direct Consolidation Loan will equal the sum of the payoff balances on the loans selected for consolidation. My signature on this Note serves as my authorization to pay off the balances of the loans selected for consolidation as provided by the holders of the loans.

**Promissory Note – continued from page 3**

The payoff amount may be greater than or less than the estimated total balance I have indicated in Section C1. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of my Direct Consolidation Loan.

I will not sign this Note before reading the entire Note, even if I am told not to read it. I am entitled to an exact copy of this Note and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this Note, including the Borrower Understandings, Certifications, and Authorizations in Section E, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT THIS IS A LOAN THAT I MUST REPAY.**

**26. Borrower's Signature**    Jessica m Jacobson                 **Today's Date (mm-dd-yyyy)**  08/30/2013

**(Electronic Signature)**

### Governing Law

The terms of this Federal Direct Consolidation Loan Application and Promissory Note (Note) will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), the U.S. Department of Education's (ED's) regulations, as they may be amended in accordance with their effective date, and other applicable federal laws and regulations (collectively referred to as the "Act"). Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this Note.

### Disclosure of Loan Terms

This Note applies to a Federal Direct Consolidation Loan (Direct Consolidation Loan). Under this Note, the principal amount that I owe and am required to repay will be equal to all sums disbursed to pay off my prior loan obligations, plus any unpaid interest that is capitalized and added to the principal amount.

My Direct Consolidation Loan may have up to two separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans and prior unsubsidized loans. Each applicable loan identification number is represented by this Note.

When the loans that I am consolidating are paid off, a disclosure statement will be provided to me. The disclosure will identify the amount of my Direct Consolidation Loan, the associated loan identification number(s), and additional terms of the loan, such as the interest rate and repayment schedule. If I have questions about the information disclosed, I may contact my servicer. Important additional information is also contained in the Borrower's Rights and Responsibilities Statement. The Borrower's Rights and Responsibilities Statement and any disclosure I receive in connection with the loan made under this Note are hereby incorporated into this Note.

I understand that ED may use a servicer to handle billing and other communications related to my loan.

### Interest

Interest will be calculated using a formula provided for by the Act. Unless ED notifies me in writing of a lower rate, the interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but will not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged, except for interest ED does not charge me during a deferment period on the subsidized portion of the Direct Consolidation Loan. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

### Late Charges and Collection Costs

ED may collect from me: (1) a late charge of not more than six cents for each dollar of each late payment if I fail to make any part of a required installment payment within 30 days after it becomes due, and (2) any other charges and fees that are permitted by the Act related to the collection of my Direct Consolidation Loan. If I default on my loan, I will pay reasonable collection costs, plus court costs and attorney fees.

### Repayment

I must repay the full amount of the Direct Consolidation Loan made under this Note, plus accrued interest. I will repay my loan in monthly installments during a repayment period that begins on the date of the first disbursement of the loan, unless it is in a deferment or forbearance period. Payments made by me or on my behalf will be applied first to late charges and collection costs that are due, then

to interest that has not been paid, and finally to the principal amount of the loan, except during periods of repayment under the Income-Based Repayment (IBR) Plan. Under the IBR Plan, payments will be applied first to interest that is due, then to fees that are due, and then to the principal amount.

ED will provide me with a choice of repayment plans. Information on these plans is included in the Borrower's Rights and Responsibilities Statement. I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with the Act.

ED will provide me with a repayment schedule that identifies my payment amounts and due dates. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in a deferment or forbearance period. If I am unable to make my scheduled loan payments, ED may allow me to temporarily stop making payments, reduce my payment amount, or extend the time for making payments, as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance.

ED may adjust payment dates on my Direct Consolidation Loan or may grant me forbearance to eliminate a delinquency that remains even though I am making scheduled installment payments.

I may prepay any part of the unpaid balance on my loan at any time without penalty. After I have repaid my Direct Consolidation Loan in full, ED will send me a notice telling me that I have paid off my loan.

### Acceleration and Default

At ED's option, the entire unpaid balance of the Direct Consolidation Loan will become immediately due and payable (this is called "acceleration") if either of the following events occurs: (1) I make a false representation that results in my receiving a loan for which I am not eligible; or (2) I default on the loan.

The following events will constitute a default on my loan: (1) I fail to pay the entire unpaid balance of the loan after ED has exercised its option under the preceding paragraph; (2) I fail to make installment payments when due, provided my failure has persisted for at least 270 days; or (3) I fail to comply with other terms of the loan, and ED reasonably concludes that I no longer intend to honor my repayment obligation. If I default, ED may capitalize all outstanding interest. This will increase the principal balance, and the full amount of the loan, including the new principal balance and collection costs, will become immediately due and payable.

If I default, the default will be reported to national consumer reporting agencies and will significantly and adversely affect my credit rating. I understand that a default will have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement. Following default, I may be required to repay the loan (including potential collection of amounts in excess of the principal and interest) under the Income Contingent Repayment (ICR) Plan or the IBR Plan in accordance with the Act.

### Legal Notices

Any notice required to be given to me will be effective if sent by first class mail to the most recent address that ED has for me, by electronic means to an address I have provided, or by any other method of notification permitted or required by applicable statute or regulation. I will immediately notify ED of a change of contact information or status, as specified in the Borrower's Rights and Responsibilities Statement.

If ED fails to enforce or insist on compliance with any term on this Note, this does not waive any right of ED. No provision of this Note may be modified or waived except in writing by ED. If any provision of this Note is determined to be unenforceable, the remaining provisions will remain in force.

Information about my loan will be submitted to the National Student Loan Data System (NSLDS). Information in NSLDS is accessible to schools, lenders, and guarantors for specific purposes as authorized by ED.

*Important Notice: This Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of the loan you will receive under the accompanying Federal Direct Consolidation Loan (Direct Consolidation Loan) Application and Promissory Note (Note). Please keep a copy of the Note and this Borrower's Rights and Responsibilities Statement for your records.*

*In this document, the words "we," "us," and "our" refer to the U.S. Department of Education.*

**1. The William D. Ford Federal Direct Loan Program.** The William D. Ford Federal Direct Loan (Direct Loan) Program includes the following types of loans, known collectively as "Direct Loans":

- Federal Direct Stafford/Ford Loans (Direct Subsidized Loans)
- Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans)
- Federal Direct PLUS Loans (Direct PLUS Loans)
- Federal Direct Consolidation Loans (Direct Consolidation Loans)

The Direct Loan Program is authorized by Title IV, Part D, of the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 *et seq.* (HEA).

Direct Loans are made by the U.S. Department of Education. We contract with servicers to service, answer questions about, and process payments on Direct Loans. We will provide you with the address and telephone number of the servicer for your loan.

**2. Laws that apply to this Note.** The terms and conditions of loans made under this Note are determined by the HEA and other applicable federal laws and regulations. These laws and regulations are referred to as "the Act" throughout this Borrower's Rights and Responsibilities Statement. State law, unless it is preempted by federal law, may provide you with certain rights, remedies, and defenses in addition to those stated in the Note and this Borrower's Rights and Responsibilities Statement.

**NOTE:** Any change to the Act applies to loans in accordance with the effective date of the change.

**3. Direct Consolidation Loan identification numbers.** Depending on the type(s) of federal education loan(s) that you choose to consolidate, your Direct Consolidation Loan may have up to two individual loan identification numbers. However, you will have only one Direct Consolidation Loan and will receive only one bill.

**3a.** The subsidized portion of your Direct Consolidation Loan ("Direct Subsidized Consolidation Loan") will have one loan identification number representing the amount of the following types of loans that you consolidate:

- Subsidized Federal Stafford Loans
- Direct Subsidized Loans
- Subsidized Federal Consolidation Loans
- Direct Subsidized Consolidation Loans
- Federal Insured Student Loans (FISL)
- Guaranteed Student Loans (GSL)

**3b.** The unsubsidized portion of your Direct Consolidation Loan ("Direct Unsubsidized Consolidation Loan") will have one identification number representing the amount of the following types of loans that you consolidate:

- Unsubsidized and Nonsubsidized Federal Stafford Loans
- Direct Unsubsidized Loans
- Unsubsidized Federal Consolidation Loans
- Direct Unsubsidized Consolidation Loans
- Federal PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Consolidation Loans
- Federal Perkins Loans
- National Direct Student Loans (NDSL)
- National Defense Student Loans (NDSL)
- Federal Supplemental Loans for Students (SLS)
- Parent Loans for Undergraduate Students (PLUS)
- Auxiliary Loans to Assist Students (ALAS)
- Health Professions Student Loans (HPSL)
- Health Education Assistance Loans (HEAL)
- Nursing Student Loans (NSL)
- Loans for Disadvantaged Students (LDS)

**4. Adding eligible loans to your Direct Consolidation Loan.** You may add eligible loans to your Direct Consolidation Loan by submitting a request to us within 180 days of the date your Direct Consolidation Loan is made. (Your Direct Consolidation Loan is "made" on the date we pay off the first loan that you are consolidating.) After we pay off any loans that you add during the 180-day period, we will notify you of the new total amount of your Direct Consolidation Loan and of any adjustments that must be made to your monthly payment amount and/or interest rate.

If you want to consolidate any additional eligible loan(s) after the 180-day period, you must apply for a new Direct Consolidation Loan.

**5. Loans that may be consolidated.** *General.* Only the federal education loans listed in Items 3a and 3b. of this Borrower's Rights and Responsibilities Statement may be consolidated into a Direct Consolidation Loan. You may only consolidate loans that are in a grace period or in repayment (including loans in deferment or forbearance). At least one of the loans that you consolidate must be a Direct Loan Program loan or a Federal Family Education Loan (FFEL) Program loan.

*Defaulted loans.* You may consolidate a loan that is in default if **(a)** you first make satisfactory repayment arrangements with the holder of the defaulted loan, or **(b)** you agree to repay your Direct Consolidation Loan under the Income Contingent Repayment (ICR) Plan or the Income-Based Repayment (IBR) Plan (see Item 10).

*Existing consolidation loans.* Generally, you may consolidate an existing Direct Consolidation Loan or Federal Consolidation Loan into a new Direct Consolidation Loan only if you include at least one additional eligible loan in the consolidation. However, you may consolidate a Federal Consolidation Loan into a new Direct Consolidation Loan without including an additional loan if the Federal Consolidation Loan is delinquent and has been submitted by the lender to the guaranty agency for default aversion, or if the Federal Consolidation Loan is in default. In such cases, you must agree to repay the new Direct Consolidation Loan under the ICR Plan or the IBR Plan. You may also consolidate a single Federal Consolidation Loan into a new Direct Consolidation Loan to use the Public Service Loan Forgiveness program described in Item 17 of this Borrower's Rights and Responsibilities Statement, or the no accrual of interest benefit for active duty service members described in Item 8.

**6. Information you must report to us.** Until your loan is repaid, you must notify your servicer if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Change your employer or your employer's address or telephone number changes; or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment)

**7. Interest rate.** The interest rate on your Direct Consolidation Loan will be the lesser of the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, OR 8.25%. We will send you a notice that tells you the interest rate on your loan.

The interest rate on a Direct Consolidation Loan is a fixed rate. This means that the interest rate will remain the same throughout the life of your loan.

If you qualify under the Servicemembers Civil Relief Act, the interest rate on your loans obtained prior to military service may be limited to 6% during your military service. To receive this benefit, you must contact your servicer for information about the documentation you must provide to show that you qualify.

**8. Payment of interest.** Except as provided below for borrowers who serve in the military, interest accrues on a Direct Consolidation Loan from the date the loan is made until it is paid in full or discharged, including during periods of deferment or forbearance. You are responsible for paying all interest that accrues, except for interest that accrues on the subsidized portion of a Direct Consolidation Loan ("Direct Subsidized Consolidation Loan" -- see Item 3a.) during deferment periods.

If you do not pay the interest as it accrues during the periods described above, we will add the interest to the unpaid principal amount of your loan at the end of the deferment or forbearance period. This is called "capitalization." Capitalization increases the unpaid principal balance of your loan, and interest will then accrue on the increased principal amount.

The chart below shows the difference in the total amount you would repay on a $15,000 Direct Unsubsidized Consolidation Loan if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized.

| | If you pay the interest as it accrues... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan Amount | $15,000 | $15,000 |
| Capitalized Interest for 12 Months (at the maximum rate of 8.25%) | $0 | $1,238 |
| Principal to be Repaid | $15,000 | $16,238 |
| Monthly Payment (Standard Repayment Plan) | $146 | $158 |
| Number of Payments | 180 | 180 |
| Total Amount Repaid | $26,209 | $28,359 |

In this example, you would pay $12 less per month and $2,150 less altogether if you pay the interest as it accrues during a 12-month deferment or forbearance period.

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.ustreas.gov.

Under the no interest accrual benefit for active duty service members, during periods of qualifying active duty military service interest does not accrue on the portion of a Direct Consolidation Loan that repaid a Direct Loan Program or FFEL Program loan first disbursed on or after October 1, 2008 (for up to 60 months).

**9. Repayment Incentive programs.** A repayment incentive is a benefit that we offer to encourage you to repay your loan on time. Under a repayment incentive program, the interest rate we charge on your loan may be reduced. Some repayment incentive programs require you to make a certain number of payments on time to keep the reduced interest rate. For Direct Consolidation Loans, the following repayment incentive program may be available to you:

*Interest Rate Reduction for Automatic Withdrawal of Payments*

Under the automatic withdrawal option, your bank automatically deducts your monthly loan payment from your checking or savings account and sends it to us. Automatic withdrawal helps to ensure that your payments are made on time. In addition, you receive a 0.25% interest rate reduction while you repay under the automatic withdrawal option in your first bill. You can also get this information on your servicer's web site, or by calling your servicer. Your servicer's web site address and toll-free telephone number are provided on all correspondence that your servicer sends you.

Your servicer can provide you with more information on other repayment incentive programs that may be available.

**Note:** Another repayment incentive program, the up-front interest rebate, is available on Direct Subsidized Loans, Direct Unsubsidized Loans, and Direct PLUS Loans that were first disbursed before July 1, 2012. The rebate is equal to a percentage of the loan amount, and is the same amount that would result if the interest rate on the loan were lowered by a specific percentage. To permanently keep an up-front interest rebate, a borrower must make each of the first 12 required monthly payments on time when the loan enters repayment. If you consolidate a Direct Loan on which you received an up-front interest rebate before you permanently keep the rebate (the correspondence you received about your loan will tell you if you received a rebate), you will have to make the first 12 required monthly payments on your Direct Consolidation Loan on time to keep the interest rebate. "On time" means that we must receive each payment no later than 6 days after the due date. You will lose the rebate if you do not make all of

your first 12 required monthly payments on your Direct Consolidation Loan on time. If you lose the rebate, we will add the rebate amount back to the principal balance on your loan account. This will increase the amount that you must repay.

**10. Repaying your loan.** Unless you receive a deferment or forbearance on your loan (see Item 16), your first payment will be due within 60 days of the first disbursement of your Direct Consolidation Loan. Your servicer will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

Generally, you must repay all of your Direct Loans under the same repayment plan. You may choose one of the following repayment plans to repay any Direct Consolidation Loan:

- **Standard Repayment Plan** – Under this plan, you will make fixed monthly payments and repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the amount of your Direct Consolidation Loan and the amount of your other student loan debt (not to exceed the amount you are consolidating) as listed in Section C2 of your Note (see the chart below). Your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time period.

- **Graduated Repayment Plan** – Under this plan, your payments will be lower at first and will then increase over time, usually every two years. You will repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the total amount of your Direct Consolidation Loan and the amount of your other student loan debt (not to exceed the amount you are consolidating) as listed in Section C2 of your Note (see the chart below). No single payment under this plan will be more than three times greater than any other payment.

| Maximum Repayment Periods Under the Standard and Graduated Repayment Plans | |
|---|---|
| Total Education Loan Indebtedness | Maximum Repayment Period |
| Less than $7,500 | 10 years |
| $7,500 to $9,999 | 12 years |
| $10,000 to $19,999 | 15 years |
| $20,000 to $39,999 | 20 years |
| $40,000 to $59,999 | 25 years |
| $60,000 or more | 30 years |

- **Extended Repayment Plan** – You may choose this plan only if: (1) you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998, or on the date you obtained a Direct Loan Program loan on or after October 7, 1998; and (2) you have an outstanding balance on Direct Loan Program loans that exceeds $30,000. Under this plan, you may choose to make either fixed or graduated monthly payments and will repay your loan in full over a repayment period not to exceed 25 years (not including periods of deferment or forbearance) from the date your loan entered repayment. If you choose to make fixed monthly payments, your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time. If you choose to make graduated monthly payments, your payments will start out lower and will then increase over time, generally every two years. Under a graduated repayment schedule, your monthly payment must at least be equal to the amount of interest that accrues each month, and no single payment will be more than three times greater than any other payment.

- **Income Contingent Repayment (ICR) Plan** – Under this plan, your monthly payment amount will be based on your adjusted gross income (and that of your spouse if you are married), your family size, and the total amount of your Direct Loans. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues

monthly on your loan unless you request a forbearance. As your income changes, your payments may change. If you do not repay your loan after 25 years under this plan, the unpaid portion will be forgiven. You may have to pay income tax on any amount forgiven.

In addition to the repayment plans listed above, you may also choose the following repayment plan to repay a Direct Consolidation Loan if you are not consolidating a parent Direct PLUS Loan or a parent Federal PLUS Loan (see Note below):

- **Income-Based Repayment (IBR) Plan** – Under this plan, your required monthly payment amount will be based on your income. To initially qualify for this plan and to continue to make income-based payments, you must have a partial financial hardship. Your monthly payment amount may be adjusted annually. The maximum repayment period under this plan may exceed 10 years. If your loan is not repaid in full after you have made the equivalent of 25 years of qualifying payments and at least 25 years have elapsed, you may qualify for forgiveness of any outstanding balance on your loans. You may have to pay income tax on any amount forgiven.

NOTE: A parent PLUS loan is a PLUS loan that you obtained to help pay for your dependent child's undergraduate education. Direct Consolidation Loans that repaid parent Direct PLUS Loans or parent Federal PLUS Loans may not be repaid under the IBR Plan. However, such loans may be repaid under the ICR Plan.

If you can show to our satisfaction that the terms and conditions of these repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

If you do not choose a repayment plan, we will choose a plan for you in accordance with the Act.

You may change repayment plans at any time after you have begun repaying your loan. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month.

Except for payments made under the IBR Plan, we apply your payments in the following order: **(1)** late charges and collection costs, **(2)** outstanding interest, and **(3)** outstanding principal. For payments made under the IBR Plan, we apply your payments in the following order: **(1)** outstanding interest, **(2)** late charges and collection costs, and **(3)** outstanding principal.

When you have repaid your loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

**11. Transfer of loan.** We may transfer one or all of your loans to another servicer without your consent. If the address to which you must send payments or correspondence changes, you will be notified of the new servicer's name, address and telephone number, the effective date of the transfer, and the date when you must begin sending payments or directing communications to that servicer. Transfer of a loan to a different servicer does not affect your rights and responsibilities under that loan.

**12. Late charges and collection costs.** If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than six cents for each dollar of each late payment. If you do not make payments as scheduled, we may also require you to pay other charges and fees involved in collecting your loan.

**13. Demand for immediate repayment.** The entire unpaid amount of your loan becomes due and payable (this is called "acceleration") if you:

- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan.

**14. Defaulting on your loan.** Default (failing to repay your loan) is defined in detail under "Acceleration and Default" on page 4 of this Note. If you default:

- You will be required to immediately repay the entire unpaid amount of your loan.
- We may sue you, take all or part of your federal tax refund or other federal payments, and/or garnish your wages so that your employer is required to send us part of your wages to pay off your loan.
- You will be required to pay reasonable collection fees and costs, plus court costs and attorney fees.
- You will lose eligibility for other federal student aid and assistance under most federal benefit programs.
- You will lose eligibility for loan deferments.
- We will report your default to national consumer reporting agencies (see Item 15).

**15. Consumer reporting agency notification.** We will report information about your loan to each national consumer reporting agency on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). Your loan will be identified as an education loan.

If you default on a loan, we will report the default to national consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report it.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the consumer reporting agency with a prompt response.

**16. Deferment and forbearance (postponing payments).** If you meet certain requirements, you may receive a **deferment** that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a **forbearance**. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment:

- While you are enrolled at least half time at an eligible school;
- While you are in a full-time course of study in a graduate fellowship program;
- While you are in an approved full-time rehabilitation program for individuals with disabilities;
- While you are unemployed (for a maximum of three years; you must be diligently seeking, but unable to find, full-time employment); or
- While you are experiencing an economic hardship (including Peace Corps service), as determined under the Act (for a maximum of three years).
- While you are serving on active duty during a war or other military operation or national emergency, or performing qualifying National Guard duty during a war or other military operation or national emergency, and if you were serving on or after October 1, 2007, for an additional 180-day period following the demobilization date for your qualifying service; or
- If you are a member of the National Guard or other reserve component of the U.S. Armed Forces (current or retired) and you are called or ordered to active duty while enrolled at an eligible school, or within 6 months of having been enrolled at least half time, you are eligible for a deferment during the 13 months following the conclusion of the active duty service, or until you return to enrolled student status on at least a half-time basis, whichever is earlier.

You may be eligible to receive additional deferments if, at the time you received your first Direct Loan, you had an outstanding balance on a loan made under the Federal Family Education Loan (FFEL) Program before July 1, 1993. If you meet this requirement, contact your servicer about additional deferments that may be available.

You may receive a deferment while you are enrolled in school on at least a half-time basis if: **(1)** you submit a deferment request form to your servicer along with documentation of your eligibility for the deferment; or **(2)** your servicer receives information from the school you are attending that indicates you are enrolled at least half time. If your servicer processes a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active military duty or qualifying National Guard duty during a war or other military operation or national emergency, your representative) must submit a deferment request form to your servicer, along with documentation of your eligibility for the deferment. In certain circumstances, you may not be required to provide documentation of your eligibility if your servicer confirms that you have been granted the same deferment for the same period of time on a FFEL Program loan. Your servicer can provide you with a deferment request form that explains the requirements for the type of deferment you are requesting. You may also obtain deferment request forms and information on deferment eligibility requirements from your servicer's web site.

If you are in default on your loan, you are not eligible for a deferment.

You are responsible for paying the interest that accrues on a Direct Unsubsidized Consolidation Loan during a deferment period. You are not responsible for paying the interest that accrues on a Direct Subsidized Consolidation Loan during a deferment period.

Forbearance

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

We will give you a forbearance if:

- You are serving in a medical or dental internship or residency program, and you meet specific requirements;
- The total amount you owe each month for all of the student loans you received under Title IV of the Act is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in a national service position for which you receive a national service education award under the National and Community Service Act of 1990 (AmeriCorps). In some cases, the interest that accrues on a qualified loan during the service period will be paid by the Corporation for National and Community Service;
- You qualify for partial repayment of your loans under the Student Loan Repayment Program, as administered by the Department of Defense;
- You are performing service that would qualify you for loan forgiveness under the teacher loan forgiveness program that is available to certain Direct Loan and FFEL program borrowers; or
- You are a member of the National Guard who qualifies for a post-active duty student deferment but not for a military service deferment or other deferment, and you are engaged in active state duty for a period of more than 30 consecutive days.

To request a forbearance, contact your servicer. Your servicer can provide you with a forbearance request form that explains the requirements for the type of forbearance you are requesting. You may also obtain forbearance request forms and information on forbearance eligibility requirements from your servicer's web site. Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following:

- Periods necessary for us to determine your eligibility for a loan discharge;
- A period of up to 60 days for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize interest charged during this period); or
- Periods when you are involved in a military mobilization or are affected by a local or national emergency.

You are responsible for paying the interest that accrues on your entire Direct Consolidation Loan during a forbearance period.

**17. Discharge (having your loan forgiven).** We will discharge (forgive) your Direct Consolidation Loan if:

- Your servicer receives acceptable documentation of your death. We will also discharge the portion of a Direct Consolidation Loan that repaid one or more Direct PLUS Loans or Federal PLUS Loans obtained on behalf of a student who dies.
- Your loan is discharged in bankruptcy. However, federal student loans are not automatically discharged if you file for bankruptcy. To have your loan discharged in bankruptcy, you must prove to the bankruptcy court in an adversary proceeding that repaying the loan would cause undue hardship.
- You become totally and permanently disabled (as defined in the Act) and meet certain other requirements.

In certain cases, we may also discharge all or a portion of your Direct Consolidation Loan if:

- One or more Direct Loan Program, FFEL Program, or Federal Perkins Loan Program loans that you consolidated was used to pay for a program of study that you (or the dependent student for whom you borrowed a PLUS loan) were unable to complete because the school closed;
- Your eligibility (or the eligibility of the dependent student for whom you borrowed a PLUS loan) for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified by the school;
- Your eligibility for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified as a result of a crime of identity theft; or

- The school did not pay a required refund of one or more Direct Loan Program or FFEL Program loans that you consolidated.

We may forgive a portion of your Direct Consolidation Loan that repaid Direct Subsidized or Direct Unsubsidized Loans you received after October 1, 1998, or subsidized or unsubsidized Federal Stafford Loans you received under the FFEL program after October 1, 1998 if you: (1) teach full time for five consecutive years in certain elementary and/or secondary schools or educational service agencies that serve low-income families; (2) meet certain other qualifications; and (3) did not owe a Direct Loan or a FFEL Program loan as of October 1, 1998, or as of the date you obtain a loan after October 1, 1998.

A Public Service Loan Forgiveness program is available that provides for the cancellation of the remaining balance due on your eligible Direct Loan Program loans after you have made 120 full, on-time, scheduled monthly payments (after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by certain public service organizations.

The Act may provide for certain loan forgiveness or repayment benefits on your loans in addition to the benefits described above. If other forgiveness or repayment options become available, your servicer will provide information about these benefits.

To request a loan discharge based on one of the conditions described above (except for discharges due to death or bankruptcy), you must complete an application that you may obtain from your servicer.

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law. If you believe that you have a defense against repayment of your loan, contact your servicer.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You must repay your loan even if you do not complete your education, are unable to obtain employment in your field of study, or are dissatisfied with, or do not receive, the education you paid for with the loan.

**18. Department of Defense and other federal agency loan repayment.** Under certain circumstances, military personnel may have education loans repaid by the Secretary of Defense. This benefit is offered as part of a recruitment program that does not apply to individuals based on their previous military service or to those who are not eligible for enlistment in the U.S. Armed Forces. For more information, contact your local military service recruitment office.

Other agencies of the federal government may also offer student loan repayment programs as an incentive to recruit and retain employees. Contact the agency's human resources department for more information.

*END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT*

**IMPORTANT NOTICES**

**Gramm-Leach-Bliley Act Notice**

In 1999, Congress enacted the Gramm-Leach-Bliley Act (Public Law 106-102). This Act requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

**Privacy Act Notice**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 et seq. of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Financial Privacy Act Notice**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program.

**Paperwork Reduction Notice**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless the collection displays a valid OMB control number. Public reporting burden for this collection of information is estimated to average 1.0 hour (60 minutes) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201(c)(1). Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Education, 400 Maryland Ave., SW, Washington, DC 20210-4537 or e-mail ICDocketMgr@ed.gov and reference OMB Control Number 1845-0053. **Note: Please do not return the completed Federal Direct Consolidation Loan Application and Promissory Note to this address.**

If you have any questions regarding the status of your individual submission of this form, write directly to:

**U.S. Department of Education**
**Consolidation Department**
**P.O. Box 242800**
**Louisville, KY 40224-2800**

## Transaction History

Below is a summary of actions that you completed during the electronic consolidation application and promissory note process:

Your identity was confirmed by the PIN web site on                                                    08/30/2013 at 13:32:20 CT

You agreed to use an electronic consolidation application and promissory note on                       08/30/2013 at 15:32:53 ET

You confirmed that you read, understood, and agreed to the statement of
Borrower's Rights and Responsibilities on                                                              08/30/2013 at 15:33:23 ET

You reviewed your draft consolidation application and promissory note and confirmed that you read, understood, and agreed to
the Certification and Authorization, Promise to Pay, Disclosure of Terms, and Important Notices on      08/30/2013 at 15:33:50 ET

You signed your consolidation application and promissory note on                                        08/30/2013 at 15:34:21 ET

You reviewed your signed consolidation application and promissory note and entered your
Confirmation Code on                                                                                   08/30/2013 at 15:37:23 ET

You confirmed your acceptance of the terms and conditions of this consolidation application and promissory note and submitted
it to us on                                                                                            08/30/2013 at 15:37:30 ET

## Your consolidation application and promissory note Confirmation Code is: 29D

# ATTACHMENT 2



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 4, 2014

Elizabeth Warren
United States Senate
Washington, DC 20510

Dear Senator Warren:

Thank you for your letter of June 25, 2014, concerning Corinthian Colleges, Inc. (Corinthian). The U.S. Department of Education (Department) is doing everything it can to protect students as a result of the sale or closure of Corinthian's institutions of higher education, including seeking to avoid or minimize the disruption to students' lives and educational aspirations that you note could otherwise result from their abrupt closure. At the same time, we are continuing to perform our important oversight work of Corinthian and will hold the company accountable for compliance with the requirements of the Higher Education Act of 1965, as amended (HEA) and our regulations.

I am pleased to report that on July 9, 2014, the Department reached an agreement with Corinthian on a process to govern the eventual closure and sale of its institutions. The Operating Agreement covers certain issues that are directly responsive to some of the issues you raised in your letter, and I appreciate the opportunity to provide further detail. However, please note that the recent events unfolded at an accelerated pace; that the scope of potential institutional closures and sales associated with a single corporate entity is unprecedented; and that circumstances remain quite fluid and will continue to evolve. As a result, we will continue to review our plans and processes going forward to ensure that we are continuing to do all we can to protect both students' and taxpayers' interests as Corinthian's participation in the Federal Student Aid programs ends.

The agreement reached with Corinthian includes features that your letter urged the Department to consider. For example, Corinthian will cease to enroll new students in certain circumstances described below, and will make disclosures to affected students concerning their options and the status of their respective institutions. In particular, and with respect to your specific questions:

- As of July 9, 2014, Corinthian has identified those institutions it plans to sell, as well as those institutions it plans to close *after* providing students who are already enrolled with time to complete their educational programs ("teach-out" institutions). Corinthian is required, under the Operating Agreement, to cease enrollment of new students at teach-out institutions. In some cases, Corinthian may work with another institution so that an enrolled student would complete his/her educational program at such other institution.

- Under the Operating Agreement, certain students in a teach-out school may have options that vary depending on their date of enrollment.

Page 2

o   Students who enrolled prior to June 23, 2014—the date the Department placed
    Corinthian on heightened financial oversight—will be able to either (1) continue
    and complete their educational program or (2) withdraw and obtain a full refund
    of all tuition and other fees paid for their program. Under the agreement,
    Corinthian will determine whether to provide these students the option of a full
    refund of tuition and charges paid or the ability to complete their education as
    originally intended. Students who complete their education under this option
    would not be eligible for a closed school loan discharge. Students who qualify for
    a Corinthian refund will have the refund applied to their Federal loan balances,
    and may qualify for a closed school loan discharge of the remaining amount
    owed, if any. Students will have an opportunity to appeal Corinthian's decision
    regarding the option they may pursue.

o   Students who enrolled on or after June 23, 2014, and before July 8, 2014, have the
    option to choose to (1) continue and complete their educational program or (2)
    withdraw and obtain a full refund of all tuition and other fees paid for their
    program. Under the Operating Agreement, Corinthian must provide these
    students the ability to choose whichever option benefits them the most. Further,
    under the agreement, students who fail to make a choice will be withdrawn from
    their program and provided a full refund. Students who complete their education
    would not qualify for a closed school loan discharge of their Federal loans.
    Students who qualify for a Corinthian refund will have the refund applied to their
    Federal loan balances, and may qualify for a closed school discharge of the
    remaining amount owed, if any.

- Under the Operating Agreement, Corinthian is also required to disclose to students
  enrolled at those institutions it plans to sell information regarding the status of the
  institutions and the options and protections afforded to those students. In addition to
  specific disclosures drafted for use for students at teach-out institutions discussed above,
  the Department has drafted disclosures for Corinthian to provide to prospective students
  enrolling in institutions identified as being for sale. The disclosures inform prospective
  students that certain Federal and State authorities are investigating the institution and that
  these investigations could result in future enforcement actions that might negatively
  affect students' ability to complete their educational programs. The disclosure further
  informs prospective students that if a school is sold, any new owner might make changes
  to their educational program, and that it is possible that any credits they earn at a
  Corinthian institution may not transfer to another school. Further, the Operating
  Agreement requires Corinthian to obtain signed acknowledgments from new students that
  they have received the disclosure prior to enrollment to ensure, to the best of the
  Department's ability, that students are fully aware of the pending sale of the school and
  what that could mean for their studies.

Please note that the Operating Agreement contemplates that the status of any particular
Corinthian institution could change as a result of the Department's ongoing review of
Corinthian's compliance with statutory and regulatory requirements. In January, the Department

Page 3

denied Corinthian's request for approval to add certain new locations and programs at selected institutions because it had admitted to falsifying placement rates and/or grade and attendance records at various institutions and because of ongoing State and Federal investigations into serious allegations with respect to Corinthian's administration of the Federal Student Aid programs. Because these issues suggested systemic deficiencies in the operations of Corinthian as a parent corporation of its individual institutions, the Department instructed the company to provide certain required documentation and information with respect to placement rate percentages, and grade and attendance record changes at all Corinthian institutions. Corinthian's failure to substantially comply with our request is what led the Department to place it on a heightened level of Departmental financial oversight and precipitated the establishment of the Operating Agreement.

Under the Operating Agreement, if the Department finds, based on its reviews, that certain Corinthian institutions are ineligible for recertification to participate in Federal Student Aid programs, or are otherwise determined to be ineligible to participate, Corinthian is required to provide students their choice of whether to (1) continue and complete their educational program in accordance with regulations that govern school closures, as in the case that institutions are found to be ineligible, or (2) withdraw from school and receive a full refund of all tuition and other fees paid for their program. In addition, in these circumstances, students may be eligible for closed school loan discharges of any Federal student loans they took out for attendance at the formerly eligible institution. The conditions and qualifications pertaining to closed school discharges are different from those for the refund Corinthian is obligated to provide under the Operating Agreement; an affected student borrower may qualify for both, either, or neither.

You also asked how the Department will seek to ensure relief for Corinthian students with private student loan debt. In the Operating Agreement, we require Corinthian to include private student loans within the refunds that the company provides to students. In particular, we defined refunds in such cases to include repaying any private student loan or debt to any other lender from whom Corinthian received direct disbursements for such student's cost of attendance at Corinthian the amount of such disbursements, including reimbursing the student for any origination and other fees incurred by the student in obtaining a private student loan. Absent this explicit provision in the Operating Agreement, the HEA does not otherwise authorize the Department to seek such relief, and closed school loan discharges pertain only to Federal, not private, student loans. As to other relief that may be available for students who have obtained private loans, the terms of the loan agreement may permit the borrower to assert, as defenses to repayment, claims that the borrower has against the school. Borrowers should review their private loan agreements to determine whether they include a provision allowing such defenses.

The Operating Agreement makes no distinction between students enrolled in online-only programs and students who enroll in programs that require physical attendance.

In addition, you ask how the Department plans to ensure that students are properly notified of their options in cases of school closures and sales, and the consequences for students in cases of program changes by a new owner of a school consequent to a sale. A number of the disclosure requirements within the Operating Agreement are outlined above, and the Department is currently developing a more detailed plan to ensure it is prepared for both an entirely orderly

Page 4

closure and transition of all Corinthian's institutions, as well as a precipitous closure of all of its institutions, should either occur.

School closures and sales are not uncommon. However, the simultaneous closure and sale of as many institutions as comprise Corinthian, and that affect as large a student population, is without precedent. The Department is building upon and modifying existing plans for school closures and sales to bring them into line with the scale of Corinthian's operations. These plans include how the Department will coordinate with accrediting agencies and State authorizing agencies that, under the HEA, have principal roles and authorities in these cases. For example, the potential consequences and options for students as the result of any particular change in ownership will depend on, among other things, the interest and willingness of a buyer to accept and comply with any particular condition, the particular requirements or conditions that an accrediting agency may impose, and the conditions a State may require, given that the HEA does not generally preempt State law or override States' responsibilities for authorizing institutions that operate within their borders. As a result, the features and conditions of any particular sale, and the consequences and options for students, could vary on a case-by-case basis. In the end, however, the Department's concerns and interests are the concerns and interests of students and taxpayers, and the Department will strive to ensure their welfare in the subsequent closure and sale of Corinthian's institutions. To be clear, the Department will not approve a sale to another entity if that entity is currently under State and/or Federal investigation or is unable to meet the qualifications established under the HEA to qualify for Federal Student Aid.

With respect to your question about borrowers' right to present claims to the Department, the Department recognizes as a defense to repayment of Direct Loans a claim that the borrower has against the school that is based on the making of the loan or the provision of educational services, if State law recognizes such a claim and if the borrower proves the elements required to establish the claim.

A borrower or class of borrowers who obtain a judgment against a school upholding a claim can more readily establish that claim as a defense to repayment, but the borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department.

Finally, as part of the Operating Agreement, the Department required that an independent monitor would be appointed to oversee Corinthian's actions. I am pleased to report that Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, under the leadership of former U.S. Attorney Patrick Fitzgerald, has been selected to take on this monitoring role. The Department is confident that Mr. Fitzgerald and his team will strengthen our efforts to oversee this process.

I appreciate your recommendations to the Department as we move forward in addressing issues arising from matters related to Corinthian's decision to wind down and cease operations. We continue to analyze how we can best protect students and taxpayers, and in so doing, will

Page 5

continue to actively consider your recommendations.  If you have additional questions, please
have your staff contact Lloyd Horwich, Acting Assistant Secretary, Office of Legislation and
Congressional Affairs, at (202) 401-0020.

Sincerely,

Arne Duncan

# ATTACHMENT 3



**The New England Institute of Art®**

CREATIVITY for LIFE

10 Brookline Place West, Brookline, MA 02445
617.739.1700 • 800.903.4425 • www.artinstitutes.edu/boston

**Disclosure Required by Massachusetts Regulation 940 CMR 31.00**
**Media Arts & Animation – Bachelor of Science**

Program cost:

      Average program tuition is $92,700
      Average cost of books and digital resources is $3,000
      Average cost of program fees is $430
      Average cost of program room and board is $72,900*
      The average total cost of the program is $169,030

30% of students graduated from the program during 2012 – 2013 calendar years. **

The average student graduates in 43 months.

50% of The New England Institute of Art students defaulted on, or failed to repay, their loans during the period of cohort year 2010. The official federal cohort default rate is 17.10%. The U. S. Department of Education does not officially calculate an institution's deferment or forbearance rate and, thus, The New England Institute of Art internally calculated the total percentage of student borrowers who had at least one of their federal loans in deferment or forbearance to be 32.9%. In general terms, a deferment or forbearance is a temporary suspension of payment of up to 12 months, approved by a borrower's federal loan servicer, due to a student's economic hardship, unemployment, continuing education, or military status.***

You must repay money that you borrow as student loans to pay for this program, including interest. You must repay any portion of the money you borrow to pay for this program, even if you fail to complete or drop out of the program. Failure to repay student loans is likely to have a serious negative effect on your credit, future earnings, and your ability to obtain future student loans.

22% of graduates during 2012 - 2013 calendar years obtained full-time, non-temporary jobs in their field of study. 7% of students who enrolled in the program during 2012 - 2013 calendar years obtained full-time, non-temporary jobs in their field of study. ****

Employment statistics substantiating these placement rates are available for inspection on request.

_____    _____
Signature of prospective student                  Date

_____    _____
Parent/guardian (if prospective student is under the age of 18)    Date

* Transportation between student housing and the campus is included in the cost of student housing.

** The New England Institute of Art provides this graduation rate in compliance with Massachusetts 940 CMR 31.00. The Massachusetts graduation rate is a specific calculation based on the number of students who received certificates, diplomas, or degrees in the program during the last two calendar years, divided by the number of students who enrolled in the program during the last two calendar years. Students are included in the calculation based strictly on whether they enrolled in the program in the last two calendar years; the rate does not take into consideration whether the student has been enrolled long enough to complete the program.

*** The federal FY10 cohort default rate is calculated by dividing the number of student borrowers who entered repayment between October 1, 2009 and September 30, 2010 and defaulted by September 30, 2011 by the number of student borrowers who entered repayment during that same period. (Generally the borrowers are students who left school between April 1, 2009 through March 31, 2010.)

**** The New England Institute of Art provides this placement rate in compliance with Massachusetts 940 CMR 31.00. The Massachusetts graduate placement rate is a specific calculation based on the number of students obtaining full time (at least 32 hours per week) and non-temporary employment in the field of study during the latest two calendar years for which the institution has obtain verification, divided by the number of all students graduating from the program during the latest two calendar years, as determined within 180 days from the end of each calendar year. The Massachusetts total placement rate is the product of the graduate placement rate and the graduation rate determined within 180 days from the end of each calendar year. There is no minimum period of time that a graduate must work in order to be included in the statistic. Graduates who were employed prior to or during their enrollment who remain in the same position after graduation are included if their employment relates to their field of study.

For additional information, visit: http://www.artinstitutes.edu/boston/student-consumer-information/overview.aspx .

# ATTACHMENT 4



# Evolve

## from student to →

COPY

**The New England Institute of Art**
10 Brookline Place West
Brookline, MA 02445-7295
www.neia.aii.edu
1.617.739.1700 or 1.800.903.4425

### Evolve your talent. Your thinking. Yourself.

Personal and professional growth are the hallmarks of an Art Institutes education in the creative and applied arts. Your talent evolves. Your thinking evolves. Even your career plans can evolve, once you know what opportunities exist out there in the real world. Preparing you for that real world is what Career Services is all about. Résumé writing, networking, and keeping you abreast of what employers are looking for are just a few of our services. But, as they say, proof is in the numbers. Below you'll find detailed information about our graduates' performance in the workplace. Careers begin here. You'll see.

| | Number of Graduates Available for Placement Within Six Months of Graduation | Number of Graduates Employed | Percentage of Graduates Employed in Related Field | Average Starting Salary |
|---|---|---|---|---|
| **Bachelor's Degree Program** | | | | |
| Multimedia & Web Design | 2 | 2 | 100.0% | $43,050 |
| **Total Bachelor's Degree Program** | 2 | 2 | 100.0% | $43,050 |
| **Associate's Degree Programs** | | | | |
| Audio Production | 105 | 94 | 89.5% | $25,615 |
| Broadcasting | 68 | 58 | 85.3% | $25,106 |
| Graphic Design | 15 | 13 | 86.7% | $29,471 |
| Multimedia & Web Design | 15 | 13 | 86.7% | $28,438 |
| **Total Associate's Degree Programs** | 208 | 183 | 88.0% | $25,827 |
| **Totals** | 210 | 185 | 88.1% | $26,014 |

### Doing Our Homework: Successful Career Planning at The Art Institutes

The Art Institutes are known as leaders in career-oriented education in design, media arts, fashion, and the culinary arts. Our partnership with local and national employers helps us to deliver industry-relevant education and curricula that benefit both students and employers. This means that students develop practical skills, using the technology that's recognized in the workplace. What's more, our faculty includes award-winning and industry-recognized professionals who train students in the fundamental skills required for success in their field. Many of our students gain on-the-job skills through participation in internship or externship programs at local companies and nationally-recognized corporations. And our concern for employer satisfaction and awareness of industry trends allows us to provide employers with candidates who fulfill their needs and leads to graduates' career success, both now and in the future.

### How Our Graduates Measure Up

Of all 2003 New England Institute of Art graduates available for employment, 88.1% were working in a field related to their program of study within six months of graduation and earning an average salary of $26,014. The chart at left reflects employment statistics for all 2003 calendar year New England Institute of Art graduates available for placement.

### Where Our Graduates Are Working

The New England Institute of Art graduates have been employed by some of the most prominent companies in the United States and beyond, such as:

- Cramer Productions
- Tweeter Center
- Pro Audio Design
- Universal Music Group
- Bose Corporation
- Greater Boston Radio Group
- WHDH-TV NBC
- Boston Common Press
- FastChannel Network
- The Gillette Company
- Comcast



→ **graduate and make an impact with your creative ideas.**

## What Our Graduates Are Doing

The New England Institute of Art prepares students to launch their careers with entry-level positions such as:

- Web/Graphic Designer
- Recording Studio Assistant
- Live Sound Technician
- Web Developer
- Television Production Assistant
- Air Talent
- Assistant Multimedia Producer
- Promotions Assistant

## Partners Working Together

Dedicated Career Services staff offer a range of services that support your efforts as you plan for your career. Our experience and employer contacts in this community, in addition to the resources of The Art Institutes across the country, give us (and therefore you) an edge. There are proven tips and techniques that can help you begin your job search. That's why we provide the following support:

- Instruction in job search skills, résumé writing, interviewing, and networking.

- Job search assistance for full-time employment in your field and a part-time job while you complete your program of study.

- Participation in career days, internships, and job fairs that enable you and employers to interact.

- Insight into what employers are looking for when it comes to skill set and portfolio content.

## Contact the Director of Career Services at the following locations:

The Art Institute of Atlanta® GA
770.394.8300 or 1.800.275.4242

The Art Institute of California® —
Los Angeles
1.310.752.4700 or 1.888.646.4610

The Art Institute of California® —
Orange County
1.714.830.0200 or 1.888.549.3055

The Art Institute of California® —
San Diego
1.858.598.1399 or 1.800.591.2422

The Art Institute of California® —
San Francisco
1.415.865.0198 or 1.888.493.3261

The Art Institute of Charlotte® NC
1.704.357.8020 or 1.800.872.4417

The Art Institute of Colorado® (Denver)
303.837.0825 or 1.800.275.2420

The Art Institute of Dallas® TX
1.214.692.8080 or 1.800.275.4243

The Art Institute of Fort Lauderdale® FL
1.954.463.3000 or 1.800.275.7603

The Art Institute of Houston® TX
1.713.623.2040 or 1.800.275.4244

The Art Institute of Las Vegas® NV
1.702.369.9944 or 1.800.833.2678

The Art Institute of New York City® NY
1.212.226.5500 or 1.800.654.2433

The Art Institute of Ohio —
Cincinnati*
1.513.771.2821 or 1.866.613.5184

The Art Institute of Philadelphia® PA
1.215.567.7080 or 1.800.275.2474

The Art Institute of Phoenix® AZ
1.602.331.7500 or 1.800.474.2479

The Art Institute of Pittsburgh® PA
1.412.291.6200 or 1.800.275.2470

The Art Institute of Portland® OR
1.503.228.6528 or 1.888.228.6528

The Art Institute of Seattle® WA
1.206.448.6600 or 1.800.275.2471

The Art Institute of Tampa® FL
A branch of Miami International University
of Art & Design
1.813.873.2112 or 1.866.703.3277

The Art Institute of Toronto® ON
1.416.351.8400 or 1.866.202.0481

The Art Institute of Vancouver® BC
1.604.683.9200 or 1.866.717.8080

The Art Institute of Vancouver — Burnaby BC
1.604.298.5400 or 1.800.661.1885

The Art Institute of Washington®
A branch of The Art Institute of Atlanta, GA
(Arlington, VA)
1.703.358.9550 or 1.877.303.3771

The Art Institute Online™
A Division of The Art Institute of Pittsburgh, PA
1.412.291.5100 or 1.877.872.8869

The Art Institutes International Minnesota™
(Minneapolis)
1.612.332.3361 or 1.800.777.3643

Bradley Academy for the Visual Arts™
(York, PA)
1.717.755.2300 or 1.800.864.7725

California Design College™
(Los Angeles — Wilshire Blvd.)
1.213.251.3636 or 1.877.468.6232

The Illinois Institute of Art® — Chicago
1.312.280.3500 or 1.800.351.3450

The Illinois Institute of Art® — Schaumburg**
1.847.619.3450 or 1.800.314.3450

Miami International University of Art & Design® FL
1.305.428.5700 or 1.800.225.9023

The New England Institute of Art® (Boston, MA)
1.617.739.1700 or 1.800.903.4425

Not all programs are offered at all locations.
Equipment and facilities vary by location.

---

* The Art Institute of Ohio — Cincinnati, 1011 Glendale-Milford Road, Cincinnati, OH 45215-1107, OH Reg. # 04-01-1699B
** The Illinois Institute of Art — Schaumburg is accredited by ACCSCT as a branch of The Illinois Institute of Art — Chicago.
A range of online course opportunities is available.
Want to learn online and in the classroom? Explore our Flex program that lets you do both.

© 2004 by The Art Institutes International, Inc.® 10920 09/04

Exhibit 40

| Case | Decision Reason | Suggested I | Date/Time Opened | Status ↑ | Application Decision |
|---|---|---|---|---|---|
| 01421849 | | | 1/10/2017 0:00 | 1.20 - Application Incomplete | |
| 01260226 | | | 8/23/2018 16:12 | 1.40 - Additional Information Required | |
| 01268774 | Lack of Reliance | | 9/19/2018 14:44 | 1.40 - Additional Information Required | Flagged for Denial |
| 01294874 | | | 12/4/2018 8:52 | 1.40 - Additional Information Required | |
| 01294944 | | | 12/4/2018 11:32 | 1.40 - Additional Information Required | |
| 01297202 | Lack of Reliance | | 4/29/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01297252 | Lack of Reliance | | 4/29/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01297993 | Lack of Reliance | | 6/1/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01298383 | Lack of Reliance | | 7/2/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01300140 | Lack of Evidence | | 1/4/2016 14:24 | 1.40 - Additional Information Required | Flagged for Denial |
| 01300324 | Lack of Reliance | | 7/12/2016 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01300445 | Lack of Reliance | | 12/29/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01300579 | | | 8/29/2016 0:00 | 1.40 - Additional Information Required | Pending Decision |
| 01301697 | | | 1/21/2016 0:00 | 1.40 - Additional Information Required | |
| 01304318 | Lack of Reliance | | 9/14/2015 11:01 | 1.40 - Additional Information Required | Flagged for Denial |
| 01304348 | Lack of Evidence | | 1/5/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01304631 | Lack of Reliance | | 9/7/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01305512 | Lack of Reliance | | 2/22/2016 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01305710 | | | 9/25/2015 0:00 | 1.40 - Additional Information Required | |
| 01325579 | Lack of Reliance | | 6/5/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01327633 | | | 7/3/2016 0:00 | 1.40 - Additional Information Required | |
| 01338085 | Lack of Reliance | | 7/16/2016 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01347643 | Lack of Reliance | | 2/2/2017 16:07 | 1.40 - Additional Information Required | Flagged for Denial |
| 01353393 | Lack of Reliance | | 1/27/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01353692 | Lack of Reliance | | 2/10/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01358959 | Lack of Reliance | | 1/26/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01361214 | Lack of Reliance | | 1/21/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01361475 | Lack of Reliance | | 3/6/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01365374 | | | 3/17/2017 0:00 | 1.40 - Additional Information Required | |
| 01374481 | Lack of Reliance | | 7/19/2016 15:34 | 1.40 - Additional Information Required | Flagged for Denial |
| 01376030 | Lack of Reliance | | 7/10/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01376110 | Lack of Reliance | | 7/18/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01377387 | Lack of Reliance | | 4/18/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01379436 | Lack of Reliance | | 5/28/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01380706 | Lack of Reliance | | 5/23/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01380941 | Lack of Reliance | | 7/12/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01381464 | | | 7/26/2016 0:00 | 1.40 - Additional Information Required | |
| 01381797 | No Claim Stated | | 6/5/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01382499 | Lack of Reliance | | 5/10/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01383373 | Lack of Reliance | | 4/21/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01385004 | Lack of Reliance | | 5/7/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01385043 | Lack of Reliance | | 8/7/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01385465 | Lack of Reliance | | 5/17/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01385762 | Lack of Reliance | | 7/10/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01386368 | Lack of Reliance | | 11/15/2016 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01387321 | Employment Prospects | 10% | 5/3/2017 0:00 | 1.40 - Additional Information Required | Flagged for Approval |
| 01387929 | Lack of Reliance | | 8/15/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01389169 | | | 7/20/2016 0:00 | 1.40 - Additional Information Required | |
| 01390217 | Lack of Reliance | | 4/18/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01390697 | Lack of Reliance | | 6/7/2017 10:36 | 1.40 - Additional Information Required | Flagged for Denial |
| 01394013 | Lack of Reliance | | 6/11/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01394607 | Lack of Reliance | | 7/18/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01394713 | Lack of Reliance | | 6/17/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01394993 | | | 7/15/2016 0:00 | 1.40 - Additional Information Required | |
| 01395613 | | | 7/12/2016 0:00 | 1.40 - Additional Information Required | |
| 01395635 | | | 7/17/2016 0:00 | 1.40 - Additional Information Required | |
| 01395684 | Lack of Reliance | | 3/2/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01395825 | Lack of Reliance | | 7/24/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01395966 | Lack of Reliance | | 9/19/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01396029 | | | 7/12/2016 0:00 | 1.40 - Additional Information Required | |
| 01396038 | | | 7/10/2016 0:00 | 1.40 - Additional Information Required | |
| 01396594 | | | 11/16/2016 0:00 | 1.40 - Additional Information Required | |
| 01397811 | Lack of Reliance | | 6/5/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01397941 | Lack of Reliance | | 8/28/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01398661 | Lack of Reliance | | 9/26/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01399170 | Lack of Reliance | | 6/28/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01401385 | | | 8/13/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01403197 | | | 8/15/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01404146 | Lack of Reliance | | 9/28/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01408759 | Educational Services | | 8/28/2017 0:00 | 1.40 - Additional Information Required | Pending Decision |
| 01409683 | Transferring Credits | | 9/25/2017 0:00 | 1.40 - Additional Information Required | Pending Decision |
| 01409737 | Employment Prospects | | 9/30/2017 0:00 | 1.40 - Additional Information Required | Pending Decision |
| 01413359 | Lack of Reliance | | 11/1/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01413623 | Lack of Reliance | | 10/17/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01416890 | Lack of Reliance | | 9/5/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01417329 | Lack of Reliance | | 12/4/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01417369 | Lack of Reliance | | 3/7/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01417376 | Lack of Reliance | | 1/19/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01418199 | Lack of Reliance | | 10/25/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01419131 | Lack of Reliance | | 12/6/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01419695 | Lack of Reliance | | 11/11/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01420815 | Lack of Reliance | | 11/6/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01420954 | Lack of Reliance | | 9/4/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01421918 | Lack of Reliance | | 6/13/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01422252 | Lack of Reliance | | 8/28/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01422904 | Lack of Reliance | | 2/26/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01425197 | Lack of Reliance | | 9/12/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01425491 | Lack of Reliance | | 4/3/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01425798 | Lack of Reliance | | 11/15/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01279076 | Job Placement Rate | | 10/18/2018 15:23 | 1.40 - Additional Information Required | Flagged for Approval |
| 01299680 | Job Placement Rate | | 11/23/2015 0:00 | 1.40 - Additional Information Required | Flagged for Approval |
| 01427301 | Transferring Credits | | 8/7/2017 0:00 | 1.40 - Additional Information Required | Pending Decision |
| 01427627 | Lack of Reliance | | 8/25/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01304178 | Job Placement Rate | | 3/28/2016 0:00 | 1.40 - Additional Information Required | Flagged for Approval |
| 01304965 | Job Placement Rate | | 2/12/2016 0:00 | 1.40 - Additional Information Required | Flagged for Approval |
| 01306375 | Job Placement Rate | | 2/15/2018 0:00 | 1.40 - Additional Information Required | Flagged for Approval |
| 01429247 | Lack of Reliance | | 1/17/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01429286 | Lack of Reliance | | 1/31/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01430021 | Lack of Reliance | | 4/15/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01430049 | Lack of Reliance | | 4/14/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01431217 | Lack of Reliance | | 4/21/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01431608 | Lack of Reliance | | 12/13/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01432639 | Lack of Reliance | | 5/11/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01433916 | Lack of Reliance | | 3/7/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01434210 | Lack of Reliance | | 7/15/2015 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01434599 | Lack of Reliance | | 3/13/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01434799 | Lack of Reliance | | 3/15/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01435048 | Lack of Reliance | | 3/4/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01435613 | Lack of Reliance | | 2/15/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01435786 | Lack of Reliance | | 2/21/2018 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01436394 | Lack of Reliance | | 10/6/2017 0:00 | 1.40 - Additional Information Required | Flagged for Denial |
| 01436565 | | | 7/5/2016 0:00 | 1.40 - Additional Information Required | |

| | | Application Decision | | | | Suggested Relief | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Count by Status | Status | Flagged for Approval | **Flagged for Denial** | BLANK | Pending Decision | 10% | 20% | 25% | 30% | 40% | 50% | 75% | 100% | blank |
| 1 | 1.20 - Application Incomplete | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 234 | 1.40 - Additional Information Required | 12 | 167 | 45 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 233 |
| 127 | 2.10 - Ready for EU Review | 13 | 8 | 74 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 127 |
| 7 | 2.11 - Narrative Needed | 0 | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 188 | 2.12 - Adjudication Hold A | 44 | 142 | 0 | 2 | 4 | 0 | 12 | 0 | 0 | 0 | 1 | 2 | 169 |
| 5 | 2.13 - Adjudication Hold B | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| 61 | 2.20 - EU Review in Progress | 2 | 2 | 39 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 61 |
| 24 | 2.21 - Ready for Quality Control | 20 | 4 | 0 | 0 | 6 | 0 | 7 | 0 | 0 | 0 | 1 | 1 | 9 |
| 1 | 2.22 - Quality Control in Progress | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 261 | 2.23 - Awaiting Evidence Check by ED Divisions | 166 | 95 | 0 | 0 | 41 | 0 | 52 | 0 | 0 | 0 | 7 | 5 | 156 |
| 262 | 2.31 - Awaiting Relief Determination | 262 | 0 | 0 | 0 | 8 | 0 | 8 | 0 | 0 | 0 | 1 | 0 | 245 |
| 1711 | 2.40 - Flagged for Approval - Confirm Loans | 0 | 1711 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1711 |
| 1549 | 2.50 - Ready for ED | 619 | 852 | 0 | 78 | 197 | 0 | 332 | 1 | 0 | 3 | 54 | 19 | 943 |
| 1716 | 2.60 - Sent to ED | 1280 | 436 | 0 | 0 | 426 | 0 | 726 | 0 | 0 | 3 | 76 | 50 | 435 |
| 198 | 3.01 - Adjudication Notice Hold A | 198 | 0 | 0 | 0 | 100 | 0 | 69 | 0 | 0 | 0 | 18 | 11 | 0 |
| 1393 | 3.02 - Adjudication Notice Hold B | 0 | 1393 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1393 |
| 2518 | 3.10 - Recommendation Signed-Off by ED | 2413 | 105 | 0 | 0 | 970 | 0 | 1226 | 0 | 0 | 9 | 151 | 56 | 106 |
| 112 | 3.11 - Post Sign-Off - Pending Loan Consolidation | 108 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 101 |
| 4677 | 3.30 - Post Sign-Off - Loan Discharge Approved | 4676 | 0 | 0 | 1 | 1527 | 2 | 2765 | 2 | 0 | 16 | 324 | 13 | 28 |
| 82 | 3.31 - Post Sign-Off - No Loans for Discharge | 80 | 0 | 0 | 2 | 5 | 10 | 0 | 0 | 0 | 0 | 0 | 5 | 62 |
| 2 | 3.40 - Post Sign-Off - Loan Discharge Denied | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 442 | 3.50 - Pre Sign-Off - No Loans for Discharge | 442 | 0 | 0 | 0 | 27 | 71 | 0 | 192 | 13 | 124 | 0 | 15 | 0 |
| 3 | 3.60 - Loan Processing Requested | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 |
| 369 | 3.61 - Confirm Processing | 369 | 0 | 0 | 0 | 98 | 0 | 245 | 0 | 0 | 1 | 23 | 0 | 2 |
| 58 | 4.00 - Closed | 33 | 11 | 13 | 1 | 3 | 5 | 6 | 8 | 0 | 2 | 0 | 0 | 34 |
| 83 | 5.00 - Reconsideration Request Pending by Borrower | 83 | 0 | 0 | 0 | 5 | 18 | 0 | 41 | 2 | 16 | 0 | 0 | 1 |
| 11 | 5.10 - Reconsideration Request Submitted by Borrowe | 10 | 1 | 0 | 0 | 2 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 1 |
| 4 | Update Received | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| **16099** | **TOTALS** | **10839** | **4934** | **176** | **150** | **3420** | **106** | **5457** | **246** | **16** | **174** | **657** | **188** | **5835** |

| | | Decision Reason | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Count by Status | Status | Barred by SOL | Career Services | Educational Services | Employment Prospects | Failed Job Placement Rate ? No Other Allegation | Failure to State a Claim Actionable Under BD Reg | Job Placement Rate | Lack of Evidence | Lack of Reliance | No Claim Stated | Other | Program Cost and Nature of Loans | Transferring Credits | blank |
| 1 | 1.20 - Application Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 234 | 1.40 - Additional Information Required | 0 | 0 | 2 | 3 | 0 | 0 | 10 | 2 | 156 | 1 | 0 | 0 | 4 | 56 |
| 127 | 2.10 - Ready for EU Review | 0 | 0 | 0 | 19 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 7 | 96 |
| 7 | 2.11 - Narrative Needed | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 1 |
| 188 | 2.12 - Adjudication Hold A | 0 | 1 | 0 | 12 | 0 | 0 | 24 | 2 | 137 | 2 | 0 | 0 | 7 | 3 |
| 5 | 2.13 - Adjudication Hold B | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 61 | 2.20 - EU Review in Progress | 0 | 0 | 0 | 9 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 49 |
| 24 | 2.21 - Ready for Quality Control | 0 | 0 | 0 | 10 | 0 | 0 | 5 | 4 | 0 | 0 | 0 | 0 | 5 | 0 |
| 1 | 2.22 - Quality Control in Progress | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 261 | 2.23 - Awaiting Evidence Check by ED Divisions | 0 | 0 | 0 | 68 | 2 | 0 | 58 | 86 | 0 | 7 | 0 | 0 | 40 | 0 |
| 262 | 2.31 - Awaiting Relief Determination | 0 | 0 | 0 | 175 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 0 |
| 1711 | 2.40 - Flagged for Approval - Confirm Loans | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 1347 | 0 | 101 | 0 | 0 | 0 | 257 |
| 1549 | 2.50 - Ready for ED | 1 | 0 | 0 | 379 | 298 | 58 | 0 | 3 | 26 | 220 | 2 | 0 | 240 | 322 |
| 1716 | 2.60 - Sent to ED | 0 | 0 | 0 | 768 | 1 | 3 | 0 | 318 | 21 | 26 | 1 | 0 | 512 | 66 |
| 198 | 3.01 - Adjudication Notice Hold A | 0 | 0 | 0 | 135 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63 | 0 |
| 1393 | 3.02 - Adjudication Notice Hold B | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1181 | 1 | 207 | 0 | 0 | 0 | 0 |
| 2518 | 3.10 - Recommendation Signed-Off by ED | 0 | 0 | 0 | 1620 | 4 | 0 | 0 | 89 | 0 | 12 | 0 | 1 | 792 | 0 |
| 112 | 3.11 - Post Sign-Off - Pending Loan Consolidation | 0 | 0 | 0 | 1 | 0 | 0 | 67 | 0 | 0 | 0 | 0 | 0 | 40 | 4 |
| 4677 | 3.30 - Post Sign-Off - Loan Discharge Approved | 0 | 0 | 0 | 3305 | 0 | 0 | 28 | 0 | 0 | 0 | 1 | 0 | 1342 | 1 |
| 82 | 3.31 - Post Sign-Off - No Loans for Discharge | 0 | 0 | 0 | 1 | 0 | 0 | 77 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| 2 | 3.40 - Post Sign-Off - Loan Discharge Denied | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 442 | 3.50 - Pre Sign-Off - No Loans for Discharge | 0 | 0 | 0 | 0 | 0 | 0 | 441 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 3 | 3.60 - Loan Processing Requested | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 369 | 3.61 - Confirm Processing | 0 | 0 | 0 | 302 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 66 | 0 |
| 58 | 4.00 - Closed | 0 | 0 | 0 | 6 | 0 | 0 | 24 | 4 | 7 | 0 | 0 | 0 | 4 | 13 |
| 83 | 5.00 - Reconsideration Request Pending by Borrower | 0 | 0 | 0 | 0 | 0 | 0 | 83 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | 5.10 - Reconsideration Request Submitted by Borrowe | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 4 | 0 |
| 4 | Update Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| **16099** | **TOTALS** | **1** | **1** | **2** | **6821** | **312** | **65** | **827** | **3041** | **349** | **579** | **4** | **2** | **3220** | **875** |

This document is converted from the first page of the spreadsheet Bates No. DOE00006186, originally produced in native format. This notation in red font was added by Plaintiffs for attachment to their Motion for Summary Judgment.