# Exhibit 41

# Initial Review of Medium Batch Applications

## BACKGROUND

| Name of Institution | Davenport University |
|---|---|
| Corporate Owner(s) | Davenport University, Inc. |
| Open or Closed | OPEN but several of the branches closed between 2005 and 2018 |
| Total Number of Applications | 40 |
| Patterns of Alleged Misconduct | Several of the allegations state that the school failed to provide career services or promised that there would be jobs in the student's field. There are also allegations that credits from previous schools would not transfer to Davenport. There is no mention of lawsuits or investigations. |
| Evidence/Litigation | • 2014 article about settlement with Higher One-students who went to schools that contracted with Higher One to distribute financial aid are eligible for portion of the settlement because the company allegedly charged improper fees and made misleading statements regarding account costs. Davenport was one of these schools. No allegations against Davenport specifically. (https://www.mlive.com/lansing-news/2014/02/higher_one_debit_card_settleme.html)<br><br>• 2016 Complaint to the U.S. Department of Education that Davenport University discriminated against a student on the basis of disability. The allegation states that the University discriminated against students with vision impairments on their homepage and online platform. The school made the necessary changes and the complaint is resolved. |

DOE00010647

| | (https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/1516 2175-a.pdf) |
|---|---|
| **Name of Reviewer** | Alana Smith |
| **Date Review Completed** | 7/1/19 |

## SUMMARY APPLICATION OVERVIEW

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| 01249022 | Kalamazoo, MI | Systems Analyst | 2005 | Financial Aid, Transferability, Other | Signed Statement |
| 01276267 | Online | Post Grad Medical Case Management | 2010 | Educational Services, Financial Aid, Other | Signed Statement |
| 01286867 | Midland, MI | IT | 2001 | Educational Services, Program Cost, Urgency to Enroll | Signed Statement |
| 01418113 | Merrilville, IN | Business Management, Bachelor and Human Resource Management, Masters | 2002 | Career Services, Transferability, Other | Signed statement |
| 01440551 | Warren, MI | Accounting and Management, Bachelor | 1996 | Transferability, Other | Signed Statement |
| 01441923 | Kalamazoo, MI | Medical Transcriptionist, AS | 2001 | Guaranteed Job, Other | Signed Statement |
| 01448544 | Flint, MI | Nursing | 2004 | Educational Services | Signed Statement |
| 01481796 | Grand Rapids, MI | Nursing Medical Assistant, AS | 1999 | Financial Aid, Career Services, Other | Signed Statement |
| 01484136 | Merillville, MI | Medical Assistant | 2002 | Career services, Financial Aid, Program Cost, | Signed Statement |

| | | | | Pressure to Enroll | |
|---|---|---|---|---|---|
| 01523524 | Online | Medical Coding | 2007 | Other | Signed Statement |

## RECOMMENDATION

The majority of allegations in these cases do not rise to the level of misrepresentations that violates state law. Most of the allegations are that the school failed to offer career services or job placement assistance, that the school misstated the job market, or that the school failed to accept credits that transferred in from other schools. There is little corroboration between the allegations and cases.

The only evidence against the school consists of a 2016 allegation of discrimination filed with the US Department of Education. The complaint was resolve d in 2017. Also, one of the loan companies Davenport University contracted with, Higher One, settled a lawsuit with students from Davenport and other schools for allegations of improperly charging fees and misrepresenting costs and fees. There were no allegations against Davenport University specifically, just against Higher One.

Given the lack of evidence and corroboration, I recommend adjudicating these cases.

# Exhibit 42

# Initial Review of Medium Batch Applications

## BACKGROUND

| Name of Institution | Southwest University |
|---|---|
| Corporate Owner(s) | Southwest University |
| Open or Closed | Open |
| Total Number of Applications | 5 |
| Patterns of Alleged Misconduct | N/A |
| Evidence/Litigation | N/A |
| Name of Reviewer | Maureen Taylor |
| Date Review Completed | 10/11/2019 |

## SUMMARY APPLICATION OVERVIEW

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| 01249555 | Southwest University | Medical Assistant | 2/17/2015 | Other, Career Services, Program Cost, Pressure to Enroll | Emailed Statement |
| 01276186 | Southwest University | Medical Assistant | 2/16/2015 | Guaranteed Job, Financial Aid, Transferability, Career Services, Educational Services, Pressure to Enroll, Other | Emailed Statement |
| 01282353 | Southwest University | Medical Assistant | 9/22/2009 | Career Services, Financial Aid, Pressure to Enroll, Other | Emailed Statement |
| 01531031 | Southwest University | Medical Assistant | 9/8/2014 | Guaranteed Job, Pressure to Enroll, Other, Transferability | Emailed Statement |

| 01595932 | Southwest University | Health Administration | 2/18/2019 | Transferability, Educational Services | Emailed Statement |
|---|---|---|---|---|---|

## RECOMMENDATION:

The Allegations made by the applicants vary but do not violate state law. No lawsuits against the school were discovered. Further investigation is not recommended.

**APPROVED BY: John Stephenson**
**DATE: 10/11/2019**

# Exhibit 43

# Initial Review of Medium Batch Applications

## BACKGROUND

| | |
|---|---|
| **Name of Institution** | San Diego College/ Career College of San Diego |
| **Corporate Owner(s)** | San Diego College |
| **Open or Closed** | Closed |
| **Total Number of Applications** | 9 |
| **Patterns of Alleged Misconduct** | N/A |
| **Evidence/Litigation** | N/A |
| **Name of Reviewer** | Maureen Taylor |
| **Date Review Completed** | 10/10/2019 |

## SUMMARY APPLICATION OVERVIEW

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| 01284129 | Career College of San Diego | Medical Billing and Coding | 8/1/2011 | Career Services, Guaranteed Job, Other | Emailed Statement |
| 01452281 | Career College of San Diego | Not Listed | 5/1/2011 | Financial Aid, Transferability, Career Services, Pressure to Enroll, Other | Emailed Statement |
| 01471742 | Career College of San Diego | Business | 1/1/2011 | Career Services, Financial Aid, Educational Services, Pressure to Enroll, Other | Emailed Statement |
| 01533060 | San Diego College | Medical Billing and Coding | 10/1/2014 | Transferability, Program Cost, Career Services, Educational Services, Other | Emailed Statement |
| 01538795 | San Diego | Medical | 10/30/2013 | Career | Emailed |

| | | College | Billing and Coding | | Services, Educational Services, Other | Statement |
|---|---|---|---|---|---|---|
| 01579343 | San Diego College | Medical Assistant | 4/16/2013 | Career Services, Pressure to Enroll | Emailed Statement |
| 01603605 | San Diego College | Medical Billing and Coding | 10/13/2013 | Educational Services, Pressure to Enroll | Emailed Statement |
| 01607534 | San Diego College | Medical Assistant | 11/17/2014 | Guaranteed Jo, Career Services, Pressure to Enroll, Other | Emailed Statement |
| 01897267 | San Diego College | Medical Assistant | 9/6/2014 | Other, Educational Services, | Emailed Statement |

## RECOMMENDATION:

The allegations made by the applicants vary and do not violate state law. No lawsuits against the school were discovered. Further investigation is not recommended.

**APPROVED BY: John Stephenson**
**DATE: 10/11/2019**

# Exhibit 44

<u>MEMORANDUM</u>

TO: Colleen Nevin

FROM: Erin Conroy

DATE: May 12, 2020

RE: Borrower Defense Unit Investigation of Charlotte School of Law prior to 2015

Charlotte School of Law (CSL) was founded in 2004 as part of the Infilaw System, a group of for-profit law schools that also includes Arizona Summit Law School and Florida Coastal School of Law.[1] CSL was granted a license to operate by the state of North Carolina in 2005, and the school was actively enrolling students at its sole campus in Charlotte, North Carolina from 2006 until its closure in 2017.[2]

As of May 18, 2020, the Borrower Defense Unit (BDU) has received approximately 1,000 applications from borrowers who attended CSL. These cases span the entire history of CSL's existence, with the bulk of the cases coming from borrowers who first enrolled from 2011 to 2015.[3]

As of the date of this memorandum, the BDU has obtained evidence relevant to the borrower defense allegations filed against CSL. In particular, in addition to what is attached by borrowers in their applications, the BDU has reviewed evidence in connection with the following: (1) an American Bar Association (ABA) investigation against CSL which resulted in the ABA placing CSL on probationary accreditation status in November of 2016; (2) The Department's decision to deny CSL's application for recertification to participate in federal student financial assistance programs; and (3) a letter to the Department of Education from North Carolina Department of Justice requesting that the Department extend the closed school discharge window for CSL borrowers.

Based on its review of the above evidence, the BDU recommends individual adjudication of all claims where the borrower separated from CSL prior to February 24, 2015. While the ABA's investigation officially began in 2014 and its report from its March 2014 site visit represents the BDU's earliest evidence against CSL, the ABA did not issue its first decision letter to CSL until February 24, 2015[4] and did not find CSL to be out of compliance with the Standards that led to it being put on probation until February 3, 2016.[5] Further, there is no indication that the ABA's findings were intended to be retroactive. Similarly, the Department's decision to deny CSL's application for recertification was based on the ABA's findings, as well as statements made by CSL in 2016.[6] Finally, while both the University of North Carolina Board of Governors and the North Carolina Department of Justice requested documents from CSL

---

[1] U.S. Department of Education Denial of Recertification Letter, at 2 (Dec. 19, 2016).
[2] ABA Inspection Report on Charlotte School of Law, at 2 (Sept. 15, 2014).
[3] Salesforce reports generated by BDU personnel (on file with the Department).
[4] ABA Decision Letter to President Lively and Dean Conison (February 24, 2015).
[5] ABA Decision Letter to President Ogene and Dean Conison, at 1 (February 3, 2016).
[6] U.S. Department of Education Denial of Recertification Letter (Dec. 19, 2016).

DOE00002528

going back as far as 2014, this was largely to obtain the documents that the ABA used to make its decision.[7]

February 24, 2015 represents the earliest date that CSL was on clear notice of the gravity of the ABA's ongoing investigation into its compliance, and therefore it is appropriate to adjudicate borrowers who separated from the school prior to that date individually. February 2015 also serves as an appropriate cutoff date because the evidence suggests that CSL began administering its Path Program in 2015, which paid students to postpone sitting for the bar exam and therefore would only apply to their bar data reported past 2015. The BDU is not in possession of, nor aware of, any evidence to corroborate borrowers' claims of misconduct prior to this cut-off date. As of May 11, 2020, BDU is in possession of 406 cases where the borrower alleges a date of separation prior to February 24, 2015.[8]

In order to adjudicate these cases, the BDU will open each case and review each allegation and any evidence the borrower attached to the case. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. In cases where the borrower provides no evidence or the evidence provided does not prove any allegation, then the case will be flagged for denial. If additional evidence is discovered in the future, these pre-February 24, 2015 cases may be revisited.

---

[7] University of North Carolina Required Documents Letter to Dean Conison (Jan. 24, 2017).
[8] Extracted on 5/11/20 using Salesforce program report, filtering for program end dates less than Feb. 24, 2015.

DOE00002529

# Exhibit 45

**Summary of Information Requested by Diane**
**Regarding Loan Discharges Pursuant to 2016 Regulation**

1. **Overview of Status of Implementation of the 2016 Regulation**

FSA is in the process of gathering information and compiling questions and issues for discussion with OUS, OPE, and OGC in connection with the implementation of the 2016 regulation. With respect to the Automatic Closed School Discharge ("ACSD"), work is underway to set up processes at the servicers for implementation once we have the list of borrowers who are eligible for discharge.

2. **How do we determine who qualifies for ACSD?**

Under the 2016 regulation, ACSD applies with respect to schools that closed on or after November 1, 2013. The regulation stipulates that the Secretary shall discharge loans without an application from a borrower if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed. Borrowers who qualify for an ACSD include those who did not complete their program of study at the school because the school closed while the student was enrolled, or those who withdrew from the school not more than 120 days before the school closed. The Secretary may extend the 120-day period if the Secretary determines that exceptional circumstances related to a school's closing justify an extension. In the case of Corinthian, the former Secretary extended the period to include borrowers who withdrew on or after June 20, 2014.

FSA has developed, and is currently refining, an algorithm to query the National Student Loan Data System (NSLDS) to identify those borrowers who are eligible for ACSD. We currently are making adjustments to the algorithm to account for the multiple OPEID numbers under which Corinthian operated to ensure that an accurate list of borrowers who are eligible for relief is compiled. With respect to Corinthian, the algorithm will produce a list of non-completers who had attended a Corinthian school when it closed, or who had withdrawn from such a school on or after June 20, 2014, and who had not subsequently re-enrolled in any title IV-eligible institution within a period of three years from April 27, 2015.

- Closing Date

Program Compliance has an official closure date for each school closure. It is the date that the school last offered instruction. This is the date reflected as the closing date in NSLDS, which is what will be pulled into the algorithm developed to address a specific school closure.

- <u>Subsequent Enrollment</u>

Another component of the algorithm pulled from the NSLDS data is the borrower's student aid information (specifically, grant and loan disbursements subsequent to the school closure) to determine whether or not the student had a subsequent enrollment.

The ACSD process only applies to those borrowers as described above. For other situations, the closed school discharge process operates as it otherwise has. These other situations include, for example, borrowers who re-enroll in another institution, but not in a comparable program; and, borrowers who re-enroll in a comparable program at another institution but do not complete the program. In these cases, borrowers must apply for the discharge, and only the loans the borrowers received at the closed school are eligible for discharge. Borrowers who transfer credits and complete their program at another institution are not eligible for a closed school discharge.

### 3. Processes and Timeline for ACSD and Approximate Number of Eligible Borrowers

FSA recommends a phased approach to implementing the ACSD. Specifically, the first phase probably would be limited to borrowers who had attended a Corinthian school that closed and who had no loan disbursements after the school closure. The second phase will include borrowers who attended other closed schools.

On a parallel track with finalizing the algorithm, FSA is working on the servicer requirements and other operational pieces. We will supplement our response with a projected timeline for implementing Phase I early next week, including the timing for an initial email to the borrower from FSA advising that he or she is eligible for ACSD and will be receiving a notice of the loan discharge from the servicer.

The estimate of approximately 5,000 eligible borrowers previously referenced by OGC was a preliminary number generated using a preliminary version of the algorithm. FSA found some data anomalies in the result, and we currently are in the process of making adjustments to the algorithm that will likely change the number of eligible Corinthian borrowers identified.

### 4. ACSD Overlap with Borrower Defense Claims

The above-referenced 5,000 number was <u>not</u> solely borrowers who also have a borrower defense application – it was intended to include Corinthian borrowers eligible for ACSD, regardless of whether they have filed a BD or standard CSD application. Once we have finalized and re-run the algorithm, FSA will cross-reference the ACSD list with the list of Corinthian borrowers who have pending BD claims to determine the overlap.

The algorithm will identify borrowers who previously received partial relief in connection with a BD claim because these borrowers' loans were not fully discharged. Those loans will be discharged in full under the ACSD and any payments made on the loans will be refunded.

DOE00004317

### 5. ITT Tech Claims Eligible for ACSD

ITT's official closure date was September 3, 2016. Therefore, no borrowers from ITT will be eligible for ACSD until September 2019. Because it is possible that some former ITT students may enroll in other schools between now and next September, any projections likely would be over-inclusive. However, once the algorithm is finalized, FSA can run a modified version to provide projected numbers and anticipated cost based on the closure date. FSA also will provide projected costs assuming an expanded window for discharge that would allow for immediate discharges.

FSA is in the process of compiling data to provide the loan total for pending BD claims from ITT Tech students. Because the data currently is on two different systems, FSA estimates that it will take two to three weeks to gather and merge the data, which then will have to be validated. In the interim, FSA will provide next week the total number of currently pending BD claims from ITT borrowers.

### 6. Closed School History re: Corinthian and ITT

To date, there have been no closed school discharges without an application; students were required to apply individually. Although there are many borrowers from Corinthian who applied for both BD and closed school, the processes are separate. Part of the BD intake process includes a review of whether the borrower already has received a closed school discharge; if so, the BD claim is closed. Additionally, there is a follow-up step during the BD adjudication phase to carve out any claims for borrowers who received a closed school discharge after the BD application was filed but while BD application was still pending.[1]

Currently, for borrowers who applied for BD only and have not filed a closed school discharge application, there is no assessment of the borrower's eligibility for closed school discharge (even if it would provide greater relief). The closed school discharges are a separate process handled by the servicers under the supervision of Business Operations, and an application is required. FSA can explore adding a preliminary closed school discharge assessment to the BD review process, if desired.

### 7. Group Claims from AGs

Regarding requests from Attorneys General seeking group discharges on behalf of their constituents, FSA has received the following lists:

- American Career Institute ("ACI"):
  - MA AG list identifying 4,458 borrowers (all loans previously were discharged in connection with group BD discharge process in January 2017)

---

[1] This step was added in late 2016. Prior to the addition of that step to the process, there were borrowers who had BD applications approved after their loans already had been discharged under the closed school discharge process.

[ PAGE \* MERGEFORMAT ]

DOE00004318

- Anthem:
  - MN AG submitted four different lists identifying a total of 49 borrowers (most or all borrowers listed appear to have submitted individual applications as well)
- Corinthian:
  - IL AG list identifying 3,368 borrowers
  - MA AG list identifying 2,444 borrowers
  - WA AG list identifying 3,637 borrowers
- Globe/Minnesota School of Business:
  - MN AG list identifying 1,949 borrowers
- Kaplan:
  - MA AG submitted two lists identifying a total of 97 borrowers
- Lincoln Tech:
  - MA AG list identifying 351 borrowers
- Westwood:
  - IL AG list identifying 1,243 borrowers

**8. Breakdown of Costs – Borrowers Currently eligible for ACSD from Corinthian, ITT, ACI and Globe and Aggregate Loan Balance for Each**

Once FSA finalizes the algorithm, it will re-run it to determine the borrowers who currently are eligible for ACSD. Phase I will focus on borrowers who attended a Corinthian school that closed. FSA will pull the aggregate loan total once the list is generated.

As previously noted, the list of borrowers currently eligible for ACSD will not include any ITT borrowers; ITT did not close until September 2016 and, therefore, no ITT borrowers will be eligible until next September unless the window is extended. Similarly, because Globe campuses closed at various times between June 24, 2016 and September 14, 2017, the first Globe borrowers will not be eligible until June 24, 2019 unless the 120 day window is extended. The list also will not include any ACI borrowers because the school closed in January of 2013, and the ACSD regulation only applies to borrowers from schools that closed on or after November 1, 2013.

**9. Additional cost if time period for ACSD is extended to the longer timeframe afforded to Corinthian borrowers – for ITT, Globe and ACI**

Once the algorithm is finalized, FSA can run a modified algorithm to provide a projection of costs using both the closing date and any other time period requested for comparison and policy decisions regarding ITT and Globe borrowers. For the reason noted above, the 2016 ACSD provisions do not apply to ACI.

**10. How do we notify the holder of student records of the names of those who received loan discharge and are therefore not entitled to an official transcript?**

There currently is no process in place to advise closed schools (or the holder of records for a closed school) that the borrower has received a closed school discharge. Although it does not

[ PAGE \* MERGEFORMAT ]

DOE00004319

appear that such notification is required under title IV or regulation, FSA can explore options in consultation with OGC for providing such a notice, if desired.

**11. School Closures Since 2013**

FSA has compiled a list of schools with closures between November 1, 2013 and November 7, 2018. Please see the attached Excel spreadsheet.

**12. BD Claims Subject to 2016 Regulation (Loans issued on or after July 1, 2017)**

Our very rough preliminary estimate is that fewer than 5% of the pending BD claims will be reviewed under the 2016 regulation. We currently are transitioning BD data from one system to another, so we are in the process of pulling and merging the data from the two different systems. We will have a more accurate/complete picture in 2-3 weeks and will provide the requested data as soon as it is validated.

For borrowers who have loans both before and after July 1, 2017, FSA has had preliminary discussions with OGC on this issue and will provide a response once OGC has confirmed the required approach.

**13. Closed School Discharge Applications from Mount Ida**

FSA will request this data from the servicers.

**14. Closing Date and Approach for Closed School Discharge Applications from Art Institute Students**

Regarding whether we have received applications from Art Institute borrowers, FSA will request this information from the servicers. Art Institute borrowers currently attending school will not be eligible for ACSD until 3 years from the date of closure, which is planned for December 31, 2018.

The ACSD provision requires that the closing date be the basis for determining eligibility (rather than the proposed announcement date). However, as a policy matter, the Secretary could decide to extend the 120 day window in order to provide additional relief as was done in connection with Corinthian's closure.

**15. Weekly Report from FSA Re: Implementation of 2016 Regulation**

FSA will develop a weekly report advising of discharge numbers, costs and other data and information requested.

DOE00004320

# Exhibit 46

To:      Under Secretary Ted Mitchell
From:    Borrower Defense Unit
Date:    January 10, 2017
Re:      Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment -- California
         Students

---

ITT Technical Institute ("ITT") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. This memorandum addresses borrower defense (BD) claims premised on these misrepresentations submitted by borrowers who attended an ITT campus in California.[1] As set forth below, the Borrower Defense Unit recommends full relief (subject to the statute of limitations) for borrowers[2] who (1) enrolled at any ITT California campus between January 1, 2005[3] and ITT's closing and (2) whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including representations that all graduates obtain employment.

## I.     Summary of ITT's Representations to Borrowers Promising Employment

Like former Corinthian students,[4] former ITT students have submitted guaranteed employment claims that are factually consistent, pervasive across campuses, and constant over a span of years. In these BD applications, ITT borrowers (both from California and throughout the country) consistently allege, each in their own words,[5] that ITT staff promised, guaranteed, or otherwise assured that they would be placed in jobs. These oral representations occurred both in person and during phone calls with prospective students. The Department has received guaranteed employment claims from borrowers at every campus sampled, dating back to the 1990s. Based on those statements, as well as corroborating evidence from former ITT employees, a preponderance of the evidence demonstrates that ITT guaranteed or otherwise assured borrowers future job placement.[6]

---

[1] As discussed below, guaranteed jobs misrepresentations were evident throughout ITT's campuses nationwide. Because California law has already been thoroughly analyzed by the Department for the same claim in connection with Corinthian Colleges, we recommend proceeding with discharges for ITT California students with guaranteed jobs allegations, as set forth below.

[2] For purposes of this memorandum, Parent PLUS borrowers are included in the definition of California students.

[3] Although this memorandum only addresses borrowers who enrolled on or after January 1, 2005, additional evidence (including from additional BD claims) may support future relief for applicants who enrolled prior to 2005. The Department will evaluate this evidence on an ongoing basis and may update this recommendation accordingly.

[4] *See* Memorandum from Borrower Defense Unit to Under Secretary Mitchell re: Corinthian Borrowers Alleging That They Were Guaranteed Employment (Jan. 9, 2017).

[5] The Department has received ITT BD applications submitted via narratives in Word documents and emails, as well as via forms provided to borrowers by the Debt Collective. A vast majority of these allegations are unprompted. Some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but the Department's BD website has only instructed borrowers to provide "other information…that you think is relevant."

[6] We have reviewed the ITT evidence on a nationwide level as well as on a California-specific level. As set forth below, ITT's conduct with respect to guaranteed jobs was consistent nationwide; we have found nothing unique about ITT's conduct in California as compared to other states. Thus, the fact section addresses both California-specific evidence as well as nationwide evidence.

DOE00009399

## A.    Guaranteed Employment Representations Consistent in Nature

Of 320 randomly sampled BD applications submitted by ITT borrowers, 103 (32% of the total) state that the borrower was promised, guaranteed, or otherwise assured employment.[7]  The unprompted factual similarity of these BD claims evidence a strong indicia of reliability.  For example, at ITT-San Diego, where 7 of 19 BD applications sampled alleged guaranteed employment, borrowers submitted the following highly consistent statements:

- "The school assured me that I would find employment in my field of study and that the industry of my field of study was in high demand." [8]
- "I was also told by the recruiters from the school about wages I could make that I have yet to be able to earn due to the fact that the school is and was not very credible. . . .The ITT Tech recruiters assured me A.A. students graduate making around 50-60K a year and the B.S. graduates would be around $80k a year. They misrepresented their product, their name brand and their education."[9]
- "The promises were that it would be easy to find a high paying job right away."[10]
- "I was promised that once I graduated I would be able to get into any field of my choice from Crime Scene Investigator, Crime Mapping, Probation to Detective to many many more. The promise of salaries starting at 50K upward depending on my field of choice and my recruiter said employers are beating down their door saying we want to hire the graduates as they know the latest and the best information available."[11]
- "They promised to place me into a good job making a middle class wage but were unable to put myself or other students into anything but a low paying temp job. Then it was promised that I would be better off with a Bachelors from ITT in order to get the higher pay job. I and multiple other students were duped into thinking that."[12]
- "They additionally gave promises of placement in good jobs, while in reality I have been swamped with a large amount of debt, inability to attain a job in the degree field or of even better earnings."[13]
- "I was also told that they have a great job placement program and that all students that seek help would be placed with a job within my new field after the first six months of school."[14]

## B.    Guaranteed Employment Representations Pervasive Throughout ITT

Guaranteed employment representations were not limited to ITT-San Diego.  In fact, such representations were pervasive throughout ITT's network of campuses in California and nationwide.  Former students alleged guaranteed employment at each of the 22 ITT campuses sampled, which were located across 17 states (CA, IL, MI, PA, WA, AK, VA, MO, FL, NM, TX, OR, TN, AL, NY, OK, and WI).  A sample of these claims, detailed below, demonstrates the pervasiveness of guaranteed employment misrepresentations throughout ITT:

---

[7] This total excludes allegations that may pertain to guaranteed jobs but were not sufficiently specific to qualify for relief. For example, allegations that ITT's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment claims.
[8] BD1655184.
[9] BD1639392.
[10] BD1655377.
[11] BD1605233.
[12] BD1655410.
[13] BD1655354.
[14] BD1638087.

DOE00009400

- ITT-Orange (CA): "I was told that ITT had a 100% job placement upon graduating students."[15]
- ITT-Anaheim (CA): "I was promised that immediately after graduating, I would be placed in a job within my field of study."[16]
- ITT-Sylmar (CA): "I was told that my degree would guarantee me employment."[17]
- ITT- Rancho Cordova (CA): "The sales representative stated that after completion of my education courses I would make between $50,000 and $75,000 USD per year."[18]
- ITT-Oak Brook (IL): "They advised me that I would have a job waiting for me. The credits for the field I was in were not accredited. The degree is not worth anything and the school is a scam."[19]
- ITT-Swartz Creek (MI): "They guarantee jobs right after graduating."[20]
- ITT-Harrisburg (PA): "I was told on several occasions by ITT Admissions Representatives that the school has 100% job placement upon completion for students"[21]
- ITT-Seattle (WA): "They said that 100% job placement and that I should have no problem finding a job in my field."[22]
- ITT-Little Rock (AK): "They promised that they had companies like Blizzard Entertainment, Electronic Arts, Sony, Nintendo, etc. fighting for graduates for their companies . . . They not only lied about the job placement but they lied about the fact that we could be making a 5 figure salary."[23]
- ITT-Springfield (VA): "I WAS LED BY THE RECRUITER TO BELIEVE THAT THE JOB OPPORTUNITIES WOULD BE POURING IN."[24]
- ITT-Arnold (MO): "I was told that I would get a job in my field"[25]
- ITT-Albuquerque (NM): "ITT lied about job prospects and guaranteed a job after graduation."[26]
- ITT-Richardson (TX): "After the tour ended, the counselor told me the multimedia program was game development and stated that upon completion of the program I would have a guaranteed job through their job placement program and that the starting base pay for such a job was $70,000/year."[27]
- ITT-Portland (OR): "Told me they would have me in a career by the end of my first year in school."[28]
- ITT-Knoxville (TN): "I was told that they had 100's of jobs waiting for only their graduates. No one but ITT Tech graduates could apply to these jobs"[29]
- ITT-Bessemer (AL): "I was promised job placement upon completing my courses . . . I was also given an estimated range of amount of starting salary/hourly pay."[30]
- ITT-Greenfield (WI): "They also provided misleading stories about how their program would land me the job of tomorrow and how much people in my field were being paid during and after graduation."[31]
- ITT-Tulsa (OK): "They said they would have me working in the gaming industry....they told me to look in the classifieds."[32]

---

[15] BD156693.
[16] BD1651614.
[17] BD1639208.
[18] BD1601288.
[19] BD156627.
[20] BD153161.
[21] BD156697.
[22] BD1600120.
[23] BD153747.
[24] BD155274.
[25] BD1659434.
[26] BD1604365.
[27] BD1659402.
[28] BD1607247.
[29] BD1619298.
[30] BD1655120.
[31] BD1604587.

DOE00009401

| ITT Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| San Diego (CA) | 19 | 7 | 42.11% |
| Anaheim (CA) | 10 | 4 | 40.00% |
| Rancho Cordova (CA) | 15 | 2 | 13.33% |
| Sylmar (CA) | 16 | 2 | 12.5% |
| Dayton (OH) | 12 | 5 | 41.66% |
| Arnold (MO) | 23 | 6 | 26.09% |
| Greenfield (WI) | 17 | 6 | 35.29% |
| Knoxville (TN) | 18 | 5 | 27.78% |
| Portland (OR) | 14 | 2 | 14.29% |
| Richardson (TX) | 15 | 3 | 20.00% |
| Spokane Valley (WA) | 30 | 10 | 33.33% |
| Tampa (FL) | 17 | 4 | 23.53% |
| Arlington Heights (IL) | 11 | 3 | 27.27% |
| Getzville (NY) | 10 | 1 | 10% |
| Albuquerque (NM) | 9 | 3 | 33.33% |
| Various Campuses[33] | 84 | 39 | 46.43% |
| **TOTAL** | **320** | **102** | **31.90%** |

Moreover, BD applications alleging guaranteed employment are buttressed by numerous borrower statements in connection with government investigations and private litigation, as well as statements provided to the Borrower Defense Unit by veterans targeted by ITT for enrollment.[34]

### C.   Guaranteed Employment Representations Constant Across Years

Guaranteed employment representations also are constant across a span of years. Importantly, the claims of borrowers who attended in earlier years are consistent with claims submitted by students who attended more recently. Just as the claims sampled at each campus corroborate each other, the following allegations over time strongly suggest that representations of guaranteed employment were endemic at ITT:

- [2005]: "Promised great jobs and prosperous careers . . ."[35]

---

[32] BD153174.

[33] This number includes a random sample of 84 claims from 22 campuses across 18 states.

[34] In response to government investigations, ITT borrowers consistently alleged that they were "guaranteed to get a job," *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Civil Action 14-00292-SEB-TAB (S.D. Ind.) (hereinafter "*CFPB Case*"), Declaration of MT at ¶ 3 (July 11, 2016); that they would be placed in "jobs in their field of study within nine months of graduating," *Commonwealth of Massachusetts v. ITT Educational Services, Inc.*, Civil Action 16-0411 (Mass. Sup. Ct. Compl. at ¶ 55, filed Mar. 31, 2016) (hereinafter "*MA AG Case*"); and that "recruiters guarantee ITT will find you a job," S. Health, Educ., Labor & Pensions Comm., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012) (hereinafter "*Harkin Report*"), p. 539, *available at* https://www.help.senate.gov/imo/media/for_profit_report/PartII/ITT.pdf. These statements are corroborated by 90 allegations of guaranteed employment cited in a recent class action filed by the Harvard Legal Services Center, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No. 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan. 3, 2017), as well as by dozens of guaranteed employment allegations submitted by veterans who attended ITT, *Veterans Education Success*, "ITT Trends" (2016) (compiling summaries of interviews and student quotations) (on file) (hereinafter "*ITT Trends*").

[35] BD156898 (ITT Torrance).

4

DOE000009402

- [2006]: "I was told that I would be able to make about 64K once I graduated because I was going into a Bachelors program degree. I got promised the stars and the sky."[36]
- [2007]: "I was also led to believe that what I was going to school for would be a sure job after graduation."[37]
- [2009]: "I was told that I would definitely have a job if I enrolled."[38]
- [2011]: "We were told that there would be no problem getting a job and they would help."[39]
- [2013]: "I was told I would obtain a job in the field upon graduation, easily with a high salary."[40]

As further discussed below, these claims are supported by corroborating evidence from former employees and spanning the period of at least 2005 to the school's closure.

### D.    Statements of Former ITT Employees Corroborate Guaranteed Employment Claims

ITT borrower defense claims based on guaranteed employment misrepresentations are substantiated by the affidavits, interviews, and testimony of former employees at campuses nationwide. This former employee evidence establishes that, in response to oral directives from management, recruiters from at least 2005 through ITT's closing led prospective students to believe that employment was guaranteed.

ITT orally directed staff to present recruitment documents in a manner that guaranteed or otherwise assured employment. ITT employees were trained to provide these oral promises of employment despite the existence of written documents to the contrary.[41] For example, one former employee explained that "[w]ritten instruction from ITT headquarters was contradicted by oral instructions from the District Manager or a Senior Vice President . . . [ITT] was interested in getting students into the school no matter what it took to do so."[42] Another former employee, in testimony before the National Advisory Committee on Institutional Quality and Integrity (NACIQI), explained that recruiters "were consistently trained . . . to go verbally around the requirements" and that, even if recruiters did not expressly guarantee employment, "it was taken that way."[43]

As a result, former employees at ITT consistently report that staff guaranteed or otherwise assured employment. Some employees guaranteed employment expressly. For example, one former employee stated, "[m]arketing told students not to worry about prior felonies and they would get placed in jobs."[44] Another stated, "I heard recruiters assure students that they would get a great job that would enable them to pay back

---

[36] BD156228 (ITT-Sylmar).

[37] BD1659496 (ITT-Rancho Cordova).

[38] BD157549 (ITT-Indianapolis).

[39] BD156506 (ITT-Swartz Creek).

[40] BD154555 (ITT-Murray).

[41] *State of New Mexico v. ITT Educational Services, Inc.*, Civil Action D-202-CV-2014 (D.N.M) (hereinafter "*NM AG Case*"), ITT Training Document entitled "The Importance of our Language: Comments to Avoid," dated July 18, 2011, ITT-NMAG 0006448 (Feb. 26, 2014) (explaining that ITT disseminated a document on "Comments to Avoid," which barred personnel from promising job placement and stated, "[w]e do not guarantee jobs to any student or graduate").

[42] *CFPB Case*, Interview of Wendy Maddox-Wright, former employee from April 2005 to August 2011, ITT-Louisville (Jan. 28, 2014). See also *id.*, Interview of Amy St. Clair Lachman, former employee, ITT-Johnson City (April 9, 2014) ("[E]mployees knew what ITT wanted and it was not about helping people. Rather, it was about how many people ITT could get into a chair.").

[43] Transcript of Testimony of ITT Recruiter Matthew Mitchell before NACIQI at 217 (June 23, 2016) (Mitchell was employed as a recruiter in 2013).

[44] *CFPB Case*, Interview of former employee Sarah Doggett (employed from late 2005 to 2009) at 6 (ITT-Louisville, Feb. 26, 2014).

DOE00009403

their loans."[45] And another explained that "[b]efore showing any forms or numbers to students, financial aid staff was trained to emphasize all of the benefits students would receive from their education. From 2004 to 2007, this was done with the guidance of a 'return on investment document' that [the President and CEO of ITT] developed" which "contained misleading information about the average salaries of graduates of different programs."[46]

Recruiters, under pressure to enroll students, used a variety of tactics to pave the way for these false employment promises, including presenting documents in a manner that led students to believe employment was assured. A review of ITT's internal "Mystery Shopper" audio files corroborated testimony that recruiters deceived prospective students with a "wink and a nod." In one recording, for example, a recruiter displayed a "Career Wheel" and reassured the borrower regarding his chances of landing one of the entry level jobs listed: "As long as you have the foundation to be able to go in there and experience some of this, you'll be good to go."[47]

Guaranteed employment claims are further corroborated by recent ACICS findings against ITT[48] as well as by numerous former employee statements regarding falsification of student documents and manipulation of job placement statistics.[49] Based on the widespread evidence cited herein that ITT guaranteed or otherwise assured employment to its prospective students during the period of 2005 until the school's closure in 2016, we recommend no further year-by-year or campus-by-campus breakdown for additional ITT campuses.

## II.    Evidence of the Falsity of the Alleged Representations

ITT's own records show that for the students who managed to graduate, the school was unsuccessful at placing thousands of them. Moreover, former employee statements show the school knew it could not live up to its employment promises. For example, according to a former employee from ITT-Louisville, marketing representatives told prospective students that they could get jobs creating PlayStation games with a certain Bachelor's degree; however, not a single student with the degree obtained employment.[50] Another former

---

[45] *CFPB Case,* Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[46] *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), Affidavit of Dawn Lueck (Dec. 20, 2016) Lueck began working at ITT's Henderson, Nevada, campus in 1999. In 2002, she began working at ITT's corporate office in Carmel, Indiana, as a student loan refund coordinator. In 2003, she moved to ITT's Murray, Utah campus, where she began working as a financial aid administrator, and was promoted to director of finance in 2006. In 2007, she moved to ITT's new Phoenix, Arizona campus to set up their financial aid department, and was employed there until she left ITT in 2009.

[47] *Audiotape: ITT Mystery Shopper Investigation,* ITDS0000009 at 30 mins (Nov. 21, 2012) (on file).

[48] ACICS found that ITT violated its requirements for reporting job placements rates. *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016), *available at* http://acics.org/commission%20actions/content.aspx?id=6712.

[49] *CFPB Case,* Interview of former employee Bradley Parrish, ITT-Knoxville (April 23, 2014) (explaining that some graduate employment verification forms, or GEI's, "had been falsified and student signatures had been fabricated . . . These were called 'magic GEI's' because magic tape was used to either transfer a student signature from another form to the GEI or to have the student sign a blank GEI"); *CFPB Case,* Complaint at ¶ 33 (alleging that "placement rates do not include former students who did not graduate . . . may include jobs that do not require the degrees students paid for . . . and may include positions that were merely seasonal"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.,* 388 F. Supp. 2d 932, 938 (S.D. Ind. 2005) (former ITT employee who worked as a mater admissions representative at ITT-San Bernardino (CA) allegedly "concealed adverse student statistics by switching students from program to program"); *id.* (former ITT employee from the Torrence, California Campus stated that ITT fabricated and stretched its student statistics and that ITT's graduate placement figures were inaccurate by at least 20%).

[50] *CFPB Case,* Interview of former employee Sarah Doggett, ITT-Louisville (Feb. 26, 2014) (employed from late 2005 to 2009).

DOE00009404

employee, who served as the Dean of Academic Affairs at ITT-Tallahassee, stated that recruiters asked prospective students if they were familiar with the show "CSI Miami" and then guaranteed future employment as crime scene investigators, even though he was "not aware of a single student who graduated from the Criminal Justice program and became a CSI."[51] Instead, most of those students became security guards – "positions that didn't require a degree at all."[52]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations – and many other ITT BD applicants – state that they were unable to find a job at graduation; that they were unable to find employment that used their degree; and/or that they were forced to remain in a job that they had prior to enrolling at ITT.[53] These narratives are consistent with student accounts provided to law enforcement agencies[54] and non-profit organizations regarding their inability to find employment related to their fields of study.[55] In sum, the evidence overwhelmingly shows that ITT could not truthfully guarantee employment upon graduation.

**III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for California Students Making Guaranteed Employment BD Claims Under California Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

For the reasons set forth below, California students with borrower defense claims predicated on a guaranteed employment allegation have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[56] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.[57]

Moreover, California students with guaranteed employment allegations should, under California law, be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

**A.   The Department Will Apply California Law to Claims by California Students**

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from

---

[51] *CFPB Case*, Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[52] *Id.*

[53] *See supra*, Section I and *infra* Section III(E).

[54] *CFPB Case*, Complaint at ¶¶ 36-49 (providing that numerous students complained that ITT promised better results than they were able to achieve and that ITT misled potential students through job placement rates which inappropriately included temporary work); *Id.* Declaration of Jacy Belyeu at ¶ 8 (ITT-Tucson July 14, 2016) (stating that "[i]n the three years since I graduated, my ITT degree hasn't increased my pay of my job opportunities as promised"); *Id.* Declaration of Michael Tolliver at ¶ 10 (ITT-Chattanooga, July 11, 2016) (stating that since graduating, the "degree has been worthless to me. I have applied for hundreds of jobs in the IT field and I haven't been hired in the field. The job opportunities the recruiter talked about have not been available as he promised").

[55] *See ITT Trends* (providing dozens of statements by veteran borrowers attending California campuses, as well as campuses nationwide, that ITT promised them jobs upon graduation).

[56] CAL. BUS. & PROF. CODE § 17200.

[57] Although we elected to review applications of borrowers attending California campuses based on California law, *see supra* note 1, we note that claims by such borrowers may also be reviewed under Indiana law, the location of ITT's corporate headquarters. Indiana law would support relief for guaranteed jobs claims under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a) *et seq*, as well as under the Indiana common law theory of constructive fraud, *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996); *Harmon v. Fisher*, 56 N.E.3d 95, 100 (Ind. App. 2016).

7

DOE00009405

the Secretary, in any action arising from or relating to a [Direct] loan…, an amount in excess of the amount such borrower has repaid on such loan."[58] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[59]

At the time of its closing, there were more ITT students *and* campuses in California than in any other state.[60] ITT was incorporated in Delaware but operated no campuses there. ITT's corporate headquarters were located in Indiana, but at the time of closing fewer than 3% of its students were Indiana residents, a smaller number of residents than each of the following eleven states (in order from most to least)— California, Texas, Florida, Ohio, Virginia, Pennsylvania, Michigan, Georgia, Tennessee, North Carolina and Alabama.

Here, the Department has determined that it is appropriate to apply California law to claims by California students. This approach is reasonable and consistent with common state choice-of-law analyses, which look primarily to the location of the wrong (and only secondarily to the place of incorporation or location of corporate headquarters). Indeed, the key factor in the choice-of-law analysis under California law,[61] Indiana law,[62] and the Restatement (2nd) of Conflict of Laws is the location "where the wrong occurred."[63] Accordingly, because the wrong for California students occurred in California, it is reasonable for the Department to determine that a California court would apply California law in addressing the claims of ITT's California students.

**B.      California Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the California UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[64] Here, ITT's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.      The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[65] Thus, if a business practice violates any law, this is *per se* a UCL violation.[66] Corporate

---

[58] 20 USC § 1087e(h).
[59] 34 C.F.R. § 685.206(c)(1).
[60] At the time of closing, ITT operated fourteen campuses in California. No other state operated more than nine. Similarly, ITT enrolled 4,482 California residents, over 1,100 more than Texas, the state with the second largest student population.
[61] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). See also *Hernandez v. Burger*, 102 Cal.App.3d 795, 802, 162 Cal. Rptr. 564 (1980), *cited with approval by Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (holding that the state with "the predominant interest" is the state "where the wrong occurred.")
[62] Indiana treats a consumer protection claim as recovery in tort. See *McKinney v. State*, 693 N.E.2d 65, 72 (Ind. 1998) (finding that, despite the fact that "fraud is not an element of" an IDCSA claim, "the action is nonetheless based on fraud"). Under Indiana law, the choice-of-law rule governing tort actions is *lex loci delicti*—"the law of the place where the tort was committed is the law of the resulting litigation." *Eby v. York-Div., Borg-Warner*, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983).
[63] Restatement (Second) of Conflict of Laws § 145 (1971) ("Subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection.").
[64] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).
[65] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

DOE00009406

misrepresentations like ITT's promises of employment are prohibited by a number of state and federal laws.[67] In particular, ITT's misrepresentation regarding its student's employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[68] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[69]

Applying that three step inquiry, ITT clearly violated the FTC Act.

1. As described above, ITT made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[70] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that ITT schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Indeed, for many students, the principal purpose of attending a career college like ITT was to obtain employment in a particular field.[71] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, ITT's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

---

[66] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[67] Though the analysis below focuses exclusively on the FTC Act, ITT's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that ITT's conduct violates the FTC Act, this memorandum does not reach the issue of whether it may be unlawful under other applicable rules.

[68] *See* FTC Act § 5(a)(1), 15 U.S.C.§ 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[69] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[70] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[71] Under these circumstances, students' reliance on a guarantee of employment was reasonable. Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of ITT claims making guaranteed employment allegations is a clear indication that students believed what they were told.

DOE00009407

## 2. The Fraudulent Prong

ITT's misrepresentations regarding employment prospects are also a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for ITT students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[72] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[73] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[74] As noted, the representations ITT made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and . . . lost money or property" as a result of the deceptive practice alleged.[75] However, for a consumer who was deceived into purchasing a product[76]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[77] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[78]

Express or implied claims like those made by ITT about employment prospects are presumptively material,[79] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[80] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to enroll.[81] Statements by large numbers of borrowers across ITT campuses make clear that the promise of employment entered substantially into their choice to attend ITT.

### C. Weak Disclaimers In Some of ITT's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

ITT's promises of employment were false and misleading, despite the limited, fine print disclaimers on some enrollment agreements that the school does not guarantee "job placement" or "a salary." As set forth

---

[72] *See Bank of the West*, 2 Cal. 4th at 1254.

[73] CAL. CIV. C. §1709.

[74] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[75] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[76] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[77] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[78] *Id.* (internal quotation marks omitted).

[79] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept.17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim is presumed to be material).

[80] *In re Tobacco II Cases*, 46 Cal.4th at 298.

[81] Because deception occurs at the time of decision, it is sufficient for ITT students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

DOE-00009408

below, these fine print disclaimers do not change the overall impression created by the oral representations described above.

For example, if a student examined an ITT enrollment agreement, the student would have to read through two pages of fine print to find a list of twenty-eight fine print disclaimers, the eleventh of which states that ITT "does not represent, promise or guarantee that Student or any other student will obtain employment."[82] This disclaimer is not highlighted or bolded in any way. The agreement then continues on with four more pages of fine print.

These disclaimers do not cure the falsity of ITT's oral promises regarding employment prospects. Courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[83] The California Supreme Court also has held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[84]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, ITT's disclaimers were particularly ineffective when considered in the context of its unsophisticated student population and high-pressure admissions practices.[85] Indeed, there is evidence that some ITT students were not afforded the opportunity to even review the enrollment agreement prior to enrollment and that admission representatives would go so far as to e-sign enrollment paperwork on behalf of students, without their consent.[86] Moreover, as with Corinthian, ITT advertised heavily on daytime TV, targeting the un- or under-employed. Indeed, admissions representatives were under such tremendous pressure to enroll new students that even homeless veterans were recruited despite the additional challenges

---

[82] *See, e.g.,* ITT Albuquerque Enrollment Agreement (September 1, 2011) (on file).

[83] *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[84] *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("[T]he fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[85] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics. ITT's high pressure enrollment tactics are described in detail by numerous sources. *See, e.g.,* Harkin Report at 527-531; *CFPB Case,* Complaint at ¶¶64-66 ("In contrast to the lengthy sales pitch, the enrollment and financial aid processes were much faster, so that many consumers did not know or did not understand what they signed up for. Recruiters induced prospective students to sign forms without giving them sufficient information about what they were signing [and] required potential students to sign an Enrollment Agreement before they could receive information about their financial aid options . . .")

[86] *CFPB Case,* Affidavit of former admissions representative Ricky Bueche at ¶ 15 (ITT-Baton Rouge, 2010-2014) (explaining that "[m]any times, when students left the campus without agreeing to apply, the Director of Admissions would instruct representatives to go back to the computer to e-sign on behalf of the students to apply to ITT, without the students being present and without the students' knowledge or agreement"); *Villalba* Compl. at Ex. 19, Student Statement 14 ("First and foremost I never physically signed an enrollment agreement (I have a copy). The recruiter signed for myself and my dad via computer, and because of this dishonest tactic my dad is on the hook for a parent plus loan."); *Id.*at Student Statement 49 ("There are MANY instances that I have found on all the enrollment paperwork (that I have since gotten copies of) where my signature/initials were forged, and not in my handwriting. There were many things that weren't explained to me AT ALL, where I was told to 'sign' electronically.").

DOE00009409

they would face in completing their studies.[87] In sum, the net impression of the oral misrepresentations on the typical ITT student likely would not have been altered by buried written disclosures.

Finally, the fact that the ITT guaranteed employment claims reviewed to date make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population ITT targeted, and the high pressure sales tactics and oral representations that ITT personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

**D.   Eligible Borrowers**

Based on the above analysis, the following ITT students should be eligible for relief: any BD claimant who enrolled at an ITT campus in California on or after January 1, 2005 and whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including those told that all graduates obtain employment.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis for Corinthian, the type of misrepresentation at issue here went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

**E.   Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

When determining the amount of relief due to plaintiffs under the UCL, California courts rely on cases interpreting the Federal Trade Commission Act.[88] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[89]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[87] *CFPB Case*, Affidavit of former admissions representative Pearl Gardner at ¶¶ 11-12 (ITT-Atlanta South, 2008-2014) ("There was enormous pressure on me and the other representatives and financial aid coordinators ("FACS") to make sales calls, enroll students, complete financial aid packages, and get students to attend an ITT class. This pressure was relentless . . . To solicit interest in ITT programs, I would go to job fairs, workforce events, and Stand Down events for homeless veterans (events where homeless veterans are given supplies and services, such as food, clothing, shelter, health screenings, and other assistance)."); *see also CFPB Case*, Complaint at ¶¶ 55-84 (summarizing mystery shopper evidence related to high pressure sales tactics).

[88] *See, e.g.*, *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[89] *See, e.g.*, *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE00009410

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[90]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value provided by ITT.[91] The facts described above closely resemble those relating to Corinthian Colleges, where the Department determined that borrowers should receive full relief. That determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by:

- Repeated misleading statements to students, regulators and accreditors;
- Elaborate job placement fraud; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Given such pervasive and highly publicized misconduct, the Department determined that the value of the education provided by Corinthian was severely limited.

ITT's conduct was as flagrant as Corinthian's. Hundreds of unprompted student statements confirm the lack of value of an ITT education, as ITT students time and again report that their education was sub-standard and that their degree or affiliation with the school was an impediment rather than an asset as they sought employment. These include numerous statements in BD claims,[92] statements to VES,[93] and over 500 statements attached to the *Villalba* Class Action Complaint.[94]

Furthermore, the ITT "brand" became severely tarnished in the lead-up to and wake of its collapse. Over the past several years, ITT has been the subject of a steady stream of federal, state, and private lawsuits and investigations detailing misleading statements to students regarding (among other things) placement rates, employment prospects, expected salaries, transferability of credits, and the quality of the education.[95] This

---

[90] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[91] *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).

[92] *See, e.g.* BD1655232, BD1619298, BD1658596, BD155745, and BD153269 (alleging that employers "will not hire ITT grads because they find the college to be subpar," that borrowers "had to take ITT off [their] resume" in order to get a job, that ITT grads were considered to have "no college education," and that they were "mocked because of [their] education at ITT").

[93] *See, e.g., ITT Trends* (containing statements from dozens of veterans who attended various ITT California campuses alleging, among other things, that "I feel scammed out of a proper education," that "employers do not see the school as a real school," that "no one would even consider me for employment," and that "I wasted over 50k and 2 years of my life I can never get back").

[94] The exhibits attached to the *Villalba* Complaint include the following: 521 statements explaining how an ITT degree operates as a disadvantage in the job market (Ex. 1); 326 statements explaining how ITT misrepresented the quality of instructors, training, curriculum, or facilities (Ex. 6); 62 statements describing how ITT is "ruining people's lives" (Ex. 25); 473 statements about how ITT prevented other opportunities (Ex. 27); and 18 statements about how ITT debt has driven borrowers into or to the brink of homelessness (Ex. 28).

[95] *See, e.g.* CFPB Case, MA AG Case, NM AG Case, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), and *Lipscomb v. ITT Ed. Servs. Inc.* (M.D. FL Compl. filed Apr. 8, 2015). In addition, over 15 state AGs have issued subpoenas or CIDs relating to fraud and deceptive marketing against ITT from the beginning of 2004 through the end of May 2014. These states include: Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Hawaii, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, Tennessee and Washington. *See* ITT Form 10-Q Quarterly Report (June 30, 2014).

DOE00009411

conduct has also led to actions against ITT by the Department[96] and ACICS,[97] as well as to numerous negative national news stories.[98]

Given this extensively well-documented, pervasive, and highly publicized misconduct, the Department has determined that the value of an ITT education—like Corinthian—is likely either negligible or non-existent. In a court proceeding, ITT would very likely be unable to produce any persuasive evidence showing why the amount of recovery should be offset by value received by the borrowers from ITT education so as to preclude full recovery. Accordingly, it is appropriate for the Department to award eligible borrowers full relief.

CONCUR:

_____                    _____
Office of the General Counsel                 Date

---

[96] In the years leading up to its closure, the Department increased financial oversight over ITT and required it to increase its cash reserves to cover potential damages to taxpayers and students. The nature and scope of the Department's actions against ITT are contained within a series of letters from the Department to ITT dated: August 19, 2014, August 21, 2014, May 20, 2015, June 08, 2015, October 19, 2015, December 10, 2015, June 6, 2016, July 6, 2016, and August 25, 2016.
[97] See Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016).
[98] See, e.g. Mary Beth Marklein, Jodi Upton and Sandhya Kambhampati, "College Default Rates Higher Than Grad Rates," USA TODAY (July 2, 2013) (listing more than 50 ITT campuses as "red flag" schools because student loan default rates were higher than graduation rates); Kim Clark, "The 5 Colleges that Leave the Most Students Crippled by Debt" Time.com (Sept. 24, 2014) (ranking ITT second on the list of schools that leave the most students crippled by debt).

DOE00009412

Exhibit 47

Privileged/Deliberative/Confidential

Draft of May 14, 2015

## I. Elements of the UCL applied to Heald Borrowers

### A. The misrepresentation of placement rates identified in ED's Heald fine letter constitutes unfair competition under the Unfair Competition Law.

The UCL prohibits unfair competition, which it defines in a number of categories established by the UCL. A business practice need only fall under one of these categories to constitute unfair competition.[1]

1. Heald's misrepresentation of placement rates violated federal law, specifically, 34 C.F.R. § 668, as determined by ED. The UCL defines unfair competition to include any "unlawful...business act or practice." The Legislature intended unfair competition "to include anything that can properly be called a business practice and that at the same time is forbidden by law."[2] If a business practice violates any law, this is *per se* a UCL violation.[3] Therefore, Heald's misrepresentations constitute unlawful business practices and unfair competition under the UCL.

2. Heald's misrepresentation of placement rates also constitute fraudulent business practices under the UCL, another form of unfair competition. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[4] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[5] True statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[6]

   In the Heald fine letter, ED found as follows:
   > Heald's inaccurate or incomplete placement rate disclosures were misleading or false; [] they overstated the employment prospects of graduates of Heald's programs; and [] current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures.

---

[1] *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[2] *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992) (citations omitted).

[3] *See Kasky v. Nike*, 45 P.3d 243, 249 (Cal. 2002); *see also People v. E.W.A.P. Inc.*, 165 Cal.Rptr. 73, 75 (Cal. Ct. App. 1980).

[4] *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983)35 Cal.3d 197, 211 (Sup. Ct. 1983) superseded by statute, 2004 Cal. Legtis. Serv. Prop. 64 on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006). Note: The "likely to be deceived" standard does not establish a private plaintiff's standing.

[5] CAL. CIV. C. § 1709.

[6] *Boschma v. Home Loan Center*, 129 Cal.Rptr.3d 874, 893 (Cal. Ct. App. 2011).

DOE00013704

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

Heald fine letter at 10. This finding places Heald's misrepresentations squarely within the UCL's definition of fraudulent business practices and thus within its definition of unfair competition.

3. Heald's misrepresentation of placement rates may also be unfair competition under two other prongs of 17200, "unfair, deceptive or untrue advertising" and "unfair...business act or practice." The advertising prong is considered to be very similar to the fraudulent business practice prong. *See* Stern, Business and Professional Code § 172000 Practice at 3-70 (2015).

Regarding unfair business practices, "[t]he state of the law...is somewhat unsettled."[7] However, the trend appears to be in favor of using section 5 of the Federal Trade Commission Act ("FTCA") to define unfairness. To find unfairness under the FTCA: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.[8] ". . . [C]onsumers cannot have reasonably avoided the injury . . . if their free market decisions were unjustifiably hampered by the conduct of the seller."[9] The placement rate misrepresentations at issue here easily could be described as meeting these standards.

**B. Borrowers who relied on Heald's misrepresented placement rates in deciding to attend Heald programs suffered economic harm.**

Section 17204 requires that an individual seeking relief under the UCL have "suffered injury in fact and [have] lost money or property as a result of" the unfair completion of which the person complains. In *Kwikset v. Superior Court*, the California Supreme Court set out numerous ways a consumer can show economic injury and meet these requirements. "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."[10]

Regarding false labeling, the *Kwikset* court also stated,
A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer

---

[7] *Davis v. Ford Motor Credit Co.*, 101 Cal.Rptr.3d 697, 706 (Cal. Ct. App. 2009).
[8] *Id.* at 709.
[9] *Camacho v. Automobile Club of Southern California*, 48 Cal.Rptr.3d 770, 777-78 (Cal. Ct. App. 2006).
[10] *Kwikset Corp.*, 246 P.3d at 885-86.

DOE00013705

Privileged/Deliberative/Confidential
Attorney-Client Communication

valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[11]

Other cases have made clear that a consumer suffers economic harm when he or she makes a purchase in reliance on false representations and thereby is denied benefits or value promised by the seller. For example, a federal district court ruled in *Johnson v. Gen. Mills, Inc.* that a consumer satisfied the UCL's harm requirement based on his reliance on false statements about a food's health benefits. The court stated,

> [The plaintiff] has UCL … standing because he alleges that he bought YoPlus in reliance on General Mills' allegedly deceptive representations concerning the digestive health benefit of YoPlus as communicated by the second generation YoPlus packaging and a television commercial for YoPlus. He further asserts that he suffered economic injury because he purchased YoPlus but did not receive the promised digestive health benefit.[12]

In *Daghlian v. DeVry University, Inc.*, plaintiff student enrolled at the school and incurred debt "in reliance on defendants' misrepresentations and omissions about the transferability of credits."[13] Plaintiff did not attempt to transfer the credits, and he did not allege that he had to restart his education at a different school.[14] Plaintiff alleged "he did not receive what he bargained for."[15] The court found the plaintiff suffered an injury in fact sufficient to bring a UCL cause of action.[16]

Here, students who were deceived by Heald's inflated placement rates can plausibly argue that they got far less than they bargained for, thus suffering an economic injury. Judging the quality and value of education is a notoriously difficult task. It would be reasonable for prospective students to look at placement rates (especially placement rates disclosed under legal requirements) as one significant benchmark of quality. For example, a student selecting a medical assistant training program might well have looked differently at Heald's offering had he known that the placement rate was 33% rather than the advertised 78 %. See Heald Fine Letter of April 14, 2015 at 9-10. The prospective

---

[11] *Id.* at 329-30.
[12] 275 F.R.D. 282, 286 (C.D. Cal. 2011).
[13] 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006).
[14] *Id.*
[15] *Id.* at 1155.
[16] *Id.* at 1156. *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (consumer alleged economic harm where he purchased merchandise advertised as having been marked down from a fictitious original price; "the bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore has a higher resale value.")

3

DOE00013706

Privileged/Deliberative/Confidential
Attorney-Client Communication

student might have determined the Heald program was not worth the offering price. (A factual note is relevant here: the tuition at Heald was significantly higher than at community colleges. Indeed, one argument we have heard is that some students have said that had they known the actual success rate of the Corinthian schools, they would have chosen community colleges.)

The reputational and credentialing purpose of education further supports the argument that an inflated placement rate was part of what a purchaser might have valued in selecting a Heald program. Besides the training one receives in one's education, part of the utility of a degree is what it represents to others. According to some, Heald has enjoyed a relatively good local reputation. It is over 100 years old and was regarded as the best asset among the Corinthian chains. That reputation is largely in tatters with the Department of Education's revelations about the school's inflated placement rates. Had students known the true placement rates in the Heald programs, they would have known that Heald's reputation was inflated beyond its reality, and they might have judged that the value of their credential was vulnerable to significant deflation if the truth were discovered. In this sense, too, then, students got far less than they bargained for, and this loss will be suffered every time one shows a resume that shows a Heald degree.

## E. Statute of Limitations

In 2013, the California Supreme Court resolved a split regarding whether Section 17208's four-year statute of limitations was rigid, or whether the discovery rule and other equitable doctrines applied to UCL claims. In *Aryeh v. Canon Business Solutions*, the court held the discovery rule applied, and thus the statute of limitations only begins accruing "when a reasonable person would have discovered the factual basis for a claim."[17] Because a reasonable person would not have known about Heald's placement rate violations until ED's Heald fine letter, published April 14, 2015, no claims based on those misrepresentations are now barred by the statute of limitations.

---

[17] 55 Cal.4th 1185, 1195-96 (Cal. 2013).

4

DOE00013707

Exhibit 48

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

To:    Under Secretary Ted Mitchell

From:  Borrower Defense Unit

Date:  October 20, 2016

Re:    Recommendation for Borrower Defense Relief for Heald College Borrowers Alleging
       Transfer of Credit Claims

The Borrower Defense Unit proposes loan relief for students who enrolled in degree, certificate or Associate in Applied Science ("AAS") programs at the California campuses of Heald College after the school was acquired by Corinthian Colleges, Inc. ("Corinthian")[1], and who state that Heald misrepresented their ability to transfer to other schools after completing a degree at Heald. Heald made false and misleading representations to these students that they could generally transfer their credits, including to schools in the California State University ("CSU") system. These students are eligible for relief under the borrower defense regulation, 34 C.F.R. § 685.206(c), because these misrepresentations constitute a valid consumer protection claim under California's Unfair Competition Law ("UCL"). Moreover, full loan discharges, subject to the UCL's four-year statute of limitations, are appropriate in this circumstance given the lack of value conferred by Heald credits and/or degrees. Such relief is consistent with the Department's prior borrower defense relief to Corinthian borrowers.

## I.    Heald Represented That Heald Credits Were Transferable And Would Permit Students to Transfer to the CSU System To Earn A Bachelor's Degree

Numerous borrowers report that Heald representatives told them that attending Heald would permit them to transfer into other schools, particularly in the CSU system, and that their Heald credits would be accepted by those schools. Moreover, documents collected by the California AG's office and submitted in support of a default judgment against Heald corroborate these students' general transferability claims.

### A.    Oral Representations of Transferability

In a recent review of 738 borrower defense ("BD") claims submitted by former students of Heald's California campuses, 49 students enrolled in degree, certificate or Associate in Applied Science ("AAS") programs seek borrower defense relief based on oral representations about their ability to transfer their Heald credits to other schools, particularly schools in the CSU system.[2] In addition, in sworn witness statements obtained by the California Attorney General's Office, seven former students of Heald allege that school staff made oral representations that credits earned at Heald would transfer to other colleges and universities.[3] Heald borrowers seeking BD relief report that school representatives orally promised that they would be able to

---

[1] Further research needs to be conducted regarding the falsity of Heald's representations to students at its two non-California campuses, in Honolulu, Hawaii and Portland, Oregon.
[2] Our review of Heald claims is ongoing and we anticipate reviewing additional BD applications making transferability allegations.
[3] *See* Declaration of Nancy Quach, AGPA, in Support of Plaintiff's Application for Entry of Default Judgment Against All Defendants, *California v. Heald et al.* (Mar. 14, 2016) ("Quach Decl."), Ex. 105-11.

1

DOE00013708

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer to other schools and use their Heald credits towards a degree at those schools.  For example, borrowers state the following:

1. "When I first enrolled at Heald College in March of 2010, I explained to my representative that was assigned to me, that I wanted to go to Fresno State for my Bachelors Degree after graduating from Heald and while working...I was told by Elias Astuto my Heald Representative, that all of my credits would transfer to Fresno State..."[4]

2. "Also throughout my time at Heald I was told they are accredited (which I believe they were) and that if we wanted to continue our education at Fresno State (for example) our credits would transfer and we could continue our education.  What they failed to tell us Is that when you go to apply to Fresno State they do not accept any of your units as they are not accredited the same as Heald led you to believe.  We had meetings with the head of Heald's financial aid department and I remember a student asked 'will my units transfer to Fresno State' without hesitation he stated 'Yes they will transfer.'"[5]

3. "They had told me I was going to be able to transfer to a university such as San Jose State."[6]

4. "I was told I would be able to transfer to any 4 year college with my Heald credits."[7]

5. "They lied saying I could take my credits anywhere if I decided to leave the school...They said I could transfer my credits anywhere which I found out later was a lie."[8]

6. "I was also told when i was done i could transfer out to any university."[9]

7. "they told me that all the classes i took from heald college will be transferred to other schools."[10]

8. "I was also informed by my admissions advisor that all of my credits would be completely transferable, which I also later found to be false."[11]

---

[4] Claim No. BD1614388.
[5] Claim No. BD154156.
[6] Claim No. BD152391.
[7] Claim No. BD1604229.
[8] Claim No. BD151373.
[9] Claim No. BD156458.
[10] Claim No. BD150682.
[11] Claim No. BD1619101.

2

DOE00013709

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.    Corroborating Written Representations of Transferability**

The Heald website and promotional materials corroborate and/or support students' reports of oral assurances that they would be able to transfer to other schools and use their Heald credits towards a degree at those schools.[12]  Heald's marketing materials contain the following statements:

1.    The Heald website advertised that, "Because Heald is regionally accredited, it has articulation agreements with other regionally accredited institutions that accept Heald credits toward bachelor's degree programs.  This means that you can transfer your credits if you choose to pursue further education."[13]

2.    The website also stated: "For those students who transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs."[14]  Moreover, the website listed the "California State University (CSU) system" and seven specific schools in the CSU system as schools with which Heald has articulation agreements and/or documented transfer practices.

3.    On another page on the Heald website, the "California State University (CSU) system" and eight specific CSU campuses were described as "Partner Schools," along with the statement "For students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs.[15]

4.    The Heald College "Viewbook" promised: "use your Heald credits towards a bachelor's degree" and *Heald has articulation agreements or documented transfer guidance with a number of accredited institutions that accept Heald credits toward bachelor's degree programs.  This allows students to transfer and apply coursework toward a higher degree.*"[16]  (emphasis added.)  The Viewbook listed the CSU system and seven specific CSU schools as institutions that had articulation agreements or documented transfer guidance with Heald.

As discussed further below in Section III.C., limited disclaimers attendant to the claims on the website and in the Viewbook fail to cure the deceptive net impression of the transferability claims Heald representatives made to students.

---

[12] The Heald written representations described in this section are attached as Exhibit A to this memorandum.  All red markings on the documents were made by the California AG.
[13] Quach Decl. Ex. 90.
[14] *Id.*
[15] Quach Decl. Ex. 91-92.
[16] Quach Decl. Ex. 94.

3

DOE00013710

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

## II. Heald's Representations of Transferability Were False and Misleading

Heald's representations that credits earned at Heald were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree were false and misleading. Obtaining a Heald diploma, certificate or AAS degree did not permit students to transfer into the CSU system using Heald credits alone. These students would have insufficient credits to transfer as upper-division transfer students, and the CSU schools generally only accept upper-division transfer students. Therefore, as a practical matter, Heald credits were not transferable to the CSU system.

Significantly, in its answer to the California Attorney General's first amended complaint, Heald admitted that "students who complete Heald diploma, certificate, or AAS degree programs do not, without further coursework, appear to qualify for admission as upper division transfers to CSU."[17] A review of Heald's Course Catalog and Transfer Guide confirms that the diploma and certificate programs did not provide the 90 quarter units that CSU schools require for upper-division transfers.[18] The AAS degree programs required 100 quarter credits, but some of the courses within these programs were not considered "college level" by the CSU system, and therefore AAS degree program graduates also would not have the 90 quarter units required for an upper-division transfer. Even if individual Heald credits were technically transferable to a CSU school, Heald students could not actually transfer their credits because they could not enroll as an upper-division transfer using just their Heald credits.

The falsity of Heald's representations about transfer into the CSU system is particularly significant for several reasons. First, the CSU system is "California's primary undergraduate teaching institution" and the "greatest producer of bachelor's degrees"[19] in the state, making it likely that students who sought to transfer credits from Heald's California campuses would seek to transfer those credits to the CSU system. Second, Heald's representations regarding transferability focused on the ease of transferring to the CSU system—its website and other marketing materials specifically discuss the process for transferring to the CSU system.

The California State University system's public statements confirm that, dating back to at least 2012, students typically cannot transfer to CSU as lower-division transfer students. The California State University System's CSUMentor website contains a page with information for transfer applicants. That page states:

> *Most CSU campuses do not accept lower-division transfers, so be sure to check with the campus if you are considering transferring as a lower-division student.*[20]

---

[17] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, Permanent Injunction, and Other Equitable Relief at ¶ 86(b), 26, *California v. Heald et al.*, No. CGC-13-534793 (Ca. Super. Ct. Mar. 17, 2014).
[18] "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016), http://www.cci.edu/multimedia/closure/Heald-Student-Guide-to-Transfer.pdf; Heald College Academic Catalog, Effective July 2014.
[19] "2016 Facts About the CSU," The California State University (Aug. 23, 2016), *available at* http://www.calstate.edu/csufacts/2016Facts/.
[20] "Transfer Applicant Overview and Definitions," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/ (emphasis added).

4

DOE00013711

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

The CSU Lower-Division Transfer Requirements website further states: "Please be aware that most CSU campuses do not admit lower-division transfer students."[21] In fact, twenty out of twenty-three individual CSU campuses report on their websites that they do not accept lower-division transfer students:

1. **Channel Islands**: On a site entitled "Transfer Admission Requirements," the school states: "California State University Channel Islands (CI) accepts transfer applications for upper-division transfer students: students with more than 60 transferable semester units, or 90 transferable quarter units."[22] The website does not mention the admission of lower-division transfer students. The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

2. **Chico**: The school's "Eligibility Requirements" for transfer admissions website states: "Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."[23]

3. **Dominguez Hills**: On a site entitled "Admissions Criteria for Transfer Students," the school lists only requirements for upper-division transfer students, and does not mention lower-division transfer students.[24] The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

4. **East Bay**: The school's "Transfer Admission" page states "CSUEB only accepts applications from upper-division transfer students."[25]

5. **Fresno**: The school's transfer website states "Fresno State does not accept lower division transfer students at this time."[26]

6. **Fullerton**: Fullerton's "Transfer Undergraduate Students" website states that "CSU Fullerton does not accept lower division transfer applicants.[27]

---

[21] "Lower Division Transfer Requirements," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/lower_div.asp; *see also* Quach Decl. Ex. 95; and "Transfer Applicant Overview and Definitions," CSU Mentor (Dec. 10, 2012), https://web.archive.org/web/20121610333100/http://www.csumentor.edu/planning/transfer/lower_div.asp.

[22] "Transfer Admission Requirements," CSU (May 31, 2016), http://www.csuci.edu/admissions/transfer/ud-requirements.htm.

[23] "Eligibility Requirements: Transfer Students," California State University: Chico (May 31, 2016), http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml.

[24] "Admissions Criteria for Transfer Students," California State University: Dominguez Hills (May 31, 2016), http://www4.csudh.edu/admissions/transfer-students/admission-requirements/index.

[25] "Transfer Student Admission," California State University: East Bay (May 31, 2016), http://www.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/; *see also* Quach Decl. Ex. 98.

[26] "Student Affairs and Enrollment Management," Fresno State (May 31, 2016), http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html; *see also* Quach Decl. Ex. 99.

[27] "Upper Division Transfers," California State University Fullerton (May 31, 2016), http://admissions.fullerton.edu/prospectivestudent/transferlocaladmissionarea.php.

5

DOE00013712

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

7. **Humboldt:** The school's Admissions website for lower-division transfer students states "HSU is not currently accepting lower division transfer applications."[28]

8. **Los Angeles:** The "Transfer Admission" page of the school's website states "Cal State LA is currently <u>not</u> accepting lower division transfer applicants."[29]

9. **Monterey Bay:** The school's "Transfer Admissions" website states "Cal State Monterey Bay is currently not accepting lower division transfer students. You must meet the upper division requirements for admissions purposes."[30]

10. **Northridge:** On a site entitled "Apply Lower-Division Transfer Student," the school states "NOTE: Due to increased enrollment demands, Cal State Northridge does not currently admit lower-division transfer applicants. No exceptions are anticipated at this time."[31]

11. **Pomona:** The Pomona transfer admissions website includes the following statement: "NOTE: We are currently not accepting applications from Lower-Division Transfers - applicants who have completed less than 60 semester transferable college units (90 quarter units)."[32]

12. **Sacramento:** The "Transfer Admission" webpage on the Sacramento State website states: "CSU, Sacramento is not accepting applications from lower division transfers."[33]

13. **San Bernardino:** In a section called "Lower-Division Transfer Students" on its Transfer FAQs, the school states "CSUSB is not able to accept applications from or admit lower division transfer students."[34]

14. **San Diego:** San Diego State's Fall 2016 Admissions Criteria include the following: "SDSU accepts transfer applications only from upper-division transfer or readmission applicants who will have completed 60 or more transferable semester (or 90 or more quarter) units by the end of spring 2016. We do not

---

[28] "Lower Division Transfer Requirements," Humboldt State University (May 31, 2016), http://www2.humboldt.edu/admissions/apply/transfers/lowerdivision.html.
[29] "Transfer Admission," Cal State LA (May 31, 2016), http://www.calstatela.edu/admissions/transfer-admission.
[30] "Transfer Requirements," CSU Monterey Bay (May 31, 2016), https://csumb.edu/admissions/transfer-requirements; *see also* Quach Decl. Ex. 100.
[31] "Apply Lower Division Transfer Student," CSU Northridge (May 31, 2016), http://www.csun.edu/admissions-records/apply-lower-division-transfer-student.
[32] "Admission Requirements and Deadlines," CAL POLY POMONA (May 31, 2016), https://www.cpp.edu/~admissions/undergraduate/transfer/before/requirements-deadlines.shtml.
[33] "Transfer Admission," Sacramento State (May 31, 2016), http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html; *see also* Quach Decl. Ex. 101.
[34] "Admissions and Student Recruitment," CSU San Bernardino (May 31, 2016), http://admissions.csusb.edu/transfer/h_transferstatus.shtml.

DOE00013713

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

accept transfer applications from lower-division students with fewer than 60 transferable semester units."[35]

15. **San Francisco:** On the transfer section of the school's website, the school provides: "SF State is not currently accepting applications from lower division transfer students. Freshman and sophomore students who have completed fewer than 60 transferable semester units (90 quarter units) are considered lower-division transfer students."[36]

16. **San Jose:** On a page called "Lower division transfers (Freshmen/Sophomores)," the school notes that "SJSU no longer admits lower division transfers. A lower division transfer has completed 59 transferable semester units (89 quarter units) or fewer."[37]

17. **San Luis Obispo:** The school's Transfer Students Admissions website states: "Cal Poly does NOT accept applications for these categories: … Lower-division transfer applicants (less than 60 transferable semester units or 90 transferable quarter units upon transfer)."[38]

18. **San Marcos:** Under the "Transfer" section of its website, the school states "California State University San Marcos accepts upper-division transfer student applications each year between October 1 and November 30 for admission to the following fall term."[39] The website does not mention the admission of lower-division transfer students. The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

19. **Sonoma:** Under "Fall 2016 Admissions" the school's website states "Lower Division Transfer – CLOSED." Under "Spring 2017 Admissions" the website states "Closed to lower-division applicants."[40]

---

[35] "Fall 2016 Transfer Admission Criteria," San Diego State University (May 31, 2016), http://arweb.sdsu.edu/es/admissions/transfers/index.html.

[36] "How to Apply – Transfer," San Francisco State University (May 31, 2016), http://www.sfsu.edu/future/apply/transfer.html.

[37] Quach Decl. Ex. 102; *see also* "Lower Division Transfers," San Jose State University (May 31, 2016), http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html.

[38] "Transfer Students," Cal Poly San Luis Obispo (May 31, 2016), http://admissions.calpoly.edu/applicants/transfer/.

[39] "Transfer Student," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/transfer/index.html. This campus appears to accept out-of-state and international lower-division transfers, but not in-state lower-division transfers. *See* "Out-of-State Students," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/out-of-state/index.html. Heald California students would be applying as California residents and therefore would not be able to obtain admission this way.

[40] "Filing Information, Dates, and Deadlines," Sonoma State University (May 31, 2016), http://www.sonoma.edu/admissions/filing.html; *see also* Quach Decl. Ex. 104, "Office of Admissions: Admission Requirements for Transfers," Sonoma State University (Jan. 28, 2014), http://www.sonoma.edu/admissions/ts/requirements.

7

DOE00013714

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

20. **Stanislaus**: The Stanislaus website states that "[w]e are closed to Lower-Division Transfers (transfers with fewer than 60 semester/90 quarter units)" for both the Fall 2016 and Spring 2016 semesters.[41]

The only CSU schools that <u>do</u> appear to accept lower-division transfer students are CSU Bakersfield[42], the Maritime Academy, and CSU Long Beach. The Maritime Academy is a specialized school with a student body of less than 1,000 students offering six majors relating to the maritime industry.[43] CSU Long Beach only accepts lower-division transfer students for a few majors.[44] CSU Bakersfield seems to be the only CSU institution that offers a standard undergraduate curriculum and accepts lower-division transfer students.

We also conducted a historical review of websites of seven CSU campuses identified by Heald as "partner schools" in the school's marketing materials. None of our research into the historical transfer policies at CSU campuses, dating as far back as 2010, suggests the policies described above have changed.[45]

In sum, it is nearly impossible for a student to transfer into the CSU system as a lower-division transfer student. Since no Heald degree, certificate or AAS graduate would have sufficient credits to qualify for transfer as an upper-division transfer student, representations that Heald graduates could transfer to the CSU system or specific CSU schools to "pursue further education" were false and misleading.[46]

---

[41] "Dates and Deadlines," Stanislaus State (May 31, 2016), https://www.csustan.edu/admissions/dates-deadlines.
[42] "Admission Requirements for Transfer Students," CSU Bakersfield (May 31, 2016), http://www.csub.edu/admissions/apply/transfer/admission_requirements/.
[43] "Academics," California State University Maritime (May 31, 2016), https://www.csum.edu/web/academics.
[44] "Lower Division Transfer Requirements," California State University Long Beach (May 31, 2016), http://web.csulb.edu/divisions/aa/catalog/current/admissions/ld_transfer_requirements.html.
[45] *See* "Eligibility Requirements, Transfer Students," CSU Chico (Jan. 5, 2010), https://web.archive.org/web/20110105090936/http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml ("Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."); "Transfer Student Admission," CSU East Bay (Apr. 9, 2010), https://web.archive.org/web/20100409052353/http://www20.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/ ("Cal State East Bay no longer accepts applications from lower-division transfers."); "Transfer Requirements," CSU Fresno (November 17, 2012), https://web.archive.org/web/20121117011918/http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html ("Fresno State does not accept lower division transfer students at this time."); "Transfer Admission," CSU Sacramento (Aug. 18, 2010), https://web.archive.org/web/20100818083106/http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html ("CSU, Sacramento is not accepting applications from lower division transfers."); "Lower division transfers (Frosh/Sophomore)," CSU San Jose (October 21, 2014), https://web.archive.org/web/20141021203825/http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html ("SJSU no longer admits lower division transfers."); "Office of Admissions: Admission Requirements for Upper-Division Transfers," CSU Sonoma (July 5, 2011), https://web.archive.org/web/20110705071536/http://sonoma.edu/admissions/ts/requirements (No process is described for lower division transfers); "Dates and Deadlines," CSU Stanislaus (Mar 29, 2014), https://web.archive.org/web/20140329215220/http://www.csustan.edu/admissions/dates-deadlines ("We are closed to Lower-Division Transfers").
[46] Heald's statements may have been particularly misleading to students seeking to transfer into the CSU system, given recent changes in the law governing the transfer of credits into the CSU system. On September 29, 2010 the Student Transfer Agreement Reform Act ("STAR Act") was signed into law, making it easier for students attending

DOE00013715

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

It should be noted that there is an articulation agreement between Heald and the CSU system, which provides that certain Heald coursework will be accepted by CSU to meet certain general education requirements.[47] Also, according to a higher education advisory publication listing the transfer credit practices of major public institutions, CSU Northridge did have a general policy of accepting Heald credits from certain Heald campuses.[48] The possibility that some Heald courses might be transferable into the CSU system, however, does not change the misleading nature of Heald's transferability representations, because students who enrolled in Heald's diploma, certificate and AAS programs would never have enough credits from Heald to qualify for transfer admission into the CSU system in the first place. The fact that some Heald credits might be transferable after a Heald student was accepted as a transfer into CSU is immaterial when the student could not transfer into CSU at all using Heald credits alone.

Heald California students also faced challenges trying to transfer to other institutions outside the CSU system. For example, in reviewed applications students report that they were unable to transfer all or a majority of their credits to the following institutions:

1. Modesto Junior College,[49]

2. Contra Costa College,[50]

3. University of California, Berkeley,[51] and

4. Unnamed Nevada community college.[52]

In fact, one student stated that Everest College – another school owned by Corinthian – would not accept Heald credits.[53] Other students reported that their credits were not transferable to the school they transferred to, but did not specify the institution.[54]

---

California public community colleges to transfer into the CSU system as an upper division student. SB 1440 – Padilla. This program went into effect in the 2011-2012 academic year. Under that law, students who have earned a transfer associate degree at a public California community college are guaranteed junior standing and priority admission consideration over all other transfer students when applying to a CSU program that has been deemed similar to the student's community college program. Once admitted to CSU, the transfer associate degree student will only be required to complete 60 additional units to earn a bachelor's degree in the program. The misleading nature of Heald's statements about the ease of transferring to CSU may have been enhanced by the new law.

[47] *See* CSU General Education-Breadth Certification List for Heald College, last updated April 2010 *available at* https://www.calstate.edu/APP/documents/GeneralEducation/Heald-GE-Breadth-certifications.pdf. An articulation agreement, as defined by the Higher Education Act, is an "agreement between or among institutions of higher education that specifies the acceptability of courses in transfer toward meeting specific degree or program requirements." Section 486A of the Higher Education Act, 20 U.S.C. §1093a.

[48] *See* American Association of Collegiate Registrars and Admissions Officers, TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2012 and TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2015 (noting that Heald credits were transferable to CSU Northridge).

[49] Claim No. BD156389 (Heald Salida/Modesto student).

[50] Claim No. BD153784 (Heald San Francisco student).

[51] Claim No. BD152473 (Heald Heyward student).

[52] Claim No. BD150563 (Heald Stockton student).

[53] Claim No. BD154681 (Heald Concord student).

DOE00013716

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

In sum, the nearly-universal inability of Heald diploma, certificate and AAS students to transfer into the CSU system, combined with student-submitted evidence of credits not transferring to other schools, establishes that Heald's representations of general transferability were false and misleading.

## III. Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[55] The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. For the following reasons, the cohort of Heald students identified below applying for borrower defense relief predicated on Heald's transferability misrepresentations: 1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL. Moreover, given the lack of value conferred by Heald credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid as applicable, subject to the UCL's four-year statute of limitations.[56] Such relief is consistent with the Department's award of full borrower defense relief to Corinthian students to date.

### A. Heald Students Have Standing Under California's UCL

Students attending Heald programs in California demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Heald regarding the transferability of Heald course credits. Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[57] California courts have interpreted the UCL to apply only to violations occurring inside the state.[58] Significantly, however, injured non-residents have standing to assert UCL claims for such conduct provided they allege that the conduct occurred in the state.[59] Here, all the students attended Heald's California campuses, and the misrepresentations at issue were made by Heald employees of campuses located in California. Thus, whether or not the students resided in California when they submitted their BD claim or at the time they enrolled, they have standing to bring a California UCL claim.

---

[54] Claim No. BD151150 (Heald Milipitas student); Claim No. BD153655 (Heald Milipitas student); Claim No. BD156458 (Heald Salinas student); Claim No. BD152391 (Heald Salinas student); Claim No. BD157356 (Heald Hayward student); Claim No. BD152589 (Heald Stockton).
[55] 34 C.F.R. § 685.206(c).
[56] CAL. BUS. & PROF. CODE §17208.
[57] CAL. BUS. & PROF. CODE §17204.
[58] *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999).
[59] *Id.*

10

DOE00013717

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.   Heald Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[60] Here, Heald's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[61]

**1.   The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[62] Thus, if a business practice violates any law, this is *per se* a UCL violation.[63]

Corporate misrepresentations like those Heald made regarding transferability are prohibited by a number of state and federal laws. In particular, Heald's misrepresentation of the transferability of its credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[64] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[65]

As described above, Heald made oral and written representations that its credits were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree. These statements were false and misleading. Heald's

---

[60] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[61] Although not discussed here, Heald's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair...business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code § 172000 Practice at 3:212 (2016).

[62] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

[63] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[64] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[65] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

11

DOE00013718

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer of credits representations misled students about the value of the credits they would be earning at Heald. Based on the school's misrepresentations, individuals considering enrolling at Heald would have the false belief that Heald credits would not only allow them to obtain a Heald degree, but would also give them a direct entrée into the CSU system as a transfer student, where they would be able to complete a bachelor's degree using their Heald credits. This was in nearly all cases impossible.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor;" furthermore, express claims are presumptively material.[66] Heald's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In attestations submitted to the Department,[67] these borrowers have noted the importance of Heald's transferability claim. Furthermore, their reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Heald students after the institution closed. Moreover, Heald's express assurances in its marketing and other materials that Heald credits transferred to other schools make such statements presumptively material, and demonstrate that Heald recognized how important the issue was for its students. Thus, Heald's transferability misrepresentations constitute unlawful business practices under the FTC Act, and therefore the UCL.

## 2. The Fraudulent Prong

Heald's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Heald students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[68] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[69] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[70] As noted, the transferability representations that Heald made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and... lost money or property" as a result of the deceptive practice alleged.[71] However, for a consumer who was deceived into purchasing a product—or a student who was

---

[66] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[67] Although the large majority of these applications submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of Department's form and therefore made unsigned statements.

[68] *See Bank of the West*, 2 Cal. 4th at 1254.

[69] CAL CIV. C. § 1709.

[70] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[71] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

12

DOE00013719

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

deceived into enrolling at a school[72]—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.[73] Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[74] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[75]

As discussed above, the evidence shows that students relied on Heald's transferability representations when they enrolled. Moreover, Heald widely advertised the transferability of its credits online and in other marketing materials, thereby recognizing its materiality to a prospective student's enrollment. Indeed, express claims like those made by Heald about the transferability of credits are presumptively material.[76] Under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[77] Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

## C. Weak Disclaimers In Some of Heald's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Heald's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials as follows:

1. At the bottom of the Heald webpages containing representations regarding transferability is the following disclaimer: "It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing."[78]

2. Similarly, after misleading statements about transferability, the Heald Viewbook contains the following statement: "Acceptance standards vary by program and institution. Transfer of credits from Heald to another college is determined by the receiving school."[79]

3. In its answer to the California AG's complaint, Heald argued that a disclosure form signed by incoming students titled "Notice Concerning Transferability of Units and Degrees Earned at Our School," gave notice to students that credits

---

[72] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[73] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").
[74] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[75] *Id.* (internal quotation marks omitted).
[76] *See, e.g., Telebrands Corp.*, 140 F.T.C. 278, 292 (2005); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013).
[77] *In re Tobacco II Cases*, 46 Cal. 4th at 298.
[78] Quach Decl. Ex. 90-92.
[79] Quach Decl. Ex. 93.

13

DOE00013720

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

might not transfer to other schools. Allegedly, the disclosure states: "As with any accredited school, the transferability of credits to another institution is determined exclusively by each receiving institution. Units I earn in my programs, in most cases, will not be transferable to any other college or university.... I acknowledge that it has not been guaranteed or implied by any employee of the School that my credits, diploma or degree will be transferable to another institution."[80] However, this document was not attached to the answer and we have been unable to locate it to date.[81]

These disclaimers do not cure the falsity of Heald's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations. *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers). The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract. *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

Indeed, the disclaimers described above are not even sufficient to cure the otherwise false and misleading statements made by Heald regarding transferability in the written marketing materials. An advertisement "may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[82] The written marketing materials, when reviewed as a whole, still clearly convey that enrolling at Heald would allow a student to directly transfer from Heald to a CSU school in order to complete a bachelor's degree program, which, as explained above, is generally false and misleading. The materials' prominent references to CSU and other institutions as "Partner Schools" create the impression that a student would be able to transfer easily to Heald's "partner school," CSU. A disclaimer at the bottom of the webpage that the receiving institution would ultimately decide which specific credits transfer does not diminish the expectation that students could transfer to CSU, which they generally could not do.

Moreover, here, Heald's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices. Corinthian documents show that the school sought to enroll vulnerable people who

---

[80] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, *supra* note 20 at 87.
[81] Heald did not allege in its answer in the California litigation that there were any disclaimers its course catalog that cured any misrepresentations about transferability. A 2014 edition of a Heald course catalog contains similar language to the written disclaimers described above, but there is no reason to think that any student would have reviewed the course catalog prior to enrollment, given what students report about the enrollment process.
[82] *F.T.C. v. Cyberspace.Com LLC,* 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases).

14

DOE00013721

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[83] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[84] Corinthian advertised on daytime TV,[85] targeting the un- or under-employed. In some instances,, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[86]

Furthermore, regardless of the precise language in any documents provided at the time of enrollment, the nature of the enrollment process made it unlikely that students ever read them. Students repeatedly reported being pressured by school sales representatives to enroll immediately, including being rushed through the enrollment process and not being provided an opportunity to read and review the enrollment agreement.[87]

**D. Eligible Borrowers**

Based on the above analysis, the following Heald students alleging transfer of credits claims should be eligible for relief, subject to the UCL's four-year statute of limitations:

1. Any claimant who attended a Heald California campus and who:

   a. enrolled in any diploma, certificate, or AAS degree program (i.e., programs for which fewer than 90 quarter units were transferable to CSU schools) on or after January 4, 2010[88], and

---

[83] CA AG Quach Decl. Ex 113.
[84] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).
[85] CA AG Quach Decl. Ex 113.
[86] CA AG Decl. of Holly Harsh.
[87] See, e.g., BD Claim No. BD152166 ("I told [the admissions representative] I wasn't comfortable . . . and didn't understand the process and why I was signing for a loan if I was covered. I asked for more time to think. She continued to pressure and reassure me my financial aid was fully covered, how Heald guarantees student job placement and how the drop out ratings at Heald was lower than other schools in Honolulu. I felt pressured but trusted and enrolled in Heald College anyway."); Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891("After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process."); Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914 ("The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision."); Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887 ("They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour.").
[88] Because Corinthian purchased all of the Heald campuses on January 4, 2010 (through its purchase of Heald Capital, LLC), for the purposes of granting any potential relief to students, we can reasonably assume that these practices occurred from that point going forward. The transaction was signed on October 19, 2009. However, in its answer to the California AG's first amended complaint, Heald's acknowledgment that the diploma, certificate and AAS degree programs were not transferable to CSU schools was not time-limited. There is also evidence that Heald College made representations regarding the transferability of its credits to the CSU schools as far back as

15

DOE00013722

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

  b. states the school misrepresented that credits were generally transferable, or
   that credits would be transferable to the CSU system or one of the 23 CSU
   campuses.

## IV. Full BD Relief Should Be Provided to Eligible Borrowers

  When determining the amount of relief due to plaintiffs under the UCL, courts rely on
cases interpreting the Federal Trade Commission Act. *See, e.g., Makaeff v. Trump Univ.*, 309
F.R.D. 631, 637-8 (S.D. Cal. 2015). In cases where a substantial/material misrepresentation was
made, FTC law provides significant support for requiring complete restitution of the amount paid
by consumers. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that
restitution should include "the full amount lost by consumers rather than limiting damages to a
defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The
injury to consumers… is the amount consumers spent… that would not have been spent absent
[the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316
(8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by
use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-
283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for
consumers harmed by misleading marketing regarding a business coaching program).

  In a recent California federal court decision analyzing the appropriate remedy for
consumers alleging educational misrepresentations under the UCL, the court explicitly
analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to
"restore the status quo by returning to the plaintiff funds in which he or she has an ownership
interest" was a justifiable basis for a class action theory of relief. *Makaeff v. Trump Univ.*, 309
F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

  However, nothing in the borrower defense statute or regulation requires the Department
to apply state law remedies when reviewing a borrower's claim. The only statutory limit on the
Secretary's ability to grant relief is that no student may recover in excess of the amount the
borrower has repaid on the loan.[89]

  Indeed, under the current regulation, while a claimant must allege an act or omission that
would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD
relief, the rule does not direct the Department to award relief to a claimant based on state law
principles of restitution or damages. Instead, the borrower defense regulation clearly provides
that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

   If the borrower's defense against repayment is successful, the Secretary notifies the
   borrower that the borrower is relieved of the obligation to repay all or part of the loan and

---

January 2006. *See* http://www.heald.edu/programs/partner_colleges.htm ("For those students who want to transfer
coursework from Heald to apply to a higher degree, Heald has articulation agreements with many other accredited
institutions that accept Heald credits toward bachelor's degree programs. Below is a sampling of those schools:
…California State University (CSU) system") (accessed January 2, 2006 via the Wayback Machine). Therefore,
after further research and review, there may be a basis on which to provide relief to a larger cohort of students
alleging a misrepresentation regarding transferability of credits.
[89] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

DOE00013723

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[90]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of ... remedies." *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively). Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Heald education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student cannot transfer credits without great difficulty, a chief value conferred by such credits is greatly diminished. Likewise, there is diminished value in a degree conferred by an institution that issues credits generally not worthy of transfer towards admission.

Second, and perhaps more importantly, the Department has found that Heald and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[91] Given this well-documented, pervasive, and

---

[90] 34 C.F.R. § 685.206(c)(2).

[91] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

DOE00013724

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

highly publicized misconduct at Corinthian, the value of a Heald education has been severely limited.

Indeed, borrower defense applications confirm the lack of value of a Heald education as many Heald students report that their coursework from Heald has been an impediment rather than an asset as they seek employment. For example, a Heald student reported that "After graduation, I was not able to get any jobs whatsoever with my degree and in many interviews, the employer questioned the validity of my degree with a Heald institution."[92] Another reports: "there is a stigma that follows [Heald]. I feel that when employers see where my degree comes from it will be seen as a joke because it came from a school that committed fraud and lied to their students."[93] Yet another student states "The word 'Heald' in my resume actually made employers turn down my [job application]."[94]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to the UCL's four-year statute of limitations.

---

[92] Claim No. BD154195.
[93] Claim No. BD151006.
[94] Claim No. BD150260.

DOE00013725

Exhibit 49

To:     Under Secretary Ted Mitchell
From:   Borrower Defense Unit
Date:    January 9, 2017
Re:     Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment

      Corinthian Colleges, Inc. ("Corinthian") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. Accordingly, the Borrower Defense Unit recommends full relief for Corinthian borrower defense (BD) applicants who submit "guaranteed employment allegations" – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

## I.     Summary of Corinthian's Representations to Borrowers Promising Employment

      In BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs. These oral representations sometimes took the form of a guarantee regarding the individual student and sometimes took the form of a guarantee of universal employment for graduates. In both cases, the obvious impression to students would have been that 1) the value of the education would be substantial; and 2) they would get jobs upon graduation.

      These representations occurred both in person and during telephone calls with prospective students. Borrowers' allegations of "guaranteed employment" are unprompted,[1] specific, and consistent across a span of years. Indeed, the Department has received consistent guaranteed employment claims from borrowers at every campus sampled, including borrowers who enrolled between 1998 and 2013, demonstrating that personnel made consistent guaranteed employment representations throughout the entire time that Corinthian operated its schools. Taken together, based on an evaluation of the credibility of those statements, as well as Corinthian's record of making misrepresentations to prospective students,[2] a preponderance of the evidence demonstrates that Corinthian promised borrowers that they would receive jobs upon graduation.

### A.     Guaranteed Employment Representations at Heald College

      **At Heald, of the 1015 claims sampled, 141 (13.9% of the total) include allegations of guaranteed employment.**[3] The high incidence of guaranteed employment allegations was evident at all Heald campuses. **At Heald Modesto, for example,** of 61 BD claims sampled, 9 allege guaranteed employment (14.8% of the

---

[1] All of the above student statements came from a variety of different types of applications including the Heald, Everest, and WyoTech attestation forms ED created for job placement rate claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."

[2] *See* discussion below, Section II, describing Corinthian's misrepresentations regarding job placement rates.

[3] This count excludes allegations that may pertain to guaranteed jobs but that were not sufficiently clear or specific to qualify for relief. For example, allegations that Corinthian's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment allegations.

total).[4]  A sample of claims from Modesto borrowers demonstrates the consistency and specificity of guaranteed employment representations made by school representatives:

- "Heald college recruiters stated, 'I was guaranteed' to obtain a job after graduation."[5]
- "I was told that when I finished my program I would automatically have job placement and never received that placement."[6]
- "Heald promised me a job placement in the field.  To this day, I haven't been able to find a job in my field, or a good paying job."[7]
- "I was given the false pretense that I could obtain a career in law enforcement with an Associate's degree and was guaranteed job placement."[8]

Guaranteed employment allegations appeared with similar pervasiveness and consistency at all of the other 11 Heald campuses.  A sample of these claims, detailed below, demonstrates the high incidence of guaranteed employment misrepresentations at the school.

- Heald Concord: "During my experience, they promised me jobs after graduation . . . I still have the same jobs after graduation and Heald did nothing to help me . . . Heald College promised that they will find job for me upon graduation."[9]
- Heald Honolulu: "Upon admission, my admission's advisor, Roy Honjo, informed that an associate's degree in applied science in Health Information Technology (HIT) would provide me many job opportunities . . . He insisted I would find a job that would suit me and would be a smart decision to pursue."[10]
- Heald Roseville: "When I first looked into Heald College and spoke with the Academic Advisor, I was promised a job position within six months.  It is now 2015 and I have yet to have ever worked in a medical office.  The degree has done nothing for me."[11]
- Heald Salinas: "When I first enrolled, they said I had a job at the end of my education."[12]
- Heald San Jose: "They stated on many occasions that after I graduate and complete the program that I would be placed in job where I would be able to pay off my student loans easily... They guaranteed job placement and never delivered."[13]
- Heald San Francisco: "Heald College's promises of guaranteed job placement after graduation sold me on becoming a student."[14]

---

[4] The Modesto campus was selected because relatively few Modesto borrowers qualified for relief based on ED's findings regarding job placement rates.  Modesto was a relatively new campus, and therefore had calculated placement rates for fewer years in the period surveyed.

[5] BD155524.

[6] BD155784.

[7] BD155698.

[8] BD154018.

[9] BD151426.

[10] BD1600328.

[11] BD157436.

[12] BD151163.

[13] BD153799.

[14] BD153784.

2

DOE00007867

| Heald Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Heald Modesto | 61 | 9 | 14.8% |
| Heald San Jose | 151 | 29 | 19.2% |
| Heald Rancho Cordova | 40 | 5 | 12.5% |
| Heald Roseville | 56 | 9 | 16.1% |
| Heald Hayward | 138 | 18 | 13.0% |
| Heald Stockton | 125 | 11 | 8.8% |
| Heald Concord | 150 | 22 | 14.7% |
| Heald Fresno | 103 | 11 | 10.7% |
| Heald Honolulu | 63 | 10 | 15.9% |
| Heald Portland | 24 | 3 | 12.5% |
| Heald Salinas | 43 | 4 | 9.3% |
| Heald San Francisco | 61 | 10 | 16.4% |
| **TOTAL** | **1015** | **141** | **13.9%** |

### B.   Guaranteed Employment Representations at Everest and WyoTech

**The high incidence of guaranteed employment allegations at Heald was evident at Everest and WyoTech, as well.** At Everest, 231 out of 1277 BD claims sampled, or 18.1%, made guaranteed employment allegations. At Everest Brandon, for example, 45 of 305 claims sampled, or 14.8% of the total, alleged guaranteed employment. A sample of claims from Everest Brandon borrowers follows:

- "They told me that every student that graduated the program was placed."[15]
- "I was told that I would be able to attain a job in my field with no problem.  I have applied to multiple agencies and was told I was not qualified."[16]
- "I was told I would find a job in my field . . .  I 'graduated' and still can't find a job that will honor my degree."[17]
- "I was told that I would be placed into a career field of my studies, but I was not."[18]

The Department sampled claims at 22 Everest campuses[19] across ten separate states (AZ, FL, MI, MA, TX, VA, CO, WI, NY, CA).  Just like the Everest Brandon campus discussed above, the guaranteed employment allegations were common at all of these campuses and were distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian.  Most importantly, the review of these claims across campuses and years demonstrates that students made substantially similar guaranteed employment allegations – whether the student enrolled at Brandon in 1998 or Rochester in 2008.

---

[15] BD151311.

[16] BD150332

[17] BD1612793.

[18] BD1614055.

[19] The oldest Everest campuses were opened in California in 1995.  Others opened anywhere between 1996 and 2012.  The 22 campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

3

DOE00007868

Similarly, at WyoTech, 64 out of 455 BD claims sampled, or 14.1%, alleged guaranteed employment. At WyoTech Laramie, for example, 8 of 31 claims, or 25.8% of the total, alleged guaranteed employment. A sample of claims from WyoTech Laramie borrowers follows:

- "They promised me a high paying career and said they would find it for me after graduation. They stated that all of the students who pass the program . . . will have jobs waiting for them."[20]
- "The education was sold as a way to guarantee future employment, with access to a nationwide network of job placement experts."[21]
- "The school was promising a career in the field after schooling."[22]
- "[They] would say that just by speaking the name Wyotech you so get hired and make over 100K a year. They said it would be automatic hiring and that the industry knows the Wyotech name."[23]
- "We were recruited hard and we were promised [that] [name redacted] . . . would have his choice of many fine, well-paying positions once he completed his studies."[24]

The tables below summarize the number of guaranteed employment allegations at Everest and WyoTech for all of the sampled campuses:

| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
|---|---|---|---|
| Everest Claims | | | |
| Everest Brandon | 305 | 45 | 14.8% |
| Everest Grand Rapids | 46 | 3 | 6.5% |
| Everest Largo | 31 | 6 | 19.4% |
| Everest Ontario Metro | 34 | 7 | 20.6% |
| Everest Orange Park | 36 | 9 | 25.0% |
| Everest Orlando North | 47 | 6 | 12.8% |
| Everest Orlando South | 226 | 33 | 14.6% |
| Everest Phoenix | 81 | 40 | 49.4% |
| Everest Pompano Beach | 97 | 9 | 9.3% |
| Everest Rochester | 53 | 14 | 26.4% |
| Everest Tampa | 32 | 9 | 28.1% |
| Everest San Bernardino | 15 | 1 | 6.6% |
| Everest Milwaukee | 38 | 6 | 15.8% |
| Everest Colorado Springs | 37 | 10 | 27.0% |
| Everest Ft. Worth South | 54 | 8 | 14.8% |
| Everest Tyson's Corner | 15 | 2 | 13.3% |
| Everest Vienna | 21 | 2 | 9.5% |
| Everest Arlington | 31 | 4 | 12.9% |
| Everest Aurora | 50 | 3 | 6% |
| Everest Thornton | 4 | 1 | 25% |
| Everest Chelsea | 12 | 6 | 50% |
| Everest Brighton | 12 | 7 | 58.3% |
| **TOTAL** | **1277** | **231** | **18.1%** |

---

[20] BD150863.
[21] BD152602.
[22] BD155621.
[23] BD151128.
[24] BD151903.

DOE00007869

| WyoTech Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| WyoTech Laramie | 31 | 8 | 25.8% |
| WyoTech Fremont | 135 | 16 | 11.8% |
| WyoTech Blairsville | 157 | 18 | 11.4% |
| WyoTech West Sacramento | 132 | 22 | 16.6% |
| **TOTAL** | **455** | **64** | **14.1%** |

Significantly, just as the aforementioned Heald, Everest, and WyoTech claims at each campus corroborate each other, the number of similar allegations at and across all Corinthian schools and campuses strongly suggests that promises of employment were endemic to Corinthian's institutional culture.

### C. Guaranteed Employment Claims Consistent Across a Span of Years

Although the Borrower Defense Unit has received fewer claims from borrowers that attended Corinthian schools in earlier years,[25] such claims bear the same indicia of reliability as claims from students who attended more recently. Student statements about admissions representatives' misrepresentations are consistent across a span of years, as demonstrated by claims from former students at Everest – Orlando South:

- [1999]: "Everest recruiters told students that they were **'guaranteed' to obtain jobs.**"[26]
- [2001]: "They . . . told me I would be **guaranteed a job once I graduated.**"[27]
- [2002]: "I was told **I would get a job right away...**"[28]
- [2003]: "I was lured into this organization with false promises of **100% job placement...**"[29]
- [2005]: "They said I was **guaranteed job placement after I graduated.**"[30]
- [2006]: "Everest **guaranteed me career placement upon graduation.**"[31]
- [2007]: "They told me that I will be **guaranteed a job placement after I graduate.**"[32]
- [2008]: "They told me I was **guaranteed a job.**"[33]
- [2009]: "**I was promised job placement, high salaries and success.**"[34]
- [2010] "I was **guaranteed a job** from my Academic advisor and Career Counselor."[35]
- [2011] "...told me I **was guaranteed a job** in my profession **after I graduated** making twice as much as minimum wage at least."[36]
- [2012]: "I was **promised employment after graduation.**"[37]

---

[25] The Department's outreach has targeted borrowers from more recent years in an attempt to reach borrowers that may be eligible for relief on the basis of misrepresented job placement rates.

[26] BD155177.

[27] BD156179.

[28] BD1600004

[29] BD151816

[30] BD150148.

[31] BD157758.

[32] BD153166.

[33] BD153136.

[34] BD156038

[35] BD1605002.

[36] BD155731.

[37] BD1615288.

5

DOE00007870

- [2013]: "They called me over and over and promise **jobs after graduating...**"[38]

### D. Corinthian Employee Statements and Other Employment-Related Misrepresentations Corroborate Guaranteed Employment Claims

The similarity of student statements across schools, campuses, and years strongly suggests that the misrepresentations were system-wide and, indeed, part of Corinthian's institutional culture. This conclusion finds further support in the affidavits of former employees, who admitted that Corinthian employees misled prospective students about their employment prospects. For example, a former instructor at Everest's Chelsea campus stated, "People in corporate told prospective students they guaranteed jobs . . . They saw job placement not as job placement in the students' fields of study, but as a student getting any job."[39] An admissions representative from the same campus stated, "Admissions representatives told prospective students that medical assistants are in high-demand and that they would have no problem finding jobs . . . and they will definitely find jobs."[40]

Furthermore, guaranteeing jobs to prospective students appears to have been part of a pattern of employment-related misrepresentations at Corinthian. An internal Corinthian audit of admissions calls from one its campuses found that that 21% of admissions representatives "provided [a] false or misleading statement (such as best case scenario)," which likely pertained to employment outcomes.[41] Further, in a letter issuing a nearly $30 million fine to Heald, the Department found that Heald "represented with regard to many of its programs that it placed 100% of its graduates in jobs," but Heald was unable to provide evidence to substantiate these representations. The Department further noted that based on the evidence that Heald was able to provide, the job placement rates appeared to be substantially lower than 100%, and for several programs, below 50%.[42] At the same time that Corinthian was making false representations about its job placement rates, executives at Corinthian were putting heavy pressure on campuses to attract new students. One admissions director reported that his superiors at Corinthian instructed him to "enroll your brains out."[43] In this context, it is unsurprising that staff at the campus level would be guaranteeing students a job.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for additional Corinthian campuses. The hundreds of claims reviewed corroborate that Corinthian personnel made guaranteed employment representations beginning shortly after Corinthian opened or gained control of a campus.

## II. Evidence of the Falsity of the Alleged Representations

Corinthian's own records show that the school was unsuccessful at placing large numbers of Corinthian graduates. The Everest records, for example, reveal that nearly half of the school's programs placed 50% or fewer of the program graduates. Further, evidence from Corinthian's internal communications shows that they were aware that the school could not live up to their promises of employment. For example, an internal email from Corinthian's Vice President for Operations stated that, "at some campuses" they had "not been

---

[38] BD1617088.

[39] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, *Medolo* Aff. ¶ 4, June 26, 2015.

[40] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, Morrison Aff. ¶ 5, July 6, 2015.

[41] Exhibit 40 - CA AG Default Motion at 278.

[42] Heald Fine Letter, http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.

[43] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, Exhibit 36 - CA AG Default Motion.

DOE00007871

consistently delivering" on the promise to students to "find a position that will help them launch a successful career."[44]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations—and many other BD applicants—state that they were unable to find a job upon graduation; that they were unable to find employment that used their degree; or that they were forced to remain in the job that they had prior to enrolling at Heald, Everest, or WyoTech. In sum, the evidence overwhelmingly shows that Corinthian campuses could not truthfully guarantee prospective students employment upon graduation.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations

For the reasons set forth below, the Corinthian borrowers' applications for borrower defense relief predicated on a guaranteed employment allegation: a) are reviewed under California law; and b) have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[45] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. Moreover, given the lack of value conferred by Corinthian credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A.   The Department will apply California Law to These Claims.

To prevail with a defense to repayment, a borrower must assert acts or omissions "that would give rise to a cause of action against the school under applicable state law."[46] With the assistance of the Office of General Counsel, we have examined specifically whether borrowers making the claims described in this memo could bring a cause of action in California and determined that they could. Specifically, the Department has concluded not only that students who were subjected to California to the acts complained of here would have been able to bring their cases in California courts under California law, but also that borrowers who attended Corinthian in other states could have brought their claims in the context of a class action in a California court, which would have applied California law.

California has general jurisdiction over Corinthian.[47] As to the law a California court would have applied, California courts have recognized that a forum state (such as California) "may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'" *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001) (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)). California is neither an arbitrary nor an unfair state for a class of Corinthian borrowers to bring a

---

[44] Exhibit 36 - CA AG Default Motion.

[45] CAL. BUS. & PROF. CODE § 17200, et seq.

[46] 34 C.F.R. § 685.206(c) (emphasis added).

[47] Corinthian was headquartered in California, and was therefore a resident corporation subject to the state's general jurisdiction. Furthermore, even a non-resident corporation is subject to a forum's general jurisdiction "if [its] contacts in the forum state are substantial[,] continuous and systematic." *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1092 (Cal. 1996) (internal quotation marks and alterations omitted). In such a case, "defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction," and there is no need to determine whether the specific acts alleged in the suit meet the threshold for specific jurisdiction. *Id.* Such is the case with Corinthian; the largest numbers of both campuses and students were located in California.

7

DOE00007872

claim, and the conduct at issue had significant contacts with California insofar as the students were enrolling in a California-based school and recruiters were receiving at least some of their training from high levels of administration at the school.

Furthermore, under California's choice-of-law test, the court considers both the defendant's headquarters and the state where many students attended the school.[48] Another key factor in the choice-of-law analysis under California law is the location "where the wrong occurred."[49] At Corinthian, the largest numbers of both campuses and students were located in California. Further, as proved to be the case in the Department's investigation of Corinthian, the fact that a school is headquartered in a given state will often mean that "*some or all* of the challenged conduct emanates" from that state, another common factor in choice of law determinations.[50] At Corinthian, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment.[51]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, that the largest numbers of its campuses and students were located in California, and that decisions and policies made by its California based corporate leadership harmed students across the nation – it is reasonable for the Department to determine that a California court would apply California law to these claims. Therefore, BD claims submitted by former students from all Corinthian campuses will be considered under the California UCL.

    **B.**    **Corinthian Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[52] Here, Corinthian's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

    **1. The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[53] Thus, if a business practice violates any law, this is *per se* a UCL violation.[54] Corporate

---

[48] *See, e.g., In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)) (considering, among other factors, "where the defendant does business [and] whether the defendant's principal offices are located in California…").

[49] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). *See also McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("Although California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred without regard to the nature of the issue that was before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." (internal citation and quotation marks omitted)).

[50] *See, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612 (Ct. App. 1987).

[51] *See* Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15; Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013).

[52] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[53] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

8

DOE00007873

misrepresentations like Corinthian's promises of employment are prohibited by a number of state and federal laws.[54] In particular, Corinthian's misrepresentation regarding its students' employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[56] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[57]

Applying that three step inquiry, Corinthian clearly violated the FTC Act.

1. As described above, Corinthian made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[58] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that Corinthian schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Students enrolled "primarily to gain skills and find a position that will help them launch a successful career."[59] Corinthian's own marketing materials emphasized that the school was a pathway to employment, often noting "solid industry employment contacts"[60] and the availability of "lifetime career services." For many students, the principal purpose of attending a career college like

---

[54] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).
[55] Though the analysis below focuses exclusively on the FTC Act, Corinthian's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that Corinthian's conduct violates the FTC Act, this memo does not reach the issue of whether it may be unlawful under other applicable rules.
[56] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").
[57] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).
[58] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").
[59] Exhibit 36 - CA AG Default Motion.
[60] Exhibit 179, Part 1; Declaration of Jacinto P. Fernandez (CA AG), Exhibit Y

9

Everest, Heald or WyoTech was to obtain employment in a particular field.[61] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, Corinthian's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

### 2. The Fraudulent Prong

Corinthian's misrepresentations regarding employment prospects also are a fraudulent business practice under the UCL, and therefore are another form of unfair competition providing an independent basis for borrower defense relief for Corinthian students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[62] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[63] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[64] As noted, the representations Corinthian made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[65] However, for a consumer who was deceived into purchasing a product[66]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[67] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[68]

Express or implied claims like those made by Corinthian about employment prospects are presumptively material,[69] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[70] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to

---

[61] Under these circumstances, students' reliance on a guarantee of employment was reasonable. Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of claims making guaranteed employment allegations is a clear indication that students believed what they were told.
[62] *See Bank of the West*, 2 Cal. 4th at 1254.
[63] CAL CIV. C. § 1709.
[64] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).
[65] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).
[66] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[67] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[68] *Id.* (internal quotation marks omitted).
[69] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).
[70] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

DOE00007875

enroll.[71] Statements by large numbers of borrowers across Corinthian campuses make clear that the promise of employment entered substantially into their choice to attend a Corinthian school.

### C.   Weak Disclaimers In Some of Everest and WyoTech's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

Corinthian's promises of employment were false and misleading, despite the limited disclaimers on some Everest and WyoTech enrollment agreements. Although those enrollment agreements state that the school does not guarantee "job placement" or "a salary," such written information did not change the overall impression created by the oral representations.

For example, if a student examined an Everest enrollment agreement, the student would have to read through two pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[72] Part of the way through that box of fine print, item number 2 states that Everest "does not guarantee job placement to graduates upon program / course completion or upon graduation, and does not guarantee a salary or salary range to graduates."[73] That item is not highlighted or bolded in any way. The agreement then continues on with an additional page of fine print disclaimers. The WyoTech enrollment agreement includes a similar disclaimer on its first page: "The school does not guarantee employment following graduation, but does offer placement assistance to graduates." This is included as item "(a)" in a list of nine fine print disclaimers following a paragraph-long disclaimer about the cost of books and tools.

These disclaimers do not cure the falsity of Everest and WyoTech's oral promises regarding employment prospects. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[74] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[75]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, Corinthian's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.[76]

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want[ed] quick solutions."[77] Corinthian's CEO, in a letter to

---

[71] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

[72] See, e.g., Everest Institute Brighton/Chelsea Enrollment Agreement.

[73] BD150633, Attachment #3, page 7.

[74] See, e.g., FTC v. Minuteman Press, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); see also Chapman v. Skype Inc., 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[75] Chern v. Bank of Am., 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[76] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics.

[77] CA AG Quach Decl. Ex 113.

11

Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[78] Corinthian advertised on daytime TV,[79] targeting the un- or under-employed. In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[80] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Finally, the fact that the 436 Corinthian claims reviewed to date that allege Corinthian guaranteed employment make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations that Corinthian personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.   Eligible Borrowers

Based on the above analysis, the following Corinthian students making guaranteed jobs allegations should be eligible for relief: <u>any claimant who attended a Corinthian campus and who alleges that they were promised, guaranteed, or otherwise assured employment or job placement.</u>

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis, the misrepresentation in this case went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of the borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E.   Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[81] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[82]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[78] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[79] CA AG Quach Decl. Ex 113.

[80] CA AG Decl. of Holly Harsh.

[81] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[82] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

12

DOE00007877

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[83]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Corinthian education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). The Department has found that Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[84] Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest, Heald or WyoTech education has been severely limited.

Borrower defense applications confirm the lack of value of a Corinthian education as many Corinthian students report that their degree or affiliation with the school has been an impediment rather than an asset as they seek employment. For example, one Everest student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[85] Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[86] A student from WyoTech states: "Any association with WyoTech hurts my chances for employment. I was promised jobs with big salaries, a career I would hold for life and all WyoTech gave me was debt and shame. I was told by two interviewers, that they would NEVER hire a WyoTech graduate..."[87] And a Heald student states: "The school is not reputable no other institution recognizes the credits earned and jobs stray away from Heald graduates, claiming they lack in teaching students current and up to date information in the coding industry. I have yet to work in my field of study and utilize my degree. I have a useless degree from a closed college."[88]

Finally, awarding full relief to students who make guaranteed employment allegations is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inconsistent to limit the relief of students who make guaranteed employment allegations—which are essentially 100% job placement claims—while providing full relief to those students who qualify for job placement rate relief.

---

[83] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[84] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CORINTHIAN-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

[85] BD1614100.

[86] BD1602593.

[87] BD151191.

[88] BD157356.

DOE00007878

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, [89] it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.


CONCUR:

_____

Office of the General Counsel

$\frac{1}{\phantom{x}}$ / 12 / 17

Date

---

[89] This approach also is consistent with the Department's new regulations in that the Department has considered whether the value of the education provided by Corinthian was such that it would be appropriate to offset the relief provided to borrowers who were guaranteed employment. The Department has concluded that the Corinthian education lacked sufficient value to do so.

14

# Exhibit 50

Memorandum

To: Colleen Nevin
From: Daniel Davis
Date: August 7, 2020
Re: Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2008)[1]

## I.   **Introduction**

Education Management Corporation ("EDMC"), a for-profit education company organized as a Pennsylvania corporation in 1962,[2] brought together and consolidated a number of educational institutions under the following brands: (i) The Art Institutes; (ii) Argosy University; (iii) Brown Mackie College; (iv) South University; and (v) Western State College of Law ("EDMC Schools").[3] The EDMC Schools operated across as many as 109 campuses (both physical and exclusively online) with an active enrollment of over 158,000 students.[4]

As of August 7, 2020, the Borrower Defense Unit ("BDU") has approximately 13,000 pending applications from borrowers who attended EDMC Schools.[5]

This memorandum solely addresses borrower defense applications alleging misconduct at EDMC Schools from July 1, 2003 through December 31, 2008,[6] excluding borrowers who make professional licensure allegations for psychology masters and doctorate programs at Argosy University.[7]

## II.   **Evidence Regarding Alleged Misconduct at EDMC Schools**

---

[1]   The July 21, 2020 version of this memorandum (previously "Borrower Defense Unit Investigation of EDMC Schools (July 1, 2003 – December 31, 2017) has been amended, effective August 7, 2020, to also include borrowers who enrolled at EDMC Schools between January 1, 2008 through December 31, 2008. Further, this memorandum should be read in conjunction with the previously submitted "Borrower Defense Unit Investigation of EDMC Schools Prior to July 1, 2013" and "Borrower Defense Unit Investigation of EDMC Schools from January 1, 2016 to September 30, 2017." Finally, the BDU's investigation of EDMC Schools is ongoing and the BDU will draft a memorandum to provide a more comprehensive view of the EDMC Schools' conduct.

[2]   Educ. Mgmt. Corp., Annual Report (Form 10-K), at 2 (June 30, 2003).

[3]   Educ. Mgmt. Corp., Annual Report (Form 10-K), at 6 (June 30, 2011); Educ. Mgmt. Corp., Annual Report (Form 10-K), at 10 (June 30, 2002).

[4]   Educ. Mgmt. Corp., Annual Report (Form 10-K), at 3 (June 30, 2012); S. Rep No. 112-37, at 451 (2012).

[5]   *See* Salesforce reports generated by BDU personnel (on file with the department).

[6]   *See* "Borrower Defense Unit Investigation of EDMC Schools Prior to July 1, 2003" for an assessment of borrower defense applications alleging misconduct against EDMC Schools prior to July 1, 2003 and "Borrower Defense Unit Investigation of EDMC Schools from January 1, 2016 to September 30, 2017" for an assessment of borrower defense applications alleging misconduct against EDMC Schools between January 1, 2016 and September 30, 2017. Further, as noted above, the BDU investigation of EDMC Schools is ongoing and the BDU will provide a more comprehensive analysis of EDMC School conduct.

[7]   BDU's investigation into borrower defense applications during this period of time who make professional licensure allegations related to nursing and psychology, along with borrowers who enrolled between January 1, 2009 and December 31, 205 and those who enrolled after September 30, 2017 are subject to ongoing investigation.

1

DOE00009626

Although BDU's investigation is ongoing, the BDU does not have sufficient evidence in its possession to substantiate the borrower defense ("BD") allegations against EDMC schools submitted by borrowers who enrolled between July 1, 2003 through December 31, 2008.

As of the date of this memorandum, the BDU has obtained the following evidence relevant to July 1, 2003 through December 31, 2008: (i) exhibits and congressional testimony referenced in the 2012 U.S. Senate Committee on Health, Education, Labor & Pensions on for profit higher education;[8] (ii) marketing materials, contractual agreements, and similar documents distributed to students by EDMC Schools;[9] (iii) EDMC's SEC financial filings;[10] and (iv) borrower applications with attachments.

The BDU has also obtained evidence from the Pennsylvania attorney general's office and the Iowa attorney general's office. While most of this evidence relates to times beyond the scope of this memorandum, some of the materials do relate to the period at issue. These materials include EDMC School's representations of employment prospects and job placement rates to prospective students as well as school brochures. However, BDU does not possess the underlying data and internal policies to assess the accuracy of these representations.[11]

The above evidence obtained by the BDU relating to the borrower defense applications at issue in this memorandum is not sufficient to corroborate borrower allegations against EDMC Schools. Additionally, no external body has found that EDMC engaged in any misconduct during this period.

Finally, while the BDU has identified a number of lawsuits that included allegations potentially related to some of the allegations asserted by EDMC borrowers, the BDU has not received[12] any evidence to substantiate the BD-related allegations from those cases. The cases include the following:

## A. *Washington and Mahoney ex rel. US v. EDMC*

In 2007, Lynntoya Washington, then employed by EDMC Schools, instituted *qui tam* false claims act litigation alleging that EDMC Schools violated the incentive compensation ban as

---

[8]     *See, e.g., The Federal Investment in For-Profit Education: Are Students Succeeding? Hearing of the Committee on Health, Education, Labor, And Pensions United States Senate*, S. HRG. 111–1162, 111 Cong. 2 (Sept. 30, 2010) (Statement of Kathleen Bittel). Kathleen Bittel, a former EDMC employee testified that the work was "all about hitting [enrollment] quotas" and that the career services numbers were not realistic since EDMC had 1,600 admissions recruiters and only nine career services advisors to work with the graduates of all EDMC online programs. *Id.* Absent external evidence corroborating her allegations, which the BDU does not possess, Kathleen Bittel's testimony does not independently substantiate BD allegations of students who attended EDMC Schools from July 1, 2003 through December 31, 2008.

[9]     *See, e.g.,* The Art Institute employment statistics and representations of graduate job placement rates obtained by the BDU in borrower application attachments (on file with the department).

[10]     *See, e.g.,* Educ. Mgmt. Corp., Annual Report (Form 10-K) (June 30,2003).

[11]     While BDU has EDMC career services policies and in-field employment data for nine EDMC Schools for graduates starting in 2008, this data was first provided to students in 2009 and does not impact borrowers who enrolled at EDMC Schools in 2008.

[12]     *See* Section II.A. *infra* for a discussion of boxes of materials currently in BDU's possession.

2

far back as 2003.[13]  The Department of Justice ("DOJ"), along with certain states intervened in the case in 2011.[14] The case ultimately settled without EDMC admitting to any wrongdoing.[15]

While the case was pending, and under the supervision of a special master, EDMC Schools and DOJ engaged in extensive written discovery.[16]  Based on a review of public records, EDMC produced millions of pages of discovery in this litigation.[17] However, BDU was unable to obtain any of these documents as they were destroyed, or returned to EDMC in light of the confidentiality agreement in the case.[18] As EDMC ceased operating its schools in 2017[19] and subsequently closed, BDU was unable to request the records from the school, and BDU, therefore, is not able to ascertain whether the documents would have provided corroborating evidence for any borrower defense claims.

On or about August 3, 2020, relator Washington's counsel returned to the Department approximately 60 file boxes of documents that, on information, the Department of Education originally produced in discovery and that are unlikely to corroborate BD applications.  However, given the current state of the COVID-19 pandemic, and current COVID-19 Federal Student Aid policies for employees in response to current health and safety risks, BDU has been unable to review the contents of the returned files to confirm that the materials are not relevant to the cases at issue in this memo or are insufficient to corroborate the borrowers' claims.   While BDU recommends proceeding with adjudication based on its current understanding of the Department materials, BDU will confirm the contents of the returned Department materials as soon as it is safe to do so.   Once the BDU is able to review these documents, it will update this memorandum accordingly.  In the unlikely event that the documents would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

**B.** *Gaer*

---

[13]     Second Amended Complaint, *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. May 2, 2011) (Michael Mahoney was EDMC's Director of Training for the Online Higher Education Division from 2006 – 2007 and joined the litigation in the Second Amended Complaint).

[14]     *See* Joint Complaint in Intervention by the United States of America, and the States of California, Florida, Illinois, and Indiana. *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. August 8, 2011)

[15]     *See* Settlement Agreement in *Washington v. Education Management Corporation*, No. 07-CV-461 (W.D. Pa. Nov. 12, 2015).  This settlement agreement also resolved other pending *qui tam* lawsuits against EDMC including the settlement referenced below in *Laukaitis. Id.* at 9.

[16]     *See* Docket in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. 2007)

[17]     *See* Report & Recommendation #2 of the Special Master [Plaintiff's Motions to Compel the Production of Documents and Answers to Interrogatories] filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. May 14, 2013); Protective Order Governing Confidential Materials filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. April 12, 2013); Case Management Order No. 2 filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. September 13, 2013) Report & Recommendation #4 of the Special Master [Plaintiffs' and Defendants' Submissions Regarding Ongoing Discovery Disputes] filed in *Washington v. EDMC, et al.*, No. 2:07-cv-00461-NBF (W.D. Pa. November 24, 2013);

[18]     *Project Predatory Lending of the Legal Services Center of Harvard Law School v. United States Department of Justice,* 17-CV-00210, ECF No. 80, Memorandum Opinion, p. 22 (W.D. Penn. 2017) (J. Fischer).

[19]     *See* Third Annual Report of the Settlement Administrator Under the Consent Judgments with Education Management Corporation (EDMC) as Succeeded by Dream Center Education Holdings, Thomas J. Perrelli as Settlement Administrator, September 30, 2018, 1.

3

The complaint in *Gaer*, a securities class action claim brought against EDMC, includes allegations from confidential witnesses who purportedly worked at EDMC Schools during the relevant period of time.[20]  Allegations from confidential witnesses focused primarily on incentive compensation issues, aggressive enrollment quotas, inadequate career services employee staffing, and inaccurate job placement rates.[21]  The BDU is unable to assess the voracity the allegations made by the confidential witnesses in the *Gaer* complaint and is not aware of the identifies of the confidential witnesses.  The case ultimately concluded with no admission of wrongdoing on the part of EDMC.

### C. *Laukaitis*

In 2011, former EDMC employees brought a *qui tam* action against EDMC and alleged False Claims Act violations for misrepresenting "recruiter compensation, information provided to prospective students, and the amount of revenue that may be received from federal financial aid sources."[22]  The relators in *Laukaitis* also alleged, without providing additional detail, that EDMC and its "admissions representatives misrepresent[ed] graduation and retention rates, employment statistics, and the salaries that students can expect to earn upon completing their program of study."[23]  The case ultimately settled without EDMC admitting  liability or admitting to making any misrepresentations.[24]

### D. *Robb*

The complaint in *Robb*, a securities class action claim brought against EDMC, includes allegations from confidential witnesses who purportedly worked at EDMC Schools during the relevant time frame.[25]  The confidential witnesses alleged that EDMC Schools engaged in predatory recruitment practices including knowingly enrolling students who could not complete the program, and falsifying employment data.[26]  The Robb action settled in 2015 for $2,500,000 without EDMC admitting to any wrongdoing.[27]  The BDU has been unable to determine the identities of, or otherwise assess the voracity of claims made by, the confidential witnesses referenced in the Robb complaint for the period July 1, 2003 through December 31, 2008.

---

[20]     Second Amended Complaint, *Gaer v. Education Management Corporation, et al.*, No. 2:10-cv-01061-NBF-RCM (W.D. Pa. Jan. 10/2011) (the sixteen confidential witnesses purportedly included various admissions representatives, human resources personnel, and an Associate Director of Finance).

[21]     *Id.* at 19-37.

[22]     Third Amended Complaint, *United States, ex. rel. Laukaitis v. Education Management Corporation, et. al.*, at ¶ 4, No. 11-602 (W.D. Pa. Oct. 22, 2013).

[23]     *Id.* at 45.

[24]     Settlement Agreement in *Washington v. Education Management Corporation*, No. 07-CV-461 (W.D. Pa. Nov. 12, 2015) at 9.

[25]     *See* Consolidated Amended Complaint, *Robb v. Education Management Corporation, et al.*, No. 2:14-cv-01287-DSC (W.D. Pa. April 8, 2015).

[26]     *Robb v. Education Management Corporation, et al.*, No. 2:14-cv-01287-DSC (W.D. Pa.); *see id.* at ¶109 (describing a situation where the confidential witness' manager ordered the witness to enroll a student who could not read or write).

[27]     Stipulation of Settlement, Robb v. Education Management Corporation, et al., No. 2:14-cv-01287-DSC (W.D. Pa. Sept. 17, 2015).

4

Although the allegations in *Washington, Gaer, Laukaitis,* and *Robb* may be relevant to borrowers' allegations, the BDU does not currently have any documents or evidence[28] to substantiate the claims made in these lawsuits for the period July 1, 2003 through December 31, 2008. The existence of these lawsuits, absent corroborating evidence, does not constitute evidence to substantiate the borrower allegations against EDMC schools during the July 1, 2003 through December 31, 2008 timeframe.

### III.  **Conclusion and Recommendations**

Although BDU's investigation of EDMC Schools is ongoing, BDU currently does not have evidence in its possession to substantiate the borrower defense allegations of students who are the subject of this memorandum.

As a result, the BDU recommends that all EDMC Schools applications reflecting an enrollment date between July 1, 2003 and December 31, 2008, excluding those who make professional licensure allegations relating to psychology masters and doctorate level programs at Argosy University, be adjudicated in accordance with the following standard review protocol: BDU attorneys will individually adjudicate each application by opening each claim and reviewing all allegations made by the borrower and any supporting evidence provided by the borrower. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. However, where the borrower provides no evidence, or the evidence provided is insufficient to prove any allegations, denial of the application is appropriate. If additional evidence is obtained in the future, these claims may be subject to redetermination as warranted.

---

[28] As noted with respect to the *Washington* case, while it is BDU's understanding that the returned Department records are not likely to contain corroborative evidence, BDU will confirm the contents and revise this memorandum as needed to the extent that there is any corroborating evidence in the materials. In the unlikely event that the records would change the outcome of any borrower cases, BDU would consider this as new evidence and reopen any such case(s).

5

DOE00009630

Exhibit 51

# MEMORANDUM

TO: Colleen Nevin

FROM: Alana Smith

DATE: June 1, 2020

RE: Borrower Defense Unit Investigation of Anthem Education Group

---

Anthem Education Group, LLC was founded in 1965 under the name High Tech Institute, Inc. and included schools operating under the names of High-Tech Institute, Anthem Career College, Anthem College, Anthem College Online, Anthem Institute, Morrison University, and the Bryman School of Arizona.[1] At its peak, Anthem Education Group included 22 campuses in 15 states and an online division.[2]  In 2014, Anthem Education Group, LLC declared bankruptcy and closed.[3]

As of June 1, 2020, the Borrower Defense Unit (BDU) has received approximately 1,508 applications from borrowers who attended a school under the Anthem Education Group, LLC umbrella. These cases span the entire history of Anthem's existence with the bulk of the cases from borrowers who first enrolled from 2007 to 2010.[4]

As of the date of this memorandum, the BDU has obtained limited evidence relevant to the borrower defense allegations filed against Anthem Education Group. BDU has reviewed evidence in connection with the following: (1) information from the Minnesota Attorney General's Office, (2) letters to the Department of Education from the Minnesota Attorney General requesting that the Department provide federal loan forgiveness to the borrowers, and (3) final program review determination reports generated by the Department.  BDU also reviewed Anthem Education Group's website from 2008 on for representations that the school was registered with Minnesota Office of Higher Education[5]. The only relevant evidence BDU has obtained pertains to the campus in Minnesota. BDU has been unable to locate evidence to support the allegations of students who attended campuses in other states.

Based upon a review of the above evidence, the BDU recommends individual adjudication of all claims where the borrower attended a campus located in states other than Minnesota. To adjudicate these cases, the BDU will open each case and review each allegation and any evidence the borrower attached to the case. If the borrower has provided evidence sufficient to support their allegations, then the application will be set aside for further review. In cases where the borrower provides no evidence or the evidence provided does not prove any

---

[1] For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, 2012 U.S. Senate Committee Findings, Senate Health, Education, Labor and Pensions (HELP) Committee, 254.

[2] For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, 2012 U.S. Senate Committee Findings, Senate Health, Education, Labor and Pensions (HELP) Committee, 254.

[3] See Tyson, Charlie, Anthem Bows Out, INSIDE HIGHER ED, August 29, 2014, https://www.insidehighered.com/news/2014/08/29/profit-anthem-education-abruptly-closes-campuses-after-filing-bankruptcy.

[4] Salesforce reports generated by BDU personnel (on file with the Department)

[5]  https://web.archive.org/web/20110326054346/http://anthem.edu/accreditations/

DOE00009519

allegation, then the case will be flagged for denial. If additional evidence is discovered in the future, these cases at campuses other than in Minnesota may be revised.

DOE00009520

# Exhibit 52

To:     Colleen Nevin
From:   Michael Alonso
Date:   June 19, 2020 (**Updated December 2, 2020**)
Re:     Career Education Corporation (CEC) n/k/a Perdoceo Education Corporation (PEC)

**December 2, 2020 Update:** The Department has recently received additional evidence that may require a change in our adjudication protocols for CEC and potentially would support reopening some of the previously adjudicated borrower defense claims. As a result, the Department has paused the adjudication or processing of CEC claims pending its review of the scope of this evidence. This memo will be updated again once we have completed that review.

## Introduction

The Borrower Defense Unit (BDU) recommends adjudication of certain Borrower Defense (BD) applications submitted by borrowers attending Career Education Corporation schools, including those currently owned by Perdoceo Education Corporation (collectively, "CEC"). School brands currently or previously owned by CEC include the following:

- American Intercontinental University
- Briarcliffe College
- Brooks College
- Brooks Institute (a/k/a/ Brooks Institute of Photography)
- Brown College
- Brown Institute
- Collins College (a/k/a Al Collins Graphic Design School)
- Colorado Technical University
- Harrington College of Design (a/k/a Harrington Institute of Interior Design)
- International Academy of Design & Technology (a/k/a School of Computer Technology; a/k/a International Academy of Merchandising & Design)
- Le Cordon Bleu College of Culinary Arts (a/k/a Le Cordon Bleu Institute of Culinary Arts; a/k/a Kitchen Academy; a/k/a Southern California School of Culinary Arts; a/k/a California School of Culinary Arts; a/k/a Pennsylvania Culinary Institute; a/k/a Orlando Culinary Academy; a/k/a Cooking and Hospitality Institute of Chicago; a/k/a Scottsdale Culinary Institute; a/k/a/ Western Culinary Institute; a/k/a California Culinary Academy)
- Lehigh Valley College (a/k/a Allentown Business School)
- Katharine Gibbs School (a/k/a Gibbs College; a/k/a Washington Business School)
- McIntosh College
- Missouri College
- Sanford-Brown College (a/k/a Ultrasound Diagnostic Schools)
- Sanford-Brown Institute (a/k/a Western School of Health and Business Careers; n/k/a Pittsburgh Career Institute[1])
- SBI Campus—An Affiliate of Sanford-Brown Institute

---

[1] "In 2014, New Opportunity Calling LLC purchased Sanford-Brown Institute and changed its name to Pittsburgh Career Institute." About Pittsburgh Career Institute, *available at* https://pci.edu/about-pci/ (last reviewed on 3/30/2020).

All CEC's school brands are currently closed (or were sold and remained open, in the case of schools now known as Pittsburgh Career Institute), except for the brands American Intercontinental University and Colorado Technical University, which remain open.

**RECOMMENDATION**

BDU recommends adjudication of applications from borrowers who attended any CEC school and had an enrollment start date on or after January 1, 2013.

Based on a review of public information and filings on Westlaw, none of the schools above – during the specified time period – are the subject of a known investigation or lawsuit that would likely reveal supporting evidence relevant to BD claims. In light of the absence of any such evidence in the Department's possession regarding CEC schools after 2012, BDU will apply a standard protocol and open each claim, review all allegations and any evidence appended by individual borrowers, and conduct an individual adjudication of each case. If evidence attached by the borrower proves any of his/her allegations, then the case will be set aside for consideration for approval. However, where the borrower provides no evidence or evidence provided fails to satisfactorily prove any allegations, will be denial of the application is appropriate.

# Exhibit 53



PROUD SPONSOR *of*
*the* AMERICAN MIND™

### Initial Review of Medium Batch Applications

**BACKGROUND**

| | |
|---|---|
| **Name of Institution and OPEID** | Keller Graduate School of Management – 02075400; 12075400 |
| **Open or Closed** | Open |
| **Additional Locations**<br>• Add closure date if applicable | See Attachment A – Keller Graduate School of Management Locations[1] |
| **Corporate Owner(s)** | DeVry Education Group Inc.<br>DeVry/New York Inc.<br>After December 5, 2017: Adtalem Global Education, Inc. |
| **Total Number of Applications** | 810 applications as of April 2, 2020 |
| **Patterns of Alleged Misconduct** | Patterns of alleged misconduct include misrepresentations of employment prospects and transferring of credits/school accreditation. |
| **Class Issue or Singular** | Class issue |
| **Internal ED Investigation(s)**<br>• PC, AAASG, OIG | N/A |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BD** | • Lindberg et al v. Adtalem Global Education Inc. f/k/a DeVry Education Group, Inc. and DeVry University, Inc.[2] – The plaintiffs of the suit were enrolled in Keller Graduate School of Management. The plaintiffs contend that DeVry University and Keller Graduate School of Management "made deceptive representations about the benefits of obtaining a degree from DeVry University and Keller Graduate School of Management" in violation of Texas state law. The Lindberg case was consolidated with the Rangel v. Adtalem and DeVry University, Inc. case because the allegations against DeVry and Keller were |

---

[1] See Attachment A: Keller Graduate School of Management Locations.
[2] *Lindberg et al v. Adtalem Global Education Inc. f/k/a DeVry Education Group, Inc. and DeVry University, Inc.*, Case No. 18-cv-649, W. D. TX; https://www.truthinadvertising.org/wp-content/uploads/2018/08/Lindberg-v-Adtalem-Global-Education-complaint.pdf; https://vetsedsuccess.org/wp-content/uploads/2018/10/texas-students-lawsuit-devry.pdf; https://www.courtlistener.com/docket/7302337/lindberg-v-adtalem-global-education-inc/

DOE00011331

| | identical. Plaintiffs refiled and consolidated, and the Rangel v. Adtalem and DeVry University, Inc.[3] case is currently pending.[4]<br><br>• Pierce v. DeVry Education Group[5] - On March 30, 2016, the plaintiff filed a case against DeVry University, Keller Graduate School of Management. The plaintiff alleged that DeVry made deceptive representations about the school accreditation, transferability of the credits, and job placement rates in violation of New Jersey state laws. The case was settled by the parties on December 21, 2016. This case has a pending borrower defense application. |
|---|---|
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BD** | N/A |
| **News Articles/Media** | N/A |
| **Name of Reviewer** | Nastashia Matos |
| **Date Review Completed** | 04/03/2020 |

**SUMMARY OF ALLEGATIONS AND RECOMMENDATION**

| **Summary of Allegations Reviewed** | **Application Summary:[6]**<br>Borrower defense reviewed a sample of 50 allegations for each allegation category to identify potential trends in the applicant pool. As of April 2, 2020, there are 810 borrower applications for the Keller Graduate School of Management. The most common allegations are employment prospects and transferring of credits/school accreditation. Many of the allegations regard misrepresentations or omissions made by the school, but borrowers have not provided relevant supporting evidence to support their allegations.<br><br>**Allegation Break Down:**<br><br>Employment Prospects: 649 allegations<br>Out of 50 sampled allegations, 34 of the 50 made employment prospect allegations that might warrant BD relief, if supported by evidence. The borrowers allege that Keller guaranteed jobs, that they were told career services would place them in a |
|---|---|

---

[3] https://usdedeop.sharepoint.com/teams/FSA/zdo%20not%20use/Forms/AllItems.aspx?id=%2Fteams%2FFSA%2F zdo%20not%20use%2FBorrower%20Defense%20Team%2FInvestigations%2FMid%2DSize%2FIn%20Progress%2FN astashia%2FKeller%20Graduate%20School%20of%20Managment%2FConsolidated%2DAmended%20Rangel%20v% 2E%20Adtalem%20Complaint%2Epdf&parent=%2Fteams%2FFSA%2Fzdo%20not%20use%2FBorrower%20Defense %20Team%2FInvestigations%2FMid%2DSize%2FIn%20Progress%2FNastashia%2FKeller%20Graduate%20School%2 0of%20Managment; *Luis Rangel, et al. v. Adtalem Global Education, Inc. and DeVry University, Inc.*, Civil Action No. 5:18-cv-0082-DAE.

[4] Attachment B: Plaintiffs of the Rangel Case with a Pending Borrower Defense Application.

[5] https://www.courtlistener.com/docket/13352609/peirce-v-devry-education-group/; Borrower Defense case no. 01252100.

[6] See Attachment C: Keller Graduate School of Management Summary of Application Overview

DOE00011332

job after graduation, that they were offered job placement, and that 90% of DeVry graduates obtain a job within 6 months from the date of graduation. There was insufficient commonality of campus and/or time period to suggest a pattern that warrants further investigation, and the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Program Cost and Nature of Loans: 426 allegations
Out of 50 sampled allegations, only 12 made allegations that might warrant BD relief, if supported by evidence. Those borrowers stated that Keller misrepresented the total cost of the program when the borrower was told a certain amount but was charged another. There was insufficient commonality of campus and/or time period to suggest a pattern that warrants further investigation, and the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Transferring Credits: 226 allegations
Out of 50 sampled allegations, 31 made allegations that might warrant BD relief, if supported by evidence. The borrowers allege that Keller misrepresented the nature of their accreditation and the transferability of credits. There was insufficient commonality of campus and/or time period to suggest a pattern that warrants further investigation, and the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Career Services: 574 allegations
Out of 50 sampled allegations, 30 made career services allegations that might warrant BD relief, if supported by evidence. The borrowers allege that Keller misrepresented the nature and availability career services, job placement ability and offered job placement, and that 90% of Keller graduates obtain a job within 6 months from the date of graduation. There was insufficient commonality of campus and/or time period to suggest a pattern that warrants further investigation, and the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Educational Services: 327 allegations
Out of 50 sampled allegations, only 2 made educational services allegations that might warrant BD relief. The educational service allegations were that borrowers were promised tutoring services, and that the school represented that professors who taught the classes were IT experts. The borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Admissions and Urgency to Enroll: 343 allegations
After sampling 50 allegations, none of the allegations were the type to warrant borrower defense relief. Additionally, borrowers failed to provide relevant supporting evidence for these allegations.

DOE00011333

| | Other: 421 allegations |
|---|---|
| | After sampling 50 allegations, only 2 out of the 50 made allegations that might warrant BD relief, alleging promises of a job and misrepresenting accreditation by DeVry University/Keller Graduate School of Management. The other allegations reference the FTC settlement with DeVry; none of the applicants' state that they were involved in the suit or benefited from the suit. |
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings), Department of Education internal resources (FRPDs, AASG, and OIG investigations), and the sampling of claims, there is insufficient evidence of widespread misconduct by Keller Graduate School of Management to warrant further investigation, with the possible exception of the borrowers listed on Attachment B (discussed below). Additionally, as there is no evidence of widespread misconduct, notice to the school on these claims is not required. <br><br> BD recommends that the cases be adjudicated using the standard protocol, with the exception of the Rangel plaintiffs identified in Attachment B. The cases identified in Attachment B should be set aside, and the applicants contacted by Investigations. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Michael Page |
| **DATE:** | 4/24/2020 |

| **Evidence Considered** | ☐ Attorney Submission <br> ☐ **Borrower Submission** <br> ☐ **Evidence Obtained by the Department in conjunction with its regular oversight activities** <br> ☐ Federal Trade Commission <br> ☐ Department of Justice <br> ☐ Securities and Exchange Commission <br> ☐ Attorney General _____ (state) <br> ☐ Consumer Financial Protection Bureau <br> ☐ ED - FSA/OIG <br> ☐ Other |
|---|---|

4

Attachment A:

Keller Graduate School of Management Locations

DOE00011335

| OPE ID | Location | Status |
|--------|----------|--------|
| 02075400 | Downers Grove, IL | Open |
| 02075401 | Phoenix, AZ | Open |
| 02075402 | Kansas City, MO | Open |
| 02075403 | Milwaukee, WI | Open |
| 02075404 | Schaumburg, IL | Open |
| 02075405 | Naperville, IL | Open |
| 02075406 | Lincolnshire, IL | Open |
| 02075407 | Tinley Park, IL | Open |
| 02075408 | Kansas City, MO | Open |
| 02075409 | Mesa, AZ | Open |
| 02075410 | Elgin, IL | Open |
| 02075411 | Waukesha, WI | Open |
| 02075412 | Saint Louis, MO | Open |
| 02075413 | Decatur, GA | Open |
| 02075414 | Atlanta, GA | Closed: 2/7/2013 |
| 02075415 | Long Beach, CA | Open |
| 02075416 | Pomona, CA | Open |
| 02075417 | Manassas, VA | Open |
| 02075418 | Chicago, IL | Open |
| 02075419 | Merrillville, IN | Open |
| 02075420 | St, Louis, MO | Closed: 5/29/2007 |
| 02075421 | San Diego, CA | Open |
| 02075422 | San Jose, CA | Closed: 02/27/2007 |
| 02075423 | Atlanta, GA | Closed: 11/22/1999 |
| 02075424 | Atlanta, GA | Open |
| 02075425 | Fremont, CA | Open |
| 02075426 | Alpharetta, GA | Open |
| 02075427 | Irvine, CA | Open |
| 02075428 | Fremont, CA | Closed: 08/10/2000 |
| 02075429 | Tampa, FL | Open |
| 02075430 | Orlando, FL | Open |
| 02075431 | Phoenix, AZ | Open |
| 02075432 | Arlington, VA | Open |
| 02075433 | Chicago, IL | Open |
| 02075434 | Sherman Oaks, CA | Open |
| 02075435 | Broomfield, CO | Closed: 07/01/2004 |
| 02075436 | Miami, FL | Open |
| 02075437 | Bethesda, MD | Open |
| 02075438 | Columbus, OH | Open |
| 02075439 | Orlando, FL | Open |
| 02075440 | Bellevue, WA | Open |
| 02075441 | Irving, TX | Open |
| 02075442 | Duluth, GA | Open |
| 02075443 | Cleveland, OH | Closed: 8/6/2008 |
| 02075444 | Federal Way, WA | Open |

DOE00011336

| 02075445 | Oakland, CA | Open |
| 02075446 | Columbus, OH | Open |
| 02075447 | Houston, TX | Open |
| 02075448 | Charlotte, NC | Open |
| 02075449 | Fort Washington, PA | Open |
| 02075450 | King of Prussia, PA | Open |
| 02075451 | Colorado Springs, CO | Open |
| 02075452 | Richardson, TX | Open |
| 02075453 | Miramar, FL | Open |
| 02075454 | Atlanta, GA | Open |
| 02075455 | Long Island City, NY | Closed: 1/25/2012 |
| 02075456 | New York, NY | Open |
| 02075457 | Beachwood, OH | Closed: 8/13/2003 |
| 02075458 | Indianapolis, IN | Open |
| 02075459 | Pittsburgh, PA | Open |
| 02075460 | Portland, OR | Open |
| 02075461 | Henderson, NV | Open |
| 02075462 | Independence, OH | Open |
| 02075463 | Gurnee, IL | Open |
| 02075464 | Philadelphia, PA | Open |
| 02075465 | Atlanta, GA | Open |
| 02075466 | Atlanta, GA | Closed: 2/7/2013 |
| 02075467 | Westminster, CO | Open |
| 02075468 | Fort Lauderdale, FL | Open |
| 02075469 | Fort Worth, TX | Open |
| 02075470 | Greenwood Village, CO | Open |
| 02075471 | Elk Grove, CA | Open |
| 02075472 | Austin, TX | Open |
| 02075473 | Edina, MN | Open |
| 02075474 | Stockbridge, GA | Open |
| 02075475 | St. Louis Park, MN | Closed: 6/29/2012 |
| 02075476 | San Antonio, TX | Open |
| 02075477 | Morrisville, NC | Open |
| 02075478 | Fresno, CA | Open |
| 02075479 | Cincinnati, OH | Open |
| 02075480 | Oklahoma City, OK | Open |
| 02075481 | Houston, TX | Open |
| 02075482 | Colton, CA | Open |
| 02075483 | Sandy, UT | Open |
| 02075484 | Dayton, OH | Open |
| 02075485 | Memphis, TN | Open |
| 02075486 | Tampa, FL | Open |
| 02075487 | Jacksonville, FL | Open |
| 02075488 | San Jose, CA | Open |
| 02075489 | Nashville, TN | Open |
| 02075490 | Chesapeake, VA | Open |

DOE00011337

| 02075491 | Southfield, MI | Open |
|----------|----------------|------|
| 02075492 | Bakersfield, CA | Open |
| 02075493 | Palmdale, CA | Open |
| 02075494 | Louisville, KY | Open |
| 02075495 | Paramus, NJ | Open |
| 02075496 | Daly City, CA | Open |
| 02075497 | Alhambra, CA | Open |
| 02075498 | Anaheim, CA | Open |
| 02075499 | Chicago, IL | Open |
| 12075400 | Glendale, AZ | Open |
| 12075401 | North Brunswick, NJ | Open |
| 12075402 | Cedar Hill, TX | Closed: 2/7/2013 |
| 12075403 | Sugar Land, TX | Open |
| 12075404 | Rego Park, NY | Open |
| 12075405 | Oxnard, CA | Open |
| 12075406 | Lynnwood, WA | Open |
| 12075407 | Cranberry, PA | Closed: 2/8/2012 |
| 12075408 | Cherry Hill, NJ | Open |

DOE00011338

Attachment B:
Plaintiffs of the Rangel Case with a Pending Borrower Defense Application

*Luis Rangel, et al. v. Adtalem Global Education, Inc. and DeVry University, Inc.,*
Civil Action No. 5:18-cv-0082-DAE.

| Case No. | Name | Status |
|---|---|---|
| 01498515 | Christina Cabello | Open |
| 01258902 | Elisabeth Nguyen | Open |
| 01378809 | Christal Turner | Open |
| 01497289 | Martin Oloyede | Open |
| 01536610 | Nathalie A. Yeka | Open |
| 01357947 | Tristen Keith Wilson | Open |
| 01395834 | Emmanuel T. Makari | Open |
| 01373933 | Victor P. Sekgantso | Open |
| 01325018 | Candance D. Smith | Open |
| 02028380 | Alan Ta | Open |
| 01483392 | Sharonda Monique' Ford | Open |
| 01464123 | Jayson R. Fox | Open |
| 01376523 | Courtney Frazier | Open |
| 02105111 | Nathaniel Jones | Open |
| 01467302 | Derrick Milan Keith | Open |
| 01404956 | Andres Orlando Salazar | Open |
| 01372594 | Scott Anthony Sullivan | Open |
| 01379962 | Sean Monyese Williams | Open |
| 01478559 | Richard A Shaw | Open |
| 01411595 | Heather M. Emmons | Open |
| 01240869 | Ruben A. Espinoza | Open |
| 01376578 | Barrie Bergans | Open |
| 01375978 | David Michael Corvin | Open |
| 01607080 | Bobby Garza | Closed |
| 01383764 | Kevin Michael Guest | Open |
| 01367463 | Teneika L. Tillis | Open |
| 01376566 | Billy Jerome Morris | Open |
| 01306556 | Eddie Silas | Open |
| 01403434 | Tuwandra L. Harris | Open |
| 01904328 | Joshua A Palczynsky | Open |
| 01527803 | Ebony R. Ijeh | Open |

Attachment C:

Keller Graduate School of Management Application Sample Overview

DOE00011340

# Exhibit 54



PROUD SPONSOR *of*
*the* AMERICAN MIND™

## Initial Review of Mid-Size Batch Applications

## BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Empire Beauty School (49 listed Franchises.  See attached document for individual OPEIDs.)[1] |
| **Open or Closed** | See Attached OPEID Document |
| **Date Advanced Letter Sent** | N/A |
| **Additional Locations**<br>• **Add closure date if applicable** | - Empire Beauty School – Flagstaff (OPEID- 01180800)<br>- Empire Beauty School – Arvada (OPEID- 02072200)<br>- Empire Beauty School – Thornton (OPEID-02160600)<br>- Empire Beauty School – Lakewood (OPEID-01070900)<br>- Empire Beauty School – Littleton (OPEID-02141100)<br>- Empire Beauty Schools – (OPEID-02179600) |
| **Corporate Owner(s)** | Each individual location, while under the franchise umbrella of Empire Beauty School, is independently owned and operated.  Many locations have, or have had, multiple owners at any given time.  While the individual schools (based on their OPEID numbers) are unique, many of them are owned, at least in part, by either EEG, Inc. or Empire Beauty School, Inc. |
| **Total Number of Applications** | There were 205 applications as of August 13, 2020 193 at Empire Beauty School Locations; 3 at Flagstaff; 1 at Arvada; 1 at Thornton; 1 at Lakewood; 3 at Littleton; 3 at Empire Beauty Schools. |
| **Patterns of Alleged Misconduct** | As detailed below, former students at the Empire Beauty School locations have made consistent allegations against the school.  However, based on the applications, the borrowers do not present evidence that indicates that the Empire Beauty School locations listed above have committed overt or repetitive misconduct, fraud, or misrepresentations.  The application narratives provide individual experiences, frustrations, or issues encountered as a customer of Empire Beauty School.  Additionally, although some of the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence to establish a pattern or practice of this type of misconduct. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | **AAASG/Debarment**<br>In 2007, Ms. Janet Ferguson was sent notice proposing to debar her from participation in all covered transactions under procurement and non-procurement programs and activities of any federal agency.  As an Admissions Representative at Empire Beauty School in Harrisburg, PA, Ms. Ferguson plead guilty to Making False Statements in Federal Student Loan Applications and False Use of a Social Security Number.  Under the first count, Ms. Ferguson admitted to knowingly and willfully making |

---

[1] Empire Beauty School OPEIDs

**Federal Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND™

materially false statements in federal student loan and grant applications for the purpose of obtaining federal education benefits and with the intent to deceive.  As a result of her guilty plea, Ms. Ferguson was sentenced to 14 months of imprisonment and was ordered to restitution to Empire Beauty School in the amount of $9,191.36 and to the PA Department of Labor, $9,204.00.

In 2011, Tara Wright, former Admissions Representative at Empire's Manhattan Campus enrolled ineligible students at Empire by creating and/or accepting fraudulent High School Diplomas and New York State General Equivalency Diplomas (GED), as well as falsifying registration and financial aid documents.   She was debarred for her actions.  On July 20, 2009, Wright was sentenced on felony charges of federal financial aid fraud in the United States District Court in the Southern District of NY.

On June 26, 2013, AAASG sent notice proposing to debar Mr. David Benton from receiving financial and non-financial assistance or benefits from any federal agency, under procurement and non-procurement programs and activities.  As a former Admissions Representative for Empire Education Group-Bordentown, from about April 2, 2007 through March 9, 2009, Mr. Benton created false documents, made false statements on documents, accepted false documents, and forged documents necessary for students to obtain federal financial aid.  As a result of his conviction for falsifying documents for students to obtain federal student aid, Mr. Benton was sentenced to, among other things, five years of probation, six months home confinement, and 300 hours of community service.  Mr. Benton was also ordered to pay a $15,000 fine and an assessment of $100.00.

December 17, 2013, AAASG sent notice proposing to debar Ms. Katie Champion from receiving financial and non-financial assistance or benefits from any federal agency, under procurement and non-procurement programs and activities.  Between December 21, 2007 and June 21, 2010, while employed as an admissions representative at Empire Beauty School, Ms. Champion created false documents, made false statements on documents, accepted false documents and forged documents necessary for students to obtain federal financial aid.[2]

**OIG Investigation**
Ineligible disbursements – one employee falsifying docs. 2015 (02149800)

PRCN: 201330228269

---

[2] AAASG Monthly Report June 2014, AAASG Monthly Report September 2015

DOE00010775



Finding 1.  Ineligible Disbursements
The citation, 34 C.F.R. § 668.32(e), states that in order to receive Federal Student Aid funds, a student must be qualified to study at the Post-Secondary level.  Empire had self-reported to the Office of Inspector General (OIG) that it believed an Admission Representative had admitted and enrolled students who did not have valid high school diplomas or valid GEDs.  The OIG conducted an investigation into this individual and confirmed the fraudulent activity.  Empire was required to provide documented evidence that the funds obtained from these falsified reports, totaling $231,407.88, had been returned to the appropriate program for the students in question.  The final determination stated that based on the documentation provided by Empire, the school must refund the Department $33,687 in interest.

**OIG Investigation**
A 2011 OIG investigation revealed that Tara Wright, former Admissions Representative at Empire's Manhattan Campus enrolled ineligible students at Empire by creating and/or accepting fraudulent High School Diplomas and New York State General Equivalency Diplomas (GED), as well as falsifying registration and financial aid documents.  Approximately $200,000 in Federal Student Aid was disbursed on behalf of the ineligible students based on representations that they were high school graduates or had earned their GEDs.  On July 20, 2009, Wright was sentenced on felony charges of federal financial aid fraud in the United States District Court in the Southern District of NY.  OIG agents reviewed enrollment records for additional Admissions Representatives but did not find substantial evidence to warrant further investigation.  However, the program review did find Empire to be in noncompliance with its campus security policies and distribution of an annual security report.

**PRCN: 201330228268 (02344200) (2015)**
Finding 1: Ineligible Disbursements
The citation, 34 C.F.R. § 668.32(e), states that in order to receive Federal Student Aid funds, a student must be qualified to study at the Post-Secondary level.  Empire had self-reported to the Office of Inspector General (OIG) that it believed an Admission Representative had admitted and enrolled students who did not have valid high school diplomas or valid GEDs.  The OIG conducted an investigation into this individual and confirmed the fraudulent activity.  The investigation confirmed the employee assisted students in obtained fraudulent GEDs and high school diplomas in order to register for classes at Empire.  Empire provided documented evidence that $385,297.08 from the list entitled "Confirmed Ineligible" has been returned to the appropriate program.  The Department was able to confirm $259,318.50 from the list entitled "Fake

DOE00010776



Camden High School Diplomas" was returned to the appropriate program. Empire provided further documentation confirming the funds have been returned to the Department. Based on the documentation submitted by Empire, Empire must refund $80,405.39 in interest to the Department.

The 2013 OIG investigation revealed that a former Empire Admissions Representative at the Bordentown, New Jersey campus, David Benton, enrolled ineligible students at Empire by knowingly accepting fraudulent high school diplomas and New Jersey State General Equivalency Diplomas (GED). Based on a review of Empire's records and interviews conducted by EDOIG, EDOIG determined that Benton was responsible for at least 20 fraudulent enrollments. The total Title IV aid disbursed for these enrollments was $247,694.84. On April 7, 2001, Benton plead guilty to an information for felony charges of Federal Student Aid fraud in the United States District Court in the District of New Jersey. In addition, a subsequent EDOIGs investigation lead to the arrest of Katie Champion, an Admissions Representative at the Cherry Hill campus. Champion also plead guilty to Federal Student Aid fraud in the United States District Court in the District of New Jersey. Based on Empire's review of enrollment records, EDOIG determined that Empire was responsible for a total of $385,297.08 in Title IV disbursed for students who were ineligible based on fake proof of secondary education or whose eligibility was unable to be confirmed.

**Program Compliance**
**PRCN: 201020227160 (OPEID-02173200) (2011)**
This 2011 program review had two findings. The first was Crime Awareness Requirements Not Met and the second was Ineligible Student -High School Student. The nature of these findings do not indicate that this review is related to borrower defense.

**PRCN: 201220227827 (OPEID- 02079410 - formerly 01260500) (2017)**
Finding 1. Inaccurate/Unsupported Attendance Records
Empire Beauty School uses a system known as Time Star to record time and attendance for all of its students. The review of the institution and the Time Star program determined that the Time Star system is impacting the school's ability to properly monitor whether a student is making satisfactory academic process. In addition, it also affects Empire's ability to properly determine when a student has completed the required number of hours in a payment period and started another payment period.

In response to the findings, Empire agreed that the Time Star system had been erroneously set up in a manner that could result in a students



receiving credit for "excess hours" if they clocked in before the scheduled time of their classes and that the "excess hours" could be credited to the students as "makeup" hours even when they had not missed classes. Empire ultimately modified the system to prevent this type of error from occurring again.  They also reviewed their files to determine if there had been improper disbursements of Title IV funds to Empire due to the system error.  The final determination was the Empire is liable for $62,214.02 in returns due back to the Title IV programs. Although Empire failed to properly account for student attendance, this finding is outside the scope of borrower defense.

**PRCN: 201410228466 (OPEID-00966400) (2018)**
Finding 1. Incentive Compensation Violation
Empire violated incentive compensation regulations when it provided employees directly involved in the enrollment and recruitment of students with yearly increases based in part on factors that consider the employee's success in recruiting and securing enrollments.  the incentive compensation violation identified in this finding is a corporate-wide issue for all schools owned and operated by EEG, Inc. Although Empire violated the incentive compensation regulation, this finding is outside the scope of borrower defense.

| | |
|---|---|
| **Internal Contact(s) for Further Investigation** | Jacqueline Watford and Jane Eldred |
| **External Investigations (AG), Evidence or Litigation Related to BD** | A review of publicly available information found no evidence related to Borrower Defense. |
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BD** | ***Jones v. EEG, INC.*, 2016 WL 1572901**<br>The plaintiffs in this lawsuit allege that Empire Beauty Schools systemically charge more for student-provided cosmetology services than the cost of the materials used in providing those treatments in violation of Pennsylvania and New Jersey state law.  A settlement in the case was reached in the amount of $6,750,000. |
| **News Articles/Media** | **REGIS TO MERGE BEAUTY SCHOOLS INTO EMPIRE EDUCATION GROUP – 2007**<br>The Regis Corporation entered into an agreement to merge its 51 accredited cosmetology schools into Empire Education Group.  Upon completion of the transaction, Regis Corporation will own a 49 percent minority interest in Empire Education Group.<br>https://www.sec.gov/Archives/edgar/data/716643/000110465907030693/a07-11872_1ex99.htm |

DOE00010778



| | Empire Beauty School, Inc. Profile<br>https://www.bloomberg.com/profile/company/0835269D:US<br><br>**AG Secures $900,000 to Help Students of Online Education Company**<br>An April 2018, press release put out by the Massachusetts Office of Attorney General Maura Healey mentioned that the MA AG's office "reached a settlement with Empire Beauty, a for-profit cosmetology school with locations in Boston, Framingham, and Malden, over allegations of failing to provide job placement rates to prospective students and engaging in excessive recruitment calls."[3]<br>https://www.mass.gov/news/ag-secures-900000-to-help-students-of-online-education-company |
| --- | --- |
| **Name of Reviewer** | Shana Metzger |
| **Date Review Completed** | 08/24/2020 |

## SUMMARY OF ALLEGATIONS AND RECOMMENDATION

| Summary of Allegations Reviewed | As of August 13, 2020, there were 205 Borrower Defense applications filed against the Empire Beauty School franchises, with enrollment dates ranging from 1987 to 2020.  The bulk of the applicants have enrollment start dates between 2003 and 2019. While the franchises are separate entities, the allegations across the locations were similar in nature.<br><br>Admissions and Urgency to Enroll:<br>Of the 205 applications, 68 borrowers raised admissions and urgency to enroll allegations.  Borrowers allege that various Empire Beauty School franchises used similar sales tactics that included pressuring potential students into enrolling quickly and offering incentive programs such as a discount on tuition if the borrower enrolled right then. These claims are not the type that would warrant Borrower Defense relief absent a misrepresentation.<br><br>Career Services:<br>Of the 205 applications, 99 borrowers raised career services allegations. Borrowers allege that Empire Beauty School(s) failed to assist them with job placement, placed them in externships that they believed would lead to permanent positions but did not, made false promises regarding the types of connections that Empire Beauty School had with potential employers in the community, promised to assist them with interview skills and failed to prepare them for their board certification tests.  Although the allegations asserted may be relevant to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct. |
| --- | --- |

---

[3] I was unable to find any evidence relating to this settlement.



Educational Services:
Of the 205 applications, 94 of the borrowers' allegations discuss the quality of the education received, including misrepresentations as to the quality and qualifications of the instructors, the high turn-over rate of instructors, the student-teacher ratio being higher than promised, and the fact that the school stated that they offered state prep classes but did not. Although the allegation asserted may be relative to Borrower Defense, the borrowers fail to provide any supporting evidence and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

Finally, several borrowers stated additional claims including bullying, inadequate accommodations for a borrower with a learning disability, and fraudulently signing documents on behalf of the borrower. While the potential for issues of harassment, discrimination and fraud need not be ruled out, these allegations are outside a Borrower Defense determination.

Employment Prospects:
Of the 205 applications, 134 borrowers raised employment prospect allegations. Borrowers allege that Empire lied about job placement rates, employment outcomes, job placement assistance, their network of potential employers in each city, and compensation rates upon completion of their course work. In addition, some borrowers claim that the school lied to them about their ability to be gainfully employed upon graduation due to their felony convictions. Borrowers have failed to provide any supporting evidence that exhibits a pattern of practice consistent with misconduct and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.

Program Costs and Nature of Loans:
Of the 205 applications, 124 borrowers raised employment program costs and nature of loans allegations. Borrowers allege that the amount of tuition was one amount and later found out that it was considerably more, that they were not informed about the nature of the loans or how much the program would cost, that the school did not properly explain to them the nature of the loans when they asked, and that the school told them that all equipment would be covered in the tuition but were later made to pay for them separately. These claims are not the type that would warrant Borrower Defense relief absent a misrepresentation.

Finally, several borrowers have alleged that Empire signed for, and took out, loans in their name without the borrowers' knowledge or understanding and/or lied to them about nature and amounts of the loans. In addition, parent borrowers allege that they were unaware that they were taking out loans in



| | their own names but believed that they were co-signing for loans in their child's name.  These types of allegations are consistent with possible fraudulent activity associated various Empire franchisees' loan application and management practices.  However, and while the potential for fraud need not be ruled out, these allegations pertain to a false certification of loans review and therefore, are outside a Borrower Defense determination. |
|---|---|
| | <u>Transferring Credits:</u><br>Of the 205 applications, 150 borrowers raised transferring credits allegations. Borrowers allege that Empire told them that their credits earned at other institutions would transfer over or that their credits were transferrable. However, they do not provide any evidence of the credits' purported transferability and therefore have not provided enough evidence that exhibits a pattern of practice consistent with misconduct and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct.. |
| | <u>Other:</u><br>Of the 205 applications, 112 borrowers raised "other" allegations.  Borrowers provided explanatory narratives relevant to their personal experiences, addressing the implications of acquiring educational debt without secure employment, commenting on the quality of their educational experience, or detailing interpersonal relationship issues.  The allegations do not suggest widespread misrepresentations or violations. These claims are not the type that would warrant Borrower Defense relief absent a misrepresentation. |
| **Recommended Next Steps** | In reviewing the allegations as a whole, a number of the types of allegations asserted by the borrowers are those that are consistent with possible harassment, discriminatory, or fraudulent activity associated various Empire franchisees' loan application and management practices.  However, and while the potential for harassment, discrimination and fraud need not be ruled out, these allegations are outside a Borrower Defense determination.<br><br>With that said, most of the allegations asserted may be relevant to Borrower Defense.  However, based on public information (including public records, news articles, court documents, and filings), Department of Education internal resources (FPRDs, AAASG, and OIG investigations), and the review of the claims, there is insufficient evidence to suggest that the named Empire Beauty School franchises engaged in widespread conduct of a type that would warrant borrower defense relief. In addition, the borrowers fail to provide any supporting evidence to support the allegations.  Without further evidence, it is recommended that the cases be adjudicated individually.  Additionally, as there is no evidence of widespread misconduct, notice to the schools on these claims is not required. |



| Recommended Focus Area(s) | N/A |
|---|---|
| APPROVED BY: | Sarah Angilello |
| DATE: | 08/24/2020 |

| Evidence Considered | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☐ <mark>Evidence Obtained by the Department in conjunction with its regular oversight activities</mark><br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state)<br>☐ Other<br>☐ No Other Evidence Considered |
|---|---|

| Advanced Letter Requests | ☐Standard Letter<br>☐Standard Letter Plus:<br>   • |
|---|---|

**Links:** In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.

- Advanced Letter (if applicable)

- Salesforce Allegation Report
  - Cases with Allegations Report

- Program Review Report

Exhibit 55



PROUD SPONSOR *of* the AMERICAN MIND™

## Initial Review of Medium Batch Applications

### BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Everglades University and Everglades College, d/b/a Keiser University[1] 02151900 |
| **Open or Closed** | Open |
| **Date Advanced Letter Sent** | |
| **Additional Locations** • **Add closure date if applicable** | See Attachment A -Everglades University and Everglades College Additional Locations |
| **Corporate Owner(s)** | Everglades College, Inc. |
| **Total Number of Applications** | 525 (as of 7/1/2020) |
| **Patterns of Alleged Misconduct** | Everglades College currently does not have any pending litigation and BD has not identified evidence that suggests that the Everglades is participating in fraudulent or illegal activity that would support borrower defense discharges. Based on a sample of 50 applications below, the borrowers do not present evidence that indicate Everglades committed misconduct, fraud, or misrepresentations. The application narratives provide individual experiences, frustrations, or misunderstandings encountered as a customer of Everglades. |
| **Internal ED Investigation(s)** • **PC, AAASG, OIG** | **Program Compliance** <br><br> **AAASG and OIG Investigations** |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence** | Assurance of Voluntary Compliance, In the Investigation of Keiser University, et al, Case No. L10-3-1201 <br> 10/25/2012 Settlement without an admission of guilt between the State of Florida and Everglades College over Florida's Deceptive and Unfair Trade Practices Act allegations. |

[1] Everglades, Inc., owns both Everglades University and Keiser University. Everglades, Inc. purchased Keiser in 2011. The 2012 Florida Attorney General Assurance of Voluntary investigated practices at both Everglades University and Keiser University from before and after the sale. Our investigation did not reveal any evidence to establish a pattern or practice of misconduct occurring at Keiser prior to the purchase, outside of the Assurance of Voluntary Compliance noted above.

DOE00010818

| or Litigation Related to BD | Everglades entered into the Assurance of Voluntary Compliance (AVC) without an admission that they violated Florida's Deceptive and Unfair Trade Practices Act, or any other law, and solely for the purpose of resolution of the matter with the Attorney General. The AVC established that Everglades would implement disclosure policies in several areas, including the transfer of credits, to the extent that they were not already in place. <br><br> Pursuant to the AVC, Everglades offered a retraining program for students who attended Everglades during the "relevant period" of 1/1/2008-10/25/2012. The AVC states that Everglades "offered this definition in a show of good faith to their former students and in recognition of the current economic climate of the United States." (AVC Section 10(a)(ii), Page 7).  The Department is not in possession of any evidence from the investigation at this time and the conclusions made in this memo were reached without access to such evidence. |
|---|---|
| External Contact(s) for Further Investigation | N/A |
| External Investigations, Evidence or Litigation NOT related to BD | United States v. Everglades Coll., Inc., 855 F.3d 1279 (11th Cir. 2017) <br> Settlement without an admission of guilt between DOJ and Everglades College over False Claims Act allegations of incentive payments to admission counselors <br><br> Telephone Consumer Protection Act Class Action <br> On July 28, 2016 the Broward Palm Beach New Times wrote an article about a class action suit which contended that Keiser University was using recruiters (also known as admissions counselors) to make phone calls to prospective students. The article claims that the school violated the Telephone Consumer Protection Act by doing so because the recruiters pay was incentivized based on the number of student's they were able to enroll. In a statement from the university concerning this matter, the school denied all wrongdoing. |
| News Articles/Media | https://www.prnewswire.com/news-releases/keiser-university-to-become-private-not-for-profit-university-114160804.html <br> 1/18/2011 Everglades College, Inc., the non-profit owner of Everglades University, acquired Keiser University. <br><br> Florida Attorney General Settlement <br> On October 31, 2012 the Southern Florida Sun Sentinel reported a settlement between Keiser and the Florida attorney general's office. The article discusses that the settlement was the result of an investigation into the admissions practice of Keiser University regarding inaccurate enrollment information. Students made allegations that Keiser was providing misleading information about it costs, accreditation, and the transferability of its credits. The settlement agreement provides that Keiser will not admit any fault for its actions but will provide former students with free retraining, and Keiser promises that its admission counselors will not make any misrepresentations concerning the programs that the school offers. |

2

DOE00010819

| | **For-Profit to Non-Profit Transition**<br>On April 23, 2015 Michael Vasquez of the Miami Herald published an online article discussing the change of Keiser University' status from a for -profit institution to a non-profit institution. This article avers that Keiser's change in status was largely due to the Obama Administration's proposal to significantly limited federal funding for career training programs that schools like Keiser University featured. The article further notes how other similarly situated schools like Keiser felt that it was appropriate to switch their status for regulatory reasons and for the public perception reasons. |
|---|---|
| **Name of Reviewer** | Conor Kruger |
| **Date Review Completed** | 07/06/20 |

## SUMMARY OF ALLEGATIONS AND RECOMMENDATION

| **Summary of Allegations Reviewed** | **Application Sample:**<br>Borrower Defense reviewed a sample of 50 allegations of each allegation type to identify potential trends in the applicant pool. The enrollment dates for Everglades College range from 1990 to 2019. The narratives in the reviewed applications provide commentary on the quality of education, the transferability of credits, and frustrations arising from the attendance at the school.<br><br>**Allegation Break Down**<br>Transferring Credits<br>Of the 525 total applications, 272 raise a transfer of credits allegation. Of the 50 allegations in sampled applications; 26 allegations assert that Everglades specifically told Borrowers that credits were generally transferable, 10 allegations assert that Borrowers' Everglades credits did not transfer to other institutions but make no allegation as to any representations by the school, and 7 allegations assert that Borrowers were unable or had difficulty transferring credits from other institutions into Everglades including some cases where Everglades made representations to the contrary.<br><br>Most of the claims are from borrowers who were enrolled in Everglades before the Assurance of Voluntary Compliance (AVC) was reached on 10/25/2012. Of the 272 transfer of credits allegations, 137 are from Borrowers who attended Everglades during the "relevant period" defined in the AVC. The Everglades applications are from borrowers who attended the school over a 29-year period yet over half of the transfer of credits allegations are from the four-year period defined as the "relevant period" in the AVC. In contrast, only 45 allegations are from Borrowers who attended Everglades after the "relevant period" and the AVC was reached between Everglades and the Attorney General for the State of Florida. Although the allegations asserted are of the type that might warrant BD relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Everglades. |
|---|---|

3

Career Services

Of the 525 total applications, 314 raise a career services allegation. Of the 50 allegations in sampled applications, 14 are of the type that might warrant BD relief, if supported by evidence. The borrowers in the sampled cases allege that they were guaranteed job placement, assistance with job placement, or that they would receive a certain wage or job. Although the allegations asserted are of the type that might warrant BD relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Everglades.

Employment Prospects

Of the 525 total applications, 357 raise an employment allegation. Of the 50 allegations in sampled applications, 20 are of the type that might warrant BD relief, if supported by evidence. The borrowers allege that Everglades representatives lied about job placement assistance, employment outcomes, and the school's relationship with employers. The allegations made in the Employment Prospects claims are quite similar to and/or overlap with those made in the Career Services allegations and many of the allegations in both sections are made by the same borrowers. Borrowers in the sampled cases allege that they were guaranteed job placement, assistance with job placement, or that they would receive a certain wage or job. There are a similar number of Employment Prospect and Career Services throughout the total number of cases and the two have similar rates of relevant cases. Although the allegations asserted are of the type that might warrant BD relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Everglades.

Program Cost and Nature of Loans

Of the 525 total applications, 370 raise a program cost allegation. Of the 50 allegations in sampled cases, 14 are of the type that might warrant BD relief, if supported by evidence. Most of the claims allege that Everglades lied about the cost of attendance, did not properly explain the cost of attendance, or lied about the amount of financial assistance a borrower would receive. A few borrowers allege that they were not informed of payments they would have to make while still enrolled at Everglades. Although the allegations asserted are of the type that might warrant BD relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Everglades.

Educational Services

Of the 525 total applications, 250 raise an educational services allegation. Of the 50 allegations in sampled cases, 16 are of the type that might warrant BD relief, if supported by evidence. The allegations that are of the type that might warrant BD relief are those that allege that they were misled as to the school's accreditation or certification. The borrowers' allegations discuss the quality of the education received, including opinions on the qualifications of instructors, the availability of externships, and the quality of the curriculum  These claims are not the type that would warrant relief absent a misrepresentation.

4

DOE00010821

|  | Admissions and Urgency to Enroll Admissions<br>Of the 525 total applications, 305 raise an admissions allegation. Several borrowers allege that recruiters stated that there were a limited number of spaces filling up quickly and if the borrower failed to sign up that they would have to wait an extended period before enrolling. These claims are not the type that would warrant relief absent a misrepresentation.<br><br>Other<br>Of the 525 total applications, 278 raise an "other" allegation. Of the 50 allegations in sampled cases, 2 are of the type that might warrant BD relief, if supported by evidence. These borrowers provided explanatory narratives relevant to their experiences with accreditation, litigation involving the schools, fees associated with the school. Although the allegations asserted are of the type that might warrant BD relief, borrowers failed to provide relevant supporting evidence with their claims and FSA is not otherwise in possession of evidence to establish a pattern or practice of this type of misconduct occurring at Everglades.<br><br>Job Placement Rate<br>Of the 525 total applications, 2 raise a "job placement rate" allegation, both of which are of the type that might warrant BD relief, but are not supported by evidence. |
| :--- | :--- |
| **Recommended Next Steps** | The transfer of credits allegations suggest a pattern of misconduct relating to representations of the transferability of credits to and from Everglades; however, the borrowers do not provide any evidence of a pattern and FSA is not in possession of evidence from external investigations to corroborate the allegations.<br><br>Accordingly, it is recommended that the cases be adjudicated using the standard protocol. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 07/27/20 |

| **Evidence Considered** | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☐ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application<br>☐ Evidence Obtained by the Department in conjunction with its regular oversight activities<br>☐ Federal Trade Commission (FTC)<br>☐ Department of Justice (DOJ)<br>☐ U.S. Securities and Exchange (SEC)<br>☐ Attorney General _____ (state) |
| :--- | :--- |

5

DOE00010822

| | ☐ Other: Assurance of Voluntary Compliance, In the Investigation of Keiser University, et al, Case No. L10-3-1201 ☐ No Other Evidence Considered |
|---|---|

| Advanced Letter Requests | Standard Letter: ☐ N/A |
|---|---|

**Links:** (In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.)

- Salesforce Allegation Report
- Assurance of Voluntary Compliance, In the Investigation of Keiser University, et al, Case No. L10-3-1201

6

DOE00010823

**Attachment A- Everglades University and Everglades College Additional Locations**

3108500 Everglades University

3108502 Everglades University - Maitland

3108504 Everglades University - Miami

3108503 Everglades University - Tampa

3108501 Everglades University - Sarasota

02151900 Keiser University

02151901 Keiser University - Melbourne Campus

02151902 Keiser University - Tallahassee Campus

02151903 Keiser University - Sarasota Campus

02151904 Keiser University - Daytona Beach

02151905 Keiser College - Daytona Beach Campus

02151906 Keiser University – Lakeland

02151907 Keiser University - Sarasota SCTI Fire Academy

02151908 Keiser University - Miami Campus

02151909 Keiser University - Orlando

02151910 Keiser University – Jacksonville

02151911 Keiser University - Pt St Lucie

02151912 Keiser University - West Palm Beach

02151913 Keiser University - Pembroke Pine

02151914 Keiser University – Tampa

02151915 Keiser University – Miami

02151916 Keiser University - PSL – COG

02151917 Keiser University - Ft Myers

02151918 Keiser University - Tallahassee Additional Classrooms

02151919 Keiser University - San Marcos Nicaragua

02151920 Keiser University – Clearwater

02151921 Keiser University – NPR

02151922 Keiser University - Flagship (Residential)

7

02151923 Keiser University - Patrick Air Force Base

02151924 Keiser University – Naples

8

DOE00010825

Exhibit 56



PROUD SPONSOR *of* the AMERICAN MIND ™

## Initial Review of Medium Batch Applications

### BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Universal Technical Institute (UTI)<br>• 00822100: Avondale, AZ<br>• 02100500: Phoenix, AZ<br>• 02362000: Houston, TX |
| **Open or Closed** | Open |
| **Additional Locations**<br>• **Add closure date if applicable** | • 00822101: Lisle, IL<br>• 00822102: Phoenix, AZ (closed 06/11/04)<br>• 00822103: Rancho Cucamonga, CA<br>• 00822104: Mooresville, NC<br>• 00822105: Norwood, MA<br>• 00822106: Long Beach, CA<br>• 00822107: Mooresville, NC (closed 05/22/17)<br>• 02100501: Phoenix, AZ (closed 08/16/90)<br>• 02100502: Orlando, FL<br>• 02100503: Phoenix, AZ (closed 10/10/16)<br>• 02100504: Phoenix, AZ (closed 10/10/16)<br>• 02100505: Sacramento, CA (02/23/06)<br>• 02362001: Houston, TX (closed 05/07/03)<br>• 02362002: Exton, PA<br>• 02362003: Irving, TX<br>• 02362004: Bloomfield, NJ |
| **Corporate Owner(s)** | • UTI Holdings, Inc.<br>    ○ Universal Technical Institute, Inc |
| **Total Number of Applications** | 601 (as of 5/5/2020) |
| **Patterns of Alleged Misconduct** | UTI currently does not have any pending litigation and no evidence suggests that UTI is participating in misrepresentation or fraudulent activity. Based on a sample of 50 applications, the borrowers do not present evidence that indicate UTI committed overt or repetitive misconduct, fraud, or misrepresentations. The application narratives provide individual experiences, frustrations, or misunderstandings encountered as a customer of UTI. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | Eric Miles: FPRD 07/30/18<br>The Department of Education's Multi-Region & Foreign Schools Participation Division completed a Final Program Review Determination of UTI on July 30, 2018. The review team made nine findings of noncompliance at the school. The most relevant finding to Borrower Defense being "Finding 7: Consumer Information." The team found that UTI did not provide its students with the required disclosure regarding the cost of attendance. This finding is |

| | considered resolved with no further action required on the part of UTI. |
|---|---|
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BD** | • The United States Department of Justice notified UTI that the DOJ has declined to intervene in Federal False Claims Act lawsuit and that it has closed its investigation<br><br>  o In July 2012, UTI received notice from the Department of Justice (DOJ) that it was the subject of a preliminary investigation into claims brought by a former employee who alleged UTI's compensation of its admissions representatives violated the "incentive compensation ban," amongst other potential violations allegedly occurring over a number of years.  The same former employee had filed a complaint with the Department of Labor (DOL) alleging retaliatory employment practices in violation of the whistleblower provisions of the Sarbanes-Oxley Act of 2002. UTI entered into a settlement agreement with the former employee resolving all pending claims.<br><br>  o Under the terms of the settlement agreement, UTI and the former employee, sought dismissal of the False Claims Act Suit and a final agency disposition of the DOL complaint, which were obtained on October 29, 2013 and November 7, 2013, respectively.<br><br>  o As of 5/5/2020, the DOJ has not released any findings in relation to this investigation and has not provided to the Department any evidence.<br><br>• In 2012, UTI was the subject of a Civil Investigative Demand (CID) from the Attorney General of the Commonwealth of Massachusetts related to a pending investigation in connection with allegations relating to student loans, guarantees and grants provided to students at Norwood campus<br><br>  o The investigation is not listed on UTI's most recent 10-Q filing with the SEC, indicating that UTI no longer believes the investigation will have an impact on the company's future financial position.<br><br>  o As of 5/5/2020, the Office of the Attorney General for the Commonwealth of Massachusetts has not released any findings in relation to this investigation and has not provided to the Department any evidence. |
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BD** | • *Fletcher v. Universal Technical Inst., Inc.*, 2006 WL 2297041. unpaid overtime wages and unpaid wages, alleging violations of the Fair Labor Standards Act and Chapter 448 of the Florida Statutes, and Florida common law. |

2

DOE0001 2874

| | |
|---|---|
| | • *Henry v. Universal Technical Institute*, 559 Fed.Appx.648 (2014). Student brought action against school, instructors, and administrators, alleging race and national origin discrimination in violation of Title VI. The United States District Court for the District of Arizona. <br> • *Brady v. University Technical Institute of Arizona, Inc.* No. CV-09-1044-PHX-FJM (2009). An employment arbitration agreement was valid and enforceable, as both the employee and employer were equally bound by the terms of the arbitration agreement. <br> • *Porter v. Universal Technical Institution of North Carolina, Inc.* 2004 WL 2236080 (W.D.N.C.) (2004). Statutory and common-law cause of action for violations of Title VII of the Civil Rights Act of 1964, as amended and wrongful termination in violation of North Carolina Equal Employment Practices Act. |
| **News Articles/Media** | • Law Offices of Todd M. Garber Announces Investigation into Possible Suit Against of Universal Technical Institute, Inc. <br>     o In a press release, the Law Offices of Todd M Garber, a plaintiff's class action firm, announced that it was investigating potential claims related to the Department of Justice preliminary investigation into Federal False Claims Act claims (see above). The law office has not made any public filings or statements in relation to investigation since the press release. <br> • 10-K Filing <br> • Universal Technical Institute Teacher Files Suit Claiming He Was Assaulted in Classroom <br> • Student Complaint Chat "Pissed Consumers" <br> • Thread regarding layoffs theLayoff.com |
| **Name of Reviewer** | Conor Kruger |
| **Date Review Completed** | 05/05/20 |

## RECOMMENDATION

| | |
|---|---|
| **Summary of Allegations Reviewed** | **Application Sample:** <br> Borrower Defense reviewed allegations of each allegation type to identify potential trends in the applicant pool. The enrollment dates for UTI range from 1986 to 2019. The narratives in the reviewed applications provide commentary on the admissions process, the quality of the career services department, the cost of attendance, and frustrations arising from unemployment. <br><br> **Allegation Break Down:** <br> Employment Prospects <br> Five hundred twenty-two of the total applications raise an employment prospects allegation. Of the fifty sampled allegations, twenty-three allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers allege |

3

DOE0012875

that UTI mispresented job placement assistance, employment outcomes, and UTI's relationship with employers. The most common allegations are that UTI guaranteed a job or a wage after graduation. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Program Cost and Nature of Loans
Four hundred fifty of the total applications raise a program cost allegation. Of the fifty sampled allegations, nineteen allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers allege that they were told one price but were ultimately charged another and that they were misled as to whether the aid they received was in the form of grants or loans. Several of the sampled applications allege that they either were not informed about the total cost of attendance or that borrowers were confused as to the total cost. Several borrowers state that UTI made a representation to the effects that they would not have to worry about their loans because they would be making enough to pay them back. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Career Services
Four hundred ninety-one of the total applications raise a career services allegation. Of the fifty sampled allegations, seventeen allegations are of the type that might warrant BD relief, if supported by evidence. The most common allegations are that UTI promised job placement services or job placement assistance. Several claims asserted that UTI guaranteed a wage or employment for the borrower. The rest of the claims asserted that the school promised to help the borrower find a job, but the school failed to deliver. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Admission and Urgency to Enroll
Three hundred eighty-nine of the total applications raise an admissions allegation. Of the fifty sampled allegations, six allegations are of the type that might warrant BD relief, if supported by evidence. The allegations of the type that might warrant BD relief are allegations of misrepresentations related to employment prospects and program cost made during the admissions process or used as the basis for the urgency to enroll. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Educational Services
Three hundred sixty-five of the total applications raise an educational services allegation. Of the fifty sampled allegations, six allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers' allegations discuss the quality of the education received, including the lack of hands-on training and relevance of the curriculum to the profession. Borrowers failed to

4

DOE0001 2876
DOE0001574

|  | provide relevant supporting evidence to establish misconduct regarding educational services. |
|--|--|
|  | **Transfer of Credits**<br>Two hundred ninety-seven of the total applications raise a transfer of credits allegation. Of the fifty sampled allegations, twenty-nine allegations are of the type that might warrant BD relief, if supported by evidence. Most allegations express credit-related issues encountered throughout the borrower's individual experience. Some borrowers assert that UTI specifically told Borrowers that their UTI credits were generally transferable and their UTI credits did not transfer. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation. |
|  | **Other**<br>Two hundred eighty-five of the total applications raise an "other" allegation. Of the fifty sampled allegations, three allegations are of the type that might warrant BD relief, if supported by evidence. Most of the "other" allegations list the potential violations of Federal law allegedly committed by the school. The rest of the allegations detail issues with the quality of education and the ability to obtain employment afterward. The borrowers failed to provide relevant supporting evidence to establish an allegation of misrepresentation. |
| **Recommended Next Steps** | Based on public information (including public records, news articles, court documents, and filings) and the Department of Education's internal resources (FRPDs, AASG, and OIG investigations), there is no evidence to suggest that Universal Technical Institute engaged in widespread conduct of a type that would warrant borrower defense relief. In addition to research conducted, the 50-case sample did not identify a pattern of practice consistent with general misconduct. The allegations sampled focus on individual experiences and do not suggest widespread misrepresentations or violations. Accordingly, it is recommended that the cases be adjudicated using a standard protocol. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 05/08/20 |

| **Evidence Considered** | ☐ Attorney Submission |
|--|--|
|  | ☐ Borrower Submission |
|  | ☐ Federal Trade Commission |
|  | ☐ Department of Justice |
|  | ☐ Securities and Exchange Commission |
|  | ☐ Attorney General _____ (state) |
|  | ☐ Consumer Financial Protection Bureau |
|  | ☐ ED - FSA/OIG |
|  | ☐ Other - Publicly available SEC filings |

DOE0001_2877

# Exhibit 57



PROUD SPONSOR *of*
the AMERICAN MIND™

### Initial Review of Mid-Size Batch Applications

## BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Suburban Technical School (01093000) |
| **Open or Closed** | Closed (11/21/2011) |
| **Date Advanced Letter Sent** | N/A |
| **Additional Locations**<br>• **Add closure date if applicable** | There are no additional locations for this school, however Suburban Technical School (01093000) merged/consolidated with the Harris School of Business (02104003). |
| **Corporate Owner(s)** | Premier Education Group, L.P.<br><br>• Robert B. Bast<br>• Elizabeth Brennan Trust<br>Private |
| **Total Number of Applications** | As of August 26, 2020, there are 23 applications already adjudicated and one application awaiting adjudication. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | **Program Compliance**<br>Program reviews were conducted on 12/16/2004 and 3/26/2008, however, none of the findings were relevant to borrower defense.<br><br>**AAASG and OIG Investigations**<br>Borrower Defense found no past or pending AAASG or OIG investigations.<br><br>**OGC/DOJ**<br>Borrower Defense found no past or pending OGC/DOJ investigations. |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BORROWER DEFENSE** | *United States, ex rel. LaPorte v. Premier Educ. Grp., L.P.,* Civ. No. 11-3523, 2014 WL 5449745 (D.N.J. Oct.27, 2014)<br><br>Plaintiffs allege that Premier Education Group ("PEG") made or caused to be made false claims and statements in order to participate in the Federal student financial aid programs. Specifically, PEG violated provisions of the contractual agreements between PEG and the Department of Education ("DOE"), called Program Participation Agreements ("PPAs"), in which |

| | |
|---|---|
| | PEG agreed to abide by Federal regulations and not engage in material misrepresentations as a condition of PEG's eligibility to receive said funding. *United States v. Premier Educ. Grp., L.P.*, Civ. No. 113523, 2016 WL 274 7195 (D.N.J. May 11, 2016) Plaintiff's alleged that PEG violated provisions of the contractual agreements between PEG and the DOE, PPA's, in which PEG agreed to abide by federal regulations and not engage in material misrepresentations as a condition of PEG's eligibility to receive said funding. |
| **External Contact(s) for Further Investigation** | N/A |
| **Name of Reviewer** | Carrington Jackson |
| **Date Review Completed** | 8/27/2020 |

| | |
|---|---|
| **Recommended Next Steps** | Based on our search for public information (including public records, news articles, court documents and filings) and Department of Education internal resources (FRPDs, AASG, and OIG investigations), there is insufficient evidence of widespread misconduct by Suburban Technical School to warrant further investigation. If additional evidence is discovered or received in the future, these claims may be revisited as warranted. As such, it is recommended the cases be adjudicated. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Shana Metzger |
| **DATE:** | 08/27/2020 |

| | |
|---|---|
| **Evidence Considered** | ☐ Attorney Submission<br>☐ Borrower Submission<br>☐ Consumer Protection Financial Bureau (CPFB)<br>☒ Department of Education-Office of Investigator General (OIG)<br>☐ Documents Submitted by the school in response to your application |

DOE0001 2674

| | ☐ Evidence Obtained by the Department in conjunction with its regular oversight activities<br>☐ Federal Trade Commission (FTC)<br>☒ Department of Justice (DOJ)<br>☒ U.S. Securities and Exchange (SEC)<br>☐ Attorney General_____(state)<br>☐ Other<br>☐ No Other Evidence Considered |
|---|---|

| **Advanced Letter Requests** | ☐Standard Letter<br>☐Standard Letter Plus:<br>• |
|---|---|

**Links:** In this section please provide the Sharepoint links to working documents and evidence reviewed. Example of items to provide links for below.

- Working Documents
  - https://usdedeop.sharepoint.com/:f:/r/teams/FSA/zdo%20not%20use/Borrower%20Defense%20Team/Investigations/MidSize/In%20Progress/Carrington/Suburban%20Technical%20School?csf=1&web=1&e=fmMZdu
- Program Review Report
  - https://usdedeop.sharepoint.com/teams/FSA/zdo%20not%20use/Borrower%20Defense%20Team/Investigations/Mid-Size/PEPS%20School%20Reports/Suburban%20Technical%20School%20OPEID%2001093000.PDF

3

Exhibit 58

**Florida Career College** – Evidence Considered Protocol

<u>Applicable to</u>:

Florida Career College

<u>Entering Evidence Considered Manually</u>:

1. Open a case with a suggested closing correspondence value of Standard Denial with Evidence Considered in status 3.10
2. In the "Evidence Considered" field on the case select the following:
    a. Evidence obtained by the Department in conjunction with its regular oversight activities
3. In the "Other Evidence" field on the case input the following:
    a. Britt v. IEC d.b.a. Florida Career College (S.D. Fla, April 20, 2020)
    b. Ortiz v. IEC Corporation (S.D.Fla-Miami, May 15, 2019)
4. The case is now ready to process following the normal borrower notification letter creation process.

<u>Bulk Update Options</u>:

Bulk update (by work ticket to Accenture) all Florida Career College cases in 3.10 with the following:

    a. In the "Evidence Considered" dropdown, select "Evidence obtained by the Department in conjunction with its regular oversight activities."
    b. In the "Other Evidence" field on input the following:
        i. Britt v. IEC d.b.a. Florida Career College (S.D. Fla, April 20, 2020)
        ii. Ortiz v. IEC Corporation (S.D.Fla-Miami, May 15, 2019)

2. Process following the normal borrower notification letter creation process.

# Exhibit 59

NO. __D-1-GN-19-000017__

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| | § | |
| STATE OF TEXAS | § | |
| | § | |
| | § | |
| and | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAREER EDUCATION CORPORATION, | § | |
| AMERICAN INTERCONTINENTAL | § | |
| UNIVERSITY, INC., and | § | |
| COLORADO TECHNICAL UNIVERSITY, | § | |
| INC. | § | |
| Respondent. | § | 353RD JUDICIAL DISTRICT |

## ASSURANCE OF VOLUNTARY COMPLIANCE

This Assurance of Voluntary Compliance ("AVC") is entered into by the Attorneys General of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (referred to collectively as the "Attorneys General") and Career Education Corporation ("CEC"), American InterContinental University, Inc. ("AIU") and Colorado Technical University, Inc. ("CTU"), including, except as otherwise provided herein, all of their respective subsidiaries, affiliates, successors, and assigns (collectively, "CEC" and, together with the Attorneys General, the "Parties").

This AVC resolves certain claims of the Attorneys General relating to CEC's compliance with applicable state consumer protection laws, particularly with respect to recruitment and enrollment practices relating to CEC's institutions' post-secondary educational programs.

CEC enters into this AVC solely for the purpose of resolving the allegations and related claims of the Attorneys General.  Nothing contained herein shall constitute or may be construed as an admission by CEC of any liability or wrongdoing.

## PARTIES

1.     The parties to this AVC are as follows:

(a)     The State of Texas through Attorney General Ken Paxton, is authorized to enforce its consumer protections laws, including Texas Deceptive Trade Practices – Consumer Protection Act.  See, Tex. Bus. & Com. Code Ann §§ 17.41-17.63.

(b)     Career Education Corporation is a Delaware corporation with corporate headquarters at Schaumburg, Illinois.  American InterContinental University, Inc. is a Georgia Corporation with its corporate headquarters in Schaumburg, Illinois. Colorado Technical University, Inc. is a Colorado corporation with its corporate headquarters in Colorado Springs, Colorado.

## THE ALLEGATIONS OF THE ATTORNEYS GENERAL

2.     At times during the course of offering enrollment in educational programs, CEC placed significant pressure on its employees to enroll students and engaged in unfair and deceptive practices by making misleading statements to prospective students, failing to disclose material facts to prospective students, and otherwise engaging in Unreasonable Recruitment Methods in violation of state consumer protections laws as follows:

(a)     CEC misled students about the total costs of enrollment at CEC institutions;

(b)     CEC misled students about the transferability of credits into CEC from other institutions and out of CEC to other institutions;

(c)     CEC misrepresented their program offerings and the potential to obtain employment in the field desired by prospective students, including failing to adequately disclose the fact that certain programs lacked the necessary programmatic accreditation, which negatively affect a student's ability to obtain a license or employment; and

(d)     CEC engaged in unfair and deceptive practices in calculating job placement rates, thereby giving prospective students an inaccurate impression of CEC graduates' employment outcomes.  CEC's misrepresentations related to job placement rates include but are not limited to:

    (i)     misrepresenting CEC graduates who worked only temporarily as having been "placed," based, for example, on less than two weeks of work or having continued in an internship for a week after graduation; and

    (ii)     misrepresenting CEC graduates as having been "placed" in fields in which the students trained or in related fields, when in fact, CEC graduates employment was neither in the field in which the graduate was trained nor in a field related to their field of study.

As a result of the unfair and deceptive practices described above, some students enrolled in CEC who would not have otherwise enrolled, could not obtain professional licensure, and/or incurred debts that they could not repay nor discharge.

## CEC'S RESPONSE TO ALLEGATIONS

3.     CEC denies the allegations of the Attorneys General, including those set forth in paragraph 2, denies any wrongdoing or liability of any kind, and enters into this AVC solely for the purpose of resolving certain disputed claims of the Attorneys General relating to the

allegations including those set forth above in paragraph 2.

## DEFINITIONS

Whenever the terms listed below are used in this AVC, the following definitions shall apply:

4.     "**Administrator**" shall have the meaning set forth in paragraphs 34 through 37 below.

5.     "**Admissions Advisor**" means any natural person employed by CEC who has substantial responsibility for encouraging Prospective Students to apply or enroll in a Program of Study or recruiting Prospective Students, including but not limited to assisting Prospective Students with the application process and informing Prospective Students about Programs of Study at CEC's institutions, but shall exclude Financial Aid Advisors.

6.     "**Anticipated Total Direct Cost**" means the estimated cost of tuition, fees, books, supplies, and equipment to complete a Program of Study.

7.     "**Attorneys General**" means the Attorneys General of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

8.     "**CIP Code**" means the six-digit U.S. Department of Education Classification of Instructional Program ("CIP") code identified for a particular Program of Study.

9.     "**CIP to SOC Crosswalk**" means the crosswalk developed by the National Center for

Educational Statistics and the Bureau of Labor Statistics relating CIP Codes to Standard Occupational Classification ("SOC") codes and available at http://nces.ed.gov/ipeds/cipcode/resources.aspx or its successor site.

10.     "**Clearly and Conspicuously**" or "**Clear and Conspicuous**," when referring to a statement or disclosure, means that such statement or disclosure is made in such size, color, contrast, location, and duration that it is readily noticeable, readable, and understandable. A statement may not contradict or be inconsistent with any other information with which it is presented.  If a statement modifies, explains, or clarifies other information with which it is presented, it must be presented in proximity to the information it modifies, in a manner that is likely to be noticed, readable, and understandable, and it must not be obscured in any manner.

11.     "**Core Skills**" means skills that are necessary to receive a diploma or degree in a Student's field of study, such that failure to master these skills will result in no diploma or degree being awarded.  "Core Skills" are specific to the Program of Study and are not taught in general education courses or generally taught across all fields of study, and are not the same as basic skills, which are skills that are necessary for success in a Student's field of study, but which the Student should possess upon entry into a Program of Study.  Core Skills do not include generic skills such as "collaboration," "team work," and "communication," and for bachelor's degree programs, Core Skills do not include skills taught in 100-level courses unless the skill is refined and specifically identified in upper-level courses.

12.      "**Cost of Attendance**" means cost of attendance as defined in the Federal Higher Education Act of 1965, § 472, 20 U.S.C. § 1087ll, or as that statute may be amended.

13.    "**Completer**," only for purposes of calculating a Job Placement Rate in accordance with this AVC, means a Student who is no longer enrolled in a Program of Study and who has either completed the time allowed or attempted the maximum allowable number of credits for the Program of Study but who did not accomplish the requirements for graduation, such as:

(a)    achieving the necessary grade point average;

(b)    attaining required competencies or speed skills; or,

(c)    satisfying non-academic requirements, including but not limited to paying outstanding financial obligations.

14.    "**Do Not Call Registry**" means the national registry established by the Federal Communications Commission and the Federal Trade Commission and the state registry established by the Public Utility Commission of the State of Texas that prohibits the initiation of outbound telephone calls, with certain statutory exemptions, to registered consumers.

15.    "**Effective Date**" means January 2, 2019.

16.    "**Electronic Financial Impact Platform**" means an interactive, internet-based program that produces a personalized disclosure for a Prospective Student of the potential financial impact of pursuing a particular Program of Study and incurring a specific amount of debt. The platform shall permit Prospective Students to input and/or adjust fields to customize the resulting disclosure, including but not limited to the fields that pertain to sources of funding (*i.e.*, scholarships, grants, student contributions, federal loans, and private loans) and post-graduation expenses, and shall generate a customized disclosure for the Prospective Student that shows current estimates of (a) the Prospective Student's

Anticipated Total Direct Costs in pursuing the Program of Study, (b) the Prospective Student's Cost of Attendance, including each component thereof, (c) the Prospective Student's estimated total debt incurred by pursuing the Program of Study at the time of repayment and the corresponding monthly loan payments over a term of years based on the loan interest rate information, (d) the Prospective Student's estimated income if he/she successfully graduates from the Program of Study, if available from the U.S. Department of the Education, and (e) the Prospective Student's estimated post-graduation expenses, including personal financial obligations such as rent or mortgage payments, other debt, car payments, child care expenses, utilities, and the like. The Electronic Financial Impact Platform shall also provide information about the Program of Study, including the following information: Program Completion Rates, Median Debt for Completers, and Program Cohort Default Rate. For the avoidance of doubt, the Parties agree that the Program Cohort Default Rate and the Median Earnings for Completers are to be calculated by the U.S. Department of Education and that this AVC does not require CEC itself to calculate these figures for use in the Electronic Financial Impact Platform if unavailable from the U.S. Department of Education.

17. "**Enrollment Agreement**" shall mean the document executed by a Prospective Student that sets forth certain terms and conditions of the Prospective Student's enrollment in a Program of Study.

18. "**Executive Committee**" shall refer to the Attorneys General of the States of Connecticut, Illinois, Iowa, Kentucky, Maryland, Oregon, and Pennsylvania.

19. "**Financial Aid Advisor**" means any natural person employed by CEC who has substantial responsibility for assisting or advising Students and Prospective Students with respect to

financial aid matters.

20.   "**Former Employee**" means any person who was employed by CEC on or after the Effective Date and who is no longer employed by CEC.

21.   "**Good Cause**" means: (a) a material and substantial breach of the terms of this AVC by the Administrator, including the failure to comply with the terms and limitations of this AVC, (b) any act of dishonesty, misappropriation, embezzlement, intentional fraud, or similar conduct by the Administrator, (c) any intentional act of bias or prejudice in favor or against either party or Students by the Administrator, or (d) conduct by the Administrator that demonstrates unfitness to serve in any administrative capacity. Good Cause shall not include disagreements with the decisions of the Administrator pursuant to this AVC, unless there is a clear pattern in the Administrator's decisions that demonstrates or shows that the Administrator has not been acting as an independent third party in rendering decisions.

22.   "**Graduate**," only for purposes of calculating a Job Placement Rate in accordance with this AVC, means a Student who has accomplished all of the requirements of graduation from a Program of Study, such as, for example, achieving the necessary grade point average, successfully passing all required courses and meeting all clinical, internship, and externship requirements, and satisfying all non-academic requirements.

23.   "**Job Placement Rate**" means the job placement rate calculated in accordance with this AVC and is a numeric rate calculated by dividing the total number of placed Graduate/Completers by the total number of Graduate/Completers who do not qualify for exclusion from the calculation as set out below. CEC shall count a Graduate/Completer as placed or excluded for purposes of calculating a Job Placement Rate in accordance with this AVC only where CEC is able to successfully contact a Graduate/Completer or

employer to verify employment or exclusion and possesses at the time it is calculating the Job Placement Rate the documentation required below.

(a)     In calculating Job Placement Rates in accordance with this AVC, CEC shall assess whether the Student has been placed within six (6) months of the later of (i) the end of the month in which the Student becomes a Graduate/Completer or (ii) if a license or certification is required for the relevant occupation, the date on which the results of the first licensing or certification exam for which the Graduate/Completer was eligible to sit become available; *provided*, *however*, that such six (6) month period shall be extended for up to sixty (60) days to permit Students who accepted employment prior to the expiration of such six (6) month period to satisfy the minimum employment threshold set forth in paragraph 68(a)(v) and (a)(vi), in which case the Graduate/Completer shall be excluded from the current reporting cohort and included in the next reporting cohort.

(b)     In calculating a Job Placement Rate in accordance with this AVC, a Graduate/Completer may be excluded from the total number of Graduates/Completers (*i.e.*, the denominator) if CEC obtains written documentation that the Graduate/Completer:

(i)      has a medical condition or disability that results in the Graduate/Completer's inability to work or the Graduate/Completer is not available for employment because the Graduate/Completer has a parent, child, or spouse who has a medical condition that requires the care of the Graduate/Completer;

(ii)     is engaged in full time active military duty;

(iii)   is enrolled at least half-time in an additional program of post-secondary education;

(iv)   is deceased;

(v)   is not eligible for placement in the United States because of visa restrictions;

(vi)   is a spouse or dependent of military personnel who have moved due to military transfer orders;

(vii)   is incarcerated; or

(viii)   qualifies for any other job placement rate calculation exclusion that the U.S. Department of Education adopts subsequent to the Effective Date, unless the Attorneys General determine in their reasonable judgment within thirty (30) days of being notified by CEC of the adoption of such waiver that recognizing the waiver for purposes of calculating the Job Placement Rate would be contrary to the interests of Prospective Students; *provided, however*, that CEC shall have the right to apply to the District Court for the State of Iowa, Fifth Judicial District, for a ruling as to whether any such determination by the Attorneys General was reasonable under the circumstances.

(c)   Where CEC excludes a Graduate/Completer from the total number of Graduate/Completers for the purposes of calculating the Job Placement Rate, CEC shall not count that Graduate/Completer as "placed."

24.   "**Median Earnings for Completers**" means the earnings calculated according to the definitions and method provided by the U.S. Department of Education in 34 CFR 668.413(b)(8) and as that regulation may be amended or recodified.

25.   "**Median Debt for Completers**" includes Title IV loans, institutional loans, private loans, credit, or unpaid balances extended by or on behalf of the CEC institution to Students, as provided in 34 CFR 668.404(d)(1).  Median Debt for Completers is the median debt for Students who completed the program during the most recent award year and is determined according to the definitions and method provided in 34 CFR 668.413(b)(4) and as that regulation may be amended or recodified.

26.   "**Program Cohort Default Rate**" means the program cohort default rate determined according to 34 CFR 668.413(b) (13) and as that regulation may be amended or recodified.

27.   "**Program Completion Rate**" means the program completion rate for full-time Students calculated according to the definitions and method provided by the U.S. Department of Education in 34 CFR 668.413 and as that regulation may be amended or recodified.

28.   "**Program of Study**" shall mean a series of courses, seminar, or other educational program offered at a CEC institution in the United States, for which CEC charges tuition and/or fees, which is designed to lead toward a degree, certificate or diploma, and which (a) is eligible for Title IV funding, (b) involves more than 25 contact hours in a credit bearing course, or (c) is designed to make a Student eligible to sit for any state or national certification or licensing examination.  Notwithstanding anything in the foregoing sentence to the contrary, non-credit courses, courses paid for entirely by employers, or programs offered for personal enrichment, *i.e.*, hobby or training courses, that are not Title-IV eligible, courses that are not taken for the purpose of ultimately obtaining a degree, certificate, diploma, or review courses that are designed to assist with a Student's preparation for a state or national certification or licensing exam for which the Student is already eligible to sit, shall not be Programs of Study.

29.  "**Prospective Student**" means any natural person who is being recruited for a Program of Study and/or pursuing enrollment at a CEC institution in a Program of Study and is a resident of a state which is a party to this AVC at the time of such recruitment or pursuit.

30.  "**Student**" means any natural person who is or was enrolled at a CEC institution in a Program of Study and is or was a resident of a state which is a party to this AVC at the time of enrollment.

31.  "**Third-Party Lead Vendor**" means any third-party vendor (whether a person, corporation, partnership, or other type of entity) that is directly retained and authorized by CEC to provide Prospective Student inquiries to CEC, but excludes companies that host CEC's advertising or marketing content including but not limited to Facebook, Google, Twitter, and LinkedIn.

32.  "**Transferability of Credits Disclosure**" means a disclosure with respect to the transferability of credits earned at CEC institutions.  For regionally accredited institutions, each such disclosure shall state: "Course credits are not guaranteed to transfer to other schools."  For all other institutions each such disclosure shall state: "Course credits will likely not transfer to other schools.  Degrees will likely not be honored by other schools." CEC shall be permitted to make such reasonable changes to the Transferability of Credits Disclosure that are approved by the Administrator in consultation with the Attorneys General.

33.  "**Unreasonable Recruitment Methods**" means the intentional exploitation of a Prospective Student's fears, anxieties, or insecurities, or any method intentionally calculated to place unreasonable pressure on a Student to enroll in a CEC institution.

## **TERMS OF AGREEMENT**

## **ADMINISTRATOR PROVISIONS**

### **Appointment of an Administrator**

34.     Robert M. McKenna, Esq. of Orrick, Herrington & Sutcliffe LLP is appointed as the Administrator to oversee CEC's compliance with the provisions of this AVC, effective as of the Effective Date.   The Administrator may act directly or through staff, agents, employees, contractors, and representatives in overseeing CEC's compliance with the terms of this AVC.

35.     Contemporaneously with the execution of this AVC, the Parties shall execute a separate Work Plan that sets forth the Administrator's scope of work consistent with the Powers and Duties of the Administrator, set forth in paragraph 39.   In the event of any dispute arising over the Administrator's performance or the reasonableness of the Administrator's costs and fees, either CEC or the Attorneys General may request that the issue be submitted to the Iowa Attorney General, and, if necessary, the issue may be resolved by the District Court for the State of Iowa, Fifth Judicial District.

36.     The Administrator may be dismissed for any reason by agreement of the Parties.   In the event the Parties do not agree to the dismissal of the Administrator, either the Attorneys General or CEC may submit the question of the Administrator's dismissal to the District Court for the State of Iowa, Fifth Judicial District, and the Administrator shall only be dismissed if that court finds that there is Good Cause for dismissal.

37.     The Administrator shall be appointed for a term of three (3) years, to run from the Effective Date.  If the Administrator is dismissed or leaves the position for any reason before the end of the term, another Administrator shall be appointed by agreement of CEC and the

Attorneys General to serve the remainder of the term.

## Costs of the Administrator

38.     CEC shall provide for the reasonable and necessary fees, expenses, and costs of the Administrator as set forth in the Administrator's fee agreement, but in no event shall the Administrator's fees, expenses, and costs exceed $1,000,000 in the first year, $600,000 in the second year, and $400,000 in the third year.

## Powers and Duties of the Administrator

39.     The Administrator shall independently review CEC's compliance with the terms of this AVC in accordance with the Work Plan referenced in paragraph 35.  In furtherance of this purpose, and without limiting the power of the Administrator to review any relevant matter within the scope of this AVC, the Administrator shall be permitted to:

(a)     observe Admissions Advisor and Financial Aid Advisor training sessions;

(b)     review telephone calls and meetings between Admissions Advisors or Financial Aid Advisors, on the one hand, and Students or Prospective Students, on the other; the Administrator shall not be permitted to participate in such calls or attend such meetings, but it is expressly understood that the Administrator may review CEC's existing mystery shopping program and be permitted to request additional mystery shops and/or utilize independent mystery shops if the Administrator believes that such additional shops are reasonably necessary to review compliance with this AVC;

(c)     review transcripts, recordings, and/or reports, to the extent they exist, related to any telephone call or meeting with Prospective Students;

(d)     review materials used to train Admissions Advisors and Financial Aid Advisors;

(e)     review complaints made to CEC, its accreditors, the Attorneys General, the Better Business Bureau, or any state or federal governmental body, after the Effective Date of this AVC, which potentially concern or relate to any of CEC's recruitment, admissions, Student financial aid, or career services practices;

(f)     review CEC's advertisements, marketing materials, websites, catalogs, enrollment agreements, disclosures, and other public-facing media to verify compliance with this AVC;

(g)     review documents, data, and information related to CEC's calculation of any job placement rate;

(h)     review CEC's compliance practices with respect to the conduct of Third-Party Lead Vendors;

(i)     review documents in the possession of CEC or reasonably accessible to CEC related to the conduct of Third-Party Lead Vendors;

(j)     review communications with Students and Prospective Students in the possession of CEC or reasonably accessible to CEC related to Student recruitment, admissions, financial aid, or career services;

(k)     review CEC's compliance with its refund policy;

(l)     review CEC's compliance with data reporting requirements imposed by this AVC;

(m)     review CEC's complaint resolution practices;

(n)     review reports provided by CEC's third-party vendor related to CEC's monitoring of Third-Party Lead Vendors;

(o)     review CEC's institutional and programmatic accreditation status to verify compliance with this AVC;

(p)     review CEC's records to verify CEC's compliance with its obligation to forgo efforts to collect outstanding debt from certain Students pursuant to paragraphs 116 and 117 of this AVC;

(q)     have reasonable access to books, records, other documents, and staff sufficient to insure implementation of and compliance with this AVC; and

(r)     have reasonable access to employees and Former Employees of CEC as the Administrator deems necessary to insure implementation of and compliance with this AVC; reasonable access for purposes of this subparagraph includes disclosing the identity of any current employee or Former Employee if the identity is requested by the Administrator and can be determined by CEC; reasonable access to current employees shall include providing appropriate times and locations for staff interviews; and reasonable access to Former Employees shall include providing the most recent contact information available;

*provided, however*, that this AVC shall not effectuate a waiver of the attorney-client privilege or the attorney-work-product doctrine, and the Administrator shall not have the right to demand access to documents or information protected by the attorney-client privilege or the attorney-work-product doctrine.

40.     The Administrator shall make a good faith effort to leverage CEC's existing compliance mechanisms when reviewing CEC's compliance with this AVC.

41.     The Administrator shall make a good faith effort to perform his or her duties in a manner designed to cause minimal disruption to CEC's activities.  In this regard, CEC shall designate senior officials within the Office of the General Counsel (or any office subsequently organized to succeed to the duties of the foregoing office) to serve as the

primary points of contact for the Administrator in order to facilitate the Administrator's

access to documents, materials, or staff necessary to review CEC's compliance with this

AVC.  The Administrator shall communicate any request for documents, materials, or

access to staff to the designated contacts, unless otherwise instructed.  For the avoidance

of doubt, nothing in this paragraph shall be interpreted to prohibit the Administrator from

speaking with a current or Former Employee of CEC.

42.     If at any time the Administrator believes that there is undue delay, resistance, interference,

limitation, or denial of access to any records or to any employee or Former Employee

deemed necessary by the Administrator to implement or review compliance with this AVC,

the Administrator shall meet and confer with the designated CEC officials referenced in

paragraph 41.  If the Administrator cannot resolve such limitation or denial, it shall be

immediately reported to the Attorneys General.

43.     Nothing in this AVC shall limit the ability of the Administrator to communicate at any time

with the Attorneys General regarding CEC's conduct or to provide documents or

information to the Attorneys General as it relates to the Administrator's role of ensuring

compliance with this AVC.

**Oversight and Compliance**

44.     The Administrator and the designated CEC officials referenced in paragraph 41 shall meet

on a quarterly basis, or more frequently if the Administrator or CEC deem reasonably

necessary, in order to discuss any facts, matters, issues, or concerns that may arise in the

administration of this AVC or that may come to the attention of the Administrator or CEC.

The purpose of these meetings is to permit CEC to confer with the Administrator and

address issues and concerns as they arise.  In addition, the Administrator may in his

discretion and on reasonable advance notice invite the CEC officials referenced in paragraph 41 and the Attorneys General to meet and confer to the extent he deems it reasonably necessary for the administration of this AVC.

45.    The Administrator shall issue a report (hereinafter "Annual Report") to the Attorneys General and to CEC within nine (9) months after the Effective Date and every twelve (12) months thereafter for the duration of the Administrator's term.  The Administrator may make more frequent reports to the Attorneys General and to CEC as deemed reasonably necessary to ensure compliance with this AVC or upon request of the Attorneys General. The Annual Report and all written reports requested by the Attorneys General shall be provided to CEC prior to their presentation to the Attorneys General.  The Administrator and CEC shall meet and confer to discuss all written reports and Annual Reports prior to their presentation to the Attorneys General.   As part of this conferral process, the Administrator shall in good faith consider all reasonable modifications to the report proposed by CEC.

46.    The Annual Report shall include:

(a)    a description of the methodology and review procedures used;

(b)    an evaluation of whether CEC is in compliance with the provisions of this AVC, together with a description of the underlying basis for that evaluation; and

(c)    a description of any practice which the Administrator believes may constitute a deceptive or unfair practice (as those terms are commonly understood in the context of consumer protection laws).

47.    Notwithstanding any other provision in this AVC, the Administrator's reports (including the Annual Reports) shall identify only practices or patterns of CEC's noncompliance with

this AVC, if any, and are not intended to identify isolated incidents, unless the Administrator determines that such incidents are indicative of CEC's substantial non-compliance with the AVC.

48.     If, at the conclusion of the Administrator's three-year term, the Attorneys General determine in good faith and in consultation with the Administrator that justifiable cause exists, the Administrator's engagement shall be extended for an additional term of up to two (2) years, subject to the right of CEC to commence legal proceedings for the purpose of challenging the decision of the Attorneys General and to seek preliminary and permanent injunctive relief with respect thereto. For purposes of this paragraph, "justifiable cause" means a failure by CEC to achieve and maintain substantial compliance with the substantive provisions of the AVC.

**Use of the Administrator's Reports**

49.     The Administrator's reports (including the Annual Reports) and testimony may be used by the Attorneys General or CEC in any action or proceeding brought by the Attorneys General or CEC relating (a) to this AVC or (b) to any CEC conduct described in the reports by the Administrator to the Attorneys General, and the reports shall be admissible into evidence in any such action or proceeding to the extent allowed by the rules of evidence of the respective tribunal in which such reports are sought to be introduced. For the avoidance of doubt, the Parties do not intend for the Administrator's reports (including the Annual Reports) or testimony to be admissible in any action or proceeding other than an action or proceeding described in the preceding sentence. No action or lack of action by the Attorneys General regarding information received from the Administrator regarding CEC's conduct shall be considered affirmation, acceptance, or ratification of that conduct

by the Attorneys General, and the Attorneys General reserve the right to act at any time regarding information provided to them by the Administrator.

## Confidentiality

50.     The Administrator shall keep confidential from any and all individuals, entities, regulators, government officials, or any other third party that is not a party to this AVC all communications with employees and information and documents obtained by or produced to the Administrator in the course of his duties.  The Administrator also agrees to ensure that any third-party whom the Administrator engages shall agree to the same restriction. Nothing in the preceding sentences shall limit the Administrator's ability to make any disclosure compelled by law.   In the event the Administrator receives a request for disclosure of any such communications, information, or documents, the Administrator shall notify CEC the sooner of no more than ten (10) business days following receipt of the request or five (5) business days prior to disclosure to afford CEC time to object to such disclosure.  Nothing herein shall relieve the Administrator of his obligation to comply with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

51.     It is understood that any document, information, or report shared with the Attorneys General pursuant to this AVC (including reports created by the Administrator pursuant to paragraphs 45 and 112) may be subject to applicable state open records laws.  Nevertheless, the Attorneys General recognize that some or all of such documents, information, or reports may be confidential pursuant to those laws or other applicable state statutes or federal laws. In the event that the Attorneys General (or any of them) receive a request or otherwise intends to disclose a document, information, or report, and the Attorneys General (or any of them) determine that the requested document, information, or report is not confidential

pursuant to applicable law and is subject to disclosure, or if the Attorneys General (or any of them) are compelled to produce the material pursuant to a court or administrative order, the relevant Attorney(s) General shall provide notice to CEC ten (10) business days prior to disclosing the document, information, or report to any third party, or any lesser period required under state law. Notwithstanding the above requirements, the Attorneys General may share any document, information, or report subject to this paragraph with any other local, state, or federal agency empowered to investigate or prosecute any laws, regulations, or rules. Subject to the foregoing, unless required under applicable state law, the Attorneys General shall not release to the public any confidential document or information provided by CEC pursuant to this AVC.

**Miscellaneous Administrator Provisions**

52.     Non Retaliation Clause:  CEC shall not intimidate, harass, threaten, or penalize any employee or Former Employee for his or her cooperation with or assistance to the Administrator relating to the Administrator's Powers and Duties to ensure implementation of and compliance with this AVC.

53.     Compliance Hotline:  It is understood that CEC is operating a compliance hotline, which permits employees to lodge concerns with CEC anonymously.  CEC shall continue to maintain this hotline or a reasonable equivalent.  CEC shall provide the Administrator access to any complaints or reports made through this hotline (whether made anonymously or not).

## REQUIRED DISCLOSURES

**General Disclosures**

54.    CEC shall comply with 34 CFR 668.412(e) and any substantially similar successor regulation requiring the direct disclosure of the U.S. Department of Education gainful employment template information to Prospective Students.  The requirements of paragraphs 55-58 herein shall take effect only if the U.S. Department of Education repeals, amends, or delays 34 CFR 668.412(e) in a manner that substantially changes this direct disclosure requirement.  In addition, should paragraphs 55-58 take effect, CEC may cease compliance with providing a Single-Page Disclosure Sheet as required by paragraphs 55-58 in the event the U.S. Department of Education or Congress promulgates a substantially similar direct disclosure requirement.

55.    CEC shall Clearly and Conspicuously disclose to Prospective Students a "Single-Page Disclosure Sheet" that conforms as to form to the sample disclosure sheet attached as Exhibit B hereto and contains the following information:

(a)    the Anticipated Total Direct Cost for the Program of Study at the prospective campus; *provided*, *however*, that this provision shall not be interpreted to restrict CEC's ability to change tuition, fees, or expenses;

(b)    the Median Debt for Completers for the Program of Study for the most recent reporting period, if available;

(c)    the Program Cohort Default Rate for the most recent reporting period if available;

(d)    the Program Completion Rate for the most recent reporting period, if available;

(e)    the Transferability of Credits Disclosure;

(f)    the Median Earnings for Completers for the Program of Study for the most recent reporting period, if available; and

(g)    the Job Placement Rate Disclosure for the Program of Study at the prospective

campus for the most recent reporting period, if available.

For the avoidance of doubt, the Parties agree that the Program Cohort Default Rate and the Median Earnings for Completers are to be calculated by the U.S. Department of Education and that this AVC does not require CEC itself to disclose figures that are unavailable from the Department.

56. Specifically, CEC shall Clearly and Conspicuously disclose the Single-Page Disclosure Sheet for the Program of Study in which the Prospective Student is seeking to enroll in the following ways: (1) by Clearly and Conspicuously disclosing the Single-Page Disclosure Sheet during the enrollment process, prior to the Prospective Student's execution of the Enrollment Agreement; and (2) CEC shall also email the Single-Page Disclosure Sheet as one of two attachments in an email to the Prospective Student prior to starting the first day of class. The other attachment in this email would be a Clear and Conspicuous disclosure of the refund policy as outlined in Paragraph 101.

57. Before an already-enrolled Student begins a new Program of Study, CEC shall Clearly and Conspicuously disclose to the Student the Single-Page Disclosure Sheet for that Program of Study. Additionally, CEC shall also email the Single-Page Disclosure Sheet to the Student prior to starting the first day of class in the new Program of Study.

58. CEC shall be permitted to make such reasonable changes to the Single-Page Disclosure Sheet and to the form and timing of the disclosure of the Single-Page Disclosure Sheet as are approved by the Administrator in consultation with the Attorneys General.

59. CEC may calculate and disclose to Students and Prospective Students, in materials other than the gainful employment template or the Single-Page Disclosure Sheet, information with respect to the income earned by CEC's graduates in reporting period as to which the

Median Earnings for Completers is not available, provided that such information is not false, misleading, or deceptive.

60.     If a CEC institution elects to disclose that it has articulation agreements for the transferal of credits to other schools, then, in addition to the foregoing, the CEC institution shall also Clearly and Conspicuously:  (a) list any school(s) with articulation agreements with that CEC institution, (b) list the classes for which the receiving school allows credits to transfer, (c) disclose any conditions upon the acceptance of transferred credits, and (d) disclose that credits are accepted by the receiving school for elective credit only, if that is the case.

**Job Placement Rate Disclosures**

61.     For any Program of Study at a CEC institution that is required to calculate or provide a job placement rate by a national accreditor or any federal, state, or local law, rule, or judgment, CEC shall calculate a Job Placement Rate for such Program of Study in accordance with this AVC, and such rate shall be disclosed on the Single-Page Disclosure Sheet described in paragraph 55.  The parties agree that a regionally accredited institution shall not be subject to paragraphs 61 to 69 relating to placement rates unless it shall choose to voluntarily report a placement rate.  If a CEC institution voluntarily calculates a job placement rate for any Program of Study offered at a CEC campus, it must calculate the Job Placement Rate in accordance with this AVC for that Program of Study and also calculate a Job Placement Rate in accordance with this AVC for all Programs of Study that are offered at that same CEC campus, and such rates shall be disclosed on the Single-Page Disclosure Sheet described in paragraph 55.  For purposes of this paragraph, all online offerings of each one of CEC's institutions shall be considered a "campus." Notwithstanding the foregoing, CEC shall not be required to calculate Job Placement Rates

for any Program of Study that CEC is teaching out (*i.e.*, that is not accepting new Students).

62.     If CEC does not calculate a job placement rate for a Program of Study, and it is not required to calculate a Job Placement Rate by this AVC, then CEC shall disclose to Prospective Students on the Single Page Disclosure Sheet that: "[CEC institution] does not calculate a job placement rate for students who completed this program."

63.     CEC shall not make any claims or representations to Prospective Students about the likelihood of such Prospective Students obtaining employment after completing a Program of Study if it does not calculate and disclose a Job Placement Rate in accordance with this AVC.

64.     The Job Placement Rate calculated in accordance with this AVC shall be disclosed on the U.S. Department of Education's Gainful Employment Program Disclosure Template, which is the disclosure form issued by the Secretary of the U.S. Department of Education for Gainful Employment Programs, as well as at the time(s) and in the manner(s) provided herein. Moreover, with respect to job placement rates that CEC calculates after the Effective Date, CEC shall not report and/or disclose any job placement rate other than the Job Placement Rate calculated in accordance with this AVC, except as may be required by a government entity or accreditor. CEC must comply with any state regulations in addition to the requirements of this AVC.

65.     Notwithstanding anything to the contrary in this AVC, CEC shall not be required to disclose a Program Completion Rate, a Program Cohort Default Rate, a Median Debt for Completers, or a Job Placement Rate for any Program of Study at a location with fewer than ten (10) Students or Graduates/Completers, as applicable, in that program.

66.     Notwithstanding anything to the contrary in this AVC, CEC shall not be required to

calculate a Job Placement Rate for new Programs of Study that have not had any Completers or Graduates.  A Program of Study is not "new" for purposes of this paragraph if the same campus at which the Program of Study is offered previously offered a program of substantially similar subject matter, content, length, and ending credential.  For the avoidance of doubt, a Program of Study will be "new" for purposes of Job Placement Rate calculations if any governmental entity or any relevant accreditor considers the Program of Study substantially different from a prior Program of Study in terms of subject matter, content, length, or ending credential.

67.    If CEC relies on a third party for verifying and/or calculating Job Placement Rates, CEC shall enter into a contract with such third party pursuant to which the third party shall agree to adhere to the requirements of this AVC concerning calculation and/or verification of Job Placement Rates (to the extent applicable) and require the third party to provide any requested information regarding the calculation and/or verification of Job Placement Rates to the Administrator.  CEC shall monitor such third party's compliance with these requirements.

68.    CEC shall deem an individual as "placed" only if the Graduate or Completer meets the below conditions of "employed" or "self-employed."

(a)    Employed.  The individual shall be deemed "employed" if each of the following six (6) requirements are met:

(i)    The position is in the field of study or a related field of study.  The position shall be considered to be in the field of study or a related field of study if it meets one of the following criteria:

(1)    the position is included on the list of job titles for the

Graduate's/Completer's Program of Study published by the institution and is included in the most recent CIP to SOC Crosswalk for the applicable CIP Code; *provided*, *however*, that it is understood that in an instance where a Graduate/Completer's actual job title is not listed on the CIP to SOC Crosswalk, CEC may include the job as a placement under this provision if the job title the Graduate/Completer obtained is listed as a "Lay Title" on the O*Net Code Connector for an SOC job title that is linked to the Graduate/Completer's Program CIP per the CIP to SOC Crosswalk, regardless of any job level within the Graduate/Completer's title (*e.g.*, Registered Nurse 1, Registered Nurse 2, etc.), and the job description by the employer for the job title the Graduate/Completer obtained predominantly matches the job description, tasks, and work activities for the SOC job title that is linked to the CIP for the Graduate/Completer's program; or

(2)     the position requires the Graduate/Completer to use, during a majority of the time while at work, the Core Skills listed in the institution's published program and course descriptions expected to have been taught in the Student's program; and (a) the written job description requires education beyond a high school diploma or provides that a postsecondary credential is preferred, (b) the position is one as a supervisor or manager, or (c) the Graduate/Completer or the employer certifies in writing that the education received by the

Graduate/Completer provided a benefit or advantage to the Graduate/Completer in obtaining the position.

(ii)　The position is a permanent position (*i.e.*, there is no planned end date) or a temporary position that the Graduate/Completer expects to maintain for a minimum of one hundred and eighty (180) days;

(iii)　The position is a paid position;

(iv)　The position requires at least twenty (20) work hours per week;

(v)　The Graduate/Completer has worked in the position for a minimum of thirty (30) days; and

(vi)　CEC has verified the employment after the Graduate/Completer has worked in the position for a minimum of thirty (30) days by:　(1) speaking to either the employer or an agent of the employer to confirm employment, (2) contacting the Graduate/Completer directly, (3) receiving an email from the Graduate/Completer, or (4) the Graduate/Completer's employer provides employment information about the Graduate/Completer by email or other written confirmation, or on-line.

(b)　Self-Employed.　The individual shall be deemed placed as "self-employed" if each of the following four (4) requirements is met:

(i)　The position is in the field of study or a related field of study.　The position shall be considered to be in the field of study or a related field of study if it meets one of the following criteria:

(1)　the position is included on the list of job titles for the Graduate's/Completer's Program of Study published by the

institution and is included in the most recent CIP to SOC Crosswalk for the applicable CIP Code; *provided*, *however*, that it is understood that in an instance where a Graduate/Completer's actual job title is not listed on the CIP to SOC Crosswalk, CEC may include the job as a placement under this provision if the job title the Graduate/Completer obtained is listed as a "Lay Title" on the O*Net Code Connector for an SOC job title that is linked to the Graduate/Completer's Program CIP per the CIP to SOC Crosswalk and the job description by the employer for the job title the Graduate/Completer obtained matches the job description, tasks, and work activities for the SOC job title that is linked to the CIP for the Graduate/Completer's program; or

(2)    the position requires the Graduate/Completer to use, during a majority of the time while at work, the Core Skills listed in the institution's published program and course descriptions expected to have been taught in the Student's program; and the Graduate/Completer certifies in writing that the education received by the Graduate/Completer provided a benefit or advantage to the Graduate/Completer in performing the tasks entailed in such self-employment;

(ii)    The Graduate/Completer has received some compensation in return for services provided in connection with the self-employment;

(iii)    In the case of grant-funded or similar employment, the position is

anticipated to employ the Graduate/Completer for a period of no less than three (3) months; and

(iv)    CEC has verified the self-employment and the Graduate/Completer has either (a) completed at least 135 hours of work (including, for example, time devoted to marketing or other unpaid preparatory or developmental work) in connection with the Graduate/Completer's self-employment or (b) received no less than $4,500.00 in compensation, over a period of no more than ninety (90) days, in return for services provided in connection with the self-employment, provided that CEC has obtained written verification directly from the Graduate/Completer that includes:  (1) an attestation that s/he is self-employed with a description of the nature of the self-employment and (2) the number of hours worked and/or amount of compensation earned.

(c)    Federal Work/Study positions at CEC or any affiliated school shall not be counted as "employment" or "self-employment."

(d)    Continuing Employment.

(i)    Graduates/Completers continuing employment in a position that was held prior to enrolling in the Program of Study shall not be deemed "placed" unless:

(1)    the requirements of subsections (a)(i) through (a)(vi) of this paragraph are met; and

(2)    completing the Program of Study enabled the Graduate/Completer to maintain the position, or the Graduate/Completer earned a

promotion or an increase in pay as a result of completing the Program of Study.

(ii)     If a Graduate/Completer continuing in a pre-enrollment position enrolled in the Program of Study pursuant to an "established employer educational assistance program," and the conditions of subsection (d)(i)(2) of this paragraph are not satisfied, then the Graduate/Completer shall be excluded from the Job Placement Rate calculation. (The term "established employer educational assistance program" shall mean a program evidenced in writing in which an employer pays 50% or more of the cost of tuition for its employee to attend a Program of Study to gain skills related to the employee's current position with the employer.)

(e)     CEC's first calculation of the Job Placement Rate in accordance with the provisions of this AVC will be for the cohort of Graduates and Completers from July 1 through June 30 of the year following that time period in which this paragraph becomes effective.

69.     CEC shall implement a protocol for performance checks of those employees responsible for verifying, calculating, and/or disclosing job placement rates. Such performance checks shall be designed to provide a reliable assessment of the accuracy of disclosed job placement rates and compliance by CEC's employees, agents, and/or contractors with the verification, calculation, and disclosure of job placement rates. The performance checks shall be carried out regularly by CEC's compliance department or an independent third party, if used. If the institution obtains placement data by contacting employers and Completer/Graduates, the information should be documented in writing, including, to the

extent practicable, the name of the employer, name of the Student, address and telephone number of Student and employer, title of employment, duties of employment, length of employment, hours worked, the name and title of the person(s) providing the information to CEC, the name and title of the person(s) at CEC who received and recorded the information, and the date the information was provided. CEC shall maintain a copy of the above information for a period no less than three (3) years.

**Electronic Financial Impact Platform Disclosures**

70.    As soon as reasonably practicable after a Prospective Student has enrolled in a program for the first time and received a financial aid award letter, CEC shall provide the Student with a link such that the Student generates a required personalized disclosure using the Electronic Financial Impact Platform; *provided*, *however*, that Prospective Students who are ineligible for federal student aid or who are not borrowing funds to finance their education shall be exempt from this requirement. For the avoidance of doubt, in the event that a Student chooses to revisit the Electronic Financial Impact Platform after enrolling in a Program of Study, CEC shall not have any additional obligations to that Student under this paragraph. If a Student's refund period expires without the Student having received a financial aid award letter and link to the Electronic Financial Impact Platform, CEC shall Clearly and Conspicuously disclose to that Student that he or she may withdraw from his or her Program of Study without financial responsibility for any tuition and fees associated with the Student's class attendance that term. For purposes of this paragraph, the term "refund period" is described by paragraph 101 unless that paragraph does not apply, in which case the refund period is any time frame within which the Student is eligible to withdraw without financial liability for tuition and fees associated with attending classes.

71.    Within one hundred eighty (180) days of the Effective Date, CEC shall, in consultation with the Administrator and the Attorneys General, implement its Electronic Financial Impact Platform.  The link required in paragraph 70 may include a disclaimer that states: "This link is provided to you for informational purposes only and is not intended to provide, suggest, or imply financial advice of any kind."

## MISREPRESENTATIONS, PROHIBITIONS, AND REQUIRED CONDUCT

72.    In connection with the recruitment of any Prospective Students, CEC is prohibited from:

   (a)    making any false, deceptive, or misleading statements;

   (b)    omitting any material fact;

   (c)    engaging in unfair practices (as that term is commonly understood in the context of consumer protection laws);

   (d)    using any Unreasonable Recruitment Methods to persuade a Student to enroll or remain enrolled at a CEC institution; and

   (e)    making any representation inconsistent with required Disclosures of the U.S. Department of Education found in Title 34 of the Code of Federal Regulations Chapter 668 as such regulations may be amended or recodified.

73.    In connection with any communication with Students or Prospective Students, CEC shall not:

   (a)    make a false, misleading, or deceptive statement about any governmental (federal, state, or other) approval related to a Program of Study;

   (b)    represent that a "recommendation" is required for acceptance into a Program of Study or that an Admissions Advisor must recommend the Student for acceptance prior to admission unless such recommendation is an independent requirement for

admission and is expressly stated in the catalog; or

(c)    provide inaccurate statistics regarding any statistic required to be disclosed by this AVC or by the U.S. Department of Education in Title 34 of the Code of Federal Regulation Chapter 668.

74.    In connection with any communication with Students or Prospective Students, CEC shall not make any false, deceptive, or misleading statements or guarantees concerning Student outcomes by:

(a)    misrepresenting that Students will be assured program completion or graduation;

(b)    misrepresenting that Students will be assured a job or employment following graduation; or

(c)    misrepresenting how many of the Student's credits will transfer in or out of the institution, or representing to the Student that any credits obtained while attending the institution are transferable (unless CEC receives written assurance from another school or transfer of credits is assured through an articulation agreement or is required by state law).

Notwithstanding the prohibitions contained in subparagraphs (a) through (c), CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about how many of the Students' or Prospective Students' credits obtained while attending other schools will transfer to a CEC institution.

75.    In connection with any communication with Students or Prospective Students concerning financial aid, CEC shall not:

(a)    make any false, deceptive, or misleading statements concerning whether a Student will receive financial aid or any particular amount of financial aid;

(b)     purport to guarantee a Student particular military or veteran benefit without proper documentation on file; or

(c)     imply that financial aid or military funding will cover the entire costs of tuition, the costs of books or supplies, or the costs of attending a Program of Study, including living expenses, if such is not the case.

Notwithstanding the prohibitions contained in subparagraphs (a) through (c), CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about the amount of financial aid they may be expected to receive.

76.    CEC shall not make express or implied false, deceptive, or misleading claims to Prospective Students with regard to the likelihood of obtaining employment as a result of enrolling, including but not limited to misrepresenting:

(a)     the percentage, rate, or portion of Students who obtain employment following the completion of a Program of Study;

(b)     the annual starting salary for persons employed in a given field;

(c)     the annual starting salary of Graduates employed in a given field; and

(d)     the annual starting salary of Graduates.

77.    CEC shall not make any express or implied false, deceptive, or misleading claims that Program Completion Rates, job placement rates, or annual salaries that are generally applicable to CEC are equivalent to those for a specific Program of Study or that institution-wide rates for a Program of Study are equivalent to those for a specific campus.

78.    CEC shall not make express or implied false, deceptive, or misleading claims to Students or Prospective Students with regard to the ability to obtain a license or certification from a third party as a result of enrolling in a Program of Study, including but not limited to

misrepresenting:

(a)     whether the Program of Study will qualify a Student to sit for a licensure exam, if any;

(b)     the types of licensure exams Students are eligible to sit for;

(c)     the states where completion of the Program of Study will qualify a Student to take an exam or attain immediate authorization to work in the field of study;

(d)     the passage rates of graduates from that Program of Study;

(e)     the states where completion of the Program of Study will not qualify a Student to sit for a licensure exam or attain immediate authorization to work in the field of study; and

(f)     the states where a Student may be qualified to work within a profession if the Student must meet other requirements to be employed in such states.

79.     CEC shall not make express or implied false, deceptive, or misleading claims to Prospective Students with regard to the academic standing of its programs and faculty, including but not limited to misrepresenting:

(a)     the transferability, or lack thereof, of any credits, including but not limited to any credits for which the Student wishes to receive credit from a CEC institution and for all credits from a CEC institution for which the Student may wish to receive credit from another school, provided however, that CEC and its representatives are permitted to provide good-faith estimates to Students and Prospective Students about how many of the Students' or Prospective Students' credits obtained while attending other schools will transfer to a CEC institution;

(b)     the accreditation and the name of the accrediting organization(s);

(c)     the Student/faculty ratio;

(d)     the percentage of faculty holding advance degrees in the program;

(e)     the names and academic qualifications of all full-time faculty members;

(f)     the course credits and any requirements for satisfactorily completing a Program of Study, such as clinicals, internships, and externships; and

(g)     the Program Completion Rates for each of its offered Programs of Study.

80.    CEC shall not make express or implied false or misleading claims to Prospective Students regarding actual or potential financial obligations the Student will incur regarding a Program of Study, including but not limited to:

(a)     the Cost of Attendance;

(b)     the Anticipated Total Direct Cost the Student will incur to complete the Program of Study;

(c)     the Program Cohort Default Rate; and

(d)     the Median Debt of Completers of each Program of Study.

81.    CEC shall provide all Admissions Advisors and Student Financial Aid Advisors with the information reasonably necessary to inform Prospective Students about CEC and its Programs of Study, including but not limited to the Single-Page Disclosure Sheet, and if a representative of CEC truthfully advises a Student or Prospective Student that he or she does not have the information requested by the Student or Prospective Student at hand, then CEC shall subsequently, to the extent such information is reasonably ascertainable prior to the expiration of the applicable refund period established by paragraph 101 (or, if no such refund period applies, prior to the first day of the Student's semester, quarter, or payment term), provide such information.

82.   Except as set forth in paragraph 84, CEC shall not represent in advertising, marketing, or promotional materials or otherwise that graduates of a Program of Study would be qualified for a particular occupation if that Program of Study lacks an accreditation necessary to qualify graduates for such occupation.

83.   Except as set forth in paragraph 84, for Programs of Study that prepare Students for employment in fields that require Students to obtain state licensure or authorization for such employment, CEC shall not enroll Students in the Program of Study if graduation from the Program of Study would not qualify such Students for state licensure or authorization or to take the exams required for such licensure or authorization in the state in which:

   (a)   the CEC campus is located, if the Program of Study is offered at an on-ground campus;

   (b)   the Prospective Student resides, if the student resides in a different state from the on-ground campus; or

   (c)   the Prospective Student resides if the Program of Study is offered online.

84.   The prohibitions established by paragraphs 82 and 83 shall not apply if:

   (a)   the Program of Study is a new program that cannot obtain a programmatic accreditation that would be necessary to qualify Students for state licensure or authorization or to take exams required for such licensure or authorization in the relevant state until the program is operational, the institution is making a good faith effort to obtain the necessary programmatic accreditation in a timely manner, the institution Clearly and Conspicuously discloses to Prospective Students on all promotional materials for the Program of Study and in a Clear and Conspicuous

written disclosure prior to the Student signing an Enrollment Agreement that such programmatic accreditation would need to be obtained before the Student would qualify for state licensure or authorization or to take exams required for such licensure or authorization, and CEC teaches-out the program if the institution's application for accreditation for a program subject to this paragraph is denied, and it is not subject to further review;

(b)     the Prospective Student has notified CEC in writing that the Student intends to seek employment in a state where the program does lead to immediate state licensure or authorization or qualification to take the exams required for such licensure or authorization;

(c)     the Prospective Student has already completed some of the coursework necessary to complete the Program of Study and is seeking re-enrollment, and CEC advises the Prospective Student Clearly and Conspicuously in writing prior to re-enrollment that completion of the Program of Study is not expected to qualify the Student for state licensure or authorization or to take exams required for such licensure or authorization; or

(d)     the reason that graduation from the Program of Study would not qualify the Prospective Student for state licensure or authorization or to take the exams required for such licensure or authorization is that the Prospective Student has a criminal record that is disqualifying, and CEC has complied with the disclosure and acknowledgement requirements of paragraph 87.

85.   CEC shall take reasonable measures to arrange and facilitate sufficient placements for Students in internships, externships, practicums, or clinicals that are prerequisites for

graduation, licensure, or certification; *provided, however*, that nothing herein shall prevent a CEC institution from requiring its Students to seek to obtain an internship, externship, practicum, or clinical through their own efforts in the first instance.

86. CEC shall not knowingly enroll a Student in a Program of Study that does not possess the programmatic accreditation typically required by employers in the Student's state of residence for employment, except where a Student has indicated the intention to seek employment in a different state in which employers do not typically require programmatic accreditation for that Program of Study, or where the Program of Study does possess the programmatic accreditation typically required by employers in that state. "Typically" shall mean 75% or more of job opportunities in a particular occupation are open only to graduates of a school with certain accreditation(s) and/or an academic program with certain programmatic accreditation(s). CEC shall make reasonable efforts to assess employer requirements in states where they enroll Students.

87. If CEC knows that a criminal record may disqualify a Student from employment in the field or a related field for which the Program of Study is a prerequisite, then CEC shall (a) Clearly and Conspicuously disclose that a criminal record may disqualify the Student for the chosen field or related field of employment and (b) require the Student's acknowledgment of such disclosure in writing at or before the time of enrollment. If CEC knows that a criminal record will disqualify a Student from employment in the field or a related field for which the Program of Study is a prerequisite, then CEC shall (a) Clearly and Conspicuously disclose that a criminal record will be disqualifying and (b) require the Student's acknowledgment of such disclosure in writing at or before the time of enrollment.

88. Arbitrations between CEC and any Student shall not be protected or treated as confidential

proceedings, unless confidentiality is required by law or the Student requests confidentiality. CEC shall not ask or require any Student, participant, or witness to agree to keep the arbitration confidential, unless confidentiality is required by law. Nothing in this paragraph shall prevent CEC from asking the arbitrator to designate arbitration materials as a trade secret or proprietary information subject to nondisclosure. Except as may be prohibited by law or a Student request for confidentiality, and subject to appropriate assertions of the following:

(a)     the attorney-client privilege and/or the attorney-work-product doctrine; and

(b)     compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g;

the Administrator and the Attorneys General shall not be prohibited from reviewing or inspecting the parties, proceedings, and evidence pertaining to any arbitration involving a Student that commences after the Effective Date of this AVC. The Administrator and the Attorneys General shall not, to the extent permitted by law, disclose any of CEC's properly designated trade secrets or proprietary information that appear in arbitration materials.

89.    CEC shall not adopt any policy or engage in any practice that delays or prevents Students with complaints or grievances against CEC from contacting any accrediting body, state or federal regulator, or Attorney General regarding the complaint or grievance. Notwithstanding anything to the contrary in this paragraph, CEC shall be permitted to encourage Prospective Students and Students to file any complaint or grievance with CEC in the first instance, so long as CEC does not represent or imply that Students are required to file their complaints or grievances with CEC before contacting any accrediting body, state or federal regulator, or Attorney General regarding the complaint or grievance, unless

the accrediting body, state or federal regulator, or Attorney General so requires.

## CEC RECRUITING PRACTICES

90.    CEC shall not engage in any false, misleading, deceptive, abusive, or unfair acts or practices (as those terms are commonly understood in the context of consumer protection laws) when recruiting Prospective Students, including during the orientation program and refund periods referenced in paragraphs 100 and 101.

91.    CEC shall not use Unreasonable Recruitment Methods when communicating with Prospective Students during the admissions and enrollment process.  CEC shall train Admissions Advisors and other employees to avoid use of Unreasonable Recruitment Methods.  CEC shall audit its communications with Prospective Students, including those of its Admissions Advisors, to ensure that Unreasonable Recruitment Methods are not being used.  CEC shall make the results of such audits reasonably available to the Administrator and the Attorneys General upon request.

92.    CEC shall record all telephone calls and online chats between Admissions Advisors or Financial Aid Advisors, on the one hand, Students and Prospective Students, on the other, subject to interruptions in the ordinary course of business; *provided*, *however,* that CEC shall not be required to record telephone calls between Students and Admissions Advisors when the purpose of the telephone call or online chat is not to discuss recruiting, admissions, or financial aid related to admissions, but the Admissions Advisor is instead serving an advisory role related to the Student's performance in the Program of Study.  This provision shall not require CEC to record telephone calls or online chats placed or received on personal devices, such as cell phones.  Admissions Advisors and Financial Aid Advisors will be trained not to engage in communications with Students on personal devices.  During

the term of this AVC, CEC shall continue to retain its current third party vendor, or a vendor who employs comparative services, for call recording under this paragraph and for automated voice interaction analytics. Any decision to switch from its current vendor to another vendor shall be done in consultation with and approval by the Administrator. CEC shall make the call recordings required under this paragraph reasonably available to the Administrator and the Attorneys General upon request.

93.     Notwithstanding anything to the contrary in this AVC, CEC shall not be required to record a telephone conversation if the Student or Prospective Student, after receiving the disclosure required by paragraph 95, objects to the conversation being recorded, nor shall CEC be prohibited from continuing a telephone conversation with a Student or Prospective Student on an unrecorded line once such an objection has been made; *provided*, *however*, that CEC shall be prohibited from encouraging Students or Prospective Students to object to recording the conversation.

94.     Call recordings and online chats shall be maintained for a period not less than ninety (90) days after the date of the call. The Administrator shall have full and complete access to all recordings via the voice analytics platform.

95.     CEC shall inform a Prospective Student at the outset of any telephone call after the initial greeting that the call may be being recorded. CEC shall be permitted to make this disclosure in pre-recorded form.

96.     CEC shall not initiate unsolicited telephone calls to a Prospective Student's telephone number that appears on any current Do Not Call Registry. CEC shall keep an accurate record of and comply with any request to not receive further telephone calls. CEC shall not initiate any outbound telephone calls to a person who has previously stated to CEC that

he or she does not wish to receive telephone calls from CEC, or who has expressed a desire

not to be contacted anymore by CEC, or who has requested that they be placed on CEC's

internal do-not-call list, unless the person has made a renewed request for contact or has

otherwise indicated a desire to again receive calls from CEC.

97. CEC shall not continue a telephone call after a Prospective Student has expressed a desire

to conclude the call or has clearly stated that he/she does not want to apply to or enroll at a

CEC institution.

98. CEC shall not prevent a Prospective Student from consulting with or obtaining advice from

a parent, adult friend, or relative with respect to any issue relevant to enrollment.

99. CEC shall invite Prospective Students under the age of eighteen (18) to bring an adult with

them to any interview/meeting on campus prior to enrollment.

<u>**REQUIRED ORIENTATION AND REFUND PROVISIONS**</u>

100. CEC shall require all incoming Students (other than graduate Students and Students who

have already obtained twenty-four (24) or more credits at the post-secondary education

level) to complete an online and/or in-person orientation program prior to the Student's

first class at no cost to the Student. This orientation program shall be approved by the

Administrator in consultation with the Attorneys General. This orientation program shall

address such topics as study skills, organization, literacy, financial skills, and computer

competency. A Student may withdraw from enrollment in a Program of Study at any time

during the orientation program without any cost, and any grants or financial aid received

directly from a grantor or lender on behalf of the Student shall be returned to the grantor

or lender. In the alternative, and in lieu of the orientation described above, CEC may satisfy

its obligation by requiring all incoming Students (other than graduate Students and

Students who have already obtained twenty-four (24) or more credits at the post-secondary education level) to complete a college readiness course components of which will address the topics referenced above and the content of which will be approved by the Administrator in consultation with the Attorneys General. If CEC elects to offer a college readiness course, CEC shall give Students enrolled in the course a Clear and Conspicuous disclosure of the refund provision contained in paragraph 101 within ten (10) days after the start of the course.

101. All Students who are newly enrolled in any fully online Program of Study at CEC institution (other than graduate Students and Students who have already obtained twenty-four (24) or more online credits at the post-secondary education level) shall be permitted to withdraw within the first twenty-one (21) days of the first day of the Student's semester, quarter, or (with respect to students enrolled in a non-term program) payment term at the CEC institution in which the Student enrolled. If a Student's credits are from a university that predominantly offers online programs, CEC can count the Student's credits towards the 24 online credit threshold. All Students who are newly enrolled in any on-ground Program of Study at a CEC institution (other than graduate Students) shall be permitted to withdraw within the first seven (7) days of the first day of the Student's first session, at the CEC institution in which the Student enrolled. CEC shall Clearly and Conspicuously disclose the availability of the refund periods described in this paragraph in the Enrollment Agreement or in a separate written disclosure prior to starting class. CEC shall not hold a qualifying Student who withdraws in accordance with this paragraph liable for any tuition and fees associated with attending classes and shall return to grantors or lenders any grants and financial aid received directly from a grantor or lender for or on behalf of the Student.

Under no circumstances shall the time of a Student's attendance in the orientation program required pursuant to paragraph 100 be included in the refund periods required pursuant to this paragraph.

102. Except for qualifying Students who withdraw during the new Student orientation program required pursuant to paragraph 100 or the applicable refund period established by paragraph 101, when a Student withdraws from a Program of Study, CEC may retain or be entitled to payment for a percentage of any tuition and fees and other educational costs earned, based on the percentage of the enrollment period attended by the Student, subject to the CEC institution's internal refund policies and applicable law; *provided*, *however*, that where a student has not attended sixty (60) percent of the academic term as calculated in accordance with 34 CFR 668.22, CEC shall not retain or be entitled to payment for a percentage of any tuition and fees or other educational costs for a class that was scheduled to be taken during the relevant academic term but was not attended because the student withdrew from school prior to the commencement of the class. Except as mandated by changes to federal or state laws or regulations, no CEC institution shall change its internal policy with respect to calculating the percentage of tuition and fees and other educational costs that a Student remains obligated to pay upon withdrawal in a manner that results in the policy becoming less favorable to Students unless CEC obtains the prior approval of the Administrator or, if the Administrator's term has expired, the Executive Committee. CEC shall comply with all state and federal record-keeping requirements for documenting Student attendance and determining dates of withdrawal.

103. CEC shall comply with applicable state and federal law specifying the amounts owed by or to be refunded to Students to the extent their application would result in a greater refund

or lower cost for a Student than is otherwise required herein.

## THIRD-PARTY LEAD VENDOR REQUIREMENTS

104.  CEC shall require that all contracts with Third-Party Lead Vendors who provide it with lead generation services include each of the following:

(a)  a provision requiring that the Third-Party Lead Vendor comply with:

  (i)  CEC's lead aggregator guidelines in effect at the time of contracting or as may be modified subsequently, subject to approval by the Administrator;

  (ii)  all applicable state and federal consumer protection laws;

  (iii)  if and when applicable to CEC, all provisions in the Code of Conduct referenced in paragraph 105; and

  (iv)  all provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227;

(b)  a prohibition on attracting Students or obtaining leads by misleading advertising suggesting available employment opportunities rather than educational opportunities;

(c)  a prohibition on representing that a Student or Prospective Student is guaranteed to receive "free" financing from the federal or a state government; *provided*, *however*, that CEC may permit its Third-Party Lead Vendors to represent that grants and scholarships may be available and would not need to be repaid;

(d)  a prohibition on representing that loans are grants that do not carry with them an obligation to be repaid;

(e)  a provision prohibiting Third-Party Lead Vendors from transferring a Prospective Student inquiry to a CEC institution unless the Prospective Student has expressly informed the Third-Party Lead Vendor that he or she is interested in educational

opportunities. Prior to transferring a Prospective Student to a CEC institution, Third-Party Lead Vendors shall be required to ask the Prospective Student if they are interested in educational opportunities. Should the Prospective Student say "no," or otherwise provide a clear negative response as to their interest in pursuing educational opportunities, the Prospective Student cannot be directed to a CEC institution. Should the Prospective Student say "I'm not sure," or otherwise provide an equivocal response as to their interest in pursuing educational opportunities as opposed to job opportunities, the Third-Party Lead Vendor shall be permitted to describe the advantages an education may provide in creating additional job opportunities, but in so doing, the Third-Party Lead Vendor shall be prohibited from referencing any specific salary amounts. The Third-Party Lead Vendor shall then again ask the Prospective Student if they are interested in educational opportunities. Should the Prospective Student respond by providing a clear and affirmative indication that they are interested in educational opportunities, the Third-Party Lead Vendor shall be permitted to continue transferring the Prospective Student to a CEC institution; otherwise, the Prospective Student cannot be transferred to a CEC institution. In all events, prior to transferring any Prospective Student to a representative of any CEC institution, Third-Party Lead Vendors shall be required to confirm the Prospective Student's interest in pursuing educational opportunities; and

(f)     a requirement that all Third-Party Lead Vendors begin calls made on behalf of CEC with the following statement immediately after the Prospective Student answers the phone, "This is [insert company], this call may be recorded for quality assurance

and training purposes," or words to that effect.  Should the Prospective Student that answers the phone transfer the call to another Prospective Student, the preceding statement must be repeated for this Prospective Student and any other Prospective Student that may be later connected to the call.  Additionally, the Third-Party Lead Vendor will clearly state that "this call may be recorded for quality assurance and training purposes" before transferring a call to CEC.

105.    In addition, CEC shall negotiate in good faith with the Attorneys General and other post-secondary educational institutions with the goal of codifying a Code of Conduct that may be amended from time to time, for the recruitment of Students through Third-Party Lead Vendors.  The Code of Conduct shall include provisions to help ensure that Third-Party Lead Vendors do not make misleading claims or use misleading solicitation strategies when generating leads for post-secondary educational institutions.  CEC shall be bound to abide by the provisions of the Code of Conduct that post-secondary educational institutions agree to follow and implement as long as those provisions do not conflict with any other requirement of this AVC.  CEC shall not be obligated to abide by the Code of Conduct provisions unless and until the Code of Conduct becomes effective as to industry participants representing (together with CEC) at least 50% of students enrolled in for-profit schools, with such percentage to be calculated using the most recent available data from The Integrated Postsecondary Education Data System regarding student enrollments at four-year and two-year post-secondary educational institutions that award degrees at the associate's degree level or above.  All parties shall use reasonable efforts to encourage the participation of Third-Party Lead Vendors in the Code of Conduct.

(a)    During the term of this AVC, CEC shall continue to retain its current third-party

vendor, or a vendor who employs comparative services, to monitor the conduct of CEC's Third-Party Lead Vendors and monitor that they are complying with the contractual terms set forth in paragraph 104, including but not limited to whether the Third-Party Lead Vendors are using any unfair, false, misleading, deceptive, or abusive acts or practices (as those terms are commonly understood in the context of consumer protection laws), and the use of any incentive, discount, or inducement of any kind to encourage Student inquiries or otherwise used to recruit Students. Any decision to switch from its current vendor to another vendor shall be done in consultation with and approval by the Administrator.

106.   If CEC learns that a Third-Party Lead Vendor or a sub-vendor, which for the purposes of this paragraph shall mean a third-party utilized by a Third-Party Lead Vendor to assist it in providing Prospective Student inquiries to CEC, that provides services to the Third-Party Lead Vendor has failed to materially comply with the contractual terms set forth in paragraphs 104(a)(ii) through 104(f), or has failed to materially comply with any of CEC's Lead Aggregator Guidelines that would give rise to a violation of paragraphs 104(a)(ii) through 104(a)(iv) ("a Violation"), CEC shall retain a record of such Violation (which record shall be available to the Administrator and the Attorneys General upon request) for a period of two (2) years and shall address such Violation by taking corrective action against the segment of the Third-Party Lead Vendor's business in which the Violation occurred (for example, if the Third-Party Lead Vendor commits a Violation related to a webpage, electronic solicitation, or other online advertisement, CEC shall not be required to take corrective action against that Third-Party Lead Vendor with respect to any call center, that the Third-Party Lead Vendor may be providing to CEC) or by demanding

corrective action against the sub-vendor as follows:

(a)    <u>First Violation within any rolling 12-month period</u>:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform the Third-Party Lead Vendor and pause the campaign, or if the Violation was committed by a sub-vendor, demand that the Third-Party Lead Vendor pause the sub-vendor's participation in the campaign, until the Violation is corrected;

(b)    <u>Second Repeated Violation within any rolling 12-month period</u>:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform the Third-Party Lead Vendor and pause the campaign, or if the Violation was committed by a sub-vendor, demand that the Third-Party Lead Vendor pause the sub-vendor's participation in the campaign, for thirty (30) days or until the Violation is corrected, whichever is longer; and

(c)    <u>Third Repeated Violation within any rolling 12-month period</u>:  CEC shall notify the Third-Party Lead Vendor of the Violation and the steps it must take to correct the Violation.  If, within five (5) business days, the Third-Party Lead Vendor does not document that it is actively engaged in making the required changes, the Violation shall be escalated to CEC's Compliance Department, which shall inform

the Third-Party Lead Vendor that the segment of the Third-Party Lead Vendor's business in which the Violations occurred shall be removed from CEC's vendor list for a period of at least one (1) year, or if the Violation was committed by a sub-vendor, that the Third-Party Lead Vendor must cease using the sub-vendor for CEC's account for a period of at least one (1) year;

*provided*, *however*, that nothing in this paragraph shall be deemed to limit or otherwise affect CEC's obligations under paragraph 107 of this AVC.

107.    Termination Violations.

(a)    For purposes of this paragraph, a "Termination Violation" means any one of the following occurrences:

(i)    a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement references both a post-secondary educational opportunity and an employment opportunity, and the webpage, electronic solicitation, or online advertisement (1) uses a substantially smaller font size to present the educational opportunity as compared with the employment opportunity or (2) represents the educational opportunity as a "want ad" or employment application;

(ii)    a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement states that the Prospective Student (1) is eligible for a scholarship, grant, or financial aid as the result of having already won a drawing or raffle, (2) has been specially selected to receive a scholarship, grant, or financial aid, or (3) is entitled to receive compensation to fund his or her education in exchange for completing a form; or

(iii) a Third-Party Lead Vendor's webpage, electronic solicitation, or other online advertisement states that a Prospective Student will receive compensation to fund his or her post-secondary education that will not need to be repaid, unless the statement refers to grants that are expressly stated to be subject to eligibility.

(b) Notwithstanding anything in paragraph 106 to the contrary, in the event that a Third-Party Lead Vendor incurs three Termination Violations within a 180-day period, CEC shall, within thirty (30) days of discovering the third such Termination Violation, terminate any outstanding insertion orders to the segment of the Third-Party Lead Vendor's business in which the Termination Violations occurred and not issue any new insertion orders to that business segment for at least ninety (90) days if the Termination Violations were attributable to the Third-Party Lead Vendor, or if the Termination Violations were attributable to a sub-vendor, demand that the Third-Party Lead Vendor must cease using the sub-vendor for CEC's account a period of at least ninety (90) days; *provided*, *however*, that the requirements of this subparagraph shall not apply if the CEC and/or the Third-Party Lead Vendor document to the reasonable satisfaction of the Administrator that the three Termination Violations that would otherwise have triggered the requirements of this subparagraph represented, in the aggregate, no more than 1% of the total Prospective Student leads from the Third-Party Lead Vendor during the relevant period.

108. Upon written notice from the Attorneys General or Administrator that a Third-Party Lead Vendor has failed to comply with the contractual terms set forth in paragraph 104 of this

AVC, or any provision of an applicable state consumer protection law, CEC shall conduct an investigation of the Third-Party Lead Vendor practice and report the results of that investigation to the Attorneys General and to the Administrator within thirty (30) days, unless the Attorneys General agree otherwise.

109. CEC shall maintain policies and procedures and take appropriate action, including but not limited to exercising any rights available to it under a contract, to require Third-Party Lead Vendors to comply with this AVC.  Appropriate action shall be determined by the nature and circumstance of the alleged Violation, including but not limited to the pattern or severity of the alleged conduct.

110. Subject to the prior approval of the U.S. Department of Education, CEC shall work in good faith to develop and implement a system of paying Third-Party Lead Vendors based on the actual quality of leads produced by the particular vendor.

111. Nothing in this AVC limits the right of the Attorneys General to investigate or take any action against Third-Party Lead Vendors for any violation of applicable law, nor shall anything in this AVC be construed to limit the remedies available to the Attorneys General for any violation of applicable law by Third-Party Lead Vendors.

## **ENFORCEMENT**

112. The terms of this paragraph apply only during the term of the Administrator.

(a)     If at any time it appears that CEC is engaged in a practice or pattern of non-compliance with this AVC, or commits an egregious act of non-compliance with this AVC, either on the basis of information obtained by the Administrator pursuant to the Work Plan or from information obtained through any other source, then the Administrator shall review the relevant facts, collect whatever additional facts the

Administrator deems necessary, and seek CEC's position as to the practice, pattern, or egregious act of alleged non-compliance and related instances of individual violations.  If the Administrator's review establishes either a pattern or practice of non-compliance or egregious act of non-compliance with this AVC, then the Administrator shall work in conjunction with CEC to devise a corrective action plan to remedy such practice or pattern of non-compliance, including a reasonable period for corrective action and implementation of such plan.  To the extent that the Administrator and CEC are unable to agree to a corrective action plan, the Attorneys General may take whatever action they deem necessary, including but not limited to bringing an action to enforce this AVC, filing a new original action, conducting further investigation, or attempting to negotiate a corrective action plan directly with CEC.  Should the Attorneys General choose to file a new original action, nothing referred to in this paragraph shall affect the release in paragraph 131.

(b)     At a reasonable time following the period for corrective action, the Administrator shall provide a report to the Executive Committee, setting forth:

(i)     a description of the practice or pattern of non-compliance and related instances of individual violations of this AVC (including the relevant facts);

(ii)    a description of the corrective action plan;

(iii)   findings by the Administrator as to whether the Administrator deems it reasonably likely that CEC is in substantial compliance with the terms of this AVC, including but not limited to whether CEC has ceased to engage in a practice or pattern of non-compliance; and

        (iv)     a description of CEC's views as to the foregoing matters.

    (c)     The Attorneys General agree that they will meet and confer with CEC concerning the subject of the action before filing any action related to this AVC, so long as CEC makes necessary representatives available to meet and confer in a timely manner.  However, an Attorney General may take any action where the Attorney General concludes that, because of a specific practice, an imminent threat to the health, safety, or welfare of the citizens of the State exists, or the practice creates a public emergency requiring immediate action.

    (d)     The Attorneys General agree that no action may be filed to enforce the terms of this AVC unless they have proceeded as set forth in this paragraph.  However, an Attorney General may take any action where the Attorney General concludes that, because of a specific practice, an imminent threat to the health, safety, or welfare of the citizens of the State exists, or the practice creates a public emergency requiring immediate action.

113.    The terms of this paragraph shall apply following the term of the Administrator.

    (a)     For the purposes of resolving disputes with respect to compliance with this AVC, should any of the Attorneys General have a reasonable basis to believe that CEC has engaged in a practice that violates a provision of this AVC and decide to pursue the matter, then such Attorney General shall notify CEC in writing of the specific practice in question, identify with particularity the provision of this AVC that the practice appears to violate, and give CEC thirty (30) days to respond to the notification.  Within thirty (30) days of its receipt of such written notice, CEC shall provide a good-faith written response to the Attorney General notification,

containing either a statement explaining why CEC believes it is in compliance with this AVC, or a detailed explanation of how the alleged violation occurred and a statement explaining how CEC intends to remedy the alleged breach.

(b)     Should any of the Attorneys General have a reasonable basis to believe that CEC has engaged in a practice that violates a provision of this AVC and decide to pursue the matter, and following notice to CEC as provided in subparagraph (a), CEC shall provide the Attorneys General reasonable access to inspect and copy relevant, non-privileged records and documents in the possession, custody, or control of CEC that relate to CEC's compliance with the identified practice that the Attorneys General believe may violate this AVC.  If the Attorneys General make or request copies of any documents during the course of that inspection, the Attorneys General will provide a list of those documents to CEC.  This provision does not limit the rights of the Attorneys General to otherwise serve subpoenas or CIDs on CEC or to enforce them.

(c)     The Attorneys General may assert any claim that CEC has violated this AVC in a separate civil action to enforce compliance with this AVC, or may seek any other relief afforded by law to enforce compliance with this AVC, but only after providing CEC an opportunity to respond to the notification described in subparagraph (a); *provided*, *however*, that an Attorney General may take any action if the Attorney General concludes that a specific practice alleged to be in violation of this AVC requires immediate action due to an imminent threat to the health, safety, or welfare of the public, or the practice creates a public emergency requiring immediate action.

114. The Attorneys General agree to make good faith efforts to coordinate any future efforts to enforce violations of this AVC to the extent they are reasonably able to do so.  To that end, each Attorney General agrees to provide notice to the Executive Committee at least ten (10) business days prior to the filing of any action to enforce this AVC against any of the parties released from liability pursuant to paragraph 131.  However, nothing in this paragraph shall be construed so as to limit the right of a state to enforce any law in any action by that state not related to enforcement of compliance with this AVC.  In addition, the notice requirement stated herein shall not apply to the extent that the relevant Attorney General concludes that further delay in acting constitutes a threat to public health, safety, or welfare, or that the action intended to be taken addresses a public emergency requiring immediate action.  For the avoidance of doubt, nothing in this paragraph shall relieve the Attorneys General of the requirements of paragraphs 112 and 113 of this AVC, which must be satisfied before any Attorney General may provide the notices required by this paragraph.

115. Subject to the release set forth in paragraph 131, nothing in this AVC limits the right of the Attorneys General to conduct investigations or examinations or file suit for any violation of applicable law, not related to the enforcement of compliance with this AVC nor shall anything in this AVC be construed to limit the remedies available to the Attorneys General for any violation of applicable law that is not released by this AVC.  For the avoidance of doubt, nothing in this paragraph shall be construed to modify the procedures to be followed prior to the filing of an action to enforce the terms of this AVC, as set forth in paragraphs 112 through 114.

## INSTITUTIONAL RECEIVABLES

116.    For purposes of this paragraph and paragraph 117, a "Qualifying Former Student" means
any former student whose last known address at the time of the Effective Date is in a state
that is a party to this AVC and either (a) attended a CEC institution which was closed prior
to the Effective Date or is currently scheduled to close before December 31, 2018; or (b)
whose final day of attendance at AIU or CTU occurred on or before December 31, 2013.
As partial consideration for the release set forth in paragraph 131, without any admission
of wrongdoing, CEC agrees to forgo any and all efforts to collect any amounts that are
owed to CEC by such Qualifying Former Students (hereinafter "Institutional Receivables")
on the first day of the month following after the Effective Date which amounts totaled, as
of December 1, 2018, approximately $493,687,220.00.  The parties agree that issuance of
1099s is not required, and that 1099s will not be issued to Qualifying Former Students.  For
the avoidance of doubt, Institutional Receivables shall not include any amounts that are
owed to non-CEC entities, such as, for example, federal student loans owed to the United
States government.  In the event that any Qualifying Former Student or a co-signer for a
Qualifying Former Student attempts to make a payment to CEC after the first day of the
month following thirty (30) days after the Effective Date that relates to Institutional
Receivables, CEC shall use all reasonable efforts to refuse such payment and return the
payment.  CEC shall request that any and all trade line information related to amounts
covered by this paragraph be deleted from Qualifying Former Students' credit reports, to
the extent that such trade line information exists, at CEC's own expense.  For the avoidance
of doubt, it is not the Parties' intent to allow Qualifying Former Students to recover the
amounts CEC is foregoing collection of pursuant to this paragraph in any other forum.

117.    On or before sixty (60) days after the Effective Date, CEC shall send a letter by U.S. mail

to each Qualifying Former Student at his or her last known mailing address notifying such

former students that CEC are forgoing collection on their Institutional Debt, including all

interest and fees.  The notice shall state that due to a recent settlement with the Attorneys

General the student's account balance owing to CEC is $0 and shall encourage the student

to advise any and all co-signers that the student's account balance owing to CEC has been

reduced to $0.  The notice shall also inform the student that CEC will send a copy of the

notice to each of the credit reporting agencies (*i.e.*, TransUnion, Equifax, and Experian).

The notice shall further inform the student that if the student finds that the amounts owed

to CEC by the student are still erroneously appearing on the student's credit report after

one hundred and twenty (120) days and notifies CEC, then CEC, at its own expense, shall

promptly and properly notify the appropriate credit reporting agency, whether directly or

indirectly, of any change(s) to be made to the credit reporting resulting from the application

of the terms of this AVC.  The notice shall provide CEC's contact information for making

a request to correct a credit report and for any additional inquiries about the student's

account.

## PAYMENT TO THE STATES

118.    CEC shall pay $5 million (the "Payment Amount") to the Attorneys General.  CEC and the

Attorneys General agree that CEC shall make this payment according to instructions

communicated to CEC by the Attorneys General of the State of Connecticut and the State

of Iowa, including allocated distributions to the Attorneys General as determined by the

Executive Committee and a payment of $500,000.00 to the National Association of

Attorneys General Financial Services and Consumer Protection Fund and $250,000.00 to

the State Center.  The Texas Attorney General shall receive a payment of $50,000.00.
Payment by CEC shall be made no later than thirty (30) days after the Effective Date of
this AVC and after CEC's receipt of such payment instructions.  The Executive Committee
shall, in its sole discretion, determine the amount to be allocated to each Attorney General
from the Payment Amount.  Each Attorney General may, at his or her sole discretion, use
such allocation for any purpose or expenditure permitted by law, including but not limited
to attorneys' fees and other costs, and/or for any other consumer protection purpose.
However, no portion of the Payment Amount or such allocation shall be characterized as
the payment by CEC of a fine, civil penalty, or forfeiture.

## TIME TO IMPLEMENT AND DURATION

119.   Except as otherwise provided in paragraphs 116 and 117 and Exhibit A hereto, CEC shall
implement the terms of this AVC by no later than the Effective Date.

120.   With respect to each of the paragraphs of this AVC listed in Exhibit A hereto, CEC shall
implement the terms of the relevant paragraph of this AVC by no later than the date set
forth in Exhibit A.

121.   Except as otherwise provided in paragraphs 37 and 48, CEC shall be relieved of its
obligations under this AVC on the sixth anniversary of the Effective Date; provided,
however, that CEC's obligations under paragraphs 72 through 80, 82, 90, 91 (first sentence
only), and 133 through 139 of this AVC shall remain in effect unless and until the AVC is
terminated or modified by the Parties.

122.   Beginning on the fourth anniversary of the Effective Date, CEC shall have the right to
petition the Executive Committee to be relieved of its obligations under specific identified
paragraphs of this AVC that CEC believes have become overly burdensome or

unnecessary.  CEC shall set forth in writing the reasons why it believes it should be relieved from such obligations and any additional factors that it would like the Executive Committee to consider.  Moreover, if the U.S. Department of Education adopts regulations that establish a uniform approach for the calculation and disclosure of job placement rates that is applicable to CEC institutions, then CEC may petition the Executive Committee to be relieved of its obligations under paragraph 23 and paragraphs 61 through 69 on the date when such regulations become effective.  The Executive Committee shall consider any petitions made by CEC in good faith and, in each case, the Executive Committee shall be obligated to meet and confer with CEC within sixty (60) days of the request being sent and to make a recommendation about the petition to the Attorneys General within sixty (60) days thereafter.

123.  In the event that CEC sells or otherwise transfers control of American InterContinental University or Colorado Technical University, to a third-party acquirer (the "Acquiring Company"), and the Acquiring Company becomes subject to the terms of this AVC as a successor to CEC, the Acquiring Company shall assume CEC's rights to petition under this paragraph with respect to the institutions sold or transferred by CEC.

## MISCELLANEOUS PROVISIONS

124.  All obligations undertaken by CEC under this AVC shall apply prospectively.  Nothing herein, including the powers and duties of the Administrator to review CEC's compliance with this AVC shall apply to any of the schools owned or operated by Career Education Corporation fully taught out by December 31, 2018.

125.  Nothing in this AVC shall override or prevent CEC from complying with its obligations under the August 19, 2013 Assurance of Voluntary Discontinuance with the New York

Attorney General, including its obligations regarding placement rate disclosures.

126. During the term of this AVC, if the position of the Administrator is vacant, then, to the extent that this AVC or the Work Plan referenced in paragraph 35 requires the Administrator's approval or consent for CEC to take a particular action, then CEC shall be entitled to take that action if it notifies the Attorneys General of its intent to act and the Attorneys General fail to object with particularity within thirty (30) days.  If the Attorneys General object and particularize the bases for the objection within the thirty (30) day period, then the Parties shall promptly meet and confer, following which CEC shall be entitled to seek judicial review with regard to the objection if necessary.

127. Either the Attorneys General or CEC may request to meet and confer with respect to any aspect of this AVC or its implementation by notifying the other party.  The notice shall state the subjects proposed to be discussed.  The recipient of the notice shall in good faith make itself and/or its representatives available to meet and confer at a mutually convenient time within thirty (30) days of the notice being sent.

128. This AVC is for settlement purposes only.  No part of this AVC constitutes or shall be deemed to constitute an admission by CEC that they have ever engaged in any conduct proscribed by this AVC.

129. This AVC is made without trial or adjudication of any issue of fact or law by a court at law or equity, or finding of liability or fact of any kind, and no party to this agreement shall make contrary representations.  This AVC is not intended by the parties to constitute evidence against CEC in, or provide any basis for, any action brought by any person or entity for any violation of the common law, any federal or state statute or regulation, or constitute evidence in, or provide any basis for, any defenses, claims or assertions by or on

behalf of current or former Students seeking student loan forgiveness or defense to repayment claims initiated at or by the U.S. Department of Education.  Further, this AVC is not intended by the parties to constitute evidence in favor of CEC in, or provide any basis for, any defense put forward by CEC against any alleged violation of the common law, or any federal or state statute or regulation, or to constitute evidence in or provide any basis for any defenses, claims or assertions by or on behalf of CEC seeking to disallow student loan forgiveness or defense to repayment claims initiated at or by the U.S. Department of Education.

130.   Notwithstanding the provisions of paragraphs 128, 129, or any other provision of this AVC, this AVC may be used as evidence in an action brought by the Attorneys General to enforce the terms of this AVC for the sole purpose of establishing those terms of the AVC that any such action seeks to enforce.  In addition, notwithstanding the provisions of paragraphs 128, 129, or any other provision of this AVC, this AVC may be used by CEC and may constitute evidence in favor of CEC in any proceeding (a) brought by or on behalf of Students whose institutional debt has been forgiven pursuant to the provisions of paragraphs 116 and 117 of this AVC for the sole purpose of establishing the amount of institutional debt forgiven, or (b) brought by the Attorneys General seeking relief or recovery for claims or other matters released pursuant to paragraph 131 of this AVC for the sole purpose of establishing the matters allegedly released, or (c) in any action brought by the Attorneys General to enforce the terms of this AVC for the sole purpose of establishing conditions precedent to the bringing of such action, pursuant to paragraphs 112 and 113.

131.   As of the Effective Date, the Attorney Generals hereby release CEC from any and all civil

claims, actions, causes of action, damages, losses, fines, costs, and penalties, pursuant to each Attorney General's State's consumer protection and trade practice statutes, that have been or could have been brought against CEC or any of their respective current or former subsidiaries, affiliates, divisions, agents, representatives, and each of their respective officers, directors, shareholders, members, insurers, attorneys or employees on or before the Effective Date related to (1) the allegations set forth in paragraph 2 and (2) CEC's institutional lending practices that are the subject of paragraphs 116 and 117. Notwithstanding any other term of this AVC, the following do not comprise released claims:  private rights of action; criminal claims; claims of environmental or tax liability; claims for property damage; claims alleging violations of State or federal securities laws; claims alleging violations of State or federal antitrust laws; claims brought by any other agency or subdivision of the State; claims alleging violations of State or federal privacy laws or State data breach laws; and claims alleging a breach of this AVC.

132.  The Parties agree that this AVC does not constitute an approval by the Attorneys General of any of CEC's past or future practices, and CEC shall not make any representation to the contrary.

133.  The requirements of this AVC are in addition to, and not in lieu of, any other requirements of state or federal law.  Nothing in this AVC shall be construed as relieving CEC of the obligation to comply with all local, state, and federal laws, regulations, or rules, nor shall any of the provisions of this AVC be deemed as permission for CEC to engage in any acts or practices prohibited by such laws, regulations, or rules.

134.  Nothing contained in this AVC shall be construed to create or waive any individual private right of action.

135.   CEC shall not participate directly or indirectly in any activity to form or proceed as a separate entity or corporation for the purpose of engaging in acts prohibited in this AVC or for any other purpose which would otherwise circumvent any part of this AVC.

136.   If any clause, provision or section of this AVC shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this AVC and this AVC shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

137.   The section headings and subheadings contained in this AVC are included for convenience of reference only and shall be ignored in the construction or interpretation of this AVC.

138.   To the extent that any changes in CEC's business, advertisements, and/or advertising practices are made to achieve or facilitate conformance to the terms of this AVC, the fact that such changes were made shall not constitute any form of evidence or admission, explicit or implicit, by CEC of wrongdoing.

139.   In the event that any statute, rule, or regulation pertaining to the subject matter of this AVC is enacted, promulgated, modified, or interpreted by any federal or state government or agency, or a court of competent jurisdiction holds that such statute, rule, or regulation is in conflict with any provision of this AVC, and compliance with this AVC and the subject statute, rule, or regulation is impossible, CEC may comply with such statute, rule, or regulation and such action in the affected jurisdiction shall not constitute a violation of this AVC.  CEC shall provide written notices to the Attorneys General and the Administrator, if applicable, that it is impossible to comply with this AVC and the subject law and shall explain in detail the basis for claimed impossibility, with specific reference to any

applicable statutes, regulations, rules, and court opinions. Such notice shall be provided immediately upon CEC learning of the potential impossibility and at least thirty (30) days in advance of any act or omission which is not in compliance with this AVC. Nothing in this paragraph shall limit the right of the Attorney General to disagree with CEC as to the impossibility of compliance and to seek to enforce this AVC accordingly.

140.    All notices under this AVC shall be provided to the following via email and Overnight Mail:

        FOR CEC

            Jeffrey D. Ayers
            Senior Vice President, General Counsel and Secretary
            Career Education Corporation
            231 N. Martingale Rd.
             Schaumburg, Illinois 60173
            jayers@careered.com

            Jerry W. Kilgore
            Cozen O'Connor
            Three James Plaza
            Suite 1420
            Richmond, VA 23219
            jkilgore@cozen.com

        FOR THE STATE OF TEXAS

            Office of the Texas Attorney General
            Consumer Protection Division
            Attention: D. Esther Chavez
            P.O. Box 12548
            Austin, Texas 78711-2548
            Esther.Chavez@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

PAUL SINGER
Chief, Consumer Protection Division


D. ESTHER CHAVEZ
Senior Assistant Attorney General
State Bar No. 04162200
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 475-4628
Facsimile:    (512) 463-8301
Email: Esther.Chavez@oag.texas.gov
Dated: **JAN. 2,** _____, 2019.

For Career Education Corporation, American InterContinental University, Inc., and Colorado
Technical University, Inc.

Jeffrey D. Ayers
Senior Vice President, General Counsel and Secretary
Career Education Corporation
231 N. Martingale Rd.
Schaumburg, Illinois 60173
jayers@careered.com

Counsel for Career Education Corporation, American InterContinental University, Inc., and Colorado Technical University, Inc.

_Jerry Kilgore_

Jerry W. Kilgore
COZEN O'CONNOR
Three James Plaza
Suite 1420
Richmond, VA 23219
Phone: (804) 762-6916
jkilgore@cozen.com

**EXHIBIT A**

tabbies

**Exhibit A – Implementation Schedule**

| AVC Paragraph(s) | Subject Matter | Deadline for Compliance |
|---|---|---|
| ¶¶ 54-59<br>(and all other references) | Single-Page Disclosure Sheet[1] | 180 days from the Effective Date, subject to the qualifications contained in the relevant paragraphs regarding what information must be contained in the Single-Page Disclosure. |
| ¶¶ 70-71 | Electronic Financial Impact Platform | CEC shall have one hundred eighty (180) days from the Effective Date to complete development, have approved by the Administrator in consultation with the Attorneys General, and implement its Electronic Financial Impact Platform |

---

[1] All capitalized terms used in this Exhibit A shall have the meaning given to them in the AVC.

-1-

**EXHIBIT**

**B**

# PROGRAM NAME

## PROGRAM COST AND LENGTH

### TUITION AND FEES*: $XX,XXX   PROGRAM LENGTH: XX months

| Tuition: | Total Credits: | Cost Per Credit Hour: | Technology Fee: | Graduation Fee: |
|---|---|---|---|---|
| $XX,XXX | XXX | $XXX | $XXX/term | $XXX |

*The amounts shown above include costs for the entire program, assuming normal time to completion. In addition, a non-refundable $150 Graduation Fee will be charged to the student's account during the final term. Program length and cost may vary due to multiple factors including eligible transferred credits, program pacing and proficiency credit awarded for passing knowledge assessments.

## TRANSFER CREDITS

- **Course credits are not guaranteed to transfer to other schools.**
  Transferability of credits is at the sole discretion of the receiving institution.

- **Not all credits are eligible to transfer.**
  The Prior Learning Assessment Team can determine what credits students may be eligible to transfer into their current program.  You can transfer in up to 75% of credits required for a degree. See the university's catalog regarding transfer credit policies.

## STUDENT SUCCESS & OUTCOMES

### THE TYPICAL GRADUATE LEAVES WITH A LOAN DEBT OF: $XX,XXX

The median debt of borrowers who completed this program. This debt includes federal, private, and institutional loans.

### SUCCESS OF STUDENTS WHO ENROLL

**XX%** of Title IV students complete the program within XX months



XX out of XX complete within XX months



XX out of XX do not complete within XX months

### THE TYPICAL GRADUATE EARNS $XX,XXX PER YEAR AFTER LEAVING THIS PROGRAM.

The median earnings of program graduates who received Federal aid.

Exhibit 60

Case 3:19-cv-03674-WHA   Document 143-3   Filed 06/09/20   Page 201 of 463

# Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants

**While courts continue to deliberate, DeVos moves forward with ensuring harmed students receive relief**

DECEMBER 10, 2019

**Contact:** Press Office, (202) 401-1576, press@ed.gov

WASHINGTON —Today, U.S. Secretary of Education Betsy DeVos announced the Department has implemented a new methodology for assessing borrower defense to repayment (BDR) claims, many of which were left behind by the previous administration. The new methodology relies on publicly available earnings data and a scientifically robust statistical methodology to determine harm.

> **More Resources**
>
> New Borrower Defense Relief Methodology Policy Statement

"Despite the mess we inherited from the previous administration, we committed from day one to getting this right for students and taxpayers," said Secretary DeVos. "We cannot tolerate fraud in higher education, nor can we tolerate furiously giving away taxpayer money to those who have submitted a false claim or aren't eligible for relief. This new methodology treats students fairly and ensures that taxpayers who did not go to college or who faithfully paid off their student loans do not shoulder student loan costs for those who didn't suffer harm."

As illustrated in the chart below, the new borrower defense relief methodology relies on publicly available data to compare median earnings of graduates who have made BDR claims to the median earnings of graduates from comparable programs. If the earnings from the school in question under the BDR application are lower than the median for that program at all comparable schools, then they will be determined to have suffered harm and will receive student loan relief, either in full or in part:

- Earnings lower than two standard deviations from the median will result in full relief.
- Successful BDR applicants whose program earnings are lower than the median but higher than two standard deviations from the median will receive tiered relief of either 25%, 50%, or 75%, based on their program's earnings deviation from the median.



To calculate harm and determine the relief amount, the Department is relying on publicly available 2017 Gainful Employment earnings data, Social Security Administration earnings, College Scorecard data and IRS information.

Because of promises made by the prior administration, and damages likely caused to those borrowers by the Department's continuous efforts to use Corinthian Colleges, Inc. (CCI) institutions as an example, the Department will award no less than 10% relief to all eligible CCI Borrower Defense applicants, regardless of program earnings.

Hundreds of claims adjudicated utilizing the new methodology, mostly consisting of Corinthian and ITT borrowers, will be released this week. FSA will also resume notifying borrowers that their loans are ineligible for relief under the 2016 BDR regulation based on the following factors:

- Borrowers did not have Direct Loans related to the claim.

000602

- Borrowers were not part of the pre-identified class of Corinthian Colleges for whom approval was provided in advance.
- Borrowers did not make an allegation or provide sufficient evidence that the institution violated an applicable state law.
  - For example, borrowers who submitted a claim stating that their teacher was unfair or that they have not found a job they like are not eligible for relief under the applicable BDR provision.

The decisions issued this week include thousands of claims that were effectively denied by the prior administration but were left behind for this administration to notify borrowers. For context, the prior administration's final BDR report had indicated approximately 40% of pending claims at that point in time were deemed ineligible. Students deemed ineligible for relief, who have loans held by the Department, will have any interest accrued on their loan waived from the date their claim was submitted.

This is the second robust adjudication process put in place by this administration to address pending claims. As many will recall, the Department first began adjudicating BDR claims in 2017 but was stopped by a California court based on technical, legal questions arising from a data-sharing agreement within the federal government. The Department appealed the court's decision, but when it became obvious that the court was not going to move quickly, the Department began to develop the new methodology released today for adjudicating claims.

Exhibit 61

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009715; DOE00009719 | Academy of Art University | Stephens Institute, Inc. | 5/12/2020, updated 11/17/2020 | 409 | N |
| DOE00009723 | Academy of Healing Arts | LaSalle Capital Group | 11/5/2019 | 7 | N |
| DOE00009724; DOE00009728; DOE00009732 | ACT College | Applied Career Training, Inc. | 8/18/2020, updated 11/19/2020 | 54 | N |
| DOE00009733; DOE00009734 | Adelphi Business College | Unknown | 8/31/2020, updated 11/17/2020 | 14 | N |
| DOE00009735; DOE00009737; DOE00009739 | Alabama A&M University | Public | 12/20/2019; 8/19/2020, updated 11/20/2020 | 22 | N |
| DOE00009740; DOE00009743; DOE00009745; DOE00009747 | Alabama State University | Public | 11/4/2019; 8/19/2020, updated 11/19/2020 | 21 | N |
| DOE00009748; DOE00009751; DOE00009756 | Albany State University | Public | 11/8/2019; 7/31/2020, updated 11/20/2020 | 22 | N |
| DOE00009761; DOE00009762 | Albert Merrill School | Unknown | 9/4/2020, updated 11/18/2020 | 12 | N |
| DOE00009545, DOE00009548, DOE00009550, DOE00009552 | All CEC schools (listed in memo) | Career Education Corporation (CEC) | 4/2/2020, 6/19/2020, 12/2/2020 | Unspecified | Maybe - students with enrollment start date between 1/1/2008 - 12/31/2012 |
| DOE00009765; DOE00009767; DOE00009768 | Allied American University | Allied Business Schools, Inc.; The George E. Achenbach Irrevocable Trust | 10/15/2019; 9/14/2020, updated 11/18/2020 | 13 | N |
| DOE00009769; DOE00009773; DOE00009777 | American Broadcasting School | American Broadcasting School, Inc. | 8/6/2020, updated 11/24/2020 | 7 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009778; DOE00009781; DOE00009784; DOE00009788 | American Business Institute | Wilfred American Education Corp. | 10/3/2019; 9/15/2020 | 36 | N |
| DOE00009470 | American Career Institute | Not specified | 1/4/2017 | Unspecified | Unknown |
| DOE00009789; DOE00009792; DOE00009794 | American Career Training Travel School | Joseph Calareso | 8/19/2020, updated 11/23/2020 | 13 | N |
| DOE00009797; DOE00009798 | American College | Unknown | 9/15/2020, updated 11/20/2020 | 14 | N |
| DOE00009795; DOE00009796 | American College of Medical Technology | Daniel Dorim Kim | 8/19/2020, updated 11/20/2020 | 18 | N |
| DOE00009704; DOE00009709; DOE00009714 | American Commercial College | Doyle Sheets and Sheets Family Partnership | 2/10/2020, updated 11/18/2020 | 57 | N |
| DOE00009799; DOE00009800 | American Hi-Tech Business Technology | Robert Fiance Business Institute | 9/4/2020, updated 11/19/2020 | 12 | N |
| DOE00009806; DOE00009809; DOE00009812; DOE00009805 | American Institute | Unspecified | 2/10/2020; 8/28/2020, updated 11/19/2020 | 38 | N |
| DOE00009801; DOE00009802 | American Institute of Business | Unknown | 8/31/2020, updated 11/19/2020 | 10 | N |
| DOE00009803 | American Institute of Trucking | Charles R. ("Chuck") Wirth | 11/13/2019 | 7 | N |
| DOE00009814; DOE00009815 | American Musical & Dramatic Academy | Nonprofit | 8/31/2020, updated 11/18/2020 | 18 | N |
| DOE00009817; DOE00009823; DOE00009816 | American Professional Institute/Helms College | Goodwill Industries, Inc. | 8/12/2020, updated 11/20/2020 | 69 | N |
| DOE00009829 | American Public University System | American Public Education, Inc. | 8/23/2019 | 38 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009831; DOE00009834; DOE00009837 | American School of Technology | American School of Technology Management, Inc. (Michael Schiff) | 9/26/2019; 9/23/2020, updated 11/20/2020 | 27 | N |
| DOE00009840; DOE00009842 | American University of the Caribbean School of Medicine | Adtalem Global Education Inc. | 9/25/2020, updated 11/18/2020 | 6 | N |
| DOE00009844; DOE00009845; DOE00009846 | Ameritech College | Ameritech College (William Jones) | 11/18/2019; 9/14/2020, updated 11/19/2020 | 10 | N |
| DOE00009847; DOE00009849; DOE00009854 | Anamarc College | Anamarc Enterprises, Inc. (Enrique Diaz, Elsa Lorena Pina, Ana Maria Pina Houde) | 7/12/2019; 7/31/2020, updated 11/19/2020 | 74 | N |
| DOE00009859 | Angley College | Angley College, Inc. | 8/7/2019 | 23 | N |
| DOE00009862; DOE0009864 | Antioch University | Private | 9/15/2020, updated 11/19/2020 | 10 | N |
| DOE00009866; DOE00009870 | Antonelli College | Technology Training Systems, Inc. | 8/26/2020, updated 11/17/2020 | 64 | N |
| DOE00009874 | Antonelli Institute | Edward Gillespie | 11/14/2019 | 10 | N |
| DOE00010161; DOE00010167; DOE00010160 | Antonelli Institute; Antonelli Institute of Art & Photography; Bradford School; Fox College; Hickey College; International Business College; King's College; Minneapolis Business College; Vet Tech Institute; Wood Tobe-Coburn School | Bradford Schools, Inc. | 8/12/2020, updated 11/20/2020 | 230 | N |
| DOE00009875; DOE00009878 | Apex Technical School | Breton International Inc. (William Z. Cann, The Estate of Dorothy Cann Hamilton) | 9/10/2020, updated 11/20/2020 | 25 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009622 | Argosy University, South University, Western State College of Law | EDMC (Education Management Corp.) | 8/13/2020 | Unclear re: these 3 brands; 13,000 from EDMC total | Y - Allegations re: professional licensure for psychology masters & doctorates at Argosy; professional licensure for South University nursing program in 2009; any allegations during Dream Center ownership |
| DOE00009881 | Arizona College | Eduvision Inc. | 11/19/2019 | 6 | N |
| DOE00009883 | Arizona Institute of Electrolysis Div Unif School | Unknown | 11/18/2019 | 7 | N |
| DOE00009885; DOE00009887; DOE00009891 | Arizona State University | Public | 7/11/2019; 9/8/2020, updated 11/20/2020 | 50 | N |
| DOE00009895; DOE00009899 | Armstrong State University (now Georgia Southern Armstrong Campus) | Public | 8/4/2020, updated 11/18/2020 | 5 | N |
| DOE00009635 | Art Institutes, Argosy University, Brown Mackie College, South University, Western State College of Law | EDMC | 4/30/2020 | 18,000 | Maybe - This memo addresses allegations from before 7/1/2003; other time periods/issues in other memos |
| DOE00009631 | Art Institutes, Argosy University, Brown Mackie College, South University, Western State College of Law | EDMC | 6/2/2020 | Not specified | Maybe - This memo addresses allegations from between 1/1/2016-9/30/2017; other time periods/issues in other memos |
| DOE00009626; DOE00009638; DOE00009608; DOE00009616 | Art Institutes, Argosy University, Brown Mackie College, South University, Western State College of Law | EDMC | 8/7/2020; 7/21/2020 | 17,000 | Maybe - This memo addresses allegations from between 7/1/2003-12/31/2008 (except professional licensure for psychology masters & |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009903; DOE00009909; DOE00009915 | ASA College | ASA Institute of Business & Computer Technology, Inc. (Alex Shchegol) | 8/31/2020, updated 11/23/2020 | 88 | N |
| DOE00009539 | Ashford University | Bridgepoint | Undated | Unspecified | Unknown |
| DOE00009916; DOE00009918; DOE00009923; DOE00009928 | Associated Technical College | Diversified Education Co. | 11/13/2019; 8/3/2020, updated 11/22/2020 | 24 | N |
| DOE00009929; DOE00009930 | ATA College | Educational Ventures, LLC | 8/19/2020, updated 11/22/2020 | 24 | N |
| DOE00009932; DOE00009934; DOE00009931 | Atlanta's John Marshall Law School / Savannah Law School | John Marshall Law School, LLC | 8/19/2020 | 12 | N |
| DOE00009936; DOE00009942 | Atlantic Union College | Private | 8/3/2020 | 7 | N |
| DOE00009948 | Austin Community College | Austin Independent School District (public) | 11/13/2019 | 7 | N |
| DOE00009950 | Austin Peay State University | Public | 11/5/2019 | 10 | N |
| DOE00009952; DOE00009954; DOE00009955; DOE00009960 | Austin's School of Spa Technology | Empire Education Corp. (solely owned by Faith Takes) | 12/2/2019; 8/5/2020; 8/24/2020, updated 11/23/2020 | 16 | N |
| DOE00009965; DOE00009966; DOE 00009967 | Avalon School of Cosmetology | EA Education, Inc. (owned by P-Squared, Inc.; in turn owned by BP Assets, LLC [Brandon Pobiak], DP Assets, LLC [Donald Pobiak], and KP Assets, LLC [Clint Tryon & Kimberly Tryon]) | 12/19/2020 [likely typo for 2019]; 8/24/2020, updated 11/18/2020 | 12 | N |
| DOE00009969; DOE00009970 | Aveda Arts & Sciences Institute Covington | Beauty Basics, Inc. (Debra A. Neill Baker and Edwin H. Neill GST Trust) | 8/24/2020; 8/13/2020 | 16 | N |
| DOE00009975; DOE00009980 | Aveda Institute - South Florida | TSP Institute, Inc. | 8/13/2020, updated 11/19/2020 | 8 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009985 | Aviation Institute of Maintenance | Employment Services, Inc. | 7/18/2019 | 27 | N |
| DOE00010797; DOE00010802; DOE00010807 | Aviation Institute of Maintenance, Centura College, Centura Institute, Tidewater Tech | Employment Services, Inc. | 5/1/2020, updated 11/22/2020 | 164 | Y - Aviation Inst. Students between 2007-2018 who allege misrepresentations re: graduation rates & employability of students with criminal records |
| DOE00009987 | Azusa Pacific University | Azusa Pacific University | 10/21/2019 | 12 | N |
| DOE00009990 | Bainbridge State College | Public | 11/25/2019 | 6 | N |
| DOE00009992; DOE00009994; DOE00009997; DOE00010002; DOE00010007 | Baker College | Private (Jewell family) | 7/17/2019; 10/22/2019; 9/2/2020, updated 11/19/2020 | 137 | N |
| DOE00010008; DOE00010009 | Barber-Scotia College | Private | 8/27/2020, updated 11/18/2020 | 19 | N |
| DOE00010010; DOE00010011 | Barclay College | Glenn Rodano | 9/15/2020, updated 11/17/2020 | 16 | N |
| DOE00010012; DOE00010018 | Barry University | Barry University, Inc. | 9/29/2020; updated 11/20/2020 | 23 | N |
| DOE00010024; DOE00009645 | Bauder College | Kaplan Higher Education Corp. | 11/1/2019 | 90 | N |
| DOE00009645 | Bauder College, Kaplan Career Institute, Kaplan College, Mount Washington College, Purdue University Global, Maric College | Graham Holdings Co. (Kaplan) | Undated | Unspecified | Unknown |
| DOE00010027 | Bay State College | Bay State College | 1/2/2020 | 7 | N |
| DOE00010031; DOE00010032 | Beauty Institute (The) | Magnolia School of Ambler Corp. (Truc Do) | 9/15/2020, updated 11/20/2020 | 10 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010028 | Beauty Institute (The), a/k/a The Beauty Institute-Schwarzkopf Professional | Unknown | 10/22/2019 | 17 | N |
| DOE00010033; DOE00010039 | Beauty Schools of America | Coral Springs Schools, Inc. (John W. Rebstock) | 8/31/2020, updated 11/18/2020 | 129 | N |
| DOE00010045; DOE00010050; DOE00010055 | Beckfield College | Quad Partners III-A LP (previously Kentucky Career Institute, Beckfield, and Daymar) | 8/28/2020; updated 11/23/2020 | 32 | N |
| DOE0010056; DOE0010057 | Belhaven University | Private | 9/15/2020, updated 11/22/2020 | 11 | N |
| DOE00010058; DOE00010062 | Bellus Academy | Beauty Boutique, Inc. (Chula Vista & El Cajon); Poway Academy of Hair Design, Inc. (Poway) (both controlled by William & Lynelle Lynch) | 2/19/2020, updated 11/24/2020 | 13 | N |
| DOE00010067; DOE00010070 | Belmont Abbey College | Private | 8/4/2020, updated 11/20/2020 | 5 | N |
| DOE00010074; DOE00010076; DOE00010078; DOE00010080 | Benedict College | Private | 8/2/2019; 8/11/2020, updated 11/17/2020 | 30 | N |
| DOE00010081 | Benjamin Franklin Institute of Technology | Benjamin Franklin Institute of Technology | 12/11/2019 | 6 | N |
| DOE00010082 | Bennett College | Affiliated with United Methodist Church | 12/18/2019 | 6 | N |
| DOE00010084; DOE00010089 | Berkeley College | Berkeley Educational Services of New Jersey, Inc. & Berkeley Educational Services of New York, Inc. (Randy B. Luing, Kevin L. Luing, Timothy D. Luing, Brian D. Luing) | 9/8/2020, updated 11/20/2020 | 91 | N |
| DOE00009561 | Berks Technical College | Unspecified | Undated | Unspecified | Unknown |
| DOE00010094 | Bethune-Cookman University | Private | 8/1/2019 | 19 | N |
| DOE00010097; DOE00010098 | Blake Business School | Barbara Marion & Rex Shaw | 9/15/2020, updated 11/23/2020 | 17 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010099; DOE00010104 | Blanton's College | Blanton's College, Inc. | 7/31/2020, updated 11/22/2020 | 6 | N |
| DOE00010109 | Bloomsburg University of Pennsylvania | Pennsylvania State System of Higher Education (public | | | |
| DOE00010111; DOE00010113; DOE00010117; DOE00010122 | Blue Cliff College | Education Management Inc. | 8/23/2019; 9/15/2020, updated Nov. 2020(?) | 79 | N |
| DOE00010123; DOE00010127 | Blue Ridge Community and Technical College | Public | 8/4/2020, updated 11/20/2020 | 5 | N |
| DOE00010131; DOE00010137; DOE00010143 | Boca Beauty Academy | Boca Beauty Academy, LLC (Jack Bragin) | 7/30/2020, updated 11/18/2020 | 10 | N |
| DOE00010144 | Boise State University | Public | 11/15/2019 | 6 | N |
| DOE00010146 | Boston University | Private non-profit | 10/31/2019 | 9 | N |
| DOE00010148; DOE00010152; DOE00010158; DOE00010157 | Bowling Green State University | Public | 11/8/2019; 7/31/2020, updated 11/20/2020 | 16 | N |
| DOE00010173; DOE00010178 | Bramson ORT College | ORT America, World ORT | 8/5/2020, updated 11/18/2020 | 7 | N |
| DOE00010182; DOE00010184; DOE00010185 | Brandman University | Brandman University | 10/9/2019; 9/15/2020, updated 11/18/2020 | 21 | N |
| DOE00010186 | Brensten Education | Brensten Education, Inc. | 7/23/2019 | 26 | N |
| DOE00010191; DOE00010196; DOE00010190 | Broadview University | C Square Educational Enterprises; Broadview Institute, Inc.; Terry L. Myhre | 10/5/2020, updated 11/22/2020 | 43 | Y - Students enrolled between 1/1/1997-8/31/1999 |
| DOE00010201; DOE00010206; DOE00010209 | Brookline College | Brookline College, LLC | 11/14/2019; 8/18/2020 | 98 | N |
| DOE00010214; DOE00010217; DOE00010221; DOE00010225 | Brookstone College of Business | Commercial College of Asheboro, Inc.; Jack & Marlene Henderson | 10/11/2019; 8/31/2020, updated 11/19/2020 | 40 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010226; DOE00010228; DOE00010231; DOE00010233 | Broward College | Public community college | 7/30/2019; 8/25/2020, updated 11/18/2020 | 22 | N |
| DOE00010234; DOE00010235 | Brown College of Court Reporting | Coyne American Institute, Inc.; Russell T. Freeman | 9/15/2020, updated 11/20/2020 | 10 | N |
| DOE00010237; DOE00010241; DOE00010246; DOE00010236 | Bryan College | Alta Education, LLC (John S. Ledesma); Bryan College, LLC | 11/25/2019; 8/27/2020, updated 11/20/2020 | 63 | N |
| DOE00010251; DOE00010256; DOE00010261 | Bryan University | Bryan College, LLC (Chad Evans) | 10/21/2020, updated 11/18/2020 | 60 | N |
| DOE00010262; DOE00010266; DOE00010270 | Bryan University [unaffiliated with entry above] | Bryan Career College Inc. (Brian D. Stewart) | 10/19/2020, updated 11/23/2020 | 23 | N |
| DOE00010271; DOE00010274; DOE00010279; DOE00010273 | Bryant & Stratton College | Bryant & Stratton Limited Partnership | 11/5/2019; 3/23/2020, updated 11/22/2020 | 215 | N |
| DOE00010284; DOE00010290; DOE00010296 | Business Career Training Institute, f/k/a Business Computer Training Institute | Business Career Training Institute, Inc. (G. Morris Pigott, Thomas Jonez) | 8/25/2020, updated 11/22/2020 | 190 | N |
| DOE00010297; DOE00010299 | Business Industrial Resources | Business Industrial Resources (Irene Zakron) | 8/5/2020, updated 11/19/2020 | 37 | N |
| DOE00010301 | Butler Business School | Academic Enterprises, Inc. | 7/19/2019 | 25 | N |
| DOE00010303; DOE00010307 | Caliber Training Institute | Caliber Training Institute, Inc. (Ben D. Lokos) | 8/19/2020, updated 11/18/2020 | 41 | N |
| DOE00010311 | California College of Vocational Careers | Rudesindo Fernandez | 10/30/2019 | 12 | N |
| DOE00010313 | California Healing Arts College | California Healing Arts College | 12/20/2019 | 6 | N |
| DOE00010314 | California State University East Bay | Public | 3/5/2020 | 7 | N |
| DOE00010316 | California State University Los Angeles | Public | 3/5/2020 | 7 | N |
| DOE00010318; DOE00010319 | California State University Northridge | Public | 8/27/2020, updated 11/20/2020 | 18 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010320 | California State University Sacramento | Public | 10/15/2019 | 13 | N |
| DOE00010322; DOE00010323; DOE00010324 | Cambridge Technical Institute | Cambridge Technical Institute, Inc. | 10/23/2019; 9/14/2020, updated 11/20/2020 | 12 | N |
| DOE00010325 | Camelot College | Ronnie Williams | 10/31/2019 | 9 | N |
| DOE00009542; DOE00009544; DOE00002492 | Capella University | Strategic Education Co. (since 2018 following Strayer-Capella merger) | 7/13/2020 | 700 | Y - Doctoral students |
| DOE00010327 | Capitol City Trade & Technical School | Unknown | 10/15/2019 | 15 | N |
| DOE00010330; DOE00010331 | Capri Institute of Hair Design | Capri Training Centers, Inc.; Capri Corporate Management, Inc. (Helmut E. Muenster Trust A & Anne E. Muenster) | 9/16/2020, updated 11/18/2020 | 10 | N |
| DOE00010332; DOE00010334 | Career Care Institute | Edmund Carrasco | 9/15/2020, updated 11/23/2020 | 11 | N |
| DOE00010336; DOE00010337 | Career College of Northern Nevada | Career Colleges, Inc. (Larry N. Clark) | 8/24/2020, updated 11/22/2020 | 12 | N |
| DOE00010338 | Career Institute of America | Career Institute of America | 12/28/2019 | 6 | N |
| DOE00010339 | Career Institute of Health and Technology | Computer Career Center, Inc. | 8/9/2019 | 51 | N |
| DOE00010341; DOE00010346; DOE00010351 | Career Point College | Dickinson College of San Antonio, Inc. dba Career Point | 8/31/2020, updated 11/22/2020 | 437 | N |
| DOE00010352 | Career Technical College | Private | 11/25/2019 | 10 | N |
| DOE00010354; DOE00010356; DOE00010358 | Career Technical Institute | Career Technical Institute, Inc. (Moses Rabi) | 12/27/2019; 9/18/2020, updated 11/20/2020 | 23 | N |
| DOE00010359; DOE00010361 | Career Training Academy | Career Training Academy, Inc.; HCP ED Holdings, Inc.; HCP ED Holdings, LLC; Hispania Private Equity II, L.P. | 9/3/2020, updated 11/18/2020 | 20 | N |
| DOE00009763 | Carlos Albizu University | Puerto Rico Institute of Psychology Inc. | 11/15/2019 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010364; DOE00010368; DOE00010363 | Carrington College | San Joaquin Valley College, Inc. | 3/31/2020, updated 11/20/2020 | 375 | N |
| DOE00010372; DOE00010374; DOE00010375 | Casa Loma College | Private | 11/5/2019; 9/21/2020, updated 11/20/2020 | 18 | N |
| DOE00010377 | Catherine College | Unknown | 11/4/2019 | 7 | N |
| DOE00010378; DOE00010385; DOE00010388 | CC's Cosmetology School, CC's Cosmetology College | James & Starlith ("Chiquita") Carter | 4/10/2020, updated 9/17/2020 & 11/23/2020 | 19 | N |
| DOE00010389; DOE00010393 | CDA Technical Institute | CDA Technical Institute, Inc. | 8/4/2020, updated 11/22/2020 | 8 | N |
| DOE00010397; DOE00010398; DOE00010399 | Center for the Media Arts | The Center for the Media Arts Inc. | 11/13/2019; 8/28/2020, updated 11/22/2020 | 12 | N |
| DOE00010400; DOE00010401; DOE00010402 | Central Connecticut State University | Public | 11/15/2019; 8/26/2020, updated 11/20/2020 | 11 | N |
| DOE00010403; DOE00010406; DOE00010407 | Central Florida Institute | Career Path Training Corp.; CG&G II, Inc.; Werner Enterprises | 10/3/2019; 9/17/2020, updated 11/23/2020 | 27 | N |
| DOE00010409 | Central Michigan University | Public | 11/5/2019 | 8 | N |
| DOE00010411; DOE00010415 | Central New Mexico Community College | Public | 8/5/2020, updated 11/20/2020 | 5 | N |
| DOE00010419 | Central Nursing College | LLC, Katherine Ahn | 10/11/2019 | 6 | N |
| DOE00010422; DOE00010424; DOE00010426 | Central State University | Public | 8/24/2020, updated 11/20/2020 | 18 | N |
| DOE00010426; DOE00010434; DOE00010427 | Chamberlain University | Adtalem Global Education Inc. | 7/31/2020, updated 11/18/2020 | 77 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment

FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010440; DOE00010442; DOE00010444 | Chancellor University, David N. Myers University, Dyke College | Chancellor University System, LLC | 8/19/2019; 9/17/2020, updated 11/19/2020 | 29 | N |
| DOE00010446 | Chapman University | Daniele C. Struppa | 11/6/2019 | 8 | N |
| DOE00010448 | Charleston Southern University | South Carolina Baptist Convention | 11/6/2019 | 5 | N |
| DOE00009555; DOE00009560; DOE00002528 | Charlotte School of Law | Infilaw System | 5/12/2020 | 1,000 | Y - Students with separation date on or after 2/24/2015 |
| DOE00010450 | Charter College | Prospect Education, LLC | 1/23/2020 | 46 | N |
| DOE00010455 | Chattanooga College-Medical, Dental, and Technical Careers, Inc. | ECPI | 2/21/2020 | 7 | N |
| DOE00010457 | Chicago Institute of Technology | Unknown | 11/14/2019 | 10 | N |
| DOE00010458; DOE00010460; DOE00010462 | Cincinnati Christian University | Private | 8/27/2020, updated 11/22/2020 | 12 | N |
| DOE00010463; DOE00010464 | Cincinnati State Technical & Community College | Public | 9/4/2020, updated 11/22/2020 | 12 | N |
| DOE00010465; DOE00010466; DOE00010468; DOE00010470 | CIT College of InfoMedical Technology | Mohammad Qamaruddin | 11/14/2019; 8/31/2020, updated 11/19/2020 | 20 | N |
| DOE00010471; DOE00010477 | City College | Private | 8/25/2020, updated 11/20/2020 | 69 | N |
| DOE00010483 | Clark Atlanta University | Private | 9/6/2019 | 13 | N |
| DOE00010485; DOE00010487 | Clark State Community College | Public | 12/29/2019; 2/21/2020 | 6 | N |
| DOE00010491; DOE00010493 | Cleveland Chiropractic College (Kansas City) [location inferred from -10489] | Private | 9/16/2020, updated 11/23/2020 | 12 | N |
| DOE00010489 | Cleveland Chiropractic College (Los Angeles) | Cleveland Chiropractic College | 11/5/2019 | 10 | N |
| DOE00010495 | Cleveland Institute of Dental-Medical Assistants | Cleveland Institute of Dental-Medical Assistants, Inc. | 9/16/2019 | 15 | N |
| DOE00010498 | Cleveland State University | Public | 11/15/2019 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010500; DOE00010504; DOE00010506; DOE00010510 | College of Health Care Professions (The) | Empowerment Schools, Inc. | 7/16/2019; 9/19/2020, updated 11/20/2020 | 53 | N |
| DOE00010511; DOE00010513; DOE00010517 | College of New Rochelle (The) | Private | 2/10/2019; 9/15/2020, updated 11/18/2020 | 100 | N |
| DOE00010521; DOE00010523; DOE00010525 | College of Office Technology (The) | Assurance Corp.; Pedro Galva | 9/1/2020, updated 11/19/2020 | 39 | N |
| DOE00010526 | College of Southern Nevada | Public | 9/27/2019 | 13 | N |
| DOE00010530; DOE00010531; DOE00010534; DOE00010537 | College of Westchester (The) | The College of Westchester, Inc. (Karen J. Smith) | 11/12/2019; 10/2/2020, updated 11/22/2020 | 20 | N |
| DOE00010538 | Colorado Christian University | Private | 11/12/2019 | 6 | N |
| DOE00010539 | Columbia College of Missouri, Columbia College of Chicago | Private | 8/21/2019 | 35 | N |
| DOE00010541; DOE00010542 | Columbia School of Broadcasting, Home Study | Private | 8/28/2020, updated 11/22/2020 | 11 | N |
| DOE00010543; DOE00010545; DOE00010549 | Columbia Southern University | Columbia Southern University, Inc.; Columbia Souther Education Group, Inc. (Chantell M. Cooley, Minnie L. Mayes, Robert G. Mayes) | 1/15/2020; 9/4/2020, updated 11/20/2020 | 43 | N |
| DOE00010554 | Columbus State Community College, Columbus Area Technician's School, Columbus Technical Institute | Public (?) | 9/6/2019 | 10 | N |
| DOE00010556 | Community Care College | Community HigherEd Institute (since 2015, previously Dental Directions, Inc.) | 11/8/2019 | 10 | N |
| DOE00010559 | Community College of Philadelphia | Public | 8/12/2019 | 21 | N |
| DOE00010562; DOE00010565; DOE00010570 | Computer Processing Institute | Adecco, SA | 4/20/2020, updated 11/24/2020 | 11 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010571; DOE00010573 | Concorde Career Institute, Concorde Career College | Concorde Careers-Florida, Inc. | 8/5/2019; 1/28/2020 | 46 | N |
| DOE00010576 | Concordia College Alabama | Concordia College Alabama | 2/25/2020 | 7 | N |
| DOE00010578; DOE00010584; DOE00010577 | Concordia University | Private | 9/4/2020, updated 11/18/2020 | 72 | N |
| DOE00010591; DOE00010594; DOE00010599; DOE00010590 | Cortiva Institute, Cortiva Institute-Charlottesville, Texas Center for Massage Therapy, Utah College of Massage Therapy, Connecticut Center of Massage Therapy, Florida College of Natural Health, Nevada Institute, Arizona School of Massage Therapy | Steiner Leisure Limited; FCNH, Inc. | 7/25/2019; 9/1/2020, updated 11/22/2020 | 87 | N |
| DOE00010604; DOE00010606; DOE00010608 | Cosmetology Career Institute | New Growth Partners LLC | 8/11/2020, updated 11/22/2020 | 14 | N |
| DOE00010609; DOE00010610 | Coyne College | Coyne American Institute, Inc. | 9/18/2020, updated 11/20/2020 | 12 | N |
| DOE00010611; DOE00010616 | Cuyahoga Community College | Public | 3/27/2020, updated 11/20/2020 | 7 | N |
| DOE00010622; DOE00010627; DOE00010621 | Dade Medical College | Dade Medical College, Inc. (Ernesto Perez, Jr.) | 3/10/2020, updated 11/20/2020 | 279 | N |
| DOE00010632; DOE00010633 | Dallas Nursing Institute | TCS Education-Texas, Inc. | 9/1/2020, updated 11/20/2020 | 12 | N |
| DOE00010635; DOE00010638; DOE00010643; DOE00010634 | Daniel Webster College | Non-profit through 2009, when sold to ITT Tech | 11/8/2019; 9/2/2020, updated 11/20/2020 | 44 (at least 9 pre-ITT) | Y - Students enrolled after ITT acquisition |
| DOE00010647; DOE00010650; DOE00010652; DOE00010656; DOE00010663; DOE00010664 | Davenport University | Davenport University, Inc. | 7/1/2019; 10/29/2019; 12/10/2019; 9/15/2020, updated 11/20/2020 | 73 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010666; DOE00010668 | Dawn Career Institute | DCIA, LLC; Education Evolve, LLC; Joseph Fortunato; Michael C. Marino; Carl Spatocco; Joseph W. Marino | 8/26/2020, updated 11/22/2020 | 16 | N |
| DOE00010669; DOE00010670 | Daytona State College | Public | 9/21/2020, updated 11/22/2020 | 13 | N |
| DOE00010671; DOE00010673; DOE00010674; DOE00010679 | Decker College | Compass Educational Holdings, Inc. | 11/5/2019; 5/21/2020, updated 11/20/2020 | 56 | N |
| DOE00010684; DOE00010686; DOE00010687 | Delaware State University | Public | 10/21/2019; 9/18/2020, updated 11/20/2020 | 15 | N |
| DOE00010688 | Delgado Community College | Delgado Community College, Inc. | 7/30/2019 | 20 | Y - Allegations in connection with tuition bribery scheme that resulted in plea deal |
| DOE00010690 | Delta School of Business & Technology | Unknown | 10/11/2019 | 17 | N |
| DOE00010694; DOE00010702; DOE00010710 | DeMarge College | DeMarge College, Inc.; Argie Caporal and Dee Hoshall | 5/18/2020, updated 11/20/2020 | 9 | N |
| DOE00010711; DOE00010713 | DePaul University | Private | 9/16/2020, updated 11/20/2020 | 38 | N |
| DOE00010715 | Des Moines Area Community College | Public | 10/30/2019 | 11 | N |
| DOE00009583; DOE00002532 | DeVry University; DeVry College of Technology; DeVry Institute of Technology | DeVry Inc.; became Adtalem Global Education in 2017; sold to Cogswell Education LLC in 2018 | 6/15/2020 | "thousands" | Y - Allegations re: job placement rates between 1/1/2008 - 9/30/2015 |
| DOE00010717; DOE00010720 | Dover Business College | Dover Educational Services, LLC (Randy B. Luing, Timothy D. Luing, Kevin L. Luing, Brian D. Luing) | 9/16/2020, updated 11/20/2020 | 20 | N |
| DOE00010722 | Dowling College | Private | 8/16/2019 | 98 | N |
| DOE00010726; DOE00010728; DOE00010730 | DPT Business School | Paul T. Siemann | 9/30/2020, updated 11/20/2020 | 20 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010731; DOE00010732 | Draughons College | RD Shelton | 8/26/2020, updated 11/22/2020 | 10 | N |
| DOE00010733 | Drexel University | Private | 9/16/2019 | 14 | N |
| DOE00010735; DOE00010736 | Duluth Business University | Duluth Business University, Inc. (James R. Gessner, Terry L. Myhre) | 8/28/2020, updated 11/20/2020 | 11 | N |
| DOE00010737 | Duquesne University of the Holy Spirit | Private | 11/23/2020 | 14 | N |
| DOE00010738 | Eagle Gate College | Bullen & Wilson, LLC | 8/22/2019 | 18 | N |
| DOE00010741; DOE00010742 | East Carolina University | Public | 8/24/2020, updated 11/20/2020 | 16 | N |
| DOE00010751; DOE00010755 | East Coast Polytechnic Institute | ECPI University LLC; Novateur Education, Inc. Mark Dreyfus | 3/3/2020, updated 11/20/2020 | 82 | N |
| DOE00010743 | Eastern Kentucky University | Public | 11/6/2019 | 8 | N |
| DOE00010744 | Eastern Michigan University | Public | 9/10/2019 | 15 | N |
| DOE00010746 | East-West University | East-West University, Inc. | 11/13/2019 | 7 | N |
| DOE00010748 | Eastwick College | Eastwick Education (Thomas Eastwick) | 11/7/2019 | 19 | N |
| DOE00010759 | Eldorado College | Anthony J. Pitale | 11/8/2019 | 7 | N |
| DOE00010761; DOE00010765; DOE00010769 | Elmira Business Institute | Elmira Business Institute | 5/12/2020, updated 11/20/2020 | 21 | N |
| DOE00010770; DOE00010771; DOE00010772 | Embry-Riddle Aeronautical University | Embry-Riddle Aeronautical University, Inc. | 10/30/2019; 9/22/2020, updated 11/20/2020 | 12 | N |
| DOE00010774; DOE00010783; DOE00010792; DOE00010795 | Empire Beauty School | Empire Education Group (merged with Regis Corp. in 2007) is franchisor; each location independently owned by franchisee | 1/7/2020; 8/24/2020, updated 11/22/2020 | 205 | N |
| DOE00010808; DOE00010810 | ESS College of Business | Executive Secretarial School of Texas | 9/1/2020, updated 11/20/2020 | 25 | N |
| DOE00010812; DOE00010816; DOE00010817 | Eternity Cosmetology School | Eternity Cosmetology School Corp. (Mirenia Ceballo, Marisela Alvarez) | 2/21/2020; 8/28/2020, updated 11/20/2020 | 12 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010818; DOE00010826; DOE00010834 | Everglades University, Everglades College dba Keiser University | Everglades College, Inc. (purchased Keiser in 2011) | 7/27/2020, updated 11/23/2020 | 525 | N |
| DOE00010835; DOE00010836; DOE00010838 | Excelsior College | Excelsior College | 8/25/2020, updated 11/20/2020 | 24 | N |
| DOE00010840; DOE00010842; DOE00010843 | Fairleigh Dickinson University | Private | 11/5/2019; 8/24/2020, updated 11/20/2020 | 15 | N |
| DOE00010844; DOE00010848; DOE00010852 | Fashion Institute of Design & Merchandising | Fashion Institute of Design & Merchandising (Tonian Hohberg) | 12/15/2019; 8/27/2020, updated 11/20/2020 | 69 | N |
| DOE00010853 | Five Towns College | Private | 11/8/2019 | 7 | N |
| DOE00010855; DOE00010857; DOE00010860; DOE00010863; DOE00010865 | Florida Agricultural & Mechanical University; Florida A&M College of Law | Public | 8/6/2019; 11/6/2019; 8/24/2020, updated 11/22/2020 | 31 | N |
| DOE00010867 | Florida Atlantic University | Unspecified | 11/7/2019 | 6 | N |
| DOE00010869 | Florida Barber Academy | Unspecified | 11/5/2019 | 5 | N |
| DOE00010870; DOE00010871; DOE00010875 | Florida Career College | International Education Group (2014-present); Anthem Education Group (2012-2014) | 5/8/2020 | 374 | N |
| DOE00010879; DOE00010881; DOE00010885 | Florida International University | Public | 7/14/2019; 9/18/2020, updated 11/20/2020 | 42 | N |
| DOE00010889; DOE00010891; DOE00010892 | Florida Memorial University | Private | 9/13/2019; 8/27/2020, updated 11/19/2020 | 14 | N |
| DOE00010893; DOE00010895; DOE00010898 | Florida National University | Florida National University, Inc. (Lourdes Andreu, Omar Sanchez, Frank Andreu, Maria C. Regueiro) | 9/13/2019; 8/20/2020, updated 11/20/2020 | 31 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010901; DOE00010903 | Florida SouthWestern State College, f/k/a Edison Junior College, Edison Community College, Edison College, Edison State College | Public | 8/27/2020, updated 11/21/2020 | 23 | N |
| DOE00010905; DOE00010910; DOE00010913 | Florida State College at Jacksonville | Public | 8/5/2019; 9/16/2020, updated 11/20/2020 | 29 | N |
| DOE00010915; DOE00010917; DOE00010918 | Florida State University | Public | 9/23/2019; 9/21/2020, updated 11/20/2020 | 19 | N |
| DOE00010919; DOE00010920; DOE00010924 | Florida Technical College | Leeds IV Advisors, Inc. | 8/28/2020, updated 11/22/2020 | 86 | N |
| DOE00010928; DOE00010931; DOE00010935 | Four-D College, a/k/a Four-D Career College | Four-D College (Linda L. Smith) | 7/10/2019; 9/18/2020, updated 11/22/2020 | 123 | N |
| DOE00010939 | Franklin University | Private | 11/12/2019 | 7 | N |
| DOE00010940 | Fremont College | Bechtel family; Fremont Private Investments | 9/26/2019 | 10 | N |
| DOE00010943; DOE00010944; DOE00010948 | Full Sail University | Full Sail Recorders Inc. (TA Associates, Edward E. Haddock Jr. Trusts; Garry Jones Entities; James W. Heavener Entities & Trusts; Jonathon D. Phelps Entities & Trusts) | 5/14/2020, updated 11/20/2020 | 561 | N |
| DOE00010952; DOE00010953; DOE00010954; DOE00010956 | Galen Health Institutes a/k/a Galen College of Nursing | Two different listed: Isleworth Partners, Inc., acquired by HCA Healthcare in 2020 (-10952); Galen College of California, Inc./Galen College of Medical and Dental Assistants/Clara B. Esquivel (-10953) | 8/24/2020, updated 11/19/2020 and 11/23/2020 | 17 | N |
| DOE00010957; DOE00010958; DOE00010963 | Galiano Career Academy | Anthony Galiano | 9/6/2020, updated 11/23/2020 | 42 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010967; DOE00010968 | Gateway Electronics Institute | Unknown | 8/28/2020, updated 11/20/2020 | 7 | N |
| DOE00010969; DOE00010970 | General Communications | Victor Berlin, Janice Berlin, Irv Monsein | 8/28/2020, updated 11/20/2020 | 6 | N |
| DOE00010971; DOE00010972 | Genesis Career College | Genesis Career College; Genesis Career Group, Inc.; Richard J. Bundy | 8/26/2020, updated 11/22/2020 | 11 | N |
| DOE00010973; DOE00010976; DOE00010978 | George Mason University | Public | 9/6/2019; 8/24/2020, updated 11/22/2020 | 17 | N |
| DOE00010980 | George Washington University | Private | 10/16/2019 | 11 | N |
| DOE00010983 | Georgia Beauty Academy | Unknown | 10/30/2019 | 13 | N |
| DOE00010985; DOE00010986; DOE00010987 | Georgia Perimeter College | Private until merged with Georgia State University in 2016 | 10/31/2019; 9/16/2020, updated 11/20/2020 | 13 | N |
| DOE00010988 | Georgia Southern University | Public | 11/6/2019 | 6 | N |
| DOE00010990 | Georgia State University | Public | 10/30/2019 | 11 | N |
| DOE00010993 | Glendale Career College | Glendale Career Schools, Inc. (formerly a division of Landmark Education Services, Inc.; in 2008 sold to Success Education Colleges) | 9/4/2019 | 9 | N |
| DOE00009642 | Globe University, Minnesota School of Business | Myrhe family | 8/19/2020 | 2,500 | Y - Criminal justice program |
| DOE00010996 | Goodwin College, f/k/a Data Institute | Mark Scheinberg | 9/27/2019 | 11 | N |
| DOE00010998; DOE00010999; DOE00011000; DOE00011001; DOE00011003 | Governors State University | Public | 9/10/2020, updated 11/19/2020; 9/17/2020, updated 11/21/2020 | 10 | N |
| DOE00011004 | Grand Rapids Community College | Public | 12/2/2019 | 6 | N |
| DOE00011006 | Grantham University | Grantham Education Corp. | 9/3/2019 | 19 | N |
| DOE00011009 | Green Mountain College | Private (part of EcoLeague) | 11/8/2019 | 7 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011011; DOE00011012; DOE00011013 | Greenville Technical College | Public | 10/29/2019; 9/17/2020, updated 11/20/2020 | 14 | N |
| DOE00011014; DOE00011015 | Griffin College | Gerald C. Phillips | 9/1/2020, updated 11/23/2020 | 11 | N |
| DOE00011016; DOE00011017 | Guilford Technical Community College | Public | 9/18/2020, updated 11/23/2020 | 10 | N |
| DOE00011018 | GUTI The Premier Beauty and Wellness Academy | Private | 12/15/2019 | 6 | N |
| DOE00011020; DOE00011021 | Hair Fashions by Kaye Beauty College | Kaye Maxwell | 9/17/2020, updated 11/22/2020 | 18 | N |
| DOE00011022 | Hallmark Institute of Photography | Premier Education Group (bought from bank in 2009 after previous owner, George J. Rosa III, defaulted) | 8/19/2019 | 16 | N |
| DOE00011028; DOE00011029 | Hallmark University, Hallmark College of Aeronautics | Hallmark University, Inc. | 9/17/2020, updated 11/22/2020 | 16 | N |
| DOE00011026 | Hallmark University, Hallmark Institute of Technology, Hallmark College | Premier Education Group | 11/12/2019 | 12 | N |
| DOE00011030; DOE00011033 | Hamilton College | Iowa College Acquisition LLC | 9/1/2020, updated 11/20/2020 | 22 | N |
| DOE00011036; DOE00011038; DOE00011039 | Harrisburg Area Community College | Public | 11/6/2019; 9/17/2020, updated 11/19/2020 | 15 | N |
| DOE00011040; DOE00011041; DOE00011046 | Harrison Career Institute | Harrison Career Institute, Inc. | 4/29/2020, updated 11/20/2020 | 74 | N |
| DOE00011052; DOE00011059 | Harrison College | Educational Management Corp. (purchased 1986) | 6/11/2020, updated 11/20/2020 | 323 | N |
| DOE00011065; DOE00011066 | Hausman Computer Associates School of Computer Programming | Private | 9/8/2020, updated 11/20/2020 | 3 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00010553; DOE00011067; DOE00011069 | Hawaii Business College | National Career College, Inc. (Allen Mirzaei, Jeff Hirsa, Kamaledin Tabatabai) | 9/3/2020, updated 11/20/2020 | 13 | N |
| DOE00011071; DOE00011072 | Heald Business College | Heald (sold to Corinthian in 2010 but these apps pre-date Corinthian ownership) | 8/27/2020, updated 12/2/2020 | 14 | N |
| DOE00011073; DOE00011074 | Healthy Hair Academy | Ronny J's Hair Inc. (Abdu R. Ali) | 9/17/2020, updated 11/22/2020 | 20 | N |
| DOE00011075 | Henry Ford College | Public | 10/22/2019 | 10 | N |
| DOE00011077; DOE00011086 | Heritage College; Heritage Institute | Weston Educational, Inc. (Earl Weston) | 4/29/2020, updated 11/23/2020 | 666 | N |
| DOE00011095; DOE00011098 | Herzing University | Herzing, Inc. in GA, MN, AL; Herzing Educational Foundation, Ltd. In WI | 9/8/2020, updated 11/23/2020 | 93 | N |
| DOE00011101 | Hickey College | Bradford Schools, Inc. | 11/6/2019 | 7 | N |
| DOE00009519; DOE00009521 | High-Tech Institute, Anthem Career College, Anthem College, Anthem College Online, Anthem Institute, Morrison University, Bryman School of AZ | Anthem Education Group, LLC | 6/1/2020 | 1,508 | Y - Cases in Minnesota |
| DOE00011102 | Hillsborough Community College | Public | 8/27/2019 | 10 | N |
| DOE00011104; DOE00011105; DOE00011108 | Hinds Community College | Public | 9/17/2020, updated 11/20/2020 | 26 | N |
| DOE00011111 | Hiwassee College | Methodist Episcopal Church, South | 12/12/2019 | 7 | N |
| DOE00011113 | Hodges University | Hodges University, Inc. | 12/29/2019 | 6 | N |
| DOE00011114 | Hofstra University | Private | 9/13/2019 | 14 | N |
| DOE00011117 | Hollywood Beauty College | Hollywood Beauty College, Inc. | 10/9/2019 | 7 | N |
| DOE00011120; DOE0001121 | Hollywood Institute | Way Beyond Education LLC (owned in turn by NT Holdings, LLC -> Ryan Ross, LLC -> Neal R. Heller) | 8/31/2020, updated 11/20/2020 | 18 | N |
| DOE00011122 | Hollywood Institute of Beauty Careers | Unknown | 10/11/2019 | 11 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011126; DOE00011127; DOE00011129; DOE00011131; DOE00011134; DOE00011137 | Houston Community College | Public | 8/13/2019; 11/7/2019; 2/7/2020; 8/26/2020, updated 11/20/2020 | 35 | N |
| DOE00011138; DOE00011141; DOE00011145 | Howard University | Private | 8/22/2019; 9/21/2020, updated 11/20/2020 | 61 | N |
| DOE00011149 | Hudson Valley Community College | Public | 11/7/2019 | 6 | N |
| DOE00011151 | Huston-Tillotson University | Unspecified | 10/30/2019 | 10 | N |
| DOE00011153; DOE00011154; DOE00011156; DOE00011159 | IBMC College | The Laub Corporation (Richard B. Laub, Colleen A. Laub) | 11/15/2019; 9/22/2020, updated 11/22/2020 | 21 | N |
| DOE00011162; DOE00011163; DOE00011173 | ICDC College | International Career Development Center Inc. (Anna and Herman Berger) | 5/14/2020, updated 11/22/2020 | 467 | N |
| DOE00011184 | Idaho State University | Public | 11/12/2019 | 7 | N |
| DOE00011186 | Illinois Media School | Illinois Media School | 1/17/2020 | 6 | N |
| DOE00011187 | Illinois State University | Public | 10/31/2019 | 9 | N |
| DOE00011189; DOE00011190; DOE00011193; DOE00011196 | Indiana Institute of Technology | Indiana Institute of Technology | 9/7/2019; 9/17/2020, updated 11/29/2020 | 22 | Y - Applications relating to Indiana Tech Law School |
| DOE00011199 | Indiana University | Public | 9/26/2019 | 16 | N |
| DOE00011201; DOE00011202 | Indiana Wesleyan University | Private | 8/24/2020, updated 11/19/2020 | 13 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011203; DOE00011207 | Institute for Business & Technology; National Career Education; Lamson Institute | Since Dec. 2004: Institute for Business & Technology, Inc. -> Mikhail Education Corp. -> Mikhail Family Partnership (Peter Mikhail & Sally M. Bemis); from June 1985-Dec. 2004 was owned by National Career Education, a subsidiary of Delta Career Education Corp. | 9/10/2020, updated 11/20/2020 | 33 | N |
| DOE00011210 | Institute for Health Education | Private | 1/23/2020 | 13 | N |
| DOE00011212; DOE00011213; DOE00011215 | Institute of Production and Recording (The) | The Institute of Production and Recording, Inc. | 8/20/2020, updated 11/20/2020 | 6 | N |
| DOE00011217; DOE00011221 | Institute of Technology | Select Education Group -> National Holistic Institute (Timothy Veitzer, Mason Myers) | 9/17/2020, updated 11/20/2020 | 80 | N |
| DOE00011225; DOE00011229 | IntelliTec College | DVMD, LLC (David G. Vice; MDDV, Inc. [David G. Vice, Michael Dourgarian]) | 8/26/2020, updated 11/22/2020 | 24 | N |
| DOE00011183 | Interactive College of Technology | Elmer Smith | 11/14/2019 | 9 | N |
| DOE00011232; DOE00011233 | InterAmerican University of Puerto Rico | Private | 8/27/2020, updated 11/22/2020 | 15 | N |
| DOE00011234; DOE00011241 | Intercoast College | Intercoast Colleges | 8/5/2020, updated 11/20/2020 | 83 | N |
| DOE00011247; DOE00011248 | International Aviation & Travel Academy | KD Schools, Inc. (Kenneth D. Woods) | 8/31/2020, updated 11/19/2020 | 14 | N |
| DOE00011249 | International Business College | Bradford Schools, Inc. | 4/13/2020 | 36 | N |
| DOE00011253 | International School of Health, Beauty and Technology | International School of Health, Beauty and Technology | 10/22/2019 | 13 | N |
| DOE00011254; DOE00011255; DOE00011259 | Iverson Institute, a/k/a Iverson Business School and Court Reporting | Silicon Valley, Inc. (Akber Mithani) | 5/12/2020, updated 11/21/2020 | 19 | N |
| DOE00011264; DOE00011266 | Ivy Tech Community College of Indiana | Public | 8/9/2019; 1/25/2020 | 79 | N |
| DOE00011268; DOE00011270 | Jackson State University | Public | 6/27/2019; 11/7/2019 | 27 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011272; DOE00011274; DOE00011276; DOE00011277 | Jacksonville Beauty Institute | Jacksonville Beauty Institute, Inc. (Misty L. Craig, Sonia Craig-Sutton) | 9/11/2020, updated 11/18/2020; 9/23/2020, updated 11/20/2020 | 20 | N |
| DOE00011278; DOE00011279 | Jacksonville State University | Public | 8/26/2020, updated 11/20/2020 | 10 | N |
| DOE00011280 | James Madison University | James Madison University | 11/7/2019 | 7 | N |
| DOE00011282 | Jefferson Community and Technical College | Public | 10/22/2019 | 9 | N |
| DOE00011283; DOE00011284 | Jersey College | SSS Education, Inc. (Greg Karzhevsky) | 8/26/2020, updated 11/22/2020 | 9 | N |
| DOE00011285; DOE00011288; DOE00011292 | Johnson and Wales University | Private | 6/21/2019; 9/9/2020, updated 11/22/2020 | 46 | N |
| DOE00011296; DOE00011297; DOE00011299; DOE00011301 | Johnson C Smith University | Private | 11/12/2019; 8/24/2020, updated 11/20/2020 | 11 | N |
| DOE00011302; DOE00011304; DOE00011306; DOE00011310 | Jones College | Private | 6/28/2019; 8/31/2020, updated 11/19/2020 | 41 | N |
| DOE00011314; DOE00011319 | Jones International University | Jones Knowledge, Inc. (Glenn Jones) | 4/15/2020, 11/20/2020 | 103 | N |
| DOE00011323; DOE00011325 | Kansas State University | Public | 9/19/2020, updated 11/20/2020 | 9 | N |
| DOE00011326; DOE00011328; DOE00011329 | Kean University | Public | 10/25/2019; 8/28/2020, updated 11/20/2020 | 13 | Y - Physician assistant masters' program |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00009585; DOE00011330; DOE00011331; DOE00011341 | Keller Graduate School of Management | DeVry Education Group Inc.; DeVry/New York Inc.; became Adtalem Global Education in 2017 | 4/24/2020 | 810 | N |
| DOE00011351; DOE00011354; DOE00011357 | Kelsey-Jenney College | Private | 10/11/2019; 9/8/2020, updated 11/22/2020 | 29 | N |
| DOE00011360; DOE00011361 | Kendall College | Kendall College, LLC (Exeter Street Holdings, LLC) | 9/10/2020, updated 11/22/2020 | 14 | N |
| DOE00011362; DOE00011363; DOE00011364 | Kennesaw State University | Public | 9/23/2019; 9/18/2020, updated 11/20/2020 | 17 | N |
| DOE00011368 | Kent State University | Public | 7/25/2019 | 31 | N |
| DOE00011370 | Kentucky State University | Public | 10/18/2019 | 6 | N |
| DOE00011372; DOE00011373 | Key College | Independent Education Corp. (Ronald H. Dooley) | 9/8/2020, updated 11/19/2020 | 11 | N |
| DOE00011374; DOE00011376 | King's College | King's College | 8/30/2019; 10/31/2019 | 53 | N |
| DOE00011379 | Knoxville College | United Presbyterian Church | 12/5/2019 | 6 | N |
| DOE00011380; DOE00011381 | Kurtztown University of Pennsylvania | Public | 9/1/2020, updated 11/20/2020 | 10 | N |
| DOE00011382; DOE00011384 | LA College International | AmericanWay Education, LLC -> Prime II Investments, L.P. -> Diamond Ventures, LLC (Robert W. Hughes, Gregory Marchbanks) | 8/27/2020, updated 11/20/2020 | 18 | N |
| DOE00011388; DOE00011396 | Lacy Cosmetology School | Lacy School of Cosmetology LLC (Ernest J. Lacy) | 10/28/2020, updated 11/20/2020 | 49 | Y - Applications relating to accreditation of Advanced Cosmetology program between 7/1/2009-6/30/2011 |
| DOE00011404 | Lake Lanier School of Massage; American Professional Institute; Woodruff Medical Training and Testing | Lake Lanier School of Massage | 10/11/2019 | 6 | N |
| DOE00011406 | Lamar University | Public | 11/8/2019 | 7 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011407; DOE00011409 | Lane Community College | Public | 8/26/2020, updated 11/20/2020 | 19 | N |
| DOE00011410 | Lansing Community College | Public | 12/2/2019 | 7 | N |
| DOE00011412 | Laurus College | Laurus College, LLC | 10/11/2019 | 12 | N |
| DOE00011416; DOE00011419 | Laurus Technical Institute, f/k/a ETI Careers Institute | Unspecified | 8/27/2019; 11/4/2019 | 15 | N |
| DOE00011421; DOE00011422; DOE00011426 | Lawton School | Allied Education Corp. (Glenn Rodano) | 9/30/2020, updated 11/22/2020 | 19 (mixed with other Lawton School) | N |
| DOE00011430; DOE00011431; DOE00011434 | Lawton School for Medical and Dental Assistants | Private | 9/21/2020, updated 11/22/2020 | 22 (mixed with other Lawton School) | N |
| DOE00011436; DOE00011438; DOE00011439 | LeMoyne Owen College | Private | 10/30/2019; 9/17/2020, updated 11/20/2020 | 12 | N |
| DOE00011440 | LeTourneau University | Joy Global Inc. | 12/29/2019 | 6 | N |
| DOE00011441; DOE00011442 | Lewis University | Private | 9/15/2020, updated 11/19/2020 | 12 | N |
| DOE00011443; DOE00011447 | Liberty University | Unspecified | 4/27/2020, updated 11/20/2020 | 111 | N |
| DOE00011452; DOE00011456 | Life University | Private | 8/7/2020, updated 11/23/2020 | 23 | N |
| DOE00011459; DOE00011463 | Lincoln College of New England | Lincoln Educational Services Corp. | 10/31/2019 | 14 | N |
| DOE00009649; DOE00009652 | Lincoln Technical Institute | Lincoln Educational Services Corp. | 7/15/2020 | 1,100 | Y - Criminal justice and medical programs in MA, CT, NJ, OH from 2007-2013; electronics systems technician program in MD from 2007-2013 |
| DOE00011464; DOE00011465 | Lincoln University | Public | 9/18/2020, updated 11/22/2020 | 14 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011466; DOE00011469; DOE00011471 | Lindenwood University | Private | 10/18/2019; 9/16/2020, updated 11/22/2020 | 16 | N |
| DOE00012443 | Living Arts College; School of Communication Arts of North Carolina | Roger Klietz | 10/3/2019 | 11 | N |
| DOE00011473; DOE00011474; DOE00011479 | Lone Star College System | Public | 8/28/2020, updated 11/19/2020 | 31 | N |
| DOE00011484; DOE00011494; DOE00011496 | Long Island University | Private | 6/1/2018 | 32 | N |
| DOE00011499 | Lorain County Community College | Public | 12/2/2019 | 7 | N |
| DOE00011501 | Los Angeles Film School (The) | Los Angeles Film Schools, LLC | 8/6/2020 Updated 11/20/2020 | 46 | N |
| DOE00011522 | Madison Media Institute | New Media Arts Training Centers, Inc. -> American Higher Education Development Corp. -> Evergreen Acquisition Fund 1, L.P. -> AHED Ventures Ltd. -> Wafra InterVet Corp. -> Public Institution for Social Security | 10/9/2019 9/17/2020 | 71 | N |
| DOE00011564 | Masters Institute | Les S. Nicholaeff | 8/27/2020 | 30 | N |
| DOE00011569 | Masters of Cosmetology College | Masters of Cosmetology College, Inc. (Kaydean Geist) | 9/2/2020 | 36 | N |
| DOE00011571; DOE00011572; DOE00011575; DOE00011579 | Mattia College | Professional Training Centers, Inc. (Antonia Mattia) | 7/8/2019, 8/26/2020 | 58 | N |
| DOE00011583; DOE00011584 | MBTI Business Training Institute | WI: Jere Ervin, Masukazu Fukuda, Seiji Suzuki; PR: Barbara Alonso, Fidel Alonso, Paulette Alonso, Sharline Alonso | 8/26/2020 | 11 | N |
| DOE00009575; DOE00009576 | McCann School of Business & Technology | Unspecified | Undated | Unspecified | Y - Medical lab technician program |
| DOE00011585; DOE00011586 | MCI Institute of Technology | Medical Career Institute of South Florida (Thomas P. Kilianski) | 9/3/2020 | 19 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011587 | McLennan Community College | Public | 11/6/2019 | 7 | N |
| DOE00011588; DOE00011589 | MDT College of Health Sciences | Mark Bykov | 8/26/2020, updated 11/20/2020 | 11 | N |
| DOE00011590 | Medaille College | Institute of the Sisters of St. Joseph of the Diocese of Buffalo | 12/2/2019 | 7 | N |
| DOE00011591; DOE00011592; DOE00011595 | Med-Life Institute | Med-Life Enterprise, Inc. | 4/10/2020 | 9 | N |
| DOE00005945 | Medtech College; Gwinnett College (aka Medtech); Radians College | JTC Education Holdings, Inc.; JTC Education, Inc.; LTT Enterprise (purchased Gwinnett College - Atlanta campus on 4/12/2015) | 5/14/2020 (approved but marked as draft) | 471 | Y - "Recommended Focus Areas" include a list of 6 campuses and programs in VA, GA, DC, and MD related to medical assistant and medical coding programs |
| DOE00011598 | Memphis School of Barbering | | 12/10/2019 | 5 | N |
| DOE00011600; DOE00011602 | Mercer University | Private | 9/16/2020 | 11 | N |
| DOE00011603; DOE00011604; DOE00011606 | Mercy College | Private | 10/16/2019; 9/16/2020 | 28 | N |
| DOE00011608 | Meridian University | Jean Houston, Chancellor | 10/15/2019 | 5 | N |
| DOE00011610; DOE00011611 | Mesa Community College | Public | 8/24/2020 | 13 | N |
| DOE00011612; DOE00011613; DOE00011615 | Metropolitan College | Private ("run by" Wyandotte County Industrial Development Commission) | 9/9/2020 (Updated 11/22/2020); | 22 | N |
| DOE00011618; DOE00011619 | Metropolitan College of New York | Private | 9/16/2020 | 11 | N |
| DOE00011620; DOE00011621 | Metropolitan Community College | Public | 9/3/2020 | 12 | N |
| DOE00011622 | Metropolitan State University | Public | 11/8/2019 | 7 | N |
| DOE00011624; DOE00011626; DOE00011628 | Metropolitan State University of Dencer | Public | 9/17/2020; 10/15/2019 | 19 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011630; DOE00011632 | Miami Dade College | Public | 8/24/2020, updated 11/20/2020 | 22 | N |
| DOE00009579 | Miami Jacobs Career College | Unspecified | Undated | Unspecified | N |
| DOE00011634; DOE00011635 | Miami Media School | M&S Media, Inc. (Robert Mills) | 8/28/2020 | 10 | N |
| DOE00011636; DOE00011637 | Miami University | Public | 8/24/2020 | 10 | N |
| DOE00011638; DOE00011639 | MIAT College of Technology | Michigan Institute of Aeronautics -> HCP Holdings, Inc. -> HCP Holdings, LLC -> Hispania Private Equity II, L.P. | 9/17/2020 | 12 | N |
| DOE00011640 | Michigan Computer Institute | Michigan Computer Institute | 2/3/2020 | 6 | N |
| DOE00011641 | Michigan State University | Public | 8/28/2019 | 10 | N |
| DOE00011643; DOE00011644; DOE00011648; DOE00011653 | Micropower Career Institute | Micropower USA Corp. | 11/1/2019 | 44 | N |
| DOE00011658; DOE00011661; DOE00011663; DOE00011665 | Mid-Continent University | Private | 8/6/2019; 8/26/2020 | 36 | N |
| DOE00011666; DOE00011668; DOE00011669 | Middle Tennessee State University | Public | 10/29/2019; 8/26/2020 | 19 | N |
| DOE00011670; DOE00011672 | Midland Career Institute | Tri-Lake Concepts, Inc.; Alan Frost and Anne Bracken | 9/2/2020 | 9 | N |
| DOE00011674; DOE00011675 | Midlands Technical College | Public | 9/3/2020 | 18 | N |
| DOE00011676; DOE00011677 | Midstate College | Robert D. Bunch & Meredith N. Bunch | 9/16/2020 | 11 | N |
| DOE00011678 | Midwest Institute | Elizabeth Shreffler, Christine Shreffler | 1/27/2020 | 7 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011680; DOE00011687; DOE00011690 | Midwest Technical Institute; Delta Technical College | Midwest Technical Institute | 10/7/2019; 9/11/2020 | 28 | N |
| DOE00011693 | Mildred Elley | Empire Education Corp. (DBA Mildred Elley) -> Faith Takes; Mildren Elley School, Inc. f/k/a Mesi Acquisition Corp. | 8/16/2019 | 17 | N |
| DOE00011696 | Miles College | Miles College | 11/4/2019 | 8 | N |
| DOE00009580; DOE00009581 | Miller-Motte Technical College | Unspecified | undated | unspecified | Y - Medical lab technician program |
| DOE00011698; DOE00011699 | Minneapolis Community and Technical College | Public | 8/28/2020 | 16 | N |
| DOE00011700; DOE00011702 | Minnesota State Community and Technical College | Public | 8/27/2020 | 11 | N |
| DOE00011703 | Minnesota State University | Public | 9/26/2019 | 8 | N |
| DOE00011705 | Missouri State University | Public | 11/7/2019 | 7 | Y - One applicant who submitted evidence |
| DOE00011707 | Missouri Technical School | Missouri Technical School | 9/25/2019 | 11 | N |
| DOE00011712; DOE00011713; DOE00011718 | Monroe College | Monroe College, Ltd.; Stephen J. Jerome & Marc Jerome | 8/31/2020 | 44 | N |
| DOE00011722; DOE00011724 | Monroe Community College | Public | 8/26/2020 | 19 | N |
| DOE00011726; DOE00011727; DOE00011729; DOE00011731 | Montclair State University | Public | 8/27/2020; 10/10/19 | 23 | N |
| DOE00011735; DOE00011736 | Morgan State University | Public | 8/24/2020 (updated 11/22/2020) | 20 | N |
| DOE00011737; DOE00011738; DOE00011746 | Morris Brown College | Private (affiliated with African Methodist Episcopal Church) | 7/30/2020 | 119 | N |
| DOE00011753 | Mount Hood Community College | Public | 12/3/2019 | 6 | N |
| DOE00011755 | Mount Ida College | Private | 8/15/2019 | 29 | N |
| DOE00011758; DOE00011759 | Mount Saint Mary's University | Private | 8/27/2020 | 11 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011760; DOE00011766 | Mountain State University | Private | 5/14/2020 | 225 | N |
| DOE00011771 | MSTA Business College | Private | 12/3/2019 | 5 | N |
| DOE00011772; DOE00011776; DOE00011779 | Mt. Sierra College | Mt. Sierra College, Inc.; Hengda USA Education Corp.; Heijing Hengda Investment Co., Ltd.; Li Jianyou; Xubeng Tang; Wellsland, LLC | 9/4/2020; 10/16/2019 | 32 | N |
| DOE00011782; DOE00011783; DOE00011786; DOE00011789 | MTA School; Resident School | Unidentified | 10/11/2019; 9/3/2020 | 29 | N |
| DOE00011791; DOE00011792 | MTI Business College | Steven J. Brenner; MTI Business College of Stockton, Inc. | 8/26/2020 | 13 | N |
| DOE00011794; DOE00011795 | MTI Business School | Proprietary | 9/3/2020 | 10 | N |
| DOE00011793 | MTI College | Private | 12/3/2019 | 5 | N |
| DOE00011796 | MTI College of Business and Technology | Unknown | 10/28/2019 | 14 | N |
| DOE00011797; DOE00011798; DOE00011799 | Musicians Institute; Guitar Craft Academy | Hisatake Shibuya | 12/20/2019; 9/16/2020 | 14 | N |
| DOE00011800; DOE00011801; DOE00011804; DOE00011807 | MyComputerCareer.com | James A. Galati | 9/17/2020 | 21 | N |
| DOE00011809; DOE00011811; DOE00011812 | Nashville Auto Diesel College (NADC) | Purchased by Lincoln College of Technology after closure (Nashville Acquisition, LLC -> Lincoln Technical Institute, Inc. -> Back to School Acquisition, L.L.C. & Lincoln Educational Services Corp.) | 10/16/2019; 8/27/2020 | 18 | N |
| DOE00011813; DOE00011814 | Nassau Community College | Public | 8/27/2020 | 11 | N |
| DOE00011815; DOE00011818; DOE00011820 | National Academy of Beauty Arts | Gary Schaefer, Stephen Witte; Beauty Unlimited dba National Acad.; NABA Holding, Inc. | 9/21/2020 | 38 | N |
| DOE00011822 | National Aviation Academy | Mac Elliott | 1/23/2020 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011823 | National College; National College of Business & Technology; National Business College; American National University | National College of Business and Technology Inc. | 12/3/2019 | 19 | N |
| DOE00011824; DOE00011825 | National Education Center-Bauder College Campus | National Education Corporation | 8/28/2020 | 11 | N |
| DOE00011826; DOE00011827 | National Education Center-Bryman Campus | National Education Corporation | 9/1/2020 | 11 | N |
| DOE00011828 | National Education Center-Kee Business College Campus | Corinthian Colleges, Inc. | 1/27/2020 | 5 | N |
| DOE00011829; DOE00011830 | National Education Center-National Institute of Technology Campus | Harcourt General | 8/26/2020 | 12 | N |
| DOE00011831 | National Paralegal College | Avi Katz | 10/11/2019 | 5 | N |
| DOE00011834; DOE00011835; DOE00011836 | National Polytechnic College | National Polytechnic College Inc. (Dariush "David" Maddahi) | 9/15/2020 | 16 | N |
| DOE00011837; DOE00011838 | National Technical Schools | Unknown | 8/31/2020 | 12 | N |
| DOE00011839; DOE00011840; DOE00011842 | National Training Systems | National Training Systems, Inc. | 9/2/2020 | 2 | N |
| DOE00011844 | National University College (NUC) | Unknown | 11/12/2019 | 10 | N |
| DOE00011846 | Navarro College | Public | 10/21/2019 | 12 | N |
| DOE00011848 | New Castle School of Trades | EFC Trade, INC. | 11/13/2019 | 6 | N |
| DOE00011849; DOE00011850 | New College of California | Private | 8/26/2020 | 17 | N |
| DOE00011851; DOE00011852 | New England College | Private | 8/24/2020 | 10 | N |
| DOE00011853; DOE00011854; DOE00011857 | New England Institute of Technology | Private | 9/16/2020 | 22 | N |
| DOE00011860 | New England Tractor Trailer Training School of Connecticut | Unknown | 11/12/2019 | 13 | N |
| DOE00011862 | New Jersey City University | Public | 11/5/2019 | 7 | N |
| DOE00011864 | New Life Business Institute | New Life Business Institute | 9/23/2019 | 11 | N |
| DOE00011895 | New School of Design and Architecture | Ambow NSAD, Inc. | 11/7/2019 | 7 | N |
| DOE00011868; DOE00011870 | New Wave Hair Academy | H.D. Adcock & Associates | 9/3/2020 | 22 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011872 | New York Automotive and Diesel Institute | Unknown | 12/20/2019 | 6 | N |
| DOE00011873; DOE00011874; DOE00011876; DOE00011879 | New York Institute of Technology (Central Islip location closed); Ellis College (closed) | NYIT (non-profit); Ellis College (for-profit created in partnership between NYIT and Cardean Learning Group, which was subsequently purchased by Capital Education) | 8/8/2019 | 29 | N |
| DOE00011882; DOE00011883; DOE00011886 | New York University | Private | 9/9/2020 | 28 | N |
| DOE00011889; DOE00011890; DOE00011893 | Newbury College | Private | 9/2/2020 | 26 | N |
| DOE00011896; DOE00011897; DOE00011899 | Norfolk State University | Public | 8/31/2020 | 22 | N |
| DOE00011901; DOE00011902 | North American Trade Schools | EFC Trade, Inc. -> IV Educational Enterprises Inc. -> North American Trade Schools Inc. -> Wesley J. Henry, Rex D. Spalding, Henry Equity Trust, Crystal Henry, Christopher Henry | 8/28/2020 | 10 | N |
| DOE00011903; DOE00011905; DOE00011906 | North Carolina Agricultural & Technical State University | Public | 10/22/2019 | 8 | N |
| DOE00011907 | North Carolina Wesleyan College | United Methodist Church | 12/4/2019 | 7 | N |
| DOE00011908; DOE00011909; DOE00011911 | Northcentral University | Innova Management Group, Inc. | 9/9/2020 | 55 | N |
| DOE00011913; DOE00011914; DOE00011915 | Northeastern University | Private | 8/26/2020 | 11 | N |
| DOE00011916 | Northern Arizona University | Public | 11/7/2019 | 7 | N |
| DOE00011918 | Northern Illinois University | Public | 11/8/19 (approved) | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011919 | Northern Virginia Community College | Public | 11/5/2019 | 9 | N |
| DOE00011921 | Northwest Career College | | 12/5/2019 (approved) | 7 | N |
| DOE00011922 | North-West College | North-West College, Inc. | 8/6/2019 (reviewed) | 25 | N |
| DOE00011924; DOE00011925; DOE00011928; DOE00011931 | Northwestern College (some campuses closed); Northwestern Business College (closed) | Northwestern College, Inc.; Lancelot, Inc.; Lawrence Shumacher | 7/25/19 (approved) | 23 | N |
| DOE00011933 | Northwestern State University | Public | 10/18/19 (approved) | 6 | N |
| DOE00011934 | Northwood University (some campuses closed) | Private | 11/1/2019 | 9 | N |
| DOE00011936 | Notre Dame of Maryland University | School Sisters of Notre Dame | 11/8/2019 | 7 | N |
| DOE00011938; DOE00011940; DOE00011945; DOE00011950 | Nova Southeastern University | Private | 11/14/2019 (approved) | 53 | N |
| DOE00011951 | Ohio Christian University | Ohio Christian University | 11/7/2019 | 6 | N |
| DOE00011953 | Ohio Media School | Ohio Center for Broadcasting | 9/24/2019 | 14 | N |
| DOE00011960; DOE00011961 | Ohio Technical College | M L Brenner Living Trust | 9/17/2020 | 11 | N |
| DOE00011962 | Ohio University | Public | 11/8/2019 | 6 | N |
| DOE00011964 | Oklahoma Health Academy | Unknown | 11/12/2019 | 7 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00011965 | Old Dominion University | Public | 10/17/2019 | 7 | N |
| DOE00011966; DOE00011967; DOE00011969 | Olympian Academy of Cosmetology; I.T.S. Academy of Beauty; Hair Benders Academy; Olympus Beauty Academy | Olympus, Inc. (Gerald D. Johnson) | 11/4/2019; 8/24/2020 | 16 | N |
| DOE00011971 | Omnitech Institute | Charlton Carlos Lester | 11/4/2019 | 9 | N |
| DOE00011973; DOE00011974; DOE00011977 | Orion College | National Institute for Medical Assistant Advancement, Inc.; Allied Health Online, Inc. | 8/31/2020 | 24 | N |
| DOE00011980 | Ottawa University | Private | 11/7/2019 | 7 | N |
| DOE00011981; DOE00011982; DOE00011984; DOE00011989 | Owens Community College | Public | 9/1/2020 | 15 | N |
| DOE00011994; DOE00011998; DOE00012000 | Pace University | Private | 8/27/2020 | 17 | N |
| DOE00012002 | Pacific College of Oriental Medicine | Private | 11/12/2019 | 7 | N |
| DOE00012003; DOE00012005; DOE00012007 | Pacific Travel Trade School | Private | 9/16/2020 | 33 | N |
| DOE00012009; DOE00012010 | Paine College | Affiliated with United Methodist Church | 8/27/2020 | 11 | N |
| DOE00012011 | Park University | Private | 2/25/2020 | 6 | N |
| DOE00012012; DOE00012018; DOE00012021 | Park West Barber School | Park West Barber School, LLC | 9/21/2020 | 27 | N |
| DOE00012024 | Parkland College | Public | 11/13/2019 | 6 | N |
| DOE00012026; DOE00012026 | Paul Mitchell The School | John Paul Mitchell Systems | 10/17/2019 | 7 | N |
| DOE00012027; DOE00012028 | PCI College | Professional Career Institute Inc. (Ray N. Khan, Amber R. Khan) | 9/1/2020 | 13 | N |
| DOE00012029; DOE00012030 | PCI Health Training Center | Prince Careers, Inc. (Rhonda G. White) | 8/25/2020 | 19 | N |
| DOE00012031; DOE00012033 | Penn Ohio College | Private | 8/18/2020 | 2 | N |
| DOE00012035 | Pennco Tech | Pennco Tech Institutes | 7/12/2019 | 26 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012038; DOE00012039; DOE00012040 | Pennsylvania Institute of Technology | Pennsylvania Institute of Technology, Inc. | 8/27/2020 | 15 | N |
| DOE00012041; DOE00012042 | Pennsylvania School of Business | Information Computer Systems -> Interboro Holding, Inc. -> EVCI Career Colleges Holding Corp. | 8/26/2020 | 18 | N |
| DOE00012043; DOE00012044; DOE00012048 | Pennsylvania State University | Public | 9/17/2020 | 45 | N |
| DOE00012052; DOE00012053; DOE00012055 | Performance Training Institute | RSTM, LLC -> Barth Educational Investments (Robert K. Barth, Suzanne C. Barth, Robert T. Barth, Marissa P. Barth) | 8/6/2020 | 26 | N |
| DOE00012057; DOE00012058; DOE00012063 | Phillips Junior College | Gerald C. Phillips | 10/16/2020 | 32 | N |
| DOE00012068 | Phoenix College | Public | 8/28/2019 | 16 | N |
| DOE00012071 | Pima Community College | Public | 11/12/2019 | 5 | N |
| DOE00012075; DOE00012080 | Pima Medical Institute | Vocational Training Institute, Inc.; The Luebke Revocable Trust, UA; Pima Medical Institute Employee Stock Ownership Trust | 5/13/2020 | 114 | N |
| DOE00012087; DOE00012089 | Pinnacle Career Institute | Manufacturer's Technical Institute, Inc. | 8/25/2020 | 34 | N |
| DOE00012091 | Pinnacle College | Unknown | 11/7/2019 | 10 | N |
| DOE00012093 | Pioneer Pacific College | Private | 11/4/2019 | 8 | N |
| DOE00012095; DOE00012097; DOE00012099 | Pittsburgh Technical College | Center for Excellence in Education | 11/12/2019; 8/26/2020; 11/23/2020 | 39 | N |
| DOE00012101 | Platt College | Caltius Equity Partners III, LP | 11/4/2019 | 37 | N |
| DOE00012104 | Platt College (no relation) | Stvt-Aai Education Inc. | 11/4/2019 | 39 | N |
| DOE00012106 | Platt College-San Diego | Robert Leiker | 11/4/2019 | 5 | N |
| DOE00012107 | Point Park University | Private | 10/30/2019 | 4 | N |
| DOE00012109 | Point University (fka Atlanta Christian College) | Non-profit Christian College | 11/7/2019 | 6 | N |

Case 3:19-cv-03674-WHA     Document 245-4     Filed 06/09/22     Page 241 of 463
Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012110 | Porter and Chester Institute | The Porter and Chester Inst., Inc. (WL Brown, Henry J. Kamerzel, John D. Mashia) | 11/12/2019 | 9 | N |
| DOE00012111; DOE00012112; DOE00012113 | Portland Community College | Public | 8/31/2020; 9/20/2019 | 16 | N |
| DOE00012116 | Portland State University | Public | 11/4/2019 | 9 | N |
| DOE00012119; DOE00012120; DOE00012125 | Post University | Post University, Inc.; Post Education, Inc.; Generation Capital Partners II L.P. | 8/25/2020 | 59 | N |
| DOE00012130; DOE00012131 | Prarie View Agricultural & Mechanical University | Public | 8/28/2020 | 18 | N |
| DOE00012132 | Prescott College | Prescott College, Inc. | 2/10/2020 | 7 | N |
| DOE00012133 | Prince Institute-Southeast | Prince Institute of Professional Studies, Inc. | 1/28/2020 | 5 | N |
| DOE00012134; DOE00012135; DOE00012138; DOE00012142 | Prism Career Institute | Prism Education Group, Inc.; PrisMed of South Jersey, Inc.; PJA School, Inc. | 9/17/2020 | 50 | N |
| DOE00012146 | Professional Business School | Unknown | 11/12/2019 | 8 | N |
| DOE00012147 | Professional Career Centers | Unknown | 1/27/2020 | 7 | N |
| DOE00012149 | Professional Career Institute | Professional Career Institute | 1/27/2020 | 10 | N |
| DOE00012150; DOE00012156; DOE00012157 | Professional Hands Institute | Professional Hands Institute, Inc. (Caridad Triana) | 8/31/2020 | 12 | N |
| DOE00012158 | Prospect College | Unknown | 11/12/2019 | 7 | N |
| DOE00012159; DOE00012160; DOE00012161 | Provo College | Unitek College Utah, LLC -> Unitek College Holding Co., LLC -> Unitek Learning, Inc. -> HealthEd, Inc. -> HealthEd Intermediate Holdings, Inc. -> HealthEd Holdings, LLC -> Cressey and Company Fund IV, LP | 10/30/2019 | 6 | N |
| DOE00012162; DOE00012168 | PSI Institute | Programming & Systems, Inc. | 4/08/2020 (initial); 9/25/2020 (final) | 54 | N |
| DOE00012174; DOE00012176 | PTC Career Institute | Richard & Rimona Friedberg | 9/18/2020 | 10 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012177; DOE00012178 | Purdue University | Public | 8/26/2020 | 11 | N |
| DOE00012179; DOE00012181; DOE00012184 | Quest College; College Beauty Health and Wellness Center | Quest College, Inc. (Jeanne C. Martin) | 9/18/2019 (approved) | 7 | N |
| DOE00012186 | Quincy College (nursing program temporarily closed) | City of Quincy | 9/23/19 (approved) | 10 | N |
| DOE00012189 | Radians College (closed; see also DOE00005945) | Radians College, LLC -> JTC Education, Inc. | 7/25/19 (approved) | 23 | N |
| DOE00012191; DOE00012192; DOE00012193; DOE00012199 | Rasmussen College | Rasmussen, Inc.; Rasmussen Colleges, Inc. | 5/6/20 (approved) | 128 | N |
| DOE00012206; DOE00012207; DOE00012218 | Regency Beauty Institute (closed) | Lyanna, Inc.; Regency Corp. (includes partnerships of Prairie Capital III, L.P. and LLR Equity Partners, L.P.) | 4/2/20 (approved) | 338 | N |
| DOE00012229; DOE00012230; DOE00012231 | Regent University (closed) | CBN University (faith-based private school started by Pat Robertson) | 8/27/20 (approved) | 13 | N |
| DOE00012233; DOE00012235 | Regina's College of Beauty | Regina's College of Beauty, Inc. | 8/27/2020 | 26 | N |
| DOE00012237; DOE00012239; DOE00012241 | Regis University | Private | 8/27/20 (approved) | 17 | N |
| DOE00012242; DOE00012245; DOE00012259 | Remington College (some campuses closed); Education America | Since 2011: BCL, Inc. (Jerald M. Barnett); before 2011: Education America (Jerald M. Barnett & Jack W. Forrest) | 12/6/19 (approved) | 493 | N |
| DOE00012273; DOE00012274; DOE00012277; DOE00012282; DOE00012284 | Ridley-Lowell Business & Technical Institute (closed); Ridley-Lowell School of Business (closed) | Wilfred T. & Norma Weymouth | 9/21/2020 | 66 (Business & Technical Institute)  12 (School of Business) | N |
| DOE00012285; DOE00012288; DOE00012291 | Rio Salado Community College (2 campuses closed in 2019 due to low enrollment numbers) | Public | 9/18/2020 | 24 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012292 | Riverside School of Aeronautics (closed) | Private | 12/18/19 (approved) | 6 | N |
| DOE00012294; DOE00012295; DOE00012300 | Robert Fiance Beauty School; Robert Fiance Hair Design Institute (closed); Robert Fiance Institute of Florida (closed) | Reignbow Beauty Academy, Inc. (Paul Ferrara); Robert Fiance Beauty Schools (Paul Ferrara); GBR, Inc. (Paul Ferrara) | 8/25/20 (approved) | 24 | N |
| DOE00012305; DOE00012306; DOE00012312 | Robert Morris University Illinois (as of 2020, merged into Roosevelt University) (Springfield campus closed) | Private | 9/22/20 (approved) | 60 | N |
| DOE00012318 | Rochester Institute of Technology | | 11/4/2019 | 7 | N |
| DOE00012320; DOE00012322; DOE00012324 | Rocky Mountain College of Art & Design | Rocky Mountain College, LLC -> Rocky Mountain School of Art, Inc. -> Phelps Education West III, LLC (Jonathan D. Phelps); Haddock Education IV LLC (Edward E. Haddock Jr. Family Trusts); Heavener Co. Education West III, LLC (James W. Heavener) | 8/27/2020 | 10 | N |
| DOE00012325 | Ross Medical Education Center (12 campus closures from 1992 - 2009) | Ross Education, LLC | 11/14/2019 | 14 | N |
| DOE00012326; DOE00012327; DOE00012331 | Ross University School of Medicine | Acquired by DeVry in 2003; DeVry acquired by Adtalem Global Education; Adtalem acquired by Cogswell Education, LLC in 2018 | 9/24/20 (approval) | 28 | N |
| DOE00012335; DOE00012337 | Ross University School of Veterinary Medicine | Acquired by DeVry in 2003; DeVry acquired by Adtalem Global Education; Adtalem acquired by Cogswell Education, LLC in 2018 | 9/10/20 (approval) | 9 | N |
| DOE00012339 | Rowan University | Public | 11/4/2019 | 5 | N |
| DOE00012340 | Royal Beauty Careers (closed) | Noorruddin (Nick) Mithani | 9/19/19 (approval) | 8 | N |
| DOE00012343; DOE00012344; DOE00012348 | Rutgers, the State University of New Jersey | Public | 8/26/2020 | 38 | N |
| DOE00012352 | SAE Expression College (f/k/a Expression College for Digital Arts) | Navitas Group | 10/30/2019 | 23 | N |
| DOE00012355 | SAE Institute of Technology Los Angeles | Private | 10/16/2019 | 10 | N |
| DOE00012356 | Sage College | Private | 7/23/2019 | 5 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012358 | Saint Augustine's University | Private | 10/10/2019 | 13 | N |
| DOE00012361 | Saint John's University | Congregation of the Mission (Vincentian Fathers) | 11/7/2019 | 11 | N |
| DOE00012363 | Saint Joseph's College | Private | 10/1/2019 | 7 | N |
| DOE00012367; DOE00012369; DOE00012373 | Saint Leo University | Private | 9/1/2020 | 30 | N |
| DOE00012377; DOE00012378; DOE00012379 | Saint Louis College of Health Careers | Rush L. Robinson, Steven N. Barsam | 8/25/2020 | 12 | N |
| DOE00012380; DOE00012381 | Saint Paul's College | Private | 8/26/2020 | 18 | N |
| DOE00012382 | Saint Xavier University | Sisters of Mercy | 11/6/2019 | 6 | N |
| DOE00012384; DOE00012385 | Salt Lake Community College | Public | 9/17/2020 | 11 | N |
| DOE00012386 | Sam Houston State University | Public | 10/29/2019 | 11 | N |
| DOE00012388 | San Diego College; Career College of San Diego | Private | 10/10/2019 | 9 | N |
| DOE00012390 | San Diego State University | Public | 10/17/2019 | 6 | N |
| DOE00012392 | San Francisco State University | Public | 10/21/2019 | 10 | N |
| DOE00012395; DOE00012396; DOE00012399; DOE00012401; DOE00012407 | San Joaquin Valley College | San Joaquin Valley College, Inc. (Shirley Perry, Kristopher Perry, Mark Perry, Michael Perry, Robert Perry, Stephanie Perry, Aaron Perry, Alyssa Perry, Joshua Perry) | 8/31/2020 | 145 | N |
| DOE00012413; DOE00012415; DOE00012416 | San Jose State University | Public | 8/27/2020 | 16 | N |
| DOE00012417 | Santa Barbara Business College | Private | 7/27/2019 | 20 | N |
| DOE00012427; DOE00012428 | Savannah River College (closed) | Dennis Kerr Enterprises Inc. (Dennis C. Kerr) | 8/31/2020 | 17 | N |
| DOE00012429; DOE00012430; DOE00012433 | Sawyer College (closed) | CollegeAmerica, Inc. (Carl B. Barney) | 9/3/2020 | 26 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012436 | Saybrook College | Private (part of TCS Education System) | 9/19/2020 | 12 | Y - Cases alleging misrepresentations of APA accreditation; schools/programs affiliated with TCS Education System |
| DOE00012441; DOE00012442 | Saybrook University | Private | 8/31/2020 | 15 | N |
| DOE00012448 | School of Visual Arts | School of Visual Arts, LLC | 12/20/2019 | 7 | N |
| DOE00012452; DOE00012454; DOE00012455 | Seminole State College of Florida | Public | 10/15/2019; 9/16/2020 | 13 | N |
| DOE00012450 | Seton Hall University | Roman Catholic Church | 11/5/2019 | 8 | N |
| DOE00012456 | Shaw University | North Carolina Baptist Convention | 10/22/2019 | 9 | N |
| DOE00012458 | Shirley Baker Career Institute | Shirley Baker | 11/8/2019 | 6 | N |
| DOE00012459 | Siena Heights University | Adrian Dominican Sisters | 11/6/2019 | 6 | N |
| DOE00012460 | Sinclair Community College | Public | 10/10/2019 | 4 | N |
| DOE00012462 | Skyline College (closed) | ECPI (former) | 11/12/2019 | 8 | N |
| DOE00012463; DOE00012464; DOE00012468; DOE00012472 | Sojourner-Douglass College (Closed) | Private | 9/17/2020; 8/8/2019 | 77 | N |
| DOE00012475 | South Carolina State University | Public | 11/4/2019 | 7 | N |
| DOE00012477; DOE00012478 | South Coast College | Whitley College | 1/15/2020 | 15 | N |
| DOE00012480 | South College | Stephen A. Smith | 10/18/2019 | 16 | N |
| DOE00012481; DOE00012485 | South Texas Vocational Technical Institute | STVT-Aai Education Inc. -> Ancora Intermediate Holdings, LLC; RG Educational Services, Inc. -> Ray Garcia & Hilario Rincones | 9/17/2020 | 26 | N |
| DOE00012488 | Southeast Community College | Public | 1/2/2020 | 6 | N |
| DOE00012490; DOE00012492 | Southeast Missouri State University | Public | 9/10/2020 | 12 | N |
| DOE00012494 | Southeastern Academy | Unknown | 10/30/2019 | 9 | N |
| DOE00012497; DOE00012501 | Southeastern College | Bar Education, Inc. | 9/2/2020 | 64 | N |
| DOE00012506 | Southeastern Louisiana University | Public | 9/20/2019 | 11 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012508 | Southeastern University | Private | 10/10/2019 | 3 | N |
| DOE00012511; DOE00012512; DOE00012514 | Southern California Health Institute | OPPT Career Schools, Inc. (Marina Isounts) | 8/6/2020 | 8 | N |
| DOE00012516; DOE00012517; DOE00012521; DOE00012523; DOE00012527 | Southern Careers Institute | Endeavvour Capital Fund V, L.P. | 9/21/2020; 6/24/2019 | 56 | N |
| DOE00012529 | Southern College | David L. Peoples | 1/2/2020 | 10 | N |
| DOE00012505 | Southern Connecticut University | Stanley Battle and Joe Bertolino | 11/5/2019 | 7 | N |
| DOE00012531 | Southern Illinois University | Public | 9/26/2019 | 26 | N |
| DOE00012533; DOE00012534; DOE00012539; DOE00012544 | Southern New Hampshire University | Private | 9/29/2020; 7/25/2019 | 72 | N |
| DOE00012546; DOE00012547; DOE00012548; DOE00012553 | Southern Technical College | Southern Technical Institute, LLC | 10/21/2019; 8/18/2020 | 120 | N |
| DOE00012556 | Southern University and Agricultural & Mechanical College at Baton Rouge | Southern University System | 2/24/2020 | 19 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012558 | Southwest Acupuncture College | Human Capital Inc. | 1/2/2020 | 10 | N |
| DOE00012560 | Southwest University | Private | 10/11/2019 | 5 | N |
| DOE00012562; DOE00012563 | Southwest University at El Paso | Benjamin Arriola Jr. Special Trust No. 1; Christopher Arriola Special Trust No. 1; | 9/16/2020 | 10 | N |
| DOE00012564; DOE00012565; DOE00012568; DOE00012571 | Southwest University of Visual Arts | The Art Center | 9/23/2019 | 37 | N |
| DOE00012573 | Spalding University | Tori Murden | 11/5/2019 | 6 | N |
| DOE00012574; DOE00012576 | Spartan College of Aeronautics and Technology | Spartan Education Industries, Inc. | 8/28/2019 | 103 | N |
| DOE00012584 | Spees Howard School of Media Arts | Private | 12/16/2019 | 6 | N |
| DOE00012586 | Spokane Community College | Public | 8/26/2020 | 12 | N |
| DOE00012587; DOE00012589 | Springfield College | Private | 12/9/2019 | 18 | N |
| DOE00012592 | St. Catharine College (closed) | Private | 8/3/2020 | 24 | N |
| DOE00012594 | St. Cloud State University | Public | 11/4/2019 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012596 | St. Petersburg College | Public | 7/29/2019 | 24 | N |
| DOE00012598 | Star Technical Institute (closed0 | Star Technical Institute Career Group | 8/15/2019 | 23 | N |
| DOE00012601; DOE00012602; DOE00012607 | Stark State College | Public | 8/26/2020 | 21 | N |
| DOE00012611 | State College of Florida, Manatee-Sarasota | Public | 8/26/2020 | 15 | N |
| DOE00012613 | State University of New York at Albany | Public | 9/17/2020 | 15 | N |
| DOE00012689 | State University of New York at Albany | Public | 11/3/20 (approved) | 23 | N |
| DOE00012614; DOE00012616 | State University of New York at Buffalo | Public | 8/27/2020 | 12 | N |
| DOE00012617; DOE00012623 | Stautzenberger College | American Higher Education Development | 8/27/2019 | 18 | N |
| DOE00012626 | StenoTech Career Institute | Private | 12/16/2019 | 6 | N |
| DOE00012628; DOE00012629 | Stenotype Institute of Jacksonville | Stenotype Institute of Jacksonville, Inc. (Gloria Wiley) | 9/1/2020 | 66 | N |
| DOE00012639; DOE00012642 | Stillman College | Cynthia Warrick, Private | 9/21/2020 | 14 | N |
| DOE00012644 | Stone Academy | Career Training Specialists, LLC (Mark E. Scheinberg & Joseph Bierbaum) | 8/27/2020 | 15 | N |
| DOE00012649; DOE00012653; DOE00012655; DOE00012656 | Stratford University (some campus closures) | Stratford University, Inc. (Mary Shurtz, Richard Shurtz Sr., Richard Shurtz II, Barbara Snyder) | 9/21/20 (approval) | 44 | N |
| DOE00012658; DOE00012664 | Strayer University; Strayer Business College (closed) | Strategic Education, Inc. | 11/22/20 (updated approval) | 550 | N |
| DOE00012669; DOE00012673 | Suburban Technical School (closed) | Premier Education Group, L.P. (Robert B. Bast; Elizabeth Brennan Trust) | 8/27/2020 | 24 | N |
| DOE00012677 | Suffolk University | N/A | 8/27/2020 | 11 | N |
| DOE00012678; DOE00012679; DOE00012683 | Summit College | Summit Career College, Inc. (Jay A. Murvine; James Hall; Esther Abrahams) | 9/21/20 (approved) | 35 | N |
| DOE00012686 | Sumner College | Cascade Education, LLC | 8/27/2020 | 9 | N |
| DOE00012691 | SUNY Broome Community College | Public | 1/2/20 (approved) | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012693; DOE00012696 | SUNY Buffalo | Public | 9/1/2020 | 10 | N |
| DOE00012698 | SUNY Empire State College | Public | 8/26/20 (approved) | 13 | N |
| DOE00012699; DOE00012700; DOE00012705 | Superior Training Services (closed) | N/A | 9/1/20 (approved) | 40 | N |
| DOE00012709; DOE00012712 | Tarrant County College | Public | 9/6/2019; 11/7/2019 | 15 | N |
| DOE00012715 | Taylor Business Institute | Level 1: Pan Ethnic International, Inc.; Level 2: Janice C Parker | 9/3/2020 | 22 | N |
| DOE00012717 | Teachers College, Columbia University | Private, Not for Profit | 9/17/2020 | 10 | N |
| DOE00012721 | Tennessee Academy of Cosmetology (closed) | Level 1: Vanede, LLC; Level 2: GLC Solutions, LLC | 9/15/2020 | 24 | N |
| DOE00012724; DOE00012728 | Tennessee State University | Public | 9/10/2020 | 21 | N |
| DOE00012730; DOE00012734 | Tennessee Technological University | Public | 8/10/2020 | 9 | N |
| DOE00012737 | Tennessee Temple University (Closed) | Private | 10/15/2019 | 11 | N |
| DOE00012741 | Texas A&M University | Public | 8/31/2020 | 10 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012742 | Texas Barber College | TBD | 11/7/2019 | 7 | N |
| DOE00012744; DOE00012750; DOE00012756 | Texas Southern University | Public | 10/15/2019; 6/26/2019; 9/16/2020 | 60 | N |
| DOE00012762; DOE00012764; DOE00012768 | Texas State Technical College | Public | 10/18/2019; 9/22/2020 | 22 | N |
| DOE00012771 | Texas State University | Public | 11/1/2019 | 7 | N |
| DOE00012775 | Texas Tech University | Public | 8/31/2020 | 13 | N |
| DOE00012777 | The College of Health Care Professions | The College of Health Care Professions, Inc. | 12/11/2019 | 7 | N |
| DOE00012778 | The College of New Rochelle (Closed) | Private, Catholic | 7/24/2019 | 31 | N |
| DOE00012782 | The Hair Design School | Proprietary | 8/31/2020 | 13 | N |
| DOE00012784 | The New School | New School for Social Research | 8/25/2020 | 14 | N |
| DOE00012785 | The Ohio State University | Public | 7/27/2019 | 20 | N |
| DOE00012787 | The Pennsylvania State University | Public | 9/5/2019 | 16 | N |
| DOE00012790 | The Real Barbers College (Closed) | Private | 10/8/2019 | 9 | N |
| DOE00012798 | The Salon Professional Academy | The Salon Professional Education Company (SPEC) | 9/23/2020 | 18 | N |
| DOE00012804 | The University of Akron | Public | 9/10/2019 | 15 | N |
| DOE00012893; DOE00012895 | The University of Akron | Public | 9/17/2020 | 30 | N |
| DOE00012806 | The University of Memphis | Public | 11/1/2019 | 9 | N |
| DOE00012810; DOE00012811 | Thomas M. Cooley Law School | Private, Not for Profit | 9/17/2020 | 10 | N |
| DOE00012814 | Tidewater Community College | Virginia State Board for Community Colleges | 7/3/2019 | 26 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012816 | TONI & GUY Hairdressing Academy | Multiple owners listed for different OPEIDs | 8/26/2020 | 16 | N |
| DOE00012820; DOE00012821; DOE00012822; DOE00012825 | Touro College | Private, Not for Profit | 12/9/2019; 8/13/2020 | 35 | N |
| DOE00012828 | Towson University | Public | 11/1/2019 | 5 | N |
| DOE00012829 | Trainco Business School (Closed) | Private, For Profit, Owner TBD | 10/4/2019 | 8 | N |
| DOE00012833 | Tricoci University of Beauty Culture | Tricoci University of Beauty Culture is an LLC that operates as a university | 9/26/2019 | 10 | N |
| DOE00012836 | Trident Technical College | Trident Technical College Enterprise Campus Authority d/b/a Trident Technical College | 8/23/2019 | 13 | N |
| DOE00012839; DOE00012842; DOE00012843 | Trident University International | Trident University International, LLC | 10/11/2019; 9/17/2020 | 17 | N |
| DOE00012844 | Trinity Valley Community College | Public | 12/19/2019 | 6 | N |
| DOE00012845 | Tri-State Institute of Hair Design | Debbie and J. B. Brown; Hair Bella, Inc. | 10/19/2019 | 5 | N |
| DOE00012847 | Troy University | Public | 10/31/2019 | 9 | N |
| DOE00012850; DOE00012851; DOE00012857 | Ultimate Medical Academy | N/A | 5/12/2020 | 260 | N |
| DOE00012862 | Unitech Training Academy | Unitech Training Academy | 8/23/2019 | 55 | N |
| DOE00012864; DOE00012868; DOE00012869 | United College of Business (Closed) | N/A | 10/8/2019; 9/3/2020 | 17 | N |
| DOE00009656 | United Education Institute; UEI College | Unspecified | Undated | Unspecified | Unknown |
| DOE00012870 | United Schools | United Schools | 11/5/2019 | 6 | N |
| DOE00012873; DOE00012878 | Universal Technical Institute | UTI Holdings, Inc. | 5/5/2020 | 601 | N |
| DOE00012884; DOE00012885; DOE00012886 | Universidad Ana G. Mendez - Gurabo Campus; Carolina Campus | Private, Not for Profit | 8/27/2020 | 17 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012888; DOE00012890; DOE00012892 | University of Advancing Computer Technology | Proprietary, Private for-profit | 8/28/2020 | 18 | N |
| DOE00012900; DOE00012903 | University of Alabama, Birmingham | Publilc | 11/1/2019; 9/15/2020 | 6 | N |
| DOE00012905 | University of Antelope Valley | Marco Johnson | 11/1/2019 | 6 | N |
| DOE00012906 | University of Arizona | Public | 8/30/2019 | ? | N |
| DOE00012909 | University of Arkansas - Pulaski Technical College | Public | 10/29/2019 | 9 | N |
| DOE00012952 | University of Arksansas, Little Rock | Public | 11/1/2019 | 8 | N |
| DOE00010189 | University of Bridgeport | Private | 11/1/2019 | 7 | N |
| DOE00012914 | University of Bridgeport | Private, Not for Profit | 9/17/2020 | 17 | N |
| DOE00012923 | University of California, Davis | Public | 12/10/2019 | 5 | N |
| DOE00012916 | University of California, Los Angeles | Public | 11/1/2019 | 10 | N |
| DOE00012925 | University of Central Arkansas | Public | 11/4/2019 | 9 | N |
| DOE00012927 | University of Central Florida | Public | 9/25/2019 | 9 | N |
| DOE00012933 | University of Cincinnati | Public | 9/1/2020 | 10 | N |
| DOE00012935 | University of Colorado, Denver | Public | 8/26/2020 | 10 | N |
| DOE00012939 | University of Detroit, Mercy | Private | 11/1/2019 | 6 | N |
| DOE00012940 | University of Florida | Public | 8/3/2020 | 10 | N |
| DOE00012944 | University of Houston | Public | 9/17/2020 | 13 | N |
| DOE00012946 | University of Illinois, Chicago | Public | 8/30/2020 | 12 | N |
| DOE00012948 | University of Illinois, Urbana-Champaign | Public | 9/3/2020 | 13 | N |
| DOE00012950 | University of Kansas | Public | 8/3/2020 | 11 | N |
| DOE00011386 | University of La Verne | Private / Church of the Brethren | 10/31/2019 | 7 | N |
| DOE00012954 | University of Maryland (Global Campus; Eastern Shore; College Park; Baltimore County) | Public | 8/16/2019 | 34 | N |
| DOE00012974 | University of Massachusetts | Public | 11/7/2019 | 8 | N |
| DOE00012976 | University of Memphis | Public | 8/26/2020 | 21 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00012807 | University of Miami Law School | University of Miami | 11/1/2019 | 10 | N |
| DOE00012980 | University of Minnesota, Twin Cities | Public | 10/31/2019 | 8 | N |
| DOE00012984 | University of Mississippi | Public | 8/26/2020 | 14 | N |
| DOE00012986; DOE00012987 | University of Missouri, Kansas City | Public | 8/25/2020 (updated 11/18/2020) | 8 | N |
| DOE00012991 | University of Missouri, St. Louis | Public | 8/26/2020 | 9 | N |
| DOE00011303 | University of Missouri-Kansas City | | | | |
| DOE00012993 | University of Nebraska, Omaha | Public | 11/5/2019 | 6 | N |
| DOE00012994 | University of Nevada, Las Vegas | Public | 8/27/2019 | 10 | N |
| DOE00013000 | University of North Colorado | Public | 10/31/2019 | 6 | N |
| DOE00012998 | University of North Texas | Public | 10/17/2019 | 11 | N |
| DOE00013002 | University of Oklahoma | Public | 8/31/2020 | 12 | N |
| DOE00009659; DOE00009672 | University of Phoenix | Apollo Education Group | 5/19/2020 | See above | Maybe - At least some who enrolled after 1/1/2010 |
| DOE00009666; DOE00009669 | University of Phoenix | Apollo Education Group | 7/14/2020 | Over 22,000 | Maybe - At least some who enrolled after 10/1/2012 |
| DOE00009662 | University of Phoenix | Apollo Education Group | 6/29/2020 | Unspecified | Unknown |
| DOE00013012 | University of Pittsburgh | Public | 10/31/2019 | 6 | N |
| DOE00013016 | University of San Francisco | Private, Not for Profit | 8/26/2020 | 14 | N |
| DOE00013018 | University of South Alabama | Public | 10/21/2019 | 8 | N |
| DOE00013019 | University of South Carolina - Columbia | Public | 9/16/2020 | 19 | N |
| DOE00013021 | University of South Carolina Upstate | Public | 9/30/2019 | 21 | N |
| DOE00013024 | University of South Florida | Public | 9/25/2019 | 9 | N |
| DOE00013029; DOE00013036 | University of Southern California | Private, Not for Profit | 8/25/2020 | 54 | N |
| DOE00013036 | University of Southern California | Private | 9/11/2020, updated 11/20/2020 | 54 | N |
| DOE00013040; DOE00013041; DOE00013044 | University of Southern Mississippi | Public | 9/25/2020, updated 11/20/2020 | 25 | N |
| DOE00013047; DOE00013050 | University of Southernmost Florida | University of Southernmost Florida, Inc. (Ernesto Perez) | 9/21/2020, updated 11/23/2020 | 30 | N |
| DOE00013053 | University of Tennessee | Public | 11/1/2019 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment

FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00013056; DOE00013057 | University of Texas - Arlington | Public | 9/11/2020, updated 11/23/2020 | 12 | N |
| DOE00013054 | University of Texas - El Paso | Public | 10/31/2019 | 6 | N |
| DOE00013055 | University of Texas - Rio Grande Valley | Public | 10/31/2019 | 7 | N |
| DOE00013058; DOE00013059 | University of the District of Columbia | Unspecified | 8/28/2020, updated 11/20/2020 | 13 | N |
| DOE00013060 | University of Toledo | University of Toledo | 8/23/2019 | 17 | N |
| DOE00013062 | University of Utah | University of Utah | 10/31/2019 | 7 | N |
| DOE00013063; DOE00013065; DOE00013067 | University of Washington - Seattle | Public | 10/30/2019; 9/3/2020, updated 11/20/2020 | 11 | N |
| DOE00013068; DOE00013069; DOE00013070 | Upper Iowa University | Private | 9/18/2020, updated 11/23/2020 | 11 | N |
| DOE00013071 | USA Training Academy Home Study | USA Training Academy Home Study | 10/31/2019 | 9 | N |
| DOE00013072 | Valdosta State University | Public | 9/27/2019 | 8 | N |
| DOE00013075; DOE00013078; DOE00013079; DOE00013082 | Valencia College | Public | 8/1/2019; 8/27/2020, updated 11/23/2020 | 32 | N |
| DOE00013085; DOE00010387; DOE00013088 | Valparaiso University | Lutheran University Association | 10/17/2019; 9/17/2020, updated 11/20/2020 | 17 | N |
| DOE00013089; DOE00013091 | Vantage College | Ethos Educational Services, LLC (Elvia S. Perales, Eduardo Tribaldos) | 8/31/2020, updated 11/20/2020 | 29 | N |
| DOE00009690; DOE00009689 | Vatterott College, Vatterott Educational Centers, L'Ecole Culinaire, Court Reporting Institute of St. Louis, Ex'Treme Institute by Nelly | Vatterot Educational Centers, Inc. (controlled by Wellspring Capital Partners from 2003-2009, then by TA Associates) | 9/3/2020 | 975 | Y - Allegations re: transfer of credits and length/cost/nature regarding medical office administration and medical assistant programs |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00013093; DOE00013094; DOE00013096; DOE00013100; DOE00013104 | Victory University, f/k/a Crichton; Victory College | SignificantPsychology, LLC -> Significant Ventures, LLC -> Significant Venture Holdings, LLC -> Significant Management Holdings, LLC -> Clifford Capital, LLC (Michael K. & Lindsey Clifford) | 7/8/2019; 7/10/2019; 9/30/2020 | 63 | N |
| DOE00013106; DOE00013111 | Video Symphony EnterTraining | Video Symphony EnterTraining, Inc. (Michael Flanagan) | 9/4/2020, updated 11/23/2020 | 42 | N |
| DOE00013107 | Video Symphony EnterTraining (Closed) | Michael Flanagan - Video Symphony EnterTraining, Inc. | 9/3/2020 | 42 | N |
| DOE00009586; DOE00013657 | Virginia College, Brightwood College, Brightwood Career Institute, Kaplan Career Institute | Education Corp. of America (ECA) (entire period for VC; acquired Brightwood campuses in 2015 via purchase from Kaplan) | 7/13/2020 | over 5,000 | Y - Allegations re: transfer of credits after 5/1/2018 at 3 campuses; educational services after various dates at 3 other campuses; "Kaplan Carve Out Protocol" applies if loan date before 9/3/2015 for Brightwood College, Brightwood Career, or Kaplan Career |
| DOE00013115 | Virginia State University | Virginia State University | 10/9/2019 | 13 | N |
| DOE00013120; DOE00013122; DOE00013127; DOE00013132 | Vista College | Education Futures Group, LLC; Education Futures Management Co.; Computer Career Center, L.P.; EFG Limited Partner Corp.; Prospect Partners II, L.P. | 7/9/2019; 7/10/2019; 8/31/2020, updated 11/20/2020 | 76 | N |
| DOE00013134; DOE00013135 | Vocational Institute | Intercontinental Vocational School Inc. | 8/27/2020, updated 11/20/2020 | 10 | N |
| DOE00013136 | Vocational Training Center | Vocational Training Center | 10/30/2019 | 7 | N |
| DOE00013137; DOE00013138; DOE00013139 | Wake Technical Community College | Public | 10/30/2019; 9/17/2020, updated 11/23/2020 | 12 | N |
| DOE00013140 | Washington Adventist University | Seventh-Day Adventist Church | 10/31/2019 | 3 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00013142; DOE00013143; DOE00013145 | Washington School for Secretaries | Unspecified | 8/11/2020, updated 11/23/2020 | 5 | N |
| DOE00013147; DOE00013148 | Washington State University | Public | 9/17/2020, updated 11/20/2020 | 11 | N |
| DOE00013149; DOE00013150; DOE00013153; DOE00013156; DOE00013157 | Watterson College; Watterson College Pacific | WPS Enterprises, Inc. | 8/27/2020, updated 11/20/2020; 9/1/2020, updated 11/23/2020 | 25 | N |
| DOE00013158 | Wayne County Community College | Unspecified | 10/29/2019 | 6 | N |
| DOE00013159 | Webster Career College | Webster Career College, Inc. | 12/10/2019 | 9 | N |
| DOE00013161; DOE00013162; DOE00013164; DOE00013167 | Webster University | Private | 8/20/2019; 9/9/2020, updated 11/20/2020 | 37 | N |
| DOE00013170; DOE00013171 | West Coast Ultrasound Institute | West Coast Ultrasound, Inc. (Myra Chason) | 9/1/2020, updated 11/20/2020 | 13 | N |
| DOE00013172 | West Tennessee Business College | Charlotte Burch | 10/29/2019 | 7 | N |
| DOE00013173 | Westech College | Private | 8/14/2019 | 14 | N |
| DOE00013176; DOE00013177; DOE00013179 | Western Beauty Institute | San Fernando Beauty Academy, Inc. (Rosa Christina Diaz) | 8/27/2020, updated 11/20/2020 | 29 | N |
| DOE00012086; DOE00013182 | Western Governors University | | | | |
| DOE00013191; DOE00013198 | Western International University | Western International University, Inc. -> Apollo Global, Inc. -> AP VII Queso Holdings, L.P. -> AP VII Socrates Holdings, L.P. -> Apollo Investment Fund VIII, L.P. | 10/2/2020, updated 11/23/2020 | 121 | N |
| DOE00013205 | Western Kentucky University | Western Kentucky University | 10/29/2019 | 6 | N |
| DOE00013206 | Western Michigan University | Public | 10/28/2019 | 8 | Y - Applicants from Cooley School of Law |
| DOE00013212; DOE00013213 | Western Technical College (OPEID 00384000) | Public | 9/15/2020, updated 11/23/2020 | 5 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00013208; DOE00013209 | Western Technical College (OPEID 00810600) | Unspecified | 9/16/2020, updated 11/20/2020 | 1 | N |
| DOE00013210; DOE00013211; DOE00013212; DOE00013213 | Western Technical College (OPEID 02098300) | El Paso Trade School, Inc. (William M. Terrell, Randy L. Kuykendall, Brad Kuykendall) | 9/16/2020, updated 11/20/2020 | 8 | N |
| DOE00009694; DOE00009698; DOE00009701 | Westwood College (f/k/a Denver Institute of Technology) | Alta Colleges, Inc. | 5/14/2020, 12/2/2020 | 4,600 | Maybe - Claims for campuses outside CA, GA, or VA; claims for brick-and-mortar campuses in IL if enrollment after 5/1/2004 |
| DOE00013242 | Wichita Technical Institute | Public | 10/30/2019 | 10 | N |
| DOE00013214; DOE00013215 | Widener University | Private | 9/15/2020 | 17 | N |
| DOE00013216; DOE00013217; DOE00013219; DOE00013229 | Wilfred Academy; Wilfred Academy of Hair & Beauty Culture | Wilfred America Education Corporation | 8/5/2019 | 95 | |
| DOE00013233; DOE00013234; DOE00013235 | Wilkes University | Private | 10/25/2019; 9/1/2020, updated 11/20/2020 | 10 | N |
| DOE00013236; DOE00013238 | Willsey Institute | Willsey Limited Rockland, Inc. (Linda Chapilliquen) | 9/2/2020, updated 11/23/2020 | 10 | N |
| DOE00013240; DOE00013241 | Wilshire Computer College | Unknown | 8/26/2020, updated 11/23/2020 | 10 | N |
| DOE00013243; DOE00013244 | Wood Tobe-Coburn School | Wood Tobe-Coburn School | 8/9/2019; 10/29/2019 | 42 | N |
| DOE00013247 | Xavier University of Louisiana | Privately owned by lay-religious board on behalf of the Roman Catholic Church | 10/9/2019 | 4 | N |
| DOE00013250; DOE00013251; DOE00013252 | Yorktowne Business Institute | Yorktowne Business Institute, Inc. (Elizabeth M. Dribelbis) | 8/31/2020, approved 11/20/2020 | 16 | N |
| DOE00013253 | Youngstown State University | Youngstown State University | 10/7/2019 | 6 | N |

Sweet v. Cardona - Plaintiffs' Motion for Summary Judgment
FRE 1006 Summary Exhibit: School-Specific Memoranda Prepared by BDU

| Bates Number(s) | School Name(s) | Corporate Owner(s) | Memo Date | # of Applications as of Memo Date | Any Categories of Applications Approved for Further Review? |
|---|---|---|---|---|---|
| DOE00013257; DOE00013259 | YTI Career Institute; YTI Career Institute-Lancaster | York Technical Institute, LLC (The Porter and Chester Institute, Inc.; Thoma Cressey Fund VII, Inc.; TC Partners VII, LP; Thoma Cressey Bravo, Inc; Carl Thoma) | 9/1/2020, updated 11/23/2020 | 10 | N |
| DOE00013255 | YTI Career Institute-Altoona; Computer Learning Network | CLN Acquisition, Inc., d/b/a Computer Learning Network | 10/7/2019 | 3 | N |
| DOE00013261 | Zane State College | Public | 10/9/2019 | 3 | N |

# Exhibit 62

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

Case No.: 19-cv-03674-WHA

*Plaintiffs,*

v.

**AFFIDAVIT OF DANIEL DEEGAN**

ELISABETH DEVOS, in her official
capacity as Secretary of the United States
Department of Education,

And

THE UNITED STATES DEPARTMENT OF
EDUCATION,

*Defendants.*

I, Daniel Deegan, state as follows:

1.      I am submitting this affidavit in relation to the above-captioned case.

2.      I borrowed federal student loans in order to attend Devry University's Keller Graduate School of Management.

3.      On November 1, 2016, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4.      On May 7, 2020, I received correspondence from the Department of Education, stating that my claim had been denied.  A copy of that correspondence is attached as Exhibit B.

5.      In between the time that I first submitted an application for loan cancellation and when I received the notification of denial, my federal student loans have been in forbearance.

1

AFFIDAVIT

6. The denial notice says that I provided insufficient evidence that Devry University's Keller Graduate School of Management engaged in misconduct related to Employment Prospects.

7. The denial notice says that I provided insufficient evidence that Devry University's Keller Graduate School of Management engaged in misconduct related to Career Services.

8. I do not understand how the evidence that I submitted was insufficient. My application contains details about my experience and links to publicly available information about Devry's conduct as detailed in the FTC Complaint, but the denial notice I received does not respond to any of the information I provided.

9. The notification of denial states that I may ask for reconsideration. I am not aware of any additional information I could possibly submit.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 12, 2020

_____Atco_____, New Jersey

_____
Daniel Deegan

2

AFFIDAVIT

# Exhibit A



--
Dan Deegan

---------- Forwarded message ---------
From: Dan Deegan <
Date: Tue, Nov 1, 2016 at 5:02 PM
Subject: Borrower Defense to Repayment - Devry University
To: <FSAOperations@ed.gov>

Hello,

I graduated from Devry University's Keller Graduate School of Management in October of 2008 with an MBA. I wish to assert a borrower defense to repayment claim based on the fact that I was defrauded by them in several ways:

They influenced my choice to enroll based on unsubstantiated employment statistics that are now under fire by the FTC, for misleading students about the percentage of graduates that find jobs in their field within six months, and with higher salaries. I have attached a PDF from the lawsuit which explains this in great detail, and here are some links relevant to the claim:

https://www.ftc.gov/news-events/press-releases/2016/01/ftc-brings-enforcement-action-against-devry-university

https://www.consumeraffairs.com/education/devry.html

http://www.huffingtonpost.com/entry/feds-sue-devry-university_us_56a904c7e4b0f7179928af63

They also claimed I would be assisted by their career services department upon graduation, which never happened despite my efforts to get in touch with them (Their career services department is included in the FTC complaint). On numerous occasions I called their career services department for help, got a voicemail message, left a message and never heard anything back. Obviously I have no way to prove this, but the fact that it's included in the FTC complaint it must mean that it is a widespread issue. They maintain in the complaint that their employment statistics came from data their career services department obtained while communicating with students. I never once received a call from them to even obtain any information from me, let alone get any help in finding a job with my new MBA.

They also touted that their graduates made substantially higher salaries than averages (a statistic they heavily marketed after I had already graduated, but they were already doing this while I was enrolled there). After graduation, I remained in my same job, with the same salary, then was laid off not too long after I received my MBA. I spent several years without gainful employment, received unemployment benefits and COBRA, and had to put my loans in deferment which amassed substantial interest. I never heard from career services, applied to countless jobs hoping an MBA would help me find one, and ended up taking a job in a computer shop to get back on my feet.

I now owe them somewhere in the family of $50,000+, never found a job in Business Management, and work in the IT field. My loan amount with them is an estimate, due to all my loans being combined with my undergraduate degree from Widener University. I'm sure it can be determined which loans originated where in your system. Based on all of this, I would like to assert borrower defense against my loans with them, not pay them any more money, and re-claim the money I have paid in loans that have gone into their pockets. I do not wish my loans to get into deferment during this as I'm already battling extremely high interest and have loans that are not associated with Devry.


Name - Daniel Patrick Deegan
DOB - █████████
Last 4 of SS# - ████
Home Address - █████████████████████
Phone Number - ████████████
Email - █████████████
Name of School/Location - Devry University/Keller Graduate School of Management - 1800 John F Kennedy Blvd #200, Philadelphia, PA 19103
Program of Study - Business Management
Degree Obtained/Date - MBA - October, 2008




--
Dan Deegan
████████████████████


--

Dan Deegan

# Exhibit B

**From:** Borrower Defense <borrowerdefense@ed.gov>
**Date:** May 7, 2020 at 1:06:49 PM EDT

**Subject: Borrower defense discharge ineligibility information for you**    [

5/7/2020

Borrower Defense Application #: ██████

Dear Daniel Deegan:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Keller Graduate School of Management. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Keller Graduate School of Management. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action

directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

<u>Allegation 1: Employment Prospects</u>

You allege that Keller Graduate School of Management engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

<u>Allegation 2: Career Services</u>

You allege that Keller Graduate School of Management engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

Evidence obtained by the Department in conjunction with its regular oversight activities.

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration ████████████████████████ to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including

administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education

Federal Student Aid

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the

intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

--

Dan Deegan

# Exhibit 63

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

        *Plaintiffs,*

    v.

ELISABETH DEVOS, in her official
capacity as Secretary of the United States
Department of Education,

And

THE UNITED STATES DEPARTMENT OF
EDUCATION,

        *Defendants.*

Case No.: 19-cv-03674-WHA

**AFFIDAVIT OF YVETTE COLON**

I, Yvette Colon, state as follows:

1.     I am submitting this affidavit in relation to the above-captioned case.

2.     I borrowed federal student loans in order to attend the Non-Invasive
Cardiovascular Technology program at Sanford-Brown Institute (Sanford-Brown) in New York.

3.     I received a restitution check in the amount of $3,094.93 because the Office of the
Attorney General (OAG) of the State of New York investigated Sanford-Brown and found that it
misled and lied to students like me.

4.     On March 9, 2015, my attorneys submitted, on my behalf, a borrower defense
application to the United States Department of Education, asking for these loans to be cancelled.
A copy of that application is attached as Exhibit A, with redactions for personally identifiable
information and communications with my attorneys.

5.     On April 24, 2015, Navient, my loan servicer, sent a letter to my attorney stating
that it "was unable to forgive the balance on [my] Federal Stafford Loans." The letter further

1

1    stated that my loans could only be forgiven upon death or disability, or a school's closure. The

2    letter provided various options for repayment.

3        6.    On August 12, 2016, the Department of Education sent a letter to my attorney

4    providing "information on the status of" my borrower defense application. The letter stated that

5    by May 6, 2015, the Department had "determined that" my borrower defense application "was

6    substantially complete." The Department stated that it would "inform" my attorney "once a

7    determination has been made in relation to the request for a discharge."

8        7.    On July 2, 2020, I received correspondence from the Department of Education,

9    stating that my claim had been denied (denial notice). A copy of the denial notice is attached as

10   Exhibit B.

11       8.    In between the time that I first submitted an application for loan cancellation and

12   when I received the denial notice, my loans were in forbearance.

13       9.    The denial notice says that I provided insufficient evidence that Sanford-Brown

14   engaged in misconduct related to employment prospects.

15       10.   The denial notice says that I provided insufficient evidence that Sanford-Brown

16   engaged in misconduct related to transferring credits.

17       11.   The denial notice says that I provided insufficient evidence about whether

18   Sanford-Brown engaged in misconduct related to educational services.

19       12.   The denial notice says that I provided insufficient evidence about whether

20   Sanford-Brown engaged in misconduct related to "other."

21       13.   I am shocked and disappointed that the Department completely denied my

22   application. I submitted a lot of evidence with the help of my attorneys. Not only did I submit a

23   lot of evidence, I received a restitution check because the OAG found that Sanford-Brown

24   misled and lied to students, including me.  If what I submitted was not enough for the

25   Department, I don't understand what more I could have provided.

26       14.   I do not know what the Department means by "other."

27       15.   The notification of denial states that I may ask for reconsideration. I am unsure of

28   what additional information I could possibly submit since I submitted so much in my application.

2

AFFIDAVIT

I also cannot tell what evidence I submitted was considered and was found to be deficient, or why it was deficient.

I swear under penalty of perjury that the foregoing is true.

Executed on:  August   13  , 2020
New York, NY


_Yvette Colon_
Yvette Colon

3

# EXHIBIT A



**NEW YORK LEGAL ASSISTANCE GROUP**

Navient
P.O. Box 9500
Wilkes-Barre, PA 18773-9500

Cc:   U.S. Department of Education
      FSA Ombudsman Group
      830 First Street, N.E.
      Mail Stop 5144
      Washington, DC 20202-5144

*By Certified Mail*

March 9, 2015

Re: Yvette Colon's Defense to Repayment of Her FFELP Loans, Account # ▮▮▮▮▮▮

Dear Navient:

I represent Yvette Colon, whose Federal Family Education Loan Program (FFELP) loans are serviced by Navient. Ms. Colon incurred these loans in connection with her enrollment in the Non-Invasive Cardiovascular Technology certificate program at Sanford-Brown Institute (SBI) in New York.

On behalf of Ms. Colon, I write to assert a defense to the repayment of these student loans. SBI falsely represented that it offered a professional certificate that would lead to Ms. Colon obtaining gainful employment as a cardiac sonographer. In fact, SBI's sonography program lacked the programmatic accreditation necessary for Ms. Colon and others to obtain such work. Only after incurring substantial student loan obligations did Ms. Colon learn that SBI's statements about accreditation were false. Ms. Colon has been unable to find employment in her field of study, or to transfer her credits to a legitimate higher education institution.

Federal law,[1] regulations,[2] and the terms of her Master Promissory Note (MPN) provide Ms. Colon with a complete defense to repayment of her FFELP loans under these circumstances, and entitle her to reimbursement of amounts she has already paid toward her loans, and other relief.

Notably, the Office of the Attorney General of the State of New York (OAG) has already determined that SBI systematically engaged in an illegal pattern of making false and deceptive

---

[1] 20 U.S.C. §§ 1082(a)(5)–(6), 1087e(h).

[2] 34 C.F.R. §§ 30.70, 682.209(g), 685.206(c).

representations to prospective students, in violation of the consumer-protection provisions of New York General Business Law §§ 349 and 350. The OAG's investigation examined the consumer-oriented practices at all SBI campuses in New York state, as well as other campuses in New York operated by SBI's parent company, the Career Education Corporation (CEC). The investigation, which lasted several years, focused on SBI's misleading job placement disclosures, its deception regarding its lack of programmatic accreditation, and its failure to disclose that its graduates generally could not transfer their credits to legitimate institutions. The OAG eventually concluded that CEC violated New York consumer protection law in each of these respects. In August 2013, CEC entered into an Assurance of Discontinuance with the OAG, pursuant to which CEC agreed to make extensive changes in its business practices to remedy its violations of law, and to pay restitution to compensate for its illegal practices.[3]

This application for a defense to repayment is supported by an affidavit, sworn under penalty of perjury, of Ms. Colon,[4] the Assurance of Discontinuance entered into by CEC and the OAG (Assurance or AOD), a declaration, sworn under penalty of perjury, of Ms. Colon's counsel,[5] and other attached Exhibits establishing the misrepresentations of SBI.

## I.      SBI's Misconduct Toward Ms. Colon

SBI induced Ms. Colon to enroll and remain enrolled in the Non-Invasive Cardiovascular Technology program on the basis of several misrepresentations. In short, Program Director Naoufel Brahmi and other SBI representatives repeatedly, falsely assured her that SBI already had, or would obtain, the necessary programmatic accreditation for her to obtain a sonography job upon graduation,[6] and that in any event, she and her classmates were guaranteed to obtain highly-paid sonography jobs — which SBI would help them obtain.[7] SBI representatives also inaccurately informed her that her credits were transferrable to legitimate educational institutions.[8]

Before enrolling at SBI, Ms. Colon had taken some nursing classes at community college,[9] and in 1985 completed a medical assistant certificate program.[10] For more than two decades, she

---

[3] *See In re Career Educ. Corp.*, AOD No. 13-379, Assurance of Discontinuance (Aug. 19, 2013) [attached to Declaration of Jason Glick (Mar. 9, 2015) [hereinafter "Glick Decl."] as Ex. A].

[4] *See* Affidavit of Yvette Colon (Feb. 27, 2015) [hereinafter "Colon Aff."].

[5] *See* Glick Decl.

[6] *See* Colon Aff. ¶¶ 24–26, 31–34.

[7] *See id.* ¶¶ 28, 32.

[8] *See id.* ¶ 52.

[9] *See id.* ¶ 7.

[10] *See id.* ¶ 9.

worked in clinical settings, including an oncology hospital, and private OBGYN and radiology practices.[11] Her responsibilities included assisting with patient care, such as biopsies, pap smears, and Doppler monitoring, as well as office management tasks.[12]

In 2004, while working in a radiology practice, Ms. Colon became interested in pursuing a career in cardiac sonography.[13] She was encouraged by a coworker in the radiology practice, herself a sonographer.[14] Her coworker advised Ms. Colon that it was of paramount importance to attend a properly accredited sonography program, so that she could find work in the field upon graduation.[15]

In addition to the proper accreditation, Ms. Colon sought out programs that would allow her to continue her full-time job. At the time, she was financially responsible for her father and other family members, and was not in a position to give up her income. She therefore looked for a program that offered classes at night.[16] Although her coworker recommended the sonography program at NYU,[17] neither this program nor any of those at community colleges offered evening sessions. Ms. Colon then found information about the Ultrasound Diagnostic School (UDS), which did offer evening classes.[18] Ms. Colon began the enrollment process at UDS in 2004.[19] She ultimately did not begin classes at UDS, however, because of personal and family obligations that arose.[20]

In 2006, when Ms. Colon was ready to pursue sonography studies to launch the next phase of her career, she returned to UDS, only to learn that SBI had taken over the school.[21] If she still wanted to enroll in the Non-Invasive Cardiovascular Technology program, she would need to sign a new contract with SBI, at a higher two-year tuition, $29,825 — approximately $6,830 more than she had agreed to pay UDS.[22]

---

[11] *See id.* ¶¶ 10–14.

[12] *See id.* ¶ 10.

[13] *See id.* ¶ 15.

[14] *See id.* ¶¶ 15–16.

[15] *See id.* ¶ 23.

[16] *See id.* ¶ 17.

[17] *See id.* ¶ 16.

[18] *See id.* ¶ 18.

[19] *See id.*

[20] *See id.* ¶ 19.

[21] *See id.* ¶ 20.

[22] *See id.* ¶ 21.

Before finally deciding to enroll at SBI, Ms. Colon went to SBI to speak with a representative again.[23] At her co-worker's urging, she asked an SBI representative whether the program was accredited for cardiac sonography.[24] The SBI representative said, "Oh yes, we are accredited," and pointed to a plaque on the wall, which had the word "accredited."[25] Ms. Colon accordingly decided to enroll in SBI's Non-Invasive Cardiovascular Technology certificate program (SBI did not offer a degree program in this field of study).[26]

When Ms. Colon went back to SBI to complete her financial aid paperwork, she asked a financial aid representative what salary she could expect to earn in a sonography job upon graduation. The representative informed Ms. Colon that she would definitely get a job as a sonographer when she graduated from SBI, and that she would earn $50,000 to $60,000 annually in that job.[27] Ms. Colon took out substantial debt, including federal and private loans, to pay for her tuition.[28]

Toward the end of the first year of her course of study, Ms. Colon and her classmates heard rumors that graduating students were unable to sit for the industry-standard American Registry for Diagnostic Medical Sonography (ARDMS) certification examination.[29] Alarmed, Ms.

---

[23] *See id.* ¶¶ 22, 24.

[24] *See id.* ¶ 23.

[25] *See id.* ¶ 24.

[26] *See id.* ¶ 25.

[27] *See id.* ¶¶ 27–28.

[28] *See id.* ¶ 4; *see also id.* Ex. A (National Student Loan Data System (NSLDS) data) & Ex. D (Navient statement).

[29] *See* Colon Aff. ¶ 31. As a U.S. Senate Committee explained in a scathing report that documented widespread misconduct by for-profit higher education institutions, a de facto requirement for graduates of certificate programs to obtain employment as a sonographer is successful completion of the licensing examination administered by ARDMS. *See* STAFF OF S. COMM. ON HEALTH, EDUC., LABOR, & PENSIONS, FOR PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 103 & n.411 (July 30, 2012), *available at* http://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf [hereinafter "S. HELP REP." or "Senate HELP Report"]. An individual with a certificate in sonography may only sit for the ARDMS examination in one of two circumstances: if she graduated from a certificate program accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP), or if she has worked full-time, in a paid position as a sonographer for a least a year. *See* ARDMS, *SPI Requirement and General Prerequisites*, at 2, 5 nn.2–3, http://www.ardms.org/files/downloads/Prerequisite_Chart.pdf [Glick Decl. Ex. B]. As noted by the Senate HELP Committee, "most employers seek to hire only registered sonographers," and "gaining work experience in lieu of an accredited degree can be very challenging. Accordingly, while State law does not create an absolute barrier to practicing for students from unaccredited programs, the practical effect can be the same . . . ." *See* S. HELP REP. 102; *see also* Assurance ¶ 32 (describing "catch-22" of graduates of SBI ultrasound programs in finding employment without certification); *see also* Assurance p. 30 nn. 2–3

Colon's classmates raised their concerns with SBI's Director, Dr. Naoufel Brahmi. The Director's response was to visit Ms. Colon's class to assure her and her classmates that they had nothing to worry about, for two reasons. First, although the sonography program was not accredited — the first time that SBI informed Ms. Colon of that fact — SBI was supposedly going through the accreditation process, so Ms. Colon and her classmates would be eligible to take the necessary certification examination. Second, SBI reassured the students that their upcoming externships would lead to ultrasound jobs, so that even if the program did not become properly accredited, they would be eligible to take the certification examination after one year working in the cardiac ultrasound field.[30] Given the Director's comments, Ms. Colon decided to remain enrolled, and to continue into the second year of SBI's program — taking out more loans in the process.[31]

As part of SBI's certificate program, Ms. Colon was assigned to complete two consecutive externships, neither of which led to employment. At her first externship, at NYU,[32] her supervisor repeatedly expressed dismay that unlike externs from other schools,[33] the SBI externs were ill-prepared to work in a clinical setting.[34] Ms. Colon's cohort was the first SBI cohort that NYU accepted for externship placements,[35] and based on NYU's experience with SBI's training, it was also the last cohort.[36] Neither Ms. Colon nor any of her classmates received a job offer from NYU after the externship.[37] Ms. Colon's second externship placement was at a Veteran Affairs Hospital in Manhattan.[38] This externship did not lead to a sonography job.[39] From what Ms. Colon heard from the externship coordinator at each site, those hospitals were not interested in hiring SBI graduates based on the lack of hands-on experience in SBI's curriculum.[40]

---

(qualifying exam and/or credential is "typically necessary" for employment in field where more than 50% of jobs require passage of an exam or possession of a credential).

[30] *See* Colon Aff. ¶¶ 32–33.

[31] *See id.* ¶ 34; *see also* Colon Aff. Ex. A (NSLDS data).

[32] *See* Colon Aff. ¶ 36.

[33] *See id.* ¶ 37.

[34] *See id.* ¶ 38.

[35] *See id.* ¶ 37.

[36] *See id.* ¶ 39.

[37] *See id.* ¶ 40.

[38] *See id.* ¶ 36.

[39] *See id.* ¶ 41.

[40] *See id.* ¶¶ 40–41.

Shortly after earning her certificate in sonography from SBI in May 2008,[41] Ms. Colon attempted to register for the certification exam.[42] About a month later, ARDMS returned her application with a letter stating that she was ineligible to even sit for the exam, because she had not submitted documentation that she had graduated from an accredited sonography program.[43]

Ms. Colon thus faced an insurmountable Catch 22: because of SBI's lack of accreditation, she could only sit for the ARDMS exam if she had job experience.[44] But despite her best efforts,[45] she could not find a job without the ARDMS certification in hand. At every job she applied to, employers asked if she already had her license. After she answered no, she never received a callback.[46]

Nor was SBI of any help. To the contrary, Ms. Colon had to conduct her cardiac sonography job search on her own, because SBI's promises of job placement assistance never materialized. She regularly called SBI to ask if they knew of any available positions,[47] but they never provided her any leads.[48] Frustrated that SBI did not provide the job placement resources that it had guaranteed her when she enrolled, she eventually filed a complaint with the SBI Director, Dr. Brahmi.[49] As a result of that complaint, SBI eventually arranged a single, telephone interview for her. The interviewer, a physician, was unprofessional during the interview, and Ms. Colon had a horrible feeling about the job. She later found out from SBI classmates who went to work for that physician that they had quit after being forced to work twelve-hour days without legally required breaks.[50]

Unable to find work in the cardiac sonography field, Ms. Colon eventually found employment in medical billing — the same sector she worked in before attending SBI.[51] Without a license, she remains ineligible to work in the sonography field.

---

[41] *See id.* ¶ 42; *see also* Colon Aff. Ex. B (SBI Certificate).

[42] *See* Colon Aff. ¶ 48.

[43] *See id.* ¶¶ 49–50; *see also* Colon Aff. Ex. C (ARDMS letter).

[44] *See* Colon Aff. ¶ 51.

[45] *See id.* ¶¶ 43–47.

[46] *See id.* ¶ 47.

[47] *See id.* ¶ 43.

[48] *See id.* ¶ 46.

[49] *See id.* ¶ 44.

[50] *See id.* ¶ 45.

[51] *See id.* ¶ 51.

Furthermore, Ms. Colon made unsuccessful attempts to apply her SBI certificate towards a legitimately accredited credential. During her attendance, SBI representatives repeatedly represented that, upon graduation, Ms. Colon would have the option of transferring her credits toward an associate degree program. But when Ms. Colon attempted to register at Borough of Manhattan Community College in 2008, she learned that these representations were false. Her SBI credits were not transferrable, because SBI as an institution did not have the accreditation necessary for other, legitimate institutions to accept her credits.[52]

## II.     SBI Repeatedly Violated Ms. Colon's Rights Under New York Law

SBI's unfair and misleading conduct toward Ms. Colon constituted an ongoing series of violations of New York's General Business Law § 349 (GBL). That statute prohibits "[d]eceptive acts or practice in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.[53] This consumer protection statute was adopted "to even the playing field" between consumers and "better funded and superiorly situated fraudulent businesses."[54]

"A plaintiff under [GBL] section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."[55]

There can be no question that SBI's entire interaction with Ms. Colon was "consumer oriented." New York courts have repeatedly held that companies selling post-secondary educational services engage in "consumer-oriented" conduct within the scope of section 349.[56] Moreover, the existence of the OAG investigation into SBI's conduct (to which Ms. Colon was subject) and the subsequent Assurance of Discontinuance provide indisputable proof of the consumer-oriented nature of SBI's misconduct. The OAG is authorized, "in the name of and on behalf of the people of the state of New York," to act against "any person, firm, corporation or association" who "has engaged in or is about to engage in" acts proscribed by section 349.[57] By committing its scarce resources to investigate and prosecute SBI, the OAG necessarily

---

[52] *See id.* ¶ 52.

[53] *See* N.Y. Gen. Bus. Law § 349(a).

[54] *See Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995) (internal quotations omitted).

[55] *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).

[56] *See, e.g., Ansari v. N.Y. Univ.*, No. 96 Civ. 5280, 1997 WL 257473 (S.D.N.Y. May 16, 1997); *Moy v. Adelphi Inst., Inc.*, 886 F. Supp. 696 (E.D.N.Y. 1994); *Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 58 (1st Dep't 2012); *Enzinna v. D'Youville Coll.*, 946 N.Y.S.2d 66 (Sup. Ct. 2010), *aff'd*, 922 N.Y.S.2d 729 (4th Dep't 2011); *Chais v. Technical Career Insts.*, No. 0114949/2001, 2002 WL 34433891 (N.Y. Sup. Ct. 2002); *Bevelacqua v. Brooklyn Law Sch.*, 975 N.Y.S.2d 365 (Sup. Ct. 2013).

[57] N.Y. Gen. Bus. Law § 349(b).

determined that the conduct in question affected the public interest and consumers at large. This conduct is therefore presumptively consumer-oriented conduct within the meaning of GBL § 349.[58]

Moreover, the OAG has already made official findings that several of CEC's practices toward students and prospective students "constitute[d] repeated violations of General Business Law Article 22-A," including section 349 — *i.e.*, these practices were "consumer-oriented," materially deceptive and misleading, and injured students.[59]

Specific to Ms. Colon, three specific aspects of SBI's consumer-oriented conduct were materially misleading and injured Ms. Colon. First, SBI misrepresented and omitted crucial information about its programmatic accreditation status, which led Ms. Colon to believe that the program would permit her to sit for the necessary credentialing exam, and had the potential to lead to gainful employment in her field of study. Second, SBI misled Ms. Colon about the job placement assistance it would provide her and the types of jobs she supposedly was guaranteed to find, and failed to provide the job placement assistance that might have enabled Ms. Colon to obtain employment in her field notwithstanding the fact that SBI lacked the necessary accreditation. Third, SBI gave Ms. Colon patently false information about the transferability of its credits, leaving her unable to pursue further education at a reputable and affordable institute of higher education without starting from scratch.

### A. SBI Violated New York's GBL by Deceiving Ms. Colon About Its Programmatic Accreditation Status

The overlap — indeed, identity — between Ms. Colon's own experience with SBI, and the OAG's findings that SBI regularly presented false and misleading information to prospective and current students concerning programmatic accreditation, compels the conclusion that SBI violated the GBL in relation to Ms. Colon.

SBI's representations to Ms. Colon about its accreditation status were unquestionably false and misleading. Before Ms. Colon ever enrolled at SBI, she sought assurances that SBI was properly accredited. Not only did SBI deceive her about its accreditation status before she enrolled, but SBI continued to engage in a pattern of deceptive conduct to cover up its lack of programmatic accreditation, when the Director falsely assured Ms. Colon and her classmates that that SBI had any control over the supposedly ongoing CAAHEP accreditation process and that the students would be able to obtain jobs regardless of the accreditation outcome.

---

[58] *See Vitolo v. Mentor H/S, Inc.*, 213 F. App'x. 16 (2d Cir. 2007) (interpreting GBL § 349) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 56 F.3d 256, 264-65 (2d Cir. 1995)).

[59] *See* Assurance ¶¶ 1–43.

In fact, as CEC's Vice President of Regulatory Review has admitted, SBI's Non-Invasive Cardiovascular Technology program "has never been programmatically accredited."[60] Yet, during the entire time Ms. Colon was enrolled at SBI, SBI's website never disclosed the Non-Invasive Cardiovascular Technology program's lack of accreditation. In fact, it suggested the opposite. For example, around the time Ms. Colon first enrolled, SBI's website advertised the Non-Invasive Cardiovascular Technology program as an "exciting . . . career training program," "designed to prepare students for entry-level jobs in the healthcare field that may involve . . . [p]erforming non-invasive cardiovascular procedures," and made no mention of the lack of accreditation.[61] The website was updated in March 2008 to disclose, for the first time, that SBI "[could not] guarantee that graduates will be eligible to take certification exams at all or at any specific time."[62] Even still, the website made no mention of the fact that the program lacked CAAHEP accreditation. Even with the updated website, then, and for the entire time that Ms. Colon was enrolled at SBI, SBI was in violation of the Federal Trade Commission (FTC) requirement that when a vocational school "offers courses or programs of instruction that are not accredited, all advertisements or promotional materials pertaining to those courses or programs, and making reference to the accreditation of the school, should clearly and conspicuously disclose that those particular courses or programs are not accredited."[63] Similarly, SBI violated the federal regulatory requirement that higher education institutions refrain from making "false, erroneous or misleading statements concerning . . . [t]he particular type(s), specific source(s), nature and extent of [their] institutional, programmatic, or specialized accreditation."[64]

---

[60] *See* E-mail from Jill A. DeAtley, Vice President of Regulatory Review, Career Educ. Corp. (Aug. 19, 2013) [Glick Decl. Ex. C]. SBI's archived websites also make clear that SBI-New York lacks CAAHEP accreditation. *See, e.g.*, *Accreditation and Certification*, SANFORD-BROWN (Apr. 2, 2010), http://web.archive.org/web/20100402035756/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (not listing SBI's New York campus as among CAAHEP-accredited programs) [Glick Decl. Ex. D]; *Accreditation and Certification*, SANFORD-BROWN (Jan. 11, 2011), http://web.archive.org/web/20110111064842/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (same) [Glick Decl. Ex. E]; *Accreditation and Licensure*, SANFORD-BROWN (Nov. 6, 2013), http://web.archive.org/web/20131106061316/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (not listing SBI's New York campus as among CAAHEP-accredited Cardiovascular Sonography/Technology programs) [Glick Decl. Ex. F].

[61] *See Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Oct. 23, 2006), https://web.archive.org/web/20061023183826/http://www.sbnewyork.com/programs/cardiovascular.asp [Glick Decl. Ex. G]; *Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Aug. 17, 2007), https://web.archive.org/web/20070817072236/http://www.sbnewyork.com/programs/cardiovascular.asp [Glick Decl. Ex. H].

[62] *See Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Mar. 19, 2008), https://web.archive.org/web/20080319002138/http://www.sanford-brown.edu/campus/59/programs.asp?map=18 [Glick Decl. Ex. I].

[63] *See* 16 C.F.R. § 254.3(a)(1) (2005) (version in effect at the time of SBI's misrepresentations to Ms. Colon).

[64] *See* 34 C.F.R. § 668.72(a).

Moreover, the limited "disclosure" that SBI did provide to Ms. Colon was itself highly deceptive and misleading. For example, SBI claimed — in direct contradiction to the OAG's and Senate HELP Report's conclusions — that "programmatic accreditation is not required for employment in most cases."[65] SBI also explained only in general terms that several of its programs were "not currently programmatically accredited,"[66] and failed to disclose "clearly and conspicuously,"[67] as the OAG requires, that Ms. Colon's specific program, in Non-Invasive Cardiovascular Technology at the New York campus, lacked programmatic accreditation. The "disclosure" template provided to Ms. Colon presumably would fail to satisfy the terms of the Assurance that CEC is now enjoined to follow, to prevent future violations of the GBL.[68] In any event, New York's highest court has unequivocally held that an inadequate disclaimer is insufficient to defeat a GBL claim where oral representations contradict the substance of the disclosure.[69]

The OAG found, consistent with Ms. Colon's experience, that SBI's disclosures about programmatic accreditation were misleading,[70] and misleading in a way that violated the GBL. According to the OAG, SBI's "graduates faced a 'Catch 22'" in that "most employers viewed certification as a requirement for employment, but graduates were ineligible for certification until they obtained one year of employment."[71]

---

[65] *See* SBI, "Accreditation/Certification Information" (June 26, 2006) [Glick Decl. Ex. J].

[66] *See id.*

[67] *See* Assurance p. 31.

[68] Assurance ¶ 37, p. 31 (emphasis added); *see id.* p. 31 (requiring that CEC "clearly and conspicuously" disclose to all prospective students: if a program lacks programmatic accreditation; that graduates of such programs "are not able to sit for certain qualifying exams typically necessary for employment immediately upon graduation or are unable to become registered, licensed, or otherwise credentialed, as applicable, due to the program's or institution's lack of accreditation[;] and that such registration, license, or other credential is typically necessary for employment").

[69] *See Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y. 2d 330, 345 (1999) (GBL standard is whether, considering a defendant's overall course of deception along with any "disclaimers," "reasonable consumers would be misled in a material way").

[70] According to the OAG, SBI, among other CEC institutions, "failed to adequately disclose to prospective and current students that" its health services programs, including the Cardiovascular Sonography program attended by Ms. Colon, "[1] were not programmatically accredited; [2] that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation, and [3] that graduates' inability to sit for these exams could negatively affect their employment opportunities." Assurance ¶¶ 32–33. SBI's failure "to provide clear and conspicuous disclosures concerning the programmatic accreditation status of SBI programs on its websites" constituted an additional GBL violation. *Id.* ¶¶ 34–37, 43.

[71] *See id.* ¶ 32; *accord* S. HELP REP. 103, 106–08.

The OAG's conclusion — that SBI's misrepresentation of its programmatic accreditation violated the GBL — is consistent with judicial conclusions in similar circumstances. Courts have unanimously held that ultrasound schools' misrepresentations about programmatic accreditation violate consumer protection statutes, and in particular, constitute materially misleading representations. For example, New Jersey's appellate court has held that a graduate of an ultrasound program stated a cause of action for the violation of a consumer protection statute when: (1) a school not accredited by CAAHEP failed to disclose that graduates could not sit for an ARDMS examination; and (2) the school's dean told a student during her course of study that "she did not need to worry about" ARDMS certification until after graduation.[72] The court held that such "affirmative misrepresentations . . . satisf[ied] the criteria for materiality" under the relevant consumer protection statute.[73] Similarly, a California Court of Appeal upheld a judgment for fraud against an ultrasound school director who informed students that upon completion of a non-CAAHEP-accredited program, they would be able to "obtain positions as ultrasound technicians" and be eligible to take and pass the ARDMS exam.[74] Scores of cases are in accord.[75]

The OAG's conclusion is also consistent with federal law. Specifically, the FTC's Guides for Private Vocational and Distance Education Schools similarly provides that an institute of higher education carries out "deceptive" conduct when it "misrepresent[s], directly or indirectly, the extent or nature of . . . accreditation by an accrediting agency or association."[76] New York courts, in turn, follow the FTC's interpretations as a persuasive guide to determine which deceptive acts and practices violate New York's GBL.[77]

---

[72] *Suarez v. E. Int'l Coll.*, 50 A.3d 75, 80 (N.J. Super. Ct. App. Div. 2012).

[73] *See id.* at 90.

[74] *See Chen v. Instit. of Med. Educ.*, No. 1-11-cv205651, 2014 WL 5409153, at *10 (Cal. Ct. App. Oct. 24, 2014).

[75] *See, e.g.*, *Illinois v. Alta Colls., Inc.*, No. 14-c-3786, 2014 WL 4377579 (N.D. Ill. Sept. 4, 2014) (denying motion to dismiss consumer protection claims based on allegations, *inter alia*, that school falsely informed students that it was accredited); *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 14 (1st Cir. 2004) ("actionably misleading" for a school official to mislead a student to believe that the school could guarantee the outcome of an external accreditation process); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226 (E.D. Pa. 1999) (certifying consumer protection class claims brought by UDS students unable to obtain work or sit for the ARDMS exam because UDS lacked CAAHEP accreditation); *Cavaliere v. Duff's Bus. Instit.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (recognizing cause of action where a "school has asserted that it is accredited or licensed . . . and it is later discovered that this is false"); *Malone v. Acad. of Court Reporting*, 582 N.E.2d 54, 58–59 (Ohio Ct. App. 1990) ("recogniz[ing] . . . that an action for misrepresentation would lie for untrue or misleading statements about accreditation").

[76] 16 C.F.R. § 254.3(a) (2005).

[77] *See, e.g.*, *People ex rel. Spitzer v. Applied Card Systems, Inc.*, 805 N.Y.S.2d 175, 178 (3d Dep't 2005) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)).

**B. SBI Violated New York's GBL by Misleading Ms. Colon About Its Job Placement Assistance**

SBI further violated the GBL when it misled Ms. Colon about the job placement assistance it would provide and the types of jobs she supposedly was guaranteed to find, and failed to provide the job placement assistance that might have enabled Ms. Colon to obtain employment in her field notwithstanding the fact that SBI lacked the necessary accreditation. SBI materially misrepresented to Ms. Colon the job placement assistance it would provide, and her likelihood of obtaining a job in her field of study.

First, before she enrolled, an SBI representative informed Ms. Colon that she "would definitely get a job as a sonographer" when she graduated from SBI, and that she would earn $50,000 to $60,000 annually in that job.[78] Second, SBI's Director falsely claimed that Ms. Colon's and her classmates' externships would lead to permanent jobs in the ultrasound field. Finally, SBI provided virtually none of the job placement assistance it had promised; what little assistance it did provide came only at Ms. Colon's insistence and in the form of a single referral to a physician with a dubious reputation.

SBI's misconduct toward Ms. Colon is typical of its business model as a whole. For example, notwithstanding its lack of programmatic accreditation, at the time of Ms. Colon's enrollment, SBI's website touted as among the "Top Ten" reasons for attending SBI both: 1) "Career Placement Assistance with healthcare industry contacts to help Sanford-Brown students with professional career development and job opportunities" and 2) "**Have the opportunity to gain industry-current job skills to help make you marketable and employable in the healthcare or medical field.**"[79]

These practices are materially misleading. Ms. Colon attended SBI precisely because she reasonably believed, based on SBI's representations, that SBI's program would allow her to advance her career in the medical field. During her tenure as a student, SBI perpetuated the impression that her sonography certificate would lead to a permanent job. But SBI's promised job placement assistance never materialized — in retrospect, perhaps unsurprisingly, in light of the fact that SBI knew the certificate was virtually meaningless given SBI's lack of programmatic accreditation.

---

[78] *See* Colon Aff. ¶ 28.

[79] *See Top Ten Reasons to attend SBI New York*, SANFORD-BROWN (Oct. 23, 2006), http://web.archive.org/web/20061023183837/http://www.sbnewyork.com/topten.asp (emphasis in the original) [Glick Decl. Ex. K].

The OAG, moreover, has already found that similar misconduct by CEC, including at SBI campuses, violates the GBL.[80] As the OAG has explained, "[s]tudents choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly," the OAG found, representations to students about job outcomes and job "placement rate[s] is an important factor in students' decision to enroll in and complete CEC programs."[81]

Indeed, proprietary schools such as SBI are permitted to participate in the Title IV loan program only on the condition that such institutions comply with all statutory and regulatory requirements,[82] including that they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation."[83] For that reason, federal regulations prohibit an institution of higher education from making "false, erroneous or misleading statements concerning . . . [t]he institution's plans to maintain a placement service for graduates or otherwise assist its graduates to obtain employment[, and t]he institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared."[84]

### C. SBI Violated New York's GBL by Misleading Ms. Colon About The Transferability of SBI's Credits

Finally, SBI violated the GBL by deceiving Ms. Colon about the transferability of SBI's credits. SBI representatives misled Ms. Colon that she could transfer her credits toward an associate degree program at another institution. Such misrepresentations by CEC — the OAG has already found — constitute violations of the GBL.[85]

Contrary to SBI's representations to Ms. Colon, SBI's credits were not transferrable to most public and non-profit degree granting educational institutions, because those institutions are

---

[80] *See* Assurance ¶¶ 19–22, 43.

[81] *See id.* ¶ 20.

[82] *See* 34 C.F.R. § 668.14(a), (b)(1).

[83] *See* 20 U.S.C. § 1002(b)(1)(A)(i). Each of SBI's job-placement-related deceptive practices individually — and certainly taken as a whole — also violate the FTC's Guidelines. *See* 16 C.F.R. § 254.4(a)(3) (2005) (providing that it is "deceptive" for a proprietary school to "[m]isrepresent the availability of employment while the student is undergoing instruction or the role of the school in providing or arranging for such employment"); *id.* § 254.4(d) ("deceptive" for a proprietary school to "misrepresent . . . the availability of employment after graduation from a course of training, the success that the member's graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment").

[84] *See* 34 C.F.R. § 668.74(b), (c).

[85] *See* Assurance ¶¶ 38–40, 43.

"regionally, rather than nationally, accredited."[86] CEC, in contrast, was nationally accredited. Thus, as the OAG has explained, "credits earned at CEC's nationally-accredited schools are generally not transferrable to public and non-profit degree-granting educational institutions."[87] And as the OAG has found, corroborating Ms. Colon's own experience, "CEC enrollment representatives fail to adequately disclose to prospective students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions."[88]

Both the FTC's and the U.S. Department of Education's regulations alike recognize that proprietary schools engage in materially misleading conduct when they deceive students about the transferability of credits. For example, the FTC recognizes that a proprietary school acts deceptively when the school "[m]isrepresent[s] that students successfully completing a course or program of instruction can transfer the credit to an accredited institution of higher education."[89] And a higher education institution violates the Higher Education Act when it makes "false, erroneous or misleading statements concerning . . . [w]hether a student may transfer course credits earned at the institution to any other institution."[90]

### D. Ms. Colon Suffered Injury as a Result of SBI's Materially Misleading and Deceptive Acts

Ms. Colon's injury from SBI's misconduct takes several forms.

First and foremost, based on SBI's misrepresentations,[91] Ms. Colon enrolled in, and decided to remain enrolled at, SBI, which drew down approximately $14,838 in Stafford loans in Ms. Colon's name in 2006 and 2007. Despite the payments Ms. Colon has already made, that amount, including interest, has since ballooned to an outstanding federal loan balance for Ms. Colon of $22,130.96.[92]

---

[86] *See id.* ¶ 38.

[87] *See id.*

[88] *See id.* ¶ 39.

[89] *See* 16 C.F.R. § 254.3(a)(3) (2005).

[90] *See* 34 C.F.R. § 668.72(b)(1).

[91] Although "reliance is not an element of a [GBL] section 349 claim," *see Stutman*, 95 N.Y.2d at 29, the fact that Ms. Colon did rely on SBI's misrepresentations establishes that in her case, SBI's "'material deceptive act[s]' caused [her] injury," *see id.* Other students may be able to establish causation and injury under the GBL, and accordingly, defenses to repayment, notwithstanding their lack of reliance.

[92] *See* Colon Aff. Ex. D (Navient Statement).

Second, given the extraordinary cost of SBI's program, Ms. Colon was also forced to take out additional private loans to cover that portion of tuition that exceeded maximum annual federal loan allowances,[93] and to cover living expenses when she had to quit her job to complete required externships. With interest, that separate loan balance now totals $29,284.13.

Third, SBI's deceptive course of conduct about its lack of programmatic accreditation induced Ms. Colon to enroll in its program, rather than an accredited program, and thereby prevented Ms. Colon from obtaining a job in her chosen field of study. While SBI was enriched by the student loans disbursed at Ms. Colon's expense, Ms. Colon was left stymied in her efforts to advance in her career, and remains employed in the same career, medical billing, as before she became indebted to SBI. Had SBI not lured Ms. Colon into its unscrupulous program, she could have invested her time in a course of study at an accredited institution. This non-pecuniary harm, attributable to SBI's deceptive and illegal practices, is another form of injury under New York law.[94]

Moreover, as discussed throughout this request, in 2013, the OAG made findings concerning CEC's "repeated violations" of the GBL, including at SBI's New York location, based on SBI's deceptions about its lack of programmatic accreditation, its misleading disclosures about job placement, and its deceptive statements about the transferability of SBI credits.[95] Pursuant to the OAG's Assurance of Discontinuance with CEC, SBI graduates such as Ms. Colon who had enrolled in SBI's programs lacking programmatic accreditation and met other qualifications were entitled to receive restitution from a limited fund.[96] Ms. Colon in fact received $3,094.93 from that fund, as very limited and partial restitution for SBI's wrongdoing. Her qualification for restitution under the OAG's Assurance with SBI's parent company reinforces that she was in fact injured by SBI's misconduct.

In light of the foregoing, in all practical senses, Ms. Colon's degree is practically worthless. The difference between what she was promised and what she actually obtained as a result of attending SBI is cognizable under the GBL.[97]

---

[93] CEC has acknowledged that the Department of Education's "maximum annual borrowing limits with respect to Stafford Loans . . . are generally less than the tuition costs" at its schools. *See* Career Educ. Corp., Annual Report (Form 10-K) (Feb. 28, 2008), *available at* https://www.sec.gov/Archives/edgar/data/1046568/000119312508041800/d10k.htm.

[94] *See Stutman*, 95 N.Y.2d at 29 (both pecuniary and non-pecuniary harm satisfy the GBL's injury requirement).

[95] *See* Assurance ¶¶ 1–43.

[96] *See* Assurance pp. 35–37.

[97] A plaintiff suffers compensable injury under section 349 when his or her "expectations were actually not met" in a consumer transaction. *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 212 (2001). In New York, plaintiffs "adequately allege…injury or damage" under section 349 where they "have

## III.    Ms. Colon Has a Complete Defense to the Repayment of Her FFELP Loans

SBI lured Ms. Colon into enrolling on false pretenses; prolonged her enrollment through repeated material misrepresentations; and left her with a worthless certificate. Under federal law and the terms of her MPN, and given SBI's relationship with the lender for Ms. Colon's FFELP loans, Ms. Colon has a complete defense to the repayment of her FFELP loans based on SBI's violations of New York law.

### A. Federal Regulations and the Mastery Promissory Note Establish Ms. Colon's Right to a Defense to Repayment Based on SBI's Misconduct

For decades, the Department has recognized the Secretary's "long-standing authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."[98] Consistent with that authority, Congress also squarely contemplated that under these circumstances, borrowers such as Ms. Colon would not be required to repay their FFELP loans. Pursuant to the Higher Education Amendments of 1992, "Congress . . . directed the Secretary to develop a 'Common Guaranteed Student Loan Application Form and Promissory Note' specifying the contractual terms governing [FFELP] student loans, and to study the possibility of permitting students to raise fraud-based state law defenses against repayment of student loans."[99] Directly in response to Congress's directive, "the Secretary prepared a common promissory note and included in it a provision modeled on the FTC Holder Rule that was directed specifically at lenders affiliated with for-profit schools."[100]

That promissory note provides:

> If this loan is made by the school, or if the proceeds of this loan are used to pay tuition and charges of a for-profit school that refers applicants to the lender, or that is affiliated with the lender by common control, contract or business

---

alleged that they each were induced to part with [thousands of dollars] in tuition by defendant's alleged misrepresentations of fact and/or unfulfilled promises" about the value of educational programs. *Enzinna*, 946 N.Y.S.2d 66, at *4; *see also Brown v. Hambric*, 638 N.Y.S.2d 873, 877 (Yonkers City Ct. 1995) (plaintiff sufficiently alleged injury under section 349 where she paid hundreds of dollars "for educational services" that defendant represented would "provide the training and education necessary to become a professional travel agent," when in fact it did not).

[98] *See* 60 Fed. Reg. 37,768, 37,769 (July 21, 1995) (quoting 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994)) (discussing FFELP loans).

[99] *See Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1365 (D.C. Cir. 1999) (citing Pub. L. No. 102-325)); *see also* 60 Fed. Reg. 37,768, 37,769.

[100] *See Armstrong*, 168 F.3d at 1365.

arrangement, *any holder of this Note is subject to all claims and defenses which I could assert against the School.*[101]

Federal regulations codify this Master Promissory Note language and provide that any entity

holding a [FFELP] loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan if—

(1) The loan was made by the school or a school-affiliated organization;
(2) The lender who made the loan provided an improper inducement, as described in paragraph (5)(i) of the definition of Lender in § 682.200(b), to the school or any other party in connection with the making of the loan;
(3) The school refers borrowers to the lender; or
(4) The school is affiliated with the lender by common control, contract, or business arrangement.[102]

Federal law and regulations governing defenses to repayment of Direct Loans based on schools' violations of state or federal law also inform the availability of a defense to Ms. Colon's repayment of her FFELP loans under these circumstances.[103] And the Secretary recently confirmed that a Direct Loan borrower may assert a defense to repayment even when the loan is not delinquent. In a letter to several Senators, including Elizabeth Warren, dated August 4, 2014, concerning Corinthian Colleges, Secretary Duncan wrote, "[A] borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department."[104]

As thoroughly described above, Ms. Colon has demonstrated the requisite misconduct by SBI that entitles her to a defense to the repayment of her federal loans.[105] The affidavits of Ms. Colon

---

[101] *See* "Application and Promissory Note," subsection "Governing Law and Notices" (attachment to "Dear Colleague" letter (Apr. 16, 1993)) (emphasis added) [Glick Decl. Ex. L].

[102] *See* 34 C.F.R. § 682.209(g); *see also* Letter from Acting Asst. Sec'y Whitehead to Congressman Stephen Solarz (May 19, 1988) (explaining the Department's longstanding position that even before the 1992 Higher Education Act amendments, "[i]f a loan is not legally enforceable, it is not reinsurable by the Department") [Glick Decl. Ex. M].

[103] *See* 20 U.S.C § 1087e(h); 34 C.F.R. § 685.206(c).

[104] Letter from Sec'y Duncan to Sen. Warren, at 4 (Aug. 4, 2014). The Direct Loan regulations are also persuasive given that in other contexts, the Secretary has explained the absence of a regulation under the FFEL loan program does not mean that FFEL loans are not subject to state law defenses to repayment. *See* 71 Fed. Reg. 45,666, 45,676–77 (Aug. 9, 2006) (discussing identify theft false certification discharge). Moreover, the Department has explained that the "Direct Loan regulations are intended to ensure that institutions participating in the FFEL and Direct Loan programs have a similar potential liability." *See* 60 Fed. Reg. 37,768, 37,769.

[105] *See* 34 C.F.R. § 682.209(g); 34 C.F.R. § 685.206(c).

and her counsel, and the exhibits thereto, including the Assurance of Discontinuance between OAG and CEC, all point unmistakably to SBI's conduct that renders her FFELP loans unenforceable.

As the Department has recognized, a "borrower is not required to sue or obtain a judgment against [a] school in order to assert [a] claim against the school as a defense to repayment."[106] Even so, Ms. Colon's claims are all the stronger given the OAG's definitive findings regarding CEC's misconduct. The Department has also explained that a "borrower or class of borrowers who obtain a judgment against a school upholding a claim can more readily establish that claim as a defense to repayment."[107] Here, the Assurance stands in lieu of a judgment, and represents the OAG's determination — and CEC's acquiescence to that determination — that CEC had violated New York law.[108]

### B. CEC's Relationship with Sallie Mae Entitles Ms. Colon to Invoke the Holder Rule

As set forth above, there are four independent scenarios under which a FFELP borrower such as Ms. Colon is entitled, under federal law and the Master Promissory Note, to assert, against any current loan holder, a claim that the borrower could assert directly against the school.[109] Each of those four scenarios is satisfied here.

Most evidently, SBI "referred [Ms. Colon] to the lender" of her FFELP loans (and incidentally, her private loans), Sallie Mae, pursuant to a preferred lender relationship.[110] As

---

[106] Letter from Sec'y Duncan to Sen. Warren, at 4 (Aug. 4, 2014).

[107] *Id.*

[108] New York decisional law supports the proposition that, even absent an express admission of wrongdoing, a duly executed Assurance of Discontinuance serves to prove, "as a matter of law," that acts set forth in the AOD constitute violations of the law. *Geiger v. Town of Greece*, No. 07 Civ. 6066, 2007 WL 4232717, at *6 (W.D.N.Y. Sept. 4, 2007); *see also Millenium Partners, L.P. v. Select Ins. Co.*, 24 Misc. 3d 212, 218 (Sup. Ct. N.Y. Cty. 2009) (finding AOD not "susceptible to any other interpretation" than that the defendant violated the law in question). The very authority of the OAG to enter into the Assurance with CEC is predicated on the conduct identified, and in the future restrained, being illegal. The OAG is authorized by New York Executive Law, in lieu of prosecuting a civil action or proceeding as authorized by any law of the state, to "accept an assurance of discontinuance of any act or practice in violation of such law *from any person engaged or who has engaged in any such act or practice.*" N.Y. Exec. Law § 63(15) (emphasis added). Although CEC was not required to concede its liability under the AOD, *see* Assurance p. 14 (setting forth that CEC "neither admits nor denies OAG's Findings"), CEC agreed not to challenge, contest, or otherwise contradict that the OAG's findings were supported by the evidence, *see id.* p. 39 (preventing CEC from "denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis").

[109] *See* 34 C.F.R. § 682.209(g).

[110] *See id.* § 682.209(g)(3); FFELP Federal Stafford Loan MPN (July 8, 2006) [Glick Decl. Ex. N].

stated in her affidavit, when Ms. Colon filled out her financial aid paperwork in 2006, SBI chose the FFELP lender for Ms. Colon, and did not permit her any opportunity to select the lender.[111] And as the Department has unambiguously explained — consistent with the plain text of the regulation — "the Holder Rule applies where a school recommends a particular lender."[112]

Moreover, the safe harbor provision that may be available in some situations, when a "lender has a good-faith belief that [there was] no recommendation" by the school of a particular lender, has no applicability here.[113] As the Department has also explained, "a lender that sends the school promotional material regarding its lending activity would have good reason to believe that loan applications it receives from that school were the result of school recommendation," and therefore no "good-faith belief" that no school recommendation occurred.[114] The following facts vitiate any possibility that Sallie Mae could have such a good-faith belief.

Around the time that SBI chose Sallie Mae as the lender for Ms. Colon's loans, Sallie Mae widely touted that its "sales force, which works with financial aid administrators on a daily basis, [was] the largest in the industry," and that schools' "financial aid office[s]" were Sallie Mae's "primary marketing point-of-contact" for its lending activity, especially at "for-profit schools."[115]

Unsurprisingly, given Sallie Mae's aggressive marketing activity, CEC's schools included Sallie Mae on their preferred lender list. In fact, in 2007, following an investigation of CEC's and other institutions' lending practices, the OAG and the Office of the Illinois Attorney General jointly determined that Sallie Mae and another lender had paid more than $21,000 to CEC, while those lenders were on CEC's preferred lender list, in violation of New York's GBL and Illinois consumer protection statutes.[116] The Attorneys General explained that CEC's misconduct, by

---

[111] *See* Colon Aff. ¶ 30 & Exs. A & D (showing NSLDS data, including lender information). The successor in interest to Ms. Colon's original FFELP lender is "Deutsche Bank ELT Navient & SLM Trusts." *See id.* Ex. A. As an eligible lender trustee (ELT), Deutsche Bank acts as a trustee to Navient and SLM, successors in interest to Sallie Mae. *See, e.g.*, 20 U.S.C. § 1085(d)(7).

[112] U.S. Dep't of Educ., *Overview: Federal Trade Commission (FTC) Holder Rule*, at 3 (July 2, 1993) [hereinafter "*Overview: Holder Rule*"] [Glick Aff., Ex. O].

[113] *See id.*

[114] *See id.*

[115] *See* SLM Corp., Annual Report 12 (10-K) (Mar. 1, 2007), *available at* http://www.sec.gov/Archives/edgar/data/1032033/000095013307000881/w30676e10vk.htm. Sallie Mae pointed to the fact that its "FFELP and private originations at for-profit schools have grown faster than at traditional higher education schools due to enrollment trends as well as [its] increased market share of lending to these institutions." *Id.*

[116] *In re Career Educ. Corp.*, Agreement on Code of Conduct ¶ 14 (Apr. 16, 2007), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2007_04/Agreement%20CEC%20Final.pdf [Glick Decl. Ex. P]; Ill. Att'y Gen., *Madigan Announces Student Loan Agreements – Schools to Adopt New College Code of Conduct* (Apr. 23, 2007), http://www.illinoisattorneygeneral.gov/pressroom/2007_04/20070423.html [Glick Decl. Ex. Q]; Sam

accepting Sallie Mae's donation, came amidst "industry-wide" misconduct involving schools "neglect[ing] to make clear that borrowers have a right to select the Stafford Loan . . . lender of their choice."[117] Similarly, CEC soon thereafter acknowledged that the "majority of non-recourse private loans received by" CEC students in 2005 to 2007 "were provided by" Sallie Mae.[118]

Nor was CEC's preferred-lender-relationship misconduct isolated to New York and Illinois. The Bureau of Consumer Protection of the Office of Attorney General in Pennsylvania, for example, also determined that another of CEC's campuses improperly used a preferred lender list, and among other consumer protection violations, "rushed students through the loan financing process."[119]

Given Sallie Mae's status as a preferred lender, its sophisticated marketing campaign to schools including CEC, and its payments to CEC, it would strain credulity that Sallie Mae "had no direct communication with" CEC "about loan availability," such that Sallie Mae could have a "good-faith belief" that the loan applications it received from CEC on behalf of Ms. Colon and other applicants "were not the result of a school recommendation."[120]

Moreover, in light of the well-documented business relationship between CEC and Sallie Mae, Ms. Colon satisfies each of the other three independent avenues for invoking the Holder Rule. First, given Sallie Mae's donations to CEC around the time SBI chose Sallie Mae as Ms. Colon's lender, Sallie Mae "provided an improper inducement . . . to the school."[121] Second, for the same reasons, SBI and Ms. Colon's lender were "affiliated . . . by . . . business arrangement."[122] Finally, on the same facts, Sallie Mae constitutes a "school-affiliated organization," such that Ms. Colon's FFELP loans were "made by . . . a school-affiliated organization."[123]

---

Dillon, *In U.S. Absence, States Take Lead in Student Loan Cases*, N.Y. TIMES (Apr. 24, 2007), http://www.nytimes.com/2007/04/24/education/24loans.html.

[117] Agreement on Code of Conduct ¶ 8.

[118] *See* Career Educ. Corp., Annual Report 20 (Form 10-K) (Feb. 28, 2008).

[119] *See id.* at 108; *PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues* (Feb. 20, 2008), http://www.prnewswire.com/news-releases/pa-attorney-general-corbett-announces-200000-settlement-in-lehigh-valley-college-probe-funds-will-support-new-statewide-education-program-for-consumer-credit-issues-57034552.html [Glick Decl. Ex. R].

[120] *Cf. Overview: Holder Rule*, at 3.

[121] *See* 34 C.F.R. § 682.209(g)(2).

[122] *Id.* § 682.209(g)(4).

[123] *See id.* § 682.209(g)(1).

Ms. Colon has satisfied each of the four independent criteria of a school-lender affiliation, as a prerequisite to invoking the Holder Rule. SBI's misconduct therefore stands as a bar to the enforceability of her FFELP loans.

## IV. Conclusion

For the foregoing reasons, Ms. Colon has established and corroborated causes of action against SBI for its numerous GBL violations. She accordingly requests that, in accordance with federal law and the terms of her Master Promissory Note, Navient and/or the Department recognize her complete defense to the repayment of her student loans, and immediately and permanently cease any attempt to collect on these loan obligations. Ms. Colon further requests that Navient and/or the Department: reimburse her for amounts already paid (voluntarily or involuntarily) towards these unenforceable and invalid student loans; restore her ability to receive federal student aid; and remove any negative reports associated with her SBI student loans from the reports of any consumer credit reporting agency. Finally, Ms. Colon requests that the Department initiate proceedings against CEC to recoup amounts nullified under her loan obligations as a consequence of this request.[124]

Thank you for your attention to this matter. Should you have any questions, please contact me or my colleague as listed below. If I do not receive any communication from you within thirty days, I shall consider your non-response a constructive denial and shall pursue an appeal accordingly.

Sincerely,

Eileen Connor
econnor@nylag.org
(212) 613-6544

Jason Glick
jglick@nylag.org
(212) 613-5000 ext. 5429

---

[124] *See* 60 Fed. Reg. 37,768, 37,769; *see also* 34 C.F.R. § 685.206(c)(3). Given the Senate HELP Committee's and the OAG's investigations and subsequent findings, CEC has long had notice of the facts underlying Ms. Colon's claims. For the fiscal year ending December 31, 2014, CEC reported revenue of $741,358,000, 78 percent of which (or $578,259,240) derived from Title IV funds. For the fiscal year ending December 31, 2013, CEC reported revenue of $839,681,000, 78 percent of which (or $654,951,180) derived from Title IV funds. For the fiscal year ending December 31, 2012, CEC reported revenue of $1,019,903,000, 80 percent of which (or $815,922,400) derived from Title IV funds. *See* Career Educ. Corp., Annual Report 58, 81 (Form 10-K) (Mar. 3, 2015), *available at* http://www.sec.gov/Archives/edgar/data/1046568/000119312515075170/d824438d10k.htm.

**AFFIDAVIT OF YVETTE COLON**

State of New York )
                ) s.s.:
County of New York )

    I, Yvette Colon, currently residing at ███████████████ New York, NY 10029, being duly sworn, depose and say:

1.    I submit this Affidavit in support of my asserted defense to repayment of my student loans, obtained to pay for my attendance at Sanford-Brown Institute, New York, New York ("SBI").

2.    I attended SBI from 2006 to 2008 and graduated with a certificate in Non-Invasive Cardiovascular Technology.

3.    In addition to a $75 application fee, the first year tuition was $17,000, and the second year tuition was $12,750.

4.    I paid for my attendance at SBI with a combination of federal and private loans. Specifically, in September 2006, I took out approximately $6,625 in federal loans, and in August 2007, I took out approximately $8,233 in federal loans.

5.    Because SBI's tuition far exceeded the maximum annual borrowing limit for federal Stafford loans, I also took out a considerable additional amount in private student loans. To the best of my knowledge, I borrowed those private loans through Sallie Mae.

6.    I was born in New York on ███████████.

7.    After I graduated from high school, I attended Manhattan Community College for less than one year. I studied nursing.

8.    I left school when I got a full-time job at Memorial Sloan Kettering Cancer Center. I was a unit secretary, working on the breast cancer and orthopedic floors.

1

9.      I very much liked working in the medical field, and decided to pursue additional credentials. I attended Mandl School, and obtained a certificate in Medical Assisting in about 1985.

10.     After I obtained this certificate, Mandl assisted in placing me in a job as a Medical Assistant, with Dr. Jacobsen, who had an OBGYN private practice in New York. I worked for him for many years. As a Medical Assistant, I took patient vital signs and collected labs. I also assisted Dr. Jacobsen in clinical functions such as biopsies, pap smears, and Doppler monitoring, and conducted filing and paperwork tasks.

11.     When Dr. Jacobsen retired in approximately 1990, I went back to Memorial Sloan Kettering, and worked in the Social Work Department.

12.     I subsequently left the medical field for several years, to run my own business. When my business began to fail, around 1998, I went back to the medical field.

13.     I obtained a job with a radiologist, Dr. Weinburger, as a receptionist.

14.     This job exposed me to sonography, which is the field of taking radiographic images for diagnostic purposes.

15.     I wanted to become a cardiac sonographer, to advance my career in the medical field. I spoke with a sonographer at Dr. Weinburger's office, Donna, who encouraged me to pursue this dream.

16.     Donna initially encouraged me to go to New York University ("NYU") to study sonography, because they had a good program.

17.     When I looked into the program at NYU, I learned that they did not offer any evening classes. This meant that I would have to quit my job in order to go to school. This was

2

not a possibility for me. My mother had recently passed away, and I was working to support my father.

18.     I learned that a school called Ultrasound Diagnostic School ("UDS"), located in Manhattan, offered evening classes in sonography. In March 2004, I met with a recruiter at UDS and then began the enrollment process.

19.     I was initially set to begin classes in the fall of 2004, but because of family health issues and personal obligations, I delayed my enrollment until those issues resolved.

20.     In 2006, I had the time once again to commit to pursue the necessary training for a career in sonography. I went back to UDS to finalize the enrollment paperwork I had filled out a couple of years earlier.

21.     A representative explained to me that the school was now known as Sanford-Brown Institute. The representative told me that the contract I had signed with UDS was now null and void, and that I would need to sign a new contract. Also, the tuition had gone up by $6,830.

22.     I told the SBI representative I would think about whether I still wanted to enroll.

23.     I mentioned to my co-worker, Donna, that I was considering enrolling at SBI. She immediately responded that I should be careful because not all schools are accredited. Donna told me that I had to make sure that the school was properly accredited, because if it was not, I would have trouble finding a job in my field of study.

24.     Before finally deciding to enroll at SBI, I went back to ask SBI to ask whether the program was accredited for cardiac sonography. An SBI representative said, "Oh yes, we are accredited." She pointed to a plaque on the wall, which had the word "accredited" on it.

3

25.     Based on SBI's assurances about accreditation, I signed up to attend SBI, to obtain a certificate in Non-Invasive Cardiovascular Technology. Because I was in the evening program, the course would take two years to complete.

26.     Had I known that SBI was in fact not programmatically accredited, I would never have decided to make the tremendous time and financial investment to enroll.

27.     When I went back to pick up my schedule, I met with another SBI representative to complete my financial aid paperwork.

28.     I asked this SBI representative what the salary range for sonography graduates was, and he told me it was $50,000 to $60,000. He emphasized that once I graduated, I would definitely get a job as a sonographer.

29.     Had I known that SBI's lack of accreditation meant it was virtually impossible for me to obtain work as a sonographer, I definitely would not have enrolled.

30.     SBI did not give me any opportunity to select the lender for my student loans. The financial aid representative just gave me a pile of forms and told me to sign them. To the best of my knowledge, SBI chose the lender for my loans.

31.     Toward the end of my first year of classes at SBI, around the spring of 2007, I heard that those in the class above me were having trouble sitting for the licensure exam in sonography, which was necessary to get a job.

32.     Some of my classmates asked Naoufel Brahmi, Director of the Cardiovascular Technology program at SBI about these rumors. Dr. Brahmi came into our class and assured us that we had nothing to worry about. He said that the school was going through the process of accreditation, and that my class would not be affected because the accreditation would be in place by the time we graduated and sat for the exam. He also said that we would all get jobs

4

from our externships, and that after one year we would be able to take the state exam, regardless of what happened with SBI's accreditation.

33.     There were about twenty students in my evening class, and we all decided to continue at SBI based on what Dr. Brahmi said.

34.     Had I known that the Director was not telling the truth about SBI's accreditation status and process, and about our chances of obtaining employment, I would not have continued into the second year of the program.

35.     When it came time to do the externship part of my program, I had to quit my day job, because evening externship placements were not available.

36.     I did an externship for three months at NYU, and for three months at the Veterans Affairs ("VA") Hospital on 23rd Street.

37.     Mine was the first group of externs that NYU took from SBI. My supervisor at NYU was named Anthony, and he was not happy with SBI as a school. He felt that my classmates and I had not received appropriate training. He corrected us and guided us on basic techniques, and instructed us on how to use NYU's sonography machines, which were newer and different than the ones we trained on at SBI.

38.     I noticed that the students who were studying at NYU were more competent. Their program was a full-time, two-year program, and they received much more hands-on instruction in the hospital, rather than in the classroom. The SBI students were trying to make up for all of that hands-on training during our externships.

39.     After my class, NYU stopped receiving externs from SBI.

5

40. Neither I nor any of my classmates got a job from our externships at NYU. I learned from Anthony that NYU decided to hire students from NYU's own program and determined that SBI students were not as well-trained.

41. Neither I nor any of my classmates obtained a job from our externships at the VA hospital. I later heard from the supervisor of my externship at the VA Hospital that the Hospital didn't think that SBI had a very good reputation, and was considering discontinuing its externship program with SBI.

42. I graduated from my program at SBI in April 2008.

43. I called SBI frequently to ask whether they had job leads and opportunities.

44. When nothing materialized, I called and emailed Dr. Brahmi about the fact that SBI's job placement assistance was so awful.

45. Because of the pressure I put on SBI, someone from SBI eventually arranged a phone interview for me with a medical office. The doctor who interviewed me asked me nothing except my salary expectations. I thought that was very strange and had a bad feeling about the doctor. I later met other students who worked briefly for that doctor before quitting, because they were forced to work twelve hour days at low pay, with no lunch break.

46. That distressing interview was the only one that SBI helped me find.

47. In addition, I applied to several sonography positions on my own. Employers asked me if I had a license, and unfortunately, I had to answer no. I did not get any callbacks.

48. About a month after graduating, I registered for the sonography licensing exam administered by the American Registry for Diagnostic Medical Sonography ("ARDMS"). I filled out all of the paperwork and sent it in, along with a $140 check for the registration fee.

49.     About one month later, I received my check back in the mail, along with a letter from ARDMS explaining that I did not qualify to sit for the exam under "prerequisite 2," which provides for graduates of properly accredited sonography programs to take the exam, because I had not supplied the required documentation. But I had submitted my SBI certificate, a letter from SBI, and the other paperwork that was called for.

50.     I called the telephone number listed on the letter to obtain more information. I was told that I did not qualify based on my SBI certificate, but that I could qualify otherwise, if I had a Bachelor's Degree or one year of work experience as a sonographer. I had neither.

51.     I was furious. I felt that I was in a catch-22. By this time, I had obtained a position doing medical billing at Memorial Sloan Kettering. To this day, I'm still working in that job.

52.     When I attended SBI, I was told that our credits would transfer to an Associate Degree program. Later, in the summer of 2008, when I attempted to register at Borough of Manhattan Community College for an Associate Degree program, I learned that none of my SBI credits would transfer because SBI did not have the right accreditation.

53.     I wrote a complaint to the Better Business Bureau about SBI because I felt that I had been defrauded. I was promised that SBI would help me find work as a sonographer; that the school was accredited; and that my credits would transfer. None of these promises was true.

54.     Nothing came of my complaint to the Better Business Bureau.

55.     I received a letter from the New York State Attorney General in 2013 about SBI. The letter said that I could apply for restitution, because the school had misled me and others in my position about the accreditation of the sonography program.

56.     I applied for restitution and received $3,094.93.

7

57.     I currently owe about $22,130.96 on my federal student loans. I also owe about $29,284.13 in private student loans, which I borrowed to pay part of my tuition, and to cover my living expenses during the time that I was doing my externship at SBI, since I had to quit my job in order to do the externship.

58.     My federal and private loans are currently serviced by Navient. My account number is

59.     I would not have attended SBI if I had known that it was not properly accredited. I also was misled about the number of graduates who were placed in jobs, my ability to get a job as a sonographer after finishing the certificate program, and the transferability of credits.

60.     I would gladly exchange my certificate from SBI for cancellation of my student loans. The certificate is useless to me. I learned a few things at SBI, which make it easier when, in my private life, I need to speak with doctors. But besides that, I did not get anything from the program.

61.     When I see people on the subway holding SBI literature, I go out of my way to warn them not to enroll and to explain how SBI misled and defrauded me.

62.     Attached as Exhibit A is a true and correct copy of a summary of my federal loan disbursal history, from the National Student Loan Data System.

63.     Attached as Exhibit B is a true and correct copy of my SBI certificate.

64.     Attached as Exhibit C is a true and correct copy of ARDMS's letter, dated July 31, 2008.

8

65. Attached as Exhibit D is a true and correct copy of a summary of my recent loan balance, from Navient's website.

**WHEREFORE:**

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097;

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein;

I **CERTIFY**, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

Yvette Colon

2/27/15

Sworn to before me this 27th day of

February, 2015

NOTARY PUBLIC

SIRRAH KARIMA HARRIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 02HA6292419
Qualified in Queens County
My Commission Expires November 04, 2017

9

Financial Aid Review -- YVETTE COLON                                                                    Page 1 of 1



STARTHERE.
GO FURTHER
FEDERAL STUDENT AID

National Student Loan Data System (NSLDS) for Stu

*NSLDS is a repository of information from many sources. Changes to the data are made by those sources. Collecting the data into one central location such as NSLDS gives you convenience and saves you time. If for any reason you disagree with the information reported to NSLDS, please contact one or more of the sources of your data listed on the detail pages on this site. The Department is also available as a resource at 1-800-4FEDAID if you need additional assistance. Your comments and corrections will help improve the services NSLDS provides.*

---

Aid Summary for YVETTE COLON                                        Your enrollment status is GRADUATED , effective 04/29/2008.



MyStudentData
Download

### Loans

| | Type of Loan | Loan Amount | Loan Date | Disbursed Amount | Canceled Amount | Outstanding Principal | Outstanding Interest |
|---|---|---|---|---|---|---|---|
| 1 | STAFFORD SUBSIDIZED | $4,348 | 08/14/2007 | $4,348 | $0 | $6,066 | $50 |
| 2 | STAFFORD UNSUBSIDIZED | $3,865 | 08/14/2007 | $3,865 | $0 | $5,722 | $94 |
| 3 | STAFFORD UNSUBSIDIZED | $4,000 | 09/08/2008 | $4,000 | $0 | $6,277 | $93 |
| 4 | STAFFORD SUBSIDIZED | $2,825 | 09/08/2008 | $2,825 | $0 | $3,663 | $54 |
| 5 | SUPPLEMENTAL LOAN (SLS) | $2,500 | 09/26/1985 | $2,500 | $0 | $1 | $0 |
| Total STAFFORD SUBSIDIZED | | | | | | $9,731 | $144 |
| Total STAFFORD UNSUBSIDIZED | | | | | | $11,999 | $187 |
| Total SUPPLEMENTAL LOAN (SLS) | | | | | | $0 | $0 |
| Total All Loans | | | | | | $21,730 | $331 |

*Information contained on these pages reflects the most current data in the NSLDS database. The data contained on this site is for general information purposes and should not be used to determine eligibility, loan payoffs, overpayment status, or tax reporting. Please consult the Financial Aid Officer at your school or the specific holder of your debts for further information.*

MyStudentData
File Source:U.S. DEPARTMENT OF EDUCATION, NATIONAL STUDENT LOAN DATA SYSTEM
(NSLDS)
File Request Date:2015-02-25-16.23.26.299
Student First Name:YVETTE
Student Middle Initial:
Student Last Name:COLON
Student Street Address 1:
Student Street Address 2:
Student City:
Student State Code:
Student Country Code:
Student Zip Code:
Student Email Address:
Student Home Phone Country Code:
Student Home Phone Number:
Student Home Phone Preferred:
Student Cell Phone Country Code:
Student Cell Phone Number:
Student Cell Phone Preferred:
Student Work Phone Country Code:
Student Work Phone Number:
Student Work Phone Preferred:
Student SULA MEP Program School Name:
Student SULA MEP Program Enrollment Status:
Student SULA MEP Program CIP Title:
Student SULA MEP Program Credential Level:
Student SULA MEP Program Begin Date:
Student SULA MEP Program Length In Years:0.0
Student SULA Maximum Eligibility Period:0.0
Student SULA Subsidized Usage Period:0.0
Student SULA Remaining Eligibility Period:0.0
Student Enrollment Status:GRADUATED
Student Enrollment Status Effective Date:04/29/2008
Student Total All Loans Outstanding Principal:$21,730
Student Total All Loans Outstanding Interest:$458
Student Pell Lifetime Eligibility Used:0.000%
Student Total All Grants:$0
Total STAFFORD SUBSIDIZED Outstanding Principal:$9,731
Total STAFFORD SUBSIDIZED Outstanding Interest:$201
Total STAFFORD UNSUBSIDIZED Outstanding Principal:$11,999
Total STAFFORD UNSUBSIDIZED Outstanding Interest:$257
Total SUPPLEMENTAL LOAN (SLS) Outstanding Principal:$0
Total SUPPLEMENTAL LOAN (SLS) Outstanding Interest:$0
Loan Type:STAFFORD SUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW
YORK
Loan Attending School OPEID:02116011
Loan Date:08/14/2007
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/20/2007
Loan Period End Date:04/30/2008
Loan Amount:$4,348
Loan Disbursed Amount:$4,348
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$6,068
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$125
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:4.50%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP

MyStudentData

Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:08/14/2007
Loan Disbursement Date:05/19/2008
Loan Disbursement Amount:$2,174
Loan Disbursement Date:10/12/2007
Loan Disbursement Amount:$2,174
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD UNSUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW YORK
Loan Attending School OPEID:02116011
Loan Date:08/14/2007
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/20/2007
Loan Period End Date:04/30/2008
Loan Amount:$3,865
Loan Disbursed Amount:$3,865

MyStudentData

Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$5,722
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$127
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:6.80%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:08/14/2007
Loan Disbursement Date:05/19/2008
Loan Disbursement Amount:$1,932
Loan Disbursement Date:10/12/2007
Loan Disbursement Amount:$1,933
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262

MyStudentData

Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD UNSUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW YORK
Loan Attending School OPEID:02116011
Loan Date:09/08/2006
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/14/2006
Loan Period End Date:05/21/2007
Loan Amount:$4,000
Loan Disbursed Amount:$4,000
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$6,277
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$130
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:6.80%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:09/08/2006
Loan Disbursement Date:04/20/2007
Loan Disbursement Amount:$2,000
Loan Disbursement Date:09/12/2006
Loan Disbursement Amount:$2,000
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON

MyStudentData

Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD SUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW YORK
Loan Attending School OPEID:02116011
Loan Date:09/08/2006
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/14/2006
Loan Period End Date:05/21/2007
Loan Amount:$2,625
Loan Disbursed Amount:$2,625
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$3,663
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$76
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:4.50%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:09/08/2006
Loan Disbursement Date:04/20/2007
Loan Disbursement Amount:$1,312
Loan Disbursement Date:09/12/2006
Loan Disbursement Amount:$1,313
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.

MyStudentData
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:SUPPLEMENTAL LOAN (SLS)
Loan Award ID:
Loan Attending School Name:MANDL SCHOOL
Loan Attending School OPEID:00740100
Loan Date:09/26/1985
Loan Repayment Begin Date:03/02/1986
Loan Period Begin Date:09/01/1985
Loan Period End Date:03/31/1986
Loan Amount:$2,500
Loan Disbursed Amount:$2,500
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$0
Loan Outstanding Principal Balance as of Date:08/05/1996
Loan Outstanding Interest Balance:$0
Loan Outstanding Interest Balance as of Date:08/05/1996
Loan Interest Rate Type:FIXED
Loan Interest Rate:12.00%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:DP
Loan Status Description:DEFAULTED, PAID IN FULL
Loan Status Effective Date:08/05/1996
Loan Status:DX
Loan Status Description:DEFAULTED, SIX CONSECUTIVE PAYMENTS
Loan Status Effective Date:11/09/1995
Loan Status:DU
Loan Status Description:DEFAULTED, UNRESOLVED
Loan Status Effective Date:10/31/1986
Loan Disbursement Date:10/28/1985
Loan Disbursement Amount:$2,500
Loan Contact Type:Current Lender
Loan Contact Name:FLEET NATIONAL BANK/GOLDMMAN SACHS
Loan Contact Street Address 1:100 SECOND AVE S STE 400-S TOWER
Page 6

MyStudentData

```
Loan Contact Street Address 2:
Loan Contact City:ST PETERSBURG
Loan Contact State Code:FL
Loan Contact Zip Code:337160000
Loan Contact Phone Number:
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:USA FUNDS, INC.
Loan Contact Street Address 1:P.O. BOX 6180
Loan Contact Street Address 2:
Loan Contact City:INDIANAPOLIS
Loan Contact State Code:IN
Loan Contact Zip Code:462066180
Loan Contact Phone Number:
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
```



Be it known to all who are interested in the Allied Health Sciences, that

# Yvette Colon

Has successfully completed the comprehensive course

## Non-Invasive Cardiovascular Technology

In recognition of this accomplishment, this

### Certificate

Has been awarded with honors this 29th Day April 2008

Administered by

## Sanford-Brown Institute

New York City, New York Campus

*School President*

*VP of Academic Affairs*

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

From: unknown    Page: 17/34    Date: 2/23/2015 8:34:40 AM



ARDMS
The globally recognized standard
of excellence in sonography

Yvette Colon

New York, NY  10029

July 31, 2008

Dear Yvette Colon:

After careful review of your application, it is necessary to inform you that you are not currently eligible to sit for an ARDMS examination at this time. In order to apply under Prerequisite 2, you must have submitted the following:

- Copy of diploma from ultrasound/vascular program or an official transcript.
- Original letter signed by program director and/or medical director indicating date of graduation or successful completion of the program. Program directors must use the mandatory formatted sample letter, available at www.ARDMS.org/templateletter and shown on page 9 of the 2008 application booklet.
- The clinical verification (CV) form is not required if the application is submitted and received in the ARDMS office within one year after successful completion of the program. Otherwise, an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available online at www.ARDMS.org/cv.

At this time, you have not submitted all of the requisite documentation needed to complete the processing of your application.

_Your application cannot be approved without all required documentation._ A refund check in the amount of $140.00 is enclosed. A non-refundable processing fee, as specified in the ARDMS applications booklet, has been withheld for each examination. _Please note that when you reapply, you will be considered a first-time applicant, and you will need to submit all documentation and fees._ If you have any questions regarding your eligibility for future examinations, please feel free to contact Registrant Services at the number listed below.

Sincerely,

Registrant Services Department
Certification Processing Specialist
800-541-9754

cc: Applicant File

Navient - Integrated Account Summary                                    Page 1 of 2

## NAVIENT

APPLY FOR A NEW LOAN    MY ACCOUNT ▓    WELCOME
                                        YVETTE
                                        LOGOUT

MY LOANS        MAKE PAYMENT        CHANGE PAYMENT        CUSTOMER SUPPORT

Form 1098-E statements are available via Print Statements and Documents under the Customer Support menu. Learn more!

---

### ⚠ NEEDS IMMEDIATE ATTENTION

You have missed 19 payment(s). You may pay all of your loans by selecting Quick Pay or pay your loans individually via the following links: Private Loans and Federal Loans.

You have 3 message(s) View all message(s)     NOTE: This notification is an attempt to collect a debt and information obtained will be used for that purpose.

---

## Loan Summary        Learn how your payments are allocated and applied.

| | Loans Balance | Payment Due | Pay all of your loans at once |
|---|---|---|---|
| **GRAND TOTAL** | **$51,415.09** | **$5,181.22** | ▸ QUICK PAY |

### PRIVATE LOANS                                    TAKE ACTION ON YOUR LOANS

Visit our FAQs for info on how to make payments, credit reporting, and how to contact us.

| Loan Name | Loan Balance | Current Interest Rate | Payment Due | Past Due | Payment Due Date |
|---|---|---|---|---|---|
| **Signature Student Loan -3157** | $13,235.46 | 7.25% | $3,592.27 | $3,390.90 | 01/17/2015 ⚠ |
| **TOTAL** | $13,235.46 | | $3,592.27 | $3,390.90 | |
| **Signature Student Loan -3159** | $16,048.87 | 7.25% | $1,404.92 | $1,237.15 | 01/17/2015 ⚠ |

The Smart Option Student Loan. Get Started. Sallie Mae® | Navient℠

| | TOTAL | $16,048.87 | | $1,404.92 | $1,237.15 |
|---|---|---|---|---|---|

▸ Pay Private Loans

### FEDERAL LOANS                                    TAKE ACTION ON YOUR LOANS

Visit our FAQs for info on how to make payments, credit reporting, and how to contact us

| Loan Name | Loan Balance | Current Interest Rate | Payment Due | Past Due | Payment Due Date |
|---|---|---|---|---|---|

Navient - Integrated Account Summary



| | | | | | |
|---|---|---|---|---|---|
| **Stafford** 1-02 | $3,729.08 | 6.8% | $42.83 | $20.79 | 01/17/2015 ⚠ |
| **Stafford** 1-03 | $8,398.35 | 6.8% | $73.38 | $35.62 | 01/17/2015 ⚠ |
| **Stafford** 1-05 | $6,176.87 | 6.8% | $70.93 | $34.43 | 01/17/2015 ⚠ |
| **Stafford** 1-06 | $5,834.66 | 6.8% | $86.89 | $32.47 | 01/17/2015 ⚠ |
| **TOTAL** | $22,130.96 | | $254.03 | $123.31 | |

For delinquency counseling see your options here.                    ▸ Pay Federal Loans

| | Loans Balance | Payment Due | Pay all of your loans at once |
|---|---|---|---|
| **GRAND TOTAL** | $61,415.09 | $5,181.22 | ▸ QUICK PAY |

**PENDING PAYMENTS**
PRIVATE LOANS

PRIVATE LOANS
You currently do not have any pending payments
FEDERAL LOANS

**PAYMENTS RECEIVED**
PRIVATE LOANS

| PRIVATE LOANS FEDERAL LOANS | Amount |
|---|---|
| 12/29/2014 | $-100.00 |
| 11/26/2014 | $-100.00 |
| 10/27/2014 | $-100.00 |

View transaction history

**u**promise    **REWARDS**

Learn More

Join Upromise for free and earn cash back for
everyday spending - which can help pay your loan
faster!

About Us | Terms of Use | Protecting Your Privacy | Social Media Policies | About Our Ads | Contact Us

Feedback ↦

© 2014 - 2015 Navient Solutions, Inc. All rights reserved. Navient and the Navient logo are service marks of Navient Solutions, Inc.
Navient Corporation and its subsidiaries, including Navient Solutions, Inc. are not sponsored by or agencies of the United States of America.

## DECLARATION OF JASON GLICK

I, Jason Glick, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746, hereby declare as follows:

1. I am an attorney at the New York Legal Assistance Group ("NYLAG"). NYLAG represents Ms. Colon in connection with her student loans.

2. Exhibit A, attached, is a true and correct copy of the Assurance of Discontinuance dated August 19, 2013, between the Office of the Attorney General of the State of New York and Career Education Corporation, as downloaded from the website of the Huffington Post on August 20, 2013.

3. Exhibit B, attached, is a true and correct copy of "SPI Requirement and General Prerequisites," as downloaded from the website of the American Registry for Diagnostic Medical Sonography on February 26, 2015.

4. Exhibit C, attached, is a true and correct copy of an e-mail from Jill DeAtley dated August 19, 2013, as received by NYLAG from Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

5. Exhibit D, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation and Certification" and dated April 2, 2010, as downloaded from the website of the Internet Archive on January 12, 2015.

6. Exhibit E, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation and Certification" and dated January 11, 2011, as downloaded from the website of the Internet Archive on January 12, 2015.

7. Exhibit F, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation & Licensure" and dated November 6, 2013, as downloaded from the website of the Internet Archive on February 27, 2015.

8.    Exhibit G, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Cardiovascular Technology Training at Sanford Brown NY" and dated October 23, 2006, as downloaded from the website of the Internet Archive on February 27, 2015.

9.    Exhibit H, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Non-Invasive Cardiovascular Technology Training New York, NY" and dated August 17, 2007, as downloaded from the website of the Internet Archive on February 27, 2015.

10.    Exhibit I, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Non-Invasive Cardiovascular Technology" and dated March 19, 2008, as downloaded from the website of the Internet Archive on February 27, 2015.

11.    Exhibit J, attached, is a true and correct copy of a document titled "Accreditation/Certification Information," dated June 26, 2006, as received by NYLAG from Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

12.    Exhibit K, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Top Ten Reasons to Study at SBI" and dated October 23, 2006, as downloaded from the website of the Internet Archive on February 13, 2015.

13.    Exhibit L, attached, is a true and correct copy of a "Dear Colleague" letter dated April 16, 1993 from Robert W. Evans, Director, Division of Policy Development, U.S. Department of Education, and the attachments thereto, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

14.    Exhibit M, attached, is a true and correct copy of a letter dated May 19, 1988 from Acting Assistant Secretary Kenneth D. Whitehead, U.S. Department of Education, to U.S. Representative Stephen J. Solarz, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

15.    Exhibit N, attached, is a true and correct copy of the first page of a FFELP Federal Stafford Loan Master Promissory Note dated July 8, 2006 as received by NYLAG from

2

Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

16.     Exhibit O, attached, is a true and correct copy of a U.S. Department of Education document entitled "Overview: Federal Trade Commission (FTC) Holder Rule," dated July 2, 1993, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

17.     Exhibit P, attached, is a true and correct copy of the Agreement on Code of Conduct dated April 16, 2007, between the Office of the Attorney General of the State of New York and Career Education Corporation, as downloaded from the website of the Illinois Attorney General on February 27, 2015.

18.     Exhibit Q, attached, is a true and correct copy of an April 23, 2007 document titled "Madigan Announces Student Loan Agreements   Schools to Adopt New College Code of Conduct," as downloaded from the website of the Illinois Attorney General on February 27, 2015.

19.     Exhibit R, attached, is a true and correct copy of a February 20, 2008 document titled "PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues," as downloaded from Lexis Nexis on February 27, 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

Dated: March 9, 2015
New York, New York

Jason Glick
Staff Attorney/Skadden Fellow
New York Legal Assistance Group
7 Hanover Square, 18th Floor
New York, New York 10004
(212) 613-5000 x5429
JGlick@nylag.org

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF CONSUMER FRAUDS & PROTECTION
------------------------------------------------------------------------------X

In the Matter of the
Investigation by Eric T. Schneiderman,
Attorney General of New York, of

                                           AOD No. 13-379

CAREER EDUCATION CORPORATION,

                               Respondent.

------------------------------------------------------------------------------X

       The Office of the Attorney General of the State of New York ("OAG") has

conducted an investigation, pursuant to Executive Law § 63(12) and General Business

Law ("GBL") Article 22-A, into certain business practices of Career Education

Corporation ("CEC"). This Assurance of Discontinuance ("Assurance") contains the

findings of the OAG's investigation and the relief agreed to by the OAG and CEC

(collectively referred to hereinafter as the "parties").

## FINDINGS

      1.     CEC is a publicly-traded Delaware corporation with principal offices

located at 231 N. Martingale Rd., Schaumburg, Illinois, 60173.

      2.     In 2012, CEC had over 90 campuses throughout the country and

internationally and offered educational programs to over 116,000 students worldwide in a

range of career-oriented disciplines. Currently, CEC has approximately 75 campuses and

student enrollment of approximately 75,000. CEC is organized into six segments or

"strategic business units" ("SBUs"): university, culinary arts, health care education, art

and design, international, and transitional schools.

      3.     CEC operates seven brick-and-mortar campuses in New York State and

two online institutions outside of New York State that enroll New York students. The

New York brick-and-mortar campuses include three Sanford-Brown Institute ("SBI")

campuses, one SBI-affiliate campus, and three Briarcliffe campuses. These campuses offer non-degree certificate programs and associate's and bachelor's degrees. The SBI and Briarcliffe campuses offer campus-based and online programs. CEC also operates online institutions outside of New York State that enroll New York residents. CEC's online institutions with material enrollments of New York residents are American InterContinental University ("AIU") and Colorado Technical University ("CTU").

4.     The SBI campuses are located at: 711 Stewart Avenue, Garden City, New York; 120 East 16th Street, New York, New York; and 333 Westchester Avenue, White Plains, New York. The SBI-affiliate campus is located at 320 South Service Road, Melville, New York. The Briarcliff campuses are located at: 1055 Stewart Avenue, Bethpage, New York; 225 West Main Street, Patchogue, New York; and 30-30 Thomson Avenue, Long Island City, Queens, New York.

5.     For the period of July 2009 through May 2011, there were approximately 11,000 students enrolled in the brick-and-mortar campuses in New York and approximately 8,800 New Yorkers enrolled in the online institutions.

6.     CEC's SBI campuses in New York are nationally accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"). Briarcliffe College is regionally accredited by the Middle States Association of Colleges and Schools ("MSACS"). AIU and CTU are regionally accredited by the Higher Learning Commission ("HLC"). In addition, certain programs offered by CEC's schools were or are accredited by programmatic accreditors, including the Accrediting Bureau of Health Education Schools ("ABHES") and the Commission on Accreditation of Allied Health Education Programs ("CAAHEP").

7.      Educational institutions are required to maintain institutional accreditation status with an accreditor recognized by the U.S. Department of Education in order to be eligible to receive federal financial aid, including federal grants and federally guaranteed student loans.  Some accrediting agencies develop criteria for schools to employ in calculating and reporting an annual placement rate, the rate at which graduates of the programs are placed in employment.

8.      ACICS requires ACICS-accredited schools to: (a) report placement rates annually to ACICS; (b) disclose placement rate information to students; and (c) for the period of 2008 through 2010, maintain a baseline placement rate of 65%.  Schools that do not meet ACICS' baseline placement rate are subject to heightened monitoring and reporting and, if they do not meet such standards within a certain period of time, could lose their accreditation.

9.      ABHES requires ABHES-accredited programs to: (a) report placement numbers annually; (b) disclose placement rates to students, and (c) maintain a baseline placement rate of 70% in accredited Medical Assistant programs.  Like the ACICS-accredited schools, programs that do not meet ABHES' baseline placement rate are also subject to heightened monitoring and reporting, and, if they do not meet such standards, could lose their accreditation.

10.     CAAHEP requires CAAHEP-programs to: (a) report placement numbers annually; (b) disclose placement rates to students; and (c) maintain a baseline placement rate of 75% in accredited Diagnostic Medical Ultrasound programs, 70% in accredited Cardiovascular Technology programs, and 80% in accredited Surgical Technology programs.  Programs that do not meet CAAHEP's baseline placement rate are also subject

3

to heightened monitoring and reporting and, if they do not meet such standards, could lose accreditation.

11.     Neither MSACS nor HLC requires schools to calculate, report, or disclose placement rates, and neither imposes a minimum requirement for placement rates.

12.     From fall 2008 through spring 2011, certain CEC employees improperly counted graduates as "placed", which inflated CEC's placement rates at CEC's New York schools. As a result, CEC provided inaccurate and inflated placement rates to prospective and then current students. In addition, CEC reported inaccurate and inflated placement rate data and placement rates to CEC's accrediting agencies and to the New York State Department of Education's Bureau of Proprietary School Supervision for these schools.

13.     Some CEC Career Services employees used several methods to improperly count graduates as "placed", which inflated placement rates. First, certain CEC Career Services employees counted certain CEC graduates of health care services programs as "placed" based on these graduates' employment at single one-day health fairs, including fairs initiated at CEC's request for the purpose of inflating placement rates. Second, certain CEC Career Services employees mischaracterized certain CEC graduates' job duties in order to improperly count such students as "placed" in the field in which the student trained or a related field, when in fact the graduates' employment was neither in the field in which the graduate was trained nor in a field related to their field of study.

14.     CEC set annual goals to meet the accreditors' baseline placement rate requirements at each CEC institution. CEC school Presidents, Career Services Directors, and other Career Services employees received bonuses based in part upon whether such baseline placement rate requirements were met. Thus, these employees had financial incentives to meet the placement rate goals set by CEC.

A.    **Deceptive Practices Related to Calculation of Placement Rates**

    (i)    **Counting Employment at One-day Health Fairs As "Placements"**

15.    Prior to September 2008, CEC policy required CEC employees to wait until a graduate had completed either three or five days of employment before verifying that graduate's employment for purposes of calculating placement rates.  In September 2008, CEC changed its official policy concerning employment verification to permit CEC employees to verify employment on the same day that a graduate began employment. After CEC modified its policies to permit employment verification on the first day of employment, certain CEC Career Services employees began counting graduates' employment at a single one-day health fair as a "placement" for purposes of calculating CEC's placement rates, even though the graduates did not obtain any subsequent employment with the health fair company.  Moreover, certain of the CEC employees requested that health companies sponsor health fairs so that large numbers of graduates could be counted as "placed".  In the 2010 reporting cohort (July 1, 2009 to June 30, 2010), for example, CEC employees at SBI-NY recorded 101 "placements" based on a single day's employment at one-day health fairs held in that period.

16.    High-level Career Services managers in the Health SBU at CEC's headquarters not only knew about the practice of counting employment at single one-day health fairs as "placements," but explicitly condoned and even encouraged the practice of recording such employment as "placements."

    (ii)    **Mischaracterizing Certain Positions as "In-field" or "Related Field" Employment**

17.    Certain CEC Career Services employees improperly characterized certain graduates' employment as "in-field" or "related field" placements at New York schools.

5

In some cases, these CEC employees mischaracterized graduates' employment duties in order to support their improper characterization of the graduate's employment as an "in field" or "related field" placement. In certain instances, these CEC employees even placed false information in students' placement files to support this mischaracterization.

18.     For example, certain CEC Career Service employees improperly characterized graduates of Criminal Justice programs at New York schools who were employed in retail sales positions and data processing positions as having obtained "in field" placements. Similarly, certain graduates of Accounting programs who were employed as secretaries were improperly characterized as having obtained "in field" placements. In one example, a graduate of a CEC New York Criminal Justice program employed as a data processor at a company that processed parking ticket data was characterized as having obtained a "related field" placement, on the grounds that the graduate's duties included dealing "with the courts" by processing parking ticket data.

### (iii)     Disclosure of Inaccurate and Inflated Placement Rates to Prospective and Current Students

19.     CEC misrepresented its placement rates for New York schools to prospective and then current students. As detailed below, CEC included inaccurate and inflated placement rates for New York schools in school catalogs distributed to prospective and then current students, on CEC's public website, and in written disclosures provided to prospective students who requested placement rate information. These inflated placement rates provided false and misleading information concerning CEC's New York schools' success in placing graduates of its programs in employment.

20.     Students choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly, placement rate is an important factor in students' decision to enroll in and complete CEC programs.

6

21.     The placement rates for New York schools disclosed to prospective and then current students during the period of 2009 through spring 2011 were significantly inflated, giving prospective students a distorted, significantly overly-favorable impression of CEC graduates' employment outcomes.  For example, for the 2008-2009 and 2009-10 reporting cohort, CEC disclosed placement rates for its New York SBI and Briarcliffe campuses ranging from 54.9% to 80.2%, when the corrected rates based on CEC's subsequent efforts to verify placement rates ranged from 24.1% to 64.1%.  CEC disclosed that SBI New York had a placement rate of 65.7% in 2008-2009, but the corrected rate based on CEC's subsequent efforts to verify placement rates was 42.1%.  In another example, CEC disclosed that SBI Melville had a 70% placement rate in the 2009-2010 cohort, but the corrected placement rate was 26.1%.

22.     Furthermore, as detailed below, the corrected placement rates for the SBI campuses in New York and for a number of programmatically accredited programs did not meet CEC's accreditors' baseline placement rate requirements for the 2008-2009, 2009-2010, and 2010-2011 reporting cohorts.  The failure to meet the accreditors' baseline placement rate requirements would have triggered a review that would have put these schools and programs on monitoring and ultimately at potential risk of losing institutional and/or programmatic accreditation.

(iv)     **Reporting Inflated Placement Rates to Accreditors**

23.     CEC reported inaccurate, inflated placement rates in its annual reports to the accreditor of its New York SBI campuses, ACICS, for the reporting cohorts 2008-2009 and 2009-2010.

24.     By reporting inflated placement rates to ACICS, CEC was able to meet ACICS' baseline placement rate requirements for New York Health SBU schools,

7

enabling these CEC schools to maintain their accreditation status and thus maintain eligibility to receive federal financial aid. CEC would not have met the ACICS' baseline at any of its New York ACICS-accredited campuses during the period in question had it not reported inflated placement rates. Thus, CEC would have been at serious risk of triggering review and monitoring that could have put these schools and programs at potential risk of losing accreditation at those campuses.

25.     CEC also provided inaccurate graduate placement rates for its programmatically accredited programs at its New York SBI campuses to its programmatic accreditors ABHES and CAAHEP for the 2008-2009 and 2009-2010 reporting cohorts. The corrected placement rates for some of these programmatically accredited programs would not have met ABHES' and CAAHEP's minimum placement rate requirements. Had CEC reported the corrected placement rates, CEC would have triggered a review and monitoring and been at potential risk of losing programmatic accreditation for those programs.

26.     On November 14, 2011, CEC received a letter from ACICS directing CEC to "Show Cause" at a December 2011 meeting as to why CEC's current accreditation status should not be withdrawn from its' Health SBU ACICS-accredited CEC campuses due to CEC's reporting of inaccurate and inflated placement rates to ACICS.

27.     Based on corrective actions taken by CEC, including efforts to independently verify all placements for the 2010-2011 reporting cohort and improve its placement results and collection of placement results, ACICS determined not to suspend the accreditation of CEC's ACICS-accredited schools. Nor did ACICS request that CEC recalculate inaccurate placement rates reported for the 2008-2009 and 2009-2010 reporting cohorts.

28.     On August 10, 2012, ABHES issued a "Show Cause" letter to SBI-White Plains based upon concerns that SBI-White Plains had inflated 2010-2011 placement rates for its Medical Assistant program graduates by mischaracterizing certain placements, such as secretarial placements, as "in field" or "related field" placements. ABHES required SBI-White Plains to submit a re-calculated placement rate, and SBI-White Plains submitted a revised Annual Report to ABHES for the 2010-2011 reporting cohort re-designating several students who had previously been designated as "placed" to "not yet placed."   However, before ABHES issued a final ruling in the matter, CEC voluntarily relinquished ABHES accreditation for all of its Medical Assistant Programs, rendering the proceedings moot.

                (v)     **Reporting Inaccurate and Inflated Placement Rates To New York State**

29.     CEC reported inaccurate and inflated placement statistics in its annual reports to the New York State Department of Education's Bureau of Proprietary School Supervision for the years 2008-2009 and 2009-2010.

30.     The reported statistics were inaccurate with regard to the number of students who obtained employment in their field of study or in a related field after graduating from a specific academic program.

                (vi)    **CEC's Corrective Actions**

31.     After discovering its employees' misconduct in the calculation, disclosure and reporting of placement rates subsequent to receipt of the OAG's subpoena, CEC cooperated in the OAG investigation by bringing these issues to the attention of the OAG and producing evidence and answering questions relevant to the investigation.  CEC immediately suspended employees, and later terminated 15 employees who it determined had engaged in such misconduct, including several high-level managers in the Health

9

SBU at CEC corporate headquarters. CEC also promptly upon discovering these issues, but prior to being requested by the OAG to take any action, began the process of reviewing and modifying its placement practices in an effort to prevent the abuses identified in the investigation from recurring, including by revising its Career Services Policy Manual to impose new, more stringent requirements for calculating placement rates, including, *inter alia,* new requirements related to verifying employment. CEC also created a new position, the Director of Career Services Compliance, to monitor compliance with CEC's revised policies related to calculation of placement rates. In addition, CEC hired an independent company to contact 2010-2011 graduates to confirm placement and subsequently disclosed revised placement rates for 2010-2011 on its websites.

### B. Deceptive Practices Related to Accreditation Status Disclosures

32. Certain CEC health services programs, including the Diagnostic Medical Ultrasound, the Cardiovascular Technology, and Surgical Technology programs at CEC's SBI-White Plains and Garden City campuses, either lack programmatic accreditation or lacked programmatic accreditation until September 17, 2010 (the SBI-Garden City Diagnostic Medical Ultrasound program) or until November 18, 2011 (the SBI-White Plains Diagnostic Medical Ultrasound and Medical Sonography programs). As a result, graduates of these programs were not eligible to sit for certain types of qualifying exams immediately upon graduation. In the case of the Diagnostic Medical Ultrasound programs, for example, graduates could not sit for the certification exam until they had completed one year of full-time, paid clinical employment. However, graduates who lacked certification often had difficulty finding such employment. Such graduates faced a

10

"Catch 22": most employers viewed certification as a requirement for employment, but graduates were ineligible for certification until they obtained one year of employment.

33.     Certain CEC enrollment representatives failed to adequately disclose to prospective and current students that the above-referenced programs were not programmatically accredited; that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation; and that graduates' inability to sit for these exams could negatively affect their employment opportunities.

34.     In addition, CEC fails to provide clear and conspicuous disclosures concerning the programmatic accreditation status of SBI programs on its websites. CEC operates three websites for its SBI institutions: www.sanfordbrown.edu, www.sanfordbrown-online.com, and www.careered.com. At the www.sanfordbrown.edu website, webpages that described programs offered at particular campuses did not indicate whether a program had programmatic accreditation directly on the webpage, but instead included a hyperlink titled: "To learn more about what accreditation is, why it is important and details about certification and disclosure information for this and other Sanford-Brown programs and campuses, please click here." The hyperlink was later replaced with a hyperlink titled "Accreditation and Licensure" that appears in a list of hyperlinks when a visitor scrolls over the hyperlink titled "About Us." This hyperlink leads to a webpage that shows hyperlinks labeled "State Authorization information" and "Institutional Accreditation information." No information related to programmatic accreditation is immediately visible. Prospective students are required to scroll through lists below each of these hyperlinks to reach the "Programmatic Accreditation" section. That section includes lists of accredited campuses of particular programs, in paragraph form. The

11

paragraphs are divided by program and by accreditor. Thus, a prospective student seeking to determine whether a program at a particular campus is accredited would, in some cases, have to check several different lists. Where a program lacks programmatic accreditation at particular campuses, the program simply does not appear on any of the lists.

35.　Similarly, the www.sanfordbrown-online.com website failed to adequately disclose whether programs are programmatically accredited. The website included dedicated pages for various SBI campuses and programs offered at each campus, but neither the campus nor program webpages included a disclosure regarding programmatic accreditation on the webpage. Instead, these pages contained a hyperlink titled "More Information" which led to a webpage that contained programmatic accreditation disclosures. However, because the hyperlink did not indicate that accreditation status is available through this hyperlink, website visitors were unlikely to discover the accreditation information.

36.　CEC also operates a website at www.careered.com. At www.careered.com, webpages that list programs offered at particular campuses do not indicate whether a program has programmatic accreditation directly on the webpage, but instead include a hyperlink titled "Accreditation." This hyperlink leads to a webpage that shows information regarding the institutional accreditation of the campus where the program is offered.　No information about programmatic accreditation is immediately visible. Prospective students must scroll through the "Institutional Accreditation" section to reach the "Programmatic Accreditation" section. This section includes lists of accredited campuses, in paragraph form. The paragraphs are divided by program and by accreditor. Thus, a prospective student seeking to determine whether a program at a particular campus is accredited would, in some cases, have to check several different lists.

Where a program lacks accreditation at particular campuses, the program does not appear on any of the lists.

37.     Furthermore, with respect to programs where lack of programmatic accreditation results in ineligibility to sit for qualifying exams or otherwise obtain certification or licensure, neither the www.sanfordbrown.edu website, the www.sandfordbrown-online.edu website, nor the www.careered.com website include clear and conspicuous program-specific disclosures that programmatic accreditation will result in graduates' inability to sit for such exam or otherwise obtain certification or licensure, or that this may impede graduates' professional prospects.

### C.     Inadequate Disclosure Regarding lack of Transferability of Credits Earned

38.     As noted above, CEC's New York SBI campuses are accredited by national accreditors.  Most public and non-profit degree granting educational institutions are regionally, rather than nationally, accredited.  In most cases, regionally accredited schools do not accept credits from nationally-accredited schools.  Thus, credits earned at CEC's nationally-accredited schools are generally not transferrable to public and non-profit degree-granting educational institutions.

39.     CEC enrollment representatives fail to adequately disclose to prospective students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions.

40.     In addition, CEC's SBI websites failed to adequately disclose that credits earned at CEC's SBI campuses are usually not transferable to regionally accredited public and non-profit institutions.

13

41.     New York Executive Law § 63(12) prohibits persons or business entities from engaging in repeated fraudulent or illegal acts or otherwise demonstrating persistent fraud or illegality in the carrying on, conducting or transaction of business.

42.     New York General Business Law ("GBL") Article 22-A prohibits deceptive acts or practices (GBL § 349) and false advertising (GBL § 350) in the conduct of any business, trade or commerce in this State.

43.     The OAG finds that the practices described above constitute repeated violations of General Business Law Article 22-A, §§ 349 and 350, and repeated fraudulent and illegal acts under Executive Law § 63(12).

## AGREEMENT

**WHEREAS**, OAG is willing to accept the terms of this Assurance pursuant to New York Executive Law § 63(15) and to discontinue its investigation;

**WHEREAS,** CEC neither admits nor denies OAG's Findings (1)-(43) above; and

**WHEREAS**, the parties each believe that the obligations imposed by this Assurance are prudent and appropriate;

**IT IS HEREBY UNDERSTOOD AND AGREED**, by and between the parties that:

## I.     DEFINITIONS

1.     "Clear and Conspicuous" or "Clearly and Conspicuously" means that the statement, representation or term being disclosed is of such size, color, contrast and/or audibility and is so presented as to be readily noticed and understood by the person to whom it is being disclosed.  If such statement is necessary as a modification, explanation or clarification to other information with which it is presented, it must be presented in close proximity to the information it modifies, in a manner so as to be readily noticed and

14

understood. In addition to the foregoing, in interactive media, the disclosures shall be presented either directly on a webpage or via a hyperlink that is a prominent and direct link to another webpage and that is obvious and appropriately labeled to convey the importance, nature and relevance of the information it leads to. Such interactive media disclosures shall be displayed in an open format that can be retrieved, downloaded, indexed, and searched by commonly-used web search applications. An open format is one that is platform independent, is machine readable, and is made public without restrictions that would impede the reuse of that information.

2.  "Completer" means a student who is no longer enrolled in a CEC program of study and who has either completed the time allowed or attempted the maximum allowable number of credits for the program of study but who did not accomplish the requirements of graduation, such as, for example, achieving a minimum G.P.A. of at least 2.0, attaining required competencies or speed skills, or satisfying non-academic requirements (*e.g.*, outstanding financial obligations).

3.  "Graduate" means a student who has accomplished all of the requirements of graduation from a CEC program, such as, for example, achieving a minimum G.P.A. of at least 2.0; successfully passing all required courses and meeting all clinical, internship, and externship requirements; satisfying all non-academic requirements for graduation, such as payment of tuition and fees, return of books, etc.; receiving the appropriate credential; and ceasing enrolling in the program at the campus, unless re-enrolled as a new student in a different program.

4.  "New York Program" shall mean any CEC program offered at a physical location within New York State, except those offered at a regionally accredited institution. "New York Program" shall include, but is not limited to, online programs

15

offered by non-regionally accredited CEC institutions that are physically located within New York State. Examples of New York Programs include, but are not limited to, the SBI - New York Certificate Program in Diagnostic Medical Ultrasound, the SBI - Garden City Certificate Program in Medical Assistant, and the SBI - Melville Associate in Health Information Management.

5.  "New York Campus" shall mean any CEC campus located in New York State, except campuses of regionally accredited institutions. Examples of New York Campuses include, but are not limited to, SBI - New York, SBI - Garden City, and SBI - White Plains.

6.  "New York Online Institution" shall mean any CEC institution located outside of New York State that offers online programs and has enrolled at least 50 New York residents within a single reporting cohort (meaning July 1 to June 30 of the following year). Examples of New York Online Institutions include, but are not limited to, AIU and CTU. With respect to CEC institutions located outside of New York State that have not enrolled at least 50 New York residents within a single reporting cohort as of the Effective Date of this Assurance, the requirements of this Assurance shall begin for the first reporting cohort for the first cohort year after such CEC institution located outside of New York State that offers online programs enrolls at least 50 New York residents.

7.  "New York Online Program" shall mean any online CEC program offered to New York residents by a New York Online Institution. Examples of New York Online Programs include, but are not limited to, CTU's Associate of Science in Health Administrative Services and AIU's Bachelors in Accounting.

16

8.    "New York Regionally Accredited Institution" shall mean any regionally accredited CEC institution located in New York State.  For example, Briarcliffe College is a New York Regionally Accredited Institution.

9.    "Admissions Personnel" shall mean any CEC employees or agents that regularly interact with prospective students during recruitment and enrollment, except that Admissions Personnel shall not include financial aid representatives.

## II.    **INJUNCTIVE RELIEF**

### A.    NEW YORK EXECUTIVE LAW § 63(12) AND NEW YORK GENERAL BUSINESS LAW ARTICLE 22-A

1.    CEC is hereby permanently enjoined from any future violations of New York Executive Law § 63(12) and New York General Business Law ("GBL") Article 22-A, §§ 349 and 350.

### B.    CALCULATION AND VERIFICATION OF PLACEMENT RATES

1.    For a period of five cohort years, beginning with cohort year 2013 (e.g., students who graduate between July 1, 2012 and June 30, 2013) and ending with cohort year 2017, CEC shall calculate  placement rates for each New York Program and New York Campus as set forth in Section II.B  of this Assurance, except that for the 2013 cohort only, CEC may verify employment after the graduate/completer has worked in the position for a minimum of 10 days.

2.    For a period of five years, beginning with cohort year 2014 (e.g., for students who graduate between July 1, 2013 and June 30, 2014, and for the 2015, 2016, 2017, and 2018 cohorts) CEC shall calculate placement rates for each New York Online Program and each program offered by a New York Regionally Accredited Institution as set forth in Sections II.B  of this Assurance, except for liberal arts or general studies programs.  In addition, during cohort years 2014 through 2018, CEC shall adhere to the

17

requirements of Section II.B of this Assurance for each New York Online Program and each program offered by a New York Regionally Accredited Institution whenever CEC calculates, reports, and/or discloses placement rates for such program(s) to accreditors, governmental entities, the public, and/or prospective students.

      3.     When calculating placement rates for a New York Online Program as required pursuant to this Section, CEC may calculate placement rates based on data for all graduates/completers of such program, or, in the alternative, CEC may calculate placement rates based on data for the New York graduates/completers only. In any disclosure of a placement rate that is based on data for the New York graduates/completers only, CEC shall clearly and conspicuously state that the placement rate is based on data for the New York graduates/completers only.

      4.     For purposes of this Section and calculating placement rates, CEC shall only deem an individual as "placed" if the individual is a graduate/completer and meets the below definition of "employed" or "self-employed or "contract/freelance employee."

      (a)     <u>Employed.</u> The individual shall be deemed "employed" if each of the following requirements are met:

               (i)     the position is included on the list of job titles published by the institution for which the program prepares graduates/completers; requires the use of the skills learned in the graduate's/completer's program as a

18

predominant component of the job[1]; or, for graduates/completers continuing employment in a position that was held prior to enrolling in the program, the graduate/completer attests in writing that the training received enabled the graduate/completer to maintain or advance in the graduate's/completer's position;

(ii)     the position is permanent (*i.e.*, there is no planned end-date);

(iii)    the position is a paid position;

(iv)    the position requires at least 20 work hours per week;

(v)     the graduate/completer has worked in the position for a minimum of 18 days (*e.g.*, if a graduate/completer works only two days per week, the graduate/completer cannot be counted as "placed" until the graduate/completer has worked for 9 weeks); and

(vi)    CEC has verified the employment after the graduate/completer has worked in the position for a minimum of 18 days by either: (1) speaking to either the employer or an agent of the employer to confirm employment, (2) contacting the graduate/completer directly, (3) receiving an email from the graduate/completer, (4) the graduate/completer's employer provides employment information about the graduate/completer by email or on-line; or (5) for

---

[1] Examples of positions that do *not* "require the use of the skills learned in the graduate's/completer's program as a predominate component of the job" include, but are not limited to: for graduates/completers of criminal justice programs, retail sales positions; and for graduates/completers of medical assistant programs, receptionist or childcare positions.

graduates/completers continuing employment in a position that was held prior to enrolling in or during the program, the graduate/completer attests in writing that the training received enabled the graduate/completer to maintain or advance in the graduate's/completer's position. The attestation form provided by CEC to graduates/completers continuing in a position held prior to enrolling in or during the program shall state that CEC will use the attestation for purposes of calculating placement rates.

(b)    <u>Self-Employed or Contract/Freelance Employee.</u> The individual shall be deemed "self-employed" or a "contract/freelance employee" if each of the following requirements are met:

    (i)    the self-employment or contract/freelance employment meets the requirements of paragraph 4(a)(i) of this Section;

    (ii)    the graduate/completer has received or anticipates receiving compensation in return for services provided in connection with the self-employment or contract/freelance employment;

    (iii)    in the case of contractual, grant-funded or similar employment, that the position is anticipated to employ the graduate for a period of no less than three months;

    (iv)    the graduate/completer has completed at least 135 hours of work in connection with the graduate's/completer's self-employment or contract/freelance employment, including time spent marketing the business, cultivating clients,

20

preparing proposals for bids, negotiating contracts and initiating and/or completing the work; and

(v)    CEC has verified the self-employment or contract/freelance employment after the graduate/completer has completed at least 135 hours of work in connection with the graduate's/completer's self-employment or contract/freelance employment by obtaining written verification from the graduate/completer that: (A) he/she is self-employed or a contract/freelance employee (and a description of the nature of the self-employment or contract/freelance employment), and (B) the self-employment or contract/freelance employment meets each of the requirements of subparts (b)(i)-(iv) of this paragraph.

(vi)    Federal Work/Study positions at CEC institutions shall not be counted as self-employment or contractual/freelance employment.

5.    The term "placement rate" shall mean the total number of placed graduates/completers divided by the total number of graduates/completers who do not qualify for exclusion from the calculation as set out in paragraph II.B(8) below. CEC will only count a graduate/completer as placed or excluded for purposes of calculating a placement rate where CEC is able to successfully contact a graduate/completer or employer to verify employment or exclusion.

6.    Placement rates shall be calculated based on the employment status of graduates/completers (a) who graduated/completed during the period of July 1 through June 30 ("Reporting Period") and (b) as of November 1 of each year,

21

subject to modification or extension of the November 1 deadline by ACICS, the accreditor of the majority of CEC's New York locations.

7.    Where CEC relies on a third party for verifying and/or calculating placement rates, CEC shall enter into a contract with such third party pursuant to which the third party shall agree to adhere to the requirements of this Assurance concerning calculation and verification of placement rates. CEC shall monitor and ensure such third party's compliance with the requirements of the Assurance.

8.    In calculating placement rate, a graduate/completer may be excluded from the total number of graduates/completers (*i.e.*, the "denominator") if CEC obtains written documentation that the graduate/completer:

> (a)    is pregnant or has a medical condition or disability that results in the graduate/completer's inability to work or the graduate/completer has a parent, child or spouse who has a medical condition that requires the care of the graduate;
>
> (b)    is engaged in full-time active military duty;
>
> (c)    is enrolled in an additional program of post-secondary education;
>
> (d)    is deceased;
>
> (e)    is not eligible for placement in the United States because of visa restrictions;
>
> (f)    is a completer/graduate of a stand-alone English as a Second Language Program;

       (g)     is a spouse or dependent of military personnel who have moved due to military transfer orders; or

       (h)     for the on-line AIU and CTU programs, CEC obtains written documentation signed by the graduate/completer stating that the graduate/completer is not seeking employment or not seeking new employment but remaining in a position held before graduation and not seeking to obtain promotion or move up over time.

9.     Where CEC excludes a graduate/completer from the total number of graduate/completers for the purposes of calculating the placement rate pursuant to paragraph II.B(8), CEC shall not count that graduate/completer as "placed".

10.     Within 90 days of execution of the Assurance, CEC shall submit to the OAG for review and approval a protocol for performance checks of those employees responsible for verifying, calculating, and/or disclosing placement rates. Such performance checks shall be designed to provide a reliable assessment of the accuracy of disclosed placement rates and compliance by CEC employees with the terms of this Assurance for the verification, calculation, and disclosure of placement rates. The performance checks shall be carried out regularly by CEC's quality assurance or auditing department or an independent third-party. The protocol will include specific instructions concerning:

       (a)     a schedule for performance checks coinciding with each Reporting Period;

23

(b)    a requirement that each employee who engages in verification, calculation, or disclosure of placement rates be subject to such performance checks;

(c)    a description of mandatory, non-discretionary disciplinary actions (such as demotion or termination) that shall be applied to CEC employees and agents who are found to have violated the requirements of this Assurance, falsified placement rate data, or engaged in other misconduct related to placement rates; and

(d)    a requirement that where performance checks reveal that 5% or more of the graduates/completers were incorrectly counted as placed for the purposes of calculating a placement rate, CEC shall: (i) conduct a review of the employment status of every graduate/completer deemed to have been placed to determine the extent to which the placement rate must be revised, (ii) calculate and disclose any corrected placement rates; and (iii) notify the OAG of this finding.

11.    CEC shall not be required to calculate or disclose placement rates for programs being offered for the first time in the relevant cohort reporting period or for any programs with fewer than five students in the relevant cohort reporting period. CEC shall be required to calculate and disclose placement rates as set forth in Sections II.B and C of this Assurance beginning with the first full cohort year that follows the cohort year in which a program is offered for the first time. For example, a program first offered beginning January 1, 2014, will be required to calculate and disclose placement rates as set forth in Sections II.B and C of this Assurance beginning with the July 1, 2014 to June 30, 2015 cohort year.

24

## C.  DISCLOSURE OF PLACEMENT RATES

1.    CEC shall not make any misrepresentations concerning the placement rates of CEC graduates/completers of any institution or program that enrolls New York residents in any advertising or in any oral or written disclosures to students, prospective students, the public, an accrediting agency, or a government entity.

2.    Where CEC is required to calculate and disclose placement rates for New York Programs, New York Campuses, New York Regionally Accredited Institutions, or New York Online Institutions, CEC shall clearly and conspicuously disclose placement rates (a) in all catalogues referencing the particular program, campus, or institution, and (b) on CEC's website.

3.    In all advertising or promotional materials for institutions or programs that enroll New York residents, including but not limited to direct mail and email provided to prospective students, where there is an express or implied representation that completion of a CEC program will result in employment, CEC must either disclose the relevant placement rate for such program or provide a hyperlink (in interactive media) or the URL (in other types of media) for a website that provides the relevant placement rate disclosures.  The hyperlink or URL label shall include the terms "Placement Rate" or "Employment Rate" or a term of similar meaning.

4.    With regard to disclosures of placement rates on CEC's websites, CEC shall, for all institutions and programs that enroll New York residents: (a) provide a prominent, obvious, appropriately labeled, and direct link to placement rate disclosures on the homepage of its website and on any other webpage containing general, academic, or admissions information about the program; and (b) display the placement rate disclosures in an open format that can be retrieved, downloaded, indexed and searched

25

by commonly used web search applications.  The hyperlink label to placement rate

disclosures shall include the terms "Placement Rate" or "Employment Rate" or a term of

similar meaning.

5.     Whenever CEC is required to calculate placement rates pursuant to

Section II.B  for CEC institutions or programs that enroll New York residents,

CEC shall also clearly and conspicuously disclose:

(a)     the categories of graduates/completers that were excluded from

the calculation pursuant to paragraph II.B(8) of this Assurance;

(b)     if CEC counts as "placed" those graduates/completers who are

employed after graduation in the same position that they held prior

to beginning or during CEC's program, that such

graduates/completers were counted as "placed";

(c)     that graduates/completers were counted as "placed" if (i) their

position was included on the list of job titles published by the

institution for which the program prepares graduates/completers;

(ii) their position requires the use of the skills learned in the

graduate's/completer's program as a predominant component of

the job; or (iii) for graduates/completers continuing employment

in a position that was held prior to enrolling in the program, the

graduate/completer attests in writing that the training received

enabled the graduate/completer to maintain or advance in the

graduate's/completer's position; and

(d)      that graduates/completers were counted as "placed" if the

graduate/completer obtained either a full-time position or a part-time position of at least 20 hours per week.

6.    CEC employees or agents shall not make any verbal representations to prospective students concerning the placement rates of CEC institutions or programs that enroll New York residents.

7.    CEC Admissions Personnel at CEC institutions that enroll New York residents shall either provide CEC-approved written disclosures of placement rates in response to inquiries from prospective students concerning placement rates or, where the prospective student has immediate access to CEC's website, CEC may refer such prospective student to CEC's website disclosures. Such disclosures shall include the placement rate for the specific program and campus where the prospective student intends to enroll (except where placement rate information is unavailable because the program is being offered for the first time or enrolled fewer than five students in the relevant cohort reporting period). The website disclosures shall comply with the requirements of this Assurance and be clear and conspicuous.

8.    CEC shall provide training on at least an annual basis to all CEC Admissions Personnel for CEC institutions that enroll New York residents regarding appropriate procedures for responding to inquiries regarding placement rates and the disclosure of placement rates. Such training shall include: (a) notification that Admissions Personnel are prohibited from making verbal representations concerning placement rates to prospective students; (b) notification that Admissions Personnel shall either provide a CEC-approved written disclosure to prospective students in response to inquiries concerning placement rates or, where the prospective student has immediate access to CEC's website, may direct prospective students to CEC-approved disclosures

27

of placement rates on CEC's website; and (c) notification of the disciplinary actions (such as demotion or termination) that shall be applied to CEC Admissions Personnel who are found to have violated the requirements of this Assurance, falsified placement rate data, or engaged in other misconduct related to placement rates.

D.  TERMINATING PROGRAMS WITH INADEQUATE PLACEMENT RATES

1.  Beginning with placement rates for academic year 2013-2014, where placement rates for a program offered to New York residents fall below 47.5% for a given cohort year, CEC must take appropriate action to bring the program's placement rate above 47.5% within a time period not to exceed:

(a)  Twelve months from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program is less than one year in length;

(b)  Eighteen months from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program, or the longest program offered by the institution, is at least one year, but less than two years, in length; or

(c)  Two years from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program, or the longest program offered by the institution, is at least two years in length.

2.  If the program's placement is not above 47.5% within the specified period, CEC shall teach-out the program (*i.e.*, end enrollment of new students in the program), unless CEC requests and the OAG approves alternative corrective action.

28

E.    OBLIGATIONS CONCERNING INSTITUTIONAL AND PROGRAMMATIC ACCREDITATION

1.    CEC shall not misrepresent the accreditation status (*e.g.*, provisional accreditation, accreditation in a probationary status, etc.) of any institution or program that enrolls New York residents.

2.    All CEC webpages that reference a New York Program, New York Campus, New York Online Institution, New York Online Program, or New York Regionally Accredited Institution must clearly and conspicuously disclose up-to-date information regarding the accreditation status of such campus, institution or program in close proximity to the name of the program, campus or institution and directly on the specific webpage that references the New York Program, New York Campus, New York Online Institution, New York Online Program, or New York Regionally Accredited Institution, including, where applicable, the disclosures set forth in Section II.E(4) of this Assurance.  Providing disclosures concerning accreditation status via a hyperlink shall not be sufficient to meet this requirement.  Such disclosures shall consist of a statement concerning the accreditation status of the particular institution or program referenced only, rather than a list of accreditation statuses of multiple institutions/programs.  Where CEC provides the required clear and conspicuous, proximate disclosure of the accreditation status of a campus, institution or program directly on the webpage that references such program, campus or institution, CEC may also provide additional information related to accreditation via hyperlink.

3.    CEC shall not offer any program at any institution that enrolls New York residents where the program, or institution where the program is offered, is not accredited and this may result in an inability to sit for at least one qualifying exam that is

29

typically necessary for employment[2] immediately upon graduation or in an inability to become registered, licensed, or otherwise credentialed where such registration, license, or credential is typically necessary for employment[3] upon graduation, except that CEC may offer such a program:

(a)     where CEC has obtained provisional accreditation for such program or institution and CEC is making a good faith effort to obtain full accreditation as promptly as possible; or

(b)     where CEC has formally applied for accreditation for such program or institution and CEC is making a good faith effort to advance the application as promptly as possible; or

(c)     where an accreditor requires that a program or institution be operational prior to the submission of an application for accreditation and: (i) CEC provides written pre-notification to the accreditor indicating that CEC intends to apply for accreditation for the program or institution; (ii) CEC makes such application within three months of the last day of any prescribed time-period for applying for accreditation, or if there is no prescribed time-period, within six months of the start date of the program; and (iii) CEC makes a good faith effort to advance such application as promptly as possible.

---

[2] For purposes of this Assurance, a qualifying exam is "typically necessary for employment" where more than 50% of positions are open only to graduates that have passed that qualifying exam.

[3] For purposes of this Assurance, a registration, license or credential is "typically necessary for employment" where more than 50% of positions are open only to graduates that have obtain such registration, license or credential.

Where CEC has submitted an application for accreditation for a program subject to this paragraph and such application is denied, CEC shall teach-out the program (*i.e.*, end enrollment of new students in the program).

4. Where a program or institution that enrolls New York residents is not accredited or is provisionally accredited and this may result in an inability to sit for at least one qualifying exam that is typically necessary for employment immediately upon graduation or in an inability to become registered, licensed, or otherwise credentialed where such registration, license, or credential is typically necessary for employment immediately upon graduation, CEC must clearly and conspicuously disclose on all webpages that refer to the program, in all CEC catalogues and promotional materials that reference the program or institution, and in a separate written disclosure form that shall be provided to prospective students prior to such student enrolling in the institution or program:

(a) that the institution or program lacks accreditation from the relevant institutional or programmatic accreditor or is provisionally accredited only and may not achieve full accreditation status; and

(b) that graduates are not able to sit for certain qualifying exams typically necessary for employment immediately upon graduation or are unable to become registered, licensed, or otherwise credentialed, as applicable, due to the program's or institution's lack of accreditation, and that such registration, license, or other credential is typically necessary for employment.

F.  DISCLOSURE CONCERNING LACK OF TRANSFERABILITY OF
    CREDITS EARNED AT NON-REGIONALLY ACCREDITED
    INSTITUTIONS

1.      All CEC websites that reference a non-regionally accredited institution
that enrolls New York residents shall clearly and conspicuously disclose that credits
earned at such institution are usually not transferable to public and private non-profit
colleges or universities.

2.      CEC shall provide a written disclosure to prospective students at non-
regionally-accredited CEC institutions that enroll New York residents stating that credits
earned at the institution are usually not transferable to public or private non-profit
colleges or universities.

G.  PROVIDING ADEQUATE PLACEMENT ASSISTANCE

1.      CEC shall provide adequate placement assistance services to all enrollees
and graduates/completers of programs at New York Campuses.  CEC shall designate full-
time equivalent employees as placement representatives for each New York Campus.  The
placement representatives' job responsibilities shall be primarily related to assisting
students and graduates/completers in obtaining jobs, including, for example: providing
training in resume and cover letter writing, job search strategies, and/or interviewing;
editing resumes and cover letters; researching employment opportunities; providing
information about employment opportunities to graduates, etc.

2.      CEC shall provide adequate placement assistance services to all enrollees
and graduates/completers of programs at regionally accredited campuses or institutions
that enroll New York residents where any of CEC's advertisements for such campus or
institution during the prior two years included any claims related to the campus's or
institution's provision of placement assistance services.  Where CEC's advertisements for

32

such campus or institution during the prior two years included any claims related to the provision of placement assistance services, CEC shall designate full-time equivalent employees as placement representatives for such institution. The placement representatives' job responsibilities shall be primarily related to assisting students and graduates/completers in obtaining jobs, including, for example: providing training in resume and cover letter writing, job search strategies, and/or interviewing; editing resumes and cover letters; researching employment opportunities; providing information about employment opportunities to graduates, etc.

   3. CEC shall maintain appropriate placement representative-to-student ratios at (a) all New York Campuses and (b) those regionally accredited institutions that enroll New York residents that included any claims as to placement assistance services in advertisements in the prior two years. With respect to nationally accredited institutions that enroll New York residents, CEC shall provide at least one placement representative for every 100 students graduating on an annual basis for a period of five cohort years beginning with the 2013 cohort (students graduating between July 1, 2013 and June 30, 2014). With respect to regionally accredited institutions subject to this provision, there must be at least one placement counselor for every 125 students graduating and seeking employment on an annual basis for a period of five cohort years beginning in the 2013 cohort.

   4. At all New York Campuses and at regionally accredited institutions that are subject to this provision, CEC shall document and retain records of: (a) all written student and graduate/completer requests for placement assistance services, (b) all placement assistance services provided to students and graduates/completers, and (c) all

33

written complaints related to placement assistance services and CEC's responses to such complaints.

     5.     CEC shall include in any general graduate survey to graduates of New York Campuses or regionally accredited institution that are subject to this provision questions requesting that graduates rate or provide information about their satisfaction with the placement assistance services offered by CEC.

     H.     COMPLIANCE MEASURES

     1.     CEC shall hire an independent consultant or audit firm to independently seek to verify, using the methods described in paragraphs II.B(4)(a)(vi) and II.B(4)(b)(v), 100% of graduates/completers that have been deemed by CEC to be placed for the following placement rate calculations: 2012-13; 2013-14; and 2014-15 for all New York Programs and New York campuses; and 2013-14, 2014-15, and 2015-16 for all New York Regionally Accredited Institutions, programs offered by New York Regionally Accredited Institutions, New York Online Institutions, and New York Online Programs.

     2.     Upon completion of the independent verification process, the consultant or audit firm shall prepare a report that includes a description of: (a) the methodology used to conduct the review; and (b) the results of the review. In addition, CEC will provide a description of any corrective actions that have been taken to address any identified problems. The report shall be submitted to the OAG and CEC's Board of Directors on January 15, 2014 for the 2012-2013 year, on and January 15 of each subsequent year for each subsequent cohort for three years total, ending January 15, 2016 for the New York Programs and New York Campuses and ending January 15, 2017 for the New York Regionally Accredited Institutions, programs offered by New York Regionally Accredited Institutions, New York Online Institutions, and New York Online Programs.

I.   ADDITIONAL REPORTING REQUIREMENTS

1.   For a period of three years, CEC shall provide to the OAG by March 1,

2014 for the 2012-2013 year and subsequently by March 1 of each subsequent year:

(a)   an affidavit of compliance with the Assurance;

(b)   placement rate data for each program, campus and institution for
which CEC calculated and disclosed placement rate data pursuant to
Sections II.B and C of this Assurance;

(c)   representative examples of any advertisements that include
placement rates;

(d)   representative examples of written placement rate disclosures, if
any;

(e)   a summary of the results of the performance checks (described in
paragraph II.B(11) above) that were conducted during the
calendar year;

(f)   a detailed description of any instances where disclosed placement
rates were revised after disclosure; and

(g)   any written complaints from students or graduates/completers
related to placement assistance services, accreditation, or difficulty
obtaining employment.

III.   RESTITUTION

A.   Restitution Fund and Claims Process

1.   The OAG shall hire an outside administrator to administer the claims

process.  CEC shall be responsible for the cost of the administrator and all costs

associated with the claims process in an amount not to exceed $250,000, with any amount above $250,000 to be paid from the Restitution Fund.

  2.  CEC shall pay $9,250,000 into a Restitution Fund administered by the outside administrator within thirty (30) days of the Effective Date of the Assurance. Restitution shall be distributed to eligible consumers pursuant to formulas to be determined by the OAG.

  B.  <u>Restitution Related to Placement Rate Misrepresentations</u>

  1.  All graduates/completers who were enrolled in a New York Program or New York Regionally Accredited Institution and all New York graduates/completers who were enrolled in a New York Online Program during 2009-10, 2010-11, or 2011-12 shall be eligible to receive a claim form. Such graduates/completers shall be eligible to receive restitution where such graduate/completer was not employed within 180 days of graduation/completion in a position that met the requirements set forth in Section II.B.4(a) or II.B.4(b).

  2.  The OAG shall determine a formula for calculating the amount of restitution eligible claimants shall receive.

  3.  Within 60 days of the Effective Date of the Assurance, CEC shall provide the administrator with a database that includes the following information necessary to carry out the claims process related to placement rate misrepresentations: (a) the names and last known addresses of all graduates/completers who were enrolled in a New York Program or New York Regionally Accredited Institution and all New York graduates/completers who were enrolled in a New York Online Program during cohort years 2009-10, 2010-11, or 2011-12; (b) the program(s) that the graduates/completers graduated

36

from or completed; (c) the amount of tuition paid by such graduates/completers; and (d) the disclosed placement rate for the program(s) and institution(s) graduated from or completed.

      C.      <u>Restitution related to Programmatic Accreditation</u>

      1.      New York graduates/completers who enrolled during the cohort years 2009-10, 2010-11, or 2011-12 in CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs that lacked programmatic accreditation, as well as New York graduates/completers who enrolled prior to cohort year 2009-2010 in CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs lacking programmatic accreditation who submitted a complaint to the OAG, Better Business Bureau, or State Education Department prior to the Effective Date of this Assurance or who submit a complaint to the OAG within 60 days of the Effective Date of this Assurance, shall be eligible for restitution from the Restitution Fund pursuant to a formula to be determined by the OAG.

      2.      Within 60 days of the Effective Date of the Assurance, CEC shall provide the administrator with a database that includes the following information: (a) the names and last known addresses of all graduates/completers who were enrolled CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs that lacked programmatic accreditation during cohort years 2009-10, 2010-11, or 2011-12; (b) the program(s) that the graduates/completers graduated from or completed; and (c) the amount of tuition paid by such graduates/completers.

      3.      The OAG shall determine a formula for calculating the amount of restitution eligible claimants shall receive.

<div align="center">37</div>

IV.    CIVIL PENALTY

    1.    In consideration of the making and execution of this Assurance, and within ten (10) business days of the Effective Date of this Assurance, CEC shall pay by wire transfer, certified or bank check payable to the State of New York $1 million for penalties, fees and costs. If payment is made by check, it shall be payable to the State of New York and delivered to the State of New York Office of the Attorney General, Consumer Frauds and Protection Bureau, Attention: Jeanna Hussey, Assistant Attorney General, 120 Broadway, 3rd Floor, New York, New York, 10271.

V.    SUBSEQUENT CHANGES IN LAW OR ACCREDITATION STANDARDS

    1.    If federal law or regulations or state laws or regulations are enacted subsequent to the Effective Date of the Assurance which relate to calculation of or disclosure of placement rates or other matters hereunder, and such laws or regulations are inconsistent with the provisions of the Assurance, CEC will notify the OAG concerning these changes in law or regulation and may request modification of the relevant provisions of the Assurance, which modification shall not be unreasonably withheld.

    2.    If ACICS or any other relevant institutional or programmatic accreditor modifies or revises its guidelines or standards subsequent to the Effective Date of the Assurance, and where such modifications are inconsistent with the provisions of the Assurance, CEC will notify the OAG concerning these changes in guidelines or standards and may request modification of provisions of the Assurance that conflict with such guidelines or standards.

    3.    Nothing in this agreement is intended to modify or change the requirements imposed relating to calculating, reporting or disclosing separate placement rates to the New York State Bureau of Proprietary School Supervision (BPSS), New York

State Education Department (NYSED), other governmental entities, or CEC's institutional or programmatic accreditors, where required, and CEC may separately calculate, report or disclose to the public and/or prospective students those separate placement rates, as applicable, along with any placements rates calculated and disclosed pursuant to the terms of the Assurance. CEC shall notify the OAG of significant changes to requirements imposed relating to calculating, reporting, or disclosing separate placement rates to the governmental entities or CEC's accreditors.

VI.    <u>MISCELLANEOUS</u>

      1.      OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by CEC and OAG's own factual investigation as set forth in Findings (1)-(42) above. To the extent that any material representations are later found to be materially inaccurate or misleading, this Assurance is voidable by OAG in its sole discretion.

      2.      No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by CEC in agreeing to this Assurance.

      3.      CEC represents and warrants, through the signature below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized. CEC shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis. Nothing in this paragraph affects CEC's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which OAG is not a party. This Assurance is not intended for use by any

third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by CEC.

4.      This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

5.      This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG.

6.      It is understood and agreed that this Assurance shall apply to CEC, whether acting through its respective directors, officers, employees, representatives, agents, assigns, successors, affiliates, subsidiaries or other business persons or business entities whose acts, practices, policies are directed, formulated or controlled by Respondents.

7.      In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, in the sole discretion of OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

8.      To the extent not already provided under this Assurance, CEC shall, upon request by OAG, provide all documentation and information reasonably necessary for OAG to verify compliance with this Assurance.

9.      All notices, reports, requests, and other communications to any party pursuant to this Assurance shall be in writing and shall be directed by fax and UPS priority mail as follows:

If to CEC, to:

        Jeffrey D. Ayers
        Senior Vice President, General Counsel & Corporate Secretary
        Career Education Corporation
        231 N. Martingale Road
        Schaumburg, Illinois 60173

If to OAG, to:

        Jeanna Hussey
        Assistant Attorney General
        Bureau of Consumer Frauds & Protection
        Office of the Attorney General of the State of New York
        120 Broadway, 3rd Floor
        New York, NY 10271

10.     Acceptance of this Assurance by OAG shall not be deemed approval by OAG of any of the practices or procedures referenced herein, and CEC shall make no representation to the contrary.

11.     Pursuant to Executive Law § 63(15), evidence of a violation of this Assurance shall constitute prima facie proof of violation of the applicable law in any action or proceeding thereafter commenced by OAG.

12.     If a court of competent jurisdiction determines that CEC has breached this Assurance, CEC shall pay to OAG the cost, if any, of such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

13.     OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding. This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

14.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

15. This Assurance constitutes the entire agreement between the OAG and CEC and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of this Assurance.

16. This Assurance may be executed in multiple counterparts.

17. The Effective Date of this Assurance shall be the date upon which it has been fully executed by all of the signatories hereto.

**IN WITNESS THEREOF**, this Assurance is executed by the parties hereto on August **19**, 2013.

Career Education Corporation

By: _____

Jeffrey D. Ayers
Senior Vice President, General Counsel & Corporate Secretary

Eric T. Schneiderman
Attorney General of the State of New York

By: _____

Jane M. Azia
Bureau Chief
Bureau of Consumer Frauds & Protection

By: _____

Jeanna Hussey
Assistant Attorney General

_____

Carolyn Fast
Assistant Attorney General

42

Melvin Goldberg
Assistant Attorney General



# ARDMS®

# SPI Requirement
# and General Prerequisites



## ARDMS.org
## 1-800-541-9754

2013-2

# Sonography Principles and Instrumentation (SPI) Examination Requirement

*(Note: All listed items must be met and completed prior to submission. See the Notes About the SPI Requirement for footnotes, definitions and complete details.)*

### Education

Successful completion of a general, medical or sonographic physics class/seminar/course.

### Documentation Required with Application

1) A transcript (see transcript requirements below) reflecting successful completion of a graded general, medical or sonographic college, post secondary or higher education physics class (with a grade of C or above);

### OR

A CME certificate denoting successful completion of a general, medical or sonographic physics seminar, physics review course, or physics correspondence course, denoting a minimum award of 12 ARDMS-accepted CME credits. The certificate must meet ARDMS CME documentation requirements (visit ARDMS.org/CME to view ARDMS-accepted CMEs). The CME credits must be earned within two (2) years prior to application submission.

2) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

### Transcript Requirements

• Name of applicant and school must be printed on the transcript; handwritten information will not be accepted.

• The class or course name must specifically indicate "Physics," "Physical Principles" and/or "Instrumentation" in the title and be printed on the transcript. Supplementary information will not be accepted.

• Transcript can be unofficial or official.

• If submitting a foreign transcript or degree, an original course by course foreign transcript evaluation must accompany the application summary and indicate the aforementioned requirements.

• Transcripts only indicating a number grade must include a "grade key" printed on the transcript showing what letter grade the number grade is equivalent to. Supplementary information will not be accepted.

• A grade report will not be accepted in lieu of the transcript (unofficial or official).

## Prerequisite 1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

A single two-year allied health education program that is patient-care related.[1]

Allied health occupations include, but are not limited to, diagnostic medical sonographer, radiologic technologist, respiratory therapist, occupational therapist, physical therapist and registered nurse.

### Required Clinical Ultrasound/Vascular Experience

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

Note: If you are using your DMS/CVT program for the educational requirement, you still have to document an additional 12 months of full-time clinical ultrasound/vascular experience earned outside the two-year program.

### Documentation Required with Application

1) Official transcript from two-year allied health education program as noted in the "Education" requirement of this prerequisite. Must state specific number of credits and indicate quarter or semester based system.

2) Copy of education program certificate, credential or license.

3) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. For required letter content, please visit: ARDMS.org/sampleletters.

4) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

Graduate of a program accredited by an agency recognized by the Council for Higher Education Accreditation (CHEA), United States Department of Education (USDOE) or Canadian Medical Association (CMA), that specifically conducts programmatic accreditation for diagnostic medical sonography/diagnostic cardiac sonography/vascular technology. Currently the only organizations that offer programmatic accreditation under the aforementioned associations are the Commission on Accreditation of Allied Health Education Programs (CAAHEP) and the Canadian Medical Association (CMA).

### Required Clinical Ultrasound/Vascular Experience

No additional experience is required.

### Documentation Required with Application

1) Copy of diploma from ultrasound/vascular program or an official transcript indicating the date the degree was conferred.

2) Original letter signed by program director and/or medical director indicating date of graduation or successful completion of the program[4]. Program directors must use the mandatory formatted sample letter, available on ARDMS.org /sampleletters.

3) The CV form is not required if the application is submitted and received in the ARDMS office within one year after successful completion of the program. Otherwise an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 3A

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

Bachelor's degree (any major) or foreign degree equivalent to a Bachelor's degree in the U.S. or Canada.

### Required Clinical Ultrasound/Vascular Experience

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

### Documentation Required with Application

1) Copy of Bachelor's degree or an official transcript earned in the U.S. or Canada or an original foreign transcript evaluation indicating that the degree is equivalent to a Bachelor's degree in the U.S. or Canada.

2) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 3B

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

Bachelor's degree in sonography or vascular technology or foreign degree equivalent to a Bachelor's degree in sonography or vascular technology in the U.S. or Canada.

**Required Clinical Ultrasound/Vascular Experience**

No additional experience is required.

Note: Sonography or vascular technology Bachelor's degree applicants may take the examination one year prior to the completion of degree, provided they have completed 12 months of full-time[2] clinical experience[3] within the program.

**Documentation Required with Application**

1) Copy of Bachelor's degree or an official transcript earned in the U.S. or Canada or an original foreign transcript evaluation indicating that the degree is equivalent to a Bachelor's degree in the U.S. or Canada.

2) Original letter signed by education program director verifying length of ultrasound or vascular experience. If program is not completed at the time of application, a letter signed by the program director stating graduation date and completion of appropriate clinical ultrasound experience[3] is needed[5]. Program directors must use the mandatory formatted sample letters, available on ARDMS.org/sampleletters.

3) The clinical verification (CV) form is not required if the application is submitted and received in the ARDMS office within one year prior to successful completion of the program, provided that the applicant has completed 12 months of full-time clinical experience within the program at the time that the application is submitted. Otherwise, an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 4A1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General, U.S., and Canada — MD or DO degree earned in the U.S. or Canada.

Formal Training — Attendance of an Accreditation Council for Graduate Medical Education (ACGME) or Royal College of Physicians and Surgeons of Canada (RCPSC) accredited residency or fellowship that includes didactic and clinical ultrasound/vascular experience as an integral part of the program.

**Required Clinical Ultrasound/Vascular Experience**

The applicant must be able to document clinical experience with a minimum of 800 studies in the area in which he/she is applying for.

**Documentation Required with Application**

1) Copy of medical school diploma.

2) Original letter from residency/fellowship program director verifying dates of attendance and completion of a minimum of 800 studies in the area in which you are applying. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Applicants should maintain a patient log or other record of the 800 studies. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of application for examination.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 4A2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General, U.S., and Canada — MD or DO degree earned in the U.S. or Canada.

**Required Clinical Ultrasound/Vascular Experience**

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

**Documentation Required with Application**

1) Copy of medical school diploma.

2) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. If you are the supervising physician, you may write your own letter. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

## Prerequisite 4B1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General - Outside U.S., and Canada — MD or DO degrees equivalent to those of the U.S. or Canada.

Formal Training — Attendance of an accredited residency or fellowship that includes didactic and clinical ultrasound/vascular experience as an integral part of the program.

**Required Clinical Ultrasound/Vascular Experience**

The applicant must be able to document clinical experience with a minimum of 800 studies in the area in which he/she is applying for.

**Documentation Required with Application**

1) Original credential report or official notarized copy of the evaluation converting the foreign medical degree must indicate that this medical degree is equivalent to a doctor of medicine degree in the U.S. or Canada. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent can be found at ARDMS.org/ForeignTranscripts. If the applicant has taken and passed all three parts of and earned the Educational Commission for Foreign Medical Graduates (ECFMG®) certification, a copy of the ECFMG® certificate may be submitted with a copy of a current, valid MD or DO license from the U.S. or Canada in lieu of the evaluation.

2) Original letter from residency/fellowship program director verifying dates of attendance and completion of a minimum of 800 studies in the area in which you are applying. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Applicants should maintain a patient log or other record of the 800 studies. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of application for examination.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 4B2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General - Outside U.S., and Canada — MD or DO degrees equivalent to those of the U.S. or Canada.

**Required Clinical Ultrasound/Vascular Experience**

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

**Documentation Required with Application**

1) Original credential report or official notarized copy of the evaluation converting the foreign medical degree must indicate that this medical degree is equivalent to a doctor of medicine degree in the U.S. or Canada. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent can be found at ARDMS.org/ForeignTranscripts. If the applicant has taken and passed all three parts of and earned the Educational Commission for Foreign Medical Graduates (ECFMG®) certification, a copy of the ECFMG® certificate may be submitted with a copy of a current, valid MD or DO license from the U.S. or Canada in lieu of the evaluation.

2) Original letter from supervising physician, sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. If you are the supervising physician, you may write your own letter. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s).

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 5

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General—Must hold one of the following Active certifications:

ONLY *RCS, RCCS* or *RVS* through Cardiovascular Credentialing International (CCI), or

ONLY *Sonography, Vascular Sonography* or *Breast Sonography* through American Registry of Radiologic Technologist (ARRT), or

*DMU* through Australian Society of Ultrasound in Medicine (ASUM).

**Required Clinical Ultrasound/Vascular Experience**

Previously met by achievement of other organization's credential.

**Documentation Required with Application**

1) Copy of Active certification identification card or copy of license.

2) Original signed and completed CV form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

3) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 6

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

MD or DO with RPVI (Active Status)

Physicians who currently hold the RPVI credential with active status may apply directly for the RDMS, RDCS and RVT credential examinations.

**Documentation Required with Application**

1) Copy of current, valid medical license.

2) Original signed and completed Clinical Verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

3) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 7

*Prerequisite 7 is scheduled to expire on 12/31/2017.*

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education:**

High school graduate or U.S. or Canadian equivalent of foreign high school graduate.

**Required Clinical Ultrasound/Vascular Experience**

Minimum of 48 months full-time[2] clinical ultrasound/vascular experience[3] and a minimum of 3,200 cases in each applied for specialty area.

**Documentation Required with Application**

1) Copy of high school diploma or U.S. or Canadian equivalent of foreign high school graduate. (For individuals whose high school diploma/equivalent was earned outside of the U.S. or Canada, an original credential report or official notarized copy of the evaluation is required. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent, can be found at ARDMS.org/ForeignTranscripts.)

2) Original Physician's Statement Experience letter(s) from reporting physician(s) indicating a minimum of 48 months of full-time clinical/vascular experience and including exact dates of ultrasound experience in each applied for specialty area.

3) Original Sonographer's Statement letter from an ARDMS Registered Sonographer verifying the applicant has performed independently and effectively under their supervision a minimum of 3,200 cases in each applied for specialty area. For required letter content, please visit: ARDMS.org/sampleletters.

4) Original signed and completed Clinical Verification (CV) form for each appropriate specialty area(s). CV forms may be found at ARDMS.org/CV.

5) Thirty ARDMS accepted CMEs that are ultrasound related in the specific applied for specialty area earned within three years prior to the date of application for examination.

6) Applicants should maintain a patient log or other record of the 3,200 cases for each applied for specialty area. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of examination.

7) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Notes About the SPI Examination Requirement

- The SPI Examination Requirement applies to the SPI examination only.

- SPI Applicants who can fully meet an existing ARDMS prerequisite (1 through 7) are strongly encouraged to apply under that prerequisite, as future application processing will be faster and easier.

- Applicants who have applied for and been approved to take a former Principles and Instrumentation examination (UPI, CPI, VPI) or any ARDMS specialty examination(s) (e.g. AB, BR, OB/GYN, NE, FE, AE, PE, VT) should not apply under the SPI Examination Requirement but rather as a re-applicant (visit ARDMS.org/reapplicant for details).

- A clinical verification (CV) form is not required when applying under the SPI Examination Requirement.

- To apply for an ARDMS specialty examination (e.g. AB, BR, OB/GYN, NE, FE, AE, PE, VT), an existing ARDMS prerequisite (1 through 7) must be met.

# Notes About the Prerequisites

[1] A two-year allied health education program that is patient-care related is defined as (1) 24 full-time consecutive calendar months or (2) 60 semester credits or (3) 84 quarter credits (4) and requiring a clinical internship/externship to complete the program. Credit hours are based on U.S. equivalency in a post secondary institution. The program or school must be authorized by an accrediting agency to award semester or quarter credits and the type of credits granted must be reflected on the transcript. Transcripts reflecting clock hours must be converted to credit hours. If submitting a foreign degree, an original course by course foreign transcript evaluation must accompany the application summary and indicate the aforementioned requirements.

[2] Full-time is defined as 35 hours per week, at least 48 weeks per year. If working part time, the requirements are prorated. Twenty hours per week would take approximately two years. The full-time definition applies to both paid clinical ultrasound/vascular experience and experience earned through completion of a formal ultrasound/vascular program.

[3] Clinical ultrasound/vascular experience may be obtained one of two ways: (1) being employed as an ultrasound/vascular sonographer in a clinical setting for a minimum of 12 months and a minimum of 1680 hours, or (2) successfully completing a formal, full-time ultrasound/vascular program that is a minimum of 12 months in length, a minimum of 1680 total program hours, including appropriate clinical and didactic hours, and requires a clinical internship/externship to complete the program . If the total length of the program exceeds 12 months, the applicant must successfully complete the program in its entirety prior to using the program as documentation of the required clinical ultrasound/vascular experience. It is recommended that an applicant be directly involved in a minimum of 800 diagnostic cases during his/her clinical experience in each specialty area for which he/she is applying. Clinical diagnostic settings include hospitals, clinics and private practices. ARDMS does not accept volunteer, instructorship, unpaid, barter or veterinarian experience. The time frames in which the education and clinical requirements are met cannot overlap. Clinical experience earned to document the education requirement cannot also be used to support the clinical requirement.

[4] The mandatory Prerequisite 2 Application letter (found on ARDMS.org /sampleletters) is valid for one year from the date of graduation. If the application and appropriate supporting documentation are not received after one year of successful completion of the program, the applicant will need new documentation verifying successful program completion, and a current, completed, original signed CV form for each applied-for specialty area will be required. An original letter per student is required. First-time applicants applying under Prerequisite 2 must apply for either the Sonography Principles and Instrumentation (SPI) examination or a specialty area that is included within the programmatically accredited curriculum.

[5] The mandatory Student Prerequisite 3B Application Letter (found on ARDMS.org/sampleletters), is valid through the expected graduation date. If the student chooses to apply after graduation, then the Graduate Prerequisite 3B Application letter (found on ARDMS.org /sampleletters) and a current, completed, original CV form for each applied-for specialty area will be required. An original letter per student is required.

Note: If the Bachelor's Degree sonography/ vascular technology program is also programmatically accredited through one of the following: Council for Higher Education Accreditation (CHEA), United States Department of Education (USDOE), or Canadian Medical Association (CMA), and the students have graduated, then the prerequisite 3B students should apply under prerequisite 2.

Note: ARDMS, in its discretion, may request from you or others information concerning matters that may be relevant to your eligibility for certification and certification status.

All documentation must be in English or include a notarized translation. (MD licenses, CMEs, etc.)

All documents, communications, and other information received by ARDMS become the property of ARDMS and will not be returned.



Johnny Solis
Registrar
120 Third Avenue, Room 317
NY, NY 10003
Tel: (212) 555-6565
Fax: 212 555-6701
Email: jsolis@nmewyork.com

Sanford Brown
COLLEGE

**From:** Sabina Cruz
**Sent:** Tuesday, August 20, 2013 11:09 AM
**To:** Kathy Lynch, Johnny Solis
**Subject:** FW: Yvette Colon - 250NY
**Importance:** High

We need to pull up the file of the above named student (CC'd you on credit/ASH Cam) this one I'd wanted you and locate the file and documents over to me. Thanks!

**From:** Jill Dealey
**Sent:** Monday, August 19, 2013 2:31 PM
**To:** Mark Sprenn
**Subject:** FW: Yvette Colon - 250NY

The Cardiovascular Technology program at 38 New York has never been programmatically accredited.

Jill A. Dealey
Vice President of Regulatory Review
Career Education Corporation
847-585-2075 direct | 847-930-0512 cell

**From:** Marisa Sanaya
**Sent:** Monday, August 19, 2013 2:25 PM
**To:** Jill Dealey
**Subject:** Yvette Colon - 250NY

Graduated from Cardiovascular Technology program on 4/29/2008

- Original enrollment status on 5/5/2004
- Cancellation 9/21/2004
- Reenrollment 7/26/2006
- Active between 8/15/2006 - 4/29/2008

Ledger ending in: 30

It still hasn't printed from ground due for some reason.

22

**Sanford-Brown**

**Apply Now!** ✔
If you're ready to take the step towards your career...

**Request Info** @
It's easy to learn more about Sanford-Brown

**Career Services:** Pursue a career that's right for you!

ABOUT US    AREAS OF STUDY    LOCATIONS    ADMISSIONS    TUITION & FINANCIAL AID    STUDENT LIFE    REQUEST INFO    APPLY NOW!

🏠 **Home**

**About Us**
   Welcome Message
   History & Mission
   Accreditation & Certification
   State Licensure & Registration
   Why Choose Sanford-Brown?
   Hospital & Community Partners
   Suggestion Box
   Career Opportunities
   Sanford-Brown In the News
   Sanford-Brown Events
   Health Forum
   Press Room



About Us
Accreditation & Certification

**Candidate for Acceptance**

FIND OUT IF YOU'RE A
CANDIDATE FOR ACCEPTANCE TODAY!

LEARN MORE

🖨 Print    ⭐ Bookmark    📑 Share

Home > About Us > Accreditation & Certification

## Accreditation and Certification

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality.

Sanford-Brown Institute - Monroeville and Sanford-Brown Institute – Pittsburgh are institutionally accredited by the Accrediting Commission of Career Schools of Colleges (ACCSC), an independent accrediting agency recognized by the United States Department of Education (DOE).

This indicates that Sanford-Brown Institute - Monroeville and Sanford-Brown Institute – Pittsburgh substantially meets or exceeds the stated criteria of education quality established by ACCSC and approved by the DOE. This recognition of institutional accreditation by ACCSC entitles SBI to offer Title IV Financial Assistance to students who qualify.

All remaining Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the United States Department of Education (DOE) and the Council for Higher Education Accreditation (CHEA).

This indicates that these schools substantially meet or exceed the stated criteria of education quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional accreditation by ACICS to offer Title IV Financial Assistance to students who qualify.

An additional form of accreditation that a school may undertake to obtain is a specific, individual accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same as or a substitution for programmatic accreditation.

Although programmatic accreditation is not required for employment in many cases, the existence of programmatic accreditation is a further indication that a program meets the standards of the profession, and may therefore indirectly enhance employment opportunities.

Also, in some cases, programmatic accreditation will allow the graduates of the accredited program to sit for some credentialing exams immediately upon graduation without any requirement of work experience.

## Institutional Accreditation

- **Sanford-Brown Institute – Monroeville and Sanford-Brown Institute – Pittsburgh** are institutionally accredited by the Accrediting Commission of Career Schools of Colleges (ACCSC) to award certificates and degrees.



ACCSC
2101 Wilson Boulevard
Suite 302
Arlington, VA 22201
(703) 247-4212
(703) 247-4533 (fax)

- **All remaining Sanford-Brown schools** are institutionally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award

certificates and degrees


INTERNET ARCHIVE   **wayback machine**

http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification   Go

86 captures
2 Apr. 10 – 29 Nov. 14

MAR **APR** MAY   Close ✖

2

2009 **2010** 2011   Help ?



ACICS
750 First Street NE
Suite 980
Washington, DC 20002-4241
(202) 336-6780
(866) 510-0746

## Programmatic Accreditation

- The Medical Assistant Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Collinsville, Sanford-Brown College – Fenton, Sanford-Brown College – Hazelwood-Diploma Program in Medical Assistant, Sanford-Brown College – Houston, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – New York, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Pittsburgh, Sanford-Brown Institute – Tampa, Sanford-Brown Institute – Trevose, Sanford-Brown Institute – White Plains.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

- The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Houston, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Tampa.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

■ The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown College – Houston, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Monroeville, and Sanford-Brown Institute – Tampa.

■ The Diagnostic Medical Sonography Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRCDMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Houston, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Pittsburgh.
CAAHEP
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

■ The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Pittsburgh.

CoARC
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

■ The Practical Nursing Program at Sanford-Brown College – St. Peters is approved by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3252. Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

■ The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Tampa.

ASHP
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

■ The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Fenton and Sanford-Brown Institute - Pittsburgh.

- Mission Statement & Goals

- Technical Requirements

- Admission Requirements

**Mission**
The mission of Sanford-Brown College Radiography Program is to provide a quality, highly specialized educational program in the field of radiography to adult learners. The focused radiography program will provide the knowledge necessary for successful passing of the certification exam and for future employment in imaging.

**Program Goals**
1. The graduates will have entry-level employment skills as a radiographer.
2. The graduates will be clinically competent.
3. The graduates will apply critical thinking, problem solving, and communication skills during radiographic procedures.
4. The graduates will demonstrate professional growth and development skills.
5. The radiography program will be evaluated for effectiveness annually.

For more information on JRCERT Accreditation, please contact the JRCERT at:

JRCERT
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

- The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters and Sanford-Brown Institute - Pittsburgh.

AVMA
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800.248.2862

- The Occupational Therapy Assistant program at Sanford-Brown College – Hazelwood is currently the only Sanford-Brown campus that is programmatically accredited by the Accreditation Council for Occupational Therapy Education (ACOTE) and is currently on probationary status.

ACOTE
4720 Montgomery Lane
PO Box 31220
Bethesda, MD 20824-1220
Phone: 301-652-2682

The American Occupational Therapy Association, Inc.

## Request More Info!

Tell us more about yourself and specify your campus and program of interest. An admissions representative will contact you to provide you with more information.

* = required fields



**Step 1 of 2**

* Campus of Interest: — Select —

* Program of Interest: — Select —

**NEXT**

| About Us | Areas of Study | Locations | Admissions | Tuition & Financial Aid | Student Life |
|---|---|---|---|---|---|
| Welcome Message | Learning Options | Arizona | How to Apply for Admission | How to Apply for Financial Aid | Online Communities |
| History and Mission | Allied Health Diagnostic | Florida | Admission Requirements | Financing Options for Your Education | Alumni |
| Accreditation & Certification | Allied Health Technicians and Therapists | Georgia | Are you a Candidate for Acceptance? | Grants & Scholarships | Career Services |
| State Licensure & Registration | Dental | Illinois | Schedule an Appointment Today | Refund Policy | Faculty Profiles |
| Why Choose Sanford-Brown? | Nursing | Indiana | Documents & Resources | Financial Aid Tools | Sanford-Brown In the News |
| Hospital & Community Partners | Business, Administrative and Legal | Maryland Michigan | Request Information | CEC Code of Conduct | Sanford-Brown Events |
| Suggestion Box | Art, Design and Technology | Missouri | Apply Now | Documents & Resources | Refer a Friend |
| Career Opportunities | | New Jersey | | Request Information | |
| Sanford-Brown In the News | | New York Ohio | | Apply Now | |
| Sanford-Brown Events | | Pennsylvania | | | |
| Health Forum | | Rhode Island | | | |
| Press Room | | Texas | | | |
| | | Virginia | | | |
| | | Wisconsin | | | |
| | | | | | |
| | | Affiliated Schools: | | | |
| | | SBI Melville | | | |
| | | Missouri College | | | |
| | | Gibbs Boston | | | |
| | | Gibbs Farmington | | | |
| | | Brown College | | | |

©2010 Sanford-Brown. All rights reserved.

No information may be duplicated without permission from Sanford-Brown.

Sanford-Brown does not guarantee employment or salary.

Privacy Statement     Legal Terms and Conditions     Sitemap



INTERNET ARCHIVE
WaybackMachine

http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification    Go    DEC  JAN  FEB    Close

86 captures    ◄  11  ►    Help
2 Apr 10 - 29 Nov 14    2010  2011  2012

Contact Us:  TOLL FREE 1-877-809-2444    Search

**Career Services:** Pursue a career that's right for you!

ABOUT US    AREAS OF STUDY    LOCATIONS    ADMISSIONS    TUITION & FINANCIAL AID    STUDENT LIFE    REQUEST INFO    APPLY NOW!

Home

**About Us**
Welcome Message
History & Mission
Accreditation & Certification
State Licensure & Registration
Why Choose Sanford-Brown?
Hospital & Community Partners
Social Responsibility
Suggestion Box
Career Opportunities
Sanford-Brown in the News
Sanford-Brown Events
Health Forum
Press Room

## About Us
### Accreditation and Certification

Print    Bookmark    Share

Home    **About Us**    Accreditation & Certification

# Accreditation and Certification

Accreditation is a voluntary process which may be undertaken by
schools to demonstrate compliance with specific standards designed
to indicate a level of education quality.



## Institutional Accreditation

Sanford-Brown Institute - Monroeville and Sanford-Brown Institute –
Pittsburgh are institutionally accredited by the Accrediting Commission
of Career Schools of Colleges (ACCSC), an independent accrediting
agency recognized by the United States Department of Education
(DOE). This indicates that Sanford-Brown Institute - Monroeville and
Sanford-Brown Institute – Pittsburgh substantially meets or exceeds
the stated criteria of education quality established by ACCSC and
approved by the DOE. This recognition of institutional accreditation by
ACCSC entitles SBI to offer Title IV Financial Assistance to students
who qualify.

All remaining Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting
Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the
United States Department of Education (DOE) and the Council for Higher Education Accreditation
(CHEA). This indicates that these schools substantially meet or exceed the stated criteria of education
quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional
accreditation by ACICS entitles SBC to offer Title IV Financial Assistance to students who quality.

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with
specific standards designed to indicate a level of education quality. Each campus has been approved by
its respective Institutional Accreditor to offer all of its currently available programs.

**Sanford-Brown Institute – Monroeville and Sanford-Brown Institute – Pittsburgh** are
institutionally accredited by the Accrediting Commission of Career Schools of Colleges
(ACCSC) to award certificates and degrees.

ACCSC
2101 Wilson Boulevard
Suite 302
Arlington, VA 22201
(703) 247-4212
(703) 247-4533 (fax)

**All remaining Sanford-Brown schools** are institutionally
accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award
certificates and degrees.

ACICS
750 First Street NE
Suite 980
Washington, DC 20002-4241
(202) 336-6780
(866) 510-0746

## Programmatic Accreditation

An additional form of accreditation that a school may undertake to obtain is a specific, individual
accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same
as or a substitution for programmatic accreditation. Although programmatic accreditation is not required
for employment in many cases, the existence of programmatic accreditation is a further indication that a
program meets the standards of the profession, and may therefore indirectly enhance employment
opportunities. Also, in some cases, programmatic accreditation will allow the graduates of the accredited
program to sit for some credentialing exams immediately upon graduation without any requirement of
work experience.

It is important to understand what accreditation is and why it is important to Sanford-Brown. The goal of
accreditation is to ensure that the education provided by institutions of higher education meets acceptable
levels of quality. DOE recognized accrediting agencies have adopted criteria reflecting the qualities of a
sound educational program and have developed procedures for evaluating institutions or programs to
determine whether or not they meet these criteria. The standards by which institutions or programs are
measured have been developed by subject matter experts and are intended to include what is critical for
students to learn in order to successfully pursue a given profession. Having this kind of oversight and
ensuring compliance with stated standards is essential to maintaining quality for students. Institutional
Accreditation measures the entire operations of a given campus. Programmatic accreditation evaluates
the components of a given academic program. Sanford-Brown is committed to offering programs that live
up to these standards so that we can help provide qualified and prepared graduates in the field of
healthcare. We understand that accreditation is not merely a recognition granted once an institution or
program is in substantial compliance with the stated standards, but is a privilege that we must continue to
earn through disciplined actions and quality instruction.

Broadly, across our Sanford-Brown campuses, over 60 programs are currently programmatically
accredited. Some accrediting agencies require that a new program graduate its first class before the
program is eligible for programmatic accreditation but we strive to run our programs according to the
standards of our relevant programmatic accreditors and are committed to seeking programmatic
accreditation for our eligible programs. This includes not starting the first class until the clinical site
requirement is formally demonstrated, not over seating classes, ensuring the self study process is part of
the educational plan and making certain that the curriculum, facility, equipment, staff and leadership meet
the programmatic accreditation requirements.

To learn about which programs are programmatically accredited by campus, see the detailed information
below.

The Medical Assistant Programs at the following Sanford-Brown campuses are currently the
only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau
of Health Education Schools (ABHES), a national accrediting agency recognized by the United
States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of
the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College –
Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Collinsville, Sanford-
Brown College - Dearborn, Sanford-Brown College - Grand Rapids, Sanford-Brown College –
Fenton, Sanford-Brown College – Hazelwood-Diploma Program in Medical Assistant, Sanford-

Brown College – Houston, Sanford-Brown College – Milwaukee, Sanford-Brown College – Phoenix, Sanford-Brown College – Dallas, Sanford-Brown College - San Antonio, Sanford-Brown College – St. Peters, Sanford-Brown College – Vienna, Sanford-Brown Institute - Cranston, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – New York, Sanford-Brown College – North Loop, Sanford-Brown Institute – Orlando, Sanford-Brown Institute – Pittsburgh, Sanford-Brown Institute – Tampa, Sanford-Brown Institute – Trevose, Sanford-Brown Institute – White Plains.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Houston, Sanford-Brown College – St. Peters, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Tampa.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown College – Houston, Sanford-Brown College - Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Monroeville, and Sanford-Brown Institute – Tampa.

The Diagnostic Medical Sonography Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRCDMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Houston, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Pittsburgh.

CAAHEP
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Monroeville.

CoARC
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

The Practical Nursing Program at Sanford-Brown College – St. Peters is conditionally approved by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3252. Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Houston, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute - Jacksonville, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – New York, Sanford-Brown Institute – Tampa.

ASHP
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Cleveland, Sanford-Brown College – Fenton, Sanford-Brown College – Milwaukee, and Sanford-Brown Institute - Pittsburgh.

Mission Statement & Goals

Technical Requirements

Admission Requirements

**Mission**
The mission of Sanford-Brown College Radiography Program is to provide a quality, highly specialized educational program in the field of radiography to adult learners. The focused radiography program will provide the knowledge necessary for successful passing of the certification exam and for future employment in imaging.

**Program Goals**
1. The graduates will have entry-level employment skills as a radiographer.
2. The graduates will be clinically competent.
3. The graduates will apply critical thinking, problem solving, and communication skills during radiographic procedures.
4. The graduates will demonstrate professional growth and development skills.
5. The radiography program will be evaluated for effectiveness annually.

For more information on JRCERT Accreditation, please contact the JRCERT at:

JRCERT
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters and Sanford-Brown Institute - Pittsburgh.

AVMA
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800.248.2862

The occupational therapy assistant program at **Sanford-Brown College, Hazelwood, Missouri**, was placed on Probationary Accreditation effective December 4, 2010, for nearing the end of the USDE-mandated time period for returning the program to compliance with 2006 OTA Standard A.5.3. (program evaluation plan); Standard A.5.5 (program evaluation data analysis and annual report); and Standard A.5.6. (results of ongoing evaluation). The program has been requested to submit a Progress Report to return the program to full compliance with the Standards within the USDE-mandated time period for correction.

ACOTE
4720 Montgomery Lane
PO Box 31220
Bethesda, MD 20824-1220
Phone: 301-652-2682

The American Occupational Therapy Association, Inc.

Sanford-Brown College - Houston's Medical Laboratory Technician program is programmatically accredited by the National Accrediting Agency for Clinical Laboratory Science (NAACLS). This means that students are eligible take the ASCP and NCA national certification exams for Medical Laboratory Technicians.

NAACLS
National Accrediting Agency for Clinical Laboratory Sciences
5600 N. River Road, Suite, 720
Rosemont, IL 60018
Phone: 773-714-8880

---

## Request More Info!

Tell us more about yourself and specify your campus and program of interest. An admissions representative will contact you to provide you with more information.

* = required fields

**STEP 1 OF 2**

* Campus of Interest: — Select —

* Program of Interest: Please select a campus

| About Us | Areas of Study | Locations | Admissions | Tuition & Financial Aid | Student Life |
|---|---|---|---|---|---|
| Welcome Message | Learning Options | Arizona | How to Apply for Admission | How to Apply for Financial Aid | Online Communities |
| History and Mission | Allied Health Diagnostic | Connecticut | Admission Requirements | Financing Options for Your Education | Alumni |
| Accreditation & Certification | Allied Health Technicians and Therapists | Florida | Are you a Candidate for Acceptance? | Grants & Scholarships | Career Services |
| State Licensure & Registration | Dental | Georgia | Schedule an Appointment Today | Refund Policy | Faculty Profiles |
| Why Choose Sanford-Brown? | Nursing | Illinois | Documents & Resources | Financial Aid Tools | Sanford-Brown in the News |
| Hospital & Community Partners | Business, Administrative and Legal | Indiana | Request Information | CEC Code of Conduct | Sanford-Brown Events |
| Suggestion Box | Art, Design and Technology | Maryland | Apply Now | Documents & Resources | Refer a Friend |
| Career Opportunities | | Michigan | | Request Information | |
| Sanford-Brown in the News | | Missouri | | Apply Now | |
| Sanford-Brown Events | | New Jersey | | | |
| Health Forum | | New York | | | |
| Press Room | | Ohio | | | |
| | | Oregon | | | |
| | | Pennsylvania | | | |
| | | Rhode Island | | | |
| | | Texas | | | |
| | | Virginia | | | |
| | | Wisconsin | | | |

Affiliated Schools:
SBI Melville
Briarcliffe College
Brown College
Gibbs Boston
Missouri College

©2010 Sanford-Brown. All rights reserved.

No information may be duplicated without permission from Sanford-Brown.

Sanford-Brown does not guarantee employment or salary. Credits earned are unlikely to transfer.

Privacy Statement    Legal Terms and Conditions    Student Outcomes/Disclosures    Sitemap



Contact Us:  Toll Free 1-877-809-2444     En-Español

Student Portal Login ▼

http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification    Go

OCT NOV DEC    Close    GO

86 captures    ◄ 6 ►    Help
2 Apr 10 - 29 Nov 14    2012 2013 2014

**Apply Now!** ✓
If you're ready to take the first step towards your career

**Request Info @**
It's easy to learn more about Sanford-Brown

CHAT

About Us    Areas of Study    Locations    Admissions    Tuition & Financial Aid    Student Life    Request Info

Apply Now!
Home



About Us
Accreditation & Licensure

**About Us**
Welcome Message
History & Mission
Accreditation & Licensure
Why Choose Sanford-Brown?
State Licensure & Registration
Hospital & Community Partners
Social Responsibility
Suggestion Box
Jobs at Sanford Brown
Sanford-Brown Events
Health Forum
Pegasus Lectures
Press Room
Articulation Agreements

g+1  0

Home    **About Us**    Accreditation & Licensure

## Accreditation & Licensure

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality. Additionally, all schools are authorized in the states in which they operate.

State Authorization information
Institutional Accreditation information

### State Authorization

**ARIZONA**
**Sanford-Brown College, Phoenix AZ**
Sanford-Brown College is licensed by The Arizona State Board for Private Postsecondary Education.

**CONNECTICUT**
**Sanford-Brown College, Farmington CT**
The Connecticut Board of Governors for Higher Education has approved Sanford-Brown College to confer the Associate of Applied Science Degree and Associate of Science. The college is accredited by the State of Connecticut Board of Governors for Higher Education.

**FLORIDA**
**Sanford-Brown Institute, Jacksonville FL**
Sanford-Brown Institute – Jacksonville (License #3006) is licensed by the Commission for Independent Education The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**Sanford-Brown Institute, Ft. Lauderdale, FL**
Sanford-Brown Institute, Fort Lauderdale (License #3005) is licensed by the Commission for Independent Education, The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, toll free telephone number (888) 224-6684.

**Sanford-Brown Institute, Orlando FL**
Sanford-Brown Institute, Orlando (License ID # 4091) is licensed by the Commission for Independent Education; The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**Sanford-Brown Institute, Tampa FL**

Sanford-Brown Institute, Tampa (License #3007) is licensed by Commission for Independent Education; The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**GEORGIA**

**Sanford-Brown College, Atlanta GA**

Sanford-Brown College – Atlanta campus is licensed by the State of Georgia. Nonpublic Postsecondary Education Commission, 2082 East Exchange Place, Suite 220, Tucker, Georgia 30084-5305. Phone: (770) 414-3300.

**INDIANA**

**Sanford-Brown College, Indianapolis IN**

Sanford-Brown College is regulated by the Board for Proprietary Education (BPE), Indiana Commission for Higher Education, 101 West Ohio Street, Suite 670 Indianapolis, IN 46204. Phone: (317) 464-4400 and Fax: (317) 233-4219.

**ILLINOIS**

**Sanford-Brown College, Collinsville IL**

The college is licensed to operate in the State of Illinois through the office of Illinois State Board of Education 100 North First Street, Springfield, Illinois 62777, (217) 782-2948 or 100 W. Randolph, Suite 14-300, Chicago, Illinois 60601, (312) 814-2220.

The college is also approved to offer Associate of Applied Science degrees in Business Administration, Medical Billing and Coding, Medical Laboratory Technician, and Medical Massage Therapy through the office of the Illinois Board of Higher Education, 431 East Adams Street, Springfield, Illinois 62701

**Sanford-Brown College, Hillside IL**

Certificate of Approval to Operate issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**Sanford-Brown College, Skokie IL**

Certificate of Approval to Operate issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777.

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**Sanford-Brown College, Tinley Park IL**

Certificate of Approval to Operate issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777.

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**MASSACHUSSETTS**

**Sanford-Brown College Inc., a private two year college, Boston MA**

The Boston, Massachusetts School is licensed by the Commonwealth of Massachusetts, Department of Education, 350 Main Street, Malden, MA 02148

**MICHIGAN**

**Sanford-Brown College, Dearborn MI**

Sanford-Brown is licensed by the State of Michigan.

**Sanford-Brown College, Grand Rapids MI**

Sanford-Brown is licensed by the State of Michigan.

**MISSOURI**

**Sanford-Brown College, Fenton MO**

Sanford-Brown College is approved to operate in the State of Missouri by the Missouri Department of Higher Education and approved, certified, or recognized by the following agencies/funding sources:

• Vocational Rehabilitation Departments of Missouri and Illinois

• Missouri State Approving Agency (Veterans Education Benefits)

• Workforce Investment Act.

**Sanford-Brown College, St Peters MO**

Sanford-Brown College is approved to operate in the State of Missouri by the Missouri Department of Higher Education and approved, certified, or recognized by the following agencies/funding sources:

• U.S. Department of Education
• Missouri State Board of Nursing (Conditional approval for the Practical Nursing Program)
• Missouri Board of Therapeutic Massage
• Vocational Rehabilitation Departments of Missouri and Illinois
• Missouri State Approving Agency (Veterans Education Benefits)
• Workforce Investment Act

### NEW JERSEY

#### Sanford-Brown Institute, Iselin NJ

Sanford-Brown Institute – Iselin is licensed by the State of New Jersey Departments of Education and Labor and Workforce Development, Division of One-Stop Coordination and Support, School Approval Unit, John Fitch Plaza, Labor Building, 2nd floor, Trenton, New Jersey 08625.

### NEW YORK

#### SBI Campus - an affiliate of Sanford-Brown, Melville NY

The institution is authorized by the Board of Regents of New York State to confer the Associate in Applied Science (A.A.S), the Associate in Occupational Studies (A.O.S.), and certificate programs. All programs are registered by the State Education Department.

#### Sanford-Brown Institute, Garden City, NY

The institution is licensed by the New York State Education Department, Albany, New York.

#### Sanford-Brown Institute, New York City, NY

The institution is licensed by the New York State Education Department, Albany, New York.

#### Sanford-Brown Institute, White Plains, NY

The institution is licensed by the New York State Education Department, Albany, New York.

### OHIO

#### Sanford-Brown College, Middleburg Heights OH

Sanford-Brown College in Middleburg Heights, Ohio is approved by the Ohio State Board of Career Colleges and Schools, Columbus, Ohio, Registration #03-07-1880T.

#### Sanford-Brown College, Columbus OH

Sanford-Brown College in Columbus, Ohio is approved by the Ohio State Board of Career Colleges and Schools, Columbus, Ohio, Registration # 11-01-1956T.

### OREGON

#### Sanford-Brown College, Portland OR

Sanford-Brown College in Portland operates under the corporate laws of Oregon and the regulations of Oregon's Office of Degree Authorization. This school is a unit of a business corporation authorized by the State of Oregon to offer and confer the academic degrees described herein, following a determination that state academic standards will be satisfied under OAR 583-030. Inquiries concerning the standards or school compliance may be directed to the Oregon Office of Degree Authorization, 1500 Valley River Drive, Suite 100, Eugene, OR 97401, (541) 687-7478.

### PENNSYLVANIA

#### Sanford-Brown Institute, Pittsburgh PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

#### Sanford-Brown Institute, Trevose PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

#### Sanford-Brown Institute, Wilkins Township PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

### RHODE ISLAND

#### Sanford-Brown Institute, Cranston RI

Sanford-Brown Institute is authorized by the Rhode Island Board of Governors for Higher Education to grant certificates. Rhode Island Board of Governors of Higher Education, Shepard Building, Suite 524, 80 Washington Street, Providence, RI 02903, (401) 456-6000

### TEXAS

#### Sanford-Brown College, Austin TX

Sanford-Brown College is approved and regulated by the following agencies:

Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Austin campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241

THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

### Sanford-Brown College, Dallas TX

Sanford-Brown College is approved and regulated by the following agencies:

Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Dallas campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241

THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, Houston TX

Sanford-Brown College is approved and regulated by the following agencies. Certificate Programs:

Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Houston campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241

THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, Houston-Northloop, TX

Sanford-Brown College is approved and regulated by the following agencies:

Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*North Loop campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241

THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, San Antonio TX

Sanford-Brown College is approved and regulated by the following agencies:

Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*San Antonio campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241

THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

### VIRGINIA

### Sanford-Brown College, Vienna VA

Sanford-Brown College is certified by the State Council of Higher Education for Virginia (SCHEV) to operate campuses in Virginia. SCHEV is located at 101 North 14th Street, James Monroe Building, Richmond, VA 23219. (804) 225-2600.

### WISCONSIN

**Sanford-Brown College, West Allis WI**

Sanford-Brown College is authorized to offer education programs and award degrees and diplomas in the State of Wisconsin by the Educational Approval Board, 30 West Mifflin St., 6th Floor, Madison, Wisconsin 53703 (608) 266-1996.

Students are strongly encouraged to utilize the School's grievance procedure which can be found in the Catalog. The school's grievance procedure allows for the prompt resolution of grievances. For additional state contact information, please click here.

Back to Top

# Institutional Accreditation

All Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the United States Department of Education (DOE) and the Council for Higher Education Accreditation (CHEA). This indicates that these schools substantially meet or exceed the stated criteria of education quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional accreditation by ACICS entitles Sanford-Brown schools to offer Title IV Financial Assistance to students who qualify.

Effective as of May 5, 2012, ACICS placed the Sanford-Brown College – Indianapolis, IN campus and the Sanford-Brown College – West Allis, WI campus on probation due to job placement rates that did not meet the expectations of ACICS. Despite the probation action, these schools remain accredited and this status does not affect the institution's ability to continue to offer programs to existing or new students, confer academic credentials, and financial aid is available for students who qualify.

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality. Each campus has been approved by its respective institutional Accreditor to offer all of its currently available programs.

    All Sanford-Brown schools are institutionally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award certificates and degrees.


    ACICS
    750 First Street NE
    Suite 980
    Washington, DC 20002-4241
    (202) 336-6780
    (866) 510-0748

# Programmatic Accreditation

An additional form of accreditation that a school may undertake to obtain is a specific, individual accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same as or a substitution for programmatic accreditation. Although programmatic accreditation is not required for employment in many cases, the existence of programmatic accreditation is a further indication that a program meets the standards of the profession, and may therefore indirectly enhance employment opportunities. Also, in some cases, programmatic accreditation will allow the graduates of the accredited program to sit for some credentialing exams immediately upon graduation without any requirement of work experience.

It is important to understand what accreditation is and why it is important to Sanford-Brown. The goal of accreditation is to ensure that the education provided by institutions of higher education meets acceptable levels of quality. DOE recognized accrediting agencies have adopted criteria reflecting the qualities of a sound educational program and have developed procedures for evaluating institutions or programs to determine whether or not they meet these criteria. The standards by which institutions or programs are measured have been developed by subject matter experts and are intended to include what is critical for students to learn in order to successfully pursue a given profession. Having this kind of oversight and ensuring compliance with stated standards is essential to maintaining quality for students. Institutional Accreditation measures the entire operations of a given campus. Programmatic accreditation evaluates the components of a given academic program. Sanford-Brown is committed to offering programs that live up to these standards so that we can help provide qualified and prepared graduates in the field of healthcare. We understand that accreditation is not merely a recognition granted once an institution or program is in substantial compliance with the stated standards, but is a privilege that we must continue to earn through disciplined actions and quality instruction.

Broadly, across our Sanford-Brown campuses, over 80 programs are currently programmatically accredited. Some accrediting agencies require that a new program graduate its first class before the program is eligible for programmatic

accreditation but we strive to run our programs according to the standards of our relevant programmatic accreditors and are committed to seeking programmatic accreditation for our eligible programs. This includes not starting the first class until the clinical site requirement is formally demonstrated, not over seeing classes, ensuring the self study process is part of the educational plan and making certain that the curriculum, facility, equipment, staff and leadership meet the programmatic accreditation requirements.

To learn about which programs are programmatically accredited by campus, see the detailed information below.

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Dallas, Sanford-Brown College – Houston, Sanford-Brown College – Northhloop, Sanford-Brown College – Skokie, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, and Sanford-Brown Institute – New York.



**ABHES**
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) accredits upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown Institute – Iselin and Sanford-Brown Institute – Wilkins Township.

The Diagnostic Medical Sonography and Diagnostic Medical Ultrasound Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRC-DMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Dearborn, Sanford-Brown College – Houston, Sanford-Brown College – Fenton, Sanford-Brown College – Phoenix, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – White Plains, Sanford-Brown Institute – New York, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Pittsburgh, and Sanford-Brown Institute – Trevose.

The Cardiovascular Sonography/Technology (CVS/CVT) programs at the following campuses are currently the only Sanford-Brown campuses that have CVS/CVT programs programmatically accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP) upon the recommendation of the Joint Review Committee on Education in Cardiovascular Technology (JRC-CVT): Sanford-Brown College – Atlanta, Sanford-Brown College – Boston, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Dearborn, Sanford-Brown College – Hillside, Sanford-Brown College – Milwaukee, Sanford-Brown Institute – Jacksonville, Sanrod-Brown College – San Antonio, and Sanford-Brown Institute – Fort Lauderdale.



**CAAHEP**
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

**Sanford-Brown College – Fenton:** The *Polysomnographic Technology* program is accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Committee on Accreditation for Polysomnographic Technologist Education.

The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Wilkins Township.



CoARC
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

The Practical Nursing Program at Sanford-Brown College – St. Peters has full approval by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved with probationary status by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3262, Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

The Dialysis Technology programs at the following Sanford-Brown campuses are currently approved by the Board of Nephrology Examiners, Inc. Nursing and Technology (BONENT): Sanford-Brown College-Skokie, Sanford-Brown College-North Loop, and Sanford-Brown College-San Antonio.



BONENT
1901 Pennsylvania Ave, NW
Suite 607
Washington, DC 20006
Main Phone: 202-462-1252

The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Houston, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Wilkins Township, Sanford-Brown Institute – New York, Sanford-Brown Institute – Tampa, Sanford-Brown College – Phoenix, and Sanford-Brown College - Indianapolis.



ASHP
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Cleveland, Sanford-Brown College – Fenton, Sanford-Brown College – Milwaukee, Sanford-Brown College – Northloop.

The Radiography program at Sanford-Brown Pittsburgh is on probationary status by JRCERT, and is not enrolling additional students until further notice.

For more information on JRCERT Accreditation, please contact the JRCERT at:



JRCERT
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown College – Grand Rapids, Sanford-Brown College – Dearborn, Sanford-Brown College – Portland, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Pittsburgh, and Sanford-Brown College – Tyson's Corner.

The program offered at SBC-Fenton is currently under probationary status by the AVMA. This status does not affect the institution's ability to continue to offer programs to existing students, confer academic credentials,

and financial aid continues to be available for students who otherwise qualify. Graduates of a probationally accredited program are graduates of an accredited program. Programs may remain on probationary accreditation for a maximum of two years, at which time accreditation may be withdrawn if SBC-Fenton fails to substantially meet the Standards of Accreditation.

The program offered at SBI-Jacksonville is currently under probationary status by the AVMA. This status does not affect the institution's ability to continue to offer programs to existing students, confer academic credentials, and financial aid continues to be available for students who otherwise qualify. Graduates of a probationally accredited program are graduates of an accredited program. Programs may remain on probationary accreditation for a maximum of two years (i.e. until Fall 2014), at which time accreditation may be withdrawn if SBI-Jacksonville fails to substantially meet the Standards of Accreditation.



AVMA
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800.248.2862

Sanford-Brown College – Collinsville and Sanford-Brown College - Houston's Medical Laboratory Technician programs are programmatically accredited by the National Accrediting Agency for Clinical Laboratory Science (NAACLS). This means that students are eligible take the ASCP and NCA national certification exams for Medical Laboratory Technicians.



NAACLS
National Accrediting Agency for Clinical Laboratory Sciences
5600 N. River Road, Suite 720
Rosemont, IL 60018
Phone: 773-714-8880

**Dallas, Ft. Lauderdale and Jacksonville:** The program in Dental Hygiene is accredited by the Commission on Dental Accreditation *and has been granted the accreditation status of Approval without Reporting Requirements.* The Commission is a specialized accrediting body recognized by the United States Department of Education. The Commission on Dental Accreditation can be contacted at (312) 440-4653 or at 211 East Chicago Avenue, Chicago, IL 60611-2678. The Commission's web address is: http://www.ada.org/100.aspx.

**Orlando and Skokie:** The Dental Hygiene programs accreditation has been discontinued by the Commission on Dental Accreditation. Students currently enrolled in the program will be considered graduates of an accredited program. The Commission is a specialized accrediting body recognized by the United States Department of Education. The Commission on Dental Accreditation can be contacted at (312) 440-4653 or at 211 East Chicago Avenue, Chicago, IL 60611-2678. The Commission's web address is: http://www.ada.org/100.aspx.

The Commission on Dental Accreditation (CODA) does not accredit the "Expanded Functions" component of dental assisting programs. CODA accredits the basic dental assisting certificate or diploma programs that comply with the Accreditation Standards and Commission policy. Expanded Functions are unique and specific to each state and are dictated by each state's dental practice act.



┌─ **Request More Info!** ─

Tell us more about yourself and specify your campus and program of interest. An admissions representative will contact you to provide you with more information.

*= required fields*

**STEP 1 OF 2**

\* Campus of Interest    — Select — ▼

\* Program of Interest:    — Select — ▼

Next Step

**About Us**

Welcome Message
History and Mission
Accreditation &
Certification
State Licensure &
Registration
Why Choose Sanford-
Brown?
Hospital & Community
Partners
Suggestion Box
Jobs at Sanford Brown
Sanford-Brown In the
News
Sanford-Brown Events
Health Forum
Press Room

**Areas of Study**

Learning Options
Allied Health Diagnostic
Allied Health Technicians
and Therapists
Dental
Nursing
Business, Administrative
and Legal
Art, Design and
Technology

**Locations**

Arizona
Connecticut
Florida
  Ft. Lauderdale
  Jacksonville
  Orlando
  Tampa
Georgia
Illinois
  Collinsville
  Hillside
  Skokie
  Tinley Park
Indiana
Maryland
Massachusetts
Michigan
  Dearborn
  Grand Rapids
Missouri
  Fenton
  Hazelwood
  St. Peters
New Jersey
New York
  Garden City
  New York City
  White Plains
Ohio
  Cleveland
  Columbus
Oregon
Pennsylvania
  Pittsburgh
  Trevose
  Wilkins-Township
Rhode Island
Texas
  Austin
  Dallas
  Houston
  North Loop
  San Antonio
Virginia
Wisconsin

**Affiliated Schools:**
SBI Melville
Briarcliffe College
Brown College
Missouri College

**Admissions**

How to Apply for
Admission
Admission Requirements
Are you a Candidate for
Acceptance?
Schedule an Appointment
Today
Documents & Resources
Request Information
Apply Now

**Tuition & Financial Aid**

Net-Price-Calculator
How to Apply for
Financial Aid
Financing Options for
Your Education
Grants & Scholarships
Refund Policy
Financial Aid Tools
CEC Code of Conduct
Documents & Resources
Request Information
Apply Now

**Student Life**

Online Communities
Alumni
Transcript Request
Career Services
Faculty Profiles
Sanford-Brown In the
News
Sanford-Brown Events
Refer a Friend

©2015 **Sanford-Brown. All rights reserved.**
No information may be duplicated without permission from Sanford-Brown.
Sanford-Brown cannot guarantee employment or salary. Credits earned are unlikely to transfer.
Privacy Statement    Legal Terms and Conditions    Student Disclosures    Sitemap





NEW YORK CAMPUS FINANCIAL AID

INTERNET ARCHIVE WaybackMachine http://www.sbnewyork.com/programs/cardiovascular.asp Go
2 captures 23 Oct 06 - 17 Aug 07
SEP OCT 23 2005 2006

SANFORD BROWN INSTITUTE

HOME | ABOUT US | ADMISSIONS | CAREER SERVICES | CONTACT US

A LEADER IN HEALTHCARE EDUCATION

Non-Invasive Cardiovascular Technology

This exciting 16 to 20 month program can provide the student at our school with entry-level skills in cardiovascular technology to perform non-invasive cardiovascular exams, including EKG, stress EKG, echocardiographic and vascular testing as an entry-level cardiovascular technologist. Sanford-Brown's comprehensive non-invasive cardiovascular technology training program is also well weighted with practical learning. Both day and evening programs include a full-time, unpaid clinical externship. The programs' courses are designed to prepare students for entry-level jobs in the healthcare field that may involve:

- Performing non-invasive cardiovascular procedures
- Assisting physicians in the diagnosis of a patient's condition through echocardiography
- Working with a team of healthcare physicians in a hospital or clinical environment

Learn more about non-invasive cardiovascular technology.

For more information about Sanford Brown's exciting non-invasive cardiovascular technology career training program, please contact us today for details and start studying for a career in non-invasive cardiovascular technology!

Ready to apply? Find out now if you are a candidate for acceptance at Sanford-Brown Institute in New York, NY.

Back to Sanford-Brown Career Training Programs

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician

Click here to CONTACT US Now!

Click here to find out if you are a candidate FOR ACCEPTANCE!

Click here to find out THE TOP 10 REASONS TO ATTEND SB NEW YORK!

Home | About Us | Admissions | Programs | Financial Aid | Apply
Online | Site Map
Career Services | Contact Us




**Licensed by the New York State Education Department**
**Copyright © 2006 Sanford-Brown Institute - New York. All Rights**
**Reserved.**
**No information may be duplicated without permission from**
**Sanford-Brown Institute - New York.**

**Sanford-Brown Institute - New York**
**120 E. 16th St, 2nd Floor**
**New York City, NY 10003**
**888-578-9333**

Privacy Statement | Legal Terms and Conditions | Webmaster

102

INTERNET ARCHIVE
**WayBackMachine**
2 captures
23 Oct 06 - 17 Aug 07

http://www.sbnewyork.com/programs/cardiovascular.asp   Go

OCT AUG
◀ **17**
2006 2007



**NEW YORK** CAMPUS                          FINANCIAL AID

SANFORD
BROWN ™
INSTITUTE

HOME     PROGRAMS     ABOUT US     ADMISSIONS     CAREER SERVICES     CONTACT US

A LEADER IN HEALTHCARE EDUCATION

Non-Invasive Cardiovascular Technology







Click here to
**CONTACT US** Now!

Click here to find out
if you are a candidate
**FOR ACCEPTANCE!**

This exciting 16 to 20 month program can provide the student at our school with entry-level skills in cardiovascular technology to perform non-invasive cardiovascular exams, including EKG, stress EKG, echocardiographic and vascular testing as an entry-level cardiovascular technologist. Sanford-Brown's comprehensive non-invasive cardiovascular technology training program is also well weighted with practical learning. Both day and evening programs include a full-time, unpaid clinical externship. The program's courses are designed to prepare students for entry-level jobs in the healthcare field that may involve:

- Performing non-invasive cardiovascular procedures
- Assisting physicians in the diagnosis of a patient's condition through echocardiography
- Working with a team of healthcare physicians in a hospital or clinical environment

Learn more about non-invasive cardiovascular technology.

For more information about Sanford Brown's exciting non-invasive cardiovascular technology career training program, please contact us today for details and start studying for a career in non-invasive cardiovascular technology!

Ready to apply? Find out now if you are a candidate for acceptance at Sanford-Brown Institute in New York, NY.

Back to Sanford-Brown Career Training Programs

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician



Click here to find out
**THE TOP 10 REASONS
TO ATTEND
SB NEW YORK!**



A Leader in Healthcare Education

Home | About Us | Admissions | Programs | Financial Aid | Site Map
Career Services | Contact Us



Licensed by the New York State Education Department
Copyright © 2007 Sanford-Brown Institute - New York. All Rights
Reserved.
No information may be duplicated without permission from
Sanford-Brown Institute - New York.



Sanford-Brown Institute – New York
120 East 16th Street – 4th Floor
New York, NY 10003

Privacy Statement | Legal Terms and Conditions | Webmaster

Information on Classes Call Toll Free: (888) 773-9233
All Other Inquiries: (646) 111-4519

209

2/27/2015

INTERNET ARCHIVE
**WayBackMachine**
4 captures
19 Mar 08 - 19 Jan 10

http://www.sanford-brown.edu/campus/59/programs.asp?map=18    Go

FEB MAR
◄ 19
2007 **2008**



**NEW YORK** CAMPUS

FINANCIAL AID

**SANFORD BROWN** INSTITUTE™

HOME    PROGRAMS    ABOUT US    ADMISSIONS    CAREER SERVICES    CONTACT US

A LEADER IN HEALTHCARE EDUCATION





Click here to
**CONTACT US Now!**

Click here to find out
if you are a candidate
**FOR ACCEPTANCE!**

The Non-Invasive Cardiovascular Technology program at Sanford-Brown Institute-New York City (SBI) is designed to prepare the students to perform non-invasive echocardiographic examinations under the direction of a physician / cardiologist. Students gain both didactic knowledge and practical experience in cardiovascular science, EKG, holter monitoring, telemetry, and echocardiography. The students will have the opportunity to study the anatomy, physiology, and pathophysiology of the organ systems, recognize the EKG patterns of infarction, arrhythmia recognition, appreciate emergency protocols, and perform echocardiography. The core curriculum is structured to include a lecture component and an imaging laboratory component. The final externship portion of the curriculum is structured to include supervised experiences in the clinical environment that require competencies, logs, and evaluations completed by the student. At the conclusion of the program, graduates who have diligently attended class and their externship, studied, and practiced their skills should have the skills to seek entry-level employment as non-invasive cardiovascular technologists.

Graduates of the Non-Invasive Cardiovascular Technology program are encouraged to take the credentialing examinations offered by Cardiovascular Credentialing International (CCI) and the American Registry of Diagnostic Medical Sonographers (ARDMS). These exams are voluntary but obtaining this credential does enhance employment opportunities. Graduates are eligible to apply for the Certified Cardiographic Technician (CCT) and Registered Cardiac Sonographer (RCS) examinations offered by CCI

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician

Certificate Program in Diagnostic Radiography

https://web.archive.org/web/20080319002138/http://www.sanford-brown.edu/campus/59/programs.asp?map=18    1/2

upon graduation, and to apply for the Registered
Diagnostic Cardiac Sonographer (RDMS) exam
offered by ARDMS after acquiring the necessary
experience after graduation as defined by the
ARDMS. Registration and certification
requirements for taking and passing these
examinations are not controlled by SBI but by
outside agencies and are subject to change by the
agency without notice. Therefore, SBI cannot
guarantee that graduates will be eligible to take
these exams, at all or at any specific time,
regardless of their eligibility status upon
enrollment.

For more information about this exciting
program, please contact us today for details!

Ready to apply? Click here to find out if you are a
candidate for acceptance.



**A Leader in Healthcare Education**
Home | About Us | Admissions | Programs | Financial Aid | Site Map
Career Services | Contact Us



Licensed by the New York State Education Department
Copyright © 2006 Sanford-Brown Institute - New York. All Rights
Reserved.
No information may be duplicated without permission from
Sanford-Brown Institute - New York.

Sanford-Brown Institute - New York
120 E. 16th St, 4th Floor
New York City, NY 10003

Privacy Statement | Legal Terms and Conditions | Webmaster

Information on Careers Call Toll Free: (888) 878-6333
All Other Inquiries: (866) 173-4512



INSTITUTE

## ACCREDITATION/CERTIFICATION INFORMATION

[illegible]

**Diagnostic Medical Sonography/Ultrasound and Cardiovascular Technology**

[illegible]

**Medical Billing and Coding Specialist**

[illegible]

**Medical Assistant**

[illegible]

**Surgical Technology**

[illegible]

School Signature — Date

Admissions Representative Signature — Date



doing, using the techniques and tools of professionals working in careers in the medical field.

- Many of our school's professors are experienced professionals, bringing real-world experience to Sanford-Brown classes.
- Sanford-Brown's Financial Aid Representatives are accessible to students to answer any questions in regard to student finances, financial aid, student loans or grants.
- Sanford-Brown students take advantage of industry-current equipment and labs used in healthcare settings.
- Career Placement Assistance with healthcare industry contacts to help Sanford-Brown students with professional career development and job opportunities.
- Flexibility - Day, evening and weekend classes are available for Sanford-Brown students.
- Smaller Class Sizes
- Extensive career training program offerings - Our programs are designed to prepare Sanford-Brown students for employment for today's medical careers.
- Strong emphasis on career specific courses & training
- **Have the opportunity to gain industry-current job skills to help make you marketable and employable in the healthcare or medical field.**

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician



Ready to apply? Find out now if you are a candidate for acceptance. Start studying for a medical career.

Or if you have further questions about our medical career training programs at Sanford-Brown New York please contact us today!



Home | About Us | Admissions | Programs | Financial Aid | Apply Online | Site Map
Career Services | Contact Us





**Licensed by the New York State Education Department**
**Copyright © 2006 Sanford-Brown Institute - New York. All Rights Reserved.**
**No information may be duplicated without permission from Sanford-Brown Institute - New York.**

**Sanford-Brown Institute - New York**
**120 E. 16th St, 2nd Floor**
**New York City, NY 10003**
**888-578-9333**



Privacy Statement | Legal Terms and Conditions | Webmaster

133



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

April 16, 1993

Dear Colleague:

Enclosed you will find information about the new common forms for the Federal Family Education Loan Program. This material has been sent to the guaranty agencies and I wanted you to receive a copy of the final product.

As you review this information, if you have questions please feel free to contact me.

Sincerely yours,

Bob

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

# Common Application Material

**SUMMARY:** This information material prescribes the content and layout of the common loan application/promissory note for Federal Stafford Loans (subsidized and unsubsidized) and Federal Supplemental Loans for Students (SLS), related instructions, and information about a borrower's rights and responsibilities, and instructions for the transition to implement the common forms. In addition, this material prescribes the revised common addendum for the current application.

## Common Application and Promissory Note

As mandated by Section 432(m)(1) of the Higher Education Act, the U.S. Department of Education (ED) has developed a common federal loan application form and promissory note in cooperation with representatives of guaranty agencies, lenders, and student financial assistance organizations. ED has approved the attached forms of the complete loan application/promissory note, discussion of borrower rights and responsibilities, and related instructions.

No changes to, deletions from, or additions to the prescribed language in these forms will be permitted, except that information and/or logos identifying the guaranty agency or program may be printed in the space provided in the upper right-hand corner of the application form and the front page of the instructions. The boxes in the upper right-hand corner of the common application form and front page of the instructions are intended to provide a guaranty agency with a space to include its logo, name, a telephone number, and appropriate coding (for example, bar coding to reflect the source, type, or other identification system for filing or processing). An agency may use bar coding in other places on the common application form, (that is, the side or bottom margins of the application) to meet requirements for its individual processing system. These coding identifiers may not be printed on the application where they would alter the general layout of the common form.

## Implementation and Transition Period

The attached documents (the "common forms") have been approved for immediate use. However, ED recognizes that a transition period is needed for schools, lenders, and guaranty agencies to put in place the new common forms and related processing procedures. During the transition period (from now until December 31, 1993), ED expects program participants to process both the existing forms and the new forms as they become available. Agencies may elect to cease distributing previously approved editions of their applications with approved addendum when they have printed and distributed the new common form. However, a lender, school, or agency may not refuse to process a previous application (other than an application that relates only to a specific program year) that a student submits for processing. ED does not want to cause a student to complete two applications for the same period of enrollment because of the new common application form.

During the transition period between forms, ED wants to ensure that students are not subject to filing duplicate applications. We believe that by December 31, 1993, program participants will have made the transition to the common form to the degree that an adequate supply of new common loan applications will be available and that schools and lenders will have prepared for the transition. As financial aid administrators will have received applications and be conducting certification reviews, ED has established December 31, 1993 as the close of the transition period. School officials should plan their processing systems to ensure that all loan applications for the Federal Stafford (subsidized and unsubsidized) and Federal SLS program that are certified on or after January 1, 1994 are processed using the new common application. Guaranty agencies should establish the necessary procedures to ensure that all applications certified by the institution on or after January 1, 1994 and received by the agency for guarantee are on the new common application.

Guaranty agencies that continue to use existing forms approved by ED in the past will be required to use the new addendum in connection with all loans for which the first disbursement is made on or after July 1, 1993.

If agencies use the new common forms as part of a renewal application process, information may be preprinted on the form which the agency has for a borrower. This preprinted information may include the prior lender and code number if the borrower has previously received a loan for that lender.

## Current Applications — Revised Addendum

Included in this mailing is the revised common addendum for current Federal Stafford and SLS applications that is to be used with existing applications. The addendum may not be used after December 31, 1993. This addendum is necessary to comply with the new provisions of the reauthorized Higher Education Act that take effect on July 1, 1993. However, the addendum may not be used with the new common loan application/promissory note, only with the existing applications during the transition period. This addendum will ensure the proper disclosure information is provided to borrowers. This notice serves as approval for the use of this addendum by your agency; no changes or revisions are permitted to this form.

## Agency-specific Information

No other materials may be physically attached to the forms. However, other appropriate materials may be provided to schools and borrowers along with the common forms. Such agency-specific information is intended as a way for the agency to provide applicants with specific information they need to know about the unique procedures of that guaranty agency. Moreover, until a common description of all loan programs, eligibility information, and general program requirements is developed for future years, agencies might want to include this type of information. Such materials may be shrink-wrapped or placed in folders together with the common forms. The common forms may also be inserted into other materials. The forms cannot, however, be physically attached to these materials. While these other materials may include instructions and other documents specific to the guaranty agency or program providing the application package, they may not include requests for any additional or supplemental information from borrowers, schools, or lenders for purposes of processing the application for FFEL Program loans.

---

*Common Application Material*                                    *Page 3*

So that ED can monitor the context in which the application is presented, each guaranty agency that sends out common forms together with other materials must submit the packet of material to ED.  They should be submitted to me at the Division of Policy Development; U.S. Department of Education/Office of Postsecondary Education; Policy, Training, and Analysis Service; Room 4310, ROB-3; 400 Maryland Avenue, S.W.; Washington, D.C. 20202.  However, ED does not intend to approve or comment on these materials unless they do not meet the required standards.  This material must to submitted prior to distribution of the forms to the agency's participating schools and lenders.

Notice of Guaranty and Disclosure

The common forms do not include the form of Notice of Guarantee and Disclosure Statement to be sent to borrowers by the guaranty agency. Following consultation with affected groups, ED intends to develop, at a later date, standardized forms for such notices.

Electronic Processing

The Higher Education Act specifically requires that in prescribing common forms that ED not limit the development of electronic forms and procedures. Until further notice, ED is not dictating the format for electronic application forms; however, if these are used, all of the data elements prescribed for the forms by ED must be included.

There are a variety of methods that agencies currently use for electronically processing applications.  ED recognizes that in some electronic systems the school and lender sections of applications are completed electronically.  If an agency provides for this option in its system, the school and lender section need not be printed on the form that the student completes.  The agency may print routing information or brief instructions to the borrower in the space where the school and lender sections normally would be continued.  These messages should only provide directions to the borrower; they must not request additional data from the borrower or describe additional services or products offered by the agency, school, or lender.  At this time, agencies are not required to submit these variances from the common forms to ED for

approval. Each agency should retain in its files a copy of its electronic formats for further review if ED requires them in the future.

At this time, ED is also not establishing common procedures or other format requirements for the electronic processing system. In the future, ED will work with representatives of the community to review how some areas of electronic processing systems might be standardized and how to create general guidelines for operating of electronic processing systems.

Borrower's Authorization Statement

The common application and promissory note includes an Electronic Fund Transfer authorization statement (Item 16 of the application) for electronic transfer of funds. ED has determined that this certification provision will meet the requirements of 34 CFR §682.207(b)(1)(iii)(B) if the school provides a notice to the borrower either 30 days before the date the school credits the student's account with the loan proceeds or not later than 30 days after that date notifying the borrower that the funds have been credited to the borrower's account at the school. ED is not prescribing the form of the notice. However, a billing statement, award letter, receipt form, or other appropriate notification procedure by the institution could meet this requirement.

Delinquency on Other Non-Title IV Federal Debt

Item 17 of the common application includes a question asking if the borrower is delinquent on any non-Title IV federal debt. This question is required as part of a governmentwide initiative from the Office of Management and Budget. If an applicant indicates that he or she is delinquent on a non-Title IV federal debt, the lender should determine the reason for the delinquency and whether the applicant has made satisfactory arrangements for remedying the delinquency. In addition, until related regulations are published by ED, a lender must document the reason for making the loan when the applicant is delinquent on a non-Title IV federal debt. The appropriate documentation from the applicant and the determination by the lender's decision to make the loan despite the applicant's delinquent status should become a part of the loan file created by the lender.

## Certified Loan Amount(s)

The financial Aid administrator is required to determine the actual amount of loan eligibility for items 29a, 29b, and 29c.  During the design of the common application, several comments requested that ED permit a guaranty agency to calculate the actual loan eligibility on the basis of information provided on the application by schools.  Pursuant to 34 CFR 682.603 (b), ED requires financial aid administrators to provide the actual certification of loan amount; guaranty agencies may not fulfill this function for schools.  If a school fails to complete the certified loan amount in 29a, 29b, or 29c, the application must be returned by the guaranty agency or lender for completion before a loan is approved.

## Anticipated Completion (Graduation) Date

When a school fills in the anticipated completion or graduation date for a borrower, the actual date is required.  If the school has not yet established the completion or graduation date, the school official may use the last day of the month in which it will occur.  When the Student Status Confirmation Roster system reporting requirements provided for in the December 18, 1992 Federal Family Education Loan Program regulations are implemented, and the actual date for completion or graduation is known, it will be required that the date be sent to the appropriate guaranty agency.  For schools that have established the actual completion or graduation dates, the actual date should be provided on the application.

## Access to Data at the Central Processing System

As part of implementing the common application procedures, ED is making data supplied in by students on the *Free Application for Federal Student Aid* available to guaranty agencies.  Information on this service will be described in future materials from ED.

## Governing Law and Notices

The Secretary of Education has determined that the Governing Law and Notices section of the common promissory note must include the Federal Trade Commission (FTC) consumer defense clause as required by the FTC regulations, 16 CFR Section 433.2. In addition, this section includes a reference to choice of venue for collection suits and choice of law provision. The note includes a venue clause that would permit -- unless expressly prohibited by state law -- the guarantor to bring suit against defaulters who are residents of the guarantor's own state in the locale of the guarantor's main office as long as the borrower may have the suit transferred to a more convenient location simply by making a timely written objection to the guarantor. The venue clause does not address the venue for suits against non-resident borrowers. ED has decided to leave that question to state law. Please review this section of the promissory note which has been approved by ED's Office of the General Counsel.

## Reproduction of Application Materials

Arrangements have been made to provide the necessary output for application materials in a camera-ready format. Under separate cover you will receive from Desktop Technologies, Inc., a description of the service that will be available. All documents that are a part of the common application will be available. You are not, of course, required to use this service. (This service will be available as of April 26, 1993.) However, you are responsible for ensuring that the forms used by your agency are identical to the ones that ED has approved. As indicated previously, no changes may be made to this form unless they fall into the categories previously discussed in this material.

When the common forms are printed by an agency, the forms must be printed with black ink on white paper. The type face, point size, and general presentation of the form may not be changed from the form which the

Secretary has approved. The actual number of copies is not being specified, so an agency may print as many copies of the original as are needed. An agency may print in the lower right hand corner on the application a reference to the type of copy, (e.g. original, student copy, file copy, etc. and NCR paper may be used for the copies.)

Informational Meeting for Program Participants

It has been suggested that a special informational meeting be held so that program participants can meet with ED representatives to review the common application form. Such a meeting would permit ED to review the purpose of the form, discuss the general policies and procedures that will govern its use for 1993-94, present the guidelines for the transition period, and provide an opportunity to discuss each item on the common forms and describe ED's expectations of how data should be handled. In addition, the meeting would provide a forum for representatives of guaranty agencies, schools, lenders, higher education associations, and other interested parties to raise questions for ED to review about the use of the common forms.

ED has received an invitation from United Student Aid Funds (USAF) in Indianapolis, Indiana, to hold such a meeting at its facility on May 3, 1993. You are invited to send representatives to Indianapolis to participate in ED's briefing and to discuss the issues that still need to be considered for successfully implementing the common forms. I hope you will send representatives to this meeting and encourage you to consider sending representatives from your operations and policy staff who will be responsible for implementing the common forms. Attached to this material, you will find a registration form for the meeting on May 3. Please fax this registration form to me at 202-205-0786 no later than noon on April 28. The meeting will commence at 9 a.m. on May 3. A map is enclosed for direction to the USAF offices and includes information about hotel accommodations.

Included in this material is a Question/Answer form for questions that you or your staff may need to submit in advance of the meeting on May 3. Please ask your staff to record their questions in advance of the meeting and we will seek to include these in the meeting. We will also use this form at the meeting in case we do not have time to respond to all of the questions.

---

On a personal note, let me express my deep appreciation to the many people who have worked to ensure that we will implement the new common forms before the deadline established in the statutes. I recognize that we could not meet all the expectations that participants had for the common forms, but I believe we have make a significant step forward by getting approval of a common loan form. As we go forward to implement this common form, we know that fine-tuning the common form for 1994-95 is just around the corner.

---

4/16/93
_____
Date

Robert W. Evans
_____

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

Enclosures

---

# FEDERAL FAMILY EDUCATION LOAN PROGRAM

# ADDENDUM
## (Read this before accepting your loan.)

A new federal law called the Higher Education Amendments of 1992 recently took effect. This law changed the name and some of the terms of the Robert T. Stafford Student Loan Program. This program, now called the Federal Family Education Loan (FFEL) Program, includes Federal Stafford Loans, Federal Supplemental Loans for Students (SLS), and Federal PLUS (Parent) Loans.

You agree to accept the terms described below if you accept your loan. You accept your loan if you sign your loan check or a statement authorizing your school to release funds that your lender has electronically transferred to the school for you. This is true even if you previously received information that was different than what is described on this form. **If you do not agree to accept the terms described on this form:**

1. Do not sign your loan check. Request, in writing, that the check be returned to your lender and your loan be cancelled; or

2. If your loan has been or will be disbursed by electronic funds transfer, do not sign the statement authorizing your school to transfer your loan proceeds to your student account. Request, in writing, that the funds be returned to your lender and your loan be cancelled. If you have already signed an Electronic Funds Transfer authorization, inform your school, in writing, that you do not want to accept the loan.

**YOU ARE RECEIVING A LOAN THAT MUST BE REPAID.**

## Changes Affecting the Federal Family Education Loan Program

**1. Minimum Annual Payment:** The total payments that you are expected to make during any year of any repayment period for your Federal Family Education Loans may not be less than $600 or the amount of interest that is due and payable on those loans, whichever is more. FFEL Program loans are not eligible for the special minimum payment amount previously available for married couples.

**2. "New" Borrower Deferments:** If you are a "new" borrower — a borrower who on the date of application for a loan has no outstanding FFEL Program loans which were disbursed prior to July 1, 1993 — and your loan is disbursed on or after July 1, 1993, you are eligible only for the following deferments covering:

a. Periods during which you are pursuing at least a half-time course of study as determined by an eligible institution.

b. Periods during which you are pursuing a course of study under a graduate fellowship program (inside or outside the United States) or an eligible rehabilitation training program for disabled individuals.

c. Up to three years during periods in which you are seeking and unable to find full-time employment.

d. Up to three years for any reason which the lender determines under federal regulations has caused, or will cause, you to have an economic hardship.

An economic hardship exists when you are working full time and you are earning an amount that does not exceed the greater of the minimum wage or the poverty line for a family of two as determined in accordance with 673 (2) of the Community Service Block Grant Act or if you meet other criteria established in federal regulations.

**3. Prior Borrower Deferments:** Deferment provisions that were in effect before July 1, 1993, will continue to apply to borrowers with FFEL Program loans made before July 1, 1993, for the life of the borrower's loan.

**4. Extension of Deferments:** If you receive a deferment on any of your loans, the deferment will apply to the total amount of all of your non-defaulted loans held by the same lender, unless you request otherwise. If you have loans with more than one lender, you must contact each lender to obtain deferment on all of your loans.

**5. Forbearance for Medical Interns/Residents:** If you are a medical intern or resident, you are eligible for a forbearance if you request it and have exhausted all eligibility for the internship deferments. If the interest that accrues during your forbearance is capitalized, the principal amount you owe will increase.

**6. Forbearance for Borrowers Generally:** If you request and are granted a forbearance, you will receive a forbearance of all payments unless you request an extension of time for making payments or permission to make smaller payments than were previously scheduled. If the interest that accrues during your forbearance is capitalized, the principal amount you owe will increase.

**7. Administrative Forbearances:** Your lender may automatically grant you forbearance to bring your account current if you are delinquent at the time an authorized deferment is granted or if you are less than 60 days delinquent on a loan at the time the loan is sold or transferred. This may result in the capitalization of interest, which will increase the principal amount you owe.

**8. Loan Sales:** Your loan may be sold, transferred or assigned to another holder. If your loan is sold, transferred, or assigned, and the address to which you send payments has changed, you will be notified of the name and address to which you must send subsequent payments and communications. Your rights and responsibilities and those of your lender will not change.

**9. Consolidation of Debts:** A Federal Consolidation Program is available under which you, or your spouse and you, may consolidate the following loans: FISL, Federal Stafford, Perkins, Federal PLUS (student), Federal PLUS (parent loans made on or after 10-17-86), Federal SLS, Federal Direct, Health Professions Student Loans (HPSL) and Health Education Assistance Loans (HEAL). The minimum amount of a Consolidation Loan is $7,500.

**10. Credit Bureau Reporting:** Information concerning your loan, including the date(s) and amount(s) of disbursements, will be reported to a national credit bureau.

**11. Default:** If you default on an FFEL Program loan:

- You may be sued to collect the loan and have a judgment rendered against you.

- Your default will be reported to a national credit bureau.

- You will be liable for substantial collection costs.

- Your federal and state income tax refunds may be withheld to pay the debt.

- Your wages may be garnished (withheld) to pay the debt.

- You may be ineligible for additional federal student financial aid, as well as assistance under most federal benefit programs.

- The renewal of your professional license may be denied.

**12. Repayment of Your Loan:** For a Stafford Loan, the repayment period begins six months following the end of your grace period. For an SLS Loan, the repayment period begins on the date of the last disbursement of the loan. For the purposes of calculating the 10-year maximum repayment period for an SLS Loan the period shall commence at the time the first payment of principal is due from the borrower. For a PLUS Loan, the repayment period begins on the date the loan is disbursed.

**13. Address Information from State Licensing Boards:** If you are ever licensed for professional practice or service in any state, the state board that licenses you is permitted to provide your address to your guaranty agency, if that agency ever requests a because your location is unknown or unavailable to that agency.

**14. See Chart A "Annual Loan Limits" on Reverse side.**

## Changes Affecting Federal Stafford Loans

**1. Interest Rate:**

a. If you have no outstanding loans under the Federal Family Education Loan Program and you are borrowing a Federal Stafford Loan fee which the first disbursement is made on or after October 1, 1992, your loan's interest rate is variable and may change every July 1 but will never exceed 9%. If you meet these conditions, the interest rate that applies to your loan until July 1, 1993, is 6.94%. After July 1, 1993, the new interest rate decides applies to your loan will be available from your lender.

b. If you already have Stafford Loans, your interest rate on new loans will be the same as on your existing loans; but under certain circumstances, you may be eligible for a partial rebate of interest.

c. If you are a first time Federal Stafford Loan borrower with a first disbursement made on or after October 1, 1992 and you have no Federal SLS, PLUS, or Consolidation Loan(s), the interest rate on your loan will be an 8% fixed rate (a fixed interest rate does not change).

## Unsubsidized Federal Stafford Loans

**1. New Program:** The new law authorizes a program of unsubsidized Federal Stafford Loans for students who do not qualify, in whole or in part, for subsidized Federal Stafford Loans. The unsubsidized loan may be made for periods of enrollment beginning on or after October 1, 1992. If your loan is unsubsidized, this fact will be disclosed to you by your lender. The terms of your unsubsidized loan are the same as the terms for subsidized Stafford Loans (including those described earlier) except as described below:

a. **Interest Payment:** The government does not pay interest on your unsubsidized Federal Stafford loan. You must pay all of the interest that accrues on this loan during the time you are enrolled in school, during your grace period, and during periods of authorized deferment and forbearance. There are two ways for you to pay interest during these periods:

i. you may make monthly or quarterly payments to your lender, or

ii. you and your lender may agree to add your interest to the principal of your loan, no more often than quarterly (this

is called capitalization). The cost of capitalization to you is illustrated in Chart B. If you do not make an interest payment as scheduled, your interest will be capitalized.

b. Federal Origination Fee/Insurance Premium: You will be charged a 6.5% origination fee/insurance premium on each disbursement of your unsubsidized Federal Stafford Loan. This fee will be deducted from each disbursement and paid to the federal government.

## Changes Affecting Federal Stafford and SLS Loans

1. Graduated or Income Sensitive Repayment: If you are a "new" borrower, you may request an income-sensitive or graduated repayment schedule from your lender. A new borrower is one who on the date of application for a loan has no outstanding FFEL Program loans which were disbursed prior to July 1, 1993, and the new loan is disbursed on or after July 1, 1993.

2. Federal Collection: Should you default on your Federal Stafford or SLS Loan, and should it become payable to the federal government, you may be required to repay your loan debt under an income-contingent repayment plan. This plan, established by regulations to be issued by the United States Department of Education, may result in your having to repay more than the principal and interest on your loan(s).

## Changes Affecting Federal PLUS Loans

1. Adverse Credit History: If you are borrowing a Federal PLUS Loan that will be disbursed on or after July 1, 1993, you are subject to a credit evaluation based on criteria established in federal regulations. Borrowers with an adverse credit history will not be eligible for a PLUS Loan.

2. Discharge of Federal PLUS Loan When Student Dies: If you are a Federal PLUS borrower and the dependent student for whom you borrowed dies, your debt will be discharged.

3. Federal PLUS Loan Disbursement: All Federal PLUS Loans must be disbursed by either a check sent to the eligible school that is copayable to the school and the parent borrower or by electronic transfer of funds (EFT) from the lender to the eligible school.

## Changes Affecting Federal SLS and PLUS Loans

1. Interest Rate: If you are borrowing a Federal SLS or PLUS Loan the first disbursement of which is made on or after October 1, 1992, your loan's interest rate will be 7.36% until July 1, 1993. After that date it will vary every July 1, but will never exceed 11% if it is an SLS Loan or 10% if it is a PLUS Loan. This interest rate applies to your new loan even if you have outstanding loans at different interest rates.

2. Federal Origination Fee: You will be charged a 5% origination fee on each disbursement of your Federal PLUS or SLS Loan. This fee will be deducted from each disbursement and paid to the federal government.

3. Principal Payment: If you are borrowing a Federal SLS Loan and you also have an outstanding Federal Stafford Loan, you are eligible to postpone the repayment of your SLS Loan's principal until the expiration of your Stafford Loan's grace period. This option may involve the capitalization of interest. Contact your lender for further information. The estimated cost of capitalization is illustrated in Chart B on this form.

### Chart A

**Annual Loan Limits**

| Borrower's Academic Level and Program Length | Federal Stafford Loan (Subsidized and Unsubsidized) | Federal SLS Loan |
|---|---|---|
| **First Year Undergraduate Student** | | |
| one academic year in length | $2,625 | $4,000 |
| 2/3 academic year in length | $1,750 | $2,500 |
| 1/3 academic year in length | $875 | $1,500 |
| **Second Year Undergraduate Student** | | |
| one academic year in length | $3,500 | $4,000 |
| 2/3 academic year in length | $2,325 | $2,500 |
| 1/3 academic year in length | $1,175 | $1,500 |
| **Third Year and Remaining Undergraduate Student** | | |
| one academic year in length | $5,500 | $5,000 |
| 2/3 academic year in length | $3,675 | $3,325 |
| 1/3 academic year in length | $1,825 | $1,675 |
| Graduate/Professional Student | $7,500* | $10,000 |
| **Aggregate Loan Limits** | | |
| Undergraduate | $23,000 | $23,000♦ |
| Graduate | $65,000 | $73,000♦ |

\* $8,500. Effective for loans with periods of enrollment on or after 10/1/93.

♦ No annual or aggregate limit for PLUS (parent) loans. Effective for loans with a first disbursement on or after 7/1/93.

### Chart B

The purpose of this chart is to help you estimate the amount of interest that would accrue on your loan every month so that you can estimate how much would be added to your loan's principal if you and your lender agree to capitalize interest as described on this form.

**Approximate Monthly Accrued Interest if Interest Rate is:**

| Principal | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% | 11.0% |
|---|---|---|---|---|---|---|
| $500.00 | $2.50 | $2.92 | $3.33 | $3.75 | $4.17 | $4.58 |
| $1,000.00 | $5.00 | $5.83 | $6.67 | $7.50 | $8.33 | $9.17 |
| $1,500.00 | $7.50 | $8.75 | $10.00 | $11.25 | $12.50 | $13.75 |
| $2,000.00 | $10.00 | $11.67 | $13.33 | $15.00 | $16.67 | $18.33 |
| $2,500.00 | $12.50 | $14.58 | $16.67 | $18.75 | $20.83 | $22.92 |
| $3,000.00 | $15.00 | $17.50 | $20.00 | $22.50 | $25.00 | $27.50 |
| $3,500.00 | $17.50 | $20.42 | $23.33 | $26.25 | $29.17 | $32.08 |
| $4,000.00 | $20.00 | $23.33 | $26.67 | $30.00 | $33.33 | $36.67 |
| $4,500.00 | $22.50 | $26.25 | $30.00 | $33.75 | $37.50 | $41.25 |
| $5,000.00 | $25.00 | $29.17 | $33.33 | $37.50 | $41.67 | $45.83 |
| $5,500.00 | $27.50 | $32.08 | $36.67 | $41.25 | $45.83 | $50.42 |
| $6,000.00 | $30.00 | $35.00 | $40.00 | $45.00 | $50.00 | $55.00 |
| $6,500.00 | $32.50 | $37.92 | $43.33 | $48.75 | $54.17 | $59.58 |
| $7,000.00 | $35.00 | $40.83 | $46.67 | $52.50 | $58.33 | $64.17 |
| $7,500.00 | $37.50 | $43.75 | $50.00 | $56.25 | $62.50 | $68.75 |

The advantage of capitalizing interest is that you would not be required to make interest payments during in-school, grace, deferment or forbearance periods. The disadvantage is that you will pay more in interest charges over the life of your loan because your interest charges will be added to your principal balance. Your monthly repayment amount will be higher if you choose to capitalize.

For example, if you owe $500.00 in principal at an interest rate of 6.0%, then approximately $2.50 in interest would accrue on your loan every month. If you and your lender agree to capitalize your interest on a quarterly basis (every three months), approximately $7.50 would be added to your $500.00 principal balance. As a result, at the end of one quarter, you would owe, and interest would accrue on, $507.50 in principal.

Or, if you owe $4,000.00 in principal at an interest rate of 11.0%, then approximately $36.67 in interest would accrue on your loan every month. If you and your lender agree to capitalize your interest on a quarterly basis (every three months), approximately $110.01 would be added to your $4,000.00 principal balance. As a result, at the end of one quarter, you would owe, and interest would accrue on, $4,110.01 in principal.

Contact your lender if you have questions or need more information.

Case 3:20-cv-00876-WHA   Document 208-16   Filed 08/20/20   Page 415 of 463

# • Application and Promissory Note

for Federal Stafford Loans (Subsidized and Unsubsidized) and Federal Supplemental Loans for Students (SLS)

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines or imprisonment under the United States Criminal Code and 20 U.S.C. 1097.

## BORROWER SECTION — Please Print Neatly or Type — READ THE INSTRUCTIONS CAREFULLY

| 1. Last Name | First Name | MI | • 2. Social Security Number |
|---|---|---|---|

| 3. Permanent Street Address (If P.O. Box, see instructions) | 4. Telephone Number | 5. Loan Period (MO/YR) From: To: |
|---|---|---|
| City    State    Zip Code | 6. Driver's License Number (List State Abbreviation First) | |
| 7. Lender Name    City    State    Zip Code | 8. Lender Code, If Known | 9. Date of Birth (MO/DAY/YR) |

10. a. Check the interest rate for your most recent Federal Stafford Loan, if any.

| 7 % | 8 % | 9 % | 8 / 10 % ● | Variable |
|---|---|---|---|---|

b. Do you currently have an outstanding Federal SLS, PLUS, or Consolidation Loan(s) at agencies other than the one this application will be processed to? If yes, check here:

**11. REFERENCES** You must provide two separate references with different addresses. Both references must be completed fully.

| Name | | |
|---|---|---|
| Permanent Address | | |
| City, State, Zip Code | | |
| Area Code/Telephone | ( ) | ( ) |
| Relationship to Borrower | | |

## LOAN ASSISTANCE REQUESTED

12. I wish to apply for the following type(s) of loans in the order presented to the extent that I am eligible: **(See Instructions - Select all that apply)**

| a. ● SUBSIDIZED FEDERAL STAFFORD | b. ● UNSUBSIDIZED FEDERAL STAFFORD | c. ● FEDERAL SUPPLEMENTAL LOANS FOR STUDENTS (SLS) |
|---|---|---|

13. I request a total amount under these programs not to exceed **(see instructions for loan maximums):** My school will certify my eligibility for each program for which I am applying. The amount and other details of my loan(s) will be described to me in a Disclosure Statement.    **$                    .00**

14. If I check yes, I am requesting postponement (deferment) of repayment for my Stafford and SLS loan(s) during the in-school and grace periods. If I check no, I do not want to defer repayment.    a. Yes, I want a deferment.    b. No, I prefer to pay the interest.

15. If I check yes, I am requesting that the lender add the interest on my unsubsidized Stafford and SLS loan(s) which accrues during the in-school and deferment periods, to my loan principal (capitalization). If I check no, I prefer to pay the interest.    a. Yes, I want my interest capitalized.    b. No, I do not want a deferment.

16. If my school participates in EFT, I authorize the school to transfer the loan proceeds received by EFT to my student account.    a. Yes ●    b. No

17. I certify that I am not delinquent or in default on a Title IV federal debt.    a. Yes    b. No

### PROMISSORY NOTE   (Continued on the reverse side)

**PROMISE TO PAY**

I promise to pay to the Lender, or a subsequent holder of this Promissory Note, all sums disbursed (hereafter "loan" or "loans") under the terms of this Note, plus interest and other fees which may become due as provided in this Note. If I fail to make payments on this Note when due, I will also pay reasonable collection costs, including attorney's fees, court costs and collection fees. I understand I may cancel or reduce the size of any loan by refusing to accept any disbursement that is issued.

I understand that this is a Promissory Note. I will not sign this Note before reading it, including the writing on the reverse side, even if otherwise advised. My signature certifies I have read and agree to the terms and conditions, including the "Borrower's Certification" printed on the reverse side of this Application.

**THIS IS A LOAN(S) THAT MUST BE REPAID**

18. Borrower's Signature

Today's Date (MO/DAY/YR) —

Today's Date (MO/DAY/YR)

## SCHOOL CERTIFICATION SECTION — TO BE COMPLETED BY SCHOOL

| 19. School Name | 25. School Code/Branch | 30. Telephone Number ( ) |
|---|---|---|
| 20. Street Address | 26. Cost of Attendance $          .00 | 31. Recommended Disbursement Date(s) (MO/DAY/YR) 1st.        2nd. |
| City    State    Zip Code | 27. Federal Expected Family Contribution $          .00 | 3rd.        4th. |
| 21. Loan Period (MO/YR) From        To | 28. Estimated Financial Aid $          .00 | My Signature Certifies that I Have Read and Agreed to the "School Certification" Printed on the Reverse of this Application. 32. Signature of Authorized School Official |
| 22. Grade Level | 29. Certified Loan Amount(s) a. Subsidized $          .00 | |
| 23. Enrollment Status: Full Time    At Least Half-Time | b. Unsubsidized $          .00 | Print or Type Name |
| 24. Anticipated Completion (Graduation) Date (MO/DAY/YR) | c. SLS $          .00 | Date    Check box if electronically transmitted to guarantor: |

## LENDER SECTION — TO BE COMPLETED BY LENDER

| 33. Lender Name | 34. Lender Code/Branch | 35. Telephone Number ( ) | 36. Lender Use Only |
|---|---|---|---|
| Street Address | 37. Amount(s) Approved a. Subsidized $          .00    b. Unsubsidized $          .00    c. SLS $          .00 | | |
| City    State    Zip Code | 38. Signature of Authorized Lending Official | | Print or Type Name, Title and Date |

4/14/93

# Promissory Note *(continued)*

## Disclosure of Terms

This Note may apply to one or more of the following types of loans, which have different terms: subsidized Federal Stafford Loan, unsubsidized Federal Stafford Loan, and Federal Supplemental Loans for Students (SLS). I agree that the lender or any subsequent holder may assign my loan(s) and acknowledge that any one loan may be assigned independently of any other loan to which this Note applies.

At or before the time of my first disbursement, the lender will send me a Disclosure Statement identifying additional terms of each loan. Important additional terms are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this Note.

## Interest

Interest accrues on the unpaid principal balance of each loan from the date of disbursement until the entire principal balance is paid in full. I must pay all interest charges on my unsubsidized Federal Stafford Loan and Federal SLS Loan. For a subsidized Federal Stafford Loan, I do not pay interest payable by the federal government under the Higher Education Act of 1965, as amended, and applicable U.S. Department of Education regulations (collectively referred to as the Act). Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loan(s) are those specified in the Act and presented in the statement of Borrower's Rights and Responsibilities. I also may receive rebates of interest as provided by the Act.

Unless I have requested that the interest that accrues on my unsubsidized Federal Stafford and Federal SLS Loans be added to the principal balance of my loans (referred to as Capitalization), I will begin paying interest upon disbursement of such loans. Should I fail to make required payments of interest prior to the commencement of principal repayment, or during a period of authorized deferment or forbearance, I agree that the holder may Capitalize such interest to the extent permitted by the Act.

## Origination Fee and Guarantee Fee

For each loan, the federal government charges an origination fee equal to the amount required by the Act. The guaranty agency that guarantees my loan(s) (the Guarantor) may charge a guarantee fee not to exceed a maximum amount specified in the Act. I will pay these fees, as identified in the Disclosure Statement, which will be deducted proportionately from each disbursement of my loan(s). I understand the origination and guarantee fees are refundable only if a disbursement is canceled or repaid in full within 120 days of disbursement.

## Late Charges and Collection Costs

If I fail to make any part of an installment payment within 10 days after it becomes due, the holder may collect from me a late charge not to exceed 6% of each late installment. If I default on a loan(s), I shall pay reasonable collection fees and costs, plus court costs and attorney fees.

## Repayment

Federal Stafford Loans have a repayment "Grace Period," usually until 6 months after I cease enrollment as at least a half-time student at an eligible school. My Grace Period will be disclosed in my Disclosure Statement.

I will repay the principal of my loan(s) in periodic installments during a repayment period(s) that begins: (i) in the case of a subsidized or unsubsidized Federal Stafford Loan, on the day immediately following the end of my Grace Period; (ii) in the case of a Federal SLS Loan, on the day of the final disbursement. My principal repayment period for each loan generally lasts five years but may not exceed ten years, exclusive of any period of deferment or forbearance.

The holder of my loan(s) will provide me with a Repayment Schedule that identifies my payment amounts and due dates. The minimum annual payment required on all my Federal Stafford and Federal SLS Loans is $600 or the amount of interest due and payable,

whichever is larger. If I am eligible and I request it, my lender must provide me with a graduated or income-sensitive Repayment Schedule consistent with the provisions of the Act.

My Repayment Schedule may include all of my loans that are owned by the holder of this Note. I agree the holder may grant me a forbearance for purposes of aligning payment dates on my loans or to eliminate a delinquency that persists even though I am making scheduled payments. I may prepay all or any part of the unpaid balance on my loans at any time without penalty.

## Acceleration and Default

At the option of the holder, the entire unpaid balance shall become immediately due and payable upon the occurrence of any one of the following events: (i) I fail to enroll as at least a half-time student at the school that certified my Application; (ii) I fail to use the proceeds of the loan(s) solely for educational expenses; (iii) I make false representation that results in my receiving a loan(s) for which I am not eligible; or (iv) I default on the loan(s).

The following events that constitute a default on a loan: (i) I fail to pay the entire unpaid balance after the holder has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan(s), and the Guarantor reasonably concludes I no longer intend to honor my repayment obligation, provided my failure has persisted for at least 180 days for payments due monthly or 240 days for payments due less frequently than monthly. If I default, the Guarantor may purchase my loan, and Capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.

If I default, this will be reported to National Credit Bureau Organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the statement of Borrower's Rights and Responsibilities. Following default, the loan(s) may be

subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

## Governing Law and Notices

The terms of this Note will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), other applicable federal statutes and regulations, and the Guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies and defenses in addition to those stated in this Note.

If this loan is made by the school, or if the proceeds of this loan are used to pay tuition and charges of a first-party school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract or business arrangement, any holder of this Note is subject to all claims and defenses which I could assert against the school. My recovery under this provision shall not exceed the amount I paid on this loan.

If I reside in the state in which the principal office of the Guarantor is located, the Guarantor may sue to enforce this loan in the county in which the Guarantor's office is located. However, if I object to being sued there and I mail a written objection to the Guarantor, that is postmarked no later than 30 days after I am served with the suit, the Guarantor will either have the court transfer the suit to the county in which I live or will dismiss the lawsuit.

Any notice required to be given to me will be effective if mailed by first class mail to the latest address I have provided to the holder of this Note, or if the holder reasonably determines that this address is no longer my address, to the latest address secured by the holder from the Department of Education or other reliable source. Failure by the holder to enforce or insist on compliance with any term of this Note shall not be a waiver of any right of the holder. No provision of this Note may be modified or waived except in writing. If any provision of this Note is determined to be unenforceable, the remaining provisions shall remain in force.

## Borrower Certification

I declare under penalty of perjury that the following is true and correct: (1) I certify that the information contained in the Borrower Section of the Application is true, complete, and correct to the best of my knowledge and belief and is made in good faith. (2) I certify that loan proceeds will be used for authorized educational expenses and that I will immediately repay any loan proceeds that cannot reasonably be attributed to educational expenses for attendance on at least a half-time basis at the certifying school for the loan period certified on the Application. (3) I certify that the total amount of loans I receive under this Note will not exceed the allowable maximums under the Act. (4) I authorize my school to pay to the holder any refund, that may be due to me up to the amount of the loan(s). (5) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Supplemental Educational Opportunity Grant, or State Student Incentive Grant and that I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans) or the Federal Family Education Loan Program (or "FFELP" as defined in the statement of Borrower's Rights and Responsibilities) or, if I am in default, I have made payment arrangements that are satisfactory to the holder. (6) I authorize the holder(s) of my loan(s), the Guarantor, or their agents, to investigate my credit record and report information concerning my loan status to proper persons and organizations. (7) I authorize the release of information pertinent to this loan: (i) by the school, current holder and the Guarantor, or their agents, to members of my immediate family unless I submit written directions otherwise; and, (ii) by and amongst my schools, lenders, Guarantors, subsequent holders, the Department of Education, and their agents. (8) So that the loan(s) requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to state agencies and nonprofit organizations that administer financial aid programs under the FFELP. (9) I authorize my schools and Guarantors to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan records is incorrect, then I authorize SSA to disclose my correct social security number to these parties. (10) I have read and understand this Application and Promissory Note and the accompanying statement of Borrower's Rights and Responsibilities.

## School Certification

I hereby certify that the borrower named on this Application is accepted for enrollment on at least a half-time basis and is making satisfactory progress in a program that is eligible for the loan type(s) certified. I certify that the student is an eligible borrower in accordance with the Act. I further certify that the borrower's eligibility for a Pell Grant has been determined, that the borrower is not incarcerated, and that the borrower has been determined eligible for loan(s) in the amount(s) certified. I further certify that the disbursement schedule complies with the requirements of the Act and hereby authorize the Guarantor to adjust disbursement dates, if necessary, to ensure compliance with the Act. I further certify that the above amounts are not in excess of and does not exceed the amounts available and I have inquiry into the borrower has met the requirements of the Selective Service Act, that the borrower is not liable for an overpayment of any federal grant made under the Act, and that the information provided in the Borrower and the School sections of this Application (including information supplied in electronic format) is true, complete and accurate to the best of my knowledge and belief. I agree to provide the borrower with confirmation of any transfer of funds through EFT to the borrower's student account.

| | |
|---|---|
| **Application and Promissory Note**<br>for Federal Stafford Loans (Subsidized and Unsubsidized)<br>and Federal Supplemental Loans for Students (SLS) | Guarantor or Program Identification |

## Instructions for Completing Your Application/Promissory Note

# For Federal Stafford Loans (Subsidized and Unsubsidized) and Federal Supplemental Loans for Students (SLS)

## Borrower Section

Items 11-18 are to be completed by the student borrower.

DO NOT COMPLETE IN PENCIL. USE A BLACK INK BALLPOINT PEN OR TYPEWRITER. YOU ARE MAKING SEVERAL COPIES, SO PRESS FIRMLY ON A HARD SURFACE. IF ALL COPIES ARE NOT LEGIBLE, YOUR APPLICATION WILL BE DELAYED.

NOTE: Incorrect or incomplete information may cause your application to be rejected.

**ITEM 1:** Enter your last name first, then your first name and middle initial. If this item has been completed for you and any part of your name is incorrect, cross out all the incorrect information and print the correct information.

**ITEM 2:** Enter your 9-digit Social Security Number. If this item has been completed for you, review it for correctness. If it is incorrect, neatly line through the entire incorrect number and print the entire correct Social Security Number in this box. An application without a Social Security Number will not be processed. Read the Privacy Act and the Right to Financial Privacy Act Notices in this booklet before completing this item.

**ITEM 3:** Enter your permanent home street address, apartment number, city, state and zip code. If you have a Post Office Box and a street address, you must list both. A temporary school address is not acceptable. If this item has been completed for you and any part of your address is incorrect, cross out all the incorrect information and print the correct information.

**ITEM 4:** Enter the area code and telephone number for the address listed in ITEM 3.

**ITEM 5:** Enter the beginning and ending dates (Month and Year) of the academic period for which this loan is to be used (for example, 9/93 to 8/94). These dates must not be more than 12 months apart.

**ITEM 6:** Enter your current driver's license number, listing the state that issued this license, followed by the number. If you do not have a valid driver's license, enter N/A.

**ITEM 7:** Enter the name and address of the lender you wish to borrow from for this loan. If you do not already have a lender for this loan, contact the Lender where you do business or your school's Financial Aid Office.

**ITEM 8:** If you know the 6-digit lender code, enter it here. Otherwise, leave it blank.

**ITEM 9:** Enter the month, day and year of your birth. Use only numbers. Be careful not to enter the current year.

**ITEM 10:** Enter the following information about your prior federal student loans:

**Item 10a** - If you have an outstanding Federal Stafford Loan, check the appropriate box to indicate your most recent interest rate. Check only one box. If you do not have an outstanding Federal Stafford Loan do not answer this question.

**Item 10b** - Check this box if you currently have an outstanding Federal SLS, PLUS, or Consolidation Loan(s) at an agency (or agencies) other than the one this application will be processed by.

**ITEM 11:** Enter the requested information for two adult references with different addresses. The first reference should be a parent or legal guardian. References with addresses outside the United States are not acceptable. At requested items, including telephone number, must be complete or your application will be delayed.

**ITEM 12:** Your choices in this item determine which loans you may be considered for. You should check boxes for all loan types for which you are applying. A subsidized Federal Stafford Loan is a guaranteed loan on which the federal government pays the interest while you are in school. An unsubsidized Federal Stafford Loan is a guaranteed loan on which the borrower is responsible for paying the interest. A Federal SLS is a supplemental loan which is available for graduate and professional students, and independent undergraduate students. (Refer to Rights and Responsibilities.) Requesting a given loan type does not necessarily mean you will be eligible to receive that loan type.

**Item 12a** - Check this box if you wish to receive a subsidized Federal Stafford Loan. If you check this box only, you will not be considered for either an unsubsidized Federal Stafford or an SLS Loan.

**Item 12b** - Check this box if you wish to receive an unsubsidized Federal Stafford Loan. If you also apply for a subsidized Federal Stafford Loan, the school will determine your eligibility first for the subsidized Federal Stafford Loan, then for the unsubsidized Federal Stafford Loan. If you check this box only, you will not be considered for a subsidized Federal Stafford or Federal SLS Loan. Note: If you apply for an unsubsidized loan, you may reduce your parents' ability to borrow under the Federal PLUS loan program.

**Item 12c** - Check this box if you wish to receive a Federal SLS Loan. If you also apply for a subsidized Federal Stafford or

a Federal SLS Loan, the school will determine your eligibility first for the subsidized Federal Stafford Loan, then for the unsubsidized Federal Stafford Loan, then for the Federal SLS. Not all schools participate in the SLS program. Your school will determine if you are eligible. If you check this box only, you will not be considered for a subsidized or unsubsidized Federal Stafford Loan.

**ITEM 13:** Enter the maximum total amount you wish to borrow under the loan programs you selected in ITEM 12. Enter the amount you will need to pay your educational expenses. Apply for what you will need this year, keeping in mind your ability to eventually repay your loan. You may borrow up to the loan limits described in the chart on Maximum Loan Amounts. (See Borrowers Rights and Responsibilities) Note: A disclosure statement sets forth the interest rate and any additional fees. This statement must be presented to you prior to your receiving funds from your lender.

**ITEM 14:** If you are in school on at least a half-time basis, you are eligible for a postponement (deferment) of payments on your outstanding subsidized and unsubsidized Federal Stafford Loans and Federal SLS Loans. By deferring repayment of your loans, you may coordinate the repayment date for your Federal Stafford and Federal SLS Loans. If you want the deferment, check the "yes" box in this item. If you prefer to make regular payments while in school, check the "no" box. If you want to defer some, but not all of these loans, check the "no" box, then file a separate deferment form for the loan(s) you want to defer. Note: If you fail to respond to this question, it will be assumed that your answer is no.

**ITEM 15:** If you want the interest added to your loan principal, check the "yes" box. If you wish to pay the interest while you are in school, during any grace period or during periods of authorized deferments, check the "no" box. Even if you indicate now that you want the interest added to your loan principal (capitalization), you may make payments on your loan at any time. The federal government does not pay the interest on your unsubsidized Federal Stafford Loan or Federal SLS Loan while you are in school, during any grace period or during periods of deferment. Therefore, you are responsible for payment of interest during these periods. You may pay the interest while you are in school, or you may request that the lender add the interest to your loan principal. No more frequently than quarterly, this increases the total amount of your loan. Note: If you fail to respond to this question, it will be assumed that your answer is no.

**ITEM 16:** Your choices to this question determine whether you wish to authorize your school to transfer your loan proceeds received by Electronic Funds Transfer (EFT) to your student account or school, if your school participates in EFT.

Item 16a – Check this box if you authorize your school to transfer your loan proceeds received by EFT to your student account.

Item 16b – Check this box if you do not wish to authorize your school to transfer your loan proceeds by EFT to your student account.

ITEM 17: Indicate whether or not you are delinquent on any non Title IV federal debt.

Item 17a – Check this box if you are delinquent on any non Title IV federal debt.

Item 17b – Check this box if you are not delinquent on any non Title IV federal debt.

Note: if you have answered yes to this question, you must attach a written statement explaining your current status and submit it with your application.

ITEM 18: Borrower Signature and Date are Required. Sign your legal name, including your first name, middle initial and last name. USE A BALLPOINT PEN. You are making several copies, so press firmly.

Enter the date you are signing the Application/Promissory Note by signing, you

1) Acknowledge that you have read, understand and agree to the provisions in the Borrower Certification in the Promissory Note,

2) Agree to repay the loan in full in accordance with all the terms and conditions in the Promissory Note.

If you fail to sign and date the Promissory Note, your application will not be processed.

## School Certification Section

Only a Financial Aid Administrator or other authorized school official is to complete this section. Improperly certified information can create a financial liability for the school.

ITEMS 19-20: Enter your school name and complete address of the office that completes this application.

ITEM 21: Enter the dates covered by the Cost of Attendance shown in ITEM 26. These dates must coincide with actual term starting and ending dates. Please use numbers in a Month, Day, Year format; for example, 9/15/93.

ITEM 22: Indicate the academic level for which the student is seeking a loan. Select the proper grade level indicator using the standard grade level codes provided.

| Code | Grade Level |
|------|-------------|
| 1 | Freshman/First Year (include proprietary institution programs that are less than one year in duration) |
| 2 | Sophomore/Second Year |
| 3 | Junior/Third Year |
| 4 | Senior/Fourth Year |
| 5 | Fifth Year/Other Undergraduate (including between undergraduate and continuing education students) |
| A | First Year Graduate/Professional |
| B | Second Year Graduate/Professional |
| C | Third Year Graduate/Professional |
| D | Beyond Third Year Graduate/Professional |

ITEM 23: Indicate whether the borrower is enrolled at least half-time or full time. Students enrolled less than half-time are not eligible.

ITEM 24: This is the date the student is expected to complete the program at your institution. Please use numbers in a Month, Day, Year format; for example, 6/9/94. Day date is needed to determine the specific day borrowers will enter repayment (as per the Act). If you are unsure of the completion (graduation) date in the future, enter the last day of the month.

ITEM 25: Enter the assigned six or eight digit codes for your institution. This code is provided by the U.S. Department of Education for the Federal Family Education Loan Programs.

ITEM 26: Enter the total cost for the student's tuition and fees, room and board, books and supplies, transportation and personal expenses.

ITEM 27: Enter the amount of the Expected Family Contribution based on needs analysis. Enter $ 0 for any student whose need analysis produces a negative Expected Family Contribution.

ITEM 28: Enter the amount of assistance, which the school knows the student has been or will be awarded, for the enrollment period indicated in ITEM 19. Financial aid should include aid from all federal, state or private sources, excluding the loan(s) applied for with this application.

ITEM 29: Enter the amount of the borrower's eligibility for each loan type. The borrower's certified eligibility must be reduced if the borrower is attending a program with a length of less than a full academic year. The borrower's eligibility may also be reduced based on professional judgement. If this field is left blank the application will not be processed by the guarantor and will be returned to the school.

ITEM 29a – Certify the borrower's eligibility for a subsidized Federal Stafford Loan here. If the borrower is not eligible for a subsidized Federal Stafford Loan, enter $ 0.

ITEM 29b – Certify the borrower's eligibility for an unsubsidized Federal Stafford Loan here. If the borrower is not eligible for a unsubsidized Federal Stafford Loan, enter $0.

ITEM 29c – Certify the borrower's eligibility for a Federal SLS Loan here. If the borrower is not eligible for a Federal SLS Loan enter $0.

ITEM 30: Enter the telephone number, including area code, of the school official who can answer questions about this application.

ITEM 31: Enter the disbursement dates for this loan(s). First year, first time borrowers may not receive their first disbursement prior to 30 days after the start of classes. Schools may not request that a lender disburse loan proceeds earlier than 30 days prior to the first day of the loan period. For all borrowers, second disbursements, if earlier than the midpoint of the enrollment period, must not be sooner than 30 days prior to the commencement of the second term. Multiple disbursements are required unless the loan is disbursed more than halfway through the loan period. You are certifying that the dates you enter meet these requirements.

ITEM 32: Your signature acknowledges that you have read and agree to the provisions in the School Certification in the Promissory Note. You must sign the application, print your name and provide the date of certification.

If you have electronically transmitted the school certification data to the Lender or Guaranty Agency, check the box.

## Lender Section

ITEM 33: Enter your Lender name and complete address.

ITEM 34: Enter the assigned six digit code for your lending institution. This code has been provided by the U.S. Department of Education for the Federal Family Education Loan Programs.

ITEM 35: Enter the telephone number, including area code, of the lending official who can answer questions about this application.

ITEM 36: This item may be left blank or used by the lender as needed.

ITEM 37: Indicate the approved amount for each loan type. Unless you wish to reduce the amount certified by the school, enter the amounts from 27a, 27b, and 27c.

ITEM 37a – Authorize the loan amount for a subsidized Federal Stafford Loan here. If you do not authorize a subsidized Federal Stafford Loan, enter $ 0.

ITEM 37b – Authorize the loan amount for an unsubsidized Federal Stafford Loan here. If you do not authorize a unsubsidized Federal Stafford Loan, enter $ 0.

ITEM 37c – Authorize the loan amount for a Federal SLS Loan here. If you do not authorize a Federal SLS loan, enter $ 0.

ITEM 38: Sign and date the application. Print or type your name and the date you are certifying the application.

(This section will contain the Privacy Act Notice, the Financial Privacy Act Notice and the Equal Credit Opportunity Act Notice.)

## Privacy Act Notice

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is Section 428(b)(2)(A) of the Higher Education Act of 1965, as amended (20 U.S.C. 1078(b)(2)(a)). You are advised that participation in the Federal Family Education Loan Program is voluntary, but the requested information is necessary for participation.

The principal purpose of this information is to verify your identity, to determine your Program eligibility and benefits, to permit the servicing of your loan(s), and, in the event it is necessary, to locate you and to collect on your loan(s) if it becomes delinquent or defaulted.

The routine uses of this information include its disclosure to federal, state, or local agencies, to provide parties such as relatives, present and former employers, business and personal associates, to agency agencies, to credit bureau organizations, to educational and financial institutions, and to agency contractors in order to verify your identity, to determine your Program eligibility and benefits, to permit the servicing or collecting of your loan(s), to counsel you in repayment efforts, to investigate possible fraud and to verify compliance with Program regulations, or to locate you if you become delinquent in your loan(s) payments or you default.

You must provide all of the information requested in order to have your application processed.

Section 7(b) of the Privacy Act of 1974 (5 U.S.C. 552a note) requires that when any federal, state, or local government agency requests that you disclose your Social Security Number (SSN), you must also be advised whether that disclosure is mandatory or voluntary, by what statutory or other authority your SSN is solicited, and what uses will be made of it.

Section 7(a)(2) of the Privacy Act provides that an agency may continue to require disclosure of your SSN as a condition to grant you a right, benefit, or privilege provided by law in cases in which the agency required this disclosure under statute or regulation prior to January 1, 1975, in order to verify the identity of an individual.

Disclosure of your SSN is required to participate in the Federal Family Education Program. The United States Department of Education has, for several years, consistently required the disclosure of the SSN on application forms and other necessary Federal Family Education Loan Program documents, adopted pursuant to published regulations. Authority for releasing this information is found in Federal Family Education Loan Program regulations, particularly 34 CFR 682.201 (a)(2) and (b)(2) and 682.504.

Your SSN will be used to verify your identity, and as an account number (identifier) throughout the life of your loan(s) in order to record necessary data accurately. As an identifier, the SSN is used in such Program activities as determining your Program eligibility, certifying your school attendance and student status, determining your eligibility for deferment of repayments, determining your eligibility for disability or death claims, and for tracing and collecting from you in case you become delinquent in your loan payments or you default.

## Financial Privacy Act Notice

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), the U.S. Department of Education will have access to financial records in your student loan file maintained by the lender in compliance with the administration of the Federal Family Education Loan Program.

## Equal Credit Opportunity Act Notice

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against you on the basis of race, color, religion, national origin, sex, marital status, or age (provided that you have the capacity to enter into a binding contract); because all or part of your income derives from any public assistance program; or because you have in good faith exercised any right under the Consumer Credit Protection Act.

The names and addresses of the federal agencies which administer compliance with this law are listed below. During the course of the loan application process your lender will, upon request, inform you of the proper body which regulates the lender.

Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551

Office of the Comptroller of the Currency
490 L'Enfant Plaza East, SW
Washington, DC 20219

Federal Deposit Insurance Corporation
550 17th Street, NW
Washington, DC 20429

Federal Home Loan Bank Board
1101 Indiana Avenue, NW
Washington, DC 20552

National Credit Union Administration
2025 M Street, NW
Washington, DC 20456

Federal Trade Commission
6th Street and Pennsylvania Avenue, NW
Washington, DC 20580

# Borrower's Rights and Responsibilities

**1. Maximum Loan Amounts** - Under both the Federal Stafford Loan program (including subsidized and unsubsidized loans) and the Federal SLS Loan program, I am subject to annual and aggregate loan limits that are based on my academic level and the length of the academic program (refer to Maximum Loan Amounts chart). If I have received student loans from more than one lender, I am responsible for informing my school and lender of my other student loans. In some cases I may not be eligible for loans for which I have applied.

**2. Use of Loan Proceeds** - I must use loan proceeds for authorized educational expenses incurred to attend the school named (for the loan period indicated) on the Application. Authorized expenses include: tuition, room, board, fees, books, supplies, equipment, dependent child care, transportation and commuting expenses. Loan proceeds may not be used to purchase or lease an automobile.

**3. Change of Status** - I must notify the financial aid office of my school if I reduce my enrollment status to less than half time, withdraw, or fail to re-enroll at the conclusion of a term. I must also notify my school of any change in my local or permanent address during enrollment. Shortly before I end enrollment, I must participate in an Exit Counseling session with my school during which I will update important loan records regarding my address, telephone number, future employer, and repayment plan.

Federal law also requires me to notify my lender (or any subsequent holder of my loans), in writing, if any of the following events occur before a loan is repaid:

- I change my address;
- I change my name (for example, maiden name to married name);
- I fail to enroll in school for the loan period certified;
- I withdraw from school or begin attending less than half-time;
- I transfer from one school to another school;
- I graduate;
- I change my employer or my employer's address changes; or
- I have any other change in status that would affect my loan status (for example, the loss of eligibility for an unemployment deferment by obtaining a job).

**4. Effect of Loans on other Student Aid** - As receipt of this loan will affect my eligibility for other student aid, it may be to my benefit to determine first my eligibility for grants, work-study funds and other forms of student assistance. Before receiving a loan, I must receive a determination of my Pell Grant eligibility. My Federal Stafford Loan (subsidized and unsubsidized) eligibility must be determined before I accept a Federal SLS Loan.

**5. Interest Rate** - Except for interest charges the federal government will pay on my behalf for a subsidized Federal Stafford Loan, I have agreed to pay interest on the principal amount of my loan(s) from the date of disbursement until the loan is paid in full. The actual interest rate applicable to my loan(s) will be disclosed to me in the Disclosure Statement.

## Maximum Loan Amounts

| Borrower's Academic Level | Federal Stafford (Subsidized and Unsubsidized) | Federal SLS |
|---|---|---|
| | Annual Loan Limits | |
| **First Year Undergraduate Student** | | |
| one academic year | $2,625 | $4,000 |
| 2/3 academic year | $1,750 | $2,500 |
| 1/3 academic year | $ 875 | $1,500 |
| **Second Year Undergraduate Student** | | |
| one academic year | $3,500 | $4,000 |
| 2/3 academic year | $2,325 | $2,500 |
| 1/3 academic year | $1,175 | $1,500 |
| **Third Year and Remaining Undergraduate Student** | | |
| one academic year | $5,500 | $5,000 |
| 2/3 academic year | $3,675 | $3,325 |
| 1/3 academic year | $1,825 | $1,675 |
| **Graduate or Professional Student** | $7,500* | $10,000 |

*$8,500 effective for loans with periods of enrollment beginning on or after 10/1/93.

| Borrower's Academic Level | Federal Stafford (Subsidized and Unsubsidized)^ | Federal SLS |
|---|---|---|
| | Aggregate Loan Limits | |
| **Undergraduate Student** | $23,000 | $23,000 |
| **Graduate or Professional Student** | $65,500 | $73,000 |

The maximum interest rate applicable to a Federal Stafford Loan (both subsidized and unsubsidized) depends on whether I have an outstanding balance on a loan under the Federal Family Education Loan Program (FFELP). The FFELP includes any loans under the Federal Stafford, GSL, FISL, SLS, ALAS, PLUS, or Consolidation loan programs.

If I have no outstanding balance on a FFELP loan, the interest rate will be a variable rate, adjusted annually on July 1, not to exceed 9%. The variable rate for each 12-month period will be equal to the bond equivalent rate of 91-day Treasury Bills auctioned at the final auction held prior to the preceding June 1, plus 3.1%.

If I have an outstanding balance on any Federal Stafford, GSL, or FISL Loan, my interest rate on subsequent Federal Stafford Loans will be the same as the applicable rate on my existing loan(s) - either 7%, 8%, 9%, or 8% through the 48th month of the repayment period and 10% thereafter, or a variable rate as described above.

If I have no outstanding balance on a Federal Stafford, GSL, or FISL Loan, but have an outstanding balance on a Federal SLS, ALAS, Federal PLUS or Federal Consolidation loan, the applicable maximum interest rate on my Federal Stafford Loan will be 8%.

The maximum interest rate applicable to a Federal SLS Loan will be a variable rate adjusted annually on July 1, not to exceed 11%. The variable rate for each 12-month period will be equal to the bond equivalent rate of 52-week Treasury Bills auctioned at the final auction held prior to the preceding June 1, plus 3.1%. Outstanding Federal SLS Loans that I received prior to October 1, 1992, may have a different interest rate.

**6. Cost of Deferring Interest Payments -** Under certain circumstances, interest charges on an unsubsidized Federal Stafford Loan or a Federal SLS Loan will accrue and may be capitalized (added to loan principal) during the in-school and Grace Period, as well as during periods of deferment and forbearance. (See

Item 15 of the Application). Capitalization may occur no more frequently than quarterly.

If I choose to defer and capitalize interest charges on an unsubsidized Federal Stafford or a Federal SLS Loan, this will increase the principal balance of my loan and the total amount of interest cost I incur. The chart on the reverse side of this page allows me to estimate the cost and relative effect of capitalization on my monthly payments. If necessary, I must add two or more estimates of my payments together to approximate the more closely the total monthly payment.

**7. Sale or Transfer of Loan(s) -** The lender may sell or otherwise transfer one or all of my loans without my consent. Should ownership of a loan be transferred, I will be notified of the name, address and telephone number of the new holder of my loan. Sale or transfer of my loans to a subsequent holder does not affect my rights and responsibilities.

**8. Consequences of Default -** Default is defined in the Note. If I default, the entire unpaid balance and collection fees, will become immediately due and payable. Failure to repay a loan according to its terms and conditions may result in any or all of the following: loss of federal and state income tax refunds, legal action, assessment of collection charges including attorney fees, loss of professional license, loss of eligibility for other student aid, loss of eligibility for deferments, negative credit reports, and administrative wage garnishment.

**Credit Bureau Notification -** Information concerning the amount, disbursement, and repayment of loans will be reported to one or more national credit bureau organizations. If I default on a loan, this will also be reported to all national credit bureaus. I will be notified at least 30 days in advance that default information will be disclosed to a credit bureau unless I enter into repayment on the loan within 30 days. I will be given a chance to ask for a review of the debt before it is reported. My holder and Guarantor must provide a timely response to a request from any credit organization regarding objections

might arise with that organization about the accuracy and completeness of information.

## 10. Special Repayment Arrangements -A

A Federal Consolidation Loan Program is available under which I (or my spouse and I jointly) may consolidate into one debt student loans received from different lenders and/or under different student loan programs. The Federal Consolidation Loan Program allows the extension of the repayment period beyond the normal 10-year period and permits multiple debts to be combined, resulting in one monthly payment. For additional information, I should contact my lender(s) or holder(s).

If I have outstanding Federal SLS loans at a fixed interest rate, I am eligible to refinance these loans to secure a variable interest rate. For further information, I should contact my holder(s). My holder may charge me an amount not to exceed $100 to cover the administrative costs of refinancing these loans.

Under certain circumstances, military personnel may have their loans repaid by the Secretary of Defense in accordance with 10 U.S.C. 2141. Questions should be addressed to the local service recruiter. This is a recruiting program and does not pertain to prior service individuals or those not eligible for enlistment in the Armed Forces.

## 11. Loan Cancellation - My loan debt will be cancelled if documentation of my death is submitted to my holder or if my holder accepts a statement submitted from a physician verifying my total and permanent disability. My loan(s) will not automatically be discharged in bankruptcy.

The Act provides for certain loan cancellations for borrowers who are unable to complete a course of study because the institution closes, or whose eligibility was falsely certified by the institution.

Neither the lender, the Guarantor, nor the Department of Education vouch for the quality or suitability of the academic programs offered by participating schools. Repayment of the loans is not conditioned upon the performance of my school nor obtaining employment in my field of study.

## 12. Deferments - I am entitled to postpone repayment if I provide the holder of my loan(s) (or its servicing agent, with a request for a deferment together with evidence that verifies my eligibility. Upon request, the holder will provide me with a deferment application that lists deferment categories and eligibility requirements. The types of deferments that are available depend on when I first borrowed a FFELP loan.

For Federal Stafford and Federal SLS loans disbursed on or after July 1, 1993, to borrowers with no outstanding balance on a FFELP loan prior to July 1, 1993, the following types of deferments are available:

Enrollment in at least a half-time course of study as determined by an eligible school.

Provided the program is approved by the Department of Education, pursuing a graduate fellowship program or a rehabilitation training program for individuals with disabilities. Up to three years, if I am conscientiously seeking but unable to find full-time employment.

Up to three years, for any reason (in accordance with federal regulations) that has caused me to have an economic hardship.

Deferment categories for borrowers with an outstanding FFELP loan disbursed prior to July 1, 1993, include:

- full-time study in an eligible school, a graduate fellowship program or a rehabilitation program for disabled individuals

- at least half-time study at an eligible school, if I borrow a new loan during the deferment period

- active duty status in the Armed Forces of the United States, or serving as an officer in the Commissioned Corps of the United States Public Health Service, or an active duty member of the National Oceanic and Atmospheric Administration Corps

- serving as a full-time volunteer under the Peace Corps Act, in an ACTION Program or

another comparable program determined eligible for deferment by the U.S. Department of Education

- temporary total disability of the borrower or a dependent

- conscientiously seeking but unable to find full-time employment in the United States

- serving in an internship required to receive professional recognition to begin professional practice, or leading to a post-graduate degree or certificate

- parental leave to care for a newborn or newly adopted child

- full-time teaching in a teacher shortage area as defined by the U.S. Department of Education

- a mother of preschool age children, who is entering or reentering the work force at a salary that is not more than one dollar above the federal minimum wage.

## 13. Forbearance - During a period of forbearance, interest charges continue to accrue while I am temporarily furnished to delay or reduce payments. If I am willing, but financially unable, to make payments under my repayment schedule, I may request forbearance to allow for any of the following:

- a short period during which I make no payments;

- an extension of time for making payments; or

- a period during which I make smaller payments than were scheduled originally.

My holder is generally not required to grant a forbearance and may ask for my reasons for the request and other information. However, if I am serving in a medical or dental internship or residency program, my holder is required to grant me a forbearance under certain conditions. The Act also provides for forbearance when my debt burden equals or exceeds 20% of gross income.

---

## Capitalization of Unsubsidized Federal Stafford and Federal SLS Loan Interest

### What is Capitalization?

Capitalization is a process whereby a lender adds unpaid interest to the principal balance of a loan. You are responsible for paying the interest due on an unsubsidized Federal Stafford Loan or a Federal SLS Loan from the date the lender disburses the loan.

If you choose to defer and capitalize interest charges, the principal balance of your loan will increase each time your lender capitalizes unpaid interest. As a result, you will pay more interest charges over the life of the loan. When you leave school and begin repaying your loan, your monthly payment amount will be higher or, if your loan is subject to the $50 minimum payment, you will make more payments.

Contact your lender if you have questions or need more information.

| Loan Type | Option 1: Interest Payment Made | | | Option 2: Interest Payment Deferred | |
|---|---|---|---|---|---|
| | Loan Amount | Monthly Interest | Monthly Payment* | Interest Capitalized | Monthly Payment* |
| Unsubsidized Stafford Loan | $2,625 | $19.69 | $50 (67 payments) | $244 | $50 (76 payments) |
| | $3,500 | $26.25 | $50 (99 payments) | $326 | $50 (114 payments) |
| 9% Interest | $5,500 | $41.25 | $70 | $512 | $76 |
| SLS Interest | $4,000 | $36.67 | $55 | $458 | $61 |
| 11% Interest | $5,000 | $45.83 | $69 | $573 | $77 |

\* 120 monthly payments unless otherwise noted.

This chart compares the monthly payments on loans where interest is paid while the borrower is in school (Option 1) and loans where the interest is capitalized (Option 2). The estimate of interest capitalized in these examples is based on quarterly capitalization over a 12-month period.

## Repaying Your Loans

Follow these steps to estimate your loan payment. For subsidized Federal Stafford Loans, complete Step 3 only. The Federal government pays the interest while you are in school.

### Step 1: Calculate Your Monthly Interest Charges

Round your loan up to the nearest $500. If you have a variable interest rate, use 9% for Federal Stafford or 11% for Federal SLS. If your loan amount is not on the table, follow the example below to estimate your monthly accrued interest.

**Example:**

Stafford loan of $2,500 at 9% interest

$2,000 = $15.00/month
+ 500 = 3.75/month
18.75/month

Your monthly interest $ _____

#### Approximate Monthly Interest

| Loan Amount | 7.0% | 8.0% | 9.0% | 11.0% | 12.0% |
|---|---|---|---|---|---|
| $500 | $2.92 | $3.33 | $3.75 | $4.58 | $5.00 |
| $1,000 | $5.83 | $6.67 | $7.50 | $9.17 | $10.00 |
| $2,000 | $11.67 | $13.33 | $15.00 | $18.33 | $20.00 |
| $3,000 | $17.50 | $20.00 | $22.50 | $27.50 | $30.00 |
| $3,500 | $20.42 | $23.33 | $26.25 | $32.08 | $35.00 |
| $4,000 | $23.33 | $26.67 | $30.00 | $36.67 | $40.00 |
| $5,000 | $29.17 | $33.33 | $37.50 | $45.83 | $50.00 |
| $5,500 | $32.08 | $36.67 | $41.25 | $50.42 | $55.00 |
| $6,000 | $35.00 | $40.00 | $45.00 | $55.00 | $60.00 |
| $7,000 | $40.83 | $46.67 | $52.50 | $64.17 | $70.00 |
| $7,500 | $43.75 | $50.00 | $56.25 | $68.75 | $75.00 |

### Step 2: Estimate Your Capitalized Interest

Complete this step only if you will capitalize interest on an unsubsidized Federal Stafford Loan or a Federal SLS Loan. THIS IS AN ESTIMATE ONLY. Actual interest capitalized will depend on disbursement dates, number of disbursements, the variable interest rate and the frequency of capitalization.

| | Monthly Interest (From Step One) | | Number of Months in School and Grace | | Estimate of Capitalized Interest |
|---|---|---|---|---|---|
| Sample | $ 18.75 | x | $ 27 | = | $ 506 |
| Unsubsidized Stafford | $ _____ | x | $ _____ | = | $ _____ |
| SLS | $ _____ | x | $ _____ | = | $ _____ |

### Step 3: Estimate Your Monthly Payment

Round your loan up to the nearest $500. If your principal amount is not on the table, follow the example below to estimate your monthly payment.

**Example:**

Stafford loan of $13,000 at 9% interest

$10,000 = $126.68/month
+3,000 = 38.01/month
$164.69/month

*Minimum monthly payment = $50

#### Estimated Monthly Payments *(10 Year Term)*

| Principal Balance | 7.0% | 8.0% | 9.0% | 11.0% | 12.0% |
|---|---|---|---|---|---|
| $500* | $5.81 | $8.07 | $6.34 | $6.89 | $7.18 |
| $1,000* | $11.62 | $12.14 | $12.67 | $13.78 | $14.35 |
| $3,000* | $34.84 | $36.40 | $38.01 | $41.33 | $43.05 |
| $4,000* | $46.45 | $48.54 | $50.68 | $55.10 | $57.39 |
| $5,000 | $58.06 | $60.67 | $63.34 | $68.88 | $71.74 |
| $7,000 | $81.28 | $84.93 | $88.68 | $96.43 | $100.43 |
| $9,000 | $104.50 | $109.20 | $114.01 | $123.98 | $129.13 |
| $10,000 | $116.11 | $121.33 | $126.68 | $137.75 | $143.48 |
| $15,000 | $174.17 | $182.00 | $190.02 | $206.63 | $215.21 |
| $20,000 | $232.22 | $242.66 | $263.36 | $275.50 | $286.95 |
| $25,000 | $290.28 | $303.32 | $316.69 | $344.38 | $358.68 |

*Minimum monthly payment = $50

| | Loan Amount | | Estimate of Capitalized Interest (From Step Two) | | New Principal Balance | Estimated Monthly Payment |
|---|---|---|---|---|---|---|
| Sample | $ 2,500 | + | $ 506 | = | $ 3,006 | $ 50.00 * |
| Subsidized Stafford | $ _____ | + | $ -0- | = | $ _____ | $ _____ |
| Unsubsidized Stafford | $ _____ | + | $ _____ | = | $ _____ | $ _____ |
| SLS | $ _____ | + | $ _____ | = | $ _____ | $ _____ |

4/14/93

## GROUND TRANSPORTATION:

Indy Connection Limousines., Inc.   1/800 888INDY  (This service is less
expensive than taxi service, which is also available at the airport.)

The major car rental companies are all located at the Indianapolis airport.

## HOTEL:

Omni North Hotel, 8181 N. Shadeland Avenue    (See map below)
(317)849-6668

$65/night

A block of 100 rooms will be held until April 26 under the Department of
Education.

The hotel is approximately 30 minutes from the airport and 7-10 minutes from
USA GROUP.

# USA GROUP LOCATOR MAPS

## INDIANAPOLIS



From the Indianapolis International Airport, take I-465 North
to I-465 East. Follow I-465 East to I-69 North. Take the
Fishers/116th Street Exit off I-69 and turn right. At the
first road, turn right into the Exit Five Corporate Park and
follow USA Parkway to the USA GROUP Headquarters.

## FISHERS/CASTLETON



⚓ USA GROUP Headquarters
① Omni North Hotel
② Quality Inn - Castleton Suites

# Registration Form

## Common Application Meeting
### U.S. Department of Education
### Indianapolis, Indiana
### May 3, 1993

**NAME AND TITLE**

**AGENCY**

**ADDRESS**

**PHONE NUMBER**

**FAX NUMBER**

**Special Note:** Prior to April 28, 1993 return this form to Robert W. Evans, Director, Division of Policy Development, Policy, Training, and Analysis, U.S. Department of Education --- *FAX TO: 202-205-0786*

(FORMS)

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE ASSISTANT SECRETARY FOR POSTSECONDARY EDUCATION

RECEIVED JUN   9 1988

MAY 19 1988

Honorable Stephen J. Solarz
House of Representatives
Washington, D.C. 20515

Dear Mr. Solarz:

This responds to your letter of February 10, 1988 to Secretary Bennett concerning former students of Adelphi Institute, Inc. who have outstanding Guaranteed Student Loans (GSL) for attendance at that school.

Many students borrowed under the Guaranteed Student Loan Program to finance their enrollment at Adelphi. These loans were made by various banks and were guaranteed by a number of guaranty agencies, including the Higher Education Assistance Foundation. Each of these guaranty agencies has a reinsurance agreement with the Department. The Department paid interest subsidies on each loan to a financially needy Adelphi borrower and reimbursed the agency for most of its losses with regard to those losses on which borrowers defaulted and the lenders filed claims on the respective guarantees.

If a loan is not legally enforceable, it is not reimbursable by the Department, and the Department would not encourage or require a lender or guaranty agency to attempt to collect such a loan. As a legal matter, however, a student who borrows under the GSL program from a third party lender remains responsible for repaying the loan even if the school closes, unless a relationship exists between the lender and the school that would make the school's failure to render educational services a defense to repayment of the loan to the lender. This kind of relationship can arise when the lender makes the school its agent for certain functions in the loan making process. The Department has termed such an agency relationship an "origination relationship." 34 CFR 682.200.

As you may be aware, students who attended the Gary, Indiana branch of Adelphi have filed a class action challenging the enforceability of their Adelphi loans guaranteed by HEAF. If the court finds that the school acted as agent of the lender, and determines that the loans, for that reason, are null or partially unenforceable against the borrowers, the Department would honor that determination, and would regard these loans, to that extent, as not reimbursable. We would not expect HEAF or the lenders or the guaranty agencies to collect them.

Page 3 - Honorable Cf.„k
Page 3 - Honorable Stephen J. Solarz*

I hope that this has clarified the Department's position regarding the forgiveness of loans under these circumstances. If you have any further questions, or wish any additional information, please contact Mr. William L. Moran, Director, Division of Policy and Program Development, at 732-5217.

Sincerely

Kenneth D. Whitehead
Acting Assistant Secretary

Federal Family Education Loan Program (FFELP)

Guarantor, Program, or Lender Identification

706

California Student Aid
Commission - 706

02116011

# Federal Stafford Loan
# Master Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both, under the United States Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0006
Form Approved
Exp. date 2-28-2009

## Borrower Information

*Please print neatly or type. Read the instructions carefully.*

| 1. Last Name | First Name | MI | 2. Social Security Number |
|---|---|---|---|
| colon | yvette | | |

| 3. Permanent Street Address (if P.O. Box, see instructions.) | | 4. Home Area Code/Telephone Number |
|---|---|---|
| | | (212 ) |

| City | State | Zip Code | 6. Driver's License State and Number |
|---|---|---|---|
| new york | ny | 10029 | State ny # |

| | | 5. Date of Birth (Month/Day/Year) |
|---|---|---|
| | | |

| 7. E-mail Address |
|---|
| @hotmail.com |

| 8. Lender Name | City | State | Zip Code | 9. Lender Code, if known |
|---|---|---|---|---|
| SALLIE MAE EDUCATION TRUST (802218) | | | | 802218 |

10. **References:** You must provide two separate references with different U.S. addresses. The first reference should be a parent (if living) or legal guardian. Both references must be completed in full.

| | A. | | B. |
|---|---|---|---|
| Name | | | |
| Permanent Address | | | |
| City, State, Zip Code | | | |
| E-mail Address | | n/a | |
| Area Code/Telephone Number | ( ) | | ( ) |
| Relationship to Borrower | 0 - Other | | 0 - Other |

11. **Requested Loan Amount:** I request a total amount of subsidized and unsubsidized loans under this Master Promissory Note not to exceed the allowable maximums under the Higher Education Act. My school will notify me of the type(s) and amount(s) of loan(s) that I am eligible to receive. I may cancel my loan or request a lower amount by contacting my lender or school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and Disclosure Statements that have been or will be provided to me.

12. **Interest Payments (Optional):**
☐ I want to pay unsubsidized interest while I am in school.

## Borrower Certifications and Authorizations

*Read carefully before signing below.*

13. Under penalty of perjury I certify that:

A. The information I have provided on this Master Promissory Note and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

B. I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.

C. (I) I do not now owe an overpayment on a Federal Pell Grant, Supplemental Educational Opportunity Grant, or a Leveraging Educational Assistance Partnership Grant (formerly State Student Incentive Grant); or, if I owe an overpayment, I have made repayment arrangements with the holder to repay the amount owed. (II) I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans), the Federal Direct Loan Program, or the Federal Family Education Loan Program ("FFELP" as defined in the Borrower's Rights and Responsibilities Statement); or, (III) I am in default on a loan, and I have made satisfactory arrangements with the holder of the defaulted loan.

14. For all subsidized and unsubsidized Federal Stafford Loans (as described in the additional MPN provisions and the Borrower's Rights and Responsibilities Statement) I receive under this Master Promissory Note, and for certain other loans as described below, I make the following authorizations:

A. I authorize my school to certify my eligibility for loans under this Master Promissory Note.

B. I authorize my school to transfer loan proceeds received by electronic funds transfer (EFT) or master check to my student account.

C. I authorize my school to pay to the lender any refund that may be due up to the full amount of the loan(s).

D. I authorize the lender, the guarantor, or their agents, to investigate my credit record and report information concerning my loan status to persons and organizations permitted by law to receive such information.

E. I request and authorize my lender to: (I) during the in-school and grace periods of any loans made under this Master Promissory Note, defer and align the repayment of principal on all of my FFELP loans that are in repayment status; and (II) add unpaid interest that accrues on all my FFELP loans to the principal balance of such loans ("capitalization") including such loans made under this Master Promissory Note, during forbearance periods, and for unsubsidized loans, during in-school, grace, and deferment periods as provided under the Act. "Capitalization" will increase the principal balance on my loans and the total amount of interest charges I must pay.

F. I authorize the release of information pertinent to my loans: (I) by the school, the lender, and the guarantor, or their agents, to the references on the applicable loans and to members of my immediate family unless I submit written directions otherwise; and, (II) by and among my schools, lenders, guarantors, the Department of Education, and their agents.

G. So that the loans requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to the school, the lender, and to state agencies and nonprofit organizations that administer financial aid programs under the FFELP.

## Promise to Pay

*In this Master Promissory Note (MPN), "lender" refers to, and this MPN benefits, the original lender and its successors and assigns, including any subsequent holder of this MPN.*

15. I promise to pay to the order of the lender all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that multiple loans may be made to me under this MPN. I understand that by accepting any disbursements issued at any time under this MPN, I agree to repay the loans. I understand that, within certain time frames, I may cancel or reduce the amount of any loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that accrues on my unsubsidized loans during in-school, grace, and deferment periods will be added as provided under the Act to the principal balance of such loans. If I do not make any payment on any loan made under this MPN while it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Certifications and Authorizations printed above, the Notice About Subsequent Loans Made Under This MPN, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

| 16. Borrower's Signature | 17. Today's Date (Month/Day/Year) |
|---|---|
| yvette   colon | 07/08/2006 |

01.01.01   01939BDBBA9A462BF713A2BC174U7B79

*Additional MPN provisions follow*



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE ASSISTANT SECRETARY FOR POSTSECONDARY EDUCATION

# Overview
## Federal Trade Commission (FTC)
## Holder Rule

In preparing the common loan application/promissory note for the FFEL Program, the Department engaged in extensive consultations with representatives for lenders, schools, guaranty agencies, and students. One of the main topics of discussion was the incorporation of the FTC Holder Rule into the promissory note. Some of the representatives urged us not to include the FTC Holder Rule in the Note, but others argued that the law and public policy supported inclusion of the FTC Holder Rule notice in the promissory note. We carefully considered all the views expressed during our consultations, but ultimately the Secretary concluded that the notice must be in the promissory note.

The FTC has consistently stated, both publicly and privately, that their regulation applies to the FFEL Program, and a number of court decisions have agreed with that conclusion. *See* 57 Fed. Reg. 28815 (June 29, 1992); Jackson v. Culinary School of Washington, 788 F.Supp. 1233 (D.D.C. 1992); Hernandez v. Alexander, C.A. No. CV-S-91-705-PMP (D.Nev., May 19, 1992); Spinner v. Chesapeake Business Institute, C.A. No. 91-634 (E.D.Va., February 5, 1993). Accordingly, the Secretary decided that the FTC Holder Rule notice must be included in the common application/promissory note.

If a for-profit school and a lender have a referral or business arrangement, the common application/promissory note, by including the Holder Rule clause, makes borrower claims against the school available as legal defenses to repayment of the loan, but apart from that, does not create any new liability for a lender or guarantor. Whether the claim of the borrower is in fact a legal claim or defense against a holder of the loan, depends on state law.

Page Two:

The Higher Education Act of 1965, as amended (HEA), and FFEL Program regulations require a school and a lender to perform certain specific duties, which may involve some cooperative activity. That specific activity is not the kind of cooperative conduct that constitutes a referral or affiliation" relationship within the meaning of the Holder Rule. Therefore, a for-profit school and a lender do not create a referral or business arrangement between themselves if each does no more than perform those specific duties that the HEA and regulations expressly require each of them to perform.

Furthermore, a for-profit **school does not** generally create a referral or **business arrangement if**, in **addition to** performing **specific** duties required by the **HEA or regulations**, the school does no more than give its students *information* on the availability of student loans – for example, a **list of** available lenders - but does not *recommend* that the **applicants seek loans** from those lenders and has **no** other business dealings (*i.e.*, **other than those expressly required by statute** or **regulations,** as noted above) **with the identified** lenders regarding student loans. The Holder Rule clause therefore **does not apply to** loans made under these **circumstances.**

If the school contacted a particular lender **to** inquire whether that lender **would be willing to make loans for** *its own students*, **and later** included this lender (if it responded positively) on its information list of **lenders, that exchange** would **be** more likely to be considered an affiliation **and implicate the Holder Rule.** On the other hand, if the school obtained its lender information from third-party sources, **such as the guarantor or a trade** association, **or from a more** generalized school inquiry to a lender (*e.g.*, asking merely whether the lender is generally **willing to make loans** to trade school students in a particular state), that exchange does **not** constitute an **affiliation**, again assuming **that** the school has no other **business** dealings (*i.e.*, other than those required **by** statute or regulations, as noted above) with the **identified lenders** regarding student loans. The **Holder** Rule does not apply in **the latter situations.**

Page Three:

Although the Holder Rule applies where a school recommends a particular lender or lenders, in order for a referral relationship to arise between a T ~ school and a lender, the lender must know that a loan applicant was referred by a school. If the lender has no knowledge that the school recommended it to the loan applicant (and, as noted earlier, no other facts exist that would give rise to a referral or affiliation), the Holder Rule is not applicable to that loan.

**Whether** the lender has a good-faith belief that no recommendation occurred will of course depend on the facts of particular cases. A lender that had no direct communication with a school about loan availability would be **more** likely to demonstrate a good-faith belief that applications it receives from the school were not the result of a school recommendation, while a lender that sends the school promotional material regarding its lending activity would have good reason to believe that loan applications it receives from that school were the result of school recommendation.

A lender **that advises** a school that it is generally willing to make student loans, but demands and receives from the **school** credible assurances that **the** school will do no more than include its name on a **list** of willing lenders for interested **loan** applicants, could in good-faith believe **that** no recommendation was taking place. **Until the lender is** on notice of facts that call such **assurances into question, and** in the absence of other actions that would give rise to a referral or affiliation, the Holder Rule clause would not **apply to** ~ loans made under those circumstances. This is consistent with **Department** regulations **that permit** lenders to rely in good-faith on statements made by the school in the loan application process. 34 CFR 682.206(a)(2).

Because the FTC promulgated and administers the Holder Rule, the Department must give deference to any interpretation by the FTC of the **application** of the rule. An FTC opinion as to whether the rule applies in particular fact situations will therefore be ordinarily dispositive *on that issue* in any dispute regarding the enforceability of an FFEL Program loan. The FTC has provided explanatory statements in the Federal Register regarding

Page Four:

the application of the Holder Rule. These are found in the Federal Register of November 18, 1975 (40 FR 53506), August 16, 1976 (41 FR 48594), and June 29, 1992 (57 FR 28814).

Finally, we understand that the Department's action in including the Holder Rule language in the promissory note has caused confusion for some lenders. However, lenders are familiar with the implications of the FTC Holder Rule since it applies to every other consumer loan transaction in which they are * involved. We anticipate that loans will continue to be generally available.

7/2/93
Date

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

**ATTORNEY GENERAL OF THE STATE OF NEW YORK**
-----------------------------------------------------------------------X

**In the Matter of**

**Career Education Corporation,**

**Respondent.**

-----------------------------------------------------------------------X

## AGREEMENT ON CODE OF CONDUCT

**WHEREAS** the Office of Attorney General of the State of New York (the "OAG") has commenced an investigation pursuant to Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Office of the Illinois Attorney General ("ILOAG") has commenced an investigation pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Illinois Consumer Fraud Act") into practices related to higher education loans offered to students and parents (the "Investigation");

**WHEREAS** in the course of the Investigation the OAG reviewed extensive evidence;

**WHEREAS** Career Education Corporation ("CEC") has cooperated in the Investigation by voluntarily producing evidence and answering questions relevant to the Investigation;

**WHEREAS,** as set forth in the findings of fact ("Findings") below, the OAG and the ILOAG assert that the Investigation has revealed that many institutions of higher education and lenders that provide loans to or on behalf of students of those institutions have engaged in certain acts, practices and omissions that violated Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/2;

**WHEREAS**, as set forth below in section I(B), the OAG and the ILOAG allege that CEC has engaged in certain of the practices that violate these statutes;

**WHEREAS** CEC does not admit, and expressly denies, that its conduct constituted any violation of law;

**WHEREAS** CEC has advised the OAG and the ILOAG of its desire to resolve the Investigation through this Agreement on Code of Conduct (the "Agreement");

**WHEREAS** CEC, without admitting the OAG's and the ILOAG's Findings and assertions made below, has agreed to alter its practices with respect to education loans, and to adopt a Code of Conduct for education loan practices;

**NOW THEREFORE**, the OAG and the ILOAG, based upon the Investigation, makes the following Findings:

## I. FINDINGS OF THE ATTORNEY GENERAL

### A. Industry-Wide Findings

The Investigation has covered many lenders and institutions of higher education. Based on the Investigation, the OAG and the ILOAG make the following findings as to common practices found throughout the higher education loan industry.

1. Many students and their families are unable to pay all of the expenses appurtenant to higher education. In addition to grants, scholarships and work-study programs, significant numbers of students and their parents turn to loans to cover what they cannot otherwise afford to pay. Higher education loans constitute an $85 billion per year industry.

2. Higher education loans take several forms. By dollar amount, most loans are borrowed by students themselves and are federally regulated and guaranteed. The federal government has created a program for providing loans, know as "Stafford Loans," to students.

2

The interest rate for Stafford Loans is set by the federal government. Lenders, however, have wide latitude in offering benefits to borrowers, including discounts off of that interest rate.

3. Other federal loans, known as "PLUS Loans" are offered to students' parents to cover higher education expenses incurred by their children and to graduate students. Like Stafford Loans, the federal government sets the interest rates for PLUS Loans and lenders have wide latitude in offering borrower benefits.

4. In addition to the federal loans described above, parents or students can obtain private "alternative loans" to cover educational expenses not covered by other financial aid. The federal government does not sponsor, subsidize or guarantee alternative loans. Accordingly, the interest rate and other terms of the loans are determined by the borrower's creditworthiness and market forces.

     *i.*      *"Preferred Lender" Lists*

5. In response to the staggering array of lenders that offer each of the various types of education loans, some institutions of higher education have created lists of recommended lenders. Institutions of higher education that use such lists usually have separate lists for each of the several types of education loans available. In some instances, such lender lists contain dozens of potential lenders that meet certain minimal requirements. In other cases, institutions of higher education use the lists to recommend a handful of lenders, or even a single lender, as "preferred."

6. The lenders listed on an institution of higher education's list of preferred lenders typically receive up to 90% of the loans taken out by the institution's students and their parents. Despite the significant role that these lists play in determining the lenders from which students and parents borrow, many institutions did not inform their student and parent borrowers about

3

the process and criteria used to formulate the lists of recommended or preferred lenders. Nor did they disclose the potential conflicts of interest on the part of their financial aid offices, which typically compile the preferred lender lists. These conflicts of interest may arise from: lender-funded travel expenses for institutions' financial aid officials to attend meetings and seminars in attractive locations; the appointment of the institutions' financial aid officials to "Boards" or "Committees" sponsored by the lenders; the lenders' provision of staff and services to the institutions; the lenders' provision of "Opportunity Loans;" and revenue sharing. These practices are described below.

  *ii.*  *Revenue Sharing*

  7.  In the context of the education loan business, revenue sharing refers to an arrangement whereby a lender pays an institution of higher education a percentage of the principal of each loan directed toward the lender from a borrower at the institution, often in exchange for the institution of higher education placing the given lender on the institution of higher education's preferred lender lists. This type of arrangement is prohibited by federal regulation in the context of Stafford Loans, PLUS Loans and other federal loan programs; it occurs only in the alternative loan segment of the industry.

  8.  The practice of revenue sharing creates a conflict of interest on the part of the institutions of higher education. When and if the institutions direct students to lenders, they should do so based solely on the best interests of the student and parents who may take out loans from the lenders; yet, the institutions have a financial interest in the selection of the lenders by the student and parents. If the student and parents select a lender with which the institution has a revenue sharing contract – even if another lender or other financial aid resource would be more suitable for the student or parents – the institution receives a financial benefit.

4

*iii.    Denial of Choice of Lender*

9.    Some institutions of higher education have neglected to make clear that borrowers have a right to select the Stafford Loan and PLUS Loan lender of their choice, irrespective of whether the lender appears on any preferred lender lists. In the most egregious cases, institutions have gone so far as to abrogate this right, by stating or strongly implying that the student and parents were limited to the lenders on the list, or even to a single lender.

*iv.    Exclusive Consolidation Loan Marketing Agreements*

10.    Former students may wish to combine their various education loans into a single package, called a "consolidation loan." Some institutions of higher education have entered into agreements with the providers of such consolidation loans pursuant to which the institution agrees to encourage its former students to consolidate the former students' loans with a particular lender and no other. In exchange, the institution secures revenue sharing or other benefits that inure directly or indirectly to the institution rather than the borrower. Once again, the institution is in a conflicted position because its advice and encouragement may be influenced by its financial self-interest.

*v.    Undisclosed Sales of Loans to Another Lender*

11.    In many instances, institutions of higher education place several lenders on the institutions' lists of preferred lenders causing the potential borrower to think that the lender list represents a real choice of options. But, the choice is illusory when, as sometimes occurs, all or a number of the lenders on a lender list have arranged with each other to sell any loans to one of the lenders immediately after one of the other complicit lenders disburses a loan.

*vi.    Opportunity Loans*

5

12. Lenders have entered into undisclosed agreements with institutions of higher education to provide what are referred to as "Opportunity Loans." These agreements provide that the lender will make loans up to a specified aggregate amount to students with poor or no credit history, or international students, who the lender claims would otherwise not be eligible for the lender's alternative loan program. In exchange for the lender's commitment to make such loans, the institution may provide concessions or promises to the lender that may prejudice other borrowers.

**B.     Findings as to CEC**

13. Career Education Corporation is a foreign corporation with a principal place of business located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, Illinois. CEC operates post-secondary educational institutions within New York State and elsewhere.

14. Two Lending Institutions, as defined below, which have made private, alternative loans to CEC students, have made donations to the Career Education Scholarship Fund, a section 501(c)(3) entity, in the aggregate amount of $21,200.00. These funds were not made available in consideration of placement of the Lending Institutions on a preferred lender list, or for reaching agreed loan volumes in any lending program, or in return for any other thing of value.

**C.     Violations**

15. The OAG and the ILOAG allege that the acts, practices, and omissions set forth in section I(B) on the part of CEC created a conflict of interest and violated Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/2.

6

## II. AGREEMENT

**IT NOW APPEARING THAT** CEC, while it denies any conflict of interest or violation of the laws cited in this Agreement, desires to settle and resolve the Investigation without admitting the OAG's and the ILOAG's Findings;

**AND IT FURTHER APPEARING THAT** CEC agrees to accept a Code of Conduct promulgated by the OAG and the ILOAG for institutions of higher education involved in providing and servicing education loans or advising students or their parents with respect to education loans;

**NOW, THEREFORE,** the OAG, the ILOAG and CEC hereby enter into the Agreement, pursuant to Executive Law § 63(15) and the Illinois Consumer Fraud Act, 815 ILCS 505/6.1, as follows:

### A.   Code of Conduct

*i.   Prohibition of Certain Remuneration to CEC Employees*

16.   CEC shall require and ensure that no officer, trustee, director, employee, or agent of CEC accepts anything of more than nominal value on his or her own behalf or on behalf of another during any 12 month period from or on behalf of a Lending Institution, except that this provision shall not be construed to prohibit any officer, trustee, director, employee, or agent of CEC from conducting non-CEC business with any Lending Institution. As used in the preceding sentence and throughout the Agreement, a Lending Institution is defined as:

> (a) Any entity that itself or through an affiliate engages in the business of making loans to students, parents or others for purposes of financing higher education expenses or that securitizes such loans; or

> (b) Any entity, or association of entities, that guarantees education loans; or

7

(c) Any industry, trade or professional association that receives money from any entity described above in subsections a and b.

Nothing in this provision or throughout the Agreement shall prevent CEC from holding membership in any nonprofit professional association.

17.     The prohibition set forth in the previous paragraph shall include, but not be limited to, a ban on any payment or reimbursement by a Lending Institution to a CEC employee for lodging, meals, or travel to conferences or training seminars.

*ii.     Limitations on CEC Employees Participating on Lender Advisory Boards*

18.     CEC shall prohibit any officer, trustee, director, employee, or agent of CEC from receiving any remuneration for serving as a member or participant of an advisory board of a Lending Institution, or receiving any reimbursement of expenses for so serving, provided, however, that participation on advisory boards that are unrelated in any way to higher education loans shall not be prohibited by the Agreement.

*iii.     Prohibition of Certain Remuneration to CEC*

19.     CEC may not accept on its own behalf anything of value from any Lending Institution in exchange for any advantage or consideration provided to the Lending Institution related to its education loan activity. This prohibition shall include, but not be limited to, (i) "revenue sharing" by a Lending Institution with CEC, (ii) CEC's receipt from any Lending Institution of any computer hardware for which CEC pays below-market prices and (iii) printing costs or services. Notwithstanding anything else in this paragraph, CEC may accept assistance as contemplated in 34 CFR 682.200(b)(definition of "Lender")(5)(i).

*iv.     Preferred Lender Lists*

8

20.     In the event that CEC promulgates a list of preferred or recommended lenders or similar ranking or designation ("Preferred Lender List"), then

(a) Every brochure, web page or other document that sets forth a Preferred Lender List must clearly disclose the process by which CEC selected lenders for said Preferred Lender List, including but not limited to the criteria used in compiling said list and the relative importance of those criteria; and

(b) Every brochure, web page or other document that sets forth a Preferred Lender List or identifies any lender as being on said Preferred lender List shall state in the same font and same manner as the predominant text on the document that students and their parents have the right and ability to select the education loan provider of their choice, are not required to use any of the lenders on said Preferred Lender List, and will suffer no penalty for choosing a lender that is not on said Preferred Lender List.

(c) CEC's decision to include a Lending Institution on any such list and CEC's decision as to where on the list the Lending Institution's name appears shall be determined solely by consideration of the best interests of the students or parents who may use said list without regard to the pecuniary interests of CEC;

(d) The constitution of any Preferred Lender List shall be reviewed no less than annually;

(e) No Lending Institution shall be placed on any Preferred Lender List unless the said lender provides assurance to CEC and to student and parent borrowers who take out loans from said Lending Institution that the advertised benefits

9

upon repayment will continue to inure to the benefit of student and parent borrowers regardless of whether the Lending Institution's loan are sold;

(f) No Lending Institution that has an agreement to sell its loans to another unaffiliated Lending Institution shall be included on any Preferred Lender List unless such agreement is disclosed therein in the same font and same manner as the predominant text on the document in which the Preferred Lender List appears;

(g) No Lending Institution shall be placed on any one of CEC's Preferred Lender Lists or in favored placement on any one of CEC's Preferred Lender Lists for a particular type of loan, in exchange for benefits provided to CEC or to CEC's students in connection with a different type of loan;

v. *Prohibition of Lending Institutions' Staffing of CEC's Financial Aid Offices*

21. CEC shall ensure that no employee or other agent of a Lending Institution is ever identified to students or prospective students of CEC or their parents as an employee or agent of CEC. No employee or other agent of a Lending Institution may staff CEC's financial aid offices at any time.

vi. *Proper Execution of Master Promissory Notes*

22. To the extent that CEC links or otherwise directs potential borrowers to any electronic Master Promissory Notes or other loan agreements that do not allow students to enter the lender code or name for any lender offering the relevant loan at that guarantee agency, then CEC shall undertake to use its best efforts so as to allow students to enter such information electronically or otherwise. CEC's link or direction referred to in the prior sentence shall comply with paragraphs 20(a) and (b) herein.

*vii.*     *School as Lender*

23.     If CEC participates in the "School as Lender" program under 20 U.S.C.

§ 1085(d)(1)(E), CEC may not treat School As Lender loans any differently than if the loans

originated directly from another lender; all sections of the Agreement apply equally to such

School as Lender loans as if the loans were provided by another lender.

*viii.*     *Prohibition of Opportunity Loans*

24.     CEC shall not arrange with a Lending Institution to provide any Opportunity

Loans as defined above in section I(A)(vi), if the provision of such Opportunity Loans prejudices

any other borrower.

**B.     Consumer Education Program Fund**

25.     Within 30 days of the effective date of the Agreement, CEC will pay to the

OAG the sum of $21,200.00, which shall use the funds to create a national consumer education

program for high school seniors and their parents.

**C.     Scope of the Agreement**

26.     Except as provided below, the Agreement precludes any action that the OAG and

the ILOAG could commence against CEC or its affiliates and their respective current and former

officers, directors, trustees and employees for the acts, practices, and omissions listed in section

I(B) of the Agreement; provided however, that nothing contained in the Agreement shall be

construed to cover claims of any type by any other state agency or any claims that may be

brought by the OAG and/or the ILOAG to enforce CEC's obligations arising from or relating to

the provisions contained in the Agreement. The Agreement shall not prejudice, waive or affect

any claims, rights or remedies of the OAG and/or the ILOAG with respect to any person, other

than CEC and its affiliates and their current and former officers, directors, trustees and

employees, all of which claims, rights, and remedies are expressly preserved, nor shall the Agreement create any rights on behalf of persons not parties to the Agreement. The Agreement does not preclude any action that the OAG and/or ILOAG may take for acts, practices, or omissions not listed in the Findings section of the Agreement, even if such acts, practices, or omissions constitute a part of the Investigation.

**D.    Cooperation**

27.    CEC shall continue to cooperate fully and promptly with the OAG and the ILOAG with regard to the Investigation and any related proceedings and actions. CEC shall use its best efforts to ensure that all of its officers, directors, employees and agents also fully and promptly cooperate with the OAG and the ILOAG in the Investigation and any related proceedings and actions, subject to their individual rights and privileges.

28.    Cooperation shall include without limitation:

(a) Production, voluntarily and without service of subpoena, by CEC of any information and all documents or other tangible evidence related to education loan practices reasonably requested by the OAG and the ILOAG, and any compilations or summaries of information or data that the OAG and the ILOAG reasonably requests be prepared, subject to recognized privileges and protections for confidential information;

(b) Using CEC's best efforts to cause CEC's officers, directors, employees and agents to attend any proceedings at which the presence of any such persons is requested by the OAG and the ILOAG and having such persons answer any and all inquiries that may be put by the OAG and the ILOAG to any of them at any proceedings or otherwise ("proceedings" include but are not limited to

12

any meetings, interviews, depositions, hearings, grand jury hearing, trial or other proceedings) voluntarily, and without service of a subpoena, subject to their individual rights and privileges; and

(c) Fully, fairly and truthfully disclosing all information and producing all records and other evidence in its possession relevant to all inquiries made by the OAG and the ILOAG in connection with this Investigation concerning any alleged fraudulent or criminal conduct by anyone whatsoever about which CEC, its officers, trustees, directors, employees and agents may have any knowledge or information, subject to recognized privileges and protections for confidential information.

29.     In the event any document otherwise required to be provided under the terms of the Agreement is withheld or redacted on grounds of privilege, work-product or other legal doctrine, a statement shall be submitted in writing by CEC indicating: the type of document; the date of the document; the author and recipient of the document; the general subject matter of the document; the reason for withholding the document; and the Bates number or range of the withheld document. The OAG and/or the ILOAG may challenge such claim in any forum of its choice and may, without limitation, rely on all documents or communications theretofore produced or the contents of which have been described by CEC, its officers, directors, employees, or agents.

30.     CEC shall not jeopardize the confidentiality of any aspect of the Investigation, including sharing or disclosing evidence, documents, or other information with others during the course of the investigation without the consent of the OAG and the ILOAG. Nothing herein

shall prevent CEC from conferring with counsel or consultants, issuing public statements, from providing such evidence or information to other regulators or as otherwise required by law.

**E.     Miscellaneous Provisions**

31.     Pursuant to Executive Law § 63(15) and the Illinois Consumer Fraud Act, the Agreement serves as an assurance of discontinuance. As such, evidence of a violation of the Agreement by CEC shall constitute prima facie proof of a violation of Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* in any civil action or proceeding subsequently commenced by the OAG or the ILOAG.

32.     If CEC breaches any of the obligations described herein, the OAG and/or the ILOAG may in its sole discretion terminate the Agreement upon written notice to CEC. In such event, any statute of limitations or other time-related defense applicable to the subject of the Agreement and any claims arising from or relating thereto are tolled from and after the last execution date of the Agreement and the Agreement shall in no way bar or otherwise preclude the OAG and/or the ILOAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Investigation, against CEC or from using in any way any statements, documents or other materials produced or provided by CEC after commencement of the Investigation, including, without limitation, any statements, documents or other materials provided for purposes of settlement negotiations.

33.     The Agreement and any dispute related thereto shall be governed by the laws of the State of New York and the State of Illinois without regard to any conflicts of laws principles.

34.     No failure or delay by the OAG and the ILOAG in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise

thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative.

35.     CEC enters into the Agreement voluntarily and represents that no threats, offers, promises or inducements of any kind have been made by the OAG and the ILOAG or any member, officer, employee, agent or representative of the OAG or the ILOAG to induce CEC to enter into the Agreement other than as described herein.

36.     The Agreement may be changed, amended or modified only by a writing signed by all parties hereto.

37.     The Agreement constitutes the entire agreement between the OAG, the ILOAG and CEC and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of the Agreement.

38.     The Agreement shall be binding upon CEC and its successors, assigns, and/or purchasers of all or substantially all its assets.

39.     The Agreement and its provisions shall be effective on the date that it is signed by an authorized representative of the OAG and the ILOAG, except for the provisions contained in sections II(A)(iv) and II(A)(vi) which shall become effective on June 1, 2007.

40.     The Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

41.     Nothing contained herein shall be construed as relieving CEC of its obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions of the Agreement be deemed permission to engage in any act or practice prohibited by such laws, regulations or rules.

42.     The acceptance of the Agreement by the OAG and the ILOAG shall not be

deemed approval by the Attorney Generals of any of CEC's business practices, and CEC shall

make no representation to the contrary.  CEC's execution of the Agreement is not an admission

of liability.

43.     Unless otherwise provided, all notices as required by the Agreement shall be

provided as follows:

> To the OAG:
>
> Melvin Goldberg, Assistant Attorney General
> Office of the New York State Attorney General
> Bureau of Consumer Frauds & Protection
> 120 Broadway, 3rd Floor
> New York, New York 10271
> tel. (212) 416-8296
> fax. (212) 416-6003
>
> To the ILOAG:
>
> Deborah Hagan, Consumer Protection Division Chief
> Office of the Illinois Attorney General
> Consumer Fraud Bureau
> 500 South Second Street
> Springfield, IL 62706
>
> To CEC:
>
> Career Education Corporation
> Office of General Counsel
> 2895 Greenspoint Parkway, Suite 600
> Hoffman Estates, Illinois 60169
> Tel (847) 585-2600
> Fax (847) 585-2640

44.     Nothing in the Agreement shall be construed to prevent any individual from

pursuing any right or remedy at law which any consumer may have against CEC.

45. CEC shall submit to the Attorney Generals, on or before August 15, 2007, an affidavit, subscribed to by an officer of CEC authorized to bind CEC, setting forth its compliance with the provisions of the Agreement.

WHEREFORE, the signatures evidencing assent to this agreement have been affixed hereto on the dates set forth below.

ANDREW M. CUOMO
Attorney General of the State of New York

Dated: April 16, 2007

By: _____
Benjamin E. Rosenberg
Chief Trial Counsel

LISA MADIGAN
Attorney General of the State of Illinois

Dated: April 16, 2007

By: _____
Deborah Hagan
Consumer Protection Division Chief

Career Education Corporation

Dated: April 13 2007

By: _____
Jeremy Wheaton
Senior Vice President of Operations,
Shared Services

18

## ACKNOWLEDGMENT

STATE OF *Illinois* )
                    ) :s.s.
COUNTY OF *Cook*   )

On this the___day of April, 2007, before me personally came Jeremy Wheaton, known to me, who, being duly sworn by me, did depose and say that she/he is Senior Vice President Operations, Shared Services of Career Education Corporation and is duly authorized to execute this document on behalf of Career Education Corporation, and that she/he signed her/his name by like authorization.

_____
Notary Public

OFFICIAL SEAL
SHERRI M WEISSMAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/13/10

Office of the Illinois Attorney General - Student Loan Agreements

ILLINOIS ATTORNEY GENERAL LISA MADIGAN

## PRESS RELEASE

Office of the Illinois Attorney General

Contact: Robyn Ziegler
312-814-3118
877-844-5461 (TTY)
rziegler@atg.state.il.us

**For Immediate Release**
**April 23, 2007**

## MADIGAN ANNOUNCES STUDENT LOAN AGREEMENTS – SCHOOLS TO ADOPT NEW COLLEGE LOAN CODE OF CONDUCT

Chicago–Attorney General Lisa Madigan announced that she and the New York Attorney General's Office have reached settlements with Illinois-based DeVry University and Career Education Corporation concerning student loan practices involving the schools and lenders. The settlements require the schools to adopt a *College Code of Conduct* and to return the money paid by lenders to schools.

"Illinois students are entitled to full disclosure of the criteria used to place lenders on the schools' preferred lender lists and should have access to all of the information necessary to ensure that they are able to choose the loan that is best for them," said Madigan. "We acknowledge DeVry University and Career Education Corporation for promptly adopting the College Code of Conduct. We will continue to review the school loan lending practices of all the schools in Illinois."

DeVry University and Career Education Corporation agreed to adopt the College *Code of Conduct* which outlines requirements for the lender-school relationship.

The *Code of Conduct* requires:

- On all preferred lender lists, the College must clearly disclose the criteria and process used to select preferred lenders. Students must also be told that they have the right to select the lender of their choice regardless of the preferred lender list.

- College preferred lender lists must be based solely on the best interests of the students or parents who may use the list without regard to financial interests of the College.

- Colleges are prohibited from receiving anything of value from any lending institution in exchange for any advantage sought by the lending institution. This specifically prohibits "revenue sharing" arrangements.

- College employees are prohibited from taking anything of more than nominal value from any lending institution. This includes a prohibition

on trips to seminars for financial aid officers and other college officials paid for by lenders.

- College employees are prohibited from receiving anything of value for serving on the advisory board of any lending institution.

- Colleges must ensure that employees of lenders do not staff university financial aid offices or identify themselves as employees of the College.

In addition to abiding by the Code of Conduct, both schools have agreed to return money received from lenders.

DeVry will return to students the $88,122 that it received in the form of revenue-sharing payments from Citibank for listing its private loan product among the University's preferred lender list. This money will be distributed to individual students and parents who took out loans in 2004-2005 on a pro rata basis depending upon the amount of the loan and the interest rate.

DeVry no longer maintains a relationship with Citibank as a preferred lender. DeVry's preferred lenders have also hosted or sponsored national business meetings, meals and training seminars for the university's campus and corporate student finance officers. The Code of Conduct, as well as the settlement agreement, prohibits DeVry from continuing to accept these gifts or promotions.

Career Education Corporation received donations in an aggregate amount of $21,200 from Wachovia and Sallie Mae, two lending institutions on its preferred lender list. Career Education Corporation directed this money to the Career Education Scholarship Fund, a non-profit, tax exempt entity. Career Education Corporation will contribute $21,200 to a nationwide consumer education fund to be used to inform high school students and parents about student loans.

DeVry University is based in Oakbrook Terrace, Illinois. More than 52,000 students are enrolled at its 84 locations in 24 states and Canada, as well as through DeVry University Online. DeVry University offers undergraduate degrees in technology, business, and healthcare technology and graduate degrees in management through the Keller Graduate School of Management.

Career Education Corporation is based in Hoffman Estates, Illinois. Career Education Corporation operates 71 schools and universities nationwide with the following five schools located in Illinois: American InterContinental University Online in Hoffman Estates, International Academy of Design & Technology in Chicago, Sanford-Brown University in Collinsville, The Cooking and Hospitality Institute of Chicago in Chicago, and Harrington College of Design in Chicago.

The Special Litigation and Consumer Fraud Bureaus in Attorney General Madigan's Office are continuing this ongoing investigation of student loan practices in Illinois.

- 30 -

DeVry University Settlement Agreement

Career Education Corp Settlement Agreement

Return to April 2007 Press Releases



1 of 2 DOCUMENTS

Copyright 2008 PR Newswire Association LLC.
All Rights Reserved.
PR Newswire

February 20, 2008 Wednesday 2:57 PM GMT

**LENGTH:** 788 words

**HEADLINE:** PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues

**DATELINE:** HARRISBURG, Pa. Feb. 20

**BODY:**

HARRISBURG, Pa., Feb. 20 /PRNewswire-USNewswire/ -- Attorney General Tom Corbett today announced that the Attorney General's Bureau of Consumer Protection has reached a $200,000 settlement with the two parent companies for Lehigh Valley College, located near Allentown, resolving allegations that the school misrepresented information about student loans, job-placement and the ability to transfer credits to other institutions.

"This consumer settlement will ensure that students receive accurate information and full disclosure about financial aid, the ability to transfer credits to other schools and the likelihood of finding work following graduation -- all key issues in a student's selection of a school," Corbett said. "Additionally, the civil penalties and costs included in this settlement will be used to help launch a new statewide education program about consumer credit, helping every Pennsylvania family make wise choices about college financing, credit cards, home loans and other financial issues."

Corbett said the Assurance of Voluntary Compliance (AVC) covering the conduct at Lehigh Valley College was reached with Allentown Business School Ltd. and Illinois-based Career Education Corporation, which owns Lehigh Valley College and numerous other for-profit schools across the country; including the Katherine Gibbs School, in Norristown, Montgomery County.

Corbett said the consumer settlement resolves allegations that Lehigh Valley College rushed students through the loan financing process, failed to disclose terms of student loans, made inflated claims about its ability to place students in jobs following graduation and misrepresented the ability of students to transfer credits to other schools.

According to the AVC, the owners of Lehigh Valley College are required to pay $50,000 in civil penalties for alleged wrong doing. They are also required to take the following steps to ensure that students receive accurate information:

-- No false or misleading statements about future employment opportunities.

-- No false or misleading statements about the ability to transfer credits to other schools.

PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues PR Newswire February 20, 2008 We

-- Clear and detailed disclosures about student loans and student financial aid.

-- Clear disclosures about the selection of lenders for any "preferred lender lists."

-- Fully comply with Pennsylvania's Consumer Protection Law.

"This case sends a clear message that we will vigorously investigate any allegations of deceptive marketing or unfair trade practices involving schools and colleges operating in Pennsylvania," Corbett said. "Additionally, this settlement will benefit every college-bound student, every family and every consumer in Pennsylvania -- helping to better educate and inform all state residents about essential financial issues."

Corbett said that the settlement includes $150,000 in costs, which will be used to create a statewide consumer education program about financial issues, including a new "Your Money" section of the Attorney General's website ( http://www.attorneygeneral.gov/ ). The education program and interactive website will include information on college financial aid, mortgage lending and refinancing, credit cards, predatory lending, debt collection and other common topics of financial complaints.

The new consumer financial education program and interactive financial website are expected to be launched in June 2008.

Corbett noted that credit issues impact every Pennsylvania household and generate a regular flow of complaints to the Attorney General's Office.

"Every year, consumer credit issues are typically the number one topic for complaints to the Attorney General's Bureau of Consumer Protection," Corbett said. "Last year alone, we received more than 7,500 complaints, spanning a wide range of credit problems -- from disputes over loans and credit cards to difficulties with credit ratings and debt collectors."

The Assurance of Voluntary Compliance was filed on Tuesday, February 19, 2008, in Lehigh County Court of Common Pleas by Senior Deputy Attorney General William A. Slotter, of the Attorney General's Bureau of Consumer Protection.

(The Signing of an Assurance of Voluntary Compliance is not considered an admission of violation of the Consumer Protection Law.)

Editors' Note: A copy of the Assurance of Voluntary Compliance is available by contacting the Attorney General's Press Office at 717-787-5211.

```
CONTACT: Nils Hagen-Frederiksen
Deputy Press Secretary
717-787-5211
nhf@attorneygeneral.gov
```

CONTACT: Nils Hagen-Frederiksen, Deputy Press Secretary for Pennsylvania Attorney General Corbett, +1-717-787-5211, or cell, +1-717-319-2252, nhf@attorneygeneral.gov

Web Site: http://www.attorneygeneral.gov/

SOURCE Pennsylvania Office of Attorney General

PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support
New Statewide Education Program for Consumer Credit Issues PR Newswire February 20, 2008 We

**URL:** http://www.prnewswire.com

**LOAD-DATE:** February 21, 2008

EXHIBIT B

| From: | Yvette Colon |
| To: | ███████████████ |
| Subject: | Fwd: Borrower defense discharge ineligibility information for you [ ref:_███████████████ ] |
| Date: | Thursday, July 2, 2020 7:38:43 PM |

███████████████

---------- Forwarded message ---------
From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Thu, Jul 2, 2020 at 4:36 PM
Subject: Borrower defense discharge ineligibility information for you [
ref: ███████████████ ]
To: ███████████████ < ███████████████ >

7/2/2020

Borrower Defense Application #: ███████████

Dear Yvette Colon:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Sanford-Brown College. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Sanford-Brown College. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20

U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Educational Services

You allege that Sanford-Brown College engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 2: Other

You allege that Sanford-Brown College engaged in misconduct related to Other. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 3: Transferring Credits

You allege that Sanford-Brown College engaged in misconduct related to

Transferring Credits. This allegation fails for the following
reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

<u>Allegation 4: Employment Prospects</u>

You allege that Sanford-Brown College engaged in misconduct related to
Employment Prospects. This allegation fails for the following
reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's
ineligibility?**

We reviewed evidence provided by you and other borrowers who attended
your school. Additionally, we considered evidence gathered from the
following sources:

> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular
> oversight activities
> Publicly available securities filings made by Career Education
> Corporation (now known as Perdoceo Education Corporation)
> Multi-State Attorney General Assurance of Voluntary Compliance
> (effective January 2, 2019)

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your
application. To submit a request for reconsideration, please send an email
with the subject line "Request for
Reconsideration [ ref:███████████████████]"
to BorrowerDefense@ed.gov or mail your request to U.S. Department of
Education, P.O. Box 1854, Monticello, KY 42633. In your Request for
Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense

to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any

interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid





CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.