JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521


*Attorneys for Plaintiffs*

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
REBECCA C. ELLIS *(pro hac vice)*
rellis@law.harvard.edu
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

        *Plaintiffs*,

        v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

        *Defendants*.

Case No.: 19-cv-03674-WHA


**PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO INTERVENE**

**HEARING DATE: August 4, 2022**

(Class Action)
(Administrative Procedure Act Case)

# **TABLE OF CONTENTS**

I.   Introduction ....................................................................................................1

II.  Background ....................................................................................................1

III. Argument ......................................................................................................4

    A.    Movants Are Not Entitled to Intervene as of Right ................................4

        1.    The Motions Are Not Timely ...................................................... 5

            a)    Movants Were or Should Have Been Aware of Their Asserted Interests Long Ago .................5

            b)    Intervention at This Late Stage Would Severely Prejudice Class Members. ...................9

        2.    Movants Do Not Have a Significant Protectable Interest ........................ 10

            a)    Movants Do Not Have a Significant Protectable Property Interest in Receiving Notice of Borrower Defense Claims .......11

            b)    Movants Are Raising a Preemptive Defense to a Potential Future Proceeding That Is Distinct from the Claims in This Case ........................13

            c)    Allegations of Harm to Movants' Reputational Interests Are Ill-Supported and Immaterial ...................15

        3.    The Disposition of This Action Will Not Impair or Impede Movants' Ability to Protect their Interests. .................16

    B.    Movants Fail to Meet the Standard for Permissive Intervention ..........................16

        1.    There Is No Common Question of Law or Fact ......................................... 17

        2.    Granting Permissive Intervention Would Prejudice the Parties. .............. 18

    C.    The Motions Are an Attempt by Non-Parties to Exercise a Veto Over a Settlement That Does Not Affect Them ...................19

    D.    Movants Fail to Establish Any Other Reason to Deny Preliminary Approval ......22

IV. Conclusion ....................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abdurahman v. Alltran Fin., LP*, 330 F.R.D. 276 (S.D. Cal. 2018) .............................................. 11

*Adamson v. Bowen*, 855 F.2d 668 (10th Cir. 1988) ...................................................................... 24

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) ..................................................................... 8, 21

*Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113 (9th Cir. 2002) ................................................................................................................................ 5

*Callahan v. Brookdale Senior Living Communities, Inc.*, -- F. 4th ---, 2022 WL 2336656 (9th Cir. 2022) .......................................................................................................................................... 5

*Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) ......................................... 24

*Ctr. for Biological Diversity v. Bartel*, No. 09-CV-1864, 2010 WL 11508776 (S.D. Cal. Sept. 22, 2010) ........................................................................................................................................... 8

*Deus v. Allstate Ins. Co.*, 15 F.3d 506 (5th Cir. 1994) ................................................................ 18

*Diamond v. Charles*, 476 U.S. 54 (1986) ..................................................................................... 20

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998) ..................................................... 11, 16, 18

*E. Bay Sanctuary Covenant v. Barr*, 500 F. Supp. 3d 103 (N.D. Cal. 2020) ............................... 5

*Fernanda Soto Leigue v. Everglades College, Inc. d/b/a Keiser University*, No. 1:22-cv-22307 (S.D. Fla. Jul 22, 2022) ................................................................................................................ 7

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203 (D.D.C. 2021) ............................................ 23

*Floyd v. New York City*, 302 F.R.D. 69 (S.D.N.Y.), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014) ............................................................................................................. 15

*Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976) ....................................................... 8

*Freedom from Religion Fndn. v. Geithner*, 644 F.3d 836 (9th Cir. 2011) .................................... 5

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................ 23

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785 (7th Cir. 2013) ..................... 16

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .................................. 18

*In re Cathode Ray Tube Antitrust Litig.*, No. 07-cv-05944, 2020 WL 5224241 (N.D. Cal. Aug. 27, 2020) ..................................................................................................................................... 19

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)..................................... 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, MDL No.

   2672, 2016 WL 4376623 (N.D. Cal. Aug. 17, 2016) ................................................ 21

*Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983)............................ 8, 20

*League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997) ......................... 17

*Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,

   478 U.S. 501 (1986)............................................................................... 20, 22

*Lyon v. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961 (N.D. Cal. 2016)................................... 24

*Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544 (D.C. Cir. 2015) ............................. 24

*Montana v. EPA*, 137 F.3d 1135 (9th Cir. 1998)............................................................ 11

*Moore v. Verizon Commc'ns Inc.*, No. 09-cv-1823, 2013 WL 450365

   (N.D. Cal. Feb. 5, 2013)......................................................................... 13, 14, 16

*Orange County v. Air California*, 799 F.2d 535 (9th Cir. 1986) ........................................... 8

*Pacharne v. DHS*, No. 1:21-cv-115, 2021 WL 4497481 (N.D. Miss. Sept. 30, 2021) ............... 23

*Perry v. Proposition 8 Official Proponents*, 587 F.3d 94 (9th Cir. 2009) ................................. 5

*Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006)......................................................... 20

*Rai v. Biden*, No. 21-cv-863, 2021 WL 4439074 (D.D.C. Sept. 27, 2021) ................................. 23

*Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*, No. 18-cv-10792, 2019 WL 5685272 (D. Mass. Oct. 31,

   2019) ............................................................................................ 15

*Rosebrock v. Mathis*, 745 F.3d 963 (9th Cir. 2014)..................................................... 22, 23

*Sarrassat v. Sullivan*, 961 F.2d 217 (9th Cir. 1992) ..................................................... 5

*Truit v. The Chicago School of Professional Psychology*, No. BC495518 (Cal. Super. L.A. Cnty.

   2012) ............................................................................................ 7

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010)........................................ 14

*United States v. Alisal Water Corp.*, 370 F.3d 915  (9th Cir. 2004)................................... passim

*United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002)................................................ 7

*United States v. Los Angeles*, 288 F.3d 391 (9th Cir. 2002)............................................. 16

*United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996) ............................................... 5

*United States ex rel. Christianson v. Everglades College, Inc.*, No. 12-60185-CIV (S.D. Fla. Apr. 1, 2015) ................................................................................................................ 6

*Wittman v. Personhuballah*, 578 U.S. 539 (2016) ..................................................... 20

*Zepeda v. PayPal, Inc.*, No. 10-cv-02500, 2014 WL 1653246 (N.D. Cal. Apr. 23, 2014), *objections overruled*, No. 10-cv-1668, 2014 WL 4354386 (N.D. Cal. Sept. 2, 2014) ............. 21

**Other Authorities**

Assurance of Voluntary Compliance, *In re: Keiser University*, *available at* https://www.republicreport.org/wp-content/uploads/2017/04/Keiser-FL-AVC-2012.pdf ......... 6

Danielle Douglas-Gabriel, "House Panel Says Nonprofit Everglades College Enriches Its Owner," *Wash. Post* (Feb. 2, 2022), https://www.washingtonpost.com/education/2022/02/01/ keiser-everglades-university-for-profit/ ................................................................... 7

David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721 (Feb. 1968) .............................................................................. 20

Final Judgment by Consent, *Massachusetts v. Lincoln Technical Institute Inc.*, *available at* http://www.republicreport.org/wp-content/uploads/2015/07/Lincoln-Tech-settlement.pdf ...... 6

Lucy Campell, "Students Win $11.2m Settlement in Chicago School of Psychology Fraud Lawsuit," *LawersandSettlements.com* (Sept. 22, 2016), https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-settlement-in-chicago-school-of.html ........................................................................................ 7

Melanie Hanson, "Student Loan Debt Statistics," *Education Data Initiative* (last updated May 30, 2022), https://educationdata.org/ student-loan-debt-statistics ............................ 25

Non-Profit Explorer: Everglades College Inc., *ProPublica* (last visited July 20, 2022), https://projects.propublica.org/nonprofits/organizations/650216638 ............................ 22

Patricia Cohen, "Some Owners of Private Colleges Turn a Tidy Profit by Going Nonprofit," *N.Y. Times* (Mar. 2, 2015), https://www.nytimes.com/2015/03/03/business/some-private-colleges-turn-a-tidy-profit-by-going-nonprofit.html .............................................................. 7

Scott Travis, "Controversial High School Diplomas Create Turmoil at Keiser University," *South Fla. Sun-Sentinel* (Sept. 3, 2010), https://www.sun-sentinel.com/news/fl-xpm-2010-09-03-fl-keiser-diploma-mill-20100903-story.html ........................................................................ 6

U.S. Dep't of Education, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664-01 (Dec. 1, 2994) ............................................................................................................ 11

U.S. Dep't of Education, Notice of Proposed Rulemaking, 87 Fed. Reg. 41,878 (July 13, 2022) .................................................................................................... 13, 24

U.S. Dep't of Education, Student Assistance General Provisions *et alia*, 81 Fed. Reg. 75,926-01 (Nov. 1, 2016) ................................................................................................... 12, 13

Veronica Jean Seltzer, "American National Univ. Found Guilty of Violating Ky. Consumer Protection Act," *WTVQ-ABC36* (June 18, 2019), https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-protection-act/ .................................................. 7

**Rules**

Fed. R. Civ. P. 24(b)(2) ........................................................................................... 16

Fed. R. Evid. 408 ................................................................................................... 18

**Regulations**

34 C.F.R. § 668.87(a) .............................................................................................. 12

34 C.F.R. § 668.87(b) .............................................................................................. 12

34 C.F.R. § 668.87(c) ........................................................................................ 13, 14

34 C.F.R. § 685.206(e)(10) ....................................................................................... 12

34 C.F.R. § 685.206(e)(16) ....................................................................................... 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    <u>INTRODUCTION</u>

On June 22, 2022, after three years of hard-fought litigation,[1] the parties in this action filed a motion for preliminary approval of a settlement agreement to resolve this class action case. The proposed settlement aims to accomplish what Plaintiffs have been seeking for years: a timely and lawful resolution of the borrower defense ("BD") applications they submitted to the U.S. Department of Education ("Department"). Two weeks before the scheduled hearing on preliminary approval, four institutions—Lincoln Educational Services Corporation ("Lincoln"), American National University ("ANU"), Everglades College, Inc. ("ECI"), doing business as Keiser University and Everglades University, and the Chicago School of Professional Psychology ("CSPP") (together, "Movants")—filed motions to intervene in this case to register their disagreement with the proposed settlement. Not one Movant had shown any interest in this litigation before. None identifies, much less pleads, any cause of action it could pursue against either Plaintiffs or Defendants. Movants are certainly not class members; they neither gain nor relinquish anything under the proposed settlement agreement. Yet they arrive at the eleventh hour, seeking to veto the proposed settlement and further delay these proceedings.

Movants do not actually want to intervene in this action. Rather, they are seeking simply to disrupt the orderly process for approval of a settlement they do not like—one which they cannot modify, are not entitled to negotiate, and do not have standing to block. Movants were content to sit on the sidelines while members of the class fought tirelessly to vindicate their rights. Now, they attempt to force their way into this case not because they have a legal claim or defense to assert, nor because they are suffering any imminent threat to a legal interest, but because they think they should have a veto over their former students' settlement. They do not. The motions should be denied, and the settlement process should continue.

## II.    <u>BACKGROUND</u>

On June 22, 2022, the parties filed their Joint Motion for Preliminary Approval ("Joint

---

[1] As this Court is very familiar with the history of this case, Plaintiffs will not belabor the point.

Mot.") and settlement agreement ("Agreement"). *See* ECF Nos. 246, 246-1. The Agreement sets out the manner in which the Department will process the BD applications of the Class in this case, defined by this Court as "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos,* No. 17-7106 (N.D. Cal.)." ECF No. 46 at 14; *see* Agreement § III.A. The Agreement closes the class as of the execution date, June 22, 2022. Agreement § III.D.

Movants' complaints about the Agreement center primarily on Section IV.A, under which Class Members who borrowed federal student loans for attendance at one of 153 schools, set forth in Exhibit C to the Agreement, will receive full settlement relief. *Id.* § IV.A.1. As explained in the Joint Motion, the schools that appear on the Exhibit C list are ones for which "the Department has identified common evidence of institutional misconduct." Joint Mot. at 17. This common evidence supports "presumptive relief" for Class Members "due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools." *Id.* at 18. In their Supplemental Complaint, Plaintiffs alleged in detail how the Department had ignored this common evidence under its unlawful 'presumption of denial' policy. *See* ECF No. 198 ¶¶ 196-236 ("Supp. Compl."). Critically for the structure of the settlement as a whole, "[c]learing these claims through provision of expeditious upfront relief will significantly reduce the backlog of pending claims," which "will allow the Department to more quickly provide decisions to remaining class members than would otherwise be possible." Joint Mot. at 18.

Class Members whose BD applications do not relate to one of the schools on Exhibit C will, under the proposed settlement, receive final written decisions on their applications according to a timeline that corresponds to how long their applications have been pending. *See* Agreement § IV.C.3. In making these decisions, the Department will "determine whether the application states a claim that, if presumed to be true, would assert a valid basis for borrower defense relief under

the standards in the borrower defense regulations published by the Department on November 1, 2016." *Id.* § IV.C.1.i. The Department will "presume that the Class Member reasonably relied on" alleged misrepresentations, and will not deny applications "on the basis of insufficient evidence." *Id.* § IV.C.1.ii-iii. These remedial steps relate to Plaintiffs' allegations that the Department's 'presumption of denial' policy had, *inter alia*, refused to consider borrowers' sworn statements as evidence supporting an application and imposed undisclosed requirements for the sufficiency of evidence. *See* Supp. Compl. ¶¶ 122-150, 172-195. If the Department fails to issue a decision within the applicable timeframe, the Class Member will receive full settlement relief. *Id.* § IV.C.8.

Finally, the proposed settlement makes certain provisions for "Post-Class Applicants": individuals who apply for BD between the execution date of the Agreement and the final approval date. Post-Class Applicants will receive a final written decision within 36 months of the effective date of the Agreement; if the Department fails to issue a decision in that time, the applicant will receive full settlement relief. Agreement § IV.D.1. Post-Class Applicants will *not* receive automatic relief even if their application relates to one of the schools listed in Exhibit C, and they will *not* receive the streamlined claim evaluation procedures applicable to Class Members who receive individual written decisions under Section IV.C of the Agreement. *See id.* §§ IV.D.1-2; Joint Mot. at 4, 8 n.4. This remedial provision is an important component of the consideration underpinning the settlement, including the agreement to close the class as of the execution date.

On July 13 and 14, 2022, Movants filed their motions for intervention. Although the four Movants filed three separate briefs, all advance the same arguments. First, each Movant claims it has a right to notice of and an opportunity to respond to BD claims, which would be impaired by approval of the Agreement. *See* ECF No. 254 ("Lincoln/ANU Mot.") at 15; ECF No. 261 ("ECI Mot.") at 15-16; ECF No. 265 ("CSPP Mot.") at 13. Each also focuses on concerns that it may, in the future, be held financially liable as a result of the proposed settlement, whether by the Department, other regulators, or private plaintiffs. *See* Lincoln/ANU Mot. at 16; ECI Mot. at 10; CSPP Mot. at 14-15. Finally, each complains of a risk of reputational harm from being included in Exhibit C—although none points to actual negative consequences. *See* Lincoln/ANU Mot. at 17

n.4 (citing a news article about the settlement that does not mention Lincoln or ANU but refers to a *different* institution as "notorious"); Decl. of Brandon Biederman, ECF No. 261-3 ¶ 12 (ECI employee stating a "belief" that the Agreement is "already causing [ECI] reputational harm," but declining to identify the "third parties" who are causing this harm or how they have done so); Decl. of Ted Scholz, ECF No. 265-4 ¶ 15 (CSPP vice president stating that he "has already received questions from current and prospective students related to" the proposed settlement, but declining to identify actual effects on the school's "ability to recruit and retain students and faculty" or "effectuate its educational mission," CSPP Mot. at 16). Movants all assert that their motions are timely because they did not know until the Agreement was filed that the resolution of this case could affect their interests. *See* Lincoln/ANU Mot. at 11; ECI Mot. at 13; CSPP Mot. at 10.

## III.   ARGUMENT

Movants fulfill none of the conditions required for intervention as of right: their motions are not timely, and they do not have a significant protectable interest that will be impaired or impeded by resolution of this litigation. Nor do Movants meet the standard for permissive intervention, because they cannot demonstrate either timeliness or a question of law or fact in common with the existing claims. Finally, and perhaps most fundamentally, these shortcomings expose the motions for what they are: premature requests to file objections to a proposed class-action settlement of a case that does not involve them. Movants seek to elevate their concerns— which are trumped up and entirely addressed by separate proceedings *from which borrowers are expressly barred*—over those of absent class members. Intervention is neither necessary nor appropriate for Movants to make their opinions about the settlement known.

### A.   Movants Are Not Entitled to Intervene as of Right

The Ninth Circuit submits motions to intervene as of right to a four-part test: "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the

1  action." *Callahan v. Brookdale Senior Living Communities, Inc.*, -- F. 4th ---, 2022 WL 2336656,

2  at *4 (9th Cir. 2022) (citation omitted). "Proposed intervenors must satisfy all four criteria, as

3  '[f]ailure to satisfy any one of the requirements is fatal to the application.'" *E. Bay Sanctuary*

4  *Covenant v. Barr*, 500 F. Supp. 3d 1030, 1037 (N.D. Cal. 2020) (alteration in original) (quoting

5  *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009)). "The applicant

6  bears the burden of showing that each of the four elements is met." *Freedom from Religion Fndn.*

7  *v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011). Because Movants fail to satisfy the first three

8  criteria, their motions must be denied.[2]

9         **1.**     **The Motions Are Not Timely**

10         **a)**     **Movants Were or Should Have Been Aware of Their Asserted**
                 **Interests Long Ago**

12       "Three factors should be evaluated to determine whether a motion to intervene is timely:

13  '(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other

14  parties; and (3) the reason for and length of the delay.'" *Cal. Dep't of Toxic Substances Control v.*

15  *Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir. 2002) (quoting *United States v.*

16  *Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996)). Waiting until the settlement stage, after years of

17  active litigation, "weighs heavily against" a putative intervenor. *Id.* Movants claim that their

18  motions are nonetheless timely because they did not learn until the proposed settlement was filed

19  that their interests could be implicated. *See* Lincoln/ANU Mot. at 11; ECI Mot. at 13; CSPP Mot.

20  at 10. As detailed further *infra*, Movants' interests are not implicated to any extent that could

21  justify intervention. But even if Movants believe them to be, they could and should have known

22  of this alleged implication well before the Joint Motion. *See Sarrassat v. Sullivan*, 961 F.2d 217,

23  1992 WL 86580, at *2 (9th Cir. 1992) (motion to intervene is untimely where movant "should

24  have known of the possible effects of the litigation long before the parties settled").

25       As defined by Movants, their interests at stake in this case are a purported right to notice

---

[2] The fourth element is not applicable because, as explained *infra*, Movants do not have a protectable interest for either existing party to represent.

of and an opportunity to respond to BD claims, and a risk of future financial liability and reputational harm. *See* Lincoln/ANU Mot. at 16; ECI Mot. at 15-16; CSPP Mot. 265 at 13-15. Put another way, they claim to have an interest in the BD process when BD claims are raised by their former students. A brief perusal of the docket reveals that this litigation has always implicated this asserted interest, and indeed Movants themselves. It was apparent from the outset that some of the BD claims at issue in this litigation would be from applicants who attended Movants' institutions. Although Movants profess to be shocked—shocked!—to find their names associated with this case, each of them has been previously named in the public docket, and two—Lincoln and ECI— have featured prominently. *See* Exhibit A (summarizing Movants' appearances in docket filings).

This is all in addition to Movants' public records of wrongdoing, which quite naturally and foreseeably led to the filing of BD claims by their former students. A few examples: Lincoln settled a consumer protection suit brought by the Massachusetts Attorney General in 2015, under which it discharged student debt and agreed to change its disclosures and job placement calculations.[3] ECI entered into an Assurance of Voluntary Compliance with the State of Florida in 2012, under which it agreed to offer thousands of students free re-training and to cease misrepresenting what the school offered.[4] ECI also settled a False Claims Act lawsuit with the federal government in 2015, which alleged violations of the incentive compensation ban,[5] and in 2010, three senior admissions officials of ECI's predecessor entity were found to have been admitting students with fake high school diplomas from a diploma mill.[6] The U.S. House of Representatives has recently

---

[3] *See* Final Judgment by Consent, *available at* http://www.republicreport.org/wp-content/uploads/2015/07/Lincoln-Tech-settlement.pdf.

[4] *See* Assurance of Voluntary Compliance, *available at* https://www.republicreport.org/wp-content/uploads/2017/04/Keiser-FL-AVC-2012.pdf.

[5] *See* Order Granting Motion for Indicative Ruling, *United States ex rel. Christianson v. Everglades College, Inc.*, No. 12-60185-CIV (S.D. Fla. Apr. 1, 2015), ECF No. 435.

[6] *See* Scott Travis, "Controversial High School Diplomas Create Turmoil at Keiser University," *South Fla. Sun-Sentinel* (Sept. 3, 2010), https://www.sun-sentinel.com/news/fl-xpm-2010-09-03-fl-keiser-diploma-mill-20100903-story.html.

Plaintiffs' Consolidated Opposition to Motions to Intervene
Case No.: 19-cv-03674-WHA

investigated ECI and asked the Internal Revenue Service to review whether ECI has complied with the requirements of its non-profit status.[7] A recent class action lawsuit alleges that ECI sent a flood of unsolicited text messages to consumers urging them to enroll at Keiser.[8] CSPP settled a class action in 2016, under which it paid $11.2 million to 87 students who alleged that they invested in a worthless education.[9] ANU was found liable of violating Kentucky's consumer protection statute in a case brought by the state's Attorney General, and the decision was upheld on appeal.[10]

Finally, both Lincoln and CSPP admit in their briefing and supporting documents that *they have already received actual notice from the Department about BD applications by their former students*. Lincoln's declarant acknowledges that the Department "transmitted approximately 307 borrower defense applications to Lincoln in two tranches in May and July 2021"—and not only that, but Lincoln has already provided written responses to the Department. Decl. of Francis Giglio, ECF No. 254-2 ¶¶ 7, 9. CSPP likewise admits that it received a set of BD applications from the Department in January 2021; it apparently did not submit a response because the Department did not offer a meeting to discuss a schedule. Decl. of Terance A. Gonsalves, ECF No. 265-3 ¶ 6.

Movants cite *United States v. Carpenter*, 298 F.3d 1122 (9th Cir. 2002), and its progeny to support their position that the motions are timely, but those cases are plainly distinguishable. The

---

[7] *See* Danielle Douglas-Gabriel, "House Panel Says Nonprofit Everglades College Enriches Its Owner," *Wash. Post* (Feb. 2, 2022), https://www.washingtonpost.com/education/2022/02/01/keiser-everglades-university-for-profit/; *see also* Patricia Cohen, "Some Owners of Private Colleges Turn a Tidy Profit by Going Nonprofit," *N.Y. Times* (Mar. 2, 2015), https://www.nytimes.com/2015/03/03/business/some-private-colleges-turn-a-tidy-profit-by-going-nonprofit.html.
[8] *See Fernanda Soto Leigue v. Everglades College, Inc. d/b/a Keiser University*, No. 1:22-cv-22307 (S.D. Fla. Jul 22, 2022).
[9] *See Truit v. The Chicago School of Professional Psychology*, No. BC495518 (Cal. Super. L.A. Cnty. 2012); Lucy Campbell, "Students Win $11.2m Settlement in Chicago School of Psychology Fraud Lawsuit," *LawersandSettlements.com* (Sept. 22, 2016), https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-settlement-in-chicago-school-of.html.
[10] *See* Veronica Jean Seltzer, "American National Univ. found guilty of violating Ky. Consumer Protection Act," *WTVQ-ABC36* (June 18, 2019), https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-protection-act/.

Ninth Circuit's reasoning in *Carpenter* "was grounded in the need to encourage the assumption that when the government is a party, the interests of others will be protected." *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015). The *Carpenter* intervenors initially "had reason to believe the government would take action consistent with" its responsibility to protect endangered species, and then sought to intervene when "they realized the government was not adequately representing [that] interest." *Ctr. for Biological Diversity v. Bartel*, No. 09-CV-1864, 2010 WL 11508776, at *4 (S.D. Cal. Sept. 22, 2010). But here, the Department "is being sued for failure to follow [its] regulations," and under those regulations the Department "is not required to act on behalf of the [Movants'] economic interests." *Id.* Moreover, the subject of litigation in *Carpenter* was real property—the case was a zero-sum equation between federal and non-federal or private ownership. Although Movants seek to obfuscate this point, there is simply no zero-sum equation here. The fate of borrowers in the BD process is completely separate from the Department's regulation of, and potential recoupment from, schools such as Movants. Given the nature of this case and the evidence in the record, Movants cannot plausibly claim that the filing of the Joint Motion and Agreement marked "the first time that [Movants] realized that the end result of the protracted litigation would not be entirely to [their] liking." *Orange County v. Air California*, 799 F.2d 535, 538 (9th Cir. 1986). "Consequently, the applicants here are not similarly situated to the applicants in *Carpenter*." *Ctr. for Biological Diversity*, 2010 WL 11508776, at *4.

So what actually changed with the filing of the Agreement? Why were Movants not upset earlier that the Department was apparently neglecting processes that the BD regulations required, including giving notice to schools? Why were they not upset that the Department was not speedily adjudicating BD claims of their former students?[11] Quite simply, it seems that Movants did not

---

[11] Movants cannot, of course, claim any legally protected interest in an unlawful procedure, including the process that led to the unlawful form denial notices. *See, e.g.*, *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1126 (2d Cir. 1983) ("Non-minorities do not have a legally protected interest in the mere expectation of appointments which could only be made pursuant to presumptively discriminatory employment practices." (citing *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 775-78 (1976))).

1    believe that the Department would actually resolve claims in Class Members' favor, at least not

2    without a further years-long "information-gathering" process that Movants and other schools could

3    have attempted to prolong through administrative levers. When the Department announced its

4    conclusion that it already had enough evidence to support the approval of many Class Members'

5    applications, *see* Joint Mot. at 17-18, Movants disagreed with the Department's assessment of that

6    evidence. Their displeasure with this outcome does not justify their belated bid for intervention.[12]

7               **b)    Intervention at This Late Stage Would Severely Prejudice Class
                         Members**
8

9          Class Members have been waiting years for a resolution of their BD claims—indeed, that

10   was the original impetus for this lawsuit when it began in 2019. Allowing Movants to intervene in

11   the litigation at this late stage, with the apparent intention of blowing up a hard-fought and long-

12   awaited settlement on deficient legal grounds, would impose severe hardship on the class.

13         Since the Joint Motion and Agreement were filed, Plaintiffs have received numerous

14   messages from Class Members showing how important a timely settlement approval process is to

15   them. For example, a Class Member recently wrote to Plaintiffs' counsel:

16         I have been waiting for an answer about my student loan forgiveness application
           since May 15, 2019, but have not heard anything yet. . . . The reason for me reaching
17         out is because I am in the process of purchasing a home and (long story short) have
           been denied for the last 3 years. I have been denied because of my $45,000 student
18         loan debt I have due to the deception from the University of Phoenix. . . . Because
           of the *Sweet v. Cardona* case, the lenders are now considering providing me and
19         my family (my fiance, [redacted], and my 3 year old, [redacted]) with a home loan.
           The last thing they are asking for is for some form of documentation stating that I
20

21

22   _____

23   [12] Movants' apparent contention that their intervention is timely now because the parties should
     have conducted all of their settlement negotiations in full view of the public similarly fails. *See,*
24   *e.g.*, Lincoln/ANU Mot. at 6-7; ECI Mot. at 3, 10, 11, 13, 18. The parties, quite naturally, discussed
     settlement confidentially, pursuant to Federal Rule of Evidence 408. There is certainly no evidence
25   of "collusion" that ECI can point to (*see* ECI Mot. at 11)—the parties have litigated this case to
     summary judgment twice and engaged in extensive discovery, including motion practice. And ECI
26   should know: their counsel represented Betsy DeVos in ancillary litigation over Plaintiffs'
     deposition subpoena of the former Secretary of Education. *See In re DeVos*, No. 3:21-mc-80075-
27   WHA (N.D. Cal.), ECF No. 31-1 (Declaration of Jesse Panuccio). ECI appears to believe that its
     mere presence on Exhibit C is proof enough of "collusion," rather than proof of the Department
28   weighing available evidence and finding that ECI's conduct supports BD relief.

                                                 9

am a part of the Sweet v. Cardano [sic] case and that my loans will be forgiven once the settlement is completed.

Exhibit B, Connor Decl., Attachment 1. Below is a small selection of additional examples:

- "I applied to the Borrow[er] Defense back in 2019 since then went through a divorce and bankruptcy and had to move out of our home that is in foreclosure. We are trying to start a new life but this is hanging over our heads. . . . I am now 66 years of age and don't know how much longer I can work."

- "I cannot afford to work in this field and was lied to multiple times about the program, job expectations and income expectations. . . . I submitted these lies with my application years ago. I cannot get a loan for a home for my children and I cannot get a loan for a car without a co-sign. This one for profit school has ruined my life and my children's lives. I've lost job prospects due to credit checks and I've contacted DOE multiple times to get any status update on my application with no answers. I don't know what else to do."

- "I have worked extremely hard to not have any luxuries in my life or start a family to make sure I can afford these [loans] (I eat little, have never owned a car). I was told by financial aid collectors when payments were late that I need to eat less to afford my loans. I receive many harassing phone calls asking for more, but I've never been able to afford more. I've worked hard to not default because I fear they would go after my mother's assets, as I don't own a home or car and have assets and she's a co-signer, with a very low income."

- "Today I work at an Amazon Fulfillment Center which I am grateful that I have a job, but all the horror stories being said are true and not an easy place to work. I have no retirement and at age 64 will soon be collecting Social Security which is nothing."

*See* Ex. B ¶¶ 5-7.

As these examples show, many Class Members are struggling to get by, and approval of the settlement would fundamentally change their lives. Movants' flippant assertions that their intervention "will not cause any prejudice, let alone undue prejudice to the other parties" (CSPP Mot. at 12) and that they "present[] no conflict with the speedy and fair adjudication of Plaintiffs' borrower-defense applications" (Lincoln/ANU Mot. at 14) demonstrate both a callous disregard for the interests of borrowers and a fundamental lack of knowledge about this litigation.

### 2.    Movants Do Not Have a Significant Protectable Interest

"'An applicant for intervention has a significantly protectable interest if the interest is protected by law and there is a relationship between the legally protected interest and the plaintiff's claims.' However, 'a mere interest in property that may be impacted by litigation is not a passport

to participate in the litigation itself.'" *Abdurahman v. Alltran Fin., LP*, 330 F.R.D. 276, 280 (S.D. Cal. 2018) (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 919, 920 n.3 (9th Cir. 2004)). "An applicant generally satisfies the 'relationship' requirement only if the resolution of the plaintiff's claims actually will affect the applicant." *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998) (citing *Montana v. EPA*, 137 F.3d 1135, 1141-42 (9th Cir. 1998)). Movants assert that the proposed settlement infringes on their right to notice of and an opportunity to respond to BD claims, and places them at risk of future financial liability and reputational harm. *See* Lincoln/ANU Mot. at 16; ECI Mot. at 15-16; CSPP Mot. at 13-15. None of these assertions constitutes a significant protectable interest that would justify intervention.

> **a)** **Movants Do Not Have a Significant Protectable Property Interest in Receiving Notice of Borrower Defense Claims**

Movants do not have a property interest in notice of and an opportunity to respond to BD claims involving them. As an initial matter, they cannot point to a law that clearly affords them this supposed interest. A significant portion of the Class has federal loans that were distributed before July 1, 2017—including all seven of the named Plaintiffs. *See* Complaint, ECF No. 1 ¶¶ 237, 259, 279, 300, 318, 337, 356; Defendants' Response to Court's February 4, 2020 Order, ECF No. 90, at 2 (noting that, as of February 4, 2020, nearly 20,000 BD *claims* had been pending without a decision since at least February 2017—which does not account for all applications concerning loans *disbursed* before that date). BD applications relating to these loans are governed by the 1994 BD regulations, which do not require that institutions receive any notice of BD claims. *See* U.S. Dep't of Education, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664-01, *61696 (1995 Final Rule, 34 C.F.R. § 685.206(c)).

The 2016 BD regulations, which govern loans issued between July 1, 2017, and July 1, 2020, provide that the Department, "[a]s part of the fact-finding process" undertaken to resolve BD claims, "notifies the school of the borrower defense application" and "considers any evidence or argument presented by the borrower and also any additional information, including . . . [a]ny response or submission from the school," but they do not expressly give institutions the right to

1  respond to BD applications. *See* U.S. Dep't of Education, Student Assistance General Provisions

2  *et alia*, 81 Fed. Reg. 75,926-01, *76,084 (2016 Final Rule, 34 C.F.R. § 685.222(e)(3)).

3        The 2020 BD regulations, which apply only to loans issued after July 1, 2020—the subject

4  of a scant minority of pending BD applications—do require the Department to notify the school

5  of any BD applications and "invite the school to respond and to submit evidence." 34 C.F.R.

6  § 685.206(e)(10). But this procedural right does not confer a protectable *property* interest. This is

7  because the approval of a BD claim does not trigger any financial liability for the school. Instead,

8  as Movants acknowledge, the school's liability—if any—is determined separately. *See*

9  Lincoln/ANU Mot. at 16 ("[T]he Department has the right to seek recoupment against the

10 institution for the amount of the forgiven loan (again, subject to procedural safeguards)."); ECI

11 Mot. at 4 ("[T]he regulations state that the Department can initiate proceedings to recover the

12 discharged amount from the school with which that debt was associated.").

13       Movants' claims that their "due process rights to defend against a [BD] claim are critical

14 . . . because the borrower defense regulations . . . provide an avenue for the Department to recoup

15 the loans that it decides to discharge" (CSPP Mot. at 14) thus completely misrepresent, or

16 misunderstand, the recoupment process. The regulation governing recoupment sets out a fulsome

17 process, including a requirement that the Department provide a statement of facts and law

18 sufficient to show its entitlement to recovery, and an opportunity for the institution to both file a

19 written response and request a hearing. *See* 34 C.F.R. §§ 668.87(a)-(b). This process is much more

20 than the "other means" available in cases like *Alisal Water*. *See* 370 F.3d at 921 (putative

21 intervenor's interest not impaired where it has access to a summary claims process).

22       Indeed, as the Department has explained, the BD regulations "do not include an appeals

23 procedure [for institutions] in the individual borrower claim process" because they instead "afford

24 an opportunity to present a defense when the Department seeks to hold a school liable and recover

25 funds." 81 Fed. Reg. at 75,963; *see also id.* at 75,959 ("Schools will not be held liable for borrower

26 defense claims until after an administrative proceeding that provides them due process."). 

27 Furthermore, the recoupment regulation—***which not a single Movant even cites, let alone***

28

*discusses*—specifies that "[t]he parties in any . . . recovery proceeding are the Department and the institution(s) against which the Department seeks to recover losses," and "[b]orrowers are not permitted to intervene or appear in this proceeding, either on their own behalf or on behalf of any purported group, except as witnesses put forth by either party." 34 C.F.R. § 668.87(c). It is equally as inappropriate for institutions to attempt to insert themselves into the BD decision, as Movants do by seeking intervention in this case, as it would be for borrowers to claim a role in the recoupment procedure between the Department and a school.[13]

Finally, as to Lincoln and CSPP in particular, their own declarants admit that they have *already* had an opportunity to review and respond to BD applications involving them.[14] Giglio Decl., ECF No. 254-2 ¶¶ 7, 9; Gonsalves Decl., ECF No. 265-3 ¶ 6. Their claims that intervention is the only way to protect their procedural interests are thus entirely unfounded.

> **b)   Movants Are Raising a Preemptive Defense to a Speculative Future Proceeding That Is Distinct from the Claims in This Case**

To the extent that Movants have an interest in potential recoupment proceedings relating to loan amounts forgiven pursuant to the Agreement, such an interest "is financial and collateral to the property or transaction that is the subject of the action." *Moore v. Verizon Commc'ns Inc.*, No. 09-cv-1823, 2013 WL 450365, at *12 (N.D. Cal. Feb. 5, 2013) (internal quotation marks

---

[13] As explained by the Department, the BD regulations "work[] toward evening the playing field" by creating "a non-adversarial process managed by a Department official." 81 Fed. Reg. at 75,962. This bifurcation is a bulwark against "resource inequities between schools and borrowers," *id.* at 75,974, the nature of which are perfectly illustrated by the present motions, brought by no less than four multinational law firms: Alston & Bird, LLP (CSPP), McGuire Woods, LLP (ANU), Gibson, Dunn & Crutcher, LLP (Lincoln), and Boies Schiller Flexner LLP (ECI).

[14] CSPP selectively quotes from certain BD applications and claims that the applications are deficient, *see* Gonsalves Decl. ¶¶ 10-11, but as far as Plaintiffs are aware, Class Members have had no opportunity to respond to CSPP's assertions because CSPP never submitted them to the Department. Although Lincoln reports that it did respond to the Department, Plaintiffs likewise are not aware of Class Members being invited to respond—as they would entitled to do under the 2020 regulations. 34 C.F.R. § 685.206(e)(10)(ii). In any case, Lincoln's responses were not made under penalty of perjury, unlike BD applications themselves. *See* U.S. Dep't of Education, Notice of Proposed Rulemaking, 87 Fed. Reg. 41,878, 41,901 (July 13, 2022) (proposing to institute such a "penalty of perjury" requirement for school responses).

omitted). In *Moore*, a class action challenging Verizon's alleged practice of assessing unauthorized charges, a nonparty moved to intervene for the sole purpose of addressing class counsels' fee application, claiming to have a significant protectable interest because it was required to indemnify Verizon for certain costs. *Id.* at *12. The Court explained that the putative intervenor's obligation to indemnify Verizon was not an issue in the litigation, and thus its interest was not significant and could not justify intervention. *Id.* Further, the putative intervenor's "financial interest in limiting its indemnity exposure . . . is purely economic and is premised on a contingency that may never materialize; namely, the initiation of a subsequent lawsuit or arbitration proceedings by Verizon seeking indemnification." *Id*. at *13. The analysis in *Moore* is equally applicable here. This case arises out of the Department's unlawful delay and unlawful policies in adjudicating hundreds of thousands of BD applications. Movants' future financial liability, if any, is not at issue in this litigation. *See id.* at *12-13; *Alisal Water*, 370 F.3d at 919-20 (affirming denial of judgment creditor's motion to intervene because financial interest was too speculative to be "concrete" and was "several degrees removed from" the issues that formed "the backbone of [the] litigation").

Moreover, Movants' purported concerns are premised on a contingency that likely *will not* materialize: Movants do not identify, and Plaintiffs are not aware of, a *single* recoupment action brought by the Department against an institution after approval of a BD application, under any of the BD regulations in force since 1994. *See* Ex. B ¶¶ 8-10. Further, as previously discussed, any financial liability will be determined in a separate proceeding solely between the Department and the institution. *See* 34 C.F.R. § 668.87(c). Such proceedings are governed by regulations that afford institutions significant procedural safeguards, *see* 34 C.F.R. § 668.87(b), and clear statutes of limitations on recovery actions, *see* 81 Fed. Reg. at 76,084 (2016 Final Rule, 34 C.F.R. § 685.222(e)(7)); 34 C.F.R. § 685.206(e)(16).[15] These safeguards distinguish Movants from the intervenors in *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1150 (9th Cir. 2010) (cited in

---

[15] The same applies to any potential administrative or litigation proceedings involving other regulators or private plaintiffs. *See, e.g.*, Lincoln/ANU Mot. at 17. Not only is the prospect of such proceedings entirely speculative, but each would come with its own due process protections.

ECI Mot. at 14; CSPP Mot. at 9), who had a statutory right to contribution that could arise without any further determinations of liability.

> **c)** **Allegations of Harm to Movants' Reputational Interests Are Ill-Supported and Immaterial**

The alleged "other potential consequences that could flow from the Department's forgiveness of loans under the terms of the proposed settlement" (Lincoln/ANU Mot. at 16)—primarily, reputational harm—are similarly too speculative and collateral to establish that Movants have a significant protectable property interest in this litigation. As an initial matter, Movants fail to adequately describe this alleged reputational harm: Lincoln and ANU only point to an excerpt from a news article that does not even mention the Exhibit C list, let alone either school, *see* Lincoln/ANU Mot. at 17, while CSPP asserts that its "sterling reputation . . . has already been harmed" without pointing to *any* evidence, CSPP Mot. at 5. As detailed *supra*, Part III.A.1.a, none of the Movants has a "sterling reputation" to protect.

Furthermore, "[a]bsent allegations of detriment arising from the subject matter of the lawsuit, courts are generally skeptical of allowing intervention based on . . . indirect reputational harm." *Floyd v. New York City*, 302 F.R.D. 69, 104 (S.D.N.Y. 2014) (collecting cases), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014). For example, in *Roe v. Lincoln-Sudbury Regional School District*, No. 18-cv-10792, 2019 WL 5685272 (D. Mass. Oct. 31, 2019), a student sued her school district and school officials for their inadequate response to her sexual assault by two fellow students. One of the accused perpetrators moved to intervene, "asserting that he needs to do so in order to protect . . . his reputational interests." *Id*. at *2. Denying his motion, the district court observed: "The substance of Roe's claims is the school's response to her allegation of assault. The perpetration of the assault is certainly a factual issue underlying the claims in this case, but the focus of the legal claims is on the school's response, not the assault itself." *Id*. at *3 n.1. In a similar vein, while allegations of misconduct underlie the BD claims at issue in this case, the litigation is centered around the Department's response to those claims, not the misconduct itself.

Going further, the Seventh Circuit has observed that "[t]o hold that the prospect of a judge's adverse finding or comment [about a non-party] could support intervention as a party . . . would amount to a stunning expansion of standing and would invite prolonged and even endless litigation." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 798 n.10 (7th Cir. 2013). Where the adverse finding is not even made by the judge, but rather implied by the terms of a settlement agreement, intervention is even less appropriate.

### 3. The Disposition of This Action Will Not Impair or Impede Movants' Ability to Protect their Interests.

Assuming, *arguendo*, that Movants had protectable property interests in this litigation—which they do not—the disposition of this action would not impair or impede their ability to protect those interests. Movants fail to establish that, should the Department seek to recover amounts forgiven pursuant to the settlement, they will be unable to challenge recoupment or introduce evidence that they did not engage in any misconduct. *See supra* Part III.A.2.b. Because they will have the opportunity to contest their liability in future proceedings, they will not be substantially affected in a practical sense by the resolution of this action. *See Moore*, 2013 WL 450365, at *13.

### B. Movants Fail to Meet the Standard for Permissive Intervention

Just as Movants fail to demonstrate that they are entitled to intervention as of right, so too do they fail to qualify for permissive intervention. "[A] court may grant permissive intervention where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *United States v. Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002). "Even if an applicant satisfies those threshold requirements, the district court has discretion to deny permissive intervention." *Donnelly*, 159 F.3d at 412. In exercising its discretion, the district court must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties. *Id.* (citing Fed. R. Civ. P. 24(b)(2)).

Movants fail to satisfy the timeliness requirement for the reasons discussed at length *supra*, Part III.A.1. *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir.

1997) ("In the context of permissive intervention . . . [courts] analyze the timeliness element more strictly than [they] do for intervention as of right."). Movants also fail to establish that their claims or defenses have a question of law or a question of fact in common with the main action. Finally, allowing permissive intervention would unduly delay the main action and prejudice Plaintiffs.

### 1.    There Is No Common Question of Law or Fact

It is not at all clear from their requests for permissive intervention what claims or defenses Movants are raising. Lincoln and ANU seem to assert that their "claim" is of a right to participate in settlement negotiations, *see* Lincoln/ANU Mot. at 20, while ECI and CSPP characterize their "defense" as one to perceived allegations against them contained in the proposed settlement, *see* ECI Mot. at 18-19; CSPP Mot. at 23. None of these questions, such as they are, resemble the legal issues in this case—*viz.*, whether the Department unlawfully withheld or unreasonably delayed BD decisions, whether it unlawfully adopted a 'presumption of denial' policy, and whether its form denial notices violated the APA and/or due process. *See, e.g.*, Supp. Compl. ¶¶ 1-9.

Even if the Court were to ignore the nature of the underlying action and consider only the questions of law and fact presented in the Joint Motion, Movants could not identify a common question. At the preliminary approval stage, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" ***to the class*** when considering the factors set out in Fed. R. Civ. P. 23(e)(2). Preliminary approval is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment ***to class representatives or segments of the class***, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (Chief Judge Vaughn Walker) (emphasis added).

As the Parties explain in their Joint Motion, the Agreement meets the standard for preliminary approval. Named Plaintiffs and Class Counsel have adequately represented the Class, negotiations were conducted at arm's length, and the Agreement offers relief to all Class Members that is comparable to or better than what Plaintiffs might have expected through continued litigation. *See* Joint Mot. at 12-18. In the context of preliminary approval, negotiations are

considered not to be conducted at arm's length where class counsel "collude with defendants . . . in return for a higher attorney's fee" or use the settlement to "pursu[e] their own self-interests." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). Movants do not offer any evidence of "collusion"—nor can they, because no such evidence exists. Counsel for each party have zealously represented their clients' interests throughout extensive settlement negotiations, and any fee award is governed by the Equal Access to Justice Act. *See* Joint Mot. at 14. Notwithstanding the assertion by ECI that the parties "colluded in secret, for months" to arrive at the Agreement (ECI Mot. at 11), there is nothing improper about the fact that the parties engaged in confidential, non-public settlement negotiations. *See, e.g.*, Fed. R. Evid. 408.

Movants disclaim any interest in the merits of this case's underlying claims. *See, e.g.*, Lincoln/ANU Mot. at 10 n.3 ("Proposed Intervenors seek intervention to be heard on the proposed settlement, not with an aim to litigating the case on the merits."). Instead, they expressly seek intervention to object to the effects they anticipate the Agreement might have ***on them*** if it is ***finally*** approved. *See, e.g.*, Lincoln/ANU Mot. at 1 (seeking intervention "to ensure that [Lincoln/ANU's] interests are protected in any finalization and implementation of the proposed settlement of this litigation"); ECI Mot. at Notice of Motion (seeking intervention "to object to the settlement as not fair, reasonable, or adequate" to ECI in light of its own interests); CSPP Mot. at 8 (seeking intervention "to be heard in opposition to the proposed settlement"). In effect, Movants are trying to challenge a settlement that does not concern them, but with which they disagree. "The intervention rule is . . . not intended to allow the creation of whole new lawsuits by the intervenors." *Donnelly*, 159 F.3d at 412 (omission in original) (quoting *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994)). Movants cannot establish that their claims or defenses—to the extent they identify any—have a question of law or fact in common with the main action, and therefore are not entitled to permissive intervention.

### 2.    Granting Permissive Intervention Would Prejudice the Plaintiffs

"In evaluating prejudice, courts are concerned when relief from long-standing inequities is delayed." *Alisal Water*, 370 F.3d at 922 (citations omitted). As this Court is well aware, Class

18

Members have been waiting for the relief promised in the proposed settlement for years. As detailed *supra*, Part III.A.1.b, allowing Movants to intervene at this late stage, for the sole and express purpose of frustrating settlement proceedings, would unduly prejudice Plaintiffs. *See id.* ("In the past, we have affirmed the denial of motions to intervene in cases where granting intervention might have compromised long-litigated settlement agreements."); *In re Cathode Ray Tube Antitrust Litig.*, No. 07-cv-05944, 2020 WL 5224241, at *5 (N.D. Cal. Aug. 27, 2020) (intervention "in order to appeal [movants'] objections to a settlement for which they are not a part would create undue delay and prejudice to the settling parties").

### C.      The Motions Are an Attempt by Non-Parties to Exercise a Veto Over a Settlement That Does Not Affect Them

Movants, by their own admission, lack any actual stake in the claims or defenses at issue in this lawsuit. *See, e.g.*, Lincoln/ANU Mot. at 10 n.3; ECI Mot. at 11; CSPP Mot. at 8. Only one of the four Movants, ECI, even attempted to file its own proposed pleadings, and those simply disclaimed knowledge of Plaintiffs' allegations—even the ones relating to ECI's own schools. *See, e.g.*, ECF No. 261-2 ¶ 199 (claiming to lack sufficient knowledge or information about Supplemental Complaint paragraph detailing Everglades University's Assurance of Voluntary Compliance with the state of Florida). Moreover, the proposition that ECI would intervene as a defendant makes no sense in the structure of this lawsuit: ECI's asserted interests present a conflict with the Department, not with Plaintiffs.[16]

Furthermore, to the extent certain Movants seek to re-open settlement negotiations (*see* Lincoln/ANU Mot. at 1; CSPP Mot. at 3, 8), intervention would not get them what they want. At this stage of the litigation, the proposed settlement will be approved as written or not at all. *See* Agreement § XIII.A ("This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review."). Plaintiffs will not agree to modify the proposed

---

[16] Movants could attempt plead their own APA claims against the Department in cross-complaints. But none has done so, nor expressed any intention to do so—and as described, those claims would not actually share a legal or factual nexus with Plaintiffs', and thus do not belong in this case. Plaintiffs express no opinion on whether any such claims would have merit if brought separately.

settlement in the manner that Movants appear to desire. *See id.* § XV.A ("Before the Preliminary Approval Date, this Agreement, including the attached exhibits, may be modified only upon the written agreement of the Parties."). Plaintiffs will not negotiate an alternative settlement with Movants—nor could they, as Movants lack any interest in or ability to settle any of Plaintiffs' claims. Rather, even if Movants were granted intervention and party status,[17] Plaintiffs could and would continue to pursue approval of their settlement with the Department as it is written. *See Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528-29 (1986) ("It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes.").

If the Agreement were approved, Movants would simply remain in the case as non-settling parties—without any claims or defenses that could keep the case live. *See id.* at 529 ("[W]hile an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent."). And because Movants lack Article III standing,[18] they would not have standing to appeal a final approval order if the Department did not. *See Wittman v. Personhuballah*, 578 U.S. 539, 543-44 (2016) (an intervenor "cannot step into the shoes of the original party" on appeal, "unless the intervenor independently fulfills the requirements of Article III"); *Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("status as an intervenor below, whether permissive or as of right, does not

---

[17] Of course, intervention does not necessarily have to equal party status—it can be conditional. *See, e.g., Kirkland*, 711 F.2d at 1126; *see generally* David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721, 727-28 (Feb. 1968).
[18] Lincoln/ANU argue that they satisfy Article III standing because "they face concrete and particularized injuries that are directly traceable to the proposed settlement," Lincoln/ANU Mot. at 21, but make no effort to establish how they could have standing as a party in the underlying litigation. ECI and CSPP do not address the standing issue. As explained *supra*, however, all of Movants' asserted interests are entirely speculative, not concrete or particularized. It is an open question whether intervenors must establish Article III standing independent of the parties to intervene as of right at all. *See, e.g., Prete v. Bradbury*, 438 F.3d 949, 956 (9th Cir. 2006) (noting that there is "a circuit split . . . whether an intervenor-applicant must also independently satisfy Article III standing to intervene as of right," and citing cases).

confer standing sufficient to keep the case alive in the absence of the State on this appeal" unless intervenor can demonstrate independent Article III standing).

As all of the shortcomings described above make clear, what Movants are pursuing here is not intervention as it is normally understood under Rule 24. Rather, they are seeking an on-the-record forum to air their grievances about a settlement that they think will make them look bad.

Intervention is not necessary or appropriate to address Movants' concerns. Movants are free, for instance, to ask the Court for permission to file amicus briefs during the time for objections following preliminary approval (if granted).[19] This course of action would be consistent with how courts have frequently treated motions for intervention by class members at the settlement stage— and class members certainly have a stronger interest than Movants have here. *See, e.g.*, *Allen*, 787 F.3d at 1222 (in class action settlement, movant's concerns "could largely be addressed through the normal objection process"); *Zepeda v. PayPal, Inc.*, No. 10-cv-02500, 2014 WL 1653246, at *4 (N.D. Cal. Apr. 23, 2014), *objections overruled*, No. 10-cv-1668, 2014 WL 4354386 (N.D. Cal. Sept. 2, 2014) (courts have "frequently denied intervention in the class action settlement context, citing concerns about prejudice, as well as putative intervenors' ability to protect their interests by less disruptive means," such as by "participat[ing] in the fairness hearing process"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*, MDL No. 2672, 2016 WL 4376623, at *4 (N.D. Cal. Aug. 17, 2016) (denying intervention because movant's interest could be adequately protected by "opt[ing] out of the Settlement and litigat[ing] his claims independently, or. . . instead object[ing] to it").

More importantly, Movants are not waiving any rights under the Agreement, and it does

---

[19] Arguably, Movants could file their own objections to the settlement. *See* Agreement § X.A.5 ("Within 14 calendar days of the Execution Date, the Parties shall jointly submit this Agreement and its exhibits to the Court, and shall apply for entry of an Order in which the Court: . . . Provides that ***any person*** who wishes to object to the terms of this Agreement, or to the entry of an Order approving this Agreement, must file a written Notice of Objection with the Court." (emphasis added)). *But see* Proposed Order, ECF No. 246-2 at 2, ¶ 3.c ("Each ***Class Member*** will have the opportunity to object to the Proposed Settlement. ***Class Members*** must submit any objections to the Settlement Agreement in writing to the Court." (emphasis added)).

Plaintiffs' Consolidated Opposition to Motions to Intervene
Case No.: 19-cv-03674-WHA

not resolve any questions regarding their future obligations or liabilities—whether to the Department, to individuals, or to other regulators. Movants can assert all of their arguments regarding notice, process, and/or the factual predicates for any allegations of misconduct in any future proceeding against them. *See Local 93,* 478 U.S. at 529-30 (intervenor could not block consent decree where the decree did not "bind [intervenor] to do or not to do anything," did not "impose[] [any] legal duties or obligations on [intervenor] at all," and did not "purport to resolve any claims [intervenor] might have" under applicable law). As to alleged reputational harm, Movants have both the resources and the wherewithal to publicize their opposition to the proposed settlement and their assertions regarding the quality of the education they provide. *See, e.g.*, Non-Profit Explorer: Everglades College Inc., *ProPublica* (last visited July 20, 2022), https://projects.propublica.org/nonprofits/organizations/650216638 (collecting tax return data showing that ECI had nearly $560 million in revenue in 2020).

### D.     Movants Fail to Establish Any Other Reason to Deny Preliminary Approval

ECI raises several additional arguments to suggest that this Court should deny preliminary approval regardless of its decision on intervention. Movants have no standing to raise these arguments. But regardless, the arguments fail on their own terms.

ECI first cites the assertion, recently raised in Defendants' summary judgment brief, that this case is moot because the Department has already begun to take action on some pending BD applications. *See* ECI Mot. at 1, 6 (citing Defendants' Cross Motion for Summary Judgment ("Defs.' Cross Motion"), ECF No. 249 at 1-2). But Defendants' mootness argument, if it had been considered on its merits, would have been wholly insufficient to strip this Court of jurisdiction to approve the proposed settlement. "A policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citations omitted). "Ultimately, the question [is] whether the party asserting mootness has met its ***heavy burden*** of proving that the challenged conduct cannot reasonably be expected to recur." *Id.* at 972 (citations and quotations omitted) (emphasis added). While the declaration submitted by Defendants in support of their mootness argument suggests

that the challenged policies are not currently being followed, it does not even attempt to establish that they will not recur. *See* Decl. of Richard Cordray ("Cordray Decl."), ECF No. 249-1 ¶¶ 9-18 (describing actions taken to work through the BD backlog, but nowhere challenging the Department's authority to delay or cease adjudication of BD applications).

Moreover, when administrative delay has been "created and perpetuated by [an agency's] inefficiencies," and "has not been significantly reduced" under current policy, the agency retains a duty to rectify that delay. *Pacharne v. DHS*, No. 1:21-cv-115, 2021 WL 4497481, at *12 (N.D. Miss. Sept. 30, 2021); *cf. Rai v. Biden*, No. 21-cv-863, 2021 WL 4439074, at *7 (D.D.C. Sept. 27, 2021) (although the unlawful policy underlying plaintiffs' claims had been revoked, claims were not moot because the effects of the resulting delay had not been "completely or irrevocably eradicated" (citation omitted)). There is no authority to support the position that "because an agency acts on some similarly situated applications, it cannot be sued for unreasonably delaying or unlawfully withholding other applications." *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021). For the vast majority of the Class, the Department's failure to decide BD applications continues, and the Department has not announced any timeline to address these claims, other than through the proposed settlement. Defendants have therefore ceased to meet their "heavy burden" to establish mootness, and the Court's jurisdiction to approve the settlement is unchanged. *See Rosebrock*, 745 at 972; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) ("The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness.").

Likewise, evidence that the Department may have abandoned its policy of inaction does not render class certification inappropriate. *See* ECI Mot. 261 at 1 (citing Defs.' Cross Motion at 1-2). By Defendants' own admission, "[a]pproximately 264,000 borrowers are waiting for a decision on their BD applications." Cordray Decl. ¶ 12. While "the reasons their applications remain pending [may] vary," Defs.' Cross Motion at 12, it is implausible to suggest that any currently pending application was unaffected by the Department's failure to "issue[] *any* final borrower defense decisions for well over a year," *id*. Because ample evidence, including

23

Defendants' own submissions, demonstrates that a common policy of inaction has impacted the entire class, decertification is inappropriate. *See Lyon v. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961, 984 (N.D. Cal. 2016) ("That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy." (quoting *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988))).

Finally, the APA does not prevent this Court from granting preliminary approval of the Agreement. ECI's suggestion that the proposed settlement constitutes unlawful regulation by concession, *see* ECI Mot. at 16-17, is both insufficiently argued and wrong as a matter of law. In *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013), the Ninth Circuit considered a consent decree that established new standards for the Northwest Forest Plan "unless and until [the relevant agencies] decide to conduct further analysis and decision making." *Id.* If the agencies decided not to conduct further decision making, "they could simply let [the new standards] stand indefinitely." *Id.* Holding that the district court abused its discretion by issuing the consent decree, the Ninth Circuit observed that a settlement is improper if it allows a federal agency "effectively to promulgate a substantial and permanent amendment to [its regulations] without having followed statutorily required procedures." *Id.* at 1188.[20] In this case, the Department has not proposed *any* amendment to its regulations, let alone "a substantial and final" one. It has simply agreed to a process and timeline to resolve the Class's claims within the existing BD framework. Applications submitted after final approval of the settlement will be processed according to the rules governing the affected loans.[21] This is thus not a case of regulation, or rescission, by concession—it is a case of the Department resolving litigation by taking steps to

---

[20] *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544 (D.C. Cir. 2015), cited by ECI, is similarly inapposite. There, the court was considering whether to prevent a duly promulgated regulation from going into effect, *see id.* at 549, 557-58—a far cry from the situation here, where the Department is taking steps to resolve a discrete set of pending individual applications for relief.
[21] Indeed, the Department recently announced an *actual* proposed amendment to its BD regulations. *See* 87 Fed. Reg. 41,878.

redress the injuries that its actions and inactions caused to the Class. Nor has the proposed settlement "essentially transformed" the case into one about "blanket debt cancellation." ECI Mot. at 18. Cancellation is a borrower defense remedy, and the Agreement applies to a defined and closed class of BD applicants who are entitled to that remedy.[22] Indeed, Plaintiffs sought, in their recent Motion for Summary Judgment, an order for the Department to show cause why *every* pending application should not be granted, immediately. *See* ECF 245 at 36-37. The APA does not prevent approval of the Agreement.

* * *

Movants' antics should not be allowed to derail or delay this case. As this Court recognized nearly two years ago, "Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm—it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans." ECF No. 146 at 15. Class members "have waited for relief, or at least decision, for" up to *seven years* at this point. *Id.* The parties have reached agreement on a settlement that, as explained in the Joint Motion, will provide fair and timely relief to the Class— and Movants seek to throw sand in the gears to delay resolution of this case even further. Their legal arguments do not support such a ploy. The motions to intervene should be denied, and Rule 23 approval proceedings should go forward on their planned track.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Lincoln/ANU's Motion to Intervene (ECF No. 254), ECI's Motion to Intervene (ECF No. 261), CSPP's Motion to Intervene (ECF No. 265), and CSPP's Motion to Continue (ECF No. 265-1).

---

[22] ECI's assertion that the Post-Class Applicant provisions are a backdoor for the Department to "unilaterally cancel ALL student loan debt" (ECI Mot. at 9) is facially absurd. There are currently 43.4 million borrowers with federal student loan debt. *See* Melanie Hanson, "Student Loan Debt Statistics," *Education Data Initiative* (last updated May 30, 2022), https://educationdata.org/ student-loan-debt-statistics. ECI's theory would require (1) a hundred-fold increase in BD applications, (2) all of which would have to be submitted over approximately the next four months, and (3) all of which the Department would have to refuse to adjudicate for three years—the exact conduct that got the Department into this lawsuit to begin with.

25

1

2    Dated: July 25, 2022

3                                        /s/ *Rebecca C. Ellis*

4                                        EILEEN M. CONNOR (SBN 248856)
                                         econnor@law.harvard.edu
5                                        REBECCA C. ELLIS (*pro hac vice)*
                                         rellis@law.harvard.edu
6                                        REBECCA C. EISENBREY (*pro hac vice*)
                                         reisenbrey@law.harvard.edu
7                                        LEGAL SERVICES CENTER OF
8                                        HARVARD LAW SCHOOL
                                         122 Boylston Street
9                                        Jamaica Plain, MA 02130
                                         Tel.: (617) 390-3003
10                                       Fax: (617) 522-0715

11                                       JOSEPH JARAMILLO (SBN 178566)
12                                       jjaramillo@heraca.org
                                         HOUSING & ECONOMIC RIGHTS
13                                       ADVOCATES
                                         3950 Broadway, Suite 200
14                                       Oakland, California 94611
                                         Tel.: (510) 271-8443
15                                       Fax: (510) 868-4521

16

17

18

19

20

21

22

23

24

25

26

27

28
Plaintiffs' Consolidated Opposition to Motions to Intervene
Case No.: 19-cv-03674-WHA