BRIAN D. NETTER
Deputy Assistant Attorney General
STEPHANIE HINDS
United States Attorney
MARCIA BERMAN
Assistant Branch Director
R. CHARLIE MERRITT
STUART J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THERESA SWEET, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>        Defendants. | No. 3:19-cv-03674-WHA<br><br>**DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR INTERVENTION**<br><br>Date:  August 4, 2022<br>Time:  8:00 a.m.<br>Place:  Courtroom 12, 19th Floor<br>Judge William Alsup |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.     Statutory and Regulatory Background ..................................................................... 3

II.    Procedural History .................................................................................................... 4

III.   The Settlement Agreement ....................................................................................... 6

IV.   The Intervention Motions ......................................................................................... 9

LEGAL STANDARDS ...................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.     The Intervention Motions Are Premature And Should Be Held In Abeyance
Pending The Court's Preliminary Approval Determination. ............................... 11

II.    Movants Are Not Entitled To Intervene As Of Right. ......................................... 13

       A.    The Proposed Settlement Is a Valid Exercise of the Federal Government's
Settlement Authority, Not an Application of the Department's Borrower
Defense Regulations. ................................................................................. 13

       B.    Movants Lack Any Concrete Interest in the Proposed Settlement. ...... 15

       C.    The Interests Claimed in the Intervention Motions Would Not Be Impaired
Absent Intervention. .................................................................................. 19

III.   The Court Should Deny Permissive Intervention. .............................................. 20

CONCLUSION .................................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) ........................................................................... 13, 21

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ................................................................................. 3

*BB&T Co. v. Pahrump 194, LLC*,
  No. 2:12-cv-1462, 2015 WL 1877422 (D. Nev. Apr. 23, 2015) ............................... 12

*Bellinghausen v. Tractor Supply Co.*,
  306 F.R.D. 245 (N.D. Cal. 2015) ............................................................................ 21

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*,
  952 F.2d 1173 (9th Cir. 1992) ................................................................................. 16

*Bova v. City of Medford*,
  564 F.3d 1093 (9th Cir. 2009) ................................................................................. 17

*Brooks v. Life Care Ctrs. of Am., Inc.*,
  No. SACV 12-659, 2015 WL 13390031 (C.D. Cal. Mar. 3, 2015) ........................... 20

*Callahan v. Brookdale Senior Living Cmtys., Inc.*,
  38 F.4th 813 (9th Cir. 2022) ......................................................................... 10, 11, 20

*Casey v. Citibank, N.A.*,
  No. 5:12-cv-820, 2014 WL 3468188 (N.D.N.Y. Mar. 21, 2014) ............................. 12

*Chavez v. PVH Corp.*,
  No. C 13-01797, 2015 WL 12915109 (N.D. Cal. Aug. 6, 2015)............................... 12

*Chi v. Univ. of S. Cal.*,
  No. 2:18-cv-4258, 2019 WL 3064457 (C.D. Cal. Apr. 18, 2019) ............................. 12

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................................................. 17

*Commodity Futures Trade Comm'n v. Heritage Cap. Advisory Servs., Ltd.*,
  736 F.2d 384 (7th Cir. 1984) ................................................................................... 19

*Cooper v. Newsom*,
  13 F.4th 857 (9th Cir. 2021) ......................................................................... 10, 11, 20

*Dilks v. Aloha Airlines*,
  642 F.2d 1155 (9th Cir. 1981) ................................................................................. 17

*FTC v. Apex Cap. Grp. LLC*,
No. CV 18-9573, 2022 WL 1060486 (C.D. Cal. Mar. 10, 2022) ............................ 18

*Freedom from Religion Found., Inc. v. Geithner*,
644 F.3d 836 (9th Cir. 2011) ............................................................................. 10

*Garza v. Cnty. of L.A.*,
918 F.2d 763 (9th Cir. 1990) ............................................................................. 20

*Gould v. Alleco, Inc.*,
883 F.2d 281 (4th Cir. 1989) ............................................................................. 13

*In re Novatel Wireless Secs. Litig.*,
No. 08CV1689, 2014 WL 2858518 (S.D. Cal. June 23, 2014) ............................ 21

*In re Tableware Antitrust Litig.*,
484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................. 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*,
229 F. Supp. 3d 1052 (N.D. Cal. 2017) ......................................................... 11, 12

*Lane v. Facebook, Inc.*,
No. C 08-3845, 2009 WL 3458198 (N.D. Cal. Oct. 23, 2009) ............................ 12

*League of United Latin Am. Citizens v. Wilson*,
131 F.3d 1297 (9th Cir. 1997) ........................................................................... 20

*Moore v. Verizon Commc'ns Inc*,
No. C 09-1823, 2013 WL 450365 (N.D. Cal. Feb. 5, 2013) ............................... 17

*Or. Prescription Drug Monitoring Program v. U.S. DEA*,
860 F.3d 1228 (9th Cir. 2017) ........................................................................... 10

*Raquedan v. Centerplate of Del. Inc.*,
376 F. Supp. 3d 1038 (N.D. Cal. 2019) ............................................................. 20

*Shoshone Bannock Tribes v. Reno*,
56 F.3d 1476 (D.C. Cir. 1995) ........................................................................... 14

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......................................................................................... 15

*Talavera v. Global Payments, Inc.*,
No. 21-cv-1585, 2021 WL 5331000 (S.D. Cal. Nov. 16, 2021) .......................... 18

*Town of Chester, NY v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ...................................................................................... 10

*United States v. Aerojet Gen. Corp.*,
606 F.3d 1142 (9th Cir. 2010) ........................................................................ 19

*United States v. Alisal Water Corp.*,
370 F.3d 915 (9th Cir. 2004) .......................................................................... 20

*United States v. Carpenter*,
526 F.3d 1237 (9th Cir. 2008) ........................................................................ 14

*United States v. Hercules, Inc.*,
961 F.2d 796 (8th Cir. 1992) .................................................................... 13, 14

*Util. Reform Project v. Bonneville Power Admin.*,
869 F.2d 437 (9th Cir. 1989) .......................................................................... 13

*Weingarten v. DeVos*,
468 F. Supp. 3d 322 (D.D.C. 2020) ................................................................ 14

*Zepeda v. PayPal, Inc.*,
No. 10-cv-2500, 2014 WL 1653246 (N.D. Cal. Apr. 23, 2014) ................. 20, 21

**STATUTES**

20 U.S.C. § 1082 .............................................................................................. 14

20 U.S.C. § 1087e .............................................................................................. 3

28 U.S.C. §§ 516-519 ........................................................................................ 13

**RULES**

Fed. R. Civ. P. 24 ...................................................................... 10, 13, 20, 21

**REGULATIONS**

28 C.F.R. §§ 0.160-0.172 .................................................................................. 14

34 C.F.R. part 668, subpart G ................................................................... 3, 4, 16

34 C.F.R. part 668, subpart H ...................................................................... 4, 16

34 C.F.R. § 668.84 .............................................................................................. 4

34 C.F.R. § 668.85 .............................................................................................. 4

34 C.F.R. § 668.86 .............................................................................................. 4

34 C.F.R. § 668.87 .............................................................................................. 4

34 C.F.R. § 668.89 ....................................................................................................... 4

34 C.F.R. § 685.206 ..................................................................................................... 3

34 C.F.R. § 685.222 ..................................................................................................... 3

Notice of Proposed Rulemaking,
    87 Fed. Reg. 41,878 (July 13, 2022)....................................................................... 9

**OTHER AUTHORITIES**

Karishma Mehrotra, Two for-profit colleges settle lawsuit with attorney general for $2.3
    million, *Boston Globe* (July 30, 2015),
    https://www.bostonglobe.com/business/2015/07/30/two-for-profit-colleges-settle-
    lawsuit-with-attorney-general-for-million/PLtMSKNp9QxG19ZGXcXUZI/story.html.......... 18

Lucy Campbell, Students Win $11.2M Settlement in Chicago School of Psychology Fraud
    Lawsuit, *Lawyers & Settlements.com* (Sept. 22, 2016),
    https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-
    settlement-in-chicago-school-of.html ....................................................................... 18

Veronica Jean Seltzer, American National Univ. found guilty of violating KY Consumer
    Protection Act, *WVTQ* (June 18, 2019),
    https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-
    protection-act/ ........................................................................................................ 18

**INTRODUCTION**

This class action lawsuit presents a dispute between student loan borrowers and the U.S. Department of Education ("Department") regarding the Department's process for reviewing and adjudicating borrowers' applications for the Department to relieve them of their loan repayment obligations based on the alleged misconduct of the schools they attended. The lawsuit exclusively addresses the Department's obligations to borrowers; it has no potential to adjudicate any rights or obligations of those schools. After three years of litigation—which has now involved multiple rounds of summary judgment briefing, extensive discovery, and months of settlement negotiations—the parties have executed a settlement agreement to resolve this dispute without the expense, uncertainty, and delay of additional protracted litigation. As detailed in the parties' joint motion seeking the Court's preliminary approval, the agreement resolves the disputed issues in this case fairly and comprehensively for the class as a whole, taking due account of the complexities of this case and the relief Plaintiffs could potentially obtain if the parties were to proceed to judgment on the merits. Now, on the eve of the scheduled preliminary approval hearing, four institutions against whom class members have alleged misconduct and sought borrower defense relief seek to intervene to object to the settlement. But they have no interest whatsoever in this litigation—much less in the exercise of the Education Secretary's and the Attorney General's discretion, respectively, to compromise class members' federal student loan debts and settle litigation on terms that further the interests of the United States. The Court should deny the intervention motions.

To start, the proposed intervenors' motions are premature. Rule 23 provides an ordered process for the consideration of objections to a proposed class action settlement, and that occurs only after the Court first grants the agreement preliminary approval. No one, not even the class members whose interests the class action settlement approval process is designed to protect, have a right to object to *preliminary*, as opposed to final, approval of a proposed settlement. For that reason, the Court should, at a minimum, hold the motions in abeyance until it makes a determination whether to preliminarily approve the proposed settlement. Proceeding otherwise would elevate the concerns of the third-party intervenors over those of the class members who,

unlike the intervenors, have a right to submit objections prior to the Court's final approval of the settlement.

If the Court does rule on the intervention motions now, it should deny them.   The Department's decision to resolve this case by, among other things, agreeing to provide up-front settlement relief to class members who attended certain schools for which the Department believes there exists a sufficient basis, for settlement purposes only, to warrant such relief has no independent legal effect on the putative intervenor schools.   The proposed settlement agreement provides for the Department to afford this relief—not the schools.   Any concrete consequences on the schools—financial or otherwise—could be imposed only after the Department initiated a separate, future proceeding, in accordance with regulations that require the Department to prove a sufficient basis for liability and provide schools with notice and an opportunity to be heard.   The proposed settlement agreement is not, and does not purport to be, a substitution for those proceedings; it will not be introduced as evidence in the event any such proceeding is initiated in the future, and it creates no independent basis for action against the schools.   Nor does the settlement guarantee that future borrower defense claims by non-class member students of those schools will be approved or have any effect on the Department's substantive adjudication of such non-class member claims going forward.   As such, the proposed intervenors do not meet Rule 24's requirements for intervention of right, both because they fail to identify any concrete, protectable interest, and because they fail to demonstrate that their participation in the closing stages of *this action* (for the purpose of derailing a duly negotiated settlement that provides for an expeditious resolution in a case about agency delay) is necessary to protect any such interest.

The Court should deny permissive intervention for the same reasons and in recognition of the prejudice that would inevitably result from delaying resolution of this action at this late stage. In its role as fiduciary for the class, the Court should reject the entreaties of institutions whose actions gave rise to class members' borrower defense applications in the first place—and who have no interest in the parties' negotiated resolution of this class action complaint—and deny intervention.

## BACKGROUND

### I.   Statutory and Regulatory Background

Defendants have described the relevant legal framework in multiple filings throughout this case.  In short, through Title IV of the Higher Education Act of 1965 ("HEA"), "Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012).  While student borrowers are generally required to repay their federal loans, Congress has granted the Education Secretary wide authority to "cancel a student federal loan repayment based on a school's misconduct."  Order Granting Mot. for Class Certification at 2, ECF No. 46 ("Class Cert. Order").  Specifically, the HEA authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment." 20 U.S.C. § 1087e(h).

Pursuant to this authority, the Department has promulgated three sets of borrower defense regulations, with various standards and procedures that apply depending on the disbursement date of the relevant student loan underlying a given borrower defense claim.  *See* 34 C.F.R. §§ 685.206; 685.222.  In general, these regulations require the Department to initiate a factfinding process to adjudicate borrower defense applications.  *Id*. §§ 685.222(e); 685.206(e).  As part of that process, the Department considers all relevant information in its possession—including evidence submitted by applicants and the institutions they attended and evidence that is available from any other source—and issues a written decision resolving the claim.  *Id*. §§ 685.222(e)(3)-(4); 685.206(e)(9)-(11).

Separately, the regulations authorize the Secretary to "initiate a proceeding" to "collect from the school the amount of relief resulting from a borrower defense." 34 C.F.R. § 685.222(e)(7) (loans disbursed between July 1, 2017 and July 1, 2020); *see also id*. § 685.206(c)(3)-(4) (loans disbursed prior to July 1, 2017); *id*. § 685.206(e)(16) (loans disbursed after July 1, 2020). Regardless of when a loan was first disbursed, the Department can only seek to recoup amounts discharged for a granted borrower defense application in accordance with the procedures specified in regulations governing the Department's affirmative enforcement activities.  *See* 34 C.F.R. part

668, subpart G.  To recover any losses incurred on the basis of institutional misconduct giving rise to a borrower defense, the Department must provide written notice to the relevant institution of its intent to do so.  34 C.F.R. § 668.87(a)(1).  That notice must include "a statement of facts and law sufficient to show that the Department is entitled" both to grant the underlying borrower defense and to recover from the school any associated losses, and it must inform the institution of its right to submit a written response and request a hearing.  *Id*. § 668.87(a)(1)(ii)-(iii).  The written notice must also specify the date that the Department intends to take action to recover such losses, and inform the institution that the Department will "not take action to recover" the losses on that date if the institution provides a written response.  *Id*. § 668.87(a)(1)(iii).  If an institution requests a hearing, "[n]o liability shall be imposed on the institution prior to the hearing."  *Id*. § 668.87(b)(2).  The Department will not take action to recover from the institution until the institution's written response is considered or the hearing conducted and a decision issued.  *Id.* §668.87(b).

Hearings are then conducted in accordance with the Department's general enforcement regulations, pursuant to which institutions have the opportunity to submit evidence, including expert evidence, and in some instances present oral argument.  *See generally id*. § 668.89.  At such a hearing, the Department carries "the burden of persuasion in a borrower defense and recovery action."  *Id* § 668.89(b)(3)(iii).  Similar procedures apply any time the Department seeks to take enforcement action against an institution based on its misconduct, including when it seeks to fine, suspend, limit, or terminate institutions from participating in Title IV programs, *see id*. § 668.84 (fine proceedings); *id*. § 668.85 (suspension proceedings); *id*. § 668.86 (limitation or termination proceedings), or when it pursues financial liabilities resulting from audits and program reviews of institutions, *see* 34 C.F.R. part 668, subpart H.

## II.   Procedural History

Plaintiffs filed a class action complaint on June 25, 2019, challenging the Department's alleged delay in adjudicating borrower defense claims.  *See* ECF No. 1.  On October 30, 2019, the Court certified a class consisting of, with certain exceptions, "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, [and] whose borrower defense has not been

granted or denied on the merits." Class Cert. Order at 14.

Defendants filed an answer and an administrative record, and the parties proceeded to brief cross-motions for summary judgment in December 2019 and January 2020. In their summary judgment briefing, Defendants contended, among other things, that the Court lacked jurisdiction because Plaintiffs' claims had become moot and that the Court lacked authority to issue any coercive relief against the Secretary. *See* Opp'n to Pls.' Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. at 2-7, ECF No. 72. Before the Court ruled on these motions, the parties executed a settlement agreement and submitted it for the Court's preliminary approval on April 10, 2020. ECF No. 97. The Court preliminarily approved the agreement on May 22, 2020, ECF No. 103 ("Prelim. Approval Order"), but ultimately, on October 19, 2020, denied final approval of the settlement because the parties had not reached a "meeting of the minds," Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 10, ECF No. 146 at 10. This conclusion was based largely on concerns Plaintiffs raised about the Department's procedures for issuing decisions denying the claims of class members, including its issuance of "form denial letters," *id*. at 13, which the Court determined "hang[] borrowers out to dry," *id*. at 15. The Court also found a "strong showing of agency pretext," *id*.—which it characterized as "the paradigm of agency bad faith," *id*. at 12—based on the Court's conclusion that it was presented "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. (citation omitted).

Based on these findings, the Court authorized discovery to include inquiry into, among other things, the "development and use of the form denial letters" and the "extent to which the Secretary has denied applications of students who have attended schools subject to findings of misconduct by the Secretary or any other state or federal body or agency, and the rationale underlying those denials." *Id*. at 16. This discovery effectively expanded the case from one solely about the Department's delay to a far-reaching challenge to the Department's procedures for reviewing and adjudicating (and specifically denying) borrower defense applications.

Plaintiffs took extensive discovery and deposed multiple Department officials, eventually filing a supplemental complaint in May 2021. ECF No. 198 ("Suppl. Compl."). This complaint

added new claims alleging that the Department had "adopt[ed] a policy of near-automatic denial of borrower defense applications" and issued "unlawful denials of borrower defense applications." *Id.* ¶ 6.  As part of Plaintiffs' overarching claim that the Department had inappropriately denied borrower defense applications, the complaint documented allegations and evidence of wrongdoing at several institutions.  *E.g.*, *id.* ¶¶ 198-232 (describing "common evidence" of misconduct supporting borrower defense applications filed against several institutions, including Everglades University).  When Plaintiffs moved for summary judgment on June 9, 2022, they requested, among other things, that the Court "[o]rder Defendants to show cause, within thirty days of the Court's ruling on this Motion, why each and every class member's BD application should not be granted immediately."  Pls.' Mot. for Summ. J. at 1, ECF No. 245.

On June 22, 2022, the day before Defendants' opposition brief and cross-motion was due, the parties executed a settlement agreement and jointly submitted it to the Court for preliminary approval.  *See* Joint Mot. for Prelim. Approval of Settlement, ECF No. 246 ("Prelim. Approval Mot.").  Immediately thereafter, the parties' submitted a stipulated request to vacate the operative briefing schedule.  ECF No. 247.  When the Court did not rule on that request prior to Defendants' filing deadline,[1] Defendants filed a brief opposing Plaintiffs' summary judgment motion and cross-moving for summary judgment.  *See* ECF No. 249.

## III.   The Settlement Agreement

Following discovery and after the change in presidential administration in January 2021, the parties began a new round of settlement negotiations in May 2021.  These negotiations continued for more than a year, reflecting the tremendous complexity of this case and the Department's larger efforts to clear an ever-growing backlog of borrower defense applications that now numbers well over 200,000.  The parties' joint motion for preliminary approval of the agreement, ultimately filed on June 22, 2022, aptly summarizes the terms of the agreement and its benefits to all parties.  *See* Prelim. Approval Mot.  Defendants highlight a few key provisions below.

---

[1] Pursuant to prior orders of the Court, that filing deadline was at Noon Pacific Time on June 23, 2022.  *See* ECF No. 240; ECF No. 224 (providing that "[a]ll [summary judgment] filings are due at Noon").

The settlement agreement provides an overarching framework for the Department to eliminate the massive backlog of borrower defense applications—and resolve the claims of all class members—according to a schedule that is workable for the Department and fair to the class. To achieve that result, the settlement provides that class members who attended certain specified institutions will receive "Full Settlement Relief" within a year of the settlement's effective date. Proposed Settlement Agreement § IV.A.1, ECF No. 246-1 ("Agreement"). The institutions are listed on Exhibit C to the parties' proposed agreement. The parties' preliminary approval motion explained that "because the Department has identified common evidence of institutional misconduct by the schools, programs, and school groups identified in Exhibit C . . ., it has determined that every Class Member whose Relevant Loan Debt is associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools." Prelim. Approval. Mot. at 17-18.

The agreement makes clear that this relief is the result of the parties' negotiated settlement, not any borrower defense adjudication through the Department's regulatory process. *See, e.g.*, Agreement §§ II.O (defining "final decision" for purposes of the agreement as a decision "either approving or denying settlement relief to a borrower under the terms of this Agreement"); § IV.A (providing for class members who attended institutions on the Exhibit C list to receive "Full Settlement Relief"). An institution's inclusion on Exhibit C is not based on an official finding of misconduct or wrongdoing by the Department. *See* Decl. of Benjamin Miller ¶ 7 ("Miller Decl.") (attached hereto as Ex. A). Rather, it is the result of the parties' negotiated assessment that, for each school, there exists a sufficient threshold indication of wrongdoing to justify summary settlement relief for associated class members. By concentrating this kind of relief among the class members most likely (though in no sense guaranteed in every case) to obtain relief through the Department's ordinary borrower defense process—itself the subject of multiple claims in Plaintiffs' supplemental complaint—the agreement allows the Department to resolve a large volume of claims in a more rational way than if the Court awarded the kind of relief Plaintiffs have

demanded (*e.g.*, granting all borrower defense applications immediately) or imposed a shorter schedule for resolving the backlog of claims that would force a more arbitrary resolution of those claims as a whole. It also allows the Department to issue decisions on a more expedited timeline to the remaining class members than would otherwise be possible.

The remainder of class members (*i.e.*, those who did not attend a school on the Exhibit C list) will receive decisions on their applications according to specified timelines, keyed to how long their applications have been pending. Agreement § IV.C.3. In response to Plaintiffs' allegations that the Department's prior methods for reviewing and adjudicating applications were unlawfully weighted towards denying such applications, the agreement provides for the Department to apply certain streamlined review procedures to class member applications. *Id*. § IV.C.1. And to account for Plaintiffs' allegations about insufficient denial notices, the agreement provides that the Department will not deny a class member's application without first providing that class member an opportunity to revise and resubmit her application, and that any denial decision will "explain the reasons the application was denied and apprise the recipient of his or her right to seek review of the decision in federal district court." *Id*. § IV.C.2. Any final decisions issued through this process are not borrower defense decisions (and do not reflect adjudications through the Department's borrower defense process) and will lead either to approval of an application for settlement (not borrower defense) relief or to denial of that application. *See, e.g.*, *id*. § IV.C.2 (a "settlement relief decision" notifies a class member "that his or her borrower defense application has been approved under the terms of this Settlement Agreement and that the Class Member will receive Full Settlement Relief"); *see also* Miller Decl. ¶¶ 7-9.

The agreement provides that the Court will retain limited jurisdiction for the specific purpose of enforcing specified breaches of the agreement, and it authorizes specified remedies in the event of non-compliance. *See generally* Agreement § V. Otherwise, the agreement requires the Court to "relinquish[] jurisdiction" over this action. *Id*. § V.E & V.F. The class members, in turn, covenant not to sue in certain situations, *id*. § IX, and agree to waive all claims asserted in this action, *id*. § VII, while Defendants remain free to assert any applicable res judicata defenses in future actions involving Class Members, *id*.

The settlement class closed as of the date of the agreement's execution, June 22, 2022. *Id*. § III.D.   However, the settlement agreement provides certain limited relief to "post-class applicants" who submit borrower defense applications between that date and the date the Court finally approves the agreement. *See id*. § IV.D.   These individuals are entitled to a decision on their claims within 36 months of the agreement's effective date; if that deadline is missed, the post-class applicants will receive full settlement relief. *Id*.   Those claims will be reviewed under normal borrower defense processes, and the post-class applicants are entitled to none of the streamlined processes specified in the agreement—including relief based on attendance at designated Exhibit C institutions.   The proposed treatment of this limited set of "post-class applicants" is in line with the Department's proposals for handling borrower defense applications outside of the proposed settlement, beginning July 1, 2023. *See* Notice of Proposed Rulemaking, 87 Fed. Reg. 41,878, 42,008 (proposed section 685.406(f)) (July 13, 2022) (proposing that borrower defense decisions should be issued within three years of receipt of a materially complete application, and that the Department's failure to provide a decision on that timeframe will render the loan obligation unenforceable).

## IV.    The Intervention Motions

On June 23, 2022, the Court vacated the remaining schedule for summary judgment briefing and scheduled a July 28, 2022 hearing on the parties' joint motion for preliminary approval of the settlement agreement.   ECF No. 250.   Approximately three weeks later, four institutions referenced in Exhibit C of the parties' settlement agreement filed a total of three intervention motions. *See* ECF No. 254 (American National University and Lincoln Education Services Corporation ("LESC") ("ANU Mot."); ECF No. 261 (Everglades College, Inc.) ("ECI Mot."); ECF No. 265 (The Chicago School of Professional Psychology) ("TCSPP Mot.") (collectively, "Movants").   The Movants frame their requests slightly differently, but all essentially seek to intervene for the purpose of objecting to the parties' proposed settlement agreement. *See* ANU Mot. at 1 (requesting "a seat at the table in the finalization and implementation of a settlement that affects their interests"); ECI Mot. at 3 (seeking intervention for the "limited purpose of protecting its rights and objecting to a 'settlement'"); TCSPP Mot. at 2 (requesting leave to "object to the

1   settlement and file an opposition to the proposed settlement").

2          The putative intervenors object to their inclusion on Exhibit C of the proposed settlement

3   agreement.   In their telling, such inclusion infringes their regulatory rights to "defend

4   [themselves]," *e.g.*, TCSPP Mot. at 2, raises the specter of "potential adverse consequences" at a

5   later date, *e.g.*, ANU Mot. at 2, and harms the schools' "reputation[s]," *e.g.*, ECI Mot. at 3; TCSPP

6   Mot. at 3.  All seek to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a), as

7   well as permissive intervention under Rule 24(b).  Pursuant to the timeline set forth in the Court's

8   July 15, 2022 order, ECF No. 269, Defendants submit this consolidated opposition brief.

9                                    **LEGAL STANDARDS**

10         Federal Rule of Civil Procedure 24(a)(2) establishes four requirements for intervention as

11  of right: "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable'

12  interest relating to the property or transaction which is the subject of the action; (3) the applicant

13  must be so situated that the disposition of the action may as a practical matter impair or impede its

14  ability to protect that interest; and (4) the applicant's interest must be inadequately represented by

15  the parties to the action."  *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 38 F.4th 813, 820

16  (9th Cir. 2022) (citation omitted).  "Failure to satisfy any one of the requirements is fatal to the

17  application."  *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011)

18  (citation omitted).  A would-be intervenor bears the burden of establishing that it meets each

19  requirement.  *Id.*  Where, as here, a non-party seeks intervention to "pursue relief that is different

20  from that which is sought by a party with standing," the would-be intervenor "must have Article

21  III standing."  *Town of Chester, NY v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017); *see also*

22  *Or. Prescription Drug Monitoring Program v. U.S. DEA*, 860 F.3d 1228, 1234 (9th Cir. 2017)

23         Federal Rule of Civil Procedure 24(b)(1)(B) provides for permissive intervention.  "An

24  applicant who seeks permissive intervention must prove that it meets three threshold requirements:

25  (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and

26  (3) the court has an independent basis for jurisdiction over the applicant's claims."  *Cooper v.*

27  *Newsom*, 13 F.4th 857, 868 (9th Cir. 2021) (citation omitted).  The district court may deny

28  permissive intervention even where a movant has satisfied these threshold requirements.  *Id.*  "In

exercising its discretion, the district court must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Id.*; *see also Callahan*, 38 F.4th at 822 (identifying additional factors court may consider).

## ARGUMENT

### I. The Intervention Motions Are Premature And Should Be Held In Abeyance Pending The Court's Preliminary Approval Determination.

To begin, the putative intervenors are mistaken in their contention that the Court must decide their motions before making a determination whether to preliminarily approve the parties' proposed settlement. *See, e.g.*, ECF No. 265-1 (TCSPP's proposed motion to continue preliminary approval hearing until after a ruling on TCSPP's intervention motion); ECI Mot. at 11 (contending that "ECI should be granted intervention—prior to the Court's consideration of the Proposed Settlement (either preliminary or final)"). As described below, the institutions have no concrete interest in this litigation at all, and the Court should therefore deny their motions to intervene. But at a minimum, because the Movants have no role to play in the preliminary approval process, the Court should at least defer consideration of their motions unless and until it sets a schedule for class member objections to a preliminarily-approved agreement.

Approval of a class action settlement is "a two-step process." *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, 229 F. Supp. 3d 1052, 1062 (N.D. Cal. 2017). The court determines first "whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, . . . the court entertains any of their objections . . . [and] determines whether the parties should be allowed to settle the class action pursuant to the agreed-upon terms." *Id.* (citations omitted). "Preliminary approval is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'" Prelim. Approval Order at 2 (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).

In light of these standards,[2] there is no basis to allow the would-be intervenors to "object[] to preliminary approval of the settlement." ECI Mot. to Shorten Time for Briefing & Hearing Mot. to Intervene at 1, ECF No. 268. Instead, "it is premature under Rule 24 for objectors to intervene at the preliminary approval stage, as all objections to the settlement agreement are contemplated to be lodged after preliminary approval and before final approval." *Chi v. Univ. of S. Cal.*, No. 2:18-cv-4258, 2019 WL 3064457, at *6 (C.D. Cal. Apr. 18, 2019); *see also, e.g.*, *Lane v. Facebook, Inc.*, No. C 08-3845, 2009 WL 3458198, at *5 (N.D. Cal. Oct. 23, 2009) (denying leave to intervene "to advance the argument that the terms of the proposed settlement are contrary to public policy and are unfair, inadequate, and unreasonable" because the proposed intervenors "failed to establish that their rights to raise these issues are not adequately protected through the process for submitting objections that will follow upon preliminary approval of the settlement agreement"); *Casey v. Citibank, N.A.*, No. 5:12-cv-820, 2014 WL 3468188, at *1 (N.D.N.Y. Mar. 21, 2014) (intervention to "object to the proposed settlement agreement is inappropriate and premature" because the "proper time to present" such objections is "at the final approval hearing").

Indeed, not even putative class members are permitted "to file objections to a motion for preliminary approval." *Chavez v. PVH Corp.*, No. C 13-01797, 2015 WL 12915109, at *3 (N.D. Cal. Aug. 6, 2015). The would-be intervenors, then, seek to circumvent the ordinary class action settlement approval process and elevate their objections to the proposed settlement over the class members whose interests the approval process is designed to protect. *See, e.g.*, *In re Volkswagen*, 229 F. Supp. 3d at 1061 (noting that "the district court has a fiduciary duty to look after the interests of those absent class members" (citation omitted)). The Court should decline to do so. The

---

[2] ECI proclaims that that the parties "have colluded to impair . . . ECI's significant interests." ECI Mot. at 18. But it offers nothing in support of this assertion, which appears to be based solely on the fact the parties negotiated their settlement "in secret." *Id.* It should go without saying that there is nothing collusive about confidential settlement negotiations. *See, e.g.*, *BB&T Co. v. Pahrump 194, LLC*, No. 2:12-cv-1462, 2015 WL 1877422, at *2 (D. Nev. Apr. 23, 2015) ("Federal courts have long held that settlement negotiations should be kept secret."). And as explained in the parties' preliminary approval motion, the agreement here was the result of arms-length negotiation. *See* Prelim. Approval Mot. at 14 (noting that in the class action settlement context, collusion is typically limited to the situation where "attorneys' fees will be paid out of the settlement funds that would otherwise be distributed to class members").

intervention motions should be denied, but at a minimum, the Court should hold them in abeyance until it has determined whether or not to grant preliminary approval.

## II.     Movants Are Not Entitled To Intervene As Of Right.

Even if the intervention motions were appropriately considered now, there is no basis for the Court to grant them.  "Cases involving non-class members' attempts to intervene and/or object to settlements are few, and the courts usually reject outsiders' attempts to enter the litigation during the settlement phase."  *Gould v. Alleco, Inc.*, 883 F.2d 281, 285 (4th Cir. 1989).  Here, intervention is inappropriate because the putative intervenors lack any concrete interest in the exercise of the Attorney General's and the Education Secretary's considerable discretion to settle claims. Accordingly, the Court should deny intervention under Rule 24(a).

### A.     The Proposed Settlement Is a Valid Exercise of the Federal Government's Settlement Authority, Not an Application of the Department's Borrower Defense Regulations.

Movants' assertions of significant protectable interests are based on their misunderstanding of the nature of the proposed agreement.  Contrary to Movants' allegations, the agreement is a litigation settlement, not a vehicle for the "resolution of borrower-defense claims . . . under the Department's regulations," ANU Mot. at 15, or a "finding of wrongdoing . . . against the schools," ECI Mot. at 14-15; *see also* TCSPP Mot. at 13 (contending that inclusion on Exhibit C reflects "an unadjudicated determination by the Department that TCSPP has committed substantial misconduct").  Because Movants' premise is incorrect, their arguments fail.

As a general matter, "the Attorney General has exclusive authority and plenary power to control the conduct of litigation in which the United States is involved."  *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992); *see also* 28 U.S.C. §§ 516-519.  That includes the authority, at issue here, to settle litigation involving the United States.  In light of the strong public interest in settling such litigation, *see, e.g.*, *Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989)—an interest that is only magnified by the "strong judicial policy" favoring the settlement of "complex class action litigation," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted)—the Attorney General's settlement authority is given a broad construction.  Indeed, "courts have long acknowledged that the Attorney General's authority to

control the course of the federal government's litigation is presumptively immune from judicial review." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (recognizing that Attorney General's "plenary discretion" to "settle litigation to which the federal government is a party" is "committed to absolute agency discretion by law," and only reviewable in exceptional circumstances).

While Congress can place certain limits on the Attorney General's authority, which of course "stops at the walls of illegality," *Carpenter*, 526 F.3d at 1242 (citation omitted), "the statutory authority of the Attorney General to control litigation is not diminished without a clear and unambiguous directive from Congress," *Hercules*, 961 F.2d at 798.  No such directive is at issue here, and the proposed intervenors do not argue otherwise.  To the contrary, the settlement agreement provides for resolution of this lawsuit based on an exercise of the Education Secretary's considerable discretion under the HEA to compromise and settle claims arising out of the federal student loan programs.  *See* 20 U.S.C. § 1082(a)(6).  The Secretary's "compromise and settlement authority" includes the authority to compromise and release the student loan debts owed to him by federal student loans borrowers on terms determined by the Secretary.  *See Weingarten v. DeVos*, 468 F. Supp. 3d 322, 338 (D.D.C. 2020) (finding that the Secretary's exercise of this authority is generally "not subject to judicial review" (citation omitted)).

The Attorney General's delegated settlement authority, *see* 28 C.F.R. §§ 0.160-0.172, and the Secretary's compromise and settlement authority were exercised to resolve the disputed claims at issue in this litigation.  The proposed settlement sets forth procedures and a framework for the Secretary to exercise his statutory authority to provide settlement relief to class members in a comprehensive manner.  In some cases, that is through the up-front discharge of loan obligations based on attendance at a specified list of schools; in others, it is through the further review of borrower defense applications through streamlined procedures specific to the parties' proposed settlement agreement.  In either situation, the procedures specified in the settlement are distinct from what class members would "receive if their claims were adjudicated outside of [the] settlement."  Prelim. Approval Mot. at 18.  Indeed, the proposed agreement speaks only in terms of "settlement relief"—never borrower defense relief—and defines "final decision" in the context

of the agreement as a decision "either approving or denying settlement relief to a borrower under the terms of [the] Agreement."   Agreement § II.O (Definitions); *see also supra* pp. 7-8.   The settlement agreement does not provide for Defendants to exercise their authority under the Department's borrower defense regulations; nor does it mandate or even suggest that the relief class members will receive is in the form of borrower defense decisions issued through the regulatory process that would be applicable outside of this settlement.

**B.    Movants Lack Any Concrete Interest in the Proposed Settlement.**

With this context in mind, Movants' claims to intervention fall apart.   While their motions are long on complaints about the settlement agreement in general, they are short on identifying any concrete, protectable interest that is impaired by the parties' settlement of disputed claims. For example, each of the proposed intervenors refers to its ability to receive notice of a pending borrower defense claim and an opportunity to respond before the Department issues a final decision resolving the borrower's application.  *See, e.g.*, ANU Mot. at 16; ECI Mot. at 15-16; TCSPP Mot. at 14.   But these procedures apply only when the Department is reviewing and adjudicating borrower defense applications in the ordinary course, which could lead to a recoupment claim against the school that is the subject of the application.   They do not apply to the situation here, *i.e.*, an exercise of the Secretary's authority to settle the debts of federal student loan borrowers—in conjunction with the Attorney General's authority to settle litigation—outside the regulatory process for reviewing and adjudicating borrower defense applications.

In any event, even if the Department had announced an intention to issue final borrower defense decisions pursuant to its operative regulations (rather than the procedures set forth in the settlement agreement), Movants would still have no standing to object.   At most, the schools object to a procedural deprivation in the Department's broader process of rendering decisions to borrowers on the merits of their applications.   It is well established, however, that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).   A school has no "concrete interest," *id*., in the Department's determination

whether to approve or deny the borrower defense claim of a student who attended that school.[3] *See, e.g.*, *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.2d 1173, 1176 (9th Cir. 1992) (party lacks standing to challenge the manner in which an agency exercises its enforcement discretion against other parties). Any such interest is only implicated later, if and when the Department decides to take further action against the school—either to recoup funds or to impose other sanctions or penalties through regulatory processes for establishing institutional misconduct. *See* 34 C.F.R., subparts G & H.

Movants, then, are left with the argument that they are concerned that the Department *may* use inclusion on Exhibit C "as a precursor to further adverse action against the institution." ANU Mot. at 16; *see also* TCSPP Mot. at 15 (expressing concern that the settlement may "provide the Department with an avenue to seek adverse administrative actions against TCSPP"). But that is incorrect. *See generally* Miller Decl. The fact that a school is included on the attachment to the settlement agreement is not a formal finding of misconduct, establishes no institutional liability, and does not provide an evidentiary basis on which the Department can take any action against the school. *See id.* ¶¶ 7-14. Far from determining that "*every* school on the Exhibit C list has committed wrongdoing as to *every* single borrower-defense applicant in the Class," ECI Mot. at 16, the settlement agreement merely states that "Defendants will effectuate Full Settlement Relief for each and every Class Member whose Relevant Loan Debt is associated with the schools, programs, and School Groups listed in Exhibit C hereto," without reference to wrongdoing by any particular school. *See* Agreement § IV.A.1; *see also* Miller Decl. ¶ 14 ("The fact of an institution's inclusion on Exhibit C will be used by the Department solely for purposes of effectuating its obligations under the Settlement Agreement to award Full Settlement Relief to certain class members."). And while Movants highlight the statement in the parties' preliminary approval motion that in the context of the settlement the Department has identified common evidence of institutional misconduct by the schools identified in Exhibit C and/or that there is a high rate of

---

[3] Were it otherwise, institutions would be able to challenge any decision approving a borrower defense claim in federal court, an unwarranted result that would be inconsistent with the regulatory scheme the Department has created. As described elsewhere in this brief, that scheme severs the process for holding institutions accountable from the initial decision—affecting only the applicant's rights—of whether to approve the claim.

1  class members with borrower defense applications related to the listed schools, *see* ANU Mot. at

2  8; ECI Mot. at 2; TCSPP Mot. at 5 (all citing Prelim. Approval Mot. at 17-18), that document is

3  not an official finding of misconduct and has no more independent effect on the Department's

4  relationship with the Exhibit C institutions than the proposed settlement agreement itself.

5      Accordingly, present concerns about future administrative enforcement actions are purely

6  speculative. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have

7  repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact,

8  and that allegations of *possible* future injury are not sufficient." (cleaned up)); *Bova v. City of*

9  *Medford* 564 F.3d 1093, 1096-97 (9th Cir. 2009) (injury that "has not yet occurred," and is

10  contingent on the occurrence of future events, is not "concrete and particularized enough to survive

11  the standing/ripeness inquiry").  Any claimed injury is expressly "premised on a contingency that

12  may never materialize; namely, the initiation of a subsequent" recoupment or enforcement

13  proceeding by the Department (the outcome of which is not pre-determined in any event).  *See*

14  *Moore v. Verizon Commc'ns Inc*, No. C 09-1823, 2013 WL 450365, at *13 (N.D. Cal. Feb. 5,

15  2013).  As discussed above, the Department can recover discharged amounts from schools only

16  after providing those schools with notice and opportunity to respond to any assertions of

17  misconduct with precisely the same evidence they seek to submit here.  And an institution's

18  inclusion on the Exhibit C list "does not itself provide any evidentiary support or basis for initiating

19  any such action."  Miller Decl. ¶ 14.  Thus, Movants purely hypothetical fear of future adverse

20  actions does not constitute an interest that is "'direct, non-contingent, substantial and legally

21  protectable' to justify intervention." *Moore*, 2013 WL 450365, at *13 (quoting *Dilks v. Aloha*

22  *Airlines*, 642 F.2d 1155, 1157 (9th Cir. 1981)).

23      The schools also claim that their inclusion on the Exhibit C attachment is already causing

24  them reputational harm.  *E.g.*, TCSPP Mot. at 13 (asserting "harm" from "being labeled by the

25  Department as an institution deemed to have engaged in substantial misconduct"); *accord* ANU

26  Mot. at 16-17; ECI Mot. at 10.  This contention is undermined by the fact that, as discussed above,

27  the exhibit is a basis for providing relief under the specific terms of the parties' settlement

28  agreement—not a broader determination that any school engaged in substantial misconduct.  *See,*

*e.g.*, *Talavera v. Global Payments, Inc.*, No. 21-cv-1585, 2021 WL 5331000, at *4 (S.D. Cal. Nov. 16, 2021) (party seeking to establish reputational harm "must produce *evidence* as opposed to 'platitudes'" (citation omitted)).  The schools are of course free to make this point to any current or prospective students.  In any case, inclusion on the settlement agreement list is not the first adverse publicity that the would-be intervenors (and/or their affiliates) have experienced.[4]

Ultimately, intervention must be based on "a particularized showing of . . . reputational harm" resulting from the proposed settlement.  *FTC v. Apex Cap. Grp. LLC*, No. CV 18-9573, 2022 WL 1060486, at *3 (C.D. Cal. Mar. 10, 2022) (rejecting intervention in the absence of such a showing or a showing that any claimed injury "could be redressed through intervention in this case").  But Movants' declarations consist largely of unsupported speculation and lack any specific assertions of concrete reputational harm.  Indeed, ECI's entire "showing" of harm reduces to the following conclusory assertion from an Assistant Vice Chancellor of Compliance: "It is my belief that the Department of Education's inclusion of ECI, Keiser, and Everglades on the Exhibit C List is already causing them reputational harm, as third parties are treating it like a finding of wrongdoing by the schools."  Decl. of Brandon Biederman ¶ 12, ECF No. 261-3; *see also* Decl. of Steven Cotton ("Cotton Decl.") ¶ 8, ECF No. 254-1 (ANU) (stating, without elaboration, that unidentified "individuals" "[o]n social media" are "falsely suggesting that [the schools listed on Exhibit C] have been subject to an adverse adjudication"); Decl. of Francis Giglio ("Giglio Decl.")

---

[4] *See, e.g.*, Veronica Jean Seltzer, American National Univ. found guilty of violating KY Consumer Protection Act, *WVTQ* (June 18, 2019), https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-protection-act/; Karishma Mehrotra, Two for-profit colleges settle lawsuit with attorney general for $2.3 million, *Boston Globe* (July 30, 2015), https://www.bostonglobe.com/business/2015/07/30/two-for-profit-colleges-settle-lawsuit-with-attorney-general-for-million/PLtMSKNp9QxG19ZGXcXUZI/story.html (reporting that Lincoln Technical Institute, an affiliate of Movant LESC, settled a lawsuit accusing it of "using unfair recruiting tactics and inflating job placement numbers"); Lucy Campbell, Students Win $11.2M Settlement in Chicago School of Psychology Fraud Lawsuit, *Lawyers & Settlements.com* (Sept. 22, 2016) https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-settlement-in-chicago-school-of.html (describing settlement in lawsuit brought by students who "wanted to study at the Chicago School of Professional Psychology," and "alleged they were provided with misleading information regarding the school's accreditation and their job prospects after completing their courses"); Suppl. Compl. ¶ 199 (describing settlement agreement between Everglades University and the state of Florida "over alleged violations of Florida's Unfair Trade Practices Act").

¶ 15, ECF No. 254-2 (Lincoln) (speculating, based on sporadic citations to "recent media coverage," that inclusion on the list "will erroneously associate Lincoln with allegedly *proven* wrongdoers"); Decl. of Ted Scholz ¶ 15, ECF No. 265-4 (TSCPP) (speculating that TCSPP's inclusion on the settlement agreement exhibit "will negatively affect TCSPP's reputation and ability to recruit and retain students and faculty," based on the fact that TCSPP has "received questions from current and prospective students" of unknown substance in an unidentified quantity).  Absent a "particularized showing" of specific reputational harm resulting from the proposed settlement, the movants cannot base a claim to intervention on this type of harm.

Finally, to the extent the would-be intervenors assert that the proposed settlement will lead to additional borrower defense discharge applications being filed, or raise the prospect of future lawsuits by borrowers or enforcement actions from state regulators or accreditation boards, *see* Cotton Decl. ¶ 8; Giglio Decl. ¶¶ 17-19, such speculation about hypothetical future events (with only a tenuous, at best, connection to the proposed settlement agreement) is insufficient to confer standing to intervene for the reasons discussed above.  In any event, Movants will have ample opportunity to defend themselves in any such future action (should it ever come to pass), rendering intervention here unnecessary.

## C.    The Interests Claimed in the Intervention Motions Would Not Be Impaired Absent Intervention.

Even if the putative intervenors could claim some protectable interest in the parties' proposed settlement agreement, they cannot show that final approval of the settlement in this action would "impair or impede [their] ability to protect that interest."  *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (citation omitted).  This is because, as described above, additional proceedings are required before the Department could take any action—*e.g.*, seeking to recover funds discharged on the basis of institutional misconduct—that would affect any of the Movants' interests.  *See, e.g.*, *Commodity Futures Trade Comm'n v. Heritage Cap. Advisory Servs., Ltd.*, 736 F.2d 384, 387 (7th Cir. 1984) (where proposed intervenors had alternative forum in which to protect the interest at issue in intervention motion, denial of intervention was appropriate because the interest "will not be impaired"); *Aerojet Gen. Corp.*, 606 F.3d at 1152

(recognizing that "[p]roposed intervenors' interest might not be *impaired* if they have other means to protect them, even if the lawsuit would affect those interests" (citation omitted)).  Movants will have a full opportunity to assert their "procedural rights" and defend against any "material adverse consequences," ANU Mot. at 18, by taking advantage of the procedures available to them should the Department actually choose to initiate the type of proceeding—*e.g.*, a recoupment action against the school, not the current settlement agreement or even the Department's first-level adjudication of a borrower defense application—that actually had the potential to impose such "adverse" consequences.  *See United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004) (intervention denied where "other means" are available "by which [the putative intervenor] may protect its interests").

## III.    The Court Should Deny Permissive Intervention.

For similar reasons, the Court should deny permissive intervention.  More so than intervention of right, the "decision to grant or deny [permissive] intervention is discretionary, subject to considerations of equity and judicial economy." *Garza v. Cnty. of L.A.*, 918 F.2d 763, 777 (9th Cir. 1990).  Even where Rule 24(b)'s threshold requirements are met, a court has discretion to deny intervention where, for example, "intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Cooper*, 13 F.4th at 868 (citation omitted); *see also Callahan*, 38 F.4th at 822 (identifying additional factors court may consider).  Notably, courts "analyze the timeliness element more strictly than [they] do for intervention as of right." *Raquedan v. Centerplate of Del. Inc.*, 376 F. Supp. 3d 1038, 1042 (N.D. Cal. 2019) (quoting *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997)).

Here, Movants seek intervention after years of complex litigation and on the eve of settlement.  Even assuming the would-be intervenors moved in a timely fashion once the proposed settlement was publicly announced, it is undoubtedly the case that allowing intervention, for the stated purpose of undermining the parties' negotiated agreement, would "disrupt and delay the settlement proceedings and prejudice both the parties and the putative class members." *Brooks v. Life Care Ctrs. of Am., Inc.*, No. SACV 12-659, 2015 WL 13390031, at *3 (C.D. Cal. Mar. 3, 2015) (denying intervention); *see also Zepeda v. PayPal, Inc.*, No. 10-cv-2500, 2014 WL 1653246,

at *8-9 (N.D. Cal. Apr. 23, 2014) (finding intervention motion timely for Rule 24(a) purposes, but exercising "discretion" to deny permissive intervention because "at this stage—after extensive mediated settlement negotiations and when an amended motion for preliminary approval is to be filed soon—[intervention] would delay the potential resolution of this case" and cause prejudice); *Allen*, 787 F.3d at 1222 (affirming denial of intervention motion that was filed "on the eve of settlement[] and threatened to prejudice settling parties by potentially derailing settlement talks").

These considerations warrant denial of the putative intervenors' motions outright.  At a minimum, they counsel limiting any intervention to submitting an objection to the settlement agreement—in the event that it receives preliminary approval—on the same schedule that the Court sets for class members to participate "through the normal objection process."  *Id.*[5]

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny the pending motions for intervention.

Dated:  July 25, 2022                                    Respectfully submitted,

                                                         BRIAN D. NETTER
                                                         Deputy Assistant Attorney General

                                                         MARCIA BERMAN
                                                         Assistant Branch Director

                                                         */s/ R. Charlie Merritt*
                                                         R. CHARLIE MERRITT (VA Bar # 89400)
                                                         STUART J. ROBINSON
                                                         Trial Attorneys
                                                         U.S. Department of Justice
                                                         Civil Division, Federal Programs Branch
                                                         1100 L Street NW

---

[5] If Movants are allowed to intervene to submit their objections to the proposed settlement, Defendants expect to establish at that time that the objections of these third parties are not relevant to the Court's consideration of whether to finally approve the agreement as "fair, adequate, and reasonable" to the class.  *E.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 254 (N.D. Cal. 2015) (listing the factors a "court typically considers"); *see also In re Novatel Wireless Secs. Litig.*, No. 08CV1689, 2014 WL 2858518, at *7 (S.D. Cal. June 23, 2014) ("appreciat[ing]" the intervenors' position," but noting that "the Court's duty is ultimately to ensure a fair, reasonable, and adequate settlement *for the class*" and granting final approval (emphasis added)).

Washington, DC 20005
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*