# Exhibit A

Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

THERESA SWEET, on behalf of    )
themselves and all others      )
similarly situated, et al.,    )
                               )
            Plaintiffs,         )
                               )
  VS.                          )   **NO. C 19-03647-WHA**
                               )
MIGUEL CARDONA, Secretary of   )
the United States Department of)
Education, et al.,             )
                               )
            Defendants.         )
_____)

                        San Francisco, California
                        Thursday, August 4, 2022

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                        PROJECT ON PREDATORY STUDENT LENDING
                        769 Centre Street - Suite 166
                        Jamaica Plain, Massachusetts 02130
                   BY:  **REBECCA C. ELLIS, ATTORNEY AT LAW**
                        **REBECCA C. EISENBREY, ATTORNEY AT LAW**

                        HOUSING AND ECONOMIC RIGHTS ADVOCATES
                        3950 Broadway - Suite 200
                        Oakland, California 94611
                   BY:  **JOSEPH E. JARAMILLO, ATTORNEY AT LAW**

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                        Civil Div., Federal Programs Branch
                        219 S. Dearborn - 5th Floor
                        Chicago, Illinois 60604
           BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**

For Proposed Intervenor American National University:
                        MCGUIREWOODS LLP
                        888 16th St. N.W. - Suite 500
                        Washington, D.C. 20006
           BY:  **JOHN S. MORAN, ATTORNEY AT LAW**

For Proposed Intervenor Chicago School of Professional
Psychology:
                        ALSTON & BIRD LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia 30309
           BY:  **TERANCE A. GONSALVES, ATTORNEY AT LAW**

                        ALSTON & BIRD LLP
                        560 Mission Street - Suite 2100
                        San Francisco, California 94105
           BY:  **TANIA L. RICE, ATTORNEY AT LAW**

For Proposed Intervenor Lincoln Educational Services
Corporation:
                        GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, NW
                        Washington, D.C. 20036
           BY:     **LUCAS TOWNSEND, ATTORNEY AT LAW**

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California 94105
           BY:  **KATHERINE WORDEN, ATTORNEY AT LAW**

For Proposed Intervenor Everglades College, Inc.:
                        BOIES, SCHILLER & FLEXNER LLP
                        1401 New York Avenue, NW
                        Washington, D.C. 20005
           BY:  **JESSE M. PANUCCIO, ATTORNEY AT LAW**

Also Present:        **Theresa Sweet**

| | |
|---|---|
| 1 | **Thursday - August 4, 2022**                              **1:01 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |

4    **THE CLERK:**  All rise.  Court is now in session.  The

5    Honorable William Alsup is presiding.

6            **THE COURT:**  Okay.  Good afternoon.  Please be seated.

7            **THE CLERK:**  Calling Civil Action 19-3674, Sweet, et

8    al., versus Cardona, et al.

9        Counsel, please approach the microphone -- the podium and

10   state your appearances, beginning with plaintiffs' counsel.

11           **MS. ELLIS:**  Good afternoon, Your Honor.  Rebecca Ellis

12   from the Project on Predatory Student Lending for the

13   plaintiffs.  And with me is my colleague Rebecca Eisenbrey,

14   also from the Project on Predatory Student Lending.

15           **THE COURT:**  You're the ones from Harvard?

16           **MS. ELLIS:**  Formerly of Harvard.

17           **THE COURT:**  Formerly of Harvard.  Okay.

18       And?

19           **MS. ELLIS:**  Joseph Jaramillo from Housing Economic

20   Rights Advocates, and our client Theresa Sweet.

21           **THE COURT:**  Okay.  Thank you.  And for the -- for the

22   defendants.

23           **MR. MERRITT:**  Yes, Your Honor.  Charlie Merritt for

24   the Department of Justice on behalf of the defendants.

25           **THE COURT:**  Okay.  Welcome to you.

1        All right.  Intervenors, or proposed intervenors.

2            **MR. PANUCCIO:**  Jesse Panuccio for proposed intervenor

3    Everglades College, Inc.  With me in the back is the general

4    counsel, our client representative, Jim Waldman.

5            **THE COURT:**  Thank you.

6            **MR. MORAN:**  John Moran on behalf of proposed

7    intervenor American National University.

8            **THE COURT:**  Say that name again.  John?

9            **MR. MORAN:**  Yes, sir.  Moran, M-O-R-A-N.

10           **THE COURT:**  Okay.  Thank you.

11           **MR. TOWNSEND:**  Good afternoon.  Lucas Townsend on

12   behalf of proposed intervenor Lincoln Educational Services

13   Corporation.  And with me is my colleague Katherine Worden.

14           **THE COURT:**  Thank you.

15           **MR. GONSALVES:**  Good afternoon, Your Honor.  My name

16   is Terrence Gonsalves, and I represent the Chicago School of

17   Professional Psychology.

18           **THE COURT:**  Great.

19           **MS. RICE:**  Good afternoon, Your Honor.  And Tania Rice

20   also representing Chicago School of Professional Psychology.

21           **THE COURT:**  Welcome.  Have a seat.

22       All right.  Let's hear from the plaintiff and then

23   the Government concerning just the overall outline of the

24   proposed settlement.

25       By the way, are there any class members here?  Anybody out

**PROCEEDINGS**

1   there a class member?  Okay.

2       One, two, three, four, five hands go up.  Thank you for

3   coming.

4       Okay.  Let's hear about the settlement.

5       **MS. ELLIS:**  Good afternoon, Your Honor.  Rebecca Ellis

6   for the plaintiffs.

7       So the settlement agreement that we filed with

8   the Government in this case provides the class with the relief

9   that they've been seeking, which is a lawful resolution of

10  their borrower defense applications within a reasonable period

11  of time.

12      To just briefly go over the structure of the settlement,

13  for purposes of settlement, the class in this case is closed as

14  of June 22nd, 2022, the date of execution of the agreement.

15  And that essentially means that anyone who had a borrower

16  defense application pending or who previously got a form denial

17  notice as of that date, is included in the class.  All of the

18  form denial notices will be rescinded under the agreement and

19  the applications treated as if they had never been denied.

20      So then once that's accomplished, the class is divided

21  into two groups.

22      The first group, which we've called the automatic relief

23  group, consists of about 75 percent of the class, about 200,000

24  people.  And those are the people whose applications for

25  borrower defense relate to one of the schools on Exhibit C to

1   the settlement agreement.

2        And I know we're going to be talking a lot about Exhibit C

3   today, but suffice to say for this purpose that if your

4   borrower defense application relates to a school on Exhibit C,

5   then you'll automatically receive full settlement relief which

6   consists of full discharge of your relevant federal student

7   loans, refund of amounts you previously paid to the Department,

8   and removal of that loan from your credit report.

9        The remaining approximately 25 percent of the class, or

10  about 64,000 people, will then be in the decision group.  These

11  are people whose applications relate to any other school.

12       And people who are in the decision group will receive a

13  decision on their borrower defense application within a time

14  that's scaled to how long their applications have already been

15  pending.  So the people with the longest pending applications

16  will receive a decision within six months of the effective date

17  of the settlement; the next longest pending group within

18  12 months, et cetera.

19       And these applications -- a decision on whether the class

20  member receives settlement relief, will be made using a set of

21  streamlined procedures which are designed to address some of

22  the issues that plaintiffs raised in their supplemental

23  complaint regarding what we called the presumption of denial

24  policy.  And the streamlined procedures assure that -- that the

25  problematic elements of the presumption of denial policy won't

1    apply to any of these class members.

2         The class members in the decision group, if they're not

3    approved for settlement relief on the first examination, will

4    receive a revise and resubmit notice which will tell them,

5    essentially, what was missing from their application, and give

6    them an additional six months to submit a revised application.

7    And that is designed to avoid some of the pitfalls that we saw

8    with the form denial notices.

9         Finally, there are some provisions in the agreement that

10   relate to what we've called post-class applicants, which are

11   people who apply for borrower defense after the cutoff date for

12   the class, but before the date of final approval of this

13   settlement, if it is approved.

14        And people who are post-class applicants will not get

15   automatic relief if they apply relating to an Exhibit C school,

16   and they won't get the streamlined procedures.  They will just

17   get regular borrower defense procedures.  But what they will

18   get is a decision within 36 months of final approval; so sort

19   of the next time period after the end of the decision group.

20        And for both the decision group and the post-class

21   applicants, if the Department fails to -- fails to actually

22   issue a decision within the applicable time frame, then the

23   person will automatically get settlement relief.

24        So that's the settlement in a nutshell.  Its structure

25   is -- it's designed to work as a whole.  So by providing

1    up-front relief to the automatic relief group, that frees up

2    the Department's resources, essentially, to be able to resolve

3    the remaining decision group and post-class applications within

4    a reasonable period of time.

5         And by imposing consequences, if the Department is not

6    able to meet those deadlines, we provide some sort of

7    disincentive for the Government to slide back into its old

8    patterns of delay.  With that being said, these timelines were

9    set through negotiation with the understanding and expectation

10   that the Department is committed to meeting them.

11        And the final thing is that class members' loans will be

12   held in forbearance at zero interest until they receive either

13   relief or a final decision denying their application; and that

14   prevents the imposition of additional harm while this

15   settlement process plays out.

16        So, Your Honor, as we argued in our joint motion for

17   preliminary approval, we believe the settlement satisfies all

18   of the Rule 23 factors.  First of all, named plaintiffs and

19   their counsel have adequately represented the class.

20   Obviously, this case has been vigorously litigated and we have

21   made sure that the voices of borrowers have been heard at all

22   stages of proceedings.

23        Second, the parties negotiated at arm's length.  This

24   settlement is the result of over a year of extensive settlement

25   negotiations.

**PROCEEDINGS**

1          And in ECI's motion to intervene, they did insinuate there

2     was some kind of collusion between the parties.  That's

3     certainly not the case.  First of all, in the context of

4     preliminary approval, collusion usually refers to a situation

5     where class counsel compromises claims of the class for their

6     own financial benefit.

7          In this case, counsel fees are governed by the Equal

8     Access to Justice Act.  They were not any part of the

9     negotiation of the settlement.  But even aside from that, ECI

10    puts forth no evidence of what this collusion is or could have

11    been.  The suggestion seemed to be that because the parties

12    engaged in confidential settlement negotiations and eventually

13    reached a settlement, that's evidence enough of collusion; and

14    certainly it's not.

15         The third factor under Rule 23, the quality of relief to

16    the class under the settlement, is comparable to or potentially

17    better than what plaintiffs could have expected to save in

18    litigation.  And perhaps most importantly, by reaching the

19    settlement, we eliminate further delay and uncertainty in a

20    case that began and has been fundamentally about trying to

21    avoid further delay.

22         Next, the costs --

23              **THE COURT:**  Let me jump ahead a little bit.

24         What is your issue?  How is the attorneys' fees part going

25    to be handled?

**PROCEEDINGS**

1          **MS. ELLIS:**  Your Honor --

2          **THE COURT:**  Is that left completely up to me or what's

3     the story on the attorneys' fees?

4          **MS. ELLIS:**  Well, the agreement provides that the

5     plaintiffs will be considered a prevailing party for the

6     purposes of the Equal Access to Justice Act.

7          **THE COURT:**  So you would be bringing a motion before

8     me in due course?

9          **MS. ELLIS:**  Yes, Your Honor.

10         **THE COURT:**  All right.

11         **MS. ELLIS:**  And we will try to -- try to address fees

12    with the Government before we submit that motion.  It's

13    possible that we'll be able to come to an agreement about it.

14    But, yes, it will be addressed after --

15         **THE COURT:**  I got to move this quickly along.  I've

16    got other problems today.

17       How does -- didn't I already certify a class and define it

18    about two years ago?

19         **MS. ELLIS:**  Yes, Your Honor.  There is a certified

20    class in this case consisting of -- I don't have it in front of

21    me, but I believe it's all individuals who borrowed, direct or

22    FFEL loan --

23         **THE COURT:**  How does that differ from the one you've

24    defined here today?

25         **MS. ELLIS:**  The definition of the class is the same.

1   The only difference is closing the class as of June 22nd, 2022.

2   So the original class definition did not have any date

3   restrictions on it.

4          **THE COURT:**  All right.  Now, I'm going to jump ahead a

5   little bit.

6          I need to understand how -- this is before the settlement.

7   I'm going to -- the Government can help me on this too, and the

8   proposed intervenors maybe.  But for the proposed settlement,

9   if a borrower defense application were granted for loans that

10  had been sold to -- by the Government to some third party, how

11  would the third-party purchaser recover on their investment?

12         **MS. ELLIS:**  Well, Your Honor, to address

13  Section 1087i, which was mentioned in your question, the

14  plaintiffs don't actually have any knowledge about whether or

15  under what conditions the Department has ever used the 1087i

16  authority.  So I would say those questions would be best

17  addressed to DOJ counsel.

18         **THE COURT:**  All right.  Then DOJ should come up.

19         Here is my concern that I want to understand:  $6 billion

20  worth of money will be forgiven, and the students don't have to

21  pay it; but somebody is holding that paper, meaning the loans.

22  It's either the schools or some bank or the Federal Government.

23         And I want to -- I need to know who is going to be

24  out-of-pocket, and will the people who believe they're going to

25  be paid all these loans be paid?

1        Now, I'm not going to -- if you dodge this, I'm not going

2   to approve this.  So I need to understand how it works and how

3   this settlement affects that.  So don't dodge it.  Give me a

4   straight answer.

5            **MR. MERRITT:**  Yes, Your Honor.  I would say as a

6   general matter, the Federal Government is holding the paper, so

7   to speak, as you just put it.

8            **THE COURT:**  As a general matter?  So there is no bank

9   anywhere out there who's holding any of this paper?

10           **MR. MERRITT:**  So I guess to -- I don't know about a

11  bank.

12           **THE COURT:**  How about an investor?

13           **MR. MERRITT:**  I would say, as a general matter, you

14  know, borrower defense regulations are a right that students

15  who have certain types of loans, specifically Title IV direct

16  loans, have and so those are held by the federal government.

17       So to take your question, the first question about selling

18  loans to third-parties under 20 U.S.C. 1087i, that is a

19  situation that has not come up.  The Department has never

20  exercised its authority to sell direct loans pursuant to that

21  statute.  I'll just --

22           **THE COURT:**  Okay.  I take your word for it.

23       If that's true -- and maybe one of the intervenors knows

24  better, but if that's true, is there any -- third party, any

25  bank, anybody out there other than the federal government

 1    itself who owns this paper?

 2          **MR. MERRITT:**  I'd say the only potential exception is

 3    with respect to Federal Family Education Loans, FFELs, which

 4    you addressed to some extent in this litigation.

 5          Generally, borrower defense relief is not available to

 6    loans held by private lenders.  It's a specific thing to

 7    Title IV --

 8          **THE COURT:**  Aren't there some of those loans?

 9          **MR. MERRITT:**  Yes.  So for that -- this is a rare type

10    of loan pursuant to which the Department ensures -- for FFEL

11    loans, the department ensures and subsidizes loans that are

12    held by participating private lenders.  You know, we've noted

13    that that program was discontinued in 2010.

14          But, as a bottom line answer to your question, a borrower

15    with an FFEL loan can apply for borrower defense relief, file a

16    borrower defense application.  Typically, they have to

17    consolidate their FFEL into a direct consolidation loan in

18    order to receive borrower defense relief.  In that scenario,

19    the Department would compensate the private FFEL loan holder

20    for the discharged amount.

21          **THE COURT:**  Is there any scenario where any private

22    entity or public entity other than the federal government, will

23    wind up not getting paid on the paper that it's holding under

24    this settlement?

25          **MR. MERRITT:**  I'm not aware of one, Your Honor.

1    Again --

2             **THE COURT:**  I'm talking about the taxpayer.  It's the

3    federal taxpayers, who will bear the brunt of the $6 billion.

4             **MR. MERRITT:**  Yes.  Although, as has been addressed in

5    the motions to intervene, there are procedures by which the

6    Department can seek to hold schools liable.

7             **THE COURT:**  I got that.  That's a good point.  We're

8    going to come to that.

9         If you didn't do that, then it would be the taxpayers.

10            **MR. MERRITT:**  Yes, Your Honor.  The Department of

11   Education is the holder of federal direct loans, which is the

12   vast majority at issue here.

13            **THE COURT:**  No.  That's good.  That simplifies things.

14            **MR. MERRITT:**  If I just could clarify, Your Honor,

15   too, under the settlement agreement, if there are discharges

16   for FFEL loans, it would not be the same procedure that happens

17   according to the borrower defense regulations, but the

18   Department would provide compensation to any private holders of

19   FFEL loans for settlement discharges.

20            **THE COURT:**  Okay.  Now, you answered my main question.

21        Let me hear from one of the intervenors, and then I'm

22   going to give you two a chance to come back and reply.

23        Let me hear from one of the -- who wants to speak for the

24   inter- -- we probably all can't speak.  So who would like to

25   speak?

**PROCEEDINGS**

1       Here is my question -- give me your name, please.

2           MR. MORAN:  John Moran for American National

3   University.

4           THE COURT:  Thank you.

5       What is your objection to this settlement?

6           MR. MORAN:  So, Your Honor, the question we've

7   directly posed, just to be clear, is that we wanted to seek to

8   intervene to be able to address the settlement.  So we think

9   that's a step antecedent to what our particular objections to

10  the settlement --

11          THE COURT:  What is your interest?

12          MR. MORAN:  I'm not trying to play cute with you.

13          THE COURT:  All right.  What is your interest that

14  would be possibly prejudiced by this?

15      I mean, newspapers, for all that matter, might have an

16  interest.  Do they get to intervene?

17      What is your stake in this deal?

18          MR. MORAN:  So we think there are three particular

19  stakes.  The first two are sort of two sides of the same coin;

20  and that is, the procedural rights that are afforded to schools

21  under the borrower defense regulations when there is a borrower

22  defense claim made against the schools.  The schools have a

23  concrete legal interest in enjoying the benefit of those

24  procedures before a borrower defense application is adjudicated

25  against them.

1          **THE COURT:**  Now, why is that?  What do you mean a

2     borrower -- so you don't lose any money by it.  If the borrower

3     defense is granted, as I understand the way it works, you still

4     get the money.  You've already gotten the money.  The school

5     has already gotten the money.

6          So unless they bring a recoupment procedure, the U.S.

7     government brings a recoupment against you, you don't lose any

8     money.  You've already gotten the money and spent it.  So how

9     can you say that you -- you're out-of-pocket anything?

10          **MR. MORAN:**  So, Your Honor, the school has received

11     the money.

12          But I would say two things:

13          One, the regulations themselves give the schools the right

14     to be heard and to have their views considered in the borrower

15     defense application.  But more importantly, I think the reason

16     that the Department's regulations provide that notice

17     opportunity to be heard is that schools do have an interest at

18     stake.  And there are a couple of different ways that can come

19     up.

20          The most direct way is that the successful application for

21     borrower defense under the regulations is a prerequisite step

22     for the Department to then turn around and seek recoupment

23     against the school in question for the amount of the loan.

24          And it makes sense that if you had a situation where a

25     school was genuinely responsible for misconduct that led to a

1    student taking out a loan for which it was later forgiven, that

2    the Department of Education would not be necessarily on the

3    hook to pay for that, but they would have the opportunity to

4    turn around and then seek recoupment of that money from the

5    school.  So we have an interest in not taking a step towards

6    the ledge of having the Department seek recoupment.

7        Beyond that, there are a number of different ways the

8    schools here, and schools in general, who participate in the

9    federal loan program are heavily regulated entities.  And any

10   time that the Department of Education were to make a

11   determination, whether it's part of this settlement or

12   otherwise, that they've engaged in misconduct that is the basis

13   for forgiving loans, the concern is that could have serious

14   consequences, not only in the subsequent recoupment action but

15   other aspects of ongoing program participation.

16       Now, the Miller declaration that was submitted with the

17   Department's opposition went some way towards addressing those

18   concerns and provided clarity that we think was totally absent

19   from the proposed settlement itself and from the joint motion,

20   to say that the Department does not view these -- the granting

21   of full settlement relief as any sort of finding of misconduct

22   against the school that could be used in any other context

23   other than under the terms of the settlement.

24       But we think that as Your Honor's own questions over the

25   past week have shown, when you combine the Department's what we

**PROCEEDINGS**

1    think is a unique purported exercise of the compromise

2    authority to compromise claims, and you combine that with a

3    very complex set of borrower defense regulations for a heavily

4    regulated industry, like schools who participate in the federal

5    loan program, that there are a lot of questions and unforeseen

6    consequences that arise.

7        And so we're here to ensure that whether it's this

8    settlement or a different settlement or otherwise, that this

9    case proceeds in a way that doesn't adversely affect the rights

10   of schools who participate.

11       **THE COURT:**  All right.  Hang on.  Let me --

12   Mr. Merritt -- no.  I want to hear from Mr. Merritt.

13       Aren't you Mr. Merritt?

14       **MR. MERRITT:**  Yes, sir.

15       **THE COURT:**  Come up here, please.

16       Your paperwork says that none of this settlement would be

17   deemed to be adjudication of a borrower defense application.

18       Am I right about that?

19       **MR. MERRITT:**  That's correct, yes.

20       **THE COURT:**  All right.  Now is a borrower defense

21   adjudication a prerequisite to bringing a recoupment action?

22       **MR. MERRITT:**  In a recoupment action, the Department

23   would have to prove that any amounts it seeks to recoup were

24   justified by claims that meet the borrower defense standard.

25       **THE COURT:**  Well --

1          **MR. MERRITT:**  So in the recoupment proceeding --

2          **THE COURT:**  That's not quite the question.

3      Counsel was telling me that a prerequsite for bringing a

4  recoupment action would be a successful borrower defense

5  application.

6      And therefore you get one step closer -- well, if that's

7  true, then you would not be able to bring any recoupment

8  actions because there would not be a successful borrower

9  defense application as the predicate, if that's true.

10     So do you see what I'm getting at?  That's what he said.

11 It was, you get one step closer to the ledge, I think he said,

12 if we go down the road of this settlement.

13         **MR. MERRITT:**  So I think if a borrower defense

14 application is denied then, of course, the Department cannot

15 then turn around and seek recoupment.  I think -- I don't know

16 that the regulation is entirely clear as to whether in this

17 situation the Department would be prevented from seeking

18 recoupment for amounts discharged through settlement.

19     But I don't think it makes any difference in this case,

20 because either way the Department has to prove the underlying

21 borrower defense in the recoupment proceeding.  And in that

22 recoupment proceeding, the schools get all the rights that they

23 would be entitled to under the first kind of borrower defense

24 adjudication step, you know, notice and an opportunity to

25 respond; plus a lot more, you know, a hearing, submitting

**PROCEEDINGS**

1  evidence, submitting expert evidence, all the things set forth

2  in the regulations.

3          THE COURT:  Is the recoupment brought before an ALJ?

4  How does that work?

5          MR. MERRITT:  It's a hearing official within the

6  Department of Education.  So it's an administrative hearing

7  but, you know, the final result of that can be appealed to

8  federal district court.

9          THE COURT:  What is the reputational effect of being

10  on Exhibit C?

11          MR. MERRITT:  Your Honor, we don't think it's an

12  interest that would justify standing or intervention in this

13  case.

14      As we've said, mere inclusion on the Exhibit C list is not

15  an official finding of the wrongdoing by the Department.  And

16  before any such official finding could be made, the schools

17  would have the opportunity to defend themselves against -- the

18  allegations, present whatever evidence they seem to be wanting

19  to present in these proceedings, and there are specific

20  proceedings for that.

21      Schools just --

22          THE COURT:  Let me give you an example.  There are 153

23  schools on the list; right?

24      Isn't that right?

25          MR. MERRITT:  Yes.

1          **THE COURT:**  153?

2          **MR. MERRITT:**  I believe so, Your Honor.

3          **THE COURT:**  All right.  So let's say, after the

4   settlement, a few months after the settlement, somebody wants

5   to borrow money to go to one of these 153 schools.  Will the

6   Department in any way say, "Oh, wait a minute, we can't grant

7   that.  They're on the list of Exhibit C"?

8          **MR. MERRITT:**  No, Your Honor.  That gets to one of the

9   questions you asked.

10      It's a similar effect as with respect to future recoupment

11   proceedings, future enforcement proceedings of any kind.  Mere

12   inclusion on the Exhibit C list has no independent legal effect

13   with respect to the relationship between the Department and the

14   schools.

15      So on that question, the listing of a school on Exhibit C

16   will not have an effect on the loan eligibility of future

17   students at those schools.  You know, if the Department -- the

18   Department would have to take formal action, in accordance with

19   its regulations, to either restrict or terminate a school's

20   participation in the federal student loan programs.  No such

21   action has been taken here, so so long as an Exhibit C school

22   has a program participation agreement to participate in the

23   federal financial aid programs and a student, you know,

24   otherwise meets the eligibility requirements for federal

25   student loans, the student can continue to receive loans to

1    attend the school.

2         **THE COURT:**  I'm talking about brand-new students.

3         **MR. MERRITT:**  And same for new students.  I mean,

4    again, things can change in the future, if -- if an action was

5    taken and the schools were prevented from participating in the

6    programs, that might -- that would be a different story that we

7    don't need to speculate or hypothesize about here.  But mere

8    inclusion on the list does not have that concrete effect on the

9    schools.

10        And the harms they have kind of hypothesized about are

11   conclusory and speculative, and not the kind of thing they have

12   an interest in that would be addressed by participating at this

13   particular stage of the proceedings, of lodging objections to a

14   settlement agreement when kind of the considerations the Court

15   is going to undertake in deciding whether to approve that,

16   you know, all the arguments the schools are raising don't go to

17   those considerations.

18        **THE COURT:**  Okay.  Hold that thought and have a seat.

19   Somebody else wanted to speak.

20        Go ahead.  What's your name and who do you represent?

21        **MR. PANUCCIO:**  Thank you, Your Honor.  I'm Jesse

22   Panuccio on behalf of Everglades College, Inc., one of the

23   proposed intervenors.

24        I just wanted to take a couple of minutes to address some

25   of these issues, if I could, on behalf of my client.

1     One, just to be clear, Rule 24 has specific requirements.

2     They've been interpreted by the Ninth Circuit in favor of

3     intervention.  We think we've set out in our papers very

4     clearly how we meet those.

5     I do want to address two issues Your Honor had brought up

6     which is:  Does the Department's answers or the declaration

7     they filed somehow eliminate our interest in this case?

8     And the answer is absolutely not, and that's for several

9     reasons.  First of all, the declaration and the Department's

10    position does nothing to effect what I call path three relief

11    in this case, what they call the post-applicant class.

12    And what they're doing there is they're saying:  The class

13    you already certified doesn't matter.  They're adding

14    potentially every student loan holder in the country to the

15    settlement agreement.  They are taking away the procedures from

16    the 2019 rule, which is in law and duly promulgated.  And they

17    will adjudicate those claims --

18        **THE COURT:**  What are they taking away?

19        **MR. PANUCCIO:**  They say that every person who files a

20    borrower defense application between the date of the

21    settlement, June 22, and the date of final approval, if you

22    were to grant it, can apply and they will be adjudicated

23    pursuant to the 2016 rule's procedures, not the 2019 rule,

24    which has many more protections for accused institutions.

25    So they are taking away our entire set of rights that we

1    have to defend ourselves under the 2019 rule.

2          **THE COURT:**  But it's not -- whatever you've -- here is

3    the thing that bothers me about your position:  You're the

4    luckiest guy in the room.  You've already gotten the money and

5    you don't have to pay it back.  You get the money and can go to

6    Hawaii on a vacation, the school can give its people big time

7    raises, and pay big-time lawyers to come in.  And you've

8    already gotten the money and there's no way they can take that

9    money back from you except through a recoupment action.  And

10   that -- all that due process is totally preserved.

11        So, yes, they take -- they are jumping over the hurdle of

12   giving you the notice to come in and give your peace before

13   they adjudicate a borrower defense, but that's not a proceeding

14   against you.  It's a proceeding where the Government forgives

15   the loan, but it just gives you the opportunity to put in your

16   two cents before they go down that road.  But if they delete

17   that, you still get your day in court before you ever have to

18   give the money back.

19         **MR. PANUCCIO:**  Well, Your Honor, it's a bit like

20   saying if you have a criminal defendant or a civil defendant,

21   and there's a whole set of procedures that protect them all

22   through the trial process.  If we eliminate half of them,

23   you're not injured because you still have the sentencing

24   hearing at the end that still has due process --

25         **THE COURT:**  Well, no.  You still get every single one

1  of those rights.  That's not a good analogy at all.

2      You get your full day in court in the recoupment.  And if

3  they don't bring a recoupment, you get all that money.  You

4  can -- you can pay your faculty members extremely large

5  salaries and -- funded by $6 billion worth of taxpayer money.

6      I'm not sure where you're -- I don't see much harm to you.

7      **MR. PANUCCIO:**  There is already a finding against us.

8  And even putting aside the financial recoupment --

9      **THE COURT:**  They told me it's not a finding against

10  you.  They're just settling.  And if your name is on Exhibit C

11  it doesn't mean anything against you; you still can participate

12  in the program.

13      **MR. PANUCCIO:**  Your Honor, Documentary 246 at 3, the

14  motion seeking settlement empty approval says the Department

15  has determined that attendance at one of these schools

16  justifies relief based on the strong indicia of substantial

17  misconduct by 153 schools -- without a single adjudication, to

18  the tune of $6 billion.

19      Even if we put aside financial harm and just talk about

20  reputation, if this Court were to sign off on that and say that

21  these schools -- 153 of them -- their federal regulator, which

22  the public is supposed to be able to trust as a neutral arbiter

23  of facts and what's going on at these schools -- to say without

24  trial, without process, that we believe they engaged in

25  substantial misconduct, at the very least creates substantial

1   reputational harm.

2        And you don't have to take it from us.  You can take it

3   from the plaintiffs' counsel's own statements.  As soon as the

4   settlement was inked, plaintiffs' counsel went to the press and

5   said:  Now all of these borrowers will be granted relief

6   because they were, quote, cheated by their schools.

7        So that is now what is -- it will be used and said about

8   these schools based on the Department of Education, which has

9   lawful regulations about how it's supposed to be an adjudicator

10  and the process it's supposed to follow, coming to this blanket

11  determination.

12       And I just want to add, Your Honor, the specific question

13  you asked this morning.  You said:  By what authority would the

14  Department do this?

15       One year ago, about a year and a half ago, the

16  Department's general counsel put out a memo -- we cited in our

17  intervention papers -- that said the Department has no --

18  absolutely no authority to grant blanket debt cancellation and

19  loan forgiveness; it would violate the Major Questions

20  Doctrine --

21       **THE COURT:**  Was that the prior administration or this

22  administration?

23       **MR. PANUCCIO:**  Prior administration.  And it has not

24  been revoked or changed in any way.  It is a memo that still

25  exists.  They've given no other analysis.  And the analysis has

1   now been buttressed by the U.S. Supreme Court's decision in

2   *West Virginia versus EPA*, which says, if you're going to take

3   an economy-altering major financial decision, you need to have

4   clear statutory authority.

5   Far from it.  They are saying, We are replacing the

6   borrower defense regulations with a completely new regime that

7   we negotiated for a year, apparently, in secret, with your

8   accusers and that is what you will now be governed by.  It is

9   hard to think of a precedent in history of a federal court

10   allowing a department to replace a regulatory regime of this

11   significance in this way.

12          **THE COURT:**  All right.  Okay.  Thank you.

13          **MR. PANUCCIO:**  Thank you, Your Honor.

14          **THE COURT:**  Any other intervenor want to be heard?  Or

15   proposed intervenor?

16   How come so many people have got red on today?  Is that a

17   signal for something?

18          **UNIDENTIFED SPEAKER:**  We're supporting our class.

19          **MR. GONSALVES:**  And I've got a red pen.

20          **THE COURT:**  And you've got a red pen.  Okay.

21   Did I miss something?  Is that just coincidence?

22          **MS. SWEET:**  It's so we can find each other.

23          **THE COURT:**  It's what?

24          **MS. SWEET:**  It's so we could find each other.

25          **THE COURT:**  I think that's pretty interesting.

PROCEEDINGS

1        Okay.  Your turn.

2        **MR. GONSALVES:**  Good afternoon, Your Honor.  Terance

3   Gonsalves on behalf of the Chicago School of Professional

4   Psychology.

5        I want to touch on whether or not our rights are

6   preserved.  You know, one of the things that we raised in our

7   papers is the declaration is a nice start, but is it binding?

8   Will the next administration have a different look and a

9   different feel such that we can rely on the statements in that.

10        Those representations made by the Department were only

11   made because we filed our motions to intervene and raised our

12   hands and said we have very serious concerns about the

13   representations made in the joint motion and in the settlement

14   itself.  The procedural rights that we were talking about in

15   the recoupment process and the prerequisite to recoupment

16   process, you are exactly right --

17        **THE COURT:**  Wait a minute.  I have not made any

18   findings.  Don't say I'm exactly right.  I've asked questions,

19   but I'm not trying to -- I want to understand this, but I'm not

20   making any findings.  So don't say I'm exactly right.

21        **MR. GONSALVES:**  Apologies.

22        You asked a question as to what the recoupment process

23   looks like.  I think the response was it was a hearing before a

24   hearing officer at the Department of Education.

25        It is a mini trial.  What we lose out on is not having to

1    go through that mini trial if we can establish with simple

2    paperwork a simple written report that the application has no

3    merit and should be denied and, therefore, we shouldn't have to

4    go through a full trial, which is what is required in the

5    recoupment process where we have these procedural rights that

6    the Department has said that we had.

7         I also want to mention very quickly, the memorandum that

8    counsel referenced that concluded -- the Office of General

9    Counsel from the Department of Education concluded that the

10   Department does not have the authority to cancel debt on a mass

11   basis.

12        I have a copy of that memorandum here, Your Honor.

13            THE COURT:  Let me see that memo.

14        MR. GONSALVES:  And I have copy for counsel as well

15   that I can share.  But I think it's important that you have it.

16        It is hard to find, but it is there for Your Honor to

17   review.

18            THE COURT:  Where is the part that says no en masse?

19        MR. GONSALVES:  If you go to the very last page,

20   Judge, where the conclusion is.  It has -- where it says that

21   the secretary may not discharge loans en masse.

22        I understand -- I understand that there was a subsequent

23   memorandum -- that one is from January of '21 -- that was in

24   April of '21.  I don't know whether it was ever finalized.  The

25   only version that I can find of the -- that April '21 version,

**PROCEEDINGS**

1    is fully redacted but --

2           THE COURT:  But this one is -- what date?  This is

3    January '21?

4           MR. GONSALVES:  That is January of '21, Your Honor,

5    from the Office of General Counsel.  And their conclusion is

6    the secretary does not have the authority to discharge loans en

7    mass.

8           THE COURT:  Thank you.

9           MR. GONSALVES:  Thank you.

10          THE COURT:  Yes.

11          MR. TOWNSEND:  Your Honor, Lucas Townsend for Lincoln

12    Educational Services Corporation.

13          I just want to emphasize that the reputational injuries as

14    a result of being on Schedule C are very important to my

15    client.  We're here because of a settlement in Lincoln.

16    Seven years ago, Lincoln settled a -- an investigation in

17    Massachusetts with -- again, with no findings, no findings of

18    wrongdoing, no admission of wrongdoing, and yet it has these

19    consequences that bring us here today.  That's what happens

20    from a settlement with no findings.

21          And we're hearing from the Government that this isn't a

22    finding of wrongdoing.  But this -- Lincoln's experience shows

23    how there are consequences from these sorts of settlements, and

24    from being listed as a presumptive wrongdoer by one's primary

25    regulator.

1      Lincoln has been providing educational services since

2  1946.  These are very important issues for any school, but

3  certainly for Lincoln.  And to be blacklisted, in effect,

4  included on a Schedule C, that affects relationships with

5  students; prospective students; past students; current

6  students; with faculty; donors; investors; regulators; and

7  creditors immediately.  Those are immediate effects.  So these

8  are very important concerns that we have with Schedule C.

9      The one final point I would mention is that with respect

10  to the hearing officer who adjudicates the recoupment

11  proceedings, that is an employee of the Department of

12  Education.  Their employer is here today telling the Court that

13  there is a presumption of wrongdoing.  How can any school

14  expect a fair shake in an adjudication by an employee of the

15  Department that has deemed these schools wrongdoers?

16      That's -- the process going forward has significant due

17  process and fairness concerns.  And so we're very concerned

18  about this proposed settlement and the school.

19          **THE COURT:**  All right.  Have I now heard from all the

20  intervenors?  I think so.  Or proposed intervenors.

21      I've told you on the plaintiffs' side I would give you a

22  chance to reply and I'll give you that chance now.

23          **MS. ELLIS:**  Thank you, Your Honor.

24          **THE COURT:**  What do you say to the reputation and what

25  they just read out that -- I don't have the language in front

1   of me, but the language about why these people got on

2   Exhibit C?

3           MS. ELLIS:  Well, Your Honor, I would start by saying

4   that none of the reputational harms that counsel were referring

5   to here are actually reflected in any of their filings.

6       All that they've said is that they in some cases have

7   received some questions about Exhibit C, but they've not

8   actually offered any supported allegations of harm to their

9   reputation, harm from --

10          THE COURT:  I thought that was in their briefs,

11  reputational harm.

12          MS. ELLIS:  Well, they assert that there will be

13  reputational harm, but they provide no examples of this

14  reputational harm actually coming to pass.

15          THE COURT:  Okay.  But -- that, I do see that as a

16  possible legitimate concern --

17          MS. ELLIS:  Yes, Your Honor.  But I --

18          THE COURT:  -- to be on Exhibit C, that is -- I don't

19  know.  I'm raising that question.  I'm not adjudicating it now,

20  but -- and they hadn't had that much time to go out and work up

21  a case either.  This just came out.

22          MS. ELLIS:  Yes, Your Honor, I do understand that.

23      But we would submit that even should some kind of

24  reputational harm come to pass, that that's not a significant

25  protectable interest for the purposes of intervention as of

1  right.   Just the mere fact that someone else's litigation might

2  reflect poorly on you is not a basis to intervene.

3      And I think the Seventh Circuit said it in the *Gryzinski*

4  (phonetic) case that we cite in our brief, they wrote (as

5  read):

6          "To hold that the prospect of an adverse finding

7      or comment could support intervention as a party with

8      rights to appeal, for example, even if the original

9      parties are satisfied with the outcome, would amount

10     to a stunning expansion of standing, and would invite

11     prolonged and even endless litigation."

12     And I think that's exactly the case here.

13         **THE COURT:**   What kind of case was that in the

14  Seventh Circuit?

15         **MS. ELLIS:**   That was a malpractice case.   Sorry.   I'm

16  just looking at my notes here.

17     Yes, it was -- there was a malpractice case that was

18  dismissed based on the Doctrine of Unclean Hands, and one of

19  the people who was alleged to have unclean hands tried to

20  intervene to protect his reputation.

21         **THE COURT:**   Okay.

22         **MS. ELLIS:**   Your Honor, if I may also address this

23  issue of the procedural rights that the intervenors say they're

24  entitled to under the Borrower Defense Regulations.

25     I would say first about that, that both Lincoln and

1  Chicago School of Professional Psychology did, in fact, receive

2  notice of borrower defense applications implicating them from

3  the Department of Education.  And Lincoln submitted a response

4  to that notice.  And so I'm not exactly sure what violation of

5  procedural rights they think has occurred.

6       And even as to ECI and American National University, the

7  2016 borrower defense regulations which set the applicable

8  procedures for the vast majority of the class, they do say that

9  a school will receive notice of applications involving them,

10 they do not give the school a right to respond.  If the school

11 does respond, the Department will take it into account.  But

12 there's not a right to respond.  And furthermore, there is

13 certainly not a right to have the Department believe whatever

14 they say when they do respond.

15      And just in general, the docket in this case would have

16 given all of the proposed intervenors notice of the fact that

17 borrower defense applications had been filed by their former

18 students.  If what the intervenors were really after is

19 protecting their right to notice and an opportunity to respond,

20 then they could have intervened in this case at the time they

21 became aware that there were borrower defense applications

22 against them; but they didn't do that.

23      They're not actually seeking to protect a notice right.

24 What they're seeking to do is to block their former students

25 from seeking relief; and that's not something they've ever had

1   a right to do.  The borrower defense applications bifurcate the

2   process.  I'm sorry.  The borrower defense regulations

3   bifurcate the process of determining whether an application

4   should be granted from determining whether the Department is

5   able to recoup any discharged amounts from the school.

6        And borrowers are explicitly barred by the regulations

7   from participating in the recoupment process.  Likewise, part

8   of the point of having these proceedings bifurcated was the

9   Department's recognition, and they said this I believe in the

10  preamble to the 2016 rule, their recognition that they did not

11  want the schools bringing their superior economic and political

12  power to bear against an applicant who's seeking relief; and

13  that's exactly what the intervenors here are seeking to do.

14       Finally, Your Honor, to address Mr. Panuccio's point about

15  discharge en masse, this is not a discharge en masse.  It's

16  certainly a discharge of quite a significant number and amount

17  of loans, but it's not broad-based debt cancellation.

18       The idea that the post-class applicant group is some kind

19  of cover for broad-based debt cancellation is, frankly, absurd.

20  There are over 47 million federal student loan borrowers in the

21  United States right now.  In the entire history of the Borrower

22  Defense Program, they've received something on the order of

23  500,000 applications; obviously, a tiny, tiny fraction.

24       And the idea that, first, tens of thousands of borrowers

25  would apply for borrower defense in the next, say, four months

1  before the final approval hearing in this case, that many of

2  them would lie under oath about having been deceived by their

3  schools, and that the Department would then sit on those

4  applications for three years, taking no action, which is

5  exactly the conduct that got them into this case to begin with,

6  it's just not realistic.  It's a scare tactic.

7       Your Honor, finally, I'd like to address Question Number 6

8  that you raised in your questions this morning about the

9  authority of the Department to -- of both the Department of

10 Education and Justice to reach this settlement.

11      I have a few citations.  I wouldn't necessarily represent

12 that this is an exhaustive list, but I would point to, first,

13 28 U.S.C. 516 and 519, Governing the Conduct and Supervision of

14 Litigation by the Attorney General, and regarding the Attorney

15 General's decision to settle a case.

16      Justice Manual 4-3.200, Bases for Compromising or Closing

17 Claims of the United States.  Those include Subsection E, The

18 Cost of Collecting Will Exceed Recovery; Subsection F,

19 Compromising the Claims is Necessary to Prevent Injustice; and

20 Subsection I, Assessment of the Litigation Risk.

21      As to the settlement and compromise of federal student

22 loans, I would point the Court to 20 U.S.C. Section 1082(a)(6)

23 which states that (as read):

24           "In the performance of and with respect to the

25      functions, powers, and duties vested in him by this

1          part, the Secretary may enforce, pay, compromise,

2          waive, or release any right, title, claim, lien, or

3          demand, however acquired, including any equity or any

4          right of redemption."

5     The Federal Claims Collection Act 31 U.S.C. Section 3711

6 states that (as read):

7          "The head of an agency can compromise according

8          to standards set out in the Attorney General's

9          regulations, and this does not displace the

10         compromise authority in an agency's organic statute."

11    Under the Department of Education's regulations

12 34 C.F.R. 30.70, regarding how the Secretary exercises

13 discretion to compromise a debt or suspend or terminate

14 collection of a debt, Subsection A1 states that the Secretary

15 uses the standards of 31 C.F.R. Part 902 to determine if

16 compromise is appropriate, and Subsection E1 states that this

17 applies to both FFEL and direct loans.

18    Then following that cross-reference to 31 C.F.R. Part 902,

19 it states under Subsection A that (as read):

20         "Agencies can compromise a debt if the

21         Government cannot collect the full amount because" --

22         including a number of provisions, among them, "the

23         debtor cannot pay the full amount in a reasonable

24         time; the cost of collecting doesn't justify attempts

25         to collect; or if there is significant doubt

 1          concerning the Government's ability to prove its case

 2          in court."

 3          Unless Your Honor has further questions, I can turn it

 4      over to my colleague from DOJ.

 5                  **THE COURT:**  Does DOJ have anything more to say?

 6                  **MR. MERRITT:**  I'll be brief, Your Honor.

 7                  **THE COURT:**  Say it again?

 8                  **MR. MERRITT:**  Yes, briefly.

 9                  **THE COURT:**  Please, go ahead.

10                  **MR. MERRITT:**  Charlie Merritt from DOJ.

11          Just quickly on that same point, especially since a lot

12      has been made of this memorandum that the intervenors raised.

13          First and foremost, the Department has the authority to

14      settle and compromise claims under 20 U.S.C. 1082(a)(6).

15                  **THE COURT:**  You're talking about the Department of

16      Justice?

17                  **MR. MERRITT:**  I'm talking about the Department of

18      Education.

19          And that authority has been used in numerous times in the

20      Department's experiences especially for cases in litigation.

21      So I just want to take the opportunity to distinguish the

22      situation addressed in that memo which is, I believe, a

23      nonpublic document, you know, internal recommendations of the

24      OGC from January 2021, referring to kind of mass or blanket

25      cancellation.

1    Here we have -- it wasn't specific to borrower defense --

2    right? -- that's a whole separate issue.  And then cases

3    actually involved in acts of litigation of court.  So the

4    authority is going to be considered a little bit differently

5    and also comes into line with the Department of Justice's

6    authority to settle litigation interests of the United States.

7    I'll just add on the point of the, you know, reputational

8    harm.  You know, schools are really asserting an interest here

9    in not kind of being accused of wrongdoing through the borrower

10   defense adjudication process, including -- which they do not

11   have, including when the Department, you know, grants a

12   borrower defense through the normal process.

13   If that were the case, they would be able to -- the

14   schools would then be able to appeal any decision the

15   Department made approving a borrower defense claim, and

16   granting relief to a borrower, in that proceeding between the

17   Department and the borrower.  The school would then be able to

18   appeal that to federal district court, which just can't be

19   right given the regulatory structure of the schools then later

20   getting their day in court.  So any reputational allegations of

21   harm have to be considered in the context in which this exists,

22   and the limited damage to the names of the schools.

23   Thank you, Your Honor.

24       **THE COURT:**  Let's talk about the -- well, first let me

25   make one ruling.

1    This settlement is good enough for the class.  I'm now

2  only talking about the class, and not the intervenors.  The

3  class originally, in this lawsuit originally, was to get an

4  injunction to require the agency to adjudicate many thousands

5  of -- many thousands of applications that had gone

6  unadjudicated.

7    And I specifically asked the lawyers if it was anything

8  more than that, and I was assured that it was only to get an

9  order to adjudicate the cases, because the agency wasn't doing

10  that.

11    Now, this settlement goes way beyond that, this settlement

12  not only skips over the adjudication and just cancels the

13  loan -- so from the point of view of the class members, this is

14  a grand slam home run.  And how could anybody, if you're a

15  class member, oppose this -- because you're getting a bonanza.

16    Now, there may be a legal question.  I'm not adjudicating

17  this right now, but there may be a legal question whether the

18  agency has the authority to do this.  But at this stage all

19  we're talking about is whether or not this is a good enough

20  deal to go forward with preliminary approval, and have a class

21  final approval hearing.

22    So from the point of view of the class, this is certainly

23  a good enough deal to give preliminary approval.

24    So I am giving preliminary approval, and I want you to --

25  I've forgotten the answer to this.

**PROCEEDINGS**

 1       Let's talk briefly to the plaintiff lawyer and

 2  the Government about the notice issue.  We need to notify every

 3  single class member and give them an opportunity to be heard.

 4       So what's our plan there?

 5          **MS. ELLIS:**  Yes, Your Honor.

 6       We have prepared a draft class notice which is attached to

 7  the settlement agreement.  The Department of Education will

 8  send that to every class member initially via e-mail for

 9  everyone for whom they have an e-mail on file.  If they don't

10  have an e-mail on file, or if they received a bounceback that

11  the e-mail is no longer active, they will send it by postal

12  mail to the class member's last address on record.

13          **THE COURT:**  When will that be done?  And the reason I

14  ask is, I've heard exactly what you've told me, and then later

15  there is a hearing where you say, "Well, Judge, we really

16  didn't get everybody notice because so many bounced back, we

17  then had to do the postal thing; and the Government is so slow

18  it didn't get around to doing it in time and, therefore, there

19  are several hundred or thousand class members who didn't get

20  notice."

21       So when -- I have to ask, I have learned the hard way --

22  when will you get this done or the -- or the Department?

23          **MS. ELLIS:**  I certainly understand your question,

24  Your Honor.  Perhaps DOJ counsel would be in a better position.

25  I believe --

1    THE COURT:  Give me a drop-dead date by which you

2  promise me every class member will get the notice one way or

3  another.

4    MR. MERRITT:  Your Honor, I believe the order we

5  proposed to you says that the defendants will e-mail out the

6  first round of notices within 15 days.

7    THE COURT:  How many?

8    MR. MERRITT:  15.

9    THE COURT:  Why not -- why do you make it 15?  That

10  will fall on a Saturday.  It should be a multiple of seven.  So

11  14 days is what with it should be.

12    MR. MERRITT:  I do think it would be Friday, if you

13  ordered this today.

14    THE COURT:  If I did this today, it would be a Friday.

15  Yeah.

16    MR. MERRITT:  Don't want to -- yeah, I understand.

17  14.

18    THE COURT:  So then what?  Because you're going to get

19  a lot of bouncebacks or for all -- I don't even know you'll get

20  a bounceback.

21    MR. MERRITT:  I believe there's a procedure by which

22  the Department will handle the bounceback issue.  And I think

23  we crafted this to be similar to what we did a couple of years

24  ago when we were able to, you know, at least effectively notice

25  the class.

**PROCEEDINGS**

1    I can't remember if this is specified in the agreement

2  itself.

3         **THE COURT:**  Is there a way to -- is there a website

4  someplace where we can put this on a website?

5         **MR. MERRITT:**  That is one of the notice procedures,

6  Your Honor, that it would be on both the plaintiffs' website

7  and the Department's website.  I believe, the way the procedure

8  is described in the settlement agreement is on page 23 of that

9  document.  It's paragraph 10B.

10    It says (as read):

11        "Defendant shall e-mail all class members who

12        provided their e-mail addresses to the Department.

13        And where defendants do not have such an e-mail

14        address available or become aware that it is

15        undeliverable" -- the bounceback situation, that

16        "defendants will mail a copy to the last known

17        address."

18    Which I believe is a change we made the last time around

19  responding to similar concerns that Your Honor raised.

20    I don't have specific dates by which that would be

21  accomplished.  Here -- and it's a little bit hard to predict,

22  you know, when the bouncebacks will happen and how that will

23  work, but. . .

24         **THE COURT:**  What's the deadline for comments by class

25  members?

1      **MR. MERRITT:**  I believe we proposed this to work

2  backwards from a final fairness hearing, Your Honor.

3      Just one second.

4                  (Pause in proceedings.)

5      **MR. MERRITT:**  Okay.  So I think what we proposed in

6  the proposed order is that the objections be submitted no later

7  than 60 days from the preliminary approval order, whenever that

8  goes out.

9      **THE COURT:**  Well, it will be verbal today.

10     **MR. MERRITT:**  It would be today?  Yes, Your Honor.

11     **THE COURT:**  It will be a minute order.  Is that okay?

12     **MR. MERRITT:**  Well, I think --

13     **THE COURT:**  Do I have to do it now?  It will be -- I

14  got my -- I'm in a big criminal trial right now, so I may not

15  have time to do a written order.

16     **MR. MERRITT:**  I understand that, Your Honor.  I

17  think --

18     **THE COURT:**  Can't I do a verbal right now?

19     **MS. ELLIS:**  Yes.  That would be fine with us, Your

20  Honor.  We would start the clock today if you rule from the

21  bench.

22     **MR. MERRITT:**  Yeah.  And if you want to look at the

23  proposed order, I guess, at ECF 246-2.  Our proposal at least

24  and, of course, you know --

25     **THE COURT:**  I don't have that.  My law clerk didn't

1  give it to me.  He gave me the proposed notice, but he didn't

2  give me the proposed timetable.

3      Angie, tell me what three weeks from today is going to be.

4          **THE CLERK:**  Your Honor, three weeks from today is

5  August 25th.

6          **THE COURT:**  What is the day that we would have the

7  final approval hearing?

8          **MR. MERRITT:**  I think we left this a little bit to

9  your discretion, Your Honor.  We had proposed that we would

10  move for a final approval within 85 days of today, you know, of

11  the preliminary approval order.

12          **THE COURT:**  Wait a minute --

13          **MR. MERRITT:**  We tried to give a little bit of

14  flexibility.

15          **THE COURT:**  Well, I've got to get it done before my

16  law clerk leaves.

17      When are you leaving?

18              (Court and law clerk conferring.)

19          **THE COURT:**  It's got to be done -- my law clerk is

20  leaving November 18th.  It will never get done unless -- and so

21  it's got to be well before that.  So let's give two weeks.

22  It's got to be two weeks before the 18th.

23      So November -- the hearing is going to be November 3rd at

24  11:00 a.m.

25      Now, work backwards from that.  Can you do that?

1          **MR. MERRITT:**  Watching me do math --

2          **THE COURT:**  I used to work in DOJ.  I know you can do

3    this, you know.

4          **MR. MERRITT:**  I think.

5          **THE COURT:**  There are typewriters there -- you know,

6    you can get it done.

7          **MR. MERRITT:**  So the last date before that is going to

8    be the motion for final approval.  And so, I guess I would ask

9    the Court a little bit how much time you think you need between

10   the filing of the motion and the date of the hearing.

11         **THE COURT:**  You should do it on --

12         **MR. MERRITT:**  Two to three weeks.

13         **THE COURT:**  I would do it on a 42-day track.  42 days

14   before the hearing.  So that means you need to have --

15   all right.

16      Let's just go -- the notice should go out pronto.  The

17   last day to object should be 49 days before the hearing, or to

18   make a comment, pro or con.  The last day for class members to

19   comment should be 49 days before that hearing.  All right.  So

20   let's do that math and figure that out.

21      When is that going to be?

22      I think that's September 15th or so, so you got to get

23   cracking.

24         **MR. MERRITT:**  September 15th being the date by which

25   the last objections to the settlement --

```
1          THE COURT:  Objection or any kind of comment, pro or

2     con.

3          MR. MERRITT:  And then the motion a week after that,

4     it looks like.

5          THE COURT:  Would be the 22nd, I believe.

6       And any motion by any intervenor, if I let them in, would

7     have to be filed by that date.

8       So -- no, it would be this:  You have to file first.

9     All right.  Here, I'm tentatively going to let these people

10    intervene on -- as of -- not as of right -- but as of

11    permissive; tentatively, I haven't made my mind up on that.

12      And I'm also going to set a date 21 days from today for

13    any other motions to intervene, and try to put out a notice

14    saying 21 days.  Because we're not going to have dribs and

15    drabs of more intervenors; that would be unthinkable.  So if

16    there's anybody else going to intervene, they've got to do it

17    21 days from today.  22 days?  Out of luck.

18      And I'm not saying that I'm going to grant all those,

19    because maybe their interest would be adequately represented by

20    these four.  And then so you would file your motion.  They

21    would file their opposition 14 days later.  And then you file

22    your response and we'll have a hearing on November 3rd.

23         MR. MERRITT:  Okay.

24         THE COURT:  Seems like there's something else I needed

25    to -- here's what I want you to do:  I want you to prepare -- I
```

1    don't like your form of order because you're putting words in

2    my mouth like "The Court finds that relief of more than is

3    reasonable" -- especially in light of, "parties have" -- here's

4    what I'm going to find verbally on the record:  The proposed

5    settlement on a preliminary basis is fair, reasonable, and

6    adequate, in my view for the class members.  It may or may not

7    be fair or so forth to the proposed intervenors.  I don't know.

8    I'm not saying one way or the other on that.

9         But I believe that this is a grand slam home run for class

10   members because not -- they don't even have to go through the

11   litigation; they get a complete cancellation.

12        But I'm not going to make all these other findings.  So

13   the notice is fine.

14        And I want you to submit a different order to me by

15   tomorrow that lays out the schedule that I think we have set

16   forth for the class members, and for the intervenors to oppose

17   it.

18        Now, I'm doing this on the fly.  I'm in the middle of a

19   huge trial.  What am I leaving out?  In other words, if the

20   intervenors are in the picture, is there something that -- is

21   there some other deadline date that you feel, to protect your

22   interests, that you want vis-a-vis the intervenors?

23             MS. ELLIS:  Just to be clear, Your Honor, would this

24   be intervention for the limited purpose of opposing final

25   approval of the settlement?

**PROCEEDINGS**

1          **THE COURT:**  I want to make sure.

2      Does any intervenor think they're going to get discovery?

3  If so, raise your hand.

4          **MR. MORAN:**  Your Honor, we would take it but --

5      (Reporter interrupts for clarification of the record.)

6          **THE COURT:**  No, I'm not going to grant that.

7          **MR. MORAN:**  No, I know.

8          **THE COURT:**  I'm not granting discovery, no

9  interrogatories.  Otherwise, forget it; go to the

10  Ninth Circuit.

11      You can oppose it.  You can oppose it on the -- you can

12  oppose the settlement; that's okay.  But not -- we're not going

13  to come in and bollix up everything with demands for discovery.

14      I want to hear the rest of you say that:  Is any one of

15  you lawyers going to ask for discovery?

16          **MR. MORAN:**  Your Honor, can I ask for clarification?

17      (Reporter interrupts for clarification of the record.)

18          **MR. MORAN:**  Sorry.  John Moran for American National

19  University.

20      What I heard you say is that you're tentatively inclined,

21  but you're not yet issuing a ruling --

22          **THE COURT:**  That's right, I want to hear you say:  We

23  don't need discovery to do our opposition.

24      You're not even going to ask for it.

25          **MR. MORAN:**  I agree.  We will oppose -- we will

**PROCEEDINGS**

1   respond to the motion that is filed by the parties without

2   seeking discovery.

3        But, Your Honor, I just --

4        **THE COURT:**  What about these others?  They're not --

5   they're kind of looking down at their shoes.

6        **MR. MORAN:**  Your Honor, they're not --

7        **THE COURT:**  They're looking at their shoelaces.

8        **MR. MORAN:**  The piece that I'd like to clarify,

9   Your Honor, is:  When the Court does issue a ruling, it would

10  be helpful to have clarity on the Court's -- whether the Court

11  is denying intervention as of right, which it sounds like

12  the Court is --

13       **THE COURT:**  That's probably -- because I don't see --

14       **MR. MORAN:**  -- in particular, as Your Honor indicated,

15  to ensure that we are aware of what our appellate rights would

16  be either now or in the future.

17       **THE COURT:**  Well, I think you would have appellate

18  rights to go up and oppose the settlement since you would be

19  objecting to it.  I would say, yes, you could have appellate

20  rights; but in terms of discovery rights, no.

21       **MR. MORAN:**  Understood, Your Honor.

22       **THE COURT:**  And I want to find out:  Any of you other

23  intervenors going to disagree with what I just heard?

24       **MR. GONSALVES:**  Terance Gonsalves on behalf of the

25  Chicago School of Professional Psychology.

**PROCEEDINGS**

1    No, Judge, we will abide by your ruling and not request

2  discovery.

3        **MR. PANUCCIO:**  Jesse Panuccio for Everglades.

4  We will abide by the ruling, Your Honor.

5        **THE COURT:**  All right.  Anyone else?

6        **MR. TOWNSEND:**  Lucas Townsend for Lincoln.

7  And we will abide by the ruling.

8        **THE COURT:**  All right.  Now, when you say you'll abide

9  by the ruling, yes, of course, you have to abide by the ruling.

10 But are you going to go up on appeal and say "He wouldn't let

11 us have discovery"?

12       **MR. TOWNSEND:**  We can oppose without discovery.  We

13 certainly would like to have information about the

14 determination that the Department has made.  We haven't seen

15 it.  We don't know who made it.  These are questions that are

16 unanswered, in our mind; but we can oppose the settlement

17 without -- without discovery.

18       **THE COURT:**  Any of you other intervenors disagree with

19 that?

20                    (No response.)

21       **THE COURT:**  I don't hear anything.  Okay.

22 Where was I?  I'm sorry.  The schedule.  You're going to

23 give me a schedule.  All right.

24 I'm making that finding that is preliminarily approved.  I

25 want you to give me the schedule.  I'm going to decide on the

**PROCEEDINGS**

 1   intervention, and 21 days for any other intervenors to move to

 2   intervene.

 3       I want to be clear that I'm not saying that any of you

 4   intervenors have a property interest that's at stake.  The main

 5   reason I'm inclined to let you in to oppose is to keep the

 6   system honest.  Because these two have reached an agreement and

 7   they both want to get it approved, so there's no one on the

 8   other side to help me see the opposing arguments; and that's

 9   sometimes pretty useful to the judge, to see the opposing

10   arguments.

11       So don't go and tell the Court of Appeals that Judge Alsup

12   found that you had a property interest that was -- I'm not.

13   I'm not.  I'm not even saying you have a reputational interest.

14   But I'm saying it would be of use to the Court to hear what you

15   have to say about this.

16       Okay.  That's the most damage I can do for one day.

17       Thanks to all you people dressed in red for coming.  And

18   I've got to go now to my next case.  So have a good day,

19   everybody.  Thank you.

20           **THE CLERK:**  Court is in recess.

21            (Proceedings adjourned at 2:16 p.m.)

22                 ---oOo---

23

24

25

## **CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Saturday, August 5, 2022




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court