**GIBSON, DUNN & CRUTCHER LLP**
LUCAS TOWNSEND (*pro hac vice*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
ltownsend@gibsondunn.com
Telephone: 202.887.3731
Facsimile: 202.530.4254

**GIBSON, DUNN & CRUTCHER LLP**
JAMES L. ZELENAY, JR., SBN 237339
333 South Grand Avenue
Los Angeles, CA 90071
jzelenay@gibsondunn.com
Telephone: 213.229.7449
Facsimile: 213.229.6449

*Attorneys for Intervenor*
*Lincoln Educational Services Corporation*

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, | Case No. 19-cv-03674-WHA |
| *Plaintiffs*, | Judge:  Hon. William H. Alsup |
| v. | Courtroom:  12 |
| MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and | **INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT** |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | **Hearing Date:  November 3, 2022** |
| *Defendants*, | **Hearing Time:  11:00 am** |
| and | (Class Action) |
| CHICAGO SCHOOL OF PROFESSIONAL PSYCHOLOGY; EVERGLADES COLLEGE, INC.; AMERICAN NATIONAL UNIVERSITY; and LINCOLN EDUCATIONAL SERVICES CORPORATION, | (Administrative Procedure Act Case) |
| *Intervenors*. | |

Gibson, Dunn & Crutcher LLP

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO
JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

# TABLE OF CONTENTS

I. INTRODUCTION ......................................................................................................... 1

II. BACKGROUND ......................................................................................................... 3

    A.    Statutory And Regulatory Background ........................................................ 3

    B.    Lincoln ......................................................................................................... 4

    C.    This Lawsuit ................................................................................................. 5

    D.    The Current Settlement Agreement ............................................................. 7

III. ARGUMENT ............................................................................................................. 8

    A.    The Proposed Class Settlement Unfairly Harms Lincoln's Reputation. ...................... 9

    B.    The Proposed Class Settlement Is Unlawful In Other Ways. ................................... 13

        1.    The Proposed Settlement Would Violate Rule 23. ......................................... 13

        2.    The Proposed Settlement Cannot Authorize The Department To Violate Its Regulations. ...................................................... 17

        3.    The Proposed Settlement Cannot Authorize The Department To Violate The APA. ...................................................... 19

        4.    The Proposed Settlement Would Violate Lincoln's Due Process Rights. ...... 22

IV.  CONCLUSION .......................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**CASES**

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954)........................................................................................20

*Am. Hosp. Ass'n v. Price,*
   867 F.3d 160 (D.C. Cir. 2017).....................................................................19, 20

*Barnes v. Am. Tobacco Co.,*
   161 F.3d 127 (3d Cir. 1998)...........................................................................13

*Bostick v. Herbalife Int'l of Am., Inc.,*
   2015 WL 12731932 (C.D. Cal. May 14, 2015) ................................................9

*Boucher v. Syracuse Univ.,*
   164 F.3d 113 (2d Cir. 1999)...........................................................................13

*Buchanan v. Tata Consultancy Servs., Ltd.,*
   2018 WL 3537083 (N.D. Cal. July 23, 2018)................................................13

*Campbell v. Bd. of Trs. of Columbia Univ.,*
   No. 22-cv-05945 (S.D.N.Y. July 12, 2022) ...................................................11

*Carrera v. Bayer Corp.,*
   727 F.3d 300 (3d Cir. 2013)...........................................................................15

*Cent. Laborers' Pension Fund v. Heinz,*
   541 U.S. 739 (2004)......................................................................................20

*Chauffeur's Training Sch., Inc. v. Riley,*
   967 F. Supp. 719 (N.D.N.Y. 1997)................................................................23

*Conservation Nw. v. Sherman,*
   715 F.3d 1181 (9th Cir. 2013)........................................................16, 19, 20, 21

*Ctr. for Food Safety v. Hamburg,*
   954 F. Supp. 2d 965 (N.D. Cal. 2013) ...........................................................17

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011)..........................................................................15

*Endy v. Cnty. of Los Angeles,*
   975 F.3d 757 (9th Cir. 2020)..........................................................................22

*Evans v. Jeff D.,*
   475 U.S. 717 (1986)......................................................................................12

ii

Gibson, Dunn &
Crutcher LLP

*Fikre v. FBI*,
   35 F.4th 762 (9th Cir. 2022) ...................................................................................................22

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ...............................................................................................................25

*Hahn v. Massage Envy Franchising LLC*,
   2015 WL 2164981 (S.D. Cal. Mar. 6, 2015) ...........................................................................9

*Hart v. Parks*,
   450 F.3d 1059 (9th Cir. 2006) ...............................................................................................22

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
   593 F.3d 923 (9th Cir. 2010) .................................................................................................17

*Hewitt v. Grabicki*,
   794 F.2d 1373 (9th Cir. 1986) ...............................................................................................21

*Kerley Indus., Inc. v. Pima Cnty.*,
   785 F.2d 1444 (9th Cir. 1986) ...............................................................................................24

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ...................................................................................................9

*Marlo v. United Parcel Serv., Inc.*,
   639 F.3d 942 (9th Cir. 2011) .................................................................................................13

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ..............................................................................................16

*Nelsen v. King Cnty.*,
   895 F.2d 1248 (9th Cir. 1990) ...............................................................................................14

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................................................................17

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ...................................................................................................9

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
   631 F.2d 953 (D.C. Cir. 1980) ..............................................................................................22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) .............................................................................15, 16

*Reno-Sparks Indian Colony v. EPA*,
   336 F.3d 899 (9th Cir. 2003) .................................................................................................20

*Richardson v. Byrd*,
   709 F.2d 1016 (5th Cir. 1983) ...............................................................................................13

Gibson, Dunn &
Crutcher LLP

*Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*,
  493 F. Supp. 976 (D.D.C. 1980) ................................................................22

*Sneaker Circus, Inc. v. Carter*,
  566 F.2d 396 (2d Cir. 1977)......................................................................24

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003)......................................................................9

*Student A v. Bd. of Trs. of Columbia Univ.*,
  No. 22-cv-06567 (S.D.N.Y. Aug. 2, 2022) ................................................11

*Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*,
  262 F.3d 559 (6th Cir. 2001)......................................................................9

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..............................................................................16

*United States v. City of Miami*,
  614 F.2d 1322 (5th Cir. 1980)....................................................................19

*United States v. City of Miami*,
  664 F.2d 435 (5th Cir. 1981) (en banc)......................................................19

*Vara v. DeVos*,
  2020 WL 3489679 (D. Mass. June 25, 2020) ............................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)....................................................................................14

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)................................................................................19

**STATUTES**

5 U.S.C. § 553 ................................................................................................20

5 U.S.C. § 555 ..................................................................................................7

5 U.S.C. § 706 ..................................................................................5, 13, 17, 21

20 U.S.C. § 1070 ..............................................................................................3

20 U.S.C. § 1087 ..............................................................................................3

28 U.S.C. § 2072 ............................................................................................19

**RULES**

Fed. R. Civ. P. 23 ..........................................................2, 5, 8, 9, 13, 14, 15, 16

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

Gibson, Dunn &
Crutcher LLP

**REGULATIONS**

34 C.F.R. § 685.206 ......................................................................3, 4, 18, 22, 23, 24, 25

34 C.F.R. § 685.222 ...................................................................3, 4, 17, 21, 22, 23, 24, 25

60 Fed. Reg. 37,768 (July 21, 1995) ...................................................................3

81 Fed. Reg. 75,926 (Nov. 1, 2016)....................................................................3

84 Fed. Reg. 49,788 (Sept. 23, 2019) .................................................................3

**OTHER AUTHORITIES**

ABA Journal, *ABA Raps Villanova re Inaccurate Admission Data, Says Law School Must Post Censure Online*, bit.ly/3V9AoBM (last accessed Oct. 5, 2022) ...................................11

ABA Journal, *Villanova Says Inaccurate LSAT and GPA Data Were 'Knowingly Reported' to the ABA in Prior Years*, bit.ly/3Rz5zU1 (last accessed Oct. 5, 2022) ...................................11

DOJ Press Release, *United States v. Moshe Porat, et al.*, bit.ly/3CeKlov (last accessed Oct. 5, 2022) ...............................................................................................................11

DOJ Press Release, *Former Temple Business School Dean Sentenced to Over One Year in Prison for Rankings Fraud Scheme*, bit.ly/3e7WOTb (last accessed Oct. 5, 2022) ........................11

Federal School Code Lists, Federal Student Aid (Aug. 18, 2022), bit.ly/3SMwRqN ......................12

Federal Student Aid, *The Biden-Harris Administration's Student Debt Relief Plan Explained*, bit.ly/3fMcL1C (last accessed Oct. 5, 2022).......................................................................8

Form 10-Q, Lincoln Educational Services Corporation (Aug. 8, 2022), bit.ly/3V56fU8 ...................23

Jon Marcus, *Caught Cheating: Colleges Falsify Admissions Data for Higher Rankings*, NBC News (Mar. 20, 2013, 7:01 AM EDT), nbcnews.to/3CxLp8y...............................................................12

Press Release, *Attorney General Kamala D. Harris Obtains $1.1 Billion Judgment Against Predatory For-Profit School Operator*, bit.ly/3rREW2h (last accessed Oct. 5, 2022)...................................10

Temple University Settlement Agreement, bit.ly/3T2rJPI (last accessed Oct. 5, 2022) .....................11

Gibson, Dunn &
Crutcher LLP

v

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

# I.  INTRODUCTION

The proposed settlement of this case bears little resemblance to the Plaintiffs' claims, the certified injunctive class, or the parties' prior litigating positions.  It would fundamentally change the case by awarding a bonanza of classwide monetary relief to settle purely procedural claims—relief far beyond what Plaintiffs could obtain by litigating their Administrative Procedure Act ("APA") claims successfully to a final judgment.  While this might have been a matter between the United States and the taxpayers footing the bill for the government's largesse, the proposed settlement goes further by scapegoating 151 third-party educational institutions who now find themselves showcased on a list of presumptive wrongdoers published by their federal regulator without any due process or reasoned explanation.  The settling parties cite no remotely analogous precedent for this remarkable outcome, because there is none.

Lincoln Educational Services Corporation ("Lincoln") is one of the educational institutions that finds itself on "Schedule C," the de facto blacklist that the Department of Education uses to deflect accountability for its settlement decision.  The Department has never explained why settling this APA case requires it to publicize Lincoln in this way, much less how the Department determined there was "substantial misconduct" sufficient to discharge all federal student loans awarded to any class member who attended a Lincoln school.  In fact, there is no judgment of wrongdoing against Lincoln and no adjudication of any borrower defense claim concerning a Lincoln school.  Nor has the Department adequately explained why other schools with "substantial misconduct" are omitted from Schedule C.  Although Lincoln does not wish to prevent a legitimate settlement of this APA case, Lincoln strongly objects to any settlement that harms its reputation or prejudices its rights, as this proposed settlement does.  As long as Lincoln remains on Schedule C, Lincoln must object to the proposed settlement and the many ways in which it violates the law and principles of basic fairness.

For starters, the settling parties have failed to carry their burden of showing that the proposed settlement is fair to the third-party schools.  It is not.  For Lincoln, the only evidence the Department has identified is a 2015 settlement between Lincoln and the Massachusetts Attorney General.  That settlement resolved an investigation into job placement reporting for a single program of study at two Lincoln campuses in Massachusetts.  The settlement made no factual findings and Lincoln admitted no

Gibson, Dunn &
Crutcher LLP

1

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

wrongdoing.  That settlement provides no basis to deem Lincoln guilty of misconduct at all Lincoln schools nationwide and for every program of study for all time.  Although the Department implausibly insists the present settlement does not unfairly harm Lincoln, that ignores the plain reality that Lincoln is now in this case, forced to defend its reputation, precisely because of a similar no-finding, no-fault settlement seven years ago.  *Of course* this settlement harms Lincoln, its students, and its stakeholders in concrete and material ways.  If the settlement is approved, it should be conditional on the parties agreeing to strike Lincoln from Schedule C.

The proposed settlement also violates Federal Rule of Civil Procedure 23 because it would require a new class that this Court has never certified, and could not certify.  This Court certified only a Rule 23(b)(2) class for declaratory and injunctive relief, and the parties litigated this case as a challenge to the Department's policy of inaction on borrower defense claims.  The government has even argued that this Court no longer has subject-matter jurisdiction because classwide injunctive relief is now moot.  Yet the proposed settlement awards up to $6 billion in substantive, classwide monetary relief on the underlying borrower defense claims themselves—claims that present countless individualized issues and defenses that would preclude class treatment.  This Court has not made Rule 23 findings on this new settlement class, and the parties have never attempted to carry their heavy burden to show that such a class would be appropriate.  Furthermore, serious questions remain unanswered regarding the number of uninjured class members—particularly after the Biden Administration's recent announcement that it would independently forgive up to $20,000 in federal student loan debt for most borrowers.  Class members whose loans will be forgiven anyway would have no cognizable injury, and would render this class fatally overbroad.

The proposed settlement also violates the APA, the bedrock rule that agencies must follow their own regulations, and Lincoln's constitutional due process rights.  A court cannot approve a settlement premised on such wholesale unlawfulness.  The settlement would circumvent the Department's borrower defense regulations, deprive schools of their right to respond to borrower defense claims, and revive claims that are time-barred under the Department's rules and applicable law.  While the settling parties insist that schools still have rights in a separate administrative process for the Department to seek recoupment from schools, the Department's proper adjudication of a borrower defense claim is a

2

Gibson, Dunn &
Crutcher LLP

necessary predicate to any such recoupment.  If the Court approves the proposed settlement (and it should not), it should hold that the settlement precludes the Department from later recouping the discharged loan amounts from schools.

For these and other reasons, the Court should decline to approve the proposed settlement or, in the alternative, condition any approval on the parties agreeing to strike Lincoln from Schedule C.  The other intervenors raise additional reasons why the settlement cannot be approved, and Lincoln joins and adopts those arguments as well.

## II.  BACKGROUND

### A.    Statutory And Regulatory Background

The Secretary of Education administers certain student loan programs under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*  This lawsuit implicates two such programs: the Direct Loan Program, which allows students to receive loans from the federal government to pay for educational expenses, and the Federal Family Education Loan Program ("FFEL"), which, until it was discontinued in 2010, allowed students to obtain private loans subsidized and guaranteed by the federal government.  In administering these programs, the Secretary may "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan."  *Id.* § 1087e(h).

Acting under that authority, the Department has adopted three sets of borrower defense regulations.  *See* 60 Fed. Reg. 37,768 (July 21, 1995); 81 Fed. Reg. 75,926 (Nov. 1, 2016); 84 Fed. Reg. 49,788 (Sept. 23, 2019).  These regulations provide that student loan borrowers may seek debt cancellation if they can allege and prove that their school misled them or engaged in certain misconduct related to their education.  For loans issued before July 1, 2017, the Department must evaluate any alleged misconduct under state law.  34 C.F.R. § 685.206(c).  For loans issued after that date, the 2016 rule created a federal standard for adjudicating allegations of misconduct.  *Id.* § 685.222.  And for loans issued after July 1, 2020, the 2019 rule further refined that federal standard.  *Id.* § 685.206(e).  Regardless of when the loans were issued, the Department's regulations afford accused schools certain rights of notice and participation, along with other protections designed to ensure that all interested parties receive fair process.  *See id.* §§ 685.206(e)(8)-(12), 685.222(e)(3)(i).

If—and only if—the Department grants a borrower defense application and discharges the borrower's debt under the regulations, the Department may initiate proceedings to recover the discharged amount from the school with which that debt was associated.   *See* 34 C.F.R. §§ 685.206(c)(3), (e)(16), 685.222(e)(7).

**B.     Lincoln**

Established in 1946, Lincoln Educational Services Corporation and its subsidiaries ("Lincoln") provide career-oriented post-secondary education to recent high school graduates and working adults. Dkt. 254-2 ¶¶ 2–3 ("Giglio Decl.").   Lincoln currently operates 22 campuses in 14 states, and offers programs in skilled trades, automotive technology, healthcare services, hospitality services, and information technology. *Id.* ¶ 2.   All of Lincoln's campuses are institutionally accredited and eligible to participate in Title IV programs administered by the Department of Education.

For years after this lawsuit was filed, Lincoln had no reason to believe this suit implicated its interests.   As the Department acknowledges, its borrower defense regulations were "rarely used" before 2015, and in the immediately following years were invoked largely to address alleged wrongdoing by a single school, Corinthian Colleges, Inc., that ceased operating in 2015.   Dkt. 63, at 6.   Before April 2021, the Department had not informed Lincoln of *any* borrower defense applications against it.   Since then, Lincoln has learned of just over 300 such applications submitted by class members, including students who were enrolled decades ago—a miniscule fraction of the over 340,000 students who have attended Lincoln schools since 2005.   Giglio Decl. ¶ 8.[1]   None of these borrower defense applications

---

[1]   On August 8, 2022 (four days after the preliminary settlement hearing), the Department notified Lincoln of a single borrower defense application purporting to cover approximately 350 students who attended two Lincoln Tech campuses in Massachusetts between 2010 and 2013.   It is unclear when the application was submitted or by whom, and the Department has not responded to Lincoln's request for more information.   On the face of the Department's letter, the application appears untimely and legally deficient.   *See* Supp. Decl. of Francis Giglio ("Giglio Supp. Decl.") ¶ 4; *cf.* Complaint ("Compl.") ¶ 161, Dkt. 1 (alleging "11-30" borrower defense applicants pending against Lincoln as of February 21, 2017).   If the application was submitted after June 22, 2022, it would be among the massive number of post-class applications spurred by publicity surrounding this proposed settlement.   Despite Plaintiffs' previous assurance to the Court that it is "not realistic" and a "scare tactic" to suggest that "tens of thousands of borrowers would apply for borrower defense in the next, say, four months before the final approval hearing," Dkt. 323-1, at 35-36, there are now ***179,000*** post-class borrower defense applicants—a number nearly equal to the class size.   Dkt. 323, at 14.

has been adjudicated, and Lincoln is aware of no judgment or credible allegations of wrongdoing against it. *Id.* ¶ 13.

In this case the only "indicia" of misconduct by Lincoln that the Department has cited is a 2015 settlement with the Massachusetts Attorney General. *See* Dkt. 288, at 18 n.4. That settlement resolved an investigation into allegations concerning job placement statistics for a single program of study at two Lincoln Tech campuses in Massachusetts. The settlement made no factual findings, and Lincoln admitted no wrongdoing. Yet seven years later it is apparently the basis for the unjustified inclusion of Lincoln Technical Institute *and* Lincoln College of Technology (the latter not even implicated in the Massachusetts settlement) on Schedule C and the continued submission of stale borrower defense claims by anonymous activists. As this experience proves, even settlements with no findings of wrongdoing have long-term material consequences for schools in this politically charged sector.

## C.     This Lawsuit

In June 2019, a group of student loan borrowers sued the Department, challenging its failure to issue decisions on pending borrower defense applications for over a year. Compl. ¶ 181. Plaintiffs alleged that the Department had "unlawfully withheld and unreasonably delayed" "agency action" under the APA, 5 U.S.C. § 706(1), but they expressly did "not ask this Court to adjudicate their borrower defenses," Compl. ¶ 10. Nor did Plaintiffs "ask this Court to dictate how the Department should prioritize their pending borrower defenses." *Id.* They simply sought to "compe[l] the Department to start granting or denying their borrower defenses." *Id.*

Relying on the Plaintiffs' representations, this Court certified a Rule 23(b)(2) declaratory and injunctive relief class of "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education" with pending borrower defense applications and who are not members of a parallel class action suit filed against Corinthian Colleges. Dkt. 46, at 14. Rule 23(b)(2) permits class treatment only when a single injunction or declaratory judgment would provide relief to each member of the class. Accordingly, the Court found that Plaintiffs sought "a single order compelling defendants to restart the processing of borrower defense claims" and not "a specific ruling for each application" that "would indeed require an individualized inquiry" defeating class certification. *Id.* at 12–13.

Shortly thereafter, the Department revealed that Plaintiffs' wish had been granted.  In January 2020, the Department represented in summary judgment briefing that it had adopted a "comprehensive methodology" for assessing borrower defense claims and restarted the process of granting or denying borrower defense applications.  Dkt. 72, at 1–2.  As a result, the Department contended, all the relief Plaintiffs sought "has been provided by the Department's action to resume issuing final decisions on borrower defense claims," rendering Plaintiffs' claims moot.  *Id.* at 4–5.

The parties began settlement negotiations in January 2020, and submitted an agreement for preliminary approval in April 2020.  Dkts. 84, 97.  Although the Court granted preliminary approval of the agreement, Dkt. 103, the settlement collapsed after it came to light that the Department was allegedly using form denial notices to clear its backlog.  This Court thus denied final approval of the settlement on the grounds that there had been no meeting of the minds between the parties, expressing "disappoint[ment]" because the Court had hoped to "get *reasoned decisions*, even if reasoned denials, to hundreds of thousands of student-loan borrowers."  Dkt. 146, at 11 (emphasis added).  The Court directed the parties to "return to litigating the merits," ordered additional discovery, and asked the Plaintiffs to renew their request for summary judgment.  *Id.* at 7–11, 16.

After additional discovery, Plaintiffs filed a Supplemental Complaint raising fresh allegations that the Department had adopted an unlawful "presumption of denial" policy for borrower defense applications and issued unlawful form denial notices.  Supplemental Complaint ("Supp. Compl.") ¶¶ 436–47, Dkt. 198.  Once again, Plaintiffs solely sought declaratory relief that the presumption of denial policy and form denial notices were unlawful, and injunctive relief to compel the Department to lawfully adjudicate borrower defense applications.  *Id.* at 76–77.

In January 2022, the parties reported to the Court that they had been engaged in settlement negotiations.  But the status report did not mention that the parties were considering blanket debt cancellation without *any* adjudication or reasoned decisions.

In June 2022, the parties again filed motions for summary judgment.  For the first time, Plaintiffs requested *en masse* student loan forgiveness—"an order for Defendants to show cause why each and every class member's BD application should not be granted immediately."  Dkt. 245, at 33. In response, the Department renewed its argument that Plaintiffs' claims were moot because the

Gibson, Dunn &
Crutcher LLP

Department had begun processing applications and the challenged "policy of inaction . . . no longer exists." Dkt. 249, at 9–11. On that ground, the Department urged the Court to decertify the class because "there [wa]s no longer a delay common to all class members." *Id.* at 2, 12–13. And the Department contended that forcing the Department "to approve *en masse* all pending borrower defense applications" was not an available remedy under the APA. *Id.* at 2, 27–28.

## D. The Current Settlement Agreement

Despite the Department's concurrent position that the case is moot and the class should be decertified, the parties filed a joint motion for preliminary approval of a new settlement agreement on June 22, 2022. Dkt. 246. Under the agreement, the Department would (1) immediately and fully discharge the loan debt and refund any payments made for class members who attended one of the schools named in Schedule C, for which the Department initially claimed to have "strong indicia" of "substantial misconduct," *id.* at 17–18; (2) evaluate applications of the remaining class members under a streamlined review process; and (3) issue decisions within 36 months for individuals who submit borrower defense applications after the proposed settlement agreement's execution date but before final approval. Dkt. 246-1, at 6–11. If the Department fails to timely issue final decisions for post-class applicants, the Department will fully discharge and refund that student's loan debt. *Id.* at 11. Notably, despite initially justifying Schedule C as based on "strong indicia regarding substantial misconduct," Dkt. 246, at 3, 18, the parties now represent only that Schedule C schools bear "sufficient indicia of misconduct to justify summary settlement relief," Dkt. 323, at 9.

The settlement effectively would create subclasses for "automatic" relief and "decision" relief. For the "automatic" relief subclass, full relief would require no adjudication or reasoned decisions— even though Plaintiffs have claimed summary *denials* violate 5 U.S.C. § 555(e)—and no consideration given to whether the applications are time-barred, frivolous, or otherwise legally deficient. For the "decision" subclass, the Department would decide claims using "a streamlined process that provides

Gibson, Dunn &
Crutcher LLP

certain presumptions in favor of the borrower," without regard to the applicable regulations or when the borrower enrolled or submitted a borrower defense application. Dkt. 246, at 3.[2]

At the August 4, 2022 fairness hearing, this Court acknowledged that Plaintiffs previously had "assured" the Court that the "only" class relief sought was "an injunction to require the agency to adjudicate . . . [the] thousands of applications that had gone unadjudicated." Dkt. 323-1, at 40. But "this settlement goes way beyond" and "not only skips over the adjudication," but also "just cancels the loan." *Id.* The Court acknowledged that "there may be a legal question" with that aspect of the settlement, but found that the fairness factors compelled preliminary approval because no class member could reasonably object to this "bonanza"—a "grand slam home run" for the class. *Id.* at 40, 48.

Since this Court's preliminary approval hearing, the Biden Administration has announced a sweeping student loan debt relief plan ("Biden plan") that provides up to $20,000 in debt relief to Federal Pell Grant recipients and up to $10,000 in debt relief to non-Pell Grant recipients for borrowers with an individual income of less than $125,000 or joint household income of less than $250,000.[3] Announced on August 24, the plan is set to take effect "in October." *Id.* Notably, many student loan borrowers who asserted borrower defense claims against Lincoln might be fully compensated by the Biden plan. *See* Giglio Supp. Decl. ¶¶ 8–10.

### III. ARGUMENT

To approve a class action settlement under Federal Rule of Civil Procedure 23(e), this Court must assure itself that the settlement is fair to all affected, including third parties. To date, however, the Department has never offered a reasoned basis for naming Lincoln on Schedule C. And there is no such basis. Lincoln's inclusion on Schedule C—without any finding of wrongdoing by Lincoln or adjudication of any borrower defense claim concerning a Lincoln school—is arbitrary and unwarranted, and it has caused serious damage to Lincoln's reputation and a surge of stale and meritless

---

[2] Upon receiving word of this unprecedented settlement, Lincoln and three other schools on Schedule C moved to intervene to protect their legal rights. *See* Dkts. 254, 261, 265. This Court granted them permissive intervenor status. Dkt. 322.

[3] Federal Student Aid, *The Biden-Harris Administration's Student Debt Relief Plan Explained*, bit.ly/3fMcL1C (last accessed Oct. 5, 2022).

borrower defense applications against it.  In the interests of fairness, this Court should condition any approval of the settlement on the parties' agreement to remove Lincoln from Schedule C.

So long as Lincoln remains on Schedule C, however, Lincoln must object to the many legal problems with the settlement.  The proposed class settlement would violate Rule 23, as the Department itself has recognized, *see* Dkt. 249, at 12–15.  The promised relief also far exceeds any lawful remedy that the Plaintiffs could obtain by litigating their APA case to final judgment.  The settlement would authorize the Department to violate its own rules and the APA.  And the proposed settlement would violate Lincoln's constitutional due process rights.  Lincoln's primary federal regulator would brand Lincoln (a public company) a presumptive wrongdoer in a final judgment without any evidence or reasoned decision.  The settlement would deny Lincoln its right to contest borrower defense claims, and it would deprive Lincoln of an unbiased adjudicative process for resolving any borrower defense claims or recoupment actions going forward.

If the Court does not condition approval of the settlement on the parties' agreement to strike Lincoln from Schedule C, Lincoln respectfully requests that the Court refuse to approve the settlement.

## A.    The Proposed Class Settlement Unfairly Harms Lincoln's Reputation.

"A district court's approval of a class-action settlement must be accompanied by a finding that the settlement is 'fair, reasonable, and adequate.'"  *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012) (quoting Fed. R. Civ. P. 23(e)).  That assessment necessarily includes fairness to third parties affected by the settlement:  The court must "reach a reasoned judgment that . . . the settlement, taken as a whole, is fair, reasonable and adequate *to all concerned*."  *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (emphasis added); *see also Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932, at *11 n.13 (C.D. Cal. May 14, 2015) (in evaluating fairness of class action settlement, court must weigh concerns "expressed by non-parties"); *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001) (remanding to the district court to consider "the fairness of the consent decree *to those affected*," including intervenors (emphasis added)).  "The settlement proponents ultimately bear the burden to show that the proposed settlement meets this standard."  *Hahn v. Massage Envy Franchising LLC*, 2015 WL 2164981, at *2 (S.D. Cal. Mar. 6, 2015) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003)).

The parties come nowhere close to carrying this burden, and Lincoln's inclusion on Schedule C is fundamentally unfair. The Department offers nothing to substantiate its baseless claim that "sufficient indicia of misconduct" justify Lincoln's inclusion on Schedule C. Dkt. 323, at 9. In all of Lincoln's 76-year history, the parties point only to a 2015 settlement agreement with the Massachusetts Attorney General that Lincoln entered to avoid the costs of litigation. Dkt. 287, at 6; Dkt. 288, at 18 n.4. In that settlement Lincoln agreed to pay $850,000 and forgive $165,000 in student debt to resolve an investigation into the disclosure and reporting of job placement data for a single program of study at two Lincoln Tech campuses in Massachusetts, but Lincoln admitted no wrongdoing and the approving court made no factual findings. *See* Townsend Decl. Ex. 1. That simply is not a reasonable or sufficient basis for the Department to deem all Lincoln schools nationwide to be presumptive wrongdoers for all academic programs and all time. Yet that is what the proposed settlement would do. And the Massachusetts settlement is not remotely comparable to the $1.1 billion judgment that the California Attorney General obtained against Corinthian, another school touted as an exemplar for wrongdoing. *See* Press Release, *Attorney General Kamala D. Harris Obtains $1.1 Billion Judgment Against Predatory For-Profit School Operator*, bit.ly/3rREW2h (last accessed Oct. 5, 2022); Dkt. 63, at 6. The lack of explanation for Schedule C's one-size-fits-all approach is especially unforgivable for a federal regulator that owes a duty of fair dealing both to students and to regulated schools.[4]

Despite the negative publicity the Massachusetts AG settlement and Lincoln's inclusion on Schedule C has engendered, only approximately 0.1% of the over 340,000 students who have enrolled in Lincoln's programs since 2005 have lodged borrower defense applications against it. Giglio Decl. ¶ 8; Giglio Supp. Decl. ¶ 2. That is roughly the same percentage of class members who objected to the parties' settlement agreement—a number the parties celebrate as a "positive response" to the settlement, Dkt. 323, at 15, while treating the same fraction as "sufficient indicia of misconduct," *id.* at 9. The tiny fraction of complaints against Lincoln should come as little surprise. Lincoln calculates

---

[4]   Lincoln submitted a Freedom of Information Act ("FOIA") request for documents describing the Department's determination to place Lincoln on Schedule C. Townsend Decl. Ex. 2. The Department responded that this would require a "vast search," *id.*, Ex. 3, even though such records should have been gathered to compile Schedule C. To date the Department has produced no records and its briefing has referenced only the 2015 Massachusetts settlement. *See* Dkt. 288, at 18 n.4.

Gibson, Dunn &
Crutcher LLP

its employment rates according to state and accreditor standards, and Lincoln even employs a qualified third-party auditor to verify its placements.  Giglio Decl. ¶ 11.  Since at least June 2011, Lincoln has had in place a Code of Compliance, Ethics and Admission Policy—which Lincoln disclosed to the Department—that imposes high ethical standards on Lincoln's admissions officers.  *Id.* ¶ 12.  Lincoln is aware of no judgment or even credible allegations of wrongdoing against it.  *Id.* ¶ 13.

The unreasonableness of Lincoln's inclusion on Schedule C is shown in even sharper relief when one considers the (unproven) allegations the Massachusetts AG actually pressed against Lincoln—*viz.*, that Lincoln improperly counted certain part-time and temporary positions toward its job placement statistics.   Although Lincoln takes all allegations of wrongdoing seriously, those allegations (which Lincoln disputed) pale in comparison to the allegations made and in some cases proven against schools the Department chose *not* to include on Schedule C:

- **Temple University** provided false information—including the number of offers of admission extended, and the debt levels of students who borrowed loans to pay tuition—to U.S. News and World Report ("USNWR") in order to inflate the rankings of its online MBA and other programs.[5]

    - The Department of Education investigated whether Temple had engaged in substantial misrepresentation of the nature of its educational program, and Temple ultimately agreed to pay a $700,000 civil penalty.  *Id.* ¶ 1.

    - Temple also settled an enforcement action by the Pennsylvania Attorney General, which required Temple to implement rigorous data submission processes, submit to oversight by a third-party auditor, and award $250,000 in new scholarships.  *Id.* ¶ H.

    - A class action by Temple's former students resulted in a settlement of approximately $5.5 million to almost 2,000 students.  *Id.* ¶ G.

    - The former Dean of Temple's business school was convicted of wire fraud for defrauding applicants, students, and donors by providing false and misleading information to USNWR.  He was sentenced to 14 months in prison, three years of supervised release, and was ordered to pay a $250,000 fine.[6]

---

[5]  Temple University Settlement Agreement ¶ D, bit.ly/3T2rJPI (last accessed Oct. 5, 2022).
[6]  Department of Justice ("DOJ") Press Release, *United States v. Moshe Porat, et al.*, bit.ly/3CeKlov (last accessed Oct. 5, 2022); DOJ Press Release, *Former Temple Business School Dean Sentenced to Over One Year in Prison for Rankings Fraud Scheme*, bit.ly/3e7WOTb (last accessed Oct. 5, 2022).

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

Gibson, Dunn &
Crutcher LLP

- **Columbia University** allegedly misreported data on its class size, faculty education, student-faculty ratio, and money spent on instruction to USNWR.[7]  USNWR allegedly "unranked" the school, and two class actions have been filed against the university by Columbia students.[8]

- **Villanova University School of Law** was sanctioned by the American Bar Association for inaccurately reporting law school admission data, including LSAT scores and GPAs, for several years.  The school was required to undergo a compliance audit and maintain a letter of public censure on its website.[9]

- Many other schools, including but not limited to **Claremont McKenna College**, **Bucknell University**, **Tulane University**, **Emory University**, **George Washington University**, and the **University of Illinois**, have admitted to misreporting information to the Department of Education and USNWR.[10]

All of these schools participate in the Title IV federal student aid programs.  *See* Federal School Code Lists, Federal Student Aid (Aug. 18, 2022), bit.ly/3SMwRqN.  Their students, like Lincoln's, took out federal student loans and could file borrower defense claims.  Yet none of these schools with "indicia" of misconduct made its way onto Schedule C.

The Department must justify its actions before disparaging a broad swath of regulated entities based on little or no evidence, and it must explain its failure to afford equal treatment to other comparably situated schools.  Its failure to do so is arbitrary and unreasonable, and Lincoln should be struck from Schedule C.  Striking Lincoln from Schedule C would have only a *de minimis* effect on this multi-billion dollar settlement; the parties already have stipulated that the removal of four other institutions from Schedule C was a "minor" "clerical" correction that "do[es] not substantively affect the terms of the Proposed Agreement," Dkt. 317, ¶¶ 2–3, 6.  But removing Lincoln from the list would substantially redress the serious harms to Lincoln.  If this small change is made, Lincoln likely would withdraw its remaining objections and the parties could proceed to final settlement with less risk of reversal on appeal.  Accordingly, if this Court is inclined to approve the settlement, Lincoln respectfully requests that the Court condition approval on the parties' agreement to strike Lincoln from Schedule

---

[7]  *Campbell v. Bd. of Trs. of Columbia Univ.*, No. 22-cv-05945, Dkt. 1 (S.D.N.Y. July 12, 2022).

[8]  *Id.*; *Student A v. Bd. of Trs. of Columbia Univ.*, No. 22-cv-06567, Dkt. 1 (S.D.N.Y. Aug. 2, 2022).

[9]  ABA Journal, *ABA Raps Villanova re Inaccurate Admission Data, Says Law School Must Post Censure Online*, bit.ly/3V9AoBM (last accessed Oct. 5, 2022); ABA Journal, *Villanova Says Inaccurate LSAT and GPA Data Were 'Knowingly Reported' to the ABA in Prior Years*, bit.ly/3Rz5zU1 (last accessed Oct. 5, 2022).

[10]  Jon Marcus, *Caught Cheating: Colleges Falsify Admissions Data for Higher Rankings*, NBC News (Mar. 20, 2013, 7:01 AM EDT), nbcnews.to/3CxLp8y.

Gibson, Dunn &
Crutcher LLP

C.  *See, e.g.*, *Evans v. Jeff D.*, 475 U.S. 717, 726–27 (1986) (district court may "advis[e]" parties "that it would not approve their proposal unless one or more of its provisions was deleted or modified").

**B.      The Proposed Class Settlement Is Unlawful In Other Ways.**

While Lincoln does not wish to prevent a legitimate settlement of this case, if Lincoln remains on Schedule C, it must object to the many ways in which the proposed settlement violates the law.

**1.      The Proposed Settlement Would Violate Rule 23.**

For starters, the proposed settlement would violate Rule 23.  This Court previously certified a class for procedural relief, but the Court bears "a responsibility to review continually the appropriateness of a certified class in light of developments subsequent to class certification." *Buchanan v. Tata Consultancy Servs., Ltd.*, 2018 WL 3537083, at *9 (N.D. Cal. July 23, 2018) (cleaned up).  Thus, this Court "*must* define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."  *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) (emphasis added); *see also Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) ("[C]ourts are required to reassess their class rulings as the case develops." (quotation marks omitted)); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 138–39 (3d Cir. 1998) (similar).  Here, although this Court certified an injunctive relief class "for all purposes, including settlement," Dkt. 46, at 14, the certified Rule 23(b)(2) class is now inappropriate for the requested settlement relief.

a.  This Court certified the class in this case on a single premise—that classwide injunctive relief is appropriate because the "plaintiffs challenge the [Department's] policy of inaction—to which each class member was subjected," and a simple order to "compel the Department to at least begin deciding applications again" would resolve the class's claims in one stroke.  Dkt. 46, at 2, 12; *see also id.* at 5 (noting that Plaintiffs' complaint "assert[ed] a single claim under Section 706(1) of the APA under the theory that the Department's inaction constituted unlawfully withheld and unreasonably delayed agency action").  It is now beyond dispute that this premise no longer holds.  As the Department has repeatedly and persuasively explained, the injunctive relief for which this Court certified a class has been rendered moot:  The Department has now "issued many decisions since this lawsuit was filed, and it plans to issue many more."  Dkt. 249, at 10.  "Unlike at the time of class certification, . . . the Department has now been issuing decisions to class members for 18 months."  *Id.* at 12.

Gibson, Dunn &
Crutcher LLP

It is little surprise, then, that the Plaintiffs' case now looks fundamentally different than it did at class certification. This lawsuit purported to seek "an injunction to require the agency to adjudicate" borrower defense applications, yet on the eve of settlement it now suddenly involves the "substance" of relief the Department must provide. Dkt. 323, at 9; Dkt. 323-1, at 40.

As a consequence, Plaintiffs can no longer show that "the requirements of Rules 23(a) and (b) are met." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011). Plaintiffs can no longer show that the suit presents a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); Fed. R. Civ. P. 23(a)(2) (commonality requirement). Today, as the Department well explains, the reasons why remaining class members may have pending borrower defense applications will vary, "depending on the school they attended, the nature of their claim, and when they submitted their application." Dkt. 249, at 12; *see also* Dkt. 46, at 11 (acknowledging, in certifying the class, that the Department had pointed to "factual differences" between Plaintiffs' substantive claims, including differences in "filing dates, factual allegations, adjudication processes, and applicable legal standards among the pending borrower defense claims"). No common policy of delay unifies the claims. The proposed settlement *itself* has been "structure[d]"—in the parties' words—to "tak[e] into account differences among Class Members' circumstances." Dkt. 323, at 11. Those differences are fatal to classwide relief. As this Court has acknowledged, absent any common policy of delay, resolving each class member's borrower defense application "would indeed require an individualized inquiry." Dkt. 46, at 12; *see also* Dkt. 249, at 13 (Department's summary judgment brief, noting that this case now "turns solely on the kind of individualized determinations that the Court previously recognized would defeat class certification").

The proposed settlement also would impermissibly expand relief *beyond* the certified class by promising relief even to non-class members who have not yet submitted a borrower defense application. Dkt. 246-1, at 11. Such post-class applicants could not have been affected by the alleged departmental policy of inaction; today, the Department "has unequivocally taken the action that Plaintiffs filed this action to compel, *i.e.*, it has 'restart[ed] the processing of borrower defense claims.'"

14

Gibson, Dunn &
Crutcher LLP

Dkt. 249, at 10 (quoting Dkt. 46, at 13).  These post-class applicants share nothing in common with the certified class.

b.  The sweeping relief Plaintiffs seek is independently unavailing because the proposed settlement effectively grants monetary damages in the form of loan forgiveness to most of the class— full and automatic relief to any student who attended a school on Schedule C.  But this class was certified as an *injunctive relief* class "for all purposes, including settlement."  Dkt. 46, at 14.  "Class certification under Fed. R. Civ. P. 23(b)(2) is not appropriate where the relief requested relates exclusively or predominately to money damages."  *Nelsen v. King Cnty.*, 895 F.2d 1248, 1255 (9th Cir. 1990) (quotation marks omitted); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (vacating certification of 23(b)(2) class and holding the district court erred by failing to consider "whether the monetary relief could be granted absent 'individualized determinations of each employee's eligibility for [monetary damages]'" (alteration in original)).  The certified injunctive class cannot be maintained for purposes of the proposed settlement, which grants wide-ranging monetary relief.  To settle this case, this Court would have to certify a *new* monetary relief class under Rule 23(b)(3).  Given the myriad differences between class members, there is no plausible way to do so.[11]

c.  The recently announced Biden plan highlights another reason why classwide relief is unavailable.  "[A] court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc), *cert. petn. filed*, No. 22-131 (U.S. Aug. 8, 2022).  If "a great number of members" suffer no injury, the class is "defined too broadly to permit certification."  *Id.*  By independently forgiving up to $20,000 in federal student debt for most borrowers,

---

[11]  The merits of individual borrower defense applications will turn on a range of factors, and a class "cannot be certified in a way that . . . masks individual issues" or eviscerates defenses.  *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).  Each borrower defense claim will depend on the plausibility of the student's specific factual allegations and the educational institution the student attended.  Even students who attended the same school will have different claims depending on when they enrolled.  Claims submitted at different times will be governed by different legal standards and different adjudication procedures.  For loans issued before 2017, students who attended institutions in different states will have their claims adjudicated under each state's law.  And differences in the underlying claims implicate different defenses: Some claims, for instance, may be time-barred.

Gibson, Dunn &
Crutcher LLP

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

the Biden plan raises serious questions as to whether a large fraction of the class will have no redressable injury. If the class members' debt will be forgiven anyway, they lack Article III standing to obtain that relief.

At least for Lincoln, available data suggests that most of its student loan borrowers may achieve a complete discharge under the Biden plan. *See* Giglio Supp. Decl. ¶ 10. Lincoln's programs typically span one to two years, and most students do not take out large federal loans for such programs. *Id.* ¶ 8. For students who have submitted a borrower defense application (or for whom an application was submitted), the average federal loan amount to students and their parents was approximately $13,000 for applications forwarded to Lincoln in 2021 and approximately $7,500 for the group application forwarded in August 2022. *Id.* ¶¶ 8–9. Over half of Lincoln borrower defense applicants who did not receive Pell Grants had an initial student loan balance below the Biden plan's corresponding $10,000 cancellation limit, and approximately 81% of applicants who received Federal Pell Grants had an initial student loan balance below the Biden plan's $20,000 cancellation limit. *Id.* ¶ 10.

The serious questions raised about class members' Article III standing independently undermine commonality. *See* Fed. R. Civ. P. 23(a). "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). That basic jurisdictional principle precludes an automatic grant of monetary relief to class members who may no longer be suffering any injury-in-fact at the time of final judgment. To satisfy Rule 23's commonality requirement, this Court would need to consider "whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 668 n.12. An inquiry to determine the effect of the Biden plan on each class member's outstanding loans is precisely the sort of individualized question that precludes classwide relief.

Thus, the certified class no longer satisfies Rule 23, and no new class could be certified to award the settlement relief. On that ground alone, the Court should deny approval of the settlement.[12]

---

[12] Should the Court conclude that it need not certify a new class, Lincoln respectfully requests that the intervenors be permitted to file motions to decertify the class. Decertification would leave only the named Plaintiffs, none of whom attended a Lincoln school. There would then be no basis to include Schedule C or name Lincoln in any final judgment on the Plaintiffs' individual claims.

16

Gibson, Dunn & Crutcher LLP

## 2. The Proposed Settlement Cannot Authorize The Department To Violate Its Regulations.

No statute or regulation authorizes the sweeping relief the Plaintiffs seek to obtain through the proposed settlement. The parties cannot achieve by settlement what the Plaintiffs could not have achieved by litigating the case to judgment. *See Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013) (parties cannot through settlement "amend[] an agency rule that would have otherwise been subject to statutory rulemaking procedures"); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) (similar). And the Department cannot promise the Plaintiffs the relief they seek without violating binding regulations. The Court should accordingly reject the proposed settlement as *ultra vires*.

In their original complaint Plaintiffs alleged that since 2018, "the Department has not granted" or denied "any borrower defense applications from any class member." Compl. ¶¶ 381–82. Invoking 5 U.S.C. § 706(1), they sought only a "simple" "order compelling the Department to start granting or denying their borrower defenses." *Id.* ¶ 10. A claim under § 706(1) may proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004) (emphases in original). It applies to a legal obligation "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

Where an agency has discretion in carrying out its statutory duties—here, either to grant or deny a borrower defense application—§ 706(1) permits a court to compel the agency to act, but "no power to specify *what* the action must be." *SUWA*, 542 U.S. at 65 (emphasis added); *Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965, 968 (N.D. Cal. 2013). Were Plaintiffs to litigate this case to final judgment, the substantive relief provided by the proposed settlement would be unavailable. Plaintiffs could not obtain an APA judgment directing the Department to grant thousands of borrower defense claims *regardless* of their merits. Yet that is precisely the relief the proposed settlement would grant.

Nor do binding regulations permit the government to grant loan forgiveness *en masse*, irrespective of the merits of the borrower defense applications. Under the regulations, the Department must provide individualized consideration of each borrower defense application, with input from

1   affected schools.  For loans disbursed before July 1, 2020, the regulations provide that the Department

2   shall "resolv[e]" a borrower's "claim through a fact-finding process."  34 C.F.R. § 685.222(e)(3).  As

3   part of this process, the Department must "notif[y] the school of the borrower defense application and

4   conside[r] . . . [a]ny response or submissions from the school."  *Id.* § 685.222(e)(3)(i).  "To establish a

5   borrower defense under this section, a preponderance of the evidence must show that the borrower has

6   a borrower defense that meets the requirements of this section."  *Id.* § 685.222(a)(2).

7           For loans disbursed after July 1, 2020, the regulations provide additional procedural protections.

8   Borrowers must submit their claims "under penalty of perjury" and "sign a waiver" allowing schools

9   to provide the Department "items from the borrower's education record relevant to" the borrower

10  defense application.  34 C.F.R. § 685.206(e)(8).  When the Department receives a borrower defense

11  application, it must "notify the school," "provide a copy" of the application, and "invite the school to

12  respond and to submit evidence" in its defense.  *Id.* § 685.206(e)(10).  "After considering the

13  borrower's application and all applicable evidence," including "the school's response," the Department

14  must "issu[e] a written decision" that "notif[ies] the borrower and the school of the decision,"

15  "[p]rovide[s] the reasons for" it, and "[i]nform[s] the borrower and the school" of the amount of relief.

16  *Id.* § 685.206(e)(11)-(12).  In sum, the regulations specify standards, method of adjudication, and

17  permissible relief for each borrower defense claim, as well as schools' rights in such adjudications.

18          Nothing in these procedures permits the promised settlement relief.  The Department admits as

19  much:  "Without the settlemen[t]," the Department could not automatically "clea[r] the large number

20  of pending applications for the entire Class," Dkt. 323, at 23, so it is proposing to do so "outside the

21  regulatory process for reviewing and adjudicating borrower defense applications," Dkt. 288, at 15.  The

22  Department is asking for nothing less than permission to disregard binding law.  While complying with

23  the law might take "an inordinate amount of time," Dkt. 323, at 23, the Department cannot ignore its

24  own regulations for the sake of expediency.

25          The parties' counter-arguments are meritless.  The parties suggest that settlements are

26  "presumptively unreviewable," Dkt. 323, at 22–24, but this Court's authority to review a class action

27  settlement for legality cannot be seriously disputed.  The Court has already exercised that power in this

28  case.  *See* Dkt. 146, at 11 (denying final approval of the parties' prior settlement agreement).

The parties also cite the Secretary of Education's and the Attorney General's statutory settlement authority, Dkt. 323, at 22–24, but that general authority does not include the power to violate specific legal requirements, *see Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017) (noting that Secretary of Health and Human Services could not "settl[e] reimbursement claims *en masse* without regard for their merit," as that would "violate the Medicare statute").  Nor does that settlement authority include the power to nullify or rewrite generally applicable regulations or to violate third parties' due process rights.  *See Conservation Nw.*, 715 F.3d at 1187.  While the government may settle a case as between itself and a private party, where a settlement implicates "the interests of individuals and organizations other than those approving the settlement," "[t]he presence of these other interests prevents . . . the trial court, from taking a totally 'hands-off' attitude toward the settlement reached." *United States v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), *aff'd in part on reh'g en banc*, 664 F.2d 435 (5th Cir. 1981).  And nothing in Rule 23(e)—setting forth this Court's authority to approve class action settlements—should be construed to countenance approval of settlements that authorize agencies to act unlawfully.  The Rules Enabling Act expressly provides that the rules "shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).

Any lingering doubt about the settlement's legality is laid to rest by the Supreme Court's recent admonition against governmental assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In the Department's view, its elephantine power to forgive student loans *en masse* has been hiding all along in a statutory mousehole permitting the Department to "compromise, waive, or release" claims in litigation relating to federal student loans.  Dkt. 323, at 21–22.  This is a textbook "major questio[n]," *West Virginia*, 142 S. Ct. at 2605.  Again, it is difficult to improve on the Department's own characterization in its summary judgment briefing: *En masse* forgiveness of loans is an "extraordinary" measure that would "likely result, without any possibility of reasoned consideration, in a massive burden to taxpayers and windfall to applicants for federal benefits."  Dkt. 249, at 29.  The law does not permit that extraordinary measure, by settlement or otherwise.

3.      **The Proposed Settlement Cannot Authorize The Department To Violate The APA.**

Gibson, Dunn &
Crutcher LLP

1    For many of the reasons just described, the proposed settlement also flouts well-settled

2  principles of administrative law.

3    a.  The proposed settlement violates the bedrock principle that an agency must follow its own

4  regulations.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *see also Cent.*

5  *Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004).  As explained above, the Department's

6  borrower defense regulations require it to give individualized consideration to borrower applications.

7  But for class members who attended one of the Schedule C schools, the proposed settlement grants

8  "automatic" relief without any evaluation of the merits of the individual claims—or any consideration

9  of the school's response.  For class members not associated with a Schedule C school, the proposed

10  settlement would establish a new "review" process that includes a series of presumptions that strongly

11  favor debt cancellation.  Dkt. 246-1, at 7–8.  And for "Post-Class Applicants," *i.e.*, *any* person who

12  submits a borrower defense application after the proposed settlement's execution date but before its

13  final approval, the Department must cancel the applicant's debt and refund prior loan payments if it

14  has failed to complete its review within three years—again, regardless of the application's merits.  *Id.*

15  at 11.  This "type of mass settlement . . . [is] illegal," because governing regulations do not permit the

16  Department to forgive federal loans "regardless of the merit of [the borrower defense] claims."  *Am.*

17  *Hosp. Ass'n*, 867 F.3d at 167.

18    b.  The proposed settlement also would violate the APA.  The Department has effectively

19  created and is attempting to enforce substantive rules that have not been promulgated through notice

20  and comment.  *See* 5 U.S.C. § 553.  Although the Department attempts to avoid that conclusion by

21  framing the promised relief as mere "settlement relief"—"not any borrower defense adjudication

22  through the Department's regulatory process," Dkt. 288, at 7—the settlement still resolves pending

23  borrower defense claims.  The borrower defense regulations govern resolution of such claims, and the

24  Department's settlement authority cannot change binding regulations.  *See Price*, 867 F.3d at 167.

25  Settlement agreements are improper if they allow a federal agency to "permanently and substantially

26

27

28

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

amend[] an agency rule that would have otherwise been subject to statutory rulemaking procedures." *Conservation Nw.*, 715 F.3d at 1187.[13]

The proposed settlement would "effect a change in existing law or policy" and implicate schools' (and applicants') substantive rights. *Reno-Sparks Indian Colony v. EPA*, 336 F.3d 899, 909 (9th Cir. 2003). It is thus "indisputable that the [Department] would have had to go through formal procedures"—notice-and-comment rulemaking—"if [it] had sought to implement the changes to [the borrower defense regulations] contained in the [proposed settlement] on [its] own." *Conservation Nw.*, 715 F.3d at 1187. Because the proposed settlement revises the regulatory framework for resolving hundreds of thousands of borrower defense claims without undertaking the requisite notice-and-comment procedures, it must be set aside.

c. The proposed settlement also violates the APA by arbitrarily stripping away schools' rights to administrative and judicial review. The Department has an "obligation to process borrower defense claims," Dkt. 46, at 12 (Class Cert. Order), and it cannot bypass that process through the label of "settlement relief," Dkt. 288, at 14–15; *see also Vara v. DeVos*, 2020 WL 3489679, at *26, *32 (D. Mass. June 25, 2020) (holding that Department must render reasoned decisions on borrower defense applications and follow its own "settled course of adjudication" in doing so). The applicable borrower defense regulations provide schools a series of procedural protections—including departmental "noti[ce]" and consideration of "[a]ny response or submissions from the school," 34 C.F.R. § 685.222(e)(3)(i) (for loans originated before July 1, 2020), and a "written decision" that informs the school of the amount of relief, *id.* § 685.206(e)(10)-(12) (for loans originated after July 1, 2020).

Those administrative protections, in turn, guarantee judicial review. As final agency action, the Department's adjudication of a borrower defense application would permit an adversely affected school to challenge the Department's determinations in federal district court as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The school would have

---

[13] Plaintiffs assert that the proposed settlement does not amend the borrower defense regulations, but rather is a "process and timeline to resolve the Class's claims *within* the existing BD framework." Dkt. 287, at 24 (emphasis added). That is pure fantasy. As the Department has recognized, the proposed settlement would resolve the borrower defense applications "*outside* the regulatory process for reviewing and adjudicating borrower defense applications." Dkt. 288, at 15 (emphasis added).

standing as a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* § 702.  But the proposed settlement casts that guarantee of judicial review aside, with the Department settling the case by agreeing to *presume* Lincoln a wrongdoer.  The APA does not allow that result.

### 4.    The Proposed Settlement Would Violate Lincoln's Due Process Rights.

Independently, the proposed settlement violates Lincoln's constitutional due process rights.  To establish a procedural due process claim, a party must show that it was deprived of "a liberty or property interest" without constitutionally adequate process.  *Hewitt v. Grabicki*, 794 F.2d 1373, 1380 (9th Cir. 1986).  Here, Schedule C labels Lincoln a wrongdoer without *any* process, impairing Lincoln's liberty interest in its reputation, Lincoln's procedural rights in the borrower defense and recoupment process, and Lincoln's property rights in Title IV funds long ago received.

a. *Liberty Interest*.   Lincoln possesses a constitutionally protected liberty interest in its reputation.  "A liberty interest may be implicated where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."  *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 764 (9th Cir. 2020) (cleaned up).  Reputational harm caused by the government can constitute the deprivation of a cognizable liberty interest if a plaintiff "was stigmatized in connection with the denial of a more tangible interest."  *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (cleaned up).  Under this "stigma-plus" test, "a plaintiff who has suffered reputational harm at the hands of the government may assert a cognizable liberty interest for procedural due process purposes if the plaintiff suffers stigma from governmental action plus alteration or extinguishment of a right or status previously recognized[.]" *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022) (cleaned up).

The Department's publication and dissemination of Schedule C has inflicted—and will continue to inflict—severe reputational harms on Lincoln.  The "stigma" of inclusion on a list of wrongdoers "bearing the imprimatur of the [Department of Education]" immediately affects their relationship with current and prospective students and can cause schools to "los[e] additional students to competitors," "los[e] donations," and suffer other consequences.  *Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*, 493 F. Supp. 976, 978–79 (D.D.C. 1980).  In addition, there is a "tangible" plus factor, *Fikre*, 35 F.4th at 776:  By labeling Lincoln a presumptive wrongdoer,

Gibson, Dunn &
Crutcher LLP

Schedule C effectively extinguishes the procedural rights explicitly provided to Lincoln by the borrower defense regulations and impairs Lincoln's right to defend itself in any future recoupment proceedings. *See infra* at 24–25; 34 C.F.R. § 685.206(c)(3), (c)(4), (e)(16); *id.* § 685.222(e)(7), (h)(1) (specifying procedures for recoupment). Lincoln thus has a protectable liberty interest in avoiding "stigmatizing governmental" action that has "an immediate and tangible effect on its ability to do business." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961 (D.C. Cir. 1980).

The harm to Lincoln's reputation from Schedule C is not "speculative," Dkt. 287, at 15, or "unsupported," Dkt. 288, at 18, as the parties have argued. Schedule C attaches (to use the Plaintiffs' words) the "stigma" of the "industry's bad behavior" to Lincoln and the other intervenors. Compl. ¶ 110. Lincoln is in this case precisely because of the reputational harm from a no-fault, no-finding settlement with the Massachusetts AG in 2015. The parties' assurances that Schedule C similarly involves no "broader determination" of "substantial misconduct," Dkt. 288, at 17, is thus wrong and beside the point. This settlement would magnify the repercussions of Lincoln's 2015 settlement concerning two campuses in Massachusetts to now include 22 campuses across 14 states. These reputational concerns are especially important for Lincoln, a public company whose stock is publicly traded. Lincoln already has described this lawsuit in its latest Form 10-Q submission to the Securities and Exchange Commission. Form 10-Q, Lincoln Educational Services Corporation (Aug. 8, 2022), bit.ly/3V56fU8. The consequences of this settlement for Lincoln are immediate and tangible.

b. *Property Interest*. The proposed settlement also would deprive schools of constitutionally protected property interests in Title IV funds that they have received—in some cases, decades ago. Schools have "a property interest in retaining the funds in [their] accounts" and thus possess a vested property interest in Title IV loans already received. *Chauffeur's Training Sch., Inc. v. Riley*, 967 F. Supp. 719, 729 (N.D.N.Y. 1997) (holding that school has "a constitutionally protected property interest" under the FFEL program in "loan proceeds" "that were paid to [the school] by its students to cover the costs of those students' educations"). Even if Title IV funds are dispersed subject to the government's limited right of recoupment, that right is prescribed in duly promulgated regulations that set strict procedures and time limits. *See* 34 C.F.R. §§ 685.206, .222. Outside those strictures, schools' rights in Title IV funds become vested and are not subject to diminishment or recoupment.

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

1       The proposed settlement would retroactively and impermissibly diminish schools' property

2 rights. Students' borrower defense claims are now time-barred for many of the FFEL loans at issue,

3 precluding even any possibility of a recoupment action. Yet the settlement is clearly reviving these

4 time-barred claims, as well as the threat of recoupment. Property rights that had been vested are now,

5 it would appear, contingent. This squarely implicates due process. *See Kerley Indus., Inc. v. Pima*

6 *Cnty.*, 785 F.2d 1444, 1446 (9th Cir. 1986).

7       c. *Constitutionally Inadequate Process.* Despite these clear liberty and property interests,

8 Lincoln has been offered *no* process to defend against its inclusion in Schedule C. The Department

9 has publicly branded Lincoln as engaging in "institutional misconduct," Dkt. 246, at 17, without any

10 official finding of wrongdoing and without affording Lincoln *any* opportunity to rebut the claims

11 against it—much less the procedure guaranteed by the regulations. That is constitutionally inadequate.

12       It is no answer that Lincoln might have an opportunity to defend itself against recoupment in

13 some later administrative proceeding. The recoupment provisions of the regulations require as an

14 essential predicate that there is a borrower defense claim adjudicated "under this section" or "under

15 this subparagraph (e)" of the regulations. 34 C.F.R. §§ 685.206(c)(3), (e)(16), 685.222(e)(7). This

16 settlement provides that no borrower defense claims are adjudicated "under" the regulations, yet the

17 government claims it still can seek recoupment from schools. *See* Dkt. 323-1, at 19. It therefore

18 appears that the government is simply eliminating the essential predicate of a lawfully adjudicated

19 borrower defense claim for schools on Schedule C—a violation of the regulations that schools have

20 every right to challenge. *See Sneaker Circus, Inc. v. Carter*, 566 F.2d 396, 402 (2d Cir. 1977) (it is "a

21 commonplace that an agency's violation of its own procedures may constitute a denial of due process").

22       In any event, any process available in these unlawful recoupment proceedings would not redress

23 the harm that Lincoln is already experiencing from being included on Schedule C. First, the settlement

24 *immediately* impairs schools' interest in avoiding a drastic and unwarranted expansion of exposure to

25 recoupment liability. The influx of borrower defense applications in the proposed settlement's wake—

26 with 179,000 post-class applicants in the last three months alone, *see supra* at 4 n.1—itself belies the

27 parties' anodyne assertion that Schedule C will have no adverse effects on schools. And it is highly

28 likely (at least in Lincoln's case) that the borrower defense claims, if fairly adjudicated, would be

denied in full.  Most are time-barred—as old as 1992, *see* Giglio Decl. ¶ 7—and legally deficient on their face.  Even if a claim had some merit, the Department can grant the claim "in whole or in part." 34 C.F.R. § 685.206(c)(1)(i), (ii).  Yet without any reasoned decision or consideration of the merits, this settlement would automatically grant all claims *in full*.  Because the Department can seek to recoup "the amount of relief arising from the borrower defense," *id.* § 685.206(c)(3), the settlement would immediately—and vastly—expand schools' potential recoupment liability.  Lincoln is thus losing important procedural protections for its vested interests here and now.[14]

Second, a hearing official in a subsequent recoupment proceeding will be impermissibly biased—both in appearance and in fact—against the Schedule C schools.  The official's employer (the Department of Education) will have decreed in a final court judgment that the schools are presumptive wrongdoers.  *See* 34 C.F.R. § 685.222(e)(3) ("a Department official" is designated "to review the borrower's application" and to conduct the "fact-finding process"); *id.* § 685.206(e)(8) (similar).  How can schools expect a fair shake from Department employees in such a proceeding?  Where property rights are at stake—as they are here—due process requires a neutral decisionmaker. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("an impartial decision maker is essential" to the adjudicatory process).  Schools cannot get that after this settlement.

## IV. CONCLUSION

Lincoln respectfully requests the Court to condition approval of the settlement on the parties' agreement to strike Lincoln from Schedule C.  Should the parties decline to do so, this Court should reject the proposed settlement.

Dated: October 6, 2022

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ *James L. Zelenay, Jr.*_____
James L. Zelenay, Jr.

*Attorneys for Intervenor Lincoln Educational Services Corporation*

---

[14] The Department's non-binding assurances in litigation that it will not seek recoupment *solely* based on this settlement (Dkt. 288-1 ¶ 9) are inadequate because they do not account for the unconstitutional taint resulting from the settlement and the erosion of schools' procedural, property, and liberty rights.  If nothing else, the Court should hold that the final settlement precludes any later action by the Department to recoup the discharged loan amounts, for the reasons described herein.

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

Gibson, Dunn & Crutcher LLP

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on October 6, 2022, I caused to be electronically filed the foregoing brief

3

with the Clerk of the Court via CM/ECF.  Notice of this filing will be sent by email to all parties by

4

operation of the Court's electronic filing systems.

5

Dated: October 6, 2022                          GIBSON, DUNN & CRUTCHER LLP

6

By:   ____/s/ *James L. Zelenay, Jr.*_____
                                                            James L. Zelenay, Jr.

7

8

*Attorneys for Intervenor Lincoln Educational Services
Corporation*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTERVENOR LINCOLN EDUCATIONAL SERVICES CORPORATION'S RESPONSE TO JOINT MOTION FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. 3:19-CV-03674-WHA

Gibson, Dunn &
Crutcher LLP