**MCGUIREWOODS LLP**
JOHN S. MORAN (*pro hac vice*)
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Telephone: 202.828.2817
Facsimile: 202.857.1737

**MCGUIREWOODS LLP**
PIPER A. WALDRON (SBN 291482)
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
Telephone: 310.315.8250
Facsimile: 310.956.3150

Attorneys for Intervenor
American National University

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>        Defendants. | CASE NO. 19-cv-03674-WHA<br><br>Judge:Hon. William H. Alsup<br>Ctrm: 12<br><br>**INTERVENOR AMERICAN NATIONAL UNIVERSITY'S OPPOSITION TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>**Hearing Date:  November 3, 2022**<br>**Hearing Time:  11:00 a.m.**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

I.   INTRODUCTION .................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ................................... 3

    A.   Litigation Background ...................................................................... 3

    B.   Proposed Settlement ......................................................................... 6

III. ARGUMENT ......................................................................................... 10

    A.   The Settlement Agreement Is Unfair to Third Parties ................... 11

        1.   The Settlement Agreement Unfairly and Unlawfully
            Circumvents the Procedures Established for Resolving
            Borrower-Defense Claims Under Department of Education
            Regulations ............................................................................ 13

        2.   The Settlement Agreement Creates an Unfair Risk of
            Collateral Consequences Through Future Recoupment
            Efforts and Otherwise ........................................................... 14

        3.   The Settlement Agreement Inflicts Unfair Reputational
            Harm on the Schools Listed on Exhibit C ............................ 15

    B.   The Parties Have Failed to Show—and Cannot Show—That the
        Settlement Agreement Is Lawful and Fair Even for the Putative
        Settlement Class ............................................................................. 21

        1.   Many Class Members Likely Lack Standing in Light of
            the Biden Administration's $400 Billion Loan Forgiveness
            Initiative .............................................................................. 23

        2.   The Settlement Class Improperly Includes Members
            Whose Borrower Defense Applications Have Already
            Been Adjudicated .................................................................. 24

        3.   The Settlement Agreement Unfairly Imposes Tax Risks
            and Consequences on Class Members Which the Parties
            Have Failed to Address ......................................................... 24

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Federal Cases**

4

5
*Am. Med. Ass'n v. Stenehjem*,
  2019 WL 10920631 (D.N.D. Nov. 26, 2019) ..................................................... 16

6

7
*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) ............................................................................................ 17

8

9
*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) .................................................................... 1, 2, 11

10

11
*Donovan v. Robbins*,
  752 F.2d 1170 (7th Cir. 1985) ........................................................................... 11

12
*In re Drexel Burnham Lambert Grp. Inc.*,
  995 F.2d 1138 (2d Cir. 1993) ........................................................................ 2, 11

13

14
*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) .................................................................... 16, 17

15

16
*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998), *overruled on other grounds by Wal-*

17
  *Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................. 11

18
*Lane v. Facebook*,
  696 F.3d 811 (9th Cir. 2012) ............................................................................. 11

19

20
*Meese v. Keene*,
  481 U.S. 465 (1987) ........................................................................................... 16

21

22
*Ness Inv. Corp. v. U.S. Dep't of Agric.*,
  512 F.2d 706 (9th Cir. 1975) ............................................................................. 13

23

24
*Okemo Mountain, Inc. v. Sikorski*,
  2006 WL 1745039 (D. Vt. June 21, 2006) ........................................................ 16

25

26
*Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*,
  663 F.2d 371 (2d Cir. 1981) .............................................................................. 16

27

28
*Robins v. Spokeo, Inc.*,
  867 F.3d 1108 (9th Cir. 2017) ........................................................................... 17

ii

*Sackman v. Liggett Grp., Inc.*,
    167 F.R.D. 6 (E.D.N.Y. 1996)................................................................16

*Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Ed.*,
    493 F. Supp. 976 (D.D.C. 1980)..........................................................17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330, 341 (2016) ....................................................................24

*Student A v. The Board of Trustees of Columbia University in the City*
    *of New York*, No. 22-cv-06567, Dkt. 1 (S.D.N.Y. Aug. 2, 2022) ...................18

*Team Worldwide Corp. v. Wal-Mart Stores, Inc.*,
    2017 WL 6059303 (E.D. Tex. Dec. 7, 2017) .......................................16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190, 2208 (2021) .............................................................24

*In re U.S. Dep't of Educ.*,
    25 F.4th 692 (9th Cir. 2022)...........................................................6, 7

*United States v. Carpenter*,
    526 F.3d 1237 (9th Cir. 2008) .......................................................13, 14

*United States v. City of Miami, Fla.*,
    614 F.2d 1322 (5th Cir. 1980) ............................................................12

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ..............................................................12

**Federal Statutes**

Administrative Procedure Act
    5 U.S.C. § 555(e) ..................................................................................5

Administrative Procedure Act
    5 U.S.C. § 706(1).................................................................................4

Administrative Procedure Act
    5 U.S.C. § 706(2).................................................................................6

Higher Education Relief Opportunnities for Students Act of 2003,
    Pub. L. No. 108-76, 117 Stat. 904 .......................................................1

Higher Education Act, 20 U.S.C.
§ 1087e(h) ............................................................................................. 3

**Other Authorities**

34 C.F.R. § 685.222(e)(3)(i) .................................................................. 9, 14

34 C.F.R. §§ 685.206, 685.222 ................................................................... 3

ABA Journal, *Villanova Says Inaccurate LSAT and GPA Data Were
    'Knowingly Reported' to the ABA in Prior Years*, bit.ly/3Rz5zU1
    (last accessed Oct. 6, 2022) ................................................................ 18

Alicia Adamcyz, *Defrauded borrowers could see their entire federal
    student loan balances forgiven thanks to monumental court case:
    What you need to know*, FORTUNE (Aug. 30, 2022),
    https://fortune.com/2022/08/30/defrauded-borrowers-could-see-
    their-entire-federal-student-loan-balances-forgiven/ ........................... 20

Douglas Laycock, *Consent Decrees Without Consent: The Rights of
    Nonconsenting Third Parties*, 1987 U. CHI. LEGAL F. 103, 104
    (1987).................................................................................................. 12

Fed. R. Civ. P. 23(b) ............................................................................ 2, 22

Fed. R. Civ. P. 23(e) ................................................................................ 11

Fed. R. Civ. P. 23(e)(B)(2) ....................................................................... 11

Fed. R. Civ. P. 23(e)(B)(2) ....................................................................... 16

NBC News, *Caught cheating: Colleges falsify admissions data for
higher rankings*, nbcnews.to/3CxLp8y (last accessed Oct. 6, 2022) ...... 18

Project on Predatory Student Lending, Information on the *Sweet v.
    Cardona* Proposed Settlement, https://www.ppsl.org/sweet-v-
    cardona-class-members/#sweet-settlement ..................................... 15, 23

Victoria (Torie) Ludwin, *Fighting Fraudulent Student Debt, One Bad
    Actor at a Time*, ARNOLD VENTURES (Aug. 30, 2022),
    https://www.arnoldventures.org/stories/fighting-fraudulent-student-
    debt-one-bad-actor-at-a-time.............................................................. 21

OPPOSITION TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

White House, *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022) ...................................23

OPPOSITION TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

1    **I.**    **INTRODUCTION**

2        After this Court granted preliminary approval for the Settlement Agreement,

3    which forgives an estimated $6 billion in student loan debt, President Biden

4    announced forgiveness for an estimated $400 billion in student loan debt under the

5    Higher Education Relief Opportunnities for Students Act of 2003.  That new

6    initiative claims to address economic effects of COVID-19, and eligibility is

7    ostensibly related to economic need.  Here, by contrast, the Settlement Agreement

8    claims to provide debt relief for the purely procedural injury of delayed application

9    processing.  And to be eligible, you must accuse your former school of

10   misrepresentation, and if you went to a school called out on Exhibit C, your loan

11   will be automatically forgiven and refunded.  It blinks reality to suggest, as the

12   parties do, that this settlement is a private matter between them with no ill effects for

13   the schools involved—especially those on Exhibit C.

14       Intervenor American National University and other schools have intervened

15   here to protect themselves from unfair and unjust treatment under the Proposed

16   Settlement, which maligns them as wrongdoers without justification or due process

17   and which will continue to affect them in their future dealings with the Department

18   of Education.  Specifically, the Settlement Agreement circumvents the regulatory

19   procedures established for resolving borrower defense claims under the Department

20   of Education's regulations that are crafted to balance due process and fairness

21   concerns; it burdens Intervenor with an unfair risk of collateral consequences

22   through future recoupment and other efforts; and it has already and will continue to

23   inflict unfair reputational harms—especially if this Court gives its imprimatur to

24   Exhibit C through final approval.

25       While the parties have attempted to address these concerns—particularly by

26   downplaying the risk of recoupment through the Miller Declaration—they have

27   fallen far short of proposing a settlement that is fair to affected third parties.  That

28   alone is sufficient basis to deny preliminary approval.  *See Campbell v. Facebook,*

*Inc.*, 951 F.3d 1106, 1120–21 (9th Cir. 2020) ("A district court may approve a class-action settlement only after finding that the settlement is 'fair, reasonable, and adequate.'"); *In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) (holding that the fairness assessment of a proposed settlement must include "how the accord affects the rights of third parties").

But separate and apart from its third-party effects, the Settlement Agreement is unlawful and cannot be approved. The Court also granted intervention because it recognized that it needed intervenors "to keep the system honest." Aug. 4 Tr. at 52:5–6. Both Plaintiffs and the Department of Education are playing with house money and have every incentive to get their agreement approved.

The Parties have therefore failed to bring the Court's attention to serious legal defects in the Settlement Agreement that preclude final approval. The Settlement Agreement purports to grant substantive debt forgiveness to borrowers who have sued over a purely procedural injury. It thus gives relief far beyond that which Plaintiffs would receive if they won this action on the merits. That relief exceeds both the Department of Education's regulatory authority to resolve borrower-defense claims and the Federal Government's settlement authority. Going forward, the Settlement Agreement would improperly allow the Department of Education to adjudicate borrower-defense applications under rules that are inconsistent with existing regulations and that have not gone through the negotiated rulemaking process themselves. Plaintiffs and the Department have failed to establish that they are entitled to certification of the newly defined settlement class under Rule 23(b). President Biden's new loan-forgiveness initiative has undermined standing for many would-be class members and has highlighted that loan forgiveness is not necessarily the windfall the parties make it out to be. The Parties have thus failed to show even that the settlement is fair for putative class members.

The Court should deny final approval and either send the parties back to the bargaining table—where Intervenors can help to craft a fair and equitable

settlement—or proceed with the case on the merits, where the United States has highlighted serious deficiencies in Plaintiffs' claims.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Litigation Background

Plaintiffs filed their class action complaint ("Complaint") on June 25, 2019, after the Department did not issue a final decision on any borrower-defense applications for over a year. *See* Dkt. 1 ("Compl.") ¶¶ 5, 135, 181–82.  The Complaint sought declaratory and injunctive relief and alleged that the delay in issuing decisions on borrower-defense claims since June 2018 constituted agency action unlawfully withheld or unreasonably delayed. *Id.* ¶¶ 377–89.

As relevant here, the crux of Plaintiffs' claim was that the Department has a mandatory duty under the Higher Education Act, 20 U.S.C. § 1087e(h), and its own regulations, 34 C.F.R. §§ 685.206, 685.222, to timely decide and resolve borrowers' claims. *See* Compl. ¶¶ 58–65.  They argued that the Department had "stop[ped] deciding borrower defenses and adopt[ed] a policy of refusing to grant any borrower defenses." *Id.* at 22.  And they asked the Court to "compel the Department to start granting Class Members' individual borrower defense assertions if they are eligible for a borrower defense" and "to start denying Class Members' individual borrower defense assertions if they are not eligible for a borrower defense." Compl. ¶ 388–89; *accord id.* ¶ 404 ("The Court should . . . vacate [the Department's] refusal to grant borrower defenses.").

Plaintiffs moved for class certification on July 23, 2019, *see* Dkt. 20, which the Court granted on October 30, 2019, Dkt. 46.  The Court certified a class of "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been ***granted or denied on the merits***, and who is not a class member in *Calvillo Manriquez v. DeVos*." *Id.* at 14 (emphasis added).  The Department filed an Answer on November 14, 2019,

Dkt. 55, and certified an Administrative Record, Dkt. 56.

The Department originally moved for summary judgment on December 5, 2019. *See* Dkt. 63. The Department argued, among other things, that its temporary delay in issuing decisions on pending borrower-defense applications was reasonable and that relief under Section 706(1) of the Administrative Procedure Act ("APA") would be inappropriate. *See id.* Plaintiffs filed a cross-motion for summary judgment on December 23, 2019, *see* Dkt. 67, and sought to supplement the Administrative Record, *see* Dkt. 66.

The Department supplemented the Administrative Record on January 9, 2020. *See* Dkt. 71. At that time, the Department represented that it had resumed the issuance of final decisions on borrower-defense applications as of December 10, 2019, and that it had adopted a new methodology for determining the amount of relief that should be afforded when it granted a borrower-defense application. *See id.*

On April 7, 2020, while the cross-motions for summary judgment remained pending, Plaintiffs and the Department executed a settlement agreement, which they submitted for preliminary approval on April 10, 2020. *See* Dkt. 97. Consistent with the nature of Plaintiffs' claims, that tentative settlement was focused on creating a timeline and associated enforcement mechanisms to ensure that the Department would continue processing borrower-defense applications and would clear its backlog. Under its key terms, the Department would have been bound to: (A) a "[t]imeline for clearing [the] backlog of Class applications pending as of the Execution Date," Dkt. 97-2, at 5; (B) a series of "[r]eporting [r]equirement[s]," *id.* at 7; (C) and three "[o]ther [a]ssurances," *id.* at 10—namely, that the Department would (1) "issue written decisions resolving borrower defense applications and communicate those decisions to borrower defense applicants, as required by the Department's 2016 Borrower Defense Regulations"; (2) "not take action to collect outstanding student loan debts through involuntary collection activity against

4

individuals with pending borrower defense applications, as required by the Department's 2016 Borrower Defense Regulations"; and (3) "provide an interest credit for any interest that accrues on the relevant federal student loan accounts [while an application is pending]," *id.*  Nothing in the 2020 proposed settlement would have altered the standards or procedures for educational institutions to participate in the adjudication processes under the Department's regulations; to the contrary, the proposed settlement made clear that applications would be adjudicated in accordance with the applicable regulations.

The Court granted preliminary approval of that proposed settlement on May 22, 2020.  *See* Dkt. 103.  A final approval hearing was set for October 1, 2020.  *See* Dkt. 105.  A dispute arose, however, over the Department's use of form denial notices, which Plaintiffs believed to be procedurally inadequate.  At Plaintiffs' request, the Court held a conference on the issue and ordered further briefing, but still held the final approval hearing on October 1, 2020.  *See* Dkt. 115; Defs.' Resp. to Aug. 31, 2020 Order, Dkt. 116; Pls.' Motion to Enforce and for Final Approval, Dkt. 129; Transcript of Oct. 1, 2020 Hearing, Dkt. 147.

The Court denied final approval of the settlement on October 19, 2020, finding there was "no meeting of the minds."  Dkt. 146 at 10.  The Court ordered Plaintiffs and the Department to conduct expedited discovery because the case required "an updated record . . . to determine what is going on before we again attempt to resolve the merits."  *Id.* at 11.  The Court also ordered the Department to show cause why it should not be enjoined from issuing any further denials of Class Members' borrower-defense applications until a ruling could be had on the legality of the form denial notices.  *See id.* at 17.  In response, the Department agreed to stop issuing denials until such a ruling.  *See* Defs.' Response to Order to Show Cause, Dkt. 150, at 2–3.

Plaintiffs and the Department conducted discovery through the spring of 2021, and Plaintiffs thereafter sought leave to file a Supplemental Complaint, *see*

Dkt. 192, which the Court granted on April 13, 2021, *see* Dkt. 197.  The Supplemental Complaint alleges that the Department had adopted an unlawful "presumption of denial" policy for borrower-defense applications, in violation of Section 706(2) of the APA, and had issued thousands of unlawful Form Denial Notices pursuant to this policy, in violation of Section 555(e) of the APA.  Dkt. 198, Supplemental Complaint ("Supp. Compl.") ¶¶ 436–47.  Plaintiffs further alleged that both the policy and the Form Denial Notices violated the Due Process Clause. *Id.* ¶¶ 448–55.  In their consolidated prayer for relief, Plaintiffs requested, *inter alia*, that the Court (i) vacate the Department's policy of refusing to adjudicate borrower-defense applications and its 'presumption of denial' policy; (ii) declare that the Form Denial Notices were invalid and vacate all such denials; (iii) compel the Department to lawfully adjudicate all pending borrower-defense applications, including by providing an adequate statement of grounds for any denials; and (iv) require the Department to hold all Class Members in forbearance or stopped collection status until their applications were granted or denied on the merits.  *Id.* at 76–77.  The Department answered the supplemental complaint on June 23, 2021. Dkt. 206.

### B. Proposed Settlement

While it was not clear to the public at the time, it is now clear that, as of May 2021, a few months after the start of the Biden Administration, Plaintiffs and the Department had begun a new round of settlement discussions.  *See* Dkt. 246, at 7. For much of the ensuing time, this litigation was stayed while the Department sought a writ of mandamus from the Ninth Circuit over the deposition of former Education Secretary Betsy DeVos, which the Ninth Circuit ultimately granted.  *See In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022).  Notably, however, when the Court of Appeals asked Plaintiffs and the Department at oral argument whether there were any pending settlement discussions that might moot the discovery dispute, *see* Oral Argument in *In re U.S. Dep't of Educ.*, No. 21-71108, at 39:20–

40:15; 45:25–46:15, *available at*

https://www.ca9.uscourts.gov/media/video/?20211006/21-71108/, they did not

disclose what they now have disclosed: that settlement discussions were actively

underway.

Following the Ninth Circuit's ruling, this Court restarted the summary

judgment process. *See* Dkt. 216, 219, 240. Plaintiffs filed their motion on June 9,

2022, *see* Dkt. 245, and the Department filed its cross-motion and opposition on

June 23, 2022, *see* Dkt. 249. In the interim, however, Plaintiffs and the Department

filed their joint motion for preliminary approval of a new Settlement Agreement.

*See* Dkt. 246. They also stipulated to vacatur of the summary judgment briefing

schedule, *see* Dkt. 247, which the Court granted, *see* Dkt. 250. The Court then

ordered on July 12, 2022, that the summary judgment hearing previously set for July

28, 2022, would be used instead for a hearing on the motion for preliminary

approval of the settlement. *See* Dkt. 251.

Shortly after Plaintiffs and the Department moved for preliminary approval,

on July 13, 2022, Intervenor filed a Motion to Intervene, *see* Dkt. 254, as did other

educational institution intervenors on July 13 and July 14, *see* Dkt. 261, 265.

Plaintiffs and the Department filed consolidated oppositions to the motions to

intervene on July 28, 2022. *See* Dkt. 287, 288. The proposed intervenors variously

sought to protect their interests in this action related to legal, economic, and

reputational harms the proposed settlement could subject them to. On July 15, 2022,

the Court set a briefing schedule for the motions to intervene and scheduled a

consolidated hearing on the motions and the motion for preliminary approval. *See*

Dkt. 269.

At the consolidated hearing on August 4, 2022, the Court granted preliminary

approval of the settlement agreement, Aug. 4 Tr. at 40, 48, and it noted it was

"tentatively" inclined to grant permissive intervention, *id.* at 47:9–11. The Court

subsequently issued a preliminary approval order setting the following deadlines:

the Department would provide notice to the Class by August 19, 2022; additional motions to intervene would be filed by August 25, 2022; Class Member comments would be submitted by September 15, 2022; Plaintiffs and the Department would move for final approval of their settlement agreement by September 22, 2022; and a final approval hearing would be held on November 3, 2022. *See* Dkt. 307, 308, 315.

No additional motions to intervene were filed by the deadline. On August 31, 2022, the Court granted the proposed intervenors' motions for permissive intervention while denying their motions to intervene as of right, allowing the intervenors to participate "for the sole and express purpose of objecting to and opposing the class action settlement." *See* Dkt. 322. Plaintiffs and the Department subsequently filed their Notice of Motion and Joint Motion for Final Approval of Settlement on September 22, 2022. *See* Dkt. 323.

The relief to class members set forth in the new proposed settlement differs substantially from the relief contemplated by the earlier proposed settlement and from what the Plaintiffs sought in both their original and supplemental complaints. In particular, the Department agrees that "[n]o later than one year after the Effective Date, [it] will effectuate Full Settlement Relief for each and every Class Member whose Relevant Loan Debt is associated with the schools, programs, and School Groups listed in Exhibit C hereto"—including for borrowers whose applications the Department had previously denied. Dkt. 246-1, at 6. The proposed settlement defines "Full Settlement Relief" as: "(i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt." *Id.* at 4. Exhibit C then includes a list of over 150 schools, including

OPPOSITION TO JOINT MOTION FOR APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

1    Intervenor and other similarly situated schools.  *See id.*, Ex. C.[1]

2           As explained in the motion to approve the proposed settlement, these

3    provisions are intended to "provide[] for automatic relief . . . for approximately 75%

4    of the class," which includes "approximately 200,000 Class Members."  Dkt. 246, at

5    3.  Without further elaboration of how this list was assembled or settled on,

6    Plaintiffs and the Department assert that "[t]he Department has determined that

7    attendance at one of these schools justifies presumptive relief, for purposes of this

8    settlement, based on strong indicia regarding substantial misconduct by listed

9    schools, whether credibly alleged or in some instances proven, and the high rate of

10   class members with applications related to the listed schools."  *Id.*[2]  This is

11   apparently so whether or not the Department has ever provided notice, consistent

12   with Department regulations, to the school that the Department has received the

13   borrower's application.  While some institutions have received notice of and

14   responded to individual borrower defense claims, the Department proposes to grant

15   "automatic" relief even where the institution has not received notice from the

16   Department, much less an opportunity to respond—such that the Department could

17   not have "consider[ed]" their responses in adjudicating the applications.  *See* 34

18   C.F.R. § 685.222(e)(3)(i).

19          The proposed settlement would also have the Department overlook any causal

20   connection between allegations of noncompliance and the individual borrower's

21

22   _____

23   [1] The proposed settlement further provides, "[i]f the Department's borrower defense
     or loan data includes conflicting evidence which raises a substantial question as to
24   whether a Class Member's Relevant Loan Debt is associated with a program,
     school, or School Group listed in Exhibit C, the question will be resolved in favor of
25   the Class Member (i.e., in favor of granting relief)."  *Id.* at 7.

26   [2] Of course, to say that allegations have been "in some instances proven" is to say
27   that, in other instances, they *have not* been proven.  Likewise, allegations "credibly
     alleged" are not proven.
28

application.  The Department proposes to grant loan forgiveness regardless of whether the student attended the school during the period of any alleged noncompliance and without adjudicating whether the student in question was actually harmed by any alleged noncompliance.

The motion in support of the proposed settlement demonstrates that Plaintiffs and the Department are capable of negotiating a settlement that facilitates speedy and fair adjudication of borrower defense applications, as they specify that "[t]he remaining 25% of the class . . . will receive final written decisions on their BD applications within the specific periods of time, correlating to how long they have been waiting." *Id.*  The proposed settlement includes "a streamlined process that provides certain presumptions in favor of the borrower." *Id.*  That streamlined process may short-circuit some of the Department's regulations, but it also does not wholesale jettison the procedural protections that they afforded to schools.

The process contemplated by the proposed settlement represents a clear departure from the Department's borrower-defense regulations and the procedural rights afforded to educational institutions under those regulations.  Indeed, the Department expressly disclaims in the proposed settlement that the relief it provides "could be recovered by Plaintiffs in this Action" (or that the Department has violated the APA in the first place).  Dkt. 246-1, at 22.  The procedures contemplated by the proposed settlement also represent a departure from the Department's role as a factfinder under those regulations, since the proposed settlement contemplates the use of strong presumptions and "automatic" relief.  The proposed settlement does not make clear, as it should, that the rights of educational institutions like Intervenor cannot be eliminated or reduced by the Department's unilateral settlement with student borrowers.

III.   **ARGUMENT**

The Court should deny final approval of the settlement because it is unfair to third parties, particularly the schools on Exhibit C, because it does not comport with

10

1   the law, including the requirements for class certification under Rule 23, and

2   because the parties have failed to establish that it is actually fair and reasonable for

3   members of the putative settlement class.  Intervenor ANU also agrees with the

4   objections raised by the other Intervenors and adopts those objections as well.

5   ### A. The Settlement Agreement Is Unfair to Third Parties

6           The Court cannot approve the Settlement Agreement consistent with its

7   obligations in equity given the unfairness it imposes on third parties like Intervenor.

8   It is clearly established that "[a] district court may approve a class-action settlement

9   only after finding that the settlement is 'fair, reasonable, and adequate.'" *Campbell*

10  *v. Facebook, Inc.*, 951 F.3d 1106, 1120–21 (9th Cir. 2020) (quoting Fed. R. Civ. P.

11  23(e)).  The district court "must evaluate the fairness of a settlement as a whole,

12  rather than assessing its individual components." *Lane v. Facebook*, 696 F.3d 811,

13  818–19 (9th Cir. 2012).  Rule 23(e) requires that the Court consider whether "(A)

14  the class representatives and class counsel have adequately represented the class;

15  (B) the proposal was negotiated at arm's length; (C) the relief provided for the class

16  is adequate . . . ; and (D) the proposal treats class members equitably relative to each

17  other." Fed. R. Civ. P. 23(e)(B)(2).  "[T]he decision to approve or reject a

18  settlement is committed to the sound discretion of the trial judge." *Hanlon v.*

19  *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by*

20  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

21          As numerous federal courts have made clear, a federal court reviewing a

22  settlement agreement (which happens only in a narrow set of circumstances) is

23  functioning as a court of equity and must consider fairness not only to the parties,

24  including absent class members, but to third parties as well. *See In re Drexel*

25  *Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) ("[B]efore

26  endorsing a settlement, the district court is obligated to make an examination of how

27  the accord affects the rights of third parties."); *Donovan v. Robbins*, 752 F.2d 1170,

28  1176 (7th Cir. 1985) ("A federal judge has the full powers of an equity judge.  So if

11

third parties complain to him that the decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside. Even if no third party complains, the judge has to consider whether the decree he is being asked to sign is lawful and reasonable, as every judicial act must be.") (citations omitted); *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983) ("In making the reasonableness determination the court is under the mandatory duty to consider the fairness of the decree to those affected."); *United States v. City of Miami, Fla.*, 614 F.2d 1322, 1331 (5th Cir. 1980), *on reh'g*, 664 F.2d 435 (5th Cir. 1981) (holding that, where a settlement implicates "the interests of individuals and organizations other than those approving the settlement," "[t]he presence of these other interests prevents us, or the trial court, from taking a totally 'hands-off' attitude toward the settlement reached").[3]

The Court cannot approve a settlement that is unfair to third parties, including Intervenor and other schools on Exhibit C, who plainly have not consented—and would not consent—to the Settlement Agreement as written. This settlement is unfair for reasons Intervenor has previously explained. First, it circumvents the procedures established for resolving borrower defense resolution ("BDR") claims

_____

[3] Professor Douglas Laycock, a leading scholar in the law of remedies, has explained that, under these and other similar cases, a third party's express agreement may be required for proper consent in cases where a third-party's rights are at stake as they are here. He provides this hypothetical: "a decree in which A and B agree to transfer the arguable rights of C is not a consent decree unless C also consents. No court should approve such a decree unless C consents, or unless the plaintiff joins C as a defendant and proves all the elements of a claim that a court can lawfully impose on C all the burdens that C bears under the decree." Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. CHI. LEGAL F. 103, 104 (1987). "A and B can agree by contract to whatever they want, but the court should not enter their agreement as a consent decree without the participation of C. If a court does enter such a decree without the consent of C, C should be wholly and genuinely unbound by the decree, able to force de novo litigation of his rights . . . ." *Id.*

OPPOSITION TO JOINT MOTION FOR APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

under Department of Education regulations.  Second, it presents an unfair risk of collateral consequences through future recoupment efforts and otherwise.  Third, it inflicts unfair reputational harm on the schools listed on Exhibit C.

### 1. The Settlement Agreement Unfairly and Unlawfully Circumvents the Procedures Established for Resolving Borrower-Defense Claims Under Department of Education Regulations

Plaintiffs and the Department recognize that Intervenor has procedural rights under the borrower-defense regulations.  *See* Pls.' Opp., Dkt 287, at 12 (citing 34 C.F.R. § 685.206(e)(10)).  Plaintiffs and the Department have failed, however, to address Intervenor's concerns regarding these rights.  While Intervenor's motion to intervene prompted the Government to file the Miller Declaration, its clarifications and assurances, despite being referenced in the Joint Motion, *see* Dkt. 323, at 25, are still not part of the formal settlement agreement.  The declaration is also not entirely clear, causing remaining uncertainty, and it does not address every scenario.  The declaration also does not fully protect Intervenor's procedural interests, including, for example, the application of 2016 regulations to borrower defense applications that should be adjudicated under different standards.  Dkt. 246.

The Joint Motion is wrong to suggest that the Government's settlement authority sidesteps these procedural issues.  Plaintiffs and the Department argue that the Government has "presumptively unreviewable" authority to settle matters.  Dkt. 323, at 21–22 (citing *Weingarten v. DeVos*, 468 F. Supp. 3d 322, 338 (D.D.C. 2020)).  However, the Ninth Circuit has held that, despite the Attorney General's plenary discretion to settle litigation, "[w]here an action is committed to absolute agency discretion by law, . . . courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations."  *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (quoting *Guadamuz v. Bowen*, 859 F.2d 762, 767 (9th Cir. 1988)); *see Ness Inv. Corp. v. U.S. Dep't of Agric.*, 512 F.2d 706, 714 (9th Cir. 1975) (holding

that discretionary agency actions are reviewable where the claim alleges "that an agency . . . abused its discretion by exceeding its legal authority or by failing to comply with its own regulations").

Here the Department "failed to follow its own regulations" in resolving borrower-defense claims.  *Carpenter*, 526 F.3d at 1241.  And the Settlement Agreement unlawfully commits the Department to ignoring its own regulations going forward:  under the terms of the Agreement, the Department will process borrower-defense applications under rules that do not comport with its existing regulations, and which have not gone through the negotiated rulemaking process. Under the Department's regulations, as the Plaintiffs and the Department admit, schools are provided certain procedural rights, such as the right to submit evidence and arguments that the Department must "consider."  34 C.F.R. § 685.222(e)(3)(i). The Government has an obligation to Intervenor, as the intended beneficiary of these provisions, to respect these interests; and it has an independent duty to follow the law.  The Department's exercise of its settlement authority here to bypass its own regulations—and to grant relief through a settlement that far exceeds what Plaintiffs could hope to obtain, even if they prevailed on the merits of their claims— is unlawful.

## 2. The Settlement Agreement Creates an Unfair Risk of Collateral Consequences Through Future Recoupment Efforts and Otherwise

The Joint Motion failed to address Intervenor's significant concern that its appearance on Exhibit C does not have adverse consequences vis-à-vis collateral action by the Department of Education or other would-be litigants.  As noted above, the Miller Declaration provides welcome clarification of the Department's position that inclusion in Exhibit C will not be used against schools.  But that declaration, which was filed as an exhibit in response to Intervenor's motion, is neither specific enough nor presently enforceable enough to protect Intervenor's interests. Intervenor previously suggested that Plaintiffs and the Department incorporate any

14

clarifications and assurances into the proposed settlement itself.  The Joint Motion refuses to do this, citing the Court's hypothesis that "due process is totally preserved" should the Government pursue a recoupment action.  Dkt. 323 (citing Aug. 4 Tr. at 24:8–10).  This theory overlooks, however, the disruption to Intervenor's procedural rights that the proposed settlement would introduce.  As the Court no doubt recalls, this action was filed by Plaintiffs to request that the Government process their borrower-defense claims according to procedural requirements under the relevant statutes and regulations.  The proposed settlement, instead, bypasses those procedural requirements, which are meant to protect all parties, and which Plaintiffs' consent alone may not dispense with.[4]

### 3. The Settlement Agreement Inflicts Unfair Reputational Harm on the Schools Listed on Exhibit C

Intervenor has substantial reputational interests at stake.  The publication and dissemination of Exhibit C has inflicted (and continues to inflict) severe reputational harms on schools, jeopardizing their relations with students (past, present, and future), faculty, donors, accreditors, regulators, and investors.  That harm is especially unwarranted here, where the Department disavows making any finding of

---

[4] In fact, the Project on Predatory Student Lending, which represents class action Plaintiffs in this action, has explained in a published set of answers to "[q]uestions about the proposed settlement" that "[s]ettling the case will provide relief to the class that, in our judgment, is equal to or greater than what we could expect to achieve if we followed the litigation through to trial, while avoiding any further delay and risk of litigation."  Project on Predatory Student Lending, Information on the *Sweet v. Cardona* Proposed Settlement, https://www.ppsl.org/sweet-v-cardona-class-members/#sweet-settlement.  The original litigation sought the enforcement of existing borrower-defense claim procedures, which included protections for Intervenor's rights; a result in which Plaintiffs end up with a settlement that bestows "greater" relief needs to ensure that the burden of such relief is not passed on to Intervenor, especially when the burden is established through procedures that circumvent Intervenor's regulatory rights.

wrongdoing.  That such reputational harms damage an organization's mission or professional standing is well-recognized.  *See, e.g., Am. Med. Ass'n v. Stenehjem*, 2019 WL 10920631, at *3, *5 (D.N.D. Nov. 26, 2019); *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 2017 WL 6059303, at *4 (E.D. Tex. Dec. 7, 2017); *Okemo Mountain, Inc. v. Sikorski*, 2006 WL 1745039, at *1 (D. Vt. June 21, 2006); *Sackman v. Liggett Grp., Inc.*, 167 F.R.D. 6, 20 (E.D.N.Y. 1996); *Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 373 (2d Cir. 1981).

Additionally, Plaintiffs acknowledge that courts will credit "allegations of detriment arising from the subject matter of the lawsuit."  Pls.' Opp., Dkt. 287, at 15 (quoting *Floyd v. New York City*, 302 F.R.D. 69, 104 (S.D.N.Y. 2014)).  Plaintiffs initiated the litigation over the Department's response to Plaintiffs' borrower defense claims, but Intervenor is concerned specifically with reputational harms that arise from the Settlement Agreement, which focuses on unproven allegations of misconduct that have caused and will continue to cause concrete harms to Intervenor.  Under the Settlement Agreement, eligibility for relief turns on whether borrowers have accused their former schools of misrepresentation, and borrowers who attended a school on Exhibit C are entitled to "automatic" relief.  The Settlement Agreement thus sends a clear message that schools on Exhibit C are wrongdoers—especially when one considers that the parties have to justify treating borrowers from Exhibit C schools differently in order to show that "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(B)(2)(D).  That suggestion of wrongdoing already has the imprimatur of the Department of Education, which is co-proposing the Settlement Agreement, and if finally approved, the Settlement Agreement would also bear the imprimatur of this Court.

Reputational harms that result directly from being publicly deemed a wrongdoer by a regulator are distinct and cognizable injuries.  *See Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see also Meese v. Keene*, 481

U.S. 465, 473–77 (1987); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017).  For schools, the "stigma" of inclusion on this list "bearing the imprimatur of the [Department of Education]" immediately affects their relationship with current and prospective students and can cause schools to "los[e] additional students to competitors," "los[e] donations," and suffer other consequences.  *Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Ed.*, 493 F. Supp. 976, 979 (D.D.C. 1980) (upholding Article III standing on theory of reputational injury); *see also Foretich*, 351 F.3d at 1211, 1215 (reputational injuries stamped by "the imprimatur of government authority" can cause spiraling injuries, including "loss of business and professional opportunities").  Each of these consequences is a "distinct, palpable, and concrete injury."  *Sherman Coll.*, 493 F. Supp. at 979; *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972).[5]

The Joint Motion suggests that the schools in Exhibit C suffer no new injury when the Department of Education publicizes them in a list of presumptive wrongdoers, Dkt. 323, at 24–25, but that is clearly wrong.  The Joint Motion itself acknowledges that "the inclusion of a school in Exhibit C is [sic] 'is the result of the parties' negotiated assessment that, for each school, there exists a sufficient threshold indication of wrongdoing to justify summary settlement relief for associated class members.'"  *Id.* at 24 (quoting Dkt. 288, at 7).

The Government's own reassurances demonstrate implicit acknowledgement of the harm to Intervenor.  After Intervenor complained that "[t]he proposed settlement does not make clear, as it should, that the rights of educational

---

[5] ANU appears to be included in the list because of an action under the Kentucky Consumer Protection Act finding it "willfully" failed to ensure a statistic on its website was not "false, misleading, or deceptive."  The Commonwealth of Kentucky Court of Appeals upheld an interpretation of the Act's willfulness requirement that included even mere "inexcusable carelessness."  This is similarly an insufficient basis to presume permanent widespread "substantial misconduct."

institutions like Proposed Intervenors and other similarly situated schools cannot be eliminated or reduced by the Department's unilateral settlement with student borrowers," Dkt. 254, at 9, the Government sought to provide clarification, *see* Defs.' Opp. at 16 (citing Miller Decl.).  The Miller Declaration is an important baseline in consideration of the settlement, but it is hardly sufficient to prevent harm to Intervenor.  And there are still substantial questions about why the proposed settlement singles out this set of schools.  The over 150 schools listed in Exhibit C of the settlement agreement, *see* Dkt. 246-1, Ex. C, appear to be almost entirely proprietary institutions, rather than strictly a list of schools with the largest number of pending claims.  Plaintiffs and the Department seem aligned in viewing proprietary schools as unworthy of fair treatment.  There have been numerous well-publicized cases involving non-profit schools facing similar allegations of wrongdoing, yet those schools inexplicably appear nowhere in the proposed settlement.[6]  Plaintiffs and the Department seem to have given most non-profit schools a free pass and spared them the harm of being published in a list of presumptive wrongdoers.  The Court should condition any approval of the proposed settlement on the Government providing far greater clarity regarding the status of educational institutions listed on Exhibit C, and it should require Plaintiffs and the Government to avoid using language publicly implying that the settlement includes a finding of wrongdoing.

---

[6] *See, e.g.*, Settlement Agreement, https://www2.ed.gov/documents/press-releases/20201204-temple.pdf, ¶ 4; *Campbell v. The Board of Trustees of Columbia University in the City of New York*, No. 22-cv-05945, Dkt. 1 (S.D.N.Y. July 12, 2022); *Student A v. The Board of Trustees of Columbia University in the City of New York*, No. 22-cv-06567, Dkt. 1 (S.D.N.Y. Aug. 2, 2022); ABA Journal, *Villanova Says Inaccurate LSAT and GPA Data Were 'Knowingly Reported' to the ABA in Prior Years*, bit.ly/3Rz5zU1 (last accessed Oct. 6, 2022); NBC News, *Caught cheating: Colleges falsify admissions data for higher rankings*, nbcnews.to/3CxLp8y (last accessed Oct. 6, 2022).

OPPOSITION TO JOINT MOTION FOR APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

The passage of time and the Court's preliminary approval of the Proposed Settlement have already exacerbated the reputational harm to schools on Exhibit C. Plaintiffs and the Department suggest Intervenor will not face any adverse consequences from the Department of Education based on its inclusion on "Exhibit C." That clarification is welcome but is not definitive or presented to be binding or enforceable. The Joint Motion contemplates "an extensive list of schools [listed on Exhibit C] for which there is sufficient indicia of misconduct to justify summary settlement relief," similar to the Settlement Agreement's language that "[t]he Department has determined that attendance at schools justified presumptive relief, for purposes of this settlement, based on strong indicia regarding substantial misconduct by listed schools, whether credibly alleged or in some instances proven." *See* Dkt. 323, at 9, Dkt. 246, at 3. But the United States had nowhere expanded on the basis for that determination or how it arrived at "Exhibit C." And the proposed settlement has been touted publicly as evidence—or even a judicial finding—of wrongdoing. *See, e.g.*, Mot., Dkt. 254, at 17 & n.4.

The Department of Education has made clear, by sworn declaration, that "[t]he Department does not consider the fact of an institution's inclusion on Exhibit C to constitute a finding of fact of misconduct" and that "[t]he discharges of Relevant Loan Debt . . . will be effectuated pursuant to the terms of the Settlement Agreement, not pursuant to the Department's borrower defense regulations." Decl. of Dep. Under Sec'y Benjamin Miller, Dkt. 288–1, ¶ 7. The Department says that schools on Exhibit C retain "all the due process rights . . . under the Subpart G regulations," *id.* ¶ 11; that "[t]he fact of an institution's inclusion on Exhibit C . . . does not constitute evidence that can or will be considered by the Department in making Program Findings or establishing Program Liabilities against an institution," *id.* ¶ 13; and that Exhibit C will be "used by the Department solely for purposes of effectuating its obligations under the Settlement Agreement to award Full Settlement Relief to certain class members," *id.* ¶ 114.

These clarifications do not undermine Intervenor's concerns; rather, under the applicable legal standard, they confirm Intervenor's cognizable harm. For one, the representations are limited in scope.[7] Second, the careful language used by the Department in the declaration suggests that these are the statements of the declarant "based on my personal knowledge as an employee of the Department." Query whether the Department is willing to be bound by these statements by one of its employees. To be binding and enforceable, these representations from the Department about the limited purpose of Exhibit C should be further clarified and incorporated into the proposed settlement itself. In addition, the mere filing of this declaration in opposition to a motion to intervene falls well short of addressing the reputational harm that the proposed settlement and Exhibit C in particular have inflicted and continue to inflict in the public sphere.

Following the Court's preliminary approval of the settlement agreement, Intervenor and other educational institutions were subject to another flurry of reporting, including related to Exhibit C, that furthered their reputational harms. As was predictable, leading publications have assigned responsibility to Intervenor and other educational institutions, calling Plaintiffs "[d]efrauded borrowers." *See* Alicia Adamcyz, *Defrauded borrowers could see their entire federal student loan balances forgiven thanks to monumental court case: What you need to know*, FORTUNE (Aug. 30, 2022), https://fortune.com/2022/08/30/defrauded-borrowers-could-see-their-entire-federal-student-loan-balances-forgiven/. An interview featuring counsel for

---

[7] As an example, paragraph 5 of the Miller Declaration states that an institution's inclusion on Exhibit C will not be considered by the Department in bringing any Subpart G proceeding. Yet that is, at best, a qualified constraint. The Department does not commit to refrain from *other* adverse action against an institution. Outside of Subpart G, the Department has the authority to take other actions that could punish or even threaten the existence of an institution, such as requiring the institution to post large letters of credit which cannot be obtained.

20

Plaintiffs that is titled "Fighting Fraudulent Student Debt, One Bad Actor at a Time" leads with a class member in this action and describes her educational institution, listed on Exhibit C, as a "now-infamous predatory school."  Victoria (Torie) Ludwin, *Fighting Fraudulent Student Debt, One Bad Actor at a Time*, ARNOLD VENTURES (Aug. 30, 2022), https://www.arnoldventures.org/stories/fighting-fraudulent-student-debt-one-bad-actor-at-a-time.  Reputational harms will only worsen should the Court approve the proposed settlement.

Finally, the "technical corrections" to Exhibit C further illustrate its fundamental unfairness.  While one might applaud Plaintiffs and the Department for bringing the errors in Exhibit C to the Court's attention, those errors went far beyond mere technical errors—they went to the very ownership of some of the schools, and thus the parties subjected to reputational harm through Exhibit C.  And to this day, the parties have never provided the Court or the public with an explanation for how they arrived at Exhibit C.  Without that explanation, and given statements that Plaintiffs and their counsel have made in this proceeding and elsewhere, it is perhaps unsurprising that the public assumes that it is based on a concrete finding of wrongdoing—notwithstanding the parties' contrary protestations in requesting final approval of the settlement over Intervenor's objections.

### B. The Parties Have Failed to Show—and Cannot Show—That the Settlement Agreement Is Lawful and Fair Even for the Putative Settlement Class

Separate and apart from its unfair effects for Intervenors and other schools, the Settlement Agreement should not be approved because it is unlawful and even potentially unfair to absent class members.  The Court wisely recognized the Parties' incentives to secure final approval of their settlement and Intervenor's competing interests in keeping the system "honest."  Consistent with that role, Intervenor ANU opposes final approval of the Settlement Agreement not only because it unfairly threatens its own interests and those of similarly situated schools

21

1   on Exhibit C, but also because it fails to comport with applicable law and may in

2   fact be unfair to the very student borrowers that it purports to benefit.

3          The Settlement Agreement purports to grant substantive debt forgiveness to

4   borrowers who have sued over a purely procedural injury.  It thus gives relief far

5   beyond that which Plaintiffs would receive if they won this action on the merits.

6   That relief exceeds both the Department of Education's regulatory authority to

7   resolve borrower-defense claims and the Federal Government's settlement authority.

8   But contrary to the Parties' suggestions, *see* Mot. 22–24, the authority to settle

9   claims is not the authority to ignore the law.  *See Am. Hosp. Ass'n v. Price*, 867 F.3d

10  160, 167 (D.C. Cir. 2017).  The Settlement Agreement would also improperly allow

11  the Department of Education to adjudicate borrower-defense applications under

12  rules that are inconsistent with existing regulations and that have not gone through

13  the negotiated rulemaking process themselves.

14         The Parties have also failed to carry their burden of establishing that the

15  Settlement Agreement—and the newly-defined class that they need the Court to

16  certify—is consistent with Rule 23(b).  Among other things, President Biden's new

17  loan-forgiveness initiative has undermined standing for many would-be class

18  members and has highlighted that loan forgiveness is not necessarily the windfall

19  the parties make it out to be.  The Parties have thus failed to show even that the

20  settlement is fair for putative class members.

21         These serious issues and others raised by Intervenors should lead the Court to

22  deny final approval and demonstrate, at a minimum, that the Parties have not met

23  their burden to obtain final approval.[8]

---

25         [8] Some of these issues relate to policy developments or other action by the

26  Government, and some of them have been discussed publicly by The Project on

27  Predatory Student Lending ("PPSL"), which represents class action Plaintiffs in this

     action.  PPSL has published responses to many "[q]uestions about the proposed

28

OPPOSITION TO JOINT MOTION FOR APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

1

### 1. Many Class Members Likely Lack Standing in Light of the Biden Administration's $400 Billion Loan Forgiveness Initiative

2

3     PPSL acknowledges uncertainty related to the Biden Administration's recent

4 announcement that "[t]he Department of Education will provide up to $20,000 in

5 debt cancellation to Pell Grant recipients with loans held by the Department of

6 Education, and up to $10,000 in debt cancellation to non-Pell Grant recipients." The

7 White House, *FACT SHEET: President Biden Announces Student Loan Relief for*

8 *Borrowers Who Need It Most* (Aug. 24, 2022); *see* PPSL FAQ Answers. PPSL

9 asserts with confidence that "even if the HEROES Act cancellation would cover

10 your entire loan balance," those in the automatic discharge group "will still receive

11 cancellation of the entire balance of [their] relevant loans, along with a refund of a

12 of amounts [they] paid to the Department, according to the schedule set out in the

13 settlement agreement." PPSL FAQ Answers. If that is correct, the Settlement

14 Agreement does not address it, and it is unclear why it would be: up to this point,

15 the Court has not yet approved the Settlement Agreement, and someone with no

16 outstanding loans cannot be a member of the class.

17     PPSL has encouraged many would-be class members to pursue the relief

18 provided by the Biden Administration owe less than $10,000 (or $20,000 in the case

19 of some borrowers). For individuals who have followed that course and obtain

20

---

21 settlement" that it believes now exist as a result of the proposed settlement. *See*

22 Project on Predatory Student Lending, *Information on the* Sweet v. Cardona

23 *Proposed Settlement*, https://www.ppsl.org/sweet-v-cardona-class-members/#sweet-

24 settlement ("PPSL FAQ Answers"). The need for these clarifications just further

25 highlights the parties' failure to reach a reasonable settlement that can reasonably be

26 understood by the class and the public at large. The Parties have so far remained

27 unwilling to address these and other issues through amendments to the settlement

28 agreement itself. But the Court should approve a settlement that is fair and

reasonable only when read together with Plaintiffs' counsel's website, a government

official's declaration attached to an opposition to motions to intervene, and other

extraneous sources.

23

relief under the Biden Administration's initiative, any procedural *Sweet* claim they might have had is almost certainly moot.  Indeed, there are likely entire schools on Exhibit C against whom *all* pending applications would be mooted by the Biden Administration's initiative.  Without satisfying itself that all members of the settlement class have standing (and that the other Rules 23 requirements are met), the Court cannot grant final approval of the Settlement Agreement.

### 2. The Settlement Class Improperly Includes Members Whose Borrower Defense Applications Have Already Been Adjudicated

Class members whose borrower-defense claims have already been adjudicated likely lack standing and may not be entitled to relief granted in any proposed settlement.  Class members who have already received relief through the borrower-defense process may receive additional relief, according to Plaintiffs' counsel, who say that those whose applications have been denied will receive a second bite at the apple, since the proposed settlement contemplates "rescind[ing] all borrower defense denials that [the Department] issued between December 2019 and October 2020."  *See* PPSL FAQ Answers.  But it is clearly established that "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  And to establish standing, a class member has to have a real and present injury—not just an interest in receiving something under the settlement. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (holding that a statutory entitlement to bring a claim for damages does not create a concrete interest to support standing).  The Court cannot approve a class settlement that grants relief to uninjured parties.

### 3. The Settlement Agreement Unfairly Imposes Tax Risks on Class Members Which the Parties Have Failed to Address

PPSL also addresses two open tax-related questions. *See* PPSL FAQ Answers.  First, it seeks to reassure borrowers that any money the Department of Education took from their income tax refunds in connection with loans subject to

24

borrower-defense applications will be refunded.  This practice appears to be inconsistent with this action's originally intended relief, the processing of borrower-defense applications, since borrower-defense applicants do not have the right to recover money that the government has already obtained for payment of the loan. Rather, borrower-defense applications are filed to avoid paying outstanding loan balances.  PPSL also acknowledges that the proposed settlement lacks clarity on federal and state tax income rules regarding the monetary benefit of a loan discharge.  *See* PPSL FAQ Answers.  It is also unclear whether the loan forgiveness and refunds proposed in the Settlement Agreement will be treated for tax and other legal purposes precisely like the forgiveness obtained through a successful borrower-defense application.  While this uncertainty is not only unfair to Plaintiff borrowers, many of whom might lack the sophistication or means necessary to "consult with a tax advisor" as PPSL suggests, the uncertainty is also unfair to the interests of the Government and the taxpayers it represents, as the Government does not have the right to disgorge its own legally obtained funds for the purposes of establishing a settlement slush fund that pays out greater benefits than Plaintiffs would have obtained through ordinary borrower-defense resolution processes.

## CONCLUSION

For the above reasons, this Court should grant Intervenor's objection to the proposed settlement.

DATED: October 6, 2022                    Respectfully submitted,

                                          **MCGUIREWOODS LLP**

                                          By:  */s/ Piper A. Waldron*
                                                John S. Moran, Esq.
                                                Piper A. Waldron, Esq.

                                          *Counsel for Intervenor*
                                          *American National University*

OPPOSITION TO JOINT MOTION FOR APPROVAL OF SETTLEMENT
3:19-cv-03674-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 6, 2022, the foregoing document entitled **INTERVENOR AMERICAN NATIONAL UNIVERSITY'S OPPOSITION TO JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT** was filed electronically with the Clerk of the Court for the United States District Court, Northern District of California using the ECF system.  Upon completion the ECF system will automatically generate a "Notice of Electronic Filing" as service through ECF to registered e-mail addresses of parties of record in the case.


*/s/ Piper A. Waldron*
Piper A. Waldron