Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

THERESA SWEET, on behalf of     )
themselves and all others       )
similarly situated, et al.,     )
                                )
            Plaintiffs,          )
                                )
  VS.                           )   NO. C 19-03674-WHA
                                )
MIGUEL CARDONA, Secretary of    )
the United States Department    )
of Education, et al.,           )
                                )
            Defendants.          )
_____)

                        San Francisco, California
                        Wednesday, November 9, 2022

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    PROJECT ON PREDATORY STUDENT LENDING
                    769 Centre Street, Suite 166
                    Jamaica Plain, Massachusetts 02130
                BY: **REBECCA C. ELLIS, ATTORNEY AT LAW**
                    **EILEEN CONNOR, ATTORNEY AT LAW**
                    **REBECCA C. EISENBREY, ATTORNEY AT LAW**

                    HOUSING AND ECONOMIC RIGHTS ADVOCATES
                    3950 Broadway, Suite 200
                    Oakland, California 94611
                BY: **JOSEPH E. JARAMILLO, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana M. Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                        Civil Division, Federal Programs Branch
                        219 South Dearborn, Fifth Floor
                        Chicago, Illinois 60604
              BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**
                   **STUART ROBINSON, ATTORNEY AT LAW**


For Intervenor American National University:
                        McGUIREWOODS LLP
                        888 16th Street N.W., Suite 500
                        Washington, D.C. 20006
              BY:  **JOHN S. MORAN, ATTORNEY AT LAW**


For Intervenor Chicago School of Professional Psychology:
                        ALSTON & BIRD LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia 30309
              BY:  **TERANCE A. GONSALVES, ATTORNEY AT LAW**

                        ALSTON & BIRD LLP
                        333 South Hope Street, 16th Floor
                        Los Angeles, California 90071-3004
              BY:  **ALEXANDER AKERMAN, ATTORNEY AT LAW**


For Intervenor Lincoln Educational Services Corporation:
                        GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, NW
                        Washington, D.C. 20036
              BY:  **LUCAS TOWNSEND, ATTORNEY AT LAW**

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street, Suite 3000
                        San Francisco, California 94105
              BY:  **KATHERINE M. WORDEN, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Intervenor Everglades College, Inc.:
                         BOIES, SCHILLER & FLEXNER LLP
 3                       1401 New York Avenue, NW
                         Washington, D.C. 20005
 4                BY:  JESSE M. PANUCCIO, ATTORNEY AT LAW

 5                       BOIES, SCHILLER & FLEXNER LLP
                         401 East Las Olas Boulevard, Suite 1200
 6                       Fort Lauderdale, Florida 33301
                  BY:  JASON HILBORN, ATTORNEY AT LAW

 7

 8   Also Present:     Theresa Sweet
                       Alicia Davis
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Wednesday, November 9, 2022**</u>                                    <u>**1:00 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

---o0o---

**THE CLERK:**  Calling Civil Action 19-3674, Sweet, et al.
vs. Cardona, et al.

Counsel, please approach the podium and state your
appearances for the record, beginning with counsel for
plaintiffs.

**MS. ELLIS:**  Good afternoon, Your Honor.  I'm Rebecca Ellis
from the Project On Predatory Student Lending for the
plaintiffs.  And with me is Eileen Connor, also from PPSL,
Rebecca Eisenbrey from PPSL, and Joe Jaramillo from Housing and
Economic Rights Advocates.

**THE COURT:**  Great.  Welcome to all of you.

And who else?

**MR. MERRITT:**  Good afternoon, Your Honor.  Charlie Merritt
from the United States Department of Justice on behalf of the
defendants.  With me at counsel's table is Stuart Robinson.

**THE COURT:**  Who is Stuart Robinson?

**MR. ROBINSON:**  Good afternoon, Your Honor.

**THE COURT:**  Okay.  Good afternoon.  Welcome to all of you.

Now, so everybody over there has been introduced?  Anyone
not yet introduced?

**MS. ELLIS:**  Also at counsel table are two of the named
plaintiffs, Theresa Sweet and Alicia Davis.

1        **THE COURT:**  Welcome to you two.  Thank you for coming.

2        Okay.  Over here on this side of the room, who do we have?

3        **MR. GONSALVES:**  Good afternoon, Your Honor.  Terance

4    Gonsalves on behalf of the Chicago School of Professional

5    Psychology.

6        **THE COURT:**  Got it.  Thank you.

7        **MR. AKERMAN:**  Good afternoon, Your Honor.  Alexander

8    Akerman, also on behalf of the Chicago School.

9        **THE COURT:**  Thank you.

10        **MR. MORAN:**  John Moran on behalf of American National

11    University.

12        **THE COURT:**  Okay.

13        **MR. PANUCCIO:**  Good afternoon, Your Honor.  Jesse Panuccio

14    on behalf of Everglades College.  With me at counsel's table is

15    Jason Hilborn.

16        **THE COURT:**  Thank you.

17        **MR. TOWNSEND:**  Good afternoon, Your Honor.  My name is

18    Lucas Townsend.  I'm with Gibson Dunn.  I represent Lincoln

19    Educational Services Corporation.  And with me at counsel's

20    table is Katherine Worden.

21        **THE COURT:**  Your name again?

22        **MR. TOWNSEND:**  Lucas Townsend.

23        **THE COURT:**  Okay.  Got it.

24        So Katherine Worden is where?

25                        (Ms. Worden raises her hand.)

```
 1          THE COURT:  Okay.  Welcome to you too.

 2          All right.  Everyone over here been introduced?

 3          Thank you.

 4          When you're speaking at the lectern, you can take your

 5   mask off so I can hear you better.  I may even take mine off at

 6   times if I think I'm going to be speaking enough.  But it's

 7   just so we can all hear you better.

 8          We're here on a hearing on final approval of a

 9   class action settlement.  And I think the first thing that is

10   in order is for plaintiffs to summarize, in two minutes or

11   less, what the settlement actually is.

12          And I want to acknowledge before you get started -- my

13   apologies -- there are, I don't know, maybe 40 people back

14   there -- not that many -- 30 people, I would say, in the

15   gallery.  It looks like they're waving their hands and wearing

16   red shirts.  So red, I guess, is the color for today's hearing.

17          Welcome to all of you.  Thank you for coming.

18          And I understand there are people on the telephone.

19          THE CLERK:  Your Honor, there are attendees that are

20   listening.

21          THE COURT:  One?  Ten?  How many?

22          THE CLERK:  1,000.

23          THE COURT:  1,000?

24                            (Laughter.)

25          THE COURT:  Are you making that number up?
```

1     **THE CLERK:**  No.

2     **THE COURT:**  Okay.  1,000 on the telephone.  So, good for

3 you, to get so many people.

4     Now, I don't know if I'm going to let any of you speak.  I

5 want to hear mainly from the lawyers.  But I'm glad you're

6 here, and thank you for coming.

7     All right.  Now, please summarize the settlement.

8     **MS. ELLIS:**  Thank you, Your Honor.

9     Under the settlement, about 75 percent of the class in

10 this case will receive automatic cancellation of their federal

11 student loans relating to their borrower defense applications,

12 they'll receive refunds on any amounts they paid to the

13 Department of Education on those loans, and they'll receive

14 removal of the lines for those loans from their credit report.

15 That's what we've been calling the Automatic Relief Group, and

16 those are people whose borrower defense applications relate to

17 one of the schools on Exhibit C to the settlement.

18     The other 25 percent of the class is in what we've been

19 calling the Decision Group.  Those are class members whose

20 applications relate to other schools not on Exhibit C.  And

21 they will receive a decision on their borrower defense

22 application within a set timeline that corresponds to how long

23 their applications have been pending.  So the people whose

24 applications have been pending longest will receive a decision

25 within six months; the next longest, within 12 months,

1    et cetera.

2         And their applications will be evaluated using a

3    settlement-specific set of a streamlined procedure under which

4    the Department will make certain presumptions; for instance, a

5    presumption that they relied on any misrepresentations they

6    described and a presumption that the allegations in the

7    application are sufficient evidence without needing to look to

8    extrinsic evidence.

9         And then, if you're in the Decision Group and your

10   application is approved, you'll get full settlement relief, so

11   the same as the Automatic Relief Group.  If your application is

12   not approved on that first pass, you'll get an opportunity to

13   revise and resubmit your application after the Department sends

14   a notice to explain what your application was missing,

15   essentially why it didn't meet the standard.  And if you do

16   getting a denial even after revise and resubmit, you can

17   challenge that denial in the district court.

18        The settlement, finally, contains certain provisions for

19   what we've called post-class applicants.  So the groups I've

20   just described apply to people who met the class definition as

21   of the date the settlement was signed, June 22nd, 2022.  For

22   people who've applied after that date and up until the date

23   that the agreement receives final approval, if it does, they

24   will have their applications decided within three years of the

25   effective date of this settlement, 36 months.  And that's

1   basically one step longer than the longest in the Decision

2   Group.  And if the Department doesn't meet that deadline,

3   they'll receive full settlement relief.

4        **THE COURT:**  On the Decision Group, did you say that's one

5   quarter of the class?

6        **MS. ELLIS:**  Approximately, yes, Your Honor.

7        **THE COURT:**  Okay.  All right.  Now, on the people who are

8   in the -- what'd you call the first group?

9        **MS. ELLIS:**  The Automatic Relief Group.

10       **THE COURT:**  -- in the Automatic Relief Group, will they

11  receive some kind of written confirmation in the mail or by

12  e-mail from the Government that says, "You have been

13  discharged"?

14       The reason I ask is, I try to imagine, if I was one of

15  those people out there and this gets approved, how will you

16  tell the rest of the world that you no longer owe this money

17  unless there's something in writing you can hold up?  So what's

18  going to happen on that front?

19       **MS. ELLIS:**  Yes, Your Honor.  They should receive notice

20  that their loans will be discharged, and the actual discharge

21  process --

22       **THE COURT:**  No, not -- will be or has been?

23       **MS. ELLIS:**  Well --

24       **THE COURT:**  Those are different.  "Has been" is what they

25  need.

1    **MS. ELLIS:**  I see.  Yes.

2        I don't believe the settlement agreement specifies that

3    they will receive written confirmation that the loans have been

4    discharged.  I think that's something --

5        **THE COURT:**  Well, do you see my point, that if some bank

6    or some collection agency or some processing agent comes to a

7    class member and says, "Okay.  You missed the last payment";

8    they say, "Well, wait a minute, wait a minute.  I'm a member of

9    the class"; and they say, "Well, too bad.  We're foreclosing on

10   your car," they take the car?

11       So don't those people need a statement saying, "This loan

12   has been discharged in full"?

13       **MS. ELLIS:**  I understand, Your Honor, yes.

14       What the Department has done in other discharges, for

15   instance, the Corinthian Colleges general discharge that was

16   announced earlier this year, is send people notice that their

17   loans are going to be discharged.  And I think the reason for

18   that is because the actual behind-the-scenes discharge process

19   can take some time.

20       My colleague from DOJ might be better able to address what

21   the Department's able to do in terms of notice.

22       **THE COURT:**  Well, maybe we'll get that comment in

23   a minute.

24       There's nothing wrong with doing both.

25       **MS. ELLIS:**  I agree.

 1          **THE COURT:**  Number one, "is going to be"; and number two,

 2    "has been."

 3          I've got a different question for you, though.  What are

 4    the tax implications for forgiveness of debt?

 5          **MS. ELLIS:**  For federal taxes, Your Honor, there is a

 6    provision that -- I want to say it was in the American Rescue

 7    Plan Act, although it may have been in one of the earlier

 8    coronavirus relief acts -- that says that student loan

 9    discharges won't be taxed through 2025.  So any relief under

10    the class settlement up until January 1st, 2026, is exempt from

11    federal income taxes.

12          On the state level, I believe that's a state-by-state

13    determination.  My understanding is that it's a minority of

14    states that tax student loan discharges.

15          But in terms of whether that raises a fairness issue,

16    I think the important --

17          **THE COURT:**  No, it does not raise a fairness issue.

18          **MS. ELLIS:**  Okay.

19          **THE COURT:**  I'm raising this so -- I would be worried if a

20    class member went out and celebrated, assuming we approve this,

21    and then only a couple of years later, find out that they're in

22    trouble with, say, the Franchise Tax Board for not having

23    reported the forgiveness.

24          And how are you going to solve -- you don't want to put

25    those class members in that mess.  So don't they need to be

1  advised in some way that maybe there are tax consequences?

2      **MS. ELLIS:**  On our FAQ on our website right now,

3  Your Honor, we do include an FAQ about taxation, where we

4  suggest that they consult a tax expert in their state or a

5  legal aid attorney who has some experience with taxes.

6      We're not tax attorneys.  That's about the best we can do.

7      I don't know if there's something else you envisioned the

8  Department might do.

9      **THE COURT:**  Well, I don't know if that's -- I mean, that's

10  what lawyers do, is they kick the can down the road and put a

11  FAQ on the website.  But I think maybe some kind of a better

12  notice than that should be considered.  I'm not requiring that.

13  I'm not even sure yet whether to approve this, but that was

14  a -- that was an issue.

15      All right.  You did a great job summarizing it.  Let me

16  hear the Government's summary.

17      Before I let you go -- I'm sorry -- there's one -- I

18  suspect there's some members of the press and maybe even

19  members of the class that are here who could have confusion

20  over one point.  I think it's worth saying this.

21      As I understand this settlement, this settlement is

22  independent and apart from the broader student loan forgiveness

23  plan that President Biden has announced.  This is separate from

24  that.  Am I right about that?

25      **MS. ELLIS:**  Yes, that's correct, Your Honor.

1    **THE COURT:**  So even if that plan -- and this one is under

2    different statutory authority than the President Biden plan.

3    Am I right about that?

4    **MS. ELLIS:**  Yes.

5    **THE COURT:**  All right.  So even though this does involve a

6    lot of money, $6 billion -- that's a huge amount -- it is

7    separate from the $30 billion that President Biden is talking

8    about; and this settlement does not turn one way or the other

9    on what happens with the litigation involving President Biden's

10   plan.  Am I right on that?

11   **MS. ELLIS:**  Yes, that's all correct.

12   **THE COURT:**  All right.  I want to get other views on that

13   point from the intervenors too, but I -- that's the way I see

14   it and I have been analyzing it.

15   All right.  With that having been said, let's hear from

16   the Government on -- I know you want the settlement, but what

17   else would you like to say by way of setting the stage for the

18   main issues we need to address today?

19   **MR. MERRITT:**  Certainly, Your Honor.

20   I won't rehash the details of the settlement agreement

21   itself.  I would just, of course, add that we believe the

22   settlement agreement should be approved under the standards set

23   forth in Rule 23.  We think that should be the Court's primary

24   focus.

25   **THE COURT:**  You're Charlie Merritt?

1          MR. MERRITT:  Yes, Your Honor.

2          THE COURT:  Right.  Okay.

3          MR. MERRITT:  I apologize.

4          THE COURT:  Yes.  Okay.

5          MR. MERRITT:  Charlie Merritt for the United States.

6          The Court's primary focus should be on the factors set

7     forth in Rule 23.  The parties' briefing explains why those are

8     met here.

9          The class responded favorably overall to the notice of

10    preliminary approval.  And we think that looking at the

11    Rule 23(e) factors, the Hanlon Factors, everything the Court is

12    to look at when approving a class action settlement justifies

13    approval in this case.

14          I will address, because it's an issue Your Honor has

15    raised and has been discussed in this case, the Government's

16    authority to enter into the settlement agreement and carry out

17    the obligations set forth for the Department of Education

18    therein.

19          And just a starting point, we are not claiming

20    unreviewable authority here because the settlement agreement

21    has been effectuated pursuant to the Attorney General's

22    settlement authority.  We cited case law that says that

23    settlement authority is presumptively unreviewable and that

24    it -- but that it can be subject to challenge in limited

25    circumstances, as the Ninth Circuit stated in the *Carpenter*

case; but that should be limited to allegations that the Agency exceeded its legal authority, acted unconstitutionally, or failed to follow its regulations.

And as we cite in the briefs, the Attorney General's plenary authority over settling cases involving the United States can be overcome only by a clear statutory directive saying that the actions set forth in the settlement agreement are not allowed.

So that is not the case here.  There is clear statutory authority for the relief being provided in the settlement agreement, and that's set forth at 20 U.S.C. 1082(a)(6), which grants the Secretary the authority to compromise, waive, or release any right, claim, or demand, however acquired, in his administration of the federal student loan programs.  That extends to waiving and releasing his right to collect repayment from federal student loan debts, including by discharging those loans, and to determine repayment obligations on the terms outlined according to the Secretary and as set forth in the settlement agreement here.

That has often been used to settle individual cases in litigation, as we noted in today's supplemental filing in response to the Friday order; but it has also been used, especially recently, to provide broader group discharges.  And that is applicable here based on the determination of how to deal with a larger problem of a large number of pending

1    borrower defense applications, given the litigation context

2    that we find ourselves in and the Government's assessment of

3    litigation risk as to what would have happened had the case

4    proceeded to judgment.

5          **THE COURT:**  Let me ask you a question about that very

6    point.

7          As of now, or as of your most recent information, how many

8    evaluators or hearing officers, or whatever the right term is,

9    are there in the BDU, the Borrower Defense Unit, at the

10   Department of Education?

11         **MR. MERRITT:**  I don't have that information available

12   today, Your Honor.

13         **THE COURT:**  Okay.

14         **MR. MERRITT:**  I can tell you that the Department has --

15   this was a carefully negotiated settlement that took into

16   account resource constraints at the Department and its best

17   estimates based on its current review of the evidence before it

18   and the nature of the group of pending applications.

19         The timeline set forth in this agreement and the

20   procedures for accomplishing those timelines are something that

21   the Department believes it can accomplish, and it is committed

22   to allocating the necessary resources to providing the relief

23   in the settlement if Your Honor approves it.

24         **THE COURT:**  All right.  But there's a big table with lots

25   of lawyers.  Maybe one of them can send an e-mail -- is your

 1   client here, by the way, the Department of Education, somewhere

 2   out there?

 3        **MR. MERRITT:**  My client is not here, Your Honor, no.

 4        **THE COURT:**  Okay.  Maybe somebody on your side could

 5   e-mail a representative of the Department of Education and find

 6   out, while this hearing is underway, how many lawyers,

 7   decision-makers, whatever their role is, are there in the BDU.

 8   I'm talking about the people who actually process the borrower

 9   defense claims.

10        **MR. MERRITT:**  That would be in charge of reviewing claims

11   according to the procedures set forth in the settlement

12   agreement?

13        **THE COURT:**  No, no.

14        **MR. MERRITT:**  More generally?

15        **THE COURT:**  I'm talking about before the settlement

16   agreement.  Let's say as of May 1 or as of June 1.  So I want

17   to know how many there were at that point.

18        **MR. MERRITT:**  Prior to the settlement agreement being --

19        **THE COURT:**  Yeah.  I think it's in the neighborhood of

20   eight.  Somewhere I read eight, but that may be old

21   information.

22        **MR. MERRITT:**  I think there may be old information about

23   that in the case.  My understanding is there had been more

24   hiring over time in that office.  More than eight.  I don't

25   want to commit to a number --

1      **THE COURT:**  Okay.  Well, then --

2      **MR. MERRITT:**  -- right here.

3      **THE COURT:**  -- can you see if you can find out?

4      **MR. MERRITT:**  We'll see what we can do.

5      **THE COURT:**  All right.  Thank you.

6      Okay.  Did you finish your argument on the authority?

7      **MR. MERRITT:**  I can be brief.  I just had a couple other

8  points.

9      I did just want to say, you know, acknowledge that the

10  statutory authority that we cited to appears in Part B of the

11  Higher Education Act, which is applicable specifically to

12  FFEL loans.

13      But there's a separate provision of the Higher Education

14  Act at 20 U.S.C. 1087e(a)(1) that provides that loans made to

15  borrowers under the Direct Loan Program, Part D, shall have the

16  same terms, conditions, and benefits and be available in the

17  same amounts as loans made to borrowers under Part B, which

18  addresses FFEL loans.

19      So under what is referred to as the parallel terms and

20  conditions statute, the Secretary's authority, settlement and

21  compromise authority, applies equally to direct loans as

22  FFEL loans.  That's a long-standing interpretation of

23  the Secretary, as it stated in the preamble to the

24  2016 Borrower Defense Rule cited in our briefs, recognized by

25  the D.D.C. decision in the *Weingarten* case.  And, you know,

1   the Secretary's authority to waive or release the right to

2   repayment is certainly a term, condition, or benefit of a

3   direct loan.

4        **THE COURT:**  All right.

5        **MR. MERRITT:**  I think that's the main issue of the

6   statutory authority.

7        Intervenors have raised other arguments that we don't

8   believe are relevant to the Court's consideration of the final

9   approval here.

10       **THE COURT:**  I'm going to give you a --

11       **MR. MERRITT:**  Happy to address them.

12       **THE COURT:**  -- rebuttal -- I'll give you a rebuttal after

13  we hear from the intervenors.

14       But before we go to the intervenors, I want to give

15  Ms. Ellis a chance.

16       Did you want to have one of your plaintiffs, like

17  Ms. Sweet, say anything briefly?  Yes or no?

18       **MS. ELLIS:**  Yes, Your Honor, we would.

19       **THE COURT:**  Who is that going to be?

20       **MS. ELLIS:**  That'll be --

21       **MS. SWEET:**  That'll be me.

22       **THE COURT:**  Come up here.

23       **MS. ELLIS:**  -- Theresa Sweet, Your Honor.

24       **THE COURT:**  Well, she should come up here and not speak

25  from way back there.

1      Please come up here to the lecturn.  Speak into the

2   microphone so everyone can hear you.  Welcome to the Court.

3      **MS. SWEET:**  Thank you.

4      **THE COURT:**  Tell us -- start with, what is your name?

5      **MS. SWEET:**  My name is Theresa Sweet, and I'm a named

6   plaintiff in this case.

7      **THE COURT:**  Great.  And would you adjust the mic so it's a

8   little closer to your voice so that it picks your voice up.

9      All right.  How long do you need?

10      **MS. SWEET:**  Under two minutes.

11      **THE COURT:**  Go ahead.

12      **MS. SWEET:**  Okay.  So in the nearly two decades since I

13   graduated from the now-shuttered Brooks Institute, I have been

14   fighting for some measure of justice --

15      **THE COURT:**  Take three minutes, but go slower.

16      **MS. SWEET:**  Okay.

17                          (Laughter.)

18      **MS. SWEET:**  Sorry.  I rehearsed it to make sure it was

19   short.

20      Okay.  In the nearly two decades since I graduated from

21   the now-shuttered Brooks Institute, I have been fighting for

22   some measure of justice for the education fraud that I and

23   thousands of others experienced.

24      For more than a decade, I approached hundreds of attorneys

25   and had door after door slammed in my face.  Many times these

attorneys told me that they knew I had a case but they were unwilling to go up against the massive corporation that owned my school.

When borrower defense was seemingly resurrected from the minutia of education regulations, I knew that it was probably our only chance to end this nightmare.

When it became clear that Betsy DeVos would be appointed Secretary of Education, that sense of hope immediately transformed into a sense of absolute dread.  Sure enough, she surrounded herself with for-profit education cronies and did her level best to rob us of justice, going so far as to negotiate, in bad faith, a settlement in the case that bears my name.  Seemingly without conscience, she denied us our right to due process.

Too often in this country regular people can only sit on the sidelines and watch in horror as our rights are trampled by corporations with big pockets and shifty government officials with dollar signs in their eyes.  These companies, such as those trying to intervene in this settlement, aren't truly afraid for their rights.  They're afraid that we, like my friends, finally got a seat at the table.

Approval of the settlement would serve to show that it is possible for people like us to fight back, that we can hold government agencies accountable, and that people are more important than greedy corporations.

 1          So respectfully, I do ask and hope very much that you will

 2     approve the settlement.

 3          **THE COURT:**  What do you do for a living now?

 4          **MS. SWEET:**  Normally, I'm a nursing assistant, but I

 5     injured my back a couple of years ago and I've been off on

 6     workers' comp disability ever since.

 7          **THE COURT:**  What city do you live in?

 8          **MS. SWEET:**  Right now, I live in Oakland.

 9          **THE COURT:**  Okay.  Well, thank you, Ms. Sweet, for that

10     statement.

11          All right.  To set the stage -- what we're about to do is

12     hear from the intervenors -- I want to say a few things about

13     the settlement which are really the obvious.

14          This is not your ordinary settlement of a class action.

15     In the ordinary case, it's a different setup.  The ordinary

16     case may be, I have a job to make sure the class members are

17     not cheated in the settlement.

18          And sometimes that actually does happen.  There might be a

19     class action settlement where you get 35 cents as a class

20     member for a claim that's worth a thousand dollars but the

21     lawyer gets a huge fee.  Now, thankfully, that doesn't happen

22     too often; but it happens often enough that the rules require

23     me to make sure the settlement is fair to the class members and

24     not just to the lawyer.

25          This case, there's no doubt that this is a good settlement

1   for the class.  In fact, last time I referred to it as a grand

2   slam home run.  When the lawsuit started, it was just to get a

3   hearing, and that would have been getting to first base.  Well,

4   the settlement provides not only do you get to first base, but

5   for at least three-fourths of the class, you get a grand slam

6   home run.  Everybody gets knocked in.  So there's no way that

7   this is not good for the class.  This is good for the class.

8       But a settlement has to be within the statutory authority

9   of the agency.  I'll give you an obvious example.  Let's say

10  that the FTC were to settle a lawsuit and give some company

11  permission to sell a drug, a new pharmaceutical drug.  Well,

12  that might sound good and it might be a grand slam home run for

13  the pharmaceutical company, but the FTC doesn't have that

14  authority.  That's a different agency.  That's called the FDA,

15  Food and Drug Administration.  So there has to be authority for

16  the agency to do what it's doing.  It can't settle a case by

17  giving away things it doesn't have the right to give away.

18      Now, in this case, the Government contends that there is

19  authority to settle lawsuits and there is authority to cancel

20  loans.  The intervenors disagree with that and say:  No, there

21  is not authority.

22      Now, I want to give -- who's going to speak for the

23  intervenors?  One of you, or -- I hope it's just one of you.

24  **MR. MORAN:**  I think we've tried to make sure we're not

25  overlapping with one another, but if you allow it, we'd each

1    appreciate the opportunity.

2        **THE COURT:**  Well, how much time do you need?  Three

3    minutes?  The other side got three minutes.  I'll give you

4    time.  You should have time to make your point.  I've read all

5    your briefs.  But there's too many of you over there.  I just

6    don't have time to give everybody a long-winded presentation

7    because I know what you're going to say anyway, but I want to

8    give you a chance to say it.  But then I've got to give the

9    other side a rebuttal.

10        So please come forward and make your point.  I do not want

11    to hear any argument on mootness or standing.  You're totally

12    wrong on that, and that will not be argued.  You're wasting

13    your time on that.  So "no" on that.  But I will let you argue

14    about statutory authority.

15        So whoever wants to speak to that, please go ahead.

16        **MR. MORAN:**  Good afternoon, Your Honor.  John Moran for

17    American National University.

18        If I may briefly, before I get specifically to statutory

19    authority, you know, the Court raised at the last preliminary

20    approval hearing the question of why are we here.  And,

21    you know, I think the Court said:  You're the luckiest guy in

22    the room.  You've already gotten the money, and you don't have

23    to pay it back.

24        And so I'd just like to briefly address why the intervenor

25    schools have good reason not to be as sanguine about their

1  position under the settlement as the Court.

2      This settlement is just one of several actions that the

3  Department of Education is taking to target for-profit private

4  institutions of higher education that make it harder, if not

5  impossible, for them to stay open in some instances.

6      Under Secretary James Kvaal has publicly described this

7  sector as not just a few bad apples but as a rotten orchard.

8      The Department is putting out new regulations, including

9  brand-new borrower defense to repayment regulations, in recent

10 weeks that make it easier to assert claims against schools

11 while making it harder for schools to defend themselves.

12     And we have groups like the student -- or the Project On

13 Predatory Student Lending, whose very name makes clear what

14 they think about these institutions.  And to be clear, they

15 don't think that the predatory lending is perpetrated by the

16 United States, who's the one that actually makes the loans,

17 sets their terms and interest rates.  They're leveling that

18 accusation against the schools who accept students who come to

19 them seeking an education and bring their Title IV money with

20 them.

21     So I hope the Court will forgive the schools if we don't

22 view it as we're the luckiest person in the room that the

23 Department has pursued this settlement.

24     And I think the thing I'd like to focus on --

25     **THE COURT:**  But you haven't made a single point yet about

```
 1   authority.  You're just making a political speech about how
 2   great the schools are without -- they have authority.  They
 3   have cited authority to me to do this settlement.  So why
 4   shouldn't I just say, "Fine, go ahead"?
 5        Now, your brief makes a point that you think they don't
 6   have authority under the major questions rule in EPA vs.
 7   West Virginia.  I would be interested to hear that kind of an
 8   argument.  That's something I'm interested in.  But a political
 9   speech?  No.  I'm sorry.  That doesn't cut mustard with me.
10        MR. MORAN:  Your Honor, I apologize.  I wasn't trying to
11   waste the Court's time, but I think it frames why we're here.
12   And we don't view it as a windfall for the schools.
13        So to address -- I'm happy to address the point about --
14        THE COURT:  Please, go ahead.  I'd like to hear about
15   EPA vs. West Virginia.
16        MR. MORAN:  Yes.  So under West Virginia vs. EPA, the
17   Supreme Court articulated the major questions doctrine, which
18   is that the -- that when federal agencies attempt to acquire
19   from themselves broad authority that has significant effects on
20   the American economy based on vague, limited, or otherwise
21   unclear statutory language, that the Court presumes that
22   Congress did not intend to give them that authority.
23        And I think here, the most salient point is that this
24   entire regime of not only having a borrower defense to
25   repayment, but allowing the Department of Education to actually
```

adjudicate the claims and discharge it, hangs on one sentence

in the Higher Education Act which gives the Secretary of

Education the authority to promulgate by regulation what shall

be a defense to repayment of a loan.

It says nothing about the Department receiving

applications, adjudicating those applications, discharging

loans en masse, let alone individually, other than the very

specific context where, for example, before the Department can

refer someone to the IRS for garnishment and collection to

repay the loan, they have to consider whether or not they have

a valid borrower defense to repayment.

So even before we get to the authority of the Department

of Justice to compromise the claims, we have to recognize that

this entire regime, to the extent it purportedly allows the

Department of Education to adjudicate applications and forgive

loans, rests on this single sentence that says that they can

declare by regulation what defenses will be available.

And I think under *West Virginia vs. EPA*, it's clear that

you can't do that; that the Department cannot declare for

itself that broad authority that has $6 billion of economic

impact in this case, but certainly more if it were applied more

broadly, based on a single sentence in the Higher Education

Act.

**THE COURT:**  Well, let me ask you a question about that.

In 2019, the Department -- this was back in the prior

1  administration.  In 2019, the Department had a mass settlement

2  covering 7,400 borrowers related to an institution called

3  Dream Center Education.  So under your argument, that was

4  illegal?

5      **MR. MORAN:**  Well, Your Honor, yes.  Under that view, this

6  entire regime, since 1995 when the Department promulgated these

7  regulations, has been in excess of its statutory authority.

8  But like a lot of things, this is the fraud that was boiled in

9  the slow-burning pot.

10     We started in 1995 with the first set of borrower defense

11  regulations that were rarely used and that provided that if a

12  student borrower would have a claim against their school under

13  state law, then they could -- then they would also have a

14  defense to repayment of their federal student loans.

15     And until the 2016 rule in the second term of the Obama

16  Administration, as others have acknowledged today, this was a

17  largely dormant provision that was not viewed as a basis for

18  the Department to adjudicate and grant debt relief to students

19  who filed claims in front of --

20     **THE COURT:**  Well, all right.  Let's say that -- I've

21  forgotten the number.  I've forgotten how many students are

22  involved in our case, but it's a lot.  Is it 500,000?  How

23  many?  Just give me --

24     **MS. ELLIS:**  260,000 in the class.

25     **THE COURT:**  260 in the class?  Okay.  So let's say -- that

1    means there are 260,000 applications pending.

2         All right.  So let's say that instead of doing it on a

3    mass basis, the Agency decided to adjudicate these on an

4    individual basis.

5         So then let's say they get to the first case.  And the

6    first -- and then the first case, they're litigating it away in

7    front of the -- whoever's in the Borrower Defense Unit; and

8    the Government lawyer decides "Hey, you know what?  It's just

9    easier and better.  We're going to lose this case.  We're going

10   to settle it."  So they settle that one.

11        **MR. MORAN:**  Well, Your Honor --

12        **THE COURT:**  You say they can't even --

13        **MR. MORAN:**  -- I defer to Mr. Merritt, but I believe the

14   United States has expressly disclaimed the position that

15   they're compromising the underlying borrower defense

16   application.

17        Instead, they claim that they're compromising the

18   procedural claims that were brought here in the *Sweet*

19   litigation.  And, again, he can correct me if he thinks I'm

20   wrong, but that they've disavowed that they're actually

21   compromising the underlying borrower defense claim.

22        **THE COURT:**  Let's take it on those terms, then.  That's

23   all the better.

24        Let's say that they're in the middle of it and then

25   the Government lawyer says, "You know, they've got all these

procedural rights.  Let's just skip over that and give them
the -- discharge the entire loan."

     But it's just for one person, for one borrower.  Are you
saying that the Government could not do even that?

     **MR. MORAN:**  Well, Your Honor, again, there's a question
about the scope of the authority, depending on what the context
is.  But I think one notable difference that that hypothetical
highlights is that there are different sets of borrower defense
rules that would apply to that procedure, depending on when the
loan was taken out and what would govern the relief in this
case.

     And so the other aspect of the settlement that circumvents
that is that for the Decision Group that we talked about a few
minutes ago, either in the pre-settlement Decision Group, the
Department and the plaintiffs have created their own new set of
streamlined borrower defense rules that they're going to apply
in lieu of the actual regulatory rules, and for the
post-settlement Decision Group, they say that those will be
adjudicated under the 2016 borrower defense regulations.

     And you might ask:  Well, why would they choose the 2016?
Because there are actually now -- we now have four different
sets of borrower defense regulations that exist.  There was the
1995 regulations that were in place for a long time; there were
the 2016 regulations that were implemented during the second
term of the Obama Administration; there was the 2019 rule that

1    was implemented during the Trump Administration; and then

2    there's -- just this past two weeks, there was the new

3    2022 Borrower Defense Rule.

4          And the reason that they picked the 2016 Borrower Defense

5    Rule we think is clear, is because it makes it -- of the three

6    that are not the brand-new one, it's the easiest to bring a

7    claim and it provides the least process and rights for the

8    schools that are involved.  Because under the 2019 rules, the

9    schools would get notice of the application; they would get an

10   opportunity to review and comment on the information that was

11   submitted about their alleged misconduct in conjunction with

12   the application, and that would be formalized under those

13   regulations.

14         And so when they -- you know, they didn't pick 2016 out of

15   a hat.  They said, we're effectively going to amend the

16   regulations without going through the rulemaking process by

17   saying, under the terms of this alleged compromise, that --

18   they're going to pick which regulations they want to apply.

19         Now, normally, the regulations apply to the loans that

20   were issued in the years that those regulations were in effect.

21   So the 2016 regulations started into effect in 2017.  And so

22   for loans that were issued between 2017 and the effective date

23   of the 2019 rule, that's three years' worth of loans that would

24   be governed by the 2016 rule, although now the new rule

25   purports to spring it back into effect.  But that is, you know,

1   likely to be challenged, and that will play out in the courts

2   over time.

3       But they've taken what should be a rule that only governs

4   applications that were filed in a three-year window and said

5   we're just going to apply this to everything, again, because it

6   sets the lowest threshold for what counts as a borrower defense

7   claim and it sets the lowest threshold for the rights that are

8   afforded to schools under the process.

9       And I don't think they've offered a satisfactory

10  explanation as to how the right to compromise claims gives them

11  the right to rewrite the regulations and pick and choose which

12  regulations they're going to apply to adjudicate those

13  applications.

14      And I guess the one last point, Your Honor, with your

15  indulgence, that I would ask is that if the Court does -- we've

16  talked a lot in the briefing about the declaration from

17  Deputy Under Secretary Ben Miller, who made representations in

18  the intervention stage about what the Department would or would

19  not do vis-à-vis schools based on their inclusion on Exhibit C.

20      And so the one request I would make is that if the Court

21  ultimately does decide, based on that declaration, that the

22  schools don't have -- you know, that this will not affect the

23  schools and so they shouldn't be, you know, complaining about

24  that, that it incorporates those key terms into its findings of

25  fact and conclusions of law in approving the settlement and not

1    just leave them buried in a declaration that's an attachment to

2    the opposition --

3        **THE COURT:**  What's the name --

4        **MR. MORAN:**  -- to the motion to intervene.

5        **THE COURT:**  What's the name of that person?

6        **MR. MORAN:**  Ben Miller.  The declaration is ECF

7    Number 288-1.  It's Exhibit E to the United States' opposition

8    to our motion to intervene.

9        And I think there are four key paragraphs in that

10   declaration that set out the arguments that the parties have

11   relied on to oppose at least a good chunk of our position.

12       Paragraph 9, which says that (as read):

13           "Providing a class member with Full Settlement

14       Relief . . . does not constitute the granting or

15       adjudication of a borrower defense pursuant to the

16       Borrower Defense Regulations, and therefore provides

17       no basis to the Department for initiating a borrower

18       defense recoupment proceeding against any institution

19       identified on Exhibit C to the Settlement . . . ."

20       Paragraph 11, which has two provisions (as read):

21           "The fact of an institution's inclusion on

22       Exhibit C . . . does not constitute evidence that can

23       or will be considered by the Department in bringing

24       any Subpart G Proceeding, including a borrower

25       defense recoupment proceeding, against an

1    institution."

2    And then later in the same paragraph (as read):

3         ". . . any institution on Exhibit C against whom

4    the Department might bring a Subpart G Proceeding in

5    the future would have all the due process rights that

6    any institution would be entitled to under

7    Subpart G . . . ."

8    Paragraph 13 (as read):

9         "The fact of an institution's inclusion on

10   Exhibit C to the Settlement . . . does not constitute

11   evidence that can or will be considered by the

12   Department in making Program Findings or establishing

13   Program Liabilities against an institution."

14   And paragraph 14 (as read):

15        "The fact of an institution's inclusion on

16   Exhibit C will be used by the Department solely for

17   purposes of effectuating its obligations under the

18   Settlement Agreement to award Full Settlement Relief

19   to certain class members.  In any action or

20   proceeding that the Department might take in the

21   future against an institution . . . the fact that an

22   institution is included on Exhibit C to the

23   Settlement . . . does not itself provide any

24   evidentiary support or basis for initiating any such

25   action against any of the listed institutions.  If

1        the Department were to initiate any such actions or

2        proceedings . . . it will comply with all applicable

3        regulations without any reliance on the fact of an

4        institution's inclusion on Exhibit C and each

5        institution would be afforded all due process and

6        opportunities to defend itself to which it would

7        otherwise be entitled in any such action or

8        proceeding."

9        And so I think --

10       **THE COURT:**  Wait, wait.  Pause there.

11       Mr. Merritt, can the Court rely upon Mr. Miller's sworn

12  statement, or are you going to backtrack?

13       **MR. MERRITT:**  Yes, you can rely on the statement.

14       I think we would have to discuss and have something to say

15  about whether that should be incorporated explicitly into the

16  settlement agreement.  But yes, it's a sworn statement of a --

17       **THE COURT:**  Not into the settlement --

18       **MR. MERRITT:**  -- government official.

19       **THE COURT:**  -- agreement.

20       **MR. MERRITT:**  I'm sorry?

21       **THE COURT:**  He's saying into my order.

22       **MR. MERRITT:**  Yeah.  Sorry.  Into your order.

23       **THE COURT:**  Look, the Government has got to keep its word.

24       **MR. MERRITT:**  I'm not --

25       **THE COURT:**  You have to keep your word.  You can't give me

1    a declaration for one -- at one early point and then wiggle off

2    of it later on.

3         **MR. MERRITT:**  I'm not trying to wiggle off, Your Honor.

4    It's a sworn statement by the Department of Education.  We

5    stand by it.

6         **THE COURT:**  That's what you need to say.

7         **MR. MERRITT:**  It's in the record in this case.

8         **THE COURT:**  Thank you.  That's all you need to say.

9         All right.  Can I let another intervenor speak?

10        **MR. MORAN:**  Sure, Your Honor.  Thank you for your time.

11        **THE COURT:**  Anyone else?

12        **MR. PANUCCIO:**  Good afternoon again, Your Honor.  Jesse

13   Panuccio for Everglades and Kaiser Universities --

14        **THE COURT:**  Great.

15        **MR. PANUCCIO:**  -- non-profit intervenors in this case.

16        **THE COURT:**  Welcome.  How can you help me?

17        **MR. PANUCCIO:**  Thank you.

18        I want to make one pragmatic point, and then I want to try

19   to address the authority issues that Your Honor is interested

20   in.

21        The first pragmatic point I just want to make is, there

22   are 150 schools on the Exhibit C list.

23        **THE COURT:**  151.

24        **MR. PANUCCIO:**  151.  Well, they changed the list after the

25   fact but --

1      **THE COURT:**  Oh, they did?  Okay.

2      **MR. PANUCCIO:**  Yes.  So I believe it might be --

3      **THE COURT:**  Just 150.

4      **MR. PANUCCIO:**  -- 150, 151, and that underscores some of

5  our points.

6      But here, as intervenors -- and you gave plenty of time

7  for schools to intervene.  There are only four.  So one

8  prag- -- and we all have, we think, very serious objections,

9  and those objections may play out over time if anyone wants to

10  appeal.

11      But one pragmatic way for the Court to deal with this

12  would simply be to carve these four schools out and ask the

13  parties to agree.  And that would mean no Exhibit C, no

14  secondary path, no Path 3 with these post- -- these undefined

15  post-class applicants, but simply say these four schools have

16  raised significant objections.

17      If you want to move forward, one easy way is you can move

18  forward with 146 other schools; and as for us, we will have the

19  lawful process that is in regulations.  Those claims can still

20  be adjudicated.  And that is all we've ever asked for.  We just

21  want the law to apply to us as it's written in the federal

22  regulations.

23      So that's just one pragmatic point that I would ask

24  the Court to consider.

25      **THE COURT:**  I ask the audience.  I know there are a

1  thousand people on the phone but they can't speak.  Raise your

2  hand if you went to one of these four schools.

3       You better read out who the four schools are.  Tell us.

4  They need to know who they are.

5       **MR. PANUCCIO:**  I believe it's -- I represent Everglades

6  University and Kaiser University.

7       American National University.

8       The -- I won't get the full -- Chicago School of

9  Professional --

10      **MR. GONSALVES:**  Psychology.

11      **MR. PANUCCIO:**  -- Psychology.

12      And then Lincoln --

13      **MR. TOWNSEND:**  Educational Services.

14      **MR. PANUCCIO:**  -- Educational Services.

15      **THE COURT:**  Anybody go to any of those four?

16                       (No response.)

17      **THE COURT:**  Okay.  No one's raising their hand here, but I

18  suspect on the telephone, there are some.

19      Have you totaled up how many people -- how many student

20  loans there are for those four?

21      **MR. PANUCCIO:**  We haven't, Your Honor.

22      As for my client, we haven't even received notice from the

23  Department that there are BD applications.  They haven't even

24  followed their regulations with respect to our client and

25  anyone in this class to this point.  So it is impossible for us

1    to even know, which is another reason why we should not be

2    included, because rights are being compromised the way things

3    are happening.  There's never even been proper notice to the

4    institution under any of the regulations.  And my point is just

5    pragmatically, the Court can deal with this by keeping us out

6    of it.

7          And all we're asking for is the law, Your Honor.  We're

8    not asking for anything different.

9          **THE COURT:**  When a lawyer says "all we're asking for" --

10         **MR. PANUCCIO:**  Well, but, truthfully, Your Honor, there

11   are regulations.

12         **THE COURT:**  -- it's usually a pretty big thing.

13         **MR. PANUCCIO:**  We're not say- -- we're not saying that

14   these claims shouldn't be processed in the normal course.  And

15   the Department has sworn, in the Cordray declaration, that they

16   have restarted their process, that they have the resources to

17   do it.  This is all in their summary judgment papers, which

18   were filed after the proposed settlement.

19         And all we want is that.  We want the lawful BDR process

20   to apply.  We don't want this transmogrified different process

21   that they have set out in a settlement agreement to apply

22   because it's not the law.

23         And if I may, Your Honor, in terms of the objections, I

24   know you don't want to hear about mootness, so I'll stand on

25   our briefs on that, and on standing, although we think those

are very serious and the Court has to have subject-matter

jurisdiction.  And I'll just note one point on that.

The United States' current position before this Court is
that the Court does not currently have subject-matter
jurisdiction.  That is the last filing it submitted.  It has
not changed its position.  If it believes the settlement is
fair and reasonable, it ought to be put to its paces on
the Court's current subject-matter jurisdiction.

Also true, you didn't mention this so I don't know if
the Court wants to hear about it, Your Honor, but class
certification is very significant at this point.  The
Supreme Court has made clear, the Ninth Circuit has made clear
that the class must be certifiable at all points of the
litigation.  And Your Honor's own order, when you certified the
(b)(2) class, you were very careful, Your Honor, to point out
why you were certifying a (b)(2) class and that that class
definition would apply all the way through settlement.

There is no way the plaintiffs can maintain a (b)(2) class
at this point with the settlement they are proposing.  It is no
longer --

**THE COURT:**  Give me just one good reason.

**MR. PANUCCIO:**  Well, one good reason is they cannot
satisfy typicality and commonality under just Rule 23(a) at
this point.

Now, let's just take, for example, what they call the

post-class applicants; we call it Path 3.  Post-class

applicants are not in Your Honor's definition of the class.

This is a class that they made up for settlement purposes.

These are people who had not filed BD applications until the

day after they filed the settlement.

So they have an ever-expanding class that has never been

reviewed by this Court for typicality or commonality or any of

the other requirements.  It is not in the Court's class

definition.  There is just no way --

**THE COURT:**  What is the "it" that you're referring to

that's not?  Which group?

**MR. PANUCCIO:**  This would be what they call post-class

applicants.

So what they've said is:  If you file -- from the day

after we lodge the proposed settlement up until the day

the Court provides final approval, if you file a borrower

defense application, you will be subsumed within the

settlement, even though none of those people were ever part of

the class definition and cannot be, because the class

definition was set, it was set for people who had filed claims

up until the time Your Honor certified the class.  And now

they're making a new class.

So what are the problems with that?  Well, one,

the Court's never done the Rule 23 analysis.  Two, there is no

named plaintiff that represents that class by definition.  All

1   of those people come after the named plaintiffs.

2       None of the named plaintiffs are similarly situated as

3   those people because those are new -- remember what this case

4   began as, Your Honor.  This was a case challenging an alleged

5   policy of delay and then later they said an alleged policy of

6   form denials.

7       Mr. Cordray has put in a sworn declaration to this Court

8   saying that those policies no longer exist.  So the people who

9   are applying, just by way of example, as post-class applicants

10  cannot possibly be affected by the policies that no longer

11  exist.

12      So that is just one example of how this case was about one

13  thing when it started and, only upon the lodging of the

14  settlement, became about something completely, completely

15  different.  I mean, it's worth Your Honor going back to their

16  complaint.

17      **THE COURT:**  I know what it says.  It's to get a hearing.

18      **MR. PANUCCIO:**  Yeah.  I mean, it's --

19      **THE COURT:**  To get a decision.  It's to get a decision.

20      **MR. PANUCCIO:**  It says more than that.  They said -- this

21  is what they said in paragraph 10 of their complaint, still

22  operative (as read):

23          "[Plaintiffs] do not ask this Court to

24      adjudicate their borrower defenses.  Nor do they ask

25      this Court to dictate how the Department should

```
1              prioritize their pending borrower defenses.  Their

2              request is simple:  They seek an order compelling the

3              Department to start granting or denying . . . ."

4          The settlement does all of the things that they told

5      this Court repeatedly in the complaint to get class

6      certification, it does all of the things that they said they

7      weren't asking the Court to do.

8          So the Court never engaged in a Rule 23 analysis about

9      whether a class is a sufficient vehicle for dealing with all

10     these things they've now put in the settlement.  So we think

11     the Rule 23 analysis is significantly important and must be

12     conducted before the Court can approve this settlement.

13         In terms of authority --

14     THE COURT:  Well, even for the -- you're saying that's

15     true for even the decision class?  The decision --

16     MR. PANUCCIO:  Yeah.

17     THE COURT:  Why would that be, though?  Those class

18     members wanted the Agency to hurry up and make up its mind one

19     way or the other and wanted me to order them to do that.  Okay.

20     But instead, they have leaped over that and gone straight to

21     grand slam home run.  But why doesn't that give them even more

22     relief?  And how could that possibly not be certifiable?

23     MR. PANUCCIO:  This goes back to the *Wal-Mart* case in the

24     Supreme Court, Your Honor.  (b)(2) is a very specific and

25     narrow class certification provision.  It has to be a single
```

policy that is being challenged that applies to the entire

class, and the relief has to be dealt with by a single

injunction that can solve everyone's problem, not multivariate

relief.

    And the very fact that they have to have three different

classes that they've now made up for settlement purposes -- not

the class the Court certified, but three new classes -- shows

that there is no single injunction.  They're asking for

multivariate relief.  And that multivariate relief is quite

individualized, which a (b)(2) class cannot be seeking

individualized relief.

    So let's take what they call the Automatic -- I think the

Automatic Relief class.  We call it Pathway 1.  So they've got

150, 151 schools on a list, and the Department says:  We've

made 150 or 151 individualized determinations about alleged

wrongdoing by those schools.

    That cannot possibly be the predicate for a (b)(2) class.

That is individualized determinations.  And so they need to

show that they have plaintiffs that represent each of those

schools.

    And I think it's very significant that you asked,

Your Honor, is there anyone even in the courtroom that,

you know, is a class member who relates to any of these schools

and no hands went up.  They certainly don't have a named

plaintiff that relates to any of these schools, Your Honor.

1   And so that's extremely significant that they cannot maintain

2   the (b)(2) class.  That's the only class that exists in this

3   case.

4        **THE COURT:**  Just on this point, my Deputy here, Clerk said

5   that when I asked that question, no one in the room raised

6   their hand, but six people raised their hands on the phone.  I

7   don't know how you do that on the phone, but there's a way to

8   do that.  And so six people raised their hands on the phone.

9        **MR. PANUCCIO:**  And, Your Honor, a robust Rule 23 analysis,

10  we would have to see who those people are.

11       We're all separately represented.  These are all separate

12  schools here.  We're not a group.  We just were grouped in by

13  the Department together.

14       But a Rule 23 analysis would have to see who those people

15  are.  Do they have class representatives?  Are their

16  circumstances typical and common such that there could be class

17  certification?  None of that has been done.  The only class

18  certification analysis the Court did related to a very

19  different case, not the case they are attempting to settle

20  today.

21       **THE COURT:**  All right.  You're repeating yourself.

22       **MR. PANUCCIO:**  Okay.

23       **THE COURT:**  All right.  Let me hear from another

24  intervenor.

25       **MR. PANUCCIO:**  Thank you, Your Honor.

1          THE COURT:  Okay.

2          MR. TOWNSEND:  Good afternoon, Your Honor.  Lucas Townsend

3     on behalf of intervenor Lincoln.

4          We agree with the points that have been made so far.  I

5     won't repeat them.

6          On the authority question, we're told that authority is

7     rooted in 20 U.S.C. Section 1082(a)(6), the Secretary's

8     authority to compromise litigation.

9          That authority can't be viewed without considering what is

10    the claim that is being compromised here.  The claim is a claim

11    under 5 U.S.C. 706, Subsection 1, to compel agency action

12    unlawfully withheld or unreasonably delayed.

13         This case was about getting a hearing.  Getting a hearing

14    is the home run.  It isn't first base.  It's the home run on

15    that claim.

16         This settlement is a home run and a touchdown.  It is

17    something --

18         THE COURT:  Well, I called it a grand slam.

19         MR. TOWNSEND:  It is a grand --

20         THE COURT:  You don't like my --

21         MR. TOWNSEND:  -- slam and a touchdown and Super Bowl on

22    top of it.  It is settling something else than what is before

23    the Court.

24         The borrower defense claims are before the Agency, before

25    the Department of Education, in an administrative process that

1    the Department has exclusive jurisdiction over.  They're not in

2    this proceeding.

3        The claim that is in this proceeding before this Court is

4    a claim for a hearing.  And we're told that the parties are

5    compromising that claim.  A claim -- a compromise implies each

6    party gives up something and the parties meet in the middle.

7    This is far beyond what the plaintiffs could have obtained by

8    litigating their claim successfully to a final judgment.

9        And the leading case on this question is

10   *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55-65,

11   and here's the relevant quote (as read):

12            ". . . when an agency is compelled by law to act

13        within a certain time period, but the manner of its

14        action is left to the agency's discretion, a court

15        can compel the agency to act, but has no power to

16        specify what the action must be."

17       This settlement determines what the action will be on

18   hundreds of thousands of bor- --

19   **THE COURT:**  But it's not the judge -- it's not the judge

20   forcing that on the Agency.  The Agency wants to do that.  So

21   the Agency has made that determination that you say is within

22   the Agency's -- I agree with you.  I couldn't -- if it went the

23   original way, the most I could do would be to say:  You've got

24   to make a decision one way or the other.

25       And so now the Agency is saying:  Okay.  We're going to

1    make a decision, and we're giving -- we're giving up.  They all

2    win.

3         So why is that so out of line with what was requested in

4    this case?

5         **MR. TOWNSEND:**  Well, Your Honor, I would say two things.

6         Those claims are not in front of the Court.  They are

7    still in front of the Agency.

8         There is no example that we've been cited or that I'm

9    aware of of an agency in court settling litigation,

10   compromising litigation that includes hundreds of thousands of

11   rights outside of court.

12        **THE COURT:**  Well, no.  The Corinthian -- I thought the

13   Corinthian case just recently in our own Court was 560,000

14   borrowers and $5.8 billion.  Same kind of thing, wasn't it?

15        **MR. TOWNSEND:**  Well, I am not sure that that forgiveness

16   was in court.  But Corinthian no longer exists.  There's no one

17   to challenge the authority in that case.  So I really can't --

18   I'm not in a position to defend that settlement.  That was

19   something that I think the Department did unilaterally in

20   another case and it wasn't challenged.

21        And I would not cite that as authority for -- in fact,

22   every one of the schools in the list that was submitted today

23   in response is no longer in business.  There's no one to

24   challenge any of those.  This is the first instance in which

25   anyone is challenging this assertion of settlement authority,

1    and we're not cited any prior instance of this happening.

2        So it's settling things that -- claims that are not in

3    court, claims that are committed to the Agency's exclusive

4    jurisdiction.

5        In fact, this settlement is deciding issues, claims that

6    hadn't even been asserted at the time that the settlement was

7    filed in this Court in June.  179,000 post-class claims have

8    been filed since then, and this settlement is asserting all of

9    those rights.

10       Again, this settlement qualifies as a rule under the

11   Administrative Procedure Act.  A rule is defined as a statement

12   of general or particular applicability that has future effect,

13   5 U.S.C. -- U.S.C. Section 551(4).  And that's exactly what

14   this settlement does.  It has general effect because it applies

15   to class members and non-class members and it applies well into

16   the future.

17       And there is Ninth Circuit authority that says judicial

18   acts in approving consent decrees and settlements can

19   constitute rules.

20       **THE COURT:**  Give me a decision that says that.

21       **MR. TOWNSEND:**  *Conservation Northwest vs. Sherman*,

22   715 F.3d at page 1187.  And the Ninth Circuit held that the

23   settlement authority in that case does not authorize

24   effectively creating a new substantive rule.

25       That's exactly what this settlement would do.  It would

1   create a new framework applying into the future, binding

2   the Secretary in the future, governing claims that hadn't been

3   filed at the time the settlement was announced.  It's a rule.

4   It has to be -- it has to comply with the Administrative

5   Procedure Act.  And moreover, it can't -- a settlement can't

6   violate other substantive law.

7        There's no authority under the Higher Education Act or the

8   Department's own rules, legislative rules, passed -- enact- --

9   or promulgated through notice and comment rulemaking for

10  granting borrower defense claims without any regard to the

11  merits of those claims.  But that is exactly what this

12  settlement would do.

13       So it is violating the Agency's own regulations, which

14  have the force and effect of law.  So --

15       **THE COURT:**  But it would only be binding on the Agency as

16  to those people who are members of the class.  It would not be

17  binding on even you four.  You're recoupment rights are fully

18  preserved.  And any other class member would not -- not class

19  member, but any other future borrower or past borrower would

20  not get the -- have any entitlement to have the benefit of this

21  settlement.  That's the way I see it.

22       So why is this a -- why does this extend beyond the four

23  corners of the class such that notice and comment would be

24  required?

25       **MR. TOWNSEND:**  Well, the first point I would make is that

the judgment would cover members, individuals who are not
members of the class, all of the post-class applicants,
179,000, we're told, as of late September when the parties
filed their final motion.  So it does bind individuals outside
of the class.

     But we do also believe -- we're very concerned that being
on List C, Schedule C, would have an effect on schools going
forward.  The Agency has to have consistent adjudicative
processes.  Future borrower defense claims might be filed after
a final judgment.  What justification is the Agency going to
give for denying borrower defense claims filed by any person
who attended a school on Schedule C after the judgment but
automatically granting all of them before the judgment?

     It does have an effect on agency decision-making
processes.  It would be an unfair process.  And the
decision-maker is not an ALJ.  It's not a judge.  It's not
someone who's neutral.  It is someone who works for
the Secretary, the Secretary who is in court telling this Court
that there is a list of presumptive wrongdoers.  How can
schools possibly get a fair shake in such a process?

     So a settlement of this nature, the settlement that the
parties are asking for, does have an effect on outside parties
and non-class members.

          **THE COURT:**  All right.  Any other intervenor wish to be
heard?

1     It's your choice, but you can take your mask off, if you

2 wish.

3     **MR. GONSALVES:**  I would love to.

4     **THE COURT:**  There you go.

5     **MR. GONSALVES:**  Terance Gonzales, Your Honor, on behalf of

6 the Chicago School of Professional Psychology.

7     My client is here in the courtroom today.

8     **THE COURT:**  Raise your hand, please.

9                    (A hand is raised.)

10     **THE COURT:**  Okay.  Welcome.

11     **MR. GONSALVES:**  It's the general counsel for the Chicago

12 School.  It's the largest non-profit school of professional

13 psychology in the country.

14     Judge, I want to touch on a couple of things with respect

15 to the authority.

16     The Department points to 1082(a)(6) as their authority to

17 enter into this $6 billion settlement.  They would have you

18 believe that that provision, read in isolation, gives the

19 Department the authority to settle any claim for any reason for

20 any amount so long as the Department sees fit.  But that

21 provision cannot be read or looked at in isolation.  It has to

22 be read in context with the other regulations.

23     So, for example, Judge, 1082 -- 20 U.S.C. 1082(b) imposes

24 a $1 million cap on the Secretary's authority to settle

25 litigation unless she gets approval from the Attorney General

1    of the United States.  That cap that is in 1082(b) is also

2    listed in 34 CFR 30.70(e)(1), where it again describes the cap

3    on her authority to settle claims absent approval from the

4    Attorney General of the United States.

5         **THE COURT:**  Do they have that approval?

6         **MR. GONSALVES:**  Well, we don't know, Judge.

7         Now, Mr. Merritt may step up and say:  Yes, we do have

8    that approval.

9         The plaintiffs may step up and say:  You know, that

10   provision doesn't apply to this particular settlement.

11        I'm aware of a letter from plaintiffs' counsel to Senator

12   Elizabeth Warren, dated September 14th, 2020, advocating on

13   behalf of mass student debt relief, where she discusses this

14   $1 million cap on the Secretary's authority.  And I have a copy

15   of that letter if you'd like to see it, Your Honor.

16        The point here, Judge, is not whether they have the

17   authority or whether it applies.  It's that 1082(a)(6) cannot

18   be looked at in a vacuum.  It must be read in conjunction with

19   the other regulations and the other statutes, including the

20   borrower defense regulations.

21        It is our position that any settlement cannot exceed what

22   those regulations provide for.

23        By way of example, Judge, the borrower defense regulations

24   require an offset of any amount discharged through those

25   regulations; and that offset must be reduced -- or any relief

must be reduced by the amount of any refund, reimbursement,
indemnification, restitution, compensatory damages, settlement,
debt forgiveness, et cetera.

   This settlement that's before Your Honor doesn't provide
for any sort of offset to those class members who have already
received relief from other class action settlements or other
federal government regulatory investigations, such as
settlements with the FTC.

   So those class members who have already received full or
partial relief are going to have a great day, an even better
day than a grand slam because they are going to be unjustly
enriched because they've already had their compensation -- or
partial compensation from those other settlements.

   And this settlement agreement provides no mechanism --

   **THE COURT:**  Just give me a hypothetical concrete example
of how somebody could be benefited like that.  I just am not
following your point about offsets.

   **MR. GONSALVES:**  So there is -- if -- there have been
consumer class actions brought against some schools, such as my
client's school -- okay? -- where there was a class action
filed and it was settled, and each one of those students who
were in that class received $90,000.

   If they did not use that money to repay their loans and
they have filed a borrower defense application -- and of the 37
that we are aware of that's pending against my client, four of

1  them were in that prior class, that *Truitt* class -- if they

2  didn't use that money to repay their loans and filed a borrower

3  defense application, like we know four did, they're going to

4  get an extra benefit because they got the 90,000, plus now

5  they're going to get all of their loans discharged.  And

6  there's no mechanism in the settlement agreement to account for

7  that.

8      **THE COURT:**  Okay.

9      **MR. GONSALVES:**  The other point that I'd like to make,

10  Your Honor, is with respect to the filing from the Department

11  today about when has 1082(a)(6) been used as authority to

12  discharge group debt, group loans.

13      And they have a list of six or seven cases here, but when

14  you go back and look at the press releases that the Department

15  released about those discharges, the press release says those

16  were done pursuant to the borrower defense regulations, not

17  pursuant to 1082(a)(6).

18      So, for example, one of them that's listed here is the

19  Marinello Schools of Beauty, April 28th, 2022, 28,000 people.

20      Give me one minute, Judge.

21                    (Pause in proceedings.)

22      **MR. GONSALVES:**  Well, let me skip that one.

23      Let me go to the Minnesota School of Business, Judge,

24  where that one was June 15th.  And the press release says, with

25  respect to the Minnesota School and Westwood -- both of them

1    are on this list -- (as read):

2              "Borrowers will receive $415 million in borrower

3        defense to repayment discharges."

4        That's a different provision, Judge.  Those are the

5    borrower defense regulations.  Those are not under 1082(a)(6).

6        And so I'm not sure -- and we can look at these other

7    press releases.  Marinello School of Beauty, that $238 million

8    group discharge, that was based on borrower defense findings.

9        For Corinthian --

10       **THE COURT:**  But does it refer in any way to any other

11   statutory authority, those press releases?

12       **MR. GONSALVES:**  The only thing these press releases -- and

13   for each one of these schools where there was a press release,

14   the only thing they refer to is the borrower defense

15   regulations.  They don't refer to any other authority.

16       Now, we don't know what --

17       **THE COURT:**  How about the settlements in court?  Did they

18   refer to -- weren't they settlements in court, or not?

19       **MR. GONSALVES:**  These were not, Judge.

20       **THE COURT:**  Okay.  These were --

21       **MR. GONSALVES:**  They have one listed here, the *Weingarten*

22   case; but these other cases were instances in which the

23   Department had received large volumes of borrower defense

24   applications.  Some of these were for closed schools.

25       Corinthian, for example, there were discharges pursuant to

1  the borrower defense regulations; and then there may have been

2  some of them that were discharged even though they had not

3  submitted a borrower defense.

4      But we -- under your order, we're not allowed discovery.

5  We don't know what the basis was for those settlements, and we

6  only got this today.

7      I can only tell you what I was able to find off of the

8  press releases that all of us have been following for many

9  years of watching these regulations play out.

10      **THE COURT:**  Okay.  Thank you.

11      **MR. GONSALVES:**  The last -- one last point, Judge.

12      **THE COURT:**  All right.

13      **MR. GONSALVES:**  And that is the question of whether

14  1082(a)(6) applies to the direct loans.  This is referenced in

15  the briefing.

16      1086 -- I'm sorry.  1082(a)(6) applies to FFEL.  The

17  Department says it also applies to direct loans.  I don't know

18  that that is a settled proposition, and I think it's something

19  that the Court should take a hard look at.

20      The Government points to 20 U.S.C. 1087e(a)(1) as the

21  basis, which says they have the same terms, conditions, and

22  benefits as FFEL loans.  But those are very different than

23  functions, powers, and duties that are provided for under

24  1082(a)(6).

25      I'd like to draw the Court's attention to *Pennsylvania*

*Higher Education Assistance vs. Perez*, 416 F.Supp. 3d 75, where

the Court concludes there is no language incorporating

the Secretary's general powers from Part B into Part D.

The statute is very specific about functions, powers, and

duties when it comes to debt cancellation, Judge, and we're not

quite sure that *Weingarten*, the case that has sort of, in

dicta, that they apply to both, answers the Court's question as

to whether 1082(a)(6) applies to both FFEL and direct loans.

**THE COURT:**  Thank you.

Let me ask my reporter.  Are you doing okay?  Can you keep

going?

**THE OFFICIAL REPORTER:**  Yes.

**THE COURT:**  All right.  Mr. Merritt, what do you say to

the $1 million cap and the Attorney General?

**MR. MERRITT:**  I think, like a lot of things we just heard,

that is an inaccurate statement of the statute.

20 U.S.C. 1082(b) requires settlements of over a million

dollars to be referred to the Attorney General for his review,

but not approved specifically.  There's nothing in the statute

that says it has to be approved.  It just has to be reviewed by

the Attorney General.

Of course here, the Attorney General, through his

delegated officials at the Department of Justice, has approved

the settlement agreement; so there's no issue there.

I want to address a few points about the statutory

1   authority because we heard a few things about what it is and

2   what it does.

3        So 20 U.S.C. 1082(a)(6) makes no reference to litigation.

4   It's not specific to litigation.  It just discusses the

5   Department's ability to waive or right or -- waive, release, or

6   compromise loan debts that are owed to it.

7        So what we're talking about here is a settlement

8   agreement.  And what the Department is doing pursuant to that

9   settlement agreement is discharging loans or setting up

10  streamlined procedures for the review of borrower defense

11  applications, ultimately potentially resulting in the discharge

12  of loans or not, however that process goes.

13       But it's all specific -- none of that is specific to a

14  case having to be in litigation.  So I would just stress that

15  when the -- in most of the cases that we cited in today's

16  filing, they did not involve cases in litigation.

17       You referenced Corinthian.  There is a case with Judge Kim

18  involving Corinthian, but that discharge that happened earlier

19  this year was not through the litigation or specific to that

20  litigation.

21       So this authority is foundational to the Secretary's

22  ability to administer the student loans and is not specific to

23  litigation, though litigation can obviously influence

24  the Secretary's judgment about the benefits, the drawbacks of a

25  particular exercise of the authority, as it has here.

1          You know, there's been a lot of talk today about how

2     the -- what the case was originally set out to do and how it

3     was about just 706(1) and getting decisions quickly.

4          After discovery and after the prior rejection of the

5     settlement agreement, there were new claims added to that that

6     attacked really all aspects of the Department's process for

7     adjudicating borrower defense claims and challenged the

8     substance and content of denial letters.

9          So in determining whether to resolve this case and provide

10    for the discharges that the settlement agreement provides for,

11    there was an assessment -- you know, litigation risk assessment

12    of what was likely to happen if the case proceeded to judgment.

13    And, obviously, that would be up to the Court.  But there was

14    more to it than just a request to provide timelines for

15    decisions, implicating the procedures the Department had in

16    place to review claims, implicating what the denial notices

17    would say.

18         **THE COURT:**  What about the post-settlement class?  The

19    class that I certified obviously didn't include them.  So do I

20    need to go through a Rule 23 process?

21         **MR. MERRITT:**  Your Honor, I think this issue is mostly

22    best addressed to plaintiffs' counsel.

23         But I will just note that the class was not certi- -- was

24    not closed as of the date of your certification order.  The

25    class was defined as anyone who had filed a borrower defense

1   application; so it was, by definition, open-ended.

2       And the parties, as part of their settlement negotiations,

3   had to -- you know, have, in the interest of efficiency and

4   providing known timelines to the Department to carry out its

5   obligations, decided a date to close the class.  But by

6   definition, the class was defined in an open-ended way.

7       And, of course, we opposed class certification in this

8   case and don't need to get into, you know, all of our views on

9   that.  But -- and, again, I think those can be presented by

10  plaintiff.  But that is an important way of -- point to make

11  about what the actual class definition is here.

12      I did just want to make a couple other points.

13      **THE COURT:**  Yeah, go ahead, but I've got some -- I've got

14  one or two other questions for you.  Please, go ahead with your

15  list.

16      **MR. MERRITT:**  Okay.  On the issue of double recovery or

17  class members getting a windfall in some way, in our filing

18  that we filed today in answer to the Court's third question

19  having to do with the separate loan forgiveness plan recently

20  announced by the President, there are specific federal statutes

21  and regulations set forth that make clear that a borrower

22  cannot recover -- or that any settlement relief in this case or

23  any relief that the borrower receives from the Department

24  cannot exceed the combined amount federal student loan debt

25  owed to and collected by the Secretary; so, essentially, more

1    than the original disbursement of the loan.

2       **THE COURT:**  Well, but what do you say to the different

3    hypothetical of these students who each got $90,000 in a prior

4    settlement directly against the school, and how is that 90,000

5    going to be factored in?  Because we don't know how the

6    student -- the student may not have given that money to the

7    bank.

8       **MR. MERRITT:**  Those are different things; right?  I mean,

9    all the Department can do is discharge outstanding loan debt

10   the Department holds or provide refunds for amounts previously

11   collected, and there is no chance that there will be kind of

12   windfall recovery within that context.

13      You know, we have no way of knowing what recoveries might

14   have been made in other contexts, and I don't think that's

15   relevant to Your Honor's consideration here.

16      Just on the point of the list that was filed today about

17   examples of group discharges, you know, the Department of

18   Education doesn't make policy through press releases.  That's

19   not official government documents as to, like, the source of

20   the authority for any of those particular discharges.

21      What you have in front of you is our, you know, court

22   filing today where we stated what the source of authority was

23   for each of those discharges, and it was the settlement and

24   compromise authority.

25      It shouldn't be surprising, necessarily, that authority

1  isn't always cited.  It's a foundational authority the

2  Department has to administer debts, to release debts, to not

3  always require repayment.  It's not, as we noted, not

4  necessarily always citing it or tracking it.  But, you know,

5  the Court filing here should control over a press release.

6      A quick note about the *Perez* case from the District of

7  Connecticut having -- that was raised on the issue of whether

8  the 1082(a)(6) authority applies to direct loans.  The Court in

9  that case made clear that it was addressing arguments that were

10  raised in a footnote, and just barely.  The Court said that.

11  And specifically what it was talking about was the Secretary's

12  authority to sue and be sued.

13      So we don't agree with that decision.  But whether

14  the Secretary can sue or be sued in district court is different

15  than the Secretary's authority to waive, compromise, or release

16  loan -- amounts of loans that are owed to the Secretary, which

17  clearly is a condition, term, or benefit of the underlying

18  loan.

19      I'll make just a couple -- if Your Honor has questions, I

20  was just going to address a quick rebuttal to the major

21  questions doctrine issue.

22      **THE COURT:**  Please, go ahead.

23      **MR. MERRITT:**  So, again, we need to focus on the correct

24  statute here.  There's reference made to the statute governing

25  borrower defense and what that says and, you know, statements

1    about the settlement and compromise authority only applying to

2    litigation.

3        But what we have in front of us is 20 U.S.C. 1082(a)(6),

4    the settlement and compromise authority which clearly, by its

5    text, authorizes the relief provided for in the settlement

6    agreement.  The major questions doctrine is a departure from

7    normal principles of statutory interpretation.  It tells --

8    it's reserved for extraordinary cases because it tells a court

9    to not give effect to the clear statutory language.

10       This is not that kind of case.  We are not dealing with a

11   novel reading of a long-standing statute for an unexpected

12   purpose.  Again, we're talking about the Secretary of Education

13   administering and determining repayment obligations for student

14   loans that the Secretary, for the most part, holds and that are

15   owed to the Secretary.

16       This is not the kind of case involving regulation of

17   private parties or broad swaths of the economy like some of the

18   times that the major questions doctrine has been invoked,

19   recently, in the *West Virginia* case that involved an EPA rule

20   applying to private power plants, certain types of emitters.

21       There was recently the case in the OSHA vaccine-or-test

22   case where it involved an agency rule requiring -- extending

23   into the employer employment relationship, where employers were

24   requiring their employees -- or, sorry -- the rule required

25   employers to require their employees to either vaccinate

against COVID-19 or test, or the *Alabama Association of Realtors* case which involved restrictions on private landlords' ability to evict tenants.

Nothing like that is at issue here.  It's a well-established statutory authority that the Secretary has often invoked and for clear statutory purposes and consistent with general powers under the HEA pursuant to which there are many options for the Secretary to reduce or eliminate student repayment obligations, including putting borrowers into deferment, forbearance, income-driven repayment plans, and providing loan forgiveness under multiple types -- multiple different statutory sources of authority.

So bottom line, there's no reason for Your Honor to apply any skepticism to the actual text of the statute here; and even if you did, the text is clear.

**THE COURT:**  What do you say to the point that this should have -- this broad policy decision, even if it's within the Agency's authority, should -- because it should have gone through notice and comment?

**MR. MERRITT:**  Well, a couple things.

The settlement agreement itself, there's no authority suggesting that a settlement agreement itself should have to go through notice and comment.

If there are rare cases -- if the settlement agreement itself were to provide, for example, for the Department to

 1   actually promulgate a rule that had application outside of this

 2   case to parties who are not class members or post-class

 3   applicants to find in a certain way here, as was the issue in

 4   the *Sherman* case that was cited, that just simply said parties

 5   cannot do a settlement agreement, agree to actually amend

 6   regulations.  That's not what's at issue here, Your Honor.

 7        The Department recently did go through the process of

 8   amending its borrower defense regulations.  A new rule was

 9   promulgated last week.  That'll be applied -- or, sorry -- on

10   November 1st.  That will be applied to anyone who is not in the

11   settlement agreement.

12        And what happens through the settlement agreement has no

13   impact or effect on any parties, any individuals who are not

14   parties to this case.  It won't determine, you know, rules or

15   precedents the Department would have to follow outside of this

16   context.

17        So it's certainly not the type of situation where an

18   agency was actually trying to promulgate a rule.  We know that

19   when the Department promulgates borrower defense rules, it goes

20   through notice and comment.

21        **THE COURT:**  All right.  Thank you.

22        Did the plaintiffs wish to say anything more?

23        **MS. ELLIS:**  Yes, Your Honor.

24        Your Honor, if I may, I'd like to begin by talking about

25   what a borrower defense is, because the intervenors threw a lot

1 of things out there about what is the claim, what claims are

2 being settled and by who, and I'm hoping to provide a bit of

3 clarity on that.

4     The Higher Education Act specifically provides that a

5 federal student loan borrower can assert a defense to repayment

6 of their federal student loans based on the misconduct of their

7 school.  The borrower defense rules implement this statutory

8 authority that the Higher Education Act gives to the Secretary.

9     They essentially -- what the borrower defense rules

10 essentially do is they say:  Here is how you assert your

11 defense to repayment.  You do it by filling out this

12 application.  The application will be reviewed, et cetera.

13     And --

14     **THE COURT:**  Do those borrower defense rules -- first,

15 they're legislative regulations -- am I correct on that?

16     **MS. ELLIS:**  Yes.  They go through --

17     **THE COURT:**  -- as opposed to interpretive?

18     **MS. ELLIS:**  -- notice and comment.

19     **THE COURT:**  All right.  So they're not interpretive;

20 they're legislative.  Correct?

21     **MS. ELLIS:**  Yes.

22     **THE COURT:**  All right.  So then do those legislative rules

23 say what the criteria will be for invalidating or forgiving a

24 loan, discharging it?

25     **MS. ELLIS:**  They do set out certain criteria, and this has

varied across the different versions of the rule.  But the
2016, 2019, and 2022 rules, for instance, say, you know, here
are examples of what is a misrepresentation that could give
rise to a borrower defense claim.

There is other subregulatory guidance that borrower
defense adjudicators use.  We know this because of discovery in
this case, and much of it we challenged as violating the APA.
We don't know exactly what of that is still in place right now.

But the basics for how you assert your defense to
repayment through a borrower defense application are addressed
in these legislative rules.

And when the plaintiffs filed this lawsuit in 2019, their
claim under the Administrative Procedure Act was that the
Department had not lawfully handled their assertion of a
defense to repayment because the Department was simply not
making decisions, and the plaintiffs were owed a decision in a
reasonable period of time.

Now that, obviously, evolved.  We learned more about what
was going on behind the scenes.  And so in our supplemental
complaint, we further alleged that the defenses to repayment
had not been handled properly because of the presumption of
denial policy, as we called it, which led to the form denial
notices.

So what's happening now in the settlement agreement is
that the Secretary is exercising his authority under

1    Section 1082(a)(6) to compromise the claims against -- to

2    compromise the defense to repayment claims that the class has.

3    He's doing that by, for many people, canceling their loans and,

4    for other people, providing them with this streamlined

5    procedure and specific timelines.

6        And by using his authority to provide redress to the

7    plaintiffs, that settles our APA claims through this negotiated

8    settlement with Ed's lawyers at the Department of Justice.

9        **THE COURT:**  All right.  Did anyone figure out how many

10   people are in the BDU unit while we've been here?

11       Mr. Merritt, did you?

12       **MR. MERRITT:**  Yes.

13       **THE COURT:**  What's the answer?

14       **MR. MERRITT:**  The point I made that I forgot to tell you.

15   33 total employees as of May/June 2022.  That includes 28

16   initial reviewers of claims and five supervisors.

17       I'm told that there have been additional hires since then

18   that we can track numbers on, but as of the time you asked for,

19   those are the numbers.

20       **THE COURT:**  What was the total again?  33?

21       **MR. MERRITT:**  33, yes.

22       **THE COURT:**  Okay.  Thank you.  Good.

23       All right.  Please continue.

24       **MS. ELLIS:**  Thank you, Your Honor.

25       I'll also continue by noting that this is not the first

1    case to address the Secretary's settlement and compromise

2    authority.  That was addressed in the *Weingarten v. DeVos* case,

3    which was listed in the filing this morning.

4         That was a case in sort of the opposite posture, where the

5    plaintiffs had -- had tried to compel the Secretary to use the

6    settlement and compromise authority to discharge their debts.

7    This was a case that had to do with the Public Service Loan

8    Forgiveness program.

9         And what the District of Columbia found in the *Weingarten*

10   case is that matters concerning the Secretary's settlement and

11   compromise authority are discretionary.  The Secretary's

12   decision not to exercise such authority or to exercise it in a

13   particular way is committed to her absolute discretion.

14        And so that is just some background.  I believe it was

15   counsel for Lincoln who said this hasn't been addressed, and it

16   has.

17        Counsel for the Chicago School also noted that we should

18   read this authority in conjunction with other authorities.  And

19   some of the important authorities in that respect are in 34 CFR

20   30.70, in Subsection (e)(1).

21        Regulations implementing, in part, the settlement and

22   compromise authority specifically state that this encompasses

23   debt arising under the FFEL program authorized under Title IV,

24   Part B, of the HEA or the William D. Ford Federal Direct Loan

25   Program authorized under Title IV, Part D, of the HEA.

 1          So that's additional authority, first of all, for the

 2    point that the authority applies equally to direct and to

 3    FFEL loans.

 4          Then, furthermore, in this 34 CFR 30.70(e)(1), it states

 5    that the Secretary can look to 31 CFR, Part 902 or 903, in

 6    deciding whether to compromise a federal student loan.

 7          And Section 902 enumerates some potential bases for

 8    compromise, one of which is significant doubt concerning

 9    the Government's ability to prove its case in court.

10          And we would submit that the class members' assertion of

11    their defenses to repayment does raise a significant doubt

12    about whether the Department could overcome that defense

13    against the validity of the loan in any future collection

14    proceeding.  And that does provide a strong reason to

15    compromise the debt.

16          **THE COURT:**  All right.  Anything more?

17          **MS. ELLIS:**  Excuse me?

18          **THE COURT:**  I'll let you make one more point.  Then we're

19    going to bring it to a close.

20          **MS. ELLIS:**  Yes, Your Honor.

21          I want to address counsel for Everglade's point about

22    class certification under Rule 23(b).

23          And the fact that some class members will receive monetary

24    relief as part of the settlement does not convert this into a

25    damages action.  It's not a case as in *Wal-Mart v. Dukes* where

1   you have individualized damages.  A defense to repayment is not

2   a claim for damages.  It is a claim that you do not have to

3   repay your loan.

4        And in terms of the relief that the settlement agreement

5   provides, it is, in its essence, injunctive relief.  What it

6   does is tell the Department:  You have to resolve these

7   people's defenses to repayment within a set timeline.

8        And then the details of it aren't creating separate

9   subclasses or anything like that.  It's simply going through

10  the steps of how is the Government going to satisfy this

11  obligation to resolve all of the backlog of BD claims by a date

12  certain.

13       And as to the post-class applicants, I would just build

14  slightly on what Mr. Merritt said, which is that if we had not,

15  in the settlement, agreed to close the class as of the

16  execution date, everyone who is called a post-class applicant

17  in the settlement would be a class member.

18       And so even though we are not including them in the

19  settlement class, even though we are not actually settling any

20  claims that they may have, we wanted to include provisions that

21  would make sure that they're treated fairly and that there

22  wasn't a recurrence of the problems --

23       **THE COURT:**  What relief will the post-settlement

24  individuals get?

25       **MS. ELLIS:**  They have a guarantee that their claims will

1   be decided within 36 months -- sorry -- that their BD

2   applications will be decided within 36 months of the effective

3   date of the settlement.

4        And if the Department doesn't meet that deadline, they'll

5   get settlement relief.  And that's all.

6        The post-class doesn't have the streamlined procedures.

7   Exhibit C does not apply to the post-class applicants.  They

8   get a firm timeline.

9        **THE COURT:**  Okay.  Thank you very much.

10       All right.  We've been going an hour and 35 minutes.

11       This is a very interesting problem.  I'm going to bring it

12   to a close unless there's some procedural, something like -- I

13   don't know.

14       Is there any procedural point anyone wants to bring up

15   that can be said in one minute or less?

16                     (No response.)

17       **THE COURT:**  No.

18       Yes?  Okay.

19       **MR. TOWNSEND:**  Your Honor, I would just point out -- Lucas

20   Townsend for Lincoln -- that we just heard that this was

21   actually an action for an injunction -- excuse me -- an

22   injunction, that a borrower defense claim is an injunctive

23   claim.

24       20 U.S.C. 1082(a)(2) bars injunctions against

25   the Secretary.  This is relief that could not have been

1   obtained through litigating these claims to a final judgment.

2       **THE COURT:**  Okay.

3       **MS. ELLIS:**  Your Honor, may I?

4       **THE COURT:**  Okay.  You get 15 seconds.

5       **MS. ELLIS:**  First, I -- well, first of all, I don't

6   believe that's a procedural point in the sense Your Honor

7   meant.

8       **THE COURT:**  No, it's not.  But go ahead.  If you want to

9   argue about it, I'll give you equal time.

10      **MS. ELLIS:**  The question of the anti-injunction provision

11  was one that was actively litigated in this case in both the

12  first and second rounds of summary judgment briefing.

13      Plaintiffs argued why the anti-injunction provision does

14  not bar these claims.  So it's not as open and shut of a

15  situation.

16      We believe that the relief ultimately would have been

17  permitted by the HEA and would have been appropriate.

18      **THE COURT:**  All right.  Time to move on.

19      So you members of the audience, again, I thank you for

20  your attendance, and those people on the phone.

21      Just so you'll know what the score is, I am not making a

22  decision right now.  I need to study this a bit.  And in about

23  a few days to a week, I will get an order out that will be in

24  writing that will explain who wins and who loses.

25      And so you have to stay tuned is, I guess, what I'm trying

1      to say.

2          I want to thank all of the lawyers on both sides for the

3      excellent presentations.

4          Okay.  We're in recess.

5          **THE CLERK:**  Court is adjourned.

6              (Proceedings adjourned at 2:39 p.m.)

7                      ---o0o---

8

9              <u>**CERTIFICATE OF REPORTER**</u>

10         I certify that the foregoing is a correct transcript

11     from the record of proceedings in the above-entitled matter.

12

13     DATE:  Friday, November 11, 2022

14

15

16     _____

17       Ana M. Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                 Official United States Reporter

18

19

20

21

22

23

24

25