**MCGUIREWOODS LLP**
JOHN S. MORAN (*pro hac vice*)
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Telephone: 202.828.2817
Facsimile: 202.857.1737

**MCGUIREWOODS LLP**
PIPER A. WALDRON (SBN 291482)
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
Telephone: 310.315.8250
Facsimile: 310.956.3150

Attorneys for Intervenor
American National University

[Additional counsel listed on next page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>        Defendants. | CASE NO. 19-cv-03674-WHA<br><br>Judge: Hon. William H. Alsup<br>Ctrm: 12<br><br>**INTERVENORS' NOTICE OF MOTION AND MOTION TO TAKE NOTICE OF RECENT DECISIONS**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

[Additional Intervenors' Counsel]

**ALSTON & BIRD LLP**
TERANCE A. GONSALVES (*pro hac vice*)
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

**ALSTON & BIRD LLP**
ALEXANDER AKERMAN (SBN 280308)
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410
Telephone: 213.576.1000
Facsimile: 213.576.1100

Attorneys for Intervenor
The Chicago School of Professional Psychology

**BOIES SCHILLER FLEXNER LLP**
JESSE PANUCCIO (*pro hac vice*)
JASON HILBORN (*pro hac vice*)
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
Telephone: 954.356.0011

**BOIES SCHILLER FLEXNER LLP**
JOHN J. KUCERA (SBN 274184)
725 S. Figueroa St., 31st Fl.
Los Angeles, CA 90017
Telephone: 213.629.9040

Attorneys for Intervenor
Everglades College, Inc.

**GIBSON, DUNN & CRUTCHER LLP**
LUCAS TOWNSEND (*pro hac vice*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: 202.887.3731
Facsimile: 202.530.4254

**GIBSON, DUNN & CRUTCHER LLP**
JAMES L. ZELENAY, JR. (SBN 237339)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7449
Facsimile: 213.229.6449

Attorneys for Intervenor
Lincoln Educational Services Corporation

INTERVENORS' NOTICE OF MOTION AND MOTION TO TAKE NOTICE
3:19-cv-03674-WHA

**TO THE HONORABLE COURT, PARTIES, AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Intervenors American National University ("ANU"), The Chicago School of Professional Psychology, Everglades College, Inc., and Lincoln Educational Services Corporation hereby seek an order taking notice of two recent decisions pursuant to Civil L.R. 7-3 (d)(2) and/or other applicable authority.

This Motion is based upon this Notice of Motion and Motion to Take Notice of Recent Decisions; the recent decisions in *Myra Brown v. U.S. Department of Education*, No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022), *notice of appeal filed* Nov. 10, 2022, and *Nebraska v. Biden*, No. 22-3179 (8th Cir. Nov. 14, 2022) (order granting preliminary injunction), as well as plaintiff states' emergency motion in *Nebraska*, true and correct copies of which are attached hereto as Exhibits A, B, and C; the pleadings and documents on file in this matter; any oral argument of counsel; and upon such other information as the Court may allow.

This Court's Local Rules contemplate the filing of a Statement of Recent Decision to bring to the Court's attention supplemental authority handed down after a party's last brief but "[b]efore the noticed hearing date." Civil L.R. 7-3(d)(2). *Brown* was issued on November 10, 2022, the day *after* this Court's November 9, 2022 hearing, and *Nebraska* was issued on November 14, 2022. Intervenors therefore bring these decisions to this Court's attention by this motion rather than by a Statement of Recent Decision.

In *Brown*, Judge Mark T. Pittman of the Northern District of Texas declared unlawful and vacated the U.S. Department of Education's recent loan-forgiveness program under the Higher Education Relief Opportunities for Students Act of 2003 (the "HEROES Act"). Applying the "major questions" doctrine articulated in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the court held that the *en masse* loan-forgiveness program was "an agency action of vast economic and political significance" subject to the "major questions" doctrine. 2022 WL 16858525, at *12.

The court further held that, because the broad significance of the program implicated the "major questions" doctrine, "the Government's assertion of authority is treated with 'skepticism,'" and "[t]o overcome that skepticism, the Government must . . . point to clear congressional authorization." *Id.* (quoting *West Virginia*, 142 S. Ct. at 2614).   The court concluded that the Department lacked the required "clear congressional authorization" to forgive student loan debt *en masse* under the HEROES Act.

The Department of Education argued in *Brown*—as it did before this Court at the November 9 hearing—that *en masse* loan forgiveness was not a matter of "economic and political significance" akin to other agency actions that have been scrutinized under the "major questions" doctrine. *See id*.  But the court in *Brown* rejected those distinctions. *See id*.

The specific statutory authority on which the Department relies is different in each case:  in *Brown*, the HEROES Act, and here, 20 U.S.C. § 1082(a)(6).  But the breadth and significance of *en masse* loan forgiveness is similar, the "major questions" doctrine applies to both, and neither statute expressly grants the Department that authority.

In *Nebraska*, the U.S. Court of Appeals for the Eighth Circuit granted the plaintiff states' emergency motion for injunction pending appeal on the grounds that "the States have satisfied the standard for injunctive relief pending review."  No. 22-3179, slip op. at 5.  In an argument similar to Judge Pittman's holding in *Brown*, the plaintiff states' emergency motion relies on the "major questions" doctrine, noting that "Congress has 'conspicuously and repeatedly declined to enact' the [c]ancellation" at issue in that case, "rejecting many sweeping student loan discharge efforts . . . ."  Emergency Motion for Injunction Pending Appeal at 16–21, *Nebraska v. Biden*, No. 22-3179 (8th Cir. 2022) (Oct. 21, 2022) (quoting *West Virginia*, 142 S. Ct. at 2610).

INTERVENORS' NOTICE OF MOTION AND MOTION TO TAKE NOTICE
3:19-cv-03674-WHA

1

## STATEMENT OF RELIEF SOUGHT

2      Intervenors seek an order, pursuant to Civil L.R. 7-3 (d)(2) and/or other

3   applicable authority, taking notice of the recent decisions in *Myra Brown v. U.S.*

4   *Department of Education*, No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex.

5   Nov. 10, 2022) and *Nebraska v. Biden*, No. 22-3179 (8th Cir. Nov. 14, 2022) (order

6   granting preliminary injunction), as well as plaintiff states' emergency motion in

7   *Nebraska*, true and correct copies of which are attached hereto as Exhibits A, B, and

8   C.

9

10   DATED: November 14, 2022              Respectfully submitted,

11                                         **MCGUIREWOODS LLP**

12

13                                    By:  */s/ Piper A. Waldron*
14                                          John S. Moran, Esq.
                                            Piper A. Waldron, Esq.
15
                                          *Counsel for Intervenor*
16                                        *American National University*

17                                        **ALSTON & BIRD LLP**

18                                        Terrance A. Gonsalves, Esq.
                                          Alexander Akerman, Esq.
19
                                          *Counsel for Intervenor*
20                                        *The Chicago School of Professional*
                                          *Psychology*
21
22                                        **BOIES SCHILLER FLEXNER LLP**

23                                        Jesse Panuccio, Esq.
                                          Jason Hilborn, Esq.
24                                        John J. Kucera, Esq.

25                                        *Counsel for Intervenor*
                                          *Everglades College, Inc.*
26

27

28

**GIBSON, DUNN & CRUTCHER LLP**

James L. Zelenay, Jr., Esq.
Lucas Townsend, Esq.

*Counsel for Intervenor*
*Lincoln Educational Services Corporation*

# EXHIBIT A

2022 WL 16858525
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Fort Worth Division.

MYRA BROWN, ET AL., Plaintiffs,

v.

U.S. DEPARTMENT OF EDUCATION, ET AL., Defendants.

No. 4:22-cv-0908-P
|
Filed 11/10/2022

**ORDER**

Mark T. Pittman UNITED STATES DISTRICT JUDGE

**\*1**  The Constitution vests "all legislative powers" in Congress. This power, however, can be delegated to the executive branch. But if the executive branch seeks to use that delegated power to create a law of vast economic and political significance, it must have clear congressional authorization. If not, the executive branch unconstitutionally exercises "legislative powers" vested in Congress. In this case, the HEROES Act—a law to provide loan assistance to military personnel defending our nation—does not provide the executive branch clear congressional authorization to create a $400 billion student loan forgiveness program. The Program is thus an unconstitutional exercise of Congress's legislative power and must be vacated. [1]

**BACKGROUND**

**A. Title IV of the Higher Education Act**

The Department of Education ("Department") offers two types of financial aid to help students pay for their college education—grants and loans. [2]  Grants do not have to be repaid. *Id.* But loans do. *Id.* Title IV of the Higher Education Act of 1965 ("HEA") covers the administration of three types of federal student loans: (1) Direct Loans; (2) Federal Family Education Loans ("FFEL"); and (3) Perkins Loans. *See* 20 U.S.C. § 1070.

With Direct Loans, the federal government provides loans directly to borrowers, who are responsible for repaying the government. *See* 20 U.S.C. § 1087a. With FFEL, the federal government pays lenders to offer student loans, and the federal government guarantees their repayment. 20 U.S.C. § 1071. With Perkins Loans, colleges loan money to students, and the federal government guarantees their repayment. § 1087aa. The HEA also provides how to pay these loans, repayment options, and loan forgiveness. *See, e.g.,* 34 C.F.R. § 685.219; 20 U.S.C. §§ 1098e; 1087e(d)(1); 1078(b)(9)(A)(v).

**B. Prior Attempts to Provide Loan Forgiveness**

With rising college costs, federal student-loan debt has skyrocketed to more than $1.61 trillion with 43 million borrowers. [3] As a result, there have been multiple attempts to enact legislation to help alleviate student-loan debt. For example, in 2019, Senator Elizabeth Warren introduced a bill to provide $50,000 in debt forgiveness for those who make under $100,000. *See* S. 2235, 116th Cong. (2019). Similarly, Representative Al Lawson introduced a bill to forgive the outstanding loan balance of all borrowers who make under $100,000 individually or $200,000 if married and filing taxes jointly. *See* H.R. 2034, 117th Cong. (2021). But both bills failed.

**\*2** The executive branch has also recently explored its ability to forgive student loans. Specifically, the Trump administration considered its statutory authority under the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act") to forgive student loans due to the COVID-19 pandemic. But the Department concluded that it lacked such authority. [4] House speaker Nancy Pelosi agreed with the Department's conclusion: "People think that the president of the United States has the power for debt forgiveness... He does not. He can postpone, he can delay, but he does not have that power. That has to be [accomplished through] an act of Congress." [5]

President Biden, however, promised to "forgive all undergraduate tuition-related federal student debt from two-and four-year public colleges and universities for debt-holders earning up to $125,000" while campaigning for the presidency. [6] After becoming president, Biden instructed the Department to prepare a memorandum exploring possible legal avenues to justify a loan forgiveness program. [7]

The Department did so but changed its tune—concluding that the HEROES Act allows the executive branch to create a loan-forgiveness program to address the financial harms of the COVID-19 pandemic. [8] The next day, the White House announced that the President would "fulfill [his] campaign commitment" by providing debt forgiveness to millions of borrowers. [9]

**C. The HEROES Act**

The HEROES Act grants the Secretary of Education ("Secretary") the authority to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act [20 U.S.C. 1070 et seq.] as the Secretary deems necessary in connection with a war or other military operation or national emergency." § 1098bb(a)(1) (alteration in original). "The term 'national emergency' means a national emergency declared by the President of the United States." § 1098ee(4).

The waiver or modification must also "be necessary to ensure that" certain objectives are achieved. § 1098bb(a)(2). The first of those objectives is "to ensure that ... recipients of student financial assistance under title IV of the [HEA] who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." § 1098bb(a)(2)(A). The HEROES Act defines "affected individuals" to include people who reside or are employed "in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." § 1098ee(2)(C)–(D).

The second objective provides that "administrative requirements placed on affected individuals ... are minimized, to the extent possible without impairing the integrity of the student financial assistance programs, to ease the burden on such students and avoid inadvertent, technical violations or defaults." § 1098bb(a)(2). [10] If the objectives of § 1098bb(a)(2) are met, "[n]otwithstanding section 1232 of this title and section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modification." § 1098bb(b)(1).

**D. Student-Loan Program**

**\*3** The Secretary invoked its authority under the HEROES Act to create a loan-forgiveness program ("Program") that would address the financial harms of the COVID-19 pandemic. [11] The Secretary contends that COVID-19 pandemic was declared a national emergency by President Trump in 2020 and thus a "national emergency" under the HEROES Act. *Id.* And according to the Secretary, every portion of the country is a "disaster area due to COVID-19," and "every person with a federal student loan under title IV of the HEA" is an affected individual. *Id.*

Because the Secretary deemed the objectives of § 1098bb(a)(2) met, the Secretary provided notice of the waivers and modifications in the Federal Register. *Id.* The notice provided that the Secretary modifies "20 U.S.C. 1087, which applies to the

Direct Loan Program under 20 U.S.C. 1087a and 1087e; 20 U.S.C. 1087dd(g); and 34 CFR part 674, subpart D, and 34 CFR 682.402 and 685.212" to provide the debt relief for certain borrowers who qualify. *Id.* A borrower qualifies if he (1) individually makes under $125,000 or $250,000 if married and filing taxes jointly and (2) has Direct, Perkins, or FFEL loans that are not commercially held. *Id.* If a borrower qualifies, the Program provides $20,000 in debt forgiveness to those who have received a Pell Grant and $10,000 to those who did not. *Id.*

### E. Procedural History

#### 1. Plaintiffs' Lawsuit

Plaintiffs Myra Brown and Alexander Taylor both have student loans. ECF No. 1 at 3–4. Brown is ineligible for any debt forgiveness under the Program because her loans are commercially held. *Id.* at 3. And Taylor is ineligible for the full $20,000 in debt forgiveness under the Program because he did not receive a Pell Grant. *Id.* at 3–4. Because Brown loses out on $20,000 in debt forgiveness and Taylor loses out on $10,000, they disagree with the lines drawn for the Program's eligibility criteria. *Id.* at 2–3.

Brown and Taylor, however, could not voice their disagreement because the Program did not undergo notice-and-comment rulemaking procedures under the Administrative Procedure Act ("APA").[12] As a result, Plaintiffs sued the Department and Secretary, seeking vacatur of the Program or nationwide injunctive relief for two reasons. *First*, they allege that the Program violates the APA's notice-and-comment requirements. ECF No. 1 at 13–14. *Second*, they also contend that the Secretary lacks the authority to implement the Program under the HEROES Act. *Id.* at 4–5.

The same day Plaintiffs sued, they moved to enjoin the Department "from enforcing, applying, or implementing the Program." ECF No. 4 at 14. Shortly after, Defendants filed their opposition to Plaintiffs' motion. ECF No. 24.

#### 2. Defendants' Motion to Dismiss for Lack of Jurisdiction

Along with opposing Plaintiffs' Motion for Preliminary Injunction, Defendants moved to dismiss for lack of jurisdiction, contending that Plaintiffs lack standing. *See* ECF Nos. 24 at 8–12; 25. And while not mentioned in their motion, Defendants at the preliminary-injunction hearing insinuated that not only do Plaintiffs lack standing, but nobody has standing to challenge the Program. ECF No. 32 at 57–58.

#### 3. Notice of the Court's Intent to Rule on the Merits

**\*4** Because of the prejudice Plaintiffs would experience if the Court delays ruling on the merits,[13] no material facts are in dispute, and the issues here are pure questions of law, the Court—out of an abundance of caution—provided the Parties notice of the Court's intent to advance Plaintiffs' Motion for Preliminary Injunction to a determination on the merits under Federal Rule of Civil Procedure 65. *See* ECF No. 33. The notice provided the Parties an opportunity to object to this advancement. *Id.* Plaintiffs did not object. *See* ECF No. 34. But Defendants did and contend that proceeding to the merits is improper. *See* ECF No. 35.

Thus, this case presents three issues. *First*, whether proceeding to the merits is appropriate. *Second*, whether the Court has jurisdiction. And *third*, whether Plaintiffs are entitled to relief. The Court addresses each in turn.

### LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The movants must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest."

*City of Dall. v. Delta Airlines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (quotation omitted). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court views the evidence in the light most favorable to the nonmovant but need not comb through the record in search of evidence creating a genuine issue of material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## ANALYSIS

### A. Proceeding to the Merits is Appropriate

Under Federal Rule of Civil Procedure 65, "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court *may* advance the trial on the merits and consolidate it with the hearing." FED. R. CIV. P. 65(a)(2) (emphasis added). But if "the eventual outcome on the merits is plain at the preliminary injunction stage, the judge *should*, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994) (emphasis added). Courts typically require that the parties "receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)) (alteration in original). Courts may also consolidate without giving the parties notice if the lack of notice is not prejudicial to either party. *See Wohlfahrt v. Mem'l Med. Ctr.*, 658 F.2d 416, 418 (5th Cir. 1981).

**\*5** If consolidation is appropriate, a district court may convert a plaintiff's preliminary-injunction motion into a motion for summary judgment. *H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 177 (5th Cir. 1988). "Summary judgment serves as 'the mechanism for deciding, as a matter of law, whether the agency action is ... consistent with the APA.' " *O.A. v. Trump*, 404 F. Supp. 3d 109, 125 (D.D.C. 2019).

Here, the Court provided the parties notice and an opportunity to object. ECF No. 33. Defendants objected, contending that advancing to a determination on the merits is improper for three reasons. ECF No. 35.

*First*, Defendants contend that Plaintiffs fail to meet the burden of proof at the summary-judgment stage to establish standing. *Id.* at 1–2. But if this were true, Defendants would not be prejudiced by proceeding to the merits because the Court would rule in Defendants favor and dismiss the case for lack of standing. This argument thus fails.

*Second*, Defendants have not had an opportunity to conduct jurisdictional discovery to examine Plaintiffs' intent to participate in any comment process and the substance of their comments. But assuming discovery revealed a fact issue as to Plaintiffs' intent to participate in any comment process and the substance of their comments, those issues are not material to standing or the merits. Thus, because these facts—even if resolved in Defendants' favor—would not "change the outcome of the lawsuit," this objection is similarly meritless. *Sweetin v. City of Tex. City*, 48 F.4th 387, 391 (5th Cir. 2022).

*Third*, Defendants have not yet produced the data underlying the Secretary's decision. ECF No. 35 at 3–4. Like Defendants' second objection, the data underlying the Secretary's decision is not material. Plaintiffs' central arguments are whether the Secretary lacks the authority for the Program and whether the Program had to go through notice-and-comment procedures before the Secretary implemented the Program. The data underlying the Secretary's decision—while part of the administrative record—is not material to either issue. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441 (5th Cir. 2001) (stating that an issue of statutory construction is "a task which we are competent to perform without the administrative record"); *Alphapointe v.*

*Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020) (stating that resolving the plaintiffs' notice-and-comment challenge "requires no obvious need for the administrative record").

The cases on which Defendants rely are not to the contrary. In each case, the issue was whether the agency's actions were "arbitrary and capricious," which concerns the reasonableness of an agency's decision-making process. *See* ECF No. 35 at 3–4; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2564 (2019). Plaintiffs bring no such claim. *See* ECF No. 3. Nor does the data underlying the Secretary's decision have any bearing on any of Plaintiffs' claims. So even if the data underlying the Secretary's decision created a fact issue, that fact issue would not be material as it would not "change the outcome of the lawsuit." *Sweetin*, 48 F.4th at 391. Defendants' third argument thus fails.

**\*6** Thus, because Defendants identify no reason for delaying a judgment in this case, the prejudice resulting to Plaintiffs if the Court delays ruling on the merits, no material facts are in dispute, and the issues here are pure questions of law, the Court converts Plaintiffs' preliminary-injunction motion to a determination on the merits.

## B. Jurisdiction

For the Court to reach the merits, Plaintiffs must establish the Court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2. To satisfy this requirement, a plaintiff must establish that he has standing—a "personal stake" in the lawsuit. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008). At the summary-judgment stage, a plaintiff must provide evidence of "specific facts" to establish standing. *Id.* Mere allegations will not suffice. *Lujan*, 504 U.S. at 560

### 1. Standing

Standing contains three requirements. *Lujan*, 504 U.S. at 560. *First*, there must be a concrete injury in fact that is not conjectural or hypothetical. *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990). *Second*, there must be causation—a fairly traceable connection between a plaintiff's injury and the complained-of conduct of the defendant. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). *Third*, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *See Lujan*, 504 U.S. at 562. These three requirements constitute the core of Article III's case-or-controversy requirement. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). But these requirements are relaxed when a plaintiff asserts a deprivation of a procedural right coupled with an associated concrete interest. *See Texas v. United States*, 809 F.3d 134, 150–51 (5th Cir. 2015).

Defendants insinuate that nobody has standing to challenge the Program—stating, "Article III of the Constitution imposes limitations on the judiciary. And sometimes the result is that there is executive or legislative action for which there isn't an appropriate plaintiff." ECF No. 32 at 57. Defendants' main contention, however, is that Plaintiffs lack standing. ECF No. 24 at 8. Thus, the Court first addresses whether anybody has standing to challenge the Program. And if so, whether Plaintiffs have standing.

### a. Defendants' Contention that No One Has Standing to Challenge the Program is Incorrect

Defendants seem to argue that no one has standing to challenge the Program because where the government is providing a benefit, nobody is harmed by the existence of that benefit. ECF No. 32 at 57–58. And according to Defendants, "sometimes the result is that there is executive or legislative action for which *there isn't an appropriate plaintiff.*" *Id.* at 57 (emphasis added). The Court must disagree. The Supreme Court has recognized that a plaintiff has standing to challenge a government benefit in many cases. *See, e.g., Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that plaintiffs who did not qualify for government benefits had standing); *Bowsher v. Synar*, 478 U.S. 714, 721, (1986) (holding that the failure to receive benefits is enough to confer Article III standing). Because Defendants' contention

that no one has standing to challenge the Program because it confers a benefit is incorrect, the Court next turns to whether Plaintiffs have standing.

### b. Plaintiffs Have Standing

#### i. Injury in fact

**\*7**  Plaintiffs allege that their concrete injury is the deprivation of their procedural right under the APA to provide meaningful input on any proposal from the Department to forgive student-loan debt and their accompanying economic interest in debt forgiveness. ECF No. 4 at 12.

As for Plaintiffs' alleged deprivation of their procedural right, the APA requires agencies administering their delegated authority to follow certain procedures. *See* 5 U.S.C. § 553. These procedures obligate agencies to subject their substantive rules to a notice-and-comment period unless an exception applies. *Id.* A plaintiff is deprived of "a procedural right to protect its concrete interests" if an agency violates the APA's procedural requirements. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). But a bare assertion of a procedural right violation is not enough to confer Article III standing. *See Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020). A plaintiff must instead show a concrete injury stemming from that procedural violation. *Id.*

Defendants dispute Plaintiffs' alleged injuries for two reasons. *First*, they argue that Plaintiffs could not have suffered a procedural deprivation based on the lack of a notice-and-comment period because the HEROES Act expressly exempts the APA's notice-and-comment requirement. ECF No. 24 at 8–9. Plaintiffs dispute this and argue that because the HEROES Act does not authorize the Program, the Program was promulgated in violation of the APA's notice-and-comment requirement. ECF No. 26 at 6–7. Because the Court must "assume, for purposes of the standing analysis, that [Plaintiffs are] correct on the merits of [their] claim that the [Program] was promulgated in violation of the APA," Plaintiffs have successfully alleged the deprivation of a procedural right. *EEOC*, 933 F.3d at 447.

*Second*, Defendants assert, even if Plaintiffs have established the violation of a procedural right, there is no accompanying concrete interest stemming from that violation. ECF No. 24 at 9–11. They contend that Plaintiffs' "unhappiness that some other borrowers are receiving a greater benefit than they are" is not a concrete interest. *Id.* But this is untrue. Plaintiffs do not argue that they are injured because other people are receiving loan forgiveness. Their injury—no matter how many people are receiving loan forgiveness—is that they personally did not receive forgiveness and were denied a procedural right to comment on the Program's eligibility requirements. Plaintiffs need to prove only the existence of an associated "concrete interest," not a guarantee of concrete harm due to the procedural violation. *EEOC*, 933 F.3d at 447. A benefit or legal-entitlement guarantee is not a prerequisite to successfully establishing standing in the event of a procedural-right violation. *See, e.g., Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015). A "plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." *Id.*

Plaintiffs have a concrete interest in having their debts forgiven to a greater degree. Brown is ineligible for the Program because her loans are commercially held. And Taylor is ineligible for the full $20,000 in debt forgiveness under the Program because he did not receive a Pell Grant in college. Brown and Taylor's inability to obtain the full benefit of debt forgiveness under the Program flows directly from the Program's eligibility requirements. Thus, Defendants' procedural error of not providing for a notice-and-comment period—which the Court must assume as true for standing—deprived Plaintiffs of "a non-illusory opportunity to pursue [the] benefit" of greater debt forgiveness and an opportunity to advocate for the expansion of the eligibility criteria of the Program. *Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 292 (5th Cir. 2018).

**\*8**  The first requirement of Article III standing is thus met.

*ii. Causation*

*Second*, Plaintiffs argue that their injury is traceable to Defendants' actions because Plaintiffs lost the chance to obtain more debt forgiveness, which flows directly from Defendants' promulgation of the Program's eligibility requirements that failed to undergo a notice-and-comment period. ECF No. 4 at 11–13. Defendants do not contest this argument. And the Court agrees with Plaintiffs.

A plaintiff only has standing if he can assert a "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California. v. Texas*, 141 S. Ct. 2104, 2117 (2021). An injury is fairly traceable if a plaintiff's "lost chance" to pursue a benefit flows directly from the procedural violation. *Ecosystem Inv. Partners*, 729 F. App'x at 293. Plaintiffs contend that they lost their chance to pursue debt forgiveness by Defendants' failure to offer a chance to comment on the Program's eligibility requirements. "This injury—denial of the opportunity to participate—is more than fairly traceable to [the agency's] alleged inaction (failure to publish for notice and comment)." *Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8, 10 (D.D.C. 1991).

Thus, the second requirement of Article III standing is met.

*iii. Redressability*

*Third*, Plaintiffs contend that there is at least some possibility that Defendants would reconsider the eligibility requirements of the Program if it were enjoined or vacated, which fulfills the lighter redressability requirement that applies when a procedural injury is alleged. ECF No. 26 at 3–4. The Court agrees. To establish standing, a plaintiff must normally prove that a favorable ruling would redress its entire injury at the hands of a defendant. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). But "when a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (emphasis added). Even if this lighter standard applies, a plaintiff must still show that it is "likely, as opposed to merely speculative, that a favorable decision will redress the [injury]." *S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001).

In response, Defendants argue that Plaintiffs' alleged injury will not be redressed by a favorable decision of the Court because enjoining or vacating the Program will not provide Plaintiffs any loan forgiveness. ECF No. 24 at 11. But Defendants misread the redressability requirement in the context of procedural injuries. Plaintiffs need only prove that there is some possibility that Defendants will reconsider the confines of the Program if it is struck down in its current form. *See Tex. v. United States*, 787 F.3d 733, 754 (5th Cir. 2015). And "enjoining the implementation of [the Program] until it undergoes notice and comment could prompt [the Secretary] to reconsider its decision, which is all a litigant must show when asserting a procedural right." *Id.* at 753–54.

**\*9** Because Plaintiffs satisfy all three Article III standing requirements, they may challenge Defendants' conduct on the merits. As a result, the Court denies Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 25).

2. Judicial Review

When a party challenges the legality of agency action, the Court must also ensure that the agency action at issue is reviewable under the APA. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022). An agency action is reviewable if (1) there has been a final agency action and (2) the plaintiff's injury is within the zone of interests of the statute allegedly violated. *See* 5 U.S.C. § 704; *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Neither party disputes that the Program is reviewable under the APA. Still, judicial review implicates jurisdiction. *Data Mktg.*

*P'ship*, 45 F.4th at 853. As a result, the Court must consider whether the Program is reviewable under the APA to ensure that it does "not exceed the scope of [its] jurisdiction." *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

### a. Final Agency Action

Finality is a "jurisdictional prerequisite of judicial review." *Data Mktg. P'ship*, 45 F.4th at 853 (quotation omitted). The APA provides a right to judicial review of "final agency action" unless the statute precludes judicial review or the action falls under agency discretion. 5 U.S.C. § 701(a). To meet the limited agency exception, there must be "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quotation omitted). Actions that fall under agency discretion are rare and only apply when the standard of review is unclear. [14]

The text of the HEROES Act does not preclude judicial review, and the Secretary's action falls within the Act's plain text, which authorizes waivers or modifications of various student-loan provisions. 20 U.S.C. § 1098bb(a)(1). This provides a clear standard of review. Thus, neither exception in § 701(a) applies here.

Finality requires two things: (1) the action must be the ending result or "consummation" of the entire agency decision-making process—not a tentative or intermediate step in the process—and (2) the action must determine rights or obligations that produce legal consequences. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597, 599 (2016).

Both conditions of finality are present. *First*, in the Secretary's notice, the Department spells out its decision-making process, legal basis for the decision, and intent to proceed with the Program. Nothing in the waiver's text reflects that the decision to implement the Program is provisional or still under review. *Second*, the action—the Program—forgives around eight million individuals a portion of their legally-binding student loan obligations, costing over $400 billion. This action affects the rights and obligations of millions of loan recipients and carries sweeping legal consequences for federal student-loan programs by changing the terms of the HEA.

**\*10** The Agency's action is thus final.

### b. Zone of Interests

Along with the finality requirement, the Court may review an agency action only if a plaintiff's interests are "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Patchak*, 567 U.S. at 224. A plaintiff with Article III standing satisfies the requirement unless their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quotation omitted). But doing so is not "especially demanding," and "the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225.

Here, Plaintiffs have Article III standing. And because the Secretary considers Plaintiffs "affected individuals" under the HEROES Act and are federal loan recipients excluded from the Program, they satisfy the zone-of-interest test. The Court may thus review the agency's implementation of the Program.

### C. Summary Judgment

Article I of the Constitution allows Congress to "delegate" some of its legislative powers to administrative agencies. U.S. CONST. art. I, § 8, cl. 3; *see Mistretta v. United States*, 488 U.S. 361, 372 (1989). When administering their delegated authority, agencies must comply with the APA's procedural and substantive requirements. *See* 5 U.S.C. § 553. The procedural requirements obligate agencies to subject their substantive rules to notice and comment unless an exception applies. *See* 5 U.S.C. § 553.

The substantive requirements " 'requires courts to hold unlawful and set aside agency action' that is 'in excess of statutory jurisdiction, authority, or limitations.' " *See Texas v. United States*, 50 F.4th 498, 525 (5th Cir. 2022) (quoting 5 U.S.C. § 706(2) (C)).

Plaintiffs argue that the Program violates the APA's procedural and substantive requirements. The Court addresses each in turn.

### 1. APA's Procedural Requirements

Plaintiffs argue that the Program violates the APA's procedural requirements because it did not go through notice and comment before implementation. ECF No. 4 at 13.

The APA requires agencies to subject their substantive rules to notice and comment. *See* 5 U.S.C. § 553. Substantive rules "grant rights, impose obligations, or produce other significant effects on private interests." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983) (quoting *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980)). A substantive rule is usually unenforceable if it does not undergo notice and comment. *Id.* But if the agency's authorizing statute expressly exempts the agency's rules from notice and comment, the rule is enforceable. 5 U.S.C. § 559.

Plaintiffs argue that the Program is a substantive rule because it ' "grants rights' by promising to eliminate individuals' debt if they meet certain requirements and 'imposes obligations' on the Department to forgive debt for those who meet the requirements." *See* ECF No. 4 at 14 (quoting *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019)). They rely on *Bernhardt* to support their argument. But this reliance is misplaced. In *Bernhardt*, the agency's statutory authority did not exempt the agency from notice-and-comment requirements of the APA. 946 F.3d at 237. The statutory authority here does: "Notwithstanding section 1232 of this title and section 553 of Title 5, the Secretary shall by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section." § 1098bb(b)(1). [15]

**\*11** Plaintiffs, however, argue that § 1098bb(b)(1) "applies only when the waiver or modifications are 'authorized' under Section 1098bb(a)" and that the Program is not "authorized" by § 1098bb(a). ECF No. 26 at 7. Whether the HEROES Act authorizes the Program pertains to the APA's substantive requirements. But as a procedural matter, the Secretary may waive or modify any provision without notice and comment under the HEROES Act. All the APA requires is that the Secretary publish the modifications of title IV of the HEA, which the Secretary has done here.

Thus, because the Program was issued under the HEROES Act, which exempts notice and comment, the Program did not violate the APA's procedural requirements. Whether the HEROES Act authorized the Program is a different story.

### 2. APA's Substantive Requirements

Plaintiffs contend that the Secretary lacks the authority to implement the Program under the HEROES Act. ECF Nos. 4 at 16; 34 at 4. When reviewing an agency's interpretation of its statutory authority, courts have generally applied the framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 (1984). Under *Chevron*, if a statute is ambiguous about the issue, courts defer to the agency's interpretation of the statute if it is "reasonable." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)). In recent years, however, the Supreme Court has chipped away at *Chevron*—giving back "the benefit of doubt about the meaning of an ambiguous law to the individual" instead of the government. *Buffington v. McDonough*, No. 21-972, 2022 WL 16726027, at \*5 (U.S. Nov. 7, 2022) (cleaned up).

The most recent example of *Chevron's* fall is the crystallization of the long-developing major-questions doctrine in *West Virginia. v. EPA*, 142 S. Ct. 2587 (2022). [16] The doctrine provides that when an agency seeks to resolve a major question, a "merely plausible textual basis for the agency action" is not enough. *Id.* at 2609. "The agency instead must point to 'clear congressional authorization' for the power it claims. *Id.* (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Plaintiffs contend that the Program fails under the major-questions doctrine. The Court thus addresses whether the doctrine applies. And if so, whether there is "clear congressional authorization" for the Program. [17]

### a. The Major-Questions Doctrine Applies

The major-questions doctrine applies if an agency claims the power to make decisions of vast "economic and political significance." *Id.* at 2607–14. It is unclear what exactly constitutes "vast economic significance." But courts have generally considered an agency action to be of vast economic significance if it requires "billions of dollars in spending." *King v. Burwell*, 576 U.S. 473, 485 (2015). For example, the Supreme Court in *Alabama Association of Realtors v. Department of Health & Human Services* reasoned that an economic impact of $50 billion was of vast economic significance. 141 S. Ct. 2485, 2489 (2021). Similarly, the Fifth Circuit in *BST Holdings, L.L.C v. OSHA* held that $3 billion in compliance costs was enough to trigger the major-questions doctrine. 17 F. 4th 604, 617 (5th Cir. 2021). Because the Program will cost more than $400 billion— over 100 times more than the amount in *BST Holdings* and 20 times more than the amount in *Alabama Association of Realtors*— it has vast economic significance.

**\*12**  An agency action is politically significant if Congress has been "engaged in robust debates" over bills authorizing something like the agency's action. *West Virginia.*, 142 S. Ct. at 2620–21 (Gorsuch, J., concurring). And if Congress "considered and rejected" such bills, "that too may be a sign that an agency is attempting to work around the legislative process to resolve for itself a question of great political significance." *Id.* (cleaned up). For example, in *NFIB v. OSHA*, the Supreme Court held that the major-questions doctrine applied when various vaccine mandate bills considered by Congress had failed, and an agency sought to mandate COVID-19 vaccines for millions of Americans. 142 S. Ct. 661, 662–66 (2022).

Similarly, Congress has introduced multiple bills to provide student loan relief to those who make under a certain amount. *See* S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021). And all have failed. A bill was also introduced—to respond to the economic impact of COVID-19—that provided the Secretary the authority to "cancel or repay" federal student loans up to "$10,000 [of] the outstanding balance" for certain borrowers. *See* H.R. 6800, 116th Cong. § 150117(h). But this bill also failed. Thus, considering Congress's extensive consideration of various bills attempting to forgive student loans and failure to pass such bills, the Program is of vast political significance.

Oddly enough, Defendants do "not deny that this is a case of economic and political significance." ECF No. 24 at 22. Instead, they argue that the doctrine does not apply because "this case involves the disbursement of a federal benefit to individuals, not the kind of expansive regulation of private parties that have previously triggered the doctrine." *Id.* at 23. [18] But this statement is untrue. *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (applying the major-questions doctrine to vaccine mandate for federal employees); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (same). And even if this were true, the Court would not presume that the doctrine does not apply to an agency decision of vast economic and political significance because it involves the disbursement of a federal benefit. Instead, the Court must "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.' " *West Virginia*, 142 S. Ct. at 2609 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017)).

Thus, because the Program is an agency action of vast economic and political significance, the major-questions doctrine applies.

### b. The Secretary Lacks "Clear Congressional Authorization" to Implement the Program

Because the major-questions doctrine applies, the Government's assertion of authority is treated with "skepticism." *West Virginia*, 142 S. Ct. at 2614. "To overcome that skepticism, the Government must ... point to clear congressional authorization" permitting its action. *Id.* (cleaned up). To do so, Defendants point to the HEROES Act. But the text of the Act points the other way for at least three reasons. *See Aldridge v. Williams*, 44 U.S. (3 How.) 9, 24 (1845) ("The law as it passed is the will of the

majority of both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used.").

**\*13**  *First*, the HEROES Act does not mention loan forgiveness. If Congress provided *clear* congressional authorization for $400 billion in student loan forgiveness via the HEROES Act, it would have mentioned loan forgiveness. The Act allows the Secretary only to "waive or modify" provisions of title IV. The Secretary then uses that provision to rewrite title IV portions to provide for loan forgiveness. [19] But "enabling legislation" like the HEROES Act is not an "open book to which the agency may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (2022); *U.S. Fleet Servs. Inc. v. City of Fort Worth*, 141 F. Supp. 2d 631, 644 (N.D. Tex. 2001) (Mahon, J.) (refusing to engage in an exercise of "legal jingoism" requiring the court to insert words into a law or rule to arrive at a particular party's interpretation). Agencies may "not seek to hide elephants in mouseholes." *West Virginia*, 142 S. at 2622 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

*Second*, the portions of the HEROES Act Defendants rely on fail to provide clear congressional authorization for the Program. Defendants rely on the COVID-19 pandemic as their justification for the Program. They contend that the HEROES Act allows the Secretary the authority to address the financial hardship of the COVID-19 pandemic. Indeed, the COVID-19 pandemic falls within the HEROES Act's definition of an emergency. § 1098ee(4). But it is unclear whether the Program is "necessary in connection with [that] national emergency." § 1098bb(a)(1). The COVID-19 pandemic was declared a national emergency almost three years ago and declared weeks before the Program by the President as "over." [20] Thus, it is unclear if COVID-19 is still a "national emergency" under the Act.

Defendants contend that in ten years, they could still use the HEROES Act to forgive student loan debt because of the COVID-19 pandemic if the Secretary deems it "necessary." ECF No. 32, at 69–70. But a legislative provision with "broad or general language" will not supply a clear statement. *Id.* at 2623. The Department's reliance on its ability to modify provisions of title IV "as the Secretary deems necessary in connection with a ... national emergency" is the very language that does not supply a clear statement. *See, e.g., Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("It is hard to see what measures [the Government's] interpretation would place outside the CDC's reach, and the Government has identified no limit in [42 U.S.C.] § 361(a) beyond the requirement that the *CDC deem a measure 'necessary.'*") (emphasis added).

*Third*, "the agency's past interpretations of the relevant statute" is another clue that the Secretary lacks clear congressional authorization for the Program. *West Virginia*, 142 S. Ct. at 2625 (Gorsuch, J., concurring). "When an agency claims to have found a previously 'unheralded power' in a rarely invoked statutory provision, its assertion generally warrants "a measure of skepticism." *Id.* (quoting *Utility Air*, 573 U. S., at 324). The Department has not "relied on the HEROES Act or any other statutory, regulatory, or interpretative authority for the blanket or mass cancellation... of student loan principal balances, and/or the material change of repayment amounts or terms." *See* Memorandum to Betsy DeVos Secretary of Education at 6.

**\*14**  Thus, because the Department lacks "clear congressional authorization" for the Program under the HEROES Act, the Court grants summary judgment in favor of Plaintiffs.

### c. Vacatur is the Appropriate Remedy

Next, the appropriate remedy. Plaintiffs seek two types of relief—vacatur of the Program and nationwide injunctive relief. "Vacatur [of an agency action] retroactively undoes or expunges a past [agency] action .... Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action." *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)) (alterations and ellipsis in original). While "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction," these circumstances do not justify such a remedy. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015).

Instead, "the ordinary practice is to vacate unlawful agency action." *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Vacatur is authorized by 5 U.S.C. § 706, which requires the Court to decide "all relevant questions of law [and] interpret constitutional and statutory provisions" and "hold unlawful and set aside" agency action "not in accordance with law," "in excess of statutory jurisdiction," or "short of statutory right." Because "under our Constitution, the people's elected representatives in Congress are the decisionmakers here—and they have not clearly granted the agency the authority it claims for itself," the Program is unlawful. *West Virginia*, 142 S. Ct. at 2626 (2022) (Gorsuch, J., concurring). The Court thus applies the "default rule" and vacates the Program. *See Data Mktg. P'ship*, 45 F.4th at 859–60.

Sometimes courts—though authorized by the APA to vacate an agency action—exercise their discretion to remand the action for adjustments or another agency review. *See, e.g., Texas v. United States*, 50 F.4th at 529. In deciding whether to sidestep complete vacatur, courts consider "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Id.* If there is a small defect or deficiency that is quickly curable or an existing complex agency program that requires major winddown efforts, a court may remand without vacating the entire action. *See, e.g., Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (remanding to the agency to recalculate amounts owed in a manner consistent with the statute).

Both factors weigh against remand. *First*, the agency's misstep is not correctible on remand—it is a complete usurpation of congressional authorization implicating the separation of powers required by the Constitution. *Second*, the Program does not require a significant administrative winddown period, as loan forgiveness has not started. Thus, remand is not the appropriate remedy.

For those reasons, vacatur of the Program is the appropriate remedy.

## CONCLUSION

This case involves the question of whether Congress—through the HEROES Act—gave the Secretary authority to implement a Program that provides debt forgiveness to millions of student-loan borrowers, totaling over $400 billion. Whether the Program constitutes good public policy is not the role of this Court to determine.[21] Still, no one can plausibly deny that it is either one of the largest delegations of legislative power to the executive branch, or one of the largest exercises of legislative power without congressional authority in the history of the United States.

**\*15**  In this country, we are not ruled by an all-powerful executive with a pen and a phone. Instead, we are ruled by a Constitution that provides for three distinct and independent branches of government. As President James Madison warned, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47.

The Court is not blind to the current political division in our country. But it is fundamental to the survival of our Republic that the separation of powers as outlined in our Constitution be preserved. And having interpreted the HEROES Act, the Court holds that it does not provide "clear congressional authorization" for the Program proposed by the Secretary.

Thus, Plaintiffs' Motion for Summary Judgment (ECF No. 3) is **GRANTED** and Defendants' Motion to Dismiss (ECF No. 25) is **DENIED**. And the Court **DECLARES UNLAWFUL** and **VACATES** the Program.

**SO ORDERED** on this **10th day** of **November 2022**.

**All Citations**

--- F.Supp.3d ----, 2022 WL 16858525

## Footnotes

1   The Court expresses no opinion on whether the Program constitutes sound or unsound public policy—a consideration inappropriate for the Court to contemplate—as it falls outside the Court's task of merely interpreting the law. *See Harris v. Harris*, 72 Va. (31 Gratt.) 13, 32 (1878) (" 'Compassion,' said an eminent Virginia chancellor, 'ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.' " (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & Wife*, Wythe's Reports 282 (Minor's Ed. 1794))); *see also Letter from Thomas Jefferson to Edmund Pendelton* (Aug. 26, 1776), *reprinted in* 1 THE PAPERS OF THOMAS JEFFERSON 505 (Julian P. Boyd, ed. 1950) ("Let mercy be the character of the law-giver, but let the judge be a mere machine. The mercies of the law will be dispensed equally and impartially to every description of men; those of the judge, or of the executive power, will be the eccentric impulses of whimsical, capricious designing men.").

2   *See Types of Aid*, U.S. DEP'T OF EDUC., https://bit.ly/3S51Heu (last visited Nov. 7, 2022).

3   *Federal Student Loan Portfolio*, U.S. DEP'T OF EDUC., https://bit.ly/3qYd5Nm (last visited Nov. 7, 2022).

4   *See* Reed Rubinstein, *Memorandum to Betsy DeVos Secretary of Education*, U.S. DEP'T OF EDUC. OFF. OF THE GEN. COUNS. (Jan. 12, 2021, 5:46 PM), https://bit.ly/3LBA36n.

5   Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. NEWS. & WORLD REPORT (July 28, 2021, 3:16 PM), https://tinyurl.com/33ex63de.

6   Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, MEDIUM (Apr. 9, 2020), https://tinyurl.com/3cbw4zh2.

7   *See* L. Egan, *Biden to Review Executive Authority to Cancel Student Debt*, NBC NEWS (Apr. 1, 2021, 1:36 PM), https://nbcnews.to/3dD85dV.

8   *See Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075 (O.L.C.), at *1 (Aug. 23, 2022).

9   *See FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, THE WHITE HOUSE (Aug. 24, 2022), https://bit.ly/3dATj7p.

10  The HEROES Act provides three additional objectives. § 1098bb(a)(2)(C)–(E). None of which are at issue or relevant to the Court's analysis.

11  No. 2022-22205, 87 Fed. Reg. 61512 (Oct. 12, 2022), https://www.federalregister.gov/documents/2022/10/12/2022-22205/federal-student-aid-programs-federal-perkins-loan-program-federal-family-education-loan-program-and.

12  No. 2022-22205, 87 Fed. Reg. 61512 (Oct. 12, 2022), https://www.federalregister.gov/documents/2022/10/12/2022-22205/federal-student-aid-programs-federal-perkins-loan-program-federal-family-education-loan-program-and.

13    *See* Aila Slisco, *Student Loan Debt Relief Checks Could Be Mailed in "Two Weeks," Biden Says*, NEWSWEEK (Oct. 27, 2022, 8:52 PM), https://www.newsweek.com/student-loan-debt-relief-checks-could-mailed-two-weeks-biden-says-1755288 (stating that on November 3, 2022, President Biden proclaimed that checks could be sent to those who applied for the Program within "two weeks").

14    *See, e.g., Lincoln*, 508 U.S. at 191 (1993) (holding that an agency's use of lump-sum appropriation funds with no designation fell within the agency's discretion); *Franklin v. Massachusetts*, 505 U.S. 788, 817, (1992) (holding that an agency's decision to fire employee fell within the agency's discretion); *Heckler v. Chaney*, 470 U.S. 821, 830, (1985) (holding that an agency's decision not to enforce their own policy fell within the agency's discretion).

15    Whether § 1098bb(b)(1) exempts notice and comment turns on the word "notwithstanding." But a dictionary definition of "notwithstanding" does not answer that question as "[d]rafters often use *notwithstanding* in a catchall provision, where its supposed referent is unclear." *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 126 (2012) (emphasis in original). "A dependent phrase that begins with notwithstanding indicates that the main clause that it introduces or follows derogates from the provision to which it refers." *Id.* Thus, "*notwithstanding* is a fail-safe way of ensuring that the clause it introduces will absolutely, positively prevail." *Id.* at 127. Here, "notwithstanding" in § 1098bb(b)(1) means without obstruction from the notice and comment requirements. Plaintiffs do not dispute this meaning.

16    The major-questions doctrine's precise relationship to the *Chevron* framework is unclear, as the Court did not mention *Chevron* in that case. Defendants stated at the preliminary-injunction hearing that *Chevron* does not apply if the major-questions doctrine applies. *See* ECF No. 32. Nor does either party mention *Chevron* in their briefs. For those reasons, the Court reasons that *Chevron* is not applicable here. But even if it were applicable, the major questions doctrine compels the same result—the Secretary lacks "clear congressional authorization" to implement the Program—regardless of how the major-questions doctrine fits into the *Chevron* framework.

17    [footnote text missing]

18    The Court finds it telling that Defendants—rather than addressing Plaintiffs' arguments that the major-questions doctrine applies—copied and pasted their entire major-questions doctrine section from another lawsuit challenging the Program. *Compare* ECF No. 24 at 22–26, *with Nebraska v. Biden*, No. 4:22-CV-1040-HEA, ECF No. 27 at 29–35.

19    As the Texas Supreme Court recognized 130 years ago:

> When the purpose of a legislative enactment is obvious from the language of the law itself, there is nothing left to construction. In such case it is vain to ask the courts to attempt to liberate an invisible spirit, supposed to live concealed within the body of the law, and thus interpret away the manifest legislative intention by embracing subjects not fairly within the scope of the statute.

> *Dodson v. Bunton*, 17 S.W. 507, 508 (Tex. 1891).

20    60 Minutes (@60Minutes), TWITTER (Sept. 18, 2022, 7:09 PM), https://tinyurl.com/2s35maau.

21    Under our system of government, public policy is typically made by the Congress through a negotiated-and-reasoned process among the members, with input from the President, and based on how Congress *legislated*, those members would then be held accountable by their constituents each election cycle. *See Speaker Sam Rayburn, quoted in* D.B. Hardeman & Donald C. Bacon, RAYBURN: A BIOGRAPHY 429 (1987) ("A [politician] who is not willing to get out and defend what he has done will ultimately find himself in poor shape politically."). As President Lyndon Johnson was found of admonishing Congress, "Come now, let us reason together." JOHN BARTLETT, FAMILIAR QUOTATIONS 872 (15th ed. 1980).

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-3179
_____

State of Nebraska; State of Missouri; State of Arkansas;
State of Iowa; State of Kansas; State of South Carolina

*Plaintiffs - Appellants*

v.

Joseph R. Biden, Jr., in his official capacity as the President of the United States of
America; Miguel Cardona, in his official capacity as Secretary, United States
Department of Education; United States Department of Education

*Defendants - Appellees*

------------------------------

Hamilton Lincoln Law Institute; Americans for Prosperity Foundation; New Civil
Liberties Alliance

*Amici on Behalf of Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri

_____

Submitted: October 24, 2022
Filed: November 14, 2022
[Published]

_____

Before SHEPHERD, ERICKSON, and GRASZ, Circuit Judges.

_____

PER CURIAM.

Whatever the eventual outcome of this case, it will affect the finances of millions of Americans with student loan debt as well as those Americans who pay taxes to finance the government and indeed everyone who is affected by such far-reaching fiscal decisions.  As such, we approach the motion before us with great care.

This case centers on the plaintiff States' request to preliminarily enjoin the United States Secretary of Education ("Secretary") from implementing a plan to discharge student loan debt under the Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (codified at 20 U.S.C. §§ 1098aa–1098ee) ("HEROES Act").  *See* Federal Student Aid Programs (Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program), 87 Fed. Reg. 61,512, 61,514 (Oct. 12, 2022) (to be codified at 34 C.F.R. pts. 674, 682, 685).  The States contend the student loan debt relief plan contravenes the separation of powers and violates the Administrative Procedure Act because it exceeds the Secretary's authority and is arbitrary and capricious.

The district court denied the States' motion for a preliminary injunction and dismissed the case for lack of jurisdiction after determining none of the States had standing to bring the lawsuit.  Key to the district court's rationale was its conclusion that the State of Missouri could not rely on any harm the Missouri Higher Education Loan Authority ("MOHELA") might suffer on account of the Secretary's cancellation of debt.  The States appealed and moved for a preliminary injunction pending appeal.  We grant the motion for the following reasons.

"In ruling on a request for an injunction pending appeal, the court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction."  *Walker v. Lockhart*, 678 F.2d 68, 70 (8th Cir. 1982).  This inquiry includes "balancing the equities between the parties."  *Id.*  We ask "whether the

balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 370 (8th Cir. 1991) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). In circumstances "where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Dataphase*, 640 F.3d at 113; *see also Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978) ("If the balance tips decidedly towards the plaintiffs and the plaintiffs have raised questions serious enough to require litigation, ordinarily the injunction should issue.").

The district court's analysis began and ended with standing. Standing is a threshold issue since it is essential to our jurisdiction. *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003). We begin by examining the standing of the State of Missouri and, like the district court, focus on MOHELA. MOHELA's unique mix of legal attributes and authority have led to differing opinions as to whether it is an "arm of the state" of Missouri for purposes of being entitled to sovereign immunity. The core issue before this court, however, is whether the alleged harm from the Secretary's debt discharge plan, considering the role of MOHELA, is sufficient to meet the requirements for Article III standing for Missouri.

The relationship between MOHELA and the State of Missouri is relevant to the standing analysis. MOHELA was created by the General Assembly of Missouri. *See* Mo. Rev. Stat. § 173.360. It is governed by a seven-member board composed of five members appointed by the Governor of Missouri, as well as the Missouri State Commissioner of Higher Education and a member of the Missouri State Coordinating Board of Higher Education. *Id.* After its creation, the Missouri General Assembly expanded MOHELA's purpose to include "support[ing] the efforts of public colleges and universities to create and fund capital projects." *Id.* Relatedly, the General Assembly established the Lewis and Clark Discovery Fund ("LCD Fund") from which the General Assembly may annually appropriate

moneys for certain purposes, including "funding of capital projects at public colleges and universities." *Id.* § 173.392. Most significantly, Missouri law, *id.* § 173.385.2, specifically directs MOHELA to distribute $350 million "into a fund in the State Treasury" for this program. MOHELA FY 2022 Financial Statements, at 20, available at https://tinyurl.com/4chp295x. MOHELA has met part of its obligation to the State treasury, but the "remaining unfunded amount . . . was $105.1 million as of June 30, 2022." *Id.*

Given this statutory framework, MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent. *See Pub. Sch. Ret. Sys. of Mo. v. St. Bank & Trust Co.*, 640 F.3d 821, 826–27, 833 (8th Cir. 2011) (applying the test to determine whether sovereign immunity applies and holding Missouri public school employment retirement systems were arms of the state). In fact, a number of district courts have concluded that MOHELA is an arm of the state. *See, e.g.*, *Good v. U.S. Dep't of Educ.*, No. 21-CV-2539-JAR-ADM, 2022 WL 2191758, at *4 (D. Kan. June 16, 2022); *Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362-CLM, 2020 WL 10180669, at *4 (N.D. Ala. June 1, 2020); *see also In re Stout*, 231 B.R. 313, 316–17 (Bankr. W.D. Mo. 1999). *But see Dykes v. Mo. Higher Educ. Loan Auth.*, No. 4:21-CV-00083-RWS, 2021 WL 3206691, at *4 (E.D. Mo. July 29, 2021); *Perkins v. Equifax Info. Servs., LLC*, No. SA-19-CA-1281-FB (HJB), 2020 WL 13120600, at *5 (W.D. Tex. May 1, 2020).

But even if MOHELA is not an arm of the State of Missouri, the financial impact on MOHELA due to the Secretary's debt discharge threatens to independently impact Missouri through the LCD Fund. It is alleged MOHELA obtains revenue from the accounts it services, and the total revenue MOHELA recovers will decrease if a substantial portion of its accounts are no longer active under the Secretary's plan. This unanticipated financial downturn will prevent or delay Missouri from funding higher education at its public colleges and universities. After all, MOHELA contributes to the LCD Fund but has not yet met its statutory obligation.

-4-

Due to MOHELA's financial obligations to the State treasury, the challenged student loan debt cancellation presents a threatened financial harm to the State of Missouri. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). Consequently, we conclude Missouri has shown a likely injury in fact that is concrete and particularized, and which is actual or imminent, traceable to the challenged action of the Secretary, and redressable by a favorable decision. Missouri, therefore, likely has legal standing to bring its claim. And since at least one party likely has standing, we need not address the standing of the other States. *See Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.*, 955 F.2d 1199, 1203 (8th Cir. 1992). Likewise, we need not decide whether the Secretary's standing argument as to harm alleged to Arkansas and Nebraska is actually better viewed as a mootness argument. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (discussing the importance of the distinction and the heavy burden of establishing mootness once a live case has allegedly become moot due to voluntary cessation of conduct).

Having addressed the threshold standing issue, we turn to the balancing of the equities and the probability of success on the merits. Not only do the "merits of the appeal before this court involve substantial questions of law which remain to be resolved," *Walker*, 678 F.2d at 71, but the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose. Among the considerations is the fact that collection of student loan payments as well as accrual of interest on student loans have both been suspended. We conclude "the equities of this case require the court to intervene to preserve the status quo pending the outcome" of the States' appeal, *id.*, and that the States have satisfied the standard for injunctive relief pending review, *see D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1001 (8th Cir. 2019) (discussing the standard for preliminary injunctive relief).

Finally, we have carefully considered the Secretary's request that we limit the scope of any temporary relief. "Crafting a preliminary injunction is an exercise of

discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam).  As the Supreme Court has explained, "one of the 'principles of equity jurisprudence' is that 'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Part of our consideration is whether the injunctive relief is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), and "workable," *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (per curiam).

We conclude that, at this stage of the litigation, an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs.  MOHELA is purportedly one of the largest nonprofit student loan secondary markets in America. It services accounts nationwide and had $168.1 billion in student loan assets serviced as of June 30, 2022.  *See Rodgers*, 942 F.3d at 458.  Given MOHELA's national role in servicing accounts, we discern no workable path in this emergency posture for narrowing the scope of relief.  And beyond Missouri, tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness.  Although such complexities may not counsel against limiting the scope of an injunction in other contexts, here the Secretary's universal suspension of both loan payments and interest on student loans weighs against delving into such uncertainty at this stage.

We GRANT the Emergency Motion for Injunction Pending Appeal.  The injunction will remain in effect until further order of this court or the Supreme Court of the United States.

_____

# EXHIBIT C

CASE NO. 22-3179

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF NEBRASKA, et al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as the President of the
United States of America, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri
The Honorable District Court Judge Henry E. Autrey
Case No. 4:22-cv-1040-HEA

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

ERIC S. SCHMITT
  *Attorney General of Missouri*
D. JOHN SAUER
  *Solicitor General of Missouri*
MICHAEL E. TALENT
  *Deputy Solicitor General of Missouri*
MISSOURI ATTORNEY GENERAL'S
  OFFICE
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
michael.talent@ago.mo.gov

DOUGLAS J. PETERSON
  *Attorney General of Nebraska*
JAMES A. CAMPBELL
  *Solicitor General of Nebraska*
CHRISTIAN EDMONDS
  *Assistant Solicitor General of
  Nebraska*
OFFICE OF THE NEBRASKA
  ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT ......................................................................................2

I. Background on Student Loans ..........................................................2

II. Mass Debt Cancellation ................................................................4

III. Procedural History ....................................................................6

ARGUMENT .......................................................................................7

I. The States have a strong likelihood of success on appeal. .............8

   A. The States have standing. ........................................................8

      1. Missouri has standing to vindicate the harms to MOHELA as a servicer of Direct Loans. ......................8

      2. The direct tax losses create standing. .........................11

      3. The consolidation harms create standing. ...................13

      4. The States' sovereign and quasi-sovereign interests create standing. ..........................................15

   B. The States are likely to prevail on their APA claim that the Department is exceeding its authority. ...........................16

      1. The major-questions doctrine applies. .........................17

      2. No clear congressional authorization exists. ...............19

   C. The States are likely to prevail on their APA arbitrary-and-capricious claim. ...............................................................22

   D. The States are likely to prevail on their ultra-vires separation-of-powers claim. ......................................................24

II. The States face irreparable harm without an injunction. .............25

i

III.   An injunction would not injure the Department, and the
       public interest favors an injunction. ..............................................26

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE...........................................................30

CERTIFICATE OF SERVICE..................................................................31

Appellate Case: 22-3179   Page: 3   Date Filed: 10/21/2022 Entry ID: 5210216

## INTRODUCTION

The Supreme Court just warned federal agencies against "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Yet the Biden Administration is doing exactly that through its Mass Debt Cancellation, which will erase over $400 billion of the $1.6 trillion in outstanding federal student loan debt.

The statute on which the Administration relies—the Higher Education Relief Opportunities for Students Act (HEROES Act)—does not empower the Department of Education or its Secretary to decree the Cancellation. This agency action thus exceeds the Administration's authority, violates the separation of powers, and is hopelessly arbitrary.

This Court should enter an injunction pending appeal because the States have standing, are facing irreparable harm, and are likely to succeed on the merits of their claims. In contrast, no borrower will be disadvantaged by interim relief because loan repayments and interest accruals are paused, and the Department can continue that forbearance while this appeal is pending.

1

# STATEMENT

## I.     Background on Student Loans

The Higher Education Act (HEA) establishes the Direct Loan Program and Federal Family Education Loan (FFEL) Program. 20 U.S.C. §§1071 *et seq.* (FFEL), 1087a *et seq.* (Direct). Direct Loans are held by the Department and serviced by entities that contract with the Department. *See* R. Doc. 5-1, at 194–254. The Higher Education Loan Authority of the State of Missouri (MOHELA)—a "public instrumentality" of the State of Missouri, Mo. Rev. Stat. §173.360—is one of those servicers and customer-support providers. *See* R. Doc. 5-1, at 194–396. MOHELA services accounts for borrowers in all 50 States. *See id.* at 92–93.

FFEL loans are held by either the Department or non-federal organizations. *See* R. Doc. 31-1, at 7–10. Borrowers may consolidate FFEL loans into Department-held Direct Loans, thereby eliminating the original FFEL loans. *See id.* at 19–20.

Financial entities that hold FFEL loans use them as assets to secure bonds, and they earn income from the payments on those loans. *See* R. Doc. 5-1, at 60, 66; R. Doc. 5-4, at 2, ¶6. MOHELA not only holds

2

FFEL loans but also services those loans, which provides it with "ongoing revenue streams" from the interest payments and servicing fees.  R. Doc. 5-1, at 66–67.  Like MOHELA, the Arkansas Student Loan Authority (ASLA)—part of the Arkansas Development Finance Authority—holds FFEL loans.  R. Doc. 5-4, at 2, ¶6.

Many institutions also invest in student-loan asset-backed securities (SLABS) secured by FFEL loans.  *See* R. Doc. 5-2, at 1–2, ¶¶4–5. The Nebraska Investment Council (NIC)—which invests assets of the State of Nebraska, including the pension fund, *see* Neb. Rev. Stat. §72-1239.01—has tens of millions of dollars in SLABS.  *See* R. Doc. 5-2, at 1–2, ¶¶4–7.

Soon after the COVID-19 pandemic began, then-President Trump, Congress, and the Department paused payments and interest accrual on Department-held student loans.  *See* 85 Fed. Reg. 79856, 79862–63 (Dec. 11, 2020).  The Department has repeatedly extended that forbearance, and it is in place until December 31, 2022.  *See* 87 Fed. Reg. 61512, 61514 (Oct. 12, 2022).  Last month, the President declared "[t]he pandemic … over."   60 Minutes, Twitter (Sept. 18, 2022), https://tinyurl.com/2s35maau.

## II.   Mass Debt Cancellation

Meanwhile, on August 24, 2022, the Administration announced its Mass Debt Cancellation.  R. Doc. 5-3, at 4.  An Administration official explained that President Biden had "promised to provide targeted student debt relief" "[d]uring the [2020 presidential] campaign" and was now "following through on that."  *Id.* at 29.  In an accompanying memorandum, the Department revoked its prior view that cannot cancel student debt en masse, *see* Memorandum from Rubinstein to DeVos 6 (Jan. 12, 2021), https://tinyurl.com/3kp29ys6 [Jan. 2021 Memo], claiming for the first time that it has such power, *see* 87 Fed. Reg. 52943 (Aug. 30, 2022).

The Congressional Budget Office estimates that this Cancellation will eliminate $430 billion of the $1.6 trillion in federal student debt. CBO Sept. 26, 2022 Letter at 3, https://tinyurl.com/2p95x8kk.  Other analyses project that the costs will reach up to $519 billion.  R. Doc. 5-3, at 23.  Of the 43 million borrowers who still owe, *see* CBO Sept. 26, 2022 Letter at 3, over 40 million will be eligible for the Cancellation, and nearly 20 million "will have their debt completely canceled."  R. Doc. 5-3, at 31; R. Doc. 31-1, at 24.

To be eligible, borrowers must owe on Direct Loans, FFEL loans, or Perkins loans held by the Department.  87 Fed. Reg. at 61514.  Borrowers also must have had "an Adjusted Gross Income (AGI) below $125,000 for an individual taxpayer or below $250,000 for borrowers filing jointly … in *either* the 2020 or 2021 Federal tax year."  *Id.* (emphasis added).  The Department will cancel up to $20,000 for eligible borrowers who received a Pell grant and $10,000 for those who did not.  *Id.*

Originally, the Department told "borrowers with privately held federal student loans," including FFEL loans, that they can receive the Cancellation "by consolidating these loans into the Direct Loan program."  R. Doc. 5-3, at 9.  This incentivized borrowers to consolidate their non-federally held FFEL loans into Direct Loans.  *See* Carmen Arroyo, *Biden's Student-Loan Relief Plan Stirs a $100 Billion Plus Debt Market*, Bloomberg (Sept. 2, 2022), https://tinyurl.com/43sc7ec4.

On October 7, the Department first produced its August 24 Rationale Memo attempting to justify the Cancellation.  R. Doc. 27-1, at 10–22.  That Memo did not consider any alternative to the widespread elimination of debt.  Nor did it address why the Cancellation includes households earning up to $250,000 or why it is enough if a borrower falls under the

income cutoff in 2020 *or* 2021 (rather than in both years). The Secretary did not carefully consider the Memo but rather signed off on it at 9:25 am the morning he received it. *Id.* at 25.

On October 12, the Secretary published the Cancellation's terms in the Federal Register. 87 Fed. Reg. 61512.

## III. Procedural History

The States filed this suit on September 29. R. Doc. 1. That same day, the Department announced that borrowers with non-federally held FFEL loans can no longer become eligible "by consolidating those loans into Direct Loans," but that borrowers "who have applied to consolidate … prior to Sept. 29[] are eligible." R. Doc. 31-1, at 9. The Department made this change to try to avoid lawsuits like this one because entities holding and investing in FFEL loans were "widely seen, both inside and outside the administration, as presenting the greatest legal risk" to the Cancellation. Michael Stratford, *Biden Administration Scales Back Student Debt Relief for Millions Amid Legal Concerns*, Politico (Sept. 29, 2022), https://tinyurl.com/2hexr9cf.

Also on September 29, the States moved for a preliminary injunction. R. Doc. 3. In response, the Department told the district court that

6

it might start discharging debt as soon as October 23.  R. Doc. 27-1, at 4,

¶5.  On October 20, the district court denied the States' motion for a pre-

liminary injunction and dismissed their case for lack of standing.  R. Doc.

44 & 46.  Later that day, the States filed a notice of appeal, R. Doc. 47,

and asked the district court for an injunction or administrative stay

pending appeal, R. Doc. 48.  Thereafter, the States filed this emergency

motion without waiting for the district court's ruling because further

delay was "impracticable" since the Department might start discharging

debt in just two days.  Fed. R. App. P. 8(a)(2)(A)(i).

## ARGUMENT

"To be entitled to an injunction pending appeal, appellants … must

show (1) the likelihood of success on the merits; (2) the likelihood of

irreparable injury to appellants absent an injunction; (3) the absence of

any substantial harm to other interested parties if an injunction is

granted; and (4) the absence of any harm to the public interest if an

injunction is granted." *Shrink Missouri Gov't PAC v. Adams*, 151 F.3d

763, 764 (8th Cir. 1998).  Those factors support an injunction here.

# I.   The States have a strong likelihood of success on appeal.

## A.   The States have standing.

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).  To establish standing, plaintiffs must show injury, causation, and redressability.  *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018).  States are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  The States here have established standing in four ways.

### 1.   Missouri has standing to vindicate the harms to MOHELA as a servicer of Direct Loans.

Missouri is harmed from the financial losses that the Cancellation inflicts on MOHELA as a servicer of Direct Loans.  MOHELA is "a public instrumentality" of the State of Missouri.  Mo. Rev. Stat. §173.360.  Its board is comprised of public officials and individuals appointed by the governor with the consent of the Missouri Senate.  *Id.*  It is part of the Missouri Department of Higher Education and Workforce Development.  §173.445.

State law charges MOHELA with the "essential public function[s]" of ensuring "all eligible postsecondary education students have access to

student loans" and providing financial support to Missouri's public colleges and universities. §173.360. To further these goals, MOHELA originated over $4 million in loans for Missouri students during the last fiscal year and gave $6 million to the State's Department of Higher Education for various financial assistance programs benefiting Missouri students and schools: Access Missouri Financial Assistance Program; Bright Flight Scholarship fund; and A+ Scholarship Program. MOHELA FY 2022 Financial Statement at 9–10, 19, https://tinyurl.com/4chp295x.

MOHELA funds those essential public functions through its work as a servicer of and customer-support provider for Direct Loans. *See* R. Doc. 5-1, at 194–396 (MOHELA's contracts). Last fiscal year, MOHELA earned $88.9 million for "servicing 5.2 million" Direct Loan accounts and $5.1 million for customer support. MOHELA FY 2022 Financial Statement at 4. This revenue is determined by how many accounts MOHELA services—the more it services, the more it earns, *see* R. Doc. 5-1, at 197–98, 209–10, 258–69—and the Cancellation will result in nearly half of all borrowers (20 of 43 million) having "their debt completely" eliminated, R. Doc. 5-3, at 31. Because many borrowers have more than one account, *see* R. Doc. 5-1, at 403–07, MOHELA stands to lose at least half of the

9

Direct Loan accounts it services, which equates to millions of dollars of revenue per year.  Stripping MOHELA of that money will leave fewer resources to fund loans and provide financial assistance through the State's Department of Higher Education.  That is a cognizable harm to the State.  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[A] loss of even a small amount of money is ordinarily an 'injury.'").

The district court dismissed MOHELA's interests by claiming that the "financial harms" to MOHELA "are not attributable to" Missouri.  R. Doc. 44, at 13.  But MOHELA is a *state* entity within Missouri's Department of Higher Education and Workforce Development run by *state* officials performing essential *state* functions.  *See* Mo. Rev. Stat. §§173.360, 173.445.  That entity's undisputed financial harms directly affect Missouri by hindering MOHELA from advancing its essential public purposes.  Missouri has standing "to protect" these "rights and interests of the state" in court.  Mo. Rev. Stat. §27.060.

The district court's analysis focused on whether Missouri's Eleventh Amendment sovereign immunity extends to MOHELA as an "arm of the State."  *See* Doc. 44, at 9 (citing that framework).  But sovereign

immunity and standing are "distinct jurisdictional requirements." *Duit Constr. Co. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015); *accord Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) (the two are not "coextensive").

The district court also emphasized that Missouri's general revenues are not available to pay MOHELA's debts. *See* R. Doc. 44, at 10–11. Yet that does not change the fact that MOHELA is (1) a state entity (2) that will be financially harmed by the Cancellation (3) and that uses its finances to perform the "essential public function[s]" of providing student loans and supporting the State's higher education system. Mo. Rev. Stat. §173.360. Those facts establish standing.

### 2.    The direct tax losses create standing.

Nebraska, Iowa, Kansas, and South Carolina face a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). To determine an individual's taxable state income, those States use the individual's federal adjusted gross income as a baseline. *See* Neb. Rev. Stat. §77-2714.01(1); Iowa Code §422.7; Kan. Stat. Ann. §79-32,117(a); S.C. Code §12-6-40. Normally, federal adjusted gross income includes student loan discharge. *See* 26 U.S.C. §61(a)(11).

11

But under the American Rescue Plan Act of 2021, discharges occurring before January 1, 2026, are not included in federal adjusted gross income. *See* 26 U.S.C. §108(f)(5).

Under existing law, the States are set to tax a substantial amount of student loan debt discharge *after* 2025. Because the Cancellation will immediately reduce the pool of debt to discharge in the future, it will result in less for the States to tax. Contrary to what the district court said, *see* R. Doc. 44, at 18, that injury is "actual" and "imminent," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The tax laws are clear, and so their results here are certainly impending. Even if the total loss is unknown, that doesn't matter because any monetary loss is an Article III injury. *See Czyzewski*, 137 S. Ct. at 983. The Cancellation will deprive the States of tax revenue, and they have standing to prevent such losses.

The district court reasoned that State "legislatures are free to propose and pass tax revenue plans as they see fit." R. Doc. 44, at 18. But the States cannot "avoid injury altogether" because forcing them to exercise their "power to create and enforce a legal code" is itself an injury, and "the possibility that a plaintiff could avoid [one] injury by incurring

12

[another] does not negate standing." *Texas v. United States*, 809 F.3d 134, 156–57 (5th Cir. 2015).

### 3.   The consolidation harms create standing.

Missouri, Arkansas, and Nebraska have experienced various harms because the Cancellation predictably prompted the extensive consolidation—and thus elimination—of non-federally held FFEL loans. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (establishing a causal connection through the "predictable effect of Government action on the decisions of third parties").

Starting with Missouri, this consolidation harms the State because it erases assets—FFEL loans—that MOHELA uses to secure bonds; it ends ongoing interest payments from those loans; and it stops the fees earned from servicing those loans. *See* R. Doc. 5-1, at 66–67, 87. Eliminating those FFEL loans thus "reduc[es] the return on [MOHELA's] investments" and inflicts an "actual financial injury." *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).

Arkansas is similarly injured through ASLA.  Before the Cancellation, ASLA held $100 million in FFEL loans.  R. Doc. 5-4, at 2, ¶6.  Since the program was announced, about $6 million of those loans have been

consolidated. *Id.* at 2, ¶7. Because ASLA's administrative fee is based on the amount of its FFEL loans, the Cancellation has reduced ASLA's revenue. *Id.* at 2, ¶8. That, in turn, lowers ASLA's funding to pursue its finance- and education-focused mission. *See* Ark. Code Ann. §15-5-1904(c) (listing those goals).

Nebraska is also harmed by consolidation. NIC invests tens of millions of dollars in SLABS. *See* R. Doc. 5-2, at 1–2, ¶¶4–7. But consolidating FFEL loans raises repayment rates on the loans held in FFEL SLABS, which returns the principal early and ends the interest income that SLABS are intended to generate. *See* R. Doc. 5-1, at 48 (noting that a FFEL-backed security might be harmed if "prepayments" of FFEL loans increase because they "are consolidated under the Direct Loan Program"); R. Doc. 5-2, at 2, ¶8 (expecting the Cancellation "will increase prepays for FFELP SLABS"). Harming Nebraska's investments in this way inflicts an "actual financial injury." *See Franchise Tax Bd.*, 493 U.S. at 336.

The district court concluded that the consolidation harms have stopped because borrowers with non-federally held FFEL loans can no longer become eligible through consolidation. R. Doc. 44, at 13–14. This

14

ignores that "voluntary cessation of a challenged practice" generally "does not moot a case." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). This rule is particularly salient here since the Department is looking for "alternative pathways to provide relief to borrowers with federal student loans not held by [the Department], including FFEL Program loans." R. Doc. 31-1, at 9–10. Moreover, an immediate injunction preventing the Department from discharging debt preserves the chance for a permanent injunction remedying some of the consolidation harms, such as an order telling the Department to direct borrowers who recently consolidated FFEL loans to pay part of the interest to the entity that held the FFEL loan.

### 4. The States' sovereign and quasi-sovereign interests create standing.

The States also have standing to vindicate the sovereign and quasi-sovereign interests that the Cancellation impairs. States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). And States may assert their sovereign and quasi-sovereign interests against "the United

States and its agents." *Kentucky v. Biden*, 23 F.4th 585, 596–99 (6th Cir. 2022).

Here, the States raise multiple sovereign and quasi-sovereign interests. First is Missouri's interest in MOHELA furthering the "essential public function[s]" of providing student aid and funding the State's public universities. Mo. Rev. Stat. §173.360. When the Cancellation reduces MOHELA revenue and diminishes its access to bond markets, it impairs Missourians' access to higher education and harms the State's "interest in the ... well-being ... of its residents." *Alfred L. Snapp*, 458 U.S. at 607. Second is the similar harm to Arkansas through ALSA. The reduction in its revenue will limit its ability to provide educational opportunities to Arkansans through student loans. *See* Ark. Code Ann. §15-5-1904(c).

## B. The States are likely to prevail on their APA claim that the Department is exceeding its authority.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory ... authority." 5 U.S.C. §706(2)(A)–(C). The Department claims authority under the HEROES Act. That Act provides, in relevant part, that the Secretary may "waive or modify any statutory or regulatory provision applicable to student financial assistance programs" when "necessary to ensure that recipients

16

of student financial assistance … who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals."  20 U.S.C. §1098bb(a)(1)–(a)(2)(A).  This text does not authorize the Cancellation.

### 1.   The major-questions doctrine applies.

The Supreme Court just reaffirmed that a federal agency may regulate on issues of immense "economic and political significance" only with explicit congressional authorization. *West Virginia*, 142 S. Ct. at 2608. The Court "presume[s] that Congress intends to make major policy decisions itself, not leave those decisions to agencies."  *Id.* at 2609 (cleaned up).  These principles apply here.

*First*, as the Department conceded, *see* R. Doc. 27, at 41, it is claiming the authority to resolve a matter of great "economic and political significance." *West Virginia*, 142 S. Ct. at 2608.  With estimated costs between $430 billion and $519 billion, *see* CBO Sept. 26, 2022 Letter at 3; R. Doc. 5-3, at 23, the economic significance is plain.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ($50 billion effect).  So is the political significance.  Congress has "conspicuously and repeatedly declined to enact" the Cancellation,

17

*West Virginia*, 142 S. Ct. at 2610, rejecting many sweeping student loan discharge efforts, including some bills specifically tied to COVID-19 relief. *E.g.*, H.R. 2034, 117th Cong. (2021); H.R. 6800, 116th Cong. §150117(h) (2020); S. 2235, 116th Cong. (2019).

*Second*, the Department claims an "unheralded power." *West Virginia*, 142 S. Ct. at 2610. Until now, the Department has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members or victims of certain natural disasters." *The Biden Administration Extends the Pause on Federal Student Loan Payments*, Congressional Research Service, at 2–3 (Jan. 27, 2021), https://tinyurl.com/yxwm4eyj. It has not "relied on the HEROES Act … for the blanket or mass cancellation … of student loan principal balances." Jan. 2021 Memo at 6.

*Third*, "[t]here is little reason to think Congress" intended the HEROES Act to authorize the Cancellation. *West Virginia*, 142 S. Ct. at 2612. The congressional findings leave no doubt that Congress's focus was affording relief to those serving in the "military" for "our nation's defense." 20 U.S.C. §1098aa(b)(1)–(6). They are not focused on nationwide debt cancellation.

*Fourth*, "the sheer scope of the [Department's] claimed authority" confirms that the major-questions doctrine applies. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. The Department claims that the class of "affected individuals" for whom it may grant relief includes every "borrower who 'resides or is employed in'" the United States or "abroad." R. Doc. 27, at 33–34. And it suggests that it could discharge all borrowers' "entire loan amount" if necessary to "mitigate the risk that delinquency and default rates will rise." R. Doc. 27-1, at 14. Courts greet such "assertions of extravagant statutory power" with skepticism. *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

### 2. No clear congressional authorization exists.

When the major-questions doctrine applies, "the Government must … point to clear congressional authorization" permitting its action. *West Virginia*, 142 S. Ct. at 2614 (quotation marks omitted). None exists here.

*First*, the HEROES Act requires that the Secretary's relief is "necessary to ensure" the assisted borrowers will not fall into "a worse position financially in relation to" their student loans. 20 U.S.C. §1098bb(a)(2)(A). But the Cancellation does not simply prevent borrowers from slipping into a *worse* position; it seeks to place them in a *better* position by

19

reducing the principal they owe.  Additionally, the Secretary has not shown that cancelling up to $20,000 in debt is necessary to keep most eligible borrowers out of trouble.

*Second*, the Act permits relief "in connection with a … military operation or national emergency."  20 U.S.C. §1098bb(a)(1).  Military operations and national emergency are by nature *temporary*, and the same must be true of the relief afforded.  *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("a word is known by the company it keeps").  Here, however, the Cancellation, unlike the payment pause, purports to *permanently* erase up to $20,000 per borrower.

*Third*, the Act demands that the "affected individuals" benefitted by the relief must be at risk of facing "a worse position financially in relation to" their loans.  20 U.S.C. §1098bb(a)(2)(A).  But many eligible borrowers—for example, individuals whose annual income has increased substantially since 2020 (including growth above the Cancellation's income cutoff)—are not remotely at risk of falling into a worse position.  *See* 87 Fed. Reg. at 61514 (requiring borrowers to meet the income cutoff in 2020 *or* 2021).

20

*Fourth*, the Act limits relief to "affected individuals."  20 U.S.C. §1098bb(a)(2)(A).  Yet the Cancellation is not confined to borrowers who have suffered "direct economic hardship as a direct result" of the pandemic.  20 U.S.C. §1098ee(2)(D).  Nor is it restricted to people who live or work in "a disaster area" in the United States.  20 U.S.C. §1098ee(2)(C).

*Fifth*, the Act applies only when borrowers are facing "a worse position financially in relation to [their] financial assistance *because of*" the invoked national emergency.  20 U.S.C. §1098bb(a)(2)(A) (emphasis added).  The Department worries that borrowers' position might deteriorate because forbearance is ending and economic conditions are difficult.  R. Doc. 27-1, at 10–13.  But these concerns stretch beyond COVID-19.  Forbearance is a prior agency action benefitting borrowers, and current economic conditions, as the Department admits, are caused by myriad factors unrelated to COVID-19.  *See id.* at 12 (citing "other factors (such as Russia's invasion of Ukraine)").  The Department's economic concerns are not "because of" COVID-19.

21

### C.     The States are likely to prevail on their APA arbitrary-and-capricious claim.

Courts applying the APA must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. §706(2)(A). The Cancellation is arbitrary and capricious for at least five reasons.

*First*, the Department's Rationale Memo failed to consider *any* reasonable alternatives to the mass elimination of debt. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (cleaned up). The Department is switching from a forbearance policy to the Cancellation, so it must consider alternatives, such as (1) continuing forbearance or (2) lengthening repayment periods to decrease monthly payments. Because those alternatives (particularly continued forbearance) are plainly within the ambit of the Department's existing policy, the failure to consider them is enough to "render[] [the] decision arbitrary." *Regents*, 140 S. Ct. at 1913.

*Second*, the Department's reliance on COVID-19 as a justification for the Cancellation is "pretextual," *Dep't of Commerce*, 139 S. Ct. at 2573, and an impermissible "*post hoc* rationalization," *Regents*, 140 S. Ct. at

22

1908.  The agency did not first identify the Cancellation as "necessary" to protect borrowers.  20 U.S.C. §1098bb(a)(2)(A).  Rather, student loan cancellation has long been the President's goal, and his Administration is using the pandemic as cover to "follow[] through" on his campaign "promise."  *See* R. Doc. 5-3, at 29.  Confirming this, the Secretary signed the directive to launch the Cancellation at 9:25 am on the day he received the Rationale Memo, *see* R. Doc. 27-1, at 25, showing that the supposed reliance on COVID-19 is "contrived," *Dep't of Commerce*, 139 S. Ct. at 2575.

*Third*, the Department has not even tried to justify the Cancellation's exceedingly broad and arbitrary scope.  The agency documents do not offer any explanation—much less the required reasonable explanation—for the $250,000 household income cutoff.  Nor has the agency bothered to address why it is sufficient if borrowers meet the income requirement in either 2020 or 2021 (rather than in both years).  Such failures to address central eligibility requirements—which drive the Cancellation's broad scope—cannot survive review.

*Fourth*, because the Department is changing its forbearance policy and thus "not writing on a blank slate, it *was* required to assess whether

there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915. But nothing in the agency materials suggests that the Department did this. The failure to "consider[]" any "reliance interests" is "arbitrary and capricious." *Id.*

*Fifth*, the Department's September 29 change on FFEL consolidation is also arbitrary, distinguishing borrowers with non-federally held FFEL loans who applied for consolidation before September 29 from those who did not. R. Doc. 31-1, at 9. The agency never attempts to justify this arbitrary distinction. Nor is there any reasonable explanation for it.

## D.   The States are likely to prevail on their ultra-vires separation-of-powers claim.

The States are also likely to prevail on their ultra-vires separation-of-powers claim. An "implied private right of action" exists "directly under the Constitution to challenge [unconstitutional] governmental action" by the federal government. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). That includes suits against federal officials for "actions [that] are ultra vires [their] authority" or in violation of the Constitution. *Larson v. Domestic & Foreign Com. Corp.*,

24

337 U.S. 682, 689–90 (1949).  Thus, "judicial review is available" for the States' ultra-vires separation-of-powers claim "even if a statutory cause of action" under the APA "is lacking."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006).  The States are likely to succeed on this claim because, as explained above, the Cancellation exceeds the Administration's statutory and constitutional authority.

## II.   The States face irreparable harm without an injunction.

Without immediate injunctive relief, the States will suffer irreparable harm.  All four categories of injuries identified in the standing analysis are irreparable.

*First*, Missouri faces irreparable injury through the financial harms to MOHELA.  The Cancellation will cause Direct Loan accounts to disappear, which will cost MOHELA revenue.  That revenue is not recoverable and thus "qualif[ies] as irreparable harm."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *see also Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm when defendants had "sovereign immunity" against "money damages").

*Second*, the States' loss of tax revenue is irreparable.  Once the Department discharges hundreds of billions of dollars in loan debt, that

25

potential tax revenue will be lost for good.  Tellingly, the Supreme Court "enjoin[ed] enforcement of the Act" in *Wyoming*, 502 U.S. at 461, indicating that it deemed irreparable the lost tax revenue.

*Third*, the harms to the States from FFEL loan consolidations also cannot be undone.  As discussed, the Department—which is searching for "pathways to provide relief" to borrowers with non-federally held FFEL loans, R. Doc. 31-1, at 9–10—might reopen the consolidation pathway to eligibility.  Thus, the incentive to consolidate, and the irreparable harm of lost FFEL loans, remains.

*Fourth*, undermining MOHELA's and ASLA's financial health harms Missouri's and Arkansas's quasi-sovereign interests in promoting higher education.  Injuries to these interests are widely dispersed, "difficult … to quantify," cannot be remedied with damages, and thus are irreparable.  *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).

## III.  An injunction would not injure the Department, and the public interest favors an injunction.

An order preventing the Department from enforcing its unlawful Mass Debt Cancellation will inflict no cognizable injury on the agency because officials "do[] not have an interest in the enforcement of [illegal

Appellate Case: 22-3179   Page: 29   Date Filed: 10/21/2022 Entry ID: 5210216

government action]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Nor will an injunction harm borrowers because their loan payments have been deferred and interest is not accruing, and the Department can extend that forbearance.

The public interest similarly supports the States.  "[T]he public's true interest lies in the correct application of the law." *Kentucky*, 23 F.4th at 612.  Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490.  Since the Cancellation is unlawful, the public interest supports enjoining it.

## CONCLUSION

The States request an injunction pending appeal.

Dated: October 21, 2022

Respectfully submitted,

/s/ James A. Campbell
James A. Campbell

ERIC S. SCHMITT
  *Attorney General of Missouri*
D. JOHN SAUER
  *Solicitor General of Missouri*
MICHAEL E. TALENT
  *Deputy Solicitor General of Missouri*
MISSOURI ATTORNEY GENERAL'S
  OFFICE
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
michael.talent@ago.mo.gov

LESLIE RUTLEDGE
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI
  *Solicitor General of Arkansas*
DYLAN L. JACOBS
  *Deputy Solicitor General of Arkansas*
OFFICE OF THE ARKANSAS ATTORNEY
  GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

DOUGLAS J. PETERSON
  *Attorney General of Nebraska*
JAMES A. CAMPBELL
  *Solicitor General of Nebraska*
CHRISTIAN EDMONDS
  *Assistant Solicitor General of
  Nebraska*
OFFICE OF THE NEBRASKA
  ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

JEFFREY S. THOMPSON
  *Solicitor General of Iowa*
SAMUEL P. LANGHOLZ
  *Assistant Solicitor General of Iowa*
OFFICE OF THE IOWA ATTORNEY
  GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov

28

DEREK SCHMIDT
  *Attorney General of Kansas*
SHANNON GRAMMEL
  *Deputy Solicitor General of
  Kansas*
OFFICE OF THE KANSAS ATTORNEY
  GENERAL
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
(785) 296-2215
shannon.grammel@ag.ks.gov

ALAN WILSON
  *Attorney General of South Carolina*
J. EMORY SMITH, JR.
  *Deputy Solicitor General of
  South Carolina*
OFFICE OF THE ATTORNEY GENERAL
  OF SOUTH CAROLINA
P.O. Box 11549
Columbia, SC 29211
803-734-3680
ESmith@scag.gov

29

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5,139 words as determined by the word-counting feature of Microsoft Word 2016.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point proportionally spaced Century Schoolbook font.

And this motion complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

/s/ James A. Campbell
James A. Campbell

30

## CERTIFICATE OF SERVICE

I certify that on October 21, 2022, I electronically filed the foregoing motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.  I also certify that a copy of the foregoing motion was served by electronic mail on counsel for Defendants-Appellees who have consented in writing to electronic mail service at the following addresses:

Thomas Pulham
Thomas.Pulham@usdoj.gov

Courtney L. Dixon
Courtney.L.Dixon@usdoj.gov

Simon C. Brewer
Simon.C.Brewer@usdoj.gov

Michael S. Raab
Michael.Raab@usdoj.gov

Sarah W. Carroll
Sarah.W.Carroll@usdoj.gov

*/s/ James A. Campbell*
James A. Campbell

31

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on November 14, 2022, the foregoing document entitled

3

**INTERVENORS' NOTICE OF MOTION AND MOTION TO TAKE**

4

**NOTICE OF RECENT DECISIONS** was filed electronically with the Clerk of the

5

Court for the United States District Court, Northern District of California using the

6

ECF system.  Upon completion the ECF system will automatically generate a

7

"Notice of Electronic Filing" as service through ECF to registered e-mail addresses

8

of parties of record in the case.

9

10

        */s/ Piper A. Waldron*

11

        Piper A. Waldron

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTERVENORS' NOTICE OF MOTION AND MOTION TO TAKE NOTICE
3:19-cv-03674-WHA