UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, et al.,

       Plaintiffs,

    v.

MIGUEL CARDONA, et al.,

       Defendants.

No.  C 19-03674 WHA

**ORDER GRANTING FINAL
SETTLEMENT APPROVAL**

## INTRODUCTION

The United States Secretary of Education has reached a settlement with a class of student-loan borrowers whose complaint alleges that, for years, the Department of Education unlawfully delayed processing, or perfunctorily denied, hundreds of thousands of "borrower-defense" applications — requests by students to discharge their loans in light of alleged wrongful acts and omissions of the schools they attended.  The settlement leaps over the borrowers' request to require administrative proceedings and provides for the automatic discharge of billions of dollars of student loans and streamlined claim processing.  This settlement is separate and apart from President Biden's broader program to forgive $430 billion in student debt.  The key question now at final approval concerns whether the Secretary has the authority to enter into such a settlement.

**STATEMENT**

Title IV of the Higher Education Act directs the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students" through financial-assistance programs.  The Student Loan Reform Act of 1993 directed the Secretary to promulgate legislative regulations for agency consideration of discharges of loans due to the wrongful acts or omissions of the schools attended by the borrowers.  20 U.S.C. §§ 1070, 1087e(h); Pub. L. No. 103-66 (1993).

The Secretary established the first "borrower defense" program for certain federal loans in 1994, which allowed a borrower to "assert as a defense against repayment of his or her loan any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994); *see also* 60 Fed. Reg. 37,768 (July 21, 1995).  These rules went largely unused for the next twenty years (AR 590).

That all changed in May 2015 with the collapse of Corinthian Colleges, Inc., a for-profit college with more than 100 campuses and over 70,000 students.  The Department faced a "flood of borrower defense claims submitted by Corinthian students."  Secretary John B. King, Jr. quickly moved to update the regulations for handling these applications to expedite processing.  81 Fed. Reg. 39,330, 39,330, 39,335 (June 16, 2016); 81 Fed. Reg. 75,926 (Nov. 1, 2016) (final regulation).[1]

The Secretary recruited an interim "Special Master" Joseph Smith to assess the influx of claims, and eventually created a "Borrower Defense Unit" ("BDU") to address the backlog.  In total, by the end of the Obama Administration, the Secretary had approved 31,773 applications for discharge and found 245 ineligible, for a 99.2% grant rate (a rate that includes both Corinthian students and claimants who attended other schools).  Borrowers, however, had

---

[1] Our action does not directly address issues related to Corinthian, which proceeded in a separate action filed in our district, *Calvillo Manriquez v. DeVos*, No. C 17-07210 (N.D. Cal. filed Dec. 20, 2017) (Judge Sallie Kim).

United States District Court
Northern District of California

1    submitted many thousands more which remained unexamined (AR 339–40, 347, 369, 384–85,

2    392–94, 502–03).

3        After the 2016 election and a change in administrations, new Secretary Elisabeth DeVos

4    paused claim adjudications in order to review the overall procedure.  She did, however, honor

5    16,164 borrower-defense applications approved but not yet finalized before the change in

6    administrations, albeit with "extreme displeasure" (Dkt. No. 66-3, Ex. 7).  Including all prior

7    decisions, by June 2018 the Department had granted in total 47,942 applications and denied or

8    closed 11,940, for an 80% grant rate for borrower defense-claims.  (The grant rate under

9    Secretary DeVos alone was 58%.)  By that point, borrowers had submitted, in total, 165,880

10   applications, leaving 105,998 still to be decided (AR 401).  The flood of applications

11   continued.

12       Then, all adjudication stopped.  For *eighteen* months, well into this suit, the Secretary

13   issued zero decisions.  As of June 2019, borrowers had filed (from day one) 272,721

14   applications and 210,168 of them remained pending (AR 350, 397–404, 587–88).

15       Named plaintiffs accordingly brought this suit to require the Secretary to adjudicate these

16   applications.  They argued the Secretary's delay constituted unlawful stonewalling.  The

17   complaint spelled out the relief sought:  "[Named plaintiffs] do not ask this Court to adjudicate

18   their borrower defenses.  Nor do they ask this Court to dictate how the Department should

19   prioritize their pending borrower defenses.  Their request is simple:  they seek an order

20   compelling the Department to start granting or denying their borrower defenses and vacating

21   the Department's policy of withholding resolution" (Compl. ¶¶ 1, 10).

22       A Rule 23(b)(2) class was eventually certified as follows:

23            All people who borrowed a Direct Loan or FFEL loan to pay for a
             program of higher education, who have asserted a borrower
24            defense to repayment to the U.S. Department of Education, whose
             borrower defense has not been granted or denied on the merits, and
25            who is not a class member in *Calvillo Manriquez v. DeVos*, No.
             17-7106 (N.D. Cal.) [the latter action concerning Corinthian
26            Colleges specifically]

27

28

3

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(Dkt. No. 46 at 14).  Afterwards, an administrative record was lodged and cross-motions for summary judgment were filed.  At that point, the number of pending applications was around 225,000 (AR 591).

Before an order issued on summary judgment, the parties ostensibly reached a settlement (an earlier one than the settlement now under consideration).  A May 2020 order preliminarily approved that proposal as it appeared to impose an eighteen-month deadline for the Secretary to decide claims and a twenty-one-month deadline to effect relief for claims filed by April 7, 2020.  That settlement also set reporting requirements and established hefty penalties should the Secretary fail to uphold her end of the bargain (Dkt. No. 103).  The parties notified the class and solicited comments for a fairness hearing scheduled for October 2020.

However, unbeknownst to class counsel or the Court, the Secretary had already adopted a practice of sending alarmingly curt form-denial notices, in violation (as class counsel put it) of both the spirit of the proposed settlement and the Administrative Procedure Act.  Upon inquiry from the Court, the Secretary acknowledged that, since December 2019 (when decisions on borrower-defense applications had resumed), the Department used four templates to deny 118,300 of 131,800 applications reviewed (for an 89.8% denial rate).  This was so out of keeping with the supposed settlement that the Court found there had been no meeting of the minds.  An October 2020 order denied the class settlement and restarted discovery.  The Secretary thereafter agreed to abstain from those types of form denials until further order (Dkt. Nos. 116, 146, 150).

Plaintiffs filed a supplemental complaint that alleged the Secretary had not actually restarted adjudication of borrower-defense claims.  Rather, plaintiffs argued she had violated the law and the settlement by sending boilerplate denials without review.  Plaintiffs asserted the Secretary's "presumption of denial" policy constituted further violations of the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.

After a trip to our court of appeals regarding the extent of permissible discovery (*In re Dep't of Education*, 25 F.4th 692 (9th Cir. 2022)), an order herein set a new summary judgment schedule with a hearing planned for July 28, 2022.  During the pendency of the

4

summary judgment briefing schedule, and after another change in administrations, the parties reached the instant settlement and filed their second motion for preliminary approval.

Separate from our litigation, President Biden announced a different plan to cancel up to $10,000 of student debt for low- to middle-income borrowers.  The reader should keep in mind that this order does not consider President Biden's initiative but considers only a discrete settlement for a specific group of borrowers who have filed borrower-defense applications.

In brief, the settlement under consideration here sorts class members into three groups.

For group one, approximately 200,000 borrowers or 75% of the class as defined by the settlement, the agreement provides for "full," "automatic" relief, *i.e.*, discharge of the borrower's federal loans, cash refunds of amounts paid to the Department, and credit repair. This "up-front" relief would go to class members who attended one of the 151 schools listed in Exhibit C to the settlement (151 of the 6,000 colleges operating in the United States).  The relief provided for this group will result in the discharge of approximately six billion dollars of debt in the aggregate.

For group two, the remaining 25% of the class as defined by the settlement (approximately 64,000 borrowers), the agreement provides for final written decisions on their borrower-defense applications within specified periods of time, correlated to how long they have been waiting for a decision.  The Department will make those decisions according to a streamlined process that provides certain presumptions in favor of the borrower.  Should the Department not issue a decision within a specified time, the borrower will receive full, automatic relief like the borrowers in group one.  The Secretary estimates the relief provided for this group will result in the discharge of a further $1.5 billion in cumulative student debt.

For group three, those who submitted a borrower-defense application after execution of the settlement on June 22, 2022, and before final approval (approximately 179,000 borrowers), *i.e.*, "post-class applicants" as defined by the settlement, the agreement provides a streamlined process for their borrower-defense applications.  If the Secretary does not render a decision within three years of final approval, then the borrower would receive full, automatic relief like

United States District Court
Northern District of California

5

the borrowers in group one.  The settlement also has reporting requirements and some appeal procedures (Dkt. No. 246-1).

Four schools filed motions to intervene to oppose the settlement:  American National University (ANU), The Chicago School of Professional Psychology, Everglades College, Inc., and Lincoln Educational Services Corporation.  The schools take issue with their inclusion on Exhibit C, which they label a scarlet letter.  Argument on their motions to intervene were heard during the hearing on preliminary approval.

Preliminary approval was granted.  After no further interested parties moved to intervene, an order found that the schools could not intervene as of right but could permissively intervene to object to the settlement (Dkt. Nos. 307, 322).  This order follows full briefing and oral argument.

## ANALYSIS

### 1.    THE SECRETARY HAS AUTHORITY TO ENTER INTO THE SETTLEMENT.

Let's consider the central issue.  The settlement provides extensive relief for the class: complete and automatic discharge of all loans for 75% of the settlement class — about six billion dollars in loan forgiveness; streamlined adjudication with a presumption towards discharge for the rest of the settlement class; and a presumption of discharge and borrower-friendly procedures for "post-class applicants," as defined by the settlement.  This bonanza raises the question whether the Secretary has authority to provide such relief.

It is important to observe (again) that this settlement is separate and apart from the significantly more expansive loan-forgiveness plan recently announced by President Biden. That plan will (potentially) affect 40 million borrowers and cancel approximately $430 billion in student debt.  *See* The Congressional Budget Office, Re: Costs of Suspending Student Loan Payments and Cancelling Debt (Sept. 26, 2022); The White House, Assessing Debt Relief's Fiscal and Cash-Flow Effects (Aug. 26, 2022).  The instant settlement is anchored in separate authority.  Even if the broader loan-forgiveness plan recently announced by President Biden

United States District Court
Northern District of California

6

United States District Court
Northern District of California

lacks authority (and this order does not so hold), this lesser litigation settlement lies within the authority of the government.

"[T]he Attorney General has plenary discretion under 28 U.S.C. §§ 516 and 519 to settle litigation to which the federal government is a party." *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008). The compromise and settlement authority has long been considered an inherent facet of the Attorney General's charge to supervise litigation for the United States. *See Confiscation Cases*, 7 Wall. 454, 19 L. Ed. 196 (1869); *Power of the Attorney General in Matters of Compromise*, 38 U.S. Op. Atty. Gen. 124 (1934). And, Section 5 of Executive Order No. 6166 (June 10, 1933), transferred to the Department of Justice the powers "to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense" of actions involving the United States. *See also* 28 U.S.C. § 510; *see generally Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 U.S. Op. Off. Legal Counsel 126, 135 (1999).

Of course, the Department of Justice, though it has plenary settlement authority, cannot agree to something that the Secretary of Education cannot do in the first place. For example, the Department of Justice could not settle a lawsuit against the Federal Communications Commission by giving a plaintiff the privilege of putting a new pharmaceutical drug on the market. The FCC lacks that authority (which is possessed by the Food and Drug Administration). "The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality." *Carpenter*, 526 F.3d at 1242 (quoting *Exec. Bus. Media, Inc. v. Dep't of Defense*, 3 F.3d 759, 762 (4th Cir. 1993)); *see also Heckler v. Chaney*, 470 U.S. 821, 834 (1985).

The Secretary primarily relies upon two provisions of the Higher Education Act to effectuate the instant settlement, 20 U.S.C. Sections 1082(a)(6) and 1087e(a)(1). *See also* 20 U.S.C. §§ 3441, 3471. Section 1082(a)(6) of Title 20 of the United States Code recites, in relevant part, "In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may . . . enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of

redemption." This provision has been in effect since 1965 and passage of the original iteration of the Higher Education Act. Upon a plain reading, it bestows the Secretary with broad discretion over handling — and discharging — student loans. *See Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 631 (2018); *United States v. Lillard*, 935 F.3d 827, 833–34 (9th Cir. 2019). The legislative history supports this reading. *See* H.R. Rep. No. 89-621, at 49 (1965); *see also* Robert A. Katzmann, Judging Statutes 29, 51–52 (2014).

The reader will note that the provision specifies "this part." Section 1082 is housed under Part B of the Student Assistance subchapter, which outlines the Federal Family Education Loan (FFEL) Program. The Federal Direct Loan Program is under a different part, Part D. Section 1087e(a)(1) of Part D, says in relevant part: "Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under sections 1078, 1078-2, 1078-3, and 1078-8 of this title." Since the Department first proposed borrower-defense regulations in 1994, it has construed Section 1087e to confirm that the Secretary's general discretion to discharge loans made pursuant to the FFEL Program applied with equal force to the Direct Loan program, ensuring parity. *See* 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994); 81 Fed. Reg. 39,330, 39,368, 39,379 (June 16, 2016).

"[C]ourts generally will defer to an agency's construction of the statute it is charged with implementing." *Chaney*, 470 U.S. at 832. The legislative history supports this conclusion, in part due to the fact that the Direct Loan Program was intended to eventually replace the FFEL Program. H.R. Rep. 102-447, at 156 (1992); H.R. Doc. No. 103-82 at 3, 357 (1993); H.R. Doc. No. 103-49, at 92 (1993). Another district court has also recently found that Section 1082(a)(6) covers both FFEL loans and Direct Loans. This order finds unpersuasive the dicta from a different district court that reached the opposite conclusion as it considered different issues and because Section 1082 is the only congressional authorization in the Higher Education Act for the Secretary to sue and be sued regarding student aid, *e.g.*, Direct Loans, FFEL loans, or otherwise. *Compare Weingarten v. DeVos*, 468 F. Supp. 3d 322, 328 (D.D.C.

2020) (Judge Dabney L. Friedrich), *with Pa. Higher Educ. Assistance Agency v. Perez*, 416 F. Supp. 3d 75, 96–97 (D. Conn. 2019) (Judge Michael P. Shea).  This order finds the Secretary's interpretation of Section 1087e(a)(1) the most reasonable interpretation of the provision and concludes that Section 1082(a)(6) applies to both FFEL loans and Direct Loans.

The school-intervenors argue, however, that the Secretary's interpretation of the Higher Education Act hides "elephants in mouseholes," which sets this action apart as a "major questions case."  *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  As the Supreme Court recently explained,

> Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.  Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme.  Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line.  We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.

*Id.* at 2609 (cleaned up).

In *West Virginia*, EPA had "issued a new rule concluding that the 'best system of emission reduction' for existing coal-fired power plants included a requirement that such facilities reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources."  "The White House stated that the Clean Power Plan would 'drive a[n] . . . aggressive transformation in the domestic energy industry.'"  In other words, the rule "restructure[ed] the Nation's overall mix of electricity generation."  *Id.* at 2599, 2604, 2607.

Our settlement, in contrast, will not fundamentally transform a domestic industry, nor will it have any national ripple effect.  The relief will remain limited to class members in a litigated case.  Yes, this settlement will discharge over six billion dollars in loans, but *West Virginia* made clear that determining whether a case contains a major question is not merely an exercise in checking the bottom line.  The representative decisions cited in *West Virginia* considered "unusual" and "unheralded" applications of agency authority.  *Id.* at 2608–09.  There is nothing unusual about the Secretary exercising his discretion to discharge student-loan

debt, and the *scale* of relief here is inherently limited to the metes and bounds of this federal

class-action litigation. *Cf. Chaney*, 470 U.S. at 833 n.4.[2]

Justice Frankfurter, as quoted with approval in *West Virginia*, reasoned that "just as

established practice may shed light on the extent of power conveyed by general statutory

language, so the want of assertion of power by those who presumably would be alert to

exercise it, is equally significant in determining whether such power was actually conferred."

142 S. Ct. at 2610. The Secretary has exercised the authority utilized in our settlement many

times, even in the past few years, even across administrations:

| School | Date Announced | Est. Number of Borrowers | Est. Amount Discharged |
|---|---|---|---|
| Dream Center Education Holdings (Art Inst. of Colo.; Ill Inst. of Art) | 2019 | 7,400 | $175    M |
| *Weingarten v. Cardona*, No. C 19-02056 DLF, Dkt. No. 49 (D.D.C.) | 2021 | 7 | $0.283 M |
| Minnesota School of Business / Globe University | 2021–22 | 1,191 | $26    M |
| Marinello Schools of Beauty | 2022 | 28,000 | $238    M |
| Corinthian Colleges, Inc. (Everest; Heald College; WyoTech) | 2022 | 560,000 | $5.8    B |
| ITT Technical Institute | 2022 | 208,000 | $3.9    B |
| Westwood College | 2022 | 79,000 | $1.5    B |

These discharges addressed both Direct Loans and loans pursuant to the FFEL program. The

Secretary also stressed that the Department has discharged many student loans pursuant to

Section 1082(a)(6) on an individual basis (Dkt. No. 337).

Our settlement will discharge less than three percent of the outstanding federal student

loan portfolio (*see* Dkt. Nos. 325-2; 331 at 16). Intervenors assert the Department's press

releases regarding the above discharges did not specifically cite Section 1082(a)(6). This is

---

[2] Everglades tears down a strawman when it argues that interpreting Section 1082(a)(6) to support the settlement leaves the Secretary with exclusive authority to eliminate a $1.6 trillion industry and discharge every student loan in America (Everglades Opp. 23). The Secretary has asserted no such broad authority. His actions remain rooted in, and limited to, this litigation. Recall, *West Virginia* based its analysis on EPA's own projections of the effects of the "Clean Power Plan" it had promulgated. 142 S. Ct. at 2603–04. Common sense dictates we consider the actual agency action — the settlement — not a hypothetical.

specious.  Statements to the general public regarding an agency action need not provide the legal minutiae regarding the authority underlying the action.  The Secretary has provided those details in a filing herein (Dkt. No. 337).

Here's the practical litigation problem the Secretary faces and seeks to settle.  The borrower-defense program set up by Congress has devolved into an impossible quagmire.  This has been true across all administrations, as detailed above.  As of now, approximately 443,000 borrowers have pending borrower-defense applications.  That is a staggering number.  If, hypothetically, the Department's Borrower Defense Unit had all 33 of its claim adjudicators working 40 hours a week, 52 weeks a year (no holidays or vacation), with each claim adjudicator processing two claims per day, it would take the Department *more than twenty-five years* to get through the backlog.

Had each and every class member sued the Department individually, the Department could have settled those individual actions one by one, and it could have done so using precisely the same criteria set forth for Exhibit C — namely, indicia of misconduct and the volume of claims associated with a given school.  Indeed, it could have done so without even revealing its internal criteria used to settle claims.  If it can do that, then this order holds that it can resolve them all in a class settlement using the same criteria and that such a settlement falls within the plenary authority of the Secretary and the Attorney General.  "For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court." *Smith v. Swormstedt*, 57 U.S. 288, 303 (1853).  This order holds that this group approach is the only feasible way for the agency to give practical relief to class members.  Conducting individualized reviews is no longer practicable.

Yes, the agency has explained its criteria and placed 151 schools on a list (151 of the 6,000 colleges operating in the United States).  This was done to explain why some class members will get full relief whereas others will get less relief.  This does not change the fact that the Department could have used the very same criteria to settle each application one at a

1    time and therefore can now do the same thing on a class basis.  The approach taken here is

2    group-wise and within the plenary settlement authority of the Secretary and Attorney General.

3           This order rejects intervenors remaining arguments.

4           *First*, intervenors dispute the Secretary's authority under Section 1082(a)(6) based upon a

5    rescinded, January 2021 memorandum composed by the Department's Office of General

6    Counsel, which the Department later substantively and procedurally disavowed.  *See* Dep't of

7    Educ., Office of the General Counsel, Memorandum re: Student Loan Principal Balance

8    Cancellation, Compromise, Discharge, and Forgiveness Authority (Jan. 12, 2021); 87 Fed.

9    Reg. 52,943 (Aug. 30, 2022).  The memo stated:  "[W]e believe 20 U.S.C. § 1082(a)(6) is best

10   construed as a limited authorization for the Secretary to provide cancellation, compromise,

11   discharge, or forgiveness only on a case-by-case basis and then only under those circumstances

12   specified by Congress."  The memo has been rescinded and this order disagrees with it for the

13   reasons stated above.

14          *Second*, at the hearing intervenors highlighted two other provisions they deemed statutory

15   bars to relief.  The anti-injunction provision in 20 U.S.C. Section 1082(a)(2) is inapplicable

16   because the government is requesting and consenting to this settlement.  Plaintiffs have also

17   maintained a viable theory throughout this litigation that the Secretary acted *ultra vires*, and

18   that consequently the anti-injunction provision does not apply.  And, Section 1082(b) only

19   places a cap on the size of settlements where the Attorney General is not involved.  The

20   government confirmed at the hearing the settlement is properly authorized.

21          *Third*, intervenors say that the settlement must incorporate the Department's standard

22   borrower-defense regulations, citing the *Accardi* doctrine (*e.g.*, Everglades Opp. 20).  This

23   order disagrees.  Those regulations constitute a procedure promulgated by the Department to

24   perform ordinary reviews of borrower-defense applications, as enabled by 20 U.S.C. Section

25   1087e(h).  Within the specific context of settling this class-action litigation, in contrast, the

26   Secretary relies upon different, independent sources of statutory authorization — Sections

27   1082(a)(6) and 1087e(a)(1).  The Secretary has plenary discretion to settle litigation within the

28   confines of the law; this order cannot dictate the basis by which the Secretary effectuates the

United States District Court
Northern District of California

12

settlement, particularly in light of the fact that the Secretary has multiple sources of statutory authority on which to premise action on student loans. *See Carpenter*, 526 F.3d at 1241; *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992). Imposing such a mandate would limit the Secretary's broad discretion in settlement — "the court's role should be more restrained." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126–27 (D.C. Cir. 1983).

*Fourth*, intervenors similarly argue that the Secretary cannot "circumvent" notice-and-comment rulemaking under the guise of settlement, citing *Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013). But in that opinion our court of appeals held "that a district court abuses its discretion when it enters a consent decree that *permanently and substantially* amends an agency rule that would have otherwise been subject to statutory rulemaking procedures." *Id.* at 1187 (emphasis added). The Secretary has not altered the borrower-defense procedures at all. Those regulations remain in place. In fact, the Department recently amended them. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022). Rather, for the specific group of borrowers contemplated by the class certification order and this settlement, the Secretary has crafted a process for resolving the enormous backlog of claims, and he has done so pursuant to specific congressional authorization. *See Turtle Island Restoration Network v. Dep't of Commerce*, 672 F.3d 1160, 1167 (9th Cir. 2012).

*Fifth*, intervenors assert "the parties cannot achieve by settlement what the [p]laintiffs could not have achieved by litigating the case to judgment" as a further reason that the borrower-defense regulations must be followed (*see* Lincoln Opp. 17). The Supreme Court has made clear, however, that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). This statement applies with equal force to settlements. *See id.* at 519; *Conservation Nw.*, 715 F.3d at 1185–86.

In sum, the Secretary has not exceeded his statutory authority or failed to follow the agency's regulations by entering into the settlement. Intervenors' constitutional arguments

United States District Court
Northern District of California

concern their inclusion on Exhibit C, which this order considers next in conjunction with their broader reputational harm contentions.

### 2. EXHIBIT C DOES NOT INVALIDATE THE SETTLEMENT.

The settlement grants full and automatic relief to all class members that attended the schools listed on Exhibit C.  Intervenors argue Exhibit C constitutes an impermissible scarlet letter.  This order finds the list does not carry the necessary legal significance to justify denying final approval of the settlement.

The settlement agreement recites that the Secretary "will effectuate Full Settlement Relief for each and every Class Member whose Relevant Loan Debt is associated with the schools, programs, and School Groups listed in Exhibit C."  Intervenors point to a statement made in the class and Secretary's joint motion for preliminary approval:

> The Department has determined that attendance at one of these schools justifies presumptive relief, for purposes of this settlement, based on strong indicia regarding substantial misconduct by listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools

(Dkt. No. 246 at 3).  The joint motion for final approval further discussed automatic loan discharge for students who attended a school on Exhibit C:

> Such automatic relief is warranted in the context of the overarching settlement structure, as certain indicia of misconduct by the listed schools, including the high volume of Class Members with applications related to the listed schools, led the Department to conclude that these Class Members were entitled to summary settlement relief without any further time-consuming individualized review process

(Br. 11).  Intervenors concentrate their fire on these statements and their inclusion on Exhibit C.

These explanations do not impose any liability whatsoever on intervenors, for the schools cannot be held liable for any remedial measures absent proceedings initiated specifically against them.  To understand why this is so, it is necessary to summarize the relevant regulations.  When a borrower-defense application criticizes a school, the Department gives the school notice and the opportunity to file a responsive statement, although the school is not

14

required to do so.  *Regardless of whether the school files such a statement (or not), the grant of a borrower-defense application has no binding effect on the school.*  If the Department approves a borrower-defense application, then that can be the predicate for the department *initiating* a proceeding against the school for recoupment.  But even in such an instance, the school still retains all due process rights, is not bound by the success of the student's application, and is free to litigate *ab initio* the merits of its performance.  The Department may also pursue other remedial actions against a school unrelated to a successful borrower-defense application but, again, in those instances the school still has all of its due process protections.  *See* 34 C.F.R. § 685.308; 34 C.F.R. Pt. 668, Subpt. G.[3]  Nothing in this settlement will cause any school to lose a dime.

Moreover, the settlement does not constitute a successful or approved borrower-defense claim, a position maintained by both the class and Secretary (*see* Dkt. No. 300).  Therefore, no recoupment action could be initiated in any event as a result of the settlement.

In *Paul v. Davis*, 424 U.S. 693, 701 (1976), the Supreme Court, in consideration of an "active shoplifters" flyer distributed by police that listed the plaintiff therein, held that "[w]hile we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."  *See also Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022).

---

[3] For clarity, this order lays out the order of operations regarding a school's participation in borrower-defense claims.  For loans issued prior to July 1, 2017, a Department official notifies the school and considers any response or submission from the school.  *See* 34 C.F.R. § 685.222(a)(1); *id.* § 685.206(c)(2); *id.* § 685.222(e)(3)(i).  For loans issued on or after July 1, 2017 but before July 1, 2020, a Department official will follow that same procedure of notifying the school and considering any response or submission from the school.  *Id.* § 685.222(a)(2), (e)(3)(i).  For loans issued on or after July 1, 2020, the Department provides the school a copy of the borrower's claim and other evidence, after which the school may respond and the borrower may reply (copies of which will also be provided to the school).  *Id.* § 685.206(e)(8)–(12).  A new set of regulations will go into effect July 1, 2023.  *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022).

United States District Court
Northern District of California

United States District Court
Northern District of California

As explained, the schools have lost no procedural rights, nor has their status been altered. No liberty or property interest has been disturbed. Any hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process. *Cf. Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 764–65 (9th Cir. 2020). The Department has also represented in the sworn declaration of Benjamin Miller that it does not consider inclusion on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could or would be considered in an action by the Department against a school. The Court relied upon, and the Court expects the government to stand behind, the statements made in the Miller Declaration (Dkt. No. 288-1).

Furthermore, because the class and Secretary's briefing advocating for approval of the settlement had no legally binding effect on the intervenors, no actionable reputational harm exists on that basis either. *See Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11–12 (D.C. Cir. 2015); *see also Przywieczerski v. Blinken*, 2021 WL 2385822, at *4 (D.N.J. June 10, 2021) (Judge Kevin McNulty) (citing cases). The issues herein differ from those in *Foretich v. United States*, 351 F.3d 1198, 1212–13 (D.C. Cir. 2003), which considered a fully enacted law that embodied a congressional determination of misconduct. Here, there is no binding or official determination of misconduct against the schools. To repeat, since the settlement does not utilize the borrower-defense procedure, the Secretary cannot initiate a recoupment action against any of the schools listed on Exhibit C premised upon a successful borrower-defense application.

Finally, intervenors contend their inclusion on Exhibit C means the settlement is not fair to them. They argue the "court must 'reach a reasoned judgment that . . . the settlement, taken as a whole, is fair, reasonable and adequate *to all concerned*'" (Lincoln Opp. 9, quoting *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), emphasis in brief). In light of the foregoing, and taking stock of the settlement as a whole, this order finds that intervenors' speculative assertions of harm fail to render the settlement unfair, especially in light of the significant benefits to both the class and Department in settling this litigation.

1     To repeat, had borrowers brought individual actions, each could have been compromised

2  using whatever criteria the Attorney General and Secretary felt wise in the circumstances,

3  including the criteria behind Exhibit C.  That the claims are aggregated and now settled on a

4  class basis using the same criteria does not matter.

5          **3.     THE CASE IS NOT MOOT AND PLAINTIFFS STILL HAVE
                     STANDING.**
6

7     The school-intervenors further argue the district court does not have jurisdiction to

8  entertain the settlement because plaintiffs lack standing and the action is now moot.  Both

9  arguments fail.

10    *First*, to establish Article III standing, plaintiffs must show they have suffered an injury

11 in fact that is concrete, particularized, and actual or imminent, that the injury was likely caused

12 by the defendants, and that the injury would likely be redressed by judicial relief.  Plaintiffs

13 must demonstrate standing to the degree required by each stage of the litigation, including at

14 the class-action settlement stage.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 2208

15 (2021); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1116 (9th Cir. 2020).

16    This order finds all class members, including our named plaintiffs, have properly asserted

17 a real and concrete injury arising from the Secretary's alleged unlawful handling of their

18 borrower-defense claims.  The injury is two-fold.  The Secretary's improper delay and

19 suspension of processing claims for debt relief has directly led to a specific economic injury to

20 each class member.  Unlawful delay of debt relief results in clear monetary harm.  Moreover,

21 as detailed in the supplemental complaint, the Secretary's "presumption of denial" policy and

22 form denials have resulted in another layer of injury to class members.  These issues would

23 likely be redressed by judicial action.  To this, the intervenors make the following arguments.

24    Everglades and ANU argue plaintiffs cannot demonstrate standing for the remedies

25 provided by the settlement (Everglades Opp. 8; ANU Opp. 24).  The standing analysis,

26 however, considers plaintiffs' stake in the case and whether they can demonstrate standing "for

27 each claim that they press and for each form of relief that they seek (for example, injunctive

28 relief and damages)."  *See TransUnion*, 141 S. Ct. at 2203, 2208.  Plaintiffs have properly

United States District Court
Northern District of California

17

demonstrated such a stake in this action and for the judicial relief they seek. And again, a settlement agreement can provide broader relief than a court could have awarded after a trial. *See Firefighters*, 478 U.S. at 519, 525; *Conservation Nw.*, 715 F.3d at 1185–86. ANU's assertion that the settlement's rescinding of form denials impermissibly puts borrowers that lack standing back into the class misses the mark for an additional reason: it wholly ignores the supplemental complaint and the allegations that the Secretary never lawfully adjudicated those claims in the first place. ANU's contention that this constitutes a "second bite at the apple" ignores the problem they never got a bite in the first place.

The Chicago School and ANU further argue the class as defined is overbroad and inherently includes individuals who lack standing. Their theory is incorrect. Per the class definition, any class member that has their claims properly adjudicated will drop out of the class. All current class members, therefore, have a concrete injury stemming from the Secretary's alleged improper delay and presumption of denial policy. The intervenors' reference to other settlements and discharges apart from this litigation is similarly inapposite. This settlement provides no opportunity for any "unjust enrichment" as it simply discharges a borrower's affirmative obligation to repay their student loans. The agreement provides that a borrower's relief cannot exceed the student loan debt associated with their borrower-defense application (Settlement Agreement II.W, Dkt. No. 246-1). On our record, there is no proof of any double recovery and specifically no proof of any litigation against a school that resulted in money going to a student specifically for loans. So, it is speculation by intervenors, and speculation only, that some will get duplicative recovery.

*Second*, litigation that becomes moot during the proceedings "is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quotations removed). Dismissal based on mootness, however, "is justified only if it is absolutely clear that the litigant no longer has any need of the judicial protection that it sought." *Pizzuto v. Tewalt*, 997 F.3d 893, 903 (9th Cir. 2021) (cleaned up).

That is not the case here.  Intervenors argue the Secretary has already "approved tens of thousands of borrower defense applications" (Everglades Opp. 7, quoting Dkt. No. 249 at 1).  But what of the hundreds of thousands of applications that remain?  It is not enough for merely some absent class members to have dropped out of the class because they have had their claims adjudicated.  Unquestionably, five of our seven named plaintiffs' borrower-defense applications remain pending and their loans outstanding.  The Chicago School says that two class representatives who attended Corinthian (but are not part of the *Calvillo Manriquez* class action) will have their loans discharged by the Secretary in a separate agency action (Chicago Opp. 13).  This does not render our action moot, nor otherwise impact the validity of the class.  *See also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

True, the Secretary argued that this action was moot in his most recent cross-motion for summary judgment, briefing of which was interrupted by the joint filing of the motion for preliminary approval (Dkt. No. 249).  Like all litigants, however, the Secretary can aggressively advocate for his position while simultaneously negotiating a settlement that will end the litigation without the risk of trial.  "Settlement is to be encouraged."  *Turtle Island*, 672 F.3d at 1167.  Because the Secretary has not resolved all of the pending borrower-defense applications, nor addressed the issues stemming from the presumption of denial policy used during the pendency of this action, this litigation is not moot.

Finally, Everglades, ANU, and Lincoln all argue that class members lack standing or that this action is moot in light of President Biden's recently announced initiative for student loan relief, which *could* provide up to $10,000 of debt relief for low and middle-income federal student-loan borrowers.  *See* The White House, Fact Sheet:  President Biden Announces Student Loan Relief for Borrowers Who Need It Most (Aug. 24, 2022).  The instant settlement, however, is anchored in separate authority and is completely independent from the Biden plan, which has already been declared unlawful by one district court, so relief thereunder is in some doubt.  *See Brown v. Dep't of Education*, 2022 WL 16858525, No. C 22-0908, Dkt. No. 37 (N.D. Tex. Nov. 10, 2022) (Judge Mark T. Pittman); *see also, e.g.*, *Nebraska v. Biden,* No. 22-3179 (8th Cir. Nov. 14, 2022).  This order need not and does not opine on the authority of the

President to cancel student loans (one way or the other), but this order does hold that the instant settlement, involving a narrower class and narrower relief, falls within the government's authority.

In sum, this order finds that plaintiffs have adequately demonstrated standing at this stage of the proceedings and that this action is not moot.

### 4. THE SETTLEMENT IS STILL VIABLE AND FAIR, REASONABLE, AND ADEQUATE.

A settlement purporting to bind absent class members must be fair, reasonable, and adequate. *See* FRCP 23(e). This settlement is not only fair, reasonable, and adequate but a grand slam home run for class members. They originally sued just to get a decision one way or another on their applications. Now, they are getting total forgiveness in most cases. For the remainder of the class, it is at least a home run. This is a very good deal for the class.

Intervenors initially question whether a viable Rule 23(b)(2) class still exists for which settlement relief can be approved, challenging commonality, typicality, adequacy, the relief provided by the settlement, and the validity of the "post-class applicant" group.

Considering commonality, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The class certification order, to this end, found "the Department's alleged policy of inaction applies to the proposed class as a whole." The order made clear that "whether a borrower defense claim has been pending for three years or three months, all claims were subject to the same alleged policy of inaction" (Dkt. No. 46 at 12, 13). As the litigation progressed, and the Secretary's practice of issuing form denials came to light, plaintiffs sought additional relief consistent with Rule 23(b)(2) to hold the Secretary accountable for further alleged *ultra vires* actions (*e.g.*, Dkt. No. 245 at 33). All class members remain subject to the same delay and allegedly unlawful policies. A single judicial remedy directed at the Secretary's activities could provide class-wide relief in a single stroke. Commonality remains.

United States District Court
Northern District of California

Everglades argues that differences in class member's individual circumstances defeat typicality, but it provides no support for that argument. Typicality — like all the Rule 23 requirements — "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (quotation omitted). Plaintiffs' claims focus on the Department's policy of inaction, form denials, and presumption of denial. Typicality is still satisfied.

Next, Lincoln says that the settlement "effectively" provides damages, which therefore destroys the viability of the class (Lincoln Opp. 15). *Dukes* explained that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 360–61. The settlement relief here fits squarely within Rule 23(b)(2) as it in effect provides injunctive relief voiding the borrower's obligation to repay their student loans. In some cases a class member will receive refunds, but refunds are restitution and fall within the relief available in an injunction/declaratory relief action. Discharge of an obligation to repay a debt does not constitute monetary damages.

Intervenors similarly argue that the settlement is inadequate and unfair because some class members will receive automatic debt relief while others will have their borrower-defense applications reviewed. This mirrors the fairness inquiry recited by Rule 23(e)(2)(D), which requires the settlement to treat class members equitably relative to one another, not for each class member to receive identical relief. The class and Secretary have provided a logical and reasoned explanation regarding how the volume of applications and certain indicia of misconduct asserted against each school warrant tailoring settlement relief to certain subgroups. This order finds such differentiation equitable. Rule 23(b)(2) does not affect this conclusion because it remains true that a single injunction or declaratory judgment after a trial could provide relief and, as explained, a settlement can provide broader relief than a court could have awarded after a trial. *See Firefighters*, 478 U.S. at 519, 525; *Conservation Nw.*, 715 F.3d at 1185–86.

The last issue intervenors raise regarding the general viability of the settlement concerns the "post-class applicant" group, which is composed of individuals that filed a borrower-

1    defense application in between execution of the settlement on June 22, 2022, and final

2    approval.  The named plaintiffs and Department state that this group does not fall "within the

3    class definition and thus [is] not formally part of the Rule 23 analysis" (Mot. Final Approval

4    12 n.3).  Contrary to these points, the class certification order set no cut-off date for

5    membership, so the class definition as recited in that order clearly encompasses all of these

6    borrowers.  Nevertheless, to ensure the overall fairness of the settlement, this group will

7    receive relief under the agreement, namely their applications will be decided with streamlined

8    procedures within three years on pain of automatic discharge of the loans.  This lesser relief is

9    justified on the ground that this group has not been waiting as long for a decision as groups one

10   and two.

11        With no issues regarding the viability of the class, this order turns to the eight *Churchill*

12   factors our court of appeals has enumerated for review in the final fairness assessment to

13   determine whether the settlement is fair, reasonable, and adequate:  (1) the strength of the

14   plaintiff's case; (2) the suit's risk, expense, complexity, and the likely duration of further

15   litigation; (3) the risk of maintaining class-action status throughout the trial; (4) the amount

16   offered in settlement; (5) the extent of discovery and the stage of the proceedings; (6) the

17   experience and views of counsel; (7) the presence of a governmental participant; and (8) the

18   reaction of class members of the proposed settlement.  Rule 23(e)(2) also requires the district

19   court to consider an overlapping set of factors.  *See Kim v. Allison*, 8 F.4th 1170, 1178–79 (9th

20   Cir. 2021) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir.

21   2011)); *Churchill Vill., LLC. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).

22        Many of these factors have been addressed in the foregoing analysis.  This order finds the

23   second, fifth, sixth, and seventh *Churchill* factors all clearly and strongly favor settlement.  A

24   brief review of the docket (and this order) will reveal to the reader the complexity of the issues

25   this action considers.  Continuing on with this litigation through summary judgment and

26   (possibly) trial would require still more expense and delay in an action directly addressing

27   undue delay and agency inaction.  *Indeed, we have already attempted a settlement once and*

28   *the proposed timeline for that entire process has come and gone*.  Discovery has already taken

22

place, so the parties have had an adequate opportunity to evaluate the strengths and weaknesses of their respective positions.  Counsel for both sides, which includes the government, have advocated for the advantages of this settlement.

Next, the first and third factors also favor settlement.  Plaintiffs have strong arguments that the Secretary's actions were unlawful, but as the opening salvos in the latest round of summary judgment reveal, the ordinary risks of litigating on a class-wide basis persist.  Moreover, as plaintiffs acknowledge, questions remain about the remedies they could seek and be granted after a trial.

The relief offered (the fourth factor) clearly favors settlement.  This order pauses to again emphasize that automatic loan discharges and a streamlined process for adjudicating the remaining borrower-defense applications as provided for in the settlement will likely prove a transformative opportunity for many class members.  These class members decided to take on considerable debt to attend schools that they now allege misled them on the value of such a significant financial decision.  The relief also furthers the Secretary's interest in resolving the backlog of claims.  Notice was sufficient, the discharge process ranks as adequate, attorney's fees have been left to the Court's discretion, and the method for processing relief is also fair.

The reaction of the class (the eighth and final *Churchill* factor) also supports the settlement.  The class has actively participated in the settlement approval process, sending both class counsel and the Court over 1,500 letters and emails.

Most of these letters express complete support for the agreement.  One class member wrote that, "Like so many thousands of college students I was misled by my graduate school and given a financial death sentence in student loan debt.  I have spent my adult life following the path of my heart and helping hundreds of patients, yet I can barely help myself."  Another voiced support but "ask[ed] the Court to ensure that [the] final terms of the settlement protect individual applicants from arbitrary treatment by the Department."  As this order demonstrates, the settlement includes appropriate protections.

Fewer than 175 borrowers objected or requested changes to the settlement.  Primarily, these borrowers requested:  additional schools be added to Exhibit C; delay of the cut-off date

for class membership (as defined by the settlement); automatic debt relief for "post-class applicants"; faster timelines for debt relief; and relief for those borrowers who refinanced their loans into private loans. None of these concerns constitute meaningful objections to the settlement as a whole. Rather, these borrowers request further relief and do not call into question the overall fairness of the settlement. One "objector" expressed concern about never receiving notice of this class action (she did not file her borrower-defense application until after the announcement of the instant settlement). She hence objected to being considered a "post-class applicant." As discussed, this objector's issues speak to the importance of the streamlined procedures for the "post-class applicant" designation in ensuring the overall fairness of the settlement. Finally, private borrowers are not part of our class.[4]

In sum, the *Churchill* factors favor settlement. We turn to the remaining two factors listed in Rule 23(e)(2).

*First*, named plaintiffs and class counsel have adequately represented the class. Everglades, the Chicago School, and one objector argued that, because class counsel was (until recently) affiliated with Harvard Law School, a conflict of interest existed. The objector noted, and intervenors echoed, that his program, the American Repertory Theater/Moscow Art Theater Institute for Advanced Theater Training at Harvard ("ART") was not on Exhibit C. This order is not persuaded. Any speculative conflict of interest is now resolved (class counsel have separated from Harvard) and neither the objecting class member nor the intervenors provide any meaningful basis to call into question counsel's representation or ART's exclusion from Exhibit C. The settlement provides substantial relief to class members, which supports the conclusion named plaintiffs and class counsel have adequately represented the class.

*Second*, the proposal was negotiated at arm's length. Everglades and the Chicago School object that the settlement is collusive. Taking a step back, the purpose of any such objection is to protect absent class members from settlements that disproportionately reward named

---

[4] ANU makes a brief argument that the settlement is unfair to the class because it imposes tax risks that the Secretary and named plaintiffs failed to address. But every class member has voluntarily filed a borrower-defense application to have their loan discharged. Any ensuing tax consequences accordingly do not rank as unfair.

United States District Court
Northern District of California

plaintiffs and their counsel at the expense of the class as a whole.  Intervenors do not raise this problem at all.  They argue instead that the settlement provides so much to the class it could not have been negotiated at arm's length.  This just underscores all the more that the settlement is and will be in the best interest of the class.  That the settlement was conducted in "secret" goes nowhere.  It's a common practice.

In short, the *Churchill* and Rule 23 factors favor final approval of the settlement.

## CONCLUSION

For the foregoing reasons, all objections are **OVERRULED**.  Final approval of the settlement is **GRANTED**.  This action is hereby **DISMISSED WITH PREJUDICE**, except in that the Court shall retain jurisdiction over this action as set forth in the settlement agreement.  Once the defendants have effectuated all appropriate relief, plaintiffs and defendants shall file a notice with the Court.  A joint status report regarding the class and Department's progress in carrying out the settlement is due **JANUARY 26, 2023**.

**IT IS SO ORDERED.**

Dated:  November 16, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California