JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

*Attorneys for Plaintiffs*

EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS *(pro hac vice)*
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
PROJECT ON PREDATORY STUDENT
LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

      *Plaintiffs*,

      v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

      *Defendants*.

Case No.: 19-cv-03674-WHA

**PLAINTIFFS' OPPOSITION TO INTERVENORS' JOINT MOTION FOR STAY PENDING APPEAL**

**HEARING DATE: February 15, 2023**

(Class Action)
(Administrative Procedure Act Case)

## **Contents**

Table of Authorities ..................................................................................................ii

I. Introduction .........................................................................................................1

II. Background..........................................................................................................1

III. Legal Standard ..................................................................................................3

IV. Argument...........................................................................................................3

    A.    Movants Will Not Experience Any Harm Absent a Stay............................4

        1.    Movants Do Not Offer Any Evidence of Irreparable Harm ......................4

        2.    The Purported Harm that Movants Describe Is Insufficient to Warrant a Stay ................................................................................................................5

        3.    The Settlement's Timing Has No Effect on Any Purported Harm............9

    B.    The Class Will Experience Serious Harm If a Stay Is Issued, and the Public Interest Accordingly Weighs Against a Stay.........................................11

    C.    Movants Are Not Likely to Succeed on the Merits of Their Appeals..............19

        1.    Movants Lack Standing to Appeal..........................................................19

        2.    Movants' Merits Arguments Are Not Likely to Succeed ........................23

V. Conclusion.........................................................................................................25

## Table of Authorities

**Cases**

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ................................................................ 4, 6

*Apotex Inc. v. U.S. Food & Drug Admin.*, 508 F. Supp. 2d 78 (D.D.C. 2007) ............................ 8

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, 2012 WL 2527044 (N.D. Cal. July 2, 2012) ...................................................................................................................................... 4

*Biden v. Nebraska*, No. 22-506 (U.S. Dec. 1, 2022) ............................................................ 24, 25

*Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213 (D. Colo. 2007) ....................... 10

*Department of Education v. Brown*, No. 22-535 (U.S. Dec. 12, 2022) ................................. 24, 25

*Diamond v. Charles*, 476 U.S. 54 (1986) ................................................................................... 19

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ......................................................................... 3

*F.T.C. v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019) ............................................................... 3

*Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762 (9th Cir. 2022) .......................................... 21

*Grae v. Corrections Corp. of Am.*, --- F.4th ---, 2023 WL 179767 (Jan. 13, 2023) .................... 8

*Grae v. Corrections Corp. of* No. 3:16-cv-2267, 2019 WL 1746492 (M.D. Tenn. Apr. 18, 2019) ...................................................................................................................................... 7

*Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006) ........................................................................... 21

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................................................................... 3

*In re Pike*, No. 07-cv-1185, 2008 WL 11336952 (C.D. Cal. Mar. 6, 2008) .............................. 17

*Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983) .............................. 23

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................................................. 20

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ............................................................... 3, 4

*Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501 (1986) ......... 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 20, 22

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................................... 3, 11

*Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980) ..... 21

*Patriot, Inc. v. U.S. Department of Housing & Urban Development*, 963 F. Supp. 1 (D.D.C. 1997) ...................................................................................................................................... 8

*Paul v. Davis*, 424 U.S. 693 (1976) ................................................................................. 21

*Przywieczerski v. Blinken*, No. 20-cv-02098, 2021 WL 2385822 (D.N.J. June 10, 2021).......... 20

*Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511 (9th Cir. 1984).......................... 7

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ......................................................................................................................... 7

*Scholl v. Mnuchin*, 494 F. Supp. 3d 661 (N.D. Cal. 2020) ...................................... 4, 6

*Shea v. Kerry*, 961 F. Supp. 2d 17 (D.D.C. 2013), *aff'd*, 796 F.3d 42 (D.C. Cir. 2015) .............. 18

*Sherman Coll. of Straight Chiropractic v. Comm'r of Educ.*, 493 F. Supp. 976 (D.D.C. 1980) ..................................................................................................................... 21, 22

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)...................................... 22

*Sofinet v. INS*, 188 F.3d 703 (7th Cir. 1999)................................................................ 3

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................... 20

*Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019)................................. 19

*Vernon v. Los Angeles*, 27 F.3d 1385 (9th Cir. 1994) ................................................ 20

*Virginian R. Co. v. United States*, 272 U.S. 658 (1926) ............................................. 3

*Wisconsin Gas v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ........................................... 8

*Wittman v. Personhuballah*, 578 U.S. 539 (2016) ..................................................... 19

**Statutes**

Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa–1098ee) ....................................... 25

**Other Authorities**

Office of Legal Counsel, U.S. Dep't of Justice, Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 46 Op. O.L.C. __ (Aug. 23, 2022), *available at* https://www.justice.gov/olc/file/1528451/download ....................................... 25

U.S. Dep't of Education, Student Assistance General Provisions *et alia*, 81 Fed. Reg. 75,926-01 ................................................................................................................ 23

U.S. Dep't of Education, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664-01 (1995 Final Rule, 34 C.F.R. § 685.206(c)) ............................................. 5

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) ............................................................ 2

**Treatises**

Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts (2012) ..... 19

**Regulations**

34 C.F.R. § 668.87(a)(1)(ii) ............................................................ 5

I.    **INTRODUCTION**

On November 16, 2022, this Court issued an order granting final approval to the parties' settlement agreement (the "Settlement") resolving this class action case. *See* ECF No. 345 ("Final Approval Order"). On January 13, 2023—the final business day before the Fed. R. App. P. 4(a) deadline—three intervenors in this case filed notices of appeal, along with the instant motion to stay the Court 's judgment pending these appeals. *See* ECF No. 350 ("Stay Motion").

The motion should be denied. First and foremost, none of the movants—Lincoln Educational Services Corporation ("Lincoln"), American National University ("ANU"), or Everglades College, Inc. ("ECI") (together, "Movants")—has demonstrated that it will experience any harm whatsoever from the Settlement taking effect, let alone the irreparable harm necessary to justify a stay pending appeal. The plaintiff class, by contrast, would be severely harmed by further delay. They have already waited years for the resolution of their borrower defense ("BD") applications, some of which have been pending *since 2015*. The loans that would be discharged under the Settlement continue to shadow them, affecting their credit, their livelihoods, their mental health, and countless other aspects of their lives. One hundred and forty-four borrowers have submitted declarations attesting to the harm a stay would cause them. *See* Exhibit A.

Nor are Movants likely to succeed on the merits of their appeals. To begin, Movants lack Article III standing to appeal at all. Standing is required for an intervenor to maintain an appeal in the absence of the original parties below. Because Movants have not suffered and will not imminently suffer any concrete harm from the Final Approval Order, they do not have Article III standing. And even if an appellate court were to reach the merits of Movants' purported disputes, the Settlement is lawful and the Final Approval Order would be upheld. Movants do not point to any facts or law that would undermine the Court's well-reasoned conclusions.

II.    **BACKGROUND**

On June 22, 2022, after three years of hard-fought litigation, the parties filed a Joint Motion for Preliminary Approval of the Settlement. *See* ECF Nos. 246 (motion), 246-1 (Settlement). On

July 13, 2022, Movants[1] filed motions to intervene in this case. They did not assert any of their own claims or defenses, but solely sought to block approval of the Settlement.

After briefing and oral argument, the Court denied Movants' requests to intervene as of right, finding that none of them had "a property interest that's at stake." Transcript of Aug. 4, 2022 Hearing ("Aug. 4 Tr.") at 52:3-4; *see* ECF No. 322 at 1. The Court did, however, grant permissive intervention "for the sole and express purpose" of allowing Movants to be heard in opposition to final approval of the Settlement. ECF No. 322 at 2.

On September 22, 2022, Plaintiffs and the Department of Education ("Department") filed their Joint Motion for Final Approval. *See* ECF No. 323. Each Movant filed an opposition brief, *see* ECF Nos. 325 ("ECI Opp."), 326 ("Lincoln Opp."), 327 ("ANU Opp."), and each Movant was heard at oral argument during the final fairness hearing, *see* Transcript of Nov. 9, 2022 Hearing ("Nov. 9 Tr.") at 24-36 (ANU), 36-45 (ECI), 46-51 (Lincoln). On November 16, 2022, the Court issued the Final Approval Order. In it, the Court addressed each of the arguments that Movants raised in their briefing—including all of the same issues they now raise in their Stay Motion—and explained in detail why those arguments did not prevail. *See generally* Final Approval Order; *see infra* § IV.C.2. That same day, the Court entered final judgment. *See* ECF No. 346.

The Settlement provides that its "Effective Date" is "the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement . . . becomes non-appealable, or, in the event of an appeal by a class member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal." ECF No. 246-1 § II.K. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), because the United States is a party to this litigation, the deadline to file a notice of appeal was 60 days after entry of judgment, or January 17, 2023. The Movants filed their notices of appeal on January 13, 2023 (the Friday evening before the deadline). No class member has appealed.

---

[1] A fourth school, The Chicago School of Professional Psychology ("TCSPP"), also moved to intervene at that time. TCSPP has not filed a notice of appeal and did not join the motion to stay.

III.   <u>**LEGAL STANDARD**</u>

A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up). Rather, a stay "is instead an exercise of judicial discretion, and . . . [t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34 (internal quotation marks and citation omitted); *see Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). In deciding whether a stay is warranted, a court considers four factors: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two of these factors are the "most critical." *Id.*

With respect to the first factor, a court need not "address the merits in detail," but rather should "assess the posture of the case in the context of the necessity of a stay pending presentation to a merits panel." *Doe #1*, 957 F.3d at 1062. In making this assessment, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 435 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)). The movant "must show at least 'a reasonable probability' or 'fair prospect' of success." *F.T.C. v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (per curiam)).

In any event, consideration of the first factor is not necessary if the movant fails to satisfy the second factor: "[I]f the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez*, 640 F.3d at 965 (citing *Nken*, 556 U.S. at 433-34). The mere "possibility" of irreparable harm is not enough—a stay applicant must show that "irreparable injury is likely to occur during the period before the appeal is decided." *Doe #1*, 957 F.3d at 1059.

IV.   <u>**ARGUMENT**</u>

Movants fail to fulfill any of the requirements for a stay pending appeal.

1

**A.  Movants Will Not Experience Any Harm Absent a Stay**

2

Movants have not shown that they will suffer any harm—let alone irreparable harm—if the

3

Settlement goes into effect. As this Court has already found, "[n]othing in this settlement will

4

cause any school to lose a dime." Final Approval Order at 15; *see also* Aug. 4 Tr. at 24:3-5

5

(observing that Movants are "the luckiest guy[s] in the room" because "[they]'ve already gotten

6

the money and [they] don't have to pay it back"). Perhaps recognizing this truth, Movants primarily

7

argue that the Settlement will have negative "regulatory" and reputational effects. Yet Movants

8

offer no evidence of any *actual* harm arising from the Settlement's alleged "scarlet letter," Stay

9

Mot. at 18—nor have they ever been able to do so, over multiple opportunities. Likewise, Movants

10

cannot point to any reason why a stay would prevent any of the (illusory) harm they complain of.

11

**1.      Movants Do Not Offer Any Evidence of Irreparable Harm**

12

As an initial matter, Movants point to zero evidence that they will suffer irreparable harm

13

absent a stay. "The minimum threshold showing for a stay pending appeal requires that irreparable

14

injury is likely to occur during the period before the appeal is likely to be decided." *Al Otro Lado*

15

*v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Leiva-Perez*, 640 F.3d at 968). In other words,

16

the party seeking a stay must present evidence that irreparable harm will result. *See Scholl v.*

17

*Mnuchin*, 494 F. Supp. 3d 661, 682 (N.D. Cal. 2020) (assertion of "self-evident harm, rather than

18

evidence of such harm," is insufficient to warrant a stay); *Apple, Inc. v. Samsung Elecs. Co.*, No.

19

11-cv-01846, 2012 WL 2527044, at *7 (N.D. Cal. July 2, 2012) (identifying "evidence of

20

employee layoffs, immediate insolvency, and possible extinction of a company" as basis for stay).

21

With respect to alleged reputational harm, the Exhibit C list has been public since June 22,

22

2022. For nearly seven months before they filed their Motion, Movants have had access to "the

23

best evidence of harms likely to occur" because of their inclusion on the list: that is, "evidence of

24

harms that *did* occur." *Al Otro Lado*, 952 F.3d at 1007. But no school has submitted any evidence

25

of harm, reputational or otherwise. ECI and ANU, for their part, do not point to a single statement

26

27

28

Plaintiffs' Opposition to Motion for Stay Pending Appeal
Case No.: 19-cv-03674-WHA

that purportedly impugns their reputations.[2] Lincoln cites one blog post by an advocacy organization and another article referring to that blog post. *See* Stay Mot. at 21 (citing ECF No. 350-1 Ex. 1 & 2). But it does not explain, let alone demonstrate, how these documents have caused palpable harm—for example, a decrease in enrollment or adverse action from an accreditor.

### 2.    The Purported Harm that Movants Describe Is Insufficient to Warrant a Stay

Much of the alleged harm at which Movants vaguely gesture simply does not exist. For example, Movants assert that they will suffer "immediate regulatory . . . consequences" if the Settlement goes into effect, as "[t]here will no longer be BD proceedings at the Department in which the schools can participate to defend their reputations and create a decisional record for any subsequent agency proceedings." Stay Mot. at 18-19. But as the parties have repeatedly explained, schools do not have a general right to participate in BD proceedings. *See, e.g.*, Pls.' Consol. Opp. to Mots. to Intervene, ECF No. 287 at 11-12. Indeed, for any loans that were originated before 2016, schools have no right to even receive *notice* that a BD claim has been filed, let alone any right to insert themselves into the decision-making process. *See id.* at 11 (citing 59 Fed. Reg. 61,664-01, *61,696 (1995 Final Rule, 34 C.F.R. § 685.206(c)). Nor are schools owed "a reasoned decision on each BD claim," Stay Mot. at 19—it is the *borrower* who is entitled to a reasoned explanation *of a denial*, so that she can "articulate [the] bases for reconsideration," *see* Order Denying Class Settlement, to Resume Discovery, and to Show Cause, ECF No. 146 at 9. Schools are only implicated in BD decisions at all if the Department, after granting an application, pursues recoupment from the school—in which case the Department is required to demonstrate that BD applications were properly granted. *See* 34 C.F.R. § 668.87(a)(1)(ii) (requiring the Department to provide "a statement of facts and law sufficient to show that the Department is entitled to grant

---

[2] Movants falsely claim that Class Counsel stated that inclusion on Exhibit C is proof that a school "cheated" its students. Stay Mot. at 21. In fact, counsel's statement about the proposed settlement did not mention the Exhibit C list or name any Exhibit C school. *See* ECF No. 325-4. The comment simply cannot be read as a "direct consequence of Exhibit C." Stay Mot. at 21. And even if it could be, Movants fail to show how this statement caused them any harm.

any borrower defense relief asserted . . . and recover for the amount of losses to the Secretary caused by granting such relief"). In that situation, the lack of a reasoned decision would weaken the Department's position, not the school's. And, of course, ***the Department has repeatedly stated that it will not seek to recoup any of the amounts discharged pursuant to the Settlement***. *See* Final Approval Order at 15. There simply is no possibility of procedural harm to Movants.[3]

Movants next shift to an assertion that having BD claims "summarily" granted will attach a "stigma" to schools on the Exhibit C list. Stay Mot. at 19. They identify neither the nature of this "stigma" nor its effects. Movants' reliance on the power of the word "stigma" is a plain appeal to "self-evident harm, rather than evidence of such harm," and is thus insufficient to warrant a stay. *Scholl*, 494 F. Supp. 3d at 682.

Finally, Movants point to "irreparable harm to their reputations, goodwill, and standing with regulators if the Settlement takes effect." Stay Mot. at 20. This attempt to establish irreparable injury fails in three different ways. ***First***, once again, Movants fail to provide a shred of evidence that suggests that such harm "is likely to occur" if the Settlement goes into effect—despite having had nearly seven months to collect evidence of harm that has occurred since the Exhibit C list was published. *See Al Otro Lado*, 952 F.3d at 1007.

***Second***, Movants fail to establish that "[b]eing publicly branded a presumptive wrongdoer by one's primary federal regulator," Stay Mot. at 21, without more, is the type of intangible injury that can qualify as irreparable harm. The authority they cite in support of their argument is plainly distinguishable, and an analysis of these cases demonstrates the weakness of their claims. For example, Movants cite *Regents of University of California v. American Broadcast Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984), for the proposition that "'palpable diminution in national reputation'

---

[3] Additionally, as this Court found, the BD regulations "constitute a procedure promulgated by the Department to perform ordinary reviews of borrower-defense applications," while "[w]ithin the specific context of settling this class-action litigation, . . . the Secretary relies upon different, independent sources of statutory authorization." Final Approval Order at 12. Because the BD regulations do not apply to discharges under the Settlement, there can be no "regulatory . . . consequences," Stay Mot. at 18.

is irreparable harm." Stay Mot. at 21. Again, Movants have not demonstrated any such "palpable diminution." But furthermore, the Ninth Circuit did not state that diminution in national reputation *alone* constitutes irreparable harm. To the contrary, the court observed that "[t]he plaintiffs described, *along with supporting evidence*, numerous ways in which they would be injured" if a restriction on the broadcast of college football games were enforced, including the impairment of recruitment programs, the "dissipation of alumni and community goodwill and support," a disadvantage for their football teams' national rankings, and "a reduction in the attractiveness of the Pac-10-Big Ten Conference  'product' which would doom the Pac-10-Big Ten's efforts to compete in the market." *Id.* at 519-20 (emphasis added). Noting that these "disparate injuries" were interrelated, the court found that the "common thread" tying them together was "the conclusion that the plaintiffs would suffer some palpable diminution in national reputation and following from their inability to telecast their premier contests." *Id.* at 520. Here, Movants point to an even weaker thread—a ***presumed*** diminution in reputation—then fail to identify any actual, specific injuries that the thread supposedly ties together. Without those injuries, their reliance on *Regents* (and on *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), which cites to *Regents* without elaboration) is misplaced.

*Grae v. Corrections Corp. of America*, No. 3:16-cv-2267, 2019 WL 1746492 (M.D. Tenn. Apr. 18, 2019), is even more easily distinguishable, as it applied an entirely different standard. In *Grae*, the Middle District of Tennessee considered the defendants' motion for a stay of discovery during the pendency of their request for a permissive appeal of the court's order granting class certification. *Id*. at *1. In granting the discovery stay—an area "uniquely within the discretion of a district court," in which the court "possesses wide discretion in deciding how strong a showing" is required—the court found persuasive the possibility that "discovery might lead to the revelation of information that could lead to reputational harm to [the defendants]." *Id.* The court's rationale *sua sponte* identified potential reputational injury as a factor—the defendants had not argued the

point in their briefing. *See Grae v. Corrections Corp. of America*, 2019 WL 1746492, Doc. 168 at 5-6 (Apr. 15, 2019). This offers no support for Movants' position.[4]

Lastly, Movants cite *Patriot, Inc. v. U.S. Department of Housing & Urban Development*, 963 F. Supp. 1, 5 (D.D.C. 1997), for the proposition that "damage to [a party's] business reputation" is irreparable injury that can justify a preliminary injunction or stay. But once again, *Patriot, Inc.* did not deal with purported reputational injury alone—rather, the court there found that the plaintiffs had demonstrated *both* damage to their business reputation resulting from HUD's unfavorable characterization of their activities *and* that, absent an injunction, they would suffer economic harm that would "threaten[] the 'very existence of [plaintiffs'] business.'" *Id.* (quoting *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Here, Movants have not introduced any evidence of "damaged relationships or of any marketplace confusion," *Apotex Inc. v. U.S. Food & Drug Admin.*, 508 F. Supp. 2d 78, 87 (D.D.C. 2007) (citing *Patriot Inc.*, 963 F. Supp. at 5), let alone an existential threat to their business.

***Third***, Movants' argument is fatally undermined by their insistence that their reputational injury is caused in part by the fact that their inclusion on the Exhibit C list is "based on undisclosed evidence (or no evidence at all)." Stay Mot. at 21. As Plaintiffs have noted, the record in this case does disclose evidence of misconduct committed by each school, much of which has been public for years and should not be assumed to constitute the totality of evidence in the Department's possession. *See* Pls.' Consol. Opp. to Mots. to Intervene at Exhibit A, ECF No. 287-1 (identifying two places that ANU had previously appeared in the docket for this case, 15 places that ECI had appeared, and 13 places that Lincoln had appeared, all in the context of evidence of wrongdoing[5]).

---

[4] The Sixth Circuit recently addressed an appeal by an intervenor in the *Grae* litigation and found that the intervenor did not have standing to appeal. *See Grae v. Corrections Corp. of Am.*, --- F.4th ---, 2023 WL 179767 (Jan. 13, 2023). The Sixth Circuit held that when an intervenor asserts an "intangible harm"—in that case, denial of access to records—he must show that he has "suffered adverse effects" as a result to establish Article III injury-in-fact. *Id.* at *2; *see infra* § IV.C.1.

[5] Without exhaustively reviewing all of these documents, Plaintiffs point out a selection of items:

1

### 3.   The Settlement's Timing Has No Effect on Any Purported Harm

Even if Movants were able to show any harm arising from the Settlement (which they have

not), they cannot show that a stay pending resolution of their appeals would in any way mitigate

that purported harm. To start, Movants did not file the Stay Motion until the 56th day of a 60-day

period for filing appeals. While not dispositive, this delay suggests that Movants did not perceive

any harm as urgently arising upon issuance of the Final Approval Order, nor that they were

---

i.   A list of open BD cases by school owner, produced by the Department in discovery, showed that as of April 2020 there were 225 pending BD applications submitted by current or former ANU students, 535 applications from ECI students, and over 1,000 applications from Lincoln students. *See* ECF No. 220-2 at 5, 7, 13. Additionally, on January 14, 2015, the Massachusetts Attorney General sought group discharge on behalf of former students at Lincoln Technical Institute's Criminal Justice program in Massachusetts. *See* ECF No. 198-5 at 59.

ii.   ECI and Lincoln both appeared repeatedly in the Senate Health, Education, Labor and Pensions Committee Report on For-Profit Higher Education ("HELP Report"), which showed that both had exceptionally poor retention rates, completion rates, and graduate debt default rates. *See* ECF No. 66-6 at 74-75 & n.266, A15-3, A16 1-4.

iii.   The HELP Report also reported that "three career services employees, including the director of career services, at Lincoln Educational Services Corporation's Grand Prairie campus made arrangements with an employer to falsely state that Lincoln graduates had worked for that employer," and that "Lincoln's internal investigator, who was charged with figuring out the extent of the fraud, called 10 'placed' students, and found that all of the students' records had been plainly falsified." *Id.* at 162.

iv.   The HELP Report included numerous complaints from former Lincoln students and instructors about poor educational services, lack of job placement assistance, and the dire financial consequences of attending a Lincoln school. *Id.* at 93, 99, 113.

v.   Plaintiffs' Supplemental Complaint in this case called attention to a settlement agreement between ECI and the State of Florida over alleged violations of Florida's Unfair Trade Practices Act, which "establish[ed] 'disclosure policies in several areas, including the transfer of credits,' and required Everglades to offer a 'retraining program for students who attended [the school] during the 'relevant period' of 1/1/2008-10/25/2012.'" ECF No. 198 ¶ 199. The Supplemental Complaint further noted that "more than one hundred BD applicants attended the school during the 'relevant period' and raised claims directly related to issues covered by the [Florida] settlement agreement." *Id.* ECI's protestation that the Department, under Secretary DeVos, ignored this evidence of wrongdoing when assessing BD claims (*see* Stay Mot. at 15) is not evidence that the wrongdoing didn't occur, but rather evidence that supports the arbitrariness of the Department's "presumption of denial" policy in place at that time.

particularly concerned with assuring that they secured relief before the Effective Date. *Cf., e.g.,*

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a "long delay

before seeking a preliminary injunction implies a lack of urgency and irreparable harm").

According to Movants, the most significant harm to them arises from the fact of being

named on Exhibit C. *See, e.g.*, Stay Mot. at 18 ("Intervenors are experiencing irreparable harm by

being branded with the Exhibit C scarlet letter."). Exhibit C has been on the record since June 22,

2022. The only thing that will change on the Effective Date of the Settlement is that Class members

will begin receiving the relief that was publicly described months ago. Movants complain that

"payments made to class members under the Settlement are likely irreversible, even if the Ninth

Circuit eventually reverses or vacates the final judgment," Stay Mot. at 19, but they fail to explain

how this will harm Movants—after all, they are not the ones who will be making these payments.[6]

Movants argue that "bureaucratic momentum" will "'ske[w]' future agency proceedings if

the judgments are reversed." Stay Mot. at 20 (alteration in original) (quoting *Colorado Wild Inc.*

*v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007)). But Movants do not explain

how this hypothetical "bureaucratic momentum" *would harm Movants*, and the authority they cite

offers no insights. In *Colorado Wild Inc.*, an environmental organization sought an injunction to

block the Forest Service's decision to grant special use authorization for rights-of-way across

National Forest System land. *See* 523 F. Supp. 2d at 1218. The Forest Service asked the court to

enter a narrow preliminary injunction that would permit limited activity during the pendency of

the case. *Id.* at 1220. Rejecting the government's proposal, the court noted "the difficulty of

stopping 'a bureaucratic steam roller' once it is launched"—that is, the risk that if the plaintiffs

prevailed and the Forest Service were required to re-decide the issue of special use authorization,

the work that they had already done would skew the agency's decision-making towards the

original, unlawful decision. *Id.* at 1221. Movants have not, and cannot, identify any analogous

_____

[6] By the same token, the disconnect between the implementation of the Settlement and any
purported injury to Movants points to a separate defect in their standing to pursue an appeal—their
claimed injury cannot be redressed even by a favorable ruling. *See infra* § IV.C.1.

"analysis and decision-making" with respect to Movants' asserted rights that could be "skewed" by the effectuation of the Settlement. And furthermore, since their only asserted interest in this case has been a desire (and claimed entitlement) to block *this* Settlement, the future outcome of this litigation is literally, and admittedly, none of their business.

Similarly, Movants have not and cannot demonstrate how—assuming any "stigma" has resulted since the public filing of the Settlement in June 2022—that stigma will become "more entrenched" absent a stay. *See* Stay Mot. at 21. If the Ninth Circuit overruled this Court's Final Approval Order and abolished the Exhibit C list, any supposed "stigma" would be erased.

## B.  The Class Will Experience Serious Harm If a Stay Is Issued, and the Public Interest Accordingly Weighs Against a Stay

The *Nken* factors asking whether issuance of a stay will substantially injure other parties and where the public interest lies merge where, as here, the Government is the opposing party. *See Nken*, 556 U.S. at 435. Both weigh heavily against a stay. In contrast to the absence of harm to Movants, the harm that class members have already suffered as a result of the conduct detailed in this lawsuit is well documented, and that harm will compound if a stay is issued. As Plaintiffs reviewed in their motion for summary judgment:

> Class members' professional and personal lives have been forced into limbo while they wait for a lawful BD decision. [The Department] has exacerbated harm to borrowers' credit, perpetuated their untenable debt-to-income ratios, restricted their employment and education options, prevented opportunities for them to develop wealth, and interfered with their ability to provide for their families. The continuing existence of these fraudulent debts and the threat of collection hangs over class members constantly and causes them serious mental and physical distress, even thoughts of suicide. Class members have lost faith in their government.

ECF No. 245 at 15-16. The Settlement marks an end to years of uncertainty, and it promises needed relief to hundreds of thousands of borrowers; delaying it would cause the plaintiff class real, demonstrable, and irreparable harm.

In the past week, Plaintiffs' counsel has heard from over 3,000 borrowers—roughly 2,000 class members and another 1,000 post-class applicants—about the irreparable harm that a stay

would cause. One hundred and forty-four of those borrowers submitted declarations in opposition to Movants' request for a stay, which are attached hereto as Exhibit A.[7]

Many of these declarations describe harm to the borrowers' mental and physical health:

- Nyo McGirt, a class member from Hayward, CA, writes: "It is very stressful and has caused mental instability due to the anxiety I have felt with the loans that I owe. It has affected my mental health and financial health as I have tried buying a house and have higher interest offers, for example. **I've literally been losing sleep over the delays around the *Sweet vs Cardona* settlement. Each time a decision has been made toward possibly cancelling my debt, basically giving my life back, there is a delay from the interveners. It's been one nightmare after another.** I know I'm not alone in saying my life was turned upside down." Exhibit A at 1.

- Alyssia Gonzalez, a class member from Scottsdale, AZ, writes: "I was lied to and was given promises of a well paying job in my field of study. I was taken advantage of and this has followed me every single day I wake up and keeps me up at night. **How can I pay for groceries? How can I pay rent? How can I buy a home? How can I start a family with this good for nothing loan hanging over my head like a noose waiting for me to just give up? I've waited years for my application to be reviewed with no decision.** I want to go back to school and build a future but I'm filled with doubt, distrust, and disgust as I recall my very first college experience. **It's been years and I cannot move on in life because this has affected everything from my mental health to my credit score.** We deserve to move on. **I deserve to live my life.**" *Id.* at 2.

- Varney Outland, a class member from Sharon Hill, PA, writes: "This case has been a burden to my family and me as I am always worried about what is going to happen to my finances as a I do not have the job base on the education that I have received from Devry to pay back the debt that I have incurred. **The stress from this has made my life a living hell.** I am always worrying which takes a toll on everything I do. I have anticipated all this to be over until I heard of the appeal that was submitted. Delaying . . . will continue to affect my livelihood. The loans have ruined my credit and it has kept a huge debt to income on my credit." *Id.* at 3.

- Lacey Hendershot, a class member from Eugene, OR, writes that if a stay were granted, "**My physical and mental health would continue to be negatively impacted due to stress.** My hopes of possibly purchasing a car or home in the next couple of years will be put on hold as this keeps getting extended and my financial well-being remains unsure. I'm emotionally spent as are the majority of full and post-class members. **It's disheartening, overwhelming, and frustrating each time we get closer to an end date only to have these 'schools' remind us that their profits are more important than their distressed students.**" *Id.* at 4.

---

[7] When quoted below, some of the declarations have been lightly edited in the interest of clarity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Karlene Liranzo, a class member from Syracuse, NY, writes: "**The delay would bring more dread into my existence.** I have been saddled with this debt, doing the best I can to come to terms with the harm that was done by this fraudulent school. It has affected my life in trying to get a car, a home, trying to live. Trying to keep my head above water and juggle payments. The overwhelming debt has made me anxious and overwhelmed to take out loans and I try my best to pay off anything with fear. My peace of mind is at stake, my financial freedom is at stake. **My heart dropped when the appeals were first discussed. The anxiety returns. I want to have a family and have children without the fear of this debt hanging over them.** I won't even marry my boyfriend because of my student debt in fear that they will burden him if something happened to me. **Please, do not let this continue. Not for just my sake, for the countless of others that are also in worse situations. The ones that want to die, the ones who can barely make it.**" *Id.* at 5.

- Carolyn Rose-Smith, a class member from Virginia Beach, VA, writes: "If a stay is issued and settlement is delayed by the Courts, **the negative effects for me will continue financially, emotionally, and mentally.** Not obtaining relief does have a negative impact on my ability to purchase a home due to the high student loan debt. In addition, I feel as if my borrower defense has been stuck in time and this part of my life is stuck in time due to the delay. I have been trying to obtain relief since 2018. **Any continued delay results in continued stress, which has resulted in high blood pressure. I now take two types of blood pressure medicine each day. Immediate relief now would help in improving my physical, emotional, and mental health as well as the quality of life for my family and me.** Therefore, I am respectfully requesting that the Courts do not issue a stay or delay the delivery of settlement relief due to the continued negative effect on all class members. Thank you for your time and consideration!" *Id.* at 6.

- Nichole Peterson, a class member from Glendale, AZ, writes: "I am a single mom, drowning in student loan debt and barely surviving while my payments are on pause. I have $85,000 in student loans that started out as $25,000 and I have been paying them for almost 19 years. **I'm also battling Stage 3 cancer. The stress from not having this resolved is awful and not helping my recovery, to put it lightly.**" *Id.* at 7.

Others describe the severe financial harm that a stay would cause, jeopardizing their housing and other basic necessities such as transportation:

- Danielle Pope, a class member from Baltimore, MD, writes: "**I am in the process of trying to purchase a house and this is delaying the process via my approval for a mortgage. For now this is drastically affecting my debt to income ratio tremendously.** We have been waiting patiently for the outcome and the release of the debt. It has been a long process and the procrastination is ridiculous. There is no need to hold up the process any longer." *Id.* at 8.

- Meghan Hall, a class member from Joliet, IL, writes: "My whole life has been on hold for 10 years due to these fraudulent, upside down loans! **I am wanting to buy a home at age 34 for my 3 children in 2023 or 2024. Extending a stay and delaying relief will cause me and other class members more harm than already endured over the last 10 years**

**of fighting these fraudulent loans.** I ask that you do NOT allow a stay and that you rule fairly for the victims of these schools to prevent us all further delay and harm. **I am missing milestones in my life every second these loans are on my credit. They prevent me from living the American dream!**" *Id.* at 9.

- Casey Dempsey, a class member from Phoenix, AZ, writes: "**I have been denied for obtaining a mortgage on my own because my debt to income ratio is too high due to the nature of the debt accrued from my school that misrepresented employment rates, bar passage rates, and ultimately closed.** I can never get rid of the stigma in my profession for having attended a law school that was shut down by the ABA. That burden will forever be tied to the name of the school on my JD degree. What I can do is finally be relieved of the debt incurred at a school that misled its students. I have had a borrower's defense to repayment application pending since 2017 (for nearly 6 years) and continually have to explain why it has not yet been resolved and why it should not be counted against me when being considered for loans. **I recently had trouble purchasing a vehicle due to the pending borrower defense to repayment application because lenders do not understand the nuances of the claim and will deny you as a result.** 6 years is long enough to wait for a resolution. **Further stay and delays in approval of the settlement will cause me delays in moving forward with my normal aspects of life.**" *Id.* at 10.

- Brian Pajak, a class member, writes: "Making these monthly payments of up to $500+ has had a massive impact on my financial plans. . . . Due to the financial impact of these payments, my family's future is in limbo until this settlement is resolved. **I am hesitant to consider any career changes, and have been holding off on home repair and improvement projects until I can be certain that we will be able to continue to pay our bills, without the looming threat of repayment on these loans.** I have received official confirmation that I am a full class member, and therefore, the settlement going into effect means an IMMEDIATE addition of $500+ a month into our family budget. **Further delay due to these baseless claims by the interveners will keep this degree of uncertainty going for months, possibly years.**" *Id.* at 11.

- Elizabeth Gilbert, a class member from Medford, OR, writes: "The longer this gets delayed, the longer it's going to take for me to buy a house. **I can get approved for a mortgage as soon as the settlement is finalized and the bank can consider an appropriate DTI.** Until then, I'll continue to live in a sketchy part of town in a small 2-bedroom apartment with my toddler and no yard..." *Id.* at 13.

- Laura Russell, a class member from Johnston, IA, writes: "I am 58 years old and I hold almost $180,000 in false school loan debt due to my fraudulent schools. **I have lost MANY years of being able to save for my retirement. Please DO NOT allow a stay! I must use the last few years to save for retirement and I need the monthly payments to do that.** I have been dealing with this school loan defraud for YEARS and I am mentally at the end of my rope." *Id.* at 14.

- Rebecca Smith, a class member from St. Clair Shores, MI, writes: "My student loans have impacted my everyday life, prevented me from getting a mortgage at times in my life and have impacted my credit substantially. **If the stay is considered and the loan goes back**

14

**into payment status, I'll have to decide whether or not I can pay for the student loans that have had no benefit to my life financially (because I can't get a job in the field) or my car payment/my mortgage or even food for my family.** Knowing if I miss a payment it will then start a vicious cycle and continue to impact my financial wellbeing, due to credit dings, and the lives of my children. I beg that you hold true to the judgment, this has been a huge burden on myself and my family for far too long." *Id.* at 15.

- Christopher Malizia, a class member from Brewster, NY, writes: "A stay would greatly affect myself and many others who have had our lives put on hold for years now regarding these borrower defense claims. **These loans have halted my progress in life as I can't afford a house with them and they make getting a mortgage close to impossible.** I've been making payments for 10 years and I owe 30% more than what I originally took the loan out for, which is ridiculous. These schools are intervening in a decision that has nothing to do with them. We have waited years for the DoE to even look at our claims and now we finally have an agreement both sides feel is fair and at the last minute these schools are trying to cause even more pain to all of these students. The students really only made one mistake in this and that was trusting these schools were legitimate institutions. Please don't let these schools' greed continue to handicap so many people." *Id.* at 16.

- Cathryne Maciolek Waugh, a class member from Albuquerque, NM, writes: "[A] stay and delayed relief would impact every aspect of my life: my family's financial stability, my living arrangement/delayed homeownership, interpersonal stress with my family that I still depend on for cosigning purchases and to borrow money from, and possibly my children's future and their ability to access higher education. **A stay delays my ability to move forward in my life.**" *Id.* at 17.

- Robyn Frumento, a class member from Gibbstown, NJ, writes: "This would immensely affect my financial health. **If this is not approved I have no idea how I can pay for necessities such as food and shelter.** This school defrauded me and should be held accountable. I have over $90,000 in student loans that were based on lies and deception." *Id.* at 18.

Other class members focused on the impact a stay would have on their ability to finally achieve the education that they had been seeking for years:

- Scarlett Sears Brown, a class member from Wingo, KY, writes that a stay "will be hurting my chances to go back to college, since the loans from Daymar have gone to default. These loans have been hurting me for over 10 years. **I would love to see them discharged, so I can start again.** Daymar tricked me into enrolling and then scammed me out of thousands of dollars. It will be so discouraging to not get them taken care of, since the school isn't one of the ones that are appealing the case." *Id.* at 19.

- Janell Durr, a class member from Sunrise Beach, MO, writes: "**This stay would be extremely detrimental to my continuing education.** I am currently working toward my BA in Human Resource Management, and I will reach the end of my loan and grant eligibility because of the loans that I had originally taken out for Vatterott. I have $30,000

15

in loans from a school that I was not able to use credits from, which caused me to have to start from scratch, and from which I have a very expensive piece of paper that means nothing. **This stay will keep me from being able to take out enough loans to finish my degree, which I need in order to have a career that I can make a meaningful, livable wage with.** If this stay goes through I will have to come up with $9,000 before I can graduate next year which is not feasible considering I have a job that only pays $14/hour while I go to school." *Id.* at 20.

- Sarah Mercer, a class member from Oroville, CA, writes: "I have waited years for a settlement one that has already taken a toll on continuing my education, impacting my credit, garnishing my wages, taking my tax returns for a school that I can't get my transcripts from. I'm 33 years old and pregnant with my first child. **Delay of this settlement postpones continuing my education to establish a career so that I can financially provide for my child as a single mother.**" *Id.* at 21.

- Tracey Quattlebaum, a class member from Oak Hill, WV, writes that if a stay is granted, "**I will, once again, be at a standstill in my life with 55k in debt.** Ashford's practices of maxing our federal aid have caused me to not be able to attend another college to get my degrees because I cannot qualify for more funding. I also can't use my Chapter 35 benefits through the Department of Veterans Affairs because no school wants to accept me due to no aid or loans available. My credit is damaged due to the amount of loans. **So I am basically stuck in this situation until resolved with no degrees and no career.** Our family has taken a financial hit because I have no degree, no money making career as was promised." *Id.* at 22.

- William Stevenson, a class member from Richmond, VA, writes that if the Settlement is delayed, "**I will be struggling to pay my bills more . . . I [want to] go back to school and actually get a real education.** I have been working jobs that are not in the field of my education. Every job I apply to with this education, they laugh at me. I really am ready to get this loan gone and move on from this horrible mistake." *Id.* at 23.

Still others focused on the harm that a stay would cause their children:

- Aleshea Robinson, a class member from Brooklyn, NY, writes: "**I am trying to get my kids and myself out of harsh living conditions and get a home. If this stay is approved and delivery of relief is delayed, it will put a strain on me and my children.**" *Id.* at 24.

- Brittainy Young, a class member from Carrollton, TX, writes: "**If relief is . . . delayed I may not be able to afford to live.** If my loans go into effect it could mean large loan payments for me. I'm a single mother of 2 and I have been working so hard to give my children a future. **The pressure of student loan debt is crushing my ability to move forward. I ask that Judge Alsup's approval moves forward and I can finally be at peace and focus on building a future for myself and my children.**" *Id.* at 25.

- April Hawthorne, a class member from Canon Lake, TX, writes: "The catastrophic amounts of student loans and inability to secure gainful employment in my career has left me, as the head of my household, and my children in shackles out of the reach of financial

independence, peace, and a healthy quality of life. **The greatest impact that settlement relief offers is to open the door to opportunities in the form of housing for my family.** My children and I are in a cohabiting situation with family members due to the massive impact that a gross amount of debt and failed promises of career success potential has burdened me with. My family of four, pioneered by my ability to survive and provide as best I have been able to manage, reside within 400 square feet of shared space. We have been busting at the seams in our living space for far too long. The emotional, psychological, and health impacts have been extensive for all of us. **Delaying settlement relief for my family and other households in need of this places a severe burden upon our lives. It means more days, months, years... that it takes to finally receive what is rightfully ours and causes stress and discourse that furthers the negative and painful effects of the situation we are already subject to and have been subject to for far too many years.**" *Id.* at 26.

- Katelin Mundy, a class member from Oklahoma City, OK, writes that if a stay were granted, "**I would lose the financing on my house and would be subject to a debt repayment that would prevent me from giving my husband and children the life that they deserve.** As a veteran, a mother, and a wife all I wanted was to go to school to obtain an education to secure a higher paying job to support my family without a worry of where we will get our next meal. . . . **If this settlement doesn't go through and my loans don't discharge soon, I will lose everything I'm fighting for.** I'm begging and pleading to please please please push this settlement through and provide relief very soon. **All I want is to provide for my family while still being able to be a present mother for my children.** Please help." *Id.* at 28.

- Erika Kollmann, a class member from Westerly, RI, writes: "I am a single mom of 2 children, one of whom is severely disabled. I have been struggling to save for a down-payment on a first home for my family. **I need the loans discharged before a mortgage loan application would be approved, and I would be able to move my family into an appropriate and affordable home that would accommodate the special needs of my child. This appeal is lengthening our wait-time and is forcing me to continue to pay unaffordable and ever-increasing rental home rates.**" *Id.* at 29 .

- LaCresha Grigsby, a class member from Murfreesboro, TN, writes that if a stay is granted, "**I will literally be homeless and still be unable to find a job to provide for my children, one of whom is special needs.**" *Id.* at 30.

As these examples show, at least some class members are certain to suffer specific, substantial harm if a stay is granted.

Movants blithely assert that a stay will not impose any harm because it will "merely maintain the status quo." Stay Mot. at 22 (quoting *In re Pike*, No. 07-cv-1185, 2008 WL 11336952, at *8 (C.D. Cal. Mar. 6, 2008)). Not only does this argument demonstrate a callous disregard for the harm class members will suffer if they continue to be deprived of the relief they are due, it also

17

relies on a blatant misreading of the Settlement. The Settlement sets its Effective Date at "the date upon which, if this Agreement has not been voided under Section XIII,[8] the Final Judgment approving this Agreement . . . becomes non-appealable, or, ***in the event of an appeal by a Class Member*** based upon a timely filed objection to this Agreement, ***upon the date of final resolution of said appeal***." ECF No. 246-1 § II.K (emphasis added). In other words, the parties agreed that if a class member appealed a final judgment, then the effectiveness of the Settlement would be delayed until that appeal's resolution. In all other circumstances, the Settlement would become effective upon the expiration of the time to appeal the District Court's final judgment.[9] That outcome—*not* a further delay in relief—is the status quo.

Movants, of course, are not class members. Yet they argue that the Settlement should be read against its plain language. *See* Stay Mot. at 20 ("This provision—written prior to intervention—is best read to delay the Effective Date until the completion of Intervenors 'appeals as well."). The Settlement is not ambiguous; there is no need to turn to canons of construction to see that it intends for the Effective Date to be delayed only by a class member's appeal. But if one were to turn to the rules of construction, one would come to the same conclusion. It is well settled that, when reading a legal text, "[n]othing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*). That is, a matter not covered is to be treated as not covered." *Shea v. Kerry*, 961 F. Supp. 2d 17, 29 n.3 (D.D.C. 2013), *aff'd*, 796 F.3d 42 (D.C. Cir. 2015) (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal*

---

[8] Movants argued at the hearing in this case on January 26, 2023, that Section XIII.A prevents the Settlement from going into effect because it states that "This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review." As Plaintiffs explained at the hearing, Movants' counter-textual interpretation would create the absurd result of rendering the Settlement Agreement void from the moment it was approved. The plain, logical reading of the interaction between Section II.K and Section XIII.A is that the Settlement would not become effective if it were not finally approved.

[9] As noted above, this date was originally January 17, 2023. Pursuant to Fed. R. App. P. 4(a)(3), upon Movants' filing of their notices of appeal, the date for any other party to file a notice of appeal was extended to 14 days following Movants' filings, or January 27, 2023. The Settlement will thus go into effect as of 12:01 a.m. Pacific time on January 28, 2023.

*Texts* 93-100 (2012)). Similarly, "[t]he expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)." *Id.* (quoting Scalia & Garner at 107-111). The parties anticipated that non-class members—including some of the thousands of borrowers classified as Post-Class Applicants—would weigh in on the Settlement and might pursue an appeal. The decision that the Effective Date would be delayed only by a class member's appeal was intentional, and it should be read as such.

As this Court recognized nearly two years ago, "Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm—it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans." ECF No. 146 at 15. Class members "have waited for relief, or at least decision, for" up to *seven years* at this point. *Id.* Further delay would cause irreparable harm.

**C. Movants Are Not Likely to Succeed on the Merits of Their Appeals**

This Court need not consider whether Movants are likely to succeed on the merits of their appeals, because Movants fail to fulfill the irreparable harm factor. *See Leiva-Perez*, 640 F.3d at 965. Nonetheless, if the Court were to reach this issue, Movants would fail here as well.

**1. Movants Lack Standing to Appeal**

An intervenor who appeals a final judgment when neither of the original parties below have appealed must demonstrate independent Article III standing to maintain that appeal. *See Wittman v. Personhuballah*, 578 U.S. 539, 543-44 (2016) (an intervenor "cannot step into the shoes of the original party" on appeal, "unless the intervenor independently fulfills the requirements of Article III"); *see also Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951, 1955 (2019); *Diamond v. Charles*, 476 U.S. 54, 68 (1986). Here, because Movants have not suffered any Article III injury, they do not have standing to appeal the Final Approval Order. They are not likely to succeed on the merits, as required to justify a stay, because their appeals fail at the outset for want of jurisdiction.

The "irreducible constitutional minimum" of standing consists of three elements: the party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An "injury in fact" consists of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

In their motions to intervene, Movants openly admitted that they lacked any actual stake in the claims or defenses at issue in this lawsuit. *See* ECF No. 254 at 10 n.3 (Lincoln/ANU); ECF No. 261 at 11 (ECI). In denying Movants' requests to intervene as of right, this Court found that Movants lacked any property interest in the litigation. Aug. 4, 2022 Tr. at 52:3-4; *see* ECF No. 322 at 1. Likewise, in the Final Approval Order, the Court found that "the schools have lost no procedural rights, nor has their status been altered. No liberty or property interest has been disturbed." Final Approval Order at 16. In other words, over multiple opportunities, Movants have never been able to identify a "legally protected interest" they have that the Settlement actually affects in a "concrete and particularized" way. *Lujan*, 504 U.S. at 560.

As detailed above, *see supra* §§ IV.A.1-2, the Stay Motion does not change this conclusion. Movants' speculation that their inclusion on Exhibit C might, someday, cause them some yet-to-be-identified harm does not rise to the level of Article III injury. *Cf., e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (no standing where plaintiffs' "claim, simply stated, is that they disagree with the judgments made by the Executive Branch," and plaintiffs offered only "speculative apprehensiveness that the [defendant] may at some future date misuse the information in some way that would cause direct harm"); *Vernon v. Los Angeles*, 27 F.3d 1385, 1394 (9th Cir. 1994) (affirming judgment that plaintiff lacked standing where the conduct he challenged was "neither regulatory, proscriptive, or compulsory in nature"); *Przywieczerski v. Blinken*, No. 20-cv-02098, 2021 WL 2385822, at *4 (D.N.J. June 10, 2021) (finding plaintiff lacked standing where "there has been no action or threatened action by the Government that could harm" him, and explaining that government's stated position in litigation "is not equivalent to a final adjudication of [plaintiff's] legal rights").

Movants now emphasize an argument that they have suffered a purported injury to their "liberty interest in their reputation." Stay Mot. at 16; *see id.* at 20-22. As explained, Movants fail to proffer any evidence of reputational harm. But regardless, case law "does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). And even if there were evidence of reputational harm, Movants fail to establish the existence of a "plus factor"—that is, "the denial of a 'more tangible' interest" in connection with the alleged stigmatization. *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (quoting *Paul*, 424 U.S. at 711-12); *see Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 776 (9th Cir. 2022). The only "plus factor" Movants mention is the purported denial of their procedural rights in the BD process—which, again, either do not exist or have not been at all impaired. *See supra* § IV.A.2.

The cases Movants cite regarding their supposed reputational injury-in-fact are easily distinguishable. For example, in *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980), the plaintiff company was denied renewal of a government contract based on a finding that the company "lacked integrity"; that finding would also prevent the company from obtaining other government contracts in the future. *Id.* at 963-64. It was the denial of this contracting opportunity that gave rise to the company's standing to assert a due process claim—not the mere conclusion that the company "lacked integrity." *Id.* at 962-63 (characterizing plaintiff's injury as a violation of the "right to be free from 'stigmatizing' governmental defamation *having an immediate and tangible effect on its ability to do business*" (emphasis added)). Likewise, in *Sherman College of Straight Chiropractic v. Commissioner of Education*, 493 F. Supp. 976 (D.D.C. 1980), the court found that the plaintiff school had standing because the government's decision at issue had the effect of preventing the school from obtaining accreditation, *see id.* at 978. Here, the opposite is true: Exhibit C is not and will not be considered "a finding of misconduct" against any of the Movants, and inclusion on Exhibit C "does not constitute evidence that could or would be considered in an action by the Department against a

school."[10] Final Approval Order at 16.  Further, the school in *Sherman College* specifically alleged that the denial of accreditation had already led the school to lose students and donations, *see* 493 F. Supp. at 978—allegations that are glaringly absent from any of the Movants' submissions.[11]

Fundamentally, the Agreement does not resolve any questions regarding Movants' future obligations or liabilities—whether to the Department, to individuals, or to other regulators. *See Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 529-30 (1986) (intervenor could not block consent decree where decree did not "bind [intervenor] to do or not to do anything," did not "impose[] [any] legal duties or obligations on [intervenor] at all," and did not "purport to resolve any claims [intervenor] might have" under applicable law). If there are ever any future regulatory proceedings against Movants (the prospect of which is entirely speculative), Movants will have full due process. *See* Final Approval Order at 14-16. Their supposed "reputational" harm is illusory: it has not led to any effects on Movants in the real world. In short, they have not suffered an injury-in-fact that can confer standing.

Finally, Movants not only lack an injury-in-fact, but have also failed to establish redressability. To have Article III standing, "it must be 'likely,' as opposed to merely 'speculative,'" that a favorable decision from the court will ameliorate the alleged injury. *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). Here, Movants request a form of relief—either invalidating the Settlement or, at minimum, carving their former students out of the certified class[12]—that would likely ***expose them to liability*** that they would avoid under the Settlement. Movants protest that they "do not wish to . . . prevent granting of meritorious BD applications," but instead "simply want . . . their removal from Exhibit C and

---

[10] As detailed above and in Plaintiffs' opposition to Movants' motions to intervene, there is ample public evidence of wrongdoing by each of the Movants. *See supra* n.5; ECF No. 287 at 6-7.

[11] Notably, the court in *Sherman College* ultimately upheld the government's decision despite the evidence of concrete injury to the school. *See* 351 F.3d at 981.

[12] As far as Plaintiffs' counsel is aware, there is no precedent in federal class action cases wherein a stranger to a class settlement was able to obtain a change to the class definition that would deprive certain class members of relief to which they would otherwise be entitled.

the assurance that any BD claims against them will be adjudicated fairly and in accordance with law." Stay Mot. at 25. If Movants were indeed removed from Exhibit C (or if they succeeded in invalidating Exhibit C or the Settlement as a whole), their former students' BD applications could still be granted,[13] and the Department would then have every right to begin recoupment proceedings against Movants. *See* Final Approval Order at 14-15 (explaining recoupment regulations). Under the Settlement, the Movants will *not* be subject to such recoupment. *See id.* at 15-16. Perversely, then, Movants are suffering no harm from the Settlement now, but would willingly invite potential future harm upon themselves—simply for the apparent purpose of ensuring that defrauded borrowers have to wait even longer for justice.

### 2. Movants' Merits Arguments Are Not Likely to Succeed

Even if Movants had standing to appeal, their arguments against the Settlement would not be likely to succeed on the merits. In the Final Approval Order, this Court thoroughly analyzed and disposed of *every single legal argument* that Movants raise in their Stay Motion. In many cases, Movants' arguments are repeated here nearly verbatim.[14] Movants do not cite any case law or authority that would call into question, let alone change, the well-reasoned conclusions this

---

[13] Movants' apparent assumption, never directly stated, is that a "fair" BD process would result in all of their former students' applications being denied. There is no evidence to support this assumption. The fact that very few BD applications were approved (or decided at all) over the course of more than 5 years was a function of processes within the Department that Plaintiffs have alleged were unlawful, not a precedent that Movants can rely on. *See, e.g.*, *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1126 (2d Cir. 1983) (party cannot claim a legally protected interest in an unlawful procedure). Moreover, under the Department's own regulations, a "fair" BD process for borrowers is one that specifically does *not* include a veto right for schools. *See* U.S. Dep't of Education, Student Assistance General Provisions *et alia*, 81 Fed. Reg. 75,926-01, *75,963 (BD regulations "do not include an appeals procedure [for institutions] in the individual borrower claim process" because they instead "afford an opportunity to present a defense when the Department seeks to hold a school liable and recover funds").

[14] *Compare, e.g.*, Stay Mot. at 5-6 ("[T]he relief that flows from Exhibit C relies on the Department's individualized determinations about each school—issues that cannot possibly be common to the entire Class."), *with* ECI Opp. at 11 ("[T]he relief that flows from Exhibit C relies on ED's individualized determinations about each school, yet no named Plaintiff has debt associated with ECI, and thus no named Plaintiff can be a representative for Class members' ECI-associated debt.").

Court reached mere weeks ago. They do not, and could not, identify any arguments they made that the Court failed to address. There is no reason why, on appeal, Movants would be likely to succeed in any of the places where they failed before.[15]

There is one other point Movants raise that warrants attention. Movants repeatedly insist that this case is intertwined with *Biden v. Nebraska*, No. 22-506 (U.S. Dec. 1, 2022), and *Department of Education v. Brown*, No. 22-535 (U.S. Dec. 12, 2022), each of which challenges the government's authority to enact a recently announced program of debt cancellation for a broad swath of low- and middle-income federal student loan borrowers. *See* Stay Mot. at 8-10, 13, 23, 24-25. To begin, this Court once again has already found that the cases are not connected. *See*

---

[15] Plaintiffs will not belabor each of the arguments that the prior briefing, argument, and decision already covered. For the Court's reference, Plaintiffs catalog here the places where these arguments were addressed, and rest on their prior briefing and the Court's conclusions in the Final Approval Order. As to mootness (Stay Mot. at 2-3): ECI Opp. at 7; Lincoln Opp. at 13; Pls.' Reply in Support of Mot. for Final Approval ("Pls.' Reply"), ECF No. 331at 1-3; Final Approval Order at 19. As to class certification as it concerns post-class applicants (Stay Mot. at 4): ECI Opp. at 10; Lincoln Opp. at 14; Pls.' Reply at 8-9; Final Approval Order at 22. As to class certification as it concerns commonality and typicality (Stay Mot. at 5-6): ECI Opp. at 11; Lincoln Opp. at 14-15; Pls.' Reply at 5-6; Final Approval Order at 20-21. As to class certification as it concerns Rule 23(b)(2) (Stay Mot. at 6): ECI Opp. at 13-14; Lincoln Opp. at 15; Pls.' Reply at 3-5; Final Approval Order at 21. As to class certification as it concerns adequacy (Stay Mot. at 7): ECI Opp. at 12; Pls.' Reply at 23; Final Approval Order at 21. As to the Department's authority under the Higher Education Act ("HEA") (Stay Mot. at 10-12): ECI Opp. at 22-23; Lincoln Opp. at 19; ANU Opp. at 22; Pls.' Reply at 12-14; Defs.' Reply in Support of Mot. for Final Approval ("Defs.' Reply"), ECF No. 332 at 5-7; Final Approval Order at 8-10. As to the HEA's anti-injunction provision (Stay Mot. at 12): Nov. 9 Tr. at 73:19–80:1; Final Approval Order at 12. As to the "major questions" doctrine (Stay Mot. at 12): ECI Opp. at 23; Lincoln Opp. at 19; Pls.' Reply at 16; Defs.' Reply at 8-10; Final Approval Order at 9. As to Administrative Procedure Act ("APA") notice and comment (Stay Mot. at 14): ECI Opp. at 18; Lincoln Opp. at 20; ANU Opp. at 14, 22; Pls.' Reply at 14-16; Defs.' Reply at 14-15; Final Approval Order at 13. As to the APA's arbitrary and capricious standard (Stay Mot. at 14-15): ECI Opp. at 15-17; Lincoln Opp. at 12; ANU Opp. at 18-19; Pls.' Reply at 14-16; Defs.' Reply at 10-13; Final Approval Order at 11-12, 16. As to due process regarding a reputational liberty interest (Stay Mot. at 16): Lincoln Opp. at 22; ANU Opp. at 15; Pls.' Reply at 19-20; Defs.' Reply at 2-5; Final Approval Order at 15. As to due process regarding a property interest (Stay Mot. at 16): Lincoln Opp. at 23-24; Defs.' Reply at 4-5; Final Approval Order at 14-15. As to procedural due process (Stay Mot. at 17-19): ECI Opp. at 18-20; Lincoln Opp. at 8, 17-18, 22-24; ANU Opp. at 13-14, 17; Pls.' Reply at 15, 20-22; Defs.' Reply at 4; Final Approval Order at 12-13, 16.

Final Approval Order at 19 ("The instant settlement, however, is anchored in separate authority and is completely independent from the Biden [debt relief] plan.").

But even aside from that finding, Movants' argument makes no sense. The *Nebraska* and *Brown* cases do not concern the borrower defense process. They do not concern the settlement of pending litigation. They do not involve borrowers who applied to the Department for statutorily authorized relief, in many cases years ago, and have had that relief unreasonably withheld. Rather, they address an entirely separate policy, enacted under separate legal authority, at a different time and under different circumstances and designed to serve different purposes than any of the policies at issue in this case. (Illustratively, Movants argue that the Department here "abandons its claim to HEROES Act[16] authority" that underlies the *Nebraska* and *Brown* cases, Stay Mot. at 9—but the HEROES Act has never been at issue in this case, and there is no reason why it would have been.)

The only thing that the *Brown* and *Nebraska* cases have in common with this one is that all involve actions the Department took with respect to federal student loans. That does not mean one controls or even relates to the other, any more than, for instance, a challenge to an FDA decision to approve a particular drug for sale would control a case involving the FDA's decision to impose certain labeling requirements on a different drug. Movants' reliance on *Brown* and *Nebraska* is merely an attempt to ride a wave of publicity into their appeals.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court deny the Joint Motion for Stay Pending Appeal.

---

[16] Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa–1098ee). The Biden Administration's debt cancellation plan relies on authority in the HEROES Act that allows the Secretary of Education to take certain actions to alleviate the hardship that federal student loan borrowers may face as a result of national emergencies, specifically here the COVID-19 pandemic. *See* Office of Legal Counsel, U.S. Dep't of Justice, Use of the HEROES Act of 2003 to Cancel  the Principal Amounts of Student Loans, 46 Op. O.L.C. __ (Aug. 23, 2022), *available at* https://www.justice.gov/olc/file/1528451/download.

1

2   Dated: January 27, 2023

3                                    /s/ *Rebecca C. Ellis*

4                                    EILEEN M. CONNOR (SBN 248856)
                                     econnor@ppsl.org
5                                    REBECCA C. ELLIS (*pro hac vice*)
                                     rellis@ppsl.org
6                                    REBECCA C. EISENBREY (*pro hac vice*)
                                     reisenbrey@ppsl.org
7                                    PROJECT ON PREDATORY STUDENT
                                     LENDING
8                                    769 Centre Street, Suite 166
9                                    Jamaica Plain, MA 02130
                                     Tel.: (617) 390-2669
10

11                                   JOSEPH JARAMILLO (SBN 178566)
                                     jjaramillo@heraca.org
12                                   HOUSING & ECONOMIC RIGHTS
                                     ADVOCATES
13                                   3950 Broadway, Suite 200
                                     Oakland, California 94611
14                                   Tel.: (510) 271-8443
                                     Fax: (510) 868-4521
15

16

17

18

19

20

21

22

23

24

25

26

27

28