Jesse Panuccio (*pro hac vice*)
Jason Hilborn (*pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
jpanuccio@bsfllp.com
jhilborn@bsfllp.com

John J. Kucera (SBN 274184)
**BOIES SCHILLER FLEXNER LLP**
725 S. Figueroa St., 31st Fl.
Los Angeles, CA 90017
Telephone: (213) 629-9040
jkucera@bsfllp.com

*Counsel for Intervenor Everglades
College, Inc.*

Lucas Townsend (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 887-3731
ltownsend@gibsondunn.com

James L. Zelenay, Jr. (SBN 237339)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7449
jzelenay@gibsondunn.com

*Counsel for Intervenor Lincoln Educational
Services Corporation*

[Additional Counsel listed on next page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MIGUEL CARDONA, in his official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 3:19-cv-03674-WHA <br><br> **INTERVENORS' REPLY IN SUPPORT OF JOINT MOTION FOR STAY PENDING APPEAL** <br><br> Date: February 15, 2023 <br> Time: 1:30 p.m. <br> Room: 12, 19th Floor <br> Judge: Honorable William Alsup <br><br> (Class Action) <br><br> (Administrative Procedure Act Case) |

John S. Moran (*pro hac vice*)
**MCGUIREWOODS LLP**
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Telephone: (202) 828-2817
jmoran@mcguirewoods.com

Piper A. Waldron (SBN 291482)
**MCGUIREWOODS LLP**
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 315-8250
pwaldron@mcguirewoods.com

*Counsel for Intervenor American National University*

INTERVENORS' REPLY IN SUPPORT OF JOINT MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................... 1

II.  ARGUMENT ......................................................................................................... 2

A.   Intervenors Are Likely to Succeed on the Merits. ............................................... 3

    1.   This Court Lacked Jurisdiction to Approve the Settlement. ................................. 3

    2.   The Classes Bound by the Settlement Were Never Certified or Should Have Been Decertified. .................................................................................. 4

    3.   The Department Lacks Authority to Provide the Settlement Relief. .................... 6

        a.   The Secretary Lacks Authority Under the HEA. ....................................... 6

        b.   The Settlement Violates the APA. ............................................................. 8

    4.   The Settlement Violates Due Process. ............................................................. 9

B.   Intervenors Have Demonstrated Irreparable Harm Absent A Stay. ..................... 9

C.   A Stay Will Not Impose Irreparable Harm. ....................................................... 13

D.   The Public Interest Favors A Stay Pending Appeal ........................................... 14

III. CONCLUSION .................................................................................................... 15

INTERVENORS' REPLY IN SUPPORT OF JOINT MOTION FOR STAY PENDING APPEAL

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   141 S. Ct. 2485 (2021)...........................................................................................7

5

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
   534 F. App'x 633 (9th Cir. 2013) .........................................................................10

6

7

*Artukovic v. Rison*,
   784 F.2d 1354 (9th Cir. 1986) ..............................................................................12

8

*Beacon Theatres, Inc. v. Westover*,
   359 U.S. 500 (1959)................................................................................................2

9

10

*Biomet 3i, LLC v. Land*,
   2017 WL 1174064 (N.D. Ind. Mar. 30, 2017) ......................................................11

11

*Bluetooth SIG, Inc. v. FCA US LLC*,
   2022 WL 789480 (W.D. Wash. Feb. 24, 2022)......................................................15

12

13

*Cholakyan v. Mercedes-Benz USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ...........................................................................5

14

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013) ................................................................................8

15

16

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ............................................................................13

17

18

*Dewey v. Volkswagen Aktiengesellschaft*,
   681 F.3d 170 (3d Cir. 2012)....................................................................................5

19

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057 (2022).............................................................................................7

20

21

*Hendricks Music Co. v. Steinway, Inc.*,
   689 F. Supp. 1501 (N.D. Ill. 1988) ......................................................................10

22

23

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
   2014 WL 4187982 (C.D. Cal. Aug. 22, 2014).......................................................11

24

*Jin v. Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021)....................................................................................4

25

26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
   463 U.S. 29 (1983)..................................................................................................9

27

28

*Mountain Paradise Vill., Inc. v. Fed. Nat'l Mortg. Ass'n*,
  2013 WL 5637931 (D. Nev. Oct. 15, 2013) ........................................................12

*Nigro v. Sears, Roebuck & Co.*,
  784 F.3d 495 (9th Cir. 2015) ...........................................................................14

*Padgett v. Loventhal*,
  2019 WL 4933629 (N.D. Cal. Oct. 7, 2019)........................................................2

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ...........................................................................10

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)..............................................................................11

*Richards v. Delta Air Lines, Inc.*,
  453 F.3d 525 (D.C. Cir. 2006) ...........................................................................5

*Rose v. Raffensperger*,
  143 S. Ct. 58 (2022) ..........................................................................................2

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)............................................................................................12

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989) .............................................................................13

*In re Subpoena*,
  No. 21-mc-80075 (N.D. Cal. May 19, 2021).................................................2, 13

*Toomey v. Arizona*,
  2021 WL 4915370 (D. Ariz. Oct. 21, 2021) ......................................................14

*In re U.S. Dep't of Educ.*,
  25 F.4th 692 (9th Cir. 2022) .............................................................................13

*United States v. Carpenter*,
  526 F.3d 1237 (9th Cir. 2008) ............................................................................8

*United States v. Mead Corp.*,
  533 U.S. 218 (2001)............................................................................................6

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................................4

*Weingarten v. DeVos*,
  468 F. Supp. 3d 322 (D.D.C. 2020)....................................................................6

INTERVENORS' REPLY IN SUPPORT OF JOINT MOTION FOR STAY PENDING APPEAL

**STATUTES**

20 U.S.C. § 1077 ....................................................................................................6

20 U.S.C. § 1082 ............................................................................................6, 7, 8

20 U.S.C. § 1098bb .................................................................................................7

**RULES**

Fed. R. Civ. P. 23 ............................................................................................4, 5, 8

**REGULATIONS**

34 C.F.R. § 685.206 ............................................................................................5, 9

34 C.F.R. § 685.207 ...............................................................................................5

34 C.F.R. § 685.222 ............................................................................................5, 9

84 Fed. Reg. 49,788 (Sept. 23, 2019) ..................................................................10

87 Fed. Reg. 65,904 (Nov. 1, 2022).......................................................................8

**TREATISES**

27 Williston on Contracts § 70:13 (4th ed.)...........................................................2

INTERVENORS' REPLY IN SUPPORT OF JOINT MOTION FOR STAY PENDING APPEAL

# I. INTRODUCTION

The Department fails to identify any harm it will suffer from a stay pending appeal, and its asserted administrative inconveniences are of its own making. Plaintiffs likewise overlook that (1) they agreed to a Settlement that itself imposes a stay pending appeal, (2) all loan obligations will remain in forbearance while appeals are pending, and (3) Plaintiffs delayed this case for more than a year while they sought to depose a single witness whose testimony was irrelevant to the Settlement. And while Plaintiffs rely on class member testimonials to show harm, none of these individuals has proven a BD claim against any school, much less Intervenors—and none will do so under the Settlement. Intervenors are sympathetic to individual hardships, but absent any BD decisions on the merits, there remains no proof that these hardships were caused by Intervenors.

In contrast, the harms that the Settlement has caused Intervenors are real, and effectuating the Settlement will make those harms irreparable. If the Department issues mass loan discharges and refunds to the class, it will become exceedingly difficult to unwind those actions if an appellate decision restores Intervenors' rights to a lawful and unbiased BD process. Effectuating the Settlement would increase Intervenors' reputational harms, which already have manifested in numerous ways. Last month, for example, Lincoln was denied an opportunity to speak with high school seniors in a government class because of the teacher's perception that Lincoln is on "the U.S. Department of Ed's list of predatory schools." These harms, which all Intervenors experience, manifest over time, often in subtle ways, but always with extreme damage to the long-term relationships that Intervenors have built with community and government partners. Effectuating the Settlement will make it even more difficult to correct these public misperceptions.

As to the merits, the Department's legal justifications for *en masse* debt cancellation are becoming ever more fantastical—to the point of eschewing the need for any legal justification. For example, in the *Nebraska/Brown* litigation, the Department now says it can proceed with debt cancellation *regardless* of whether there is a "national emergency" required by the HEROES Act. *See* Second Declaration of Lucas Townsend ("Townsend 2d Decl.") Ex. A (noting statement of administration official that "[p]roviding debt relief and pausing loan payments can continue after the formal end of the national emergency"). Similarly, here, the Department continues to ignore

the HEA's plain text and the major-questions doctrine.  Moreover, the arbitrary nature of the Department's actions has been laid bare, as the Department has now effectively admitted that, prior to entering the Settlement, it never analyzed the individual claims of borrowers who attended schools listed on Exhibit C.  And, most tellingly, the Department offers *no* explanation as to why this case is not moot or the class remains certifiable.

The significant questions raised here merit meaningful review.  The Supreme Court recognized as much in the *Nebraska/Brown* ligation, and in this case the Court has already once ordered a stay pending appeal.  *See In re Subpoena*, No. 21-mc-80075 (N.D. Cal. May 19, 2021), Dkt. 54 (stay pending mandamus review).  Here, again, the Court should stay its judgment.

## II.   ARGUMENT

A stay pending appeal is "equitable" relief, *Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022) (mem.), and before awarding such relief a court should consider remedies at law, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959).  Here, the Settlement provides for a self-executing stay pending appeal.  *See* Doc. 350 at 1-2, 20.  If the Court recognizes that the Settlement cannot take effect until appeals are resolved, the Court need not consider equitable stay relief.

Section II.K. of the Settlement defines "Effective Date" as occurring upon one of two events: (1) a "non-appealable" final judgment, or (2) "final resolution" of any class objector appeal. Doc. 246-1, § II.K; *see* Doc. 362 at 8 ("The effective date is based on two potential events").  Here, the first event has not occurred.  There is no "non-appealable" judgment because the final judgment *has been appealed*.  At the time of drafting, there were no intervenors in the case, so section II.K does not include discussion of final resolution of an intervenor appeal.  But that does not erase the first requirement that only a non-appealable judgment triggers the effective date.

The condition that the Settlement is not "voided" under Section XIII,  *see* Doc. 246-1, § II.K, powerfully confirms that the Effective Date is delayed until all appeals are resolved. Section XIII.A. states: "This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review."  Doc. 246-1, § XIII.A.  "A void contract is without legal effect.  It binds no one and is a mere nullity."  *Padgett v. Loventhal*, 2019 WL 4933629, at *4 (N.D. Cal. Oct. 7, 2019) (citation omitted); *accord* 27 Williston on Contracts § 70:13 (4th ed.).

1    Thus, the parties provided that the Settlement could be rendered null until the final judgment is

2    "not subject to any further review," Doc. 246-1, § XIII.A, regardless of who seeks review.

3         Plaintiffs attempt (at 18) to rewrite the Settlement to provide for an Effective Date "[i]n all

4    other circumstances" than a class objector appeal, but Section II.K. provides for an Effective Date

5    *only* in two circumstances.  Plaintiffs do not explain how the first circumstance—a non-appealable

6    final judgment—has occurred.  Nor could they; Plaintiffs acknowledge (at 18 n.9) that Intervenors'

7    appeals delayed the Effective Date by fourteen days.  Plaintiffs further attempt (at 18 n.8) to rewrite

8    Section XIII.A. to provide only that the Settlement is void if "not finally approved," but ignore the

9    phrase "by a final Court order not subject to any further review," which must have effect. [1]

10   Intervenors respectfully ask either that the Court find the Effective Date automatically

11   delayed pending appeal, or grant a stay pending appeal.

### A.    Intervenors Are Likely to Succeed on the Merits.

#### 1.    *This Court Lacked Jurisdiction to Approve the Settlement.*

14        The Department's last representation regarding jurisdiction was that this case is moot.  *See*

15   Doc. 249 at 1, 10-11, 24.  Tellingly, the Department has not retracted its position  and now refuses

16   to address jurisdiction *at all*.  *See* Doc. 362 at 2 n.1.  Plaintiffs' argument (Doc. 331 at 1-3) rests

17   entirely on their self-serving and unproven allegation (from before the proposed settlement was

18   lodged) that the Department "apparently lack[ed] a lawful process to evaluate and resolve borrower

19   defense applications within a reasonable timeframe."  This contention is belied by the Cordray

20   Declaration's sworn statements that  (1) "[o]ver the last approximately 18 months, … the Department

21   has prioritized … adjudication of borrower defense applications," and (2) "[a]ll applications that were

22   previously denied with a form denial notice will be reconsidered and the Department is committed to

23   issuing new decisions to each borrower."  Doc. 246-1 at ¶¶ 8-9.  This is all the relief requested in the

24   Complaints, and Plaintiffs obtained it long ago.  The case was, and is, moot.

---

[1] It is not an absurd result, as Plaintiffs contend, for the Settlement to be void because the judgment is reversed or vacated on appeal.  To the contrary, the parties expressly provided for that result.  *See* Doc. 246-1, § XIV.A. ("Should this Agreement become void as set forth in Section XIII above, none of the Parties will object to reinstatement of this Action in the same posture and form as it was pending immediately before the Execution Date.").  This is unsurprising; the Department should not wish to perform under an agreement of this magnitude and cost that might be voided by appeal.

## 2. *The Classes Bound by the Settlement Were Never Certified or Should Have Been Decertified.*

On class certification, the Department again refuses to brief the issue and thus stands by its last-stated position that the class must be decertified. Doc. 249 at 12-13. Plaintiffs incorporate prior briefing, which offered only unavailing arguments.

<u>First</u>, as to Post-Class Applicants, Plaintiffs contend only (at 9) that they "are not asserting … any claims for relief by Post-Class Applicants in this Settlement." This is false. The heading of Section IV.D of the Settlement is: "Relief for Post-Class Applicants." No one represents this class, and the Court never certified it. That is striking because, by final approval, this "post-class class" likely exceeded the size of the actual class. The Settlement—an all-or-nothing proposition—therefore could not be approved. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261-62 (2d Cir. 2021).

<u>Second</u>, as to whether the class still satisfies Rule 23(a)'s commonality and typicality requirements, Plaintiffs claim they addressed this issue in prior briefing. Doc. 361 at 24 n.15. Yet the cited briefing does not even mention the law governing commonality or typicality and merely asserts that "every member of the class has a pending BD application, and a single order requiring the Department to lawfully resolve those applications would apply to, and result in relief to, the entire class (regardless of individual outcome)." Doc. 331 at 5. But such reasoning—that Rule 23(a) is satisfied if all class injuries could be addressed by a single order directing the Department to "fix everyone's injuries"—would eviscerate the commonality and typicality inquiries, which require an ongoing, common question and injury. According to their own admission, "Plaintiffs do ***not*** contend that the 'no decisions' policy remains in effect," Doc. 331 at 2, so "individual outcome[s]" are all that remains under the Settlement. And *that* question is not common to the class, but concerns—as the settling parties concede—"the substance" of each class member's BD claims, which turn on "***differences among Class Members' circumstances***." Doc. 323 at 10-12, 22 (emphasis added).

<u>Third</u>, as to maintaining a Rule 23(b)(2) class, the Settlement transformed this case from one about enjoining an alleged uniform policy of inaction (and restarting adjudications) to one about granting "individualized monetary claims," which "belong in Rule 23(b)(3)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). Plaintiffs (at 24 n.15) incorporate the self-refuting argument that "nullify[ing] … federal student loan debt" and "return[ing] … money already collected

from the borrower" do not constitute "damages."  But that formulation distorts *Dukes*, which speaks of "monetary claims," not just "damages."  Claims seeking debt cancelation *and refunds* are "monetary claims" if those words have any meaning.[2]  And "the rule has long been that [a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money."  *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006).

Plaintiffs rely on *Fowler v. Guerin*, but the issue there was an injunction requiring the Department to "apply a single formula … to correct the amount of interest credited to class members' accounts."  899 F.3d 1112, 1120 (9th Cir. 2018).  Here, there is no single formula that can effectuate class relief.  Instead, as the Department has now revealed, effectuating monetary relief to the class requires "several complex operational steps," including "analyz[ing]" "nearly 2,900,000 federal student loans associated with the Exhibit C Class Members" and creating "detailed instructions" for "20 vendors … and numerous guaranty agencies" "as to what action should be taken *for each loan*."  Doc. 363 at ¶ 6 (Garry Decl.) (emphasis added).  The Department's admission also underscores—contra Plaintiffs' argument, Doc. 331 at 5-6—that the Settlement requires the Department to implement "an array of remedies," which Rule 23(b)(2) does not permit, *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012).

<u>Fourth</u>, on adequacy of representation, Plaintiffs incorporate their prior ipse dixit that "the automatic relief group does not … disadvantage … the decision group."  Doc. 361 at 24 n.15 (citing Doc. 331 at 23).  But the tradeoffs among groups is obvious: the "automatic relief group gets" immediate benefits, the "decision group" gets delayed benefits, and the "Post-Class Applicants" get even further delayed (or no) benefits.  Most class objectors protested their schools' inclusion in the decision group.  *See* Doc. 323 at 3, 15.  Plaintiffs have no answer to the rule that when a settlement "divides a single class" into groups "receiv[ing] different benefits," "[t]he structure of the settlement agreement itself" suggests "that the representative plaintiffs are inadequate."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187 (3d Cir. 2012).

---

[2] *See Debt*, Black's Law Dict. (11th ed. 2019) ("a specific sum of money due by agreement or otherwise"); 34 C.F.R § 685.207(a)(1) ("A borrower is obligated to ***repay*** the full amount of a Direct Loan … unless the borrower is relieved of the obligation to repay as provided in this part.") (emphasis added); 34 C.F.R. § 685.206(c)(1)(ii) ("A 'borrower defense' … includes … [a] ***claim to recover amounts*** previously collected") (emphasis added); 34 C.F.R. §685.222(a)(5)(2) (same).

**3.**      ***The Department Lacks Authority to Provide the Settlement Relief.***

   **a.**      ***The Secretary Lacks Authority Under the HEA.***

The HEA does not authorize the Department to cancel every student loan in the country.

The Department concedes that 20 U.S.C. § 1082(a)(6), standing alone, does not provide authority for this Settlement, as that provision "expressly … govern[s] the FFEL program," not Direct Loans.   Doc. 362 at 3.   The Department thus relies entirely on section 1087e(a)(1)'s provision that Direct Loans "have the same terms, conditions, and benefits … as loans made" under the FFEL program.   The Department focuses solely on such authority being "plainly a 'term' and 'condition' of any federal loan."   Doc. 362 at 3.   But there is nothing "plain" about this tortured reading.   Section 1082(a)(6) is a grant of "functions, powers, and duties" to the Secretary, not a statement of the "term[s] and condition[s]" of loans.   Indeed, the section is titled "General Powers," not "terms and conditions."   Terms and conditions, conversely, are found elsewhere in the statute. *See* 20 U.S.C. § 1077 (titled "terms of federally insured student loans").   Thus, the Department's citation to the dictionary definition of "terms"—"[p]rovisions that define and agreement's scope"—*undermines* rather than supports its position because section 1082(a)(6) is quite directly a provision that defines agency powers, not the scope of a particular agreement.[3]

The Department claims (at 4) that its "longstanding and reasonable interpretation" is entitled to judicial deference.   But such deference is limited to interpretations found in "rules carrying the force of law," such as "notice-and-comment rulemaking."   *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).   There is no such rule here.   Indeed, far from being "longstanding" or having the force of law, during the pendency of this very litigation, the Department explicitly disclaimed the interpretation it now adopts.[4]

As noted in the stay motion, *if* subsection 1082(a) is interpreted (wrongly) as providing the "terms" or "conditions" of Direct Loans, then subsection 1082(a)(2)'s anti-injunction bar applies and the Settlement is illegal.   The Department does not attempt to defend this Court's main reason

---

[3] The Department again cites *Weingarten v. DeVos*, 468 F. Supp. 3d 322, 328 (D.D.C. 2020), but fails to mention that the cited page merely provides a recitation of an allegation in a complaint.

[4] Mem. from Principal Deputy Gen. Counsel, U.S. Dep't of Educ. to Sec'y of Educ. at 4 & n.3 (Jan. 12, 2021).

1    for rejecting this conclusion (i.e., that an agency's consent can create federal jurisdiction ) and

2    merely cites the Court's "other" reasons.  Doc. 362 at 4.  The only other reason cited by this Court

3    was that "Plaintiffs have … maintained a viable theory … that the Secretary acted *ultra vires*."

4    Doc. 345 at 12.  But the anti-injunction provision does not have an exception for correcting *ultra*

5    *vires* acts; indeed, that is the *only* kind of injunction a court could issue because, if the Department

6    acted lawfully, there would be no need for an injunction.  *See Garland v. Aleman Gonzalez*, 142

7    S. Ct. 2057, 2067 (2022) (rejecting reading that "would make a court's jurisdiction to entertain a

8    request for … injunctive relief dependent upon the merits").

9         The Department (at 3) and Plaintiffs (at 24-25) insist that the *Nebraska*/*Brown* litigation

10   has no bearing here, but they sidestep Intervenors' argument.  The HEROES Act was enacted *after*

11   the HEA to provide limited authority to "waive or modify any statutory or regulatory provision

12   applicable to the student financial assistance programs under title IV of the *[Higher Education]*

13   *Act* ... as the Secretary deems necessary in connection with a ... national emergency."  20 U.S.C.

14   § 1098bb(a)(1) (emphasis added).  It makes no sense for Congress to have granted HEA waiver

15   authority in the HEROES Act if—as the Department contends here—it *already* had that authority

16   under the HEA.  The Department's reading here thus renders the HEROES Act superfluous.  And

17   if the Supreme Court rules that the HEROES Act—a specific enactment about waiver authority—

18   does not provide the power for *en masse* debt cancellation under the major-questions doctrine, that

19   holding will have an obvious bearing on whether the HEA's far narrower waiver provisions could

20   be read to grant such sweeping authority instead.  The opposing parties offer *no* response.[5]

21        As for the major-questions doctrine and authority for *en masse* debt cancellation, the

22   Department states (at 4) that Intervenors "rely[] primarily on the dollar amount at issue."  But as

23   already explained, Doc. 350 at 13, the critical point is that the Secretary "has identified no limit"

24   to his authority over all student debt in the country.  *See Ala. Ass'n of Realtors v. Dep't of Health*

25   *& Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).  In this particular settlement, that limitless claim to

---

26   [5]  Additionally, the Solicitor General defends the Department's claim to HEROES Act authority
27   based on provisions that supposedly exempt the Secretary from notice-and-comment requirements
     and from having to act only on a case-by-case basis.  Br. for United States at 6, 20, 36, *Biden v.*
28   *Nebraska*, Nos. 22-506 and 22-535 (Jan. 2023).  Section 1082(a)(6) contains no remotely similar
     provisions, further undermining the Department's claims here.

power is being applied to 400,000+ borrowers, millions of loans, and billions of dollars—but the Department's *theory* applies to *all* federal student loans, totaling more than a trillion dollars.  *See* Doc. 362 at 5 (government brief claiming that Settlement is "exercise of the Department's statutory authority to settle student loan debts" generally).  The Department ignores this point entirely.

### b.    *The Settlement Violates the APA.*

The Settlement also violates the APA.  <u>First</u>, the Settlement improperly establishes new rules for resolving BD claims outside of duly promulgated regulations.  The Department claims (at 5) this is a permissible exercise of "authority to settle student loan debts … under 20 U.S.C. § 1082(a)(6)."  But this was an APA case; the BD claims were never before this Court.  For the "automatic relief" subclass, that response just begs the question of whether subsection 1082(a)(6) authorizes *en masse* cancellation of Direct Loans.  For the "decision class" and "Post-Class Applicants," that response ignores that the Settlement does not "settle" student loans but creates new ways of adjudicating those claims that are contrary to regulatory requirements.  Indeed, the Department concedes the Settlement enshrines "provisions" that, "in significant respects, mirror" provisions of a *new* BD rule that will not be effective (if at all) until July 1, 2023.  Doc. 362 at 5 (citing 87 Fed. Reg. 65,904 (Nov. 1, 2022)).[6]

<u>Second</u>, the Department's entry into the Settlement is arbitrary and capricious.  Doc. 350 at 14-15.  As a legal matter, the Department argues (at 6) it can ignore the APA so long as it satisfies Rule 23(e)(2), but that is not the law.  APA compliance is an independent condition precedent to the Department's authority to enter any settlement.  *See Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013); *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008).  As a factual matter, the Department tries (at 6) to explain away its arbitrary action by claiming its prior findings were only "a preliminary conclusion based on partial evidence."  But the Department has provided no reasoned explanation for moving from a reasoned, original conclusion to its Settlement "determination" that a school engaged in "substantial misconduct"— a finding integral to the agency action enshrined in the Settlement.  And the more we learn about

---

[6] The Settlement, which eviscerates rights granted to institutions in the 2016 and 2019 BD rules, does not, in fact, "mirror[]" the new rule, which is "not retroactive for institutions."  87 Fed. Reg. 65,904, 65,915.

the Department's process, the more arbitrary it appears.  Six months *after* lodging Exhibit C, the Department admitted that it cannot even readily identify which students went to which Exhibit C schools, suggesting that the Department failed to analyze each BD application associated with each school before rendering its blanket determination of misconduct.  *See* Doc. 360, Tr. at 17:3-21.

### 4.   *The Settlement Violates Due Process.*

The Department's response on due process (at 7) is essentially to reassure Intervenors that no harm can befall them from their federal regulator's "determin[ation]"—with no notice or opportunity to be heard—of "strong indicia of substantial misconduct."  Doc. 246 at 3.  That is plainly wrong.  As explained below, harm has already resulted, and more is likely to follow.  *See* Docs. 254-1, 254-2, 261-3; Declaration of Francis Giglio ISO Mot. to Stay ("Giglio Decl."); Declaration of Joseph Berardinelli ISO Mot. to Stay ("Berardinelli Decl."); *infra* at 9-13.

### B.   Intervenors Have Demonstrated Irreparable Harm Absent A Stay.

Effectuating the Settlement would make Intervenors' harm irreparable.

<u>First</u>, Plaintiffs and the Department cannot deny that the Settlement would extinguish Intervenors' rights in pending BD adjudications.  Regardless of when the underlying loans were disbursed, schools have a right to receive notice of BD applications, a right to submit evidence in the factfinding process that forms the administrative record, and a right to a reasoned decision.  *See* 34 C.F.R. §§ 685.206(e)(10), .222(e)(3)(i), .206(c)(1)-(2).  These rights help ensure reasoned decisionmaking, which requires that agencies not ignore important aspects of a problem or evidence that runs counter to the agency's decision.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).  Plaintiffs counter (at 5) that Intervenors lack notice rights for loans disbursed before 2016, but Plaintiffs cite no authority for their view, which plainly misreads the regulation.  Regardless, even if the Settlement extinguishes schools' rights for some (but not all) loans, that is sufficient injury.

Plaintiffs argue (at 5) that only borrowers are entitled to "a reasoned explanation of a denial," but the regulations again say otherwise.  After considering "all applicable evidence"—including evidence provided by the school—the Department must "issu[e] a written decision … [n]otifying the borrower *and the school*" of the BD decision and "the reasons for the decision."

34 C.F.R. § 685.206(e)(11)-(12) (emphasis added).  Indeed, the Department has underscored the importance of "afford[ing] institutions the opportunity to respond … *during the adjudication process for the borrower's claim*."  84 Fed. Reg. 49,788, 49,825 (Sept. 23, 2019) (emphasis added).  Those rights "reduce the likelihood that … schools will be burdened by unjustified claims" at the threshold.  *Id.*  Effectuating the Settlement would irreparably extinguish those rights.

The Department, for its part, does not dispute schools' notice and response rights, and instead argues (at 7) that "full settlement relief" does not "constitute" decisions on the BD applications at all.  But the Department undercuts its position by *still* refusing to rule out a "hypothetical recoupment proceeding" (or other retaliatory action) against listed schools.  Doc. 362 at 7.  By reserving those threats—notwithstanding the Miller Declaration, Doc. 288-1—the Department makes clear its view that they remain an option if the Settlement takes effect.

Second, effectuating the Settlement also would inflict irreparable reputational harm on Intervenors.  Intervenors were non-parties to this APA case, yet they were named in the Settlement and determined to have engaged in misconduct by their federal regulator.  Plaintiffs and the government then aggressively promoted the Settlement to solicit more BD claims.  Giglio Decl. ¶ 6.  In appealing, Intervenors seek to remove themselves from the judgment, restore their rights to a fair and lawful BD process, and, if necessary, nullify an unlawful Settlement.  But Plaintiffs and the Department are rushing to make the settlement a *fait accompli*.  *See* Doc. 360, Tr. at 5:21-23; 6:2-6.  The harm to Intervenors (and the judicial process) from effectuating the judgment during appeal is obvious, palpable, and irreparable.

Unable to deny that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm," *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), Plaintiffs (at 4) and the Department (at 9) quibble with the sufficiency of Intervenors' showing.  Their arguments both misstate the standard for irreparable harm and ignore Intervenors' evidence of harm.  The standard is not an "existential threat" to business.  Doc. 361 at 8.  Rather, irreparable harm exists when denying a stay could "significantly contribut[e]" to Intervenors' injuries, *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013), and Intervenors "need not demonstrate that [their] total business will be

destroyed" absent a stay, *Hendricks Music Co. v. Steinway, Inc.*, 689 F. Supp. 1501, 1512 (N.D. Ill. 1988).  "[A] loss of goodwill" or "a need to start over again on building personal relationships" can suffice.  *Biomet 3i, LLC v. Land*, 2017 WL 1174064, at *5 (N.D. Ind. Mar. 30, 2017).

Intervenors have easily met that standard.  The record shows that the Department and Plaintiffs are touting Exhibit C as a list of "predatory" schools that have "cheated" their students, Doc. 325-4 at 5; Giglio Decl. ¶¶ 4, 6; members of the public understand Exhibit C as the Department's list of "predatory schools," Giglio Decl. ¶ 4; activists are using Exhibit C to oppose listed schools' continuing existence, Doc. 350-1 Exs. 1-2; and even no-admission, no-finding settlements have long-term regulatory consequences in this fraught sector, Doc. 326-1 ¶ 2.  Each appealing Intervenor is experiencing these harms.

Being "determine[d]" and advertised as a presumptive wrongdoer by one's primary federal regulator inflicts an obvious stigma, and the reputational and regulatory harms to schools are already materializing.  *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (finding harm irreparable where it was "self-evident" that company's "reputation and good will in the news industry" would be harmed).  Such harms can manifest over time in subtle ways, as when community or business partners quietly discontinue their relationships with schools, prospective students look elsewhere for their educations, or employers distance themselves from a school's graduates.  As one example, six months after Exhibit C was released, Lincoln was denied an opportunity to speak with a class at Centennial High School in Nevada specifically because "Lincoln Tech is on the U.S. Department of Ed's list of predatory schools."  Giglio Decl. ¶ 4.  *See also* Berardinelli Decl. ¶ 13 (explaining that financial partners have altered lending patterns because of Settlement).  These harms are real, even if all of their manifestations are not immediately apparent.  That is why, contrary to Plaintiffs' assertions (at 6), courts routinely recognize such "self-evident" harms as irreparable.  *Reuters*, 903 F.2d at 908; *see also Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 4187982, at *5 (C.D. Cal. Aug. 22, 2014) (finding irreparable harm where it was "self-evident that the assertion that a company sells inferior products would have the tendency to diminish the company's goodwill among customers").

These harms are not "marginal."  Doc. 362 at 11.  Effectuating the Settlement would cause

1   immediate discharges and refunds for borrowers whose BD claims have received no review and,

2   in some cases, bear indicia of material error or worse.  For example, Plaintiffs continue to cite (at

3   9 n.5) a "group" BD application against Lincoln by a state regulator, but at least 12% of individuals

4   in that group had *no* Title IV loans for attending Lincoln.  Doc. 326-1 ¶ 5.  These errors are a

5   byproduct of the Department's admitted decision not to identify "which borrowers" had applied

6   for BD relief until *after* it completed Exhibit C.  Doc. 363 ¶ 6 (Garry Decl.).  If the judgment takes

7   effect, the Department's inflated BD numbers will be irreparably attributed to Intervenors, and the

8   publicity campaign against Exhibit C schools will only intensify.

9       Plaintiffs attempt (at 8-9 n.5) to rationalize the Department's actions by reciting unproven

10  allegations that, they contend, should substitute for an administrative record to justify Exhibit C.

11  But it is well-settled that agency action "cannot be upheld unless the grounds upon which the

12  agency acted in exercising its powers were those upon which its actions can be sustained." *SEC*

13  *v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  Here, the only evidence the Department has identified

14  *refutes* any finding of wrongdoing by Intervenors.  Doc. 350 at 15.  Effectuating the Settlement

15  would give concrete effect to the Department's arbitrary and unlawful action.

16      Finally, permitting the Settlement to take effect would trigger a number of steps that would

17  likely prove difficult to unwind.  The Department has said it will immediately "email about 36,000

18  borrowers" about re-opening their cases, and "start sending lists to servicers so that those servicers

19  could start performing discharges" for "about 99-percent of borrowers in Exhibit C."  Doc. 360,

20  Tr. at 5:21-23; 6:2-6.  The settling parties will then argue that the Settlement is a *fait accompli* and

21  no longer justiciable; that it is infeasible to reverse what has been done; and that any attempt to do

22  so will cause confusion and more hardship.  Injecting these issues into the case before appellate

23  review can occur irreparably harms Intervenors and disserves the Ninth Circuit's appellate

24  jurisdiction.  *See, e.g.*, *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("evident"

25  irreparable harm where denying stay pending appeal would lead to appeal becoming moot);

26  *Mountain Paradise Vill., Inc. v. Fed. Nat'l Mortg. Ass'n*, 2013 WL 5637931, at *2 (D. Nev. Oct.

27  15, 2013) (similar).  Ultimately, the settling parties do not deny that this is their tactic, and it is

28  confirmed by the Department's rush to discharge virtually all loans associated with Exhibit C

schools on the day the Settlement takes effect.  Doc. 360, Tr. at 18:2-3.[7]

Independently, the Department's efforts to implement the Settlement create "bureaucratic momentum" that would skew future agency decisions on BD claims.  If the Ninth Circuit reverses after the Department discharges pending BD applications, the Department will be required to re-decide each BD application, and the prior discharges and refunds will skew its new decisions toward the original discharges.  The Department acknowledges that well-recognized harm (at 8), but the Department's proposed solution—"judicial review" of the new decisions—is no answer.  The same illusory "solution" was present in the many cases finding irreparable harm due to "bureaucratic momentum."  *See* Doc. 350 at 20 (citing cases); *see also, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002); *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989).

### C.   A Stay Will Not Impose Irreparable Harm.

A stay pending appeal—especially if limited to Intervenors—would not irreparably harm Plaintiffs.  In arguing otherwise, Plaintiffs obscure several mitigating factors and focus on asserted harm to borrowers who attended *other* schools.  That is not sufficient harm to deny a stay.

First, no class member is currently paying or accruing interest on any of the covered federal student loans.  Nor will that happen during any appeal.  The Settlement provides that class members' loans "will remain in forbearance or stopped collection status" until there is Full Settlement Relief.  Doc. 246-1, § IV.C.7.  On top of this, there has been a national policy of forbearance on federal student loan payments and zero interest for the last three years.  The Administration recently confirmed that this policy will "continue after the formal end of the national emergency" for COVID-19.  Townsend 2d Decl. Ex. A.  Many class members also could receive loan cancellation from the other Biden debt-cancellation plan.  Doc. 326-1 ¶¶ 6-10.

Second, Plaintiffs' assertions of harm during appellate review ring hollow in view of their own delay in 2021 and 2022 while seeking (unsuccessfully) to depose the former Secretary of Education.  *See In re Subpoena.*, No. 21-mc-80075 (N.D. Cal.); *In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022).  That 17-month delay was unnecessary in any event, but doubly so in light of

---

[7] Intervenors do not concede that the judgment would be unreviewable even if loans are discharged, because they still would be harmed by inclusion on Exhibit C and the effects from extinguishing Intervenors' administrative defenses, among other harms.

the Settlement, which bears no resemblance to any issues actually litigated.  Plaintiffs should not now be heard to complain that any appellate delay irreparably harms the class.

Third, Plaintiffs have not shown that a stay could harm borrowers who attended one of Intervenors' schools.  Plaintiffs submitted no declarations from ANU students, one for Lincoln, Doc. 361-1 at 89 (Keith Lapsker), and two for ECI, *id.* at 64 (Marlo Duffy), 158 (Tiffany Winder). Lincoln disputes that Mr. Lapsker attended Lincoln Tech.  Giglio Decl. ¶ 8.  These "self-serving," "conclus[ory]" declarations show the unreliability of this type of evidence.  *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  It also shows the unreliability of using unproven allegations to deem schools as wrongdoers.[8]

Finally, the settling parties suggest that maintaining the status quo inflicts irreparable harm given the growing backlog of BD claims, Doc. 361 at 17; Doc. 362 at 11, but nothing prevents the Department from continuing to decide BD claims lawfully while this case is appealed.  And the Department cannot reasonably complain when many of those backlogged claims were procured through the government's own advertising efforts.  Giglio Decl. ¶ 6.  Plaintiffs argue (at 18) that the status quo is an already-effective Settlement, but Plaintiffs' interpretation of the Settlement is wrong.  *See supra* at 2-3.  In any event, the Settlement's effectiveness has been stayed since January 26.  Doc. 360, Tr. at 18:6-8.  Plainly, the status quo is that discharges have not occurred.

### D.   The Public Interest Favors A Stay Pending Appeal.

It can hardly be doubted that the judgment is a jurisprudential milestone that implicates significant questions.  It deserves appellate review.  Contrary to the Department's assertions (at 12), "[t]he public interest is served in preserving the integrity of the right to appellate review." *Toomey v. Arizona*, 2021 WL 4915370, at *3 (D. Ariz. Oct. 21, 2021).  The Ninth Circuit should be permitted to review this important case without fear of injecting new harms into the case.  As explained above, the Supreme Court is also poised to issue significant guidance on the Secretary

---

[8] It bears repeating that Plaintiffs and the Department can mitigate any harm to the class by agreeing to eliminate the three Intervenors from Exhibit C and to afford them a lawful adjudication of any BD claims.  Intervenors have repeatedly stated they would withdraw their objections and dismiss their appeals if these basic legal rights are observed, leaving the parties to effectuate the Settlement for the rest of the massive class.  The Department now acknowledges that such tailored relief is feasible.  *See* Doc. 363 ¶¶ 9-10.  Plaintiffs and the Department simply choose not to offer it.

of Education's student-loan cancellation authority, *supra* at 7, and awaiting that guidance would serve "the public's interest in judicial economy." *Bluetooth SIG, Inc. v. FCA US LLC*, 2022 WL 789480, at *2 (W.D. Wash. Feb. 24, 2022).

Plaintiffs and the Department fault Intervenors for seeking a stay "at the tail end of the 60-day window to appeal," Doc. 362 at 12, but Intervenors were timely. Filing timely appeals from a final judgment and moving for a stay pending appeal is not a "strategy" to disrupt "'the orderly administration of justice.'" *Id.* at 11-12. Rather, Plaintiffs and the Department are jumping the gun. The Settlement delays the Effective Date during appeals, *see supra* at 2-3, and even when the Settlement becomes effective it contemplates a year-long process. *See* Doc. 246-1, § IV.A.1. Knowing that Intervenors might appeal, the Department planned to take irreversible steps *one business day* after the putative Effective Date. Doc. 360, Tr. at 5:21-23; 6:2-6. If those plans were disrupted because Intervenors timely exercised their rights, the Department has only itself to blame. Indeed, much of the Department's frustration stems from its decision to compile files without differentiating among Exhibit C schools, but this too is a problem of the Department's own making. Doc. 360, Tr. at 17:7. The Department now admits it *can* identify claims tied to Intervenors while providing discharges to students from other schools. Doc. 363 ¶¶ 9-10. Thus, staying the judgment as to Intervenors would work no prejudice to the settling parties or judicial administration.

## III.   CONCLUSION

Intervenors respectfully ask that the Court grant their motion to stay the judgment pending appeal, or, in the alternative, to stay the judgment as to Intervenors.

Dated: February 3, 2023                     Respectfully submitted,


s/ *James L. Zelenay, Jr.*                  s/ *Jesse Panuccio*
James L. Zelenay, Jr.                       Jesse Panuccio (*pro hac vice*)
jzelenay@gibsondunn.com                     jpanuccio@bsfllp.com
**GIBSON, DUNN & CRUTCHER LLP**             Jason Hilborn (*pro hac vice*)
333 South Grand Avenue                      jhilborn@bsfllp.com
Los Angeles, CA 90071                       **BOIES SCHILLER FLEXNER LLP**
T: (213) 229-7449                           401 E. Las Olas Blvd., Ste. 1200
                                            Fort Lauderdale, FL  33301
Lucas Townsend (*pro hac vice*)             T: (954) 356-0011
ltownsend@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**             John J. Kucera
1050 Connecticut Ave., NW                   jkucera@bsfllp.com
Washington, DC  20530                       **BOIES SCHILLER FLEXNER LLP**
T: (202) 887-3731                           725 S. Figueroa St., 31st Fl.
                                            Los Angeles, CA 90017
                                            T: (213) 692-9040


s/ *John S. Moran*
John S. Moran (*pro hac vice*)
jmoran@mcguirewoods.com
**MCGUIREWOODS LLP**
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
T: (202) 828-2817

Piper A. Waldron (SBN 291482)
pwaldron@mcguirewoods.com
**MCGUIREWOODS LLP**
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
T: (310) 315-8250