1
2
3
4
5
6          UNITED STATES DISTRICT COURT
7
8          NORTHERN DISTRICT OF CALIFORNIA
9
10   THERESA SWEET, et al.,
11          Plaintiffs,                    No.  C 19-03674 WHA
12          v.
13   MIGUEL CARDONA, et al.,               **ORDER RE MOTION TO STAY**
                                            **JUDGMENT PENDING APPEAL**
14          Defendants.
15
16                    **INTRODUCTION**
17        On November 16, 2022, a settlement between the United States Secretary of Education
18   and a class of student-loan borrowers received final approval.  The entry of final judgment
19   started a 60-day clock to appeal.  Of roughly half a million class members, none appealed the
20   final approval order.  But on day 58, three intervenor schools did.  They now move this district
21   court for a stay pending appeal.  Specifically, they move to stay the entire judgment or, in the
22   alternative, the judgment as to them.
23        Recall this settlement is independent from the more far-reaching loan forgiveness
24   initiative under review by the Supreme Court.  And notwithstanding the broad relief that this
25   settlement provides, the instant motion turns on a narrow question:  have these three intervenor
26   schools shown that they are likely to succeed on the merits of their appeals and suffer
27   irreparable harm absent a stay?  This order concludes that they have not.
28

For the following reasons, the motion to stay judgment pending appeal is **DENIED**. To the extent stated below, this order temporarily stays judgment with respect to discharges and discharge requests for loans associated with the three intervenor schools to allow the three intervenor schools to present a stay motion to our court of appeals.

**STATEMENT**

The final approval order described the factual background and procedural history at length. *See Sweet v. Cardona*, 2022 WL 16966513, at *1–4 (N.D. Cal. Nov. 16, 2022). Here, they will be sketched in broader strokes and supplemented with the latest developments.

**1.    FROM "FLOOD OF CLAIMS" TO FINAL APPROVAL.**

In 1994, the Secretary of Education established the first "borrower defense" program for federal student loans, allowing a borrower to "assert as a defense against repayment[] any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994); *see also* 60 Fed. Reg. 37,768 (July 21, 1995).

Twenty years passed in which the borrower-defense regulations largely lay dormant (AR 590). But after the collapse of one of the nation's largest for-profit college chains in 2015, the Department of Education faced a "flood of borrower defense claims." 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). The agency updated its regulations to expedite application processing and created a "Borrower Defense Unit" to address the backlog. 81 Fed. Reg. 75,926 (Nov. 1, 2016); (AR 341). Yet thousands more applications poured in, including from borrowers who attended other schools, and the backlog persisted (AR 339–41).

In 2017, a new Secretary paused claim adjudications to review the borrower-defense procedures and then stopped conducting claim adjudications entirely (AR 502–03). For eighteen months, well into this suit, she issued zero decisions (AR 350). As of June 2019, borrowers had filed 272,721 total applications, 210,168 of which remained pending (AR 399–400). Named plaintiffs filed this action to require the Secretary to carry out her statutory duty to adjudicate borrower-defense applications.

United States District Court
Northern District of California

After the certification of a Rule 23(b)(2) class and the filing of cross-motions for summary judgment, plaintiffs (a class of borrowers) and defendants (the Secretary and the Department) ostensibly reached a settlement and moved for preliminary approval.  That settlement received preliminary approval in May 2020 but failed to receive final approval four months later once it became known that there was, in fact, no meeting of the minds; unbeknownst to the class and the undersigned, the Secretary had adopted a practice of sending form-denial notices to borrowers.  Following a trip to our court of appeals to clarify permissible discovery and the filing of new cross-motions for summary judgment, plaintiffs and defendants reached the instant settlement and again moved for preliminary approval.  This settlement received preliminary approval in August 2022 and final approval that November (Dkt. No. 246-1).

In brief, the settlement agreement sorts class members into three groups.  For group one (approximately 200,000 borrowers), it provides for "full," "automatic" relief, *i.e.*, discharge of federal loans, cash refunds of amounts paid to the Department, and credit repair.  This relief goes to class members who attended one of the 151 schools listed in Exhibit C to the agreement.  As explained in the joint motion for final approval, "certain indicia of misconduct by the listed schools, including the high volume of Class Members with applications related to the listed schools, led the Department to conclude that these Class Members were entitled to summary settlement relief without any further time-consuming individualized review process" (Dkt. No. 323 at 11).

Meanwhile, for groups two and three, the agreement provides for streamlined borrower-defense application adjudication.  Specifically, for group two (approximately 64,000 borrowers), it provides for decisions within specified periods of time correlated to how long the applications have been pending, with certain presumptions in favor of the borrower.  And for group three (those who submitted applications after the execution of the settlement but before final approval, approximately 206,000 borrowers), it provides for decisions within three years of final approval without such presumptions.  If the Secretary does not render decisions

on applications for borrowers in groups two and three within the periods of time set out in the agreement, those borrowers receive full, automatic relief like borrowers in group one.

At the preliminary approval stage, four schools moved to intervene to oppose the settlement:  American National University (ANU), the Chicago School of Professional Psychology (CSPP), Everglades College, Inc. (Everglades), and Lincoln Educational Services Corporation (Lincoln).  These schools took issue with their inclusion on Exhibit C, which they labeled a "scarlet letter."  An order found the schools could not intervene as of right but could permissively intervene to object to the settlement.  When plaintiffs and defendants moved for final approval, each intervenor school filed an opposition, which the final approval order discussed in detail.  The settlement received final approval on November 16, 2022, and the entry of final judgment that day started a 60-day clock to appeal the final approval order.[1]

### 2.    THE LATEST DEVELOPMENTS.

Fifty-eight days later, on January 13, 2023, three of the four intervenor schools noticed appeals and jointly moved this district court to stay judgment pending the resolution of their appeals.[2]  In their motion, ANU, Everglades, and Lincoln explained that they filed "[i]n an abundance of caution," convinced the settlement agreement "itself is best read to delay the Effective Date during an appeal or until the final judgment is not subject to any further review" (Br. 1–2) (internal quotation and citation omitted).  Movants requested a stay of the entire judgment or, in the alternative, a stay of the judgment only as to movants, recognizing they "represent only a miniscule fraction of the claims included in the class" and "do not wish to prevent a legitimate settlement of this case or prevent granting of meritorious [borrower-defense] applications" (Br. 25).  All parties were subsequently notified that the impact of the

---

[1] Because the United States is a party to this litigation, the original deadline to file a notice of appeal was sixty days after the entry of final judgment. Fed. R. App. P. 4(a)(1)(B).  Sixty days after November 16, 2022, was January 15, 2023.  That day, however, fell on a Sunday, and the following Monday was Martin Luther King Day.  Thus, had the three intervenor schools not extended the deadline by noticing appeals, the original deadline would have been January 17, 2023.  Fed. R. App. P. 4(a)(3).

[2] CSPP neither noticed an appeal nor joined the motion to stay.

United States District Court
Northern District of California

stay motion and its pendency on the settlement would be discussed at a status conference set for January 26, 2023.

At the status conference, fireworks erupted.  After explaining that plaintiffs and defendants disputed movants' reading of the Effective Date — which they believed was actually two days away, on January 28, 2023 — counsel revealed that the Department planned to undertake "immediate actions" the following business day, on January 30, 2023 (Tr. 5). These immediate actions included "sending lists to servicers so that those servicers could start performing discharges, and that would include about 99-percent of borrowers in Exhibit C," with the expectation that some servicers would discharge loans "within that week" (Tr. 6, 9). The Department also planned to email "borrowers, including substantially all Exhibit C borrowers, letting them know about settlement relief," email "borrowers notifying them that the denials had been rescinded and their cases had been reopened," "update its own internal tracking system to reflect . . . [that those borrowers'] status had been changed," and "begin the adjudication process for reopening cases" (Tr. 5–6).  According to the defendants, "the Department really need[ed] all the time that[] [was] allowed under the settlement to fully satisfy its obligations" (Tr. 6).  Movants asked, "at the very least[,] that the Court implement an administrative stay through its decision on the underlying stay motion" (Tr. 15).

Seeking to balance fairness to plaintiffs and defendants in maintaining the settlement's momentum with fairness to movants in allowing them an opportunity to be heard, the undersigned proposed delaying loan discharges and discharge requests for borrowers who attended movants' schools until the stay motion could be heard and ruled upon.  But counsel for defendants explained that the Department could not, at that time, separate out discharge requests for borrowers who attended movants' schools.[3]  In light of this disclosure, the undersigned ordered that no discharge requests be sent and no loans be discharged until a hearing took place and an order on the stay motion issued.  That hearing occurred on February 15, 2023.  This order follows full briefing and oral argument.

---

[3] Defendants have since filed declarations describing changes made to facilitate separating out these requests (Dkt. Nos. 363, 376).

Before proceeding, it is important to reiterate that this order does not involve President Biden's plan to forgive student debt under review by the Supreme Court. *See Biden v. Nebraska*, No. 22-506; *Dep't of Educ. v. Brown*, No. 22-535. Rather, it involves approval of a discrete settlement involving a group of borrowers who filed borrower-defense applications. And this discrete settlement is based on a separate policy, enacted under a separate legal authority, designed to serve different purposes under different circumstances. *See Sweet*, 2022 WL 16966513, at *4–7.

## ANALYSIS

It is well-established that a "stay is not a matter of right" but "an exercise of judicial discretion." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and the "propriety" of the stay "is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009); *Virginian Ry. Co.*, 272 U.S. at 672–73.

In ruling on a motion to stay pending appeal, a district court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). Under our court of appeals' "sliding scale" approach, a stronger showing of one factor may offset a weaker showing of another. *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011). But the Supreme Court has made clear that the "most critical" factors are the first two; once they are satisfied, the third and fourth factors are considered. *Nken*, 556 U.S. at 434–35.

### 1.    EFFECTIVE DATE OF THE SETTLEMENT: JANUARY 28, 2023.

Prior to considering the stay factors, however, this order must address a threshold question raised by the motion: whether the settlement is now in effect. Movants maintain that the settlement "provides for a self-executing stay pending appeal" (Reply Br. 2). Accordingly, "[i]f the Court recognizes that the Settlement cannot take effect until appeals are resolved, the

United States District Court
Northern District of California

Court need not consider equitable stay relief" (*ibid.*).  The implication seems to be that if there is no settlement in effect, there is no reason to stay judgment.  Movants base their arguments on interrelated provisions in the settlement agreement:  Sections II.K and XIII.A.

### A.  SECTION II.K.

Section II.K defines Effective Date based on two potential events:

> the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement, entered by the Court in the form attached hereto as Exhibit B, becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal.

(Dkt. No. 246-1 § II.K).  Movants assert that the first potential event, final judgment "becom[ing] non-appealable," has not occurred because final judgment "*has been appealed*" (Reply Br. 2 (emphasis in original); *see* Br. 22).  Meanwhile, acknowledging that the second potential event, "the date of final resolution of said appeal," anticipates "appeal by a Class Member," movants declare that this language is best read to cover their appeals as well because it was "written prior to intervention" (Br. 20).  Walking this back a bit, they add that even if this language does not cover their appeals, it establishes that the settling parties agreed delaying the Effective Date would be necessary to prevent harm upon reversal (*ibid.*).

For their part, the settling parties reiterate that the Effective Date is January 28, 2023, pursuant to Section II.K.  Both read final judgment "becom[ing] non-appealable" as "the expiration of the time to appeal the District Court's final judgment" (Plaintiffs' Opp. 18; *see also* Defendants' Opp. 8).  As explained by plaintiffs, because movants timely noticed appeals on January 13, 2023, this extended the deadline for others to notice appeals fourteen days from that date under Federal Rule of Appellate Procedure 4(a)(3).  Thus, final judgment "bec[ame] non-appealable" the following day, January 28, 2023, and Section II.K's first potential event defined the Effective Date (Plaintiffs' Opp. 18 n.9).

Both settling parties vehemently contest movants' suggestion that the second potential event is applicable when no class member appealed the settlement.  According to defendants, "[n]othing in the settlement agreement contemplates delaying the [E]ffective [D]ate based on

United States District Court
Northern District of California

an appeal by a non-class member . . . [a]nd for good reason, as this litigation concerns the rights of borrowers and the harm that attends delay in resolving their borrower defense claims" (Defendants' Opp. 8). According to plaintiffs, "[t]he Settlement is not ambiguous; there is no need to turn to canons of construction to see that it intends for the Effective Date to be delayed only by a class member's appeal" (Plaintiffs' Opp. 18).

This order finds that the plain language of the settlement agreement supports the interpretation of its signatories. Movants conflate "the date upon which . . . Final Judgment approving this Agreement . . . becomes non-appealable" (§ II.K) and the date of "a non-appealable judgment" (Reply Br. 2). This is a paradigmatic distinction with a difference. Once movants noticed appeals on January 13, 2023, they extended the deadline for other parties to notice appeals fourteen days from that date, through January 27, 2023. Fed. R. App. P. 4(a)(3). Thus, final judgment "bec[ame] non-appealable" the next day, January 28, 2023. That is the Effective Date — a steady point of reference in a turbulent world.

True, Section II.K demonstrates the settling parties had agreed that delaying the Effective Date would be necessary to prevent harm upon reversal. As plaintiffs and defendants attest, however, this provision was drafted (and approved) with an eye to the harm that would befall *class members* eager to move on with their lives and without the threat of collection. For that reason, the settlement agreement allows for delaying the Effective Date "in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement."

This order will not read in "intervenor" or "school" where the settlement agreement clearly says "Class Member." Not only would this contravene the stated intent of the signatories — and brazenly violate some of the more widely accepted canons of construction — but it would unduly equate the (accepted) rights and harms of class members and (contested) rights and harms of movants that are implicated by the settlement. Movants are parties to this litigation, but they were not parties to this settlement agreement, which was carefully negotiated after years of heated litigation between the class of borrowers and the Secretary. The Court allowed movants to permissively intervene to oppose the agreement, but it will not entertain their attempts to re-write it.

8

### B.   SECTION XIII.A.

Movants also invoke Section XIII.A, which provides:  "This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review" (Dkt. No. 246-1 § XIII.A).  According to movants, this provision "powerfully confirms that the Effective Date is delayed until all appeals are resolved" (Reply Br. 2).  Defendants do not address this provision specifically, but plaintiffs counter that "[t]he plain, logical reading of the interaction between Section II.K and Section XIII.A is that the Settlement would not become effective if it were not finally approved" in a final approval order (Plaintiffs' Opp. 18 n.8).  Meanwhile, movants' "counter-textual interpretation would create the absurd result of rendering the Settlement Agreement void from the moment it was approved" (*ibid.*).

This order agrees with plaintiffs.  In the motion to stay, movants reason that "the Settlement is *void* altogether unless approved by a final order that is 'not subject to any further review'" (Br. 22) (emphasis in original).  By extension, movants suggest that the agreement is now void under Section XIII.A because their appeals reflect "it is not approved as written by a final Court order not subject to any further review."  Consequently, the Effective Date cannot be "the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement . . . becomes non-appealable" under Section II.K because the agreement *has* "been voided under Section XIII."  But if this agreement is now void, there can be no "self-executing stay pending appeal" because there can be no Effective Date to delay.  Indeed, there can be no approved settlement to appeal.  As counsel for Lincoln acknowledged at the status conference, "the agreement provides that if the agreement is void, the consequence of that is the parties resume litigating . . . as they were before the settlement agreement" (Tr. 13; *see* Dkt. No. 246-1 § XIV.A).

The undersigned is not convinced that plaintiffs and defendants negotiated a settlement that could conceivably lock them into settlement negotiation forever, sending them back to the drawing board with each noticed appeal irrespective of its merit.  Movants do not appear convinced either, as they equivocate in their reading of the term "void."  At the status conference, for example, counsel for Lincoln explained, "[w]e can't know whether the

9

agreement is void until the judgment is not subject to any further review" (Tr. 11). Yet if *this* is the case, and Section XIII.A delays the Effective Date indefinitely until all appeals are resolved, it short circuits Section II.K. That provision's two potential events for defining Effective Date would then only be evaluated "if this Agreement has not been voided under Section XIII," at which point the second potential event would always be superfluous. In the event of an unsuccessful class member appeal, "the date of final resolution of said appeal" and "the date upon which . . . the Final Judgment approving this Agreement . . . bec[ame] non-appealable" would invariably be identical. The settlement agreement cannot be read to create such redundancy.

In sum, this order concludes that the Effective Date of the settlement agreement is January 28, 2023. As such, the settlement is now in effect. The actions anticipated by the settlement that have yet to take effect — effecting loan discharges and sending discharge requests — are actions administratively stayed awaiting this order. Because there is no "self-executing stay pending appeal," this order turns to whether movants have carried their burden of showing that the circumstances warrant a stay of judgment based on the stay factors.

### 2. INADEQUATE SHOWING OF IRREPARABLE INJURY TO MOVANTS.

Whether movants will be irreparably injured absent a stay will be considered first. "[S]imply showing some possibility of irreparable injury fails to satisfy [this] factor." *Nken*, 556 U.S. at 434. "An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Nken*, 556 U.S. at 434). Thus, "[t]he minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Ibid.* (citing *Leiva-Perez*, 640 F.3d at 968). Accounting for all evidence on this record — even the new and tardy evidence plaintiffs sought to strike from movants' reply and attached declarations — movants do not make the minimum threshold showing here.

Their irreparable injury arguments fall into two categories: purported regulatory harm and purported reputational harm. (Conspicuously absent is purported financial harm: recall,

10

1    the settlement does not require any school to make any payment.)  These categories will be

2    taken up in turn.

3                    **A.    PURPORTED REGULATORY HARM.**

4          Starting with purported regulatory harm, movants argue that their rights enshrined in the

5    Department's borrower-defense regulations stand to be violated in effecting the settlement.

6    According to movants, the settlement "will eliminate an essential step of the administrative

7    process" because "[t]here will no longer be [borrower-defense] proceedings at the Department

8    in which the schools can participate to defend their reputations" and they "will also be denied a

9    reasoned decision on each [borrower-defense] claim" (Br. 18–19).  Thus, the "schools will

10   immediately be denied *their* right to an agency process defined by duly promulgated

11   regulations" (Br. 19) (emphasis in original).  But as plaintiffs and defendants explain, movants

12   seriously overstate their rights under the borrower-defense regulations, which are not even

13   implicated.

14         The final approval order summarized the regulations that govern a school's participation

15   in the borrower-defense administrative process.  *See Sweet*, 2022 WL 16966513, at *9; *see*

16   *also* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (new regulations effective July 2023).  Briefly here,

17   while carrying out fact-finding in review of a borrower-defense application, the Department

18   gives a school notice and an opportunity to file a responsive statement.  34 C.F.R.

19   §§ 685.222(a)(1), (a)(2), (e)(3)(i); 685.206(c)(2), (e)(8)–(12).  The school is not required to

20   respond, and only a borrower is entitled to a reasoned decision (upon *denial* of a borrower-

21   defense application).  *Id*. § 685.222(e)(4)(ii).  Upon approval of a borrower-defense

22   application, if the Department elects to initiate a proceeding against a school for recoupment of

23   an amount discharged, it gives this school a statement of facts and law, as well as an

24   opportunity to respond, request a hearing, and litigate the merits *de novo*.  *Id.* §§ 685.308(a)(3);

25   668.87(a)–(b).

26         As defendants point out, however, "[t]he settlement does not call for the Department to

27   adjudicate the borrower defense applications of the group of class members to which Exhibit C

28   applies, nor does the provision of full settlement relief to those class members constitute

                                            11

borrower defense decisions" (Defendants' Opp. 7).  In other words, the settlement does not call for the Department to adjudicate the borrower-defense applications of class members who attended movants' schools, nor does the provision of full settlement relief to these class members constitute decisions on their borrower-defense applications.  Accordingly, the relief provided to class members who attended movants' schools does not trigger the borrower-defense regulations.  Movants therefore cannot be deprived of any rights under the borrower-defense regulations through effecting the settlement.

Plaintiffs stress that "the Department has repeatedly stated that it will not seek to recoup any of the amounts discharged pursuant to the settlement" (Plaintiffs' Opp. 6) (emphasis omitted).  The reader should keep in mind, however, that the Department *cannot* recoup amounts discharged pursuant to the settlement from movants.  This is because the settlement does not call for the adjudication of borrower-defense applications of class members who attended movants' schools (as explained above).  Thus, "[t]he school's actions that gave rise to a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to § 685.206, § 685.214, § 685.216, or § 685.222" (the borrower-defense regulations) cannot be the predicate for the Department to initiate proceedings against movants for recoupment. 34 C.F.R. § 685.308(a)(3).  Under the settlement, the loans of class members who attended movants' schools are discharged pursuant to a separate authority.  *See Sweet*, 2022 WL 16966513, at *4–7.

Recoupment of amounts discharged pursuant to the settlement from movants is also foreclosed by the Miller Declaration.  As explained in the final approval order, the Department has "represented in the sworn declaration of Benjamin Miller that it does not consider inclusion on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could or would be considered in an action by the Department against a school.  The Court relied upon, and the Court expects the government to stand behind, the statements made in the Miller Declaration." *Id.* at *10 (citing Dkt. No. 288-1).  Because there can be no recoupment from movants pursuant to the settlement, there can be no deprivation of movants' rights in recoupment proceedings pursuant to the settlement.

To summarize, movants' rights under the borrower-defense regulations are simply not implicated by the settlement and the relief it provides to class members who attended movants' schools. Thus, movants do not suffer any regulatory harm — let alone irreparable regulatory harm — in the absence of a stay.

## B. *PURPORTED REPUTATIONAL HARM.*

Next, this order turns to purported reputational harm. In some instances, movants contend that they "are experiencing irreparable harm by being branded with the Exhibit C scarlet letter, and that harm will intensify after the Settlement's Effective Date" (Br. 18). In others, they claim that they "will suffer irreparable harm to their reputations, goodwill, and standing with regulators if the Settlement takes effect" (*id*. at 20). According to movants, "all schools on Exhibit C will immediately suffer the stigma of having all [borrower-defense] claims against them summarily granted — without any administrative process, judicial fact-finding, or reasoned decision on the merits" (*id*. at 19). They aver that "this unproven stigma will carry the imprimatur of both the Department and the final judgment of a federal court that deemed the Department's finding fair and reasonable," and "[i]t will be impossible to fully reverse that stigma after class members receive their promised relief" (*ibid*.). Plaintiffs and defendants respond, *inter alia*, that movants fail to offer satisfactory evidence of any reputational injury likely to befall movants as a result of the settlement that a stay would allow movants to avoid (Plaintiffs' Opp. 6–8; Defendants' Opp. 9–10). This proves to be the silver dagger to the "scarlet letter."

At the outset, to the extent that movants argue they "*are* experiencing irreparable harm by being branded with the Exhibit C scarlet letter" (back in June 2022), they cut off their noses to spite their faces (Br. 18) (emphasis added). Recall, "[a]n applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado*, 952 F.3d at 1007 (citing *Nken*, 556 U.S. at 434). If the reputational injury experienced by movants is already irreparable, it is unclear why a stay would be necessary to avoid irreparable injury pending appeal. As movants recognize, the harm inquiry requires consideration of "the significance of the change from the status quo

which would arise in the absence of a stay" (Br. 18 (quoting *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 206 (D.D.C. 2017) (Judge Rudolph Contreras)). According to movants' theory of harm here, however, in the absence of a stay, there would be no change from the status quo. Exhibit C would continue to "brand" them, either indefinitely or until our court of appeals reverses or vacates judgment. Put simply, issuing a stay would have no effect.

But to the extent that movants argue they "*will* suffer irreparable harm to their reputations, good will, and standing with regulators if the Settlement takes effect," their showing is weak (Br. 20) (emphasis added). Movants were on notice they would have to make this showing here. In their stay motion, they cite the correct legal standard and entitle a section "Intervenors Will Suffer Irreparable Harm Absent a Stay" (*id*. at 2, 18–22). What's more, the final approval order expressly cautioned that "intervenors' speculative assertions of harm fail to render the settlement unfair, especially in light of the significant benefits to both the class and the Department in settling this litigation." *Sweet*, 2022 WL 16966513, at *10. Two months after that order issued — and more than seven months after the settlement and Exhibit C were made public — movants' assertions of reputational harm remain markedly speculative, "grounded in platitudes rather than evidence." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

### (i)      *Evidence Presented with the Motion.*

In support of the reputational harm arguments made in their stay motion, movants cite a report from a students' rights advocacy group, the National Student Legal Defense Network, that has purportedly "leveraged Lincoln's mere inclusion on Exhibit C to pressure and criticize the Department for recently renewing its Program Participation Agreement [(PPA)] with Lincoln College of Technology," an agreement that is necessary for receipt of Title IV funding (Br. 21 (citing Townsend Decl. Exh. 1)). The report is attached to the motion in an attorney declaration, along with an article from the publication *Higher Ed Dive* describing this report (Townsend Decl. Exh. 2). Neither the report nor the article supports a showing of irreparable reputational harm to movants that a stay would counteract.

14

The National Student Legal Defense Network report explains that "[i]n recent months, the Department has affirmatively granted new PPAs to numerous for-profit colleges with a history of law enforcement activity and consumer fraud abuses," and "[t]his includes schools that the Department itself has determined to have 'strong indicia' of having engaged in 'substantial misconduct' that had either been 'credibly alleged' or 'proven'" (Townsend Decl. Exh. 1 at 2).  As defendants observe, movants make no effort to explain why, in light of this "history of law enforcement activity and consumer fraud abuses," any reputational harm experienced by Lincoln that is reflected in or compounded by the report is attributable to Exhibit C (Defendants' Opp. 9 n.3).  In fact, the heading for the section in the report discussing Lincoln is titled, "The Department Awarded a New Contract to Lincoln Tech After *Massachusetts Attorney General* Maura Healey Issued a Civil Investigatory Demand and while the *MA AG Borrower Defense Claim* on Behalf of Lincoln Tech Students Remains Pending at [the Department]" (Townsend Decl. Exh. 1 at 2) (emphasis added).

This section recounts a series of enforcement activities involving Lincoln:

> In July 2015, the Massachusetts Attorney General ("MA AG") entered a consent judgment with Lincoln Tech and Lincoln Educational Services (collectively "Lincoln") to resolve allegations that the school violated state consumer protection law regarding its enrollment, disclosure, admissions, and educational practices. Lincoln agreed to pay $850,000 and forgive $165,000 in student debt to resolve an investigation into the disclosure and reporting of job placement data for a single program of study at two Lincoln Tech campuses in Massachusetts.  In January 2016, the MA AG sent a letter to the Department of Education seeking a discharge of debt for affected students.

> In the meantime, Lincoln has been the subject of numerous law enforcement inquiries.  In September 2021, the Department's Inspector General determined that Lincoln failed to follow federal requirements associated with COVID-19 emergency relief programs.  In December 2021, the school received a letter from the Consumer Financial Protection Bureau ("CFPB") stating that the CFPB was requesting information and assessing conduct regarding the school's "extensions of credit" to its students.  That same month, the Department cited Lincoln for "untimely refunds," demanding that Lincoln provide a financial surety to the Department.  On June 7, 2022, the MA AG issued a new civil investigative demand to investigate consumer misconduct "in connection with their policies regarding fee refunds and associated disclosures to students and prospective students."  Lincoln reports to be "cooperating" with the MA AG investigation.

United States District Court
Northern District of California

(*id.* at 2–3) (footnotes omitted).  It is only after a survey of "numerous law enforcement inquiries" that the report matter-of-factly states:  "Meanwhile, as noted above, in 2022, the Department included Lincoln on its list of schools with a 'strong indicia' of having engaged in 'substantial misconduct' that had either been 'credibly alleged' or 'proven'" (*id.* at 3).  The relationship between alleged stigma and approved settlement is thereby strained.  Perhaps this report could support a showing of stigma afflicting Lincoln, but it does not support a showing of stigma *likely deriving from Exhibit C* or a showing of stigma *that a stay would likely offset*.  Lincoln seems to make a scapegoat of the settlement here.

The article from *Higher Ed Dive* also discusses law enforcement inquiries (*see* Townsend Decl. Exh. 2 at 1 ("The U.S. Department of Education is allowing several for-profit colleges to continue accessing federal financial aid even though they're facing scrutiny from state attorneys general and their accreditors, according to a new report from the National Student Legal Defense Network.")).  And it offers an even-handed summary of Exhibit C, going so far as to observe that "some institutions on the list have objected to the idea that the settlement proves wrongdoing on their behalf" and "[a] federal judge who approved the settlement wrote that the list of 151 colleges does not brand them with 'an impermissible scarlet letter'" (*id.* at 2).  Lincoln even provided a statement for the article:  "We believe the report strongly mischaracterizes the issues and does not properly reflect the respective outcomes" (*id.* at 3).  Again, in light of the "scrutiny from state attorneys general and their accreditors," the asserted connection between stigma and settlement is too attenuated.  Using this article, movants have not shown that Exhibit C will cause them any reputational injury.  Indeed, the very issuance of a PPA to Lincoln and other schools listed on Exhibit C powerfully signals that the Department sees no stigma arising from Exhibit C.

Based on the evidence presented with their motion, movants have not shown that a stay would avoid any reputational injury to them, let alone irreparable reputational injury.[4]

---

[4] Elsewhere, movants cite a public statement by plaintiffs' counsel, about schools that "cheated" students, as a direct consequence of Exhibit C that caused movants harm (Br. 21 (citing Dkt. No. 325-4 at 5)).  Counsel's statement did not mention Exhibit C or any school on Exhibit C, so the statement cannot be read that way.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

(ii)     *Evidence Presented with the Reply.*

Tellingly, movants raise new evidence in their reply, drawing from new declarations (Reply Br. 9–13).  They cite Lincoln executive Francis Giglio's declaration for the illustrative example that "six months after Exhibit C was released, Lincoln was denied an opportunity to speak with a class at Centennial High School in Nevada specifically because 'Lincoln Tech is on the U.S. Department of Ed's list of predatory schools'" (Reply Br. 11 (citing Giglio Decl. ¶ 4)).  For his part, Mr. Giglio cites and attaches a post on the Federal Trade Commission's website that he alleges "expressly equates inclusion on Exhibit C with deceptive practices," and he describes harm to Lincoln flowing from disclosure of this litigation as a material risk in securities filings with the Securities Exchange Commission (Giglio Decl. ¶¶ 6, 9).  Meanwhile, movants rely on Everglades executive Joseph Berardinelli's declaration for its proposition that "[s]ome lenders have expressed concern and begun inquiring about the Settlement as part of their due diligence, which has (1) required [Everglades] to dedicate resources to addressing those questions and concerns, (2) delayed and/or increased the cost of financing, and (3) caused in some instances, potential lenders not to provide financing" (Berardinelli Decl. ¶ 13; *see* Reply Br. 11).  Plaintiffs formally object to these excerpts and request they be struck from the record because they allegedly involve untimely evidence that should have been presented with the motion to stay (Dkt. No. 361).[5]

Generally, a district court declines to consider information and arguments presented for the first time in a reply.  Although it has discretion to consider new evidence presented in a reply, it generally exercises this discretion when "the new evidence appears to be a reasonable

---

[5] Plaintiffs also request leave to file a sur-reply in response to Mr. Giglio and Mr. Berardinelli's claims that their respective institutions were unable to locate records relating to three class members who filed declarations in support of plaintiffs' opposition and claimed to attend these institutions (Dkt. No. 366 (citing Giglio Decl. ¶ 8; Berardinelli Decl. ¶ 9)).  Plaintiffs seek to attach supplemental declarations from these class members that explain why the claims in the Giglio and Berardinelli Declarations were inaccurate and/or incomplete:  two class members who attended Keiser University (owned by Everglades) changed their names after marriage, and one class member attended a school that was later acquired by Lincoln (the New England Institute of Technology).  Recognizing that movants do not object to this sur-reply or the supplemental class member declarations, this order **GRANTS** plaintiffs' motion but **DENIES** the request in the sur-reply to strike the associated language from the Giglio and Berardinelli Declarations.

17

response to the opposition" or upon "giving the non-movant the opportunity to respond." *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018) (Judge Donna M. Ryu); *Harris v. City of Kent*, 2022 WL 1310080, at *5 (W.D. Wash. Mar. 11, 2022) (Judge Theresa L. Fricke) (citing *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996)).

This order agrees with plaintiffs that it was unfair to lard the record on reply and thus deprive the settling parties of the opportunity to address the new material in their oppositions. The incident with the high school teacher that Mr. Giglio describes reportedly took place on January 9, 2023 (Giglio Decl. ¶¶ 4–5). The FTC post he cites is dated September 16, 2022 (*id.* ¶ 6). And the securities filings he references are from August 8, 2022, and November 7, 2022, respectively (*id.* ¶ 9). Movants could have appended all of the evidence in the Giglio Declaration to their stay motion filed on January 13, 2023. Meanwhile, although Mr. Berardinelli does not date his assertions, he also does not in any way indicate that the harms he describes took place between January 13, 2023, when movants filed their stay motion, and February 3, 2023, when movants filed their reply.

Ordinarily, judges would not allow movants to introduce this evidence, and the relevant passages from the reply and attached declarations would be struck. Here, however, these passages will be considered. Plaintiffs' objections are **OVERRULED**. Even so, on this new and late evidence, movants have failed to show that they are likely to experience irreparable reputational harm that a stay would counteract.

*First*, with respect to the incident involving the high school teacher, it should be noted at the outset that any alleged reputational harm associated with this incident (and other potential incidents of this sort) is reparable through correction. Lincoln could provide essentially the same statement it provided to *Higher Ed Dive*: "We believe [this characterization] strongly mischaracterizes the issues . . . " (Townsend Decl. Exh. 2 at 3). What is more problematic, however, is that movants have not shown that the alleged reputational harm associated with this incident could be avoided with a stay in place. There is no indication that a *stay of judgment* would divest this teacher of the false impression that "Lincoln Tech is on the U.S.

United States District Court
Northern District of California

1    Department of Ed's list of predatory schools."  Recall, a stay would not remove Lincoln or

2    other movants from Exhibit C.  Only our court of appeals' merits ruling could do that.

3         *Second*, with respect to the FTC post, movants are not candid.  This order reproduces the

4    language that Mr. Giglio discusses in full:

5              Some of the names on the list of schools included in the *Sweet*
               settlement may look familiar — and they should.  The FTC has
6              also sued the University of Phoenix, DeVry, and the operators of
               American InterContinental University and Colorado Technical
7              University for their allegedly deceptive practices.  Students who
               took out loans to attend those schools got more than $300 million
8              in payments and debt cancellation through these FTC actions.  If
               you got a check from one of these settlements:  You're still eligible
9              to get your federal loans forgiven through the borrower defense
               program, so file your application.
10

11   (Giglio Decl. ¶ 6).  This post does not impugn the non-movant schools listed on Exhibit C on

12   account of their inclusion on Exhibit C such that it could cause reputational harm to movants.

13   Exhibit C is invoked in a neutral, accurate fashion here, solely to inform borrowers that they

14   may still be entitled to debt relief even if they have already received money from an FTC

15   settlement.  Yes, the post mentions "scammers," but that does not refer to schools listed on

16   Exhibit C but rather con artists who will try to rip-off borrowers by "helping" them get their

17   borrower-defense claims approved.

18        *Third*, with respect to Lincoln's securities filings with the SEC, this order finds that

19   plaintiffs captured the deficiency in their objection:

20             Mr. Giglio claims that disclosing the existence of the Settlement in
               this case in Lincoln's securities filings has "caused concrete and
21             material consequences for the company, its financial reporting, and
               its shareholder relations."  Giglio Decl. ¶ 9.  Yet a brief perusal of
22             Lincoln's listing on the NASDAQ exchange shows that Lincoln's
               stock was higher as of the date of the Reply Brief ($6.58) than it
23             was on the date Exhibit C was made public ($6.00).  *See*
               https://finance.yahoo.com/chart/LINC.  Indeed, the stock equaled
24             its 2022 high point ($7.71) on August 2, 2022, after Exhibit C had
               been public for over a month, and hit its 2022 low ($4.69) on
25             October 14, 2022, which was not anywhere near the disclosure
               dates cited in the Declaration.  *See id*.
26

27   (Dkt. No. 365 at 2 n.1).  No harm, no foul.

28

                                            19

*Fourth*, with respect to Mr. Berardinelli's assertions, they are simply too speculative. How is the undersigned (or Mr. Berardinelli, for that matter,) to know whether the "delayed and/or increased . . . cost of financing" or decisions "in some instances . . . not to provide financing" came about on account of "inquir[ies] about the Settlement"? (Berardinelli Decl. ¶ 13). The undersigned will not connect the dots and delineate reputational harm for movants. "[C]onclusory factual assertions and speculative arguments that are unsupported in the record" will not suffice. *Doe #1 v. Trump*, 957 F.3d 1050, 1059–60 (9th Cir. 2020).

This order recognizes movants may be correct that, if our court of appeals reverses or vacates judgment, class members may have new claims of reliance and assertions of hardship (Br. 20). This could result in harm — even irreparable harm — but not irreparable harm to movants. The key question for this order is whether movants can show that *movants* will be irreparably injured absent a stay. The showing here is too weak. At bottom, movants fail to show that a stay is necessary to avoid likely irreparable injury to movants while their appeals are pending.[6]

### 3. INADEQUATE SHOWING OF LIKELIHOOD OF SUCCESS ON THE MERITS.

"An applicant for a stay pending appeal must make 'a strong showing that he is likely to succeed on the merits.' Where, as here, the showing of irreparable harm is weak at best, the [applicant] must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach." *Al Otro Lado*, 952 F.3d at 1010 (quoting *Nken*, 556 U.S. at 434). In brief, movants have not made a commensurately strong showing of a likelihood of success on the merits.

---

[6] Two days ago, one week after the hearing, movants sought leave to file yet another piece of evidence in support of its showing of harm: a letter from plaintiffs' counsel and other organizations submitted to an entity that is considering affiliating with a non-movant school listed on Exhibit C, the University of Phoenix (Dkt. No. 381). According to movants, "[t]his letter is another example of how Plaintiffs and others are using Exhibit C to harm schools on that list, how the harm manifests itself over time, and why effectuation of the settlement during appeal will cause irreparable harm to Intervenors" (Mot. 1–2). The Court has already generously considered tardy evidence. The motion to consider even more tardy evidence is **DENIED**.

The bulk of the stay motion is dedicated to the same merits arguments that movants made at the final approval stage (Br. 2–18). The final approval order attended to every legal argument that movants have repeated in their stay motion, often verbatim, and the Court stands by its analysis. At any rate, this order need not revisit these arguments because what tips the scales for this factor is a different issue — and a threshold one.

Noticeably absent from movants' stay motion is any discussion of Article III standing. Such discussion is also noticeably absent from movants' reply, despite plaintiffs raising Article III standing in their opposition (Plaintiffs' Opp. 19–23; *cf.* Defendants' Opp. 9). An intervenor who appeals a judgment when neither original party has appealed must demonstrate independent Article III standing to maintain that appeal. *See Wittman v. Personhuballah*, 578 U.S. 539, 543–44 (2016) (holding that intervenors lack standing and dismissing appeal for lack of jurisdiction). The Supreme Court has explained:

> A party has standing only if he shows that he has suffered an "injury in fact," that the injury is "fairly traceable" to the conduct being challenged, and that the injury will likely be "redressed" by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561. . . (1992) (internal quotation marks and ellipsis omitted). The need to satisfy these three requirements persists throughout the life of the lawsuit. *Arizonans for Official English* [*v. Arizona*], 520 U.S. [43,] 67 [(1997)] . . . .
>
> An "intervenor cannot step into the shoes of the original party" (here, the Commonwealth) "unless the intervenor independently 'fulfills the requirements of Article III.'" *Id*., at 65 . . . (quoting *Diamond v. Charles*, 476 U.S. 54, 68 . . . (1986)).

*Ibid*.

As alluded to in the final approval order and this order's discussion of harm, movants have not identified an injury in fact, a "legally protected interest" they have that the settlement affects in a sufficiently "concrete and particularized" way. *Lujan*, 504 U.S. at 560; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021). This district court is at a loss to identify an injury to movants arising from this settlement agreement (that they were not a party to) resolving this litigation (that did not involve them). As discussed above and at even greater length in the final approval order, "the schools have lost no procedural rights, nor has their status been altered. No liberty or property interest has been disturbed." *Sweet*, 2022 WL

16966513, at *10.  And it is well-recognized that case law "does not establish the proposition that reputation alone, apart from some more tangible interest such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976); *see also Sweet*, 2022 WL 16966513, at *10.  As plaintiffs observe, even if there were evidence of reputational harm on this record, movants fail to establish a "plus factor," "the denial of a more tangible interest" in connection with alleged stigmatization (Plaintiffs' Opp. 21 (quoting *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (internal quotation and citation omitted)).

In light of this, movants' showing on this stay factor is unsatisfactory.  "Whether [movants have] failed to show any irreparable harm during the pendency of the appeal or [have] made only a minimal showing, [they have] not carried [their] burden to establish a sufficient likelihood of success on the merits." *Al Otro Lado*, 952 F.3d at 1010.

### 4. BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A STAY.

"Because the [movants] ha[ve] not satisfied the first two factors, we need not dwell on the final two factors — harm to the opposing party and the public interest." *Id.* at 1014 (internal quotations and citations omitted).  But this order would be remiss not to mention that both heavily weigh against a stay.  Seeing as "[t]hese factors merge when the Government is [an] opposing party," they are addressed together here. *Nken*, 556 U.S. at 435.

With respect to the third factor — whether issuance of the stay will substantially injure the other parties interested in the proceeding — movants emphasize that a stay would not cause irreparable harm to plaintiffs because their loans are in forbearance and because movants could potentially receive loan cancellation from President Biden's debt relief initiative (Reply Br. 13).  They also aver that a stay would *benefit* defendants because they would not have to expend resources effecting the settlement when it could later be reversed (Br. 22–23).

Whereas movants' claims of harm experienced by movants are acutely overstated, their claims of harm experienced by plaintiffs and defendants are acutely understated.  In short, that loans are currently in forbearance is of little consolation to plaintiffs when the sword of

22

United States District Court
Northern District of California

Damocles hangs over their heads.  There is ample evidence on this record of abiding and evolving harm to plaintiffs who are awaiting decisions on their borrower-defense applications that forbearance or hope for other debt relief cannot allay.  These include reputational harms, not to mention financial, physical, and emotional ones (*see* Plaintiffs' Opp. Exh. A (declarations of 144 borrowers in opposition to stay motion)).  Meanwhile, this order credits defendants' assertion that defendants do not, in fact, benefit from a stay that frustrates their strong interest in resolving this litigation and eliminating their backlog of borrower-defense applications — especially when defendants have already devoted substantial resources to resolving this matter (Defendants' Opp. 11).  On this record, it is evident that a stay would substantially injure plaintiffs and defendants.[7]

With respect to the fourth factor — where the public interest lies — movants argue:  (1) a stay would protect the Ninth Circuit's jurisdiction; (2) a stay would promote the orderly administration of justice, with the Supreme Court presently reviewing President Biden's debt forgiveness program; and (3) the public has no legitimate interest in constricting appellate review (Br. 23–25).  But the public interest favors the significant benefits to roughly half a million class members and the Department in settling this litigation here.

Movants state that "[a] stay would preserve the status quo while the appeal plays out" (Br. 23).  As defendants emphasize, however, movants fail to earnestly reckon with the fact "that the status quo before settlement — a massive, ever-expanding backlog of unresolved borrower-defense claims — was the impetus of this lawsuit" (Defendants' Opp. 11).  There is

---

[7] Movants also call attention to the fact that the Supreme Court recognized the propriety of maintaining a stay pending appeal of President Biden's debt forgiveness initiative in a parallel context, and that plaintiffs' claims of harm are undermined by the fact that they "chose not to advance" this litigation for seventeen months while they unsuccessfully appealed a discovery issue (Br. 22 n.12, 23).  This order (again) cautions that President Biden's initiative is separate and apart from this settlement, so drawing parallels about the harm arising from stays in these actions is perilous.  And this order considers it unfair to suggest that plaintiffs "chose not to advance" this litigation while appealing a discovery issue and that this thereby calls into question the harm they would suffer upon grant of a stay.  Indeed, this argument is particularly feeble given that movants waited until the tail end of the appeal window to notice appeals of the final approval order despite the alleged irreparable harm they discuss in their stay motion.  Movants' other arguments, including those involving the Effective Date and the students who allegedly did not attend movants' schools, are addressed elsewhere in this order and the final approval order.

23

United States District Court
Northern District of California

no public interest in the preservation of this stubborn and burgeoning backlog. The settlement breaks a logjam that has vexed several Secretaries and allows the Department to redirect resources to other initiatives. And it gives plaintiffs, who have languished in borrower-defense application limbo, their long-awaited relief. Note the relief provided by this settlement (financial and otherwise) will allow plaintiffs to breathe easier, sleep easier, repair their credit scores, take new jobs, enroll in new educational programs, finish their degrees, get married, start families, provide for their children, finance houses and vehicles, and save for retirement (Plaintiffs' Opp. Exh. A). It will allow them not only to move on, but also to move up, elevating others in the process. The public interest favors this settlement.

Resolution of a lawsuit concerning monumental delay should not be delayed any longer by three intervenor schools who were not parties to the settlement agreement and who were not involved in the long, hard-fought litigation that preceded it. For the foregoing reasons, the joint motion to stay the entire judgment pending appeal is **DENIED**. For the same reasons, the alternative request to stay judgment pending appeal only as to movants is **DENIED** as well.

### 5.     TEMPORARY STAY.

Nevertheless, this order **GRANTS** a temporary, same-day stay of judgment with respect to discharges and discharge requests for loans associated with movants to allow them to present a stay motion to our court of appeals. *See* Fed. R. App. P. 8(a)(2). The judgment with respect to discharges and discharge requests for loans associated with movants is hereby stayed for **SEVEN DAYS** pursuant to Ninth Circuit Rule 27-2. If movants file a motion to stay in our court of appeals within seven days of the entry of this order, the temporary stay will continue until our court of appeals rules on the stay motion. If movants fail to so file, however, then the temporary stay shall expire seven days after the entry of this order. Movants shall please notify the Court if they seek a stay in our court of appeals.

### CONCLUSION

For the reasons stated herein, the motion to stay judgment pending appeal is **DENIED**. This order temporarily stays judgment with respect to discharges and discharge requests for

loans associated with movants for **SEVEN DAYS** to allow them to present a stay motion to our court of appeals.

**IT IS SO ORDERED.**

Dated:  February 24, 2023.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

25