UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| THERESA SWEET, et al, ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | No. C 19-3674 WHA |
| ) | |
| MIGUEL CARDONA, et al, ) | |
| ) | San Francisco, California |
| Defendants. ) | Wednesday |
| ) | February 15, 2023 |
| _____ ) | 1:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:            PROJECT ON PREDATORY STUDENT LENDING
                           769 Centre Street
                           Suite 166
                           Jamaica Plain, Massachusetts 02130
                    BY:    **REBECCA C. ELLIS, ESQ.**
                           **REBECCA C. EISENBREY, ESQ.**


For Defendants:            U.S. DEPARTMENT OF JUSTICE
                           Civil Division
                           Federal Programs Branch
                           450 Golden Gate Avenue
                           Suite 7-5395
                           San Francisco, California 94102
                    BY:    **STUART J. ROBINSON, ESQ.**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  *Official Reporter - US District Court*
                  *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

For Intervenors:       GIBSON DUNN & CRUTCHER LLP
                       1050 Connecticut Avenue, N.W.
                       Washington, DC 20036
                  BY:  **LUCAS TOWNSEND, ESQ.**


                       BOIES SCHILLER FLEXNER LLP
                       1401 New York Avenue NW
                       Washington, DC 20005
                  BY:  **JESSE M. PANUCCIO, ESQ.**


                       MCGUIREWOODS LLP
                       Two Embarcadero Center
                       Suite 1300
                       San Francisco, California 94111
                  BY:  **JENNY YI, ESQ.**


Also Present:          **JIM WALDEN**

                            - - -

<u>**Wednesday - February 15, 2023**</u>                                    <u>**1:31 p.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

1          **THE CLERK:**  Civil Action 19-3674, Sweet, et al versus
Cardona, et al.

          Counsel, please approach the podium and state your
appearances for the record, beginning with counsel for
plaintiffs.

          **MS. ELLIS:**  Good afternoon, Your Honor.  Rebecca
Ellis from the Project on Predatory Student Lending for the
plaintiffs.

          And with me is my colleague Rebecca Eisenbrey and lead
plaintiff Theresa Sweet.

          **MR. ROBINSON:**  Good afternoon, Your Honor.  Stuart
Robinson from the Department of Justice on behalf of
defendants.

          **MR. TOWNSEND:**  Good afternoon, Your Honor.  Lucas
Townsend for Lincoln Educational Services Corporation.

          **MR. PANUCCIO:**  Good afternoon, Your Honor.  Jesse
Panuccio for Everglades College, Incorporated.

          And with me at counsel table is our client representative
and general counsel Jim Walden.

          **MS. YI:**  Good afternoon, Your Honor.  Jenny Yi on
behalf of American National University.

          **THE COURT:**  Thank you for coming.

```
 1        All right.  This is a motion to stay by the intervenors.
 2   Now, I am -- I don't want to say 100 percent, but 98 percent up
 3   to speed.  So I -- I understand the basic arguments that each
 4   side is making.  I'm going to take this off, so as you can hear
 5   me better.
 6        I want to give you a chance to address at least some of
 7   the Motion to Stay, not everything, because it's really not
 8   necessary, but I'd like to -- I think there is this issue of
 9   new evidence coming in, and I'd like to take that part up
10   first.
11        So you are objecting, right, to new evidence?  So let's
12   hear your grievance on that.
13        And then I'll let the other side respond, of course, on
14   the new evidence point.
15        MS. ELLIS:  Thank you, Your Honor.
16        We have two different papers that we filed.  The first one
17   is our motion for leave to file a sur reply brief with attached
18   declarations.  That one is concerned with setting the record
19   straight on the three class members who filed declarations in
20   support of our opposition.  The intervenors then filed
21   declarations with their reply in which their representative
22   stated that they could not find evidence that those class
23   members actually attended their institutions.
24        And what we've asked to do in our sur reply is to submit
25   supplemental declarations from those class members that
```

1   explain, you know, they did -- in two of the three cases they

2   did attend those institutions.  They're just women who changed

3   their names when they got married, and so the intervenors were

4   not searching for the right names in their records.

5        And then the third declarant, his loan originated from a

6   school that was then bought by Lincoln, and so Lincoln is the

7   school now associated with the records of his federal student

8   loans.  But the reason we think he wasn't appearing in

9   Lincoln's records is because the loan originally came from the

10  school that later became a subsidiary.

11       So we would like to submit that sur reply and respectfully

12  ask to strike the sections of the Giglio and Berardinelli

13  declarations that contain this information about the class

14  members that is incomplete or inaccurate.

15       **THE COURT:**  All right.  Do the -- by the way, did I

16  send out -- it seems like I sent out an order that said come

17  prepared.  Do I have that order up here?

18       Anyway, do the defendants now agree that these three are,

19  in fact, legitimate students?

20       **MR. PANUCCIO:**  Speaking for -- well, let me just

21  address, if I may, first our overall position on what

22  plaintiffs have filed.

23       Our position I think, speaking collectively for the three

24  intervenors, is we have no problem with the Court -- in fact,

25  would welcome the Court to consider everything that's been

 1   filed.  So that would include our declarations, all of their

 2   declarations, including the supplemental ones, and the

 3   sur reply.  We don't object to the docketing of the sur reply.

 4   We object to the substance of it, but that's for argument about

 5   the Motion to Stay.  And we think it would be appropriate for

 6   the Court to consider all of that.

 7        Plaintiffs concede it's within the Court's discretion to

 8   consider declarations submitted with a reply.  And here we

 9   think that the Court's discretion would be wisely exercised to

10   do so.

11        The settlement, as you know, in Exhibit C were negotiated

12   in secret without the school's input.  The facts about that

13   settlement and what the department's determinations were based

14   upon are unfolding in stages.  And none of the declarations

15   that -- hundreds of them that plaintiff submitted with their

16   opposition to the Motion to Stay were in the record prior to

17   that time.

18        So we simply filed two short declarations from our

19   institutions responding about those two -- those three

20   plaintiffs who were identified and then further speaking about

21   some of the harm from the settlement.

22        So we think it would be equitable for the Court to

23   consider all of that.

24            THE COURT:  Well, okay.  I -- I asked a very specific

25   question.  You raised a suggestion that these three students

1  were frauds, didn't exist, and you had no record of them.  Then

2  they went to the trouble to show that, yes, these people do

3  exist and they attend your schools.

4      So do you agree they attend your schools?

5          **MR. PANUCCIO:**  Speaking to the two declarations

6  relating to ECI, the ones the plaintiffs gave us the actual

7  enrollment names, we were able to find them, yes.

8          **THE COURT:**  All right.  Good.  That's what I want to

9  know.

10     How about the one at Lincoln by way of subsidiary?  I know

11 you don't represent Lincoln, but are you now satisfied that he

12 is a Lincoln student?

13         **MR. TOWNSEND:**  Your Honor, we are satisfied that he

14 is not a Lincoln student.  His -- and I want to be very clear

15 about what we said in the paragraph that the plaintiffs are

16 seeking to strike.

17     The original declaration said:

18         "I attended Lincoln Tech and I have been battling

19     my borrower defense claim for 25 years."

20     We made a very specific objection.  We raised a question

21 about that statement.  We're not allowed to volunteer

22 information, but he, in fact, did not attend Lincoln Tech,

23 according to his second declaration.

24     The second declaration says he enrolled in new England

25 Institute of Technology in 19906.  Lincoln Tech had no

1   connection with New England Institute of Technology in 1996.

2   Lincoln purchased New England Institute of Technology in 2006.

3        Whatever experience Mr. Lapsker had in 1996 has nothing to

4   do with Lincoln Tech, nothing whatsoever.

5        And we do thank Mr. Lapsker for filing a new declaration

6   in which he says, "I enrolled in a different school."

7        It is correct.  Lincoln acquired the new school, but

8   that's the correction that we were trying to make and, in fact,

9   it was made in the second declaration.

10        So to strike the paragraph that pointed out this

11   inaccuracy is inappropriate in our view.

12             **THE COURT:**  Well, all right.  That's a helpful

13   answer.  He does exist.

14             **MR. TOWNSEND:**  He does exist, yes.  We never said he

15   didn't.

16             **THE COURT:**  And he exists -- he did not attend

17   Lincoln back in the 90's, but he attended New England.

18             **MR. TOWNSEND:**  Correct.  Or he enrolled in New

19   England.

20             **THE COURT:**  And at some point New England got

21   acquired by Lincoln.

22             **MR. TOWNSEND:**  2006, Your Honor.

23             **THE COURT:**  Is that the way you see it, too?

24             **MS. ELLIS:**  Yes.  That's our understanding, Your

25   Honor.

1    And so now the school that's associated with Mr. Lapsker's

2    outstanding loan for the Department of Education's

3    recordkeeping purposes is Lincoln, and that's why he submitted

4    his borrower defense with Lincoln on it.  That's the advice he

5    was given by the Federal Student Aid Ombudsman's Office.

6         **MR. TOWNSEND:**  If I could just make one point, Your

7    Honor.  We never accused Mr. Lapsker of lying under oath.  That

8    was the plaintiff's characterization.

9         Again, we made a very specific objection to a statement

10   that was in -- that was in the original declaration.  It has

11   been corrected.  We thank him for that.  We're grateful that he

12   corrected it.

13        I think the -- you know, the paragraph in Mr. Giglio's

14   declaration has served its purpose here.

15        **THE COURT:**  All right.  Let's go to the next part of

16   your -- well, what's wrong with the suggestion that I just will

17   allow all of the new material, late-filed material, including

18   your sur reply?  What's wrong with that idea?

19        **MS. ELLIS:**  Well, as it concerns these three

20   declarants, Your Honor, this is a case, as you know, that is

21   likely to end up before the Ninth Circuit.  We wouldn't want

22   inaccurate representations to be part of the record on appeal.

23        But we do feel satisfied here that the intervenors are

24   acknowledging that these students were not imposters.

25        The Giglio declaration did choose its words very

 1    carefully, but the intervenor's reply brief quite clearly

 2    sought to infer from these statements in the Giglio and

 3    Berardinelli declarations that class member declarations are

 4    unreliable; that class members are not to be trusted to

 5    accurately recount their own experiences.  And that -- that

 6    could not be further from the truth, and that is the reason why

 7    we ask to strike.

 8            THE COURT:  All right.  But more generally, what's

 9    wrong with the idea that I just say:  Okay, I'm going to allow

10    all of your declarations, your reply, your sur reply, all of

11    their supplemental declarations that came in late from Gig- --

12    is it Giglio.

13            MR. TOWNSEND:  Giglio, Your Honor.

14            THE COURT:  Giglio and Berardinelli.  All right.

15    Those -- just allow it all.  What's wrong with that?

16            MS. ELLIS:  Well, Your Honor, that goes to the

17    separate argument we made in our objection to reply evidence,

18    which is that putting aside this question of the declarants,

19    there are other statements in the Giglio and Berardinelli

20    declarations that we believe could and should have been

21    submitted with the opening brief.

22            THE COURT:  Yes, that's true, but -- yes.  And I

23    normally don't like that.  That's true as well.

24        But on the merits what's wrong with me saying:  All right,

25    both sides can file material late.

1          **MS. ELLIS:**  On the merits, it is up to Your Honor's

2     discretion, of course.  And we believe that even if taken at

3     face value, those declarations do not support substantively a

4     finding of irreparable harm.

5          **THE COURT:**  But you've addressed that in your

6     sur reply.  No?

7          **MS. ELLIS:**  I believe we did state in the sur reply

8     that certain statements -- I believe it was in the Berardinelli

9     declaration, the statement that -- that the declarants should

10    have said exactly what the wrongdoing was by Kaiser.  We took

11    issue with -- we took issue with the suggestion that that was

12    legally or factually necessary.

13        I'm just looking at the papers --

14         **THE COURT:**  All right.

15         **MS. ELLIS:**  -- right now to see if I can clarify.

16         **THE COURT:**  You can come back to that.

17         **MS. ELLIS:**  Okay.

18         **THE COURT:**  Let's go to -- I want to hear from the

19    intervenors on the merits for a moment.  And I'm not ruling yet

20    on the sur reply point.

21        It's the irreparable harm issue that I -- I feel is most

22    more here.  So help me understand your arguments on irreparable

23    harm and what -- based on the record, and you can include the

24    supplemental materials if you wish for right now.  Let's hear

25    your argument on irreparable harm.

1        **MR. TOWNSEND:**  Okay.  Thank you, Your Honor.

2        So we've shown irreparable harm in a number of ways.

3    Effectuating the settlement would irreparably extinguish the

4    intervenors' rights in the pending borrower defense

5    applications.

6        And a good way to think about this is if the Department of

7    Education had done exactly what it's doing here by just

8    publishing a notice in the Federal Register some day saying:

9    No notice and comment.  We're just doing -- we're just changing

10   the process.  We're granting all of these applications.  We're

11   extinguishing school's rights.  There would be no doubt that

12   schools would have standing, would have -- would be persons

13   aggrieved, and who could challenge that under the

14   Administrative Procedure Act.  There would be no question about

15   it.  It's an injury.  It's traceable to the action.  It's

16   redressable by an order setting aside the action.

17       The only difference here is the means by which that's

18   being accomplished.  It's being done through a settlement, but

19   the harm is exactly the same.

20       And this is a recognized harm.  Courts hear these types of

21   harms every day under the Administrative Procedure Act.  It's

22   the same harm.  And extinguishing these rights through a

23   settlement is irreparable harm.

24       **THE COURT:**  What would be -- I want to hear quickly

25   from the other side about this very point, but give me one

```
 1   example of some procedural right that you're talking about?

 2           MR. TOWNSEND:  The regulations, the borrower defense

 3   regulations, require that the Department give notice to schools

 4   On borrower defense claims.  They allow schools to submit

 5   evidence in response to the borrower defense claims, and then

 6   they require a decision, a reasoned decision to the schools and

 7   the borrower.  It's not just the borrower.  It is also to the

 8   school.  It's in the regulations.  And this is one of the

 9   rights that schools have in this process.

10           THE COURT:  You don't lose any money.  That's what

11   they -- they come back and say:  There's no recoupment here.

12   You would have all of your procedural rights on recoupment.

13           MR. TOWNSEND:  Well, to that I'd say, Your Honor, not

14   ever administrative process is about money.  Rights are rights.

15   And if the rights are lost, that is a loss.  That is a harm to

16   schools.

17        So there are all sorts of Administrative Procedure Act

18   cases about rights in an adjudicative process that don't

19   concern money.

20        There's still injuries.  There are still injuries in fact

21   that can be challenged under the Administrative Procedure Act.

22        So the fact that money hasn't been assessed or a liability

23   hasn't been assessed yet, well, the predicate, the predicate

24   finding for that later procedure, that later assessment,

25   certainly has been found here and there are consequences to a
```

```
 1   finding of a -- of a granting of a borrower defense claim for
 2   schools.  It affects schools in other --
 3              THE COURT:  All right.  I understand your point.
 4   Let's hear -- don't go away.  Let me hear from the -- whoever
 5   is going to address this point.
 6              MR. ROBINSON:  Thank you, Your Honor.
 7        To begin, I think it's helpful to clarify that we're just
 8   not talking about irreparable harm, but irreparable harm absent
 9   a stay of the judgment, which is what the intervenors are
10   requesting here.
11        As the Court has recognized before, this is -- this
12   settlement does not constitute the granting of borrower defense
13   applications under the regulatory framework, but instead is an
14   exercise of the Secretary's settlement authority.
15        As this Court has also recognized, borrower defense
16   proceedings are between the Department and the borrower, not
17   between the Department, the borrower and a school.
18        The school's rights are fully protected in any recovery
19   proceeding, which intervenors can only speculate about at this
20   point.  And if there is a recovery proceeding, again entirely
21   theoretical at this juncture, they can raise any defenses in
22   that proceeding.
23        I would also add, Your Honor, that the procedural injury
24   that intervenors are speaking of is by itself insufficient to
25   demonstrate harm.  The Supreme Court was very clear on this in
```

1    the *Summers* case which says that:

2              "A procedural right *in vacuo* is insufficient to

3         confer subject matter jurisdiction."

4         So even if the Court were to analyze this harm in terms of

5    the underlying borrower defense process, it would still be

6    insufficient to demonstrate harm, let alone harm with respect

7    to a stay specifically.

8              **THE COURT:**  Well, all right.  I think -- but is it at

9    least this much true that if a borrower defense proceeding went

10   its normal course, that the -- without being settled, that the

11   school would get notice and have the opportunity to submit

12   information to the hearing officer?

13             **MR. ROBINSON:**  My understanding is it depends on

14   which regulation is being applied for loans subject to the 2016

15   borrower defense regulation.

16        The Department provided that notice as a matter of

17   practice, but didn't believe it was required for more recent

18   regulations.  Yes, that notice would be required.

19             **THE COURT:**  And then -- and the school, if it got

20   such a notice, would be entitled to do what?

21             **MR. ROBINSON:**  Provide information to the Department,

22   but it would not be required to do so.

23             **THE COURT:**  And if it did submit evidence, how would

24   that evidence be used?

25             **MR. ROBINSON:**  I believe it would simply be taken

into account by the Department in determining whether the standard for borrower defense is met.

It does not determine any rights of the school.  It does not impose any penalties on the school.  It does not limit any defenses that the school may subsequently raise in any recovery proceeding.  That is later pursued by the Department.

**THE COURT:**  In practice in these -- I know that there was a hiatus for a long time.  The Department did zero of these applications, which was the whole problem to begin with.

Before that when they -- when they were doing applications, were there times when the schools did submit evidence issues?

**MR. ROBINSON:**  I believe so, Your Honor, but I don't have any more information on that in terms of volume or frequencies.

**MR. TOWNSEND:**  Your Honor, if I may.  We have -- my client has submitted evidence in response to borrower defense claims.  Not all of the claims that are supposedly in existence, but we have done this and it is a process that was carried out.

**THE COURT:**  All right.  I understand the arguments back and forth on this one.

All right.  So don't go away over there.

What's your next irreparable harm point?

**MR. TOWNSEND:**  Thank you, Your Honor.

1       So effectuating the settlement would also inflict

2   irreparable reputational harm, as we have been saying since

3   last July.  We have said it many times.  The Court has heard it

4   before.

5       But the intervenors were non-parties in this case.  And we

6   were all very surprised to discover that we were named in a

7   judgment -- or a settlement, and the settlement included a

8   determination by the primary regulator of substantial

9   misconduct -- those were the words that were used -- by a list

10  of schools.

11      Now, I'm not here representing a list of schools.  I'm

12  representing one school.  We're three schools here today.

13      But that is -- that is most certainly a harm, especially

14  when a regulator, a primary federal regulator makes that kind

15  of a determination in a public filing.  And then as we've seen

16  in this case, the regulator, the federal government and the

17  parties, the settling parties, have promoted that settlement

18  and that determination to enlist more borrower defense claims

19  against the schools on the list and in other ways.

20      Third parties have been using this list in very concrete

21  ways to oppose schools renewal of their program participation

22  agreements for Title IV loans.

23      It has -- there have been concrete instances where members

24  of the public have called the Exhibit C a list of predatory

25  schools.  It has affected Lincoln, my client, in their

1   programmatic activities and their outreach to schools.  They

2   have been disinvited from certain events.

3       And everyone loses when that happens, but it is a concrete

4   harm to a school that has built these sorts of relationships

5   over in some instances decades.  To have them dissolve, to have

6   people in the community back away from the school, to have

7   regulators take a harder look at schools, these are the sorts

8   of harms that come out of the reputational injury on being on a

9   list, a black list essentially, of schools not to do business

10  with, not to go to.  That's what Exhibit C is.

11      And when the settlement -- if the settlement is

12  effectuated, immediately, immediately that becomes crystalized.

13  That is something then that becomes a matter of historical

14  fact.  It's not something to be carried out.  It is a matter of

15  historical fact.

16      And these types of harms are going to then manifest

17  themselves in more ways than they already have.  There is going

18  to be more use of this effectuated settlement to oppose schools

19  participation in Title IV lending, to oppose schools

20  participation on boards of directors, to oppose schools

21  involvement in community outreach and job fairs.  That's what's

22  going to happen if this settlement is affected.

23          **THE COURT:**  What's your answer to that?

24          **MR. ROBINSON:**  Thank you, Your Honor.

25      I think it's worth noting just how far this theory of

1   reputational harm has shifted just in the course of briefing

2   this motion.

3        So on Page 16 of the intervenor's motion they say that:

4             "Exhibit C has inflicted severe reputational harm

5        on intervenors that has an immediate and tangible

6        effect their ability to do business."

7        In the reply, that theory now becomes that these

8   reputational harms manifest over time often in subtle ways.

9        Under either one of those theories, Your Honor, the

10  reputational harm has not been established and is certainly not

11  proven to warrant a stay pending appeal.

12       Again, Exhibit C is not an official finding of misconduct

13  and is not the first time these schools have been publicly

14  associated with misconduct.

15            THE COURT:  How did the settlement agreement refer to

16  it?  Exhibit C is a list of schools with substantial what?

17            MR. ROBINSON:  Indicia of misconduct, I believe, Your

18  Honor.

19            THE COURT:  Indicia of misconduct?

20            MR. ROBINSON:  Yeah.  I can get -- I have the

21  agreement behind me, if you would like the precise language.

22       But, again, it is not a finding of misconduct.  It is not

23  going to be used as the basis for any recovery proceeding as

24  indicated in the Miller declaration that we filed.

25       And again, Your Honor, I would note that a stay does not

1    change the existence of Exhibit C.  What we've heard just now

2    is a complaint about the existence of Exhibit C.  But the

3    burden that intervenors carry is to show that a stay would

4    abate that harm or prevent that harm, and they have not even

5    attempted to do so.  Whether a stay is granted or not Exhibit C

6    will remain in existence.

7        The intervenors have had a chance to publicize their views

8    of their settlement.  They have, in fact, publicized their

9    views.  And the supplemental -- or, excuse me, the declaration

10   submitted in connection with the intervenor's reply brief does

11   not cure any of these deficiencies.

12       The Giglio declaration, if I'm pronouncing that correctly,

13   referenced an FTC website, but that simply had a recommendation

14   that students seek loan forgiveness.  The Department has never

15   said Exhibit C constitutes a list of --

16           THE COURT:  Well, I looked at that, and I thought the

17   intervenors were not quite forthright on that one.  The word

18   "scammer" is on there, but that's referring -- on their

19   website, but that was referring to not the schools, but the

20   scammers who call up the students to try to get money out of

21   the students to help them file a -- a relief form.

22       And it wasn't saying that the schools on Exhibit C were

23   scammers.  It was saying that other scammers are out there

24   trying to get you to sign -- to use the settlement as a way to,

25   you know, get free money, I guess is the -- isn't that the way

1    you read it?  That's the way I read it.

2         It was -- I thought you were trying to tell me that the

3    FTC was using Exhibit C to say that the schools were scammers.

4    That's not true.

5              MR. TOWNSEND:  I'm actually not sure about the

6    scammer language.

7         The language that I think we were trying to call the

8    Court's attention to was the line that said:  If some of these

9    schools look familiar, they should.  We've had all of these

10   settlements with these schools in the past, and it listed a

11   number of them.  Basically painting everyone with a broad brush

12   of people who are bad actors in front of the FTC.  That's --

13   that's how we see this exhibit.

14        The "scam" language I'm not --

15             THE COURT:  All right.  Well, then I looked at the

16   wrong part.

17             MR. ROBINSON:  Your Honor, may I respond to that?

18             THE COURT:  Yes, you can.

19             MR. ROBINSON:  I believe that just simply confirms

20   that any reputational harm cannot be attributed to Exhibit C.

21   FTC website is referencing other regulatory actions.

22        Additional evidence submitted by the intervenors refers to

23   multiple regulatory increase and, in fact, criticizes the

24   Department for renewing it's contract -- or renewing contract

25   with Lincoln.

1          And so, again, the evidence submitted by intervenors

2     themselves undermines our argument that reputational harm is

3     attributable to the Department and would be abated or prevented

4     by a stay pending appeal.

5          THE COURT:  All right.  Let's go -- what is the next

6     issue of irreparable harm?  Are those the two main points?

7          MR. TOWNSEND:  No.  We have several other points,

8     Your Honor.

9          THE COURT:  Okay.

10          MR. TOWNSEND:  Okay.  So we also have shown evidence

11     that discharging the student loans immediately would result in

12     the discharge of and refunds to borrowers whose borrower

13     defense claims are not meritorious or that have -- that reflect

14     material error at the very lease.  And there are several

15     examples of this in the record.

16          THE COURT:  Let's say that's true.  How would that

17     affect you though?  Your school has already gotten the money

18     and can keep it.

19          MR. TOWNSEND:  Well, because it -- we believe the

20     numbers are -- the numbers of borrower defense claims are

21     inflated in some instances.

22          For example, there was a borrower defense, a group claim,

23     that was submitted by a regulator against our -- against

24     Lincoln.  And approximately 12 percent of that group are

25     individuals who have no Title IV loans for any attendance with

1    Lincoln Tech, with any kind of Lincoln school.  And we think
2    these individuals would have no -- no Title -- no borrower
3    defense claim, no valid borrower defense claim whatsoever.

4          And the other example that I would point to is the example
5    of Mr. Lapsker, who filed a declaration in this case.  And if
6    I -- I go by his second declaration in this case, which was
7    that he enrolled in New England Institute of Technology in
8    1996.  He made a decision not to attend.  He does not say that
9    he took any action to communicate that to a school before the
10   start of classes.  2.5 years later is when he says he took
11   action.  And this was before Lincoln had any affiliation at all
12   with New England Institute of Technology.

13         That, we would submit, is not a valid or not a meritorious
14   borrower defense claim against Lincoln.  Lincoln has not had
15   any interaction with Mr. Lapsker.  Didn't receive any notice of
16   Mr. Lapsker's claim.  It's another instance where the school
17   would have a valid defense against the borrower defense claim.
18   And it's going to go -- it's going to be one of the numbers
19   that's counted against Lincoln and other schools if there is a
20   mass discharge and refunds.

21         And we believe the numbers are inappropriate here because
22   there are instances in the record where there would not be a
23   valid borrower defense claim.

24         THE COURT:  But don't you still get to keep the money
25   unless they get a recoupment action?

```
 1           Don't you see my point that, okay, let's say that that's
 2      true.  You still get to keep the money.
 3           MR. TOWNSEND:  I would say that -- well, schools that
 4      enroll students and receive Title IV funding for students'
 5      enrollment and that don't have -- are not faced with a borrower
 6      defense claim, then yes.  Schools get to -- that's their
 7      income.  That is how schools sustain themselves.
 8           So it's no different than any other school that has
 9      received Title IV funding.
10           THE COURT:  All right.  What do you say to that on
11      the plaintiff's side -- I'm sorry, settling party side?
12           MR. ROBINSON:  Your Honor, I'm having a difficult
13      time understanding how this is separate and distinct from the
14      procedural injury.
15           Again, the answer either way is that this is not a grant
16      or a denial of any borrower defense application.  It is an
17      exercise of the Secretary's settlement authority.
18           The due process rights of any school are fully preserved.
19      Intervenors seem to be assuming that a recovery proceeding will
20      be initiated, but that is nothing more than a theoretical
21      possibility at that point.
22           Any such recovery proceeding, regardless of whether this
23      settlement would go forward or not, the schools would have the
24      ability to raise any defenses, including that the borrower
25      defense decisions were improperly -- any borrower defense
```

 1  decision would be improperly made.  The standard for borrower

 2  defense was not -- was not met.

 3           **MR. TOWNSEND:**  Your Honor, if I may briefly respond.

 4           **THE COURT:**  Yes.

 5           **MR. TOWNSEND:**  It keeps coming back to recoupment.

 6  This is not just about recoupment for schools.  It is -- again,

 7  go back to what I just mentioned.

 8       The harm to our programmatic interest, the relationships,

 9  is really what's most troubling here.  And the -- the number of

10  borrower defense claims that are discharged and go into a

11  public record and are used in advertising against -- against

12  schools, that's something that can't be undone once those loans

13  are discharged.  And we think there are valid defenses to those

14  loans.

15       That's really what we want to -- we want to clear up the

16  record on borrower defense, and there is no process after this

17  settlement in which to do that.

18           **THE COURT:**  I want to go to a different question.

19  How many total class members are there?  Can the lawyers tell

20  me that now?  And how many are there in group three?

21           **MR. ROBINSON:**  Your Honor, I can tell you there are

22  about 200,000 in the -- in the Exhibit C list.  And I can tell

23  you that of those about, approximately, 3,900 attend the three

24  appealing intervenors' schools.  That does not include the

25  post-class applicants.

```
 1        I don't have the current number on post-class applicants
 2   in total, but would be happy to follow up with the Court about
 3   that.
 4             THE COURT:  Would you do that, please.
 5        All right.  I have one more question I'd like to ask and
 6   then I'm going to bring it to a close.  I'm going to still let
 7   you make one other point.
 8        But on the effective date of the settlement point, I'd
 9   like to hear what you think is your strongest point on the
10   intervenor side.
11             MR. TOWNSEND:  On the interpretation of the
12   settlement agreement?
13             THE COURT:  Here we have the -- the parties to the
14   agreement disagree with you.  So you're -- it's not like where
15   you've got the one side of the -- this is where both sides of
16   the agreement are in total agreement as to what it means and
17   you're trying to upset their apple cart.  So that's a little
18   strange.
19        What do you think is your best argument on this?
20             MR. TOWNSEND:  It is a strange situation.  Our best
21   argument is that the definition of "effective date" gives two
22   occurrences for an effective date and at best neither of those
23   has happened yet.
24        The first occurrence is a final judgment that is not
25   appealable.  There is a final judgment.  It has, in fact, been
```

```
 1    appealed.  So that -- that circumstance, which is, I believe,
 2    what the parties are relying on for effective date, that hasn't
 3    happened.
 4         The other circumstance is an appeal from an objector or
 5    who has raised -- a class objector who has raised a timely
 6    objection.
 7         On this point I think, I mean, we stand in the same
 8    position as a class objector, although we're not members of the
 9    class.  But it's quite clear the parties didn't contemplate,
10    when they drafted that provision, intervenors in the case.  We
11    think the best reading is that we would stand in the same shoes
12    as a class objector.  We did raise objections.  The Court has
13    found them timely.
14         But even if we don't fit into that category, we're still
15    left with a situation where the first scenario hasn't happened
16    yet.  There was not a final judgment that is non-appealable.
17    It has, in fact, been appealed.
18             THE COURT:  Okay.  And your response.
19             MR. ROBINSON:  Your Honor, I would like to invite my
20    colleague from plaintiff's counsel as well, but settlement
21    agreements are interpreted just as contracts are, and contracts
22    are meant to give effect to -- are interpreted to give effect
23    to the parties' intentions.
24         Both the defendants and the plaintiffs intend that the
25    appeal of any intervenor does not have any bearing on the
```

1   effective date.

2        The defendants and the plaintiffs agree that the effective

3   date began January 28th, and intervenors cite no authority, and

4   I am aware of none standing here, that would allow a third

5   party to override the intentions and plain language reflected

6   in the agreement.

7        I don't know if plaintiff's counsel has more to add to

8   that.

9            **THE COURT:**  I want to -- yes, I'm sorry.  Please.

10           **MS. ELLIS:**  Yes, Your Honor.

11       I agree with my colleague from the Department of Justice

12   on the interpretation of the agreement.

13       I think that the intervenor's interpretation, besides

14   being contrary to the parties' understanding, you know, we're

15   communicating here our meeting of the minds.  It would also

16   violate basic canons of construction.

17       They are essentially saying we should add language that

18   isn't there or that we should simply ignore the language that

19   is there.

20       Your Honor, I also wanted to respond to a few other points

21   that have come up in the course of this argument.

22       One is that counsel for the intervenors referred to

23   borrower defense applications against Lincoln or against the

24   schools.  That is not, in fact, what borrower defense

25   applications are.  They are asserted to or against perhaps the

1    Department of Education to assert that the loans which the

2    Department of Education holds are not enforceable against those

3    borrowers and that the Department cannot and in cases where it

4    already did should not have been collecting on those loans.

5    That's why the borrower defense process is structured the way

6    it is.

7         The borrower asserts their defense.  The Department

8    determines whether they have made out that defense, and then in

9    sum, so far extremely limited circumstances and not under this

10   settlement, the Department has the option to seek recoupment

11   against the schools.  The schools do not have any rights in

12   that initial borrower defense application.

13        There is, under the most recent version of the borrower

14   defense regulations, this notice requirement that only applies

15   to loans that were disbursed after July 2020.  The -- the tiny

16   minority of the class would be covered by that regulation.

17        Second, I want to read the language from that FTC website

18   that was being discussed earlier.  This is what it says:

19             "Some of the names on the list of schools

20        included in the Sweet settlement may look familiar and

21        they should.  The FTC has also sued the University of

22        Phoenix, DeVry, and the operators of American

23        Intercontinental University and Colorado Technical

24        University for their allegedly deceptive practices."

25        And then it goes on to say that:

1            "Money has been sent from the FTC to students

2        from those schools, but you're still eligible to get

3        your federal loans forgiven through the borrower

4        defense program if you had previously received that

5        money from the FTC."

6        So this is all strictly factual statements and these three

7    intervenors are not mentioned whatsoever.

8        The next thing is this reference to --

9            **THE COURT:**  Well, so that -- that language about if

10   some of these seem familiar, it's because they should, but

11   that's because the FTC has sued them.  There was -- not

12   referring to our intervenors.

13           **MS. ELLIS:**  That's correct, Your Honor.  It was

14   referring to the FTC's actions against University of Phoenix,

15   DeVry, American Intercontinental, which is different from

16   American National.

17           **THE COURT:**  Are they on Exhibit C --

18           **MS. ELLIS:**  And Colorado Technical.

19           **THE COURT:**  Presumably they are on -- those four are

20   on Exhibit C.

21           **MS. ELLIS:**  Yes, Your Honor.

22           **THE COURT:**  But not our intervenors.  Okay.

23           **MS. ELLIS:**  Correct.

24           **THE COURT:**  All right.

25           **MS. ELLIS:**  With respect to the other website that

1    Lincoln mentioned, the activist organization, that they -- they

2    said was impugning their reputation, the point of that post was

3    to say that the Department of Education did, in fact, approve

4    Lincoln's program participation agreement, and this

5    organization was questioning the wisdom of that decision.

6         But I think that just goes to show that these schools have

7    not suffered any actual concrete harm as a result of the

8    settlement.

9         And in particular, as my colleague has covered, the

10   effective date of the settlement in particular, which is what

11   we're here about today on the Motion to Stay, has nothing to do

12   with it.  The loan discharges and refunds that are going to go

13   out as a result of this settlement are being paid by the

14   Department of Education.  They have said they are not going to

15   recoup those amounts.  There is nothing about the distribution

16   of settlement relief that's going to affect the intervenors.

17        And I know you want to wrap this up, Your Honor, but I

18   think that the thing that we have been missing from all of the

19   discussion here today is the voice of the class.  And one of

20   the factors in the stay analysis is the balance of the

21   equities, the harm that would come to the class if a stay was

22   issued.

23        As we said, we received over 3,500 responses when we asked

24   class members how would it affect you if a stay were issued.

25   And we appended, I think, just under 150 of those responses as

1  sworn declarations with our opposition.  And I'd like to, if

2  you'll allow me to, revisit just a few of those for a moment.

3          THE COURT:  How about just one.  Give me your best

4  one.

5          MS. ELLIS:  Well, I'm not sure if I can say that --

6          THE COURT:  You can do two.

7          MS. ELLIS:  -- that one particular one is the best.

8      I'll give one example of -- this is class member named

9  Stormy Adkins who has loans from Art Institutes.  She writes:

10          "The loans are crushing me, and I'm balancing on

11          the verge of homelessness.  I need a vehicle.  I can't

12          get approved for a loan for a legitimately reliable

13          vehicle.  I'm working three jobs just to pay rent.

14          Whereas, if I had a vehicle, I would be able to

15          commute into Houston for better pay and thereby

16          achieve a better quality of life.  If the Motion to

17          Stay is granted, the extension of time will make it

18          that much harder to keep fighting for my basic life

19          necessities."

20      And that's just one example of the ways in which the

21  continued existence of these loans, even if someone is in the

22  COVID payment pause right now or in forbearance under the

23  settlement, the existence of these loans causes a direct and

24  immediate continuing harm if they are not discharged.

25      And I will read just one other example of the

1   psychological and mental health toll that these loans take on

2   class members.  Carlene Laronzo writes:

3         "My peace of mind is at stake.  My financial

4       freedom is at stake.  My heart dropped when the

5       appeals were first discussed.  The anxiety returns.

6       Please do not let this continue.  Not just for my

7       sake, but for the countless others that are also in

8       worse situations, the ones that want to die.  The ones

9       who can barely make it."

10       **MS. ELLIS:**  Thank you, Your Honor.

11       **THE COURT:**  All right.  In fairness, let's give you a

12   chance to respond.

13       **MR. TOWNSEND:**  Your Honor, of course, we are

14   sympathetic to the individual hardships.  Of course, we are.

15   And, of course, we are not trying to prevent anyone with a

16   valid borrower defense claim from obtaining relief.

17       But we did not ask to be named in this judgment.  We did

18   not ask to be called and --

19       **THE COURT:**  Well, are you in the judgment or just the

20   settlement?

21       **MR. TOWNSEND:**  The settlement -- the judgment

22   includes the settlement.  It adopts the settlement.  And it --

23   I would say -- and the settlement, of course, names us.  And it

24   has been -- it has been used.

25       And the other thing I would point out about the

```
 1    plaintiffs' declarations is all throughout them there are

 2    repeated references to the intervenors, the three schools here,

 3    as predators.  And that's the sort of public perception --

 4    that's the sort of public perception that we're trying to clear

 5    up with these appeals.  Because when our -- when our

 6    stakeholders, when our counter-parties start to adopt that sort

 7    of rationale, that sort of thinking, that we are on the list of

 8    predators, that's a death knell for schools.  That is a death

 9    knell for schools.

10        And so that's what we're trying to clear up with this

11    appeal, with these appeals.  There are three of them.  And we

12    just want a fair adjudication of borrower defense claims

13    according to law, according to the regulations, and to be off

14    of this list, to be out of this settlement.

15            THE COURT:  Okay.  I'm going to bring it to a close

16    right there.  Thank you all for your excellent arguments.

17        Are those class members back there?

18        (Spectators nodding affirmatively.)

19            THE COURT:  Both of you?

20        (Spectators nodding affirmatively.)

21            THE COURT:  Okay.  Thank you for coming.

22        Just -- this is not apropos of the settlement, but one of

23    the curious things to me -- I'll give you both a chance to --

24    when I was younger and in school I did have a loan, it was

25    nothing like these amounts, and it was all paid off in the
```

```
 1   70's.  Ha-ha.  So it's been a long time.

 2        But it seems to me that the number of people that are

 3   middle age that have student loans has grown by a factor of,

 4   I'm going to say 100.  In other words, if it was a thousand,

 5   then it's 100,000 now.  If it was 10,000, then it's a million

 6   now.

 7        So what is it that -- what happened in the last 30 years

 8   or 40 years that has caused the population of student debt to

 9   rise so much?  Is there a good explanation for that?

10        And if there is, what -- without getting into name calling

11   and using the word "predatory" and all that, do you on your

12   side have a -- on the plaintiffs' side, do you have an

13   explanation for the systemic thing that went on in the last 40

14   years that has gotten us to the point that we even need a

15   borrower defense program?

16        MS. ELLIS:  Well, Your Honor, there's certainly a

17   long book-length answer to that.  But one of the short answers

18   is that the cost of college across all sectors, both public,

19   private, non-profit and private-for-profit, has risen much

20   faster than inflation.  Much faster than wages.  College is

21   much more expensive relative to family income and family wealth

22   than it was 30 or 40 years ago.

23        As to borrower defense specifically, part of -- part of

24   the, you know, American story that we tell about college is

25   that going to college is a way to improve your life.  It's a
```

1  way to get ahead.  It's something that people deeply believe,

2  and that has been true for many people.  But it also invites --

3  it invites a situation where people feel that they have to go

4  to college.  And there are actors in the system who respond to

5  that need, some in good faith and some in bad faith.

6      I'll refrain from using the word "predatory" as you asked,

7  but there are actors within the system who see the availability

8  of federal Title IV student loans as a way to make money,

9  because there are so many people, there have been so many

10 people who want to go to college to make their lives better.

11      THE COURT:  When did the Title IV come online?  What

12 year?

13      MS. ELLIS:  That's a good question, Your Honor.  I

14 don't know the entire history of the Higher Education Act.

15 It's been around for a long time, although in many different

16 forms.

17      We could also talk probably at length about the

18 semi-privatization of federal student loans.  The FFEL, Federal

19 Family Education Loan Program, that funneled federal money

20 essentially through private lenders as a middleman to students,

21 and that's a whole other story.

22      But Title IV federal student aid has been around for a

23 long time, but the forms it has taken have varied.

24      THE COURT:  Was Title IV in existence in the 60's?

25      MS. ELLIS:  I -- here comes your helper.

1          **MS. EISENBREY:**  1965, Your Honor.

2          **THE COURT:**  '65?

3          **MS. EISENBREY:**  Yes.

4          **THE COURT:**  I wonder if I would any Title IV.  I

5     don't think so.

6          Back in that day when I was at Mississippi State, I

7     believe the tuition per semester was around $120 per semester.

8     That was not dormitory or food.  Food you could get by on for

9     one dollar a day.  I've forgotten what the dorm was.

10         Of course, it's much more expensive.  My wife and I

11    financed two children through college, and I know it's much

12    more now.

13         **MS. ELLIS:**  There's also a parallel story along with

14    Title IV about the rise of private student lending, which is

15    obviously not at issue in anything we've talked about, but

16    private lenders coming in to fill essentially the gaps between

17    the amount that the federal government is willing to lend,

18    particularly for undergraduate education and where schools were

19    setting their tuition.  And those private student loans have --

20    do not have the sorts of protections that the federal ones do,

21    such as income driven repayment.

22         So some people, even if they were able to pay off federal

23    student loans, are saddled with private student loans that had

24    much less favorable terms.

25         **THE COURT:**  All right.  What's your view over there

1   on the systemic question?

2           **MR. PANUCCIO:**  Thank you, Your Honor.  Jesse Penuccio

3   for ECI again.

4         So I think we've identified one place where we agree,

5   which is my friend said at the outset a book could be written

6   on this question, and that's probably true.

7         There's many causes for the increase in student loans, the

8   amount of them, and the number of students going to college.

9   So we would agree and probably not the best forum for being

10  able to answer that question.

11        But I would he note one comment, if I may, about that

12  answer.  You heard my friend say one of the issues here is that

13  there are those who sought to take advantage of this and the

14  implication was in nefarious ways.  And one of the things that

15  my colleague said that we're objecting to here and one of the

16  harms is that our schools have been somehow lumped together now

17  by their regulator, embodied in a final judgment of a federal

18  court that they are somehow implicated in some nefarious or bad

19  way in all of this, in improper lending and improper conduct.

20  And that is why -- the only reason we're in this case.  These

21  schools had no interest in this case until that happened.

22        And, Your Honor, if I may.  Just with the Court's

23  indulgence, I want to make one final comment.  If the Court

24  were to rule against a stay, we would respectfully ask that the

25  judgment at least be stayed for -- with enough time for us to

1  seek a stay from the Ninth Circuit so that that can proceed in

2  an orderly fashion.

3       I say that only because the Government at the status

4  hearing, you may recall, Your Honor, although the settlement

5  provides up to a year for the Exhibit C relief to flow, the

6  government said it was going to immediately instruct loan

7  servicers to provide 99 percent of that relief within three

8  days of the effective date of the settlement.

9       So it would be more orderly, we would submit, to go to the

10 Ninth Circuit if we had to in sort of a normal posture rather

11 than an overnight emergency posture.  So respectfully we would

12 ask for that, the Court's consideration on that, Your Honor.

13      Thank you.

14           **THE COURT:**  Thank you.

15      Are there any hearings of Congress -- surely there must

16 be -- on this subject of the student loans?  I know it's in the

17 Supreme Court on the -- the Biden plan, it's in the Supreme

18 Court.  But how about in Congress?  Is Congress studying this

19 problem?

20      It is, okay.

21      All right.

22           **MR. PANUCCIO:**  I thought -- sure, we do believe there

23 are various hearings on these issues, Your Honor, that Congress

24 is addressing.

25           **THE COURT:**  Which committees are looking at this?

1          **MR. PANUCCIO:**  Education, Labor and Pension.

2          **THE COURT:**  In the Senate?

3          **MR. PANUCCIO:**  House and Senate, Your Honor.  I don't

4   know if it's about this case specifically, but the broader

5   issue is being addressed.

6          **THE COURT:**  Okay.  What a country we live in that,

7   you know, the public has such a say in what happens.  Think

8   about Russia, North Korea, all those other countries where the

9   people have no rights.  They never get heard.  Somebody poisons

10  them and then dump the body in a park.  And here we have this.

11  So we have this.  We have Congress, the Supreme Court.  It's an

12  amazing country.

13      Thank you, my friends.  I'll get an order out as soon as I

14  can.  All right?  I'm not going to rule right now.

15          **THE CLERK:**  Court is adjourned.

16      (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, February  26, 2023