Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

THERESA SWEET, on behalf of    )
themselves and all others      )
similarly situated, et al.,    )
                               )
          Plaintiffs,          )
                               )
  VS.                          )  **NO. C 19-03674-WHA**
                               )
MIGUEL CARDONA, Secretary of   )
the United States Department   )
of Education, et al.,          )
                               )
          Defendants.          )
_____)

                          San Francisco, California
                          Thursday, October 24, 2019

                 **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:

                          HARVARD LAW LEGAL SERVICES
                            CENTER
                          Project On Predatory Student
                            Lending
                          122 Boylston Street
                          Jamaica Plain, MA  02130
                     BY:  **KYRA A. TAYLOR**
                          **JOSHUA D. ROVENGER**
                          **ATTORNEYS AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Ana Dub, RDR, CRR, CSR No. 7445
              Official United States Reporter

1  **APPEARANCES**:   (CONTINUED)

2  For Plaintiffs:

3                              HOUSING AND ECONOMIC RIGHTS
                                 ADVOCATES

4                              3950 Broadway, Suite 200
                               Oakland, California 94611

5                BY:  **NATALIE A. LYONS**
                       **ATTORNEY AT LAW**

6  For Defendants:

7                              U.S. DEPARTMENT OF JUSTICE
                               Civil Division

8                              Federal Programs Branch
                               20 Massachusetts Avenue, N.W.
                               Room 6130

9                              Washington, D.C. 20530

10               BY:  **KATHRYN C. DAVIS**
                       **TRIAL LAWYER**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - October 24, 2019** **8:03 a.m.** |

**P R O C E E D I N G S**

**---o0o---**

**THE CLERK:** Calling Civil Action 19-3674, Sweet, et al. versus DeVos, et al.

Counsel, please step forward and state your appearances for the record.

**MS. LYONS:** Good morning, Your Honor.  Natalie Lyons for plaintiff.

**MS. TAYLOR:** Good morning, Your Honor.  Kyra Taylor on behalf of the plaintiff and the class.

**MR. ROVENGER:** Good morning, Your Honor.  Josh Rovenger on behalf of the plaintiffs.

**MS. DAVIS:** Good morning, Your Honor.  Kathryn Davis from the Department of Justice on behalf of the defendants.

**THE COURT:** Welcome to you.

Okay.  Motion for class certification.  Please go ahead.

**MS. TAYLOR:** Thank you, Your Honor.

Your Honor, the Department has a duty to decide borrower defenses; and since June of 2018, it has not decided any borrow defenses.

The class members all request the same relief; that the Court order that the Department resolve the backlog of borrower defense applications within a set period of time so that they receive the decision that they are entitled to.

1      Before June --

2          **THE COURT:**  Let me ask.  Is there a statute that

3   requires -- in the past, I've had cases where the Department of

4   Interior failed to meet a statutory deadline; so I've ordered

5   them to do it.  But is there a statute here that gives a

6   deadline?

7          **MS. TAYLOR:**  There is no statutory deadline at play

8   here, Your Honor.

9          **THE COURT:**  So where does the deadline come from then?

10         **MS. TAYLOR:**  The deadline would come from the

11  Administrative Procedure Act, either 706(1), which compels an

12  agency to not unlawfully withhold or unreasonably delay

13  decisions; or 555(b) of the Administrative Procedure Act, which

14  requires an agency resolves matters presented to it within a

15  reasonable period of time.

16         **THE COURT:**  Okay.  So that's the theory.  Okay.

17      All right.  Good.  I understand your point.

18         **MS. TAYLOR:**  Additionally, Your Honor, all of the

19  class members -- there are now 210,000 individuals that are

20  awaiting a borrower defense application -- they're all commonly

21  waiting for what they're entitled to, a borrower defense

22  decision.

23      Additionally, not only are plaintiffs -- have we alleged

24  that the class members are all being treated in the same way by

25  the Department in that the Department has not issued any

1   decisions since June of 2018, but also we've alleged that there

2   is a policy that explains why those decisions have not been

3   issued.

4      There are numerous Department statements establishing that

5   this is not happenstance that these decisions are not being

6   effectuated.  This is a deliberate choice on the part of the

7   Department.  And so all of the borrowers --

8        **THE COURT:**  Just quote me one of them.

9        **MS. TAYLOR:**  Absolutely, Your Honor.

10       **THE COURT:**  Where does the Department say they're

11   going to shirk their responsibility?

12      **MS. TAYLOR:**  Diane Auer Jones stated this year at the

13   Bipartisan Policy Center that until we have clear direction

14   from the Court or a different methodology that doesn't run the

15   same challenges, the Department is in a holding pattern, in a

16   holding pattern waiting for a court ruling, implying --

17       **THE COURT:**  Waiting for me?

18      **MS. TAYLOR:**  No.

19       **THE COURT:**  What court are they waiting for?

20      **MS. TAYLOR:**  My apologies, Your Honor.  Not a court

21   order from you.  They are implying that they cannot make any

22   decisions because of the preliminary injunction that is in play

23   in the *Calvillo Manriquez* litigation.  However --

24       **THE COURT:**  Who is that judge?

25      **MS. TAYLOR:**  That is Judge Kim, Your Honor.

1              **THE COURT:**  Oh, okay.

2              **MS. TAYLOR:**  But that injunction is only subject --

3    only involves the *Calvillo* class members and only pertains to

4    relief methodology.  It only applies to individuals where the

5    Department has decided that they're not entitled to full

6    relief.  However, that --

7              **THE COURT:**  I'm sorry.  I'm confused.  You're saying

8    it so fast.

9         That case only -- I thought it only involved some Catholic

10   school.  What was the name of the school that Judge Kim had?

11   What was the name of it?

12             **MS. TAYLOR:**  Corinthian Colleges.

13             **THE COURT:**  Corinthian Colleges.  That's all that's

14   involved in her case.  I know it's a lot of people, but is that

15   all that's involved in her case?

16             **MS. TAYLOR:**  Yes.  But it's actually even more limited

17   than that, Your Honor.

18        So it's Corinthian students.  So there were three brands

19   of schools that were owned by the corporate owner Corinthian.

20   And the Department established a special process for specific

21   Corinthian students who had been -- who had fallen prey to the

22   school's specific misrepresentations related to employment

23   outcomes.  The Department established findings windows, where

24   they said that people who attended specific programs at

25   specific Corinthian campuses during specific times had a viable

1   borrower defense, and then established a different application

2   process for those students.  The Department already established

3   that borrower defense was warranted for those students.

4       What is at issue in the *Calvillo Manriquez* case is how

5   much relief those individuals are entitled to; whether or not

6   they get a full discharge of their federal student loan debt or

7   if they only receive a partial discharge of their federal

8   student loan debt.

9           **THE COURT:**  Does your proposed class include those

10  students too?

11          **MS. TAYLOR:**  No, Your Honor.  Our proposed class

12  explicitly excludes those individuals.

13      However, in --

14          **THE COURT:**  And your class would be -- even excluding

15  them, would be how many thousand?

16          **MS. TAYLOR:**  210,000 individuals who are awaiting a

17  borrower defense application decision.

18          **THE COURT:**  Hmm.  Okay.  I'm going to give you a

19  rebuttal, but make one more point.  Then I want to hear from

20  the Government, and then I'll come back to you.

21      Your main point is this:  Look, you've got 150,000 people

22  who the Agency's expressly saying "We're not going to decide";

23  and these people, in the meantime, want to get a decision, and

24  the agency is withholding -- what's that word in the APA?

25  Withholding?

1          **MS. TAYLOR:**  Unlawfully withholding, Your Honor, or

2     unreasonably delaying.

3          **THE COURT:**  Yes.  All those things.  That's your main

4     point, and they all have that in common.

5          Okay.  Stay right there.

6          Let me hear from the Government.  This is -- let me just

7     give you the big picture, since you came all the way from

8     Washington.  We've had a lot of these cases against the

9     administration, and when we grant a nationwide injunction, we

10    get criticized by your Department.  And so I'm assuming -- I

11    haven't -- that the reason they want class certification is to

12    avoid that criticism.  And now you're criticizing that on the

13    ground that it doesn't meet class certification.

14         But all of these individual students have in common, they

15    just want injunctive relief.  To me, it seems like a

16    straightforward Rule 23 case, and I don't understand why you're

17    objecting to it.

18         **MS. DAVIS:**  Well, what plaintiff has presented is a

19    common question; but as the Supreme Court has determined in the

20    *Wal-Mart vs. Dukes* case, simply having a common question or

21    some -- the fact that there's a commonality of a result is not

22    sufficient.

23         What the plaintiff must prove to satisfy Rule 23(a)

24    prerequisites is to show that there is a common answer; that a

25    yes-or-no answer -- a "yes" or "no" to a common answer --

```
1              THE COURT:  Wait, wait, wait.

2              MS. DAVIS:  -- will, in one stroke, resolve the legal

3    issue.

4              THE COURT:  But wait, wait, wait.  Help me.

5         The common question is whether or not under the APA, your

6    agency is -- I can never remember that language.

7              MS. DAVIS:  Unlawfully withholding --

8              THE COURT:  -- unlawfully withholding.

9         Well, if the --

10             MS. DAVIS:  -- or unreasonably delaying.

11             THE COURT:  -- head of the agency -- I mean, you've

12   got your own regulations that say you'll do this.

13        They apply under the regulations.  And now you're saying:

14   Oh, no, now we're not going -- we, as an agency, are not going

15   to process these.

16        And now you're saying:  No; that's phony.  That's bad news

17   or phony news.

18        But how come 157,000 applications haven't been processed?

19   That, a jury could decide or I could decide, yes, in fact,

20   you're not being honest with me and you do have such a policy.

21             MS. DAVIS:  Well, to answer the first question you

22   raise, the crux of this class certification motion is that

23   there is some common behavior, some common policy that the

24   Department has intentionally decided that it's not going to

25   borrow -- not going to process any borrower claims across the
```

1  board.

2          **THE COURT:**  Yes, that's the theory.

3          **MS. DAVIS:**  And that's simply not true.

4          **THE COURT:**  That's what you tell me, but it seems

5  true.

6          **MS. DAVIS:**  Well --

7          **THE COURT:**  See, the proof is in the pudding.  You

8  haven't processed them.  You haven't processed them.  From

9  that, I could decide you have a policy; end of story;

10  injunction; decide those cases.

11          **MS. DAVIS:**  Well, Your Honor --

12          **THE COURT:**  Very simple.

13          **MS. DAVIS:**  -- it's plaintiffs' burden, on a class

14  certification motion, to show --

15          **THE COURT:**  And according from your own people.

16  According from your own people that you have such a policy.

17          **MS. DAVIS:**  That is a mischaracterization of what

18  Undersecretary Auer said, as we pointed out in our briefs.  She

19  did not say that they were putting a holding pattern on every

20  single borrower defense claim in the queue; nor did they say

21  that they were not going to do anything with respect to the

22  *Manriquez* injunction.

23      Undersecretary Auer said that they were going to continue

24  to move forward with claims that did not, you know, come --

25  where the partial relief methodology did not come into play;

```
 1   but that they were also going to consider an alternative
 2   methodology.  They were not simply just going to wait and see
 3   what happened with appeal.  They were going to keep determining
 4   whether or not there was some other route to discharge these
 5   claims.
 6        But the fact that the Department has not recently issued a
 7   borrower defense claim decision does not, in itself, show that
 8   there is some common policy, some deliberate decision --
 9              THE COURT:  I don't know if that's true.
10           MS. DAVIS:  -- on behalf of the agency not to do it.
11              THE COURT:  How long has it been since you did the
12   last one?
13           MS. DAVIS:  I believe in a response to
14   Senator Murray's questions or in a congressional inquiry, they
15   stated that it was June of 2018 since the last time they issued
16   a --
17              THE COURT:  Let's see.  June of 2018 was the last one
18   you ruled on.  So now we've gotten -- June to June is
19   12 months.  July, August, September, October.  So that's
20   16 months.  And nobody's had -- that's pretty good proof right
21   there that --
22           MS. DAVIS:  The problem --
23           THE COURT:  -- there's a common policy.
24           MS. DAVIS:  The problem with the metaphor that
25   plaintiffs have sort of presented in this case, which is that
```

1  the Department has simply stopped the conveyor belt and all

2  this Court has to do is start the conveyor belt and then they

3  will all get this common relief --

4       **THE COURT:**  That's a good analogy, by the way.

5       **MS. DAVIS:**  -- is that they equate the conveyor belt

6  moving only if there is a result, only if there is a claim that

7  comes out the door.

8       And what that fails to understand is that the adjudication

9  process is not simply signing a letter and putting it in the

10  mail.  There's a lot more to the adjudication process as is

11  described in the regulations themselves.

12       **THE COURT:**  Well, what is your proof that something is

13  going on behind the scenes in addition to the escalator being

14  stopped or the conveyor belt?

15       **MS. DAVIS:**  Sure.  Well, in the evidence that

16  plaintiff submitted in support of their class certification

17  motion, it shows that the Department, both under the prior

18  administration and under this administration, has engaged in

19  the adjudication process.  They have -- they developed a new

20  methodology for partial relief, which they announced in

21  December 2017.  They have issued 40,000 decisions -- almost

22  40,000 decisions in borrower defense claims.  They are

23  currently, as a result of separate litigation, trying to

24  implement the regulations that were promulgated in 2016, which

25  had been put on hold but now, in accordance with the court

1    order, they are now implementing those.

2        The record, as we show in our brief, is replete with

3    information that shows that they are acting.  I realize that

4    it's true there hasn't been a decision that comes out the door,

5    but that doesn't mean that the conveyor belt has stopped and

6    that doesn't mean that there is evidence of some deliberate

7    determination by the Department to not act across the board.

8        And that's what plaintiffs have to show in order to meet

9    the requirements of 23(a).

10        **THE COURT:**  Yes, they have to show that there is a --

11    what's the word that we use in the securities cases? -- that

12    there's a common method of proof across the entire class.  And

13    their common method of proof is going to be that the conveyor

14    belt has stopped, and the proof of that is that no one has come

15    out the other end of the conveyor belt in 18 months.  So they

16    do have a common method of proof.

17        Now, you will come back with your proof that says:  Oh,

18    no, behind the scenes, here's what we're doing.

19        But it still can be decided on a class basis.

20        **MS. DAVIS:**  But, Your Honor, that's not the common

21    method of proof in a 706(1) claim.  The Ninth Circuit has

22    stated there is no per se rule to how long is too long to wait

23    for an agency action.  The courts in these particular cases --

24        **THE COURT:**  What case was that?  I don't quite buy

25    that one.

 1             **MS. DAVIS:**  That was *In re:  Pesticide* -- let me get

 2     the cite for you.

 3             **THE COURT:**  The Ninth Circuit has affirmed us all the

 4     time when we give them a deadline.  Okay.

 5             **MS. DAVIS:**  Where there is a case that has a statutory

 6     deadline.  Right?  Say there's an immigration case where you

 7     have to do a decision within 20 days of receiving an

 8     application.

 9             **THE COURT:**  Right.

10             **MS. DAVIS:**  That's one case.

11         But as Your Honor well pointed out during plaintiffs'

12     arguments --

13             **THE COURT:**  I know there's no statutory deadline --

14             **MS. DAVIS:**  -- there's no statutory deadline here.

15             **THE COURT:**  -- here, but there has been -- give me

16     that case again.

17             **MS. DAVIS:**  Yes.  *In re:  Pesticide Action Network of*

18     *North America.*

19             **THE COURT:**  Pesticide.  Okay.  What's the cite?

20             **MS. DAVIS:**  532 Federal Appendix 649.

21             **THE COURT:**  Federal Appendix 649.  Is that --

22             **MS. DAVIS:**  650 to -51.

23             **THE COURT:**  I'm sorry.  Is that a published decision,

24     or is that one of these advisory ones?

25             **MS. DAVIS:**  I believe it's a published decision,

1       Your Honor.

2              **THE COURT:**  Okay.

3              **MS. DAVIS:**  It's not reported in the --

4              **THE COURT:**  I thought Federal Appendix was not --

5       can't count as binding.

6              **MS. DAVIS:**  I'm not aware of that rule.  I know

7       that --

8              **THE COURT:**  Maybe I'm wrong.

9           What's the rule on that?  Federal Appendix, isn't that

10      where the non-binding ones go?

11             **MS. DAVIS:**  That's not my understanding, but I will be

12      happy to check the case.

13             **THE COURT:**  Anyway, I'll look at it.

14             **MS. DAVIS:**  It's not the only case, I think, that has

15      said that in the Ninth Circuit, but it is the case that I

16      cited.  It's 650 to -51, and that's a Ninth Circuit 2013 case.

17             **THE COURT:**  All right.

18             **MS. DAVIS:**  But there is no per se rule.  It's not

19      that you can just point at the result and say:  Well, that's

20      too long.

21          The Ninth Circuit applies the track factors that were

22      announced in the DC Circuit case to cases where there is no --

23      like this case -- no statutory time frame in which an agency is

24      supposed to act.  And those track factors, one of those may --

25      one of those factors is:  How long has a decision been pending?

1          But those track factors are fact specific.  So the answer

2     to this question isn't going to simply be:  They have gotten no

3     decision; therefore, it is unreasonable.  It's going to look at

4     the individual circumstances of the adjudication of claims.

5          So, for example, how long has a claim been pending?  Like

6     Your Honor said, there are over 150,000 currently pending

7     claims.  Some of the plaintiffs in this case have had their

8     claim pending since 2015, when borrower defense claims first

9     started rolling in.  Some of these class members theoretically

10    could have filed a claim the day before this complaint was

11    filed.

12              **THE COURT:**  That's a good point.

13              **MS. DAVIS:**  So shouldn't they also be --

14              **THE COURT:**  What do you say to that?

15         Wait, wait.  Just on that one point, aren't each of the

16    class members in a different position with respect to each

17    other on account of some of their -- some of the class members'

18    claims would not have been pending for 18 months; it just might

19    have been 18 days?

20              **MS. TAYLOR:**  No, Your Honor.

21              **THE COURT:**  So how do you deal with that?  It's not a

22    uniform class.

23              **MS. TAYLOR:**  Your Honor, it is a uniform class

24    insomuch as they're all subject to the same Department policy,

25    where they've deliberately chosen to not decide borrower

defenses.

It is unreasonable for an agency to decide to do nothing in the face of a congressional mandate.  And here, Congress instructed the Department to create borrower defenses.

They haven't created borrower defenses if they're not deciding any of those borrower defense applications, if they are not issuing decisions here.

I would also like to --

**THE COURT:**  Well, that's not quite right.  Maybe it takes some time to get -- we have to give the Agency time to do it right.  And Congress didn't give a deadline.  So I don't know about that part.

On your named plaintiffs, how many do we have?

**MS. TAYLOR:**  We have seven, Your Honor.

**THE COURT:**  How long were their -- when did they file their claims for relief?  Not in this court, but before the Agency.

**MS. TAYLOR:**  Ms. Sweet filed her borrower defense application in 2016; Ms. Apodaca filed her application in 2015; Ms. Archibald filed hers in 2016; Ms. Jacobson filed hers in 2015; Mr. Deegan filed his in 2016; Ms. Davis filed hers in 2015; and Mr. Hood filed his in 2018 and then again in --

**THE COURT:**  So at the time this lawsuit was filed, all of them were at least pending one year or more, it sounds like. Maybe two or three years.

1          **MS. TAYLOR:**  Yes, Your Honor.  I would also --

2          **THE COURT:**  Wait, wait, wait, wait.  I interrupted

3     the Government.

4          What is your view on this other case before Judge Kim and

5     how that case affects this case?  I would like to get your view

6     on that.

7          **MS. DAVIS:**  Sure, Your Honor.  I'm not sure in what

8     way you think maybe it affects this case.

9          **THE COURT:**  Well, I mean, we've got these Corinthian

10    Colleges, and you said something about the Agency is studying

11    how to comply with the judge and waiting for the judge to tell

12    the Agency what to do, what kind of methodology to use.

13         And I'm curious to know:  Does that methodology have

14    anything to do with our case?  In other words, will the class

15    members, if there is a class, or just these plaintiffs, will

16    that methodology apply to these particular plaintiffs?

17         **MS. DAVIS:**  That's a good question, Your Honor.  I'm

18    not sure I have an exact answer for you, and I don't want to

19    sort of inadvertently misrepresent anything.

20         I know that the class in *Manriquez* is excluded from this

21    class.  And so they had pointed to the fact that

22    the Government's actions in responding to the *Manriquez*

23    injunction shows some sort of policy, which is simply not true

24    and not borne out by the evidence that they've submitted to

25    their class.

1    I think to the extent -- and the Government -- the

2   Department has, in response to congressional oversight

3   questions, cited the ongoing litigation as one -- not the

4   only -- but one of many various factors that, sort of, they're

5   up against and what may be causing the delay.

6    But I'm not sure if that partial relief methodology would

7   be applied outside of the *Manriquez* class.  I don't want to

8   represent one way or the other because I'm sure I don't know

9   the answer to that.

10   **THE COURT:**  All right.  What's your view on that

11   question, about whether or not the methodology in the

12   Corinthian case would apply to your plaintiffs?

13   **MS. TAYLOR:**  No, Your Honor, it would not.

14    In the appellate briefing, the Department stated that the

15   partial methodology that was at issue in that case would only

16   apply to those individuals and that it would not apply to

17   others.

18    The Department has said that it's waiting for a ruling on

19   that partial relief methodology as guidance in determining a

20   new partial relief that would potentially apply to other

21   students.

22   **THE COURT:**  So is the ball in her court to come out

23   with an order?  Where does it stand?  Do you know?

24   **MS. TAYLOR:**  We are still waiting on a Ninth Circuit

25   opinion there, Your Honor.

1          **THE COURT:**  Are you in that case too?

2          **MS. TAYLOR:**  Counsel is, yes.

3          **THE COURT:**  You are?  One of you three are in that

4    very case?

5          **MS. TAYLOR:**  Yes, Your Honor.

6          **THE COURT:**  Okay.

7          **MS. TAYLOR:**  Both Harvard Law's Legal Services Center

8    and Housing and Economic Rights Advocates are --

9          **THE COURT:**  Is there any conflict between that class

10   and your -- this class?

11         **MS. TAYLOR:**  No, Your Honor, because there, that is a

12   case all about relief; whereas here, this case is all about the

13   Department's failure to make decisions about borrower defense.

14       In the Calvillo Manriquez case, the Department already

15   decided that those students are eligible for a borrower

16   defense.

17       Additionally, Your Honor, Judge Kim, in her order, stated

18   explicitly that nothing was stopping the Department from

19   granting full discharges or denying borrower defense

20   applications.  I would point Your Honor to ECF-70 on page 2,

21   where she said that the injunctive order there would not

22   prevent the Department from making decisions.

23       Therefore, that injunction does not explain why there's

24   been a complete shutdown of borrower defense decisions in this

25   case.

1          **THE COURT:**  Okay.  Let's go back to the Government.

2      I'll give you a chance to make one more point, and then

3  I'll give the other side a chance to make one more point.  Then

4  I've got to move on to the next case.

5          **MS. DAVIS:**  Absolutely, Your Honor.

6      Again, I think, as I've heard throughout counsel's

7  argument, they come back and again to this complete and total

8  cessation of any activity on borrower defense claims.  And

9  that, they allege, is the common thread that runs throughout

10 the -- the class.  And they simply have not shown that, as they

11 are required to do, as the Supreme Court in *Wal-Mart* said they

12 must do in order to meet Rule 23(a).

13     I am not going to belabor all the differences that these

14 class members have with their pending borrower defense claims.

15 We have cited them, and we've detailed them in length at

16 page 14 through 17 of our brief.  And I would encourage

17 Your Honor to look at all the ways in which these borrower

18 defense claims present different facts and circumstances that

19 the Court may need to look at in order to determine whether or

20 not the Department has acted unreasonably or unlawfully with

21 respect to each of these claims.

22          **THE COURT:**  What page is that in your brief?

23          **MS. DAVIS:**  Pages 14 through 17 of our opposition.

24          **THE COURT:**  14 through 17.

25          **MS. DAVIS:**  And my last point, Your Honor, is just in

1   looking at the cases that they cite and the case -- and the

2   circumstances of this case, the difference is, there isn't that

3   one sort of agency decision or one agency policy that is

4   standing in the way of plaintiffs getting what they're asking

5   for.

6        The *Kuang* case, the *Hayes* case, all of the cases that they

7   cite in their briefs have to do with either a distinct agency

8   policy that is preventing them from moving forward.  And if

9   the Court simply issues an order that moves that decision out

10  of the way, then, as their metaphor goes, the conveyor belt

11  starts moving again.  And they haven't shown that there is that

12  sort of decision here.

13       This is a circumstance of prioritization of an agency

14  having limited resources and trying their best to, you know,

15  make those resources as efficient as possible.  Not that they

16  have decided to stop doing something altogether.  So an order

17  that says, you know, "Start going" is not going to have real

18  practical effect here and is not going to provide a uniform

19  relief across the class like 23(b) requires.

20       We would ask the Court that you deny their motion.

21           **THE COURT:**  All right.  You get the last word.

22           **MS. TAYLOR:**  Thank you, Your Honor.

23       As an initial matter, the Government is asserting merits

24  questions that will be resolved during summary judgment.  And

25  we still come back to the fact that --

1          **THE COURT:**  Maybe there'll be a trial.

2          **MS. TAYLOR:**  Or maybe at a trial.

3          **THE COURT:**  Might be a trial.

4          **MS. TAYLOR:**  But we still come back to the reality

5     that all of these borrowers are entitled to a borrower defense

6     decision, and the Department has not made a single decision

7     since June of 2018.

8          Additionally --

9          **THE COURT:**  But they say they're working on it behind

10    the scenes --

11         **MS. TAYLOR:**  But, Your Honor --

12         **THE COURT:**  -- trying to figure out what the right

13    methodology is.

14         It's not like they're just doing nothing.  They are

15    working on the problem, according to counsel.

16         **MS. TAYLOR:**  But, Your Honor, before January 2017, the

17    Department had established a borrower defense unit.  They had

18    established a process by which they would investigate schools

19    that had large numbers of claims, and then would write

20    memoranda to establish that there were groups of students at

21    those schools who had a borrower defense.

22         As the Department indicated in questions for the record

23    that were submitted by Representative Murray, the Department

24    has not made a single factual finding that would establish a

25    borrower defense since 2017.

1          **THE COURT:**  Give me an example of a defense that would

2     be typical or just illustrative of why is it that you can

3     borrow money but not pay it back.   I guess I'm trying to

4     understand that.

5          **MS. TAYLOR:**  Yes, Your Honor.

6          **THE COURT:**  What would be the defense?

7          **MS. TAYLOR:**  An example of a borrower defense is a

8     student comes into a college; they sit down, and the admissions

9     representative promises that if that student goes to school

10    there, that they have guaranteed employment; they have

11    guaranteed relationships with specific employers.   The student

12    enrolls --

13         **THE COURT:**  That really happens?

14         **MS. TAYLOR:**  Yes, it does, Your Honor.

15         **THE COURT:**  Really?

16         **MS. TAYLOR:**  Yes.

17         **THE COURT:**  How can they make such guarantees?

18         **MS. TAYLOR:**  That is exactly the point, Your Honor.

19    They cannot.   And it's unfair to hold those students --

20         **THE COURT:**  But why would somebody believe that?  You

21    think people believe that?

22         **MS. TAYLOR:**  Your Honor, the schools present pictures

23    of students.   They present stories of students.   They will hire

24    students to be the admissions representatives to attest to

25    those claims.   And also, many of these students are

1  first-generation college students; so they don't have the

2  contacts, necessarily.

3         **THE COURT:**  That sounds like fraud to me.

4         **MS. TAYLOR:**  It is fraud, Your Honor.

5         **THE COURT:**  So is that the basis of the defense, that

6  they got -- but who lent the money?  Didn't a bank lend the

7  money?

8         **MS. TAYLOR:**  So in the case of direct loans, the

9  federal government lends the student the money.

10        **THE COURT:**  Right.

11        **MS. TAYLOR:**  This is federal student loan debt.

12     With FFEL loans, which stopped being issued in 2011, a

13  private lender would issue the loan.  It would be guaranteed by

14  a private guarantor and then insured again by the federal

15  student government.

16     However, for borrower defense purposes, FFEL loans are

17  still treated in the same way.  And when the Department

18  receives a borrower defense for a FFEL loan, they process that

19  borrower defense and then will consolidate that FFEL loan to

20  convert it into a direct loan.

21        **THE COURT:**  Is that F-E-L-L or --

22        **MS. TAYLOR:**  F-F-E-L, Your Honor.

23        **THE COURT:**  Okay.  So let's say Bank X loans the money

24  to go to the Fly-By-Night Junior Academy, but the bank does not

25  know it's a fraud.  The student is the one borrowing the money.

1   So why should the bank not get their money back if the bank is

2   innocent?

3          **MS. TAYLOR:**  The bank is getting its money back from

4   the federal government.

5          **THE COURT:**  I see.  So the federal government is the

6   one that would hold the bag?

7          **MS. TAYLOR:**  Yes, Your Honor.  Yes.

8          **THE COURT:**  Okay.  All right.  So the student gets off

9   the hook, the taxpayers pick up the slack, and the fraudster

10  keeps the money.

11         **MS. TAYLOR:**  Yes, Your Honor.  And as an additional

12  example --

13         **THE COURT:**  Well, why don't you sue the fraudster?

14  Why don't you sue the fraud -- I mean, they're the bad guy;

15  right?  They're the ones that promised you'd get a job.

16         **MS. TAYLOR:**  Your Honor --

17         **THE COURT:**  I know.  Your point is -- I get it.  Your

18  point is, look, that's a good lawsuit for somebody else; but

19  right now you're just trying to get your borrower defense

20  established.

21         **MS. TAYLOR:**  No, Your Honor.  The other issue that

22  comes into play here is that many of the schools that have

23  large numbers of borrower defense pending have already closed.

24  There's no one to sue.

25      Additionally, these students are restricted from their

1   ability to sue the school because of arbitration clauses,

2   because they may not realize that they were defrauded until

3   after the statute of limitations has expired.  This is their

4   only recourse.

5        And the federal government has expressed a commitment to

6   processing borrower defenses.  In 2015, James Runcie, the chief

7   operating officer of Financial Student Aid, stated that

8   borrowers have a right to assert a defense to repayment

9   claims -- an alternate term for "borrower defense" -- and the

10  Department must set up a process to review and adjudicate them.

11       The Department established a borrower defense unit because

12  it was so committed to deciding these borrower defense

13  applications.

14       And in October of 2016, the Department was encouraging

15  more students to submit borrower defenses.  James Runcie stated

16  in that same letter that they knew that over 100,000 borrowers

17  were going to be able to submit borrower defenses.

18       It doesn't make sense that the Department would be making

19  so many decisions before January of 2017 and before June of

20  2018 and then would suddenly stop and not determine any new

21  factual bases that would establish borrower defenses for groups

22  of students when they have huge numbers of students who are

23  awaiting a borrower defense decision, as is shown in

24  Exhibit 10.  It's the chart within Exhibit 10.

25            **THE COURT:**  Okay.  One last practical question.  Then

1   I'm going to stop.

2       If the federal -- if the bank has already been paid and

3   the federal government is the only one left who can come after

4   the student and the conveyor belt has stopped, which implies to

5   me that although they're not adjudicating these defenses, the

6   federal government is also not trying to garnish anybody's

7   wages -- right? -- so --

8           **MS. TAYLOR:**  No, Your Honor.

9           **THE COURT:**  That's not true?  So how does that part

10  work?  Is the federal government actually trying to collect on

11  these loans?

12          **MS. TAYLOR:**  Yes, Your Honor, they are.

13          **THE COURT:**  Is that true?

14          **MS. DAVIS:**  I thought when you submitted a borrower --

15          **THE COURT:**  How can it be --

16          **MS. DAVIS:**  -- defense claim that there was --

17          **THE COURT:**  I mean, really, if you're trying to

18  collect on these loans and not adjudicating these defenses,

19  that's not good.

20          **MS. DAVIS:**  I am not sure that's accurate.  I think

21  when you submit a borrower defense claim, that sort of stops

22  the process of any sort of garnishment or trying to collect.

23          **THE COURT:**  Is that true?

24          **MS. DAVIS:**  The interest, I believe, still accumulates

25  while your loan is kind of on hold.  But I do not believe that

1    it's accurate to say that if you have a borrower defense claim,

2    the Government is trying to collect at the same time.  That is

3    not true.

4          THE COURT:  Is that right?  If you submit your claim

5    for borrower defense, the proceedings pause until that gets

6    adjudicated?

7          MS. TAYLOR:  No, Your Honor.  And --

8          THE COURT:  That's not right?

9          MS. TAYLOR:  No, that is not right.  And 32 percent of

10   the almost 900 affidavits that we submitted in favor of class

11   certification, 32 percent said that they had received a notice

12   for payment, had received a notice of tax offset or a notice of

13   garnished wages since submitting their borrower defense,

14   afterwards.

15        So while it is true that those regulations may exist, we

16   have evidence from borrowers that they are not -- it is not

17   being fully complied with.

18        THE COURT:  Read to me one of your declarations that

19   say that, that since they submitted their -- you said you got

20   32 percent.

21        MS. TAYLOR:  Yes, Your Honor.

22        THE COURT:  Just read one of them.  So then I'm going

23   to ask government counsel whether it's true.

24        MS. TAYLOR:  It may just take me one second,

25   Your Honor.  But this was true with Ms. Davis, one of the named

 1   representatives.

 2         **THE COURT:**  And I'd like to hear what they actually

 3   said under oath.

 4         **MS. TAYLOR:**  Would you like me to read the full

 5   affidavit, Your Honor?

 6         **THE COURT:**  Just the key sentence or two, slowly.

 7         **MS. TAYLOR:**  Yes, Your Honor.

 8     (As read):

 9         "In April 2015, I submitted a borrower defense to the

10     Department of Education.  No one responded to my

11     submission.  I submitted it again in June of 2016.  To

12     date, the Department has not granted or denied my borrower

13     defense.  Even though I asserted a borrower defense in

14     2015, the Department has tried to continue collecting my

15     debt.  I defaulted on my FMU Corinthian loans shortly

16     after they went into repayment in 2016."

17     Again, she submitted her borrower defense in 2015.

18         **THE COURT:**  Well, wait.  If that's a Corinthian

19   student, they're excluded from the class.

20         **MS. TAYLOR:**  She is not within the findings window.

21   So she is included within this class, even though she's a

22   Corinthian student.

23         **THE COURT:**  Oh, I see.  All right.

24         **MS. TAYLOR:**  (As read):

25         "In 2017 and 2018, the Department warned me that it

1    will garnish my wages and seize my tax refund to repay my

2    FMU Corinthian debt" --

3       She went to Florida Metropolitan University, and it was

4    bought by Corinthian during her attendance.

5       (As read):

6       -- "even though I had already submitted a borrower

7    defense."

8       She continues (as read):

9          "Waiting for the Department to decide my borrower

10         defense has impacted nearly every aspect of my life.

11         While I have waited for the Department to decide my

12         assertions, I have experienced intense stress and anxiety

13         from not knowing whether I will have to repay my FMU

14         Corinthian debt.  I am depressed every time I am reminded

15         of the debt because I relive the shame of being a victim

16         of the lies and misleading practices at FMU Corinthian."

17      She also goes on to explain that when she was applying for

18   a job as a crime analyst, she had to write a letter explaining

19   the status of her Corinthian FMU debt to her employer.  She

20   cannot have family assets in her name, and she cannot plan her

21   financial future, a common contention amongst the nearly 900

22   affiants who submitted affidavits in favor of class

23   certification.

24         **THE COURT:**  All right.  So is all that -- is that

25   correct, that the agency continued -- not the agency, but the

 1  federal government continued to try to collect from that

 2  potential class member?

 3       **MS. DAVIS:**  That, Your Honor, is not within my

 4  knowledge.  I will need to speak with the agency about the

 5  specifics of those allegations.

 6       **THE COURT:**  Yeah, but it was in the paperwork here.

 7  You should have been ready to speak to it.

 8       **MS. DAVIS:**  I apologize, Your Honor.  I came prepared

 9  to talk about class certification.  I did not know that we

10  would delve into these particular topics.

11       **THE COURT:**  Okay.  All right.  I am going to bring it

12  to a close and get out an order.

13       **MS. TAYLOR:**  Your Honor?

14       **THE COURT:**  And is there anything else I need to --

15  yes.

16       **MS. TAYLOR:**  If I could just add one additional point.

17     The Department has made a lot of -- around the application

18  of track factors.  I would just like to pull to the Court's

19  attention that in *Kuang versus Department of Defense*, another

20  case within this district, a class was certified even though

21  the track factors did apply and even though there was no

22  timeline at issue in those regulations.  So the application of

23  track does not preclude class certification here.

24       Additionally, there are other cases within this district

25  where classes have been certified, even though it's a 706(1)

1    claim at issue.  The Department --

2              **THE COURT:**  That's discretionary within -- those are

3    all -- they're not binding decisions.  Right?  So I've got to

4    make my own decisions on it when it comes to -- I'll try to

5    look at what all the other judges have done.

6         Thank you.  I've got to move on.

7              **MS. TAYLOR:**  Thank you, Your Honor.

8              **MS. DAVIS:**  Thank you, Your Honor.

9                   (Proceedings adjourned at 8:40 a.m.)

10                        ---o0o---

11

12                   **CERTIFICATE OF REPORTER**

13         I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:  Monday, February 27, 2023

17

18

19                    _Ana Dub_

20        _____

21             Ana Dub, CSR No. 7445, RDR, CRR
                Official United States Reporter
22

23

24

25