# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al.*,

        Plaintiffs,

    v.

MIGUEL CARDONA, in his official capacity
as Secretary of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

        Defendants.

No. 3:19-cv-03674-WHA

**SETTLEMENT AGREEMENT**

## I.   INTRODUCTION

WHEREAS, in this class action the Plaintiffs assert that the U.S. Department of Education ("Department") has (i) unreasonably delayed and unlawfully withheld decisions on pending "borrower defense" claims, *i.e.*, claims for relief from certain federal student loan obligations based on institutional misconduct; (ii) issued unlawful notices denying certain borrower defense claims; and (iii) adopted unlawful policies governing the process of evaluating borrower defense claims;

WHEREAS, Defendants, the Department and its Secretary, Miguel Cardona, in his official capacity, deny any wrongdoing and deny that Plaintiffs are entitled to the relief they have sought in this Action;

WHEREAS, Defendants and Plaintiffs (referred to herein collectively, where appropriate, as "the Parties") now mutually desire to avoid the delay, uncertainty, inconvenience and expense of protracted litigation, and have determined to settle this Action, including all claims that Plaintiffs, the certified Class (as defined below), and the members of that Class have brought in this case;

NOW, THEREFORE, in reliance upon the representations, mutual promises, covenants, releases, and obligations set forth in this Settlement Agreement, and for good and valuable consideration, the Parties hereby stipulate and agree to compromise, settle, and resolve this case on the following terms and conditions.

## II.   DEFINITIONS

Unless otherwise noted, the following definitions apply in this Settlement Agreement, and for purposes of this Settlement Agreement alone.

    A.   **Action** means the litigation styled *Sweet, et al. v. Cardona, et al.*, No. 3:19-cv-3674-WHA (N.D. Cal.).

    B.   **Agreement** means this Settlement Agreement, including any attached exhibits.

    C.   **Borrower defense application** means a request by a Direct Loan or Federal Family Education Loan Program borrower for relief from his or her repayment obligations with respect to those loans based on the alleged misconduct of the borrower's

school. A borrower's application can include multiple claims of alleged misconduct on behalf of his or her school.

D.   **Borrower defense claim** means an allegation made for relief from a borrower's repayment obligations in a borrower defense application.

E.   **Class** or **Class Members** are the members of the class that has been certified by this Court and refers to individuals who meet the criteria set forth in Section II below. When used in this Agreement, the terms Class and Class Members refer, individually and collectively, to the Plaintiffs, the Class, and each Member of the Class.

F.   **Class Counsel** or **Plaintiffs' Counsel** refers to Plaintiffs' attorneys of record in this Action.

G.   **Class Notice** means the document attached hereto as Exhibit A, which shall be distributed pursuant to subsection X.B, below.

H.   **Court** means the U.S. District Court for the Northern District of California.

I.   **Department** refers to the U.S. Department of Education.

J.   **Direct Loan** means and refers to a loan made pursuant to the William D. Ford Federal Direct Loan Program, 20 U.S.C. § 1087a *et seq*.

K.   **Effective Date** means the date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement, entered by the Court in the form attached hereto as Exhibit B, becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal. When this Agreement refers to the date on which the Agreement became "Effective," such date is the Effective Date.

L.   **Execution Date** means the date upon which all Parties to this Agreement, and/or their counsel of record, have signed the Agreement.

M.  **Fairness Hearing** means a hearing held by the Court at which time the Court will determine whether this Agreement should be approved under Federal Rule of Civil Procedure 23(e).

N.  **Final Approval Date** refers to the date on which the Court enters Final Judgment approving this Agreement in the form attached hereto as Exhibit B.

O.  **Final Decision** refers to a decision by the Department either approving or denying settlement relief to a borrower under the terms of this Agreement.

P.  **FFEL** means and refers to a loan made pursuant to the Federal Family Education Loan Program, 20 U.S.C. §§ 1071-1087-4.

Q.  **Form Denial Notice** refers to a notice sent by the Department to a Class Member, in substantially the form of one of the documents submitted by Defendants to the Court in this Action at ECF Nos. 116-1, 116-2, 116-3, and 116-4.

R.  **FSA** is the Department's Federal Student Aid office.

S.  **Full Settlement Relief** means (i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt.

T.  **Involuntary Collection Activity** means any attempt by the Department or its agents to collect payments toward the Relevant Loan Debt (in whole or in part), as defined below, through involuntary means from a borrower in default, including but not limited to certifying the borrower's debts for collection through the Treasury Offset Program and/or administrative wage garnishment. Any activity by the Department or its agents that reduces the borrower's Relevant Loan Debt without any action by the borrower or which eliminates a default on the loan without action by the borrower is not an Involuntary Collection Activity.

U.  **Plaintiffs**, for purposes of Section V, includes Post-Class Applicants as the term is defined in Section IV.D.

V. **Preliminary Approval Date** refers to the date on which the Court enters a preliminary approval order, as set forth in subsection X.A.

W. **Relevant Loan Debt** refers to Direct Loans or FFEL loans associated with the school that is the subject of the Class Member's borrower defense application. That debt includes the original principal of the affected federal student loan plus any and all interest and fees that accrued or were incurred on that loan.

X. **School Group** refers to the name of a multi-institution organization based on ownership data and/or multi-campus institution as defined in FSA's Postsecondary Education Participants System ("PEPS"), to the extent that data is included in the borrower defense review platform.

Y. **Written Notice** is provided when the Department sends an email to the relevant individual's email address or, where the Department does not have such an email address available or becomes aware that email is undeliverable to the email address on file, the Department sends a copy of the relevant communication to the individual's last known mailing address.

III. **CLASS**

A. Pursuant to Federal Rule of Civil Procedure 23(b)(2), the Court has certified a plaintiff class consisting of all people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the Department, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 3:17-cv-7210 (N.D. Cal.). *See* ECF No. 46 (Oct. 30, 2019). In this Agreement, individuals who meet this class definition as of the date of class closure are referred to as "the Class" or "Class Members."

B. For the purposes of this Agreement, the Parties agree that the Class includes individuals who are members of the Plaintiffs' proposed "§ 555(e) Subclass," which the Parties agree includes all members of the class certified in this case on October 30, 2019 (ECF No. 46) whose borrower defense applications were denied

between the date of class certification and the Execution Date.  *See* Pls.' Suppl. Compl., ECF No. 198 ¶ 430 (May 4, 2021).

C.    As of the Effective Date, all Class Members are bound by the terms of this Agreement.

D.    The Class is closed as of the Execution Date.

## IV.   DEFENDANTS' CONSIDERATION

In consideration for the promises of Plaintiffs set forth in this Agreement, Defendants agree as follows:

A.    Relief for applications meeting certain school criteria.

    1.    No later than one year after the Effective Date, Defendants will effectuate Full Settlement Relief for each and every Class Member whose Relevant Loan Debt is associated with the schools, programs, and School Groups listed in Exhibit C hereto. If any such Class Member receiving relief under this Paragraph IV.A previously received a Form Denial Notice, the provision of Full Settlement Relief will be deemed to rescind that Form Denial Notice.

    2.    Class Members shall be eligible for this form of relief regardless of whether the Class Member is a member of the § 555(e) Subclass.

    3.    Defendants shall provide Written Notice of this relief to each qualifying Class Member no later than 90 calendar days after the Effective Date. The notice shall specify that the Class Member will receive Full Settlement Relief, as defined in this Agreement, and need not take any additional action to receive this relief. The notice shall also specify that the Class Member's Relevant Loan Debt will remain in forbearance or stopped collection status pending the effectuation of relief. If the notice is sent by email and it bounces back, Defendants will have an additional 90 calendar days to send the notice by first class mail to the last known mailing address.

4. The Parties acknowledge that some Class Members may be eligible for discharges of their loans, outside of this Agreement, based on the misconduct of schools they attended, and that nothing in this Agreement shall prevent the Department from effectuating such relief outside this Agreement. The Department agrees, however, that any such Class Members who are deemed eligible for such relief outside this Agreement shall receive Full Settlement Relief pursuant to this Agreement.

5. If the Department's borrower defense or loan data includes conflicting evidence which raises a substantial question as to whether a Class Member's Relevant Loan Debt is associated with a program, school, or School Group listed in Exhibit C, the question will be resolved in favor of the Class Member (*i.e.*, in favor of granting relief).

B. <u>Rescission of Form Denial Notices.</u>

1. For Class Members who do not receive relief pursuant to Paragraph IV.A, above, but previously received a Form Denial Notice, Defendants, no later than 120 calendar days after the Effective Date, will provide Written Notice to those Class Members that their denials have been rescinded and that their borrower defense applications are again under consideration.

2. For purposes of Paragraph IV.C.3, the Department will deem the applications of Class Members who previously received a Form Denial Notice to have been pending since the original date of submission.

C. <u>Process and timeline for issuing decisions on remaining Class applications.</u>

1. Defendants will apply the following procedures to their review of borrower defense applications submitted by Class Members who did not receive relief pursuant to Paragraph IV.A:

 i. Defendants will review the borrower defense application and any attachments included by the Class Member to determine whether the application states a claim that, if presumed to be true, would assert

a valid basis for borrower defense relief under the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926).  If it does, Defendants will provide that Class Member Full Settlement Relief.

ii.  If a Class Member's borrower defense application reviewed under this Paragraph IV.C alleges a misrepresentation or omission that, if presumed to be true, would assert a valid basis for borrower defense relief, Defendants will presume that the Class Member reasonably relied on that misrepresentation or omission regardless of whether the Class Member alleges such reliance in his or her application.

iii.  No borrower defense application reviewed under this Paragraph IV.C will be denied on the basis of insufficient evidence.

iv.  Defendants will not apply any statute of limitations to borrower defense applications reviewed under this Paragraph IV.C.

2.  Defendants will issue any Class Member whose borrower defense application is reviewed under this Paragraph IV.C a "settlement relief decision," a "revise and resubmit notice," or a "denial notice," as defined below.

i.  A "settlement relief decision" notifies a Class Member that his or her borrower defense application has been approved under the terms of this Settlement Agreement and that the Class Member will receive Full Settlement Relief.

ii.  A "revise and resubmit notice" notifies a Class Member that his or her borrower defense application is deficient, provides instructions on how to revise and resubmit his or her application, and advises the Class Member that he or she may do so within 6 months of the date of the notice. The notice will state that if the Class Member does not submit a revised application within 6 months, the notice itself will

serve as Defendants' final decision of denial and that the Class Member has the right to seek review of such decision in federal district court.

    iii.    A "denial decision" will only be issued to Class Members whose applications are denied after having resubmitted their application following receipt of a "revise and resubmit notice," as defined in the preceding subparagraph. A denial decision will explain the reasons the application was denied and apprise the recipient of his or her right to seek review of the decision in federal district court.

3.    Defendants will issue decisions to Class Members whose applications are reviewed under this Paragraph IV.C according to the timelines set forth below. For purposes of this subparagraph, a "decision" refers to either a "settlement relief decision" or a "revise and resubmit notice," as defined in Paragraph IV.C.2.

    i.    For any application submitted between January 1, 2015 and December 31, 2017, Defendants will issue a decision no later than 6 months after the Effective Date.

    ii.    For any application submitted between January 1, 2018 and December 31, 2018, Defendants will issue a decision no later than 12 months after the Effective Date.

    iii.    For any application submitted between January 1, 2019 and December 31, 2019, Defendants will issue a decision no later than 18 months after the Effective Date.

    iv.    For any application submitted between January 1, 2020 and December 31, 2020, Defendants will issue a decision no later than 24 months after the Effective Date.

v.     For any application submitted between January 1, 2021 and the Execution Date, Defendants will issue a decision no later than 30 months after the Effective Date.

vi.    If a Class Member has submitted more than one borrower defense application, the earliest submitted application will control for purposes of the timelines set forth above.

4.     Defendants will issue a final decision to any Class Member who resubmits his or her application after receiving a "revise and resubmit notice" no later than 6 months after Defendants receive the Class Member's resubmission. For purposes of this subparagraph IV.C.4, a "final decision" refers to either a "settlement relief decision" or a "denial decision" as defined in Paragraph IV.C.2.

5.     Class Members shall be eligible for the relief set forth in this Paragraph IV.C regardless of whether the Class Member is a member of the § 555(e) Subclass.

6.     The decisions required by this Paragraph IV.C shall be sent by Written Notice, as defined in this Agreement.

7.     The Relevant Loan Debt for each Class Member eligible under this section will remain in forbearance or stopped collection status either until he or she receives Full Settlement Relief or until the Department's decision denying the Class Member's claim becomes final pursuant to either Paragraph IV.C.2.ii or Paragraph IV.C.2.iii, as applicable. For this period of forbearance or stopped collection status, the Department will remove any interest that accrues on the Relevant Loan Debt.

8.     If a Class Member has not received a timely decision required under Paragraphs IV.C.3 and IV.C.4, as applicable, that Class Member shall receive Full Settlement Relief. Defendants shall provide the affected Class

Member with notice that the Class Member will receive this relief within 60 calendar days following the expiration of the applicable deadline.

9. Defendants will effectuate relief for any Class Member entitled to settlement relief pursuant to Paragraphs IV.C.3, IV.C.4, or IV.C.8, as applicable, no later than one year after the date that Defendants provide that Class Member Written Notice of the settlement relief decision.

D. Relief for Certain Post-Class Applicants.

1. If an individual submits a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval Date, such individual is a Post-Class Applicant. Defendants will issue a final decision on the merits of a Post-Class Applicant's application no later than 36 months after the Effective Date. In making these decisions, the Department will apply the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926).

2. If a Post-Class Applicant has not received a timely decision as required under Paragraph IV.D.1, that applicant shall receive Full Settlement Relief. Defendants shall provide the affected Post-Class Applicant with notice that the applicant will receive this relief within 60 calendar days following the expiration of the applicable deadline.

3. Defendants will effectuate relief for any Post-Class Applicant entitled to settlement relief pursuant to Paragraphs IV.D.1 and IV.D.2 no later than one year after the date that Defendants provide that applicant Written Notice of the settlement relief decision.

E. Class Member informational webpage. The Department will establish a webpage on its studentaid.gov website providing general information about this Agreement and links to copies of the Agreement and related Court documents. The webpage will be available to the public within 30 calendar days after the Preliminary Approval Date and will be updated no later than 30 calendar days after the Effective

Date to include information about how Class Members can contact the Department
if the Class Member has questions regarding their borrower defense application.

F.     Effectuating relief.

    1.     Defendants have effectuated relief for purposes of Paragraphs IV.A, IV.C,
and IV.D when they and their loan servicers have taken all steps necessary
to discharge the Relevant Loan Debt of the Class Member (or Paragraph
IV.D. Post-Class Applicant), including but not limited to (1) discharging
any interest that accrued while the borrower defense application was
pending; (2) determining if the Class Member (or Paragraph IV.D Post-
Class Applicant) is entitled to any refund, and if so, issuing refund check(s)
for payment of that refund; (3) if the Class Member's (or Paragraph IV.D
Post-Class Applicant's) Relevant Loan Debt was previously in default,
removing such debt from default status; and (4) requesting the deletion of
the relevant tradeline.

    2.     Class Members (or Paragraph IV.D Post-Class Applicants) who receive
relief under Paragraphs IV.A, IV.C, or IV.D shall not be required to take
steps to consolidate any Relevant Loan Debt into a Direct Loan to receive
the relief to which they are entitled pursuant to those Paragraphs.
Defendants shall take all necessary steps to ensure that other loan holders
effectuate the required relief.

G.     Reporting Requirement.

    1.     Within 30 calendar days after the Effective Date, Defendants will provide
Plaintiffs with, as of the Final Approval Date, (i) the total number of Class
Members, (ii) the total number of Class Members the Department has
determined are eligible for Full Settlement Relief pursuant to Paragraph
IV.A; (iii) the total number of Class Members who must receive decisions
pursuant to Paragraph IV.C; and (iv) the total number of Class Members
and Post-Class Applicants who must receive decisions by each deadline set

forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively, and a schedule of the dates certain by which such decisions must be received pursuant to these paragraphs.

2.      Defendants will submit quarterly reports to Plaintiffs documenting their progress toward fulfilling their obligations under Paragraphs IV.A, IV.C, and IV.D of this Agreement. Defendants will submit these reports to Plaintiffs' Counsel via electronic mail and will post those reports publicly on their Federal Student Aid website.

3.      The first quarterly report shall be submitted 120 calendar days after the Effective Date, unless that day falls on a weekend or Federal holiday, in which case the report shall be submitted on the next business day. The quarterly reports shall be submitted every 90 calendar days thereafter, subject to the same exceptions where the 90th day falls on a weekend or Federal holiday.

4.      The quarterly reports described herein shall contain the information listed below. The first report will reflect progress Defendants have made since the Effective Date and later reports will reflect the progress Defendants made from the last date reported in the prior report to the end of each reporting period. The first reporting period will start on the Effective Date. Each subsequent reporting period will start on the last date for which progress was reported in any previous report. Each reporting period shall exclude a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report.

i.      The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass);

Settlement Agreement
3:19-cv-03674-WHA
13

ii. The total number of settlement relief decisions, revise and resubmit notices, and denial decisions, as defined in Paragraph IV.C.2, that Defendants have issued to Class Members pursuant to Paragraph IV.C;

iii. The number of Class Members who received settlement relief decisions; the number of Class Members who received "revise and resubmit notices"; and the number of Class Members who received final denial decisions during the reporting period; and

iv. The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A, including the number of Class Members for whom Defendants effectuated relief during the reporting period.

v. For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision.

5. All of the data required in this section is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

6. Defendants shall notify Plaintiffs' Counsel within 30 calendar days of the date as of which they have resolved all Class Members' borrower defense applications, notified all Class Members of their final decisions (where applicable), and effectuated all appropriate relief to Class Members, at which point Defendants' reporting obligations will cease. Until Defendants provide such notice, Defendants shall continue providing quarterly reports as required by this Paragraph IV.G.

H.   Other Assurances. In accordance with applicable statutory and regulatory requirements, and additional governing policies and procedures specific to

Defendants' consideration of borrower defense claims, Defendants represent and confirm that the following policies will apply to all Class Members throughout the time covered by the Agreement:

1.   Defendants do not take action to collect outstanding student loan debts through involuntary collection activity against individuals with pending borrower defense applications, as required by the Department's borrower defense regulations. However, this Agreement does not preclude a Class Member from proactively and voluntarily paying his or her student loans.

2.   Defendants provide an interest credit for any interest that accrues on the relevant federal student loan accounts of borrowers between the time that the borrower submits his or her borrower defense application and the time the Department issues a final decision on the application and notifies the borrower of that decision.

## V.   ENFORCEMENT

A.   Notwithstanding all other provisions outside Section V of this Agreement, the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V. In connection with each such claim, the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section. The Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement.

B.   The only claims permissible to enforce this Agreement are as follows:

1.   <u>Failure to Provide Relief to Class Members Who Did Not Receive a Decision by the Decision Due Date.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached the Agreement if Defendants have (i) failed to issue to a Class Member or Post-Class Applicant by the due date established in Paragraph IV.C.3, IV.C.4, or IV.D.2, as applicable,

a decision, as defined by Paragraph IV.C.2; and (ii) subsequently failed, within 30 calendar days following the expiration of the applicable deadline, to provide that Class Member with notice that they will receive Full Settlement Relief, as required by Paragraph IV.C.8 or IV.D.2, as applicable.

i. Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected Class Member on a timetable set by the Court. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

ii. In the event of such a Court order, Defendants will report to Plaintiffs' Counsel and the Court on its progress of issuing relief, as provided herein, to affected Class Members.

2. <u>Failure to Issue Relief by Relief Due Date.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.A.1, IV.C.9, IV.D.1, and/or IV.D.3 of the Agreement by failing to effectuate relief within the prescribed time periods for any individual who is entitled to receive relief pursuant those Paragraphs.

i. Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected individual on a schedule set by the Court. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

ii. In the event of such a Court order, Defendants will report to Plaintiffs' Counsel and the Court on its progress of issuing relief, as provided herein, to affected Class Members.

3. <u>Failure to Submit Timely Quarterly Reports.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.G of the Agreement by failing to submit a timely and complete quarterly report to

Plaintiffs' Counsel via electronic mail within 90 calendar days after the deadline for the report according to the timelines specified therein. Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring Defendants to submit their reports on a monthly basis from the point of the order forward. Defendants shall also be liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing the claim.

4. <u>Involuntary Collections of Class Members' Student Loan Debt.</u> Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.H.1 of the Agreement by collecting on a Relevant Loan after the Effective Date through involuntary collection activity against a Class Member or Post-Class Applicant while his or her application was or is pending or while the Class Member or Post-Class Applicant was or is awaiting the effectuation of relief.

    i. Should Plaintiffs prevail on this claim, the only relief available from the Court shall be an order requiring the Department to refund the payment(s) collected. If Defendants do not have a valid address for the affected borrowers to send the refunds, Defendants will take reasonable steps to engage in skip tracing to find a valid address.

    ii. Defendants shall be liable for a material breach under this Paragraph V.B.4 if involuntary collection activity occurs because they, their agents, or their contractors took action to collect a debt through an involuntary collection activity. Defendants shall not be liable based on events outside of Defendants' control, including but not limited to a situation where a third party, such as an employer, undertakes debt collection activities, such as wage garnishment, inconsistent with Defendants' instructions that collection activity cease.

C.   All claims listed above are subject to the complete defense of impracticability or impossibility of performance, as set forth below in Paragraph V.D.5 and Paragraph XII, as well as the defense that the breach claimed by Plaintiffs is not material.

D.   The exclusive procedure for bringing a claim to enforce the terms and conditions of this Agreement shall be as follows:

1.   Prior to asserting any claim pursuant to Paragraph V.B, above, Plaintiffs' Counsel shall submit written notice alleging a material breach of this Agreement to counsel for Defendants. Such notice shall be submitted by electronic mail, and shall specify what alleged breach has occurred; describe the facts and circumstances supporting the claim; and state that Plaintiffs intend to seek an order from the Court pursuant to Paragraph V.B. Plaintiffs shall not inform the Court of their allegation(s) at that time.

2.   Within 2 business days of receipt of the notice from Plaintiffs' Counsel, Defendants will acknowledge receipt of Plaintiffs' notice.

3.   Defendants shall have a period of 14 calendar days after receipt of such notice from Plaintiffs' Counsel to inform Plaintiffs' Counsel in writing of its determination on whether a material breach has occurred, including relevant information that informed Defendants' determination.

i.   If Defendants agree that a material breach has occurred, Defendants will disclose any action they propose to take to resolve the alleged material breach in the written notice to Plaintiffs as described by this Paragraph V.D.3. The Parties will meet and confer to determine whether those actions are sufficient within 5 business days of Plaintiffs' receipt of Defendants' notice.

a.   Upon Defendants' request, Plaintiffs shall provide to Defendants any information and materials available to Plaintiffs that support the violation alleged in the notice.

b. Defendants will have 21 calendar days following the Parties' meet and confer to take the action(s) specified in their written notice and/or any further action(s) agreed upon in writing by the Parties.

c. If the Parties agree about the existence of a material breach, but cannot reach consensus on the appropriate action to resolve that breach within 21 calendar days following the Parties' meet and confer, either Party may file a motion for enforcement of the Agreement.

ii. If Defendants do not agree that a material breach has occurred, the Parties will meet and confer to determine if a consensus can be reached within 5 business days after Plaintiffs' receipt of Defendants' notice as described in this Paragraph V.D.3. If a consensus cannot be reached within 21 business days following the Parties' meet and confer, Plaintiffs may file a motion for enforcement of the Agreement.

4. Absent the prior, written agreement of the Parties, any motion for enforcement of the Agreement must be brought within two (2) years after the Parties notify the Court that Defendants have resolved all Class Members' borrower defense applications, notified all Class Members of their final decisions (where applicable), and effectuated all appropriate relief to Class Members, as specified in Paragraph XI, below. Otherwise, any claim of material breach not brought within two (2) years of such date shall be forever waived by Plaintiffs.

5. If Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV, above, due to extraordinary circumstances beyond Defendants' control, Defendants will notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination

that they will not be able to fully perform their obligations. Within that notification, Defendants will describe the facts providing their basis for believing extraordinary circumstances beyond Defendants' control prevent Defendants from fully performing their obligations. Within 14 calendar days of that notice, the Parties will meet and confer as to whether the circumstances are beyond the Defendants' control and to what extent they affect Defendants' ability to issue final decisions or effectuate relief. If the Parties agree an extension is warranted, the Parties will negotiate the length of an appropriate extension, and the deadlines set forth for Defendants' performance in Paragraph IV may be altered accordingly. If the Parties cannot agree as to whether extraordinary circumstances exist or what the appropriate length of an extension is, Plaintiffs may raise a claim of material breach of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph. Defendants shall be permitted to oppose the filing of such a claim upon the grounds of extraordinary circumstances, and the Court will at that point have jurisdiction to determine whether Defendants are entitled to any extension of the deadlines set forth in Paragraph IV on the basis of extraordinary circumstances. The extension set forth in this Paragraph V.D.5 shall be for a minimum of seven (7) calendar days beyond the deadlines for performance set forth in Paragraph IV without requiring any action by any Party other than Defendants, and may be longer than that period pursuant to written agreement among the Parties.

E.   The Court relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations, and other requests for relief in this Action that are not expressly stated in this Paragraph V.

F.    The Court shall have no jurisdiction to supervise, monitor, or issue orders in this Action, except to the extent that Plaintiffs invoke the Court's jurisdiction pursuant to the procedures set forth in this Paragraph V.

## VI.    ATTORNEYS' FEES

A.    To resolve Plaintiffs' claim for attorneys' fees, costs, and expenses, Plaintiffs will submit a petition for fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), to the Court.

B.    Defendants agree that Plaintiffs are the prevailing party in this action for purposes of a fee petition under the Equal Access to Justice Act.

C.    Nothing in this Section shall affect the Parties' ability to attempt to reach a compromise regarding Plaintiffs' claim for attorneys' fees, costs, and expenses.

## VII.    WAIVER AND RELEASE

Plaintiffs, the Class Members, and their heirs, administrators, representatives, attorneys, successors, and assigns, and each of them hereby forever waive, release, and forever discharge Defendants, and all of their officers, employees, and agents, from, and are hereby forever barred and precluded from prosecuting, any and all claims, causes of action, motions, and requests for any injunctive, declaratory, and/or monetary relief, including but not limited to damages, tax payments, debt relief, costs, attorney's fees, expenses, and/or interest, whether presently known or unknown, contingent or liquidated, alleged in this Action against Defendants through and including the Effective Date, including but not limited to the right to appeal any and all claims Plaintiffs asserted in this Action.  This Agreement is not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date, including but not limited to claims by Class Members based on the substance or content of their borrower defense decisions. The Parties do not intend to waive or narrow any res judicata defense Defendants could assert against a future claim brought by any Plaintiff.

## VIII.    NO ADMISSION OF LIABILITY

A.    Nothing in this Settlement Agreement shall constitute or be construed to constitute an admission of any wrongdoing or liability by Defendants, an admission by

Defendants of the truth of any allegation or the validity of any claim asserted in this Action, a concession or admission by Defendants of any fault or omission of any act or failure to act, or an admission by Defendants that the consideration provided to Plaintiffs under Paragraph IV, above, represents relief that could be recovered by Plaintiffs in this Action.

B.     Plaintiffs may not offer, proffer, or refer to any of the terms of this Agreement as evidence in any civil, criminal, or administrative proceedings other than proceedings that may be necessary to enforce the Agreement as set forth in Paragraph V, above, or to obtain approval from the Court as set forth in Paragraph X, below.

## IX.    PLAINTIFFS' COVENANTS NOT TO SUE

A.     Plaintiffs hereby covenant not to commence any action, claim, suit, or administrative proceeding against Defendants related to the non-performance, failed performance, or otherwise unsatisfactory performance in fulfilling their duties and responsibilities under this Agreement; provided, however, that Plaintiffs may initiate an action against Defendants pursuant to the continuing jurisdiction of the Court to compel Defendants' performance of their obligations under this Agreement, but only as expressly articulated in this Agreement in Paragraph V, above.

B.     Plaintiffs hereby covenant not to commence against Defendants any action, claim, suit, or administrative proceeding on account of any claim or cause of action that has been released or discharged by this Agreement.

## X.    PROCEDURES GOVERNING APPROVAL OF THIS AGREEMENT

A.     Within 14 calendar days of the Execution Date, the Parties shall jointly submit this Agreement and its exhibits to the Court, and shall apply for entry of an Order in which the Court:

1.     Grants preliminary approval to this Agreement as being fair, reasonable, and adequate to Plaintiffs;

2.      Approves the form of the Class Notice attached hereto as Exhibit A;

3.      Directs the Parties to provide Class Notice as set forth in Paragraph X.B below, and grants approval of such plan as reasonable under Federal Rule of Civil Procedure 23(e)(1);

4.      Schedules a Fairness Hearing to determine whether this Agreement should be approved as fair, reasonable, and adequate, and whether an order approving the settlement should be entered pursuant to Federal Rule of Civil Procedure 23(e);

5.      Provides that any person who wishes to object to the terms of this Agreement, or to the entry of an Order approving this Agreement, must file a written Notice of Objection with the Court specifying the objections and the basis for such objections as provided in the Class Notice, with copies served on all Parties' counsel;

6.      Provides that between the Execution Date and the Fairness Hearing, the Defendants shall direct all inquiries from Class Members and Post-Class Applicants regarding the Agreement to Plaintiffs' Counsel;

7.      Provides that in order to have an objection considered and heard at the Fairness Hearing, such written Notice of Objection must be filed with the Court and served on counsel by the date specified in the Class Notice;

8.      Provides that the Parties shall each be entitled, but not required, to respond, in writing, to any Objections up to 14 calendar days prior to the Fairness Hearing; and

9.      Provides that the Fairness Hearing may, from time to time and without further notice to the Class, be continued or adjourned by order of the Court.

B.      After the Court enters an Order containing all of the items set forth in Paragraph X.A, above, the Parties shall promptly distribute the Class Notice as follows:

1.      Defendants shall email all Class Members who provided their e-mail addresses to the Department on their borrower defense applications, or,

where Defendants do not have such an e-mail address available or become aware that email is undeliverable to the email address on file, Defendants shall send a copy of the notice to the Class Member's last known mailing address by first class mail.

2. Class Counsel will update the Class Member website's "Frequently Asked Questions" page regarding the lawsuit. A link to the Class Members' website will be included in the Class Notice and will be included on the Department's website.

3. Plaintiffs will also circulate the Class Notice to legal aid and advocacy organizations across the country providing borrower defense assistance.

C. No later than 3 business days before the Fairness Hearing, the Parties shall each file with the Court a declaration confirming compliance with the Notice procedures approved by the Court.

D. At the Fairness Hearing, the Parties shall jointly request the Court's final approval of this Agreement, pursuant to Federal Rule of Civil Procedure 23(e). The Parties agree to take all actions necessary to obtain approval of this Agreement.

E. If, after the Fairness Hearing, the Court approves this Agreement as fair, adequate, and reasonable, the Parties consent to entry of Final Judgment in a form substantively identical to the Final Judgment attached hereto as Exhibit B.

F. Within 120 days after the Effective Date, Defendants shall send Written Notice to all Post-Class Applicants informing them of their status as Post-Class Applicants and the provisions of the Agreement that apply to them.

## XI. DISMISSAL AND JURISDICTION OF THE COURT TO ENFORCE THIS AGREEMENT

The Parties hereby stipulate and agree to entry of Final Judgment in a form substantively identical to the Final Judgment attached hereto as Exhibit B. As provided in that exhibit, Plaintiffs' claims in this Action are dismissed with prejudice, except that the Court shall retain limited jurisdiction for the sole purpose of enforcing the terms of this Agreement as expressly set forth in Paragraph V of this Agreement. Once Defendants have resolved all Class Members' and Post-

Class Applicants' borrower defense applications, notified all Class Members and Post-Class Applicants of their final decisions (where applicable), and effectuated all appropriate relief to Class Members and Post-Class Applicants, the Parties will file a notice with the Court. Upon the date of that notice, the Court's jurisdiction over this Action shall completely terminate.

The Parties agree that any order of the Court granting approval of this Agreement does not render the terms and conditions of this Agreement subject to the contempt powers of the Court.

## XII. IMPOSSIBILITY OF PERFORMANCE

In addition to the excuses to performance listed in Paragraph V.D.5, above, if Congress renders Defendants' performance under this Agreement impossible, in whole or in part, then Defendants shall forever be relieved of all obligations that would, as a result of such Congressional action, be impossible to perform. Defendants shall not be required to take any action, or attempt to take any action, which would circumvent or violate, or have the effect of circumventing or violating, the law.

## XIII. CONDITIONS THAT RENDER THIS AGREEMENT VOID OR VOIDABLE

A. This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review.

B. This Agreement shall be voidable by Plaintiffs and/or Defendants if the Court does not enter a Final Judgment, or other Final Approval Order, that is substantively identical to the one attached hereto as Exhibit B. Any Party's decision to void the Agreement under this provision is effective only if that Party provides notice of its decision, in writing, to the counsel of record for all other Parties within 30 calendar days of the date on which the Court entered Final Judgment.

C. This Agreement shall be voidable by Plaintiffs if a condition of impossibility occurs, as described in Paragraph XII. Plaintiffs' decision to void the Agreement under this provision is effective only if Plaintiffs' Counsel provides notice of their decision, in writing, to the counsel of record for Defendants.

**XIV.   EFFECT OF AGREEMENT IF VOIDED**

A.   Should this Agreement become void as set forth in Section XIII above, none of the Parties will object to reinstatement of this Action in the same posture and form as it was pending immediately before the Execution Date.

B.   All negotiations in connection herewith, and all statements made by the Parties at or submitted to the Court as part of the Fairness Hearing process, shall be without prejudice to the Parties to this Agreement and shall not be deemed or construed to be an admission by a Party of any fact, matter, or proposition, nor admissible for any purpose in the Action other than with respect to the settlement of same.

C.   The Parties shall retain all defenses, arguments, and motions as to all claims that have been or might later be asserted in this Action, and nothing in this Agreement shall be raised or construed by any Party to defeat or limit any claims, defenses, arguments, or motions asserted by either Party.

**XV.   MODIFICATION OF THIS AGREEMENT**

A.   Before the Preliminary Approval Date, this Agreement, including the attached exhibits, may be modified only upon the written agreement of the Parties.

B.   After the Preliminary Approval Date—including the time after which Final Judgment has been entered—this Agreement, including the attached exhibits, may be modified only with the written agreement of all the Parties and with the approval of the Court, upon such notice to the Class, if any, as the Court may require.

**XVI.   RULES OF CONSTRUCTION**

A.   The Parties acknowledge that this Agreement constitutes a negotiated compromise. The Parties agree that any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Agreement.

B.   This Agreement shall be construed in a manner to ensure its consistency with federal law. Nothing contained in this Agreement shall impose upon Defendants any duty, obligation, or requirement, the performance of which would be

1  inconsistent with federal statutes, rules, or regulations in effect at the time of such

2  performance.

3     C.   The headings in this Agreement are for the convenience of the Parties only and

4  shall not limit, expand, modify, or aid in the interpretation or construction of this

5  Agreement.

6  **XVII. INTEGRATION**

7     This Agreement and its exhibits constitute the entire agreement of the Parties, and no prior

8  statement, representation, agreement, or understanding, oral or written, that is not contained herein,

9  will have any force or effect.

10  **XVIII. EXECUTION**

11     This Agreement may be executed in counterparts. Facsimiles and Adobe PDF versions of

12  signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

13

14  For the Defendants:               For the Plaintiffs:

15

16  *R. Charlie Merritt*

17  BRIAN D. NETTER             EILEEN M. CONNOR (SBN 248856)
    Deputy Assistant Attorney General     econnor@law.harvard.edu

18  STEPHANIE HINDS          REBECCA C. ELLIS (*pro hac vice*)
    United States Attorney         rellis@law.harvard.edu

19  MARCIA BERMAN           LEGAL SERVICES CENTER OF
    Assistant Branch Director       HARVARD LAW SCHOOL

20  R. CHARLIE MERRITT       122 Boylston Street

21  Trial Attorney             Jamaica Plain, MA 02130
    U.S. Department of Justice       Tel.: (617) 390-3003

22  Civil Division, Federal Programs Branch   Fax: (617) 522-0715

23  1100 L Street, N.W.
    Washington, DC 20005        JOSEPH JARAMILLO (SBN 178566)

24  Telephone: (202) 616-8098      jjaramillo@heraca.org
    E-mail: robert.c.merritt@usdoj.gov   HOUSING & ECONOMIC RIGHTS

25  ADVOCATES
    3950 Broadway, Suite 200

26  Oakland, California 94611
    Tel.: (510) 271-8443

27  Fax: (510) 868-4521

28

# Exhibit A

**DRAFT**

**Internal Name:** BD Sweet v. Cardona – General Notification
**Internal Number:** 01
**Subject if sent electronically:** Notice of Proposed Class Action Settlement - Important borrower defense information for you

[DATE]

Borrower Defense Application #: [Case Number]

Dear [Primary Contact Name]:

**Your rights may be affected, please read carefully.**

You filed a borrower defense application asking the U.S. Department of Education ("Department") to cancel some or all of your federal student loan debt because you allege the school you (or your child) attended engaged in unlawful conduct.  We write to inform you that there is a proposed settlement in a class action lawsuit that could affect your claim and to explain how your legal rights may be affected by that lawsuit.

As a borrower defense applicant, you may have been previously informed of a class action lawsuit called *Sweet v. DeVos*, which challenged the Department's delay in issuing final decisions on borrower defense applications, including yours.  You may also have been informed in 2020 that the parties had proposed a settlement of the lawsuit, subject to the court's approval.  The court did not approve that proposed settlement, so the lawsuit continued.  You can find more information about that here: https://predatorystudentlending.org/news/press-releases/in-new-ruling-judge-denies-borrower-defense-settlement-over-department-of-educations-perfunctory-alarmingly-curt-denials-press-release/. The lawsuit now also challenges the Department's denial of certain borrower defense applications.

We now write to inform you that there is a new proposed settlement of the lawsuit.  The settlement will not become final until it is approved by the court as fair, adequate, and reasonable.  This Notice describes how your legal rights may be affected by this settlement.

**What is the case about?**

A lawsuit was filed in a federal court in California by seven borrower defense applicants who represent, with certain exceptions, all borrowers with pending borrower defense applications. The lawsuit challenges the way the Department has been dealing with borrower defense applications over the past few years, including the Department's delays in issuing final decisions and the Department's denial of certain applications starting in December 2019.  The case is now called *Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.).

Now, both parties are proposing to settle this lawsuit.  This proposed settlement is a compromise of disputed claims, and Defendants continue to deny that they have acted unlawfully.

**What are the terms of the proposed settlement for borrowers who applied for borrower defense relief *on or before June 22, 2022*?**

In the proposed settlement, the Department agrees to resolve the borrower defense applications of people who have borrower defense applications pending as of June 22, 2022 on the following terms:

- If your borrower defense application related to federal student loans borrowed to pay for attendance at a school on the list attached to this letter, you will receive a discharge of federal loans associated with that school and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report. Within 90 days of the date that the court's approval of the settlement agreement becomes final, the Department will notify you that you will receive this relief. You will receive the relief within one year of the final effective date of the settlement agreement. Until this relief is provided, the Department will not take action to collect your debt.

- If your loans are not associated with a school on the list attached to this letter, you will receive a decision on your application according to the following schedule:

  o If you submitted your application between January 1, 2015 and December 31, 2017, the Department will issue a decision no later than 6 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2018 and December 31, 2018, the Department will issue a decision no later than 12 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2019 and December 31, 2019, the Department will issue a decision no later than 18 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2020 and December 31, 2020, the Department will issue a decision no later than 24 months after the court's approval of the settlement agreement becomes final.

  o If you submitted your application between January 1, 2021 and June 22, 2022, the Department will issue a decision no later than 30 months after the court's approval of the settlement agreement becomes final.

- If you do not receive a decision within the timeline outlined above, you will receive a discharge of federal loans associated with your borrower defense applications and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

- The Department will decide your application in a streamlined review process that will determine whether the application states a claim that, if presumed to be true, would assert a valid basis for

borrower defense; will not require further supporting evidence; will not require proof of reliance; and will not apply any statute of limitations to your application.

- If your application is approved under the procedures above, you will receive a discharge of federal loans associated with your borrower defense application and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

- The Department will not deny your application without first providing instructions on what is required for a successful application and giving you the opportunity to resubmit your application.

  o If you choose to resubmit your application, you must do so within 6 months after receiving those instructions.  The instructions will explain that if you do not resubmit within the 6-month period, your application will be considered denied.

  o If you choose to resubmit your application within the 6-month time period after receiving the instructions, the Department will issue you a final decision no later than 6 months after receiving your resubmitted application.

- If you received a notice from the Department in December 2019 or later informing you that your borrower defense application was denied, that denial has been voided and the Department is reviewing your application pursuant to the terms described above.

**What are the terms of the proposed settlement for borrowers who applied for borrower defense relief *after June 22, 2022 but before final approval of the settlement*?**

- If you submitted your application after June 22, 2022, but before the court approves the settlement agreement, the Department will issue a decision on your application no later than 36 months after the court's approval of the settlement agreement becomes final.  If the Department does not issue a decision within that time period, you will receive a discharge of federal loans associated with your borrower defense application and a refund of any amounts paid to the Department on those federal loans, and the credit tradeline for those loans will be deleted from your credit report.

**Does the Department have any reporting obligations?**

- The Department will provide your lawyers with information about its progress making borrower defense decisions every three months, including how many decisions the Department has made and how many borrowers have received a loan discharge.

**What if my loan is in default?**

- If you are in default, the Department will not take action to collect your debt, such as by garnishing your wages (that is, taking part of your paycheck) or taking portions of your tax refund, while your application is pending or while you are waiting to receive any relief you are owed under the settlement.

**What happens next?**

The court will need to approve the proposed settlement before it becomes final.  The court will hold a public hearing, called a fairness hearing, to decide if the proposed settlement is fair.  The hearing will be held on _____, 2022, beginning at _____, at the following address:

> United States District Court
> Northern District of California
> 450 Golden Gate Avenue, Courtroom 12, 19th Floor
> San Francisco, California 94102

Information about the hearing, including the process for participation and virtual attendance (if any), will be posted at https://predatorystudentlending.org/cases/sweet-v-devos/.

**What should I do in response to this Notice?**

IF YOU AGREE with the proposed settlement, you do not have to do anything.  You have the right to attend the fairness hearing, at the time and place above, but **you are not required to do so.**

IF YOU DISAGREE WITH OR HAVE COMMENTS on the proposed settlement, you can write to the court or ask to speak at the hearing.  You must do this by writing to the Clerk of the Court, at the following mailing address:

> Clerk of the Court
> United States District Court
> Northern District of California
> 450 Golden Gate Avenue
> San Francisco, California 94102

You can also submit comments by email to the Clerk of Court at [email address]. Your written comments or request to speak at the fairness hearing must be postmarked or date-stamped by ____, 2022.  The Clerk will provide copies of the written comments to the lawyers who brought the lawsuit.

**Where can I get more information?**

There is more information about the *Sweet* lawsuit on Class Counsel's website at https://predatorystudentlending.org/cases/sweet-v-devos/. Check this site periodically for updated information about the lawsuit.

A copy of the proposed settlement is available online at https://predatorystudentlending.org/cases/sweet-v-devos/documents/.

If you have questions about this lawsuit or about the proposed settlement, please visit this Frequently Asked Questions page, https://predatorystudentlending.org/sweet-v-devos-class-members/, which also has contact information for the lawyers who brought the lawsuit.

Sincerely,

U.S. Department of Education

Federal Student Aid

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al.*,

          Plaintiffs,

     v.

MIGUEL CARDONA, in his official capacity
as Secretary of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION

          Defendants.

No. 3:19-cv-03674-WHA

**ORDER APPROVING SETTLEMENT
AGREEMENT AND ENTERING FINAL
JUDGMENT**

Hon. William Alsup

Following this Court's Order preliminarily approving the proposed Settlement Agreement ("Agreement"), Plaintiffs and Defendants ("the Parties") disseminated a Notice of Proposed Settlement and Fairness Hearing to the Plaintiff Class.  After consideration of the written submissions of the Parties, the Agreement between the Parties, any objections to the Agreement, all filings in support of the Agreement, and the presentations at the hearing held by the Court to consider the fairness of the Agreement, the Court hereby Orders, Finds, Adjudges, and Decrees that:

1.     The Agreement between the Parties is finally approved as fair, reasonable, and adequate.  The Court hereby incorporates the terms of the Agreement, executed by the Parties on June 22, 2022, into this Judgment Order.

2.     Except as provided in paragraph 3 of this Order, this action is hereby dismissed with prejudice.

3.     The Court shall retain jurisdiction over this action solely to enforce the terms of the Agreement, but only such jurisdiction as expressly set forth in Section V of the Agreement.

4.     Once Defendants have decided all Class Members' borrower defense claims, notified all Class Members of their final decisions (where applicable), and effectuated all

appropriate relief to Class Members, the Parties will file a notice with the Court. Upon the date of that notice, the Court's jurisdiction over this action shall completely terminate.

**IT IS SO ORDERED.**

Dated:

_____
The Honorable William Alsup
United States District Judge

**Exhibit C**

*Sweet v. Cardona* Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Alta Colleges, Inc. (Westwood) | Westwood College |
| American Commercial Colleges, Inc. | American Commercial College |
| American National University | American National University |
| Ana Maria Piña Houde and Marc Houde | Anamarc College |
| Anthem Education Group; International Education Corporation | Anthem College |
| | Anthem Institute |
| Apollo Group | University of Phoenix |
| | Western International University |
| ATI Enterprises | ATI Career Training Center |
| | ATI College |
| | ATI College of Health |
| | ATI Technical Training Center |
| B&H Education, Inc. | Marinello School of Beauty |
| Berkeley College (NY) | Berkeley College |
| Bridgepoint Education | Ashford University |
| | University of the Rockies |
| Capella Education Company; Strategic Education, Inc. | Capella University |
| Career Education Corporation | American InterContinental University |
| | Briarcliffe College |
| | Brooks College |
| | Brooks Institute |
| | Collins College |
| | Colorado Technical University |
| | Gibbs College |
| | Harrington College of Design |
| | International Academy of Design and Technology |
| | Katharine Gibbs School |
| | Le Cordon Bleu |
| | Le Cordon Bleu College of Culinary Arts |
| | Le Cordon Bleu Institute of Culinary Arts |
| | Lehigh Valley College |
| | McIntosh College |
| | Missouri College of Cosmetology North |
| | Pittsburgh Career Institute |
| | Sanford-Brown College |
| | Sanford-Brown Institute |
| | Brown College |
| | Brown Institute |
| | Washington Business School |
| | Allentown Business School |
| | Western School of Health and Business Careers |
| | Ultrasound Diagnostic Schools |
| | School of Computer Technology |

*Sweet v. Cardona* Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| | Al Collins Graphic Design School |
| | Orlando Culinary Academy |
| | Southern California School of Culinary Arts |
| | California Culinary Academy |
| | California School of Culinary Arts |
| | Pennsylvania Culinary Institute |
| | Cooking and Hospitality Institute of Chicago |
| | Scottsdale Culinary Institute |
| | Texas Culinary Academy |
| | Kitchen Academy |
| | Western Culinary Institute |
| Center for Employment Training | Center for Employment Training |
| Center for Excellence in Higher Education (CEHE) | California College San Diego |
| | CollegeAmerica |
| | Independence University |
| | Stevens-Henager |
| Computer Systems Institute | |
| Court Reporting Institute, Inc. | Court Reporting Institute |
| Cynthia Becher | La' James College of Hairstyling |
| | La' James International College |
| David Pyle | American Career College |
| | American Career Institute |
| Delta Career Education Corporation | McCann School of Business & Technology |
| | Miami-Jacobs Career College |
| | Miller Motte Business College |
| | Miller-Motte College |
| | Miller-Motte Technical College |
| | Tucson College |
| DeVry | American University of the Caribbean |
| | Carrington College |
| | Chamberlain University |
| | DeVry College of Technology |
| | Devry Institute of Technology |
| | DeVry University |
| | Keller Graduate School of Management |
| | Ross University School of Veterinary Medicine |
| | Ross University School of Medicine |
| EDMC/Dream Center | Argosy University |
| | The Art Institute |
| | Brown Mackie College |
| | Illinois Institute of Art (The) |
| | Miami International University of Art & Design |
| | New England Institute of Art (The) |
| | South University |
| | Western State University College of Law |
| | All-State Career School |

*Sweet v. Cardona* Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Education Affiliates (JLL Partners) | Fortis College |
| | Fortis Institute |
| Edudyne Systems Inc. | Career Point College |
| Empire Education Group | Empire Beauty School |
| Everglades College, Inc. | Everglades University |
| | Keiser University |
| FastTrain | FastTrain |
| Globe Education Network | Globe University |
| | Minnesota School of Business |
| Graham Holdings Company (Kaplan) | Bauder College |
| | Kaplan Career Institute |
| | Kaplan College |
| | Mount Washington College |
| | Purdue University Global |
| Grand Canyon Education, Inc. | Grand Canyon University |
| Infilaw Holding, LLC | Arizona Summit Law School |
| | Charlotte School of Law |
| | Florida Coastal School of Law |
| International Education Corporation | Florida Career College |
| | United Education Institute |
| ITT Educational Services Inc. | ITT Technical Institute |
| JTC Education, Inc. | Gwinnett College |
| | Medtech College |
| | Radians College |
| Laureate Education, Inc. | Walden University |
| Leeds Equity Partners V, L.P. | Florida Technical College |
| | National University College |
| | NUC University |
| Liberty Partners | Concorde Career College |
| | Concorde Career Institute |
| Lincoln Educational Services Corporation | International Technical Institute |
| | Lincoln College of Technology |
| | Lincoln Technical Institute |
| Mark A. Gabis Trust | Daymar College |
| Mission Group Kansas, Inc. | Wright Business School |
| | Wright Career College |
| Premier Education Group L.P. | American College for Medical Careers |
| | Branford Hall Career Institute |
| | Hallmark Institute of Photography |
| | Hallmark University |
| | Harris School of Business |
| | Institute for Health Education (The) |
| | Micropower Career Institute |
| | Suburban Technical School |
| | Salter College |
| | Beckfield College |

*Sweet v. Cardona* Settlement Agreement Exhibit C

| School Owner(s) | School/Brand Name |
|---|---|
| Quad Partners LLC | Blue Cliff College |
| | Dorsey College |
| Remington University, Inc.; Remington College BCL, Inc. | Remington College |
| Southern Technical Holdings, LLC | Southern Technical College |
| Star Career Academy | Star Career Academy |
| Sullivan and Cogliano Training Center, Inc. | Sullivan and Cogliano Training Centers |
| TCS Education System | Chicago School of Professional Psychology |
| Vatterott Educational Centers, Inc. | Court Reporting Institute of St Louis |
| | Vatterott College |
| Wilfred American Education Corp. | Robert Fiance Beauty Schools |
| | Robert Fiance Hair Design Institute |
| | Robert Fiance Institute of Florida |
| | Wilfred Academy |
| | Wilfred Academy of Beauty Culture |
| | Wilfred Academy of Hair & Beauty Culture |
| Willis Stein & Partners (ECA) | Brightwood Career Institute |
| | Brightwood College |
| | New England College of Business and Finance |
| | Virginia College |

# Exhibit 2

# U.S. Department of Education

# Office of Federal Student Aid

# Initial Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**February 27, 2023**

## INITIAL REPORT

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department of Education through its Federal Student Aid office submits this Initial Report (reflecting numbers as of November 16, 2022) to Plaintiffs as required by Paragraph IV.G.1 of the Agreement and states as follows:[1]

1. Total Number of Class Members:  290,832

2. Total Number of Class Members determined to be eligible for Full Settlement Relief pursuant to Section IV.A. of the Agreement:
    195,993

3. Total Number of Class Members who must receive decisions pursuant to Paragraph IV.C. of the Agreement:   100,346

4. Total Number of Class Members and Post-Class Applicants who must receive decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D., respectively, and a schedule of the dates certain by which such decisions must be received pursuant to these paragraphs:

|  | Total Number of Class Members | Deadline for Decision |
|---|---|---|
| Class Members submitting applications 1/1/2015-12/31/2017, inclusive | 33,172 | 7/28/2023 (6 months after Effective Date) |
| Class Members submitting applications 1/1/2018-12/31/2018, inclusive | 11,553 | 1/28/2024 (Saturday) (12 months after Effective Date) |

---

[1]  On February 24, 2023, the Court denied the joint motion of Lincoln Educational Services, Everglades College, Inc., and American National University (the "Appealing Intervenor Schools") to stay the Court's final judgment approving the settlement pending appeal.  *See* ECF No. 382.  The Court did, however, grant a seven-day administrative stay to allow the Appealing Intervenor Schools the opportunity to seek a stay from the Ninth Circuit.  The information in this Initial Report captures applications filed by Class Members who attended the Appealing Intervenor Schools.  To the extent the schools succeed in obtaining a stay from the Ninth Circuit, Defendants will make any appropriate revisions in a subsequent report.

| | Total Number of Class Members | Deadline for Decision |
|---|---|---|
| Class Members submitting applications 1/1/2019-12/31/2019, inclusive | 13,604 | 7/28/2024 (Sunday) (18 months after Effective Date) |
| Class Members submitting applications 1/1/2020-12/31/2020, inclusive | 9,471 | 1/28/2025 (24 months after Effective Date) |
| Class Members submitting applications 1/1/2021-6/22/2022, inclusive | 32,551 | 7/28/2025 (30 months after Effective Date) |
| Post-Class Applicants submitting applications 6/23/2022-11/15/2022, inclusive | 205,448 | 1/28/2026 (36 months after Effective Date) |

# Exhibit 3

# U.S. Department of Education

# Office of Federal Student Aid

# First Quarterly Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**May 30, 2023**

## FIRST QUARTERLY REPORT

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department of Education through its Federal Student Aid office submits this First Quarterly Report as required by Paragraph IV.G of the Agreement.  As required by Paragraph IV.G.3 and IV.G.4 of the Agreement, this First Quarterly Report covers the progress made by the Department from January 18, 2023 (the Effective Date) through April 30, 2023[1] and states as follows:[2]

1. The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass):   __74,183__

2. (a) The total number of settlement relief decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.i of the Agreement:[3]   ____0____

   (b)  The total number of revise and resubmit notices that have been issued to Class Members pursuant to Paragraph IV.C.2.ii, of the Agreement:  ____0____

   (c) The total number of denial decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.iii:  __0____

   (d) The total number of revise and resubmit notices issued to Class Members that became denial decisions pursuant Paragraph IV.C.2.ii of the Agreement because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice:  __0____

---

[1]  As Paragraph IV.G.4 directs, each reporting period "exclude[s] a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report."

[2]  As provided in Paragraph IV.G.5 of the Agreement, all data in in this Quarterly Report is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

[3] 26,867 group relief decisions have been issued to class members receiving group borrower defense relief. These borrowers are in the process of having such relief granted and their cases closed on that basis.  Class members who have been granted group borrower defense relief are receiving equivalent relief to those who are granted relief pursuant to the *Sweet* settlement.

3.  (a) The number of Class Members who have been issued settlement relief decisions during the reporting period:[4]  _____0_____

    (b) The number of Class Members who have been issued revise and resubmit notices during the reporting period:  ___0_____

    (c) The number of Class Members who have been issued final denial decisions during the reporting period:  ___0_____

    (d) The number of Class Members whose revise and resubmit notices became denial decisions during the reporting period because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice:  __0_____

4.  The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A:

    (a) To date:  __105,973_____
    (b) During the reporting period:  ___71,038_____

5.  For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision:  N/A this reporting period because no deadlines have passed yet.

---

[4] *See supra* n.3.

# Exhibit 4

# U.S. Department of Education

# Office of Federal Student Aid

# Second Quarterly Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**August 28, 2023**

## SECOND QUARTERLY REPORT

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department of Education through its Federal Student Aid office submits this Second Quarterly Report as required by Paragraph IV.G of the Agreement.  As required by Paragraph IV.G.3 and IV.G.4 of the Agreement, this Second Quarterly Report covers the progress made by the Department from May 1, 2023 through July 29, 2023[1] and states as follows:[2]

1.  The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass):   60,429

2.  (a) The total number of settlement relief decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.i of the Agreement:[3]   11,779

    (b)  The total number of revise and resubmit notices that have been issued to Class Members pursuant to Paragraph IV.C.2.ii, of the Agreement:   2,041

    (c) The total number of denial decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.iii:   0

    (d) The total number of revise and resubmit notices issued to Class Members that became denial decisions pursuant Paragraph IV.C.2.ii of the Agreement because the

---

[1]  As Paragraph IV.G.4 directs, each reporting period "exclude[s] a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report."

[2]  As provided in Paragraph IV.G.5 of the Agreement, all data in in this Quarterly Report is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

[3] 26,863 relief decisions have been issued to class members receiving group borrower defense relief or another individually adjudicated approval of relief. The number represents a change from the number reported in the First Quarterly Report as a result of FSA's ongoing validation and verification efforts as to which class members are receiving group borrower defense relief or other individual adjudications. These borrowers are in the process of having such relief granted and their cases closed on that basis.  Class members who have been granted group borrower defense relief and individual relief are receiving equivalent relief to those who are granted relief pursuant to the *Sweet* settlement.

Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice: _____0_____

3. (a) The number of Class Members who have been issued settlement relief decisions during the reporting period: _____11,534_____

(b) The number of Class Members who have been issued revise and resubmit notices during the reporting period: _____2,021_____

(c) The number of Class Members who have been issued final denial decisions during the reporting period: _____0_____

(d) The number of Class Members whose revise and resubmit notices became denial decisions during the reporting period because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice: __0____

4. The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A:

(a) Through 7/29/2023: _____128,430_____
(b) During the reporting period: _____57,616_____

5. For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision: _____0_____

# Exhibit 5

# U.S. Department of Education

# Office of Federal Student Aid

# Third Quarterly Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**November 27, 2023**

# THIRD QUARTERLY REPORT

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department of Education through its Federal Student Aid office submits this Third Quarterly Report as required by Paragraph IV.G of the Agreement.  As required by Paragraph IV.G.3 and IV.G.4 of the Agreement, this Third Quarterly Report covers the progress made by the Department from July 30, 2023 through October 28, 2023[1] and states as follows:[2]

1.  The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass):   60,418

2.  (a) The total number of settlement relief decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.i of the Agreement:   11,777[3]

    (b)  The total number of revise and resubmit notices that have been issued to Class Members pursuant to Paragraph IV.C.2.ii, of the Agreement:   2,042[4]

    (c) The total number of denial decisions that have been issued to Class Members pursuant to Paragraph IV.C.2.iii:   0

---

[1]  As Paragraph IV.G.4 directs, each reporting period "exclude[s] a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report."

[2]  As provided in Paragraph IV.G.5 of the Agreement, all data in in this Quarterly Report is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

[3] The total number of relief decisions issued as of July 29, 2023, the "report through" date of the Second Quarterly Report (dated August 28, 2023) was actually 11,777.  The number provided in the Second Quarterly Report was 11,779.  This discrepancy  was due to one case being counted twice and another case being issued a revise and resubmit notice.

[4] The total number of revise and resubmit notices issued as of the August 28th report was 2,042, not 2,041 as previously stated in the Second Quarterly Report.  One case had not been updated in the database.  The number remained at 2,042 as of October 28, 2023, the "report through" date of this Third Quarterly Report.

(d) The total number of revise and resubmit notices issued to Class Members that became denial decisions pursuant Paragraph IV.C.2.ii of the Agreement because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice:  _____0_____

3.  (a) The number of Class Members who have been issued settlement relief decisions during the reporting period:  _____Data suppressed[5]_____

   (b) The number of Class Members who have been issued revise and resubmit notices during the reporting period:  _____0_____

   (c) The number of Class Members who have been issued final denial decisions during the reporting period:  _____0_____

   (d) The number of Class Members whose revise and resubmit notices became denial decisions during the reporting period because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice: __0____

4.  The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A:

   (a) Through 10/28/2023:  _____147,063_____
   (b) During the reporting period:  _____30,314_____

5.  For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision:  _____N/A this reporting period because no such deadlines passed during the period covered by this Report._____

---

[5]  The Settlement Agreement provides that "[a]ll of the data required in this [reporting] section is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10."  Agreement at IV.G.5.

# Exhibit 6

# U.S. Department of Education

# Office of Federal Student Aid

# Fourth Quarterly Report under Settlement Agreement in *Sweet et al. v. Cardona*, Case No. 3:19-cv-03674-WHA, U.S. District Court for the Northern District of California

**February 26, 2024**

## **FOURTH QUARTERLY REPORT**

Pursuant to the Settlement Agreement executed June 22, 2022 ("Agreement") and

granted final approval by the Court on November 16, 2022 (ECF No. 345), the U.S. Department

of Education through its Federal Student Aid office submits this Fourth Quarterly Report as

required by Paragraph IV.G of the Agreement.  As required by Paragraph IV.G.3 and IV.G.4 of

the Agreement, this Fourth Quarterly Report covers the progress made by the Department from

October 29, 2023 through January 27, 2024[1] and states as follows:[2]

1. The total number of Class Members with pending borrower defense applications
   (which number shall include members of the § 555(e) Subclass):  ___51,324___

2. (a) The total number of settlement relief decisions that have been issued to Class
   Members pursuant to Paragraph IV.C.2.i of the Agreement:  _____19,918___

   (b)  The total number of revise and resubmit notices that have been issued to Class
   Members pursuant to Paragraph IV.C.2.ii, of the Agreement: _____3,272____

   (c) The total number of denial decisions that have been issued to Class Members
   pursuant to Paragraph IV.C.2.iii:  _____Data suppressed[3]_____

   (d) The total number of revise and resubmit notices issued to Class Members that
   became denial decisions pursuant Paragraph IV.C.2.ii of the Agreement because the
   Class Member did not revise and resubmit his or her application within 6 months after
   being sent a deficiency notice:  _____0___

---

[1]  As Paragraph IV.G.4 directs, each reporting period "exclude[s] a period not exceeding 30 calendar days immediately preceding the submission of a report, during which Defendants pull, confirm, and validate the data provided in each report."

[2]  As provided in Paragraph IV.G.5 of the Agreement, all data in in this Quarterly Report is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10.

[3] The Settlement Agreement provides that "[a]ll of the data required in this [reporting] section is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10."  Agreement at IV.G.5.

3.  (a) The number of Class Members who have been issued settlement relief decisions during the reporting period:  _____7,923___

(b) The number of Class Members who have been issued revise and resubmit notices during the reporting period:  _____1,273___

(c) The number of Class Members who have been issued final denial decisions during the reporting period:  _____Data suppressed[4]_____

(d) The number of Class Members whose revise and resubmit notices became denial decisions during the reporting period because the Class Member did not revise and resubmit his or her application within 6 months after being sent a deficiency notice:  _0___

4.  The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A:

(a)  Through 1/27/2024:  _See Addendum to Fourth Quarterly Report_
(b)  During the reporting period:  _See Addendum to Fourth Quarterly Report_

5.  For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision:  _____N/A this reporting period because no such deadlines passed during the period covered by this Report._____

---

[4] The Settlement Agreement provides that "[a]ll of the data required in this [reporting] section is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10."  Agreement at IV.G.5.

## ADDENDUM TO FOURTH QUARTERLY REPORT

Item No. 4 covers Class Members eligible for relief pursuant to Paragraph IV.A.  To provide that relief, the Department prepared borrower defense ("BD") discharge requests for all loans eligible for relief pursuant to Paragraph IV.A, and, once permitted, sent those requests to the servicer for each eligible loan.  A discharge request prompts the servicer to make certain entries and updates and, once they are made, the servicer records the discharge request as fulfilled and reports a BD discharge to the National Student Loan Data System ("NSLDS").  Direct loan servicers are required to regularly update the Department on the progress of fulfilled requests that they have recorded, and the BD discharges that accompany fulfilled requests are then periodically reported to NSLDS.  For commercial Federal Family Education Loans ("FFEL loans"), the Guaranty Agencies ("GA") also regularly update the Department on the progress of fulfilled discharge requests, but BD discharges for FFEL loans are manually recorded in NSLDS, which requires additional time.  In previous reports, the figures in Item No. 4 were based on the number of Class Members for whom servicers reported a BD discharge to NSLDS.  This month, the Department concluded that those figures do not account for certain processing issues identified by the Department and, thus, did not accurately reflect the full state of some borrowers' relief status.  Specifically, in some cases, there are additional steps after the first servicer reports a BD discharge that other servicers must take for the discharge to be reflected in the accounts with the borrower's current servicer and on StudentAid.gov (which allows borrowers to view loan information from NSLDS),[5] and some loans with reported BD discharges still require these additional steps.  The result is that those Class Members' relief has started to

---

[5] For example, when a discharge-eligible loan has been consolidated, the pre-consolidation servicer receives and fulfills the discharge request, but the post-consolidation servicer must take additional steps afterward for the discharge to be reflected in the consolidation loan.  In addition, a small minority of cases may also require additional steps due to coding errors or random processing glitches.

be processed but is not yet reflected in the accounts with their current servicer or on

StudentAid.gov.  For the reasons discussed above, the Department has concluded that previous

reports' figures for Item No. 4 do not account for these discharges that are still in process.  The

Department is working with servicers and analyzing records in NSLDS to verify the status of

those discharges.

For these reasons, this Addendum provides an updated version of the figures in past

reports and also includes new figures based on an analysis of NSLDS records, which exclude any

discharges that may still be in process:

- Through January 27, 2024, servicers have reported BD discharges for 162,340 Class Members eligible for relief under Paragraph IV.A, which includes BD discharges for 24,287 such Class Members during the reporting period.

- The Department's subsequent analysis of NSLDS records indicates that, as of February 15, 2024, discharges have been fully processed for at least 135,526 Class Members eligible for relief under Paragraph IV.A.

The Department appreciates the importance of providing full settlement relief to

borrowers as promptly as possible.  The Department will continue to work on improving that

process and on verifying the status of Class Members' relief.  The Department is also committed

to working with the servicers, the guaranty agencies, and plaintiffs' counsel so that reports to

Class Members provide the data figures necessary to most accurately reflect the status of Class

Members' relief.

# Exhibit 7

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | Robinson, Stuart J. (CIV); Merritt, Robert C. (CIV) |
| **Cc:** | Eileen Connor; Rebecca Eisenbrey; jjaramillo@heraca.org |
| **Subject:** | Sweet v Cardona - MOHELA issue |
| **Date:** | Tuesday, September 19, 2023 6:59:00 PM |
| **Attachments:** | MOHELA Letter Sept 2023.pdf |

Stuart and Charlie,

We wanted to let you know that we're planning to send the attached letter to MOHELA tomorrow (Wednesday), with copies to the student loan ombuds offices of FSA, CFPB, New York, and California. Over the past couple of weeks, we've been hearing from class members with loans serviced by MOHELA that they're being told that they must go back into repayment starting next month. Even when these class members have explained to MOHELA about the terms of the settlement, and have contacted ED about the problem, MOHELA has refused to acknowledge the borrowers' right to remain in administrative forbearance pending the implementation of settlement relief.

We're strongly urging ED to make sure MOHELA is aware of and is following its obligations to hold *Sweet* class members in forbearance when the COVID payment pause ends next month—including not to send them any bills or any other communications indicating that they have payments due. As the return to repayment ramps up, we're very concerned that these issues will occur with other servicers as well unless ED takes proactive steps to ensure that the servicers are complying with the settlement. And as you know, involuntary collections on class members awaiting settlement relief are prohibited by the settlement agreement.

We'd also urge ED to communicate with MOHELA about the rights of borrowers who are entitled to loan discharges under the Department's group discharge decisions for Corinthian, ITT, and other for-profit colleges. Although the majority of these borrowers aren't part of the *Sweet* class, we have heard that they are also getting notices from MOHELA that they'll have to make payments on loans that are subject to discharge.

I'm happy to send further information about the particular borrowers we've heard from if it would be helpful, but we believe this problem is widespread among class members who have MOHELA as their servicer. We also reiterate our request for a class list – preferably one including servicer information. Having a class list would help avoid unnecessary delay and extra work for ED to run down the class status of each borrower who contacts us with issues that require follow-up.

Please let us know if you would like to discuss further.

Best,
Becca

_____

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130

Tel.: 617-322-2548
www.ppsl.org

# Exhibit 8

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | Merritt, Robert C. (CIV); Robinson, Stuart J. (CIV) |
| **Cc:** | Eileen Connor; Rebecca Eisenbrey; "jjaramillo@heraca.org" |
| **Subject:** | RE: Sweet v Cardona - MOHELA issue |
| **Date:** | Friday, September 29, 2023 12:55:00 PM |

Hi Charlie,

While we appreciate the update, we are deeply concerned about this situation. Later today we will be sending letters to additional servicers, as we've continued to receive complaints from Sweet class members about servicers refusing to recognize their class status and insisting that they will have payments due in the next couple of weeks. As I'm sure you understand, it puts borrowers under a great deal of stress when they're hearing one thing from the Department and a different thing from their servicers (and sometimes, what they hear from the Department doesn't even line up with the message that's now posted on the Department's Sweet case page). Class members are understandably afraid that they will face serious consequences if they simply do not pay their student loan bill when the servicer insists that it's due. Moreover, we've heard that servicers are not automatically removing class members from auto-debit status, so some will likely have payments taken from their accounts without their consent (an obvious violation of the settlement).

The reports we're hearing from class members are also giving us reason to believe that the quarterly reports the Department has issued thus far under the settlement agreement are not accurate or complete. Per section IV.F.1 of the settlement, relief has been "effectuated" when Defendants **and their loan servicers** have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member" and have issued any applicable refund checks (emphasis added). The Department reported most recently that relief had been "effectuated" for over 128,000 class members – but has the Department in fact confirmed that the servicers have cleared the relevant balances for all of these class members? And has the Department confirmed that the rest who are awaiting relief are being properly held in forbearance or stopped collection status? Our observations suggest it has not, and that instead the Department has exercised little to no oversight over what is actually happening to class members' loans.

We strongly reiterate our request for a class list, which we've been requesting at least since this past May. Having this list is, as we see it, part of our duty as counsel to the class. We need to know who ED currently believes to be members of the Sweet class (auto relief, decision, and post-class groups) and their contact information so that we can get accurate information about what is happening to these borrowers, provide them with accurate information about their class status, and evaluate what steps we may need to take to safeguard their rights under the settlement.

Finally, we would like to request a conversation ASAP with DOJ and ED to discuss protections for Sweet class members as payments restart. We realize the impending government shutdown could make this logistically difficult, but seeing as servicers are going to insist that student loan borrowers make payments during the shutdown, we cannot wait until whenever that situation resolves.

Best,
Becca

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Sent:** Friday, September 29, 2023 12:18 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>;
'jjaramillo@heraca.org' <jjaramillo@heraca.org>
**Subject:** RE: Sweet v Cardona - MOHELA issue

Hi all,

Wanted to follow up to tell you that FSA has updated its website to make clear that class members do not have to make payments - https://studentaid.gov/announcements-events/sweet-settlement. The Department is continuing to look into these issues and is committed to making sure that class members are afforded the protections guaranteed by the settlement.

Thanks,
Charlie

**From:** Merritt, Robert C. (CIV)
**Sent:** Wednesday, September 20, 2023 8:21 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>;
jjaramillo@heraca.org
**Subject:** RE: Sweet v Cardona - MOHELA issue

Becca,

Just wanted to follow up on this briefly to confirm that the Department understands its obligations under the settlement agreement and will make sure that class members remain in forbearance and do not have to make payments as provided under the agreement.  We are continuing to look into the issues you have raised and follow up as appropriate.

Best,
Charlie

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Tuesday, September 19, 2023 7:00 PM
**To:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Merritt, Robert C. (CIV)
<Robert.C.Merritt@usdoj.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>;
jjaramillo@heraca.org
**Subject:** [EXTERNAL] Sweet v Cardona - MOHELA issue

Stuart and Charlie,

We wanted to let you know that we're planning to send the attached letter to MOHELA tomorrow (Wednesday), with copies to the student loan ombuds offices of FSA, CFPB, New York, and California. Over the past couple of weeks, we've been hearing from class members with loans serviced by MOHELA that they're being told that they must go back into repayment starting next month. Even when these class members have explained to MOHELA about the terms of the settlement, and have contacted ED about the problem, MOHELA has refused to acknowledge the borrowers' right to remain in administrative forbearance pending the implementation of settlement relief.

We're strongly urging ED to make sure MOHELA is aware of and is following its obligations to hold *Sweet* class members in forbearance when the COVID payment pause ends next month—including not to send them any bills or any other communications indicating that they have payments due. As the return to repayment ramps up, we're very concerned that these issues will occur with other servicers as well unless ED takes proactive steps to ensure that the servicers are complying with the settlement. And as you know, involuntary collections on class members awaiting settlement relief are prohibited by the settlement agreement.

We'd also urge ED to communicate with MOHELA about the rights of borrowers who are entitled to loan discharges under the Department's group discharge decisions for Corinthian, ITT, and other for-profit colleges. Although the majority of these borrowers aren't part of the *Sweet* class, we have heard that they are also getting notices from MOHELA that they'll have to make payments on loans that are subject to discharge.

I'm happy to send further information about the particular borrowers we've heard from if it would be helpful, but we believe this problem is widespread among class members who have MOHELA as their servicer. We also reiterate our request for a class list – preferably one including servicer information. Having a class list would help avoid unnecessary delay and extra work for ED to run down the class status of each borrower who contacts us with issues that require follow-up.

Please let us know if you would like to discuss further.

Best,
Becca

_____
Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# Exhibit 9

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | Merritt, Robert C. (CIV); Robinson, Stuart J. (CIV) |
| **Cc:** | Eileen Connor; Rebecca Eisenbrey; jjaramillo@heraca.org |
| **Subject:** | Follow up from Wednesday call |
| **Date:** | Friday, October 6, 2023 3:39:00 PM |
| **Attachments:** | Borrowers who received billing notices in error.xlsx |

Charlie,

Thanks for the discussion on Wednesday about making sure the Sweet settlement is properly implemented as we enter the return to repayment. To follow up on a couple of points from that call:

First, attached is a list of borrowers who have contacted us to report that their servicers have attempted to put their Sweet-related loans into repayment. The spreadsheet has tabs for four servicers (Aidvantage, EdFinancial, MOHELA, and Nelnet). There is also a separate tab for people we've heard from who are not Sweet class members, but who are covered by group discharges and have had their servicers try to put those loans back into repayment. As discussed, we have secured Privacy Act waivers from these borrowers so the Department can contact us regarding follow-up for them. We also continue to get more reports about this each day and will be sending you more names as we collect them.

Second, as I said on the call, our view is that the class list would be covered by the Protective Order entered in the Sweet case in December 2020 (ECF 167-1, 169), because under paragraph 1.a.i, it will be a document containing information derived from records subject to the requirements of the Privacy Act. Pursuant to paragraph 3.a, we intend to use this document in connection with the prosecution of the litigation, viz., to contact class members and respond to class member inquiries in connection with implementation of the settlement. This will not involve the disclosure of class member information to anyone except that class member himself/herself.

Finally, the following are the items we're expecting to hear back on:

- DOJ/ED will provide us with a class list within 4 weeks. ED will look into whether including mailing addresses for all class members would delay the data pull; if so, that information will be provided separately later
- DOJ is investigating the accuracy of the data in the Sweet quarterly reports and will issue corrections of any errors
- ED will investigate and report back on the mechanisms for ensuring that people with consolidated loans aren't placed into repayment unless/until their balances are confirmed to no longer include any Sweet-eligible loans
- ED will provide a script or other very specific instructions for both FSA and servicer call centers to ensure people are getting correct information about the Sweet settlement
- ED will look into providing access to the "do not bill" list to borrower-facing FSA employees so that they can cross-reference it in response to borrower inquiries

We are happy to discuss any of these issues further.

Thanks,
Becca

_____

Rebecca C. Ellis (she/her)

Project on Predatory Student Lending

769 Centre Street, Suite 166

Jamaica Plain, MA 02130

Tel.: 617-322-2548

www.ppsl.org

# Exhibit 10

| | |
|---|---|
| **From:** | Merritt, Robert C. (CIV) |
| **To:** | Rebecca Ellis; Robinson, Stuart J. (CIV) |
| **Cc:** | Eileen Connor; Rebecca Eisenbrey; jjaramillo@heraca.org |
| **Subject:** | [Not Virus Scanned] [Not Virus Scanned] RE: Follow up from Wednesday call |
| **Date:** | Friday, October 27, 2023 1:47:15 PM |
| **Attachments:** | Sweet Contact List - Class Members.zipx |

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Hi Becca,

I'm following up on the below with the requested class list (I will send the password by separate email).  Consistent with our prior discussion, we are designating this list as confidential and subject to the protective order in this case, so please treat them as such.  You will note that mailing addresses are provided for many of these individuals.  As discussed, we are providing this in good faith for the purpose of ensuring that *Sweet* class members are kept in forbearance and not required to make payments on relevant loans.  We also recognize that you have raised various issues regarding the composition of the settlement class, and we hope this will be a useful tool as we continue to work collaboratively on those issues.

In addition, we wanted to confirm that the Department has now distributed the "do not bill" list we discussed to its servicers.  This is a master list of borrowers who should be in forbearance as repayment resumes, including *Sweet* class members and many others.  We are continuing to look into the other issues mentioned in your email below and will follow up as appropriate.

Please let me know if you have any difficulty accessing this file, or if you would like to discuss further.

Thank you,
Charlie

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Friday, October 06, 2023 3:40 PM
**To:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; jjaramillo@heraca.org
**Subject:** [EXTERNAL] Follow up from Wednesday call

Charlie,

Thanks for the discussion on Wednesday about making sure the Sweet settlement is properly implemented as we enter the return to repayment. To follow up on a couple of points from that call:

First, attached is a list of borrowers who have contacted us to report that their servicers have attempted to put their Sweet-related loans into repayment. The spreadsheet has tabs for four servicers (Aidvantage, EdFinancial, MOHELA, and Nelnet). There is also a separate tab for people we've heard from who are not Sweet class members, but who are covered by group discharges and have had their servicers try to put those loans back into repayment. As discussed, we have secured Privacy Act waivers from these borrowers so the Department can contact us regarding follow-up for them. We also continue to get more reports about this each day and will be sending you more names as we collect them.

Second, as I said on the call, our view is that the class list would be covered by the Protective Order entered in the Sweet case in December 2020 (ECF 167-1, 169), because under paragraph 1.a.i, it will be a document containing information derived from records subject to the requirements of the Privacy Act. Pursuant to paragraph 3.a, we intend to use this document in connection with the prosecution of the litigation, viz., to contact class members and respond to class member inquiries in connection with implementation of the settlement. This will not involve the disclosure of class member information to anyone except that class member himself/herself.

Finally, the following are the items we're expecting to hear back on:
- DOJ/ED will provide us with a class list within 4 weeks. ED will look into whether including mailing addresses for all class members would delay the data pull; if so, that information will be provided separately later
- DOJ is investigating the accuracy of the data in the Sweet quarterly reports and will issue corrections of any errors
- ED will investigate and report back on the mechanisms for ensuring that people with consolidated loans aren't placed into repayment unless/until their balances are confirmed to no longer include any Sweet-eligible loans
- ED will provide a script or other very specific instructions for both FSA and servicer call centers to ensure people are getting correct information about the Sweet settlement
- ED will look into providing access to the "do not bill" list to borrower-facing FSA employees so that they can cross-reference it in response to borrower inquiries

We are happy to discuss any of these issues further.

Thanks,
Becca

_____

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# Exhibit 11



The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

December 14, 2023

<u>VIA E-MAIL</u>

R. Charlie Merritt
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Robert.C.Merritt@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Charlie,

Thank you for sending us the *Sweet v. Cardona* class list on October 27, 2023. Following up on that communication and our prior call on October 4, 2023, we are writing to review some currently outstanding implementation issues and the further responses we are awaiting from the Department.

### 1.  Return to repayment issues

We appreciate your update on October 27, 2023, that the "do not bill list" has been distributed to servicers. We were also pleased to see the Department's announcement on October 30 that it would be imposing accountability measures on MOHELA for errors in the return to repayment process, including but not limited to sending bills to borrowers who should not be in repayment status. These efforts to correct servicing errors are certainly a step in the right direction, and we appreciate the Department's prompt attention to this issue.

That being said, there have been and continue to be servicing errors specific to the *Sweet* class that we believe require follow-up. On October 6, 2023, and again on November 1, 2023, we sent you via email spreadsheets containing information about individual borrowers who had contacted us to report that their servicers were placing their *Sweet*-eligible loans back into repayment.[1] After receiving

---

[1] The October 6, 2023 spreadsheet also included a separate list of people who are not *Sweet* class members, but who are covered by group discharges and likewise contacted us about their servicers try to put those loans back into repayment. We remain concerned about the treatment of those borrowers and urge the Department to be proactive about protecting their rights.

the class list, we conducted additional outreach to confirmed *Sweet* class members to find out more about the extent of the ongoing return to repayment issues.

Our survey of individuals from the class list yielded over 900 additional class members who report that they have been asked by their servicers to return to repayment on *Sweet*-eligible loans. Attached is a spreadsheet (with the same data columns as the class list) showing the class members who have reported this problem to us in the past two weeks.[2]

We request that the Department contact the relevant servicers to confirm, for each borrower on the three spreadsheets we've sent, that their accounts have been correctly placed in administrative forbearance pending the effectuation of *Sweet* relief, and that any payments wrongfully collected are refunded. We further request that the Department send notice to these borrowers that their status has been corrected and that they do not have any obligation to make payments on *Sweet*-eligible loans.

Additionally, the following are open questions we discussed that require follow-up from the Department to ensure that *Sweet* class members are not wrongly sent back into repayment:

a. On our October 4 call, the Department stated that it would be using forensics to examine whether *Sweet* borrowers were wrongly enrolled in autopay, and would instruct servicers to initiate automatic refunds of any payments made on loans eligible for *Sweet* discharge and/or forbearance. Has this process been completed?

b. What is the Department's mechanism for confirming that the correct calculations have been applied to consolidated loans that include both *Sweet*-eligible and non-*Sweet*-eligible constituent loans?

c. Has or will the Department develop a script for call center employees (both at FSA and the servicers) to ensure that they are giving borrowers complete and accurate information about the *Sweet* settlement?

d. Will call center representatives (both at FSA and the servicers) have access to the "do not bill" list, in order to accurately inform borrowers who reach out with billing questions about whether they are required to re-enter repayment?

e. Has the Department identified other class members who received billing notices in error, aside from those listed in the attached spreadsheet, and if so, has it corrected those class members' accounts and provided notice to the borrowers?

---

[2] This spreadsheet includes a small number of class members who reported that they received a notice showing a payment due date in 2040 (noted in the final column). We understand that this is how some servicers are reflecting administrative forbearances. However, these notices are very confusing to borrowers, because they do not state anywhere that they are meant to communicate an administrative forbearance. We urge the Department to clarify (or instruct the servicers to clarify) to everyone who has received such a notice that they are not, in fact, currently required to make any payments on the subject loan.

### 2. Post-settlement reporting

Given the apparently widespread issues with servicers attempting to collect on *Sweet* class members' loans that should be discharged,[3] we questioned the accuracy of the Department's post-settlement reporting of the number of class members for whom relief had been "effectuated." As we pointed out in our October 4 call, under section IV.F.1 of the Settlement Agreement, "effectuated" means that Defendants "**and their loan servicers** have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member" and have issued any applicable refund checks (emphasis added). We questioned whether the Department had in fact confirmed that the servicers have cleared the relevant balances and issued refunds (where applicable) for all of the class members whose relief was listed as "effectuated."

You stated at the time that DOJ and the Department were investigating the accuracy of the data in the previous reports and would issue corrections of any errors. But in the settlement implementation report we received on November 27, 2023, there was no mention of that analysis. What progress has been made on this investigation?

Additionally, in an email to DOJ on August 29, 2023, we raised another question about settlement reporting, to which we have not yet received a response. Specifically, we noted that in the initial settlement report of February 27, 2023, the Department listed 33,172 people as being included in the first decision group (*i.e.*, people who submitted their BD applications between January 1, 2015 and December 31, 2017, and were not covered by automatic relief). Yet in the August 2023 report, only 11,779 people were listed as having received settlement decisions—leaving 21,393 decision group members unaccounted for. We asked whether all of these 21,393 class members were covered by footnote 3 of the August 2023 settlement report, which stated that 26,863 class members have received relief decisions as a result of "group borrower defense relief or another individually adjudicated approval of relief."[4] And, if they are accounted for in that way, we asked you to confirm which schools those decision group members attended, or alternatively what sort of "individually adjudicated approval of relief" they received (total and permanent disability, false certification, etc.).

We look forward to receiving responses to both of these questions.

---

[3] *See, e.g.,* https://www.washingtonpost.com/education/2023/10/30/student-loan-servicing-errors-mohela/ (reporting that more than 16,000 borrowers with approved or pending BD applications received bills from their servicers in October 2023).

[4] Consistent with the return-to-repayment concerns described above, we also request assurance that these class members' accounts are being properly held in administrative forbearance pending the effectuation of relief. Even after receiving an alternate form of discharge instead of a settlement discharge, a class member remains covered by the guarantees of the Settlement Agreement. *See* § IV.A.4.

### 3.  BD website problems predating execution of the Settlement

Since July 2022, we have inquired, by our count, no less than 14 times about clarifying the class status of borrowers who attempted to submit online BD applications on or before June 22, 2022, but were unable to do so because of technical issues with the BD website.[5] We have not yet received a satisfactory response.

In a phone call on August 30, 2022—well over a year ago—representatives of FSA stated that they would investigate whether they could use back-end processes to identify attempted submissions before June 22, 2022 that were interrupted or abandoned (similar to a process it had already undertaken for people who attempted to apply in the weeks immediately after the Settlement's execution date). FSA stated at that time that it would use the date that an individual first attempted to submit a BD application as that individual's application date for purposes of the Settlement. Since that phone call, despite repeated requests, we have not heard any further update about those processes, nor have you responded to our requests to speak to FSA directly about the issue.

Moreover, on March 6, 2023; June 14, 2023; and July 18, 2023, we sent you spreadsheets with the names and identifying information of over 800 putative class members and post-class applicants who reported to us that they had been prevented from submitting a timely online BD application by technical failures on the BD website. We provided these lists at your request. Yet we have not received any response regarding the class status of any of the individuals listed.

Resolving this question has important implications for class members—particularly those who borrowed for attendance at Exhibit C schools, for whom the difference in an application date could mean the difference between automatic relief and a 3-year wait in the post-class queue. It is long past time to resolve this issue and determine once and for all which borrowers should rightfully be included in the settlement class and the post-class. We reiterate, once again, our request for individual follow-up on the specific borrowers whose information we have provided, and for a more fulsome conversation with FSA about its capability to make back-end determinations regarding attempted applications.

### 4.  Tracking of paper BD applications

Likewise, back in August 2022 we raised the issue of borrowers whose paper BD applications were not being recorded with the correct (postmark) dates that would qualify them for settlement class status. In our phone call with FSA representatives on August 30, 2022, no one from FSA had knowledge of how the Department tracks paper applications. We have since requested information on the paper application tracking and recording process at least six additional times, with no response.

---

[5] As previously mentioned, class members have sent us extensive screenshots and other documentation of the technical barriers they encountered, which we are happy to provide upon request.

Additionally, on June 14, 2023, at your request, we sent a list of seven borrowers who sent in paper BD applications and either had not received notice of their class status or had been misclassified based on an erroneous date. We requested that the Department investigate these borrowers' cases and confirm that they were included in the class.

We now reiterate our request that the Department investigate these borrowers' cases, along with our request for an explanation of how the Department processes paper applications, including how it interprets the application date.

### 5. Impermissibly using refunds to offset other loans

In March 2023, we informed you that we had heard from numerous borrowers that their servicers were applying the refunds they were owed on their *Sweet*-eligible loans to the remaining balance of other, unrelated Direct Loans on their accounts, in violation of the Settlement Agreement. After a number of exchanges about this issue, you confirmed on August 2, 2023, that servicers had indeed been making this error for a period of time, but that on March 10, 2023, FSA had instructed servicers to (1) issue full refunds to *Sweet* class members and not reallocate, and (2) reverse any reallocation transactions that had previously occurred and provide full refunds. You reported that the servicers had confirmed that they had done so. We are pleased to report that we have not heard of this problem recurring.

In connection with this issue, we provided the names of 13 class members who had experienced wrongful reallocations. On August 2, 2023, you provided information relating to six of those class members' accounts. We reiterate our request for information regarding the other seven.

### 6. "Interest credit" letters from servicers

In May and June 2023, we also alerted you that some class members had received letters from their servicers stating that the servicer does not "service [any] Direct Loans for you on ED's behalf that are eligible for borrower defense discharge," but that ED has "instructed us to apply a credit in the amount of $[] to your account because it took ED an extended period of time to review your claim." But the class members we heard from who received these letters do, in fact, have loans with these servicers that are eligible for discharge (in full or, in the case of consolidated loans, in part) under the *Sweet* settlement.

These letters also stated that commercially held FFEL loans are not eligible for an interest credit. To reiterate, this is clearly incorrect under the Settlement Agreement, which defines "Relevant Loan Debt" as including FFEL loans, *see* § II.W, and "Full Settlement Relief" as the "discharge of *all* of a Class Member's Relevant Loan Debt," § II.S (emphasis added); *see also* § IV.F.1 ("Defendants have effectuated relief . . . when they and their loan servicers have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member . . . , including but not limited to (1) discharging any interest that accrued while the borrower defense application was pending.")

On June 14, 2023, we sent you several examples of these letters, along with the names and identifying information of 16 class members who had received these inaccurate notices. We requested that the Department investigate these borrowers' cases, direct all federal loan servicers to comply with the terms of the Settlement Agreement, and confirm that the listed borrowers will have their Relevant Loan Debt discharged appropriately. We have not yet received a response to this request, and we reiterate it now.

### 7. Lack of timely notice

As you know, the following deadlines under the Settlement have now passed:

- Provide notice of settlement relief to members of the automatic relief group: April 28, 2023 (§ IV.A.3)
- Provide notice of the rescission of previous form denial notices to members of the decision group: May 28, 2023 (§ IV.B.1)
- Provide notice to post-class applicants of their membership in the post-class: May 28, 2023 (§ X.F)
- Provide settlement relief decisions or "revise and resubmit" notices to the first tranche of the decision group: July 28, 2023 (§ IV.C.3.i)

As we've previously reported, a number of borrowers have reached out to us because they did not receive the notice they believe they were due by the deadlines above. On June 14, 2023; July 18, 2023; and August 18, 2023, we provided you with lists of class members and post-class applicants experiencing these issues. On August 2 and 18, you provided responses from FSA regarding some, but not all, of these borrowers. For the remaining borrowers whose information we have provided, we reiterate our request that the Department investigate their cases and provide the appropriate notice.

### 8. Relief for class members in particular situations

We have previously asked about the Department's plans to provide settlement relief to the following types of borrowers in atypical situations, and have not yet received a response on either:

*Surviving spouses:* If a borrower died while their BD application was pending but before the Settlement went into effect, will their surviving spouse receive the refund to which the borrower would have been entitled?

*Refinance with a private lender:* If a class member refinanced their federal student loans with a private lender (e.g., SoFi, Earnest, etc.) while their BD application was pending but before the Settlement went into effect, will they be eligible for refunds of amounts they paid on those loans before refinancing? And did the Department inform these class members, at any point during the refinancing process, that they were waiving their rights to BD relief in general or to relief as a *Sweet* class member in particular?

* * *

Thank you for your attention to this matter. We appreciate the efforts of DOJ and the Department in implementing this complex but extremely important settlement. We look forward to your response and would be happy to arrange for a discussion.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
PROJECT ON PREDATORY STUDENT
LENDING

cc:     Joe Jaramillo
        Stuart J. Robinson

# Exhibit 12

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | Merritt, Robert C. (CIV); Robinson, Stuart J. (CIV) |
| **Cc:** | Eileen Connor; Rebecca Eisenbrey; jjaramillo@heraca.org |
| **Subject:** | Sweet - Jan. 28 deadline |
| **Date:** | Wednesday, January 17, 2024 4:41:00 PM |

Charlie,

I'm writing regarding the upcoming deadline of January 28, 2024, for the Department to fully effectuate relief for all members of the Sweet automatic relief group. In the last week, we have heard from five class members who were each told by either their servicer or the BD hotline that they would **not** receive their relief by the deadline. Indeed, both the hotline and some of the servicers have told class members that there is a "new timeline" and they might not receive relief until August 2024. This issue is not limited to one servicer – we've heard that this communication is coming from at least Aidvantage, EdFinancial, and Navient (as a commercial FFEL servicer). All five of these class members are included on the class list and attended Exhibit C schools.

This is, of course, the first we've heard of any "new timeline" for effectuating relief – a possibility that the Settlement Agreement does not contemplate.

The Department also has yet to respond to our inquiries, from both our call in November and our letter in December, regarding whether the Department has actually verified the accuracy of its quarterly reports of the number of class members for whom relief has been "effectuated" (a defined term in the Settlement).

Under section V.D.5 of the Settlement Agreement, "If Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV, above [including effectuating relief by the deadlines], due to extraordinary circumstances beyond Defendants' control, Defendants will notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination that they will not be able to fully perform their obligations." Is the Department planning to invoke this provision to excuse its failure to meet the January 28 deadline? If so, we request a prompt response notifying us of the Department's determination, including both the date this determination was reached and the required description of "the facts providing [the Department's] basis for believing extraordinary circumstances beyond Defendants' control prevent Defendants from fully performing their obligations."

If the Department does not plan to invoke section V.D.5, we request an update on the Department's ability to meet the January 28 deadline – including an immediate explanation of why the Department's hotline and its servicers are telling borrowers that there is a "new timeline" for relief that does not appear anywhere in the Settlement Agreement. If the Department fails to fully effectuate relief for the automatic relief group by January 28, we intend to invoke the enforcement procedures under section V of the Settlement.

In any event, we would like to schedule a phone call as soon as practicable with you and representatives of the Department to discuss settlement implementation issues. (We note that, if the Department intends to rely on section V.D.5, the Settlement requires a meet and confer within 14 calendar days of such notice.) Please let us know the availability on your end.

We look forward to your response.

Best,
Becca

_____

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# Exhibit 13



**The Project on Predatory Student Lending**

769 Centre St, Boston, MA 02130
www.ppsl.org

February 2, 2023

<u>VIA E-MAIL</u>

Stuart Robinson
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)
        Notice of Material Breach of Settlement Agreement

Dear Stuart,

Thank you for speaking with us on January 24, 2024, regarding implementation of the *Sweet v. Cardona* settlement. We appreciate the Department of Education's engagement in dialog about the delivery of settlement relief, and we hope to continue this process with further productive discussions.

Pursuant to Paragraph V.D.1 of the Settlement Agreement, Plaintiffs hereby provide notice of Plaintiffs' allegations that Defendants are in material breach of the Settlement Agreement. In the event that a meet-and-confer process does not result in prompt and assured rectification of the material breach, Plaintiffs intend to seek an order from the Court pursuant to Paragraph V.B of the Settlement Agreement. Details of the facts and circumstances regarding each alleged material breach are set forth below.

### 1.  Failure to effectuate relief by applicable due date

Defendants have materially breached Paragraph IV.A.1 of the Settlement Agreement by failing to effectuate Full Settlement Relief[1] by the applicable deadline for at least 13,000, and perhaps as many as 53,000 or more, Class Members who are entitled to relief pursuant to that paragraph.

---

[1] Capitalized terms herein are as defined in the Settlement Agreement. For reference, "Full Settlement Relief" is defined as "(i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to,

The Effective Date of the Settlement Agreement was January 28, 2023. *See* Order Re Motion to Stay Judgment Pending Appeal at 10, ECF No. 382. Thus, under Paragraph IV.A.1, every Class Member whose Relevant Loan Debt was associated with a school, program, or School Group listed in Exhibit C to the Settlement Agreement (the "automatic relief group") was due to receive Full Settlement Relief by January 28, 2024.

The Department of Education ("Department") acknowledged, in a telephone conference on January 24, 2024, that it is in breach of this provision of the settlement. The information available to Plaintiffs indicates that the Department's failure to effectuate Full Settlement Relief for the automatic relief group is sufficiently widespread to constitute a material breach.

### a.   Failure to discharge Relevant Loan Debt

The Department has not discharged all of the Relevant Loan Debt for the automatic relief group. *First*, by the Department's own admission, there are approximately 6,700 Class Members in the automatic relief group who have not received their discharges as of the January 28 deadline. These Class Members, according to the Department, have consolidation loans that include both *Sweet*-eligible and non-*Sweet*-eligible underlying loans; the Department and its servicers have not completed the process of calculating the portions of these consolidation loans that should be discharged.

*Second*, the Department reported in our phone call of January 24, 2024, that the Department has not verified that the rest of the Class Members in the automatic relief group who have consolidated loans (aside from the above-mentioned 6,700) have actually received their discharges. This is because, the Department explained, the discharge requests were sent initially to the servicers of the original loans, not to borrowers' current consolidation loan servicers. The "expectation" was that the discharge requests would "roll up" to the consolidation loan servicers. However, the Department does not know whether that has occurred. Reports we are receiving from Class Members indicate that, in many cases, it has not. Over 1,000 Class Members have reported to us since January 29, 2024, that they have consolidation loans and have not received their discharge. This is, of course, only a sample of Class Members experiencing this issue.

The Department stated on our recent call that there are approximately 47,000 Class Members in the automatic relief group who have consolidation loans. It is not clear whether many or most, let alone all, of the 40,000 Class Members in this category who fall outside the Department's 6,700 "problem" accounts have received their full discharges. The Department stated as of January 24 that it could not estimate when the process of tracking down the relief status for all of these Class Members would be complete.

---

Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt." Settlement Agreement ¶ II.S.

*Third*, Plaintiffs' counsel have already heard from approximately 400 other Class Members who do not have consolidation loans but nonetheless have not received their full discharges—indicating that the problems are broader than just the servicers' failure to "roll up" discharge instructions to consolidation servicers. This problem appears to be particularly acute for Class Members with commercially held FFEL loans—including, notably, lead plaintiff Theresa Sweet. Ms. Sweet's Federal Student Aid account portal currently shows over $65,000 in outstanding FFEL loans from her enrollment at Brooks Institute, an Exhibit C school.

With respect to FFEL loans in particular, Paragraph IV.F.2 of the Settlement provides, in relevant part: "Class Members . . . who receive relief under Paragraph[] IV.A . . . shall not be required to take steps to consolidate any Relevant Loan Debt into a Direct Loan to receive the relief to which they are entitled pursuant to those Paragraphs. *Defendants shall take all necessary steps to ensure that other loan holders effectuate the required relief*" (emphasis added). The Department has failed to comply with the assurance in the second sentence of this paragraph.

### b. Failure to issue full and accurate refunds

The Department has not provided full and accurate refunds of amounts paid to the Department to all members of the automatic relief group who are entitled to such refunds. *First*, again by the Department's own admission, there are approximately 5,000 Class Members who have not received their full refunds as of the January 28 deadline. The Department has stated that this is due to missing or inaccessible payment histories that current servicer Aidvantage received from former servicer ACS.

*Second*, information we have received from Class Members demonstrates that the problem of missing or incomplete refunds is far more widespread than the 5,000 Class Members that the Department has identified. Given the servicers' track records,[2] it would not be surprising if there are missing or incorrect payment histories for more than just those 5,000 accounts. It is unclear whether Class Members have not received their refunds for that reason or for some other reason(s).

Regardless, in the past five days, we have heard from over 1,800 Class Members who have not received any refund or have not received a refund in the amount they believe they are owed. Of these, nearly 1,500 do *not* have Aidvantage as their current servicer, which means they would not be included in the 5,000 accounts referred to above. Again, this represents only a sample of Class Members who have reached out to us regarding this issue; the fact that we have heard from so many Class Members in just the past few days suggests that many more are experiencing problems with their refunds.

### c. Failure to delete credit tradelines

The Department has not taken all steps necessary to ensure that the credit tradelines for Relevant Loan Debt are removed from the credit reports of Class Members in the automatic relief group by the

---

[2] *See, e.g.*, Cory Turner, "How the Most Affordable Student Loan Program Failed Low-Income Borrowers," *NPR* (Apr. 1, 2022), https://www.npr.org/2022/04/01/1089750113/student-loan-debt-investigation

January 28, 2024 deadline. *See* Settlement Agreement ¶ IV.F.1 ("Defendants have effectuated relief for purposes of Paragraph[] IV.A . . . when they and their loan servicers have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member . . . including but not limited to . . . requesting the deletion of the relevant tradeline.")

Plaintiffs' counsel have heard from nearly 1,200 Class Members in the automatic relief group whose Relevant Loan Debt is still appearing on their credit reports. This includes 135 Class Members whose loans *have* been discharged.

Reporting federal student loan debt to a credit bureau when that debt no longer exists violates not only the Settlement Agreement in this case, but also the Fair Credit Reporting Act. *See, e.g.*, 15 U.S.C. § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."); *id.* § 1681s-2(a)(2) ("A person who . . . has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.").

* * *

Receiving settlement relief in a timely and predictable manner is a matter of urgency for Class Members. Many of them have been counting on their discharges, refunds, and credit repair in order to take other important steps in their lives—such as paying for medical care, buying houses or cars, supporting their families, and going back to school. The failure to receive this relief by the deadline is potentially devastating. Here are just a few examples of Class Members' situations that have been reported to us over the past week:

- "I have been waiting for my loans to be discharged so I can start applying for a mortgage that I have never been approved [for]."

- "Some of my loan was paid by my co signer (my grandmother []) neither of us have received a refund of any sort in the mail. This is still on my credit destroying my life. . . . I have waited 14 years for this and I'm still stuck. My grandmother is 96 years old and deserves to have[] this money given back to her while she is still here."

- "I have put off grad school and starting a business. I have called FSA, Navient, MOHELA, and Ascendium, ad nauseum. They all give me the run around."

- "We bought a house. Had been preapproved. Made an offer, it was accepted. After [it was] accepted, bank pulled full credit report for final mortgage approval and found trade lines last reported to the reporting agencies in December 2022 did not match current state on EdFinancial or Dept. of Education web portals. Took weeks of

attempting to reach EdFinancial by phone with factual data to verify the loan amounts. Upwards of 6 hours hold time and days waiting for call backs. Ultimately our mortgage got approved, but with a higher interest rate due to the outstanding student loans negatively impacting my credit report."

- "My house purchase will not go through without the discharge reflection on my credit."

- "I am afraid that with the shuffling of funds and lack of access to payment records that I will not get the money back that I desperately need to put towards my home repairs."

- "[Nelnet] removed [my loans] from my credit report then added them again causing my credit score to plummet by almost 100 points."

- "In October, my loans were officially listed as 'discharged' and a refund was shown to be issued, but EdFinancial claimed they were no longer responsible for issuing the check and told me to wait 3 months for it to arrive. That was in October, and no further information has been relayed to me. With my job cutting hours and expenses mounting, the lack of these funds is severely impacting my livelihood and mental health, and now the deadline has come and gone with still nothing to show for it all."

Pursuant to Paragraph V.B.2 of the Settlement Agreement, Plaintiffs intend to seek an order from the Court requiring Defendants to promptly provide Full Settlement Relief to each affected individual on a schedule set by the Court. Plaintiffs will request that, as part of any such order, the Court require Defendants to make monthly, attested reports to Plaintiffs' Counsel and the Court on their progress of issuing relief to affected Class Members. Plaintiffs will request that such attestations aver, under penalty of perjury, that the Department has taken specified steps to ensure the accuracy of its reports. Plaintiffs further intend to seek attorneys' fees from Defendants for fees and costs incurred in bringing this claim, including the costs of investigating the facts that establish the claim of material breach.

## 2. Failure to submit "timely and complete" quarterly reports

Defendants have materially breached Paragraph IV.G of the Settlement Agreement by failing to submit "timely and complete" quarterly reports to Plaintiffs' Counsel. Plaintiffs do not allege that the reports have been untimely, but rather that they have been materially incomplete. Specifically, these reports have not accurately depicted the number of class members for whom relief has been "effectuated" per the definition in the Settlement Agreement.

Paragraph IV.G.2 of the Settlement provides that "Defendants will submit quarterly reports to Plaintiffs documenting their progress toward fulfilling their obligations under Paragraph[] IV.A" (among other paragraphs). These reports are required to include, *inter alia*, "[t]he total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A, including the number of Class Members for whom Defendants effectuated relief during the reporting period." Settlement Agreement ¶ IV.G.4.iv.

Plaintiffs became aware of the potential incompleteness of the quarterly reports in or around September 2023, in connection with the "return to repayment" following the end of the COVID-19 payment pause. At that time, Plaintiffs' Counsel began receiving reports from Class Members of servicers attempting to collect on Class Members' loans that should have been discharged. News reports likewise indicated that this problem was widespread.[3]

In a phone call with DOJ on October 4, 2023, we questioned the accuracy of the Department's post-settlement reporting of the number of Class Members for whom relief had been "effectuated." As we pointed out at that time, under Paragraph IV.F.1 of the Settlement Agreement, "effectuated" means that Defendants "and their loan servicers have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member . . . , including but not limited to (1) discharging any interest that accrued while the borrower defense application was pending; (2) determining if the Class Member . . . is entitled to any refund, and if so, issuing refund check(s) for payment of that refund; (3) if the Class Member's . . . Relevant Loan Debt was previously in default, removing such debt from default status; and (4) requesting the deletion of the relevant tradeline."

In our October 4 call, we questioned whether the Department had in fact confirmed that the servicers had cleared the relevant balances, issued refunds (where applicable), and requested deletion of credit tradelines for all of the Class Members whose relief was reported as "effectuated." DOJ stated at the time that it was investigating the accuracy of the data in the previous reports and would issue corrections of any errors. However, the settlement implementation report that DOJ and the Department delivered on November 27, 2023, contained no mention of any such analysis. The Department also never provided us with answers to various questions we raised about its processes for ensuring that Class Members are kept out of repayment and that they receive accurate information from their servicers.

We raised these issues again in our letter of December 14, 2023, and in our phone call of January 24, 2024. DOJ's and the Department's responses to date indicate that the Department has not verified whether the servicers have actually discharged Relevant Loan Debt, issued refunds, and/or requested deletion of credit tradelines before reporting to the Department that relief for certain Class Members had been "effectuated."

Given these representations, along with the evidence discussed above that demonstrates a significant number of Class Members who have not, in fact, received their Full Settlement Relief, we believe that the Department's quarterly reports are inaccurate and incomplete with respect to the number of Class Members in the automatic relief group for whom relief has been "effectuated."

---

[3] *See, e.g.*, Danielle Douglas-Gabriel, "Biden Administration Begins Punishing Servicers for Student Loan Errors," *Wash. Post* (Oct. 30, 2023), https://www.washingtonpost.com/education/2023/10/30/student-loan-servicing-errors-mohela/ (reporting that more than 16,000 borrowers with approved or pending BD applications received bills from their servicers in October 2023).

Pursuant to Paragraph V.B.3 of the Settlement Agreement, Plaintiffs intend to seek an order from the Court requiring Defendants to issue monthly, attested reports to Plaintiffs' Counsel and the Court on their progress of issuing relief to affected Class Members. Plaintiffs will request that such attestations aver, under penalty of perjury, that the Department has taken specified steps to ensure the accuracy of its reports. Plaintiffs further intend to seek attorneys' fees from Defendants for fees and costs incurred in bringing this claim, including the costs of investigating the facts that establish the claim of material breach.

### 3.  Violation of assurance regarding forbearance or stopped collection status

Defendants have materially breached Paragraphs IV.A.3 and IV.C.7 of the Settlement Agreement by allowing the Department's student loan servicers to send bills to, and even collect automatic debit payments from, Class Members whose Relevant Loan Debt is covered by the Settlement Agreement.[4]

Paragraphs IV.A.3 and IV.C.7 provide that Class Members' Relevant Loan Debt will remain in forbearance or stopped collection status pending the effectuation of settlement relief. Paragraph IV.C.7 additionally provides that, for "decision group" class members, their Relevant Loan Debt will remain in forbearance or stopped collection status while they await a decision on their application.

To date, Plaintiffs' Counsel has already provided Defendants with the names of hundreds of Class Members who reported that their loan servicers have demanded payment from them on their Relevant Loan Debt since September 2023, in violation of the Department's assurance that Class Members would remain in forbearance or stopped collection status. We sent lists of affected Class Members' names and identifying information to the Department on October 6, 2023; November 1, 2023; and December 14, 2023.

On October 27, 2023, DOJ reported to Plaintiffs' Counsel that a "do not bill list" had been recently distributed to servicers, in an effort to prevent collection on *Sweet*-eligible loans. However, even after that date we continued (and continue) to receive reports from Class Members that their servicers were and are sending bills and refusing to place their accounts into administrative forbearance, as required by the Settlement.

In fact, we have heard from 268 Class Members who have made payments on their Relevant Loan Debt since the "return to repayment" because they have been pressured to do so by their servicers and they fear the consequences if they don't pay. Some of these Class Members had money involuntarily

---

[4] Plaintiffs do not have sufficient information at this time to determine whether Defendants have also breached Paragraph IV.H.1 of the Settlement, which prohibits "involuntary collection activity" against Class Members. The Settlement defines "involuntary collection activity" as "any attempt by the Department or its agents to collect payments toward the Relevant Loan Debt . . . through involuntary means *from a borrower in default*" (emphasis added). Plaintiffs do not have the necessary data to know which Class Members' loans are in default. Plaintiffs reserve their right to assert a material breach of Paragraph IV.H.1 upon further investigation.

withdrawn from their bank accounts by their servicers. Others have experienced harassing debt collection activity from servicers, including servicers' use of false and misleading statements to try to trick borrowers into making payments on debts that they do not owe. For instance, multiple Class Members report being told by MOHELA and Nelnet that their Relevant Loan Debt is delinquent and they are not entitled to administrative forbearance. At least one Class Member has received debt collection calls from Navient demanding payment even though she has told Navient repeatedly that she is a *Sweet* class member. Another Class Member who has FFEL loans with Navient was told when she called for an update that since the January 28, 2024 deadline had passed, Navient now "has no deadline" to effectuate relief. These are just a few examples.

We appreciate the fact that servicers, particularly commercial FFEL servicers, are independent entities that the Department does not administer directly. But it is ultimately the Department's responsibility to maintain control over its own contractors.

Accordingly, Plaintiffs intend to seek an order from the Court requiring Defendants to issue refunds of any amounts collected from affected Class Members on their Relevant Loan Debt since September 1, 2023, and to take specific steps to ensure that the Department's loan servicers cease their violations of the Settlement Agreement.

\* \* \*

In order to undertake a productive meet-and-confer process regarding these allegations of material breach, Plaintiffs request the following information from Defendants:

i.  A copy of the document or documents referred to as "2/28/2023 Sweet Cohort 1 file" in the spreadsheet that DOJ emailed to Plaintiffs' Counsel on January 16, 2024.

ii.  Copies of all change reports and/or other instructions provided by Federal Student Aid ("FSA") to federal student loan servicers, including commercial FFEL servicers, regarding implementation of the *Sweet* settlement, from January 28, 2023 to the present.

iii.  Copies of all communications from federal student loan servicers, including commercial FFEL servicers, to FSA regarding their compliance with the change reports and/or other instructions regarding implementation of the *Sweet* settlement, from January 28, 2023 to the present.

iv.  Copies of documents showing the verification processes that FSA uses to confirm that servicers are accurately reporting whether relief has been "effectuated" for a particular Class Member.

v.  Copies of documents showing the processes that FSA uses to confirm that the data included in post-settlement reporting pursuant to Paragraph IV.G of the Settlement Agreement are accurate.

vi.     Copies of all complaints received from Class Members by Federal Student Aid, including but not limited to the Federal Student Aid Ombudsman's Office, from September 1, 2023 to the present.

vii.    An updated version of the *Sweet* class list that indicates, for each Class Member, whether the Department has classified them as a member of the automatic relief group or the decision group.

viii.   A list of the approximately 11,700 Class Members whom the Department has identified as not receiving their Full Settlement Relief by the January 28 deadline, including notation of whether each Class Member is awaiting a discharge, a refund, or both.

Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
PROJECT ON PREDATORY STUDENT LENDING

cc:     Joe Jaramillo
        Noah Zinner

# Exhibit 14



**The Project on Predatory Student Lending**

769 Centre St, Boston, MA 02130
www.ppsl.org

February 14, 2023

<u>VIA E-MAIL</u>

Stuart Robinson
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)
        Second Notice of Material Breach of Settlement Agreement

Dear Stuart,

Thank you for acknowledging receipt of our letter dated February 2, 2024, regarding our allegations of settlement breach with respect to the effectuation of relief for the automatic relief group. We look forward to receiving the Department's response and continuing the meet-and-confer process with respect to those issues.

We write today to allege a separate material breach of the Settlement Agreement. Specifically, the Department's quarterly reports pursuant to Paragraph IV.G of the Settlement have been materially incomplete because they do not account for all eligible Class Members. On numerous occasions over the past 18 months, Plaintiffs have identified multiple groups of borrowers who should be eligible for settlement relief and have asked the Department to confirm that those individuals are included in the Department's count of Class Members. The Department has refused to respond to our questions or provide assurances that these groups are included in the Class. Plaintiffs thus have no choice but to conclude that the Department has not properly included all eligible Class Members in its reports and has not provided relief to those Class Members on the appropriate schedule, in violation of Paragraphs IV.A.1 and IV.C.3 of the Settlement.

Pursuant to Paragraph V.D.1 of the Settlement Agreement, Plaintiffs hereby provide notice of Plaintiffs' allegations that Defendants are in material breach of the Settlement Agreement, along with details of the facts and circumstances regarding each alleged breach. In the event that a meet-and-confer process does not result in prompt and assured rectification of the material breach, Plaintiffs intend to seek an order from the Court pursuant to Paragraph V.B of the Settlement Agreement.

### 1.   Failure to submit "timely and complete" quarterly reports

Defendants have materially breached Paragraph IV.G of the Settlement Agreement by failing to submit "timely and complete" quarterly reports to Plaintiffs' Counsel. Specifically, these reports have been materially incomplete because they have not accurately depicted the number of Class Members entitled to Settlement relief.

Paragraph IV.G.1 of the Settlement provides that, "[w]ithin 30 calendar days after the Effective Date"—that is, by February 28, 2023—Defendants were to deliver a report to Plaintiffs' Counsel containing, "as of the Final Approval Date, (i) the total number of Class Members, (ii) the total number of Class Members the Department has determined are eligible for Full Settlement Relief pursuant to Paragraph IV.A; (iii) the total number of Class Members who must receive decisions pursuant to Paragraph IV.C; and (iv) the total number of Class Members and Post-Class Applicants who must receive decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively."

Paragraph IV.G.2 of the Settlement then provides that "Defendants will submit quarterly reports to Plaintiffs documenting their progress toward fulfilling their obligations under Paragraphs IV.A, IV.C, and IV.D." These reports are required to include, *inter alia*, "[t]he total number of Class Members with pending borrower defense applications," "[t]he total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A" (that is, the automatic relief group), and "the total number of Class Members for whom the Department did not provide a decision" as required under Paragraphs IV.C.3(i) through (v) (the decision group). *See* ¶ IV.G.4.

For each of the groups of Class Members set forth below, the Department has materially breached one or more of its obligations to set forth full and complete information in its reports.

### a.   Borrowers prevented from submitting timely applications by the Department's technical failures

From July 2022 through December 2023, we inquired, by our count, no fewer than 15 times about the class status of borrowers who attempted to submit online BD applications on or before June 22, 2022, but were unable to do so because of technical failures on the BD website. Despite initial indications from the Department that it understood the class should include borrowers who attempted to submit before the execution date, we have never received a satisfactory response to our questions about this issue, nor any confirmation about the class status of these individuals.

The problems with the BD submission website were widespread and began long before the Settlement's execution date. Putative Class Members have sent us extensive documentation of the

technical barriers they encountered, which we are happy to provide upon request (as we have offered to do on multiple occasions before).

In a phone call on August 30, 2022—nearly 18 months ago—representatives of Federal Student Aid (FSA) stated that they would use the date that an individual first attempted to submit a BD application as that individual's application date for purposes of the Settlement. They further stated that they would investigate whether they could use back-end processes to identify attempted submissions before June 22, 2022, that were interrupted or abandoned (similar to a process it had already undertaken for people who attempted to apply in the weeks immediately after the Settlement's execution date). Since that phone call, despite repeated requests, we have not heard any further update about those processes, nor has DOJ responded to our repeated requests to speak to FSA directly about the issue.

Moreover, on March 6, 2023; June 14, 2023; and July 18, 2023, we sent spreadsheets to DOJ with the names and identifying information of 1,311 putative Class Members and Post-Class Applicants who reported to us that they had been prevented from submitting a timely online BD application by technical failures on the BD website. We provided these lists at your request. Yet we have not received any response regarding the class status of any of the individuals listed.

Correct classification has crucial implications for Class Members—particularly those who borrowed for attendance at Exhibit C schools and attempted to apply for BD on or before June 22, 2022. Such individuals account for over 800 of the names on the lists we've provided. For these Class Members, the difference in an application date means the difference between automatic relief and a three-year wait in the post-class queue. As we have stated on multiple occasions, it is our position that these individuals are properly classified as Class Members and should have received Full Settlement Relief by the deadline of January 28, 2024.

The names on our lists, of course, represent only a sample of individuals who likely encountered the technical problems on the BD website. The most accurate way to identify people who should be classified as Class Members would be through analysis of the Department's back-end data, which the Department has apparently refused to undertake despite our repeated requests and their own commitment to investigate this option.

Accordingly, the Department's initial settlement report of February 2023 was materially incomplete because it did not include people who should have been classified as Class Members and Post-Class Applicants based on their attempted application dates in its counts of "(i) the total number of Class Members, (ii) the total number of Class Members the Department has determined are eligible for Full Settlement Relief pursuant to Paragraph IV.A; (iii) the total number of Class Members who must receive decisions pursuant to Paragraph IV.C; and (iv) the total number of Class Members and

Post-Class Applicants who must receive decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively."

The Department's quarterly settlement reports of May 2023, August 2023, and November 2023 were likewise materially incomplete because they did not account for these individuals, and thus did not accurately reflect "[t]he total number of Class Members with pending borrower defense applications." The August 2023 and November 2023 quarterly reports were further materially incomplete for the same reason, in that they did not accurately reflect "the total number of Class Members for whom the Department did not provide a decision" by the applicable deadline under Paragraph IV.C.

### b. Borrowers whose paper applications were lost or improperly processed

Likewise, as far back as August 2022, we raised the issue of borrowers whose paper BD applications were not being recorded with the correct (postmark) dates that would qualify them for Class Members status. In our phone call with FSA representatives on August 30, 2022, no one from FSA had knowledge of how the Department tracks paper applications. We have since requested information on the paper application tracking and recording process at least six additional times, with no response.

On June 14, 2023, at your request, we sent a list of seven Class Members who sent in paper BD applications and either had not received notice of their class status or had been misclassified based on an erroneous date. We requested that the Department investigate these borrowers' cases and confirm that they were included in the class. The Department never responded. We also do not have any visibility into complaints the Department may have received from borrowers who tried to submit paper applications.

It is admittedly more difficult (both for Plaintiffs' Counsel and, potentially, for the Department) to identify Class Members with missing or misclassified paper applications than Class Members who interacted with the Department's online application process. Nonetheless, the Department's 18-month silence on even the process that it uses to track paper applications is deeply concerning and suggests that Class Members are falling through the cracks.

Accordingly, Plaintiffs allege that the Department's initial settlement report of February 2023 was materially incomplete because it did not include all people who submitted timely paper applications in its counts of "(i) the total number of Class Members, (ii) the total number of Class Members the Department has determined are eligible for Full Settlement Relief pursuant to Paragraph IV.A; (iii) the total number of Class Members who must receive decisions pursuant to Paragraph IV.C; and (iv) the total number of Class Members and Post-Class Applicants who must receive decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively."

The Department's quarterly settlement reports of May 2023, August 2023, and November 2023 were likewise materially incomplete because they did not account for these individuals, and thus

did not accurately reflect "[t]he total number of Class Members with pending borrower defense applications." The August 2023 and November 2023 quarterly reports were further materially incomplete for the same reason, in that they did not accurately reflect "the total number of Class Members for whom the Department did not provide a decision" by the applicable deadline under Paragraph IV.C.

### c.   Class Members who paid off their federal loans via private refinancing

Paragraph II.S of the Settlement establishes that Full Settlement Relief includes "a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted)." In other words, the Department agreed in the Settlement to refund *all* amounts that Class Members had paid to the Department toward their Relevant Loan Debt, even if a Class Member no longer had any outstanding federal student loan debt at the time the Settlement Agreement was executed or (in the case of the decision group) at the time the Class Member becomes entitled to settlement relief.

On September 21, 2022, in an email to Plaintiffs' Counsel, DOJ stated for the first time that the Department did not "think there is any basis for ED to provide any payments to borrowers who refinanced their loans" with a private company (such as SoFi, Earnest/NaviReFi, or the like)—despite the Settlement Agreement containing no such caveat. The reasoning provided was that "[o]nce borrowers refinance their loans, they no longer have a federal loan or any associated BD claim. They are thus not class members as of the date of consolidation."

In response, we questioned why the Department would take the position that the source of the money that paid off a Class Member's loan (that is, a refinancing company versus the borrower's own funds, however derived) is dispositive of whether the Class Member is entitled to Full Settlement Relief. DOJ responded that "once the refinance company purchases the loan, that terminates ED's legal relationship with the borrower, and the borrower is not entitled to any benefits of the federal student loan program."

To begin, we do not believe this is an accurate portrayal of what happens when a federal student loan borrower undertakes a private refinancing. The Department does not "sell" or assign the borrower's federal loan to the refinancing company—rather, the company makes a new loan to the borrower, and the proceeds of that loan are used to pay off the federal loan. This is no different than if a borrower, for example, took out a home equity loan on their house and used the proceeds to pay off their federal student loans. Indeed, we have reviewed letters—on Department of Education letterhead—to one borrower who underwent a private refinancing, which state: "We are happy to report you have successfully completed full repayment of the U.S. Department of Education student loan listed above. Congratulations on reaching this exciting goal!"

Further, in response to the Department's stated position, we asked for clarification three times—on February 22, 2023; March 2, 2023; and December 14, 2023. Each time, we asked two questions: (i) Even if the Department contends that a borrower who would otherwise be a Class Member cannot get a refund of a payoff amount that came from a private refinancing, would that borrower be eligible for refunds of amounts they paid to the Department before refinancing?; and (ii) Did the Department inform these borrowers individually, at any point, that they were waiving their rights to BD relief in general or to relief as a *Sweet* Class Member in particular by opting for private refinance?[1] We have never received responses to these questions from the Department.

Class Members' choices to refinance their loans were the direct result of the Department misconduct at the heart of the *Sweet* case: the failure to issue timely and fair decisions on BD applications. After languishing in the Department's BD system for years, with no end in sight—and, for some borrowers, having already received a form denial letter—people understandably lost hope that the Department would ever hear their defenses and sought to make what seemed to be a reasonable financial decision, to transfer their loans to a lender who offered lower interest rates. Having driven borrowers to this situation—without, as far as we can tell, providing adequate notice of the consequences—the Department cannot deny them the same relief as other Class Members. There is no basis in the Settlement Agreement to do so.

The Department's initial settlement report of February 2023 was materially incomplete because it omitted people who met the definition of Class Member from its counts of "(i) the total number of Class Members, (ii) the total number of Class Members the Department has determined are eligible for Full Settlement Relief pursuant to Paragraph IV.A; (iii) the total number of Class Members who must receive decisions pursuant to Paragraph IV.C; and (iv) the total number of Class Members and Post-Class Applicants who must receive decisions by each deadline set forth in Paragraph IV.C.3(i) through (v) and Paragraph IV.D, respectively," based on a criterion (having undergone a private refinancing) that is not a condition of Class membership.

The Department's quarterly settlement reports of May 2023, August 2023, and November 2023 were likewise materially incomplete because they did not account for these individuals, and thus did not accurately reflect "[t]he total number of Class Members with pending borrower defense applications." The August 2023 and November 2023 quarterly reports were further materially incomplete for the same reason, in that they did not accurately reflect "the total number of Class Members for whom the Department did not provide a decision" by the applicable deadline under Paragraph IV.C.

---

[1] Significantly, documents we have reviewed that Class Members received from refinancing companies do *not* mention borrower defense, much less the *Sweet* case, as being among the rights that a borrower might lose by refinancing.

### d. "Missing" decision group Class Members

In the Department's initial settlement report of February 27, 2023, the Department listed 33,172 people as being included in the first decision group (*i.e.*, people who submitted their BD applications between January 1, 2015, and December 31, 2017, and were not covered by automatic relief). Yet in the August 2023 report, only 11,779 people were listed as having received settlement decisions—leaving 21,393 decision group members unaccounted for.

In an email to DOJ on August 29, 2023, we asked whether all of these 21,393 class members were covered by footnote 3 of the August 2023 settlement report, which stated that 26,863 class members have received relief decisions as a result of "group borrower defense relief or another individually adjudicated approval of relief." And, if they were accounted for in that way, we asked the Department to confirm which schools those decision group members attended, or alternatively what sort of "individually adjudicated approval of relief" they received (total and permanent disability, false certification, etc.).

The Department never responded to our question. We reiterated the same question in our letter of December 14, 2023. Further, consistent with the return-to-repayment concerns that had arisen by that time, we also requested assurance that these 21,393 Class Members' accounts are being properly held in administrative forbearance pending the effectuation of relief.[2]

The Department still has not provided an adequate explanation for the apparent elimination of 21,393 Class Members from the decision group. Accordingly, to the extent that the August 2023 and November 2023 quarterly reports do not account for these individuals, they are materially incomplete because they do not accurately reflect "[t]he total number of Class Members with pending borrower defense applications" and "the total number of Class Members for whom the Department did not provide a decision" by the applicable deadline under Paragraph IV.C.

Further, to the extent that those 21,393 Class Members' accounts are not being properly held in administrative forbearance pending the effectuation of relief, Defendants have materially breached the assurances in Paragraphs IV.A.3 and IV.C.7 of the Settlement Agreement.

* * *

Pursuant to Paragraph V.B.3 of the Settlement Agreement, Plaintiffs intend to seek an order from the Court requiring Defendants to revise their post-settlement reporting to correctly account for the categories of eligible Class Members described above, and going forward to issue monthly, attested reports to Plaintiffs' Counsel and the Court that correctly account for all eligible Class Members. Plaintiffs will request that such attestations aver, under penalty of perjury, that the Department has taken specified steps to ensure the accuracy of its reports. Plaintiffs further intend to seek attorneys' fees

---

[2] Even after receiving an alternate form of discharge instead of a settlement discharge, a Class Member remains covered by the guarantees of the Settlement Agreement. See ¶ IV.A.4.

from Defendants for fees and costs incurred in bringing this claim, including the costs of investigating the facts that establish the claim of material breach.

## 2. Failure to effectuate relief by applicable due date

Defendants have materially breached Paragraph IV.A.1 of the Settlement Agreement by failing to effectuate Full Settlement Relief by the applicable deadline for at least 811, and perhaps hundreds or thousands more, Class Members who are entitled to relief pursuant to that paragraph.

As noted above, Plaintiffs' Counsel has provided Defendants with the names of at least 811 individuals who should be classified as Class Members in the automatic relief group because they borrowed for attendance at Exhibit C schools and attempted to submit borrower defense applications on or before June 22, 2022, but were unable to complete their applications due to the Department's technical errors. As members of the automatic relief group, these individuals should have received Full Settlement Relief by January 28, 2024. Due to the Department's failure to properly classify them, they did not.

Pursuant to Paragraph V.B.2 of the Settlement Agreement, Plaintiffs intend to seek an order from the Court requiring Defendants to promptly provide Full Settlement Relief to each affected individual on a schedule set by the Court. Plaintiffs will request that, as part of any such order, the Court require Defendants to make monthly, attested reports to Plaintiffs' Counsel and the Court on their progress of issuing relief to affected Class Members. Plaintiffs will request that such attestations aver, under penalty of perjury, that the Department has taken specified steps to ensure the accuracy of its reports. Plaintiffs further intend to seek attorneys' fees from Defendants for fees and costs incurred in bringing this claim, including the costs of investigating the facts that establish the claim of material breach.

\* \* \*

In order to undertake a productive meet-and-confer process regarding these allegations of material breach, Plaintiffs request the following information from Defendants:

i.      Copies of all borrower inquiries and/or complaints regarding technical problems with the BD online submission process received by Federal Student Aid, including but not limited to the Federal Student Aid Ombudsman's Office, from January 1, 2022, to the present.

ii.     Any and all documents reflecting or regarding the Department's efforts to identify potential *Sweet* Class Members who were prevented from filing timely BD applications due to technical problems with the BD online submission process.

iii.    Copies of all borrower inquiries and/or complaints regarding the receipt and/or processing of paper BD applications received by Federal Student Aid, including but not

limited to the Federal Student Aid Ombudsman's Office, from January 1, 2022, to the present.

iv.    Copies of all written policies governing the handling and/or processing of paper BD applications.

v.    Any and all documents reflecting or regarding lost and/or mishandled paper BD applications.

vi.    The names of all individuals the Department excluded from Class Member status and/or excluded from receiving Full Settlement Relief (including but not limited to refunds of final loan payoff amounts) on the basis that those individuals undertook a private refinancing.

vii.    Documents sufficient to show how the Department identifies when a federal student loan payoff originates from a private refinancer as distinct from other sources.

Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
PROJECT ON PREDATORY STUDENT
LENDING

cc:    Joe Jaramillo

# Exhibit 15



**U.S. Department of Justice**

**Civil Division, Federal Programs Branch**

450 Golden Gate Ave.
San Francisco, CA 94102

| | |
|---|---|
| Stuart J. Robinson | Telephone:  (415) 436-6635 |
| Senior Counsel | E-Mail:  stuart.j.robinson@usdoj.gov |

February 16, 2024

Rebecca Ellis
Project on Predatory Student Lending
769 Centre St.
Boston, MA 02130

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Rebecca:

We write to respond to your letter dated February 2, 2024, providing notice of Plaintiffs' allegations that Defendants are in material breach of the Settlement Agreement. In accordance with the terms of the Agreement, we acknowledged receipt of your notice on February 6, 2024. Additionally, we shared your letter with the Department of Education ("Department"). The Department has reviewed the issues raised in your letter and has provided the information below.

*First*, Plaintiffs allege that the Department has failed to provide full settlement relief by January 28, 2024, to class members who received loans to attend the institutions and locations listed in Exhibit C of the Agreement. Plaintiffs' allegations concern the failure to discharge the relevant loan debt of these borrowers, the failure to issue full refunds to these borrowers, and the failure to delete credit tradelines.

The Department acknowledges that full settlement relief has not been implemented for all borrowers who are entitled to such relief under Paragraph IV.A.1 of the Agreement by January 28, 2024. By way of background, 195,993 borrowers comprise Exhibit C class members. A total of 1,847,267 loans were determined as eligible for relief based on Exhibit C's list of institutions and locations. Once permitted to do so, the Department sent a total of 251,549 discharge requests to the relevant servicers, accounting for all 195,993 Exhibit C borrowers. If a borrower had eligible loans serviced by more than one servicer, the Department sent a separate request to each servicer. If a borrower had a consolidation loan, the Department sent the request to the original servicer of the underlying loan eligible for discharge based on Exhibit C, because that servicer would be able

to initiate a series of transactions that would result in the discharge and payment of any refund and would ultimately be reflected in the balance of the borrower's consolidation loan.[1]

As of January 2024, the Department, relying on the information reported by the servicers, believed that 95% of Exhibit C borrowers had received full settlement relief. The Department conveyed this understanding to you in a call on January 24, 2024. In that call, the Department also referenced processing delays that were detected after discharge requests were fulfilled by the servicer that initially received the requests—delays that appear to largely affect class members with consolidation loans previously serviced by a since-decommissioned servicer. You mentioned reports from borrowers consistent with such issues and raised concerns that the number of Exhibit C borrowers who had not received full settlement relief was greater than 5% of Exhibit C borrowers. Also during that call, the Department described its efforts to work from records in the National Student Loan Data System ("NSLDS") and class members' current servicers to examine and verify the status of Exhibit C borrowers' discharges. Based on that work, the Department has concluded that the numbers provided by the servicers do not account for the processing issues the Department raised and, thus, did not accurately reflect the full state of some borrowers' relief status. Rather, as of February 15, 2024, the Department's analysis of NSLDS records indicates that:

- 135,526 borrowers (approximately 69% of Exhibit C borrowers) have received fully processed discharges;
- 31,437 borrowers (approximately 16% of Exhibit C borrowers) have not received fully processed discharges (of these, 3,581 borrowers have received fully processed discharges for some but not all eligible loans); and
- 28,964 borrowers (approximately 15% of Exhibit C borrowers) require further investigation as to whether they have received fully processed discharges.[2]
- For the majority of the borrowers comprising the second and third bullet points, the discharge request has been fulfilled and the discharge is currently processing.

Because the Department's investigation is ongoing, and in light of the month-long delay in the Department's ability to issue discharge requests, the Department is not prepared at this time to

---

[1] This process differs for borrowers with FFEL loans. In those cases, relief is initiated by the borrowers' loans being paid through guaranty agencies.

[2] In addition, there are 66 borrowers who filed borrower defense applications against a school listed on Exhibit C but do not have corresponding records in NSLDS. This is either because the applicant's Social Security Number ("SSN") does not match a borrower record in NSLDS or because NSLDS does not show that the borrower had any loans associated with the Exhibit C school on their application. Some possible explanations include that the SSN or OPEID on the borrower's application was entered incorrectly or that the borrower enrolled using a private loan or grant that is not eligible for borrower defense. The Department would like to work with you to resolve any questions surrounding these borrowers.

issue a determination regarding material breach.  The Department intends to supplement this letter by March 1, 2024, regarding its material breach determination.

As noted, the numbers reported above are based on the Department's review of NSLDS files, which record numerous attributes about a borrower's loan(s), including loan status (i.e., open/closed), loan balance, and whether an original servicer has reported the fulfillment of a request for borrower defense relief.[3]  NSLDS data thus indicate that borrowers fall into one of four groups: (1) fully processed discharges for all eligible loans; (2) fully processed discharges for some but not all eligible loans; (3) no discharges have been fully processed for eligible loans; and (4) loans require further investigation.  For specific types of loans, there may be additional indicia that full settlement relief has been provided.

Based on its investigation, the Department has identified three reasons that certain Exhibit C borrowers have not yet received full settlement relief.  These reasons accord with those that the Department discussed with you on January 24.  First, the Department has determined that certain borrowers have highly complex consolidation loan histories that must be manually researched and reconstructed to determine the appropriate discharge and/or refund amounts.  Second, according to the Department, the payment histories of certain borrowers are not readily available, such that the servicers must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs.  Third, the Department found that servicers have initiated the relief process for certain borrowers, but that process has not been completed, likely because a series of transactions must be executed across multiple servicers.  In a small minority of cases, this may also be due to coding errors or random processing glitches.

The Department has been able to gather additional data about the types of loans for which discharges have not been fully processed or that require further verification.  The former includes both consolidation loans and non-consolidation loans.  Many of these loans have been consolidated more than once.  The discharge process for the majority of the affected consolidation loans appears to have been initiated but not completed.  For example, discharging a consolidation loan may require a servicer to review records from the original loans' lender or servicer and then coordinate with other servicers for the discharge to be properly reflected in each of the subsequent consolidations.  This can be particularly time- and resource-consuming when the relevant loan has been consolidated with loans that are not subject to a discharge pursuant to the Agreement.[4]  In

---

[3] For borrowers with FFEL loans, information related to the fulfillment of a borrower defense request is sent to the Department rather than being directly updated to NSLDS.

[4] In some cases, the underlying loans in the consolidation include both loans eligible for discharge based on Exhibit C, as well as loans that are not eligible for discharge based on Exhibit C.  To adhere to the Agreement, the Department has instructed servicers to discharge only that portion of the loan associated with Exhibit C.  The servicers have reported that this presents a logistical challenge, as they must obtain consolidation funding histories (which can be a time-consuming process, assuming the histories can be located) and accurately calculate the amount of the current consolidation loan eligible for discharge pursuant to the Agreement.

other cases, Exhibit C borrowers have a consolidation loan that was previously serviced by an entity that is no longer in business. In that situation, the successor servicer has to implement the discharge by using information that is maintained on the servicing system inherited from the original servicer and that is not integrated with the successor servicer's system. *See* Table 1, below. The non-consolidation loans that have not been fully processed include both loans held by the Department and FFEL loans held by private FFEL lenders. *See* Table 2, below.

**Table 1.** Borrowers Without NSLDS Indicators of Complete Relief (Consolidation Loans)

| Category | Borrowers | Details |
|---|---|---|
| **Open (Consolidation Loan)** | **26,005** | |
| All Eligible/No BD Indicator | 6,436 | Borrowers with consolidation loans for which all underlying loans are discharge-eligible under Exhibit C but the consolidation loan lacks a BD indicator and is still open. This category likely includes borrowers with complex loans for which servicers have not fulfilled discharge requests and whose discharges are not yet in process. |
| All Eligible/BD Indicator | 15,091 | Borrowers with consolidation loans that bear a BD indicator and for which all underlying loans are discharge-eligible under Exhibit C but the consolidation loan is still open. This category likely includes borrowers with loans whose discharges have been initiated but are still in process. |
| Mixed/No BD Indicator | 4,478 | Borrowers with consolidation loans that lack a BD indicator and for which some but not all underlying loans are discharge-eligible under Exhibit C. This category likely includes borrowers with complex loans for which servicers have not fulfilled discharge requests and whose discharges are not yet in process. |
| **Open (Underlying Loan)** | **983** | Borrowers with consolidation loans for which one or more underlying loan is open despite the underlying loan being discharge-eligible under Exhibit C. The borrowers in this category may or may not have loans whose discharges are in process, but it is very unlikely the discharges have been fully processed. |

**Table 2.** Borrowers Without NSLDS Indicators of Complete Relief (Non-Consolidation Loans)

| Category | Borrowers | Details |
|---|---|---|
| **Department-Held** | **4,235***  | |
| Open/No BD Indicator | 2,185 | Borrowers with loans that are discharge-eligible under Exhibit C but lack a BD indicator and are still open. A likely possibility is that this category includes borrowers with loans that have transferred between servicers and whose discharges have been initiated but are still in process. |
| Open/BD Indicator | 213 | Borrowers with loans that bear a BD indicator but are still open.   The borrowers in this category may or may not have loans whose discharges are in process, but it is very unlikely the discharges have been fully processed. |
| Closed/No BD Indicator | 1,896 | Borrowers with loans that are closed but lack a BD indicator.   This category likely includes borrowers that do not have any outstanding loans but may be entitled to additional relief. |
| **FFEL** | **214** | Borrowers with eligible FFEL loans that are still open. This category likely includes borrowers with complex loans whose discharges are not yet in process. |

*  Note that individual borrowers may have loans in more than one of the listed sub-categories of Department-held loans. Thus, this total is less than the sum of the three listed sub-categories.

As to those loans where the Department's analysis of NSLDS records suggests that additional investigation is needed, these consist of open consolidation loans whose underlying loans include eligible and non-eligible loans, and as such are susceptible to processing delays. At this point, the Department's analysis suggests it is probable that some of these borrowers have in fact received full settlement relief. For example, 13,400 of these borrowers' records show a balance that has decreased by an amount that exceeds or is within $1,000 of the requested discharge amount. Likewise, 15,613 of these borrowers' records show a balance that has decreased by an amount that exceeds or is within $1,000 of the total amount disbursed for Exhibit C loans. The Department will continue to confirm the relief status of these borrowers, but these results indicate that most of the borrowers in this subset probably have fully processed discharges.

The Department acknowledges that there may be some Exhibit C borrowers who have not yet received refunds to which they are entitled under the terms of the Agreement.[5] The Department believes that a substantial number of these borrowers are prior defaulted borrowers, or borrowers whose loans have been transferred from decommissioned servicers that failed to provide complete and readily accessible records (e.g., payment histories) related to the loans. For instance, the servicer Aidvantage has reported to the Department that it has been unable to access servicing records from the now-decommissioned Affiliated Computer Services Education Services ("ACS"). The servicers have asserted that these issues require them to search data repositories to

---

[5] It is possible that the research will show, for some of these borrowers, that no refund or no further refund is due.

attempt to locate additional payment information, which can take up to two hours per borrower. The servicers have also asserted that many of the payment histories needed are over 20 years old and the data may no longer be available.

As to the deletion of tradelines, it is important to note at the outset that the Department does not have a direct relationship with credit bureaus, nor does the Department furnish any information to them. In addition, paragraph IV.F.1 of the Settlement Agreement provides that, in regard to credit reporting, full settlement relief is provided when the Department or the servicers have requested deletion of the tradeline for the relevant loan. The Department is not responsible for any delays by the credit reporting agencies in implementing the deletion. The Department timely directed servicers to request that the credit bureaus delete the relevant tradeline. Nonetheless, the Department acknowledges that the relevant loan debt for some Exhibit C borrowers has not yet been removed from their credit reports. Given the periodic nature of servicers' credit reporting, it is possible that the correct balances and tradeline deletion will be reflected in the servicer's next update to the credit bureaus. In addition, if a borrower's consolidation loan includes both eligible and non-eligible underlying loans, any tradelines reflecting the underlying loans would be deleted but the tradeline corresponding to the consolidation loan would only be updated to reflect a lower balance and would not itself be deleted.

The Department is not aware of any instances of a servicer processing an Exhibit C class member's discharge in the servicer's own accounts or records but failing to report that discharge and corresponding updates to the credit bureaus. Regardless, the Department has requested that servicers confirm they have requested credit updates for all discharges they have processed for borrowers whose loans they currently service. Additionally, the Department's efforts to resolve the processing issues discussed in this letter should address the remaining updates needed for those class members' credit reports.

*Second*, Plaintiffs allege that the Department has failed to provide complete quarterly reports regarding the number of borrowers who have received full settlement relief. The Department has provided three quarterly reports. Most of the data in the reports concern the status of the "decision groups"—those class members receiving approvals and revise-and-resubmit notices. That data is based on the Department's own records (i.e., is not dependent on information from servicers) and the Department is confident that the data regarding the decision groups are accurate. Accordingly, the Department disputes that it is in material breach of its reporting obligations. The Department does acknowledge, however, based on its recent investigation, that Item No. 4 in each of the reports (data regarding class members who have received full relief under Paragraph IV.A of the Settlement Agreement) has not been accurate. The data in Item No. 4 in each of the three quarterly reports were based on the borrowers' accounts having a borrower defense discharge reported in FSA's systems by the servicers. The Department believed the Item No. 4 data were accurate not only as of the date the reports were transmitted to Plaintiffs, but until late January 2024. The Department—having now confirmed that the information provided by the

servicers for Item No. 4 did not accurately reflect the full state of some borrowers' relief status—agrees that Item 4 of each of the quarterly reports has not been accurate. Going forward, the Department proposes that it send to you bi-weekly reports regarding the number of borrowers who have received full settlement relief, including details regarding the steps taken to verify that information, as well as information regarding the status of progress for borrowers who have not yet received full settlement relief under Paragraph IV.A of the Settlement Agreement. For example, such supplemental reports could include details such as those in Tables 1 and 2, above, and additional agreed-upon details and indicators beyond those in the quarterly reports provided in the Agreement.

*Third*, Plaintiffs allege that the Department has materially breached the Agreement by allowing servicers to bill and collect payments from members of the class whose debt is covered by the Agreement. The Department believes that the overwhelming majority of class members whose loans have not yet been discharged are in the appropriate forbearance or stopped collection status and does not, therefore, agree that a material breach has occurred. As you note, the Department has provided all loan servicers with a "Do Not Bill" list that identifies all class members who should be in forbearance or in stopped collection status on their relevant loan debt. The Department has instructed servicers that no one on the Do Not Bill list should be billed, and that no one should be removed from the Do Not Bill list unless instructed by the Department, so borrowers should not be inadvertently returned to repayment status. There may be situations in which an individual employee of a loan servicer provides incorrect information to a borrower. The Department believes that such situations are rare but is nonetheless committed to ensuring that class members are in the appropriate status on their relevant loan. The Department will continue to remind servicers that borrowers must be provided accurate information. If any borrowers made payments because servicers incorrectly sent billing notices, the Department has either already refunded such payments or will do so. To facilitate that effort, please provide us the names and loan information for the 268 borrowers referenced in your letter. Furthermore, the Department is willing to provide you regular updates on the status of these efforts.

*Fourth*, Plaintiffs have requested certain categories of documents from the Department. The Department is transmitting with this letter an updated version of the *Sweet* class list that indicates, for each class member, whether the Department has classified them as a member of the Exhibit C group or the decision group. As noted above, the Department is also willing to provide bi-weekly reports to you regarding the number of borrowers who have received full settlement relief, including details regarding the steps taken to verify that information. As noted below, the Department is also willing to share updates based on weekly *Sweet*-specific reports provided by the servicers. The Department would like to use the meet-and-confer process to better understand how the other requested information will aid Plaintiffs' efforts and explain the burden associated with some of these requests.

*        *        *

7

The Department acknowledges the importance of providing full settlement relief to borrowers as promptly as possible.  The Department shares your goal of discharging eligible loans for Exhibit C borrowers and ensuring that they receive the refund to which they are entitled.  The Department wants to assure Plaintiffs that these issues have been brought to the attention of senior agency officials, and those officials are regularly briefed on the status of the *Sweet* settlement implementation.  The Department's leadership has conveyed the urgency of resolving these issues.  To that end, Department personnel are in contact with servicers on a daily basis and are requiring servicers to provide multiple *Sweet*-specific reports each week (which the Department is willing to share with Plaintiffs on a bi-weekly basis).  The Department has also issued updated emergency work orders to address the problem posed by processing delays and has requested an additional $200,000 as an initial allocation to meet these efforts' funding needs.  Further, servicers have been instructed to prioritize resolving *Sweet* relief and, specifically, relief for Exhibit C borrowers.  The Department is also evaluating its legal options with respect to the servicers, including ways to enforce the servicers' obligations to accurately report class members' loan statuses to credit bureaus.

Additionally, more than a dozen Department personnel have been tasked with spending most or all of their working hours on *Sweet* settlement implementation, with ten other staff members devoting substantial time to that effort.  A working group, consisting of personnel across numerous offices and divisions, meets each day to evaluate the status of Exhibit C borrowers.  The team within FSA that interfaces with servicers to troubleshoot these issues has begun to standardize the troubleshooting process and has taken initial steps to redirect other personnel within FSA to be trained so they can assist going forward.

As stated during the January 24 call, when the Department believed that full settlement relief had been provided to 95% of Exhibit C borrowers, it anticipated completing full settlement relief for the large majority of Exhibit C borrowers approximately by the end of February 2024, and for a small remaining portion by approximately April 2024.  Based on the current information, the Department is unable to provide an estimate about when full settlement relief will be provided to all Exhibit C borrowers.  The Department intends to supplement this letter with an estimated timeline by March 1, 2024.

The Department deeply regrets that not all Exhibit C borrowers have received full settlement relief.  The agency looks forward to working with you over the ensuing meet-and-confer process to address these issues.  As you know, under the Agreement, the parties are to meet and confer within 5 business days of this letter.  We are available on the afternoons of February 23 and February 26.  Given that the Department expects to receive additional information throughout next week, a meeting on February 26 may allow the Department to provide the most updated information.

Sincerely,

*/s/Stuart Robinson*

Stuart Robinson

cc:    Eileen Connor
        Rebecca Eisenbrey
        Joe Jaramillo
        Noah Zinner

# Exhibit 16



The Project on Predatory Student Lending

769 Centre St, Boston, MA 02130
www.ppsl.org

March 1, 2024

<u>VIA E-MAIL</u>

Stuart Robinson
Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov
Benjamin.Takemoto@usdoj.gov

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Stuart and Ben,

    We appreciated speaking with you and representatives of the Department of Education in our meet & confer session on February 26, 2024. We are writing to follow up on issues we discussed at that meeting.

**1.    Parties' positions regarding the existence of material breaches**

    First, as to Plaintiffs' first allegation of material breach (failure to provide Full Settlement Relief to all members of the automatic relief group by the January 28, 2024 deadline), our understanding is that the Department agrees that a material breach has occurred with respect to undelivered discharges and refunds.[1] As such, in our upcoming meet & confer sessions, we will seek to come to an agreement on what actions the Department will take to rectify this breach, pursuant to Paragraph V.D.3.i of the Settlement Agreement.

---

[1] The Department took the position that the existence of a material breach should be assessed as of March 1, 2024, because implementation of the Settlement was delayed for four weeks after the Effective Date due to the Intervenors' then-pending motion for a stay. There is no language in the Settlement Agreement to support this position. Nonetheless, the Department has acknowledged that it will not deliver Full Settlement Relief to all automatic relief group members by March 1, 2024, so this disagreement is essentially academic. The Department is and will be in material breach regardless.

The Department took the position that it has not materially breached the Settlement with respect to the failure to deliver the third component of Full Settlement Relief, the deletion of credit tradelines from Class Members' credit reports. While we are cognizant that the Department does not directly provide information to credit reporting agencies ("CRAs"), the Department does have a responsibility under the Settlement to ensure that its servicers provide timely and accurate information to the CRAs. As detailed below, we are interested in receiving additional information that could clarify this situation.

As to Plaintiffs' second allegation of material breach (failure to provide "timely and complete" quarterly reports), the Department admits that it did not provide an accurate accounting of how many automatic relief group members have received Full Settlement Relief, but denies that this failure was material. As we explained in our meeting, Plaintiffs do not agree. It is true that, due to the Department's history with the Form Denial Notices, the parties negotiated for the quarterly reports to contain more detailed data regarding the decision group—but that does not mean that information about the automatic relief group is immaterial. If Plaintiffs had known earlier that the Department was on track to provide less than 70% of the required relief by the January 28 deadline, it certainly would have affected our interactions with both the Department and Class Members in the months leading up to the deadline.

That being said, we appreciate the Department's offer to provide more frequent and more detailed reporting going forward. Subject to our receiving the further information detailed below, we are open to negotiating an updated reporting process that could rectify this alleged breach.

Finally, as to Plaintiffs' third allegation of material breach (failure to maintain Class Members in forbearance or stopped collection status), the Department took the position that no material breach has occurred, apparently on the basis of its belief that any servicing errors are "rare." As we detailed in our meeting, and as we have explained to the Department in various calls and letters since October 2023, this is not what we are hearing from our clients. We have, to date, provided the Department with hundreds of names of Class Members whose servicers have tried to put them back into repayment or have taken other adverse actions on their loans since the COVID payment pause ended. There appears to be a major disconnect between what servicers are telling the Department and what they are telling borrowers. As we agreed during our meeting, the parties here have a mutual interest in ensuring that servicers are not giving out incorrect information about the Settlement.

You also stated during our meeting that the Department's position is that it is not liable for servicers acting inconsistently with its instructions. Respectfully, we disagree. The Department cannot escape its responsibilities under the Settlement simply by outsourcing these responsibilities to student loan servicers and then disclaiming any liability for these servicers' failures. Direct Loan servicers work for the Department on loans that, ultimately, are held by the Department. When the Department gives its contractors instructions—particularly instructions that relate to the correct implementation of a court-approved settlement—it is squarely the Department's responsibility to make sure those instructions are

followed. The Department's failure to oversee its contractors is not exculpatory. We continue to maintain our third allegation of material breach.

In sum, partial compliance with the Settlement is not compliance. Even the Department's estimated 70% compliance—a likely overestimate, given the absence of data about refunds—does not help the Class Members who live paycheck to paycheck, who are desperate to receive the relief they were promised, and who are facing a multitude of harms from ongoing collection and reporting on debt that they no longer owe.

By our calculation, if the parties are unable to reach consensus regarding the alleged breaches and the steps that the Department will take to rectify them, Plaintiffs would be authorized to file a motion for enforcement on or after March 19, 2024 (as to an acknowledged material breach) or March 27, 2024 (as to a disputed material breach).

**2.    The Department's commitments to provide additional information**

In your letter of February 16, 2024, and during our meeting, the Department committed to providing Plaintiffs with certain information. This information is relevant to the Department's meet & confer assertion that it is attempting in good faith to comply with the Settlement terms notwithstanding its failure to deliver required relief to a significant number of class members. This information includes:

- Copies of change requests and other instructions provided to servicers with respect to implementing the Settlement. This category will specifically include, but not be limited to:

  o Instructions to "original" loan servicers relating to how to handle consolidation loans (*i.e.*, what these servicers were told to do in order to "initiate [the] series of transactions that would result in the discharge and payment of any refund" on the consolidation loan).

  o Instructions to servicers regarding credit tradeline deletion, and/or any other information they should or should not provide to CRAs, with respect to *Sweet*-eligible loans.

- Summaries of what the Department has instructed servicers to do and how that corresponds to back-end inquiries that the Department is undertaking in NSLDS. (We understand this offer to be responsive to our request in our February 2, 2024 letter for documents showing the "verification processes that FSA uses to confirm that servicers are accurately reporting whether relief has been 'effectuated' for a particular Class Member.")

- A summary of data, similar to the bullet-point list on page 2 of your letter of February 16, showing how many and what percentage of the automatic relief group have (i) received the full refund amount to which the Department believes they are entitled; (ii) received some, but not all, of the refund amount to which the Department believes they are entitled; (iii)

have been determined by the Department to be owed no refund; and (iv) require further investigation as to their refund status.[2]

- Copies of all *Sweet*-specific reports transmitted to the Department by servicers.

- Bi-weekly reports detailing the number of borrowers who have received Full Settlement Relief, including details regarding the steps taken to verify that information, as well as information regarding the status of progress for borrowers who have not yet received Full Settlement Relief.

We request that the Department deliver this information by Friday, March 8, 2024.

The Department also asked which other indicators would be helpful for it to share in reports going forward, in addition to the data categories included in the tables in your February 16 letter. We would request the following:

- Additional information regarding FFEL loans for the automatic relief group—specifically, (i) how many Class Members in the automatic relief group had or have FFEL loans eligible for settlement discharge; (ii) how many of those Class Members have received a full discharge of all eligible FFEL loans; (iii) how many have received a partial discharge of some, but not all, eligible FFEL loans; (iv) how many have not received their FFEL discharge yet; and (v) how the Department is verifying the successful discharge of FFEL loans.

- All information provided by servicers to the Department regarding their progress in updating credit tradelines for automatic relief group members.

- The number of complaints the Department has received from Class Members regarding servicers demanding payment or taking other adverse actions (including, for example, inaccurate reporting to CRAs) on their *Sweet*-eligible loans.

### 3.    Timeline

In order to come to any consensus on how the Department might rectify its material breaches of the Settlement Agreement, we will require the Department to commit to a strict and near-term deadline by which all Class Members in the automatic relief group will receive their Full Settlement Relief—with no exceptions. If meeting this deadline means that the Department will have to take certain steps that favor borrowers—for instance, discharging the full balance of consolidation loans where servicers are unable to calculate the portion of the balance attributable to Exhibit C loans, or refunding all prior

---

[2] In our meeting, you stated that the Department does not have information about when refund checks are actually mailed to borrowers from the Treasury Department, but does have "indicators" of "where people are in the [refund] process." We understand that the data provided will be subject to this limitation.

payments where servicers are unable to apportion payments among *Sweet* and non-*Sweet* loans—then so be it.

It is simply unacceptable for the Department to state, as it did in its letter of February 16, that it is "unable to provide an estimate about when full settlement relief will be provided to all Exhibit C borrowers." This case is, at its core, about the Department's interminable delay in resolving borrower defense applications; the Class will not tolerate yet another open-ended period of delay. Here are just a few examples of Class Members we have heard from since the Department violated the January 28 deadline, who are currently suffering hardships because the Department has once again failed to meet its legal commitments:

- "So far, I have only received a discharge for the largest of my three loans for The Art Institute. . . . MOHELA has been wholly uncooperative every time I've called them. . . . I am currently being treated for cancer and have received a cancer treatment deferral, but had I not filled out that form and had my doctor sign it, they would be requiring me to make payments on my loans which should have been discharged. This is causing huge amounts of stress for me and is not helping my current health conditions." - Regina, KS, Art Institute

- "Technically my loans have been discharged due to my participation in the PSLF program. But I am still a class member and am due a refund. My loans were discharged the week FedLoan stopped servicing loans. I was told I would be transferred to MOHELA, but they had no record of me. I was/am in no man's land. . . . [I] called the BD hotline and was given one answer, then called a loan servicer provider and they gave me a totally different answer. I nearly completed suicide over these loans over a decade ago. Now the absolute utter onslaught of stress that has ensued is damaging my health. It is failing, rapidly. I'm told if I perish before the elusive and mystical check arrives, it cannot be transferred to my heir. This whole situation has taken DECADES off of my life and should be listed as a contributing factor in my cause of death." - Summer, FL, Florida Coastal School of Law

- "I am a single parent of a disabled adult child. My education was to make it possible to support my child on my own, but the school misled me, and my education didn't lead to the career I was told it would. I am now 56 years old. My son is 23. I live with my ex's mother, who is 95. If she passes away, I have no place to live. I have been working hard to save money to buy a home for my son and I and we actually CAN afford a place in a lower-income area - but only after my loans are gone, as my student loan balances impact the amount I can borrow toward a home loan. I have told my ex's mother that she is not allowed to die till my loans are gone, so I can afford to buy a home for my son and me without the impact of the loans affecting the amount I can borrow. She said she'll do her best, but at 95 I can only expect so much. I was so hopeful that this would be taken care of by 01/28/2024, but that is obviously not the case. I am very anxious." - Mary, CA, Brooks Institute

- "I am going to PERMANENTLY lose the opportunity to become a federal law enforcement officer because of MOHELA's settlement violations. . . . I had 7 months to complete the background. MOHELA's failure to discharge my loans will permanently deny me an opportunity I have worked 10+ years for. I don't get a do-over. I don't get an extension. I have one shot and MOHELA stole it. . . . I want my settlement relief. Nothing more nothing less. . . . They are causing me to appear as a financial liability and MOHELA refuses to remove erroneous information which reports my loans are delinquent. This could permanently disqualify me from ever working for an agency in any capacity. This is not fair. This is my life. . . . I've opened no less than 5 cases. I've sent 50 messages warning MOHELA of the dire consequences of violation. This is not fair, and it is unjust. Please make them enforce the settlement. Timely. I don't have time to wait." - Mallory, TN, Arizona Summit Law School

- ""This is something that has been dragging on for five years as of today. I have literally spent hours on hold and dealing with Nelnet trying to get this taken care of. Now my account is showing I am in repayment even though I was assured I was in forbearance until February. I just want this resolved. It weighs on me, not knowing what to do. Should I pay on the loan to mitigate interest and protect my credit score? Should I just sit and wait for the powers-that-be to do what they have promised? Should I yell to the mountaintops? It feels like I have a huge debt hanging over me that could drop back down on me. The last payment I made on the account was in 2022, but I have had about $1000 in 'payment' show up on the account. I am not sure if this was money that was supposed to be sent in refund or what the story is regarding that money. I have not been able to get any clear answers from Nelnet." - Cynthia, GA, University of Phoenix

- "I was taken off of admin forbearance and it has been a struggle just to get put back on it and frustration due to the fact that every person I seem to talk to at MOHELA acts like they do not know about this lawsuit. They act like they don't have the information in their system sent from the Borrowers Defense department. Even speaking with people at the Borrowers Defense department on the phone and FSA department. No one has been really helpful and more than anything I have been lied to more than I can count." - Tuwanna, WA, University of Phoenix

- "I am unable to buy a home due to this large amount on my credit. I have since had to move back to Massachusetts and sell my home in Florida due to medical reasons. I could not purchase again in MA due to these loans. Due to this, my rent is now over twice what my old mortgage was. I am a single mom working four jobs. Argosy promised a successful career in my field and I do not have one in that field. I had to pave my own way in another." - Pamela, MA, Argosy

We look forward to receiving a proposal for a more specific timeline, as you promised in your letter of February 16.

Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT
LENDING

cc:     Joe Jaramillo

# Exhibit 17



**United States Department of Justice**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102

| Stuart Robinson | (415) 436-6635 |
| Senior Counsel | stuart.j.robinson@usdoj.gov |

March 1, 2024

Rebecca Ellis
Project on Predatory Student Lending
769 Centre St.
Boston, MA 02130

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Rebecca:

 We write to supplement our letter to you dated February 16, 2024, regarding Plaintiffs' February 2, 2024 allegations that Defendants are in material breach of the Settlement Agreement.[1]

In our letter, the Department of Education ("Department") acknowledged that full settlement relief has not been implemented for all borrowers who are entitled to such relief under Paragraph IV.A.1 of the Agreement by January 28, 2024. The Department further explained that because its investigation is ongoing, and in light of the month-long delay in the Department's ability to issue discharge requests, the Department was not prepared at that time to issue a determination regarding material breach. The Department can now confirm that it agrees with Plaintiffs that, for borrowers who are entitled to, but have not yet received, full settlement relief pursuant to Paragraph IV.A.1, the Department is in material breach of the Agreement.

The Department remains optimistic that the parties can reach a consensus on the appropriate action to resolve the breach. The Department continues to work urgently to more reliably determine the status of class member relief, to investigate the circumstances of class members who have not received timely relief, and to resolve issues so that class members receive relief as quickly as possible. As an integral part of that work, the Department also continues to engage with servicers, including by instructing them to prioritize resolving *Sweet* relief (specifically, relief for Exhibit C borrowers), and by working to implement an emergency change request to address these issues. A key priority in that work is to reliably identify a timeline for

---

[1] We acknowledge receipt of your additional correspondence received today and will respond separately at a later date.

1

resolving these issues and for providing class members timely relief.  Due, in part, to the need to finalize certain instructions and details with the servicers, the Department cannot reliably identify that timeline at this time, but it remains an urgent priority and we will provide it as soon as the Department can reliably do so.

Additionally, and as referenced in our prior letter and call, the Department is willing to provide the following non-privileged documents to you during this cooperative meet and confer process in an effort to reach consensus on the path forward:

- Copies of the change requests issued to federal student loan servicers and instructions issued to commercial FFEL servicers regarding implementation of the *Sweet* settlement;

- Narrative descriptions or representative samples of communications from federal student loan servicers to FSA, and from FSA to federal student loan servicers, regarding progress toward effectuating full settlement relief for those Exhibit C borrowers who have not received such relief by February 28, 2024;

- Narrative descriptions or representative samples of documents showing the processes that FSA uses to confirm the status of effectuating full settlement relief for those Exhibit C borrowers who have not received such relief by February 28, 2024; and

- Complaints received by Federal Student Aid, including the Federal Student Aid Ombudsman's Office, from individuals who—through an agreed-upon process—can be identified as Class Members entitled to automatic discharges.

Your February 2, 2024 letter also requested the "2/28/2023 *Sweet* cohort 1 file."  This file refers to those class members entitled to automatic discharges, and that list was provided to you on February 20, 2024.   Your letter also requested an updated version of the class list to indicate inclusion in either the automatic discharge group or in the streamlined review decision group.  The updated class list is reflected in the spreadsheet provided on February 20, 2024.  Although not requested, the revised version of the class list also breaks down the streamlined group into subgroups indicating the date by which decisions are due.

Finally, you also requested "a list of the approximately 11,700 Class Members whom the Department has identified as not receiving their Full Settlement Relief by the January 28 deadline, including notation of whether each Class Member is awaiting a discharge, a refund, or both."  The Department is willing to provide you a list that identifies, based on agreed-upon criteria, eligible class members who have not received full settlement relief as part of the regular reporting updates the Department has indicated it will provide.

We look forward to your response.

Sincerely,

*/s/Stuart Robinson*

Stuart Robinson

cc:     Eileen Connor
        Rebecca Eisenbrey
        Joe Jaramillo
        Noah Zinner

# Exhibit 18



**United States Department of Justice**
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station,
Washington, DC 20044

| Benjamin T. Takemoto | (202) 532-4252 |
| Trial Attorney | benjamin.takemoto@usdoj.gov |

March 8, 2024

Rebecca Ellis
Project on Predatory Student Lending
769 Centre St.
Boston, MA 02130

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Rebecca,

We write to respond to your March 1, 2024, letter, which followed the parties' conference regarding Plaintiffs' allegations of material breach.  In your letter, you indicated that Plaintiffs are open to resolving the allegations of material breach related to the Department of Education's quarterly reports.  The parties further discussed this issue during the March 5, 2024, meet and confer.  Consistent with that meet and confer, the Department proposes that the parties resolve the alleged breach regarding the submission of quarterly reports through Defendants' (1) provision of information described on page 2 of our March 1, 2024, letter, which far exceeds the relief that the court can order pursuant to Section V.B.3 of the Settlement Agreement; and (2) consideration of class membership for individuals referenced in your March 1, 2024, letter—the five borrowers who submitted paper borrower defense applications and are in the post-class group, as well as the borrowers who state that they experienced technical difficulties in submitting a borrower defense application—based on additional materials submitted by those borrowers.

With respect to (1), the Department proposes to establish a process by which Plaintiffs can submit questions and the Department will provide responses according to an agreed-upon timeframe.  This may include general questions about settlement implementation, requests for lists or files regarding class membership, and questions regarding individual class members (or groups of class members).  As discussed during our March 5 meet and confer, the Department is enclosing its list of questions transmitted and issues raised by Plaintiffs since January 2024.  The Department has included responses to some questions, is working to respond to others, and invites you to add other questions you have.  The Department proposes that we meet and confer again in the coming week and agree upon a schedule and process for the production of records and a schedule for future questions and responses.

With respect to (2), as we discussed during our March 5 meet and confer, the Department is amenable to giving borrowers who assert that they should be class members the opportunity to

provide evidence in support of that assertion. The Department would like to discuss a process for making those determinations. As part of that discussion, the Department would like to communicate some of the conditions that will facilitate agreeing to that process. First, the universe of borrowers for whom the Department will consider evidence in support of class membership is limited to the names on the spreadsheets Plaintiffs have already provided on March 6, 2023, June 14, 2023 and July 18, 2023. Second, the Department's agreement to expand the class under the conditions described herein resolves the Plaintiffs' assertions in their February 14, 2024, letter that the Department is in material breach of the reporting requirement. In addition, the Department looks forward to discussing with you the following matters on this topic: proposed criteria and forms of evidence for demonstrating that an individual should be treated as a class member; the means of communicating these criteria to the relevant individuals; a timeline for resolving the issue of class-member status for these individuals; and a timeline for providing appropriate relief to newly added class members.[1]

As to Plaintiffs' allegations regarding the failure to maintain class members in forbearance or stopped collection status, Plaintiffs do not dispute that the Department has instructed servicers to maintain a Do Not Bill List. Rather, Plaintiffs assert that the Department is "liable for servicers acting inconsistently with its instructions." But the Settlement Agreement expressly provides that "Defendants shall not be liable based on events outside of Defendants' control, including but not limited to a situation where a third party, such as an employer, undertakes debt collection activities, such as wage garnishment, inconsistent with Defendants' instructions that collection activity cease." Settlement Agreement ¶ V.B.4.ii. Among the list of questions that the Department is addressing is your request for details about how servicers are carrying out the Department's forbearance-related instructions to them and potential ways of verifying that they are complying with those instructions.

Plaintiffs also raise the issue of the Department's timeline for effectuating full settlement relief for those Exhibit C borrowers who have not yet received such relief. Unfortunately, the Department does not yet have additional information beyond that provided in our March 1, 2024, letter. We will notify you as soon as we have additional information. Plaintiffs suggested that the Department accelerate the timeline by "discharging the full balance of consolidation loans where servicers are unable to calculate the portion of the balance attributable to Exhibit C loans, or refunding all prior payments where servicers are unable to apportion payments among *Sweet* and non-*Sweet* loans." That is not authorized by the settlement agreement, which limits the relief for this material breach to a court order requiring ED to provide full settlement relief to each affected individual on a schedule set by the court.

---

[1] "Appropriate settlement relief" means "Full Settlement Relief" (as that term is defined in the Settlement Agreement) in the case of class members entitled to automatic discharges or a streamlined decision for class members not getting automatic discharges.

Finally, Plaintiffs indicate that they may file a motion to enforce on March 19 or 27, 2024.  The Department remains optimistic that the parties can narrow the issues in dispute.  Should Plaintiffs feel compelled to seek relief from the court, we respectfully ask that you confer with us on a briefing schedule.

Sincerely,

*Benjamin Takemoto*
BENJAMIN T. TAKEMOTO

# Exhibit 19



**The Project on Predatory Student Lending**

769 Centre St, Boston, MA 02130
www.ppsl.org

March 13, 2024

<u>VIA E-MAIL</u>

Stuart Robinson
Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov
Benjamin.Takemoto@usdoj.gov

Re:     *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Stuart and Ben,

Thank you for meeting with us on March 5, 2024, and for your letter of March 8, 2024. We write to respond to your most recent proposals and address other outstanding issues regarding our allegations of settlement breach.

**1.     Breach of Section IV.A.1 (timely effectuation of Full Settlement Relief)**

As we have discussed previously, the Department concedes that a material breach has occurred with respect to the Department's failure to deliver Full Settlement Relief to all members of the automatic relief group by the deadline of January 28, 2024.

In your March 8 letter, you stated again—as you did in your letter of March 1, 2024—that the Department cannot give an estimate of when the effectuation of this relief will be complete. As you know, this uncertainty is not tolerable for Class Members who have already been waiting, and in many cases suffering serious consequences, for the past six weeks. We are and have been open to reaching consensus with the Department, but we cannot do so without a firm timeline for curing the breach.

At this time, our intention is to file a motion to enforce the Settlement Agreement with the court on March 19, 2024. Before doing so, we propose the following terms for your consideration:

1) The Department and its servicers will complete the effectuation of Full Settlement Relief, as defined in Section IV.F.1 of the Settlement Agreement,[1] for all members of the automatic relief group by May 31, 2024 (approximately four months after the original deadline).

   a. Per Section IV.F.1(1)'s specification that Full Settlement Relief shall include "discharging any interest that accrued while the borrower defense application was pending," the Department and its servicers shall, if applicable, discharge all interest that has accrued since September 1, 2023, on automatic relief group members' Direct Consolidation Loans that include Relevant Loan Debt (regardless of how such interest may have been apportioned between Relevant Loan Debt and non-*Sweet* consolidated debt).

   b. If a Class Member's discharge and/or refund would be delayed past this deadline because of complications relating to consolidation loan accounting, the Department will discharge the entire consolidation loan and/or refund all payments made on the consolidation loan in full, as applicable.[2] (Note, this process would not waive the Class Member's right to receive a refund of any payments made to the Department on the Relevant Loan Debt prior to consolidation.)

2) The Department will provide Plaintiffs' Counsel with regular reports on its progress toward completing the effectuation of relief. These reports will be delivered every 14 days, starting on March 22, 2024, and concluding on May 31, 2024.

3) The reports will include (but, at the Department's discretion, need not be limited to) the numbers of Class Members in the automatic relief group who:

   a. Are confirmed to have received each of the following categories of relief:

      i. Discharges of all Relevant Loan Debt;

      ii. All refunds to which they are entitled; and

---

[1] As the Department is aware, "Full Settlement Relief" is defined as "(i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt." Agreement § II.S. Full Settlement Relief has been "effectuated" when "Defendants . . . and their loan servicers" have "taken all steps necessary to" discharge the Relevant Loan Debt, discharge any associated interest "that accrued while the borrower defense application was pending," issue a refund check (or checks) if applicable, and request the deletion of the relevant credit tradeline. Agreement § IV.F.1.

[2] In your March 8 letter, you asserted that the Court could not order the Department to take this step. Without conceding the substance of that assertion, we simply point out that the strategies the Department may use to meet the deadline are, at this point at least, still within the Department's control.

        iii.   A request sent from their current loan servicer(s) to all credit reporting agencies to remove the credit tradeline for all Relevant Loan Debt from their credit reports.

   b.  Are confirmed to have *not* received each of the following categories of relief:

        i.   Discharges of all Relevant Loan Debt;

        ii.  All refunds to which they are entitled; and

        iii.   A request sent from their current loan servicer(s) to all credit reporting agencies requesting removal of the credit tradeline for all Relevant Loan Debt from their credit reports.

   c.  Have not had their relief status confirmed by the Department as to each of the following categories of relief:

        i.   Discharges of all Relevant Loan Debt;

        ii.  All refunds to which they are entitled; and

        iii.   A request sent from their current loan servicer(s) to all credit reporting agencies requesting removal of the credit tradeline for all Relevant Loan Debt from their credit reports.

   d.  For Class Members in categories (b) and (c), including all subcategories, how many Class Members are serviced by each of the federal loan servicers.

   e.  For Class Members in categories (b)(i) and (c)(i), how many are confirmed by the Department to currently have their Relevant Loan Debt (including consolidation loans that contain Relevant Loan Debt) in a status of forbearance, stopped collections, or $0 monthly payments under any of the available income-driven repayment plans.

        i.   For any Class Members in categories (b)(i) and (c)(i) who are *not* currently in such status, how many of them are serviced by each of the federal loan servicers.

4)  The reports will also include a description of the steps the Department has taken to verify that these reported numbers are accurate.

5)  That description and the veracity of the data will be attested to under oath by a senior Department official, such as the Chief Operating Officer of Federal Student Aid or another senior official with supervisory authority over the process of effectuating Settlement relief.

6)  At Plaintiffs' request, the Department will provide the names, contact information, and current servicer of Class Members in any of the above categories so that Plaintiffs can provide updated information directly to Class Members and/or seek confirmation of their relief status.

7)  If the Department fails to deliver Full Settlement Relief to all members of the automatic relief group by May 31, 2024, Plaintiffs will bring a motion to enforce pursuant to

Section V.B.2 of the Settlement, and Defendants will not oppose that motion and will not oppose the awarding of reasonable attorneys' fees to Plaintiffs.

Please let us know your position on this proposal as soon as possible, so that we can determine whether compromise might be possible. In the alternative, we are happy to discuss a briefing schedule for our motion to enforce.

**2.   Alleged breaches of Section IV.G (reporting requirements)**

On this point, we see a path to consensus based on our discussions so far. Below we set forth our understanding of the parties' current positions with respect to Plaintiffs' two major sets of reporting-related allegations, and specify what further steps we see as necessary to reach agreement.

**a.   Inaccuracy of past reports/failure to verify servicer data**

With respect to Plaintiffs' allegations that past post-settlement reporting was inaccurate, the Department took the step of including an "Addendum" to its Fourth Quarterly Report, which acknowledges that past reports of "effectuated" relief numbers were not accurate and provides current numbers that reflect additional verification efforts. Plaintiffs appreciate this effort to publicly correct the record.

The Department has also agreed to provide Plaintiffs with various categories of documents that will help to clarify a number of issues surrounding these allegations, including the implementation instructions provided by the Department to servicers, the Department's verification processes, and complaints that the Department has received from Class Members. *See* DOJ Letter dated Mar. 1, 2024, at 2. Again, we appreciate the Department's openness on this issue.

In our March 5 meet-and-confer call and the Department's subsequent March 8 letter, the Department also proposed that it would "establish a process by which Plaintiffs can submit questions and the Department will provide responses according to an agreed-upon timeframe." Plaintiffs are amenable to this process.

In our view, we could reach consensus regarding this set of alleged breaches once we agree on the applicable timelines. For the documents described in the Department's March 1 letter, Plaintiffs are open to a rolling production, but we propose that all documents be delivered by March 29, 2024.

For the question-and-answer process, we propose the following schedule: Plaintiffs will provide their updates to the initial question list (attached to your March 8 letter) by March 20, 2024. The Department will produce its first set of answers on April 3, 2024. Plaintiffs will provide an updated list of questions on April 10, 2024. The parties will thereafter continue on this cadence, with the Department having two weeks to provide each set of answers and Plaintiffs having one week after that to provide the next set of questions.

### b.   Exclusion of eligible individuals from total numbers of reported Class Members

In Plaintiffs' letter of February 14, 2024, we identified four categories of borrowers who, we alleged, were being miscounted in the Department's reports of the number of Class Members: (i) borrowers prevented from submitting timely BD applications by the Department's technical failures; (ii) borrowers whose paper applications were lost or improperly processed; (iii) Class Members who paid off their federal loans via private refinancing; and (iv) "missing" decision group Class Members, *i.e.*, those who had been previously counted in the decision group and then were apparently re-classified in the Second Quarterly Report as having received relief through some other channel.

With respect to group (iii), the Department stated in its letter of February 28, 2024, that— contrary to our previous understanding—"class members who privately refinanced or paid off their loans *after* filing a BD application are class members and will receive full relief" (emphasis in original). We appreciate this clarification and are satisfied on this point, provided we do not learn in the future about any problems with relief effectuation for these Class Members.

With respect to group (iv), we are amenable to the Department's proposal that we resolve these questions through the question-and-answer process discussed above, provided we can agree on an acceptable schedule.

With respect to groups (i) and (ii), in your March 8 letter you set forth several proposals for a process to establish class membership for these borrowers. Our responses to those proposals are as follows:

First, the Department proposes that "the universe of borrowers for whom the Department will consider evidence in support of class membership is limited to the names on the spreadsheets Plaintiffs have already provided on March 6, 2023, June 14, 2023 and July 18, 2023." We do not agree to this condition. A borrower's status as a Class Member should be based on what actually happened to them when they tried to apply for borrower defense, not whether they happened to contact Plaintiffs' Counsel about this issue during a particular time window. At the very least, individuals who contacted the Department to inquire about their class membership status or because of difficulty filing a BD claim prior to the Settlement's Effective Date ought to be included.

Second, the Department proposes that its agreement to reclassify certain borrowers, under the procedures agreed to in this meet-and-confer process, will resolve Plaintiffs' assertions in their February 14, 2024, letter that the Department is in material breach of the reporting requirement. Plaintiffs agree to this proposal.

Third, the Department leaves open to further discussion the following topics: (i) proposed criteria and forms of evidence for demonstrating that an individual should be treated as a class member; (ii) the means of communicating these criteria to the relevant individuals; (iii) a timeline for resolving the issue of class-member status for these individuals; and (iv) a timeline for providing appropriate relief to newly added class members. We are happy to discuss these issues with you. As an initial matter, our

position is that a declaration under oath should be considered sufficient as a "form of evidence," with no requirement of independent extrinsic evidence such as screenshots—which it is likely many borrowers did not take, or did not save over the past two years.

### 3.   Servicer violations

With respect to the various failures of student loan servicers in connection with implementation of the *Sweet* settlement (*e.g.*, failing to properly maintain Class Members in forbearance or stopped collection status, sending bills to Class Members purporting to collect on loans they do not owe, providing misinformation about the Settlement, etc.), we do not believe that Section V.B.4.ii of the Settlement absolves the Department of responsibility. The servicers are not unrelated "third part[ies], such as an employer," *id.*—they are federal contractors, answerable to the Department and purportedly working under the Department's supervision. When the servicers fail to perform their duties according to the terms of their contracts, the Department can take—and recently has taken—corrective action.[3] If the servicers have falsely represented to the government that they are doing their jobs, when in fact they are not, then they have potentially made false claims against the public fisc. They are also potentially liable for injuries to Class Members caused by their failure to follow Department directions. As class counsel, we are duty bound to explore this possibility.

However, it is ultimately the Department's (and the Department of Justice's) responsibility to make sure that the Settlement is implemented according to its terms. The Settlement explicitly establishes that "effectuat[ing] relief" means the Department will exercise oversight of its servicers to make sure that Full Settlement Relief actually reaches Class Members. *See* Settlement § IV.F.1 ("Defendants have effectuated relief for purposes of Paragraph[] IV.A . . . when they *and their loan servicers* have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member . . . ." (emphasis added)).

\* \* \*

We look forward to continuing our discussions. Thank you for your attention to this matter.

---

[3] *See, e.g.*, Press Release, "U.S. Department of Education Announces Withholding of Payment to Student Loan Servicer as Part of Accountability Measures for Harmed Borrowers" (Oct. 30, 2023), https://www.ed.gov/news/press-releases/us-department-education-announces-withholding-payment-student-loan-servicer-part-accountability-measures-harmed-borrowers; Press Release, "Biden-Harris Administration Announces Framework for Student Loan Servicer Accountability To Protect Borrowers Nationwide" (Nov. 9, 2023), https://www.ed.gov/news/press-releases/biden-harris-administration-announces-framework-student-loan-servicer-accountability-protect-borrowers-nationwide.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT
LENDING

cc:      Joe Jaramillo