BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STUART J. ROBINSON
Senior Trial Counsel
BENJAMIN T. TAKEMOTO
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4252
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON *on behalf of themselves and all others similarly situated*, | Case No. 19-cv-03674-WHA |
| *Plaintiffs*, | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE** |
| v. | **HEARING DATE: April 24, 2024** |
| MIGUEL CARDONA, *in his official capacity as Secretary of the United States Department of Education*, and | (Class Action)<br>(Administrative Procedure Act Case) |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

    A.    The Parties' Settlement Agreement .................................................................. 2

    B.    The Department's Implementation of the Agreement ...................................... 6

    C.    Plaintiffs' Allegations of Material Breach ................................................... 10

    D.    The Department's Efforts to Remedy the Material Breach ............................ 13

Discussion ............................................................................................................... 15

    A.    The Department's Failure to Effectuate Full Settlement Relief for All Exhibit C Borrowers ............................................................................................................ 15

    B.    Plaintiffs' Request for Additional Reporting ............................................... 18

    C.    Plaintiffs' Request for Reasonable Attorney's Fees ..................................... 19

Conclusion ............................................................................................................... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Hosp. Ass'n v. Price,*
   867 F.3d 160 (D.C. Cir. 2017) ......................................................................... 16

*Arata v. Nu Skin Int'l Inc.,*
   96 F.3d 1265 (9th Cir. 1996) .......................................................................... 17

*K.C. ex rel. Erica C. v. Torlakson,*
762 F.3d 963 (9th Cir. 2014) ........................................................................... 17

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ........................................................................................ 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Introduction

Just under two years ago, when the Department of Education and Plaintiffs jointly moved for preliminary approval of the Settlement Agreement, the Department believed in good faith that it could provide full settlement relief (i.e., discharging eligible student loans, refunding amounts paid to the Department toward those loans, and facilitating corresponding credit reporting relief) to Exhibit C borrowers within one year of the Agreement's effective date.  And until a few months ago, the Department continued to believe in good faith—based on the numbers it was seeing—that it could provide full settlement relief in that timeframe.

When the Department agreed to the one-year deadline, however, it failed to appreciate (1) how long it would take to provide full settlement relief to borrowers with consolidation loans (i.e., multiple loans rolled together) and (2) how many such borrowers there were.  In December 2023, the Department began to realize that the complexities of the consolidation loans among Exhibit C borrowers were far greater than it had appreciated.  Even so, the Department believed that 95 percent of Exhibit C borrowers had received full settlement relief as of January 2024.  The Department was incorrect, however.  Its error resulted from the Department's data recording only the discharge performed by the original loan servicer, even though consolidation loans require further steps from other servicers for the current loan to reflect the discharge.  For loans with many layers of consolidation, the Department's data gave only a limited window into the status of settlement relief.  This erroneous picture, coupled with the number of borrowers with consolidation loans, lead to a significant minority of Exhibit C borrowers—specifically, those who had highly complex multiple-consolidation loans—not receiving full settlement relief within one year of the Agreement's effective date.

When the Department discovered these errors, it immediately took steps to assess the scale of the problem and develop—at Plaintiffs' understandable insistence—a reasonable timeframe to provide full settlement relief.  Plaintiffs were not satisfied with the Department's inability to set forth a concrete schedule—again, understandably so—and accordingly filed their Motion to Enforce, ECF No. 397 [hereinafter Pls.' Mot.].  The purpose of this response is *not* to sidestep the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Department's responsibility for this problem.  To the contrary, the Department deeply regrets that not all Exhibit C borrowers have received full settlement relief and it accepts full responsibility for that unfortunate fact.  Rather, the purpose of this response is to explain what happened, what degree of compliance is achievable in the immediate future, and what steps towards compliance will require a longer period, given the magnitude and the complexity of the situation facing the Department.

There are no shortcuts.  Having provided full settlement relief for approximately 73 percent of Exhibit C borrowers, the remaining relief requires discharging complex consolidation loans involving many independent servicers, some of which are decommissioned; distinguishing between loans to attend Exhibit C schools, which are eligible for relief, and loans to attend non-Exhibit C schools; paying associated refunds on eligible loans; and updating credit reports via yet another set of independent actors, credit reporting agencies.  Ordering a schedule that the Department cannot meet will not facilitate the Department's efforts.  The focus should be on how these borrowers can receive full settlement relief in a realistically expeditious timeframe.  Unsatisfactory as it might be in light of the Department's previous mistakes, the Department respectfully submits that the Court should rely on the insights that the Department has developed into how these loans can be most expeditiously discharged.  To that end, the Department is determined to help the Court—through this response, the attached declaration, and at the forthcoming hearing—to set the best timeline to provide full settlement relief.

## **Background**

### A.    **The Parties' Settlement Agreement**

First filed in 2019, this case concerns the Department's delay in issuing borrower-defense decisions.  Following three years of litigation, the parties jointly moved on June 22, 2022, for

preliminary settlement approval.[1]   ECF No. 246.   Attached to the motion was the proposed Settlement Agreement, which provided a framework for comprehensively addressing the backlog of hundreds of thousands of borrower-defense applications.   The Department entered into the Agreement based on its expectation that loan servicers would be able to take the steps necessary to effectuate settlement relief under the applicable timelines.   Decl. of Richard Cordray ¶ 32 [hereinafter Cordray Decl.], attached hereto.

The Agreement generally divides borrower-defense applicants into three groups.   *See* Settlement Agreement ¶ IV.   Group One consists of the approximately 196,000 class members who received federal student loans to attend one of the 151 schools identified in the settlement's Exhibit C (often referred to as "Exhibit C borrowers").   As explained to the Court, this provision of the settlement reflects the parties' determination that borrowers "associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools."   ECF No. 246 at 17–18.   Under the settlement, these class members are entitled to a discharge of their remaining student loans associated with the relevant school, a refund of amounts already paid to the Department toward those loans, and corresponding credit reporting relief.   *See* Settlement Agreement ¶¶ II.S, IV.A.   Such "full settlement relief" was required within one year after the Effective Date of the Agreement.   *Id.* ¶ IV.A.

Group Two consists of the remaining class members who submitted borrower-defense claims on or before the date of the Agreement's execution.   The Agreement provides that these class members will receive a streamlined adjudication within set timeframes and with certain presumptions in the borrower's favor.   *See id.* ¶ IV.C.   The Agreement also provides that if the

---

[1] Defendants respectfully refer the Court to their previously filed summary judgment briefs for a complete statement of the facts predating the filing of the parties' joint motion for preliminary settlement approval.   *See* ECF No. 63, ECF No. 249.

Department fails to meet the negotiated timetable for resolution of an application, it will provide that applicant with full relief (including both a discharge of remaining balances and a refund of past payments made to the Department).  *See id.* ¶ IV.C.8.

Group Three consists of borrowers who submitted borrower-defense applications after the Agreement's execution but before this Court's final approval. *Id.* ¶ IV.D.  The Agreement provides that these applications will be adjudicated within three years of the Agreement's effective date, using normal adjudication procedures.  *Id.* ¶ IV.D.1.  As with the Group Two deadlines, if an application is not adjudicated within the prescribed period, the applicant will receive full settlement relief.  *Id*. ¶ IV.D.2.

The parties also agreed that the Department would adhere to certain reporting requirements. *Id.* ¶ IV.G.  Specifically, within thirty calendar days of the Agreement's Effective Date, the Department was required to provide Plaintiffs with information regarding the total number of class members, the number of class members eligible for full settlement relief because they fall within Group One, the number of class members who must receive decisions because they fall within Group Two, and the number of class members who must receive decisions because they fall within Group Three. *Id.* ¶ IV.G.1.  The Agreement also provides that the Department must transmit to Plaintiffs, and post on its website, quarterly reports documenting the Department's progress in meeting its obligations.  *Id.* ¶ IV.G.2-4.  Such reports are to include five separate categories of information concerning settlement implementation.  *Id.* ¶ IV.G.4.i-v.

Additionally, the Agreement includes detailed provisions regarding enforcement.  *Id.* ¶ V. Pursuant to the Agreement, "the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V." *Id.* ¶ V.A.  For claims arising under this section, the Court's jurisdiction is limited "only to order the relief explicitly specified for each particular claim[,]" and the Court "lack[s] jurisdiction to imply any claims, or authority to issue any other relief, under th[e] Agreement." *Id.*  As relevant here, the Agreement provides that, if the Department fails to effectuate full settlement relief for an Exhibit C borrower within the prescribed time period, "the only relief available from the Court shall be an order

1  requiring Defendants to promptly provide Full Settlement Relief to each affected individual on a

2  schedule set by the Court." *Id.* ¶ V.B.2.  The Agreement states that "Defendants shall also be

3  liable for Plaintiffs' reasonable attorney's fees and costs incurred in bringing the claim." *Id.* ¶

4  V.B.2.  The Agreement further specifies that, in the event of an involuntary collection of a class

5  member's student loan debt, "Defendants shall not be liable based on events outside of Defendants'

6  control, including but not limited to a situation where a third party, such as an employer, undertakes

7  debt collection activities, such as wage garnishment, inconsistent with Defendants' instructions

8  that collection activity cease." *Id.* ¶ V.B.4.ii.  Finally, the Agreement sets out a procedure for the

9  parties to meet and confer regarding allegations of material breach.  *Id.* ¶ V.D.

10       The Court granted preliminary approval to the settlement on August 4, 2022.  ECF No.

11  307.  On August 31, 2022, the Court granted the motion to permissively intervene filed by The

12  Chicago School of Professional Psychology, Everglades College, Inc., American National

13  University, and Lincoln Educational Services Corporation.  ECF No. 322.  These schools sought

14  to intervene to object to and oppose the Agreement.  *Id.*  The following month, Plaintiffs and

15  Defendants jointly moved for final settlement approval, ECF No. 323, which the Court granted on

16  November 16, 2022, ECF No. 345.  Three of the intervenor schools subsequently appealed, ECF

17  No. 347, 348, 349, and moved to stay the final judgment pending appeal, ECF No. 350.  The Court

18  held a settlement status conference on January 26, 2023; following that conference, the Court

19  ordered that "[b]ecause defendants state that they cannot separate out loan discharge requests for

20  borrowers who attended appealing intervenor schools, no loan discharge requests shall be sent and

21  no loans shall be discharged until appealing intervenors have an opportunity to have their motion

22  heard and the order on their motion issues on or about 2/15/23."  ECF No. 356.  The Court

23  ultimately denied the intervenors' motion to stay judgment pending appeal on February 25, 2023,

24  though it temporarily stayed the judgment "with respect to discharges and discharge requests for

25  loans associated with movants for [seven days] to allow them to present a stay motion to our court

26  of appeals."  ECF No. 382 at 24-25.  The Ninth Circuit denied the intervenors' motion to stay on

March 29, 2023.  ECF No. 390.  The Supreme Court denied the intervenors' emergency stay application on April 13, 2023.  No. 22A867 (Apr. 13, 2023).[2]

**B.      The Department's Implementation of the Agreement**

Even before the Court approved the Agreement, the Department began to take steps towards compliance.  *See generally* Cordray Decl. Part II.A.  Beginning in June 2022, these efforts included preparing discharge requests that would instruct servicers to complete the necessary steps to provide full settlement relief to Exhibit C borrowers (i.e., discharge the relevant loan(s), issue refunds for payments made on the loan(s), and update credit reporting).  *Id.* ¶¶ 29–31.  The Department also used this time to implement procedures to ensure that it could meet its settlement obligations with respect to class members who were not Exhibit C borrowers, including by drafting guidance documents for adjudicators and publishing information on the Department's website.  *Id.* ¶ 32.  Both at the time the Department executed the Agreement and when the Court entered final approval, the Department believed it had the resources and procedures in place to meet the applicable deadlines.  *Id.* ¶ 28.

On February 28, 2023, the Department sent to servicers the discharge requests for 180,826 Exhibit C borrowers, carving out requests for those borrowers who attended the appealing intervenors' schools.  *Id.* ¶ 40.  The remaining discharge requests were sent on March 30, 2023, and May 10, 2023, after the Ninth Circuit denied the intervenors' motion for stay.  *Id.* ¶¶ 41, 42.  Shortly after the Agreement went into effect, the Department met with loan servicers "to emphasize the timeline associated with the *Sweet* Class cases, answer servicer questions, and receive updates on servicer progress."  *Id.* ¶ 69.

The loan servicers began to promptly implement the discharge requests.  *Id.* ¶¶ 44, 69.  The specific process followed by servicers is discussed in detail in the accompanying declaration, *see*

---

[2] As of April 2, 2024, the Intervenor-Schools' appeal is pending. *See Sweet v. Everglades College, Inc.*, No. 23-15049 (9th Cir. filed Jan. 17, 2023).  Oral argument was held on December 5, 2023.

*id.* ¶¶ 44–68, though certain aspects of that process bear emphasis.  First, regardless of the type of loan, the Department sent discharge requests to the original loan servicer.  *Id.* ¶¶ 51–53.  Second, the specific steps required for effectuating full settlement relief, and the complexity of the process, depend on the type of loan.  *Id.* ¶ 44; *see generally id.* Part II.B.  For Direct Loans that were not subsequently consolidated, the original servicer would reduce an eligible loan[3] balance to zero, *id.* ¶ 47.a; identify loan payments and create a "refund file," which—after approval from the Department—was sent to the Department of the Treasury, which then issued payment to the borrower, *id.* ¶ 47.b; notify credit reporting agencies about a change in loan balance, which required credit reporting agencies to remove the tradeline as applicable, *id.* ¶ 47.c; and update the National Student Loan Data System ("NSLDS") to reflect the processing of a discharge, *id.* ¶ 47.d. Loans made pursuant to the Federal Family Education Loan Program ("FFEL") and held by commercial lenders were to be handled similarly.  *See generally id.* Part II.B.3.  After receiving a discharge request, the guaranty agency ("GA") would pay off the loan and provide for the borrower to receive a credit reporting update.  *Id.* ¶¶ 63–65.[4]

Consolidation loans, by contrast, require more steps—sometimes considerably more—by more parties.  *See generally id.* Part II.B.2.  Consolidation loans are not taken out to pay for attendance at a college or university, but rather consolidate one or more existing student loans into a new loan.  *Id.* ¶ 23.  As with Direct Loans, the Department sent the discharge request for consolidation loans to the original servicer of an eligible loan.  *Id.* ¶¶ 50–62.  Because the eligible loan was paid off by a consolidation loan, the account maintained by the eligible loan's original servicer will already show a zero balance.  *Id.* ¶ 23.c.  That servicer must nonetheless calculate a

---

[3] An "eligible loan" is one that is subject to discharge, refund, and credit reporting relief based on the borrower's using the loan to attend an Exhibit C school.

[4] Unlike in cases of Direct loans, the Department does not have contractual obligations with GAs. *Id.* ¶ 64.  Nonetheless, historically these entities have cooperated with the Department to process borrower-defense discharge requests, and they have cooperated here to effectuate full settlement relief.  *Id.*.  Pursuant to the Agreement, refunds are not provided for such loans because payments were not made to the Department.  *Id.* ¶ 66.

refund amount for any payments made to it on the eligible loan, and then send a record, or instruction, to the consolidation servicer to reduce the consolidation loan by the amount of the eligible loan (i.e., discharge the eligible loan), calculate a refund for any payments made to it, and update the credit reporting on the borrower's account. *Id.* ¶ 23.d. If the consolidation loan has been consolidated more than once—as was the case for many borrowers—a record must be created and sent to each subsequent servicer. This ensures that, by the end of the process, a discharge of the eligible loan is reflected in the current consolidation loan, all payments on subsequent loans that are attributable to the eligible loan are identified for refunds, and the credit reporting is updated appropriately. *Id.* ¶ 24. The timing associated with completing full settlement relief for an Exhibit C borrower with one or more consolidations depends on multiple complicating factors, including (1) the number of consolidations; (2) whether the underlying loan was serviced by a now-decommissioned servicer (i.e., servicers that have gone out of business or ceased servicing federal student loans); (3) whether the originator and servicer for the underlying loan were the same entity; and (4) whether a consolidation loan's original underlying school loans are all eligible for settlement relief or also include loans to attend a school not listed on Exhibit C. *Id.* ¶¶ 50, 55, 56, 57, 59.

The Department's oversight of the servicers has occurred through various channels. The Department discussed *Sweet* with the servicers in weekly calls, periodically reminded them of the settlement deadlines, and received regular reports on servicers' progress in fulfilling discharge requests. *Id.* ¶¶ 69, 70. Servicers had a 15-business-day deadline to fulfil the discharge request for the original loan. *Id.* ¶ 71. The Department closely monitored servicers' adherence to this deadline, and while the Department granted extensions to complete this step (e.g., when a servicer was faced with a complicated loan history), it "notified servicers in October 2023 that the February 2023 discharge requests for origination loans should be completed by November that year[.]" *Id.* ¶ 71. When two servicers reported in November 2023 that discharge requests remained incomplete, the Department began to hold twice weekly meetings with them, "receive updates, answer questions, and reinforce the timeline required for completion under the settlement." *Id.* ¶

72.  That month the Department also informed the servicers that it was undertaking new efforts to validate their information and emphasized the importance of communication between the Department and the servicers.  *Id.* ¶¶ 73, 74.

As late as January 2024, the Department believed that discharges had been applied for 95 percent of Exhibit C borrowers.  *Id.* ¶ 76.  That belief, it turns out, was wrong for several reasons. First, the Department failed to appreciate the implications of the consolidation loans held by Exhibit C borrowers; specifically, the amount of time and number of steps needed to effectuate full settlement relief for consolidation loans given the complexity of the process described above. *Id.* ¶¶ 5, 28 96.  The Department failed to account for the fact that adjusting consolidation loans to account for the underlying loans' discharge—especially consolidation loans with ineligible underlying loans, inaccessibly stored payment records, or records from a since-decommissioned servicer—would add such significant time for full processing.  *Id.* ¶ 70.  Second, the Department failed to establish a process to track the status of discharges for consolidation loans.  *Id.* ¶¶ 76, 96. The Department was focused on the status of discharges completed by the original servicer, and— despite emphasizing to the servicers the January 2024 deadline—neglected to carefully consider the time subsequent servicers took to discharge eligible loans, create refund files, and send updates to credit reporting agencies.  *Id.* ¶ 71.  Third, the Department failed to impose strict and enforceable deadlines on servicers processing consolidation loans beyond the origination loan.  *Id.* ¶ 96.  As noted above, the Department imposed a 15-business day deadline on original servicers but did not impose a corresponding deadline on subsequent services.  Finally, the Department failed to correctly interpret servicer-provided information, which did not indicate that consolidation loans were fully discharged, as the Department believed and reported.  *Id.* ¶ 96.  Rather, that information indicated only that the *original* servicer discharged its portion of the consolidation loan, not that *subsequent* servicers discharged their portions.  *Id.* ¶ 85.

In November 2023, the Department notified servicers that it was reviewing for completeness the processing of *Sweet* loans.  *See id.* ¶ 74.  Around December 2023, as part of the process of reconciling servicer-reported progress with NSLDS data, the Department detected a

complication with discharges of consolidation loans and began to focus on processing these adjustments so that the discharges were applied to the eligible loans' subsequent consolidations. *Id.* ¶ 75.  The Department also instructed the servicers to prioritize Exhibit C consolidation loans at that time.  *Id.*

On January 24, 2024, representatives from the Department, the Department's attorneys, and class counsel held a telephonic conference to discuss the status of full settlement relief for Exhibit C borrowers.  *Id.* ¶ 77.  The Department conveyed to class counsel its belief that, as of that date, full settlement relief had been effectuated for approximately 95 percent of Exhibit C borrowers, and that full settlement relief for the remaining portion of Exhibit C borrowers would be effectuated in the next few months, according to information provided by loan servicers.  *Id.* ¶¶ 76, 77.  The Department explained that for most of these borrowers, additional review was needed to determine if a refund is due, and the delay for the remaining borrowers was attributed to complications related to loan consolidation.  *Id.* ¶ 77.  During the call, class counsel disputed the accuracy of the 95% figure cited by the Department.  *Id.* ¶ 79.

## C.     Plaintiffs' Allegations of Material Breach

On February 2, 2024, Plaintiffs formally alleged that the Department was in material breach of the Agreement.  *Id.* ¶ 84.  As relevant here, Plaintiffs alleged that the Department failed to provide full settlement relief to all Exhibit C borrowers and again disputed the accuracy of the 95% figure.  *Id.*

The Department responded on February 16, 2024.  *Id.* ¶ 85.  In its response, the Department confirmed that the numbers it had previously reported were inaccurate.  *Id.*  Specifically, as of February 15, 2024, the Department's analysis of its records indicated the following:

- 135,526 borrowers (approximately 69 percent of Exhibit C borrowers) had received fully processed discharges;

- 31,437 borrowers (approximately 16 percent of Exhibit C borrowers) had not received fully processed discharges (of these, 3,581 borrowers had received fully processed discharges for some but not all eligible loans); and

- 28,964 borrowers (approximately 15 percent of Exhibit C borrowers) required further investigation as to whether they have received fully processed discharges.

*Id.* ¶ 86.a–c.  As of February 15, 2024, the Department was unable to determine the number of Exhibit C borrowers who had received full refunds, or whose credit reporting has been accurately updated as a result of discharges.  *Id.* ¶ 86.d.

These numbers were based on the Department's review of NSLDS files, which maintain a record of various attributes about a borrower's loans.  *Id.* ¶ 87.  Further, the Department identified three reasons that not all Exhibit C borrowers had received full settlement relief: (1) "certain borrowers have highly complex consolidation loan histories that must be manually researched and reconstructed to determine the appropriate discharge and/or refund amounts"; (2) "the payment histories of certain borrowers are not readily available, such that the servicers must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs"; and (3) "the Department found that servicers have initiated the relief process for certain borrowers, but that process has not been completed, likely because a series of transactions must be executed across multiple servicers, particularly with loans that have been consolidated multiple times."  *Id.*

The Department also provided information about the types of loans for which NSLDS data indicated had not been fully processed.  *Id.* ¶ 88.  Many included loans that had been consolidated multiple times, in which case, as explained above, servicers need to coordinate about the various stages of how the loans developed through multiple consolidations to fully discharge the Exhibit C loan (and ensure that any non-Exhibit C loans are not discharged).  *Id.*  In some cases, a consolidation loan was previously serviced by a decommissioned entity, which can present logistical challenges to the successor servicer because of deficient or nonexistent records (e.g., payment histories) related to the loans.  *Id.*  Exhibit C borrowers with non-consolidated loans were

also among those who had not yet received full settlement relief.[5]  *Id.*  For borrowers whose loans required additional verification as of February 15, 2024, the Department noted that while a substantial number likely have received fully processed discharges, others were likely delayed because consolidation loans consisted of both eligible and ineligible loans that needed to be accurately untangled.  *Id.*  This untangling involves each servicer recalculating the balance, interest, fees, and payments associated with each Exhibit C loan in the consolidation loan, beginning with the initial loan and ending with the borrower's current consolidation loan.  *Id.* ¶ 55. Take, for example, a student who has a consolidation loan associated with The Art Institute, an Exhibit C school, and UC San Francisco, which is not an Exhibit C school.  After the loans were consolidated, the servicer recorded a single balance, imposed a single interest rate, imposed a single set of fees, and collected a single payment from the borrower.  Now that the servicer has been instructed to discharge only debt associated with The Art Institute, however, the servicer must refund the payments and calculate how much the balance, interest rate, and fees, *would have been* if they were separated from the loan associated with UC San Francisco.  Because of this recalculation, which servicers must do for each consolidation, the processing times for discharging consolidation loans can be lengthy—longer at least than if servicers could discharge both eligible and ineligible debt.  *See id.* ¶¶ 120-25 (describing processing times).

The Department also addressed the status of the other aspects of full settlement relief— refunds and updates to credit bureaus.  *Id.* ¶ 89.  As to the former, the Department acknowledged that there may be some Exhibit C borrowers who are entitled to, but have not yet received, refunds pursuant to the Agreement, and that "a substantial number of these borrowers are prior defaulted

---

[5] These borrowers largely fall into two groups.  The first group is borrowers with zero balances because they received a different discharge that does not provide refunds.  Servicers for these borrowers must therefore take additional steps to ensure that the borrower receives their entitled refunds.  This group contains approximately 1,800 borrowers.  The second group is borrowers with unknown processing errors or glitches that must be individually assessed for quality control.  Many of these borrowers may have changed servicers since the discharge requests were built (and thus were sent to the wrong servicer) or had a coding error when the discharge was applied.  This group contains approximately 1,000 borrowers.

borrowers, or borrowers whose loans have been transferred from decommissioned servicers that failed to provide complete and readily accessible records (e.g., payment histories) related to the loans." *Id*. The servicers have informed the Department that, under these circumstances, obtaining additional payment information can be difficult if not impossible. *Id*. With respect to the deletion of tradelines, the Department confirmed that it "timely directed servicers to request that the credit bureaus delete the relevant tradeline." *Id*. But because the steps for refunds and credit-reporting depend on the discharge process being reflected in a borrower's current consolidation loan, the Department nonetheless "acknowledge[d] that the relevant loan debt for some Exhibit C borrowers has not yet been removed from their credit reports." *Id*.

The Department subsequently conveyed its agreement with Plaintiffs that, in light of the failure to effectuate full settlement relief for all Exhibit C borrowers, the Department is in material breach of the Settlement Agreement. *Id.* ¶ 90.

**D.     The Department's Efforts to Remedy the Material Breach**

The Department deeply regrets that not all Exhibit C borrowers have received the relief to which they are entitled. The Department accepts full responsibility for its errors and acknowledges the effects on borrowers. *See id*. ¶¶ 5, 96, 117 The Department has taken multiple steps to remedy the material breach, focusing specifically on tracking and accelerating discharges and refunds for consolidation loans.

First, the Department initiated an emergency process that would require servicers to track in a single record the loans for a given Exhibit C borrower. *Id.* ¶¶ 106–11. This new reporting mechanism will allow both servicers and the Department to follow in real time the status of discharging a consolidation loan and the creation of refund files, and will facilitate communication between the Department and the servicers about particular adjustments (i.e., discharges, refunds, and credit reporting updates) required by additional servicers beyond the original servicer. *Id.* ¶ 109.

Second, the Department has repeatedly emphasized that servicers must prioritize the processing of consolidation loans. *Id.* ¶ 75. To that end, the Department has instructed servicers to process adjustments within ten business days. *Id.* ¶ 102. Beginning April 1, 2024, if a servicer beyond the original servicer does not meet the ten-day deadline, the Department can impose consequences on that servicer, including reducing loan allocations and assessing financial penalties. *Id.* ¶ 105.

Third, the Department has initiated a process that will provide prompt credit reporting relief. *Id.* ¶¶ 112, 114–115. Specifically, the Department "has begun the process to require the servicer of each class member's current consolidation loan to direct the CRAs to delete the tradeline associated with the consolidation loan immediately rather than following the completion of steps by servicers that serviced the loans underlying the current consolidation loan." *Id.* ¶ 115. These updates should be reflected in the reports to the credit reporting agencies for the month of May for federally held loans and generally by May or June for commercial FFEL loans. *Id.*

With respect to the number of Exhibit C borrowers who have not yet received full settlement relief, the Department has analyzed its records and confirmed the following as of March 29, 2024:

- 142,676 Exhibit C class members (72.8 percent) have fully processed discharges.

- 2,280 Exhibit C class members (1.2 percent) with unconsolidated school loans (and no eligible consolidated loans) for whom relief remains incomplete.

- 50,967 Exhibit C class members (26.0 percent) with consolidation loans associated with Exhibit C loans for whom relief remains incomplete.

- Additionally, there is a small number of borrowers whose records are conflicting as to whether they have any eligible loans and that are being reviewed by the Department.

*Id.* ¶ 118.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Discussion

**A.     The Department's Failure to Effectuate Full Settlement Relief for All Exhibit C Borrowers**

Despite fully processing discharges for 72.8% of Exhibit C borrowers, the Department acknowledges that it has failed to effectuate full settlement relief for all such borrowers, and that the Court may therefore "order Defendants to promptly provide [such relief] to each affected individual on a schedule set by the Court."   Settlement Agreement ¶ V.B.2.i.   In view of the Department's reliance on loan servicers to take the necessary steps to provide full settlement relief, the number of remaining Exhibit C borrowers, and its own efforts to remedy the breach, the Department respectfully proposes that the Court set a schedule consistent with the following forecasts.

1.  May 31, 2024:  Full Settlement Relief for 5,500 additional Class Members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with Direct Loans and loans that were consolidated once.

2.  July 31, 2024:  Full Settlement Relief for 30,000 additional Class Members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with loans that were consolidated twice.

3.  August 31, 2024:  Full Settlement Relief for 12,000 additional Class Members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with loans that were consolidated three or four times.

4.  September 6, 2024:  Report to Plaintiffs and the Court on the number of remaining Class Members who have not received Full Settlement Relief.  Because relatively few borrowers have loans with five or more consolidations, the Department estimates that this population will be no more than 7,000 and may be substantially lower.  Because these loans are exceedingly complex, however, the Department is unable to predict specifically how many borrowers will remain. *See* Cordray Decl. ¶¶ 109–12, 118–24.

The accompanying declaration also describes new processes that the Department is refining with servicers to speed up relief for consolidation loans and improve the ways to confirm it. *See* Cordray Decl. ¶¶ 106–17. Although that process is not final and remains subject to numerous caveats and dependencies based on the complexity involved, the improvements in that new process could facilitate full relief for approximately 20,000 additional Exhibit C class members by May 31, 2024, and full relief for nearly all remaining Exhibit C class members by July 31, 2024. *Id*. ¶¶ 106–11, 121.

Plaintiffs ask that the Court order Defendants to "provide Full Settlement Relief to each Class Member in the automatic relief group by May 31, 2024." Pls.' Mot. at 17. Using the procedures described above and in the accompanying declaration, the Department is unable to effectuate full settlement relief by that time, particularly for consolidation loans with two or more consolidations. *Id.* ¶ 123; *see Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017) ("And just as a court may not require an agency to break the law, a court may not require an agency to render performance that is impossible."). To the contrary, the Department can only commit, at present, to providing full settlement relief to an additional 5,500 Exhibit C borrowers by May 31. Cordray Decl. ¶ 121. Plaintiffs do not provide any basis for believing that the Department can meet their May 31, 2024, deadline, though they have previously indicated their belief that the Department can meet this deadline by simply sending a discharge request to current servicers of consolidation loans with instructions to discharge both eligible and ineligible debt and refund all payments made on both eligible and ineligible loans. ECF No. 397 at 122–23. Expanding the scope of relief as Plaintiffs propose would materially expedite the process of discharging consolidated loans. Indeed, the Department assesses that if it were not required to disaggregate eligible and ineligible loans, "it would become practicable for the Department to discharge the remaining loans within 60 days of implementing a CR to carry that out." Cordray Decl. ¶ 125.e. Under such a framework, it would still not be possible to provide refunds of payments under eligible loans by May 31. *Id.* However, the relief proposed by Plaintiffs would exceed the scope

of the Agreement and would result in the discharge of an estimated several hundred millions of dollars in ineligible debt.  *Id*. ¶ 125.c.

Finally, Plaintiffs propose that the Court's order setting a schedule "would be best effectuated if the Court were to designate a single individual within the government to oversee the Department's compliance—in particular, an individual who has not previously been involved in overseeing the Department's botched handling of the Settlement."  Pls.' Mot. at 15.  Plaintiffs identify no basis for the Court to award such relief under the Agreement.  "Federal courts 'have no inherent power to enforce settlement agreements entered into by parties litigating before them.'" *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 967 (9th Cir. 2014) (quoting *Arata v. Nu Skin Int'l Inc.*, 96 F.3d 1265, 1268 (9th Cir. 1996)).  "Rather, courts have ancillary jurisdiction to enforce a settlement agreement only 'if the parties' obligation to comply with the terms of the settlement agreement ha[s] been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.'" *Id.* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)).  The Settlement Agreement explicitly limits the Court's enforcement "jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section."  Settlement Agreement ¶ V.A.  Further underscoring this limitation, the Agreement states, "The Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement."  *Id.*  Beyond the Agreement, there is no "order of dismissal" that provides additional ancillary jurisdiction; to the contrary, in its Final Judgment, the Court confirmed that it "should retain jurisdiction to monitor and oversee implementation of the settlement *as set forth in the settlement agreement*."  ECF No. 346 (emphasis added).  The Court's jurisdiction is therefore limited to the role outlined in the Settlement Agreement.  And the Agreement provides that in response to the Department's failure to provide Class Members with Full Settlement Relief, "the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected Class Member on a timetable set by the Court."  Settlement

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Agreement ¶ V.B.1.i.  Plaintiffs' additional requested relief is unequivocally beyond the Court's jurisdiction, and the Court should accordingly reject it.[6]

## B.    Plaintiffs' Request for Additional Reporting

In their motion, Plaintiffs ask the Court to order Defendants to submit reports every fourteen days that include detailed information, including "a description of the steps the Department has taken to verify that these reported numbers are accurate" that is "attested to under oath by a senior Department official[.]"  Pl.'s Mot. at 15–17.  The Court lacks jurisdiction to order this relief as well.  Pursuant to the Agreement, if the Court orders Defendants "to promptly provide Full Settlement Relief to each affected Class Member on a timetable set by the Court[,]" Defendants will report to Plaintiffs' Counsel and the Court on its progress of issuing such relief, *as provided herein*," to affected Class Members."  Settlement Agreement, ¶ V.B.2.i–ii (emphasis added).  The section of the Agreement expressly discussing the reporting of progress in the event of a material breach is found in ¶ V.B.3, which provides that "the only relief available from the Court shall be an order requiring Defendants to submit their reports on a monthly basis from the point of the order forward."  *Id.*, ¶ V.B.3; *see id.* ¶ IV.G (describing reporting requirement).  Here too, Plaintiffs identify no basis for the Court to award additional reporting relief under the Agreement.  *See id.* ¶ V.A.  Additionally, the parties have engaged in separate discussions, and now reached an agreement, to address Plaintiffs' concerns about the accuracy of the Department's reporting.

---

[6] For these reasons, the Court also lacks jurisdiction to compel the servicers—who are not parties to the Agreement or to this case—to perform any obligation under the Agreement or Final Judgment or, by extension, to hold them in contempt for failing to do so.  Neither the Agreement nor Final Judgment reserves such ancillary jurisdiction to the Court.  In an abundance of caution, the Department forwarded to all the servicers the Court's order requiring Defendants to "promptly notify their loan servicers whom they blame for delay that they are ordered to appear at the hearing on April 24, 2024, at 8:00 A.M., and show cause why they should not be held in contempt for frustrating the settlement and the final settlement approval order of the United States District Court," ECF No. 399.  But the Department does not blame the servicers for the current situation and, as noted above, takes responsibility for it.

**C.      Plaintiffs' Request for Reasonable Attorney's Fees**

Defendants agree that Plaintiffs are entitled to reasonable attorney's fees in connection with their Motion to Enforce.  *Id.* ¶ V.B.2.

<u>**Conclusion**</u>

Defendants respectfully request that the Court enter an order allowing the Department to effectuate full settlement relief to those Exhibit C borrowers who are entitled to, but have not yet received, such relief in accordance with the schedule set forth above.

Dated: April 2, 2024                                 Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*Benjamin Takemoto*

STUART J. ROBINSON
Senior Trial Counsel
BENJAMIN T. TAKEMOTO
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4252
Fax: (202) 616-8460
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendants*