UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al.,*

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
EDUCATION and MIGUEL CARDONA, in
his official capacity as Secretary of Education,

                    Defendants.

No.  19-cv-03674-WHA

DECLARATION OF RICHARD
CORDRAY

I, Richard Cordray, hereby declare under the penalty of perjury as follows:

1.      I am over the age of 18 and competent to testify to the matters herein.

2.      I was appointed the Chief Operating Officer of Federal Student Aid ("FSA") in the U.S. Department of Education (the "Department") by U.S. Secretary of Education Miguel Cardona effective May 4, 2021.

3.      I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration about the implementation of the settlement agreement in this case.  The statements contained herein are based on either my personal knowledge as an employee of the Department or on information reported to me by Department officials who created and/or are familiar with the pertinent records and communications with third-parties who are involved in the loan-servicing processes.  Some of the statements contained herein are based on forecasts or predictions, which reflect my or other Department officials' good-faith assessments that are inherently subject to unknown future developments.

4.      As the Chief Operating Officer, I oversee the management of FSA.  Through my duties in this role and my discussions with our Department colleagues working on borrower defense issues, I am familiar with the Department's efforts to comply with deadlines for effectuating "full settlement relief," as that term is defined in the Parties' Settlement Agreement.[1]

5.      As described in this declaration, an analysis of the Department's loan data indicated full settlement relief has been effectuated for 72.8% of Exhibit C borrowers.  While

---

[1] "**Full Settlement Relief** means (i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt."  Settlement Agreement ¶ II.S.

Declaration of Richard Cordray
19-cv-03674-WHA

the delivery of relief to a significant number of borrowers should not be overlooked, the Department acknowledges that it has not yet fulfilled its obligations with respect to other Exhibit C borrowers.  The purpose of this declaration is to explain, not excuse, the Department's actions to this point.  As indicated throughout this declaration, the Department takes responsibility for the current situation, particularly its failure to appreciate the practical difficulties involved in addressing the number and complexity of consolidation loans at issue. While loan servicers are important partners in this process, the Department does not blame them, but rather holds itself accountable.  The Department is committed to effectuating and verifying full settlement relief for all remaining Exhibit C class members as promptly as possible.

6.      This declaration is divided into five sections: background on federal student loans, settlement implementation, remedial efforts, status of relief, and timelines for relief moving forward.

I.      **Background on Federal Student Loans**

7.      The Settlement Agreement defines Full Settlement Relief as: "(i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt …, and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt."  Settlement Agreement ¶ II.S. "Relevant Loan Debt" is defined as "Direct Loans or FFEL loans associated with the school that is the subject of the Class Member's borrower defense application. That debt includes the original principal of the affected federal student loan plus any and all interest and fees that accrued or were incurred on that loan."  Settlement Agreement ¶ II.W.

8.      The Settlement Agreement further provides that the Department has effectuated relief when the Department and its loan servicers "have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member …, including but not limited to (1) discharging any interest that accrued while the borrower defense application was pending; (2) determining if the Class Member … is entitled to any refund, and if so, issuing refund check(s) for payment of that refund; (3) if the Class Member's … Relevant Loan Debt was previously in default, removing such debt from default status; and (4) requesting the deletion of the relevant tradeline."

9.      This results in the following practical effects for the Class Member:

a.      <u>Balance:</u> The balance of the class member's outstanding student loan debt is reduced by the sum total of the eligible loans' original principal and all interest and fees that accrued or were incurred on that loan.

b.      <u>Refund:</u> The class member receives a refund in the form of a check or electronic payment for the sum total of all payments made to the Department toward the Relevant Loan Debt.

c.      <u>Credit Reporting:</u> The class member's credit file is updated to reflect a reduced debt balance and, where appropriate, the removal of information about the Relevant Loan Debt from the class member's credit file.

**A.      Relevant Entities**

10.     There are a number of entities involved in the federal student loan programs relevant to class members' loans and the effectuation of full settlement relief.

11.     FSA administers federal student loan programs under Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 et seq. Those programs

include the Willian D. Ford Federal Direct Loan Program ("Direct Loans"), 20 U.S.C. §§ 1087a-1087j, under which the federal government lends money directly to students and parents, and the Federal Family Education Loan ("FFEL") Program, 20 U.S.C. §§ 1071 to 1087-4, under which non-federal lenders made loans to students and parents which are guaranteed by entities reinsured by the federal government and serviced by commercial servicers.  No new FFEL loans have been made since 2010, though a considerable amount of FFEL loan debt remains outstanding.

12.    Two of the key functions required for administering the federal student loan programs are loan origination and loan servicing.

  a.    Loan origination is the process of certifying a borrower's eligibility for a loan, creating the loan itself, and causing the loan funds to be disbursed.

  b.    Loan servicing involves maintaining an account for the loan, calculating and applying interest to the loan account, calculating amounts due for payment, sending the borrower bills for payments that are due, collecting and processing payments from the borrower, and applying all of these transactions to the loan's balance on the loan account. Notably, borrowers typically have multiple loans outstanding, as they typically take out multiple loans over a number of years to finance their post-secondary education, which can also consist of different programs at different schools at different times.

13.    The Department contracts with private companies to perform certain roles in the federal student loan programs.  These companies are commonly known as loan servicers, although some perform loan origination in addition to loan servicing functions.

Declaration of Richard Cordray
19-cv-03674-WHA

4

a.     The servicers that perform both loan origination and loan servicing are Nelnet Servicing and Maximus/Aidvantage.  In the past, this category included two other servicers that no longer have contracts with the Department ("decommissioned servicers").  These servicers were Great Lakes Educational Loan Services ("Great Lakes") and the Pennsylvania Higher Education Assistance Agency ("PHEAA").  Thus, there are some outstanding loans that were previously originated and/or serviced by Great Lakes or PHEAA, but which are now serviced by a different contractor.

b.     Other servicers only perform the function of loan servicing.  Among servicers that service class members loans, the servicers that only perform loan servicing are Edfinancial and MOHELA.

14.     Although new loans under the FFEL program were discontinued beginning in 2010, the entities involved in the FFEL loan program are relevant to relief for certain class members.

a.     FFEL lenders are the entities that funded and disbursed FFEL loans. FFEL servicers are entities that serviced FFEL loans and continue to service any remaining non-defaulted FFEL loans.

b.     The Guaranty Agencies ("GAs") are entities that insure FFEL loans and are reinsured by the Department and that also hold defaulted FFEL loans and loans in bankruptcy and judgment status.

c.     None of these parties has direct contractual obligations to the Department relevant to this settlement, and they are distinct from the servicers with which the Department contracts to administer the federal student loan programs.

Declaration of Richard Cordray
19-cv-03674-WHA

These entities have, however, voluntarily cooperated with the Department to carry out the steps needed to effectuate relief for class members with FFEL loans.

15.     The U.S. Department of the Treasury ("Treasury") transmits the funds that are disbursed for federal student loans and ultimately receives the funds that borrowers pay toward federal student loans.  Treasury also issues refunds approved as part of full settlement relief, which are issued by check or, if available, by electronic transfer.

16.     The national Consumer Reporting Agencies ("CRAs") are four private companies that assemble and evaluate consumer credit information or other information on consumers for the purpose of furnishing consumer credit reports to third parties.  The CRAs maintain credit files for consumers, which include a "tradeline" for each account in the consumer's name for which the consumer has been extended credit.  Credit files include information reported by creditors such as the type of credit, loan amount, account balance, payment history, whether or not the account is delinquent or in collection, and the dates the account was opened and closed.  The Department does not have a direct relationship with CRAs, nor does the Department furnish any information to them.  Information is furnished to CRAs by the loan servicers.

**B.     Database Systems**

17.     The National Student Loan Database System ("NSLDS") is a database system authorized by 20 U.S.C. 1092b and maintained by FSA that records information about federal student loans and grants.

a.     For loans other than commercially held FFEL loans (e.g., FFEL loans held by lenders or guaranty agencies), NSLDS identifies a loan based on:

Declaration of Richard Cordray
19-cv-03674-WHA

i.      <u>Award ID:</u> A unique identification number assigned to the loan.

ii.     <u>Borrower:</u> The borrower's Social Security Number ("SSN").

iii.    <u>OPEID:</u> For certain loans, as explained below, an identification number for the institution of higher education attended by the borrower and paid for with the loan proceeds known as the "Office of Postsecondary Education Identification" number or "OPIED."

iv.     <u>Disbursement Date:</u> The date of the loan's disbursement.

b.      NSLDS also records information about each loan that is updated periodically, including:

i.      <u>Loan Type:</u> The type of loan, such as a Direct Loan to attend school or Consolidation Loan.

ii.     <u>Loan Balance:</u> The balance of the loan, accounting for its principal, accrued interest, payments, and other fees or credits.

iii.    <u>Loan Status:</u> The status of the loan, which includes statuses like in-school, post-school grace period, repayment, paid-in-full, and discharged.

iv.     <u>Discharge:</u> A field indicating whether a discharge has been applied to the loan, including discharge codes for borrower defense, closed school, and false certification.

c.      The information about loans that is recorded in NSLDS is typically updated once per week by the servicers to reflect any changes made to loan accounts

that the servicers maintain.  Servicers update NSLDS by sending a file to NSLDS of all the updates from the servicer's database system.

      d.     A borrower may access information about the borrower's loans stored in NSLDS through StudentAid.gov.

18.    The loan servicers maintain database systems with accounts for the federal student loans that they service.

      a.     Each loan's account contains identifying information for the loan that corresponds with the Award ID, borrower SSN, and OPEID (if applicable) in NSLDS.

      b.     The account also records payment history, loan balance, loan status, and whether a discharge has been applied to the loan.  Changes in these loan details are included in the weekly update that each servicer sends to NSLDS.

      c.     A borrower may ordinarily access information about the borrower's current loans that is stored in the servicer's database systems through an interface provided by the loan's servicer.

19.    For previous student loan servicers that are no longer under contract with the Department, the accounts that those servicers previously maintained have been transferred to one of the Department's current servicers.  In these cases, the currently operating servicer maintains separate database systems for the servicer's own loan accounts and the loan accounts inherited from the prior servicer.

20.    The Department's Financial Management System ("FMS") is a centralized system for all FSA financial transactions.  It allows FSA's financial partners to collect, process, maintain, transmit, and report data about financial events on-line.  Borrowers are

Declaration of Richard Cordray
19-cv-03674-WHA

made aware of the refund payments reflected in FMS records when the borrower receives a check or electronic transfer for the refunded amount.

21.     A borrower's credit file maintained by a CRA contains a tradeline for each federal student loan the borrower has taken out.  The information for each student loan's tradeline is typically provided by the servicer of that loan to the CRAs once per month and is updated on the borrower's credit report the following month.  A borrower may also see information about their loan reflected in whatever information is available to the borrower from the CRAs.

### C.     Federal Student Loans

22.     There are several types of federal student loans that are relevant here: Direct Student Loans, Direct Consolidation Loans, and FFEL Loans.  While an overview of these loans is provided below, the focus of this declaration is on Direct Consolidation Loans, which comprise the vast majority of loans that require further and more complex processing in order to effectuate full settlement relief.

### 1.     Direct Consolidation Loans

23.     The first category of federal student loans relevant here is Federal Direct Consolidation Loans ("consolidation loan").  20 U.S.C. 1087e(a) and 1087e(g). Consolidation loans are not taken out to pay for attendance at an institution of higher education, but rather are the product of consolidating one or more existing student loans into a new loan.  A borrower takes out a consolidation loan by choosing the existing loans to consolidate, applying for the consolidated loan through FSA, and choosing a servicer for the consolidation loan.

a.      <u>Consolidation Originator/Servicer:</u>  For consolidation loans, servicers perform the functions of loan origination (the "consolidation originator") and loan servicing (the "consolidation servicer").  As described in Paragraph 13, however, some servicers perform both origination and servicing functions while others perform servicing functions but not origination functions.  Thus, if the borrower's chosen consolidation servicer also performs origination functions, that servicer will act as the consolidation originator and the consolidation servicer.  If the borrower's chosen consolidation servicer does not perform origination functions, a different servicer will act as the consolidation originator and then transfer it to the borrower's chosen servicer, which will act as the consolidation servicer.

b.      <u>Consolidation Loan Record/Details:</u>

- Once the consolidation loan is originated, an account for the loan is created and maintained by the consolidation servicer in its database system, and a corresponding record for the consolidation loan is created in NSLDS.

- The initial value of the consolidation loan is the sum total of the outstanding balances on each of the existing loans that the borrower chose to consolidate.

- The consolidation loan is identified by an Award ID and the borrower's SSN.  Because consolidation loans are not disbursed by schools and because loans from multiple schools can be combined into a single consolidation loan, consolidation loans are not associated with any particular school's OPEID.  The consolidation

Declaration of Richard Cordray
19-cv-03674-WHA

loan will also be reflected in a new tradeline in the borrower's credit file once the servicer has reported the new consolidation loan to the CRAs.

c.      The new consolidation loan has several effects on the status of the underlying loans.  The consolidation loan pays off the outstanding balance of all the underlying loans.  For each of the underlying  loans, the loan's balance is reduced to zero and the loan's status is updated to "Paid in Full."  Although the loan is closed, the underlying loan's servicer maintains the zero-balance account for the loan in its database system.  After the servicer's next update to NSLDS, these changes are reflected in NSLDS.  In the servicer's next update to the CRAs, the tradeline's balance is reported as zero with respect to the underlying loan.

d.      <u>Consolidation Loan Servicing:</u> Over time, the consolidation servicer services the consolidation loan by managing the borrower's repayment plan, interest accrual, billing, and payments.  Once per week, the consolidation servicer sends updates to NSLDS with any changes to the consolidation loan's balance and other information.  Relevant information about the consolidation loan's balance and status are also included in the servicer's monthly reports to the four CRAs.

24.    Borrowers may consolidate multiple times.  That is, consolidation loans may themselves be consolidated.  If a borrower chooses to consolidate an existing consolidation loan, the borrower repeats the process described in Paragraph 23, above, for a new consolidation loan.

Declaration of Richard Cordray
19-cv-03674-WHA

1

2.    **Direct Student Loans**

2        25.      The second category is loans under the Federal Direct Loan Program that are

3    taken out to attend an institution of higher learning ("Direct Student Loan").   These are

4    Federal Subsidized Student Loans, Federal Unsubsidized Student Loans and Federal PLUS

5    loans.  20 U.S.C. §§ 1078, 1078-2, 1078-8, 1087a(b)(2) and 1087e(a).  This does not include

6    federal consolidation loans.

7            a.     <u>Loan Originator/Servicer:</u> Direct Student Loans are made by the

8        Department, disbursed by the borrower's school, and then serviced by a servicer

9        under a contract with the Department.  For purposes of this explanation, the servicer

10        of a borrower's Direct Student Loan, taken out to pay for attending a school, is

11        referred to as the original servicer.

12            b.     <u>Loan Record/Details:</u>

13            • Once the Direct Student Loan is originated, an account for the loan

14                is created and maintained by the original servicer in its database

15                system and a corresponding record for the loan is created in

16                NSLDS.

17            • The initial value of the Direct Student Loan is the principal amount

18                of the loan.

19            • The loan is identified by an Award ID, the borrower's SSN, and

20                the OPEID of the school that disbursed the loan proceeds.  The

21                loan will also be reflected in a tradeline in the borrower's credit

22                file once the servicer has reported the loan to the CRAs.

Declaration of Richard Cordray
19-cv-03674-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

c.     Loan Servicing: Over time, the original servicer services the loan by managing the loan's status, the borrower's repayment plan, interest accrual, billing, and payments. Once per week, the loan servicer sends updates to NSLDS with any changes to the loan's balance and other information. Relevant information about the loan's balance and status are also included in the servicer's monthly reports to the CRAs.

### 3.     FFEL Loans

26.     The third category of federal student loans relevant here includes school loans and consolidation loans taken out from non-federal lenders under the FFEL program, under which the non-federal lenders made education loans that were guaranteed by GAs. The GAs are, in turn, reinsured by the federal government. No new FFEL loans have been originated since 2010, but some surviving FFEL loans are still administered by the GAs and some Exhibit C Class Members have FFEL loans from before 2010 that are eligible for relief under the Settlement Agreement. FFEL loans were originated and serviced through a process that involved the borrower's school, non-federal lenders, FFEL servicers, and the GAs. For FFEL loans that still exist today, loan servicing involves the non-federal lender, FFEL servicer, and GA. There are records for FFEL loans in NSLDS that are updated by the GAs on a monthly or quarterly basis. FFEL loans may be consolidated into Direct Consolidation Loans. If so, the Direct Consolidation Loan pays off the balance of the FFEL loan and then the consolidation loan is recorded and serviced as explained in Paragraphs 23 and 24.

27.     Historically, FFEL borrowers who qualify for a borrower defense discharge generally were required to consolidate their FFEL loans into a new direct consolidation loan to receive the discharge. Although such consolidation is not required as a condition to

receiving relief under the Settlement Agreement (*see* Agreement ¶ IV.F.2), the consolidation requirement under the borrower defense regulations contributed to a high volume of loan consolidations in the years prior to the settlement.

## II.   Settlement Implementation

### A.   Approval and Initial Steps

28.   On June 22, 2022, the Department and Plaintiffs agreed to the Settlement Agreement and filed a Joint Motion for Preliminary Approval of Class Settlement.  At the time it entered into the settlement, the Department believed it had the necessary resources to meet its obligations, including effectuating full settlement relief for Exhibit C borrowers.  In hindsight, it is clear that the Department failed to appreciate the number and complexity of consolidation loans among the population of Exhibit C borrowers and how those factors would affect its ability to meet the one-year deadline for effectuating full settlement relief for all Exhibit C borrowers.

29.   Soon after the Agreement was executed, the Department began to take the steps necessary to carry out the Department's obligations under the Agreement.  Beginning in June 2022, the Department devoted significant staff resources to ensure that all necessary preparations would be in place to begin implementing the Agreement in a timely manner as of the Effective Date.  A significant part of the Department's preparations was to prepare to effectuate full settlement relief for each of the approximately 200,000 class members whose loan is associated with the schools, programs, and School Groups listed in Exhibit C.  Due to the work necessary to determine the school code associated with Exhibit C schools, the Department had to prioritize the work that would be necessary to timely notify and effectuate relief for class members in the Exhibit C discharge group.

Declaration of Richard Cordray
19-cv-03674-WHA

30.     Preparations for notifying, and effectuating full settlement relief for, class members in the Exhibit C Discharge Group involved several complex operational steps within the Department.  As just described, to determine which Class Members applied for discharge of loans associated with Exhibit C schools, the Department first had to match the school codes to the Exhibit C schools.  Then, the Department evaluated *Sweet* class members to determine which borrowers applied for discharge of a loan received for attendance at an Exhibit C school.  Next, the nearly 2,900,000 federal student loans associated with the Exhibit C Class Members were analyzed to create the discharge processing requests to be sent to each servicer.

31.     The Department forewarned all servicers in the summer of 2022 of the expected significant increase in borrower defense discharge volume that would continue for several years and that they should prepare to take on that additional volume. Automation efforts and staffing levels were also discussed on many calls with the servicers.

32.     Additionally the Department began in June 2022 to implement procedures to adjudicate the borrower defense applications for non-Exhibit C class members, a separate obligation under the settlement.  Those efforts included drafting and finalizing guidance documents for adjudicators.  Additionally, the Department also used this time to prepare the class notice and put in place the framework for sending out notices to class members and published an informational page on the Department's website.  This included notices that past denials were rescinded for certain class members, notices for Exhibit C class members, and letters to send to members of the decision group once their applications had been reviewed.

33.     On July 14, 2022, four schools ("intervenor schools") who are listed on Exhibit C to the Settlement Agreement filed motions to intervene.

34.     On August 31, 2022, the Court granted the Intervenors' motions "for the sole and express purpose of objecting to and opposing the class action settlement."

35.     On November 16, 2022, the Court entered an Order Granting Final Settlement Approval.

36.     In January 2023, before the Settlement's anticipated effective date, three of the intervenor schools filed an appeal and applied for an emergency stay pending appeal.

37.     Following a January 26, 2023, settlement status conference regarding the intervenor schools' stay application, the Court ordered that "[b]ecause defendants state that they cannot separate out loan discharge requests for borrowers who attended appealing intervenor schools, no loan discharge requests shall be sent and no loans shall be discharged until appealing intervenors have an opportunity to have their motion heard and the order on their motion issues on or about 2/15/23." ECF 356 (1/26/2023 minute entry).

38.     Following the hearing, the Department undertook efforts to create new discharge requests that did not include any Exhibit C Class Members who attended the intervenor schools.

39.     On February 24, 2023 the Court denied intervenors' stay request but temporarily stayed the judgment "with respect to discharges and discharge requests for loans associated with movants for [seven days] to allow them to present a stay motion to our court of appeals." ECF No. 382 at 24-25.

40.     On February 28, 2023, the Department sent discharge requests to the servicers for an initial cohort of 180,826 Exhibit C Class Members who did not attend any of the three

appealing intervenor schools.  Based on those requests, loan servicers are required to discharge the eligible debt, issue refunds for payments made on that debt, and update the CRAs as appropriate.  The Department did not send discharge requests for Exhibit C Class Members who attended those three intervenor schools.  During this time, the Department also began reviewing applications from non-Exhibit C class members.

41.    On March 29, 2023, the U.S. Court of Appeals for the Ninth Circuit denied an emergency stay application filed by the three appealing intervenor schools.

42.    On March 30, 2023, the Department sent discharge requests to the servicers for the 3,559 Exhibit C Class Members who attended those three intervenor schools.

43.    On May 10, 2023, the Department sent a final cohort of discharge requests for 125 Exhibit C Class Members for whom additional validation of the cases resulted in them being added to Exhibit C.

**B.    Ongoing Implementation**

44.    After receiving the discharge requests, the loan servicers began the discharge process for loans eligible for full settlement relief, i.e., loans that a class member took out to attend a school on Exhibit C to the Settlement Agreement.  That process differs depending on the type of loan, and is described more fully below.

**1.    Direct Loans: No Consolidations**

45.    For an eligible loan that is a Direct Loan and has not been consolidated, the process of effectuating full settlement relief began with the Department preparing a discharge request and sending that request to the Loan Servicer.

46.    The discharge request identified the eligible loan and instructs the loan's current servicer to apply a discharge.

Declaration of Richard Cordray
19-cv-03674-WHA

17

47.     To apply a discharge, the servicer referred to various change requests ("CR") and instructions provided by the Department that explain the steps the servicer must take. These instructions include the following steps for each eligible loan:

a.     Balance: In its servicing database system, the original servicer reduces the eligible loan's balance to zero.

b.     Refund:  The servicer calculates a refund equal to the sum total of any payment(s) made toward the eligible loan.  That refund amount, along with refunds for any other eligible loans, is then included on a record known as a "refund file."  A refund file contains a list of borrowers and refunds that is sent to the Department for approval.  Therefore, for discharge of eligible loans, the refund file created by the servicer reflects the total amount of payments made to the Department that the servicer's database system shows for all eligible loans or payments made at any previous servicer if the eligible loan was transferred.  Upon approval by the Department, the Department sends a record known as a "payment file" to Treasury, which will cause Treasury to issue a payment for the listed amount to the listed recipient.  After processing the payment file, Treasury issues a check or electronic payment to the recipient the next business day.  the Department will then provide confirmation of payment to the servicer within 1 business day of payment.

c.     Credit Reporting: In the servicer's next regular update to the CRAs, the update indicates that the borrower's Eligible Loan has been discharged, which triggers the CRAs' obligation to remove that loan's tradeline in the borrower's credit file.

d.      Loan Status: In the servicer's next update to NSLDS, the servicer includes an update to indicate a discharge has been applied to the eligible loan, effective on the date of discharge approval.   It is the processing of the discharge on their loan servicing system that ultimately triggers the reporting of the discharge to NSLDS.

48.      The borrower will see evidence of these steps in various places and at different times.

a.      As a general matter, a borrower will see updated information from their servicer's systems/records when the borrower logs in to the servicer's account interface.

b.      As a general matter, a borrower will see updated information from NSLDS when the borrower logs in to StudentAid.gov.  Because servicers typically update NSLDS once per week, it may take up to a week after the original servicer applies the discharge for NSLDS to reflect updates that have already been made in the original servicer's records and database system.

c.      The borrower will receive the refund through a check mailed to the borrower or an electronic transfer from Treasury.

d.      Because servicers typically update reports with the CRAs once per month and because the CRAs take time to process updates sent by the servicers, it may take a month or longer after a discharge's completion for the discharge to be reflected in the borrower's credit file with the CRAs.

49.      For an eligible loan that is a Direct Loan that has not been consolidated, there are no remaining steps for the Department or its servicers to take in order to provide full

settlement relief once the original servicer has taken all of the steps required for a discharge and the Department has sent the relevant payment file to Treasury.

### 2. Direct Consolidation Loans

50. For an eligible loan that was subsequently consolidated into a Direct Consolidation Loan, the process for effectuating full settlement relief requires multiple steps, including actions from the eligible loan's servicer followed by additional actions from the servicer(s) involved with the origination and servicing of the borrower's Consolidation Loan. If a school loan has been subsequently consolidated multiple times, as described in Paragraphs 23 and 24, above, the process for effectuating relief is elongated accordingly, as described in greater detail below. Additionally, as explained below, the process for adjusting consolidation loans to reflect a discharge applied to underlying eligible loans requires more steps and a greater amount of time depending on how many times a loan was consolidated, whether consolidations were originated and serviced by the same servicer, and the underlying loans or subsequent consolidations were originated and/or serviced by a decommissioned servicer.

### a. Steps from Servicer of the Eligible Original Loan

51. Effectuating relief begins with the Department preparing a discharge request and sending that request to the servicer of the eligible original loan. The request is not sent to the consolidation servicer of the borrower's consolidation loan(s), because consolidation loans are not associated with school OPEIDs and, thus, the borrower's consolidation loan(s) would not be associated with a school listed on Exhibit C. Rather, eligibility for settlement relief flows from the original loan that was taken out to attend a school on Exhibit C. Note

that the servicers of these original loans have not all remained in business over the years since.

52.     The discharge request identifies the eligible loan(s) and instructs the servicer of the eligible original loan to apply a discharge.

53.     To fulfill the Department's discharge request, the servicer takes the steps necessary to apply a discharge described in Paragraphs 46 and 47.  This includes the following steps for each eligible loan:

　　　　a.     Balance:  Because the eligible loan was paid off by a consolidation loan, the account maintained by the eligible loan's servicer will already reflect a zero balance.

　　　　a.     Refund: For any payment(s) made on the eligible loan, the servicer calculates a refund amount and includes it on a refund file sent to the Department for approval, as described in Paragraph 47.b., above.  This refund amount will not include the amounts of any payments made on the consolidation loans after the eligible loan was consolidated.

　　　　b.     Credit Reporting:  Because the loan was paid off by a consolidation loan, the tradeline for the eligible loan in the borrower's credit file will already show a zero balance. Upon processing the discharge, the servicer will update the credit reporting on the borrower's account and indicate to the CRAs that the tradeline for the borrower and the eligible loan should be removed.

54.     For the discharge to be applied to the borrower's current consolidation loan, that loan's consolidation originator/servicer must take additional steps.  In order to trigger

these additional steps, the eligible loan's original servicer prepares a record of the financial

transaction that resulted from the discharge and sends it to the consolidation originator.

> **b.  Steps from the Originator(s)/Servicer(s) of the Subsequent Consolidation Loan(s)**

55.    When that record is received by the consolidation loan's originator, the

originator will perform "financial transactions" that are forwarded to the consolidation loan

servicer to be applied as "adjustments" to the consolidation loan.  Financial transactions

performed by the originator include separating out the eligible and ineligible loans and

recalculating the new balance and interest rate of the consolidation loans (if any).  The

adjustments made by the consolidation servicer include applying these financial transactions

to the servicer's account for the consolidation loan.  If the same servicer acted as the

consolidation originator and consolidation servicer, that servicer performs these financial

transactions and processes adjustments to the borrower's consolidation loan to reflect the

discharge of eligible debt.  This includes the following steps:

> a.    Balance: The consolidation originator/servicer for the borrower's
> current consolidation loan reduces the consolidation loan by the amount of the
> discharge.  If all of the consolidation loan's underlying loans are eligible loans, then
> the consolidation loan's balance is reduced to zero.  If the consolidation loan's
> underlying loans include some loans that are not eligible loans, then the consolidation
> loan's balance will only be reduced by the amount of the underlying loans that are
> eligible loans.

> b.    Refund: For any payment(s) made on the consolidation loan, the
> consolidation servicer calculates a refund amount and includes it on a refund file sent
> to the Department for approval, as described in Paragraph 47.b., above.  This refund

amount will include payments made toward the consolidation loan and will not include the amounts of any payments made on the eligible loan before it was consolidated.

        c.      Credit Reporting:  The consolidation servicer of the borrower's current consolidation loan will update the credit reporting on the borrower's account.  If all of the consolidation loan's underlying loans are eligible loans, then the consolidation loan's reported balance is reported as zero and the consolidation originator/servicer's update indicates to the CRAs that the tradeline for the borrower and the consolidation loan should be removed.  If the consolidation loan's underlying loans include some loans that are not eligible loans, then the consolidation loan's amount will be reported as a reduced balance but the update does not indicate that the tradeline should be removed, because the loan is still open.

56.     If the consolidation loan's consolidation originator and consolidation servicer are two different servicers, the consolidation originator processes the discharge's financial transactions and then sends it to the consolidation servicer.  The consolidation servicer, in turn, processes the adjustments described in Paragraphs 47 and 53, above.

57.     The timing of the process for adjusting a subsequent consolidation to reflect the discharge applied to the eligible loan varies based on the nature and complexity of the consolidation loan.  The servicers recently reported that the following timelines have applied to these loans:

        a.      If the consolidation loan's consolidation originator and consolidation servicer are two different servicers and the loan did not involve a decommissioned

servicer, it takes up to 25 business days for an adjustment to the consolidation loan to be processed.

      i.     This includes up to 13 business days for the consolidation originator to process the discharge's record of financial transaction and 2 business days for the Department to send it to the consolidation servicer.

      ii.    Once the consolidation servicer receives the record of transaction, it takes up to 10 business days for the consolidation servicer to make the required adjustments to the consolidation loan.

    b.    If the consolidation loan's consolidation originator and consolidation servicer are two different servicers and the consolidation originator was a decommissioned servicer, it takes up to 42 business days for an adjustment to the consolidation to be processed.

      i.     This includes up to 30 business days for the successor consolidation originator to process the discharge's record of financial transaction, and 2 business days for the Department to send it to the consolidation servicer.

      ii.    Once the consolidation servicer receives the record of transaction, it takes up to 10 business days for the consolidation servicer to make the required adjustments to the consolidation loan.

58.    If the consolidation loan is the borrower's current loan—that is, if the eligible loan was only consolidated one time—there are no remaining steps for the Department or its servicers to take in order to provide full settlement relief for that loan once the consolidation servicer of the current consolidation loan has taken all of the steps required to make the

Declaration of Richard Cordray
19-cv-03674-WHA

1    adjustments corresponding to a discharge and the refund's payment file has been sent to

2    Treasury.

3         59.    If the consolidation loan into which the eligible loan was consolidated is not

4    the class member's current loan—that is, if the eligible loan was consolidated more than

5    once, or even multiple times, as described in Paragraph 24, above—then there are additional

6    steps that must be taken for the process of effectuating full settlement relief to be completed.

7    Specifically, the steps described in Paragraphs 55 and 56 above, of adjusting the loan,

8    refunding payments, removing tradelines, and sending transaction records to the subsequent

9    consolidation loan's originator and servicer must be repeated by the consolidation

10   originator/servicer of each consolidation loan until the requisite adjustments, refunds, and

11   credit updates have been made for the borrower's current consolidation loan.  Thus, for

12   example, a loan consolidated twice may take as few as 10 but as many as 84 business days to

13   complete, depending on the complexity of the loan.  Note further that it is not uncommon for

14   a loan to be consolidated multiple times—more than twice, and perhaps as many as ten times

15   or more—and hence these steps would be multiplied accordingly, correspondingly drawing

16   out the timing to complete the full process.

17

18        60.    The transactions between servicers are not uniquely identified as settlement

19   relief for *Sweet* class members.  Rather, the transactions are transmitted as part of a large list

20   of transactions between servicers that includes borrower defense discharges, closed school

21   discharges, false certification discharges, death discharges, and other over- or under-

22   payments triggering the need for further transactions and adjustments between servicers in

23   the chain of consolidations.  Thus, servicers processing consolidation adjustments cannot

24   easily distinguish the transactions that are part of effectuating class members' settlement

25

relief from transactions that are part of discharge requests unrelated to this case.  As described in Part III below, however, the Department has now put in place a process to better track the status of Exhibit C borrowers with consolidation loans.

61.     For an eligible loan that has subsequently been consolidated one or more times, there are no remaining steps for the Department or the servicers to take in order to provide full settlement relief once the current consolidation loan's consolidation servicer has taken all of the steps required to make the adjustments corresponding to a discharge and the refund payment file for the current consolidation loan has been sent to Treasury.

62.     There is an exception to the foregoing description of the process for consolidation loans.  For an eligible commercial FFEL loan that was subsequently consolidated into a Direct Consolidation Loan, the process for effectuating full settlement relief requires actions from the consolidation servicer. Post-consolidation adjustments are not performed on commercial FFEL loans consolidated into a Direct Consolidation Loan. The discharge request is sent directly to the consolidation loan servicer to calculate the amount of eligible commercial FFEL loans that were consolidated using the consolidation funding history. Once the consolidation servicer calculates the amount of commercial FFEL loans consolidated, it applies a borrower defense discharge directly to the consolidation loan for the calculated amount.

### 3.     Commercial FFEL Loans

63.     For an eligible loan that is currently a FFEL loan, the Department sends a request to the GA that insures the loan, which asks the GA to purchase the loan from the commercial lender that holds the loan.

64.     Neither the GA nor the loan's commercial lender or servicer has contractual obligations that the Department can enforce requiring them to complete these steps, but the GAs have thus far cooperated with the Department's requests to carry out the steps needed to effectuate relief for class members with FFEL loans.  The GA fulfills the Department's request by paying off the loan.

65.     After the loan has been paid off, the updated balance will be reflected in the loan-holder's subsequent report to the CRAs regarding the borrower and the loan.

66.     Any payments made to parties other than the Department are not covered by relief under the settlement.  Thus, borrowers with FFEL loans eligible for discharge do not receive refunds.

67.     Because some GAs typically update NSLDS once per month, it may take up to a month after a FFEL loan discharge for NSLDS to reflect updates that have already been made in the GA's records and database system.

68.     For an eligible loan that is a FFEL loan, there are no remaining steps for the Department or any of its servicers to take in order to provide Full Settlement Relief for that loan once the Department has requested that the GA pay off the eligible loan.

**C.     The Department's Oversight**

69.     Beginning in February 2023, the Department communicated with loan servicers on a regular basis to emphasize the timeline associated with the *Sweet* class cases, answer servicer questions, and receive updates on servicer progress.  The Department periodically reminded servicers of the deadlines in the settlement agreement, including the deadline to effectuate full settlement relief for Exhibit C borrowers.  The Department held weekly liaison calls with each servicer, and borrower defense was an ongoing agenda item on

each servicer's weekly liaison call.  This included both borrower defense generally and *Sweet* specifically.

70.     The Department monitored the progress of settlement relief for Exhibit C class members based on the servicers' reported progress fulfilling the discharge requests that the Department had sent for Exhibit C class members.  The Department monitored this progress through the servicers' weekly updates to the Department that described the number of completed cases.  Depending on the contents of the report, the Department would follow up with a servicer summarizing the servicer's progress and asking questions as appropriate. It is clear now, however, that this method of monitoring was inadequate; the Department understood this progress to reflect full settlement relief, when in fact it did not account for how the additional steps needed to process consolidation loans were elongating the time needed to carry out that task for loans that had been consolidated multiple times.

71.     In both emails and phone calls, the Department set deadlines for servicers to complete discharge requests, focusing on the discharge of the origination loan.  Servicers were required to complete this step within 15 business days.  If a servicer failed to meet this deadline, the Department would follow up with the servicer by email with a summary of outstanding loan files.  At times the Department would grant a brief extension for servicers to complete this step (requested, for example, due to complicated loan histories), but the Department notified servicers in October 2023 that the February 2023 discharge requests for origination loans should be completed by November that year, and in at least one instance required the submission of a work plan to demonstrate how the servicer would meet this deadline. Until December 2023, servicers did not seek, nor did the Department grant, extension requests for fulfilling discharge requests beyond January 2024.

72.     Beginning November 7, 2023, the Department held meetings twice a week with two servicers—Nelnet and Aidvantage—that were still reporting that discharge requests for Exhibit C class members were incomplete.  In these meetings, the Department would receive updates, answer questions, and reinforce the timeline required for completion under the settlement.

73.     In November 2023, the Department initiated a reconciliation process to ensure that the servicer-reported progress on Sweet-related discharge requests was reflected in data that had been updated to NSLDS.

74.     On November 14, 2023, the Department emailed all servicers, notifying them that it was "conducting a review to validate processing of each borrower confirmed as complete for Sweet."  The Department further stated: "**It is imperative that when FSA reaches out regarding any questions, issues or, if assistance is required, that responses are provided within 48 hours**. We expect communications to occur frequently throughout each week as the review is conducted over the next several months, to conclude prior to the court mandated reporting deadline.  Please let us know if you have any questions. Please send us a list of the employees or groups that you would prefer these e-mails go to when the process starts."

75.     Beginning in December 2023, as part of the reconciliation efforts, the Department detected complications with discharges not being reflected in consolidation loans, and later identified the complications as stemming from large volumes of consolidation adjustments that needed to be applied in order for relief to be reflected in subsequent consolidation loans.  As a result, the Department began to focus on processing those adjustments so that the discharges were applied to the eligible loans' subsequent

consolidations.  At that time, the Department instructed the servicers to prioritize Exhibit C consolidation loans due to the complexities identified.

76.     As of January 2024, the Department understood reporting from the servicers to indicate that discharges had been applied for 95% of Exhibit C class members and that discharges would be applied for the remaining Exhibit C class members by April 2024.  As described below, however, the Department erred by tracking progress based only on servicer-reported data regarding initial discharge requests, as it did not speak to the additional steps that were needed to effectuate full settlement relief for consolidation loans.

### D.    Plaintiffs' Allegations

77.     On January 24, 2024, officials from the Department conveyed to class counsel during a phone call that settlement relief had been effectuated for 95% of Exhibit C borrowers.  For the remaining borrowers, officials from the Department explained that the delay was attributable to: the need for servicers to research billing histories to determine whether/how much refunds were due; and/or the need to research high-complexity consolidation loans that combined eligible and ineligible underlying loans to determine the appropriate discharge amounts for those loans.

78.     Officials from the Department also raised an issue the Department had detected for eligible loans that had been consolidated.  For these loans, the Department had detected that despite servicers having reported that discharges had been applied to eligible school loans, relief may not have been reflected in the class member's current consolidation loan because of the additional processing that was required from other servicers.  The Department further communicated that it was undertaking efforts to learn more about this issue and to find more accurate indicators of the status of these class members' relief.

79.     During the call on January 24, 2024, class counsel disputed the accuracy of the 95% figure cited by the Department.

80.     As a result of having detected the issue for consolidation loans that the Department raised with class counsel, the Department undertook efforts to retrieve and analyze NSLDS data to find more-accurate indicators of the status of class members' relief as described in Paragraph 83 below.

81.     For eligible loans that were subsequently consolidated, the Department does not have the ability to track through NSLDS whether the subsequent consolidation loans have been adjusted to reflect the discharge (and associated refund and credit relief) applied to the Eligible Loan.  Similarly, NSLDS data does not provide the Department with the ability to link Exhibit C Class Members' consolidation loans with earlier consolidation loans or original eligible loans with complete reliability.

82.     The Department could, however, retrieve all loans associated with each Exhibit C class member and analyze certain loan attributes recorded in NSLDS data to ascertain indicators about the status of the class member's relief.  Accordingly, the Department retrieved each loan associated with SSNs of Exhibit C class members and analyzed the OPEID, loan type, loan balance, loan status, and discharge type (if any).

83.     Based on the Department's analysis of these attributes, there are different indications about the status of class members' relief.

      a.     For Exhibit C class members with eligible Direct Student Loans and no subsequent consolidation loans:

            i.     If the loan is closed and has a discharge type associated with a borrower defense discharge or a discharge with equivalent remedies, this is a

strong indicator that all of the necessary steps for a discharge have been completed.

      ii.      If the loan is still open or if the loan is closed but lacks a borrower defense discharge or a discharge with equivalent remedies, this is a strong indicator that all of the necessary steps for a discharge have not been completed.

     b.     For Exhibit C class members with eligible Direct Student Loans and at least one consolidation that was disbursed after those loans:

      i.      If all eligible Direct Student Loans and all subsequent consolidation loans are closed, this is a strong indication that all of the necessary steps for a discharge have been completed.

      ii.      If a subsequent consolidation loan is open, then there is not a strong indicator that all of the necessary steps for a discharge have been completed.

      iii.     If one of the eligible Direct Student Loans is still open, this is a strong indicator that all of the necessary steps for a discharge have not been completed.

     c.     For Exhibit C class members with eligible commercial FFEL loans, all steps within the power of the Department and its servicers have been taken to effectuate relief for these borrowers once the Department has requested that the GA purchase their eligible FFEL loans.  Nonetheless, NSLDS data suggests the following for the status of these loans' relief:

Declaration of Richard Cordray
19-cv-03674-WHA

> i. If the eligible commercial FFEL loan is closed, this is a strong indicator that the loan has been discharged.

> ii. If the eligible commercial FFEL loan is open, this is a strong indicator that the loan has not been discharged.

84. On February 2, 2024, Plaintiffs alleged the Department materially breached the Agreement by failing to provide full settlement relief to all Exhibit C Class Members and again disputed the accuracy of figures reported by the Department.

85. The Department responded on February 16, 2024. In its response, the Department confirmed that its analysis of NSLDS data, described in Paragraphs 82-83, above, indicated that the numbers it had previously reported were inaccurate. To reiterate, the inaccuracy was due to the fact that for borrowers with consolidation loans—including many with loans that had been consolidated multiple times—the servicer-reported information only reflected loans and borrowers for which the original servicer of the eligible school loan had applied a discharge to the eligible school loan.

86. The Department's response further stated that, as of February 15, 2024, the Department's analysis of NSLDS records indicated that:

> a. 135,526 borrowers (approximately 69% of Exhibit C class members) had received fully processed discharges;

> b. 31,437 borrowers (approximately 16% of Exhibit C class members) had not received fully processed discharges (of these, 3,581 borrowers had received fully processed discharges for some but not all eligible loans); and

c.      28,964 borrowers (approximately 15% of Exhibit C class members) required further investigation as to whether they have received fully processed discharges.

d.      The Department was unable to determine the number of Exhibit C Class Members who have received the full refunds they are due, or whose credit reporting has been accurately updated as a result of discharges.

87.      The numbers reflected above and reported to Plaintiffs on February 16, 2024 were based on the Department's review of NSLDS records, which record attributes about a borrower's loan(s).  Further, the Department identified three reasons that not all Exhibit C Class Members had received full settlement relief: (1) certain borrowers have highly complex consolidation loan histories that must be manually researched and reconstructed to determine the appropriate discharge and/or refund amounts; (2) the payment histories of certain borrowers are not readily available, especially those dating back to servicers that are no longer in operation, such that the servicers now analyzing the loans must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs; and (3) the Department found that servicers have initiated the relief process for certain borrowers, but that process has not been completed, likely because a series of transactions must be executed across multiple servicers, particularly with loans that have been consolidated multiple times.

88.      The Department also provided Plaintiffs with information about the types of loans for which NSLDS data indicated that discharges had not been fully processed.  Many included loans that had been consolidated multiple times, in which case servicers need to coordinate to fully discharge the Exhibit C loan (and ensure that any non-Exhibit C loans are

not discharged).  In some cases, a consolidation loan was previously serviced by a decommissioned entity, which can present severe logistical challenges to the successor servicer.  Exhibit C class members with non-consolidated loans were also among those who had not yet received full settlement relief.  For borrowers whose loans required additional verification as of February 15, 2024, the Department noted that while a substantial number likely have received fully processed discharges, others were likely delayed because consolidation loans consisted of both eligible and non-eligible loans.

89.     The Department also addressed the status of the other aspects of full settlement relief—refunds and updates to CRAs.

a.     Regarding refunds, the Department acknowledged that there may be some Exhibit C class members who are entitled to, but have not yet received, refunds pursuant to the Agreement, and that a substantial number of these borrowers are prior defaulted borrowers, or borrowers whose loans have been transferred from decommissioned servicers that failed to provide complete and readily accessible records (e.g., payment histories) related to the loans.  The servicers have informed the Department that, under these circumstances, obtaining additional payment information can be difficult if not impossible.  In addition, the Department acknowledged that, for Exhibit C class members whose eligible loans were consolidated into consolidation loans, if a discharge had been applied to those Exhibit C Class Members' eligible loans but corresponding adjustments were not made to the subsequent consolidation loans, then those Exhibit C class members would not yet have received refunds on payments made toward the unadjusted consolidation loans.

b.    With respect to updates to CRAs, the Department confirmed that it timely directed servicers to request that the CRAs remove the relevant tradelines. In addition, the Department acknowledged that, for Exhibit C class members whose eligible loans were consolidated into consolidation loans, if a discharge had been applied to those Exhibit C class members' eligible loans but corresponding adjustments were not made to the subsequent consolidation loans, then those Exhibit C class members would not yet have seen all required updates reported to the CRAs. As a result, the Department "acknowledge[d] that the relevant loan debt for some Exhibit C borrowers has not yet been removed from their credit reports."

90.    On March 1, 2024, the Department subsequently conveyed its agreement with Plaintiffs that the Department is in material breach of the settlement agreement for Exhibit C class members for whom there are steps that the Department or its servicers must still take to effectuate full settlement relief.

**D.    Additional Information**

91.    In December 2022, the federal budget for Fiscal Year 2023 was passed by Congress and signed by the President. That budget provided no additional funding for the Department's student aid administration account, and specifically no additional funding for loan servicing. The Department was unable to hire additional staffing in early 2023.

92.    Due to increasing costs, including legally mandated adjustors for inflation that have now been triggered for the first time in several years, this level of flat funding effectively operated as a budget cut for the Department and for its servicing activities in particular.

93.     During most of Fiscal Year 2024 the Department has been operating under a series of continuing resolutions, which also provided no additional funding for the student aid administration account—imposing a second year of effectively cutting the budget for the Department and for servicing activities.

94.     The discharge requests sent for Exhibit C class members in this case came amid other discharge requests sent to the servicers independently of this case.

     a.      Beginning in June 2022, the Department began sending borrower defense discharge requests to the servicers for all borrowers who attended the Corinthian Colleges.  This involved approximately 552,000 borrower defense discharge requests sent to servicers.

     b.      Beginning in early August 2022, the Department began sending borrower defense discharge requests to the servicers for all borrowers who attended ITT Technical Institute between January 2005 and September 2016.  This involved approximately 233,000 borrower defense discharge requests sent to servicers.

     c.      Beginning in late August 2022, the Department began sending borrower defense discharge requests to the servicers for all borrowers who attended Westwood College between January 2002 and November 2015.  This involved approximately 81,000 borrower defense discharge requests sent to servicers.

95.     On September 1, 2023, the payment pause put in place during the COVID-19 pandemic ended and tens of millions of borrowers were returned to repayment simultaneously for the first time in three-and-a-half years, creating additional and novel burdens on the Department and its servicers.

Declaration of Richard Cordray
19-cv-03674-WHA

**III.     Remedial Efforts**

96.     The Department acknowledges the importance of providing full settlement relief to borrowers as promptly as possible.  The Department also accepts responsibility for failing to adequately oversee the servicers in effectuating full settlement relief for all Exhibit C Class Members in a timely manner.  However, the Department's material breach is not attributable to bad faith, but rather to a series of miscommunications and misjudgments about the consolidated loans, because of which the Department failed: (1) to appreciate the volume and complexities of consolidation loans owed by Exhibit C borrowers; (2) to establish a process to track the status of discharges for those loans; (3) to impose strict and enforceable deadlines on loan servicers processing consolidation loans beyond the original loan; and (4) to correctly interpret information provided by loan servicers, which did not in fact indicate that consolidation loans were being fully discharged, as the Department had believed and reported.

97.     As detailed below, the Department has undertaken a number of efforts to expedite and improve the delivery of relief to class members for whom discharges (and accompanying refunds and credit updates) are still in process, to more accurately monitor the status of class members' relief, and to take interim steps to provide affected class members with credit-related relief that does not depend on the completion of the discharge process.

**A.     Timelines For Processing Consolidation Loans**

98.     The Department has taken a number of steps with the servicers to expedite and improve the process for applying discharges and corresponding consolidation adjustments (and accompanying refunds).

99.     Upon realizing the complexity of the work needed for consolidation loans, the Department instructed servicers to process any outstanding adjustments for Exhibit C borrowers with consolidation loans, meaning the servicer beyond the origination servicer should apply discharges, create credit files, and update credit reporting.  The Department also gathered additional information about the population of Exhibit C borrowers who have at least one eligible loan with an unknown discharge status based on NSLDS records.

100.    On March 15, 2024 a senior FSA official conducted a meeting with all servicers to inform them of the consequences the Department was facing for missing the settlement deadline along with reinforcing the importance of working together to effectuate the remaining discharges, including outstanding consolidation adjustments.

101.    The Department has repeatedly instructed the servicers to prioritize consolidation adjustments for Exhibit C class members.  On January 25, 2024, the Department's Management and Program Analyst sent the list of Sweet borrowers with open consolidation loans to servicers, with instructions "we (FSA) request that each servicer work any Sweet borrowers on their outstanding consolidation adjustment files first."  On February 13, 2024, the Borrower Processing Chief reinforced the instructions sent on January 25, 2024, stating "As a reminder of the instructions provided on 1/25/2024, if you have not already done so, we need you to immediately review all outstanding adjustments spreadsheets and compare those to the Sweet open consolidation lists we provided to you on 1/25/2024.  Any Sweet borrowers that match outstanding adjustments must be completed as a priority before any other outstanding adjustments are worked."

Declaration of Richard Cordray
19-cv-03674-WHA

102.    On March 12, 2024, the Department instructed servicers to process all outstanding adjustments for loans associated with Exhibit C borrowers within 10 business days.

103.     Since March 12, 2024, Department records show one servicer (Aidvantage) as having processed all outstanding adjustments for loans associated with Exhibit C class members.  The other servicers have reported completing some but not all outstanding adjustments for loans associated with Exhibit C class members.

104.    The Department has further instructed servicers to process all future adjustments for loans associated with Exhibit C borrowers within 10 business days of receiving the transactions triggering those adjustments.

105.    With the new USDS loan servicing contracts, the Department has established a process to track servicer completion of financial adjustments within a Service Level Objective.   Servicers that do not process adjustments for loans associated with Exhibit C borrowers by the appropriate deadline will be evaluated for application of disincentives.  For adjustments received on or after April 1, 2024, consequences for servicers that do not process adjustments by the appropriate deadline include reduced future loan allocations for servicing and financial penalties.

**B.    Change Request Regarding Tracking, Effectuation, and Verification of Full Settlement Relief.**

106.    When the Department learned of the extent of Exhibit C borrowers who had not received full settlement relief, the Department immediately began an emergency change request (CR) process, directed to the servicer of each class members' current consolidation loan, to better track each step of the consolidation discharge procedures.  (A CR is necessary to require servicers to implement new processes and procedures.)

107.    Although this is an emergency CR, several steps must occur before it is implemented.

a.    Implementation timelines for the CR are determined once the servicer receives Authority to Proceed ("ATP") for the CR.  ATP occurs after the impact assessments (IAs) from servicers are received and accepted by the Department.

b.    After the CR was issued, servicers submitted questions to ensure they understood the requirements.  The Department responded to all questions so servicers could ensure their IAs accounted for the work they would need to complete for the CR.  IAs include the level of effort it will take servicers to complete the work required in the CR and the number of hours it takes to implement the CR.

c.    IAs for this CR were due on March 25, 2024, but the Department received further questions from servicers and conducted meetings on March 28 and 29 to address the final issues.  The final servicer IAs were submitted to the Department on April 1, 2024.  The Department will finalize review of the IAs and if the IAs are reasonable, the Department will accept them.

d.    Servicers will then provide the Department with Cost Proposals ("CPs") due two days after the IA is approved, which the Department will review for approval.  Once the CPs are approved, the servicer will receive ATP (usually within a few days once contract modifications are issued) to begin implementing the CR. Implementation development timelines will be approved as part of the IA/CP approval.

108.    No consequences can occur until the servicer has implemented the CR.  Once the CR has been implemented, the Department is able to enforce compliance with the

requirements, which include Corrective Action Plans and appropriate financial penalties if requirements are not met.

109.    The process being implemented by this CR includes measures to more accurately track and verify the status of relief:

a.    Servicers and the Department must track remaining Exhibit C loans from beginning to end in one process and allow the Department to ensure that all loans are appropriately updated by each servicer that held the loan before it became the final consolidation loan.

b.    All servicers must use one shared reporting spreadsheet in which adjustments, refunds, credit reporting, and NSLDS updates are tracked to completion on the final consolidation loan.

c.    All servicers throughout the history of the borrower's account must update the spreadsheet when their required steps have been completed.  The Department will have real-time access to monitor progress and will work directly with servicers when updates are not being completed.

d.    The template will indicate if the consolidation adjustments result in a full or partial discharge of the consolidation loan based on underlying loan eligibility for *Sweet* so the Department can determine when those loans in the "unknown" category are complete.

e.    This process will also provide the Department with better visibility to track refunds and credit reporting.  Additionally, the Department will assume the role of tracking the adjustments using the collaborative reporting, allowing servicers to focus on completing adjustments.

110.     In addition, the Department has included requests in the CR for the servicers to finish all current and future adjustments needed to complete relief for all outstanding Exhibit C borrowers by May 31, 2024.

a.     The CR further provides a mechanism to aid the Department in tracking the progress of the discharge processing through successive consolidation servicers.  Utilizing the template document described in Paragraph 109, above, the servicers will confirm their completion of the adjustment, refund, and credit reporting as each component of the relief is completed.

b.     The CR includes a May 31, 2024 deadline to effectuate full relief for the remaining Sweet Exhibit C population.

111.     In response to the CR, the servicers have provided impact assessments.

a.     The servicers' IAs provide the following responses:

i.     Two servicers (MOHELA and Edfinancial) responded that the work could be finished by May 31, 2024, with certain caveats, assumptions, and dependencies.

ii.     One servicer (Aidvantage) responded that the work could not be finished by May 31, 2024, but that it could be finished by July 31, 2024, with certain caveats, assumptions, and dependencies.

iii.     A final servicer (Nelnet) responded that, due to interdependencies and the other complexities involved with processing transactions and adjustments for this population of loans, the work could not be finished by May 31, 2024, and the servicer could not provide a date by which all work could be finished.

iv.     The Department requested an estimate of how many class members could be complete by May 31, 2024.  Aidvantage responded that they cannot provide that volume with any degree of confidence due to the multiple risks, variables, and dependencies.  As of the date of this declaration, Nelnet has not yet responded.

b.     The caveats, assumptions, and dependencies that qualify the time forecasts in the IAs make it incredibly difficult to represent that relief will be completely effectuated for each and every Exhibit C class member even by July 31, 2024.

i.     These forecasts assume that the CR process will finish and proceed past the ATP stage by April 5, 2024.  It is likely to take longer than 4 days to complete the CR process and could take several weeks, which would place these forecasts' completion date beyond what the servicers' have estimated.

ii.     The cost of this CR is estimated to exceed $10 million, which the Department has begun taking the required steps for allocating, but the CR process must account for the time needed to allocate such a significant amount of previously unplanned funds.

iii.     Each servicer's forecast includes the assumption that all the other servicers' transactions and adjustments are completed, shared, and processed promptly and seamlessly, but those assumptions may conflict with reality that transactions and adjustments are a sequential process.  For example, if Servicer C cannot complete (or even receive) its work until

Servicers A and B have both completed theirs, Servicer C completing relief depends on the time that it takes the other servicers to finish their tasks. Accordingly, because each servicer's IA reflects the same uncertainties and interdependencies, each has numerous assumptions and dependencies that suggest all work may not finish by each servicer's forecasted date.

## C.   Improved Process for Credit Reporting

112.   The Department has also started the process of requiring the servicers to make certain updated reports to the CRAs for borrowers with consolidation loans that do not yet reflect a discharge for the current consolidation loan.

113.   According to the ordinary discharge process, as explained in Paragraphs 46-47, updates to the CRAs are not triggered until a borrower's current consolidation loan has been adjusted to reflect a discharge based on steps completed by servicers that serviced any loans underlying the current consolidation loan.

114.   The Department has begun the process to require the servicer of each class member's current consolidation loan to direct the CRAs to delete the tradeline associated with the consolidation loan immediately rather than following the completion of steps by servicers that serviced the loans underlying the current consolidation loan.

115.   The Department anticipates that these updates will be reflected in the reports made by the servicers to the CRAs for the month of May for federally held loans and generally by May or June for commercial FFEL.  The practical effect of this change will be that remaining Exhibit C borrowers should see updates to their credit reports in the near term and will not need to wait until the discharges are fully completed.

## D.   The Court's Order Regarding Loan Servicers

116.    On March 19, 2024, the Court ordered Defendants to "promptly notify their loan servicers whom they blame for delay that they are ordered to appear at the hearing on April 24, 2024, at 8:00 A.M., and show cause why they should not be held in contempt for frustrating the settlement and the final settlement approval order of the United States District Court."  On March 22, 2024, the Department provided the Court's order to servicers and stated in part: "We recognize that you are not a direct party to the settlement agreement and thus your legal obligations differ from ours.  Nonetheless the Department cannot fulfill its obligations under the settlement without your cooperation in working to process this relief for borrowers.  We know that delivering full settlement relief to class members who have not yet received such relief is complicated and difficult in many cases, but it is an unavoidable requirement of the settlement that requires prompt action to move forward and eventually complete.  Providing appropriate relief to eligible class members must be our highest priority.  We look forward to continuing to work with you to resolve these issues for the plaintiffs in this case and to explain the discharge process and the circumstances of this case to the court."

117.    To be clear, the Department does not blame the servicers for the fact that some Exhibit C borrowers have not yet received full settlement relief.  The Department accepts responsibility for that fact.  Rather, the Department sent the Court's order to all servicers in an abundance of caution and because the servicers are necessary partners in the discharge process with special knowledge of their own operations and resource constraints.  Lest there be any doubt, the Department strongly believes that no servicer should be held in contempt. Such an order would likely impede the Department's efforts—which are

dependent on a cooperative working relationship with all servicers—to provide full settlement relief as quickly as possible.

**IV.    Status of Relief**

118.    The Department's analysis of NSLDS data as of March 29, 2024, described in Paragraphs 82-83 above, indicates the following:

a.    142,676 Exhibit C class members (72.8%) have fully processed discharges.

b.    2,280 Exhibit C class members (1.2%) have unconsolidated school loans (and no eligible consolidated loans) for whom relief remains incomplete.

c.    50,967 Exhibit C class members (26.0%) have consolidation loans associated with Exhibit C loans for whom relief remains incomplete.

d.    Additionally, a small number of borrowers have conflicting records as to whether they have any eligible loans that are being reviewed by the Department.

119.    This information is current as of March 29, 2024.  We intend to supplement this declaration with updated information prior to the April 24, 2024 hearing.

120.    The Department is making considerable efforts to determine a timeline for relief that completes relief for all Exhibit C borrowers as soon as possible, but the Department's available data on borrowers with multiple consolidation loans is limited.  The Department is working to obtain additional data from the servicers that will provide insight into the status of the discharges and associated loan adjustments for borrowers with multiple consolidations and may have additional information prior to the April 24 hearing.

121.     The following timeline is the Department's best estimate based on the information currently available to the Department and does not account for accelerated timelines requested as part of the CR:

a.      May 31, 2024: Relief complete for an additional 5,500 class members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with Direct Loans and loans that were consolidated once.  The total Exhibit C class members with complete relief would be roughly 148,000 (76%).

b.      July 31, 2024: Relief complete for an additional 30,000 class members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with loans that were consolidated twice.  The total Exhibit C class members with complete relief would be roughly 178,000 (91%).

c.      August 31, 2024: Relief complete for an additional 12,000 Exhibit C class members, which is roughly equivalent to the estimated number of remaining Exhibit C class members with loans that were consolidated three or four times.  The total Exhibit C class members with complete relief would be roughly 190,000 (97%).

d.      In addition, because some of the loans have received two or more consolidation adjustments already, the Department will try to ascertain and monitor which loans are at or close to the last consolidation adjustment each month to get those completed by August 31, 2024, as well.  The Department does not currently have an estimate of this population, but may be able to supplement this information prior to the hearing.

e.      As part of this approach, the Department could report to Plaintiffs and the Court by September 6, 2024, regarding how many Exhibit C borrowers have not

received full settlement relief and the steps the Department is taking to effectuate such relief.  Based on available information, the Department's best estimate is that this population would be no more than 7,000 Exhibit C borrowers and may be substantially lower.

122.    As noted, the Department is currently finalizing a CR with the servicers that includes a May 31, 2024, deadline to effectuate full relief for the remaining Sweet Exhibit C population.  While there are still aspects of the CR to be finalized, the CR process has provided the Department with information from the servicers regarding what is achievable by May 31, 2024 with contract changes.   Specifically, impact assessments received from the servicers as part of the CR process have provided the following information:

    a.    The responses in the servicers' impact assessments indicate that full relief for the remaining Sweet Exhibit C population is not achievable by May 31, 2024 even with a CR.  The servicers' responses indicate that three servicers may be able to complete their portions of the work to complete full relief for remaining Exhibit C borrowers by July 31, 2024, but their work is contingent on and may be impacted by timelines of other servicers.  As noted in Paragraph 111.b. all of the servicers noted that their timelines and projections are based on numerous assumptions and dependencies that may not come to pass as stated.

    b.    Assuming that the Department and servicers finalize the CR, and factoring in the servicers' caveats, assumptions and dependencies, the Department's best estimate of what the servicers are likely to complete by May 31, 2024 is full relief for approximately 20,000 additional Exhibit C borrowers.  This estimate also assumes that that 50% or fewer of the remaining Exhibit C borrowers have a loan

originated or serviced by a decommissioned servicer.  While the Department currently does not know how many borrowers are affected by the delays caused by decommissioned servicers, it is working to obtain this information and may have a more detailed estimate before the hearing.

123.    I am aware that Plaintiffs in this matter have asked the Court to set a May 31, 2024, deadline for the Department to effectuate full settlement relief for all remaining Exhibit C borrowers.  While the Department understands the need to effectuate full settlement relief as promptly as possible, it cannot accomplish that goal by May 31 for all remaining borrowers utilizing the procedures currently in place.  Even with the accelerated deadlines the Department has included in the emergency CR, it is likely that a significant number of Exhibit C borrowers would not receive full relief by May 31.

124.    I am also aware that Plaintiffs have proposed the Department that could "discharge[e] the full balance of consolidation loans where servicers are unable to calculate the portion of the balance attributable to Exhibit C loans, or refund[] all prior payments where servicers are unable to apportion payments among Sweet and non-Sweet loans." Letter from Rebecca Ellis, Project on Predatory Lending, to Stuart Robinson, U.S. Department of Justice 4–5 (Mar. 1, 2024).  It is my understanding that this proposal reflects the fact that different kinds of loans are entangled together in the consolidated loans, and it is very time-consuming to try to separate out those loans.

125.    The approach that Plaintiffs propose would involve the following steps:

a.        The Department would have to prepare, propose, and finalize a Change Request that instructs the servicers to: discharge the full balance of each remaining Exhibit C Class Member's consolidation loans, irrespective of which

Declaration of Richard Cordray
19-cv-03674-WHA

50

portion is attributable to underlying loans associated with a school listed on Exhibit C; and refund any payments made by the Exhibit C Class Member on any consolidation loans disbursed after the underlying loans associated with a school listed on Exhibit C, irrespective of whether the payment is, in whole or in part, attributable to an underlying loan associated with a school listed on Exhibit C.

b.      Because these steps would cause certain imbalances and inaccuracies in the Department's Financial Management System records, the Department would be required to create an audit exception for the Department's Financial Management System, which could be done.

c.      That approach would also lead to discharges and refunds for loans that were not the subject of class members' borrower defense applications and are not associated with schools listed on Exhibit C, and thus would not otherwise be discharged under the settlement agreement, but that are entangled with the loans that would be discharged under the settlement agreement such that separating them out would elongate the expected timeline considerably.  The Department does not currently have sufficient data to determine the value the additional discharged debt but estimates that it would correspond to hundreds of millions of dollars of loan disbursements.

d.      That approach would also result in the refunding of payments that would not otherwise be refunded under the settlement agreement, and the refunds would likely take longer than the discharges to effectuate.

e.      If the Department were to take the steps that Plaintiffs are proposing, it is the Department's estimate that it would become practicable for the Department to

discharge the remaining loans within 60 days of implementing a CR to carry that out.

Refunds likely would take longer to effectuate than the discharges would, but a

further reasonable timeline could be established for completing the refund work.

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 2nd day of April, 2024.

*Richard Cordray*

Richard Cordray
Chief Operating Officer
Office of Federal Student Aid
United States Department of Education

Declaration of Richard Cordray
19-cv-03674-WHA