EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
PROJECT ON PREDATORY STUDENT
LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669

JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>     *Defendants*. | Case No. 19-cv-03674-WHA<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT**<br><br>**HEARING DATE: April 25, 2024**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

## TABLE OF CONTENTS

ARGUMENT .................................................................................................. 1

  I.     THE DEPARTMENT'S EXCUSES ARE INADEQUATE ........................................... 1

    A.    The Department's Response Raises More Questions Than It Answers ...................... 2

    B.    The Department Fails to Address Its Outstanding Refund Obligations ...................... 5

  II.    REMEDIES FOR THE DEPARTMENT'S MATERIAL BREACH ............................. 7

    A.    An Aggressive Timeline for Relief Is Both Possible and Warranted .......................... 7

    B.    The Department Can Use Any Available Method to Meet the New Deadline ............. 8

    C.    This Court Has Authority to Ensure Its Orders Are Followed .................................... 9

  III.    THE DEPARTMENT SHOULD BE REQUIRED TO SHOW CAUSE WHY IT
SHOULD NOT BE HELD IN CONTEMPT .............................................................. 10

    A.    Legal Standard .......................................................................................................... 10

    B.    The Department Violated the Court's Order Beyond Substantial Compliance .......... 11

    C.    Potential Sanctions .................................................................................................... 12

CONCLUSION ............................................................................................. 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*A.B. by & through Trueblood v. Wash. State Dep't of Social & Health Svcs.*, 2023 WL 4407539 (W.D. Wash. July 7, 2023) ................................................................................ 12, 13

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122 (9th Cir. 2013) .................................................................................................... 12

*Anderson v. Dunn*, 6 Wheat. 204 (1821) ................................................................... 9

*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) .................................................... 10

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................ 13

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ................................................... 9, 10

*General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376 (9th Cir.1986) ..................... 11

*Gifford v. Heckler*, 741 F.2d 263 (9th Cir. 1984) ..................................................... 11

*Greene v. Babbitt*, 943 F. Supp. 1278, 1281–82 (W.D. Wash. 1996) ....................... 13

*Hall v. Stone*, 179 F.3d 1043 (7th Cir. 1999) ........................................................... 10

*Harper v. Nev. Prop. 1, LLC*, 552 F. Supp. 3d 1033 (D. Nev. 2021) .......................... 9

*Harvey v. Shinseki*, 24 Vet. App. 284 (2011) ........................................................... 11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693 (9th Cir. 1993) ....... 11, 12

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) ......... 10, 11

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..................................................... 12

*Kelly v. Wengler*, 979 F. Supp. 2d 1104 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016) ............................................................................................................ 13

*N.C. Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650 (E.D. Va. 1998) ..................... 8, 13

*Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787 (9th Cir. 1989) ............................................................................................................ 13

*Primus Automotive Fin. Svcs., Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ............. 9

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ............................................... 9

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623 (9th Cir. 2016) ...................................... 13

*Sierra Club v. Ruckelshaus*, 602 F. Supp. 892 (N.D. Cal. 1984)..................................................... 10

*Taggart v. Lorenzen*, 139 S.Ct. 1795 (2019) ................................................................................. 11

*United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993) .................................................................. 13

**Statutes**

20 U.S.C. § 1082(a)(6)...................................................................................................................... 9

**Other Authorities**

A Martinez & Cory Turner, "Millions of Student Loan Borrowers' Debt Unnecessarily Spent

    Years in Forbearance," *NPR* (Dec. 19, 2022), https://www.npr.org/2022/12/19/1144064881/

    millions-of-student-loan-borrowers-debt-unnecessarily-spent-years-in-forbearance................ 6

Annie Nova, "Federal agency: Student loan company errors could 'pose serious risks' to

    borrowers, the economy," *CNBC* (Jan. 5, 2024), https://www.cnbc.com/2024/01/05/student-

    loan-servicer-errors-pose-risks-to-borrowers-and-economy-cfpb ............................................. 1

Defendants' Brief in Response to Oct. 8, 2019 Order, *Calvillo Manriquez v. DeVos*, No. 3:17-cv-

    07210-SK, ECF No. 125 (N.D. Cal., Oct. 15, 2019) ................................................................. 5

Cory Turner, "How the Most Affordable Student Loan Program Failed Low-Income Borrowers,"

    *NPR* (Apr. 1, 2022), https://www.npr.org/2022/04/01/1089750113/student-loan-debt-

    investigation.............................................................................................................................. 7

U.S. Consumer Financial Protection Bureau, "Prepared Remarks of CFPB Director Richard

    Cordray on the Navient Enforcement Action Press Call" (Jan. 18, 2017),

    https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-

    richard-cordray-navient-enforcement-action-press-call/ .......................................................... 6

U.S. Consumer Financial Protection Bureau, "Supervisory Highlights: Student Loan Servicing

    Special Edition" (Fall 2022), *available at* https://files.consumerfinance.gov/f/documents

    /cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf....... 6

1

**ARGUMENT**

2        The Department of Education's response to Plaintiffs' Motion to Enforce the Settlement

3   Agreement (ECF No. 403, "Response") takes a contrite tone, but its content reveals a series of

4   easily avoidable errors, self-inflicted obstacles, meager excuses, and decisions that could most

5   charitably be described as grossly negligent. The Department asks this Court, in setting a new

6   deadline, to "rely on the insights that the Department has developed into how these loans can be

7   most expeditiously discharged" (Response at 2)—but the Department has shown no evidence of

8   insight into delivering expeditious relief to Class Members. Indeed, that is why we are here today.

9        Having bungled the effectuation of the Settlement Agreement to this degree, the

10  Department and its servicers—over whom the Department, incredibly, disclaims functional

11  control, despite paying them over a billion dollars per year to work on the Department's behalf[1]—

12  do not deserve the benefit of the doubt. Plaintiffs respectfully request that this Court set the nearest

13  possible date for complete effectuation of Full Settlement Relief for all members of the automatic

14  relief group, implement safeguards to ensure the Department complies with its obligations, and

15  require the Department of Education to show cause why it should not be held in contempt of court.

16  **I.      THE DEPARTMENT'S EXCUSES ARE INADEQUATE**

17       The majority of the Department's Response and the supporting Declaration of Richard

18  Cordray (ECF No. 403-1, "Cordray Decl.") offer various reasons why, the Department says, its

19  violation of the Settlement's relief deadline was merely the unfortunate outcome of complicated

20  transactions. But even a cursory examination of these reasons demonstrates that this delay was

21  entirely avoidable and need not continue now.

22

23

24  _____

25  [1] *See* Annie Nova, "Federal agency: Student loan company errors could 'pose serious risks' to
    borrowers, the economy," *CNBC* (Jan. 5, 2024), https://www.cnbc.com/2024/01/05/student-loan-

26  servicer-errors-pose-risks-to-borrowers-and-economy-cfpb ("The federal government contracts
    with different companies to service its student loans, and pays the servicers a total of more than $1

27  billion a year to do so.").

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.     The Department's Response Raises More Questions Than It Answers

The Department spends a great deal of time explaining why unwinding consolidation loans is complex. But even taking those explanations at face value, there is no legitimate reason why complexity needed to delay relief for Class Members.

The Department's story begins in June 2022, when, it says, it began preparing for implementation of the Settlement immediately after the agreement's execution. *See* Cordray Decl. ¶¶ 28–32. This raises the first question: Why did nobody at Federal Student Aid (FSA) consider, over the next eight months, that many Class Members would have consolidation loans and that FSA needed a plan to deal with them?

On February 28, 2023, the Department sent the first and largest batch of automatic relief group discharge requests to servicers. *Id.* ¶ 40. At this point, "regardless of the type of loan, the Department sent discharge requests to the original loan servicer." Response at 7 (citing Cordray Decl. ¶¶ 51–53). As the Cordray Declaration takes pains to emphasize, a number of these original servicers were "decommissioned." *See, e.g.*, Cordray Decl. ¶¶ 13(a), 50, 88, 89(a), 122(b). This raises a second question: What, exactly, did the Department expect to happen when it sent discharge requests to companies that no longer service federal student loans and thus did not have anything on their books to discharge? What instructions did the Department provide to these decommissioned servicers, and what follow-up or oversight were they subject to? On the latter, at least, the answer appears to be "none." The Department states that it still "does not know how many borrowers are affected by the delays caused by decommissioned servicers." *Id.* ¶ 122(b).

The Department claims that it set a deadline of 15 business days for an original servicer to complete a discharge request. *See id.* ¶ 71. Yet this deadline was illusory: the Department granted extensions when requested, *id.*, and did not even threaten, much less impose, any penalties when servicers missed their deadlines. Instead, it simply "reminded" them in meetings, *id.* ¶ 69, and "follow[ed] up" with emails, *id.* ¶ 71. The Department now touts that a threat of sanctions for non-

compliance with *Sweet* discharge instructions went into effect on April 1, 2024—exactly one day before it filed its Response. *See* Response at 14.

Moreover, assuming (without evidence) that at least some servicers did comply with the 15-day deadline in at least some instances, how is it possible that nobody at FSA noticed the yawning gaps in implementation until Plaintiffs raised the alarm on September 29, 2023—that is, 213 days after the Department sent the first wave of discharge requests?[2] They did not notice because nobody bothered to look. Apparently through nothing more than magical thinking, the Department expected the original loan servicers—whether decommissioned or active—to take all necessary steps to enable the current loan servicer (which might have been many steps down the chain of custody of a particular loan) to discharge a Class Member's still-extant loans, or such portions of their consolidation loans as were attributable to the original *Sweet*-eligible loans. This did not happen. And the Department, by its own account, had no idea that this was not happening. *See* Response at 9-10.

Among other failures, the Department never checked on whether the original servicers had sent any information to subsequent servicers, never imposed any deadlines on those subsequent servicers, never implemented a tracking system for the status of Class Members' discharges or refunds, and never analyzed its own NSLDS data for quality assurance. *See id.* The Department did not even require servicers to label their transactions as "settlement relief for *Sweet* class members," Cordray Decl. ¶ 60—an obviously necessary step for tracking what had been done or not done on a Class Member's loan. Once again, this raises a question: Why didn't FSA think to

---

[2] *See* Plaintiffs' Motion to Enforce Settlement ("Motion"), Ex. 8 (ECF No. 397-3) (email from Plaintiffs' Counsel to Department of Justice dated Sept. 29, 2023) ("The Department reported most recently that relief had been 'effectuated' for over 128,000 class members – but has the Department in fact confirmed that the servicers have cleared the relevant balances for all of these class members? And has the Department confirmed that the rest who are awaiting relief are being properly held in forbearance or stopped collection status? Our observations suggest it has not, and that instead the Department has exercised little to no oversight over what is actually happening to class members' loans.").

"track remaining Exhibit C loans from beginning to end in one process," Cordray Decl. ¶ 109, from the very start of Settlement implementation? How did the Department expect to certify its compliance with the Settlement when it had no internal system for knowing whether loans had *actually* been discharged and refunds *actually* disbursed?

The Department states that, in November 2023, it notified servicers that it was, for the first time, "conducting a review to validate processing of each borrower confirmed as complete for Sweet." Cordray Decl. ¶ 74. (The Department does not mention that it took this step only at Plaintiffs' insistence. *See* Motion, Exs. 8–9 (ECF No. 397-3).) It did not take long, once the Department began this process, to "detect[] complications" with "large volumes" of incomplete "consolidation adjustments." Cordray Decl. ¶ 75. Yet the Department continues to insist that "[a]s of January 2024, [it] understood reporting from the servicers to indicate that discharges had been applied for 95% of Exhibit C class members." *Id.* ¶ 76. The latter is difficult to square with the Department's admission that it had uncovered major inconsistencies in the data a month prior.

Regardless, even after the Department acknowledged that the percentage of Class Members who had received their discharges was much smaller than previously reported, it continued to be ineffectual in addressing this material breach. As detailed in Plaintiffs' Motion, *see* ECF No. 397 at 8–10, the Department refused to commit to a firm timeline for cure during the meet-and-confer process. Even now, as the Department describes the steps it is supposedly taking to remedy its breach, *see* Cordray Decl ¶¶ 96–111, it wavers and retreats from its own plans, stating without apparent irony that its "process is not final and remains subject to numerous caveats and dependencies." Response at 16. The Department also tries to demonstrate its efforts to communicate the urgency of the situation to servicers in the first three months of 2024, *see* Cordray Decl. ¶¶ 99–101, yet when the Department attempted to set a 10-day deadline for "process[ing] all outstanding adjustments," only one servicer actually followed these instructions, and the

Department does not suggest that consequences followed for the others, *see id.* ¶¶ 102–103.[3] The Department admits that, to this day, its "available data on borrowers with multiple consolidation loans is limited," and suggests that it "*may* have additional information prior to the April 24 hearing." *Id.* ¶ 120 (emphasis added).

### B.     The Department Fails to Address Its Outstanding Refund Obligations

Throughout its Response, the Department refers to its calculations of how many Class Members in the automatic relief group have received "Full Settlement Relief." *See, e.g.*, Response at 2, 14. But the data that the Department offer only concern discharges. *See id.* at 14 (setting out the number of Class Members who have received "fully processed discharges"). Full Settlement Relief includes refunds for those who paid money to the Department on their Relevant Loan Debt. *See* Agreement § II.S.

The Department states that, when a servicer reduces a loan balance to zero pursuant to a discharge request, the servicer is supposed to "calculate[] a refund equal to the sum total of any payment(s) made toward the eligible loan," and then include that amount "on a record known as a 'refund file.'" Cordray Decl. ¶ 47(b). This "refund file" is then "sent to the Department for approval," and once approved, the Department forwards the information to the Department of Treasury to issue the refund. *Id.* Presumably, then, the Department should know, from its "refund file" records, which Class Members have received the refunds to which they are entitled.

---

[3] Plaintiffs' understanding is that situations like these are a primary reason why the Court ordered the Department to produce its servicers at the April 24 hearing in this case. *See* ECF No. 399. The Department appears to have no plan to heed the Court's order. *See* Response at 18 n.6; Cordray Decl. ¶¶ 116–117. Notably, the Department's excuse for the servicers' expected nonappearance is directly at odds with the position it took in prior litigation. *See Calvillo Manriquez v. DeVos*, No. 3:17-cv-07210-SK, ECF No. 125 at 11 (N.D. Cal. Oct. 15, 2019) (in Defendants' Brief in Response to Oct. 8, 2019 Order, the Department agreed that federal student loan servicers were already, "as agents of the Department, subject to [the] Court's injunction" regarding the handling of loans subject to borrower defense applications, and that this was "true regardless of whether the servicers were parties to the original proceeding").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

But it doesn't. Instead, the Department admits that, "as of February 15, 2024, the Department was unable to determine the number of Exhibit C borrowers who had received full refunds." *Id.* ¶ 86(d). It does not appear to have made any progress on determining this number in the nearly two months since, because that number appears nowhere in the Response or the Cordray Declaration. This may be because, as noted, the Department did not think to label *Sweet* settlement relief as such in the servicers' or its own records, and did not set up an end-to-end tracking system to confirm whether Class Members had actually received relief until, approximately, last week. *See id.* ¶¶ 60, 109.

In short, once again, the Department failed to put in place any plan whatsoever to keep track of whether it had fulfilled a major obligation of the Settlement. Even now, having acknowledged its material breach, the Department does not describe any steps it has taken to determine Class Members' refund status. It offers just one, partial excuse: that "a substantial number" (who knows how many) of the borrowers who haven't received their refunds are those who "are prior defaulted borrowers, or borrowers whose loans have been transferred from decommissioned servicers that failed to provide complete and readily accessible records (e.g., payment histories) related to the loans." *Id.* ¶ 89. As to the former, it is unclear why a prior default should affect the timeliness of a refund. And as to the latter, this is a self-inflicted injury, born out of the Department's decades-long failure to rein in its servicers' incompetence and abuses.[4] The

---

[4] *See, e.g.*, U.S. Consumer Financial Protection Bureau, "Supervisory Highlights: Student Loan Servicing Special Edition" at 11–25 (Fall 2022), *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf; U.S. Consumer Financial Protection Bureau, "Prepared Remarks of CFPB Director Richard Cordray on the Navient Enforcement Action Press Call" (Jan. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-navient-enforcement-action-press-call/ (describing CFPB lawsuit against former federal servicer Navient for "systematically and illegally fail[ing] borrowers at every stage of repayment"); A Martinez & Cory Turner, "Millions of Student Loan Borrowers' Debt Unnecessarily Spent Years in Forbearance," *NPR* (Dec. 19, 2022), https://www.npr.org/2022/12/19/1144064881/millions-of-student-loan-borrowers-debt-unnecessarily-spent-years-in-forbearance.

Department was or should have been well aware that servicers, particularly decommissioned ones, were not keeping accurate records of borrowers' payment histories.[5] Yet FSA never developed a strategy for how *Sweet* Class Members in this situation would have their refunds calculated or, if that was not possible because of servicer errors, how an equivalent to a refund calculation could be performed. The Department still does not propose a solution now.

## II.   REMEDIES FOR THE DEPARTMENT'S MATERIAL BREACH

### A.   An Aggressive Timeline for Relief Is Both Possible and Warranted

The Department proposes that this Court should set a schedule that would allow it to effectuate discharges for only 5,500 additional Class Members over the next two months— representing about 10% of the people awaiting their already-late relief. *See* Response at 14–15. The Department's plan would result in discharges for most, but notably not all, automatic relief group members by August 31, 2024, over seven months after the original deadline. *Id.* at 15. For anyone whose loans have not been discharged by then, the Department still refuses to commit itself to a schedule. *See id.* The Department offers no timeline whatsoever for delivering refunds.

This Court should not accept the Department's tepid proposal. The Department's actions leading to the breach of its responsibilities under this Settlement make abundantly clear that it will not act to address or even identify obvious barriers to effectuation until faced with immediate consequences for inaction. The Department had more than a year to plan for and resolve entirely predictable compliance issues, such as the inability of defunct servicers to process discharges and the additional steps required for consolidated loans. Despite this, and despite warnings from Plaintiffs, the Department by its own admission failed even to identify the scope of the problem until immediately before it became necessary to do so under the original Court-imposed deadline.

---

[5] *See, e.g.*, Cory Turner, "How the Most Affordable Student Loan Program Failed Low-Income Borrowers," *NPR* (Apr. 1, 2022), https://www.npr.org/2022/04/01/1089750113/student-loan-debt-investigation (detailing documents showing, among other things, that servicers—including current servicer MOHELA—"weren't clearly tracking" borrower payments; that the Department knew as far back as 2016 that there were "glaring omissions in the accounts of transferred borrowers"; and that a 2020 audit revealed over 5 million account errors by former servicer ACS).

1   During this time the Department relied, and continues to rely, on self-interested reports

2   from its well-compensated agents, the student loan servicers, to inform itself, Plaintiffs, and the

3   Court on the state of compliance. The Department does so despite these servicers' extensive record

4   of failure and while simultaneously and inaccurately asserting that it has limited ability and

5   authority to control these servicers' conduct. *Cf. N.C. Fisheries Ass'n v. Daley*, 27 F. Supp. 2d

6   650, 668 (E.D. Va. 1998) (warning, in imposing sanctions for failing to follow court order, that

7   "[t]he Court cautions the Secretary of Commerce that thus far, his designees have shown little or

8   no regard for the orders of this Court"). Plaintiffs are not ignorant of the challenges that the

9   Department now faces in timely resolving its self-created breach of the Settlement. However, the

10  Department has not given Plaintiffs or the Court reason for confidence that this partial explanation

11  of its failure will lead to resolution on the proposed timeline. To the contrary, the history of this

12  litigation has made clear that distant or ambiguous deadlines run a direct path to unending delay.

13  The Court must set an earlier deadline to ensure Plaintiffs and the Court can—at a

14  minimum—ensure that the Department works effectively toward Settlement relief and that the

15  Department remains accountable to its promises, as student borrowers are to theirs.

16  **B.  The Department Can Use Any Available Method to Meet the New Deadline**

17  The Department raises, unbidden, a suggestion Plaintiffs made in the Parties' meet-and-

18  confer correspondence as a potential means to expedite relief: namely, that the Department could

19  discharge entire consolidation loans instead of undertaking time-intensive processes to unwind the

20  constituent parts of each consolidation loan. *See* Response at 16. To be clear, Plaintiffs did not ask

21  this Court to order the Department to take that step. There is thus no reason to address whether

22  such a request would "exceed the scope of the Agreement." *Id.* at 17.

23  It is, and has always been, Plaintiffs' position that the Department has discretion to use any

24  and all available means to meet the deadlines set out in the Settlement Agreement or that this Court

25

26

27

28

1    may order as a remedy for breach.[6] The Department's obligation is to comply with the Settlement.

2    Whether it does that by discharging consolidation loans or by fixing some of its other broken

3    processes makes no difference, so long as Class Members receive the relief to which they are

4    entitled on the schedule they are entitled to receive it.

5             **C.  This Court Has Authority to Ensure Its Orders Are Followed**

6             A request that Plaintiffs did, in fact, make in their Motion was for this Court to designate

7    a single individual to oversee the Department's compliance with the Court's remedial order—

8    specifically, an individual who has not previously been involved in the Department's botched

9    handling of the Settlement. *See* Motion at 15. The Department takes issue with this request, arguing

10   that it is "beyond the Court's jurisdiction" because "the only relief available" under Section V.B.2

11   of the Settlement is "an order requiring Defendants to promptly provide Full Settlement Relief to

12   each affected Class Member on a timetable set by the Court." Response at 17–18.

13            But "[c]ourts of justice are universally acknowledged to be vested, by their very creation,

14   with power to impose . . . submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501

15   U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)). "The inherent powers

16   of federal courts are those that 'are necessary to the exercise of all others.'" *Primus Automotive*

17   *Fin. Svcs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Roadway Express, Inc. v.*

18   *Piper*, 447 U.S. 752, 764 (1980)); *see, e.g.*, *Harper v. Nev. Prop. 1, LLC*, 552 F. Supp. 3d 1033,

19   1045–46 (D. Nev. 2021) ("inherent authority" includes power to hold parties to terms of a valid

20   settlement).

21            Here, Plaintiffs are not asking for a separate form of relief from what the Settlement

22   contemplates: the substantive relief they seek is for the Court to issue an order setting a timetable

23   for the provision of Full Settlement Relief. As part of that order, however, they are asking for the

24   Court to ensure "submission to [its] lawful mandates" by vesting responsibility for compliance

25

26            _____

27   [6] *See* 20 U.S.C. § 1082(a)(6) (setting out the Secretary's plenary "settlement and compromise"
     authority).

28

with that timetable in an individual who can impose accountability. *See Chambers*, 501 U.S. at 43. It is clear from the Department's own account of the past 22 months that FSA's implementation team, as presently constituted, cannot be trusted to comply on its own.

In the alternative, if the Court concludes that designating an individual to oversee compliance cannot fall within the scope of its order under Section V.B.2 of the Settlement, Plaintiffs respectfully submit that the same result could be achieved by ordering it as a remedy for contempt of court, as a means to "coerce an offender's future obedience." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994). As Plaintiffs now explain, this Court should evaluate whether contempt sanctions are warranted here.

## III.   THE DEPARTMENT SHOULD BE REQUIRED TO SHOW CAUSE WHY IT SHOULD NOT BE HELD IN CONTEMPT

In its Order of March 19, 2024, this Court required the Department to "promptly notify their loan servicers whom they blame for delay that they are ordered to appear at the hearing on April 24, 2024, at 8:00 A.M., and show cause why they should not be held in contempt for frustrating the settlement and the final settlement approval order of the United States District Court." ECF No. 399. The Department's Response says, without quite saying, that it does not expect the servicers to appear, nor will it exert any authority over the servicers to convince them to do so. If the Department indeed "takes responsibility," Response at 18 n.6, for any actions that "frustrat[ed] the settlement and the final settlement approval order," ECF No. 399, then Plaintiffs respectfully submit that, under the circumstances, the Department should instead be required to show cause why it should not be held in contempt.[7]

### A.  Legal Standard

A Court may hold a party in civil contempt when it has displayed "disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to

---

[7] Government agencies and officials may be subject to civil contempt. *See, e.g., Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 903 (N.D. Cal. 1984); *Hall v. Stone*, 179 F.3d 1043, 1043 (7th Cir. 1999); *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985).

comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "A court has wide latitude in determining whether there has been contemptuous defiance of its order." *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984). Civil contempt is appropriate where the goal is to "compel future compliance with a court order" and is "coercive" in nature. *United Mine Workers*, 512 U.S. at 827. While "substantial compliance" can be a defense to civil contempt, the putative contemnor must show that it has committed only "a few technical violations" while otherwise making "every reasonable effort . . . to comply." *Dual-Deck*, 10 F.3d at 695 (quoting *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378–79 (9th Cir.1986)).

The "absence of willfulness does not relieve" a party "from civil contempt"; rather, a party's good-faith efforts to comply are only relevant insofar as they "may help to determine an appropriate sanction." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1802 (2019); *see also Dual-Deck*, 10 F.3d at 695 ("[T]here is no good faith exception to the requirement of obedience to a court order."); *Harvey v. Shinseki*, 24 Vet. App. 284, 287 (2011) (party can be held in contempt even when its "failure to fully comply with a Court rule or order is the result of gross negligence and a gross lack of diligence," rather than bad faith (citation and quotations omitted)).

**B.  The Department Violated the Court's Order Beyond Substantial Compliance**

As detailed at length above, the Department did not take "all reasonable steps within [its] power" to comply with the Court's final approval order, which incorporated the Settlement by reference. *See* ECF No. 345 at 25. The fact that the Department never instituted a system to track Class Members' relief status—and apparently *never even considered doing so* until Plaintiffs made a formal allegation of material breach—is, frankly, shocking. Likewise the fact that the Department never conducted any direct oversight of whether loans had actually been discharged until Plaintiffs complained repeatedly about Class Members being billed on loans that, per the Settlement, should have been held in forbearance. The Department did not monitor its own data, did not exert its authority over the servicers to ensure that they did their jobs, and did not even attempt to start doing either of those things until Plaintiffs alleged a material breach and brought

the instant Motion, respectively. The Department's tardy efforts to improve its compliance have been inadequate at best: it still does not have a coherent process in place, or even a proposal, to timely and effectively deliver Full Settlement Relief to all Class Members.

A party alleging contempt ordinarily must demonstrate that the alleged contemnor violated the court's order by "clear and convincing evidence." *Dual-Deck*, 10 F.3d at 695. But here, the Department has openly admitted to all of the above-cited failures and more. *See* Cordray Decl. ¶¶ 60, 70–76, 81, 85–90, 96, 99, 102–111, 116–117, 120. By definition, because there were numerous "other reasonable steps the [Department] could have taken," it did not take "*all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) ("other reasonable steps" may include hiring appropriate staffing to ensure compliance or implementing plans to discover ongoing violations); *see also, e.g.*, *A.B. by & through Trueblood v. Wash. State Dep't of Social & Health Svcs.*, 2023 WL 4407539, at *17–19 (W.D. Wash. July 7, 2023) (holding agency in contempt where it "failed to identify any compelling evidence that it could not have complied with the Settlement Agreement[]," given that the obstacles the agency encountered "were foreseeable" and the agency "had ample alternative actions it could have taken but did not"). Plaintiffs submit that a contempt finding is thus appropriate in these circumstances. The Department should be required to show cause if it contends otherwise.

### C.  Potential Sanctions

If this Court does find that the Department is in contempt, the Court may order such sanctions as are appropriate to "coerce[] compliance with [the] court order" and to act as a "remedial sanction meant to compensate the complainant for actual losses." *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013). Here, as explained above, even if the Court does not agree with Plaintiffs that designating an individual to oversee compliance is an appropriate component of an order under Section V.B.2 of the Settlement, it would be entirely appropriate as a coercive sanction in a contempt order. Courts have frequently imposed court-ordered monitoring and/or standards as sanctions on an

administrative agency when the agency did not heed the Court's instructions the first time. *See,
e.g.*, *Trueblood*, 2023 WL 4407539, at \*12–13, \*17, \*20–21 (imposing performance and
monitoring requirements where agency "showed only limited diligence in trying to address" the
requirements of the parties' settlement, "failed to take swift or meaningful action" to cure its
violation, and "took a laconic and inadequate approach" to finding alternative means of
compliance); *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1116 (D. Idaho 2013), *aff'd*, 822 F.3d 1085
(9th Cir. 2016) (independent monitor was appropriate contempt sanction, explaining that "[r]elying
on . . . a non-party . . . imposes an added duty on the state agency to promptly report [violations]
to this Court"); *N.C. Fisheries Ass'n*, 27 F. Supp. 2d at 666–69 (setting fishing quota in plaintiff-
friendly manner when the government failed to conduct a new economic analysis as required by
the court); *Greene v. Babbitt*, 943 F. Supp. 1278, 1281–82 (W.D. Wash. 1996) (when agency failed
to follow procedures required by the court it, among other things, banned the individual
responsible and ordered defendants to decide petitioners' claim favorably). The same would be
true of Plaintiffs' request for reporting requirements. *See* Motion at 15–16.

      In addition to coercive sanctions, a court can issue compensatory contempt sanctions that
"are remedial" and that "typically take the form of unconditional monetary sanctions." *Shell
Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016). The purpose of
compensatory sanctions is to make the aggrieved party whole, and the sanction generally includes
attorneys' fees and costs. *See Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*,
877 F.2d 787, 790 (9th Cir. 1989).[8]

---

[8] This Court has authority to order monetary contempt sanctions against the Department because—
whether such sanctions are characterized as "compensatory" or "coercive"—they are not "money
damages" and thus are authorized in an action under the Administrative Procedure Act. *See Bowen
v. Massachusetts*, 487 U.S. 879, 904 (1988) ("The fact that a judicial remedy may require one party
to pay money to another is not a sufficient reason to characterize the relief as 'money damages'
under the APA."). The Court also and independently can order contempt sanctions under its
inherent supervisory powers. *See United States v. Woodley*, 9 F.3d 774, 782 (9th Cir. 1993)
("Sovereign immunity does not bar a court from imposing monetary sanctions under an exercise

As the declarations appended to Plaintiffs' Motion demonstrate, Class Members have suffered harms as a direct result of the Department's gross negligence in administering the Settlement. *See, e.g.*, Decl. of Stella Johnson ¶ 16, Motion Ex. 22 (had to take out high-interest loan to pay for surgery because Relevant Loan Debt is still appearing on her credit report); Decl. of Katelin Mundy ¶ 15, Motion Ex. 25 (unable to refinance high-interest loans because Relevant Loan Debt is still appearing on her credit report, and has to work two jobs to service high-interest debt); Decl. of Christina Shaw ¶ 19, Motion Ex. 28 (had to take out high-interest loan when her car broke down because Relevant Loan Debt is still appearing on her credit report). There are many more stories of harm like theirs, or worse. Plaintiffs' Counsel are also aware of numerous Class Members who have made payments on Relevant Loan Debt over the past six months because of servicers wrongly sending them back into repayment.

To ensure that Class Members are appropriately compensated for their economic harm stemming from Defendants' inexcusable failure to comply with this Court's final approval order, Plaintiffs' Counsel request an opportunity to determine the full scope of Class Members' compensable harms and petition the Court or a special master for relief, including compensatory sanctions and reasonable attorneys' fees and costs incurred as a result of Defendants' gross negligence.

* * *

The Department is not above the law. It cannot violate a binding court order—one which incorporated its own agreed-to commitments in the Settlement Agreement—and then plead incompetence as an excuse for neglecting the entirely foreseeable need to ensure its compliance with that order.  Holding the Department in civil contempt appropriately conveys the gravity of the situation and helps ensure appropriate respect for this Court's authority.

---

of its supervisory powers," including the power "to remedy a violation of recognized statutory, procedural, or constitutional rights," or to "deter future governmental misconduct and protect the integrity of the judicial process").

1

**CONCLUSION**

2      For the reasons set forth above, Plaintiffs respectfully request that the Court issue an order

3  requiring Defendants to (i) promptly provide Full Settlement Relief to each Class Member in the

4  automatic relief group on a schedule set by the Court, under the supervision of an individual who

5  has not previously been involved in the Department's handling of the Settlement; (ii) satisfy

6  reporting requirements consistent with that goal as set forth in Plaintiffs' Motion; (iii) pay

7  Plaintiffs' Counsel's reasonable fees and costs incurred in bringing this Motion; and (iv) show

8  cause why they should not be held in contempt for their violations of the Court's final approval

9  order.

10

11 Dated: April 9, 2024                                  Respectfully submitted,

12                                                        _Rebecca C. Ellis_____

13                                                        Eileen M. Connor (SBN 248856)

14                                                        econnor@ppsl.org
                                                          Rebecca C. Ellis (*pro hac vice*)

15                                                        rellis@ppsl.org
                                                          Rebecca C. Eisenbrey (*pro hac vice*)

16                                                        reisenbrey@ppsl.org
                                                          PROJECT ON PREDATORY

17                                                        STUDENT LENDING

18                                                        769 Centre Street, Suite 166
                                                          Jamaica Plain, MA 02130

19                                                        Tel.: (617) 390-2669

20
                                                          Joseph Jaramillo (SBN 178566)

21                                                        HOUSING & ECONOMIC RIGHTS
                                                          ADVOCATES

22                                                        3950 Broadway, Suite 200

23                                                        Oakland, California 94611
                                                          Tel: (510) 271-8443

24                                                        Fax: (510) 280-2448

25
                                                          *Attorneys for Plaintiffs*

26

27

28