Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

THERESA SWEET, on behalf of      )
themselves and all others        )
similarly situated, et al.,      )
                                 )
            Plaintiffs,           )
                                 )
  VS.                            )   NO. C 19-03647-WHA
                                 )
MIGUEL CARDONA, Secretary of     )
the United States Department of  )
Education, et al.,               )
                                 )
            Defendants.           )
_____)

San Francisco, California
Wednesday, April 24, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    PROJECT ON PREDATORY STUDENT LENDING
                    769 Centre Street - Suite 166
                    Jamaica Plain, Massachusetts 02130
               BY:  **REBECCA C. ELLIS, ATTORNEY AT LAW**
                    **REBECCA C. EISENBREY, ATTORNEY AT LAW**
                    **EILEEN M. CONNOR, ATTORNEY AT LAW**

For Defendants:

                    U.S. DEPARTMENT OF JUSTICE
                    Civil Div. - Federal Programs Branch
                    450 Golden Gate Ave. - Room 7-5354
                    San Francisco, California  94102
               BY:  **STUART J. ROBINSON, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1   **APPEARANCES**:   (CONTINUED)

2   For Defendants:

3                                       U.S. DEPARTMENT OF JUSTICE
                                        Civil Div. - Federal Programs Branch
                                        20 Massachusetts Ave., NW - Ste. 5102

4                                       Washington, D.C.  20530
                             BY:   **BENJAMIN T. TAKEMOTO, ATTORNEY AT LAW**

5                                  **MARCIA BERMAN, ATTORNEY AT LAW**

6
    **Also Present:**          **Theresa Sweet**

7                              **John Bailey**
                               **Richard Cordray**

8                              **Hunter Wiggins**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
1   Wednesday - April 24, 2024                        8:00 a.m.

2                         P R O C E E D I N G S

3                            ---o0o---

4           THE CLERK:  All rise.  Court is now in session.  The

5   Honorable William Alsup is presiding.

6           THE COURT:  Good morning.  Please be seated.

7           THE CLERK:  Calling Civil Action 19-3674, Sweet,

8   et al. vs. Cardona, et al.

9       Counsel, please approach the podium and state your

10  appearances for the record, beginning with counsel for

11  plaintiffs.

12          MS. ELLIS:  Good morning, Your Honor.  Rebecca Ellis

13  for the plaintiffs from the Project on Predatory Student

14  Lending, and with me are my colleagues.

15          MS. EISENBREY:  Rebecca Eisenbrey from the Project on

16  Predatory Student Lending.

17          MS. CONNOR:  Good morning, Your Honor.  Eileen Connor

18  from the Project on Predatory Student Lending.

19          MS. ELLIS:  And also at counsel table, lead plaintiff,

20  Theresa Sweet.

21          MR. ROBINSON:  Good morning, Your Honor.  Stuart

22  Robinson from the Department of Justice on behalf of

23  defendants.  With me at counsel's table Ben Takemoto from the

24  Department of Justice; Marcy Berman from the Department of

25  Justice; John Bailey, senior counsel from the Office of General
```

1  Counsel of the Department of Education; Richard Cordray, the

2  chief operating officer of the Federal Student Aid Office of

3  the Department of Education; and Hunter Wiggins, senior advisor

4  to Mr. Cordray.

5        THE COURT:  Which one is Mr. Cordray?

6                    (Hand raised.)

7        THE COURT:  Okay.  Thank you.  All right.

8        MR. ROBINSON:  And, Your Honor, if I also may add that

9  counsel for the servicers are here as well in the gallery.

10       THE COURT:  Where are they?  Raise your hand, please.

11                   (Hands raised.)

12       THE COURT:  Thank you for coming.

13   Okay.  We're here on a motion to hold the government in

14  contempt and to enforce the settlement.  Who's going to argue

15  for the plaintiff?

16   I want you to know, I am up to speed, so to speak, but I

17  think you should make your main points and then I may have

18  questions.

19   Please go ahead.

20       MS. ELLIS:  Yes, Your Honor.  I'll try to make it

21  brief.

22   The Department, as you know, has admitted to a material

23  breach of the settlement, and so the parties agree that a

24  remedial order under Section 5(b)(2) of the settlement is

25  justified here.  The questions at issue are what that remedial

1    order should include.

2        So the first issue is the deadline by which the Department

3    has to complete the effectuation of settlement relief.  In our

4    brief, we proposed a deadline of May 31st.  I recognize, it now

5    being April 24th, that's a fast turnaround, but the

6    Department's counterproposal is, in our view, untenable.  They

7    originally proposed that only about 5,500 class members would

8    receive discharges by May 31st out of about 50,000 who already

9    have been waiting past the deadline for their relief.

10       The most recent declaration of Mr. Cordray, which was

11   filed yesterday, suggested that now there are perhaps 12,000,

12   but still that's a fraction of who's waiting.

13       Under the Government's proposal, most -- but notably not

14   all -- of those people would receive relief by September of

15   this year.  For the people who are still left in September, a

16   number that we don't really know what that would be at this

17   point, there is no deadline, and that's not, at this point,

18   acceptable in our view.

19       The Department also doesn't offer a timeline on the

20   completion of refunds, and Your Honor had specifically asked

21   about data on refunds.  Some of that information was provided

22   in Mr. Cordray's most recent declaration, but the problem is

23   there's still no denominator.  So the Department says "Okay,

24   there's some 30,000 people with consolidation loans who have

25   received refunds."

1      Okay.  But what about the people without consolidation

2  loans?

3      They say, "Well, over 80,000 people have gotten some

4  refund but we don't know how many of those were Sweet refunds

5  because we didn't keep track."

6      So we still don't know -- of the nearly 200,000 class

7  members in the automatic relief group, we still don't know how

8  many are owed a refund, how many have not received it yet, or

9  have not received a full refund.  We do know that there are

10  some class members who received, you know, a couple thousand

11  dollars here, a couple thousand dollars there, but one of the

12  main problems is that nobody can really get answers about the

13  status of relief.  This is due in large part to the

14  government's failure to keep accurate records as they admitted

15  to in their response.

16      So the number one most common complaint that we hear from

17  class members is "I called my servicer to see what was going on

18  with my loans.  They said they have no idea, call the

19  Department.  So I call the Department.  They say 'That's not

20  our job.  You have to call the servicer.'"

21      So people end up in this loop of no information or

22  misinformation.

23      There are representatives from the servicers who say "I

24  don't know what you're talking about.  I've never heard of

25  Sweet v. Cardona."  So the problem is that there's just no

1    accountability to borrowers or to the class as a whole.

2        So in terms of the deadline, we understand that there

3    are -- you know, there's processes that the Department has to

4    go through, but they could have foreseen these processes

5    months, perhaps years ago.  And we believe that extending the

6    deadline out farther and for some class members extending it

7    out indefinitely is not what's going to get this done.  The

8    only thing that's going to get the government to speed up here

9    is a firm, final, and near-term deadline.

10       The second issue that the parties disagree on here is what

11   measures the Court can take to ensure that its remedial order

12   is followed.  In our motion we proposed that the Court should

13   impose certain specific reporting requirements.  We believe

14   that that is authorized by the settlement under Section

15   5(b)(2)(ii).

16       And we also requested that the accuracy of those reports

17   be attested to, under oath, by a senior department official.

18   And we believe that's necessary because of the Department's

19   admitted history over the course of the past year of submitting

20   inaccurate information in their quarterly reports by requiring

21   attestation under oath that will hopefully ensure that the

22   Department is taking more care to actually verify its

23   information before it's asking the Court and the plaintiffs to

24   rely on that information.

25       The other guardrail that we proposed in our motion is that

**PROCEEDINGS**

1  the Court should designate an individual to oversee the

2  Department's compliance with the new timeline and the new

3  reporting requirements.  And we suggested that that should be

4  someone who has not previously been involved with the botched

5  efforts to effectuate the settlement so far.

6      The --

7          **THE COURT:**  Who do you have in mind?

8          **MS. ELLIS:**  We suggested, as an example, the student

9  loan ombudsperson from either within Federal Student Aid or the

10  student loan ombudsperson from the Consumer Financial

11  Protection Bureau because those are positions that have

12  experience with handling borrower complaints and understand the

13  process of loan discharge.

14      That's not necessarily -- it doesn't necessarily have to

15  be those people, but that's the sort of role that we think

16  would be effective here.

17      And the purpose of that would be to impose greater

18  organization, greater accountability.  You know, there's sort

19  of a long list in the government's response, in the first

20  Cordray declaration, of things the Department just didn't do or

21  didn't follow up on or didn't anticipate even though they seem,

22  frankly, pretty obvious.

23      So -- and as class counsel, you know, we are happy to hear

24  from borrowers.  We try to communicate borrowers' issues to DOJ

25  so that those can be passed on to the Department of Education,

**PROCEEDINGS**

1    but there's nothing that we can actually do ourselves to solve

2    these problems.  So there has to be someone within the

3    Department who is able and willing to solve those problems and

4    to give these implementation issues the proper attention that

5    they deserve.

6           THE COURT:  Let me ask a question.  Do we know how

7    many people have tuned in by way of Zoom?

8           THE CLERK:  Yes, we do, Your Honor.  It's 298.

9           THE COURT:  298.  Okay.  So we have probably, I don't

10   know, 290 of those are class members, my guess.

11          THE CLERK:  And it's climbing.  Up to 301, 305.

12          THE COURT:  And so all of those people are welcome to

13   the hearing.

14       And while I'm interrupting you, I urge them to get ahold

15   of you, the class counsel, to tell you the status of their

16   either good news or bad news so that you'll be up to speed on

17   the situation.

18       Okay.  I interrupted you.  Please continue.

19          MS. ELLIS:  Thank you, Your Honor.

20       I was going to move on to our argument that the Department

21   should be ordered to show cause why it should not be held in

22   contempt.

23          THE COURT:  Let's hold off on that one for a bit.

24          MS. ELLIS:  Okay, Your Honor.

25          THE COURT:  Let's try to focus on solving the problem.

1      So what is -- where did things go wrong in your view?

2  Looking with the benefit of hindsight, where did the system and

3  the -- you, maybe, or was it the Department of Education, where

4  did things go wrong?

5      MS. ELLIS:  In our view, Your Honor, where things went

6  wrong was in the Department not -- not paying enough attention

7  to the -- to what was going to be necessary to make this

8  process work.

9      Something that was in their response brief is that after

10  the plaintiffs alleged a material breach at the beginning of

11  February this year, they eventually, by March, came up with the

12  idea that they should be tracking class members' relief

13  progress from end to end; essentially, you know, look at that

14  first notice, does -- if we send a notice to a defunct

15  servicer, does that information ever get transmitted to a

16  currently active servicer?

17      And to us, to learn -- which we did not learn until this

18  process, that the Department wasn't tracking end-to-end relief

19  for class members, you know, that was a surprise to know that

20  they essentially sent these notices asking for discharges into

21  the ether, and sort of hoped that things would be fine; that

22  they told the servicers -- or it's not entirely clear from the

23  declaration whether they told or simply passively allowed the

24  servicers to not follow recordkeeping practices that would

25  allow them to know:  Is this transaction related to the Sweet

PROCEEDINGS

1   settlement?

2       I think that was probably the root cause of this.

3       We are not alleging that the Department acted in bad faith

4   here, but essentially with a -- a gross and inexcusable

5   negligence to think about:  You know, we have to certify

6   compliance with this settlement.  In order to certify

7   compliance, we have to -- in order to certify compliance, we

8   have to know whether we're in compliance or not.

9       And, in fact, in December of 2022, so about a month after

10  the final approval order here, the Department sent a change

11  request, which is essentially an instructional document, to the

12  servicers which said that, effective immediately for borrower

13  defense discharges, servicers will no longer be required to

14  make updates in the recordkeeping tool for borrower defense

15  cases other than to update the case status to confirm

16  processing.

17      And so they kneecapped themselves here.  They told the

18  servicers, "Well, don't bother writing down what you've done.

19  Just switch the status to 'processing'."  And then that was the

20  date they gave to us to say, "Well, these discharges have

21  occurred.  See, the status was switched to 'confirmed

22  processing'," but that doesn't mean the loan has been

23  discharged.

24      And none of this came to light until the return to

25  repayment started because that's when our clients started

PROCEEDINGS

1  getting bills on loans that should have been discharged, that

2  we thought had likely been discharged because we'd been told,

3  you know, 120,000 people have their relief completed.

4      And so it was at that point that the gaps in this process

5  started to become evident and didn't really fully become

6  evident until after the deadline had already passed.

7          **THE COURT:**  The problem of consolidated loans, to what

8  extent is that the root cause here?

9          **MS. ELLIS:**  The problem with consolidated loans

10 appears to be a significant portion of what's persisting now.

11 I don't think it has been -- I don't think that has been the

12 only problem along the way.  There have also -- we've noted

13 delays in discharges for people with commercial FFEL loans.

14 According to the most recent declaration, it appears there's

15 only a couple thousand of those left.  But that was a problem

16 along the way.

17     And I think the problem of refunds is also a persistent

18 issue.  As I mentioned earlier, we don't know exactly how many

19 people are owed refunds, but we know that we've heard from many

20 hundreds of people who were expecting them and haven't gotten

21 them.

22     And part of the root cause of this goes back longer than

23 this settlement.  It goes back to, you know, many years of

24 servicers not keeping good records.  This was known by the

25 department back in 2016 or perhaps earlier.  The CFPB sued one

1   of the servicers -- not one of ones who's here today but a

2   former servicer -- partly over their poor recordkeeping.

3        So the Department should have known that when it came to

4   calculating refunds for this settlement, there were going to be

5   problems with the records and they did not create any strategy

6   to deal with that.  As far as we can tell, they still haven't

7   created a strategy to deal with that.

8        **THE COURT:**  Okay.  Hold your thought for a moment.

9   Let's hear from the Department of Justice --

10       **MS. ELLIS:**  Thank you, Your Honor.

11       **THE COURT:**  -- and DOE.

12   Go ahead please, Counsel.

13       **MR. ROBINSON:**  Thank you, Your Honor.

14       The Department of Education recognizes that its -- its

15   acknowledgement of material breach and its explanations about

16   the complexities of loan consolidation provide little comfort

17   to those Exhibit C borrowers who have not yet received full

18   settlement relief, nor does the Department of Education dispute

19   that the Court can now set a schedule for prompt relief to

20   those borrowers.

21       The Department respectfully requests that the Court take

22   into consideration the information presented in the Cordray

23   declarations in setting an achievable schedule.  The proposal

24   is set out in our response to plaintiffs' motion, but to

25   briefly summarize, what we asked was that for the period

1   between April 2nd, the response date, and May 31, that the

2   Department of Education would effectuate full settlement

3   relief, including refunds, to be clear, by May 31, for 5,500

4   borrowers, an additional 30,000 by July 31, and an additional

5   12,000 by August 31.

6        The Department recognizes that there may be some

7   borrowers, as many as 3 percent, who may not receive full

8   settlement relief by then.  The Department hopes that number is

9   smaller; but given the complexity of the loans held by those

10  borrowers, the Department of Education does not want to make

11  any commitments that it cannot keep at this time.

12       **THE COURT:**  When you say "full settlement relief,"

13  that means all three things:  Discharge, refund, and CRA?

14       **MR. ROBINSON:**  That's right, Your Honor, with just a

15  couple points of clarification.  The CRA update process

16  requires the servicers to provide instructions or requests to

17  the CRAs themselves.  The Department has no control over when

18  or whether they do that -- the CRAs do that correctly, but they

19  will take every step possible to get it to them by then.

20       And on that particular respect, the Department of

21  Education has already taken significant steps such that, as

22  outlined in our response and the supplemental declaration, the

23  expectation is that updates for the outstanding Exhibit C

24  borrowers will be reflected in May or June by the credit

25  reporting agencies.

1          THE COURT:  These numbers, 5,500 -- is it 30,000 the

2    second -- 30,000 was the second group?

3          MR. ROBINSON:  Yes, Your Honor, by July 31.

4          THE COURT:  Then 12,000.  Now, would that be a hundred

5    percent of the class?

6          MR. ROBINSON:  That would be approximately 97 percent

7    of the class, with a potential for about 3 percent, maybe 7,000

8    or so, remaining.

9       It's possible that may be a substantially lower number;

10   but given, as I mentioned, the complexity of the loans held by

11   those borrowers, the Department of Education would like to

12   gather some additional information before committing to a

13   timeline for those.

14         THE COURT:  Well, what's so hard about rolling the

15   7,000 in with this other group?

16         MR. ROBINSON:  In part, it's -- in large part, it's

17   the number of consolidated loans held by those borrowers.

18   Those are four, five, six -- more than ten consolidations.  And

19   every consolidation can present its own complications, whether

20   it's based on the number of underlying loans in the

21   consolidation, whether the originating servicer and the

22   subsequent servicer or the entity servicing the loan are the

23   same entity, whether there's a decommissioned servicer

24   involved, and whether the loan includes both what we refer to

25   as eligible and ineligible debt.  All those factors can

PROCEEDINGS

1  complicate the timeline for processing a single consolidation;

2  and so if you have more than five or more, it's difficult to

3  predict exactly how long that will take.

4      And if I may, Your Honor, I have some additional updates

5  to the numbers reported yesterday in the supplemental Cordray

6  declaration.

7          THE COURT:  All right.  Just a second.  Let me find my

8  copy of that dec- -- can you give me that declaration again?

9  You gave it to me this morning.

10     Wait a second.  I think I've got it right here.  Yeah,

11 here it is.

12     Please, go ahead.  I have the one filed last night.

13         MR. ROBINSON:  Yes, Your Honor.  Thank you.

14     So just one clarification.  Paragraph 5 on page 1, I'd

15 just like to clarify that data is current as of April 23, not

16 April 19.

17     And I also have some additional details regarding the

18 breakdown of loans that are outstanding, particularly for

19 consolidated loans.  This does not appear on the supplemental,

20 but I received it this morning so I'm happy to share it with

21 the Court.

22         THE COURT:  Well, go ahead.  I'll write -- I'll write

23 it in the margin.

24         MR. ROBINSON:  And we can file something as well to

25 get that on the docket.

1          **THE COURT:**  Okay.  Why don't you do that, but go ahead

2     and give me the info.

3          **MR. ROBINSON:**  Okay.  So there are 1,544 borrowers

4     with one consolidation.

5          **THE COURT:**  With what?  Oh, one consolidation.

6          **MR. ROBINSON:**  A single consolidation loan.

7          **THE COURT:**  And does that mean the consolidation could

8     be with an ineligible loan?

9          **MR. ROBINSON:**  Yes, Your Honor.

10          **THE COURT:**  Or an eligible loan?

11          **MR. ROBINSON:**  Correct, Your Honor.

12          **THE COURT:**  All right.  Go ahead.

13          **MR. ROBINSON:**  For borrowers with two consolidations,

14     the number is 23,521.

15          **THE COURT:**  All right.

16          **MR. ROBINSON:**  Three consolidations, 3,780; four

17     consolidations, 7,475; five consolidations, 1,705; six

18     consolidations, 2,102; seven consolidations, 747; eight

19     consolidations, 699; nine consolidations, 363; and more than

20     nine consolidations, 912.

21          I'll add, Your Honor, that that list does not include FFEL

22     loans whether consolidated or nonconsolidated FFEL loans but,

23     rather, direct consolidated loans.

24          **THE COURT:**  When you say "direct," you mean direct by

25     the DOE?

1          **MR. ROBINSON:**  Yes, Your Honor.

2      And, Your Honor, there are some borrowers with up to 25

3  consolidations, just to give some additional context there.

4          **THE COURT:**  Okay.  Now, is the schedule that you gave

5  me with or without the CR?

6          **MR. ROBINSON:**  It assumes that the CR is in place,

7  which it nearly is.  We think -- the Department of Education

8  believes the CR will facilitate the achievement of the

9  schedule.  There are a few reasons for that.

10      One, it will allow better tracking and visibility.  The

11  Department of Education acknowledges that it should have taken

12  more steps towards tracking loans on an end-to-end basis, and

13  the CR helps achieve that.

14      That deadline -- those timetables are also set on the

15  10-business-day deadline.  That is not part of the CR but a

16  separate update, that is in effect as of April 1, for servicers

17  to comply with for new consolidated adjustments.

18          **THE COURT:**  Your original papers had one schedule with

19  a CR and one schedule without, and now you're -- but the

20  schedule you're giving me, is that the most aggressive schedule

21  that you've proposed in any way?

22          **MR. ROBINSON:**  Just to clarify, Your Honor, the CR

23  that is being finalized was discussed in the original response

24  and declaration in two respects.  One was with the tracking and

25  verification effort, which is in place and finalized.  It also

1  referenced that part of the change request asked the servicers

2  about a possible May 31 deadline, and the servicers have

3  explained that they are not all able to finish the work on the

4  outstanding Exhibit C borrowers by May 31, so that piece is not

5  part of the new change request.

6        THE COURT:  But my question is:  Is the schedule you

7  gave me that leads up to August 31, is that the most aggressive

8  schedule that you've proposed in any of your paperwork?

9        MR. ROBINSON:  Yes, Your Honor.

10        THE COURT:  Okay.

11        MR. ROBINSON:  Again, we noted that there was a

12  request for information from the servicers about whether they

13  could accomplish all the work by May 31, and the answer was no.

14  So the schedule that I've discussed here, and that's in the

15  papers, is the most aggressive that the Department can propose

16  at this time.

17        And, again, these are -- these are numbers that the

18  Department of Education hopes to -- hopes to beat.  It hopes to

19  substantially do better than these projections, but given the

20  information it has now, it's not able to commit to anything

21  more substantial.

22        I will note, Your Honor, that --

23        THE COURT:  Didn't you have a -- didn't you have -- in

24  your original declaration, didn't it say everything would be

25  done by July 3rd or nearly everything would be done by

1    July 3rd?

2         **MR. ROBINSON:**  Not that I recall, Your Honor.

3    July 3rd?

4         **THE COURT:**  Or July 31?  Okay.  I meant July 31.

5         Didn't -- didn't the original -- did the original

6    declaration say that?

7         **MR. ROBINSON:**  I think that number may have been based

8    on some discussions with the servicers about what was

9    achievable, but not all servicers were able to commit to that.

10        And I think -- and I'm not in a position to speak on

11   behalf of the servicers and their counsel here -- that are here

12   today, but I think one of the concerns is that they don't know,

13   at least before implementation of this change request, what the

14   volume is going to be and how many adjustments they will be

15   asked to work on, and so they were not all able to commit to

16   finishing their work by July 31.

17        **THE COURT:**  Why wasn't all of this foreseen at the

18   time you agreed to the settlement so that you could have a plan

19   in place to march forward and get it done instead of being

20   misinformed?  I mean, I know you were acting in good faith, but

21   the -- still, this was a pretty bad error to have made.

22        **MR. ROBINSON:**  Your Honor, the Department is -- the

23   Department of Education does not dispute that it erred in

24   implementing this settlement, and I'm not here to offer excuses

25   on their behalf.  I think the explanation in the Cordray

1   declarations sort of sheds light on what was happening.

2       The Department of Education, when it entered the

3   settlement, believed that it had the resources and procedures

4   in place to meet its obligations.  It believed that it

5   identified what would be the major problems with

6   implementation, specifically the compilation of 2.9 million

7   loans and the requirement to send discharge requests for those

8   loans to the various servicers.  And so that was the focus of

9   the Department of Education's attention beginning even before

10  the Court entered final approval of the settlement.

11      That said, again, there's no dispute that the Department

12  of Education failed to take into account the complexity and

13  volume of consolidated loans, the need to track them on an

14  end-to-end basis, the need to impose deadlines not just for

15  that original servicer for a consolidated loan but on

16  subsequent servicers as well.

17      And I will add, Your Honor, that the Department of

18  Education has taken steps since identifying these concerns to

19  remedy each of those.  So, for example, as of April 1, as I

20  mentioned, subsequent servicers are subject to a strict

21  enforceable 10-business-day deadline.  Tracking will be greatly

22  improved through the implementation of this change request.

23      The Department understands better that indicators in its

24  own data system, NSLDS, do not indicate full settlement relief,

25  and has taken steps to make sure that it has a better reporting

1    mechanism so that it can be accurate in its final counts.

2         THE COURT:  What do you say to the proposal by

3    plaintiffs that a new person be put in charge to oversee the

4    implementation?

5         MR. ROBINSON:  Your Honor, there are both legal and

6    factual reasons to deny that request.  The first is that

7    the Court, respectfully, lacks jurisdiction to do so under

8    paragraphs -- or Section 5 and 11 of the settlement agreement.

9         The Court's jurisdiction here is limited to setting a

10   schedule for prompt relief.  And the Department is, of course,

11   as part of that, happy to report to the Court on its progress

12   after each of those milestones that the Department of Education

13   is proposing.

14        There's also factual problems with what they're

15   requesting.  Depending on who was appointed, it may be

16   presenting a separation of powers concern.

17        THE COURT:  Oh, please.

18        MR. ROBINSON:  The Department -- well, Your Honor, if

19   the --

20        THE COURT:  If -- I'm going to order what I think is

21   needed; and if you don't like it, you can go to the Court of

22   Appeals.  That's -- but I feel like I got bamboozled on your

23   settlement by you sneaking in those things that allow you to

24   be -- get away with murder on the implementation.

25        MR. ROBINSON:  Well, Your Honor --

1        **THE COURT:**  And now you're saying, "Oh, you can't --

2   you know, we got caught but, I'm sorry, you can't do anything

3   about it."

4        Well, I don't know -- if that's your position, you can

5   argue it to the Court of Appeals, but I am -- I am more

6   interested in your factual point.

7        On the merits, what's wrong with that idea?

8        **MR. ROBINSON:**  To the extent that plaintiffs are

9   asking that, to get at, you know, additional tension outside of

10  the Federal Student Aid Office on this settlement, no

11  additional coercion or encouragement is required at this point.

12  This settlement has the attention of senior Department of

13  Education officials.  There's a team with senior agency

14  officials working on making sure the settlement is properly

15  adhered to.

16       And it's not clear, depending on who the Court might

17  consider appointing, whether inside the executive branch or

18  outside the executive branch, how much time it would take for

19  to person to get up to speed and start issuing directives for

20  settlement compliance.

21       And if I could address just briefly Your Honor's concern

22  about what was snuck into the settlement.  Again, this case

23  began as a series of claims about delay, and it certainly

24  became more after the supplemental complaint was filed, but it

25  was a negotiated settlement, at arm's length, and as part of

1    that settlement, in Section 11, the -- and I'm quoting here (as

2    read):

3              "The parties agree that any order of the Court

4         granting approval of this agreement does not render

5         the terms and conditions of this agreement subject to

6         the contempt powers of the Court."

7    They similarly agreed to limited jurisdiction.

8         **THE COURT:**  Why would that be important?  It's only if

9    you anticipated that you would breach the agreement, and so you

10   wanted to work in there some insurance against your own breach.

11        **MR. ROBINSON:**  Your Honor, I don't think that that

12   adverse -- or that inference is warranted.  It's a somewhat

13   standard clause in many settlement agreements entered into with

14   the government.

15        The idea is that the plaintiffs received substantive

16   relief.  There's a possibility that things could go awry; and

17   rather than have the Court be able to consider it contempt, the

18   government should be able to substantially comply with an order

19   setting an achievable deadline here; and only then should the

20   Court be asked to consider an extraordinary remedy such as

21   holding an executive branch agency in contempt.

22        **THE COURT:**  All right.  Let me -- let's put that to

23   one side for a moment.

24        I'm going to ask the plaintiffs.  Let me go back over --

25   I'm going to go back over what I understood you to say.  By

1   May 31, full settlement, all three things, including the CRAs,

2   refunds, and discharge, 5,500; July 31, 30,000; August 31,

3   12,000; and at most, there would be 7,000 who -- mostly

4   consolidated, where there would be still problems.

5       And this assumes that you would put into place the

6   contract -- what did you call that?  Contract revision?

7           MR. ROBINSON:  Change request.

8           THE COURT:  Change order, yeah.  Is that what you're

9   telling me?

10          MR. ROBINSON:  That's right, Your Honor.  Though,

11  again, I'll note that the Department does not control when the

12  credit reporting agencies make their updates.  They've taken

13  all the steps they can --

14          THE COURT:  Well, but I have the servicers here.  I

15  can order them to -- to do what they've got to do to make that

16  happen.

17      All right.  Let's hear from the plaintiffs for a moment.

18  And before -- you know, you want May 31.  That's never going to

19  happen.

20          MS. ELLIS:  Understood.

21          THE COURT:  I don't even think June 30 could happen,

22  but we're in a mess.

23      Now, let me just ask you a question.  How come you didn't

24  see this coming back when you negotiated?

25      Did you sit down with them and say, "Hey, how are you

1  going to deal with the consolidated loans," and -- so that you

2  could help the Department of Education see this was going to

3  turn into a mess?

4          MS. ELLIS:  Your Honor --

5          THE COURT:  Or did you just assume, "Oh, let them deal

6  with all those problems"?

7          MS. ELLIS:  Well, Your Honor, we -- you're correct, we

8  did not discuss this with the Department, but I don't think we

9  viewed it as sort of within our sphere of authority to tell the

10 Department how to discharge the loans.  It --

11         THE COURT:  That part is true.  However, if -- if you

12 understood how the system worked -- now, I didn't understand

13 how it worked.  If I did, I would have asked these questions

14 myself whenever you presented this to me, but you're the

15 lawyer.  You should know more than the judge about this.  You

16 could have helped them if you had said, "Well, how are you

17 going to do the consolidated loans?"

18     Anyway, it's just -- I just -- I -- it -- you don't even

19 have to answer.  I -- but it's conceivable to me that in the

20 negotiations you could have raised this point.  And maybe they

21 might -- a light might have gone off in somebody's head and

22 says, "Oh, my God, that's right.  How are we going to deal with

23 those consolidated loans?"

24     All right.  But I'll pass that.

25     What does -- what do you say about the timetable that the

**PROCEEDINGS**

1  government has proposed?

2       **MS. ELLIS:**  Your Honor, the government did propose, at

3  page 16 of their responsive brief, that certain new

4  processes -- that's their words -- that they were refining with

5  the servicers could facilitate full relief for approximately

6  20,000 additional Exhibit C class members by May 31st, and full

7  relief for nearly all remaining Exhibit C class members by

8  July 31st, 2024.

9    It sounded like counsel for DOJ was saying that the

10  servicers have reported they don't think that they can

11  effectuate those processes.  I would be interested to hear from

12  the servicers.

13       **THE COURT:**  Well, wait.  Are you saying that in the

14  original brief -- say that again.

15       **MS. ELLIS:**  Yes.

16       **THE COURT:**  Full relief by July 31?

17       **MS. ELLIS:**  Full relief for nearly all remaining

18  Exhibit C class members by July 31.  That's at page 16 of

19  Document 403.

20       **THE COURT:**  Well, what does "nearly all" mean in

21  government speak?

22       **MS. ELLIS:**  Right.

23       **THE COURT:**  Probably it means nearly -- you know, all

24  but about 20,000.

25       **MS. ELLIS:**  Understood, Your Honor.

1       But I think that July 31st, the government suggested that

2   it had at least envisioned processes that could get nearly all

3   class members resolved by July 31st.  I think we could look at

4   that as a realistic date.  That would be six months --

5   approximately six months after the effective date -- or the

6   deadline for settlement relief, originally January 28th, going

7   out to July 31st.  That's six months and a couple of days.

8       **THE COURT:**  Well, August 31 is only one month more.

9   They're saying August 31 now, not July.

10      **MS. ELLIS:**  Well --

11      **THE COURT:**  Here, hold that thought for a second.

12  Don't go away.

13      Let me ask the government.  Is it true that you did -- you

14  originally said July 31 nearly all would get relief?

15      **MR. ROBINSON:**  Yes, Your Honor.  And that's in -- and

16  that cites the Cordray declaration at paragraphs 106 to 111,

17  and 121.  The discussions with the servicers, as I mentioned,

18  have confirmed that they cannot get nearly all of this done by

19  July 31.

20      The -- even with the change requests, which will allow

21  greater visibility into the process and the tracking, we will

22  not be at, for example, 97 percent by then.  August 31 remains

23  the most achievable schedule that the Department of Education

24  can propose.

25      **THE COURT:**  Okay.  So they have -- even though they

1   did say that, they're taking it back because they have more

2   information now.

3         MR. ROBINSON:  And, Your Honor -- sorry, Your Honor.

4   May I just add one point?

5         THE COURT:  Please.

6         MR. ROBINSON:  Paragraph 111 of the Cordray

7   declaration does reference the fact that the servicers were in

8   communication with the Department of Education and that -- and

9   those projections were based on concern, caveats, assumptions,

10  and dependencies.  The information the Department of Education

11  has now indicates that July 31 is not achievable.

12        THE COURT:  You know, this whole situation, there are

13  a lot of people, and -- me included, who believe, and there are

14  a lot of people who disagree with it, that the role of the

15  government, not just -- at all levels, local, state, federal,

16  that it's a great calling of public service and that good

17  things can come, and they -- and that the government is

18  competent; but, this story gives a lot of fuel to those people

19  who believe the government is incompetent and can't carry out a

20  task without goofing it up.

21        So it's discouraging that you would have done this to the

22  system and all those students.  I don't mind being -- having to

23  go through this, but I worry about all those students out there

24  who got these loans and they don't have the refunds.  They --

25  it's still being -- they're still getting billed.  They're

1  still getting -- the servicers are sending them bills, even

2  though we've told them that they've discharged, but they're not

3  discharged.

4      And it causes the public to lose confidence in the ability

5  of the government to carry out -- this is not a simple task --

6  I won't say it's a simple task, but anything complicated, that

7  the government can't do complicated math.  I want you-all to

8  prove that wrong and to get this done.

9      All right.  I'm going to do the following.  Are you ready?

10  I have my own plan.

11      I'm going to adopt on this -- on the following conditions

12  I'm going to adopt the government's schedule, and that is that

13  you're going to have -- we're going to have three meetings with

14  me in person, not by phone, on May 23 at 8:00 a.m., June 13th

15  at 8:00 a.m., and July 11th at 1:30, and those are to report to

16  me that you're on track; and if you're not on track, for me to

17  try to solve problems for you.  I'd like all these servicers to

18  attend all of those meetings.

19      But in between there has to be biweekly meetings.

20  Biweekly.  Do you want what that means?  Every other week.

21  So -- so like today -- two weeks from today you would have

22  another meeting.  And these will be at the Department of

23  Education, attended by those people who are required to -- who

24  are -- so far I'm not going to appoint your ombudsman to the --

25  I'm going to go with the DOE people in charge, but they've got

1   to -- the Department of Justice has got to be there, the

2   Department of Education has got to be there, all people there

3   who can answer questions about where it now stands.

4        And so -- and the plaintiffs have got to be there --

5   plaintiffs' counsel I mean, not the plaintiffs -- so that you

6   can be -- you can see is there progress.

7        Now, if in these meetings it appears to you that it is

8   almost certainly to fall behind schedule, then you have to

9   write a letter to me, and then we'll -- we'll move the schedule

10  up and we'll -- so that I can address it.

11       The -- I'm going to require you to do this change order

12  that you're talking about to make this happen.

13       And I want the servicers to be at -- to attend these

14  meetings, these biweekly meetings, and to attend the hearings

15  with me.  That way people will be focusing on it.

16       One thing I've learned in this job is that if things go

17  normal, you will all leave, not much will be done until

18  three days before the next hearing.  Then the fear of God will

19  occur and you will say, "My God, we've got to do something and

20  tell that judge what we're doing."

21       Please don't do that.  Pay attention to this problem and

22  use the time wisely to solve the problem.  And that's part of

23  the purpose of these biweekly meetings, is to make sure that

24  progress is being made and these deadlines are going to be met.

25  So that's my view.

 1          Now, if things go off the rails again, I don't know, maybe
 2   we'll resort to something more drastic than this.  But I've
 3   learned in this job, it is when the government fails to meet a
 4   deadline -- you know, Congress has passed many deadlines, and
 5   it's rare that the government ever meets a deadline.  And
 6   there's 42 different excuses that I've -- that they have, but
 7   they just don't meet the deadlines.  Like the Fish and Game
 8   things, endangered species.  So I try to understand the
 9   problem, and then we set a new deadline and often the
10   government does meet the new deadline.
11          So it's better to give them the chance to meet the
12   deadline -- a new deadline than it is to start holding people
13   in contempt, although ultimately you might have to do that, but
14   not yet.
15          And in terms of fees, we'll wait on that until we get to
16   the end.  I don't want to start ordering payment of fees just
17   yet, but you're -- you should get fees for the work you're
18   doing on this, but let's not -- let's get -- let's get the
19   discharges done, let's get the CRAs done, and also the refunds.
20   I want to know -- you can't even tell me that a single class
21   member has gotten a check from the Treasury; is that true?
22          **MR. ROBINSON:**  I think we can confirm that,
23   Your Honor.  That's in the supplemental Cordray declaration.
24          **THE COURT:**  Oh, it is?  Okay.  How many did get a
25   check?

1          And do we know that they were a member of the Sweet class?

2          **MR. ROBINSON:**  What we know is, Your Honor, that --

3     it's not -- it's not specific necessarily to Sweet, but the

4     Department's records show that, as of early March 2024, over

5     80,000 individuals with a Social Security number matching that

6     of an Exhibit C class member as listed -- are listed as having

7     received payments totaling more than $444 million, and this

8     includes over 34,000 class members with consolidated loans, and

9     the payments to that group exceed 168 million.

10         **THE COURT:**  Okay.  So we have to take it on faith that

11    all of those were members of our class.

12         **MR. ROBINSON:**  And, again, Your Honor, the change

13    request should provide greater visibility into the refund

14    issue.

15         **THE COURT:**  All right.  So let me ask plaintiff:  What

16    heartburn do you have over my proposal?

17         **MS. ELLIS:**  Your Honor, I think overall this is a very

18    reasonable proposal.  I think we -- a couple of things.

19         One is, we do think there should be a final date for the

20    class members who the Department says will not be resolved by

21    August 31st.  The ones who they say have the most complicated

22    loan situations, even given that complication, those class

23    members deserve a deadline and not just to be sort of left in

24    the ether at the end of the schedule.

25         **THE COURT:**  All right.  When do you think you'll be in

**PROCEEDINGS**

1   a position to address the 7,000 and give me a deadline for

2   them?

3           MR. ROBINSON:  Your Honor, what I would propose is

4   that on that first in-person meeting 5/23, the -- hopefully the

5   change request process will be implemented and there may be

6   more information that we can share with the plaintiffs, and we

7   can propose something to them at that juncture and then perhaps

8   update the Court.

9           THE COURT:  That would be two weeks from today;

10  correct?

11          MR. ROBINSON:  Well, Your Honor, I thought the Court

12  said the first meeting would be May 23rd.

13          THE COURT:  No.  That's the first meeting with me, but

14  in between there will be a meeting with counsel.

15          MR. ROBINSON:  Well, at the very least, Your Honor, we

16  would like to be able to inform the Court of that on the

17  May 23rd meeting.

18          THE COURT:  All right.  I can live with May 23 for a

19  new deadline for the 7,000.

20          MS. ELLIS:  Thank you, Your Honor.

21          THE COURT:  I want to make it real clear now.  Two

22  weeks from today, you're to have a meeting at the DOE --

23          MS. ELLIS:  Yes, Your Honor.

24          THE COURT:  -- with the servicers, everyone --

25  everybody who has an interest in this and can help solve the

1  problem should be there.  And then, on May 23, you come back

2  here, servicers too.  And then two weeks after May 23, you have

3  another in-house meeting, so -- so biweekly and -- in other

4  words, in between the hearings with me, you will have these

5  meetings at the DOE.

6          MS. ELLIS:  Thank you, Your Honor.

7      And --

8          THE COURT:  I'm going to leave it to you to pick the

9  exact date, but I -- please don't do this to me, that you say,

10  "Oh, they're on vacation."  Cancel vacations.

11      All right.  Does that -- so is that plan okay with you?

12          MR. ROBINSON:  Yes, Your Honor.

13          MS. ELLIS:  Yes, Your Honor.

14      There was just one other thing that we wanted to mention

15  about the biweekly meeting process, which is to include in

16  Your Honor's order that part of that process will be the

17  Department of Education having to address borrower questions

18  that haven't been resolved by the borrowers trying to contact

19  the Department or the servicers themselves.  So people who

20  bring questions to us, that we can ask the Department what's

21  going on with those borrowers and they tell us the answer.

22          THE COURT:  Well, can't the DOE give me the name of

23  somebody right now to whom all these questions can be referred?

24      That's a very reasonable request.

25          MR. ROBINSON:  Your Honor, Mr. Cordray is saying that

 1   they can be referred --

 2           **THE COURT:**  All right.  Mr. Cordray.

 3           **MS. BERMAN:**  Can we take a moment to discuss?

 4           **MR. ROBINSON:**  Can I just confer with my clients for a

 5   second, Your Honor?

 6           **THE COURT:**  Sure.  Go ahead.  Take a moment.

 7               (Defense counsel and clients conferring.)

 8           **MR. ROBINSON:**  Your Honor, the Department of Education

 9   proposes that person be Bonnie Latreille, the ombudsman for

10   Federal Student Aid.

11           **THE COURT:**  All right.  Do you know how to spell that?

12           **MR. ROBINSON:**  We can provide contact information to

13   plaintiffs' counsel.

14           **THE COURT:**  All right.  Excellent.

15           **MS. ELLIS:**  I believe it's L-A-T-R-E-I-L-L-E.

16           **THE COURT:**  Does that sound right?

17           **MR. ROBINSON:**  We will confirm, Your Honor.

18           **THE COURT:**  Okay.  Does anyone over there know the

19   spelling of her name?  Latreille?

20           **MR. ROBINSON:**  Bonnie Latreille.  Yes, as stated by

21   Ms. Ellis, that is correct.

22           **THE COURT:**  Great.

23       So all of you members of the class who are listening by

24   Zoom, is there an address just that goes with this so we can

25   tell them right now how to send in their questions?

PROCEEDINGS

1          **MR. ROBINSON:**  Bonnie.Latreille, as spelled by

2   Ms. Ellis, @ed.gov.

3          **THE COURT:**  So that's an e-mail address.  Say it

4   again.

5          **MR. ROBINSON:**  Oh, excuse me, Your Honor.  I'll just

6   give the full address here.

7          **THE COURT:**  All right.

8          **MR. ROBINSON:**  Bonnie.J -- oh, sorry.  No J.

9   Bonnie.Latreille@ed.gov.

10         **THE COURT:**  Okay.  Maybe the plaintiffs -- do you have

11  a website for this case?

12         **MS. ELLIS:**  We do, Your Honor.

13         **THE COURT:**  Then maybe you can put that up on your

14  website.  I recommend that the communication go both to you and

15  to Latreille so that you'll be -- have at least a copy of it.

16      And if they are -- have a question about the servicer,

17  does that also go to Latreille or does that go somewhere else?

18      What's the best way for questions for the servicer?

19         **MR. ROBINSON:**  Borrowers are free to contact the

20  servicers; but I think if they have a question for the

21  Department of Education about the servicer, they should,

22  likewise, be addressed to Ms. Latreille.

23         **THE COURT:**  I think that's right.

24      Okay.  I have a question for Ms. Sweet.  Did you -- did

25  you get your discharge as well as a check?

1    **MS. SWEET:**  I finally did get a discharge in the last

2    month or so, but I have FFEL loans so no check for me.

3    **THE COURT:**  I didn't hear you.  You did get a check?

4    Yes or no?

5    **MS. SWEET:**  No.

6    **THE COURT:**  No check?

7    **MS. SWEET:**  I'm not due a refund, though.

8    **THE COURT:**  Oh, you're not.  Okay.

9    All right.  Did you have -- how about your credit rating?

10   Is it fixed?

11   **MS. SWEET:**  They did fix it on my credit report, yes.

12   It has been --

13   **THE COURT:**  All right.  So progress.

14   **MS. SWEET:**  Yeah, a little.

15   I mean -- but I have to admit, you know, I feel that the

16   borrowers are kind of getting lost in all of this.  And I

17   appreciate you commenting about that because it seems very cold

18   from the side of the Department of Ed -- you know -- that these

19   people are still -- their lives are being held up.

20   This isn't just a discharge to them.  It's still home

21   loans.  It's still car loans.  It's still renting apartments.

22   And these are things that these people cannot do yet because of

23   this sort of train-wreck mismanagement.

24   **THE COURT:**  I understand.  And I remember the earlier

25   hearings, and I was -- it was eye opening to me to see how many

 1   people have basically put their lives and careers on hold until

 2   they can figure out how to deal with the debt that they have.

 3        So thank you.

 4             **MS. SWEET:**   Thank you.

 5             **THE COURT:**   I'm at the end.   Anything more you want to

 6   bring up?

 7             **MS. ELLIS:**   No, Your Honor.

 8        I would just hope and expect that the Department provides

 9   the appropriate resources to Ms. Latreille to handle the

10   questions that I expect will be coming in significant numbers.

11             **THE COURT:**   Yes, they will.

12        Thank you to the servicers for coming today.   I hope -- I

13   ask you to please come back next time too and attend the

14   meetings at the DOE so we can push forward and get this done.

15   This is a -- this is not easy but it is doable, and it will

16   show the world that the government can solve a problem.

17        All right.   I don't know whether I should ask you-all to

18   do the form of order, or will that just devolve into a dispute?

19             **MS. ELLIS:**   Your Honor laid out very specific

20   guidelines, so I'm confident we can --

21             **THE COURT:**   All right.   I'm not going to ask you to do

22   an order.   I think it's clear what I've asked you to do.

23        So okay.   Thank you.

24             **MR. ROBINSON:**   Thank you, Your Honor.

25             **MS. ELLIS:**   Thank you, Your Honor.

PROCEEDINGS

```
1              THE CLERK:  Court is adjourned.

2                  (Proceedings adjourned at 9:02 a.m.)

3                          ---o0o---

4

5                  CERTIFICATE OF REPORTER

6         I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9    DATE:   Monday, May 6, 2024

10

11

12

13

14    _____
      Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
15           Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25
```