Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

THERESA SWEET, on behalf of      )
themselves and all others        )
similarly situated, et al.,      )
                                 )
            Plaintiffs,           )
                                 )
  VS.                            )   NO. C 19-03674-WHA
                                 )
MIGUEL CARDONA, Secretary of     )
the United States Department of )
Education, et al.,               )
                                 )
            Defendants.           )
_____ )

                        San Francisco, California
                        Thursday, June 13, 2024

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        PROJECT ON PREDATORY STUDENT LENDING
                        769 Centre Street - Suite 166
                        Jamaica Plain, Massachusetts 02130
                  BY:   **REBECCA C. ELLIS, ATTORNEY AT LAW**
                        **REBECCA C. EISENBREY, ATTORNEY AT LAW**

For Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                        Civil Div. - Federal Programs Branch
                        450 Golden Gate Ave. - Room 7-5354
                        San Francisco, California  94102
                  BY:   **STUART J. ROBINSON, ATTORNEY AT LAW**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    **Also Present:**       Theresa Sweet
                             Richard Cordray
3                            John Bailey
                             Bonnie Latreille
4                            Lukas Sosnicki
                             Jonathan Sandler

<u>**Thursday - June 13, 2024**</u>                                **7:58 a.m.**

P R O C E E D I N G S

---o0o---

**THE CLERK:**  All rise.  Court is now in session.  The
Honorable William Alsup is presiding.

**THE COURT:**  Good morning.  Good morning.  Welcome.

Be seated, please.

**THE CLERK:**  Calling Civil Action 19-3674, Sweet, et
al. versus Cardona, et al.

Counsel, please approach the podium and state your
appearance for the record, beginning with counsel for
plaintiffs.

**MS. ELLIS:**  Good morning, Your Honor.  Rebecca Ellis
from the Project on Predatory Student Lending for the
plaintiffs.  With me is my colleague Rebecca Eisenbray, and
lead plaintiff Theresa Sweet.

**THE COURT:**  Welcome.  And?

**MR. ROBINSON:**  Good morning, Your Honor.  Stuart
Robinson from the Department of Justice on behalf of
defendants.  With me today are John Bailey, from the Office of
General Counsel of the Department of Education; Rich Cordray,
the chief operating officer of Federal Student Aid; and Bonnie
Latreille, the ombudsman for Federal Student Aid.

**THE COURT:**  Welcome to all of you, too.

**MR. ROBINSON:**  And, Your Honor, I will note that

PROCEEDINGS

1  counsel for servicers are here as well.

2          **THE COURT:**  Who are they?

3                       (Hands raised.)

4          **THE COURT:**  Okay.  Thank you all for coming.

5          Last time -- we've been having these -- I want to

6  welcome the people on -- is it Zoom?

7          **THE CLERK:**  Yes, Your Honor.

8          **THE COURT:**  How many do we have?

9          **THE CLERK:**  Currently, we have 434 and counting.

10         **THE COURT:**  434 class members, presumably, on the

11 radio.

12         Okay.  Last time we -- the Government said that it

13 would be able to comply with the settlement with a new

14 schedule, and I went along with that.  I also ordered you to do

15 some other things to keep this on track.

16         So let's hear, first, from the plaintiff to make sure

17 things are on track.

18         Please, go ahead.

19         **MS. ELLIS:**  Thank you, Your Honor.

20         Over the last three weeks, since our previous hearing,

21 the parties have been engaged in productive discussions about

22 how the Department can comply with the May 24th order and about

23 the delivery of settlement relief, more generally.

24         We do have updates on three major topic areas, I would

25 say, today.  One is the recently-passed May 31st, deadline; one

**PROCEEDINGS**

1  is the upcoming July 31st, deadline; and one is the ombudsman

2  complaint process.

3        So regarding the May 31st deadline, we can't say today

4  we're entirely confident that the Department met it, but we're

5  not going to be seeking contempt today.  We are in discussion

6  with them about the data validation processes.

7        To be specific, what happened was the Department was

8  supposed to complete full settlement relief for an additional

9  5,500 class members by May 31st.  They represented to us they

10  had done that and they sent us a list of class members who they

11  say had received complete relief.  We e-mailed all of the class

12  members on that list to confirm, and within 24 hours we had

13  received over 200 responses from people who said they had not

14  actually received complete relief.  We have passed those names

15  on, and the nature of those complaints on, to the Department;

16  they're looking into it.

17        But essentially, even if some of those people are --

18  do turn out to have gotten their full relief or the full relief

19  is in process -- we know there can be lags in credit

20  reporting -- but the issue to us is that something does not

21  seem to be right with the data validation process.

22        The Department tells us that they've done random

23  samples, they've done some deep dives, they don't see errors;

24  but the real world results here speak for themselves.

25  You know, if a class members is saying "My loans haven't been

**PROCEEDINGS**

1  discharged," then that means something is going wrong in the

2  process that's showing the Department -- that's making them

3  think the loans have been discharged.

4      **THE COURT:**  Okay.  Let's take one example or template,

5  hypothetical case.

6      What would be the first step to effect relief to these

7  5,500?

8      **MS. ELLIS:**  The first step would be discharging the

9  relevant loan debt.

10     **THE COURT:**  And how does that occur?

11     **MS. ELLIS:**  Well, it -- in the case of these 5,500,

12  our understanding is that those are people with only -- or only

13  relevant loan debt or relevant loan debt that has not been

14  consolidated with debt that's outside of the settlement.  We'll

15  talk about those people second.

16     **THE COURT:**  So the nonconsolidated, but how -- let me

17  just give you the answer that might be true that the Department

18  of Education would send authority and instructions to the

19  servicer to discharge the debt and put it on their records as

20  discharged.

21     I'm making this up.  I don't remember how it's

22  supposed to go.

23     Tell me how it's supposed to go.

24     **MS. ELLIS:**  That's correct, Your Honor.  The

25  Department sends the names of the class members and the

**PROCEEDINGS**

1   relevant loans to the servicers, instructs them to discharge

2   the debt.  The servicers, once they've done that, are supposed

3   to update the Department's student loan database systems --

4   which is called NSLDS -- to indicate that now the balance is

5   zero, and there should be a code -- it's called the BD01

6   code -- that shows that the debt was discharged to pursuant to

7   borrower defense.

8            THE COURT:  But as you describe it, there would be no

9   e-mail to the borrower.

10           MS. ELLIS:  That's correct, Your Honor.

11           THE COURT:  So how is the borrower supposed to know

12  one way or the other whether they've been discharged?

13           MS. ELLIS:  The borrower has to look up in their -- in

14  their online accounts.  So they have -- the borrower has an FSA

15  account, and also usually an online account with their

16  servicer.  And so they look at those sources to see, has this

17  balance gone to zero.

18           THE COURT:  Okay.  So of those 200 that wrote you back

19  and said -- did they actually go online and look at their

20  account and see if it was discharged?

21           MS. ELLIS:  Yes.  Not all.

22           Some of them -- a portion of them said "I haven't

23  received my discharge."  Some had received a discharge but not

24  a refund.  And some had received a discharge, potentially a

25  refund, but the loan is still showing up on their credit

PROCEEDINGS

1  report.  So there were reports of each of the three --

2       THE COURT:  Well, a credit report is a different

3  thing --

4       MS. ELLIS:  Yes.

5       THE COURT:  So on the -- but have they been -- have

6  the students been going to the servicer's online account to see

7  if it shows discharge?

8       MS. ELLIS:  Yes, that's our understanding, Your Honor.

9       THE COURT:  All right.  And you're telling me that

10  there are 200, or at least a large number, that say it's not

11  discharged.

12       MS. ELLIS:  Yes.

13       THE COURT:  Let's hold that thought for a second.

14       Who can speak to this from the Government side?

15       What's your view of this?

16       MR. ROBINSON:  Well, to begin with, Your Honor, I want

17  to make clear that the Department sent over to the plaintiffs a

18  list of over 5,900 borrowers for whom they believe settlement

19  relief had been effectuated by May 31; and the Court's order

20  required 5,500.

21       As the plaintiffs' counsel indicated, they sent us a

22  list of about 300 borrowers who said that they did not receive

23  full settlement relief.

24       The Department of Education has done a pull of the

25  data and has been able to match 297 of those 300.  Their

1   initial conclusion is that substantial compliance or compliance

2   has been achieved with the May 31 deadline.  They want to look

3   into some of the loans with greater detail, but even if there

4   were errors with some of those discharges or refunds, or other

5   aspects of relief -- and I don't think we can say for sure that

6   the process was perfect -- but they would still be in

7   compliance with the Court's order.

8          The validation process that the Department has set up

9   is a robust one.  It includes three steps.  The first is, of

10  course, confirmation from the servicer that steps have been

11  taken.

12         The second is a check against the Department's own

13  records, including in their NSLDS -- the database system

14  reflecting loan balances -- and checking against the financial

15  management system that can help identify, you know, whether

16  refunds have been paid.

17         And the third step is a sampling of the population of

18  loan files that would allow a deeper dive into each one of

19  those aspects.

20         I would also note that the ombudsman process does

21  provide an additional backup for validation and verification.

22         So at this point, the Department remains confident

23  that it is not in violation of Court's May 31 deadline.

24         **THE COURT:**  Well, how do you reconcile the information

25  that -- from counsel that 200 said they checked with the

1   servicer and they had not been discharged?

2       **MR. ROBINSON:**  I'm -- I did not understand the number

3   to be 200 who say there were no discharges.  But some of those

4   may be, for example, because of -- well, Your Honor, I can't

5   actually -- I can't -- I don't feel comfortable hypothesizing

6   or speculating.

7       The Department is looking into those complaints.

8   There are some that they want to do a more extensive analysis

9   of, and we will get back to the plaintiffs and the Court if we

10  find anything that casts doubt on the Department's conclusion

11  that compliance has been achieved.

12      **THE COURT:**  It would help me if you gave me a specific

13  example or two, like, let's take two or three.  Well, I have

14  the servicers' lawyers here.  I'll call them forward, put them

15  on the hot seat, maybe under oath, and find out what happened.

16      **MS. ELLIS:**  Sure.  We can pull up a couple of

17  borrowers' name.

18      **THE COURT:**  Give me a couple of names or -- and who

19  the servicer was so that they could be held accountable right

20  now.

21      **MS. ELLIS:**  Okay.

22      **THE COURT:**  Do you have it?

23      **MS. ELLIS:**  It's on our computers.  She's getting it.

24      In the meantime, we can talk about the July 31st

25  deadline, if it pleases the Court.

1          **THE COURT:**  Sure.  Go ahead.

2          **MS. ELLIS:**  So our understanding, at this point, is

3   the Department is not on track to meet the July 31st deadline.

4   And that's largely because the Department's plan to meet that

5   deadline was predicated on its using the discharge procedure or

6   the processing procedure that we discussed at the last hearing,

7   that the Court found was not in compliance with the settlement.

8   That was the procedure where they were taking all past payments

9   on what we have been calling the mixed consolidation loans, and

10  applying those payments to non-settlement balances instead of

11  calculating refunds.

12         And so we -- we know that -- or the Department and the

13  servicers have confirmed that they're no longer using that

14  process, but the issue was that they did not have a plan B to

15  pivot to to process those accounts in compliance with the

16  Court's order.

17         So we've been discussing extensively in the last

18  three weeks how the Department can comply with that order while

19  still moving as quickly as possible.

20         We, as plaintiffs' counsel, have learned a lot more

21  through those discussions about how the Department's and the

22  servicers' systems work, how they're actually going through

23  this process of processing class member relief.  And what we've

24  learned, unfortunately, is that a lot of potential approaches

25  to relief calculation that might seem intuitively reasonable

1    are actually not administratively feasible for them.

2         The fact is, there's a lot of missing data.  Some of

3    it has been lost in account transfers between servicers over

4    the years.  Some of it was actually lost in doing this earlier

5    erroneous procedure.  Data was deleted or overwritten as

6    accounts were being erroneously processed.  And even the data

7    that does exist can be difficult to access or, even if you've

8    accessed it, difficult to sort of interpret.

9         So we have arrived at a framework that the parties

10   have agreed on for how we can move forward on effectuating

11   relief for mixed consolidation class members in a way that we

12   think will balance feasibility, speed, and ensuring that class

13   members receive what they're entitled to.

14        So the first -- the first step for these mixed

15   consolidation loans will be that the Department is going to

16   discharge the entire remaining balance, regardless of what

17   components went into that consolidation loan to begin with.

18   Given the data and time limitations, this is really the only

19   reliable way to ensure that all of the relevant loan debt is

20   actually discharged, and do that within a reasonable time.

21        The Department will then cut refund checks for all

22   amounts that class members had paid toward this current

23   consolidation loan that's been discharged.

24        The Department has represented to us that it can

25   complete those two steps by August 31st, and we are amenable to

1  requesting that the Court adjust the July 31st deadline by

2  four weeks out to August 31st, in order to accommodate this new

3  procedure.

4          **THE COURT:**  Well, 31 days, not four weeks.

5          **MS. ELLIS:**  Well, I was rounding.

6          **THE COURT:**  Is that all correct, Counsel?

7          **MR. ROBINSON:**  Yes, Your Honor.

8          If I can add some additional comments on that.

9          So as Ms. Ellis said, the Department's April proposal,

10  which the Court adopted, was based on estimates using the

11  Department's then-current process.  The May -- the Court's

12  May 24 order regarding refunds has certainly increased the

13  complexity of that process, particularly with respect to

14  adjustments that have already been made on what we refer to as

15  mixed consolidation loans; that is, loans that have underlying

16  Sweet-eligible loans, and Sweet-ineligible loans -- or not

17  Exhibit C loans.

18          Because of that situation, the Department can no

19  longer meet the July 31 deadline which requires full settlement

20  relief for an additional 30,000 borrowers.  And the Department,

21  at this point, is unable to give a reliable estimate about when

22  it could meet that deadline or come into compliance with the

23  May 24 order for an additional 30,000.

24          As Ms. Ellis said, the Department has been conferring

25  on an alternative that would shift the work primarily to the

1   current consolidation loan servicer, which would greatly

2   simplify and shorten the process of effectuating full

3   settlement relief and greater finality for the Department.

4          The Department has analyzed the -- or at least as an

5   initial matter, has done a preliminary analysis of the

6   ineligible debt portfolio and has determined that the face

7   value would likely exceed $500 million.  But much of that

8   ineligible debt is from Exhibit C schools where no timely

9   borrower defense application was submitted.  That debt is

10  otherwise on track to be forgiven, for example, through another

11  forgiveness program, or would be prohibitively difficult to

12  collect in full.

13         It would also be partially offset by freeing up

14  resources from the Federal Student Aid Office to be used for

15  other programs that -- that bring in revenue.

16         **THE COURT:**  Are you going to meet the August 31 date

17  or not for these 30,000?

18         **MR. ROBINSON:**  I think the goal, Your Honor, would be

19  to meet it for all borrowers with mixed consolidation loans by

20  August 31.

21         **THE COURT:**  How many is that?

22         **MR. ROBINSON:**  The current estimate, I believe, is

23  about 28,000, give or take, Your Honor.

24         **THE COURT:**  Is that your understanding?

25         **MS. ELLIS:**  Yes, that's our understanding.

**PROCEEDINGS**

1          And I think the other 2,000 could be accounted for by

2   borrowers not with mixed consolidation loans who are still on

3   track to get relief, such as commercial FFEL borrowers.

4          **THE COURT:**  I'm going to accept your new August 31

5   date.

6          All right.  What's next?

7          **MR. ROBINSON:**  Can I just add one other point on that,

8   Your Honor?

9          We just want to convey that the alternative being

10  proposed is not provided for under the settlement, but -- and

11  would -- and would also require revision to the July 31

12  deadline, so we do appreciate the Court's guidance in

13  determining how to implement the settlement.

14         **THE COURT:**  I don't understand what you're asking me.

15         Why can't you do what you just outlined?

16         **MR. ROBINSON:**  We can, but we would -- we think

17  the Court -- we think it should be approved by the Court, that

18  proposal.

19         **THE COURT:**  I approve it.  I'm approving it.

20         But it's going to come to the same place that you were

21  supposed to be earlier to achieve the result of the settlement;

22  right?

23         **MS. ELLIS:**  Yes, Your Honor.

24         **THE COURT:**  That's just by a different path.  So I

25  approve the different path.

1          Next.  What's next?

2          **MS. ELLIS:**  Thank you, Your Honor.

3          There is one other aspect of this framework that we've

4     agreed to which is that we're aware that some class members

5     likely paid a significant amount on their loan before the

6     current consolidation, and so we intend to set up an

7     administrative process whereby those class members can request

8     an accounting of their past payments in order to get whatever

9     refund was -- is not accounted for by the refunds on the

10    current consolidation loan.

11         And we're still talking about the details and timeline

12    for those process -- for that process.  It's likely that would

13    extend beyond August 31st, but if the Department does complete

14    the discharges and refunds on the current loan by August 31st,

15    we think that would constitute substantial compliance and the

16    process of calculating the back refunds, which can be

17    complicated and labor intensive, would have some sort of tail

18    period beyond August 31st to work that out.

19         **THE COURT:**  Well, the August -- last time you were

20    here, there was a different August 31 date for 12,000.

21         Now, let me just ask this:  This new August 31 date

22    for 30,000, maybe 28,000-plus-two, how does that relate to the

23    12,000?

24         **MS. ELLIS:**  Your Honor, I have to say I'm not entirely

25    clear on the total portfolio of remaining un- -- remaining

1  loans that have not received full settlement relief.  So if the

2  Department, I think, that's a question for them on who are

3  those other 12,000 and can they still get relief by

4  August 31st?

5          **THE COURT:**  Go ahead.

6          **MR. ROBINSON:**  The Department believes that it can

7  effectuate relief for all remaining class members, or

8  substantially all by that August 31 deadline.

9          **THE COURT:**  Okay.  All right.  I -- this thing you're

10  bringing up now, it sounds like a new -- sounds like something

11  we did not discuss last time.

12          **MS. ELLIS:**  Well, Your Honor, the -- the idea here is

13  that what we -- what we understood originally was being done

14  with consolidation loans is that the Department was sort of

15  starting at the beginning with the original loan, moving

16  forward through each phase, each consolidation, and calculating

17  discharges and refunds based on what had been paid on each

18  stage in the life of the loan.

19          It turned out that wasn't it.  They were discharging

20  from the beginning and then applying all the payments to

21  remaining ineligible debt.

22          So what we're proposing here essentially, in the

23  interest of time and efficiency, is instead of going from back

24  to front, we go from front to back.  So we start with the most

25  recent loan; that's what gets discharged; that's what gets an

1  immediate refund.  And then, the part of the process that was

2  sort of -- that was done incorrectly the first time for some

3  people, that hasn't been done yet for others, that we know is

4  more time consuming, more complicated, we put that second.

5          So it's -- it is different but only sort of in the

6  order of operations.  And we think that the order of operations

7  we're talking about today actually makes more sense.

8          **THE COURT:**  I'm okay with what you're saying.

9          Do I need -- I don't need to rule on anything.  You're

10 just informing me; right?

11         **MS. ELLIS:**  In our view, no, Your Honor.  We think the

12 Department has authority to do all of this.

13         **THE COURT:**  Okay.  I'm -- it sounds like you're both

14 working hard to solve the problem.  And you're -- you need some

15 flexibility in the sequence in which you get that all done.

16 Good.

17         All right.  What else do you want to report?

18         **MS. ELLIS:**  Thank you, Your Honor.

19         I'll just touch briefly on the ombudsman complaint

20 process.  We have, as you ordered, looked over the shoulder of

21 the ombudsman's office to better understand how that process is

22 working.

23         **THE COURT:**  Yes.

24         **MS. ELLIS:**  I think it -- it is progressing.  I think

25 one major obstacle is cooperation from the servicers.  We heard

1    last week, and again today, that some servicers are simply not

2    responding to the ombudsman's inquiries in a timely manner.

3    Mohela, in particular, has not responded to over 80 percent.

4           **THE COURT:**  Who?

5           **MS. ELLIS:**  Mohela.

6           **THE COURT:**  Are they represented here?

7           Why don't you come up here for a minute.

8           Okay.  Coming forward now is a lawyer.

9           All right.  Please state your name and who are you

10   represent.

11          **MR. SOSNICKI:**  Good morning, Your Honor.  Lukas

12   Sosnicki, Thompson Coburn, representing Mohela.

13          **THE COURT:**  And you represent who?

14          **MR. SOSNICKI:**  Mohela, Your Honor.

15          **THE COURT:**  All right.  Tell us the grievance, and

16   then I want to give him a chance to respond.

17          **MS. ELLIS:**  The ombudsman's office, in order to

18   resolve many of the complaints, has to inquire to the servicers

19   for data, for information, and also sometimes request for the

20   servicers to execute certain actions on accounts.

21          The ombudsman's office, to date, has sent over a

22   hundred requests to Mohela, of which over 80 have not been

23   responded to yet.  And on average, it's taken them 13 days to

24   respond to the ones that they have answered.

25          **THE COURT:**  All right.  What do you say to that?

 1        **MR. SOSNICKI:**  Your Honor, my understanding of the

 2   issue was with how the complaints were labeled when Mohela

 3   received them.  That said, the problem has been resolved as of

 4   yesterday, Your Honor.

 5        As counsel indicated, 20 percent have been responded

 6   to.  Mohela has dedicated a team to get through these more

 7   quickly, and can commit to its current responding to its

 8   current pool which, as counsel indicated -- I believe the

 9   number we have is approximately 90, by the next meeting on the

10   27th.

11        So Mohela is working very hard to get through these.

12   The intake problem has been resolved and will be -- the

13   complaints will be addressed, Your Honor.

14        **THE COURT:**  But how soon?

15        **MR. SOSNICKI:**  Your Honor, my understanding is they

16   can commit to getting through all of the current complaints by

17   the next meeting, which is the 27th, two weeks from today.

18        **THE COURT:**  Okay.  Is that okay with you?

19        **MS. ELLIS:**  We would like it to be faster, Your Honor.

20        **THE COURT:**  You mean, getting that information by one

21   week, in one week, that's -- you're asking for faster than

22   that?

23        **MS. ELLIS:**  I believe counsel said two weeks, Your

24   Honor.

25        **THE COURT:**  Did you say two or one?

PROCEEDINGS

1          **MR. SOSNICKI:**  I said two weeks, Your Honor, by the

2     27th.

3          **THE COURT:**  Can you do it a few days sooner so they

4     can have the answers before the meeting?

5          **MR. SOSNICKI:**  Yes, Your Honor.  I will take that back

6     to my client, and we'll do everything we can.

7          **THE COURT:**  The 23rd, and whatever the 23rd falls on,

8     that's the day.

9          All right.  Any other grievances?  With this?

10          **MS. ELLIS:**  Thank you, Your Honor.

11          I -- my other grievance, as you put it, would be with

12     NelNet.  They've also been taking, on average, 13 days to

13     respond to complaints, which we think is not conducive --

14          **THE COURT:**  All right.  Let's have that lawyer come

15     forward.  Okay.

16          What's your name and who do you represent?

17          **MR. SANDLER:**  Good morning, Your Honor.  Jonathan

18     Sandler.  I represent NelNet.

19          **THE COURT:**  Thank you.

20          Go ahead.  What's the grievance?

21          **MS. ELLIS:**  The grievance, Your Honor, is NelNet,

22     until recently, had not responded to over 60 percent of the

23     communications from the ombudsman's office.  We do understand

24     they've resolved some of those since our meeting last week;

25     but, on average, they're taking nearly two weeks to respond to

1  inquiries, and in many cases their responses lack specificity.

2       **THE COURT:**  Okay.  What do you say in response?

3       **MR. SANDLER:**  Thank you, Your Honor.

4       Number 1, we're addressing it.

5       Number 2 --

6       **THE COURT:**  That's like "the check is in the mail."

7       **MR. SANDLER:**  I appreciate that.

8       **THE COURT:**  That's the present participle tense.  The

9  check is in the mail.

10       **MR. SANDLER:**  I appreciate that, Your Honor.

11       A couple of pieces.  Number 1, there's been responses

12  to everything.  I do understand, and this was part of the meet

13  and confer process that took place approximately two weeks ago

14  when NelNet was first made aware that its responses were

15  inadequate to both plaintiffs' counsel and to the ombudsman.

16       Since that time, NelNet has taken steps to make sure

17  that it is providing more specific responses, and is addressing

18  these complaints as we go.  Just this week, Your Honor, we were

19  able to turn around a complaint for a borrower in 24 hours that

20  the ombudsman identified.  So the process is improving.  And

21  I'm also confident that we will be able to move through the

22  outstanding complaints by the 23rd, like the Court said.

23       **THE COURT:**  All right.  That's what I'm going to ask

24  you to do.

25       **MR. SANDLER:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  Great.  Okay.

2          Any other grievances?

3          **MS. ELLIS:**  Not with the servicers specifically, Your

4   Honor.

5          I would say also with respect to the ombudsman's

6   office, as we've discussed this framework for mixed

7   consolidation with the Department, we've agreed that it would

8   make sense to funnel the backward-looking refund determinations

9   through the ombudsman's office.  That being said, we are

10  looking for assurance from the Department that the ombudsman's

11  office will be provided with sufficient staff and resources.

12         This is a complicated and labor-intensive process, and

13  also that the ombudsman's office will be specifically vested

14  with the authority to determine appropriate refund amounts and

15  then execute the requests for those refund amounts to go

16  through to the Treasury Department for checks to be issued.

17         **THE COURT:**  Well, have you reached an agreement with

18  the Department on that, or is that what you're just discussing?

19         **MS. ELLIS:**  Well, Your Honor, I think the Department

20  is in agreement on vesting the ombudsman's office with that

21  authority.  I think in terms of staffing and resources, we have

22  not reached an agreement on the exact steps that the Department

23  will take to ensure that there are enough people, enough hours,

24  to complete the process in a timely manner.

25         **THE COURT:**  All right.  What are you asking me to do?

 1          **MS. ELLIS:**  Your Honor, we're not asking you to sort

 2  of micromanage FSA's budget here --

 3          **THE COURT:**  So you're just informing me.

 4          **MS. ELLIS:**  We're informing you, yes.

 5          **THE COURT:**  All right.  Well, I'm informed.  Keep

 6  talking with them.  I'm not going to order anything on this.

 7          **MS. ELLIS:**  Those are the updates we have today, Your

 8  Honor.

 9          **THE COURT:**  Did you find a specific example?

10          **MS. ELLIS:**  Okay.  With NelNet, we have a borrower

11  named Virginia Reese -- is that R-E-E -- R-E-E-S-E, who reports

12  not having received her discharge.

13          **THE COURT:**  Okay.  Who -- Mr. NelNet, come back up

14  here, please.

15          And -- okay.  I want you to, again, state your name

16  and your client.

17          **MR. SANDLER:**  Jonathan Sandler for NelNet, Your Honor.

18          **THE COURT:**  Thank you.

19          Okay.  State the grievance.  Let's give him a chance

20  to respond.

21          **MS. ELLIS:**  Virginia, like the state, Reese,

22  R-E-E-S-E.  The Department believed that Ms. Reese had received

23  her full settlement relief.  Ms. Reese reports that she's not

24  seeing the discharge on her account.

25          **THE COURT:**  All right.  Are you able to respond now or

1    do you need -- how soon can you give me an answer on this?

2        **MR. SANDLER:**  Days would be my -- my guess, Your

3    Honor, because I need a little bit -- we're going to need more

4    information, for example, Social Security number, ID, in order

5    to be able to process --

6        **THE COURT:**  I don't want to do that in the public --

7    give me your -- social security, what else do you need?

8        **MR. SANDLER:**  If there's any kind of other

9    identifier -- probably an address.

10       **THE COURT:**  All right.  Offline you can give that

11   information.  And then, by Monday, you need to send a letter to

12   the government counsel -- you don't need to send it to me, but

13   explain what happened.

14       Now, if it turns out -- I want all the servicers to be

15   aware of this.  If it turns out that there are internal SNAFUs

16   at your operation, I'm going to let the lawyers bring -- take

17   depositions at your place to find out why you're not doing what

18   the Government is asking you to do.

19       So let's get our act together and discharge these

20   loans if the Government is asking you to do so.

21       All right.  What's your next grievance?

22       **MS. ELLIS:**  We do have another name, Your Honor, for a

23   borrower with Mohela whose account shows discharge pending, and

24   has not received a refund.  And we could, consistent with what

25   we just discussed, identify --

PROCEEDINGS

1          **THE COURT:**  Is that the same servicer?

2          **MS. ELLIS:**  No another servicer.

3          **THE COURT:**  Who is that servicer?

4          **MS. ELLIS:**  Mohela.

5          **THE COURT:**  Are they here today?

6          **MR. SOSNICKI:**  Lukas Sosnicki, Your Honor,

7  representing Mohela.

8          I would ask for the same information that

9  Mr. Sandler --

10          **THE COURT:**  All right.  We'll do that offline.  And

11  you -- by Monday, you've got to give -- send a letter saying

12  what the situation is.  It could be that counsel is incorrect.

13  It could be she is correct and there's a SNAFU.

14          **MR. SOSNICKI:**  Understood, Your Honor.  Thank you.

15          **THE COURT:**  All right.  Let's just leave it at those

16  two for now.

17          Thank you, Counsel.

18          **MR. SOSNICKI:**  Thank you.

19          **THE COURT:**  All right.  Is that it for today?

20          **MS. ELLIS:**  It is, Your Honor, from our perspective.

21          **THE COURT:**  How about from the Government?

22          **MR. ROBINSON:**  Nothing further from the Government,

23  Your Honor.

24          **THE COURT:**  All right.  So when is our next meeting?

25          **MR. ROBINSON:**  July 11th.

PROCEEDINGS

```
 1          THE CLERK:  July 11th, Your Honor.

 2          THE COURT:  Okay.  All right.  See, we'll do it on

 3  July 11th, and in between you have your bimonthly -- not

 4  bimonthly.

 5          MS. ELLIS:  Yes.  We have another in-person meeting in

 6  Washington, D.C. on June 27th.

 7          THE COURT:  Okay.  Good.  Thank you.

 8          All right.  Some progress is being made.

 9          Thanks to everybody on the telephone.  We are now

10  going to turn you off and go to the rest of the hearing.

11          (Proceedings adjourned at 8:36 a.m.)

12                      ---o0o---

13                 CERTIFICATE OF REPORTER

14          I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:   Friday, June 21, 2024

18

19

20

21

22  _____
        Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
23              Official Reporter, U.S. District Court

24

25
```