Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, et al.,              )
                                    )
            Plaintiffs,             )
                                    )
   VS.                              )      **NO. 3:19-CV-03674-WHA**
                                    )
MIGUEL CARDONA, et al.,             )
                                    )
            Defendants.             )
_____    )

                          San Francisco, California
                          Thursday, May 23, 2024

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    PROJECT ON PREDATORY STUDENT LENDING
                    769 Centre Street
                    Jamaica Plain, MA 02130
            BY:  **REBECCA C. EISENBREY**
                 **ATTORNEY AT LAW**

                    BAY AREA LEGAL AID
                    1735 Telegraph Avenue
                    Oakland, CA 94612
            BY:  **NOAH ZINNER**
                 **ATTORNEY AT LAW**

For Defendants:
                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division, Federal Programs Branch
                    450 Golden Gate Avenue, Suite 7-5395
                    San Francisco, CA 94102
            BY:  **STUART J. ROBINSON**
                 **ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE

**APPEARANCES (CONT.'D):**

For Defendants:

             U.S. DEPARTMENT OF JUSTICE
             Civil Division, Federal Programs Branch
             1100 L Street, Northwest
             Washington, DC 20005
     **BY:**  **BENJAMIN T. TAKEMOTO**
         **ATTORNEY AT LAW**

             U.S. DEPARTMENT OF EDUCATION
             Office of Legal Counsel
     **BY:**  **JOHN BAILEY**
         **ATTORNEY AT LAW**

ALSO PRESENT:    **JONATHAN SANDLER**
                  **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>Thursday - May 23, 2024</u>                    <u>7:59 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | THE COURT:  Good morning.  Please be seated. |
| 5 | THE COURTROOM DEPUTY:  Calling civil action 19-3674, |
| 6 | Sweet, et al. versus Cardona, et al.  Counsel, please approach |
| 7 | the podium and state your appearances for the record beginning |
| 8 | with counsel for plaintiffs. |
| 9 | MS. EISENBREY:  Rebecca Eisenbrey for the plaintiffs, |
| 10 | and my colleague Noah Zinner is here, and lead plaintiff |
| 11 | Theresa Sweet. |
| 12 | THE COURT:  All right.  Thank you. |
| 13 | And? |
| 14 | MR. ROBINSON:  Good morning, Your Honor.  Stuart |
| 15 | Robinson from the DOJ on behalf of the defendants.  With me at |
| 16 | counsel's table are Ben Takemoto from the Department of Justice |
| 17 | and John Bailey from the Department of Education. |
| 18 | THE COURT:  Thank you.  All right.  We are -- |
| 19 | MR. ROBINSON:  Your Honor, I'm sorry.  Counsel for |
| 20 | the servicer is here, as wells. |
| 21 | THE COURT:  Who is? |
| 22 | MR. ROBINSON:  Counsel for the servicers. |
| 23 | THE COURT:  Oh, excellent.  Thank you. |
| 24 | Your name, please? |
| 25 | MR. SANDLER:  Good morning, Your Honor.  Jonathan |

1    Sandler for Nelnet, one of the servicers.

2         **THE COURT:**  Thank you.

3         All right.  Let's -- just to recount the bidding a little

4    bit, we had a hearing, what, two weeks ago.  No, on April 24, a

5    month ago, and the problem was that the Department had fallen

6    pretty far behind on the deadlines for effecting relief to the

7    class.  So I accepted the updated schedule that the Department

8    said it would be able to meet, and we, then, are having these

9    hearings on a regular basis now so I can make sure you are on

10   schedule.

11        So who wants to go first?  Plaintiff, go first.

12        **MS. EISENBREY:**  Good morning, Your Honor.

13        As ordered, plaintiffs met with representatives from the

14   Department of Education, counsel from the Office of the General

15   Counsel and the Department of Justice and representatives from

16   the servicers in Washington, D.C., on May 8th.  At that

17   meeting, the plaintiffs asked many questions about how the

18   Department is tracking and validating relief data, most of

19   which the Department could not answer at that time.

20        We followed up with a letter that summarized what was

21   discussed and reiterated 18 specific questions about validation

22   of relief and status of relief and several requests.  We

23   received a response to that letter yesterday at 5:30 p.m.  It

24   did not include answers to all of our questions, but what it

25   did demonstrate is that there are still serious problems with

1   the validation of settlement relief.

2       We think one big problem that has happened here is that

3   soon after Your Honor granted final approval of this settlement

4   agreement, the Department issued a change request to the

5   servicers telling them that they would no longer be required to

6   report detailed information about borrower defense discharges,

7   about the discharges --

8           **THE COURT:**  About what?  I didn't hear that last

9   sentence.  Say it again, please.

10          **MS. EISENBREY:**  About borrow defense discharges.  So

11  about these very discharges.  Stated that they needed to

12  streamline the discharge process so that they could increase

13  their load processing volume.  But in so doing, they basically

14  gave up the ability to actually see whether the servicers were

15  doing what they were required to do by this Court.  This could

16  explain why they gave the inaccurate data in their quarterly

17  reports that they have admitted to giving.

18      They also failed to direct servicers how to deal with

19  consolidation loans.  So these are loans where an individual

20  borrower might have had several direct loans from one school,

21  direct loans and FFEL loans from another school and

22  consolidated them, whether to get out of discharge or to

23  qualify for a certain repayment program, any number of reasons.

24  We've heard that it's these consolidation loans that are

25  causing a lot of the problems now with relief, this unwinding

1    process.  But what we learned yesterday for the first time in

2    the letter that we received, again, at 5:30 p.m. Eastern, was

3    that the Department has instructed servicers to credit payments

4    made on eligible loans, loans that should be discharged and

5    refunds should be issued to loan balances that are not eligible

6    for settlement relief.  So that means that a borrower, who

7    should be receiving a refund under the settlement, is, without

8    having any say in the matter, having their refund credited to

9    other loans.  This violates the settlement, which says that

10   borrowers should get refunds of all payments made to the

11   Department, and it also harms class members who should have a

12   right to decide what to do with their money.

13       One of the declarants who wrote a declaration to the Court

14   in support of our enforcement motion has a mixed consolidation

15   loan.  Only part of that loan will be discharged and refunded

16   under the settlement.  She wrote that her home desperately

17   needs a new roof and a furnace, and she plans to use the refund

18   to make those improvements.  If the Department credits her

19   refund to her remaining loan balance, she can't make those

20   desperately needed changes.

21       This is also troubling for many class members who are

22   working towards public service loan forgiveness or other forms

23   of income-driven repayment who might have their loan balancing

24   forgiven and will never have to pay off those loans.  So their

25   refund is going towards a debt that they ultimately might not

1    even owe.

2        And third, the Department told us in this letter that they

3    have not implemented a system for verifying refund calculations

4    where refunds are going out.  They stated the Department does

5    not verify servicers' refund calculations for every loan.

6        As it comes to validation for total relief, it appears

7    that the Department is entirely relying on class members or

8    primarily relying on class members to identify issues with

9    their own relief and report it to Ms. Bonnie Latrell, the

10   ombudsman, who you ordered to respond to class members last

11   time at our last hearing.  But there's no evidence that the

12   ombudsman's office is actually equipped to fill this role.

13       We learned at our meeting in Washington that at that time

14   on May 8th, they had received over 2500 complaints from class

15   members, and at that time only 70 --

16       **THE COURT:**  Well, since when?  Over years and years,

17   or very recent?

18       **MS. EISENBREY:**  No, this was in the two weeks in

19   between --

20       **THE COURT:**  Two weeks?

21       **MS. EISENBREY:**  Yes.

22       **THE COURT:**  4500 (sic)?

23       **MS. EISENBREY:**  Yes.  And we haven't gotten a number

24   since then.  That was --

25       **THE COURT:**  By the way, Angie, are there any class

1  members on the telephone?

2            **THE COURTROOM DEPUTY:**  There are 278 members

3  listening right now.

4            **THE COURT:**  Okay.  I just wanted that to be on the

5  record.

6       Okay.  Go ahead.  Continue.

7            **MS. EISENBREY:**  Yes.  So as of that meeting on May

8  8th, when we had the 2500 complaints, only 74 class members

9  have had their cases fully reviewed by the ombudsman's office,

10  and only eight had had their cases resolved.

11       We believe that this is in part because, as we learned in

12  a letter yesterday, the Department is utilizing existing

13  capabilities within the ombud's office, meaning they have not

14  provided more resources.  The ombudsman's office is the FSA

15  ombudsman's office.  They were already receiving complaints

16  from class members and from other student loan borrowers who

17  have issues with their student loans.  They are now receiving

18  many more complaints.

19       We also have not received any details about those

20  complaints.  We did not get even a summary of the over 2500

21  complaints that have come in, and no one from the ombudsman's

22  office or from FSA is here to tell us or the Court about this.

23       It's also not clear that the ombud's office is actually

24  receiving cooperation from the servicers.  One thing we did get

25  was a status update for each of those nine declarants.  Of

 1    those nine, the ombudsman was only able to verify the relief

 2    status for two.  For the other seven, the letter from the

 3    Department stated that requests for information remain

 4    outstanding with the servicers.

 5         We do have copies of the letter that we sent the

 6    Department and their response.

 7              THE COURT:  Let me ask you a question.  Go back about

 8    two paragraphs.  You said that the refunds were being applied

 9    against noneligible loans.

10              MS. EISENBREY:  Yes.

11              THE COURT:  But I'm trying to figure out the

12    mechanics of that.  I was under the impression that the refunds

13    were checks cut by the Treasury.

14              MS. EISENBREY:  Yes, that is --

15              THE COURT:  So how could it be that the Treasury is

16    sending those checks to the servicers?

17              MS. EISENBREY:  It's our understanding that the

18    servicer is supposed to send the request for a check once they

19    determine the refund amount, and what they're doing is rather

20    than sending a request for a check, within their own system

21    they are just applying what would be a refund to the remaining

22    balance.

23         So this is happening within --

24              THE COURT:  There's not going to be a check in that

25    case.

1          **MS. EISENBREY:**  Exactly.

2          **THE COURT:**  Now, who authorized that?

3          **MS. EISENBREY:**  It is our understanding that this is

4     an instruction given by the Department to the servicers.  This

5     is something that we knew was happening, not with consolidation

6     loans, but with people who just had loans from different

7     schools.  We brought it to the attention of the Department last

8     year, and we received assurances that effective March 10th the

9     problem had been corrected, and anyone who had had their

10    balances credited in this way would, in fact, receive a refund.

11         This letter we received yesterday is the first we'd heard

12    from the Department that this was still happening and that this

13    was happening apparently as a matter of policy.

14         **THE COURT:**  Well, let's take a hypothetical example.

15         Let's say that a student member of the class has a $1000

16    loan from an Exhibit C school that should be canceled and -- or

17    balance remain -- has paid a thousand dollars and owes a

18    thousand dollars more on that loan.  And then there is another

19    school that is not on Exhibit C and should not be canceled, and

20    those have been consolidated.

21         So what I think you're telling me is that, yes, the as yet

22    unpaid part is canceled, but the refund part is being applied

23    to bring down the balance on the ineligible school.

24         **MS. EISENBREY:**  Exactly.

25         **THE COURT:**  Is that true?

1          **MS. EISENBREY:**  Yes.

2          **THE COURT:**  Well, this is a new problem I was unaware

3    of.

4          **MS. EISENBREY:**  So were we.

5          **THE COURT:**  And I'm going to hear from the other

6    side, but let me ask the more -- the original question:  Are we

7    on track for May 31 for full settlement relief for 5500

8    additional class members?

9          **MS. EISENBREY:**  Given these new issues, plaintiffs

10   cannot say with any confidence that we are at least when it

11   comes to refunds.  We have no evidence that the refund amounts

12   are being calculated properly, applied properly, or sent out

13   properly.

14         **THE COURT:**  All right.  Let me hear from the

15   government, Mr. Robinson.

16         **MR. ROBINSON:**  Thank you, Your Honor.  If I can

17   address the question about refunds first.

18      So just to be clear, if there is a direct loan taken out

19   on an Exhibit C school and there's no consolidation, all

20   payments made on that loan will be and have been refunded for

21   any exhibit C borrowers who are entitled to full settlement

22   relief.  It's a more complicated question when there are

23   consolidation loans with a mix of eligible and ineligible

24   loans.

25      For consolidation loans that include Exhibit C schools,

1    prior to consolidation any payments made on the loan are

2    refunded.  At the point of consolidation, there is a mix, an

3    entanglement of ineligible and eligible debt.  And as the

4    original Cordray declaration explained, part of the process

5    that the servicers are undertaking is disentangling those

6    loans, recalculating balance and interest and fees, discharging

7    the Exhibit C loan and updating credit reporting.

8        For the question of the refund, the servicers have been

9    crediting the payment towards, first, the ineligible loan.  And

10   the reason for that is to minimize the possibility that if

11   applied to the eligible loan first, the ineligible debt or

12   balance and interest would be increased.  That's what was

13   explained to the plaintiffs in the letter sent yesterday, and

14   the letter also stated that if particular borrowers wanted to

15   discuss with the Department a different arrangement -- in other

16   words, to have a payment applied in the disentangled scenario

17   to the eligible loan first, which again, may cause an increase

18   in the balance and interest for the ineligible debt, then the

19   Department is willing to have those discussions.

20       **THE COURT:**  Well, wait.  How could it -- how could it

21   increase the interest in the -- on the -- and the balance on

22   the ineligible?  Give me an example that would illustrate that

23   problem.

24       **MR. ROBINSON:**  So your question -- excuse me.  Your

25   example was a $1000 payment on a consolidation loan that

1  included a eligible Exhibit C school and an ineligible school.

2  Is that right, Your Honor?

3      **THE COURT:**  Well, let's just say that -- yes, that's

4  what I said, that there were a combination consolidated loan

5  merged a eligible, on which a thousand dollars had been paid

6  and a thousand dollars was yet to be paid.  And I didn't give

7  any numbers for the ineligible, but what you're telling me is

8  that if there is a refund check paid directly to the student on

9  the eligible, that somehow the ineligible part gets ballooned

10  up.  I don't see how that could be.

11      **MR. ROBINSON:**  It's possible, Your Honor.  It's not

12  guaranteed, but it's possible.

13      And that's because the balance -- again, imagine the loans

14  are disentangled, and so the payment does not -- is not applied

15  to the ineligible debt.  It's counted towards the eligible debt

16  and then refunded on the eligible debt, meaning there is no

17  history of the payment for the ineligible debt.  And if there's

18  no payment, that means the balance would likely have to be

19  adjusted.

20      **THE COURT:**  Well, wouldn't the student continue to

21  make payments on the ineligible part?

22      **MR. ROBINSON:**  That's certainly possible.  But in

23  terms of the loan history, it would not reflect that $1000

24  payment on the ineligible debt, which would mean that even if

25  subsequent payments had been made, that payment would not have

1  been reflected.

2      And again, Your Honor, what the Department said yesterday

3  in its letter was that if there are particular borrowers who

4  wanted a different arrangement, who want to have the payment

5  applied to eligible, thereby receiving a refund, understanding

6  that it may increase the balance or interest on the ineligible,

7  then the Department would like to have those discussions with

8  the plaintiffs about those particular circumstances.

9          THE COURT:  Well, are you committing to make -- give

10  them the check or just to talk?  Sounds like you're just

11  committing to a discussion.  That's no good.

12      I mean, what did the original agreement say?  What did our

13  original settlement agreement say about this situation?

14          MR. ROBINSON:  It's silent on this situation, Your

15  Honor.

16      And that was one of the issues that Your Honor identified

17  earlier was that the settlement agreement did not fully

18  contemplate, and the Department acknowledges this, the

19  complexities involved in these consolidated loan scenarios,

20  especially when there are a mix of eligible and ineligible

21  debt.

22          THE COURT:  How many are in this category?

23          MR. ROBINSON:  Of borrowers with consolidation loans?

24          THE COURT:  Yes, but -- and so far approximately how

25  many of them have had their refund redirected to -- as a

```
1   payment against the ineligible?

2           MR. ROBINSON:  I don't have that specific

3   information, Your Honor, but --

4           THE COURT:  Is it more than a hundred?

5           MR. ROBINSON:  I would assume so, Your Honor.

6           THE COURT:  All right.  Let me -- what else would you

7   like to say in response to what counsel said?

8           MR. ROBINSON:  Well, in terms of refund verification,

9   Your Honor, the Department of Education's letter also indicated

10  yesterday that it is true that the Department relies on the

11  servicers to calculate the refund amount, but it was also

12  explained that FSA at the Department of Education is cross-

13  referencing data from FMS, the Financial Management System, to

14  check that their refunds are accurately calculated.  So there

15  is a system in place.

16      The Department also indicated that it's going to determine

17  a sample that is statistically significant and do a more in-

18  depth audit on the various categories for full settlement

19  relief to make sure that the -- there is quality control

20  measures in place for discharge credit measures and --

21          THE COURT:  Are you on track to give full settlement

22  relief for 5500 additional class members by May 31?

23          MR. ROBINSON:  Yes, Your Honor.

24          THE COURT:  How about the other deadlines?  Are you

25  on track there?
```

1          **MR. ROBINSON:**  Yes, Your Honor.  Although we will of

2    course update the Court as we get closer to those deadlines.

3          **THE COURT:**  Okay.  Let me -- what else would you like

4    to say before I go back to the other side?

5          **MR. ROBINSON:**  Your Honor, at the prior hearing, the

6    Department indicated it would like to update the Court today on

7    the potential deadline for those who have not yet received full

8    settlement relief by August 31.

9          **THE COURT:**  Okay.

10         **MR. ROBINSON:**  And may I turn to that now, Your

11   Honor?

12         **THE COURT:**  Yes, please do.

13         **MR. ROBINSON:**  So, Your Honor, for those remaining

14   borrowers after August 31, the Department is proposing that it

15   provide full settlement relief that's verified by March 31,

16   between August 31 and March 31.  Again, to reiterate, those

17   cases are what the Department expects to be the most

18   complicated, whether in terms of number of consolidations and

19   the presence of decommissioned servicers in the loan history,

20   and the March 31 deadline, or proposal I should say, actually

21   assumes that the Department will continue to find ways to

22   improve the efficiency in the process.

23         **THE COURT:**  That date for the -- at which you'll --

24   full settlement relief to the remaining class members is going

25   to be what, again?  March 31?

1    **MR. ROBINSON:**  Yes.  For anyone who has not received

2    full settlement relief by August 31, which was the last date in

3    the Court's order, and we said that we would provide to

4    proposal for anyone remaining today.  And the Department also

5    wishes to remind the Court that, at the very least, the credit

6    reporting measures for those borrowers should be in place well

7    before then.

8            **THE COURT:**  Are we talking about those people -- I

9    forgot now.  There were three levels of class members.  Which

10   level are we talking about for March 31?

11           **MR. ROBINSON:**  It's still the Exhibit C borrowers,

12   Your Honor, but the schedule or the proposal that the

13   Department has set out was roughly equivalent to the number of

14   consolidations.  And so those for the first deadline, the

15   May 31 deadline, were roughly equivalent to the number of

16   outstanding Exhibit C borrowers between April 2 and May 31 with

17   direct loans or one consolidation loan.  The July 31 deadline

18   was approximately equivalent to the number of borrowers with

19   two consolidation loans.

20       The August 31 was for I think the three and four

21   consolidation loans.  Again, approximate number.  And then just

22   given the complexity and the number of consolidations for those

23   remaining, which in some cases exceed 20 consolidations, the

24   Department was --

25           **THE COURT:**  And how many are in that category?

1    **MR. ROBINSON:**  The last estimate that we had for the

2    Court was about 7000.  That may have gone down slightly, but I

3    don't have verified numbers, because while those numbers

4    approximate the consolidations, the servicers are also working

5    on, at the same time, borrowers with not just one or two

6    consolidations.  But as of the last hearing of the Court, it

7    was projected to be about 7000.

8    **THE COURT:**  All right.  Let me hear from the

9    plaintiff a minute.  What is your -- did the settlement

10   agreement address this problem of applying the refund against

11   the ineligible loans?

12   **MS. EISENBREY:**  The settlement agreement stated that

13   borrowers should get refund checks of all amounts paid to the

14   government on their relevant loan debt.  It did not talk about

15   any different treatment for consolidation loans or

16   nonconsolidation loans.  It did not contemplate --

17   **THE COURT:**  Read the language to me where the word

18   "check" is used.

19   **MS. EISENBREY:**  "'Settlement relief means discharge

20   of all of class member's relevant loan debt, a refund of all

21   amounts the class member previously paid to the Department

22   toward any relevant loan debt, and the deletion of credit

23   tradeline associated with the relevant loan debt."

24   **THE COURT:**  You used the word "check" earlier.

25   **MS. EISENBREY:**  I did not have it in front of me.  I

1    was paraphrasing.

2          **THE COURT:**  Well, okay.  Is there another place in

3    the settlement agreement that does use the word "check"?

4          **MS. EISENBREY:**  I do not believe so.

5          **THE COURT:**  Well, then, see, now, I'm stuck with a

6    problem.  Does refund include -- yes, it certainly includes a

7    check, but does it include any other means by which the class

8    member gets the benefit of the refund?

9          **MS. EISENBREY:**  I can say that in the course of

10   conversations with the Department and their counsel about this

11   case, it was the understanding of the parties that amounts were

12   not supposed to be applied to other loans.  As I said, we

13   brought this to their attention when it was happening with

14   direct loans and received assurances that it should not be

15   happening and was corrected.

16         **THE COURT:**  Well, have you got that language

17   somewhere?  Let me see where the government said this should

18   not be happening and we will correct it.

19         **MS. EISENBREY:**  Yes.  This is an e-mail from

20   Mr. Robinson on August 2nd, 2023.  It says:  "Your June 14th

21   letter referenced a spreadsheet you provided which identified

22   13 borrowers who were not issued full refunds because the

23   refunds were reallocated to other loans.  FSA has confirmed

24   that on March 10th, 2023, it instructed servicers to issue full

25   refunds and not reallocate.  FSA also instructed servicers to

1   determine if any Sweet borrowers had payments reallocated prior

2   to the March 10th notice, and, if so, to reverse those

3   transactions and to provide full refunds."

4          **THE COURT:**  Mr. Robinson, is that an accurate

5   statement of what you said?

6          **MR. ROBINSON:**  It's accurate, Your Honor, but it's

7   not for a situation of mixed consolidation loans.

8          **THE COURT:**  It's what?

9          **MR. ROBINSON:**  It was not pertaining to a situation

10  where there were mixed consolidation loans that were subject to

11  full settlement relief.

12         **THE COURT:**  None of those cases were such a category?

13         **MR. ROBINSON:**  I don't believe so, Your Honor.  Those

14  were, I believe, direct loans, and there were separate -- for

15  which refunds were owed, and there were separate loans for

16  which the refunds were applied.  That's not a case where the

17  eligible and ineligible debt were consolidated.

18         **THE COURT:**  What do you say to that?

19         **MS. EISENBREY:**  I apologize, Your Honor.  I did find

20  it in the settlement agreement where it does say "checks".

21         **THE COURT:**  Read it to me.

22         **MS. EISENBREY:**  It is Part F-1, Effectuating Relief.

23     "Defendants have effectuated relief for purposes of

24  Paragraph 4A, 4C and 4D when they and their loan servicers have

25  taken all steps necessary to discharge the relevant loan debt

1   of the class member, including, but not limited to:  One,

2   discharging any interest that accrued while the borrower

3   defense application was pending; two, determining if the class

4   member is entitled to any refund, and, if so, issuing refund

5   checks for payment of that refund."

6        THE COURT:  Sounds like the agreement contemplated a

7   check, not a credit.  What do you say to that?

8        MR. ROBINSON:  Your Honor, the settlement agreement

9   did not contemplate these scenarios of the mixed consolidation

10  loans with eligible and ineligible debt.

11       And just to reiterate what I said earlier, if there are

12  particular borrowers who would like to discuss with the

13  Department a separate arrangement, the Department would like to

14  have those discussions.

15       THE COURT:  Just talk to them.  Well, that's

16  ridiculous, because you've got 2500 people who are talking to

17  the ombudsman with no relief.

18       All right.  Here's my ruling.  It's got to be a check, no

19  credit.  And we're going to reverse it.  If some class member

20  wants to have a credit, they can call you up and talk to you

21  and you can fix it up.  But if -- there should be a hard copy

22  check sent.  And the class member will take the chance that

23  there's some kind of boomerang effect that's not going to be

24  credited.  I believe that's what the settlement agreement

25  contemplated, and now the government is backtracking.  So we're

1    not going to do that.  It's going to be a hard copy check going

2    from now on.

3        Now, you're going to have to undo those situations where

4    it's already been credited, but you're going to meet and confer

5    and figure out how to do that.  But going forward, check, not

6    credit.  Check, not credit.

7        All right.  What else can I help you with today?

8            MS. EISENBREY:  Well, Your Honor, we would like more

9    information from the ombudsman's office about these complaints.

10   Specifically, we would like --

11           THE COURT:  Why don't you just go to the ombudsman's

12   office and read them?  I mean, I'm going to say you're entitled

13   to do that.  Look over their shoulder.  Look over their

14   computer.  Make them stay 'til midnight.  You can do that, too.

15           MS. EISENBREY:  Okay.

16           THE COURT:  The idea that they got one person

17   answering 2500 complaints is ridiculous.  There should be a

18   dozen.  And if you want to go over, look over their shoulder,

19   see what the complaints are, I think you have that right.

20           MS. EISENBREY:  Thank you.

21       And we would also like --

22           THE COURT:  When I was working in the government I

23   worked to midnight many times.  The government can work 'til

24   midnight.

25           MS. EISENBREY:  Well, we hope that they have more

1    people spreading around so it's not fewer people working past

2    midnight, but we'll leave that to the --

3        **THE COURT:**  See, now you got this new age stuff.  You

4    can't do that.  This is -- being a trial lawyer is tough work,

5    24 hours a day sometimes.  So it's none of this nine to five.

6    This is trying to -- you gotta get in there and do the work

7    yourself.

8        **MS. EISENBREY:**  Absolutely.  I meant for the

9    validation of the complaints, the ombudsman's office.

10        But we would also like the Department to verify its

11    information, either its quarterly reports, either verify under

12    penalty of perjury or submit them directly to this Court so

13    that we can be more confident in the accuracy of the quarterly

14    reporting.

15        **THE COURT:**  Well, I don't know.  They're giving it to

16    you in writing, aren't they?

17        **MS. EISENBREY:**  They are.

18        **THE COURT:**  For now that's good enough.  I trust the

19    government to be honest until you show me otherwise.

20        All right.  What's next?

21        **MS. EISENBREY:**  As for the March 31st deadline, we

22    would push back on that strenuously.  Settlement relief was

23    supposed to be effectuated for all members of the automatic

24    relief group by January 28th of --

25        **THE COURT:**  I'm going to say December 31 of this

1  year.  That ought to be it.  December 31 for those remaining

2  approximate 7000, not March 31.  It ought to be this year, this

3  year.  And if that means work through the Christmas holiday,

4  great.  Do it.

5          **MS. EISENBREY:**  Thank you, Your Honor.

6          **THE COURT:**  All right.  What else?

7          **MS. EISENBREY:**  We -- in our motion to enforce we did

8  ask for certain contempt.

9          **THE COURT:**  No contempt yet.

10         **MS. EISENBREY:**  Okay.

11         **THE COURT:**  No contempt yet.

12     I think that, look, we all know what it is.  The

13 government needs -- agreed to more than it can feasibly do

14 without giving this a huge priority, and then we've come to

15 find out that the person they put in charge has been

16 terminated.  Right?

17         **MR. ROBINSON:**  I don't know if "terminated" is the

18 right word, but the adjudicating officer is leaving at the end

19 of June.

20         **THE COURT:**  He left the department, not terminated.

21 And so there are problems, and I think we -- I don't know if

22 we're quite on track, but we're not way off track to the new

23 settlement deadlines.

24     All right.  So those are my rulings for today.  You're

25 going to meet again in two weeks, right?

1          **MS. EISENBREY:**  Yes.

2          **THE COURT:**  And then we'll meet again here in a

3    month.

4          **MS. EISENBREY:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Anything else I can help you

6    with today on the government's side?

7          **MR. ROBINSON:**  No, Your Honor.

8          **THE COURT:**  The servicers are back there.  Let's hear

9    from the servicer.  How can I help you?

10          **THE COURTROOM DEPUTY:**  Identify yourself.

11          **MR. SANDLER:**  Good morning, again, Your Honor.

12    Jonathan Sandler for servicer Nelnet.

13      Your Honor, for the meetings that are taking place in

14    Washington, D.C., the government was able to allow parties to

15    participate via Zoom.  It was unclear to servicer counsel

16    whether we were required to participate in person.  My client

17    did attend that meeting in person.

18      I would like to request, because of the expense and

19    inconvenience, to allow my client to participate via Zoom.

20          **THE COURT:**  Negative.  Negative.  No.  You servicers

21    are part of the problem.  You gotta be there in person.

22    Denied.

23          **MR. SANDLER:**  Thank you, Your Honor.

24          **THE COURT:**  You're welcome.

25      Okay.  I'll see you at the next hearing, and thank you for

1    your attention to this problem, and thanks to all of the -- how

2    many class members do we have on the line now?

3            **THE COURTROOM DEPUTY:**  Your Honor, it's 470.

4            **THE COURT:**  All right.  Well, some of you tuned in

5    late.  I'm sorry, you gotta be more on time.  But thank you for

6    tuning in, and the hearing is now over.

7            (Proceedings concluded at 8:35 a.m.)

8                            ---o0o---

9                    <u>**CERTIFICATE OF REPORTER**</u>

10           I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:  Tuesday, July 16, 2024

14

15

16   _____

17       Stephen W. Franklin, RMR, CRR, CPE
         Official Reporter, U.S. District Court

18

19

20

21

22

23

24

25