Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, on behalf of    )
themselves and all others      )
similarly situated, et al.,    )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    NO. 19-CV-03674-WHA
                               )
MIGUEL CARDONA, Secretary of   )
the United States Department   )
of Education, et al.,          )
                               )
          Defendants.          )
_____)

                          San Francisco, California
                          Thursday, September 26, 2024

                   <u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES:</u>

For Plaintiffs:
                    PROJECT ON PREDATORY STUDENT LENDING
                    769 Centre Street, Suite 166
                    Jamaica Plain, MA 02130
               BY:  **REBECCA C. ELLIS, ATTORNEY AT LAW**
                    **NOAH ZINNER, ATTORNEY AT LAW**

For Defendants:
                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division, Federal Programs Branch
                    450 Golden Gate Avenue, Suite 7-5395
                    San Francisco, CA 94102
               BY:  **STUART J. ROBINSON, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED BY:  Kendra A. Steppler, RPR, CRR
              Official United States Reporter

**APPEARANCES:**  (CONTINUED)

                         U.S. DEPARTMENT OF JUSTICE
                         Civil Division, Federal Programs Branch
                         1100 L Street NW
                         Washington, DC 20005
                 BY:  **BENJAMIN T. TAKEMOTO, ATTORNEY AT LAW**
                      **MARCIA BERMAN, ATTORNEY AT LAW**

ALSO PRESENT:
                         Theresa Sweet
                         John Patrick Bailey
                         Hunter Wiggins
                         Bonnie Latreille
                         Jonathan Sandler
                         Ryan DiClemente
                         David Esquivel
                         Luke Sosnicki

1    <u>**Thursday - September 26, 2024**</u>                        <u>**1:31 p.m.**</u>

2                        <u>**P R O C E E D I N G S**</u>

3                              ---o0o---

4        **THE COURT:**  Good afternoon.  Please be seated.

5        **THE COURTROOM DEPUTY:**  Calling Civil Action 19-3674,

6    Sweet, et al. v. Cardona, et al.

7        Counsel, please approach the podium and state your

8    appearances for the record, beginning with counsel for

9    plaintiffs.

10       **MS. ELLIS:**  Good afternoon, Your Honor.  Rebecca Ellis

11   from the Project on Predatory Student Lending for the

12   plaintiffs.  And with me at counsel table are my colleague,

13   Noah Zinner, and lead plaintiff, Theresa Sweet.

14       **THE COURT:**  Thank you.

15       **MR. TAKEMOTO:**  Good afternoon, Your Honor.  My name is

16   Ben Takemoto from the Department of Justice on behalf of the

17   Department of Education.  With me, also from the Department of

18   Justice, are Marcia Berman, Stuart Robinson; and, also, from

19   the Department of Education, FSA Ombudsman Bonnie Latreille;

20   from the Office of General Counsel, John Bailey; and, also,

21   from Federal Student Aid, Hunter Wiggins.

22       **THE COURT:**  Who is the ombudsman?  I didn't catch the

23   name.

24       **MR. TAKEMOTO:**  Bonnie Latreille.

25       **THE COURT:**  Okay.  Got it.  Okay.  Bonnie Latreille.

```
1   Thank you.
2       Okay.  And how about from our servicers?
3           THE COURTROOM DEPUTY:  Please approach the podium.
4           MR. DiCLEMENTE:  Good afternoon, Your Honor.  Ryan
5   DiClemente from Husch Blackwell on behalf of Aidvantage and
6   Maximus Federal.
7           MR. SOSNICKI:  And good afternoon, Your Honor.  Luke
8   Sosnicki of Thompson Coburn for MOHELA.
9           MR. ESQUIVEL:  Good afternoon, Your Honor.  David
10  Esquivel on behalf of EdFinancial Services.
11          MR. SANDLER:  Afternoon, Your Honor.  Jonathan Sandler
12  on behalf of Nelnet.
13          THE COURT:  Thank you.
14          MR. SANDLER:  Your Honor, I spent the day with
15  Judge Carter yesterday.  He said to say hi.
16          THE COURT:  All right.  Well, was he on your case or
17  was he -- how did you do with him?
18          MR. SANDLER:  Your Honor, I think that if you have a
19  case with Judge Carter, he's always on your case.  And I think
20  I did as well as anybody in my shoes could have done.
21          THE COURT:  Okay.  Then -- that's great.  Okay.
22      And how many do we have on Zoom?
23          THE COURTROOM DEPUTY:  Your Honor, currently there's
24  426.
25          THE COURT:  Okay.  Welcome to all of you who are on
```

1    Zoom as class members.  Thank you for appearing by Zoom.

2        All right.  We're here for an updated status report --

3    progress report -- on the implementation of the settlement in

4    this case.  We did not have the last meeting, even though I was

5    available, because plaintiffs' counsel and defense counsel

6    jointly recommended that we not have it.  Maybe we should have,

7    in light of the letter that I got last night.  I'm sure you had

8    a good vacation instead, but that opportunity was wasted.  So

9    now I want to hear what the latest problem is.

10       Ms. Ellis, you get to go first.

11           **MS. ELLIS:**  Thank you, Your Honor.

12       We have two topics to cover today.  One is the

13   Department's compliance with the August 31st deadline with

14   respect to delivering relief to the Exhibit C group.  And --

15           **THE COURT:**  Can you speak more -- you're doing a great

16   job.  But the microphone can be pulled closer to you --

17           **MS. ELLIS:**  Yes, Your Honor.

18           **THE COURT:**  -- so that you can be heard better.  Thank

19   you.

20           **MS. ELLIS:**  All right.

21       The first topic, as I was saying, is compliance with the

22   August 31st deadline for the Exhibit C group.  And the second

23   topic, which was raised in the government's filing last night,

24   is a separate issue of material breach with respect to Decision

25   Group 1.

 1          With the Court's permission, I'll start with the

 2   August 31st deadline.

 3          **THE COURT:**  Please.

 4          **MS. ELLIS:**  Thank you.

 5          So we received updated data from the Department today on

 6   compliance with that deadline.  At this point, there are only

 7   around 870 loans from the automatic relief group that are still

 8   awaiting discharge.  These are mostly loans that either were

 9   previously in default or that are still held by commercial FFEL

10   lenders.  And so we think that this is -- this is substantial

11   compliance, in our eyes, with the August 31st deadline.  It's a

12   very small number of loans still outstanding that have these

13   particular complications.

14          On the issue of refunds, the latest data shows that there

15   are just under 4,000 refunds still being processed.  Of those,

16   about 880 are a work in progress at the Treasury Department.

17   So we expect those to be delivered to class members shortly.

18          Another 3,000, or so, are currently with the servicers.

19   Instructions have been sent to the servicers to process those

20   refunds.  But they have not yet been sent to Treasury.  So that

21   is still a loose end.  It's a smaller number than we had a

22   couple of weeks ago.  So it seems that progress is being made,

23   but those are still outstanding.

24          In addition, we do still have some complaints pending with

25   the Ombudsman's Office of class members who say -- class

members in the Exhibit C group who say they've not received
their full relief.  That most frequently has to do with the
amount of the refund.  So those are yet to be reviewed.

And we also know, as we've discussed at the prior
hearings, that there are some class members who have received
their -- class members who have the so-called mixed
consolidation loans -- they've received a discharge and refund
on their terminal consolidation loan.  The one that was most
recently opened.  But it's possible that that refund did not
account for all of the payments that were made on the previous
intermediate iterations of those loans.

And we have been trying to work with the Department to
operationalize the process for calculating those intermediate
refunds.  That process is still ongoing.  And those -- those
intermediate refunds are not accounted for in the completion
numbers that I just cited that the Department provided to us.

**THE COURT:**  Is that the same problem as the one with
the letter last night, or is this a different problem?

**MS. ELLIS:**  This is a different issue -- well --
their -- it's a different issue, but the problem has recurred
again with Decision Group 1, I would say.

This is -- we did have an agreement with the Department
that we were going to set up this intermediate loan process for
the Exhibit C group.  We've been waiting for the Department's
proposal on exactly how this is going to proceed for a number

1    of weeks now.

2        So we do think that a great deal of progress has been made

3    on the automatic relief group, especially with regard to

4    discharges.  We're very, very close to completion there.

5    Refunds -- there are still some loose ends that we are, you

6    know, following up.  But, with that, I will move to the new

7    problem, which is the Decision Group 1 problem.  And --

8            **THE COURT:**  Say that -- "Decision"...

9            **MS. ELLIS:**  Decision Group 1.

10           **THE COURT:**  Okay.

11           **MS. ELLIS:**  So just to recap briefly, the decision

12   group where the class members whose applications did not relate

13   to an Exhibit C school -- they were divided into five tranches,

14   depending on when the person had applied for borrower defense.

15   And then they had these sort of cascading deadlines, first, for

16   receiving decisions and then for receiving relief.

17       So Decision Group 1 -- those were the oldest pending

18   applications.  There's about 33,000 people in that group.  And

19   those people were due to get a decision on their applications

20   last July -- July of 2023.  And then the Department had a year,

21   until July 28th, 2024, to effectuate the relief for people who

22   were approved for relief.

23       So as that July 28th deadline approached, we asked the

24   Department for data.  Given what had happened with the

25   automatic relief group, we asked, "Can you tell us what the

1    status is on delivering relief to Decision Group 1 for this

2    July 28th deadline?"  We asked, repeatedly, over many weeks.

3    Each time, we were told it's coming, we'll get it to you, we'll

4    get it to you.  It never came.  It still has never come.  We

5    have still not received data at any kind of meaningful granular

6    level on what has happened to the members of Decision Group 1.

7         Once the July 28th deadline passed, we began hearing from

8    class members, who said, "I got approved.  I thought I was

9    supposed to get relief.  It hasn't shown up yet."  And so, on

10   August 26th, we sent a letter to the Department, under the

11   procedures in the settlement, formally alleging a breach as to

12   members of Decision Group 1, who had not yet received their

13   full settlement relief.

14        I would -- just as a side note, we did raise certain other

15   potential breaches in that letter, which we're discussing with

16   the Department now.  They're not ripe, in our view, to present

17   to Your Honor today.  But this blown deadline -- the parties

18   have agreed to present that issue today, even though, under the

19   settlement, the date to file a motion to enforce on that breach

20   would be next Friday, just in the interest of efficiency.

21        **THE COURT:**  Let me interrupt you for a second.  You

22   call it "Decision Group 1."  And that's distinguished from the

23   automatic group that -- okay.  So -- but wasn't there a point

24   in time where, if a decision was not made, then they would be

25   deemed granted?

1          **MS. ELLIS:**  That's correct, Your Honor.  Our

2    understanding, from the information we have available, is that

3    the decisions were delivered on time.  We think there may have

4    been some people who -- you know -- their email addresses

5    changed, their mailing addresses changed.  There may be some

6    smaller number of people who their decision got lost in

7    transit.  But for the substantial majority of Decision Group 1

8    people, they did receive their decisions on time.

9          **THE COURT:**  This is 33,000?

10         **MS. ELLIS:**  Yes.

11         **THE COURT:**  And how many of those got full relief?

12         **MS. ELLIS:**  We don't know.  The Department said, in

13   its filing last night, that it believes only 3,500 are left who

14   haven't gotten full relief yet.  But we've not received any

15   sort of substantiation on those numbers.  And we don't know to

16   what extent people who are marked down as full relief actually

17   got the relief they're entitled to.  And that was the next

18   issue that I was going to cover.

19         In the course of discussing this breach with the

20   Department -- and, I should mention, the Department has agreed

21   that it is in breach.  So the issue is not whether there's

22   breach, but what to do about it.  In the course of those

23   discussions, we learned that the Department had not been

24   following this Court's May 24th order, that all refunds must be

25   made by check or electronic funds transfer with respect to

1  Decision Group 1.

2       Back in that May hearing, this Court determined that the

3  reallocation procedure that the Department and servicers had

4  been using where past payments were reallocated toward the

5  balances of unrelated loans -- we looked at the settlement

6  agreement.  This Court agreed with the plaintiffs that the

7  settlement agreement clearly states the refund must be a check

8  or an EFT.

9       And after the May 24th hearing, the Department changed its

10 practices with respect to the automatic relief group, but it

11 did not change its practices with respect to Decision Group 1.

12 So we do not know how many Decision Group 1 members have

13 wrongly had their refunds reallocated to other loans.

14      This violated the Court's order.  It deprived the class

15 members of money that they're entitled to.  And we know that

16 this is a process that is slow, that is error-prone, that

17 introduces errors into the data that were not there before.  So

18 this is why we feel like we cannot confidently say how many

19 people in Decision Group 1 are still missing their relief,

20 because we don't know how many were subject to reallocation.

21      Additionally, back in June, we discussed, with the Court,

22 the issue of the processing for discharges and refunds on the

23 mixed consolidation loans.  That was a major holdup in the

24 automatic relief group.  And the Department had been using this

25 so-called roll-up process, which was causing the delays, which

1    was, once again, causing errors to be introduced into the

2    system.

3        And we came up -- the parties agreed to a procedure where

4    the Department would discharge the terminal consolidation loan,

5    refund payments on that loan, and then work backward to see if

6    the class member was owed any additional refund.  The

7    Department, at the time, asked the Court permission to take

8    that approach.  We said, at the time, we would say again, Court

9    approval was not needed.  This is within the Department's

10   authority.  But the Court did explicitly approve that approach

11   to delivering relief.

12       But the Department now says it will not follow that

13   procedure for Decision Group 1, even though the procedure has

14   been in place for a couple of months now.  It has worked.  It

15   was resulted in these positive numbers on discharge and refund

16   delivery.

17       **THE COURT:**  That was -- when we had that discussion,

18   that was pertaining to the automatic group or was it to

19   everybody?

20       **MS. ELLIS:**  Well, Your Honor, as to the refunds having

21   to be a check, that pertains to everybody, according to the

22   plain language of the settlement.  The terminal loan

23   cancelation and refund process -- when we came up with that, it

24   was for the purpose of delivering relief in a timely manner to

25   the automatic relief group.

1    But now we find ourselves, once again, in a situation

2  where the Department has blown past a deadline for the delivery

3  of relief.  We need to get this relief to class members who are

4  counting on it as soon as possible.  And instead of taking the

5  procedure that we worked on that we know is effective, the

6  Department proposes this new and extremely complicated

7  procedure that it laid out in its filing last night.

8         **THE COURT:**  What did we call the -- was there a name

9  attached to this procedure that we adopted last time?

10        **MS. ELLIS:**  I believe we've been calling it the

11 "terminal consolidation discharge procedure."  At least that's

12 what I would call it.

13        **THE COURT:**  Okay.  I just -- all right.  And you're

14 saying that that was implemented and worked well?

15        **MS. ELLIS:**  Yes, Your Honor.

16        **THE COURT:**  But now the government wants to -- for

17 the -- Decision Group 1 -- wants to use a different approach?

18        **MS. ELLIS:**  Yes.

19        **THE COURT:**  And we'll come to that in a minute, but

20 keep going.

21        **MS. ELLIS:**  Well, that process that the Department has

22 proposed -- in the filing last night was the first time we

23 heard their estimate of how long they think this would take.

24 They said it will take eight to ten weeks just to stand up the

25 process.  To us, this is unacceptable when we're already passed

1    the deadline, when we have a simpler procedure that could be

2    used starting, you know, literally this afternoon.  We don't

3    know whether the servicers actually believe this is possible,

4    again, because, you know, we heard this last night.

5         By the time it's ten weeks from now, we're looking at

6    December 4th.  They say we can complete most but not all of

7    Decision Group 1 by January 31st.  So the expectation is for

8    the servicers to do all this complicated math, which, so far,

9    they frankly have not proven themselves capable of doing, in

10   six weeks.  And, on top of that, Decision Group 2 has a

11   deadline for delivery of their relief of January 28th.  So

12   under the Department's proposal, you would be pushing the

13   Group 1 deadline past the Group 2 deadline.  Who knows when

14   Group 2 would be finished.  And there simply is not this kind

15   of time to waste in this case, as -- as Your Honor knows we've

16   been saying for years.  And it's not the case.

17        I just want to be clear, the government seems to imply, in

18   its filing, that there was some negotiation between the parties

19   on what to do about Decision Group 1.  Aside from one

20   meet-and-confer after our notice of breach, that's not the

21   case.  This was not a matter that we negotiated before or even

22   shortly after the July 28th deadline.  We had to ask for weeks

23   just to figure out what was going on with Decision Group 1 at

24   all.

25        So what we're asking the Court to do here today is simple.

1   We are requesting that the Court rule that the Department must

2   follow the same discharge in refund procedures for everyone in

3   all of the decision groups as it did for the automatic relief

4   group.  That is to say, the refunds must be a check.  Anyone

5   who had their refunds reallocated, the Department has to go

6   back and fix that to get them their proper refund.  And for

7   people with mixed consolidations, will follow the terminal loan

8   discharge and refund procedure.

9       We would request, also, that the Court set a deadline of

10  November 30th, 2024, to complete the distribution of relief to

11  Decision Group 1 members.  That's about two months from now.

12  We think -- if it is accurate, as the Department contends, that

13  many members of the group have gotten full relief already --

14  that should be a realistic deadline.  Again, we don't know how

15  accurate that is.  But we believe that another two months

16  should be sufficient.

17      We would also request that the Court order the parties and

18  the servicers to --

19          **THE COURT:**  Are you -- didn't I require you to meet

20  every other week in Washington?

21          **MS. ELLIS:**  Yes, Your Honor.

22          **THE COURT:**  Has that been happening?

23          **MS. ELLIS:**  It has.

24          **THE COURT:**  Okay.

25          **MS. ELLIS:**  Yep.

1          **THE COURT:**  On schedule?  Have you been skipping those

2    meetings?

3          **MS. ELLIS:**  We have not, Your Honor.

4          **THE COURT:**  Okay.

5          **MS. ELLIS:**  And my next request, actually, was for the

6    Court to continue to order in-person meetings with the parties

7    and the servicers between now and November 30th, and then set

8    another status conference for December.  If the Court would

9    like to hear from us earlier or more often, we're happy to do

10   so, but at least to have a status conference after our proposed

11   November 30th deadline.

12       And, finally, we would ask the Court's permission to

13   submit an application for fees and costs.  Back in the spring,

14   Your Honor indicated that we would be able to do that.  But you

15   wanted to wait until later in the process.  At this point, you

16   know, we've been at this for a number of months.  We've

17   incurred --

18          **THE COURT:**  I think you should do that.

19          **MS. ELLIS:**  Thank you, sir.

20          **THE COURT:**  All right.  That part I'm going to allow

21   you to file it as soon as you can.  But you've got to give the

22   other side a chance to -- it won't be done on a hurry-up basis.

23          **MS. ELLIS:**  Understood.  Thank you, Your Honor.

24          **THE COURT:**  Okay.  So let's hear from the government,

25   please.

1          **MR. TAKEMOTO:**  Hello, Your Honor.

2      There were a lot of characterizations that I just heard

3  that I would disagree with, but I don't think it's -- I think

4  it's a better use of everyone's time to refocus on the issue

5  here.

6      The first is with respect to what we've been meeting about

7  over this past year.  And that's Exhibit C.  I heard from the

8  other side that they agree that we're in substantial compliance

9  on the August 31st deadline.  And I think the numbers that we

10  showed in our filing last night demonstrate that.  And so the

11  issues that we've been discussing up until now, I think we've

12  substantially complied with.

13      On the new issue, plaintiffs have sent the Department a

14  letter alleging a material breach with respect to what we've

15  been calling "Decision Group 1."  On that issue, the Department

16  has responded and has acknowledged that it is in material

17  breach with respect to Decision Group 1 members who are

18  entitled to relief and who have not yet received it.

19      Ordinarily, under the settlement agreement, there would be

20  an extended process to resolve that dispute where plaintiffs

21  would file a motion to enforce and the Department would

22  respond.  But the parties are in agreement -- at least the

23  Department believes that we'd like to issue relief as

24  expeditiously and efficiently as possible.  And so that's why

25  the Department set forth its proposal on how to deal with the

1  decision groups -- not just one, but each subsequent decision

2  group -- and plaintiffs have their proposal, which is to use

3  what we've been calling the "Exhibit C approach," where we

4  focus on the terminal loan.

5       Either way, we'd appreciate the Court's guidance on which

6  option to take.  But the Department believes that its approach

7  is the one not only that would effectuate relief quickly, but

8  also effectuate relief that is most appropriately tailored to

9  that which these members are entitled to.

10      And, by that, what I mean is we're dealing with a

11 population that's significantly smaller than the Exhibit C

12 population and a population that has iterative deadlines.  Of

13 course, as we've acknowledged, the Decision Group 1 deadline

14 has passed.  The Decision Group 2 deadline is coming up in

15 January.  But they're more manageable populations.  And so --

16      **THE COURT:**  Well, let's -- let's -- can you help me

17 with the -- understand the scale of the problem?  So Decision

18 Group 1 involved I think somebody said 33,000.

19      All right.  Now, are we -- how many of those got full

20 relief and there's no problem?

21      **MR. TAKEMOTO:**  So the Department has reviewed this and

22 believes that there's 3,500, approximately, who may be owed

23 relief still.

24      **THE COURT:**  So everyone else in that 33,000 -- they've

25 gotten everything they're entitled to?

1      **MR. TAKEMOTO:**  So we believe that approximately --

2  this is -- this is in the filing last night -- the Department

3  believes that most of the approximately 31,400 borrowers in

4  this group who are entitled to relief have received their full

5  relief.

6          **THE COURT:**  Well, "most" is only 51 percent.

7          **MR. TAKEMOTO:**  Right.

8          **THE COURT:**  Can you give me a member -- are you just

9  saying that 16,000 got relief?

10         **MR. TAKEMOTO:**  All I can -- what I can say is that the

11  Department's aware of 3,500 who may not have received full

12  settlement relief.

13      But, either way, I think that the point is that it's a --

14  and the Department acknowledges that, for those who haven't

15  received relief, it's a material breach with respect to

16  Decision Group 1.  The question before the Court right now is

17  what to do about it.  And the fact is, this is a smaller

18  population than Exhibit C.  And so the approach that we've --

19  that we've developed we believe would provide relief to a

20  substantial majority of this group by the end of January, which

21  is just two months after the deadline that plaintiffs proposed.

22  So we're really talking about a difference of two months.  And

23  the benefit of this approach is that it's more tailored to the

24  relief that these borrowers are actually entitled to under the

25  settlement agreement.

1          **THE COURT:**  Give me an example of why that would be

2     true but not true under the approach we've been using all

3     along.

4          **MR. TAKEMOTO:**  So the approach that we've been using,

5     which, keep in mind, was developed in the context of an

6     imminent deadline for tens of thousands of borrowers, and so we

7     needed to do things quickly in order to meet the Court's

8     deadline, focused on the terminal loan and discharging that

9     terminal loan in the consolidation process in toto.

10         Under our --

11         **THE COURT:**  You say "terminal loan."  Are you getting

12    at this problem of merging -- merging loans?

13         **MR. TAKEMOTO:**  Exactly.

14         **THE COURT:**  So there was more than one loan to begin

15    with?

16         **MR. TAKEMOTO:**  Yes.  So it -- we're dealing with --

17    we're dealing -- even though it's a different population, we're

18    dealing -- the same problem has arisen where there are some

19    borrowers who have what are called consolidation loans --

20    loans -- numerous loans that have been consolidated into one

21    loan.

22         And the -- what we had been doing for -- what we did with

23    Exhibit C borrowers is focus on the terminal loan -- the end

24    loan in that process -- and instruct the servicers to discharge

25    that loan and also to issue refunds in the form of a check on

1   all payments that were made on that -- on that loan.

2       For this population, the Department's preference would

3   be -- and, again, we can do this for a substantial majority by

4   the end of January -- would be to calculate, essentially, the

5   percentage of eligible and ineligible debt based on original

6   loan disbursement amounts and then to use that ratio and apply

7   it to the terminal consolidation loan to estimate the amount of

8   eligible debt in that loan.  And then instruct the servicers to

9   discharge that amount; waive all interest, whether it's related

10  to eligible or ineligible debt; and then refund, in the form of

11  a check, payments made on both the intermediary and terminal

12  loans based on data that the Department has in its data

13  systems.

14      **THE COURT:**  Now, are you saying that the earlier

15  system overpays the recipient -- the student -- and that yours

16  would more carefully pay what they're entitled to get or --

17      **MR. TAKEMOTO:**  Yes.

18      **THE COURT:**  Is that what you're saying?

19      **MR. TAKEMOTO:**  Yes.

20      **THE COURT:**  Okay.  Well, the -- the other side says

21  you would need eight to ten weeks, or something like that, to

22  gin this system up; is that true?

23      **MR. TAKEMOTO:**  Yes, it's true.  It's a new system.

24  We've admitted it's more complex than the other system.  But

25  what we're really talking about is a difference of two months.

1    They're proposing November 30th --

2            **THE COURT:**  But if we were to do the math, are we

3    going to -- is the government going to wind up paying a million

4    dollars more than it really needs to or $100,000 more?  How

5    much money is this actually going to save if we did your

6    approach?

7            **MR. TAKEMOTO:**  I don't have exact numbers in front of

8    me, Your Honor, but I do know that it would save more than if

9    we took the Exhibit C approach.

10           **THE COURT:**  More than a million?

11           **MR. TAKEMOTO:**  I don't have the numbers in front of

12   me.

13           **THE COURT:**  Okay.  So at least I think I understand

14   the issue.  It pertains only to the cases where there has been

15   a combination of ineligible with eligible.

16           **MR. TAKEMOTO:**  Exactly.

17       Can I just add --

18           **THE COURT:**  Of the 33,000, are all of them in that

19   category or --

20           **MR. TAKEMOTO:**  No.  No, they're not.

21           **THE COURT:**  Would it be 10 percent?  20 percent?  What

22   do you think?  What percentage would be in this category?

23           **MR. TAKEMOTO:**  I think that's part -- I don't have --

24   I don't have those numbers in front of me.  But that's part of

25   the way that the Department got to the 3,500 borrowers who may

1   not have received full settlement relief.  We know that a lot

2   of those are mixed consolidation loans.

3       **THE COURT:**  Okay.  I'm not going to decide this at

4   this very moment.  But help me understand -- what other issues

5   are there that you want me to decide today?

6       **MR. TAKEMOTO:**  There's just two things that I'd like

7   to add to this or emphasize on this.

8       The first is that -- just to emphasize, again, the

9   Department waived all of those procedures in the settlement

10   agreement to litigate all of this.  We want this decided

11   quickly so that we can -- it's helpful for the Department to

12   know what to do --

13       **THE COURT:**  Sure.

14       **MR. TAKEMOTO:**  -- in order to get relief as quickly as

15   possible.  So that's number one, is we'd appreciate a decision

16   on this.

17       And then the second thing that I would emphasize is that

18   there are six different groups that we're talking about here.

19   And we would appreciate, you know, instruction on, if this is

20   the approach that we're going to take, is it going to be the

21   approach that we're going to take for --

22       **THE COURT:**  Remind me who -- we got six different

23   decision groups?  I didn't realize -- I thought it was three

24   somehow.

25       **MR. TAKEMOTO:**  So there's --

1      **THE COURT:**  What is Decision Group 2 and so forth?

2      **MR. TAKEMOTO:**  Yeah, Decision Group -- so Decision

3  Group 2 is -- are class members who submitted borrower defense

4  applications between January 1st, 2018, and December 31st,

5  2018.  Decision Group 3 is basically 2019.  Decision Group 4 is

6  2020.  Decision Group 5 is January 1st, 2021, to June 22nd,

7  2022.  And then 6 is post-class applicants.  So those who

8  submitted applications after the class was certified.

9      **THE COURT:**  And do we have any approximate numbers in

10  these different groups?

11      **MR. TAKEMOTO:**  Yes.  The number of class members was

12  reported to the plaintiffs in the initial quarterly report

13  under the settlement agreement.  So Decision Group 1, as we

14  flagged, constitutes approximately 33,000 class members;

15  Decision Group 2 is approximately 11,000 members; 3 is

16  approximately 13,000; 4, approximately 9,000; 5, approximately

17  32,000.  So, again, we're dealing with smaller populations.

18      **THE COURT:**  How about 6?

19      **MR. TAKEMOTO:**  6 is post-class applicants.

20      **THE COURT:**  Yes.

21      **MR. TAKEMOTO:**  I don't believe we're actually calling

22  that a decision group, but that's 205,000 people.

23      **THE COURT:**  205?

24      **MR. TAKEMOTO:**  Yes.

25      **THE COURT:**  So if you add all those numbers up, that's

1    far lower than 33,000 in Group 1.

2         **MR. TAKEMOTO:**  Yes, although there are iterative

3    deadlines.  So Decision Group 2 is -- the deadline is

4    January 28th, 2025.  3 is July 28th, 2025.  4 is January 28th,

5    2026.  5 is July 28th, 2026.

6         **THE COURT:**  But regardless of whether you meet the

7    deadline or not --

8         **MR. TAKEMOTO:**  Mm-hm.

9         **THE COURT:**  Let's say you meet the deadline in every

10   single case --

11        **MR. TAKEMOTO:**  Mm-hm.

12        **THE COURT:**  -- for those where there's a combination

13   loan, we have this problem.  Whether they're eligible plus

14   ineligible, we have the problem of how to refund and discharge.

15        **MR. TAKEMOTO:**  Right.  Which is why we would

16   appreciate instruction on which path to take rather than having

17   to re-litigate this issue over and over again.

18        I have some numbers that were just passed to me about

19   Decision Group 1, since you asked about it.

20        **THE COURT:**  Yes, please.

21        **MR. TAKEMOTO:**  So approximately -- and these are rough

22   estimates -- but approximately 88 percent of Decision Group 1

23   shows a zero balance.  In other words, they have -- they're --

24   they've been afforded full relief.  And approximately

25   12 percent indicate that they're not done.  And these would be

```
 1   mixed consolidation loans.  So 12 percent -- approximately

 2   12 percent constitute mixed consolidation loans.

 3            THE COURT:  All right.

 4            MR. TAKEMOTO:  You also asked about a rough estimate

 5   of savings of our plan compared to theirs.

 6            THE COURT:  Yeah.

 7            MR. TAKEMOTO:  We're talking tens of millions of

 8   dollars.

 9            THE COURT:  Tens of millions?

10            MR. TAKEMOTO:  Correct.

11            THE COURT:  Well, hold that thought.  Let me -- let me

12   go back to Ms. Ellis.

13        Ms. Ellis, what do you say to the point that the approach

14   we've been following gives a windfall of tens of -- will give a

15   windfall of tens of millions of dollars to students over and

16   above what they are actually entitled to under the agreement?

17            MS. ELLIS:  Well, Your Honor, I'd say that there's no

18   evidence -- or at least no evidence we've been shown -- that

19   this is a significant problem.  And part of the reason for that

20   is because the Department's and servicers' data on payment

21   histories is severely lacking.  We've talked about this issue

22   before, but --

23            THE COURT:  Say that last sentence again.  I didn't

24   quite follow it.

25            MS. ELLIS:  I'm sorry, Your Honor.
```

1          **THE COURT:**  Just repeat it.  That's all.

2          **MS. ELLIS:**  The Department's and the servicers' data

3    on past payments is severely lacking.  In many cases,

4    especially with loans that have been outstanding for, say, ten

5    or more years, payment histories have been lost.  They've been

6    corrupted.  The servicers, when calculating refunds, have not

7    looked at all of the available data for payments that were

8    made.

9          And so, admittedly, the terminal discharge process is a

10   bit of a heuristic in estimating how much of a refund class

11   members are owed.  But, in many cases, the Department simply

12   does not know how much money class members are owed because the

13   information has been lost.

14         So I don't believe that we have any concrete evidence that

15   overpayments are occurring or, if any given individual might

16   receive an overpayment, that those overpayments are not

17   canceled out by underpayments to other class members.

18         I would also note that the process that the government has

19   proposed is untested.  We don't know -- and perhaps we should

20   hear from the servicers -- if they feel that they are in a

21   position to execute on some of these complicated instructions

22   within the timeline that's been -- that's been proposed.

23         We also know, from the ombudsman's complaint process, that

24   even under the known procedures that exist, it's quite frequent

25   that servicers make errors.  And so by introducing this new and

1    complicated process, we will be inviting further errors into

2    the system.

3        Finally, the suggestion that -- that this is going to be

4    easier going forward I think is really belied by the history of

5    these enforcement proceedings.  We spoke at great length with

6    the Department over the course of this spring and summer about

7    how to deliver relief to class members.  And when we talked

8    about doing -- potentially doing sort of proportional methods,

9    it kept -- we kept hearing, "We can't do that.  It's too

10   complicated.  We don't have the right information.  It's going

11   to take too long."  So I don't think that it makes a lot of

12   sense to now be introducing that method and saying, "Actually,

13   it will be great.  We'll do it fast."

14       And, finally, Your Honor, it's not just a matter of two

15   more months.  They say they'll complete most but not all of

16   cases in two months.  We don't know how many that really is.

17   Once again, there's the people who we know haven't gotten

18   relief and then there's the people who may have gotten the

19   wrong relief because the Department was ignoring this Court's

20   order and doing the reallocation method.

21       I'll note, also, that part of the issue with the

22   reallocation method itself is that it's something that was

23   being done in the context of mixed consolidation loans.  Not

24   only those, but including mixed consolidation loans.  And so in

25   order to get people their correct refunds by check or EFT,

the -- whatever system they're doing needs to account for that

fact.  And it needs to account for that fact for all class

members.

     That section of the -- that section of the settlement

agreement that says refunds will be sent by check applies to

the automatic relief group, the decision group, and the post

class.  So whatever they're doing, it has to be able to

accommodate calculating and distributing the correct refunds.

          **THE COURT:**  What is the last date -- deadline -- for

any decision group?

          **MS. ELLIS:**  I believe it's July 28th, 2026.  For the

delivery of relief, not for the issuance of decision.

          **THE COURT:**  Right.  So the next one that's coming up

is Group 2.  And that's January what?

          **MS. ELLIS:**  January 28th, 2025.

          **THE COURT:**  And then the one -- the next one after

that is what?

          **MS. ELLIS:**  July 28th, 2025.  And then

January 28th and July 28th of 2026 for Groups 4 and 5.

          **THE COURT:**  Oh, I don't know, man.

     Raise your hand if you're a servicer.  Just a sec.  I want

to -- and raise your hand if you are a servicer and you

understand what the government's procedure -- proposed

procedure -- is.

          **MR. DiCLEMENTE:**  We don't have any additional

1    questions on the proposed procedure, Your Honor.

2         **THE COURT:**  No.  I'm asking if you understand what it

3    is.  Because the next question is, is how soon can you get it

4    operational and accurate?

5         Here, come up here and let's talk about it.

6         **MR. DiCLEMENTE:**  Good afternoon, again, Your Honor.

7    Ryan DiClemente on behalf of Aidvantage and Maximus Federal.

8         I can only obviously speak for my clients, but there was a

9    process by which questions were asked of the Department as it

10   relates to this new process.  And as I understand it, all of

11   our questions have been answered at this point.

12        We've provided estimates about how long it would take.

13   For Maximus Federal, they believe it will take 14 weeks.  That

14   14-week process is based upon an assumption of processing 950

15   loans, which is important.  If that amount were to change, then

16   obviously the timeline would need to be adjusted.

17        For Aidvantage, we have identified a 16-week timeline.

18   And that is based upon an assumption of 4,800 loans, Your

19   Honor.

20        **THE COURT:**  Fourteen weeks -- how many months is that?

21        **MR. DiCLEMENTE:**  So that's three and a half months,

22   Your Honor, approximately.  And 16 weeks obviously is four

23   months.

24        **THE COURT:**  Well, what if there was a court order that

25   said instead of 14 months, you -- 14 weeks -- you do it in nine

```
 1  weeks?
 2          MR. DiCLEMENTE:  With respect to the --
 3          THE COURT:  Would they just blow off -- would they
 4  blow off my order?
 5          MR. DiCLEMENTE:  Oh, of course not.  Nobody would try
 6  to blow off your order, Your Honor.  But this is an entirely
 7  new process, as the Department laid out in their submission of
 8  this morning.
 9      It's not about us not prioritizing.  It is about the
10  development of an entirely new process, mapping, creation,
11  testing to ensure to plaintiffs' counsel that it is correct
12  when it does get implemented.  I am confident that I do not
13  believe we could go any faster, Your Honor.
14          THE COURT:  Well, do you have the old system -- the
15  current system -- up and running now?
16          MR. DiCLEMENTE:  We do, Your Honor.
17      I'll let, obviously, anybody else speak.
18          THE COURT:  Go ahead.  Let's hear from the others.
19          MR. SOSNICKI:  Your Honor, Luke Sosnicki on behalf of
20  MOHELA.
21      I have nothing to add.  Like Mr. DiClemente's client, we
22  have --
23          THE COURT:  Well, you have nothing to add.  But are
24  you in substantially the same position?
25          MR. SOSNICKI:  We are, Your Honor.  We have a lower
```

 1  loan volume, so we have slightly lower estimates.  But we are

 2  in the same position.  Yes.

 3          **MR. SANDLER:**  Jonathan Sandler for Nelnet, Your Honor.

 4          **THE COURT:**  Say it again.

 5          **MR. SANDLER:**  Jonathan Sandler --

 6          **THE COURT:**  Yes.

 7          **MR. SANDLER:**  -- for Nelnet.

 8      Your Honor, I think we are in substantially the same

 9  position, with a clarification.  I think what Mr. DiClemente is

10  saying with his 14 weeks is that is to build the plane and then

11  also to fly it.  If that's what he's saying, then I agree.

12      So, for Nelnet, we are looking at not less than nine weeks

13  to do the technology.  It's about 830, or so, person-hours to

14  build all the technology out is kind of our estimate, based

15  upon what we understand.

16      For Nelnet's volume, we have approximately -- anticipating

17  2,900 loans that then we would have to discharge.  And we

18  anticipate that that discharge process and the refunds, et

19  cetera, would take approximately four weeks.

20          **MR. ESQUIVEL:**  Your Honor, David Esquivel on behalf of

21  EdFinancial.

22      That is substantially the same timeline that EdFinancial

23  has.  This is, in EdFinancial's estimation, at least a six-week

24  period in order to institute this new process for the same

25  reason my colleagues have said.  It is not particular to

1   student loan servicing.  This is a new technology process.  In

2   order to ensure the accuracy, it has to be tested.  It has to

3   be vetted.  And in order to ensure accuracy, just as a matter

4   of IT function, it's going to take that time to ramp up.

5          **MR. DiCLEMENTE:**  Your Honor, I just have one point of

6   clarification.  That that timeline begins to run after receipt

7   of all of the information.  We don't have the loan files yet or

8   the files from the Department.  So it wouldn't start today.  It

9   would start after we received all the information.

10         **THE COURT:**  Oh.  That 14 weeks --

11         **MR. DiCLEMENTE:**  Yes.

12         **THE COURT:**  Is that to build the system or is that to

13  complete the refunds?

14         **MR. DiCLEMENTE:**  That would be complete the volume

15  that we had estimated for Maximus Federal, which is 950 loans.

16         **THE COURT:**  Okay.

17         **MR. DiCLEMENTE:**  So it's to build it and then complete

18  the processing of those loans.

19         **THE COURT:**  Okay.  Thank you.

20      All right.  The servicers can sit in the front row there.

21      All right.  Mr. Takemoto, you were about to say something.

22         **MR. TAKEMOTO:**  Yeah.  I just wanted to say that, of

23  course, the dates that we've -- that I've presented to you have

24  been made because the Department has been consulting with the

25  servicers about these very issues.

1        You know, the Department has already begun, you know,

2    steps to set this process up by drafting preliminary

3    instructions to the servicers.  Those instructions were sent to

4    the servicers.  The Department received feedback from the

5    servicers.  And so, of course, the Department's working closely

6    to develop that timeline.

7        I also forgot to mention one important distinction between

8    the Exhibit C approach and this approach.  The Exhibit C

9    approach, as we flagged in our filing, hinges on, in part, a

10   provision of the settlement agreement about what to do with

11   conflicting evidence.  This is § IV.A.5.  And that provision

12   says, "If the Department's borrower defense or loan data

13   includes conflicting evidence which raises a substantial

14   question as to whether a Class Member's Relevant Loan Debt is

15   associated with a program, school, or School Group listed in

16   Exhibit C, the question will be resolved in favor of the Class

17   Member, (i.e., in favor of granting relief)."

18       And so that's how we were able to do the Exhibit C method.

19   Because, if there was an open question, we could, you know,

20   decide in the class member's favor.

21       That provision doesn't exist for the decision groups.  So

22   there's no equivalent provision where the Department could say

23   we're going to resolve the question in favor of the class

24   member if they're to participate in a -- if they're a member of

25   a decision group.

1          **THE COURT:**  What do you say to this:  Let's say that

2    we used your new method and it was stingier than what the

3    automatic group got.  There will be some class members who

4    would say, well, wait a minute, why did they get -- why did the

5    first group -- automatics -- get the benefit of the more

6    generous approach instead of the stingier approach that the

7    Judge made us -- what's your answer to that?

8          **MR. TAKEMOTO:**  I would say, in the first instance,

9    that both class members will receive at least as much relief as

10   they're entitled to under the settlement agreement.

11        Don't forget, even under our approach, we're waiving all

12   interest, whether that interest is related to eligible and

13   ineligible debt.  And so even under our method, there is going

14   to be some windfall to the class member.  It's just that it's

15   more tailored.

16        And then the other distinction I would make is that there

17   is this provision of the settlement agreement that treats class

18   members who attended Exhibit C schools differently than the

19   decision groups.  And that's the reason why we developed

20   these -- one of the reasons -- why we developed these two

21   methods.

22        **THE COURT:**  In your letter, what do you say the new

23   deadline would be for Decision Group 2?

24        **MR. TAKEMOTO:**  We said that we could complete a

25   substantial majority by the end of January of next year.  And

1  that there will be -- as in all of these cases -- right --

2  there are some really, really complex cases.  Even in the case

3  of Exhibit C, where plaintiffs acknowledge substantial

4  compliance, there's still a few class members who have very,

5  very complex loans.  And we said that we could complete the

6  tail -- or substantially complete the tail -- by the end of

7  March of next year.

8      **THE COURT:**  What else do I have to decide today?  You

9  had a whole laundry list, Ms. Ellis.  What was your laundry

10 list?  Just give me one.  Don't give me the whole list.  What

11 else do you want me to address today?

12     **MS. ELLIS:**  Your Honor, we asked to address what

13 procedures should apply to the decision groups.  Not just

14 Group 1, but all the groups going forward.  As we've been

15 discussing at length, to set a deadline.  We asked for the

16 deadline of November 30th for when relief will all be

17 distributed to the Decision Group 1.  We asked for an order to

18 have the parties continue to meet in person and to set a

19 further status conference.  And Your Honor already granted my

20 request for plaintiffs to submit a bill of fees and costs.

21     **THE COURT:**  For Decision Group 1, the existing

22 deadline is January 28th; right?

23     **MS. ELLIS:**  No.  That's Decision Group 2, Your Honor.

24 Decision Group 1 is the one whose deadline has already passed.

25 They were July 28th.

1          **THE COURT:**  July 28th.  Okay.

2          **MS. ELLIS:**  Yes, Your Honor.

3      And, in that vein, I just want to say, the Department

4  knew -- as of July 28th, 2023, the Department knew the

5  population of Decision Group 1 class members who were owed

6  relief.  If it wanted to tailor a complex method for delivering

7  their relief, it could have done so.  It could have done so

8  starting in August 2023 and had a year to implement it.

9          They have not even tried to design this method or talk

10  about it with the servicers until they have already blown the

11  deadline.  In that sense, we are in no different position now

12  with Decision Group 1 as we were with the automatic relief

13  group.  These people's relief is overdue, and we need to

14  deliver it as soon as possible.

15          **THE COURT:**  I'm sorry.  I've lost track.  What else do

16  I need to decide today, besides this method and which -- and

17  which groups it applies to?

18          **MS. ELLIS:**  In our view, that is all the Court needs

19  to decide today.

20          **THE COURT:**  All right.  Don't say anything more then.

21      What do you want me to decide?

22          **MR. TAKEMOTO:**  As an initial matter, I have a

23  correction.  I misheard your previous question.  I thought you

24  asked about what our deadlines were -- what our proposed

25  deadlines were -- for Decision Group 1.

1       **THE COURT:**  Right.

2       **MR. TAKEMOTO:**  But I think you asked about Decision

3  Group 2.

4       **THE COURT:**  Well, I -- okay.  What would -- all right.

5  What would be your new deadline on 1 and your new deadline on

6  2?

7       **MR. TAKEMOTO:**  So, for 1, we would say substantial

8  majority by the end of January with a tail by the end of March.

9       For 2, the Department doesn't have detailed information

10  about Decision Group 2.  But we do know that it's smaller than

11  Exhibit C and Decision Group 1.  It's only about 10,000.  And

12  so -- and the very preliminary analysis the Department has done

13  suggests that close to 80 percent of those may already have

14  discharges completed with more than three months to go.

15       So the bottom line is that it's the Department's

16  expectation that servicers will be able to complete Decision

17  Group 2 on schedule using the new approach.  That's the end of

18  January.

19       **THE COURT:**  Even though the deadline is January 28th?

20       **MR. TAKEMOTO:**  By -- by January 28 is what I mean.

21       **THE COURT:**  But you used those weasel words:

22  "substantial, entail."

23       **MR. TAKEMOTO:**  That was with respect to Decision

24  Group 1.

25       **THE COURT:**  Right.  But are you going to be --

1          MR. TAKEMOTO:  For Decision --

2          THE COURT:  -- 100 percent --

3          MR. TAKEMOTO:  For Decision --

4          THE COURT:  -- 100 percent on Group 2 by January 28th?

5          MR. TAKEMOTO:  I can never say "100 percent" for the

6    simple --

7          THE COURT:  That's the problem.

8          MR. TAKEMOTO:  Well, for the simple reason that these

9    are -- like I said, even with Exhibit C, we substantially

10   complied.  But there's some people who have very, very complex

11   loans.  And it's -- you know -- it just takes a lot of -- a lot

12   of digging and work.  And so -- but it's the Department's

13   expectation, based on the data it has now, that servicers would

14   be able to use our proposed process to complete Decision

15   Group 2 by January 28.

16      I had one other point, and then you asked what I'm asking

17   you to do today.

18         THE COURT:  Yeah, please.  Go ahead.

19         MR. TAKEMOTO:  Yeah.

20      So there was some discussion between you and my friend on

21   the other side about the tens of millions of dollars'

22   difference between the two proposals.  That cost comes from

23   discharges of ineligible debt.  It does not come from

24   overpayments of refunds, just to clarify that point.

25      And then you asked what the Department is asking today.

1    We would ask that you basically approve our approach for the

2    decision groups going forward so that we can effectuate relief

3    as quickly as possible and as tailored as possible to the

4    relief that's actually owed under the settlement agreement.

5         **MS. ELLIS:**  And, Your Honor, we would ask to have the

6    Court approve the decision group -- or, sorry -- the automatic

7    relief group method, the terminal loan discharging refund

8    method, for the whole rest of the class going forward.

9         And I know Your Honor has been hesitant to hold the

10   Department in contempt before.  But, in our view, they have

11   clearly violated the May 24th order by continuing the

12   reallocation method after Your Honor interpreted the settlement

13   agreement to require all refunds to be by check.

14        **THE COURT:**  You mean -- even as to the automatic

15   group, you're saying that some people -- their refunds were

16   applied against ineligible loans?

17        **MS. ELLIS:**  Our understanding is that after the

18   Court's order of May 24th, the Department stopped the

19   reallocation method for the automatic relief group and repaired

20   that -- the errors that were due to that -- but they did not

21   stop the reallocation method for Decision Group 1.

22        **THE COURT:**  Is that true?

23        **MR. TAKEMOTO:**  No, Your Honor.  And I've -- this has

24   been repeated several times.  The Department is -- will adhere

25   to the Court's order that we issue refund check -- refunds --

1    in the form of checks -- and that includes for Decision

2    Group 1.

3         **MS. ELLIS:**  We have class members, Your Honor, who

4    have complained to the ombudsman's group.  And in the

5    ombudsman's investigation, they have found that servicers were

6    reapplying past payments to ineligible debt for Decision

7    Group 1 members.

8         **MR. TAKEMOTO:**  I think that the difference here may be

9    in semantics over what actually is the refund.  The -- for

10   those members that opposing counsel is talking about, I believe

11   she's referring to members who are still owed a refund.  And

12   under our proposal, they will get a refund in the form of a

13   check for any payments that they made.

14        **MS. ELLIS:**  I'm not sure whether the Department's

15   proposed method accounts for people who have gotten the wrong

16   relief in the past where not necessarily --

17        **THE COURT:**  Before I hold somebody in contempt, you

18   would need to bring in sworn affidavits from the class members

19   that are current and show that, despite the May 24, the

20   government is doing it the wrong way and doing it on purpose

21   the wrong way.  You don't have that.  You're just vaguely

22   referring to the ombudsman.

23        **MS. ELLIS:**  Understood, Your Honor.

24        **THE COURT:**  We have the ombudsman here.

25        Do you want to say anything, Ms. Ombudsman?

1    I don't think so.

2         **MS. LATREILLE:**  I'll defer to my counsel.

3         **THE COURT:**  Well, she seems reticent to speak up.

4    All right.  I have an answer for you.  Are you ready?

5         **MR. TAKEMOTO:**  Yes.

6         **MS. ELLIS:**  Yes, Your Honor.

7         **THE COURT:**  I'll begin by saying I'm sympathetic to

8    the idea that the government should not pay more under the

9    settlement than was due; however, it's not that

10   straightforward.

11        The problem is more complicated because, several months

12   ago, when we had this -- the problem came up because the

13   government -- I call it the "government" -- the Department was

14   so far behind on the automatic group that we had to come up

15   with a procedure.  And the procedure that I thought everyone

16   was in agreement with then, but certainly I approved at the

17   time, was what we've been calling the "terminal consolidated

18   discharge and refund procedure."  In other words, the existing

19   procedure, which then the Department went out and implemented

20   with its servicers and has been using on the automatic group

21   but not Group -- Decision Group 1 -- although that has only

22   recently come to light.

23        And, I guess, the government realized, well, if we had a

24   different procedure, then we could save money.  You say tens of

25   millions.  I don't know if that's true or not.  I do, though,

1    agree with the general principle that the government should not

2    have to pay more than was due under the agreement.  But, again,

3    it's not that simple.

4        Here, we have the Department, who came in some time ago --

5    two years ago -- and gave me deadlines that they promised to

6    meet and did not.  Promised to meet and did not.  And it was

7    almost scandalous how bad and how far behind you got.  And,

8    meanwhile, class members are desperate to know the answer.  So

9    you came up with a discharge procedure.  It may not be the most

10   economical for the government, but it worked.  And it's in

11   place.  It has the advantage of being in place.  The servicers

12   say they have it in place -- up and running.

13       So I'm going to have kind of a split decision here.  For

14   Decision Group 1, you should use the same procedure -- terminal

15   consolidated discharge and refund procedure -- whatever it is

16   that you have been using that we approved earlier, that's the

17   one to use for Decision Group 1.

18       And, for Decision Group 2, the same.  Because if you -- I

19   know what will happen.  If you abandon the existing procedure

20   and set up a brand-new procedure, the servicers will have to

21   learn it, to get checked out.  There's no way you're going to

22   make the deadline.  But it's -- now, looking at Group 3, 4, 5,

23   and 6, it's possible you could set it up in time to save the

24   government some money for Groups 3, 4, 5, and 6.  So -- because

25   that deadline is July 28th of next year.  That's about --

1    that's about ten months away.

2        But to make this work right, I want to give both sides a

3    chance to get more information.  I'm now talking about 3, 4, 5,

4    and 6.  I'm not talking about 1 and 2.  For 1 and 2, we got to

5    use the status quo -- the existing system.  But for the 3, 4,

6    5, and 6, there's time enough for the government to file a

7    formal motion that lays out the new procedure and tries to

8    explain why it would be more economical and why there's -- it

9    can be implemented in time to still meet these deadlines.

10        And then you would get a chance to respond.  And then we

11    would have another hearing.  And then I could -- there would be

12    time enough to decide whether the new procedure would be

13    allowed for 3, 4, 5, and 6.

14        All right.  How does that sound?  Can we do that?

15            **MS. ELLIS:**  Yes, Your Honor.

16            **MR. TAKEMOTO:**  We can work with that, Your Honor.

17            **THE COURT:**  All right.  I need a date by which you'll

18    file that motion.  Can I just ask you to do it in the next four

19    weeks?  Is that enough time?  Or do you need more than that?

20    Six weeks?  And not a letter brief.  A formal motion with

21    affidavits that explain how it would work and how it would be

22    implemented with the servicers.  I'll give you six weeks to

23    file that motion.  That's looking forward to 3, 4, 5, and 6.

24        Now, you -- there was something about a deadline, but the

25    deadline has been blown for Decision Group 1 already.  If we're

1  going to use the existing procedure, can we get this done by

2  December 2nd?

3      **MR. TAKEMOTO:**  My understanding, from talking with the

4  Department, is that it would need until the end of December

5  using the existing procedures for Decision Group 1.

6      **THE COURT:**  Well -- but you know what will happen.  If

7  I give a December 31 date, around December 12th, you will be

8  filing a motion saying, oh, Judge, you forgot all about the

9  holidays.  Our people want to go on Christmas break.

10      **MR. TAKEMOTO:**  I do not plan on taking a vacation.

11      **THE COURT:**  No, you don't, because you're a

12  hard-working lawyer at the Department of Justice, the model of

13  what it should be.  But that's not true throughout the

14  government.

15      **MR. TAKEMOTO:**  Yeah.

16      **THE COURT:**  They're going to want to take a break.  So

17  I think, if we're going to do December, it's got to be earlier

18  than -- it's got to be around December 15th, at the latest.

19      **MR. TAKEMOTO:**  So part of the problem with -- I think

20  plaintiffs had proposed the end of November.  Part of the

21  problem with using the existing approach is, yes, it exists.

22  But in order to do it, the Department has to collect data on

23  the terminal consolidation loans, which it worked tirelessly to

24  do with Exhibit C.  It has to do that also for this.  So it's

25  not like there's no back-end work that needs to be done, even

```
 1    if we take the existing approach.

 2            THE COURT:  It's going to be December 20.  And do not

 3    ask for any extension.  I don't care how many people are

 4    planning to go to Switzerland and ski over the holidays.  No.

 5    They got to work hard and get it done by December 20.  Now,

 6    then, I'm talking about the new deadline for Group 1, which

 7    is -- what is that? -- five months after the fact.

 8            MS. ELLIS:  Approximately, Your Honor.

 9            THE COURT:  So -- all right.  I think I've covered the

10    points you wanted me to raise.

11            MS. ELLIS:  Yes, Your Honor.

12        Does the Court order for the plaintiffs, the defendants,

13    and the servicers to continue meeting in person --

14            THE COURT:  Yes.  I want you to meet every -- did I

15    say every week or every other week?

16            MS. ELLIS:  Every other week, Your Honor.

17            THE COURT:  Every other week, in Washington, in

18    person, to get this settlement done.

19        You know, over the last three years, we've heard so much

20    about student loans, and not a single program ever got off the

21    ground.  But the Department of Justice and these plaintiffs, on

22    a completely different playing field, were able to reach an

23    agreed settlement of a class-action lawsuit.  It's a different

24    set of problems.  But it's providing a -- some relief --

25    substantial relief -- to some borrowers of student loans.
```

1          And when all the dust settles, this is going to be the

2     only case -- the only instance -- of anybody ever getting

3     relief on student loans, absent an act of Congress.  So it can

4     be done.  This is important in the history of the Department of

5     Education, the Department of Justice, your outfit, and for

6     this -- the whole idea of student loans.  So you should have

7     these meetings.  You should get the work done.

8          Okay.  Am I done for the day?

9               MR. TAKEMOTO:  I have nothing more to add, Your Honor.

10              MS. ELLIS:  Nothing further from us, Your Honor.

11    Thank you.

12              THE COURT:  Thanks, again, to all of the people who

13    tuned in.

14         What number do we have now?

15              THE COURTROOM DEPUTY:  Your Honor, it's 542 attendees.

16              THE COURT:  542 people listening to this all across

17    the United States.  Thank you for tuning in.

18         Okay.  Hearing is at an end.

19              THE COURTROOM DEPUTY:  Court is adjourned.

20                   (Proceedings adjourned at 2:39 p.m.)

21                          ---oOo---

22

23

24

25

1

2

3        <u>**CERTIFICATE OF REPORTER**</u>

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, October 21, 2024

8

9

10   _____

11            Kendra A. Steppler, RPR, CRR

12        Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25