EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT
LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, | Case No. 19-cv-03674-WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO APPROVE SETTLEMENT RELIEF PROCESS**<br><br>**HEARING DATE: December 12, 2024** |
| *Plaintiffs*, | |
| v. | (Class Action)<br>(Administrative Procedure Act Case) |
| MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and | |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   ARGUMENT .................................................................................................... 2

      A.  The Court Should Resolve The Relief Procedure Question Now For All Remaining
          Individuals Entitled To Relief Under The Settlement Agreement............................... 2

      B.  The Settlement Agreement Authorizes And Requires The Timely Cancellation And
          Return Of Money Paid On "Relevant Loan Debt" Regardless Of Whether Such Debt
          Is Consolidated................................................................................................. 4

      C.  The Department Has Not Offered A Sufficient Justification For Its Untested
          Approach.......................................................................................................... 8

            i.    Relief will not be timely. ........................................................................ 8

            ii.   Relief will not be more economical. ........................................................ 9

III.  CONCLUSION................................................................................................ 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) ................... 5

*Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164 (9th Cir. 2001) ............... 5

*United Commercial Ins. Svc., Inc. v. Paymaster Corp.*, 962 F.2d 853 (9th Cir. 1992) ................. 5

**Regulations**

34 C.F.R § 685.214 ........................................................................................................... 13

**Other Authorities**

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on
    Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal
    Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the
    Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130
    (Oct. 31, 2024) ....................................................................................................... 12

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William
    D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan
    (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education
    Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024) .................. 11, 12, 13

Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal
    Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes (July
    2022) ........................................................................................................... 12, 13

1

## I.    INTRODUCTION

2          In its Motion to Approve Settlement Relief Process (ECF 443, "Motion"), the Department

3   of Education ("Department") begs indulgence of a wait-and-see approach to its untested,

4   experimental, and likely-to-fail method of delivering Full Settlement Relief[1] to the hundreds of

5   thousands of remaining individuals potentially eligible for relief under this Settlement. The

6   Department resists the continued application of the only approach that has proven administrable

7   or effective in this case because it believes that its new proposal is the more "fiscally responsible"

8   approach. Motion at 5. Meanwhile, the Department further hedges on its commitments to the class.

9   It asks to report back to the Court on the feasibility of its proposal to deliver relief to a subset of

10  borrowers in February 2025—past the time that the Department originally claimed it could have

11  its proposed process up and running. And it declines to bind itself to its current proposal outside

12  of this subset of borrowers, "given the change of Administration taking place in January 2025."

13  Motion at 5, n.1.

14          Past is prologue. The Department's track record of failing to deliver timely and accurate

15  relief to Class Members in this case casts fatal doubt on its ability to carry out the complex

16  calculations it proposes now. To begin, the Department has yet to meet a single relief deadline that

17  it agreed to in the Settlement. More than 50,000 members of the Automatic Relief Group lacked

18  relief by that group's deadline; thousands more members of Decision Group 1 were missing their

19  relief by their deadline. The only reason that Decision Group 2 appears to be on track to receive

20  their relief by their deadline of January 28, 2025, is because this Court ordered the Department to

21  do the very thing that it resists doing in its current Motion: *viz.*, apply the simplified terminal

22  consolidation discharge and refund procedure to deliver relief. *See* Transcript of September 26,

23  2024, Status Conference ("Sept. 26 Tr.") at 43:18-22.

24          The Department has not shown any evidence to date, and presents none with its Motion,

25  that it is now capable of undertaking a more time-consuming, more complex process of relief

26

27  ───────────────

28  [1] Capitalized terms not otherwise defined in the text are used as in the parties' Settlement
    Agreement, ECF 246-1, and prior briefing in this matter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

calculations while still meeting its agreed-upon deadlines. Indeed, the Department tries to build itself a fail-safe by suggesting that it will re-assess the feasibility of its proposed approach by February 28, 2025, and if it believes at that time that "substantial compliance is unlikely to occur" for Decision Group 3, it will return to this Court to ask for a different order. Motion at 6; *see* Decl. of Phillip Juengst ¶ 32(c) (ECF 443-1). Not only does this setup make little practical sense, but it betrays the Department's own lack of belief in its ability to execute this plan.

The dithering must end. The Department's assurance that, eventually, all will receive "as much relief as that which they are entitled to pursuant to the Settlement Agreement" (Motion at 6) offers no comfort in this moment. In a case that has always been about delay, the Department cannot be permitted to set up the parties and the Court to litigate this same question repeatedly over the next two-plus years. As the Department apparently recognized just a few weeks ago, doing so would be a flagrant waste of the Court's time. It would also impose an undue burden on Class Members who have already waited years for finality on their settlement relief. The Court should decide this issue now, for everyone, and in a manner that comports with the plain language of the Settlement.

As such, with respect to all remaining Settlement groups, the Court should rule in Plaintiffs' favor and order that those Class and Post-Class Members will have their relief processed using the terminal consolidation discharge and refund procedure.

## II.    ARGUMENT

### A.    The Court Should Resolve the Relief Procedure Question Now for All Remaining Individuals Entitled to Relief Under the Settlement Agreement

In its filing in this case on September 25, 2024, the Department argued—for the first time—that it should be permitted to create a new relief calculation process for Class Members in *all* of the Decision Groups who have mixed consolidation loans (even though relief for the first set of Decision Group Class Members was already two months overdue by then). *See* Defendants' Notice in Advance of Hearing (ECF 433) at 3. At a hearing the next day, the Department reiterated its request to apply its new relief process to *all* of the Decision Group members and Post-Class Applicants with mixed consolidation loans—even going so far as to specifically ask the Court for

1  guidance "on which path to take rather than having to re-litigate this issue over and over again."

2  Sept. 26 Tr. at 25:16-17; *see also id.* at 40:1-2. Plaintiffs agreed at the time that the Court should

3  determine how to proceed for *all* of the remaining affected Class Members, although Plaintiffs

4  advocated for using the existing relief process—referred to as the "terminal consolidation

5  discharge and refund procedure," *id.* at 42:17-18—that the parties had already created and

6  implemented for mixed consolidation loans, and which had already worked effectively for tens of

7  thousands of Class Members. *See id.* at 11-13, 15:1-4, 36:12-15.

8        At the conclusion of that hearing, this Court ordered the Department to continue using the

9  terminal consolidation discharge and refund procedure for Decision Groups 1 and 2, because

10  Decision Group 1's relief deadline had already passed and Decision Group 2's deadline was too

11  soon to accommodate any new procedure.[2] *See id.* at 43:13-22. But as to Groups 3, 4, 5, and 6,[3]

12  the Court ordered the parties to brief the question of how the Department would calculate relief.

13  *Id.* at 44:2-13 ("[F]or [groups] 3, 4, 5, and 6, there's time enough for the government to file a

14  formal motion that lays out the new procedure and tries to explain why it would be more

15  economical and why there's—it can be implemented in time to still meet these deadlines."); *see*

16  *also id.* at 44:22-23 ("I'll give you six weeks to file that motion. That's looking forward to 3, 4, 5,

17  and 6."). The Court's Minute Order following the hearing said the same: "Other Decision Groups

18  and Post-Class Applicants: Relief to be effectuated using methods to be determined upon further

19  briefing . . . ." Minute Order (ECF 434) at 2.

20        Yet in its Motion, the Department ignores this Court's clear instructions. Instead of

21  proposing a relief procedure for the remainder of the class after Decision Group 2, the Department

22  backs away from its own previous request and claims that its proposed procedure would, if

23

24  [2] The Department seeks credit for "avoid[ing] further delay" by claiming that it "waived the

25  provisions of the settlement agreement that would permit the Department to litigate" its material
   breach with respect to delivering timely relief to members of Decision Group 1 whose applications

26  were approved. Motion at 3. More accurately, the Department conceded its breach, because it
   lacked any good-faith basis to claim otherwise. *See* Sept. 26 Tr. at 17:13-18.

27  [3] "Group 6" in the September 26 transcript refers to "Post-Class Applicants" as defined in the

28  Settlement. *See* Sept. 26 Tr. at 24:7.

1    approved, *only* apply to Decision Group 3. *See* Motion at 5 n.1. This is not a principled stance: the

2    Department does not have another plan for the remaining borrowers owed relief under the

3    Settlement. Instead, it is apparently prepared to throw the remaining members of the class and

4    post-class to the political winds. *See id.* (Department is ignoring the Court's briefing order "given

5    the change of Administration taking place in January 2025").

6         Delaying a decision on the applicable relief procedure for the remaining Settlement groups

7    would be a recipe for repetitive and time-wasting litigation, as the Department itself acknowledged

8    at the September 26 hearing. The parties and the Court had the right idea that day: the Court should

9    decide, once and for all, what procedures the Department will follow going forward, until all relief

10   under the Settlement is disbursed.

11   **B.      The Settlement Agreement Authorizes and Requires the Timely Cancellation**
12   **and Return of Money Paid on "Relevant Loan Debt" Regardless of Whether**
     **Such Debt Is Consolidated**

13        The Department's Motion proposes a methodology for parsing "eligible loan debt" from

14   "ineligible loan debt." *See* Motion at 3. These terms do not appear in the Settlement Agreement.

15   Likewise, the Settlement does not carve out or otherwise provide for the parsing of "mixed

16   consolidation loans." *Id.* It does not speak of "terminal" or "intermediate" loans. *Id.* at 3–4.

17        Rather, the only defined term in the Settlement Agreement—other than "Full Settlement

18   Relief"—germane to the question before the Court is found in section II.W:

19        **Relevant Loan Debt** refers to Direct Loans or FFEL loans
20        associated with the school that is the subject of the Class Member's
          borrower defense application. That debt includes the original
21        principal of the affected federal student loan plus any and all interest
          and fees that accrued or were incurred on that loan.
22

23   Throughout, the Settlement binds the Department to take, and refrain from, certain actions with

24   respect to Relevant Loan Debt. For example:

25        •    The Department may not engage in involuntary collection
               activity on any Relevant Loan Debt (§§ II.T, IV.H.1);
26
27        •    The Department must maintain all Relevant Loan Debt in
               forbearance or stopped collection status pending the delivery of
28             relief (or determination that a Class Member is not entitled to

relief), and must refund any interest that accrues on the Relevant Loan Debt during such a forbearance (§§ IV.A.3, IV.C.7);

- To effectuate "Full Settlement Relief," the Department and its loan servicers must "discharge . . . all of a Class Member's Relevant Loan Debt," issue a "refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt," and "delet[e] . . . the credit tradeline associated with the Relevant Loan Debt" (§ II.S; see § IV.F.1).

Under federal contract law, the definition of "Relevant Loan Debt" should be read according to its plain meaning. *See United Commercial Ins. Svc., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) ("The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."); *Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir. 2001) ("Federal law governs the interpretation of contracts where the United States is a party."); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (under federal contract law, "[c]ontract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself").[4]

Straightforwardly, any Direct or FFEL loan that a Class Member took out to pay for the cost of attendance at "the school that is the subject of the Class Member's borrower defense application" is a loan "associated with" that school. A consolidation loan is simply a method of bundling multiple individual federal student loans into a single package. So if a Class Member's

---

[4] The Settlement Agreement in this case stipulates that "any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Agreement." Settlement § XVI.A. Plaintiffs do not rely on any such canon, but rather on the plain meaning of the Settlement's language. The Settlement also provides that it "shall be construed in a manner to ensure its consistency with federal law" and shall not "impose upon Defendants any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes, rules, or regulations in effect at the time of such performance." *Id.* § XVI.B. The interpretation of "Relevant Loan Debt" described in the text comports with this provision as well. The fact that the Department previously agreed to use the terminal consolidation discharge and refund procedure demonstrates the Department's acknowledgement that that procedure is consistent with and permitted under applicable law. Nor does the Department argue otherwise in the instant Motion. The Department's argument is that an alternative method is *preferable* to the government, not required by law.

consolidation loan paid off one or more Direct or FFEL loans that were "associated with the school that is the subject of the Class Member's borrower defense application," then that consolidation loan is likewise "associated with" the school, and is by definition Relevant Loan Debt.[5] The same remains true even through a chain of consolidations: if the original borrower-defense-associated debt is still a component of a consolidation loan, then that consolidation loan constitutes Relevant Loan Debt. And in order to effectuate Full Settlement Relief, all Relevant Loan Debt must be discharged. *See* Settlement §§ II.S, IV.F.1.

The strength of this reasoning is clear when all of the loans within a consolidation "package" are from the same school. That is, bundling five loans for ITT Technical Institute together into a single consolidation loan creates a consolidation loan that is "associated with" ITT Technical Institute. On this point, Plaintiffs and the Department agree. Throughout the Settlement relief distribution process, the Department has consistently treated consolidation loans as Relevant Loan Debt, and has discharged full terminal loan balances, when those consolidation loans are derived entirely from underlying loans "associated with" the school that was the subject of the borrower defense application (the "borrower defense school"). The Department has thus acted consistently with the plain meaning of "Relevant Loan Debt" set forth above—until it came to "mixed" consolidation loans.

What the Department is really saying when it argues that mixed consolidation loans should be separated into "eligible" and "ineligible" debt is that the introduction of loans from other schools into a consolidation package eliminates that consolidation loan's "association" with the borrower defense school. In the Department's reading, a consolidation loan that bundles together four loans for ITT Technical Institute and one for a local community college is, fundamentally, no longer "associated" with ITT, and thus is no longer Relevant Loan Debt. That is the only reading that could support the Department's contention that it need not discharge the entire terminal consolidation balance.

---

[5] Indeed, in many instances the Class Member may have consolidated loans "associated with" the school prior to even submitting the borrower defense application.

1    But this reading makes no sense. The presence of other loans does not negate the existence

2  of debt "associated with" the borrower defense school. That "associated" debt is an integral part

3  of what a Class Member was paying when they made payments on their consolidation loans.

4  Indeed, the Department implicitly acknowledges this in its proposed methodology by providing

5  for Class Members to receive refunds of their payments on consolidation loans, without

6  modifications for the "eligible/ineligible" ratio. *See* Juengst Decl. ¶ 15(c). This approach

7  recognizes that payments on consolidation loans are undifferentiated—you cannot separate out

8  "associated" payments from "ineligible" payments. So, too, should it be with those loans'

9  remaining balances. The Settlement not only authorizes, but requires, the Department to discharge

10  the full balance of terminal consolidation loans in order to effectuate Full Settlement Relief.

11    The Department argues that the existing terminal consolidation discharge methodology is

12  only appropriate for the Automatic Relief Group because, it says, that methodology derives not

13  from the definition of Relevant Loan Debt, but rather from paragraph IV.A.5 of the Settlement.

14  *See* Motion at 5. That paragraph, which is in the section addressing the Automatic Relief Group,

15  provides:

16    If the Department's borrower defense or loan data includes
conflicting evidence which raises a substantial question as to
17    whether a Class Member's Relevant Loan Debt is associated with a
program, school, or School Group listed in Exhibit C, the question
18    will be resolved in favor of the Class Member (*i.e.*, in favor of
granting relief).
19

20  On its face, this paragraph is not about relief at all, much less about the treatment of consolidation

21  loans. Instead, it addresses a potential situation in which the Department needs to resolve

22  uncertainty as to *which school* a borrower defense application pertains to. This might become

23  relevant if, for instance, a Class Member's application relates to a school that changed ownership,

24  or if the Department's data is unclear with respect to school identification codes. But when it comes

25  to consolidation loans, there is generally no question as to whether a particular loan "is associated

26  with" the school listed in the Class Member's application—the Department can fairly easily

27  discern whether loans tracing back to the applicable school are included in a given consolidation.

28  If they are, then, as explained above, the "association" is established.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C. The Department Has Not Offered a Sufficient Justification for its Untested Approach**

The Court provided the Department with the opportunity to demonstrate that an alternative method of providing relief would be 1) capable of meeting the existing deadlines, and 2) "more economical." Sept. 26 Tr. at 44:8-9. The Department has failed on both grounds.

**i.    Relief will not be timely.**

The Department's Motion does not actually argue that the proposed procedure will enable the Department to meet its deadlines under the Settlement. Quite the contrary: the Department states merely that it will "mak[e] a good faith attempt" to meet its deadline for Decision Group 3. Motion at 5. These "weasel words" (Sept. 26 Tr. at 38:21) are telling.

In its September 25 filing, the Department confidently claimed that it had "already taken steps to set up [its proposed] process," and that this process could be "fully operationalized" in eight to ten weeks. ECF 433 at 4. At the next day's hearing, the Department's loan servicers already began to undercut those statements, reporting on the record that they would need fourteen to sixteen weeks to process even the first, small tranche of accounts under this process. *See* Sept. 26, 2024 Tr. at 30-32.

The Motion now steps further back, explaining that the servicers will only be able to carry out this new process "subject to certain assumptions"—assumptions that the Department declines to specify. *See* Motion at 4; Juengst Decl. ¶ 30. These "assumptions" have apparently pushed the timing out even more, such that the Department will not even have a sense of whether its proposed process is feasible until the end of February 2025. *See* Motion at 6.

Further, because the Motion purports to relate solely to Decision Group 3, it does not address how these "assumptions," and the general complexity of the proposed process, might affect the Department's ability to meet its deadlines for Class Members and Post-Class Applicants in the future. Groups 4, 5, and 6 are, collectively, more than *18 times* the size of Group 3. *See* Sept. 26 Tr. at 34:13-22. Group 6 on its own is about the same size as the Automatic Relief Group. *Id.* The Department does not even begin to explain how it could administer its more complex process in a timely manner for this much larger cohort of borrowers.

1        Perhaps that is because the Department has no intention of sticking to this plan. As noted

2 above, the Department attempts to kick the can down the road, suggesting that a new

3 administration might want to re-litigate this issue come February 2025—and July 2025, and

4 January 2026, and July 2026, and January 2027. The Department is openly inviting prolonged

5 delay that, at this point—after more than five years of litigation, and two years into settlement

6 implementation—is simply intolerable for the class.

7                      **ii.  Relief will not be more economical.**

8        The Department asserts that a procedure other than the one the parties have been using—

9 which is both permissible and effective—is necessary to realize "tens of millions" in savings for

10 Group 3. Motion at 5. But the Department has failed to support this contention because significant

11 questions remain about 1) the costs of its proposed methodology, and—accepting for a moment

12 the notion of "ineligible" loan debt, *see supra* II.B—2) the comparative cost of the proven

13 methodology.

14        ***First:*** The current terminal consolidation discharge and refund methodology did not

15 require a change request, meaning that the servicers were able to implement it quickly and without

16 requiring additional payments under their servicing contracts. The same is *not* true of the

17 Department's new proposal. In its September 25 filing, the Department stated that it had

18 "determined that a formal change request is not necessary for this process." ECF 433 at 4. But

19 now, the servicers have apparently "provided additional information that changes the

20 Department's previous determination that a formal change request was not necessary." Motion at

21 5 n.2. This development, buried in a footnote amid indirect syntax, is in fact hugely relevant. It

22 means that the build-out of the proposed relief process will be delayed for weeks or perhaps longer

23 as a formal change request is negotiated, drafted, and run up the chain for approval. *See* Declaration

24 of Richard Cordray ¶¶ 107-108 (ECF 403-1) (describing change request process). It also means,

25 crucially, that the servicers are demanding more money to carry out this process—money that the

26 Department did not factor into its "cost savings" analysis, and that the Department might not even

27 have, given the uncertain state of congressional appropriations. *See id.* ¶¶ 91-93; *see also id.*

28

¶ 111(b)(2) (cost of change request for Automatic Relief Group data oversight processes estimated at $10 million).

The Department also does not balance any alleged savings from its proposed plan against the costs of collection on loans that would remain, including its own operational and administrative costs as well as the costs of compensating student loan servicers and/or debt collectors on a per-account basis.

***Second:*** Even assuming that the Department can afford to pay the servicers to implement its proposed process, its claim of over $50 million in cost savings is not based on actual loan data, but on a rough heuristic of questionable validity. The Juengst Declaration states that the Department arrived at this number by (i) determining that "[a]pproximately 39% of Decision Group 3 student loans are from schools that are not the subject of the individual's borrower defense application"; (ii) multiplying that percentage against some other number (not specified in the Declaration) to conclude that "the average member of Decision Group 3 with mixed consolidation loans would receive an additional $27,000 in relief under the Exhibit C approach as compared to the alternative approach"; and (iii) multiplying that $27,000 by the number of Class Members in Group 3 who have mixed consolidation loans (approximately 2,000). Juengst Decl. ¶¶ 23-26.

In the first step, it is not clear whether the Department reached the 39% estimate by examining all of Group 3 or just the Group 3 Class Members with mixed consolidation loans; the former could produce a quite different statistic than the latter. In the second step, the source of the purported average "additional" discharge is not specified, and the Department does not provide any explanation for how or why this average would be accurate across the population of affected Class Members. Indeed, the very fact that the Department resorts to rough averages is emblematic of a larger problem: *The Department does not know the actual amounts at issue*. This has been a persistent problem throughout the Settlement enforcement process, and it continues here. The Department simply has not kept track of which loans are governed by the Settlement, what the balances of those loans are, or how much Class Members have paid toward them. This was a major factor in the initial breaches of the Settlement with respect to the Automatic Relief Group, and the only reason why the Department now has any handle on the true status of relief for that group (and,

more recently, for Decision Groups 1 and 2) is because Plaintiffs came to this Court demanding accountability. When the Department does not even know what will be discharged under its own proposed plan, how can the class trust that it will perform its proposed calculations accurately?

**Third:** Even accepting the contention that the terminal consolidation discharge methodology has a "cost" in terms of cancellation of "ineligible" debt (*see supra* II.B), that cost remains entirely speculative. To begin, the Department admits that approximately 26% of Decision Group 3 borrowers are eligible for other forms of loan cancellation such as Public Service Loan Forgiveness, so there are no net costs to using the current methodology for those borrowers—the full balances of the terminal loans would be cancelled anyway.[6] The net costs will also be zero with respect to any borrowers whose loans date back to before 2005, because the Department has publicly acknowledged that it does not know the original balances of these loans. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564, 27,573 (Apr. 17, 2024) (hereinafter "Apr. 2024 NPRM") ("The Department faces certain data limitations that make it impossible to accurately ascertain the balance upon entering repayment for loans disbursed before January 1, 2005."). Without those original balances, the Department could not calculate its proposed "eligible to ineligible" ratio, and thus would have to use the terminal consolidation discharge method.

With respect to *all* of the "ineligible" debt, however, there is a larger problem with the Department's cost savings assumptions. Namely, the Department's own accounting assumes that much of this debt would never be repaid even if it remained on the books. The "Student Loan Model," which is "designed to calculate cash flow estimates for the Department's Federal

---

[6] The Department speaks in terms of the number of *borrowers* entitled to other types of cancellation, not the number of *loans* or the amount of *dollars*. *See* Motion at 5. It is entirely possible that this estimated 26% of Group 3 Class Members accounts for more than 26% of that group's total outstanding debt. Additionally, that percentage may well be higher for other Settlement groups; the Department has not provided sufficient data to know.

postsecondary student loan program," factors in the effects of income-driven repayment programs, the likelihood of default, data limitations, and other factors for various cohorts of loans. *See* Apr. 2024 NPRM at 27,604. Once these factors are accounted for, "[n]o Direct Loan cohort has finished repaying all of its loans since the start of the program in 1994." Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes, at 4 (July 2022), *available at* www.gao.gov/assets/gao-22-105365.pdf (hereinafter "GAO Cost Report").[7]

It is thus deeply misleading for the Department to suggest that discharging a particular amount in loan balances would equate to that same amount in lost income for the government. In reality, the amount that the Department could reasonably expect to collect on the "ineligible" debt would be far, far less.

There are reasons to believe that the portfolio of Class Members' "ineligible" loans would be particularly unlikely to result in net gains for the Department. For one, students who attended for-profit colleges—as hundreds of thousands of Class Members and Post-Class Applicants did[8]— are statistically more likely to default than students who attended other types of institutions. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130, 87,143 (Oct. 31, 2024). Class Members and Post-Class Applicants who attended more than one school frequently attended more

---

[7] Federal student loans are, overall, a money-losing endeavor: "Although Education originally estimated federal Direct Loans made in the last 25 years would generate income for the federal government, as of fiscal year 2021, Education estimates these loans will cost the government $197 billion." GAO Cost Report at 10; *see also id.* at 12 ("[L]oans made from the fiscal year 1997 through 2021 cohorts were originally estimated to generate $6 in income per every $100 disbursed. As of fiscal year 2021, those cohorts are expected to cost the government almost $9 for every $100 disbursed.").

[8] More than 75% of Post-Class applications relate to Exhibit C schools, most of which are for-profit and all of which have known indicia of misconduct. *See* Exhibit A, Declaration of Rebecca C. Ellis ¶ 10.

than one for-profit college,[9] meaning that their consolidation loans would include "ineligible" debt that is less likely to be paid back, and that might even be separately eligible for borrower defense discharge. Some of those "ineligible" loans from other for-profit schools are also likely to qualify for cancellation under closed school discharge,[10] which Class Members might not have known that they could apply for. The Department has estimated that it is currently holding $7.6 billion worth of loans that are eligible for closed school discharge. Apr. 2024 NPRM at 27,578–79.

There is more. Borrowers with loans that were disbursed before 2005 are more likely to default, because "loans that are that old and are still outstanding belong to borrowers who have had long-term struggles repaying." *Id.* at 27,573. The vast majority of borrowers in income-driven repayment plans are unlikely to pay back their principal balances before those plans reach the 20- or 25-year threshold for cancellation, because their "monthly payments [do] not cover the full amount of accumulating interest."[11] *Id.* at 27,592. And if a borrower has been in default for an extended period of time despite "the availability of . . . powerful collection tools," the Department has concluded that "the odds that they would be fully repaid in a reasonable period are unlikely." *Id.* at 27,595.

Each of the above situations almost certainly describes a significant number of borrowers in Groups 3, 4, 5, and 6. In a best-case scenario, the Department would collect—over the course of decades—only some small fraction of whatever balances it would retain by changing the discharge methodology. Meanwhile, the class and post-class would be subject to further delays, mistakes, injury, and loss of faith in the government's ability to meet its obligations.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court order that all remaining Class and Post-Class Members with mixed consolidation loans who have not yet

---

[9] Tellingly, over 72,000 Class and Post-Class Members submitted more than one borrower defense application. Ex. A, Ellis Decl. ¶ 9.

[10] *See* 34 C.F.R § 685.214.

[11] As of July 2022, about half of all federal student loan volume was being repaid through an income-driven repayment plan. *See* GAO Cost Report at 4.

1   received Full Settlement Relief will have their relief processed using the terminal consolidation

2   discharge and refund procedure.

6   Dated: November 21, 2024                    Respectfully submitted,

7                                               *Rebecca C. Ellis* _____

8                                               Eileen M. Connor (SBN 248856)
9                                               econnor@ppsl.org
                                                Rebecca C. Ellis (*pro hac vice*)
10                                              rellis@ppsl.org
                                                Rebecca C. Eisenbrey (*pro hac vice*)
11                                              reisenbrey@ppsl.org
12                                              Noah Zinner (SBN 247581)
                                                nzinner@ppsl.org
13                                              PROJECT ON PREDATORY
                                                STUDENT LENDING
14                                              769 Centre Street, Suite 166
15                                              Jamaica Plain, MA 02130
                                                Tel.: (617) 390-2669
16
17                                              *Attorneys for Plaintiffs*