BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STUART J. ROBINSON
Senior Counsel
BENJAMIN T. TAKEMOTO
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (202) 532-4252
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THERESA SWEET, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MIGUEL CARDONA, *in his official capacity as Secretary of the United States Department of Education*, and <br><br> THE UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 19-cv-03674-WHA <br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO APPROVE SETTLEMENT RELIEF PROCESS** <br><br> **HEARING DATE: December 12, 2024** <br><br> (Class Action) <br> (Administrative Procedure Act Case) |

The Department of Education ("Department") has offered a reasonable proposal to effectuate full settlement relief for class members in Decision Group 3 by July 28, 2025, the date under the settlement agreement by which such relief must be complete for that population. *See generally* Defs.' Mot. to Approve Settlement Relief Process, ECF No. 443 [hereinafter Defs.' Mot.]. Acknowledging that the proposal includes an untested process, the Department further suggested that if it determines, by February 28, 2025, that substantial compliance with the deadline is unlikely using that process, it will alert the Court of that determination, and the Court can then order the Department to instruct the servicers to employ the Exhibit C relief framework. *Id.* at 6. Either way, borrowers in Decision Group 3 will receive at least as much relief as they are entitled to under the settlement, and by the applicable deadline.

Plaintiffs remain dissatisfied. Yet their arguments do not cast doubt on the reasonableness of the Department's proposed approach. In Plaintiffs' view, the proposal is not broad enough, even though the proposal originated from the Department, which should be permitted to suggest its scope. More fundamentally, Plaintiffs now resist the entire concept of ineligible debt, even though the parties and the Court have spent nearly a year discussing it. And they dispute the self-evident proposition that discharging less debt, particularly debt which does not qualify for discharge under the terms of the settlement agreement, would save the government money. Plaintiffs' arguments cannot compel a conclusion that the government should be prohibited from even attempting its alternative proposal with respect to Decision Group 3. For the reasons discussed more fully below, the Department respectfully requests that the Court grant its motion.

1. The Department acknowledges that in its filing on September 25, 2024, the Department proposed a process for effectuating full settlement relief to remaining class members, including those in Decision Group 3. Defs.' Mot. 1-3; *see* Minute Order at 2 (ordering further briefing on the Department's proposal). But the Court declined to adopt that approach, asking that the Department submit a formal proposal with additional evidence regarding costs. In the course of developing that proposal, the Department determined—based on further investigation, discussion with the servicers, and the intervening development that the administration will change in January 2025—that it would be prudent to modify the scope of its proposal to focus on only the next deadline, which is still eight months away from now and applies to a relatively small group of class members. The Department should be permitted to modify the

*Sweet v. Cardona*, No. 19-cv-3674, Defs.' Reply

1

scope of its own proposal for the remaining groups, particularly as the Department has until January 28, 2026, to effectuate full settlement relief for Decision Group 4 borrowers; July 28, 2026, for Decision Group 5 borrowers; and January 28, 2027, for the Post-Class Group.  The Department is of course not yet in breach, or even close to being in breach, of any of these deadlines.

    Plaintiffs' primary argument concerning the scope of the Department's proposal is that it is "a recipe for repetitive and time-wasting litigation[.]"  Pls.' Opp'n Defs.' Mot. Approve Settlement Relief Process 4, ECF No. 446 [hereinafter Pls.' Opp'n].  Yet they overlook the fact that utilizing the alternative proposal as to Decision Group 3 will allow the Department to better assess the proposal's adequacy, while still delivering relief to Decision Group 3 borrowers by the applicable deadline.  Plaintiffs complain that "[i]n a case that has always been about delay, the Department cannot be permitted to set up the parties and the Court to litigate this same question repeatedly over the next two-plus years."  Pls.' Opp'n at 2.  But Plaintiffs obscure the fact that the years-away deadlines for effectuating relief for Decision Groups 4 and 5 and the Post-Class Group are part of the Settlement Agreement itself and were therefore agreed to by Plaintiffs.  Because those deadlines are so far in the future, there is simply no reason for the Court to approve a methodology for effectuating relief to those groups now.  Plaintiffs speak of additional delay caused by having to litigate this issue down the road, but that is purely speculative.  The Court should therefore limit its order in accordance with the scope of the Department's motion.

    2.    Plaintiffs do not cast doubt on the methodology underlying the Department's proposal.  Instead, Plaintiffs attempt to deny the very existence of ineligible debt in mixed consolidation loans.  Pls.' Opp'n at 4–7; *see id.* at 9 (questioning "the notion of 'ineligible' loan debt").  According to Plaintiffs, given the definition of "Relevant Loan Debt" in the settlement agreement, "if the original borrower-defense-associated debt is still a component of a consolidation loan, then that consolidation loan constitutes Relevant Loan Debt" and must be discharged in its entirety.  *Id*. at 6.  But the term "Relevant Loan Debt" does not speak to mixed consolidation loans.  Settlement Agreement, ¶ II.W.  And the parties did not foresee the complications arising from mixed consolidation loans in negotiating their settlement agreement.  Tr. at 21:11-16, 25-26 (Apr. 24, 2024).

    Moreover, over the past year, the parties have repeatedly acknowledged the dichotomy of eligible and ineligible debt, and Plaintiffs have never indicated that the "Relevant Loan Debt" definition authorizes

a full discharge of mixed consolidation loans. For instance, in a December 14, 2023, letter, Plaintiffs asked, "What is the Department's mechanism for confirming that the correct calculations have been applied to consolidated loans that include both *Sweet*-eligible and non-*Sweet* eligible constituent loans?" Letter from Rebecca Ellis, Senior Attorney, The Project on Predatory Student Lending, to R. Charlie Merritt, Trial Attorney, DOJ 2 (Dec. 14, 2023), ECF No. 397-3. And in a February 2, 2024, letter, Plaintiffs noted, with respect to mixed consolidation loans owed by Exhibit C borrowers, that "the Department and its servicers have not completed the process of calculating the portions of these consolidation loans that should be discharged[,]" Letter from Rebecca Ellis, Senior Attorney, The Project on Predatory Student Lending, to Stuart Robinson, Senior Trial Counsel, DOJ 2, ECF No. 377-3, thereby recognizing that the settlement agreement does not compel the Department to discharge ineligible debt. Likewise, in correspondence the following month, Plaintiffs proposed that the Department address the breach by "discharging the full balance of consolidation loans where servicers are unable to calculate the portion of the balance attributable to Exhibit C loans, or refunding all prior payments where servicers are unable to apportion payments among *Sweet* and non-*Sweet* loans." Letter from Rebecca Ellis, Senior Attorney, The Project on Predatory Student Lending, to Stuart Robinson, Senior Trial Counsel, DOJ 4 (March 1, 2024), ECF No. 397-3. Their proposal was grounded in expediency, not the settlement agreement's definition of "Relevant Loan Debt." *See id.* ("If meeting this deadline means that the Department will have to take [these] steps that favor borrowers . . . then so be it."). And when the Department distinguished eligible from non-eligible debt in its response to Plaintiffs' Motion to Enforce, *see* Defs.' Opp'n Pls.' Mot. Enforce 7, ECF No. 403, Plaintiffs did not claim, as they do now, that it "makes no sense" to separate loans into eligible and ineligible debt, Pls.' Opp'n Defs.' Mot. Relief 6–7. Rather, Plaintiffs claimed that the Department had not done more to complete this separation quickly enough: "Apparently through nothing more than magical thinking, the Department expected the original loan servicers—whether decommissioned or active—to take all necessary steps to enable the current loan servicer (which might have been many steps down the chain of custody of a particular loan) to discharge a Class Member's still-extant loans, or such portions of their consolidation loans as were attributable to the original *Sweet*-eligible loans." Pls.' Reply ISO Pls.' Mot. Enforce 3, ECF No. 404.

Even during the September 26, 2024, hearing—when the Department discussed its alternative

proposal for the Court—at no point did Plaintiffs indicate that they disagreed with the premise of ineligible debt or inform the Court that the definition of "Relevant Loan Debt" was germane. Their silence on this point is striking, especially as the Court stated, "So at least I think I understand the issue. It pertains only to the cases where there has been a combination of ineligible with eligible." Tr. at 22:13-15 (Sept. 26, 2024); *see id.* at 25:13-14 ("[F]or those where there's a combination loan, we have this problem. Whether they're eligible plus ineligible, we have the problem of how to refund and discharge."). Thus, the parties' course of conduct, which has (1) consistently acknowledged the existence of both eligible and ineligible debt in mixed consolidation loans and (2) never indicated that the agreement requires full discharge of mixed consolidation loans, contradicts Plaintiffs' newfound interpretation of "Relevant Loan Debt." *Cf. In re XS Ranch Fund VI, L.P.*, No. 16-31367-RLE, 2019 WL 1473399, at *11 (Bankr. N.D. Cal. Mar. 28, 2019) ("Where the parties to a contract with ambiguous terms engage in a uniform course of conduct from which its practical meaning may be understood, a court will treat it as having that meaning even though it might have been given a different meaning as an original proposition.").

Plaintiffs' post hoc rationalization is also undercut by the purpose and structure of the settlement agreement itself. The framework of the agreement is designed to resolve allegations that the Department "unreasonably delayed and unlawfully withheld decisions on pending 'borrower defense' claims, i.e., claims for relief from certain federal student loan obligations based on institutional misconduct[.]" Settlement Agreement, § 1. The purpose is not, by contrast, to relieve borrowers' obligation to pay loans taken out to attend other schools that were simply consolidated with eligible debt. *See id.* Accordingly, the term "Relevant Loan Debt" is tied to "the school that is the subject of the Class Member's borrower defense application." Settlement Agreement, ¶ II.W. By Plaintiffs' logic, a borrower with a mixed consolidation loan consisting of $1 in *Sweet*-eligible debt and $100,000 in ineligible debt should at the very least receive a loan discharge totaling $100,001. This is clearly not the agreement that the parties negotiated and the Court approved. Given the time before eligible Decision Group 3 borrowers are entitled to full settlement relief, the Department should be permitted the opportunity to tailor such relief in a way that accords with both the settlement agreement and common sense.

3.   Plaintiffs assert that, under the Department's proposal, "[r]elief will not be timely," Pls.' Opp'n 8. Yet they do not explain why that is so, especially given what Plaintiffs themselves refer to as

the "fail-safe" option of using the Exhibit C framework to meet the applicable deadline, *id.* at 2.  Nor do they acknowledge or address the aspects of the Department's proposal that are designed to avoid the complexities that previously plagued how the Department treated mixed consolidation loans, such as relying on the Department, not the servicers, to calculate the percentage of eligible to ineligible debt based on easily obtainable loan disbursement amounts, applying that percentage to only the terminal consolidation loan, waiving all accrued interest so as to not have to determine the portion attributable to eligible debt, and calculating refunds based on payments reflected in servicer databases or the National Student Loan Data System so as to avoid the problem of missing data.  Plaintiffs also criticize the Department for not explaining how it can administer its proposal for the larger Decision Groups 4 and 5 and the Post-Class Group, *id.* at 8, but the Department is not proposing at this time to use its proposal for those groups.

As to cost, Plaintiffs first suggest that the required change request would not only delay relief, but would offset the millions of dollars in savings from the Department's alternative proposal, as compared to the Exhibit C approach.  *See id.* at 9.  But again, the "fail safe" addresses the former concern.  Moreover, while the precise cost of the change request has yet to be determined, it will be orders of magnitude less than $55 million and thus does not disturb the Department's conclusion that the proposed alternative will yield significant savings.  2d Juengst Decl. ¶ 6, attached here to as Ex. A.[1]  Similarly, the cost of collection, Pls.' Opp'n 10, is *de minimis*, averaging about $360 per borrower. 2d Juengst Decl. ¶ 7.

Changing tack, Plaintiffs turn to the Department's methodology for calculating costs with respect to Decision Group 3, arguing that it "is not based on actual loan data, but on a rough heuristic of questionable validity." Pls.' Opp'n 10.  Specifically, Plaintiffs question whether the Department examined all of Decision Group 3 or only a subset of individuals with mixed consolidation loans and baselessly assert that the Department calculated these numbers using "rough averages."  *See id.*  Not so.  As the

---

[1] The Department also submitted a declaration from Deputy Chief Operating Officer Juengst in support of its opening Motion.  The Department submits this second declaration to respond to discrete, incorrect assertions in Plaintiffs' Opposition.  The declaration is therefore permitted under the Federal Rules of Civil Procedure.  *See Haugen v. The Burlington N. and Santa Fe R.R. Co.*, 2001 WL 1852331, at *6 (W.D. Wash. Nov. 27, 2001) (observing that "because the contested affidavits in the case at bar do not support the . . . motion, but rather support the reply, Rule 6(d) does not prohibit them from being filed subsequent to the motion as reply affidavits" (quoting *McGinnis v. Se. Anesthesia Assocs., P.A.*, 161 F.R.D. 41, 42 (W.D.N.C. 1995))).

Department explained, its analysis was based on actual data from all approved discharges in the Decision Group 3 population; information regarding that group is available because those borrowers already received decision notices. 1st Juengst Decl. ¶¶ 20–21, ECF No. 443-1. Thus the Department was able to, and did in fact, calculate a ratio of the eligible and ineligible school loans for the borrowers with mixed consolidation loans in Decision Group 3. 2d Juengst Decl. ¶ 8.[2]

Plaintiffs fare no better in asserting that the cost associated with the Department's alternative proposal "remains entirely speculative." Pls.' Opp'n at 11. The Department has acknowledged that some loans in Decision Group 3 may be uncollectable or forgiven under other programs such as Public Service Loan Forgiveness, 1st Juengst Decl. ¶ 27, but in many cases that remains to be seen and will depend, for example, on whether a borrower will continue working for a public service employer for the requisite amount of time or continue making payments on an outstanding loan, 2d Juengst Decl. ¶ 9. The future of loan forgiveness based on income-driven repayment ("IDR") is also uncertain, given an injunction preventing the Department from implementing parts of the Saving on a Valuable Education Plan and other IDR plans. 2d Juengst Decl. ¶ 9 (citing *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024)). The Department's estimates reflect the non-speculative information available as of today.

Plaintiffs' remaining argument asserts that ineligible debt is unlikely to be paid based on the possibility of default by borrowers who attended for-profit schools. Pls.' Opp'n 11–12. Plaintiffs premise their argument on their allegation that "[m]ore than 75% of Post-Class applications relate to Exhibit C schools, most of which are for-profit . . ." *Id.* at 11 n.8. But that would be the *eligible* debt if those applications were approved, not the ineligible debt. Plaintiffs hypothesize that some of these Post-Class applicants may have attended more than one for-profit college, making some of their ineligible debt less likely to be paid back. *Id*. at 12–13. But the Department and Plaintiffs are equally unable to quantify that amount, let alone speculate that it would be "only some small fraction of whatever balances it would retain." *Id*. at 13. Nor have Plaintiffs shown that these arguments about the Post-Class applicant pool

---

[2] By contrast, the Department does not have similar data for Decision Group 4, Decision Group 5, or the Post-Class Group, as the deadlines for decisions for those groups have not yet passed, thus all decisions have not been issued, which prevents the Department from identifying the class members with approved applications. Insofar as Plaintiffs are concerned that the lack of such information presents "a larger problem," Pls.' Opp. at 10, their position would further counsel against a ruling regarding those populations.

*Sweet v. Cardona*, No. 19-cv-3674, Defs.' Reply
6

1 apply to Decision Group 3 borrowers; which is all that is at issue here and all that the Department's cost estimate relates to.  *See id.* 11–13.

In short, Plaintiffs have failed to demonstrate that the Department's proposal presents a meaningful risk to the Decision Group 3 population or that it will not result in at least tens of millions of dollars of savings to the public fisc.  For the foregoing reasons, as well as those discussed in the Department's motion, the Court should approve the Department's alternative approach for the Decision Group 3 population.

Dated: November 27, 2024

Respectfully Submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*Benjamin Takemoto*
STUART J. ROBINSON
Senior Counsel
BENJAMIN T. TAKEMOTO
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4252
Fax: (202) 616-8460
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendants*