Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

THERESA SWEET, ON BEHALF OF          )
THEMSELVES AND ALL OTHERS SIMILARLY)
SITUATED,                            )
                                     )
            Plaintiffs,              )
                                     )
  vs.                                ) No. C 19-3674 WHA
                                     )
MIGUEL CARDONA, et al.,              )
                                     )  San Francisco, California
            Defendants.              )  Thursday
                                     )  December 12, 2024
_____)  8:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          PROJECT ON PREDATORY STUDENT LENDING
                             769 Centre Street
                             Suite 166
                             Jamaica Plain, Massachusetts 02130
                        BY:  **REBECCA C. ELLIS, ESQ.**

                             BAY AREA LEGAL AID
                             1735 Telegraph Avenue
                             Oakland, California 94612
                        BY:  **NOAH ZINNER, ESQ.**


**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                             Civil Division, Federal Programs Branch
                             1100 L Street, NW
                             Washington, DC 20005
                        BY:  **BENJAMIN THOMAS TAKEMOTO, ESQ.**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
        Official Reporter - US District Court
        Computerized Transcription By Eclipse

**APPEARANCES: (CONTINUED)**

**For Defendants:**               U.S. DEPARTMENT OF JUSTICE
                                  Civil Division, Federal Programs Branch
                                  450 Golden Gate Avenue.
                                  Suite 7-5395
                                  San Francisco, California 94102
                          **BY:   STUART JUSTIN ROBINSON, ESQ.**

**Also Present:**        **Todd James,** General Counsel's Office

                         **Mell Brittain-Smith,** Deputy Ombudsman

                         **Hunter Wiggins,** Federal Student Aid

                         **Colleen Fox,** Maximus Federal and Aidvantage

                         **Jonathan Sandler,** Nelnet

                         **Luke Sosnicki,** MOHELA

                         **David Esquivel,** EdFinancial

                                    -    -    -

```
 1   Thursday - December 12, 2024                    8:01 a.m.

 2                       P R O C E E D I N G S

 3                           ---oOo---

 4        THE CLERK:  Calling Civil Action 19-3674, Sweet, et

 5   al, versus Cardona, et al.

 6        Counsel, please approach the podium and state your

 7   appearances for the record, beginning with counsel for

 8   plaintiffs.

 9        MS. ELLIS:  Good morning, Your Honor.  Rebecca Ellis

10   from the Project on Predatory Student Lending for the

11   plaintiffs.

12        And with me today are my colleague Noah Zinner and lead

13   plaintiff Theresa Sweet.

14        THE COURT:  Welcome.

15        MR. TAKEMOTO:  And Benjamin Takemoto from the

16   Department of Justice on behalf of the defendants.

17        With me is Stuart Robinson also from the Department of

18   Justice; Mell Brittain-Smith, who is the Ombudsman; Hunter

19   Wiggins from FSA; and Todd James from the General Counsel's

20   Office.

21        THE COURT:  And we also have the servicers.  Would you

22   like to make your appearances, please.

23        MS. FOX:  Good morning, Your Honor.  Colleen Fox from

24   Husch Blackwell for Maximus Federal and Aidvantage.

25        THE COURT:  Thank you.
```

| | |
|---|---|
| 1 | **MR. SANDLER:**  Good morning, Your Honor.  Jonathan |
| 2 | Sandler for Nelnet. |
| 3 | **THE COURT:**  Thank you. |
| 4 | **MR. SOSNICKI:**  Good morning, Your Honor.  Luke |
| 5 | Sosnicki, Thompson Coburn, for MOHELA. |
| 6 | **THE COURT:**  Thank you. |
| 7 | **MR. ESQUIVEL:**  Good morning.  David Esquivel with |
| 8 | Bass, Berry and Sims on behalf of EdFinancial Services. |
| 9 | **THE COURT:**  Thank you.  I appreciate the servicers |
| 10 | being present. |
| 11 | Do we have any class members on the radio? |
| 12 | **THE CLERK:**  We do, Your Honor.  We have 100. |
| 13 | **THE COURT:**  Interest is dwindling.  Last time it was |
| 14 | 500 or 600.  Possibly it's too early in the morning, but let me |
| 15 | know if the number increases. |
| 16 | **THE CLERK:**  I will. |
| 17 | **THE COURT:**  We're here for two motions, a motion to |
| 18 | change the implementation method.  This is the Government's |
| 19 | motion.  Please proceed. |
| 20 | **MR. TAKEMOTO:**  Good morning, Your Honor.  May it |
| 21 | please the Court. |
| 22 | The Court should approve the Department's alternative |
| 23 | process for providing full settlement relief to Division |
| 24 | Group 3 for two reasons. |
| 25 | Number one, it is preferable to the Exhibit C process |

1  because the alternative process is more tailored to eligible

2  loan debt.

3      And, number two, it is feasible.

4      The Department and the servicers are committed to building

5  a framework and making a good faith attempt to use it to

6  deliver relief by July 28.  And if the Department determines

7  that that is not possible by February 28th, it will revert to

8  the Exhibit C process.  This will leave five months to handle

9  just a few thousand borrowers with mixed consolidation loans.

10     So just to recap the choice between the Exhibit C process

11  and the alternative process.  As we discussed at our September

12  hearing, the alternative approach targets eligible debt by

13  calculating the ratio of eligible to ineligible debt in the

14  original loan disbursement amounts and applying that ratio to

15  the principle amounts of the terminal consolidation loan.  The

16  Department would then waive all accrued interest and it would

17  refund payments made.

18     This is different from Exhibit C which targets the entire

19  terminal consolidation loan.  And, once again, the Department

20  proposed that process to deal with significantly larger

21  population with a more impending deadline than the one we're

22  facing right now.

23     On the first reason for the alternative process, that it's

24  fiscally responsible, as the Court instructed, the Department

25  has analyzed the cost of implementing the two approaches and

1    has determined that the alternative approach for Decision

2    Gruesome 3 would save approximately $55 million.

3        Broken down further, the average member of Decision

4    Group 3 with a mixed consolidation loan would receive

5    approximately $27,000 in additional relief under the Exhibit C

6    process, as compared to the alternative approach.

7        **THE COURT:**  Which would be what?  Under the

8    alternative approach, what would they receive?  I didn't

9    understand that.

10        **MR. TAKEMOTO:**  Sorry.  On average, the average

11    Decision Group 3 member would receive an additional 27,000 --

12    approximately $27,000 under the --

13        **THE COURT:**  Are we talking about 27,000 off of

14    100,000?  27,000 off of 50,000?  Or what would be the average

15    payout -- I mean, loan amount?

16        **MR. TAKEMOTO:**  I don't have the numbers of the average

17    payout.  Of course, it varies depending on the borrower.

18        But that was just -- that's a number to illustrate how

19    much additional ineligible debt would be discharged.

20        **THE COURT:**  Okay.  All right.  Keep going.

21        Tell me this.  Is this -- you don't have an actual plan

22    yet.  You have a plan to get a plan.  That's mainly what

23    concerns me, is that we actually don't know that this is going

24    to work.  And come January, February, we could be in a mess

25    having to go back to square one.

1    So address that point.

2        **MR. TAKEMOTO:**  Yeah.  The first point that I would

3    make is that this alternative process, of course, still needs

4    to undergo a change request, as we pointed out in our motion.

5    We received additional information from the servicers requiring

6    a change request.

7        The process itself though, although more complex than

8    Exhibit C process, is still relatively straightforward and

9    deals with a lot of the issues that we've had over the course

10    of the year, over the course of this past year.

11        So on the first -- so first on that point, it is the

12    Department now in its proposal that would come up with this

13    ratio of eligible to ineligible debt, not the servicers.  So

14    that way the Department is the one that's feeding that

15    information for the servicers to process.  That deals with one

16    issue we dealt with over the past year.

17        The second is that the Department is going to waive all

18    interest, as opposed to parsing out the interest to associate

19    it with eligible or ineligible debt.  This deals with another

20    issue over the past year that we've dealt with.

21        And then the last is on the payments that are going to be

22    refunded, we're using either data in the servicer databases or

23    through an SLDS, which deals with the issue that we've dealt

24    with over the past year on unreliable payment data.

25        Now, so that's the process and why we believe that it is a

```
 1   feasible process.

 2        On setting it up, I think the key thing to point out is

 3   this is exactly why we have that fail-safe mechanism; that the

 4   Department would determine by February 28th if it is unlikely

 5   to, using the alternative process, substantially complete

 6   relief to Decision Group 3 by the deadline, which is July 28.

 7        THE COURT:  Let me interrupt you.  Is July 28th the

 8   next imminent deadline?

 9        MR. TAKEMOTO:  The next imminent deadline is Decision

10   Group 2, which is January 28.

11        And on that, actually, if we could just briefly step

12   aside.  I do have good numbers to report on Decision Groups 1

13   and 2.

14        On Decision Group 1, this is as of last week and these are

15   proximate numbers, of course, but 99 percent of discharges are

16   complete for Decision Group 1; 98percent of refunds; and

17   97 percent of borrowers have received all relief.

18        And on Decision Group 2 we have 98 percent discharges;

19   96 percent refunds; and 95 percent of borrowers have received

20   all relief.

21        THE COURT:  So which group is it that's coming up in

22   January?

23        MR. TAKEMOTO:  Decision Group 2.

24        THE COURT:  And on that one, we -- your motion does

25   not pertain to that.
```

 1          **MR. TAKEMOTO:**  Correct.  We're -- at the previous --

 2  actually a couple hearings ago, the Court instructed the

 3  Department to use the Exhibit C methodology, to provide relief.

 4  So we're focusing -- we're discharging the entire terminal loan

 5  with respect to Decision Groups 1 and 2.

 6          **THE COURT:**  Now, if you were to stick with Exhibit C

 7  on No. 3, could the -- could the process be moving along and

 8  rest of December, January and February to provide relief, or --

 9  or are you going to be withholding relief until you find out if

10  you have a viable system?

11          **MR. TAKEMOTO:**  As I -- we may have discussed this

12  before, but it's difficult for the Department to be doing

13  this -- these simultaneous processes with the servicers.

14      So what would happen under our proposal is February 28 --

15  so we're going to try to do the alternative process, and

16  February 28 is a moment when the Department determines is this

17  going to work by the deadline.

18          **THE COURT:**  All right.  But under your proposal would

19  you be actually cutting checks before February 28th for Group

20  No. 3?

21          **MR. TAKEMOTO:**  That depends on how the process is

22  going, but the deadline to cut checks for Decision Group 3 is

23  actually July 28 not February 28.

24          **THE COURT:**  I got that, but normally you would be

25  doing it on a rolling basis.

```
 1            MR. TAKEMOTO:  Yeah.

 2            THE COURT:  You wouldn't wait until July 27th to send

 3    out all the checks.

 4            MR. TAKEMOTO:  Right.  I mean, it depends on how the

 5    process is going.

 6         I think the thing I would also flag here is that

 7    February 28 is five months away from when the deadline actually

 8    is, and the population of folks with mixed consolidation loans

 9    in Decision Group 3 is quite small.  It's just a few thousand

10    borrowers.

11         And so this is very different from the issue we were

12    dealing with earlier this year where we had, I believe it was

13    around a two-month deadline dealing with the population that

14    involved, you know, tens of thousands of borrowers.

15         So it's --

16            THE COURT:  How many are in Group 3?

17            MR. TAKEMOTO:  The total number is -- it's in our

18    motion.

19         (Brief pause.)

20            MR. TAKEMOTO:  Decision Group 3 contains 13,604

21    members.

22            THE COURT:  And how about number -- while we're at it,

23    Number 4?

24            MR. TAKEMOTO:  Number 4 is 9,471 members.

25         Of course, the Department is only moving as to Group 3.
```

 1  That's the group where written notices have already been sent

 2  out, and so the Department has actual data on that group.

 3        **THE COURT:**  Why did you pick February 28th?

 4        **MR. TAKEMOTO:**  The Department determined that that was

 5  the amount of time that would be needed if we needed to fall

 6  back on the Exhibit C process and still meet the July 28

 7  deadline.

 8        **THE COURT:**  How good has the Department's estimates

 9  been so far on meeting deadlines?

10        **MR. TAKEMOTO:**  Your Honor, I think, as I've said,

11  we've -- we have encountered issues, of course, over the past

12  year, but we've learned from those issues.  And all of those

13  issues, as I mentioned, have been built into this; right?  The

14  issue of servicer data is incorporated into the process.  The

15  issue of calculating the ratio is incorporated into the

16  process.

17        **THE COURT:**  Let me ask a somewhat related question.

18     Raise your hand over there if you're in the Department of

19  Education.

20     (Show of hands.)

21        **THE COURT:**  I've forgotten who's -- one, two, three.

22  Okay.

23     Now we're going to have a new change in administrations.

24  They are saying they are going to eliminate the Department of

25  Education.  Will these three people be here all the way through

1    July next year?

2            **MR. TAKEMOTO:**  Yeah.  I mean, I --

3            **THE COURT:**  Are they going to -- maybe one of them is

4    planning to leave tomorrow, for all I know.

5        I read in the paper in this very case after one of our

6    hearings, about a week later the ombudsman, or somebody -- I've

7    forgotten who it was -- was terminated or -- you know, they

8    were in the newspaper.  So it could happen.

9        And your program probably depends upon good people sitting

10    here at this table being able to see the process through.

11            **MR. TAKEMOTO:**  I think what I would say in response to

12    that is that, of course, Your Honor, like, you know, for any

13    reason issues could arise.  That is why we have this fail-safe

14    mechanism in place.  It gives the Department enough time to

15    give it its best effort to be as fiscally responsible as

16    possible.

17            **THE COURT:**  Could you move that up to, say,

18    January 31?  That's six weeks.

19            **MR. TAKEMOTO:**  I think I'd have to discuss that with

20    the Department, but, I mean, I think, you know, if we -- of

21    course, it's possible to move the date earlier, but that would

22    just make it less likely that the alternative process would --

23    I mean, we want to give it our best effort to have this

24    alternative process work.

25            **THE COURT:**  It depends on it being implementable by

1  the servicers; correct?

2          **MR. TAKEMOTO:**  Correct.

3          **THE COURT:**  They have to learn the new system, have

4  the change orders in place.

5          **MR. TAKEMOTO:**  Right.  And they are involved with

6  building it, too, and agreeing to the change request.  But

7  that's incorporated into this -- that's why we have this

8  fail-safe mechanism.

9          **THE COURT:**  Have you run it through the servicers to

10  see if they have any estimates of whether it will work or not?

11          **MR. TAKEMOTO:**  So we have, and we're in ongoing

12  discussions.  That's part of what needs to happen over the

13  course of the next few months.

14      We have, as I mentioned at the last hearing, sent draft

15  instructions to the servicers.  We've received feedback from

16  the servicers.  That's been an iterative process.

17      I think at this stage, you know, if we get a Court order

18  to approve this alternative process, then we would begin to

19  finalize those instructions and then get this all underway.

20  But, of course, they have been, you know, a key part of the

21  developing this proposal.

22          **THE COURT:**  Let me hear from the other side.

23  Ms. Ellis.

24          **MS. ELLIS:**  Thank you, Your Honor.

25          **THE COURT:**  Let me start with this -- I don't like the

1    idea of a windfall.  I think the class members ought to get

2    their relief, but they shouldn't -- I am sympathetic to the

3    Government's point that they will be getting a windfall, this

4    vast amount of money that the Government would be overpaying.

5    So that's their best point.

6         So I want to understand your -- your concerns.

7              **MS. ELLIS:**  Thank you, Your Honor.

8         I think our concern is that, as Your Honor put it, what

9    the Department has now is a plan to make a plan.  Their

10   briefing didn't include any details about what status is this

11   change request at?  Has it actually been drafted?  When do they

12   expect it to be finalized?  How much money is it going to cost?

13   We know that the Department has at other times told us their

14   capacity is limited by their budget.

15        We don't want to be back here in a couple of months

16   hearing:  Well, we actually can't pay the servicers to do what

17   we want to do.

18        The Department also -- back in September, on

19   September 25th the Department filed a notice, what they called

20   a notice with this Court.  They stated that they could set up

21   their proposed alternative process in eight to ten weeks with

22   no change request.

23        Now we're back here.  It's ten weeks after this filing.

24   The process has not been built.  It does require a change

25   request.  And they are actually not sure when they are going to

 1   be able to determine whether the process works.

 2        In our view, Your Honor, the deadlines are at the absolute

 3   heart of this Settlement Agreement.  This was a case about

 4   delay.  The settlement established dates certain by which class

 5   members would have their borrower defenses resolved and would

 6   have their relief delivered.

 7        The Department so far has not met a single deadline in

 8   this case.  They missed the deadline for the automatic relief

 9   group.  They missed the deadline for Decision Group 1.

10        The only reason that Decision Group 2 appears to be on

11   track to meet its deadline is because this Court ordered the

12   Department to follow the procedure that right now it's trying

13   to throw out, which is the terminal mixed consolidation

14   discharge procedure.

15        We understand Your Honor's concern about the fiscal

16   responsibility aspect.  To that I would say that this estimate

17   of $50 million is wildly overstated.

18        What they are saying essentially is that they would be

19   able to keep $50 million worth of loans on the books.  And we

20   don't actually have insight into the data they used to come up

21   with that number.  We don't know any more than what's in their

22   papers.

23        But having $50 million of loans on the books is not the

24   same as having $50 million in hand.  They are going to have to

25   pay the servicers to do their procedure.

1    Whereas, the terminal discharge procedure that we have

2 been using, it did not require a change request.  It did not

3 require any additional payments to the servicers for them to

4 execute it.

5    The Department also ignores its own accounting procedures.

6 It's well known.  It's acknowledged in Department rule-making

7 and by the GAO that no single cohort of direct loan borrowers

8 has ever repaid the full balance of their loans.

9    So because the Government itself acknowledges about a

10 quarter of the remaining loans would likely be eligible for

11 discharge under public service loan forgiveness and other

12 programs, given our particular population of borrowers in this

13 class, people who went to for-profit colleges, many of them,

14 and a large number went to more than one for-profit college.

15    Some of these other remaining loans may be eligible for

16 borrower defense discharge.  They may be eligible for close

17 school discharge.  Some members of the class may have

18 disabilities that entitle them to a disability discharge.  If

19 someone is in income driven repayment, they will be making

20 payments that often don't even cover the interest, let alone

21 the principle.  And those loans, under current law at least,

22 will be forgiven after 20 to 25 years.

23    So our point here is it's not so much about the specific

24 amount of money at issue.  We acknowledge that changing to the

25 Government's procedure would probably bring in more than zero

 1  dollars.  I don't think we have a good handle on how much more

 2  than zero.

 3      But the point is that the Department is asking the class

 4  to bear a significant risk.  They are asking them to bear the

 5  risk of further delay, further violations of the Settlement

 6  Agreement, and the class gets no benefit from that risk.  The

 7  Department only gets a highly contingent and uncertain benefit

 8  from that risk.

 9      And the only reason that this risk is presented now is

10  because the Government didn't get a handle on its own loan

11  discharge procedures earlier.  They signed the Settlement

12  Agreement in June 2022.  The first payments weren't due to the

13  automatic relief group until January 2024.  They had a year and

14  a half to figure out discharge procedures that worked.  They

15  didn't do it.

16      In fact, they didn't even notice that consolidated loans

17  weren't being discharged until we, the plaintiffs, wrote to

18  them, called them, emailed them for months saying:  Hey, we're

19  seeing these red flags that you're going to blow the first

20  deadline.  And only then did they realize:  Oh, no,

21  consolidated loans exist.

22      It then took them another nine months to come up with this

23  procedure or this idea of a possible procedure.

24      And, Your Honor, I also want to highlight the fact that

25  they are saying they only want to apply this procedure to

1     Decision Group 3, not to Decision Groups 3, 4, 5 and 6.  This

2     Court specifically ordered us to brief the issue of how to

3     calculate relief for everyone who might be entitled to relief

4     in the class and the post class under the rest of the

5     settlement.  The Department has refused to do that.  They put

6     in it a footnote, but it's highly significant.  They say we

7     only want to do this for Decision Group 3 because we might

8     change our mind.  We might want to do a different procedure

9     later.

10          So, first of all, if we're talking about costs, if they

11    want to change the procedure later, there is probably going to

12    be another change request.  An earlier change request in this

13    very case cost $10 million.  So --

14              THE COURT:  Say that again?  What did?

15              MS. ELLIS:  A change request that the Department put

16    in back in, I believe, April or May of 2024 to collect

17    additional data from the servicers so that they could deliver

18    relief to the automatic relief group, that change request cost

19    $10 million.  And that was according to a declaration, I

20    believe, from Richard Cordray that was filed in this case.

21              THE COURT:  They had to pay the servicers a total of

22    $10 million to make the change order?

23              MS. ELLIS:  Yes, Your Honor.

24              THE COURT:  Just to make the change order, not to

25    actually do the work?

1     **MS. ELLIS:**  Well, the change order, it sets out how

2  much the servicers will be paid for the work that they do.

3     So if the Government wants to then do another change order

4  in next July, in a year from now, that's going to cost more

5  money.  But more importantly, what it's going to do is engender

6  further litigation.

7     I think it is -- the kindest way I can put it is that it's

8  unrealistic for the Department to, in its papers, say:  Well,

9  we don't know.  We don't know if there will be further

10  litigation if we change the method.

11     I think we know.  We've all been here in this case for the

12  last five years.  We've seen what happened, for instance, the

13  first time that the parties tried to settle this case.

14     The Department thought they found a loophole in that first

15  settlement.  They started sending out the mass denial notices.

16  They essentially hoped we wouldn't notice before it was too

17  late.  We cannot leave a loophole for something like that to

18  happen again with the delivery of relief.

19     I think it's extremely important that this Court establish

20  the procedures for all of the remaining class members and

21  post-class members now.  Obviously, as we've argued, we think

22  the better approach under the circumstances is to do the

23  terminal consolidation discharge.  That is the only method that

24  we know works.  We've seen it work with the automatic relief

25  group.  We've seen it work with Decision Groups 1 and 2.

```
 1        But even if this Court disagrees and thinks that there
 2   should be another method, there should be just one method that
 3   is established for everybody so that we're not having this
 4   fight every six months for the next three years.
 5        THE COURT:  What does the Government say to
 6   Ms. Ellis's point that if we were to make a change, it should
 7   be across the board for all groups?
 8        MR. TAKEMOTO:  Yes, Your Honor.
 9        The first thing I would say is that it's confusing to me
10   why plaintiffs are arguing that on the one hand this
11   alternative process is risky, but also that we should be
12   applying it to more groups than just Decision Group 3.
13        But at any rate --
14        THE COURT:  I know a reason.  Because if you start
15   changing the horses in midstream, only to find out that that
16   system failed and then you've got to go back to another system,
17   yet a third system, then these deadlines will be in great
18   jeopardy and the class members have been waiting a long time.
19        MR. TAKEMOTO:  Well, I think that goes to the reason
20   why the Department had initially proposed a process for all of
21   the decision groups and, frankly, circumstances have changed
22   since that time.
23        Part of that included the new information that we received
24   from the servicers that necessitated a change request.  Part of
25   that had to do with the fact that there was a change in --
```

1   there will be a change in administrations.  And what that means

2   is that, you know, some of these deadlines that we're talking

3   about are years in the future.  So we thought it would be more

4   appropriate to focus on the more immediate deadline.

5       Of course, there is no allegation -- and we're not even

6   close to material breach for those groups, right, for Decision

7   Groups 3, 4 and 5, because they are very far in the future.

8       And so we thought it would be prudent also because of the

9   fact that we have actual data on Decision Group 3.  Those

10  notices of decisions have actually gone out.  Notices have not

11  gone out yet for 4, 5 and 6 in total -- sorry, 4, 5 and the

12  post-class group, because those deadlines have not come to pass

13  yet.  And so for those reasons, we're focusing on Decision

14  Group 3.

15      Your Honor, I did have a question that I wanted to answer

16  to previously, which is whether checks would start to be cut

17  now or whether we'd have to wait until February 27.  I think

18  it's important to remember that we're talking only about

19  borrowers with mixed consolidation loans in Decision Group 3.

20  The Department and the servicers are working on folks who do

21  not have mixed consolidation loans in Decision Group 3 as we

22  speak.  So we're really only talking about that subset --

23          **THE COURT:**  In Group 3 how many have mixed loans?

24          **MR. TAKEMOTO:**  Approximately 2,000.

25          **THE COURT:**  In total how many are in 3?

1              **MR. TAKEMOTO:**  Approximately 13,000.

2              **THE COURT:**  So 2 out of 13, okay.

3              **MR. TAKEMOTO:**  Yeah.

4         And then, you know, I think the bottom line on the points

5    that my friend on the other side raised about cost.  You know,

6    I think plaintiffs have raised some cost offsets, of course,

7    that the Department acknowledges.  You know, for example, the

8    ability to collect -- or the cost of collecting on loans.

9         As we've explained in our declaration, we've addressed all

10   of these points.  You know, that the cost of collection is

11   diminimus.  You know, it's -- it's, of course, possible that

12   loans could be forgiven under other programs, although that

13   itself is speculative, particularly the injunction on the Save

14   and other income driven repayment plans.

15        But the bottom line is that, of course, the Department

16   will save money under the alternative approach, as compared to

17   the Exhibit C approach, for the simple reason that it is

18   discharging data that is more tailored to the relief that the

19   Settlement Agreement provides, as opposed to the Exhibit C

20   process, which is more expansive and encompasses the entire

21   terminal consolidation loan regardless of whether it's eligible

22   or ineligible debt.

23        And then the last point that I want to make on this is,

24   you know, I think it's important to emphasize that there really

25   is no risk under our proposal.  We've built in time to

1    determine whether this alternative approach is working.  And if

2    we determine that it's not working by February 28th, that gives

3    us five months to handle approximately 2,000 borrowers with

4    mixed consolidation loans, and the Department has shown that it

5    is more than capable of doing that.

6        I mean, I pointed out earlier since the September hearing

7    for Decision Groups 1 and 2, using the Exhibit C approach,

8    we've reached substantial compliance with respect to those two

9    groups in just a matter of months.

10           **THE COURT:**  Okay.  Do you want to hear the answer?

11           **MR. TAKEMOTO:**  Yes.

12           **THE COURT:**  Do you want to hear the answer?

13           **MS. ELLIS:**  Yes, Your Honor.

14           **THE COURT:**  How many people are listening on the

15   radio?

16           **THE CLERK:**  331, Your Honor, are attendees.

17           **THE COURT:**  Probably the reason it's a little lower

18   than before is so many people have already gotten relief.  So

19   that's -- it used to be a thousand.  Now it's down to 300.

20       Okay.  Here is the answer.  It's a two-part answer.

21   Denied, for now.  Because the record is not adequate to meet

22   the concern that you just got to plan to get a plan.  It's not

23   a plan yet.  That's the main reason.

24       I am sympathetic to saving the Government money, but here

25   is the second part.

1      You may file yet another motion by January 31 to do the

2   same thing, but with a better record.  And by "better record"

3   I mean something pretty stiff as follows.

4      First, that all three of those Department of Education

5   people here in the courtroom are going to still be with the

6   Department through at least July.

7      Second, that you have sworn, sworn, affidavits by the

8   Department and by you that this will work without a glitch,

9   whatever your plan to get a plan is, and affidavits by the

10   servicers that they understand the new plan and they will be

11   able to comply and get it all done on time.

12      Now, that would be a good record.  Wherever -- of course,

13   you have to lay out what the -- how it's going to work, but

14   right now all you have is:  Judge, we will revert to the

15   original scheme if -- on February 28th.

16      I would take your word for that if it weren't for the

17   record in this case of every deadline being blown.  You've not

18   been -- you don't have a good record.  So even though I believe

19   you believe it, I don't believe you could meet a deadline of

20   February 28.  Possibly you could meet January 31, if the record

21   is good enough.

22      Now, this means, of course, work over the holidays.  Oh,

23   my God.  You have to work, actually work over the holidays.

24   When I was in the Justice Department, we worked on Christmas

25   Day.  So there you go.

```
 1        All right.  So that's the answer to that.  Denied with
 2    that caveat.  You get one more shot at it if you have a better
 3    record.
 4        Okay.  Number 2, fees.  I've got a question for you.  Have
 5    you been paid any fees in this case for your main work on the
 6    case?
 7            MS. ELLIS:  Yes, Your Honor.  We did come to a fee
 8    agreement for the work that was done from the inception of the
 9    case through final approval.
10            THE COURT:  Have you been approved?  Has that been
11    paid?
12            MS. ELLIS:  Yes.
13            THE COURT:  Okay.  So what we're talking about now
14    is -- I thought that's what we were talking about now.  So
15    you're talking about the -- something narrower than that.
16            MS. ELLIS:  That's correct, Your Honor.  This is fees
17    to -- to bring and prosecute the enforcement motion.
18            THE COURT:  All right.  You stipulated to it; right?
19            MR. TAKEMOTO:  Correct.
20            THE COURT:  I'm going to grant that.
21            MS. ELLIS:  Thank you, Your Honor.
22            THE COURT:  No more argument needed.  Okay.  So that's
23    granted.
24        Any other business today?
25            MR. TAKEMOTO:  Not from the Department, Your Honor.
```

1        **MS. ELLIS:**  Your Honor, could I just ask for

2   clarification on your order on the Government's motion?

3        The order is that we will not today establish refund

4   methodology going forward, but we will after the

5   January 31st --

6        **THE COURT:**  Right now the method that's in place is

7   your method.

8        **MS. ELLIS:**  Understood.  Thank you, Your Honor.

9        **THE COURT:**  That's the method that is in place for the

10  combined loans, the mixed loans.

11       However, I'm still willing to entertain a change if the

12  Government can give me a record that shows it will be done and

13  it's -- and it says guaranteed by the lawyers and those three

14  people there and the servicers.  No question it's going to be

15  doable.  Then, okay, then I'll probably say yes.

16       Right now it's just a plan to get a plan.  And I know what

17  will happen.  There will be too many glitches.  You'll -- it

18  won't work.  It will miss the deadline.

19       **MS. ELLIS:**  And the current methodology will apply to

20  all groups going forward unless and until the Government

21  provides that record.

22       **THE COURT:**  Correct.  That's right.  But they can

23  still possibly persuade me to change my mind.

24       **MS. ELLIS:**  Understood, Your Honor.  Thank you.

25       **THE COURT:**  I want to thank the servicers for showing

```
 1   up.  Who came the farthest?  Which one of you?

 2         (Hand raised.)

 3             THE COURT:  How far did you come?

 4             MS. FOX:  From New Jersey, Your Honor.

 5             THE COURT:  New Jersey.  Where the drones are flying

 6   over.

 7             MS. FOX:  That's right.

 8             THE COURT:  Okay.  Well, thank you.  That's bad

 9   weather and all that, and thank you for coming out.

10         I want to thank the members of the class for showing up on

11   the Zoom.  I know it's of great interest to you.

12         Okay.  The hearing is at an end.

13         (Proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25
```

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, January 30, 2025