EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THERESA SWEET et al., <br><br> Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education*, and <br><br> THE UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 19-cv-03674-WHA <br><br> **PLAINTIFFS' STATEMENT REGARDING SETTLEMENT IMPLEMENTATION** <br><br> **HEARING DATE: April 15, 2025** <br><br> (Class Action) <br> (Administrative Procedure Act Case) |

Plaintiffs Theresa Sweet, et al. ("Plaintiffs") respectfully submit this statement in advance of the upcoming hearing to provide a status update regarding the implementation of settlement relief, pursuant to the Court's Order following the hearing in this matter on March 13, 2025 (ECF No. 463).[1]

## I. Plaintiffs' Statement Regarding Obstacles to the Distribution of Relief for Automatic Relief Group and Decision Groups 1, 2, and 3

The Department provided statistics regarding the delivery of settlement relief to the above-listed groups. ECF No. 468 at 1. Plaintiffs agree that the Department is in substantial compliance with the Settlement Agreement with respect to the delivery of relief to the Automatic Relief Group and Decision Groups 1 and 2. Progress on Decision Group 3 appears sufficient at this time for Defendants to achieve substantial compliance by the July 28, 2025, deadline, although Plaintiffs reserve on this question.

However, Plaintiffs have identified numerous issues that pose obstacles to the completion of relief for all Class Members, including Class Members who are counted as "complete" in the data provided by the Department. Unfortunately, the Department has not cooperated with Plaintiffs' efforts to resolve these issues. Additionally, the Department has not cooperated with Plaintiffs' requests for data regarding Decision Groups 3 and 4, which is necessary for Plaintiffs to oversee the Department's continued compliance.

### 1. De-Staffing the Ombudsman's Office

On March 14, 2025, Plaintiffs sent Defendants a letter with detailed requests for information regarding changes to the staffing of the Ombudsman's Office since February 1, 2025, specifically focusing on Ombuds staff who worked on *Sweet* Class Member inquiries. *See* Letter from R. Ellis to B. Takemoto & C. Merritt (Mar. 14, 2025), Ellis Decl. Ex. A. Plaintiffs' request was intended to address the questions raised at the March 13, 2025, hearing in this matter regarding the Ombudsman's Office's ability to continue responding to Class Member complaints submitted to sweet@ed.gov following the Department's extraordinary staffing cuts.

---

[1] Plaintiffs and Defendants were not able to agree on the topics for inclusion in the Joint Status Report. Plaintiffs respectfully submit this separate report in effort to provide the Court with information relevant and germane to the question of progress toward providing Full Settlement Relief to all Class Members.

Defendants refused to discuss Plaintiffs' questions at the parties' in-person meeting on April 10, 2025. At that meeting, Phillip Juengst, the Deputy Chief Operating Officer of Federal Student Aid (FSA), stated for the first time that "there is not a *Sweet* team" at the Ombudsman's Office any longer. Previously, on March 12, 2025, DOJ had assured Plaintiffs that there were eight full-time Ombuds employees staffed to the *Sweet* team.[2] Defendants also stated at the April 10 meeting that they would refuse to provide the names of the people in the Ombuds office who have worked on and who are allegedly now working on *Sweet* complaints.

Defendants responded to Plaintiffs' letter less than 24 hours before the scheduled status conference in this matter, and less than 2 hours before the time when the parties were scheduled to file a joint status report. In their response, Defendants did not respond to Plaintiffs' questions. Instead, Defendants claimed, falsely, that "staffing levels at the Ombudsman's Office have increased in recent months to handle various needs that have arisen." Letter from L. Jines to R. Ellis at 1 (Apr. 14, 2025), Ellis Decl. Ex. C. Based on available information, it is Plaintiffs' understanding that Defendants fired all Ombuds staff who were designated as "probationary" employees in February 2025, and that the following sections of the Ombudsman's Office were entirely or almost entirely eliminated in the Reduction in Force of March 2025: the Community Support Division, the Intake Division, the Dispute Resolution Division, and the External Outreach and Stakeholder Engagement Division. These firings included people who had worked on the *Sweet* case team as well as people who had been processing emails to the sweet@ed.gov inbox into the Ombuds complaint tracking system. *See* Letter from R. Ellis to B. Takemoto (Mar. 25, 2025) at 3–4, Ellis Decl. Ex. B. Defendants also maintained in their April 14 letter Mr. Juengst's position that there is no "*Sweet* case team"—despite the fact that, for months now, Plaintiffs have been meeting weekly with a specific set of people to discuss *Sweet* complaint resolution.

Individual staff members in the Ombudsman's Office have been working hard on Class Members' behalf, but their efforts cannot overcome the systematic shortcomings caused by the recent firings or the overall mismatch between the number of Class Member questions and the number of people tasked with resolving them. As of April 9, 2025 (the most recent date for which Plaintiffs have data), there are over

---

[2] Plaintiffs note that, in the course of the Parties' regular meetings since April 2024, they have never observed more than six Ombuds employees working on *Sweet* complaint resolution on a regular basis.

2,200 emails in the sweet@ed.gov inbox that have not yet been read, let alone catalogued. There are 10,410 submissions that have been catalogued but have not yet been resolved. Of those, 1,149 submissions have had a solution to the Class Member's problem identified, but the Ombuds staff has not been able to complete relief because they are waiting for action from the servicers, the Department's Office of General Counsel (OGC), or other staff within the Department. The Ombuds staff has, to date, fully resolved only 2,764 of 13,174 questions/complaints that have been catalogued.

Resolving individual Class Member complaints is a bespoke process: it can take months for an FSA employee to learn the Settlement's requirements and the processes needed to resolve issues. By eliminating staff who understood how to implement *Sweet* relief, Defendants have badly slowed down a process that was already struggling to keep up with the demand for help. And by firing most of the Ombuds staff altogether, Defendants have all but ensured that there are inadequate resources to backstop those losses. Mr. Juengst suggested at the Parties' April 10 meeting that Ombuds staff are now "floating" in and out of *Sweet* work; the Defendants' recent letter echoes this assertion, claiming that dozens of people are performing *Sweet* work on a regular basis. *See* Ellis Decl. Ex. C at 2. If this representation is accurate—which the numbers belie—then it would be a recipe for disaster.

To be clear, the number of outstanding Class Member inquiries is not the only metric of importance here. As with the issue of Form Denial Notices earlier in this litigation, simply closing a case is not satisfactory if the Class Member's issue is not resolved or is resolved in a way that denies the Class Member any of the Full Settlement Relief to which they are entitled. The Ombuds staff on the *Sweet* team have done an admirable job so far of making sure that questions are answered correctly and thoroughly. But they clearly are not receiving adequate support.

### 2.    Refunds of Income Tax Offsets and Wage Garnishments

Class Members in all relief groups have experienced major delays in receiving refunds of amounts garnished from their tax refunds and wages, via the Treasury Offset Program and Administrative Wage Garnishment (TOP/AWG), to pay their *Sweet*-related loans. Plaintiffs' understanding is that the delays are because the record-keeping for these collections was poor and was not integrated with the Department's National Student Loan Data System (NSLDS).

Since fall 2024, the Parties have been discussing the issue of TOP/AWG refunds, particularly as concerns Class Members with FFEL loans. The Department has committed to providing these refunds, but it has repeatedly failed to deliver them, or even to provide Plaintiffs with a repeatedly promised "update" on how it will do so. *See* Ellis Decl. Ex. B at 5–6; Ellis Decl. Ex. C at 6. Since these TOP/AWG discussions began, two different OGC attorneys who were overseeing compliance with the *Sweet* settlement have left the Department; it is Plaintiffs' understanding that OGC's staff has been severely reduced by the Department's recent firings.

By the Department's own admission, there are nearly two hundred complaints in the Ombuds office's queue that the Ombuds team cannot resolve because they have been waiting for guidance from OGC on this issue. *See* Ellis Decl. Ex. C at 6. Some of these complaints have lingered for months and relate to relief that was due months ago. They require prompt resolution.

### 3. Servicer Operations Issues

As the Parties discussed at the previous hearing in March 2025, the problems with Ombuds staffing are having spillover effects that implicate the loan servicers. When Class Members do not receive a response from their inquiries to sweet@ed.gov, they often turn to their servicers to try to get information about their accounts. But Class Members are experiencing worsening problems with call hold times and dropped calls when they try to contact their servicers directly. As Plaintiffs highlighted at the March hearing, MOHELA is a notable offender, but Class Members have had trouble getting their issues resolved with other servicers, too.

After hearing from dozens of Class Members after the March hearing, Named Plaintiff Alicia Davis circulated a survey via online groups for *Sweet* Class Members requesting information about servicer wait times. She received 457 responses. *See* Camargo Almeida Decl. ¶ 2. Class Members who tried to call their servicers reported that they frequently had to wait on hold for hours before being able to speak with a person.[3] Across all servicers, a plurality of Class Members (about 30%) reported that their

---

[3] Student loan servicer hold times and abandoned calls were, until recently, a supervisory concern of the Consumer Financial Protection Bureau (CFPB). With the administration's recent efforts to stop work at the CFPB, that supervision is no longer taking place. The Department likewise eliminated its entire Vendor Performance Division and Vendor Audit Division in March 2025. It is unclear, then, who is ensuring that student loan servicers fulfill their obligations to borrowers (and to their own federal contracts). Plaintiffs

average hold times were an hour or less. For MOHELA, however, the most common answer was three to four hours. *See* Camargo Almeida Decl. ¶ 16. Indeed, in a letter submitted to the Court today, MOHELA conceded that the average hold time for callers was nearly three and a half hours from March 12 to April 12, 2025. ECF No. 468-2 at 1.

Specifically, survey respondents reported the following regarding how long it took to reach a human representative:

- Of the 161 Class Member respondents who called MOHELA, only 22 reported that they were on hold for less than one hour. By contrast, 51 Class Members reported that their average hold time was one to two hours; 57 reported three to four hours; 22 reported five to six hours; three reported seven to eight hours; two reported nine to ten hours; and three reported over eleven hours.[4] *See* Camargo Almeida Decl. ¶ 6.

- Of the 59 Class Members who called Aidvantage, 28 reported that their average hold time was less than one hour; 21 reported one to two hours; eight reported three to four hours; one reported five to six hours; and one reported over eleven hours. *See* Camargo Almeida Decl. ¶ 7.

- Of the 85 Class Members who called Nelnet, 38 reported that they were on hold for less than one hour; 32 reported that their average hold time was one to two hours; nine reported three to four hours; and four reported five to six hours.[5] *See* Camargo Almeida Decl. ¶ 8.

---

have requested information from the Department regarding who is performing servicer oversight now for *Sweet* compliance purposes and what that oversight consists of, *see* Ellis Decl. Ex. B at 5; the Department did not provide the requested information, instead asserting that "[t]he Department . . . meets regularly with servicers to discuss call center metrics such as timeliness and quality of customer service" and "track[s] instances of non-compliance and continue to follow up with servicers until corrected." *See* Ellis Decl. Ex. C at 6.

[4] Although the remaining Class Member who reported calling MOHELA did eventually reach a representative, they had to end calls because hold times were too long and they had to attend to work and family obligations. They did not, however, provide an average hold time.

[5] The remaining two Class Members who reported calling Nelnet did not provide information about average hold times, nor did they state whether they were eventually able to reach a representative.

*Sweet v. Cardona*, No. 19-cv-3674, Plaintiffs' Statement re Settlement Implementation

5

- The fewest Class Member respondents called EdFinancial. Of the 13 Class Members who did, seven reported that they were on hold for less than one hour, and three reported that their average hold time was one to two hours.[6] *See* Camargo Almeida Decl. ¶ 9.

Even when Class Members are able to reach a human, that does not mean they will get answers to their questions—especially accurate answers. Several dozen survey respondents who called their servicers reported being told contradicting or wrong information about the *Sweet* case. Many Class Members responded along the lines of "[I] received different answers each time I called," or "each time I spoke with someone I was told different things." Many others were told to contact the Department of Education, when the Department had told them to contact their servicer in the first place. For example, one borrower who was purchasing a house asked Nelnet to temporarily take them out of administrative forbearance so that they could show their bank a status of repayment and get a mortgage approved. When trying to get back into administrative forbearance on March 14, 2025, they were told to call FSA, who then said only Nelnet had the power to place them in administrative forbearance. The borrower remained in repayment as of March 20, 2025. *See* Camargo Almeida Decl. ¶ 10.

Several other callers reported speaking with a servicer representative who was not aware of the *Sweet* litigation or did not have any idea how to answer questions pertaining to the caller's borrower defense case. One Class Member from the Automatic Relief Group stated, "They did not even know a check was sent or that it went to the wrong address so they kept telling me to call back on a weekly basis." For callers, spending hours on the phone only to be connected with someone who could not provide any helpful answers was not only wasteful, but also emotionally draining. One Post-Class caller said they "left the conversation worse off emotionally than I was before the call. If the servicer doesn't know what they're doing, what hope do I have[?]" Another caller spent five to six hours on hold before finally reaching a representative, only to be told that they would be transferred and put on hold again; at 5:00 p.m., the call was disconnected because the call center office closed. A Decision Group 2 caller shared their frustrating

---

[6] Of the remaining three Class Members who reported calling EdFinancial, one stated that they called numerous times and never reached a representative; another stated that they never reached a representative and had to end calls because hold times were too long and they had to attend to work obligations; and the last did not provide any further information. None of these three respondents provided an average hold time.

experience trying to get information from their servicer: First, a phone representative told the caller that they were not permitted to send an email confirming what they discussed over the phone, and later, the caller was not allowed to speak directly with a supervisor when the person the caller was talking to did not know anything about the *Sweet* settlement. *See* Camargo Almeida Decl. ¶ 11.

Notably, there is no way to reach the Ombudsman's Office by phone. Class Members who try to call the Department with *Sweet*-related questions are routed to the general-purpose call center. Ms. Davis's survey also asked about Class Members' experiences attempting to contact the Department. Of the 324 Class Member respondents who reported that they called the Department, 102 stated that they were *sometimes* able to speak to a representative; 84 said they were able to speak to a representative *every time*; and 62 said they were *never* able to reach a representative. *See* Camargo Almeida Decl. ¶ 13. Human contact, then, is in the overall minority of experiences. When asked the average time they spent on hold, 129 Class Members (about 40%) responded that their average wait time was less than one hour; 77 reported one to two hours; 24 reported three to four hours; seven reported five to six hours; two reported seven to eight hours; one reported nine to ten hours; and four people responded that their average wait time was over eleven hours. *See* Camargo Almeida Decl. ¶ 12. *Compare* Transcript of Mar. 13, 2025, Hearing at 17:3–12, ECF No. 466 (Christian Odom, current Ombudsman, stating that "[t]he hold times at FSAIC [the Department's phone line] have been reasonable").

Overall, 55 percent of Class Member respondents reported that their call to the Department did not solve the issue they called about. Only nine percent said their issue was resolved, and six percent reported unclear/partially fixed issues.[7] *See* Camargo Almeida Decl. ¶ 14. As was the case with the servicers, Class Members included narratives in their survey responses about their frustrating experiences when calling the Department. One stated, "[M]ost of the rep[resentatives] were uneducated on the process." Another reported, "[I] was first told they didn't know about the lawsuit. Then I was told there was no court order." Another Class Member wrote, "[T]hey had no clue what I was talking about [and] couldn't even see that I was a member of the class even though I am." Several others shared similar experiences of receiving contradicting information or being told to contact their servicer after having already done so. One Class

---

[7] The remaining 30 percent did not state whether their issue was resolved.

*Sweet v. Cardona*, No. 19-cv-3674, Plaintiffs' Statement re Settlement Implementation

7

Member wrote, "I would typically get told to contact my loan servicer to resolve my issues. The loan service[r] would tell me to contact FSA. It was a lot of back and forth without any resolve." Another stated that the outcome of their calls was "usually being hung up on. Sometimes I was given widely inaccurate information. I was treated horribly." *See* Camargo Almeida Decl. ¶ 15.

Servicer response times to questions or instructions from the Ombudsman's Office are, likewise, inconsistent at best. Data that Plaintiffs received from the Ombudsman's Office on March 19, 2025, showed that, for instance, MOHELA had averaged more than 20 days to close each task, which is usually just one step on the road to ultimate resolution of the Class Member complaint. Data as of April 9, 2025, suggests that MOHELA has closed a number of tasks since receiving Court scrutiny on this issue, but its remaining tasks have been pending for an average of two weeks. Nelnet likewise had an average open task age of 21 days; although EdFinancial had only four open tasks, those tasks had been pending for an average of *69 days*. In general, it is not possible to run an efficient complaint resolution process when servicers sit on requests for three weeks or more at a time. Moreover, these "open task" statistics also do not include situations in which servicers have provided an initial response that fails to actually answer the question or respond to the instruction they received from the Ombuds staff. Plaintiffs are currently tracking over 70 cases that are waiting for further servicer action, many of which have already involved back-and-forth between Ombuds and the servicer.

**II.     Progress of Adjudications for Decision Group 5 and the Post-Class**

Decision Group 5 consists of 32,551 Class Members.[8] Under the Settlement, each of these Class Members is entitled to receive a decision on their borrower defense application(s) by no later than July 28, 2025. Settlement Agreement ¶ IV.C.3.v. The Post-Class consists of 205,448 Post-Class Members, each of whom is entitled to receive a decision on their borrower defense application(s) by no later than January 28, 2026. *Id.* ¶ IV.D.1.

On March 25, 2025, Plaintiffs requested that the Department provide, *inter alia*, an update

---

[8] Class member counts herein are based on the Department's "Initial Report under Settlement Agreement in *Sweet et al. v. Cardona*," dated February 27, 2023. For both Decision Group 5 and the Post-Class, there are more pending applications in each group than there are Class/Post-Class Members, because some individuals filed more than one application.

*Sweet v. Cardona*, No. 19-cv-3674, Plaintiffs' Statement re Settlement Implementation

8

regarding (i) how many applications in Decision Group 5 and the Post-Class, respectively, have already been adjudicated; and (ii) of those, how many adjudications are denials. *See* Ellis Decl. Ex. B at 6–7. Defendants have not provided an answer to these questions, stating only that "any deadlines are still, at the very least, several months away," and that "[t]he Department is dedicated to meeting the deadlines." *See* Ellis Decl. Ex. C at 6–7.

Adjudications under the Settlement, including those for Decision Group 5 and the Post-Class, are made by attorneys in the Department's Borrower Defense Group (BDG). As discussed at the March 13 hearing in this matter, BDG lost approximately a quarter of its staff between December 2024 and March 2025, going from 66 to 50 attorneys. Mar. 13 Hearing Tr. at 9:24–10:2. By contrast, in FSA's fiscal year 2025 budget, the agency stated that in order to complete the adjudication of these applications on time, it would need to hire *300 attorneys*.[9]

Importantly, as Plaintiffs noted at the March 13 hearing, form denial notices that do not contain individualized reasons for denying an application are not "decisions" under the Settlement. *See* Settlement Agreement ¶¶ IV.C.2.iii, V.B.1. The Department must provide either an approval notice or a specific, reasoned denial to every Decision Group 5 and Post-Class member by the applicable deadline. The Department thus cannot escape from under its backlog of applications by simply denying as many applications as possible—which it tried to do under the first, aborted settlement in this case, and which the Court found to be "unreasoned" and "Kafkaesque." ECF 146 at 7–9.

The Department's refusal to answer Plaintiffs' questions regarding its progress on these adjudications is highly concerning. It appears likely, if not certain, that the Department will once again breach the Settlement by failing to provide timely decisions to Decision Group 5 and the Post-Class.

---

[9] U.S. Dep't of Educ., Student Aid Administration Fiscal Year 2025 Budget Request at 40–41, https://www.ed.gov/media/document/r-saapdf-39388.pdf.

Dated: April 14, 2025

Respectfully Submitted,

　/s/ Rebecca C. Ellis
EILEEN M. CONNOR (SBN 248856)
REBECCA C. ELLIS (*pro hac vice*)
REBECCA C. EISENBREY (*pro hac vice*)
NOAH ZINNER (SBN 247581)
PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669
Email: rellis@ppsl.org

*Attorneys for Plaintiffs*