# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, *et al.*,

        *Plaintiffs*,

   v.

LINDA MCMAHON, in her official capacity
as Secretary of the United States Department
of Education, and the UNITED
STATES DEPARTMENT OF EDUCATION,

        *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF
REBECCA C. ELLIS, ESQ.**

I, Rebecca C. Ellis, state as follows:

1.  I am submitting this declaration in relation to the above-captioned case.

2.  I am the deputy director of litigation at the Project on Predatory Lending (PPSL), which represents Plaintiffs in this case. I am a member in good standing of the bar of the Commonwealth of Massachusetts. I was admitted to practice *pro hac vice* in the U.S. District Court for the Northern District of California in relation to this matter on February 3, 2021.

3.  The statements contained herein are true and accurate to the best of my knowledge.

4.  On March 14, 2025, I sent a letter by email to Benjamin Takemoto, attorney for the Defendants in this matter. A true and correct copy of that letter is appended hereto as Exhibit A.

5.  On March 25, 2025, I sent another letter by email to Mr. Takemoto. A true and correct copy of that letter is appended hereto as Exhibit B.

6.  On April 14, 2025, at 10:21 a.m. Pacific time, I received a letter from Mr. Takemoto's colleague, Lydia Jines. A true and correct copy of that letter is appended hereto as Exhibit C.

I swear under penalty of perjury that the foregoing is true and correct.

1

DECLARATION

Executed on:   April 14, 2025

SAN FRANCISCO COUNTY, CALIFORNIA

_____

REBECCA C. ELLIS

DECLARATION

# Exhibit A

**The Project on Predatory Student Lending**

769 Centre St, Boston, MA 02130
www.ppsl.org

March 14, 2025

<u>VIA E-MAIL</u>

R. Charlie Merritt
Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Robert.C.Merritt@usdoj.gov
Benjamin.Takemoto@usdoj.gov

Re:    *Sweet v. McMahon*, No. 19-cv-03674 (N.D. Cal.)

Dear Ben and Charlie,

Following the hearing yesterday and the letter that counsel reviewed in chambers afterward, we are requesting the following information, which is relevant to the Department's ongoing implementation of Settlement relief:

1) Please provide the names of all individuals who, as of February 1, 2025:
   a. Were assigned to the "*Sweet* case team" within the Ombudsman's Office;
   b. Performed work related to resolving *Sweet* class member inquiries, although they were not formally assigned to the "*Sweet* case team";
   c. Performed work on intake of *Sweet* class member inquiries, including but not limited to addressing inquiries received via the sweet@ed.gov inbox; and
   d. Performed administrative or management work relating to *Sweet* class member inquiries.

2) For each individual listed in response to question 1, please state whether, as of February 1, 2025, their position was housed within one or more of the following units of FSA:
   a. The Ombudsman's Office Community Support Division;
   b. The Ombudsman's Office Intake Division;
   c. The Ombudsman's Office Dispute Resolution Division;
   d. The External Outreach and Stakeholder Engagement Division; or
   e. Another division (please specify).

3) For each individual listed in response to question 1, please state whether, as of the date of your response to this letter, that person remains an active employee of the Department (*i.e.*, is not on administrative leave, has not been issued a notice of termination, and/or has not tendered their resignation).

4) Please provide the names of all individuals who, as of March 7, 2025:
    a. Were assigned to the "*Sweet* case team" within the Ombudsman's Office;
    b. Performed work related to resolving *Sweet* class member inquiries, although they were not formally assigned to the "*Sweet* case team";
    c. Performed work on intake of *Sweet* class member inquiries, including but not limited to addressing inquiries received via the sweet@ed.gov inbox;
    d. Performed administrative or management work relating to *Sweet* class member inquiries.

5) For each individual listed in response to question 4, please state whether, as of March 7, 2025, their position was housed within one or more of the following units of FSA:
    a. The Ombudsman's Office Community Support Division;
    b. The Ombudsman's Office Intake Division;
    c. The Ombudsman's Office Dispute Resolution Division;
    d. The External Outreach and Stakeholder Engagement Division; or
    e. Another division (please specify).

6) For each individual listed in response to question 4, please state whether, as of the date of your response to this letter, that person remains an active employee of the Department (*i.e.*, is not on administrative leave, has not been issued a notice of termination, and/or has not tendered their resignation).

7) Please provide the names of all individuals who, as of the date of your response to this letter:
    a. Are assigned to the "*Sweet* case team" within the Ombudsman's Office;
    b. Perform work related to resolving *Sweet* class member inquiries, although they are not formally assigned to the "*Sweet* case team";
    c. Perform work on intake of *Sweet* class member inquiries, including but not limited to addressing inquiries received via the sweet@ed.gov inbox;
    d. Perform administrative or management work relating to *Sweet* class member inquiries.

8) For each individual listed in response to question 7, please state whether, as of the date of your response, their position is housed within one or more of the following units of FSA:
    a. The Ombudsman's Office Community Support Division;
    b. The Ombudsman's Office Intake Division;

    c.   The Ombudsman's Office Dispute Resolution Division;

    d.   The External Outreach and Stakeholder Engagement Division; or

    e.   Another division (please specify).

9) Please state, for every Friday from November 1, 2024, through the date of your response to this letter:

    a.   How many emails were received in the sweet@ed.gov inbox during the preceding week;

    b.   How many emails in the sweet@ed.gov inbox received a response from an individual conducting intake during the preceding week;

    c.   How many emails in the sweet@ed.gov inbox resulted in escalation of a class member inquiry to the *Sweet* case team during the preceding week; and

    d.   How many emails remained unread in the sweet@ed.gov inbox as of that Friday.

Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT LENDING

# Exhibit B

**The Project on Predatory Student Lending**

769 Centre St, Boston, MA 02130
www.ppsl.org

March 25, 2025

<u>VIA E-MAIL</u>

Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Benjamin.Takemoto@usdoj.gov

Re:    *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Ben,

We are writing in anticipation of the parties' upcoming Joint Status Report, which is due to the Court by noon on April 14, 2025. Judge Alsup ordered that the report should help the Court "understand how much progress we're making toward . . . getting to the goal posts" of Settlement implementation (Transcript of 3/13/2025 Hearing at 27:19–21).

Below we describe the issues that Plaintiffs currently see as impediments to reaching full Settlement implementation. We are happy to discuss how to resolve these impediments over the coming weeks, including (but not limited to) at the parties' upcoming April in-person meeting. If we are not able to resolve these issues or reach agreement on how to resolve them before April 14, we intend to raise them in our section of the Joint Status Report.

1)  <u>**Outstanding data requests**</u>

On March 4, 2025, we emailed you a list of outstanding data requests. Each item on the list had previously been raised with DOJ and the Department—at our February 27, 2025, in-person meeting, via email, or both. On March 12, 2025, Charlie Merritt responded to that email, but many of his responses raised more questions than they answered. The following requests remain outstanding, and we request further clarification of certain statements Mr. Merritt made in his March 12 email:

- <u>Decision Group 3 final outcome data</u>, including revise & resubmit conversions to denial. Mr. Merritt stated on the afternoon of March 12 that DOJ "hoped" that it would be able to transmit that data "later this evening." We still have not received it. **Please let us know when we can expect this information.**

- <u>Decision Group 4 decision data</u>. Same as above—Mr. Merritt suggested that this data would be transmitted on the evening of March 12, but we still have not received it. **Please let us know when we can expect this information.**

- <u>Decision Group 3 census</u>. For weeks leading up to Mr. Merritt's March 12 email, the Department had been stating that it would provide us with a "census" for Decision Group 3— the same process we had used to validate relief for the Automatic Relief Group (ARG) and Decision Groups 1 and 2. In Mr. Merritt's email, however, he stated with respect to our request for this census: "FSA can provide discharge status data upon request pertaining to Decision Group 3, relying solely on NSLDS data."

  We do not understand what this statement means. For one thing, the census has always listed all class members approved for Settlement relief in a particular relief group; there is thus no need to "request" information for any individual. For another, the census for previous relief groups has included both discharge and refund data, and it has pulled from sources other than NSLDS. Indeed, the latter was a primary purpose of the census: if you recall, the implementation process for the ARG revealed that NSLDS data regarding past payments was incomplete, which led the Department to start collecting payment data from servicers in order to validate refund amounts. The data from servicers, along with data from the Financial Management System, constitute vital components of the census.

  **Please confirm** that the Department is compiling a census for Decision Group 3 using the same methods, and pulling from the same sources of data, as it did for the ARG and Decision Groups 1 and 2. **Please let us know when we can expect to receive this Decision Group 3 census.** Finally, **please also confirm** that that same process will be used in future census compilations for Decision Groups 4, 5, and the Post-Class.

- <u>Attestation group class list</u>. In our March 4 email (and previously), we requested a list of people who were added to the class via attestation, because those individuals do not appear on the most recent class list we received (dated December 2024). Mr. Merritt responded: "As of the latest monthly extract, only Exhibit C attestation borrowers are marked in the borrower defense system."

  We do not know what Mr. Merritt meant by "the borrower defense system." But we do know that the Ombudsman's Office has sent the names of attestation group borrowers to the servicers for the implementation of Settlement relief (in the form, as we understand it, of two to three group lists and a number of individual requests). Further, we know that the Ombudsman's Office sent the names of other attestation group borrowers to the Borrower Defense Group, in situations where those borrowers were to be slotted into Decisions Group 4, 5, or the Post-Class.

  We are simply asking for a list of those borrowers whom the Ombudsman's Office has categorized as attestation group/class inclusion members, along with their contact information

and the group into which they were waived. **Please let us know when we can expect this information.**

- <u>Attestation group census</u>. Mr. Merritt stated: "FSA is working on determining census files for other attestation groups (DG1-3)." To begin, this appears to contradict the above response. But additionally, Mr. Merritt's email did not address census files for attestation group members added to the ARG. Does FSA currently have census information for ARG attestation group members? **If so, please provide it.** If not, **please let us know when we can expect** census information for attestation group members in the ARG and Decision Groups 1-3.

- <u>Class members who initially received non-*Sweet* discharges</u>. We asked for a list of class members who initially received non-*Sweet* discharges (such as IDR, PSLF, closed school, etc.), in order to determine whether these individuals subsequently received Full Settlement Relief. As you know, this is relevant because some discharge orders—including those for IDR and PSLF—do not include refunds, whereas *Sweet* relief does. Mr. Merritt stated in his March 12 email that FSA is "unable to generate a complete list" of these individuals.

  We realize that compiling such a list might be complicated, but it is necessary. After all, if the Department is unable to identify these borrowers, how does the Department plan to ensure that all affected class members receive Full Settlement Relief?

  **Please provide** a list of class members whose NSLDS profiles currently indicate that some or all of their *Sweet*-related loans[1] were discharged by processes other than borrower defense.

  We are also aware that, for some borrowers, their NSLDS profiles have been edited to switch non-BD discharge notations to BD discharge notations. **Please describe** the process that the Department has used to convert non-BD discharges to BD discharges for *Sweet* class members and the associated review, if any, of whether the individual has received Full Settlement Relief.

2) **Impact of staffing changes on Ombudsman's Office**

On March 14, 2025, we wrote to you with questions regarding the staffing changes at the Ombudsman's Office from February 1, 2025, to the present. **Please let us know when we can expect a response to these questions.**

More generally, we are concerned about the impact of replacing experienced staff on the *Sweet* case team and in *Sweet* supporting roles with people who are unfamiliar with how to handle class member complaints. We are aware that at least two experienced members of the *Sweet* Ombuds team were fired

---

[1] This request applies to loans that were never consolidated and to terminal consolidation loans. We are not seeking information about loans that were paid off through Direct or FFEL consolidation.

in February 2025. Since then, there has been a revolving door of attendees at our weekly Ombuds meetings, and some long-time team members appear to have been pushed into subordinate roles.

Meanwhile, the backlog of *Sweet* complaints continues to grow. At most recent count, there were 6,978 open cases on our weekly complaint spreadsheet, up from 5,661 in the first week of February. And we believe this is likely an undercount: Publicly available reporting indicates that the Ombudsman's Office's entire intake team was eliminated in the March 2025 Reduction in Force, and we are already seeing the impact of this loss. The most recent complaint spreadsheet added only 34 new complaints, a marked decrease from previous spreadsheets that can only be explained by the lack of staff to review the sweet@ed.gov inbox and triage, categorize, and upload class member complaints. During the past week, PPSL has been copied on over 100 emails to sweet@ed.gov, and there are undoubtedly many more emails that did not copy us. In short, it appears the Department has placed a larger burden on the Ombuds staff who remain to monitor the sweet@ed.gov inbox as well as dealing with their complaint resolution responsibilities.

These concerns are only becoming more urgent as we embark on the "administrative process" for evaluating whether class members with mixed consolidation loans are entitled to greater refunds than what they received through the terminal consolidation refund process. Nearly 50,000 class members from the ARG and Decisions Groups 1 and 2 were potentially eligible to request the administrative process[2]; even if only a fraction of them make the request, that will be a significant undertaking for the Ombuds team on top of their existing complaint caseload.

In connection with this latter concern, **please provide** a count of how many class members have, to date, made a request for the administrative process. **Please also provide** an update on when the Department plans to begin executing the agreed-upon plan for the administrative process, and how long the Department believes it will take to resolve all pending requests.

Addressing *Sweet* class members' issues with their decisions and relief is a complex and unique process. The long-time members of the *Sweet* Ombuds team have become experts in this process, and they have done admirable work to advance Settlement implementation. Yet the Department does not appear to be giving them the support they need, nor valuing the essential work that they do. **Please provide assurances** that the remaining members of the *Sweet* Ombuds team will not be removed from their roles or fired in upcoming Reductions in Force while Settlement implementation is ongoing.

3) <u>Servicer operations issues</u>

Similar to the above concerns, we have observed problems with the servicers' responses to class member complaints that seem to have worsened over the past several weeks.

---

[2] We are awaiting further census data to determine administrative process eligibility counts for Decision Group 3 and, eventually, Decision Groups 4 and 5.

First, as we have discussed at previous meetings, servicer response times to questions or instructions from the Ombudsman's Office are inconsistent at best. Data that we received from the Ombuds team on March 19 show that, for instance, MOHELA has averaged more than 20 days to close each task, with the age of closed tasks in March ballooning to 43 days. It is not possible to run an efficient complaint-resolution process when MOHELA sits on requests for three weeks or more at a time.[3]

Second, as we discussed at the March 13 hearing, class members are experiencing worsening problems with call hold times and dropped calls when they try to contact their servicers directly. Again, MOHELA is a notable offender, but class members have had trouble reaching a human representative at other servicers, too. When class members do manage to reach someone on the phone, they are often told that the representative doesn't know anything about the *Sweet* case and the class member should call FSA instead. The FSA phone line then refers the borrower back to the servicer, in an endless loop.

As you may be aware, student loan servicer hold times and abandoned calls were, until recently, a supervisory concern of the Consumer Financial Protection Bureau[4]; with recent efforts to sideline the CFPB, that supervision is no longer taking place. The Department likewise eliminated its entire vendor oversight office in the March 2025 Reduction in Force. It is unclear, then, who is ensuring that student loan servicers fulfill their obligations to borrowers (and to their own federal contracts).

In the context of the *Sweet* case, it is incumbent on the Department to ensure that class members are able to obtain prompt and accurate responses to their questions about Settlement relief and to ensure that servicers do not violate the Settlement—for example, by providing incorrect information about class members' entitlement to Settlement relief, or by placing borrowers into repayment status when the Settlement entitles them to forbearance. **Please provide** the names of the Department employees who are currently performing oversight of the servicers to ensure their compliance with the Settlement, and a description of the oversight processes.

### 4)  Treasury offset/wage garnishment refunds

Since fall 2024, we have been discussing the issue of refunds to class members of amounts taken from them via the Treasury Offset Program and Administrative Wage Garnishment (TOP/AWG), particularly as concerns class members with FFEL loans. The Department has committed to providing these refunds, but it has repeatedly failed to deliver on the promised "update" on how it will do so. Our understanding is that the record-keeping for these collections was poor, and was not integrated with other systems such as NSLDS.

Nonetheless, Todd Davis from the Department's Office of General Counsel (OGC) stated at our last in-person meeting that he was setting up a process to track down TOP/AWG data for a sample of

---

[3] Other servicers appear to have faster response times, although those statistics have varied over time.

[4] *See, e.g.*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-identifies-challenges-faced-by-borrowers-in-resumption-of-student-loan-payments/.

affected class members, and depending on the results, that process could be generalizable for more class members. We understand that Mr. Davis is now in the process of leaving the Department. **Please advise** as to who is now responsible for the TOP/AWG issue and the status of the process that Mr. Davis was setting up.

There are complaints in the Ombudsman's Office's queue that the Ombuds team cannot resolve because they have been waiting for guidance from OGC on this issue. Some of these complaints have lingered for months and relate to relief that was due over a year ago under the terms of the Settlement; they require prompt resolution.

### 5) Decision Group 5 and Post-Class adjudication

At the hearing on March 13, you informed the Court that there are currently 50 people in the Borrower Defense Group who are actively reviewing the BD applications of *Sweet* class and post-class members. The question is whether this staffing is sufficient to meet the Department's decision deadlines of July 28, 2025 for Decision Group 5 and January 28, 2026 for the Post-Class.

As we pointed out at the hearing, form denial notices that do not contain individualized reasons for denying an application are not "decisions" under the Settlement. The Department must provide either an approval notice or a specific, reasoned denial to every Decision Group 5 and Post-Class member by the applicable deadline. We will be carefully monitoring class member communications to ensure the Department's compliance with these requirements.

To gauge the Department's progress toward complying with these deadlines**, please provide answers to the following questions**, as of the date of your response to this letter:

- How many applications from, respectively, Decision Group 5 and the Post-Class have been adjudicated so far?
  - Of the adjudications to date, how many are denials?
  - Which schools are associated with the denials?[5]

- How many applications from, respectively, Decision Group 5 and the Post-Class have been resolved through group discharges?
  - How many of those applications are associated with each group discharge school/school group?
  - Is the Department continuing to track these borrowers as *Sweet* class/post-class members—that is, is the Department ensuring that their discharges, refunds, and credit repair are completed within the applicable time frame, with the correct NSLDS

---

[5] We understand that the Department will suppress the names of schools associated with less than 10 total denials, as it has done in past reporting.

designation, and that they receive Full Settlement Relief? Please specify how the Department is ensuring Settlement compliance for these borrowers.

* * *

Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT
LENDING

# Exhibit C



**U.S. Department of Justice**
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station,
Washington, DC 20044

---

Lydia J. Jines                                                (202) 353-5652
Trial Attorney                                               lydia.jines@usdoj.gov

April 14, 2025

Rebecca Ellis
Project on Predatory Student Leasing
769 Centre St.
Boston, MA 02130

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Becca,

We write to respond to your March 14, 2025 letter, which sought specific staffing information about the Ombudsman's Office and data regarding emails in the sweet@ed.gov inbox, and your March 25, 2025 letter, which sought data for a number of groups, reiterated your request for staffing information regarding changes at the Ombudsman's Office, raised concerns with reported servicer issues, asked for clarification on Treasury offset and wage garnishment, and requested to-date information about Decision Group 5 and Post-Class members. We shared your letter with the Department of Education. The Department has reviewed the issues raised in your letters and has provided the information below.

*First*, you requested information regarding personnel assigned to *Sweet* casework within the Ombudsman's Office as of February 1, 2025, March 7, 2025, and the present date. You reiterated this request in your March 25, 2025 letter (point no. 2). As an initial matter, we do not understand the purpose of this question; as you have acknowledged, the hard work of the Ombudsman's Office has allowed the Department to resolve a large volume of cases over the past year. And, as explained below, staffing levels at the Ombudsman's Office have *increased* in recent months to handle various needs that have arisen, such as the forthcoming administrative process. More fundamentally, the Department is no longer in material breach of the Settlement Agreement, which is the reason why the Ombudsman's Office became involved in the first place. The Department has demonstrated that it is well positioned to determine staffing levels to meet its obligations under the Settlement Agreement.

That said, the Department is happy to respond to your questions. To clarify, the Ombudsman's Office does not maintain a dedicated "*Sweet* Case Team." *Sweet* cases are and have been managed by experienced staff across existing teams and divisions. Relatedly, the Office does not maintain a staffing roster specific to the implementation of *Sweet* casework at

various points in time, as you requested.  However, the Office was able to consult with existing staff and records to recount full-time equivalent (FTE) levels in the Office over months-long periods. In January 2025, there were 9 FTE working on *Sweet* cases and 3 individuals who contributed fractional support to that work. In March 2025, the number of FTE increased to 15 and the number of fractional supporters increased to 8 in order to address the growing volume of emails in the *Sweet* inbox (which followed your outreach email asking class members to avail themselves of the administrative process). At peak the Ombudsman's Office had 23 FTE working on *Sweet* related activities. Now that inbox volumes have been reduced following recent surges, there are 16 FTE and 6 individuals contributing fractional support to that work, again to address the growing needs in the Office. For the past few months and over the past year—and as you have observed in weekly meetings with the Ombudsman's Office—the Office has been able to deliver relief to class members, regardless of the volume of cases or staffing changes. If you have specific concerns with the Office's work product, we encourage you to raise those issues at our in-person meetings. But over this period, the only concerns that you have raised have been (1) the inbox, which, as discussed below, the Office has made significant progress on (2) servicer response time to inquiries from the Ombudsman's Office, which, as discussed below, has improved, and (3) a single email to a borrower that contained incorrect information (which has since been corrected).

As the above changes to staffing levels indicate, and as you have observed throughout this case, staffing needs fluctuate over time. Therefore, the staffing data provided in this letter should not be viewed as a fixed commitment to maintain current levels. The Ombudsman's Office will continuously adjust staffing and strategies to meet or exceed the required outcomes for borrowers. Furthermore, changes to staffing levels in no way support your baseless assertion that the Department does not "valu[e] the essential work that [ED employees] do." To the contrary, the Department deeply values the work of its employees. The Department also values the importance of meeting its obligations under the Settlement Agreement while protecting the public fisc. The Department is confident that its ongoing efforts will enhance the efficiency and effectiveness of this work.

*Second*, you have separately raised concerns about servicer response time to the Ombudsman's Office inquiries. The Office recognizes the importance of receiving timely responses and has instituted a series of activities to ensure that occurs so that reported issues are addressed and their cases resolved.  During March 2025, Office staff instituted weekly meetings with the servicer staff. In advance of each session, the Office provides a report of open tasks awaiting resolution that includes the age of outstanding tasks. During the meetings, the Office and servicers review these tasks and discuss any impediments preventing resolution.

At the last status hearing, the Court asked servicers to provide data on task closure including the number outstanding tasks. The Office observed that servicers have worked diligently to address any backlogs and through this effort closed aged tasks during the final two weeks of March. The Office's report for the first week of April shows an average age ranging from four to seven days, which the Office believes demonstrates timely resolution. The Office plans to monitor task closure times to ensure continued timely response and will continue to regularly share reporting with you.

*Third*, you requested week-to-week data regarding the number of emails in the sweet@ed.gov inbox.  The Ombudsman's Office compiles a weekly report every Monday, which provides a snapshot of the number of emails awaiting review in the *Sweet* inbox on that day.  The Ombudsman's Office is unable to ascertain historical data, such as the number of unread emails on specific past Fridays.

Note: Starting in March 2025, the Ombudsman's Office began separately reporting Administrative Process Requests and Class Inclusion Requests emails, providing more reliable data.  Class inclusion emails received prior to March 2025 were likely not included in earlier reported counts.

**Table 1: *Sweet* Inbox Reporting – Emails Awaiting Review**

This table captures the number of emails awaiting review in the *Sweet* inbox for each reporting period from November 1, 2024, to April 4, 2025.  Beginning in March 2025, it distinguishes between Administrative Process Requests, Class Inclusion Requests, Regular Inquiries, and the total number of emails.  Data points are only available for weeks in which data was captured.

| *SWEET* INBOX REPORTING, EMAILS AWAITING REVIEW[1] | | | | |
|---|---|---|---|---|
| Report Date | Administrative Process Requests | Class Inclusion Requests | Regular Inquiries | Total Emails |
| Nov. 4 | | | 713 | |
| Nov. 12 | | | 314 | |
| Nov. 18 | | | 214 | |
| Nov. 25 | | | | |
| Dec. 2 | | | 34 | |
| Dec. 9 | | | | |
| Dec. 16 | | | | |
| Dec. 23 | | | | |
| Dec. 30 | | | | |
| Jan. 6 | | | | |
| Jan. 13 | | | | |
| Jan. 21 | | | 1,009 | |
| Jan. 27 | | | 169 | |
| Feb. 3 | | | 1,329 | |
| Feb. 10 | | | 957 | |
| Feb. 18 | | | 1,301 | |
| Feb. 24 | | | 1,411 | |
| Mar. 3 | 1,000 | 1,126 | 1,411 | 3,537 |
| Mar. 10 | 1,017 | 1,078 | 794 | 2,889 |
| Mar. 17 | 914 | 1,053 | 681 | 2,648 |
| Mar. 24 | 2,232 | 1,063 | 994 | 4,289 |

---

[1] Cells shaded in gray denote that information was not collected at the time.

- 4 -

| | | | |
|---|---|---|---|
| Apr. 1 | 2,478 | 1,074 | 153 | 3,705 |
| Apr. 8 | 1,058 | 1,098 | 48 | 2,204 |

**Table 2: *Sweet* Case Intake – Number of Cases Created by Week**

This table lists the number of new *Sweet* cases created each week, based on emails reviewed and processed. It highlights the workload and case creation volume for the Ombudsman's office from November 2024 through April 2025.

| *SWEET* CASE INTAKE, BY WEEK | |
|---|---|
| **Week (7-day period ending on the date listed)** | **No. of *Sweet* Cases Created[2]** |
| Week ending Nov. 1 | 141 |
| Week ending Nov. 8 | 145 |
| Week ending Nov. 15 | 95 |
| Week ending Nov. 22 | 133 |
| Week ending Nov. 29 | 32 |
| Week ending Dec. 6 | 61 |
| Week ending Dec. 13 | 71 |
| Week ending Dec. 20 | 70 |
| Week ending Dec. 27 | 20 |
| Week ending Jan. 3 | 146 |
| Week ending Jan. 10 | 27 |
| Week ending Jan. 17 | 46 |
| Week ending Jan. 24 | 221 |
| Week ending Jan. 31 | 47 |
| Week ending Feb. 7 | 19 |
| Week ending Feb. 14 | 80 |
| Week ending Feb. 21 | 99 |
| Week ending Feb. 28 | 335 |
| Week ending Mar. 7 | 726 |
| Week ending Mar. 14 | 237 |
| Week ending Mar. 21 | 40 |
| Week ending Mar. 28 | 103 |
| Week ending Apr. 04 | 1,054 |

*Fourth*, you requested that the Department provide the number of class members who have made a request for the Administrative Process, as well as the date the Department anticipates it will begin executing the Administrative Process, and how long the Department anticipates it will take to resolve all pending requests. As the Department has repeatedly

---

[2] Ombudsman staff create cases in FSA's complaint system for emails reviewed in the *Sweet* inbox. When an inquiry relates to a case that already exists, the email is added to the existing case instead of creating a new case. Upon the creation of new cases, all borrowers receive an automated email response acknowledging their inquiry.

demonstrated in the weekly meetings, the Department is committed to ensuring that class members eligible for the Administrative Process are being included, including through identification by the Ombudsman's Office that the borrower would qualify for the Administrative Process but has not requested the Administrative Process. The Department has confirmed that class members whose email contained the word "refund" in the subject line or who either responded to or forwarded one of your emails to the *Sweet* inbox would be identified as having availed themselves of the Administrative Process. And, as we discussed at our in-person meeting this week, we are happy to collaborate with you again on future outreach to class members regarding the administrative process.

*Fifth*, you requested data regarding Decision Group 3 final outcomes and Decision Group 4 decisions, censuses for Decision Group 3 and the Attestation group, and lists of class members in the Attestation group or who initially received non-*Sweet* discharges. The Department has provided the enclosed spreadsheets containing Decision Group 3 final outcome data, Decision Group 4 decision data, and a list of class members in the Attestation group. Data for Decision Groups 3 and 4 are current as of April 7, 2025 and the contact list of Attestation Group class members is current as of April 8, 2025.

Below, please find census data for both Decision Group 3 and the Attestation Groups. All data is reported current as of 4/1/25.

| Sweet Decision Group | Units | Decision Group 3 | % | Attestation Groups (Exhibit C) | % |
|---|---|---|---|---|---|
| All | Borrowers | 12,128 | | 1,480 | |
| **Discharge** | | | | | |
| Complete | Borrowers | 11,470 | 94.6% | 1,370 | 92.6% |
| Not Complete | Borrowers | 658 | 5.4% | 110 | 7.4% |
| **Refunds Exceed Payments**\*\* | | | | | |
| Complete | Borrowers | 10,486 | 86.5% | 1,274 | 86.1% |
| Not Complete | Borrowers | 1,642 | 13.5% | 206 | 13.9% |
| **Discharge & Refunds**\*\* | | | | | |
| Complete | Borrowers | 10,013 | 82.6% | 1,170 | 79.1% |
| Not Complete | Borrowers | 2,115 | 17.4% | 310 | 20.9% |

The Department is unable to dedicate the significant resources necessary to identify and compile a list of class members who received a different type of discharge and believes its resources would be better utilized to effectuate relief. The Department tracks refunds for all *Sweet* class members separately from discharges; the refund tracking considers NSLDS-reported and servicer-reported payments made on eligible school loans and terminal consolidation loans for all *Sweet* class members whose cases have been approved in the Digital Customer Care system, without considering the processed discharge type. As such, the type of discharge that a

*Sweet* class member receives does not impact their refund amount.  And, the Department is confident that *Sweet* class members who may have initially received a non-*Sweet* discharge have already, or will, receive full relief.

*Sixth*, you requested information regarding Department oversight of its servicers and a description of the oversight processes.  The Department reviews servicer workload to assess indicators such as abandonment rate and comparable volumes on dates and times. The monitoring is not *Sweet* specific.  We note that some, if not most, of the backlog identified in your letter can be attributed to non-*Sweet* matters, including the recent Executive Order regarding the Public Service Loan Forgiveness (PSLF) Program, which caused a spike in borrower calls in early March 2025. The Department also meets regularly with servicers to discuss call center metrics such as timeliness and quality of customer service. We track instances of non-compliance and continue to follow up with servicers until corrected.

*Seventh*, you requested an update on guidance concerning certain class members affected by the Treasury Offset Program and Administrative Wage Garnishment.  As we have repeatedly informed you at our in-person meetings, this is a complex issue that applies to a group of class members who have very old commercial loans from the Federal Family Education Loan Program (FFEL). These loans have been in various statuses (e.g., defaulted, subsequently rehabbed, consolidated, paid off) and have been held by various guarantee agencies, some of which no longer exist. As a result, identifying documentation regarding these loans is exceedingly difficult. The Department also has had to consult with outside stakeholders, including the Department of the Treasury, to address this issue. The Department of Education is committed to providing full relief to all class members, but as we have explained before, there will be a very small percentage of borrowers with complex borrowing histories whose issues will take a significant amount of time to resolve. The Department will continue to work diligently on this issue, but given the small population, this does not affect the Department's substantial compliance with the Settlement Agreement. To date, of the approximately 12,500 *Sweet*-related complaints that have come in to the Ombudsman's office, approximately 189 have been identified as raising a TOP or AWG issue and not all of those relate to payments made on commercially-held FFEL loans.  While the Department works to identify any impacted class members in addition to those who have already submitted a complaint, we believe that you can help accelerate this process by bringing to our attention class members with commercially-held FFEL loans who believe that they are owed refunds from administrative wage garnishments or Treasury offsets. We would be happy to work with you on this outreach.

Although not mentioned in your March correspondence, you did raise at both of the in-person meetings this week the outstanding guidance on the statute of limitations on refunds that were not received by class members.  We want to assure you that the Department continues to work on this issue.  The Department met with representatives from the Department of the Treasury in January of this year and has followed-up with them since that meeting.  We will provide you with an update once we have one.

*Eighth*, you requested information regarding progress on adjudicating Decision Group 5 and the Post-Class applications.  The deadline for Decision Group 5 and Post-Class borrowers are July 28, 2025, and January 28, 2026, respectively.  As such, any deadlines are still, at the

- 7 -

very least, several months away.  The Department is dedicated to meeting the deadlines set forth in the Settlement Agreement.

Sincerely,

*Lydia J. Jines*
LYDIA J. JINES

Enclosures:

Decision Group 3 Final Outcome data (as of 4/7/2025)
Decision Group 4 Decision data (as of 4/7/2025)
Attestation Contact List (as of 4/8/2025)