BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

R. CHARLIE MERRITT
Senior Counsel
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| THERESA SWEET, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education*, and <br><br> THE UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 3:19-cv-03674-WHA <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RELIEF FROM JUDGMENT** <br><br> Date: December 11, 2025 <br> Time: 8:00 a.m. <br> Place: Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR TEMPORARY RELIEF FROM JUDGMENT ................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

INTRODUCTION ...............................................................................................................................1

ISSUE TO BE DECIDED ...................................................................................................................3

BACKGROUND .................................................................................................................................3

I.      This Case and The Parties' Settlement Agreement .................................................................3

II.     The Department's Implementation of the Agreement ............................................................6

LEGAL STANDARD ........................................................................................................................8

ARGUMENT ......................................................................................................................................9

I.      The Court Has Jurisdiction to Modify the Settlement Agreement Pursuant to Rule
        60(B). ...................................................................................................................................9

II.     Relief Under Rule 60(B)(5) Is Appropriate. ......................................................................11

        A.      The Judgment Adopting the Settlement Agreement Has Prospective
                Application. ...............................................................................................................11

        B.      Requiring Defendants to Provide Full Discharges and Refunds to 190,000
                Post-Class Applicants at a Cost of $12 Billion to the Public Fisc Is No Longer
                Equitable. ...................................................................................................................12

        C.      It Would Serve the Public Interest to Allow Defendants Additional Time to
                Adjudicate Post-Class Applications Before Requiring Automatic Settlement
                Relief. ........................................................................................................................20

III.    In the Alternative, Relief Under Rule 60(b)(6) Is Appropriate. .....................................21

CONCLUSION...................................................................................................................................22

1

**TABLE OF AUTHORITIES**

**Cases**

2

*Am. Hosp. Assoc. v. Price*,
    867 F.3d 160 (D.C. Cir. 2017) ................................................................................................. 18

3

4

*Bay Marine Boatworks, Inc. v. S/Y Pursuit*,
    No. 3:20-cv-05399, 2022 WL 991751 (N.D. Cal. Apr. 1, 2022) ........................................... 10

5

*BLOM Bank SAL v. Honickman*,
    605 U.S. 204 (2025) .................................................................................................................. 9

6

7

*California v. EPA*,
    978 F.3d 708 (9th Cir. 2020) .............................................................................................. 8, 11

8

*Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) .................................................................................................. 16

9

10

*Clark v. California*,
    739 F. Supp. 2d 1168 (N.D. Cal. 2010) ................................................................................ 13

11

*Flores v. Rosen*,
    984 F.3d 720 (9th Cir. 2020) ................................................................................................. 12

12

13

*FTC v. Hewitt*,
    68 F.4th 461 (9th Cir. 2023) .................................................................................................. 11

14

*Hajro v. USCIS*,
    811 F.3d 1086 (9th Cir. 2016) ................................................................................................. 9

15

*Henson v. Fidelity Nat'l Fin., Inc.*,
    943 F.3d 434 (9th Cir. 2019) ............................................................................................. 9, 21

16

17

*Horne v. Flores*,
    557 U.S. 433 (2009) ............................................................................................................. 8, 9

18

*Kelly v. Wengler*,
    822 F.3d 1085 (9th Cir. 2016) ........................................................................................... 9, 10

19

20

*LaShawn A. v. Fenty*,
    701 F. Supp. 2d 84 (D.D.C 2010) ......................................................................................... 20

21

*Maraziti v. Thorpe*,
    52 F.3d 252 (9th Cir. 1995) ................................................................................................... 11

22

*Richardson v. Nat'l R.R. Passenger Corp.*,
    150 F.R.D. 1 (D.D.C. 1993) ................................................................................................... 22

23

24

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992) ............................................................................................................... 12

25

*United States v. Asarco Inc.*,
    430 F.3d 972 (9th Cir. 2005) ................................................................................................. 13

26

*United States v. Suarez*,
    880 F.2d 626 (2d Cir. 1989) .................................................................................................. 21

27

28

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

*United States v. Turner*,
  No. 3:13-cv-1827, 2022 WL 1570741 (S.D. Cal. May 17, 2022) ........................... 20

*United States v. Western Elec. Co.*,
  46 F.3d 1198 (D.C. Cir. 1995) ........................................................................ 14

*Walsh v. U.S. Postal Serv.*,
  No. 1:20-cv-00435, 2021 WL 2337605 (E.D. Cal. June 8, 2021) ....................... 12

*Warren v. City of Chico*,
  No. 2:21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025).................... *passim*

**Rules**

Federal Rule of Civil Procedure 23(e) ...................................................... 5, 12

Federal Rule of Civil Procedure 60(b) ...................................................... 1, 8

Federal Rule of Civil Procedure 60(b)(5) .............................................. *passim*

**Regulations**

34 C.F.R. § 685.406(g) ................................................................................. 16

Notice of Proposed Rulemaking, 87 Fed. Reg. 41878 (July 13, 2022) ................. 16

Final Regulations, 87 Fed. Reg. 65904 (Nov. 1, 2022) ..................................... 16

**Other Authorities**

Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary (April 2025), https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf ......................................................................................... 8

Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions (2025), https://www.congress.gov/crs-product/R43397................................................ 8

Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025), https://www.congress.gov/crs-product/R43419 ................................................ 8

Dep't of Educ., Fisal Year 2024 Budget Request (Mar. 9, 2023) ............................. 16

FSA Data Center, Borrower Defense Monthly Report for November 2022, https://perma.cc/DE8R-HGRD ..................................................................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### NOTICE OF MOTION AND MOTION FOR
### TEMPORARY RELIEF FROM JUDGMENT

Notice is hereby given that on December 11, 2025, at 8:00 a.m., before the Honorable William Alsup, in Courtroom 12 of the 19th Floor of the San Francisco Courthouse, Defendants will move the Court for relief pursuant to Federal Rule of Civil Procedure 60(b).

Defendants seek temporary relief from the provision of the parties' settlement agreement, as incorporated in the Court's final judgment order (ECF No. 346), that requires Defendants to provide full settlement relief to certain non-class members if Defendants fail to issue timely final decisions on such non-class members' borrower defense applications by January 28, 2026. Defendants respectfully request that the deadline for providing final decisions to these non-class members be extended by eighteen months, until July 28, 2027, at which point Defendants' obligation to provide full settlement relief to any non-class members whose applications are undecided by that date would be reinstated. The basis for the motion is set forth in the following Memorandum of Points and Authorities.

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In June 2022, the Department of Education and Plaintiffs reached a settlement agreement that provided a comprehensive framework for resolving hundreds of thousands of pending borrower defense applications, some of which had been pending for more than seven years. The Court approved that agreement, finding it to be a "grand slam home run for class members," Order Granting Final Settlement Approval at 20, ECF No. 345, and retained jurisdiction to oversee the settlement's implementation. In the three years since, the settlement agreement has provided a reasonable and equitable resolution of class member claims, and the Department has substantially complied with all of its obligations to class members. However, obligations to one group of individuals addressed in the settlement—the "post-class," consisting of certain individuals who had not submitted borrower defense applications at the time the parties executed their agreement—remain outstanding. The settlement requires the Department to adjudicate all claims submitted by this set of "post-class applicants" by January 28, 2026 or else provide them full settlement relief (including discharging relevant student loan debt, refunding amounts paid to

1    the Department toward those loans, and facilitating corresponding credit reporting relief). But things have

2    changed, and due to a variety of circumstances—including most notably the unanticipated size of the post-

3    class pool, the Department's reasonable but unexpected resource constraints, and the new requirement in

4    certain circumstances that the Department now discharge ineligible loan debt unrelated to a post-class

5    applicant's borrower defense application—the Court should provide the Department relief from this one

6    aspect of the parties' comprehensive and otherwise nearly concluded settlement agreement.

7           Federal Rule of Civil Procedure 60(b)(5) provides a Court discretion to "relieve a party or its legal

8    representative from a final judgment, order or proceeding [if] . . . applying it prospectively is no longer

9    equitable." This standard is met with respect to the requirement that the Department provide full

10   settlement relief on any post-class borrower defense application that remains unadjudicated as of January

11   28, 2026. To start, the Court has jurisdiction to provide relief because it approved the agreement,

12   incorporated it into a final judgment, and retained jurisdiction over the matter—the agreement is thus

13   subject to modification the same as any other "final judgment" or "order." And relief is appropriate here

14   because the size of the post-class—comprising 207,000 applicants who submitted more than 251,000

15   applications in the less than five-month period from June 23, 2022 (the day after the settlement was

16   executed) to  November 15, 2022 (the day before it received final Court approval)—is an order of

17   magnitude greater than anything the Department could have reasonably expected when it entered the

18   settlement. Indeed, the post-class pool of applications exceeds by more than 200,000 the number of

19   applications that were submitted in any comparable 5-month period before or after the agreement was

20   executed and rivals the total number of borrower defense applications that were pending at the time the

21   settlement was executed. Moreover, the Department has not received the resources that are needed to

22   adjudicate post-class applications—Congress repeatedly ignored requests for funding to increase staffing

23   to the levels the Department deemed necessary to fully implement the settlement, and the Department's

24   Federal Student Aid office ("FSA") has instead seen staffing dwindle at the time when resources for post-

25   class adjudication are most needed. As a result, the Department currently projects that it will come well

26   short of adjudicating all post-class claims by the deadline, and the consequences are magnified by the

27   Court's recent (as of 2024) requirement that post-class applicants with certain types of loans who receive

28

relief as a result of the missed deadline should receive a discharge of ineligible debt as well as eligible debt; the Department estimates that this requirement will transfer an additional $4.5 billion windfall to post-class borrowers with unadjudicated claims at taxpayer expense.

In these circumstances, it would be inequitable to require the Department to approve without review nearly 200,000 applications from borrowers who are explicitly not defined as class members and who only made themselves parties to the settlement by filing claims after the agreement was announced and the allegedly illegal practices giving rise to the settlement were discontinued.  As set forth below, the Court should instead exercise its equitable authority to allow the Department to continue its work of adjudicating post-class applications and extend the relevant deadline imposing the automatic relief requirement to July 28, 2027.

## ISSUE TO BE DECIDED

1.  Whether it remains equitable to require the Department of Education to provide full settlement relief to non-class members whose applications it is unable to adjudicate, regardless of the merits of their claims or if their loans are eligible for discharge under the terms of the settlement, by the January 28, 2026 deadline established by the settlement agreement.

## BACKGROUND

### I.   This Case and The Parties' Settlement Agreement

Plaintiffs filed this case in 2019 to challenge the Department's alleged delay in adjudicating borrower defense claims.  They sought and obtained certification of a class consisting of all individuals with a pending borrower defense application, which at the time consisted of more than 200,000 applications dating as far back as 2015.  *See*, *e.g.*, Defs.' Mot. for Summ. J. at 11, ECF No. 63.[1]  After three years of litigation, the parties executed a settlement agreement on June 22, 2022 and submitted it for the Court's preliminary approval that same day.  *See generally* Joint Mot. for Prelim. Approval, ECF No. 246.  The parties' settlement agreement provides a framework to comprehensively address the then-

---

[1] Defendants respectfully refer the Court to their previously filed summary judgment briefs for a complete statement of the facts and background predating the filing of the parties' joint motion for preliminary settlement approval.  *See* ECF No. 63, ECF No. 249.

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA

1  pending hundreds of thousands of class member borrower defense applications.  *See generally* ECF No.

2  246-1 ("Agreement").

3  The Agreement generally divides class members into two groups.  *See* Agreement ¶ IV.  The first

4  group consisted of approximately 196,000 class members, *see* Decl. of James Bergeron ¶ 5 ("Bergeron

5  Decl."), who received federal student loans to attend one of the 151 schools identified in the settlement's

6  Exhibit C ("Exhibit C Group" borrowers).  *See* Agreement ¶ IV.A.  The second group consisted of all

7  remaining class members who submitted claims on or before the date the Agreement was executed.  These

8  class members ("Decision Group" borrowers) received a streamlined adjudication and final decision

9  within set timeframes under the Agreement and benefitted from certain presumptions designed to speed

10 up the adjudication of claims, including a presumption of the truth of the claims asserted.  *Id.* ¶ IV.C.

11 These presumptions reduce the time it takes to adjudicate a claim, but they also likely provide overbroad

12 relief to the extent that certain borrowers' claims would not have survived scrutiny had the Department

13 engaged in the type of fact-finding that would be required under otherwise applicable regulations.  The

14 Agreement divides this set of borrowers into five decision groups, based on the date they submitted their

15 application, and provides for decisions to be issued to each group every six months, with the oldest

16 applications receiving the earliest decisions.  *Id.*

17 Decision Group 1 consisted of approximately 33,000 class members who filed more than 34,000

18 applications between January 1, 2015 and December 31, 2017.  *See* Bergeron Decl. ¶ 5, Table 1.  Decision

19 Group 2 consisted of more than 11,000 class members who filed 12,000 claims between January 1, 2018

20 and December 31, 2018.  *Id.*  Decision Group 3 consisted of nearly 14,000 borrowers who filed more than

21 14,000 claims between January 1, 2019 and December 31, 2019.  *Id.*  Decision Group 4 consisted of more

22 than 9,000 borrowers who filed 10,000 claims between January 1, 2020 and December 31, 2020.  *Id.*  And

23 Decision Group 5 consists of approximately 33,000 class members who filed 36,000 claims between

24 January 1, 2021 and June 22, 2022.  *Id.*  To the extent the Department fails to issue a final decision to a

25 class member according to the negotiated timeline applicable to any Decision Group borrower's claim,

26 the Agreement requires that the class member receive full settlement relief.  *See* Agreement ¶ IV.B.8.

27 The Agreement provides that the "Class is closed as of the Execution Date," *i.e.*, June 22, 2022,

28

and that only "Class Members are bound by the terms of this Agreement." *Id*. ¶ III.  Nonetheless, it contains a subsection providing certain limited relief to a subset of definitionally non-class member "post-class applicants." *See id*. ¶ IV.D.  In particular, the Agreement provides that borrower defense applications submitted after the Agreement's Execution Date and before the date of the Agreement's final approval will be adjudicated within three years of the Agreement's Effective Date (*i.e.*, the date on which the Court's final approval order becomes a final judgment).  *See id*.; *see also id*. ¶ I.K (defining "Effective Date").  As with the Decision Group deadlines, the Agreement specifies that if a post-class application is not adjudicated within the prescribed period, the applicant will receive full settlement relief.  *Id*. ¶ IV.D.2.  The time period during which a borrower could submit a "post-class application" and receive the benefit of this provision of the Agreement ultimately spanned less than five months, from June 23, 2022 (the day after the Execution Date) to November 15, 2022 (the day before the Final Approval date).  In that short time period, 207,000 borrowers submitted more than 251,000 claims, *see id*. ¶ 5, Table 1, a number of borrowers that more than doubled all five Decision Groups combined and amounted to more than two-thirds of the entire set of class members covered by the Agreement, which swept in all 291,000 borrowers who had asserted borrower defense claims and not received a decision before June 22, 2022, *see id*. ¶¶ 5-6.  This represents a 523 percent increase in applications over the average number of applications the Department received during even the most voluminous comparable timeframe.  *See id*. ¶ 5, Table 2 (setting forth the number of applications received in comparable 5-month periods before and after the post-class period, which never exceeded 48,000).

The Court preliminarily approved the settlement on August 4, 2022.  ECF No. 307.  After following the class action settlement procedures specified in Federal Rule of Civil Procedure 23(e), and hearing the objections of a group of permissive intervenors, *see* ECF No. 322, the Court finally approved the Agreement and entered final judgment on November 16, 2022.  Order Granting Final Settlement Approval; Final J., ECF No. 346.  The Agreement provides that its "Effective Date" is the date on which that final judgment becomes non-appealable, or in the event of an appeal by a Class Member, upon the date of final resolution of that appeal.  Agreement ¶ I.K.  Although the intervenors sought to appeal the Court's final approval order, no class member did, and so the Agreement became effective on January 28,

2023.  *See* Order Re: Mot. to Stay J. Pending Appeal at 10, ECF No. 382 ("In sum, this order concludes that the Effective Date of the settlement agreement is January 28, 2023.").  Among other things, this effective date established January 28, 2026 as the deadline for issuing timely decisions to post-class applicants.  Agreement ¶ IV.D.1 ("Defendants will issue a final decision on the merits of a Post-Class Applicant's application no later than 36 months after the Effective Date.").

## II.    The Department's Implementation of the Agreement

In general, the Agreement contemplated processes and procedures for reviewing the claims of and providing relief to class members—both Exhibit C class members and Decision Group class members—that had not previously existed.  Before it could begin the actual work of effectuating settlement relief (for each group of borrowers covered by the Agreement), then, the Department needed to establish a new framework for doing that work, including new processes, rules, and procedures.  *See* Bergeron Decl. ¶¶ 19-28.  As a general matter, due to the timelines involved, the Department first prioritized the class members in the Exhibit C and Decision Groups.  *Id.* ¶ 20.  But it also began laying the foundation for the adjudication of post-class claims—standing up new policies and procedures that differed from those used for class members, including those related to fact-finding and decision-making, training staff, and making technological updates.  *See id.* ¶¶ 21, 25-26.   FSA's Borrower Defense Branch ("BDB") began issuing decisions on post-class applications in approximately August 2023 and worked up to a steady pace of approximately 1,500 adjudications per month by January 2025.  *Id.* ¶ 21.  BDB also worked on "all aspects of implementing the Settlement Agreement, other than effectuating relief by discharging loans," *id.* ¶ 22, meaning the same staff responsible for adjudicating Decision Group class member applications pursuant to the Agreement's staggered deadlines have also been responsible for adjudicating post-class applications, as well as engaging in relevant administrative work and helping to research and respond to class member questions and concerns.  *Id.*  Over time, the staffing in the BDB has fluctuated, with staffing generally in the range of 30-50 attorneys, other than a brief period throughout 2024 when BDB was able to bring in detail attorneys from another federal agency (the Department of Health and Human Services, "HHS") to perform borrower defense work on a temporary basis.  *See id.* ¶ 9.

As the Court is aware, the Department was not able to meet some of the settlement deadlines,

particularly those related to effectuating relief, due to a host of complications relating to the mechanics of loan discharge.  *See, e.g.*, Defs.' Resp. to Pls.' Mot. to Enforce, ECF No. 403 (explaining some of these issues).  Defendants have worked collaboratively with Plaintiffs and the Court to address those issues and will not extensively reproduce that history.  But relevant here, many of the delays in processing were the result of complex "mixed consolidation" loans that consist of both loans eligible for relief under the Agreement and loans ineligible for such relief.  When it was unable to meet either the original or a revised schedule for providing relief to Exhibit C class members, the Department suggested a streamlined approach to accelerate the provision of such relief to those specific class members with mixed consolidations loans—which has come to be known as the Exhibit C terminal loan methodology.  *See, e.g.*, Defs.' Notice, ECF No.  421 (July 11, 2024) ("Defs.' Notice"); Defs.' Mot. to Approve Settlement Relief Process, ECF No. 443.  This approach was easier to implement because it included discharging the terminal consolidation loan in full.  While quicker, the relief provided has been overbroad and provides a windfall benefit to certain borrowers because it requires discharging ineligible debt that is not the subject of an eligible borrower defense application.  *Id*.  The Court first approved and ordered this methodology to be applied to Exhibit C borrowers and borrowers in Decision Groups 1 and 2.  *See* Defs.' Notice; Minute Entry, ECF No. 416 (June 13, 2024), Minute Entry, ECF No. 434 (Sep. 26, 2024).  Eventually, despite concerns raised by Defendants about the fiscal responsibility of continuing to apply the Exhibit C terminal loan methodology outside of the limited context in which it was developed, the Court ordered that the methodology "be used for Decision Group Three, Decision Group Four, Decision Group Five, and the Post-Class Applicants."  Minute Entry, ECF No. 451 (Dec. 12, 2024).

At present, the Department has come into substantial compliance with its obligation to provide relief to the Exhibit C Group; has substantially met the decision deadlines for all five Decision Groups; and anticipates meeting the January 28, 2026 deadline for adjudicating any Group 5 applications that are resubmitted under the revise and resubmit process.  *See* Bergeron Decl. ¶ 30.  With respect to the post-class, the Department is currently adjudicating approximately 1,500 applications per month, *id*. ¶ 29; *see also id*. ¶¶ 10-18 (describing the complexities associated with adjudicating such applications).  As of October 31, 2025, nearly 54,000 post-class applications have been adjudicated.  *Id*. ¶ 31.  Continuing at

the pace of 1,500 adjudications per month, the Department estimates that it will adjudicate another 4,500 applications by the January 28, 2026 deadline, and it projects that it will not meet that deadline for approximately 193,000 applications whose associated outstanding loan balances total $11.8 billion. *Id*. ¶¶ 31-32. To date, approximately half of the post-class applications have been denied. *Id*. ¶ 33. The Department cannot predict whether that rate will continue for all post-class applications or whether the actual denial rate will be higher or lower than fifty percent. But if that rate were to continue and the relief requested in this motion is not granted, the Department estimates that the result will be an approximately $6 billion windfall for borrowers who might not have been eligible for relief had their applications been adjudicated. *Id*. ¶ 33. This is an extraordinary sum of taxpayer resources that would flow to borrowers who, based upon the denial/approval rate of post-class applications to date, would otherwise be ineligible for relief. For context, the appropriation for fiscal year 2025 to fund the Legislative Branch was approximately $6.7 billion; to fund the federal Judicial Branch was approximately $8.6 billion; and to fund the exploration budget for the National Aeronautics and Space Administration ("NASA") was approximately $7.6 billion.[2]

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) allows a Court to "relieve a party or its legal representatives from a final judgment, order, or proceeding for" specified reasons. One of these reasons is that applying the final judgment or order "prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This Rule "provides a means by which a party can ask a court to modify or vacate a judgement or order if 'a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citation omitted). Ultimately, Rule 60(b)(5) establishes a "pliable standard" that "codifies the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees." *California v. EPA*, 978 F.3d

---

[2] *See* Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions (2025), https://www.congress.gov/crs-product/R43397; Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary, at *i* (April 2025), https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf; Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025), https://www.congress.gov/crs-product/R43419.

708, 713 (9th Cir. 2020) (citation omitted).  If a party carries its burden of establishing that "changed circumstances warrant relief," a "court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne*, 557 U.S. at 447 (cleaned up).

Rule 60(b)(6) also allows a court to provide relief from a final judgment, order, or proceeding for "any other reason that justifies relief."  This "catchall" provision provides "grounds for relief not already covered by the preceding five paragraphs." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025). A movant "seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." *Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443-44 (9th Cir. 2019) (cleaned up).

## ARGUMENT

At this point, Defendants have carried out nearly all their settlement obligations with respect to the class members defined in the parties' settlement agreement.  What remains is a "post-class" group that had not filed applications or otherwise been made parties to the case at the time the Agreement was executed.  Under the terms of the Agreement, more than 190,000 of these individuals are now projected to receive full settlement relief, regardless of the merits of their claims, because the Department, despite reasonable efforts, will not be able to adjudicate their applications within the specified three-year timeline. The size of this "post-class group" was not reasonably anticipated when the parties signed the Agreement, and subsequent developments—most notably, the required application of the Exhibit C terminal loan methodology, which was not contemplated by the Agreement—now place a nearly $12 billion price tag on the automatic relief provision for these borrowers.  Applying that provision of the settlement prospectively to require such windfall relief with extraordinary harm to the public fisc is not equitable, and relief under Rule 60(b) is appropriate.

## I.     The Court Has Jurisdiction To Modify The Settlement Agreement Pursuant To Rule 60(b).

In its final judgment order, the Court expressly "retain[ed] jurisdiction to monitor and oversee implementation of the settlement as set forth in the settlement agreement."  Final J. at 1.  It thus plainly has jurisdiction to "enforce the terms of [the Agreement] under the doctrine of ancillary jurisdiction." *Hajro v. USCIS*, 811 F.3d 1086, 1099 (9th Cir. 2016); *see also Kelly v. Wengler*, 822 F.3d 1085, 1094

(9th Cir. 2016) ("When a court's order dismissing a case with prejudice incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement because a breach of the incorporated agreement is a violation of the dismissal order."). Moreover, the Court's orders approving the Agreement and dismissing the case subject to an explicit retention of jurisdiction incorporate the Agreement and make its terms subject to modification to the same extent as any court order. *See, e.g.*, *Kelly*, 822 F.3d at 1097-98 (finding that modification of a term in a court-approved settlement was "a modification of a court order"); *Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 3:20-cv-05399, 2022 WL 991751, at *3 (N.D. Cal. Apr. 1, 2022) (although "settlement agreements are private contracts that courts do not usually rework, that does not prevent altering the terms because the *judicial order* itself is what allocated the parties' rights and obligations"). Given the Court's Rule 23-mandated role in approving any class action settlement, and the retention of jurisdiction provisions in the Agreement itself, *see* Agreement ¶ XI, and the final judgment order, the Agreement here is one that "the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Bay Marine Boatworks*, 2022 WL 991751, at *3. The Court's jurisdiction thus extends to "its inherent power to modify its order and, by incorporation, the Settlement Agreement." *Warren v. City of Chico*, No. 2:21-cv-00640, 2025 WL 974068, at *3 (E.D. Cal. Mar. 31, 2025); *see also Bay Marine Boatworks*, 2022 WL 991751, at *2-3 (finding that the court had jurisdiction under Rule 60(b) to modify a court-approved settlement over one party's objection).

In this case, the parties' settlement agreement establishes a dispute resolution process that defines Plaintiffs' ability to bring, and the Court's jurisdiction to hear, claims that Defendants have materially breached the Agreement. *See generally* Agreement ¶ V. The Agreement further provides that any such claims are subject to "the complete defense of impracticability," *id.* ¶ V.C, *i.e.*, that "Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV," *id.* ¶ V.D.5. But the purpose of this provision—which requires Defendants to notify Plaintiffs if Defendants determine in advance that they will not be able to fully perform any settlement obligation due to extraordinary circumstances beyond their control and for the parties to meet and confer about an appropriate extension—is to provide Plaintiffs with a means of asserting a claim for anticipatory breach

prior to the expiration of a settlement deadline (which the Agreement does not otherwise provide for).  *See id.* (stating that if the parties "cannot agree as to whether extraordinary circumstances exist or what the appropriate length of an extension is, Plaintiffs may raise a claim of material breach . . . prior to the expiration of the [relevant] timelines").[3]  It does not prevent Defendants from seeking other available means of relief from the Court's judgment or deprive the Court of its inherent jurisdiction to modify the terms, in accordance with Rule 60, of a final judgment adopting a settlement agreement.  *See, e.g.*, *Warren*, 2025 WL 974068, at *4 ("Though the parties' Settlement Agreement contains an explicit modification procedure under its Dispute Resolution process, this does not displace the alternative means of a party to modify the Settlement Agreement pursuant to Rule 60(b).").

## II.      Relief Under Rule 60(b)(5) Is Appropriate.

"Rule 60(b)(5) authorizes relief from a judgment where, *inter alia*, 'applying it prospectively is no longer equitable.'"  *FTC v. Hewitt*, 68 F.4th 461, 466 (9th Cir. 2023) (quoting Fed. R. Civ. P. 60(b)(5)).  That standard is met here with respect to the requirement that the Department award full settlement relief, including the discharge of ineligible debt pursuant to the Exhibit C terminal loan methodology, to all post-class applicants who claims it has not adjudicated by January 28, 2026, regardless of the merits of such claims.

### A.      The Judgment Adopting the Settlement Agreement Has Prospective Application.

As a threshold matter, Rule 60(b)(5)'s "no longer equitable" prong is available to seek relief from judgments that apply "prospectively."  "The standard used in determining whether a judgment has prospective application is 'whether it is executory or involves the supervision of changing conduct or conditions.'"  *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995) (citation omitted).  The Agreement, as adopted and incorporated by the Court's orders, does both.  It is "executory" because it "compels a party to perform," *California*, 978 F.3d at 717—the provision from which Defendants seek relief requires them to provide full settlement relief to any post-class applicant who does not receive a decision by January 28,

---

[3] As this motion makes clear, Defendants have now determined that they will not be able to meet the Agreement's deadline for adjudicating post-class applications.  Whether or not that delay is due to "extraordinary circumstances beyond Defendants' control"—a standard that does not govern the relief Defendants seek in this motion—Defendants have, as a courtesy, begun the meet-and-confer process set forth in Paragraph V.D.5 of the Agreement.

2026, Agreement ¶ IV.D.2.  And it contemplates and even requires ongoing court supervision of any changes in conduct or conditions.  As noted above, the Court retained jurisdiction to "monitor and oversee implementation of the settlement as set forth in the settlement agreement," Final J. at 1, a jurisdiction it has exercised on multiple occasions to resolve disputes and ensure that settlement obligations are met in response to evolving circumstances (including, for example, ordering continued application of the Exhibit C terminal loan methodology in response to Defendants' delays in effectuating relief due to complications associated with mixed consolidation loans, *see supra* pp. 6-7).  *See Warren*, 2025 WL 974068, at *4 (recognizing that a settlement's retention of jurisdiction provisions "contemplated court oversight to some degree" and gave the agreement "some prospective effect").

> **B.    Requiring Defendants to Provide Full Discharges and Refunds to 190,000 Post-Class Applicants at a Cost of $12 Billion to the Public Fisc Is No Longer Equitable.**

When a party seeks to modify a court order under Rule 60(b)(5), it "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Flores v. Rosen*, 984 F.3d 720, 740-41 (9th Cir. 2020) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992)).  At the outset, Defendants acknowledge that this standard has most often been applied in the context of injunctions or consent decrees.  But as discussed above, the Agreement in this case is effectively a judicial order because the Court was required by law to approve it, did approve it via a final judgment, and then entered a final judgment that retained jurisdiction to oversee implementation and compliance.  And, similar to a consent decree, the Agreement—like all class action settlements—must be approved by the court as "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e); *see, e.g.*, *Walsh v. U.S. Postal Serv.*, No. 1:20-cv-00435, 2021 WL 2337605, at *2 (E.D. Cal. June 8, 2021) (noting that a "consent decree is essentially a settlement agreement subject to continued judicial policing," and that, before approving one, a "district court must independently determine that the proposed agreement is 'fundamentally fair, adequate, and reasonable' and 'conforms to applicable laws'" (citations omitted)).  There is thus no basis to apply Rule 60(b) any differently here merely because Defendants seek to modify a court-approved class action settlement agreement rather than a formal injunction or consent decree.

Under the relevant standard, modification "may be warranted when changed factual conditions make compliance with the order substantially more onerous, when an order proves to be unworkable because of unforeseen obstacles, or when enforcement of the order without modification would be detrimental to the public interest." *Clark v. California*, 739 F. Supp. 2d 1168, 1233 (N.D. Cal. 2010). A court should "not ordinarily modify" an order "where a party relies upon events that actually were anticipated at the time it entered into a decree," *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005), but "the movant is not required to show that the changed circumstances were unforeseeable," *Warren*, 2025 WL 974068, at *9.

Again, Defendants seek to modify only the requirement that they be required to provide automatic full settlement relief to post-class applicants who do not receive a decision by January 28, 2026, and instead seek an additional 18 months to adjudicate such applications before such relief would be required. This modification is appropriately tailored to current circumstances. Enforcing this term of the Agreement is no longer equitable, and modification is appropriate, for three key reasons: (1) the unanticipated size of the post-class pool; (2) unanticipated constraints on the Department's resources and staffing; and (3) unanticipated issues with mixed consolidation loans that led to the imposition of the Exhibit C terminal loan methodology, which results in significant windfalls to borrowers and detriment to the public fisc.

<u>The Explosion of Post-Class Applications</u>

When the parties executed the Agreement in June 2022, the class consisted of approximately 291,000 individuals who had submitted more than 300,000 applications. *See* Bergeron Decl. ¶ 5. This included all individuals who had submitted borrower defense applications (and not yet had them decided), dating at least as far back as 2015. *Id*. ¶ 5 & n.1. No Decision Group encompassed more than 35,000 borrowers,[4] and in the five months preceding the parties' execution of the Agreement, the Department received 48,000 borrower defense claims. *See id*. ¶ 5, Tables 1 & 2. The post-class period was open for four months and 24 days, and during that time 207,000 borrowers filed more than 251,000 claims,

---

[4] This does not account for the 196,000 Exhibit C borrowers who submitted applications during the time periods covered by the decision groups, but the post-class exceeds the entire size of the Exhibit C Group, and even if the latter group of borrowers were to be equally attributed to each of the five Decision Groups, the largest Decision Group would consist of less than 80,000 borrowers.

1   supplying in less than 150 days nearly one-third of the borrower defense applications that had been

2   submitted in the previous six-and-a-half years.[5]  As set forth in Table 2 to the Bergeron Declaration, in

3   each of the six five-month intervals preceding the Agreement's execution (dating back to 2020), the

4   Department never received more than 48,000 applications and the average rate was fewer 29,000 per five-

5   month interval.  *Id.* ¶ 5, Table 2.  In one period (November 1, 2020 through March 31, 2021), only

6   approximately 14,000 applications were received.  *Id.*  Over the subsequent six five-month intervals after

7   the settlement received final approval and the post-class period closed, the Department has never received

8   more than 45,000 borrower defense applications, and the average rate was fewer than 38,000 applications

9   per post-approval five-month interval.  *Id.*  In sum, during the post-class period, the Department received

10  a *523 percent increase* in borrower defense applications when compared to the highest number of

11  applications (48,000) it received in any comparable five-month period either before or after the Agreement

12  was executed and finally approved.  *See id.*

13          It may have been reasonable for the Department to expect a slight increase in applications during

14  the post-class period based on the likelihood that borrowers would be alerted about the Agreement's

15  treatment of post-class applicants.  But the Department had no reason to think that there would be a 523

16  percent increase in applications.  In the past, "the Department has seen application volume temporarily

17  triple from the previous month following announcements such as a large institution of higher education

18  closing, but these spikes were often temporary and followed low-volume application months."  Bergeron

19  Decl. ¶ 6.  The Department had never had a 523 percent increase over a comparable five-month period,

20  and so the post-class application period was "the largest increase in applications the Department had ever

21  seen by far."  *Id.*  The increase was so anomalous that it was not reasonably foreseeable at the time the

22  parties executed the Agreement because the Department did not have any historical precedent for such a

23  large volume of applications being submitted in a comparable period of time.  *See United States v. Western*

24  *Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) ("Rule 60(b)(5) does not foreclose modifications based on

25

26          [5] As of the end of November 2022, borrowers had submitted 762,800 applications since 2015.  *See*
    FSA Data Center, Borrower Defense Monthly Report for November 2022, https://perma.cc/DE8R-
27  HGRD. That number includes the 251,000 post-class applications, so 511,800 applications were received
    over a six-and-a-half year period, and then the 251,000 post-class applications were received in less than
28  five months.

1  developments that, in hindsight, were things that 'could' happen. . . The focus of Rule 60(b)(5) is not on

2  what was possible, but on what the parties and the court reasonably anticipated.'").

3           The size of the post-class impacts the Department's ability to meet the applicable deadline because

4  adjudication of post-class claims is a much more time-consuming process than adjudicating class member

5  claims under the procedures set forth in the Agreement.  The Agreement was designed to provide

6  comprehensive and expedited relief to a large (as noted above, just under 300,000) set of class members

7  with pending applications, in recognition of the claims at issue in the lawsuit, including the original

8  unreasonable delay claim from 2019.  This result was achieved by awarding relief without adjudication to

9  Exhibit C borrowers and by using streamlined procedures to issue decisions to Decision Group borrowers

10 more quickly than would otherwise be possible under the Department's regulations.  But the post-class,

11 on the other hand, "did not experience the allegedly unlawful policies and procedures that Plaintiffs

12 describe in their original and supplemental Complaints," Joint Mot. for Final Approval at 12 n.3, ECF No.

13 323, and were instead guaranteed only "the benefit of a set timeline for decision on their BD applications"

14 under the 2016 borrower defense regulations, *id*.  Unlike the streamlined adjudication procedures the

15 Department agreed to provide to Decision Group class members, post-class adjudications under the 2016

16 regulations generally require fact-finding, consideration of any rebuttal materials submitted by the

17 schools, weighing of evidence, and a determination of the proper amount of relief.  *See* Bergeron

18 Decl.¶¶ 10-18.

19          It is true that the Department became aware of the size of the post-class at the point at which the

20 Court granted final approval, closed the post-class, and entered the judgment from which Defendants now

21 seek relief.  But the obligation itself was memorialized in the Agreement, which was executed without

22 knowledge of the extraordinary increase in claims that would occur during the post-class period.  And the

23 Agreement is a final document that explicitly states that it will be submitted to the Court for preliminary

24 and final approval without change.  *See, e.g.*, Agreement ¶ X (providing that the "Parties shall jointly

25 submit this Agreement and its exhibits to the Court, and shall apply for entry of an Order" granting

26 preliminary approval, and that, following preliminary approval, the Parties "shall jointly request the

27 Court's final approval of this Agreement"); *id*. ¶ XIII (providing that the "Agreement shall be void if it is

28

1   not approved as written by a final Court order not subject to any further review").

2          It is also notable that, at the time of the Agreement, the post-class was being accorded the same

3   treatment as borrower defense applicants more generally would have been under a rule the Department

4   proposed in 2022.  *See* Notice of Proposed Rulemaking, 87 Fed. Reg. 41878, 42008 (proposed section

5   685.406(f)) (July 13, 2022) (proposing that borrower defense decisions should be issued within three years

6   of receipt of a materially complete application, and that the Department's failure to provide a decision on

7   that timeframe will render the loan obligation unenforceable).  The Department's final rule (87 Fed. Reg.

8   65904 (Nov. 1, 2022)), which contained a similar provision—*see* 87 Fed. Reg. at 66072 (34 C.F.R. §

9   685.406(g))—was enjoined before it could ever take effect.  *See Career Colls. & Schs. of Texas v. U.S.*

10  *Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024).  This is another factor that makes automatic discharge for

11  the post-class under the terms of the Agreement currently inequitable: when the Department executed the

12  Agreement, it could not foresee that its post-class provisions would lead to such differential treatment

13  between a much larger than expected set of post-class applicants and all other individuals who would

14  submit borrower defense applications after the final approval date.

15          <u>FSA Resources</u>

16          The Department has also faced significant resource constraints over the past three years, leaving

17  it with significantly fewer than expected resources to apply to adjudicating the exponentially larger than

18  expected pool of post-class applicants.  This starts with funding to hire and train staff to adjudicate

19  borrower defense applications.  Shortly after the Agreement received final Court approval, the Department

20  submitted a budget request to Congress that emphasized the need for, and sought $21 million in, additional

21  resources and staffing to "meet the terms of the *Sweet* settlement," Department of Education, Fisal Year

22  2024 Budget Request (Mar. 9, 2023) (cited at Bergeron Decl. ¶ 7).  Congress did not approve the requested

23  increase, leading the Department to seek even more additional resources the next year to "hire hundreds

24  of attorneys to adjudicate" pending borrower defense applications.  Bergeron Decl. ¶ 7.  Again, Congress

25  did not provide any additional resources and ultimately "maintain[ed] level funding for Federal Student

26  Aid from FY 2022 through FY 2025."  *Id.*  As a result, the Department was not able to devote additional

27  resources to borrower defense to "increase the number of attorneys adjudicating applications to the extent

28

needed to meet the deadlines" in the Agreement. *Id*. ¶ 8.  FSA also was not able to significantly reallocate resources from other FSA programs that would have been necessary to adjudicate post-class applications more quickly, particularly in light of multiple competing statutory deadlines that the Department was required to prioritize over the same period of time with the same limited resources. *Id*.

Despite these obstacles, the overall attorney staffing levels in the BDB have at times increased, reaching a high of 73 attorneys in November 2024. *Id*. ¶ 9.  As noted above, this growth was largely based on increases to BDB hiring authority in 2024 that led to its ability to hire temporary detail attorneys from HHS to work on borrower defense claims. *Id*.  It is worth emphasizing, however, that during this period of time, the Department was facing—and prioritizing its limited resources to meet—several Agreement deadlines more imminent than the deadline for post-class adjudication, including providing decisions to borrowers in the second, third, and fourth decision groups, *see* FSA, Initial Report (Feb. 27, 2023) (attached hereto as Exhibit A) (setting forth decision group deadlines), and complying with Court-ordered schedules for providing relief to Exhibit C and certain decision group borrowers, *see* Minute Entry, ECF No. 407 (Apr. 24, 2024); Minute Entry, ECF No. 414 (May 23, 2024); Minute Entry, ECF No. 434 (Sept. 26, 2024); *see also* Bergeron Decl. ¶¶ 20-21 (explaining how the Department necessarily "prioritized putting processes into place to meet the settlement deadlines for class members").  By the time those deadlines passed and attention could focus more on the post-class, BDB staffing levels had decreased significantly, down to a current level of about 42 attorneys.  Bergeron Decl. ¶¶ 9, 29. The decrease was not the result of "the agency-wide reduction-in-force ('RIF') that was initiated in March 2025," but did reflect the end of the HHS-attorney details and voluntary resignations through attrition. *Id*. ¶ 9.

To be clear, the Department has devoted resources to the post-class applicant pool throughout the period of settlement performance.  At the beginning, the Department focused on developing "new policies and procedures for adjudicating post-class applications under the 2016 Regulation," *Id*. ¶ 21, which was required because the Department rescinded the prior policies and procedures that were challenged in Plaintiffs' amended complaint, *id*. ¶¶ 12, 21, 25. After those new procedures were in place, the Department began to adjudicate claims.  While the pace of post-class adjudications has ebbed and flowed over time, the pace has been at a steady rate of issuing approximately 1,500 post-class adjudication notices per month

1    since January 2025. *Id*. ¶ 29. That pace continues to this day, even in the face of significantly reduced

2    staff, *id*., but it is not enough: at the current rate, approximately 193,000 post-class applications will remain

3    unadjudicated on January 28, 2026, and approximately $11.8 billion in outstanding student loan balances

4    will as a result have to be forgiven with no adjudication. *Id*. ¶¶ 31-32. Absent relief, this would provide

5    windfall benefits to any post-class applicants whose applications would have been denied had they been

6    adjudicated, at the expense of taxpayers. *Id*. ¶¶ 32-33. In light of these constraints, which make it

7    impossible for the Department to adjudicate all post-class claims by the current deadline, it would not be

8    equitable to enforce the provision of the Agreement that requires all such unadjudicated applications to

9    receive full windfall settlement relief, regardless of the merits of those applications. *Cf. Am. Hosp. Assoc.*

10   *v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017) ("a court may not require an agency to render performance

11   that is impossible"). Furthermore, the Department does not think it is appropriate for such a significant

12   sum of taxpayer resources to flow to borrowers who would not otherwise qualify for relief.

13          Exhibit C Terminal Loan Methodology

14          All of these problems with applying the automatic full settlement relief provision to the post-class

15   are exacerbated by the Court's requirement that "the methods adopted for implementing relief for the

16   Automatic Relief Group and later ordered for Decision Group One and Decision Group Two shall be used

17   for . . . the Post-Class Applicants." Minute Entry, ECF No. 451 (Dec. 12, 2024).

18          The Agreement makes clear that the "relevant loan debt" eligible for discharge under the

19   Agreement's provisions is "loans associated with the school that is the subject of the Class Member's

20   borrower defense application." Agreement ¶ I.W; *see also id*. ¶ I.S (defining "Full Settlement Relief" as

21   a discharge of, and refunds of amounts paid toward, "Relevant Loan Debt"). As the Court is aware, the

22   Department encountered difficulties with fully effectuating that measure of relief for borrowers with

23   mixed consolidation loans and as a result was unable to meet the original or revised deadlines for

24   effectuating relief for that subset of Exhibit C borrowers. In response, the Department suggested, and the

25   Court ultimately approved and ordered the provision of relief according to, the Exhibit C terminal loan

26   methodology (or "Exhibit C approach"). *See* Minute Entry, ECF No. 416 (June 13, 2024), Defs.' Notice.

27   According to this method, borrowers who have consolidation loans made up of eligible and ineligible

28

loans—*i.e.*, loans that are subject to a borrower defense application and thus the *Sweet* case and settlement, and those that are not—receive discharge of their full terminal consolidation loan, including both the eligible and the ineligible debt, as well as a refund of all payments made to the Department on the terminal consolidation loan (including payments attributable to ineligible debt). The Exhibit C terminal loan methodology was developed in response to the particular circumstances in which it arose and, as the Department has previously explained, leads to the discharge of substantial quantities of ineligible debt. *See, e.g.*, Defs.' Mot. to Approve Settlement Relief Process at 1 (explaining that using this methodology for Decision Group 3 would result in disbursing "approximately $55 million in additional ineligible relief").

Defendants appreciate and respect the Court's prior orders rejecting proposed alternatives and requiring that the Exhibit C terminal loan methodology be applied to additional groups of borrowers receiving relief under the settlement. But Defendants emphasize how inequitable that result is for the post-class in particular. Again, unlike borrowers defined in the Agreement as class members, post-class applicants "did not experience the allegedly unlawful policies and procedures that Plaintiffs describe in their original and supplement complaints," and thus receive under the Agreement only a guarantee that their claims will be adjudicated in a set period of time. Joint Mot. for Final Approval at 12 n.3. Due to the size of the post-class and the Department's resource constraints, the Department currently projects that more than 190,000 post-class applicants will not have their claims adjudicated by the January 28, 2026 deadline and thus will be entitled, without the relief sought in this motion, to full settlement relief regardless of the merits of their claims. *See* Bergeron Decl. ¶¶ 31-32. Requiring that the Department use the Exhibit C terminal loan methodology "significantly" increases the cost to the taxpayer associated with providing such relief, raising it from approximately $7.3 billion in discharges and $446 million in refunds to approximately $11.8 billion in discharges and $640 million in refunds.[6] *Id.* ¶ 32. In other words, the

---

[6] Of course, the government and taxpayer will incur some of this cost even if this motion is granted, because some (and likely many) post-class applications will be granted. But the effect of the automatic relief provision is to short-circuit that process and ensure that no one will ever know the true size of the financial burden of unadjudicated claims that lack merit. This concern is not theoretical. While these numbers are always subject to change, to date the BDB has "denied approximately 50% of the post-class applications that it has adjudicated," and if that ratio were to continue, a significant number of borrowers

cost of applying the Exhibit C terminal loan methodology—which was indisputably not anticipated at the time of the Agreement—to the post-class is approximately $4.5 billion in discharges alone (plus an additional nearly $200 million in refunds). *Id.* "Financial constraints are a legitimate concern" that courts should consider when evaluating a request for Rule 60(b) relief, *LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 102 (D.D.C 2010), and particularly here where those constraints have increased substantially in unforeseeable ways since the settlement provision from which Defendants now seek relief was executed.

### C. It Would Serve the Public Interest to Allow Defendants Additional Time to Adjudicate Post-Class Applications Before Requiring Automatic Settlement Relief.

Instead of requiring the Department to provide full relief to any post-class application the Department does not adjudicate by January 28, 2026, the Court should extend the relevant deadline by 18 months. *See, e.g.*, *United States v. Turner*, No. 3:13-cv-1827, 2022 WL 1570741, at *1 (S.D. Cal. May 17, 2022) ("Rule 60(b)(5) requires the Court to 'take all the circumstances into account,' including the public interest and the judiciary's interest in the finality of judgments" (citation omitted)).

Recent changes in the Department's resources make the Department's proposed modification to the timetable both manageable and appropriately tailored to current circumstances. In particular, Congress's most recent budget bill, passed on July 4, 2025, provides significant additional funding to FSA—$1 billion—that will allow it to "provide stable and dedicated funding for its administrative functions." Bergeron Decl. ¶ 34. With these funds, FSA anticipates being able to hire approximately 450 new attorneys to adjudicate borrower defense claims. *Id.* ¶¶ 35-36. These contract attorneys will be supervised by, and final decision-making authority will continue to reside with, government attorneys in BDB. *Id.* ¶ 36. The process of identifying and finalizing contracts for such attorneys, as well as the subsequent onboarding and training process may take up to six months, which means that it is not practicable for the Department to utilize these additional resources to meet the current January 2026 deadline. *See id.* ¶¶ 35-37. Allowing for the time needed to enter into the contract and onboard and train the new attorneys, the Department estimates that the newly hired attorneys could begin adjudicating

---

"whose applications might otherwise have been denied had they been adjudicated on the merits" would receive windfall benefits. Bergeron Decl. ¶ 33.

1    applications no later than July 2026.  *Id.* ¶ 37.

2         This proposed modification advances both the overall framework of the Agreement and the public

3    interest.  It affects only those individuals who were not impacted by the issues that led to the litigation and

4    its settlement, continues to provide those individuals with the same measure of relief in the form of an

5    ultimately timely decision, and avoids providing the post-class windfall benefits that would exceed in

6    many cases the relief received by actual class members at great harm to the public fisc.  *See, e.g.*, *United*

7    *States v. Suarez*, 880 F.2d 626, 630 (2d Cir. 1989) ("[T]here is an obvious legitimate public interest in

8    how taxpayers' money is being spent, particularly when the amount is large.").  The modification would

9    also not deny post-class applicants any benefit to which they are otherwise entitled: if a post-class claim

10   is ultimately successful, it will be granted and the post-class applicant will receive appropriate relief; post-

11   class applicants still get a reasonably timely decision (at the latest, about five years after submitting an

12   application instead of three); and they remain in forbearance and do not have to make payments on relevant

13   loans while their applications are pending, *see, e.g.*, Agreement ¶ IV.H.

14   **III.    In the Alternative, Relief Under Rule 60(b)(6) Is Appropriate.**

15        Even if the Court determines not to afford relief under Rule 60(b)(5), Defendants respectfully

16   submit that the Court should grant them relief pursuant to Rule 60(b)(6), which permits a court to provide

17   relief from a final judgment, order, or proceeding for "any other reason that justifies relief."  This catch-

18   all provision gives district courts the flexibility to "accomplish justice" where a movant is able to show

19   "extraordinary circumstances justifying the reopening of a final judgment."  *Henson*, 943 F.3d at 443

20   (citation omitted).  While the Ninth Circuit has held that a "change in the controlling law can—but does

21   not always—provide a sufficient basis for granting relief under Rule 60(b)(6)," case law does not foreclose

22   the Court from granting relief where there is not a change in law so long as extraordinary circumstances

23   are present.  *Id.* at 444.

24        For the reasons discussed above, the extraordinary circumstances of the post-class warrant the

25   approval of Defendants' requested relief.  Absent an extension or other relief from the requirement that

26   Defendants provide full settlement relief on any unadjudicated post-class application, the Department will

27   be forced to provide loan discharges and refunds, including in many instances for loan debt that is not

28

1  eligible for discharge under the settlement, to nearly 200,000 borrowers, regardless of the merits of their

2  claims and at a cost to the taxpayer of nearly $12 billion.  This is primarily because of the extraordinary

3  523 percent increase in applications that the Department received during the post-class period that the

4  Department could not have reasonably foreseen at the time it executed the Agreement.

5  In sum, it would accomplish justice, and work no unfairness to the pool of post-class applicants,

6  to allow the Department a modest extension of time to avoid this result through the continued adjudication

7  of claims on the merits.  *See, e.g.*, *Richardson v. Nat'l R.R. Passenger Corp.*, 150 F.R.D. 1, 8 (D.D.C.

8  1993) (the underlying purpose of Rule 60(b)(6) is to "ensure that justice and fundamental fairness are not

9  defeated" after "weigh[ing] conflicting equities, including the interests of plaintiffs and defendants and

10  the interest of finality of judgment and fundamental fairness").

## CONCLUSION

12  For the foregoing reasons, the Court should grant Defendants' motion and allow them until July

13  28, 2027 to adjudicate post-class applications before requiring that post-class applicants receive full

14  settlement relief regardless of the merits of their applications.

Dated: November 6, 2025                    Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT
Senior Counsel (VA Bar No. 89400)
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

Defendants' Motion for Temporary Relief from Judgment
3:19-cv-03674-WHA