BRETT A. SHUMATE
Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

R. CHARLIE MERRITT
Senior Counsel
LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| THERESA SWEET et al. | Case No. 19-cv-03674-WHA |
| Plaintiffs, | **DECLARATION OF JAMES BERGERON** |
| v. |  |
| LINDA MCMAHON, *in her official capacity as Secretary of Education*, and UNITED STATES DEPARTMENT OF EDUCATION, | (Class Action) (Administrative Procedure Act Case) |
| Defendants. |  |

Pursuant to 28 U.S.C. § 1746, I, James Bergeron, declare as follows:

1.      In January, 2025, I was appointed as the Deputy Under Secretary and Acting Under Secretary of the Department of Education ("Department").   I served as the Acting Under Secretary until August 4, 2025 when the Under Secretary was sworn in.  In addition to continuing to serve as the Deputy Under Secretary, I assumed the additional role of the Acting Chief

Operating Officer ("Acting COO") of the Department's Federal Student Aid ("FSA") office on April 2, 2025.

2.     I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration in support of the Department's Rule 60(b) motion for relief from the January 28, 2026 deadline for adjudicating the remaining applications of post-class applicants under the parties June 22, 2022 settlement agreement, as adopted and approved by the Court on November 16, 2022, ECF Nos. 345 & 346 ("Settlement Agreement").  The statements contained herein are based either on my personal knowledge as an employee of the Department or on information reported to me by Department officials and staff.  Some of the statements contained herein are based on forecasts or predictions, which reflect my or other Department officials' or staff's good-faith assessments that are inherently subject to unknown future developments.

3.     Among my various responsibilities as FSA's Acting COO, I oversee the adjudication functions of FSA's borrower defense branch ("BDB") (formerly known as the Borrower Defense Group), which is the FSA branch responsible for adjudicating borrower defense applications, including, but not limited to, those applications that are subject to the Settlement Agreement.

**POST-CLASS APPLICANTS COMPARED TO
OTHER SETTLEMENT CATEGORIES**

4.     The Settlement Agreement groups borrowers into three categories:  class members receiving automatic settlement relief because they took out Department loans to attend a school on Exhibit C to the Settlement Agreement (the "Exhibit C class members");  class members whose applications are reviewed and adjudicated under a streamlined process (the "Decision Group class members") (divided into five decision groups, "DG1," "DG2," "DG3," "DG4" and "DG5"); and borrowers who were not members of the certified class in this case but who applied

for borrower defense relief during the period between the parties' execution of the Settlement Agreement and the Court's order finally approving that agreement (i.e., from June 23, 2022 up to and including November 15, 2022) (the "post-class applicants") whose applications, pursuant to the Settlement Agreement (¶ IV.D.1. ), are adjudicated pursuant to the borrower defense regulation finalized November 1, 2016 (the "2016 Regulation").  Pursuant to the Settlement Agreement, whether a borrower is a Decision Group class member or a post-class applicant depends solely on the date of the borrower's borrower defense application.  Any borrower (other than Exhibit C class members) who had a borrower defense application pending on June 22, 2022, when the Settlement Agreement was executed, was categorized as a Decision Group class member.  Any borrower who applied for borrower defense relief from June 23, 2022 (the day *after* the Settlement Agreement was executed) to and including November 15, 2022 (the day *before* the Court granted final approval to the Settlement Agreement) was categorized as a post-class applicant.

5.    When the parties executed the Settlement Agreement in June, 2022, the class consisted of approximately 291,000 individuals who had submitted more than 300,000 applications.  There were approximately 196,000 Exhibit C class members and they submitted approximately 212,000 borrower defense applications.  Because the Exhibit C class members received automatic settlement relief, those 212,000 borrower defense applications did not have to be adjudicated, *i.e.*, reviewed to determine whether they should be approved or denied.  Only the borrower defense applications of the Decision Group class members and the post-class applicants require adjudication.  Table 1[1] below shows the number of Decision Group applications and

---

[1]  The numbers of Decision Group applications and borrowers in Table 1 reflect the composition of each Decision Group as of June 22, 2022, the date the settlement class was closed.  The numbers do not include the historic data of all applications received during those periods but adjudicated prior to June 22, 2022. Even so, the approximately 250,000 applications received during the less-than 5-month post-class period represent approximately one third of all applications received from 2015 to November 2022.

borrowers compared to the post-class borrowers, and Table 2 shows the number of applications

received in the periods before, during and after the post-class period:

**TABLE 1:  Post-Class compared to Decision Groups (numbers are rounded)**

| Category | Borrowers | Apps | Date Range of Applications |
|---|---|---|---|
| DG1 | 33,000 | 34,000 | 01/01/2015-12/31/2017 (3 years) |
| DG2 | 11,000 | 12,000 | 01/01/2018-12/31/2018 (1 year) |
| DG3 | 14,000 | 14,000 | 01/01/2019-12/31/2019 (1 year) |
| DG4 | 9,000 | 10,000 | 01/01/2020-12/31/2020 (1 year) |
| DG5 | 33,000 | 36,000 | 01/01/2021-06/22/2022 (1 year, 5 months, 22 days) |
| **Post-Class** | **207,000** | **251,000** | **06/23/2022-11/15/2022 (4 months, 24 days)** |

**TABLE 2:  Post-Class Application Rate Compared to Other Comparable Periods (numbers are rounded)**

| Applications | Dates Received |
|---|---|
| 21,000 | 01/01/2020-05/31/2020 (5 months) |
| 15,000 | 06/01/2020-10/31/2020 (5 months) |
| 14,000 | 11/01/2020-03/31/2021 (5 months) |
| 35,000 | 04/01/2021-08/31/2021 (5 months) |
| 39,000 | 09/01/2021-01/31/2022 (5 months) |
| 48,000 | 02/01/2022-06/22/2022 (5 months) |
| **251,400 (Post-Class)** | **06/23/2022-11/15/2022 (4 months, 24 days)** |
| 44,000 | 11/16/2022-04/30/2023 (5 months) |
| 45,000 | 05/01/2023-09/30/2023 (5 months) |
| 40,000 | 10/01/2023-02/29/2024 (5 months) |
| 37,000 | 03/01/2024-07/31/2024 (5 months) |
| 24,000 | 08/01/2024-12/31/2024 (5 months) |
| 37,000 | 01/01/2025-05/31/2025 (5 months) |

6.      As Table No. 1 shows, the number of post-class applications that were received in the less than five-month post-class period is more than twice the number of all Decision Group applications, which cover a more than seven-year period, **combined**.   Comparing the number of applications received in several five-month periods before and after the Settlement Agreement was executed to the number of applications received during the post-class period demonstrates the unprecedented surge of post-class applications, as shown in Table 2. In the past, the Department has seen application volume temporarily triple from the previous month following announcements such as  a large institution of higher education closing, but these spikes were often temporary and followed low-volume application months. The Department had never had a 523 percent increase over a comparable 5-month period, and so the post-class application period was the largest increase in applications the Department had ever seen by far.   Had the rate of applications received in an average 5-month period held, the Department would have expected to receive approximately 50,000 applications during the post-class period, not 250,000 applications. In fact, the application volume submitted during the post-class application period represented one-third of all borrower defense to repayment applications ever submitted to the Department through November 2022. When the parties executed the Settlement Agreement, the Department did not know the number of post-class applicants whose applications would have to be adjudicated because, by definition, those are the borrowers who applied for borrower defense relief *after* the Settlement Agreement was executed.  Settlement Agreement at ¶ IV.D.1.  Based on historical experience prior to June 22, 2022, the Department could not have anticipated the high number of applications received during the June-to-November, 2022 post-class period. Because the size of the post-class was able to continue to grow, the Department did not know the size of the post-class until the Settlement Agreement received final court approval on November 16, 2022, closing the post-class period.

**FSA RESOURCES**

7. As of November 16, 2022, when the Settlement Agreement received final court approval, FSA employed 33 BDB attorneys. For consecutive years thereafter, the President's Budget Request to Congress requested increases in funding.  In those budget submissions, the Department highlighted the need for additional attorneys to effectively manage the borrower defense program.  The Fiscal Year ("FY") 2024 request, submitted March 9, 2023, highlighted the urgent need for additional resources to meet the terms of the Settlement Agreement.  The Department requested $21.0 million for additional staffing needed to provide decisions on approximately 250,000 claims received at the budget request date and meet the relevant deadlines https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/justifications/q-saa.pdf.    In the President's Budget for FY25, the Department requested $56 million to hire hundreds of attorneys to adjudicate these applications.  This larger request reflected the fact that BDB did not receive additional funding in FY24. www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/r-saa.pdf.  For each of these fiscal years, Congress did not approve increases, maintaining level funding for Federal Student Aid from FY 2022 through FY 2025.

8. Absent increased funding from Congress, FSA was unable to increase the number of attorneys adjudicating borrower defense applications to the extent needed to meet the deadlines in the Settlement Agreement.  FSA also was not able to significantly reallocate resources from other FSA programs toward borrower defense due to competing statutory requirements placed on FSA by Congress. These included the FUTURE Act (the Fostering Undergraduate Talent by Unlocking Resources for Education Act) and the FAFSA Simplification Act, which set requirements and deadlines for significant technology changes for the delivery of federal student aid.

9.    Even with these challenges, FSA increased the number of BDB attorneys from 34 in January 2023 to a high of 73 attorneys in November 2024.  This increase included a temporary interagency agreement the Department entered into with the Department of Health and Human Services ("HHS"), which the Department was not able to continue long-term once the period of performance ended because HHS attorneys were needed for emerging requirements at their agency. As a result of attrition, the number of attorneys is currently 42.   Over time, the number of BDB attorneys has both increased and decreased, as shown in Table 3:

**TABLE 3:  FSA Staffing Level Changes**

| Time Period | Number of Attorneys | Increase/Decrease Notes |
|---|---|---|
| June 2022 | 33 | |
| November 2022 | 33 | |
| January 2023 | 34 | |
| March 2023 | 35 | |
| May 2023 | 44 | |
| August 2023 | 44 | |
| September 2023 | 41 | |
| October 2023 | 41 | |
| November 2023 | 44 | |
| December 2023 | 44 | |
| January 2024 | 45 | |
| February 2024 | 46 | |
| June 2024 | 58 | BDB increased its hiring authority and ED entered into inter-agency agreement with HHS to detail attorneys to FSA |
| November 2024 | 73 | BDB increased its hiring authority and ED entered into inter-agency agreement with HHS to detail attorneys to FSA |
| February 2025 | 50 | • BDB lost 9 HHS attorneys when inter-agency agreement was not renewed<br>• 6 attorneys took the deferred resignation<br>• 6 probationary attorneys were terminated (eventually following a lawsuit, they were offered the opportunity to return, but only 1 returned).<br>• 2 attorneys resigned |
| March 2025 | 46 | |
| April 2025 | 52 | 6 attorneys from FSA's investigations group were detailed to BDB |
| May 2025 | 51 | |
| June 2025 | 47 | |
| July 2025 | 47 | |
| August 2025 | 42 | |

| September 2025 | 42 | |
|---|---|---|

Although the number of attorneys noticeably decreased in and after February 2025, no BDB attorneys were terminated due to the agency-wide reduction-in-force ("RIF") that was initiated in March 2025.   As shown in Table 3, only 6 attorneys were involuntarily terminated; this was due to their probationary status, and all were subsequently offered reemployment. The decrease in attorneys since February 2025 is due exclusively to voluntary departures.

**ADJUDICATION COMPARISON**

10.      There is a difference in how borrower defense applications are adjudicated depending on whether a borrower is a Decision Group class member or a post-class applicant. The Settlement Agreement provides that the borrower defense applications of Decision Group class members are adjudicated according to a streamlined review process.  Settlement Agreement at ¶ IV.C.1.  By contrast, the applications of post-class applicants are decided under the 2016 Regulation.  *Id.* at ¶ IV.D.1.

11.      Adjudicating the post-class applications under the 2016 Regulation takes significantly more time than adjudicating Decision Group applications under the streamlined process for several reasons.  First, the streamlined process (described at Paragraph IV.C. of the Settlement Agreement), unlike adjudication under the 2016 Regulation, does not require any fact-finding.  Second, the streamlined process does not require the same detailed individual adjudication.  Under the 2016 Regulation, the borrower must demonstrate by a preponderance of the evidence each element under the legal standard.  By contrast, under the streamlined process, a borrower need only state an allegation that, if true, establishes a ground for borrower defense.  No weighing of the evidence is required.  Lastly, for approved Decision Group applications, the streamlined adjudication process does not require a relief determination because the Settlement Agreement dictates that Full Settlement Relief is to be awarded to all Decision Group class

members whose borrower defense applications are approved. Settlement Agreement at ¶ IV.C.2.i. For approved post-class applications, however, a relief determination under the 2016 Regulation must be made.

12.      As noted above, the 2016 Regulation requires fact-finding. It provides, in pertinent part, that a Department official is designated to "determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official." 34 C.F.R. § 685.222(e)(3). Fact-Finding is a school-based process that is conducted on a regular cadence, meaning that once BDB completes fact-finding on a school, it will not conduct fact-finding with respect to that school again for another two years unless a significant number of applications are submitted warranting further fact-finding before the two-year period ends. At a threshold level, fact-finding consists of review by a BDB attorney of the following evidence:  (a) any borrower evidence and/or argument; (b) any responses the school submits to the Department after being notified of pending applications; (c) any Department Records; and (d) any additional information or arguments that may be obtained by the Department official (such as accreditor records, documentation from the school, court records, or information obtained from law enforcement partners).  34 C.F.R. § 685.222(e)(3)(i). The Department defined "Department Records" and "any additional information" in new policies and procedures BDB had to develop for adjudication under the 2016 Regulation because previous policies and procedures had been rescinded. *See infra* at ¶ 21. In 2022, after the *Sweet* settlement was finalized, BDB created policies and procedures for streamlined adjudication and began adjudicating Decision Group applications. In January of 2023 BDB began drafting policies and procedures for post-class adjudication and fact-finding which were finalized in April of 2023.

13.      At minimum, all schools receive the above-described threshold level of fact-finding (*i.e.*, review of borrower evidence and/or argument; school responses, Department

Records and any additional information or arguments that the Department obtains). 34 C.F.R. § 685.222(e)(3)(i).

14.     Further fact-finding will be conducted if, after reviewing any Department Records or additional information, the BDB attorney discovers evidence relevant to the adjudication of borrower defense applications.  Any further fact-finding includes summarizing the evidence gathered and, if necessary, gathering additional evidence from the following sources: the school at issue, law enforcement partners, and/or accreditors or other licensing bodies.  The process of gathering and reviewing additional evidence can take significant time as it requires drafting requests for information and negotiating with third parties on production schedules.  Depending on the amount of evidence gathered and the nature of the evidence, BDB may draft common findings to make adjudication more efficient.

15.     Once fact-finding is completed, the borrower defense applications associated with the school at issue can be adjudicated independently on their merits.  During adjudication, BDB attorneys consider the individual claims made by the applicant as well as the evidence gathered during fact-finding to determine whether the borrower establishes a borrower defense by a preponderance of the evidence.  The 2016 Regulation allows for three different grounds for relief: (a) substantial misrepresentation; (b) breach of contract; and (c) nondefault favorable contested judgment.  As part of the adjudication process, the BDB attorney determines if each element of the alleged grounds for relief is established by a preponderance of the evidence.

16.     If each element under the legal standard in the 2016 Regulation is established, the post-class application is approved.  If one or more elements are not established, the post-class application is denied.

17.     If a post-class application is approved, the next step is to determine the relief.  Any approved post-class application that is based on a non-default favorable contested judgment is

entitled to relief based on the unsatisfied amount of the judgment or, if no specific relief is awarded, on an amount determined by the Department based on applicable law and the holding of the case. 34 C.F.R. § 685.222(*i*)(2)(ii).  If the approved application is based on a breach of contract, the relief is determined according to the common law of contracts.  34 C.F.R. § 685.222(*i*)(2)(iii).   Where the approved application is based on a substantial misrepresentation, the Department's current policy is to presume that the borrower is entitled to full relief (full discharge and refund of all payments made to the Department).  However, this presumption can be rebutted by the facts and circumstances of the specific case.  Specifically, where the borrower defense is based on substantial misrepresentation, BDB considers facts relating to the cost of the education, the value of the education a reasonable borrower would have received after the misconduct as compared to what they should have expected to receive; and what value the actual borrower received.  34 C.F.R. § 6685.222(*i*)(2)(i).  Depending on the facts and circumstances, the relief may be reduced.  34 C.F.R. § 6685.222(*i*)(1).  BDB attorneys then recommend relief to the Department official, who ultimately determines the relief to be given to the borrower.  The borrower receives a brief written notification that the application has been approved and that the borrower is entitled to relief.

18.     If a case is denied, the BDB attorney drafts a detailed denial letter describing each allegation made, the legal standard applied to the allegation, and why the allegation did not meet the legal standard.

### BDB'S PRIORITIES DURING IMPLEMENTATION OF THE SETTLEMENT AGREEMENT

19.     Although the Settlement Agreement did not receive final court approval until November 16, 2022 and did not become "effective" until January 28, 2023 (*see* ECF 382 at 6-10), the Department began to take steps to implement the Settlement Agreement soon after the Settlement Agreement was executed and was preliminarily approved by the Court.

20.    As the Department began to implement the Settlement Agreement, it first prioritized putting processes into place to meet the settlement deadlines for class members (*i.e.*, Exhibit C class members and borrowers in Decision Groups 1-5).    Although the Exhibit C class members' borrower defense applications did not have to be adjudicated (because they were automatically approved), the Department was facing a one-year deadline to effectuate Full Settlement Relief for those borrowers.    Although the applications of the Decision Group class members were adjudicated pursuant to a streamlined process that was less onerous than the process required by the 2016 regulation, the Department had to meet decision and relief effectuation deadlines for the Decision Group class members at six-month intervals starting July 28, 2023.    In addition, once the first Decision Group adjudication deadline (July 28, 2023) passed, BDB has had to re-adjudicate the applications of any Decision Group borrower who took advantage of the opportunity to revise and resubmit an application that did not receive an initial approval.  *See* Settlement Agreement at ¶ IV.C.2.ii.  All final decisions on resubmitted applications are due no later than six months after the Department's receipt of the resubmission. *Id*. at IV.C.4.

## TABLE 4 – DECISION GROUP ADJUDICATION AND RELIEF DEADLINES

| Deadline | Action |
|---|---|
| July 28, 2023 | DG1 Decisions Due |
| January 28, 2024 | DG2 Decisions Due |
| July 28, 2024 | DG1 relief due for initial approvals |
| | DG1 Revise & Resubmit decisions due |
| | DG3 Decisions Due |
| January 28, 2025 | DG2 relief due for initial approvals |
| | DG2 Revise & Resubmit decisions due |
| | DG4 Decisions Due |
| July 28, 2025 | DG1 relief due for Revise & Resubmit approvals |
| | DG3 relief due for initial approvals |
| | DG3 Revise & Resubmit decisions due |
| | DG5 Decisions Due |

| January 28, 2026 | DG2 relief due for Revise & Resubmit approvals |
| | DG4 relief due for initial approvals |
| | DG4 Revise & Resubmit decisions due |
| July 28, 2026 | DG3 relief due for Revise & Resubmit approvals |
| | DG5 relief due for initial approvals |
| | DG5 Revise & Resubmit decisions due |
| January 28, 2027 | DG4 relief due for Revise & Resubmit approvals |
| July 28, 2027 | DG5 relief due for Revise & Resubmit approvals |

21.     At the time the Department was prioritizing putting processes into place to meet the relief and decision deadlines for the Exhibit C and Decision Group class members, it had to develop new policies and procedures for adjudicating the post-class applications under the 2016 Regulation because the previous policies and procedures had been rescinded.  Thus, during the first two years of implementing the Settlement Agreement, BDB's priority for the post-class borrowers was to stand up its new policies and procedures, primarily by focusing on schools with a low number of applications.  BDB started with schools with a low number of applications because these schools are less likely to have evidence of school misconduct beyond the allegations in a particular application; to the extent such evidence exists and additional fact-finding is required, that can delay adjudication of applications from schools with higher numbers of applications. Additionally, during this time, BDB prioritized responding to group borrower defense requests made by third parties that in some applications had been pending for years. When a group request is granted, all borrowers who enrolled in the school during the relevant time period receive a discharge of their eligible student loan balance. This positively impacted post-class applicants because there was a significant number of post-class applications associated with those group requests, which were approved through the group process.    BDB began training staff on post-class adjudications early in the summer of 2023 and issued its first decision letters to post-class applicants in August of 2023.   BDB ramped up to a steady pace of approximately 1,500 post-class adjudications per month by January 2025.

**BDB'S IMPLEMENTATION OF THE SETTLEMENT AGREEMENT**

22.     BDB has worked on all aspects of implementing the Settlement Agreement, other than effectuating the relief by discharging loans, which is carried out by the servicers.  This work can be divided into five main categories: (a) determining class and post-class borrowers and tagging applications; (b) adjudicating class member applications; (c) adjudicating post-class applications;  (d) conducting administrative work needed to comply with the Settlement Agreement; and (e) working with the Ombudsman office to resolve class member questions.

23.     First, BDB worked on identifying which borrowers were Exhibit C class members and which borrowers were Decision Group class members.  Once the Decision Group class members were identified, BDB identified the Decision Group (DG1, DG2, DG3, DG4 or DG5) in which they belonged.  This process involved running multiple data queries on pending borrower defense applications and cross-referencing that data with data pulled from the National Student Loan Data System ("NSLDS").  Additionally, this process included determining which Office of Postsecondary Education Identifier numbers ("OPEID") fell within the list of schools on Exhibit C to the Settlement Agreement.  Once determinations were made, BDB had to work with the Department's technology contractors to correctly tag all of the applications in the Department's system of record.  Much of this work took place in the second half of 2022 between the time the Settlement Agreement was executed and the time the Settlement Agreement received final court approval.

24.     Second, BDB had to develop all new policies and procedures required to adjudicate class member applications that fell under Decision Groups 1 through 5.  The Settlement Agreement created a new "streamlined" adjudication process for class members that did not previously exist.  BDB drafted policies and procedures and obtained the necessary approval from Department

leadership. Much of this work happened relatively quickly with policies and procedures approved

by the end of July 2022. However, once these policies and procedures were approved, BDB needed

to train staff and adjudicate the DG1 applications to ensure the Department met the first decision

deadline of July 28, 2023. BDB completed its training of staff on class member adjudication in

January 2023, meaning from that date BDB staff could focus their full energy on class member

adjudication for the five Decision Groups.

25.    Third, as discussed *supra*, BDB developed new policies and procedures required to

adjudicate post-class applications. These applications are adjudicated under the 2016 Regulation,

a regulation under which BDB had previously adjudicated applications. However, the manner in

which the Department adjudicated applications under the 2016 regulation in late December 2019

and early 2020 led to the collapse of a 2020 settlement agreement that had received preliminary

(but not final) approval from the court. Effective October 21, 2020, the Department stopped

issuing further decisions denying the applications of *Sweet* class members and confirmed that it

would not issue any further decisions denying the borrower defense applications of class

members until entry of a final judgment on the merits by the Court. *See* ECF 150-1 (Declaration

of then FSA Chief Operating Officer Mark Brown) at ¶ 5. In March of 2021, the Department

announced the rescission of the partial relief methodology that had been in use since December

2019 and amended in August 2020. A copy of the March 2021 press release is attached as

Exhibit 1. Following final court approval in November 2022 of the extant Settlement Agreement,

the Department developed new policies and procedures for adjudicating applications under the

2016 Regulation to replace the policies and procedures previously rescinded. The newly

developed policies and procedures are significantly more complex than the streamlined review

process for adjudication of the Decision Group borrowers because the 2016 Regulation does not

include a presumption that borrower allegations are true (as there is for the streamlined review

process for class members).  Additionally, the 2016 Regulation requires school notification and fact-finding that must be conducted prior to adjudication. BDB finalized its fact-finding policies and procedures in March of 2023 and its adjudication and letter writing policies and procedures in May of 2023. BDB then trained staff on these policies and procedures. All then-existing staff were trained by December 2023; however, BDB continued to train staff over the next year as it onboarded new staff.

26.    Fourth, there has been significant administrative work required to implement the Settlement Agreement, which took several forms.  BDB had to create a fact-finding database to track and document the results of fact-finding.  BDB also had to implement technology updates in its claim review system to properly adjudicate class member and post-class applications. While these updates were completed on a rolling basis, many of them were not completed until the Fall of 2023 and required significant time working with BDB's technology contractor to implement. BDB also had to draft the notice letters sent to borrowers. These included letters informing class members that they were part of the class, letters informing class members that their previous denial was being rescinded, various iterations of approval, revise and resubmit, and denial letters for the class members, and a separate set of letters for approvals and denials of the post-class applications. BDB also had to coordinate with the Department regarding how to pull data for the Settlement Agreement's required quarterly reporting.  Lastly, and most time consuming, BDB spent significant time hiring, onboarding, and training new staff.  In June of 2022, BDB had approximately 35 staff, but at its peak it had approximately 75 staff.  It took significant resources to develop job postings, review thousands of resumes, interview hundreds of candidates, onboard new hires, and fully train new hires – these steps applied to all new hires, including those detailed from HHS.

27.    Lastly, BDB spends resources working with the Office of the Ombudsman to resolve questions that come into the Department as part of the Ombudsman complaint process set up to address complaints from class members and post-class applicants.  While this often does not take significant BDB resources because many of the questions relate to processing concerns outside of BDB's expertise, BDB has had to regularly meet with members of the Ombudsman team to resolve questions relating to adjudication and class membership.  Further, BDB has had to spend resources to ensure that Ombudsman work is being correctly entered into borrower applications so that the Department can provide accurate data reporting to the Court and Plaintiffs.

28.    In November of 2024, the Department approved a policy addressing the prioritization of BDB resources through January 2026.  That policy reflected the Department's determination that BDB should prioritize adjudication of all class member applications and all post-class applications related to schools with no or minimal evidence found during fact-finding.  Additionally, the policy discussed how to prioritize schools for which there was significant evidence identified and further evidence gathering was needed.  Factors the policy considered were the volume of post-class applications from the school, whether additional fact-finding was anticipated and how long it might take, whether group relief was under consideration, the number of borrowers impacted by the evidence, and the magnitude of the alleged school misconduct.  However, due to the significant decrease in BDB's staffing from the conclusion of the interagency agreement with HHS and attrition (*see supra* at Table 3), BDB, under policy direction from the current administration, has focused on adjudicating applications where fact-finding for the school has already been completed and on schools where there are high-dollar amounts involved.

29.     Currently, the BDB team has 42 staff consisting of 37 staff attorneys, four supervisory attorneys, and one Acting Branch Chief.  Since approximately January 2025, this staff has adjudicated and issued decisions on approximately 1,500 applications per month.  This rate of post-class adjudication is similar to what BDB was completing when it had nearly double the staff.  BDB has been able to increase its pace by reprioritizing its work and not using staff resources to complete the fact-finding on schools where the threshold level of fact-finding indicated that there may be significant supporting evidence.  BDB will need to reallocate resources to complete fact-finding on schools that may have significant evidence so those applications can be adjudicated. This additional fact-finding takes significant time and resources and may result in a slower adjudication rate as more complex schools move through the fact-finding workstream.

### STATUS OF POST-CLASS ADJUDICATIONS

30.     The Settlement Agreement establishes deadlines for issuing decisions to the Decision Group class members and to the post-class applicants.  The decision deadline for DG1 was July 28, 2023 and the decision deadlines for DG2 through DG5 followed at six-month intervals until the July 28, 2025 decision deadline for DG5.  The Department has substantially met the adjudication deadlines that have already passed for all five Decision Groups and anticipates meeting the January 28, 2026 deadline for adjudicating any DG5 resubmissions under the revise and resubmit process.  Separately, January 28, 2026 is also the adjudication deadline for adjudicating all post-class applications.

31.     The Department reported at the August 29, 2025 hearing that approximately 50,800 post-class applications had been adjudicated.  As of October 31, 2025, nearly 54,000 post-class applications have been adjudicated.  At the adjudication rate of approximately 1,500 adjudications per month, the Department estimates that it will adjudicate another 4,500

applications by the deadline and has determined that it will not meet the January 28, 2026 deadline for adjudicating the remaining post-class applications. The Department currently projects that by the January 28, 2026 deadline, approximately 193,000 applications will remain unadjudicated.

32.    Under the terms of the Settlement Agreement, the Department must provide full settlement relief to any post-class applicant that has not received a decision by the January 28, 2026 deadline. Settlement Agreement at ¶ IV.D.2. If an extension is not granted and the Department is unable to adjudicate those remaining 193,000 applications by the January deadline, the Department has determined that the associated liability is approximately $11.8 billion in discharges and $640 million in refunds. This estimated liability is significantly greater due to the Exhibit C terminal loan methodology that was not required by the Settlement Agreement for post-class applicants, but the Court ordered must be used to calculate relief for any borrower, including post-class applicants, entitled to relief. *See* ECF 451 (12/12/2024 Minute Order). If the liabilities were to be limited to only the loans relating to the school that is the subject of the borrower defense application, the total estimated liability would be $7.3 billion in discharges and $446 million in refunds. Having to use the Exhibit C terminal loan methodology thus increases the liability by approximately $4.5 billion in discharges and approximately $194 million in refunds.

33.    To date, BDB has denied approximately 50% of the post-class applications that it has adjudicated. Although it is difficult (if not impossible) to predict in advance whether a post-class application will be approved or denied, if this ratio were to continue, half of the $11.8 billion - or $6 billion - of the outstanding student loan balances getting discharged as the result of a missed deadline would amount to a windfall to borrowers whose applications might otherwise have been denied had they been adjudicated on the merits. The Department has significant

interests in protecting taxpayer resources, and windfall discharges result in more significant losses for the government.

**INCREASED STAFFING OPPORTUNITIES DUE TO RECONCILIATION ACT**

34.     On July 4, 2025, the One Big Beautiful Bill Act ("OBBB Act"), Public Law 119-21, was enacted.  Among its other provisions, the OBBB Act provides additional funding to FSA to support administrative costs associated with the servicing and oversight of federal student loans.  The OBBB Act appropriated an additional $1 billion for FSA.  In addition to its annual appropriation, these additional resources will enable FSA to provide stable and dedicated funding for its administrative functions to include meeting the terms of the Settlement Agreement should the Court agree to extend the January 28, 2026 decision deadline.

35.     Even though the additional funds from the OBBB Act are now available for FSA to use for additional hiring, the onboarding and training process has made it impractical to increase BDB's staffing at such a late date with the January 28, 2026 post-class decision deadline still intact.  Typically, it takes FSA at least three months to recruit and onboard new staff attorneys, which in and of itself would take the Department up to the deadline.  Even if this process could be sped up or if existing Department staff could be detailed to BDB, there would be minimal if any impact on the number of post-class applications adjudicated prior to the deadline, due to the time it takes new staff to be trained and become proficient in adjudication.  Training on the borrower defense adjudication process takes approximately three weeks of hands-on training which is followed by a quality control ("QC") period where 100 percent of the work of newly hired attorneys is reviewed by an experienced attorney to ensure a full understanding of BDB's policies and procedures.  After the initial three-week training period, it typically takes another couple of months for that attorney to be fully proficient at adjudication.  During this training and ramp up period, BDB expends significant staff resources conducting the training, conducting the

quality control, and assisting staff in getting up to speed, which takes that staff away from its own adjudication work.  While training new staff would increase BDB production in the long term, in the short term, it can reduce production because experienced staff is training the new staff. FSA has initiated the process to hire and contract for a substantial increase in attorneys.  Given the short period of time left until the January 28, 2026 deadline and the time needed to complete onboarding and training as explained above, these additional attorneys will not be on-board with sufficient time to allow BDB to increase its rate of post-class adjudications by the final adjudication deadline.

36.     FSA intends to use a significant amount of funds made available to it through the OBBB Act to conduct a major hiring campaign of contract and permanent BDB attorneys to adjudicate the post-class applications.   These contract attorneys will be supervised by, and final decision-making authority will continue to reside with, government attorneys in BDB.  Because of the additional time needed for the hiring of contract attorneys due to the time it takes to award such a contract, in September 2025, the Department conducted market research of contract attorney firms that could assist in this endeavor. The market research concluded that the Department would have to issue a "multiple award" contract to several firms with demonstrated capability to quickly provide legal services at scale.   An award to several firms would enable the Department to onboard approximately 450 attorneys in as little as three months.  Based on the market research, the Department has identified a number of firms capable of providing these kinds of legal services.  The Department is proceeding to finalize the market research needed to provide an acquisition approach and full timeline to award such contracts for attorneys.

37.     Because of the time that these additional steps will take - *e.g.,* the additional market research, the acquisition process, onboarding and training - the Department estimates that the new attorneys could begin adjudicating applications within six months of the current deadline

(*i.e.,* by approximately July 28, 2026).  The Department estimates that all post-class applications could be adjudicated within one year after the newly hired contract attorneys have been onboarded and trained.  Accordingly, the Department estimates that it can complete the remaining post-class adjudications within 18 months of the current deadline (*i.e.,* by July 28, 2027).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 6, 2025.

James Bergeron
Deputy Under Secretary and
Acting Chief Operating Officer
Federal Student Aid Office
U.S. Department of Education

**EXHIBIT 1**

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | 🔤 Language Assistance ▾

Search...

**ARCHIVED INFORMATION**

# Department of Education Announces Action to Streamline Borrower Defense Relief Process

MARCH 18, 2021

**Contact:**  Contact: Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Today, the U.S. Department of Education (Department) announced it will streamline debt relief determinations for borrowers with claims approved to date that their institution engaged in certain misconduct. The Department will be rescinding the formula for calculating partial relief and adopting a streamlined approach for granting full relief under the regulations to borrower defense claims approved to date. The Department anticipates this change will ultimately help approximately 72,000 borrowers receive $1 billion in loan cancellation.

"Borrowers deserve a simplified and fair path to relief when they have been harmed by their institution's misconduct," said Secretary of Education Miguel Cardona. "A close review of these claims and the associated evidence showed these borrowers have been harmed and we will grant them a fresh start from their debt."

Current provisions in federal law called "borrower defense to repayment" or "borrower defense" allow federal borrowers to seek cancellation of their William D. Ford Direct Loan (Direct Loan) Program loans if their institution engaged in certain misconduct. Beginning today, the Department will ensure that borrowers with approved borrower defense claims to date will have a streamlined path to receiving full loan discharges. This includes borrowers with previously approved claims that received less than a full loan discharge.

Full relief under the regulations will include:

- 100 percent discharge of borrowers' related federal student loans.
- Reimbursement of any amounts paid on the loans, where appropriate under the regulations.
- Requests to credit bureaus to remove any related negative credit reporting. And,
- Reinstatement of federal student aid eligibility, if applicable.

This new approach replaces a methodology first announced in December 2019 (https://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=) to determine the amount of relief granted to borrowers with approved claims. After completing a comprehensive review of that methodology, the Department determined that it did not result in an appropriate relief determination.

This is the Department's first step in addressing borrower defense claims as well as the underlying regulations. The Department will be pursuing additional actions, including re-regulation, in the future.

The Department will begin applying this new approach today and affected borrowers will receive notices from the Department over the next several weeks with discharges following after that. Updated information for borrowers will be posted to StudentAid.gov/borrower-defense (https://studentaid.gov/borrower-defense/?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=).

**Tags:**    Defense Relief (/category/keyword/defense-relief)
Federal Student Loans (/category/keyword/federal-student-loans)
Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- Higher Education Rulemaking (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://studentprivacy.ed.gov?src=rn)
- FAFSA (https://fafsa.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Elevating Teaching (https://www.ed.gov/teaching?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)
- Engage Every Student (https://www.ed.gov/ost?src=rn)
- Unlocking Career Success (https://cte.ed.gov/unlocking-career-success/)
- Cybersecurity (https://tech.ed.gov/cyberhelp/)

# Search press releases

Search...

# Find By Month

- October 2023 (/news/press-releases/monthly/202310)
- September 2023 (/news/press-releases/monthly/202309)
- August 2023 (/news/press-releases/monthly/202308)
- July 2023 (/news/press-releases/monthly/202307)
- June 2023 (/news/press-releases/monthly/202306)
- May 2023 (/news/press-releases/monthly/202305)
- April 2023 (/news/press-releases/monthly/202304)
- March 2023 (/news/press-releases/monthly/202303)
- February 2023 (/news/press-releases/monthly/202302)
- January 2023 (/news/press-releases/monthly/202301)
- December 2022 (/news/press-releases/monthly/202212)