EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT
LENDING
769 Centre Street
Jamaica Plain, MA 02130
Tel.: (617) 390-2669

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>      *Defendants*. | Case No. 19-cv-03674-WHA<br><br>**PLAINTIFFS' OPPOSITION AND MOTION TO STRIKE DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT**<br><br>**HEARING DATE: December 11, 2025**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

1
2

# TABLE OF CONTENTS

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.     INTRODUCTION ........................................................................................ 1

II.    ARGUMENT ............................................................................................... 2

       A.     The Court Should Strike the Department's Motion Because It Violates the
              Settlement Agreement............................................................................ 2

       B.     The Motion Should Be Denied As Untimely.......................................... 4

       C.     The Department's Motion Fails on Its Merits......................................... 9

              i.     The Equities Favor Plaintiffs ....................................................... 9

              ii.    The Department's Own Choices Caused This Situation............... 13

              iii.   The Department Misrepresents the Financial Effects of Maintaining the
                     Deadline ...................................................................................... 15

              iv.    Relief Is Not Available Under Rule 60(b)(6) ............................... 20

III.   DEFENDANTS ARE IN MATERIAL BREACH OF THE SETTLEMENT
       AGREEMENT............................................................................................. 20

CONCLUSION............................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................... 15

*Ashford v. Steuart*, 657 F.2d 1053 (9th Cir. 1981) (per curiam) ............................ 5, 9

*Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 20-cv-05399, 2022 WL 991751 (N.D. Cal. Apr. 1, 2022) .............................................................................................. 4

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ...................... 14

*Cassidy v. Tenorio*, 856 F.2d 1412 (9th Cir. 1988) ................................................... 9

*Coleman v. Brown*, 922 F. Supp. 2d 1004 (E.D. Cal. 2013) ....................... 9, 13, 14, 15

*Ctr. For Biological Diversity v. Norton*, No. 01-cv-2101, 2003 WL 22225620 (S.D. Cal. Sept. 9, 2003) ............................................................................................... 14

*Fed. Trade Comm'n v. Apex Capital Grp.*, No. 18-cv-9573, 2021 WL 7707269 (C.D. Cal. Sept. 3, 2021) ............................................................................................ 20

*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) ......................................................... 9

*Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831 (7th Cir. 2005) ................................ 5

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..................................................... 4

*Kingdom v. Lamerque*, 392 F. App'x 520 (9th Cir. 2010) ........................................ 5

*Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380(1993) ......... 20

*Pratt v. DeVos*, No. 20-cv-1501 (D.D.C. Feb. 1, 2021) .............................................. 14

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) .................................... 9

*S.E.C. v. Coldicutt*, 258 F.3d 939 (9th Cir. 2001) ................................................... 9

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ................................. 13,

*Warren v. City of Chico*, No. 21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025) ............................................................................................ 4, 9, 15, 20

**Other Authorities**

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal

Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130 (Oct. 31, 2024) ........................................................................................................................ 18

Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024)........................ 16, 19

Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes (July 2022) ........................................................................................................................ 18

**Rules**

Fed. R. Civ. P. 60(b)(5) ............................................................................................. *passim*

Fed. R. Civ. P. 60(b)(6) .................................................................................................... 20

Fed. R. Civ. P. 60(c)(1).................................................................................................... 5

1    **I.    INTRODUCTION**

2          Three and a half years ago, the Department of Education ("Department") entered into a

3    binding Settlement Agreement with Plaintiffs in which, among other things, it committed to

4    issuing borrower defense decisions to Post-Class Applicants[1] within 36 months of the Effective

5    Date of the Settlement. If it did not meet that deadline, the Department agreed, it would provide

6    all Post-Class Applicants who hadn't received a timely decision with Full Settlement Relief. The

7    Department had a realistic idea of the size of the Post-Class by at least September 2022, and—

8    according to its own filing—had finalized its numbers by February 2023.

9          Post-Class Applicants have now relied on the Settlement Agreement for over three years.

10   They have planned their lives around the expectation that they will get at least finality, and perhaps

11   a grant of relief, by January 28, 2026. They have tuned in to the regular status conferences in this

12   case over Zoom, listening as the Department repeatedly stated that it was on track and committed

13   to meeting the Post-Class decision deadline.

14         Now, less than 12 weeks before the deadline, the Department reveals that not only is it

15   behind schedule to meet that deadline, it *never had a prayer of meeting the deadline*: out of more

16   than 251,000 Post-Class applications, it has adjudicated fewer than 54,000—barely one-fifth. *See*

17   Defs.' Mot. for Temporary Relief from Judgment ("Mot.") at 7, ECF No. 492. This is far worse

18   than the worst-case scenario that Plaintiffs anticipated in the June 2025 status conference. *See* Tr.

19   of June 26, 2025 Hrg. at 12:20–13:5, ECF No. 479 ("The actual thing that we want the Court to

20   instruct the Department on is that the deadline for the post-class is firm, that there will be no further

21   extensions. . . . [W]hat we don't want to do is show up here on January 2nd, 2026, and have them

22   say, 'Actually, we've still got 50,000 more to go. Can we have an extension, please?'").

23         This case, and this Settlement, has always been about relieving class members from the

24   Department's chronic and unreasonable delays. Yet the Department now begs indulgence for its

25   own poor planning and lack of candor with Plaintiffs and the Court, in the form of a last-minute

26

27   ───────────────

     [1] Capitalized terms not otherwise defined in the text are used as in the parties' Settlement

28   Agreement, ECF 246-1, and prior briefing in this matter.

18-month delay of the Post-Class deadline. The relevant loans have already wreaked havoc on Post-Class Applicants' lives, and further delay will, for many, be the literal difference between housing and homelessness, between health and illness, between being able to provide for their families and falling into desperation. In these circumstances, the Department's assertion that the equities favor further delay are positively Orwellian.

Even aside from that fundamental failing, the Department's motion is legally deficient in multiple other ways. First, the Settlement Agreement provides the exclusive procedures for resolving disputes about Settlement enforcement, including for situations where the Department determines it cannot meet a deadline. The Department did not follow those procedures; as such, its motion should be stricken.

Second, if the Court does entertain the motion, it should deny the motion because it is woefully untimely. Even crediting the Department's narrative (which has notable omissions), it is clear that the Department knew it would not meet the Post-Class deadline months or even years ago. Rule 60 requires a motion for relief from judgment to be brought "within a reasonable time." The Department, despite having every opportunity to bring a timely motion, did not do so.

Finally, the motion fails on its merits. The Department cannot demonstrate that there are any significant and unanticipated changes in the facts that would warrant the extraordinary step of granting it relief from a contract that it willingly entered into. Indeed, nothing could be *more* anticipated than the Department finding itself in the very situation that Plaintiffs have been warning about for months. After stringing Post-Class Applicants along for the last three years, it is time for the Department to hold to its commitments and move this Settlement to its final phase. The motion should be denied.

## II.    ARGUMENT

### A.    The Court Should Strike the Department's Motion Because It Violates the Settlement Agreement

Paragraph V.A of the Settlement Agreement provides that "the Court shall retain jurisdiction" of this case "only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V." ECF 246-1 at 15. Further, "[i]n connection with each such claim,

the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim," and "[t]he Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement." *Id.* The Settlement's language is crystal clear: if the Department wants to seek relief relating to the Settlement, it must do so under the Settlement's procedures.

Indeed, the Settlement provides a procedure for this precise situation, which the Department admits it did not follow. *See* Mot. at 10-11 & n.3. Under Paragraph V.D.5, if "Defendants are reasonably prevented from or delayed in fully performing any of the obligations set forth in Paragraph IV . . . due to extraordinary circumstances beyond Defendants' control, Defendants will notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination that they will not be able to fully perform their obligations." ECF 246-1 at 19-20. The Department certainly did not notify Plaintiffs within the required 14 days, given that it would have been apparent long ago that the Department was hopelessly behind schedule on Post-Class adjudications. Regardless, the Settlement instructs that the Parties must meet and confer "as to whether the circumstances are beyond the Defendants' control and to what extent they affect Defendants' ability to issue final decisions or effectuate relief."[2] *Id.* at 20. If the Parties cannot reach agreement on either or both of those factors, "Plaintiffs may raise a claim of material breach of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph." *Id.* The Department notably omits the following sentences from its summary of the Settlement terms (*see* Mot. at 10-11): It is only then, after Plaintiffs have raised a claim of breach, that "Defendants shall be permitted to oppose the filing of such a claim upon the grounds of extraordinary circumstances, and the Court **will at that point** have jurisdiction to determine whether Defendants are entitled to any extension of the deadlines." *Id.* (emphasis added).

Plaintiffs do not contest that the Court retains subject matter jurisdiction over its final order incorporating the Settlement Agreement, and with that the power to modify the order. *See, e.g.*,

---

[2] Defendants notified Plaintiffs' counsel of their intention to file the instant motion mere hours before filing it. *See* Ellis Decl. ¶¶ 42–43 & Ex. K. The Department's assertion that it "ha[s], as a courtesy, begun the meet-and-confer process set forth in Paragraph V.D.5 of the Agreement" (Mot. at 11 n.3) is misleading at best.

*Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016); *Bay Marine Boatworks, Inc. v. S/Y Pursuit*, No. 20-cv-05399, 2022 WL 991751, at *2–3 (N.D. Cal. Apr. 1, 2022). But in this case, there are specific procedures in the Settlement designed to create the conditions for the Court to exercise its authority to decide whether to modify a Settlement deadline. When such a remedy exists, following the settlement is the preferred way to establish the parties' rights, not a collateral attack via Rule 60. *See Bay Marine*, 2022 WL 991751, at *4 ("I will not exercise my discretion to rewrite the agreement in this way because [the Rule 60 movant] has long had other, better options for judicial relief that, for whatever reason, it has refused to use.").[3]

The Department contends that that Paragraph V.D.5 does not apply here, because the Department is not contending that the requested delay is due to "extraordinary circumstances beyond Defendants' control." Mot. at 11 n.3. But this argument proves too much. If the circumstances here are *not* extraordinary, and the situation is *within* Defendants' control, then there is certainly no legitimate basis for granting relief under Rule 60(b)(5).

## B.  The Motion Should Be Denied as Untimely

Even if the Court entertains the motion despite Defendants' flaunting of the Settlement's procedures, the motion should be denied because it is untimely. Since the fall of 2022—before this Court signed the Final Approval Order—the Department has known at least the rough size of the Post-Class. Since February 2023, it has known the exact size of the Post-Class. Since April 2024, the Department has been attending regular status conferences before this Court to report on its progress implementing the Settlement, and at no point in all that time did the Department ever indicate that it would request an extension of the Post-Class decision deadline. To the contrary, when Plaintiffs expressed concern about the deadline, the Department responded, essentially,

---

[3] The court in *Warren v. City of Chico*, No. 21-cv-00640, 2025 WL 974068 (E.D. Cal. Mar. 31, 2025), reached the opposite conclusion, although with minimal legal analysis. *See id.* at *4 (stating merely that, "[t]hough the parties' Settlement Agreement contains an explicit modification procedure under its Dispute Resolution process, this does not displace the alternative means of a party to modify the Settlement Agreement pursuant to Rule 60(b)").

"Nothing to see here." There was, it turns out, ample reason for concern. The Department cannot now be heard to request an extension that it studiously avoided requesting for over three years.

Rule 60(c)(1) provides that "[a] motion under Rule 60(b) must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam). Reconsideration is not, however, "an appropriate place to slip in arguments that should have been made earlier." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005) (cited in *Kingdom v. Lamerque*, 392 F. App'x 520, 522 (9th Cir. 2010)).

The Department has always had a clear view of its obligations to the Post-Class under the Settlement. As the Parties jointly explained in support of preliminary approval, the Settlement contains "strong procedural protections" for Post-Class Applicants: "If the Department fails to meet the deadlines set forth in the Agreement, . . . Post-Class Applicants receive Full Settlement Relief." Joint Mot. for Prelim. Settlement Approval at 16, ECF No. 246; *see also* Tr. of Prelim. Approval Hrg. (Aug. 4, 2022) at 8:5-10, ECF No. 311 ("And by imposing consequences, if the Department is not able to meet those deadlines, we provide some sort of disincentive for the Government to slide back into its old patterns of delay. With that being said, these timelines were set through negotiation with the understanding and expectation that the Department is committed to meeting them."). Post-Class members relied on these representations in supporting approval of the Settlement: During the comment period, 796 Post-Class Applicants signed a letter to the Court urging approval of the Settlement because it "ensures that the Department of Education meets strict measures, which have been proven necessary by the discovery in this case." Letter from Post-Class Applicants, ECF No. 292.

By the time the Department jointly moved with Plaintiffs for final approval of the Settlement, it was already on notice that the Post-Class would be significantly larger than any of the Decision Groups in the class proper. *See* Joint Mot. for Final Settlement Approval at 14, ECF No. 323 (noting that, "as of September 20, 2022," the Post-Class Applicant group already included

"approximately 179,000 borrowers"). The Department viewed this fact as a feature, not a bug, in the Settlement's structure, stating that the classification of later-applying borrowers as Post-Class Applicants was necessary to enable the Department "to meet the deadlines carefully negotiated and included in the Agreement." *Id.* at 18-19. In its Final Approval Order, this Court reiterated the Department's obligations to the Post-Class and the then-known size of the Post-Class. Order Granting Final Approval at 5-6, ECF No. 345; *see also id.* at 22 (Post-Class applications will be decided "within three years on pain of automatic discharge of the loans").[4] As the Department's own attachment to the instant motion shows, the number of Post-Class Applicants was known with certainty by, at the latest, February 27, 2023. ECF 492-2 at 2.

When Plaintiffs brought a Motion to Enforce in March 2024, asserting Defendants had breached other provisions of the Settlement (*see* ECF No. 397), this Court ordered the Parties to engage in monthly in-person meetings and regular status conferences to address the violations and get Settlement implementation on track. *See* Minute Order, ECF 407. These meetings and hearings were eventually successful in correcting most of the problems with discharge and refund delivery for the Automatic Relief Group and Decision Groups—including, in December 2024, through the Court's ruling establishing the "terminal consolidation discharge methodology" as the applicable relief method for all Settlement groups. *See* Minute Entry, ECF 451. When it came to the Post-Class, however, warning signs soon began to emerge.

As early as February 27, 2025, Plaintiffs questioned in an in-person meeting whether there were enough Borrower Defense Branch ("BDB") staff to complete Post-Class adjudications. Ellis Decl. ¶ 35. In a hearing on March 13, 2025, Plaintiffs expressed to the Court their "serious concerns about the capacity of the borrower defense group to handle [Post-Class] adjudications." Tr. of Mar. 13, 2025 Hrg. at 9:20-21, ECF 466; *see also id.* at 5:7–17, 10:3–6 ("In its fiscal year 2025 budget,

---

[4] The Court also found that because "the class certification order set no cut-off date for membership, . . . the class definition as recited in that order clearly encompasses all of these [Post-Class] borrowers." Order Granting Final Approval at 22. As such, Post-Class Applicants are members of the *Sweet* class. Under the law of the case, the Department is simply wrong that Post-Class Applicants "are explicitly not defined as class members." Mot. at 3.

FSA had said that in order to complete the adjudication of post-class applications on time, it would need $56 million to hire 300 contract attorneys. A staff of 50 simply is not enough."). Because of those concerns, Plaintiffs asked the Court to order the Department to regularly report on its progress adjudicating Post-Class applications, *id.* at 11:7–16, and for the Court to recommit the Department to its decision deadline, because "we don't want … another drawn-out series of enforcement proceedings where the Government blows the deadline and then comes and says, well, we just need more time," *id.* at 12:6–11. In response, the Department assured the Court that it was "committed to providing full settlement relief." *Id.* at 14:5–6. When the Court asked the Department's attorney whether, "despite the reorganization [at the Department], you're confident that you will honor the settlement agreement?", the DOJ attorney responded, "The Department fully understands its obligations under the settlement agreement ... [T]he Department is committed to honoring the settlement agreement." *Id.* at 25:21–26:17.

At the next hearing, it was more of the same. Plaintiffs expressed their concerns about BDB staffing and the Department's lack of transparency about its progress for the Post-Class, particularly given the large size of that group. *See* Tr. of Apr. 15, 2025 Hrg. at 10:4–7, 11:8–18, 13:8–14. ECF 472. In response, the DOJ attorney assured the Court that "the bottom line, though, is that, as Your Honor has pointed out, if the Department doesn't issue decisions by [the deadline], then the borrower is entitled to full settlement relief." *Id.* at 15:3–5. Once again, the Court asked the DOJ attorney whether the Department was going to meet its deadlines; once again, he responded, "[W]e understand that those are our obligations, and we're going to work on it." *Id.* at 31:13–22.

Two months later, the same. By then, the Department had revealed that it had only adjudicated a tiny fraction of Post-Class applications so far. Tr. of June 26, 2025 Hrg. at 7:9–18. Plaintiffs asked the Court again to "instruct the Department … that the deadline for the post-class is firm, that there will be no further extensions," because "we don't want to … show up here on January 2nd, 2026, and have them say, 'Actually, we've still got 50,000 more to go. Can we have an extension, please?'" *Id.* at 12:20–13:5. The Court asked the Department's attorney, "[A]re you going to make the deadline?" *Id.* at 13:6–7. And the DOJ attorney responded, "We have every

incentive to make the deadline. I think, as both plaintiffs' counsel and you have said, if we don't, everyone who has not received a decision will be entitled to full settlement relief." *Id.* at 13:10–13. The Court then stated that it was "not going to issue an order" for the Department to stick to the deadline because "[i]t's already an order; right? It's already an order. That's in your settlement agreement that I reduced to an order." *Id.* at 13:15–17.

On it went. *See* Tr. of Aug. 28, 2025 Hrg. at 4:22–5:1 (Plaintiffs' counsel: "I think our primary concerns coming up are the next deadlines, which are for the post-class decisions, and that's going to be in January. That is a large group of people, 250,000 people. We have asked for but not received data on how that, those reviews are going[.]").[5] Not once, in any of these hearings, did the Department suggest to the Court that it might move for an extension of the Post-Class deadline. To the contrary, it repeatedly reassured the Court—and the Plaintiffs, and all of the Post-Class Applicants listening to these hearings over Zoom—that it was committed to the deadline and understood that breaching the deadline would mean the automatic delivery of Full Settlement Relief to anyone who had not received a decision.

Under these circumstances, the Department cannot with a straight face assert that its present motion is timely. It was on notice of the facts relevant to the current situation for years. The Department acts shocked at the size of the Post-Class and the scope of the adjudication task, when these factors have been clear since at least late 2022 and Plaintiffs have explicitly brought up this very issue at four hearings over the past nine months. Issues with mixed consolidation loans have been apparent since at least early 2024, *see, e.g.*, Tr. of June 13, 2024 Hrg. at 11:2–12:23, and the terminal consolidation discharge methodology has been in place for the Post-Class for nearly a year, *see* Minute Order, ECF 451 (Dec. 12, 2024). The Department thus fails to carry its burden to show that the "interest in finality, the reason for delay, [or] the practical ability of the

---

[5] At the August hearing, the DOJ attorney represented that "the Department has made progress on the post-class. … I did forecast[] for plaintiffs' counsel that we would be -- the Department would be providing some top-line data in the coming weeks." *Id.* at 7:11–16. *But see* Ellis Decl. ¶¶ 37–41 (Department did not provide the requested Post-Class data at July, August, September, or October 2025 meetings).

litigant to learn earlier of the grounds relied upon" favor its position here. *Ashford*, 657 F.2d at 1055. As for "prejudice to other parties," *id.*, as detailed *infra* Section C.i, Post-Class Applicants will be severely prejudiced by further delay, whereas the Department will simply have to do exactly what it agreed to do.

### C.      The Department's Motion Fails on Its Merits

The Department argues that it should be excused from complying with its own contractual obligations because, under Rule 60(b)(5), it is "no longer equitable" to enforce the Settlement as written. Mot. at 3. This position is meritless and should be rejected.

The moving party bears the burden of establishing that Rule 60(b) relief is justified. *Cassidy v. Tenorio*, 856 F.2d 1412, 1415 (9th Cir. 1988). This is a heavy burden. "Relief from a court order should not be granted . . . simply because a party finds 'it is no longer convenient to live with the terms' of the order." *S.E.C. v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2001) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992)). "Ordinarily, the party may not rely on 'events that actually were anticipated at the time it entered into a decree'" to argue for Rule 60(b)(5) relief. *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1027 (E.D. Cal. 2013) (three-judge panel) (quoting *Rufo*, 502 U.S. at 385).

In general, under Rule 60(b)(5), the movant must "establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Flores v. Rosen*, 984 F.3d 720, 740–41 (9th Cir. 2020) (quoting *Rufo*, 502 U.S. at 393). Notably, the Department cites a number of cases involving government requests for modification of consent decrees. *See* Mot. at 9, 12. But here, of course, the Settlement is not a consent decree or an injunction, but rather "a contract agreed to by the parties," and in such a situation "it is certainly arguable that a more stringent standard should apply." *Warren v. City of Chico*, 2025 WL 974068, at *5 (E.D. Cal. Mar. 31, 2025).

### i.      The Equities Favor Plaintiffs

The Department makes an argument fundamentally based on the equities, yet never once considers the effect that its proposed delay would have on the people most affected by it: the Post-Class Applicants themselves. Indeed, the Department's argument relies on a pernicious underlying

assumption that Post-Class Applicants are not part of "the public" or "taxpayers" whom the Department sees itself as serving. *See* Mot. at 21. But they are, and the Department's proposed delay would cause them immediate, irreparable, life-changing harm. *See* Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 15, ECF 146 ("Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm — it descended upon the class long ago."); Ex. 2, Decl. of Alice Zafiris ¶ 13 ("To hear the Department describe borrowers like me as receiving a 'windfall' is profoundly demoralizing. There is nothing windfall-like about years of waiting, mounting debt, and living in constant financial instability. We are not opportunists; we are people who believed the settlement meant what it said.").

In the two weeks since the Department filed its motion, Plaintiffs' counsel have conducted a survey of Post-Class Applicants to gather information about how an additional 18-month delay would affect their lives. *See* Ellis Decl. ¶¶ 23–29. Over 20,000 Post-Class Applicants responded to the survey, *id.* ¶ 30; this level of engagement alone indicates how important this issue is to so many people. And the results of the survey were overwhelming: over 80% of respondents reported that they were concerned about being placed back into repayment; over 81% reported that a further delay would negatively affect their credit report, credit score, and/or debt-to-income ratio; and nearly 90% (18,443 people) reported that a further delay would cause them stress, anxiety, and/or other negative impacts to their mental and emotional health. *Id.* ¶ 31. Respondents were also highly concerned about negative effects on their family's well-being (66.5%), being unable to afford an important purchase or cover an important expense (58.6%), suffering negative effects on their physical health (48.3%), and having their tax refunds or wages garnished because their loans had previously been in default (46.8%). *Id.* Over a quarter of respondents reported that having these loans outstanding was preventing them from going back to school or finishing their degree. *Id.* Just one percent (218 people) said a delay would have no effect on them. *Id.*

These numbers, while striking in themselves, cannot do justice to the profound impact that a further delay will have on Post-Class Applicants' lives:

In the absence of a decision on their borrower defense applications, Post-Class Applicants' struggles with credit reporting have blocked them from access to reasonable options for housing,

transportation, and other forms of credit. *E.g.*, Ex. 3, Decl. of Sherri Mainhart ¶ 10; Ex. 4, Decl. of Beth Huegel ¶ 10; Ex. 5, Decl. of Erin Williams ¶ 9; Ex. 6, Decl. of Kimberly O'neill ¶ 8; Ex. 7, Decl. of Lauren Bartholomew ¶¶ 12-13; Ex. 8, Decl. of Meloney Garrett ¶ 8; Ex. 9, Decl. of Nina Mecham ¶ 11; Ex. 10, Decl. of Stacey Barton ¶ 8; Ex. 11, Decl. of Stephanie DiMaso ¶ 9; Ex. 12, Decl. of Mark Gomez ¶ 10.

They are likewise blocked from advancing in their careers because they do not know if they will be able to go back to school or pass a security clearance screening. *E.g.*, Ex. 13, Decl. of Contessa Tracy ¶ 11; Ex. 14, Decl. of Sean Sanders ¶ 16; Ex. 15, Decl. of Akram Jaber ¶ 11; Ex. 16, Decl. of Alexandra Strong ¶ 9; Ex. 7, Bartholomew Decl. ¶¶ 15-18; Ex. 9, Mecham Decl. ¶ 11.

They put off major needs such as home repairs, health insurance, and saving for retirement. *E.g.*, Ex. 17, Decl. of Chandy Niles ¶ 9; Ex. 18, Decl. of Jennifer McMillian ¶ 8; Ex. 19, Decl. of Lyndsay Pelchat ¶ 7; Ex. 20, Decl. of Margo Rutland ¶ 11; Ex. 21, Decl. of Richard Hancock ¶ 9.

The uncertainty of having these loans hanging over their heads causes physical symptoms from stress, such as loss of sleep, headaches, and high blood pressure. *E.g.*, Ex. 15, Jaber Decl. ¶ 9; Ex. 22, Decl. of Elizabeth Lahren ¶ 7. They struggle with anxiety, depression, and a loss of faith in their government. *E.g.*, Ex. 23, Decl. of Federico Garza ¶ 9; Ex. 3, Mainhart Decl. ¶ 14; Ex. 6, O'neill Decl. ¶ 11; Ex. 19, Pelchat Decl. ¶¶ 10–11.

Some have put off marriage or children because of the specter of their debt. *E.g.*, Ex. 24, Decl. of Tiffany Kobs ¶ 12; Ex. 2, Zafiris Decl. ¶ 11; Ex. 7, Bartholomew Decl. ¶ 21.

Under these excruciating conditions, Post-Class members are still doing their best to care for their families. *E.g.*, Ex. 25, Decl. of Danielle Desormier ¶ 10; Ex. 26, Decl. of Erica Eacott ¶ 11; Ex. 27, Decl. of Lacricia Lee ¶ 8; Ex. 28, Decl. of Summer Hardy ¶ 9; Ex. 29, Decl. of Stephen DeCoteau ¶ 11; Ex. 35, Decl. of Angela Nocom ¶¶ 7–8; Ex. 12, Gomez Decl. ¶¶ 12–13; Ex. 17, Niles Decl. ¶ 8; Ex. 20, Rutland Decl. ¶¶ 7–8.

Borrowers from around the country attest to the hardships they will face if the Department is permitted to break its word:

- "These student loans have hung over my head for years and destroyed my credit. When I learned in 2022 that I could apply for a borrower defense discharge of my student

loans I felt like I could breathe for the first time in a long time. … I am still waiting for this weight to be lifted off my shoulders so that I can work on building my life rather than surviving it. Recently, my husband's cancer recurred and he is now unable to work. The uncertainty of my outstanding student loans only adds to the stress and anxiety we are experiencing from my husband's illness." Allyse, age 32, Minnesota (Ex. 30, ¶ 9)

- "As the sole income earner for my family, this ongoing situation is creating unbearable financial and emotional stress, pushing me dangerously close to bankruptcy, and I can't tell if I need to file or not because I'm getting mixed information from my servicer, AidVantage, and from the Department. ... I have had to move far from my family because I couldn't afford the cost of living given my income and debts. My financial uncertainty means that I'm unable to move closer or even to visit them. This is extremely painful to me." Beth, age 35, South Carolina (Ex. 4, ¶¶ 9, 13)

- "My poor credit previously forced me into three months of homelessness in 2023, when I could not rent an apartment because [of] my credit score. I had to live in hotels until a family member could co-sign for me to rent an apartment. A delay will hurt my credit score even further. I will not be able to qualify for a loan unless the ITT debt is removed from my credit report. I have tried four different lenders for a home loan, and it always comes back to the same issue—my debt-to-income ratio." Dawnelle, age 50, Indiana (Ex. 31, ¶¶ 10–11)

- "I retired from employment with the City of Phoenix, but returned to work in 2023 due to the high cost of health insurance and rising costs in general. … I have health issues, but continue working because I'm afraid that student loan payments will come due. The stress of having this repayment lingering only adds to my health issues. Flare ups from my autoimmune disease are triggered by stress. I need to retire. I want to go into retirement knowing exactly where I stand financially as my income will be fixed." Terri, age 61, Arizona (Ex. 32, ¶¶ 7–8)

- "I was diagnosed [with cancer] in 2018 before learning about Borrowers Defense and the Sweet case. I lived in my own home and was living paycheck to paycheck. My circumstances changed during covid, and by 2021, I was homeless. Can you imagine trying to fight cancer while being homeless? I am grateful to my relatives for letting me rent a room from them, but it's not all perfect and we still struggle. ... [M]y cancer keeps coming back and doctors say it is from the stress. I need stability, privacy, and my own space to manage treatment and recovery. Uncertainty spikes stress, worsens symptoms, and disrupts care planning. Years of collection threats preceded my Borrower Defense application, including demands for unaffordable monthly payments and tax refund offsets. I fear this will return someday, and it adds to the trauma of it all." Michelle, age 51, Georgia (Ex. 33, ¶ 9)

- "In my field, or for certain job roles, the existence of large, unresolved debt can be a factor in hiring, security clearance, or professional licensing. I have to report any unresolved debt to my employer. This delay ensures that this potential negative effect

on my employment or professional well-being remains a reality." Sean, age 56, Florida (Ex. 14, ¶ 16)

- "As a service member, I made a commitment to serve my country and I have continued to uphold that commitment while also carrying the weight of unresolved student loan issues tied to an institution that misled students and misused federal aid funds. Because my application remains in limbo, I am not receiving credit toward Public Service Loan Forgiveness. This means that every month of delay pushes my financial future further out of reach and traps me in debt that would be forgiven if the Department honored the timelines promised under this settlement." Contessa, age 34, Maryland (Ex. 13, ¶¶ 9–10)

- "This week brought the most painful consequence yet — my father passed away on Sunday night and I am unable to apply for a low-interest funeral loan to pay for the services because of my debt to income ratio. I'm having to take out a much higher interest rate loan with a shadier creditor in order to pay for this. It's insult to injury. A dagger in my grieving heart." Alice, age 40, Virginia (Ex. 2, ¶ 15)

- "While I was in school, I was battling cancer. I had to take some time off school to get radiation treatments. My school forced me to retake classes I passed with an A, putting me in more debt. … It disgusts me to think of how I was deceived by a school that received government funding while I was fighting for my life. Meanwhile, the government doesn't seem to care about me." Brittney, age 36, Alabama (Ex. 34, ¶ 10)

### ii. The Department's Own Choices Caused This Situation

The burden falls on Defendants to demonstrate a "significant and unanticipated change in factual conditions warranting modification" of the Settlement's deadline. *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005). Contrary to the Department's complaints, *see* Mot. at 13, there is nothing unanticipated about the situation in which it now finds itself. Rather, this situation is an entirely foreseeable consequence of the Department's own decisions, as it voluntarily entered into the Settlement and then spent the better part of three years kicking the can down the road. *See Coleman*, 922 F. Supp. 2d at 1044 (Rule 60(b) relief not justified where "defendants are fully responsible for" failure to achieve settlement goals, as defendants "prevent[ed] themselves from achieving a long-term solution . . . without taking a number of steps that they could but are unwilling to take").

According to its declarant, the Department employed between 33 and 46 BDB attorneys for most of the Settlement implementation period, Bergeron Decl. ¶ 9 Tbl. 3, despite it being clear that this was nowhere near enough people to adjudicate the number of applications. The

Department's purported attempt to increase staffing through an agreement with HHS lasted less than eight months, and staffing is now back at 2023 levels. *Id.* The Department asserts that it "was not able" to "reallocate resources" to comply with the Settlement by adding more staff, but it does not provide any statutory or regulatory basis for this supposed inability. *Id.* ¶ 8; *compare, e.g.*, *Ctr. For Biological Diversity v. Norton*, No. 01-cv-2101, 2003 WL 22225620, at *4 (S.D. Cal. Sept. 9, 2003) (agency prohibited by statute from expending further funds on habitat designations).

Reportedly, the Department spent the "first ***two years*** of implementing the Settlement Agreement" on "stand[ing] up its new policies and procedures." Bergeron Decl. ¶ 21 (emphasis added). The Department had the BDB spend months conducting fact-finding, *id.* ¶¶ 12–14—even though it had already established a factual basis for finding substantial indicia of misconduct by at least 151 schools on Exhibit C to the Settlement, *see* Joint Mot. for Final Settlement Approval at 11. The Department also prioritized analyzing whether it could justify partial relief for approved applications, Bergeron Decl. ¶ 17, even though the Department's partial relief methods have been successfully challenged in at least two other lawsuits.[6] In short, the Department spent its time doing anything *but* the task that actually had to be completed: deciding applications.

Nor does the Department's eleventh-hour insistence that it now has a better plan change the analysis. *See* Mot. at 20. To begin, the plan is not actually better. The Department states that it is "proceeding to finalize the market research needed to provide an acquisition approach and full timeline to award . . . contracts for attorneys." Bergeron Decl. ¶ 36. In other words, it still has no idea where the new attorneys will come from, how it will hire them, or when it will actually be able to make any hires. The Department then lays out an over six-month-long process of onboarding that will admittedly reduce the already limited capacity of the BDB. *See id.* ¶¶ 35, 37. It does not take a math genius to see that this plan risks even further delays if there are any hiccups at all in the purported hiring plan. What the Department offers here "is not a plan for compliance; it is a plan for non-compliance." *Coleman*, 922 F. Supp. 2d at 1049.

---

[6] *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018); Joint Status Report, *Pratt v. DeVos*, No. 20-cv-1501 (D.D.C. Feb. 1, 2021), ECF No. 23 (Department abandoned partial relief methodology after certification of class).

But regardless of the weaknesses in the plan itself, the fact remains that "we'll do better next time" is not the standard for a Rule 60(b)(5) motion—it is a "significant and unanticipated change in factual conditions." *Asarco*, 430 F.3d at 979. And as detailed above, the Department knew full well that if it did not decide the applications by January 28, 2026, then Post-Class Applicants without decisions would receive Full Settlement Relief. Its attorneys repeated and reaffirmed this fact over and over before this Court throughout the past year. Indeed, "[n]othing could be more 'anticipated' than" the exact situation described in the Settlement and discussed in multiple hearings coming to pass. *Coleman*, 922 F. Supp. 2d at 1032. The Department's new "contention that the enforcement procedures [in the Settlement] constitute a change in factual circumstances" is "unpersuasive" where "the Settlement Agreement which defendants assented to contained the terms for those procedures." *Warren*, 2025 WL 974068, at *10.

### iii. The Department Misrepresents the Financial Effects of Maintaining the Deadline

The Department asserts that delaying the Post-Class deadline will prevent billions of dollars of "windfall" to Post-Class Applicants at "taxpayer expense." Mot. at 3. For one thing, Post-Class Applicants are taxpayers too. For another, a party cannot argue for changed circumstances "based on the 'exorbitant costs of complying'" where it was "aware that additional costs would be incurred' due to the court's judgment"—here, the costs of Post-Class Applicants receiving either approvals or relief by default. *Coleman*, 922 F. Supp. 2d at 1027 (quoting *Agostini v. Felton*, 521 U.S. 203, 215–16 (1997)). "That these predictions of additional costs turned out to be accurate does not constitute a change in factual conditions warranting relief under Rule 60(b)(5)." *Agostini*, 521 U.S. at 216.

But more importantly, the Department's claim of cost savings is unreliable at best, and downright false at worst.

***First:*** The basis for the Department's claim is not adequately explained in its motion or in the Declaration of James Bergeron. The Bergeron Declaration states that the "associated liability" of following the Settlement is "approximately $11.8 billion in discharges and $640 million in refunds" under the Court-ordered terminal consolidation discharge methodology, whereas "[i]f the

liabilities were to be limited to only the loans relating to the school that is the subject of the borrower defense application, the total estimated liability would be $7.3 billion in discharges and $446 million in refunds." Bergeron Decl. ¶ 32. But the Declaration does not explain how these numbers were calculated. And in the absence of any substantiation, this assertion raises more questions than it answers.

To begin, this Court ordered the Department to use the terminal consolidation discharge methodology for all Settlement groups after briefing and argument showed that the Department quite simply *could not* execute its relief obligations under the Settlement any other way. At that time, the Department failed to present evidence that it knew or had any reliable way to calculate discharge or refund amounts that were solely "related to" underlying borrower defense school loans within mixed consolidation loans. The Bergeron Declaration does not explain how the Department supposedly knows that information now.[7]

Next, the Court has already ordered that the Department must use the terminal consolidation discharge methodology for the Post-Class. *See* Minute Entry, ECF 451. The amount that the Department would theoretically discharge under some other, unspecified methodology is therefore irrelevant. Rather, the relevant calculation would be how many Post-Class Applicants would receive Full Settlement Relief as a result of Defendants' breach of the deadline versus how many Post-Class applications would be approved during the Department's requested delay period. But the Department avoids addressing this obvious logical misstep, for an obvious reason: the Department does not know how many applications would be approved. It weakly suggests that its

---

[7] As one specific example: For any Post-Class Applicants whose loans were disbursed before 2005, the Department has publicly acknowledged that it does not know the original balances of these loans. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564, 27,573 (Apr. 17, 2024) (hereinafter "Apr. 2024 NPRM") ("The Department faces certain data limitations that make it impossible to accurately ascertain the balance upon entering repayment for loans disbursed before January 1, 2005."). Without those original balances, the Department could not calculate a "related to unrelated" ratio.

50% approval rate to date might continue.[8] *See* Bergeron Decl. ¶ 33. But the Department's own description of its decision methodology suggests that the approval rate would, if the Department acts in good faith, likely be far greater.

Specifically, the Department (mystifyingly) prioritized making decisions on Post-Class applications where there was *less* evidence of school misconduct and *fewer* applications per school. Bergeron Decl. ¶ 21. Overall, more than 80% of Post-Class applications relate to schools on the Settlement's Exhibit C list. *See* Ellis Decl. ¶ 15 (204,530 Post-Class applications from Exhibit C schools). If the Department's Post-Class decisions to date overwhelmingly concern non–Exhibit C schools, that means an even greater percentage of remaining applications relate to schools with known, and in some cases very extensive, records of misconduct—including "group discharge" schools, where the Department has already ordered that *all* borrowers who attended over a period of many years should have their loans discharged.[9] One can reasonably expect that applications from these schools are likely to be granted at a much higher rate.

As a result, in order to realize the savings it predicts, the Department would have to deny tens of thousands of applications from schools with known evidence of misconduct. This would fly in the face of one of the Settlement's major purposes: preventing arbitrary denials.

---

[8] Plaintiffs do not concede that this approval rate accurately reflects the merits of the underlying applications adjudicated so far.

[9] The Bergeron Declaration misstates the effect of group discharges on Post-Class Applicants. Mr. Bergeron states that the group discharges "positively impacted post-class applicants because there was a significant number of post-class applications associated with those group requests, which were approved through the group process." Bergeron Decl. ¶ 21. This is wrong on a few levels. First, a group discharge is not a "group request"—there is no mechanism to request a group discharge. Second, borrower defense applications are not "associated with" group discharges; by definition, group discharges affect borrowers from a given school regardless of whether they ever filed for borrower defense. *See* Ellis Decl. Exs. A–I. Third, a Post-Class Applicant who is also eligible for a group discharge does *not* automatically receive an approval of their borrower defense application. *See, e.g.*, Ex. 4, Huegel Decl. ¶ 9 (Post-Class Applicant eligible for group discharge has not received approval or relief); Ex. 17, Niles Decl. ¶ 6 (Post-Class Applicant partially eligible for group discharge has not received approval for loans that fall outside group discharge time window). In fact, as far as Plaintiffs are aware, the Department does not even know which borrower defense applicants fall into the category of group discharge/Post-Class overlap—a piece of information that Plaintiffs requested at multiple in-person meetings. *See* Ellis Decl. ¶¶ 36–41.

*Second*, as Plaintiffs have explained before,[10] the Department's own accounting assumes that much of this debt would never be repaid even if it remained on the books. Federal student loans are, overall, a money-losing endeavor. *See* Gov't Accountability Office, GAO-22-105365, Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes, at 12 (July 2022), *available at* www.gao.gov/assets/gao-22-105365.pdf (hereinafter "GAO Cost Report") ("[L]oans made from the fiscal year 1997 through 2021 cohorts were originally estimated to generate $6 in income per every $100 disbursed. As of fiscal year 2021, those cohorts are expected to cost the government almost $9 for every $100 disbursed."). Once the accounting is done, "[n]o Direct Loan cohort has finished repaying all of its loans since the start of the program in 1994." *Id.* at 4. It is thus deeply misleading to suggest that discharging a particular amount in loan balances would equate to that same amount in "losses" to "taxpayers."

There are reasons to believe that the portfolio of Post-Class Applicants' loans would be particularly unlikely to result in net gains for the Department. For one, students who attended for-profit colleges are statistically more likely to default than students who attended other types of institutions. *See* Department of Education, Notice of Proposed Rulemaking, Student Debt Relief Based on Hardship for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 87,130, 87,143 (Oct. 31, 2024). Post-Class Applicants who attended more than one school frequently attended more than one for-profit college,[11] meaning that if they have consolidation loans, that entire balance would consist of debt that is less likely to be paid back.

In a best-case scenario, the Department would collect—over the course of decades—only some small fraction of whatever balances it would retain by delaying the Post-Class deadline in

---

[10] *See* Pltfs.' Opp. to Mot. to Approve Settlement Relief Process at 11-13, ECF 446.

[11] Over 41,000 Post-Class Applicants submitted more than one borrower defense application; of those, 20,516 people—very close to half—attended more than one Exhibit C school. Ellis Decl. ¶¶ 21–22. All but 12 Exhibit C schools are for-profit. *Id.* ¶ 14.

order to deny more applications.[12] Meanwhile, as detailed *supra*, the Post-Class is already suffering from the Department's slow march toward adjudicating applications, and will suffer further if any additional delay is allowed.

**Third,** in addition to these general accounting deficiencies, the Department's calculations make other unrealistic assumptions about the alleged gains to be realized under its proposed delay. For one, the Department does not take into account the fact that a significant portion of the balances to be discharged under the Settlement schedule would be discharged in any event. The Post-Class includes more than 32,000 applications—nearly 13% of the total—that relate to group discharge schools. Ellis Decl. ¶ 17. Thus, most of these loans would eventually be discharged even absent the Settlement. Some percentage of Post-Class Applicants are also very likely to be eligible for other forms of loan cancellation, such as total and permanent disability discharge, closed school discharge, income-based repayment discharge, or Public Service Loan Forgiveness ("PSLF"), so the full balances of their loans will or should be cancelled as well. *See* Defs.' Mot. to Approve Settlement Relief Process at 5, ECF 443 (26% of *Sweet* Decision Group 3 was eligible for PSLF); Ex. 13, Tracy Decl. ¶ 10 (Post-Class Applicant working toward PSLF); Ex. 5, Williams Decl. ¶ 8 (Post-Class Applicant working toward income-based repayment discharge); Ex. 33, Reed Decl. ¶ 11 (Post-Class Applicant is permanently disabled); Apr. 2024 NPRM at 27,565 (Department is currently holding $7.6 billion worth of loans that are eligible for closed school discharge).

Nor does the Department balance any alleged savings from its proposed plan against the costs of that plan—which appear to be significant, although the Department does not offer an estimate. It also does not take into account the costs of servicing and collection on loans that would

---

[12] For example, borrowers with loans that were disbursed before 2005 are also more likely to default, because "loans that are that old and are still outstanding belong to borrowers who have had long-term struggles repaying." Apr. 2024 NPRM at 27,573. The vast majority of borrowers in income-driven repayment plans are unlikely to pay back their principal balances before those plans reach the 20- or 25-year threshold for cancellation, because their "monthly payments [do] not cover the full amount of accumulating interest." *Id.* at 27,592. And if a borrower has been in default for an extended period of time despite "the availability of . . . powerful collection tools," the Department has concluded that "the odds that they would be fully repaid in a reasonable period are unlikely." *Id.* at 27,595.

remain, including the Department's own operational and administrative costs as well as the costs of compensating student loan servicers and/or debt collectors on a per-account basis.

### iv.  Relief Is Not Available Under Rule 60(b)(6)

As a last-ditch effort, the Department briefly argues that if the Court rejects its Rule 60(b)(5) argument, it should receive relief under Rule 60(b)(6). Mot. at 21-22. But "[t]o justify relief under subsection (6), a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay." *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 393 (1993). For all of the reasons detailed above, the Department cannot satisfy this standard. "When a party makes a conscious and informed choice of litigation strategy, [that party] cannot seek extraordinary relief [under Rule 60(b)(6)] merely because his assessment of the consequences was incorrect." *Warren*, 2025 WL 974068, at *15 (alterations in original) (quoting *Fed. Trade Comm'n v. Apex Capital Grp.*, No. 18-cv-9573, 2021 WL 7707269, at *4 (C.D. Cal. Sept. 3, 2021)).

## III.    DEFENDANTS ARE IN MATERIAL BREACH OF THE SETTLEMENT AGREEMENT

Defendants are in material breach of the following provisions of the Settlement:

Paragraphs V.A and V.D.5, by failing to follow the procedures established by the Settlement for situations in which the Department contends that it is unable to fully perform its obligations under the Settlement.

Paragraph V.D.5, by failing to "notify Plaintiffs' Counsel within 14 calendar days of Defendants' determination that they will not be able to fully perform their obligations" under the Settlement.

Paragraph IV.D.2, in an anticipatory breach. Pursuant to Paragraph V.D.5, where the parties are unable to agree "as to whether extraordinary circumstances exist [to justify a deadline extension] or what the appropriate length of an extension is"—which is the case here—then "Plaintiffs may raise a claim of material breach of Paragraph IV with the Court prior to the expiration of the timelines provided in that Paragraph." It is clear from the Department's motion that a material breach of this provision will occur on January 29, 2026.

1

**CONCLUSION**

2        For the reasons set forth above, Plaintiffs respectfully request that the Court strike or in the

3   alternative deny Defendants' Motion for Relief from Judgment.

4        Plaintiffs further respectfully request that the Court find that Defendants are in material

5   breach of the Settlement Agreement and, pursuant to Paragraph V.B.1 of the Settlement, (i) order

6   Defendants to promptly provide Full Settlement Relief to each affected Post-Class Applicant on a

7   timetable set by the Court, with that timetable to follow the Settlement's original agreed-upon

8   schedule; and (ii) order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs incurred

9   in relation to these breaches of the Settlement.

10

11

12

13  Dated: November 20, 2025                          Respectfully submitted,

14
                                                     _Rebecca C. Ellis_____
15
                                                     Eileen M. Connor (SBN 248856)
16                                                   econnor@ppsl.org
                                                     Rebecca C. Ellis (*pro hac vice*)
17                                                   rellis@ppsl.org
                                                     Rebecca C. Eisenbrey (*pro hac vice*)
18                                                   reisenbrey@ppsl.org
                                                     Noah Zinner (SBN 247581)
19                                                   nzinner@ppsl.org
                                                     PROJECT ON PREDATORY
20                                                   STUDENT LENDING
                                                     769 Centre Street
21                                                   Jamaica Plain, MA 02130
                                                     Tel.: (617) 390-2669
22

23

24                                                   *Attorneys for Plaintiffs*

25

26

27

28