BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-4964
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| THERESA SWEET, et al., | |
| Plaintiffs, | Case No. 4:19-cv-03674-HSG |
| v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)** |
| LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education*, and | |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | Date: March 26, 2026 |
| Defendants. | Time: 2:00 p.m. |
| | Place: Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B) ...................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................1

INTRODUCTION ........................................................................................................1

ISSUE TO BE DECIDED .............................................................................................5

BACKGROUND ..........................................................................................................5

    I.    This Case and The Parties' Settlement Agreement.................................................5

    II.    The Department's Implementation of the Agreement ...........................................8

    III.    The Court's December 2025 Decision on Defendants' Motion for Temporary Relief from Judgment. ..................................................................................11

LEGAL STANDARD..................................................................................................12

ARGUMENT ..............................................................................................................13

    I.    The Court Should Reconsider the Decision Because it is Premised on Manifest Legal Error in Treating Post-Class Members as Parties. ...................................14

    II.    The Court Should Reconsider the Decision Because it is Premised on Manifest Errors of Fact. ............................................................................................17

        A.    The Court's Finding that the Department's Existing Staff of 37 Attorneys Could Adjudicate 170,000 Applications by Working Overtime Over the Holidays is Clearly Erroneous. ..................................................17

        B.    The Court Failed to Consider that the Department Cannot Premise Post-Class Application Decisions on the Applicant's Attendance at an Exhibit C School. ...............................................................................20

    III.    The Court Should Reconsider the Decision Because the Department is Continuing in Good Faith to Implement Its Plan to Use One Big Beautiful Bill Act Funds to Hire Staff Needed to Adjudicate Outstanding Post-Class Applications and the Department has Continued to Review and Adjudicate as Many Post-Class Applications as Possible with Existing Resources. ...........................................22

    IV.    Defendants Respectfully Request Prompt Action Granting this Motion or a Temporary Stay of the Agreement's Notice Deadline.........................................23

    V.    If Civil Local Rule 7-9 Governs This Motion, Defendants, in the Alternative, Seek Leave to File a Motion for Reconsideration. ...............................................24

CONCLUSION............................................................................................................24

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987)................................................................. 15

*BLOM Bank SAL v. Honickman*,
  605 U.S. 204 (2025)................................................................. 13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................................. 15

*California v. EPA*,
  978 F.3d 708 (9th Cir. 2020) ................................................... 13

*FDA v. Wages & White Lion Invs., LLC*,
  604 U.S. 542 (2025)........................................................... 19, 20

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004)................................................................. 12

*Henson v. Fidelity Nat'l Fin., Inc.*,
  943 F.3d 434 (9th Cir. 2019) ................................................... 13

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)................................................................. 16

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2011) ............................................... 19

*Lewis v. Casey*,
  518 U.S. 343 (1996)................................................................. 15

*N. Side Lumber Co. v. Block*,
  753 F.2d 1482 (9th Cir. 1985) .............................................. 16-17

*Phila. Welfare Rts. Org. v. Shapp*,
  602 F.2d 1114 (3d Cir. 1979) ........................................... *passim*

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992)................................................................. 12

*Sweet v. Cardona*,
  641 F. Supp. 3d 814 (N.D. Cal. 2022), *aff'd*, 121 F.4th 32 (9th Cir. 2024), *petition for cert. docketed
  sub nom. Everglades Coll., Inc. v. McMahon*, No. 25-492 (U.S. Oct. 21, 2025) ........................... 3, 4, 5

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)......................................................... 15, 16, 17

*United Aeronautical Corp. v. U.S. Air Force*,
  80 F.4th 1017 (9th Cir. 2023) ................................................. 17

*United States v. Texas*,
  144 S. Ct. 797 (2024)............................................................... 23

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................................ 16

**Rules**

Civ. L.R. 7-9 ........................................................................................................... 13, 24

Fed. R. Civ. P. 23(e) ....................................................................................................... 7

Fed. R. Civ. P. 60(b) .......................................................................................... 1, 12, 13

**Regulations**

34 C.F.R. § 685.222 (2017) ........................................................................................ 20, 21

34 C.F.R. § 685.222(d) .................................................................................................. 21

**Other Authorities**

Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary (April
    2025),
    https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf
    ................................................................................................................................ 3,10

Ida A. Brudnick, Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked
    Questions (2025),
    https://www.congress.gov/crs-product/R43397 ................................................... 3, 10

Rachel Lindbergh, Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance
    (2025),
    https://www.congress.gov/crs-product/R43419 ................................................... 3, 10

William B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. Dec. 2025 update) ........... 20

U.S. Court, Federal Judicial Caseload Statistics 2025,
    https://www.uscourts.gov/data-news/reports/statistical-reports/federal-judicial-caseload-
    statistics/federal-judicial-caseload-statistics-2025 .................................................... 2

U.S. Dep't of Educ., Department of Education Fiscal. Fiscal Year 2024 Budget Request,
    https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/justifications/q-saa.pdf ............. 19

1

**NOTICE OF MOTION AND MOTION FOR**
**RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)**

2    Notice is hereby given that Defendants move the Court for temporary relief from judgment under

3  Federal Rule of Civil Procedure 60(b).  Because this motion is time sensitive, *see infra* at p. 23, Defendants

4  anticipate submitting an administrative motion for determination without hearing, or in the alternative, for

5  a specially set hearing date, such that the motion is resolved on or before March 2, 2026.  Should the Court

6  desire a hearing on this motion, Defendants provide notice that, consistent with the Local Rules, they will

7  move pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for the aforementioned relief on

8  March 26, 2026, at 2:00 p.m., before the Honorable Haywood S. Gilliam, Jr., in Courtroom 2 of the 4th

9  Floor of the Oakland Courthouse (the earliest date currently available on the Court's motions calendar),

10  or such earlier time as the Court may set.  But as described *infra* at p. 23, this motion is time sensitive,

11  and Defendants respectfully request a decision on or before March 2, 2026.

12    Defendants move for Rule 60(b) relief from the parties' settlement agreement, as incorporated in

13  the Court's final judgment order, ECF No. 346, and as further modified by the Court on December 11,

14  2025.  Defendants are currently required to provide full settlement relief to certain non-class members if

15  Defendants fail to issue timely final decisions on such non-class members' borrower defense applications

16  by January 28, 2026.  Defendants respectfully request that the Court reconsider Defendants' request that

17  the deadline for providing final decisions to these non-class members be extended by eighteen months,

18  until July 28, 2027, at which point Defendants' obligation to provide full settlement relief to any non-class

19  members whose applications are undecided by that date would be reinstated.  The basis for the motion is

20  set forth in the following Memorandum of Points and Authorities.

21    **MEMORANDUM OF POINTS AND AUTHORITIES**

22    **INTRODUCTION**

23    In June 2022, the Department of Education and Plaintiffs reached a settlement agreement that

24  provided a comprehensive framework for resolving hundreds of thousands of pending borrower defense

25  applications, some of which had been pending for more than seven years.  In the three years since, the

26  Department has substantially complied with all its obligations to class members.  However, obligations to

27  one group of individuals addressed in the settlement—the "post-class," consisting of certain individuals

28

who submitted borrower defense applications over a five-month period after the parties executed the agreement—remain outstanding. But these individuals are not members of the class or parties in this case. By agreement, incorporated in the Court's Final Judgment, the Department must adjudicate all claims submitted by this set of non-parties by January 28, 2026, or else provide them full settlement relief (including discharging relevant student loan debt, refunding amounts paid to the Department toward those loans, and facilitating corresponding credit reporting relief).

The post-class applicant pool turned out to be enormous. It exceeds by more than 200,000 the number of applications that were submitted in any comparable five-month period before or after the Settlement Agreement, ECF No. 246-1 ("Agreement"), was executed—an at least 523% increase. For context, there were 271,802 civil cases filed in federal district courts in 2025 in total. U.S. Court, Federal Judicial Caseload Statistics 2025, https://www.uscourts.gov/data-news/reports/statistical-reports/federal-judicial-caseload-statistics/federal-judicial-caseload-statistics-2025. While lawsuits differ materially than borrower defense claims, the comparison shows how extraordinary this five-month application period was. The Department had no basis to know it was agreeing to adjudicate such an enormous number of applications by January 2026 when it executed the Agreement.

In response to the size of the post-class, the Department repeatedly sought implementation funding from Congress to gain sufficient staffing resources to adjudicate all post-class applications by January 28, 2026. But Congress repeatedly rejected the Department's funding requests. It was not until July 2025 that Congress changed course and provided the Department's Federal Student Aid ("FSA") office adequate funding as part of the One Big Beautiful Bill Act. Shortly after Congress appropriated $1 billion to FSA in July 2025, the Department worked to develop and finalize budget plans and conducted market research to hire contract attorneys. Then the Government expeditiously moved for modification of the Court's final judgment to account for achievability given Congress's post-judgment funding decisions. *See Phila. Welfare Rts. Org. v. Shapp*, 602 F.2d 1114, 1120 (3d Cir. 1979). By putting this new funding to work, the Department developed a plan to hire 450 contract attorneys and adjudicate the remaining post-class applications by July 2027.

That plan required this Court's modification of the January 2026 deadline. In late 2025, the

Department anticipated that it would not meet the January 2026 deadline for approximately 193,000 applications whose outstanding loan balances total $11.8 billion. *See* Decl. of James Bergeron ¶ 5 ("Bergeron Decl."), ECF No. 492-1. The Department explained that, to date, approximately half of the post-class applications have been denied. *Id.* ¶ 33. The Department cannot predict whether that rate will continue for all post-class applications or whether the actual denial rate will be higher or lower than fifty percent. But the Department estimated that the result would be an approximately $6 billion windfall for borrowers who might not have been eligible for relief had their applications been adjudicated absent modification of the January 2026 deadline. *Id.* This is an extraordinary sum of taxpayer resources that would flow to borrowers who, based upon the prior denial/approval rate of post-class applications, would otherwise be ineligible for relief. For context, the appropriation for fiscal year 2025 to fund the Legislative Branch was approximately $6.7 billion; to fund the federal Judicial Branch was approximately $8.6 billion; and to fund the exploration budget for the National Aeronautics and Space Administration ("NASA") was approximately $7.6 billion.[1]

On December 11, 2025, the Court granted in part and denied in part Defendants' motion. In particular, the Court denied the motion as to approximately 170,000 applications—those that involve what is known as an "Exhibit C" school.[2] In doing so, however, the Court made several manifest errors of law and fact that warrant reconsideration. First, the Court mistook post-class members to be members of the class. In fact, however, they are not members of the class, not represented by the Class Representatives, and not parties to this action at all. Because traditional equitable principles required the Court to consider party-specific equities in determining whether applying the judgment prospectively is no longer equitable

---

[1] *See* Ida A. Brudnick, Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions (2025), https://www.congress.gov/crs-product/R43397; Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary, at *i* (April 2025), https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf; Rachel Lindbergh, Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025), https://www.congress.gov/crs-product/R43419.

[2] Exhibit C to the Settlement Agreement was a list of schools, created for settlement purposes only, addressing components of the class that are not directly at issue in this motion. The "settlement grant[ed] full and automatic relief to all class members that attended the schools listed on Exhibit C." *Sweet v. Cardona*, 641 F. Supp. 3d 814, 827 (N.D. Cal. 2022), *aff'd*, 121 F.4th 32 (9th Cir. 2024), *petition for cert. docketed sub nom. Everglades Coll., Inc. v. McMahon*, No. 25-492 (U.S. Oct. 21, 2025). But "inclusion on Exhibit C" is not itself considered "a finding of misconduct[.]" *Id.* at 829.

under Rule 60(b), the Court's outsized focus on non-parties was a manifest error of law requiring reconsideration.

The Court's decision is also premised on manifest errors of fact. The Court concluded that the thirty-seven attorneys in the Department's Borrower Defense Branch could adjudicate the 170,000 post-class applications related to Exhibit C schools by January 28, 2026 (the "January Tranche"), by working overtime during the holiday season, including on Christmas Day and New Year's Day. That finding is irreconcilable with the evidence in the record regarding the Department's capacity to adjudicate claims, as the Department has on average completed about 1,500 adjudications per month. Bergeron Decl. ¶¶ 21, 29, 31. It is also contradicted by the Court's own findings at the settlement approval stage. Based on a similar number of adjudicators, the Court had found that it would take the Borrower Defense Branch "*more than twenty-five years*" to adjudicate 443,000 applications. *Sweet v. Cardona*, 641 F. Supp. 3d 814, 825-28 (N.D. Cal. 2022), *aff'd*, 121 F.4th 32 (9th Cir. 2024), *petition for cert. docketed sub nom. Everglades Coll., Inc. v. McMahon*, No. 25-492 (U.S. Oct. 21, 2025). The Court did not explain on what basis it believed Department attorneys could suddenly increase their capacity to adjudicate 170,000 applications in six weeks.

Unsurprisingly, the Court's projection turned out to be wildly inaccurate. Using best efforts, the Department was able to adjudicate approximately 2,030 post-class applications since the December hearing. Declaration of Richard Lucas ¶¶ 8-9 ("Lucas Decl."). But approximately 169,900 cases from the January Tranche remain unadjudicated. *Id.* The notion that processing this number of applications by January 28, 2026, with existing staffing was "realistically achievable," *Phila. Welfare Rights Org*, 602 F.2d at 1120, was clearly erroneous. The Court manifestly erred in making this determination.

What is more, the Court manifestly erred in failing to consider that applicable regulations (and the Agreement itself) require the Department to adjudicate post-class borrower defense applications in a specific manner. The Court's decision denying Defendants' motion in part was premised on its view that the Department could rely on Exhibit C's existence to somehow expedite processing of post-class applications related to Exhibit C schools. But the Department's regulations (and the Agreement itself) require a fact-finding process—a determination regarding school misconduct based on substantial

evidence in the administrative record for the application.  Indeed, the Court previously acknowledged that Exhibit C provides no basis for the Department to make an "official determination of misconduct against the schools."  *Sweet*, 641 F. Supp. 3d at 829.  The applicable regulations also require an individualized analysis and concrete evidence that the borrower relied on a misrepresentation to the borrower's detriment when the borrower decided to attend, or continue attending, the school or decided to take out the relevant loan.  Exhibit C provides no basis for expediting 170,000 determinations on those issues either.

Since the Court's December order, the Department has continued to make progress on its plan to hire contract attorneys and meet the hiring, onboarding, and training timelines it has previously laid out to enable it to complete post-class application processing by July 2027, consistent with the funding resources Congress recently provided.  The Department's continued progress shows its commitment to the plan it laid out in its Rule 60 motion and provides yet another reason for the Court to reconsider its order.

## ISSUE TO BE DECIDED

1.    Whether the Court should reconsider its decision that it remains equitable to require the Department of Education to provide full settlement relief to non-class members whose applications it is unable to adjudicate, regardless of the merits of their claims or if their loans are eligible for discharge under the terms of the settlement, by the January 28, 2026 deadline that was established by the settlement agreement before the enormous volume of such post-class applications became known.

## BACKGROUND

### I.    This Case and The Parties' Settlement Agreement

Plaintiffs filed this case in 2019 to challenge the Department's delay in adjudicating borrower defense claims.  They sought and obtained certification of a class consisting of all individuals with a pending borrower defense application, which at the time consisted of more than 200,000 applications dating as far back as 2015.  *See*, *e.g.*, Defs.' Mot. for Summ. J. at 11, ECF No. 63.[3]  After three years of

---

[3] Defendants respectfully refer the Court to their previously filed summary judgment briefs for a complete statement of the facts and background predating the filing of the parties' joint motion for preliminary settlement approval.  *See* ECF No. 63, ECF No. 249.

litigation, the parties executed a settlement agreement on June 22, 2022, and submitted it for the Court's preliminary approval that same day.  *See generally* Joint Mot. for Prelim. Approval, ECF No. 246.  The parties' settlement agreement provides a framework to comprehensively address the then-pending hundreds of thousands of class member borrower defense applications.  *See generally* ECF No. 246-1 ("Agreement").

The Agreement generally divides class members into two groups.  *See* Agreement ¶ IV.  The first group consisted of approximately 196,000 class members, *see* Bergeron Decl. ¶ 5, who received federal student loans to attend one of the 151 schools identified in the settlement's Exhibit C ("Exhibit C Group" borrowers).  *See* Agreement ¶ IV.A.  The second group consisted of all remaining class members who submitted claims on or before the date the Agreement was executed.  These class members ("Decision Group" borrowers) received a streamlined adjudication and final decision within set timeframes under the Agreement and benefitted from certain presumptions designed to speed up the adjudication of claims, including a presumption of the truth of the claims asserted.  *Id*. ¶ IV.C.  These presumptions reduce the time it takes to adjudicate a claim, but they also likely provide overbroad relief to the extent that certain borrowers' claims would not have survived scrutiny had the Department engaged in the type of fact-finding that would be required under otherwise applicable regulations.  The Agreement divides this set of borrowers into five decision groups, based on the date they submitted their application, and provides for decisions to be issued to each group every six months, with the oldest applications receiving the earliest decisions.  *Id*.

Decision Group 1 consisted of approximately 33,000 class members who filed more than 34,000 applications between January 1, 2015 and December 31, 2017.  *See* Bergeron Decl. ¶ 5, Table 1.  Decision Group 2 consisted of more than 11,000 class members who filed 12,000 claims between January 1, 2018 and December 31, 2018.  *Id*.  Decision Group 3 consisted of nearly 14,000 borrowers who filed more than 14,000 claims between January 1, 2019 and December 31, 2019.  *Id*.  Decision Group 4 consisted of more than 9,000 borrowers who filed 10,000 claims between January 1, 2020 and December 31, 2020.  *Id*.  And Decision Group 5 consists of approximately 33,000 class members who filed 36,000 claims between January 1, 2021 and June 22, 2022.  *Id*.  To the extent the Department fails to issue a final decision to a

1 class member according to the negotiated timeline applicable to any Decision Group borrower's claim,

2 the Agreement requires that the class member receive full settlement relief. *See* Agreement ¶ IV.C.8.

3       The Agreement provides that the "Class is closed as of the Execution Date," *i.e.*, June 22, 2022,

4 and that only "Class Members are bound by the terms of this Agreement." *Id*. ¶ III.  Nonetheless, it

5 contains a provision whereby the Department agreed to provide additional relief to a set of non-class

6 member (and, thus, non-party) "post-class applicants." *See id*. ¶ IV.D.  In particular, the Agreement

7 provides that borrower defense applications submitted after the Agreement's Execution Date and before

8 the date of the Agreement's final approval will be adjudicated within three years of the Agreement's

9 Effective Date (*i.e.*, the date on which the Court's final approval order becomes a final judgment). *See*

10 *id*.; *see also id*. ¶ I.K (defining "Effective Date").  As with the Decision Group deadlines, the Agreement

11 specifies that if a post-class application is not adjudicated within the prescribed period, the applicant will

12 receive full settlement relief.  *Id*. ¶ IV.D.2.  The time period during which a borrower could submit a

13 "post-class application" and receive the benefit of this provision of the Agreement ultimately spanned less

14 than five months, from June 23, 2022 (the day after the Execution Date) to November 15, 2022 (the day

15 before the Final Approval date).  In that short time period, however, 207,000 borrowers submitted more

16 than 251,000 claims, *see* Bergeron Decl. ¶ 5, Table 1, a number of borrowers that more than doubled all

17 five Decision Groups combined and amounted to more than two-thirds of the entire set of class members

18 covered by the Agreement, which swept in all 291,000 borrowers who had asserted borrower defense

19 claims and not received a decision before June 22, 2022, *see id*. ¶¶ 5-6.  This represents a 523 percent

20 increase in applications over the average number of applications the Department received during even the

21 most voluminous comparable timeframe.  *See id*. ¶ 5, Table 2 (setting forth the number of applications

22 received in comparable 5-month periods before and after the post-class period, which never exceeded

23 48,000).

24       The Court preliminarily approved the settlement on August 4, 2022.  Order, ECF No. 307.  After

25 following the class action settlement procedures specified in Federal Rule of Civil Procedure 23(e), and

26 hearing the objections of a group of permissive intervenors, *see* Order, ECF No. 322, the Court finally

27 approved the Agreement and entered final judgment on November 16, 2022.  Order Granting Final

28

Settlement Approval, ECF No. 345; Final J., ECF No. 346.  The Effective Date of the Agreement was January 28, 2023, which established January 28, 2026 as the deadline for issuing timely decisions to post-class applicants.  Agreement ¶ IV.D.1 ("Defendants will issue a final decision on the merits of a Post-Class Applicant's application no later than 36 months after the Effective Date."); Order Re Motion to Stay Judgment Pending Appeal (ECF No. 382) at 6-8 (establishing January 28, 2023 as the Effective Date of the settlement agreement).

## II.    The Department's Implementation of the Agreement

In general, the Agreement contemplated processes and procedures for reviewing the claims of and providing relief to class members—both Exhibit C class members and Decision Group class members—that had not previously existed.  Before it could begin the actual work of effectuating settlement relief (for each group of borrowers covered by the Agreement), the Department needed to establish a new framework for doing that work, including new processes, rules, and procedures.  *See* Bergeron Decl. ¶¶ 19-28.  As a general matter, due to the timelines involved, the Department first prioritized the class members in the Exhibit C and Decision Groups.  *Id*. ¶ 20.  But it also began laying the foundation for the adjudication of post-class claims—standing up new policies and procedures that differed from those used for class members, including those related to fact-finding and decision-making, training staff, and making technological updates.  *See id*. ¶¶ 21, 25-26.

FSA's Borrower Defense Branch ("BDB") began issuing decisions on post-class applications in approximately August 2023 and worked up to a steady pace of approximately 1,500 adjudications per month by January 2025.  *Id*. ¶ 21.  BDB also worked on "all aspects of implementing the Settlement Agreement, other than effectuating relief by discharging loans," *id*. ¶ 22, meaning the same staff responsible for adjudicating Decision Group class member applications pursuant to the Agreement's staggered deadlines have also been responsible for adjudicating post-class applications, as well as engaging in relevant administrative work and helping to research and respond to class member questions and concerns.  *Id*.  Over time, the staffing in the BDB has fluctuated, with staffing generally in the range of 30-50 attorneys, other than a brief period throughout 2024 when BDB was able to bring in attorneys from the Department of Health and Human Services ("HHS") to perform borrower defense work on a

1    temporary basis through a detail. *See id.* ¶ 9.

2        While the Department has substantially met all of the decision deadlines to date, the Department

3    was not able to meet some of the settlement deadlines related to effectuating relief due to a host of

4    complications relating to the mechanics of how loan servicers address discharges. *See, e.g.*, Defs.' Resp.

5    to Pls.' Mot. to Enforce, ECF No. 403 (explaining some of these issues). Defendants have worked

6    collaboratively with Plaintiffs and the Court to address those issues and will not extensively reproduce

7    that history. But relevant here, many of the delays in processing were the result of complex "mixed

8    consolidation" loans that consist of both loans eligible for relief under the Agreement and loans ineligible

9    for such relief. When it was unable to meet either the original or a revised schedule for providing relief

10   to Exhibit C class members, a streamlined approach to accelerate relief was developed for those specific

11   class members with mixed consolidations loans—which has come to be known as the Exhibit C terminal

12   loan methodology. *See, e.g.*, Defs.' Notice, ECF No. 421 (July 11, 2024) ("Defs.' Notice"); Defs.' Mot.

13   to Approve Settlement Relief Process, ECF No. 443. This approach was easier to implement because it

14   included discharging the terminal consolidation loan in full. While quicker, the relief provided has been

15   overbroad and provides a windfall benefit to certain borrowers because it requires discharging ineligible

16   debt that is not the subject of an eligible borrower defense application. ECF No. 443 at 5-6. The Court

17   first approved and ordered this methodology to be applied to Exhibit C borrowers but later ordered the

18   Department to apply it to borrowers in Decision Groups 1 and 2. *See* Defs.' Notice; Minute Entry, ECF

19   No. 416 (June 13, 2024), Minute Entry, ECF No. 434 (Sep. 26, 2024). Eventually, despite concerns raised

20   by Defendants about the fiscal responsibility of continuing to apply the Exhibit C terminal loan

21   methodology outside of the limited context in which it was developed, the Court ordered that the

22   methodology "be used for Decision Group Three, Decision Group Four, Decision Group Five, and the

23   Post-Class Applicants." Minute Entry, ECF No. 451 (Dec. 12, 2024).

24       The Department has come into substantial compliance with its obligation to provide relief to the

25   Exhibit C Group; has substantially met the decision deadlines for all five Decision Groups; and anticipates

26   meeting the January 28, 2026 deadline for adjudicating any Group 5 applications that are resubmitted

27   under the revise and resubmit process. *See* Bergeron Decl. ¶ 30.

28

Defendants' Motion for Relief Under Federal Rule of Civil Procedure 60(b)
4:19-cv-03674-HSG

As relevant here, with respect to the post-class, the Department has been adjudicating approximately 1,500 applications per month, *id*. ¶ 29; *see also id*. ¶¶ 10-18 (describing the complexities associated with adjudicating such applications); Lucas Decl. ¶ 8.  Although more than 54,000 post-class applications have been adjudicated, *see* Bergeron Decl. ¶ 31; Lucas Decl. ¶ 8, approximately 187,980 have not.  Lucas Decl. ¶ 8.  The liability associated with those unadjudicated applications is over $11 billion. Bergeron Decl. ¶¶ 31-32.

As of November 2025, approximately half of the post-class applications had been denied.  *Id*. ¶ 33. The Department cannot predict with certainty whether that rate would continue for all post-class applications or whether the actual denial rate would be higher or lower than fifty percent.  But if that rate were to continue and the relief requested in this motion is not granted, the Department estimates that the result will be an approximately $6 billion windfall for borrowers who might not have been eligible for relief had their applications been adjudicated.  *Id*. ¶ 33.  This is an extraordinary sum of taxpayer resources that would flow to borrowers who, based upon the denial/approval rate of post-class applications to date, would otherwise be ineligible for relief.  For context, the appropriation for fiscal year 2025 to fund the Legislative Branch was approximately $6.7 billion; to fund the federal Judicial Branch was approximately $8.6 billion; and to fund the exploration budget for the National Aeronautics and Space Administration ("NASA") was approximately $7.6 billion.[4]

---

[4] *See* Ida A. Brudnick, Cong. Rsch. Serv., R43397, Legislative Branch Appropriations: Frequently Asked Questions (2025), https://www.congress.gov/crs-product/R43397; Admin. Off. of the U.S. Courts, The Judiciary Fiscal Year 2026 Congressional Budget Summary, at *i* (April 2025), https://www.uscourts.gov/sites/default/files/document/fy-2026-congressional-budget-summary.pdf; Rachel Lindbergh, Cong. Rsch. Serv., R43419, NASA Appropriations and Authorizations: At a Glance (2025), https://www.congress.gov/crs-product/R43419.

1

2   **III.   The Court's December 2025 Decision on Defendants' Motion for Temporary Relief from Judgment.**

3

4    On December 11, 2025, the Court held a motion hearing on Defendants' motion for Rule 60(b)

5   temporary relief from judgment.  In their motion, Defendants presented the issue of whether it remains

6   equitable to require the Department of Education to provide full settlement relief to non-class members

7   whose applications it is unable to adjudicate, regardless of the merits of their claims or if their loans are

8   eligible for discharge under the terms of the settlement, by the January 28, 2026 deadline established by

9   the settlement agreement and the Court's judgment incorporating it. Defs.' Mot. for Temp. Relief from J.

10   at 3, ECF No. 492.  The Department sought an order modifying the judgment to permit it until July 28,

11   2027, to adjudicate post-class applications before requiring that post-class applicants receive full

12   settlement relief regardless of the merits of their applications.  *Id*. at 22.

13    The Court ruled from the bench at the conclusion of the motion hearing, granting in part and

14   denying in part Defendants' motion.  Tr. of Proceedings at 82:3-8 (Dec. 11, 2025) ("Tr.").  Specifically,

15   the Court denied the motion insofar as it relates to the January Tranche, the post-class members whose

16   borrower defense applications address loans for attendance at Exhibit C-listed schools.  As for other

17   applications (the "April Tranche"), the Court extended the adjudication deadline for post-class applicants

18   until April 15, 2026, "with the caveat that the subsequent judge is invited to give more time if the

19   Government shows progress, satisfactory progress" on its plan to hire and train the additional One Big

20   Beautiful Bill Act-funded contract attorneys needed to address the post-class applicant pool.  *Id*. at 82:5-

21   8.[5]

22    As required by Rule 60(b), the Court balanced equities in ruling on the motion.  First, the Court

23   considered the equities of post-class members, who are not parties to this case.  The Court explained that

24   they "have a great interest in this because the student loan has been hanging over their head for how many

25   years?  How many decades?"  *Id*. at 79:2-4.  The Court considered the credit implications of those loans.

26

27

28    _____

    [5] The Department anticipates filing a separate renewed motion for Rule 60(b) relief from the April 2026 application processing deadline consistent with the Court's invitation.

Defendants' Motion for Relief Under Federal Rule of Civil Procedure 60(b)
4:19-cv-03674-HSG

*Id*. at 79:5.  It explained that "Congress wanted these things adjudicated.  So there is a huge equity working in favor of the class."  *Id*. at 79:6-89.

On the other hand, the Court:

> recognize[d] that another equity going the other way is there is a chance that some applications would be automatically [granted] come January 28th and they shouldn't have been.  If they were adjudicated on the merits, the student would not have won.  There is that risk.  And the taxpayers will pick up that, I recognize that.

*Id*. at 79:11-16.

The Court also considered whether, for Exhibit C schools, the Department could achieve compliance with the January 28, 2026 deadline.  *Id*. at 79:22-80:8.  The Court explained that it thought "it can be done."  *Id*. at 79:22.  The Court provided two reasons.  First, the Court explained that employees may be able to work over the holidays.  *See id*. at 80:2-3 ("When I worked for the Government, I worked on Christmas Day and New Year's Day."); *see also id*. at 81:21-82:1 ("[M]y advice to you is to go ahead and hire these people, train these people.  Do it as expeditiously as you can and get them working on it.  But meanwhile, you've already got 37 people who can work over the holidays and, in my judgment, get the Exhibit C schools completed").  Second, the Court explained that "it's possible to get this job done because the people on Exhibit C, they're already highly suspect.  These are the schools that the attorney generals in various states have already singled out as fraudulent."  *Id*. at 80:4-8.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) allows a Court to "relieve a party or its legal representatives from a final judgment, order, or proceeding for" specified reasons.  One of these reasons is that applying the final judgment or order "prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  Under this Rule, "[w]here an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that defendants have made a good faith effort to achieve the object by contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has the power to modify" the order.  *Phila. Welfare Rights Org.*, 602 F.2d at 1120 (cited with approval in *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992) and *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).  Ultimately, Rule 60(b)(5) establishes a "pliable standard" that "codifies the courts'

traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees." *California v. EPA*, 978 F.3d 708, 713 (9th Cir. 2020) (citation omitted).

Rule 60(b)(6) also allows a court to provide relief from a final judgment, order, or proceeding for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This "catchall" provision provides "grounds for relief not already covered by the preceding five paragraphs." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211-12 (2025). A movant "seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." *Henson v. Fidelity Nat'l Fin., Inc.*, 943 F.3d 434, 443-44 (9th Cir. 2019) (cleaned up).

Civil Local Rule 7-9 applies "[b]efore the entry of a [final] judgment[.]" Civil L.R. 7-9(a). It requires a "motion for leave to file a motion for reconsideration[.]" *Id.* 7-9(b). The moving party must show

reasonable diligence in bringing the motion and one of the following:

**(1)** That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

**(2)** The emergence of new material facts or a change of law occurring after the time of such order; or

**(3)** A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

*Id.*

# ARGUMENT

Defendants respectfully ask the Court to reconsider its decision on Defendants' first motion for Rule 60(b) temporary relief from judgment and allow them until July 28, 2027 to adjudicate post-class applications before requiring that post-class applicants receive full settlement relief regardless of the merits of their applications. The Court should grant this motion for several reasons. First, the Court's prior decision was premised on manifest legal error insofar as it treated post-class members as parties to this case for purposes of balancing the equities. Second, the Court's prior decision rested on clearly

erroneous findings to conclude that compliance was achievable. In particular, the record does not support the Court's findings that thirty-seven attorneys could process 170,000 applications by working over the holidays and that the Department could resolve post-class borrower defense applications based solely on whether the applicant attended an Exhibit C school. Not surprisingly, despite the Department's good-faith efforts, actual progress was nowhere close to what the Court projected. Finally, the Department's continued progress since December 2025 on its plan to hire new contract attorneys to tackle the post-class applicant pool constitutes new facts that further support reconsideration.

I.    **The Court Should Reconsider the Decision Because it is Premised on Manifest Legal Error in Treating Post-Class Members as Parties.**

In its ruling, the Court weighed two equities. First, it considered that many post-class members "have a great interest in this because the[ir] student loan has been hanging over their head for" many years and that "Congress wanted these things adjudicated." Tr. at 79:2-8. The Court balanced that equity against "another equity going the other way"—"there is a chance that some applications would be automatically [granted] come January 28th and they shouldn't have been. If they were adjudicated on the merits, the student would not have won. There is that risk, and the taxpayers will pick up that." *Id*. at 79:11-16.

In weighing those equities, the Court was explicit in its belief that post-class members are class members, and thus, parties to the case. The Court explained that the equities in favor of adjudication present a "huge equity working in favor of the class." Tr. at 79:7-8. And when considering the Departments' equities, the Court explained that those interests have to be balanced "against what the class members have been suffering through all these years." *Id*. at 79:16-18.[6]

That belief was erroneous: post-class applicants are not members of the class or parties to this case at all. As Defendants articulated in earlier briefing, *see* Defs.' Reply in Supp. Mot. for Temp. Relief at 11 n.14, ECF No. 503, post-class applicants are not class members. The Court's November 2022 Final Judgment explicitly "grant[ed] final approval of the class settlement" agreement. ECF No. 346. And that Agreement, in turn, is explicit: the "Class is closed as of the Execution Date," *i.e.*, June 22, 2022.

---

[6] Earlier in its ruling, the Court reiterated the misstatement that the "class would include these" post-class members. Tr. at 74:17-18.

1    Agreement ¶ III.D, ECF No. 246-1 at 6.  The post-class includes only individuals who submitted a

2    "borrower defense application *after* the Execution Date (*i.e.*, the date the class closes), but before the"

3    date that the Agreement was approved and Final Judgment was entered.  *Id*. ¶IV.D.1., ECF No. 246-1 at

4    11 (emphasis added).  The Court's approval of the parties' Agreement superseded any definition of the

5    class provided in any earlier pre-judgment class certification order.  ECF Nos. 345-46.

6        Properly analyzed, therefore, the Court should not have weighed the equities of the post-class (non-

7    parties) against the equities of Defendants (parties).  The relevant balance should have been struck between

8    the equities of the class and Defendants.  And, as Plaintiffs never disputed, the Department has already

9    substantially complied with its settlement obligations to the class.  *See* Bergeron Decl. ¶ 30.  Indeed, in

10   issuing its ruling from the bench, the Court explained that the Government has already completed or

11   substantially completed addressing relief for class members.  Tr. at 74:3-13 (discussing the several

12   "groups" that class members were broken down into and explaining that it is "a credit to both sides here,

13   that they worked through this, and the servicers too, to get [class members]—I'm going to say 400,000,

14   350,000—relief" and "a lot of good has been done in this case").

15       Because the Court did not balance the (essentially nonexistent) equities of the Class

16   Representatives and the Class against the interests of Defendants when determining if applying the

17   judgment prospectively is no longer equitable, the Court committed clear legal error and the decision

18   should be reconsidered.  "Though flexible," a Court's "equitable authority is not freewheeling." *Trump*

19   *v. CASA, Inc.*, 606 U.S. 831, 841 (2025).  In applying traditional equitable balancing, the Court "must

20   consider the effect *on each party* of the granting or withholding of the requested relief." *Amoco Prod. Co.*

21   *v. Village of Gambell*, 480 U.S. 531, 542 (1987) (emphasis added).  To determine if applying the judgment

22   prospectively is no longer equitable, the Court is constrained to consider whether the judgment is "no

23   more burdensome to the defendant[s] than necessary to provide complete relief *to the plaintiffs*[.]" *See*

24   *CASA*, 606 U.S. at 852 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (emphasis in original).

25   Considering the interests of post-class members in weighing the equities, as the Court did, contravenes

26   the rule that non-parties are "not the proper object of [a court's] remediation." *Lewis v. Casey*, 518 U.S.

27   343, 358 (1996).

28

Rule 23 principles confirm the Court's clear error in balancing the equities. "[C]laim preclusion is the core idea of the class action: the procedural form exists precisely to liquidate the claims of many common stakeholders through litigation by a representative few of them." William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 18:14 (6th ed. Dec. 2025 update). "The purpose of the class action device is to enable litigation by representatives, but that purpose is only achieved if the representative's adjudication of common questions . . . has a binding effect on absent class members." *Id.* § 1:6.

The Supreme Court recently reaffirmed these principles in *Trump v. CASA*, 606 U.S. 831 (2025). The Court explained that the "modern class action, which is governed in federal court by Rule 23" is the "modern form" of the "bill of peace[.]" *Id.* at 849. And under traditional equity practice, as under Rule 23, "decrees obtained on a bill of peace 'would bind all members of the group, whether they were present in the action or not.'" *Id.* at 848 (citation omitted). But as the parties contemplated in the Agreement, only class members—not post-class members—are claim precluded by the Court's Final Judgment in this action. Agreement ¶ VII, ECF No. 246-1 at 21 (providing that only "Plaintiffs" and "Class Members" "waive, release, and forever discharge Defendants" from "any and all claims . . . alleged in this Action against Defendants . . .").

The fact that post-class applicants are not claim precluded by the judgment in this action is critical to any equitable balancing under Rule 60(b). Post-class applicants have an adequate remedy to redress their interests in the Department's processing of their borrower defense applications, *see* Tr. at 79:2-8: bringing their own lawsuit. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies").

Indeed, the Court's erroneous treatment of post-class applicants as parties to this case runs deeper than its decision denying the motion for reconsideration. In general, settlement agreements are contracts and any breach of those agreements is subject to ordinary contractual remedies—which, in the case of contracts with the government, generally does not include an action for specific performance in district court. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *N. Side Lumber Co. v. Block*,

753 F.2d 1482, 1484-86 (9th Cir. 1985). But here, the Court purported to incorporate the entire settlement agreement into its final judgment, giving rise to the possibility of enforcing that agreement by seeking effectively a specific-performance injunction in this Court. Whatever the permissibility of that mechanism as it regards Plaintiffs who may assert an entitlement to an injunction on their underlying claims, it cannot be permissible with respect to non-parties who would have been beyond the reach of the court's equitable powers in the underlying case. *CASA* makes clear that a district court may not properly exercise its equitable authority to provide them relief, 606 U.S at 841-54, and any right that the non-class parties may have to adjudications by January 2026 necessary flows from the Agreement. It is thus a contractual right that is not properly subject to enforcement in this Court. *Block*, 753 F.2d at 1484-86 (A claim "concerned solely with rights created within the contractual relationship" and having "nothing to do with duties arising independently of the contract" is "within the Tucker Act and subject to its restrictions on relief."); *see also United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) ("if rights and remedies are *contractually* based then only the Court of Federal Claims" has jurisdiction).

## II. The Court Should Reconsider the Decision Because it is Premised on Manifest Errors of Fact.

### A. The Court's Finding that the Department's Existing Staff of 37 Attorneys Could Adjudicate 170,000 Applications by Working Overtime Over the Holidays is Clearly Erroneous.

The Court denied Defendants' request for temporary relief from judgment insofar as it applies to post-class applications for borrowers with loans reflecting attendance at "Exhibit C" schools. Tr. 82:3-8. The Court explained that "Exhibit C" applications "must be adjudicated by the original deadline of the 28th of January, six weeks from now." Tr. 79:21-22. Recognizing that courts should not "over-emphasize[] the interest of finality at the expense of achievability" in this context, *see Phila. Welfare Rights Org.*, 602 F.2d at 1120, the Court premised its decision on its belief that it would be possible for the Department to adjudicate Exhibit C school-related applications in that period. The Court was explicit: "I think it can be done. Don't tell me holidays. You can take Christmas off, maybe New Year's Day off. But Government employees should work. When I worked for the Government, I worked on Christmas Day and New Year's Day. So it's possible to get this job done . . ." Tr. at 79:22-23-80:1-4.

The Court's finding was not supported by any evidence; indeed, it is instead contrary to the evidence in the record regarding the Department's adjudication capacities. The Deputy Under Secretary's declaration demonstrates unequivocally that the Department cannot adjudicate 170,000 applications in a six-week period and that, instead, the Department needs eighteen months to hire, onboard, and train 450 contract attorneys to adjudicate the remaining applications. Suppl. Bergeron Decl. ¶¶ 2-4, ECF No. 498-1. The Government's declaration established that BDB's current thirty-seven attorneys are adjudicating 1,500 post-class applications per month. *Id*. ¶ 3. Even if the Department required its attorneys to work on Christmas Day and New Year's Day, the notion that those additional hours would permit for the adjudication of an additional 169,000 applications was without any basis in fact. Indeed, working over two government holidays is not a "realistic[]" plan to somehow exponentially accelerate adjudications. *See Phila. Welfare Rights Org.*, 602 F.2d at 1120.

Events since December 11, 2025, confirm that the Court's projection was nowhere close to "realistically achievable[.]" *Id*. In the approximately five-week period that has elapsed since the December Hearing, the Department has worked diligently to review and adjudicate as many post-class applications as possible. Lucas Decl. ¶ 8. Although Department staff were able to make some improvement in the rate of adjudications, which was 1,500 applications per month in the months leading up to the December Hearing, the increased rate did not have a material impact on the progress of adjudications. *Id*. Since the December Hearing through January 20, 2026 (inclusive), adjudication decisions have been issued regarding approximately 1,390 post-class applications from the January Tranche and approximately 640 post-class applications from the April Tranche. *Id*. ¶¶ 8-9. Approximately 169,900 cases from the January Tranche remain unadjudicated. *Id*. ¶ 8.

The Court's determination that processing 170,000 applications over six weeks was feasible is particularly capricious considering the Court's analysis in prior decisions in this case. For example, when approving the Agreement, the Court recognized that, "[i]f, hypothetically, the Department's Borrower Defense [Branch] had all 33 of its claim adjudicators working 40 hours a week, 52 weeks a year (no holidays or vacations), with each claim adjudicator processing two claims per day, it would take the Department *more than twenty-five years* to" process the then-pending 443,000 borrower-defense

1    applications. Order Granting Final Settlement Approval at 11, ECF No. 345.  The Agreement permitted

2    Defendants to address that figure by providing automatic relief to approximately 196,000 class members,

3    *see* Bergeron Decl. ¶ 5, and providing for streamlined standards to govern application processing by other

4    class members, *infra* at pp. 20 n.7, 21 n.8. But the Court entirely failed to consider how processing post-

5    class applications under the provisions of the Agreement that govern them was "realistically achievable"

6    despite Defendants' "good faith effort to achieve" with available resources. *Phila. Welfare Rights Org.*,

7    602 F.2d at 1120.  *See infra* at pp. 20-21 (explaining the Agreement's requirements for processing post-

8    class applications).

9            The Court also erred in failing to apply the presumption of regularity that attaches to actions of

10   Executive Branch officers in the course of their official duties.  It was improper for the Court to refuse to

11   accord a presumption of regularity to Mr. Bergeron's declaration. *FDA v. Wages & White Lion Invs.,*

12   *LLC*, 604 U.S. 542, 577-78 (2025); *Latif v. Obama*, 677 F.3d 1175, 1178-85 (D.C. Cir. 2011).  There is

13   no reasonable basis whatsoever to call into question Mr. Bergeron's testimony that 170,000 applications

14   could not be adjudicated between December 11, 2025, and January 28, 2026.

15           The Court also ignored the evidence in the record when it refused to "accept the idea that there

16   was not enough money" to process post-class applications before passage of the One Big Beautiful Bill

17   Act. Tr at 77:22.  *See also id.* at 79:24-80:2 ("There was enough money. . . . So I don't accept that rationale

18   that only after the passage of the Big Beautiful Bill was there enough money to get this job done.").  The

19   Court second-guessed not only Department testimony, *see* Bergeron Decl. ¶¶ 7-8, but the Department's

20   explicit good-faith statements to Congress in 2023 and 2024 (under the prior Administration's leadership)

21   requesting additional funding, *see* ECF No. 503 at 5 (explaining that the "Department's request was

22   explicit that the funds were 'need[ed] to meet the terms of the *Sweet* settlement'") (alteration in original)

23   (quoting U.S. Dep't of Educ., Department of Education Fiscal. Fiscal Year 2024 Budget Request at 42,

24   https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/justifications/q-saa.pdf).    For   the

25   Court to have "peel[ed] back the curtain" on all those representations—consistent across several

26   administrations—"would have required [Plaintiffs] to make a 'strong showing of bad faith or improper

27   behavior[.]'" *Wages & White Lion Investments,* 604 U.S. at 577 (citation omitted).

28

1

2

**B.  The Court Failed to Consider that the Department Cannot Premise Post-Class Application Decisions on the Applicant's Attendance at an Exhibit C School.**

3

4

5

6

The Court premised its belief that the Department could adjudicate the 170,000 outstanding post-class applications related to attendance at an "Exhibit C" school on its view that Exhibit C schools are "already highly suspect." Tr. at 80:5.  The Court explained that "[t]hese are the schools that the attorney generals in various states have already singled out as fraudulent."  *Id.* at 80:5-6.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

This finding was clearly erroneous because the Court failed to consider the standards the Department is required to use in adjudicating post-class borrower defense applications.  Under the Agreement, as incorporated into the Court's Final Judgment, the Department is compelled to "apply the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926)" when making decisions on post-class applications.  Agreement ¶ IV.D.1., ECF No. 246-1 at 11.  Those regulations, in turn, require the proponent of a borrower defense claim to show by "a preponderance of the evidence" that "the borrower has a borrower defense that meets the requirements of [34 C.F.R. § 685.222]."  34 C.F.R. § 685.222(a)(2) (2017).  The applicant is required to, among other things, provide "evidence that supports the borrower defense[.]"  *Id.* § 685.222(e)(1)(i)(B) (2017).  The Department, in turn, is required to "determine whether the application states a basis for a borrower defense, and resolve[] the claim through a fact-finding process conducted by [a] Department official."  *Id.* § 685.222(e)(3) (2017).  "As part of the fact-finding process, the Department official [must] notif[y] the school of the borrower defense application and consider[] any evidence or argument presented by the borrower and also any additional information, including . . . Department records" and "submissions from the school[.]"  *Id.* § 685.222(e)(3)(i) (2017).[7]

22

23

24

Creation of the "Exhibit C" list of schools, in contrast, was not premised on any such full administrative record including submissions from the relevant school.  Rather, as the Court had already

25

26

27

28

---

[7] In contrast, when adjudicating the applications of the class members in the five decision groups, the Department only determined "whether the application states a claim that, *if presumed to be true*, would assert a valid basis for borrower defense relief under the standards in the borrower defense regulations published by the Department on November 1, 2016 (81 *Fed. Reg.* 75,926)."  Agreement ¶ IV.C.1., ECF No. 246-1 at 7-8 (emphasis added).

explained in its opinion approving the Settlement Agreement, the Department "does not consider inclusion on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could or would be considered in any action by the Department against a school."  Order Granting Final Settlement Approval at 16, ECF No. 345.  Indeed, the Court represented that it "relied upon, and the Court expects the government to stand behind, th[at] statement[.]"  *Id.* at 16.  It would be entirely inconsistent with that statement for the Department to now rely on inclusion on the "Exhibit C" list as the sole basis to grant a borrower-defense application as part of the fact-finding process required under 34 C.F.R. § 685.222 (2017).

Moreover, the Court's analysis ignored other aspects of the applicable regulations that require an individualized assessment of each borrower defense application.  For example, many borrowers rely on an allegation of substantial misrepresentation by a school.  *See* 34 C.F.R. § 685.222(d).  To make out such a borrower defense, a post-class applicant must not only show a substantial misrepresentation, but also provide evidence showing that "the borrower reasonably relied on" that misrepresentation "to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan."  *Id.*[8]  The Court entirely failed to explain how the Department can adjudicate the issue of reliance for each individual applicant solely by reference to the Exhibit C list of schools.  It cannot.

---

[8]  In contrast, when adjudicating class member applications, alleged "misrepresentations or omissions that, if presumed to be true, would assert a valid basis for borrower defense relief" were "presume[d]" to have been "reasonably relied on" by the applicant "regardless of whether the Class Member alleges such reliance in his or her application."  Agreement ¶ IV.C.1., ECF No. 246-1 at 8.

III.    **The Court Should Reconsider the Decision Because the Department is Continuing in Good Faith to Implement Its Plan to Use One Big Beautiful Bill Act Funds to Hire Staff Needed to Adjudicate Outstanding Post-Class Applications and the Department has Continued to Review and Adjudicate as Many Post-Class Applications as Possible with Existing Resources.**

Since the Court's December hearing on Defendants' motion for temporary relief from judgment, the Department has made progress with respect to the mass-hiring plan. Lucas Decl. ¶ 10. As reported at the December hearing, the Department had by then already posted requests for quotes ("RFQ") and had received responses from four contractors. *Id.* (citing December hearing Transcript at 8). In the weeks since the hearing, the Blanket Purchase Agreement ("BPA") has been awarded which will allow the Department to issue task orders to the four firms that provided quotes in response to the RFQ. Lucas Decl. at ¶ 10. Now that the BPA has been awarded, the Department is in the process of finalizing and issuing task orders with hiring and onboarding to follow thereafter. *Id.* The Department still projects that it is on track to meet earlier projections that the first group of contract attorneys could be onboarded by March 1, 2026, and sufficiently trained to begin adjudicating cases by late March or early April. *Id.*

The Department needs further guidance from the Court as soon as possible to continue implementing the hiring plan. *Id.* ¶ 11. If this motion is denied and no relief is secured on appeal, the Department anticipates revising its mass hiring plan with respect to the number of attorneys to be hired and onboarded in the first group. *Id.* The Department had previously anticipated hiring an initial group of 225 attorneys, with weekly hiring of additional attorneys thereafter. *Id.* If the Court's December 2025 Order granting only a brief extension of the January 28, 2026, deadline and for only the smaller April Tranche is not further modified, the Department instead anticipates hiring approximately 125 attorneys in the first group, with additional weekly hiring to follow. *Id.*

These new facts warrant reconsideration because they show that the Department's proposal was no gimmick. During the hearing on Defendants' motion for Rule 60(b) temporary relief from judgment, the Court questioned whether the Department's good-faith plan to use One Big Beautifull Bill Act funds to hire and train 450 contract attorneys to adjudicate outstanding post-class applications over eighteen months "is a gimmick[.]" Tr. at 18:12-13. On the contrary, updated facts show that the plan is already in motion.

1    Moreover, even though the Department was able to make only a modest improvement in the rate

2    of adjudications, it has worked diligently to review and adjudicate as many post-class application as

3    possible.  Lucas Decl. ¶¶ 8-9.  The evidence showing the Department's continued progress in achieving

4    its plan since December 11, 2025, constitutes new facts occurring after issuance of the Court's prior order

5    and provides additional justification for the Court to reconsider its decision denying Defendants' motion

6    for Rule 60(b) temporary relief from judgment.

7    **IV.    Defendants Respectfully Request Prompt Action Granting this Motion or a Temporary Stay of the Agreement's Notice Deadline.**

8

9    This motion is time sensitive, and Defendants respectfully request a decision on it as soon as

10   practicable, but no later than March 2, 2026.  Although the Court's order left the January 28, 2026 deadline

11   in place as to Exhibit C school-related applications, the Court may still provide meaningful relief after

12   that date.  The Agreement provides that the Department must provide any post-class applicant who is not

13   sent an adjudication decision by January 28, 2026 with a "notice that the applicant will receive [settlement

14   relief] within 60 calendar days following" January 28, 2026, *i.e.*, by March 29, 2026.  Agreement ¶ IV.D.2.

15   Because March 29, 2026, is a Sunday, that notice deadline is March 30, 2026, for Exhibit C-school related

16   unadjudicated post-class applications.  Defendants are then obligated to effectuate relief for any Post-

17   Class Applicant entitled to settlement relief no later than one year after they provide the applicant with

18   the required notice.  *Id*. ¶ IV.D.3.

19   If the Court needs additional time to address the motion, Defendants respectfully request that the

20   Court administratively stay Defendants' deadline for issuing notice to post-class members.

21   "Administrative stays do not . . . reflect the court's consideration of the merits of the" underlying motion.

22   *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to

23   vacate stay).  "Rather, they 'freeze legal proceedings until the court can rule on a party's request for

24   expedited relief.'"  *Id*. (citation omitted).  An administrative stay would permit the Court to issue an

25

26

27

28

opinion on this motion before Defendants are required to send notices of settlement relief to post-class members.

Moreover, should the Court deny this motion, Defendants respectfully request that the deadline for issuing notices to post-class members be stayed pending the disposition of any appeal that is authorized, or at a minimum that the deadline be administratively stayed for a period of seven days to allow an opportunity to seek expedited relief.

**V.     If Civil Local Rule 7-9 Governs This Motion, Defendants, in the Alternative, Seek Leave to File a Motion for Reconsideration.**

Civil Local Rule 7-9 does not govern this motion.  That rule applies "[b]efore the entry of a judgment[.]"  Civil L.R. 7-9(a).  *See also* Cross Reference to Civil L.R. 7-9(a) (referencing "Fed. R. Civ. P. 54(b) regarding discretion of the Court to reconsider its orders prior to entry of final judgment").  It does not apply to a motion seeking reconsideration after final judgment, such as a Rule 60(b) motion. Civil L.R. 7-9(a).

If, however, the Court disagrees and concludes that Civil Local Rule 7-9 applies to this motion, then Defendants hereby respectfully request leave to file a motion for reconsideration.  Defendants have been reasonably diligent in bringing the motion—filing it only forty-two days after the Court's decision on December 11, 2025.  *See* Civil L.R. 7-9(b).  Moreover, as described *supra*, the motion shows a manifest failure by the Court to consider material facts and dispositive legal arguments that were presented to the Court.  *See id*. 7-9(b)(3).  And Defendants' continued progress, since the Court's December 11 order, effectuating its plan to use One Big Beautiful Bill Act funding to resolve post-class applications, constitutes new material facts that support reconsideration.  *See id*. 7-9(b)(2).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for reconsideration and modify the judgment to allow them until July 28, 2027 to adjudicate all remaining post-class applications before requiring that post-class applicants receive full settlement relief regardless of the merits of their applications.  Defendants respectfully request a decision on this motion no later than March 2, 2026.

Dated: January 22, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 514-4964
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*