EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669
Fax: (781) 218-9625

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | Case No. 19-cv-03674-HSG<br><br>**NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AGREEMENT** |

## TABLE OF CONTENTS

NOTICE OF MOTION ........ 1
MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
I. INTRODUCTION ........ 1
II. BACKGROUND AND PROCEDURAL HISTORY ........ 3
A. The Department Is in Breach of Settlement Paragraphs IV.A.1 and IV.C.9 ........ 5
B. The Department's Refusal to Comply with Court Orders Has Prevented Plaintiffs from Learning the Full Extent of the Breach ........ 11
C. Affected Class Members Have Been Harmed by Continued Delay ........ 12
III. ARGUMENT ........ 14
A. The Court Has Jurisdiction to Decide This Motion ........ 15
B. Plaintiffs Are Entitled to Relief Under Paragraph V.B.2 of the Settlement ........ 16
IV. CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## Cases

*Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025) .......... 18, 19

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir. 2001) .......... 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Product Liab. Litig.*, 975 F.3d 770 (9th Cir. 2020) .......... 15

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) .......... 16, 18

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) .......... 16

*Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016) .......... 18, 19

*Wells Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964) .......... 18

## Statutes

20 U.S.C. § 1071 .......... 9

31 U.S.C. § 3712 .......... 10

**NOTICE OF MOTION**

PLEASE TAKE NOTICE THAT on September 24, 2026, Plaintiffs will and hereby do respectfully move the Court for an order enforcing certain provisions of the class action Settlement Agreement in this case. This Motion is supported by the accompanying memorandum of points and authorities, the attached declarations and exhibits, the pleadings and other papers filed in this case, oral argument, and any other matters in the records or of which this Court takes notice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs bring this Motion to compel the Department of Education ("Department") to issue overdue Settlement-mandated relief to Class Members who were entitled to receive it months or even years ago. Counsel for Plaintiffs are able to substantiate breach of the Settlement Agreement as to over one thousand Class Members. As explained below, the Department has denied Plaintiffs access to records that would allow confirmation of an unknown number of additional affected individuals.

The *Sweet* litigation has always been about the harms that student loan borrowers suffer when the Department unfairly and unduly delays acting on borrower defense applications. The Settlement was meant to cure this delay by setting firm timelines for the Department to act. Instead, the Department has undermined the Settlement by repeatedly missing its deadlines. The Court has already found the Department in breach of the Settlement three times. The Department continues this pattern today, and there are more deadlines to come.

In response to Plaintiffs' first motion to enforce the parties' Settlement Agreement in 2024, the Court ordered Plaintiffs' counsel to "look over [the Department's] shoulder" to ensure the timely delivery of relief to Class Members. Since that time, and at the Court's continued direction, Plaintiffs met weekly with the Department to address thousands of individual Class Member complaints about missing relief, as well as biweekly or monthly with the Department and its servicers to resolve systemic issues causing delay. As detailed below, however, the past several months have seen a dramatic shift in the Department's cooperation with these Court-ordered enforcement efforts. The Department has now taken the position that it does not have to finish

providing Settlement relief on any particular schedule. It has also recently begun obstructing Plaintiffs' access to necessary data (which it previously provided without objection) and has unilaterally scaled back its participation in these Court-ordered exchanges.

To support its sudden and inexplicable intransigence, the Department has claimed a prerogative to unilaterally decide when its refusal to deliver Settlement relief is "material." This position is, of course, entirely unsupported by the Settlement, any of the Court's prior enforcement orders, or the parties' previously consistent course of dealing. If the Department were correct about what the Settlement means, then the Department could indefinitely delay relief to some indeterminate number of Class Members on the basis that it had already delivered a "material" amount of relief to other Class Members. But that is contrary to both the language and purpose of the Settlement.

The Settlement specifically provides that "Plaintiffs may bring a claim alleging that Defendants have materially breached" the Settlement when the Department "fail[s] to effectuate relief within the prescribed time periods *for any individual* who is entitled to receive relief pursuant [the relevant] Paragraphs." Settlement Agreement ¶ V.B.2 (emphasis added), appended hereto as Exhibit 1 to the Declaration of Rebecca C. Ellis ("Ellis Decl."). A material breach, in other words, is a failure to deliver timely relief to *any* Class Member by the relevant deadline. The reasoning behind this plain language is obvious: To the Department of Education, a few thousand dollars is less than a rounding error; to a Class Member, it can be life-changing.

The Department must deliver Full Settlement Relief to every Class Member entitled to it by a specific date; the Department has not done so; and as a result, the Department is, still and again, in material breach of the Settlement. Despite Plaintiffs' efforts through the parties' Court-ordered meet-and-confer sessions, the Department has proved unable or unwilling to deliver this relief, or even to provide a date by which it will resolve any of the systemic issues delaying relief. This has resulted in significant harm to Class Members whose relief is long overdue.

Accordingly, pursuant to Paragraph V.B.2 of the Settlement, Plaintiffs bring this motion to enforce the Settlement's terms. Plaintiffs respectfully request that this Court issue an order requiring Defendants to promptly provide Full Settlement Relief to each affected Class Member

on a schedule set by the Court. The Department must be held to a specific deadline, set in the near future, since it has already blown past the operative deadlines and it now denies any further obligation under the Settlement as to these Class Members. Plaintiffs also respectfully request that the schedule set by the Court include regular status hearings and regular reports, to be signed under oath by a Department official, regarding the Department's compliance with the Settlement's and the Court's requirements until relief is completed.

## II. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are a certified class of federal student loan borrowers who sought relief from the Department under the Higher Education Act's borrower defense ("BD") provisions. Plaintiffs filed this lawsuit in 2019 to challenge the Department's failure to timely process the backlog of BD applications. *See generally* Complaint, ECF No. 1. After extensive litigation, the parties entered into the Settlement on June 22, 2022. *See* ECF No. 246. The Settlement resolved Plaintiffs' claims by setting out clear deadlines by which the Department was required to adjudicate pending BD applications and effectuate Full Settlement Relief—the discharge of relevant federal student loan debt, the deletion or correction of related credit tradelines, and, where applicable, the refund of all associated payments made to the Department. *See* Settlement ¶¶ II.S (definition of "Full Settlement Relief"); IV.A, IV.C, IV.D (setting out deadlines and procedures for Settlement groups).

The Settlement has required constant enforcement and oversight by Plaintiffs and the Court due to the Department's repeated failures to meet the agreed-upon relief deadlines. The Department missed the Settlement's first deadline on January 28, 2024, to provide relief to Class Members in the Automatic Relief Group[1] ("ARG"); as the Department later acknowledged, over 55,000 class members were missing their relief as of that date. *See* ECF No. 397 at 1. The Department followed that by missing the next deadline on July 28, 2024, to provide relief to members of Decision Group One whose applications were approved. *See* Ellis Decl. Ex. 5 at 1.

---

[1] *See* Settlement ¶ IV.A.1. The Class members described in this paragraph of the Settlement are referred to herein as the Automatic Relief Group or ARG. The class members described in Paragraphs IV.C.3.i–v are referred to herein as Decision Groups One through Five, respectively.

Plaintiffs moved to enforce the Settlement as to both of those breaches, and in response, the Court entered several orders and held regular hearings to bring the Department into compliance. As part of these compliance proceedings, the Court ordered the parties and representatives of the Department's student loan servicers to meet regularly in person to address problems as they arose. *See, e.g.*, Ellis Decl. Ex. 2. The Court also ordered the Department to set up a process for resolving individual Class Member complaints about missing relief through the Federal Student Aid (FSA) Ombudsman's office, and ordered the Department to "permit [Plaintiffs'] counsel to access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." Ellis Decl. Ex. 3. The Court later went further, ordering Plaintiffs' counsel to remain closely engaged in the resolution of Class Member complaints: "The Court pointed out there is no reason why class counsel cannot roll up sleeves alongside the government to resolve [the complaints]." Ellis Decl. Ex. 6. In response to this order, the parties set up weekly virtual meetings between Plaintiffs' counsel and the Ombudsman's office, in addition to the monthly in-person meetings that involved longer working sessions. The parties reported to the Court about these weekly meetings in March 2025, and the Court ordered them to continue:

> [DOJ Counsel]: Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office.
> THE COURT: Yeah.
> [DOJ Counsel]: And we have informally scheduled meetings to that effect. And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings. And we've given plaintiffs' counsel access to --
> THE COURT: Okay. I want that to continue. And I want your monthly meetings to continue.

Ellis Decl. Ex. 19 at 26:25–27:8.

While the parties have made progress in effectuating relief since the Department's initial breaches, there are still over a thousand Class Members (that Plaintiffs know of) in the ARG and Decision Groups One through Four who have not received their relief, even though the relevant deadlines passed, in some cases, over a year and a half ago. Despite Plaintiffs' repeated efforts to resolve these delays, the Department has not cured them, nor even committed to a timeline for curing them. Additionally, the Department has recently refused to attend several Court-ordered

weekly Ombuds meetings and has refused Plaintiffs' requests to inspect records for the purpose of ensuring that Settlement relief is timely and complete.[2]

As a result, on June 18, 2026, Plaintiffs served on the Department a written notice alleging that the Department is in material breach of the Settlement, as required by Paragraph V.D.1 of the Settlement. *See* Notice of Material Breach, appended hereto as Exhibit 21 to the Declaration of Nicole Camargo Almeida ("Almeida Decl."). The Department responded on July 2, 2026. *See* Almeida Decl. Ex. 22 ("DOJ Response"). The Department denied the allegations of material breach, claiming it is in "substantial compliance" with the Settlement and that all of Plaintiffs' allegations are "subject to the complete defense of immateriality." *Id.* at 2. The parties met and conferred regarding the allegations of breach, as required by Paragraph V.D.3.ii of the Settlement, but were not able to reach a consensus on how or when the Department would deliver overdue relief. Almeida Decl. ¶ 84–85. This motion followed.

**A. The Department Is in Breach of Settlement Paragraphs IV.A.1 and IV.C.9**

Paragraph IV.A.1 of the Settlement provides that, "[n]o later than one year after the Effective Date [of the Settlement], Defendants will effectuate Full Settlement Relief for each and every Class Member" in the ARG. That one-year deadline was originally January 28, 2024; after the Department's breach and Plaintiffs' first enforcement motion, the Court set a number of interim deadlines, and eventually the final relief deadline for the ARG was set for December 31, 2024. *See* Ellis Decl. Ex. 4 at 2.

Paragraph IV.C.3 of the Settlement set rolling deadlines for the Department to adjudicate the BD applications of Class Members in the five Decision Groups. The latest of those decision deadlines was July 28, 2025. Paragraph IV.C.9, in turn, provides that "Defendants will effectuate relief for any Class Member entitled to settlement relief pursuant to Paragraph[] IV.C.3 . . . no later than one year after the date that Defendants provide that Class Member Written Notice of the settlement relief decision." As a result of the Department's breach, the deadline for relief to

[2] Plaintiffs are filing, simultaneously with this Motion, a separate Motion for Finding of Contempt and Sanctions ("Motion for Contempt"), based on the Department's violations of the Court's orders of May 23, 2024; November 13, 2024; and March 13, 2025. That motion sets forth the details of this conduct. *See* Motion for Contempt at 2–6.

Decision Group One was extended by Court order to December 20, 2024. *See* Ellis Decl. Ex. 5. The relief deadlines for Decision Groups Two, Three, and Four were, respectively, January 28, 2025; July 28, 2025; and January 28, 2026.[3]

The Department is in breach of each of these deadlines as to hundreds of Class Members, as detailed herein.

1. *The Department admits that at least 807 members of the ARG and Decision Groups One through Four have not received discharges and/or refunds.*

At each of the parties' Court-ordered monthly in-person meetings, the Department provides relief progress data to Plaintiffs. These data show the number of members of the ARG and the Decision Groups whom the Department concedes have not yet received Full Settlement Relief. *See* Almeida Decl. ¶ 5 & Ex. 1. Based on the data provided by the Department at the parties' July 23, 2026, meeting, at least 807 borrowers belonging to the relevant Settlement groups still have not received discharges and/or refunds.[4] Almeida Decl. ¶ 14 & Tbl. 2. These data clearly establish that the Department is in breach of the Settlement as to at least these 807 Class Members.

Plaintiffs have requested more detailed data from the Department regarding who these borrowers are and why their loans have not been discharged and/or refunds issued. The Department has refused to provide that data. *See* Almeida Decl. ¶ 17.

2. *The Department has not issued complete refunds to hundreds of members of the ARG and Decision Groups One through Four.*

Borrowers who combine loans from two or more schools into a consolidation loan have what are called "mixed" consolidation loans. Some borrowers consolidate their loans multiple

---

[3] The relief deadline for Decision Group Five recently passed on July 28, 2026. According to the Department's own data, it is in material breach of that deadline as well. However, because the Decision Group Five deadline had not passed at the time Plaintiffs provided Defendants with their most recent Notice of Material Breach, Plaintiffs do not address Group Five in this motion.

[4] Notably, this data report only tracked whether borrowers who had been flagged as "incomplete relief" in the May report had since received relief. In previous months, the Department's data had provided an overall "delta" calculation; a negative delta indicated that the number of "incomplete" borrowers had actually increased from month to month. *See* Almeida Decl. ¶ 10 & n.2. This recent change to the data reporting, which eliminates the "delta," obscures whether Class Members were added to the "incomplete" total. There is thus reason to believe that the July 23 data undercounts the number of people missing Full Settlement Relief.

times, resulting in one or more "intermediate" mixed consolidation loans underlying the final, "terminal" mixed consolidation loan. After Plaintiffs filed their first enforcement motion, the Department conceded that it had not adequately addressed the process for discharging and refunding payments for Class Members with mixed consolidation loans, leading to significant delays in delivering relief. *See, e.g.*, Decl. of Richard Cordray ¶¶ 50–62, 75–76, ECF No. 403-1.

At a status conference on June 13, 2024, the parties informed the Court that they had reached an agreement on a "terminal loan methodology" to simplify and speed up relief processing for these Class Members.[5] *See* Ellis Decl. Ex. 16 at 12:9–13:3, 15:15–25. Under this methodology, the Department would discharge and issue a refund on a Class Member's terminal consolidation loan—the one with a currently outstanding balance—in full, instead of attempting to discharge and refund prorated amounts. But for Class Members who had paid toward earlier "intermediate" consolidation loans before their more recent "terminal" consolidation loan was created, this process would undercount the payments they had made, resulting in incomplete refunds. The parties thus informed the Court that they were developing an "administrative review process" to ensure that these Class Members would be made whole. *Id.* at 16:3–10. To be clear, the parties understood that the administrative process was part and parcel of the terminal loan methodology, and the Department specifically sought and received the Court's blessing to follow that methodology. *See id.* at 15:14–25; Ellis Decl. Ex. 17 at 12:3–11; Ellis Decl. Ex. 18 at 5:10–6:15.

The parties agreed that manually reviewing payment records for borrowers with intermediate mixed consolidation loans would be time-consuming and, due to inadequate recordkeeping, often infeasible. *See* Almeida Decl. Ex. 13 at 2 n.1; Ellis Decl. Ex. 16 at 12:2–13 (Plaintiffs' Counsel: "The fact is, there's a lot of missing data. . . . And even the data that does exist can be difficult to access or, even if you've accessed it, difficult to sort of interpret. So we have arrived at a framework that the parties have agreed on for how we can move forward on

[5] The parties initially developed the terminal loan methodology for the ARG. The Court later ordered the Department to use the methodology for all Settlement groups, including the Post-Class. *See* Ellis Decl. Ex. 5 (ordering methodology for Decision Groups 1 and 2); Ellis Decl. Ex. 7 (ordering methodology for all other groups).

effectuating relief for mixed consolidation class members in a way that we think will balance feasibility, speed, and ensuring that class members receive what they're entitled to."). Instead, the parties agreed that Class Members with mixed intermediate consolidation loans would have their refunds calculated using an objective formula. *See* Almeida Decl. Ex. 13.

As part of the administrative process, Class Members would have to affirmatively reach out to the Ombudsman's office and request administrative review. The Department requested that Plaintiffs' Counsel, rather than the Department, reach out to Class Members with information about the administrative process, and it provided data sufficient for Plaintiffs to do so.[6] *See* Almeida Decl. ¶ 25 & Exs. 5 at 1, 6 at 2. The deadline for ARG, Decision Group One, and Decision Group Two borrowers to request administrative review was March 30, 2025. *See* Almeida Decl. ¶ 74. It took the Department until December 2025 just to identify which of these Class Members had intermediate mixed consolidation loans that required administrative review. *See id.* ¶ 76; Notice of Material Breach at 4. In total, the Department eventually identified 583 Class Members eligible for the administrative process; 283 with "complicated" cases; and 1,872 who did not have intermediate mixed consolidation loans but would nonetheless receive a manual review of their refunds. Almeida Decl. ¶ 77. Notably, these Class Members are ***not*** counted by the Department in its monthly progress reports as individuals whose relief is incomplete, even though many of them are entitled to additional refunds. *Id.* ¶ 7.

At the parties' meeting in Washington, D.C., on April 30, 2026, the Department unilaterally informed Plaintiffs that instead of following the administrative process agreed to by the parties, it would manually review records to determine whether Class Members' refunds were complete. Almeida Decl. ¶ 78. This newly proposed process consisted of the very actions the Department had conceded a year earlier could cause delays and lead to inaccurate results. *See* Notice of Material Breach at 4. Plaintiffs thus requested more data from the Department, including the length of time it would take the Department to perform the new review process and an explanation of

---

[6] Plaintiffs have provided administrative process notices for the ARG and Decision Groups One, Two, and Three. Plaintiffs have not sent notice to Decision Group Four due to the Department's delay in implementing the administrative process, as described in the text. Almeida Decl. ¶ 25.

whether and how the new process worked when applied to specific borrowers. Almeida Decl. ¶ 79. Plaintiffs also asked the Department to share a written description of the new review process with Plaintiffs. *Id.* To date, the Department has not provided any of the information Plaintiffs requested. *Id.* Nor has it directed the issuance of any refund under the administrative review process for any Class Member. *Id.* ¶ 80. Additionally, to Plaintiffs' knowledge, the Department has not started any manual review for borrowers not eligible for the administrative process. *Id.* ¶ 81. This leaves at least hundreds, and potentially thousands, of Class Members with incomplete refunds and no set or even proposed timeline for determining what, if anything, they are owed.

*3. The Department has failed to refund Class Members with defaulted commercially held Federal Family Education Loans (FFEL) whose tax refunds were offset and/or wages were garnished.*

In general, Class Members who made payments on commercially held FFEL loans are not entitled to refunds of those payments under the Settlement because the payments were made to private banks, not to the Department.[7] *See* Settlement ¶ II.S.ii (Full Settlement Relief includes "a refund of all amounts the class member previously paid *to the Department* toward any Relevant Loan Debt" (emphasis added)). When a commercially held FFEL loan goes into default, however, it is transferred to the Department's Default Resolution Group, and payments seized from borrowers' tax refunds through the Treasury Offset Program ("TOP") or from their paychecks through Administrative Wage Garnishment ("AWG") are paid to the Department. These payments are therefore eligible for refund under the Settlement. *See* Almeida Decl. ¶ 59.

Beginning in the summer of 2024, Plaintiffs' counsel began hearing from ARG Class Members that they had not received refunds of FFEL loan payments taken from them through TOP and/or AWG (generally, "FFEL TOP/AWG" payments). *Id.* ¶ 53. Plaintiffs raised this issue with the Department, and, at the parties' December 2024 in-person meeting, a representative of the Department's Office of General Counsel agreed that the Department would refund FFEL

[7] The FFEL program provided federal guarantees to student loans disbursed by banks. Unlike federal Direct Loans, FFEL loans were not held by the U.S. government, except in cases where the Department took over loans that the commercial lenders no longer wished to hold, or where those loans defaulted, as explained in the text. By statute, the FFEL program sunset on July 1, 2010, *see* 20 U.S.C. § 1071(d), but many FFEL loans made before that date remain outstanding.

TOP/AWG payments. *Id.* ¶ 59. At the parties' May 2025 in-person meeting, the Department told Plaintiffs' counsel that it was still "researching" the FFEL TOP/AWG issue. *Id.* ¶¶ 61–62 & Ex. 20 at 4. Despite Plaintiffs' inquiring about this issue every month since, the Department has yet to issue a single FFEL TOP/AWG refund. *Id.* ¶ 64.

Plaintiffs have identified 77 Class Members in the ARG and Decision Groups One through Four who are owed FFEL TOP/AWG refunds, and the number is likely higher, as the Department has not, to Plaintiffs' knowledge, taken any affirmative steps to identify Class Members who are owed a refund of FFEL TOP/AWG payments. *Id.* ¶¶ 65–66.

*4. The Department has failed to deliver refunds to dozens of Class Members whose refund checks were fraudulently cashed.*

As Plaintiffs only learned through their Court-ordered enforcement activities, neither the Department, nor its servicers, nor any other entity contacts a Class Member to let them know that the Treasury Department has mailed them a Settlement refund check. Almeida Decl. ¶ 56. The Class Member thus does not know to look out for the check or to alert the Department if the check is not delivered.

The Treasury Department has a one-year statute of limitations on claims of fraudulent endorsement. *See* 31 U.S.C. § 3712(a)(1). Any Class Member who does not raise the issue of a missing *Sweet* refund check within one year of the date of fraudulent endorsement technically falls outside that statute of limitations—even if the Class Member's check was stolen and fraudulently cashed long before the Class Member even knew it existed.

On September 13, 2024, Plaintiffs informed the Department about the issue of stolen refund checks. Almeida Decl. ¶ 54. The Department acknowledged that the lack of notice to Class Members made the application of the Treasury statute of limitations uncertain; the Department stated that its Office of General Counsel would work with counsel for Treasury to resolve the issue. *Id.* ¶¶ 57, 60. Plaintiffs have asked for an update about this issue at every monthly meeting since. But the Department has simply repeated each time that they are "researching" it. *Id.* ¶ 63. To Plaintiffs' knowledge, no Class Member who notified Plaintiffs' counsel or the Department of a stolen check outside of the Treasury's one-year window has received a reissued refund. *Id.* ¶ 64.

The Department has been aware of this issue for nearly two years, yet it cannot or will not provide a date by which this group of Class Members will receive their refunds.

*5. The Department paused its Delegated Authority policy for months, resulting in further delay to Class Members with overdue relief.*

On September 12, 2024, the Department informed Plaintiffs that the Secretary had delegated authority to the Ombudsman's office to expedite *Sweet* relief. Almeida Decl. ¶ 22. Using this delegated authority ("DA"), Ombudsman staff could directly instruct loan servicers to process delayed or improperly withheld *Sweet* relief rather than having to route instructions through other offices within FSA. *Id.* The Ombudsman's office used DA to complete loan discharges, request refunds, process class inclusion cases, and expedite case investigations. *Id.*

In February 2026, the Department informed Plaintiffs that it was "updating" its DA process and that, as a result, all tasks requiring the use of DA were on hold. *Id.* ¶ 67. At the parties' July 23, 2026, in-person meeting, the Department stated that it was "reviewing" DA tasks again; however, none of the pending DA cases that Plaintiffs were tracking from months earlier had been resolved. *Id.* ¶ 69–70. As of the date of this filing, at least 17 ARG and Decision Group One members are still awaiting Full Settlement Relief while the Department's DA "update" simply shuffles the same responsibilities among newly created job titles. *Id.* ¶ 72.

**B. The Department's Refusal to Comply with Court Orders Has Prevented Plaintiffs from Learning the Full Extent of the Breach**

Plaintiffs' Motion for Contempt, filed simultaneously with this Motion, sets forth the details of the Department's recent violations of Court orders. *See* Motion for Contempt at 2–6. For purposes of the present Motion, however, those violations are independently relevant because they have obscured the true size of the breach.

As explained in the Motion for Contempt, over the past several months the Department has refused to provide Plaintiffs with access to crucial records, including an accurate and up-to-date class list, outcome data for Decision Groups Four and Five and the Post-Class, and refund "census" data. *See* Motion for Contempt at 3–4. Without this information, Plaintiffs and the Court are left—as they were prior to the Department's first breach—with only the Department's oft-disproven assurances of Settlement compliance. In other words, not only is the Department failing to provide

relief to the Class Members whom Plaintiffs have managed to identify above, but it is reporting "complete" relief for Class Members for whom that might not be true, and withholding data that would allow Plaintiffs to identify gaps in the reporting. This is exactly why the Court ordered the Department to grant Plaintiffs access to relevant data over two years ago.

Similarly, the Department's refusal to attend the Court-ordered weekly Ombuds meetings, *see* Motion for Contempt at 4–6, has hampered Plaintiffs' ability to identify which Class Members are missing relief and work with the Ombuds staff to deliver that relief. The delays between meetings cause widening gaps between the time when Plaintiffs identify a Class Member issue for resolution and the time when that issue can actually be resolved.

**C. Affected Class Members Have Been Harmed by Continued Delay**

In its response to Plaintiffs' Notice of Material Breach, the Department stated, apparently unironically, that it "is committed to hearing and addressing any individualized issue raised by any borrower who believes that he or she did not receive the Full Settlement Relief that the Department promised to the class in the Agreement." DOJ Response at 2. But Plaintiffs have raised hundreds of cases of incomplete relief to the Department that remain unresolved, due to persistent systemic issues, lack of urgency, or, more often than not, both. Meanwhile, Class Members who are awaiting overdue relief are suffering. The Department's contention that late relief for any particular Class Member is "immaterial," DOJ Response *passim*, cavalierly dismisses the life-changing impact of Full Settlement Relief.

Class Members awaiting delayed relief describe their struggles to support themselves and their families.[8] *See, e.g.*, Michelin Decl. ¶ 11 ("With this refund, I hope to catch up on bills."); Perkins Decl. ¶ 9–10 ("I am behind in bills, rent, and now have to pay for late fees. . . . I am also my mother's primary caretaker. She is a senior citizen who requires full-time care."); Liles Decl. ¶ 9 ("Because the government has not returned the money that was garnished from my wages and seized from my tax refunds, I am trapped in a cycle of living paycheck to paycheck and am barely getting by."); Jasper Decl. ¶ 9 ("I am a full-time college student working toward my bachelor's

[8] The Class Member declarations cited in this section are appended to the Almeida Declaration at Exhibits 23–44. *See* Almeida Decl. ¶ 89 for an index.

degree while raising two young children with autism as their sole caregiver. Because of their disabilities, I am unable to work a traditional full-time job outside the home. Every dollar matters to our household."); Conidi Decl. ¶ 9 ("I am 69 years old and rely on a fixed income consisting of Social Security and a pension. Because I have not received the refund I am owed, I have had to pay for basic living necessities, including housing, utilities, and medical costs, using credit cards. Those balances continue to accrue interest each month, which has increased the total amount I owe rather than reduced it.").

Some Class Members are awaiting thousands of dollars in long-overdue refunds. *See, e.g.*, Edgerton Decl. ¶ 6 ($8,500); Amoh-Adjei Decl. ¶¶ 9, 12 ($10,000); Ogden Decl. ¶ 6 ($10,000); Smith Decl. ¶ 6 ($12,000); Conidi Decl. ¶ 11 ($14,000); Riffle Decl. ¶ 6 ($20,000). But even what the Department chooses to characterize as an insignificant refund, *see* DOJ Response at 5, makes a meaningful difference to the many Class Members who are struggling to afford basic expenses—in significant part because of the predatory school misconduct at the root of this lawsuit. *See, e.g.*, Perkins Decl. ¶ 9; Borbon Decl. ¶¶ 9–10; Young Decl. ¶ 10; Smith Decl. ¶¶ 9–10; Melendez Decl. ¶¶ 9–11; Peters Decl. ¶ 9; Hronek Decl. ¶ 11; Galaviz Decl. ¶¶ 9–10; Wardner Decl. ¶ 10.

Two Class Members recently lost or are about to lose access to housing. Lamb Decl. ¶ 11; Watson Decl. ¶ 9. Others need their refunds to pay for medical treatment, *see* Amoh-Adjei Decl. ¶ 12; Riffle Decl. ¶ 10; or to pay for a broken roof or furnace, *see* Edgerton Decl. ¶ 9; Johnson Decl. ¶ 10–11. The absence of Full Settlement Relief can also harm Class Members' credit, forcing them into abusive high-cost borrowing like payday loans in order to make ends meet. *See* Liles Decl. ¶ 10; Young Decl. ¶ 11; Peters Decl. ¶ 10. Many Class Members are at or approaching retirement age. *See, e.g.*, Conidi Decl. ¶ 9 (age 69, retired); Riffle Decl. ¶¶ 3, 9 (age 62, retired); Melendez Decl. ¶ 3 (60 years old); Borbon Decl. ¶ 3 (60 years old); Liles Decl. ¶ 3 (59 years old); Cobb Decl. ¶¶ 3–4, 11 (age 62, social worker: "It is very overwhelming, when you're single, want to get an education, doing the 'right thing,' with no financial guidance or even help from school. . . . When you trust the school and the Department of Education, you trust that they tell you the truth and the risks. Then you're older and realize you're on your own.").

The delay itself also causes Class Members stress and anxiety. Multiple Class Members describe contacting both FSA and their servicers to find out the status of their relief, only to get confusing and often contradictory answers. *See* Lamb Decl. ¶ 7; Johnson Decl. ¶ 10; Amoh-Adjei Decl. ¶¶ 10–11; Lamb Decl. ¶ 7; Young Decl. ¶ 7; Riffle Decl. ¶ 9; Hronek Decl. ¶ 10; Taylor Decl. ¶ 12; Cobb Decl. ¶¶ 6, 9–10. This dearth of consistent or competent information adds to the feelings of betrayal and hopelessness that Class Members already experience as a result of first being defrauded by their schools, then having their applications for relief ignored by the Department for years. *See, e.g.*, Young Decl. ¶ 11 ("This debt from twenty years ago continues to affect every aspect of my life."); Smith ¶ 12 ("This situation has left me feeling hopeless that I will ever get the money I am owed. I abandoned the possibility of returning to school because of this whole experience."); Melendez Decl. ¶ 14 ("This should not have gone on for so long—40 years spent suffering over a $5,000 loan to pay for a fraudulent school."); Peters Decl. ¶ 11 ("I was taken advantage of when I was young and now I feel like after 25 years of being ignored and unheard, I have to wait more for the money they took from me. I feel like I don't matter when it comes to the eyes of the education system in America."); Borbon Decl. ¶ 12 ("I cannot buy a home, cannot get credit, and cannot get a loan to make any big purchases. This is a real emotional and mental blow that is beyond explanation.").

As the Department continues to delay delivering Full Settlement Relief, the financial and mental injuries to Class Members compound. To Class Members, the Settlement represents the promise of long-delayed fairness and justice. The Department's recent decision to treat Class Members left stranded by its inability to finish the job as "immaterial" insults that promise. As one Class Member put it: "When I received the $5,000 check last year, I was hopeful that meant [the rest of] my money would be returned soon. Now, I feel hopeless again and I just hope I live long enough to receive it. I told my kids that, in case I am gone, they should look out for that money." Riffle Decl. ¶ 11.

## III. ARGUMENT

The Department is in material breach of the Settlement by failing to provide over a thousand Class Members with Full Settlement Relief by the applicable due dates. Following the

Department's initial Settlement breach in early 2024, the Court ordered the parties to work diligently together to ensure that Class Members who were missing timely relief received it. In the years since, Plaintiffs and the Department met as ordered to find solutions to relief delays on both a systemic and individual level. The Department has now unilaterally abandoned that pursuit, having presented the justification that being almost done with its job is good enough, and that it should no longer be held accountable to the complaints—and lives—of the individual Class Members it left behind. This cynical argument lacks any legal foundation. The solution, as prescribed by the Settlement, is to set a date certain for the Department to finish this work.

**A. The Court Has Jurisdiction to Decide This Motion**

Paragraph V.A of the Settlement provides that this Court "shall retain jurisdiction only to review claims set forth" in the applicable section. One of the enumerated "claims permissible to enforce this Agreement" is "a claim alleging that Defendants have materially breached Paragraph IV.A.1 [and/or] IV.C.9 . . . of the Agreement by failing to effectuate relief within the prescribed time periods for any individual who is entitled to receive relief pursuant those Paragraphs." *Id.* ¶ V.B.2. This motion is such a claim. The Settlement further provides that "the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section." *Id.* ¶ V.A. As detailed *supra*, despite the parties' participation in a meet-and-confer process, the Department has not provided or agreed to provide the Settlement's required remedy for its breaches: a date certain by which it will complete Full Settlement Relief for each and every member of the ARG and Decision Groups One through Four. *See id.* ¶ V.B.2.i.

Additionally, a federal district court has the power to enforce its order approving a settlement "to protect the integrity of a complex class settlement over which it has retained jurisdiction." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Product Liab. Litig.*, 975 F.3d 770, 775 (9th Cir. 2020) (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367–68 (3d Cir. 2001)). When a court's dismissal order incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement, because a breach of the incorporated agreement is a violation of the dismissal order. *Kelly v. Wengler*, 822

F.3d 1085, 1094 (9th Cir. 2016) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)). Here, the Court stated in its Final Judgment: "The Court should retain jurisdiction to monitor and oversee implementation of the settlement as set forth in the settlement agreement." ECF No. 346. This is sufficient to establish the Court's jurisdiction over this motion. *See Kokkonen*, 511 U.S. at 381.

**B. Plaintiffs Are Entitled to Relief Under Paragraph V.B.2 of the Settlement**

Paragraph V.B.2 of the Settlement states that "Plaintiffs may bring a claim alleging that Defendants have materially breached" the Settlement "by failing to effectuate relief within the prescribed time periods for ***any individual*** who is entitled to receive relief pursuant to," *inter alia*, Paragraphs IV.A.1 and IV.C.9 (emphasis added). The plain reading of this provision is that a material breach can exist as to every single Class Member whose relief is overdue.

As detailed above, the Department's own data clearly establish that it has failed to provide Full Settlement Relief to at least 807 Class Members belonging to the ARG and Decision Groups One through Four by their respective deadlines. The Department is also in material breach as to at least hundreds, and perhaps thousands, more Class Members due to its failure to calculate and issue applicable refunds for Class Members with intermediate mixed consolidation loans; its failure to issue refunds to Class Members who had their tax refunds offset and/or wages garnished to pay *Sweet*-eligible commercially held FFEL loans; its failure to reissue refund checks that were stolen and fraudulently cashed outside of the Treasury Department's one-year limit on fraud claims; and its failure to use its available Delegated Authority to effectuate relief that it knows is due, owing, and late. The Department is thus, straightforwardly, in breach of the Settlement as to each individual in the ARG and Decision Groups One through Four who falls within one or more of these groups.

*1. "Substantial compliance" is not relevant.*

In its response to Plaintiffs' Notice of Material Breach, the Department denied that it is in material breach—but it did ***not*** maintain that it had actually delivered timely Settlement relief to

any of the Class Members described above.[9] Instead, it asserted a defense of "immateriality," claiming that it is in "substantial compliance" with its Settlement obligations. DOJ Response at 2–4. But this argument misreads both the Settlement itself and the applicable law.

First, "immateriality" and "substantial compliance" are not the same thing, and only one has any legal relevance in the context of the Settlement. As explained above, a claim of "material breach" is defined in the Settlement, and that definition expressly includes a claim that the Department has failed to provide timely relief to "any individual." Settlement ¶ V.B.2. While the Settlement does preserve a defense for the Department "that the breach claimed by Plaintiffs is not material," *id.* ¶ V.C, the definition of the claim of breach precludes the argument that a breach is ***necessarily*** immaterial if it involves only a single Class Member (or a hundred Class Members, or a thousand). The Department may argue, if it wishes, that the amount of relief owed to each of the thousand-plus Class Members detailed above is an immaterial amount, or that the delay each has experienced constitutes an immaterial period of time. But the Settlement does not allow for the Department's apparent belief that a breach only "counts" if it affects tens of thousands of people. *See* DOJ Response at 2–3.

Second, and relatedly, the Settlement does not preserve a defense of "substantial compliance."[10] *See* Settlement ¶ V.C. Under the plain language of the Settlement, materiality is

[9] The Department did attempt to shift responsibility for its own data shortcomings onto Plaintiffs, arguing that the Department's reporting cannot be relied upon as an indicator of whether relief is complete or not. *See* DOJ Response at 3. But whether a particular loan has been discharged or a particular refund issued is information uniquely within the Department's control; Plaintiffs have no access to loan data other than what they receive through the Department.

[10] For this reason, Plaintiffs' statements in two previous status conferences that the Department was at the time in "substantial compliance" with particular Settlement provisions or Court orders, *see* DOJ Response at 3–4, does not constitute either a legal concession relevant to Settlement interpretation or a factual concession that the Department is in substantial compliance now. In September 2024, the Department was digging itself out of a hole of over 50,000 Class Members with late relief, and Plaintiffs had sought a contempt order based on the Department's failure to rectify its errors. *See* Plaintiffs' Reply in Support of Motion to Enforce at 10, ECF No. 404. At the hearing on September 26, 2024, Plaintiffs' counsel agreed that the discharge of all but "around 870 loans" showed "substantial compliance" with the Court's revised August 31 relief deadline for the ARG. Ellis Decl. Ex. 17 at 6:6–13. In this context, Plaintiffs' statement reflected a good-faith belief that the Department was on its way to curing its breach, and an agreement that Plaintiffs were no longer seeking a finding of contempt. Likewise, on April 14, 2025, the Department

measured on the level of the individual, not on the level of the Class. The reason why is clear from the Class Member declarations cited above: the absence of relief for an individual Class Member can be extremely, desperately material to that person, even if represents only a tiny percentage of the relief to the Class as a whole. The parties did not intend to leave these Class Members in dire straits. The Department's completion of relief for most Class Members is not, and cannot be, sufficient to insulate it from its obligations to the rest.

Even if the background legal principles of "substantial compliance" were relevant here (they are not), the Department could not show that it is actually in "substantial compliance." "[A] party is deemed to have substantially complied with an obligation only where any deviation is 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish.'" *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016) (quoting *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964)). "Merely taking significant steps toward implementing the [Settlement] falls far short of substantial compliance." *Id.* Instead, the Department "bears the heavier burden of showing that it took '*all* reasonable steps to comply'" with the Settlement. *Coleman v. Newsom*, 131 F.4th 948, 958 (9th Cir. 2025) (quoting *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016)). All "distinct provisions of [a Settlement] are independent obligations, each of which must be satisfied." *Rouser*, 825 F.3d at 1081–82.

As Defendants well know, the gravamen of this litigation is undue delay, and accordingly the Settlement was premised on firm deadlines. The Department cannot, and has not even attempted to, demonstrate that it has taken all reasonable steps to comply with those deadlines for the remaining Class Members with incomplete relief. Instead, it argues that it *does not have to*

reported that 99.5% of the ARG, 98.4% of Decision Group One, and 97.2% of Decision Group Two had received their discharges and refunds. *See* Defendants' Status Report, ECF No. 468. In the context of the earlier relief backlog, Plaintiffs' counsel agreed that the Department appeared to be in "substantial compliance" as to those groups. Ellis Decl. Ex. 20 at 9:24–10:1. Plaintiffs did not anticipate at the time that, by July 2026, hundreds of members of those groups would *still* be awaiting relief. Plaintiffs also did not anticipate that the issues delaying relief for these groups would still be unresolved, such that members of Decision Groups Three and Four would also be facing indefinite delays, or that the Department would suddenly disclaim its Settlement responsibilities to affected Class Members.

*comply* with the deadlines anymore. That argument flies in the face of both the language and purpose of the Settlement. Members of the ARG and Decision Groups One through Four who have not received Full Settlement Relief have already waited years for a resolution to their borrower defense claims, and now they continue to face burdensome delays. Yet the Department will not even offer dates by which it will resolve the systemic issues impeding the effectuation of Full Settlement Relief.

Instead, it has now unilaterally discontinued Court-ordered engagement intended to ensure accountability and transparency, and has taken a new and unsupportable position that it has no obligation to provide complete and timely relief to individual Class Members under the Settlement. *See, e.g.*, DOJ Response at 5. The result of the Department's recent and escalating intransigence is an indefinite delay in already overdue relief for over a thousand Class Members in a Settlement intended to remedy years-long delay. The Department is not in substantial compliance. *See Rouser*, 825 F.3d at 1082; *Coleman*, 131 F.4th at 958.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request, pursuant to Paragraph V.B.2 of the Settlement, that the Court issue an order requiring the Department to (i) provide Full Settlement Relief to each and every remaining class member in the ARG and Decision Groups One through Four on a schedule set by the Court; (ii) report to Plaintiffs' Counsel and the Court on its progress of issuing relief at regular status hearings and in regular reports until all relief is completed, as set forth in detail in the attached Proposed Order; and (iii) pay Plaintiffs' Counsel's reasonable fees and costs incurred in bringing these claims.

Dated: August 18, 2026

Respectfully submitted,

*<u>/s/ Rebecca C. Ellis</u>*
EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)

reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING, INC.
769 Centre Street
Jamaica Plain, MA 02130
Tel.: (617) 617-390-2669
Fax: (617) 781-218-9625

*Attorneys for Plaintiffs*