**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al.*,

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF NICOLE CAMARGO ALMEIDA, ESQ., IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE AND FOR ORDER TO SHOW CAUSE**

I, Nicole Camargo Almeida, state as follows:

1. I am submitting this declaration in relation to the above-captioned case.

2. I am a staff attorney at the Project on Predatory Lending ("PPSL"), which represents Plaintiffs in this case. I am a member in good standing of the bar of the State of Illinois.

3. The statements contained herein are true and accurate to the best of my knowledge. These statements are based on my personal observations and my review of the relevant records, including contemporaneous notes taken by other PPSL attorneys.

4. I have been working at PPSL since December 2, 2024. I help monitor and implement Settlement relief to hundreds of thousands of Class Members in the above-captioned case.

**Relief Progress Data Provided by the Department**

5. Since November 2024, the Department of Education ("Department") has provided PPSL with monthly relief progress data. For each Settlement group, these data show the total

number of Class Members who have received loan discharges, refunds, or both, as well as the number of Class Members whose relief remains incomplete.[1]

6. The Department's relief progress data does not count as "incomplete" Class Members who have received their loan dicharge and refund but are still waiting on their credit report to be fixed.

7. The Department's relief progress data does not count as "incomplete" any Class Member who has received their discharge and refund on their terminal mixed consolidation loan(s), but is or may be still owed a refund of payments made on their intermediate mixed consolidation loan(s).

8. The Department's relief progress data does not count as "incomplete" any Class Member who is still owed a refund of amounts garnished from their wages or offset from their taxes to pay *Sweet*-eligible commercially held FFEL loans.

9. Finally, the Department's relief progress data does not count as "incomplete" Class Members whose refund checks were fraudulently cashed by someone other than the borrower, but who fall outside the Department of Treasury's statute of limitations for requesting a "fraud packet" (an application for reissuance of a fraudulently cashed check).

10. Until July 2026, this monthly data also included a "Delta" column, which calculated the prior month's incomplete borrower count minus the current month's incomplete borrower count. A negative delta indicated that the number of borrowers with incomplete relief had increased since the last reporting period. There were several months in which the Department's completion data showed a negative delta.[2]

---

[1] The Department generally presents the relief progress data during the parties' monthly in-person meetings, and sometimes (but not always) provides Plaintiffs with a copy of the data after the meetings. Plaintiffs submit as Exhibits the data available to Plaintiffs at this time. Plaintiffs currently do not have copies of the relief progress data for December 6, 2024; January 29, 2025; May 15, 2025; July 16, 2025; and March 27, 2026.

[2] For example, the relief progress data from June 2026 showed that six fewer members of the ARG had complete relief than was reported the previous month, *see* Exhibit 1 at 39; the relief progress data from May 2026 showed that seven fewer members of Decision Group One had complete relief than was reported the previous month, *see id.* at 34; the relief progress data from February 2026 showed that 29 fewer members of the ARG had complete relief than was reported the previous month, *see id.* at 25; and the relief progress data from December 2025 showed that one fewer

11. Attached as **Exhibit 1** are true and correct copies of the Department's monthly relief data currently available to Plaintiffs from November 2024 through July 2026. Attached as **Exhibit 2** is a chart I prepared summarizing the Department's relief progress data.[3]

12. The relief data reflects that the Department did not achieve 100% completion for the ARG by its deadline of December 31, 2024; for Decision Group One by its deadline of December 20, 2024; for Decision Group Two by its deadline of January 28, 2025; for Decision Group Three by its deadline of July 28, 2025; or for Decision Group Four by its deadline of January 28, 2026. *See* Exs. 1, 2.

13. In fact, the Department has not reached 100% relief completion for *any* Settlement group to date.

14. According to the most recent data provided at the July 2026 in-person meeting, there are still 807 Class Members who have not received Full Settlement Relief. More specifically, the Department reports that there are 110 borrowers in the ARG, 299 borrowers in Decision Group One, 163 borrowers in Decision Group Two, 104 borrowers in Decision Group Three, and 131 borrowers in Decision Group Four whose Settlement relief is not yet complete.

15. The table below shows the percentage of borrowers whose relief was complete as of the listed date for each relevant Settlement group, according to the Department's data. The data show that relief completion eventually plateaus at the 98% to 99% range for each group.

member of Decision Group Two had complete relief than was reported the previous month, *see id.* at 22.

[3] At the parties' meeting on July 23, 2026, the Department provided the number of incomplete borrowers for each Settlement group. Using that data, Plaintiffs calculated the percentage data for July 2026 as seen in Exhibit 2.

*Table 1: Percentage of Relief Completion for the Relevant Settlement Groups*

| Date | ARG | DG1[4] | DG2[5] | DG3[6] | DG4[7] |
|---|---|---|---|---|---|
| 11/06/24 | 99.2% | 87% | 86% | | |
| 01/06/25 (after relief deadlines for ARG and DG1 passed) | 99.3% | 97% | 95% | | |
| 02/27/25 | 99.6% | 98.7% | 97.3% | | |
| 04/10/25 (after relief deadline for DG2 passed) | 99.5% | 98.4% | 97.4% | 82.6% | |
| 06/12/25 | 99.2% | 98.1% | 97.1% | 88.5% | |
| 08/21/25 (after relief deadline for DG3 passed) | 98.7% | 98.6% | 97.9% | 97.8% | |
| 09/25/25 | 99.7% | 98.6% | 97.9% | 98% | |
| 12/04/25 | 99.7% | 98.7% | 97.7% | 98.5% | 91.5% |
| 01/22/26 | 98+% | 98+% | 98+% | 98+% | 96.6% |
| 02/26/26 (after relief deadline for DG4 passed) | 99.8% | 98.7% | 98% | 98.7% | 97.7% |
| 04/30/26 | 99.9% | 98.7% | 98% | 98.7% | 97.9% |
| 05/28/26 | 99.9% | 98.7% | 98% | 98.8% | 98% |
| 06/25/26 | 99.9% | 98.7% | 98.1% | 98.9% | 98% |
| 07/23/26 | 99.9% | 99.1% | 98.4% | 99.1% | 98.5% |

16. The table below shows the number of borrowers whose relief remains incomplete for each relevant Settlement group, according to the Department's data.

17. PPSL has requested more detailed data from the Department regarding who these borrowers are and why their loans have not been discharged and/or refunds issued. The Department has not provided that data.

*Table 2: Total Number of Borrowers in Each Relevant Settlement Group with Incomplete Relief*

| Date | ARG | DG1 | DG2 | DG3 | DG4 |
|---|---|---|---|---|---|
| 11/06/24 | 1,656 | 3,942 | 1,444 | | |
| 01/06/25 (after relief deadlines for ARG and DG1 passed) | 1,384 | 794 | 484 | | |
| 02/27/25 | 842 | 418 | 273 | | |
| 04/10/25 (after relief deadline for DG2 passed) | 1,045 | 504 | 282 | 2,115 | |
| 06/12/25 *[continued next page]* | 1,620 | 601 | 298 | 1,392 | |

[4] Decision Group One

[5] Decision Group Two

[6] Decision Group Three

[7] Decision Group Four

| Date | ARG | DG1 | DG2 | DG3 | DG4 |
|---|---|---|---|---|---|
| 08/21/25 (after relief deadline for DG3 passed) | 2,595 | 433 | 218 | 271 | |
| 09/25/25 | 526 | 428 | 216 | 240 | |
| 12/04/25 | 507 | 423 | 217 | 176 | 723 |
| 01/22/26 | n/a | n/a | n/a | n/a | 290 |
| 02/26/26 (after relief deadline for DG4 passed) | 439 | 409 | 203 | 155 | 193 |
| 04/30/26 | 189 | 400 | 200 | 153 | 180 |
| 05/28/26 | 122 | 407 | 200 | 148 | 174 |
| 06/25/26 | 128 | 394 | 194 | 136 | 170 |
| 07/23/26 | 110 | 299 | 163 | 104 | 131 |

**The Parties' History of Exchanging Class Member Information to Ensure Proper and Prompt Settlement Effectuation**

18. Since 2023, the parties have exchanged relevant information about the Class and the progress of Settlement relief, which, until recently, the parties have recognized as a relevant and necessary part of Settlement implementation.

19. After the COVID payment pause ended in September 2023, Plaintiffs learned that many Class Members were being placed into repayment status, despite the Settlement mandating that Class Members stay in forbearance or stopped collection status. *See* Settlement ¶ IV.C.7. As part of the parties' effort to safeguard Class Members from collections, the Department provided PPSL with a class list. *See* Email from DOJ Counsel to Plaintiffs' Counsel dated Oct. 27, 2023, appended hereto as **Exhibit 3**.

20. From spring 2024 through approximately December 2025, in the course of the parties' Court-ordered biweekly or monthly in-person enforcement meetings, the Department frequently shared relevant data with PPSL to verify the progress of Settlement relief and to enable the parties to resolve both individual and systemic Class Member problems with the delivery of relief.

21. This data included, among other things:

- Further class lists, *see* **Exhibit 4** (email from DOJ Counsel to Plaintiffs' Counsel dated Aug. 20, 2024); **Exhibit 5** (email chain between DOJ Counsel and Plaintiffs' Counsel dated Jan. 8–16, 2025)[8];
- Data showing the adjudication outcomes for individual Class Members in the Decision Groups, *see, e.g.*, Ex. 5; **Exhibit 6** at 2–3 (letter from Plaintiffs' Counsel to DOJ Counsel dated Dec. 10, 2024); **Exhibit 7** (email from DOJ Counsel to Plaintiffs' Counsel dated Apr. 14, 2025, attaching documents "Sweet-DG3-4-7-25" and "Sweet-DG4-4-7-25"); **Exhibit 8** (email from Department's Office of General Counsel to Plaintiffs' Counsel dated Dec. 17, 2025); and
- Data showing the amount of Settlement refunds that individual Class Members received or should have received, including whether Class Members have mixed consolidation loans (referred to by the parties as the "census"), *see* Ex. 5; Ex. 6 at 2-3; **Exhibit 9** (email from DOJ Counsel to Plaintiffs' Counsel dated Aug. 21, 2025); **Exhibit 10** (email from DOJ Counsel to Plaintiffs' Counsel dated Feb. 25, 2026.

22. At the in-person meeting on September 12, 2024, the Department shared with Plaintiffs that the Secretary of Education had delegated authority to the Ombudsman's office to expedite *Sweet* relief. The Department shared its standard operating procedure for its delegated authority with Plaintiffs. The standard operating procedure explained how the Department would use its authority to process class inclusion requests, expedite *Sweet* relief, and instruct servicers on *Sweet*-related matters. Using the delegated authority, staff of the Ombudsman's office could directly instruct loan servicers to process delayed or improperly withheld *Sweet* relief rather than having to route instructions through other offices within Federal Student Aid. The Ombudsman's office thereafter used delegated authority to complete loan discharges, request refunds, and expedite case investigations.

23. Also in September 2024, the Department's then-Ombudsman shared with PPSL a list of borrowers who would be waived into the class due to technical issues with the Department's website and/or the Department's mis-filing of paper BD applications, refered to by the parties as

[8] Plaintiffs have redacted Exhibit 5 to remove URLs for websites hosting sensitive data.

the "attestation group." *See* **Exhibit 11** (email from Bonnie Latreille to Plaintiffs' Counsel et al., dated Sept. 19, 2024). PPSL later exchanged a list of attestation group borrowers missing from the September 2024 list, who were also entitled to class inclusion. *See* **Exhibit 12** (email from Plaintiffs' Counsel to Bonnie Latreille et al., dated Oct. 18, 2024). On April 14, 2025, the Department shared with Plaintiffs an updated attestation group contact list. *See* Ex. 7 (attaching document labeled "Sweet Attestation-Contact-List-4-8-25.xls").

24. On or about October 16, 2024, the parties agreed to a procedure for the "administrative process" to calculate refunds for Class Members with intermediate mixed consolidation loans. A copy of the agreed-upon procedure document is appended hereto as **Exhibit 13**. This agreement established that the Department would use an objective formula, instead of manually reviewing records, to determine the refund amount owed to Class Members with intermediate mixed consolidation loans. *Id.* In the agreement, the Department acknowledged that manually reviewing records could pose problems due to innacurate recordkeeping and missing data. *Id.* at 2 n.1.

25. The Department requested that PPSL, rather than the Department, reach out to Class Members with information about the administrative process, and it provided data sufficient for PPSL to do so. *See* Ex. 5; Ex. 6 at 2. Plaintiffs have provided administrative process notices for the ARG and Decision Groups One, Two, and Three. Plaintiffs have not sent notice to Decision Group Four due to the Department's delay in implementing the administrative process, as described below.

26. From November 2024 to the present, PPSL has prepared and sent a list of prioritized *Sweet* complaints to the Ombuds team every week. Also every week, the Ombuds staff shares with PPSL an updated tracking sheet of *Sweet* complaints showing open and closed cases, referred to by the parties as the "Plaintiff Report."

27. As of August 10, 2026, the Plaintiff Report shows 7,696 unresolved cases, of which 6,181, or 80%, involve Class Members from the ARG and Decision Groups One through Four. Eighty-eight percent of unresolved cases (6,761) have been pending for more than eight months (since December 7, 2025), and 83% (6,398) have been pending for more than a year (since May 7,

2025).[9] Nearly 80% of open complaints were submitted by borrowers in the ARG who were owed Full Settlement Relief more than a year and a half ago.

28. PPSL has used and continues to use the class list data, outcome data, census data, and other information provided by the Department to confirm the class status of people reaching out to PPSL, communicate with Class Members about their status, and to prepare the prioritized list of cases that PPSL sends to the Ombuds team every week. PPSL uses the outcome lists to ensure that relevant Class Members receive appropriate notices and to confirm that Class Members whose applications were approved receive relief by the appropriate deadline. PPSL uses the refund "census" spreadsheets to communicate with Class Members about their expected refunds and to provide information about the administrative process.

29. The Department is and was aware of these uses, and until approximately December 2025, it often worked together with PPSL to facilitate Class Member communications. *See, e.g.*, **Exhibit 14** (email chain between Plaintiffs' Counsel and DOJ Counsel dated Jan. 14–28, 2025).

**Breakdown in the Department's Cooperation With Enforcement Proceedings**

**A. Refusal to Provide Access to Data**

30. Starting in May 2025, Plaintiffs repeatedly requested an "attestation group" update that included relief progress. At the August 2025 in-person meeting, the Department told Plaintiffs that they would provide the list within two weeks. At the September 2025 in-person meeting, the Department reported that the list was "ready to go."

31. Plaintiffs still have not received this list.

32. Plaintiffs are aware, based on the thousands of email inquiries PPSL receives from Class Members, that many Class Members have moved, changed names, or otherwise changed their contact information since the date when they applied for borrower defense to repayment.

[9] At the July 2023 in-person meeting, the Department told Plaintiffs that it had recently closed hundreds of "class inclusion" cases—requests from Post-Class Applicants to be included in the ARG or one of the Decision Groups because technical issues precluded the timely filing of their applications. These cases were not closed through active casework; instead, the class inclusion requests became moot when the adjudication deadlines for the Post-Class passed and no decision had issued to these Class Members, resulting in their becoming entitled to Full Settlement Relief.

33. To PPSL's knowledge, the contact information on the most recent class list that PPSL received was populated using data from Class Members' borrower defense applications.

34. In January 2026, Plaintiffs requested a complete and updated master class list that included attestation group borrowers and updated contact information for all Class Members. Plaintiffs explained to Defendants that as part of Settlement implementation, Plaintiffs need to be able to accurately communicate with Class Members about the status of their borrower defense applications.

35. Also beginning in January 2026, Plaintiffs requested final outcome data for Decision Groups Four and Five along with outcome data for the Post-Class. The Decision Group Four final outcome data would have been available to the Department as of July 28, 2025 (six months after the Decision Group Four initial decision deadline). The final Decision Group Five outcome data and the majority of the Post-Class outcome data would have been available to the Department as of January 28, 2026. The outcome data for the remaining minority of Post-Class members would have been available to the Department as of April 15, 2026.

36. At the January 22, 2026, in-person meeting, the Department told PPSL that it was working on an updated master class list and that it could provide this list at the same time as the Decision Group Four census.

37. At the February 26, 2026, in-person meeting, the Department told PPSL that it was working on the master class list and acknowledged it was delayed.

38. At the March 27, 2026, in-person meeting, PPSL reiterated that access to a class list and Post-Class outcomes data is essential for Settlement implementation. Specifically, outcome data allow PPSL to confirm the class status of thousands of borrowers that reach out to PPSL, thus making the weekly Ombuds meetings more efficient. PPSL also noted that the Department was under Court order to allow Plaintiffs to inspect the Department's records.

39. On April 29, 2026, DOJ Counsel sent PPSL a letter stating that the Department would not provide the requested data. A true and correct copy of that letter is appended hereto as **Exhibit 15**. The letter did not acknowledge the Court's May 2024, November 2024, or March 2025 orders regarding Plaintiffs' access to data through the Ombudsman's office, but rather stated

that there was no requirement under the Settlement to provide the information Plaintiffs had requested. *See id.*[10]

40. In subsequent in-person meetings, PPSL has explained at length to the Department and DOJ Counsel that the Department never before refused to provide a class list or outcome data, and that any data exchanged between the parties is covered by the Protective Order that has been in place in this case since 2020.

41. As the July 28, 2026, deadline for Decision Group Five relief approached, PPSL requested that the Department provide the Decision Group Five census, as had been customary for each Settlement group.

42. At the July 23, 2026, in-person meeting, DOJ Counsel stated that the Department would not provide the census data for the reasons stated in its letter of April 29, 2026.

43. PPSL has asked DOJ Counsel for an explanation of the Department's change in position on data sharing, and DOJ Counsel has refused to provide one.

44. PPSL still has not received an updated class list, any Post-Class outcome data, any relief data for "attestation group" Class Members, or a Decision Group Five census.

**B. Refusal to Attend Weekly Ombuds Meetings**

45. On February 11, 2026, at the end of a weekly Ombuds meeting, the Department's counsel stated that the Department would switch to biweekly instead of weekly meetings between PPSL and the Ombudsman's office, ostensibly in order to "improve efficiency." PPSL opposed, noting that the backlog of *Sweet* complaints continued to increase, and asked for clarification on how reducing the time spent resolving cases would improve efficiency. The Department's counsel stated its position that it is within the Department's discretion to choose when to meet with Plaintiffs.

---

[10] In this letter, the Department incorrectly stated that PPSL had requested the Social Security numbers of Class Members, which Department counsel claimed raised concerns under the Privacy Act. Ex. 15 at 1–2. In fact, PPSL never requested Social Security numbers; the Department had previously provided that data to PPSL in order to reduce its own administrative burden, over PPSL's concerns about data security. *See* Ex. 5 at 2–3.

46. After the meeting, PPSL emailed DOJ Counsel, explaining that the Court's March 13, 2025, order required the parties to continue the weekly meetings. *See* **Exhibit 16** (email from Plaintiffs' Counsel to DOJ Counsel dated Feb. 11, 2026). PPSL also invited the opportunity to discuss ways to improve efficiency of the Ombuds meetings. *See id.*

47. On February 13, 2026, PPSL sent a letter to the Department that included both a detailed procedural history of the Court-ordered Ombuds process and seven suggestions for ways to improve the meetings' efficiency. *See* **Exhibit 17**.

48. On March 3, 2026, DOJ Counsel emailed PPSL and took the position that the March 13, 2025, Court order was not binding. *See* **Exhibit 18** at 2 (email chain between Plaintiffs' Counsel and DOJ Counsel, dated Feb. 11, 2026 through Mar. 6, 2026).

49. On March 6, 2026, PPSL responded and took the position that the Department's unilateral decision to cancel the March 4, 2026, Ombuds meeting, and any subsequent weekly meetings, constituted a violation of the March 13, 2025 Court order. *Id.* at 1.

50. At the March 27, 2026, in-person meeting, PPSL again asked about the proposals to improve meeting efficiency. The Department did not acknowledge the proposals and DOJ Counsel stated that the Department would not respond in writing.

51. The Department has unilaterally refused to attend twelve weekly Ombuds meetings in 2026: March 4, March 18, April 1, April 15, May 6, May 20, June 3, June 17, July 1, July 15, July 29, and August 12.

52. The Department has notified Plaintiffs that it likewise intends to refuse to attend (at minimum) the weekly Ombuds meetings that should be held on August 26, and September 9, 2026. *See* **Exhibit 19** (email chain between DOJ Counsel and Plaintiffs' Counsel dated Aug. 4–10, 2026).

### C. Refusal to Implement Agreed-Upon Relief Procedures

#### i. FFEL Tax Offset/Wage Garnishment and Stolen Check Refunds

53. No later than August 22, 2024, PPSL informed the Department that PPSL was receiving several emails from Class Members who had not received refunds of amounts garnished

from their wages or offset from their federal income tax refunds to pay commercially held FFEL loans.

54. At the in-person meeting on September 13, 2024, PPSL told the Department that several Class Members had reached out to PPSL about never receiving their refund checks.

55. When the parties investigated the latter Class Members' records, they discovered that some of these checks had been stolen, altered, and fraudulently cashed by someone other than the Class Member. Under Treasury Department procedures, an individual whose check was fraudulently cashed may submit a "fraud packet" to request that their check be reissued. The fraud packet must be submitted within one year of the date the check was fraudulently cashed.

56. PPSL told the Department that many of the Class Members reaching out to PPSL about missing checks reported never receiving notice that a check was issued, so they did not know to expect it. The Department confirmed that neither the Department, nor its servicers, nor any other entity contacts a Class Member to let them know that the Treasury Department has mailed them a Settlement refund check. As a result, these Class Members only learned their checks had been stolen close to, or more than, one a year after the checks were cashed.

57. The Department agreed that lack of notice to Class Members made the applicability of the fraud packet statute of limitations policy uncertain. The Department stated that it would work with the Treasury Department to reissue refunds to affected Class Members.

58. At the in-person meeting on December 6, 2024, PPSL again raised the issues of Class Members missing refunds of amounts offset or garnished to pay commercially held FFEL loans and Class Members not able to submit a fraud packet because of the Treasury statute of limitations.

59. During this meeting, a representative of the Department's Office of General Counsel agreed that the Department would refund amounts offset or garnished to pay commercially held FFEL loans. The representative explained that once a borrower defaults, any commercially held loans are transferred to the Default Resolution Group, an agency within the Department's control, and any payments made through wage garnishments or tax offsets go to the Department as the creditor of the defaulted loan.

60. The Department also confirmed that it was working on the issue pertaining to Class Members not eligible to submit fraud packets to reclaim their stolen checks.

61. At the in-person meeting on May 14, 2025, the Department presented PPSL with a handout of its work on the systemic issues previously raised. A true and correct copy of this handout is appended hereto as **Exhibit 20**.

62. The handout stated that the Department was "researching" the "Treasury Statute of Limitations Issue" and the "FFEL TOP/AWG Issue."

63. PPSL has asked about updates regarding these issues at each in-person meeting since May 2025. At each meeting, the Department states that it is still researching how to refund Class Members affected by the Treasury statute of limitations and those whose taxes were offset or wages were garnished to pay commercially held FFEL loans.

64. To PPSL's knowledge, no Class Member has received a refund of payments taken from their tax refunds or wages to pay commercially held FFEL loans, or a reissued check where the fraud was identified more than one year after the check was fraudulently cashed.

65. PPSL has identified 77 Class Members in the ARG and Decision Groups One through Four who are owed FFEL TOP/AWG refunds.

66. To PPSL's knowledge, the Department has not taken any affirmative steps to identify Class Members who are owed a refund of FFEL TOP/AWG payments.

**ii. Delegated Authority**

67. On February 26, 2026, the Department told PPSL it was pausing its use of delegated authority to make "updates" to its procedure document, and as a result, all tasks requiring the use of delegated authority were on hold. PPSL asked for more information regarding the types of "updates" being implemented and whether certain delegated authority tasks that were not subject to "updates" could still be completed in the interim. PPSL also requested a copy of the updated written procedures. The Department stated that the updates were to "improve efficiency" and that delegated authority would return "soon."

68. To PPSL's knowledge, the Department did not use delegated authority to effectuate any Settlement relief between at least February and July 2026, even where the Department acknowledged that relief was owed to the Class Member and was due or overdue.

69. On July 23, 2026, the Department told PPSL it had begun reviewing delegated authority tasks again. When PPSL asked for the updated standard operating procedures, as they had received in the past, DOJ Counsel refused to provide it.

70. At that meeting, PPSL asked if any of the cases affected by the delegated authority pause had now been resolved. The Department confirmed that none of the cases had been resolved.

71. As of today, at least 17 ARG and Decision Group One members are still awaiting Full Settlement Relief as a result of the suspension of DA task processing.

72. Counsel for the Department did not provide the updated procedure document until August 10, 2026. The updated procedure document reveals that no substantive changes have been made to the Ombudsman's office's delegated authority to direct servicers to issue *Sweet* discharges and refunds, nor to its process of using that authority. Instead, the primary "update" appears to be renaming the role of "Project Specialist" to "Designated Peer Reviewer."

**iii. Administrative Process**

73. As noted above, the Department relied on PPSL to use the Department's data to contact Class Members about the availability of the administrative process for determining refunds on intermediate mixed consolidation loans.

74. The negotiated deadline for ARG, Decision Group One, and Decision Group Two Class Members to request administrative review was March 30, 2025.

75. The negotiated deadline for Decision Group Three Class Members to request administrative review was November 29, 2025.

76. It took until December 2025 for the Department to identify which of the ARG, Decision Group One, and Decision Group Two Class Members who had requested administrative review actually had mixed intermediate consolidation loans and thus were eligible for the administrative process.

77. In total, the Department eventually identified 583 Class Members eligible for the administrative process; 283 with "complicated" cases; and 1,872 who did not have mixed intermediate consolidation loans but would nonetheless receive a manual review of their refunds.

78. At the April 30, 2026, in-person meeting, the Department informed Plaintiffs that it would not use the previously agreed-upon administrative process formula to calculate refund amounts for borrowers with mixed intermediate consolidation loans. The Department explained that it was manually reviewing payment histories instead.

79. Plaintiffs requested more data from the Department about this change in position, including the length of time it would take the Department to perform the new review process and an explanation of whether and how the new process worked when applied to specific borrowers. Plaintiffs also asked for a written explanation of the process that the Department was now following instead of the agreed-upon administrative review process. To this day, the Department has not shared the requested data or the written procedures.

80. To Plaintiffs' knowledge, the Department has not yet directed the issuance of any refund under the administrative review process for any Class Member.

81. Additionally, to Plaintiffs' knowledge, the Department has not started its promised manual review process for Class Members who are not eligible for the administrative process but who disputed their refund amount.

**Inability to Reach Consensus on Curing Breaches**

82. On June 18, 2026, Plaintiffs served on the Department a notice of Plaintiffs' allegations that Defendants are in material breach of the Settlement, due to their failure to deliver Full Settlement Relief by the deadlines to all members of the ARG, Decision Group One, Decision Group Two, Decision Group Three, and Decision Group Four. A true and correct copy of the Notice of Material Breach is appended hereto as **Exhibit 21**.

83. On July 2, 2026, the Department responded to Plaintiffs' Notice and denied the allegations of breach. A true and correct copy of the Department's response is appended hereto as **Exhibit 22**.

84. On July 10, 2026, the parties met and conferred but were unable to reach a consensus on how the Department would effectuate Full Settlement Relief to the affected Class Members in a timely manner.

85. The parties met again on July 23, 2026, for an in-person meeting, and on August 6, 2026, for a virtual Ombuds meeting. The parties did not reach consensus at either of these meetings as to any outstanding issues relating to the allegations of material breach.

86. To Plaintiffs' knowledge, the Department has not been able to solve any of the systemic issues delaying relief for Class Members that Plaintiffs detailed in their Notice of Material Breach.

**Harm to Class Members**

87. In recent weeks, PPSL reached out to several Class Members who, according to data available to PPSL, are still owed Full Settlement Relief despite their relief deadlines passing.

88. Many of the Class Members with whom PPSL spoke have submitted declarations describing the harm they are suffering as a result of the Department's failure to timely deliver their Full Settlement Relief.

89. Those declarations are attached hereto, as follows:

| **Exhibit No.** | **Declaration** |
|---|---|
| 23 | Declaration of Hope Amoh-Adjei |
| 24 | Declaration of Maria Borbon |
| 25 | Declaration of Daniel Conidi |
| 26 | Declaration of Andrew Edgerton |
| 27 | Declaration of Rafael Galaviz |
| 28 | Declaration of Nanette Hronek |
| 29 | Declaration of Crystal Jasper |
| 30 | Declaration of Stella Johnson |
| 31 | Declaration of William Bradley Lamb |
| 32 | Declaration of Teana Liles |
| 33 | Declaration of Loritza Melendez |

| Exhibit No. | Declaration |
|---|---|
| 34 | Declaration of Edmund Michelin |
| 35 | Declaration of Sandra Ogden |
| 36 | Declaration of Candace Perkins |
| 37 | Declaration of Lynne Peters |
| 38 | Declaration of Lisa Riffle |
| 39 | Declaration of Leslie Smith |
| 40 | Declaration of Kiwana Watson |
| 41 | Declaration of Kyle Young |
| 42 | Declaration of Jody Taylor |
| 43 | Declaration of Patty Cobb |
| 44 | Declaration of Jenna Wardner |

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 18, 2026

COOK COUNTY, ILLINOIS

Nicole Camargo Almeida

NICOLE CAMARGO ALMEIDA

# EXHIBIT 1

# November 2024 Sweet Relief

| Sweet Decision Group | Units | Total | % | Decision Group 1 | % | Decision Group 2 | % | Delta |
|---|---|---|---|---|---|---|---|---|
| All | Borrowers | 41,581 | | 31,368 | | 10,213 | | - |
| **Discharge** | | | | | | | | - |
| Complete | Borrowers | 40,973 | 99% | 30,983 | 99% | 9,990 | 98% | 458 |
| Not Complete | Borrowers | 608 | 1% | 385 | 1% | 223 | 2% | (458) |
| **Refunds** | | | | | | | | - |
| Complete | Borrowers | 36,740 | 88% | 27,779 | 89% | 8,961 | 88% | 1,327 |
| Not Complete | Borrowers | 4,841 | 12% | 3,589 | 11% | 1,252 | 12% | (1,327) |
| **Discharge & Refunds** | | | | | | | | - |
| Complete | Borrowers | 36,195 | 87% | 27,426 | 87% | 8,769 | 86% | 1,605 |
| Not Complete | Borrowers | 5,386 | 13% | 3,942 | 13% | 1,444 | 14% | (1,605) |
| | | | | | | | | - |
| | | | | | | | | - |

| Discharges (Details) | Units | Total | % | DG1 | % | DG2 | % | |
|---|---|---|---|---|---|---|---|---|
| All | Loans | 227,593 | 100% | 169,011 | 100% | 58,582 | 100% | (52) |
| Discharged ($0) | Loans | 226,441 | 99% | 168,280 | 100% | 58,161 | 99% | 1,065 |
| Not Discharged (>$0) | Loans | 1,152 | 1% | 731 | 0% | 421 | 1% | (1,117) |
| Outstanding | Balance | $18,885,359 | | $11,784,716 | | $7,100,643 | | (12,236,240) |
| **Payments (Details)** | **Units** | **Total** | **%** | **DG1** | **%** | **DG2** | **%** | |
| Paid (All) | Payments | $105,967,725 | 100% | $78,766,485 | 100% | $27,201,240 | 100% | (129,603) |
| Paid (Sweet Only) | Payments | $91,482,737 | 86.3% | $69,906,649 | 88.8% | $21,576,088 | 79.3% | (29,917) |
| Paid (Mix Term) | Payments | $11,061,410 | 10.4% | $6,570,095 | 8.3% | $4,491,315 | 16.5% | (3,186,062) |
| Paid (Mix Nonterm) | Payments | $3,423,579 | 3.2% | $2,289,742 | 2.9% | $1,133,837 | 4.2% | 3,086,376 |
| Paid (Refundable) | Payments | $105,546,325 | 99.6% | $78,433,176 | 99.6% | $27,113,149 | 99.7% | (213,800) |
| **Refunds (Details)** | **Units** | **Total** | **%** | **DG1** | **%** | **DG2** | **%** | |
| Refunds (Paid) | Refunds | $136,699,824 | | $106,947,035 | | $29,752,789 | | 3,328,822 |
| Refunds (Owed) | Refunds | $16,335,085 | 15% | $9,707,525 | 12% | $6,627,560 | 24% | (2,084,387) |
| Refunds (WIP) | Refunds | $2,998,991 | 3% | $1,674,518 | 2% | $1,324,473 | 5% | (749,012) |
| Refunds (Still Owed) | Refunds | $14,372,904 | 14% | $8,702,801 | 11% | $5,670,103 | 21% | (1,451,552) |

# November 2024 Sweet Relief

| Discharges | Total Loans | Open Loans | % | Open (DG1) | en (DG | |
|---|---|---|---|---|---|---|
| **MOHELA** | 10,607 | 28 | 0% | 13 | 15 | (469) |
| **EdFinancial** | 23,147 | 14 | 0% | 14 | - | 8 |
| **ECSI** | 18 | - | 0% | - | - | (2) |
| **DMCS** | 27,043 | 366 | 1% | 231 | 135 | (637) |
| **AidVantage** | 50,852 | 10 | 0% | 6 | 4 | (8) |
| **Nelnet** | 74,844 | 11 | 0% | 5 | 6 | (1) |
| **FFEL** | 40,897 | 723 | 2% | 462 | 261 | (8) |
| **TOTAL** | **227,408** | **1,152** | 1% | **731** | **421** | (1,117) |

| Refunds | Total Borro | Refund Owed | % | Open (DG1) | en (DG |
|---|---|---|---|---|---|
| EdFinancial | 4,847 | 696 | 14% | 526 | 170 |
| MOHELA | 2,197 | 512 | 23% | 314 | 198 |
| ECSI | 1 | 1 | 100% | 1 | - |
| DMCS | 7,711 | 622 | 8% | 412 | 210 |
| AidVantage | 9,274 | 1,299 | 14% | 1,021 | 278 |
| Nelnet | 15,462 | 1,698 | 11% | 1,310 | 388 |
| **TOTAL** | **39,492** | **4,828** | 12% | **3,584** | **###** |

# November 2024 Sweet Relief

| DRAFT WORKING DOCUMENT (11/05/24 0700) | Any Sweet | Mixed | Sweet Only | |
|---|---|---|---|---|
| **Total Borrowers** | **195,993** | **40,319** | **155,674** | |
| | | | | |
| **Discharge Confirmed (per NSLDS)** | **195,616** | **40,257** | **155,359** | 26 |
| **Discharge Confirmed (%)** | **99.8%** | **99.8%** | **99.8%** | 0 |
| Balance = $1/loan | 48 | 13 | 35 | 19 |
| **Discharge Likely Complete (#)** | **195,664** | **40,270** | **155,394** | 45 |
| **Discharge Likely Complete (%)** | **99.8%** | **99.9%** | **99.8%** | 0 |
| | | | | - |
| **Refunds Confirmed (per FMS)** | **194,706** | **39,954** | **154,752** | (76) |
| **Refunds Confirmed (%)** | **99.34%** | **99.09%** | **99.41%** | (0) |
| Refund Processing (per FMS WIP) | 128 | 68 | 60 | 5 |
| Refund Instructions Sent | 1,087 | 286 | 801 | 31 |
| **Refunds Confirmed or Instructions Sent (#)** | **195,921** | **40,308** | **155,613** | (40) |
| **Refunds Confirmed or Instructions Sent (%)** | **99.96%** | **99.97%** | **99.96%** | (0) |
| | | | | - |
| **Discharge & Refunds Confirmed** | **194,337** | **39,894** | **154,443** | (53) |
| **Discharge Refunds Confirmed (%)** | **99.2%** | **99%** | **99%** | (0) |
| Discharge Confirmed & Refund Processing (FMS WIP) | 128 | 68 | 60 | 6 |
| Discharge Confirmed & Refund Instructions Sent | 1,085 | 285 | 800 | 33 |
| **Discharge & Refunds Confirmed or Instructions Sent (#)** | **195,550** | **40,247** | **155,303** | (14) |
| **Discharge & Refunds Confirmed or Instructions Sent (%)** | **99.8%** | **99.8%** | **99.8%** | (0) |
| | | | | - |
| **Remaining Borrowers:** | | | | - |
| Discharge Only | 369 | 60 | 309 | (23) |
| Discharge & Refunds | 8 | 2 | 6 | (3) |
| Refunds Only | 66 | 10 | 56 | 40 |
| **Remaining Borrowers (#)** | **443** | **72** | **371** | 14 |
| **Remaining Borrowers (%)** | 0.2% | 0.2% | 0.2% | |
| | | | | |

| | | |
|---|---|---|
| 195,993 | 40,319 | 155,674 |
| - | - | - |

November 2024 Sweet Relief

| Open Loans (Exhibit C) | 11/5/2024 | |
|---|---|---|
| **MOHELA** | 29 | 12 |
| **EdFinancial** | 29 | 17 |
| **DMCS** | 259 | (90) |
| **AidVantage** | 12 | - |
| **Nelnet** | 25 | 8 |
| **Other ED** | 40 | - |
| **Commercial FFEL** | 293 | 100 |
| **TOTAL** | **687** | 47 |

| Refunds Owed (Exhibit C) | Owed | FMS WIP | Lump Sum | |
|---|---|---|---|---|
| **MOHELA** | 566 | 108 | 458 | 81% |
| **EdFinancial** | 64 | 13 | 51 | 80% |
| **DMCS** | 394 | 3 | 391 | 99% |
| **AidVantage** | 108 | 2 | 106 | 98% |
| **Nelnet** | 153 | 2 | 151 | 99% |
| **Commercial FFEL** | 2 | - | 2 | 100% |
| Total | **1,287** | **128** | **1,159** | 90% |

# January 2025 Sweet Relief

| Sweet Decision Group | Units | Total | % | Decision Group 1 | % | Decision Group 2 | % |
|---|---|---|---|---|---|---|---|
| All | Borrowers | 41,581 | | 31,368 | | 10,213 | |
| **Discharge** | | | | | | | |
| Complete | Borrowers | 41,089 | 99% | 31,037 | 99% | 10,052 | 98% |
| Not Complete | Borrowers | 492 | 1% | 331 | 1% | 161 | 2% |
| **Refunds** | | | | | | | |
| Complete | Borrowers | 40,737 | 98% | 30,870 | 98% | 9,867 | 97% |
| Not Complete | Borrowers | 844 | 2% | 498 | 2% | 346 | 3% |
| **Discharge & Refunds** | | | | | | | |
| Complete | Borrowers | 40,303 | 97% | 30,574 | 97% | 9,729 | 95% |
| Not Complete | Borrowers | 1,278 | 3% | 794 | 3% | 484 | 5% |

| Discharges (Details) | Units | Total | % | DG1 | % | DG2 | % |
|---|---|---|---|---|---|---|---|
| All | Loans | 227,604 | 100% | 169,014 | 100% | 58,590 | 100% |
| Discharged ($0) | Loans | 226,777 | 100% | 168,442 | 100% | 58,335 | 100% |
| Not Discharged (>$0) | Loans | 827 | 0% | 572 | 0% | 255 | 0% |
| Outstanding | Balance | $14,060,948 | | $9,223,507 | | $4,837,441 | |
| **Payments (Details)** | **Units** | **Total** | **%** | **DG1** | **%** | **DG2** | **%** |
| Paid (All) | Payments | $107,551,725 | 100% | $79,694,485 | 100% | $27,857,239 | 100% |
| Paid (Sweet Only) | Payments | $93,183,410 | 86.6% | $70,857,131 | 88.9% | $22,326,280 | 80.1% |
| Paid (Mix Term) | Payments | $14,083,219 | 13.1% | $8,639,830 | 10.8% | $5,443,389 | 19.5% |
| Paid (Mix Nonterm) | Payments | $285,095 | 0.3% | $197,524 | 0.2% | $87,571 | 0.3% |
| Paid (Refundable) | Payments | $107,266,630 | 99.7% | $79,496,961 | 99.8% | $27,769,669 | 99.7% |
| **Refunds (Details)** | **Units** | **Total** | **%** | **DG1** | **%** | **DG2** | **%** |
| Refunds (Paid) | Refunds | $152,864,656 | | $116,875,371 | | $35,989,285 | |
| Refunds (Owed) | Refunds | $3,495,970 | 3% | $1,952,340 | 2% | $1,543,630 | 6% |
| Refunds (WIP) | Refunds | $3,116,709 | 3% | $1,748,248 | 2% | $1,368,461 | 5% |
| Refunds (Still Owed) | Refunds | $1,622,247 | 2% | $909,946 | 1% | $712,301 | 3% |

| Discharges | Total Loans | Open | % | Open (DG1) | | Open (DG2) |
|---|---|---|---|---|---|---|
| **MOHELA** | 10,612 | 73 | 1% | 56 | | 17 |
| **EdFinancial** | 23,150 | 21 | 0% | 20 | | 1 |
| **ECSI** | 19 | 1 | 5% | 1 | | - |
| **DMCS** | 27,038 | 191 | 1% | 125 | | 66 |
| **AidVantage** | 50,864 | 21 | 0% | 14 | | 7 |
| **Nelnet** | 74,842 | 16 | 0% | 11 | | 5 |
| **FFEL** | 40,894 | 504 | 1% | 345 | | 159 |
| **TOTAL** | **227,419** | **827** | 0% | **572** | | **255** |

| Refunds | Total Borrowers | Refund Owed | % | Open (DG1) | | Open (DG2) | |
|---|---|---|---|---|---|---|---|
| EdFinancial | 4,847 | 16 | 0% | 10 | | 6 | 507 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MOHELA | 2,197 | 503 | 23% | 307 | | 196 | 512 |
| ECSI | 1 | 1 | 100% | 1 | | - | 529 |
| DMCS | 7,711 | 246 | 3% | 132 | | 114 | 556 |
| AidVantage | 9,274 | 18 | 0% | 10 | | 8 | 578 |
| Nelnet | 15,462 | 50 | 0% | 33 | | 17 | 580 |
| **TOTAL** | **39,492** | **834** | 2% | **493** | | **341** | |

# January 2025 Sweet Relief

| DRAFT WORKING DOCUMENT (12/24/24 0700) | Any Sweet | Mixed | Sweet Only | Delta |
|---|---|---|---|---|
| **Total Borrowers** | **195,993** | **41,555** | **154,438** | |
| | | | | |
| **Discharge Confirmed (per NSLDS)** | **195,640** | **41,481** | **154,159** | 148 |
| **Discharge Confirmed (%)** | **99.8%** | **99.8%** | **99.8%** | 0 |
| Balance = $1/loan | 57 | 21 | 36 | 2 |
| **Discharge Likely Complete (#)** | **195,697** | **41,502** | **154,195** | 150 |
| **Discharge Likely Complete (%)** | **99.8%** | **99.9%** | **99.8%** | 0 |
| | | | | - |
| **Refunds Confirmed (per FMS)** | **194,955** | **41,278** | **153,677** | 8 |
| **Refunds Confirmed (%)** | **99.47%** | **99.33%** | **99.51%** | 0 |
| Refund Processing (per FMS WIP) | 405 | 177 | 228 | 382 |
| Refund Instructions Sent | 586 | 96 | 490 | (380) |
| **Refunds Confirmed or Instructions Sent (#)** | **195,946** | **41,551** | **154,395** | 10 |
| **Refunds Confirmed or Instructions Sent (%)** | **99.98%** | **99.99%** | **99.97%** | 0 |
| | | | | - |
| **Discharge & Refunds Confirmed** | **194,609** | **41,205** | **153,404** | 156 |
| **Discharge Refunds Confirmed (%)** | **99.3%** | **99%** | **99%** | 0 |
| Discharge Confirmed & Refund Processing (FMS WIP) | 403 | 177 | 226 | 380 |
| Discharge Confirmed & Refund Instructions Sent | 585 | 96 | 489 | (380) |
| **Discharge & Refunds Confirmed or Instructions Sent (#)** | **195,597** | **41,478** | **154,119** | 156 |
| **Discharge & Refunds Confirmed or Instructions Sent (%)** | **99.8%** | **99.8%** | **99.8%** | 0 |
| | | | | - |
| **Remaining Borrowers:** | | | | - |
| Discharge Only | 346 | 73 | 273 | (148) |
| Discharge & Refunds | 7 | 1 | 6 | - |
| Refunds Only | 43 | 3 | 40 | (8) |
| **Remaining Borrowers (#)** | **396** | **77** | **319** | (156) |
| **Remaining Borrowers (%)** | 0.2% | 0.2% | 0.2% | (0) |
| | | | | - |
| | | | | - |
| | | | | - |

| Open Loans (Exhibit C) | 12/16/2024 | All Loans | Complete | |
|---|---|---|---|---|
| **MOHELA** | 49 | 112,444 | 99.96% | (25) |
| **EdFinancial** | 29 | 148,682 | 99.98% | (34) |
| **DMCS** | 339 | 117,567 | 99.71% | - |
| **AidVantage** | 9 | 431,142 | 100.00% | (63) |
| **Nelnet** | 31 | 607,279 | 99.99% | - |
| **Other ED** | 40 | 529 | 92.44% | - |
| **Commercial FFEL** | 173 | 407,090 | 99.96% | (7) |
| **TOTAL** | **670** | **1,824,733** | 99.96% | (129) |

| Refunds Owed (Exhibit C) | Owed | Elig | Complete | FMS WIP | Lump Sum | |
|---|---|---|---|---|---|---|
| **MOHELA** | 500 | 14,342 | 96.51% | 390 | 110 | (1) |
| **EdFinancial** | 40 | 15,006 | 99.73% | 9 | 31 | (5) |
| **DMCS** | 350 | 14,554 | 97.60% | 4 | 346 | (2) |
| **AidVantage** | 18 | 32,074 | 99.94% | - | 18 | 2 |
| **Nelnet** | 128 | 43,747 | 99.71% | 2 | 126 | (2) |
| **Commercial FFEL** | 2 | 24 | 91.67% | - | 2 | - |
| Total | **1,038** | **119,747** | 99.13% | **405** | **633** | (8) |

| | | |
|---|---|---|
| 195,993 | 41,555 | 154,438 |
| - | - | - |

# January 2025 Sweet Relief

| | Total | | Exhibit_C | Sweet Group 1 | Sweet Group 2 |
|---|---|---|---|---|---|
| **Total Refunds Owed** | **1,882** | | **1,038** | **498** | **346** |
| WIP Completes Refund | 847 | 45% | 405 | 275 | 167 |
| Owed Additional Refunds | 1,035 | 55% | 633 | 223 | 179 |
| | | | | | |
| Discharge Complete | 1,817 | **97%** | 1,031 | 463 | 323 |
| Discharge Not complete | 65 | **3%** | 7 | 35 | 23 |

| | Total Refunds Owed | Total | | Exhibit_C | 1 | 2 |
|---|---|---|---|---|---|---|
| **507** | **EdFinancial** | 56 | 3% | 40 | 10 | 6 |
| **512** | **MOHELA** | 1,003 | 53% | 500 | 307 | 196 |
| **529** | **ECSI** | 1 | 0% | - | 1 | - |
| **556** | **DMCS** | 596 | 32% | 350 | 132 | 114 |
| **578** | **AIdVantage** | 36 | 2% | 18 | 10 | 8 |
| **580** | **Nelnet** | 178 | 9% | 128 | 33 | 17 |
| **FFEL** | | 12 | 1% | 2 | 5 | 5 |
| | **Total** | **1,882** | | **1,038** | **498** | **346** |

| | WIP Completes Refund | Total | | Exhibit_C | 1 | 2 |
|---|---|---|---|---|---|---|
| **507** | **EdFinancial** | 9 | 1% | 9 | - | - |
| **512** | **MOHELA** | 813 | 79% | 390 | 267 | 156 |
| **529** | **ECSI** | - | 0% | - | - | - |
| **556** | **DMCS** | 14 | 1% | 4 | 4 | 6 |
| **578** | **AIdVantage** | - | 0% | - | - | - |
| **580** | **Nelnet** | 11 | 1% | 2 | 4 | 5 |
| **FFEL** | | - | 0% | - | - | - |
| | **Total** | **847** | | **405** | **275** | **167** |
| | | 45% | | 39% | 55% | 48% |

| | Owed Additional Refunds | Total | | Exhibit_C | 1 | 2 |
|---|---|---|---|---|---|---|
| **507** | **EdFinancial** | 47 | 5% | 31 | 10 | 6 |
| **512** | **MOHELA** | 190 | 18% | 110 | 40 | 40 |
| **529** | **ECSI** | 1 | 0% | - | 1 | - |
| **556** | **DMCS** | 582 | 56% | 346 | 128 | 108 |
| **578** | **AidVantage** | 36 | 3% | 18 | 10 | 8 |
| **580** | **Nelnet** | 167 | 16% | 126 | 29 | 12 |
| **FFEL** | | 12 | 1% | 2 | 5 | 5 |
| | **Total** | **1,035** | | **633** | **223** | **179** |
| | | 55% | | 61% | 45% | 52% |

# February 2025 Sweet Relief

| 19/2025 | | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % |
|---|---|---|---|---|---|---|---|
| | ALL | 195,993 | | 31,368 | | 10,213 | |
| | Discharge & Refunds | | | | | | |
| | Complete | 195,151 | 99.6% | 30,950 | 98.7% | 9,940 | 97.3% |
| | Not Complete | 842 | 0.4% | 418 | 1.3% | 273 | 2.7% |
| | Delta | 167 | | 55 | | 30 | |

| 2/19/2025 | Exhibit C Borrowers | Units | All Exhibit C | % | Mixed | % | Sweet Only | % | Delta |
|---|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | 41,561 | | 154,432 | | |
| | Discharge | | | | | | | | |
| | Complete | Borrowers | 195,726 | 99.9% | 41,497 | 99.8% | 154,229 | 99.9% | 122 |
| | Not Complete | Borrowers | 267 | 0.1% | 64 | 0.2% | 203 | 0.1% | (122) |
| | Refunds | | | | | | | | |
| | Complete | Borrowers | 195,413 | 99.7% | 41,468 | 99.8% | 153,945 | 99.7% | 47 |
| | Not Complete | Borrowers | 580 | 0.3% | 93 | 0.2% | 487 | 0.3% | (47) |
| | Discharge & Refunds | | | | | | | | |
| | Complete | Borrowers | 195,151 | 99.6% | 41,406 | 99.6% | 153,745 | 99.6% | 167 |
| | Not Complete | Borrowers | 842 | 0.4% | 155 | 0.4% | 687 | 0.4% | (167) |

| | Open Loans | All Loans | Complete | | |
|---|---|---|---|---|---|
| MOHELA | 50 | 112,444 | 99.96% | - | 11% |
| EdFinancial | 21 | 148,682 | 99.99% | 11 | 5% |
| DMCS | 128 | 117,567 | 99.89% | 185 | 29% |
| AidVantage | 8 | 431,142 | 100.00% | 2 | 2% |
| Nelnet | 30 | 607,279 | 100.00% | 49 | 7% |
| Other ED | 40 | 529 | 92.44% | - | 9% |
| Commercial FFEL | [illegible]3 | 407,211 | 99.96% | 5 | 37% |
| TOTAL | 440 | 1,824,854 | 99.98% | 252 | |

DA

| Refunds Owed (Exhibit C) | Owed | Elig | Complete | Lump Sum | | |
|---|---|---|---|---|---|---|
| MOHELA | 76 | 14,327 | 99.47% | 52 | 10 | 13% |
| EdFinancial | 19 | 14,998 | 99.87% | 16 | 19 | 3% |
| DMCS | 345 | 14,544 | 97.63% | 341 | - | 59% |
| AidVantage | 15 | 32,031 | 99.95% | 11 | 11 | 3% |
| Nelnet | 123 | 43,709 | 99.72% | 123 | 7 | 21% |
| Commercial FFEL | 2 | 24 | 91.67% | 2 | - | 0% |
| Total | 580 | 119,633 | 99.52% | 545 | 47 | |

# February 2025 Sweet Relief

| 2/19/2025 | Sweet Decision Group | Units | Total | % | Decision Group 1 | % | Decision Group 2 | % | Delta |
|---|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 41,581 | | 31,368 | | 10,213 | | - |
| | **Discharge** | | | | | | | | - |
| | Complete | Borrowers | 41,[illegible]5 | 99.0% | 31,106 | 99.2% | 10,079 | 98.7% | 61 |
| | Not Complete | Borrowers | 396 | 1.0% | 262 | 0.8% | 134 | 1.3% | (61) |
| | **Refunds** | | | | | | | | - |
| | Complete | Borrowers | 41,247 | 99.2% | 31,187 | 99.4% | 10,060 | 98.5% | 36 |
| | Not Complete | Borrowers | 334 | 0.8% | 181 | 0.6% | 153 | 1.5% | (36) |
| | **Discharge & Refunds** | | | | | | | | - |
| | Complete | Borrowers | 40,890 | 98.3% | 30,950 | 98.7% | 9,940 | 97.3% | 85 |
| | Not Complete | Borrowers | 691 | 1.7% | 418 | 1.3% | 273 | 2.7% | (85) |
| | | | | | | | | | - |

| Discharges | Total Loans | Open | % Complete | Open (DG1) | | Open (DG2) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | - | |
| MOHELA | 10,624 | 76 | 99.28% | 56 | [redacted] | 20 | [redacted] | (2) | 12% |
| EdFinancial | 23,161 | 37 | 99.84% | 34 | [redacted] | 3 | [redacted] | 3 | 6% |
| ECSI | 19 | 1 | 94.74% | 1 | [redacted] | - | [redacted] | - | 0% |
| DMCS | 27,036 | 114 | 99.58% | 82 | [redacted] | 32 | [redacted] | (77) | 18% |
| AidVantage | 50,877 | 37 | 99.93% | 24 | [redacted] | 13 | [redacted] | 4 | 6% |
| Nelnet | 74,814 | 19 | 99.97% | 13 | [redacted] | 6 | [redacted] | (13) | 3% |
| FFEL | 40,889 | 349 | 99.15% | 221 | [redacted] | 128 | [redacted] | (46) | 55% |
| **TOTAL** | **227,420** | **633** | 99.72% | **431** | [redacted] | **202** | [redacted] | (131) | |

| 2/19/2025 | Sweet Decision Group | Units | Total | % | Decision Group 1 | % | Decision Group 2 | % | Delta | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FFEL | 40,889 | 349 | 99.15% | 221 | [redacted] | 128 | [redacted] | (46) | | 55% |
| | **TOTAL** | **227,420** | **633** | 99.72% | **431** | [redacted] | **202** | [redacted] | (131) | | |
| | | | | | | | | | - | | |
| | **Refunds** | **Total Borrowers** | **Refund Owed** | **% Complete** | **Open (DG1)** | | **Open (DG2)** | | | | |
| 507 | EdFinancial | 4,847 | 17 | 99.65% | 12 | [redacted] | 5 | [redacted] | - | | 5% |
| 512 | MOHELA | 2,197 | 52 | 97.63% | 23 | [redacted] | 29 | [redacted] | (5) | | 16% |
| 529 | ECSI | 1 | 1 | 0.00% | 1 | [redacted] | 0 | [redacted] | - | | 0% |
| 556 | DMCS | 7,711 | 211 | 97.26% | 109 | [redacted] | 102 | [redacted] | (14) | | 65% |
| 578 | AidVantage | 9,274 | 2 | 99.98% | 1 | [redacted] | 1 | [redacted] | (16) | | 1% |
| 580 | Nelnet | 15,462 | 41 | 99.73% | 30 | [redacted] | 11 | [redacted] | (1) | | 13% |
| | **TOTAL** | **39,492** | **324** | 99.18% | **176** | [redacted] | **148** | [redacted] | (36) | | |
| | | | | | | | | | - | | |

# April 2025 Sweet Relief

| 3/31/2025 - 4/1/2025 | | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | Attestation Borrowers | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | All | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 1,480 | |
| | Discharge & Refunds | | | | | | | | | | |
| | Complete | 194,948 | 99.5% | 30,864 | 98.4% | 9,931 | 97.2% | 10,013 | 82.6% | 1,170 | 79.1% |
| | Not Complete | 1,045 | 0.5% | 504 | 1.6% | 282 | 2.8% | 2,115 | 17.4% | 310 | 20.9% |
| | Delta | (203) | | (86) | | (9) | | n/a | | n/a | |

| 3/31/2025 | Exhibit C Borrowers | Units | All Exhibit C | % | Mixed | % | Sweet Only | % | Delta |
|---|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | 41,567 | | 154,426 | | |
| | Discharge | | | | | | | | |
| | Complete | Borrowers | 195,618 | 99.8% | 41,467 | 99.8% | 154,151 | 99.8% | (108) |
| | Not Complete | Borrowers | 375 | 0.2% | 100 | 0.2% | 275 | 0.2% | 108 |
| | Refunds Exceed Payments* | | | | | | | | |
| | Complete | Borrowers | 195,314 | 99.7% | 41,456 | 99.7% | 153,858 | 99.6% | (99) |
| | Not Complete | Borrowers | 679 | 0.3% | 111 | 0.3% | 568 | 0.4% | 99 |
| | Discharge & Refunds* | | | | | | | | |
| | Complete | Borrowers | 194,948 | 99.5% | 41,360 | 99.5% | 153,588 | 99.5% | (203) |
| | Not Complete | Borrowers | 1,045 | 0.5% | 207 | 0.5% | 838 | 0.5% | 203 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

# April 2025 Sweet Relief

Discharges

| Servicer | Total Loans | Open | % Complete |
|---|---|---|---|
| MOHELA | 112,422 | 38 | 99.97% |
| EdFinancial | 148,645 | 14 | 99.99% |
| DMCS | 121,276 | 221 | 99.82% |
| AidVantage | 427,319 | 400 | 99.91% |
| Nelnet | 607,851 | 112 | 99.98% |
| Commercial FFEL* | 409,332 | 130 | 99.97% |
| Consolidated Perkins* | 8,049 | - | 100.00% |
| Other ED* | - | - | NA |
| **Total** | **1,834,894** | **915** | **99.95%** |

*For Commercial FFEL, mixed consolidation loans are excluded from the "open"

Refunds

| Servicer | Refund Eligible | Refund Owed | % Complete |
|---|---|---|---|
| MOHELA | 14,352 | 82 | 99.43% |
| EdFinancial | 15,022 | 23 | 99.85% |
| DMCS | 14,797 | 354 | 97.61% |
| AidVantage | 32,164 | 61 | 99.81% |
| Nelnet | 44,173 | 156 | 99.65% |
| Commercial FFEL* | 26 | 3 | 88.46% |
| **Total** | **120,534** | **679** | **99.44%** |

*Borrowers with multiple servicers are assigned to the servicer which holds the borrower's most loans in the above chart. Borrowers who appear as eligible for refunds but assigned to a Commercial FFEL lender will require further review.

| 3/31/2025 | Sweet Decision Group | Units | Total | % | Decision Group 1 | % | Decision Group 2 | % | Delta (2/19) |
|---|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 41,581 | | 31,368 | | 10,213 | | |
| | **Discharge** | | | | | | | | |
| | Complete | Borrowers | 41,239 | 99.2% | 31,143 | 99.3% | 10,096 | 98.9% | 54 |
| | Not Complete | Borrowers | 342 | 0.8% | 225 | 0.7% | 117 | 1.1% | (54) |
| | **Refunds Exceed Payments*** | | | | | | | | |
| | Complete | Borrowers | 41,115 | 98.9% | 31,075 | 99.1% | 10,040 | 98.3% | (132) |
| | Not Complete | Borrowers | 466 | 1.1% | 293 | 0.9% | 173 | 1.7% | 132 |
| | **Discharge & Refunds*** | | | | | | | | |
| | Complete | Borrowers | 40,795 | 98.1% | 30,864 | 98.4% | 9,931 | 97.2% | (95) |
| | Not Complete | Borrowers | 786 | 1.9% | 504 | 1.6% | 282 | 2.8% | 95 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

April 2025 Sweet Relief

Discharges

| Servicer | Total Loans | Open | % Complete |
|---|---|---|---|
| MOHELA | 10,630 | 57 | 99.46% |
| EdFinancial | 23,163 | 6 | 99.97% |
| ECSI | 19 | 1 | 94.74% |
| DMCS | 27,462 | 55 | 99.80% |
| AidVantage | 50,462 | 62 | 99.88% |
| Nelnet | 74,864 | 25 | 99.97% |
| Commercial FFEL* | 40,888 | 337 | 99.18% |
| **Total** | **227,488** | **543** | **99.76%** |

*For Commercial FFEL, mixed consolidation loans are excluded from the "open" cat

Refunds

| Servicer | Refund Eligible | Refund Owed | % Complete |
|---|---|---|---|
| EdFinancial | 2,696 | 19 | 99.30% |
| MOHELA | 1,193 | 61 | 94.89% |
| ECSI | 1 | 1 | 0.00% |
| DMCS | 5,724 | 327 | 94.29% |
| AidVantage | 5,332 | 9 | 99.83% |
| Nelnet | 7,349 | 38 | 99.48% |
| Commercial FFEL* | 17 | 11 | 35.29% |
| **Total** | **22,312** | **466** | **97.91%** |

*Borrowers with multiple servicers are assigned to the servicer which

| 4/1/2025 | Sweet Decision Group | Units | Decision Group 3 | % | Attestation Groups (Exhibit C) | % |
|---|---|---|---|---|---|---|
| | All | Borrowers | 12,128 | | 1,480 | |
| | **Discharge** | | | | | |
| | Complete | Borrowers | 11,470 | 94.60% | 1,370 | 92.60% |
| | Not Complete | Borrowers | 658 | 5.40% | 110 | 7.40% |
| | **Refunds Exceed Payments**** | | | | | |
| | Complete | Borrowers | 10,486 | 86.50% | 1,274 | 86.10% |
| | Not Complete | Borrowers | 1,642 | 13.50% | 206 | 13.90% |
| | **Discharge & Refunds**** | | | | | |
| | Complete | Borrowers | 10,013 | 82.60% | 1,170 | 79.10% |
| | Not Complete | Borrowers | 2,115 | 17.40% | 310 | 20.90% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 6/2/2025 | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % |
|---|---|---|---|---|---|---|---|---|
| All | 195,993 | | 31,368 | | 10,213 | | 12,128 | |
| Discharge & Refunds | | | | | | | | |
| Complete | 194,373 | 99.2% | 30,767 | 98.1% | 9,915 | 97.1% | 10,736 | 88.5% |
| Not Complete | 1,620 | 0.8% | 601 | 1.9% | 298 | 2.9% | 1,392 | 11.5% |
| Delta | (695) | | (101) | | 6 | | 189 | |

| 6/2/2025 Sweet Decision Group | Units | Decision Group 3 | % | Delta DG3 |
|---|---|---|---|---|
| All | Borrowers | 12,128 | | - |
| **Discharge** | | | | |
| Complete | Borrowers | 11,650 | 96.1% | 39 |
| Not Complete | Borrowers | 478 | 3.9% | (39) |
| **Refunds Exceed Payments**** | | | | |
| Complete | Borrowers | 11,120 | 91.7% | 166 |
| Not Complete | Borrowers | 1,008 | 8.3% | (166) |
| **Discharge & Refunds**** | | | | |
| Complete | Borrowers | 10,736 | 88.5% | 189 |
| Not Complete | Borrowers | 1,392 | 11.5% | (189) |

Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| rowers | Units | All Exhibit C | % | Mixed | % | Sweet Only | % | Delta (5/7) |
|---|---|---|---|---|---|---|---|---|
| | Borrowers | 195,993 | | 41,560 | | 154,433 | | |
| ge | | | | | | | | |
| :e | Borrowers | 195,744 | 99.9% | 41,493 | 99.8% | 154,251 | 99.9% | 13 |
| ıplete | Borrowers | 249 | 0.1% | 67 | 0.2% | 182 | 0.1% | (13) |
| Exceed Payments* | | | | | | | | |
| :e | Borrowers | 194,614 | 99.3% | 41,345 | 99.5% | 153,269 | 99.2% | (712) |
| ıplete | Borrowers | 1,379 | 0.7% | 215 | 0.5% | 1,164 | 0.8% | 712 |
| ;e & Refunds* | | | | | | | | |
| :e | Borrowers | 194,373 | 99.2% | 41,280 | 99.3% | 153,093 | 99.1% | (695) |
| ıplete | Borrowers | 1,620 | 0.8% | 280 | 0.7% | 1,340 | 0.9% | 695 |

ılete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and
l mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was
determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered

August 2025 Sweet Relief




CONTROLLED UNCLASSIFIED INFORMATION

| 025 | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % |
|---|---|---|---|---|---|---|---|---|
| All | 195,993 | | 31,368 | | 10,213 | | 12,128 | |
| Discharge & Refunds | | | | | | | | |
| Complete | 193,398 | 98.7% | 30,935 | 98.6% | 9,995 | 97.9% | 11,857 | 97.8% |
| Not Complete | 2,595 | 1.3% | 433 | 1.4% | 218 | 2.1% | 271 | 2.2% |
| Delta | 111 | | 120 | | 70 | | 1,058 | |




**Preliminary Aggregate DG5 Outcome Data**

| | Case Count | Percent |
|---|---|---|
| Initial Sweet Relief | 30700 | 85% |
| Non-Sweet Approval | 1000 | 3% |
| Revise and Re-submit | 4200 | 12% |
| Closed without Decision Notification | 400 | 1% |
| | 36300 | |




**Preliminary Aggregate DG5 Outcome Data**

| | Case Count | Percent |
|---|---|---|
| Initial Sweet Relief | 30700 | 85% |
| Non-Sweet Approval | 1000 | 3% |
| Revise and Re-submit | 4200 | 12% |
| Closed without Decision Notification | 400 | 1% |
| | 36300 | |

CONTROLLED UNCLASSIFIED INFORMATION

| | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % |
|---|---|---|---|---|---|---|---|---|
| **All** | 195,993 | | 31,368 | | 10,213 | | 12,128 | |
| **Discharge & Refunds** | | | | | | | | |
| Complete | 195,467 | 99.7% | 30,940 | 98.6% | 9,997 | 97.9% | 11,888 | 98.0% |
| Not Complete | 526 | 0.3% | 428 | 1.4% | 216 | 2.1% | 240 | 2.0% |
| Delta | 2,069 | | 5 | | 2 | | 31 | |

**12/1/2025**

| | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | DG 4 Borrowers | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **All** | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 8,521 | |
| **Discharge & Refunds** | | | | | | | | | | |
| Complete | 195,486 | **99.7%** | 30,945 | **98.7%** | 9,996 | **97.9%** | 11,952 | **98.5%** | 7,798 | **91.5%** |
| Not Complete | 507 | **0.3%** | 423 | **1.3%** | 217 | **2.1%** | 176 | **1.5%** | 723 | **8.5%** |
| Delta | 19 | | 5 | | (1) | | 64 | | n/a | |

| 12/1/2025 | Exhibit C | Units | All | % | Delta |
|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | |
| | **Discharge** | | | | |
| | Complete* | Borrowers | 195,758 | 99.9% | 17 |
| | Not Complete | Borrowers | 235 | 0.1% | (17) |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 195,714 | 99.9% | 3 |
| | Not Complete | Borrowers | 279 | 0.1% | (3) |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 195,486 | 99.7% | 19 |
| | Not Complete | Borrowers | 507 | 0.3% | (19) |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 12/1/2025 | Sweet Decision Group | Units | DG1 | % | DG2 | % | Delta DG1 | Delta DG2 |
|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 31,368 | | 10,213 | | | |
| | **Discharge** | | | | | | | |
| | Complete | Borrowers | 31,319 | **99.8%** | 10,186 | **99.7%** | (5) | (2) |
| | Not Complete | Borrowers | 49 | **0.2%** | 27 | **0.3%** | 5 | 2 |
| | **Refunds Exceed Payments**** | | | | | | | |
| | Complete | Borrowers | 30,991 | **98.8%** | 10,022 | **98.1%** | 10 | 1 |
| | Not Complete | Borrowers | 377 | **1.2%** | 191 | **1.9%** | (10) | (1) |
| | **Discharge & Refunds**** | | | | | | | |
| | Complete | Borrowers | 30,945 | **98.7%** | 9,996 | **97.9%** | 5 | (1) |
| | Not Complete | Borrowers | 423 | **1.3%** | 217 | **2.1%** | (5) | 1 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 12/1/2025 | Sweet Decision Group | Units | Decision Group 3 | % | Delta DG3 |
|---|---|---|---|---|---|
| | All | Borrowers | 12,128 | | - |
| | **Discharge** | | | | |
| | Complete | Borrowers | 12,048 | 99.3% | 55 |
| | Not Complete | Borrowers | 80 | 0.7% | (55) |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 12,022 | 99.1% | 6 |
| | Not Complete | Borrowers | 106 | 0.9% | (6) |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 11,952 | 98.5% | 64 |
| | Not Complete | Borrowers | 176 | 1.5% | (64) |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 12/1/2025 | Sweet Decision Group | Units | Decision Group 4 | % |
|---|---|---|---|---|
| | All | Borrowers | 8,521 | |
| | **Discharge** | | | |
| | Complete | Borrowers | 8,165 | **95.8%** |
| | Not Complete | Borrowers | 356 | **4.2%** |
| | **Refunds Exceed Payments**** | | | |
| | Complete | Borrowers | 8,116 | **95.2%** |
| | Not Complete | Borrowers | 405 | **4.8%** |
| | **Discharge & Refunds**** | | | |
| | Complete | Borrowers | 7,798 | **91.5%** |
| | Not Complete | Borrowers | 723 | **8.5%** |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

CONTROLLED UNCLASSIFIED INFORMATION

| 2/24/2026 | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | DG 4 Borrowers | % |
|---|---|---|---|---|---|---|---|---|---|---|
| All | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 8,521 | |
| **Discharge & Refunds** | | | | | | | | | | |
| Complete | 195,554 | 99.8% | 30,959 | 98.7% | 10,010 | 98.0% | 11,973 | 98.7% | 8,328 | 97.7% |
| Not Complete | 439 | 0.2% | 409 | 1.3% | 203 | 2.0% | 155 | 1.3% | 193 | 2.3% |
| Delta | -29 | | 6 | | 6 | | 10 | | 96 | |

4/23/2026

| | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | DG 4 Borrowers | % | DG 5 Borrower | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All** | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 8,521 | | 29,392 | |
| **Discharge & Refunds** | | | | | | | | | | | | |
| Complete | 195,804 | **99.9%** | 30,968 | **98.7%** | 10,013 | **98.0%** | 11,974 | **98.7%** | 8,341 | **97.9%** | 26,992 | **91.8%** |
| Not Complete | 189 | **0.1%** | 400 | **1.3%** | 200 | **2.0%** | 154 | **1.3%** | 180 | **2.1%** | 2,400 | **8.2%** |
| Delta | 225 | | 3 | | 3 | | 3 | | 6 | | n/a | |

| 4/23/2026 | Exhibit C | Units | All | % | Delta |
|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | |
| | **Discharge** | | | | |
| | Complete* | Borrowers | 195,879 | **99.9%** | 21 |
| | Not Complete | Borrowers | 114 | **0.1%** | -21 |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 195,916 | **100.0%** | 205 |
| | Not Complete | Borrowers | 77 | **0.0%** | -205 |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 195,804 | **99.9%** | 225 |
| | Not Complete | Borrowers | 189 | **0.1%** | -225 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 4/23/2026 | Sweet Decision Group | Units | DG1 | % | DG2 | % | Delta DG1 | Delta DG2 |
|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 31,368 | | 10,213 | | | |
| | **Discharge** | | | | | | | |
| | Complete | Borrowers | 31,325 | **99.9%** | 10,189 | **99.8%** | 2 | 0 |
| | Not Complete | Borrowers | 43 | **0.1%** | 24 | **0.2%** | -2 | 0 |
| | **Refunds Exceed Payments**** | | | | | | | |
| | Complete | Borrowers | 31,007 | **98.8%** | 10,036 | **98.3%** | 1 | 3 |
| | Not Complete | Borrowers | 361 | **1.2%** | 177 | **1.7%** | -1 | -3 |
| | **Discharge & Refunds**** | | | | | | | |
| | Complete | Borrowers | 30,968 | **98.7%** | 10,013 | **98.0%** | 3 | 3 |
| | Not Complete | Borrowers | 400 | **1.3%** | 200 | **2.0%** | -3 | -3 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 4/23/2026 | Sweet Decision Group | Units | Decision Group 3 | % | Delta DG3 |
|---|---|---|---|---|---|
| | All | Borrowers | 12,128 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 12,054 | 99.4% | |
| | Not Complete | Borrowers | 74 | 0.6% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 12,043 | 99.3% | 5 |
| | Not Complete | Borrowers | 85 | 0.7% | -5 |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 11,974 | 98.7% | 3 |
| | Not Complete | Borrowers | 154 | 1.3% | -3 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 4/23/2026 | Sweet Decision Group | Units | Decision Group 4 | % | Delta DG4 |
|---|---|---|---|---|---|
| | All | Borrowers | 8,521 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 8,466 | **99.4%** | 2 |
| | Not Complete | Borrowers | 55 | **0.6%** | -2 |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 8,392 | **98.5%** | 4 |
| | Not Complete | Borrowers | 129 | **1.5%** | -4 |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 8,341 | **97.9%** | 6 |
| | Not Complete | Borrowers | 180 | **2.1%** | -6 |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

4/23/2026

| Sweet Decision Group | Units | Decision Group 5 | % |
|---|---|---|---|
| All | Borrowers | 29,392 | |
| **Discharge** | | | |
| Complete | Borrowers | 28,463 | **96.8%** |
| Not Complete | Borrowers | 929 | **3.2%** |
| **Refunds Exceed Payments**** | | | |
| Complete | Borrowers | 27,780 | **94.5%** |
| Not Complete | Borrowers | 1612 | **5.5%** |
| **Discharge & Refunds**** | | | |
| Complete | Borrowers | 26,992 | **91.8%** |
| Not Complete | Borrowers | 2400 | **8.2%** |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 5/26/2026 | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | DG 4 Borrowers | % | DG 5 Borrowers | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All** | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 8,521 | | 29,392 | |
| **Discharge & Refunds** | | | | | | | | | | | | |
| Complete | 195,871 | **99.9%** | 30,961 | **98.7%** | 10,013 | **98.0%** | 11,980 | **98.8%** | 8,347 | **98.0%** | 27,519 | **93.6%** |
| Not Complete | 122 | **0.1%** | 407 | **1.3%** | 200 | **2.0%** | 148 | **1.2%** | 174 | **2.0%** | 1,873 | **6.4%** |
| Delta | 67 | | -7 | | - | | 6 | | 6 | | 527 | |

| 5/26/2026 | Exhibit C | Units | All | % | Delta |
|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | |
| | **Discharge** | | | | |
| | Complete* | Borrowers | 195,895 | 99.9% | 16 |
| | Not Complete | Borrowers | 98 | 0.1% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 195,969 | 100.0% | 53 |
| | Not Complete | Borrowers | 24 | 0.0% | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 195,871 | 99.9% | 67 |
| | Not Complete | Borrowers | 122 | 0.1% | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 5/26/2026 | Sweet Decision Group | Units | DG1 | % | DG2 | % | Delta DG1 | Delta DG2 |
|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 31,368 | | 10,213 | | | |
| | **Discharge** | | | | | | | |
| | Complete | Borrowers | 31,317 | **99.8%** | 10,188 | **99.8%** | -8 | -1 |
| | Not Complete | Borrowers | 51 | **0.2%** | 25 | **0.2%** | | |
| | **Refunds Exceed Payments**** | | | | | | | |
| | Complete | Borrowers | 31,008 | **98.9%** | 10,037 | **98.3%** | 1 | 1 |
| | Not Complete | Borrowers | 360 | **1.1%** | 176 | **1.7%** | | |
| | **Discharge & Refunds**** | | | | | | | |
| | Complete | Borrowers | 30,961 | **98.7%** | 10,013 | **98.0%** | -7 | - |
| | Not Complete | Borrowers | 407 | **1.3%** | 200 | **2.0%** | | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 5/26/2026 | Sweet Decision Group | Units | Decision Group 3 | % | Delta DG3 |
|---|---|---|---|---|---|
| | All | Borrowers | 12,128 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 12,059 | 99.4% | 5 |
| | Not Complete | Borrowers | 69 | 0.6% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 12,044 | 99.3% | 1 |
| | Not Complete | Borrowers | 84 | 0.7% | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 11,980 | 98.8% | 6 |
| | Not Complete | Borrowers | 148 | 1.2% | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 5/26/2026 | Sweet Decision Group | Units | Decision Group 4 | % | Delta DG4 |
|---|---|---|---|---|---|
| | All | Borrowers | 8,521 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 8,470 | 99.4% | 4 |
| | Not Complete | Borrowers | 51 | 0.6% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 8,394 | 98.5% | 2 |
| | Not Complete | Borrowers | 127 | 1.5% | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 8,347 | 98.00% | 6 |
| | Not Complete | Borrowers | 174 | 2.00% | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 5/26/2026 | Sweet Decision Group | Units | Decision Group 5 | % | Delta DG5 |
|---|---|---|---|---|---|
| | All | Borrowers | 29,392 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 28,487 | **96.9%** | 24 |
| | Not Complete | Borrowers | 905 | **3.1%** | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 28,288 | **96.2%** | 508 |
| | Not Complete | Borrowers | 1,104 | **3.8%** | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 27,519 | **93.6%** | 527 |
| | Not Complete | Borrowers | 1,873 | **6.4%** | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

6/22/2026

| | Exhibit C Borrowers | % | DG 1 Borrowers | % | DG 2 Borrowers | % | DG 3 Borrowers | % | DG 4 Borrowers | % | DG 5 Borrowers | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All** | 195,993 | | 31,368 | | 10,213 | | 12,128 | | 8,521 | | 29,392 | |
| **Discharge & Refunds** | | | | | | | | | | | | |
| Complete | 195,865 | **99.9%** | 30,974 | **98.7%** | 10,019 | **98.1%** | 11,992 | **98.9%** | 8,351 | **98.0%** | 27,973 | **95.2%** |
| Not Complete | 128 | **0.1%** | 394 | **1.3%** | 194 | **1.9%** | 136 | **1.1%** | 170 | **2.0%** | 1,419 | **4.8%** |
| Delta | -6 | | 13 | | 6 | | 12 | | 4 | | 454 | |

| 6/22/2026 | Exhibit C | Units | All | % | Delta |
|---|---|---|---|---|---|
| | All | Borrowers | 195,993 | | |
| | **Discharge** | | | | |
| | Complete* | Borrowers | 195,893 | 99.9% | -2 |
| | Not Complete | Borrowers | 100 | 0.1% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 195,965 | 100.0% | -4 |
| | Not Complete | Borrowers | 28 | 0.0% | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 195,865 | 99.9% | -6 |
| | Not Complete | Borrowers | 128 | 0.1% | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 6/22/2026 | Sweet Decision Group | Units | DG1 | % | DG2 | % | Delta DG1 | Delta DG2 |
|---|---|---|---|---|---|---|---|---|
| | All | Borrowers | 31,368 | | 10,213 | | | |
| | **Discharge** | | | | | | | |
| | Complete | Borrowers | 31,331 | **99.9%** | 10,192 | **99.8%** | 14 | 4 |
| | Not Complete | Borrowers | 37 | **0.1%** | 21 | **0.2%** | | |
| | **Refunds Exceed Payments**** | | | | | | | |
| | Complete | Borrowers | 31,011 | **98.9%** | 10,040 | **98.3%** | 3 | 3 |
| | Not Complete | Borrowers | 357 | **1.1%** | 173 | **1.7%** | | |
| | **Discharge & Refunds**** | | | | | | | |
| | Complete | Borrowers | 30,974 | **98.7%** | 10,019 | **98.1%** | 13 | 6 |
| | Not Complete | Borrowers | 394 | **1.3%** | 194 | **1.9%** | | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 6/22/2026 | Sweet Decision Group | Units | Decision Group 3 | % | Delta DG3 |
|---|---|---|---|---|---|
| | All | Borrowers | 12,128 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 12,069 | 99.5% | 10 |
| | Not Complete | Borrowers | 59 | 0.5% | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 12,046 | 99.3% | 2 |
| | Not Complete | Borrowers | 82 | 0.7% | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 11,992 | 98.9% | 12 |
| | Not Complete | Borrowers | 136 | 1.1% | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 6/22/2026 | Sweet Decision Group | Units | Decision Group 4 | % | Delta DG4 |
|---|---|---|---|---|---|
| | All | Borrowers | 8,521 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 8,475 | **99.5%** | 5 |
| | Not Complete | Borrowers | 46 | **0.5%** | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 8,394 | **98.5%** | - |
| | Not Complete | Borrowers | 127 | **1.5%** | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 8,351 | **98.0%** | 4 |
| | Not Complete | Borrowers | 170 | **2.0%** | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

| 6/22/2026 | Sweet Decision Group | Units | Decision Group 5 | % | Delta DG5 |
|---|---|---|---|---|---|
| | All | Borrowers | 29,392 | | |
| | **Discharge** | | | | |
| | Complete | Borrowers | 28,953 | **98.5%** | 466 |
| | Not Complete | Borrowers | 439 | **1.5%** | |
| | **Refunds Exceed Payments**** | | | | |
| | Complete | Borrowers | 28,296 | **96.3%** | 8 |
| | Not Complete | Borrowers | 1,096 | **3.7%** | |
| | **Discharge & Refunds**** | | | | |
| | Complete | Borrowers | 27,973 | **95.2%** | 454 |
| | Not Complete | Borrowers | 1,419 | **4.8%** | |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Exhibit C

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 122 | 100.0% |
| Discharges in July - Complete | 12 | 12.2% |
| Discharges in July - Incomplete | 86 | 87.8% |
| Refunds in July - Complete | 0 | 0.0% |
| Refunds in July - Incomplete | 24 | 100.0% |
| Discharge and Refunds in July - Complete (both) | 12 | 9.8% |
| Discharge and Refunds in July - Incomplete | 110 | 90.2% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Decision Group 1

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 407 | 100.0% |
| Discharges in July - Complete | 35 | 68.6% |
| Discharges in July - Incomplete | 16 | 31.4% |
| Refunds in July - Complete | 77 | 21.4% |
| Refunds in July - Incomplete | 283 | 78.6% |
| Discharge and Refunds in July - Complete (both) | 108 | 26.5% |
| Discharge and Refunds in July - Incomplete | 299 | 73.5% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Decision Group 2

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 200 | 100.0% |
| Discharges in July - Complete | 16 | 64.0% |
| Discharges in July - Incomplete | 9 | 36.0% |
| Refunds in July - Complete | 23 | 13.1% |
| Refunds in July - Incomplete | 153 | 86.9% |
| Discharge and Refunds in July - Complete (both) | 37 | 18.5% |
| Discharge and Refunds in July - Incomplete | 163 | 81.5% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Decision Group 3

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 148 | 100.0% |
| Discharges in July - Complete | 17 | 24.6% |
| Discharges in July - Incomplete | 52 | 75.4% |
| Refunds in July - Complete | 30 | 35.7% |
| Refunds in July - Incomplete | 54 | 64.3% |
| Discharge and Refunds in July - Complete (both) | 44 | 29.7% |
| Discharge and Refunds in July - Incomplete | 104 | 70.3% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Decision Group 4

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 174 | 100.0% |
| Discharges in July - Complete | 8 | 15.7% |
| Discharges in July - Incomplete | 43 | 84.3% |
| Refunds in July - Complete | 40 | 31.5% |
| Refunds in July - Incomplete | 87 | 68.5% |
| Discharge and Refunds in July - Complete (both) | 43 | 24.7% |
| Discharge and Refunds in July - Incomplete | 131 | 75.3% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

## Decision Group 5

| Metric | Count | Percent of May |
|---|---|---|
| Total May Incomplete Borrowers | 1,873 | 100.0% |
| Discharges in July - Complete | 798 | 88.2% |
| Discharges in July - Incomplete | 107 | 11.8% |
| Refunds in July - Complete | 444 | 40.2% |
| Refunds in July - Incomplete | 660 | 59.8% |
| Discharge and Refunds in July - Complete (both) | 1,104 | 58.9% |
| Discharge and Refunds in July - Incomplete | 769 | 41.1% |

* "Complete" refund indicates that the borrower has been issued more refunds than their total payments on Sweet-only loans and terminal mixed consolidation loans, calculated from NSLDS data and servicer data whenever each is available. It is possible that some "complete" borrowers are still entitled to additional refunds or were overpaid; similarly, it is possible that some "not complete" borrowers have already received their full refund for Settlement relief or an overpayment. A threshold of $1.00 was used for determining refunds, such that a borrower with a difference of $1.00 or less between payments and refunds is considered "complete."

# EXHIBIT 2

# Sweet Completion Data as of July 23, 2026 (as reported to Plaintiffs at monthly meetings)

| Deadline Data | ARG | DG1 | DG2 | DG3 | DG4 | DG5 | Ex. C PCA | other PCA |
|---|---|---|---|---|---|---|---|---|
| Original Relief Deadline | 1/28/2024 | 7/28/2024 | 1/28/2025 | 7/28/2025 | 1/28/2026 | 7/28/2026 | 1/28/2027 | 1/28/2027 |
| Deadline Extensions? | 2 | 1 | no | no | no | no | no | 1 |
| Final Deadline | 12/31/2024 | 12/20/2024 | 1/28/2025 | 7/28/2025 | 1/28/2026 | 7/28/2026 | 1/28/2027 | 4/15/2027 |

| ED Completion Data (Percentage) | ARG | DG1 | DG2 | DG3 | DG4 | DG5 | Ex. C PCA | other PCA |
|---|---|---|---|---|---|---|---|---|
| **11/6/2024** | | | | | | | | |
| complete | 99.20% | 87% | 86% | | | | | |
| not complete | 0.80% | 13% | 14% | | | | | |
| **12/6/2024** | | | | | | | | |
| complete | ? | ? | ? | | | | | |
| not complete | ? | ? | ? | | | | | |
| **1/6/2025** | | | | | | | | |
| complete | 99.30% | 97% | 95% | | | | | |
| not complete | 0.70% | 3% | 5% | | | | | |
| **1/29/2025** | | | | | | | | |
| complete | ? | ? | ? | | | | | |
| not complete | ? | ? | ? | | | | | |
| **2/27/2025** | | | | | | | | |
| complete | 99.60% | 98.70% | 97.30% | | | | | |
| not complete | 4% | 1.30% | 2.70% | | | | | |
| **4/10/2025** | | | | | | | | |
| complete | 99.50% | 98.40% | 97.20% | 82.60% | | | | |
| not complete | 5% | 1.60% | 2.80% | 17.40% | | | | |
| **5/15/2025** | | | | | | | | |
| complete | ? | ? | ? | ? | | | | |
| not complete | ? | ? | ? | ? | | | | |
| **6/12/2025** | | | | | | | | |
| complete | 99.20% | 98.10% | 97.10% | 88.50% | | | | |
| not complete | 0.80% | 1.90% | 2.90% | 11.50% | | | | |
| **7/16/2025** | | | | | | | | |
| complete | ? | ? | ? | ? | | | | |
| not complete | ? | ? | ? | ? | | | | |
| **8/21/2025** | | | | | | | | |
| complete | 98.70% | 98.60% | 97.90% | 97.80% | | | | |
| not complete | 1.30% | 1.40% | 2.10% | 2.20% | | | | |
| **9/25/2025** | | | | | | | | |
| complete | 99.70% | 98.60% | 97.90% | 98% | | | | |
| not complete | 0.30% | 1.40% | 2.10% | 2% | | | | |
| **12/4/2025** | | | | | | | | |
| complete | 99.70% | 98.70% | 97.70% | 98.50% | 91.50% | | | |
| not complete | 0.30% | 1.30% | 2.10% | 1.50% | 8.50% | | | |
| **1/22/2026** | | | | | | | | |
| complete | 98+% | 98+% | 98+% | 98+% | 96.60% | | | |
| not complete | | | | | 3.40% | | | |
| **2/26/2026** | | | | | | | | |
| complete | 99.80% | 98.70% | 98% | 98.70% | 97.70% | | | |
| not complete | 0.20% | 1.30% | 2% | 1.30% | 2.30% | | | |
| **3/27/2026** | | | | | | | | |
| complete | ? | ? | ? | ? | ? | | | |
| not complete | ? | ? | ? | ? | ? | | | |
| **4/30/2026** | | | | | | | | |
| complete | 99.90% | 98.70% | 98% | 98.70% | 97.90% | 91.80% | | |
| not complete | 0.10% | 1.30% | 2% | 1.30% | 2.10% | 8.20% | | |
| **5/28/2026** | | | | | | | | |
| complete | 99.90% | 98.70% | 98% | 98.80% | 98% | 93.60% | | |
| not complete | 0.10% | 1.30% | 2% | 1.20% | 2% | 6.40% | | |
| **6/25/2026** | | | | | | | | |
| complete | 99.90% | 98.70% | 98.10% | 98.90% | 98% | 95.20% | | |
| not complete | 0.10% | 1.30% | 1.90% | 1.10% | 2% | 4.80% | | |
| **7/23/2026** | | | | | | | | |
| complete | 99.90% | 99.10% | 98.40% | 99.10% | 98.50% | 97.40% | | |
| not complete | 0.10% | 0.90% | 1.60% | 0.90% | 1.50% | 2.60% | | |

| ED Completion Data (# borrowers) | ARG | DG1 | DG2 | DG3 | DG4 | DG5 | Ex. C PCA | other PCA |
|---|---|---|---|---|---|---|---|---|
| **11/6/2024** | | | | | | | | |
| complete | 194,337 | 27,426 | 8,769 | | | | | |
| not complete | 1,656 | 3,942 | 1,444 | | | | | |
| **12/6/2024** | | | | | | | | |
| complete | ? | ? | ? | | | | | |
| not complete | ? | ? | ? | | | | | |
| **1/6/2025** | | ? | ? | | | | | |
| complete | 194,609 | 30,574 | 9,729 | | | | | |
| not complete | 1,384 | 794 | 484 | | | | | |
| **1/29/2025** | | | | | | | | |
| complete | ? | ? | ? | | | | | |
| not complete | ? | ? | ? | | | | | |
| **2/27/2025** | | | | | | | | |
| complete | 195,151 | 30,950 | 9,940 | | | | | |
| not complete | 842 | 418 | 273 | | | | | |
| **4/10/2025** | | | | | | | | |
| complete | 194,948 | 30,864 | 9,931 | 10,013 | | | | |
| not complete | 1,045 | 504 | 282 | 2,115 | | | | |
| **5/15/2025** | | | | | | | | |
| complete | ? | ? | ? | ? | | | | |
| not complete | ? | ? | ? | ? | | | | |
| **6/12/2025** | | | | | | | | |
| complete | 194,373 | 30,767 | 9,915 | 10,736 | | | | |
| not complete | 1,620 | 601 | 298 | 1,392 | | | | |
| **7/16/2025** | | | | | | | | |
| complete | ? | ? | ? | ? | | | | |
| not complete | ? | ? | ? | ? | | | | |
| **8/21/2025** | | | | | | | | |
| complete | 193,398 | 30,935 | 9,995 | 11,857 | | | | |
| not complete | 2,595 | 433 | 218 | 271 | | | | |
| **9/25/2025** | | | | | | | | |
| complete | 195,467 | 30,940 | 9,997 | 11,888 | | | | |
| not complete | 526 | 428 | 216 | 240 | | | | |
| **12/4/2025** | | | | | | | | |
| complete | 195,486 | 30,945 | 9,996 | 11,952 | 7,798 | | | |
| not complete | 507 | 423 | 217 | 176 | 723 | | | |
| **1/22/2026** | | | | | | | | |
| complete | | | | | 8,231 | | | |
| not complete | | | | | 290 | | | |
| **2/26/2026** | | | | | | | | |
| complete | 195,554 | 30,959 | 10,010 | 11,973 | 8,328 | | | |
| not complete | 439 | 409 | 203 | 155 | 193 | | | |
| **3/27/2026** | | | | | | | | |
| complete | ? | ? | ? | ? | ? | | | |
| not complete | ? | ? | ? | ? | ? | | | |
| **4/30/2026** | | | | | | | | |
| complete | 195,804 | 30,968 | 10,013 | 11,974 | 8,341 | 26,992 | | |
| not complete | 189 | 400 | 200 | 153 | 180 | 2,400 | | |
| **5/28/2026** | | | | | | | | |
| complete | 195,871 | 30,961 | 10,013 | 11,980 | 8,347 | 27,519 | | |
| not complete | 122 | 407 | 200 | 148 | 174 | 1,873 | | |
| **6/25/2026** | | | | | | | | |
| complete | 195,865 | 30,794 | 10,019 | 11,992 | 8,351 | 27,973 | | |
| not complete | 128 | 394 | 194 | 136 | 170 | 1,419 | | |
| **7/23/2026** | | | | | | | | |
| complete | 195,883 | 31,069 | 10,050 | 12,024 | 8,390 | 28,623 | | |
| not complete | 110 | 299 | 163 | 104 | 131 | 769 | | |

# EXHIBIT 3

**From:** Merritt, Robert C. (CIV)
**To:** Rebecca Ellis; Robinson, Stuart J. (CIV)
**Cc:** Eileen Connor; Rebecca Eisenbrey; jjaramillo@heraca.org
**Subject:** [Not Virus Scanned] [Not Virus Scanned] RE: Follow up from Wednesday call
**Date:** Friday, October 27, 2023 1:47:15 PM
**Attachments:** Sweet Contact List - Class Members.zipx

---

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
Hi Becca,

I'm following up on the below with the requested class list (I will send the password by separate email). Consistent with our prior discussion, we are designating this list as confidential and subject to the protective order in this case, so please treat them as such. You will note that mailing addresses are provided for many of these individuals. As discussed, we are providing this in good faith for the purpose of ensuring that *Sweet* class members are kept in forbearance and not required to make payments on relevant loans. We also recognize that you have raised various issues regarding the composition of the settlement class, and we hope this will be a useful tool as we continue to work collaboratively on those issues.

In addition, we wanted to confirm that the Department has now distributed the "do not bill" list we discussed to its servicers. This is a master list of borrowers who should be in forbearance as repayment resumes, including *Sweet* class members and many others. We are continuing to look into the other issues mentioned in your email below and will follow up as appropriate.

Please let me know if you have any difficulty accessing this file, or if you would like to discuss further.

Thank you,
Charlie

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Friday, October 06, 2023 3:40 PM
**To:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; jjaramillo@heraca.org
**Subject:** [EXTERNAL] Follow up from Wednesday call

Charlie,

Thanks for the discussion on Wednesday about making sure the Sweet settlement is properly implemented as we enter the return to repayment. To follow up on a couple of points from that call:

First, attached is a list of borrowers who have contacted us to report that their servicers have attempted to put their Sweet-related loans into repayment. The spreadsheet has tabs for four servicers (Aidvantage, EdFinancial, MOHELA, and Nelnet). There is also a separate tab for people we've heard from who are not Sweet class members, but who are covered by group discharges and have had their servicers try to put those loans back into repayment. As discussed, we have secured Privacy Act waivers from these borrowers so the Department can contact us regarding follow-up for them. We also continue to get more reports about this each day and will be sending you more names as we collect them.

Second, as I said on the call, our view is that the class list would be covered by the Protective Order entered in the Sweet case in December 2020 (ECF 167-1, 169), because under paragraph 1.a.i, it will be a document containing information derived from records subject to the requirements of the Privacy Act. Pursuant to paragraph 3.a, we intend to use this document in connection with the prosecution of the litigation, viz., to contact class members and respond to class member inquiries in connection with implementation of the settlement. This will not involve the disclosure of class member information to anyone except that class member himself/herself.

Finally, the following are the items we're expecting to hear back on:

- DOJ/ED will provide us with a class list within 4 weeks. ED will look into whether including mailing addresses for all class members would delay the data pull; if so, that information will be provided separately later
- DOJ is investigating the accuracy of the data in the Sweet quarterly reports and will issue corrections of any errors
- ED will investigate and report back on the mechanisms for ensuring that people with consolidated loans aren't placed into repayment unless/until their balances are confirmed to no longer include any Sweet-eligible loans
- ED will provide a script or other very specific instructions for both FSA and servicer call centers to ensure people are getting correct information about the Sweet settlement
- ED will look into providing access to the "do not bill" list to borrower-facing FSA employees so that they can cross-reference it in response to borrower inquiries

We are happy to discuss any of these issues further.

Thanks,
Becca

___________________________________

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# EXHIBIT 4

| | |
|---|---|
| **From:** | Takemoto, Benjamin (CIV) |
| **To:** | Eileen Connor; Rebecca Eisenbrey; Noah Zinner; Rebecca Ellis |
| **Cc:** | Robinson, Stuart J. (CIV) |
| **Subject:** | [Not Virus Scanned] [Not Virus Scanned] Sweet / Exhibit C Class List |
| **Date:** | Tuesday, August 20, 2024 4:51:15 PM |
| **Attachments:** | 2024-08 Exhibit C Mailing Address and Email for Plaintiffs EXTERNAL.zip |

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Hi all,

As you requested, please see attached the list of Exhibit C class members. I’m sending the password separately.

Ben

--

Benjamin T. Takemoto
Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box 883, Washington, DC 20044
Tel: (202) 532-4252

The information in this email and subsequent emails in this chain, including any attachments, is intended only for the recipient(s) listed above. It may be privileged or confidential. Any review, use, distribution, or copying is prohibited except by or on behalf of the intended recipient. If you have received this in error, please notify me immediately and destroy all copies. I appreciate your cooperation.

# EXHIBIT 5

**From:** Merritt, Robert C. (CIV)
**To:** Rebecca Ellis; Takemoto, Benjamin (CIV); Noah Zinner; Eileen Connor; Rebecca Eisenbrey; Nicole Almeida
**Subject:** RE: Sweet / Follow Up
**Date:** Thursday, January 16, 2025 10:46:54 AM
**Attachments:** GA guidance.pdf

---

Hi Becca,
Here are the links/documents we have available now. These links will expire on February 1 so please be sure to download the information before then. We are still working to obtain the information about class members for whom skip tracing did not work and expect to have that available next week. I will send the passwords in a follow up email.

1. **Master Class List** – [redacted]
2. **Accenture review of Adobe Campaign** - [redacted]
3. **Census Ex. C/DG1/DG2** - [redacted]
4. **Suspected deceased borrowers** - [redacted]
5. **Revise and resubmit missed:** [redacted]
6. **Ombuds Attestation Group – Cohort 1 status** - [redacted]
7. **Mail sends for R&R DG 1/2/3** - [redacted]
8. **Combined confirmation of mail sends** - [redacted]
9. **CCI borrowers who were also in DG 4 and 5** - [redacted]
10. **DG1/DG1 Revise and Resubmit status list** - [redacted]
11. **The language that will be issued to the guaranty agencies to fix the interest calculations on mixed loans** (see attachment to this email)

**R. Charlie Merritt**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8098
Email: robert.c.merritt@usdoj.gov

---

**From:** Rebecca Ellis
**Sent:** Wednesday, January 15, 2025 4:30 PM
**To:** Takemoto, Benjamin (CIV) ; Noah Zinner ; Eileen Connor ; Rebecca Eisenbrey ; Nicole Almeida
**Cc:** Merritt, Robert C. (CIV)
**Subject:** [EXTERNAL] RE: Sweet / Follow Up

Hi Charlie,
We have our data repository set up and are ready to receive the encrypted links Ben described in his email from last week. Please send them along as soon as they are available.
Thanks,
Becca

---

**From:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Sent:** Monday, January 13, 2025 4:32 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Subject:** RE: Sweet / Follow Up

Hi Becca,
Just confirming that I've received this and have passed it along to ED. I also wanted to let you know that Charlie, whom I've cc'd, is back from his detail—could you please include him on future correspondence?
Thanks,
Ben
--
Benjamin T. Takemoto
Trial Attorney / Federal Programs Branch / (202) 532-4252

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Friday, January 10, 2025 2:59 PM
**To:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Subject:** [EXTERNAL] RE: Sweet / Follow Up

Hi Ben,
Thanks for this information. We're working with our IT contractor to set up a secure repository for this data so that we can receive it with SSNs included. We believe we'll have that ready to go by the middle of next week. Can you please plan to have the encrypted links ready to send to us by next Thursday 1/16?
Thanks,
Becca

---

**From:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Sent:** Wednesday, January 8, 2025 3:03 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Subject:** Sweet / Follow Up

Hi all,
Following up on Monday's meeting, ED is able to provide the following reports/data this week if you are willing to use the SSNs included in each report to match the data and collect the necessary email addresses. ED can transmit these spreadsheets to you via an encrypted

Salesforce link (so no zip file issues). However, we know that historically you have been reluctant to house SSN data, so if you're willing to wait a few more weeks, we can provide the matched data later this month.

- Master class list with names, BD case number, SSN, mailing address, email address, and class group cohort – this will be the file against which the other reports are matched
- Census data for Exhibit C/DG1/DG2 – SSN, refund amount owed, mixed consol status, whether FSA believes the refund is completed
- DG1/DG1 Revise and Resubmit status list – SSN/case number/outcome decision/OPEID
- List of Sweet class members who attended a CCI school and will be removed from DG4 and 5 and placed into Exhibit C – case number/SSN
- List of likely deceased class members for whom we need PPSL to identify where to issue refunds – SSN
- List of class members for whom skip tracing did not work – SSN
- Accenture mailing data

Please let me know how you'd like to proceed. Thanks, and safe travels to SF.

Ben

--

Benjamin T. Takemoto
Trial Attorney
U.S. Department of Justice, Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box 883, Washington, DC 20044
Tel: (202) 532-4252

The information in this email and subsequent emails in this chain, including any attachments, is intended only for the recipient(s) listed above. It may be privileged or confidential. Any review, use, distribution, or copying is prohibited except by or on behalf of the intended recipient. If you have received this in error, please notify me immediately and destroy all copies. I appreciate your cooperation.

# EXHIBIT 6

The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

December 10, 2024

VIA E-MAIL

Stuart Robinson
Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov
Benjamin.Takemoto@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Stuart and Ben,

Thank you for meeting with us on December 6, 2024. We write to confirm our understanding of the parties' discussions at that meeting.

**1. Revise and resubmit issues for Decisions Groups 1, 2, and 3**

The Department agreed that Class Members in Decision Groups 1, 2, and 3 who were never sent a "revise & resubmit" notice—whether due to the Department's identified Accenture error or for other reasons—will be approved for Full Settlement Relief. The Department will send notices of settlement approval to all such borrowers who it has identified. The Department will also send Plaintiffs the data they receive from Accenture and the names and email addresses of the borrowers approved for Full Settlement Relief.

With respect to Decision Group Class Members who were sent a revise & resubmit notice but whose notices converted to denials due to purported failure to submit a revised application: The Department will provide a list of names and emails of these Class Members for each of Decision Groups 1, 2, and 3. PPSL will reach out to those Class Members via email (with proposed language to be provided to the Department before sending). The email will ask (1) whether the Class Member received the revise & resubmit notice, and (2) if yes, whether the Class Member submitted further information to the Department in response. If the Class Member's answer to question 1 is "no" *or* if the answer to question 2 is "yes," the Class Member will be approved for Full Settlement Relief.

The Department agreed to change the language in the revise & resubmit notice that will be sent to Class Members in Decision Groups 4 and 5 to clarify that the correct method for revising/resubmitting is to submit a new borrower defense application via https://studentaid.gov/borrower-defense/. The Department also agreed to add language to that website specifically directed at Class Members who visit that page to revise & resubmit. The Department asked Plaintiffs to propose revised language for both the notice and the website; we provided those proposed edits to you via email on Monday, December 9.

**2. Miscoding of applications**

The Department has identified an error in the coding of certain Class Members' applications, resulting the applications being associated with the wrong school. This has, in some cases, affected whether the Class Member was slotted into the correct settlement group (Automatic Relief vs. Decision Group). The Department found that the Borrower Defense Group flagged this error for many Class Members, using a distinct task code, but did not correct it. The Department agreed that it would review this error and task coding and determine how to correct it on a systemic basis.

The Department also stated that it is in the process of identifying Class Members who were slotted into Decision Groups 3, 4, and 5 but who should have received Full Settlement Relief as a member of the Corinthian group discharge cohort. Those Class Members, once identified, will receive Full Settlement Relief in accordance with Exhibit C procedures.

**3. Other materials that PPSL will provide to the Department**

PPSL will draft an email to Class Members in the Automatic Relief Group and Decision Groups 1 and 2 who had mixed consolidation loans to inform them of the refund amount they have already been issued (per the "Sweet census") and advise them that they can contact the FSA Ombudsman's office via sweet@ed.gov if (1) they have not received the amount reflected on the census, and/or (2) they believe they are owed an additional refund for payments made on intermediate consolidation loans. PPSL will share this draft with the Department. The email will be sent in the second week of January.

**4. Other materials that the Department will provide to PPSL**

The Department agreed to provide the following to PPSL:

- "Census" data for Decision Groups 1 and 2 (including relevant members of the "attestation group"). The Department committed to provide that data this week (the week of December 9, 2024).
- An updated census for the Automatic Relief Group (including relevant members of the "attestation group"), to include refunds owed and issued for Treasury offsets and wage garnishments.
- Full outcome data for Decision Groups 2 and 3 (*i.e.*, whether each Class Member

received an approval or a revise & resubmit notice; for Decision Group 2, if the latter, whether the notice converted to a denial or the Class Member resubmitted; and if the latter, whether the resubmission was approved or denied).

- An update on the progress of delivery of settlement relief to "attestation group" Class Members. The Department committed to provide that data this week (the week of December 9, 2024).
- Information sufficient to show confirmation from the Department's mail vendor that Decision Group Class Members whose notice emails bounced back or who did not have an email address on file were actually sent notice by postal mail.
- Written clarification on how the Department is handling Treasury offset and wage garnishment refunds for Class Members with commercial FFEL loans.

With respect to the first two items listed above, the Department has agreed to schedule a call with PPSL once we receive the updated census data to discuss which fields are relevant to the mixed consolidation email described in item 3 above.

Thank you for your attention to this matter.

Sincerely,



Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT LENDING

# EXHIBIT 7

**From:** Jines, Lydia (CIV)
**To:** Rebecca Ellis; Rebecca Eisenbrey; Noah Zinner; Nicole Almeida; Eileen Connor
**Cc:** Takemoto, Benjamin (CIV); Berman, Marcia (CIV)
**Subject:** Response to Plaintiffs" March 14, 2025 and March 30, 2025 Letters + Draft JSR
**Date:** Monday, April 14, 2025 1:21:17 PM
**Attachments:** 2025-04-14 DOJ Response to 250314 Letter (to Pls.) final.pdf
Sweet-DG3-4-7-25.xlsx
Sweet-DG4-4-7-25.xlsx
Sweet Attestation-Contact-List-4-8-2025.xls
April 2025 Hearing Status Report v.2 BTT.docx

---

Hi Becca,

Please find attached our response to your March 14, 2025 and March 25, 2025 letters (with the enclosed excel spreadsheets containing requested data). Also attached is a draft of the JSR to be filed today. We are awaiting letters from some of the servicers.

Thanks very much,
Lydia

**Lydia J. Jines** | Trial Attorney
U.S. Department of Justice, Civil Division **|** Federal Programs Branch
C: 202-353-5652

# EXHIBIT 8

**From:** Karas, Karen
**To:** Rebecca Ellis
**Cc:** Holland, Liam C. (CIV); Nicole Almeida; Rebecca Eisenbrey; Noah Zinner
**Subject:** Sweet v. Dept. - DG5 Outcome data
**Date:** Wednesday, December 17, 2025 2:00:49 PM
**Attachments:** Decision-Group5-Outcome-Data-Plaintiffs-Dec-2025.xlsx

---

Hi Becca. Attached is the DG5 outcome data you asked about in this morning's Ombuds meeting. Password to follow.

Karen

Karen Karas
General Attorney
Office of the General Counsel
U.S. Department of Education
Email: karen.karas@ed.gov
Phone Number: 202-987-1496

# EXHIBIT 9

**From:** Jines, Lydia (CIV)
**To:** Rebecca Ellis; Nicole Almeida; Rebecca Eisenbrey; Noah Zinner; Eileen Connor
**Cc:** Merritt, Robert C. (CIV); Karas, Karen
**Subject:** [Not Virus Scanned] [Not Virus Scanned] Sweet v. Dep"t of Education - DG3 Census/DG5 Outcomes
**Date:** Thursday, August 21, 2025 4:06:53 PM
**Attachments:** 2025-08 Decision Group 3 Census NO PII - CUI.xlsx

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Hi Becca,

Thanks for a very productive couple of meetings this week. As promised, attached is the DG3 census. I will send the password under separate cover. I'm in the process of collecting everyone's availability for a meeting the week of September 1. If there are days that work best for you all, please let me know.

I am also providing a preliminary top-line summary of the Decision Group 5 outcome data in the chart below. As we discussed, the system is not completely updated yet due to postal sends, so we cannot yet provide the individual level case data.

**Preliminary Aggregate DG5 Outcome Data**

| | Case Count | Percent |
|---|---|---|
| Initial Sweet Relief | 30700 | 85% |
| Non-Sweet Approval | 1000 | 3% |
| Revise and Resubmit | 4200 | 12% |
| Closed without Decision Notification | 400 | 1% |
| | 36300 | |

Thank you,
Lydia

**Lydia J. Jines** | Trial Attorney
U.S. Department of Justice, Civil Division | Federal Programs Branch
C: 202-353-5652

# EXHIBIT 10

**From:** Holland, Liam C. (CIV)
**To:** Rebecca Eisenbrey; Noah Zinner; Rebecca Ellis; Nicole Almeida; Eileen Connor
**Subject:** Sweet DG4 Census
**Date:** Wednesday, February 25, 2026 9:43:59 AM

---

Good morning,

I shared access to a box.com file sharing folder which includes a copy of the DG4 census. Please let me know if you have trouble accessing the material.

Best,
Liam

**Liam Holland**
Trial Attorney | United States Department of Justice
Civil Division | Federal Programs Branch
Tel: (202) 514-4964

*This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, the reader is hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.*

# EXHIBIT 11

| | |
|---|---|
| **From:** | Latreille, Bonnie |
| **To:** | Noah Zinner |
| **Cc:** | Robinson, Stuart J. (CIV); Eileen Connor; Rebecca Eisenbrey; Rebecca Ellis |
| **Subject:** | RE: Tech issues- borrowers to be added to class list |
| **Date:** | Thursday, September 19, 2024 6:55:54 PM |
| **Attachments:** | 2024.09.19 Class Inclusion For Plaintiffs - FINAL.xlsx |

Attached. We will provide a more fine grain reporting as we continue our review.

**From:** Noah Zinner <nzinner@ppsl.org>
**Sent:** Tuesday, September 17, 2024 1:29 PM
**To:** Latreille, Bonnie <Bonnie.J.Latreille@ed.gov>
**Cc:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** RE: Tech issues- borrowers to be added to class list

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thanks Bonnie,
Unless you are expecting to be done with the scrub in the next day or so it, would be helpful to see the list now and then the updated one later when it is ready. We have a few questions coming in from the borrowers on that list and it would be good to update them on their status.

Best,

Noah Zinner (he/him)
Director of Litigation
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
(617) 322-2200
www.ppsl.org

**From:** Latreille, Bonnie <Bonnie.J.Latreille@ed.gov>
**Sent:** Tuesday, September 17, 2024 1:09 PM
**To:** Noah Zinner <nzinner@ppsl.org>
**Cc:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** RE: Tech issues- borrowers to be added to class list

We will send shortly! I asked my team to do another scrub of the borrowers they couldn't identify and try to gauge whether they could fill in the blanks (e.g., clear typos in the email, borrower can be identified from email handle, etc.).

If you want it now without that, I can send now.

---

**From:** Noah Zinner <nzinner@ppsl.org>
**Sent:** Tuesday, September 17, 2024 1:06 PM
**To:** Latreille, Bonnie <Bonnie.J.Latreille@ed.gov>
**Cc:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** RE: Tech issues- borrowers to be added to class list

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Bonnie,
When we met last week, you mentioned that you would be sending us back the list of attestation/tech issue borrowers with status updates. Does your team have that ready? Thank you.

Best,

Noah Zinner (he/him)
Director of Litigation
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
(617) 322-2200
www.ppsl.org

---

**From:** Noah Zinner
**Sent:** Thursday, August 22, 2024 9:03 AM
**To:** Bonnie.j.latreille@ed.gov
**Cc:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** Tech issues- borrowers to be added to class list

As discussed yesterday. Please let me know if you have trouble opening.

Best,

Noah Zinner (he/him)
Director of Litigation
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130

(617) 322-2200
www.ppsl.org

# EXHIBIT 12

**From:** Rebecca Eisenbrey
**To:** Bonnie.J.Latreille@ed.gov
**Cc:** Robinson, Stuart J. (CIV); Takemoto, Benjamin (CIV); Bailey, John; Noah Zinner; Rebecca Ellis; Eileen Connor
**Subject:** Sweet Attestation Group - PPSL Survey Respondents
**Date:** Friday, October 18, 2024 12:57:26 PM
**Attachments:** Website Issue Survey Respondents.xlsx

---

Bonnie,

Attached is a spreadsheet of PPSL website issue survey respondents who are not yet on the attestation group list. It includes email, name, and date the person first tried to apply, as well as whether the application related to an Exhibit C school and whether and how the person was ultimately able to submit.

Many thanks,

Becca

Becca Eisenbrey
Attorney
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2808
Fax: 781-218-9625
www.ppsl.org

This communication may be privileged and confidential, and may relate to legal matters, which may be subject to the attorney-client privilege. If you are not the intended designated recipient of this communication, you should destroy this email and any attachments or copies, and you are prohibited from retaining, distributing, disclosing, or using any information contained herein. Please notify the sender of any error by return email or by calling (617) 322-2808. Thank you.

# EXHIBIT 13

**Administrative Process Proposal:**

This process is limited to Exhibit C class members whose mixed consolidation terminal loans were discharged in full. The administrative process specifically concerns refunds that may be due on intermediary loans. To access the administrative process, class members must submit an email or letter pursuant to the process below no later than 60 days after an agreed upon date. No other form of communication other than an email or letter received by FSA will be accepted, and emails received by FSA, or letters postmarked, after the 60-day window will not be accepted.

**Part 1: Intermediary Consolidation Loan Refunds**

1. If an Exhibit C class member believes they are entitled to refunds stemming from payments made on an intermediary loan owned by the Department of Education, the class member shall submit an email request to Sweet@ed.gov or a letter to FSA OMBUDSMAN, 830 First St. NE, Washington, DC, 20002 for review of their refunds due.

2. To participate in this administrative process, the subject line of the class member's email or heading in the letter must state: "REQUEST FOR SWEET REFUND ADMINISTRATIVE REVIEW." If an email or letter submitted by an Exhibit C class member during the 60-day window does not include that specific statement in the subject line or letter heading, any request for review of the class member's refunds shall not be considered a request covered by this administrative process regardless of the content of the email or letter.

3. For each submission, the FSA Ombudsman Office ("Ombudsman") will confirm the class member's current address. Confirmation of address for class members who submit via postal mail will be determined based on the return address of the letter. If no return address is provided, the Ombudsman will attempt to contact the class member directly using contact information in NSLDS.

4. Ombudsman will calculate the class member's "eligible loan ratio," which is the ratio of Sweet-eligible debt to non-Sweet eligible debt in the consolidation loan chain based on FSA disbursement data. Ombudsman will perform this calculation by:

   (a) identifying and compiling relevant loan disbursement amounts of all school loans that become part of the chain of loans comprising the class member's terminal consolidation loan, which includes (i) eligible school loans taken out to attend an Exhibit C school and (ii) ineligible loans taken out to attend a non-Exhibit C school; then

   (b) calculating the ratio of eligible-to-ineligible debt based on the totals of (a)(i) and (a)(ii).

5. Ombudsman will determine the standard monthly payment amount (level payment amount over a ten-year amortization, "standard-10") based on the original principal balance of each identified intermediary loan. Where a borrower has multiple applicable intermediary loans, Ombudsman will determine the standard-10 monthly payment amount for each loan.

6. For each month a borrower was in a repayment status on an intermediary loan, Ombudsman will impute the standard-10 payment amount for that loan in lieu of reviewing actual payment

histories.[1] The total of this amount shall be called the "imputed payment total." Periods of forbearance, deferment, default without borrower payments, or other non-repayment statuses will not be counted. In addition, if the intermediary loan was a FFEL program loan, payments will only be imputed for periods when the Department of Education owned the loan.

7. Ombudsman will combine the imputed payment total and the actual amount of any refund(s) paid on the class member's terminal loan, and multiply that combined total by the eligible loan ratio identified in Step 4 to calculate the total refund amount due to the class member.

8. Ombudsman will compare this total refund amount due against all refunds already issued to the class member on the underlying loans (including, e.g., terminal loan refunds and CARES Act refunds) to calculate the net amount due, if any, to the class member.

9. If a refund is due, Ombudsman will direct the servicer to issue a refund for the net amount due and inform the class member to expect a refund check and will indicate the amount and the address to which the refund will be sent. If no refund is due, Ombudsman will inform the borrower. In both instances, the letter shall inform the borrower of how to access the additional review administrative process outlined in Part 2.

**Part 2: Administrative Review of Additional Payment Amounts**

1. If a class member believes that a larger refund is due than they have received through the Part 1 process and wishes FSA to perform an additional administrative review, the class member shall provide proof of payments exceeding the refund amount already paid to the class member to Ombudsman by emailing Sweet@ed.gov.

2. Ombudsman will review the submission. If the proof of payment is determined to be valid and exceeds the amount FSA records show has already been paid, the Ombudsman will direct an additional refund.

**EXAMPLE:**

Borrower has an intermediary Sweet-eligible consolidation loan for $5,000 at 4% interest. That loan is later consolidated again into a Sweet-eligible terminal consolidation loan.

[1] The payment histories of certain borrowers may not be available given the date of the loan. In other instances, servicers must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs—a process that may lead to inaccurate results.




Assumptions:

1. Borrower issued check/ACH refund on their mixed consolidated terminal loan in the amount of $1000. No other refunds issued.

2. Throughout the consolidated loan chain, borrower received 3k in Sweet loan disbursements and 2k non-Sweet loan disbursements. (60% Sweet debt, 40% non-Sweet)
3. The borrower's payment history on the intermediary consolidation loan is as follows:

- **Year 1:** 6 months of grace period, 6 months of repayment
- **Year 2:** 8 months of repayment, 4 months of forbearance
- **Year 3:** 12 months of repayment
- **Year 4:** 3 months of repayment, 3 months of deferment, followed by a consolidation

**Step 1:** Ombudsman determines borrower's "eligible loan ratio" is 60%.

**Step 2**: Ombudsman determines the standard payment amount on the intermediary loan. For a $5,000 loan at 4% interest, the standard payment amount is $50.62 per month.

**Step 3**: Ombudsman determines how many months of repayment status are on the loan. For this intermediary loan, the borrower has 29 months of repayment.

**Step 4:** Ombudsman multiplies the standard payment amount by the number of months in repayment to calculate the "imputed payment total" on the intermediary loan. $50.62 x 29 months = $1,467.98.

**Step 5:** Ombudsman adds previously issued refunds ($1,000) and the imputed payment total ($1,467.98) = $2,467.98, and multiplies that amount by the eligible loan ratio (.60) to calculate the total amount due to the borrower. $2467.98 x .60 = $1480.79

**Step 6:** Ombudsman subtracts actual refunds issued from the total amount due to the borrower determined in Step 5. $1480.97 - $1000 = $480.97

**Step 7:** Since the amount in Step 5 is positive, Ombudsman directs an additional $480.97 refund.

# EXHIBIT 14

**From:** Takemoto, Benjamin (CIV)
**To:** Rebecca Ellis; Merritt, Robert C. (CIV)
**Cc:** Rebecca Eisenbrey; Nicole Almeida; Noah Zinner; Eileen Connor
**Subject:** RE: Sweet - emails to class members
**Date:** Tuesday, January 28, 2025 5:17:42 PM

---

Thanks, Becca. I've passed this along to ombuds and FSA.

Ben

--

Benjamin T. Takemoto
Trial Attorney / Federal Programs Branch / (202) 532-4252

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Tuesday, January 28, 2025 4:51 PM
**To:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>; Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** [EXTERNAL] RE: Sweet - emails to class members

Charlie,

As discussed, we sent the email out to the R&R conversion cohort and have been collecting results through our online survey. Attached is a list of respondents (as of this morning) who are, as we agreed, entitled to settlement relief because they either did not receive their revise & resubmit notice or they attempted to resubmit but their response was not recorded by FSA. Please pass this list along to ombuds/SEAD as necessary to have these accounts processed for settlement relief.

We will supplement this list as needed if/when we receive further responses.

Thanks,
Becca

---

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Sent:** Thursday, January 16, 2025 3:59 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** RE: Sweet - emails to class members

Becca,

Thanks again for sending these emails for our review. They look ok to us, but we just wanted to flag that FSA is moving offices in March 2025, so the address provided for the Ombudsman may change at that time. The new office address for the Ombudsman is not yet determined, but we can follow up with more information when we have it.

Thanks,
Charlie

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Tuesday, January 14, 2025 3:41 PM
**To:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>; Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** [EXTERNAL] Sweet - emails to class members

Ben and Charlie,

As discussed at our prior Sweet settlement meetings, attached please find draft copy for two outreach emails to specific sets of Sweet class members:

(1) An email to class members with mixed consolidation loans who have already received their terminal loan refunds, informing them of the administrative process to request additional refunds; and
(2) An email to decision group members whose revise & resubmit status converted to a denial due to purported lack of resubmission, to collect information about whether they received the R&R notice and whether they attempted to resubmit.

I've also attached draft copy for the survey that will be linked in the R&R email.

Please let us know this week whether you have any proposed edits to the copy. We are planning to send these emails once we receive the updated data from the Department this Thursday.

Thanks,
Becca

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166

Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# EXHIBIT 15

**U.S. Department of Justice**
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station,
Washington, DC 20044

Liam C. Holland
Trial Attorney

(202) 514-4964
liam.c.holland@usdoj.gov

April 29, 2026

Rebecca Ellis
Project on Predatory Student Leasing
769 Centre St.
Boston, MA 02130

Re: *Sweet v. McMahon*, No. 4:19-cv-03674 (N.D. Cal.)

Dear Becca,

I write in response to your request that the Department produce a list of personal identifying information for each individual absent class member as well as each "post-class" applicant. I understand that the Department has provided you with this information, at least with respect to absent class members, in the past. At an in-person meeting on March 27, 2026, I requested that you explain the basis of the Department's legal obligation to provide you with this information. You indicated that doing so would be in the Department's interest as, in your view, it may reduce the number of inquiries that would otherwise be directed to the Department's Student Loan Ombudsman. To be clear, I understand your request to include names, addresses, email addresses, and social security numbers of hundreds of thousands of individuals who submitted requests that the Department recognize a borrower defense to repayment.

The Department does not agree with your view that providing the Project on Predatory Student Lending ("PPSL") with this data is likely to support Ombudsman engagement with borrowers. Rather, the Department believes, based on past practice, that providing PPSL with an email list will principally drive up the volume of email inquiries received by the Ombudsman, creating an appearance of a growing number of unresolved issues requiring sustained engagement. But a significant portion of those inquires (in the thousands) are from borrowers following up before they are eligible for relief—information that PPSL can ascertain by engaging with the borrower and reviewing the terms of the Agreement without directing these borrowers to the Ombudsman. Thus, even if the Department could, in its discretion, provide you with the requested personally identifying information, it declines to do so based on the only justification you have offered.

Moreover, your request for this information is inconsistent with the terms of the Settlement Agreement. In the Settlement Agreement, the parties carefully negotiated reporting obligations

that arise in relation to this matter. Specifically, the parties negotiated for quarterly reports that include only the following information:

1. The total number of Class Members with pending borrower defense applications (which number shall include members of the § 555(e) Subclass);
2. The total number of settlement relief decisions, revise and resubmit notices, and denial decisions, as defined in Paragraph IV.C.2, that Defendants have issued to Class Members pursuant to Paragraph IV.C;
3. The number of Class Members who received settlement relief decisions; the number of Class Members who received "revise and resubmit notices"; and the number of Class Members who received final denial decisions during the reporting period; and
4. The total number of Class Members for whom Defendants have effectuated relief pursuant to Paragraph IV.A, including the number of Class Members for whom Defendants effectuated relief during the reporting period.
5. For any quarterly report covering the time period during which a deadline established in Paragraphs IV.C.3(i) through (v) and Paragraph IV.D falls, the total number of Class Members for whom the Department did not provide a decision.

Providing personally identifying information of hundreds of thousands of absent class members and "post-class" applicants is not required by the information production provisions that were negotiated by the parties. The fact that the Department may have voluntarily provided some such information in the past does not bind it to continue to provide such information now or in the future.

Although the above is sufficient to decline your request, I will also note that, while I have not made a conclusive determination, I have substantial concerns regarding the Department's ability to provide PPSL with this information consistent with its obligations under the Privacy Act. *See* 5 U.S.C. § 552a(b).

Sincerely,

*Liam C. Holland*

LIAM C. HOLLAND

# EXHIBIT 16

**From:** Rebecca Ellis
**To:** Holland, Liam C. (CIV)
**Cc:** Rebecca Eisenbrey; Noah Zinner; Nicole Almeida; Eileen Connor
**Subject:** Sweet ombuds meetings
**Date:** Wednesday, February 11, 2026 5:57:00 PM
**Attachments:** Transcript 03-13-25 Hearing.pdf

---

Liam,

I'm following up on your statement at the Ombuds meeting today that it is within the Department's discretion to choose the frequency of the Ombuds meetings with Plaintiffs' counsel. As we have discussed before, it is not. For your reference, I'm attaching here the transcript of the status conference in this case on March 13, 2025. The following exchange occurs at pages 26-27 between the Court and Benjamin Takemoto, previous DOJ counsel for the Department (emphasis added):

MR. TAKEMOTO: Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office.
THE COURT: Yeah.
MR. TAKEMOTO: And we have informally scheduled meetings to that effect. **And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings.** And we've given plaintiffs' counsel access to --
THE COURT: **Okay. I want that to continue. And I want your monthly meetings to continue.**

We're happy to discuss processes for improving the efficiency of these meetings. However, there is an outstanding court order for the weekly meetings to continue, so the Department does not have discretion to change the cadence. We expect to receive a calendar invitation for next week's meeting.

Thanks,
Becca

---

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
(617) 322-2548
www.ppsl.org

# EXHIBIT 17

The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

February 13, 2026

VIA E-MAIL

Liam Holland
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Liam.C.Holland@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Liam,

We are writing in response to your statement at our meeting yesterday, February 11, that the Department of Education wants to change from a weekly meeting between the Ombudsman's Office and Plaintiffs' counsel to a biweekly meeting. We disagree that this is a matter within the Department's discretion and oppose any change to the current schedule, which is set by Court order. We are happy to work with the Ombudsman's Office to improve the efficiency of our processes, but in order to do so, we would need to better understand exactly what the objections to the current process are. Below, we have proposed some suggestions and would be happy to hear from the Ombuds staff about whether they have additional ideas.

**1) The frequency and terms of these meetings are not up to the Department's discretion.**

We have recited this history before, but to reiterate: At the hearing on Plaintiffs' Motion to Enforce the Settlement on April 24, 2024, Plaintiffs explained to the Court that borrowers had no way to verify their relief status because representatives of the Department were referring them to the servicers, and the servicers would then refer them back to the Department. Transcript of Apr. 24, 2024, Hearing at 6:16–7:1. Plaintiffs' counsel were unable to answer borrowers' questions because we did not have access to the relevant information. *See id.* at 8:23–9:5. The Court, with the Department's input, designated the then–FSA Ombudsman, Bonnie Latreille, to be the person "to whom all these [Class Member] questions can be referred." *Id.* at 35:23, 36:8–37:15. Plaintiffs' counsel then stated that we "hope and expect that the Department provides the appropriate resources to Ms. Latreille to handle the questions that [we] expect will be coming in significant numbers." *Id.* at 39:8–10. The Court responded: "Yes, they will." *Id.* at 39:11. Following that hearing, the Court issued an order that "[q]uestions from

borrowers to be resolved at [the parties' in-person] meetings may be directed to Bonnie Latreille." ECF No. 407.

A month later, Plaintiffs' counsel reported to the Court that, as of the parties' previous in-person meeting, the Ombudsman's office had received 2,500 complaints from *Sweet* class members about missing relief, but only 74 class members had had their cases fully reviewed by the ombudsman's office, and only eight had had their cases resolved. Transcript of May 23, 2024, Hearing at 8:7–10. This was, in part, because the Department had not followed the Court's instruction to provide appropriate resources to the Ombudsman's office. *Id.* at 8:11–18. It was also because the Ombudsman's office was not receiving cooperation from servicers. *Id.* at 8:23–9:4. Meanwhile, Plaintiffs' counsel had no visibility into how the complaint process was operating. *Id.* at 8:19–22. Plaintiffs requested that the Court order the Ombudsman's office to provide Plaintiffs' counsel with additional information. *Id.* at 22:8–10. The Court responded:

> Why don't you just go to the ombudsman's office and read them? I mean, I'm going to say you're entitled to do that. Look over their shoulder. Look over their computer. Make them stay 'til midnight. You can do that, too. . . . And if you want to go over, look over their shoulder, see what the complaints are, I think you have that right.

*Id.* at 22:11–19. It was in this context that the Court wrote in its order, following the hearing, that "the Department of Education[']s Federal Student Aid ombudsman shall permit borrowers['] counsel to access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." ECF No. 414.

The Court's order could not have been clearer: Plaintiffs' counsel are entitled to access to the Ombudsman's office on Plaintiffs' terms, *not* the Department's. As a matter of professional courtesy, Plaintiffs have never requested that Ombuds staff stay in the office until midnight to answer our questions—and the parties' agreement on weekly meetings was intended to comply with the Court's directive for substantial oversight of complaint resolution while remaining manageable for the Department.

The Ombudsman's complaint process remained a topic that the parties discussed with the Court at subsequent hearings. *See, e.g.*, Transcript of June 13, 2024, Hearing at 18–23 (discussing need for servicer cooperation with complaint process and for additional resources in Ombudsman's group to address refund calculations); Transcript of July 11, 2024, Hearing at 4:20–5:12 (reporting updates on intermediate loan relief and complaint process); Transcript of September 26, 2024, Hearing at 6:24–7:3, 41:3–7 (reporting on pending Ombuds complaints regarding incomplete Exhibit C relief). The process, in other words, was not something the Court left to the Department's discretion, but rather was a subject of consistent oversight.

At a hearing on November 13, 2024, Plaintiffs reported that only between 25 and 50 percent of complaints to the Ombudsman's office had been resolved to date. Transcript of Nov. 13, 2024, Hearing at 7:15–8:3. The Court asked Plaintiffs' counsel: "Well, why can't you go and look at the e-mails and prioritize them yourself and say please answer these first?" *Id.* at 8:6–7. Plaintiffs' counsel explained that we had been attempting to do so. *Id.* at 8:8–12. Following that hearing, the Court re-emphasized its order of May 24: "[P]arties are now considering the backlog of class members' complaints on the sweet[@]ed.gov email address. The Court pointed out there is no reason why class counsel cannot roll up sleeves alongside the government to resolve them." ECF No. 444.

It was after this hearing that the parties instituted the weekly meetings between the Ombuds staff and Plaintiffs' counsel. Again, this was not a matter of the Department's good grace—it was a direct response to a Court order that Plaintiffs' counsel must be closely involved in the complaint process, including the identification of particular complaints for priority resolution.

In a hearing on March 13, 2025, the Court explicitly ordered the weekly ombuds meetings to continue. After Plaintiffs' counsel reported to the Court about the weekly meetings, and expressed alarm about recent reductions in force that had affected members of the Ombuds team who were working on *Sweet* complaints, *see* Transcript of March 13, 2025, Hearing at 5:11–7:8, 9:7–11, the Department assured the Court that "[w]e've allowed plaintiffs to have oversight over the ombuds team to look over the shoulder, as Your Honor put it. That has continued to happen." *Id.* at 14:9–11. The following exchange then took place between Benjamin Takemoto, DOJ counsel for the Department, and the Court:

> MR. TAKEMOTO: Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office.
>
> THE COURT: Yeah.
>
> MR. TAKEMOTO: And we have informally scheduled meetings to that effect. **And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings.** And we've given plaintiffs' counsel access to --
>
> THE COURT: **Okay. I want that to continue.** And I want your monthly meetings to continue.

*Id.* at 26:25–27:8 (emphasis added). At this point, then, the weekly Ombuds meetings became the subject of an explicit Court order.

At no time since March 13, 2025, has the Court altered that order. And, in keeping the order in force, the Court was well aware of the time- and effort-intensive process of these meetings. *See* Transcript of April 15, 2025, Hearing at 26:8–29:19. Indeed, until recently, the Department touted these meetings as proof of the Department's good-faith progress toward resolving class members' problems with relief delivery. *See, e.g.*, *id.* 20:12–15 (Mr. Takemoto: "I wish Your Honor could see some of these weekly meetings that we have with plaintiffs. They last for hours at a time. They are very thorough. They go through, complaint by complaint, various issues the plaintiffs bring up.").

In sum, then, the Department has no authority to change the Ombuds meeting schedule from weekly to biweekly, nor in any other way to reduce or restrict Plaintiffs' counsel's access to the Ombuds team or Ombuds data. We expect to continue to meet with the Ombuds team once per week, unless and until the Court orders otherwise.

**2) <u>Improving "efficiency" of Ombuds meetings</u>**

In our meeting yesterday, representatives of the Department repeatedly stated that the reason they wanted to reduce the meeting frequency was to make the process of complaint resolution more "efficient." However, the Department could not explain how meeting less often would improve efficiency.

One suggestion from the Department was that having fewer meetings would reduce the time Ombuds staff spend "triaging" cases for meetings, so that they could instead focus on "resolving" cases. We questioned what the difference was between "triaging" and "resolving" cases, since to our understanding, both of those require the same steps: *e.g.*, locating borrower data in NSLDS, requesting payment history from servicers, calculating refund amounts, checking TCIS for whether refund checks were issued, tasking servicers to take actions to resolve problems, contacting borrowers for further information, etc. Indeed, the entire point of working cases for the meetings is to resolve those cases. The Department was not able to explain the difference between any work involved in "triaging" versus "resolving."

Another argument from the Department was that too much time in the meetings is being spent on "new" cases versus "returning" cases. According to this argument, the turnaround time between meetings is too fast to make significant progress on "new" cases before a given meeting. We proposed, in response, that we spend every other meeting on "new" cases and every other meeting on "returning" cases, so that "new" cases would have 2 weeks of lead time to make progress before coming up for discussion. The Department then stated that their objection to weekly meetings was not actually based on case prioritization, but generally on "efficiency." The Department was not able to explain why our proposal would not have addressed its stated concern about increasing the lead time available to work "new" cases and increasing the amount of time spent resolving "returning" cases.

Finally, the Department suggested that there is actually not enough time in the meetings to cover all the cases they have prepared. We proposed, in response, that we increase the length of the meetings, in order to cover all the prepared cases. The Department rejected this proposal, without explaining why this would not have addressed its stated concern.

In short, it was clear that the Department representatives came to our meeting yesterday prepared with talking points about "efficiency," but not prepared to engage with us about ways to actually increase efficiency. We are happy to discuss ways to improve our meeting processes; to be sure, any complex process is likely to require fine-tuning at various points along the way. But the Department did not offer any concrete justification for reducing Plaintiffs' involvement in the process, and we would not agree to

such in any event, as it would violate the Court's directives. Moreover, given the history in this case, we are not confident that the Ombuds process would become more "efficient" without Plaintiffs' frequent and detailed involvement. As detailed above, the parties' experience shows exactly the opposite.

**3) <u>Proposals for meetings going forward</u>**

As we stated yesterday, Plaintiffs are open to changing our meeting processes in order to address the specific concerns mentioned by Department representatives. We propose that Plaintiffs and the Ombuds group discuss the feasibility of any or all of the following:

- Alternating between discussions of "new" and "returning" cases every other week (as we proposed yesterday). This will allow Ombuds staff additional time to make progress on "new" cases before reporting back to Plaintiffs, and increase the amount of time devoted to resolving longer-pending cases.

- Developing a prioritization system for resolving longer-pending cases, whether or not they already appear on Plaintiffs' "returning cases" list. For example, we could devote a certain amount of time every week (or every other week) to identifying and discussing Automatic Relief Group members who still have complaints pending, followed by Decision Group 1 members, and so on.

- Developing a system to identify and resolve longer-pending complaints with common issues. For example, many class members write in to ask about missing refunds when it turns out they only have commercial FFEL loans, which are not entitled to refunds under the Settlement unless the loans were in default and payments were made through administrative wage garnishment or Treasury offsets. The Ombuds team could identify people who have submitted complaints who appear to have commercial FFEL loans, and we could devote a certain amount of meeting time to discussing whether any of them need further investigation. This is just an example; the same approach could be used for other recurring issues.

- Working together to draft a communication to be emailed to class members with longer-pending complaints to ask whether they still require further action or information. For example, a borrower might have written in about an incomplete refund, but later received an additional check that completes their refund. By checking back in with these class members, we might be able to close a number of backlogged cases without further time-consuming investigation.

- Having the Ombuds staff provide Plaintiffs with a weekly list of cases they have closed (including an explanation of the nature of the resolution and a statement of whether the borrower has been notified of the resolution). If this list were provided before that week's meeting, Plaintiffs could review it and bring any questions to the meeting, but the group would not have to discuss all of these cases, thus reserving time for more complex outstanding cases.

- Increasing the length of our weekly meetings, so that Ombuds staff have time to present all of the cases they've prepared for that week.
- Increasing the length of our monthly in-person meetings (while keeping weekly teleconference meetings the same length), so that the parties can make more progress on a single day when everyone has specifically set aside time for this project.

We are also happy to discuss other proposals that the Ombuds team might have. We believe that taking common-sense steps such as these will do much more to improve the complaint resolution process than debating the merits of the Court's order to continue holding weekly meetings.

* * *

Thank you for your attention to this matter.

Sincerely,

Rebecca Eisenbrey
Rebecca Ellis
Eileen Connor
Noah Zinner
PROJECT ON PREDATORY STUDENT LENDING

# EXHIBIT 18

**From:** Rebecca Ellis
**To:** Holland, Liam C. (CIV); Rebecca Eisenbrey
**Cc:** Noah Zinner; Nicole Almeida; Eileen Connor; karen.karas@ed.gov
**Subject:** RE: Sweet ombuds meetings
**Date:** Friday, March 6, 2026 1:32:00 PM

Liam,

As I am sure you know, oral orders of the court are equally as binding as written ones. *See, e.g.*, *Noli v. Comm'r of Internal Revenue*, 860 F.2d 1521, 1525 (9th Cir. 1989) (oral order "was effective and binding upon the parties" where petitioners "were present when the oral order was issued and clearly had notice of its existence and content"); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 987 (9th Cir. 1999) ("[A]n oral order is an 'order'"); *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011) ("[A]n oral order of a district court, though perhaps imposed quickly at the conclusion of a hearing, is nonetheless binding on the parties."). The order for the parties to continue weekly Ombuds meetings bears no resemblance to the order at issue in *Lau* (a case which, significantly, involved a pro se plaintiff who could not be expected to know the specifics of civil procedure).

Your unilateral decision to cancel this week's Ombuds meeting is a violation of Judge Alsup's oral order of March 13, 2025. We will consider further weekly meeting cancellations to be further violations of the order unless the parties are able to reach a specific agreement on how to make biweekly meetings equally as robust in terms of Plaintiffs' access to the Ombuds process and ability to address our class members' concerns.

Our letter of February 13 offered numerous proposals for organizing our Ombuds meetings to address some of the Department's alleged concerns about "efficiency." Your email does not respond to, or even acknowledge, any of them – which only further reinforces our suspicion that the Department's recent conduct with respect to these meetings is not really about efficiency at all. Nonetheless, we remain willing to discuss and implement any of the changes we proposed. In particular, receiving certain updates in writing in advance of each meeting (such as a list of recently closed cases with a description of the resolution, and a list of updates on previously discussed pending cases) would help streamline the meetings and increase the number of cases we can review.

If you continue to refuse to hold the weekly meetings in the absence of an agreement, we are happy to travel to Washington to "look over the shoulder" of the Ombuds team on a schedule convenient to Plaintiffs, as Judge Alsup also ordered.

Best,
Becca

---

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Tuesday, March 3, 2026 10:05 AM
**To:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Cc:** Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>; karen.karas@ed.gov
**Subject:** RE: Sweet ombuds meetings

Hi Becca,

Thank you for your letter dated February 13, 2026. Defendants will obey any order that has been issued by the district court until it is modified or vacated. But Plaintiffs are incorrect to assert that "the Court explicitly ordered . . . weekly ombuds meetings" Letter at 3. Please see attached for the Court's Minute Entry from March 13, 2025, dictating the "orders" that "resulted" from the proceedings held before Judge Alsup on that day. There is no order requiring weekly meetings. By memorializing in writing the specific orders that resulted from the proceedings on March 13, 2025, Judge Alsup recognized that Defendants must "receive explicit notice of precisely what conduct is" forbidden or required. *See, e.g., Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000). That conduct does not include weekly meetings.

As you are aware, the Ombuds team believes that weekly meetings reporting to you about their work on individualized issues with class members take up an incredible amount of staff time that could otherwise be directed to the proper execution of the work of the Ombuds team—including resolving even more individualized issues raised by *Sweet* class members and other borrowers. Ombuds is willing to continue having biweekly meetings. Please anticipate a meeting invite for March 11, 2026.

Best,
Liam

---

**From:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Sent:** Friday, February 13, 2026 4:20 PM
**To:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>; Rebecca Ellis <REllis@ppsl.org>
**Cc:** Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>; karen.karas@ed.gov
**Subject:** [EXTERNAL] RE: Sweet ombuds meetings

Thank you, Liam. We look forward to meeting with the team next week.

Enjoy the long weekend,

Becca

---

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Friday, February 13, 2026 4:15 PM
**To:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Cc:** Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>; karen.karas@ed.gov
**Subject:** RE: Sweet ombuds meetings

Hi Becca,

Thank you for this letter and for Becca's message yesterday. Especially given its length, we need some time to review it. Defendants will review their position considering the points raised in the letter and yesterday's email. ED will consent to hold a meeting with your team this upcoming Wednesday in the interim. But we are not conceding at this stage that weekly meetings are required by court order.

Best,
Liam

---

**From:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Sent:** Friday, February 13, 2026 2:21 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Cc:** Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** [EXTERNAL] RE: Sweet ombuds meetings

Liam,

Please see the attached letter, which expands on Becca's email, proposes solutions to increase the efficiency of our weekly Ombuds meetings, and reiterates our request to reinstate next week's meeting.

Many thanks, and have a lovely weekend,

Becca

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Wednesday, February 11, 2026 5:57 PM
**To:** Holland, Liam C. (CIV) <liam.c.holland@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** Sweet ombuds meetings

Liam,

I'm following up on your statement at the Ombuds meeting today that it is within the Department's discretion to choose the frequency of the Ombuds meetings with Plaintiffs' counsel. As we have discussed before, it is not. For your reference, I'm attaching here the transcript of the status conference in this case on March 13, 2025. The following exchange occurs at pages 26-27 between the Court and Benjamin Takemoto, previous DOJ counsel for the Department (emphasis added):

MR. TAKEMOTO: Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office.
THE COURT: Yeah.
MR. TAKEMOTO: And we have informally scheduled meetings to that effect. **And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings.** And we've given plaintiffs' counsel access to --
THE COURT: **Okay. I want that to continue. And I want your monthly meetings to continue.**

We're happy to discuss processes for improving the efficiency of these meetings. However, there is an outstanding court order for the weekly meetings to continue, so the Department does not have discretion to change the cadence. We expect to receive a calendar invitation for next week's meeting.

Thanks,
Becca

---

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
(617) 322-2548
www.ppsl.org

# EXHIBIT 19

**From:** Rebecca Ellis
**To:** Holland, Liam C. (CIV); Nicole Almeida
**Cc:** Rebecca Eisenbrey; Karas, Karen; David.Garza@ed.gov; Rodriguez, Maria; Odom, Christian
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26
**Date:** Monday, August 10, 2026 12:25:00 PM

Liam,

The Department is subject to multiple court orders that grant Plaintiffs' counsel access to the Ombudsman's office and a right to inspect records, including in meetings on a weekly basis. There is no "reasonableness" component to these orders, nor do we agree that the amount of meetings is "unreasonable" given the Department's lengthy track record of delay and the continuing sizable backlog of Sweet complaints.

We have requested access to the Ombudsman's office and to relevant records, and you have unilaterally denied us that access. This conduct is in violation of court orders; as you know, we will be bringing this matter to the Court's attention and seeking an order to show cause why the Department should not be held in contempt.

I understand from your emails that you are refusing Plaintiffs' counsel access to the Ombudsman's office and to relevant records except at the dates and times listed in your most recent email below. Our agreement to meet with the Ombudsman's office at any particular time does not indicate that we agree in any way with your position or that we concede our right to demand access and inspection at any other time.

We will appear at your unilaterally scheduled meetings with the Ombudsman's office on August 20, September 2, and September 17. We will not agree to any further dates at this time. We plan to notice a hearing on our motion to enforce and for an order to show cause on September 24, at which point the Court will have an opportunity to weigh in.

Becca

---

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Thursday, August 6, 2026 4:19 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Karas, Karen <karen.karas@ed.gov>; David.Garza@ed.gov; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Becca,

Defendants' view is that the quantity of meetings is already unreasonable. We agree that there are a lot of inquiries from *Sweet* class members and from other borrowers for caseworkers to address. But given that the Ombudsman's office hosted a meeting today, the schedule you propose would require about 7.5 hours of staff time in the month of August—multiplied by all of the caseworkers who attend these meetings—staff time that will not be used to address borrower inquiries and complaints raised by *Sweet* class members and other borrowers alike. Accordingly, the Ombudsman respectfully does not wish to accept your request to deviate from the two-week cadence this month.

As to the holiday weeks, we propose meetings on the Monday of each—November 23 and December 21. Hosting meetings on the Monday of each holiday week will minimize any absences and accounts for travel costs. We would also not object to travel costs as good cause to host a meeting virtually, if you wish. Finally, we would have no objection if PPSL wishes to send individual class member complaints a few days earlier than usual before those weeks to ensure that Ombuds will be prepared to present on their responses to them on the Monday.

Thanks,
Liam

| Month | Meeting Date/Week | Format | Notes |
|---|---|---|---|
| **August** | Thursday, August 6 | Virtual | Reset meeting; team available from 1:00–3:00 p.m. |
| | Week of August 17 — proposed August 20 | All-day / Virtual **(Agreed Upon Exception Due to Office Move)** | Replaces the previously scheduled August 27 meeting |
| **September** | Week of August 31 — proposed September 2 | Virtual | First September meeting |
| | Week of September 14 — proposed September 17 | Virtual | Second September meeting |
| | Week of September 28 — proposed September 30 | All-day / In person | Additional bi-weekly meeting in the September cycle |
| **October** | Week of October 12 — proposed October 15 | Virtual | First meeting in the October cycle |
| | Week of October 26 — proposed October 28 | All-day / In person | Second meeting in the October cycle |
| **November** | Week of November 9 — proposed November 12 | Virtual | First meeting in the November cycle |
| | Week of November 23 — proposed November 23 | All-day / In person | Subject to the Thanksgiving holiday and federal closures |

| | | | |
|---|---|---|---|
| **December** | Week of December 7 — proposed December 10 | Virtual | First meeting in the December cycle |
| | Week of December 21 — proposed December 21 | All-day / In person | Subject to federal holidays and closures |

---

**From:** Holland, Liam C. (CIV)
**Sent:** Wednesday, August 5, 2026 7:36 PM
**To:** 'Rebecca Ellis' <REllis@ppsl.org>; 'Nicole Almeida' <nalmeida@ppsl.org>
**Cc:** 'Rebecca Eisenbrey' <REisenbrey@ppsl.org>; 'Karas, Karen' <karen.karas@ed.gov>; 'David.Garza@ed.gov' <david.garza@ed.gov>; 'Rodriguez, Maria' <maria.rodriguez@ed.gov>; 'Odom, Christian' <christian.odom@ed.gov>
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Becca,

We are still considering your proposed schedule and will likely get back to you about it later tomorrow or Friday. As you have likely seen, ED sent a meeting invitation for tomorrow in the interim.

Thanks,
Liam

---

**From:** Holland, Liam C. (CIV)
**Sent:** Wednesday, August 5, 2026 3:09 PM
**To:** 'Rebecca Ellis' <REllis@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Karas, Karen <karen.karas@ed.gov>; David.Garza@ed.gov; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

I apologize, I misread your e-mail's reference to 8/19. Let me take this back.

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Wednesday, August 5, 2026 3:06 PM
**To:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Karas, Karen <karen.karas@ed.gov>; David.Garza@ed.gov; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Subject:** [EXTERNAL] RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Liam,

We did not propose another meeting next week (8/12), but rather a meeting on 8/19, in keeping with a two-week cadence. We do not think it is unreasonable to have a meeting on 8/19 and another on 8/27, given that there is plenty of ground to cover. We also do not think it's practical to plan meetings for the weeks of 11/23 or 12/21; given the major holidays those weeks, the meeting time options will be fewer; our travel will be significantly more expensive (and more likely to experience delays); and people's vacations are likely to cause absences at the meetings.

We obviously disagree with your position about the status of the Ombuds meetings, and likewise reserve all rights. Without waiving or conceding that a two-week cadence is permitted by Court order, we propose the following schedule, subject to change based on the outcome of our upcoming motion.

| Month | Meeting Date/Week | Format | Notes |
|---|---|---|---|
| **August** | Thursday, August 6 | Virtual | Reset meeting; team available from 1:00–3:00 p.m. |
| | Wednesday, August 19 | Virtual | |
| | Thursday, August 27 | All-day / Virtual **(Agreed Upon Exception Due to Office Move)** | As previously agreed |
| **September** | Wednesday, September 9 | Virtual | |
| | Week of September 21 — proposed September 23 or 24 | All-day / In person | |
| **October** | Wednesday, October 7 | Virtual | |
| | Week of October 19 — proposed October 21 or 22 | All-day / In person | |
| **November** | Wednesday, November 4 | Virtual | |
| | Week of November 16 — proposed November 18 or 19 | All-day / In person | |
| **December** | Wednesday, December 4 | Virtual | |
| | Week of December 16 — proposed December 18 or 19 | All-day / In person | |

---

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Wednesday, August 5, 2026 1:55 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>

**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Karas, Karen <karen.karas@ed.gov>; David.Garza@ed.gov; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Becca,

The Ombudsman's office can accommodate a meeting tomorrow, August 6, from 1:00 to 3:00pm ET.

For the reasons that we have discussed at length and I too do not want to rehash, ED will not accommodate another meeting next week if it hosts one tomorrow. If PPSL wishes to meet tomorrow, the Ombudsman's office proposes to reset the schedule for the rest of the year to reduce any further miscommunications or ambiguity. Their proposal is below. **To be clear, this proposed schedule is based on Defendants' position that these meetings are provided as a courtesy to PPSL and are not required by court order or by binding agreement. We are not waiving or forfeiting any arguments that Defendants may raise with the court regarding meetings going forward.** Moreover, any consent by PPSL to the schedule below is not intended to prejudice any litigation position that PPSL may take to the contrary and that Defendants disagree with. Rather, again, we are seeking to ensure predictability for everyone's calendars. Setting aside the parties' disagreement as to the existence of an injunction compelling the ombudsman to host these presentation meetings for PPSL weekly, please let us know if you have further objections to the proposed schedule below. **Please note that this requires a change in the date of the monthly meeting.**

Best,
Liam

| Month | Meeting Date/Week | Format | Notes |
|---|---|---|---|
| **August** | Thursday, August 6 | Virtual | Reset meeting; team available from 1:00–3:00 p.m. |
| | Week of August 17 — proposed August 20 | All-day / Virtual **(Agreed Upon Exception Due to Office Move)** | Replaces the previously scheduled August 27 meeting |
| **September** | Week of August 31 — proposed September 2 | Virtual | First September meeting |
| | Week of September 14 — proposed September 17 | Virtual | Second September meeting |
| | Week of September 28 — | All-day / In person | Additional bi-weekly |

| | | | |
|---|---|---|---|
| | proposed September 30 | | meeting in the September cycle |
| **October** | Week of October 12 — proposed October 15 | Virtual | First meeting in the October cycle |
| | Week of October 26 — proposed October 28 | All-day / In person | Second meeting in the October cycle |
| **November** | Week of November 9 — proposed November 12 | Virtual | First meeting in the November cycle |
| | Week of November 23 — date to be confirmed | All-day / In person | Subject to the Thanksgiving holiday and federal closures |
| **December** | Week of December 7 — proposed December 10 | Virtual | First meeting in the December cycle |
| | Week of December 21 — date to be confirmed | All-day / In person | Subject to federal holidays and closures |

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Wednesday, August 5, 2026 11:48 AM
**To:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>; Nicole Almeida <nalmeida@ppsl.org>; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Subject:** [EXTERNAL] RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Liam,

I will not rehash the reasons why our Ombuds meetings are necessary to resolve Sweet borrower complaints; suffice to say this is well-trod ground.

We are available tomorrow (Thursday 8/9) between noon and 4 pm ET, and Friday 8/7 between 9 am and 1 pm ET.

To be clear, we also expect the following meeting to be held on Wednesday 8/19.

Thanks,
Becca

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Wednesday, August 5, 2026 11:32 AM
**To:** Rebecca Ellis <REllis@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>

**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Subject:** Re: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Becca,

I believe that ED may be open to considering a request from PPSL to deviate from the schedule sent on April 30, 2026, to accommodate a meeting sometime this week rather than next week. If that is your preference, please propose a time tomorrow or Friday and we can confer on our end. But it is my understanding that it is too late to schedule a meeting for today. Too many individuals have scheduled their day today based on the meeting invites sent on April 30, 2026. I sincerely apologize for any miscommunication based on individuals' reliance on the meeting invites sent on April 30, 2026.

In all events, this issue does not present any need for a breakdown in civility between the parties. It is not helpful or professional to assert that I am being disingenuous.

I also do not appreciate your mischaracterization of my email. The ombuds team is absolutely committed to addressing the needs of all student loan borrowers or former borrowers with concerns, including *Sweet* class members. My comments in no way excludes *Sweet* class members. But the time it takes to present to PPSL as to how caseworkers have addressed borrower complaints diverts their resources from that important work.

Best,
Liam

---

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Wednesday, 05 August 2026 11:17:15
**To:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>; Nicole Almeida <nalmeida@ppsl.org>; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>
**Subject:** [EXTERNAL] RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Liam,

It has been 2 weeks since our last meeting. It should not come as a surprise that we expected to meet today. It is disingenuous to claim that ED had "a few hours' notice" of this meeting when we have been meeting every 2 weeks for several months, since you first unilaterally changed your client's availability. When Nicole sent the list of new cases

this past Friday, she indicated our expectation that we would meet this week, and no one objected.

The fact that Maria sent certain calendar invites in the past does not change the expectation that we will meet every other Wednesday at this time (and in fact, as we've stated, we should be meeting every Wednesday at this time). If the calendar invites don't align with that expectation, then it's the invites that need to change. There was certainly no communication from you or from the Ombuds office at the time we received those invites that they set in stone a meeting schedule for the rest of the calendar year, particularly where the invites conflict with your representation that we would meet every other week.

Finally, the "important concerns of student loan borrowers" include the concerns of members of the Sweet class. Your suggestion otherwise speaks volumes.

If it's your position that the Ombuds team is unable to meet today, please let us know. We will be sure to include that fact in our upcoming motion.

Best,
Becca

---

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Wednesday, August 5, 2026 11:05 AM
**To:** Nicole Almeida <nalmeida@ppsl.org>; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** RE: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Nicole,

On April 30, 2026, Maria sent invites for ombuds meetings providing a schedule for the rest of the calendar year. I am included on those invites and, based on my review of them, so are you.

Setting aside the parties' disagreement as to the existence of an injunction compelling the ombudsman to host these presentation meetings for PPSL weekly, for important practical reasons, the Department needs considerably more than a few hours' notice of any further objections or claims of error as to the schedule that Maria sent on April 30, 2026. There are a great number of ED personnel—in particular ombudsman caseworkers—who attend these meetings in diversion of their normal work attending to

the important concerns of student loan borrowers. It is not possible to set up such a large meeting with only several hours' notice of an objection to the current schedule.

Thanks,
Liam

---

**From:** Nicole Almeida <nalmeida@ppsl.org>
**Sent:** Wednesday, August 5, 2026 10:46 AM
**To:** Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** [EXTERNAL] Re: Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hi Maria, Christian, and Liam,

Following up that we have not received the meeting link.

Thanks,

Nicole

---

**From:** Nicole Almeida <nalmeida@ppsl.org>
**Sent:** Tuesday, August 4, 2026 10:02 PM
**To:** Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>; 'Holland, Liam C. (CIV)' <liam.c.holland@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>
**Subject:** Ombuds Meeting for Sweet Complaints Tomorrow 8/5/26

Hello all,

We look forward to our Sweet Ombuds meeting tomorrow. We wanted to flag that we have not received the calendar invite with the meeting link. Please send it before the meeting.

Thanks,

Nicole

# EXHIBIT 20

CUI//[Insert CUI Category(ies) in alphabetical order separated by single slashes]

# OMBUDSMAN / PPSL IN-PERSON

Agenda and Status Updates

*May 14, 2025*

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

# AGENDA

1 Use of our weekly meetings going forward

2 Action Items & Follow-ups: Status Updates

3 Working Session on Casework

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

# ACTION ITEMS & FOLLOW-UPS

| # | Description | Update | Owner | Status |
|---|---|---|---|---|
| 1 | **Revised and Resubmit Lists 1–3:** PPSL previously provided cohorts of individuals who either did not receive a Revised and Resubmit (R&R) notice, or who received and responded to the notice, but whose documentation was not subsequently adjudicated. Per prior agreement with the government, these individuals were to receive full settlement relief. | The current team has located all three lists and, based on the prior agreement, will ensure that the impacted borrowers receive full settlement relief. These individuals will be notified as part of the upcoming notification planned for July 2025 and will be processed along with that group. This approach ensures their inclusion in the regular operational process—supporting accurate handling—and in the necessary tracking and reporting required under the settlement agreement. | FSA | In Progress |
| 2 | **Additional Attestation Groups:** PPSL provided attestation groups in August 2024 and October 2024. The PPSL team indicated that the government agreed to waive these cohorts into the class en masse. The current Ombudsman team later discovered that a list was provided in October 2024, but no adjudication or inclusion of these individuals occurred in our Feedback Management System, which is used to process class inclusions. This issue was reported to PPSL in April 2025, and we initiated an investigation to resolve the matter and determine a path forward. | We are currently researching the disposition of the August 2024 list and have located written documentation outlining the handling of that cohort. The planned disposition of the October 2024 list is still under review. If no documentation is located, we will determine whether to process the cohort en masse or to process individuals separately—providing borrowers the opportunity to submit evidence or a written declaration for inclusion in the class. | FSA<br>Bonnie memo Will share | Researching |

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

# ACTION ITEMS & FOLLOW-UPS

| # | Description | Update | Owner | Status |
|---|---|---|---|---|
| 3 | **Treasury Statute of Limitations Issue:** The team has identified cases where borrowers report not receiving their refund checks, despite Treasury records indicating the checks were cashed. In certain instances, borrowers are raising fraud claims more than one year after Treasury's allowable timeframe to request check reissuance. | The issue is currently with OGC and DOJ for engagement with Treasury on potential solutions, if any exist. | ED OGC | Researching |
| 4 | **FFELP TOP/AWG Issue** | With OGC for follow up. | ED OGC | Researching |
| 5 | **Pell Restoration Issue:** The team has identified instances where Pell Grant eligibility was not restored following a borrower defense (BD) discharge. Although Pell restoration is not explicitly required under the terms of the settlement, the Ombudsman team is investigating whether any form of relief can be provided to affected individuals. | The Ombudsman has engaged with the Policy Implementation Division to assess potential remedies. Resolution of this issue will likely require the development and issuance of standard guidance to relevant FSA offices. | FSA | Researching |
| 6 | **Information Request from PPSL:**DOJ/ED received a follow-up request for information on or about 04/30/2025. | This item is with DOJ for response. We are coordinating and collaborating with ED teams to ensure the necessary information is included. | DOJ | In progress. |

# EXHIBIT 21

The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

June 18, 2026

VIA E-MAIL

Liam Holland
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Liam.C.Holland@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)
Notice of Material Breach of Settlement Agreement

Dear Liam,

Pursuant to Paragraph V.D.1 of the Settlement Agreement in the above-captioned matter, Plaintiffs hereby provide notice of Plaintiffs' allegations that Defendants are and continue to be in material breach of the Settlement Agreement. In the event that a meet-and-confer process does not result in prompt and assured rectification of the material breach, Plaintiffs intend to seek an order from the Court pursuant to Paragraph V.B of the Settlement Agreement. Details of the facts and circumstances regarding each alleged material breach are set forth below.

1) **Defendants are in breach of the Settlement for failing to effectuate timely Full Settlement Relief for members of the Automatic Relief Group, Decision Group One, Decision Group Two, Decision Group Three, and Decision Group Four.**

Defendants continue to be in material breach of the Settlement Agreement, as they have been since January 29, 2024, by failing to effectuate Full Settlement Relief[1] by the applicable deadlines. At last known count, the Department's breaches now affect at least 1,051 Class Members, representing members of the Automatic Relief Group (ARG) and Decision Groups One (DG1), Two (DG2), Three

[1] Capitalized terms herein are as defined in the Settlement Agreement. For reference, "Full Settlement Relief" is defined as "(i) discharge of all of a Class Member's Relevant Loan Debt, (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted), and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt." Settlement Agreement ¶ II.S.

(DG3) and Four (DG4).[2] Defendants' failure to complete relief continues to harm the groups that have been waiting the longest for their settlement relief. To date, Defendants have refused to provide even an estimate of when these Class Members will receive their Full Settlement Relief, let alone commit to a date certain by which relief will be completed.

**a) Defendants have failed to effectuate relief owed to at least 122 Class Members belonging to the Automatic Relief Group.**

Relief for the Automatic Relief Group was originally due by January 28, 2024, a year after the Effective Date of the Settlement Agreement. The Department acknowledged on January 24, 2024, that it was in breach of Paragraph IV.A.1 of the Settlement. *See* ECF No. 397 at 7. On April 24, 2024, the Court held a hearing on Plaintiffs' motion to enforce the settlement and set a schedule by which Defendants had to finish delivering Full Settlement Relief to the Automatic Relief Group. *See* Minute Order, ECF No. 407. At a further hearing in May 2024, the Court fixed the date by which Full Settlement Relief was due to *all* remaining Automatic Relief Group Class Members as December 31, 2024. *See* Minute Order, ECF No. 414. Despite this extension, and despite consistent meet-and-confer sessions between the parties since April 2024, the Department still has not completed Full Settlement Relief for all members of the Automatic Relief Group. That relief is now 18 months overdue.

According to data provided to Plaintiffs by the Department, the completion rate for the Automatic Relief Group has remained at 98-99% since November 2024. *See* Relief Data Spreadsheet, appended hereto as Exhibit 1. On May 28, 2026, the Department represented to Plaintiffs that 122 ARG Class Members are still awaiting relief. The Department has not provided an explanation to Plaintiffs of who these Class Members are or why their relief has not yet been delivered.

The Department is in material breach of Paragraph IV.A.1 of the Settlement as to each of these 122 Class Members, and with respect to each and every Class Member from the ARG who is not accounted for in this data and who has not yet received Full Settlement Relief.

**b) Defendants have failed to effectuate relief for at least 929 Class Members from Decision Groups One, Two, Three, and Four.**

Under the Settlement, relief for Decision Groups One, Two, Three, and Four was due July 28, 2024; January 28, 2025; July 28, 2025; and January 28, 2026, respectively. *See* ECF No. 246-1 at 9. At the September 2024 hearing, the Court extended the deadline for Decision Group One to December 20, 2024. *See* Minute Order, ECF No. 434. Deadlines for Decision Groups Two, Three, and Four remained unchanged.

According to data provided to Plaintiffs by the Department, as of May 28, 2026, 929 borrowers from these groups are still waiting for Full Settlement Relief. *See* Ex. 1, Relief Data Spreadsheet. The

[2] The relief deadline for Decision Group Five (DG5) is July 28, 2026. Based on past patterns, Plaintiffs expect the number of Class Members missing relief to increase once that date passes.

Department's progress on issuing relief for DG1 and DG2 Class Members, in particular, has been nearly stagnant for over a year now. Since February 2025 (after the deadlines for DG1 and DG2 had passed), the Department has completed relief for ***a net of only 11*** DG1 borrowers and ***a net of 73*** DG2 borrowers. *See id.* Once again, the Department has not provided an explanation to Plaintiffs of who these Class Members are or why their relief has not yet been delivered.

The Department is in material breach of Paragraph IV.C.9 of the Settlement as to each of these 929 Class Members, and with respect to each and every Class Member from DG1, DG2, DG3, and DG4 who is not accounted for in this data and who has not yet received Full Settlement Relief.

**c) Defendants have failed to fully effectuate relief for over 816 Class Members who had intermediate mixed consolidation loans.**

As part of the process of resolving the Department's breach of its obligation to provide timely Full Settlement Relief to ARG and DG1 members, the parties agreed in fall 2024 to develop a process to calculate refund amounts for Class Members with "intermediate" mixed consolidation loans (that is, one or more mixed consolidation loans that were later further consolidated, one or more times, before becoming the borrower's "terminal" mixed consolidation loan). After months of discussion, the parties agreed on a formula for this process, which we have called the "administrative process." This process was designed to simplify refund calculations to expedite the processing of relief without requiring a manual review of payment histories.[3] A copy of the parties' administrative process agreement, along with emails confirming that agreement, are appended hereto as Exhibit 2. The parties also agreed that Plaintiffs would reach out to Class Members who were potentially eligible for the administrative process, and that Class Members would have to "raise their hands" to have their refunds reviewed. *See, e.g.*, Exhibit 3 (email chain from January 2025); Exhibit 4 (email chain from April 2025). Plaintiffs did so for Class Members in the ARG, DG1, DG2, and DG3.[4]

The parties agreed to the following formula: Instead of manually reviewing payment records or requesting potentially erroneous servicer records, the Department would look at the number of months that a borrower's intermediate mixed consolidation loan(s) was/were in repayment, determine the standard monthly payment amount,[5] calculate the imputed payment total, add to this number the amount of refunds paid on the borrower's terminal mixed consolidation loan, multiply that by the eligible loan ratio, and subtract already refunded amounts, to calculate the net refund still owed. *See* Ex.

[3] In the Department's own words, "The Payment histories of certain borrowers may not be available given the date of the loan. In other instances, servicers must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs—a process that may lead to inaccurate results." Administrative Process Formula, page 2 n.1.

[4] Plaintiffs have not yet reached out to potentially eligible DG4 borrowers because of the problems with the process detailed below. Plaintiffs are not able to identify potentially eligible DG5 borrowers until we receive the DG5 relief census, which the Department has not yet provided.

[5] Based on the original principal balance of each intermediate loan.

2. After this formula was agreed upon, the only update Defendants gave Plaintiffs for the next several months was that the process was being set up.

In December 2025—over a year after the parties reached an initial agreement to implement the administrative process—the Department informed Plaintiffs that 583 class members were eligible for the process and the Department could start working on those cases. The Department also identified 283 "complicated" administrative process cases. In total, 2,688 Class Members requested the administrative process, and 1,872 were found not eligible because they turned out not to have intermediate mixed consolidation loans. The Department told Plaintiffs that the borrowers who were not eligible for the administrative process would still get a manual review to make sure that their refunds were complete. The Department stated that it was still setting up the administrative review process at this time.

At the parties' in-person meeting on April 30, 2026, the Department walked Plaintiffs through certain examples of administrative process cases. It was at this point that it became clear to Plaintiffs that the Department was not actually following the administrative process agreement at all. The Department stated that these example cases had erroneous NSLDS coding, and as a result, the Department was manually reviewing each intermediary loan for that borrower, requesting payment histories from the servicers, and looking at actual amounts paid by the borrower.

This process is in direct contradiction to what was agreed upon by the parties and defeats the purpose of why the parties developed the administrative process in the first place. Incomplete or erroneous recordkeeping was specifically contemplated by the parties, *see* Ex. 2 process description at 2 fn. 1, which is why the parties agreed that the Department would ***not*** request payment histories and instead would start from the year the loan was originated and impute the total payment amount from that date. Moreover, as of the date of this writing, Defendants have not started applying the administrative process formula to the "non-complicated" cases that they acknowledge are eligible for the process.

As a result, at least those 816 Class Members who have been identified as eligible for the administrative process have, at this time, presumptively incomplete refunds, placing the Department in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement (as applicable) with respect to each of these Class Members.

Moreover, the Department also has not started manual review for the borrowers who requested but are not eligible for the administrative process; this means some percentage of those 1,872 borrowers also presumptively have incomplete refunds. The Department is in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement (as applicable) with respect to each of those Class Members as well.

These numbers do not include members of DG4 who had mixed consolidation loans. Plaintiffs have not yet sent administrative process notices to potentially eligible DG4 Class Members because of the Department's failure so far to implement the agreed-upon process. Thus, the number of Class Members as to whom the Department is in material breach is larger than what is listed here.

**d) Defendants have failed to fully effectuate relief for at least 73 Class Members whose tax refunds were offset or wages were garnished to pay *Sweet*-eligible FFEL loans.**

At our in-person meeting with DOJ and the Department on December 6, 2024, the Department confirmed that its Office of General Counsel had agreed that the Department would refund tax offset amounts ("TOP") and garnished wages ("AWG") for Class Members who had commercially held FFEL loans. The Department has failed to deliver these refunds, despite Plaintiffs asking for an update every month since then.

Currently, Plaintiffs are tracking 76 cases of borrowers waiting for a FFEL TOP/AWG refund. Of those 76 Class Members, 57 are members of the ARG, four are members of DG1, four are members of DG2, three are members of DG3, and five are members of DG4. From the available data, we calculate that at least $144,351.17 in FFEL TOP/AWG refunds are owed to the 73 Class Members from the ARG, DG1, DG2, DG3, and DG4. Plaintiffs believe there are additional Class Members who are owed TOP/AWG FFEL refunds whose cases are not being tracked by Plaintiffs, and thus the number of Class Members as to whom the Department is in material breach is likely larger than what is listed here.

The Department is in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement (as applicable) with respect to each of those 73 Class Members, and with respect to each and every Class Member from the ARG, DG1, DG2, DG3, and DG4 who is owed, but has not yet received, a refund of amounts seized from them through TOP and/or AWG to pay their *Sweet*-related FFEL loans.

**e) Defendants have failed to fully effectuate relief for more than 13 Class Members due to the Department's unjustified suspension of delegated authority.**

On September 12, 2024, the Department established a delegation of authority ("DA") to the FSA Ombudsman's office that allowed Ombuds staff to resolve Class Members' issues with incomplete relief by giving instructions directly to servicers rather than having to route instructions through other offices within FSA. DA enables Ombuds staff to order the completion of loan discharges, request refunds, process class inclusion cases, and expedite case investigations. The use of DA unquestionably helped expedite the resolution of relief issues.

In February 2026, the Department informed Plaintiffs that it was "updating" its DA process and, as a result, all relief instructions requiring DA had been paused indefinitely. The Department stated at our meetings in March, April, and May of 2026 that it was aiming to "streamline" the DA process, allegedly to make the process more "efficient." But there is nothing "efficient" about suspending the use of DA while a process document is updated, particularly given the Department's concessions at our recent meetings that there was nothing wrong with the DA process to begin with. The Department has, to date, refused to provide a date by which the DA process will resume. To our knowledge, the Ombudsman continues to have the authority to personally approve DA requests at any time.

As a result, Class Members whose relief was due over a year ago are once again waiting indefinitely for their relief. At least thirteen known cases are on hold due to the Department's refusal to use DA; based on our review of the Ombuds weekly reporting, we have reason to believe there are other affected cases that have not been discussed in Plaintiffs' meetings with the Ombuds team. It appears that the main groups affected by the DA hold are the ARG and DG1, as shown below.

The following are known examples of borrowers from the ARG and DG1 awaiting relief that is now further stalled due to DA being "paused" since at least February 2026:

- Case 19804974 (ARG), open since May 2, 2024, awaiting discharge and refund.
- Case 19870298 (ARG), open since May 6, 2024, awaiting refund.
- Case 22572921 (ARG), open since September 5, 2024, awaiting $45 refund.
- Case 28932691 (ARG), open since May 5, 2025, awaiting $3,847 refund.
- Case 32407317 (ARG), open since December 1, 2025, awaiting discharge and refund.
- Case 28238522 (ARG—waived in), open since April 2, 2025, awaiting discharge and refund. Borrower was waived into the class on October 16, 2024.
- Case 26637828 (DG1), open since January 24, 2025, awaiting discharge.
- Case 28320745 (DG1), open since April 7, 2025, awaiting discharge and $503.72 refund.
- Case 33147596 (DG1), open since January 1, 2026, awaiting discharge and refund.
- Case 33807678 (DG1), open since March 9, 2026, awaiting discharge and $12,978 refund.
- Case 20542141 (DG1), awaiting DA task to grant *Sweet* relief because EdFinancial wrongfully advised borrower not to revise and resubmit.
- Case 28279506 (ARG—waived in), open since April 3, 2025, awaiting discharge. Borrower was waived into the class on December 2024. Case 20318489 (ARG), open since May 29, 2024, awaiting confirmation of tradeline deletion.
- Case 26640839 (ARG—waived in), open since January 24, 2025, awaiting discharge and refund. Borrower was waived into the class on February 7, 2025.

The Department is in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement (as applicable) with respect to each of these 13 borrowers, and as to each and every Class Member from the ARG, DG1, DG2, DG3, and DG4 whose relief is currently being delayed by the Department's refusal to use the DA process.

#### f) Defendants have failed to fully effectuate relief for at least 15 Class Members whose refund checks were stolen.

Since the in-person meeting on September 13, 2024, the parties have been regularly discussing compensation for Class Members whose refund checks were stolen and fraudulently cashed, but who did not learn of this fraud until over a year after the check was issued and thus fall outside the Department of Treasury's usual time limitation for submitting a "fraud packet." Plaintiffs have pointed out repeatedly that these Class Members were not able to learn of this fraud within the time limit because neither the Department nor the servicers gave Class Members any notice when refund checks were

issued. As a result, Class Members did not know to look out for these checks and consequently did not know if a check failed to arrive.

Currently, Plaintiffs are tracking 13 ARG members and two DG1 members who are missing a refund that was fraudulently cashed by someone else. The earliest case Plaintiffs are tracking has been open since June 2024. The Department has stated in the parties' in-person meetings that it requested guidance from "leadership" on how to refund these borrowers—but despite Plaintiffs asking for an update regarding this issue at every monthly in-person meeting, Defendants have never provided an update for this group of borrowers.

The Department is in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement (as applicable) with respect to each of these 15 borrowers, and with respect to each and every Class Member from the ARG, DG1, DG2, DG3, and DG4 whose refund checks were stolen but who did not discover the fraud until more than one year after the check was issued.

**2) Defendants are in contempt of the Court's orders by denying Plaintiffs access to the Department's records and suspending the weekly Ombuds meetings.**

The Department is in violation of the Court's orders of May 23, 2024; November 13, 2024; and March 13, 2025. The Department is well aware of the conditions that led to these Court orders; we will not belabor them here.

On May 23, 2024, the Court ordered the Department, and specifically the Ombudsman's office, to "permit borrowers['] counsel to access the ombudsmans office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." Minute Order, ECF No. 414. On November 13, 2024, the Court further ordered that Plaintiffs' counsel should "roll up sleeves alongside the government to resolve" the "backlog of class members' complaints on the sweet[@]ed.gov email address." Minute Order, ECF No. 444. On March 13, 2025, in response to the Department's counsel bringing up the weekly Ombuds meeting in an effort to demonstrate the Department's good faith in resolving relief problems, the Court ordered those weekly meetings to continue. Transcript of March 13, 2025 Hearing at 26:25–27:8.

**a) Defendants' refusal to provide an updated class list and Post-Class outcomes list are violations of the Court's order that Plaintiffs' counsel must be permitted to inspect records.**

During the course of Settlement implementation, the Department provided Plaintiffs' counsel with class lists on several occasions. These lists included each Class Member's name, borrower defense application number, email address, mailing address, BD-related school, date of application, and Settlement group. Additionally, for each Decision Group, the Department provided Plaintiffs' counsel with outcome lists that showed, for each Class Member in that group, whether they received an approval or a revise & resubmit letter; if the latter, whether the Class Member submitted a revised application; and if they did, whether the revised application was approved.

These lists have served several important purposes. For one, having a class list allows Plaintiffs' counsel to screen incoming *Sweet*-related communications to determine whether the person contacting us is actually a Class Member and, if so, when their decision/relief is or was due. That determination affects whether Plaintiffs' counsel can respond to these communications with information already available to us, or whether the Class Member's issue requires consultation with the Ombuds team to resolve. For another, having Class Members' contact information enables Plaintiffs' counsel to reach out to Class Members to implement relief effectuation policies, such as notifying Class Members about the administrative process. These lists have also facilitated the identification of systemic problems with relief delivery: for example, Plaintiffs' communications with Class Members on the DG1 outcomes list led to the revelation that the Department's Accenture system had failed to deliver revise & resubmit notices to dozens of DG1 Class Members.

Yet Defendants are now refusing to provide Plaintiffs' counsel with an updated class list or an outcomes list for the Post-Class. On April 29, 2026, Defendants sent Plaintiffs a letter asserting that there was no legal basis to provide Plaintiffs with an updated class list and that doing so would be a violation of the Privacy Act. These claims are unfounded.

To begin, this Privacy Act objection fails to account for the parties' Protective Order in this case (*see* ECF Nos. 167-1, 169), which has been in place since 2020 and which has never before been a subject of dispute. Defendants have provided class lists and decision outcome lists in the past without a Privacy Act objection.[6] Further, when the Court ordered the parties to work together and for the Department to allow Plaintiffs access to its records, Defendants did not raise any Privacy Act objections. Nor did they make any such objections during the subsequent two years, as Plaintiffs have discussed Class Member identifying data with the Department and the Ombuds team nearly every week.

Further, well-established civil procedure principles make clear that attorneys representing a certified class have an attorney-client relationship with all class members—whether or not you characterize them as "absent." *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 99, cmt. 1 (2000) ("[A]ccording to the majority of decisions, once the proceeding has been certified as a class action the members of the class are considered the clients of the lawyer for the class."); Manual for Complex Litigation § 21.33 (4th ed. 2004) ("Once a class has been certified, the rules governing communications apply as though each class member is a client of the class counsel.") (footnote omitted); *Briseño v. Henderson*, 998 F.3d 1014, 1025 (9th Cir. 2021) ("[A]ppointed class counsel . . . owes a fiduciary duty to the class members[.]"); *Greenfield v. Villager Indus., Inc.*, 483 F.3d 824, 832 (3d Cir. 1973) ("[I]n addition to the normal obligations of an officer of the court, and as counsel to parties to

---

[6] In January 2025, the Department provided Plaintiffs with a then-current class list that included Class Members' Social Security numbers, because at the time that information was necessary to match class list entries to relief census entries. In an abundance of caution, Plaintiffs paid a contractor to build a secure website to host that information, and we have kept it secure ever since. Nonetheless, at the in-person meetings on April 30 and May 28, 2026, Plaintiffs clarified that any future class lists do not need to include Social Security numbers, if that is in fact the basis of the Department's objection to providing an updated class list.

the litigation, class action counsel possess, in a very real sense, fiduciary obligations to those not before the court."); *Kleiner v. First Nat. Bank of Atlanta*, 102 F.R.D. 754, 769 (N.D. Ga. 1983), *vacated in part on other grounds*, 751 F.2d 1193 (11th Cir. 1985) ("A lawyer who represents the named plaintiff in a class which has been certified immediately assumes responsibility to class members for diligent, competent prosecution of the certified claims."). Class counsel owes this duty "until the end (i.e., enforcement of the judgment) and not just until judgment." *Barboza v. W. Coast Digital GSM, Inc.*, 179 Cal. App. 4th 540, 545 (Cal. Ct. App. 2009) (internal quotation marks omitted); *see also Kleiner*, 751 F.2d at 1200 ("The unique nature of a class action necessitates participation of counsel even after the settlement is approved by the court."). Your newfound suggestion that Plaintiffs' counsel do not have any right to know who their clients are is not only legally unfounded, it is plainly pretextual. It flies in the face of the Court's orders and impedes Plaintiffs' ability to work together with the Department to complete Settlement relief.

More specifically, Plaintiffs' legal basis for requesting an up-to-date and accurate class list comes from the several Court orders instructing Plaintiffs to monitor Settlement implementation and ordering Defendants to allow Plaintiffs access to the Department's records, as explained above. Your email of June 12, 2026, ignores these orders, and moreover contains multiple statements that are quite simply untrue. We have been explaining to you for months that we already had a class list with identifying information for individual Class Members, and we simply wanted an updated version with more up-to-date information. It came as a shock to us at the May 2026 in-person meeting to realize you were under the misapprehension that we had never received a class list that included the Post-Class. This information would have been readily available had you simply reviewed your own client's records. Your suggestion that the production of the January 2025 class list was somehow unintentional has no basis in reality, as once again you would see if you consulted the records of contemporaneous correspondence between Plaintiffs, DOJ, and the Department.

An updated class list is a basic necessity to implement Settlement relief. Thousands of Class Members have changed their emails, mailing addresses, and names over time, and others have been moved between Settlement groups as a result of relief implementation work (for instance, the hundreds of Class Members who were "waived in" from the Post-Class to the ARG or Decision Groups due to documented problems with BD website access and lost paper applications). As class counsel, Plaintiffs need to be able to cross-reference borrowers that reach out to us with an accurate class list to determine if they are *Sweet* Class Members.

As to the Post-Class outcomes list, Plaintiffs receive emails every day from confused Post-Class members who are being told conflicting information by servicers and FSA personnel about the status of their borrower defense cases. A decision outcome list would allow Plaintiffs to tell Post-Class members whether they need to request reconsideration or simply wait until the relief deadline.

Defendants' refusal to provide an updated class list and a Post-Class outcome list constitutes a frustration of the purpose of the Court's orders requiring Defendants to collaborate with Plaintiffs to implement the Settlement. Defendants are currently in contempt of, at a minimum, the Court's order

of May 23, 2024, by refusing to "permit borrowers['] counsel . . . to inspect records" via the Ombudsman's office "to ensure accountability and to support efforts to enforce judgment promptly." ECF 414.

**b) Defendants' unilateral cancellation of weekly Ombuds meetings is a violation of the Court's order that the weekly meetings should continue.**

As explained above, the Court issued an oral order on March 13, 2025, for the weekly meetings between Plaintiffs' counsel and the Ombuds team to continue. Despite this order, in February 2026 the Department informed Plaintiffs that it had unilaterally decided to no longer attend the weekly Ombuds meetings.

Plaintiffs reminded the Department of its obligation under Judge Alsup's order of March 13, 2025, yet you claimed in an email on March 3, 2026, that this order somehow did not count because it had not been made in writing. Of course, oral orders of the court are equally as binding as written ones. *See, e.g.*, *Noli v. Comm'r of Internal Revenue*, 860 F.2d 1521, 1525 (9th Cir. 1989) (oral order "was effective and binding upon the parties" where petitioners "were present when the oral order was issued and clearly had notice of its existence and content"); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 987 (9th Cir. 1999) ("[A]n oral order is an 'order[.]'"); *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011) ("[A]n oral order of a district court, though perhaps imposed quickly at the conclusion of a hearing, is nonetheless binding on the parties.").

The Department's stated reasoning for violating the Court's order was that meeting every two weeks instead of every week would be more "efficient"—notwithstanding the fact that the Department's view of "efficiency" is not a relevant factor under any of the Court's several orders regarding cooperation with Plaintiffs in the Ombuds complaint resolution process. Plaintiffs, in a letter dated February 13, 2026 (appended hereto as Exhibit 5), reviewed the history of the Ombuds process and Court orders in detail, and made several suggestions for how to address the claimed "efficiency" concerns without violating the Court's order. To date, the Department has not responded to any of those suggestions, but rather has simply refused to attend nine meetings. Nor do we see any indication that the Department's unilateral cancelation of the weekly meetings in fact improved its efficiency in resolving cases. Clearly, "efficiency" was never the goal in the first place.

The Department's refusal to attend the weekly meeting has materially interfered with Plaintiffs' ability to "access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman" pursuant to the May 2024 order, and to "roll up sleeves alongside the government to resolve" the "backlog of class members' complaints on the sweet[@]ed.gov email address" pursuant to the November 2024 order. It also violates the Court's explicit order of March 13, 2025, that the weekly Ombuds meetings should continue. Defendants are currently in contempt of all three of those orders.

**3) Defendants are not in substantial compliance with the Settlement Agreement.**

Defendants have been in breach of Paragraphs IV.A.1 and IV.C.9 since January 29, 2024, and July 29, 2024, respectively, for failing to timely provide Full Settlement Relief to the ARG and DG1. Since then, the parties have consistently met and negotiated pursuant to the Court's orders in an effort to cure those breaches and address any breaches of the deadlines that followed for DG2, DG3, and DG4. Given that the January 2024 and July 2024 breaches are still not cured to this day, and now there are hundreds more Class Members from DG2, DG3, and DG4 missing timely relief, Defendants are not in substantial compliance with the Settlement Agreement.

A party is in substantial compliance with an obligation only where deviation does not defeat the object of the agreement. *See Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016). As Defendants know, the gravamen of this litigation is undue delay. Class members from the ARG, DG1, DG2, DG3, and DG4 who have not received Full Settlement Relief continue to face burdensome delays. While Plaintiffs have recognized the Department's progress toward delivering relief in the past, Plaintiffs did not anticipate that relief for these groups still would not be completed by June 2026. The Department's failure to reach 100% completion for any group, even this long after their respective deadlines, raises further concerns for DG5 and the Post-Class as well.

The fact that the Department has completed relief for the majority of Class Members in the ARG through DG4 does not insulate it from allegations of material breach. Paragraph V.B.2 of the Settlement provides, in relevant part: "Plaintiffs may bring a claim alleging that Defendants have materially breached Paragraph IV.A.1 [and/or] IV.C.9 . . . of the Agreement by failing to effectuate relief within the prescribed time periods ***for any individual*** who is entitled to receive relief pursuant those Paragraphs" (emphasis added). In other words, a breach as to a single Class Member is a material breach. And here, we are not dealing with a single Class Member, but over a thousand of them, and potentially many more.

* * *

Pursuant to the Court's orders, Plaintiffs have spent more than two years, to the full extent of our abilities, helping the Department find ways to cure its own breaches and complete Settlement relief. Defendants are aware that receiving Settlement relief in a timely and predictable manner is a matter of urgency for Class Members. Plaintiffs remain committed to working together to deliver relief to all Class Members as efficiently as possible.

In accord with Paragraph V.D.3 of the Settlement, we expect a response to this letter within 14 days. In addition, we request that Defendants provide the below-requested information no later than the parties' July 23 in-person meeting:

i. An updated class list (including the Post-Class), in substantially the same format as the class list the Department produced to Plaintiffs in January 2025, with the exception that the updated list need not include Social Security numbers.

ii. A DG5 census, in substantially the same format as the previously provided DG3 and DG4 census spreadsheets.

iii. A decision outcome list for the Post-Class, in substantially the same format as the outcome lists the Department has previously produced for the Decision Groups.

iv. For each ARG Class Member discussed in Section 1.a above, the Class Member's name; data specifying their *Sweet*-related loan(s) still outstanding and/or refund(s) owed; and an explanation of why those loan(s) have not been discharged and/or refund(s) have not been issued.

v. For each DG1, DG2, DG3, and DG4 Class Member discussed in Section 1.b above, the Class Member's name and Settlement group; data specifying their *Sweet*-related loan(s) still outstanding and/or refund(s) owed; and an explanation of why those loan(s) have not been discharged and/or refund(s) have not been issued.

vi. A definitive date by which the Ombudsman's delegated authority process will be fully operational.

vii. A copy of the updated delegated authority procedure document.

viii. A definitive date by which Ombuds staff will begin processing administrative process cases for the ARG, DG1, DG2, and DG3, and a projected date by which that processing will be completed.

ix. A copy of the written procedures Ombuds staff are following to implement the administrative process, as promised at our last in-person meeting on May 28, 2026.

x. A definitive date by which Ombuds staff will begin reviewing refunds for Class Members who requested, but are not eligible for, the administrative process, and a projected date by which that review will be completed.

xi. A definitive date by which the Department will begin disbursing FFEL TOP/AWG refunds, and a projected date by which that disbursement will be completed.

xii. A definitive date by which the Department will make a determination of its policy with respect to the issue of Settlement check fraud discovered after the one-year time limit.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
Nicole Camargo Almeida
PROJECT ON PREDATORY STUDENT LENDING

# Exhibit 1

Sweet Completion Data as of June 18, 2026 (as reported to Plaintiffs at monthly meetings)

| Deadline Data | ARG | DG1 | DG2 | DG3 | DG4 | DG5 | Ex. C PCA | other PCA |
|---|---|---|---|---|---|---|---|---|
| Original Relief Deadline | 1/28/2024 | 7/28/2024 | 1/28/2025 | 7/28/2025 | 1/28/2026 | 7/28/2026 | 1/28/2027 | 1/28/2027 |
| Deadline Extensions? | 2 | 1 | no | no | no | no | no | 1 |
| Final Deadline | 12/31/2024 | 12/20/2024 | 1/28/2025 | 7/28/2025 | 1/28/2026 | 7/28/2026 | 1/28/2027 | 4/15/2027 |
| | | | | | | | | |
| **ED Completion Data (Percentage)** | | | | | | | | |
| **11/6/2024** | | | | | | | | |
| complete | 99.20% | 87% | 86% | | | | | |
| not complete | 0.80% | 13% | 14% | | | | | |
| **12/6/2024** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **1/6/2025** | | | | | | | | |
| complete | 99.30% | 97% | 95% | | | | | |
| not complete | 0.70% | 3% | 5% | | | | | |
| **1/29/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **2/27/2025** | | | | | | | | |
| complete | 99.60% | 98.70% | 97.30% | | | | | |
| not complete | 4% | 1.30% | 2.70% | | | | | |
| **4/10/2025** | | | | | | | | |
| complete | 99.50% | 98.40% | 97.20% | 82.60% | | | | |
| not complete | 5% | 1.60% | 2.80% | 17.40% | | | | |
| **5/15/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **6/12/2025** | | | | | | | | |
| complete | 99.20% | 98.10% | 97.10% | 88.50% | | | | |
| not complete | 0.80% | 1.90% | 2.90% | 11.50% | | | | |
| **7/16/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **8/21/2035** | | | | | | | | |
| complete | 98.70% | 98.60% | 97.90% | 97.80% | | | | |
| not complete | 1.30% | 1.40% | 2.10% | 2.20% | | | | |
| **9/25/2025** | | | | | | | | |
| complete | 99.70% | 98.60% | 97.90% | 98% | | | | |
| not complete | 0.30% | 1.40% | 2.10% | 2% | | | | |
| **12/4/2025** | | | | | | | | |
| complete | 99.70% | 98.70% | 97.70% | 98.50% | 91.50% | | | |
| not complete | 0.30% | 1.30% | 2.10% | 1.50% | 8.50% | | | |
| **1/22/2026** | | | | | | | | |
| complete | 98+% | 98+% | 98+% | 98+% | 96.60% | | | |
| not complete | | | | | 3.40% | | | |
| **2/26/2026** | | | | | | | | |
| complete | 99.80% | 98.70% | 98% | 98.70% | 97.70% | | | |
| not complete | 0.20% | 1.30% | 2% | 1.30% | 2.30% | | | |
| **3/27/2026** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **4/30/2026** | | | | | | | | |
| complete | 99.90% | 98.70% | 98% | 98.70% | 97.90% | 91.80% | | |
| not complete | 0.10% | 1.30% | 2% | 1.30% | 2.10% | 8.20% | | |
| **5/28/2026** | | | | | | | | |
| complete | 99.90% | 98.70% | 98% | 98.80% | 98% | 93.60% | | |
| not complete | 0.10% | 1.30% | 2% | 1.20% | 2% | 6.40% | | |

| | ARG | DG1 | DG2 | DG3 | DG4 | DG5 | Ex. C PCA | other PCA |
|---|---|---|---|---|---|---|---|---|
| **ED Completion Data (# borrowers)** | | | | | | | | |
| **11/6/2024** | | | | | | | | |
| complete | 194,337 | 27,426 | 8,769 | | | | | |
| not complete | 1,656 | 3,942 | 1,444 | | | | | |
| **12/6/2024** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **1/6/2025** | | | | | | | | |
| complete | 194,609 | 30,574 | 9,729 | | | | | |
| not complete | 1,384 | 794 | 484 | | | | | |
| **1/29/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **2/27/2025** | | | | | | | | |
| complete | 195,151 | 30,950 | 9,940 | | | | | |
| not complete | 842 | 418 | 273 | | | | | |
| **4/10/2025** | | | | | | | | |
| complete | 194,948 | 30,864 | 9,931 | 10,013 | | | | |
| not complete | 1,045 | 504 | 282 | 2,115 | | | | |
| **5/15/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **6/12/2025** | | | | | | | | |
| complete | 194,373 | 30,767 | 9,915 | 10,736 | | | | |
| not complete | 1,620 | 601 | 298 | 1,392 | | | | |
| **7/16/2025** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **8/21/2025** | | | | | | | | |
| complete | 193,398 | 30,935 | 9,995 | 11,857 | | | | |
| not complete | 2,595 | 433 | 218 | 271 | | | | |
| **9/25/2025** | | | | | | | | |
| complete | 195,467 | 30,940 | 9,997 | 11,888 | | | | |
| not complete | 526 | 428 | 216 | 240 | | | | |
| **12/4/2025** | | | | | | | | |
| complete | 195,486 | 30,945 | 9,996 | 11,952 | 7,798 | | | |
| not complete | 507 | 423 | 217 | 176 | 723 | | | |
| **1/22/2026** | | | | | | | | |
| complete | | | | | 8,231 | | | |
| not complete | | | | | 290 | | | |
| **2/26/2026** | | | | | | | | |
| complete | 195,554 | 30,959 | 10,010 | 11,973 | 8,328 | | | |
| not complete | 439 | 409 | 203 | 155 | 193 | | | |
| **3/27/2026** | | | | | | | | |
| complete | Data unavailable | | | | | | | |
| not complete | | | | | | | | |
| **4/30/2026** | | | | | | | | |
| complete | 195,804 | 30,968 | 10,013 | 11,974 | 8,341 | 26,992 | | |
| not complete | 189 | 400 | 200 | 153 | 180 | 2,400 | | |
| **5/28/2026** | | | | | | | | |
| complete | 195,871 | 30,961 | 10,013 | 11,980 | 8,347 | 27,519 | | |
| not complete | 122 | 407 | 200 | 148 | 174 | 1,873 | | |

Ombuds Open Case Data as of June 18, 2026 (as reported to Plaintiffs)

| | | | Open Cases Pending Since: | | Number of Open Cases for Each Sweet Group | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Plaintiff Report | Open Cases | Total Open Cases ARG-DG4 | May 7, 2025 (1 Year) | December 7, 2025 (6 Months ) | ARG | DG1 | DG2 | DG3 | DG4 |
| 1/7/2026 | 8,589 | 7,111 | 6,818 | 7,024 | 6,296 | 474 | 172 | 93 | 76 |
| 2/11/2026 | 8,427 | 6,902 | 6,590 | 6,787 | 6,090 | 471 | 167 | 95 | 79 |
| 3/4/2026 | 8,440 | 6,832 | 6,503 | 6,701 | 6,014 | 470 | 172 | 95 | 81 |
| 4/6/2026 | 8,384 | 6,581 | 6,316 | 6,499 | 5,798 | 450 | 163 | 88 | 82 |
| 5/4/2026 | 8,428 | 6,499 | 6,165 | 6,339 | 5,696 | 461 | 166 | 93 | 83 |
| 6/1/2026 | 8,405 | 6,379 | 7,273 | 8,405 | 5,579 | 457 | 165 | 92 | 85 |

# Exhibit 2

**From:** Jines, Lydia (CIV)
**To:** Rebecca Eisenbrey; Rebecca Ellis; Nicole Almeida; Noah Zinner; Eileen Connor
**Cc:** Merritt, Robert C. (CIV)
**Subject:** Sweet v. Dep"t of Education - Administrative Process Procedure
**Date:** Monday, August 11, 2025 10:06:34 AM
**Attachments:** Administrative Process 12.5.24 - Plaintiff redline 4-30-25 (+DOJ) 08062025.docx

---

Hi Becca,

Several months ago, PPSL provided us with a redline of the Administrative Process Procedure document with edits to reflect that this process will apply to later Decision Groups, and to modify the requirements for a class member to raise their hand. Those changes are acceptable to the Department.

The Department has suggested some further edits to bring the procedure in line with our current agreed-upon process, including that the Department will accept emails containing the word "refund" in the subject line ***or*** forwarded emails sent by PPSL, and also retains discretion to consider other class members who the Ombudsman's Office has identified as eligible for administrative process review.

Please let me know if there are any other edits PPSL would suggest and/or if you'd like to discuss further.

Thanks,
Lydia

**Administrative Process:**

This process is limited to Exhibit C class members whose mixed consolidation terminal loans were discharged in full. The administrative process specifically concerns refunds that may be due on intermediary loans. To access the administrative process, a class members must submit an email or letter pursuant to the process below no later than 60 days after the Plaintiffs' Counsel transmits email correspondence to this group of borrowersthat class member informing them of the availability of the administrative process. No other form of communication other than an email or letter received by FSA will be accepted, and emails received by FSA, or letters postmarked after the 60-day window, will not be accepted.

**Part 1: Intermediary Consolidation Loan Refunds**

1. If an Exhibit Ca class member believes they are entitled to refunds stemming from payments made on an intermediary loan owned by the Department of Education, the class member shall submit an email request to Sweet@ed.gov or a letter to FSA OMBUDSMAN, 830 First St. NE, Washington, DC, 20002 for review of their refunds due.

2. To participate in this administrative process, the subject line of the class member's email or heading in the letter must should must either include at a minimum the word: "refund" but ideally include the phrase "Request for Sweet Refund Administrative Review." or respond to (or forward) an email by Plaintiffs' counsel regarding the administrative review process. If the email or letter does not meet either criteria, the Ombudsman's Office retains the discretion to mark a class member as eligible for the administrative process based on an individual review of the class member's complaint. If an email or letter submitted by an Exhibit C class member during the 60-day window does not include the word "refund" in the subject line or letter heading, any request for review of the class member's refunds shall not be considered a request covered by this administrative process regardless of the content of the email or letter.

3. For each approved submission for which a refund is due, the FSA Ombudsman Office ("Ombudsman") will confirm the class member's current address. Confirmation of address for class members who submit via postal mail will be determined based on the return address of the letter. If no return address is provided, the Ombudsman will attempt to contact the class member directly using contact information.

4. Ombudsman will calculate the class member's "eligible loan ratio," which is the ratio of Sweet-eligible debt to non-Sweet eligible debt in the consolidation loan chain based on FSA disbursement data. Ombudsman will perform this calculation by:

   (a) identifying and compiling relevant loan disbursement amounts of all school loans that become part of the chain of loans comprising the class member's terminal consolidation loan, which includes (i) eligible school loans taken out to attend an Exhibit Cthe borrower defense school(s) and (ii) ineligible loans taken out to attend a non-Exhibit C school(s) not covered by the class member's borrower defense application(s); then

   (b) calculating the ratio of eligible-to-ineligible debt based on the totals of (a)(i) and (a)(ii).

5. Ombudsman will determine the standard monthly payment amount (level payment amount over a ten-year amortization, "standard-10") based on the original principal balance of each identified intermediary loan. Where a borrower has multiple applicable intermediary loans, Ombudsman will determine the standard-10 monthly payment amount for each loan.

6. For each month a borrower was in a repayment status on an intermediary loan, Ombudsman will impute the standard-10 payment amount for that loan in lieu of reviewing actual payment histories.[1] The total of this amount shall be called the "imputed payment total." Periods of forbearance, deferment, default without borrower payments, or other non-repayment statuses will not be counted. In addition, if the intermediary loan was a FFEL program loan, payments will only be imputed for periods when the Department of Education owned the loan.

7. Ombudsman will combine the imputed payment total, and the actual amount of any refund(s) paid on the class member's terminal loan, and multiply that combined total by the eligible loan ratio identified in Step 4 to calculate the total refund amount due to the class member.

8. Ombudsman will compare this total refund amount due against all refunds already issued to the class member on the underlying loans (including, e.g., terminal loan refunds and CARES Act refunds) to calculate the net amount due, if any, to the class member.

9. If a refund is due, Ombudsman will direct the servicer to issue a refund for the net amount due and inform the class member to expect a refund check and will indicate the amount and the address to which the refund will be sent. If no refund is due, Ombudsman will inform the borrower. In both instances, the letter shall inform the borrower of how to access the additional review administrative process outlined in Part 2.

**Part 2: Administrative Review of Additional Payment Amounts**

1. If a class member believes that a larger refund is due than they have received through the Part 1 process and wishes FSA to perform an additional administrative review, the class member shall provide proof of payments exceeding the refund amount already paid to the class member to Ombudsman by emailing Sweet@ed.gov.

2. Ombudsman will review the submission. If the proof of payment is determined to be valid and exceeds the amount FSA records show has already been paid, the Ombudsman will direct an additional refund.

---

[1] The payment histories of certain borrowers may not be available given the date of the loan. In other instances, servicers must reconstruct the borrower's billing history from records that are often dated and contained only in imaged PDFs—a process that may lead to inaccurate results.

**EXAMPLE:**

Borrower has an intermediary Sweet-eligible consolidation loan for $5,000 at 4% interest. That loan is later consolidated again into a Sweet-eligible terminal consolidation loan.




Assumptions:

1. Borrower issued check/ACH refund on their mixed consolidated terminal loan in the amount of $1000. No other refunds issued.

2. Throughout the consolidated loan chain, borrower received 3k in Sweet loan disbursements and 2k non-Sweet loan disbursements. (60% Sweet debt, 40% non-Sweet)
3. The borrower's payment history on the intermediary consolidation loan is as follows:

- **Year 1:** 6 months of grace period, 6 months of repayment
- **Year 2:** 8 months of repayment, 4 months of forbearance
- **Year 3:** 12 months of repayment
- **Year 4:** 3 months of repayment, 3 months of deferment, followed by a consolidation

**Step 1:** Ombudsman determines borrower's "eligible loan ratio" is 60%.

**Step 2**: Ombudsman determines the standard payment amount on the intermediary loan. For a $5,000 loan at 4% interest, the standard payment amount is $50.62 per month.

**Step 3**: Ombudsman determines how many months of repayment status are on the loan. For this intermediary loan, the borrower has 29 months of repayment.

**Step 4:** Ombudsman multiplies the standard payment amount by the number of months in repayment to calculate the "imputed payment total" on the intermediary loan. $50.62 x 29 months = $1,467.98.

**Step 5:** Ombudsman adds previously issued refunds ($1,000) and the imputed payment total ($1,467.98) = $2,467.98, and multiplies that amount by the eligible loan ratio (.60) to calculate the total amount due to the borrower. $2467.98 x .60 = $1480.79

**Step 6:** Ombudsman subtracts actual refunds issued from the total amount due to the borrower determined in Step 5. $1480.97 - $1000 = $480.97

**Step 7:** Since the amount in Step 5 is positive, Ombudsman directs an additional $480.97 refund.

**From:** Rebecca Ellis
**To:** Jines, Lydia (CIV); Rebecca Eisenbrey; Nicole Almeida; Noah Zinner; Eileen Connor
**Cc:** Merritt, Robert C. (CIV)
**Subject:** RE: Sweet v. Dep"t of Education - Administrative Process Procedure
**Date:** Monday, August 18, 2025 12:53:00 PM

Hi Lydia,

We agree to the edits in this version.

Thanks,
Becca

**From:** Jines, Lydia (CIV) <Lydia.Jines@usdoj.gov>
**Sent:** Monday, August 11, 2025 10:06 AM
**To:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Cc:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Subject:** Sweet v. Dep't of Education - Administrative Process Procedure

Hi Becca,

Several months ago, PPSL provided us with a redline of the Administrative Process Procedure document with edits to reflect that this process will apply to later Decision Groups, and to modify the requirements for a class member to raise their hand. Those changes are acceptable to the Department.

The Department has suggested some further edits to bring the procedure in line with our current agreed-upon process, including that the Department will accept emails containing the word “refund” in the subject line ***or*** forwarded emails sent by PPSL, and also retains discretion to consider other class members who the Ombudsman’s Office has identified as eligible for administrative process review.

Please let me know if there are any other edits PPSL would suggest and/or if you’d like to discuss further.

Thanks,
Lydia

# Exhibit 3

**From:** Rebecca Ellis
**To:** Merritt, Robert C. (CIV); Takemoto, Benjamin (CIV)
**Cc:** Rebecca Eisenbrey; Nicole Almeida; Noah Zinner; Eileen Connor
**Subject:** RE: Sweet - emails to class members
**Date:** Friday, January 17, 2025 10:40:00 AM

Thanks Charlie, we're happy to send out an update when we have the updated address in the spring. For now we'll proceed with what we have.

Separately, does the government have a response for us on upcoming meeting dates? We'd like to make travel arrangements.

Thanks,
Becca

**From:** Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Sent:** Thursday, January 16, 2025 3:59 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** RE: Sweet - emails to class members

Becca,

Thanks again for sending these emails for our review. They look ok to us, but we just wanted to flag that FSA is moving offices in March 2025, so the address provided for the Ombudsman may change at that time. The new office address for the Ombudsman is not yet determined, but we can follow up with more information when we have it.

Thanks,
Charlie

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Tuesday, January 14, 2025 3:41 PM
**To:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>; Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** [EXTERNAL] Sweet - emails to class members

Ben and Charlie,

As discussed at our prior Sweet settlement meetings, attached please find draft copy for two outreach emails to specific sets of Sweet class members:

(1) An email to class members with mixed consolidation loans who have already received their terminal loan refunds, informing them of the administrative process to request additional refunds; and
(2) An email to decision group members whose revise & resubmit status converted to a denial due to purported lack of resubmission, to collect information about whether they received the R&R notice and whether they attempted to resubmit.

I've also attached draft copy for the survey that will be linked in the R&R email.

Please let us know this week whether you have any proposed edits to the copy. We are planning to send these emails once we receive the updated data from the Department this Thursday.

Thanks,
Becca

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org

# Exhibit 4

**From:** Jines, Lydia (CIV)
**To:** Rebecca Ellis
**Cc:** Rebecca Eisenbrey; Nicole Almeida; Eileen Connor; Noah Zinner; Takemoto, Benjamin (CIV)
**Subject:** RE: Sweet admin process follow-up
**Date:** Wednesday, April 30, 2025 12:59:45 PM
**Attachments:** Administrative Process 12.5.24.docx

Hi Becca,

I'm following up on Ben's email below. As Ben noted, the Ombudsman's Office agrees that anyone who used the word "refund" in the subject line or who forwarded an email containing the four subject lines you provided to DOJ will be included in the administrative process. And, as you've noticed, the Ombudsman's Office has identified and included class members who may not have raised their hand by either method and are still eligible for the administrative process. I hope this resolves your concerns.

To avoid any continuing questions about the administrative process as it begins, please send your written acceptance of the administrative process as embodied in the attached document. As soon as we receive this back from you, we can take the steps necessary to begin the process.

Thank you,
Lydia

**Lydia J. Jines** | Trial Attorney
U.S. Department of Justice, Civil Division **|** Federal Programs Branch
C: 202-353-5652

**From:** Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>
**Sent:** Thursday, April 10, 2025 9:18 AM
**To:** Rebecca Ellis <REllis@ppsl.org>
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>; Eileen Connor <econnor@ppsl.org>; Jines, Lydia (CIV) <Lydia.Jines@usdoj.gov>; 'Noah Zinner' <nzinner@ppsl.org>
**Subject:** RE: Sweet admin process follow-up

Hi Becca,

Thank you for sending this. As you'll recall (and as Noah acknowledged in Court), by the November 13 hearing, the parties had agreed to the administrative process except as to how class members can "raise their hand" to avail themselves of the process. PPSL then negotiated with the Ombudsman's Office on that final step, keeping in mind resource constraints at the Ombudsman's Office. As a result of those negotiations, at the December 5 in-person meeting, PPSL agreed to the process as described in the document that I sent you. If you have something that suggests that a different agreement was made, please send to me. But I have a contemporaneous email from Wendy indicating that PPSL agreed to that document.

Regardless, the Ombudsman's Office has indicated that it is able to identify emails containing the subject lines that you listed below. So, anyone who used the word "refund" in the subject line or who forwarded an email containing the four subject lines listed below will be included.

I also think in light of this issue that it would be good to have your written acceptance of the administrative process so that we have certainty as it begins. Could you please send that?

Thank you,
Ben

--

Benjamin T. Takemoto
Trial Attorney / Federal Programs Branch / (202) 532-4252

---

**From:** Rebecca Ellis
**Sent:** Thursday, April 03, 2025 2:53 PM
**To:** Takemoto, Benjamin (CIV)
**Cc:** Rebecca Eisenbrey ; Nicole Almeida ; Eileen Connor
**Subject:** [EXTERNAL] Sweet admin process follow-up

Ben,

As discussed at yesterday's ombuds meeting, below are the subject lines of emails we sent to eligible class members about the administrative process. Please note, Charlie approved the first subject line in an email on January 16, 2025. I have attached our email exchange here for your reference. Our follow-up emails to class members generally followed the language of the initial, mutually agreed upon subject line.

- Sweet v. Cardona Settlement Relief for Mixed Consolidation Loans
- UPDATE: Your Sweet v. Cardona Refund & Webinar
- NEXT STEPS: Sweet Mixed Consolidation Relief
- REMINDER: Sweet v. Cardona Settlement Relief for Mixed Consolidation Loans

Since our conversation yesterday, I have reviewed PPSL's contemporaneous notes, which show that in October 2024 the parties discussed in detail the issue of how to identify an administrative process request, and ED ultimately agreed that if the word "refund" appeared anywhere in the body of an email – not just in the subject line – then they could readily identify such requests. That agreement is reflected in the fact that our email to class members, approved by DOJ, stated that class members "should" use a subject line including the word "refund," but not that they MUST do so, nor that doing so would be a prerequisite to having their request considered.

Christian stated yesterday that the ombuds team was already aware of people replying to or forwarding emails with the above subject lines to sweet@ed.gov, so these emails should be easily identifiable and easy to categorize as administrative process requests. Please confirm that the ombuds team will do so going forward, and that the ombuds team will NOT exclude anyone from administrative process review for the reason that the subject line of their email fails to include the word "refund."

Thanks,
Becca

---

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
(617) 322-2548
www.ppsl.org

# Exhibit 5

The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

February 13, 2026

VIA E-MAIL

Liam Holland
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Liam.C.Holland@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Liam,

We are writing in response to your statement at our meeting yesterday, February 11, that the Department of Education wants to change from a weekly meeting between the Ombudsman's Office and Plaintiffs' counsel to a biweekly meeting. We disagree that this is a matter within the Department's discretion and oppose any change to the current schedule, which is set by Court order. We are happy to work with the Ombudsman's Office to improve the efficiency of our processes, but in order to do so, we would need to better understand exactly what the objections to the current process are. Below, we have proposed some suggestions and would be happy to hear from the Ombuds staff about whether they have additional ideas.

**1) The frequency and terms of these meetings are not up to the Department's discretion.**

We have recited this history before, but to reiterate: At the hearing on Plaintiffs' Motion to Enforce the Settlement on April 24, 2024, Plaintiffs explained to the Court that borrowers had no way to verify their relief status because representatives of the Department were referring them to the servicers, and the servicers would then refer them back to the Department. Transcript of Apr. 24, 2024, Hearing at 6:16–7:1. Plaintiffs' counsel were unable to answer borrowers' questions because we did not have access to the relevant information. *See id.* at 8:23–9:5. The Court, with the Department's input, designated the then–FSA Ombudsman, Bonnie Latreille, to be the person "to whom all these [Class Member] questions can be referred." *Id.* at 35:23, 36:8–37:15. Plaintiffs' counsel then stated that we "hope and expect that the Department provides the appropriate resources to Ms. Latreille to handle the questions that [we] expect will be coming in significant numbers." *Id.* at 39:8–10. The Court responded: "Yes, they will." *Id.* at 39:11. Following that hearing, the Court issued an order that "[q]uestions from

borrowers to be resolved at [the parties' in-person] meetings may be directed to Bonnie Latreille." ECF No. 407.

A month later, Plaintiffs' counsel reported to the Court that, as of the parties' previous in-person meeting, the Ombudsman's office had received 2,500 complaints from *Sweet* class members about missing relief, but only 74 class members had had their cases fully reviewed by the ombudsman's office, and only eight had had their cases resolved. Transcript of May 23, 2024, Hearing at 8:7–10. This was, in part, because the Department had not followed the Court's instruction to provide appropriate resources to the Ombudsman's office. *Id.* at 8:11–18. It was also because the Ombudsman's office was not receiving cooperation from servicers. *Id.* at 8:23–9:4. Meanwhile, Plaintiffs' counsel had no visibility into how the complaint process was operating. *Id.* at 8:19–22. Plaintiffs requested that the Court order the Ombudsman's office to provide Plaintiffs' counsel with additional information. *Id.* at 22:8–10. The Court responded:

> Why don't you just go to the ombudsman's office and read them? I mean, I'm going to say you're entitled to do that. Look over their shoulder. Look over their computer. Make them stay 'til midnight. You can do that, too. . . . And if you want to go over, look over their shoulder, see what the complaints are, I think you have that right.

*Id.* at 22:11–19. It was in this context that the Court wrote in its order, following the hearing, that "the Department of Education[']s Federal Student Aid ombudsman shall permit borrowers['] counsel to access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." ECF No. 414.

The Court's order could not have been clearer: Plaintiffs' counsel are entitled to access to the Ombudsman's office on Plaintiffs' terms, *not* the Department's. As a matter of professional courtesy, Plaintiffs have never requested that Ombuds staff stay in the office until midnight to answer our questions—and the parties' agreement on weekly meetings was intended to comply with the Court's directive for substantial oversight of complaint resolution while remaining manageable for the Department.

The Ombudsman's complaint process remained a topic that the parties discussed with the Court at subsequent hearings. *See, e.g.*, Transcript of June 13, 2024, Hearing at 18–23 (discussing need for servicer cooperation with complaint process and for additional resources in Ombudsman's group to address refund calculations); Transcript of July 11, 2024, Hearing at 4:20–5:12 (reporting updates on intermediate loan relief and complaint process); Transcript of September 26, 2024, Hearing at 6:24–7:3, 41:3–7 (reporting on pending Ombuds complaints regarding incomplete Exhibit C relief). The process, in other words, was not something the Court left to the Department's discretion, but rather was a subject of consistent oversight.

At a hearing on November 13, 2024, Plaintiffs reported that only between 25 and 50 percent of complaints to the Ombudsman's office had been resolved to date. Transcript of Nov. 13, 2024, Hearing at 7:15–8:3. The Court asked Plaintiffs' counsel: "Well, why can't you go and look at the e-mails and prioritize them yourself and say please answer these first?" *Id.* at 8:6–7. Plaintiffs' counsel explained that we had been attempting to do so. *Id.* at 8:8–12. Following that hearing, the Court re-emphasized its order of May 24: "[P]arties are now considering the backlog of class members' complaints on the sweet[@]ed.gov email address. The Court pointed out there is no reason why class counsel cannot roll up sleeves alongside the government to resolve them." ECF No. 444.

It was after this hearing that the parties instituted the weekly meetings between the Ombuds staff and Plaintiffs' counsel. Again, this was not a matter of the Department's good grace—it was a direct response to a Court order that Plaintiffs' counsel must be closely involved in the complaint process, including the identification of particular complaints for priority resolution.

In a hearing on March 13, 2025, the Court explicitly ordered the weekly ombuds meetings to continue. After Plaintiffs' counsel reported to the Court about the weekly meetings, and expressed alarm about recent reductions in force that had affected members of the Ombuds team who were working on *Sweet* complaints, *see* Transcript of March 13, 2025, Hearing at 5:11–7:8, 9:7–11, the Department assured the Court that "[w]e've allowed plaintiffs to have oversight over the ombuds team to look over the shoulder, as Your Honor put it. That has continued to happen." *Id.* at 14:9–11. The following exchange then took place between Benjamin Takemoto, DOJ counsel for the Department, and the Court:

> MR. TAKEMOTO: Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office.
>
> THE COURT: Yeah.
>
> MR. TAKEMOTO: And we have informally scheduled meetings to that effect. **And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings.** And we've given plaintiffs' counsel access to --
>
> THE COURT: **Okay. I want that to continue.** And I want your monthly meetings to continue.

*Id.* at 26:25–27:8 (emphasis added). At this point, then, the weekly Ombuds meetings became the subject of an explicit Court order.

At no time since March 13, 2025, has the Court altered that order. And, in keeping the order in force, the Court was well aware of the time- and effort-intensive process of these meetings. *See* Transcript of April 15, 2025, Hearing at 26:8–29:19. Indeed, until recently, the Department touted these meetings as proof of the Department's good-faith progress toward resolving class members' problems with relief delivery. *See, e.g.*, *id.* 20:12–15 (Mr. Takemoto: "I wish Your Honor could see some of these weekly meetings that we have with plaintiffs. They last for hours at a time. They are very thorough. They go through, complaint by complaint, various issues the plaintiffs bring up.").

In sum, then, the Department has no authority to change the Ombuds meeting schedule from weekly to biweekly, nor in any other way to reduce or restrict Plaintiffs' counsel's access to the Ombuds team or Ombuds data. We expect to continue to meet with the Ombuds team once per week, unless and until the Court orders otherwise.

**2) <u>Improving "efficiency" of Ombuds meetings</u>**

In our meeting yesterday, representatives of the Department repeatedly stated that the reason they wanted to reduce the meeting frequency was to make the process of complaint resolution more "efficient." However, the Department could not explain how meeting less often would improve efficiency.

One suggestion from the Department was that having fewer meetings would reduce the time Ombuds staff spend "triaging" cases for meetings, so that they could instead focus on "resolving" cases. We questioned what the difference was between "triaging" and "resolving" cases, since to our understanding, both of those require the same steps: *e.g.*, locating borrower data in NSLDS, requesting payment history from servicers, calculating refund amounts, checking TCIS for whether refund checks were issued, tasking servicers to take actions to resolve problems, contacting borrowers for further information, etc. Indeed, the entire point of working cases for the meetings is to resolve those cases. The Department was not able to explain the difference between any work involved in "triaging" versus "resolving."

Another argument from the Department was that too much time in the meetings is being spent on "new" cases versus "returning" cases. According to this argument, the turnaround time between meetings is too fast to make significant progress on "new" cases before a given meeting. We proposed, in response, that we spend every other meeting on "new" cases and every other meeting on "returning" cases, so that "new" cases would have 2 weeks of lead time to make progress before coming up for discussion. The Department then stated that their objection to weekly meetings was not actually based on case prioritization, but generally on "efficiency." The Department was not able to explain why our proposal would not have addressed its stated concern about increasing the lead time available to work "new" cases and increasing the amount of time spent resolving "returning" cases.

Finally, the Department suggested that there is actually not enough time in the meetings to cover all the cases they have prepared. We proposed, in response, that we increase the length of the meetings, in order to cover all the prepared cases. The Department rejected this proposal, without explaining why this would not have addressed its stated concern.

In short, it was clear that the Department representatives came to our meeting yesterday prepared with talking points about "efficiency," but not prepared to engage with us about ways to actually increase efficiency. We are happy to discuss ways to improve our meeting processes; to be sure, any complex process is likely to require fine-tuning at various points along the way. But the Department did not offer any concrete justification for reducing Plaintiffs' involvement in the process, and we would not agree to

such in any event, as it would violate the Court's directives. Moreover, given the history in this case, we are not confident that the Ombuds process would become more "efficient" without Plaintiffs' frequent and detailed involvement. As detailed above, the parties' experience shows exactly the opposite.

### 3) **Proposals for meetings going forward**

As we stated yesterday, Plaintiffs are open to changing our meeting processes in order to address the specific concerns mentioned by Department representatives. We propose that Plaintiffs and the Ombuds group discuss the feasibility of any or all of the following:

- Alternating between discussions of "new" and "returning" cases every other week (as we proposed yesterday). This will allow Ombuds staff additional time to make progress on "new" cases before reporting back to Plaintiffs, and increase the amount of time devoted to resolving longer-pending cases.

- Developing a prioritization system for resolving longer-pending cases, whether or not they already appear on Plaintiffs' "returning cases" list. For example, we could devote a certain amount of time every week (or every other week) to identifying and discussing Automatic Relief Group members who still have complaints pending, followed by Decision Group 1 members, and so on.

- Developing a system to identify and resolve longer-pending complaints with common issues. For example, many class members write in to ask about missing refunds when it turns out they only have commercial FFEL loans, which are not entitled to refunds under the Settlement unless the loans were in default and payments were made through administrative wage garnishment or Treasury offsets. The Ombuds team could identify people who have submitted complaints who appear to have commercial FFEL loans, and we could devote a certain amount of meeting time to discussing whether any of them need further investigation. This is just an example; the same approach could be used for other recurring issues.

- Working together to draft a communication to be emailed to class members with longer-pending complaints to ask whether they still require further action or information. For example, a borrower might have written in about an incomplete refund, but later received an additional check that completes their refund. By checking back in with these class members, we might be able to close a number of backlogged cases without further time-consuming investigation.

- Having the Ombuds staff provide Plaintiffs with a weekly list of cases they have closed (including an explanation of the nature of the resolution and a statement of whether the borrower has been notified of the resolution). If this list were provided before that week's meeting, Plaintiffs could review it and bring any questions to the meeting, but the group would not have to discuss all of these cases, thus reserving time for more complex outstanding cases.

- Increasing the length of our weekly meetings, so that Ombuds staff have time to present all of the cases they've prepared for that week.

- Increasing the length of our monthly in-person meetings (while keeping weekly teleconference meetings the same length), so that the parties can make more progress on a single day when everyone has specifically set aside time for this project.

We are also happy to discuss other proposals that the Ombuds team might have. We believe that taking common-sense steps such as these will do much more to improve the complaint resolution process than debating the merits of the Court's order to continue holding weekly meetings.

* * *

Thank you for your attention to this matter.

Sincerely,

Rebecca Eisenbrey
Rebecca Ellis
Eileen Connor
Noah Zinner
PROJECT ON PREDATORY STUDENT LENDING

# EXHIBIT 22

**U.S. Department of Justice**
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station,
Washington, DC 20044

Liam C. Holland
Trial Attorney

(202) 514-4964
liam.c.holland@usdoj.gov

July 2, 2026

Rebecca Ellis
Project on Predatory Student Lending
769 Centre St.
Boston, MA 02130

Re: *Sweet v. McMahon*, No. 4:19-cv-03674 (N.D. Cal.)
Notice Pursuant to Paragraph V.D.3 of the Settlement Agreement.

Counsel,

I write to respond to your letter dated June 18, 2026, providing notice of Plaintiffs' allegations that Defendants are in material breach of their obligations to the class under the parties' Settlement Agreement.[1] In accordance with the terms of the Agreement, I acknowledged receipt of your notice on June 23, 2026. Additionally, I shared your letter with the Department of Education ("Department").

Over the past several years, the Department has worked diligently to comply with its obligations to the class under the Settlement Agreement. Even though the Agreement is premised on "a series of miscommunications and misjudgments" about the complexity of effectuating the discharge of eligible loans and of confirming that the discharges had been effectuated,[2] the Department has expended countless resources overcoming those challenges and making sure that various third parties to this suit take actions needed to effectuate the Agreement. The Department has ensured that relief is effectuated for class members in the Automatic Relief Group and the

[1] This response does not address any of the allegations at pages seven to ten of your letter asserting that the Department is in contempt of court orders. Only the breach allegations of your letter are subject to the meet and confer process and time limitations in Paragraph V.D.3 of the Agreement. The portion of your letter that alleges contempt of the court orders is currently under review.

[2] *See* Declaration of Richard Cordray ¶ 96, ECF No. 403-1.

Decision Groups.[3] As Judge Alsup has explained, "that's a credit to both sides here, that they worked through this, and the servicers too, to get a lot of people . . . —400,000, 350,000—relief."[4] The Department has done "a lot of good" work.[5]

On March 6, 2026, invoking the fee liability provisions included in Section V of the Agreement, Plaintiffs submitted a motion to the district court seeking an order compelling the United States to compensate them $1,546,982.81 for their attorneys' fees and other expenses that were incurred since the fall of 2024. ECF No. 535. In opposing the motion, the Government explained that the fee-liability generating provisions only permit fees for time incurred bringing certain claims for breach under Paragraphs V.B.1, V.B.2, or V.B.3, and Plaintiffs had not brought any such claim since they last prevailed on one in September 2024. ECF No. 540. Less than two months after the conclusion of briefing on that motion, you are now invoking the fee-liability generating provisions of the Agreement for the first time in many years.

The Department has reviewed the issues raised in your letter and has made the following determinations. First, the letter fails to describe facts and circumstances supporting a claim of material breach under Paragraph V.B.2. Second, even if Plaintiffs could satisfy their initial burden, any such breach claimed by Plaintiffs is subject to the complete defense of immateriality under Paragraph V.C. The provisions of the Settlement Agreement that form the basis of Plaintiffs' breach claims address Defendants' obligations to a class consisting of hundreds of thousands of borrowers certified under Rule 23(b)(2) and for which a "single injunction or declaratory judgment would provide relief to each member of the class." *Sweet v. Devos*, 2019 WL 5595171, at *8 (N.D. Cal. Oct. 30, 2019). The Department is committed to hearing and addressing any individualized issue raised by any borrower who believes that he or she did not receive the Full Settlement Relief that the Department promised to the class in the Agreement. Insofar as individualized disputes remain between individual absent class members and the Department, the parties were clear in the Agreement that the waiver and release was "not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date[.]" Settlement Agreement § VII. But Section V of the Agreement is not a vehicle for Plaintiffs to litigate the type of issues and claims that you raise in your letter. No class is certified to litigate the individualized claims that you raise.

**I. Defendants Are in Substantial Compliance with Paragraph IV.A.1.**

Paragraph IV.A.1 requires Defendants to effectuate Full Settlement Relief for approximately 196,000 class members (*i.e.*, class members in the automatic discharge group who attended Exhibit C schools) ("ARG" class members). "Defendants have effectuated relief for purposes of Paragraph[] IV.A . . . when they and their loan servicers have taken all steps necessary to discharge the Relevant Loan Debt of the Class Member[.]" Settlement Agreement ¶ IV.F.1. Your letter fails to describe facts and circumstances supporting a claim of material breach of Paragraph IV.A.1 under Paragraph V.B.2. Second, any claimed breach of Defendants' obligations to the class under Paragraph IV.A.1 is subject to the complete defense of immateriality under

[3] *See* Transcript of Motion Hearing at 74 (Dec. 11, 2025) ("All of those have been substantially completed or have been completed.")

[4] *Id*.

[5] *Id*.

Paragraph V.C because it is premised on 122 of the approximately 196,000 class members at issue under Paragraph IV.A.1.

First, your notice fails to describe any facts or circumstances supporting any claim of breach of Paragraph IV.A.1—material or not. For example, this allegation of breach is based entirely on data reported to you by Federal Student Aid ("FSA") during the May 2026 mandatory monthly meeting. But neither that data nor your allegations identifies whether a borrower's debt involved commercial Federal Family Education Loan Program ("FFEL") loans or loans held by the Department and serviced by loan servicer entities under contract with the Department. Insofar as any of these individuals have FFEL loan debt that is held by a private commercial lender rather than the Department, Plaintiffs fail to explain how the Department or its loan servicers have failed to satisfy their obligations supporting allegations of even immaterial breach, let alone a material breach. *See* Settlement Agreement ¶ IV.F.1.

The notice fails to describe any facts or circumstances supporting a claim of material breach even at the individual level for additional reasons. For example, the data reported to you in May uses a threshold of $1.00 for determining refunds such that a borrower owed only $1.25 on what was originally $400,000 in debt may be reported as having their discharge and refunds not complete. Accordingly, the data reported to you in May cannot form the basis of any claim of material breach under Paragraph V.B.2.

Second, even assuming that Defendants have yet to take action to effectuate relief for these 122 ARG class members, Plaintiffs would not be entitled to relief on any Paragraph V.B.2 claim. Defendants will show that they are entitled to prevail based on "the complete defense" that "the breach" of Defendants' obligations to the class under Paragraph IV.A.1 "claimed by Plaintiffs is not material." Settlement Agreement ¶ V.C. Paragraph IV.A.1 requires Defendants to effectuate Full Settlement Relief for approximately 196,000 ARG class members. Any claimed delay by the Department or its loan servicers affecting 122 of those approximately 196,000 class members is immaterial and does not undermine Defendants' substantial compliance with their obligations to the class under Paragraph IV.A.1.[6]

Your representations to the Court in this action confirm as much. Almost two years ago—when even fewer ARG class members had confirmed complete relief—you represented to the Court that the Department had reached "substantial compliance" with the August 2024 relief

---

[6] You note that the Department's substantial compliance with its obligations "does not insulate it from ***allegations*** of material breach" under ¶ V.B.2 (emphasis added). *See* Letter at 11 (citing ¶ V.B.2's provisions authorizing Plaintiffs to allege a material breach by reference to "any individual who is entitled to receive relief."). But the Agreement does not provide that the Department's failure to timely deliver relief to an individual ***constitutes*** a material breach of the Agreement. The Court's limited continuing jurisdiction to consider allegations under Paragraph V.B.2 based on any individual's circumstances—something Plaintiffs do not actually do for any member of the ARG—does not preclude Defendants from showing that they are entitled to prevail on the ¶ V.B.2 claim relying on the "the defense that the breach claimed by Plaintiffs"—in this circumstance, of Defendants' obligations to the class under ¶ IV.A.I—"is not material" under ¶ V.C. *Sweet* was a class action. The Court's continuing jurisdiction under Section V is not a follow-on action for individualized relief based on the Department's promises to the class in the Agreement.

deadline for the ARG class members. *See* Transcript of 9/26/2024 Hearing at 6:5-13. *See also* Transcript of 3/13/2025 Hearing at 4:19-23 (Plaintiffs' counsel stating, "In terms of implementation as it concerns the automatic relief group and Decisions Groups 1 and 2, which are the groups whose deadlines for relief have passed already, we have made significant progress there. We're at over 97 percent relief completion for those groups.").

**II. Defendants are in Substantial Compliance with Paragraph IV.C.9.**

For essentially the same reasons, your letter fails to describe facts and circumstances to support a claim of material breach of Paragraph IV.C.9. And any such breach claimed by Plaintiffs is subject to the complete defense of immateriality under Paragraph V.C because it is premised on 929 of the approximately 62,230 class members at issue under Paragraph IV.C.9.

**III. Plaintiffs' Allegations Regarding the 816 Individuals Who Have Petitioned the Department for Relief as Part of the So-Called "Administrative Process" Do Not State a Breach Claim Under Paragraph V.B.**

Under Judge Alsup's orders, *see ,e.g.* ECF No. 421, ECF No. 451, the method required for implementing relief to members of the Automatic Relief Group, Decision Group One, Decision Group Two, Decision Group Three, Decision Group Four, Decision Group Five, and the Post-Class Applicants, in full satisfaction of the Settlement Agreement, is the so-called "Terminal Loan Methodology." Under this court-approved approach to Full Settlement Relief, Defendants and their loan servicers must effectuate relief under the Agreement by discharging the terminal consolidation loan in full—including the class member's ineligible loan debt (which the Agreement does not require the Department to discharge or refund)—and providing refunds on amounts paid on the terminal consolidation loan. Plaintiffs do not dispute that Defendants and their loan servicers have completely effectuated relief using the Terminal Loan Methodology ordered by the Court for the 816 individuals you reference on pages three and four of your letter. As a result, Plaintiffs fail to state a claim for breach under Paragraph V.B.2 of the Agreement.

Any individual who believes that they are entitled to a refund of amounts paid to the Department regarding their student loans—including individuals seeking an additional refund beyond that provided under the Terminal Loan Methodology that satisfies Defendants' obligations in this case—are free to request a further refund through the Department of Education Student Loan Ombudsman. *See* 5 U.S.C. § 555(b). Plaintiffs reference materials—Exhibit 3 and Exhibit 4—that discuss Defendants' good faith efforts to articulate—in a nonbinding document that does not create independently enforceable rights or obligations—how Defendants might address those requests for further relief. Those materials were provided by the Defendants in good faith in response to your petitions and requests during various meet and confers. But those materials do not alter or expand the scope of the Settlement Agreement. *See* Settlement Agreement ¶ XV.B. And any alleged violation of the additional processes contemplated in those documents is not a breach of the Settlement Agreement in this action that can form the basis of a breach claim under Paragraph V.B.2. *See id*. Again, there is no dispute that Defendants effectuated relief using the court-ordered Terminal Loan Methodology for all these individuals. Any individual claiming that the Department is taking too long to address a request for additional relief beyond that required by the court-ordered Terminal Loan Methodology may seek to invoke the standards provided by 5 U.S.C. § 706(1) in a new lawsuit.

Defendants are disappointed by your use of their good faith efforts to work cooperatively with you as a sword against which to attack the Department by raising new claims for material breach—and to provide a putative further basis to seek attorney fees from the public fisc—in this action. Under Plaintiffs' theory, post-judgment proceedings in this action could extend indefinitely as long as individual absent class members—based on inherently individualized issues—continue to dispute refund amounts. That is not how Rule 23(b)(2) classes operate and it certainly has little to do with Defendants' compliance with their obligations to the class writ large. On the contrary, the Agreement is clear that individual absent class members have not "release[d] any claim based on an act or omission or other conduct occurring after the Effective Date" addressing inherently individualized complaints about their refunds. Settlement Agreement § VII. Because Defendants and their loan servicers have "determine[d]" if these class members are "entitled to any refund" and if so "isssu[ed] refund check(s)" as part of the court-ordered Terminal Loan Discharge Methodology, *see* Settlement Agreement ¶ IV.F.1, Plaintiffs' claims are beyond the scope of the Court's limited continuing jurisdiction under Section V.

Even accepting Plaintiffs' theory—that Defendants have failed to effectuate Full Settlement Relief for individuals with "incomplete refunds," *see* Letter at 4—Plaintiffs have failed to state a claim for breach of Defendants' obligations with respect to even one individual. Nowhere in their papers or exhibits do Plaintiffs provide any "facts and circumstances supporting a claim" that even one single individual has an incomplete refund. Settlement Agreement ¶ V.D.1. Rather, Plaintiffs assert that 816 individuals have "*presumptively* incomplete refunds" because they have individually petitioned the Department on that issue. Letter at 4 (emphasis added). Plaintiffs nowhere explain the basis of this presumption. Insofar as Plaintiffs are suggesting that the Department is in material breach of the Agreement by providing incomplete refunds, Plaintiffs must provide some concrete evidence supporting the claim. Moreover, Plaintiffs must establish that the issue is capable of classwide resolution. Pro se petitions to the Department claiming incomplete refunds are obviously not entitled to a presumption that the underlying claim in the petition is valid.

Plaintiffs' failure to identify facts and circumstances associated with even one individual suggests, for additional reasons, that you have not stated a claim under Paragraph V.B.2 that Defendants have materially breached Paragraph IV.A.1, IV.C.9, IV.D.1, and/or IV.D.3 of the Agreement under this theory. Consider an absent class member who may have received $3,000 in ineligible debt discharged pursuant to the court-ordered Terminal Loan Methodology and who has now petitioned the Department for an additional $50 in refunds under the administrative process. Insofar as Plaintiffs' breach claim is premised on such an individual's circumstances, Plaintiffs do not state a claim that Defendants have materially breached their obligation to effectuate that individual's relief.

## IV. Unilateral Promises Made in December 2024 Are Not Enforceable Under Section V.B.2, and Even if They Were, the Claim is Subject to the Complete Defense of Immateriality.

For the reasons already explained *supra*, Defendants are not in material breach of Paragraphs IV.A.1 and IV.C.9 of the Settlement Agreement. On page five of your letter, you state that the Department has failed to deliver refunds premised on a unilateral promise made by the Department in December 2024 that amounts collected through the tax offset program ("TOP") and administrative wage garnishments ("AWG") to make payments on defaulted commercial FFEL

loans would be refunded. But Plaintiffs' allegation that Defendants have violated that unilateral promise does not state a claim of material breach under Paragraph V.B.2 of the Agreement.[7]

Moreover, because the subject loans are all defaulted commercially held FFEL loans, any additional refunds that the Department might issue as a result of TOP/AWG are dependent on the guaranty agencies' issuing the refunds after being instructed to do so by the Department. As the Department has explained to you on more than one occasion, the Department does not have contractual relationships with the guaranty agencies, but they have cooperated to provide settlement relief in *Sweet*. *See e.g.*, Defendants' Response to Plaintiffs' Motion to Enforce (ECF 403) at 10 & n.4; Declaration of Richard Cordray (ECF No. 403-1) at ¶¶14, 63-64; 5/22/2024 Department of Justice letter responding to your 5/14/2024 letter at n.2. For this reason as well, you have not stated a claim that the Department and its Loan Servicers have failed to take all steps necessary to discharge the Relevant Loan Debt of any class member insofar as any delay is rooted in a guaranty agency failure to act. *See* Settlement Agreement ¶ IV.F.1.

Even if these allegations fall within the scope of Section V, your notice fails to provide facts and circumstances supporting a claim under Paragraph V.B.2. *See* Settlement Agreement ¶ V.D.1. You have not alleged that even one of the seventy-six borrowers invoked has failed to receive any relief. Plaintiffs instead dispute the amount of the relief provided. But there are no allegations placing the alleged refunds owed for each borrower in the context of the relief already provided under the Agreement. For example, if a borrower has already received $20,000 in discharged debt obligations but is seeking an order that the Department effectuate a $100 refund associated with an intercepted tax refund, that is not a material breach, even from the perspective of an individual class member. Plaintiffs have thus failed to plead materiality even from the perspective of any individual borrower.

In addition, this claim is subject to the complete defense of immateriality under Paragraph V.C. Again, the Department has substantially complied with its obligations to the class under both Paragraphs IV.A.1 and IV.C.9, at a cost of more than ten billion dollars. Defendants will show that any breach of their obligations to the class under Paragraphs IV.A.1 and IV.C.9 to the tune of $144,351.17 is immaterial. To be clear, Defendants represent only that they have substantially complied with their obligations to the class under the relevant provisions of the Agreement and therefore any breach of Paragraphs IV.A.1 and IV.C.9 is immaterial under Paragraph V.C. This document is not intended to represent that any of the seventy-six borrowers that Plaintiffs reference on page five of their letter may not bring an individualized claim for relief against Defendants in a proper forum. *See* Settlement Agreement § VII ("This Agreement is not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date").[8]

---

[7] Nothing in this document is intended to reflect a repudiation of any unilateral promise made by the Department.

[8] Defendants reserve the right to bring additional jurisdictional and threshold objections to any motion for relief under Section V that do not have to be disclosed under Paragraph V.D.3 of the Agreement. For example, Defendants note that Plaintiffs have identified no statutory waiver of sovereign immunity for the district court to adjudicate a claim against the United States for an order awarding a sum of money by a date certain based on the breach of a contractual promise.

**V. Plaintiffs' Allegations Regarding the Department's Internal Governance Procedures Do Not State a Breach Claim Under Paragraph V.B, and Even if They Did, the Claim is Subject to the Complete Defense of Immateriality.**

On pages five and six of your letter, you raise grievances about the Department's "delegation of authority" to the FSA Ombudsman's office. But Plaintiffs identify no provision of the Settlement Agreement compelling the Department to structure its internal operations in any particular way. Rather, Plaintiffs again claim only that Defendants have materially breached Paragraphs IV.A.1 and IV.C.9. For reasons already provided, they have not. Indeed, like the administrative process discussed *supra*, the delegation of authority to the Ombudsman resulted from the Department's voluntary agreement to offer such additional processes to class members and is external to, and not addressed in, the Settlement Agreement. The Department agrees that using the delegation of authority ("DA") process has helped to expedite the resolution of relief issues. However, as the Department has explained to you in several meetings, the Department determined that there was a need to put the use of the DA process on hold temporarily while it improves the process. Your letter fails to recognize that although that particular aspect of the Ombudsman's complaint resolution process is temporarily on hold, the Ombudsman staff has continued in its casework to resolve many other cases that do not involve the DA process.

Even if your allegations fall within the scope of Section V, your notice fails to provide facts and circumstances supporting a claim under Paragraph V.B.2. *See* Settlement Agreement ¶ V.D.1. The notice identifies internal FSA Ombudsman case numbers associated with thirteen pending borrower complaints. But the notice includes only vague and conclusory assertions regarding those complaints. For example, the notice asserts without elaboration that one borrower is "awaiting discharge and refund." The notice fails to provide any of the facts and circumstances surrounding any of the individual thirteen complainants. For some borrowers, even from an individualized perspective, the claim is clearly immaterial on its face. For example, Plaintiffs invoke a claim for $45. But for all borrowers, Plaintiffs fail to place the complaint in the context of the individual's overall settlement relief provided. For example, Plaintiffs invoke another individual who is "awaiting [a] $3,847 refund." But Plaintiffs provide no indication of whether the $3,847 disputed compares to $10 already refunded by the Department or $100,000 already refunded by the Department. The facts stated provide no basis to conclude that, even if the Agreement were between the Department and any of these individuals, any complaint is material.

In any event, this claim is subject to the complete defense of immateriality under Paragraph V.C. Again, the Department has substantially complied with its obligations to the class under both Paragraphs IV.A.1 and IV.C.9, at a cost of more than ten billion dollars, for hundreds of thousands of individuals. Defendants will show that any breach of their obligations to the class under Paragraphs IV.A.1 and IV.C.9 affecting thirteen individuals is immaterial. To be clear, Defendants represent only that they have substantially complied with their obligations to the class under these provisions of the Agreement and therefore any breach of Paragraphs IV.A.1 and IV.C.9 is immaterial under Paragraph V.C. This document is not intended to represent that any of the thirteen borrowers that Plaintiffs reference on page six of their letter may not bring an individualized claim for relief against Defendants in a proper forum. *See* Settlement Agreement § VII ("This Agreement is not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date").

**VI. Plaintiffs' Claims of Fraud by Third Parties Do Not State a Claim Under Paragraph V.B, and Even if They Did, the Claim is Subject to the Complete Defense of Immateriality.**

On pages six and seven of your letter, you allege that fifteen class members had their refund checks "fraudulently cashed" by third parties. This does not state a claim under Paragraph V.B.2 of the Agreement.

Pursuant to the Agreement, "Defendants have effectuated relief for purposes of Paragraphs IV.A, IV.C, and IV.D when they and their loan servicers have" as relevant here "determine[d] if the Class Member . . . is entitled to any refund, and if so, issu[d] refund check(s) for payment of that refund." Settlement Agreement ¶ IV.F.1. You describe no facts or circumstances indicating that Defendants and their loan servicers have failed to satisfy that obligation. You do not dispute that Defendants issued refund checks for payment of the refunds for these borrowers.

As you reference in your letter, the Department of the Treasury has issued binding regulations requiring that any "claim on account of a Treasury check must be presented to the agency that authorized the issuance of such check within one year after the date of issuance of the check[.]" 31 C.F.R. § 245.3. You have not claimed that the regulation is invalid or unenforceable. Even if you were correct that the Agreement includes a provision obligating the United States to investigate the fraud by third parties alleged here outside the time limits provided for under 31 C.F.R. § 245.3—which it does not—the provision would not be enforceable. *See Sarmiento v. Fresh Harvest, Inc.*, 573 F. Supp. 3d 1378, 1389 (N.D. Cal. 2021) ("Contracts that are contrary to express statutes or to the policy of express statutes . . . are illegal contracts." (citation omitted)).

You claim that "these Class Members were not able to learn of this fraud within the time limit because neither the Department nor the servicers gave Class Members any notice of when refund checks were issued." This is not relevant to whether Defendants have breached their obligations under the Agreement. But it is also false. All class members received the court-approved notice under Rule 23, which is the only notice of class action settlement terms that they are required to be provided. *See* Fed. R. Civ. P. 23(e)(1). *See* Settlement Agreement ¶ X.B. That court-approved notice provided each class member with notice of their rights and obligations under the Agreement. Not only did class members receive notice of the Agreement itself and all of Defendants' obligations under its provisions, but the Agreement obligated Defendants to provide additional notices to each class member that they would receive Full Settlement Relief within certain time periods. *See, e.g.*, *id.* ¶¶ IV.C.2.i, IV.C.8. You do not allege that Defendants failed to provide any of these individuals with required notices.

Even if your allegations fall within the scope of Section V, your notice fails to provide facts and circumstances supporting a claim under Paragraph V.B.2. *See* Settlement Agreement ¶ V.D.1. Neither the Government nor the Court may accept as true without conclusive evidence that a Government-issued check was not cashed by the intended recipient but instead cashed by someone else, or that the Government failed to send the check to the appropriate address. Yet your notice includes only conclusory allegations that fifteen individuals had their checks "fraudulently cashed" by third parties. Undoubtedly, this is an insufficient basis upon which to premise a court order compelling the United States to re-issue refund checks already issued "to each affected individual on a schedule set by the Court." Settlement Agreement ¶ V.B.2.i.

Moreover, Plaintiffs have failed to state a Paragraph V.B.2 claim with respect to even one individual for additional reasons. Nowhere in their papers or exhibits do Plaintiffs provide any indication of how much of any individual class member's total refund was allegedly stolen. As is evident from the casework that we review in the regular Ombudsman's meetings, many class members receive their refunds by way of multiple checks. If a borrower has already received $20,000 in refunds but is missing the remaining $100 that was allegedly stolen, that is not a material breach, even from the perspective of an individual class member.

In any event, this claim is subject to the complete defense of immateriality under Paragraph V.C. Again, the Department has substantially complied with its obligations to the class under both Paragraphs IV.A.1 and IV.C.9, at a cost of more than ten billion dollars, for hundreds of thousands of individuals. Defendants will show that any breach of their obligations to the class under Paragraphs IV.A.1 and IV.C.9 affecting fifteen individuals is immaterial. To be clear, Defendants represent only that they have substantially complied with their obligations to the class under these provisions of the Agreement and therefore any breach of Paragraphs IV.A.1 and IV.C.9 is immaterial under Paragraph V.C. This document is not intended to represent that any of the fifteen borrowers that you reference on pages seven and eight of your letter may not bring an individualized claim for relief against Defendants in a proper forum. *See* Settlement Agreement § VII ("This Agreement is not intended to release any claim based on an act or omission or other conduct occurring after the Effective Date").

Sincerely,

*Liam C. Holland*
LIAM C. HOLLAND

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF HOPE AMOH-ADJEI**

I, Hope Amoh-Adjei, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Atlanta, Georgia.

3. I am 48 years old.

4. I borrowed federal student loans in order to attend Brightwood College to get a degree in intellectual property.

5. I applied for Borrower Defense on April 11, 2021. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received my refund. I received full loan discharge in 2017 through Total and Permanent Disability relief.

7. I first reached out to sweet@ed.gov in May 2023 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. The government took my tax refunds from 2013 to 2017. The state of Georgia and the state of Indiana gave me a full audit of how much was offset from me to pay the student loans, and it was over $10,000.

10. On October 9, 2024, I received a call from an Aidvantage representative named Brittney who wanted to confirm if I had received a refund check for $20,180.53. She told me this money had been sent to Federal Student Aid from Nelnet. I told her I had not received the check and that no one else had told me I would be getting a refund. In fact, the Department of Education told me I was not entitled to a refund because I received relief due to my disability, which is incorrect under the *Sweet* Settlement.

11. When I called Nelnet, they were not even aware of my borrower defense case. For seven months straight, I was on top of this, calling every entity I was refered to—the Ombudsman, Nelnet, Aidvantage, Navient, Debt Management; I have sent countless emails, trying to understand what I was being told, and trying to get clarity. But getting a clear answer from anyone feels impossible and it is very mentally draining. Because of the stress this is causing, I thought I would have a heart attack.

12. Receiving this money when it was due in 2024 would have helped me a lot as a person with a disability. In 2018, I was in a bad car crash that severely injured my back. I was in another car accident some time later, which made things worse. I needed to get therapy to help with my leg and back pain. Walking and driving was painful and even dangerous for me. I needed to see a brain specialist because of my back injury. I was told I needed to get some medical procedures to put a metal device in my spine so I could control my movements better. If I had my refund at that time, I could have afforded to take care of my injuries.

13. I want to know a date when I will receive what I'm owed. I've been struggling to get clear answers from people for the past two years and this has gone on for too long. I want definite answers. When will we receive our tax refunds and who will be responsible for verifying that the amounts are accurate? I was able to get the amounts offset from me from the states of

Georgia and Indiana and the Department needs to do its job too. What happened to the $20,000 that Aidvantage sent to the Department? And why are people with disabilities being treated unfairly? I made payments on the loans and I paid taxes, and I still had money unfairly taken from me that has not been returned. I respectfully ask the Court to help us get what we are owed.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

FULTON COUNTY, GEORGIA

Hope Amoh Adjei
Hope Amoh Adjei (Aug 5, 2026 19:30:05 EDT)

Hope Amoh-Adjei

# EXHIBIT 24

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF MARIA ANTOINNETTE BORBON**

I, Maria Antoinnette Borbon, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Davis, California.

3. I am 60 years old.

4. I borrowed federal student loans in order to attend Bryan College to study court reporting.

5. I applied for Borrower Defense on November 18, 2019. I understand that means that I am a member of Decision Group Three under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, July 28, 2025.

6. I have still not received credit tradeline deletion on my Transunion credit report. I am also awaiting a refund of taxes offset to pay for commercial FFEL Bryan College loans.

7. I first reached out to sweet@ed.gov in June 2025 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. Bryan College closed in 2011. I tried enrolling in a community college and was told that I was still enrolled at Bryan College. Bryan College charged students for an extra year of school. They maxed out my federal student loans and took an extra $17,000 from me. An attorney filed individual lawsuits on behalf of twenty Bryan College borrowers, but I never heard back from him.

10. In 2012, I had to default because I could not afford to make payments. My tax refund was offset for five years, from 2014-2019. To this day, I am still not able to puruse an education or get any type of loan because of my bad credit.

11. While my relief was due over a year ago, I have only received a single check for $2,800. This is not the full amount that was taken from me for five years in a row. I reached out to the Department in 2025 and they told me that they do not know how to refund borrowers like me.

12. The truth is that no amount of money can ever restitute the pain and suffering I have endured. I have suffered financially and professionaly because I was robbed of a court reporting career—something that could have given me financial freedom. I cannot buy a home, cannot get credit, and cannot get a loan to make any big purchases. This is a real emotional and mental blow that is beyond explanation.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

YOLO COUNTY, CALIFORNIA

[signature] toinnette Borbon (Aug 5, 2026 10:36:27 PDT)

Maria Antoinnette Borbon

# EXHIBIT 25

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF DANIEL CONIDI**

I, Daniel Conidi, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Chicago, Illinois.

3. I am 69 years old.

4. I borrowed federal student loans in order to attend Thomas M. Cooley Law School.

5. I applied for Borrower Defense in July 2020. I understand that means that I am in Decision Group Four under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, January 28, 2026.

6. I have not received any refund. I received loan discharge in 2025.

7. I first reached out to sweet@ed.gov in May 2025. I reached out again every few weeks. After the relief deadline, I reached out on February 5, April 6, and on June 17, 2026. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement relief has caused me to suffer harm as described below.

9. I am 69 years old and rely on a fixed income consisting of Social Security and a pension. Because I have not received the refund I am owed, I have had to pay for basic living necessities, including housing, utilities, and medical costs, using credit cards. Those balances continue to accrue interest each month, which has increased the total amount I owe rather than reduced it. This has made it materially more difficult for me to meet my monthly obligations on a fixed income. Had I received my refund when I was entitled to it, I would not have needed to rely on credit card debt to cover these expenses, and receiving that refund now would directly and substantially improve my financial situation.

10. In 2018, I defaulted on two FFEL loans. Between May 1, 2019, and March 2, 2020, the Department of Education collected money from my Social Security benefits and federal pension via Treasury Offset Program. The official U.S. Treasury garnishment letter dated June 19, 2019, indentified the creditor as: "U.S. DEPARTMENT OF EDUCATION."

11. I've provided the Department with all the information they need to give me my refund. I obtained my records from AES, which shows at least $14,102.92 taken from my taxes. The actual amount offset from my benefits may have been higher if Treasury retained collection fees before crediting my account.

12. AES said they never received this money and that the those funds are kept by the U.S. Department of Treasury. However, federal regulation clarifies where offset collections are actually transmitted: "amounts collected by offset shall be transmitted by Fiscal Service to the creditor agency account." 31 C.F.R. §285.5(e)(1). The creditor agency was the Department of Education, as confirmed by U.S. Treasury garnishment letter. Treasury is a collection agent. The Department of Education is the creditor.

13. I respectfully ask the Court to ensure that I, and others in my position, receive the relief we are owed. Every month this relief is delayed, my credit card balances grow further due to accumulating interest, making it harder for me to recover financially even after I eventually receive my refund.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2026

COOK COUNTY, ILLINOIS

Daniel Conidi (Aug 7, 2026 21:56:51 CDT)

Daniel Conidi

# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*
*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF ANDREW EDGERTON**

I, Andrew Edgerton, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Paradise, Michigan.

3. I am 49 years old.

4. I borrowed federal student loans in order to attend Le Cordon Bleu College of Culinary Arts.

5. I applied for Borrower Defense on February 2, 2016. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have received a refund of about $2,000. I still have not received $8,500 that I know I am owed. I may be entitled to more, but the Department's website has no trace of the full amount.

7. I first reached out to sweet@ed.gov on June 4, 2024. I have never received a response to more than twenty emails I sent asking about my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I need to get my roof fixed. The money that was taken from my wages could have been used for this and a lot of other things I need.

10. Having my wages garnished is like a domino effect that led to me having to put a lot of things on the backburner just to survive. Being deprived of my own income has caused me to put off things for over twenty years.

11. I first defaulted in 2006 or 2007. The school I got into debt for lied about expected salaries and job placements. I was expecting to make $40,000 a year to afford paying student loans. In the cooking industry, the first several years you're making minimum wage. Then, my car broke down. Then came more unexpected expenses.

12. My wages were first garnished in 2011. They took them again every year until 2014. The same thing happened with my tax returns. From 2011 to 2014, I could not count on my wages or tax return to pay for basic necessities.

13. I respectfully ask the Court to help us get what we are owed.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

LOS ANGELES COUNTY, CALIFORNIA

Andrew Edgerton
Andrew Edgerton (Aug 5, 2026 10:42:36 EDT)

Andrew Edgerton

# EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF RAFAEL GALAVIZ**

I, Rafael Galaviz, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Sacramento, California.

3. I am 50 years old.

4. I borrowed federal student loans in order to attend Everest College to get a Massage Therapy Certification.

5. I applied for Borrower Defense on May 6, 2017. I understand that means that I am a member of Decision Group 1 under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 20, 2024.

6. I have still not received a refund of the money the United States garnished from my wages and seized from my tax refunds before my loans were discharged. I am waiting for a refund and believe I am owed approximately $1,200.

7. I first began reaching out to the Department of Education and PPSL in August 2024 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. The Department's delay has prevented me from gaining emotional closure on one of the most troubling times in my life. Through my education, I gained a certificate that is useless, and I've been unable to go to another school to further my career.

10. Furthermore, the financial, mental, and emotional burden of doing retail work has been heavy. A refund will help me financially, and having this all behind me will allow me to move on with my life.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: 08/10/2026
SACRAMENTO COUNTY, CALIFORNIA

Rafael Galaviz (Aug 10, 2026 07:10:45 PDT)

Rafael Galaviz

# EXHIBIT 28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF NANETTE HRONEK**

I, Nanette Hronek, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Pine Knot, Kentucky.

3. I am 54 years old.

4. I borrowed federal student loans in order to attend Brown-Mackie College to study medical assistance and surgical tech.

5. I applied for Borrower Defense on August 21, 2018. I understand that means that I am in the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received a refund. My loans are down to $0 and they took them off my credit report.

7. I first reached out to sweet@ed.gov in May 2024. I reached out to the Ombudsman before they changed Ombudsman, but no one has ever responded to me. I have

received automatic responses that they are working on my case. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. My loans started with Great Lakes, then were transferred to Nelnet, then Sloan. In 2025, Sloan told me they submitted a refund to the Department but I never received it. The amount Sloan submitted was for $200.

10. I was able to get my records and submitted proof to show where the government had taken my income tax refund in 2013, 2014, and 2015 to pay the student loans. One year they took around $9,000. Another year they took $5,000. The federal website doesn't show the full payment history either, and I can't contact Great Lakes because they shut down and the school shut down too. No one can tell me where my money went.

11. I had to deafult around 2013 because the student loan payments were too high. I had kids I had to raise. I couldn't find a job with my degree. When I was told I would get my tax refunds back, I was waiting on that money to support my kids. When you rely on that money and don't get it, it puts a damper on you.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2026

MCCREARY COUNTY, KENTUCKY

(Caudill) Hronek (Aug 7, 2026 22:05:39 EDT)

Nanette Hronek

# EXHIBIT 29

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF CRYSTAL JASPER**

I, Crystal Jasper, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Cincinnati, Ohio.

3. I am 41 years old.

4. I borrowed federal student loans in order to attend Lincoln College of Technology to study criminal justice.

5. I applied for Borrower Defense on March 25, 2021. I understand that means that I am in the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. Although my federal student loans were discharged, I have still not received any of the money that should have been refunded to me.

7. I first reached out to sweet@ed.gov in 2024 and have not received any responses. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I am a full-time college student working toward my bachelor's degree while raising two young children with autism as their sole caregiver. Because of their disabilities, I am unable to work a traditional full-time job outside the home. Every dollar matters to our household.

10. The money that remains owed to me is not extra money—it is money that was wrongfully taken from me over the years on loans that should have never existed. The *Sweet* settlement recognized that harm and promised relief. While I am grateful that my loans were discharged, the refund portion of my settlement has still not been completed.

11. The continued delay has caused real financial hardship. My family has faced ongoing hosuing challenges, rising costs of living, educational expenses, transportation needs, and the daily costs of raising two children with special needs. I have had to make difficult decisions about purchasing the equipment I need for college while trying to provide stability for my children.

12. If I had received my refund in a timely manner, it would have helped me pay for essential education items for school, including a reliable computer, textbooks, course materials, software, and other necessary supplies. As a full-time student, these expenses are critical to my success, and the delay has forced me to continue struggling to afford the tools I need to complete my coursework and achieve my goals.

13. Receiving the remainder of my settlement would make a meaningful difference in our lives. It would help relieve financial pressure that has continued long after the Court approved this settlement.

14. I fulfilled every requirement expected of me as a class member. I trusted that the settlement approved by the Court would be honored in full. It is discouraging that years later I am still waiting for relief that was promised.

15. I respectfully ask the Court to require the Department of Education to fully comply with the *Sweet* settlement and provide the remaining relief owed to class members like me without further delay.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2026

HAMILTON COUNTY, OHIO

Crystal Jasper (Aug 7, 2026 18:11:27 EDT)

Crystal Jasper

# EXHIBIT 30

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF STELLA JEAN JOHNSON**

I, Stella Jean Johnson, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Harrisburg, Illinois.

3. I am 53 years old.

4. I borrowed federal student loans in order to attend High Tech/Anthem Insitute to study criminal justice.

5. I applied for Borrower Defense on November 18, 2018. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received my refund. I received full discharge of my loans in 2024, but they still show on my credit report as "loans discharged." It was my understanding that they were supposed to be completely deleted from my credit report.

7. I first reached out to sweet@ed.gov in 2025 after I was told that I was owed an $800 refund. I reached out to tell them I was entitled to more than that. Twelve weeks later, the

Department told me that my $800 refund was disbursed in several checks in 2020, however I never received those checks. Someone else received and cashed those checks in 2020, meaning I am not eligible to fill out a "fraud packet" to get my refund. I am also waiting on a refund from a tax refund offset to pay commercial FFEL High Tech Institute loans.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I defaulted in 2012 because I could not afford to make payments. Then, my wages were garnished around 2013-2014. I have been waiting for my refund since 2018 when I filed for borrower defense to repayment.

10. In 2025, the Department told me I was entitled to $800, but I believe I am entitled to more than that amount. I am not able to get my full loan history from Aidvantage because they say I have no loans with them, due to the loans being discharged. However, in 2023, Aidvantage issued a refund for $1,900 but then rescinded it without explanation.

11. Waiting so long for this money has caused me great harm as a person living with a disability. I have been waiting on this money to do repairs on my home. I need a new roof and a furnace. I have lived wihtout a furnace for the past three years. Because I have to use space heaters, my electric bill is $1,900 a month. I also tried to get a credit card to make house repairs or at least get supplies for the roof and was denied because of the student loans on my credit report. The two credit cards I do have only have a $350 limit, so I am not able to purchase supplies or hire someone to do house repairs.

12. I believe I am owed $4,000. To someone like me, that amount would help tremendously. Having to wait years for an answer is mentally exhausting. I have anxiety, panic attacks, and suicidal thoughts. My mental health not only affects me, but those around me. I am in a bad and irritable mood around my loved ones because of the Department's failure to issue my refund when it was due. It's not fair that I take it out on others, but it's hard to be in a good mood with this hanging over my head.

13. Nobody can tell me when I will actually receive my refund. So I just have to wait, while continuing to pay bills, including 38% interest on my credit cards. I ask the Court to please

do something to make the Department deliver us our owed relief. This is out of control and hundreds of us are affected.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2026

SALINE COUNTY, ILLINOIS

Stella Johnson (Aug 7, 2026 13:45:47 CDT)

Stella Jean Johnson

# EXHIBIT 31

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*
*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF WILLIAM BRADLEY LAMB**

I, William Bradley Lamb, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Smyrna, Tennessee.

3. I am 56 years old.

4. I borrowed federal student loans in order to attend CareerCom Junior College of Business.

5. I applied for Borrower Defense on June 30, 2020. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received my refund. I received discharge of my loans last year, finally. In 2020, I received a check for $500, but it is my understanding that this is not the full amount I am owed.

7. I first reached out to sweet@ed.gov in 2023 to ask about the status of my relief. I have also contacted Edfinancial countless times but they tell me something different every time I

call. I asked Edfinancial to do a full audit of my account because I've been passed around different servicers and I do not believe they have an accurate record of my loan history. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I took out the student loans in 1989. I believe I first defaulted sometime in the late 1990s. They took my first tax refund around that time, and again in the early 2000s. I was not able to afford student loan monthly payments.

10. Eventually, I was able to find employment, but nothing related to my time at CareerCom.

11. I expected to have this refund by 2024. Things would have been very different if I had received this money years ago. When I learned that I was getting a refund, I was hopeful. Then, the refund never came. I was living with a roommate, but could not afford being the only income in the household. In 2025, I became homeless.

12. I have submitted complaints with the Ombudsman's office hoping to get a date when I will receive the money I'm owed. I am going to start school again soon, despite my experience, and hope things are better this time. Right now, I'm doing my best to find stable housing and I'm glad I have some people I can rely on.

13. I ask the Court to please consider what people are going through. When I'm late on a payment, I get charged extra in the form of interest. The Department has blown so many deadlines that there should be a little more consequences, they should pay an interest to the people affected too.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5____, 2026

LOS ANGELES COUNTY, CALIFORNIA

William Bradley Lamb
William Bradley Lamb (Aug 5, 2026 11:34:28 CDT)
______________________

William Bradley Lamb

# EXHIBIT 32

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al*<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>*Defendants*. | Case No.: 19-cv-03674-HSG<br><br>**DECLARATION OF TEANA LILES** |

I, Teana Liles, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Baytown, Texas.

3. I am 59 years old.

4. I borrowed federal student loans in order to attend ITT Technical Institute to get a degree in Computer Science.

5. I applied for Borrower Defense on September 11, 2019. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received a refund of the money the United States garnished from my wages and seized from my tax refunds before my loans were discharged. I am awaiting a refund and believe I am owed approximately $25,000.

7. I have been reaching out to PPSL and the Department of Education since at least May 2024 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. The Department's failure to deliver my Full Settlement Relief has caused me to suffer severe financial hardship and ongoing instability. Because the government has not returned the money that was garnished from my wages and seized from my tax refunds, I am trapped in a cycle of living paycheck to paycheck and am barely getting by.

10. Furthermore, waiting for this relief has severely damaged my credit score due to the impact of the unpaid loans hanging over me, compounding my financial distress. The rising cost of living has made it impossible to keep up with my basic expenses without this refund. I am currently facing a mountain of unpaid bills, and I am forced to pay all of my monthly obligations late, which continuously causes further damage to my credit. The situation became so desperate that I had to borrow money from high-interest payday loans just to pay my rent and keep from being evicted from my home.

11. Experiencing this level of daily financial survival while knowing the Department of Education missed its legally mandated December 31, 2024, deadline to return my money has caused me immense stress and anxiety. If the Department had delivered my refund on time, I would have been able to clear my past-due bills, avoid predatory debt, begin repairing my credit score, and achieve basic housing security.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: 08/05/2026
HARRIS COUNTY, TEXAS

Teana Liles
Teana Liles (Aug 5, 2026 15:32:30 CDT)

Teana Liles

# EXHIBIT 33

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*
*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF LORITZA MELENDEZ**

I, Loritza Melendez, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Poughkeepsie, New York.

3. I am 60 years old.

4. I borrowed federal student loans in order to attend Wilfred Academy of Hair and Beauty Culture.

5. I applied for Borrower Defense on September 28, 2020. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I still have not received my refund. My loans have been discharged, and two out of three credit reporting agencies have deleted the credit tradelines.

7. I first reached out to sweet@ed.gov in 2023 to ask about the status of my relief. I have been contacting the Deparment since 2019. I understand that PPSL has been trying to secure my missing relief, but has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement relief has caused me to suffer harm as described below.

9. I have been dealing with the harm from Wilfred Academy for the past 40 years. I was 19 years old when I took out $5,000 in student loans to attend Wilfred Academy. They only disbursed $2,500 because I had to withdraw due to safety concerns. However, I was told that I would have to pay the full $5,000 back.

10. I had to default around 1985. Then, in 1988, my wages were garnished to pay for that $5,000 loan. I tried to tell every institution—the banks, the Department—that my school had been shut down due to fraud, and that I never received the full loan amount. But no one listened.

11. I was then 20 years old and spending any little money I made through odd jobs on this loan. I was afraid because they threatened to take my father's house since he was the co-signor.

12. Every single year, until I received discharge through the *Sweet* case, they took my wages and tax returns. They took money not only from me, but from my family. I was raising two girls and the heartache and anxiousness we felt every tax season was awful. Despite paying taxes and working hard, we knew we could never count on that money because it would be taken from us.

13. All those years, we could have used that money to get ahead by paying major bills, repairing cars, or doing something nice for my girls. This loan hanging over my family felt like a constant threat we could not get rid of—we felt oppressed. There was nothing we could do to fix this. My husband, who was working as a window cleaner at the time, was risking his life for his job and we also had to consider that his wages could be taken. We had to pay more money to fill out the proper spousal tax form to protect his state and federal tax refund. We were never able to afford a down payment for a house.

14. This should not have gone on for so long—40 years spent suffering over a $5,000 loan to pay for a fraudulent school. If it wasn't for this case, my wages and tax refunds would still be garnished from me. How does $2,500 take 40 years to pay? I respectfully ask the Court to do right by all affected borrowers and tell the Department to give us what we are owed.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5___, 2026

DUTCHESS, NEW YORK

Loritza Melendez (Aug 5, 2026 10:27:43 EDT)

Loritza Melendez

# EXHIBIT 34

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al*<br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>*Defendants*. | Case No.: 19-cv-03674-HSG<br><br>**DECLARATION OF EDMUND LEONARD MICHELIN III** |

I, Edmund Leonard Michelin III, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Hollywood, California.

3. I am 42 years old.

4. I borrowed federal student loans in order to attend ITT Technical Institute to get a degree in computer electronic engineering.

5. I applied for Borrower Defense on October 19, 2018. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received any relief. I was told that a refund check was sent in 2024, but neither my mother, who was my co-signer, nor I received it. The check was fraudulently cashed by someone else. I understand that since I did not learn of this fraud until a year after the check was issued, I am not eligible to request a "fraud packet" to get my refund reissued to me.

7. I first reached out to PPSL in 2025 to ask about my Settlement relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I defaulted around 2009-2010 because I could not afford to make payments. I had moved out of my home state in 2007. When the recession happened, life got a lot more difficult. I was threatened with wage garnishments and they might have taken one or two of my tax refunds.

10. I made payments on these loans for five years straight, once I was able to. Then around 2012-2013 I could only afford to pay $30 a month. My mother, who was my co-signer, paid off her portion of the loans.

11. For me, things are tough right now. Everything is getting more expensive and having this money would have helped a lot, especially two years ago when I did not have a car. In 2023, I was experiencing seizures and other medical problems and was set back financially because of it. With this refund, I hope to catch up on bills.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 6, 2026

LOS ANGELES COUNTY, CALIFORNIA

Edmund Michelin (Aug 6, 2026 03:37:12 PDT)

Edmund Michelin

# EXHIBIT 35

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al*<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>*Defendants*. | Case No.: 19-cv-03674-HSG<br><br>**DECLARATION OF SANDRA OGDEN** |

I, Sandra Ogden, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Ripon, California.

3. I am 47 years old.

4. I borrowed federal student loans in order to attend Remington College.

5. I applied for Borrower Defense on August 24, 2020. I understand that means that I am an Automatic Relief Group member under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received a refund of the money the United States garnished from my wages and seized from my tax refunds before my loans were discharged. I believe I am owed a refund of approximately $10,000.

7. I have been reaching out to PPSL and the Department for some time, including multiple times this year, asking about the status of my refund. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. The delay in receiving my refund has caused significant financial harm, as I have been deprived of the funds that are rightfully owed to me. Furthermore, I was never notifed that my loan was in default, nor was I ever contacted regarding the wage garnishment or given an opportunity to resolve the situation.

10. In addition to the financial impact, this situation has caused considerable emotional distress due to the ongoing and frustrating lack of resolution from the Department of Education.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: 08/10/2026

SAN JOAQUIN COUNTY, CALIFORNIA

Sandra Ogden (Aug 10, 2026 09:36:33 PDT)

Sandra Ogden

# EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF CANDACE PERKINS**

I, Candace Perkins, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Schaumburg, Illinois.

3. I am 37 years old.

4. I borrowed federal student loans in order to attend DeVry University to get a Bachelor's in Business and Master's in Public Health Administration.

5. I applied for Borrower Defense on March 29, 2019. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received my refund for payments I made on mixed consolidation loans. I have received discharge and credit tradeline deletion.

7. I first reached out to sweet@ed.gov in 2024 to ask about my refund. I emailed several times and have not been able to get a substantive response. I emailed PPSL in 2025 to

ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I received two degrees from DeVry that are worthless. I believed that the school would set me up financially and professionally. Instead, I was defrauded, like many others, not only of money but of time and hope. I am not making the salary that I went into debt for. I have had to file bankruptcy and currently, I am behind in bills, rent, and now have to pay for late fees. Instead of the career I was promised, I take odd jobs to support myself.

10. I am also my mother's primary caretaker. She is a senior citizen who requires full-time care.

11. I do not understand why it takes the government so long to refund my the money I am owed. I have asked countless times for updates and nobody can tell me a final date by which I will receive my refund. I just hope that this year we can hear a definite and clear update that the government will actually follow.

12. Waiting years for this refund has caused me a lot of financial and psychological stress. With the refund, I could catch up on bills and not have to pay the late fees.

13. I respectfully ask the Court to order the Department to fulfill its obligations under the Settlement.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 8, 2026

COOK COUNTY, ILLINOIS

Candace Perkins (Aug 5, 2026 15:48:45 CDT)

Candace Perkins

# EXHIBIT 37

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF LYNNE ELIZABETH PETERS**

I, Lynne Elizabeth Peters, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Stafford Springs, Connecticut.

3. I am 41 years old.

4. I borrowed federal student loans in order to attend Connecticut Culinary Institute/Lincoln Technical Institute to study advanced culinary arts.

5. I applied for Borrower Defense on July 9, 2021. I understand that means that I am in the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not been reimbursed for anything, not for the taxes the government took starting in 2018 until 2020. I received loan discharge.

7. I first reached out to sweet@ed.gov sometime in 2024. I would reach out every six months to ask about my refund. No one ever responded. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I went to a school that promised me that I would find a job in the culinary field, making $70,000 a year. Instead, I had to work multiple jobs just to survive and afford rent and other basic necessities. I definitely couldn't afford to make student loan payments.

10. I experience daily harm in how this has affected every aspect of my life. My credit is impacted. I have credit cards with crazy amounts because I had to put food on credit cards. This all because I still don't have the money I'm owed.

11. Receiving my refund would clear my debt, essentially. I was taken advantage of when I was young and now I feel like after 25 years of being ignored and unheard, I have to wait more for the money they took from me. I feel like I don't matter when it comes to the eyes of the education system in America.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 7, 2026

TOLLAND COUNTY, CONNECTICUT

Lynne Peters (Aug 7, 2026 18:13:08 EDT)

Lynne Elizabeth Peters

# EXHIBIT 38

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF LISA RIFFLE**

I, Lisa Riffle, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Mesa, Arizona.

3. I am 62 years old.

4. I borrowed federal student loans in order to attend University of Phoenix to get a Master's Degree in business.

5. I applied for Borrower Defense on December 19, 2019. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received my full refund amount. I have received discharge and my credit report was updated in late 2023. In 2025, I received a check for $5,000, but I made $28,000 worth of payments on mixed consolidation loans.

7. I first reached out to sweet@ed.gov in 2023 to ask about the status of my refund. I reached out every six months througout 2024 with no response. In 2025, I reached out again after

finding out that I was eligible for administrative review of payments made on mixed consolidation loans. I understand that PPSL has been trying to secure my missing relief, but has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I am retired and have been waiting for my refund for over two years. I called the Department of Education and the phone representative was not aware of my Borrower Defense case. They told me that I was not entitled to a refund and to call my servicer. Nelnet told me that they did not have my loan records. I emailed the Ombudsman's office all of the payment history I downloaded from Great Lakes, which shows the full history of payments I made on the consolidation loans. I don't understand why it is taking so long, when I sent them all the information they need to confirm my refund amount.

10. Not knowing if this refund will ever come is causing me great mental, physical, and financial stress. I do not have medical insurance and decided to undergo a medical procedure during the year I was told my refund would come. Now, I am in medical debt with compounding interest. I do not qualify for Medicare yet. I have incurred additional costs that I was not counting on, because I believed the Department would obey the Settlement and comply by the relief deadline.

11. When I received the $5,000 check last year, I was hopeful that meant my money would be rerturned soon. Now, I feel hopeless again and I just hope I live long enough to receive it. I told my kids that, in case I am gone, they should look out for that money. My life feels on hold and it is very emotionally taxing.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

MARICOPA COUNTY, ARIZONA

Lisa M Riffle
Lisa M Riffle (Aug 5, 2026 10:17:53 EDT)

Lisa Riffle

# EXHIBIT 39

| | |
|---|---|
| THERESA SWEET, *et al*<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>*Defendants*. | Case No.: 19-cv-03674-HSG<br><br>**DECLARATION OF LESLIE SMITH** |

I, Leslie Smith, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Wellston, Oklahoma.

3. I am 47 years old.

4. I borrowed federal student loans in order to attend Wright Career College to get a cerrtificate in Medical Billing.

5. I applied for Borrower Defense on April 9, 2017. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received a refund of about $12,000 that was offset from my tax return to pay for commercial FFEL Wright Career College loans. I have received a discharge and credit tradeline deletion.

7. I first reached out to sweet@ed.gov in September 2024 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I enrolled in Wright Career College because I was told there would be guaranteed job placement. However, after I finished the certificate, I could not find a job in that field, so I took any job I could find.

10. I was a single mom and I could not afford to pay student loans, so I had to default. At some point, I got a letter in the mail that $12,000 would be taken from my tax return.

11. I reached out to the Department in 2024 to ask about my Settlement relief. They told me that they would do an investigation of my case. I was not even aware that I was entitled to a refund of the offset tax amount until I read about it online and after PPSL informed me. I first reached out to PPSL in December 2024, after not receiving an update from the Department.

12. Waiting so long for my refund has caused me a lot of stress. It is frustrating that the Department did not even let me know that I was due a refund and that we have to follow up so much for something they should have done years ago under the Settlement. This situation has left me feeling hopeless that I will ever get the money I am owed. I abandonded the possibility of returning to school because of this whole experience. Receiving this money would help me and my family, as it would help a lot to pay the bills.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

LINCOLN COUNTY, OKLAHOMA

Leslie Ann Smith (Aug 5, 2026 09:36:37 CDT)

Leslie Smith

# EXHIBIT 40

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF KIWANA WATSON**

I, Kiwana Watson, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Memphis, Tennessee.

3. I am 49 years old.

4. I borrowed federal student loans in order to attend ITT Technical Institute to study computer programming.

5. I applied for Borrower Defense on April 15, 2018. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received any refunds. The loans have been discharged.

7. I first reached out to sweet@ed.gov in 2024 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I have sent the Department multiple messages regarding my situation. My children and I were given two weeks to pay or vacate this week (July 30, 2026). My daughter recently had surgery and we are in the midst of seeking a child support settlement. That money could have saved us from homelessness in the meantime.

10. I feel we are owed further restitution beyond the original amount due to further hardship incurred simply by the government's refusal to provide the full relief even after the original harm was acknowledged. This has burdened and hampered my family financially, emotionally, and psychologically for decades.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 10, 2026

SHELBY COUNTY, TENNESSEE

Kiwana Watson
Kiwana Watson (Aug 10, 2026 10:11:14 CDT)

Kiwana Watson

# EXHIBIT 41

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*
*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF KYLE YOUNG**

I, Kyle Young, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Chino Hills, California.

3. I am 42 years old.

4. I borrowed federal student loans in order to attend Brooks College to get a degree in filmmaking.

5. I applied for Borrower Defense on March 23, 2021. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received my refund. I am still missing about $7,000 from wages garnished to pay on commercial FFEL Brooks Institute loans. The majority of the federal loans were discharged but one is still pending for about $2,324. I am also still waiting for my credit report to be updated.

7. I first reached out to sweet@ed.gov in 2024 after the first relief deadline (January 28, 2024) to ask about my refund and loan discharge. The Department directed me to the loan servicer, who then directed me to the Department. I spent about a week and a half going back and forth between the Department and the servicer until I got frustrated. I was never able to get a response from anyone. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I defaulted around 2006 or 2007. My wages were first garnished in 2009. They were garnished for about four or five years. This has caused and continues to cause me harm because I continue to be deprived of money I am owed.

10. I was 18 years old when I enrolled at Brooks Institute, believing that I was going to get the education I signed up for. Because of the school's fradudulent activities, I was not able to earn the salary I was promised. At the time, I was not making enough to both pay the student loans and afford the cost of living. Still, I had to use payment plans, debt plans, and credit cards to pay for necessities. I am still paying down all of these things today.

11. This debt from twenty years ago continues to affect every aspect of my life. Interest rates continue to roll because of debt I incurred twenty years ago. I never had a chance to live a debt-free life. I am not able to get caught up with my finances due to the viciousness of interest rates. Every month when I receive a billing statement, I am reminded of that failure from over twenty years ago.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 5, 2026

SAN BERNARDINO COUNTY, CALIFORNIA

Kyle Young (Aug 5, 2026 08:27:27 PDT)

Kyle Young

# EXHIBIT 42

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al*<br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>*Defendants*. | Case No.: 19-cv-03674-HSG<br><br>**DECLARATION OF JODY TAYLOR** |

I, Jody Taylor, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Pittsfield, New Hampshire.

3. I am 44 years old.

4. I borrowed federal student loans in order to attend the International Academy of Design and Technology (IADT) to get a degree in computer animation.

5. I applied for Borrower Defense on October 16, 2017. I understand that means that I am a member of the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have still not received my refund. I did receive student loan discharge in 2024.

7. I first reached out to sweet@ed.gov in 2024 to ask about the status of my relief. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. The predatory school I attended maxed out all of the federal student loans I could borrow. They did the same with Pell Grants. And they also refered me to Sallie Mae, so I had to take out private student loans too.

10. I understand that this Settlement cannot refund me on payments I made on private loans, or commercial FFEL loans, but I still paid over $50,000 in the span of 25 years because of IADT. The way the lenders chased me to make payments was very predatory. They also would not work with me when I was struggling to make payments, so for a while I was paying Sallie Mae $1,000 a month. Years of paying so much money only to see my student loan balance go up was devastating.

11. Around 2022 or 2023, I received a letter from the Department about the *Sweet* Settlement. At the time I still had a balance of $83,851 in student loans for IADT. We paid off all the private loans back in 2016, so I was excited to learn we would get some relief after all this time.

12. I received two checks, for $5 and $10 dollars, with no letter or explanation of what it was. I called Nelnet to ask about how much I would be entitled to and they said they didn't know. They told me I had to call the Department of Education and the Department said that the servicers are the ones who would have my payment history and to call them. At this point, no one has told me how much I'm entitled to. I've kept records of my payments and I filed complaints with the Ombudsman's office to know for certain how much in payments I'm getting back. No one can tell me how much refund I'm owed.

/

/

/

/

/

/

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 10, 2026

MERRIMACK COUNTY, NEW HAMPSHIRE



Jody Taylor (Aug 10, 2026 17:17:45 EDT)

Jody Taylor

# EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF PATTY COBB**

I, Patty Cobb, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Richmond, Virginia.

3. I am 62 years old.

4. I borrowed federal student loans in order to attend Virginia Commonwealth University to get a Master's degree in social work.

5. I applied for Borrower Defense on July 6, 2020. I understand that means that I am in Decision Group Four under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by January 28, 2026.

6. I have approximately $280,674 in outstanding federal student loans. In December 2025, my servicer, Sloan, credited my account approximately $33,000. I emailed the Department, Sloan, and Nelnet so many times, asking why I have only received a partial discharge of my loans. I even hired an attorney to help expedite my case.

7. I first reached out to sweet@ed.gov on August 28, 2025 to ask about the status of my relief. I received an automated email that the Department was investigating my case and have not heard anything else. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. Waiting so long for this relief is very emotionally draining. When I received some loan discharge in December, I was hopeful that more was coming. Now, I see that $11,000 or $12,000 in interest is accruing. Come December, I'm going to have to start paying it according to my servicer. Every day I see my balance going up. The money keeps accumulating. I took out a small amount for school, but the interest and the transfer of different servicers has made this go up so much. It is astronomical. I was very young when I went to school and I wish I had a little better guidance on how all this would affect me.

10. It is very frustrating that this is still not resolved. My loans are due in December. They are in administrative forbearance right now, but I'm getting emails that I'm supposed to choose an income based plan to figure this out. It is a huge amount with interest capitalizing. I don't want to default on my loans, I have always made payments to never default. But the balance is so big, I am not sure what will happen.

11. I was never notified when the discharge started, I just logged into my account and saw the amount had changed. It is very overwhelming, when you're single, want to get an education, doing the "right thing," with no financial guidance or even help from school. The schools don't realize the impact of all of this. When you trust the school and the Department of Education, you trust that they tell you the truth and the risks. Then you're older and realize you're on your own.

12. Reading the stories of other people affected is heartbreaking. We all need help understanding this education system, because it is too complicated and it is not what most people think. We need better tools to guide people.

13. I was so happy when I was told I would get loan discharge. I was single with no job, no idea how I would pay. I want this expedited. I can't trust the servicer to get this right. From 2001 to 2006, I made regular, recurring monthly student loan payments directly to ACS Student Loan Services over those years, despite any missing records caused by ACS's poor data tracking. I made monthly payments of $480+.

14. I want to feel like I can breath again.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 10, 2026
RICHMOND, VIRGINIA

P.Cobb
Patty Cobb (Aug 10, 2026 17:19:34 EDT)

Patty Cobb

# EXHIBIT 44

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, *et al*

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION

*Defendants*.

Case No.: 19-cv-03674-HSG

**DECLARATION OF JENNA WARDNER**

I, Jenna Wardner, state as follows:

1. I am submitting this declaration in relation to the above-captioned case. I am over the age of eighteen. The statements contained herein are true and accurate to the best of my knowledge.

2. I live in Brooklyn, New York.

3. I am 38 years old.

4. I borrowed federal student loans in order to attend the Art Institute of Portland.

5. I applied for Borrower Defense on March 17, 2020. I understand that means that I am in the Automatic Relief Group under the *Sweet v. McMahon* Settlement, and I was entitled to Full Settlement Relief by, at the latest, December 31, 2024.

6. I have not received my full refund. I received one check in August 2024. I am still waiting for another check that was cashed by someone else in April 2024.

7. I first reached out to sweet@ed.gov sometime in 2024. I reached out to the Department before that, in 2021. I have sent lots of communications to the Department with little to no response. I received communications more recently and it sounds like they are trying to

reissue my stolen check and that I'm not the only one this happened too. I understand that PPSL has been trying to secure my missing relief, but not has not been able to resolve my issue.

8. The Department's failure to deliver Full Settlement Relief has caused me to suffer harm as described below.

9. I'm probably one of the lucky ones because I received the larger check. That check had at first been altered and cashed by someone else. So I applied for a fraud packet, and the Department reissued the check, which was about $14,000. Then, I got an email from the Department closing my case and it included the fact that there had been another check for $3,000 that had also been altered and cashed by someone else. I reached out to the Department and told them I never received the $3,000 check. I tried to file a claim for fraud but I was told I was past the one-year window to apply, so I couldn't do that.

10. This has been more of a headache than anything. The student loans impacted my credit and made it hard to get business loans or any types of loans. The Department didn't remove the loans from my credit, so I had to file claims with the credit bureau to get them removed. They were really large student loans, $55,000 just sitting there affecting my credit.

11. I've also had issues getting jobs because I don't have transcripts, just a diploma I printed. So when jobs asked for my education, I had no way to show them anything. I was able to secure a job myself by networking. But this probably will have a forever impact on my career. It's an emotional toll, just to get what I'm entitled to.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August 10, 2026

KINGS COUNTY, NEW YORK

Jenna Wardner

Jenna Wardner