EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: (617) 390-2669
Fax: (781) 218-9625

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | Case No. 19-cv-03674-HSG<br><br>**NOTICE OF MOTION AND MOTION FOR FINDING OF CONTEMPT AND SANCTIONS** |

**TABLE OF CONTENTS**


NOTICE OF MOTION ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. INTRODUCTION ........ 1

II. BACKGROUND AND PROCEDURAL HISTORY ........ 1

A. Refusal to Allow Plaintiffs to Inspect Records ........ 3

B. Violation of the Court's Orders to Continue Weekly Ombuds Meetings ........ 4

III. ARGUMENT ........ 6

A. Legal Standard ........ 6

B. The Department Has Disobeyed Specific Court Orders ........ 8

C. Remedies ........ 11

IV. CONCLUSION ........ 16

## TABLE OF AUTHORITIES

**Cases**

*A.B. ex rel. Trueblood v. Wash. State Dep't of Social & Health Svcs.*, 681 F. Supp. 3d 1149 (W.D. Wash. July 7, 2023) .................... 11
*Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025).................... 14
*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122 (9th Cir. 2013).................... 7, 8, 11, 14
*Al-Adahi v. Obama*, 672 F. Supp. 2d 114 (D.D.C. 2009) .................... 7
*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) .................... 7
*Blalock v. United States*, 844 F.2d 1546 (11th Cir. 1988) .................... 13
*Bowen v. Massachusetts*, 487 U.S. 879 (1988).................... 12, 13
*Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021).................... 10
*Calvillo Manriquez v. DeVos*, 411 F. Supp. 3d 535 (N.D. Cal. 2019) .................... *passim*
*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).................... 13
*Connell v. United States*, 69 F. App'x 867 (9th Cir. 2003) .................... 13
*Epic Games v. Apple, Inc.*, 161 F.4th 1162 (9th Cir. 2025).................... 7
*Ex parte Robinson*, 19 Wall. 505 (1874) .................... 13
*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .................... 8
*Falstaff Brewing Co. v. Miller Brewing Co.*, 702 F.2d 770 (9th Cir. 1983).................... 11
*FDIC v. Meyer*, 510 U.S. 471 (1994) .................... 12
*FHA v. Burr*, 309 U.S. 242 (1940).................... 12
*General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376 (9th Cir. 1986) .................... 8
*Gharib v. Casey (In re Kenny G Enters., LLC)*, 692 F. App'x 950 (9th Cir. 2017).................... 15
*Gifford v. Heckler*, 741 F.2d 263 (9th Cir. 1984) .................... 7
*Gompers v. Buck Stove & Range Co.*, 221 U.S. 418 (1911).................... 13, 14
*Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash. 1996) .................... 12
*Greenfield v. Villager Indus., Inc.*, 483 F.2d 824 (3d Cir. 1973).................... 10
*Hall v. Stone*, 179 F.3d 1043 (7th Cir. 1999).................... 7

*Henderson v. Orr*, No. C-3-81-554, 1987 WL 19715 (S.D. Ohio, May 5, 1987) ........................ 11
*In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361 (9th Cir. 1987)..................................... 8
*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693 (9th Cir. 1993)........... 7, 8
*In re Matter of Grand Jury Proceedings Empanelled May 1988*, 894 F.2d 881 (7th Cir. 1989)............................................................................................................... 13
*INS v. Chadha*, 462 U.S. 919 (1982) ........................................................................................ 14
*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)............................ 7, 13
*J.L. v Cuccinelli*, No. 18-CV-04914-NC, 2020 WL 2562895 (N.D. Cal. Feb. 20, 2020)........ 7, 11
*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)................................................................. 8, 11
*Kleiner v. First Nat. Bank of Atlanta*, 102 F.R.D. 754 (N.D. Ga. 1983) ..................................... 10
*Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) ........................................ 11
*Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932)................................................ 13
*Mattingly v. United States*, 939 F. 2d 816 (9th Cir 1991)............................................................ 13
*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ............................................................ 8
*Mittelstadt v. Perdue*, 913 F.3d 626 (7th Cir. 2019)................................................................... 13
*N.C. Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650 (E.D. Va. 1998)........................................... 11
*Perdomo v. Mullin*, No. 25-CV-05605, 2026 WL 2251571 (C.D. Cal. July 28, 2026).......... 11, 12
*Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787 (9th Cir. 1989)............................................................................................................... 16
*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) ........................ 15
*Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623 (9th Cir. 2016) ............................... 11, 16
*Sierra Club v. Ruckelshaus*, 602 F. Supp. 892 (N.D. Cal. 1984)................................................... 7
*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) ........................................ 15
*Taggart v. Lorenzen*, 587 U.S. 554 (2019) ..................................................................................... 8
*United States v. Jefferson*, 816 F. Supp. 3d 590 (E.D. Va. 2026)................................................ 14
*United States v. Powers*, 629 F.2d 619 (9th Cir. 1980) ................................................................. 7
*United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947) .......................................... 15
*Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510 (9th Cir. 1992) .............................................. 15

*Young v. United States ex rel. Vuitton Et. Fils. S.A.*, 481 U.S. 787 (1987) ............................ 13, 14

**Statutes**

5 U.S.C. § 702 ........................................................................................................ 12

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on September 24, 2026, Plaintiffs will and hereby do respectfully move the Court for a finding that the Department is in contempt of certain orders of the Court and for sanctions. This Motion is supported by the accompanying memorandum of points and authorities, the attached declarations and exhibits, the pleadings and other papers filed in this case, oral argument, and any other matters in the records or of which this Court takes notice.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The post-judgment proceedings in this matter have been lengthy and detailed. The conduct at issue in this motion, however, is simple. The Court issued several orders in 2024 and 2025 that required the Department of Education ("Department") to cooperate with Plaintiffs' counsel in specific ways in order to cure the Department's several breaches of the parties' Settlement Agreement and prevent further breaches from occurring. Beginning in early 2026, following the retirement of the District Court judge who had overseen these proceedings for over six years, the Department stopped following those orders. There is no basis in law for this change in position.

Plaintiffs respectfully request that the Court find that Defendants are in contempt of the Court's orders of May 23, 2024; November 13, 2024; and March 13, 2025; and to issue appropriate sanctions as set forth in the attached Proposed Order.

### II. BACKGROUND AND PROCEDURAL HISTORY

The facts underlying the present dispute are set forth at length in Plaintiffs' Motion to Enforce the Settlement ("Motion to Enforce"), filed simultaneously with this motion. *See* Motion to Enforce at 3–5.

As relevant here, the Department is currently subject to several Court orders that resulted from the Department's various breaches of the Settlement. Those orders require the Department to, *inter alia*:

- Meet monthly, in person, with Plaintiffs' counsel and representatives of the Department's student loan servicers to address issues relating to delivery of Settlement relief. Ellis Decl. Exs. 2, 9.[1]
- Maintain a process for resolving individual Class Member complaints about missing Settlement relief through the Federal Student Aid (FSA) Ombudsman's office. Ellis Decl. Ex. 3; Ex 14 at 35:14–37:23.
- "[P]ermit [Plaintiffs'] counsel to access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." Ellis Decl. Ex. 3.
- Work cooperatively with Plaintiffs' counsel in the Ombudsman's complaint resolution process, such that Plaintiffs' counsel can "roll up sleeves alongside the government to resolve [the complaints]." Ellis Decl. Ex. 6.
- Hold weekly meetings between Plaintiffs' counsel and the Ombudsman's office to address Class Member complaints (hereinafter, "Ombuds meetings"). Ellis Decl. Ex. 19 at 26:25–27:8.

Recently, the Department has refused to attend several Court-ordered weekly Ombuds meetings and has refused Plaintiffs' requests to inspect records for the purpose of ensuring that Settlement relief is timely and complete. Plaintiffs have notified the Department, repeatedly, that this conduct constitutes a violation of the Court's orders and contradicts how the parties had mutually followed those orders for the past two-plus years. *See, e.g.*, Almeida Decl. ¶¶ 38, 40, 45–49, and Ex. 16 (email from Plaintiffs' Counsel to DOJ Counsel dated Feb. 11, 2026), Ex. 17 (Letter from Plaintiffs' Counsel to DOJ Counsel dated Feb. 13, 2026), Ex. 21 at 7–11 (Notice of Material Breach). Nonetheless, the Department has maintained that these orders either do not exist, *see* Almeida Decl. Ex. 18 at 2 (contending that oral Court orders are not binding), or do not require the Department's compliance, *see id.* Ex. 15 at 1 (asserting "discretion" to withhold relevant data);

---

[1] Citations to the Ellis Declaration and the Almeida Declaration refer to the declarations and respective exhibits filed with the Motion to Enforce.

alternatively, the Department has simply ignored Plaintiffs' communications, *see id.* Ex. 22 at 1 n.1 (claiming that allegations of contempt in the Notice of Material Breach are "under review"; to date, Plaintiffs' counsel has not received a response).

**A. Refusal to Allow Plaintiffs to Inspect Records**

At the May 23, 2024, status conference following the Department's first breach of the Settlement, the Court ordered the Department to "permit borrowers['] counsel to access the ombudsman[']s office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly." Ellis Decl. Ex. 3. Even before this Order, the Department had shared information with Plaintiffs' counsel to ensure that the Settlement was being properly effectuated. *See* Almeida Decl. ¶ 19 & Ex. 3. Over the past several months, however, the Department has refused to provide access to crucial records, hampering Plaintiffs' enforcement abilities.

Plaintiffs first received a class list from the Department in October 2023. *Id.* At the time, the Department stated that the class list was provided "for the purpose of ensuring that *Sweet* class members are kept in forbearance and not required to make payments on relevant loans." *Id.* Ex. 3. The Department subsequently provided updated class lists in August 2024 and January 2025, which Plaintiffs have used (with the Department's knowledge) to communicate with Class Members and verify that the Settlement is being properly effectuated. *See id.* ¶¶ 21, 28–29 & Exs. 4–5. Since the January 2025 class list was prepared, the parties have learned of numerous deficiencies in that list; most significantly, the list does not include many individuals whose applications were not initially identified as falling within the class period because of technical issues with the FSA website. *Id.* ¶¶ 23, 30–31. It also does not include the current email addresses used by many Class Members, which hampers Plaintiffs' ability to communicate with Class Members. *Id.* ¶¶ 32–33. Because of these deficiencies, Plaintiffs are unable to determine whether more Class Members—those who have not affirmatively reached out to Plaintiffs' counsel for assistance—are still awaiting overdue relief.

Until recently, the Department had also provided Plaintiffs with Decision Group outcome data and refund data for all Settlement groups once the adjudication and relief deadlines,

respectively, passed for each group. *Id.* ¶ 21 & Exs. 6–10. Plaintiffs use the outcome data to ensure that relevant Class Members received appropriate notices and to confirm that Class Members whose applications were approved receive relief by the appropriate deadline. *Id.* ¶ 28. Plaintiffs use the refund "census" spreadsheets to communicate with Class Members about their expected refunds and to provide information about the administrative process. *Id.* The Department has long understood both Plaintiffs' need for this information and the Department's obligation to provide it. *E.g.*, Ellis Decl. Ex. 21 at 5:5–6:5 (Counsel for the Department: "[W]e understand what plaintiffs need with respect to Decision Group 3 and we will provide that data." The Court: "Okay. Soon?" Counsel for the Department: "Yes. Soon, Your Honor.").

Since January 2026, Plaintiffs have asked the Department each month for an updated and complete class list and for final outcome data for Decision Groups Four and Five. Almeida Decl. ¶¶ 34–35. Plaintiffs have been waiting for an "attestation group" census for even longer. *Id.* ¶¶ 30–31. As the relief deadline for Decision Group Five approached, Plaintiffs also asked for a census spreadsheet for Decision Group Five. *Id.* ¶ 41. Finally, following the passing of the adjudication deadlines for the Post-Class, Plaintiffs asked for a Post-Class outcomes list. *Id.* ¶ 35. At first, Department representatives indicated that they were working on providing this information. *Id.* ¶¶ 30, 36–37. But then, in a stark departure from the parties' course of performance, the Department's counsel suddenly refused to provide any of these items, citing alleged privacy concerns—even though the parties have had a protective order in place since 2020 and had regularly shared Class Member information for years without incident. *Id.* ¶ 39 & Ex. 15; *see* ECF Nos. 167-1, 169. The Department's counsel has refused to provide an explanation for the Department's abrupt change in position. Almeida Decl. ¶ 43.

Without this information, Plaintiffs cannot determine whether the Department is actually in compliance with the Settlement, or the size of any suspected breach. This is exactly why the Court ordered the Department to grant Plaintiffs access to relevant data over two years ago.

**B. Violation of the Court's Orders to Continue Weekly Ombuds Meetings**

At the April 24, 2024, hearing on Plaintiffs' first motion to enforce, the Court ordered the Department and representatives of its servicers to meet with Plaintiffs' counsel in Washington,

D.C., on a biweekly basis "to make sure that progress is being made and these [relief] deadlines are going to be met." Ellis Decl. Ex. 14 at 31:23–24; *see id.* at 29:12–32:14. The Court also ordered the Department to designate a representative to whom all Class Member complaints could be referred; the Department selected the FSA Ombudsman. *Id.* at 35:14–37:23. A month later, after Plaintiffs informed the Court of the severe backlog of complaints from *Sweet* Class Members about missing Settlement relief and other issues, *see* Ellis Decl. Ex. 15 at 8:7–10 (out of 2,500 *Sweet* complaints that had been submitted in the preceding two weeks, the Department had only resolved eight), the Court stated that Plaintiffs' counsel must be "entitled" to "go to the ombudsman's office and read" Class Members' complaints: "Look over their shoulder. Look over their computer. Make them stay 'til midnight." *Id.* at 22:11–14. Following this Order, the parties put in place procedures to share relevant data and collaborate on resolving Class Member complaints.

Months later, in response to a report that there was still a significant backlog of complaints, the Court further directed Plaintiffs to "roll up sleeves alongside the government to resolve" the "backlog of class members' complaints on the sweet[@]ed.gov email address." Ellis Decl. Ex. 6; *see id.* Ex. 18 at 8:6–7 (the Court, to Plaintiffs' Counsel: "Well, why can't you go and look at the e-mails and prioritize them yourself and say please answer these first?"). Soon after, the parties began to hold Ombuds meetings virtually on a weekly basis to work on *Sweet* complaints, and changed the in-person meetings with the wider Department staff and servicers to a monthly cadence to discuss systemic issues, *see* Ellis Decl. Ex. 9. The Court explicitly ordered that both the weekly Ombuds meetings and the monthly in-person meetings should continue. *See* Ellis Decl. Ex. 19 at 27:3–9.

On February 11, 2026, the Department's counsel unilaterally declared that Plaintiffs' meetings with the Ombudsman's office would thereafter be held on a biweekly rather than weekly basis. Almeida Decl. ¶ 45. Counsel stated that meeting biweekly would improve "efficiency." *Id.* Plaintiffs strenuously opposed the change, citing the Court's May 2024, November 2024, and March 2025 orders. *Id.* ¶¶ 45–47 & Exs. 16–17. Plaintiffs also offered several ways to modify the weekly meetings to support the Department's stated interest in "efficiency" without violating the Court's order. *See id.* ¶ 47 & Ex. 17 at 4–6. In response, the Department dismissed the Court's oral

orders as nonbinding, and simply ignored Plaintiffs' proposed alternatives. *Id.* ¶¶ 48, 50 & Ex. 18 at 2. Beginning in March 2026, the Department refused to schedule weekly meetings with Plaintiffs, and instead offered only a biweekly cadence. *Id.* ¶ 51. As a result, the parties have missed twelve Court-ordered meetings to date, and Plaintiffs expect the Department will refuse to attend at least two more before this motion is heard. *Id.* ¶¶ 51–52 & Ex. 19.

Meanwhile, the backlog of complaints that inspired the Court's orders remains largely unabated. According to the complaint tracking spreadsheet maintained by the Ombudsman's office, 7,696 complaints were "open"—unresolved—as of August 10, 2026. *Id.* ¶ 27. Of those, 6,761 have been open since at least December 7, 2025, and 6,398 have been open since at least May 7, 2025. *Id.* And nearly 80% of open complaints were submitted by borrowers in the ARG who were owed Full Settlement Relief more than a year and a half ago. *Id.*

## III. ARGUMENT

The Department has violated the Court's orders by failing to provide Plaintiffs with access to relevant data and failing to continue weekly Ombuds meetings until all Class Member complaints are resolved or until this Court orders otherwise. Plaintiffs respectfully request that this Court find Defendants in contempt. If the Court does issue a contempt finding, Plaintiffs respectfully submit that both coercive and compensatory sanctions would be appropriate here. As to the former, the Court can impose fines until the Department comes into compliance; in addition or in the alternative, the Court can (and should) impose non-monetary conditions, including but not limited to (i) the appointment of a special master or magistrate judge to oversee compliance, and (ii) a requirement that the Department provide specific data to Plaintiffs on a set schedule, with those productions to be verified under oath by a Department representative. As to the latter, Plaintiffs' counsel respectfully request an opportunity to petition the Court or a magistrate/special master for reasonable attorneys' fees and costs incurred as a result of Defendants' intentional flouting of the Court's orders.

### A. Legal Standard

A court may hold a party in civil contempt when that party has displayed "disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power

to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "A court has wide latitude in determining whether there has been contemptuous defiance of its order." *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984). "Like private parties, government agencies and officials may be subject to civil contempt." *Calvillo Manriquez v. DeVos*, 411 F. Supp. 3d 535, 537 (N.D. Cal. 2019) (holding Department of Education and its Secretary in civil contempt) (citing *Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 903 (N.D. Cal. 1984)); *see also, e.g.*, *J.L. v Cuccinelli*, No. 18-CV-04914-NC, 2020 WL 2562895, at *3 (N.D. Cal. Feb. 20, 2020), *modified on reconsideration*, 2020 WL 2562896 (Mar. 27, 2020) (finding Department of Homeland Security and Citizenship and Immigration Services in civil contempt); *Hall v. Stone*, 179 F.3d 1043, 1044 (7th Cir. 1999) (per curiam) (federal prison warden held in civil contempt); *Berger v. Heckler*, 771 F.2d 1556, 1568–69 (2d Cir. 1985) (Secretary of Department of Health and Human Services held in civil contempt for failing to comply with consent decree); *Al-Adahi v. Obama*, 672 F. Supp. 2d 114, 116–17 (D.D.C. 2009) (Department of Defense held in civil contempt).

Civil contempt is "coercive" in nature, and is appropriate where the goal is to "compel future compliance with a court order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1131 (9th Cir. 2013). Thus, unlike in criminal contempt, "the contemnor is able to purge the contempt . . . by committing an affirmative," remedial act.[2] *Bagwell*, 512 U.S. at 828. Sanctions for civil contempt are also appropriate to "compensate the contemnor's

[2] "The difference between criminal and civil contempt is in the intended effects of the court's punishment." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980). A contempt sanction is criminal, or punitive, "if it is imposed retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the [sanction] through later compliance." *Epic Games v. Apple, Inc.*, 161 F.4th 1162, 1185 (9th Cir. 2025), *cert. granted in part on other grounds*, No. 25-1311 (U.S. June 30, 2026) (quoting *Bagwell*, 512 U.S. at 828–29) (cleaned up). "On the other hand, a remedy is civil—and may be imposed without a jury trial or proof beyond a reasonable doubt—if it is meant to coerce the contemnor into complying with an order or compensate someone else for losses caused by the contempt." *Id.* at 1185–86. Civil contempt sanctions "are avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827.

adversary for injuries resulting from the contemnor's noncompliance." *Ahearn*, 721 F.3d at 1131. In considering what sanctions are justified, "[t]he private or public rights that the decree sought to protect are an important measure of the remedy." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).

"[C]ivil contempt sanctions may be warranted when a party acts in bad faith." *Taggart v. Lorenzen*, 587 U.S. 554, 561–62 (2019). But the "absence of willfulness does not relieve" a party "from civil contempt" if the party's "subjective belief that [it] was complying with an order . . . was objectively unreasonable." *Id.* at 561 (quoting *McComb*, 336 U.S. at 191); *see also Dual-Deck*, 10 F.3d at 695 ("[T]here is no good faith exception to the requirement of obedience to a court order."); *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (conduct "need not be willful" to justify a finding of civil contempt). In such a situation, a party's good-faith efforts are only relevant insofar as they "may help to determine an appropriate sanction." *Taggart*, 587 U.S. at 562. While "substantial compliance" can be a defense to civil contempt, the party must show that it has committed only "a few technical violations" while otherwise making "every reasonable effort . . . to comply." *Dual-Deck*, 10 F.3d at 695 (quoting *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378–79 (9th Cir. 1986)). Taking some steps while ignoring other reasonably available measures is insufficient. *Kelly v. Wengler*, 822 F.3d 1085, 1096–97 (9th Cir. 2016).

### B. The Department Has Disobeyed Specific Court Orders

"When civil contempt is at issue, the party moving for a contempt finding bears the burden of showing by clear and convincing evidence that contemnors violated a specific and definite order of the court." *Calvillo Manriquez*, 411 F. Supp. 3d at 540 (citing *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Id.*

Here, the Department's conduct throughout 2024 and most of 2025 showed that, at that time, it fully understood and was in compliance with the Court's orders directing the parties to work together to ensure the delivery of Settlement relief and requiring the Department to allow Plaintiffs access to its records. Since January 2026, however, the situation has changed. The

Department's recent decision to refuse to provide data that it previously provided without objection directly contradicts the Court's orders and is both unreasoned and unreasonable. Likewise, the Department's decision not to attend the weekly Ombuds meetings was made in the face of direct knowledge that doing so would violate the Court's order of March 13, 2025. The Department, without any reasonable explanation for its change in position, simply decided that it no longer wished to comply.

The Court clearly and repeatedly ordered the parties to work together to resolve *Sweet* relief issues, to continue the weekly Ombuds meetings, and to allow Plaintiffs to inspect records. The Court's orders were specific and definite. In a multi-year series of hearings and status conferences, the Court heard updates about how the parties were implementing those orders and insisted that the Department continue its compliance. Thus, whether the Court should hold Defendants in contempt turns on a single question: Did the Department take all reasonable steps to comply with the Court's orders since January 2026? It did not, nor has it ever even attempted to contend that it did. Instead, the Department has simply asserted that it need not follow these orders if it doesn't want to. It has not provided, and cannot provide, evidence that it was unable to comply with the orders.

As discussed *supra*, the records that the Court authorized Plaintiffs to inspect include basic information that Plaintiffs' counsel, and this Court, need to protect the interests of Class Members in receiving timely and accurate Settlement relief. Without this data, Plaintiffs are unable to fulfill their duties under the same Court orders to "look over the [Department's] shoulder" and work alongside the Department to help effectuate Settlement relief. Similarly, by refusing to make Ombuds staff available to meet weekly with Plaintiffs' counsel (as the Department had previously been doing for over a year), the Department now impedes Plaintiffs' ability to help clear the ever-growing backlog of *Sweet* complaints. The Department's contention that this change was motivated by concerns about "efficiency" is entirely unconvincing, *see* Notice of Material Breach at 10, but more to the point, it is irrelevant: the Court's orders are not premised on whether a process is "efficient" or not.

Plaintiffs have explained to the Department on several occasions that it is under Court order to allow Plaintiffs to inspect Class Member records and meet weekly with the Ombuds team. *See* Notice of Material Breach at 7–10; Almeida Decl. ¶¶ 38, 40, 46–47 & Ex. 17. Plaintiffs have likewise explained that the Protective Order that has been in place in this case since 2020 protects the sharing of sensitive information between the parties, assuaging any asserted privacy concerns. *See* Notice of Material Breach at 8; Almeida Decl. ¶ 40; ECF Nos. 167-1, 169.

Plaintiffs' counsel have also emphasized that as class counsel, they have a fiduciary duty to all Class Members to ensure proper Settlement implementation. *See* Notice of Material Breach at 8–9; *see, e.g.*, *Briseño v. Henderson*, 998 F.3d 1014, 1025 (9th Cir. 2021) ("[A]ppointed class counsel . . . owes a fiduciary duty to the class members[.]"); *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before the court."); *Kleiner v. First Nat. Bank of Atlanta*, 102 F.R.D. 754, 769 (N.D. Ga. 1983), *vacated in part on other grounds*, 751 F.2d 1193 (11th Cir. 1985) ("A lawyer who represents the named plaintiff in a class which has been certified immediately assumes responsibility to class members for diligent, competent prosecution of the certified claims."). The Department has, nonetheless, now taken the position that Plaintiffs' counsel cannot represent "absent" Class Members in post-judgment proceedings, and that these Class Members must file individual lawsuits against the government to vindicate their right to Settlement relief. *See* Almeida Decl. Ex. 22, Response to Notice of Material Breach at 5. This position conflicts with the plain language of the Settlement, which specifically authorizes Plaintiffs' counsel to bring claims for breach on behalf of "any individual" Class Member (including the Post-Class) who does not receive timely relief. Settlement ¶ V.B.2. It is legally absurd to boot. *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 99, cmt. 1 (2000) ("[A]ccording to the majority of decisions, once the proceeding has been certified as a class action the members of the class are considered the clients of the lawyer for the class."); *Kleiner*, 102 F.R.D. at 769. Class counsel owes a duty to diligently pursue Class Members' claims "until the end (*i.e.*, enforcement of the judgment) and not just until judgment." *Barboza v. W. Coast Digital GSM, Inc.*, 179 Cal. App. 4th 540, 545 (Cal. Ct. App. 2009) (internal quotation marks omitted); *see also Kleiner v. First Nat. Bank of Atlanta*, 751

F.2d 1193, 1200 (11th Cir. 1985) ("The unique nature of a class action necessitates participation of counsel even after the settlement is approved by the court.").

There were very simple "other reasonable steps the [Department] could have taken" to comply with the Court's orders: it could have continued the same things it was doing in 2024 and 2025. Because the Department instead chose to discontinue its previously established compliance with the Court's orders, it did not take "*all* reasonable steps to comply," and thus the Department is in contempt. *Kelly*, 822 F.3d at 1096; *see also, e.g.*, *A.B. ex rel. Trueblood v. Wash. State Dep't of Social & Health Svcs.*, 681 F. Supp. 3d 1149, 1176–77 (W.D. Wash. July 7, 2023) (holding state agency in contempt where it "failed to identify any compelling evidence that it could not have complied with the Settlement Agreement[]," given that the obstacles the agency encountered "were foreseeable" and the agency "had ample alternative actions it could have taken but did not").

**C. Remedies**

Once a court finds that a party is in civil contempt, sanctions are appropriate to "coerce[] compliance with [the] court order" and to act as a "remedial sanction meant to compensate the complainant for actual losses." *Ahearn*, 721 F.3d at 1129; *see also Falstaff Brewing Co. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).

"Coercive civil sanctions, intended to deter, generally take the form of conditional fines," *Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016), which stay in effect until the contempt is purged, *see, e.g., Perdomo v. Mullin*, No. 25-CV-05605, 2026 WL 2251571, at *1 (C.D. Cal. July 28, 2026) (ordering government defendant to pay fine of $500 per day until it came into compliance with court order); *Henderson v. Orr*, No. C-3-81-554, 1987 WL 19715 at *2 (S.D. Ohio, May 5, 1987) (same). As an alternative to fines, some courts have employed litigation-related sanctions to coerce government officials into compliance. *See, e.g.*, *J.L.*, 2020 WL 2562895, at *3 (requiring agency to return wrongly deported class members to the United States and promptly resolve their petitions); *Calvillo Manriquez*, 411 F. Supp. 3d at 540–41 (requiring agency to file detailed monthly reporting on compliance with injunction); *N.C. Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 666–69 (E.D. Va. 1998) (setting agency "fishing quota" in plaintiff-friendly manner when the government failed to conduct a new economic analysis required

by the court); *Greene v. Babbitt*, 943 F. Supp. 1278, 1281–82 (W.D. Wash. 1996) (banning the individual responsible for failing to follow court-ordered procedures from agency decision-making on the matter and ordering agency to decide petitioners' claim favorably).

Courts also regularly order compensatory sanctions when the moving party has sustained expenses as a result of the contemnor's violation of court orders. *See, e.g.*, *Perdomo*, 2026 WL 2251571, at *1 (ordering government to "reimburse plaintiffs . . . for the time and costs spent by their attorneys in getting the Government to comply with the Magistrate Judge's Order"); *Calvillo Manriquez*, 411 F. Supp. 3d at 540 (ordering government to pay monetary sanction of $100,000 into to a fund held by Plaintiffs' counsel to compensate student loan borrowers harmed by contempt and to pay administrative expenses to remedy the harm).

1. *Monetary Sanctions Are Available Against the Executive Branch and Its Officers*

Sovereign immunity is no barrier to monetary contempt sanctions: Congress waived sovereign immunity for such sanctions in cases under the Administrative Procedure Act (APA), as this case is. *See* 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."). Broadly stated waivers of immunity should be "liberally construed." *FDIC v. Meyer*, 510 U.S. 471, 480 (1994) (citing *FHA v. Burr*, 309 U.S. 242, 245 (1940)). The Supreme Court has explained that a "restrictive interpretation" of the APA would counteract its purpose: to provide broad avenues for judicial relief. *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988). Thus, under the plain language of the APA, while actions for money damages are barred based on sovereign immunity principles, courts remain empowered to require payment in other contexts—including monetary contempt sanctions. *See id.* at 897 (concluding that the APA's sovereign immunity waiver prohibits actions for "money damages" only: "No one suggested that the term

['money damages'] was the functional equivalent of a broader concept such as 'monetary relief' and no one proposed that the broader term be substituted for the familiar one").[3]

Nor does civil contempt, imposed for the violation of court orders, raise any separation of powers concerns. The Supreme Court has long described the contempt power as "a necessary and integral part of the independence of the judiciary" and as "absolutely essential to the performance of the duties imposed on them by law." *Gompers*, 221 U.S. at 450; *see also Bagwell*, 512 U.S. at 831 ("The traditional justification for the relative breadth of contempt power has been necessity. . . . Courts . . . have embraced an inherent contempt authority as a power necessary to the exercise of all others."); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that the power to punish for contempt is inherent in all courts." (cleaned up) (quoting *Ex parte Robinson*, 19 Wall. 505, 510 (1874))). The shibboleth "separation of powers" cannot

[3] Money damages and monetary contempt sanctions are legally distinct. Money damages are imposed through an independent cause of action for such, and "there is no such thing as an independent cause of action for civil contempt." *Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir. 1988). On the other hand, contempt sanctions can be imposed only on litigants before the court, and only for a violation of a court's order. *See Young v. United States ex rel. Vuitton Et. Fils. S.A.*, 481 U.S. 787, 798 (1987) (purpose of civil contempt sanctions is to punish "disobedience to the orders of the Judiciary"); *Gompers v. Buck Stove & Range Co.*, 221 U.S. 418, 443 (1911) (unlike "money damages," even "remedial" civil contempt sanctions are a "vindication of the court's authority"). The Supreme Court has described civil sanctions as "instituted and tried as part of the main cause." *Gompers*, 221 U.S. at 445; *see Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452–53 (1932) (a "proceeding in equity for civil contempt" was "not to be regarded as an independent [suit], but as a part of the original cause"). Sanctions for civil contempt are equitable, having "originated . . . in equity, as a device for enforcing compliance with equitable decrees," *In re Matter of Grand Jury Proceedings Empanelled May 1988*, 894 F.2d 881, 884 (7th Cir. 1989), and thus they are not by definition "damages"—regardless of whether they are characterized as compensatory or coercive. For this reason, the Supreme Court has confirmed that courts may impose monetary sanctions even where the underlying suit is one for equitable relief. *Bowen*, 487 U.S. at 893 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages' under the APA."). *Cf., e.g.*, *Connell v. United States*, 69 F. App'x 867, 868 (9th Cir. 2003) (sovereign immunity did not bar a claim of improper garnishment because the plaintiff sought "only restitution of the garnished monies, rather than damages"); *Mittelstadt v. Perdue*, 913 F.3d 626, 632–33 n.20 (7th Cir. 2019) (sovereign immunity did not bar a request that the government "pay all amounts due" under an environmental regulation, because the requested payment was not "money damages" but rather the "very thing to which [plaintiff] was entitled" under the law); *Mattingly v. United States*, 939 F. 2d 816, 818 (9th Cir 1991) (Rules Enabling Act waived sovereign immunity for monetary sanctions resulting from violations of the Federal Rules of Civil Procedure).

impinge on the judiciary's ability to carry out its essential duties. *See, e.g.*, *United States v. Jefferson*, 816 F. Supp. 3d 590, 598–99 (E.D. Va. 2026) ("[T]here exists no reason why this Court should perform its critical function of maintaining the integrity of judicial proceedings with any less vigor when the miscreant serves in federal or state government," a federal prosecutor's "separation-of-powers arguments notwithstanding"); *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *5 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring) ("Requiring the Government to [follow the district court's order] here is nothing less than exercising our duty to uphold the separation of powers.").

Without contempt sanctions, agencies would effectively have the power to disregard or override federal court decisions, as the Department has explicitly done here (*see, e.g.*, Almeida Decl. Ex. 18 at 2), violating the Constitution. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 963 (1982) (Powell, J., concurring) (separation of powers is violated when one branch "interfere[s] impermissibly with the other's performance of its constitutionally assigned function"); *Young*, 481 U.S. at 796 (federal courts have inherent power to appoint special prosecutors to prosecute contempt of court; noting that "[t]he ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicating its own authority without complete dependence on other Branches"); *Jefferson*, 816 F. Supp. 3d at 601 ("At the end of the day, [the federal prosecutor] asserts that she is free to act in an unlawful capacity, because she disagrees that she does so unlawfully. But that's not how our legal system works."). The executive branch cannot ignore federal court orders with impunity. *See Gompers*, 221 U.S. at 450 ("For while it is sparingly used, yet the power of the courts to punish for contempts [sic] is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory.").

2. *Remedies for the Department's Refusal to Follow Court Orders*

If this Court does find that the Department is in contempt, the Court may order such sanctions as are appropriate to "coerce[] compliance with [the] court order" and to act as a "remedial sanction meant to compensate the complainant for actual losses." *Ahearn*, 721 F.3d at

1129. Here, coercive sanctions are necessary: Defendants have had ample notice and opportunity to comply, yet have simply chosen not to.

In fashioning the sanction, the Court could choose the traditional route and impose fines against Secretary McMahon in the amount of $500 per day,[4] to continue until the Department provides the data Plaintiffs have requested and establishes that it will continue the weekly Ombuds meetings as ordered by the Court.

In addition or alternatively, it would be appropriate as a coercive non-monetary sanction to order measures to ensure accountability and oversight, such as appointing a special master or magistrate judge to supervise the Department's compliance with the Court's orders and its provision of accurate data, until it finally delivers all of the relief that it owes to all Class Members. *See Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 859 n.18 (9th Cir. 1992) ("Federal courts repeatedly have approved the use of special masters to monitor compliance with court orders and consent decrees."). Given the Department's established refusal to provide complete and accurate information directly to Plaintiffs' counsel, a special master, magistrate, or other independent entity would guarantee accurate and timely updates on Defendants' compliance efforts. Any non-monetary coercive sanction should also include (either in combination with a special master or separately) a requirement that the Department provide specific data at specific times so that Plaintiffs can fulfill their obligations to Class Members. *See Calvillo Manriquez*, 411 F. Supp. 3d at 540–41 (ordering detailed monthly reporting). Plaintiffs include a description of

[4] To determine the appropriate amount of a coercive sanction, the Court "must consider the character and magnitude of the harm threated by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th Cir. 1992) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)). The Court should also take into account the contemnor's "financial position." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992). Here, a fine of $500 per day would be reasonable in light of the harm that continued non-compliance causes and in light of Defendants' financial position. It is also less than the amount that the Ninth Circuit has routinely upheld as appropriate as a civil contempt sanction. *See, e.g.*, *Gharib v. Casey (In re Kenny G Enters., LLC)*, 692 F. App'x 950, 953 (9th Cir. 2017) (upholding $1,000 daily fine against contemnor); *Shell Offshore*, 815 F.3d at 630 (upholding coercive fines of "$2,500 per hour for the first 24-hour period" that the contemnor violated the injunction, which then increased "until it reached a cap of $10,000 per hour"); *Whittaker Corp.*, 954 F.3d at 514, 520 (upholding $10,000 daily fine); *Richmark Corp.*, 959 F.2d at 1481 (same).

these proposed data productions in the attached Proposed Order. This reporting should be verified under oath by a representative of the Department, as a measure to ensure accuracy.

Compensatory contempt sanctions, in the form of attorneys' fees and costs, would also be appropriate. *See Shell Offshore*, 815 F.3d at 629 (civil compensatory sanctions "are remedial" and "typically take the form of unconditional monetary sanctions"). The purpose of compensatory sanctions is to make the aggrieved party whole, and the sanction generally includes attorneys' fees and costs. *See Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 790 (9th Cir. 1989); *Calvillo Manriquez*, 411 F. Supp. 3d at 540 (imposing civil contempt sanction of $100,000 to compensate student loan borrowers for Department of Education's violation of injunction). As the declarations appended to Plaintiffs' Motion to Enforce demonstrate, *see* Almeida Decl. Exs. 23–44, Class Members rely on Plaintiffs' counsel's enforcement and oversight activities. The Department's defiance of the Court's May 2024, November 2024, and March 2025 orders has prevented Plaintiffs' Counsel from completing this necessary work and has instead required them to spend significant time addressing the Department's unreasonable positions regarding matters that the post-judgment litigation had already settled. Meanwhile, Defendants' defiance of Court orders has deepened the harm from delay and uncertainty that the Settlement was intended to cure, and Plaintiffs have had to spend time addressing Class Members' understandable distress and further complaints about missing relief.

Plaintiffs respectfully ask that the Court set a date by which Plaintiffs will petition the Court (or, if applicable, the special master or magistrate) for compensatory sanctions in the form of attorneys' fees and costs.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue an order finding the Department in contempt and imposing the remedies set forth in the attached Proposed Order.

Dated: August 18, 2026

Respectfully submitted,

*/s/ Rebecca C. Ellis*_____
EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING, INC.
769 Centre Street
Jamaica Plain, MA 02130
Tel.: (617) 617-390-2669
Fax: (617) 781-218-9625

*Attorneys for Plaintiffs*