BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-4964
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION**

| | |
|---|---|
| THERESA SWEET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, *in her official capacity as Secretary of the United States Department of Education*, and<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 4:19-cv-03674-HSG<br><br>**OPPOSITION TO PLAINTIFFS' MOTION FOR FINDING OF CONTEMPT AND SANCTIONS**<br><br>Date: November 5, 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 4th Floor |

## TABLE OF CONTENTS


INTRODUCTION ....... 1

BACKGROUND ....... 1

I. The Department of Education Office of the Ombudsman ....... 1

II. The Court's Retention of Jurisdiction is Extremely Narrow. ....... 2

III. After Entry of Final Judgment, at Plaintiffs' Behest, the Court Issues Orders Exceeding the Scope of Its Retained Jurisdiction, and the Ombudsman's Office Hosts Weekly Meetings as a Courtesy. ....... 3

LEGAL STANDARD ....... 6

ARGUMENT ....... 7

I. The Department Has Complied with All Orders. ....... 7

A. The Ombudsman is Not Enjoined to Host Weekly Meetings in Which Plaintiffs' Counsel Interrogates Caseworkers Who Present on Responses to Class Member Inquiries. ....... 7

B. The Court Has Not Ordered Defendants to Produce Personally Identifying Information of Hundreds of Thousands of People Stored in Records Systems Not Held by the Ombudsman's Office. ....... 15

II. At a Minimum, the Motion Should Be Denied Insofar as the Orders are Ambiguous. ....... 17

III. Defendants May Not Be Held in Contempt for Violating an Order that the Court Relinquished Jurisdiction to Enter. ....... 19

A. A Party May Not Be Held in Contempt for Violating an Invalid Order ....... 19

B. The Court's Jurisdiction is Constrained by the Terms of the Agreement Incorporated into the Final Judgment. ....... 19

C. The Court Relinquished Jurisdiction to Enter the Orders and Putative Orders. ....... 20

D. 20 U.S.C. § 1082(a)(2) Precluded the Court from Entering Mandatory Injunctions Enforceable By Contempt Against the Secretary. ....... 21

IV. The Court Should Deny Plaintiffs' Motion for Violating Local Rule 7-8. ....... 22

V. If the Court Finds Contempt, It Should Defer Consideration of a Remedial Order Until Defendants Have an Opportunity to Purge the Contempt. ....22

A. The Government Has Not Waived Sovereign Immunity from the Court's Entry of Monetary Fines. ....22

B. The Court Should Defer Consideration of Any Contempt Remedy Until Issuance of Contempt Findings. ....23

VI. Ordering Status Conferences Before a Magistrate Judge Every One to Three Months Is Not an Appropriate Coercive Remedy. ....23

VII. Plaintiffs Cannot Bypass the Traditional Standards for Entry of a Mandatory Injunction Against a Federal Official by Requesting One as a Putative Contempt Remedy. ....24

## TABLE OF AUTHORITIES

**CASES**

*Am. Ass'n of Cosmetology Schs. v. Riley*,
170 F.3d 1250 (9th Cir. 1999) ........................................ 22

*Anago Franchising, Inc. v. Shaz, LLC*,
677 F.3d 1272 (11th Cir. 2012) ........................................ 20

*Balla v. Idaho State Bd. of Corr.*,
869 F.2d 461 (9th Cir. 1989) ........................................ 12

*Barry v. Bowen*,
884 F.2d 442 (9th Cir. 1989) ........................................ 22

*Belcher v. Bassett Furniture Indus., Inc.*,
588 F.2d 904 (4th Cir. 1978) ........................................ 16

*Cal. Artificial Stone Paving Co. v. Molitor*,
113 U.S. 609 (1885)........................................ 6

*City of New York v. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ........................................ 21

*Cobel v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003)........................................ 24

*Coleman v. Espy*,
986 F.2d 1184 (8th Cir. 1993) ........................................ 22

*Compassion Over Killing v. U.S. FDA*,
849 F.3d 849 (9th Cir. 2017) ........................................ 13

*Curry v. Allan S. Goodman, Inc.*,
No. Civ 3:02-CV-1149, 2003 WL 22305161 (D. Conn. May 22, 2003)........................................ 10

*Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*,
774 F.2d 1371 (9th Cir. 1985) ........................................ 18

*Fahmy v. Jay-Z*,
No. CV 07-5715, 2012 WL 2897869 (C.D. Cal. June 10, 2013) ........................................ 12

*Fallini v. Hodel*,
783 F.2d 1343 (9th Cir. 1986) ........................................ 25

*FCC v. Pottsville Broad. Co.*,
309 U.S. 134 (1940) .......... 14

*Franklin-Mason v. Mabus*,
742 F.3d 1051 (D.C. Cir. 2014) .......... 19

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) .......... 6, 8

*FTC v. Enforma Nat. Prods., Inc.*,
362 F.3d 1204 (9th Cir. 2004) .......... 6, 8, 16

*Gaines v. Thompson*,
74 U.S. 347 (1868) .......... 25

*Garcia v. Google*,
786 F.3d 733 (9th Cir. 2015) .......... 24

*Gates v. Shinn*,
98 F.3d 463 (9th Cir. 1996) .......... 12

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) .......... 25

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) .......... 25

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) .......... 6

*In re Sealed Case*,
77 F.4th 815 (D.C. Cir. 2023) .......... 23

*INS v. Orlando Ventura*,
537 U.S. 12 (2002) .......... 12

*Internet Sports Int'l, Ltd. v. Amelco USA, LLC*,
No. 2:23-cv-00893, 2025 WL 2735534 (D. Nev. Sept. 24, 2025) .......... 12, 15, 16

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) .......... *passim*

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) .......... 23, 24

*Keepseagle v. Vilsack*,
815 F.3d 28 (D.C. Cir. 2016) .......... 20, 21

*Kirkland v. Legion Ins. Co.*,
343 F.3d 1135 (9th Cir. 2003) .......... 19

*Kokkonen v. Guardian Life Ins. Co. of. Am.*,
511 U.S. 375 (1994) .......... 19, 20

*Loc. Joint Exec. Bd. of L.V. v. NLRB*,
657 F.3d 865 (9th Cir. 2011) .......... 14

*Lopez v. Garland*,
60 F.4th 1208 (9th Cir. 2023) .......... 14

*Lovitky v. Trump*,
949 F.3d 753 (D.C. Cir. 2020) .......... 25

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .......... 13

*McBride v. Coleman*,
955 F.2d 571 (8th Cir. 1992) .......... 22, 23

*Midwater Trawlers Coop. v. Dep't of Com.*,
393 F.3d 994 (9th Cir. 2004) .......... 14

*Miguel v. McCarl*,
291 U.S. 442 (1934) .......... 25

*Nat'l Sec. Couns. v. CIA*,
969 F.3d 406 (D.C. Cir. 2020) .......... 16

*Nat'l Wildlife Fed'n v. United States*,
626 F.2d 917 (D.C. Cir. 1980) .......... 25

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 21

*O'Connor v. Colvin*,
70 F.3d 530 (9th Cir. 1995) .......... 19

*Or. Nat'l Res. Council v. Harrell*,
52 F.3d 1499 (9th Cir. 1995) .......... 25

*PBGC v. LTV Corp.*,
496 U.S. 633 (1990) .......... 14

*Penobscot Air Servs., Ltd. v. FAA*,
164 F.3d 713 (1st Cir. 1999) .......... 14

*Pigford v. Veneman*,
292 F.3d 918 (D.C. Cir. 2002) .......... 20

*Power v. Barnhart*,
292 F.3d 781 (D.C. Cir. 2002) .......... 25

*Sanchez- Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) .......... 25

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 6, 17, 18

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) .......... 6, 7, 11, 17

*U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*,
487 U.S. 72 (1988) .......... 19

*United Staes v. Ayres*,
166 F.3d 991 (9th Cir. 1999) .......... 24

*United States v. Horn*,
29 F.3d 754 (1st Cir. 1994) .......... 22

*United States v. Stein*,
435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) .......... 22

*United States v. Territory of V.I.*,
280 F.R.D. 232 (D.V.I. 2012) .......... 10

*United States v. United Mine Worker of Am.*,
330 U.S. 258 (1947) .......... 19

*United States v. Woodley*,
9 F.3d 774 (9th Cir. 1993) .......... 22

*Witasick v. Minn. Mut. Life Ins. Co.*,
803 F.3d 184 (3d Cir. 2015) .......... 11

**STATUTES**

5 U.S.C. § 555 .......... 14

18 U.S.C. § 401 .......... 22

20 U.S.C. § 1018 .......... *passim*

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Fed. R. Civ. P. 23(b)(2) ........ 2

Fed. R. Civ. P. 30 ........ 10

Fed. R. Civ. P. 34 ........ 10

Fed. R. Civ. P. 65(d) ........ 6, 16, 17, 18

## INTRODUCTION

While this case was before Judge Alsup, Plaintiffs expressed their disagreement with the U.S. Department of Education and its staff through repeated contempt requests. Judge Alsup rejected each of these groundless demands. *See, e.g.,* Tr. at 40:9-41:22, ECF No. 438; ECF No. 434 at 2; Tr. at 24:7-11, ECF No. 423. Plaintiffs' latest contempt request is equally baseless, and it too should be rejected.

First, no order compels the Student Loan Ombudsman to host weekly meetings in which caseworkers take time from their work to present to Plaintiffs' counsel on their resolution of class members' inquiries ("case reporting meetings"). When the Court intended to order meetings, it knew how to do so. *See, e.g.*, Min. Entry, ECF No. 414 (ordering "bi-weekly meetings"); Min. Entry, ECF No. 463 (ordering "monthly meetings"). Rather, the Ombudsman agreed to host such meetings as an alternative to the Court's order authorizing Plaintiffs' counsel to access the premises of the Ombudsman's office and to inspect records therein. ECF No. 414. That records inspection order followed Plaintiffs' counsel's complaint, in 2024, that the Ombudsman's office had received many inquiries from *Sweet* class members and based on Plaintiffs' assertions that caseworkers were providing incorrect information. As discussed below, Plaintiffs have never invoked that order. Because no order requires the Ombudsman to host the case reporting meetings at all, much less weekly, his decision to host these meetings less frequently than weekly did not violate any order.

Second, the same records inspection order does not compel the Department to produce to Plaintiffs material that is not included in the Ombudsman's office records systems. That order applies strictly to records in the Ombudsman's office. Thus, Defendants are not compelled to compile spreadsheets of personally identifiable information of hundreds of thousands of individuals from records systems that are not in that office and produce them to Plaintiffs.

## BACKGROUND

### I. The Department of Education Office of the Ombudsman

By statute, the Department employs a Student Loan Ombudsman "to provide timely assistance to borrowers of loans made, insured, or guaranteed under subchapter IV [of Chapter 28 of the United States Code] by performing" certain "functions[.]" 20 U.S.C. § 1018(f)(1). In particular, the Ombudsman shall

"receive, review, and attempt to resolve informally complaints from borrowers of [certain student] loans" including "attempts to resolve such complaints within the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in the [relevant] student loan programs." *Id.* at § 1018(f)(3). The Ombudsman's staff includes eight supervisors, twenty-one caseworkers, and eight additional employees. Decl. of Christian L. Odom ("Odom Decl.") ¶ 6.

## II. The Court's Retention of Jurisdiction is Extremely Narrow.

Before entry of Final Judgment, this case was a class action certified under Federal Rule of Civil Procedure 23(b)(2). The parties executed a settlement in June 2022, *see* Settlement Agreement, ECF No. 246-1 ("Agr."), which the Court approved on November 16, 2022, *see* Order Granting Final Settlement Approval, ECF No. 345; Final Judgment, ECF No. 346. The Final Judgment dismissed the class's claims. ECF No. 346 (providing for final "judgment of dismissal of the class's claims").

The Department settled this case to avoid the "inconvenience" and "expense of protracted litigation." Agr. § I. Thus, the Department insisted, and Plaintiffs agreed, that the Court largely relinquish jurisdiction to oversee implementation of the Agreement:

> The Court relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations and other requests for relief in this Action that are not expressly stated in this Paragraph V.

Agr. ¶ V.E. Instead, the parties agreed on an unambiguous and restricted retention of jurisdiction provision, to supplement any Court of Federal Claims jurisdiction over breach claims raised by class members.[1] Specifically, the parties agreed that the Court retains jurisdiction *only* "to order the relief explicitly specified for each particular claim" that is outlined in Section V:

> Notwithstanding all other provisions outside Section V of this Agreement, the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V. In connection with each such claim, the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section. The Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement.

[1] The parties were explicit that the waiver and release was "not intended to release any [individualized] claim based on an act or omission or other conduct occurring after the Effective Date, including but not limited to claims by Class Members based on the substance or content of their borrower defense decisions." Agr. § VII.

*Id.* ¶ V.A. Together, these provisions authorize only extremely limited supervision and monitoring. Insofar as Defendants materially breach a relevant obligation to the class, as defined in the Agreement, Plaintiffs may bring it to the Court's attention only by bringing one of the limited claims for one of few specific orders identified in Section V. And, setting aside any claim that the Department has failed to submit required quarterly reports (which Plaintiffs do not allege),[2] the parties agreed that "the only relief available from the Court shall be an order requiring Defendants to promptly provide Full Settlement Relief to each affected Class Member on a timetable set by the Court." *Id.* ¶¶ V.B.1.i, V.B.2.i.

The parties also carefully negotiated Defendants' reporting obligations. *Id.* ¶ IV.G. Specifically, the parties carefully negotiated for "quarterly reports[.]" *Id.* ¶ IV.G.2. The content of the reports is prescribed by the Agreement. *Id.* ¶ IV.G.4. The parties agreed that "the data required" to be included "is subject to privacy restrictions and will be suppressed where the total number of Class Members for any data point is less than 10." *Id.* ¶ IV.G.5.

## III. After Entry of Final Judgment, at Plaintiffs' Behest, the Court Issues Orders Exceeding the Scope of Its Retained Jurisdiction, and the Ombudsman's Office Hosts Weekly Meetings as a Courtesy.

As described in further detail in earlier briefing, *see*, *e.g.*, Opp'n to Pls.' Mot. for Fees & Costs, at 6-8, ECF No. 540, between Final Judgment and 2026, Plaintiffs initiated the exclusive procedure under ¶¶ V.D for them to bring a ¶ V.B claim to enforce the Agreement only twice. The first claim was resolved in April 2024 when the Court issued an order to provide full settlement relief to affected automatic relief group class members on a new schedule set by the Court. *See* ECF No. 540 at 6-7. The second claim was resolved on September 26, 2024, when the Court entered an order to provide full settlement relief to affected decision group one class members on a new schedule set by the Court. *See id.* at 7-8.

However, the Court also took actions that are not authorized under Section V. As the Court explained at a 2024 status conference, it also "ordered [the parties] to do some other things" nowhere to be found in the limited retention of jurisdiction provisions "to make sure things are on track." Tr. 4:16-17, ECF No. 420. For example, in April 2026, the Court directed "bi-weekly"—i.e., every other week—

[2] The Department has submitted all fourteen quarterly reports that were due to date. In the event Plaintiffs were to successfully allege that Plaintiffs failed to submit a quarterly report, the only available relief would be an order requiring monthly, instead of quarterly, reporting. Agr. ¶ V.B.3.

"meetings attended by Department of Education/Department of Justice, the servicers, and plaintiffs['] counsel to resolve issues[,]" Min. Entry, ECF No. 407, distinct from the meetings with the Ombudsman's office that Plaintiffs now claim are required.

The following month, the list of injunctive orders grew. For example, after Plaintiffs complained to the Court that the Ombudsman's office had received complaints potentially related to the *Sweet* agreement, and that they had "not received any details about those complaints" and "did not get even a summary of [them]," Plaintiffs' counsel asked the Court for "more information from the ombudsman's office about these complaints." Tr. at 8-9:19-20, 22:8-9, ECF No. 423. The Court answered: "Why don't you just go to the ombudsman's office and read them? I mean, I'm going to say you're entitled to do that. Look over their shoulder. Look over their computer." *Id.* at 22:11-14. The Minute Entry, ECF No. 414, entered after the status conference provided that the Court issued the following orders, among others:

> (3) the Department of Education's Federal Student Aid ombudsman shall permit borrowers counsel to access the ombudsmans office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly;
>
> (4) the bi-weekly meetings previously ordered (Dkt. No. 407) shall be attended in person by servicers and parties['] respective representatives except for good cause; . . .

The Court has never ordered the parties to attend weekly meetings.

Instead of the inspection of records and premises approach that the Court authorized, the Ombudsman's office began hosting regular meetings between a group of caseworkers and Plaintiffs' counsel. Odom Decl. ¶¶ 21-23. Eventually, the routine evolved to include Plaintiffs' counsel sending, each Friday, a spreadsheet of complaints made to the Ombudsman's Office that counsel wants to discuss. *Id.* ¶ 24-25. The following week, caseworkers in attendance at a videoconference meeting would take turns, over 2 or 3.5 hours, depending on the meeting, working through Plaintiffs' spreadsheet, presenting on how they had resolved the complaint or inquiry. *Id.* ¶¶ 28-31. For some complaints, Plaintiffs' counsel interrogates the caseworker about the resolution and conducts a mini-trial over the class member's issue. *Id.* ¶¶ 27, 36. "At times, those exchanges become adversarial and require individual caseworkers to explain or defend the analysis and operational decisions underlying a particular resolution." *Id.* ¶ 36.

Currently, Ombudsman's office staff is "incredibly well-versed in *Sweet* complaint resolution." *Id.* ¶¶ 11. Thus, only "sometimes" do meetings result in identification of "an issue warranting additional review or action." *Id.* ¶ 38. But in "many of the cases discussed," Ombudsman's office staff merely "reports that full relief has already been effectuated and that the complaint is closed—confirming that the borrower's concerns had already been addressed through ordinary administrative channels." *Id.* ¶ 29. "When additional action remains necessary," Ombudsman "staff generally has already identified the issue and next steps." *Id.*

The frequent meetings are incredibly burdensome to the Ombudsman's office, which should be focused on its statutory work including responding to class member complaints. *Id.* ¶¶ 24-38. For example, preparing for the weekly meetings requires "extensive investigative preparation" including "requiring staff to re-investigate matters that were already audited and closed" and "re-index[] their case notes to align with changes in the ordering of cases for discussion." *Id.* at ¶¶ 26. The burden is reflected in case closure data, which have been "51 percent lower during meeting weeks." *Id.* ¶ 33.

As a result of this burden, in early 2026, the Ombudsman determined to reduce the cadence of the meetings from each week to every other week. *Id.* ¶ 35. Even if weekly meetings were sensible in 2024, when caseworkers were largely unfamiliar with the mechanics and details of the *Sweet* Agreement's provisions, which apply to hundreds of thousands of borrowers, by 2026, after years of meetings, the caseworkers are masters of the Agreement and its terms. *Id.* ¶ 11. The Ombudsman's decision to host these meetings less frequently than each week was without prejudice to Plaintiffs' counsel invoking the order to access the Ombudsman's office, upon reasonable notice, to read complaints, or to observe caseworkers while they work. *See* ECF No. 414(3); ECF No. 423 at 22:11-14.

On August 18, 2026, Plaintiffs filed a motion for findings of contempt and sanctions. Notice of Mot. & Mot. for Finding of Contempt & Sanctions, ECF No. 553. Plaintiffs request twenty-three paragraphs of orders spanning four pages. Proposed Order, ECF No. 553-1.

## LEGAL STANDARD

"[C]ivil contempt is a 'severe remedy'" that "should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (second alteration and emphasis in original) (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). "In other words, civil contempt" is appropriate only "if there is no objectively reasonable basis for concluding that the [Defendants'] conduct might be lawful." *Id*. at 557. "This standard reflects the fact that . . . principles of 'basic fairness requir[e] that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt[.]'" *Id*. at 561 (alteration in original) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). A party seeking contempt sanctions must establish that the Department (1) "violated [a] court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

Moreover, any "equitable decree compelling obedience under the threat of contempt" must comply with the requirements of Fed. R. Civ. P. 65(d). *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 75-76 (1967). Insufficient compliance with Rule 65(d) is "both serious and decisive[,]" rendering the order unenforceable through the Court's contempt powers. *Id*. at 76. Rule 65(d) requires that "[e]very order granting an injunction" must "state the reasons why it issued[,]" "state its terms specifically[,]" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). This rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt*, 414 U.S. at 476. The Court must "frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n*, 389 U.S. at 76. Thus, "[i]n a civil contempt action, '[t]he moving party has the burden of showing by clear and convincing evidence that the [alleged] contemnors violated a specific and definite order of the court.'" *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004) (quoting *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)).

## ARGUMENT

### I. The Department Has Complied with All Orders.

Plaintiffs' claims that Defendants have violated court orders are baseless. Plaintiffs wrongly contend that the Court enjoined Defendants to host weekly meetings. ECF No. 553 at 4-6. That is incorrect. The Ombudsman's office has hosted meetings *instead of* Plaintiffs' counsel taking the inspection of records and premises approach that the Court's order, ECF No. 414, authorized.

Plaintiffs' records inspection claims are also incorrect. ECF No. 553 at 3-4. The Court ordered the Ombudsman to "permit borrower['s] counsel to access the ombudsman's office" and "to inspect records therein[.]" ECF No. 414. The history leading to that order confirms that it was issued in response to Plaintiffs' demand that they be permitted to review complaints that had been submitted to the Ombudsman's office. Plaintiffs' claim that Defendants have violated this order by declining to compile and produce personally identifiable information of hundreds of thousands of class members from records systems having little to do with the Ombudsman's office is meritless. Plaintiffs certainly have not shown, as they must, that "there is no objectively reasonable basis for concluding that the [Defendants'] conduct might be lawful." *Taggart*, 587 U.S. at 557.

#### A. The Ombudsman is Not Enjoined to Host Weekly Meetings in Which Plaintiffs' Counsel Interrogates Caseworkers Who Present on Responses to Class Member Inquiries.

First, Plaintiffs are wrong to claim that the Ombudsman is subject to a court order requiring him to host the type of meetings that Plaintiffs demand continue on a weekly basis. Plaintiffs' brief includes about three pages of argument under a header "The Department has Disobeyed Specific Court Orders." ECF No. 553 at 8-11. Yet nowhere in those pages do Plaintiffs clearly identify and analyze a single court order. *Id*. at 8-11. Indeed, one page includes an entire narrative without a single citation. *Id*. at 9. Plaintiffs thus not only fail to specifically identify what order(s) they contend Defendants violated, but fall well short of their burden to provide clear and convincing evidence of an intentional violation.

At best, Plaintiffs' motion vaguely gestures at alleged "May 2024, November 2024, and March 2025 orders." *Id*. at 5. Because the Court did not enjoin the Ombudsman to host weekly meetings in any of those three months, the motion should be denied.

**1. May 2024**

First, Plaintiffs are wrong to contend that, in May 2024, the Court ordered weekly meetings in which caseworkers divert time from their work resolving complaints—including *Sweet* class member complaints—to present on their resolution of those complaints to Plaintiffs' counsel and to face interrogation by Plaintiffs' counsel. *See* ECF No. 553 at 5 (suggesting that hosting these meetings weekly is required by a "May 2024" court order). On May 23, 2024, the Court entered the following "orders":

> (1) All refunds shall be sent by check to class members, not applied to loan balances, except as any individual class member requests as to his/her refund;
>
> (2) any refunds already applied to loan balances shall be returned to class members by check, subject to the same proviso; parties shall meet and confer before the next hearing with the Court to determine how to expeditiously achieve this result;
>
> (3) the Department of Education's Federal Student Aid ombudsman shall permit borrowers counsel to access the ombudsman['s] office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman to ensure accountability and to support efforts to enforce judgment promptly;
>
> (4) the bi-weekly meetings previously ordered (Dkt. No. 407) shall be attended in person by servicers and parties respective representatives except for good cause; and
>
> (5) other conditions previously imposed, including hearing dates, still apply.

ECF No. 414. Insofar as Plaintiffs' position is that Order #3 is a "specific and definite order of the court," *see Enforma Nat. Prods,* 362 F.3d at 1211 (quoting *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)), compelling the Ombudsman host the weekly presentation and interrogation meetings, Odom Decl. ¶¶ 21-38, Plaintiffs are wrong.

Although the scope of Order #3 is ambiguous—particularly the "look over the shoulder" component—context clarifies that Order #3 does not compel meetings in which caseworkers present on their resolution of complaints to Plaintiffs' counsel. When the Court intended to order meetings, it said so specifically. Indeed, on the very same day, in Order #4, the Court ordered "bi-weekly meetings"—not weekly meetings.[3] And in September 2024, Plaintiffs' counsel asked the Court whether "the Court order

[3] Defendants do not concede that the bi-weekly meetings referenced in Order #4 address the meetings that the Ombudsman has been hosting with Plaintiffs' counsel. But the Court need not resolve this issue because, even assuming that the Court-ordered biweekly meetings apply to the Ombudsman's meetings with Plaintiffs' counsel, Plaintiffs do not dispute that the Ombudsman's office has continued to

for the plaintiffs, the defendants, and the servicers to continue meeting in person" still stands. ECF No. 438 at 46:12-15. The Court answered affirmatively, and asked Plaintiffs' counsel whether the earlier order required meetings "every week or every other week?" *Id.* Plaintiffs' counsel responded: "Every other week, Your Honor." *Id.* at 46:16. The point is that, whatever the scope of Order #3, it is not an order requiring meetings, such as Order #4.

Proceedings during the May 2024 status conference, which led to the order, ECF No. 414, confirm that Order #3 was not intended to require counterproductive meetings in which Ombudsman's office caseworkers take time away from resolving borrower complaints to present to Plaintiffs' counsel. *See* Odom Decl. ¶¶ 21-38. Rather, those proceedings clarify that Order #3 is, at most, an inspection of premises order authorizing counsel to inspect complaints and watch caseworkers while they *do their work* resolving complaints.

The order was generated after Plaintiffs' counsel requested "more information from the [O]mbudsman's office about [various] complaints" raised by *Sweet* class members, ECF No. 423 at 22:8-9, to which they had no entitlement under the Settlement Agreement. Plaintiffs' counsel may have wanted the Ombudman's office to host meetings wherein "experienced caseworkers" "divert" their time from statutory responsibilities "reviewing and resolving borrower complaints" to instead present to counsel about complaints. *See* Odom Decl. ¶ 26. But that is not what the Court wanted. Rather, the Court directed Plaintiffs' counsel to "go to the Ombudsman's office and read" the complaints. ECF No. 423 at 22:11-14. And it suggested that Plaintiffs' counsel could "[l]ook over the[] shoulder" of caseworkers or "their computer[s]" presumably while they worked to resolve complaints between the borrower and the relevant loan servicer. *Id.* It is doubtful that the Court wanted to slow down the process of complaint resolution by requiring caseworkers to take time away from their work to present to Plaintiffs' counsel on complaint resolution. *See id.* Yet that is what the meetings have become and what Defendants told Plaintiffs they will not continue doing every week. Odom Decl. ¶¶ 21-38.

The Court's suggestion that Plaintiffs' counsel "go to the Ombudsman's office and read" complaints, *id.* at 22:11-12, and its corresponding order requiring the "Ombudsman [to] permit

---

host meetings on a bi-weekly basis. Odom Decl. ¶ 35.

borrowers['] counsel to access the ombudsman['s] office" and to "inspect records therein," ECF No. 414, are best understood in light of the background principles governing inspection of documents and premises referenced by the Court's language. Courts and lawyers are familiar with discovery principles, including the distinction in the Federal Rules of Civil Procedure between (1) producing documents, (2) entering onto land for inspection and other purposes, and (3) examining individuals by oral questions. Fed. R. Civ. P. 30, 34. The Court presumably contemplated that borrower's counsel could access the Ombudsman's office to inspect records and to observe staff while they work. *See* ECF No. 414; Fed. R. Civ. P. 34; ECF No. 423 at 22:8-19. The Court did not authorize oral questioning, which is undeniably even more burdensome and intrusive of agency operations. *Cf.* Fed. R. Civ. P. 30. Yet that is what Plaintiffs insist the Department do—*every week*. *See* Odom Decl. ¶¶ 27, 36.

Legal authorization to conduct an inspection "does not entitle [a] Plaintiff to interview Defendants' staff during an inspection." *United States v. Territory of V.I.*, 280 F.R.D. 232, 236 (D.V.I. 2012). Similarly here, the Court's order authorizing access to the Ombudsman's office and for inspections of records, ECF No. 414, does "not require[] Defendants to provide Plaintiff with access to interview [Ombudsman's office] staff." *See Territory of V.I.*, 280 F.R.D. at 236; *see also Curry v. Allan S. Goodman, Inc.*, No. Civ 3:02-CV-1149, 2003 WL 22305161, at *1 (D. Conn. May 22, 2003) (concluding that an inspection "is not to be treated as a hybrid visit/deposition" and if "plaintiff wants to question managerial personnel, questions will be presented through formal discovery mechanisms").

Plaintiffs do not argue that they have made a request, or that the Department has ever denied them a request, made under the procedures described in Rule 34 or otherwise, to come to the Ombudsman's office to read complaints lodged by *Sweet* class members or to observe any caseworker while he or she works. *See* Odom Decl. ¶ 79. The parties have never utilized the procedures that the Court authorized. The Ombudsman instead agreed to host regular meetings, which at some point increased to a weekly cadence and in which caseworkers would present on their responses to complaints. *Id.* ¶ 21-38**.** "Plaintiffs have demanded the parties' alternative arrangement where" the Ombudsman's "staff present on the results of their case work, rather than performing their work." *Id.* ¶ 79**.** As circumstances changed, the Ombudsman decided to change the frequency of these good faith meetings. *Id.* ¶ 35. That change does

not violate any order because these meetings were never ordered by the Court to begin with. For all of these reasons, Plaintiffs have failed to show that "there is no objectively reasonable basis for concluding that [Defendants'] conduct" in not hosting weekly meetings with Ombudsman's office staff "might be lawful." *Taggart*, 587 U.S. at 557.

**2. November 2024**

Plaintiffs are likewise wrong to contend that, in November 2024, the Court ordered weekly meetings in which caseworkers divert time from their work resolving complaints—including *Sweet* class member complaints—to present on their resolution of those complaints to Plaintiffs' counsel and to face interrogation by Plaintiffs' counsel. *See* ECF No. 553 at 5 (suggesting that hosting these meeting weekly was required by a "November 2024" court order). On November 13, 2024, the Court entered a Minute Entry on the docket regarding the status conference held that day. Min. Entry, ECF No. 444. Unlike the Minute Entry dated May 23, 2024, the Court did not state that any orders were prompted based on the status conference. *Compare* ECF No. 414, *with* ECF No. 444. Rather, the Court provided:

> Ongoing Meet-and-Confer Issues: Government stated completion numbers for Decision Groups 1 and 2. Class counsel stated parties nearly agreed on how to resolve interim mixed consolidated loans. And, parties are now considering the backlog of class members' complaints on the sweet.ed.gov email address. The Court pointed out there is no reason why class counsel cannot roll up sleeves alongside the government to resolve them.

ECF No. 444. The Ombudsman may not be held in contempt for violating the November 2024 Minute Entry because it is not an order and, even if it was, it does not include a specific and definite requirement to hold weekly meetings.

First, the Minute Entry's reference to "rolling up sleeves" is a minute entry, not an order. "The federal CM/ECF system allows for three distinct types of case-related entries: text orders, utility events, and minute entries." *Witasick v. Minn. Mut. Life Ins. Co.*, 803 F.3d 184, 188-89 (3d Cir. 2015). The latter "types of electronic docket entries are vastly different from text [or minute] orders. Indeed, they are not orders at all." *Id*. at 189. "[M]inute entries are not orders of the district court[.]" *Id.*

Second, even assuming the November 2024 Minute Entry is an order—which it is not—it does not specifically and definitively command the Ombudsman to host the weekly presentations at issue. "Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and

definite." *Gates v. Shinn*, 98 F.3d 463, 472 (9th Cir. 1996) (quoting *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989)). The statement that "there is no reason why class counsel cannot roll up sleeves alongside the government to resolve [complaints]" is an observation, not an order (and a dubious one at that[4]). And it is directed at Plaintiffs' counsel, not Defendants. ECF No. 444. It is not an order directing Defendants to do anything, much less host the type of weekly presentation meetings described above, which divert Ombudsman staff from their work of actually resolving issues raised by class members and individuals who are not class members. Odom Decl. ¶¶ 24-38. *See, e.g.*, *Internet Sports Int'l, Ltd. v. Amelco USA, LLC*, No. 2:23-cv-00893, 2025 WL 2735534, at *3 (D. Nev. Sept. 24, 2025) (When a court does not "specify the form of compliance with its order[,]" it "certainly" does not "issue a 'specific and definite order'" justifying sanctions.); *Fahmy v. Jay-Z*, No. CV 07-5715, 2012 WL 2897869, at *2 (C.D. Cal. June 10, 2013) (An order that "sets out a broad duty on the part of defendants" is not an order that is "sufficiently specific to provide the foundation for a finding of contempt.").

Third, proceedings during the November 2024 status conference, which led to the Minute Entry, ECF No. 444, confirm that the Court did not intend to require counterproductive meetings in which Ombudsman's office caseworkers take time away from resolving borrower complaints to present to Plaintiffs' counsel. Instead, consistent with its earlier statements in May 2024, in November 2024 the Court suggested that Plaintiffs' counsel "go" to the Ombudsman's office "and look at the e-mails[,]" to decide which ones the Ombudsman should prioritize, and then ask politely to "please answer these first[.]" ECF No. 448 at 8:6-7. But Plaintiffs are not asking the Department to produce to them emails submitted to the Ombudsman's office so that they may respond by politely requesting that certain e-mails be answered first. *See id.*; ECF No. 553. Plaintiffs are demanding that the Court hold the Ombudsman in contempt of court for not requiring that his staff take time from their work to present on their responses to complaints every single week instead of on a cadence that is compatible with the Ombudsman's statutory obligations. ECF No. 553. The record does not demonstrate—much less clearly so—that the Court

[4] Congress vested the Ombudsman—not Plaintiffs' counsel—with the duty to "resolve informally complaints" lodged with his office, including those lodged by *Sweet* class members. 20 U.S.C. § 1018(f)(3)(a). *See, e.g., INS v. Orlando Ventura*, 537 U.S. 12, 17 (2002) (courts cannot "disregard[] the agency's legally mandated role"). Plaintiffs' counsel are not employed by nor under contract with the Ombudsman or the Department of Education.

envisioned such a time-consuming and counterproductive process. Again, those proceedings clarify the Court's intent that Plaintiffs' counsel be permitted to, at most, come to the Ombudsman's office to inspect the complaints filed with the Ombudsman's office. ECF No. 448 at 8:6-7.

**3. March 2025**

Plaintiffs are also wrong to contend that the Court ordered weekly meetings in March 2025. *See* ECF No. 553 at 5 (suggesting that hosting these meeting weekly was required by a "March 2025" court order). During a March 2025 status conference, Government counsel stated that the parties had "informally scheduled" weekly meetings between Plaintiffs' counsel and the Ombudsman's office. Tr. at 27:3-4, ECF No. 466. The Court responded: "Okay. I want that to continue. And I want your monthly meetings to continue. It would be worthwhile for you to meet even before the April meeting here with me." *Id*. at 27:7-9. The Minute Entry memorializing the statute conference, ECF No. 463, provided that "[t]he following orders resulted" from the conference:

1. The previously ordered in-person monthly meetings shall continue until further order.
2. Parties shall jointly submit a status update by noon the day before our next status conference.
3. Servicers shall each submit a statistics report by that time as well, each to include [specific data].

*Id*. Noticeably absent from that list of "orders" that "resulted" from the status conference is an order enjoining the Ombudsman to host weekly meetings. *See id*.

The context and language that the Court used during its colloquy with Government counsel confirm that the Court did not orally enjoin the Ombudsman to host weekly meetings. The context and language demonstrate that the Court was happy that the parties had reached an informal voluntary agreement but that it was not intending to order anything, which was confirmed by the order entered after the status conference. The Court did not intend to usurp the Ombudsman's authority to manage his affairs.

The Court's decision not to reduce the parties' informally scheduled meetings to a binding court order reflects the background operative legal principle that the Ombudsman has "broad discretion to choose how best to marshal [his office's] limited resources and personnel to carry out its delegated responsibilities." *Compassion Over Killing v. U.S. FDA*, 849 F.3d 849, 856 (9th Cir. 2017) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007)). The Ombudsman believes that "recurring case-by-case

reporting, together with the associated preparation and follow-up, materially and adversely affects the Office's ability to determine how best to sequence its work and deploy its staff across its overall complaint inventory." Odom Decl. ¶ 38.

Plaintiffs' contention to the contrary would violate longstanding administrative law principles. Congress vested in the Ombudsman—not Plaintiffs' counsel—the statutory duty to "resolve informally complaints from borrowers of loans" whether or not they are *Sweet* class members. 20 U.S.C. § 1018(f)(3)(A). It is not "up to courts to specify the procedures that" he "should follow" when implementing that statutory responsibility, regardless of whether the complaints at issue are raised by individuals whose class-wide claims in *Sweet* were resolved by the parties' Agreement. *See Lopez v. Garland*, 60 F.4th 1208, 1212 (9th Cir. 2023). On the contrary, "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Midwater Trawlers Coop. v. Dep't of Com.*, 393 F.3d 994, 1006 (9th Cir. 2004) (quoting *PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990)). This Court "must defer" to the Ombudsman's "choice of particular procedures that [he] has decided are best suited" to permit him and his staff to "discharge their multitudinous duties." *Loc. Joint Exec. Bd. of L.V. v. NLRB*, 657 F.3d 865, 872 (9th Cir. 2011) (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 143 (1940)).

Plaintiffs' arguments also violate longstanding administrative law principles holding that agencies are not required to hold hearings on informal complaints. Plaintiffs cannot and do not "point to any provision in" 20 U.S.C. § 1018(f)(3)(A) "or the APA which gives" Plaintiffs' counsel "the procedural right[]" to individual hearings on class member complaints raised with the Ombudsman. *PBGC*, 496 U.S. at 655. The Ombudsman's consideration of informal complaints is "lawfully made by informal adjudication, the minimal requirements for which are set forth in the APA, 5 U.S.C. § 555, and do not include" weekly hearings by Plaintiffs' counsel. *See id.* at 655-65. If the relevant statute, here § 1018(f)(3)(A) does not require a hearing, "then [a] party is entitled only to the limited procedures in [the] APA § 555[.]" *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999) (citation omitted).

The Ombudsman would like to take back control of overseeing and directing his office in the way

that best enables him to meet his statutory duties. Odom Decl. ¶ 38. The settlement agreement does not even mention the Ombudsman's office. *See generally* Agr. Insofar as the Office of the Ombudsman's involvement in this matter stemmed from the initial breaches in 2024, those breaches have long been substantially cured, as Plaintiffs effectively concede, ECF No. 552 at 17 n.10.

**B. The Court Has Not Ordered Defendants to Produce Personally Identifying Information of Hundreds of Thousands of People Stored in Records Systems Not Held by the Ombudsman's Office.**

Plaintiffs' contention that any order that the Court entered in May 2024 compels Defendants to compile and produce to Plaintiffs what they refer to as a class list and decision group outcome and refund data—but are actually lists of personally identifiable information ("PII") of the hundreds of thousands of class members in this case—is entirely meritless. Plaintiffs argue that Defendants have violated the Court's order compelling the Ombudsman to "permit borrowers['] counsel to access the ombudsman[']s office" and to "inspect records therein[.]" ECF No. 553 at 3 (citation omitted). Specifically, they contend that Defendants violated the Court's order compelling Defendants to "inspect records" in the Ombudsman's office. *Id*. They are wrong for several reasons.

First, Defendants have never denied counsel access to the Ombudsman's office to conduct a Rule 34 inspection of any records therein at any time, as discussed above. Plaintiffs identify no instance when they have ever provided notice that they intended to conduct a Rule 34 inspection under these procedures, which are undoubtedly what the Court was referring to when it granted them authority to inspect records. *See supra* at pp. 9-11. Plaintiffs appear to believe that the Court ordered Defendants to compile information from various databases and produce it to them. But if the Court had intended to issue an order compelling Defendants to produce information or documents to counsel rather than permit them to conduct an inspection, it knew how to say so. *See, e.g.*, Min. Entry, ECF No. 186.

Second, and most importantly, the PII that Plaintiffs demand is not stored in an Ombudsman's office system of records. Odom Decl. ¶¶ 73-77; Decl. of Colby Jennings ¶¶ 104-06. Because the Court's order unambiguously allows only an "inspect[ion] of records therein," ECF No. 414—in other words, in the Ombudsman's office—it does not constitute a "specific and definite order" covering materials that are not stored in any Ombudsman's office records system. *Internet Sports Int'l, Ltd.*, 2025 WL 2735534, at

*2 (quoting *Enforma Nat. Prods.*, 362 F.3d at 1211).

Third, Plaintiffs' misunderstanding of the Court's order is incompatible with the cases instructing courts of the "necessity of exercising precision and care in the formulation of inspection orders." *Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 910 (4th Cir. 1978). Again, that order is specifically limited to the Ombudsman's office. It does not authorize Plaintiffs to inspect records, let alone demand the compilation and production of materials, that are not in that office.

Fourth, "none of the records that Plaintiffs seek are already existing records. They have to be created." Odom Decl. ¶ 74. But the inspection of records order authorizes only the "inspect[ion] of *records*" in the Ombudsman's office. ECF No. 414 (emphasis added). And similar obligations regarding agency records are understood not to require "the creation of new records not otherwise in the agency's possession." *See Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 409 (D.C. Cir. 2020).

Fifth, the relief that Plaintiffs ask the Court to enter if they succeed on this motion demonstrates that the Court did not earlier enter a "specific and definite order" compelling the Department to provide class lists or outcome and refund data. *See Internet Sports Int'l*, 2025 WL 2735534, at *2 (citation omitted). Plaintiffs' proposed order spells out over several pages what data they want the Court to order the Department to provide to them and when. ECF No. 553-1 ¶ 11. But the Court's prior orders do not look anything like that. *See, e.g.,* ECF No. 414. Thus, the Court's prior orders were not "specific and definite order[s]" unambiguously compelling the Department to provide class lists or outcome and refund data. *See Internet Sports Int'l*, 2025 WL 2735534, at *2. Even if the prior orders could be *interpreted* to require the compilation and production to Plaintiffs of this information, they "clearly failed to comply with" Rule 65(d) because they "did not state" so "in 'specific . . . terms'" and thus provide no basis to "hold[ Defendants] in contempt." *See Int'l Longshoremen's Ass'n*, 389 U.S. at 76 (citation omitted); *see also infra* at pp. 17-18.

Moreover, if construed to require the compilation and production of this data, the orders would exceed the Department's obligations under the Settlement Agreement, and thus the Court's limited retention of jurisdiction to enforce it. In the Agreement, the parties carefully negotiated the Department's limited reporting obligations. Agr. ¶ IV.G. And the parties did not agree that Defendants would produce

class lists and decision group outcome data. *Id*. Indeed, the Agreement's limited retention of jurisdiction provisions explicitly provide for a procedure to compel the Department to provide the data that the Agreement contemplates. *Id*. ¶ V.B.3. Paragraph V.B.3 does not authorize the Court to enter the order compelling the information production that Plaintiffs demand. The parties agreed that the Court relinquished jurisdiction to consider such orders. *See infra* at pp. 19-21. That the Department may have provided to Plaintiffs similar information in the past does not bind it to doing so in the future. Plaintiffs have identified no "written agreement of all the Parties and with the approval of the Court" to show otherwise. *See* Agr. ¶ XV.B.

For these reasons, Plaintiffs have not even shown that their requests have anything to do with the order Plaintiffs invoke. They thus fail to show "no objectively reasonable basis for concluding that the [Defendants'] conduct might be lawful." *Taggart*, 587 U.S. at 557.

**II. At a Minimum, the Motion Should Be Denied Insofar as the Orders are Ambiguous.**

Plaintiffs' motion should be denied because a party may not be held in contempt for violating an ambiguous order. Any "equitable decree compelling obedience under the threat of contempt" must comply with the requirements of Fed. R. Civ. P. 65(d). *Int'l Longshoremen's Ass'n*, 389 U.S. at 75-76. A court's failure to comply with Rule 65(d) is "both serious and decisive," rendering the order invalid and unenforceable through the Court's contempt powers. *Id*. at 76. Rule 65(d) requires that "[e]very order granting an injunction" must "state the reasons why it issued[,]" "state its terms specifically[,]" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). This rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt*, 414 U.S. at 476.

Insofar as Plaintiffs rely on orders issued in violation of Rule 65(d), those orders cannot form the basis of contempt proceedings and thus their motion must be denied. For example, to the extent that Plaintiffs rely on an order providing that the Ombudsman shall permit borrower's counsel "to otherwise look over the shoulder of the ombudsman," ECF No. 414, the order is facially ambiguous. Plaintiffs do not argue that this provision should be construed literally. ECF No. 553 at 11. Indeed, Plaintiffs provide

no analysis of the order at all. *Id*. Defendants understand this language to be some type of idiom, and, again, believe it was intended to permit Plaintiffs' counsel to observe caseworkers while they work. *See supra* at p. 9. But that's where the understanding stops. Whatever this component of the order requires the Ombudsman to permit Plaintiffs' counsel to do, the acts required are certainly not "state[d] . . . specifically" or "describe[d] in reasonable detail[.]" *See* Fed. R. Civ. P. 65(d). Thus, "basic fairness" precludes Plaintiffs from invoking the Court's contempt powers based on this order. *See Schmidt*, 414 U.S. at 476; *see also Int'l Longshoremen's Ass'n*, 389 U.S. at 75-76. "Language this unspecific cannot support a finding of contempt for noncompliance with it." *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1376 (9th Cir. 1985).

"[B]asic fairness[,]" *Schmidt*, 414 U.S. at 476, also precludes Plaintiffs from invoking as a basis for contempt the Court's colloquy with Government counsel during a status conference that the Court "want[s]" the informally scheduled weekly meetings "to continue[,]" ECF No. 466 at 27:7-8. The Government's reliance on the Court's Minute Entry explaining that "[t]he following orders resulted" from the status conference, omitting any reference to court-ordered weekly meetings, ECF No. 463, supports its conclusion that the colloquy with counsel was not intended to be an order enforceable by contempt eliminating the Ombudsman's discretion to manage his staff. To enforce the colloquy statement as an injunction despite the Court's omitting any mention of it in its Minute Entry would violate the Supreme Court's directives in this area. *Int'l Longshoremen's Ass'n*, 389 U.S. at 76. The Court was required to state specifically and describe in reasonable detail the acts that—as a court order—it restrained or required. *Id.*; Fed. R. Civ. P. 65(d).

The same is true for the Minute Entry stating that "The Court pointed out there is no reason why class counsel cannot roll up sleeves alongside the government to resolve" complaints. ECF No. 444. Even assuming that this is a court order, this statement comes nowhere close to stating specifically, consistent with the demands of Rule 65(d), that Defendants are required to host weekly Ombudsman's office for Plaintiffs' counsel or produce to Plaintiffs' counsel the class list and decision group outcome data that they demand. *Int'l Longshoremen's Ass'n*, 389 U.S. at 76.

## III. Defendants May Not Be Held in Contempt for Violating an Order that the Court Relinquished Jurisdiction to Enter.

Defendants have not violated any order at issue. But Plaintiffs' motion should also be denied because a court may not hold a party in contempt for violating an invalidly issued order. And the Court's limited retention of jurisdiction excludes jurisdiction to enter the orders (and putative orders) upon which Plaintiffs premise their contempt claims.

### A. A Party May Not Be Held in Contempt for Violating an Invalid Order.

A court may not hold a party in contempt for violating an invalidly issued order. "[V]alidity of a contempt adjudication is based on the legitimacy of the underlying order." *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1142 (9th Cir. 2003); *see U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76-80 (1988). Plaintiffs have no "right to remedial relief" based on claimed violations of an "injunction" that was "erroneously issued, and *a fortiori* when the injunction . . . was beyond the jurisdiction of the court." *United States v. United Mine Worker of Am.*, 330 U.S. 258, 294-95 (1947) (citation omitted). Thus, if the Court lacked jurisdiction to enter the orders and putative orders upon which Plaintiffs premise their contempt motion, then their motion for contempt must be denied.

### B. The Court's Jurisdiction is Constrained by the Terms of the Agreement Incorporated into the Final Judgment.

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree[.]" *Kokkonen v. Guardian Life Ins. Co. of. Am.*, 511 U.S. 375, 377 (1994). When a district court dismisses an action with prejudice pursuant to a settlement agreement "federal jurisdiction terminates." *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995).

Although a court may sometimes retain jurisdiction to enforce a settlement agreement after a plaintiff's claims are dismissed pursuant to its terms, *see Kokkonen*, 511 U.S. at 381,[5] "district courts

[5] Defendants' argument assumes, but Defendants do not concede, that the exceptional circumstances articulated in *Kokkonen* for retention of jurisdiction apply to settlement agreements with the Federal Government. At a minimum, *Kokkonen* does not allow for retention of jurisdiction to enforce disputes that the Tucker Act and Little Tucker Act combined vest in the Court of Federal Claims. *See Franklin-Mason v. Mabus*, 742 F.3d 1051, 1055 (D.C. Cir. 2014) ("To permit the logic of *Kokkonen* to reduce the scope of the Court of Federal Claims' jurisdiction would be to violate the time-honored rule

enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees [or settlement agreements], but are instead constrained by the terms of the decree and related order[,]" *Keepseagle v. Vilsack*, 815 F.3d 28, 33 (D.C. Cir. 2016) (quoting *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002)). The language of the settlement reflects "the parties' bargain resolving their case" and "'an enforcement clause limited by its plain language' to only certain kinds of enforcement disputes does not confer ancillary jurisdiction over disputes that extend beyond that limiting language[.]" *Id*. at 35 (quoting *Pigford*, 292 F.3d at 924). The Court must respect an agreement's enforcement provision under which "jurisdiction is drawn exceedingly narrowly[.]" *See id*. at 36.[6] To conclude otherwise would preclude the Government from ever entering into a similar agreement. "Who would sign a [class action settlement] if district courts had free-ranging . . . enforcement authority untethered from the [the] negotiated terms?" *Pigford*, 292 F.3d at 925.

**C. The Court Relinquished Jurisdiction to Enter the Orders and Putative Orders.**

The Court did not retain broad jurisdictional supervision over the settlement's execution. Rather, the parties negotiated an unambiguous and highly restrictive relinquishment of jurisdiction:

> The Court relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations and other requests for relief in this Action that are not expressly stated in this Paragraph V.

Agr. ¶ V.E. To eliminate any doubt about the extreme limitation on the Court's retention of jurisdiction, the parties also agreed that the Court retained jurisdiction *only* to enter specific orders, *i.e.*, "only to order the relief explicitly specified for each particular claim" that is outlined in Section V:

> Notwithstanding all other provisions outside Section V of this Agreement, the Court shall retain jurisdiction only to review claims set forth in this Section V, and only in the manner explicitly provided in Section V. In connection with each such claim, the Court shall retain jurisdiction only to order the relief explicitly specified for each particular claim and only where Defendants have not provided that relief pursuant to the procedures specified in this Section. The Court shall lack jurisdiction to imply any claims, or authority to issue any other relief, under this Agreement.

---

that neither a court nor the parties has the power to alter a federal court's statutory grant of subject matter jurisdiction.").

[6] *See also Kokkonen*, 511 U.S. at 382 (authorizing retention of jurisdiction only insofar as "the parties agree"); *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1280 (11th Cir. 2012) ("It is undoubtedly true that all parties must consent to the retention of jurisdiction over the enforcement of a settlement agreement if the case is dismissed by stipulation of all parties[.]").

*Id.* ¶ V.A.

Here, any order Plaintiffs invoke was indisputably beyond the jurisdiction of the Court. Again, this Court has "retain[ed] jurisdiction only to order the relief explicitly specified" for each of the "only claims permissible" described in Section V, *see* Agr. ¶¶ V.A, and an injunction, for example, compelling the Ombudsman to permit Plaintiffs' counsel "to access the ombudsman['s] office, to inspect records therein, and to otherwise look over the shoulder of the ombudsman[,]" ECF No. 414, is not any of the relief explicitly specified for any of the particular limited claims for which the Court retains limited jurisdiction to consider under Section V. *See Keepseagle*, 815 F.3d at 31 ("This portion of the Agreement mentions nothing about the decisions of the Claim Administrator or the Track A or B Neutral and therefore confers on the District Court no jurisdiction over those determinations.").

Plaintiffs' motion for finding of contempt and sanctions itself violates the relinquishment and limited retention clauses as well. The Court retained "jurisdiction only to order the relief explicitly specified for each particular claim" and "shall lack jurisdiction . . . to issue any other relief[.]" Agr ¶ V.A. Plaintiffs' motion does not seek a remedy outlined anywhere in Section V, such as "an order requiring Defendants to promptly provide Full Settlement Relief" on "a new timetable" or "an order requiring Defendants to submit their [quarterly] reports on a monthly basis[.]" *E.g. id.* ¶¶ V.B.2, V.B.3. None of the four pages of proposed orders that Plaintiffs ask the Court to enter, *see* ECF No. 533-1, are set forth in Section V. For example, Plaintiffs ask the Court to enter an order referring this case to a Magistrate Judge "to oversee Defendants' compliance with the Court's orders[.]" ECF No. 553-1 ¶ 10. But that is not an order that the parties agreed the Court may enter in its limited retention of jurisdiction under Section V. Defendants did not agree to entry of orders "injecting [a] judge into day-to-day agency management" that would have been unavailable in what originated as an APA case. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004); *see also City of New York v. Dep't of Def.*, 913 F.3d 423, 434 (4th Cir. 2019).

**D. 20 U.S.C. § 1082(a)(2) Precluded the Court from Entering Mandatory Injunctions Enforceable By Contempt Against the Secretary.**

Any plainly coercive order was also invalid because Congress precluded courts from issuing them against the Secretary of Education. Congress included an anti-injunction provision in the Higher

Education Act, providing that "no . . . injunction . . . or other similar process . . . shall be issued against the Secretary[.]" 20 U.S.C. § 1082(a)(2). The Ninth Circuit has interpreted this provision to preclude court orders that are "plainly coercive" "no matter what name" the order is "given." *Am. Ass'n of Cosmetology Schs. v. Riley*, 170 F.3d 1250, 1254 (9th Cir. 1999). Plaintiffs' effort to enforce any order through contempt, ECF No. 553, demonstrates that they believe that the order was plainly coercive.[7]

**IV. The Court Should Deny Plaintiffs' Motion for Violating Local Rule 7-8.**

Plaintiffs' motion should be denied for the additional reason that it fails to comply with Local Rule 7-8. Under this rule, "no motion for sanctions may be served and filed more than 14 days after entry of judgment by the District Court" unless "otherwise ordered by the Court." Civ. Local Rule 7-8(d). Final judgment was entered in this action in 2022, and Plaintiffs did not obtain advance approval by the Court to file this motion. The motion was therefore filed in violation of Local Civil Rule 7-8(d).[8]

**V. If the Court Finds Contempt, It Should Defer Consideration of a Remedial Order Until Defendants Have an Opportunity to Purge the Contempt.**

**A. The Government Has Not Waived Sovereign Immunity from the Court's Entry of Monetary Fines.**

The Ninth Circuit has expressed "doubts about the power of the district court to impose monetary sanctions" against the Federal Government, noting that it is aware of no authority "which suggests that the United States expressly has waived its sovereign immunity with respect to contempt sanctions." *Barry v. Bowen*, 884 F.2d 442, 443-44 (9th Cir. 1989). The Court may not enter an order for monetary contempt sanctions against the United States. *See, e.g.*, *United States v. Stein*, 435 F. Supp. 2d 330, 375 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008). Plaintiffs cite no case holding that the APA provides a waiver of sovereign immunity for monetary contempt sanctions. ECF No. 553 at 12-14.[9]

---

[7] Indeed, Plaintiffs are not shy about seeking, by way of the present motion, remedies plainly "'coercive' in nature," ECF No. 553 at 7.

[8] Further, as noted *supra*, the Court previously rejected Plaintiffs' entreaties to consider contempt.

[9] *See also United States v. Horn*, 29 F.3d 754, 763-67 (1st Cir. 1994) (holding, in detailed analysis, that fee-award sanction was unavailable against the United States absent a statute "that authorizes such an award"); *United States v. Woodley*, 9 F.3d 774, 781-82 (9th Cir. 1993) (concluding that sovereign immunity barred imposition of monetary sanctions because there "was no express waiver here"); *Coleman v. Espy*, 986 F.2d 1184, 1190-92 (8th Cir. 1993) (in action seeking compensatory contempt sanctions against federal government based on violation of a court order, requiring an "explicit, unequivocal waiver

### B. The Court Should Defer Consideration of Any Contempt Remedy Until Issuance of Contempt Findings.

Rather than addressing this issue now, the Court should defer adjudication of any contempt remedy until after it renders any contempt findings. If the Court finds that Defendants are in violation of a court order—and it should not—either because they are not hosting weekly Ombudsman meetings or because they are not providing Plaintiffs' counsel demanded data, Defendants should be so notified by the Court and given the opportunity to immediately purge in a manner acceptable to the Court (*e.g.*, by either hosting weekly meetings, providing the demanded data, or both), rendering unnecessary the need for the Court to immediately adjudicate and order any contempt remedy. *Cf. In re Sealed Case*, 77 F.4th 815, 834 (D.C. Cir. 2023) (referring to a procedure under which "a conditional order finding the recalcitrant party in contempt and threatening to impose a specified[10] penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions" is issued before "exaction of the threatened penalty").

## VI. Ordering Status Conferences Before a Magistrate Judge Every One to Three Months Is Not an Appropriate Coercive Remedy.

Again, if the Court finds Defendants in contempt, the Court's findings will be sufficient; the Court does not need to consider an appropriate contempt remedy before providing Defendants a reasonable opportunity to purge the contempt. But in no event should the Court enter an order referring this case to a magistrate judge to entirely undermine the limited retention of jurisdiction provisions that Defendants negotiated for in good faith. *See* ECF No. 553-1 ¶¶ 10-11, 13, 21.

A "coercive" "civil contempt sanction" is a sanction imposed on a defendant "indefinitely *until he*

---

of sovereign immunity," finding none in the federal contempt statute, 18 U.S.C. § 401, and concluding that, particularly "in light of the potentially significant effect on the public fisc," it was not "within [the court's] power" to authorize "compensatory civil contempt proceedings" (citation omitted)); *McBride v. Coleman*, 955 F.2d 571, 576-78 (8th Cir. 1992) (vacating compensatory contempt sanction, expressing "grave doubts" about the district court's authority to enter it, and considering it a "dubious proposition" that "by filing a contempt motion a claimant can be positioned to recover an unlimited amount of compensatory damages from the United States without being bound by the strictures of either the Tucker Act or the Federal Tort Claims Act, which are express (but carefully limited) waivers by the United States of its sovereign immunity with respect to contract and tort claims").

[10] To be clear, Defendants are suggesting that it would be unnecessary for the Court to specify a contempt remedy at this stage.

*complies with [the] affirmative command*" that the Court finds the defendant violated. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994) (emphasis added). Although the remedy may "exert a constant coercive pressure," it does so only to coerce "the jural command." *Id*. at 829. "[O]nce the jural command is obeyed, the future, indefinite" contempt remedy is "purged." *Id*.; *see also, e.g.*, *United Staes v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999). Thus, the ability to purge is a distinguishing feature of civil contempt—the contempt sanction must end the moment the defendant complies—here by providing the demanded class list/related data or by hosting weekly rather than biweekly meetings with the Ombudsman's office. *See Mine Workers*, 512 U.S. at 828 ("[T]he contemnor is able to purge the contempt and obtain his release" from the sanction "by committing [the] affirmative act[.]"); *Cobel v. Norton*, 334 F.3d 1128, 1145 (D.C. Cir. 2003) ("Civil contempt is ordinarily used to compel compliance with an order of the court[.]").

Plaintiffs' demand for indefinite magistrate judge supervision entirely untethered to whether Defendants comply with the contempt issues they raise in this motion—providing class lists/outcome data and hosting weekly meetings with the Ombudsman—violates these principles. Instead, Plaintiffs appear to be seeking to create a procedure that is foreclosed by, and which Defendants explicitly bargained in good faith not to be subjected to under, the Agreement's extremely limited retention of jurisdiction provisions.

### VII. Plaintiffs Cannot Bypass the Traditional Standards for Entry of a Mandatory Injunction Against a Federal Official by Requesting One as a Putative Contempt Remedy.

Again, if the Court finds Defendants in contempt, the Court's findings will be sufficient; the Court does not need to consider an appropriate contempt remedy before providing Defendants a reasonable opportunity to purge the contempt. *See supra* at p. 23. But in no event should the Court enter the new multi-prong mandatory injunction compelling Defendants to, among other things, produce to Plaintiffs a class list, outcome data, census data, as well as a mandatory injunction compelling Defendants to produce to them any "updated data relating to the effectuation of Settlement relief" no matter what or how burdensome. ECF No. 553-1 ¶¶ 11-23.

Each component of Plaintiffs' new requested order would compel the Secretary of Education (or officials over whom she has authority) "to take a [specific] affirmative action" and thus "is treated as a

mandatory injunction" never entered as of right. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015). Indeed, any "equitable decree compelling obedience under the threat of contempt" is "an 'order granting an injunction' within the meaning of Rule 65(d)." *Int'l Longshoremen's Ass'n*, 389 U.S. at 75. And request for "a mandatory injunction against a federal official is analyzed as one requesting mandamus." *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 918 n.1 (D.C. Cir. 1980).[11]

Mandamus is "'drastic'" and "'is hardly ever granted[.]'" *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (citation omitted). This standard is met only "when '(1) the plaintiff's claim is clear and certain; (2) the duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available.'" *Harrell*, 52 F.3d at 1508 (quoting *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986)). "[T]he 'party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable.'" *Lovitky v. Trump*, 949 F.3d 753, 759-60 (D.C. Cir. 2020) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). Plaintiffs have failed to make any of these showings for any of their numerous requests for this type of injunction, ECF No. 553-1 ¶¶ 11, 13, 15-17, for many of the same reasons provided in Defendants' opposition to Plaintiffs' motion to enforce, to be filed today.

Insofar as the Court determines that Defendants violated the Court's prior orders, that those prior orders are enforceable, and that those orders already require the information production and weekly meetings that Plaintiffs posit, there is no reason or basis for the Court to expose Defendants to additional mandatory injunctive orders. Instead, the Court's findings would clarify the meaning of the existing orders on the docket.

---

[11] *See also Miguel v. McCarl*, 291 U.S. 442, 452 (1934) ("The mandatory injunction here prayed for is in effect equivalent to a writ of mandamus, and governed by like considerations."); *Gaines v. Thompson*, 74 U.S. 347, 352 (1868) (explaining that "doctrine" applicable to "relief sought . . . through the writ of mandamus . . . is as applicable to the writ of injunction[.]"); *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) ("'The principles that governed the former writ now govern attempts to secure similar relief,' such as a mandatory injunction ordering a government employee or agency to perform a duty owed to the plaintiff" (quoting *Sanchez- Espinoza v. Reagan*, 770 F.2d 202, 207 n.7 (D.C. Cir. 1985)); *Or. Nat'l Res. Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995) ("When the effect of a mandatory injunction is the equivalent of mandamus, it is governed by the same standard.").

Dated: October 1, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

/s/ *Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 514-4964
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*