BRETT A. SHUMATE
Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 514-4964
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION**

| | |
|---|---|
| THERESA SWEET et al.<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, *in her official capacity as Secretary of Education*, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 19-cv-03674-HSG<br><br>**DECLARATION OF CHRISTIAN L. ODOM**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

Pursuant to 28 U.S.C. § 1746, I, Christian L. Odom, declare as follows:

1. I am the Student Loan Ombudsman within the Office of the Student Loan Ombudsman in the Department of Education's ("Department") Federal Student Aid ("FSA") office. I have served in that capacity since February 9, 2025. Prior to my appointment as the

Student Loan Ombudsman, I served as Director of the Next Gen FSA Program Office at the office of Federal Student Aid.

2. I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration in support of the Defendants' opposition to the Plaintiffs' Motion to Enforce Settlement Agreement (ECF No. 552) ("Motion to Enforce") and Plaintiffs' Motion for Finding of Contempt and Sanctions (ECF No. 553) ("Contempt Motion"). The statements contained herein are based either on my personal knowledge as an employee of the Department or on information reported to me by Department officials and staff.

3. The Office of the Student Loan Ombudsman ("Office") is statutorily required by the Higher Education Act of 1965, as amended ("HEA"). *See* HEA at § 141(f); 20 U.S.C. § 1018(f). The Student Loan Ombudsman is appointed by the Department's Chief Operating Officer. *Id*. The statutory functions of the Office include the following:

a. in accordance with regulations of the Secretary, receive, review, and attempt to resolve informally complaints from borrowers of loans described in paragraph (1), including, as appropriate, attempts to resolve such complaints within the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in the loan programs described in paragraph (1); and

b. compile and analyze data on borrower complaints and make appropriate recommendations. *Id.* at (f)(3).

4. In addition to the foregoing duties, the Student Loan Ombudsman is statutorily required to "submit a report to the Chief Operating Officer, for inclusion in the annual report under subsection (c)(2), that describes the activities, and evaluates the effectiveness of the Student Loan Ombudsman during the preceding year." HEA at § 141(f)(4).

5. As the Student Loan Ombudsman, I am knowledgeable about the Office staff's work generally as well as with respect to this case.

6. In addition to me, the Office is currently staffed by 8 additional supervisors, 21 caseworkers, and 8 additional FTE helping to fulfill the office's statutory responsibilities.

7. The Office is a resource available to individuals who have first sought help through other customer service avenues. The Office reviews, processes and resolves complaints. Most complaints received by the Office are from student aid borrowers concerning their federal student loans. The following paragraph describes how complaints received by the office are generally handled, outside of this case.

8. FSA's website provides StudentAid.gov/submit-feedback as a way for borrowers and other customers to submit complaints and feedback. Borrowers may also submit complaints by mail or by calling 1-800-4-FED-AID. Through the website, customers are asked to identify the type of issue they are experiencing, describe the issue, identify what they believe would be a fair outcome, provide contact information, and, if appropriate, upload supporting documentation. Once submitted, the complaint is entered into FSA's complaint system, assigned a case number and routed based on the nature of the issue. Depending on how it is routed, the complaint may be handled by an FSA contact center, a loan servicing partner, or the FSA Ombudsman. The assigned team reviews and researches the complaint, may seek additional information or coordinate with other entities as necessary, and provides a response or resolution to the customer.

9. I am aware that at an April 24, 2024 hearing, in connection with Plaintiffs' allegation that the Department had breached the January 2024 relief deadline for effectuating relief for class members in the automatic discharge group, the Plaintiffs' counsel asked the Court to order the Department to address questions from *Sweet* borrowers. ECF No. 412 at 35. The Court requested the Department to provide the name of someone "to whom all these questions [from *Sweet* borrowers] can be referred." ECF No. 412 at 35. In response, the Department identified my predecessor, the then-Ombudsman, and provided her Department email address. *Id*.

at 36. Soon thereafter, the Department created a dedicated mailbox – sweet@ed.gov ("*Sweet* mailbox") - in lieu of the Student Loan Ombudsman's individual email address to which *Sweet* borrowers can direct their complaints. This is a dedicated mailbox for *Sweet* borrowers and is different from the link identified in Paragraph 8, above, for non-*Sweet* borrowers submitting complaints to the Office.

10. For purposes of resolving *Sweet* complaints received by the Office, the Department delegated certain decision-making authority to the "Ombudsman". A delegation of authority ("DA") was certified August, 14, 2024 and amended October 11, 2024. The subject line of the DA, as amended, reads: "the DA authorizes the Office to Make Decisions on Class Membership and Amount of Relief for Certain Federal Student Loan Borrowers Who Are Members of the Class in *Sweet v.* [*McMahon*] and to Direct Loan Servicers to Implement Such Relief to Add the Authority to Direct Guaranty Agencies, Other Holders of Loans made Under the Federal Family Education Loan (FFEL) Program, and the Servicers of Those FFEL Loans to Provide Such Relief."

11. Unlike non-*Sweet* complaints, resolving the complaints of *Sweet* borrowers requires that the Office staff familiarize themselves with the Settlement Agreement and the many complexities of resolving *Sweet* complaints. Although it has taken staff some time to understand all of the complexities, the current staff have been reviewing and resolving *Sweet* complaints since approximately April 2024 with some staff added in 2025. They are all incredibly well-versed in *Sweet* complaint resolution. In addition to their on-the-job training from working the cases, they have all been provided standards of procedure to guide them in doing their work. *See* below at ¶¶41-42.

## NATURE AND RESOLUTION OF *SWEET* COMPLAINTS

12. A wide variety of complaints are received by the *Sweet* mailbox.

13. Some complaints that are sent to the *Sweet* mailbox that the Office reviews are from borrowers who believe they are *Sweet* borrowers but who, in fact, are not. For example, some complaints are from borrowers who filed a borrower defense application outside of the time periods covered by the *Sweet* settlement. Some complaints are from borrowers who submitted borrower defense applications within the requisite time period covered by the *Sweet* settlement, but the application was closed because the borrower did not have any open loans when the application was filed. However, the majority of the complaints sent to the *Sweet* mailbox that the Office staff have reviewed so far are from *Sweet* borrowers.

14. The Settlement Agreement establishes a number of different decision deadlines (the dates by which the Department was to adjudicate *Sweet* borrowers' borrower defense applications) and relief deadlines (the date by which relief is due). *See e.g.* Settlement Agreement at ¶ IV.C.3 (decision deadlines); ¶ IV.C.9 (relief deadline). Some complaints that came into the *Sweet* mailbox prior to the decision deadlines passing were from borrowers asking for updates about their decisions even though the decision deadlines had not yet passed. Other complaints have been from borrowers asserting they did not receive a decision on their application within the time periods under the Settlement Agreement. Some of those complaints were valid, but not all were. In many cases, a decision was timely emailed to a borrower, but the borrower did not see the decision.

15. Now that all of the decision deadlines have passed and class members have received a Final Decision (*see* Settlement Agreement at ¶¶ II. O; IV.C.4) or a notice that their decision deadline was missed (*see* Settlement Agreement at ¶ IV.C.8), most complaints and questions now being handled by the Office staff relate to relief or status as a class member. Some

examples include: "when will I get my refund?"; "when will I get the rest of my refund?"; "why haven't all my loans been discharged yet?"; "why hasn't my loan been removed from my credit report?". Many emails and inquiries have come from *Sweet* borrowers whose applicable relief deadlines—for example, deadlines associated with their decision group—had not yet passed, or who are asking the Office to determine whether they may be entitled to additional refunds beyond those associated with relief already processed.

16. Other types of complaints pertain to status as a class member. Some borrowers assert that they submitted a borrower defense application by the June 22, 2022 deadline (one of the requisites for class membership), but the Department has no record of it or the Department's records show that the application was received after that date, or the borrower contends that they had technological difficulties submitting the application online by the June 22, 2022 deadline. Many complaints are received from class members asking about a refund even if though they are not due a refund because all of their loans are held by a commercial lender under the Federal Family Education Loan ("FFEL") loan program or they are not owed a refund because they did not make payments on their Direct loans. Many class members complain about discharge and refunds of loans that are not eligible for discharge or refund under the Agreement because they consist only of debt for attending schools that were not the subject of the Class Member's borrower defense application. A notable portion of prolonged or pending inquiries stem not from agency inaction, but from class members' failing to provide requested substantiating documentation (such as disputed servicer letters or payment receipts) despite repeated outreach spanning months, while servicers confirm all records have been fully accounted for.

17. Generally, for each complaint sent to the *Sweet* mailbox, the assigned staff person contacts the individual borrower, contacts the borrower's servicer to, *e.g.*, request payment histories or to find out if a refund was issued, and review records pertaining to that individual

borrower. Some *Sweet* complaints can be resolved very quickly; other *Sweet* complaints require more time, often because there is a complicated loan history or external input is needed (*e.g.* information from servicer or borrower). A loan file for any particular borrower can include dozens of entries over decades and numerous servicers. In fact, a single borrower's file often requires reconciling disparate historical data between commercial servicers, the Department's Default Resolution Group/DMCS, and current federal loan servicers, particularly where loans defaulted, were consolidated, or were transferred while refunds were pending; only a minority of the cases have a single loan servicing history.

18. There are a variety of ways in which complaints can be resolved. Here are just some representative samples:

a. Representative outcomes when borrower complains no refund was received or refund was not in the correct amount - (i) the caseworker determines that the refund was sent to an old address because borrower failed to notify the Department or the servicer of a new address. The original refund is cancelled and a new refund issued and sent to the new address; (ii) the caseworker determines that the borrower only had commercial FFEL loans and therefore is not due a refund: (iii) after receiving information from the caseworker about the amount and timing of the refund, the borrower realizes that they forgot they had in fact received the refund; (iv) the loan was in forbearance for the entire period and, therefore, the borrower had not make any payments on the loan; (v) borrower's assertion that refund was not received or additional refund is due is substantiated and casework requests that a refund be issued.

b. Representative outcomes when the borrower complains that they are in repayment erroneously: (i) the caseworker, after checking the borrower defense application, informs the borrower that they elected not to be in payment forbearance; (ii) the caseworker determines that the borrower is in repayment status on a loan that is not related to *Sweet* and for which no borrower defense application was submitted; (iii) the caseworker determines that a borrower is in a $0 Income Driven Repayment ("IDR") plan which overrides the borrower defense forbearance and which is viewed by the Department as more favorable to the borrower because it allows them to continue gaining qualifying payments towards IDR forgiveness. When this is true, accounts are generally flagged by the servicer so that if a borrower recertifies and no longer has a $0 IDR payment, the BD forbearance will automatically apply. and (iv) the caseworker determines that the borrower's complaint is substantiated and requests that the appropriate servicer or guaranty agency put the borrower's loan into forbearance. Resolving account-

status complaints frequently involves balancing competing borrower interests, such as coordinating with loan servicers to determine whether administrative forbearances can be tailored to individual loans without inadvertently suppressing repayment counts toward other statutory relief programs, such as Public Service Loan Forgiveness.

c. Representative outcomes when the borrower complains that they still have loans on their credit report: (i) all of the borrower's *Sweet* loans have been discharged and removed from the credit report and there are no loans remaining on the credit report; (ii) all of the borrower's *Sweet* loans have been discharged and removed from the credit report, but the borrower has non-*Sweet* loans which correctly continue to appear on the credit report; and (iii) the borrower's *Sweet* loans have been discharged and should have been removed from the credit report but were not, and the caseworker directs the servicer or guaranty agency to request the credit reporting agency to remove the loans.

19. Once my staff has completed their casework to resolve a particular complaint or answer a particular question, they notify the borrower of the resolution of the complaint and/or the response to the question and close the complaint.

20. All of the foregoing work is ongoing. One recurring activity that reduces the time available for this day-to-day casework is the preparation for, participation in, and follow-up associated with the regular casework reporting meetings with Plaintiffs' counsel.

## THE TYPE AND CADENCE OF THE MEETINGS WITH PLAINTIFFS' COUNSEL

21. Beginning in 2024 with my predecessor, the Office staff have met regularly with Plaintiffs' counsel about complaints received in the *Sweet* mailbox. I understand that originally these meetings occurred in person every other week. At some point, before I became the Student Loan Ombudsman, I understand that these meetings with Office staff switched from in-person meetings to virtual, except for a monthly in person meeting. As described below, for as long as I have been the Student Loan Ombudsman, the regular meetings with Plaintiffs' counsel are casework reporting meetings at which the Office staff report on their *Sweet* casework. At some

point, the frequency of the virtual casework reporting meetings increased to weekly (other than the week in which the monthly in person meeting occurs).

22. Beginning in my predecessor's tenure and continuing after I was appointed Ombudsman through approximately September 25, 2025, the Department hosted monthly in-person meetings consisting of two back-to-back days of meetings. The first day was a lengthy in-person casework reporting meeting the Office agreed to host which was attended in person by Plaintiffs' counsel, attorneys from the Department's Office of the General Counsel ("OGC") and the Department of Justice ("DOJ"), and Office staff, including approximately five to six caseworkers. The next day was a shorter in-person meeting attended by Plaintiffs' counsel, DOJ and OGC counsel, FSA staff, the loan servicers and their counsel, as required by court order. In its June 26, 2025 minute order (ECF No. 477), the Court granted the servicers' counsel's request that servicers and their counsel could begin attending the court-ordered component of the monthly meeting virtually rather than in person. There were no in-person meetings during October and November 2025 due to the lapse in appropriations. Based on the agreement of the parties and beginning with the December 2025 meeting, the back-to-back Ombudsman's casework reporting meeting the Department agreed to host and the court-ordered meeting with the servicers were combined into just one day of monthly in person meetings. A true and correct copy of an 11/21/2025 email from Plaintiffs' counsel is attached hereto as Exhibit A.

23. During my tenure as the Student Loan Ombudsman and until approximately April 2026, casework reporting meetings with Plaintiffs' counsel were scheduled on a weekly cadence, although individual meetings were sometimes canceled or rescheduled. Generally, there have been four weekly meetings per month, although in some months there have been five weekly meetings. One casework reporting meeting each month is an in-person meeting and the remaining weekly meetings are two-hour virtual meetings. During the in-person meeting each

month, the first part of the day (generally, from 10:30-3:00 with a one-hour lunch break) is the casework reporting meeting. That meeting is followed (generally, from 3:30-4:30) by a meeting attended by Plaintiffs' counsel, DOJ and OGC counsel, FSA staff, the servicers and the servicers' counsel. As noted above, the servicers and their counsel now participate in the monthly meeting virtually. As explained below at Paragraph 35, the Department reduced the frequency of the meetings in April, 2026.

**CASEWORK REPORTING MEETINGS ARE DISRUPTIVE**
**TO THE OFFICE'S CASEWORK**

24. The casework reporting meetings and the days leading up to them follow a regular pattern. Until approximately March 23, 2026, in advance of the casework reporting meetings, my staff provided two reports to Plaintiffs' counsel created by my staff specifically for Plaintiffs' counsel. One report gave an update of the number of emails received into the *Sweet* mailbox (to which *Sweet* borrowers send their complaints), data on the types of complaints received, and the number of outstanding complaints associated with each servicer. The other report is a spreadsheet identifying each *Sweet* borrower who has complained, the topic of the complaint, a description of the issue, the type of loan involved, the primary servicer for the loan(s), and the current disposition of the complaint, as well as a separate tab for the tasks to the servicers and a status of those tasks. Essentially, the spreadsheet contained the data on which the update report was based. Given the burden and additional staff time that was required to prepare the update report, starting March 23, 2026, the Department advised Plaintiffs' counsel that it would begin providing only the data spreadsheet. *See* 3/23/2026 email from Liam Holland to Plaintiffs' counsel, a true and correct copy of which is attached hereto as Exhibit B. My staff also provided instructions to Plaintiffs to explain how they could analyze the data to arrive at the information previously provided in the update reports. *Id*. None of the reports or spreadsheets described in this paragraph are required by the Settlement Agreement or ordered by the Court. Rather,

through the spirit of collaboration, the Office has voluntarily provided the update reports and spreadsheets to Plaintiffs' counsel.

25. On the Friday or Monday before the casework reporting meeting, Plaintiffs' counsel provides my staff with a spreadsheet of the complaints made to the Office that Plaintiffs' counsel wants to discuss at the casework reporting meeting and learn whether and how the complaint was resolved. The borrowers on Plaintiffs' spreadsheet are borrowers who both submitted a complaint to the *Sweet* mailbox and complained to Plaintiffs' counsel who Plaintiffs' want to prioritize discussing in the ensuing casework reporting meeting. Plaintiffs' spreadsheets identify on average approximately 30 new individual complaints each week. My understanding is that Plaintiffs compile the information in their spreadsheet based on multiple inputs including the data provided by my Office, inquiries via the *Sweet* mailbox, accounts they are monitoring, escalated issues, and their own borrower communication.

26. Preparing for the casework reporting meetings requires substantial staff time outside of the meetings themselves. My staff must extract and analyze borrower data from complex Department and federal systems—including the National Student Loan Data System ("NSLDS"), the Common Origination and Disbursement system, and the Department of the Treasury's Treasury Check Information System ("TCIS")—while simultaneously liaising with servicers (such as MOHELA, Nelnet, and Aidvantage) to audit payment histories and recalculate refund disbursements down to the penny. Each participating caseworker spends approximately 16–18 hours preparing for each meeting. This preparation requires staff to disrupt their established triage queues to pull forward cases prioritized by Plaintiffs' counsel, frequently requiring staff to re-investigate matters that were already audited and closed. Furthermore, because Plaintiffs' counsel regularly reorganizes, resort-orders, or alters the master tracking list in the days leading up to or during the meetings, caseworkers spend additional time re-indexing their

case notes to align with changes in the ordering of cases for discussion. When this extensive investigative preparation is combined with attendance at these multi-hour sessions (which last two hours for the virtual meetings and nearly five hours for the monthly in person meetings) and post-meeting follow-up, the total commitment reaches 30 hours on average per caseworker during meeting weeks. The preparation, meeting participation, and follow-up associated with this process divert experienced caseworkers from the ordinary flow of reviewing and resolving borrower complaints and effectuating relief.

27. During the regular casework reporting meetings, the underlying loan research, data analysis, servicer coordination, and corrective work generally occur outside of the meeting. My staff typically comes to the meeting having already investigated the cases identified for discussion and presents the resulting factual findings, including the servicers involved, refund or Treasury status, payment-history issues, and credit-reporting status. Plaintiffs' counsel generally receives those reports, asks questions regarding the status or handling of particular matters, identifies issues it believes warrant further review, and records case numbers and narrative updates. As described below, there have been limited instances in which we have used a meeting to discuss a broader operational issue more collaboratively, but even in those instances the underlying account research and analysis were performed by my staff outside of the meeting.

28. Some examples of the reporting on individual cases that occurs during the meetings include the following:

a. My staff reports on borrower-specific refund issues, including whether refunds have been issued, the amounts and timing of those refunds, whether checks were canceled and reissued, whether payment histories from servicers align with borrower records, and whether borrowers have confirmed receipt of funds.

b. My staff reports on borrower complaints involving discharge and account status, including whether loans have been discharged, whether borrowers continue to receive billing statements after discharge, whether

loans have been placed into forbearance where appropriate, and whether additional steps are required to complete relief.

c. My staff reports on class membership and application-related issues, including whether borrowers qualify as class or post-class members, whether applications were timely submitted, whether supporting evidence exists in Department or contractor systems, and whether additional documentation must be obtained from the borrower.

d. My staff reports on credit reporting issues, including whether credit tradelines have been deleted following discharge, whether prior servicer data has been transferred correctly, and whether further action with servicers is required to correct inaccurate reporting.

e. My staff reports on communications and tasking to loan servicers, including requests for payment histories, refund verification, discharge processing, correction of servicing errors, reissuance of refunds due to address or processing issues, and escalation of unresolved matters through ongoing coordination with servicers.

29. In many of the cases discussed, my staff reports that full relief has already been effectuated and that the complaint is closed—confirming that the borrower's concerns had already been addressed through ordinary administrative channels. Where additional action remains necessary, my staff generally has already identified the issue and the next steps. Any remaining account research, borrower or servicer outreach, corrective action, discharge, refund, or other operational work is performed outside of the meeting.

30. Some of the borrowers whose cases are identified by Plaintiffs' counsel for prioritized resolution which are reported on during the casework reporting meetings. have only non-*Sweet* issues (*e.g.*, issues related to private loans or Perkins loans) or a combination of *Sweet* and non-*Sweet* issues. The following examples illustrate some of the cases my staff have reported on in the casework reporting meetings and the resolution of the case reported to Plaintiffs' counsel:

a. One absent class member has been issued a refund check multiple times but has not cashed the check. While the borrowers has complained about not receiving his refund, the check has been reissued on several occasions, and delivery has been complicated by the

borrower's frequent international travel and lack of a consistent mailing address.

b. In another case, an absent class member inquired about the timeline for issuance of relief; however, the borrower was part of an automatic relief group, whose loans had already been discharged and who had already received a full refund.

c. Further, in another case an absent class member inquired about a refund; however, because the class member's payments were made on commercial FFEL loans, there is no refund due because the payments were not made to the Department, and therefore the payments are outside the scope of refund relief under the Sweet settlement. The class member is only entitled to a discharge.

d. In another case, an absent class member inquired about the status of settlement relief in 2025; however, the borrower had already received multiple refunds from more than one servicer in 2024, and Department records reflected a remaining loan balance of zero.

e. Lastly, in another case an individual inquired about eligibility for relief under the *Sweet* settlement; however, the individual submitted a borrower defense application after the relevant time period and is not covered by the settlement.

31. In addition to the staff hours needed for preparatory work to get ready for the casework reporting meetings that would be saved from reducing the frequency of the meetings or eliminating them altogether, additional staff hours would be saved from not *attending* the meetings. Each virtual casework reporting meeting lasts for two hours and is attended by, on average, 4 caseworkers and 1-2 management officials. Those Office staff members and management officials would otherwise be available to perform other work of the Office. The monthly in-person meetings are scheduled for 4.5 hours with a one-hour lunch break for a total meeting time of 3.5 hours. The staff will often spend time during the designated lunch breaks doing additional case work to follow up on any cases from the morning session. The in- person meetings are attended (some in person and some virtually) by the same Office staff who attend the two-hour all virtual meetings.

32. I also reviewed the Office's actual weekly case-closure data to determine whether the operational burden described above was reflected in case output. Because staffing, available capacity, and overall case-closure volume changed over the course of 2026, I do not view the entire period as an apples-to-apples comparison. The clearest comparison is July and August 2026, after the Office's case-resolution output had substantially increased and before temporary surge staff began materially contributing to weekly closures, as shown by the following chart:




33. During those two months, there were four work weeks in which a casework reporting meeting occurred and four intervening work weeks in which no such meeting occurred. The Office closed 511 cases during the four meeting weeks, an average of approximately 128 cases per week, compared with 1,036 cases during the four non-meeting weeks, an average of 259 cases per week. Average weekly case closures were therefore approximately 51 percent lower during meeting weeks. Every non-meeting week during July and August also had more case closures than every meeting week during that same period.

34. I do not attribute the entire difference in weekly output solely to these meetings because case complexity, staffing, overtime, and other operational factors can vary from week to

week. Nevertheless, this repeated pattern is consistent with what I have observed operationally: preparing for, participating in, and following up on these meetings reduces the uninterrupted time available for staff to review and resolve borrower complaints.

35. Due to the burden on staff in preparing for and attending the regular virtual and in person casework reporting meetings, with the resulting reduced time available to actually work their cases (*i.e.,* resolve *Sweet* complaints), the Department informed Plaintiffs' counsel in early 2026 that it wanted to reduce the frequency of the meetings. After the parties exchanged correspondence about Plaintiffs' claim that weekly meetings are required by court order, and after Government counsel reviewed Plaintiffs' arguments, in April, 2026, the Department reduced the frequency of the meetings to a bi-weekly cadence, consisting of one two-hour virtual meeting and one monthly in-person meeting. The Department notified Plaintiffs' counsel that it was reducing the frequency of the case reporting meetings because preparation for the meetings takes my staff away from actual case work – the work that is needed to review and resolve *Sweet* borrowers' complaints.

36. The regular case reporting meetings generally are not working sessions in which the parties jointly perform the underlying casework or resolve cases in real time. My staff typically performs the substantive research, account review, data analysis, servicer outreach, calculations, and other investigative work outside of the meetings. During the meetings, my staff generally reports on that work, explains its findings and proposed approach, and responds to questions or concerns raised by Plaintiffs' counsel. There have been limited instances in which we have used a meeting more collaboratively to work through a broader operational issue. For example, as described below with respect to the administrative process, we used one in-person engagement to walk through several borrower examples, explain the problems we had identified, and discuss possible approaches with Plaintiffs' counsel. Even in that instance, however, the

underlying research, retrieval and review of servicing records, calculations, and analysis were performed by my staff outside of the meeting; the meeting itself was used to present that work, discuss the issues, and obtain Plaintiffs' counsel's reaction to the approach the Office was considering. Outside of those limited working discussions, Plaintiffs' counsel generally asks questions regarding the status or handling of particular matters and may request additional research, records, explanations, borrower or servicer contact, or other follow-up. At times, those exchanges become adversarial and require individual caseworkers to explain or defend the analysis and operational decisions underlying a particular resolution.

37. Plaintiffs' counsel also identifies particular cases that it wants the Office to address on a priority basis and seeks updates regarding when particular research, outreach, or corrective actions will be completed. Responding to those requests affects which cases my staff work, when they work them, and how limited staff resources are allocated. Cases selected for discussion may need to be pulled forward from the Office's ordinary queue, may interrupt work already underway, or may require staff to revisit matters that otherwise would not have required additional review at that time. This is significant because the Office is responsible not only for *Sweet*-related matters, but also for carrying out its statutory responsibilities to other federal student aid borrowers.

38. I do not mean to suggest that these meetings never identify an issue warranting additional review or action. They sometimes do. My concern is that recurring case-by-case reporting, together with the associated preparation and follow-up, materially and adversely affects the Office's ability to determine how best to sequence its work and deploy its staff across its overall complaint inventory.

**RESOLUTION OF COMPLAINTS IN BREACH LETTER**

39. As noted above at Paragraph 10, the Department delegated significant decision-making authority to the Student Loan Ombudsman for purposes of the Department's implementation of the *Sweet* Settlement Agreement. The delegated authority permits the Ombudsman to: (1) determine whether certain individuals are members of the certified *Sweet* class and entitled to relief; (2) determine the amount of relief, if any, to which such individuals are entitled; and (3) direct the Department's loan servicers, guaranty agencies, and other holders of FFEL Program loans to effectuate that relief, including by issuing refunds, reducing loan balances, and revising credit reporting. The authority therefore encompasses both case-specific determinations concerning entitlement to relief and directions to operational entities to implement relief once the appropriate determination has been made.

40. On or about February 26, 2026, the Office informed Plaintiffs' counsel that it was temporarily pausing its ***exercise*** of delegated authority while I reviewed and updated the procedures governing its use. The underlying delegation itself was not revoked or suspended. By that time, the two staff members who had previously performed much of the day-to-day delegated-authority work had left FSA, responsibility for the process had shifted to other staff, and new managers were assuming responsibility for overseeing the end-to-end *Sweet* processes. As I reviewed the delegated-authority workflow, I determined that the existing procedures did not provide sufficient documented management oversight, separation of responsibilities, independent quality review, and traceability for the exercise and redelegation of an authority of this significance.

41. I therefore directed that the standards of procedure ("SOP") be revised to clearly identify the roles and responsibilities of the Ombudsman, management officials, caseworkers, and reviewers; document the redelegation and oversight of the authority; and establish an independent

review between the employee developing a proposed delegated-authority action and the employee approving or denying that action. As part of implementing the revised process, I also required the supervisors responsible for this work to review the pending delegated-authority inventory. That review allowed the managers who were now responsible for the process to become familiar with the pending matters, test the revised procedures from beginning to end, and identify areas requiring additional training or guidance before routine processing resumed.

42. The revised SOP was approved and became effective on July 23, 2026. It expressly assigns management responsibility for workflow and operational oversight, retains Ombudsman oversight of redelegated authority, requires an independent review of delegated-authority requests, and establishes quality-control and follow-up procedures after relief is transmitted to a servicer or guaranty agency. The Office resumed processing matters under the revised procedures, and the updated SOP was provided to Plaintiffs' counsel on August 10, 2026 as a courtesy. A true and correct copy of Government Counsel's 8/10/2026 email to Plaintiffs' counsel transmitting the SOP is attached hereto as Exhibit C.

43. The existence of a pending delegated-authority task does not necessarily mean that the Office has already made a final determination that relief is owed and that the only remaining step is to transmit an instruction. Delegated authority is used for different purposes depending on the case. In some matters, exercising the authority is itself how the Ombudsman determines whether an individual should be included in the *Sweet* class or determines the amount of relief, if any, to which the borrower is entitled. In other matters, entitlement to relief may already have been established and delegated authority is used to direct a servicer or guaranty agency to implement that relief. A caseworker may identify a potential issue or recommend a particular action, but that recommendation is not, in every case, the Office's final delegated-authority

determination. Under the revised process, the proposed action is subject to an independent review before it is approved, denied, or transmitted for implementation.

44. In their June 18, 2026 letter alleging breach, the Plaintiffs identified thirteen class members whose Ombudsman cases are still open and for whom they allege the Department "failed to fully effectuate relief . . . due to the Department's unjustified suspension of delegated authority." As noted above, the Department did not suspend the delegation of authority. Rather, in February 2026, the Office temporarily paused its exercise of delegated authority while it amended its SOPs. My staff has reported to me that the current status of those cases is as follows:

**TABLE 1**

| CASE NO. | ISSUE IDENTIFIED IN BREACH LETTER | STATUS |
|---|---|---|
| 19804974 (ARG) | Awaiting discharge and refund | Borrower was issued refunds of more than $27,000 in 2023 ($6,547) and 2024 ($21,567). The refunds that were issued in 2023 and 2024 are consistent with the payment histories reviewed to date. The borrower received loan forgiveness in 2023 under the Income Driven Repayment plan ("IDR") totaling $25,521. However, on September 15, 2026, the Office instructed the servicer under DA to undo the IDR forgiveness and update it to BD due to *Sweet* which will result in an increased discharge amount. The task was created and is being reviewed by the servicer. |
| 19870298 (ARG) | Awaiting refund | The borrower received a discharge in the amount of $35,741 in July 2024. Although initially tagged by the Office as requiring DA review, the Office has determined that the pending refund issue will be resolved instead through the administrative process. |

| | | |
|---|---|---|
| 22572921 (ARG) | Awaiting $45 refund | The borrower received a discharge of the terminal consolidation loan in the amount of $39,989. The borrower also received $25.35 in refunds in two checks, one issued in July 2024 ($5.35) and one issued in August 2024 ($20.00). Upon further review, the discharged loans were found to be in a default status from September 2015 to February 2017. In response to a September 15, 2026, DA instruction from the Office, the defaulted loan servicer informed the Office that the payments needed to be returned from the current servicer of the loan since the defaulted loan had been returned to regular servicing. Thus, on September 30, 2026, the Office sent new DA instruction to the current servicer to return to the borrower all payments made to rehabilitate the defaulted loans. The Office continues to monitor this case for resolution. |
| 28932691 (ARG) | Awaiting $3,847 refund | The borrower was issued refunds totaling $19,162.76 divided between two checks – one issued in June 2023 and one issued in September 2024. The Office determined that an additional refund of $3,847.21 was due and instructed the servicer to issue the refund. As of September 9, 2026, the servicer informed the Office that the refund will be issued in 4-6 weeks. In addition, the borrower has already received $ 71,602 in discharges. The discharge amount includes a DA request that was resolved by the servicer on September 8, 2026. |
| 32407317 (ARG) | Awaiting discharge and refund | This borrower was entitled to relief both under the *Sweet* settlement and under the group discharge for the Art Institute. When there are overlapping sources of relief (*i.e.*, *Sweet* discharges and group discharges), complexities for discharge and refunds result. In working the case, the Office determined that two loans had not yet been discharged when the complaint was received. However, both of those loans have now been discharged in the total amount of $36,469. The servicer requested the deletion of the credit tradelines on April 27,2026. Additional refunds in the amount of $23,183.16 are due. The Office has also determined that the servicer tagged the |

| | | |
|---|---|---|
| | | discharge as closed school loan instead of borrower defense, leading to the delay in determining that a refund was due. As of September 18, 2026, the servicer indicated that NSLDS has been updated to reflect that the two loans have been updated and loans show discharged loan with a borrower defense notation effective 9/18/2026. Plaintiffs incorrectly identified this borrower as part of the ARG. The Office has determined that this borrower is a post-class applicant whose relief deadline is March 30, 2027. |
| 28238522 (ARG—waived in)[1] | Discharge partially and refund | The borrower has eleven loans, but only nine are *Sweet* eligible. Of those nine, seven are federally serviced and were discharged in 2024. The discharged amount is $19,260. The servicer requested the deletion of the credit tradelines on December 23, 2024. The borrower was issued refunds on those seven loans in the total amount of $6,847 issued on January 28, 2025. Two loans are commercially serviced (in the total amount of $6,625) and remain in forbearance. The Office used its DA on September 15, 2026 and requested that the guaranty agency process the discharge for the remaining two loans. |
| 26637828 (DG1) | Awaiting discharge | The borrower had two eligible *Sweet* loans. One loan was discharged effective November 11, 2023 and posted January 30, 2024 in the amount of $26,052. The borrower was issued a refund on that loan in the amount of $27,451.84 in December of 2023. The check was cancelled, reissued in April 2024 and reconciled. The second loan (with a discharge amount of $49,488) was discharged as a result of DA instruction from the Office to the servicer in August 2026. On September 1, 2026, the servicer confirmed refund issuance and instruction to the CRA to delete the tradeline. The refund amount issued for the second loan is $52,146.96. It was issued on August 28, 2026. |

[1] Any case that is characterized as "ARG – waived in" means that the borrower had not previously been identified by the Department as a class member in the automatic relief group and the Office exercised its delegated authority to waive that borrower into the automatic relief group.

| | | |
|---|---|---|
| 28320745 (DG1) | awaiting discharge and $503.72 refund | The borrower's eligible loans were consolidated in 2001, again in 2005, and again in 2024. The borrower's two direct consolidation loans were then discharged in October 2024 in the total discharge amount of $177,494. On April 6, 2026 and August 29, 2026, the servicer requested the deletion of the credit tradelines. No payments were made (and therefore no refund is due) on the discharged 2024 Direct Consolidation Loan. The Office has confirmed that the borrower is entitled to a $503.72 refund based on payments on mixed intermediary Direct Consolidation Loans. Office working to issue refund under DA. |
| 33147596 (DG1) | awaiting discharge and refund | This borrower was entitled to relief both under the *Sweet* settlement and under the group discharge for schools owned by Corinthian Colleges, Inc. When there are overlapping sources of relief (*i.e.*, *Sweet* discharges and group discharges), complexities for discharge and refunds result. As a result of those complexities and prior to the Court's ordering the terminal loan methodology, two terminal direct consolidation loans were partially discharged, in the amount of $15,646 in March 28, 2026. There were no payments (the borrower was on a $0 monthly payment IDR plan) and therefore no refunds due. The two remaining loans were then transferred to a different servicer in July 2024, and have since been discharged. The additional amount discharged was $19,047. In total, the amount discharged is $34,693 in federal loans. No payments were made on the consolidation loan and all underlying loans are commercially-held FFEL loans; therefore, borrower not eligible for a refund. The DA task was not necessary because no refunds are due and all discharges are complete. |
| 33807678 (DG1) | awaiting discharge and $12,978 refund | The borrower has three *Sweet* eligible loans from 2009. All three loans were paid off, in the amount of $12,978, in 2021. The borrower was approved for *Sweet* relief in July 2023, but inadvertently, the discharge request for the loans was not sent to the servicer. In August 2026, the Office submitted DA instructions to the servicer to discharge the loans (in the total |

| | | |
|---|---|---|
| | | amount of $9,737) and to issue a refund. Loans were discharged by servicer; refund issued for $12,979.07 on September 4, 2026. Borrower confirmed receipt with the Office. |
| 20542141 (DG1) | Discharge complete. Awaiting refund. | This DG1 borrower's borrower defense application was not initially approved. Pursuant to the Settlement Agreement, the borrower was notified by BDB of the opportunity to revise and resubmit their application for additional review. Because the borrower did not revise and resubmit their application, the application was deemed denied, pursuant to the terms of the settlement agreement, with no relief due. As a result of its review of the borrower's complaint, the Office staff determined that the reason the borrower did not submit a revise and resubmit request is because the servicer incorrectly advised the borrower that doing so was not necessary because the borrower's loans were covered by a group discharge. Using its DA, the Office instructed the servicer on September 8, 2026 to discharge the loans, issue the refunds and delete the credit trade lines. Total discharge amount is $46,685. Anticipated refund is $1,839.00. The servicer has confirmed that it discharged loans it held on September 14, 2026 and that it is sending request to FMS to issue refund. The borrower has no outstanding loan balance. |
| 28279506 (ARG—waived in) | Discharge partially complete. Awaiting remaining discharge and refund. | Two cases opened for the same borrower.<br><br><u>Case 28279506</u>: Borrower had 19 *Sweet* eligible loans associated with Florida Coastal School of Law. 18 loans were correctly discharged in January 2025 in the total discharge amount of $122,933. No refunds were issued as no payments were made on the loans. An additional loan (loan 24), in the amount of $15,994, was incorrectly discharged in April 2025 due to an error in a DA request in April 2025. Instead of loan 24, loan 13 should have been discharged in the amount of $31,596. On August 6, 2026, the Office instructed the servicer under DA to reinstate loan 24, to discharge loan 13, to issue refund in the amount of $305 for applicable loan and to |

| | | |
|---|---|---|
| | | confirm credit tradeline deletion. Servicer has discharged loan 13 in the amount of $31,596 which posted on September 10, 2026. Reinstatement of loan 24 still in process.<br><br>Case 20318489: Borrower received discharges on their FFEL consolidation loans in May 2023 for ITT Technical Institute in the amount of $28,472. The borrower is not eligible for refund relief as the loans were made under the FFEL. The Office staff sent requests to the servicer prior to April 2026 regarding the credit tradelines but those requests did not resolve the issue. On April 29, 2026, the Office staff sent a new request to a different servicer to confirm deletion of the tradelines. , The requests to the servicers regarding the credit tradelines were not DA instructions. The Office received confirmation on May 14, 2026, that the tradelines had not been reported to the consumer reporting agencies so there were no tradelines to remove. |
| 20318489 (ARG) | Discharge and Clarification of tradeline deletion complete. | |
| 26640839 (ARG—waived in) | Awaiting discharge and refund | The borrower has 16 *Sweet* eligible loans with a total discharge amount (not completely effectuated) of approximately $289,115.10 loans are commercially serviced, with no collections, and no refund is due. The other 6 loans are federally serviced and have been discharged. Using its DA, the Office instructed the servicer on August 20, 2026 to discharge the federally serviced loans. The servicer confirmed discharge relief for these loans on September 2, 2026 in the amount of $78,180. For the federally-serviced loans, the servicer confirmed approximately $36,727 is due in refunds to be sent in 4-6 weeks. The servicer also indicated the tradelines were to have been deleted by September 11, 2026. On September 18, 2026, the Office instructed the guaranty agency who manages the 10 commercial loans to discharge the loans and confirm credit tradeline deletion. The Office is awaiting guaranty agency completion of the instruction. |

45. In her Declaration, Nicole Almeida asserts that, as of August 18, 2026, "at least 17 ARG and DG1 class members are still awaiting Full Settlement Relief as a result of the suspension of DA task processing." Almeida Decl. ¶ 71. Plaintiffs' June 18, 2026 letter identified thirteen borrowers (whose cases are discussed above), however, and the Motion and Almeida Declaration do not identify the additional four borrowers or provide their Ombudsman complaint numbers. I therefore cannot assess the circumstances of those additional cases.

46. More fundamentally, the fact that a borrower had an open matter involving delegated authority does not establish that any outstanding relief was caused solely by the temporary pause in the Office's exercise of that authority. As reflected in the table above, the identified cases involve different circumstances and stages of review. Some required further account analysis, some involved servicer or guaranty-agency implementation, some implicated the separate administrative process, and others involved overlapping sources of relief or borrower-specific account issues. Nor does the existence of a pending delegated-authority task necessarily establish, for the reasons explained above, that a final determination granting the requested relief had already been made.

47. The temporary pause in exercising delegated authority did not suspend the Office's broader work resolving *Sweet* complaints. During that period, staff continued resolving matters that did not require delegated authority and continued performing the underlying research, account review, servicer coordination, and other casework necessary to evaluate matters that might ultimately require its use. Since February 2026, my staff has also hosted 16 casework reporting meetings (nine virtual and seven in person) with Plaintiffs' counsel, during which it has reported the status of at least many borrower complaints.

48. In addition to the above-identified Ombudsman's complaints referenced in

Plaintiffs' June 18, 2026 letter, the Plaintiffs have included declarations from borrowers in support of their Motions in which the borrowers allege that their relief is not yet complete. These Declarations are discussed below.

**RESPONSES TO BORROWER DECLARATIONS**

49. Plaintiffs included Declarations of twenty-two *Sweet* borrowers in support of their Motions ("Borrower Declarants"). The Declarants make various assertions about the status of their relief, including refunds, discharges and credit tradeline deletions.

50. My staff reviewed each and every Declaration. Attached hereto as Exhibit D is a summary of that review.

51. As Exhibit D shows, most of the Borrower Declarants who allege their relief is incomplete are alleging they are due a refund of Treasury Offset payments. Importantly, most have already received their full discharges and, as the Exhibit shows, all but one of those discharges was effectuated by the deadline. *See* Alemeida Declaration at Exhibit 31 (Declaration of William Lamb). Some of the discharges were very large. *See* Declaration Summary at ¶ 14 (Borrower Declarant Perkins received discharges totaling $139,752). Not all of the Borrower Declarants acknowledged having received their discharges, however. *See* e.g. Alemeida Declaration at Exhibits 24 (Borbon), 25 (Conidi), 26 (Edgerton), 27 (Glaviz), and 32 (Liles),

**THE ADMINISTRATIVE PROCESS**

52. As a result of the efforts of my predecessor and FSA staff, the Department developed an administrative process by which *Sweet* borrowers whose terminal consolidation loans have been discharged and refunded can seek additional refunds if they have intermediary mixed consolidation loans. The administrative process is described in a document that Plaintiffs' counsel were invited to review and suggest edits to. The Almeida Declaration states that "[o]n or about October 16, 2024, the parties agreed to a procedure for the 'administrative process' to

calculate refunds for Class Members with intermediate mixed consolidation loans." To the extent Plaintiffs' counsel mean to suggest that the procedure was finalized in October 2024, it was not, nor is Exhibit 13 to the Almeida Declaration the final version of the document describing that administrative process. In fact, Plaintiffs' sent proposed revisions in April 2025. The parties did not confirm acceptance of additional edits that had been made to the administrative process document ("APD") until August 2025. Attached as Exhibit E hereto is a true and correct copy of 8/18/2025 email between counsel in which Plaintiffs' counsel state they "agree to the edits in this [August 11, 2025] version. The terms of the APD were not submitted to, reviewed by, required by, ordered by, or otherwise approved by the Court. Nor am I aware of any commitment by the Department that it would never revisit or revise the content of the APD. Entering into an APD of any sort is not required by the Settlement Agreement. The APD does not include any deadline by which the Office must begin considering or complete its review of any borrower request for the administrative process. The Department understands this document, which was supported by no consideration from Plaintiffs, to be nonbinding guidance that does not dictate in a binding manner the methods or procedures to be used to consider administrative process applications.

53. On or about January 31, 2025, before the incoming Ombudsman management team had operationalized the administrative process, Plaintiffs' counsel communicated with a group of class members advising them of the opportunity to request such a review. The content of the administrative process itself had not yet been finally confirmed; as explained above, the parties did not finally confirm the administrative process document until August 2025.

54. The deadlines associated with that outreach were deadlines for borrowers to ***request*** review. They were not deadlines requiring the Office to complete its review, determine that an additional refund was due, or issue a refund by a particular date. The administrative process document itself contains no deadline by which the Office must begin or complete the review of

those requests. I understand that in a letter dated June 18, 2024 (a true and correct copy of which is attached hereto as Exhibit F), Plaintiffs demanded that the "Ombudsman's office shall resolve all refund requests [made through the administrative process] within 180 days following expiration of the last-occurring 90-day deadline" for addressing the two-step court-ordered terminal loan discharge process for effectuating relief under the Agreement. The Department did not agree to any such deadline. Even if it had, that deadline would not have passed yet. The "last-occurring 90-day deadline" is October 26, 2026 (90 days after the July 28, 2026 Decision Group 5 deadline). 180 days after that is April 24, 2027.

55. A terminal consolidation loan, in this context, is the final consolidation loan containing debt subject to *Sweet* relief and to which the terminal-loan methodology is applied. An intermediary consolidation loan is an earlier consolidation loan that was later consolidated into the terminal loan. An intermediary consolidation loan may contain both debt associated with a *Sweet* school and other debt. The administrative process was intended to provide a methodology for determining whether payments made on such an intermediary loan included payments attributable to *Sweet*-eligible debt for which the borrower might be entitled to an additional refund.

56. Thus, a borrower having the appropriate loan structure does not mean that the borrower is necessarily entitled to an additional refund. It means only that the borrower's loan history warrants further review. Determining whether a refund is actually due can require examination of repayment periods, servicing histories, prior discharges and refunds, and the actual application of payments.

57. The January 2025 notice generated requests from a much broader population than the Office ultimately determined could be reviewed under the administrative-process methodology. Many respondents did not have mixed intermediary consolidation loans at all. In addition, the notice did not merely advise borrowers that the Department would determine whether an additional

refund might be due on an intermediary consolidation loan. It also advised recipients that the Department would review the completeness of the relief they had already received on their terminal loans. As a result, the response population included borrowers seeking what was effectively another review of previously effectuated relief even where they had not identified a specific missing discharge, refund, or credit-reporting problem.

58. To manage that population, the Office developed a data query to distinguish borrowers who had potentially relevant intermediary loan structures from those who did not. That review identified approximately 1,872 borrowers who did not have mixed intermediary consolidation loans and therefore were not candidates for application of the administrative-process methodology. The Office also identified approximately 583 comparatively straightforward cases and 283 more complex cases involving loan structures that warranted further administrative-process review. Those designations did not mean that any of those borrowers had been determined to be entitled to an additional refund. Further substantive review was necessary to make that determination.

59. The approximately 1,872 borrowers identified above are different from the administrative-process population because they do not have mixed intermediary consolidation loans to which the administrative-process methodology applies. The Office initially intended to advise those borrowers that the administrative process did not apply to their loan histories. Plaintiffs' counsel objected to doing so on the ground that the January 2025 outreach had also advised recipients that the Department would review the completeness of the relief already provided on their terminal loans. As a result, reviewing this population requires an additional review of previously effectuated terminal-loan relief even where a borrower has not identified a specific unresolved discharge, refund, or credit-reporting issue. That work is separate from

determining whether a borrower is entitled to an additional refund under the administrative process and requires the same caseworkers who are responsible for the Office's other complaint inventory.

60. When I became Ombudsman on February 9, 2025, the Office inherited an existing inventory of unresolved *Sweet* complaints, including complaints dating back to the summer of 2024. The administrative-process requests therefore did not arrive into an empty queue. They arrived after other borrowers had already raised unresolved issues involving matters such as allegedly missing refunds, undischarged loans, and credit-reporting problems.

61. My preference was to work those matters in an orderly priority sequence rather than automatically move the administrative-process population ahead of borrowers whose complaints had been pending longer. Plaintiffs' counsel, however, repeatedly requested that the Office accelerate review of the administrative-process population, particularly for earlier class groups. Ultimately, the Office agreed to begin devoting staff resources to that population even though doing so required the same caseworkers who otherwise would have been working older complaints and newly received cases to redirect a portion of their time to the administrative-process review.

62. As the Office began applying the administrative process to actual borrower files, it became apparent that the methodology could not simply be applied mechanically in every case. Although the APD had been agreed to at a high level, it had not previously been fully operationalized against the range of loan histories staff encountered. Among other things, the methodology relied in part on imputed payment calculations and assumed that particular historical loan information in Department systems would be consistently available and usable to perform the required steps. In actual borrower files, those assumptions did not always hold. In some circumstances, the methodology could produce an assumed payment amount based on an amortization schedule rather than the borrower's actual payment history, while in other

circumstances the information needed to complete the contemplated calculation was unavailable or could not be interpreted as the methodology anticipated.

63. Between approximately April and July 2026, I raised these operational concerns with Plaintiffs' counsel during our regular in-person engagements. In one of those engagements, we intentionally used the meeting as a substantive working session to walk through multiple borrower examples and discuss the operational problems we had identified. Before the meeting, my staff had performed the underlying account research, reviewed Department and servicing data, applied the steps contemplated by the APD, and developed calculations and analyses for the examples. During the meeting, we presented that work, walked Plaintiffs' counsel through the difficulties we encountered in applying the methodology, and discussed possible approaches for resolving those issues. We used that session to test our approach and obtain Plaintiffs' counsel's reaction before proceeding further. The examples demonstrated circumstances in which the administrative-process calculation could not reliably be completed without obtaining additional account information. We agreed that the Office would obtain actual servicing records for examples involving more complicated histories and report back regarding both the information obtained and how long it took to obtain it.

64. In the examples we tested, the Office was generally able to obtain the requested servicing records within approximately one or two business days. Those records helped explain apparent gaps or inconsistencies in the information available through Department systems. For example, in some cases the underlying loan had already been discharged or refunded; in others there were no relevant payments to refund; and in still others the servicer maintained an actual payment history that could be used instead of estimating payments. Where actual historical transaction records were readily available, I believed those records provided a more accurate basis for determining whether an additional refund was due than relying solely on an imputed calculation.

Plaintiffs' counsel expressed concern that obtaining servicing records represented a departure from the previously agreed methodology and could further delay review. The Office nevertheless agreed to continue applying the APD methodology in cases where the required information was available and the methodology could reasonably be applied, while identifying cases in which additional records or further discussion were necessary to reach a reliable determination.

65. As this operationalization work was underway, on or about June 22, 2026, I authorized my staff to begin implementing the administrative process more broadly for borrowers who had been identified for further administrative-process review.

66. Plaintiffs' characterization that the Department simply stopped using the agreed administrative process without explaining what it was doing instead does not reflect these exchanges. The Office did not adopt a wholly separate replacement process. Rather, we continued to work through how to operationalize the existing APD in actual borrower files, including how to address cases in which the contemplated inputs were unavailable or actual servicing records provided a more reliable basis for determining what payments had been made. Plaintiffs' counsel was advised of these issues during the April through July 2026 engagements, participated in the working session described above, and was advised of the results of the Office's effort to obtain actual servicing records. Plaintiffs' counsel also requested a written explanation of the approach the Office would use going forward. The Office did not create a separate written replacement procedure because it had not abandoned the APD and replaced it with an entirely different process.

67. By the time a borrower reaches administrative-process review, the Department has already reviewed and effectuated the relief associated with the borrower's terminal consolidation loan, including the applicable discharge and any refund associated with payments on that terminal loan. The administrative process concerns a different and additional question: whether the

borrower may be entitled to an additional refund based on payments made on an earlier intermediary consolidation loan that was later consolidated into the terminal loan. Thus, the administrative-process population is not a group of borrowers awaiting their initial *Sweet* relief. It is a population whose terminal-loan relief has already been addressed and whose earlier loan history is being reviewed to determine whether an additional refund may be due. None of the approximately 583 comparatively straightforward cases or 283 more complex cases was determined, merely by being placed in one of those categories, to be owed an additional refund.

68. My preference has therefore been to place administrative-process requests within the Office's existing *Sweet* complaint queue based on the date received and to work them in order received, rather than automatically move this later-arriving population ahead of *Sweet* complaints that were already pending. Plaintiffs' counsel, however, has repeatedly asked the Office to depart from that sequencing by accelerating administrative-process review for populations Plaintiffs identify as priorities, including borrowers in earlier decision groups. At the same time, Plaintiffs' counsel regularly identifies separate individual complaints each week that it wants the Office to prioritize for research, resolution, and discussion during the casework reporting meetings.

69. Responding to both sets of requests affects the order in which the Office performs its work. The same caseworkers who are responsible for working the existing *Sweet* inventory must pull forward administrative-process requests or individual cases selected by Plaintiffs' counsel, often ahead of complaints that were received earlier. This requires the Office to redirect staff time and resources away from the sequencing that Office management otherwise would use to reduce the overall complaint inventory.

70. Plaintiffs' counsel has invoked the Court's orders and the oversight contemplated by those orders as the basis for recurring case reporting and case-specific follow-up. Within that recurring engagement, Plaintiffs' counsel also requests that particular cases or populations be

prioritized. I defer to counsel regarding the legal scope of those orders. From an operational perspective, however, the practical effect is that Plaintiffs' counsel's priorities influence which matters my staff work, when they work them, and how Office resources are allocated. That influence extends beyond receiving information about the Office's work and, in practice, affects the sequencing and management of the work itself.

71. As the Student Loan Ombudsman, I am responsible for managing that inventory and determining how the Office's personnel and resources are deployed. Plaintiffs' counsel does not formally supervise or direct my staff, but the recurring requests that particular populations and particular cases be accelerated have, in practice, caused the Office to alter the sequencing and allocation of its work.

72. As of the date of this Declaration, the Office has not yet directed an additional refund as a result of an administrative-process determination. That does not mean that refunds were due and the Office has failed to direct that they be issued. Rather, as explained above, the 866 borrowers were identified because their loan structures warranted further review. The purpose of the administrative process is to determine whether an additional refund is actually due; inclusion in the population itself does not establish an entitlement to payment.

## RECORDS REQUESTED BY PLAINTIFFS

73. In both their Motion to Enforce and Motion for Contempt, Plaintiffs allege that the Student Loan Ombudsman's Office has denied Plaintiffs access to its records. Specifically, Plaintiffs seek access to updated class lists, outcome data for Decision Groups 4 and 5, and the post-class, and refund census data.

74. The materials that Plaintiffs demand from the Student Loan Ombudsman's Office are not the Student Loan Ombudsman's Office records. First, none of the materials the Plaintiffs seek are already existing records. They have to be created. The class list and the spreadsheets

containing outcome data that the Department has previously provided to Plaintiffs are based on a compilation and analysis of raw data contained in the Department's Salesforce database. While the Ombudsman can access the data in the Salesforce platform, the platform itself does not contain a "class list," an "outcomes list," or a refund census. Rather, the lists have to be created based on retrieving certain data contained in Salesforce. The following is based on my own understanding and information that I have received from FSA's Borrower Defense Branch ("BDB") (regarding the class list and outcomes data) and FSA's Project Management and DRT teams (regarding the refund census data).

75. Sometime after the Settlement Agreement was executed, BDB together with the Office of the Undersecretary, the Office of the General Counsel and the Data Request Team ("DRT"), together with FSA's processing team, worked together to develop the filters needed to identify *Sweet* class members and post-class applicants. Using that information, DRT applied those filters to borrower defense applications which allowed the BDB team to put in a ticket to Accenture to tag all *Sweet* cases in Salesforce for the ARG, Decision Groups 1 through 5, and the post-class applicants. The data on the Salesforce platform would be the source of the data used to generate a class list (and a list of post-class applicants) if one were to be created.

76. "Outcome data" is populated in Salesforce by BDB when a case is adjudicated. There are fields for each Sweet borrower defense case on Salesforce where BDB can input the adjudication information including, for example, whether an application was approved or denied. Information about outcomes requires an analysis of different fields including, for example, whether a memoID field is marked with an A (approval based on the borrower defense regulations), a D (denial on the merits or after the time elapses to submit a revised application), R (revise and resubmit), S (Exhibit C approval, streamlined approval, approval after an application has been revised and resubmitted, or an approval issued after a deadline was missed). The

Ombudsman's Office does not adjudicate applications and does not populate the outcome data in Salesforce.

77. The "census refund" data is compiled and maintained by FSA, drawing from systems such as the NSLDS, the *Sweet* Servicer Census, and the Financial Management System (FMS). The data is not input by, nor does it belong to the Ombudsman's office. If the Department were to provide census refund data, FSA's Program Management and DRT teams would retrieve, validate, and reconcile payment records across these systems, then generate the spreadsheet. This process would ensure all *Sweet*-eligible refunds are accurately reflected, and previously issued refunds are accounted for.

78. In addition to the fact that the materials Plaintiffs have demanded are not records of the Student Loan Ombudsman, Plaintiffs are seeking records containing personally identifiable information of absent class members and absent post-class applicants yet have provided no privacy act waivers.

79. I am aware that in Civil Minutes filed on May 23, 2024 (ECF No. 414) following a status conference, the Court entered an order stating that "[FSA's] ombudsman shall permit borrowers' counsel to access the ombudsman's office, to inspect records therein, and to otherwise 'look over the shoulder of the ombudsman[.]'" I am also aware that the next day, invoking that order, Plaintiffs' counsel requested in person access to the Student Loan Ombudsman's Office (then directed by my predecessor) to "review complaint data and processing information." A true and correct copy of the 5/24/2024 email is attached hereto as Exhibit G. I am not aware that Plaintiffs' counsel have ever notified the Department that it wishes to conduct an inspection by overseeing my staff in real time as they work. Rather, Plaintiffs have demanded the parties' alternative arrangement where my staff present the results of their case work, rather than performing their work.

80. To the extent the Office has reviewed complaints asserting that relief was not timely effectuated, it has not seen any evidence to suggest that the missed deadline or the incompleteness of relief was due to bad faith or an intentional act. Not having updated addresses for refunds, the complexities of loan histories, and missing payment histories are some of the reasons that have contributed to any such deficiencies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2026.

Odom, Christian

Digitally signed by Odom, Christian
Date: 2026.10.01 20:31:09 -04'00'

Christian L. Odom
Ombudsman
Federal Student Aid Office
U.S. Department of Education

# EXHIBIT A

| | |
|---|---|
| **From:** | Rebecca Ellis |
| **To:** | Holland, Liam C. (CIV); Rebecca Eisenbrey; Eileen Connor; Noah Zinner; Nicole Almeida |
| **Cc:** | Karas, Karen; Rodriguez, Maria; Odom, Christian; Krusemark, Sarah; Krol, Kristen; Jefferson, Ricardo; Emlemdi, Nina; Mccool, Malia; Illes, Michael; Merritt, Robert C. (CIV); Baylor, Elizabeth; Knight, Shakema |
| **Subject:** | RE: Sweet Monthly In-Person Meeting--Scheduling Request |
| **Date:** | Friday, November 21, 2025 2:49:00 PM |
| **Attachments:** | image001.jpg |

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

We are fine with a one-day format as long as we still get the full amount of time with the ombuds team, especially now since we'll have over 2 months' worth of cases to review.

**From:** Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Sent:** Friday, November 21, 2025 2:25 PM
**To:** Rebecca Ellis <REllis@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Eileen Connor <econnor@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Nicole Almeida <nalmeida@ppsl.org>
**Cc:** Karas, Karen <karen.karas@ed.gov>; Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>; Sarah.Krusemark@ed.gov; Kristen.Krol@ed.gov; Ricardo.Jefferson@ed.gov; Nina.Emlemdi@ed.gov; Malia.McCool@ed.gov; Michael.Illes@ed.gov; Merritt, Robert C. (CIV) <Robert.C.Merritt@usdoj.gov>; Elizabeth.Baylor@ed.gov; Shakema.Knight@ed.gov
**Subject:** RE: Sweet Monthly In-Person Meeting--Scheduling Request

Hi Becca,

We'll confer internally about which of those dates works best for us and get back to you. To be clear, we would like to conduct the Ombuds and servicer meetings in one day for efficiency reasons. I understand that there had been a two-day format in the past.

Best,
Liam

# EXHIBIT B

**From:** Holland, Liam C. (CIV)
**To:** Nicole Almeida; Rebecca Eisenbrey; Rebecca Ellis; Noah Zinner; Eileen Connor
**Cc:** Rodriguez, Maria; Odom, Christian; Baylor, Elizabeth; Karas, Karen
**Subject:** [Not Virus Scanned] [Not Virus Scanned] RE: Sweet Complaints for Ombuds 03-27-26
**Date:** Monday, March 23, 2026 8:38:22 PM
**Attachments:** Sweet Plaintiff Weekly Data 03.23.06.zip
Sweet Plaintiff Weekly Data_Reference Document.docx

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Good evening,

ED has asked me to inform you that ED is transitioning to a new format of ombudsman weekly reporting. Going forward, ED will send you an export of the underlying data from the ombudsman complaint system rather than a curated report. Unlike in the past, ED will now be providing you with case closure dates and a narrative field including case worker notes on the closure. ED believes that this additional data will give you visibility into each case without requiring individualized review during a meeting. And ED believes that it may help reduce the number of cases that PPSL marks as "open." Curating the prior report format, however, consumed a considerable amount of ED staff time.

Attached is the weekly Sweet export for 3/23/26.

PASSWORD REDACTED [redacted]

In addition, attached is a word document offering guidance to understand and analyze the data.

If you have any questions, Elizabeth Baylor will be available to discuss during Friday's monthly meeting.

Best,
Liam

**From:** Nicole Almeida <nalmeida@ppsl.org>
**Sent:** Friday, March 20, 2026 3:10 PM
**To:** Rodriguez, Maria <maria.rodriguez@ed.gov>; Odom, Christian <christian.odom@ed.gov>; Knight, Shakema <Shakema.Knight@ed.gov>; Baylor, Elizabeth <elizabeth.baylor@ed.gov>; Karas, Karen <karen.karas@ed.gov>; Krusemark, Sarah <sarah.krusemark@ed.gov>; Krol, Kristen <kristen.krol@ed.gov>; Jefferson, Ricardo <ricardo.jefferson@ed.gov>; Mccool, Malia <Malia.McCool@ed.gov>; Emlemdi, Nina <nina.emlemdi@ed.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>; colby.jennings@ed.gov
**Cc:** Rebecca Eisenbrey <REisenbrey@ppsl.org>; Rebecca Ellis <REllis@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; Eileen Connor <econnor@ppsl.org>
**Subject:** [EXTERNAL] Sweet Complaints for Ombuds 03-27-26

Hi all,

Here is the updated list of Sweet complaints. As a reminder, we asked for updates regarding the admin process and TOP FFEL refunds before the next in-person meeting.

In addition to the usual data requests, we hope to discuss the P.O. Box issue, efficiency and frequency of the ombuds meetings, and the borrowers who received denial letters with the wrong name and BD number.

See you next week,

Nicole

# EXHIBIT C

| | |
|---|---|
| **From:** | Holland, Liam C. (CIV) |
| **To:** | "Rebecca Ellis"; nalmeida@ppsl.org; "Rebecca Eisenbrey"; Noah Zinner |
| **Subject:** | Request for Updated Delegated Authority Document |
| **Date:** | Monday, August 10, 2026 4:17:08 PM |
| **Attachments:** | Delegated Authority v6 07.23.26.pdf |

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good afternoon,

As a courtesy, please see attached for a copy of the updated delegated authority procedure document.

Best,
Liam

**Liam Holland**
Trial Attorney | United States Department of Justice
Civil Division | Federal Programs Branch
Tel: (202) 514-4964

*This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, the reader is hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.*

# EXHIBIT D

**Summary of Class Member Declarations**[1]

1. Almeida Declaration Exhibit 23 is from Hope Amoh-Adjei. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. She received a $22,099.00 Total and Permanent Disability Discharge on April 28, 2021, more than a year before the *Sweet* Settlement Agreement was executed. No refund is due on the discharged consolidated loan because no payments were made. The outstanding relief issue is the estimated $3,870 in TOP payments while the underlying (pre-consolidation) commercial FFEL loans were in default.

2. Almeida Declaration Exhibit 24 is from Maria Borbon. This Decision Group 3 class member's relief was due by July 28, 2025. Well before her relief deadline, she received a discharge in the amount of $32,837 in two phases: part of the loan was discharged November 7, 2024 and the remainder was discharged on January 13, 2025. The borrower also reports in her Declaration receiving a refund check in the amount of $2,800.00. The outstanding relief issue is the estimated $12,627 in TOP payments while the loans were in default. The borrower also mentions credit tradeline deletions in the Declaration but the credit tradeline was deleted August 31, 2024 according to information provided to the Office.

3. Almeida Declaration Exhibit 25 is from Daniel Conidi. This Decision Group 4 class member's relief was due by January 28, 2026. Well before his relief deadline, he

[1] Caseworkers in the Ombudsman's office reviewed information, including discharge and refund data, for each Borrower Declarant. This document summarizes that review.

received a discharge in the amount of $71,668 on June 16, 2025. The outstanding relief issue is the estimated $13,379 in TOP payments on the defaulted FFEL loans.

4. Almeida Declaration Exhibit 26 is from Andrew Edgerton. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before his relief deadline, the borrower received a $12,702 discharge of his loan on February 22, 2024 and a $1,972 refund of direct loan payments on March 4, 2024. The outstanding relief issue is the estimated $7,202 in TOP payments while the consolidated commercial FFEL loan was in default.

5. Almeida Declaration Exhibit 27 is from Rafael Glaviz. This Decision Group 1 class member's relief was due by the December 20, 2024 revised deadline set by the court. Well before the relief deadline, the class member received a $12,020 loan discharge on December 1, 2022. The loan was discharged under the Corinthian Group discharge announced June 1, 2022. The outstanding relief issue is the estimated $1,127 in TOP payments.

6. Almeida Declaration Exhibit 28 is from Nanette Hronek. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the borrower received a $28,408 loan discharge on July 2, 2024. The outstanding relief issue is the estimated $12,105 in TOP payments on a defaulted loan.

7. Almeida Declaration Exhibit 29 is from Crystal Jasper. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the borrower received a $35,741.00 loan discharge on July 19, 2024. No payments were made on the two direct consolidation loans. No payments were

made through TOP on the underlying defaulted commercial FFEL loan. The period of the borrower's default was brief and the defaulted loan was paid off through consolidation. The Ombudsman's Office will be reviewing the borrower's multiple loan consolidations through the administrative process to determine whether any refund might be due on voluntary payments made any of the intermediary consolidated loans of the underlying defaulted loans.

8. Almeida Declaration Exhibit 30 is from Stella Jean Johnson. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the borrower received a $12,424 loan discharge on July 23, 2024. The outstanding relief issue is the estimated $968 in TOP payments while the loan was in default. In her Declaration, the borrower also raised the issue of credit tradeline deletion of the discharged loan. The borrower also asserts in her Declaration that she is due $800 disbursed in 2020 that allegedly were stolen. However, any refund issued in 2020 pre-dates the *Sweet* settlement agreement.

9. Almeida Declaration Exhibit 31 is from William Bradley Lamb. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. The borrower's loan was discharged in the amount of $34,708.00 on January 7, 2025, shortly after the deadline. The outstanding relief issue is the estimated $3,808 in TOP payments on defaulted loans.

10. Almeida Declaration Exhibit 32 is from Teana Liles. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $20,176 loan discharge on November 8, 2022

as part of the ITT group discharge announced August 16, 2022. The outstanding relief issue is the estimated $6,628 in TOP and/or AWG payments.

11. Almeida Declaration Exhibit 33 is from Loritza Melendez. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $14,078 loan discharge on commercially-held FFEL loans on October 18, 2023. The outstanding relief issue is the estimated $5,849 in TOP payments on the defaulted loans.

12. Almeida Declaration Exhibit 34 is from Edmund Leoanard Michelin, III. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $24,084.00 loan discharge on January 16, 2024. The outstanding relief issue is the $2,985.00 refund check that the Department instructed to be issued but which the Declarant asserts was fraudulently cashed.

13. Almeida Declaration Exhibit 35 is from Sandra Ogden. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $32,798 discharge on the Direct consolidation loans on May 11, 2023, on which the borrower made no payments. The outstanding relief issue is the estimated $4,900 in TOP payments on the defaulted underlying FFEL consolidation loans.

14. Almeida Declaration Exhibit 36 is from Candace Perkins. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $25.00 refund on April 19, 2023 and

two discharges: a $35,304 terminal consolidation loan discharge on July 17, 2024 and a $104,448 discharge of underlying loans on March 14, 2023, for a total discharge amount of $139,752. The relief issue is whether additional relief will be due upon review through the administrative process of two intermediary consolidation loans.

15. Almeida Declaration Exhibit 37 is from Lynne Elizabeth Peters. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $20,724 discharge on September 7, 2023. The outstanding relief issue is the estimated $1,109 in TOP payments on the defaulted FFEL loans.

16. Almeida Declaration Exhibit 38 is from Lisa Riffle. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $135,484 discharge on July 15, 2024. A refund of $5,235.61 was issued after the deadline, on August 18, 2025. The relief issue is whether additional refund relief will be due upon review through the administrative process.

17. Almeida Declaration Exhibit 39 is from Leslie Smith. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. The borrower's commercially-held FFEL loans were paid-in-full.. The outstanding relief issue is the estimated $11,311 in TOP payments.

18. Almeida Declaration Exhibit 40 is from Kiwana Watson. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a $4,949.00 discharge on February 7,

2024. The outstanding relief issue is the estimated $5,773 in TOP payments on the defaulted consolidation loan.

19. Almeida Declaration Exhibit 41 is from Kyle Yound. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received two discharges on the commercially-serviced FFEL loan: a $10,288 discharge on July 27, 2023 and a $10,518 discharge on August 17, 2023, for a total discharge amount of $20,806. The outstanding relief issue is the estimated $8,182 in TOP payments on the defaulted consolidation loan.

20. Almeida Declaration Exhibit 42 is from Jody Taylor. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the relief deadline, the class member received a total discharge of $39,989. A partial amount was discharged on June 20, 2024 and the remaining portion was discharged on August 23, 2024. The borrower also received two refunds in the amounts of $20.00 on August 28, 2024 and $5.35 on July 12, 2024. The outstanding relief issue is whether the borrower is entitled to an additional $45 in refunds. The Declarant is also one of the class members whose Ombudsman's complaint is discussed in Table 1 of the Declaration of Christian Odom. *See* Table 1 of the Odom Declaration at Case No. 22572921.

21. Almeida Declaration Exhibit 43 is from Patty Cobb. This Decision Group 4 class member's relief was due by January 28, 2026. The borrower received initial relief before her relief deadline in the form of a discharge in the amount of $33,422 on December 19, 2025. Recently, an additional discharge was processed (September 18, 2026) but the discharge has not posted to NSLDS yet. The borrower's loan history is complicated,

including the fact some loans are very old. The Office staff is continuing to analyze the account to determine what, if any additional relief, may be due.

22. Almeida Declaration Exhibit 44 is from Jenna Wardner. This ARG class member's relief was due by the December 31, 2024 revised deadline set by the Court. Well before the deadline, the class member received a total discharge of $56,049: $44,700.00 was discharged on November 10, 2023 and $11,349.00 was discharged August 16, 2024. The borrower also received refunds totaling $17,836.91. A refund of $2,998.38 was issued on August 28, 2024 and a second refund in the amount of $14,838.53 was issued October 8, 2024. Thus, the borrower's total relief that has already been issued is $73,885.91. The outstanding relief issue is the $2,998.38 refund check that the Department instructed to be issued but which the Declarant asserts was fraudulently cashed.

# EXHIBIT E

[redacted]

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Monday, August 18, 2025 12:54 PM
**To:** Jines, Lydia (CIV); Rebecca Eisenbrey; Nicole Almeida; Noah Zinner; Eileen Connor
**Cc:** Merritt, Robert C. (CIV)
**Subject:** [EXTERNAL] RE: Sweet v. Dep't of Education - Administrative Process Procedure

Hi Lydia,

We agree to the edits in this version.

Thanks,
Becca

---

**From:** Jines, Lydia (CIV)
**Sent:** Monday, August 11, 2025 10:06 AM
**To:** Rebecca Eisenbrey ; Rebecca Ellis ; Nicole Almeida ; Noah Zinner ; Eileen Connor
**Cc:** Merritt, Robert C. (CIV)
**Subject:** Sweet v. Dep't of Education - Administrative Process Procedure

Hi Becca,

Several months ago, PPSL provided us with a redline of the Administrative Process Procedure document with edits to reflect that this process will apply to later Decision Groups, and to modify the requirements for a class member to raise their hand. Those changes are acceptable to the Department.

The Department has suggested some further edits to bring the procedure in line with our current agreed-upon process, including that the Department will accept emails containing the word “refund” in the subject line ***or*** forwarded emails sent by PPSL, and also retains discretion to consider other class members who the Ombudsman�s Office has identified as eligible for administrative process review.

Please let me know if there are any other edits PPSL would suggest and/or if you�d like to discuss further.

Thanks,
Lydia

# EXHIBIT F

The Project on Predatory Student Lending
769 Centre St, Boston, MA 02130
www.ppsl.org

June 18, 2024

VIA E-MAIL

Stuart Robinson
Benjamin Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Stuart.J.Robinson@usdoj.gov
Benjamin.Takemoto@usdoj.gov

Re: *Sweet v. Cardona*, No. 19-cv-03674 (N.D. Cal.)

Dear Stuart and Ben,

Following the recent hearing on June 13, 2024, and the Court's associated oral rulings and minute order (ECF No. 416), we wanted to confirm our understanding and discuss further details regarding the "Parties' agreed method for accomplishing full relief for class members having consolidated loans" (ECF No. 416 at 1).

**1. Cessation of Prior Methodology for Mixed Consolidations**

At our in-person meeting on June 6, 2024, the Department indicated that, as of that date, its servicers had stopped using the methodology for mixed consolidations that had led to Class Members' payments being "allocated" to offset other loans instead of being returned as refunds. As we discussed in our phone calls and emails of June 11 and 12, 2024, the parties will consider June 6, 2024 to be the "pencils down" date on that previous methodology. No Class Member's loan will have that methodology applied to it after the "pencils down" date.

**2. Discharges and Refunds on Most Recent Consolidation Loan**

Going forward, the Department will approach mixed consolidation loans as follows. First, under the framework we agreed to in our discussions on June 12, all Class Members who had any remaining balance on their current consolidation loan as of June 6, 2024, will have the entire balance of that loan discharged, regardless of the composition of the underlying loans that went into the consolidation. This approach will be applied regardless of whether the Class Member previously

received any "adjustment" to the balance of the current consolidation loan under the Department's previous methodology for mixed consolidations.

Second, all Class Members who receive a discharge as described above will also receive a refund, to be sent by check or electronic funds transfer (EFT), consisting of all payments they made on the discharged consolidation loan, regardless of whether or how the Department may have "allocated" those payments under its previous methodology. The loan balance of the current consolidation loan will remain zero, notwithstanding this refund.

Additionally, if a Class Member experienced an "adjustment" of their most recent consolidation loan under the Department's prior methodology that already brought such loan's balance to zero, that Class Member will still receive a refund via check or EFT of all payments they made on that loan, to the extent such amounts have not already been fully refunded via check or EFT. The receipt of this refund will not cause any loan balance to be reinstated.

At the most recent hearing, the Court agreed that the Department could proceed with the steps outlined above. Our understanding is that the Department will begin this discharge and refund process as soon as possible. Per the Court's order, the Department will complete this process by **August 31, 2024**.[1] Once all Class Members with mixed consolidation loans receive their discharges and/or refunds pursuant to this procedure, Plaintiffs will consider the Department to be in substantial compliance with the Settlement as to those Class Members.

### 3. Administrative Process for Back Refunds

Class Members who receive discharges and/or refunds under Section 2 above will be able to submit a request through an administrative process for further refunds based on payments they made on iterations of their Relevant Loan Debt that pre-dated their most recent consolidation loan. We agreed that this refund process will be handled by the FSA Ombudsman's office, via a separate workstream from other *Sweet*-related complaints. During our conversations on June 12, we agreed that we would discuss further details about how this refund process will proceed. Below are our proposals:

i. All Class Members who receive a discharge and/or refund under the procedure described in Section 2 above will receive a communication from the Department (with language to be mutually agreed upon by the parties) describing the relief they have received and the option to seek additional relief through the administrative process for back refunds. The communication shall describe the steps necessary to request such additional relief.

---

[1] The Court's schedule anticipates that the Department will complete the effectuation of relief for 42,000 additional Class Members by August 31, 2024. We understand, based on the numbers provided to us and your representations at the June 13 hearing, that the August deadline will encompass the specified relief for all Class Members with mixed consolidation loans.

a. The Department shall provide Plaintiffs with a list of Class Members to whom they send this communication (including such Class Members' contact information).

ii. A Class Member seeking additional relief shall email sweet@ed.gov with the following information: name; email address; mailing address; Borrower Defense case number; school(s) for which they applied for Borrower Defense; most recent federal loan servicer; past federal loan servicer(s) to the best of their recollection; and description of their basis for believing that they are owed a further refund. Class Members will be encouraged, but not required, to submit documentation showing payments on Relevant Loan Debt prior to their most recent loan consolidation (*e.g.*, loan statements, bank records).

iii. Class Members shall have 90 days following the date they receive the above-described notice to submit a request for additional refund to sweet@ed.gov.[2]

iv. After receiving the refund request, the Ombudsman's office shall review any documentation submitted by the Class Member and shall collect available payment history information from the Class Member's past servicers to determine the amount of additional refund the Class Member is due, if any.

a. In making this calculation, the Ombudsman's office shall not perform any offsets (*e.g.*, by comparing payments on past iterations of Relevant Loan Debt to the refund a Class Member received under Section 2 above, or by "allocating" payments on past consolidation loans to non-Relevant Loan Debt).

v. The Ombudsman's office shall resolve all refund requests within 180 days following the expiration of the last-occurring 90-day deadline described in step (iii) above.

Please let us know your views on this proposal and whether there are other aspects of the look-back process that you believe we need to discuss.

**4. Authority and Resources for the Ombudsman's Office**

Finally, as presented to the Court, the Ombudsman's office must be vested with the necessary authority and resources to resolve Class Member issues and carry out the process envisioned in relation to refunds. In our understanding, this could be accomplished by a re-delegation of the authority currently delegated from the Secretary to the Chief Operating Officer (such as is authorized in

[2] Please note that this deadline applies specifically to the refund look-back process for Class Members who receive relief under Section 2 above. Class Members who have questions or complaints regarding the refunds they received via other Settlement relief processes (*e.g.*, on non-consolidation Direct Loans) will still be able to request assistance via sweet@ed.gov at any time.

delegations EA/EN/68 and EA/EN/96). Regardless of the method, we would like to see written evidence of the Ombudsman's authority to:

i. Request and timely receive information from loan servicers regarding Class Member accounts;

ii. Determine final refund amounts for Class Members described in Section 2, above; and

iii. Submit requests through the appropriate channels within the Department to send requests to Treasury to pay the determined refund amounts (without the need to route refund payment requests through the servicers).

In addition to the above, we ask that you consider endowing the Ombudsman with authority to resolve the other issues related to Settlement implementation that we have discussed through the meet and confer process and as are being raised through the sweet@ed.gov channel.

Finally, we would like some form of assurance that the Ombudsman's office has sufficient staffing and resources to handle both the refund look-back process and other *Sweet*-related complaints in a timely manner, without placing unreasonable burdens on existing staff members.

* * *

We believe that the above is an accurate and complete description of the process that we agreed to in advance of the last hearing. Please advise as soon as possible if you concur. We look forward to continuing our discussions. Thank you for your attention to this matter.

Sincerely,

Rebecca Ellis
Eileen Connor
Rebecca Eisenbrey
Noah Zinner
PROJECT ON PREDATORY STUDENT LENDING

# EXHIBIT G

**From:** Rebecca Ellis <REllis@ppsl.org>
**Sent:** Friday, May 24, 2024 9:43 AM
**To:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Takemoto, Benjamin (CIV) <Benjamin.Takemoto@usdoj.gov>; Latreille, Bonnie <Bonnie.J.Latreille@ed.gov>
**Cc:** Eileen Connor <econnor@ppsl.org>; Rebecca Eisenbrey <REisenbrey@ppsl.org>; Noah Zinner <nzinner@ppsl.org>; jjaramillo@heraca.org
**Subject:** Sweet - review of Ombuds systems

You don't often get email from rellis@ppsl.org. Learn why this is important

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Stuart and Ben,

We are following up on Judge Alsup's ruling yesterday that plaintiffs' counsel should be given in-person access to the Ombudsman's office to review complaint data and processing information. I am copying Bonnie Latreille on this email.

We intend to exercise our right to inspection on Tuesday, June 4, the day before our next in-person meeting in Washington DC. We would appreciate if Ms. Latreille could confirm her availability on that date and the location of the Ombudsman's office.

Relatedly, please let us know what time on June 5 will work for representatives of DOJ, ED, and the servicers for our meeting.

Thanks,
Becca

Rebecca C. Ellis (she/her)
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
Tel.: 617-322-2548
www.ppsl.org