BRETT A. SHUMATE
Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-8098
E-mail: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION**

| | |
|---|---|
| THERESA SWEET et al.<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, *in her official capacity as Secretary of Education*, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 4:19-cv-03674-HSG<br><br>**DECLARATION OF COLBY JENNINGS**<br><br>(Class Action)<br>(Administrative Procedure Act Case) |

Pursuant to 28 U.S.C. § 1746, I, Colby Jennings, declare as follows:

1. I have worked in the United States Department of Education's ("Department") Federal Student Aid ("FSA") office since June 2015. Since 2023, I have worked in the Office of Loan Portfolio Management ("OLPM") which was previously known as the Office of Student Experience and Aid Delivery ("SEAD"). Although I have held various titles during certain

phases of reorganization of FSA, as is pertinent to this litigation I have managed the Borrower Defense Program within OLPM (f/k/a SEAD) for a combined total of approximately five years. My responsibilities include: the operational oversight and implementation of the Borrower Defense Program, including ensuring that borrowers who are approved for relief receive the full benefit of that relief. I oversee and manage the work performed by loan servicers and other vendors on behalf of the Department to ensure that program requirements are properly implemented and that borrower relief is accurately and timely effectuated. I also coordinate and engage with staff across the Department and FSA to provide operational support, address escalated issues, resolve program-related matters, and ensure consistent implementation of the Borrower Defense Program.

2. I certify that I am duly qualified and authorized by the Department to make the statements contained in this Declaration in support of the Defendants' opposition to the Plaintiffs' Motion to Enforce Settlement Agreement (ECF No. 552) ("Motion to Enforce") and Plaintiffs' Motion for Finding of Contempt and Sanctions (ECF No. 553) ("Contempt Motion"). The statements contained herein are based either on my personal knowledge as an employee of the Department or on information reported to me by Department officials and staff.

3. Under the Settlement Agreement executed by the parties on June 22, 2022 (ECF. No. 246-1) ("Settlement Agreement"), "Full Settlement Relief" is defined as: "(i) discharge of all of a Class Member's Relevant Loan Debt ["discharge"], (ii) a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt (including, but not limited to, Relevant Loan Debt that was fully paid off at the time that borrower defense relief is granted) ["refund"], and (iii) deletion of the credit tradeline associated with the Relevant Loan Debt ["tradeline deletion]." Settlement Agreement at ¶ II.S.

## SECTION I - GENERALLY APPLICABLE PROCESSES

4. This Section I describes the processes involved in delivering each aspect of loan relief (discharge, refund and credit tradeline deletion) to borrowers eligible for such relief. These processes apply generally and also were followed by the Department in effectuating Full Settlement Relief under the Settlement Agreement until approximately the late Spring and early summer of 2024 at which point the Court ordered the Department to change its loan discharge and refund processes.

**A. Relevant Entities**:

5. FSA administers federal student loan programs under Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 et seq. Those programs include the Willian D. Ford Federal Direct Loan Program ("Direct Loans"), 20 U.S.C. 1087a-1087j, under which the federal government lends money directly to students and parents, and the Federal Family Education Loan ("FFEL") Program, 20 U.S.C. §§ 1071 to 1087-4, under which non-federal lenders made loans to students and parents which are guaranteed by entities reinsured by the federal government and serviced by commercial servicers. No new FFEL loans have been made since 2010, though FFEL loan debt remains outstanding. Some FFEL loans have been purchased by the Department from the commercial lender ("Department-held FFEL loans").

6. One of the key functions required for administering the federal student loan programs is loan servicing. Loan servicing involves maintaining an account for the loan, calculating and applying interest to the loan account, calculating amounts due for payment, sending the borrower bills for payments that are due, collecting and processing payments from the borrower, and applying all of these transactions to the loan's balance on the loan account. Notably, borrowers typically have multiple loans outstanding, as they typically take out multiple loans over a number

of years to finance their post-secondary education, which can also consist of different loan programs at different schools at different times.

7. The Department contracts with private companies ("Direct Loan Servicers") to perform loan servicing of Direct Loans and Department-held FFEL loans. These loans do not necessarily remain with just one servicer over the life of the loan. Nor have the companies providing loan servicing remained constant. Through the years, some loan servicing companies have been decommissioned. When a servicer is decommissioned, the loan portfolio of that servicer is transferred to one or more other loan servicing companies.

8. Non-defaulted commercially-held FFEL loans are serviced by FFEL servicers ("FFEL Servicers"). Guaranty Agencies ("GAs") are entities that insure FFEL loans and are reinsured by the Department and that also hold defaulted FFEL loans and loans in bankruptcy and judgment status. The FFEL Servicers and GAs are distinct from the Direct Loan Servicers.

9. The U.S. Department of the Treasury ("Treasury") transmits the funds that are disbursed for federal student loans and ultimately receives the funds that borrowers pay toward federal student loans. Treasury also issues refunds approved relief, which are issued by check or, if available, by electronic transfer.

10. The national Consumer Reporting Agencies ("CRAs") are four private companies that assemble and evaluate consumer credit information or other information on consumers for the purpose of furnishing consumer credit reports to third parties. The CRAs maintain credit files for consumers, which include a "tradeline" for each account in the consumer's name for which the consumer has been extended credit. Credit files include information reported by creditors such as the type of credit, loan amount, account balance, payment history, whether or not the account is delinquent or in collection, and the dates the account was opened and closed. The Department does

not have a direct relationship with CRAs, nor does the Department furnish any information to them. Information is furnished to CRAs by the Direct Loan Servicers, the FFEL Servicers and GAs.

**B. <u>Database Systems</u>:**

11. The National Student Loan Database System ("NSLDS") is a database system authorized by 20 U.S.C. 1092b and maintained by FSA that records information about federal student loans and grants.

12. For loans other than commercially-held FFEL loans, NSLDS identifies a loan based on Award ID (a unique identification number assigned to the loan), borrower (the borrower's social security number ("SSN")), OPEID (the Office of Postsecondary Education Identification number for the institution of higher education attended by the borrower and paid for with the loan proceeds), Disbursement Date (the date of the loan's disbursement).

13. NSLDS also records information about each loan that is updated periodically, including Loan Type (the type of loan, such as a Direct Loan to attend school or Consolidation Loan), Loan Balance (the balance of the loan, accounting for its principal, accrued interest, payments, and other fees or credits), Loan Status (the status of the loan, which includes statuses like in-school, post-school grace period, repayment, paid-in-full, and discharged) and discharge (a field indicating whether a discharge has been applied to the loan, including discharge codes for borrower defense, closed school, and false certification).

14. The information about loans that is recorded in NSLDS is typically updated once per week by the Direct Loan Servicers to reflect any changes made to loan accounts that the servicers maintain. Servicers update NSLDS by sending a file to NSLDS of all the updates from the servicer's database system. A borrower may access information about the borrower's loans stored in NSLDS through StudentAid.gov.

15. The loan servicers maintain database systems with accounts for the federal student loans that they service. Each loan's account contains identifying information for the loan that corresponds with the Award ID, borrower SSN, and OPEID (if applicable) in NSLDS. Changes in these loan details are included in the weekly update that each servicer sends to NSLDS. A borrower may ordinarily access information about the borrower's current loans that is stored in the servicer's database systems through an interface provided by the loan's servicer. For previous student loan servicers that are no longer under contract with the Department, the accounts that those servicers previously maintained have been transferred to one of the Department's current servicers. In these cases, the currently operating servicer maintains separate database systems for the servicer's own loan accounts and the loan accounts inherited from the prior servicer.

16. The Department's Financial Management System ("FMS") is a centralized system for all FSA financial transactions. It allows FSA's financial partners to collect, process, maintain, transmit, and report data about financial events on-line. Borrowers are made aware of the refund payments reflected in FMS records when the borrower receives a check or electronic transfer for the refunded amount.

17. A borrower's credit file maintained by a CRA contains a tradeline for each federal student loan the borrower has taken out. The information for each student loan's tradeline is typically provided by the servicer of that loan to the CRAs once per month and is updated on the borrower's credit report the following month. A borrower may also see information about their loan reflected in whatever information is available to the borrower from the CRAs.

**C. <u>Federal Student Loan Types</u>**

18. There are several types of federal student loans that are relevant here: Direct Student Loans, FFEL Loans, and Direct Consolidation Loans.

19. ***Direct Student Loans*** are loans under the Federal Direct Loan Program that are taken out to attend an institution of higher learning ("Direct Student Loan"). These are Federal Subsidized Student Loans, Federal Unsubsidized Student Loans and Federal PLUS loans. 20 U.S.C. §§ 1078, 1078-2, 1078-8, 1087a(b)(2) and 1087e(a).

a. These loans are made by the Department, disbursed by the borrower's school, and then serviced by a servicer under a contract with the Department. For purposes of this explanation, the servicer of a borrower's Direct Student Loan, taken out to pay for attending a school, is referred to as the original servicer.

b. Once the Direct Student Loan is originated, an account for the loan is created and maintained by the original servicer in its database system and a corresponding record for the loan is created in NSLDS. The initial value of the Direct Student Loan is the principal amount of the loan. The loan is identified by an Award ID, the borrower's SSN, and the OPEID of the school that disbursed the loan proceeds. The loan will also be reflected in a tradeline in the borrower's credit file once the servicer has reported the loan to the CRAs.

c. Over time, the original servicer services the loan by managing the loan's status, the borrower's repayment plan, interest accrual, billing, and payments. Once per week, the loan servicer sends updates to NSLDS with any changes to the loan's balance and other information. Relevant information about the loan's balance and status are also included in the servicer's monthly reports to the CRAs.

20. ***FFEL Loans*** are school loans and consolidation loans taken out from non-federal lenders under the FFEL program, under which the non-federal lenders made education loans that were guaranteed by GAs. The GAs are, in turn, reinsured by the federal government. No new FFEL loans have been originated since 2010, but some surviving FFEL loans are still held by lenders or administered by the GAs and some class members may have FFEL loans from before 2010.

a. FFEL loans were originated and serviced through a process that involved the borrower's school, non-federal lenders, FFEL servicers, and the GAs. For FFEL loans that still exist today, loan servicing involves the non-federal lender, FFEL servicer, and GA.

b. There are records for FFEL loans in NSLDS that are updated by the GAs on a monthly or quarterly basis.

c. FFEL loans may be consolidated into Direct Consolidation Loans. If so, the Direct Consolidation Loan pays off the balance of the FFEL loan and then the consolidation loan is recorded and serviced as explained below.

21. ***Direct Consolidation Loans*** are not taken out to pay for attendance at an institution of higher education, but rather are the product of consolidating one or more existing student loans into a new loan. A borrower takes out a consolidation loan by choosing the existing loans to consolidate, applying for the consolidated loan through FSA, and choosing a servicer for the consolidation loan.

a. For consolidation loans, servicers perform the functions of loan origination (the "consolidation originator") and loan servicing (the "consolidation servicer"). Some servicers perform both origination and servicing functions while others perform servicing functions but not origination functions. Thus, if the borrower's chosen consolidation servicer also performs origination functions, that servicer will act as the consolidation originator and the consolidation servicer. If the borrower's chosen consolidation servicer does not perform origination functions, a different servicer will act as the consolidation originator and then transfer it to the borrower's chosen servicer, which will act as the consolidation servicer.

b. Once the consolidation loan is originated, an account for the loan is created and maintained by the consolidation servicer in its database system, and a corresponding record for the consolidation loan is created in NSLDS. The initial value of the consolidation loan is the sum total of the outstanding balances on each of the existing loans that the borrower chose to consolidate. The consolidation loan is identified by an Award ID and the borrower's SSN. Because consolidation loans are not disbursed by schools and because loans from multiple schools can be combined into a single consolidation loan, consolidation loans are not associated with any particular school's OPEID. The consolidation loan will also be reflected in a new tradeline in the borrower's credit file once the servicer has reported the new consolidation loan to the CRAs.

c. The new consolidation loan has several effects on the status of the underlying loans. The consolidation loan pays off the outstanding balance of all the underlying loans. For each of the underlying loans, the loan's balance is reduced to zero and the loan's status is updated to "Paid in Full." Although the loan is closed, the underlying loan's servicer maintains the zero-balance account for the loan in its database system. After the servicer's next update to NSLDS, these changes are reflected in NSLDS. In the servicer's next update to the CRAs, the tradeline's balance is reported as zero with respect to the underlying loan.

d. Over time, the consolidation servicer services the consolidation loan by managing the borrower's repayment plan, interest accrual, billing, and payments. Once per week, the consolidation servicer sends updates to NSLDS with any changes to the consolidation loan's balance and other information. Relevant information about the consolidation loan's balance and status are also included in the servicer's monthly reports to the four CRAs.

e. Borrowers may consolidate multiple times. That is, consolidation loans may themselves be consolidated. If a borrower chooses to consolidate an existing consolidation loan, the borrower repeats the process described earlier in this Paragraph for a new consolidation loan.

**D. <u>Discharge-Related Processing</u>**

22. When the Department determines to discharge a loan, it submits instructions, or "discharge requests" to the loan servicers as described in the following paragraphs. After receiving the discharge requests, the loan servicers begin taking certain discharge-related processing tasks. That process differs depending on the type of loan and is described more fully below.

23. ***Direct Loans where there are no consolidations (Paragraphs 23-25):*** for a Direct Loan that has not been consolidated,[1] the Department prepares a discharge request and sends that request to the loan servicer. The discharge request identifies the eligible loan and instructs the loan's current servicer to apply a discharge. To apply a discharge, the servicer refers to various change requests ("CR") and instructions provided by the Department that explain the steps the servicer must take. These instructions include the following steps for each loan being discharged:

a. <u>Balance</u>: In its servicing database system, the original servicer reduces the eligible loan's balance to zero**.**

b. <u>Refund</u>: The servicer calculates a refund equal to the sum total of any payment(s) made toward the eligible loan. That refund amount, along with refunds for any other eligible loans, is then included on a record known as a "refund file."[2] A refund file contains a list of borrowers and refunds that is sent to the Department for approval. Therefore, for discharge of eligible loans, the refund file created by the servicer reflects the total amount of payments made to the Department that the servicer's database system shows for all eligible loans or payments made at any previous servicer if the eligible loan was transferred. Upon approval by the Department, the Department sends a record known as a "payment file" to Treasury, which will cause Treasury to issue a payment for the listed amount to the listed recipient. After processing the payment file, Treasury issues a check or electronic payment to the

---

[1] In this Declaration, references to "Direct Loans" include federally serviced FFEL loans.

[2] Refund files are only generated for borrowers where the servicer has a valid address to issue a payment to the borrower. If the borrower has no valid address and the servicer is unable to locate a valid address through outreach to the borrower or through skip tracing, or if the borrower is deceased and the servicer has not been able to validate the estate, the servicer will notify FSA and a refund will not be sent until an address can be located.

recipient the next business day. The Department will then provide confirmation of payment to the servicer within 1 business day of payment

c. Credit Reporting: In the servicer's next regular update to the CRAs, the update indicates that the borrower's Eligible Loan has been discharged, which triggers the CRAs' obligation to remove that loan's tradeline in the borrower's credit file.

d. Loan Status: In the servicer's next update to NSLDS, the servicer includes an update to indicate a discharge has been applied to the eligible loan, effective on the date of discharge approval. It is the processing of the discharge on their loan servicing system that ultimately triggers the reporting of the discharge to NSLDS.

e. The borrower will see evidence of these steps in various places and at different times.

24. As a general matter, a borrower will see updated information from their servicer's systems/records when the borrower logs in to the servicer's account interface, as well as updated information from NSLDS when the borrower logs in to StudentAid.gov. Because servicers typically update NSLDS once per week, it may take up to a week after the original servicer applies the discharge for NSLDS to reflect updates that have already been made in the original servicer's records and database system. The borrower will receive the refund through a check mailed to the borrower or an electronic transfer from Treasury. Because servicers typically update reports with the CRAs once per month and because the CRAs take time to process updates sent by the servicers, it may take a month or longer after a discharge's completion for the discharge to be reflected in the borrower's credit file with the CRAs.

25. For an eligible loan that is a Direct Loan that has not been consolidated, there are no remaining steps for the Department or its servicers to take once the original servicer has taken all of the steps required for a discharge and the Department has sent the relevant payment file to Treasury.

26. ***Direct Consolidation Loans***: for loans that are subsequently consolidated into a Direct Consolidation Loan, the process requires multiple steps, including actions from the eligible loan's servicer followed by additional actions from the servicer(s) involved with the origination

and servicing of the borrower's Consolidation Loan. If a school loan has been subsequently consolidated multiple times, the process is elongated accordingly, as described in greater detail below. Additionally, as explained below, the process for adjusting consolidation loans to reflect a discharge applied to underlying eligible loans requires more steps and a greater amount of time depending on how many times a loan was consolidated, whether consolidations were originated and serviced by the same servicer, and the underlying loans or subsequent consolidations were originated and/or serviced by a decommissioned servicer. The servicer of the original loan and the originator(s)/servicer(s) of the subsequent consolidation loan(s) each have a role to play in the discharge of a loan that has been consolidated.

27. The process begins with the Department preparing a discharge request and sending that request to the servicer of the eligible original loan. The request is not sent to the consolidation servicer of the borrower's consolidation loan(s), because consolidation loans are not associated with school OPEIDs and, thus, the borrower's consolidation loan(s) would not be associated with the school that is associated with the underlying loan that is being discharged. Rather, eligibility flows from the original loan that was taken out to attend a school that is being discharged. Note that the servicers of these original loans may not have all remained in business over the years since.

28. The discharge request identifies the eligible loan(s) and instructs the servicer of the eligible original loan to apply a discharge. To fulfill the Department's discharge request, the servicer takes the steps necessary to apply a discharge described above in Paragraph 23. This includes the following steps for each eligible loan:

a. Balance: Because the eligible loan was paid off by a consolidation loan, the account maintained by the eligible loan's servicer will already reflect a zero balance.

b. Refund: For any payment(s) made on the eligible loan, the servicer calculates a refund amount and includes it on a refund file sent to the Department for approval, as described in Paragraph 23(b), above. This refund amount will not include the amounts of any payments made on the consolidation loans after the eligible loan was consolidated.

c. Credit Reporting: Because the loan was paid off by a consolidation loan, the tradeline for the eligible loan in the borrower's credit file will already show a zero balance. Upon processing the discharge, the servicer will update the credit reporting on the borrower's account and indicate to the CRAs that the tradeline for the borrower and the eligible loan should be removed.

d. Loan Status: For the adjustment to be applied to the borrower's current consolidation loan, following the eligible loan discharge, that loan's consolidation originator/servicer must take additional steps (described below). In order to trigger these additional steps, the eligible loan's original servicer prepares a record of the financial transaction that resulted from the discharge and sends it to the Department, which in turn sends it to the consolidation originator.

29. When that record is received by the consolidation loan's originator, the originator will perform "financial transactions" that are forwarded to the Department, which are then sent to the consolidation loan servicer to be applied as "adjustments" to the consolidation loan. Financial transactions performed by the originator include separating out the eligible and ineligible loans and recalculating the new balance and interest rate of the consolidation loans (if any). The adjustments made by the consolidation servicer include applying these financial transactions to the servicer's account for the consolidation loan. If the same servicer acted as the consolidation originator and consolidation servicer, that servicer performs these financial transactions and processes adjustments to the borrower's consolidation loan to reflect the discharge of eligible debt. This includes the following steps:

a. Balance: The consolidation originator/servicer for the borrower's current consolidation loan reduces the consolidation loan by the amount of the discharge. If all of the consolidation loan's underlying loans are eligible for discharge, then the consolidation loan's balance is reduced to zero. If the consolidation loan's underlying loans include some loans that are not eligible loans, then the consolidation loan's balance will only be reduced by the amount of the underlying loans that are eligible loans.

b. Refund: For any payment(s) made on the consolidation loan, the consolidation servicer calculates a refund amount and includes it on a refund file sent to the Department for approval, as described in Paragraph 23(b), above. This refund amount will include payments made toward the consolidation loan and will not

include the amounts of any payments made on the eligible loan before it was consolidated.

c. Credit Reporting: The consolidation servicer of the borrower's current consolidation loan will update the credit reporting on the borrower's account. If all of the consolidation loan's underlying loans are eligible loans, then the consolidation loan's reported balance is reported as zero. Likewise, if the consolidation loan's underlying loans include some loans that are not eligible loans, then the consolidation loan's amount will be reported as a reduced balance. Neither update indicates that the tradeline should be removed. FSA does not direct the discharge of the consolidation loans, requiring the deletion of tradelines.

30. If the consolidation loan's consolidation originator and consolidation servicer are two different servicers, the information goes through the Department for distribution amongst the various vendors. The consolidation originator will send the disbursement adjustment to the Department. Department personnel will review the adjustment and then forward along to the respective consolidation servicer to process the adjustment. Once complete, the consolidation servicer will report the transaction back to the Department to be reviewed and marked as complete. Thereafter, the Department will report the completion to the consolidation originator for final record keeping.

31. The timing of the process for adjusting a subsequent consolidation to reflect the discharge applied to the eligible loan varies based on the nature and complexity of the consolidation loan.

32. If the consolidation loan is the borrower's current loan—that is, if the eligible loan was only consolidated one time—there are no remaining steps for the Department or the loan servicers to take once the consolidation servicer of the current consolidation loan has taken all of the steps required to make the adjustments corresponding to a discharge and the refund's payment file has been sent to Treasury.

33. If the consolidation loan into which the eligible loan was consolidated is not the borrower's current loan—that is, if the eligible loan was consolidated more than once, or even

multiple times, as described in Paragraph 21(e), above—then there are additional steps that must be taken for the process to be completed. Specifically, the steps described in Paragraphs 29 and 30, above, of adjusting the loan, refunding payments, removing tradelines, and sending transaction records to the subsequent consolidation loan's originator and servicer must be repeated by the consolidation originator/servicer of each consolidation loan until the requisite adjustments, refunds, and credit updates have been made for the borrower's current consolidation loan. Note further that it is not uncommon for a loan to be consolidated multiple times—more than twice, and perhaps as many as ten times or more—and hence these steps would be multiplied accordingly, correspondingly drawing out the timing to complete the full process.

34. The transactions between servicers may be transmitted as part of a large list of transactions between servicers that includes borrower defense discharges, closed school discharges, false certification discharges, death discharges, and other over- or under-payments triggering the need for further transactions and adjustments between servicers in the chain of consolidations.

35. For an eligible loan that has subsequently been consolidated one or more times, there are no remaining steps for the Department or the servicers to take to discharge the loan once the current consolidation loan's consolidation servicer has taken all of the steps required to make the adjustments corresponding to a discharge and the refund payment file for the current consolidation loan has been sent to Treasury.

36. There is an exception to the foregoing description of the process for consolidation loans. For an eligible commercial FFEL loan that was subsequently consolidated into a Direct Consolidation Loan, the process requires actions from the consolidation servicer. Post-consolidation adjustments are not performed on commercial FFEL loans consolidated into a Direct Consolidation Loan. The discharge request is sent directly to the consolidation loan servicer to calculate the amount of eligible commercial FFEL loans that were consolidated using the

consolidation funding history. Once the consolidation servicer calculates the amount of commercial FFEL loans consolidated, it applies the discharge directly to the consolidation loan for the calculated amount. If a borrower has both commercial FFEL and Direct Loans that are consolidated together into a Direct Consolidation Loan, the process outlined in this paragraph is applied.

37. ***Commercial FFEL Loans (Paragraphs 37-40)*:** For an eligible loan that is currently a FFEL loan, the Department sends a request to the GA that insures the loan, which asks the GA to purchase the loan from the commercial lender that holds the loan. Neither the GA nor the loan's commercial lender or servicer has contractual obligations that the Department can enforce requiring them to complete these steps, but the GAs have thus far cooperated with the Department's requests to carry out the steps needed to address borrowers with FFEL loans. The GA fulfills the Department's request by paying off the loan.

38. Because some GAs typically update NSLDS once per month, it may take up to a month after a FFEL loan discharge for NSLDS to reflect updates that have already been made in the GA's records and database system.

39. For an eligible loan that is an FFEL loan, there are no remaining steps for the Department or any of its servicers to take for that loan once the Department has requested that the GA pay off the eligible loan.

40. After the loan has been paid off, the updated balance will be reflected in the loan-holder's subsequent report to the CRAs regarding the borrower and the loan.

## SECTION II – STEPS FSA TOOK TO DELIVER RELIEF TO *SWEET* BORROWERS THROUGH MID-2024

41. After the Settlement Agreement was executed in June 2022, the Department began to take steps to prepare to meet the first relief deadline under the Settlement Agreement even though the Department did not yet know whether the Agreement would receive final court approval or what the actual relief deadline would be because it was keyed to the "Effective Date" of the

Agreement which had not yet been established. *See* Settlement Agreement at ¶ II.K (defining "Effective Date" as the "date upon which, if this Agreement has not been voided under Section XIII, the Final Judgment approving this Agreement, entered by the Court in the form attached hereto as Exhibit B, becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal"). The first deadline was for effectuating relief for borrowers who took out loans to attend a school on Exhibit C to the Settlement Agreement.[3] These class members, sometimes collectively referred to by the parties as the "Automatic Relief Group" ("ARG"), were eligible for relief under the Settlement Agreement without the need to have their borrower defense applications adjudicated. The relief deadline for ARG class members was one year after the Effective Date. *See* Settlement Agreement at ¶ IV.A. By Order dated February 24, 2023, the Effective Date was established as January 28, 2023 (*see* ECF No. 382 at 6, 8) and therefore the relief deadline for ARG class members was January 28, 2024.

42. Knowing it would have to follow all the steps outlined in Section I for delivering Full Settlement Relief, the Department began taking preparatory steps soon after the execution of the Settlement Agreement, focusing its initial efforts on the approximately 200,000 ARG class members. *See* January 30, 2023 Declaration of Michael Garry (ECF No. 363) ("Garry Declaration") at ¶ 5. As detailed in Paragraph 6 of the Garry Declaration (emphasis added):

> Preparations for notifying, and effectuating full settlement relief for, [ARG] class members involved several complex operational steps within FSA. As just described, to determine which Class Members applied for discharge of loans associated with Exhibit C schools, FSA first had to match the school codes to the Exhibit C schools. Then, FSA evaluated Sweet Class Members to determine which borrowers applied for discharge of a loan received for attendance at an Exhibit C school. Next, the ***nearly 2,900,000 federal student loans*** associated with the Exhibit C Class Members were analyzed to create the discharge processing requests. The part of the process to analyze the loans and create the discharge requests alone took

[3] The various categories of borrowers and relief deadlines (as modified by Court order) are set forth in Section IV and in Table 1.

> approximately three months. In all there are approximately 20 vendors which includes six Federal Loan Servicers, the Department's Debt Management and Collection System ("DMCS"), and numerous guaranty agencies. Each will receive its own list of loans that require action. Each vendor will process Exhibit C discharge requests, and each is set to receive a list of loans that need action taken under the Agreement. Each list of loans is comprised of a file containing borrower and loan information. The file also contains detailed instructions as to what action should be taken for each loan.

43. Although the Court did not establish the Effective Date until its February 24, 2023 Order, the parties had already calculated the Effective Date as January 28, 2023. *See* Transcript of January 26, 2023, hearing at 7-8 (DOJ counsel stating the Effective Date was January 28, 2023); *id*. at 14 (Plaintiffs' counsel stating the Effective Date was January 28, 2023). Thus, by January 30, 2023, FSA was ready to send approximately 99% of the ARG discharge requests to the Federal Loan Servicers, and the discharge requests to the guaranty agencies in the days thereafter (Garry Decl. at ¶7). However, at the January 26, 2023 hearing, when the Department explained it was not able to segregate out the loans related to the intervenor schools, the Court ordered the Department "to hold off on all [discharges]" until the Court could hear the motion to stay filed by the four Exhibit C schools who had intervened seeking to have the Settlement Agreement invalidated. *See* Transcript of January 26, 2023 hearing at 17-18.

44. After the hearing, the Department reviewed whether there was viable way to segregate the intervenor school loans from the remainder of the ARG loans. As explained in Mr. Garry's February 14, 2023 Supplemental Declaration (ECF No. 376) ("Supplemental Garry Declaration"), FSA was able to "successfully remove[ ] all the borrower cases and loans associated with the four Intervenor schools and has completed preparing (but has not sent) the revised discharge requests for the remaining schools from the January 30, 2023 Discharge Requests ('Remaining Discharge Requests')" and was prepared to issue those requests to FSA's vendors for processing as soon as approved by the Court. Supplemental Garry Decl. at ¶ 9.

45. In its February 24, 2023 Order, the District Court denied the intervenors' motion to stay judgment but granted a temporary stay of its order limited to discharges and discharge requests for loans for the ARG class members associated with the four intervenor schools. ECF No. 382 at 24-25. Thus, nearly a month after the Effective Date, FSA was finally cleared to begin sending out discharge requests to servicers with respect to loans of ARG class members other than those associated with the four intervening schools.

46. Subsequent to the District Court's temporary stay with respect to the discharge of loans related to the intervening schools, the intervenors sought longer stays, first in the Ninth Circuit and then in the Supreme Court, both of which were denied. After some subsequent delays related to the intervenors' stay motions filed with the 9th Circuit and Supreme Court (which were denied May 30, 2023 and April 11, 2023, respectively), FSA was finally able to issue its discharge instructions for the remaining Exhibit C loans.

47. Once FSA was cleared by the various court orders to issue discharge instructions for all the ARG class members, it did so and its work to implement the processes described in Section 1 to deliver discharges, refunds and credit tradeline deletions to the ARG was ongoing and continuous. A description of some of the efforts FSA took with respect to relief for the ARG is set forth in the April 2, 2024 Declaration of Richard Cordray (ECF No. 403-1) ("Cordray Declaration") at ¶¶ 69-75.

## **SECTION III - RELIEF PROCESSES APPLICABLE TO *SWEET***

### **A. Background**

48. Despite its efforts to ensure compliance with the first relief deadline of January 28, 2024, including monitoring servicers' reported progress in fulfilling *Sweet* discharge requests. regular communications with loan servicers, answering servicer questions, receiving updates on

servicer progress weekly liaison calls with each servicer and reminders of the settlement deadlines, the Department did not meet the deadline for some of the ARG class members.

49. As detailed in the Cordray Declaration), "[b]eginning in December 2023, as part of the reconciliation efforts, the Department detected complications with discharges not being reflected in consolidation loans and later identified the complications as stemming from large volumes of consolidation adjustments that needed to be applied in order for relief to be reflected in subsequent consolidation loans. As a result, the Department began to focus on processing those adjustments so that the discharges were applied to the eligible loans' subsequent consolidations. At that time, the Department instructed the servicers to prioritize Exhibit C consolidation loans due to the complexities identified." Cordray Decl. at ¶75.

50. As of January 2024, the Department "understood reporting from the servicers to indicate that discharges had been applied for 95% of Exhibit C class members and that discharges would be applied for the remaining Exhibit C class members by April 2024." *Id.* at ¶ 76. In fact, however, "the Department erred by tracking progress based only on servicer reported data regarding initial discharge requests, as it did not speak to the additional steps that were needed to effectuate full settlement relief for consolidation loans." *Id*. As further explained in the Cordray Declaration, "[f]or eligible loans that were subsequently consolidated, the Department does not have the ability to track through NSLDS whether the subsequent consolidation loans have been adjusted to reflect the discharge (and associated refund and credit relief) applied to the Eligible Loan. Similarly, NSLDS data does not provide the Department with the ability to link Exhibit C Class Members' consolidation loans with earlier consolidation loans or original eligible loans with complete reliability." *Id*. at ¶81. When these complexities and other concerns came to light, the Department undertook additional efforts to "find more-accurate indicators of the status of class members' relief[.]" *Id.* at ¶ 80; *see also id.* at ¶¶ 81- 83.

51. As a result of its failure to meet the January 28, 2024 deadline for the ARG class members, the Court found that the Department had breached the Settlement Agreement and adopted a

revised relief schedule proposed by Defendants to complete relief for the ARG class members. *See* ECF No. 407 (4/24/2024 Order). Under the revised schedule, each of four tranches of ARG class members were to have their relief completed by May 31, 2024, July 31, 2024, August 31, 2024 and a final deadline to be established at a May 23, 2024 hearing. *Id*.

52. At the May, 23, 2024 hearing, the Department proposed March 31, 2025 as the final deadline to complete relief for the fourth tranche of ARG class members. Transcript of 5/23/2024 Hearing (ECF No. 423) at 16. Rejecting the Department's proposal, the Court set December 31, 2024 as the final deadline for ARG relief. *Id*. at 23-24; *see also* ECF 414 (order following 5/23/2024 hearing).

53. In addition to setting a new deadline by which the Department was to complete relief for the ARG class members, the Court's May 23, 2024 Order also altered how the Department effectuates refund relief. Generally, when borrowers are due a refund on an underlying eligible loan that is later consolidated with a loan that is not being discharged, the Department applies the refund amount to reduce the remaining balance of the consolidated loan. Until May 2024, the Department had followed that general practice for refunds that were due to ARG class members with consolidated loans. The Plaintiffs' counsel objected to that practice for *Sweet* class members. Transcript of 5/23/2024 Hearing at 9-10. The Court agreed with Plaintiffs' position and ordered the Department to begin issuing checks for all refunds due for any *Sweet* borrowers instead of using refund amounts to reduce remaining loan balances. ECF 414. This was the first Court-ordered modification to the Department's usual processes for effectuating relief for borrowers that would be applicable to *Sweet* borrowers.

54. Prior to the next hearing on June 13, 2024, the Department determined that it would not meet the July 31, 2024 deadline the Court had previously set for one of the ARG tranches and, after discussion with the Plaintiffs' counsel, agreed to a new discharge process for the remaining ARG class members whose relief was not yet complete. Under the new *Sweet*-specific loan discharge process (the "Terminal Loan Relief Methodology") for ARG class members with consolidated loans, the Department agreed that it would instruct servicers to discharge the current (*i.e.,* "terminal")

consolidation loan and refund all payments the borrower had made on the terminal loan. This was a more expeditious process than the Department's usual process (described *supra* at Section I), but it came at a cost – discharges and refunds on underlying loans that would not have otherwise been eligible for relief under the Settlement Agreement. The Court agreed to extend the July 31, 2024 deadline to August 31, 2024 and ordered the use of the new Terminal Loan Relief Methodology to meet that deadline. ECF 416 (6/13/2024 Order).

55. By the time of the next hearing on September 26, 2024, the parties represented to the Court that the Department was in substantial compliance with the August 31, 2024 deadline for effectuating relief for the remainder of the ARG class members. *See* Transcript of 9/26/2026 hearing at 6 (Plaintiffs' counsel), 17 (Department's counsel).

56. Ultimately and over the Department's objections, the Court ordered the Department to use the Terminal Loan Relief Methodology for all remaining *Sweet* borrowers with consolidated loans. *See* ECF Nos. 434, 451.

57. FSA has instructed all of the Federal Loan Servicers, as well as the Commercial Servicers and GAs, to use the Terminal Loan Relief Methodology for all *Sweet* borrowers with consolidated loans whose relief had been incomplete as of June 13, 2024.

58. As part of its oversight of the servicers' work to complete discharge and refund processing, including application of the Terminal Loan Relief Methodology, FSA set up regular business processing with the Direct Loan servicers based on FSA's monthly data analysis. This involves FSA's aggregation of data from servicers, NSLDS, and Treasury refunds issued, which results in sending the servicers two files as needed, one for Open Loans and one for Refunds. Open loan files are sent not less than every other month although refund files are sent less frequently. Through this process FSA provides oversight over the servicers' continued implementation of the relief due under the Settlement Agreement.

59. The Terminal Loan Relief Methodology addressed and changed just two aspects of *Sweet* relief – discharges and refunds. The Department has continued to follow the processes described in Section I for credit tradeline deletions, but the impact of the Terminal Loan Relief Methodology is that the tradeline associated with the mixed terminal loan is terminated. By comparison, without the Terminal Loan Relief Methodology, only the eligible portion of the terminal loan would be adjusted to account for the discharge and therefore the tradeline of the remaining balance would be reported.

**B. Steps Necessary to Effectuate Full Settlement Relief Under the Court-Ordered Terminal Loan Methodology.**

60. Effectuating Full Settlement Relief under the Court-ordered terminal loan methodology mirrors the traditional process described in Paragraphs 23-24, above, for a Direct Loan that has not been consolidated. Specifically, for an eligible loan that was subsequently consolidated into a direct consolidation loan, the Department prepares a discharge request and sends that request to the consolidation loan servicer for the class member's current and open loan, regardless of the number of times that the eligible loan had been subsequently consolidated. The discharge request instructs the class member's current servicer to apply a discharge. To apply a discharge, the servicer refers to various change requests ("CR") and instructions provided by the Department that explain the steps the servicer must take. These instructions include the following steps for each loan being discharged:

a. <u>Balance</u>: In its servicing database system, the servicer reduces the terminal consolidation loan's balance to zero**.**

b. <u>Refund</u>: The servicer calculates a refund equal to the sum total of any payment(s) made toward the terminal consolidation loan. That refund amount is then included on a record known as a "refund file." A refund file contains a list of borrowers and refunds that is sent to the Department for approval. Therefore, for discharge of the terminal consolidation loan, the refund file created by the servicer reflects the total amount of payments made to the Department that the servicer's database system shows for all payments made on the terminal consolidation loan. Upon approval by the Department, the Department sends a record known as a "payment file" to Treasury, which will cause Treasury to issue a payment for the listed amount to the listed recipient. After processing the payment file, Treasury issues a check or

electronic payment to the recipient the next business day. The Department will then provide confirmation of payment to the servicer within 1 business day of payment

c. Credit Reporting: In the servicer's next regular update to the CRAs, the update indicates that the borrower's terminal consolidation loan has been discharged, which triggers the CRAs' obligation to remove that loan's tradeline in the borrower's credit file.

d. Loan Status: In the servicer's next update to NSLDS, the servicer includes an update to indicate a discharge has been applied to the terminal consolidation loan, effective on the date of discharge approval. It is the processing of the discharge on their loan servicing system that ultimately triggers the reporting of the discharge to NSLDS.

e. The borrower will see evidence of these steps in various places and at different times.

61. Pursuant to court-ordered terminal loan methodology, to effectuate Full Settlement Relief, for an eligible loan that has been subsequently consolidated at least one time, there are no remaining steps for the Department or its servicers to take once the class member's current servicer has taken all of the steps required for a discharge of the terminal consolidation loan and the Department has sent the relevant payment file to Treasury.

**SECTION IV - SETTLEMENT RELIEF DEADLINES**

62. The Settlement Agreement divides the borrowers into seven different groups: the ARG, five decision groups (Decision Groups 1 through 5) for class members who are not in the ARG and applied for borrower defense relief on or before June 22, 2022, and the post-class applicant group (those who applied for borrower defense from June 23, 2022 through November 15, 2022), each with its own deadline by which the Department must effectuate Full Settlement Relief for those entitled to such relief. In December 2025, the Court further divided the post-class applicant group into two groups. *See* Transcript of 12/11/2025 Hearing at 82. In addition, the Court modified some of the original relief deadlines. The following table shows the groups as currently constituted and the applicable deadlines, and reflects any modifications by the Court:

**TABLE 1**
**SETTLEMENT RELIEF DEADLINES**

| SETTLEMENT GROUP | RELIEF DEADLINE |
|---|---|
| Automatic Relief Group | December 31, 2024 (court-ordered change of original January 28, 2024 deadline)[4] |
| Decision Group 1 | December 20, 2024 (court-ordered change of original July 28, 2024 deadline) |
| Decision Group 2 | January 28, 2025 |
| Decision Group 3 | July 28, 2025 |
| Decision Group 4 | January 28, 2026 |
| Decision Group 5 | July 28, 2026 |
| Post-Class Applicants who attended an Exhibit C school | March 30, 2027 (revised relief deadline resulting from extension of original January 28, 2027 decision deadline) |
| Post-Class Applicants who did not attend an Exhibit C school | June 11, 2027 (revised relief deadline resulting from extension of original January 28, 2027 decision deadline) |

63. For class members in the Decision Groups whose applications were not initially approved and who took advantage of the revise and resubmit process afforded by the Settlement Agreement, the relief deadline is generally six months later than indicated in the table for those class members whose borrower defense applications were approved as a result of the revise and resubmit process. *See* Agreement at ¶¶ IV.C.2, IV.C.4.

64. All class members in the ARG are automatically entitled to Full Settlement Relief. Class members in Decision Groups 1 through 5 and both tranches of the post-class applicants are entitled to Full Settlement Relief only if their borrower defense application was adjudicated to an approval or the deadline for adjudicating their borrower defense application was missed. The Settlement Agreement establishes a schedule by which class members' borrower defense

[4] The Court established four new deadlines for four different tranches of the class members in ARG whose January 28, 2024 relief deadline had been missed, the latest of which was December 31, 2024. ECF No. 414 (5/23/2024 Civil Minutes). The deadline for the third tranche was later extended, but the December 31, 2024 deadline for the final tranche remained. ECF No. 416 (6/13/2024 Civil Minutes). On September 25, 2024, the Department reported to the Court and Plaintiffs that as of September 25, 2024, it had already completed discharges for 99.8% and refunds for 98.03% of the ARG class members still waiting for relief (ECF No. 433 at 2), ahead of the December 31, 2024 deadline.

applications were to be adjudicated. Settlement Agreement at ¶ IV.C.3. The adjudication deadlines were at 6-month intervals, with the first deadline being six months after the Effective Date (*i.e.,* July 28, 2023). Thus, the Department could not have gotten a head start on effectuating that relief – *i.e.,* it could not have started effectuating relief for these groups in, for example, February 2023. The applications had to be adjudicated first, by the adjudication deadlines established in the settlement agreement, to determine whether class members in each group were approved for relief.

65. The relief deadlines at issue in the Plaintiffs' Motion to Enforce are the deadlines for the class members in the ARG and Decision Groups 1-4, highlighted in blue in the Table 1.

**SECTION V – THE DEPARTMENT AND ITS LOAN SERVICERS HAVE TAKEN EACH STEP NECESSARY TO DISCHARGE RELEVANT LOAN DEBT OF MAY DATA CLASS MEMBERS**

66. The Department has not merely taken significant steps to effectuate relief for the ARG and Decision Group 1 through Decision Group 4 class members, as asserted by Plaintiffs. Rather, the Department has taken multiple hundreds of thousands of steps. As shown below, the Department has supervised the provision of Full Settlement Relief to hundreds of thousands of class members and the overwhelming majority governed by each of the cascading relief deadlines that have passed. By May 2026, the Department had confirmed that discharges (in the amount of nearly $10 billion) for 2,150,375 loans for the ARG and Decision Groups 1through 4 class members had been completed. Those loans are associated with a total of 257,929 class members. By May 2026, the Department had also confirmed that refunds had been issued to 257,000 class members (in the amount of $1.2 billion)[5] in the ARG and Decision Groups 1 through 4.

[5] As explained in Mr. Cordray's Supplemental Declaration, The Department's Financial Management System ("FMS") currently does not track refund payments at the loan level or by discharge type, but it does have records showing payments to individual borrowers. ECF No. 406-1 at 4. The Department's FMS data is not specific to refunds under the settlement and, therefore, some of the refund totals could include some refund amounts attributable to other types of discharges or financial adjustments. *Id.*

67. As of late May 2026 (just prior to the Department's receipt of Plaintiffs' breach allegations), the Department's data showed the following progress of discharges and refunds:

**TABLE 2**
**DISCHARGE/REFUND PROGRESS FOR ARG**

| AUTOMATIC RELIEF GROUP | | |
|---|---|---|
| **Discharge** | **195,993 Class Members** | **~1,818,000 Loans** |
| Confirmed Complete | 195,895 Class Members | 1,817,693 Loans |
| Not yet confirmed complete | 98 Class Members | 77 Federally Serviced Loans<br>110 Commercial FFEL Loans<br>187 Loans Total |
| | | |
| **Refund** | **195,993 Class Members** | *See* Fn 5 |
| Confirmed Complete | 195,969 Class Members | *See* Fn 5 |
| Not yet confirmed complete | 24 Class Members | *See* Fn 5 |
| | | |
| **Discharge & Refunds** | **195,993 Class Members** | **~1,818,000 Loans** |
| Confirmed Complete | 195,871 Class Members | 1,817,693 Loans |
| Not yet confirmed complete | 122 Class Members | 77 Federally Serviced Loans<br>110 Commercial FFEL Loans<br>187 Loans Total |

[Tables continued on next page.]

**TABLE 3**
**DISCHARGE/REFUND PROGRESS FOR DECISION GROUP 1**

| DECISION GROUP 1 | | |
|---|---|---|
| **Discharge** | **31,368 Class Members** | **~161,300 Loans** |
| Confirmed Complete | 31,317 Class Members | 161,197 Loans |
| Not yet confirmed complete | 51 Class Members | 61 Federally Serviced Loans<br>27 Commercial FFEL Loans<br>88 Loans Total |
| | | |
| **Refund** | **31,368 Class Members** | *See* Fn 5 |
| Confirmed Complete | 31,008 Class Members | *See* Fn 5 |
| Not yet confirmed complete | 360 Class Members | *See* Fn 5 |
| | | |
| **Discharge & Refunds** | **31,368 Class Members** | **~161,300 Loans** |
| Confirmed Complete | 30,961 Class Members | 161,197 Loans |
| Not yet confirmed complete | 407 Class Members | 61 Federally Serviced Loans<br>27 Commercial FFEL Loans<br>88 Loans Total |

**TABLE 4**
**DISCHARGE/REFUND PROGRESS FOR DECISION GROUP 2**

| DECISION GROUP 2 | | |
|---|---|---|
| **Discharge** | **10,213 Class Members** | **~56,800 Loans** |
| Confirmed Complete | 10,188 Class Members | 56,768 Loans |
| Not yet confirmed complete | 25 Class Members | 21 Federally Serviced Loans<br>13 Commercial FFEL Loans<br>34 Loans Total |
| | | |
| **Refund** | **10,213 Class Members** | *See* Fn 5 |
| Confirmed Complete | 10,037 Class Members | *See* Fn 5 |
| Not yet confirmed complete | 176 Class Members | *See* Fn 5 |
| | | |
| **Discharge & Refunds** | **10,213 Class Members** | **~56,800 Loans** |
| Confirmed Complete | 10,013 Class Members | 56,768 Loans |
| Not yet confirmed complete | 200 Class Members | 21 Federally Serviced Loans<br>13 Commercial FFEL Loans<br>34 Loans Total |

**TABLE 5**
**DISCHARGE/REFUND PROGRESS FOR DECISION GROUP 3**

| DECISION GROUP 3 | | |
|---|---|---|
| **Discharge** | **12,128 Class Members** | **~66,500 Loans** |
| Confirmed Complete | 12,059 Class Members | 66,398 Loans |
| Not yet confirmed complete | 69 Class Members | 22 Federally Serviced Loans<br>81 Commercial FFEL Loans<br>103 Loans Total |
| | | |
| **Refund** | **12,128 Class Members** | *See* Fn 5 |
| Confirmed Complete | 12,044 Class Members | *See* Fn 5 |
| Not yet confirmed complete | 84 Class Members | *See* Fn 5 |
| | | |
| **Discharge & Refunds** | **12,128 Class Members** | **~66,500 Loans** |
| Confirmed Complete | 11,980 Class Members | 66,398 Loans |
| Not yet confirmed complete | 148 Class Members | 22 Federally Serviced Loans<br>81 Commercial FFEL Loans<br>103 Loans Total |

**TABLE 6**
**DISCHARGE/REFUND PROGRESS FOR DECISION GROUP 4**

| DECISION GROUP 4 | | |
|---|---|---|
| **Discharge** | **8,521 Class Members** | **~48,400 Loans** |
| Confirmed Complete | 8,470 Class Members | 48,319 Loans |
| Not yet confirmed complete | 51 Class Members | 28 Federally Serviced Loans<br>65 Commercial FFEL Loans<br>93 Loans Total |
| | | |
| **Refund** | **8,521 Class Members** | *See* Fn 5 |
| Confirmed Complete | 8,394 Class Members | *See* Fn 5 |
| Not yet confirmed complete | 127 Class Members | *See* Fn 5 |
| | | |
| **Discharge & Refunds** | **8,521 Class Members** | **~48,400 Loans** |
| Confirmed Complete | 8,347 Class Members | 48,319 Loans |
| Not yet confirmed complete | 174 Class Members | 28 Federally Serviced Loans<br>65 Commercial FFEL Loans<br>93 Loans Total |

68. In Tables 2 through 6, "confirmed complete" means that the Department has been able to confirm that the relief is complete. "Not yet confirmed complete" means that although discharge or refund relief may in fact already be complete, the Department has not yet been able to confirm that it is complete. For refunds, any class member for whom the data shows there is more than a $1.00 difference between the refund amount the class member has already been issued and the payment history, the class member's refund progress is marked as not yet confirmed complete.

69. On June 18, 2026, Plaintiffs' counsel provided notice to the Department of allegations pursuant to Paragraph V.D.1 of the Settlement Agreement that Defendants are in material breach of the Settlement Agreement. Among other allegations, Plaintiffs alleged that the Department was in breach of its obligations as to each of the 1,051 Class Members identified as "not yet confirmed complete" in Tables 2 through 6. In this Declaration these 1,051 individuals are referred to as the "May Data Class Members."

**A. <u>The Department Has Taken All Steps Necessary to Effectuate Relief for May Data Class Members with Commercial FFEL Loans.</u>**

70. Of the 505 eligible loans represented by the 1,051 May Data Class Members whose loans were not yet discharged as of May, 296 are commercially held private loans serviced by commercial servicers with no contractual relationship with the Department. As explained earlier in this Declaration in Paragraph 37, above, although the commercial lenders and GAs have essential roles in discharging commercially-held loans, the Department does not have a contractual relationship with the commercial servicers or the GAs. As a result, the Department can do no more than request their cooperation in discharging such loans and the Department has done so. FSA has identified all of the commercially-held loans that are to be discharged for the ARG and DG1 through 4 class members and has requested that that the commercial servicers and GAs effectuate the discharges and credit tradeline deletions. By issuing those requests, the Department has "taken all steps necessary to discharge the Relevant [Commercially-held FFEL] Loan Debt of the Class

Member" in ARG and DG1 through 4. Settlement Agreement at ¶ IV.F.1. Had *Sweet* class members with commercially-held FFEL loans been required to consolidate those loans into Direct Consolidation Loans as is usually required under the Higher Education Act (20 U.S.C. §§ 1087a, 1087e(h)), the Department would have been dealing with federal loan servicers instead of the commercial servicers and GAs. However, the Settlement Agreement expressly provides that class members "shall not be required to take steps to consolidate any Relevant Loan Debt into a Direct Loan to receive the relief to which they are entitled pursuant to [the Settlement Agreement]. Defendants shall take all necessary steps to ensure that other loan holders effectuate the required relief." Settlement Agreement at ¶IV.F.2. Borrowers with FFEL loans eligible for discharge do not receive refunds.

### B. The Department and its Loan Servicers Have Taken All Steps Necessary to Effectuate Relief for May Data Class Members with Direct Loans.

#### 1. Discharge Accounting

71. Again, of the 1,051 May Data Class Members, 294 borrowers had a discharge not confirmed complete in May. Those 294 borrowers had combined total of 505 eligible loans. Of those 505 eligible loans, 209 are Direct Loans addressing debt held by the Department and serviced by one of its servicers. The *Department* does not reduce a borrower's loan balance to zero when a borrower is entitled to discharge relief. Rather, as explained above in Paragraph 23(b), it is the servicers who reduce the eligible loan's balance to zero in their servicing database systems, to which the Department does not have access. Thus, the act of reducing the loan balance of any *Sweet* class member to zero is not a step that the Department could actually take, or should be required to take, to effectuate settlement relief. For an eligible loan that is a Direct Loan, the Department prepares a "discharge request" or instruction and sends it to the servicer that services the debt. *See supra* at Section 1.D. The discharge request identifies the loan or, in the case of a

consolidated loan, identifies the terminal consolidation loan and instructs the servicer to "apply a discharge."

72. As detailed in Section II of this Declaration, the Department began taking preparatory steps in 2022 soon after the execution of the Settlement Agreement, followed by the issuance of the discharge instructions for all ARG class members (other than those who attended one of the intervenor schools) once cleared to do so by the Court in February 2023, and then followed soon thereafter for the ARG class members who attended the intervenor schools. *See* Cordray Declaration (ECF No. 403-1) at ¶¶ 29-32 & §II.B (Ongoing Implementation). Not only did the Department issue the necessary loan discharge instructions, it engaged in regular oversight of the servicers as they worked to effectuate relief. *Id.*at § II.C (The Department's Oversight). After the Court ordered the Department to apply the Terminal Loan Relief Methodology, the Department took all the necessary steps to instruct the servicers to discharge the Terminal Consolidation Loans[6] and loan debt originally disbursed for the eligible school for all impacted borrowers in the ARG and Decision Groups 1 through 4. *See* above at Section III (describing the implementation of the Terminal Loan Relief Methodology). But even if there were evidence that the Department inadvertently failed to take a step necessary for the discharge of one of the 205 Direct Loans reported in the May Data as not yet confirmed complete, the Department has taken additional steps (described below) since then to ensure those remaining direct loans are discharged.

73. Since the Department received Plaintiffs' allegations of material breach, FSA has continued to work with the loan servicers under contract with the Department to complete the relief for ARG and DG1 through DG4 class members. As explained in Paragraph 58, above, FSA sends

[6] "Terminal consolidation loan" refers to the final open consolidation loan held by an individual borrower. As ordered by the Court, the terminal consolidation loan is discharged in full whether the loan is comprised of fully eligible underlying debt or has a mix of both ineligible and eligible debt. Borrowers with mixed terminal consolidation loans receive additional relief as a result.

servicers Open Loans and Refund files. Files were sent to the servicers on June 11, 2026. On or about July 20, 2026, all servicers responded with details regarding both the Open Loans file and on the Refunds file to confirm completion of review or action between both files or to provide additional information for FSA to review and decide if additional work was necessary or determine if the borrower was fully or partially complete. DOJ counsel then scheduled two meetings with attorneys for each of the loan servicers, also attended by FSA and OGC counsel.

74. The first of these meetings took place on July 22, 2026. During the meeting the Department agreed to send the servicers lists of borrower accounts associated with the May Data Class Members, so that the loan servicers could provide the Department with more information about the accounts or other information indicating how much longer processing should take. FSA staff sent those lists the following day, July 23, 2026.

75. On July 23, Aidvantage and Nelnet confirmed to me that they took all steps to issue refunds of May Data Class Members they service and all steps to reduce the balance of the loans to zero had been taken for the same population.

76. The second of these meetings took place on July 30, 2026. The purpose of this meeting was to obtain more information about the accounts or other information indicating how much longer processing should take. During the meeting, however, servicers confirmed that processing tasks for accounts on the list were largely completed except in a small number of cases, which servicers had anticipated completing imminently. Later the same day, MOHELA confirmed that it had taken all steps necessary to reduce the balance of the loans to zero for its share of the May Data Class Members. On August 6, 2026, MOHELA confirmed that they took all steps to issue refunds of May Data Class Members they service from the list sent on July 23.

77. Following the July 23, 2026 meeting, DMCS conducted an additional review of its files, and I had a follow-up conversation with them. DMCS then provided its final response on

August 24, 2026. It confirmed that they took all steps necessary to issue refunds of May Data Class Members they service from the list sent on July 23 as described in Paragraph 23(b) & fn.2.

78. Thus, the servicers have now submitted documentation to the Department showing that they have taken each of the steps described in Paragraphs 22-25, 54, 60, above. Specifically, as of August 24, 2026, FSA has received confirmation from the Direct Loan Servicers showing that all discharges have been applied correctly and refund relief was complete for May Data Class Members sent on July 23.

79. Table 7 below describes the status, as of September 30, 2026, of May Data Class Members Ed-Held Loans that are reported in Tables 2 through 6 above as "Not Confirmed Complete."

**TABLE 7**
**Current Status of Discharges of May Data Class Members' ED-Held Loans**

| As of May 2026 | As of Sept. 30, 2026 |
|---|---|
| 209 ED-Held Loans | 0 ED-Held Loans |

80. As Table 7 shows, all servicers have now confirmed that discharges for all Department-Held loans for May Data Class Members in ARG and Decision Groups 1 through 4 are now complete.

**2. Refunds.**

81. The Department has also taken all steps necessary to effectuate refunds for May Data Class Members who are owed refunds. Of the 1,051 May Data Class Members, 771 borrowers were reported as of late May, 2026 as allegedly being owed more than $1 in refunds. After loan servicers create a refund file showing the total amount of payments made on relevant debt and send the file to the Department, *see* Paragraphs 23(b), 58, 60(b), above, the Department reviews the refund file and, upon approval, sends a record known as a "payment file" to the Treasury, which

will cause the Treasury to issue a payment for the listed amount to the listed recipient. The Department has taken these steps consistent with the refund files received as described in the foregoing paragraphs.

82. Table 8 describes the status as of September 30, 2026, for May Data Class Members of the refunds that are reported in Tables 2 through 6 above as "Not Confirmed Complete."

**TABLE 8**
**Current Status of Refunds of May Data Class Members**

| **As of May 2026** | **As of Sept. 30, 2026** |
|---|---|
| 771 Class Members | 2 Class Members |

83. Because FSA does not send out discharge requests and refunds simultaneously when engaged in the type of oversight of the servicers' continued implementation of relief, as described in Paragraph 69, 16 May Data Class Members required follow up to ensure that refunds were effectuated. The servicers responded confirming fourteen May Data Class Members refunds were complete. Two class members serviced by MOHELA have not yet been issued refunds. MOHELA has reported that it expects to send the refund files for these two borrowers to FSA by approximately October 6. FSA will then release the refunds to Treasury for issuance to the borrowers.

84. For the foregoing reasons, The Department and its loan servicers have taken all steps necessary to effectuate relief for the May Data Class Members, as described in Paragraphs 23-24, 37-40, 60-61, except for the two individuals serviced by MOHELA.

## SECTION VI - COMPLEXITIES IN CONFIRMING COMPLETION FOR DISCHARGES AND REFUNDS

85. There are a number of complexities in completing discharges and refunds.

86. One such factor is the identification of eligible loans. FSA identifies which loans are eligible for discharge under the *Sweet* settlement agreement and sends a list of loans to the servicers. The list of loans is sent to the individual servicer identified by NSLDS loan information.

The NSLDS is FSA's best source for identifying eligible loans for relief. FSA queries the NSLDS system using a set of criteria to determine which loans are eligible for discharge. The logic assumes the NSLDS data is accurate, but the data is not always error proof.

87. For example, servicers report data weekly to NSLDS, and as a result, sometimes, the servicer listed in NSLDS may not actually hold the loan when it is transferred to another servicer or is transferred to DMCS because of default. If loans are returned as not serviced by the loan servicer initially identified, FSA must take additional steps such as requesting the servicer advise of the last known servicer or, if they know, who the loan was transferred to. Upon receipt of additional information from the initial servicer (Servicer A), FSA must generate a new approval file to send to the next identified loan servicer (Servicer B). If Servicer B holds the loan(s), they will take appropriate action, including updates to NSLDS to reflect the appropriate loan holder and relief actions taken. If Servicer B does not hold the loan, FSA will generate a servicer agnostic approval file and request all servicers scan their systems to determine if they hold the loan(s) and take action. At times, if the loans are not found on any servicing systems or NSLDS, neither the servicers nor FSA will be able to determine who holds the loan(s). In the event that this happens, additional research is conducted to determine if the loan is accurate or a duplicate that has already been discharged, and FSA determines whether to manually address the loan by requesting the record be deleted because it is inaccurate.

88. The loan transfers to DMCS are particularly challenging. Loans that default and are rehabilitated may shift between servicers, and edit errors often require ongoing coordination between DMCS, servicers, and FSA staff. Edit errors occur when there is a conflict with the servicer updates submitted to NSLDS. These errors are returned to the servicer and updates cannot be posted, such as the loan holder changes. For example, if a loan has been rehabilitated from DMCS to a prior servicer, DMCS' submission to NSLDS may contain an edit error which cannot be

processed by NSLDS. In this instance, while the loan is transferred to Nelnet, for example, NSLDS will reflect DMCS as the current servicer until the edit error is resolved. When discrepancies in reporting occur, FSA must review, in detail, response files which are returned by the servicer containing a response for each individual loan record indicating actions taken or not taken, confirm completion, and redistribute loans accordingly to ensure relief is provided in full. As mentioned earlier, redistribution of loans to servicers must occur to ensure that any errors found in the data residing in NSLDS results in full relief provided to borrowers with eligible loans.

89. If changes to NSLDS data are retroactively reported, both loan eligibility and data reporting accuracy can be impacted. For example, if loans are transferred to another servicer due to the decommissioning of the transferring servicer, a balance might be reinstated that needs to be resolved through ongoing monitoring. As another example, there may be consolidation loans that were misreported in the wrong status such as "cancelled" instead of paid through consolidation. These inadvertent changes in status can affect FSA's eligibility status which needs to be monitored and corrected as needed.

90. As discussed earlier in this Declaration, as a result of the Court's orders, borrowers approved for relief in *Sweet* who have consolidation loans are entitled to have their terminal loan discharged and payments made to the Department on the terminal loan refunded. While FSA supplies eligible loan data and directs servicers to process terminal loan discharges, the servicers are still responsible for applying consolidation adjustments to intermediary loans to ensure full relief is provided on all loans, which continues even after relief is effectuated on the terminal loans. As financial adjustments are made, balances can persist (or reappear) until the adjustment process is completed. FSA actively monitors these open loans and directs servicers to quickly address them as they arise, but the timing of resolution is not always certain. If an interim balance appears as a result of an adjustment that has not been resolved when the data is pulled, FSA will not consider

the discharge on that loan to be "complete" even though the terminal loan balance has already been discharged, resulting in over-reporting of incomplete discharges.

91. Just as there can be complications in the discharge data, there are also some refunds issues that complicate the determination as to whether a *Sweet* borrower's refund is complete. FSA sees this with DMCS accounts in particular. The reconciliation of refunds often results in "phantom balances," particularly with DMCS. These phantom balances are not genuine debts but are flagged in NSLDS and require servicers to correct the data, ensuring loans reflect a $0 balance. The primary reason this happens is because when a refund is processed, it temporarily creates a balance (positive or negative) on the servicer system, which then in turn may update NSLDS with a balance that needs to be corrected after the refund has been issued. This process can add further complexity and delay to confirming cohort completion. As long as the phantom balance appears, FSA does not consider the discharge (and sometimes the refund) complete.

92. Another impediment to completing refund relief is when the borrower is deceased. Before June 30, 2026, servicers did not request the issuance of refunds to borrowers who the servicers determined were deceased unless and until they could confirm an address for an authorized estate or personal representative. Effective July 1, 2026, they are prevented from doing so due to the Department's implementation of Executive Order 14249 which requires refund requests from government agencies (including but not limited to the Department) to go through an SSN matching process against the U.S. Department of Treasury's Do Not Pay system to ensure that refunds (or any other payments) are not being sent to deceased persons. If there is a Do Not Pay SSN deceased person match for any person otherwise entitled to a refund, including any *Sweet* borrower, Treasury will reject the refund request. If that happens, the servicers will take steps (as it had done in the past) to determine if there is an estate or other eligible party to receive the refund.

93. The foregoing are just a few examples of the issues that can come up that would cause FSA to not be able to confirm that refund and /or discharge relief is complete. It may be that a borrower has in fact received a full discharge and refund, but until FSA is able to confirm that relief is complete, it will report the discharge and refund as not yet complete for data reporting purposes.

94. In their Motion to Enforce, the Plaintiffs state that the Department "has taken a new position that "it has no obligation to provide complete and timely relief to individual class members under the Settlement." ECF No. 552 at 19. I am not aware that anyone in the Department has taken this position. The Department continues to work towards completing relief for all *Sweet* borrowers. Even for the relatively small number of May Data Class Members who were still awaiting relief as of late May 2026, or who may be seeking additional relief through the Ombudsman's office, I am not aware that the Department have ever stated that they will not continue to work toward effectuating that relief. Indeed, I still meet regularly with the servicers to ensure that they are taking all steps necessary to effectuating relief for every remaining borrower entitled to relief under the *Sweet* Settlement Agreement, including not just ARG and Decision Group 1 through 4 class members, but class members in Decision Group 5 and the Post-Class Applicants as well. I continue to do so until all relief has been effectuated for all *Sweet* borrowers. For the foregoing reasons, even though in many situations a borrower's relief is in fact complete and no additional relief is due, it can take additional time and effort for FSA to confirm that all necessary records that all relief is complete.

95. As this declaration describes, effectuation of relief can be administratively complex. The Department apologies for any delay, but emphasizes that any delay is in no way intentional or in bad faith.

**SECTION VII - TOP/AWG OFFSETS FOR**
**DEFAULTED COMMERCIAL LOANS**

96. The description in Paragraphs 37-40 above regarding discharge-related processing for Commercial-FELL loans does not reference refund processing. That is because generally Commercial-FFEL borrowers are not entitled to refunds because their loan payments are made to the commercial-FFEL lenders, not to the Department.

97. I understand that one of the issues that has come up in the regular casework reporting meetings between Plaintiffs' counsel and the Ombudsman's Office relates to the refund of payments involuntarily offset through the government's Treasury Offset Program ("TOP") and through Administrative Wage Garnishments ("AWG") to *Sweet* class members who defaulted on their Commercially-held FFEL loans. The Settlement Agreement does not directly address the refunds of such involuntary payments.

98. In August 2025, FSA leadership approved a plan permitting FSA staff to contact the GAs and identify the scope of the Commercially-held FFEL loans and monies collected through TOP and AWG.

99. It then took FSA a couple of months to prepare the data to send to the GAs. When FSA staff was formulating the plan for the TOP/AWG related instructions to the GAs, FSA had anticipated that the instructions would cover only ARG and DG1 through DG4 because the DG5 decision deadline (July 28, 2025) had not passed yet. Due to timing and reprioritization, the approved DG5 decisions were sent to the GAs for discharge prior to the TOP/AWG guidance being distributed. Therefore, FSA held off sending the TOP/AWG instructions so that the data could include DG5 as well. Although including the DG5 data delayed sending the guidance to the GAs, FSA staff anticipated that the inclusion of Decision Group 5 in the first phase would increase efficiency of the process by retrieving refund estimates for more Class Members in the first phase of this process. Once the data was ready to send, FSA staff obtained reapproval from FSA

leadership in January 2026 to request the cost estimates from the GAs. The guidance, request for estimated costs for the TOP/AWG refunds and the associated data was sent to the GAs on January 28, 2026.

100. In early February 2026, in response to FSA's January 28, 2026 guidance, one of the GAs contacted FSA to ask some preliminary questions and to advise that the GAs had organized a small operational GA workgroup to review the guidance. Thereafter, the guidance continued to be implemented. The first phase, which began after the guidance was issued, took place over several months and consisted of an exchange of questions and answers as between FSA staff and the GAs. By early May, 2026, FSA had received summary level estimates from all of the GAs. FSA then followed up individually with each GA with some additional requests related to those estimates.

101. By late May, 2026, the GAs were in various stages of providing detailed estimates of TOP/AWG for ARG and DG 1 through DG 4 class members. FSA had received detailed data from some GAs while other GAs were still preparing the detailed data.

102. Through late June, 2026, the GAs continued to be in various phases of providing the requested information. By way of example, one GA who by that time had not yet provided detailed data to FSA had requested additional time to ensure coding was precise to determine the amount of involuntary TOP/AWG payments. As of late July, 2026, FSA had received initial estimates with summaries and detailed lists of borrower and their estimated TOP/AWG amounts from all of the GAs with respect to the class members in ARG and Decision Groups 1- 4.

103. Determining TOP/AWG payments is very complicated. For example, there is no unique transaction code on DMCS that makes these payments uniquely identifiable so there is no automated way to identify the payments. Identifying the payments requires manual review by the GAs of financial transactions. To issue refunds, multiple steps would be required and complicated

calculations made to ensure revisions to borrower accounts are correct, refund amounts are accurate, and the resulting financial statement reporting remains reliable.

**SECTION VIII - RECORDS REQUESTED BY PLAINTIFFS**

104. In both their Motion to Enforce and Motion for Contempt, Plaintiffs demand access from FSA's Office of the Ombudsman to updated class lists, outcome data for Decision Groups 4 and 5, and the post-class, and refund census data.

105. The records that Plaintiffs demand from the Ombudsman's Office are not the Ombudsman's Office records. First, none of the records the Plaintiffs seek are already existing records. They have to be created from FSA data. Second, the lists are not created by the Ombudsman's Office. They are created by FSA's Data Request Team ("DRT"). The DRT creates the class list, and the spreadsheets containing outcome data and refund census information that the Department has previously provided to Plaintiffs based on DRT's analysis of raw data. Although the Ombudsman's Office has *access to* the data and resulting lists, the data and the lists "belong to" DRT, not to the Ombudsman's office.

106. The "census refund" data is compiled and maintained by Federal Student Aid (FSA), drawing from systems such as the National Student Loan Data System (NSLDS), Sweet Servicer Census, and the Financial Management System (FMS). The data is not input by, nor does it belong to the Ombudsman's office. If ED were to provide census refund data, FSA's Program Management and DRT teams would retrieve, validate, and reconcile payment records across these systems, then generate the spreadsheet. This process would ensure all Sweet-eligible refunds are accurately reflected, and previously issued refunds are accounted for.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the date contained in the digital signature.

COLBY JENNINGS

Digitally signed by COLBY JENNINGS
Date: 2026.10.01 00:45:19 -04'00'

Colby Jennings
Branch Chief, Escalations
Program Manager – Borrower Defense
Office of Loan Portfolio Management
Federal Student Aid Office
U.S. Department of Education