EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street
Jamaica Plain, MA 02130
Tel.: (617) 390-2669
Fax: (781) 218-9625

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants*.

Case No. 19-cv-03674-HSG

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR FINDING OF CONTEMPT AND SANCTIONS**

Date: November 5, 2026
Time: 2:00 p.m.
Location: Courtroom 2, 4th Floor

Assigned to Hon. Haywood S. Gilliam, Jr.

**TABLE OF CONTENTS**

I. ARGUMENT ........................................................................................................ 1

A. The Department Has Waived or Forfeited Any Objections to the Orders......................... 1

B. The Department Should Not Have Ceased Compliance Without Seeking and Obtaining Relief from the Court ........................................................................................ 2

C. The Department's Attacks on the Orders Are Without Merit........................................... 3

*1. The Orders Are Authorized by the Settlement* ……………………………………..……...3

*2. The Orders Are Not Impermissibly Vague*……………………………………..……4

D. The Department Violated the Orders ........................................................................ 6

*1. The Department Must Continue the Weekly Ombudsman's Meetings*……….………...6

*2. The Department Must Allow Plaintiffs Access to the Requested Records*……..……9

E. The Requested Remedies Are Appropriate.......................................................... 11

II. CONCLUSION ................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Cosmetology Schs. v. Riley*, 170 F.3d 1250 (9th Cir. 1999) .................................... 13

*Armstrong v. Newsom*, 484 F. Supp. 3d 808 (N.D. Cal. 2020), *aff'd*, 58 F.4th 1283 (9th Cir. 2023) .................................... 11

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .................................... 14

*Calvillo Manriquez v. DeVos*, 411 F. Supp. 3d 535 (N.D. Cal. 2019) .................................... 6

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022) .................................... 2

*Drescher v. Baby It's You LLC*, No. CV-10-6854, 2011 WL 13142639 (C.D. Cal. Dec. 21, 2011) .................................... 2

*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .................................... 6

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .................................... 13

*Hebrand v. Nofziger*, 90 F.4th 1000 (9th Cir. 2024) .................................... 1

*Henry v. Sneiders*, 490 F.2d 315 (9th Cir. 1974) .................................... 7

*Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457 (9th Cir. 2023) .................................... 1

*Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023) .................................... 13

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 (9th Cir. 2014) ........ 6

*Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821 (1994) .................................... 13

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64 (1967) .................................... 4, 5

*J.G.G. v. Trump*, 778 F. Supp. 3d 24 (D.D.C. 2025), *rev'd on other grounds*, 147 F.4th 1044 (D.C. Cir.) .................................... 2, 8

*Lovitky v. Trump*, 949 F.3d 753 (D.C. Cir. 2020) .................................... 13

*Malautea v. Suzuki Motor Co.*, 987 F.2d 1536 (11th Cir. 1993) .................................... 7

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) .................................... 3

*Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917 (D.C. Cir. 1980) .................................... 13

*Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846 (9th Cir. 2007) .................................... 11

*Noli v. Comm'r of Internal Revenue*, 860 F.2d 1521 (9th Cir. 1988) .................................... 8

*Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499 (9th Cir. 1995) .... 13
*Schmidt v. Lessard*, 414 U.S. 473 (1974) .... 6
*TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) .... 2
*TNT Mktg., Inc. v. Agresti*, 796 F.2d 276 (9th Cir. 1986) .... 11
*United States v. Olano*, 507 U.S. 725 (1993) .... 2
*Vazquez v. Libre by Nexus, Inc.*, No. 17-cv-00755, 2023 WL 360242 (N.D. Cal. Jan. 23, 2023) .... 12
*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) .... 14
*Yourish v. Cal. Amplifier*, 191 F.3d 983 (9th Cir. 1999) .... 7

**Statutes**

5 U.S.C. § 702 .... 14

**Rules**

Fed. R. Civ. P. 65(d) .... 6
Civil Local Rule 7-8 .... 12

Plaintiffs' Motion for Contempt and Sanctions (ECF 553, "Mot.") identifies and seeks to enforce specific orders ("Orders") the Court entered following and in response to the Department's breaches of the parties' Settlement Agreement ("Settlement"). *See* Mot. 1–2. The Department's Opposition (ECF 559, "Opp.") takes as its organizing principle that the Department has the discretion to disregard these Orders if it disagrees with them or because, in its unilateral determination, the Orders are improper. That is not how court orders work.

The Department now argues that the Orders do not mean what they self-evidently say, and what the Department itself understood them to say during its 18-month period of drama-free compliance with the Orders. These arguments are deeply disingenuous. The Department knowingly and deliberately violated the Orders; its *post hoc* rationalizations for doing so strain credulity. The Motion should be granted.

## I. ARGUMENT

### A. The Department Has Waived or Forfeited Any Objections to the Orders

The Department now objects to orders that have been in place for at least 18 months, some for as long as two and a half years. During most of the time the Orders have been in force, the Department was appearing before the Court for regular status conferences in this case. The Department had ample opportunity to raise objections; it never did. Instead, the Department obeyed the Orders without issue until approximately January 2026, at which point it suddenly discovered objections it had never raised before. As explained *infra*, those objections are without merit—but the Department has waived the ability to raise them at all.

"A finding of waiver requires evidence of a party's actions that evince his intentional relinquishment of a known right." *Hebrand v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024). Waiver has occurred here because the Department indisputably "had knowledge of and knew how to assert its right to" challenge an enforcement order, and it did not. *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 471 (9th Cir. 2023). The Department appeared for dozens of meetings and hearings in compliance with the Court's Orders. It worked amicably with Plaintiffs to implement the parties' shared understanding of a judicial mandate to cooperate in delivering Full Settlement Relief to all eligible Class Members following severe breaches of the Settlement. It provided Class Member

data to Plaintiffs so the parties could work together to analyze the progress of Settlement relief, respond to Class Member inquiries, and find solutions to implementation challenges before they caused further breach of Settlement deadlines. The Department reported back to the Court about its good faith and fidelity in complying with the Orders it now challenges. *See, e.g.*, Declaration of Rebecca C. Ellis in Support of Plaintiffs' Reply Briefs ("Ellis Decl.") Ex. 1 at 14:4–14; Ex. 7 at 19:10–20:15; Ex. 14 at 5:5–6:6; *cf. id.* Ex. 15 at 13:1–4 (DOJ Counsel: "I think the Department and plaintiffs' counsel have really fostered a great relationship and are able to work through a lot of complex issues, so I'm thankful for that."). This conduct is sufficient to establish waiver—the knowing relinquishment of a right—as well as forfeiture—"the failure to make the timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993); *see also Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022) (where party "elected to wait until long after oral argument to raise" a new theory, court "decline[d] to consider it").

Whether characterized as waiver or forfeiture,[1] the Department should not now be heard to complain that the Orders were too vague or were outside the scope of the Settlement, because the Department clearly understood and complied extensively with them. The time to complain has come and gone.

**B. The Department Should Not Have Ceased Compliance Without Seeking and Obtaining Relief from the Court**

Even if the Department had not waived or forfeited its objections to the Orders, it had an obligation to raise those objections with the Court and seek modification or vacatur of the Orders before terminating its course of performance under the parties' and the Court's established understanding of them. "[W]here a party faced with an injunction perceives an ambiguity in the injunction, it cannot unilaterally decide to proceed in the face of the injunction and make an after-the-fact contention that it is unduly vague." *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 885 (Fed. Cir. 2011); *see also J.G.G. v. Trump*, 778 F. Supp. 3d 24, 51 (D.D.C. 2025), *rev'd on other grounds*, 147 F.4th 1044 (D.C. Cir.) ("By disobeying the Order rather than pursuing appellate

[1] At the very least, the Department's "belated objection" should "be considered as evidence of the Parties' mutual intent" in complying with the Orders until January 2026. *Drescher v. Baby It's You LLC*, No. CV-10-6854, 2011 WL 13142639, at *6 n.2 (C.D. Cal. Dec. 21, 2011).

relief, Defendants cannot now rely on any nonconformity with Rule 65(d) as a defense to contempt.”). That is exactly what the Department did here.

A party who disobeys court orders on its own initiative acts “at [its] peril.” *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (“Respondents could have petitioned the District Court for a modification, clarification or construction of the order. But respondents did not take that course either. They undertook to make their own determination of what the decree meant. They knew they acted at their peril.” (cleaned up)); *see* Mot. 2, 5–6, 10 (detailing Plaintiffs’ warnings to the Department that its conduct violated the Orders); Declaration of Nicole Camargo Almeida (ECF 552-2, “Almeida Decl.”) ¶¶ 38, 40, 45–49 & Exs. 16, 17, 21 (same). The Department cannot avoid a finding of contempt by arguing that the Orders were too vague or otherwise defective when it simply stopped complying rather than requesting clarification from the Court.

**C. The Department’s Attacks on the Orders Are Without Merit**

Putting aside, *arguendo*, the propriety of the Department’s belated objections to the Orders, those objections fail on their merits.

***1. The Orders Are Authorized by the Settlement***

The Department misreads the Settlement when it argues that the Orders were outside the scope of what the Settlement permits. *See* Opp. 3. First, as part of the remedy for breach, the Court can order the Department to make reports on relief progress beyond the quarterly reports described in Paragraph IV.G. *See* Settlement ¶ V.B.2.ii (“In the event of such a Court order [requiring Defendants to repair a breach by promptly providing Full Settlement Relief to each affected individual on a schedule set by the Court], Defendants will report to Plaintiffs’ Counsel and the Court on its progress of issuing relief, as provided herein, to affected Class Members.”). The Department’s contention otherwise (Opp. 3, 16) would render Paragraph V.B.2.ii meaningless: the Department must provide the Paragraph IV.G reporting regardless of whether it is in breach, so the provision for the Court to order reporting in the event of breach would have no independent significance if it simply required the same reporting the Department was already going to make. The Court’s Orders for the Department to allow Plaintiffs access to records to verify and resolve

complaints about missing Settlement relief are thus in line with Paragraph V.B.2.ii's "reporting" provision. *See also* Plaintiffs' Reply in Support of Motion to Enforce at 10–11 ("Enforce Reply," filed contemporaneously herewith).

Second, the meetings the Court ordered—both the ones between Plaintiffs, the Department, and the servicers, and the ones in which Plaintiffs "look over the shoulder" of the Ombudsman's Office—were part and parcel of the orders for the Department to provide relief on a schedule set by the Court under Paragraph V.B.2.i. The many enforcement hearings and status conferences in 2024 made clear that the Department, absent supervision from Plaintiffs and the Court, was failing to deliver relief on the schedule set by the Settlement.[2] Accordingly, the supervision procedures that the Court instituted were designed to bring the Department into compliance with the Court's orders to cure its breaches and prevent future breaches from occurring. *See, e.g.*, May 23, 2024 Order, ECF 414 (Plaintiffs' counsel permitted access to Ombudsman's Office and right to inspect records "to ensure accountability and to support efforts to enforce judgment promptly"). The Settlement certainly does not foreclose the Court's ability to tailor its scheduling and reporting orders in such a way as to ensure they are followed.

### ***2. The Orders Are Not Impermissibly Vague***

The Department's record of compliance with the Orders until early 2026 shows that the Orders were sufficiently clear for the Department to understand its obligations. The Orders did not suddenly become vague; the Department simply decided it no longer wanted to comply with them.

The Department cites *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64 (1967), to support its argument that the order requiring Plaintiffs to "look over [the Ombudsman's] shoulder" is too vague to be enforceable. Opp. 6, 17–18. But that case bears no resemblance to the facts here. In *Longshoremen*, the district court issued an order compelling a union to "comply with and to abide by" an arbitrator's award

[2] The Department's later failure to meet the decision deadline for the Post-Class, leading to its last-minute Rule 60 motions and the Court's finding of anticipatory breach, *see generally* Transcript of Dec. 11, 2025 Hearing (ECF 512), underlined that even *with* extensive supervision, the Department could not be trusted to hew to its Settlement commitments.

with respect to the application of collective bargaining agreement terms to an hourly pay dispute. 389 U.S. at 69. When the union and employer later disputed the application of these terms to a different but related set of facts, the employer eschewed arbitration and went directly to the district court for an order compelling the union to comply with the arbitrator's previous award. The district court did so order, without any further explanation. *Id*. at 72. The Supreme Court emphasized that at the hearing where the order issued, and in subsequent contempt proceedings, the union's counsel repeatedly asked the district court for clarification regarding what types of conduct would violate the order. The district court explicitly refused to offer any such clarity. Under the circumstances, the Supreme Court concluded that "[w]e do not deal here with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate. We deal instead with acts alleged to violate a decree that can only be described as unintelligible." *Id.* at 76.

Here, by contrast, the parties engaged in repeated, extensive, productive communications with each other, and directly with the Court, regarding the significance of the Court's Orders for Plaintiffs to "look over the shoulder" of Department employees, and they reached agreement on the implementation of processes aimed at complying with the Orders. These included agreements on the cadence, location, and substance of meetings. They also included the creation of a specific email address to handle complaints from individual Class Members regarding failures to deliver timely relief. Finally, they included the exchange and presentation of data. And not only did the parties reach these agreements, but they also confirmed these agreements in open court and received the Court's specific approval. *See, e.g.*, Ellis Decl. Ex. 1 at 26:25–27:9 (weekly Ombudsman's Office meetings); Ex. 14 at 5:5–6:6 (data).

At no point during this lengthy history of the parties' compliance with the Court's Orders did either party express confusion over their meaning. Both parties understood the Orders as a mandate to "roll up [their] sleeves" and work collaboratively to ensure that the Settlement was implemented. Nov. 14, 2024 Order, ECF 444. When the parties were unable to reach agreement on a specific topic—for example, the use of the "terminal loan methodology" for later Decision Groups—they brought these issues to the Court. *See generally* Dec. 12, 2024 Order, ECF 451. It was not until the Department's change of counsel in late 2025, and Judge Alsup's retirement, that

the Department disengaged from this course of conduct by unilaterally ending long-established and Court-ordered accords.

This is not a situation, then, where the Court ran afoul of Fed. R. Civ. P. 65(d), which "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The Department understood perfectly well what the Court meant. The long history of post-judgment proceedings in this case shows that its new arguments otherwise are disingenuous.

**D. The Department Violated the Orders**

"When civil contempt is at issue, the party moving for a contempt finding bears the burden of showing by clear and convincing evidence that contemnors violated a specific and definite order of the court." *Calvillo Manriquez v. DeVos*, 411 F. Supp. 3d 535, 540 (N.D. Cal. 2019) (citing *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999)). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *Id.* "In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction."[3] *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (cleaned up).

Here, Plaintiffs set out the Department's violations in detail, *see* Mot. 3–6, and the Department has not shown any reason why it could not comply—only offered excuses for why it did not have to comply. Those excuses do not withstand scrutiny.

***1. The Department Must Continue the Weekly Ombudsman's Meetings***

Following the Court's May 23, 2024, and November 13, 2024 orders, the parties worked together to arrive at a strategy for handling Plaintiffs' participation in the Ombudsman's complaint

[3] On this topic, Judge Alsup observed: "You know, over the last three years, we've heard so much about student loans, and not a single program ever got off the ground. But the Department of Justice and these plaintiffs, on a completely different playing field, were able to reach an agreed settlement of a class-action lawsuit. . . . So it can be done. This is important in the history of the Department of Education, the Department of Justice, your outfit [Plaintiffs' counsel], and for this -- the whole idea of student loans. So you should have these meetings. You should get the work done." Ellis Decl. Ex. 12 at 46:19–47:7.

resolution process. That strategy became the weekly meetings—a method that was and is more organized, predictable, and efficient than what the Department proposes now (*viz.*, having Plaintiffs' counsel arrive at the Ombudsman's Office at unspecified times and buttonhole a staff member for an unknown duration, *see* Opp. 9).

The Court's oral order of March 13, 2025, was clear and specific: Plaintiffs should continue to hold weekly meetings with the Ombudsman's Office. As explained in the Motion, it was the Department's own counsel who offered these meetings to demonstrate compliance with the Court's previous orders, and the Court took him up on this proffer. Ellis Decl. Ex. 1 at 14:7–11 ("[DOJ Counsel:] As Your Honor has instructed, we've met with opposing counsel monthly at the Department of Education, and we will continue to do that. We've allowed plaintiffs to have oversight over the ombuds team to look over the shoulder, as Your Honor put it. That has continued to happen."); *id.* at 26:25–27:9 ("[DOJ Counsel:] Your Honor had ordered that plaintiffs be able to look over the shoulder of the Ombuds Office. . . . And we have informally scheduled meetings to that effect. And we've increased the frequency -- I forget when -- but it was some time ago to weekly meetings. And we've given plaintiffs' counsel access to -- THE COURT: Okay. I want that to continue. And I want your monthly meetings to continue.").

The Department now complains that the Court's March 13, 2025 Order was not reduced to writing after the hearing, and thus the Department could not have expected to be held to it. Opp. 13. Even aside from the fact that the Department's understanding was clearly different until its recent change of heart, this argument betrays a level of deliberate ignorance that the law does not condone. "Where oral proceedings unequivocally give a litigant notice that certain [actions must be taken], the absence of a written order does not preclude the entry of a default judgment for failure to comply." *Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974) (noting that "[i]t is clear from an examination of the oral proceedings . . . that the district court had orally ordered appellant to produce the records"); *see also, e.g.*, *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) ("Oral orders are just as binding on litigants as written orders; the consequences for violating an oral order are the same as those for violating a written order."); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 987 (9th Cir. 1999) (applying *Henry* to conclude that, "[j]ust as an oral

order is an 'order,' . . . [the district court's] minute order was an 'order,' the disobedience of which justified" the sanction of dismissal under Fed. R. Civ. P. 41); *Noli v. Comm'r of Internal Revenue*, 860 F.2d 1521, 1525 (9th Cir. 1988) (rejecting argument that oral order granting relief from automatic bankruptcy stay "was neither properly rendered nor docketed," as the argument "misperceives . . . the binding effect of an order notwithstanding the issuing court's failure to enter it on the docket"); *J.G.G.*, 778 F. Supp. 3d at 52 (considering and rejecting "the absurd mischief" that would result from defendants' position that an oral order was "not binding for purposes of contempt unless or until memorialized in a written Order").

The Court's Orders also specifically contemplated Plaintiffs bringing individual complaints to the Ombudsman's Office for priority resolution. *See* Ellis Decl. Ex. 13 at 8:6–10 ("[THE COURT:] Well, why can't you go and look at the e-mails and prioritize them yourself and say please answer these first? [Plaintiffs' Counsel]: We have been. When we've been meeting regularly with the Department and ombuds office, we've been spending a day going through complaints individually."); Ex. 7 at 26:12–27:2 ("THE COURT: Well, let's say you go and there are a thousand emails backed up, but you go with 20 that you want to get results. Why can't you-all sit there in the Department of Education and work through the 20 with you being there? . . . [Plaintiffs' Counsel]: Your Honor, that's actually a very accurate description of our weekly ombuds meetings . . ."); *id.* at 27:6–29:22 (further discussion of Court's expectations for Plaintiffs' counsel to participate in Ombudsman's complaint process). Whatever the current Ombudsman might think about that procedure, *see* Declaration of Christian Odom (ECF 558-1, "Odom Decl.") ¶ 37, it was part of the Court's Orders to resolve the backlog of Class Member complaints. And it has been effective: through the Ombudsman's Office meetings, the parties have resolved nearly 2,500 Class Member complaints, including by delivering over $4.4 million in refunds that were late, incomplete, or missing. *See* Ellis Decl. ¶ 32. Plaintiffs' counsel have also used the Ombudsman's Office meetings to complete Class Members' discharges, ensure that their credit tradelines are correctly deleted or adjusted, secure administrative forbearances,[4] get wrongfully

[4] *See* Settlement ¶ IV.A.3, IV.C.7 (Relevant Loan Debt must be maintained in forbearance or stopped collection status until Full Settlement Relief is effectuated).

excluded Class Members included in the class, provide Class Members with missing documents, correct misinformation provided to Class Members by their servicers (or even by FSA itself), and help Class Members understand their relief status, among other resolutions.[5] *See id.* ¶¶ 32–34.

***2. The Department Must Allow Plaintiffs Access to the Requested Records***

Under the Court's Orders, Plaintiffs are entitled to access records in the Ombudsman's possession and on which the Department relies in disbursing Settlement relief and addressing Class Member complaints. This includes lists of certain information about Class Members' borrower defense cases, including (but not limited to) their Settlement group, decision status, and calculated refund amount. Consistent with the parties' understanding of the Orders, the Department provided these types of information about relief effectuation as an accepted part of the parties' course of dealing until the Department's recent, abrupt, and unreasoned change in position. *See, e.g.*, Almeida Decl. ¶¶ 18–21 & Exs. 4–10; Ellis Decl. Exs. 3, 4, 17; *see also id.* Ex. 4 at 2 (DOJ Counsel: "The Department can confirm that it is compiling a census for Decision Group 3 using the same methods and sources of data as it did for earlier censuses, and that it will continue to do so for future groups."). The Court likewise understood that access to this data was part of the process of confirming whether Full Settlement Relief was complete for individuals or subsets of Class Members. *See* Ellis Decl. Ex. 14 at 5:5–6:6 ("[Plaintiffs' Counsel:] We have asked the Department to provide us with detailed individual data on Decision Group 3 relief. It's something we've done for the previous groups, so we can kind of vet that information and use it to respond to outreach from class members with questions. So we would like to receive that as soon as possible. . . . THE COURT: All right. Just have somebody -- . . . Just answer that one question of where that piece of it stands. [DOJ Counsel]: Yes, Your Honor. So at the last in-person meeting,

[5] These latter examples demonstrate why Mr. Odom's protestations about the Ombudsman's Office meetings are misplaced (*see, e.g.*, Odom Decl. ¶¶ 29–30): Just because a Class Member does not, for example, receive a larger refund as a result of the complaint resolution process does not mean the Class Member gained nothing from the process. Student loans, the borrower defense system, and the Settlement process itself are often confusing and opaque to Class Members; ensuring that Settlement relief has been delivered in full often requires sifting through conflicting records and providing Class Members with more information than the Department had otherwise given them. That is exactly what the Ombudsman process was meant to do. *See* Ellis Decl. ¶ 28.

we discussed plaintiffs' outstanding data requests, and we understand what plaintiffs need with respect to Decision Group 3 and we will provide that data. THE COURT: Okay. Soon? [DOJ Counsel]: Yes. Soon, Your Honor. THE COURT: All right. That's fine.").

The Department attempts to deflect these facts with arguments about who controls the Department's various databases (Opp. 15–16)—but this is beside the point. To begin, the Department's brief misrepresents its own supporting declaration. The Department claims that the information Plaintiffs are seeking "is not stored in an Ombudsman's office system of records," Opp. 15, but the Odom Declaration states quite clearly that "the Ombudsman can access the data in the Salesforce platform" that serves as the source of the subject information, Odom Decl. ¶ 74. Mr. Odom goes on to detail the ways in which the Salesforce system, which the Ombudsman's Office regularly uses, includes the relevant information about each *Sweet* Class Member. *Id.* ¶¶ 75–76; *see* Ellis Decl. ¶ 27. He further explains that Class Member relief data is available in the National Student Loan Data System (NSLDS), the *Sweet* Servicer Census, and the Department's Financial Management System (FMS), Odom Decl. ¶ 77—which the Ombudsman's Office staff likewise have access to and consult on a regular basis during *Sweet* complaint review, *see* Ellis Decl. ¶ 27. In other words, the information is readily available and accessible to the Ombudsman's Office and would be subject to any inspection of the Office's records relating to *Sweet* relief. This is not a Freedom of Information Act inquiry where the specific custodian of information might determine the government's disclosure obligations; it is an ongoing proceeding to enforce a settlement, in which the government's chronic failures to disclose accurate information led the Court to require additional transparency.

Nor is it accurate to claim that the information Plaintiffs are seeking does not exist (Opp. 16) simply because no one has bothered to retrieve it from Salesforce. Mr. Odom protests that spreadsheets previously provided to Plaintiffs "are based on a compilation and analysis of raw data contained in the Department's Salesforce database," Odom Decl. ¶ 74—but this is an overstatement of what it means to generate a spreadsheet in Salesforce. The process of identifying individuals who meet certain criteria (*e.g.*, Class Members in the Post-Class group whose

applications were approved) takes approximately five minutes and requires no expertise. *See* Ellis Decl. ¶¶ 24–26.

Finally, the Department's objections about data privacy are a smokescreen. *See* Odom Decl. ¶ 78; Opp. 15. There is a Protective Order in this case (ECF 169) that has been in force since 2020, which the Department correctly understood for years to allow the exchange of information about Class Members. For instance, in a February 27, 2025 letter, DOJ Counsel stated:

> As the parties explained at the time [the Protective Order was entered] in a joint motion, "Plaintiffs have requested certain confidential documents and information . . . that the Privacy Act may prevent Defendants from disclosing without a Court order," and the entry of a protective order "addressing the disclosure, handling, and use of such information would expedite the exchange of discovery material, ensure compliance with the Privacy Act . . . , facilitate the prompt resolution of disputes over confidentiality, and protect discovery material entitled to be kept confidential." ECF No. 167. Consistent with that underlying purpose, the main provision of the Protective Order authorizes Defendants to release to Plaintiffs "Covered Documents containing information protected under the Privacy Act." Protective Order ¶ 2(a).

Ellis Decl. Ex. 16 at 2 (third alteration in original).

**E. The Requested Remedies Are Appropriate**

Finally, the Department argues that the contempt remedies Plaintiffs have requested are not available here. The Department is wrong, for several reasons.

***First***, a court's contempt powers are inherent and can be exercised to enforce the court's authority.[6] *See, e.g.*, *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 841 (N.D. Cal. 2020), *aff'd*, 58 F.4th 1283 (9th Cir. 2023) ("It is well established that the district court has the inherent authority to enforce compliance with a consent decree that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree." (quoting *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007))); *TNT Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) ("Although the court normally exercises its enforcement power in response to a motion to enforce the agreement, it may do so in contempt proceedings for violation of a court

[6] It is ironic that the Department now objects to the Court's exercise of its inherent authority, *see* Opp. 2–3, 21, when the Department used an argument based on inherent authority to flout the Settlement's dispute resolution procedures and file two separate motions for relief from judgment under Rule 60, *see* ECF Nos. 492, 514.

order approving the settlement and commanding or enjoining particular conduct." (cleaned up)); *Vazquez v. Libre by Nexus, Inc.*, No. 17-cv-00755, 2023 WL 360242, at *3–4 (N.D. Cal. Jan. 23, 2023) (issuing civil contempt order where court had "retained jurisdiction over the action and the parties, including to enforce, interpret, and effectuate the settlement agreement and the Court's Final Approval Order and Judgment," and defendants had "violated the Final Approval Order and Judgment and enforcement orders on multiple occasions"); *see also* Mot. 7, 13 (citing cases).[7]

The Court need not limit its inherent contempt authority to the provisions the parties included in Paragraph V.B.2 of the Settlement. Those are the remedies for breach, not the remedies for contempt. Regardless, the Department is wrong that Plaintiffs seek more than what the Settlement provides. The Settlement requires the Department to take "all steps necessary" to effectuate Full Settlement Relief on a specific timeline. Settlement ¶ IV.F.1. The Department initially breached this obligation in January 2024 and, following Plaintiffs' first motion to enforce the Settlement, the Court issued remedial orders requiring the Department to complete overdue relief under a modified deadline, requiring all parties to meet regularly and to work together to "resolve issues," and scheduling additional hearings to monitor compliance. May 23, 2024 Order, ECF 414. Over the course of these proceedings, the Department never questioned that all of these steps were in service of the Settlement's ultimate mandate: to effectuate Full Settlement Relief for all eligible Class Members on a set timeline. However, as discussed *supra*, the Department has made the decision to walk away from the Court-ordered course of conduct ensuring Settlement compliance, and has shown that it will not return to the table without this Court's mandate.

---

[7] Given the Court's inherent authority to enforce its own post-judgment orders, the Department's argument that Civil Local Rule 7-8 should be read to prohibit the Motion (Opp. 22) fails to land. Applying the rule's 14-day post-judgment restriction in this situation does not square with a court's jurisdiction to enforce its own orders following settlement, since such violations necessarily occur after judgment. The Department notes that the Court has previously denied Plaintiffs' requests for contempt findings, Opp. 22 n.8, but fails to note that the Court made no reference to Civ. L.R. 7-8 in denying those requests. Moreover, although the Court rejected the requests for contempt findings at the time, it also issued contemporaneous remedial orders establishing a course of conduct for the parties to resolve the Department's ongoing failure to timely deliver Full Settlement Relief. Those orders include those at issue in this Motion and Plaintiffs' current Motion to Enforce. *See, e.g.*, May 23, 2024 Order, ECF 414; Sept. 26, 2024 Order, ECF 434; Ellis Decl. Ex. 9 at 21:18–24:4; *id.* Ex. 12 at 43:4–44:14.

The relief that Plaintiffs request from the Court here is tailored to ensure that the Department remains accountable under orders designed to resolve its ongoing breaches of Settlement timelines and to provide Full Settlement Relief to those Class Members whose relief is overdue. Plaintiffs' proposals include returning to the parties' Court-ordered course of conduct with respect to meeting cadence and data reporting, with court oversight or penalties for non-compliance to ensure that the Department does not abandon the project again. In other words, the remedies Plaintiffs seek here are to ensure that the Department complies with the "jural command." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 829 (1994).

***Second***, the Department's arguments that contempt remedies are barred here by the Higher Education Act's "anti-injunction" provision or by some principle relating to mandamus (Opp. 21–22, 24–25) are off base. The Department cites *American Association of Cosmetology Schools v. Riley*, 170 F.3d 1250 (9th Cir. 1999), for the principle that it can never be subject to an injunctive remedy. *See* Opp. 22. However, that case related only to the ability of a plaintiff to seek an injunction as a remedy in a lawsuit against the Department—an injunction, at that, which would have forced the Department to allow schools into the Title IV student aid program when the Department had already deemed them ineligible. *See Riley*, 170 F.3d at 1254. It has no relevance to this case, where the Department has already agreed to take an action (delivering Full Settlement Relief) and Plaintiffs seek remedies to ensure the Department keeps its promise. *See also* Enforce Reply 8–10.

The Department's scattershot recital of case law that purports to restrict a court's choice of remedy when enforcing its own orders is similarly unavailing. *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015), recites the standards for obtaining a preliminary injunction, *see id.* at 740, while the other cases cited by the Department pertain only to the availability of mandamus relief through an original claim in a lawsuit against a government agency. *See Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980); *Illinois v. Ferriero*, 60 F.4th 704, 709 (D.C. Cir. 2023); *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020); *Oregon Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995). None of these cases stands for the proposition that a court cannot enforce its own orders through remedies that compel a government defendant to take

certain prescribed actions toward compliance. *See, e.g.*, Mot. 11–12 (citing cases); *cf. Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987) ("The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches."). If the Department's argument were accepted, it would render the Department entirely unaccountable to the Court's authority.

In addition to arguing that this Court lacks the authority to enforce its orders through injunctive remedies, the Department also argues that it cannot be subjected to monetary sanctions to coerce its compliance because Congress has not explicitly waived its sovereign immunity from such orders. Opp. 22. However, as Plaintiffs previously explained, Congress waived sovereign immunity for claims involving monetary relief, as distinct from "money damages," in cases brought under the Administrative Procedure Act. *See* Mot. 12; *see also* 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 898 (1988) ("[I]t seems obvious that if [Congress] had intended the exclusion for proceedings seeking 'money damages' to encompass all proceedings seeking any form of monetary relief, they would have drafted their proposal differently.").

## II. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Contempt and Sanctions should be granted, and remedies ordered consistent with Plaintiffs' Proposed Order.

Dated: October 15, 2026 Respectfully submitted,

*/s/ Rebecca C. Ellis*_____
EILEEN M. CONNOR (SBN 248856)
econnor@ppsl.org
REBECCA C. ELLIS (*pro hac vice*)
rellis@ppsl.org
REBECCA C. EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
NOAH ZINNER (SBN 247581)
nzinner@ppsl.org
PROJECT ON PREDATORY STUDENT
LENDING, INC.

769 Centre Street
Jamaica Plain, MA 02130
Tel.: (617) 390-2669
Fax: (781) 218-9625

*Attorneys for Plaintiffs*